# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

| | |
|---|---|
| FLORIDA DECIDES HEALTHCARE, INC., et al. | |
| *Plaintiffs,* | |
| **v.** | **No.** |
| CORD BYRD, in his official capacity as Secretary of the State of Florida, et al. | |
| *Defendants.* | |

**DECLARATION OF MITCHELL EMERSON IN SUPPORT OF PLAINTIFFS' COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

Pursuant to 28 U.S.C. § 1746, I, Mitchell Emerson, declare as follows:

1.  I am competent to make this declaration.

2.  I serve as the Campaign Manager of Florida Decides Healthcare, Inc. ("FDH"), a Florida 501(c)(4) non-profit corporation with a principal place of business, office, and registered agent in Miami, Florida.

3.  FDH was established in February 2024 for the purpose of expanding access to affordable, high-quality healthcare for 1.4 million Floridians, particularly low-income and underserved communities.

1

4.      FDH is currently sponsoring a citizens' initiative for the 2026 general election that would expand eligibility for Medicaid in Florida pursuant to the Affordable Care Act, championing healthcare rights for Florida's working families.

5.      I am a Florida resident and registered voter who has signed a petition for the proposed amendment.

6.      The amendment, "Provide Medicaid Coverage to Eligible Low-Income Adults" ("the Amendment") establishes Article X, Section 33 of the Florida Constitution, and is summarized as follows:

> "Requires State to provide Medicaid coverage to individuals over age 18 and under age 65 whose incomes are at or below 138 percent of the federal poverty level and meet other nonfinancial eligibility requirements, with no greater burdens placed on eligibility, enrollment, or benefits for these newly eligible individuals compared to other Medicaid beneficiaries. Directs Agency for Health Care Administration to implement the initiative by maximizing federal financial participation for newly eligible individuals."

7.      Our stated mission is to "let voters decide whether Florida should expand Medicaid, bring billions of our tax dollars home, increase jobs, grow our economy, and provide access to care to over 1 million people."

8.      More than three-fourths of those polled by the Mason-Dixon Polling & Strategy between March 27 and March 30, 2023, supported expanding Medicaid. Seven states have used ballot initiatives to expand Medicaid, including South Dakota in 2022.

9.    Our proposed Amendment is currently supported by a diverse coalition of policy experts, healthcare providers, patient advocates, employee associations, and directly impacted individuals.

10.    In order for our proposed Amendment to qualify for the 2026 general election ballot, we must submit the required number of signatures, and have the signature verification process completed, no later than 5:00 p.m. on February 1, 2026. Our petition must be signed by 880,062 voters and the signatures must come from a number of electors in each of one half of the congressional districts of the state, and of the state as a whole, equal to eight percent of the votes cast in each of such districts respectively and in the state as a whole in the last preceding election in which presidential electors were chosen.

11.    Given the scope and complexity of the process for qualifying a proposed constitutional amendment for the ballot, and as further explained below, we have been collecting signatures since last year.

12.    FDH utilizes multiple methods to collect petitions in Florida and meet the stringent requirements for ballot qualification.

13.    We currently employ 250 paid petition circulators throughout the State of Florida, with plans to scale up to 3,000 petition circulators by September 2025. It is unknown exactly how many individuals are collecting petitions on our behalf, but we partner with a broad network of grassroots organizations who collect petitions on a

3

volunteer basis. Consistent with current petition circulator requirements, FDH has hired petition circulators that are not residents of Florida, petition circulators that are not U.S citizens, and petition circulators that have felony convictions.

14. Petition circulators are stationed in various locations throughout the state and work diligently to talk about the initiative with individuals and, if they are eligible Florida voters who support the initiative and want to sign the petition, assist them with signing the forms.

15. We also encourage Floridians to complete the petition form on their own time and either mail the signed form to our Jacksonville office or drop it off in person at one of 46 designated "hub" locations throughout the state. Blank petition forms are also available for pickup at these locations. To make the process even more accessible, we provide blank petition forms on our website in English, Spanish, and Haitian Creole. Voters may download the form, complete their personal information, and return the signed petition by mail or in person.

16. In addition, we have allowed Floridians to request a pre-filled petition form through our partner organization, TallyEd. Using the TallyEd platform, voters can search for their registration records and have a petition form automatically generated with certain fields pre-filled. They are then given the option to: (1) receive the petition by email to print, sign, date, and return themselves; (2) receive the petition by mail if they do not have access to a printer, and sign, date, and return it; or (3)

decline to sign the petition altogether. In order to substantially comply with the provisions of House Bill 1205, we have since removed this option from our website.

