# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

|  |  |
|---|---|
| LEAGUE OF WOMEN VOTERS OF FLORIDA; LEAGUE OF WOMEN VOTERS OF FLORIDA EDUCATION FUND, INC.; LEAGUE OF UNITED LATIN AMERICAN CITIZENS; CECILE SCOON; and DEBRA CHANDLER, <br><br> *Plaintiffs*, <br><br> v. <br><br> CORD BYRD, in his official capacity as the Secretary of State of Florida; JAMES UTHMEIER, in his official capacity as Attorney General of the State of Florida; KIM BARTON, in her official capacity as Supervisor of Elections for Alachua County; CHRISTOPHER MILTON, in his official capacity as Supervisor of Elections for Baker County; NINA WARD, in her official capacity as Supervisor of Elections for Bay County; AMANDA SEYFANG, in her official capacity as Supervisor of Elections for Bradford County; TIM BOBANIC, in his official capacity as Supervisor of Elections for Brevard County; JOE SCOTT, in his official capacity as Supervisor of Elections for Broward County; SHARON CHASON, in her official capacity as Supervisor of Elections for Calhoun County; LEAH VALENTI, in her official capacity as | No.: 4:25-cv-00211-MW-MAF |

Supervisor of Elections for Charlotte )
County; MAUREEN "MO" BAIRD, in )
her official capacity as Supervisor of )
Elections for Citrus County; CHRIS H. )
CHAMBLESS, in his official capacity as )
Supervisor of Elections for Clay County; )
MELISSA BLAZIER, in her official )
capacity as Supervisor of Elections for )
Collier County; TOMI STINSON )
BROWN, in her official capacity as )
Supervisor of Elections for Columbia )
County; DEBBIE WERTZ, in her official )
capacity as Supervisor of Elections for )
DeSoto County; DARBI CHAIRES, in )
her official capacity as Supervisor of )
Elections for Dixie County; JERRY )
HOLLAND, in his official capacity as )
Supervisor of Elections for Duval )
County; ROBERT BENDER, in his )
official capacity as Supervisor of )
Elections for Escambia County; )
KAITLYN LENHART, in her official )
capacity as Supervisor of Elections for )
Flagler County; HEATHER RILEY, in )
her official capacity as Supervisor of )
Elections for Franklin County; KENYA )
WILLIAMS, in her official capacity as )
Supervisor of Elections for Gadsden )
County; LISA DARUS, in her official )
capacity as Supervisor of Elections for )
Gilchrist County; ALETRIS FARNAM, )
in her official capacity as Supervisor of )
Elections for Glades County; RHONDA )
PIERCE in her official capacity as )
Supervisor of Elections for Gulf County; )
LAURA HUTTO, in her official capacity )
as Supervisor of Elections for Hamilton )
County; DIANE SMITH, in her official )
capacity as Supervisor of Elections for )
Hardee County; SHERRY TAYLOR, in )

her official capacity as Supervisor of )
Elections for Hendry County; DENISE )
LAVANCHER, in her official capacity as )
Supervisor of Elections for Hernando )
Highlands County; KAREN HEALY, in )
her official capacity as Supervisor of )
Elections for Highlands County; CRAIG )
LATIMER, in his official capacity as )
Supervisor of Elections for Hillsborough )
County; H. RUSSELL WILLIAMS, in )
his official capacity as Supervisor of )
Elections for Holmes County; LESLIE R. )
SWAN, in her official capacity as )
Supervisor of Elections for Indian River )
County; CAROL A. DUNAWAY, in her )
official capacity as Supervisor of )
Elections for Jackson County; )
MICHELLE MILLIGAN, in her official )
capacity as Supervisor of Elections for )
Jefferson County; TRAVIS HART, in his )
official capacity as Supervisor of )
Elections for Lafayette County; ALAN )
HAYS, in his official capacity as )
Supervisor of Elections for Lake County; )
TOMMY DOYLE, in his official )
capacity as Supervisor of Elections for )
Lee County; MARK EARLEY, in his )
official capacity as Supervisor of )
Elections for Leon County; TAMMY )
JONES, in her official capacity as )
Supervisor of Elections for Levy County; )
GRANT CONYERS, in his official )
capacity as Supervisor of Elections for )
Liberty County; HEATH DRIGGERS, in )
his official capacity as Supervisor of )
Elections for Madison County; SCOTT )
FARRINGTON, in his official capacity )
as Supervisor of Elections for Manatee )
County; WESLEY WILCOX, in his )
official capacity as Supervisor of )

3

Elections for Marion County; VICKI )
DAVIS, in her official capacity as )
Supervisor of Elections for Martin )
County; ALINA GARCIA, in her official )
capacity as Supervisor of Elections for )
Miami-Dade County; SHERRI HODIE, )
in her official capacity as Supervisor of )
Elections for Monroe County; JANET H. )
ADKINS, in her official capacity as )
Supervisor of Elections for Nassau )
County; PAUL A. LUX, in his official )
capacity as Supervisor of Elections for )
Okaloosa County; DAVID MAY, in his )
official capacity as Supervisor of )
Elections for Okeechobee County; )
KAREN CASTOR DENTEL, in her )
official capacity as Supervisor of )
Elections for Orange County; MARY )
JANE ARRINGTON, in her official )
capacity as Supervisor of Elections for )
Osceola County; WENDY LINK, in her )
official capacity as Supervisor of )
Elections for Palm Beach County; )
BRIAN CORLEY, in his official capacity )
as Supervisor of Elections for Pasco )
County; JULIE MARCUS, in her official )
capacity as Supervisor of Elections for )
Pinellas County; MELONY BELL, in her )
official capacity as Supervisor of )
Elections for Polk County; CHARLES )
OVERTURF, in his official capacity as )
Supervisor of Elections for Putnam )
County; TAPPIE VILLANE, in her )
official capacity as Supervisor of )
Elections for Santa Rosa County; RON )
TURNER, in his official capacity as )
Supervisor of Elections for Sarasota )
County; AMY PENNOCK, in her official )
capacity as Supervisor of Elections for )
Seminole County; VICKY OAKES, in )

her official capacity as Supervisor of )
Elections for St. Johns County; )
GERTRUDE WALKER, in her official )
capacity as Supervisor of Elections for St. )
Lucie County; WILLIAM KEEN, in his )
official capacity as Supervisor of )
Elections for Sumter County; JENNIFER )
KINSEY, in her official capacity as )
Supervisor of Elections for Suwannee )
County; DANA SOUTHERLAND, in )
her official capacity as Supervisor of )
Elections for Taylor County; DEBORAH )
OSBORNE, in her official capacity as )
Supervisor of Elections for Union )
County; LISA LEWIS, in her official )
capacity as Supervisor of Elections for )
Volusia County; JOSEPH R. MORGAN, )
in his official capacity as Supervisor of )
Elections for Wakulla County; RYAN )
MESSER, in his official capacity as the )
Supervisor of Elections for Walton )
County; DEIDRA PETTIS, in her official )
capacity as Supervisor of Elections for )
Washington County; GINGER )
BOWDEN MADDEN, in her official )
capacity as State Attorney for the First )
Judicial Circuit of Florida; JACK )
CAMPBELL, in his official capacity as )
State Attorney for the Second Judicial )
Circuit of Florida; JOHN DURRETT, in )
his official capacity as State Attorney for )
the Third Judicial Circuit of Florida; )
MELISSA W. NELSON, in her official )
capacity as State Attorney for the Fourth )
Judicial Circuit of Florida; BILL )
GLADSON, in his official capacity as )
State Attorney for the Fifth Judicial )
Circuit of Florida; BRUCE BARTLETT, )
in his official capacity as State Attorney )
for the Sixth Judicial Circuit of Florida; )

