# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

| | |
|---|---|
| FLORIDA DECIDES HEALTHCARE, INC., MITCHELL EMERSON, in his individual capacity, JORDAN SIMMONS, in his individual capacity.<br><br>*Plaintiffs,*<br><br>v.<br><br>CORD BYRD, in his official capacity as Secretary of State of Florida, et al.<br><br>*Defendants.* | CASE NO. 4:25-CV-00211-MW-MAF |

### DECLARATION OF MITCHELL EMERSON IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Pursuant to 28 U.S.C. § 1746, I, Mitchell Emerson, declare as follows:

1. I am competent to make this declaration.

2. I serve as the Executive Director and Campaign Manager of Florida Decides Healthcare, Inc. ("FDH"), a Florida 501(c)(3) non-profit corporation with a principal place of business, office, and registered agent in Miami, Florida.

3. As explained in my previous declaration dated May 4, 2025, FDH has utilized multiple methods to collect petitions in Florida and meet the stringent

1

requirements for ballot qualification, including use of paid canvassing services and working with volunteers. This declaration provides more information about how House Bill ("HB") 1205 has affected our campaign through the present—largely shutting down our operations.

**A.     HB 1205 Is Deterring Volunteers from Supporting FDH's petition drive and Exposes FDH to Criminal and Civil Penalties for Circulators It Cannot Control**

4.     We partner with a broad network of grassroots organizations who collect petitions on a volunteer basis. We also encourage Floridians to complete the petition form on their own time and either mail the signed form to our Jacksonville office or drop it off in person at one of 50 designated "hub" locations throughout the state. Each Hub location has a designated Hub lead. Blank petition forms are also available for pickup at these locations.

5.     Some Hub locations are personal residences of volunteers; others are offices of organizations that support our work. Separately, we work with partner organizations that support our proposed constitutional amendment, and have their own networks of volunteers who circulate FDH's petition.

6.     Since HB 1205 passed, we have attempted to continue our volunteer petition drive, but have already started to face very serious challenges.

7.     HB 1205 revises Florida law to provide that where a sponsor "uses a petition circulator to collect petition forms," it is subject to fines for each petition

received by the county in which the voter resides that is returned more than 10 days after the voter signed. The law does not define the meaning of "uses." Our understanding is that if we work with volunteers, such as through our hub structure, then we "use" the volunteer circulators who support that process.

8. However, we have no real way of controlling whether, when, and how volunteers return petitions. All we can do is attempt to provide support and guidance. For example, FDH holds biweekly grassroots calls that Hub leads and other FDH partners can attend, where we share information. After HB 1205 passed, we have encouraged Hub locations to only hand out blank petitions to volunteers who can commit to returning signed petitions within 24 hours. We also asked our Hubs to mail returned petitions to FDH every day to aid our effort to comply with the ten-day return provision. But we cannot control whether volunteers actually do so.

9. HB 1205 makes petition circulators potentially subject to several different criminal penalties. Since HB 1205 passed, many volunteers have expressed serious fear, uncertainty, and confusion about the new law. Multiple individuals and organizations have raised concerns to me about whether they will be able to continue to participate in our petition drive. During our most recent grassroots call after HB 1205 passed, for example, multiple attendees expressed the belief that collecting petitions is now a felony. I have heard others express similar fears at other times as well, particularly because there is awareness that the State of Florida arrested multiple

petition circulators last year. Multiple individuals have told me that they will stop circulating petitions if HB 1205 remains in effect, or that they are strongly considering doing so.

10. We have already had one Hub location end its association with FDH. Prior to the passage of HB 1205, the Manatee County Democratic Party had allowed FDH to use its headquarters as one of our hub locations. On May 7, 2025, FDH received an email from the Office Manager of the Manatee County Democratic Party, informing us that it could no longer serve as a hub. A true and correct copy of this email is attached as Exhibit 1. Ms. Williams' email reads, in relevant part:

> Regretfully, we at the MCDP headquarters are going to have to step away from being a hub for Florida Decides Healthcare for the time being, given the horrible new law and its confusing and punitive rules that are almost impossible to follow consistently.
> We are definitely open to resuming activity as a hub should there be an injunction against the law, and very much hope that we will be able to do so.

11. When a hub shuts down, it essentially shuts down our volunteer activities in the area. And this does not just affect one county – a given hub may be the closest Hub location for many miles around, which affects our volunteer program in surrounding counties as well. For example, the next closest Hubs to our Manatee County location are in Sarasota County (about 40 minutes away) and Pinellas County (about 35 minutes away); with those time estimates assuming no traffic. It was already difficult to find volunteers willing to incur the time and energy necessary to serve as a hub. It is all the harder now that volunteers may face exposure to criminal

penalties if they mishandle petitions in some way.

