## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

| | |
|---|---|
| FLORIDA DECIDES HEALTHCARE, INC., *et al.*, <br><br> *Plaintiffs-Intervenors*, <br><br> v. <br><br> CORD BYRD, in his official capacity as Secretary of the State of Florida, *et al.*, <br><br> *Defendants*. | Case No.: 4:25cv211-MW/MAF |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
## FIRST MOTION FOR PRELIMINARY INJUNCTION

Since 1968, the Florida Constitution has "reserved to the people" of Florida "[t]he power to propose the revision or amendment of any portion or portions of this constitution." Fla. Const. art. XI, § 3. This "'self-executing' constitutional provision . . . was adopted to bypass legislative and executive control and to provide the people of Florida a narrow but direct voice in amending their fundamental organic law." *Browning v. Fla. Hometown Democracy, Inc., PAC*, 29 So. 3d 1053, 1063 (Fla. 2010). The people of Florida have used this power thirty-six times—making changes to their state's foundational document to address public concerns such as mandating universal pre-K and banning gerrymandering.

In turn, the State has serially imposed new administrative burdens and ever mounting costs and penalties on initiative proponents. But the State's latest attack

on the people's initiative power—HB 1205—violates the U.S. Constitution. Though the ballot initiative power is a creature of state law, restrictions on its exercise implicate the First Amendment: "If the State chooses to tap the energy and the legitimizing power of the democratic process, it must accord the participants in that process . . . the First Amendment rights that attach to their roles." *Republican Party of Minn. v. White*, 536 U.S. 765, 788 (2002) (quotations omitted). Accordingly, "[t]he circulation of an initiative petition" is "core political speech." *Meyer v. Grant*, 486 U.S. 414, 421–22 (1988) (quotations omitted). As such, any restrictions on that activity must meet the "well-nigh insurmountable" burden of "exacting scrutiny." *Id.* at 420, 425. Applying such scrutiny, the Supreme Court has invalidated laws that criminalize paying petition circulators, *id.* at 417, laws that require circulators to be registered voters or to wear identification badges, and laws that require the disclosure of personal petition circulator information. *Buckley v. ACLF*, 525 U.S. 182, 197, 200, 204 (1999).

Because HB 1205's challenged provisions violate the U.S. Constitution, Plaintiffs Florida Decides Healthcare ("FDH"), Smart & Safe Florida ("Smart & Safe"), Mitchell Emerson, and Jordan Simmons (together, "Plaintiffs") move for a preliminary injunction, enjoining Defendants—the Attorney General, the State

Attorneys, and the Secretary of State—from implementing specific provisions of HB 1205.[1]

Plaintiffs initially filed a motion for a temporary restraining order challenging certain provisions of HB 1205. Per the Court's order, ECF No. 70, Plaintiffs have converted that motion into a motion for preliminary injunction, addressing the same provisions. For judicial efficiency, Plaintiffs, including intervenor Safe & Smart, now submit this as a joint motion along with additional evidence in support. Other provisions of HB 1205 take effect July 1st, and Plaintiffs intend to seek relief enjoining enforcement of those provisions in advance of that date.

I.    **Statement of Facts**

The Florida Constitution reserves to the people the power to propose constitutional amendments by initiative, independent of the Florida Legislature. *See* Fla. Const. art. XI, § 3. At the center of the initiative process are initiative sponsors like FDH and Smart & Safe (collectively the "Sponsors")—organizations or individuals who draft proposed measures and lead campaigns to qualify them for the ballot. These sponsors coordinate signature collection efforts, conduct public education, and bear the financial and legal responsibility to comply with complex state regulations. Over the last two decades, sponsors and voters harnessed the

---

[1] At this time, Plaintiffs do not seek a preliminary injunction against the Supervisors. Any reference to "Defendants" throughout this memorandum does not include the Supervisors of Election.

initiative process to pass widely popular reforms opposed by the State's leadership.

The Florida Legislature responded to these successful initiatives by systematically making it harder for Floridians to exercise their initiative rights. *See* ECF No. 19 ¶¶ 55–61. What was once a relatively accessible avenue for civic participation has increasingly become a high-cost, high-stakes legal minefield, paved with deliberate legislative roadblocks designed to silence dissent and consolidate power. HB 1205, enacted on May 2, 2025, is the latest installment in the Legislature's ongoing effort to suppress the voices of Floridians using the initiative process to speak, advocate, organize, and amend their state constitution. The law imposes new draconian procedural hurdles, financial obligations, and criminal penalties rendering Florida's initiative process effectively impassible.

While several of HB 1205's provisions are unconstitutional, the following cause immediate and irreparable injury to Plaintiffs that should be enjoined without delay, pending further relief:

- (1) the Severe and Punitive Fines, Fla. Stat. § 100.371(7)(a)1–3, (8), and (10) (2025), which authorize steep, uncapped financial penalties for minor errors or delays in petition submissions, severely burdening grassroots political activity;

- (2) the Ten-Day Return Time, Fla. Stat. § 100.371(7)(a)1–3 (2025), which drastically shortens the deadline for delivering signed petitions

to supervisors of elections from 30 days to just 10, making timely compliance virtually impossible for many organizations; and

- (3) the Vague Criminal Penalties, Fla. Stat. §§ 100.371(9), 104.185(2), and 895.02(8)(d) (2025), which expose petition circulators to unclear and overbroad criminal liability—including potential racketeering charges—without clear notice of what conduct is prohibited, chilling protected political expression.

Consider each of these three categories.

## A. HB 1205 Imposes Severe and Punitive Fines.

HB 1205 imposes multiple fines related to the delivery of petition forms— most purely procedural in nature:

- If a sponsor or petition circulator fails to deliver a petition form to the proper county within ten days of the voter's signature, the sponsor is subject to fines of $50 per day of delay, with no cap, regardless of whether the Supervisors, the mail, or voters caused the delay. Ch. 2025-21, § 6, at 14, Laws of Fla. For any "willful" delay in delivery, the sponsor is also subject to an additional $2,500 fine per petition. *Id*.

