# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

| | |
|---|---|
| FLORIDA DECIDES HEALTHCARE, INC., *et al.*,<br><br>              *Plaintiffs*,<br>     v.<br>CORD BYRD, *et al.*,<br><br>              *Defendants*. | No.: 4:25-cv-00211-MW-MAF |

SMART & SAFE FLORIDA, *et al.*,

              *Intervenor-Plaintiff*,
     v.

CORD BYRD, *et al.*,

              *Defendants*.

LEAGUE OF WOMEN VOTERS OF FLORIDA, *et al.*,

              *Intervenor-Plaintiffs*,
     v.

CORD BYRD, *et al.*,

              *Defendants*.

**DECLARATION OF CECILE SCOON ON BEHALF OF INTERVENOR-PLAINTIFF THE LEAGUE OF WOMEN VOTERS OF FLORIDA AND <u>THE LEAGUE OF WOMEN VOTERS OF FLORIDA EDUCATION FUND, INC.</u>**

1

I, Cecile Scoon, pursuant to 28 U.S.C. § 1746, declare that the following statements are true and correct to the best of my knowledge and belief:

1. I submit this declaration on behalf of Intervenor-Plaintiffs the League of Women Voters of Florida, Inc. and the League of Women Voters of Florida Education Fund, Inc. (together, the "League" or "LWVFL")

2. I have served as the Co-President of the League since 2023. Prior to that, I served as President of the League from 2021 to 2023.

3. I have been a member of the League since about 2000.

4. The League has 29 local leagues across the State of Florida, ranging from Pensacola down to the Keys, and thousands of members statewide.

5. The League's mission is to encourage voter participation, educate voters on issues of public import, and advocate for legislative changes and policies for the public good.

6. Collecting petitions in support of citizen-led ballot initiatives is one of the major tools the League uses to pursue its mission.

7. Since the mid-1990s the League has supported citizen initiatives, mobilized thousands of volunteer petition collectors, and gathered hundreds of thousands of petition forms.

8. The League also trains its volunteers on collecting petition forms. This training includes instruction on the state-law requirements related to petition

collection. The League will only send volunteers into the field after providing them with training.

9. The League relies exclusively on volunteers for petition collection; it does not use paid circulators, nor does it have permanent staff to collect petitions.

10. HB 1205/SB 7016 (the "Law") significantly hinders the League's ability to pursue its mission through support of citizen-led ballot initiatives. Since the night the Law passed in the Senate, the League has heard concerns from volunteers concerning the Law's potential impacts. Already, volunteers have told the League that they are hesitant to participate in petition-collection efforts if the Law remains in place.

11. The Law imposes near insurmountable burdens on the League by introducing new requirements for volunteer petition gatherers, imposing new fines and criminal penalties for good faith mistakes in the petitioning process, and placing an unworkable deadline on petition form submissions.

12. Until the Law passed, the League was collecting petitions in support of two ballot initiatives: the Provide Medicaid Coverage to Eligible Low-Income Adults Initiative and the Right to Clean and Healthy Waters Initiative.

13. But because of the new Law, the League has already been forced to discontinue its petition collection efforts in support of the Clean Water initiative, as requested by the sponsors that are concerned about the potential deleterious impact

of the Law's new requirements. The League is considering whether to completely stop collecting petitions at all and/or significantly scale back its collection after July 1, 2025, the effective date for the new Law's circulator registrations with the state. In recent days, the League has received phone calls and emails from numerous League volunteers concerned about the new Law's impact on them. Volunteers worry that they will accidentally violate the Law's requirements and expose themselves to criminal liability. Volunteers have also expressed concern about providing information like the last four digits of their social security numbers to the state.

14. These impacts will only grow and compound as time goes on. Indeed just days after its effectuation, it is already clear that the League will lose vital volunteers due to the Law's onerous requirements and draconian punishments.

