IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

FLORIDA DECIDES HEALTHCARE,
INC., et al.,

     *Plaintiffs*,

v.                                Case No. 4:25-cv-211-MW-MAF

CORD BYRD, in his official capacity as
Secretary of State of Florida, et al.,

     *Defendants*.

_____/

## THE SECRETARY AND ATTORNEY GENERAL'S RESPONSE IN OPPOSITION TO PLAINTIFFS' FIRST PRELIMINARY INJUNCTION MOTION

1

**INTRODUCTION**

Florida's initiative petition process has a problem. Circulators sometimes forge voters' signatures on petitions. Sometimes they sign for the deceased. Sometimes they misappropriate voter information. Some commit identity theft. Petition sponsors fail to timely submit completed petitions to supervisors of elections, resulting in thousands of dollars in penalties. And the problems are magnified when petition sponsors use out-of-state petition circulators, contractors, and subcontractors, who lack ties to Florida and don't respect its law enforcements' subpoena power.

House Bill 1205 operates against this backdrop. The bill strengthens Florida's power to stop petition fraud and voter information misappropriation. It ensures petitions are submitted on time. And its overall goal is to give Floridians confidence that initiative petitions aren't placed on the ballot because of fraud and bad actors.

Plaintiffs attempt to enjoin various HB1205 provisions—including provisions that penalize petition circulators who "sign[] another person's name or a fictitious name" or "fill[] in missing information on a signed petition." They say that all the challenged restrictions must be subjected to "exacting scrutiny" and must fail.

Yet HB1205's regulation of the petition gathering *process* is subject to rational basis review under binding Eleventh Circuit precedent. "Exacting scrutiny" is nevertheless satisfied because HB1205 furthers the State's compelling interests in ensuring the integrity of the petition process and restoring confidence to that process through tailored solutions. This Court should thus deny Plaintiffs' motion.

# BACKGROUND

## I.    Plaintiffs' Lawsuit, Categories, and Motion

Plaintiffs challenge several provisions of HB1205. As pled by the lead Plaintiffs, Florida Decides Healthcare, they sort the provisions into seven "categories." Doc.19 ¶ 73. The categories range from petition circulator requirements (called the "**Petition Circulator Eligibility**" category), to fines provisions (called the "**Fines**" category here), to petition-return provisions (called the "**Ten-Day Return Time**" category), to criminal penalties provisions (called the "**Criminal Penalties**" category here), among others. Doc.19 ¶ 73.

In their preliminary injunction motion, Plaintiffs Florida Decides Healthcare and Smart & Safe seek to enjoin three categories: the **Fines** category, **Ten-Day Return Time** category, and the **Criminal Penalties** category. Doc.92-1 at 4-5. To assist this Court, the Secretary and Attorney General provide a chart with this response, providing the category, statutory citation, HB1205 bill lines, and annotated text. Doc.103-1.

In short, the provisions in the three categories do the following:

- **Fines**: imposes fines for delivering completed petitions late or to the wrong supervisor's office; imposes fines for "sign[ing] another person's name or a fictitious name to any petition, or fill[ing] in missing information on a signed petition"; and imposes fines when a pre-filled petition is sent to a voter for completion.[1]

---

[1] The Secretary and Attorney General don't view Plaintiffs as seeking to enjoin the fees associated with the **Petition Circulator Eligibility** fines (which are contained in section 100.371(4)(g), Fla. HB1205 ll. 676-679). In their motion, Plaintiffs state that

- **Ten-Day Return Time**: requires petition sponsors to deliver completed petitions to the voter's supervisor of elections office within ten days after the voter signs the petition.

- **Criminal Penalties**: prevents copying or retaining voters' personal information on petitions "for any reason other than to provide such information to the sponsor of the initiative petition"; prevents "sign[ing] another person's name or a fictitious name to any petition," or "fill[ing] in missing information on a signed petition"; and expands "racketeering activity" to violating "the Florida Election Code relating to irregularities or fraud involving issue petition activities."

## II.    Problems with the Initiative Petition Process

Unfortunately, the HB1205 provisions weren't created in a vacuum. Recent years have seen increasing numbers of criminal investigations, charges, arrests, and convictions of petition circulators. Fraudulent petitions have been sent to government officials sometimes in the official's name but with a signature that doesn't belong to the official. Personal information has been stolen. Floridians have had their petitions turned in late. And significant civil penalties have been assessed against petition sponsors.

These problems were detailed in recent reports by the Florida Office of Election Crimes and Security. One details problems from 2024, Doc.103-2, and the other details problems from 2023, Doc.103-3. The reports were sent to the Governor, Speaker of

---

they are seeking to enjoin the fines in "Fla. Stat. § 100.371(7)(a)1–3, (8), and (10) (2025), which authorize steep, uncapped financial penalties for minor errors or delays in petition submissions, severely burdening grassroots political activity." Doc.92-1 at 4. Those fines are different from the **Petition Circulator Eligibility** fines, and the **Petition Circulator Eligibility** fines aren't mentioned in Plaintiffs' description of the challenged fines. Doc.92-1 at 5-7.

the Florida House, and Florida Senate President in 2025 and 2024, respectively. There was also a supplemental report, which was also sent to these officials in 2024. Doc.103-4. Notably, all three reports were sent before HB1205 passed and was signed into law. As detailed below, the legislation itself is replete with references to the Office of Election Crimes and Security, which prepared the reports.

The reports themselves discuss the "widespread petition fraud in connection with a number of initiative petitions." Doc.103-2 at 8.[2] The reports are provided with the Secretary and Attorney General's response, and the problems the reports address are only briefly summarized below.

**Late Petition Submissions.** In 2023 alone, the Office of Election Crimes and Security "reviewed thousands" of "untimely initiative petition forms" and "issued fines" "totaling approximately $34,000." Doc.103-3 at 11. Note that in 2023, petition sponsors had *thirty days* to return completed petitions to supervisors of elections. Fla. Stat. § 100.371(7)(a) (2023).

