IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

| | |
|---|---|
| FLORIDA DECIDES HEALTHCARE, INC., *et al.*, <br><br> *Plaintiffs-Intervenors*, <br><br> v. <br><br> CORD BYRD, in his official capacity as Secretary of the State of Florida, *et al.*, <br><br> *Defendants*. | Case No.: 4:25cv211-MW/MAF |

**PLAINTIFFS' REPLY IN SUPPORT OF
THEIR MOTION FOR PRELIMINARY INJUNCTION**

As Defendants say, Florida's petition process has a problem—namely, the State sometimes passes laws illegally restricting it. Sometimes these laws limit monetary contributions. *ACLU of Fla., Inc. v. Lee*, 546 F. Supp. 3d 1096, 1104 (N.D. Fla. 2021). Sometimes these laws favor initiative opponents over proponents. *Browning v. Fla. Hometown Democracy PAC*, 29 So. 3d 1053, 1069 (Fla. 2010). And the problems are only magnified when the State employs such laws to directly silence speech that the Supreme Court has repeatedly held to be at the First Amendment's core.

Plaintiffs' reply operates against this backdrop.

## I. Plaintiffs Have Standing

Defendants suggest that there may be "some trouble" with Plaintiffs' standing. ECF No. 105 ("Resp.") at 14. Defendants' half-hearted challenge is narrow: they don't challenge traceability and redressability. Instead, Defendants argue only that Plaintiffs have not suffered—and are unlikely to suffer—harm because Defendants "may" waive fines based on "impossibility of performance," Fla. Stat. § 100.371(7)(b), or when a sponsor "reports the violation as soon as practicable to the secretary," *id.* § 100.371(11). *But see Cauble v. Kaczmarski*, 389 So. 3d 687, 688 (Fla. 3d DCA 2024) ("[I]t is well-settled that the word 'may' is permissive."). And because, according to Defendants, Plaintiffs don't *intend* to violate the law, Plaintiffs lack standing to challenge HB 1205. Defendants are wrong in law and fact.

On the law, Defendants' premise is incorrect: Plaintiffs need not show that they have violated or intend to violate the law, or that it is "guaranteed" that the State will impose penalties. *Compare* Resp. at 15, *with HM Fla.-ORL, LLC v. Gov. of Fla.*, No. 23-12160, 2025 WL 1375363, at *3 (11th Cir. May 13, 2025) ("[N]o party wants to tell a court that it intends to violate a law, and we do not ask parties to do so."); *see also id.* at *4 ("[A] credible threat of prosecution inheres in any recently passed law . . . .").

And Plaintiffs' evidence shows why Defendants are wrong on the facts. That evidence is set out in detail in Plaintiffs' motion, ECF No. 92-1 at 13-17, and

2

unrebutted by Defendants. As Plaintiffs and Smart & Safe explain, even if it were logistically possible to consistently comply with the ten-day return rule, it is impossible to do so (a) without incurring significantly greater costs and diverting organizational resources and (b) forgoing quality control measures to guard against HB 1205's other penalties. The First Amendment bars the Hobson's choice HB 1205 demands: curtail core protected speech in an attempt to comply with the law, and likely fail to collect enough signatures for a successful campaign, or risk criminal liability and severe financial penalties that would bankrupt the organization.[1] Defendants' suggestion that the State *may*, in its beneficence, waive penalties it has otherwise assessed does not "ameliorate[]" Plaintiffs' harm. Resp. at 15.

Defendants' arguments against standing are meritless.

## II.   Plaintiffs Are Substantially Likely to Succeed on the Merits

### a. Exacting scrutiny applies

Seeking to escape the heightened scrutiny standard they know they can't meet, Defendants use *Biddulph v. Mortham* to obfuscate *Meyer* and *Buckley*'s clear rule. To be sure, *Biddulph* drew a line between the "initiative process in general and the

---

[1] Defendants confusingly state that the exceptions would prevent Plaintiffs' articulated harm, but it is unclear how. If Defendants claim that HB 1205's requirements are impossible to follow, and thus sponsors would have fines waived for things like late petition submissions, then HB 1205's requirements are meaningless. More likely, however, waiver will not save sponsors from errors made in good faith, and routine delays, when they are submitting over one million petitions.

