# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

FLORIDARIGHTTOCLEANWATER
.ORG a/k/a FLORIDA RIGHT TO
CLEAN WATER and MELISSA
MARTIN, in her individual capacity,

       *Plaintiffs*,

v.

CORD BYRD, in his official capacity as
Secretary of State of Florida, JAMES
UTHMEIER, in his official capacity as
Attorney General of the State of
Florida; KIM BARTON, in her official
capacity as Supervisor of Elections for
Alachua County; CHRISTOPHER
MILTON, in his official capacity as
Supervisor of Elections for Baker
County; NINA WARD, in her official
capacity as Supervisor of Elections for
Bay County; AMANDA SEYFANG, in
her official capacity as Supervisor of
Elections for Bradford County; TIM
BOBANIC, in his official capacity as
Supervisor of Elections for Brevard
County; JOE SCOTT, in his official
capacity as Supervisor of Elections for
Broward County; SHARON CHASON,
in her official capacity as Supervisor of
Elections for Calhoun County; LEAH
VALENTI, in her official capacity as
Supervisor of Elections for Charlotte

Case No. 4:25-cv-00211-MW-MAF

1

County; MAUREEN BAIRD, in her
official capacity as Supervisor of
Elections for Citrus County; CHRIS H.
CHAMBLESS, in his official capacity
as Supervisor of Elections for Clay
County; MELISSA BLAZIER, in her
official capacity as Supervisor of
Elections for Collier County; TOMI
STINSON BROWN, in her official
capacity as Supervisor for Columbia
County; DEBBIE WERTZ, in her
official capacity as Supervisor of
Elections for DeSoto County; DARBI
CHAIRES, in her official capacity as
Supervisor of Elections for Dixie
County; JERRY HOLLAND, in his
official capacity as Supervisor of
Elections for Duval County; ROBERT
BENDER, in his official capacity as
Supervisor of Elections for Escambia
County; KAITLYN LENHART, in her
official capacity as Supervisor of
Elections for Flagler County;
HEATHER RILEY, in her official
capacity as Supervisor of Elections for
Franklin County; KENYA WILLIAMS,
in her official capacity as Supervisor of
Elections for Gadsden County; LISA
DARUS, in her official capacity as
Supervisor of Elections for Gilchrist
County; ALETRIS FARNAM, in her
official capacity as Supervisor of
Elections for Glades County; RHONDA
PIERCE in her official capacity as
Supervisor of Elections for Gulf
County; LAURA HUTTO, in her
official capacity as Supervisor of
Elections for Hamilton County; DIANE

2

SMITH, in her official capacity as
Supervisor of Elections for Hardee
County; SHERRY TAYLOR, in her
official capacity as Supervisor of
Elections for Hendry County; DENISE
LAVANCHER, in her official capacity
as Supervisor of Elections for
Hernando County; KAREN HEALY, in
her official capacity as Supervisor of
Elections for Highlands County;
CRAIG LATIMER, in his official
capacity as Supervisor of Elections for
Hillsborough County; H. RUSSELL
WILLIAMS, in his official capacity as
Supervisor of Elections for Holmes
County; LESLIE R. SWAN, in her
official capacity as Supervisor of
Elections for Indian River County;
CAROL A. DUNAWAY, in her official
capacity as Supervisor of Elections for
Jackson County; MICHELLE
MILLIGAN, in her official capacity as
Supervisor of Elections for Jefferson
County; TRAVIS HART, in his official
capacity as Supervisor of Elections for
Lafayette County; ALAN HAYS, in his
official capacity as Supervisor of
Elections for Lake County; TOMMY
DOYLE, in his official capacity as
Supervisor of Elections for Lee County;
MARK EARLEY, in his official
capacity as Supervisor of Elections for
Leon County; TAMMY JONES, in her
official capacity as Supervisor of
Elections for Levy County; GRANT
CONYERS, in his official capacity as
Supervisor of Elections for Liberty
County; HEATH DRIGGERS, in his

3

official capacity as Supervisor of
Elections for Madison County; SCOTT
FARRINGTON, in his official capacity
as Supervisor of Elections for Manatee
County; WESLEY WILCOX, in his
official capacity as Supervisor of
Elections for Marion County; VICKI
DAVIS, in her official capacity as
Supervisor of Elections for Martin
County; ALINA GARCIA, in her
official capacity as Supervisor of
Elections for Miami-Dade County;
SHERRI HODIE, in her official
capacity as Supervisor of Elections for
Monroe County; JANET H. ADKINS,
in her official capacity as Supervisor of
Elections for Nassau County; PAUL A.
LUX, in his official capacity as
Supervisor of Elections for Okaloosa
County; DAVID MAY, in his official
capacity as Supervisor of Elections for
Okeechobee County; KAREN CASTOR
DENTEL, in her official capacity as
Supervisor of Elections for Orange
County; MARY JANE ARRINGTON,
in her official capacity as Supervisor of
Elections for Osceola County; WENDY
LINK, in her official capacity as
Supervisor of Elections for Palm Beach
County; Brian Corley, in his official
capacity as Supervisor of Elections for
Pasco County; JULIE MARCUS, in her
official capacity as Supervisor of
Elections for Pinellas County;
MELONY BELL, in her official
capacity as Supervisor of Elections for
Polk County; CHARLES OVERTURF,
in his official capacity as Supervisor of

4

Elections for Putnam County; TAPPIE
VILLANE, in her official capacity as
Supervisor of Elections for Santa Rosa
County; RON TURNER, in his official
capacity as Supervisor of Elections for
Sarasota County; AMY PENNOCK, in
her official capacity as Supervisor of
Elections for Seminole County; VICKY
OAKES, in her official capacity as
Supervisor of Elections for St. Johns
County; GERTRUDE WALKER, in her
official capacity as Supervisor of
Elections for St. Lucie County;
WILLIAM KEEN, in his official
capacity as Supervisor of Elections for
Sumter County; JENNIFER KINSEY,
in her official capacity as Supervisor of
Elections for Suwannee County; DANA
SOUTHERLAND, in her official
capacity as Supervisor of Elections for
Taylor County; DEBORAH OSBORNE,
in her official capacity as Supervisor of
Elections for Union County; LISA
LEWIS, in her official capacity as
Supervisor of Elections for Volusia
County; JOSEPH R. MORGAN, in his
official capacity as Supervisor of
Elections for Wakulla County; RYAN
MESSER, in his official capacity as
Supervisor of Elections for Walton
County; DEIDRA PETTIS, in her
official capacity as Supervisor of
Elections for Washington County;
GINGER BOWDEN MADDEN, in her
official capacity as State Attorney for
the First Judicial Circuit of Florida;
JACK CAMPBELL, in his official
capacity as State Attorney for the

5

Second Judicial Circuit of Florida;
JOHN DURRETT, in his official
capacity as State Attorney for the
Third Judicial Circuit of Florida;
MELISSA W. NELSON, in her official
capacity as State Attorney for the
Fourth Judicial Circuit of Florida;
BILL GLADSON, in his official
capacity as State Attorney for the Fifth
Judicial Circuit of Florida; BRUCE
BARTLETT, in his official capacity as
State Attorney for the Sixth Judicial
Circuit of Florida; R.J. LARIZZA, in
his official capacity as State Attorney
for the Seventh Judicial Circuit of
Florida; BRIAN KRAMER, in his
official capacity as State Attorney for
the Eighth Judicial Circuit of Florida;
MONIQUE WORRELL, in her official
capacity as State Attorney for the
Ninth Judicial Circuit of Florida;
BRIAN HAAS, in his official capacity
as State Attorney for the Tenth
Judicial Circuit of Florida;
KATHERINE FERNANDEZ
RUNDLE, in her official capacity as
State Attorney for the Eleventh
Judicial Circuit of Florida; ED
BRODSKY, in his official capacity as
State Attorney for the Twelfth Judicial
Circuit of Florida; SUSAN LOPEZ, in
her official capacity as State Attorney
for the Thirteenth Judicial Circuit of
Florida; LARRY BASFORD, in his
official capacity as State Attorney for
the Fourteenth Judicial Circuit of
Florida; ALEXCIA COX, in her official
capacity as State Attorney for the

6


Fifteenth Judicial Circuit of Florida;
DENNIS W. WARD, in his official
capacity as State Attorney for the
Sixteenth Judicial Circuit of Florida;
HAROLD F. PRYOR, in his capacity as
State Attorney for the Seventeenth
Judicial Circuit of Florida; WILL
SCHEINER, in his official capacity as
State Attorney for the Eighteenth
Judicial Circuit of Florida; THOMAS
BAKKEDAHL, in his official capacity
as State Attorney for the Nineteenth
Judicial Circuit of Florida; and AMIRA
D. FOX, in her official capacity as
State Attorney for the Twentieth
Judicial Circuit of Florida,
            *Defendants*.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs FloridaRighttoCleanWater.org ("Florida Right to Clean Water" or "RTCW") and Melissa Martin bring this action against Defendants Cord Byrd, in his official capacity as Florida Secretary of State; James Uthmeier, in his official capacity as Attorney General of Florida; County Supervisors of Elections ("SOEs") in their official capacities, and State Attorneys in their official capacities (collectively, "Defendants"), and allege the following:

## INTRODUCTION

1.     The Florida Constitution protects the right of Floridians to band together to propose amendments to the constitution themselves, without the input of the Florida Legislature.

2.     Rather than embrace people-led initiatives as an expression of the will of the people, the Florida Legislature has attacked popular democracy in the Sunshine State time and time again, responding to successful initiatives by layering increasingly onerous requirements and procedures onto the initiative process that undermine the right of the people to decide how they want to be governed and all but ensure that only the most well-resourced and politically-connected initiatives can succeed.

3.     House Bill 1205 ("H.B. 1205") is the latest in a long series of legislative attacks on the initiative process. It makes a process that was already extremely complex and onerous for grassroots initiative sponsors virtually impossible.

4.     Plaintiff Florida Right to Clean Water is one such grassroots initiative sponsor. RTCW is a people-driven, volunteer-run organization committed to protecting the rights of all Floridians to clean water. RTCW

8

is in the middle of an ongoing petition drive to get its proposed constitutional amendment on the 2026 ballot. Plaintiff Melissa Martin is RTCW's Campaign Coordinator, and until H.B. 1205's passage, gathered signatures for the initiative herself.

