**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

```
FLORIDA DECIDES HEALTHCARE, INC,)
et al.,                         )
                                )
            Plaintiffs,         ) Case No: 4:25cv211
                                )
        v.                      ) Tallahassee, Florida
                                ) May 22, 2025
CORD BYRD, in his official      )
capacity as Secretary of State  )
of Florida, et al.,             )
                                ) 9:00 AM
            Defendants.         )
_____ )
```

**TRANSCRIPT OF PRELIMINARY INJUNCTION PROCEEDINGS**
**BEFORE THE HONORABLE MARK E. WALKER**
**UNITED STATES CHIEF DISTRICT JUDGE**
**(Pages 1 through 118)**

Court Reporter:          MEGAN A. HAGUE, RPR, FCRR, CSR
                         111 North Adams Street
                         Tallahassee, Florida 32301
                         megan.a.hague@gmail.com

*Proceedings reported by stenotype reporter.*
*Transcript produced by Computer-Aided Transcription.*

**APPEARANCES:**

For the Plaintiffs:         King Blackwell Zehnder & Wermuth PA
                            By:  FREDERICK STANTON WERMUTH
                                 Attorney at Law
                                 fwermuth@kbzwlaw.com
                            25 East Pine Street
                            Orlando, Florida 32801

                            Elias Law Group
                            By:  BEN STAFFORD
                                 Attorney at Law
                                 bstafford@elias.law
                            1700 Seventh Avenue
                            Suite 2100
                            Seattle, Washington 98101

                            Southern Poverty Law Center
                            By:  NICHOLAS TAICHI STEINER
                                 Attorney at Law
                                 nick.steiner@splcenter.org
                            1101 17th Street NW
                            Suite 550
                            Washington, DC 20036


For Intervenor Plaintiff Safe & Smart:

                            Stearns Weaver Miller
                            By:  GLENN BURHANS, JR.
                                 HANNAH E. MURPHY
                                 Attorneys at Law
                                 gburhans@stearnsweaver.com
                                 hmurphy@stearnsweaver.com
                            106 East College Avenue
                            Suite 700
                            Tallahassee, Florida 32301


For Intervenor Plaintiff League of Women Voters of Florida:

                            Democracy Defenders Fund
                            By:  POOJA CHAUDHURI
                                 SPENCER KLEIN
                                 Attorneys at Law
                            pooja@statedemocracydefenders.org
                            spencer@statedemocracydefenders.org
                            600 Pennsylvania Avenue SE
                            Unit 15180
                            Washington, DC 20003

**APPEARANCES (cont'd):**


**For Defendant Cord Byrd:**

                         Holtzman Vogel Baran, et al.
                         By:  MOHAMMAD O. JAZIL
                              MICHAEL R. BEATO
                              Attorneys at Law
                              mjazil@holtzmanvogel.com
                              mbeato@holtzmanvogel.com
                         119 South Monroe Street, Suite 500
                         Tallahassee, Florida 32301


**For Defendant James Uthmeier:**

                         Florida Attorney General's Office
                         By:  WILLIAM STAFFORD, III
                              SARA SPEARS
                              Attorneys at Law
                         sara.spears@myfloridalegal.com
                         william.stafford@myfloridalegal.com
                         119 South Monroe Street, Suite 500
                         Tallahassee, Florida 32301


**For Defendant State Attorneys:**

                         Jacobs Scholz & Wyler, LLC
                         By:  ARTHUR JACOBS
                              Attorney at Law
                              buddy@jswflorida.com
                         961687 Gateway Boulevard
                         Suite 201-1
                         Fernandina Beach, Florida 32034

**P R O C E E D I N G S**

(Call to Order of the Court at 8:59 a.m. on the 22nd day of May, 2025.)

THE COURT:  Please take your seats.

We are here in Case No. 4:25cv211.  We are here on the preliminary injunction.  I've got counsel present.  We have a large number of lawyers.

I'm not going to have y'all introduce yourselves.  You can identify yourselves when you speak.

I'd like to start by noting that my inquiry is limited to the narrow confines of the motions for preliminary injunction, which is ECF No. 92.  I recognize that the House Bill 1205 which is at issue has other provisions that plaintiff may challenge in this case but which have not gone into effect yet and which were not included in plaintiffs' pending motion for preliminary injunction.

But right now I'm limited to addressing the request to preliminarily enjoin defendants from enforcing the ten-day return deadline; the fines, plural, provisions; and the criminal provisions outlined in the motion, namely, the voter information retention ban, the expansion of the definition of "racketeering activity," and the ban on filling in missing information on a signed petition.

I only note that because, again, any reviewing court, if there is a reviewing court, will wonder since there is a

number of other provisions referenced or contained in the bill.

(Pause in the proceeding.)

THE COURT:  I will move closer to the microphone. Apparently, the last hearing I had I was chewing on the microphone, and it was too close.  Like little bear, I apparently can't get it just right.

Okay.  And I think everybody here knew that we're, obviously -- and it should be obvious that we are limited to what's in the motion, but, again, there's other moving parts associated with the bill.

Let me start with a slightly different protocol in this case and others.  Oftentimes I'll have a scheduling conference, and the parties will submit a proposed schedule and their decision to not call live witnesses and so forth, and that's all worked out prior to the hearing.  Things moved slightly differently here in as much as it started off as a TRO, then morphed into a preliminary injunction.  So the procedural history here is going to be slightly different than some of the hearings I've had in similar challenges.

But I need to find out first whether or not anyone intends to introduce any additional evidence, or is the evidence currently before me; that y'all expect to rely on the declarations, including the affidavits that were filed yesterday evening.

Let me start with counsel for the plaintiffs.

MR. WERMUTH:  Fritz Wermuth for the Florida Decides Healthcare plaintiffs.  I -- we will not have any more evidence other than what's been submitted.

MR. BURHANS:  Good morning, Your Honor.  Glenn Burhans on behalf of Smart & Safe Florida.  We will rely solely upon the evidence that's already been submitted.

THE COURT:  And my understanding is the League of Women Voters is not going to introduce any evidence; is that correct?

MS. CHAUDHURI:  That's right, Your Honor.

My name is Pooja Chaudhuri.  I represent the League plaintiffs, and we are not going to introduce evidence and rely on the declarations.

THE COURT:  Let me turn to counsel for the defense.

MR. JAZIL:  Good morning, Your Honor.  Mohammad Jazil for the Secretary of State.  We will not be providing any additional evidence.

THE COURT:  The other -- and when I say "defense," my understanding is, Mr. Jazil, unless I have questions, you are the only one speaking today; is that correct?

MR. JAZIL:  Yes, Your Honor, but Mr. Stafford reserves the right to tell me I'm wrong.

THE COURT:  Okay.  Certainly.

So let me find out from the other lawyers for the other defendants.

I was just trying to make clear for the record why I was saying "counsel for the defense."  I understand there are a number of other lawyers here but, based on what had been submitted to Court, it was my understanding that I was going to hear from Mr. Jazil unless I had specific questions for one of the other defendants.  That's the reason why I phrased it the way I phrased it.  I certainly wasn't cutting anybody off or eliminating anybody else.

Mr. Stafford.

MR. STAFFORD:  Yes, Your Honor.  What that -- your understanding is correct.  We will defer to Mo -- to Mr. Jazil, unless the Court has any specific questions for the Attorney General.

THE COURT:  Okay.

And nobody has -- from the defense has any additional evidence you seek to admit or witnesses to call and so forth; is that correct?

MR. JAZIL:  That's correct, Your Honor.

THE COURT:  All right.  And I went through that exercise -- and I didn't have any reason to think otherwise, but there was some reference in some of the papers that were filed with me to suggest that, depending on the Court's questions, somebody may want to submit something, and I clarified and -- did an order of clarification indicating that, no, I would determine what evidence is before me before I heard argument,

and then the evidence would be locked in, and I wouldn't -- we wouldn't be reopening the evidence once I turned to argument of counsel.  So that's why I went through that exchange.

So we now have all the evidence.  This motion has been fully briefed.  The last thing I got was -- in terms of briefing, was the reply from the plaintiffs.

So what I have typically started doing is starting with defense so we are not going back and forth like a ping-pong to see if there is anything defense wants to add -- when I say "defense," collectively the defendants -- to add in response to the reply.  Then I'll essentially get a sur-sur-reply from the plaintiffs.  And then if I have any questions once I hear from the presentation of the lawyers, then I'll ask the questions at that point rather than starting with the questions.

So Mr. Jazil.

MR. JAZIL:  Your Honor, nothing to add.  Happy to address the issues as we present the argument.

THE COURT:  Okay.

And I'm not going to limit the plaintiffs.  I understand I've got, I believe, two lawyers that wanted to make some presentation on behalf of the plaintiffs; is that correct?

MR. STEINER:  Yes, Your Honor, that's correct.

My name is Nick Steiner.  I'll be speaking on behalf of the Florida Decides Healthcare plaintiffs; and on the other hand of the table, we have Mr. Glenn Burhans, who is going to be

talking about the case as it relates to Smart & Safe.

THE COURT:  And, Mr. Steiner, how long do you request for your presentation?

MR. STEINER:  I would say 15, 20 minutes.

THE COURT:  I'm just -- I'm not artificially limiting anyone, and I won't limit Mr. Jazil in his response.  I simply want to kind of have some idea for our schedule this morning.

Mr. Burhans.

MR. BURHANS:  Your Honor, Glenn Burhans for Smart & Safe.  I expect to be about the same length of time as Mr. Steiner.

THE COURT:  Okay.  All right.  So I suspect what I'll do -- and is it your -- do y'all care which of you goes first?  Have y'all worked that out?

MR. STEINER:  Yes, I think I'll be going first.

THE COURT:  Fair enough.  If you hadn't, we could have done rock, paper, scissors.  All right.  So Mr. Steiner will go first and then Mr. Burhans.

Then what I'll probably do is, for the benefit of the court reporter, take a break.  That will also give Mr. Jazil an opportunity to consider what presentation has been made by counsel for the plaintiffs and confer with counsel for the other defendants, and then we'll come back and hear from Mr. Jazil.

Mr. Steiner, you have the floor.

MR. STEINER:  I assume you want me up here,

Your Honor?

THE COURT:  More importantly, I think the court reporter wants you up there so you can be heard next to a microphone.  The longer I serve on the bench, the more I realize that in some ways the court reporter outranks me.

But go ahead.

MR. STEINER:  May it please the Court, my name is Nick Steiner with the Southern Poverty Law Center on behalf of the plaintiffs Florida Decides Healthcare, Mr. Mitchell Emerson, and Mr. Jordan Simmons.

As we were discussing earlier at the outset, I'd just like to lay out I will be speaking about the three provisions of HB 1205 as they relate to FDH, Mr. Emerson, and Mr. Simmons, and my colleague will discuss the case as it relates to Smart & Safe.

To begin, Your Honor, Article XI, Section 3, of the Florida Constitution was adopted during the Civil Rights Era and was adopted in that context.  And since then, over decades, the Florida State Legislature has been rolling back the protections guaranteed in that -- in that article.  And with the passage of HB 1205 on May 2nd, those protections have been eliminated altogether, in particular for the plaintiffs Florida Decides Healthcare and Mr. Simmons.  And it's -- and in our preliminary injunction motion, we are requesting that the three categories of provisions -- the ten-day deadline to submit petitions, the

civil penalties -- the civil fines, rather, categories of HB 1205, and the criminal penalties -- be enjoined because they are chilling the First Amendment rights of the plaintiffs and the Fourteenth Amendment.

THE COURT:  Hold on.  I don't have dog ears, but even I can hear the squealing.

Do we know what's up?

THE COURTROOM DEPUTY:  No.

THE COURT:  All right.  Mr. Steiner, my apologies.

MR. STEINER:  Is this your dog --

THE COURT:  We'll soldier on.  But my apologies.  I don't know what's wrong with the audio system.

MR. STEINER:  Okay.  Yeah.

So the provisions of HB 1205, those three provisions that we are seeking to enjoin with this preliminary injunction motion, violate the plaintiffs' First Amendment rights and the plaintiffs' Fourteenth Amendment due process rights.

FDH is a sponsor organization seeking to expand Medicaid for Floridians.  They have a demonstrated harm, and they are losing, every day, petition circulators who are chilled by the provisions of HB 1205, and they are losing the ability to effectively communicate with the Florida public, which *Meyer v. Grant* and *Buckley v. ACLF* have said are unconstitutional.  And for Mr. Simmons, he is an individual plaintiff.  He's a petition circulator and is chilled, as well, from engaging with the

Florida public on the Medicaid question -- expansion question from both the fine and the criminal penalties in HB 1205.

As a threshold matter, just to address standing, the State only really contends that there is an issue with injury. They don't contend that there's an issue with traceability or redressability.

So just to briefly address the standing issue, there clearly is an injury here.  Every day that HB 1205 is in effect, they are -- they've paused outreach; their petition circulation efforts have plummeted by 88 percent; they lost -- on May 7th, they lost one of their hubs in Manatee County to collect and distribute petitions.

And if we look at Ms. Rachel Prestipino's declaration, who -- she is part of another hub -- there is -- she describes that there is a chilling effect there as well.  So every day that HB 1205 is left on the books, FDH continues to be injured.

And for Mr. Simmons, he has -- he is also -- as a petition circulator, is being (indiscernible) -- is being chilled.

(Reporter requested clarification.)

MR. STEINER:  So every day that HB 1205 is on the books, Mr. Simmons' and FDH's ability to engage with the public on this question of Medicaid expansion is chilled.

Turning to the merits, Your Honor, this case falls squarely in the *Meyer* and *Buckley* line of cases; and in those

cases, there is a heightened -- a heightened First Amendment scrutiny standard. And in *Meyer* and *Buckley*, the standard was articulated as exacting scrutiny. In order to satisfy exacting scrutiny, HB 1205 has to be narrowly tailored to a legitimate State interest.

THE COURT: Counsel, forgive me, I was going to not interrupt you, but y'all do this in your papers, and now you're doing it. You're jumping from it's self-evident that *Meyer* and *Buckley* would stop these rules, and these changes run afoul of *Meyer* and *Buckley*, and you go directly to the tailoring.

But, you know, the Eleventh Circuit has said that it doesn't have to be the most efficient or the least expensive process, and so it seems to me the threshold question is when do you cross that line. So -- and Mr. Jazil may disagree with this, but it seems to me that if -- just because you label something processed doesn't mean that you -- the plaintiffs lose.

So, for example, if the law said you had to return the -- the return -- the return deadline was 12 hours, or the law was you could only collect petitions in June, July, and August when the temperature falls below 40 degrees in Florida, you've set rules that would effectively render the process a nullity. So it would be impossible to comply with the State's rule.

So I'm not saying it has to be that drastic, but it

seems to me there is a line somewhere between you've burdened it so much you've effectively removed the ability to communicate versus you've done things that have made it more expensive and less efficient.  And it seems to me, before I get into whether it's least restrictive and so forth and skip to the heightened review that you've suggested, I've got to decide whether or not that line has been crossed by these changes to the law.

So I don't want you to wish when you read my order that you didn't have a chance to respond to this.  So I'm not doing it to be difficult; I just want you to have a meaningful opportunity to respond to my concern.

So before you jump into the disconnect between the rules and the goals, help me to understand why -- what they've done here is so onerous it effectively stops the communication, which is the heart of the issue.

MR. STEINER:  Yes.

