# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

FLORIDA DECIDES HEALTHCARE,
INC., MITCHELL EMERSON, in his
individual capacity, JORDAN SIMMONS,
in his individual capacity.

*Plaintiffs*,

v.                                          Case No. 4:25-cv-211-MW-MAF

CORD BYRD, in his official capacity as
Secretary of State of Florida, JAMES
UTHMEIER, in his official capacity as
Attorney General of the State of Florida;
KIM BARTON, in her official capacity as
Supervisor of Elections for Alachua
County; CHRISTOPHER MILTON, in his
official capacity as Supervisor of Elections
for Baker County; NINA WARD, in her
official capacity as Supervisor of Elections
for Bay County; AMANDA SEYFANG,
in her official capacity as Supervisor of
Elections for Bradford County; TIM
BOBANIC, in his official capacity as
Supervisor of Elections for Brevard
County; JOE SCOTT, in his official
capacity as Supervisor of Elections for
Broward County; SHARON CHASON, in
her official capacity as Supervisor of
Elections for Calhoun County; LEAH
VALENTI, in her official capacity as
Supervisor of Elections for Charlotte
County; MAUREEN "MO" BAIRD, in
her official capacity as Supervisor of
Elections for Citrus County; CHRIS H.
CHAMBLESS, in his official capacity as
Supervisor of Elections for Clay County;
MELISSA BLAZIER, in her official

2

capacity as Supervisor of Elections for
Collier County; TOMI STINSON
BROWN, in her official capacity as
Supervisor for Columbia County; DEBBIE
WERTZ, in her official capacity as
Supervisor of Elections for DeSoto
County; DARBI CHAIRES, in her official
capacity as Supervisor of Elections for
Dixie County; JERRY HOLLAND, in his
official capacity as Supervisor of Elections
for Duval County; ROBERT BENDER, in
his official capacity as Supervisor of
Elections for Escambia County;
KAITLYN LENHART, in her official
capacity as Supervisor of Elections for
Flagler County; HEATHER RILEY, in her
official capacity as Supervisor of Elections
for Franklin County; KENYA
WILLIAMS, in her official capacity as
Supervisor of Elections for Gadsden
County; LISA DARUS, in her official
capacity as Supervisor of Elections for
Gilchrist County; ALETRIS FARNAM, in
her official capacity as Supervisor of
Elections for Glades County; RHONDA
PIERCE in her official capacity as
Supervisor of Elections for Gulf County;
LAURA HUTTO, in her official capacity
as Supervisor of Elections for Hamilton
County; DIANE SMITH, in her official
capacity as Supervisor of Elections for
Hardee County; SHERRY TAYLOR, in
her official capacity as Supervisor of
Elections for Hendry County; DENISE
LAVANCHER, in her official capacity as
Supervisor of Elections for Hernando
County; KAREN HEALY, in her official
capacity as Supervisor of Elections for
Highlands County; CRAIG LATIMER, in
his official capacity as Supervisor of

3

Elections for Hillsborough County; H.
RUSSELL WILLIAMS, in his official
capacity as Supervisor of Elections for
Holmes County; LESLIE R. SWAN, in
her official capacity as Supervisor of
Elections for Indian River County;
CAROL A. DUNAWAY, in her official
capacity as Supervisor of Elections for
Jackson County; MICHELLE
MILLIGAN, in her official capacity as
Supervisor of Elections for Jefferson
County; TRAVIS HART, in his official
capacity as Supervisor of Elections for
Lafayette County; ALAN HAYS, in his
official capacity as Supervisor of Elections
for Lake County; TOMMY DOYLE, in his
official capacity as Supervisor of Elections
for Lee County; MARK EARLEY, in his
official capacity as Supervisor of Elections
for Leon County; TAMMY JONES, in her
official capacity as Supervisor of Elections
for Levy County; GRANT CONYERS, in
his official capacity as Supervisor of
Elections for Liberty County; HEATH
DRIGGERS, in his official capacity as
Supervisor of Elections for Madison
County; SCOTT FARRINGTON, in his
official capacity as Supervisor of Elections
for Manatee County; WESLEY WILCOX,
in his official capacity as Supervisor of
Elections for Marion County; VICKI
DAVIS, in her official capacity as
Supervisor of Elections for Martin County;
ALINA GARCIA, in her official capacity
as Supervisor of Elections for Miami-Dade
County; SHERRI HODIE, in her official
capacity as Supervisor of Elections for
Monroe County; JANET H. ADKINS, in
her official capacity as Supervisor of
Elections for Nassau County; PAUL A.

4

LUX, in his official capacity as Supervisor
of Elections for Okaloosa County; DAVID
MAY, in his official capacity as
Supervisor of Elections for Okeechobee
County; KAREN CASTOR DENTEL, in
her official capacity as Supervisor of
Elections for Orange County; MARY
JANE ARRINGTON, in her official
capacity as Supervisor of Elections for
Osceola County; WENDY LINK, in her
official capacity as Supervisor of Elections
for Palm Beach County; BRIAN
CORLEY, in his official capacity as
Supervisor of Elections for Pasco County;
JULIE MARCUS, in her official capacity
as Supervisor of Elections for Pinellas
County; MELONY BELL, in her official
capacity as Supervisor of Elections for
Polk County; CHARLES OVERTURF, in
his official capacity as Supervisor of
Elections for Putnam County; TAPPIE
VILLANE, in her official capacity as
Supervisor of Elections for Santa Rosa
County; RON TURNER, in his official
capacity as Supervisor of Elections for
Sarasota County; AMY PENNOCK, in her
official capacity as Supervisor of Elections
for Seminole County; VICKY OAKES, in
her official capacity as Supervisor of
Elections for St. Johns County;
GERTRUDE WALKER, in her official
capacity as Supervisor of Elections for St.
Lucie County; WILLIAM KEEN, in his
official capacity as Supervisor of Elections
for Sumter County; JENNIFER KINSEY,
in her official capacity as Supervisor of
Elections for Suwannee County; DANA
SOUTHERLAND, in her official capacity
as Supervisor of Elections for Taylor
County; DEBORAH OSBORNE, in her

5

official capacity as Supervisor of Elections
for Union County; LISA LEWIS, in her
official capacity as Supervisor of Elections
for Volusia County; JOSEPH R.
MORGAN, in his official capacity as
Supervisor of Elections for Wakulla
County; RYAN MESSER, in his official
capacity as Supervisor of Elections for
Walton County; DEIDRA PETTIS, in her
official capacity as Supervisor of Elections
for Washington County; GINGER
BOWDEN MADDEN, in her official
capacity as State Attorney for the First
Judicial Circuit of Florida; JACK
CAMPBELL, in his official capacity as
State Attorney for the Second Judicial
Circuit of Florida; JOHN DURRETT, in
his official capacity as State Attorney for
the Third Judicial Circuit of Florida;
MELISSA W. NELSON, in her official
capacity as State Attorney for the Fourth
Judicial Circuit of Florida; BILL
GLADSON, in his official capacity as
State Attorney for the Fifth Judicial Circuit
of Florida; BRUCE BARTLETT, in his
official capacity as State Attorney for the
Sixth Judicial Circuit of Florida; R.J.
LARIZZA, in his official capacity as State
Attorney for the Seventh Judicial Circuit
of Florida; BRIAN KRAMER, in his
official capacity as State Attorney for the
Eighth Judicial Circuit of Florida;
MONIQUE WORRELL, in her official
capacity as State Attorney for the Ninth
Judicial Circuit of Florida; BRIAN HAAS,
in his official capacity as State Attorney
for the Tenth Judicial Circuit of Florida;
KATHERINE FERNANDEZ RUNDLE,
in her official capacity as State Attorney
for the Eleventh Judicial Circuit of

6

Florida; ED BRODSKY, in his official capacity as State Attorney for the Twelfth Judicial Circuit of Florida; SUSAN LOPEZ, in her official capacity as State Attorney for the Thirteenth Judicial Circuit of Florida; LARRY BASFORD, in his official capacity as State Attorney for the Fourteenth Judicial Circuit of Florida; ALEXCIA COX, in her official capacity as State Attorney for the Fifteenth Judicial Circuit of Florida; DENNIS W. WARD, in his official capacity as State Attorney for the Sixteenth Judicial Circuit of Florida; HAROLD F. PRYOR, in his capacity as State Attorney for the Seventeenth Judicial Circuit of Florida; WILL SCHEINER, in his official capacity as State Attorney for the Eighteenth Judicial Circuit of Florida; THOMAS BAKKEDAHL, in his official capacity as State Attorney for the Nineteenth Judicial Circuit of Florida; and AMIRA D. FOX, in her official capacity as State Attorney for the Twentieth Judicial Circuit of Florida,

*Defendants.*

## AMENDED[1] COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

---

[1] Amends paragraphs 20, 21, 73, 101, 102, 112, 113, 129, 133, 138, 180, 192, 198 and adds paragraphs 82, 83, 97, and 107-110 to update allegations and clarify the provisions of HB 1205 that Plaintiffs challenge; amends each count's WHEREFORE clause and adds Appendix A, a table, specifying the specific claims that are brought against specific defendants, given their particular role in administering the initiative process; and updates associated paragraph numbering, internal cross references, and headings.

Plaintiffs Florida Decides Healthcare, Inc. ("FDH"), Mitchell Emerson, and Jordan Simmons bring this action against Cord Byrd, in his official capacity as Secretary of the State of Florida, James Uthmeier, in his official capacity as Attorney General of the State of Florida, and the County Supervisors of Elections and State Attorneys, in their official capacities, (collectively, "Defendants") and allege the following:

## INTRODUCTION

1.    Since 1968, Floridians have had the power to propose and vote on changes to the state constitution through a citizen-led initiative process. Enshrined in the Florida Constitution for nearly six decades, the process empowers Floridians to amend the state constitution by popular initiative. Historically, this mechanism has allowed ordinary citizens—not just the politically connected or well-financed—to shape the legal landscape of their state.

2.    For years, the Florida Legislature has responded to citizens' efforts to evoke this process by passing a series of increasingly punitive restrictions on and barriers to the process that have made it far more costly and cumbersome. In 2024, despite these barriers, citizen initiatives managed to make it onto the ballot, but fell short of the 60% supermajority requirement for passage, a requirement itself that was a Florida Legislature referred measure.

3. This year, in response, the Legislature acted to put the initiative process even more out of reach of all but the wealthiest special interests—or the few sponsors who are able to muster sufficient support for broadly popular proposals—through the enactment of a series of additional burdensome statutory changes.

4. The cumulative effect is a drastic curtailment of direct democracy in Florida. The latest legislative assault—House Bill 1205 ("HB 1205")—pushes these restrictions well past constitutional boundaries. HB 1205 imposes vague, punitive, and excessive requirements on citizens and organizations engaged in the initiative process. They put initiative sponsors and volunteer and paid petition circulators alike at constant, extraordinary risk of legal and financial liability for engaging in constitutionally protected activity. The predictable effect is to deter participation, discourage civic engagement, and concentrate power in the hands of elected officials—contrary to the very purpose of Florida's citizen-led initiative provision.

5. The Legislature not only imposed these onerous restrictions on direct democracy *prospectively*—it attempted to change the system while citizen groups are currently in the midst of gathering petitions.

6. Plaintiff FDH is one such group. FDH is a nonprofit organization currently actively attempting to qualify a ballot measure for the 2026 general election that would expand access to Medicaid coverage across Florida. Because of HB 1205's punitive and onerous restrictions, set to go into effect in the middle of

9

FDH's ongoing petition drive, the organization faces the real and imminent threat of being unable to continue its operations. HB 1205 creates intolerable uncertainty, exposes FDH to ruinous civil and criminal penalties, and could ultimately force FDH to shut down its campaign entirely.

7.      HB 1205 further infringes on the rights of petition circulators, and those who otherwise collect, deliver or physically possess petitions, such as Plaintiff Jordan Simmons, by implementing vague criminal penalties and restricting the right of individuals to participate in the citizen-led initiative process based on arbitrary exclusions.

8.      HB 1205 also infringes on the rights of individual Florida voters, like Plaintiff Mitchell Emerson, who have signed a petition, by establishing a government-controlled veto point in the initiative process, and burdening voters' constitutional right to participate in that process.

9.      As a result, HB 1205 violates Plaintiffs' rights under the First and Fourteenth Amendments to the U.S. Constitution. Plaintiffs accordingly bring this action seeking declaratory and injunctive relief, to protect themselves against severe and irreparable harm to their constitutional rights.

## JURISDICTION AND VENUE

10.    The Court has jurisdiction to hear this case pursuant to 28 U.S.C. §§ 1331 and 1343 because the Plaintiffs' claims arise under the Constitution and laws of the United States.

11.    This Court also has jurisdiction under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and Rules 57 and 65 of the Federal Rules of Civil Procedure to grant the declaratory and injunctive relief requested.

12.    Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendants are residents of Florida and numerous Defendants reside in this judicial district. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events that give rise to Plaintiffs' claims occurred and will occur in this judicial district.

