# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

FLORIDA DECIDES HEALTHCARE,
INC., *et al.*,

                            *Plaintiffs*,

        v.

BYRD, *et al.*,

                            *Defendants*.

No.: 4:25-cv-00211-MW-MAF

SMART & SAFE FLORIDA, *et al.*,

                            *Intervenor-Plaintiff*,

        v.

BYRD, *et al.*,

                            *Defendants*.

LEAGUE OF WOMEN VOTERS OF
FLORIDA, *et al.*,

                            *Intervenor-
Plaintiffs*,

        v.

BYRD, *et al.*,

                            *Defendants*.

1

**SECOND DECLARATION OF CECILE SCOON ON BEHALF OF
INTERVENOR-PLAINTIFF THE LEAGUE OF WOMEN VOTERS OF
FLORIDA AND THE LEAGUE OF WOMEN VOTERS OF FLORIDA
<u>EDUCATION FUND, INC.</u>**

I, Cecile Scoon, pursuant to 28 U.S.C. § 1746, declare that the following statements are true and correct to the best of my knowledge and belief:

1.      I submit this declaration on behalf of Intervenor-Plaintiffs the League of Women Voters of Florida, Inc. and the League of Women Voters of Florida Education Fund, Inc. (together, the "League" or "LWVFL").

2.      I rely on this Declaration as well as the prior Declaration I submitted on behalf of the League to this Court on May 14, 2025 (ECF No. 93-1).

3.      I have served as the Co-President of the League since 2023. Prior to that, I served as President of the League from 2021 to 2023.

4.      I have been a member of the League since about 2000.

5.      LWVFL has 29 local leagues across the State of Florida, located in Pensacola down to the Keys. LWVFL has  thousands of members statewide.

6.      The League's mission is to encourage voter participation, educate voters on issues of public import, and advocate for legislative changes and policies for the public good.

### *LWVFL's Past Work on Citizen-Led Ballot Initiatives*

7.      Collecting petitions in support of citizen-led ballot initiatives is one of the major tools the League uses to pursue its mission.

8.    Since the mid-1990s the League has supported citizen initiatives, mobilized thousands of volunteer petition collectors, and gathered hundreds of thousands of petition forms.

9.    The League also trains its volunteers on collecting petition forms. This training includes instruction on the state-law requirements related to petition collection. The League will only send volunteers into the field after providing them with training.

10.    The League relies exclusively on volunteers for petition collection; it does not use paid circulators, nor does it have permanent staff to collect petitions.

11.    The League has played an instrumental role in previous campaigns in support of ballot initiatives in Florida. Most recently, the League played a major role in putting Amendment Four on the 2024 ballot.  The Amendment Four initiative aimed to protect reproductive rights in the state of Florida. To my knowledge, the League collected more signatures than any other volunteer-based organization in support of Amendment Four. The same is true of Amendment Four in 2018, which restored voting rights to most individuals with felony convictions.

12.    Before HB 1205's passage, the League was collecting petitions in support of two ballot initiatives–the Provide Medicaid Coverage to Eligible Low-Income Adults Initiative and the Right to Clean and Healthy Waters

Initiative–for which the deadline to collect and submit signatures is February 1, 2026.

13.    To date, LWVFL has mobilized hundreds of volunteers and members to distribute, collect, and deliver petitions in support of these two initiatives. So far, LWVFL volunteers have collected more than one thousand petitions for the Medicaid Initiative and a similar quantity for the Clean Water Initiative.

14.    LWVFL has supported the Medicaid expansion efforts through the citizen amendment process since 2013. This time around, the League started working on the Medicaid Initiative in early 2024. The Medicaid Initiative is extremely important to LWVFL. Were the ballot measure to pass, it would expand Medicaid to individuals aged 18-65 with incomes at or below 138% of the federal poverty level. LWVFL has members and serves constituents who would qualify for Medicaid if this amendment were to pass. Therefore, LWVFL has worked hard to collect petitions and planned to continue collecting petitions in support of this initiative. The League has worked with the sponsor of this initiative, held trainings for League members to educate them about the initiative, and provided talking points on why the initiative is important to the mission of LWVFL and the constituents it serves.

