# EXHIBIT A

**IN THE UNITED STATES DISTRICT
COURT FOR THE NORTHERN DISTRICT
OF FLORIDA TALLAHASSEE DIVISION**

LEAGUE OF WOMEN VOTERS OF
FLORIDA, INC., *et al.*

   *Intervenor-Plaintiffs,*

v.

CORD BYRD, in his official capacity as
Secretary of the State of Florida, *et al.*

   *Defendants.*

No. 4:25-cv-00211-MW-MAF

## <u>DECLARATION OF JESSICA LOWE-MINOR</u>

I, Jessica Lowe-Minor, hereby declare and state as follows:

1.    I am over eighteen years old, and I have personal knowledge of the facts set forth in this Declaration. I could and would testify competently to those facts if called to be a witness in this case.

2.    I have been the President of the League of Women Voters of Florida ("LWVFL") since June 2025. I served on the League of Women Voters' National Board of Directors from June 2016 through June 2022. Before that, I served on the Board of Directors for the League of Women Voters of Tallahassee. From 2010 through 2014, I served as the Executive Director of LWVFL. I have been a dues-paying member of this organization

1

since 2010.

3. I joined the LWVFL and have remained deeply engaged in its work because I firmly believe in its mission of empowering voters and defending democracy. Ensuring access to direct democracy is deeply important to me because I firmly believe that it is our right as Americans to have a voice in the government.

4. Since its inception in 1939, LWVFL has advanced civic engagement with the democratic process by facilitating participation in citizen-led constitutional amendments in various capacities, including through volunteer petition collection efforts. For example, we mobilized over a thousand volunteers to successfully place the Standards for Legislature to Follow in Congressional Redistricting on the ballot in 2010 and collected tens of thousands of signed petitions. In 2018, our members collected thousands of signed petitions for the Voting Restoration Amendment on the ballot. And in 2024, our members collected tens of thousands of signed forms in support of the Amendment to Limit Government Interference with Abortion.

5. I have collected well over 25 signed petitions for any given initiative. Before the passage of HB 1205, I had concrete plans to circulate over 25 petitions for the Florida Right to Clean Water Initiative and Florida Medicaid Expansion Initiative.

6.     Throughout my 15 years of LWVFL membership, I've never heard of a single instance of petition fraud committed by any member. As far as I'm aware, throughout LWVFL's long history, no member has ever been charged with or convicted of fraud related to petition circulation efforts. This makes sense. Our members and volunteers are people who stand with LWVFL because they want to do their part to strengthen, not weaken, our democracy. It's also worth noting that, as unpaid volunteers, our members have zero incentive to commit fraud because they do not receive compensation for circulating petitions. And at any rate, there are already laws in place that deter fraud.

***Organizational Resource Diversion***

7.     In the months leading up to and shortly after HB 1205's passage, LWVFL dedicated significant resources to preparing for and dealing with the impacts of the law.

8.     As one example, we were forced to dedicate our monthly, all presidents meetings to combating HB 1205 and strategizing on how to keep our members safe from exposure to HB 1205's criminal provisions. The presidents of all local LWVFL chapters ordinarily meet each month to share information, tools, and strategies; decide on operational matters; and work together to plan and execute fundraising initiatives—among other things. This

3

work is crucial to our ability to execute projects and keep the lights on. Forgoing fundraising initiatives that sustain LWVFL's operations and putting a pause on our other projects to focus on HB 1205 has diminished LWVFL's capacity to carry out its core work.

9.    LWVFL's committee members, too, were forced to focus on dealing with HB 1205. The chairs of all local LWVFL's Voter Services' and Healthcare Committees, respectively, meet each month to collaborate on a wide array of projects. Specifically, the Voter Services Committee usually works on planning voter registration drives and other mission-driven initiatives. Over the spring and summer, it had specifically been working on ensuring voters knew they had to make new requests for vote-by-mail ballots for the 2025 and 2026 elections, informing voters that voter registration records need to be updated when they renewed or replaced their Florida drivers licenses or identification card, hosting candidate forums, and encouraging voters to vote in multiple "off-season" elections throughout the state, among other efforts. The Healthcare Committee usually works on advancing LWVFL's work on Medicaid expansion, access to reproductive rights, and other health-related initiatives. Over the spring and summer, it had specifically been working on advocacy efforts to keep fluoride in our water. These committees, like our chapter presidents, were forced to stop their work

4

to focus instead on tracking HB 1205 as it moved through the legislature, updating our members as developments arose, and ultimately mitigating HB 1205's impact on our members, such as by finding ways to connect members with trainings and voters with educational materials on HB 1205.

