# EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

FLORIDA DECIDES HEALTHCARE, INC., *et al.*,

        *Plaintiffs*,

v.

BYRD, *et al.*,

        *Defendants*.

No.: 4:25-cv-00211-MW-MAF

SMART & SAFE FLORIDA, *et al.*,

        *Intervenor-Plaintiff*,

v.

BYRD, *et al.*,

        *Defendants*.

LEAGUE OF WOMEN VOTERS OF FLORIDA, *et al.*,

        *Intervenor-Plaintiffs*,

v.

BYRD, *et al.*,

1

2

*Defendants.*

# SUPPLEMENTAL DECLARATION OF JUAN PROAÑO, ON BEHALF OF PLAINTIFF- INTERVENOR LEAGUE OF UNITED LATIN AMERICAN CITIZENS

I, Juan Proaño, pursuant to 28 U.S.C. § 1746, declare that the following statements are true and correct to the best of my knowledge and belief:

1. I am the Chief Executive Officer of the League of United Latin American Citizens. I have served in this position since November 2023.

2. LULAC is the largest and oldest Hispanic civil rights organization in the United States of America. LULAC's mission is to advance the economic condition, educational attainment, political influence, housing, health and civil rights of the Hispanic population of the United States.

3. LULAC has over 575,000 members in 31 states, the District of Columbia, and Puerto Rico.

4. LULAC has more than 431 councils nationwide, including 17 in the state of Florida.

5. LULAC's state affiliate, LULAC Florida, has thousands of members and operates throughout the state.

6. LULAC operates entirely through volunteers. As a core part of its mission, LULAC advocates for policies that will improve the lives of Hispanic communities. Its advocacy has included support for driver's licenses for all Florida residents regardless of immigration status and fighting back against private utility companies that charge discriminatory rates to Hispanic customers.

7. LULAC has also worked with other organizations to support ballot initiatives in the state of Florida, including the Right to Abortion Initiative and the Rights Restoration for Felons Initiative.

8. Ensuring access to direct democracy—including through volunteer- and organization-led petition circulation—has long been an important part of LULAC's civic engagement work in Florida.

9. Many LULAC members, both inside and outside of Florida, have collected petition forms for initiatives like these and planned to collect petitions in support of the Florida Decides Healthcare ("FDH") initiative.

10. This initiative would extend Medicaid benefits to any individual or family in the state making less than 138% of the federal poverty level.

11. The FDH initiative is important to LULAC's constituents. Many LULAC members fit the eligibility criteria for Medicaid under the proposed expansion. Securing passage of this initiative would mean that our members can reap the benefits of the tax dollars they send to Washington.

12. Unfortunately, the newly-enacted Florida HB 1205 will make it impossible for LULAC to collect petitions in support of FDH.

13. Among a host of new and burdensome requirements for petition gathering, the new Law prohibits noncitizens from collecting petition forms.

14. This provision severely limits LULAC's ability to utilize our full membership base and volunteer base. That is because many of our members and

volunteers do not have United States citizenship.

15. LULAC has a large volunteer base that is made up of permanent residents or of people who are on work or student visas. LULAC had hoped to rely on these individuals to help gather petition signatures in support of the FDH initiative.

16. Indeed, noncitizen members and LULAC volunteers have previously gathered petitions for the Rights Restoration initiative in 2018, the Reproductive Freedom initiative in 2024, and other initiatives.

17. These individuals have gathered petition forms again in support of the FDH initiative. Our noncitizen members had plans to continue to collect petition signatures in support of FDH, including at large community events throughout the state, in order to help the initiative secure placement on the ballot for 2026 or 2028. Because of HB 1205, they now cannot do so.

18. LULAC's noncitizen members play an important role in helping to get LULAC's message out. Because LULAC's noncitizen members cannot vote, circulation is one of their few opportunities to participate in civic life, and they are eager to engage in the public discussion around pressing issues that takes place when they circulate petitions. Because HB 1205 excludes them from collecting petition signatures, it has cut off a crucial channel for those members to reach out to voters and engage them in political discussions.

19. Not only does HB 1205 harm LULAC's noncitizen members and its volunteer base, it also harms LULAC's citizen members.

20. Several citizen and noncitizen LULAC members have informed us

that they will no longer participate in petition circulation due to fear of harassment, retaliation, and potential criminal liability.

21. For instance, HB 1205 requires anyone wishing to collect more than 25 petitions from non-family members to register as a circulator and sign an affidavit with each petition form. Both steps require disclosing the "circulator's" personal information, including their permanent address. Both of these documents then become public records.

