# EXHIBIT G

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF FLORIDA, *et al.*, <br><br> *Intervenor-Plaintiffs*, <br><br> v. <br><br> CORD BYRD, et al., <br> *Defendants*. | No.: 4:25-cv-00211-MW-MAF |

**THIRD DECLARATION OF CECILE SCOON ON BEHALF OF
INTERVENOR-PLAINTIFFS THE LEAGUE OF WOMEN VOTERS OF
FLORIDA AND THE LEAGUE OF WOMEN VOTERS OF FLORIDA
<u>EDUCATION FUND, INC.</u>**

I, Cecile Scoon, pursuant to 28 U.S.C. § 1746, declare that the following statements are true and correct to the best of my knowledge and belief:

1. I submit this declaration on behalf of Intervenor-Plaintiffs the League of Women Voters Florida, Inc. and the League of Women Voters of Florida Education Fund, Inc. (together, the "League" or "LWVFL").

2. I previously submitted declarations to this Court on behalf of the League on May 14, 2025 (ECF No. 93-1) and on June 3, 2025 (ECF No. 174-1).

3. I served as the Co-President of the League from 2023 to June 7, 2025. Prior to that, I served as President of the League from 2021 to 2023 and have been a member of the League since about 2000.

4. The League has 29 local Leagues across the State of Florida, located in Pensacola down to the Keys, with thousands of members statewide. Members in all of these League chapters have volunteered to circulate petitions.

5. The League's mission is to encourage voter participation, educate voters on issues of public import, and advocate for legislative changes and policies for the public good. Core to our mission is ensuring access to direct democracy for all Floridians.

***The League's Petition Circulation Activities Before HB 1205's Enactment***

6. Collecting petitions in support of citizen-led ballot initiatives is one of the major tools the League uses to pursue its mission.

7. Since at least the mid-1990s, the League has supported citizen initiatives, mobilized thousands of volunteer petition circulators, and gathered hundreds of thousands of petition forms.

8. The League engages in significant outreach across all 67 counties in Florida to ensure that, even in sparsely-populated counties, the League can advance its mission through circulating petitions, educating voters, and hosting events. Members across our chapters have regularly collected more than 25 petitions per event.

9. The League relies exclusively on volunteers for petition collection. It does not use paid circulators, nor does it have permanent staff to collect petitions.

10. Volunteers are critical to the League's mission in other ways as well. Volunteers assist the League with hosting petition gathering events and with media outreach. At a typical event, for example, there are generally fifteen League volunteers and members there to facilitate proceedings. The League hosts large-scale events on certain holidays such as the Fourth of July, when the public's sense of civic duty is high and folks are in high spirits. We also host regional events around, for example, Veterans Day and Christmas, to gather folks from towns and surrounding rural counties in one place. Doing so has allowed us to boost the number of volunteers available to collect petitions for us.

11. Before HB 1205's passage, the League was collecting petitions in support of two ballot initiatives: the Provide Medicaid Coverage to Eligible Low-Income Adults Initiative, sponsored by Florida Decides Healthcare, and the Right to Clean and Healthy Waters Initiative, sponsored by Right to Clean Water.

12. The League had mobilized hundreds of volunteers and members to distribute, collect, and deliver petitions in support of these two initiatives, and had collected more than one-thousand petitions on behalf of each initiative. The League and its volunteers and members had worked hard to collect petitions and had planned to continue collecting petitions in support of these initiatives. The League had held trainings for League members to educate them about the initiatives and provided talking points on why the initiatives were important to the mission of the League and the constituents it serves.

### *HB 1205's Impact on the League: Diversion of Resources*

13. HB 1205 has placed significant burdens, both directly and indirectly, on the League's ability to carry out its mission-driven work.

14. After HB 1205 passed, but before it went into effect, the League spent a tremendous amount of time and energy educating its members, volunteers, and the public about HB 1205 and speaking out against HB 1205 through press conferences. We also spent significant time and energy collaborating with our allies on a strategy to combat HB 1205 and mitigate its effects.

15. These efforts diverted between 20–50% of my attention away from my duties as Co-President and diverted the League from efforts that advance its mission. As a result, I could no longer devote time I usually spent assisting with applications for grants that fund the League's operations and various projects. I have personally secured a $120,000 grant on behalf of the League and have been significantly involved with other League members in writing and securing grants for the League; as just one metric, I have heavily assisted with securing over half a million dollars in funding over the past 6 to 7 years alone. The League lost out on working on several grant opportunities because of HB 1205. This appears clear from the numbers; for example, from May 2024 to May 2025, the League's education account dropped by $161,256. This has, in turn, limited funding available for League events, internships, and other programming.

16. My colleagues were also forced to divert their attention to dealing with HB 1205. For instance, other League leaders worked hard to find ways to educate our members about HB 1205. This entailed connecting members with trainings and educational materials on HB 1205.