17.    FDH has invested substantial time, money, and organizational resources into the development, promotion, and signature-gathering for the initiative. These efforts have already been hampered by shifting state requirements and guidance.

18.    After the Florida Department of State issued new guidance on August 2024, FDH was forced to forego some signatures, and we lost months on critical organizing time and were compelled to rebuild momentum from scratch.

19.    As of May 4, 2025, we have collected over 100,000 signed petitions.

20.    The passage of House Bill 1205—in the middle of our ongoing petition collection effort—has made this process even more difficult. As a result, we face the real and imminent threat of being unable to continue our operations.

21.    On Wednesday, April 30, in anticipation of the passage of House Bill 1205, paid petition outreach firms were shut down. During this time, petition collection activities must pause and emergency calls to teams have already been necessary. This time is being used to ensure circulators are in compliance with the new law. As of May 4, these collection activities are still on hold.

22.    We are concerned about the impact of the new requirements, including the reduced return deadline for signed petitions, on our ability to effectively circulate petitions throughout the state.

23.    Prior to the passage of House Bill 1205, under the 30-day framework for returning petitions, we batch petitions weekly and put each batch through multiple internal quality control processes. Those batches are then sorted and mailed to the appropriate counties. Each county has a different submission method, and we must accommodate and account for each. For example, some counties use P.O. Boxes rather than physical addresses for receipt of petitions, and it can be difficult to confirm delivery.

24.    The new 10-day return rule on House Bill 1205 forces us to ship smaller batches more frequently, often on a daily basis, to account possible rejections and returns, as well as the varying submission methods. To comply, we would be required to use expedited or overnight delivery services, which are substantially more expensive and less reliable over time.

25.    Further, the tightened return deadline is an added strain on our internal processes, undermining the systems we've built to ensure petition integrity, and forcing us to divert limited resources away from outreach and signature collection to cover the escalating costs of compliance.

26.    Also, the House Bill 1205's requirement that the supervisors of elections cease signature verifications from July 1, 2025 to September 30, 2025, in the middle of our ongoing petition drive and require expiration of petition circulators would cause substantial hardship and, possibly, the ability of our organization to collect sufficient

signatures to continue to operate. During the 90-day period where verifications would cease, we would not be able to track petitions or demonstrate progress towards certain thresholds.

27.    House Bill 1205 also imposes new and significant fines and criminal liability for both petition sponsors and circulators. These steep and uncapped fines, and criminal penalties, will further impact our ability to hire petition circulators, reduce the number of volunteers who are willing to engage in petition circulator efforts, and shut down our operations.

28.    The new law limits who we can hire to collect signed petition forms, prohibiting us from hiring anyone who is not a Florida resident, is not a U.S. citizen, or has a felony conviction. As a result of this new law, we would be required to terminate any employees who do not meet these requirements. We would also need to spend significant resources to ensure we are in compliance.

29.    These restrictions would seriously affect our ability to recruit and hire petition circulators. We have already received direct feedback from our circulators expressing fear and hesitation about circulating petitions due to House Bill 1205's penalties, fines and new registration requirements. This is affecting our ability to engage in petition collection activity, disrupting our ongoing petition effort, affecting hundreds of employees, and imposing substantial costs.

30.    House Bill 1205 imposes various kinds of liability on FDH for the actions of volunteer circulators. But FDH is not aware of all individuals who may choose to circulate its petitions. The law therefore creates unclear and potentially very significant liability for unknown volunteer circulators, causing confusion and deterring our petition collection efforts.

31.    FDH works diligently to comply with Florida law and self-reports any known discrepancies in petitions. However, House Bill 1205 creates confusion about what can and cannot be included on petition forms, impacting our ability to sponsor our initiative for fear of breaking the rules and being penalized.

32.    FDH cannot afford to risk paying the severe and potentially ruinous fines threatened by the Law.

33.    As campaign manager for FDH, one of my responsibilities is fundraising to support the petition process. I am aware that current and potential donors to FDH have expressed serious concerns about the effect of HB 1205 on the ability to qualify our proposed amendment for the ballot, including the fact that if the State assigns a financial impact statement that is later rejected, it will force FDH to refile a new petition and start the process over again entirely. Even before HB 1205 became law, it negatively affected our efforts to raise the funds necessary to qualify our amendment for the ballot.

34.    House Bill 1205 will ultimately force FDH to impose an extended moratorium on its petition circulation activities, severely impacting or eliminating the ability to circulate petitions and gain sufficient support for the placement of its initiative on the 2026 general election ballot.

35.    On May 4, pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury the foregoing is true and correct.

**Mitchell Emerson**
Campaign Manager
Florida Decides
Healthcare, inc.