5

R.J. LARIZZA, in his official capacity as )
State Attorney for the Seventh Judicial )
Circuit of Florida; BRIAN KRAMER, in )
his official capacity as State Attorney for )
the Eighth Judicial Circuit of Florida; )
MONIQUE WORRELL, in her official )
capacity as State Attorney for the Ninth )
Judicial Circuit of Florida; BRIAN )
HAAS, in his official capacity as State )
Attorney for the Tenth Judicial Circuit of )
Florida; KATHERINE FERNANDEZ )
RUNDLE, in her official capacity as )
State Attorney for the Eleventh Judicial )
Circuit of Florida; ED BRODSKY, in his )
official capacity as State Attorney for the )
Twelfth Judicial Circuit of Florida; )
SUSAN LOPEZ, in her official capacity )
as State Attorney for the Thirteenth )
Judicial Circuit of Florida; LARRY )
BASFORD, in his official capacity as )
State Attorney for the Fourteenth Judicial )
Circuit of Florida; ALEXCIA COX, in )
her official capacity as State Attorney for )
the Fifteenth Judicial Circuit of Florida; )
DENNIS W. WARD, in his official )
capacity as State Attorney for the )
Sixteenth Judicial Circuit of Florida; )
HAROLD F. PRYOR, in his official )
capacity as State Attorney for the )
Seventeenth Judicial Circuit of Florida; )
WILL SCHEINER, in his official )
capacity as State Attorney for the )
Eighteenth Judicial Circuit of Florida; )
THOMAS BAKKEDAHL, in his official )
capacity as State Attorney for the )
Nineteenth Judicial Circuit of Florida; )
and AMIRA D. FOX, in her official )
capacity as State Attorney for the )
Twentieth Judicial Circuit of Florida, )
                    *Defendants.* )

6

# COMPLAINT

Plaintiffs League of Women Voters of Florida and League of Women Voters of Florida Education Fund, Inc. (together, "LWVFL" or the "League"), Plaintiff League of United Latin American Citizens ("LULAC"), and two members (as well as the current Co-Presidents) of LWVFL, Cecile Scoon and Debra Chandler (together, "Individual Plaintiffs") (collectively, "Plaintiffs") bring this Complaint for injunctive and declaratory relief against Defendants, and allege as follows:

## INTRODUCTION

1. For more than half a century, direct democracy has played a vital role in Florida's political landscape. Embodied in the state's ballot initiative process—through which the Florida Constitution may be revised or amended by a measure receiving 60% of the popular vote—direct democracy has served as a crucial tool by which Floridians have constitutionalized some of their most treasured rights.

2. Over the years, voters have placed 42 amendments on the ballot and approved the vast majority—32 to date. These amendments have secured the constitutional right of privacy; ensured a fair redistricting process; established homestead property tax exemptions for low-income seniors, military spouses, and disabled first responders; enacted a $15 minimum wage; provided free universal and high-quality pre-K to every four-year-old in Florida; and restored the right to vote for those with felony convictions who have completed their sentences.

7

3.      The initiative process has been a force for good in Florida, mobilizing grassroots organizations, encouraging robust discussion and debate, and engaging voters on issues of pressing importance to them and their families.

4.      That direct democracy complements representative democracy is nothing new. The two have co-existed since the founding of this nation.

5.      Indeed, nearly four decades ago, the United States Supreme Court recognized that the circulation of an initiative petition—the same activity at issue in this lawsuit—is First Amendment-protected "core political speech" because it entails "interactive communication concerning political change[.]" *Meyer v. Grant*, 486 U.S. 414, 422 (1988). Since then, the Court has consistently pushed back on attempts to curtail such activity and gum up the channels of democracy, strongly disfavoring "undue hindrances to political conversations and the exchange of ideas." *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 192 (1999).

6.      In sharp contrast, the Florida Legislature (the "Legislature") has for many years expressed discomfort with the idea that everyday Floridians have a direct say regarding the laws that govern them. Rather than encourage a thriving ballot initiative process through which their constituents could directly make their voices heard on issues of major import to them, members of the Legislature have repeatedly attempted to ensure that they—and the special interest groups they often represent— would be the only ones with a real say in Florida's future. Implicitly conceding the

popularity and legitimacy of the ballot initiative process, the Legislature has tried to chip away at its edges through legislation intended to make it increasingly difficult for citizens to successfully send proposed measures to the ballot box.

7.    Time and again, both federal and Florida state courts have rejected these efforts. Yet none of these setbacks have apparently dulled the Legislature's desire to raise its own voice over those of its constituents. The latest sally in this decades-old campaign comes in the form of House Bill ("HB") 1205 and its counterpart, Senate Bill ("SB") 7016 (together, the "Law"), which attempts to effectively destroy citizens' ability to place issues on the ballot.

8.    The Law implements a litany of restrictions and requirements including, but not limited to, narrowing petition circulator eligibility, requiring volunteers to register as petition circulators, shortening return deadlines for petitions, and imposing vague and draconian criminal penalties, along with exorbitant fines. Collectively and individually, each of these requirements is onerous and unconstitutional.

9.    The U.S. Constitution does not countenance such attacks on the right to free speech, the right to associate, and the right to due process. The Law cannot be reconciled with the Supreme Court's clear dictates.

10.    Plaintiffs therefore respectfully request that the Court issue declaratory and injunctive relief finding that the challenged provisions of the Law identified

herein violate the First and Fourteenth Amendments of the U.S. Constitution and enjoining these provisions from taking effect.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (action to redress deprivation of rights secured by the Constitution of the United States) because Plaintiffs initiated this action pursuant to the U.S. Constitution. It also has jurisdiction under the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.

12.    Venue is proper in this district under 28 U.S.C. § 1391(b)(1) because all Defendants reside in this state and several Defendants reside in this district and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred and will occur in this judicial district.

13.    This Court has authority to enter declaratory judgment and to provide injunctive relief pursuant to Federal Rules of Civil Procedure 57 and 65, and 28 U.S.C. §§ 2201-2202.

## PARTIES

**<u>Plaintiffs</u>**

14.    Plaintiff LEAGUE OF WOMEN VOTERS OF FLORIDA, INC. and LEAGUE OF WOMEN VOTERS OF FLORIDA EDUCATION FUND, INC. are nonprofit organizations formed under section 501(c)(4) and section 501(c)(3) of the

Internal Revenue Code, respectively, and have their office located in Orlando, Florida. The League is a nonpartisan, voter-focused, grassroots, nonprofit membership-based organization.

15.    The League has 29 local Leagues across the State of Florida, from Pensacola to the Keys, and thousands of members statewide. Members of local Leagues are members of LWVFL, and each local League is a member of LWVFL. It has operated in the state since 1920. LWVFL's mission is to encourage voter participation, increase understanding of major policy issues, and advocate for legislative changes and policies for the public good. To accomplish these goals, LWVFL registers Floridians to vote, hosts voter education events, publishes voter guides and directories of elected officials, organizes get-out-the-vote efforts, advocates for legislative priorities, and engages in the citizen petition process.

16.    Since the mid-1990s, LWVFL has been actively involved in petition collection as part of its commitment to direct democracy. The League has supported citizen initiatives, mobilized thousands of volunteer petition collectors, and gathered hundreds of thousands of signatures. The League also trains each of its volunteer petition collectors on state law requirements related to petition collection before they go out into the field.