**B.  HB 1205 Has Forced FDH to Shut Down Its Paid Petition Circulation Efforts**

12.    On Wednesday, April 30, in anticipation of the passage of House Bill 1205, FDH shut down its paid petition outreach firms' collection efforts. We did so because various aspects of the draft bill would have taken immediate effect, and we could not ensure compliance immediately. Once HB 1205 passed, it was clear to us that we could not maintain the same scope and volume of operations because we could not comply with the 10-day return rule with our program as it was then constructed, and we were uncertain as to whether other aspects of our existing petition circulation processes are permissible under HB 1205. To date, we still have not resumed our paid petition circulation process—with one limited exception.

13.    To support our petition drive, we work with various vendors. We use one main paid petition circulation vendor. To staff our project, the vendor has hired personnel and rented office locations and otherwise incurred costs that affect the service fees we are responsible for under our contract. This vendor's work remains shut down, but we are currently still responsible for paying the vendor hundreds of thousands of dollars per month. In addition, the most valuable resource we have on a campaign is time. Every day we cannot collect petitions is a day we cannot get back, and makes it more likely that we will not have the time and resources necessary to

ramp up our paid petition program quickly enough to gather enough petitions to qualify for the ballot.

14. I consider us as having effectively shut down our paid petition circulation process. The week before HB 1205 passed, our main vendor collected 18,443 petitions. We had ramped up signatures collected per week each week before this and planned to continue to scale up each week into July. Instead, our petition collection has plummeted by 88%—down to 2,230 petitions last week. The reason we are collecting even this small number of petitions is that, shortly before HB 1205 passed, our main vendor hired a subcontractor, and we elected to continue their work as we could not cancel the contract, and we believed the subcontractor's volume of work would be small enough that we had the capacity to comply with the ten-day provision.

15. To qualify for the ballot, we must collect 880,062 valid signatures statewide. We cannot possibly qualify unless we significantly scale up our operations as we had originally planned, but we cannot be confident that we could do so quickly while complying with the ten-day return provision for each and every petition. Even assuming the ten-day return provision was stopped from going into effect, it will almost certainly take us around six-to-eight weeks from that point to return to the 18,000 petition per week level we had previously achieved, let alone to increase our collection rate to what we need in order to qualify for the ballot (an average of

approximately 6,500 petitions per day/45,500 petitions per week between today and the end of the year)r.

16. To explain why the ten-day return provision has had such a significant impact on our operations—especially when combined with the various other civil and criminal penalties set out in HB 1205—it is helpful to understand some of the logistics of running a petition campaign in Florida.

17. As explained in my initial declaration, prior to the passage of HB 1205, under the 30-day framework for returning petitions, we originally planned to batch petitions weekly and put each batch through multiple internal quality control processes. For example, our main petition circulation vendor would scan all petitions it collected, and then conduct quality control efforts to ensure petitions were valid, and identify any areas for improvement in collection including ensuring that circulators are collecting all needed information, or catching potential issues of fraud. It would then send all petitions to a third-party validation vendor, who would again scan all petitions, and conduct a similar quality control effort. Those batches were then sorted and mailed to the appropriate counties.

18. After we saw proposed bills that reduced the return deadline to ten days, we started mailing petitions three days a week to help prepare to streamline processes and identify challenges posed by a ten-day return deadline. Even doing this was a serious challenge and rushed our internal validation process. We also determined that

7

there is insufficient time to do the quality control processes set out above and safely meet the ten-day return requirement. Instead, FDH has been forced to eliminate these internal quality control measures, and instead begin mailing petitions to counties on a daily basis.

19. In addition to impeding quality control efforts, this also impedes our campaign efforts in multiple ways.

20. For example, one of our vendors previously could look up each person who had signed a petition to determine the congressional district in which the voter resided. We needed this information to track progress to achieving required petition collection thresholds in each congressional district. This allowed us to, in real time, focus and shift collection as needed to qualify for the ballot. We no longer have time to do this, and so we have to wait—usually for weeks—until county supervisors of elections verify submitted petitions and provide congressional district information to us.