- If a sponsor or petition circulator does not submit a collected petition form until after the signature return deadline (February 1 of the year of the general election), the sponsor is subject to a fine of $100 per day, up to a $5,000 cap, plus an additional $5,000 fine per petition for any "willful" delay in delivery. *Id.*

5

- If the sponsor delivers a petition to the wrong county—regardless of whether the sponsor relied on voter-provided address—they are subject to a fine of $500 per petition, with no cap, and an additional $5,000 fine per petition if the incorrect county delivery was done "willfully." *Id.*[2]

- Sponsors are strictly liable for a $5,000 fine per petition if any circulator signs another person's name, uses a fictitious name, or fills in missing information on the petition form in violation of Fla. Stat. § 104.185(2)—even if the sponsor did not authorize or have knowledge of these actions, and even though state law *compels* sponsors to submit all gathered petitions, even those the sponsor knows may not be valid. Ch. 2025-21, § 6, at 14, Laws of Fla.

- HB 1205 imposes a $50 per petition fine if a sponsor pre-populates any voter information on the petition form, even if that information is accurate, and even if the voter validates the information and signs the petition. *Id.* at 15.

These fines are severe and punitive, creating a chilling effect on petition circulators and sponsor organizations. The chilling effect is immediate and is further exacerbated by the other provisions addressed in this motion. Absent immediate relief, FDH's petition effort may be entirely dismantled and Smart & Safe

---

[2] These penalties represent a dramatic escalation from prior law, which imposed a still-significant $50 fine for delivery beyond a 30-day return period—and $250 for willful violations—especially given the volume of petitions at issue. *See* Ex. 1 ¶ 37. Exhibit cites are to ECF No. 91.

may fail to gather enough signatures to place its initiative on the 2026 General Election ballot. *See* ECF No. 19-1 ¶¶ 20, 34; Ex. 1 ¶¶ 29, 34, 35.[3]

**B. The Restrictive Ten-Day Return Time is an Administrative and Financial Burden Wholly Unrelated to Ballot Integrity.**

Defendants' immediate enforcement of the Ten-Day Return Time also creates administrative and financial hurdles to petition collection. HB 1205 requires initiative sponsors to deliver each signed petition form to the supervisor of elections in the county where the voter resides within *ten days* of signing or face a $50 per-petition per-day fine with no cap. Ch. 2025-21, § 6, at 14, Laws of Fla. Previously, sponsors had thirty days to return petition forms—which allowed sponsors significantly more opportunity to address logistical challenges, processing, and quality control. Fla. Stat. § 100.371(7)(a) (2022); *see, e.g.*, Ex. 2 ¶¶ 16–18; Ex. 1 ¶¶ 8–10. And regardless, this arbitrary deadline has no bearing on a petition's validity and a late delivered petition will still be counted so long as it is verified and reported to the Division of Elections by 5:00 p.m. on February 1 of the general election year. *See* Fla. Admin. Code R. 1S-2.0091(2)(b), (7).

HB 1205 provides no exceptions or safe harbor for good faith errors, including voter errors. Nor does the law provide any exception for logistical delays caused by supervisors—for example, when a supervisor's use of a P.O. Box, or extraordinary delay by the USPS, results in late receipt through no fault of the

---

[3] The Court "may rely on affidavits and hearsay materials" at the preliminary injunction stage. *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995).

sponsor. *See* Ex. 2 ¶¶ 25–27; Ex. 1 ¶¶ 37–45. HB 1205 thus imposes strict liability on the sponsor, even if the sponsor acts diligently and in good faith. The only exceptions are for "[statutory] impossibility of performance" or "force majeure." Fla. Stat. § 100.371(7)(b).

And while the Secretary's prior administrative rules already require that petition forms be submitted to the correct county supervisor, there was no constricted ten-day turnaround requirement, nor was there a strict penalty regime for errors. *See* Fla. Admin. Code R. 1S-2.0091(2)(c) ("The petition sponsor shall make all reasonable efforts to file in the proper county.").

The Sponsors' internal processing involves multiple steps, including circulator collection, preliminary verification, quality control, and data management. ECF No. 19-1 ¶¶ 12–16, 23; Ex 2 ¶¶ 16–23; Ex. 1 ¶¶ 11–14. These steps already require close coordination, and the shortened window compresses this workflow into a costly and logistically fragile operation. Ex. 2 ¶¶ 16–27; Ex. 1 ¶¶ 24–29, 34. Previously, the Sponsors could batch petitions weekly, allowing time to conduct these quality control measures. The new Ten-Day Return Time forces daily shipments and expensive overnight delivery to avoid penalties—substantially increasing operational costs. ECF No. 19-1 ¶¶ 23–24. Smart & Safe alone has seen an increase in costs of 370% to perform expedited quality control and estimates an increase of 300-400% in delivery costs in response to HB 1205. Ex. 1 ¶ 28.

In short, the Ten-Day Return Time imposes an unworkable burden on initiative sponsors like FDH and Smart & Safe, who must now track, process, and

deliver tens of thousands of petition forms to 67 counties in an unworkably short timeframe. Coupled with steep, uncapped fines and the rigid requirement that each petition be delivered to the correct county, this provision has already disrupted Sponsors' operations, drained resources, and chilled participation by circulators and volunteers. ECF No. 19-1 ¶¶ 22–25; Ex. 1 ¶¶ 29, 34–35.

### C. The Vague Criminal Penalties Deter Participation in Petition Circulation.

HB 1205 also amends § 895.02(8)(d) to expand the definition of "racketeering activity" to include actual or attempted "violation[s] of the Florida Election Code relating to irregularities or fraud involving issue petition activities." Ch. 2025-21, § 19, Laws of Fla. This appears to convert, at the State's discretion, any violation of the Florida Election Code related to undefined petition "irregularities" into a predicate offense for a racketeering charge.

HB 1205 also amends § 104.185 to expand the current third-degree felony for signing another person's name or a fictitious name on a petition. Now, the offense also applies to any person who "fills in missing information on a signed petition." Ch. 2025-21, § 6, at 15, Laws of Fla. HB 1205 does not define "missing information," nor does § 104.185(2), creating uncertainty as to what conduct the new provision criminalizes.

Finally, HB 1205 makes it a third-degree felony for a circulator to retain "a voter's personal information, such as the voter's Florida driver license number, Florida identification card number, social security number, or signature," Ch.