15. The Law's requirements that volunteer petition gatherers register as circulators with the Secretary of State and undergo training (if they wish to collect more than 25 petition forms from non-family members), will deter volunteers from participating in the League's operations and at a minimum slow down the League's process of training volunteers and putting them into the field.

16. Already, the League has heard from volunteers who are now afraid to participate in the League's efforts because of the new registration requirements.

Absent relief from this Court, the League expects to lose its volunteer petition gatherers throughout the state.

17.  The Law also requires volunteers to provide a raft of personal information to register, including the last four digits of their Social Security number. Volunteers have already told the League that they do not want to provide such personal details to the state. The League has heard volunteers express similar concerns in the past regarding other laws that require members to turn over their names and personal identifying information. This has deterred volunteers from supporting the League's work. The League expects this requirement to do the same: as word of the Law spreads, this requirement will further deter League volunteers from participating in petition collection.

18.  The registration and training requirements also impact the League in its own right. The League must now walk its volunteers through the state's circulator registration and training process and answer volunteers' questions about the process, including sensitive questions related to potential felony convictions or U.S. citizenship. The League has already held training on this topic, and fields questions about this on a daily basis. This has required the League to devote time and resources away from other time-sensitive issues.

19.  Right now the League is preparing for its convention and has multiple grant deadlines it has to meet, so the time diverted away to addressing the issues

arising from the new Law and planning for any additional costs the League may have to bear, has been a drain on the organization's limited resources.

20. Likewise, the Law's requirements that petition volunteers sign oaths affirming that they are U.S. Citizens, residents of Florida, and do not have felony convictions (or have had their voting rights restored), will cause the League's volunteers to hesitate to volunteer in the first place. Many individuals, including some League volunteers, are unsure whether they have a felony conviction and whether they have had their voting rights restored.

21. Many of volunteers' concerns stem from the fact that many of the Law's provisions are not clear about what they prohibit and whom they apply to. For example, the Law creates felony liability for anyone working "on behalf of a sponsor of an initiative petition" who "fills in missing information on a signed petition." However, the Law does not define "missing information" or "on behalf of a sponsor." As a result, volunteers are concerned that they may be guilty of a felony if they, for example, assist someone with vision impairment in filling out a form. The League's volunteers have also expressed concern that this may force them to participate in a violation of federal disability laws by denying assistance to people with disabilities. This is not a theoretical concern: assisting people with disabilities is a large part of the League's outreach effort.

22. The Law's vague provisions also create a logistical headache for the League. As discussed, the League trains each of its volunteers on the legal requirements for petition collection before sending them out into the field. Members and volunteers expect the League to have a clear plan for legal compliance; they do not accept a fly-by-night approach to the law. In recent days, the League has had to turn its work upside down to meet the immediate needs of its members to give them guidance about the Law, diverting resources from other organizational priorities. First, the League has had to discuss and debate the meaning of the Law so it can, to the extent possible, determine what the law means. Next, the League will need to create trainings for its members on these vague provisions and field volunteers' questions about what they mean. This will require delaying or canceling other scheduled League events related to competing organizational priorities.

23. The Law's wholesale exclusion of non-Florida residents, non-citizens, and individuals with felony convictions from collecting petitions harms both the League's volunteer recruit and voter outreach efforts. Many of the League's volunteers are "snowbirds," who split their time between Florida and another state. The League also relies on volunteers from other states to support its efforts. Some volunteers also lack U.S. citizenship or have felony convictions. By excluding each of these groups, the Law narrows the pool of volunteers the League can use to support its petition-collection efforts.

24. The exclusions also limit the communities of voters the League can reach. For instance, League members with felony convictions are a necessary bridge between the League and the community of people with felony convictions who have had their voting rights restored. These volunteers possess the "street cred" to earn the trust of these voters and engage them in a discussion on signing a petition form. Without the ability to work with volunteers with a criminal history, the League will be cut off from these communities entirely.