That's not all. The 2024 supplemental report notes that in one year's time, the office "issued three letters fining" one petition sponsor for "failing to timely deliver petition forms in some cases and" "failing to deliver the forms at all in others." Doc.103-4 at 16. That petition sponsor "paid over $22,000 in civil fines for violating

---

[2] Report citations go to the upper-right, blue docketed page numbers.

Florida election laws. It paid another $164,000 to the Department of State pursuant to a settlement agreement in December 2024." Doc.103-4 at 16 (citation omitted).

**Petition Circulators Filling in Petitions.** The reports detail a number of petition circulators "using voters personal identifying information to complete the initiative petition." Doc.103-3 at 10. "Some enterprising criminals" "obtain lists of personal identifying information for Florida voters and fill out the petitions, forging voter signatures." Doc.103-3 at 10. Some bad actors "don't even attempt to hide the fraud, as the handwriting is the same for each voter; some names even appear to be in alphabetical order as if they were copied directly off a list or database." Doc.103-3 at 10. As one bad actor put it: "[p]eople did that a lot. They would just fill out, people would just—fake, fake, fake, because they didn't care." Doc.103-2 at 11. Average Floridians aren't the only people susceptible to these bad actors. This happened to several staffers in supervisors of elections offices throughout the State. Doc.103-2 at 10 (Martin County, Osceola County, Duval County).

**Petition Circulators Tampering with Completed Petitions.** Circulators have "tampered with petition forms after they were signed and submitted by electors." Doc.103-2 at 9. One petition circulator stated that, after receiving a petition, the subcontractor he worked for would "use a website to verify personal identifying information" and "fill in the missing information" if "incomplete." Doc.103-2 at 9.

**Petition Circulators Committing Identity Theft.** In December 2023, Florida law enforcement "announced the arrests of four petition circulators and an outstanding

capias warrant for a fifth. All five defendants were charged with a total of 92 felony counts of theft of personal identifiable information and false swearing of voter registration information, among other charges." Doc.103-3 at 6.

**Petition Circulators Forging Signatures.** A number of circulators have "forged signatures, submitted duplicate signatures on behalf of voters, and signed for deceased voters." Doc.103-3 at 9. One bad actor "submitted petitions on behalf of 23 deceased individuals in at least four counties." Doc.103-2 at 12.

**Petition Circulators Fraudulently Inducing Petition Signing.** Voters have complained that petition circulators induced them into signing petitions, without showing them "all the" petition "verbiage" or telling them "what" the petition "was for." Doc.103-2 at 9.

**Petition Sponsors Using Out-of-State Circulators, Contractors, and Subcontractors.** The 2024 report details the issues concerning out-of-state circulators, contractors, and subcontractors. During the 2024 election, one petition sponsor used "a California-based corporation" to "conduct[] and oversee[]" its petition collection operations. Doc.103-2 at 7. It soon became apparent that the corporation illegally paid petition circulators per signature collected. Doc.103-2 at 7-8. When the State tried to get information and documents from the petition sponsor, the sponsor replied that it didn't "have custody or control of *any* of the requested documents." Doc.103-2 at 8. "Ostensibly, all petition forms collected by" the petition circulators "were submitted

to" the corporation, not the petition sponsor, "and then submitted by" the corporation "to the Supervisors of Elections on behalf of" the petition sponsor. Doc.103-2 at 8.

When the State tried to get answers from the out-of-state corporation, the corporation was "less than helpful to Florida law enforcement agencies, even when faced with a subpoena." Doc.103-2 at 8 (footnote omitted). As the report put it, the "State's ability to execute the subpoena" was "hampered by the fact that" the corporation "is not a registered business entity in Florida." Doc.103-2 at 8.

The out-of-state corporation's subcontracting of petition circulation duties with other out-of-state entities compounded the problem. To assist with petition circulation, the petition sponsor "was able to delegate key aspects of its petition initiative activities to out-of-state entities, who then subcontracted with other individuals who were even further outside the reach of Florida authorities. These challenges made it incredibly difficult for investigators and law enforcement to investigate and prosecute subcontractors perpetuating petition fraud, let alone before the petition was certified for ballot placement." Doc.103-2 at 8.

Use of out-of-state *circulators* by the out-of-state *subcontractor* for the out-of-state *contractor* made things worse. "[M]any" "paid circulators have few if any ties to Florida and list addresses in other, sometimes faraway, states. Some appear to be transient, going from state to state to do similar work." Doc.103-2 at 8. "The out-of-state residency of key suspects and witnesses has made for significant investigative challenges." Doc.103-2 at 8. "In fact, two paid circulators arrested for petition fraud

in" Florida "also face charges for petition fraud in Kansas after leaving Florida." Doc.103-2 at 8.

*    *    *

These actions have consequences. Since 2022, there have been "17 arrests of Florida paid initiative petition circulators collecting on behalf of four different initiative petitions," and "[h]undreds of criminal investigations remain open." Doc.103-2 at 5. This is significant. One bad actor can greatly affect the initiative petition process. For example, 35,000 *validated* petitions "came from" "35 suspected" petition circulator "fraudsters." Doc.103-2 at 6.

The Office of Election Crimes and Security, moreover, "reviewed and analyzed a total of 13,059 validated petition forms" and "determined that, at a minimum, 2,650 (20.3%) should not have been validated due to statutory deficiencies or a clear mismatch between the signature on the petition and any signature on file." Doc.103-2 at 21.