3

power to regulate the exchange of ideas about political changes sought through the process." 89 F.3d 1491, 1498 n.7 (11th Cir. 1996). Exacting scrutiny applies to the latter, but not the former. *Id.* But that does not mean HB 1205 gets rational basis review.

Start with what *Meyer* and *Buckley* (which came after *Biddulph*) actually held. While Defendants claim it matters not whether a regulation limits how many people a sponsor will reach, that's *exactly* what *Meyer* said: Colorado's law "restrict[ed] political expression" by "limit[ing] the number of voices who will convey [sponsors'] message[s] and . . . therefore, limit[ed] the size of the audience they can reach." *Meyer v. Grant*, 486 U.S. 414, 422-23 (1988). Defendants also claim that it matters not "whether a regulation reduces the chance that petition sponsor will prevail at the ballot." Resp. at 18. But that's not Plaintiffs' argument. Plaintiffs don't claim a right to prevail at the ballot; Plaintiffs claim a right to have the debate in the first place.[2]

And that's what makes *Biddulph* and the out-of-circuit case Defendants rely on factually distinct. *Biddulph* involved an initiative that was excluded from the

---

[2] Defendants' argument that HB 1205 does not regulate "the whos and hows of petition circulating" is plainly false. Resp. at 20. Imposing draconian fines and criminal penalties for paperwork errors in petition circulation is, on its face, a regulation on the "how" of petition circulating. If all that mattered was the moment the circulator spoke, *Meyer* would not have rejected the argument that banning paid circulation did not violate the First Amendment because "other avenues of expression remain open." *Meyer*, 486 U.S. at 424.

4

ballot by requirements governing amendments' substance and titles, 89 F.3d at 1493, and *Initiative Referendum Institute v. Walker* required a supermajority for wildlife initiatives to pass. 450 F.3d 1082, 1085 (10th Cir. 2006) (en banc). Both cases drew a distinction between the right to engage in the petition process and the right to have a proposed amendment become law.

So, in both cases, the challenged requirements were fundamentally different from HB 1205's regime of fines and criminal penalties; a regime that has a direct and palpable chilling effect on petition circulators and burdens sponsors' ability to engage in an initiative campaign at all. This case squarely implicates the "exchange of ideas about political changes sought through the [initiative] process" that motivated the Court in *Meyer* and *Buckley*, activating the exacting scrutiny the First Amendment requires. *Biddulph*, 89 F.3d at 1498 n.7.

### b. The Severe and Punitive Fines and Ten-Day Return Time provisions are not narrowly tailored

Defendants' attempts to justify the challenged provisions miss the mark. Plaintiffs don't challenge existing restrictions on the initiative process—including the 30-day return provision, requirements that all paid petition circulators register with the State, sponsors' obligation to pay for signature verification, or the imposition of criminal sanctions and penalties for forging a voter's signature. The State vigorously enforces these rules, launching "criminal investigations, charges, arrests, and convictions of petition circulators," and levying hefty penalties. Resp. at 4-9.

5

The question is whether the *new* restrictions Plaintiffs challenge are narrowly tailored to a legitimate state interest. They are not.

First, Defendants dramatically overstate the extent to which petition fraud affects the initiative petition process. On two occasions, the Supreme Court has noted that "the risk of fraud or corruption, or the appearance thereof, is more remote at the petition stage of an initiative than at the time of balloting." *Buckley v. ACLF*, 525 U.S. 182, 203 (1999) (*quoting Meyer*, 486 U.S. at 427). Further, because "[r]eferenda are held on issues, not candidates for public office," the "risk of corruption perceived in cases involving candidate elections simply is not present in a popular vote on a public issue." *First Nat. Bank of Bos. v. Bellotti*, 435 U.S. 765, 790 (1978) (citations omitted).