5.    H.B. 1205's onerous requirements, steep penalties, and ambiguous language forced RTCW to instruct volunteers to halt *all* petitioning operations immediately after the law's enactment during a critical time for petition collecting and donor outreach. RTCW is and will continue to be irreparably harmed by H.B. 1205.

6.    On their own, many provisions of H.B. 1205 individually violate the First and Fourteenth Amendments to the Constitution. When added together, the law's provisions are exponentially worse: H.B. 1205 fundamentally undermines the core political speech of initiative supporters and initiative sponsors—particularly those who rely on grassroots, volunteer support.

7.    H.B. 1205 violates Plaintiffs' rights under the First and Fourteenth Amendments to the U.S. Constitution.

## JURISDICTION AND VENUE

8.    This action is brought under the United States Constitution, 42 U.S.C. § 1983, and 42 U.S.C. § 1988. This Court has jurisdiction to hear this case under 28 U.S.C. §§ 1331 and 1343 because the claims in this action arise under the Constitution of the United States.

9.    This Court has jurisdiction to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

10.    This Court has personal jurisdiction over the Defendants because they are residents of Florida and their principal places of business are in this District.

11.    Venue in this District is proper pursuant to 28 U.S.C. § 1391(b)(1) because Defendants are residents of Florida and multiple Defendants reside in this judicial district. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial portion of the events giving rise to these claims occurred in the Northern District of Florida.

12.    This case is properly filed in the Tallahassee Division under Local Rule 3.1(B).

## PARTIES

### A. Plaintiffs

13.    Plaintiff **FLORIDA RIGHT TO CLEAN WATER** is a registered Florida political committee sponsoring an initiative for the 2026 general election entitled "Right to Clean and Healthy Waters."

14.    The Right to Clean and Healthy Waters amendment would create an enforceable, fundamental right to clean and healthy water in the state of Florida.

15.    The ballot summary for RTCW's proposed constitutional amendment states:

> This amendment creates an enforceable, fundamental right to clean and healthy waters, authorizing a person to sue for equitable relief when a State executive agency, by action or inaction, allows harm or threat of harm to Florida waters. This amendment provides for strict judicial scrutiny of such action or inaction; adds to available remedies; identifies affected constitutional provisions; provides for enforcement; defines terms; and requires attorney's fees and costs to prevailing plaintiffs.

*Constitutional Amendment Full Text*, Right to Clean and Healthy Waters (approved Mar. 7, 2024).

16.    For the amendment to qualify for the 2026 ballot, RTCW needs to submit 880,062 valid petitions statewide, which must include voters in at least half of Florida's congressional districts, by the end of 2025 such that they can be verified by February 1, 2026. As a practical

matter, RTCW will likely need to submit more than one million petitions by the end of 2025, as a certain number of signatures are typically found to be invalid.

17. RTCW is a non-partisan, grassroots, all-volunteer organization. RTCW relies on a network of volunteers across the state to circulate its petitions, including individuals who volunteer independently or through allied organizations to circulate petitions on behalf of RTCW.

18. RTCW's Campaign Coordinator, Plaintiff Melissa Martin, coordinates the petition campaign, which includes developing strategic plans and operations, completing administrative tasks, liaising with volunteers, managing logistical support for volunteers, overseeing fundraising efforts, and maintaining the organization's website and social media. Like all roles at RTCW, Campaign Coordinator is an unpaid position.

19. RTCW has Regional Coordinators who oversee the organization's petition activities in various regions of the state; some regions also have Deputy Regional Coordinators.

20. Underneath Regional Coordinators, RTCW has County Captains and Lead Ambassadors in a number of counties who interface

with the county Supervisors of Elections and, in some cases, organize local volunteers to collect petitions. RTCW maintains a list of agents authorized in writing by the campaign to submit signed petitions into the county SOEs.

21.    RTCW does not employ any paid staff or hire paid petition circulators to conduct its petition activities. Because they are volunteers, neither RTCW nor the volunteers who distribute, collect, and deliver signed petition forms on behalf of RTCW—whether they volunteer directly through RTCW or do so independently—have previously had to comply with the stringent requirements that applied only to paid circulators prior to H.B. 1205.

22.    RTCW has not engaged in background checks or reviews of its volunteers, which—if possible at all—would interfere with petitioning and be cost-prohibitive. Consequently, on information and belief, volunteers for RTCW have included non-residents and non-U.S. citizens.

23.    RTCW recruits volunteers in a variety of ways, including through calls on social media and email campaigns. Because it has limited resources and needs to collect approximately one million signed petitions by the end of 2025, RTCW aims to spread its message to inspire

13

individuals and other organizations that share its values to conduct petitioning activities on its behalf. As such, RTCW heavily relies on informal volunteers, in addition to its own volunteer network, in order to spread awareness and collect petitions.

24.    Volunteers who register directly with RTCW are called "Ambassadors." These volunteers sign a form indicating to RTCW that they would like to volunteer and collect petitions. RTCW currently has approximately 720 Ambassadors who have signed up for the current campaign. RTCW maintains a list of Ambassadors in a database and sends email communications as needed.

25.    RTCW provides training and guidance to its Ambassadors with information on the petition gathering process. When there is an influx of volunteers, RTCW typically conducts monthly training sessions with new Ambassadors. Otherwise, the campaign ensures that County Captains, Lead Ambassadors, and/or Regional Coordinators touch base with new volunteers to provide adequate training and support. RTCW also fields questions from Ambassadors who request additional guidance and resources.

14

26.    RTCW maintains a close relationship with its Ambassadors and incorporates on-the-ground feedback from Ambassadors and other volunteers collecting petitions on behalf of the organization into its organizational plans, policies, practices, and protocols.

27.    Prior to the enactment of H.B. 1205, Ambassadors often filled different roles in the petition process as volunteers, including as petition collectors or processors/submitters. Due to the nature of volunteering, volunteers were able to fulfill varying roles at varying times. Channels of communication between the campaign and volunteers remained open to adapt to and resolve any gaps or redundancies of process as much as possible.

28.    Ambassadors who serve as petition collectors typically engage with Florida voters, explaining why the RTCW ballot amendment is important to them, and ask them to sign the Right to Clean and Healthy Waters petition. Collectors then generally deliver signed petitions to a petition processor.

29.    Ambassadors who serve as petition processors can be Lead Ambassadors, County Captains, or other Ambassadors who, prior to H.B. 1205, would receive signed petitions, perfect petitions if appropriate (e.g.,

by ensuring that the voter listed their home county rather than their home country), and deliver them to the RTCW volunteer who was authorized to submit petitions to the county SOE, if they themselves did not have such authority.

30. Not all RTCW volunteers register as Ambassadors with RTCW. Any person can choose to circulate RTCW petitions, and information about the petition for circulation is available on RTCW's website. Those volunteers typically collect petitions for RTCW for the same reason that Ambassadors do: they believe that Floridians deserve clean and safe waterways and drinking water. Those volunteers may essentially perform the same functions as Ambassadors; some distribute RTCW petitions through other civic engagement organizations as well. Such volunteers may, as individuals or as members of an organization, independently collect signatures on behalf of the initiative. The RTCW campaign may learn of such efforts if a volunteer delivers signed petitions to an Ambassador for processing or delivers them to a RTCW petition drop off location or the RTCW address in Fort Myers, Florida.

31. Before pausing its operations due to the enactment of H.B. 1205, RTCW Ambassadors, either in their respective counties or at the

Fort Myers address, would organize signed petitions by county and deliver them to the county processor authorized to submit petitions to the SOE on behalf of RTCW.

32. Plaintiff **MELISSA MARTIN** is RTCW's Campaign Coordinator and a native Floridian currently residing in Oregon.

33. In addition to fulfilling her duties as RTCW's Campaign Coordinator, Ms. Martin has collected and delivered, and wishes to continue to collect and deliver, signed petitions for the Right to Clean and Healthy Waters initiative when she is visiting her home state of Florida.

**B. Defendants**

34. Defendant **CORD BYRD** is the Secretary of State of Florida ("Secretary") and is sued in his official capacity. The Secretary is the head of the Florida Department of State (the "Department") and is the Chief Election Officer of the State. Fla. Stat. § 97.012.

35. Among other tasks in the petition process, the Secretary is responsible for submitting an initiative petition to the Attorney General when it meets specified criteria. Fla. Stat. § 15.21.

36. As head of the Department, the Secretary oversees the Division of Elections (the "Division") and the Office of Election Crimes

and Security ("OECS"). Fla. Stat. §§ 20.10(2)(a), 97.022. The Secretary is responsible for obtaining and maintaining "uniformity in the interpretation . . . of the election laws," and providing "uniform standards for the proper and equitable interpretation and implementation" of such laws. Fla. Stat. § 97.012(1)-(2).

37.    The Secretary is charged with conducting preliminary investigations into irregularities or fraud involving petition activities and referring violations to the Attorney General or relevant state attorney for enforcement. Fla. Stat. §§ 97.012, 100.371.

38.    The Division, which the Secretary oversees, is also responsible for maintaining the registrations of petition circulators and adopting "[r]ules and guidelines for [initiative] petition verification," Fla. Stat. §§ 99.097, 100.371.

39.    The Secretary is responsible for imposing fines incurred for violations of H.B. 1205. Fla. Admin. Code r. 1S-2.0091(2)(b).

40.    Defendant **JAMES UTHMEIER** is the Attorney General of Florida and is sued in his official capacity. The Attorney General is the chief state legal officer and oversees the Department of Legal Affairs and

the Office of the Statewide Prosecutor. Fla. Stat. §§ 16.015, 16.56; Fla. Const. art. IV, § 4(b).

41.    The Attorney General is authorized by statute to "institute a civil action for a violation of" laws governing petitioning activities "or to prevent a violation of" those provisions. Fla. Stat. § 100.371(11).

42.    The Attorney General is also charged with receiving initiative petitions from the Secretary of State and petitioning the Florida Supreme Court for an opinion regarding the initiative petition's compliance with applicable law and the State and U.S. Constitutions. Fla. Stat. §§ 16.061, 100.371.