So there's a lot of things, actually.  So the -- the problem, first starting with -- I guess let's start with the ten-day deadline.  What that does is it hamstrings FDH's ability to actually -- so FDH is put into a position where it has to decide whether it's going to engage in that quality control process that it did under the 30-day deadline in ten days, and do it on a very small number of petitions, which then limits its ability to actually get enough petitions to have a successful campaign.  It's limited in that way.  Or it has to just

simply -- and as Mr. Emerson describes in his declaration, the option they decided to take, which was to just gather the petitions and submit them as quickly as possible, because that ten-day deadline is very short.

What that does, in effect, is that when it goes to the supervisors, the supervisors will probably find a lot more mistakes in those petitions than they would otherwise.  And those petitions get rejected, and then they have to collect even more petitions, potentially --

(Indiscernible crosstalk.)

THE COURT:  Which begs the question, how much time is enough and how much time is too little?  Where is the line drawn and what's the evidence before me to decide that line has been crossed?  So if you had a thousand days to review them, then you've got, you know, plenty of time to review them.  If you have an hour to review them and submit them, then that -- Mr. Jazil, again, may disagree.  He'll have to let me know, but it seems to me that that would be impossible to comply with.

So the question becomes where is the line, and then what is the evidence before me to ascertain that that line -- or find that substantial likelihood of success on the merits, that you've demonstrated that line has been crossed.  Because, again, the Eleventh Circuit has made plain that it's got to substantially restrict the political discussion, and that simply because it's more efficient and less affordable is not enough.

So it's --

MR. STEINER:  Yeah.  So that line, Your Honor, is not really something the Court has to decide here.  I think in the *League of Women V Browning* case and -- before this Court in 2012, there was a time-limit question of whether or not 48 hours --

THE COURT:  That was Judge Hinkle's case; right?

MR. STEINER:  Yes, exactly.

-- whether or not the 48-hour requirement was enough.  And Judge Hinkle explained that it's up to the State Legislature to decide what that time limit is.  But he did find that 48 hours was unconstitutional and --

THE COURT:  But why did he find it's -- why did he find the 48 hours is unconstitutional?

MR. STEINER:  Because it made it impossible to --

THE COURT:  Right.  So --

    (Indiscernible crosstalk.)

THE COURT:  Isn't that my same task, to determine there is a difference between 48 hours and ten days?

MR. STEINER:  In this context, Your Honor, ten days is impossible to comply with and -- in the way that FDH is able to actually -- either collect enough signatures to have a successful campaign or be subject to so many fines that it bankrupts the organizations.

THE COURT:  Isn't the argument --

MR. STEINER:  And that's the problem.

THE COURT:  Isn't the argument when you take -- because you've said this, but I want to -- let's make explicit what's implicit in what you're saying -- is that, Judge, you are just not looking at the ten days in a vacuum, when you have all these provisions where you've got to have a quality control. Otherwise you are going to be fined to the point that you can't exist.

When you combine that with the ten days, it's looking at it together that -- if there was no quality control and you weren't facing all these fines and they didn't add all these other provisions, then you probably could comply with the ten days.  But you have to look at it as a package, because the entity that's going through this process has to address the package as a whole, and it's the ten days becomes impossible if you also are going to comply with the other requirements of the State; namely, the quality control you'd have to have to meet the other standards that they've set.  Is that --

MR. STEINER:  That's exactly right, Your Honor. That's exactly right.  And they do work together in that way.

THE COURT:  What if it was 15 days?  Would that be impossible?

MR. STEINER:  I --

THE COURT:  15 days and four hours?

Again --

MR. STEINER:  Again, Your Honor, I don't know if --

THE COURT:  I mean, Judge Hinkle got kind of a softball, in fairness.

I mean, if Mr. Jazil would be -- have a lot of explaining to do, and I probably would have started questioning him without even -- if this was a 24-hour requirement, then this would be a much shorter hearing.  But --

MR. STEINER:  Yes.

THE COURT:  Anything else -- I just want to make sure you have every opportunity to explore this, because it is troubling me.

MR. STEINER:  I do -- I thank Your Honor.

In order to strike down this provision, the ten-day requirement and the fine provisions, I don't think you need to find a specific number of days that -- where it --

THE COURT:  I agree with that.

MR. STEINER:  -- it becomes constitutional.

THE COURT:  There's a difference between I don't have to find a specific number of days versus I have to find the restriction itself.  That was my point.  The 48 hours is easy.  24 hours would be easy.  But I do have to decide is -- does ten days cross that line; right?

MR. STEINER:  Yes.  Yes.

And I think with the evidence from Mr. Emerson about how these different provisions are interacting and affecting FDH

that the ten-day requirement and the fines associated with late petitions crosses that line and burdens the plaintiffs' First Amendment rights to be able to find it unconstitutional and enjoin it.

THE COURT:  All right.

MR. STEINER:  So -- I mean, so turning to the standard in *Meyer* and *Buckley*, the exacting scrutiny standard, there -- in order for HB 1205 to satisfy it, it needs to be narrowly tailored to a legitimate state interest.  And starting with the second part first, I think the declaration that we submitted yesterday at about 5:00 o'clock -- apologies for the late submission.  But in there it really -- Dr. Herron really speaks to the unreliability of the reports that the State relies on to justify its interest.  And in the report, just kind of globally, looking at his conclusions globally, there is a lot of statistical errors in the way that they calculated how many fraudsters -- quote, unquote, how many fraudsters there were in Florida and are extrapolating from three counties that they handpicked to the entire state to say, look, there's all this fraud, we have to do something to address it.  But according to Dr. Herron, the statistical methodologies that they used were not sound and makes all of their data justifying the state interest -- puts it into question.

And then so for the -- and then looking at how HB 1205 is tailored to address that interest, you'll see that none of

the provisions are actually narrowly tailored to address fraud in the initiative process.

So, for example, starting with the fine provisions, mailing a petition to the wrong county might be a mistake, but that's not fraud. And so penalizing FDH with uncapped fees for a provision like that doesn't actually go to the state's interest in preventing fraud. It's just -- it's just an error.

And similar with, like, submitting a late petition that will be counted anyway, that has -- that's not narrowly tailored to address fraud. It just is submitted late. It will be counted anyway, and the civil fine penalties that are exacted against FDH can be crippling. It will -- it will be -- it's uncapped $50 per petition, per late, per date. And when we are talking about over a million petitions that are being submitted to reach that 880,000 or so petition requirement, we are talking about thousands and thousands, hundreds of thousands of dollars in fines.

THE COURT: Counsel, let me ask you there, when I'm going through that analysis, whose resources do I consider? So, for example, if a single person -- and I ask this, and it's kind of highlighted by your colleague that's going to speak after you, where they have a lot more resources, arguably, I suspect, than your client. So -- but we could also have somebody in The Villages that wants to put a voter initiative about elder care on the ballot, and a group of ten individuals get together,

decide to do that, well, any fine at all would be a burden on them.

So what does the Court -- what analysis do I go through in that regard when you start talking about these fines and the weight that it's putting on folks?  Because it kind of depends on who you are talking about.  A fine would mean -- something to me would be entirely different to John Morgan if he's trying to get a voter initiative on there.  I'm just a humble public servant, and he's got the largest law firm in America or whatever the signs say.  That's only highlighted for me because he even had his banners flying at Yankee Stadium this past weekend I saw.  And strangely enough, when I visited my other daughter, he had the same banners when I saw the Bruins play in Boston.  So apparently they are more ubiquitous than sliced bread.  But go ahead.

MR. STEINER:  I guess what I would say is that --

THE COURT:  I basically did that to give you time to think about what your response was.

MR. STEINER:  I appreciate that.

THE COURT:  It really doesn't matter what ball game I saw this weekend or that Morgan & Morgan has a banner, but I always try, when I ask a question, to give folks a chance to think about their answer.

MR. STEINER:  I think -- I mean, to respond to your question, Your Honor, we are not challenging the previous -- or

the fine provisions that were under the -- that were law before HB 1205.

And I think what is distinct about HB 1205 is that the fine provisions now make it so even the, like, really wealthy organizations that have the finances to fund the campaign -- not Mr. Morgan -- even they're locked out of this process. And I think at this point --

THE COURT: And what's the evidence --

(Indiscernible crosstalk.)

THE COURT: -- before me that would support that conclusion?

MR. STEINER: I'm sorry. Say that one more time.

THE COURT: What's the evidence before me that would support that conclusion that these are set at such a high rate?

Again, Mr. Jazil would have some explaining to me if -- he's got some explaining anyway -- but I would have led with it if the fine was a million dollars per error. I mean, I can almost see Dr. Evil putting his pinky up and, you know, we want a bazillion dollars for every fine. Not suggesting that Dr. Evil is currently leading the State of Florida. But if he was and that was what he did, then that would be easy, kind of like the softball Judge Hinkle had.

But same question, doesn't -- when I start talking about the overwhelming nature of the fines, there's a line somewhere, and the question that I've got to ask is, do these

sums cross that line; right?

MR. STEINER:  Yeah.  So if we're looking at evidence, I think -- I mean, I don't have FDH's budget numbers in front of me right now, but I mean, they hire hundreds of petition circulators.  They are engaging with voters across the entire state.  They have an organizational infrastructure to actually collect enough signatures for this petition process.  And even for FDH, with those resources, with those financial resources, the fines are uncapped.  So it has potential to go even beyond millions depending on the number of violations that are found.

And then if we look at -- I mean, the other -- the intervenors in this case, we have other large organizations coming in because they too have a -- feel that this law, HB 1205, is preventing them from engaging in this initiative process as well.

So even for large organizations like FDH that have many different -- many petition circulators on staff, can't keep up with the fines that will be levied against them if HB 1205 --

THE COURT:  So the standard would be if the fines are set at such a level that even large organizations that otherwise would be equipped to get the requisite number of signatures -- that's what you'd look to as the -- I've got to write an order.

MR. STEINER:  I understand your predicament, Your Honor.

I think -- I mean, I think the way that I would phrase

it and frame it is that there's no -- there's no ceiling to these fines.  So because there's no ceiling, it doesn't matter how much money you really have.  If you're incurring a bunch of violations that are -- on petitions that are being submitted, then the amount of money that you'll have to pay in fines is potentially devastating to the point where no organization can actually fund a successful campaign in getting an initiative put on the ballot.

THE COURT:  And harkening back to one of your prior responses to me, isn't it also, Judge, you can't look at it in a vacuum.  If you shrink it to ten days and you've got all these requirements where they're going to flyspeck everything we do, combined with the increased fines, it's the combination of those things that creates the exposure based on where the fines are set?

MR. STEINER:  That's correct.

And to add on to that, we haven't really been talking about the criminal penalties, but that also plays a major role in this, because if the criminal penalties are limiting the ability of organizations like FDH to actually hire people who are willing to go out and ask for signatures on a petition, then they're limited in their ability to actually engage with their target audience.

THE COURT:  Are you satisfied that the papers are sufficiently well-developed?  But y'all referenced -- switching

back to the idea of tailoring -- that identifying the other restrictions that are already in place that address late filings, for example -- is there anything you need to add to that?  Because it seems to me that would be part of the -- the narrowly tailoring analysis would be -- would already exist to address those perceived problems.

MR. STEINER:  Yes, Your Honor, I think so.

THE COURT:  Okay.

MR. STEINER:  I think so, yeah.

So -- and --

THE COURT:  Before we move on from there --

MR. STEINER:  Yeah.

THE COURT:  -- folks say we're having trouble getting signatures.  Do we have a -- the evidence in front of me, does it talk about the efforts and how easy or hard it was to get signatures in terms of before and after these changes went into effect?

MR. STEINER:  Yes, Your Honor.

So I think Mr. Emerson talks about the injury since HB 1205, the injury that FDH is suffering, in that they've had to cut down petition circulation by 88 percent.  It's not sustainable long-term.

THE COURT:  And from that you'd extrapolate that it's the change, not the fact that the initiative itself is unpopular.

So, for example, if I have an initiative that I want to make the swamp rat the state animal or whatever, perhaps the reason why I'm not getting signatures is because a swamp rat isn't real popular.  But here you'd say the reason why the record would allow me to reach such a conclusion would be because we've got evidence --

MR. STEINER:  Yes.

THE COURT:  -- to suggest that it's more or less popular.

MR. STEINER:  Yes, I think there is evidence in the record to support that.  Before HB 1205 was passed, FDH had already collected about a hundred thousand petition signatures, and there's no reason -- I mean, the reduction in petition circulators is the reason for this reduction in new signatures coming in, not --

THE COURT:  What -- how do I not -- couldn't it also be you had reached sort of the ceiling?  Because at the same point, hasn't the marijuana initiative received around 700,000 signatures?

MR. STEINER:  Well, there's still time before the deadline to collect more signatures.  And the way that FDH operates, they go to major events and festivals, and as those events happen over the course of the year, they are able to collect a significant number of petitions at those events.  And under this -- under HB 1205, they would be forced to be

submitting large batches of petitions that they gather at these events without any quality control measures at all.

THE COURT:  All right.  I understand.

Thank you.

MR. STEINER:  So -- and then turning, Your Honor, to some of the criminal penalties, again, these are also not narrowly tailored to prevent fraud, and, in addition, they are also vague and overbroad.  Vague in the sense that there are -- a reasonable person, Mr. Simmons, could interpret some of the words that are in these criminal provisions in different ways, and a reasonable person could read them in different ways, such as the word "irregularities."

If a -- if FDH were to spare, I guess, Mr. Simmons, since he would be the one who would be criminally prosecuted -- if he were to submit a handful of petitions late, does that make it an irregularity?  We don't know.  I think there's multiple definitions of what an irregularity could be, but we don't know what the State will interpret "irregularity" to mean, and that infringes on Mr. Simmons' due process rights because he has to have at least some notice of what the criminal provision is going to criminalize, what conduct.

THE COURT:  But Mr. Jazil says that there's a handful of cases where state court judges in other contexts have used the word "irregularity" in cases, including ballot initiatives and so forth, or -- so it's self-evident, and you've got

guidance there. So that solves the problem. Both the enforcers as well as the folks that risk enforcement are on notice because they're -- you can scour Florida case law and find some judges that have used the word "irregularity" to apply to at least a subset of problems, and, bingo, everybody is on notice. No problem there; nothing to see.

MR. STEINER: Your Honor, there is actually no common law crime of irregularity, so it still isn't clear exactly what -- even with what the State says, it's not clear what "irregularity" actually means.

And if we're looking at the *Dream Defenders* case --

THE COURT: I'm familiar with that one. But go ahead.

MR. STEINER: -- the State can codify common law crimes. That's okay. And -- but we can't look to common law as defining what "irregularity" means. And even looking at that, we don't even know what it means because there is no common law crime of irregularity.

THE COURT: And one thing that you might as well go ahead and address because the -- certain appellate judges love this. They start talking about the rule of lenity, which I understand can keep you from being convicted, but it doesn't help you if you are being arrested.

So for purposes of the criminal provisions and vagueness, does it matter that you would have a good argument to have the charges dismissed or avoid conviction, or is it the

arrest that we're concerned with for purposes of vagueness in the criminal provisions?

MR. STEINER:  Well, for purposes of vagueness -- I mean, it certainly has a chilling effect.  Arrest in and of itself will chill people from wanting to actually petition -- or gather signatures for petitions.

THE COURT:  I guess what I'm asking, is the rule of lenity a safe harbor for the State when you start talking about criminal prosecutions in this context?

MR. STEINER:  I don't think so, Your Honor, no.  It is the act of the State pursuing individuals for these crimes, investigating them, criminalizing, seeking criminal prosecutions for them even if they're -- if they end up dismissing the cases. They are still engaging in the act of pursuing a criminal investigation for -- for these provisions.  So, no, I don't think so.