13.    This case is properly filed in the Tallahassee Division under Local Rule 3.1(B).

## PARTIES

### A. Plaintiffs

14.    **Plaintiff FDH** is a Florida 501(c)(4) non-profit corporation with a principal place of business, office, and registered agent in Miami, Florida.

15.    Established in February 2024, FDH is working to expand access to affordable, high-quality healthcare for 1.4 million Floridians, especially those in low-income and underserved communities.

16.    FDH is currently sponsoring a citizens' initiative for the 2026 general election that would expand eligibility for Medicaid in Florida pursuant to the Affordable Care Act, championing healthcare rights for Florida's working families.

17.    FDH's stated mission is to "let voters decide whether Florida should expand Medicaid, bring billions of our tax dollars home, increase jobs, grow our economy, and provide access to care to over 1 million people." Ex. A, Decl. of Mitchell Emerson ¶ 7 (May 4, 2025) ("Emerson Decl.").

18.    The summary for FDH's proposed constitutional amendment, "Provide Medicaid Coverage to Eligible Low-Income Adults," ("the Amendment") states:

> Requires State to provide Medicaid coverage to individuals over age 18 and under age 65 whose incomes are at or below 138 percent of the federal poverty level and meet other nonfinancial eligibility requirements, with no greater burdens placed on eligibility, enrollment, or benefits for these newly eligible individuals compared to other Medicaid beneficiaries. Directs Agency for Health Care Administration to implement the initiative by maximizing federal financial participation for newly eligible individuals.

Fla. Const. art. X, § 33  (Dec. 12, 2018) (proposed amendment), https://initiativepetitions.elections.myflorida.com/InitiativeForms/Fulltext/Fulltext_1816_EN.pdf.

19.    The Amendment is supported by a diverse coalition of policy experts, healthcare providers, patient advocates, employee associations, and directly affected individuals across Florida.

20.    To engage voters across the state, FDH relies on a network of paid circulators, volunteers, and 45 decentralized petition hubs. At present, FDH employs hundreds of paid circulators, with plans to hire hundreds more before July 1, and to scale up to 3,000 by September 2025 to bolster its ballot initiative efforts. Petition forms are made available in English, Spanish, and Haitian Creole, and voters may also submit completed forms via mail or in person at roughly 50 hub locations across Florida. FDH extends opportunities to circulate to anyone who supports its mission, including noncitizens and citizens that are not Florida residents.

21.    **Plaintiff Mitchell Emerson** is the Executive Director and Campaign Manager for FDH. He is also a Florida resident and registered voter. As a registered Florida voter, he has already signed a petition in support of the proposed Amendment.

22.    **Plaintiff Jordan Simmons** is a resident of Missouri. He is currently employed as a project director for FDH. In this role, Mr. Simmons both personally engages in petition circulation and helps to ensure that FDH appropriately handles and submits petitions that have been returned by petition circulators. Mr. Simmons is passionately committed to the goal of expanding Medicaid, including in his home

state of Missouri, where he worked on a Medicaid expansion ballot measure. As a non-resident of Florida, Mr. Simmons will not be legally allowed to continue his current job responsibilities starting July 1, and will resign his employment if he is unable to continue to work.

## B. Defendants

23.     **Defendant Cord Byrd**, in his official capacity as Secretary of State of Florida, is the head of the Florida Department of State ("the Department") and the chief election officer of the state. Fla. Stat. § 97.012. The Department "shall have general supervision and administration of the election laws." *Id*. § 15.13.

24.     As head of the Department of State, the Secretary oversees the Division of Elections and the Office of Election Crimes and Security. *Id*. §§ 20.10(2)(a) (2021), 97.022 (2022). The Secretary is responsible for ensuring uniform interpretation and implementation of election laws. *Id.* § 97.012(1)-(2).

25.     The Secretary is charged with ensuring state compliance with election laws and may conduct preliminary investigations into irregularities or fraud involving petition activities. *Id.* § 97.012(15).

26.     The Secretary also refers violations of ballot initiative provisions to the Attorney General for enforcement.

27.     **Defendants Supervisors of Elections**, who are sued in their official capacities only, are responsible for administering elections in each of Florida's 67

counties. With regard to the initiative process, in particular, supervisors disseminate, collect, and verify petition forms, including the verification of petition signatures. *Id.* § 110.371(6)–(12).

28.    Defendants Supervisors of Elections are: Kim Barton, for Alachua County; Christopher Milton, for Baker County; Nina Ward, for Bay County; Amanda Seyfang, Bradford County; Tim Bobanic, for Brevard County; Joe Scott, for Broward County; Sharon Chason, for Calhoun County; Leah Valenti, for Charlotte County; Maureen "Mo" Baird, for Citrus County; Chris H. Chambless, for Clay County; Melissa Blazier, for Collier County; Tomi Stinson Brown, for Columbia County; Debbie Wertz, for DeSoto County; Darbi Chaires, for Dixie County; Jerry Holland, for Duval County; Robert Bender, for Escambia County; Kaitlyn Lenhart, for Flagler County; Heather Riley, for Franklin County; Kenya Williams, for Gadsden County; Lisa Darus, for Gilchrist County; Aletris Farnam, for Glades County; Rhonda Pierce for Gulf County; Laura Hutto, for Hamilton County; Diane Smith, for Hardee County; Sherry Taylor, for Hendry County; Denise LaVancher, for Hernando County; Karen Healy, for Highlands County; Craig Latimer, for Hillsborough County; H. Russell Williams, for Holmes County; Leslie R. Swan, for Indian River County; Carol A. Dunaway, for Jackson County; Michelle Milligan, for Jefferson County; Travis Hart, for Lafayette County; Alan Hays, for Lake County; Tommy Doyle, for Lee County; Mark Earley, for Leon County;

Tammy Jones, for Levy County; Grant Conyers, for Liberty County; Heath Driggers, for Madison County; Scott Farrington, for Manatee County; Wesley Wilcox, for Marion County; Vicki Davis, for Martin County; Alina Garcia, for Miami-Dade County; Sherri Hodie, for Monroe County; Janet H. Adkins, for Nassau County; Paul A. Lux, for Okaloosa County; David May, for Okeechobee County; Karen Castor Dentel, for Orange County; Mary Jane Arrington, for Osceola County; Wendy Link, for Palm Beach County; Brian Corley, for Pasco County; Julie Marcus, for Pinellas County; Melony Bell, for Polk County; Charles Overturf, for Putnam County; Tappie Villane, for Santa Rosa County; Ron Turner, for Sarasota County; Amy Pennock, for Seminole County; Vicky Oakes, for St. Johns County; Gertrude Walker, for St. Lucie County; William Keen, for Sumter County; Jennifer Kinsey, for Suwannee County; Dana Southerland, for Taylor County; Deborah Osborne, for Union County; Lisa Lewis, for Volusia County; Joseph R. Morgan, for Wakulla County; Ryan Messer, for Walton County; Deidra Pettis, for Washington County.

29.    **Defendant James Uthmeier**, in his official capacity as the Attorney General of Florida, is the chief state legal officer and maintains the office of the statewide prosecutor. Fla. Const. art. IV, § 4(b). Attorney General Uthmeier is responsible for enforcing HB 1205.

30.    The Attorney General has concurrent jurisdiction, through the office of the statewide prosecutor, with the state attorneys to prosecute violations of criminal laws occurring in two or more judicial circuits. *Id.*

31.    The Attorney General also requests opinions from the Florida Supreme Court regarding the validity of initiative petitions. Fla. Stat. § 16.061; Fla. Const. art. IV, § 10.

32.    **Defendant State Attorneys**, in their official capacities, are the prosecuting officers of all trial courts in Florida. Fla. Stat. § 27.02. There are twenty State Attorneys, one for each judicial circuit. Fla. Const. art. V, § 17.

33.    Defendants State Attorneys are: Ginger Bowden Madden, for the First Judicial Circuit of Florida; Jack Campbell, for the Second Judicial Circuit of Florida; John Durrett, for the Third Judicial Circuit of Florida; Melissa W. Nelson, for the Fourth Judicial Circuit of Florida; Bill Gladson, for the Fifth Judicial Circuit of Florida; Bruce Bartlett, for the Sixth Judicial Circuit of Florida; R.J. Larizza, for the Seventh Judicial Circuit of Florida; Brian Kramer, for the Eighth Judicial Circuit of Florida; Monique Worrell, for the Ninth Judicial Circuit of Florida; Brian Haas, for the Tenth Judicial Circuit of Florida; Katherine Fernandez Rundle, for the Eleventh Judicial Circuit of Florida; Ed Brodsky, for the Twelfth Judicial Circuit of Florida; Susan Lopez, for the Thirteenth Judicial Circuit of Florida; Larry Basford, for the Fourteenth Judicial Circuit of Florida; Alexcia Cox, for the Fifteenth Judicial Circuit

17

of Florida; Dennis W. Ward, for the Sixteenth Judicial Circuit of Florida; Harold F. Pryor, for the Seventeenth Judicial Circuit of Florida; Will Scheiner, for the Eighteenth Judicial Circuit of Florida; Thomas Bakkedahl, for the Nineteenth Judicial Circuit of Florida; and Amira D. Fox, for the Twentieth Judicial Circuit of Florida.

## FACTUAL ALLEGATIONS

### A. Floridians Have a Right to Citizen-Led Initiatives.

34.    Citizen-led initiative campaigns empower everyday citizens to pass policies that improve lives and strengthen communities. Florida is one of at least twenty-four states that permit constitutional amendments by citizen-led initiative without requiring legislative approval. Nat'l Conf. of State Legs., Initiative and Referendum Processes (updated Apr. 22, 2025), https://www.ncsl.org/elections-and-campaigns/initiative-and-referendum-processes.

35.    The Florida Constitution has enshrined the process for passing these amendments—a core feature of feature of the state's tradition of direct democracy—since 1968.

36.    Article XI, section 3 of the Florida Constitution reserves for the people the power to propose constitutional amendments by initiative, independent of the Florida Legislature.

37.    Since 1976, Floridians have put 44 citizen-led amendments to the Florida Constitution on the ballot, 36 of which Florida voters approved.

38.    At the center of the initiative process are initiative sponsors like FDH—organizations or individuals who draft proposed measures and lead campaigns to qualify them for the ballot. These sponsors coordinate signature collection efforts, conduct public education, and bear the financial and legal responsibilities of compliance with complex state regulations.

39.    Petition circulators are also indispensable to the initiative process. Whether paid or volunteer, these individuals engage directly with the public to collect the signatures necessary to place a measure on the ballot. Their work involves not only gathering signatures but also informing voters about the initiative's purpose and implications—making them central participants in the dissemination of political ideas and civic engagement. Without them, initiative sponsors cannot effectively reach and communicate with voters or meet the statutory thresholds required for ballot placement.

40.    By its nature, direct democracy allows citizens to sidestep the state legislature to advance causes that the legislature—because of partisanship, vested interests, or other reasons—fails to advance. Perhaps unsurprisingly, then, the Florida Legislature has imposed an array of increasingly onerous restrictions on the process of qualifying a measure for the ballot.

41.    As a result, sponsors seeking to qualify a proposed constitutional amendment for the Florida ballot must overcome complex, costly, and highly burdensome obstacles, designed with multiple layers of review and legal scrutiny.

42.    To initiate the process, sponsors must first register as a political committee and submit the text of the proposed amendment to the Secretary of State for approval. Fla. Stat. § 100.371(2).

43.    Once approved, the sponsor must collect a substantial number of verified petition signatures from Florida voters. To qualify a measure for the 2026 ballot, proponents must collect 880,062 valid signatures statewide—or 8% of the votes cast in the most recent 2024 presidential election. *See* Fla. Const. art. XI, § 3.

44.    To trigger even the initial phase of review, sponsors must gather 220,016 signatures—25% of the total—distributed across at least half of the state's congressional districts. *See* Fla. Stat. § 15.21(1)(c).

45.    Once this preliminary signature threshold is met, the Secretary of State is required to forward the proposed measure to multiple state entities—including the Florida Attorney General and the Financial Impact Estimating Conference ("FIEC")—for further review and analysis. *Id*. § 100.371(13)(a).

46.    Once received, the Attorney General is obligated by law to petition the Florida Supreme Court for an advisory opinion on the measure's compliance with specific legal standards. This initiates judicial review to determine whether: (a) the

amendment complies with the single-subject rule; (b) the ballot title and summary are clear and accurate; and (c) the measure is facially valid under the U.S. Constitution. *Id*. § 16.061.

47.    In parallel, the FIEC evaluates the potential economic consequences of the proposed amendment. This process requires detailed fiscal projections and culminates in the publication of a financial impact statement ("FIS"), which appears on the ballot alongside the measure and is often cited by opponents and voters alike. *Id*. § 100.371(13)(a).