15.    LWVFL started working on the Clean Water Initiative in early 2024. LWVFL formally announced in 2024 that it had joined the Clean Water campaign

to support putting a constitutional amendment on the ballot in 2024 for civil action to enforce the right to clean and healthy waters. It is my belief that most local Leagues in Florida have participated in petition collection. To that end, LWVFL has worked closely with the sponsor of this initiative, held trainings for League members to educate them about the initiative, and provided talking points on why the initiative is important to the mission of LWVFL and the constituents it serves.

16.    Before the Law passed, LWVFL was planning to train hundreds of volunteers over the summer months and into the fall to collect petitions on behalf of the sponsors of both initiatives.

17.    Because of the new Law, the League has suspended all petition collection efforts in support of the Clean Water initiative, as requested by the sponsor, who is concerned about the potential deleterious impact of the Law's new requirements on its campaign.

18.    If HB 1205 goes into effect on July 1, 2025, the League is highly likely to discontinue *all* petition collection efforts. Debra Chandler and I, as Co-Presidents, plan to recommend to the Board that the League advise its members and volunteers not to collect ballot petitions after July 1, absent action from this Court. Without a Court order striking down the challenged provisions of the Law, LWVFL does not wish to subject its volunteers and members to criminal and civil liability for good faith mistakes. The Board has heeded our recommendations in

the past, and we expect that it will follow our recommendation this time. As such, we fully expect that LWVFL will stop gathering petitions after July 1 if HB 1205 is not enjoined.

19.    This decision was informed by the phone calls and emails LWVFL received from volunteers concerned about the new Law's impact on them. Volunteers are afraid that they will accidentally violate the law, exposing themselves to liability and harming the League's reputation. The League cannot, in good conscience, encourage volunteers to continue gathering petitions in the face of such risks.

20.    All of LWVFL's petition gathering work on these two initiatives thus far, i.e.,  training and mobilizing volunteers to distribute, collect, and deliver petitions and its work generally advocating for the initiatives, will go to waste if LWVFL cannot resume petition collection well in advance of February 1, 2026, the deadline to submit petitions to place these initiatives on the ballot for the 2026 election cycle.

***The Law's Cumulative Impact on LWVFL***

21.    The new Law has numerous provisions, criminal penalties, and civil fines that target different aspects of the petition collection process. It goes after "who" can collect petitions, "how" petitions are distributed and collected, and when petitions must be returned. Together, all these provisions will have a

devastating effect on the League's work on citizen-led ballot initiatives. And most immediately, they will force us to stop the organization's ongoing work on behalf of the Medicaid and Clean Water initiatives.

22.    One of the most harmful impacts of the Law on LWVFL is that it completely obliterates the volunteer petition gathering ecosystem in Florida which, for many years, has been LWVFL's mechanism for supporting and helping to get other impactful issues on the ballot. The Law imposes near insurmountable burdens on the League by introducing highly burdensome new requirements for volunteer petition gatherers, imposing new fines and criminal penalties for good faith mistakes in the petitioning process, and placing an unworkable deadline on petition form submissions.

23.    My understanding is that before this Law was passed, only paid petition circulators were subject to registration requirements. That has all changed now, as volunteer petition gatherers will have to undergo registration, sign affidavits under penalty of perjury, and comply with the various disclosure provisions of the Law.

24.    Since the night the Law passed in the Senate, the League has heard concerns from volunteers about the Law's potential impacts. Already, volunteers have told the League that they either will no longer participate in petition

collection or are hesitant to participate in petition-collection efforts if the Law remains in place.

26.     Volunteers have also expressed concern about providing information like the last four digits of their social security numbers to the state and making their personal information accessible to the public.