10.    LWVFL's Board of Directors also dedicated its monthly meetings from March to June 2025 to HB 1205. The Board had been planning on using this time to work on other initiatives, such as planning for an upcoming convention, planning events for an October Day of Action, and supporting the Bridging Floridians Together Initiative. They were forced to redirect their time and efforts to discussing and finding ways to mitigate the negative effects of HB 1205.

***LWVFL's Decision to End Petition Circulation***

11.    On May 8, 2025, LWVFL's executive team issued guidance to our members stating that we would, as an organization, no longer circulate petitions beginning on July 1, 2025, when HB 1205 went into effect. This was in response to the Florida Legislature's enactment of HB 1205 on May 2, 2025.

12.    The executive team weighed the various risks involved—particularly the risk of subjecting LWVFL and our members to criminal liability and government investigation under HB 1205's vague and expansive

provisions. The executive team also considered the risk that LWVFL members might make inadvertent mistakes that could end up subjecting our close sponsor-partners, to debilitating fines, sullying LWVFL's reputation in the process.

13.    After carefully weighing the risks associated with each of HB 1205's provisions—and after taking stock of what the sponsors of Florida Medicaid Expansion Initiative and the Florida Right to Clean Water Initiative planned to do to keep their own volunteers and campaigns staff safe—the executive team decided not to proceed with circulating petitions. In particular, the executive team decided that LWVFL could not in good conscience encourage activities that place our members at risk of criminal prosecution or that put their personal safety at risk.

14.    Deciding not to circulate petitions as an organization was a profoundly difficult decision for our executive team. Engaging volunteers in ballot petition initiatives has always been one of the primary ways in which LWVFL has been able to advance causes that are crucial to its mission. Our organization has a relatively modest budget; we do not have the capacity to fund initiatives with large checks—nor do we make financial contributions to sponsors or initiatives. Getting our members together and mobilizing them to circulate petitions had been one of the few cost-effective ways we could

advocate for sweeping change. HB 1205 has caused LWVFL to lose a vital avenue for making a difference in our state.

**HB 1205's Categorical Bans**

15.    LWVFL has always relied and would, absent HB 1205, continue to rely on non-citizen and non-resident members—as well as on members who have had felony convictions—to carry out our petition circulation efforts.

16.    Our non-citizen members, like Cecilia Gonzalez, regularly collect signed petitions for us. [*See* Gonzalez Decl.] They've played a pivotal role in connecting us with citizens in their communities, including hard-to-reach, non-English speakers. This, in turn, has allowed us to reach a much broader audience. HB 1205 bars us from working with these members on our petition circulation efforts moving forward—and in so doing, closes us off from reaching communities that they're part of. Our petition circulation efforts were always a big volunteer draw, and it was not uncommon for new volunteers to ask how they could get more involved with our work—including by joining as LWVFL members. By barring non-citizens from participating in one of the LWVFL's major volunteer operations in the first place, HB 1205 greatly impairs our ability to recruit, retain, and otherwise associate with new non-citizen members.

17.    Our non-resident members have also played a crucial role in our

petition circulation efforts. Many of them have second homes in Florida and are deeply embedded in their neighborhoods and communities. Many are frequent, years-long participants in our work, including in petition circulation. For example, in Lee County, two of our members—residents of Pennsylvania and Ohio, respectively—recently circulated petitions for the Amendment to Limit Government Interference with Abortion, Florida Right to Clean Water Initiative, and Florida Medicaid Expansion Initiative. Had HB 1205 not been passed, these two non-resident members would have continued circulating petitions for the Florida Right to Clean Water Initiative and Florida Medicaid Expansion Initiative. They, too, can no longer do so.

18.    Our members and volunteers have also included individuals who have had felony convictions. We work closely with such members to ensure that their voting rights are restored when possible. But we have always invited *all* our members, regardless of their enfranchisement status, to join us in our volunteer efforts, including petition circulation. HB 1205 wholly bars LWVFL from relying on these members again.

19.    Members who fall under each of these categories are easy to locate; because if they're members of LWFVL, we have their contact information and addresses, and we are in frequent touch.

***The Preregistration Requirements***

8

20.    Before LWVFL stopped circulating petitions altogether, it regularly hosted petition circulator events. LWVFL members would gather to receive materials—such as petitions, pens, and clipboards—as well as instructions for petition gathering and information on the given initiative. LWVFL trained volunteers on which fields of the petition the voters must complete and informed volunteers about the content of the petition, ensuring that volunteers understood the nuances and details about the issues to help voters decide if they wanted to sign the petition.

21.    LWVFL's petition collection events were an incredibly effective community engagement tool, at least in part because the events were accessible to all. All members and people in their networks could participate, regardless of their citizenship, residency, and enfranchisement status. There was no cost to participate, and we worked very hard to make these events warm, welcoming, and engaging for our participants. These events were a great opportunity to bring together diverse groups of volunteers from all walks of life to discuss and advocate for causes they believe in.