22. But many of LULAC's citizen members are from mixed-status households, which include parents, grandparents, siblings, aunts, uncles, or cousins who do not have US citizenship and may be undocumented. This places the citizen members who want to exercise their voice and engage in basic civic and democratic processes in a bind. Even if they are citizens themselves, they are afraid that disclosing their addresses on a public form, sharing the last four digits of their social security numbers with the State, and having their names publicly associated with supporting controversial initiatives, will invite harassment from state and federal authorities who will use this information to identify, arrest, and deport their undocumented family members.

23. Separate and apart from safety concerns, some of our members object on principle to a system that forces them to publicly disclose personal information and their support for specific initiatives as a condition of engaging in core political activity.

24. These requirements are not only intimidating, they are also needlessly

burdensome. To register, LULAC members must provide extensive details to the State and undergo training on petition circulation. LULAC already ensures that its members are properly trained before they engage in any field outreach, so this requirement serves no serious purpose and, in practice, forecloses participation.

25. Therefore, LULAC members and volunteers, even if they are citizens themselves, will not sign up to become petition circulators under HB 1205. And as a result, LULAC, as an organization, will suffer because it will not be able to mobilize any of its members or volunteers to participate in the circulation process.

26. HB 1205's categorical bans extend beyond noncitizens to include nonresidents and individuals with felony convictions who have not had their voting rights restored. Historically, LULAC Florida has relied on support from members who reside outside Florida and from returning citizens whose voting rights have not been restored. HB 1205 prevents us from engaging those volunteers in petition circulation.

27. The registration and affidavit requirements have made it significantly harder for LULAC to recruit new volunteers and grow membership, particularly at community events where spontaneous participation was previously common.

28. HB 1205's new requirements have also placed significant administrative burdens on LULAC itself. The vague and indecipherable language in HB 1205 (e.g., the lack of clarity about what "irregularities" means), has hindered LULAC Florida from developing clear guidelines for our members. This is because it does not know what conduct is or is not permitted by the Law. Until these ambiguities are resolved, LULAC Florida will not encourage its members and volunteers to gather

7

petitions. The organization assumes responsibility for keeping its members and volunteers safe, and the new law unfortunately exposes LULAC and its members and volunteers to an unacceptable level of risk.

29. In addition to conducting trainings, LULAC Florida diverted staff and volunteer time to interpret HB 1205, consult with counsel about its scope and risk, and update internal compliance checks for petition forms. The time and attention devoted to trainings, legal consultation, and compliance diverted resources from other organizational priorities, including defending noncitizen members from arrest and deportation by immigration authorities and supporting broader voter education efforts.

30. In past campaigns, some LULAC members have retained limited voter contact information solely to notify voters about curable issues on their petition forms. HB 1205's provisions, and the ambiguity about what it means to "retain" information, now deter that basic quality-control practice. Many of our members have already stopped circulating petitions because they are unwilling to risk exposure to third-degree felony charges for good-faith mistakes.

31. Historically, LULAC members collected signed petitions and submitted them directly to initiative sponsors, who then mailed them to the appropriate supervisors of elections. The new 10-day deadline compresses that timeline considerably, increasing members' mailing and processing costs and the risk that, despite good-faith efforts, some forms will be late or contain inadvertent errors.

32. HB 1205 has also strained LULAC's relationships with sponsor organizations. Because fines may be imposed on sponsors for errors made by

8

volunteers, these organizations are now more hesitant to collaborate with LULAC, undermining our shared efforts to advance shared ballot-access priorities.

33. HB 1205 also heightens fear of government investigation. We understand that submitting a threshold percentage of "invalid" forms—including late submissions—can trigger mandatory reporting and investigation by state authorities. Given the statute's vagueness, our members fear that good-faith mistakes will expose them and the organization to investigation, which has further chilled participation.

34. In the meantime, LULAC Florida has received many questions from members and it has developed trainings that inform members and volunteers about the law, particularly the risks associated with collecting petitions. The time spent on these trainings has diverted LULAC's attention from other organizational priorities, such as defending its noncitizen members from arrest and deportation by ICE. This diversion of LULAC Florida's resources means that LULAC has fewer resources to defend constituents from immigration enforcement.

35. As a result of HB 1205's burdensome and vague requirements, LULAC has made the decision that it will not be collecting petition forms for the foreseeable future. Nor will it encourage its members or volunteers to collect petitions, as it is LULAC's responsibility to protect these individuals from harm, whether in the form of harassment by bad actors, intimidation or arrest by ICE, retaliation from the state of Florida, or criminal enforcement under HB 1205.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 27th day of October in Miami, FL.

Juan Proaño
Chief Executive Officer
League of United Latin American Citizens