17. But for HB 1205, the League would have instead focused its efforts on other important issues and functions, such as working with people who have felony convictions to get their voting rights restored. HB 1205 has significantly hindered

the League's efforts to assist these individuals because the resources here—time and money—were instead used to address HB 1205.

*Eligibility Requirements: Wholesale Exclusions*

18. HB 1205's wholesale exclusion of non-Florida residents, non-citizens, and individuals with felony convictions who have not had their rights restored from collecting petitions have severely limited the number of volunteers on which the League can rely for petition circulation efforts. Without these volunteers, it will be even more difficult to host petition-gathering events or engage in voter outreach.

19. The League relies on members with felony convictions to "bridge the gap" between the League and the communities of which these members are part. HB 1205's categorical ban on these members' participation in petition circulation collapses that bridge.

20. Furthermore, the League has had tremendous support from non-resident members over the years. The League can no longer rely on these members because of HB 1205's non-resident ban. Many of the League's volunteers are "snowbirds," who split their time between Florida and another state. The League also relies on members from other states to support its efforts. The League has significantly reduced its reliance on "snowbirds" to avoid criminal liability and harm to its volunteers.

21. I have personal knowledge of four to five non-resident members who regularly traveled to Florida to assist with registering voters and circulating petitions. For example, in past cycles, a non-resident member and his daughter have traveled to Florida and donated a week of their time to assist with registering voters and petition circulation. Another non-resident member from California will also no longer be traveling to Florida to help the League with circulating petitions because of HB 1205. Still others reside in Canada and travel to Florida on occasion to help with the League's efforts. HB 1205's non-resident ban has eliminated our ability to rely on dedicated members like these volunteers.

22. Some members also lack U.S. citizenship. Several League member-volunteers are permanent residents of the U.S. without citizenship. These volunteers have collected petitions on behalf of the League before, but now cannot because of HB 1205. Furthermore, non-citizen League members and volunteers across the state, particularly in southern Florida, would assist by bridging the language barrier between local communities and the League. Non-citizen members have cultural ties and language skills that the League relies heavily on to connect with Florida's Asian, Hispanic, and Haitian communities, which it is hindered in accomplishing because of HB 1205's non-citizen ban. Non-citizen League members and volunteers are trusted sources of information for their community, but HB 1205 has made it more difficult to build and maintain trust in the

community because non-citizen members and volunteers can no longer help the League gather petitions in those communities.

23. By excluding each of these groups, HB 1205 narrows the pool of volunteers the League can rely on to support its petition-collection efforts, and it further stretches the League's resources thin, forcing us to divert resources to try and replace these volunteers.

24. The exclusions also limit the communities of voters the League can reach. For instance, the League has many volunteers from Florida's immigrant communities, including members of the Cuban and Haitian communities. Many members of those communities are citizens, but some do not speak English. The League's non-citizen volunteers are often the only ones with the language skills to discuss petitions with members of these communities and answer their questions. By excluding non-citizens from the petition gathering process, HB 1205 severs the League's connections to these communities.

*Enactment of HB 1205 & Decision to Stop Circulating Petitions*

25. The League's executive team made the decision to completely stop circulating petitions on July 1, 2025, the day HB 1205 went into effect. Before July 1, 2025, the League had followed the lead of sponsors of the initiative petitions: the League stopped collecting petition for Florida Right to Clean Water before July 1 and continued collecting petitions for Florida Decides Healthcare right until July 1,

when Florida Decides Healthcare told all its volunteers, and in turn the League's volunteers, to stop circulating petitions and instead distribute empty forms to avoid potential criminal or civil liability under HB 1205.

26. A significant factor in the League's decision to stop petition circulation was the concern that its members and volunteers would potentially be subject to criminal liability under HB 1205's vague criminal provisions. We were driven by a deep concern for our volunteers' and members' safety. In voting against continuing our petition circulation efforts, our leaders voted to protect our volunteers and members from criminal liability for good faith mistakes. Our leaders also weighed and considered HB 1205's 10-day return deadline, which exponentially increases costs of petition-gathering.

27. The League was also concerned for its members and volunteers' privacy and safety, since they would be required to give out their private information under HB 1205. HB 1205 requires League members and volunteers to attach a signed affidavit to each petition form they collect, listing their name and permanent address, which will become public record and searchable online. Those who fail to do so face criminal liability. This is a new burden that League members and volunteers will have to face that would subject them to criminal liability if they accidentally forget to attach or sign an affidavit. Furthermore, given the

demographic of the League's members volunteers, the privacy concerns are especially daunting.