17.    Notably, the League is one of the few organizations in Florida that relies exclusively on volunteers for petition collection. The League's reputation and

influence are so significant that sponsors of citizen initiative amendments often seek its endorsement, recognizing that the League's support can be a deciding factor in whether an initiative moves forward to the ballot. However, the Legislature's latest action now imposes strict limitations on LWVFL's ability to participate in direct democracy efforts, severely restricting its role in the citizen petition process.

18.    Plaintiff LEAGUE OF UNITED LATIN AMERICAN VOTERS is a nonprofit, nonpartisan, membership-based organization with 525 councils (local chapters) and over 325,000 members in 27 states, the District of Columbia, and Puerto Rico. LULAC was established in 1929 and has its headquarters in Washington, D.C. LULAC is the largest and oldest Latino civil rights organization in the United States. LULAC's mission is to improve the lives of Latino families throughout the United States and to protect their civil rights in all aspects. LULAC Florida, LULAC's state arm, has thousands of members and 17 councils across the state, which include adult and young adult councils.

19.    LULAC operates entirely through volunteers and focuses on issues that significantly affect Latino communities in the state. In the past, it has advocated for driver's licenses for all residents regardless of immigration status and taken legal action against private utility companies over increased electricity rates for LULAC's constituents. Regarding ballot initiatives, LULAC has worked with other organizations to support measures like the Right to Abortion Initiative and the Rights

Restoration for Felons Initiative. Although LULAC has never directly collected petitions in Florida before, this year it planned to mobilize its members to gather signatures for the Florida Medicaid Expansion Initiative. However, the new Law effectively prevents LULAC from participating in this process. Many of LULAC's members are noncitizens and still more are not Florida residents, both of which the Law bars from circulating initiative petitions. Even for those LULAC members who are citizens and Florida residents, the Law imposes burdensome new requirements that make it nearly impossible for LULAC and its eligible volunteers to circulate petitions.

20.    Plaintiff CECILE SCOON is a member and the current Co-President of LWVFL and is a Plaintiff here in her individual capacity as a member of and volunteer for LWVFL. Plaintiff Scoon is a U.S. citizen and a registered voter in Bay County, Florida. She was a prosecutor for the U.S. Air Force and later became the first Black woman in private law practice in Bay County. She has been a member of LWVFL since about 2000. Plaintiff Scoon served as President of LWVFL from 2021 to 2023 and as Co-President from 2023 to present. Plaintiff Scoon began volunteering as a petition circulator for the League in support of the successful Fair Districts Amendment in 2010. Since then, she has not only collected and submitted petition forms herself but has also trained other League volunteers and members of other organizations on petition circulation, used her law office as a central location

for mailing completed petition forms gathered at various events, and worked closely with petition sponsors to help advance their initiatives.

21.    Plaintiff DEBRA CHANDLER is a member and the current Co-President of LWVFL and is a Plaintiff here in her individual capacity as a member of and volunteer for LWVFL. Plaintiff Chandler is a U.S. citizen and a registered voter in Palm Beach County. She has been a member of the League since 2017 and served in various leadership roles in the Palm Beach County League before she became the Co-President of LWVFL in 2023. Plaintiff Chandler has collected and submitted petitions for years supporting various citizen amendments, trained other League volunteers and members of other organizations on petition circulation, and worked closely with petition sponsors to help advance their initiatives.

**Defendants**

22.    Defendant Cord Byrd is Florida's Secretary of State, whose principal place of business is located at 2415 N. Monroe Street, Suite 810, Tallahassee, FL 32303. Defendant Byrd is the state's "chief election officer" and his duties include "[o]btain[ing] and maintain[ing] uniformity in the interpretation and implementation of the election laws." Fla. Stat. § 97.012. Defendant Byrd's statutory responsibilities include managing voter registration and overseeing the registration of third-party voter registration organizations to ensure compliance with the law. *Id.* § 97.0575(1).

If the Secretary of State reasonably believes that a person has violated the Law, he may refer the matter to the Attorney General for enforcement. *Id.* § 97.0575(8).

23.    Defendant JAMES UTHMEIER, in his official capacity as the Attorney General of Florida, is the chief state legal officer and maintains the office of the statewide prosecutor. Fla. Const. art. IV, § 4(b). He is responsible for enforcing the Law.

24.    Defendants the SUPERVISORS OF ELECTIONS, sued in their official capacities, are responsible for administering elections in each of Florida's 67 counties. Supervisors are responsible for distributing, collecting, and verifying petition forms, and verifying petition signatures. Fla. Stat. § 100.371(6)-(12).

25.    Defendants the STATE ATTORNEYS, one for each of Florida's 20 judicial circuits (listed in their entirety above), are named in their official capacities. Fla. Const. art. V, § 17. The State Attorneys are the responsible prosecuting offices for all Florida's trial courts. Fla. Stat. § 27.02

## FACTUAL ALLEGATIONS

## I.    BACKGROUND ON FLORIDA'S BALLOT INITIATIVE PROCESS

26.    Under the Florida Constitution, "[t]he power to propose the revision or amendment of any portion or portions of this constitution by initiative is reserved to the people[.]" Fla. Const. art. XI, § 3.

27.    Placing a proposed constitutional amendment on the ballot is by no means an easy task. The Florida Constitution sets forth the requirement that to place an amendment on the ballot, the supporters of an initiative must obtain valid signatures by 8% of the voters in at least one-half of the state's congressional districts and statewide as of the last presidential election. *Id.*

28.    This requirement also mandates geographic diversity for initiatives by requiring signatures from at least half of the state's congressional districts and requiring that in each district, the number of signatures equal 8% of the votes cast in that district in the last presidential election. *Id.*

29.    Accordingly, to qualify an issue on the ballot for the 2026 General Election, for example, supporters of an initiative would have to collect at least 880,062 valid voter signatures.[1]

30.    For many years, citizens have relied on this process to push for changes that the Legislature has declined to address through traditional legislation. But each time Floridians have pushed for change, the Legislature has systematically erected new barriers to direct democracy, making it more difficult each time for voters to approve new initiative amendments, let alone place initiatives on the ballot.

---

[1] *See* Fla. Div. Elections, *Constitutional Amendments/Initiatives*, (last updated Mar. 3, 2025), https://dos.fl.gov/elections/laws-rules/constitutional-amendmentsinitiatives/ ("In order to get a proposed amendment by initiative on the 2026 General Election ballot, a petition must be signed by 880,062 voters").

31.    Starting in 1977, lawmakers imposed a verification fee on every signature collected—a financial hurdle designed to stifle grassroots efforts. In subsequent years, they layered on additional requirements, including: a 75-word limit on ballot summaries; the expiration of initiative petition signatures after four years; a mandatory review by the Florida Supreme Court of all citizen-led proposals; and the imposition of a first-degree misdemeanor on any person who knowingly signs a petition more than once.

32.    In 1997, the year after three Everglades conservation initiatives appeared on the ballot, lawmakers sought to further regulate the initiative process. Among the new requirements, paid circulators were forced to disclose personal details by writing their names and addresses on each petition form they circulated, and the deadline to submit signatures was pushed forward from just 90 days before the general election to 121 or 151 days before the general election, depending on the signature verification method.

33.    In 2002, after Florida voters approved an amendment for universal pre-kindergarten education, lawmakers again imposed additional requirements. These new requirements mandated that every initiative include ballot language disclosing estimated costs and revenues, moved the petition deadline for general election ballots five months earlier to February 1, thereby shortening the window for signature collection, required petition forms to list a voter's street address, county,

and either their registration number or date of birth, and allowed voters to revoke

their signatures after signing a petition. H.B. 65-E §§ 1-3, 5-6, 2002 Leg. (Fla. 2002)

(amending Fla. Stat. §§ 15.21, 16.061, 100.371, 101.161, 216.136 (2001)).