21. In addition, as explained above, our vendors used to scan a copy of each petition we collected before we submitted it to a county supervisor of elections. This allowed us to address any discrepancies that can arise as a normal part of the process. For example, a county might report that we returned only 98 petitions when we, in fact, submitted 100. This can happen because of simple issues like two petitions being stuck together or a simple paperwork error at the supervisor of elections. Given the

8

volume of petitions at issue, even a very low rate of commonplace human error can affect many thousands of petitions over the course of a campaign. But we no longer are scanning and keeping copies of petitions. In part, this is because we simply do not have adequate time to do so, and, in part, it is because HB 1205 makes it a felony for a person to "retain" a voter's "personal information," including a voter's signature. Our vendors are unsure whether they are lawfully allowed to retain copies of petitions containing this information, and the State and county supervisors are not required to issue new forms or guidance until June 1. Without retaining petition forms, we cannot catch county processing errors or protect ourselves from any future allegations that we mishandled a given set of petitions.

22. Even with streamlining (and worsening) our processes in these various ways, it is still extremely challenging to ensure that petitions collected across Florida are gathered and transmitted to the appropriate supervisor of elections within ten days.

23. When the 30-day return rule was in effect, we would typically try to avoid mailing large batches of petitions in a single delivery, to avoid the risk of large penalties if, for example, the mail was misrouted. Now, we have to mail petitions as quickly as we can. Particularly as we ramp up, we may be sending 500-1000 petitions to some supervisors on a daily basis. On occasion, we may send even more, such as if we were able to gather thousands of petitions at a major concert or event in Miami Dade.

24. This creates the risk of enormous penalties. For example, if we mail 1,000 petitions to a county, and mail is delayed two days, such that the mail is received 12 days after the voters signed, FDH will be subject to a $100,000 penalty. Or to give another example, FDH expects that it will need to collect 1.3 million petitions to ensure that it collects enough valid petitions to qualify for the ballot. If just 1% of those petitions are delivered one day late, the State could assess FDH with a $650,000 penalty for that single issue alone.

25. With such a tight turnaround, even mundane issues beyond routine mail delays could result in many thousands of dollars in penalties. For example, some counties use P.O. Boxes rather than physical addresses for receipt of petitions. If the county checks the P.O. Box once a day in the morning and our petitions arrive in the afternoon, the county will designate our petitions as arriving the day after the petitions were actually delivered. I am aware that this kind of delivery date discrepancy has occurred already (in Polk County). In this instance, our internal tracking showed that a batch of petitions was delivered one day *before* the county recorded receipt. Even a single day discrepancy exposes FDH to significant penalties.

26. The issue is compounded by the fact that HB 1205 ties the ten-day return provision to the date the petition is received by the county supervisor in the county in which the voter resides. Sometimes, voters list the wrong county on their petition. In my experience, for example, a voter who has moved to the Orlando area may assume

they live in Orange County when, in fact, they live over the county line in Seminole or Osceola County. In these cases, FDH will return the petition to the county the voter lists on the petition—which is *not* the county in which the voter resides.

27. Under our internal validation processes, FDH may identify that the voter is registered in a different county than the one listed on the petition, but we must return the petition to the county identified by the voter, because Florida law requires a sponsor to "submit signed and dated forms to the supervisor of elections for the county of residence listed by the person signing the form for verification of the number of valid signatures obtained." Fla. Stat.§100.371(11)(a). We then have to wait until the county completes its verification process and informs us that we delivered some petitions from voters who resided in other counties to reroute the petition. This is typically weeks after delivery to the county, because counties cannot process petitions instantaneously. Delay is inevitable when our campaign is submitting hundreds or thousands of signatures a day, other initiative campaigns are doing the same, and counties are also processing candidate petitions. Through no fault of FDH's own, we will submit some petitions to the "wrong" county and have no opportunity to fix the issues within ten days of the voter's signature.

28. HB 1205 has affected our petition drive in other ways as well. As explained in my initial declaration, prior to HB 1205, we used a process where we could provide voters with a pre-filled petition form, which autopopulated the voter's name and address information based on publicly-available information, leaving it to the voter to sign and date the petition if they wished to return it. This process was very successful, because it avoids common technical issues that can result in petitions being rejected, such as voters writing in a nickname or maiden name instead of their legal name, or miswriting address information.

29. This process was active for a few months, during which time we gathered approximately 4,900 petitions, with a validity rate of 97%--which is extremely high compared to other petition circulation options. This approach was also much less costly than alternatives. Now that HB 1205 has prohibited "prefilling" information on petitions, we had to cancel this program.

30. On May 14, pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury the foregoing is true and correct.

_____
Mitchell Emerson
Executive Director &
Campaign Manager
Florida Decides
Healthcare, inc.