2025-21, § 6, at 14–15, Laws of Fla.—language this Court has already found un-constitutionally vague in the voter registration context. *Fla. State Conf. of Branches & Youth Units of the NAACP v. Byrd*, 680 F. Supp. 3d 1291, 1320 (N.D. Fla. 2023) ("*Fla. NAACP*"). Under this provision, it is unclear what information sponsors cannot retain. And it is also unclear whether standard petition handling practices, such as storing or transmitting completed forms, could expose petition circulators or sponsors to criminal liability. *See* Ex. 2 ¶ 9 ("During our grassroots call after HB 1205 passed, for example, multiple attendees expressed the belief that collecting petitions is now a felony."); *see also id.* ¶ 21 (explaining that FDH and its quality control vendors are no long scanning petitions to screen for dis-crepancies for fear of retaining "personal information").

These new criminal provisions apply to individuals engaged in core peti-tion-related functions, including circulating, collecting, or assisting with initiative petitions. The lack of clarity introduces substantial risk for sponsors and individ-uals like Plaintiff Simmons and Mr. Morales, who engage in petition-related ac-tivities. Circulators have expressed fear and hesitation about continuing their work due to the risk of criminal liability under HB 1205, or struggle to meet the new demanding deadlines. ECF No. 19-1 ¶ 29; ECF No. 14-3 ¶¶ 8–10; ECF No. 14-2 ¶¶ 6–7; Ex. 1 ¶ 34. This will inevitably reduce the pool of individuals avail-able to circulate petitions due to the fear of inadvertently violating the law. In fact, it already has. One FDH partner has declined to act as a petition circulator "hub." Ex. 2 ¶ 10. Volunteers have refused to continue circulating petitions. Ex.

3 ¶¶ 7–8 (explaining that "some volunteers have stopped collecting petitions altogether"); Ex. 4 ¶¶ 7–8. And Smart & Safe has already lost most of its circulators. Ex. 1 ¶ 34.

## II.   Argument

### A. Preliminary Injunction Standard.

The Court should grant a preliminary injunction if the moving party shows "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). "Although the initial burden of persuasion is on the moving party, the ultimate burden is on the party who would have the burden at trial." *FF Cosms. FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1298 (11th Cir. 2017). Accordingly, although Plaintiffs bear the initial burden of persuasion, the State bears the burden of justifying its conduct under the First and Fourteenth Amendments. *See id*. at 1298–1301.

### B. Plaintiffs Are Substantially Likely to Succeed on the Merits.

#### 1. All Plaintiffs have standing.

Plaintiffs have standing where they can show: (1) that they have suffered an injury-in-fact; (2) traceable to the defendant; and (3) can likely be redressed by a favorable ruling. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

#### a.  Plaintiffs are injured.

To establish injury in a pre-enforcement challenge, a plaintiff must show (1) that they intend to engage in protected activity that (2) "a law prohibits or otherwise unconstitutionally burdens" and (3) "that a credible threat of prosecution exists under that law." *HM Fla.-ORL, LLC v. Gov. of Fla.*, No. 23-12160, 2025 WL 1375363, at *3 (11th Cir. May 13, 2025). Similarly, for a pre-enforcement vagueness challenge, a plaintiff must show "(1) he seriously wishes to speak; (2) such speech would arguably be affected by the rules, but the rules are at least arguably vague as they apply to him; and (3) there is at least a minimal probability that the rules will be enforced." *Id.* These tests apply "most loosely where First Amendment rights are involved, lest free speech be chilled even before the law or regulation is enforced." *Harrell v. Fla. Bar*, 608 F.3d 1241, 1254 (11th Cir. 2010).

Under this standard, Plaintiffs need not allege that they "intend[] to violate a law"—they don't. *HM Fla.*, 2025 WL 1375363, at *3. Rather, Plaintiffs need only show that the law "arguably proscribe[s]" their intended speech, leading to self-censorship. *Id.*; *see also id.* ("[S]elf-censorship—that is, 'forgo[ing] expression in order to avoid enforcement consequences'—can constitute an injury for standing purposes." (quoting *Pittman v. Cole*, 267 F.3d 1269, 1283 (11th Cir. 2001)).

Finally, organizations like the Sponsors may assert claims based on direct injuries to the organization or through actual harm caused by diverting resources to address the illegal act. *See Fla. Democratic Party v. Hood*, 342 F. Supp. 2d

1073, 1079 (N.D. Fla. 2004); *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1165–66 (11th Cir. 2008). Applying these standards, all Plaintiffs are suffering severe Article III injuries, which Plaintiffs address in turn.

**Plaintiff Simmons** is undeniably engaged in protected speech: prior to HB 1205, he engaged in petitioning activity for FDH. ECF No. 14-3 ¶¶ 4–5. But Plaintiff Simmons is now unwilling to even handle petitions. *Id.* ¶ 9 ("I am not willing to take the risk of handling petitions at all."). Such chilled speech is a clear constitutional harm—the "prototypical concrete injury." *Polelle v. Fla. Sec'y of State*, 131 F.4th 1201, 1209 (11th Cir. 2025). And further, if FDH does not have a non-petitioning role available, Plaintiff Simmons will resign to "avoid criminal and civil liability." ECF No. 14-3 ¶ 9. Plaintiff Simmons's impending loss of income also passes the Article III test. *See Polelle,* 131 F.4th at 1209. (explaining that "financial loss . . . easily satisfy[ies]" the concreteness requirement).

Plaintiff Simmons's self-censorship is also reasonable, in part, due to the "severity of the potential consequences" of violating HB 1205, *HM Fla.*, 2025 WL 1375363, at *5, and because "the State of Florida arrested multiple petition circulators last year," Ex. 2 ¶ 9. Plus, because he is not a Florida resident, by continuing to petition, Plaintiff Simmons would expose FDH to massive fines. More still, because of HB 1205's vague criminal provisions, Plaintiff Simmons reasonably fears that he could face felony charges based on whatever the state decides is an "irregularity," or considers "missing" or "personal" information. *See HM Fla.*, 2025 WL 1375363, at 4 (explaining that an "[a]ct's vagueness makes

. . . self-censorship more reasonable"); ECF No. 14-3 ¶ 9 ("The law is not clear what I am and am not allowed to do . . . .").