25. The Law's new 10-day deadline for returning petition forms creates a significant burden for the League and its volunteers. When the League collects petitions, it engages in a rigorous compliance review to ensure that petition forms are filled out accurately and in conformance with existing requirements. This process will often include calling petition signers and asking them to come to my law office, located downtown, so that they can fill in any information that is missing or incorrect on otherwise-completed forms. For example, sometimes a voter mistakes the word "county" for "country" and writes "USA" on the form. When the return deadline was 30 days, this process was arduous, but the League was able to conduct compliance review and return petitions on time.

26. The 10-day deadline now makes it impossible for the League to conduct adequate compliance checks. In order to ensure petitions are turned in before the new deadline, the League and its volunteers must deliver forms to county supervisors

almost as quickly as they are collected. This problem is further compounded by the Law's imposition of new requirements for petition forms, including the requirement that petition circulators include a signed affidavit with each petition form. This new deadline will guarantee that the League will be forced to turn in at least some petition forms that are incomplete or incorrectly completed.

27. The League's volunteers will also be deterred from participating in petition collection because of the possibility of investigation by the Office of Election Crimes. Under the Law, if any county supervisor discovers that greater than 25% of the forms turned in are invalid, they must make a referral to the Offices of Election Crimes, who will then conduct a preliminary investigation of any individuals or organizations involved in collecting petitions. As described, the Law makes it more likely that volunteers will turn in forms that are not valid. This catch-22 for volunteers will hinder the League's recruitment efforts and ultimately its ability to collect petition forms in support of ballot initiatives.

28. The Law's potential fines for late-returned forms will also hinder the League's pursuit of its mission. The League highly values its relationships with petition sponsors and does everything it can to maintain its reputation as a trusted source of grassroots support in citizen-initiative campaigns. If sponsors incur substantial fines because of forms returned late by the League's volunteers, that will damage relationships and limit sponsors' willingness to work with the League.

29. Absent relief, the harm to the League and its volunteers will be immediate. The League must start to train its volunteers immediately. Already, the League has hosted a lunch-and-learn on the new Law. In just the last two days, the League issued guidance to each of its members on the new Law. Projects like this require time and resources that would otherwise be devoted to other priorities, including petition collection itself.

30. In two weeks, the League will hold its biannual statewide convention, attended by members of local leagues throughout the state. Currently, the convention's agenda devotes significant time to discussions of the new Law. This distracts from other pressing organizational matters that the League was planning to discuss at this meeting, including the approval of by-laws and elections of new officers.

31. The League must also immediately start updating its compliance review process for petition forms. As described, the Law provides the League with only 10 days from the time a voter signs to turn in a petition form and imposes a raft of new requirements on those forms. This means the League needs to determine how it can best navigate these requirements. Such an effort will require staff time, organizational resources, and consultation with counsel. This consumes time that would otherwise be spent on supporting petition circulator volunteers and educating the public on the substantive issues underlying proposed ballot initiatives.

32. The Law's blow to the morale of the League and its volunteers has been profound. The League's members are in great distress over the legislature's attempt to silence their voices and render nearly impossible work that they value deeply. If left unabated, this will destroy morale, which is essential to any successful volunteer-based campaign.

33. Both individually and together, the Law's new requirements will make it almost impossible for the League to support petition-collection efforts without risking substantial fines, criminal investigation, damaged relationships with trusted partners, and potential criminal liability for its volunteers. It will also make it much harder to recruit volunteers who have already reached out to the League with grave concerns about the Law's new requirements.

34. Given that many of the provisions go into effect July 1, 2025, the League needs to know what it can or cannot do and how it should conduct its operations.

35. In light of all this, the League is seriously considering discontinuing petition collection, especially after July 1, 2025, altogether.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 14th day of May in Panama City, FL.

*[signature: Cecile Scoon]*

Cecile Scoon, Co-President,
League of Women Voters of
Florida