It's no surprise, then, that in HB1205, the Florida Legislature included the following in the bill it ultimately passed:

> The Legislature finds that the power to propose an amendment to the State Constitution is reserved to the people of Florida consistent with s. 3, Article XI of the State Constitution. *Evidence of fraud related to the process of gathering signatures on petitions for constitutional amendments compels the Legislature to act* to protect the integrity of the ballot, ensure a valid election process, and protect the constitutionally provided initiative process.
>
> It is the intent of the Legislature to update the reasonable regulations in place for petition circulators, increase transparency and accountability for sponsors of initiative petitions, *provide prospective signatories with objective*

9

> *information regarding the impact of a proposed amendment, and deter, prevent, and*
> *penalize fraudulent activities related to initiative petitions.*

Fla. HB1205 § 1, ll. 361-375 (2025) (cleaned up) (emphases added). HB1205 also

expressly acknowledged that the:

> investigations conducted by the Office of Election Crimes and Security
> have shown that agents of political committees sponsoring initiative
> petitions engaged in illegal and fraudulent activities while gathering
> petition signatures in the lead-up to recent elections . . . .

> [and acknowledged that] the evidence brought forward indicates
> numerous instances of petition circulators being paid per signature,
> signing petition forms on behalf of deceased individuals, forging or
> misrepresenting voter signatures on petition forms, using voters' personal
> identifying information without consent, committing perjury, and
> swearing false oaths . . . .

> [and acknowledged that] sponsors, contractors, and petition circulators
> have blatantly attempted to evade investigation by delegating key aspects
> of petition activities to out-of-state entities, who then subcontracted with
> other individuals who were even further outside the reach of Florida
> authorities . . . .

> [and acknowledged that] evidence provided to the Office of Election
> Crimes and Security by supervisors of elections in several counties showed
> that petition circulators submitted petition forms on behalf of more than
> 50 deceased Floridians . . . .

> [and acknowledged that] at least one sponsor of an initiative amendment
> circulated during the 2024 General Election cycle settled a complaint with
> the Office of Election Crimes and Security for violations related to the
> petition process and agreed to pay $164,000 in fines . . . .

> [and acknowledged that] existing fines and penalties levied against petition
> sponsors engaging in, encouraging, or, at the very least, turning a blind eye
> to illegal activities related to the petition process appear to be inadequate
> deterrents.

Fla. HB1205 ll. 234-357.

### III.    Problems with Plaintiffs

Unfortunately, the declarations Plaintiffs submitted in this case don't alleviate these concerns. They exasperate them. Consider the following:

- **Out-of-State Contractors and Subcontractors.** Smart & Safe acknowledges that it uses out-of-state entities for its circulation efforts. They identify Groundgame Political Solutions, Doc.91-1 at 1 ¶ 1, which is incorporated in Delaware and has its principal address in Missouri. They also identify Vanguard Field Strategies, Doc.91-1 at 1 ¶ 2, which isn't incorporated in Florida.

- **Contractors and Subcontractors Have Outsize Control.** As the Smart & Safe declarant put it, Groundgame "circulates, gathers, processes, validates, and delivers signed petitions to [Vanguard], which in turn delivers signed petitions to Florida county supervisors of elections for verification in order to place the Initiative on the 2026 General Election ballot." Doc.91-1 at 2 ¶ 4. So, two out-of-state entities do most of the circulation, gathering, processing, etc. Missing is the petition sponsor itself, Smart & Safe. Even the Florida Decides Healthcare declarant stated that its "main vendor hired a subcontractor." Doc.91-2 at 6 ¶ 14.

- **Millions of Mailed, Nearly Completed Petitions.** Smart & Safe has sent mail to "more than 5.6 million voters using the USPS." Doc.91-1 at 2 ¶ 8. It sends these voters a "pre-filled mailed petition," which "contains information about the particular voter, including name, address, county of residence, and voter identification number," all "obtained from public sources." Doc.91-1 at 3 ¶ 9. The only things missing are the signature and signing date and date of birth. Of course, there's no guarantee that the information from the public sources is accurate. Or if the voter is getting one—and only one—petition. The Secretary knows, for instance, that voters and supervisors have complained about these pre-filled forms causing confusion and much worse; it's prompted some voters to send back two separate forms (one pre-filled, and one blank form that's included in Smart & Safe's package) and has given others an opportunity to return forms with forged signatures. Doc.103-5 at 4.

- **Languishing Petitions.** Two Smart & Safe circulators explained how difficult it would be to turn in completed petitions within two days. Doc.91-1 at 15 ¶ 2; Doc.91-1 at 17 ¶ 2. They would much rather prefer seven days, as was the case before HB1205. This raises the question of why, before HB1205, the circulators would allow the petitions to languish, for days, before being submitted by the circulators to the entity hired by the sponsor (or the sponsor's primary contractor) to coordinate the circulation effort.

- **Rogue Circulators.** Apparently, petition sponsors have little control over circulators. Florida Decides Healthcare's declarant stated that it has "no real way of controlling whether, when, and how volunteers return petitions. All we can do is attempt to provide support and guidance." Doc.91-2 at 3 ¶ 8. "But we cannot control" what "volunteers actually" do. Doc.91-2 at 3 ¶ 8.

- **Massive Submissions to Supervisors.** The same declarant stated that his organization aims to submit "6,500 petitions per day/45,500 petitions per week." Doc.91-2 at 6-7 ¶ 15. "Particularly as we ramp up, we may be sending 500-1000 petitions to some supervisors on a daily basis. On occasion, we may send even more, such as if we were able to gather thousands of petitions at a major concert or event in Miami Dade." Doc.91-2 at 9 ¶ 23. Assuming each supervisor gets an even amount, that means that each supervisor receives over 650 petitions per week—from just one petition sponsor for a statewide initiative (to say nothing of local initiatives). This makes clear that an earlier deadline to return completed petitions to the supervisors gives the supervisors more time to review, assess, and verify the information provided on the petitions rather than rushing to do their jobs.

- **Voter Information to Third Parties.** Florida Decides Healthcare's declarant stated that his organization, as well as its vendors, scan all collected petitions. Doc.91-2 at 7 ¶ 17 ("our main petition circulation vendor would scan all petitions it collected"). Those completed, collected petitions include a voter's signature. With the new petition form requirements (driver license, voter registration number, social security number, Fla. HB1205 ll. 537-546), petition sponsors and their contractors have much of the information needed to request a vote-by-mail ballot, fill out that ballot, and return that ballot with a signature. Fla. Stat. § 101.62.