Second, even assuming there is truth to Defendants' allegations of widespread fraud and that the State has a legitimate reason to adopt added measures to address the problem, the challenged provisions in no way meet the moment. The State's scattershot approach severely burdens Plaintiffs' First Amendment free speech and associational rights without addressing fraud.

Start with the ten-day rule and the severe fines imposed for violating it. Plaintiffs have adduced substantial evidence of the serious injury the provision inflicts on their petition circulation efforts. ECF No. 91-1 ¶¶ 24-46; ECF No. 91-2 ¶¶ 16-27. Defendants respond only that with "more time, the State can better detect fraud,"

6

without offering any evidence that's true. Resp. at 22. But if the State really needed more time, it could expand the 60 days it currently gives supervisors to verify petitions. Fla. Stat. § 100.371(11)(b). And there's ample evidence that the ten-day rule will make it exponentially *harder* for sponsors to do quality control on their end, including ferreting out fraud. ECF No. 91-1 ¶ 27; ECF No. 91-2 ¶ 18. So the ten-day rule actually operates against Defendants' stated goal of combating fraud.

Or consider fines for filling in "missing information" or inadvertently submitting a petition to the wrong county: the Court will search Defendants' brief in vain for *any* coherent articulation of the supposed state interest these fines serve. Defendants claim the "missing information" provision is narrowly tailored to address a "risk that pre-filled forms contain the wrong information." Resp. at 23. But the State could penalize prefilling *inaccurate* information on forms. The State has no legitimate interest in making it harder to submit accurate petitions. And while Plaintiffs have offered evidence that the dramatic increases in the fine amount for submitting petitions in the wrong county could bankrupt sponsors, ECF 91-1 ¶ 37; ECF No. 91-2 ¶ 24, Defendants have failed to provide even a rational explanation as to how this provision would prevent fraud.

Finally, the criminal penalties also bear little relation to the State's legitimate interests. Defendants have proffered at most meager evidence supporting their claim that "Florida has a problem with petition circulators misappropriating voters'

7

information," Resp. at 23, but even assuming this is a significant problem, the State could more effectively address it by enhancing penalties for identity theft, rather than subjecting innocent circulators to criminal liability for copying or retaining a voter's "personal information"—whatever that means.

### III. HB 1205's Criminal Penalties Are Vague.

Defendants claim that the criminal penalties are not vague because they have a "core meaning." Resp. at 24 (quoting *SisterSong Women of Color Reprod. Just. Collective v. Gov. of Ga.*, 40 F.4th 1320, 1327 (11th Cir. 2022)). But *SisterSong*'s rule applied because the law there *did not* implicate a fundamental right. *Id.* at 1328. So straight from go, Defendants' argument is misplaced. Because the challenged provisions burden First Amendment activity, the Court must apply the vagueness doctrine with "heightened vigor." *HM Fla.*, 2025 WL 1375363, at *12 (quotations omitted). Keeping that in mind, consider Defendants' arguments.

**1. "Missing Information."** Defendants try to rescue this provision by implicitly inserting the word "voter's" before information. HB 1205 is not so limited, imposing criminal liability on anyone who "fills in missing information on a signed petition." Fla. Stat. § 104.185(2). HB 1205 requires myriad information on petition forms—including affidavits by circulators and circulators' identifying information. Fla. Stat. § 100.371(3)(d)–(e). Is it now a crime to add that information after a form is signed? Perhaps recognizing this problem, Defendants quickly turn to the OECS

report for the *reason* the Legislature allegedly passed this provision. Resp. at 25. But legislative history cannot "dictate how the . . . act should be read." *Halifax Hosp. Med. Ctr. v. State*, 278 So. 3d 545, 548 n.3 (Fla. 2019). Defendants are stuck with the plain (vague) language.[3]