43.    Defendants **SUPERVISORS OF ELECTIONS** are sued in their official capacities. There are 67 supervisors of elections, one in each of Florida's counties. Defendants Supervisors of Elections are Kim Barton, Alachua County; Chris Milton, Baker County; Nina Ward, Bay County; Amanda Seyfang, Bradford County; Tim Bobanic, Brevard County; Joe Scott, Broward County; Sharon Chason, Calhoun County; Leah Valenti, Charlotte County; Maureen Baird, Citrus County; Chris H. Chambless, Clay County; Melissa Blazier, Collier County; Tomi S. Brown, Columbia County; Debbie Wertz, DeSoto County; Darbi Chaires,

Dixie County; Jerry Holland, Duval County; Robert Bender, Escambia County; Kaitlyn Lenhart, Flagler County; Heather Riley, Franklin County; Kenya Williams, Gadsden County; Lisa Darus, Gilchrist County; Aletris Farnam, Glades County; Rhonda Pierce, Gulf County; Laura Hutto, Hamilton County; Diane Smith, Hardee County; Sherry Taylor, Hendry County; Denise LaVancher, Hernando County; Karen Healy, Highlands County; Craig Latimer, Hillsborough County; Rusty Williams, Holmes County; Leslie R. Swan, Indian River County; Carol A. Dunaway, Jackson County; Michelle Milligan, Jefferson County; Travis Hart, Lafayette County; Alan Hays, Lake County; Tommy Doyle, Lee County; Mark Earley, Leon County; Tammy Jones, Levy County; Grant Conyers, Liberty County; Heath Driggers, Madison County; Scott Farrington, Manatee County; Wesley Wilcox, Marion County; Vicki Davis, Martin County; Alina Garcia, Miami-Dade County; Sherri Hodie, Monroe County; Janet H. Adkins, Nassau County; Paul A. Lux, Okaloosa County; David May, Okeechobee County; Karen Castor Dentel, Orange County; Mary Jane Arrington, Osceola County; Wendy Link, Palm Beach County; Brian Corley, Pasco County; Julie Marcus, Pinellas County; Melony Bell, Polk County; Charles Overturf, Putnam County; Tappie Villane, Santa

20

Rosa County; Ron Turner, Sarasota County; Amy Pennock, Seminole County; Vicky Oakes, St. Johns County; Gertrude Walker, St. Lucie County; William Keen, Sumter County; Jennifer Kinsey, Suwannee County; Dana Southerland, Taylor County; Deborah Osborne, Union County; Lisa Lewis, Volusia County; Joseph R. Morgan, Wakulla County; Ryan Messer, Walton County; and Deidra Pettis, Washington County.

44.    Supervisors of elections are charged with administering elections in their counties. Supervisors are responsible for verifying petition signatures and distributing, collecting, and verifying petition forms. Fla. Stat. § 100.371.

45.    Defendants **STATE ATTORNEYS** are sued in their official capacities. There are twenty state attorneys, each assigned to one of Florida's judicial circuits. Defendants State Attorneys are Ginger Bowden Madden, First Judicial Circuit of Florida; Jack Campbell, Second Judicial Circuit of Florida; John Durrett, Third Judicial Circuit of Florida; Melissa W. Nelson, Fourth Judicial Circuit of Florida; Bill Gladson, Fifth Judicial Circuit of Florida; Bruce Bartlett, Sixth Judicial Circuit of Florida; R.J. Larizza, Seventh Judicial Circuit of Florida; Brian Kramer, Eighth Judicial Circuit of Florida; Monique Worrell, Ninth

Judicial Circuit of Florida; Brian Haas, Tenth Judicial Circuit of Florida; Katherine Fernandez Rundle, Eleventh Judicial Circuit of Florida; Ed Brodsky, Twelfth Judicial Circuit of Florida; Susan Lopez, Thirteenth Judicial Circuit of Florida; Larry Basford, Fourteenth Judicial Circuit of Florida; Alexcia Cox, Fifteenth Judicial Circuit of Florida; Dennis W. Ward, Sixteenth Judicial Circuit of Florida; Harold F. Pryor, Seventeenth Judicial Circuit of Florida; Will Scheiner, Eighteenth Judicial Circuit of Florida; Thomas Bakkedahl, Nineteenth Judicial Circuit of Florida; and Amira D. Fox, Twentieth Judicial Circuit of Florida.

46.    State attorneys are the prosecuting officers of all trial courts in Florida and prosecute violations involving petition activities, including violations that have been referred to the state attorney by OECS. Fla Stat. §§ 27.02, 97.012(15), 100.371.

## FACTUAL ALLEGATIONS

### A. Floridians' Right to Lawmaking through Ballot Initiative

47.    The Florida Constitution secures Floridians' right to revise or amend the constitution using the petition process. Fla. Const. art. XI, § 3; *see also Browning v. Fla. Hometown Democracy, Inc., PAC*, 29 So. 3d 1053, 1068 (Fla. 2010).

22

48.    When the government ignores their concerns, this process allows the people of Florida to bypass the Legislature and put proposed amendments to the state constitution directly on the ballot so that the voters themselves can determine what policies they want to govern their lives.

49.    However, over the years, the Florida Legislature has imposed layer upon layer of burdensome regulations that make it virtually impossible for grassroots initiatives supported by the people of Florida to appear on the ballot.

50.    To begin the people-led initiative process, a potential sponsor must first register as a political committee with the Division of Elections and submit the text of their proposed amendment to the Secretary. Fla. Stat. §§ 100.371, 106.03.

51.    To get the proposed initiative on the ballot, sponsors must submit signed and verified petition forms totaling at least 8% of the number of voters who cast a ballot in the previous presidential election cycle in at least half of Florida's congressional districts and in the state as a whole. Fla. Const. art. XI, § 3. For the 2026 election, sponsors will have to submit at least 880,062 signed and verified forms.

52.    However, to qualify for even the first step of review, sponsors must collect 25% of the verified signatures needed to qualify for the ballot—totaling 220,016 signatures for the 2026 ballot—across at least half of the state's congressional districts. *See* Fla. Stat. § 15.21. Only after these 220,016 forms have been processed and verified by the county supervisors of election can the Secretary send the proposed initiative to the Attorney General.

53.    When the Attorney General receives the proposed initiative, the Attorney General must petition the Florida Supreme Court for an advisory opinion regarding the initiative petition's compliance with applicable law and the state and federal constitutions, including, as newly required by H.B. 1205, the compliance of the financial impact statement ("FIS") with the law. Fla. Const. art. XI, § 3; Fla. Stat. §§ 16.061, 100.371.

54.    Prior to H.B. 1205, the proposed initiative would be concurrently submitted to the Financial Impact Estimating Conference ("FIEC") to prepare a FIS at the same time the initiative was submitted to the Attorney General. Fla. Stat. § 100.371(13)(a) (2022).

55.    Now, under H.B. 1205, the Secretary must submit a copy of the proposed amendment to the FIEC "for review, analysis, and estimation of the financial impact of the proposed amendment" at the *beginning* of the process, before any petitions are circulated. Fla. Stat. § 100.371(2). Within 75 days of receipt from the Secretary, the FIEC must complete the FIS to be placed on the ballot. Fla. Stat. § 100.371(16). Under H.B. 1205, the FIS must be included on the petition form for proposed amendments submitted to the Secretary after May 2, 2025 (the effective date of the act). Fla. Stat. § 100.371(3)(a)(7).

56.    If the Supreme Court finds that the FIS is not in accordance with the law, the FIEC must adopt a revised FIS, and "[t]he sponsor of the initiative must refile the petition with the revised financial impact statement with the Secretary of State as a new petition." Fla. Stat. § 100.371(16)(e).

## B. H.B. 1205 Places a Variety of Undue Constraints on Ballot Initiative Sponsors and Supporters

57.    H.B. 1205 is another chapter in the Florida Legislature's history of imposing suffocating restrictions on the ballot initiative process that make it nearly impossible for ordinary residents of Florida organizing grassroots campaigns to amend the state constitution.

25

58.    The effect of the restrictions imposed by the Florida Legislature is to ensure that only politically connected and well-financed campaigns have any hope of success—not because of the popularity of their message, but because of the complex web of regulatory and procedural hurdles initiative sponsors are required to clear.

59.    The provisions of H.B. 1205, collectively and individually, severely restrict RTCW and volunteer circulators from engaging in constitutionally protected core political speech.

60.    H.B. 1205 systematically increases the burden on all who participate in the popular initiative process: petition sponsors, citizens who sign petitions, and those individuals who circulate petitions and otherwise engage in expressive speech with Floridians regarding proposed constitutional amendments.

61.    H.B. 1205 makes a series of changes to the petition form, which was previously a simple one-page, single-sided form prior to the law's enactment.[1]

---

[1] As RTCW has not used paid petition circulators for its campaign, all petition forms were either collected by volunteers or submitted directly by the voter themselves. *See Constitutional Amendment Initiative Petition Form – Volunteer*, Right to Clean and Healthy Waters (approved Mar.                              8,                              2024)

62.    Beginning July 1, 2025, petition signers will be required to include a litany of additional information on the petition form, including the last four digits of their Social Security Number, Florida driver license number, or Florida identification number. Fla. Stat. § 100.371(3)(c)(4).

63.    Also beginning July 1, 2025, the petition forms themselves must include host of other additional components, including a notice on the petition circulator's form that it is a misdemeanor to knowingly sign the petition more than once (the "Misdemeanor Notice"), Fla. Stat. § 100.371(3)(a)(5), and a notice on the "personal use" form (distributed by individuals who are not registered petition circulators, *see infra* ¶¶ 145-149) that it is a third-degree felony "to collect, deliver, or otherwise physically possess more than 25 signed petition forms in addition to your own or those of your immediate family members" unless registered as a petition circulator, Fla. Stat. § 100.371(3)(e).

64.    Finally, beginning July 1, 2025, the petition form must include the full text of the proposed ballot amendment. Fla. Stat. § 100.371(3)(b). Under current law, the full text of the amendment is not

---

https://www.floridarighttocleanwater.org/_files/ugd/d9c45c_8210360ac2c740a586a2717c4f64ec3f.pdf.

on the petition form itself, but it is accessible to any voter who wants to review prior to signing the petition.

65.    Taken together, all of these components of the petition form make it substantially more burdensome, if not impossible, for RTCW to facilitate petition gathering: the form will be so dense and intimidating as to discourage individuals from signing, especially because it requires additional personal information; the costs to RTCW to print and distribute forms will dramatically increase with the increase in the length of the form; and petition circulators will be intimidated from engaging in their constitutionally protected speech of petitioning for RTCW.

66.    Taken together, these and other provisions of H.B. 1205 make clear that the goal of the Florida Legislature in enacting this legislation was to stifle the initiative process, and H.B. 1205 imposes significant unconstitutional burdens on the petition process.