And then in the other provisions for retaining personal information, that is also vague and overbroad. Retaining personal information in the *Florida NAACP* case, it's vague.  Personal information is dependent on whose personal information it is and what that person feels is personal or not.

And HB 1205 leaves open an open list of things that are personal information, and so it says such as social security number, driver's license.  So it leaves that kind of -- it leaves that open, so it's unclear what the bounds are.

THE COURT:  Well, let me ask everybody -- pause there -- since we are talking about the personal information.

And so it's under (9), "such as."  I believe the only sample form that I've got was filed by your colleague as Exhibit 2 in ECF No. -- I think it's 50-3.  And as I understand the ballots, they only vary by the ballot title and summary at the top and the sponsor's information, but the rest of the form is the form issued by the State.

So does everybody agree that that is the form and that is the information and that it doesn't matter -- the only thing it changes is the top, which is the sponsor and the amendment information; is that correct?

MR. BURHANS:  That's right, Your Honor.  There will be a serial number that's linked to each issue.

I want to point out one distinction.  I don't know that it matters for your question, but you should know it.  The example that's in the exhibit is the petition form for a volunteer.

THE COURT:  Right.

MR. BURHANS:  That doesn't involve a paid circulator. Where you have a paid circulator there will be additional requirements under law that appear in the affidavit and so forth.  That will also be the same information required regardless of what initiative it is.

THE COURT:  And I don't have that -- do I have that

form?

MR. BURHANS:  That's not in the record.  I don't know if it's material for today's purposes, but we can certainly put it into evidence.

THE COURT:  You don't have to.  I was just asking.  And you answered my question, which is it's not.  And I just wanted to verify -- and it's going -- because it will make sense why I'm asking this question in a moment.

Because as I understand it, when you have -- I mean, this is the State.  It's their law, and they issue their form, and they give examples, "such as," and the only overlap between the "such as" and the form they generate is the signature; correct?

MR. STEINER:  Yes.

THE COURT:  Is that right?  I mean, if I'm wrong, I'm wrong.  I'm holding it up, and I highlighted "other information" in -- I'm color blind -- purple, I think, and I highlighted "signature" in pink and -- because when I'm reading (9), "such as," it seems like the only example they offer that the State puts on their form is "signature," and the other "such as" may be informative, may help inform you as to the type of information they're talking about.

But aren't we really talking about whether one's name, address, date of birth, and registration number are or are not personal information?  I mean, there's a limited universe of

what we're talking about; right?

MR. STEINER:  Yes.  There is a limited universe of things.

But I think, like, practically speaking, the retention of personal information is something that -- for FDH, anyway -- is potentially raising this as an issue, this particular criminal provision, in that -- well, I guess prior to HB 1205, they would retain this personal information when they would essentially scan petition forms and keep -- keep all of the forms for, like, quality control purposes.  Make sure that those -- that there's no duplicates and things like duplicate petition forms or if there's two people with the same name or something like that.  They were engaging in that quality control process and retaining that personal information, which isn't clear whether that now is the retention of personal information --

THE COURT:  Well, let me ask you directly --

(Indiscernible crosstalk.)

THE COURT:  -- because I want to make sure I know what the plaintiffs' position is.  And there is no right or wrong answer.  Are you -- and that's why I was harping on there is a limited universe.  We are not talking about some hypothetical social security number, which is one of the examples, because that's not collected; right?

MR. STEINER:  Right.

THE COURT:  All right.  So is it the plaintiffs' position -- and Mr. Burhans may have a different answer.  Is -- do y'all consider the name of the person to be personal information, or it could possibly be personal information, so that puts us in a trick bag?

MR. STEINER:  I think that can be, yes.

THE COURT:  Are you saying the address of an individual could be personal information such that it puts us in a trick bag?

MR. STEINER:  Yes.

THE COURT:  Are you saying the registration number could be personal information such that it puts us in a trick bag?

MR. STEINER:  Yes.

THE COURT:  And are you saying the date of birth could be personal information such that it puts us in a trick bag?

MR. STEINER:  Yes.

THE COURT:  When I say "us," your folks that are trying to comply with the law.

MR. STEINER:  Yes.

THE COURT:  So what we are really talking about, are those four things conceivably personal information such that it creates exposure?  Not everything else -- and when you look at the examples of signature and the other things, would it be obvious such that it's not vague that those four things would or

would -- would fall outside of -- either would fall within or outside of personal information within the meaning of the prohibition; correct?

MR. STEINER:  That's correct.

And I think one thing I would like to add, Your Honor, is that on June 1st there is going to be a new form.  That's part of what HB 1205 is doing, and we don't know yet what that form looks like.

It's possible there are additional things.

THE COURT:  I'm many things but I'm not clairvoyant, so I have no idea what's going to be on the form.  And I don't know how I would fashion an order to assume that it's either going to be better or worse; right?

MR. STEINER:  Right.

THE COURT:  So that's what we'd call one of those nice little factoids, but it doesn't really change my analysis; right?

MR. STEINER:  But I think in terms of, like, what other personal information may be added as a requirement on the form.

THE COURT:  Or --

(Indiscernible crosstalk.)

THE COURT:  Or they may have just conferred with Mr. Jazil and chosen a prettier font, I don't know.  I don't know what they did or will do.  Okay.

MR. STEINER:  Yeah.  So I guess then turning to the missing information piece, that is also unclear exactly what -- and as you were describing earlier, I mean, there is a closed universe here of things that could be missing information.  But it is criminalizing a petitioner from filling out missing information on a signed petition, but it's unclear whether or not that means if a petitioner is helping somebody fill out a petition form, is that also criminal now, a felony?  That is unclear.

And is also overbroad in the sense that it is criminalizing things now that are not -- that are not fraudulent.  A person -- a circulator could be helping somebody fill out their form, putting in, let's say a county is missing, they could fill in the county.  That's not fraud.  They are just helping fill out a petition -- a petition.

And so in that sense, Your Honor, all of the -- the criminal provisions irregularity, missing information, and retention of personal information are vague and overbroad, and it's --

THE COURT:  Is it personal information and the word "retention," or is it just the personal information that you are challenging as vague?

MR. STEINER:  Well, I think the personal information is vague, and I think the retention of personal information is overbroad.

THE COURT: Okay.

MR. STEINER: And so all of that is in violation of Mr. Simmons --

THE COURT: Let me circle back to what you just said, because at some -- I mean, you can twist yourself into a pretzel and make anything vague, but why isn't the plain reading just you got to wait and have them sign it? You're free to help them fill it out, you just don't have them sign it until after you've done whatever you are going to do to help them to fill out information.

Why isn't that the answer?

MR. STEINER: Well, I think, practically, Your Honor, when you are collecting signatures for a petition, you only have a certain limited amount of time that you have with the voter to discuss the issues and get everything filled out. And it's possible that there may be instances where the circulator will know that I was in Orange County and this person's address is in Orange County and realize later that Orange County was not filled in. The signature will be on there already.

THE COURT: So you are saying they can go back in there and fill it in after the fact?

MR. STEINER: No. I'm saying that -- I'm saying that what HB 1205 is doing is now making that a criminal penalty to maybe later go and confirm that that person actually lives in Orange County and fill it in. If they go back and find the

voter and then ask them, can I put this in, they'll be filling in missing information. This is why it's so vague and unclear exactly what the provision is criminalizing, because in a circumstance like that, that could be criminal under this law, and the circulator could be charged with a third-degree felony.

THE COURT: Okay.

MR. STEINER: So, yes, I think the Fourteenth Amendment due process and First Amendment overbreadth on these criminal provisions, counsel enjoining the criminal provisions also because they are not narrowly tailored to the State interest of addressing fraud, they go way above and beyond.

And that's all I have, Your Honor, on the merits.

In terms of irreparable harm, as I was mentioning earlier, FDH has limited significantly its petition circulation efforts. I think the harm is compounding every day. They are losing valuable time in collecting more signatures. And Mr. Simmons is harmed because he is chilled out of his core political speech, in violation of the First Amendment.

And the balance of the equities in public interest are always -- weigh in favor of an injunction. There is always an interest in the State respecting the constitution, and the burden on the plaintiffs's First Amendment rights clearly outweigh the State's interests here.

And for these reasons, FDH and Mr. Simmons and Mr. Emerson respectfully request that this Court enjoin those

three categories.

THE COURT:  I have got a couple of other things I want to ask you quickly to clean up.

MR. STEINER:  Sure.

THE COURT:  Aside from invoking the free association clause in the title of subsection (b)(2), you don't really develop any argument concerning an infringement of your free association rights with respect to the challenged provisions at issue in the preliminary injunction motion; is that right?  I just don't see that argument developed or put in front of me. It may be because it may be something that's going to come up in the future, but I just don't see any discussion of that.

So is that challenge in front of me?

MR. STEINER:  I think -- no, Your Honor.  I think -- I mean, the associational -- there is associational harm.  But the strength of the First Amendment claims are direct to FDH for -- for not being able to engage the public, their target audience, in an effective way, and Mr. Simmons on his Fourteenth Amendment and First Amendment rights.

But, yes, I mean, there is associational harm, and I think that claim will be fleshed out more in another preliminary injunction motion on other provisions.

THE COURT:  I just wanted to make sure I wasn't missing anything.

In your reply you appear to address only the

racketeering definition with respect to defendants' response concerning your overbreadth claims. You posed the question to the Court, quote, whether Florida can turn even the most minute errors in an activity that unquestionably implicates the First Amendment into a felony punishable by up to three years in prison, so I just wanted to -- you mentioned this before, but when I read your papers, it seemed like your overbreadth issue was limited to the racketeering definition, is that not true?

MR. STEINER: That isn't true, Your Honor.

I think the other criminal provisions are also overly broad. I think -- and as we were discussing earlier, retaining personal information can be any number of things beyond what it seems the State might be trying to criminalize here.

And so it goes -- there are minute errors that could occur in filling in missing information. Also, I mean, retaining personal information, FDH collects petitions, scans them, retains them. That could be now criminal under this statute. And for that reason, it's also overbroad in that it's criminalizing things that should not be criminal.

THE COURT: All right. And I thought I understood that from your argument earlier, but I wanted to circle back and make sure that you fleshed it out as much as you wanted to inasmuch as the argument in your papers you filed were slightly more limited.

Finally, before we take a break, you haven't really

mentioned prefilled petitions. To the extent you argue the fines for providing prefilled petitions implicate protected speech, the only case that I could find on point is the Tenth Circuit's case in *Vote America versus Schwab,* S-c-h-w-a-b. But in that case, the Tenth Circuit rejected the plaintiffs' argument that *Meyer* and *Buckley* applied and required strict scrutiny.

What is your best argument to distinguish the case with respect to the level of scrutiny that applies if this Court is persuaded that mailing prefiled petitions is protected speech?

MR. STEINER: I think, Your Honor, in the prefilled information, prefilled information expands -- and actually, for -- in one of FDH's declarations, Mr. Emerson's declarations, he explains that in a couple of months, using prefilled information actually was better, more accurate, and was actually better at addressing some of the concerns that the State has, at least what they purport to have, in terms of their interest in curtailing fraud. Prefilling information actually helps that State interest and -- so fining an organization like FDH for prefilling information goes against their State interest, not in favor of it.

THE COURT: Okay. I think I was asking a slightly different question, but fair enough.

Anything additional at this point?

I'm going to obviously -- y'all can reply once I hear from Mr. Jazil.

MR. STEINER:  Not from me, Your Honor.

THE COURT:  It's been an hour, so I'm going to take a break for the benefit of the court reporter.

And you had said 15 minutes.  I know I ask a lot of questions, but you had a full and fair opportunity to say what you wanted to say; is that correct?

MR. STEINER:  Yes.

THE COURT:  All right.  We'll go ahead and take a break, and when we come back I'll hear from Mr. Burhans.

MR. STEINER:  Thank you, Your Honor.

THE COURT:  Thank you.

(Recess taken at 10:00 AM.)

(Resumed at 10:12 AM.)

THE COURT:  Please take your seats.

If we could, let's go ahead and close the doors in the back.

All right.  We are back on the record, and let me just ask counsel -- Mr. Steiner is going to get a gold star from the court reporter because he speaks at a nice pace.  So -- and apparently I matched him, which is unusual because I normally speak too quickly.  So if you'll just try to speak slightly slower so we can get a good record, and Mr. Jazil is going to follow suit.

But you may proceed.

MR. BURHANS:  Thank you, Your Honor.

Glenn Burhans of Stearns Weaver Miller on behalf of plaintiff Smart & Safe Florida, which is the sponsor of the Initiative Petition 2501 which we are attempting to place on the ballot for the 2026 general election.

I understand your desire to get to the evidence of the harm created by HB 1205, particularly the ten-day rule and the fines, and I'm going to get into that in detail in just a moment.

But I wanted to start by making sure I'm on the same page as you are with respect to the standard, and you alluded to the Eleventh Circuit.  Of course, you were talking about the *Biddulph* case, and the interesting thing about *Biddulph* is -- well, first of all, the Secretary and the Attorney General cut short the relevant quote from the case as to how the standard applies, and so I'm going to read that so I understand that we are on the same page.

*Absent some showing that the initiative process substantially restricts political discussion of the issue Biddulph is seeking to put on the ballot, Meyer is inapplicable.*

And that went to the issue you went to this morning, Your Honor, that there has to be a showing that the regulations substantially restrict the speech.  In that case, per the Eleventh Circuit in *Biddulph*, *Meyer* applies, and I submit -- and

as I'm about to walk you through the evidence -- that there has been a substantial restriction on political speech.

But let me submit this, Your Honor.  It matters not what standard you apply because under any standard, the ten-day rule and the fines fail the test, and that is so because the ten-day rule and the fines have zero bearing upon the stated aims of preventing fraud or preserving ballot integrity.

And why do I say that?  Well, I say that because the Secretary's own rule, 1S-2.0091(2)(b) states that a late-delivered petition will not be invalidated merely because it's late.

Your Honor, I'm just going to bring that up for you so you can see it.

Madam Clerk, if you can put it on the screen so we can see what I'm talking about.

Okay.  So under (2)(b), you can see in the last sentence -- pardon me -- *The untimely filing* -- this is the last sentence.  *The untimely filing of a form does not invalidate the signature on the form.*

Now, later on in the rule it describes the criteria for what constitutes a valid petition.  That includes the requisite information:  The voter's name; the voter's address, including city and county; the voter's date of birth, or the voter registration number; the signature; the date the petition was signed.  And if it's a paid circulation -- circulator, then the

circulator affidavit. If those requisites are present, that petition cannot be invalidated merely because it's late, and it must be counted.

So if the ten-day deadline does not invalidate a petition, it cannot serve any purpose with respect to fighting fraud or preserving ballot integrity. There is absolutely no connection. So apply whatever test you want. It fails that test.

Now, with that stage setting, Your Honor, let's talk about the evidence that's been presented in this case. By the way, it's completely unrebutted. And most of this is found in the declaration of Ms. Cox -- there are two -- submitted as the corporate representative of Smart & Safe Florida, her first declaration, and the second declaration submitted yesterday.

Now, importantly, the effects of 1205 have been immediate. Smart & Safe's workforce has been reduced by nearly 85 percent. We've lost 1100 workers, circulators, out in the field. A couple of those have submitted declarations as to the difficulties they faced under HB 1205, including the inability -- one woman who has vision problems, can't drive at night, lives two and a half hours away from the office -- cannot get to the drop-off office every couple of days in order to satisfy this ten-day requirement. That's Ms. Barbara Ramphal, and her affidavit appears as composite Exhibit A in the first Cox declaration.