48.    Prior to the recent passage of HB 1205, which altered procedures in various ways, a measure was required to complete this multi-stage review process before proponents could begin collecting the remaining 75% of the required signatures.

49.    Proponents must accordingly expend significant time, resources, and legal expertise navigating this early labyrinth of procedural and substantive scrutiny—all without any guarantee that the proposed measure will ultimately appear on the ballot.

50.    The other two processes for initiating a constitutional amendment—through the Legislature or via the Constitutional Revision Commission—face far fewer obstacles.

51.    For instance, Florida lawmakers can propose a ballot initiative with a three-fifths vote in each chamber—a simple feat for a party with a legislative supermajority. Fla. Const., art. XI, § 1. The Governor cannot veto an initiative proposed by the Legislature, and there is no mandatory Supreme Court review before it appears on the ballot for voter approval.

## B. The Florida Legislature Responds to Successful Citizen-led Initiatives by Systematically Restricting and Imposing Burdens on the Process.

52.    Florida's legal and logistical requirements already require legal precision, political coordination, and extensive financial investment, well before any voter ever sees a proposed amendment on the ballot.

53.    Over the last two decades, Floridians have pressed through these obstacles to pass a range of widely popular reforms opposed by the state's leadership, including: a 2016 constitutional amendment authorizing the use of medical marijuana; a 2018 amendment restoring voting rights to most Floridians with prior felony convictions; and a 2020 amendment to increase the state minimum wage to $15 per hour.

54.    In response to the success of such initiatives, particularly those viewed as contrary to the priorities of the state's political leadership, the Florida Legislature has systematically made it harder for Floridians to exercise their initiative rights. Over time, the Legislature has transformed the initiative process from a tool of

popular sovereignty into a regulatory gauntlet, imposing burdens designed to stymie and suppress citizen-led campaigns.

55.    In 1997, just one year after a trio of Everglades conservation initiatives appeared on the ballot, the Legislature responded by imposing a slate of new procedural requirements: sponsors were now required to prepay signature-verification fees, file affidavits disclosing their use of paid petition circulators, and publicly report the names and addresses of those circulators. The Legislature also required paid circulators to handwrite their identifying information on every petition form and significantly shortened the timeline for signature submission—up to 151 days before the general election, depending on verification method—making the process more demanding and time-deprived. Ch. 97-13, § 21, at 29, Laws of Fla. (amending § 99.097(4), Fla. Stat. (1995)); *id.* § 22, at 29–30 (amending § 100.371, Fla. Stat. (1995)).

56.    When voters approved landmark education amendments in 2002, including measures for universal pre-kindergarten and smaller class sizes, the Legislature responded once again by raising the bar. A new requirement mandated that every ballot initiative include a FIS estimating revenues and costs. Ch. 2002-390, Laws of Fla. (amending §§ 15.21, 16.061, 100.371, 101.161, 216.136, Fla. Stat. (2001)).

57.    In 2006, the Florida Legislature, through a legislatively referred constitutional amendment, sought to raise the threshold for voter approval of constitutional amendments from a simple majority to 60%. Ironically, the very amendment imposing this supermajority requirement would not have passed under the standard it created—it passed with less than 60% of the vote.

58.    Two years later, in the wake of a campaign to place the anti-gerrymandering Fair Districts Amendments on the 2010 ballot, the Legislature outlawed the bundling of multiple proposals into a single initiative, a move that undercut efforts to address systemic reforms with interrelated components. Ch. 2008-95, § 14, at 16, Laws of Fla. (amending § 100.371, Fla. Stat. (2007)).

59.    The Legislature struck again in 2011, after voters overwhelmingly adopted the Fair Districts Amendments. This time, lawmakers halved the time that petition signatures remained valid—from four years to two—and eliminated the more affordable random sampling method for signature verification, sharply increasing the financial and logistical burden on initiative sponsors—who are now, as described below, forced to pay costs associated with signature-by-signature verification of the hundreds of thousands of signatures necessary to qualify a measure for the ballot. Random sampling for verification of *candidate* petitions remained untouched. Ch. 2011-40, § 19, at 25, Laws of Fla. (amending Fla. Stat. §

99.097(1), Fla. Stat. (2010)); *id.* § 23, at 30 (amending § 100.371(3), Fla. Stat. (2010)).

60.    Following the passage of the 2018 Voter Restoration Amendment, the Legislature doubled down, enacting a sweeping regulatory framework aimed squarely at paid petition circulators. The Legislature prohibited sponsors from compensating circulators on a per-signature basis and subjected circulators to mandatory registration, individualized petition forms, and affidavit requirements for every collected signature. The Legislature imposed severe fines for delays in submitting petitions and required a bold-font disclaimer on the ballot of any initiative projected to have negative fiscal implications—regardless of the proposal's broader merits. Ch. 2019-64, § 3, at 4–9, Laws of Fla. (amending § 100.371, Fla. Stat. (2018)).

61.    By 2020, the Legislature had enacted even more stringent restrictions. It more than doubled the number of signatures a sponsor was required to collect to trigger Florida Supreme Court review; created a private right of action for challenging circulator registrations; and limited signature collection to a narrow, two-year window ending February 1 of the election year. It also imposed a regime requiring initiative sponsors to pay the full, actual cost of signature verification—far exceeding the nominal rate still applicable to candidates—and invalidated any signatures collected by improperly registered circulators. Ch. 2020-15, § 1, at 1–2

25

(amending § 15.21, Fla. Stat. (2019)); *id.* § 2, at 2 (amending § 16.061(1) Fla. Stat. (2019)); *id.* § 3, at 2–4 (amending § 100.371(3) and (11), Fla. Stat. (2019)); *id.* § 4, at 7–8 (amending § 101.161(1), Fla. Stat. (2019)).

62.     Taken together, these escalating restrictions have radically transformed Florida's initiative process. What was once a vital avenue for civic participation has become a high-cost, high-stakes legal minefield. For grassroots groups, volunteer-led efforts, and ordinary citizens seeking to bring change through democratic means, the pathway has become nearly impassable—paved with deliberate legislative roadblocks designed to silence dissent and consolidate power.

63.     Despite significant existing hurdles, some citizen groups have persisted.

64.     In 2024, Amendment 4, a reproductive rights citizen-led initiative successfully made it onto the ballot. The State mounted a concerted opposition effort, spending millions of dollars in publicly funded ads opposing the measure and threatening criminal prosecution of television stations airing a certain advertisement supporting the measure.

65.     Even in spite of this extraordinary state-sponsored opposition, Amendment 4 was approved by 57% of the voters, narrowly failing to meet the 60% threshold enacted earlier by the Legislature to stymie measures like this one, despite it having significant voter support.

66.    Also in 2024, Amendment 3, a marijuana legalization initiative, similarly secured nearly 56% of the vote despite facing similarly significant State opposition.

**C. HB 1205 Creates Unconstitutional Burdens on the Citizen-Led Initiative Process.**

67.    Apparently concerned that even the 60% threshold would not be enough to quash popular citizen-supported measures in the future, the 2025 Legislature retaliated by adopting a new raft of restrictions on the initiative process. HB 1205 adds yet another layer to an already oppressive framework, exponentially compounding the procedural hurdles, financial obligations, and compelled disclosures that have come to define Florida's initiative process.

68.    During the legislative process, numerous civil rights and voting rights organizations—including the National Association for the Advancement of Colored People ("NAACP") and Common Cause Florida—publicly opposed the legislation. These groups expressed concern that the law was designed to suppress citizen-led ballot measures by imposing new procedural and financial obstacles.

69.    In public testimony before legislative committees, Larry Colleton of the Orange County NAACP recognized the matter for what it was, stating, "There is a desire not to have citizens' petitions anymore. Just say that."

27

70.    Amy Keith, Executive Director of Common Cause Florida, described the bill as "a big government takeover that will hand this process to billionaire corporate elites."

71.    Despite significant opposition, on May 2, 2025, the Florida Legislature passed HB 1205, which Governor DeSantis signed into law the same day.

72.    Sponsors of citizen-led initiatives, such as FDH, now confront an even more costly and complex regulatory regime that suffocates their ability to communicate ideas, mobilize supporters, and engage in core political speech, and will likely eliminate their ability to effectively advocate for citizen-led initiatives. Petition circulators, like Plaintiff Simmons, face the threat of criminal prosecution and loss of employment, while Florida voters risk having their voices disregarded and their lawfully submitted signatures discarded without cause.

73.    HB 1205 makes numerous changes to Florida's citizens' initiative process. Specifically, Plaintiffs' challenge to HB 1205 can be divided into eight categories: (collectively, the "Challenged Provisions"): (i) Petition Circulator Eligibility; (ii) Volunteer Circulator Registration; (iii) Voter Personal Identifying Information Disclosures ("Voter PII Disclosures"); (iv) Signature Verification Suspension; (v) Ten-Day Return Time; (vi) Severe and Punitive Fines; (vii) Vague Criminal Penalties; and (viii) Requirement to Re-file.

### i. *Petition Circulator Eligibility*

74.    HB 1205 imposes strict eligibility requirements on individuals who collect initiative petition forms on behalf of sponsors, whether paid or volunteer, reducing the number of individuals who can associate with FDH and speak to voters about their political support for FDH's petition.

75.    As of July 1, 2025, HB 1205 will require all paid and unpaid petition circulators, and those otherwise collecting, delivering or otherwise physically possessing petitions on behalf of sponsors, to be both U.S. citizens and Florida residents and have no felony convictions, unless their voting rights have been restored. H.B. 1205, 2025 Leg., Reg. Sess. (Fla. 2025) (Engrossed 2) ("H.B. 1205"), ll. 598–603.

76.    HB 1205 mandates enforcement through a registration system that requires circulators to affirm that they are Florida residents and U.S. citizens, and that they have not been convicted of a felony violation or have had their rights restored. *Id.*, ll. 610–47.

77.    Sponsors face a *$50,000 fine per circulator* if any individual collecting petitions on their behalf is determined to be a non-Florida resident, a non-citizen, or a person with a felony conviction whose voting rights have not been restored. The fine is applicable even if the State has registered the circulator as meeting these requirements, and regardless of the sponsor's reasonable efforts to verify eligibility.

78.    FDH is deeply concerned about the impact these new provisions will have on its ability to continue its work. These provisions create five primary issues.

79.    First, the Petition Circulator Eligibility restrictions prevent FDH from continuing to associate with various individuals who support and advance its mission. HB 1205 effectively prohibits Plaintiff FDH and similarly situated sponsors from engaging a broad and diverse group of willing petition circulators. This includes out-of-state staff, a diverse group of non-U.S. citizens, such as lawful permanent residents and DACA recipients, and individuals with prior felony convictions whose voting rights have not yet been formally restored. These restrictions dramatically narrow the field of eligible participants, making it more difficult for sponsors to reach voters across the state—especially in communities where these individuals may be among the most motivated and effective advocates, impairing the ability of both sponsors and supporters to associate freely in support of ballot initiatives, and excluding otherwise qualified and willing employees or volunteers, without a compelling reason.

80.    FDH regularly contracts with employees and relies on a broader network of volunteers to circulate petitions—including non-residents, non-U.S. citizens, and individuals with felony convictions. Emerson Decl. ¶¶ 13, 28.

81.    HB 1205 forces FDH to terminate the jobs and contracts of paid petition circulators who would no longer be eligible to participate, but who are otherwise

actively engaged, in current circulation efforts. For example, Plaintiff Jordan Simmons is an employee of FDH who, as a non-resident, will no longer be able to perform the duties of his position under the new law, and so likely will be forced to resign.

82.    Plaintiff Simmons faces the imminent threat of job loss under the re-registration and residency requirements imposed by HB 1205. Mr. Simmons is a resident of Missouri and currently works as a paid petition circulator for FDH. In that role, he not only gathers signatures himself but also handles and submits petition forms collected by other circulators. Under the new law, his continued employment and participation in these core petitioning activities are effectively prohibited due to his out-of-state residency.

83.    FDH engages a number of other nonresidents who, like Mr. Simmons, are employed in roles that require them to physically possess and circulate petitions. FDH will have no choice but to terminate paid petition circulators who will be ineligible to circulate petition under HB 1205.

84.    Second, the Petition Circulator Eligibility restrictions create administrative hurdles to ensuring compliance that add an additional financial and logistical barrier. To protect their operations and avoid fines, sponsors will likely have to ensure that all their circulators can provide proof of Florida residency and U.S. citizenship and submit to a criminal background check paid for by either the

31

initiative sponsor or the applicant. Based on their current employee pool, a number of volunteers and employees would no longer be eligible.

85.    For example, background checks generally range from $20 to upwards of $100 per person, depending on the type, depth, and provider, creating another financial obstacle to petition circulator activities.

86.    Third, the Petition Circulator Eligibility restrictions put sponsors in the impossible position of bearing legal and financial risk for facts they may not be able to ascertain. This blanket liability chills association with volunteers who are otherwise willing to participate in civic advocacy efforts but may hesitate due to uncertainty about their own eligibility.