26.     These impacts will only grow and compound as time goes on.

**The Impacts of Each Provision on LWVFL**

### The Definition and Eligibility Requirements

27.     To begin with, prior to HB 1205, it was very common for League volunteers to collect more than 25 signed petition forms from non-family members. The League often collects petition forms at large events, including street festivals, parades, and marches. They attend events hosted by partner clubs and organizations, setting up tables where they distribute and collect petition forms. LWVFL volunteers even attend smaller gatherings like book club events or birthday parties, or they set up tables outside of crowded places like grocery stores and libraries where they collect more than 25 petition forms at a time.

28.     Thus, it is not rare for an individual volunteer to collect more than 25 signed petition forms at a single event, that are not signed by family members. Some go to multiple events in a week, accumulating even more petition forms. In

fact, it is quite common for one League volunteer to collect sometimes hundreds petitions over the course of a campaign.

29.    Under HB 1205, volunteers must decide between registering as a circulator or being subject to a 25-petition limit.

30.    Many League volunteers have told me that they do not want to register as circulators because of privacy concerns with the registration process (described in more detail below). Those same volunteers are also unsure of how they can comply with the 25-petition limit. The statute does not specify whether this limit prohibits holding only 25 petitions at a given moment, over the course of a single campaign, or some other duration.

31.    Many League volunteers have expressed to me that they plan to forgo collecting petitions altogether, out of fear that they will be arrested or charged with a crime for making a mistake.

32.    The Law's wholesale exclusion of non-Florida residents, non-citizens, and individuals with felony convictions from collecting petitions harms both the League's volunteer recruitment and voter outreach efforts. Many of the League's volunteers are "snowbirds," who split their time between Florida and another state. The League also relies on members from other states to support its efforts.

33.    Some volunteers also lack U.S. citizenship. Several League volunteers are permanent residents of the United States without citizenship. Still others reside

in Canada and travel to Florida on occasion to help with our efforts. These volunteers have collected petitions on behalf of the League before, but now cannot, because of the Law.

34.    By excluding each of these groups, the Law narrows the pool of volunteers the League can use to support its petition-collection efforts.

35.    The exclusions also limit the communities of voters the League can reach. For instance, the League has many volunteers from Florida's immigrant communities, including members of the Cuban and Haitian communities. Many members of those communities are citizens, but some do not speak English. The League's noncitizen volunteers are often the only ones with the language skills to discuss petitions with members of these communities and answer their questions. By excluding noncitizens from the petition gathering process, HB 1205 severs the League's connections to these communities.

***The Registration Requirement***

36.    The Law's requirements that volunteer petition gatherers register as circulators with the Secretary of State and undergo training (if they wish to collect more than 25 petition forms from non-family members) has deterred and will continue to deter volunteers from participating in the League's operations. It has also slowed down the League's process of training volunteers and putting them into the field to a crawl.

11

37.    The Law requires volunteers to provide a raft of personal information to register, including the last four digits of their Social Security number. Volunteers have told the League that they do not want to provide such personal details to the state. The League has heard volunteers express similar concerns in the past regarding other laws that require members to turn over their names and personal identifying information. This has deterred volunteers from supporting the League's work. The League expects this requirement to do the same: as word of the Law spreads, this requirement will further deter League volunteers from participating in petition collection.

38.    League volunteers have also reached out to me to express grave concerns about having their personal information—including their home addresses—available to the public, as well. Because circulator applications and petition forms are public records, anyone who registers as a circulator or signs a circulator affidavit accompanying a petition form makes their name and address available online. Many League members and volunteers are elderly and/or live alone. These individuals are very concerned about political extremists having easy access to their name, address, and the fact that they volunteered in support of specific initiatives.

39.    Absent relief from this Court, the League expects to lose volunteer petition gatherers throughout the state as a result of the registration requirement.

40.    Likewise, the Law's requirements that petition volunteers sign oaths affirming that they are U.S. Citizens, residents of Florida, and do not have felony convictions (or have had their voting rights restored), will deter volunteer participation. Many individuals, including some League volunteers, are unsure whether they have a felony conviction and whether they have had their voting rights restored. These same individuals have had negative interactions with law enforcement in the past and are exceedingly cautious not to find themselves on the wrong side of the law again.