22.    LWVFL members frequently brought non-members to these petition gathering events, such as their spouses or friends. These individuals often decided on the spot that they wanted to volunteer to help, too. Because there was no pre-registration requirement at the time, we were able to

accommodate their interest. We provided those new volunteers with the same materials and training that we gave our members. As part of preregistering, HB 1205 requires volunteers to complete an online state-run training program and examination. Given HB 1205's preregistration and training requirements, LWVFL is wholly barred from engaging impassioned new volunteers who show up at our events in our petition circulation work. The inability to onboard on-the-spot volunteers eliminates one of the most effective and organic recruitment pathways for volunteering for LWVFL.

23.     Having their names searchable on a state database has already and will continue to deter many of our members who are already anxious about the political climate and the possibility of retaliation from circulating over 25 petitions, even in their individual capacities. This chilling effect is particularly acute in Tallahassee, where I have heard from our members who work for state agencies or public universities that they will not disclose their names alongside information about their involvement in activities disfavored by the current administration, given the risk that doing so could adversely affect their careers.

24.     HB 1205's preregistration requirement violates the rights of our members whose personal addresses are protected by law. Florida law expressly protects from public disclosure the home address and other personal

information of current and former public defenders, assistant public defenders, criminal conflict counsel, civil regional counsel, assistant criminal conflict counsel, assistant civil regional counsel, judges, magistrate judges, and current and former military personnel. Many of our members' addresses are protected from public disclosure under this statute. As just one example, I am personally familiar with Jacqueline Azis, the President of the League of Women Voters of the St. Petersburg Area, who served for years as an assistant public defender. Jackie—who once regularly circulated over 25 petitions and planned to do so again before HB 1205 went into effect—applied for and received the state's protection of her home address information. Her home address is not available on any public forum. Jackie took steps to carefully guard her home address from public disclosure in order to keep herself and her family safe, given the sensitive nature of her prior employment. Jackie will not relinquish the safety and privacy protections that the state has provided for her to the chance that a government employee processing any Florida Public Records Law request for petition circulator registrations incorrectly applies the public defender exemption. She will not circulate over 25 petitions again because of HB 1205.

25.    For my own part, I'm deeply concerned about the possibility of having my own name and home address made publicly available in connection

with particular initiatives that I support. In his capacity on the Leon County Board of County Commissioners, my husband has received death threats, which we have reported to the authorities. Florida recently recognized a public records exemption, under which public officials like my husband need not disclose their home addresses. We are imminently moving into a new home, which is currently under contract. Under the exemption, which covers spouses as well, our new address will be protected from public disclosure.

26.     Yet, if I register my address with the state in order to collect over 25 petitions, I face a serious risk of my address becoming public; there is no guarantee that a government employee processing any Florida Public Records Law request of petition collection records will correctly apply the exemption to keep my address—which is a proxy for my husband's—protected. Even writing down my address to register as a petition circulator creates a risk of public disclosure and my family's safety and privacy. As a result, I will not register as a petition circulator.

27.     Beyond safety and privacy concerns, as a matter of principle, I do not believe I should have to disclose my home address and other personal information to the state to engage in constitutionally protected activity. Petition gathering is a core expression of the constitutional right to free speech, and it is one of my chosen methods of exercising that right. I should

not be required to register my personal political affiliations and views with the government to exercise my constitutional right. On principle, I will not register as a petition circulator.

### *The Ten-Day Return Deadline*

28.    Prior to HB 1205, LWVFL's process for collecting signed petitions began with members collecting signed petitions. Our members then provided these petitions to a single point-person in their local League who checked them for completeness before delivering them to the sponsor's local office—either via mail or by physically dropping them off. Our members who live in more rural areas that are further from sponsor's local offices had to rely exclusively on mail to send in these signed forms. LWVFL reimburses members for postage expenses upon request. Once these signed petitions were at the sponsor's local office, an employee or volunteer of the sponsor delivered the signed petitions to the primary office of the sponsor, usually the address on the petition. Then, the primary office of the sponsor separated the signed petitions by county and delivered them to the appropriate supervisor of elections offices.

29.    HB 1205's ten-day return deadline gives us a third of the time to complete all steps of this process—and in so doing, it increases the total costs and reduces the current quality control steps. If LWVFL circulates petitions

again, it will be forced to reimburse members for expedited mail expenses to ensure that signed petition forms get to the sponsor's primary office in time. There will be no time for members to deliver signed forms to a single point-person in their local League to run a quality check before delivering the signed forms to the local sponsor's offices as the ten-day deadline notably includes within the ten-day count weekends, holidays, and travel time, and does not account for the geographic dispersion of volunteers. It makes it nearly impossible for LWVFL to run an effective volunteer petition collection effort for the causes we support as an organization.