28. As mentioned, the League's volunteers and members are unpaid, and the majority of the League's demographic consists of vulnerable populations whose age average in the mid-70s, including seniors, some of whom are in assisted living and/or require transportation assistance on a day-to-day basis. Yet, to fight for democracy, the League's volunteers circulate petitions and engage in debates at private and public events. On average, at public, on-the-street events, there are attendees who are unwell or dangerous such that volunteers would feel unsafe revealing any personal information. To ask these volunteers to give up their names and address and/or subject themselves to potential criminal or civil liability is an outrage and places them at risk.

### *Effects of the 10-Day Deadline*

29. The 10-day deadline diverts resources from necessary organizational activities such as grant-writing and petition collection because, to comply with the new deadline and avoid risking fines that would *further* strain the League's finances, the League must change its practice of mailing out petitions from once or twice every month to once or twice *a week*. Postage is incredibly expensive and is covered by local Leagues. A substantial portion of the local Leagues' funding is used for postage costs. Now, to comply with the deadline, the League must divert

even more money to address the disproportionately large postage fee of overnight and other expedited forms of mail, displacing money that would have otherwise been used to further the League's mission. Furthermore, League members and volunteers will have to spend more in gas money to drive petitions to the Supervisor of Elections.

30. In addition to financial costs, there are heightened administrative costs implicated by the 10-day deadline. Were we to circulate petitions again, League chapters would be forced to spend increased time going to the post office or the campaign office on a near-constant basis, displacing time they could have dedicated to grant-writing efforts, hosting petition circulation events, and hosting other trainings and educational programming.

31. Based on my experience, the 10-day deadline will actually *increase* the number of petitions with incorrect information. Prior to HB 1205's enactment, the League regularly discovered that 8–10% of petition forms required follow-up with voters. As one example, sometimes the voter misreads "county" as "country." As another example, voters have accidentally provided incorrect information on petitions at League events hosted in a county in which they do not live. Those same individuals are now required to arrange plans and travel within 10 days to cure their forms, or submit the petition with the incorrect information. The League had fully utilized each day of the 30 days we were previously allocated under the law

to reach out to voters who made such mistakes and arrange for them to meet with the League to fix and submit a corrected petition. That work is impossible to complete within HB 1205's 10-day deadline. Also, for example, when the League hosts large public events and collects petitions signed by voters from surrounding rural counties, the League is required to transport those signed petitions *back* to the voter's rural county to submit it to the proper Supervisor of Elections office. This often requires long drives that are typically an hour long, and under the new deadline, such feats are unfeasible, and ultimately this will increase the number of erroneous petitions submitted by the League.

32. This lost opportunity to have voters correct their petition forms results in more petitions with incorrect information because the League is required to turn in such petitions even if the information is incorrect. The League has no authority to hold back petitions it *knows* are erroneous or incomplete; it must mail in all signed petitions even if the League knows they will be rejected. Given that League members could face potential criminal liability for a vague and undefined number of "irregularities" that may occur in petition circulation, including submitting too many petitions with incorrect information, League members are rightfully in fear of engaging in petition circulation post-HB 1205.

33. Furthermore, the League must expend additional resources to avoid mistakes, such as accidentally mailing signed petitions to the incorrect county. This

means the League must not only mail signed petitions on a continuous basis but also ensure that each batch is properly separated and going to the correct county.

34. Based on my years of experience doing this work, the 10-day deadline will almost certainly result in more petitions with incorrect information and/or petitions that are rejected.

*Conclusion*

35. Both individually and together, HB 1205's requirements have made it impossible for the League to support petition-collection efforts without risking substantial fines and fees, criminal investigation, and potential criminal liability for its volunteers and members. It is my belief that HB 1205 is negatively impacting League volunteer recruitment and retention: I have drawn in innumerable League members and volunteers by hosting petition circulation events and engaging in petition circulation activities through the League. Thus, due to HB 1205's new restrictions which prevent me from engaging in usual League responsibilities because I am diverting resources to combating HB 1205, I can no longer personally recruit new volunteers and members, resulting in lost opportunities for the League's growth. We have lost the opportunity to inspire our community through person-to-person outreach and ultimately it has been much harder to recruit volunteers.

36. The League's members and volunteers pride themselves in advocating for direct democracy and initiating conversations with voters and the community while circulating petitions. Because of HB 1205's limitations on who can become petition circulators, people who may be interested in joining the League for those very reasons are no longer allowed to do so. And in turn, this decreases the League's ability to recruit and keep members and expand its membership. Lastly, since the League can no longer engage in petition circulation due to HB 1205, the League must develop programs and activities for its existing members to facilitate outreach and education in the field. Time and financial resources devoted to those tasks prevents us from working on obtaining additional funding.

37. As a result of the severe burdens imposed on the League by HB 1205, the League discontinued all petition collection efforts on July 1, 2025.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this _28th_ day of _October 2025__ in Tampa, FL.

Cecile Scoon, Former Co-President
League of Women Voters of Florida