34.    In 2010, following the passage of the amendment for fair districts, the

Legislature reduced the validity period for petition signatures from four years to just

two. H.B. 1355 § 23, 2011 Leg. (Fla. 2011) (amending Fla. Stat. § 100.371(3)

(2010)).

35.    In 2019, voters approved the 2018 Voter Restoration Amendment to

restore the voting rights of individuals convicted of felonies who had completed their

sentences. Shortly afterwards, the Legislature imposed a strict regulatory scheme on

paid petition circulators by banning the payment of circulators per-signature and

requiring paid circulators to register with the Secretary, file an affidavit with each

petition they collect, and use only individualized forms issued to them by the state

or the supervisors of elections. The law also established fines for petitions delivered

by both paid and unpaid circulators to the supervisors of elections more than 30 days

after the voter signed the petition. H.B. 5 § 3, 2019 Leg. (Fla. 2019) (amending Fla.

Stat. § 100.371 (2018)).

36.    In 2020, the Legislature imposed stricter rules for initiatives, including:

doubling the signature requirement for Supreme Court review; allowing legal

challenges to the registration of circulators; limiting signature collection to a

two-year period ending February 1; requiring sponsors to cover full verification costs; voiding signatures if circulators were unregistered; and mandating bold-font financial impact statements on ballots.

37.    In response to the coronavirus pandemic, the state approved remote-signed signatures for candidate petitions but not for initiative petitions. 46 Fla. Admin. Reg. 1415, R. 1SER20-2 (Apr. 3, 2020). And in 2021, the Division of Elections issued a rule requiring that a voter's "original signature" on an initiative petition must be a wet-ink signature. *See* Fla. Dep't State, Advisory Opinion DE 21-01 (2021) (citing Fla. Stat. § 100.371(11)(a)).

38.    The cumulation of restrictions that govern the initiative process today—which were repeatedly enacted after citizens successfully placed initiatives on the ballot or passed certain initiatives—betray a clear pattern of hostility toward the constitutional right of Floridians to shape their own laws.

39.    This pattern of legislative obstruction intensified in 2025. After Floridians successfully placed the amendments related to abortion rights and medical marijuana on the 2024 general election ballot (and came within three percentage points of protecting access to abortion), lawmakers retaliated by enacting their broadest and most ambitious restriction on direct democracy to date.

19

## II.    THE CHALLENGED PROVISIONS OF THE LAW

40.    The Law launches an assault on Florida citizens' ability to change their laws through popular initiative. As described below, the Law targets every stage of the petitioning process, from registration and training of petition collectors, to the start of signature collection, through the submission of petition form to county supervisors, carrying on until after supervisors verify these petitions. It imposes near-insurmountable costs, a myriad administrative difficulties, and unrealistic deadlines, all while adding new forms of criminal liability through vague and widely drawn provisions.

### A. Petition Circulator Definition and Eligibility

41.    The Law expands the definition of "petition circulator" to include any person who wishes to collect more than a handful of petition forms. This now requires all volunteers who collect more than 25 petitions from persons outside of their families to register as circulators and undergo training before they can collect signatures.

42.    "Petition circulator" was historically defined to include only *compensated* entities or persons who work for sponsors of initiatives and collect signatures. *See* Fla. Stat. § 97.021(28) (2024) ("'Petition circulator' means an entity or individual who collects signatures for compensation for the purpose of qualifying a proposed constitutional amendment for ballot placement.").

20

43.    The new Law, however, significantly broadens that definition beyond those who are "compensated," to include any entity or individual, *regardless of whether the person is a volunteer or a paid circulator*, who collects more than 25 petition forms from people outside of their family, for the purpose of qualifying a proposed constitutional amendment on the ballot. H.B. 1205 § 4, 2025 Leg. (Fla. 2025) (amending Fla. Stat. § 97.021(28)).

44.    To become a circulator, a Florida voter must complete a form that includes their "name, permanent address, temporary address, if applicable, date of birth, Florida driver license or Florida identification card number, and the last four digits of his or her social security number." H.B. 1205 § 6, 2025 Leg. (Fla. 2025) (amending Fla. Stat. § 100.371).

45.    The circulator must then undergo a training on petition circulation, developed by the Division of Elections, which includes, among other things, a description of the "specific criminal penalties to which a petition circulator may be subject for violating the Florida Election Code." *Id.*

46.    Section 4 arbitrarily excuses from these requirements anyone "who collects, delivers, or otherwise physically possesses no more than 25 signed petition forms in addition to his or her own signed petition form or a signed petition form belonging to the person's" family member (e.g., spouse, parent, child, grandparent,

grandchild, sibling, or sibling's spouse). H.B. 1205 § 4, 2025 Leg. (Fla. 2025) (amending Fla. Stat. § 97.021(28)).

47.    The new Law also bans certain classes of individuals altogether from participating in the circulation process. Section 6 prohibits non-citizens from circulating petitions. H.B. 1205 § 6, 2025 Leg. (Fla. 2025) (amending Fla. Stat. § 100.371).

48.    The same Section prohibits any person who has been convicted of a felony and has not had their voting rights restored from circulating petitions. *Id.*

49.    It also prohibits anyone who is not a resident of the state from circulating petitions. *Id.* Altogether, the new definition and eligibility requirements for petition circulators (the "Eligibility Requirements"), work to significantly restrict the League's ability to conduct large-scale petition gathering efforts.

**B. Petition Circulator Disclosure and Oath and Registration Requirements**

50.    Any person who falls under the Law's definition of "petition circulator" must now comply with certain new disclosure and oath requirements described below ("Disclosure and Oath requirements").

51.    Now, to become a circulator, the applicant must affirm, under penalty of perjury, that they are a U.S. citizen, Florida resident, and that they do not have a felony conviction. *Id.*

52.    Every petition circulator's application to register must include—in addition to the individual's name, date of birth, and address— their "Florida driver license or Florida identification card number, **and** the last four digits of his or her social security number" (the "Registration Requirements"). *Id.* (emphasis added).

53.    Each petition form distributed by a circulator must also, under penalty of perjury, include a statement from the circulator affirming the following:

> By my signature below, as petition circulator, I verify that the petition was completed and signed by the voter in my presence. Under penalty of perjury, I declare that I have read the foregoing Petition Circulator's Affidavit, and that the facts stated in it are true, and that if I was paid to circulate or collect this petition, payment was not on a per signature basis.

*Id.*

54.    These new Registration Requirements make the process of filling out a petition form more burdensome: those registering as petition circulators must provide the last four digits of their social security numbers, a requirement that will dissuade many from even participating in the process. The Disclosure and Oath requirements will also have a chilling effect on speech as they obligate petition circulators to determine and disclose whether they have felony convictions.

## C. The 10-day Return Deadline

55.    Previously, Florida law gave sponsors of initiative amendments and petition circulators 30 days from the time a voter signed to return petition forms.

Failure to do so resulted in a $50 total fine to the sponsor for each petition form that was returned late. Fla. Stat. § 100.371(7)(a).

56.    The new Law requires petition circulators (including LWVFL's volunteers) to deliver each signed petition form to the supervisor of elections *in the county where the voter resides* within *ten days* of signing. H.B. 1205 § 6, 2025 Leg. (Fla. 2025) (amending Fla. Stat. § 100.371).

57.    It imposes on sponsors a $50 fine *for each day* that a petition form is delivered late, and the penalty increases to $2,500 for "willful[]" violations. H.B. 1205 § 6, 2025 Leg. (Fla. 2025) (amending Fla. Stat. § 100.371).