**Plaintiff FDH** is likewise injured. FDH is currently self-censoring and has suffered both a direct organizational injury and a diversion-of-resources injury. The threat of HB 1205's sweeping penalties has forced FDH to cease many of its operations. Due to FDH's multi-tiered, statewide structure, it needs significant lead time to adjust its operations. Anticipating HB 1205's passage, FDH had to cease using paid petition outreach firms, pause some petition collection activities (i.e., forego protected speech), and hold multiple emergency calls with its teams as early as April 30, 2025. ECF No. 19-1 ¶¶ 20–21 ¶¶ 3–4, 6–7, 34; Ex. 2 ¶ 14 ("[O]ur petition collection has plummeted by 88% . . . ."). And, unless enjoined, HB 1205's Severe and Punitive Fines and Vague Criminal Penalties will also chill petition circulators from participating in FDH's petition drives. ECF No. 19-1 ¶¶ 29–30.

In fact, on May 7, 2025, the Manatee County Democratic Party, a hub that helps FDH collect petitions, informed FDH that they are shutting down operations "given the horrible new law and its confusing and punitive rules that are almost impossible to follow consistently." Ex. 2 ¶¶ 10–11. Carlos Morales, a paid canvasser for FDH, also feels compelled to scale back or even leave his role, fearing criminal or civil liability for even inadvertent petitioning mistakes. ECF No. 14-2 ¶¶ 6–7; *see also* Ex. 4 ¶¶ 7–8; Ex. 3 ¶¶ 6–7.

Further still, the Ten-Day Return Time virtually guarantees that FDH will be liable for fines that could potentially bankrupt the organization. *See* ECF No. 19-1 ¶ 32; Ex. 2 ¶ 24 (explaining that if just 1% of FDH's petitions were "delivered one day late, the State could assess . . . a $650,000 penalty"); *see also Fla. NAACP*, 680 F. Supp. 3d at 1308 (finding direct injury when law "directly impede[d]" plaintiff organizations' "mission of increasing political participation"). Taken together, the challenged provisions choke FDH's speech and all but assure that FDH will not obtain enough petitions to successfully place its citizen-led initiative on the 2026 ballot.

FDH must also divert significant resources to address the new financial liability it faces under HB 1205. ECF No. 19-1 ¶¶ 21, 23–25, 28–29. For example, the implementation of the Ten-Day Return Time, a drastic reduction from the prior 30-day deadline, requires significant coordination. In preparation for this, and to avoid liability, FDH has been forced to preemptively shut down much of its petition collection activities. *Id.* ¶¶ 20–21.

**Plaintiff Smart & Safe** has likewise suffered both diversion-of-resources injuries and direct organizational injuries. In response to HB 1205, Smart & Safe has reasonably changed its procedures to comply with the Ten-Day Return Time to avoid crippling fines. Smart & Safe has completely halted use of the United States Postal Service to deliver petitions to voters or supervisors of elections, Ex. 1 ¶ 25, is making more frequent deliveries to supervisors of elections by more

15

expensive means, *id.* ¶ 26, will decrease quality control efforts, *id.* ¶ 27, and is paying more for expedited quality control, *id.* ¶ 27–28.

All of these changes are harming Smart & Safe's ability to talk to voters. Not only do higher processing costs mean Smart & Safe has less money to talk to voters, *id.* ¶ 29, but Smart & Safe has diverted circulators from talking to voters and collecting signatures to operational positions, *id.* ¶ 24. And the uncertainty and arduous deadlines following HB 1205 have resulted in 1,100 trained circulators leaving Smart & Safe. *Id.* ¶ 34. These effects have resulted in a 75% decrease in the number of signatures collected as compared to before HB 1205 became law. *Id.* ¶ 35.

Further, the Ten-Day Return Time guarantees that Smart & Safe will face crippling fines. Smart & Safe received a Notice of Violation for a fine of $121,850 for delays outside of its control in 2024, when the deadline was *thirty* days. *Id.* ¶ 37. And where a plaintiff has been "cited for engaging in the very behavior he intends to repeat . . . . [law enforcement's] past conduct and its threat of future enforcement is enough to meet the injury-in-fact requirement." *LaCroix v. Town of Fort Myers Beach*, 38 F.4th 941, 947 (11th Cir. 2022). While Smart & Safe certainly does not intend to violate the Ten-Day Return Time, factors entirely outside of Smart & Safe's control will inevitably result in late submissions. Ex. 1 ¶¶ 20-22, 39–45. In fact, Smart & Safe has recently learned that delays in delivery of the U.S. Mail caused the late delivery of more than 2,400 petitions to the

Volusia County Supervisor of Elections, potentially resulting in fines exceeding $749,600.[4] *Id.* ¶¶ 43–45.

Finally, as to all Plaintiffs, the Court may infer that Defendants will enforce HB 1205 because "a credible threat of prosecution inheres in any recently passed law." *HM-Fla.*, 2025 WL 1375363, at *4.

Plaintiffs have suffered concrete, particularized, actual, and imminent injuries stemming from Defendants' threatened enforcement of HB 1205.

### b. Plaintiffs' injuries are traceable to Defendants and redressable by an injunction.

Plaintiffs' injuries are also traceable to Defendants' threatened enforcement of HB 1205 and redressable by an injunction barring that enforcement. Traceability and redressability "often travel together." *Support Working Animals, Inc. v. Gov. of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021). For traceability, Plaintiffs must establish causation by showing that "their injuries are connected with" Defendants' conduct. *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1125 (11th Cir. 2019) (cleaned up); *HM Fla.*, 2025 WL 1375363, at *9 ("[W]hen a plaintiff's asserted injury flows from steps it takes to comply with a law, that injury is generally traceable to government officials with the authority to enforce that law."). To do that, Plaintiffs need only show "that there is a 'substantial likelihood' of causation." *Duke Power Co. v. Env't Study Grp.*, 438 U.S. 59, 75 n.20 (1978). In turn,

---

[4] Volusia Box 1: 1,528 petitions, delivered five days late, $50 per day, results in fines of $382,000.  Volusia Box 2: 919 petitions, delivered eight days late, $50 per day fine, results in fines of $367,600.

the redressability prong asks "whether the injury that a plaintiff alleges is likely to be redressed through the litigation." *Sprint Commc'ns Co., L.P. v. APCC Servs.*, 554 U.S. 269, 287 (2008) (emphasis removed). Under this standard, the injuries imposed on Plaintiffs by the three categories of challenged provisions are traceable to the Defendants and redressable through an injunction.