And it's worth noting that Smart & Safe, one of the intervenor-plaintiffs, featured heavily in the Office of Election Crimes and Security reports. As detailed in the reports, "at least 35 individual paid circulators who likely committed fraud against Florida voters" worked for "Smart & Safe Florida" and "submitted petitions across more than a dozen counties." Doc.103-2 at 6. "[O]ver 35,000 validated petitions came from the 35 suspected Smart & Safe fraudsters." Doc.103-2 at 6. The "Duval County Supervisor of Elections," for that matter, "reported to" the Office of Election Crimes and Security "that a member of his elections staff had her personal identification information misappropriated, and signature forged on petition forms submitted by a Smart & Safe circulator." Doc.103-2 at 10. One "Smart & Safe paid circulator told law enforcement that she found electors' information, including their dates of birth, through their Facebook profiles." Doc.103-2 at 12.

This wasn't entirely surprising, because a "Do Not Buy" list—a "list circulated in the petition gathering community" that identifies bad-acting circulators—contained "18 paid circulators who submitted petitions for Smart & Safe." Doc.103-2 at 10. "Despite this, some of these individuals, and many others who are currently under active criminal investigation were widely utilized by Smart & Safe in its petition gathering and submission operations." Doc.103-2 at 12. One Smart & Safe circulator, Jessica Humphreys, submitted petitions with "names of individuals who were not registered Florida voters and appeared to be fictitious." Doc.103-2 at 16. Ms.

Humphreys *alone* submitted 3,980 petitions, and 2,064 were invalidated. Doc.103-2 at 16. She was eventually arrested. Many bad actors evade detection and arrest.

## LEGAL STANDARD

To obtain a preliminary injunction, a plaintiff must demonstrate "(1) a substantial likelihood of success on the merits; (2) that the preliminary injunction is necessary to prevent irreparable injury; (3) that the threatened injury outweighs the harm the preliminary injunction would cause the other litigant; and (4) that the preliminary injunction would not be averse to the public interest." *Chavez v. Fla. SP Warden*, 742 F.3d 1267, 1271 (11th Cir. 2014). The plaintiff must also establish that he has standing to challenge the defendant's actions.

## ARGUMENT

Plaintiffs' motion should be denied. They still have some trouble with standing. But even assuming standing, Plaintiffs fail to establish the four preliminary injunction elements, particularly the merits.

## I.    Plaintiffs' Standing Issues Persist

In their motion, Plaintiffs argue that they have standing to challenge provisions in their **Fines**, **Ten-Day Return Time**, and **Criminal Penalties** categories. But it's not that clearcut. The Secretary and Attorney General highlight standing problems in the three categories. *See generally Harrell v. Fla. Bar*, 608 F.3d 1241, 1253-54 (11th Cir. 2010).

**A.** For the provisions in the **Ten-Day Return Time** category (and its overlapping **Fines** category), Plaintiffs complain of ruinous civil penalties, potentially because of delivery problems and other circumstances out of their control. Doc.92-1 at 15. Yet there may not be a "substantial likelihood" that they will suffer such alleged harm. *Worthy v. Phenix City*, 930 F.3d 1206, 1216 (11th Cir. 2019).

Pre-existing provisions of Florida law and a new provision included through HB1205 ameliorate the fines-related concerns. Under pre-existing Florida law, delivery-related fines "may be waived upon a showing that the failure to deliver the petition form promptly is based upon force majeure or *impossibility of performance*." Fla. Stat. § 100.371(7)(b) (emphasis added). HB1205 adds another good-faith protection for petition sponsors: "[i]f the sponsor of an initiative petition discovers a violation of" section 100.371 "and reports the violation as soon as practicable to the secretary, the sponsor may not be fined for such violation." Fla. HB1205 ll. 781-784. Taken together, Florida law thus provides safeguards for those who are diligent and for those who—through no fault of their own—may not be able to comply with certain requirements. As such, there's no guarantee that Plaintiffs will face the kind of injuries they allege.

**B.** Consider also the **Fines** provision that applies where a circulator "signs another person's name or a fictitious name to any petition, or fills in missing information on a signed petition." Doc.103-1 at 1. As far as the Secretary and Attorney General can tell, not one of Plaintiffs declarants stated that they have ever signed another person's name or a fictitious name on a petition, or filled in missing information

"*on a signed petition*," or ever intend to. Plaintiffs thus don't have standing to challenge a statutory provision they haven't previously violated and are unlikely to violate. *See generally LWVFL v. Byrd*, 4:23-cv-216, 2023 U.S. Dist. LEXIS 237881, at *17-18 (N.D. Fla. July 11, 2023).

**C.** Finally, one **Criminal Penalties** provision makes it a crime to "sign[] another person's name or a fictitious name to any petition," or "fill[] in missing information on a signed petition." Doc.103-1 at 3. Again, as far as the Secretary and Attorney General can tell, not one of Plaintiffs declarants stated that they have ever signed another person's name or a fictitious name on a petition, or filled in missing information "*on a signed petition*," or ever intend to. So, again, Plaintiffs lack standing to challenge this particular provision.

## II.    Plaintiffs' First Amendment, Vagueness, and Overbreadth Claims Fail on the Merits

Turning to the first element for a preliminary injunction, Plaintiffs' claims fail on the merits. None of the provisions violate the First Amendment, and the **Criminal Penalties** provisions aren't void for vagueness or overly broad.

### A.    The Provisions Are Constitutional Under the First Amendment

The HB1205 provisions in the **Fines**, **Ten-Day Return Time**, and **Criminal Penalties** categories don't violate the First Amendment. For the most part, they are unlike the laws struck down by the U.S. Supreme Court in *Meyer v. Grant*, 486 U.S. 414

(1988), and *Buckley v. American Constitutional Law Foundation*, 525 U.S. 182 (1999). Even if they were somehow similar, the HB1205 provisions survive "exacting scrutiny."