**2**. **"Irregularities."** Here, Defendants immediately depart from the statutory text—never to return. HB 1205 doesn't define "irregularities," so Plaintiffs naturally looked to the Florida Election Code to determine what irregularities related to violations of the Florida Election Code means. Defendants say Plaintiffs foolishly "rely a little too much" on statutory text, and instead, "Plaintiffs should have looked to case law" because "case law can clarify a statutory term's meaning." Resp. at 26 (citing *DeSantis v. Dream Defenders*, 389 So. 3d 413, 420 (Fla. 2024)). But that's not what *Dream Defenders* said.

*Dream Defenders* didn't hold that otherwise vague laws may be cured by cases interpreting the problematic language in other contexts; *Dream Defenders* held that, when "the Legislature chooses to codify what was once a common-law crime,"

---

[3] Defendants repeatedly mischaracterize Plaintiffs' motion as challenging Florida's preexisting bar on falsely signing another's name on a petition. Resp. at 20-21. But "Plaintiffs do not challenge that the state can—as it already has—sanction those who forge voter signatures on petitions or engage in similar fraud." ECF No. 92-1 at 23. Instead, Plaintiffs argue that the prohibition on filling in missing information is vague and overbroad. And when a party whose conduct is protected challenges an overbroad law, a court may limit its injunction to the unconstitutional part of a statute but leave the remainder intact. *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 503–04 (1985). That's the relief Plaintiffs request here.

courts will assume the common law meaning applies. 389 So. 3d at 421. There is no common-law crime of "irregularity."

That aside, the Eleventh Circuit just rejected a similar argument. In *HM Florida*, the State argued that a law prohibiting depictions of lewd conduct was not vague because the Florida Supreme Court had defined "lewd" in a different context. 2025 WL 1375363, at *17. But that argument failed because it didn't "read the 'lewd conduct' provision in its statutory context" but instead "relie[d] on judicial interpretations of 'lewdness' plucked from statutes that don't specifically describe any prohibited depictions." *Id.*

Indeed, while the *HM Florida* defendants at least cited cases *interpreting* the word "lewd," Defendants simply cite cases *using* the word "irregularity." Under that theory, because cases have used the word "bizarre," *Kowkabany v. Home Depot, Inc.*, 606 So. 2d 716, 721 (Fla. 1st DCA 1992), or "outrageous," *Williams v. City of Minneola*, 575 So. 2d 683, 690 (Fla. 5th DCA 1991), there would be no due process problem in criminalizing "bizarre or outrageous" conduct.

And more still, Defendants' proffered definition of irregularity—substantial noncompliance with the Election Code—doesn't appear in the case Defendants cite. Defendants reach this definition by altering the original phrase from *Boardman v. Esteva*—"substantial compliance with the requirements of the absentee voting statute is all that is required to give legality to the absentee ballots"—by inserting

10

"[non]" before "compliance." 323 So. 2d 259, 267 (Fla. 1975). Indeed, *Esteva* identified "the presence or absence of fraud, gross negligence, or intentional wrongdoing" as a key factor in determining whether "irregularities" could invalidate a ballot.[4] *Id.* at 269. *Contra* Resp. at 27.

To be sure, Defendants' sweeping arguments underscore why the vagueness doctrine "applies with heightened vigor to laws touching on protected speech." *HM Fla.*, 2025 WL 1375363, at *12 (quotations omitted). Defendants embrace a reading under which mundane paperwork errors in petitioning activity—wholly unrelated to fraud—are now a felony.[5] That Defendants perceive no First Amendment defect in a rule criminalizing clerical errors or omissions in an activity squarely within the First Amendment's protection only shows how desperately the State needs the

---

[4] Further, substantial noncompliance with a law sounds a lot like a violation. *See* VIOLATION, Black's Law Dictionary (12th ed. 2024) ("An infraction or breach of the law; a transgression."). So Defendants' interpretation runs roughshod over the "basic premise of statutory construction that a statute is to be interpreted so that no words shall be discarded as being meaningless, redundant, or mere surplusage." *Aspen Am. Ins. Co. v. Landstar Ranger, Inc.*, 65 F.4th 1261, 1271 (11th Cir. 2023) (cleaned up).