67.    Plaintiffs challenge the following specific provisions of H.B. 1205 in this action ("Challenged Provisions"):

### a. Prohibition on Individuals who Are Not United States Citizens from Collecting Signatures or Initiative Petitions (Non-U.S. Citizen Restriction)

68.    H.B. 1205 prohibits entire classes of people from circulating petitions, including non-U.S. citizens: "A person may not collect signatures or initiative petitions if he or she . . . [i]s not a citizen of the United States." Fla. Stat. § 100.371(4)(b). That prohibition includes anyone who lacks citizenship status, including legal permanent residents and Deferred Action for Childhood Arrivals recipients ("Dreamers").

69.    Because that provision categorically prohibits noncitizens from "collect[ing] signatures or initiative petitions," they are barred not only from registering as petition circulators but also from collecting even the 25 "personal use" petitions allotted to their citizen neighbors. Fla. Stat. § 100.371(4)(b). Nor does the prohibition carve out immediate family members. *Compare* Fla. Stat. § 100.371(4)(b) *with* Fla. Stat. § 100.371(4)(a). As a result, under H.B. 1205, a legal permanent resident is barred from collecting even their own spouse's petition.

70.    People who submit applications for registration as a petition circulator must attest, under penalty of perjury, that they are "a citizen of the United States of America." Fla. Stat. §§ 100.371(4)(c)(7),

100.371(4)(c)(9). False affirmations of the same are a third-degree felony under Florida law. Fla. Stat. § 104.011.

71.    Prior to the enactment of H.B. 1205, no person was barred from circulating petitions on the basis of their citizenship status. Upon information and belief, RTCW has utilized at least one legal permanent resident who is now forbidden from engaging in protected speech.

### b. Prohibition on Individuals Who Are Not Residents of Florida from Collecting Signatures or Initiative Petitions (Non-Resident Restriction)

72.    In addition to non-U.S. citizens, H.B. 1205 also prohibits anyone who "[i]s not a resident of this state" from circulating petitions. Fla. Stat. § 100.371(4)(b)(3).

73.    And as with the non-U.S. citizen bar, the provision categorically prohibits out-of-state residents from "collect[ing] signatures or initiative petitions," including the 25 "personal use" petitions allotted to Florida residents, Fla. Stat. § 100.371(4)(b), and petitions collected from immediate family members, *compare* Fla. Stat. § 100.371(4)(b) *with* Fla. Stat. § 100.371(4)(a).

74.    People who submit applications for registration as a petition circulator must attest, under penalty of perjury, that they are "a resident

of the state of Florida." Fla. Stat. §§ 100.371(4)(c)(8), 100.371(4)(c)(9). False affirmations of the same are a third-degree felony under Florida law. Fla. Stat. § 104.011.

75. Prior to the enactment of H.B. 1205, no person was barred from circulating petitions based on their state of residency.

### c. Petition Circulator's Affidavit

76. In addition to the law's eligibility criteria, volunteer petition circulators must now disclose personal information and sign an oath on each petition form itself. H.B. 1205 requires that "[a] petition form distributed by a petition circulator must also include . . . [t]he Petition Circulator's Affidavit with the circulator's name, permanent address, and petition circulator number or barcode." Fla. Stat. § 100.371(3)(d)(1). The petition form must also include the following oath, "which must be signed and dated by the circulator":

> By my signature below, as petition circulator, I verify that the petition was completed and signed by the voter in my presence. Under penalty of perjury, I declare that I have read the foregoing Petition Circulator's Affidavit, and that the facts stated in it are true, and that if I was paid to circulate or collect this petition, payment was not on a per signature basis.

Fla. Stat. § 100.371(3)(d)(2). Petition forms distributed by people other than petition circulators must include the following:

31

This form is for PERSONAL USE only. Unless registered as a petition circulator, it is a third degree felony to collect, deliver, or otherwise physically possess more than 25 signed petition forms in addition to your own or those of immediate family members.

*Id.* § 100.371(3)(e).

77.    By its terms, H.B. 1205 requires that the Petition Circulator's Affidavit, including "the circulator's name" and "permanent address," and the text of accompanying oath be included on the "petition form" that is "distributed" to the prospective signatory. Fla. Stat. § 100.371(3)(d)(1). The petition signatory then completes the required portions of the form and provides their signature. Fla. Stat. § 100.371(3)(c). Finally, the petition circulator signs the required oath, which attests that "the petition was completed and signed by the voter in [the] presence [of the petition circulator]." Fla. Stat. § 100.371(3)(d)(2).

78.    Prior to the enactment of H.B. 1205, an affidavit and oath were only required of paid petition circulators. *See* Fla. Stat. §§ 97.021(28), 100.371(5)(b) (2022).

### d. Volunteer Petition Circulator Registration Requirement

79.   H.B. 1205 both redefines the term "petition circulator" and creates criminal liability for people who violate the requirements accompanying the new vague and contradictory definition.

80.   Prior to H.B. 1205, an individual was only considered a "petition circulator" if they received compensation. Fla. Stat. § 97.021(28) (2022). Without explanation, H.B. 1205 expands the definition of a "petition circulator" to include any "entity or individual who collects signatures for the purpose of qualifying a proposed constitutional amendment for ballot placement," regardless of whether or not they are paid. Fla. Stat. § 97.021(28) (effective July 1, 2025). H.B. 1205 excludes "a person who collects, delivers, or otherwise physically possesses no more than 25 signed petition forms in addition to his or her own signed petition form or a signed petition form belonging to the person's spouse, or the parent, child, grandparent, grandchild, or sibling of the person or the person's spouse" from the definition of "petition circulator." Fla. Stat. § 97.021(28) (effective July 1, 2025).

81.   H.B. 1205 further imposes felony liability on any individual, including uncompensated volunteers who collect petitions in their spare

33

time, who fails to comply with the law's standards regarding petition circulator registration.

82.    Effective July 1, 2025, "[a] person who collects, delivers, or otherwise physically possesses more than 25 signed petition forms in addition to his or her own signed petition form or a signed petition form belonging to an immediate family member, and who is not registered as a petition circulator pursuant to s. 100.371(4)(a), commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084." Fla. Stat. § 104.188(2) (emphasis added). Thus, felony liability is defined, in part, in terms of compliance with the Volunteer Petition Circulator Registration Requirement under Section 100.371(4)(a).

83.    To receive a "petition circulator number or barcode," a petition circulator must be registered with the state, *see* Fla. Stat. § 100.371(4)(a), and H.B. 1205, in turn, creates new registration requirements. Now, in addition to providing "[t]he applicant's name, permanent address, temporary address, if applicable, and date of birth" when applying for registration, Fla. Stat. § 100.371(4)(b) (2022), an applicant must also provide their "Florida driver license or Florida identification card number, and the last four digits of his or her social

34

security number." Fla. Stat. § 100.371(4)(c)(2). This provision intimidates volunteers who would be collecting the most petitions for RTCW from engaging in their protected speech.

84.    As such, individuals who wish to participate in petition gathering efforts on any meaningful scale as volunteers must comply with burdensome pre-registration requirements including disclosing personal information, undergoing significant training, and complying with deadlines and other logistical requirements.   These burdensome requirements unlawfully chill the constitutionally protected core political speech of RTCW and its volunteers.

### e. Personal Use Petition Restrictions

85.    H.B. 1205 also provides for the creation of "personal use" petitions which may be used by individuals *not* registered as petition circulators. Fla. Stat. § 100.371(3)(e).

86.    H.B. 1205's requirements for personal use petitions are both restrictive and vague. Beginning July 1, 2025, the law provides that a person not registered as a petition circulator "may not collect, deliver, or otherwise physically possess more than 25 signed petition forms in

addition to his or her own signed petition form or a signed petition form belonging to an immediate family member."[2] Fla. Stat. § 100.371(4)(a).

87.    H.B. 1205 is vague with respect to personal use petitions in multiple respects. First, the definition of "petition circulator" only includes people who "collect[] signatures," but the penalty provision applies to any person who "collect[s], deliver[s], or otherwise physically possess[es]" petitions. Fla. Stat. §§ 97.021(28); 100.371(4)(a).

88.    Moreover, the statute does not provide any time period during which an individual using petitions for "personal use" may do so. As such, it is unclear whether an individual is prohibited from "collect[ing], deliver[ing], or otherwise physically possess[ing]" up to 25 signed personal use petitions at one given time, per day, in total across the life cycle of an entire petition campaign, for their entire lives, or during some other period of time.

89.    It is also common for individuals engaged in petition activities to solicit signatures for multiple campaigns within the same election cycle. It is unclear whether the law's 25 petition limit applies to petitions

---

[2] The term "immediate family" includes "a person's spouse, or the parent, child, grandparent, grandchild, or sibling of the person or the person's spouse." Fla. Stat. § 100.371(4)(a).

for a single campaign, or whether petitions collected, delivered, or physically possessed for multiple campaigns by one individual are aggregated to count toward the total.

90.    The terms "collect, deliver, or otherwise physically possess" themselves are also unclear and undefined. For example, it is not clear whether an individual could hand out any number of unsigned petitions, but only retrieve ("collect") up to 25 from individuals outside of their immediate family.

91.    As noted above, individuals are subject to felony liability for transgressing this ambiguous limitation: Effective July 1, 2025, "[a] person who collects, delivers, or otherwise physically possesses more than 25 signed petition forms in addition to his or her own signed petition form or a signed petition form belonging to an immediate family member, and who is not registered as a petition circulator pursuant to s. 100.371(4)(a), commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084." Fla. Stat. § 104.188(2) (emphasis added).

92.    Taken together, these provisions undermine the constitutionally protected activities of RTCW and volunteers to collect petitions.

### f. Severe Fines on Sponsors

93.    H.B. 1205 imposes a variety of severe fines on sponsors of initiative petitions, including for conduct over which the sponsor has no notice, knowledge, or control.

94.    H.B. 1205 shortens the window for petition delivery by a petition circulator (which now includes both compensated circulators and unpaid volunteers) from 30 days to 10 days. Fla. Stat. § 100.371(7)(a).