Now, aside from that 85 percent in the workforce,

that's resulted in circulator hours and the number of signatures collected dropping significantly by 75 percent, Your Honor. That's Cox paragraph 35 in her first declaration.

In the second declaration at paragraph 32, we put some numbers on that.  Smart & Safe has gone from collecting an average of 78,000 signed petitions per week, 78,000 per week, down to an average of 12,000 to 15,000 per week.

That places the ability to get this initiative on the ballot for statewide discussion in grave doubt because of, as a direct result of, HB 1205.  In particular, the ten-day rule.

So it diverts circulators from the field.  We now have to shift them from collecting signatures, so we are taking people engaged with speech with voters out of field, no longer communicating with voters, and putting them into the back office to try to process these things within the ten-day time period.

But there's more.  The cost of expediting review and processing and delivery has increased by 370 percent.  That's $3.42 per petition.  That results in an increase of budgeted cost for Smart & Safe of $1.4 million.  That's money that can't be spent on speech.  And as we know, the case law tells us, less money for speech equals less speech.  And in this case, it is hampering the ability to get to the ballot for the voters to decide.  There's been increased delivery costs.  If you look at the first Cox declaration at paragraphs 28, 29, there's a discussion of how these costs impact Smart & Safe and its

ability to get its core speech message to the voters.

Now, as you'll see in the declaration as well -- and this is in a number of spots, I'll point them to you in a moment. But the ten-day rule significantly hampers Smart & Safe's quality control and fraud-detection processes. As Ms. Cox testified, Smart & Safe takes a -- numerous steps to detect and prevent fraud, not the least of which is comparing petitions by hand so that they can ferret out fraud.

And one of the things -- this is really ironic, Your Honor. One of the things that the report highlighted was saying that, well, there are these petition circulators, these suspected fraudsters, and they are just filling out petitions. And you can tell by -- all you have do is compare the handwriting between these petitions, and you can see it's the same handwriting and it's the same person signing these things. But guess what, under the ten-day rule, sponsors can no longer perform that vital function. It's absurd.

And what's the result? Ruinous fines for not being able to comply with an obvious fraud protection measure that can now not be conducted because of the ten-day deadline under HB 1205.

I want to talk to Your Honor a little bit about the impact of -- well, before I get to the fines, a couple more points on the ten-day rule.

Every petition that is signed has to be turned in. So

even if there's a defect, even if this is suspected fraud that somehow gets caught in the ten-day time period, it has to be produced.  That's significant, because I think what you are going to see, and as the declarations discuss, there is going to be an increased invalidity rate.

Now, as Ms. Cox testified, petition invalidity can range from 5 to 10 percent just on signature mismatches alone.  And that doesn't mean it's fraudulent.  It means somebody is in a hurry outside of Publix and writes their name really fast or it's a clipboard is at an awkward angle.  Whatever the reason, signatures change over time.

But when the invalidity rate reaches 25 percent, the supervisors are required to report it to the Office of Election Crimes and Security, who conducts an investigation, and they make criminal referrals.  So by hampering the sponsor's ability to ferret out fraud, separate, segregate, and identify suspect petitions for the supervisors so that the supervisors are on notice and can investigate as required, that can't happen.

That also means sponsors are unlikely going to be able to take shelter in the self-reporting provision because there is no time to identify those things before they get turned over to the supervisors.

The other thing I want to mention about the -- the ten-day period is that it artificially constrains -- it arbitrarily constrains the time period to conduct this quality

control.  It's got significant fines.  I'll talk about that in a moment.  It prevents detection of fraud.  It punishes sponsors for failing to deliver petitions on days when the office is closed.  And I'll get to that in a moment.

But, Your Honor, it's -- here's an application that can very easily happen in real life, and Ms. Cox talks about it in her declaration.  Because every petition has to be turned in -- believe it or not, it's not all that uncommon for somebody to get the wrong county on their form.  They might put their PO Box address versus their legal residence, or they may have moved and didn't realize that they are now registered in this different county.

Under the old statute where you had 30 days, all you had to do was the sponsor would submit it to the Supervisors of Elections listed on the form, they would review it.  If it turned out to be the wrong county, sponsor was put on notice and it went to the right county to get collected.

In this circumstance, under the ten-day rule, if that happens, I don't see any way that the correct county could ever receive the petition in time, because you're submitting from the sponsor to the wrong supervisor within ten days already, right?  So that's already a tight time period.  Then the sponsor has up to 60 days by law to review.  And then it's got to go to the correct sponsor.  Well, you know, what -- the correct county.  By then it's way too late.  Ms. Cox talks about it in her

declaration. And I think that's going to be a very real-world problem with this statute.

Now, let's talk about how ten days is not really ten days, because we have a real example that's coming up just this weekend. Monday is Memorial Day. We are all going to leave town or go to barbecues and that kind of thing for the weekend, and the supervisor's office is closed.

What's the impact of that? Well, the impact is, for petitions that were gathered just six days ago, Friday, May 16th, that means if those petitions are not turned in to the supervisors by tomorrow, within 7 days, not 10, they will be untimely because the Legislature has taken out the provision that would allow for counting the petition as timely on a day where the office is closed.

And that's found, Your Honor, in HB 1205 at lines 727 through 728. And they struck the provision that would not have a fine apply if it was delivered on the next business day if the office is closed.

So let's go back to the Memorial Day example. And you'll note that in the second Cox declaration at paragraph 32, Ms. Cox estimated that the amount of signatures gathered has dropped from 78,000 to an average of 12- to 15,000 per week.

So let's take -- let's be conservative. Let's take the low end of 12,000. Well, 12,000 divided by seven days of the week is roughly 1,700, exactly 1,714. Let's go with 1,700

to make the math easy.  Let's look at what happens in just this example.

So you have 1,700 petitions that were gathered on May 16th.  On May 24th, the supervisor's office is closed.  That's an $85,000 fine right there on those 1,700 petitions.

On Sunday, May 25th, the supervisor's office is closed.  Another $85,000 fine for those late-delivered fines -- petitions, excuse me.

Monday, Memorial Day, fortunately the office is closed because those poor supervisor staff, they need a break.  They worked really hard.  Our folks work closely with them, and we understand the good job they do under tough circumstances.  So as they are enjoying their break, Smart & Safe is incurring another $85,000 in fines.  So that results in $255,000 of fines because Smart & Safe didn't get their petitions submitted within seven days instead of the ten days.

Your Honor, that's real life.  That's impact.  That's $255,000 that does not go to conducting speech out in the field with the voters.  That scenario will be replicated on Labor Day.  Incidentally, it will also be repeated on President's Day of next year.  We won't be gathering then, hopefully.  And MLK Day.

But my point is this, Your Honor:  The ten-day rule has zero relation to fighting fraud or preserving the ballot integrity because it's not a basis to invalidate the petitions.

What, then, is the purpose of so arbitrarily

constraining the delivery period to ten days?  Which sometimes is not really ten days, it's seven days.  And what's the purpose of imposing these uncapped fines?  Simple.  It is to squash the initiative process, pure and simple.

When you look at provisions like the ten-day rule, when you look at striking the next-business-day provision, that's not fighting fraud.  It's stamping on speech.  It bears no relation to those claimed rationales.

Now, Your Honor, there's more.

I talked about the impact on the work force, the decrease in the petitions gathered.  There's just about 32 weeks to go before the deadline, because these petitions have really got to be in the door by January 31st.  Because at that point in time, the supervisors will only have 30 days to verify.  So if we don't hit our number -- and we've got several hundred thousand to go.  Recall, I think it was in the declaration, you have to collect well over a million to get to 888,000 verified.

That is placing our ability to get to the ballot uncertain.  And that is unconstitutional for the reasons talked about in *Meyers* and the other cases cited in our briefs.

But let's talk a little bit more about the fines, because there is more real-world experience.  So let's harken back for a moment to last year's election, 2024.  Smart & Safe was a sponsor of Amendment 3.

And you will no doubt notice that Exhibit 2 to the

Cox -- the first Cox declaration was a letter from the Secretary of State, Office of Election Crimes and Security, fining Smart & Safe in the amount of $121,000 -- 850 -- that's -- $121,850. PS, that was reduced to $150 because, after dialogue with the State, they agreed that five petitions should not have been deemed late.  And we thank them for that.  I'm not making light of that.

But my point is this:  That's a significant fine.  It was imposed four months after the election occurred and well over a year after those signatures were verified by the Secretary.

The only reason Smart & Safe was around in March of 2025 is because we are continuing the effort for this election cycle.  Most other political committees, when they lose, they fold up the tent stakes and they go home.  And so my point of this is to say, this fine, not only does it not combat fraud and it does not preserve ballot integrity, it's likely going to be meaningless for those sponsors that are long gone and have closed their committee.  Is the State going to force them to reopen and raise more money to pay off fines?  I don't know.  It doesn't make much sense to me, but we'll leave that to the Secretary and the Legislature.

The larger point is, Your Honor, Smart & Safe was already fined $121,000 under the 30-day time period, not because Smart & Safe was negligent, not because they engaged in fraud,

but merely because the petitions were late.  That's it.

As you've seen in the declarations, sometimes petitions are late because of the mail; sometimes the petitions are late because voters sign them and hold onto them.  In Ms. Cox's declaration, she talks about how on the day before she signed her declaration, on May 13th Smart & Safe received a number of petitions that were dated in February.  Not only does that violate the 30-day rule, it violates the 10-day rule.  So Smart & Safe is being fined for no fault of their own.

And, by the way, those can be found at Composite Exhibit B to the first Cox declaration.  She discusses those at paragraphs 22 and 39.

What purpose does it serve to fine a sponsor because a voter delayed beyond 10 or beyond 30 days to return the petition to the sponsor?  It serves zero purpose, Your Honor, except to quash speech, to cause disruption in the process, to divert resources away from engaging and communicating with the voters.

I want to talk about one more example that's mentioned in Ms. Cox's declaration.  It's the example of Volusia County, and there are two boxes of petitions that were submitted to Volusia.  The post office took possession of them on the same day.  In total, they are about 2,400 petitions involved.  As Ms. Cox testified, those boxes sat in the USPS facility for four days before moving, and then after that, one box was delivered five days late, and another box was delivered eight days late.

Now, if you were to apply the $50-per-petition per-day penalty, that would be about $750,000. I'm not suggesting that's going to be the actual fine. Obviously, somebody is going to have to look at all the petitions in that box to determine whether every single one was late, but it makes my point. Sponsors under this regime are fined hundreds -- or potentially subject to fines of hundreds of thousand of dollars because the Supervisors of Elections' offices are closed for three days in a row on a holiday weekend, because voters hold on to their petitions for weeks or months, or because of delays caused by the United Postal Service.

So, Your Honor, no matter how you look at it, the ten-day requirement as I've described is not the least restrictive means. It's not narrowly tailored. I don't even think it has a rational basis to the purported excuse of fraud or preserving ballot integrity, because, as we saw under the Secretary's rule, 1S-2.0091(2)(b), those late-delivered petitions must be counted so long as they satisfy the other criteria.

So in the end, these provisions burden Smart & Safe's political speech by making it less likely that it will garner enough signatures to place the measure on the ballot, thus limiting its ability to maybe make the issue of the amendment a subject or a focus of statewide discussion.

Now, you had asked counsel for Florida Decides

Healthcare whether, you know, there's -- if there's a dropoff in the petitions and could that be due to -- well, maybe it's just not a popular initiative.  Well, let me address that.

In the last general election in 2024, Amendment 3 -- and it's the same amendment here, Judge -- received over 5. -- million votes.  Barely 60 million -- rather, barely 60,000 -- excuse me -- than the 6.1 million garnered by President Trump in the very same election, and more than 1.3 million than Governor DeSantis gained in his last re-election.  It is a popular measure.  It enjoys broad support amongst the people.

The reason why we have 1205, I think, is because that measure is very popular, and when you look at the types of restrictions that have been put here -- the ten-day rule, the fines -- there are others that we'll address later in the lawsuit that we will point to specific provisions that look like they were designed to undercut the success achieved by Amendment 3 in the last election.  That's not a burden of proof we have, but I think it speaks volumes as to what is going on here.

But let me kind of finish off with this.  I talked to you about the *Biddulph* holding.  I think it's actually perfectly consistent here because we have shown the substantial impact on the speech.  There are substantial restrictions.  And, you know, when you look at these provisions -- and I'm going to apologize to Robert Frost -- where "two roads" diverged in a yellow wood," the Legislature chose to trample upon the First Amendment and

turned away from reasonable opportunities to craft narrowly tailored means, or least restrictive means, or even means that bear a rational relation to the statement of interest.  And let's be clear, as I've outlined, the ten-day provision and the attendant fines bear zero relationship to preventing ballot fraud or protecting ballot integrity.

That's all I have now, Your Honor.  I'll be happy to answer any questions.

THE COURT:  Quick question.  I want to circle back to -- you were talking about what you were going to talk about moving forward and evidence that would come forward moving forward.

It seems to me -- and I don't think that Mr. Jazil would disagree -- that if you claim initiative regulations that were content based, that would be more -- had a disparate impact on certain political viewpoints -- that is a different potential subissue.

Here I understood, at this juncture for this PI, the plaintiffs were all arguing that the State was impermissibly burdening the free exchange of ideas about the objectives of an initiative proposal, not that, for example, with Amendment 3 success and stuff, they were targeting you or your message at this point, although that -- you were just suggesting that could be before me later.

I just want to make sure that's the case.  I'm not

discounting that, but I didn't understand the papers at this juncture for y'all to be arguing in support of the PI, that the record was developed such that you are arguing that it was the message of your initiative that's being targeted at this juncture.  Do I have that wrong?

MR. BURHANS:  You don't have that wrong, Your Honor. That's not our argument today, and I'm not necessarily suggesting it's an argument later on.  As I like to tell folks, it may just be a little flavor of the soup down the road, but you don't have to worry about it today.

THE COURT:  I understand.

Thank you.

MR. BURHANS:  Anything else?

Thank you.

THE COURT:  We've -- Mr. Jazil, we've been going for a half an hour, and then we're going to -- we're going to take a five-minute break, regroup, and have you come back.

At this juncture, how long do you think you need?

MR. JAZIL:  Your Honor, as long as it takes for me to answer your questions to try to persuade you.

THE COURT:  You've heard my questions generally, but I -- although I'm going to have some questions regarding the vagueness arguments, but -- anyway, so in terms of your presentation before I interrupt you, how long do you think you need?

MR. JAZIL:  20 minutes, Your Honor.

THE COURT:  Fair enough.

We'll take a five-minute recess and come back.

Thank you.

(Recess taken at 10:42 AM.)

(Resumed at 10:49 AM.)

THE COURT:  Please take your seats.

And, Mr. Jazil, if you could step back for one second. I need Mr. Burhans to come -- I have a quick question.

In terms of your declarations, you've mentioned the number of employees that -- it could be employees, it could be volunteers -- the number of folks that are collecting are down. As I recall, that declaration doesn't say why.  And then we've got the two individual folks, one who has the family commitments and the other person who has the vision impairment, explaining individually where theirs is.

But is there anything in the record that tells me they were fired?  You couldn't afford them?  They left?  I mean, it seems to me all I know is you've had a large number of people leave, and then I've got the two examples from the two declarations, one because of the sight impairment and one because of the family -- how it impacted their family.

MR. BURHANS:  So there is nothing in the record that says people were fired.  There is evidence in the record that we had to divert some of those to back-office operations, taking

them out of the field. And then there is testimony by Ms. Cox stating that -- I think she stated something to the effect that there was fear and uncertainty as to how the fines would be imposed on circulators.