87.    For example, HB 1205 applies equally to unpaid volunteers and paid circulators, potentially exposing initiative sponsors to substantial penalties even where an ineligible individual assists without the sponsor's knowledge or authorization.

88.    Likewise, determining a person's citizenship status is often complex and not reliably verifiable by employers or initiative sponsors. Determining whether a person acquired or derived U.S. citizenship can depend on several factors including the citizenship status and residency history of the person's parents or grandparents, and whether the individual lived in the custody of a U.S. citizen parent. *See Gonzalez*

*v. Immigr. & Customs Enf't*, 416 F. Supp. 3d 995, 1004 (C.D. Cal. 2019), *rev'd on other grounds*, 975 F.3d 788 (9th Cir. 2020).

89.    There is no publicly accessible or reliable government database that enables sponsors to confirm the citizenship status of their employees or volunteers. Government officials themselves have misclassified U.S. citizens due to database errors, including cases in which naturalized citizens are listed as non-citizens and derivative citizenship is not captured in the system. *Id.* at 1018.

90.    The combination of these restrictions, particularly the residency and citizenship requirements, places significant administrative burdens on initiative sponsors and exposes them to substantial penalties—even when they act in good faith.

91.    Fourth, beyond outright exclusion, the law also creates a chilling effect. Individuals who are eligible to participate may nonetheless avoid involvement due to confusion, fear of legal consequences, or uncertainty about how their immigration or criminal history may be scrutinized. The mere prospect of being questioned about one's citizenship or legal status—or being forced to register with the State and submit to a background check before petitioning citizens to support a citizen-led initiative—is enough to deter many from engaging in political activity.

92.    FDH has already received feedback from their staff and volunteers, including Mr. Simmons, about how HB 1205 would negatively affect their

33

involvement. They express fear and hesitation about circulating petitions due to HB 1205's penalties, fines, and new registration requirements. Emerson Decl. ¶ 29.

93.    Finally, and notably, these restrictions apply regardless of the validity of the signatures being collected by a newly "ineligible" circulator. HB 1205 automatically invalidates any petition form submitted by an ineligible or unregistered petition circulator. H.B. 1205, ll. 967–70.

94.    This provision creates a significant risk that valid signatures collected in good faith will be discarded solely because the individual who circulated the petition was unknowingly out of compliance with the registration requirements. For example, individuals who previously registered as circulators but fail to re-register under the new law (as described in Subsection ii)—due to confusion, lack of notice, or administrative delay—could continue circulating petitions, unaware that their efforts are invalid.

95.    This direct penalty on protected speech nullifies otherwise valid expressions of political support—collected through the organized petitioning efforts of sponsors, like FDH and circulators, like Mr. Simmons. FDH's ability to communicate its message, engage with voters, and advance its initiative is severely compromised when signatures are discarded for reasons beyond its control. And this creates a chilling effect on core political expression that is especially acute during time-sensitive campaigns.

## ii. *Volunteer Circulator Registration*

96.    HB 1205 abruptly cancels the registration of each petition circulator on July 1, 2025. H.B. 1205, ll. 1174–75. As a result, any circulator registered prior to that date is automatically disqualified, regardless of their compliance status or current participation in an active petition drive. To resume petitioning activities, circulators must re-register under the Law's newly imposed requirements, regardless of whether, in fact, they already meet those requirements. *Id.*, ll. 1176–80.

97.    The law also newly requires most volunteer circulators to register. Starting July 1, a person cannot "collect, deliver, or otherwise physically possess more than 25 signed petition forms" in addition to the person's own, until they register as a petition circulator with the Secretary of State and are issued a petition circulator number. Fla. Stat. § 100.371(4)(a). The only exception to the 25-petition rule is delivery or possession of the petition forms of certain family members; specifically, a spouse, parent, child, grandparent, grandchild, or sibling of the person or the person's spouse. *Id.*

98.    Compounding this disruption, HB 1205 imposes immediate compliance with a range of new petition collection procedures—such as strict delivery and return timelines—without providing a meaningful transition period.

99.    This abrupt shift creates overlapping and conflicting obligations that make implementation unworkable for sponsors and circulators, especially in the midst of an active petition campaign.

100.    For example, sponsors must now comply with the ten-day return requirement without any grace period to update training materials, reorient circulators, or revise workflows. It is also unclear whether circulator activity conducted under the prior rules will subject sponsors to penalties, particularly since updated forms and training materials from the Department will not be available until June 1. As a result, circulators could unknowingly violate the new rules and incur fines before they are even made aware of the changes.

101.    The new requirement to register volunteer circulators adds to the confusion. Volunteer circulators who were lawfully and actively engaged in the initiative process are now suddenly disqualified, with little notice and no clear mechanism for continued participation.

102.    These abrupt changes have forced sponsors like FDH to pause operations, retrain staff, and reprocess registrations. Emerson Decl. ¶ 21. Additionally, FDH currently associates with about one thousand petition circulators who volunteer directly with FDH, as well as others who volunteer indirectly through partner organizations, and through FDH's volunteer hubs. As of July 1, FDH will immediately lose access to these circulators until they can register, which will take

an unknown length of time. Delays like these are particularly harmful during time-sensitive petition drives. Moreover, FDH is aware that many volunteers will refuse to continue their volunteer work if they are forced to register; for example, multiple hubs have informed FDH that they will no longer be able to support petition circulation for FDH if volunteers are required to register.

103.   To comply with the new procedural demands of HB 1205, especially without any prior guidance from the Department, FDH is forced to immediately overhaul its petition submission systems, retrain circulators, and reconfigure internal verification processes.

104.   Additionally, FDH will be required to pay some staff for nonproductive time, while others—particularly temporary and volunteer workers—may leave altogether due to the instability. Restarting operations following even a brief pause requires substantial time, money, and coordination, and in some cases, replacement hiring.

105.   The organization cannot afford to pay hundreds—or thousands—of workers while their operations are on hold, and any break in momentum during peak signature-gathering periods significantly reduces the chances of ballot qualification. The looming threat of shutdown due to legal uncertainty creates operational instability that undermines the viability of the initiative process.

106.    Sponsors, including FDH, were actively collecting signed petition forms prior to HB 1205's effective date. The combined effect of the abrupt cancellation of circulator registrations, and the requirement to comply with new procedures immediately upon enactment, creates substantial confusion. The result is a substantial disruption of ongoing petition circulation efforts and a chilling effect on civic participation.

### iii.  *Voter PII Disclosures*

107.    HB 1205 requires voters themselves to disclose—to the circulator who asks them to sign a petition and to the State additional personal identifying information in order to sign a petition. Florida law already required voters to provide their full name, address, and either their voter registration number or date of birth. Fl. Stat. § 100.371(11)(a)(3) (2022). Voters now must *also* provide their Florida driver license number or identification card number, or the last four digits of the voter's social security number, as well as an attestation that the voter is a registered Florida voter and is petitioning the Secretary of State to place the proposed amendment on the ballot. H.B. 1205, ll, 2025 Leg., Reg. Sess. (Fla. 2025) (Engrossed 2), Fla. Stat. § 100.371(3)(c)(4).  In addition, beginning July 1, 2025, the

petition form must prominently display a notice that the form becomes a public record upon receipt by the Supervisor of Elections. *Id*. § 100.371 (3(a)(4).

108.    These new voter disclosures will make it far more difficult to convince voters to sign FDH's petition. In effect a voter cannot sign a petition unless they are willing to hand over their driver's license number (or state identification number) *and* part of their social security number to a stranger (in most cases) in public and do so on a form stating that the information becomes public record. Voters are particularly hesitant to provide drivers license and social security numbers out of fear of compromising their privacy. FDH has already heard from circulators with experience registering voters that it has been difficult to convince Floridians to provide such information in order to register. These circulators have, in the past, had more success collecting petition signatures than registering voters, due in large part to the fact that collecting petition signatures did not require voters to provide as much personal identifying information.

109.    By dissuading Florida voters from signing petitions, HB 1205 burdens FDH's ability to associate with individuals who support their mission and makes it more difficult to collect enough signatures to qualify for the ballot.

110.    There is no compelling reason for the State to require voters to disclose so much personal identifying information. The State cites concerns that a voter's name, address, and date of birth may be publicly available, allowing sponsors to

forge signatures for verification. But the State has offered no evidence that such misconduct—if it exists—is sufficiently widespread to justify burdening *all* sponsors' ability to associate with like-minded voters. More, as discussed *infra* ¶¶ 171-183, the State has ample other means to deter, detect, and punish such fraudulent activity that does not require burdening sponsors' ability to lawfully collect signatures in the first place.

### iv. *Signature Verification Suspension*

111.   HB 1205 imposes a 90-day suspension of signature verification during which supervisors of elections are prohibited from verifying signed petitions, ostensibly to "ensure uniformity and integrity in the initiative process." H.B. 1205, ll. 1431–33. From July 1, 2025, to September 30, 2025—a critical window for active petition collection—the State of Florida will effectively refuse to verify petitions submitted by FDH. This verification freeze is occurring in the middle of FDH's ongoing petition drive, halting a core procedural step essential to the exercise of First Amendment-protected activities.

112.   As of May 5, FDH has collected over 100,000 petitions, placing it within striking distance of the 25% threshold required to trigger key milestones in the initiative process, including review by the Attorney General, fiscal impact estimation, and Florida Supreme Court review. However, under HB 1205, any signatures submitted on or after July 1 will be placed in limbo—collected but

unverifiable—for a full three months. During this period, FDH will be unable to demonstrate its progress toward required thresholds, significantly delaying advancement through the statutory process. Although FDH could technically continue to collect signatures, the campaign would be operating without guidance or necessary data—unable to track whether its efforts are effective, which counties need additional outreach, or how close it is to reaching required thresholds for petition collection; both statewide in particular congressional districts. Emerson Decl. ¶ 26; *see also* ECF No. 168-1 ¶¶ 27-37.

113.    This mandatory verification freeze undercuts campaign momentum, deprives sponsors of real-time feedback essential to strategy and planning, and increases the risk that circulators will duplicate efforts or fall short of their goals. Depriving FDH of the ability to meet key milestones in the process, such as triggering Florida Supreme Court review and approval, has a substantial deterrent effect on volunteers and funders who would otherwise begin to associate, or continue associating, with FDH. ECF No. 168-1 ¶ 30; ECF No. 168-2 ¶¶ 30-32. The delay also compounds the financial and logistical burden of petition circulation, forcing sponsors to invest in continued outreach without confirmation that previously submitted petitions are valid or counted. In this way, the tolling period imposes a substantial and unjustified burden on the exercise of core political speech and associational rights protected by the First Amendment.

41

114.   There is no rational justification for this across-the-board suspension of petition verification. The State has offered no evidence that a 90-day freeze promotes integrity or uniformity in any meaningful way. Rather, it operates as an arbitrary and unnecessary restriction on initiative sponsors at the height of political engagement, with no consideration for less burdensome alternatives.

### v.  *Ten-day Return Time*

115.   HB 1205 requires initiative sponsors to deliver each signed petition form to the supervisor of elections in the county where the voter resides within *ten days* of signing. H.B. 1205, ll. 714–23. The law imposes steep fines—$50 per day, per petition—for late submission, escalating to $2,500 per day for "willful" violations. *Id.*, ll. 728–30.

116.   Previously, under Fla. Stat. § 100.371(7)(a) (2022), sponsors had thirty days to return petition forms—a timeline that allowed significantly more time to address logistical challenges, processing, and quality control.

117.   HB 1205 provides no exceptions or safe harbor for good faith errors, including errors caused by incorrect voter-provided information, such as return of a petition to the "wrong" county because a voter inadvertently provided inaccurate residence or county information.

118.   Nor does the law provide any exception for logistical delays caused by supervisors of elections—for example, when a supervisor uses a P.O. Box and fails

to check it regularly, potentially resulting in late receipt through no fault of the sponsor.

119.    The law imposes strict liability on the sponsor, even if the sponsor acts diligently and in good faith when collecting, reviewing, and submitting petitions gathered by a large number of people—including many volunteers—from across the state. The only exceptions are for the current standard of "[statutory] impossibility of performance" or "force majeure." Fla. Stat. § 100.371(7)(b).

120.    The county-specific return requirement further compounds the issue. Even when sponsors act in good faith, they may be unable to comply with the county-specific return requirement.

121.    For instance, a voter may list a mailing address that differs from their actual county of registration or mistakenly check the wrong county box on a form—leading the sponsor to submit the petition to the wrong county through no fault of their own, causing additional delays.

122.    While the Department's prior administrative rules required that petition forms be submitted to the correct county supervisor, there was no constricted ten-day turnaround requirement nor was there a strict penalty regime for errors. Misrouted forms typically could be redirected or reprocessed, and sponsors could not be punished for various good faith issues in directing a petition to the proper county. Further, the 30-day return requirement was satisfied as of the date the form

was submitted to *any* supervisor. This cooperative approach, in place since 2021, facilitated ballot access while still ensuring petitions were verified by the appropriate county supervisor.