### The 10-Day Return Deadline

41.    The Law's new 10-day deadline for returning petition forms creates a significant burden for the League and its volunteers. When the League collects petitions, it engages in a rigorous compliance review to ensure that petition forms are filled out accurately and in conformance with existing requirements. This process will often include calling petition signers and asking them to come to my law office, located downtown, so that they can fill in any information that is missing or incorrect on otherwise-completed forms. For example, sometimes a voter mistakes the word "county" for "country" and writes "USA" on the form. When the return deadline was 30 days, this process was arduous, but the League was able to conduct compliance review and return petitions on time.

42.    The 10-day deadline now makes it impossible for the League to conduct adequate compliance checks. In order to ensure petitions are turned in before the new deadline, the League and its volunteers must deliver forms to county supervisors almost as quickly as they are collected. This problem is further compounded by the Law's imposition of new requirements for petition forms, including the requirement that petition circulators include a signed affidavit with each petition form. This new deadline will guarantee that the League will be forced to turn in at least some petition forms that are incomplete or incorrectly completed.

### Criminal Investigations

43.    The League's volunteers will also be deterred from participating in petition collection because of the possibility of investigation by the Office of Election Crimes. Under the Law, if any county supervisor discovers that greater than 25% of the forms turned in are invalid, they must make a referral to the Office of Election Crimes, who will then conduct a preliminary investigation of any individuals or organizations involved in collecting petitions. As described, the Law makes it more likely that volunteers will turn in forms that are not valid. This catch-22 for volunteers will hinder the League's recruitment efforts and ultimately its ability to collect petition forms in support of ballot initiatives.

44.    The Law's potential fines for late-returned forms will also hinder the League's pursuit of its mission. The League highly values its relationships with

petition sponsors and does everything it can to maintain its reputation as a trusted source of grassroots support in citizen-initiative campaigns. If sponsors incur substantial fines because of forms returned late by the League's volunteers, that will damage relationships and limit sponsors' willingness to work with the League.

***Harms to the League's Core Business***

45.    HB 1205 also causes direct harm the League's ability to carry out its mission by diverting volunteer time, the League's most important resource. As discussed, the League trains each of its volunteers on the legal requirements for petition collection before sending them out into the field. Members and volunteers expect the League to have a clear plan for legal compliance; they do not accept a fly-by-night approach to the law. In recent weeks, the League has had to turn its work upside down to meet the immediate needs of its members to give them guidance about the Law, diverting resources from other organizational priorities. First, the League has had to discuss and debate the meaning of the Law so it can, to the extent possible, determine what the Law means. Next, the League will need to create trainings for those members that continue to collect petitions on their own. This will require delaying or canceling other scheduled League events related to competing organizational priorities. It will also consume volunteer hours. In 2024, the League logged 93,900 volunteer hours, much of it devoted to petition

collection. The administrative tasks above will consume a significant number of these volunteer hours, inhibiting the League from carrying out its mission.

46.    In about a week, the League will hold its biannual statewide convention, attended by members of local leagues throughout the state. Currently, the convention's agenda devotes significant time to discussions of the new Law, owing to the large number of questions about the law the League has received from its members. This distracts from other pressing organizational matters that the League was planning to discuss at this meeting, including the approval of by-laws and elections of new officers.

47.    The League is also working to meet several grant deadlines. The time the League spends responding to HB 1205 is time it cannot spend preparing grant applications. The League needs these grants to fund its core operations. Failure to obtain this funding will lead to a drain on the organization's resources, which have already been strained by HB 1205. Similarly, LWVFL's loss of precious volunteer hours for specified projects will impact its ability to obtain funding.

48.    The League must also immediately start updating its compliance review process for petition forms. As described, the Law provides the League with only 10 days from the time a voter signs to turn in a petition form and imposes a raft of new requirements on those forms. This means the League needs to determine how it can best navigate these requirements. Such an effort will require

16

staff time, organizational resources, and consultation with counsel. This consumes time that would otherwise be spent on supporting petition circulator volunteers and educating the public on the substantive issues underlying proposed ballot initiatives.