30.    HB 1205's unreasonable deadline injects more room for error as current quality control steps will have to be bypassed to complete the collection process in just ten days. Without an adequate quality control process, LWVFL will inevitably turn in some incomplete, incorrect, or late forms. This could result in signed forms not being counted, which silences the free speech rights of those voters who signed a petition. At the same time, it also requires the Office of Election Crimes and Security to investigate petition circulators to determine whether any invalidated petitions were invalidated due to fraud or other violations of HB 1205 if the supervisor invalidates more than twenty-five percent of the overall petitions collected in a reporting period. LWVFL members have told me that they're terrified of being

investigated for inadvertent mistakes. This is enough for some of our members to opt out of collecting signed petitions altogether.

### *The Provision on Filling in Missing Information*

31.    LWVFL members are trained to work with individuals who cannot complete forms themselves—usually due to some visual impairment or physical disability—by filling in missing information at the voter's direction and with their full consent. I have personal experience doing so myself. For example, I helped a voter with a hand tremor to fill in missing information on her form. The voter made a mark on the signature line, and at the voter's direction, I filled in the blank fields on the petition form that she was unable to complete on her own.

32.    HB 1205 makes it a crime to fill in missing information on a signed petition. Under this provision, providing routine assistance could be prosecuted as criminal conduct. To avoid criminal penalties, we can no longer instruct our members to help disabled voters to fill in missing information on voters' petition forms. The practical result is that voters with disabilities will lose meaningful access to the petition process.

### *The Provision on Retaining Voters' Information*

33.    HB 1205 makes it a crime to retain a voter's personal information. While it provides a handful of examples of the types of personal

information that cannot be retained, it does not expressly state whether, for instance, the provision implicates a situation in which a voter fills out a petition form but also leaves some of the same information, such as their name and contact information, with the circulators for other purposes.

34.    This provision weakens our recruitment efforts and impact. Our volunteers often carry sign-up sheets with them while circulating petitions, to give voters the opportunity to learn more about our organization and our other volunteer efforts. It is unclear if doing so will subject these volunteers to criminal liability. These sign-up sheets were an important way that we recruited new members and volunteers. But to avoid subjecting our members and volunteers to criminal liability, LWVFL will not ask our volunteers to carry sign-up sheets while circulating petitions again.

### LWVFL's Partnerships with Sponsors

35.    Supporting ballot measures aligns directly with LWVFL's mission. By working closely with sponsors of petitions, we translate our mission into concrete action. LWVFL is a multi-issue organization. We have a broad range of advocacy positions on topics that are outside the elections and voting space—for example, on healthcare, environmental sustainability, reproductive rights, and money in politics. These topics are not necessarily directly perceived as voting-related, but we view them through the lens of

good public policy. In general, we advocate for causes that we believe are necessary to support a strong, functioning society.

36.    We decide on advocacy positions as an organization, and we have held many of our policy positions for decades. First, we develop our positions through a research study on a particular topic. We next generate an advocacy position based on that study, which we present to our members at state or national conventions every two years. New policy positions must then be approved by a consensus of our members at these conventions. We next decide on actions—such as petition circulation efforts—that advance our policy positions. Our partnerships with petition sponsors are crucial to our ability to move the needle on our policy positions.

37.    LWVFL frequently joins the steering committees of these petition sponsor organizations. In that capacity, LWVFL has helped petition sponsors set their overall strategic directions, finalize ballot measure language, and determine which regions of the state to prioritize for outreach efforts.

38.    HB 1205 has impeded and will continue to severely harm LWVFL's relationships with petition sponsor-partners. Mistakes by our members directly implicate petition sponsor. For instance, as I understand it, if a member fills in missing information for a disabled voter and is reported

as having violated HB 1205 for doing so, the petition sponsor would be fined for that members' actions. The ten-day deadline creates more room for inadvertent mistakes, and HB 1205 subjects our petition sponsor-partners to hundreds of thousands of dollars in fines for such mistakes. Those fines, in turn, pose existential threats to the sponsors. Avoiding the risk of subjecting LWVFL's close sponsor-partners to these fines is one reason LWVFL agreed to stop circulating ballot petitions. In effect, LWVFL is barred from being able to work with sponsor organizations on shared policy positions, which directly harms our ability to carry out our mission-driven work.

39.    I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 27th day of October      2025      in      [ Leon County                ],      Florida.

DocuSigned by:

*Jessica Lowe-Minor*

19A17397EA524F4...

Jessica Lowe-Minor, President, LWVFL