58.    For the League, which is committed to ensuring the accuracy of these forms, a 10-day return deadline is extremely brief and does not allow sufficient time to notify voters if their forms are missing information or incomplete, nor to give voters the opportunity to resubmit.

59.    With less time available to reach out to voters and obtain corrected forms, the League is now more likely to submit incomplete forms, as the Law mandates that they submit all collected forms regardless of their completeness.

60.    The previous 30-day timeframe, by contrast, enabled the League to conduct comprehensive compliance reviews of each petition form submitted.

**D. Vague and Draconian Criminal Penalties**

61.    The new Law imposes a whole host of severe and burdensome penalties for ill-defined conduct (the "Vague and Draconian Criminal Penalties").

62.    A person "collecting petition forms on behalf of a sponsor of an initiative petition" is liable for a felony of the third degree if the person "fills in missing information on a signed petition[.]" H.B. 1205 § 6, 2025 Leg. (Fla. 2025) (amending Fla. Stat. § 100.371).; H.B. 1205 § 12, 2025 Leg. (Fla. 2025) (amending Fla. Stat. § 104.185(2)).

63.    The Law also makes it a third-degree felony for persons collecting petition forms "on behalf of a sponsor of an initiative petition" to "cop[y] or retain[] a voter's personal information, such as the voter's Florida driver license number, Florida identification card number, social security number, or signature, for any reason other than to provide such information to the sponsor of the initiative petition[.]" H.B. 1205 § 6, 2025 Leg. (Fla. 2025) (amending Fla. Stat. § 100.371).

64.    In addition, the Law includes within the definition of "racketeering activity" (also known as a RICO violation), which carries up to 30 years in prison, "a violation of the Florida Election Code relating to irregularities or fraud involving issue petition activities." H.B. 1205 § 19, 2025 Leg. (Fla. 2025) (amending Fla. Stat. § 895.02(8)).

65.    All of the aforementioned provisions are vague and overbroad. First, the Law does not specify what constitutes acting "on behalf of a sponsor organization," but the definition could be read to include Plaintiff organizations that promote initiatives and collect petitions "on behalf" of a sponsor. This lack of clarity makes it difficult for individuals and organizations to know whether they are subject to felony liability.

66.    Second, the Law does not define what constitutes "missing information." For example, it is unclear whether helping a blind or disabled voter to correct a date or add a missing county is prohibited.

67.    Third, the Law does not define what it means to "retain" a voter's personal information. It does not specify how long a volunteer may possess personal information before it has been "retain[ed]." It is therefore possible that, under this provision, a volunteer could be subject to criminal liability for temporarily possessing a voter's petition form (which includes personal information) prior to submitting it.

68.    Fourth, the phrase "for any reason other than to provide such information to the sponsor" is not specific about what actions are permissible. For example, if temporary possession of a petition constitutes "retaining" a petition, then it is unclear whether retaining the petition for the purpose of submitting directly to supervisors is allowed, or if only direct handover to the sponsor is permitted.

69. Fifth, the use of "irregularities" is vague because Florida law does not provide a precise definition for "irregularities" in the context of petition activities. "Irregularities" could refer to any deviation from standard procedures, including unintentional mistakes, minor administrative errors, or technical violations that do not involve criminal intent. For instance, it is not apparent whether turning in a petition form without signing the circulator affidavit constitutes an "irregularity." Because the Law does not clarify what types or levels of irregularities rise to the level of criminal conduct, organizations, volunteers, and sponsors are left to speculate as to whether their conduct may give rise to a third-degree felony or a state RICO charge.

### E. Office of Election Crimes and Security Investigations

70. The Law also subjects organizations that support petition circulation to investigation by the Office of Election Crimes and Security ("OECS") and potential criminal liability for the simple act of turning in too many invalid forms. H.B. 1205 § 6, 2025 Leg. (Fla. 2025) (amending Fla. Stat. § 100.371).

71. Specifically, if "[f]or any reporting period in which the percentage of petition forms deemed invalid by the supervisor exceeds a total of 25 percent of the petition forms received by the supervisor for that reporting period," the supervisor of elections must notify the OECS. *Id.*

72.     OECS then must conduct a "preliminary investigation" into "the activities of the sponsor, one or more petition circulators, or a person collecting petition forms on behalf of a sponsor." *Id.* And, if warranted, OECS may "report findings to the statewide prosecutor or the state attorney for the judicial circuit in which the alleged violation occurred for prosecution." *Id.*

## III.   THE IMPACT OF THE CHALLENGED PROVISIONS ON PLAINTIFFS

### A. Plaintiff LWVFL

73.     For years, LWVFL has invested substantial time, effort and organizational resources in the ballot initiative process. The League and its local Leagues organize, educate, train, support, and dispatch volunteers, many of whom are members of LWVFL, to advocate for ballot initiatives by informing the public of priority issues and collecting petition signatures. In the past, LWVFL has mobilized thousands of volunteers and collected hundreds of thousands of petition forms in support of initiative amendments.

74.     The League provides its volunteers with thorough training on both the new constitutional amendments being considered and the proper procedures for each stage of the citizen petition process. Most of the volunteers' efforts focus on educating voters about the policies behind proposed ballot initiatives. They engage with the community by going door-to-door, hosting tables at local events, hosting events at their own homes such during "afternoon teas," attending parades, and

visiting places like college campuses, bridge clubs, book clubs, supermarkets, birthday parties, and libraries to talk with voters and collect signatures from those who support the initiative and believe it should be put to a statewide vote.

75.    For voters who are willing to complete petition forms in support of a ballot amendment, LWVFL volunteers guide them through the process and answer any questions. The League specifically instructs their volunteers to have each voter fill out the petition form and not to fill out the form for a voter.

76.    Volunteers also provide instructions on how voters can mail their completed forms to their local supervisor of elections and encourage voters to return their own forms. In practice, however, many voters ask LWVFL volunteers to return their signed forms for them, leaving their petitions with volunteers. As a result, after some events, League volunteers may collect hundreds of petitions within just a few hours.

77.    After collecting petitions, League volunteers also play a key role in the verification process, ensuring that petitions satisfy the requisite (and weighty) legal requirements. They confirm that collected petitions have been properly completed, and if petitions have not been completed properly, they attempt to contact the voter to urge them to fill out a new form or correct their incomplete form.

78.    Under the previous statutory framework, the League volunteers had 30 days to turn in petition forms, and during this time, they were able to conduct a robust

compliance check of all forms and alert voters if their forms were incomplete. Now with the truncated 10-day timeline, the League will have significantly less time to contact voters and will likely be forced to submit more "invalid" forms.

79.    To help minimize the costs of mailing and delivery, several League members use their local businesses as "ballot collection hubs," where other volunteers drop off petitions gathered at events. These hubs ensure the timely delivery of the forms to the supervisor of elections.

80.    Over the years, the League has perfected its collection processes and adapted to new restrictions put in place by the Legislature. As such, the League's influence in the ballot initiative process has proven substantial. For example, the League organized thousands of its members to circulate and collect petitions to put the Right to Abortion Initiative (voted on in 2024) and the Rights Restoration for Felons Initiative (voted on in 2018) on the ballot.

81.    To the League's knowledge, no other single organization brought as many volunteers to the 2024 Right to Abortion Initiative campaign as the League did. While voters approved only one of the three amendments LWVFL worked on in 2024, Floridians could make their voices heard by having the opportunity to vote on these amendments only by virtue of a functioning ballot initiative process.