The harms caused by the Severe and Punitive Fines and Ten-Day Return Time travel together and are both traceable to the Secretary. The Secretary is responsible for imposing HB 1205's punitive fines. Fla. Admin. Code R. 1S-2.0091(2)(b). And the Secretary has in the past issued fines pursuant to the statute that HB 1205 amends. "Notice of Violation," Ex. 2 to Ex. 1. An injunction barring the Secretary from imposing fines would redress Plaintiffs' related harms.

The harms caused by the Vague Criminal Penalties are similarly traceable to the State Attorneys and the Attorney General. The State Attorneys are responsible for prosecuting crimes in their judicial districts, Fla. Const. art. V, § 17, and the Attorney General—through the Office of Statewide Prosecutor—may prosecute crimes occurring in or affecting two or more judicial districts. Fla. Stat. § 16.56(1)(c). Moreover, the Attorney General has taken the position that all election-related crimes occur in and/or affect two or more of Florida's judicial districts. At least two of Florida's District Courts of Appeal have agreed. *State v. Hubbard*, 392 So. 3d 1067, 1072–73 (Fla. 4th DCA 2024); *State v. Miller*, 394 So. 3d 164, 167–70 (Fla. 3d DCA 2024). The Attorney General has thus asserted and exercised plenary enforcement power over all crimes relating to elections. In

short, both the Attorney General and the State Attorneys are tasked with enforcing the Vague Criminal Penalties, and the harms flowing from those penalties are traceable to, and redressable by, an injunction against them.

For all these reasons, Plaintiffs have established a likelihood of standing.

### 2. HB 1205 Imposes a Severe Burden on Core Political Speech and Association, Failing Exacting Scrutiny

Turning to the merits, Plaintiffs are likely to succeed on their First Amendment claims. For various reasons, each of the challenged provisions—(1) the Severe and Punitive Fines, (2) the Ten-Day Return Time, and (3) the Vague Criminal Penalties—burden Plaintiffs' First Amendment rights to engage in core political speech and association.

HB 1205's challenged provisions impose multiple, severe burdens on Plaintiffs' ability to engage in protected speech and expressive conduct that limits their ability to convey their political message through the initiative process—violating Plaintiffs' First Amendment rights. *See Buckley*, 525 U.S. at 194–95 (cleaned up) (striking down a burden on petition circulators and initiative sponsors because the restrictions "limit the number of voices who will convey the initiative proponents' message" and "reduce[] the chances that initiative proponents would gather signatures sufficient in number to qualify for the ballot"); *Delgado v. Smith*, 861 F.2d 1489, 1494 (11th Cir. 1988) ("[A]ny degree of governmental hindrance upon the freedom of a given group of citizens to pursue the

19

initiative petition process with whomever, and concerning whatever they choose must be viewed with some suspicion.").

HB 1205's provisions suppress petition circulators' ability to convey the Sponsors' political messages, thereby limiting the number of people sponsors can reach and makes it next to impossible for sponsors, and similar organizations to collect the signatures necessary to qualify the initiative for the ballot—thus effectively preventing the question from being presented to Florida voters. Ex. 1 ¶¶ 29, 35.

But the "circulation of initiative petitions and the concomitant exchange of political ideas" are "core political speech" under the First Amendment. *Biddulph v. Mortham*, 89 F.3d 1491, 1498 (11th Cir. 1996). So when it comes to the Sponsors' petition drives, the First Amendment's protection is "at its zenith." *Buckley*, 525 U.S. at 186 (quoting *Meyer*, 486 U.S. at 422). HB 1205 limits the political expression attendant to initiative petition circulation, triggering the "well-nigh insurmountable" burden of strict or exacting scrutiny. *Meyer*, 486 U.S. at 425. HB 1205's challenged provisions fail that test.

### a. The Severe and Punitive Fines and Ten-Day Return Time are not narrowly tailored and do not serve a compelling state interest.

Because they implicate protected speech and association, restrictions on initiative circulation must meet, at the very least, "exacting scrutiny." *Buckley*, 525 U.S. at 204 (1999). That means Defendants can prevail only if the challenged provisions "are narrowly tailored to serve an overriding state interest." *McIntyre*

*v. Ohio Elections Comm'n*, 514 U.S. 334, 347(1995); *Meyer*, 486 U.S. at 425. To withstand exacting scrutiny, "the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *John Doe No. 1 v. Reed*, 561 U.S. 186, 196 (2010). Here, the State is effectively abolishing Plaintiffs' First Amendment right to free speech under the guise of addressing fraud and maintaining integrity—all while mechanisms already exist to address these concerns.

The Legislature's primary purported interest in passing HB 1205 was preventing fraud. Ch. 2025-21, at 4–6, Laws of Fla. *But see Buckley*, 525 U.S. at 203 (quoting *Meyer* and noting that "the risk of fraud or corruption, or the appearance thereof, is more remote at the petition stage of an initiative than at the time of balloting"). Yet, HB 1205's challenged provisions do not serve that interest at all, let alone narrowly.

For example, HB 1205 imposes an uncapped $500 fine per petition submitted to a county other than the one in which the signor resides. Ch. 2025-21, § 6, at 14, Laws of Fla. But submitting a ballot to the wrong county is not fraud. What's worse, Florida *requires* sponsors to submit petitions to the county marked by the voter, even if the sponsor knows it is incorrect. Ex. 1 ¶ 19. In short, penalizing sponsors for signor error does nothing to prevent fraud, but everything to prevent petitioning.

So too with the 10-day return window. A reduced return deadline does not reduce fraud—a false petition may be submitted just as quickly as a legitimate

one. A shortened timeline, however, gives sponsors like FDH and Smart & Safe *less* time to review petitions and identify potential fraud or irregularities on the front end. *See id.* ¶¶ 10–13, 24, 27; ECF No. 19-1 ¶¶ 23–24.