**1.** Different initiative petition regulations receive different First Amendment scrutiny. "[A] state's broad discretion in administering its initiative process is subject to [exacting] scrutiny only in certain narrow circumstances." *Biddulph v. Mortham*, 89 F.3d 1491, 1500 (11th Cir. 1996).[3] Otherwise, rational basis review applies. *Id.*

More specifically, as the Eleventh Circuit put it, there's "an explicit distinction between" the regulation of "the initiative process in general and the power to regulate the exchange of ideas about political changes sought through the process." *Id.* at 1498 n.7. The latter kind of laws "dictate[] *who* could speak" or "*how* to go about speaking"— they concern the circulator's interaction with a prospect about an issue. *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1099 (10th Cir. 2006) (en banc). Think of the prohibition on paid circulators in *Meyer* (concerning *who* can speak) and the registered-

---

[3] Though *Biddulph v. Mortham* used "strict scrutiny" interchangeably with "exacting scrutiny," i.e., the phrase used in *Meyer*, the Supreme Court has since clarified that the two levels of scrutiny are distinct. The latter "does not require" the State to employ "the least restrictive means of achieving [its] ends," but "does require" that the ends "be narrowly tailored to the government's asserted interest." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 608 (2021). "Exacting scrutiny" is also satisfied if there's "a substantial relation between" a statutory provision "and a sufficiently important governmental interest." *Id.* at 607 (cleaned up).

voter-circulator and badge requirements in *Buckley* (concerning *how* these circulators can speak). These kinds of laws undergo "exacting scrutiny." *Meyer*, 486 U.S. at 420.[4]

But other kinds of initiative petition regulations get rational basis review. *Biddulph*, 89 F.3d at 1500. They range from criminalizing "initiative-petition signature" "forge[ry]" to signature threshold requirements. *Buckley*, 525 U.S. at 205. These "general initiative regulations" are presumptively constitutional. *Biddulph*, 89 F.3d at 1497. That's true, even if the regulations are "overly and unnecessarily burdensome," add "unnecessary risk into the process," or are "costly and time[ ] consuming." *Id.* at 1496. This lower-level review makes sense: "the Constitution does not require Florida to structure its initiative process in the most efficient, user-friendly way possible." *Id.* at 1500-01. The State can choose the process that works best for it.

Therefore, the test for "exacting scrutiny" is to see whether a regulation dictates who can speak to prospective signatories and how they go about speaking. "Most restrictions a state might impose on its initiative process would not implicate [heightened] First Amendment concerns." *Id.* at 1500.

Put another way, the test for "exacting scrutiny" isn't to see whether a regulation somehow "limit[s] the number of people sponsors can reach" or whether a regulation reduces the chances that petition sponsors will prevail at the ballot. Doc.92-1 at 20.

---

[4] *Meyer*, 486 U.S. at 420 ("We fully agree with the Court of Appeals' conclusion that this case involves a limitation on political expression subject to exacting scrutiny. *Buckley v. Valeo*, 424 U.S. 1, 45, 46 L. Ed. 2d 659, 96 S. Ct. 612 (1976).").

That can't be the test. Every regulation causes some sort of limitation, and Plaintiffs' test would completely expand the "narrow circumstances" warranting heightened review. *Biddulph*, 89 F.3d at 1500. Case law also doesn't support Plaintiffs' test.

For example, the Florida Supreme Court must review petitions for legal compliance, a process that could prevent petitions from going on the ballot. That process could have (and has had) the effect of ending petition campaigns, stopping petition sponsors from further reaching and communicating with voters, and nullifying a petition's chances of ballot approval. But that kind of regulation wouldn't be subjected to strict scrutiny under *Meyer* or *Buckley*. It would get rational basis review—and would easily survive. *Id.* at 1496, 1500-01.

The same is true with the requirement from *Initiative & Referendum Institute v. Walker*, the en banc Tenth Circuit case, that said wildlife-related citizen petitions must pass with a supermajority vote. Given this high threshold, it would chill many petition sponsors' ability to reach voters on wildlife issues, and it greatly threatens ballot success. But this regulation, like most citizen initiative regulations, undergoes lower First Amendment scrutiny. 450 F.3d at 1085.

**2.** To be sure, the HB1205 provisions in the **Fines**, **Ten-Day Return Time**, and **Criminal Penalties** categories get lower First Amendment scrutiny. They aren't like the laws in either *Meyer* or *Buckley*. They don't regulate the whos and hows of petition circulating. Rational basis therefore applies.

To be more precise, the **Fines** and **Ten-Day Return Time** provisions are just "general initiative regulations," which impose structure on the petition circulation process. *Biddulph*, 89 F.3d at 1497. These provisions don't touch how a petition circulator communicates or interacts with a voter. They don't "regulate the exchange of ideas about political changes sought through the" petition "process." *Id.* at 1498 n.7.

Preventing a petition circulator from fraudulently signing, or filling in missing information from a signed petition, doesn't regulate the exchange of ideas. *Buckley*, 525 U.S. at 205 (expressing support of such laws). So too with fines associated with pre-filling petitions and the **Ten-Day Return Time** provisions. These provisions don't touch any exchange of ideas, either.

Tellingly, in their description of the **Fines** and **Ten-Day Return Time** provisions, Plaintiffs emphasize the harm on the sponsor and not the circulator. They discuss the "severe and punitive" nature of the fines that would be assessed against the sponsor for failing to return petitions within ten days of signing, for delivering a petition to the wrong county, for falsifying information, and for pre-filling petitions. Doc.92-1 at 5-7. And they discuss the "Sponsors' internal processing" intended to avoid fines by way of "preliminary verification, quality control, and data management." Doc.92-1 at 8.