[5] Not just a felony, a first-degree felony, Fla. Stat. § 895.04(1), punishable "by a term of imprisonment not exceeding *30 years*," Fla. Stat. § 775.082(3)(b) (emphasis added). By anyone's measure, "that's a pretty big deal." *Fla. State Conf. of Branches & Youth Units of the NAACP v. Byrd*, 680 F. Supp. 3d 1291, 1309 n.13 (N.D. Fla. 2023) (quotations omitted).

11

"strong medicine" the overbreadth doctrine provides. *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973).

**3**. **"Personal Information."** Defendants try to save this provision by pointing out that the "in compliance with this section" language this Court found vague in *Florida NAACP* is absent from HB 1205. 680 F. Supp. 3d at 1317. True enough, but this Court also found "personal information" vague. *Id.* at 1318–19. A statute that's only vague for one reason instead of two is still a vague statute.[6]

Finally, the criminal provisions are also invalid because they fail "to provide explicit standards for those who apply speech laws." *HM Fla.*, 2025 WL 1375363, at *13 (cleaned up). Such "standardless statutes . . . authorize or even encourage arbitrary and discriminatory enforcement." *Id.* (cleaned up). Under Defendants' reading, HB 1205 gives prosecutors unbridled, standardless discretion to determine (a) whether someone has "substantially" complied with all provisions of the Florida Election Code and (b), if not, to seek to imprison that person for up to thirty years.

---

[6] The State claims that Florida law already protects much of this information from public records disclosure. That may be right for social security numbers, but not for anything else. To argue that signatures, driver's license numbers, and identification numbers are exempt from disclosure, the State cites a statute that applies only to voter registrations, Fla. Stat. § 97.0585, and a subsection of the public records statute discussing records held by the DHSMV, Fla. Stat. § 119.0712(2). And if these records were truly exempt, one might reasonably wonder why the Secretary's current petition form includes the statement: "This form becomes a public record once filed with the Supervisor of Elections." DS-DE 155B (10-2021).

Thus, the criminal provisions also violate Plaintiffs' due process rights because they provide "insufficient standards to cabin enforcement discretion." *Id.*

## IV. The Criminal Provisions Are Overbroad

The criminal provisions are vague, and in their vagueness, they are overbroad. But assume the criminal provisions are clear—that might resolve Defendants' vagueness problem, but it does nothing to address Defendants' overbreadth problem.

Even while demanding rational basis review, Defendants can't bring themselves to deny that the criminal provisions implicate the First Amendment. *See* Resp. at 19 (arguing that the "Criminal Penalties . . . get lower First Amendment scrutiny") (emphasis deleted). And so, the question for this Court is whether Florida can turn even the most minute errors in an activity that unquestionably implicates the First Amendment into a felony punishable by up to thirty years in prison. Of course it cannot. The overbreadth doctrine flows from the "concern that the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech—especially when the overbroad statute imposes criminal sanctions." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003). When this happens, everyone loses—society is "deprived of an uninhibited marketplace of ideas." *Id.* That's exactly what's happening here. HB 1205's criminal penalties are overbroad, regardless of whether they are vague.

## V.     The Balance of Equities Favors Plaintiffs

Finally, the equities favor Plaintiffs. The parties seemingly agree that the equities turn on whether HB 1205's challenged provisions are constitutional. If they are not, the equities favor Plaintiffs. An injunction should issue here, where the challenged provisions are likely unconstitutional, and the State will suffer no injury by enforcing the same rules that governed Plaintiffs immediately before HB 1205's passage.