95.    The law further imposes fines on a "sponsor that collects petition forms or uses a petition circulator to collect petition forms" for delivery of petitions beyond this exceedingly short 10-day window or to the incorrect county, including non-compliant delivery by a petition circulator over which the sponsor may have no knowledge or control. Fla. Stat. § 100.371(7)(a). The sponsor is liable for the following fines related to any petition form collected by the sponsor or any petition circulator:

a.    "A fine in the amount of $50 per each day late for each petition form received by the supervisor of elections in the county in

which the voter resides more than 10 days after the voter signed the petition form. A fine in the amount of $2,500 for each petition form received if the sponsor or petition circulator acted willfully." Fla. Stat. § 100.371(7)(a)(1).

b.      "A fine in the amount of $100 per each day late, up to a maximum of $5,000, for each petition form collected by a sponsor or a petition circulator, signed by a voter on or before February 1 of the year the general election is held and received by the supervisor of elections in the county in which the voter resides after the deadline for such election. A fine in the amount of $5,000 for each such petition form received if the sponsor or petition circulator acted willfully." Fla. Stat. § 100.371(7)(a)(2).

c.      "A fine in the amount of $500 for each petition form collected by a petition circulator which is not submitted to the supervisor of elections in the county in which the voter resides. A fine in the amount of $5,000 for any petition form not so submitted if the sponsor or petition circulator acting on its behalf acted willfully." Fla. Stat. § 100.371(7)(a)(3).

96.    H.B. 1205 imposes these fines regardless of whether the sponsor had any notice of whether the petition circulator was collecting petitions for the sponsor or otherwise had any culpability in the late delivery of forms or delivery to the incorrect county.

97.    H.B. 1205 does not explain how the fines and deadlines apply to petitions signed by the voter but not delivered to the county SOE prior to the Governor's signing of the law on May 2, 2025.

98.    The law's application to a "sponsor that collects petition forms" is also unclear, as the law does not explain what activity would place a sponsor in violation of the law. For example, it is not clear what it means for a sponsor—the legal entity sponsoring the initiative—to "collect" petition forms, including whether a sponsor retrieving forms from volunteers, including those using personal use petitions, constitutes "collect[ing]" forms.

99.    Sponsors like RTCW are further liable for individuals collecting petitions on its behalf who complete missing information on a signed petition: "If a person collecting petition forms on behalf of a sponsor of an initiative petition signs another person's name or a fictitious name to any petition, or fills in missing information on a signed

40

petition, to secure a ballot position in violation of s. 104.185(2), the sponsor of the initiative petition is liable for a fine in the amount of $5,000 for each such petition." Fla. Stat. § 100.371(8).

100. Prior to the enactment of H.B. 1205, RTCW requested its volunteers to "perfect" petitions by correcting or completing missing basic information other than the date or signature, such as adding the correct "county" to the form where voters often mistakenly write the "country." That was a common practice among citizen initiative campaigns and permitted by county SOEs.

101. Further, "[a] sponsor of an initiative petition or a person collecting petition forms on behalf of a sponsor of an initiative petition may not mail or otherwise provide a petition form upon which any information about a voter has been filled in before it is provided to the voter. The sponsor of an initiative petition is liable for a fine in the amount of $50 for each petition form that is a violation of this subsection." Fla. Stat. § 100.371(10).

102. Sponsors like RTCW are now liable in the amount of $5,000 per petition if a person collecting petition forms on the sponsor's behalf fills in such missing information, or $50 per petition if a person collecting

petition forms on the sponsor's behalf prefills a voter's information on a petition form. Fla. Stat. §§ 100.371(8), (10).

103. H.B. 1205 appears to impose this liability on the sponsor for the conduct of *any* individual collecting petitions on behalf of the sponsor, not only registered petition circulators.

104. This means that RTCW is subject to massive fines if an individual collecting a petition on behalf of an immediate family member or another individual with a personal use petition—an individual who RTCW would have no ability or reason to know even exists—fills in "missing information," such as the full legal name of their family member or friend signing a personal use form.

105. H.B. 1205 further provides that "[t]he sponsor of the initiative amendment is liable for a fine in the amount of $50,000 for each person the sponsor knowingly allows to collect petition forms on behalf of the sponsor in violation of [subsection 100.371(4)]," which sets out the requirements and prohibitions for petition circulators and individuals who collect petitions. Fla. Stat. § 100.371(4)(g).

106. RTCW is at risk of incurring all of the aforementioned liability *in the midst of an ongoing petition campaign*. H.B. 1205 does not account

42

for the practical realities of grassroots movements, including the people-powered campaigns that drive direct democracy in Florida. It takes a substantial amount of time for volunteer-driven organizations, including RTCW, to redesign protocols, develop guidance, and retrain its volunteers. As a result, RTCW was already forced to suspend petition gathering while it develops a response to H.B. 1205, suffering a massive disruption to its time-sensitive campaign.

### g. Arbitrarily Invalidated Petitions

107.  H.B. 1205 provides for the invalidation of any signed petition form that is collected by someone who was not properly registered, regardless of whether the voter's signature was legitimate and the petition was otherwise valid. Fla. Stat. § 100.371(14)(h) ("A signed petition form submitted by an ineligible or unregistered petition circulator must be invalidated and may not be counted toward the number of necessary signatures for placement on the ballot.").

108.  At the same time, the law provides no mechanism for the voter to receive notice that their properly signed petition was invalidated.

109.  Thus, H.B. 1205 sets up a process by which a voter signs a petition provided by an individual who—unbeknownst to the voter—may

later be determined to be ineligible or unregistered as a petition circulator, and that eligible voter's valid petition is invalidated without any notice or process to the voter.

110.   If the voter did manage to find out that their petition form was invalidated through no fault of their own, it is also unclear whether they may sign another petition because it is a misdemeanor to knowingly sign a petition more than once. Fla. Stat. § 104.185(1).

111.  H.B. 1205 ironically does provide notice to voters whose petition *is* validated and provides an opportunity for the voter to check a box and return the notice to the OECS if the voter believes their signature "has been misrepresented or forged on a petition" and invalidate the petition. *See* Fla. Stat. § 100.371(14)(e). No similar notice is provided to voters whose petitions are invalidated.

## C. The Restrictions on Petition Activities in H.B. 1205, Collectively and Individually, Harm RTCW and its Volunteers

112.   RTCW and its volunteers who collect petitions on behalf of RTCW are harmed by the restrictions imposed by H.B. 1205 as a whole, and the Challenged Provisions individually.

113. H.B. 1205's provisions, taken together, make it virtually impossible for grassroots, all-volunteer initiative campaigns to have a chance of success in gathering a sufficient number of petitions and, because of the number of obstacles for sponsors and petitioners, to even simply engage in protected core political speech.

114. Overall, H.B. 1205 makes it illegal to collect over 25 petitions (at unknown intervals of time) without registering as a petition circulator, requires even uncompensated volunteers to register as petition circulators, imposes burdensome requirements on petition circulators, and then imposes severe fines and criminal penalties on sponsors and petition circulators who are unable to comply with new, unreasonable deadlines and requirements. Navigating the labyrinths of these provisions—some of which impose liability on RTCW for others' errors that RTCW has no way to know of or prevent—will be functionally impossible. They undoubtedly reduce the "total quantum of speech" RTCW and its volunteers can engage in on the critical use of the right to clean water and their ability, by collecting sufficient signatures, to "make the matter the focus of statewide discussion." *Meyer v. Grant*, 486 U.S. 414, 423 (1988).

45

115. In addition to directly harming RTCW as an organization by preventing them from collecting petitions, the Challenged Provisions will require RTCW to divert resources in their attempts to comply with the law. For example, they will have to use funds, resources, and volunteer time to create entirely new protocols for petition gathering that both comply with the law and allow their volunteers to collect petitions without fear of undue intrusion into their privacy or risk of criminal liability. Those resources will be diverted from existing, core activities that would help RTCW serve its purpose, such as recruiting volunteers and collecting petitions.

116. Separately, as explained below, the Challenged Provisions will harm RTCW's leaders and volunteers in multiple ways, including but not limited to preventing some from collecting petitions; subjecting them to restrictive deadlines, fines and penalties; and requiring them to divulge personal information to potential signatories. Moreover, most RTCW volunteers, such as its Ambassadors and leadership who collect petitions, have signed or plan to sign the Right to Clean and Healthy Waters petition as well, and they suffer distinct harms from H.B. 1205's provisions unlawfully jeopardizing the validity of their signatures.

46

117. The Challenged Provisions are harming, and will continue to harm, RTCW.

### a. Non-U.S. Citizen Restriction

118. RTCW has never vetted its volunteers, nor anyone who collects petitions on its behalf, for citizenship status, felony conviction status, or residency.

119. H.B. 1205 bars non-U.S. citizens from "collect[ing] signatures or initiative petitions," whether as a petition circulator or using personal use petitions. Fla. Stat. § 100.371(4)(b)(2)

120. It would be unfeasible for RTCW to begin independently verifying that every volunteer who registers with RTCW or otherwise collects petitions on its behalf—potentially including personal use petitions delivered to RTCW for submission to an SOE—is a U.S. citizen and resident of Florida who does not have a felony conviction without the right to vote restored. If RTCW attempted to do so, its operations would be grievously burdened.

121. RTCW believes that healthy waterways benefit everyone. As such, RTCW is an inclusive, nonpartisan cause, and the organization associates with individuals across the political spectrum interested in

47

keeping Florida's waters clean. RTCW associates with, and wishes to continue associating with, all individuals who believe in its mission, regardless of citizenship status, previous interaction with the criminal legal system, or in-state residency.

122. RTCW's efforts include one or more volunteers who are not U.S. citizens who collect petition signatures. H.B. 1205's ban on non-U.S. citizens collecting petitions in any capacity—either as a paid or volunteer circulator or through the use of personal use petitions—reduces the amount of speech about the organization's Right to Clean and Healthy Water initiative and harms the organization's ability to get its petition on the ballot. *See Meyer*, 486 U.S. at 422-23 (First Amendment rights are burdened by petition circulation requirements that "limit[] the number of voices who will convey [plaintiffs'] message and . . . therefore, limits the size of the audience they can reach" or that "make[] it less likely that [plaintiffs] will garner the number of signatures necessary to place the matter on the ballot, thus limiting their ability to make the matter the focus of statewide discussion.").

123. RTCW is aware of at least one volunteer who is a legal permanent resident of the United States and collected petitions on behalf

of the Right to Clean and Healthy Waters initiative as recently as May 1, 2025—the day before H.B. 1205 was signed into law by Governor DeSantis.