THE COURT: And that was going to be the follow-up question, which it seemed like that -- that seemed to be the focus or the explanation for why there were a large number of people that were no longer gathering. Is that a fair --

MR. BURHANS: Yeah. You know, I think a fair inference for me to draw is on May 1st we had to then, you know, May 2nd or 3rd, the day after, we had 75 percent less.

1400.

Now, at trial we will put on people who will testify why they stopped circulating.

THE COURT: I understand. Let me -- before you step back, you also had suggested there was a -- no rational connection between the fraud and the ten-day return deadline, but separate and apart from fraud, and it's not always the case, but here didn't the Legislature say that in addition to fraud that one of the goals and purposes was to increase transparency and accountability for sponsors?

So if that's the -- one of the stated purpose is, is there the same disconnect that you suggested with the ten-day return? I understand in your explanation why it doesn't have anything to do with fraud, but what says you to the additional

reason offered by the Legislature for these changes; namely, to increase transparency and accountability for sponsors of initiative petitions?

MR. BURHANS:  So my argument, Your Honor, is yes, absolutely there is no disconnect, and here's why.  Compressing the time frame from 30 to 10 days increase transparency.  You have to turn in every petition.  What it does do is it hinders accountability and actually falsely creates liability for late delivered petitions.

Because we can't engage in the fulsome quality control process that we were doing prior to HB 1205, we are less accountable under the ten-day rule than we were before, because we simply don't have the time to gather the information to advise the supervisors, hey, these may be problematic for whatever reason.  And I think that's a big problem, so that's why my answer is the same.

THE COURT:  And I assumed that was going to be your response, but since you focused on -- I didn't want to extrapolate from your prior response talking about fraud, so -- but, again, thank you.

MR. BURHANS:  Thank you, Judge.

THE COURT:  Mr. Jazil.

MR. JAZIL:  Thank you, Your Honor.  And may it please the Court.  Mohammad Jazil for the Secretary of State.

As I mentioned before, Mr. Stafford will jump in as

necessary if he'd like to address something.

Your Honor, I would like to talk about standing, First Amendment issues, overbreadth, and then save void for vagueness later.  I recognize that the irregularities provision is the hardest part of my case, and I'd like to save some time and focus the Court's attention to that near the end, unless the Court wants otherwise.

Before I delve into the issues, Your Honor, my friend from the other side, Mr. Burhans, discussed the ten-day provision and how the ten-day provision would work when there is a weekend or a holiday.  I simply note, Your Honor, that Rule 1S2.0091 discusses how if the tenth day falls on a weekend or a holiday, we just roll over to the next one that's not a holiday or weekend.

So, Your Honor, starting with standing, you've got the standing discussion in our papers, my friends for the other side discussed the *Hamburger Mary* case that came out recently from the Eleventh Circuit.  And I just want to highlight that case and discuss how that affects the standing analysis.

*Hamburger Mary,* Your Honor, concerned a Florida provision, as you know, that dealt with drag shows.  And I'm paraphrasing here.  And in *Hamburger Mary*, there was a First Amendment challenge and the panel -- a split panel, two to one -- went through the discussion and said that the First Amendment standing analysis is still applicable, but it's a

little loose in a First Amendment context.

But, Your Honor, I would like to note that the panel didn't say that the plaintiffs don't have the burden of showing some kind of substantial likelihood that they'll suffer an injury.  So substantial likelihood of an injury is still important.

Also, Your Honor, in *Hamburger Mary*, there is no dispute that the plaintiff was engaging in the activity, and there was no dispute that the plaintiff was engaging in the activity some of which was for over 18, but minors could participate with parental supervision.

So I simply add that gloss, Your Honor, to the standing discussion and the remaining discussion I simply rest on our papers on standing.

Moving to the First Amendment issues, Your Honor, I'd like to talk about the four salient says cases in our papers are *Meyer*, *Buckley*, *Biddulph*, and the *Institute and Referendum [sic] versus Walker.*  This is a Tenth Circuit en banc opinion.

And, Your Honor, I'd like to highlight for the Court why it is I rely on those four cases.  *Meyer*, *Buckley* obviously are Supreme Court cases.  *Biddulph* was between *Meyer* and *Buckley*, and it said what it said without the benefit of *Buckley*.  *Walker,* I believe, is a very important case because it essentially came to the same place as *Biddulph* with the benefit of *Buckley*.  And to me, then it becomes sort of a lily pad case

where, you know, I can use it to jump to the point that *Biddulph* is still on all fours even with *Buckley* being decided after *Biddulph*.

Your Honor, also just to set the stage, Judge Hinkle's case was mentioned about the 48-hour deadline. I note that there the Court -- Judge Hinkle went through an *Anderson-Burdick* analysis and an NVRA analysis. There is a footnote in *Biddulph* that says that *Anderson-Burdick* isn't the applicable test here. The plaintiffs in their papers also talk about *Anderson-Burdick* isn't the applicable test here. But just to take a step back, there the Court had more flexibility, as you know, in an *Anderson-Burdick* context, to measure the State's interests and the State's justifications where the burden's imposed, so it was slightly different.

I also commend for the Court's consideration --

THE COURT: Let me ask you this, Mr. -- Mr. Jazil -- and I didn't mean to be all cutesy about it. But this would be a very different case if you said you've got ten hours to turn in petitions, wouldn't it?

At some point --

MR. JAZIL: Yeah.

THE COURT: Or make it an hour. My point is, at some point it's so compressed that you've effectively made it impossible to comply such that you have an initiative process but you then shut it down. It no longer becomes process, it

becomes you've eliminated it.

MR. JAZIL:  Your Honor --

THE COURT:  And I'm not saying that's this case.

MR. JAZIL:  So, your Honor, I would say that would be unproper and it would be struck down as unconstitutional, but I think you can get there with sort of a more bright-line framework where a rational basis applies, and there is no rational basis there.  And there I'd like to commend for the Court's consideration Judge Hinkle's opinion in *Doe versus Ladapo*, where he goes through in detail the various levels of scrutiny, what they mean, why they are there, and he explains how rational basis does not mean there is no review whatsoever. And he discusses how rational basis with teeth applies.

And, Your Honor, this was also part of a colloquy with Judge Jordan at a recent Eleventh Circuit argument where we discussed how, you know, rational basis isn't a free pass.  The Supreme Court in the -- there was a petition case or perhaps a gay marriage case where rational basis was the standard that was applied but was used to strike down law.

So the point simply is, Your Honor, we can create a bright-line framework like *Biddulph* does, and I'd like to go into that in a minute, and still come to the conclusion that a 48-hour requirement or a 10-hour requirement is unconstitutional.

THE COURT:  I certainly understand and would agree

that rational basis is still review. It's a remarkable statement. And you don't -- certainly there are courts that have found things don't pass rational basis review.

But moving -- the suggestion that it may not pass rational basis review, and so fear not, which is sort of the implication of what you said, that's a slightly different answer that answers a different question I was asking, which is: Are you suggesting that if you said you can only collect petitions when the moon is full in Florida and it falls below 30 degrees, that that -- you wouldn't apply a heightened scrutiny because you'd say it doesn't pass rational basis. So it's a process so you can do whatever you want under -- it might be subject to rational basis review, but you could do whatever you want and it wouldn't be subject to heightened scrutiny?

MR. JAZIL: Your Honor, I'm saying it would not be subject to heightened scrutiny, but it would be struck down as something for which there is no rational reason --

(Indiscernible crosstalk.)

THE COURT: So the answer to the question is, yes, Judge, we can do whatever we want, and we are not going to get into any heightened review because you are just going to fall back on rational basis. So if it involves process or procedure, it's only going to be reviewed under rational basis?

MR. JAZIL: Yes, Your Honor. And I'd like to explain why. I know it seems like an extreme position, but I would like

to explain why it is that this is a position we're taking.

THE COURT:  I'm just trying to figure out what your position was.  I'm not -- so the record is clear, since -- lest I be accused of something, I'm not yelling, I'm not pounding, I'm not grimacing.  Same thing I did with plaintiffs earlier, are you arguing about association?  Same thing I did with plaintiffs earlier, are you arguing that they were targeting your particular initiative?  I'm not -- it's not a loaded question, I just want to make sure I understood the position.

MR. JAZIL:  Yes, Your Honor, and I'd like to explain why.

If we go to the *Biddulph* case, the Court says, We hold that a state's broad discretion in administering its initiative process is subject to strict scrutiny only in certain narrow circumstances.  Then it describes the circumstances: Content-based restrictions, disparate impact on particular viewpoints, and the application of facially neutral regulations in a discriminatory manner.  And then it goes on to say --

THE COURT:  Or if a state impermissibly burdens the free exchange of ideas about the objectives of an initiative proposal.

MR. JAZIL:  Yes, Your Honor.  And that part -- that's the part where I think there is a distinction between process and what's actually said between the circulator and the person to whom they are trying to exchange the ideas.  What I'm trying

to create, Your Honor -- and as I read this, the reason the bright-line that one can create between the exchange of ideas and the process.  And I'd like to create that bright line because from my perspective, my client's perspective, it gives us --

THE COURT:  And let me make plain, I absolutely agree with you that not anything that touches upon the initiative process necessary -- while it indirectly could have a collateral consequence or something, it's not directed to the communication such that these cases are implicated.  I agree with that.  And so that was going to be -- I didn't ask, but those were going to be some of my questions to the plaintiffs, how does this truly impact.

(Indiscernible crosstalk.)

MR. JAZIL:  So, Your Honor, if we create two categories, then the harder question for the Court becomes, what is process, what is speech?  And that becomes a tough question, right?  And that's the part where --

THE COURT:  The process could completely shut down speech.

MR. JAZIL:  And that's how *Meyers* can be read and *Buckley* can be read.  And Your Honor, there I pivot to my lily-pad case, the *Walker* case from the Tenth Circuit.

THE COURT:  By the way, when we start talking about the Eleventh Circuit, I mean, *Buckley* cites it with approval.

So to the extent it says what it says, the Superior Court acknowledged the Eleventh Circuit had done that and basically nodded its head "yes"; right?

MR. JAZIL:  Yes, Your Honor, it did.

And there is -- in candor to the Court, there is some language in *Buckley* that cuts the other way.  *Buckley* says there is no litmus test.  And I think what *Buckley* is talking about when it talks about there is no litmus test is, Hey, there's no litmus test for figuring out what's process and what's speech. And I think that's what they are getting at.  So there is a bright line.  There are two categories.  If I fall under one, rational basis applies, but am I truly in that one category becomes a harder question for the Court to decide.

And I think that's the fair reading of the law.

So, Your Honor, then if we take a look at the *Walker* case, which is the en banc Tenth Circuit, there is discussion in there about, you know, how is it that we go about separating things into two different categories?

And the Court says that the process of requesting signatures on an initiative petition implicates the free exchange of ideas, and so that would be speech.  Then it goes on to say that laws that specifically regulate the process of advocacy itself, the laws that dictate who could speak, only the volunteer circulators and registered voters --

(Reporter requests clarification.)

MR. JAZIL:  Pardon me.

The volunteer circulators and registered voters, or how they go about speaking.

And so, Your Honor, this is why in our briefing we talk about the whos and hows as shorthand for what it is that's being implicated.  And then if we use that as the framework and we look at the provisions that are being challenged, our contention is that the provisions that are being challenged in the PII at least, are on the process side.  They are not on the speech side.  And so rational basis --

THE COURT:  And, Judge, that's the gloss I'd put on the third category, which is the state impermissibly burdens the free exchange, you got to distinguish between process and speech.  And, Judge, in this case what you are talking about squarely falls within speech because it's not the who or how.

MR. JAZIL:  Exactly, your Honor.

THE COURT:  I understand.

MR. JAZIL:  So that's where we are.

So then if we assume that rational basis applies, we believe that the findings that the Legislature made in prelude to the bill, the "whereas" clauses, they have a separate findings section, provide the necessary rational basis.

Your Honor, I also note that if compelling interests were to apply, we think that our reports that were before the Legislature satisfy that test.  And, Your Honor, there I'd like

to make a distinction here.  When we are talking about compelling interests and heightened scrutiny, the *Brumby* case from the Eleventh Circuit says that I am limited to what the Legislature had before, and I can't come up with any post hoc rationalizations, et cetera.

So what did the Legislature have before it?  We know that the Legislature had the OECS reports before it.  They are referenced in the "whereas" clauses.  They are referenced in the findings.  And if this case proceeds, you'll see that they are referenced in the legislative debates.

There I note that Dr. Herron takes issue of a number in the OECS report:  The extrapolation of a sample size to a statewide error rate for a petition.  Now, the 14.8 number. Your Honor, I note that we did not rely on that number in our papers, number one.

Number two, that number in Dr. Herron's expert opinion isn't saying that there wasn't fraud, that there weren't issues, that there weren't concerns.  He's simply saying that that number is wrong.

And number three, Your Honor, Dr. Herron has the underlying data.  He could have used it to put forward another number showing that the true/false acceptance rate is higher or lower, and he didn't do that here so.

So, Your Honor, to jump back again, the question in a heightened scrutiny context would be whether or not the

Legislature had appropriate reasons to do what it did.  It had the expert -- they are not expert reports, they are the obligatory Office of Election Crimes and Security reports that are referred to.  To my knowledge there was no expert opinion from Dr. Herron or anyone else provided saying that those numbers are wrong or those reports are wrong.

And so when judging whether or not we satisfy compelling interest, the reports should be taken at face value because they were the reports that the Legislature had and the Legislature took it at face value.

And so, Your Honor, I think that once we go through the reports, we go through the "whereas" clauses, we go through the findings, even if compelling interest applies, which we maintain it doesn't, we would satisfy that.

Your Honor, I'd also like to just briefly touch on the materials that were provided together with the preliminary injunction motion, the affidavits, et cetera.  Your Honor already hit on one of my concerns with Ms. Cox.  In paragraph 36 she talks about how circulators are being let go, but then there's an including clause.  So we can't isolate which provision the folks are being terminated for or being reassigned for, et cetera.  If we then go down a little further, Ms. Cox talks about how Airbnbs have been scheduled and are being, you know, undone because of HB 1205.

With respect, Your Honor, that one provision about the

Airbnbs for out-of-state circulators isn't implicated here because that provision isn't being challenged just yet.

You Honor, also, Ms. Cox's affidavit actually, it's our contention, proved the point that we've been trying to make, that there are out-of-state contracts and subcontracts.  Ms. Cox is an out-of-state subcontractor for an out-of-state contractor who apparently is responsibility for, quote, circulating, gathering, processing, validating --

(Reporter requests clarification.)

MR. JAZIL:  -- circulating, gathering, processing, validating, and delivering signed petitions to the contractor. And the contractor then gets these things over to the Supervisor of Elections.

So Smart & Safe's corporate representative, they list her as a corporate representative in the declaration, is an out-of-state subcontractor for an out-of-state contractor.  And again, that highlights one of the concerns that the Legislature had.

We have Ms. Cox talking about how millions of nearly completed petitions have been sent.  The number is 5.6 million, according to Ms. Cox.  These prefilled petitions have everything but the name -- but the signature and date of birth for the voter.

And, Your Honor, again, how do we know that this information is being accurately taken from some public source

and being put on these prefilled petitions being sent out?

And, Your Honor, we provided material on the record highlighting how this is sometimes causing confusion because these prefiled petitions are being sent with blank petitions. And then what's happening is someone in a household is returning two when they can only return one. There are instances of someone signing another person's name and sending it back, which is impermissible.

Your Honor, we also have a discussion -- and this is a constant theme in both Ms. Cox's affidavit and Mr. Emerson's affidavit, that they need more time so they can do their own petition verification.