123.   Under the prior 30-day framework, FDH and similar sponsors could batch petitions weekly, allowing time for internal quality control and verification before mailing to the appropriate counties. The new ten-day rule would eliminate this flexibility, forcing daily shipments and requiring expensive overnight delivery to avoid penalties—substantially increasing operational costs. Emerson Decl. ¶¶ 23–24.

124.   FDH's internal processing involves multiple steps, including circulator collection, preliminary verification, quality control, and data management through a third-party vendor such as TallyEd. *Id.* ¶¶ 12–16, 23. These steps already require close coordination, and the shortened window compresses this workflow into a costly and logistically fragile operation.

125.   The absence of a universal submission method further complicates compliance. Some counties have already rejected and returned petitions sent to the wrong location, creating delays and confusion. This burden is exacerbated by the use of P.O. Boxes by several counties, which hinders reliable tracking and confirmation of timely delivery.

126.    The combination of shortened timelines, required precision in delivery, and the absence of a universal submission method places sponsors in an untenable position. HB 1205 would force them to ship smaller batches more frequently, likely on a daily basis, and utilize expensive expedited or overnight delivery services. *Id.* ¶ 24.

127.    The State's ten-day requirement is not necessary to prevent fraud or otherwise facilitate the petition process. Indeed, most states do not require ballot measure sponsors to submit petitions on a rolling basis, and Florida will not process any petitions submitted for a 90-day period starting in July.

128.    As a result, FDH and similar initiative sponsors face increased administrative burdens, operational risks, and financial penalties when attempting to comply with the new delivery requirements. FDH has also shut down most of their operations to implement these new requirements, chilling an active petition collection campaign.

### vi.  Severe and Punitive Fines

129.    HB 1205 exposes initiative sponsors to multiple steep and uncapped fines, which significantly hinder their ability to engage in core political speech and petition activity protected by the First Amendment.

130.    These fines are not only punitive in amount but also impose strict and, in many cases, vicarious liability, irrespective of the sponsor's knowledge, intent, or efforts at compliance.

131.    A sponsor is subject to a $50,000 fine *per circulator* if the petition circulator violates any one of the enumerated requirements of the law, including: (1) collecting, delivering, or possessing a certain number of petitions while not being registered as a petition circulator; (2) collecting petitions when the person has been convicted of a felony violation and has not had his or her right to vote restored; (3) collecting petitions when the person is not a United States citizen; and (4) collecting petitions when the person is not a Florida resident. H.B. 1205, ll. 676–79.

132.    HB 1205 also imposes multiple fines related to delivery of petition forms, many of which are purely procedural in nature, and have nothing to do with the underlying veracity of the petition form.

- $50 per day late, with no cap, if a sponsor fails to deliver a petition form to the proper county within ten days of the voter's signature, regardless of delay caused by the State itself or in the verification process or by the voter. *Id.*, ll. 724–30.

- An additional $2,500 fine per petition for any "willful" delay in delivery. *Id.*

46

- $100 per day late, up to a $5,000 cap, if a sponsor or petition circulator collects and submits a petition form after the signature deadline (February 1 of the year of the general election) that was signed before that deadline. *Id.*, ll. 731–38.

- An additional $5,000 fine per petition for any "willful" delay in delivery. *Id.*

- $500 per petition, with no cap, if the sponsor delivers a petition to the wrong county, regardless of whether the cause is information supplied by a voter and relied upon by the sponsor. *Id.*, ll. 739–44.

- An additional $5,000 fine per petition if the incorrect county delivery was done "willfully." *Id.*

133.   Florida law previously subjected sponsors to a still-significant $50 fine for delivery beyond a 30-day return period, or $250 for willful violations. HB 1205's penalties thus represent a dramatic escalation from prior law, especially given the volume of petitions at issue.

134.   The law also makes sponsors strictly liable for a $5,000 fine per petition if any circulator signs another person's name, uses a fictitious name, or fills in missing information on the petition form in violation of Fla. Stat. § 104.185(2)— even if the sponsor did not authorize or have knowledge of these actions, and even

though state law *compels* sponsors to submit all gathered petitions, even those the sponsor knows may not be valid. H.B. 1205, ll. 752–58.

135.   Similarly, a $50 per petition fine is imposed if a sponsor prepopulates any voter information on the petition form, even if that information is accurate, and even if the voter validates the information and signs the petition. *Id.*, ll. 767–73.

136.   These financial penalties—many of which are imposed without regard to fault, and some of which are duplicative or overlapping—create a chilling effect on initiative sponsors' exercise of their constitutional rights, particularly when coupled with the sweeping criminal penalties discussed below.

137.   The cumulative financial exposure created by HB 1205 is so severe that it threatens the continued operation of FDH's initiative campaign.

138.   In preparation for compliance, FDH has already shut down most of its petition circulation operations. On Wednesday, April 30, paid petition outreach firms were shut down, some petition collection activities have been paused, and multiple emergency calls to teams have already been necessary. Emerson Decl. ¶ 20. By June 13, in order to ensure compliance with new eligibility restrictions and registration requirements, FDH will need to direct that ineligible paid circulators are terminated, and to instruct staff to attempt to prevent ineligible individuals from volunteering. ECF No. 168-1 ¶ 6.

139.   Even a brief shutdown imposes significant costs—paid circulators cannot be reassigned or paused without compensation, and any delay risks losing trained personnel.

140.   The cumulative financial exposure faced by FDH and other initiative sponsors under HB 1205 is staggering, and it will deter sponsors from participating in the initiative process altogether.

### vii.  Vague Criminal Penalties

141.   HB 1205 amends Section 895.02(8)(d), Florida Statutes, to expand the definition of "racketeering activity" to include "violation[s] of the Florida Election Code relating to irregularities or fraud involving issue petition activities." H.B. 1205, ll. 1422–30.

142.   Florida law does not define or criminalize a petition "irregularity," and the term is not associated with a specific criminal offense under existing statutes.

143.   Additionally, Florida law draws a distinction between "irregularities" and legal violations. Section 97.022(7), Fla. Stat., which governs the Office of Election Crimes and Security, states "[f]or each alleged violation or irregularity investigated, the report must include: (a) The source of the alleged violation or irregularity; (b) The law allegedly violated or the nature of the irregularity reported." The requirement to report both alleged legal violations and "irregularities"—listed

49

as distinct categories—indicates they should be treated as separate and independent concerns.

144.   Despite the absence of a statutory definition or offense, HB 1205's amendment to Section 895.02(8)(d), Fla. Stat., appears to convert any violation of the Florida Election Code related to a petition "irregularity" into a predicate offense for a racketeering charge, but fails to specify which actions would constitute such conduct. The law is so vague that it appears to give the State broad authority to treat any "attempt to commit" a "violation" of the Election Code involving any "irregularity" as potential racketeering. H.B. 1205, ll. 1426–30.

145.   This creates a chilling effect, forcing sponsors, employees, and volunteers to operate under constant fear that even minor issues—like returning a petition one day late—could result in criminal prosecution.

146.   HB 1205 also amends Section 104.185, Fla. Stat., to expand the current third-degree felony for signing another person's name or a fictitious name on a petition. Under HB 1205, the offense now also applies to any person who "fills in missing information on [a] signed petition." H.B. 1205, ll. 1302–11.

147.   HB 1205 does not define the term "missing information," nor does Section 104.185(2), Fla. Stat., creating uncertainty as to what conduct the new provision criminalizes.

50

148.    Finally, HB 1205 makes it a third-degree felony for a circulator to retain "a voter's personal information, such as the voter's Florida driver license number, Florida identification card number, social security number, or signature," H.B. 1205, ll. 759–66—language this Court has already found to be unconstitutionally vague. *Fla. State Conf. of Branches & Youth Units of the NAACP v. Byrd*, 680 F. Supp. 3d 1291, 1320 (N.D. Fla. 2023).

149.    At the same time that the law makes it a third-degree felony to "retain" this information. HB 1205 creates a contradictory and confusing legal framework by requiring petition signers to provide personal information—such as social security or identification numbers—on petition forms that are considered public records. As a result, it is unclear whether standard petition handling practices, such as storing or transmitting completed forms, could expose circulators or sponsors to criminal liability.

150.    Compounding this confusion, the Legislature rejected a proposed amendment that would have exempted this sensitive personal information from Florida's public records laws. Instead, it left intact a scheme that mandates disclosure while criminalizing retention, creating uncertainty and risk for sponsors, circulators, and volunteers engaging in the initiative process.

151.    Accordingly, HB 1205 may subject Plaintiff Jordan Simmons and other individuals collecting petitions—including volunteers—to felony charges for

51

actions that previously did not carry criminal penalties. And those sanctions can be extreme. A person convicted of racketeering is guilty of a first-degree felony, punishable by up to thirty years in prison. Fla. Stat. §§ 895.04(1), 775.082(3)(b). As civil penalties to organizations like FDH, the State may impose such consequences as dissolution of an organization and civil forfeiture. *Id.* § 895.05.

152.    The lack of clarity regarding what constitutes an "irregularity" or "missing information" or "personal information" combined with the imposition of felony charges, introduces substantial risk for individuals like Mr. Simmons currently engaged in initiative petition activities.

153.    FDH has heard directly from circulators expressing fear and hesitation about continuing their work due to the risk of criminal liability under HB 1205. Emerson Decl. ¶ 29.

154.    These new criminal provisions apply to individuals engaged in core petition-related functions, including circulating, collecting, or assisting with initiative petitions, as well as volunteers and supporters who may assist in good faith.

155.    These laws are vague in scope and punitive in effect. They impose criminal and civil penalties without clear standards, creating legal uncertainty for organizations and individuals engaged in petition activity, reducing the pool of individuals available to circulate petitions.

156.    Because HB 1205 imposes criminal penalties without clear statutory guidance, individuals like Mr. Simmons and organizations engaged in the petition process may be deterred from participating due to the fear of inadvertently violating the law. Sponsors—and those who associate with them—often are petitioning for the adoption of amendments disfavored by the State. Under HB 1205, they must now do so while the State dangles a Sword of Damocles over their heads.

### viii.   Requirement to Refile

157.    HB 1205 imposes a new and burdensome requirement on initiative sponsors in the event the Florida Supreme Court finds that the FIS for a citizen-led amendment fails to meet statutory requirements.

158.    Specifically, the law mandates that an FIS be added to the petition form and that, should the Supreme Court find the FIS to be non-compliant with the law, "[t]he sponsor of the initiative must *refile* the petition with the revised [FIS] with the Secretary of State as a new petition." H.B. 1205, ll. 1105–16 (emphasis added).

159.    Sponsors have no role in drafting the FIS, nor do they have any actual control over the content, adequacy, or form of the FIS. While sponsors are allowed to submit any information they think might be helpful, the FIEC, a state-controlled body, is solely responsible for preparing the statement. The Florida Supreme Court then reviews and may reject the statement if it determines that it fails to meet applicable legal standards.

160.   Under HB 1205, if the Florida Supreme Court rejects the FIS—even due to minor or technical issues outside the sponsor's control—the sponsor must terminate the current petition and restart the process from the beginning. This includes drafting and submitting a new petition and restarting all regulatory filings and compliance procedures.

161.   The risk of complete invalidation and forced restart—based solely on state-drafted language—chills sponsors from pursuing initiative campaigns altogether, especially when current and potential donors might be wary of such a provision.

162.   Although Plaintiff FDH does not currently have to include an FIS on its petition form because it submitted the proposed amendment to the Secretary of State before the effective date of HB 1205, it remains subject to the FIS requirement once the FIEC completes its review and the statement is assigned.

163.   If the Florida Supreme Court later finds the assigned FIS legally insufficient, the refile provision of HB 1205 will apply, and FDH will be required to abandon its current petition and submit a new one.

164.   Because the refile provision is triggered by the Court's rejection of the FIS—an event entirely outside the sponsor's control—it creates legal and practical uncertainty for sponsors mid-campaign and undermines their ability to confidently plan, execute, and fundraise for ballot qualification efforts.

54

165.    As a sponsor of a citizen-led initiative, FDH must fundraise to support the petition process. Even before HB 1205 was enacted, current and potential donors to FDH have expressed serious concerns about the impact of then-proposed HB 1205 on the campaign's viability. In particular, donors have cited the risk that the State could assign an FIS that is later rejected by the Court, thereby forcing FDH to refile and restart the entire process. Emerson Decl. ¶ 33.

166.    If FDH were forced to restart the petition process because the State rejected a state-drafted FIS, all signatures collected up to that point—including those gathered lawfully and in good faith—would be rendered invalid. This means that voters who have taken the time to review, consider, and support the proposed amendment by signing the petition would have their political expression nullified through no fault of their own.

167.    Notably, the refile requirement also creates a regime where a sponsor effectively can never challenge an unlawful State-assigned FIS—because if the sponsor sues and "wins," the consequence will be it has to start over the process from scratch.