### *Vague Criminal Provisions*

49.    The law's vague criminal provisions are also a major concern for the League and its members. The law prohibits volunteers from "filling in missing information on a signed petition," but does not clarify what "missing information" is. As a result, volunteers are concerned that they may be guilty of a felony if they, for example, assist someone with vision impairment in filling out a form. The League's volunteers have also expressed concern that this may force them to participate in a violation of federal disability laws by denying assistance to people with disabilities. This is not a theoretical concern: assisting people with disabilities is a large part of the League's outreach effort.

50.    HB 1205 also punishes anyone who "retains a voters personal information . . . for any other reason other than to provide such information to the sponsor of the initiative petition," but does not define "retain." It is not even clear, for example, whether a volunteer violates this provision by simply holding on to a petition form to confirm its accuracy after the voter signs it. It is also not clear whether this provision implicates the League's practice of holding on to voters'

17

contact information to reach out to them if the voter accidentally fills out a petition form more than once. Additionally, HB 1205 updates Florida's definition of "racketeering activities" to include any "violation of the Florida Election Code relating to irregularities or fraud in volving issue petition activities," but does not define "irregularities." League members worry that this may include mistakes like filling in a voter's information incorrectly, turning a form in to the wrong supervisor, or turning in a form late. These provisions force League members to collect petitions under the specter of criminal liability without any assurances as to the law's meaning.

***Irreparable Harm***

51.    Absent relief, the harm to the League and its volunteers will be immediate. For a ballot question to appear on the ballot for the 2026 election, the Secretary of State must receive the required number of valid and verified petition forms prior to February 1. Florida law requires signatures from 25 percent of voters statewide across one-half of the state's congressional districts in order for an initiative to be placed on the ballot. With such a high threshold, every second counts. Presently, the League has paused petition collection in support of the Clean Water initiative, and its efforts in support of the Medicaid initiative have slowed substantially. If HB 1205 goes into effect on July 1, the League is highly likely to

pause petition gathering altogether. With each day that passes under this status quo, the likelihood that either initiative will qualify for the 2026 ballot plummets.

52.    The Law's blow to the morale of the League and its volunteers has also been profound. The League's members are in great distress over the legislature's attempt to silence their voices and render nearly impossible work that they value deeply. If left unabated, this will destroy morale, which is essential to any successful volunteer-based campaign. A later-granted permanent injunction against this law is unlikely to rehabilitate the league's morale after it is broken, and the onerous penalties of HB 1205, left undeterred, are likely to break or deeply harm the morale of League members. In addition, a delayed response from the court cannot undo the months during which the League will be unable to recruit volunteers to support its core operations.

53.    HB 1205 has already begun to stymie the ability of the League and its members to get their message out, and this harm will grow exponentially when the law goes into effect on July 1.   As discussed, many League members and volunteers have already chosen not to collect petitions at all, rather than risk criminal liability. Gathering petitions is one of the primary ways the League communicates with members of the public about issues of public importance—including clean water and Medicaid expansion. When volunteers exit the field, that means fewer people involved in this discussion. And, of course,

when the League discontinues petition collection (as it is highly likely to do if HB 1205 goes into effect), almost all of its members will exit the public discussion on these issues. That will be a profound loss for not just the League, but the entire state of Florida.

***Conclusion***

54.    Both individually and together, the Law's new requirements will make it almost impossible for the League to support petition-collection efforts without risking substantial fines, criminal investigation, damaged relationships with trusted partners, and potential criminal liability for its volunteers. It will also make it much harder to recruit volunteers who have already reached out to the League with grave concerns about the Law's new requirements.

55.    As a result of the severe burdens imposed on the League by HB 1205, the League is highly likely to discontinue all petition collection after July 1, if the law goes into effect.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this 2nd day of June in Panama City, FL.

Cecile Scoon, Co-President,
League of Women Voters of
Florida

20