82.    The League's work on the ballot initiative process remains ongoing. Currently, the League is working to collect petitions for two initiatives: the Provide

Medicaid Coverage to Eligible Low-Income Adults Initiative and the Right to Clean and Healthy Waters Initiative.

83.    The League does not have permanent staff collect petitions; it relies on volunteers to undertake its citizen petition work. But the new Law places significant burdens on the League and its large-scale volunteer petition-collection operation. Its vague provisions have already harmed the League's core business activity by frightening League members and deterring the League from undertaking petition collection to support the Medicaid and Clean Water initiatives, as well as any other initiative.

84.    Under the new definition of "Petition Circulator," both LWVFL as an organization and its thousands of volunteers who collect petitions would be defined as petition circulators because they physically possess more than the allowed number of petitions at a time. This expanded definition subjects the League and each of its volunteers to a range of new, burdensome requirements with which they must now comply. This will, in turn, deter volunteers from joining the League's petitioning efforts. For those volunteers still willing to participate, the League will need to guide them through the circulator registration process for the first time and answer volunteers' questions about the relevant requirements.

85.    The Law's new Eligibility Requirements bar certain groups of League volunteers from participating in the citizen petition process entirely. The Law

31

prohibits individuals who are non-citizens (including permanent residents and visa holders), those with felony convictions whose voting rights have not been restored, and non-residents of Florida from serving as petition circulators. H.B. 1205 § 6, 2025 Leg. (Fla. 2025) (amending Fla. Stat. § 100.371). LWVFL includes members in all these categories—such as "snowbirds," who split time between states or members from other state Leagues who help with petition drives. As a volunteer-based organization, the League depends on the participation of all its members to operate effectively. These new Eligibility Requirements significantly restrict LWVFL's ability to conduct large-scale petition gathering efforts.

86.    The new Registration Requirement will discourage many of LWVFL's volunteers from participating in the citizen petition process. The Law now requires petition circulators—including volunteers—to provide the last four digits of their Social Security number on an application to register as a circulator, which is considered a public document available to anyone upon request. This heightened disclosure raises grave privacy concerns and will deter volunteers from engaging in petition gathering, as it may risk exposing sensitive information. Consequently, the League will have a smaller pool of volunteers and will not be able to support ballot initiatives at the same scale as before.

87.    Similarly, the Disclosure and Oath Requirements—especially the requirement that circulators attest under penalty of perjury that they do not have a

32

felony conviction—create a significant chilling effect on volunteers. Many individuals are unsure whether they have a felony conviction in Florida or any other state, or whether they have had their right to vote restored, and the statute does not clarify whether someone with an expunged conviction can truthfully make this attestation. This uncertainty will discourage League volunteers from participating in the citizen petition process.

88.    Additionally, these requirements place extra burdens on the League, which relies on thousands of volunteers, as it must now consider conducting costly criminal background checks on each of its volunteers to avoid the risk of severe criminal penalties for the organization and for its volunteers. Background checks are costly, logistically difficult to obtain, and can be at times unreliable.

89.    As mentioned above, the 10-day deadline for returning petition forms to supervisors of elections places a significant burden on the League and its volunteers. This new deadline will require LWVFL volunteers to collect, sort, and mail or drop off signed petitions to the relevant county supervisors on an extremely truncated timeline. Citizen petition campaigns are often possible because of economies of scale—for example, a stack of signed petition forms can be mailed to the relevant county supervisor at the end of the month or the next time a volunteer is driving to the county.

90.     But under this new provision, forms must be *delivered* to the county supervisor within 10 days. Mail will have to be sent almost continuously, and even that may not be sufficient to meet the deadline. In those instances where a voter signs a petition form that was distributed by an LWVFL volunteer but does not return it to the volunteer for several days (as often happens when a voter wants to spend some time considering the issue), the volunteer may not be able to meet the 10-day deadline at all.

91.     This 10-day timeline will also limit volunteers' efforts to submit "valid" petition forms that are properly filled out. Under the current 30-day deadline for delivery, LWVFL volunteers often reviewed collected petitions for errors or incomplete information. Indeed, because LWVFL already spends considerable time reviewing forms for compliance—and will need to be even more meticulous under the new Law—this 10-day window makes the process much more challenging, increasing the risk of errors and potential violations of criminal statutes.

92.     For instance, it is not unusual for a voter to misread the form's request for "county" as "country," resulting in incorrect information being provided. When this happens, LWVFL volunteers typically follow up with the signer to correct the form. However, with the new 10-day deadline, volunteers would need to implement an almost continuous review process to catch such errors in time, making it much more difficult to reconnect with voters and fix mistakes before the deadline. In many

cases, volunteers would likely have to ask voters to complete an entirely new form, which often requires arranging another in-person meeting. These added obstacles hinder the League's ability to mobilize volunteers and diminish its capacity to support initiatives on the same scale as before.

93.    The League is also harmed by the possibility of fines against sponsors for late-submitted petition forms. If a sponsor incurs substantial fines because one of the League's volunteers returns a form late, it will damage the League's relationships with sponsors and potential sponsors. It will also undermine the League's reputation as a trusted source of support of grassroots efforts and expertise on election issues.

94.    The Law's Vague and Severe Criminal Penalties compound its chilling effect on the League. The Law does not specify what constitutes acting "on behalf of a sponsor organization," but the definition is broad enough to include the League, which works on behalf of sponsors by supporting their initiatives. This lack of clarity makes it difficult for the League to know whether it is subject to felony liability for certain mistakes. H.B. 1205 § 6, 2025 Leg. (Fla. 2025) (amending Fla. Stat. §§ 100.371(7)(b)(8)-(9)).

95.    The Law classifies the act of filling in missing information as a third-degree felony. This provision directly impacts the assistance that League volunteers can offer to blind voters and those with disabilities who are unable to

complete the form themselves. In the past, the League has collected petitions at nursing homes, where many voters—especially those who have difficulty writing—require help to fill out their forms. However, the law does not provide any exceptions for extenuating circumstances such as visual impairments or other disabilities, leaving League volunteers uncertain about how to assist these voters without risking criminal liability.

96.    The statute's 10-day return timeline, in conjunction with the penalties for turning in invalid forms, also harms the League. As described, the League has trained its volunteers to never fill in missing information on a completed form and to instead contact the voter to physically fill in the information themselves.

97.    The short 10-day window leaves League volunteers with an extremely short amount of time to contact voters. If the volunteer cannot reach the voter in time, no good options remain: the League is now more apprehensive about turning in incomplete forms since that will increase the number of invalid petition forms, which raises the likelihood of an investigation by the OECS. Nor can the League simply hold on to the forms beyond 10 days, as it must submit every petition form collected almost immediately to have them delivered on time. Furthermore, even if the League did hold on to forms for a temporary period within the allowed 10 days, the Law imposes penalties on organizations that "retain" information without defining the meaning of "retain." These ambiguities leave the League and its

volunteers in a Catch-22: the League is required to fully comply with the new restrictions or otherwise risk turning in invalid forms, which could lead to investigation by the OECS for crossing the 25% threshold of invalid forms—yet, the compressed 10-day deadline significant limited the time available to conduct such comprehensive checks. As a result, the reduced timeframe significantly increases the risk of inadvertently violating the new law.

98.    The Law fails to clarify what it means to "retain" a voter's personal information. For example, voters often ask the League to submit forms on their behalf because they trust the organization. The Law prohibits the retention of forms "for any reason other than to provide such information to the sponsor." Since it is unclear whether temporarily holding petition forms prior to turning them into the supervisor counts as retention, the League is uncertain whether it is permitted to continue this practice, which is a central part of its petition operation. The League is therefore forced to consider whether it should stop collecting petitions altogether.