What's more, the State has no compelling interest in levying draconian penalties for failing to meet its arbitrarily-abbreviated deadlines because those deadlines have no bearing on a petition's validity. This is so because a late delivered petition will still be counted so long as it is verified and reported to the Division of Elections by 5:00 p.m. on February 1 of the general election year. *See* Fla. Admin. Code R. 1S-2.0091(2)(b) ("The untimely filing of a form does not invalidate the signature on the form."); *id.* § 1S-2.0091(7) ("In order for the initiative petition to be timely filed for appearance on the ballot for the next general election, the constitutionally requisite number of verified signatures must be verified and reported to the Division no later than 5:00 p.m. on February 1 of the year in which the general election is held.").

And so again, the 10-day return time does not further any state interest. Indeed, in the voter registration context, courts have found similarly restrictive deadlines constitutionally deficient. *See, e.g.*, *League of Women Voters of Fla. v. Cobb*, 447 F. Supp. 2d 1314, 1332–1333, 1341 (S.D. Fla. 2006) (granting a preliminary injunction for punishing organizations for late submissions of voter registration applications); *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1160–62 (N.D. Fla. 2012) (similar). The prohibition on prepopulated forms—which significantly reduce errors—only compounds these issues. Ex. 2 ¶

22

28; Ex. 1 ¶¶ 8–9. Moreover, because voters must still confirm their information is correct, the ban on prepopulated forms does nothing to prevent fraud.

Plaintiffs do not challenge that the state can—as it already has—sanction those who forge voter signatures on petitions or engage in similar fraud. But that is not the course HB 1205 charts; HB 1205 instead weaves a web of ruinous penalties that are already chilling speech and will destroy citizen-led initiatives entirely. So far from furthering any state interest, HB 1205's Severe and Punitive Fines and 10-day Return time only "reduce[] the number of circulators available to carry [sponsor's] message, thereby limiting the size of the audience [the sponsor] can reach." *Pierce v. Jacobsen*, 44 F.4th 853, 860 (9th Cir. 2022).

In short, HB 1205's challenged provisions obliterate protected speech and impede on core associational rights without narrowly furthering any corresponding, let alone compelling, state interest—"curtailing debate and discussion of a ballot measure" is not a compelling interest. *Citizens Against Rent Control/Coal. for Fair Hous. v. City of Berkeley*, 454 U.S. 290, 299 (1981); *see also Let's Help Fla. v. McCrary*, 621 F.2d 195, 199–200 (5th Cir. 1980). Under the exacting scrutiny standard articulated in *Meyer* and *Buckley*, the challenged provisions are not narrowly tailored to a compelling government interest and thus violate Plaintiffs' First Amendment rights to engage in political speech and association.

### 3.  The Vague Criminal Penalties in HB 1205 are Void for Vagueness.

Plaintiffs are also likely to succeed on their challenge to HB 1205's Vague Criminal Penalties because those provisions are void for vagueness in violation of the Fourteenth Amendment's Due Process Clause. The Due Process Clause guarantees that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. This means that "[n]o one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes." *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939); *see also Dream Defs. v. Gov. of Fla.*, 119 F.4th 872, 878 (11th Cir. 2024) ("A law is unconstitutionally vague if its prohibitions are not clearly defined.") (internal quotations and citations omitted).

The vagueness "doctrine guarantees that ordinary people have fair notice of the conduct a statute proscribes." *Dream Defs.*, 119 F.4th at 878 (quotations omitted). Understandably, "[v]agueness is of greater concern with laws that carry criminal penalties*." Id.* at 879. The same is true of laws that burden speech. "The First Amendment context amplifies [vagueness] concerns because an unconstitutionally vague law can chill expressive conduct by causing citizens to 'steer far wider of the unlawful zone' to avoid the law's unclear boundaries." *Keister v. Bell*, 29 F.4th 1239, 1258–59 (11th Cir. 2022) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972)); *see also Smith v. Groguen*, 415 U.S. 566, 573 (1974).

HB 1205 is infected with the evils that the vagueness doctrine guards against. HB 1205 amends Florida's criminal RICO statute to penalize—through

civil or criminal liability—undefined "election irregularities,"[5] or "missing information" in the context of political advocacy and ballot initiative activity.

First, Florida law does not define petition "irregularity," and the term is not associated with a specific, existing criminal offense. But it must be different from a "violation" because Florida law draws a distinction between "irregularities" and legal violations. Section 97.022(7)—governing the Office of Election Crimes and Security—states, "[f]or each alleged violation *or* irregularity investigated, the report must include: (a) The source of the alleged violation *or* irregularity; (b) The law allegedly violated *or* the nature of the irregularity reported." (emphasis added). This requirement to report both legal violations and "irregularities"—listed as distinct categories—indicates they are separate and independent concerns. *See Hill v. Davis*, 70 So. 3d 572, 577 (Fla. 2011) ("[S]tatutes relating to the same subject matter should be read *in pari materia*.").

But if an irregularity is not a legal violation, what is it? "Irregularities" is not reasonably understandable to a person of ordinary intelligence and invites arbitrary and discriminatory enforcement. Is it improper for someone to turn in a petition late? Is it improper for someone to circulate petitions without registering with the state? Is it improper to turn in a petition to a county other than the county

---

[5] Specifically, the law states: "'Racketeering activity' means to commit, to attempt to commit, to conspire to commit, or to solicit, coerce, or intimidate another person to commit: . . . [a] violation of the Florida Election Code relating to irregularities or fraud involving issue petition activities." Ch. 2025-21, § 19, Laws of Fla.

in which the signatory resides? The Florida Legislature clearly thinks so. Does that mean these technical violations are now criminal RICO violations? A person working with others on a petition drive may run afoul of any number of technical requirements under Florida's election code—what "violations" may lead the State to prosecute that person for criminal racketeering and seek to seize their assets under civil forfeiture provisions? This uncertainty is the essence of vagueness.

The same is true for the prohibition on filling in "missing information." Is it improper to provide voters with pre-filled petitions containing their information that they review and confirm as accurate before signing? Is it improper for circulators to help a voter fill out a petition? Sponsors have no way to know.