Plaintiffs' emphasis on the sponsor brings home the distinction between "the moment the circulator speaks," *Buckley*, 525 U.S. at 198, and everything else that follows. Communicating with voters is distinct from the back end of ensuring that petitions are accurate and processed in a timely way. The sponsors are generally responsible for the

back-end work. And the State gets substantial leeway in regulating the sponsor's back-end work because *Buckley*, "like *Meyer*, separate[d] petition circulators from the proponents and financial backers of ballot initiatives." *Id.* at 194 n.16.

The provisions in the **Criminal Penalties** category get the same rational basis treatment. Preventing informational theft, petition fraud, and signature forging are all within the "arsenal of safeguards" that States are allowed to use in the petition circulation process. *Id.* at 205. They don't touch the whos and hows of petition circulating, like the laws in *Meyer* and *Buckley*. They concern only the process separate and apart from any speech; circulators, volunteers, friends, family, and sponsors remain free to discuss the merits of their positions with whomever they choose.

**3.** Regardless, the provisions in each of the three HB1205 categories would survive heightened scrutiny even if it applied.

Preventing election fraud, and ensuring the integrity of the ballot, are compelling governmental interests. The Supreme Court has said so time and again. *Eu v. San Francisco Cnty. Democratic Central Comm.*, 489 U.S. 214, 231(1989) ("A State indisputably has a compelling interest in preserving the integrity of its election process."); *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (same); *Brnovich v. DNC*, 594 U.S. 647, 685 (2021) (same).

So is "maintaining fairness, honesty, and order" in the election process. *Green v. Mortham*, 155 F.3d 1332, 1335 (11th Cir. 1998). The Florida Supreme Court put it best: the State has "the duty and obligation to ensure ballot integrity and a valid election process. Ballot integrity is necessary to ensure the effectiveness of the constitutionally

provided initiative process." *State ex rel. Citizens Proposition for Tax Relief v. Firestone*, 386 So. 2d 561, 566-67 (Fla. 1980).

Here, the HB1205 provisions in the **Fines**, **Ten-Day Return Time**, and **Criminal Penalties** categories are narrowly tailored to serve those compelling interests.

To begin, the provisions in the **Ten-Day Return Time** category ensure order in the petition process and give governmental officials more time to check submitted petitions for fraud. As the 2023 Office of Election Crimes and Security report shows, petition sponsors haven't always submitted completed petitions on time, even incurring, in 2023 alone, tens of thousands of dollars in fines. *Supra*. And all three reports show an outsized need for the State to ensure that petitions are properly being validated. *Supra*. With more time, the State can better detect fraud—and not sort through troves of petitions dumped at one time, *supra*, with each day getting closer to an upcoming election. After all, as one report put it, it's "during the validity check by the Supervisor of Elections where much of the fraud is initially spotted—some by mismatched signatures, some petitions include deceased Floridians, some include incorrect personal identifying information, etc." Doc.103-3 at 10. Relatedly, the ten-day return deadline gives the irresponsible circulator less time to lose the petition; the criminal circulator less time to steal information from the petition; or the out-of-state contractors or subcontractors to do the same.

Narrow tailoring is further met, given the "impossibility of performance" consideration under Florida law and the new self-reporting defense from fines enacted

as part of HB1205. *Supra.* Together, these provisions ameliorate any fines-related concerns that the diligent sponsor might have.

The **Fines** provisions are similarly valid. The reports show that there's fraud, forgery, and information misappropriation in the initiative petition process, and the **Fines** provisions directly penalize those actions. *Supra.* Evidence in this case has already shown that there's an issue with individuals fraudulently signing petitions. *Supra.* The issue is magnified when petition sponsors are mailing millions of nearly completed petitions, requiring only a fraudulent signature and signing date and date of birth. So too is the risk that pre-filled forms contain the wrong information, or the risk that a petition sponsor mails *numerous* nearly completed petitions to the same voter. *Supra.* All of this is what time- and resource-strapped supervisors must guard against, daily.

The **Criminal Penalties** provisions withstand scrutiny, too. They directly prevent petition fraud and misconduct. Florida has a problem with petition circulators misappropriating voters' information, *supra*, and HB1205 has a provision that prevents that. Don't forget that the information protected by this retention provision (driver license number, social security number, among other personal information), is the same information that's needed to obtain a vote-by-mail ballot. Fla. Stat. § 101.62. Florida also has a problem with petition circulators fraudulently signing and completing petitions, *supra*, and HB1205 has a provision that prevents that. Florida found it difficult to enforce its laws against large, often out-of-state entities hired by petition sponsors, *supra*, so HB1205 expands the definition of "racketeering activities" to assist state law

enforcement. These are among the "arsenal of safeguards" that States can, and should be able to, use to ensure election security and integrity. *Buckley*, 525 U.S. at 205.

All told, under any First Amendment test, the challenged HB1205 provisions withstand constitutional scrutiny.

*    *    *

The HB1205 provisions are constitutional under the First Amendment.

### B.    The Criminal Penalties Provisions Satisfy Due Process

Plaintiffs contend that the **Criminal Penalties** provisions are unconstitutionally vague. Doc.92-1 at 23. They aren't. Laws are facially vague when they lack a "core meaning"—when they are "utterly devoid of a standard of conduct." *SisterSong Women of Color Reprod. Just. Collective v. Governor of Ga.*, 40 F.4th 1320, 1327 (11th Cir. 2022) (cleaned up). True, "the Constitution tolerates a lesser degree of vagueness in enactments with criminal rather than civil penalties," but the Eleventh Circuit still "recognize[s] that absolute precision in drafting laws is not demanded." *High Ol' Times v. Busbee*, 673 F.2d 1225, 1229 (11th Cir. 1982). Each **Criminal Penalties** provision survives this constitutional standard.

**1.** One provision makes it a crime to "sign[] another person's name or a fictitious name to any petition" or "fill[] in missing information on a signed petition." Doc.103-1 at 3. Plaintiffs argue that they don't know what "missing information" can mean or could mean. Doc.92-1 at 26. This isn't a strong argument.