Dated: May 19, 2025                              Respectfully submitted,

/s/ *Nicholas T. Steiner*

| | |
|---|---|
| Glenn Burhans, Jr. | Matletha Bennette, Fla. Bar No. 1003257 |
| Florida Bar No. 0605867 | Krista Dolan, Fla. Bar No. 1012147 |
| Bridget K. Smitha | SOUTHERN POVERTY LAW CENTER |
| Florida Bar No. 709581 | PO Box 10788 |
| Christopher R. Clark | Tallahassee, FL 32302-2788 |
| Florida Bar No. 1002388 | Telephone (850) 408-4840 |
| Liz Desloge Ellis | Matletha.bennette@splcenter.org |
| Florida Bar No. 97873 | Krista.dolan@splcenter.org |
| Hannah E. Murphy | |
| Florida Bar No. 1032759 | Bradley E. Heard** |
| Matthew Bryant | Avner Shapiro* |
| Florida Bar No. 93190 | Nicholas Taichi Steiner* |
| STEARNS WEAVER MILLER | SOUTHERN POVERTY LAW CENTER |
| WEISSLER ALHADEFF & | 1101 17th St NW Ste 550 |
| SITTERSON, P.A. | Washington, DC 20036 |
| 106 E. College Avenue, Suite 700 | bradley.heard@splcenter.org |
| Tallahassee, Florida 32301 | Avner.shapiro@splcenter.org |
| Telephone: (850) 580-7200 | nick.steiner@splcenter.org |
| gburhans@stearnsweaver.com | |
| bsmitha@stearnsweaver.com | Frederick S. Wermuth |
| crclark@stearnsweaver.com | Florida Bar No. 0184111 |
| lellis@stearnsweaver.com | Quinn B. Ritter |
| hmurphy@stearnsweaver.com | Florida Bar No. 1018135 |

| | |
|---|---|
| mbryant@stearnsweaver.com<br>cacosta@stearnsweaver.com<br>abrantley@stearnsweaver.com<br>aruddock@stearnsweaver.com<br><br>*Counsel for Plaintiff, Smart & Safe Florida* | KING, BLACKWELL,<br>ZEHNDER & WERMUTH, P.A.<br>25 E. Pine Street<br>Orlando, FL 32801<br>Telephone: (407) 422-2472<br>Facsimile: (407) 648-0161<br>fwermuth@kbzwlaw.com<br>qritter@kbzwlaw.com<br><br>Ben Stafford*<br>ELIAS LAW GROUP LLP<br>1700 Seventh Ave., Suite 2100<br>Seattle, Washington 98101<br>Telephone: (206) 656-0177<br>bstafford@elias.law<br><br>Emma Olson Sharkey*<br>ELIAS LAW GROUP LLP<br>250 Massachusetts Ave. NW, Suite 400<br>Washington, D.C. 20001<br>Telephone: 202-968-4490<br>eolsonsharkey@elias.law<br><br>*Attorneys for Plaintiffs*<br><br>**Admitted pro hac vice*<br>***Pro hac vice application* forthcoming |

## CERTIFICATE OF SERVICE

I hereby certify that on May 19, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the counsel of record in this case.

/s/ *Frederick S. Wermuth*
Frederick S. Wermuth
Florida Bar No. 0184111

*Attorney for Plaintiffs*

## CERTIFICATE OF WORD COUNT

The undersigned certifies on this 19th day of May, 2025, that this document complies with word limits set forth in Rule 7.1(F), N.D. Fla. Loc. R., and contains 3,187 words which includes the headings, footnotes, and quotations, but does not include the case style, signature block or Certificates of Word Count and Service.

/s/ *Frederick S. Wermuth*
Frederick S. Wermuth
Florida Bar No. 0184111

*Attorney for Plaintiffs*