124.  This individual began collecting petitions on behalf of RTCW around April 2023. He was introduced to RTCW's petition initiative when an RTCW volunteer approached him at a community event, educated him about the proposed ballot amendment, and asked him to sign the petition. While he said that he was unable to sign the petition because he was not a U.S. citizen, he asked if he could collect signatures on behalf of the initiative and began doing so.

125.  RTCW is well-integrated into community organizing events, and as such, RTCW volunteers typically attend a range of political and civic events to collect petitions from attendees. This allowed the legal permanent resident to collect signed petitions on behalf of RTCW on numerous occasions since 2023, including by volunteering to help RTCW volunteers collect petitions on-the-spot when he has attended events with RTCW volunteers present, or through more formal volunteer opportunities organized by political or other non-profit organizations.

126.  The legal permanent resident estimates that he has collected between 50 and 60 RTCW petitions, until he was forced to abruptly halt any activities related to petition gathering with the signing of H.B. 1205 into law on May 2, 2025.

127.  When volunteering on behalf of RTCW, this legal permanent resident would engage individuals in conversation, generally explaining the petition process and sharing information about the Right to Clean and Healthy Waters petition and why the issue was important to him.

128.  This former volunteer greatly values his ability to engage in speech related to causes he cares about, including the right to clean and healthy water in his home of Florida. He would continue to engage individuals at community events and collect signed Right to Clean and Healthy Waters petitions, as well as petitions promoting other causes that are important to him, if H.B. 1205's ban on petition activity by non-U.S. citizens were lifted.

129.  Moreover, because sponsors are fined "$50,000 for each person the sponsor knowingly allows to collect petition forms on behalf of the sponsor," RTCW is concerned that it could be subject to this fine if RTCW allowed an individual to volunteer on-the-spot to collect signatures, using

even personal use petitions (which do not require registering as a petition circulator), and that individual turned out to be a non-U.S. citizen, non-resident, or have a felony conviction without the right to vote restored.

### b. Non-Resident Restriction

130.  The Non-Resident Restriction harms RTCW in the same ways as the Non-U.S. Citizen Restriction described just above, including burdens from verification processes and procedures, impacts on volunteer recruitment, and restrictions on political association.

131.  The Non-Resident Restriction also bars Plaintiff Melissa Martin, the Campaign Coordinator for RTCW's initiative effort, from circulating petitions because she is not a Florida resident. Despite the fact that she was born and raised in Florida, works on Florida-related issues, and frequently visits Florida, she is prohibited under H.B. 1205 from engaging in core political speech to support the initiative effort *that she leads* on issues directly related to her enjoyment of Florida waters.

132.  Prior to the enactment of H.B. 1205, Ms. Martin would circulate petitions on behalf of RTCW's ballot initiative when she visited the state and intended to continue doing so during the remainder of the ongoing initiative campaign. But now, she can no longer do so without

51

incurring felony liability, subjecting RTCW to severe fines, and invalidating all petitions that she collects.

### c. Petition Circulator's Affidavit

133. The free speech rights of RTCW and the uncompensated volunteers who engage in petition activity on its behalf are infringed by the requirement that petition circulator petitions include an affidavit with the circulator's name and permanent address on the petition form distributed to prospective signatories.

134. RTCW has never had paid circulators. Accordingly, under the law prior to H.B. 1205, its volunteers were not required to register as petition circulators and did not need to collect petitions using the petition circulator form. Now, any volunteer who wants to collect more than the (arbitrary and ambiguous) number permitted as personal use petitions on behalf of RTCW will need to register as a petition circulator with the state and accordingly distribute their name and permanent address at the moment they are engaging in protected speech.

135. Volunteers who collect petitions on behalf of RTCW, including but not limited to the legal permanent resident who is a former volunteer on behalf of RTCW, would feel uncomfortable providing their name,

address, and other personal identifying information to strangers they approach regarding the petition. The former volunteer who is a legal permanent resident would also consider refraining from petition gathering activities if he were required to do so, even if the Non-U.S. Citizen Restriction was lifted.

136.  RTCW volunteers have never had to provide this information before, and RTCW is aware of volunteers who will stop collecting petitions on behalf of RTCW because of the requirement to register as a petition circulator and provide personal information to prospective signatories through the Petition Circulator's Affidavit.

137. Because of the Petition Circulator's Affidavit, RTCW anticipates that it will need to significantly increase reliance on personal use petitions to conduct its campaign, which substantially reduces the number of people spreading the message about the Right to Clean and Healthy Waters initiative and the number of people this speech is able to reach. RTCW largely relies on recurring volunteers to collect most of the signatures for its initiative; limiting these volunteers to 25 petitions—however the provision is interpreted—will drastically limit the speech

that RTCW is able to express about its initiative and the number of people it is able to reach.

### d. Volunteer Petition Circulator Registration

138.  RTCW has never paid petition circulators because it does not have the resources to do so. Under the law that existed prior to H.B. 1205, uncompensated volunteer petition circulators were not required to register with the state. *See* Fla. Stat. § 97.021(28) (2022).

139.  Without any explanation or reasoning, H.B. 1205 expands the definition of petition circulator to include any "entity or individual who collects signatures for the purpose of qualifying a proposed constitutional amendment for ballot placement," regardless of whether or not they receive compensation. Fla. Stat. § 97.021(28).

140.  The penalty provision also applies to those who deliver or otherwise physically possess signed petitions. Fla. Stat. § 100.371(4)(a).

141.  As a result, all individuals who wish to collect petitions on behalf of RTCW beyond the limited number of personal use petitions permitted by law are required to disclose personal information, undergo significant training requirements, and comply with deadlines and logistical requirements that impose a significant burden on individuals

acting in a purely volunteer capacity or risk felony liability. Significantly, the same is true for other volunteers who do not even directly collect petition forms from voters, but who deliver or otherwise possess petitions at some point during the process of submitting signed forms to the state.

142.  Even worse, this registration with the state must occur *before* any petition circulation takes place. This hamstrings RTCW from engaging new volunteers at events, slows down the volunteer onboarding process, and requires RTCW to reject willing volunteers simply because they have not yet registered.

143. H.B. 1205 thus places the entire apparatus of informal volunteering, upon which RTCW relies, at risk. The law prohibits individuals from volunteering on-the-spot to collect a substantial number of petitions for RTCW because even uncompensated volunteers must be registered petition circulators.

144.  This seismic shift in the law imposes a massive burden on Plaintiffs and will severely limit the ability of the organization and its volunteers to speak about its message.

### e. Personal Use Petition Restrictions

145. H.B. 1205 also imposes indecipherable requirements on individuals who are not registered petition circulators but wish to collect "personal use" petitions and creates felony liability for individuals who transgress those indecipherable boundaries.

146. Because of the requirements H.B. 1205 imposes on registered petition circulators discussed above, RTCW would like to rely heavily on volunteers collecting personal use petitions.

147. However, both RTCW and volunteers who otherwise plan to collect personal use petitions on its behalf do not understand what activities will subject them to fines or criminal liability.

148. As discussed *supra* ¶¶ 88-90, it is not clear whether the 25-petition limit applies to any particular period of time, whether it is an aggregate total for petitions collected across multiple campaigns, and what specific activities, including distributing blank petitions, are encompassed by the law's ban on "collect[ing], deliver[ing], or otherwise physically possess[ing]" more than the allotted number of petitions.

149. This uncertainty has complicated RTCW's ability to provide guidance to potential volunteers about the requirements of the law and

has restricted the speech of both RTCW and its volunteers, who are chilled from engaging in petition activity when they do not know what activity will violate the law.

### f. Severe Fines on Sponsors

150.  RTCW is severely harmed by the specter of massive fines H.B. 1205 imposes on sponsors, including in circumstances where the sponsor is not culpable or even aware of a legal violation.

151.  RTCW's speech is chilled because the law does not make clear the circumstances under which RTCW could be subject to ruinous financial liability. As such, RTCW is forced to severely curtail its petition activities in order to avoid the possibility of extremely hefty fines—fines that would be crushing to the organization.

152.  As described *supra* ¶¶ 93-96, RTCW is at risk of severe and potentially ruinous fines if petitions are delivered later than 10 days after they are signed or to the incorrect county. Before H.B. 1205, RTCW provided training and guidance to volunteers to "protect and deliver signed petitions to the nearest processor at your earliest convenience." If volunteers did not know who this person was, they could receive guidance from a Lead Ambassador, County Captain, Regional Coordinator, or the

Campaign Coordinator. The processor(s), who are also volunteer(s), would then organize received signed petitions by county, deliver out-of-county petitions to the rightful contact or the Fort Myers address, perfect as may be necessary, and, if they are authorized and able, submit signed petitions to the correct SOE. The entire process, on average, normally takes between two or three weeks.

153. Signed petitions may be delivered to the incorrect county for a variety of reasons beyond the control of the sponsor. For example, RTCW volunteers often experience situations in which voters write the incorrect county on the petition form. Especially given H.B. 1205's prohibition on a volunteer correcting this information, delivery to the incorrect county is often beyond the control of any volunteer circulator, or especially the initiative sponsor, who may have no knowledge or control of the individuals collecting petitions on its behalf.

154. As described *supra* ¶¶ 99-104, RTCW is subject to further fines if *anyone* collecting petitions on its behalf fills in missing information or prefills any voter information on a petition.

155. These fines would be imposed for actions by petition circulators or other individuals collecting personal use petitions over

58

which RTCW has no control or culpability. Notably, RTCW is held liable for actions by anyone collecting petitions on its behalf, which would presumably include individuals collecting personal use petitions from friends and family—individuals RTCW has no awareness of, let alone control over.

156. Fines for perfecting petitions where voters make a common mistake—such as writing the correct county on the petition form—further harms Plaintiffs. RTCW has a fiduciary duty to the voter and is obligated to turn in the form, and it will now be obligated to turn in forms that it knows will be invalidated for minor errors. This increases the harm to RTCW's campaign.

157. RTCW is also subject to a massive fine of $50,000 "for each person the sponsor knowingly allows to collect petition forms on behalf of the sponsor in violation of [subsection 100.371(4)." Fla. Stat. § 100.371(4)(g). This includes individuals who collect petition forms in violation of petition circulator registration requirements or personal use petition requirements, including individuals who collect signatures or initiative petitions of any kind and have been convicted of a felony

without the right to vote restored, are not U.S. citizens, or are not Florida residents.