THE COURT: And let's pause there, because I was assuming this was going to be your answer when there was no good reason.

I'm assuming the limiting the time frame is so that the initiatives come in to the supervisors not all at once in huge batches but so that they themselves have a meaningful opportunity to discharge their duties, and that's why the time matters and one of the reasons why you just don't give folks unlimited amount of times to submit and when they are going to submit them.

So I'm assuming, based on prior hearings, that's one of the reasons?

MR. JAZIL: Exactly, Your Honor.

And I think that is the reason, as we learned from the affidavits, what's happening is folks who are the sponsors are batching these petitions, big batches, then sending them out weekly or what have you to the supervisors.

Now, again, I know smaller batches help the supervisors because they have less petitions than any one particular time to review.

Also, Your Honor, if this process is being done, the 30 days are being used to verify the petitions on the sponsor's end, it's better to have the impartial publically-elected Supervisor of Elections doing the verification, because we also know that the supervisors are the ones who are providing us the concerns or highlighting the problems.

Jessica Humphreys, for example, who had 2,000 invalidated petitions, a Smart & Safe circulator, didn't get identified by Smart & Safe.  It was a supervisor who figured out that this person is not giving us good work product, and this person -- the petitions coming from this person are suspect. It's the supervisor who did that.  So why not give the supervisors more time?  There's no obligation for plaintiffs to do the self-verification requirement.  None, whatsoever.  So if the need for additional time is to do the self-verification, A, the record suggests they are not doing a great job; B, it's something that can be done by the Supervisors of Elections; C, we know the supervisors do it better because they are the ones

who have identified these problems, have brought them to the fore, and -- which has now resulted in this legislation.

Your Honor, also I'd like to highlight for the Court the fact that these aren't draconian fines and penalties that are going to lead to ruin.  We note in our papers that there's the impossibility defense.  We also note in our papers the new addition in the legislation, which talks about how if someone identifies a problem and says that there is going to be a problem, as soon as practicable -- and makes that point to the Secretary of State, the Secretary of State is not going to be imposing fines.  I read that as a mandatory provision on the Secretary.  The Secretary may not fine if someone identifies a problem as soon as practicable.

And, Your Honor, that's significant, because if we know that -- look --

THE COURT:  Aren't they going to say, though, if we don't have the time to review the petitions, then we don't have the time -- we don't have the ability to notify you of anything, and that the fines are going to rack up?  Isn't -- and I'm not saying they win.  Isn't that the nub of the issue from the plaintiffs' perspective, that if you keep shrinking the time, we don't have the ability to do what we need to do to save ourselves, to avoid fines, to notify you of a problem, et cetera, because we don't even have the ability to identify the problem.

MR. JAZIL:  Sure, Your Honor.  So let's take those in turn.

If you've got the ten-day requirement, you've got the petition for Mo Jazil who signed it, and you know that your circulator left the petitions on a bus, you are in the process of trying to figure out where that is, do you need 30 days to figure out that the petition circulator left those things on a bus so that you can tell the Secretary of State's Office, hey, Billy Bob, our circulator, left some petitions on a bus, they are going to be late?  I don't think so, Your Honor.

The wrong county issue, that too can be easily figured out.  If we are doing a massive petition-gathering effort at a Taylor Swift concert in Miami and we know that people from two dozen counties are going to come by for that, you can tell the Secretary of State, look, we are going to have some problems with this because this was a mass event, we are letting you know that these petitions are going to be coming from here.

Your Honor, so I do think there's going to be time, and there's no evidence in the record suggesting otherwise.  And so I would say that -- that provision is helpful.

Your Honor, also, as we point out in our papers, as Mr. Beato has just told me, the paperwork shows that it's not hard to identify some of these problems.  A quote from the report, which is quoting one of circulators, is, we don't even attempt to hide the fraud as the handwriting is the same for

each voters.  Some of the names just appear alphabetically so those things are easier to spot, and you don't necessarily need 30 days of a verification to do that.

Your Honor, also on the impossibility, I refer the Court to document 103-5, that's Mr. Burhans's letter, talking about how Smart & Safe would like to avail itself of the impossibility defense under Florida law.  It's at the very bottom of that page.  He then includes a series of court cases in a footnote that talk about how, quote --

(Reporter requested clarification.)

MR. JAZIL:  -- Florida law is clear that it does not impose penalties upon an individual for failing to take certain actions that are physically impossible for that individual to take.

And so that's Smart & Safe's position about how Florida law is clear on one's ability to avail themselves of the impossibility affirmative defense when it comes to fines and penalties.

And finally, Your Honor -- and when we are talking about the ameliorative effects, I hadn't thought about this, but Mr. Burhans makes a good point.  We have got 20 petition circulators for sponsors -- 20 sponsors, pardon me.  Most of them go away after every cycle.

So if we are talking about fines being imposed on an entity that is going to disappear, as Mr. Burhans has pointed

out, I guess I'm struggling to see how the fines are then onerous. If the entity is going to disappear, who are we fining? Are we trying to squeeze water out of a rock? It just -- the two points don't quite jive in my mind. They are contradictory. There is tension there. If all these entities are going to disappear after a cycle and they are worried about fining being levied at the end of a cycle, I'm not understanding the need for how this is going to create some kind of ruinous circumstance.

Your Honor, I'll stop there and see if the Court has any other questions on the evidentiary issues or the First Amendment issues before I --

THE COURT: Not at this juncture.

MR. JAZIL: Thank you, Your Honor.

And, Your Honor, I'd like to take the overbreadth issue first. The laws that are being challenged aren't overbroad. The toughest provision for us, Your Honor, and the one I'd like to focus on, the RICO predicate, the irregularity, and the fraud.

So as I read overbreadth under *Hansen,* there are two salient questions. The first is what's covered. The second is does the statute prohibit substantially more protected speech than not.

And so when we are thinking about this, if we take the second question first, what is the protected speech that's

arguably covered, the untimely delivery of provisions isn't protected speech; the wrong county issue isn't protected speech; the trying to retain personal information isn't protected speeched; forging someone's signature isn't protected speech. So if we are looking at this through an overbreadth lens, I just don't think that that lens is applicable.

Again, Your Honor, there is also a safe harbor provision as we are reading this law.  Anyone who has 25 petitions or less, excluding, you know, your own -- your immediate family members, is not subject to most of these requirements.

And so I simply note that as we are doing the overbreadth analysis, the question I'd like to commend for the Court's consideration are is there protected speech -- and we discussed that already -- and the second is, well, how does the safe harbor play into this and does that create a more narrow approach to things.

Your Honor, then the void for vagueness issue, and the void for vagueness issue concerns the missing information provision, the retaining provision, and the RICO provision.

Your Honor, the RICO provision, the irregularities fraud, is the hardest one for us, and we've had our best attempt to try to address this issue.  I'd like to try to see if I can add to that.

Laws are facially vague when they lack a core meaning.

That's the standard.  Irregularity is something that could be -- if we're reading it literally, irregularity could be failing to comply with any nit in the election code.  We cited cases for the proposition that irregularities really matter under Florida election law when there are substantial irregularities, there is substantial noncompliance with the law.  And, Your Honor, there what I'm trying to say, I suppose, is that if someone forgets to put a stamp on something, that's not enough for a RICO predicate.  Substantial noncompliance is something --

THE COURT:  What if they fail to put a stamp on 100 things?

MR. JAZIL:  That may well be substantial noncompliance, Your Honor.

And Your Honor asked an earlier question about -- to my friends about, well, look, the rule of leniency --

THE COURT:  Lenity.

MR. JAZIL:  Pardon me.

The rule of lenity, how does that play into the circumstance?

And, Your Honor, I will concede here, as I have in the Amendment 4 case, the SB 90 case, the 7050 case, getting arrested is a big deal.  It just is.  And -- I will concede that up front, because I have in other cases, and so I'd like to put that issue to the side and focus on just, okay, is there a core meaning to the phrase "irregularity" read in the context within

which it appears, i.e., in an election context.  And there, if we're talking about substantial noncompliance, one missed stamp isn't enough; a hundred might be.

The question then becomes, okay --

THE COURT:  Well, that presupposes that "substantial noncompliance" is what it means; right?

MR. JAZIL:  Yes, that does presuppose that.  But, Your Honor, I did my best to cite the cases that discuss this issue, and I think, best read, you see an arc in the cases where early on the cases said any irregularity was a problem under Florida election laws, and then that changed at the *Broadman* case where --

THE COURT:  And I -- that's why I brought up the rule of lenity.  I -- having served on the state court and been assigned to the criminal division, I understand the appeal and why citing those cases may matter if you try to get the charges dropped.  File a motion to dismiss.  Judge, we not challenging the facts, so it's not a traverse.  We are simply arguing it's not a violation of the law under the rule of lenity because it's not clear whether this conduct would -- assuming you did what the State says you did, that you violated the law.

But I'm -- help me to understand the reasoning that because in limited instances that's how it's been applied by a state court in a case and other contexts, that that suddenly becomes notice to folks what they can do, and for those that are

enforcing the law, circumscribes what they are or are not going to do.

MR. JAZIL:  So for the folks who are enforcing the law, they're in a better position to understand what it is -- irregularities in an election context means, because often these cases, the way they play out, is there is some kind of referral from OECS or a supervisor to a state attorney, who then brings the charges.  So the supervisors, state attorneys who work these cases, the Secretary of State's Office should be familiar with irregularities, substantial irregularities being the thing that should trouble them, that has historically troubled them, that has been the --

THE COURT:  What would put them or the people that are collecting on notice that it has to be a substantial irregularity to trigger being arrested for a felony?

MR. JAZIL:  Your Honor --

THE COURT:  Good legal argument if you're a defense lawyer and citing those cases in a criminal case.  Not so sure how that makes you comfortable if you are the one involved in this process that you may or may not be committing a felony.  I mean, I wonder if you or any judge on the Eleventh Circuit would risk their Bar license based on a state court defining irregularity in that way in another context; that it has to be substantial noncompliance such that I can't possibly be arrested, and I can do this and do it freely.  And I think

that's a good way to phrase it.  I would be interested if any member of the Eleventh Circuit would risk their judgeship or their Bar license on -- and would bet on that's the definition.

MR. JAZIL:  Fair point, Your Honor.  Your Honor, I don't have a great answer for you on that particular point.

I would like to note this, though.  That phrase "irregularity" is severable from the remainder of that provision and that makes fraud a predicate for a racketeering charge.  As my friends note in their briefing, fraud and irregularities are two different things, two different words being used here.  So I simply note that that one part is severable.

THE COURT:  Look, I'm asking the questions.  You had a thoughtful response in your paper, and you've had a thoughtful response now.  I just want to keep nibbling at the edges to find out if there is anything else.

MR. JAZIL:  No, Your Honor, other than the fact if we are talking about facial vagueness, is it facially vague in all of its applications in a really broad sweep such that there is no core meaning?  I guess that's a broader question than the one Your Honor posed.  I have nothing beyond my papers and the severability point I just made.

THE COURT:  Fair enough.

Let's talk about the "such as" and what is or is not personal information.

And let me start with -- it was helpful that you cited

Chapter -- I want to make sure that I -- I thought I had put sticky notes on here.  Give me one second.

(Pause in proceedings.)

THE COURT:  Ah, I did.

In Chapter 119 when you talk about "other personal information" includes social security numbers, but then it's talking about that would be other personal information, which suggests there's personal information before that, and when you go through that personal information, it seems to include home addresses -- and I understand that's not the purpose for which you cited Chapter 119, and I understand that doesn't determine what is or is not personal information for purposes of 100.371.

But since you cited 119, help me to understand -- it seems to support the conclusion that, for example, addresses could be personal information in other statutes and viewed as personal information, and there's a difference between confidential information and personal information, which is the second question.  It seems like personal information would generally be broader than confidential information, and there's -- so let's start there.

MR. JAZIL:  Sure, Your Honor.  And if I understand the question, it's can certain things be public records and be given in one context and be exempt in another context.  Is that --

THE COURT:  Well, you cited Chapter 119.  Let's start with the -- you're not suggesting that it -- whatever the

definition is there determines what the definition is for purposes of the statute I'm considering; correct?

MR. JAZIL:  True.

THE COURT:  It just helps inform the analysis; correct?

MR. JAZIL:  Yes, Your Honor.

THE COURT:  And so I was leading to the next question -- I should just be more direct -- which is if that informs our analysis, I thought it was interesting that 119 includes addresses as examples of personal information, and so -- let's start there.

Would you agree that one's address for purposes of the statute at issue before me would be personal information?

MR. JAZIL:  No, and here's why, Your Honor.

We cited 119 for the social security exemption, for example.  Social security is a very specific thing.  It's no different from one context to the other.

THE COURT:  Which really isn't implicated here -- right? -- because social security isn't on your form.

MR. JAZIL:  It will be, Your Honor.  So the form is going to be amended, and the form is going to ask for more information, including social security information, driver's license number, et cetera.  So there is going to be a new form July 1, Your Honor, and that would be on there.

THE COURT:  What, if anything, do I do with that for

purposes of my current analysis since that's not before me?  I don't have that -- other than argument of counsel, the suggestion by plaintiffs' counsel the form is coming, and now your argument of counsel that this is what it's going to include.  Is that even properly before me for purposes of my analysis here?

MR. JAZIL:  Your Honor, I would have to concede that it is just because the statute says that we need to put those things in the new form that we have July 1.  It would be easier for me to say it's not, and I can -- it helps me with the PI.  But it just is, Your Honor, because it's in the statute.  It's laid out as things that shall be included.

THE COURT:  That's why I asked.

So, Judge, yes, those things are going to be -- so other than signature, which I think you would agree that at this juncture what's on the form -- the only thing that falls within the examples of the "such as" is signature, but that's going to change with the new form because a number of other items that fall within the "such as" language of 100.371 will now be on the new form; is that correct?

MR. JAZIL:  Yes, Your Honor, that's correct.

THE COURT:  All right.

MR. JAZIL:  And so, Your Honor, the home addresses, those are treated as personal information under 119 broadly. Then we go to the more specific election-related statutes, and

those are given out as public records as part of the voter registration file.  So you've got sort of a general discussion in Chapter 119 which is trumped by the more specific discussion in the election code.

When it comes to the social security numbers and driver's license numbers in the election code, when it comes to voter registration forms, there's a very specific provision that says all those things are protected.  The subsection (2) of that form doesn't apply to just the voter registration context.  It applies to the election code more broadly, and it protects the signature.

The social security numbers and driver's license numbers, Your Honor, they're separate -- social security numbers and driver's license numbers are protected under 119, and then there's a separate part of 119 that deals with DSMVs and driver's license numbers.

THE COURT:  Go ahead.

MR. JAZIL:  All right.  Sorry, Your Honor.

Now, driver's licenses numbers and social security numbers are also -- there's nothing contradictory in the election code saying those things are going to be public records.  In the voter registration context, those things are called out and specifically protected.

And now, Your Honor -- so taking all that information in, as I read it and as the department has read it, the driver's

license number, social security number, and the signature are protected in all election contexts, and the reason for that is the specific language in 97.0585 that discusses signatures in subsection (2), the general language in Chapter 119 that protects that information, which isn't contradicted elsewhere in the election code.  And, Your Honor, as a practical matter, if the voter registration form provision specifically says that we're not going to give out the driver's license number and we're not going to give out the social security number, but you can -- if it's on a voter registration form, but you can get it if it's in our elections file for some other purpose, that would read out the exemption in 97.0585.  It would render that provision irrelevant and superfluous.