168.    Further, individual Florida voters who have already exercised their constitutional right to participate in the citizen-led initiative process would have their voices erased by the refiling requirement.

169.   For example, Plaintiff Mitchell Emerson is a Florida voter who has already signed the FDH petition. If FDH is forced to refile, the consequence is that valid signatures of Florida electors like Mr. Emerson—who expressed their desire to have a proposed amendment submitted to the voters for consideration—will be arbitrarily invalidated due to issues of the State's own making. *See* Emerson Decl. ¶ 5.

170.   The provision thus undermines not only the sponsor's efforts, but also the participatory rights of every voter who has chosen to engage in the democratic process. The Requirement to Re-file operates as a disproportionate penalty and an undue burden on political participation. It chills both speech and association by undermining confidence in the initiative process and discouraging financial support for qualifying ballot measures.

### D. The Challenged Provisions Do Not Serve a Compelling or Legitimate State Interest.

171.   The State claims the Challenged Provisions are necessary to "protect the integrity of the ballot, ensure a valid election process, and protect the constitutionally provided initiative process." H.B. 1205, ll. 366–68. It further asserts that the law aims to "update the reasonable regulations in place for petition circulators, increase transparency and accountability for sponsors of initiative petitions, provide prospective signatories with objective information regarding the impact of a proposed amendment, and deter, prevent, and penalize fraudulent

56

activities[.]" *Id.*, ll. 369–75. The Challenged Provisions, however, are not remotely tailored to achieve these objectives. Many bear no connection to fraud, transparency, or voter information, and several directly undermine the very initiative process the State claims to protect.

172.    In practice, the law's overly broad and indiscriminate restrictions suggest that its true purpose is not to safeguard against fraud or promote transparency, but to suppress citizen-led ballot initiatives that may conflict with the policy preferences of the current legislative majority. Florida has steadily erected procedural barriers to the initiative process in recent years, and the scope and severity of the Challenged Provisions continue this pattern—escalating burdens on sponsors and circulators without meaningful justification. The State has no compelling interest in undermining its own citizens' right to direct democracy.

173.    The State draws much of its justification for the Challenged Provisions from the January 2025 annual report of Florida's Office of Election Crimes and Security.[2] The report focused primarily on alleged instances of fraud in petition gathering.

---

[2] *See* Fla. Dep't of State Off. of Election Crimes & Sec., 2024 Annual Rep. (Jan. 15, 2025), https://files.floridados.gov/media/708747/office_of_election_crimes_and_security_report_2024.pdf.

174.    During legislative debates, the bill's sponsor, Representative Jenna Persons-Mulicka, described the initiative process as "broken" and cited a "quality control problem" as justification for sweeping changes. Yet, she offered no evidence to show that the existing system is failing, nor did she provide evidence that the Challenged Provisions would meaningfully address any documented shortcomings.

175.    The assertion that these new restrictions combat fraud or promote transparency is not supported by the record. For example, shortening the petition return window to ten days—a central feature of the law—has no plausible connection to preventing fraudulent activity.

176.    Fraudulent petitions are not more likely to be submitted on day eleven than day nine, nor does a shorter window enhance detection. And, to the extent the State believes circulators engage in fraud or misconduct, limiting the amount of time sponsors have to engage in quality control would only make it harder for them to ferret it out.

177.    Moreover, the fact that the State will be imposing a 90-day moratorium on verifying returned petitions demonstrates that there is no need for the State to require sponsors to adhere to a ten-day return window.

178.    Worse still, one of the proffered justifications for shortening the return window was to prevent the copying of personal information. But HB 1205 expressly

makes that information a public record. The advanced justification for reducing the return window is nonsensical.

179.   Furthermore, Florida law already prohibits fraudulent petition activity, including forgery and misrepresentation, and provides criminal penalties for violations. The State has successfully prosecuted bad actors under these statutes, as stated in the annual report, in legislative hearings, and in the preamble to HB 1205—proving that Florida already possesses effective tools to deter and penalize fraud without resorting to blanket restrictions on lawful petition activity.

180.   Nor is there any justification for requiring voters to provide more personal information when signing a petition. Voters must already personally sign and date petitions, and the petition form contains an array of other information to confirm the voter's identity. County supervisors of elections must "match" the voter's signature on the petition with the voter's signature on file to confirm their identity. And after a voter's petition is verified, HB 1205 requires that each voter be contacted and given an opportunity to assert their signature was fraudulently obtained. Requiring voters to turn over *more* PII does not advance any state interest; if anything, having more PII on petition forms *increases* the risk of the voter's personal information being misused. If the State were truly concerned with deterring fraud and increasing transparency, it could pursue far less burdensome and more

59

targeted measures, such as improving the training of paid circulators or bolstering the enforcement of existing laws.

181.   Instead, HB 1205 imposes sweeping and immediate restrictions that burden all sponsors and circulators—regardless of whether there is any indication of misconduct. The result is a regulatory scheme that delays and chills constitutionally protected political expression under the guise of reform.

182.   By imposing the Challenged Provisions, the State obstructs—rather than protects—the initiative process. These measures are not tailored to any identified problem, and they undermine public trust in, and access to, the democratic process they purport to safeguard.

183.   HB 1205 thus fails to serve any legitimate—let alone compelling— state interest in a narrowly tailored manner. It does not meaningfully deter fraud, enhance transparency, or protect voters. Instead, it imposes unnecessary, vague, and punitive restrictions that suppress First Amendment activity and deter meaningful participation in Florida's citizen-led initiative process.

## CLAIMS FOR RELIEF

### COUNT I

**Infringement on Plaintiff FDH's, Plaintiff Mitch Emerson's,
and Plaintiff Jordan Simmons's First Amendment Rights
(Undue Burden on Core Political Speech)
U.S. Const. amends. I, XIV; 42 U.S.C. § 1983**

184.  Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-183 as if fully set forth herein.

185.  Plaintiffs allege that, for the reasons below, the challenged provisions are both facially unconstitutional and unconstitutional as applied to Plaintiffs.

186.  The circulation of petitions, including the petition for FDH's proposed amendment to the Florida Constitution, is "'core political speech,' for which First Amendment protection is 'at its zenith.'" *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 183 (1999) (quoting *Meyer v. Grant*, 486 U.S. 414, 422, 425 (1988)).

187.  Courts have consistently recognized that the First Amendment protects the rights of citizens and organizations to engage in the initiative process free from undue governmental interference. *See*, *e.g.*, *League of Women Voters of Fla. v. Cobb*, 447 F. Supp. 2d 1314 (S.D. Fla. 2006) (striking down laws that imposed chilling penalties on voter registration groups and holding the law's burdens on protected activity to be unconstitutional); *see also Randall v. Sorrell*, 548 U.S. 230, 246 (2006); *Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290, 295–96 (1981); *Buckley v. Valeo*, 424 U.S. 1, 15, 23, 65–66 (1976); *Let's Help Fla. v. McCrary*, 621 F.2d 195, 199 (5th Cir. 1980), *aff'd sub nom. Firestone v. Let's Help Fla.*, 454 U.S. 1130 (1982).

188.  The First Amendment's protections are especially vital in the context of citizen-initiated measures, where public discourse depends on "the widest

possible dissemination of information from diverse and antagonistic sources."
*Associated Press v. United States*, 326 U.S. 1, 20 (1945).

189.    The Supreme Court has struck down laws that burden petition circulators and initiative sponsors because such restrictions "limi[t] the number of voices who will convey [the initiative proponents'] message" and "reduce[] the chances that initiative proponents would gather signatures sufficient . . . to qualify for the ballot[.]" *Buckley*, 525 U.S. at 194–95 (quoting *Meyer*, 486 U.S. at 422–23).

190.    For these reasons, laws burdening petition circulation must satisfy "exacting scrutiny." *Meyer*, 486 U.S. at 420; *see also McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995).

191.    The Challenged Provisions, individually and in combination, chill protected speech, deter participation in the initiative process, and impose unconstitutional barriers to political engagement and public discourse.

192.    Specifically, HB 1205 imposes multiple, severe burdens on Plaintiff FDH's ability to engage in protected speech and expressive conduct, as well as to associate with circulators and Florida voters that support its mission. This includes the Volunteer Circulator Registration, the Signature Verification Suspension, the Voter PII Disclosures, the Ten-Day Return Time, Petition Circulator Eligibility, Severe and Punitive Fines, Vague Criminal Penalties, and the Requirement to Re-file provisions.

193.   HB 1205 places severe burdens on organizations, like FDH, that initiate ballot amendments and oversee the collection of petitions for those initiatives. The financial penalties and requirements to refile pose an existential threat to FDH's operations. Given the penalty regime created by HB 1205, even a single issue may give rise to sizeable and often overlapping penalties that would be a serious financial burden for FDH. When compounded, HB 1205's lattice of penalties could shut down the organization's civic work entirely.

194.   FDH faces ruinous liability for technical violations, including for late submissions, or missing voter information—conduct often outside of its direct control, yet heavily penalized under HB 1205.

195.   Additionally, HB 1205's current moratorium of signature verification, combined with the overwhelming administrative and financial burdens, imposes a substantial chill on core political speech protected by the First Amendment.

196.   HB 1205 also infringes on the constitutional rights of voters, like Plaintiff Mitchell Emerson, who have already signed the proposed Amendment, and risk having their signatures nullified due to the Requirement to Re-file.

197.   Once the state chooses to enact a petition process, the full panoply of constitutional protections apply. *E.g., John Doe No. 1 v. Reed*, 561 U.S. 186, 195 (2010). That means the state cannot arbitrarily invalidate the admittedly valid signatures of thousands of Florida electors, including Plaintiff Mitch Emerson, who

have expressed their desire to have a proposed amendment submitted to the electorate for consideration. The requirement to refile the petition after a Supreme Court opinion introduces a government-controlled veto point into the initiative process that harms Florida voters. By creating a regime where a determination that a FIS is noncompliant for reasons outside of a sponsor's control in turn invalidates a petition, HB 1205 chills FDH's speech and deters those who would otherwise associate with it by providing financial or other support.

198.    Finally, the Petition Circulator Eligibility provisions impose an unconstitutional burden on Plaintiff Simmons's core political speech in violation of the First and Fourteenth Amendments. Petition circulation is a form of interactive, person-to-person communication that lies at the heart of the First Amendment's protection. By prohibiting Mr. Simmons from collecting, handling, or submitting petitions solely because he resides outside of Florida, the State is impermissibly restricting his ability to engage in political advocacy and participate in the citizen-led initiative process. These restrictions are not narrowly tailored to serve any compelling state interest and instead operate to exclude entire classes of individuals—like Mr. Simmons—from meaningful political participation, thereby chilling speech and association essential to the democratic process.

199.    The State has "no significant state or public interest in curtailing debate and discussion of a ballot measure," whether through fines, restrictions on initiative

sponsors and their employees, or limitations imposed on voters. *Citizens Against Rent Control*, 454 U.S. at 299; *see also McCrary*, 621 F.2d at 199. The burden the State must overcome is "well-nigh insurmountable." *Meyer*, 486 U.S. at 425.

200.   Thus, HB 1205 violates Plaintiffs' rights under the First and Fourteenth Amendments to the United States Constitution because it burdens core political speech and is not narrowly tailored or sufficiently related to any compelling, or even legitimate or important, government interest.

WHEREFORE, Plaintiffs respectfully request that this Court enter a judgment providing the following relief:

A. Declare that the following Challenged Provisions within, and as amended by, HB 1205 violate the First and Fourteenth Amendments:

   i.   Volunteer Circulator Registration, H.B. 1205, 2025 Leg., Reg. Sess. (Fla. 2025) (Engrossed 2), Fla. Stat. § 100.371(4)(a);

   ii.  Signature Verification Suspension, H.B. 1205, 2025 Leg., Reg. Sess. (Fla. 2025) (Engrossed 2), ll. 1431–33 (Section 20);

   iii. Voter PII Disclosures, 2025 Leg., Reg. Sess. (Fla. 2025) (Engrossed 2), Fla. Stat. § 100.371(3)(c)(4);

   iv.  Ten-Day Return Time, Fla. Stat. § 100.371(7)(a)1–3 (2025);

   v.   Petition Circulator Eligibility, Fla. Stat. § 100.371(4)(b)1-3, (c)6–9, (14)(h) (2025);

65

     vi.  Severe and Punitive Fines, Fla. Stat. § 100.371(4)(g), (7)(a)1–3, (8), and (10) (2025);

     vii.  Vague Criminal Penalties, Fla. Stat. §§ 100.371(9), 104.185(2), 895.02(8)(d) (2025); and

     viii.  Requirement to Re-file, Fla. Stat. § 100.371(16)(e).