99.    The expansion of the definition of "racketeering activity" to include "irregularities," *see* H.B. 1205 § 19, 2025 Leg. (Fla. 2025) (amending Fla. Stat. § 895.02(d)), related to the Florida Election Code has had a strong chilling effect on the League. Although the League has rigorous compliance procedures, it now fears exposure to criminal liability for minor clerical mistakes or technical violations that lack criminal intent. There is also concern that the organization itself could be

prosecuted for "racketeering activity" due to unintentional errors. Because the Law does not specify what kind or degree of irregularities constitute criminal conduct, the League is left uncertain about what actions are prohibited or punishable under the statute, forcing it to scale back its petition activities.

100.   The Law also creates new costs for the League that have already affected its petition collection efforts. As discussed, OECS must now investigate any petition collector or organization that submits forms with a 25% invalidation rate. Since League volunteers gather thousands of petitions, many are concerned they could be investigated for violating the Law's complex and unclear requirements. The League itself, which collects hundreds of thousands of petitions, is also worried about facing investigations as an organization.

101.   A 75% validity rate places a significant burden on LWVFL which, in the past, has collected hundreds of petitions at a single event. Combined with the new 10-day return deadline, there's a higher chance that the League will not be able to get in touch with a voter to have them correct an incomplete form, and consequently, the League faces a greater likelihood that it is subjected to an investigation. The specifics of such investigations remain unclear, but the intended impact is evident: LWVFL volunteers who fear being swept up into a criminal investigation or prosecuted for alleged petition-related misconduct will hesitate to participate as petition gatherers at all.

102.   That fear is not unfounded. In the 2024 election, law enforcement officers from OECS knocked on the doors of Floridians who signed the petition to put the Right to Abortion Initiative on the ballot and questioned them. This provision will intensify the climate of fear and intimidation already fostered by the OECS and will further suppress petition circulator activity across the State.

103.   Individually, and together, the new Law's challenged provisions significantly burden LWVFL's petition collection activities and its members and volunteers. These burdens include eligibility restrictions, expanded personal information disclosures and oath requirements, tighter deadlines, stricter signature verification requirements, criminal liability, exorbitant fines, and exposure to investigations.

104.   Collectively, these changes make it more difficult, costly, and risky for the League and its volunteers to organize and participate in petition drives at the scale they have in the past, if at all.

**B. LULAC**

105.    Plaintiff LULAC, together with its state arm, LULAC Florida, planned to mobilize its volunteers to support the Medicaid Initiative, which would expand Medicaid coverage to individuals aged 18-65 with incomes at or below 138% of the federal poverty level.

106.   LULAC has many members and constituents in Florida who rely on Medicaid coverage, and therefore, this initiative is important to the organization's mission.

107.   Just as LWVFL and its volunteers are hesitant to participate in petition collection under the burdensome, vague, and harsh provisions of the new Law, LULAC—as an organization considering this work for the first time—is now unlikely to even begin collecting signatures to support the Medicaid Initiative.

108.   This undermines LULAC's ability to have a voice in the ballot initiative process and mobilize its volunteers. LULAC also has members who are non-citizens who would be interested in doing this work and now cannot because of the strict eligibility requirements. It also has strong relationships with other state councils and those councils have expressed interest in sending members to help the LULAC on petition collection—but the new Law prohibits non-residents from gathering petitions. This impacts LULAC's ability to interface with its sister councils and reduces the number of individuals upon which LULAC may rely for petition circulation.

109.   The new Law's requirement that all petition circulators provide the last four digits of their social security numbers is particularly intimidating. Many LULAC volunteers are very cautious about sharing personal information, especially since some have family and friends who are undocumented and fear exposure to U.S.

Immigration and Customs Enforcement. This heightened risk of personal information becoming public will discourage participation, preventing LULAC from fully utilizing its volunteer base.

110.    The vague criminal penalties and heightened risk of investigation are enough to discourage LULAC and its volunteers from participating in petition collection at all.

111.    The new Law significantly hampers the ability of organizations like LULAC to participate in the direct democracy process and make their voices heard. It also discourages efforts to involve young members, as many will not take part if they are required to provide their social security numbers and other personal information.

112.    The overall impact is a reduction in voices within direct democracy, diminished public discourse, and decreased participation.

**C. The Individual Plaintiffs**

113.    Plaintiffs Scoon and Chandler are both individual petition-collection volunteers. If they wish to collect petitions as they have in the past, they must comply with the Law's new costly and burdensome requirements on the petitioning process. This new law, particularly its requirement that petition signers disclose the last four digits of their social security numbers on petition forms, will have a chilling effect on Plaintiffs by hampering their outreach to and discussions with potential signers.

114.   Plaintiffs Scoon and Chandler have experienced a chilling effect from the criminal penalties associated with violating the Law's unclear provisions. These concerns include the risk of penalties for temporarily retaining forms to return them to supervisors of elections, being held liable for irregularities that could be classified as "racketeering activity" or other forms of fraud, and facing investigations if 25% of the forms they submit are later found invalid by supervisors of elections. They are also highly concerned that they will not be able to meet the 10-day deadline for submitting petition forms, especially because doing so will likely require contacting voters that failed to complete their forms so the voters can complete the forms themselves. Again, the Law makes it a felony for volunteers to fill in "missing information."

## IV.    THE PROVISIONS OF THE LAW ARE NOT TAILORED TO THE LEGISLATURE'S STATED INTENT.

115.   The new Law's various provisions are not narrowly tailored to address the Legislature's stated goal of deterring fraud and promoting transparency in the petition circulation process. Instead, the requirements are needlessly broad and impose significant burdens that extend well beyond what is necessary for preventing fraud.

116.   During the legislative session, lawmakers did not provide explanations for several key changes:

117.   Legislators did not clarify any specific connection between fraud and the exclusion of non-citizens, individuals with felony convictions, or non-residents, nor did they justify why these groups are completely barred from submitting petitions.

118.   No rationale was given for requiring petition circulators to provide the last four digits of their social security numbers and Florida ID numbers or Florida driver's license numbers. If the Legislature contends that this provision is necessary to prevent fraudulent application submissions, there are less intrusive ways to achieve that goal. For instance, the state already has criminal penalties for individuals who engage in misconduct related to voting and petitioning. If the state increased its enforcement of those prohibitions, it could punish wrongdoers and deter future misconduct without requiring volunteers to turn over sensitive information.

119.   Lawmakers did not explain the rationale for reducing the petition return deadline from 30 days to 10 days. Nor is one apparent: the speed at which a petition form is returned has no bearing on the likelihood of fraud or the transparency of the process.

120.   There was no clarification or justification for the vague provisions in the Law or the strict criminal penalties for violating unclear requirements.

121.   There is no permissible state interest that could even plausibly support any of the changes described above.

122.  As a result, the Law regulates conduct far beyond what is constitutionally permissible, affecting a wide range of individuals and organizations and raising serious concerns about its impact on direct democracy in Florida.

### CLAIMS FOR RELIEF

### COUNT I
### Burden on Core Political Speech in Violation of the First and Fourteenth Amendments and 42 U.S.C. § 1983

123.  Plaintiffs repeat, reallege, and incorporate the allegations in the paragraphs above as though fully set forth herein.

124.  The circulation of petitions is considered core political speech, and the First Amendment forbids restrictions that place undue burdens on political expression.

125.  Such restrictions have two main effects: they create a chilling effect that discourages constitutionally protected speech, and they also decrease the overall amount of speech. Both outcomes limit the scope of public discourse.