As for HB 1205's provision making it a third-degree felony for a circulator to retain "a voter's personal information, such as the voter's Florida driver license number, Florida identification card number, social security number, or signature," Ch. 2025-21, § 6, at 14–15, Laws of Fla., this Court has already spoken on the issue in the context of voter registration drives. *Fla. NAACP*, 680 F. Supp. 3d at 1320. Nothing about HB 1205 makes this language any less vague in this context; for that reason alone, Plaintiffs are highly likely to succeed on this challenge.

Second, if that were not enough, the challenged provisions also trigger another key vagueness concern: They fail to provide adequate notice of what conduct is prohibited and allow for selective enforcement against disfavored speakers or political viewpoints—violating Due Process and core First Amendment principles. *See, e.g.*, *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

These ambiguities lend themselves to selective enforcement, as the Attorney General or Secretary can decide, after the fact, what conduct is prohibited. *See, e.g.*, *Papachristou v. City of Jacksonville*, 405 U.S. 156, 170 (1972). This leaves Sponsors and their staff open to selective criminal prosecution.

In short, by creating uncertainty about what conduct may subject circulators to penalties, enforcement actions, or criminal investigation, the vague language in HB 1205 violates, in particular, Plaintiff Simmons's constitutional right to Due Process. Simmons' uncertainty has led him to fear that even routine activities within his role, which were previously permissible under Florida law, could now result in severe legal consequences. ECF No. 14-3 ¶¶ 7–8; *see also* ECF 14-2 ¶ 6 ("I am afraid that if I make a mistake, I will be sanctioned and possibly charged with a felony."). Similarly, these vague provisions harm the Sponsors by discouraging circulators from associating with them. *See, e.g.*, Ex. ¶ 34.

Without "fair notice" of what conduct may trigger enforcement, Plaintiff Simmons—and other circulators like Morales—face the threat of prosecution without due process. This injury is not speculative; it is immediate and ongoing, as HB 1205 is already in effect. HB 1205 is unconstitutionally vague under the Fourteenth Amendment, violates Plaintiff Simmons's right to Due Process and the Sponsors' right to associate, and must be enjoined.

### 4. The Vague Criminal Penalties are Overbroad

The Vague Criminal Penalties also present an additional constitutional concern: they are overbroad because they are vague. Vague laws "lead those

whose protected speech the statute may not in fact prohibit to silence themselves anyway, effectively increasing the statute's range of impermissible applications." *HM Fla.*, 2025 WL 1375363, at *13. Thus, when evaluating HB 1205's "sweep in [this] overbreadth challenge," the Court must "evaluate the ambiguous as well as the unambiguous scope of the enactment." *Id.* (quotations omitted).

And here, the Vague Criminal Penalties sweep broadly; their provisions arguably criminalize any error in core petition-related functions—including circulating, collecting, or assisting with initiative petitions. And these criminal penalties not only hinder the Sponsors' ability to collect enough petitions for a successful campaign, but also directly chill petition circulators' (like Plaintiff Simmons or Mr. Morales) ability to engage with the public about matters of public concern.

Weighing the Vague Criminal Penalties' unlawful sweep against their lawful sweep, the former dwarfs the latter. True, "irregularities" may pick up some genuine fraud, but that fraud is minuscule when compared to the many honest and insignificant errors the law arguably covers. For example, submitting 2,437 petitions late could be an irregularity—even if it's less than 1% of a sponsor's total. Ex. 1 ¶ 37. The same could be said for petitions submitted late because of errors by the USPS. *Id.* ¶¶ 43–45.

Plus, when it comes to personal information, there is no legitimate sweep at all. Whatever "personal information" means, if it's on a petition, it's a public record. The Legislature could have addressed this incongruity, but it affirmatively

chose not to. *See* Fla. H.R. Jour. 365–66 (Reg. Sess. 2025) (rejecting proposed amendment to make information on petitions exempt from disclosure as a public record); *cf.* Fla. Stat. § 97.0585(1)(c) (exempting certain information on voter registration forms from disclosure). Retaining information that anyone could obtain through a public records request is not criminal.

So too with missing information, the law already banned adding *false* information to a petition, and the state has no legitimate interest in banning the addition of *true* information—like when a circulator helps a voter fill out a petition. *See* Fla. Stat. § 105.185(2) (2022). Put simply, the Vague Criminal Penalties have almost no legitimate sweep and, in their vagueness, apply to swaths of activity for which First Amendment protection is "at its zenith." *Buckley*, 525 U.S. at 186 (quoting *Meyer*, 486 U.S. at 422). Defendants must be enjoined from enforcing them.

### C. Plaintiffs Satisfy the Other Preliminary Injunction Factors.

#### 1. An injunction is necessary to avoid irreparable harm.

"[D]irect penalization of protected speech, . . . for even minimal periods of time, constitutes a per se irreparable injury." *Otto v. City of Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020) (cleaned up). Here, the immediate harm to Plaintiffs is irreparable and urgent. The Ten-Day Return Time, the Severe and Punitive Fines, and the Vague Criminal Penalties are already in effect, have already disrupted the Sponsors' operations and chilled petition circulators from participating in

initiative efforts, and are irreparably suppressing Sponsors and Jordan Simmons's First Amendment rights to free speech and association.

FDH is also diverting resources to understand the numerous new requirements and avoid penalties and, as a result, has significantly paused petition-gathering efforts, losing valuable time at a critical point in the petition collection process and less than a year from the deadline for qualifying for the November 2026 ballot. ECF No. 19-1 ¶ 21. Likewise, Smart & Safe has lost circulators, redeployed others, and has already seen a decline of 75% in signed petitions gathered as a direct result of the unduly restrictive ten-day deadline and unavoidable risk of crippling fines created by HB 1205. Ex. 1 ¶ 35. Once lost, there is no way for this Court to return that time.

Further, the Ten-Day Return Time has made collecting new petitions untenable for the Sponsors. Under the prior 30-day deadline, Sponsors already used every available moment to ensure they submitted compliant petitions that county supervisors would accept. ECF No. 19-1 ¶ 23; Ex. 1 ¶¶ 10–14, 16–17, 19–21, 24–29, 34. Reducing that period to ten days has made completing the process near-impossible—particularly given the scale at which the Sponsors previously submitted petitions. *See* ECF No. 19-1 ¶ 23; Ex. 1 ¶¶ 37–46.