When a voter "signs" a "petition," the voter must include on the form a first name, last name, middle name, address, city, zip code, county, voter registration number or date of birth, and then a signature, among other information. If a voter doesn't fill in these sections, it would be "missing information." One Office of Election Crimes and Security report stated that a petition circulation subcontractor would take partially completed forms and then "use a website to verify personal identifying information" and "fill in the missing information" where "incomplete." Doc.103-2 at 9.

Yet Plaintiffs seem to misunderstand the clear provision. They ask whether it's "improper to provide voters with pre-filled petitions containing their information that they review and confirm as accurate before signing." Doc.92-1 at 26. Putting aside that another HB1205 provision prevents this conduct, the answer is still no. The **Criminal Penalties** provision prevents filling in missing information "on a signed petition." Plaintiffs' hypothetical concerns conduct done "before signing." The provision is clear.

As such, the missing-information provision's core meaning, and terms, are readily ascertainable, and aren't vague.

**2.** Another provision expands "racketeering activity" to violations "of the Florida Election Code relating to irregularities or fraud involving issue petition activities." Doc.103-1 at 3. Plaintiffs question what "irregularities" mean. Doc.92-1 at 25. They also cite the statute that establishes the Office of Election Crimes and Security, which states that the office can investigate "occurrences of election law violations or election irregularities." Fla. Stat. § 97.022; Doc.92-1 at 25. Based on this statute, Plaintiffs

contend that election *violations* and election *irregularities* are legally distinct. Doc.92-1 at 25. These arguments, however, aren't convincing.

To begin, Plaintiffs rely a little too much on the Office of Election Crimes and Security statute. It is the *only* statute they cite for their proposition that violations and irregularities are legally distinct. With this argument, Plaintiffs forget "absolute precision in drafting laws is not demanded" by the constitution. *High Ol' Times*, 673 F.2d at 1229.

Instead, Plaintiffs should have looked to case law. After all, case law can clarify a statutory term's meaning. *See, e.g.*, *DeSantis v. Dream Defenders*, 389 So. 3d 413, 420 (Fla. 2024) ("Our cases and laws have used the term 'riot' outside Florida's criminal code.").

There's longstanding case law in Florida that concerns election irregularities. *See, e.g.*, *Boardman v. Esteva*, 323 So. 2d 259, 269 (Fla. 1975) (in "determining the effect of irregularities on the validity of absentee ballots cast," courts "consider[]" several "factors"); *Speigel v. Knight*, 224 So. 2d 703, 706 (Fla. 3d DCA 1969) (explaining the "different rule" that "applies to technical or procedural irregularities which occur and are challenged prior to a general election"); *Bay County v. State*, 24 So. 2d 714, 716 (Fla. 1946) ("The only irregularity shown to have occurred in this case was that the notice provided that the polls should be open from 7 o'clock A.M. until sundown."); *McLean v. Bellamy*, 437 So. 2d 737, 750 (Fla. 1st DCA 1983) ("It is obvious that the subject election was managed by the election officials in a manner other than in strict conformance with the applicable voting laws. It may well be that such irregularities were the result of negligence on the part of the election officials."); *Floridians Against Expanded*

*Gambling v. Floridians for a Level Playing Field*, 945 So. 2d 553, 559 n.4 (Fla. 1st DCA 2006) (en banc) ("Defects in the form of" initiative petition "submission are mere formal or procedural irregularities." (cleaned up, citing cases)).

There's even a section in Florida Jurisprudence titled "effect of irregularities in elections, generally." 21 Fla. Jur. 2d Elections § 139.

Best understood, "irregularities" mean "substantial [non]compliance" with provisions of the election code. *Boardman*, 323 So. 2d at 267-68. In *Boardman v. Esteva*, for example, the Florida Supreme Court reviewed 1,450 instances of irregularities in absentee ballots cast during a judicial election. *Id.* at 261. Notably absent in the case was any alleged "fraud or wrongdoing." *Id.* Even so, the irregularities alleged ranged from ballots that weren't signed, return envelopes that weren't signed, instances where the subscribing witnesses' title wasn't indicated, instances where "the names of the electors were not on record," and "clerical misprisions or omissions." *Id.* at 261-62. The supreme court considered whether the irregularities warranted changing the election results. *Id.* at 269 (in "determining the effect of irregularities on the validity of absentee ballots cast," courts "consider[]" several "factors").

With this context, "irregularities" has a clear meaning. Plaintiffs may question the wisdom of this HB1205 provision. But they shouldn't question its meaning.

**3.** Finally, there's a **Criminal Penalties** provision that relates to copying or retaining personal information on a petition:

> If a person collecting petition forms on behalf of a sponsor of an initiative petition copies or retains a voter's personal information, such as the voter's Florida driver license number, Florida identification card number, social security number, or signature, for any reason other than to provide such information to the sponsor of the initiative petition, the person commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

Doc.103-1 at 3. Plaintiffs' main argument against this provision is that this Court preliminarily enjoined a similar third-party voter registration organization regulation in *Florida State Conference of Branches & Youth Units of the NAACP v. Byrd*, 680 F. Supp. 3d 1291 (N.D. Fla. 2023). Doc.92-1 at 26. But this loses sight of an important distinction.

The 3PVRO provision in *NAACP* isn't exactly the same as the provision here, putting aside that one pertains to 3PVROs and one pertains to initiative petitions. The initiative petition provision doesn't contain the "in compliance with this section" clause that this Court found ambiguous in *NAACP*. 680 F. Supp. 3d at 1318. For reference, the 3PVRO provision provides:

> If a person collecting voter registration applications on behalf of a third-party voter registration organization copies a voter's application or retains a voter's personal information . . . for any reason other than to provide such application or information to the third-party voter registration organization *in compliance with this section*, the person commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

Fla. Stat. § 97.0575(7) (emphasis added).