158.  RTCW is unsure how this standard would apply in a variety of scenarios where individuals have commonly collected petitions on behalf of RTCW. For example, individuals like the legal permanent resident discussed *supra* ¶¶ 123-129 have interacted with RTCW volunteers at events and volunteered to collect petitions. Because the law is vague, RTCW may face liability for knowingly allowing a person to collect petitions without knowing that person's citizenship status, residency status, or whether they have been convicted of a felony without the right to vote restored, and the fear of ruinous financial liability has already chilled, and will continue to chill, its speech.

### g. Arbitrarily Invalidated Petitions

159.  RTCW has a fiduciary duty to the voters who sign its Right to Clean and Healthy Waters petition, Fla. Stat. § 100.371(7)(a), and it is committed to ensuring that voters who sign its petition have their rights effectuated.

160.  Moreover, RTCW volunteers who are eligible to sign the Right to Clean and Healthy Waters petition have generally done so, and these

60

individuals have a protected liberty interest—created by the Florida Constitution—in ensuring that their petition is verified and counted toward the total needed to place the initiative on the 2026 ballot.

161.  However, H.B. 1205 allows for the invalidation of petitions for reasons completely beyond the voter's control and knowledge and without any notice to the voter: "A signed petition form submitted by an ineligible or unregistered petition circulator must be invalidated and may not be counted toward the number of necessary signatures for placement on the ballot." Fla. Stat. § 100.371(14)(h).

162.  As such, eligible individuals who sign RTCW's Right to Clean and Healthy Waters petition, including RTCW volunteers and other supporters, are at risk of having their valid petitions nonetheless invalidated because of the identity of the individual who submitted it.

163. It is not even clear from the law who qualifies as an "ineligible" petition circulator. For example, this could include an individual who is duly registered as a petition circulator—and a voter therefore has no reason to suspect is ineligible—and is later deemed to be ineligible because of residency status or another issue.

164. Eligible petition signatories will have no reason to suspect that their petition would not be counted and will receive no notice that their valid petition is nonetheless invalidated.

165. Moreover, it is not clear that these individuals who completed valid petitions submitted by an ineligible or unregistered petition circulator would have the opportunity to sign another petition should they learn that their first petition was invalidated. Fla. Stat. § 104.185(1) (first degree misdemeanor to knowingly sign a petition more than once).

### D. H.B. 1205's Restrictions are Not Appropriately Tailored to Any State Interest

166. The State asserts that the Challenged Provisions were a necessary response to "[e]vidence of fraud related to the process of gathering signatures on petitions for constitutional amendments." H.B. 1205, § 1(1) at 364-65. The State claims that the Challenged Provisions will "protect the integrity of the ballot, ensure a valid election process, and protect the constitutionally provided initiative process" by "updat[ing] the reasonable regulations in place for petition circulators, increase[ing] transparency and accountability for sponsors of initiative petitions, provid[ing] prospective signatories with objective information regarding the impact of a proposed amendment, and deter[ing],

prevent[ing], and penaliz[ing] fraudulent activities related to initiative petitions." *Id.* § 1(2) at 366-75. However, the State's justifications for the Challenged Provisions fall short.

167.  First, the State has proffered no compelling evidence of fraud occurring in the ballot initiative process that would warrant the burdensome and punitive Challenged Provisions, or that would be addressed by the Challenged Provisions.

168.  Second, Florida law already proscribes fraudulent petition activity and provides sufficient criminal penalties for any violations. *See* Fla. Stat. § 104.185 (2022). Furthermore, individuals who believe that their signatures may have been forged, misrepresented, or not delivered to an SOE may already file a complaint. *See* Fla. Stat. § 100.371(9); Form for Complaint Against Petition Circulator, FLA. DIV. OF ELECTIONS, https://files.floridados.gov/media/704896/dsde153.pdf.    That    OECS already investigates any instances of alleged petition fraud cuts against any argument that existing law is insufficient. *See* Fla. Dep't of State Off. of Election Crimes & Sec., 2024 Annual Rep. (Jan. 15, 2025), https://dos.fl.gov/elections/integrity?os=vbkn42&ref=app.

169. Third, the Challenged Provisions are not narrowly tailored to achieve the objectives of deterring fraud and increasing transparency. The State could pursue far less burdensome and more targeted measures, such as improving the enforcement of existing laws. Instead, the Challenged Provisions impose broad and punitive restrictions on all sponsors and circulators, which chill their constitutionally-protected political expression without justification.

170. Therefore, the Challenged Provisions are not narrowly tailored to serve any legitimate state interest. They do not meaningfully combat fraud, increase transparency, or protect election integrity. Instead, the Challenged Provisions impose unnecessary, burdensome, and punitive restrictions on Florida's ballot initiative process and on those who seek to use that process to express their political views and make political change in their communities.

## CLAIMS

### COUNT I
### Violation of the First and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983
### (Infringement of Core Political Speech)

171. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-170 as if fully set forth herein.

64

172. The First Amendment to the United States Constitution prohibits abridgment of freedom of speech. The First Amendment is applied to the states through the Fourteenth Amendment.

173. Circulation of an initiative petition for signatures is "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Meyer v. Grant*, 486 U.S. 414, 421-22 (1988). Whether a voter should support a particular initiative is a "matter of societal concern that [plaintiffs] have a right to discuss publicly without risking criminal sanctions." *Id.* at 421; *see also Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182, 186-87 (1999) (quoting *Meyer*, 486 U.S. at 422).

174. Together and individually, the Non-U.S. Citizen Restriction, Non-Resident Restriction, Petition Circulator's Affidavit, Volunteer Petition Circulator Registration Requirement (including related criminal penalties), and Personal Use Petition Restrictions (including related criminal penalties) curtail Plaintiffs' core political speech in violation of the First Amendment, including by chilling protected speech and restricting the amount of speech conveying Plaintiffs' message that will be communicated. The Petition Circulator's Affidavit and related notice

for personal use forms, the FIS, the Misdemeanor Notice, and the requirement that petition forms include the full language of the proposed ballot measure also combine to infringe on Plaintiffs' core political speech, in part by requiring so much information as to intrude on and drown out Plaintiffs' speech.

175. By chilling the ballot initiative process, those provisions of H.B. 1205 will "reduce[] the voices available to convey political messages." *Buckley*, 525 U.S. at 210 (Thomas, J., concurring). These provisions of H.B. 1205 will reduce the total voices available to speak in favor of supporting a ballot initiative promoting the right to clean water and hamstring RTCW's ability to place the initiative on the ballot and thus "make the matter the focus of statewide discussion." *Meyer*, 486 U.S. at 423. Therefore, they run afoul of the First Amendment.

176. The speech of RTCW and its volunteers includes its interactive communications and activities aimed at encouraging eligible Floridians to support its initiative petition promoting the right to clean water. RTCW and its volunteers take a position and express a point of view in the ongoing debate on whether the people have a fundamental

66

right to clean and healthy waters, and whether state officials have a duty to the public in safeguarding this right.

177.   Punitive civil and criminal sanctions associated with political expression inhibit the exercise of First Amendment freedoms.

178.   Because of the chilling effect of the risk of punitive criminal and civil sanctions and the restrictions on how RTCW can communicate about and conduct its ballot initiative efforts, these challenged provisions of H.B. 1205 unconstitutionally infringe upon RTCW's First Amendment rights and the First Amendment rights of those who collect petitions on its behalf.

179.   These requirements are not narrowly tailored to serve any compelling state interest. Indeed, these requirements do not actually advance any legitimate regulatory interest and serve little purpose other than to dissuade civic organizations like RTCW from engaging in the ballot initiative process.

180.   Under the exacting scrutiny applied in *Meyer* and *Buckley*, or any other level of judicial scrutiny, these requirements fail.

181.   Plaintiffs are and will continue to be irreparably harmed by the violation of their First and Fourteenth Amendment Rights.

## COUNT II
### Violation of the First and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983 (Substantial Overbreadth)

182. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-181 as if fully set forth herein.

183. The First Amendment prohibits government abridgment of the freedom of speech through the enactment of substantially overbroad laws. *See Bd. of Airport Comm'rs of City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 577 (1987).

184. A law may be struck down as facially unconstitutional if it prohibits a substantial amount of speech and thus chills those who "desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid." *Id.* at 574 (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 503 (1985)).

185. The Non-U.S. Citizen Restriction, Non-Resident Restriction, Petition Circulator's Affidavit, Volunteer Petition Circulator Registration Requirement (including related criminal penalties), and Personal Use Petition Restrictions (including related criminal penalties) provisions of H.B. 1205 are unconstitutionally overbroad, as they

68

needlessly regulate a substantial amount of constitutionally protected speech and association and chill constitutionally protected expression.

186.    H.B. 1205's threat of civil and criminal penalties for violations will impermissibly chill Plaintiff's protected speech and the protected speech of those who collect petitions on its behalf.

187.  Plaintiffs are and will continue to be irreparably harmed by the violation of their First and Fourteenth Amendment Rights.

## <u>COUNT III</u>
**Violation of the First and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983 (Infringement of Right to Association)**

188.  Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-187 as if fully set forth herein.

189.  The First Amendment prohibits government abridgment of the freedom of association. *See NAACP v. Button*, 371 U.S. 415, 430 (1963).

190. H.B. 1205's Non-U.S. Citizen Restriction, Non-Resident Restriction, Petition Circulator's Affidavit, Volunteer Petition Circulator Registration Requirement (including related criminal penalties), and Personal Use Petition Restrictions (including related criminal penalties) provisions chill the ability of Plaintiffs to join together with their

69

volunteers to spread its message, advocate for shared beliefs, and engage in the petitioning process in Florida. The Non-U.S. Citizen and Non-Resident Restrictions outright bar Plaintiffs from associating with non-citizens and non-residents for the purposes of petition gathering. And the other Challenged Provisions severely burden association because many potential volunteers will be unwilling to associate with RTCW under this threatening regime.

191.    The Non-U.S. Citizen Restriction, Non-Resident Restriction, Petition Circulator's Affidavit, Volunteer Petition Circulator Registration Requirement (including related criminal penalties), and Personal Use Petition Restrictions (including related criminal penalties) provisions are not narrowly tailored to serve any compelling state interest. They restrict RTCW and all similarly situated organizations from engaging with voters and associating with volunteers for the purpose of attempting to place its initiative on the ballot. They also restrict Ms. Martin from engaging with voters and associating with volunteers in petition gathering activities.