So a better reading is to say we have got 97.0585; we've got the public records law; we've got the public records laws specific to DSMV.  This information is protected because there's no contradictory --

THE COURT:  Riddle me this, Counsel.  I just -- the Legislature has got really bright folks helping them, including you, working for the Secretary of State.  If it's so easy-peasy and it's obvious, it's not vague, why didn't they just say that --

MR. JAZIL:  Your Honor --

THE COURT:  -- if it's protected information elsewhere, you can't retain it?

It seems to me -- the argument that when you read all these things together, it obviously means X because this is what all these other provisions say -- it seems to me that the easy way for it not to be vague is just to say that.

MR. JAZIL:  Your Honor, legislation is sausage making, as it should be.  There are trade-offs, compromises.  All that's --

THE COURT:  Yeah, but sometimes a sausage isn't real tasty, Mr. Jazil, and that's why we have challenges here.  I mean, the question for me to decide, using the sausage analogy, is it rank, and on more than one occasion, I found the sausage that they produced down the street is just nasty and they shouldn't serve it.

So that's sort of the question:  Is this nasty sausage?

MR. JAZIL:  Your Honor, using the analogy, I'd say the question before the Court is whether or not the sausage is edible, and the answer to that is --

THE COURT:  Well, I'll say they serve nonedible sausage on occasion.

MR. JAZIL:  The answer there, Your Honor, is it is because they've taken a whole set of meats, combined them together into one delicious package.

And, Your Honor, again, I simply note there that what I'm trying to do is to give effect to the exemptions that are

already in the law and make sure that information that can be used to ask for a vote-by-mail ballot and send back a vote-by-mail doesn't just become publically available in the hands of folks.  And I think it's appropriate to get there the way I'm suggesting, because this information has historically been protected and, if one reads the various provisions of the law, it should continue --

THE COURT:  This too, though, is a felony if I get it wrong; right?

MR. JAZIL:  Pardon me?

THE COURT:  If the person gets it wrong, either -- that's charging you, the police officer, or you're the person that's in the process of collecting and retaining -- if they get it wrong, it's a felony; right?

MR. JAZIL:  It is a felony.  And, Your Honor, we should also read the provision --

THE COURT:  So you can't vote; you can't carry a firearm, which, by the way, is apparently more important than voting, so -- you can't have -- let's stick with that.  You can no longer have a firearm and hunt, and you can't get certain jobs; you can't get certain clearances, all of that because you got this wrong because you didn't read all the statutes in conjunction and cobble together this definition of "personal information."  That fairly sums it up; right?

MR. JAZIL:  Those are the consequences if you get

charged, Your Honor.

But I'd like to focus the Court's attention on a couple of things. If we read that provision, it says that those horribles happen if you use this information for any reason other than to provide the information to the sponsor of the initiative petition.

So if we're using the information -- if you're a circulator out there, you are gathering this information; you are copying it, scanning it; you're getting to it the supervisor -- to the sponsor who is overseeing you, you're not going to be punished for that.

Then for the sponsor the question becomes, okay, one, is 100.371(9) implicated here for the sponsor where it says a person collecting forms on behalf of a sponsor who copies and retains is liable for these penalties? So now we've got the sponsor. The circulator has given all of the stuff to the sponsor. The sponsor has this information. Is the sponsor implicated? Under the plain language of the statute, the answer is no.

The second question then becomes, okay, are we retaining personal information? Well, what's personal information on that form? Personal information is information like the driver's license number, identification number, social security number, or signature.

If we take a look at the form that will be

promulgated, Your Honor, that's --

THE COURT:  By the way, if somebody has people climbing over their walls and threatening to kill me, I think an address is a pretty personal piece of information, and I don't know -- and since I have to go to great lengths to seal it because it can be so personal and have such consequences, it seems to me -- I'm finding it hard-pressed to believe why my address or the fact that I -- I may not support an initiative, but I support your right to get on the ballot.  The fact that I've put my name on it and then you can get a list of everybody that sponsored it, I'm hard-pressed to see why that's not personal information.

MR. JAZIL:  We're talking about the voter's personal information; right?

THE COURT:  Right.

MR. JAZIL:  So the voter's personal information is already out -- the address is already out.  The address is on the voter rolls that folks can request from the Secretary of State's Office.  So the address for --

THE COURT:  Yeah, but you don't know without the name and the address that I supported Amendment 4 -- I'm not saying I did -- but that I submitted Amendment 4.  So I'm a baby murderer.  So you know I supported murdering babies, and so you want to show up at my address and go after a baby murderer. Isn't that the mischief associated with -- and why it certainly

could be personal information, my name and address associated with the specific ballot initiative?

I'm using that as an example because I can't think of a more emotionally, politically charged issue than abortion.

And it seems to me -- since we've got people blowing up facilities, shooting doctors, you know, screaming obscenities and hurling things at women going into clinics, it's not really farfetched and some crazy hypothetical that says we're going to target the people that are signing off on initiatives to promote killing babies, Amendment 4, apparently so serious the state of Florida, through its governor, spent millions of dollars fighting against it.  So you've got the Governor leading the charge.  It's an emotionally charged issue, and now you're just going to hand out and have people's address and names connected to a particular initiative.

It seems awfully personal to me, and I don't see how I'm comfortable that -- and I understand that's not the issue before me, but it seems to me that there's a lot of -- there's reasons why one can construe that as personal information.  And that's just an example, given the parade of horribles that could flow from that.

MR. JAZIL:  Understood, Your Honor.

So if the motivation was to guard against people who are signing these petitions being harassed, then the Legislature could have just said the entire petition is exempt from the

public records laws.  That's not what they said; right?

And so what is it that --

THE COURT:  They also didn't say confidential information is -- can't be retained.  They also didn't say information that otherwise -- not subject to disclosure under other laws will not be retained.  I mean -- yeah.

MR. JAZIL:  But they did say "such as a voter's driver's license number, Florida identification card, social security number."  And those three things -- if we take a look at the "whereas" clauses; we take a look at the findings; we take a look at the OECS report, those things were used in part to fill in people's names without their knowledge.  Those things were the things that were used to sign on behalf of people without their consent.  So there is a tie.  If the motivation is not having people harassed to sign these things, then what Your Honor is laying out is the more --

THE COURT:  So you're saying you look at the "whereas" clause, and if -- if I feel good about the fact that some local law enforcement isn't going to read it differently, and what should give me comfort is that -- you look to the "whereas" clause and that interpretation of personal information that should be more narrowly read should give me comfort I'm not going to be arrested for a felony because the "whereas" clause -- it would be inconsistent with that "whereas" clause to construe it otherwise?

MR. JAZIL:  Your Honor, two points.

One, words should be read in context.  We're all textualists; we're not all literalists.

Two, Your Honor, when we're taking a look at this provision, the whole provision should be read as a whole. First, if you're the circulator -- again, Your Honor, if you're giving this information to the sponsor, there is a safe harbor. If you're not giving it to the sponsor, then do you have a threat of being arrested if you are retaining personal information such as -- and it's got the descriptors; right?

And if we take a look at the form that will be promulgated, there's a finite amount of information there, and the "such as" is capturing the information that the State has historically said is not a public record.  The provision isn't saying that everything on the form is improper and everything on the form is unable to be retained.

THE COURT:  It just seems to me to be odd that -- you're creating a felony and y'all create the form -- that you just can't say, since you're creating the form, Here's what's on the form you can't retain.

I mean, we wouldn't have an issue here if you -- if we simply had a provision that, We, as the creators of the form, include these five pieces of information, and those are the two you can't retain.  I mean, we wouldn't be here if we didn't have such a "such as" and leave it open-ended; right?

MR. JAZIL:  So Your Honor is highlighting a point that will come up in the rulemaking.  The statute lays out what it is a department must include in the form.  If the department includes as part of that form saying -- and there are asterisks next to the things that can't be retained and says, These are the things that cannot be retained -- I can't commit to that in this hearing.  That's something that under Florida law has to be fleshed out through the rulemaking process, but that is a possible solution, right, where you have the asterisk saying this personal information that cannot be retained or copied.  And to the extent that that's an option, that's something that's not dictated to --

THE COURT:  I'm not saying that renders it vague.  The point is suggesting that this idea that there's no ambiguity with clauses such as "such as" and then you've got other information that can be construed as such that it highlights the reason why that could create confusion by virtue of the fact there is an easy fix but not determinative of the case in front of me, so I --

MR. JAZIL:  And again, Your Honor, just to take a step back, these are being challenged as facially vague.  The question is is there a core meaning in light of the descriptors that are being given?  Is this thing utterly devoid of a standard of conduct?  Right?  And I don't think we can say that this is utterly devoid of a standard of conduct, and I don't

think we can say this thing lacks a core meaning.  Could it have been written better?  Yes.  Could the rulemaking --

THE COURT:  I absolutely agree the standard is not going to be drafted better because you would lose every time because that's a given that it could be written better.

MR. JAZIL:  Is the sausage edible?

THE COURT:  That's why I was asking -- the more important focus was I'm still not sure why date of birth, name and address -- given the number of felonies that are committed using personal information that come before me as a federal judge using that exact information -- name, address, and date of birth -- I'm just hard-pressed to see why somebody wouldn't think that that was personal information.  But you've responded to that question.

MR. JAZIL:  Yes, Your Honor.

And Garamond 14 is my preferred font if someone were to ask, but they never do, Your Honor, despite the Court's suggestion.

Your Honor, I'm happy to answer any other questions the court might have?

THE COURT:  Fair enough.

Thank you.

Well, let me find out -- Mr. Steiner, Mr. Burhans, do y'all have additional argument you want to make?  And if you, do -- and we're going to take a five-minute break, but I'm just

trying to find out how long you need.

MR. STEINER:  Not long.

THE COURT:  All right.  A lawyer telling me "not long" is not going to cut it.

MR. STEINER:  I'll say ten minutes.

MR. BURHANS:  Ten minutes or less, Your Honor.

THE COURT:  Okay.  Why don't we take a five-minute break.  We'll come back.  We'll wrap up the argument, and then we'll break for the day.

Thank you.

(Recess taken at 11:46 AM.)

(Resumed at 11:53 AM.)

THE COURT:  Y'all can take your seats.

Well, we are back on the record.  Since Mr. Burhans is not here, we'll have Ms. Murphy --

MS. MURPHY:  Stop.

THE COURT:  Well, there comes Mr. Burhans.  I just called on Ms. Murphy to make your argument, and she --

MR. BURHANS:  She'll do much better than I could, Your Honor.

THE COURT:  She said pass.

All right.  I do -- before counsel for the plaintiff stands up -- and I meant -- had intended to ask Mr. Jazil about this as well in their position, but it's really more for the plaintiffs.

The question on the voter information retention program -- it's not really for you.  It's just that sometimes I ask you a question because I want them to respond in reply -- is whether there's anything in the record demonstrating that folks who are gathering petitions on the sponsor's behalf are doing anything with the voter information other than scanning it for your own internal quality control.

In a related case involving voters they retained it to reach out to voters to encourage them to vote and so forth.

So in terms of copying or retaining, is the only conduct we're talking about in terms of this record is the scanning of the petitions for quality control?

So y'all -- either Mr. Burhans or Mr. Steiner can address that.  I just want to --

MR. BURHANS:  Your Honor, I don't know if in the two declarations that we've submitted we expressly state that all we are doing with that information is scanning it for purposes of verification, but I do know and I can represent that I am not aware of any other circumstance of it being used.

THE COURT:  All right.  And the reason why I asked the question is because I didn't want to miss something that you put in your papers, because, again, in other cases in other contexts, there were many reasons why one would retain information other than quality control; for example, voter outreach if you are trying to get somebody to go to the polls

after they registered to vote.  So that was the context in which I was asking the question.  So fair enough.

MR. BURHANS:  Frankly, if I may, I think that may be something that gets further developed when we go to trial.

THE COURT:  Fair enough.  But right now what we've got is retaining for quality control.  I've got it.

Mr. Steiner.

MR. STEINER:  Yes, Your Honor.

In addition to that, I think there's also some retention of information for purposes of, like, confirming things that -- maybe when they send it to the sponsor, the sponsor might flag some things, send it back to the petitioner, who retains the records to check and see what exactly the sponsor is talking about.  They'll have it and might go back to the voter to confirm things.  So they'll retain that information.

So I wanted to address just a few things that Mr. Jazil raised and also wanted to address some of your earlier questions that I wanted to flesh out a little bit further.

On the prefilled information question that you had with *Voter America v. Schwab,* that being a Tenth Circuit case, the Eleventh Circuit hasn't ruled on this issue yet.  But the Tenth Circuit did employ an intermediate scrutiny standard there.  It was a little different because it was about voter registration as opposed to what we're looking at here, which is

petition gathering and circulate -- initiative -- petitions in furtherance of an initiative.

But regardless, Your Honor, even if we were employing an intermediate scrutiny standard, completing information -- it's not tailored at all -- HB 1205 is not tailored at all in that they are punishing people for prefilling information as opposed to -- let's say if it was inaccuracies in the prefilled information that they are concerned about, then they should penalize the inaccuracy, not the prefilling of information.

But, regardless, it is in fact limiting the ability of sponsors to engage in petition circulation because by virtue of prefilling information, you're able to reach more people, and eliminating that as an option necessarily means that they can't reach as many people in their efforts to get the question put on the ballot.

And then I also wanted to address the associational harm.  We do have the factual predicate in the record to find that there is an associational harm, and the associational harms follow the other First Amendment arguments, because FDH is unable to associate with particular petitioners, and it is because -- and the petitioners also can't associate, and they don't want to associate if they're going to be criminally prosecuted.  So it is creating a barrier between the circulators and FDH and other sponsor organizations.

In terms of the correct standard, Mr. Jazil was

talking about how -- the whos and the hows, but the thing is, Your Honor, *Buckley* is actually a process case.  It was limiting the ability of -- it was requiring, rather, that petition circulators wear ID badges; it was requiring that they be registered voters themselves.  Those are process questions, and what we are talking about with HB 1205 is similar process questions.

THE COURT:  Well, Mr. Jazil actually was -- I think he would say that goes to the who or the how, which is why you could -- I think he ultimately said, Well, Judge, there could be things that some might call process, but it could still impact what was being communicated.  And that's why he added the further gloss -- and he can correct me if I'm wrong -- of the who or the how.

Wouldn't that fall within the ambit of the construction that Mr. Jazil gave it?

MR. STEINER:  Well --

THE COURT:  I'm not ruling.

MR. STEINER:  -- the process is shutting down the circulation of petitions.  I mean, it's limiting speech in that way and, like, how a petitioner may -- may gather petitions.

THE COURT:  If I broadly -- Counsel, if I treat it that way without any limitation at all, then anything that touches or concerns the initiative process by definition limits speech.  So any rule -- I mean, I just -- it just seems to me to

be self-evident that anything that I add to requirements for the initiative process is an extra burden, which by definition limits the communication:  Who -- how many people can communicate, how easy it is to communicate.  And isn't that exactly what the courts have said isn't enough.  Because you have to have rules; you have to have process, and the State has to be able to regulate it; right?

MR. STEINER:  Well, I think what's happening in HB 1205 is a little bit different in that it's preventing -- it's making it impossible, really, for FDH to engage with its target audience because of the -- kind of the false choice that it has either to limit itself and how many people it can reach or face ruinous fines.

THE COURT:  And I understand that argument.

Tell me if this is wrong, because how I perceived your argument in your papers was that, Judge, at some point the limitations become so onerous you can't engage in the initiative process and, therefore, it necessarily implicates speech communication.  Right?

MR. STEINER:  That's correct, Your Honor.