B. Preliminarily and permanently enjoin Defendants,[3] their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from enforcing the foregoing Challenged Provisions within House Bill 1205, or HB 1205;

C. Retain jurisdiction to render any and all further orders that this court may deem necessary;

D. Award Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to, *inter alia*, 42 U.S.C. § 1988 and other applicable laws; and

E. Grant any and all other relief this Court deems just and proper.

## COUNT II

**Infringement on Plaintiff FDH's and Plaintiff Jordan Simmons's First
Amendment Rights to Free Association
U.S. Const. amends. I, XIV; 42 U.S.C. § 1983**

---

[3] Plaintiffs enclose, as Appendix A, a table specifying the specific claims that are brought against specific defendants, given their particular role in administering the initiative process.

201.   Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-156, and 171-183 as if fully set forth herein.

202.   Plaintiffs allege that, for the reasons below, the Challenged Provisions are both facially unconstitutional and unconstitutional as applied to Plaintiffs.

203.   The First Amendment prohibits government abridgment of the freedom of association. *See NAACP v. Button*, 371 U.S. 415, 430 (1963).

204.   The Petition Circulator Eligibility provision acts as a categorical bar on who can serve as a petition circulator, creating an unconstitutional infringement on sponsors' ability to associate freely for the purpose of petition collection.

205.   More specifically, the Petition Circulator Eligibility provision imposes multiple, interrelated burdens on Plaintiff FDH's ability to associate with others for the purpose of political advocacy—particularly in the context of petition circulation, which is an integral part of collective political expression and participation in direct democracy.

206.   HB 1205 restricts petition circulation to Florida residents, U.S. citizens, and individuals without felony convictions or who have had their rights restored, thereby barring otherwise qualified supporters—including lawful permanent residents and out-of-state volunteers and employees—from associating with initiative sponsors like FDH in core political activities.

207.   The outright exclusion of these individuals from civic participation, and the chilling effect of criminal penalties on circulators' desire to participate, without a compelling or legitimate interest from the state, is an outright burden on free association.

208.   HB 1205 also subjects FDH and its staff to liability for civil penalties if any circulator is found to be ineligible due to residency, citizenship, or felony status, regardless of intent or actual harm.

209.   Further, HB 1205 imposes criminal penalties under vague and confusing provisions, creating a climate of fear and uncertainty, and chills recruitment and collaboration by threatening significant financial and legal exposure for engaging with a broad base of supporters.

210.   The provisions of HB 1205, both individually and collectively, make participation in FDH's petition activities risky and burdensome, deterring individuals from associating with FDH. FDH has already received reports from circulators and supporters expressing concern about continuing their involvement in light of these restrictions.

211.   The overbroad limitations on who may act as a petition circulator also chill FDH's ability to recruit, consult with, and otherwise associate with volunteers, staff, and potential partners, for fear of incurring significant penalties. This fundamentally limits their operational capacity and reach.

212. The law's exclusion of non-Floridians, noncitizens, and individuals with felony convictions, from petition circulation "necessarily reduce[s] the number of circulators available to carry initiative proponents' messages, thereby limiting the size of the audience an initiative proponent can reach." *Pierce v. Jacobsen*, 44 F.4th 853, 860 (9th Cir. 2022) (citing *Buckley*, 525 U.S. at 194–95).

213. FDH can no longer freely associate with willing supporters who wish to support their causes and ballot advocacy work without fear that it will make them, their employees or volunteers, and those individuals vulnerable to invasive government investigation and potential prosecution.

214. These barriers impose a severe burden on FDH's right to free association and are therefore subject to strict scrutiny.

215. HB 1205 also violates Plaintiff Simmons's First and Fourteenth Amendment rights by burdening his freedom of association. As a member of FDH's petitioning team, Mr. Simmons works in close coordination with other circulators, staff, and volunteers to advance a shared political goal through lawful, grassroots engagement. By disqualifying him from participating in the petition process solely because of his residency status, the law severs his ability to associate with others in pursuit of collective political expression. This restriction not only dismantles existing organizing structures but also deters others from associating with out-of-

state partners, impermissibly chilling protected political collaboration without sufficient justification.

216. The provisions are not narrowly tailored to serve any compelling state interest. Nor could the provisions survive any lesser form of judicial scrutiny, as they neither advance nor are rationally related to any legitimate regulatory objective.

217. Under the applicable scrutiny standard—whether that articulated in *Meyer*, 486 U.S. at 414, and *Buckley*, 525 U.S. at 182, or any level of constitutional review—the challenged provisions violate Plaintiffs' First and Fourteenth Amendment right to free association.

WHEREFORE, Plaintiffs respectfully request that this Court enter a judgment providing the following relief:

A. Declare that the following Challenged Provisions within, and as amended by, HB 1205 violate the First and Fourteenth Amendments:

   i. Volunteer Circulator Registration, H.B. 1205, 2025 Leg., Reg. Sess. (Fla. 2025) (Engrossed 2), Fla. Stat. § 100.371(4)(a);

   ii. Signature Verification Suspension, H.B. 1205, 2025 Leg., Reg. Sess. (Fla. 2025) (Engrossed 2), ll. 1431–33 (Section 20);

   iii. Voter PII Disclosures, 2025 Leg., Reg. Sess. (Fla. 2025) (Engrossed 2), Fla. Stat. § 100.371(3)(c)(4);

   iv. Ten-Day Return Time, Fla. Stat. § 100.371(7)(a)1–3 (2025);

70

      v.   Petition Circulator Eligibility, Fla. Stat. § 100.371(4)(b)1–3, (c)6–9, (14)(h) (2025);

      vi.  Severe and Punitive Fines, Fla. Stat. § 100.371(4)(g), (7)(a)1–3, (8), and (10) (2025);

     vii.  Vague Criminal Penalties, Fla. Stat. §§ 100.371(9), 104.185(2), 895.02(8)(d) (2025); and

   viii.  Requirement to Re-file, Fla. Stat. § 100.371(16)(e).

B. Preliminarily and permanently enjoin Defendants,[4] their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from enforcing the foregoing Challenged Provisions within House Bill 1205, or HB 1205;

C. Retain jurisdiction to render any and all further orders that this court may deem necessary;

D. Award Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to, *inter alia*, 42 U.S.C. § 1988 and other applicable laws; and

E. Grant any and all other relief this Court deems just and proper.

---

[4] Plaintiffs enclose, as Appendix A, a table specifying the specific claims that are brought against specific defendants, given their particular role in administering the initiative process.

## COUNT III

**Infringement on Plaintiff FDH's and Plaintiff
Jordan Simmons's First Amendment Rights
(Substantial Overbreadth)
U.S. Const. amends. I, XIV; 42 U.S.C. § 1983**

218.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-95, 141-156, and 171-183 as if fully set forth herein.

219.    The First Amendment prohibits government abridgment of the freedom of speech through the enactment of substantially overbroad laws. *See Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc.*, 482 U.S. 569, 577 (1987).

220.    Under the overbreadth doctrine, a law is unconstitutional if it prohibits a substantial amount of protected speech relative to its legitimate sweep. *See United States v. Stevens*, 559 U.S. 460, 473 (2010); *see also Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002).

221.    The Petition Circulator Eligibility provision in HB 1205 bars individuals from collecting initiative petition signatures if they: (1) are not Florida residents; (2) are not U.S. citizens; or (3) have a felony conviction and have not had their rights restored—regardless of the nature or age of the offense, or evidence of rehabilitation.

222.    These restrictions are not narrowly tailored and impose a broad categorical ban on individuals who wish to engage in protected speech.

72

223.   The law criminalizes or disqualifies entire classes of people from participating in the petition process without any individualized determination of risk, intent, or misconduct.

224.   The restrictions apply to petition circulators, who play a critical role in promoting and facilitating ballot initiatives—a form of core political expression and association.

225.   Non-citizens lawfully present in the U.S. and permanent residents have First Amendment rights to engage in political speech. *See Bridges v. Wixon*, 326 U.S. 135, 148 (1945) (noncitizens are protected by the First Amendment); *see also Bernal v. Fainter*, 467 U.S. 216, 220 (1984) (resident aliens are protected from overbroad state laws).

226.   Similarly, non-residents and individuals with prior felony convictions may wish to support Florida citizen-led initiatives by collecting petitions and should not be barred from doing so based solely on their residency or past criminal history unrelated to the petition process.

227.   The categorical exclusion of these individuals sweeps in a wide range of otherwise lawful, protected political expression and does not directly serve any anti-fraud interest in a narrowly tailored way.

228.   Organizations like FDH rely on a broad network of volunteers and supporters to circulate petitions. The ban chills participation not only for those

individuals, but also for the organizations that rely on them, due to fear of triggering vague or severe penalties.

229.   The State has not offered any evidence that these categorical bans are necessary to prevent fraud or abuse in the petition process.

230.   The over-inclusive scope of the regulation's reach—combined with the harsh penalties and vague language—discourages participation, forces organizations to divert scarce resources to compliance and vetting, and stifles protected associational and political activity.

231.   HB 1205 is unconstitutionally overbroad in violation of the First and Fourteenth Amendments when applied to those like Plaintiff Jordan Simmons. Mr. Simmons is a Missouri resident who lawfully engages in political advocacy by collecting petitions as part of FDH's citizen initiative campaign. The statute prohibits him from continuing this work solely because of his out-of-state residency, regardless of the legality, honesty, or non-fraudulent nature of his actions. In doing so, the law sweeps far beyond any legitimate state interest and suppresses an entire category of constitutionally protected political expression and association. Mr. Simmons's participation poses no threat to election integrity, yet the statute silences his voice and the voices of others like him, chilling lawful political activity and making the initiative process less accessible and inclusive. This overbreadth renders the statute facially invalid and unconstitutional.

232.   No compelling or even substantial governmental interest justifies this broad restriction on who may collect petition forms in support of a constitutional ballot initiative.

233.   Such penalties are undoubtedly chilling on protected expression and core political speech and risk variable enforcement, and therefore do not survive First Amendment scrutiny.

WHEREFORE, Plaintiffs respectfully request that this Court enter a judgment providing the following relief:

A. Declare that the following Challenged Provisions within, and as amended by, HB 1205 violate the First and Fourteenth Amendments:

      i.   Petition Circulator Eligibility, Fla. Stat. § 100.371(4)(b)1–3, (c)6–9, (14)(h) (2025); and

      ii.  Vague Criminal Penalties, Fla. Stat. §§ 100.371(9), 104.185(2), 895.02(8)(d) (2025).

B. Preliminarily and permanently enjoin Defendants,[5] their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from enforcing the forgoing Challenged Provisions within House Bill 1205, or HB 1205;

---

[5] Plaintiffs enclose, as Appendix A, a table specifying the specific claims that are brought against specific defendants, given their particular role in administering the initiative process.

C. Retain jurisdiction to render any and all further orders that this court may deem necessary;

D. Award FDH its costs, expenses, and reasonable attorneys' fees pursuant to, *inter alia*, 42 U.S.C. § 1988 and other applicable laws; and

E. Grant any and all other relief this Court deems just and proper.

## COUNT IV

**Infringement on Plaintiff Jordan Simmons's
Right to Due Process
(Void for Vagueness)
U.S. Const. amend. XIV; 42 U.S.C. § 1983**

234.   Plaintiff repeat and reallege each and every allegation contained in paragraphs 1-73, 141-156, and 171-183 as if fully set forth herein.

235.   Plaintiff alleges that, for the reasons below, the challenged provisions are both facially unconstitutional and unconstitutional as applied to Plaintiff.

236.   The Due Process Clause of the Fourteenth Amendment prohibits the government from enforcing laws that are so vague that persons of ordinary intelligence must guess at their meaning and differ as to their application. *See Sessions v. Dimaya*, 584 U.S. 148, 155–56 (2018).

237.   "A law is unconstitutionally vague if its prohibitions are not clearly defined." *Dream Defs. v. Governor of Fla.*, 119 F.4th 872, 878 (11th Cir. 2024) (internal quotations and citations omitted). The vagueness doctrine "guarantees that ordinary people have fair notice of the conduct a statute proscribes." *Id.*

76

238.   "Vagueness is of greater concern with laws that carry criminal penalties." *Id.* And "[t]he First Amendment context amplifies [vagueness] concerns because an unconstitutionally vague law can chill expressive conduct by causing citizens to 'steer far wider of the unlawful zone' to avoid the law's unclear boundaries." *Keister v. Bell*, 29 F.4th 1239, 1258–59 (11th Cir. 2022) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972); *see also Smith v. Goguen*, 415 U.S. 566, 573 (1974) (explaining that when "a statute's literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in other contexts.").

239.   The Vague Criminal Penalties in HB 1205 purport to criminalize or penalize undefined "election irregularities," or "missing information" in the context of political advocacy and ballot initiative activity, including through threats of civil or criminal liability under state or state-influenced racketeering statutes.

240.   These vague and undefined terms are not reasonably understandable to a person of ordinary intelligence and invite arbitrary and discriminatory enforcement, particularly against sponsor organizations such as FDH.

241.   The challenged provisions fail to provide adequate notice of what conduct is prohibited and permit selective enforcement against disfavored speakers

or political viewpoints, in violation of due process and core First Amendment principles.