126.  Exacting scrutiny applies to such restrictions. *Buckley*, 525 U.S. at 204. Under this standard, the state must demonstrate that there is a sufficiently important or substantial governmental interest; that the Law or regulation is substantially related to achieving that interest; and that the Law is not significantly broader than necessary to accomplish the state's objective. *See id.* at 203–04.

127.    Individually and collectively, the challenged provisions of the Law restrict the core political speech of the League, LULAC, both organizations' members, and of Individual Plaintiffs Scoon and Chandler. They do so by deterring Plaintiffs from engaging in petition circulation through unrealistic submission timelines, the threat of criminal punishment, and unnecessary regulatory hurdles.

128.    These restrictions fail exacting scrutiny. They are not tailored to achieving the Legislature's state interests of eliminating fraud and less burdensome means exist to achieve the Legislature's stated goals.

129.    Accordingly, Plaintiffs are entitled to an order and judgment, and to a preliminary and permanent injunction, declaring the Petition Circulator Definition and Eligibility provisions (H.B. 1205 § 4, 2025 Leg. (Fla. 2025)), the Disclosure and Oath Requirements (*id.* § 6), Registration Requirements (*id.*), the 10-day Return Deadline (*id.* § 6), the Vague and Draconian Criminal Penalties (*id.* §§ 6, 12, 19), and OECS Investigations (*id.* § 6), in violation of the First and Fourteenth Amendments to the U.S. Constitution and enjoining these provisions.

## COUNT II
### Violation of the Right to Free Association Under the First and Fourteenth Amendments and 42 U.S.C. § 1983

130.    Plaintiffs repeat, reallege, and incorporate the allegations in paragraphs above as though fully set forth herein.

131.   Freedom of association is an essential component of the First Amendment. *NAACP v. Button*, 371 U.S. 415, 430 (1963). This right protects the ability of individuals to join together for expressive purposes, such as advancing shared beliefs, engaging in political activities, or advocating for causes. *Id.*

132.   Laws that directly or indirectly restrict association, by imposing burdens that chill participation in political activities and public discourse, are subject to heightened judicial scrutiny. *See id.* at 438. The government must show a compelling interest and that any infringement is narrowly tailored to serving that interest. *Id.*

133.   Individually and collectively, the challenged provisions of the Law restrict the right of association of LWVFL, LULAC, and of Individual Plaintiffs Scoon and Chandler by chilling their ability to join together with their volunteers to participate in direct democracy in Florida.

134.   Accordingly, Plaintiffs are entitled to an order and judgment, and to a preliminary and permanent injunction, declaring the challenged provisions, the Petition Circulator Definition and Eligibility provisions (H.B. 1205 § 4, 2025 Leg. (Fla. 2025)), the Disclosure and Oath Requirements (*id.* § 6), Registration Requirements (*id.*), the 10-day Return Deadline (*id.*), the Vague and Draconian Criminal Penalties (*id.* §§ 6, 12, 19), and OECS Investigations (*id.* § 6), in violation of the First and Fourteenth Amendments and enjoining these provisions.

**COUNT III**
**Violation of Due Process Under the Fifth and Fourteenth Amendments and 42**
**U.S.C. § 1983**

135.    Plaintiffs repeat, reallege, and incorporate the allegations in paragraphs above as though fully set forth herein.

136.    The void for vagueness doctrine, a constitutional principle rooted in the Due Process Clauses of the Fifth and Fourteenth Amendments, requires that laws—especially those imposing criminal penalties—must be written with enough clarity and specificity so that ordinary people can understand what conduct is prohibited and so that enforcement is not arbitrary or discriminatory. *See City of Chicago v. Morales,* 527 U.S. 41, 56 (1999).

137.    As described above, the challenged provisions of the Law are vague, ill defined, and lacking in clarity such they invite arbitrary enforcement. A violation of any one of these provisions incurs substantial criminal liability.

138.    The Law leaves Plaintiffs LWVFL to speculate at their own peril as to what conduct is prohibited or permissible. Plaintiffs risk incurring steep fines and criminal penalties for purported violations of the Law.

139.    Accordingly, Plaintiffs are entitled to an order and judgment, and to a preliminary and permanent injunction, declaring the following provisions in H.B. 1205 § 6, 2025 Leg. (Fla. 2025) (collecting petition forms "on behalf of a sponsor," "fills in missing information," "retains a voter's personal information," and

47

"percentage of petition forms deemed invalid by the supervisor") and § 19 ("irregularities" involving issue petition activities) in violation of the Fifth and Fourteenth Amendments and enjoining these provisions.

## COUNT IV
### Impermissible Chilling Effect on Speech Due to Substantial Overbreadth Under the First and Fourteenth Amendments and 42 U.S.C. § 1983

140.   Plaintiffs repeat, reallege, and incorporate the allegations in paragraphs above as though fully set forth herein.

141.   Under the substantial overbreadth doctrine, a law may be struck down as facially unconstitutional if it prohibits a significant amount of protected speech, even if the law could be validly applied in other circumstances. *See United States v. Stevens*, 559 U.S. 460, 473 (2010). A law will be struck down as overbroad if a substantial number of its applications are unconstitutional, in relation to its legitimate applications. *Id.*

142.   The doctrine protects against laws that are so broadly written that they deter or "chill" people from engaging in constitutionally protected expression out of fear of prosecution.

143.   The challenged provisions—the ban on non-citizens, non-residents, and convicted felons from participating in petition circulation, the requirement that individuals who collect more than 25 forms register with the state, and the various criminal penalties for violating the Law's vague provisions—are substantially

overbroad and have the effect of chilling constitutionally permissible speech. They sweep up good faith mistakes by volunteers seeking to engage with volunteers on issues of public importance. The steepness of the fines and other penalties under the Law make Plaintiffs and their members substantially less likely to engage in petition circulation, due to fear of punishment.

144.    Accordingly, Plaintiffs are entitled to an order and judgment, and to a preliminary and permanent injunction, declaring the challenged provisions, the Petition Circulator Definition and Eligibility provisions (H.B. 1205 § 4, 2025 Leg. (Fla. 2025)), the Vague and Draconian Criminal Penalties (*id.* §§ 6, 12, 19), and the OECS Investigations (*id.* § 6) in violation of the First and Fourteenth Amendments and enjoining these provisions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and:

1.  Declare that the Law violates the First and Fourteenth Amendments to the U.S. Constitution;

2.  Preliminarily and permanently enjoin Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from enforcing the challenged provisions of the Law;

3.   Award Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to, *inter alia*, 42 U.S.C. § 1988 and other applicable laws; *and*

4.   Grant such other and further relief as the Court deems just and proper.

Dated: May 13, 2025

Respectfully submitted,

*/s/ Gerald E. Greenberg*
GERALD E. GREENBERG
Florida Bar No. 440094
ggreenberg@gsgpa.com
SHANE GRANNUM
Florida Bar No. 1055050
sgrannum@gsgpa.com
GELBER SCHACHTER & GREENBERG, P.A.
One Southeast Third Avenue, Suite 2600
Miami, FL 33131
Telephone: (305) 728-0950
E-service: efilings@gsgpa.com


POOJA CHAUDHURI*
pooja@statedemocracydefenders.org
SPENCER KLEIN*
spencer@statedemocracydefenders.org
SOFIA FERNANDEZ GOLD*
sofia@statedemocracydefenders.org
NORMAN EISEN*
norman@statedemocracydefenders.org
TIANNA MAYS*
tianna@statedemocracydefenders.org
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Ave. SE, Suite 15180
Washington, DC 20003
Telephone: (202) 594-9958

* *Pro hac vice* applications forthcoming

*Counsel for All Plaintiffs*

51