HB 1205's vague and unconstitutional criminal laws also irreparably harm Plaintiff Simmons.  Not only does he face a chilling effect on his First Amendment rights to free speech and association, he also risks prosecution under these vague and sweeping new criminal penalties. The threat of criminal prosecution

under an unconstitutional law—and the resulting deprivation of liberty—constitutes an irreparable injury.

Absent an injunction, Sponsors and Simmons will continue to suffer immediate irreparable harm.

### 2. The balance of hardships and the public's interest weigh in favor of a preliminary injunction.

The balance of equities and public interest weigh in Plaintiffs' favor because Defendants will suffer no harm if the Court grants the requested relief, and the public interest is served when courts protect constitutional rights. The Court considers these factors jointly when a plaintiff seeks emergency relief against the government. *Otto*, 981 F.3d at 870.

As the Eleventh Circuit explained in *Otto*, "neither the government nor the public has any legitimate interest in enforcing [] unconstitutional" laws. *Id.*; *see also KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006) (holding that, in weighing the equities, "even a temporary infringement of First Amendment rights constitutes a serious and substantial injury, [whereas] the city has no legitimate interest in enforcing an unconstitutional ordinance").

Here, Plaintiffs simply seek to continue circulating petitions under the status quo processes that have governed since FDH and Smart & Safe began their campaigns. Defendants will suffer no "injury" if Sponsors return petition within thirty days instead of ten. Nor would Defendants suffer any injury if the Sponsors, and their circulators, continue to adhere to the varying, already-stringent

requirements for petition circulation—but do so without the looming specter of exorbitant fines and racketeering charges. By contrast, the Sponsors' hardships are significant. They are forced to allocate significant resources to attempt to avoid ruinous fines—all while staff and volunteers hesitate to continue associating with them if the price of doing so is exposure to civil and criminal liability for any failure to comply with the law's exacting requirements. ECF No. 19-1 ¶¶ 20, 27, 29–30, 32, 34; Ex. 1 ¶¶ 28, 34.

Similarly, an injunction is in the public interest. It is always in the public interest to prevent the government from implementing unconstitutional laws. *See Otto*, 981 F.3d at 870.

### D. Conclusion

For all these reasons, Plaintiffs respectfully requests that the Court enter a preliminary injunction enjoining the Secretary of State, Attorney General, States Attorneys, their officers, employees, and agents, all persons acting in active concert or participation, or under any their supervision, direction, or control, and all other persons within the scope of Federal Rule of Civil Procedure 65, from implementing the following provisions of HB 1205:

- (1) the Severe and Punitive Fines, Fla. Stat. § 100.371(4)(g), (7)(a)1–3, (8), and (10);

- (2) the Ten-Day Return Time, Fla. Stat. § 100.371(7)(a)1–3; and

- (3) the Vague Criminal Penalties, Fla. Stat. §§ 100.371(9), 104.185(2), and 895.02(8)(d).

Dated: May 14, 2025

Respectfully submitted,

/s/ *Nicholas T. Steiner*

Matletha Bennette, Fla. Bar No. 1003257
Krista Dolan, Fla. Bar No. 1012147
SOUTHERN POVERTY LAW CENTER
PO Box 10788
Tallahassee, FL 32302-2788
Telephone (850) 408-4840
Matletha.bennette@splcenter.org
Krista.dolan@splcenter.org

Glenn Burhans, Jr.
Florida Bar No. 0605867
Bridget K. Smitha
Florida Bar No. 709581
Christopher R. Clark
Florida Bar No. 1002388
Liz Desloge Ellis
Florida Bar No. 97873
Hannah E. Murphy
Florida Bar No. 1032759
Matthew Bryant
Florida Bar No. 93190
STEARNS WEAVER MILLER
WEISSLER ALHADEFF & SIT-
TERSON, P.A.
106 E. College Avenue, Suite 700
Tallahassee, Florida 32301
Telephone: (850) 580-7200
gburhans@stearnsweaver.com
bsmitha@stearnsweaver.com
crclark@stearnsweaver.com
lellis@stearnsweaver.com
hmurphy@stearnsweaver.com
mbryant@stearnsweaver.com
cacosta@stearnsweaver.com
abrantley@stearnsweaver.com
aruddock@stearnsweaver.com

*Counsel for Plaintiff, Smart & Safe
Florida*

Bradley E. Heard**
Avner Shapiro*
Nicholas Taichi Steiner*
SOUTHERN POVERTY LAW CENTER
1101 17th St NW Ste 550
Washington, DC 20036
bradley.heard@splcenter.org
Avner.shapiro@splcenter.org
nick.steiner@splcenter.org

Frederick S. Wermuth
Florida Bar No. 0184111
Quinn Ritter
Florida Bar No. 1018135
KING, BLACKWELL,
ZEHNDER & WERMUTH, P.A.
25 E. Pine Street
Orlando, FL 32801
Telephone: (407) 422-2472
Facsimile: (407) 648-0161
fwermuth@kbzwlaw.com
qritter@kbzwlaw.com

Ben Stafford*
ELIAS LAW GROUP LLP
1700 Seventh Ave., Suite 2100
Seattle, Washington 98101
Telephone: (206) 656-0177
bstafford@elias.law

Emma Olson Sharkey*

33

ELIAS LAW GROUP LLP
250 Massachusetts Ave. NW, Suite 400
Washington, D.C. 20001
Telephone: 202-968-4490
eolsonsharkey@elias.law

*Attorneys for Plaintiffs*

*\*Admitted pro hac vice*
*\*\*Pro hac vice application* forthcoming

## CERTIFICATE OF SERVICE

I hereby certify that on May 14, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the counsel of record in this case.

/s/ *Frederick S. Wermuth*
Frederick S. Wermuth
Florida Bar No. 0184111

*Attorney for Plaintiffs*

## CERTIFICATE OF WORD COUNT

The undersigned certifies on this 14th day of May, 2025, that this document complies with word limits set forth in Rule 7.1(F), N.D. Fla. Loc. R., and contains 7,982 words which includes the headings, footnotes, and quotations, but does not include the case style, signature block or Certificates of Word Count and Service.

/s/ *Frederick S. Wermuth*
Frederick S. Wermuth
Florida Bar No. 0184111

*Attorney for Plaintiffs*

34