Regardless, the HB1205 provision is clear. It applies to those who are "collecting petition forms on behalf of a sponsor of an initiative petition." Doc.103-1 at 3. It prevents them from transcribing or maintaining personal information on the form, like

a voter's signature. Doc.103-1 at 3. And, contrary to Plaintiffs' claim, Doc.92-1 at 28-29, not all information on a petition is a public record. Signatures aren't. Fla. Stat. § 97.0585(2). Social security numbers aren't. Fla. Stat. § 119.071(5). Nor are driver license and Florida identification numbers. Fla. Stat. §§ 97.0585(1), 119.0712(2). All told, the retention provision has a core meaning and understanding, thereby defeating any vagueness challenge. *SisterSong*, 40 F.4th at 1327.

## C.    The Criminal Penalties Aren't Overly Broad

Plaintiffs then contend that the **Criminal Penalties** provisions are overly broad. Doc.92-1 at 27. Not so. The overbreadth doctrine's "strong medicine" shouldn't be "casually employed" here. *United States v. Williams*, 553 U.S. 285, 293 (2008) (cleaned up). Its test is tough: "a statute's overbreadth" must "be substantial, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Id.* at 292. The "ratio of unlawful-to-lawful applications" must be "lopsided." *United States v. Hansen*, 599 U.S. 762, 784 (2023). That's why overbreadth must be used "sparingly and only as a last resort." *Dream Defenders v. Governor of Fla.*, 119 F.4th 872, 880 (11th Cir. 2024) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973)).

Here, Plaintiffs' challenge fails. The ratio is lopsided against them. It's plainly legitimate for the State to prevent fraud generally, fraudulent petition signings specifically, and voter information misappropriation. *Buckley*, 525 U.S. at 205. On the other side, Plaintiffs fail to identify "protected speech" that's threatened by the **Criminal Provisions**. *LWVFL v. Fla. Sec'y of State*, 66 F.4th 905, 948 (11th Cir. 2023)

(cleaned up). "[E]rrors" in petition circulation, like purposefully failing to timely deliver petitions, isn't speech, let alone protected speech. Doc.92-1 at 28. Nor is copying and retaining "personal information" from a completed petition. Doc.92-1 at 28. "[H]elp[ing] a voter fill out a petition" isn't prohibited under any **Criminal Penalties** provision. Doc.92-1 at 29. And there's an absolute safe harbor for anyone physically possessing no more than twenty-five signed petition forms (excluding those of immediate family members). Fla. HB1205 ll. 584-597 (clarifying that petition circulator requirements "may not be construed to prohibit a person from distributing petition forms designated for personal use as described in paragraph (3)(e)").

Plaintiffs thus fail to establish that the overbreadth doctrine's strong medicine is warranted.

## III. The Remaining Elements Favor the State

The other preliminary injunction elements favor the State. Plaintiffs won't suffer irreparable harm if their motion is denied. As explained above, they haven't established that they would run afoul of many HB1205 provisions. Thus, their harms, to the extent they have any, are largely speculative. Even if Plaintiffs satisfy this element, it's not dispositive: none of the four elements are controlling. *Fla Med. Ass'n, Inc. v. U.S. Dep't of Health, Educ., & Welfare*, 601 F.2d 199, 203 n.2 (5th Cir. 1979).

The balance of harms, and the public interest, greatly favor the State. If the HB1205 provisions are enjoined, the State will suffer irreparable harm—"the inability

to enforce its duly enacted plans clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018).

The public interest suffers as well. The State won't be able to effectively stop petition fraud, forgery, and bad acting—problems that exist in Florida. Doc.103-2, Doc.103-3, Doc.103-4. This will erode voter confidence in the initiative petition process and election administration. *Purcell*, 549 U.S. at 4 ("Voter fraud drives honest citizens out of the democratic process and breeds distrust of our government.").

All four preliminary injunction elements, therefore, aren't met in this case.

## **<u>CONCLUSION</u>**

This Court should deny Plaintiffs' motion for a preliminary injunction.

Dated: May 16, 2025

JAMES UTHMEIER
  *Attorney General*

/s/ William H. Stafford III
William H. Stafford III (FBN 70394)
SPECIAL COUNSEL
Sara E. Spears (FBN 1054270)
ASSISTANT ATTORNEY GENERAL
Complex Litigation Division
OFFICE OF THE ATTORNEY GENERAL
PL-01, The Capitol
Tallahassee, Florida 32399
William.Stafford@myfloridalegal.com
Sara.Spears@myfloridalegal.com
ComplexLitigation@myfloridalegal.com

*Counsel for the Attorney General*

Respectfully submitted,

Bradley R. McVay (FBN 79034)
  Deputy Secretary of State for Legal
  Affairs & Election Integrity
Ashley Davis (FBN 48032)
  General Counsel
FLORIDA DEPARTMENT OF STATE
R.A. Gray Building
500 S. Bronough Street
Tallahassee, Florida 32399
(850) 245-6511
Brad.mcvay@dos.fl.gov
Ashley.davis@dos.fl.gov

/s/ Mohammad O. Jazil
Mohammad O. Jazil (FBN 72556)
Michael Beato (FBN 1017715)
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 S. Monroe St. Suite 500
Tallahassee, Florida 32301
(850) 270-5938
mjazil@holtzmanvogel.com
mbeato@holtzmanvogel.com
zbennington@holtzmanvogel.com

*Counsel for the Secretary*

## <u>LOCAL RULE 7.1(F) CERTIFICATION</u>

Pursuant to Local Rule 7.1(F), this response contains 7,597 words, excluding the case style, signature block, and any certificate of service or certification.

/s/ Mohammad O. Jazil
Mohammad O. Jazil

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 16, 2025, I electronically filed the foregoing with the Clerk of Court by using CM/ECF, which automatically serves all counsel of record for the parties who have appeared.

/s/ Mohammad O. Jazil
Mohammad O. Jazil