192.    These requirements cannot satisfy even a more lenient standard of review because they do not actually advance and are not

70

rationally related to any legitimate regulatory interest. They do nothing more than hinder civic organizations from associating with voters and volunteers concerning ballot initiatives and other future engagement in the ballot initiative process.

193.    Under the exacting scrutiny standard applied in *Meyer* and *Buckley*—indeed, under any level of judicial scrutiny—these challenged provisions violate Plaintiffs' First Amendment guarantee of freedom of association.

194.    Plaintiffs are and will continue to be irreparably harmed by the violation of their First and Fourteenth Amendment Rights.

## <u>COUNT IV</u>
## Violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983 (Equal Protection Clause)

195.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-194 as if fully set forth herein.

196.    The Fourteenth Amendment to the United States Constitution provides that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction

71

the equal protection of the laws." U.S. Const. amend. XIV.

197.    H.B. 1205 violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution by prohibiting non-U.S. citizens, including RTCW's volunteers, from serving as petition circulators without any legitimate justification for doing so, thereby denying non-U.S. citizens equal protection of the law.

198.    "[C]lassifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny. Aliens as a class are a prime example of a 'discrete and insular' minority . . . for whom such heightened judicial solicitude is appropriate." *Graham v. Richardson*, 403 U.S. 365, 372 (1971).

199.    A state law that delineates based on a suspect classification—like citizenship—"bears a heavy burden of justification." *Appl. of Griffiths*, 413 U.S. 717, 721 (1973). Where a state law adopts a suspect classification like this one, "a State must show that its purpose or interest is both constitutionally permissible and substantial, and that its use of the classification is necessary to the accomplishment of its purpose or the safeguarding of its interest." *Id.* at 721–22 (alterations and footnotes omitted).

72

200.    "Resident aliens, like citizens, pay taxes, support the economy, serve in the Armed Forces, and contribute in myriad other ways to our society. It is appropriate that a State bear a heavy burden when it deprives them of [] opportunities." *Id.* at 722.

201.    H.B. 1205's Non-U.S. Citizen Restriction expressly singles out non-U.S. citizens and prohibits them from collecting petitions—even personal use petitions signed by friends or immediate family members—without any justification.

202.    That non-U.S. citizens are denied certain rights and privileges, such as the right to vote, has nothing to do with their right to associate and engage in protected speech. *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990) (non-citizen U.S. residents receive constitutional protections, including under the First Amendment). Nor does it justify infringing on the associational and speech rights of organizations like RTCW. *See Kleindienst v. Mandel*, 408 U.S. 753, 765 (1972) (recognizing protected First Amendment right to associate with non-citizen).

203.  Defendants cannot satisfy their heavy burden of explaining why excluding non-U.S. citizens from serving as petition circulators is narrowly tailored to further a sufficiently weighty state interest.

204.  Plaintiffs are and will continue to be irreparably harmed by the violation of its right to equal protection under the Fourteenth Amendment.

## COUNT V
### Violation of the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983
### (Unconstitutionally Vague in Violation of Due Process Clause)

205.  Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-204 as if fully set forth herein.

206.  The Fourteenth Amendment commands that a state shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

207.  Courts may hold a law unconstitutionally vague if it fails to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited" or if it invites "arbitrary and discriminatory enforcement." *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972).

208. A law is void for vagueness when people "of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926).

209. "[W]here a vague statute abut(s) upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of (those) freedoms. Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Grayned*, 408 U.S. at 109 (cleaned up).

210. Because H.B. 1205 inhibits core First Amendment activity, including petition circulation by RTCW and the volunteers who collect petitions on its behalf, "a more stringent vagueness test should apply." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982).

211. Heightened review is also required when statutes implicate criminal penalties. *See High Ol' Times, Inc. v. Busbee*, 673 F.2d 1225, 1229 (11th Cir. 1982).

212. The Volunteer Petition Circulator Registration Requirement (including related criminal penalties) and Personal Use Petition Restrictions (including related criminal penalties) provisions of H.B.

1205 are vague and ambiguous in numerous respects and do not provide eligible citizens with sufficient knowledge about how to comply with their provisions in order to exercise their rights to core political speech. *See supra* ¶¶ 79-92, 138-149.

213.  The Volunteer Petition Circulator Registration Requirement (including related criminal penalties) and Personal Use Petition Restrictions (including related criminal penalties) provisions of H.B. 1205 are unconstitutionally vague in violation of the Fourteenth Amendments.

214.  Plaintiffs are and will continue to be irreparably harmed by this violation of constitutional due process.

## **COUNT VI**
**Violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983 (Procedural Due Process)**

215.  Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-214 as if fully set forth herein.

216.  The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution prohibits any state from depriving "any person of life, liberty, or property, without due process of law." U.S. Const., art. XIV, § 1.

217.  The Arbitrarily Invalidated Petitions provision of H.B. 1205 denies Plaintiffs' liberty and property interests without due process of law.

218.  Due process requires that before the government can deprive an individual of a property or liberty interest, the individual must be afforded adequate process to safeguard that interest—including both reasonable notice and an opportunity to be heard in a meaningful way. *See Armstrong v. Manzo*, 380 U.S. 545, 550, 552 (1965).

219. A liberty interest to which procedural due process rights attach may "stem from an independent source such as state law." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972); *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 229 (1985) ("[P]roperty interests are protected by procedural due process even though the interest is derived from state law rather than the Constitution").

220.  Florida law establishes a state right to the petition initiative process. Fla. Const. art. XI, § 3; *Browning v. Fla. Hometown Democracy, Inc., PAC*, 29 So. 3d 1053, 1068 (Fla. 2010) (discussing appropriate regulation by the legislature of the "right" of the people-led petition process secured by the Florida constitution).

77

221.  The signing of a petition is an "expression of a political view [that] implicates a First Amendment right." *John Doe No. 1 v. Reed*, 561 U.S. 186, 195 (2010).

222.  Notice and the opportunity to be heard is a threshold requirement of due process before the deprivation of a liberty interest. *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). The Supreme Court has held that notice is adequate where "notice [is] reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.*; *Dorman v. Aronofsky*, 36 F.4th 1306, 1315 (11th Cir. 2022) (noting that the *Mullane* test applies to determining the adequacy of notice).

223.  The Arbitrarily Invalidated Petitions provision provides *no* notice or opportunity to be heard to a voter when their valid petition has been invalidated because the petition circulator who submitted the form was ineligible or unregistered, nor does it provide the voter with any opportunity to cure their petition by, for example, submitting a new petition not affected by the impermissible circulator.

78

224. As a result, eligible RTCW volunteers and other RTCW supporters are at imminent risk of having their valid petitions and the valid petitions they collect on behalf of RTCW discarded.

225. Plaintiffs are and will continue to be irreparably harmed by this violation of constitutional due process.

## <u>COUNT VII</u>
**Violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983 (Substantive Due Process)**

226. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-225 as if fully set forth herein.

227. "The touchstone of due process is protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974). Accordingly, "the substantive component of the Due Process Clause generally protects that person from arbitrary and irrational governmental action." *Kentner v. City of Sanibel*, 750 F.3d 1274, 1279–80 (11th Cir. 2014).

228. Moreover, being "punished without being personally guilty" implicates "a cardinal notion of liberty . . . and substantive due process is applicable." *St. Ann v. Palisi*, 495 F.2d 423, 426–27 (5th Cir. 1974).

229. H.B. 1205 imposes severe fines on initiative sponsors for violations, including violations *by others* whom the sponsor does not control and whose violations it is not aware of. *See* Fla. Stat. §§ 100.371(7)(a)(1) (sponsor fined if petition is received more than ten days after signature), 100.371(7)(a)(2) (sponsor fined if petition is received late during a certain period), 100.371(7)(a)(3) (sponsor fined if petition received by incorrect county), 100.371(7)(a)(8) (sponsor fined if petition circulator provides a fictitious name or fills in missing information), 100.371(7)(a)(10) (sponsor fined if petition circulator pre-fills information).

230. The Arbitrarily Invalidated Petitions provision also arbitrarily and irrationally invalidates petitions submitted by lawfully registered voters on the basis of the conduct or eligibility of the petition circulator. Fla. Stat. § 100.371(14)(h). These are violations by the petition circulator that the signer has no reason to be aware of and has no ability to detect or prevent.

231. The Severe Fines provisions violate substantive due process when applied to (a) "personal use" petitions and (b) petitions collected by registered petition circulators who are not paid by or authorized by the

initiative sponsor because they impose severe punishment entirely untethered from culpability.

232.  Imposing severe penalties on initiative sponsors on the basis of others' conduct is also wholly arbitrary and irrational.

233. The Arbitrarily Invalidated Petitions provision violates substantive due process in all its applications.

234.  Plaintiffs are and will continue to be irreparably harmed by this violation of constitutional due process.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and:

A. Declare that the Challenged Provisions within Fla. Stat. §§ 97.021(28), 100.371, 104.188, as amended by H.B. 1205, violate the First and Fourteenth Amendments;

B. Preliminarily and permanently enjoin Defendants from enforcing the challenged provisions within Fla. Stat. § 97.021(28), 100.371, 104.188, as amended by H.B. 1205;

C. Retain jurisdiction to render any and all further orders that this court may deem necessary;

D. Award Plaintiffs their attorneys' costs and fees pursuant to

statute; and

E. Grant any and all other relief this Court deems just and proper.

Respectfully submitted on this 21st day of May, 2025,

*/s/ Simone Leeper*

Simone Leeper (Fla. Bar No. 1020511)
Danielle Lang (D.C. Bar No. 1500218)*
Brent Ferguson (D.C. Bar No. 1782289)*
Alexandra Copper (Cal. Bar No. 335528)*
Heather Szilagyi (D.C. Bar No. 90006787)*
Ellen Boettcher (D.C. Bar No. 90005525)*
Kunal Dixit (D.C. Bar No. 90029821)*
CAMPAIGN LEGAL CENTER
1101 14th Street NW, Ste. 400
Washington, DC 20005
(202) 736-2200
sleeper@campaignlegalcenter.org
dlang@campaignlegalcenter.org
bferguson@campaignlegalcenter.org
acopper@campaignlegalcenter.org
hszilagyi@campaignlegalcenter.org
eboettcher@campaignlegalcenter.org
kdixit@campaignlegalcenter.org

*Counsel for Plaintiff-Intervenors*
**pro hac vice* motion forthcoming