THE COURT:  And what I was asking inartfully -- and it's been a long morning and I'm hungry, but is there any other -- beyond that which is, I think, obvious -- and I started this hearing by saying, Obviously, if you limited it to 24 hours, and Mr. Jazil said, Well, treat it as rational basis,

don't treat that as a limitation on communication.

But with all due respect, if you say you can only collect ballot initiatives in Florida when it's under 30 degrees, then you've just effectively stopped that -- in the summer under 30 degrees -- I guess it's possible to go under 30 degrees a few days a year -- that would be tantamount to saying, You've got a process and we are going to shut it down completely.  So that's process; you can only collect it, but it shuts it down.  So I understand that argument.

But is any other way, beyond that it effectively shuts down the process, that you believe what you are challenging implicates communication?  Because there are all kinds of other examples where -- there's a provision that limits what you can say, who you say it to, or who can say it.

So I'm just trying to find out, aside from this sort of big picture -- they put all these burdens and it's stopping the process -- is there any other argument you have that suggests this implicates communication and here's how it does?

MR. STEINER:  On the record that we've submitted, I think it is the former as opposed to there being some -- I don't think we're foreclosing the possibility that maybe there is some intentional --

THE COURT:  I'm not limiting your arguments moving forward, I'm just trying to find out what's in front of me right now.

MR. STEINER:  But, yes, I think it is the process that is being harmed, and the effect of the fine provisions in tandem with the ten-day provision and the criminal provisions are all kind of creating this insurmountable barrier for FDH to actually collect enough petitions.

THE COURT:  It was clear in your papers and it was clear in your presentation.  I was just trying to figure out if there was something beyond that.

MR. STEINER:  And I think the only other -- I wanted to address a couple of things that Mr. Jazil raised.

So in the statute it does say that the notice -- that the form becomes a public record upon receipt by the supervisor.  So, I mean, we are not really referencing -- or, rather, shouldn't be referencing other voter election laws where, looking at the statute itself, the petitions themselves become public record.

And the other thing I wanted to raise in the racketeering argument that Mr. Jazil raised in terms of striking irregularities, the way that this particular provision of the racketeering statute says, "A violation of the Florida Election Code relating to," and if we strike "irregularities," say "relating to fraud involving issue petition activities," that's fine except that the State is interpreting all sorts of different things as fraud.

So submitting a bunch of petitions late for a couple

days, in the beginning of Mr. Jazil's argument was talking about how that could be -- that could be fraud if a whole bunch of petitions were submitted a few days late.  And so in that sense, Your Honor, simply just striking "irregularities" I'm not sure does the job because of the way that they're interpreting the word "fraud" as well.

And then I know Mr. Burhans has additional points that he would like to make, so I will pass to him, if you have no more questions.

THE COURT:  Thank you, Mr. Steiner.

MR. BURHANS:  Thank you, Judge.  I'm just going to address a few points raised by counsel for the Secretary.

The first one is to briefly address the issue of impossibility of performance.

You know, as we all learned in first year contracts law, it's a contract principle primarily, and it really goes to the issue as to the nature of the thing to be done cannot be done.  It doesn't really address the ability of the party to actually do it.

And, you know, I did find one case, you know, after our briefing -- I'm not trying to spring it on counsel because I think it's just -- it's a pretty basic premise in this area of the law which says courts do not generally excuse performance that is merely inconvenient, profitless, and expensive.  That's not what impossibility means.  Ironically, that's exactly how

they are characterizing compliance with HB 1205.

By the way, that's *Valencia versus Publix Super Markets* --

(Reporter requests clarification.)

MR. BURHANS:  464 So.2d 1267.

So it is ironic that they are characterizing our ability or maybe inability to comply with HB 1205, particularly 1205 with the ten-day requirements, as something that wouldn't fit what is a typical definition of impossibility of performance.

Now, counsel suggested that Smart & Safe took the position that impossibility is clear, because we put a footnote in a letter to the Secretary advocating against being fined $121,000.

Well, Your Honor, advocating against the imposition of baseless and ruinous fines does not equal agreement that impossibility is clear within the meaning of the statute.  In fact, the Secretary never addressed that issue and it certainly was never adjudicated.

Now, if the Secretary's counsel wants to stipulate that voter delay of greater than ten days in returning a signed petition or mail delay of greater than ten days is an impossibility within the meaning of the statute, happy to have that agreement and we could move on from that issue in this case.  If not, then we have a problem.

The next issue I want to address -- and, really, this is a small one, but it bothered me because counsel added words to sworn testimony that do not appear in that testimony.  And in particular, he addressed this issue of Smart & Safe having to eat $150,000 in the Airbnb rentals and hotel accommodations.  Now he said that's for out-of-state petition circulators.  Well, those are just words he added.  That's not what the declarant said.  So I'm going to read it in full so it's in the record.

*We were blindsided by this abrupt change, having just invested over $150,000 in renewing Airbnb rentals and hotel accommodations for our circuiting teams, expenses that became essentially wasted due to the sudden work force disruption,* close quote.

Nowhere in there does it say out-of-state circulators, and that's intentional because this impacted the statewide team that includes out-of-state circulators, and in-state circulators who get deployed around the state.

So when we are quoting sworn testimony, I just hope we will all be a little bit more precise and not add words to it.

Let's move on to the ten-day issue, Your Honor.  And there's a couple of things I want to talk about.

Counsel suggested that the current Rule 1S-2.0091 provides for the receipt of signed petitions by a supervisor on the next business day and there would be no fine.

Well, there's a problem with that.  Number one, that

applies to the 30-day rule, which no longer is in effect. The statute struck that provision. I'm going to show it to you in just a moment. So we currently do not have an operative rule that says under the ten-day rule if you deliver on the next business day after the holiday, if it's greater than ten days, that you won't get a fine. That rule does not exist.

Again, if counsel will stipulate here, right now, on the record that the Secretary takes the position that under the ten-day rule if the petition is received on the next business day after the office is closed that will not result in the fine, great. If he doesn't want to take that deal, then maybe he can represent that the Secretary will promulgate such a rule.

If not, the point still stands and it's problematic. And here's why. Let's look at the actual statutory provision at issue, because, as we know, rules are promulgated based upon statutory authority.

Here you can see at the very top beginning at line 726, talks about -- the lead-in is imposing fine if it's not received in the county in which the voter resides -- I talked about that earlier -- more than ten days after the voter signed the petition form.

Now, here's the important part, Judge. And you've already seen it -- the Legislature struck the provision "or the next business day, if the office is closed."

Is Mr. Jazil suggesting that the supervisor can adopt

a rule that is contrary to this legislative intent which is saying, We are not going to give you the grace of that next business day.  If he's going to make that representation, I invite him up here to do it.  If not, we still have a big problem, because ten days doesn't mean ten days, it means seven days if you have a Monday holiday.

Your Honor, the last thing I want to finish on is to talk about the State's purported rationale for requiring the ten-day rule.  And you had a good discussion with Mr. Jazil about it, and he told you that the purpose of the ten-day rule serves really two purposes.

It serves, one, the function of providing the supervisors with more time to review the petitions.

Well, that is clearly not the case, because the supervisors have 60 days under the statute to review the petitions.

The ten-day rule does not provide them -- excuse me -- with more time beyond those 60 days.  If the Legislature wanted to give the supervisors more time, they could have done so without trampling on Smart & Safe and other sponsors' speech by restricting the submission deadline to ten days.  They could have expanded the Supervisor's deadline to 60 -- you know, more than 60 days.

So, Your Honor, if that really is the rationale for the ten-day rule, giving the supervisors time to review the

position -- petitions, then I hope counsel will come up here and explain to you why Section 20 of HB 1205 provides a 90-day freeze on signature verification from July 1st to September 30th.

Here it is, Judge, It's in their bill, section 20: *To ensure uniformity and integrity in the initiative process, a signed petition form may not be verified between July 1st, 2025, and September 30th, 2015.*

You'll note in subsection (2): *That a petition form gathered after July 1st must be delivered as provided in this Act.*

So what is this statute doing?  It's creating a 90-day logjam from review.

That cuts directly against the excuse that counsel gave you that HB 1205, the ten-day rule, is designed to give the supervisors more time to review the petitions.

Your Honor, the sausage is not only bad, it's rancid and it's filled with maggots, and it should be enjoined as soon as an order can be issued.

Thank you.

THE COURT:  Mr. Jazil, I'm not suggesting you should or should not.  I was going to stop with the plaintiffs' reply to your arguments.  But given the last series of statements inviting the -- you to respond to things, you don't have to. Don't have to add anything.  I'm just -- if you want to, then

I'm going to give you a moment to respond.

MS. CHAUDHURI:  Your Honor, I'm sorry to interrupt, but after hearing today's argument, I would like to make a few points.  I'm the counsel for the League of Women Voters of Florida.

THE COURT:  Sure.

MS. CHAUDHURI:  If you're amenable.

MR. JAZIL:  Please.  After you.

MS. CHAUDHURI:  And I can wait.

THE COURT:  No, no.  I don't want to go back and forth --

MS. CHAUDHURI:  Okay.

THE COURT:  -- back and forth like a ping pong.

MS. CHAUDHURI:  Thank you, Your Honor.

My name is Pooja Chaudhuri, and I represent the League and two individuals.

I just want to make a few points.  The first is the League is one of the most premier well-known entities.  You know, they've been in front of you before, and they are a volunteer group that has thousands of members in -- that have collected petitions in -- on behalf of sponsors that were planning to collect petitions, and actually collecting them, actually, in support of the sponsors here -- many of the sponsors here, including Clean Water and Florida Decides Healthcare.

And the provisions that you're hearing today has unique impacts on the League, and I want to make sure that they don't get lost.  They are detailed in my client's, Ms. Scoon's, declaration in 93-1.

With respect to the ten days, I'd like to point out that not only -- that, one, is the law's cumulative effect on the League has chilled its volunteers' participation and really led the League to consider stopping collecting petition gathering altogether.  The problem with the ten day is that the League, just like the other sponsors, does conduct its own compliance checks, you know, and it reduces the time that the League has to conduct the compliance checks and increases the chance of submitting invalid forms, because the League has to submit every signed petition form.

The point that I want to make that's different is that the Office of Election Crimes investigates both the entity as well as the individual volunteer under the language of this statute if a Supervisor of Elections identifies 25 percent invalid forms.  And so for the League, of course, it matters for the League as an entity because the League is collecting thousands of petitions.

But it also matters for the individual volunteer, you know, the member who is, like, the head of her local library in Palm Beach County, Florida.  Those individuals, if they submit 100 petitions and out of that 25 percent are deemed invalid,

that person would be subject to investigation.  And that has an extremely chilling effect on the ability of the League to attract volunteers, to attract members, and really fulfill their mission.

The other thing that I want to point out is that the League sponsors often approach the League and they ask the League, Are you going to support us? because they know how important the League's involvement is in this whole process. And so the League not being able to attract members, that impacts their relationship with the sponsors of petitions and impacts, you know, the ability of the League to engage in speech, much like the arguments that you've heard that impact sponsors as well.

As to the other provisions here, we obviously join in in all the relief.  Any relief that you may grant, we would like it to be extended to our client.

In terms of the personal information, we also are challenging the phrase "retains personal information" because it's unclear whether the League -- you know, keeping the form for even ten days if it's not meant to be kept for the sponsor of the organization, but, rather, you know, they need to turn it in to the supervisor, whether "retains" covers that particular conduct.

And on top of that, given the panoply of fines and criminal penalties, the League is also considering -- they feel

the need to -- to track at least the names of individuals because, you know, it's a crime to -- for the same petition gatherer to submit more than one petition on behalf of two individuals, right. And so it is important for the League to be able to track whose petitions are being collected.

I will end by saying that a lot of the provisions that are before you today don't necessarily -- that they impact the League, but the League also has challenges to some of the other provisions that are going into effect July 1st. And we didn't get a chance to brief our own PI, but if the Court is amenable to another round of PI briefing, then we would certainly submit a more fulsome brief at that point.

Thank you so much, Your Honor, for the opportunity.

THE COURT: Thank you.

Mr. Jazil, Mr. Burhans invited you to commit seppuku.

MR. JAZIL: Thank you, Your Honor. And I appreciate the invitation, but I'll decline.

Your Honor, I note this: Mr. Burhans was pointing to 1S2.0091(b). It's also the provision he cites for the proposition that petitions submitted late should still be verified. Yes, the Department's position is they should, indeed, continue to be verified. So that rule is a nullity.

And, two, Your Honor, the Department's position is this: When a statute changes, unless there is a specific conflict with a rule, the rule stays in effect. So the statute

is not in conflict when it says that we accept something the next business day after a holiday. It's just the statute is not silent on that point. But the rules filling in the gap, our intention is to keep the rule as it is unless someone during rulemaking suggests we should change the rule.

And if Mr. Burhans wants to make the change and suggest a change so it improves his litigation posture, we'll consider it. But until then, our intention is to, A, accept petitions that are submitted late, because it's not the fault of the person signing the petition, and, B, say that the next business day is appropriate.

Finally, Your Honor, my friends from the League just asked that any relief in this case be extended to them. I simply note, Your Honor, I don't believe the League has established standing as it relates to these provisions.

THE COURT: Obviously, if I was going to extend relief to somebody, I would have to go to a standing analysis.

MR. JAZIL: Yes, Your Honor.

And I note that Ms. Scoon has an affidavit. The affidavit talks about how the League uses an all volunteer force, but at no point does Ms. Scoon say that the volunteers would fall outside of the 25-plus safe harbor that's in the statute. And I say "25-plus" because the 25 doesn't include your petition, your relatives', et cetera.

Thank you, Your Honor. I have nothing further to add.

THE COURT:  All right.  I thank everybody for their thoughtful presentations.  I'll do my best to get an order out as quickly as I can.  Y'all took the time to draft your papers, so I'm going to give myself the grace to take some time to draft my order, so please be patient.

I thank you again for your professionalism.  I hope you enjoy the balance of your week and the holiday weekend.

Court is in recess.

(Recessed at 12:25 PM.)

(Resumed at 12:26 PM.)

THE COURT:  Please take your seats.

Apparently, Mr. Wermuth, they said you stood up.  You had something you needed to add?

MR. WERMUTH:  I was in the process of standing up, Your Honor.

Just to preview, obviously you've seen in the papers that we do intend to file -- we've identified our first motion for preliminary injunction.  We do intend to file a second motion for preliminary injunction.

THE COURT:  That's why I started this hearing by saying some things hadn't gone into effect and I understood there would likely be another round depending on when provisions would come into effect and so forth.

MR. WERMUTH:  We were hoping to maybe discuss the schedule of doing so.  We do have an intention to file ours

by -- not this Friday, but the next -- the 30th.  And we are going to see if there's a chance of coming to some agreement on a schedule that might work.

THE COURT:  I can tell you when you file it, I'm going to enter an order requiring everybody to confer.  And this time I'll have you do what you normally do, which is if you can come to an agreement of a schedule, you submit it; I adopt it.  If you can't, then I'll have a status conference.

MR. WERMUTH:  Thank you, Your Honor.

THE COURT:  All right.  Y'all have a good day.

And might I suggest y'all go to Bradley's.  They have very good sausage.

Thank you.

(Proceedings concluded at 12:27 PM on Thursday, May 22, 2025.)

* * * * * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. Any redaction of personal data identifiers pursuant to the Judicial Conference Policy on Privacy is noted within the transcript.


/s/ Megan A. Hague                          5/22/2025

Megan A. Hague, RPR, FCRR, CSR              Date
Official U.S. Court Reporter