242. At the same time, these ambiguities lend themselves to selective enforcement, as the Attorney General or Secretary can decide, after the fact, what conduct is prohibited.

243. HB 1205 is unconstitutionally vague as applied to Plaintiff Jordan Simmons because it threatens criminal and civil penalties for ill-defined terms such as "election irregularities" and "missing information" without providing clear standards or guidance. As a petition circulator who collects, handles, and submits signed petitions, Mr. Simmons cannot reasonably determine what conduct may expose him to prosecution or penalties—particularly in light of language suggesting liability under Florida's racketeering laws. The law fails to define what constitutes an "irregularity" or impermissible "missing information," and does not clarify whether a circulator may be held vicariously liable for actions taken by others. This uncertainty forces Mr. Simmons and other circulators to risk severe consequences for conduct he cannot know is unlawful. The statute's vagueness invites arbitrary enforcement.

244. HB 1205 is therefore void for vagueness under the Fourteenth Amendment and is unenforceable against Plaintiff Jordan Simmons.

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment providing the following relief:

A. Declare that the Vague Criminal Penalties, Fla. Stat. §§ 100.371(9), 104.185(2), 895.02(8)(d) (2025), as amended by HB 1205, violate the Fourteenth Amendment;

B. Preliminarily and permanently enjoin the Attorney General and State Attorney Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from enforcing the foregoing Challenged Provisions within House Bill 1205, or HB 1205, particularly the civil financial penalties contained therein;

C. Retain jurisdiction to render any and all further orders that this court may deem necessary;

D. Award Plaintiff his costs, expenses, and reasonable attorneys' fees pursuant to, *inter alia*, 42 U.S.C. § 1988 and other applicable laws; and

E. Grant any and all other relief this Court deems just and proper.

DATED: June 2, 2025                           Respectfully submitted,

                                              /s/*Frederick S. Wermuth*
Matletha Bennette (Fl. Bar. No. 1003257)      Frederick S. Wermuth
Krista Dolan (Fl. Bar No. 1012147)            Florida Bar No. 0184111
SOUTHERN POVERTY LAW CENTER                   Quinn Ritter
P.O. Box 10788                                Florida Bar No. 1018135
Tallahassee, FL 32302-2788                    KING, BLACKWELL,
Telephone: (850) 408-4840                     ZEHNDER & WERMUTH, P.A.
matletha.bennette@splcenter.org               25 E. Pine Street

krista.dolan@splcenter.org

Bradley E. Heard*
Avner Shapiro*
Nick Steiner*
1101 17th Street, NW, Suite 550
Washington, D.C. 20036
bradley.heard@splcenter.org
avner.shapiro@splcenter.org
nick.steiner@splcenter.org

Ben Stafford*
ELIAS LAW GROUP LLP
1700 Seventh Ave., Suite 2100
Seattle, Washington 98101
Telephone: (206) 656-0177
bstafford@elias.law

Emma Olson Sharkey*
ELIAS LAW GROUP LLP
250 Massachusetts Ave. NW, Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
eolsonsharkey@elias.law

Orlando, FL 32801
Telephone: (407) 422-2472
Facsimile: (407) 648-0161
fwermuth@kbzwlaw.com
qritter@kbzwlaw.com

*Attorneys for Plaintiffs*
*\*Admitted Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that on June 2, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the counsel of record in this case.

/s/ *Frederick S. Wermuth*
Frederick S. Wermuth
Florida Bar No. 0184111

*Attorney for Plaintiffs*

80

**APPENDIX A**

| Provision | Plaintiffs (s/) | Theories & Count(s) | Defendant(s) |
|---|---|---|---|
| Fla. Stat. § 100.371(4)(g) (2025) ("The sponsor of the initiative amendment is liable for a fine in the amount of $50,000 for each person the sponsor knowingly allows to collect petition forms on behalf of the sponsor in violation of this subsection") | FDH | (Facial & As-Applied) First Amendment Speech and Association; Overbreadth<br><br>Counts I-II | Secretary of State; |
| Fla. Stat. § 100.371(7)(a)1–3 (2025)<br>A sponsor that collects petition forms or uses a petition circulator to collect petition forms serves as a fiduciary to the ~~voter~~ elector signing the petition form and shall ensure, ensuring that any petition form entrusted to the sponsor or petition circulator is ~~shall be~~ promptly delivered to the supervisor of elections in the county in which the voter resides within 10 ~~30~~ days after the voter ~~elector~~ signs the form. If a petition form collected by the sponsor or any petition circulator is not promptly delivered to the supervisor of elections, the sponsor is liable for the following fines:<br>1. A fine in the amount of $50 per each day late for each | FDH | (Facial & As-Applied) First Amendment Speech and Association; Overbreadth<br><br>Counts I-II | Secretary of State; |

| Provision | Plaintiffs (s/) | Theories & Count(s) | Defendant(s) |
|---|---|---|---|
| petition form received by the supervisor of elections <u>in the county in which the voter resides</u> more than <u>10</u> ~~30~~ days after the <u>voter</u> ~~elector~~ signed the petition form ~~or the next business day, if the office is closed~~. A fine in the amount of <u>$2,500</u> ~~$250~~ for each petition form received if the sponsor or petition circulator acted willfully.<br>2. <u>A fine in the amount of $100 per each day late, up to a maximum of $5,000, for each petition form collected by a sponsor or a petition circulator, signed by a voter on or before February 1 of the year the general election is held and received by the supervisor of elections in the county in which the voter resides after the deadline for such election. A fine in the amount of $5,000 for each such petition form received if the sponsor or petition circulator acted willfully.</u><br>A fine in the amount of $500 for each petition form collected by a petition circulator which is not submitted to the supervisor of elections <u>in the county in which the voter resides</u>. A fine in the amount of <u>$5,000</u> ~~$1,000~~ for any petition form not <u>so</u> submitted if the sponsor or petition circulator | | | |

| Provision | Plaintiffs (s/) | Theories & Count(s) | Defendant(s) |
|---|---|---|---|
| <u>acting on its behalf</u> acted willfully. | | | |
| Fla. Stat. § 100.371(8) (2025) ("If a person collecting petition forms on behalf of a sponsor of an initiative petition signs another person's name or a fictitious name to any petition, or fills in missing information on a signed petition, to secure a ballot position in violation of s. 104.185(2), the sponsor of the initiative petition is liable for a fine in the amount of $5,000 for each such petition.") | FDH | (Facial & As-Applied) First Amendment Speech and Association; <br><br> Counts I-II | Secretary of State; |
| Fla. Stat. § 100.371(10) (2025) ("A sponsor of an initiative petition or a person collecting petition forms on behalf of a sponsor of an initiative petition may not mail or otherwise provide a petition form upon which any information about a voter has been filled in before it is provided to the voter. The sponsor of an initiative petition is liable for a fine in the amount of $50 for each petition form that is a violation of this subsection.") | FDH | (Facial & As-Applied) First Amendment Speech and Association; <br><br> Counts I-II | Secretary of State; |

| Provision | Plaintiffs (s/) | Theories & Count(s) | Defendant(s) |
|---|---|---|---|
| Fla. Stat. § 100.371(4)(a) (2025) ("Beginning July 1, 2025, unless registered as a petition circulator with the Secretary of State and issued a petition circulator number, a person may not collect, deliver, or otherwise physically possess more than 25 signed petition forms in addition to his or her own signed petition form or a signed petition form belonging to an immediate family member. This paragraph may not be construed to prohibit a person from distributing petition forms designated for personal use as described in paragraph (3)(e). For the purposes of this subsection, the term 'immediate family' means a person's spouse, or the parent, child, grandparent, grandchild, or sibling of the person or the person's spouse.") | | (Facial & As-Applied) First Amendment Speech and Association

Counts I-II | Secretary of State; |
| Fla. Stat. § 100.371(4)(b)1–3 (2025) ("A person may not collect signatures or initiative petitions if he or she: 1. Has been convicted of a felony violation and has not had his or her right to vote restored. 2. Is not a citizen of the United States. 3. Is not a resident of this state.") | FDH, Simmons | (Facial & As-Applied) First Amendment Speech and Association; Overbreadth

Counts I-III | Secretary of State; |

| Provision | Plaintiffs (s/) | Theories & Count(s) | Defendant(s) |
|---|---|---|---|
| Fla. Stat. § 100.371(4)(c)6 (2025) ("An application for registration must be submitted in the format required by the Secretary of State and must include the following: …Whether the applicant has been convicted of a felony violation and has not had his or her right to vote restored, by including the statement, "I affirm that I am not a convicted felon, or, if I am, my right to vote has been restored," and providing a box for the applicant to check to affirm the statement." | FDH; | (Facial & As-Applied) First Amendment Speech and Association; Overbreadth<br><br>Counts I-III | Secretary of State; |
| Fla. Stat. § 100.371(4)(c)7 (2025) ("An application for registration must be submitted in the format required by the Secretary of State and must include the following: …Whether the applicant is a citizen of the United States, by asking the question, "Are you a citizen of the United States of America?" and providing boxes for the applicant to check whether the applicant is or is not a citizen of the United States.") | FDH | (Facial & As-Applied) First Amendment Speech and Association; Overbreadth<br><br>Counts I-III | Secretary of State |

| Provision | Plaintiffs(s/) | Theories & Count(s) | Defendant(s) |
|---|---|---|---|
| Fla. Stat. § 100.371(4)(c)8. (2025) ("An application for registration must be submitted in the format required by the Secretary of State and must include the following: …<u>Whether the applicant is a Florida resident by asking the question, "Are you a resident of the state of Florida?" and providing boxes for the applicant to check whether the applicant is or is not a resident of the state of Florida.</u>") | FDH; Simmons | (Facial & As-Applied) First Amendment Speech and Association; Overbreadth<br><br>Counts 1-3 | Secretary of State |
| Fla. Stat. § 100.371(4)(c)9. (2025) ("An application for registration must be submitted in the format required by the Secretary of State and must include the following: …<u>The signature of the applicant under penalty of perjury for false swearing pursuant to s. 104.011, by which the applicant swears or affirms that the information contained in the application is true.</u>") | FDH; Simmons | (Facial & As-Applied) First Amendment Speech and Association; Overbreadth<br><br>Counts I-III | Secretary of State |
| Fla. Stat. § 100.371(14)(h) (2025) ("A signed petition form submitted by an ineligible or unregistered petition circulator must be invalidated and may not be counted toward the number of necessary signatures for placement on the ballot.") | FDH | (Facial & As-Applied) First Amendment Speech and Association; Overbreadth<br>_____<br><br>Counts I-III | Secretary of State; Supervisors of Elections |

| Provision | Plaintiffs (s/) | Theories & Count(s) | Defendant(s) |
|---|---|---|---|
| Fla. Stat. § 895.02(8)(d) (2025) ("As used in ss. 895.01-895.08, the term: "Racketeering activity" means to commit, to attempt to commit, to conspire to commit, or to solicit, coerce, or intimidate another person to commit: <u>A violation of the Florida Election Code relating to irregularities or fraud involving issue petition activities</u>.") | FDH, Simmons | (Facial & As-Applied) Void for Vagueness; First Amendment Speech and Association; Overbreadth<br><br>Counts I-IV | Attorney General; State Attorneys |
| Fla. Stat. § 104.185(2) (2025) ("A person who signs another person's name or a fictitious name to any petition<u>, or who fills in missing information on a signed petition</u>, to secure ballot position for a candidate, a minor political party, or an issue commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.") | FDH; Simmons | (Facial & As-Applied) Void for Vagueness; First Amendment Speech and Association; Overbreadth<br><br>Counts I-IV | Attorney General; State Attorneys |
| Fla. Stat. § 100.371(9) (2025) ("If a person collecting petition forms on behalf of a sponsor of an initiative petition copies or retains a voter's personal information, such as the voter's Florida driver license number, Florida identification card number, social security number, or signature, for any reason other than to provide such information to the sponsor of the initiative petition, the person | FDH; Simmons | (Facial & As-Applied) Void for Vagueness; First Amendment Speech and Association; Overbreadth<br><br>Counts I-IV | Attorney General; State Attorneys |

| Provision | Plaintiffs (s/) | Theories & Count(s) | Defendant(s) |
|---|---|---|---|
| commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.") | | | |
| Ch. 2025-21 § 20(a), Laws of Fla. (2025), Section 20(a) ("To ensure uniformity and integrity in the initiative process, a signed petition form may not be verified between July 1, 2025, and September 30, 2025.") | FDH | (As-Applied) First Amendment Speech and Association; Overbreadth<br><br>Counts I & II | Secretary of State; Supervisors of Elections |
| Fla. Stat. § 100.371(16)(e) ("The sponsor of the initiative must refile the petition with the revised financial impact statement with the Secretary of State as a new petition.") | Emerson | (Facial & As-Applied) First Amendment Speech and Association ⎯⎯⎯⎯<br><br>Counts I & II | Attorney General; Secretary of State |