## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

LEAGUE OF WOMEN VOTERS OF
FLORIDA, *et al.*,

               Intervenor-Plaintiffs,

     v.

CORD BYRD, *et al.*,

             Defendants.

No.: 4:25-cv-00211-MW-MAF

## INTERVENOR-PLAINTIFFS' OPPOSITION TO
## THE SECRETARY AND ATTORNEY GENERAL'S
## <u>MOTION FOR SUMMARY JUDGMENT</u>

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION .................................................................... 1

STATEMENT OF FACTS ...................................................... 3

    A.   HB1205 Imposes Categorical Bans. ................................ 4

    B.   HB1205's Petition Circulator Requirements Limit Speech
        and Deter Organizational Participation. ........................... 5

    C.   HB1205 Enforces a Strict, Ten-Day Deadline, While Harshly
        Penalizing Mistakes. ..................................................... 7

    D.   HB1205 Imposes Criminal Liability for Failure to Comply
        with Broad, Vaguely Worded Provisions. ........................ 8

    E.   HB1205 Imposes Fines That Undermine Plaintiffs'
        Partnerships with Sponsor Organizations. ....................... 9

    F.   The Evidence Contradicts Defendants' Proffered
        Justifications for HB1205's Restrictions ......................... 10

LEGAL STANDARD ........................................................... 11

ARGUMENT ........................................................................ 12

  I.    PLAINTIFFS SUFFICIENTLY DEMONSTRATE STANDING ........ 12

  II.   THE RECORD PRECLUDES SUMMARY JUDGMENT .................. 19

    A.   Triable Issues of Fact Remain as to Plaintiffs' Free-Speech
        Claims (Count I).......................................................... 19

        1.   Categorical Bans ................................................ 20

        2.   Pre-Registration and Affidavit Requirements ....... 23

        3.   Criminal Provision and OECS Investigation ......... 26

        4.   Ten-Day Return Timeline and Fines ..................... 27

B.    Plaintiffs' Have Raised Triable Issues Regarding Their
Freedom-of-Association Claim (Count II)..................................... 28

C.    Defendants Are Not Entitled to Summary Judgment on
Plaintiffs' Vagueness Claims (Count III)....................................... 29

D.    Defendants Are Not Entitled to Summary Judgment on
Plaintiffs' Overbreadth Claim (Count IV). ................................... 31

E.    Defendants Are Not Entitled to Summary Judgment on
Plaintiffs' Equal Protection Claim (Count V)............................... 33

CONCLUSION ................................................................................................... 34

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alachua Cnty. Educ. Ass'n. v. Carpenter*,
   757 F.Supp.3d 1248 (N.D. Fla. 2024) ...........................................................12

*Ams. for Prosperity Found. v. Bonta*,
   594 U.S. 595 (2021) .......................................................................................14

*Arcia v. Fla. Sec'y of State*,
   772 F.3d 1335 (11th Cir. 2014) .............................................................12, 16

*Bernal v. Fainter*,
   467 U.S. 216 (1984) .................................................................................33, 34

*Bloedorn v. Grube*,
   631 F.2d 1218 (11th Cir. 2011) .....................................................................18

*Bluman v. FEC*,
   800 F. Supp. 2d 281 (D.D.C. 2011) ..............................................................34

*Bordelon v. Chicago Sch. Reform Bd. of Trs.*,
   233 F.3d 524 (7th Cir. 2000) .........................................................................28

*Buckley v. Am. Constitutional Law Found.*,
   525 U.S. 182 (1999) ...............................................................................*passim*

*Citizens for Police Accountability Pol. Comm. v. Browning*,
   572 F.3d 1213 (11th Cir. 2009) .....................................................................28

*Clean-Up '84 v. Heinrich*,
   759 F.2d 1511 (11th Cir. 1984) .....................................................................29

*Democratic Exec. Comm. of Fla. v. Nat'l Republican Senatorial Comm.*,
   950 F.3d 790 (11th Cir. 2020) .......................................................................21

*Fla. Action Comm., Inc. v. Seminole Cnty.*,
   212 F. Supp. 3d 1213 (M.D. Fla. 2016) ...................................................29, 31

*Fla. Decides Healthcare, Inc. v. Fla. Sec'y of State*,
2025 U.S. App. LEXIS 23431 (11th Cir. Sept. 9, 2025) ...............................22, 23

*Fla. State Conf. of Branches & Youth Units of the NAACP v. Byrd*,
680 F.Supp.3d 1291 (N.D. Fla. 2023) ...................................................34

*Fla. State Conf. of NAACP v. Browning*,
522 F.3d 1153 (11th Cir. 2008) ...........................................................17

*Gale Force Roofing & Restoration v. Brown*,
2021 WL 4958101 (N.D. Fla. June 29, 2021) .....................................18

*Greater Birmingham Ministries v. Sec'y of State of Ala.*,
992 F.3d 1299 (11th Cir. 2021) ...........................................................12

*John Doe No. 1 v. Reed*,
561 U.S. 186 (2010) .............................................................................14

*League of Women Voters of Fla., Inc. v. Lee*,
2021 WL 7209574 (N.D. Fla. Dec. 17, 2021) .....................................12

*League of Women Voters of Fla., Inc. v. Lee*,
576 F. Supp. 3d 1004 (N.D. Fla. 2021) .................................12, 16, 17

*League of Women Voters of Fla., Inc. v. Lee*,
566 F. Supp. 3d 1238 (N.D. Fla. 2021) ...............................................19

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .............................................................................12

*Meyer v. Grant*,
486 U.S. 414 (1988) .....................................................................*passim*

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) .......................................................................31, 32

*OPAWL v. Yost*,
118 F.4th 770 (6th Cir. 2024) ..............................................................34

*Pierce v. Jacobsen*,
44 F.4th 853 (9th Cir. 2022) ................................................................21

*Reno v. ACLU*,
    521 U.S. 844 (1997)..........................................................................26

*Turner Broad. Sys., Inc. v. F.C.C.*,
    512 U.S. 622 (1994)..........................................................................23

*United States v. Hansen*,
    599 U.S. 762 (2023)..........................................................................32

*United States v. Stevens*,
    559 U.S. 460 (2010)..........................................................................31

*Univ. of Texas v. Camenisch*,
    451 U.S. 390 (1981)..........................................................................28

*Vital Pharms., Inc. v. Alfieri*,
    2022 WL 1450042 (S.D. Fla. May 9, 2022)......................................13

*Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*,
    536 U.S. 150 (2002)..........................................................................24

*Weaver v. Bonner*,
    309 F.3d 1312 (11th Cir. 2002) ........................................................17

*Wollschlaeger v. Gov, Fla.*,
    848 F.3d 1293 (11th Cir. 2017) ........................................................15

**Statutes**

Fla. Stat. § 19.071 ...................................................................................6

Fla. Stat. § 99.097 .................................................................................25

Fla. Stat. § 100.371 (3)(a) (2022) ..........................................................24

Fla. Stat. § 100.371(3)(d)(1) ....................................................................6

Fla. Stat. § 100.371(3)(e) ..........................................................................6

Fla. Stat. § 100.371(4)(a) ..........................................................................5

Fla. Stat. § 100.371(4)(b).....................................................................4, 23

Fla. Stat. § 100.371(4)(c) ..........................................................................5

Fla. Stat. § 100.371(7)(a) ...........................................................................7

Fla. Stat. § 100.371 (7)(a)(3) ......................................................................8

Fla. Stat. § 100.371(7)(b)(8) .......................................................................8

Fla. Stat. § 100.371(8) ...............................................................................30

Fla. Stat. § 100.371(9) .................................................................................8

Fla. Stat. § 100.371(14)(d) ..........................................................................8

Fla. Stat. § 100.371(14)(g)-(h) .....................................................................8

Fla. Stat. § 100.371(b)(9) ...........................................................................30

Fla. Stat. § 104.185(2) ............................................................................8, 30

Fla. Stat. § 119.011(12) ...............................................................................6

Fla. Stat. § 895.02(8)(d) ..............................................................................8

**INTRODUCTION**

The Supreme Court has long held that petition circulation involves "core political speech" because it involves "interactive communication concerning political change." *Meyer v. Grant*, 486 U.S. 414, 422 (1988).  If regulations on petition circulation "significantly inhibit" such communications, they are subject to exacting, or strict, scrutiny.  *Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182, 192, 192 n.11 (1999).

House Bill 1205 ("HB1205") unquestionably meets this standard.  Its provisions, individually and collectively, appear tailor-made to frustrate petition collection efforts and thus eliminate direct democracy in Florida.  It prohibits persons who are not citizens or Florida residents, such as college students or snowbirds, from collecting petitions.  It requires volunteer circulators who collect more than 25 petitions to identify themselves by name and address in publicly accessible documents, opening themselves up to retaliation and harassment.  It demands that every signed petition be sent to election officials within 10 days despite the series of often onerous steps involved in doing so.  And it enforces these constraints—many of which are described in vague, sometimes inscrutable language—with a series of criminal penalties for "offenders," including felony convictions and heavy fines.

All of this led Plaintiff League of Women Voters of Florida ("LWVFL") to halt its long-standing volunteer petition circulation programs, and Plaintiff League

of United Latin American Citizens of Florida ("LULAC") to forestall its efforts to engage in volunteer petition collection to support the Florida Decides Healthcare Petition. And, finding themselves unable to engage in protected First Amendment activity so foundational to the democratic process in an election year, both LWVFL and LULAC (together, "Plaintiffs") brought this suit.

Defendants Secretary of State and Attorney General have now filed a Motion for Summary Judgment ("Motion") against LWVFL and LULAC on nearly all claims.[1]  ECF 474.  The Motion is largely a rehash of their perfunctory motion to dismiss and, like that pleading, is a mile wide (at the mouth) but barely an inch deep. Notably missing from the Motion, and the record, are reasons justifying HB1205's draconian measures. Defendants proffer no evidence of problems with petition circulation originating with volunteers, non-citizens, persons with felony convictions, or (with a few irrelevant exceptions) non-residents.  Nor do they explain how the previous, less-restrictive 30-day deadline for submitting petitions was inadequate.

HB1205's prohibitions, penalties, and requirements implicate constitutional protections, and Defendants have failed to provide adequate justification for those

---

[1] Defendants do not challenge Plaintiffs Cecile Scoon and Debra Chandler's standing to challenge HB1205.  Nor could they.  Scoon and Chandler have been directly harmed by HB1205.  *See* ECF 174-4 ¶¶ 14–23; Chandler Decl. ¶¶ 14–23.

provisions. Consequently, Defendants cannot demonstrate that there are no triable issues of material fact, and they are not entitled to summary judgment.

## STATEMENT OF FACTS

Since its inception in 1939, LWVFL has advanced civic engagement with the democratic process. ECF 520-1 ("Lowe-Minor Decl.") ¶¶ 3–4. As part of that mission, it has long facilitated participation in petition circulation. *Id.* ¶ 4. Since its founding in 1951, LULAC has been one of the most active Latinx civil rights organizations in Florida, particularly in areas involving voter registration and access to the ballot. ECF 520-2 ("Proaño Supp. Decl.") ¶ 2. Facilitating access to volunteer opportunities, including to volunteer- and organization-led petition circulation activities, is key to advancing LULAC's organizational mission. Proaño Supp. Decl. ¶¶ 6–7. LULAC members, including non-citizens, have gathered petitions for initiatives prior to 2025. ECF 520-3 ("Patricio Decl.") ¶¶ 6, 8–9; ECF 520-4 ("Medrano Decl.") ¶ 4.

Given the serious risks HB1205's passage and enforcement posed to Plaintiffs and their members, LWVFL placed a moratorium on all organization-led petition circulation, and LULAC likewise halted plans to engage in organization-led petition circulation. Lowe-Minor Decl. ¶ 11; Proaño Supp. Decl. ¶ 36. Those risks included the possibility of criminal liability arising from hard-to-understand laws. Lowe-Minor Decl. ¶¶ 12–13; Proaño Supp. Decl. ¶ 36. Further, Plaintiffs could not, in

good conscience, encourage participation in petition circulation knowing that their members would be forced to assume risks to their personal safety from, *inter alia*, making their home addresses public alongside information on (often controversial) causes they support. Lowe-Minor Decl. ¶ 13; Proaño Supp. Decl. ¶ 36. Absent HB1205, both Plaintiffs had concrete plans to circulate petitions in support of ballot initiatives this year. *See* ECF 174-1 ("Second LWVFL Decl.") ¶ 12, 16–18; Proaño Supp. Decl. ¶ 10.

Before Plaintiffs halted their plans for petition circulation, they were forced to divert staff and volunteer hours to interpret HB1205's provisions, consult with counsel, and update compliance review processes for petition forms. Lowe-Minor Decl. ¶¶ 7–10; Second LWVFL Decl. ¶¶ 45–48; Proaño Supp. Decl. ¶ 30. These resources would have otherwise been spent supporting volunteers, educating the public, and funding other initiatives that are core to Plaintiffs' missions. Lowe-Minor Decl. ¶¶ 7–10; Second LWVFL Decl. ¶¶ 45–48; Proaño Supp. Decl. ¶ 30.

Having been forced to shutter petition circulation, Plaintiffs now challenge the provisions of HB1205 set forth below (collectively, the "Challenged Provisions") on behalf of themselves and their members.

### A.    HB1205 Imposes Categorical Bans.

HB1205 creates a categorical ban on all non-citizens, non-residents, and individuals convicted of a felony who have not had their voting rights restored from

"collect[ing] signatures or initiative petitions." *See* Fla. Stat. § 100.371(4)(b). LWVFL has historically relied, and going forward Plaintiffs intended to rely, on individuals from each of these categories to advance their missions. *See, e.g.*, Lowe-Minor Decl. ¶¶ 15–18; ECF 278 ("Scoon Prelim. Inj. Hr'g Tr.") 83:21–24; ECF 520-5 ("Gonzalez Decl.") ¶¶ 4–5; ECF 520-6 ("Poff Decl.") ¶ 2; Proaño Supp. Decl. ¶¶ 14–19, 27; Patricio Decl. ¶¶ 9–11.

These categorical bans also prevent Plaintiffs from associating with individuals within these groups who believe in their missions. The excluded groups now not only cannot volunteer to circulate petitions, but also cannot participate in petition circulation events with other members or help recruit energetic new volunteers from the excluded groups. Lowe-Minor Decl. ¶¶ 16–18, 20–22; Proaño Supp. Decl. ¶ 27. Crucially, they now also cannot serve as conduits between Plaintiffs and communities that Plaintiffs cannot otherwise reach. Second LWVFL Decl. ¶¶ 32–35; ECF 520-7 ("Third LWVFL Decl.") ¶¶ 18–24; Proaño Supp. Decl. ¶ 19; Patricio Decl. ¶ 10.

### B. HB1205's Petition Circulator Requirements Limit Speech and Deter Organizational Participation.

HB1205 expands the definition of "petition circulator" to all volunteers who collect, deliver, or physically possess more than 25 signed petitions from persons outside of their families. *See* Fla. Stat. § 100.371(4)(a). Every circulator must register with the State—which requires, *inter alia*, providing one's permanent

5

address to the Secretary of State. *See* Fla. Stat. § 100.371(4)(c). Further, all "petition circulators" must attach a signed affidavit to each petition form they collect, listing their name and permanent address. *See* Fla. Stat. §§ 100.371(3)(d)(1), 100.371(3)(e). Both the affidavit and registration forms are public records. Fla. Stat. § 119.011(12). Those who inadvertently fail to meet the registration requirements face felony liability. Fla. Stat. § 100.371(3)(e).

Plaintiffs have members that historically collected more than 25 signed petitions for an initiative. *See, e.g.*, Second LWVFL Decl. ¶ 6; Third LWVFL Decl. ¶ 8; ECF 174-03 ("Chandler Decl.") ¶ 10; Lowe-Minor Decl. ¶ 5; Medrano Decl. ¶ 4. Under HB1205, these members must now register as circulators to do so in the future—a process replete with costs and risks. Requiring members to spend time preregistering has eliminated Plaintiffs' ability to recruit new volunteers through brief in-person engagement (e.g., at petition-gathering events) and dramatically reduced the number of member volunteers. *See, e.g.*, Lowe-Minor Decl. ¶¶ 20–22; Patricio Decl. ¶ 10. Some members will not register given the personal safety risks—particularly those associated with publicly exposing one's name and permanent address alongside controversial political causes. ECF 520-8 ("Davis Decl.") ¶ 11; Proaño Supp. Decl. ¶ 24. This includes members whose addresses are otherwise meant to be protected from public disclosure by Florida law, but whose addresses may nonetheless be exposed where an employee applying the Florida

Public Records Law fails to identify or apply redactions. *See generally* Fla. Stat. § 19.071; Lowe-Minor Decl. ¶¶ 24–27. These protections were enacted in recognition of the fact that such disclosure could place public officials' and their families' lives at risk. *See* Florida Staff Analysis, S.B. 268, 3/31/2025 ("It protects sensitive, personal information, the release of which would . . . jeopardize the individual's safety."). Others will not register out of principle, believing they should not be forced to seek the State's permission before they speak. Lowe-Minor Decl. ¶ 27; Proaño Supp. Decl. ¶ 24; Medrano Decl. ¶ 9.

### C.    HB1205 Enforces a Strict, Ten-Day Deadline, While Harshly Penalizing Mistakes.

HB1205 requires that each signed petition form be submitted to the supervisor of elections in the county where the voter resides (regardless of where the petition is actually signed) within ten days of its signing (shortened from the previous 30). *See* Fla. Stat. § 100.371(7)(a). LWVFL already conducts a multi-step process to ensure it submits only valid forms: (1) members collect signed petitions; (2) members deliver signed petitions to their local League point-person; (3) that point-person performs quality control and either mails or physically drops off the signed petitions at the sponsor's local office; (4) the sponsor's local office delivers the signed petitions to the sponsor's primary office; and (5) the sponsor mails the petitions to the appropriate supervisors of elections. Lowe-Minor Decl. ¶ 28. The new ten-day deadline "makes it impossible for the [LWVFL] to conduct adequate compliance

checks" and "guarantees that [LWVFL] will be forced to turn in at least some petition forms that are incomplete or incorrectly completed." Second LWVFL Decl. ¶¶ 41–42; Third LWVFL Decl. ¶ 31; Lowe-Minor Decl. ¶ 30. Alternatively, petitions will be turned in late and may not count, thus silencing the free-speech rights of those who attempted to fill out and sign the petition. Lowe-Minor Decl. ¶ 30.

But submitting forms with incorrect information carries its own risks because Plaintiffs have no authority to hold back petitions it *knows* are erroneous or incomplete and must mail in all signed petitions, and it is unclear whether those petitions with incorrect information are considered "invalid forms" under HB1205. Third LWVFL Decl. ¶ 32. HB1205 subjects organizations *and* individuals that turn in a threshold percentage of "invalid forms"—including late forms, even if inadvertently—to investigations by the Office of Election Crimes ("OECS") and the Secretary. *See* Fla. Stat. §§ 100.371(14)(d), 100.371(14)(g)–(h), 895.02(8)(d). The threat of government investigation for inadvertent mistakes has led members to stop circulating petitions. *See* Lowe-Minor Decl. ¶ 30.

### D.    HB1205 Imposes Criminal Liability for Failure to Comply with Broad, Vaguely Worded Provisions.

Under HB1205, Plaintiffs' members can be charged with third-degree felonies for: (1) filling in missing information on a petition on behalf of a sponsor, Fla. Stat. §§ 100.371(7)(b)(8), 104.185(2), and (2) retaining a voter's personal information—regardless of intent. Fla. Stat. § 100.371(9).

Historically, LWVFL members have helped disabled individuals fill out arguably "missing" information in their forms; for example, a voter with a hand tremor unable to complete his form without dictating it. Lowe-Minor Decl. ¶¶ 31–32. LWVFL has arguably "retain[ed]" voters' contact information during the circulation process via volunteer sign-up forms. Lowe-Minor Decl. ¶¶ 33–34. LULAC has retained voters' contact information to notify them of curable issues with their ballots. Proaño Supp. Decl. ¶ 31. It is unclear whether HB1205 criminalizes acts like these; because they cannot be confident that such actions are legal, Plaintiffs are effectively barred from doing them. Lowe-Minor Decl. ¶ 34; Proaño Supp. Decl. ¶ 31. Indeed, members have already ceased participating in petition circulation because of these provisions. *See, e.g.*, Chandler Decl. ¶¶ 12–13; Proaño Supp. Decl. ¶ 31.

### E.    HB1205 Imposes Fines That Undermine Plaintiffs' Partnerships with Sponsor Organizations.

HB1205 also imposes fines on sponsor groups for petitions received after the ten-day return deadline or sent to the wrong county and for petition circulators who fill in missing information or who pre-fill information. HB1205 § 6, 2025 Leg. (Fla. 2025). While Plaintiffs are not sponsors, Plaintiffs work closely with sponsors to advance shared goals, and mistakes by Plaintiffs' members are imputed on sponsor organizations for purposes of this provision. Lowe-Minor Decl. ¶¶ 35–38; Proaño Supp. Decl. ¶¶ 31–32. These provisions risk damaging relationships between

Plaintiffs and sponsor organizations, making it harder for Plaintiffs to advance their missions.  Lowe-Minor Decl. ¶¶ 12, 35–38; Proaño Supp. Decl. ¶¶ 31–32.

### F. The Evidence Contradicts Defendants' Proffered Justifications for HB1205's Restrictions

Defendants argue that it is undisputed that "there's petition fraud in Florida's citizen-initiative process."  Mot. 5.  But every "fact" Defendants point to is disputed or irrelevant.  Moreover, Defendants fail entirely to address whether there are less-burdensome means for achieving the State's purported goals.

Plaintiffs dispute that non-citizens and non-residents are "'difficult to locate and investigate,'" which Defendants supposedly argue is justification for the categorical bans.  Mot. 5 (citing ECF 470-4 at 6).  Members falling within these categories often maintain close ties to their communities in Florida and maintain regular contacts with Plaintiffs. Lowe-Minor Decl. ¶¶ 16–19; Medrano Decl. ¶ 10. Plaintiffs further dispute that "[t]wo non-citizens [who] have been arrested [for voting]" (ECF 470-1 at 26)—*not* for petition circulation fraud—has any bearing here, much less as justification for a categorical ban on First Amendment activity by all non-citizens.  Critically, Defendants cite no evidence of petition fraud committed by any non-citizen, and Defendants' own declarant is "unaware of any investigations involving non-citizen petition circulators."  ECF 267-2 ¶ 17.

Plaintiffs dispute that "issues [pertaining to alleged fraud] are magnified for volunteer circulators[.]"  Mot. 6.  Defendants offer a passing reference to "several

duplicate petition signatures" allegedly submitted by volunteers, ECF 470-4 ¶ 16, but provide no further details on the incident. *See generally id.* Defendants' remaining record evidence—which relates exclusively to paid circulators (*see generally* ECFs 470-1, 470-2, 470-3, 470-5, 470-6, 470-7)—is irrelevant. There is no dispute on this record that ***volunteer*** circulators—the only circulators at issue here—have never been convicted of petition fraud.

Tellingly, when Supervisor of Elections Mark Earley was asked whether, in his nearly decade-long tenure, he knew of supervisors validating petitions with fraudulent signatures, he replied in the negative. *See* Ex. 520-9 (Earley Dep. Tr.) at 54:24–55:6. When asked whether he knew of a *single* instance in which a voter alleged that their signature had been forged on a validated petition, Mr. Earley confirmed that he did not. *Id.* at 54:2–18. Nor have Plaintiffs ever heard of any volunteer or member being charged with committing petition fraud. *See* Lowe-Minor Decl. ¶ 6; Medrano Decl. ¶ 8.

## LEGAL STANDARD

A movant is entitled to summary judgment only when no material fact is in dispute and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). To establish standing, Plaintiffs must show: (1) that they have suffered an injury-in-fact; (2) that is traceable to Defendants; and (3) can likely be redressed by a favorable ruling. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). The

11

standing inquiry ends once a single Plaintiff demonstrates standing for each challenged statutory provision. *Alachua Cnty. Educ. Ass'n. v. Carpenter*, 757 F.Supp.3d 1248, 1254 (N.D. Fla. 2024). Plaintiffs may assert injury-in-fact through either organizational or associational standing. *League of Women Voters of Fla., Inc. v. Lee*, 576 F. Supp. 3d 1004, 1009 (N.D. Fla. 2021) (Walker, J.). Here, Plaintiffs are proceeding under both theories.[2]

## ARGUMENT

## I.    PLAINTIFFS SUFFICIENTLY DEMONSTRATE STANDING

Relying primarily on the Court's preliminary injunction order, *see* ECF 283, Defendants suggest—in a phrase that manages to be both vague and cavalier—that Plaintiffs "have some standing issues." Mot. 9. We think Defendants are asserting that Plaintiffs lack standing because (1) they have not identified harm to individual members, and/or (2) they have not shown harm to the organization itself. The record here demonstrates just the opposite.[3]

---

[2] This Court is familiar with the relevant standards for organizational and associational standing. *See, e.g.*, *League of Women Voters of Fla., Inc. v. Lee*, 2021 WL 7209574, at *1 (N.D. Fla. Dec. 17, 2021) (citing *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014)); *Greater Birmingham Ministries v. Sec'y of State of Ala.*, 992 F.3d 1299, 1316 (11th Cir. 2021). As such, Plaintiffs do not repeat them here.

[3] Defendants also challenge Plaintiffs' showing as to redressability with respect to the OECS investigation provision. *See* Mot. 9. That argument is similarly meritless. *See infra* at 18–19.

***HB1205's Categorical Bans***: Defendants wrongly assert that Plaintiffs lack standing because they have not produced any evidence that any non-residents, non-citizens, or returning citizens are members of their organizations and had plans to circulate petitions.  Mot. 7.  In fact, Plaintiffs' membership includes all three categories, each with concrete plans to collect petitions but for HB1205.  LWVFL members, including Cecilia Gonzalez (non-citizen) and Christine Poff (non-resident) are barred from participating as petition circulators and, absent HB1205, would have actively circulated petitions.  *See* Gonzalez Decl. ¶¶ 4–6, 9; Poff Decl. ¶ 5.  The same goes for LULAC members.  Proaño Supp. Decl. ¶¶ 15–18; Patricio Decl. ¶¶ 9, 17.

Plaintiffs are directly harmed too.  Both LWVFL and LULAC rely on non-citizen, non-resident, and returning citizen members to circulate petitions.  *See* Proaño Supp. Decl. ¶¶ 15–18; Scoon Prelim. Inj. Hr'g Tr. at 83:21–24; ECF 93-1 ("First LWVFL Decl.") ¶ 23; Gonzalez Decl. ¶¶ 4–6 (non-citizen member); Poff Decl. ¶ 2 (non-resident member).  HB1205's categorical bans prevent them from engaging such members in their mission-driven work, drastically limiting their ability to reach voters.  Third LWVFL Decl. ¶ 18; Proaño Supp. Decl. ¶ 15.

***Pre-Registration and Affidavit Requirements***: Defendants wrongly point to the Court's findings at the preliminary injunction stage regarding these provisions to support their arguments.  Mot. 7.  Those determinations are not binding at the

summary judgment stage.  *See Vital Pharms., Inc. v. Alfieri*, 2022 WL 1450042, at *3 (S.D. Fla. May 9, 2022).  In any event, Plaintiffs have standing, as demonstrated by the evidence generated since the Court's preliminary injunction ruling.

Plaintiffs' members are directly harmed by HB1205's pre-registration and affidavit requirements.  Members have historically collected, and absent HB1205, *would continue* to collect, more than 25 petitions.  *See, e.g.*, Second LWVFL Decl. ¶¶ 27–31; Chandler Decl. ¶ 10; Davis Decl. ¶¶ 5–6.  But members are unwilling to register as circulators given the risks involved: members have experienced threats and harassment related to initiative petition advocacy, including on issues concerned in this litigation.  Davis Decl. ¶¶ 7–11, 13; Scoon Prelim. Inj. Hr'g Tr. 97:4–18.  It is thus reasonable for LWVFL's members to fear disclosing their names, addresses, and the causes they support to the public.  *See Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021) (ruling on the merits that evidence of threats and retaliation against some donors resulting from a donor-disclosure requirement established First Amendment harm, even if only some registrants feared disclosure).[4]

----

[4] This Court has previously suggested that Plaintiffs may not base a reasonable fear of harassment on threats related to advocacy on more controversial issues that are not the subject of any active ballot initiatives (e.g., abortion).  ECF 283 at 7 n.7 (citing *John Doe No. 1 v. Reed*, 561 U.S. 186 (2010)).  Plaintiffs respectfully submit that the Supreme Court's more recent 2021 decision in *Bonta* has limited *Reed*'s applicability.  In *Bonta*, the Court struck down a California law requiring charitable organizations to disclose their donors in the face of arguments that "[c]ertain donors—like those who give to noncontroversial charities—are unlikely to be

Additionally, some members are unwilling on principle to seek the State's permission before they speak. *See, e.g.*, Lowe-Minor Decl. ¶ 27; Davis Decl. ¶ 12. The Supreme Court has recognized that Plaintiffs suffer a cognizable injury when they decide to self-censor rather than betray deeply held beliefs by registering with the State. *See Buckley*, 525 U.S. at 195–96. These limitations on members' speech are sufficient to demonstrate standing. *Wollschlaeger v. Gov, Fla.*, 848 F.3d 1293, 1305 (11th Cir. 2017) (self-censorship sufficient injury-in-fact to demonstrate standing).

Plaintiffs are directly harmed as well. LWVFL's and LULAC's core missions are directly impacted because they have had to divert resources away from core activities. First LWVFL Decl. ¶¶ 19, 22; Third LWVFL Decl. ¶¶ 13–17; Proaño Supp. Decl. ¶¶ 29, 34. With respect to LWVFL, resources have been and will continue to be diverted from efforts to obtain grants—which are central to sustaining LWVFL's core mission—to, for example, train members regarding HB1205's unlawful requirements. First LWVFL Decl. ¶ 18 (LWVFL "must now walk its volunteers through the state's circulator registration and training process" and "has

---

deterred from contributing" by the State's donor-disclosure requirement. 594 U.S. at 616. The Court instead concluded it was "irrelevant . . . that some donors might not mind—or might even prefer—the disclosure of their identities to the State," because the requirement "create[d] an unnecessary risk of chilling . . . indiscriminately sweeping up the information of every major donor with reason to remain anonymous." *Id.* at 616–17.

already held training on this topic, and fields questions about this on a daily basis."). LULAC was similarly forced to divert resources to train members regarding "risks associated with collecting petitions" due to HB1205.  Proaño Supp. Decl. ¶ 26.  This diversion of resources is sufficient to demonstrate standing. *See Arcia*, 772 F.3d at 1341–42; *Lee*, 576 F. Supp. 3d at 971.

Finally, HB1205's registration and attestation requirements also stifle Plaintiffs' ability to recruit volunteers.  Second LWVFL Decl. ¶ 36; Third LWVFL Decl. ¶ 27 (volunteers less willing to participate in petition circulation due to affidavit requirement); Proaño Supp. Decl. ¶ 27.  This chilling effect is sufficient to demonstrate standing as well.  *Lee*, 566 F. Supp. 3d at 1277.

***Ten-Day Return Timeline*:** Defendants argue that Plaintiffs lack standing to challenge these provisions "because [they] only affect petition sponsors, and Plaintiffs aren't petition sponsors."  Mot. 7.  But that misses the point.  While Plaintiffs do not pay these fines, they face reputational and associational injury therefrom, as sponsors will curtail their association with Plaintiffs if they are fined because Plaintiffs' members violate the ten-day deadline. Second LWVFL Decl. ¶ 44; Proaño Supp. Decl. ¶ 32.  And, as with other provisions of HB1205, both LWVFL and LULAC would need to divert resources from their core activities to comply with this provision and avoid fines to sponsors resulting from violations. Complying with this provision would require LWVFL to engage in almost

*continuous* delivery of signed petitions, at great cost to the organization. Third LWVFL Decl. ¶¶ 29, 33. Such funds would otherwise be allocated to LWVFL's usual voter outreach efforts. *Id.* ¶ 29. This direct diversion of resources is sufficient to establish standing. *See, e.g.*, *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1165–66 (11th Cir. 2008); *Lee*, 576 F. Supp. 3d at 982.

***Criminal Penalties***: Defendants assert that Plaintiffs have not produced any evidence that they copy or retain sensitive voter information from completed petitions, nor have they demonstrated "that copying or retaining completed initiative petitions" is "constitutionally protected activity." This misses the mark.

As an initial matter, the record shows that Plaintiffs have arguably retained sensitive voter information, such as to reach out to voters about mistakes or about further volunteer opportunities. Third LWVFL Decl. ¶¶ 31–32; Proaño Supp. Decl. ¶ 30. As for Defendants' legal argument, Plaintiffs need only show that enforcement of the provision has a chilling effect, not that the criminalized conduct is constitutionally protected. *See Weaver v. Bonner*, 309 F.3d 1312, 1318 (11th Cir. 2002) ("[T]he court will strike down the statute even though the governmental entity enforced the statute against those engaged in unprotected activities.") (citation omitted).

***Fines***: Defendants argue that Plaintiffs have standing issues for the provisions in HB1205 that impose fines for (i) fraudulently signing or filling in missing

information from completed petitions and (ii) violating the ten-day timeline provision. But again, Plaintiffs need not show that they will violate these portions of the law in order to have standing to challenge those provisions. *Gale Force Roofing & Restoration v. Brown*, 2021 WL 4958101 at *1 (N.D. Fla. June 29, 2021). Rather, Plaintiffs need only show that they are "chilled from exercising [their] right to free expression or forgo[] expression in order to avoid enforcement consequences." *Id.* (quoting *Bloedorn v. Grube*, 631 F.2d 1218, 1228 (11th Cir. 2011)). Such harm is clear from the record. The "missing information" ban impedes Plaintiffs' work assisting persons with disabilities; and Plaintiffs diverted valuable resources to educating members on HB1205's fines provisions and how to avoid them. First LWVFL Decl. ¶ 18; Proaño Supp. Decl. ¶ 26.

***OECS Investigation***: Defendants argue that Plaintiffs have failed to produce evidence establishing that their fear of investigation is objectively reasonable. Not so. Because HB1205's ten-day return requirement necessarily increases the number of incomplete or unintentionally erroneous petitions that will be submitted, fear of an investigation where more than 25% of forms returned are invalid is entirely reasonable. *See* Second LWVFL Decl. ¶ 43; Third LWVFL Decl. ¶ 32; Chandler Decl. ¶ 27.

Defendants also posit that it is "unclear" how Plaintiffs' challenge to this provision is redressable. Mot. 9. That argument is baseless. Plaintiffs' Complaint

challenges the *supervisor of elections'* mandatory reporting requirement for invalid petition forms—which triggers the OECS's investigation into the alleged violation. The redressability prong asks "whether the injury … is likely to be redressed through the litigation." *League of Women Voters of Fla., Inc. v. Lee*, 566 F. Supp. 3d 1238, 1255 (N.D. Fla. 2021). The answer to that question is a resounding yes. Enjoining the supervisor of elections' mandatory reporting requirement would remove the "threat of punishment" and eliminate a "major deterrent" to petition circulation, which Plaintiffs have halted due to fear of submitting invalid petition forms, triggering mandatory reporting, and thus facing criminal liability despite good-faith efforts. *Id.*

## II.    THE RECORD PRECLUDES SUMMARY JUDGMENT

Defendants' merits arguments are largely a cut and paste of their 12(b)(6) motion; indeed, they assert in a heading that Plaintiffs "Fail to State Claims." Mot. 9. Those arguments are equally unpersuasive now. The law and the record facts establish triable issues of material fact with respect to each Count.

### A.    Triable Issues of Fact Remain as to Plaintiffs' Free-Speech Claims (Count I).

Petition circulation is "core political speech" because it involves "interactive communication concerning political change," for which "First Amendment protection . . . is at its zenith.'" *Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182, 186–87 (1999) (quoting *Meyer v. Grant*, 486 U.S. 414, 422–25 (1988)).

The Supreme Court has provided guideposts for when regulations on petition circulation warrant exacting scrutiny. Exacting scrutiny applies when the State deters would-be circulators from participating in the initiative process due to reasonable fear of harassment and retaliation. *See Buckley*, 525 U.S. at 199–200. Nor may the State force circulators to choose between compromising deeply held beliefs and abstaining from petition circulation altogether. *Id.* at 195–96. It is also impermissible for it to pass laws that limit "the number of voices who will" spread initiative proponents' message and "the size of the audience they can reach," while making it less likely that proponents "will garner the number of signatures necessary to place the matter on the ballot, thus limiting their ability to make the matter the focus of statewide discussion," as the paid-circulator ban did in *Meyer*, 486 U.S. at 422–23. The Challenged Provisions cross each of these red lines. Exacting scrutiny is therefore warranted. As explained below, each of the Challenged Provisions fails exacting scrutiny. At the very least, how the provisions fare is a triable issue of fact.

### 1. Categorical Bans

The categorical bans restrict protected speech and are therefore subject to exacting scrutiny. The categorical exclusions have severely burdened Plaintiffs' petition circulation. Plaintiffs relied on members of these communities as volunteers to circulate petitions. *See supra* Statement of Facts Section A. They can no longer do so. By restricting the volunteer pool, the Challenged Provisions impermissibly

(1) limit "the number of voices" that may convey their message and (2) make it less likely that Plaintiffs' preferred initiative will appear on the ballot to become the subject of statewide discussion. *See Meyer*, 486 U.S. at 414, 422–23. The restrictions therefore encroach "upon an area in which the importance of First Amendment protections is 'at its zenith'" and warrant exacting scrutiny. *Id.* at 425.

The overwhelming majority of circuits have considered similar residency requirements and applied exacting scrutiny to strike them down. *See* ECF 283 at 20–21 (collecting cases); *see also Pierce v. Jacobsen*, 44 F.4th 853, 861 (9th Cir. 2022) (residency requirement impermissibly burdened speech because it "impose[d] an outright ban on a form of core political speech for all non-residents and necessarily diminishe[d] the pool of circulators"). The only appellate decision to conclude otherwise is unpersuasive. As this Court recognized, the Eighth Circuit in *Jaeger* improperly focused on alternative means for plaintiffs to communicate, contradicting *Meyer*. ECF 283 at 24–25.

Defendants' reliance on this Circuit's stay opinion for the proposition that Defendants are likely to prevail with respect to their argument that the categorical bans regulate conduct and not speech is misplaced. Mot. 9. First, it is not binding at the summary judgment stage. *See Democratic Exec. Comm. of Fla. v. Nat'l Republican Senatorial Comm.*, 950 F.3d 790, 795 (11th Cir. 2020). The panel majority itself stressed that it wrote only "to explain [its] reasoning for granting the

stay." *Fla. Decides Healthcare, Inc. v. Fla. Sec'y of State*, 2025 U.S. App. LEXIS 23431, at *5 n.2 (11th Cir. Sep. 9, 2025). That makes sense, as the parties have since produced tens of thousands of pages of documents and Plaintiffs have submitted new declarations demonstrating the harm caused by the categorical bans. Indeed, Defendants concede that the Eleventh Circuit order is not binding authority. *See, e.g.*, ECF 513 at 2-3.

Second, the panel relied on a speech-conduct distinction that is irreconcilable with Supreme Court precedent. *Fla. Decides Healthcare*, 2025 U.S. App. LEXIS 23431, at *14–15. In *Buckley*, the Court struck down Colorado's requirement that petition circulators be registered voters, notwithstanding that the provision did not "directly regulate speech." 525 U.S. at 193–97, 210 (Thomas, J., concurring). Likewise, the *Meyer* Court invalidated a law prohibiting payment of petition circulators, which similarly did not involve discussions with voters. *See Meyer*, 486 U.S. at 420. In both cases, the Court applied exacting scrutiny because, as here, the regulations at issue deterred petition circulation, limited the number of voices to convey initiative proponents' message, and forced circulators to compromise deeply held beliefs. *See id.*; *Buckley*, 525 U.S. at 195–97.

Third, the panel's decision misunderstood the Eligibility Provisions as applying "only to individuals who physically possess more than 25 already-signed petition forms." *Fla. Decides Healthcare*, 2025 U.S. App. LEXIS 23431, at *16.

HB1205, however, provides that non-citizens and non-residents "may not collect signatures or initiative petitions," full stop. Fla. Stat. § 100.371(4)(b). This misstep mattered: the panel used this reading to distinguish this case from the many circuit decisions (discussed above) that have struck down nearly identical residency restrictions. *Fla. Decides Healthcare*, 2025 U.S. App. LEXIS 23431, at *15–16.

The categorical bans would fail even if lower levels of scrutiny applied. That is because Defendants cite ***no evidence*** of fraud by volunteer non-residents, non-citizens, or returning citizens. *See supra* Statement of Facts Section F. Where, as here, Defendants merely "posit the existence of the disease sought to be cured," they fail even intermediate scrutiny. *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664 (1994). The State has a pre-existing "arsenal of safeguards" against fraud, including requiring paid circulators to register and enforcing statutes that already prohibit circulator fraud. *Buckley*, 525 U.S. at 205. At a minimum, Plaintiffs raise a genuine dispute concerning whether the State has a less intrusive means of furthering its purported interest. *See Turner*, 512 U.S. at 666–68. Summary judgment is therefore not warranted.

### 2.    Pre-Registration and Affidavit Requirements

Defendants' challenge to Plaintiffs' free-speech claim concerning the pre-registration requirement similarly fails. The pre-registration requirement imposes a severe burden on Plaintiffs' First Amendment rights, which warrants

exacting scrutiny.  First, HB1205's requirement that circulators provide their name and permanent address on a form that becomes a public record is closely analogous to the badge requirement in *Buckley*, which the Court struck for its speech-deterrent effects.  *See* 525 U.S. at 199–200.  Like the circulators in *Buckley*, Plaintiffs' members have, out of a reasonable fear of harassment and retaliation, self-censored due to HB1205, thereby limiting the pool of volunteers available.  *See supra* Section I.

Nor may the state require members to seek its permission before circulating petitions.  The Supreme Court has stressed that the state may not force a speaker to compromise their values as a precondition to engaging in protected speech.  *See Buckley*, 525 U.S. at 195–96.  Where, as here, members have expressed "firm convictions about their constitutional right to engage in uninhibited debate in the context of door-to-door advocacy, [and have testified] that they would prefer silence to speech licensed by a petty official," the imposition of a registration precondition imposes an impermissible burden on their speech.  *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 167 (2002); *see supra* Statement of Facts Sections B–D.  Again, Defendants wholly fail to justify the burdens on speech here.  *See supra* Statement of Facts Section F.

Additionally, less burdensome means of achieving this goal already exist.  The state already required paid circulators to register before HB1205.  Fla. Stat. §

100.371 (3)(a) (2022).  The state also has the authority to prosecute volunteers who commit petition-related fraud and maintains a comprehensive signature matching process, meant to identify instances of fraud by scrutinizing the handwriting on initiative petitions.  Fla. Stat. § 99.097.  That the state has not once used these provisions to identify and prosecute volunteer circulators demonstrates either that volunteers do not present the same fraud concerns or that existing criminal statutes serve as a sufficient deterrent.  At a minimum, a material dispute of fact exists as to whether the pre-registration provision is necessary to achieve the goals Defendants cite.

Defendants make no argument in support of the affidavit requirement other than to quickly assert that the *Buckley* Court "spoke favorably of it."  Mot. 10.  But the Supreme Court did not consider the merits of Plaintiffs' challenge to Colorado's affidavit provision; the Tenth Circuit rejected the claim, and Plaintiffs did not appeal.  *See Buckley*, 525 U.S. at 196.  Moreover, the factual record here bears no resemblance to *Buckley* on this issue because unlike Colorado's affidavit provision, which required the affidavit to be attached to each petition *section*, which is a "bound compilation of initiative forms," HB1205 requires petition circulators to attach affidavits to each petition *form* that goes with each voter.  *Id.* at 188 n.6, 198 (explaining that the petition section contains the collected signatures of voters).  HB1205's affidavit requirement is not "separated from the moment a circulator

speaks"; rather, it imposes an "immediacy, and corresponding reliability" that is akin to the unconstitutional badge requirement. *Id.* at 196, 198. Accordingly, *Buckley* does not warrant summary judgment as to Plaintiffs' claims challenging the affidavit requirement.

### 3. Criminal Provision and OECS Investigation

The few sentences that Defendants offer in defense of the Criminal and OECS Investigation provisions do not support summary judgment. Defendants posit that "no political speech is implicated when someone fraudulently signs or fills in a petition, copies a driver's license number or social security number, or engages in voter misconduct and irregularities." Mot. 10. This invokes a speech-conduct distinction that, for reasons already described, is not viable. The law is clear that when a disputed law impermissibly chills speech with the threat of severe criminal penalties for violating difficult-to-understand statutory provisions, it cannot survive strict scrutiny. *See Reno v. ACLU*, 521 U.S. 844, 872 (1997).

Under HB1205, it is unclear whether members will face criminal liability for helping persons with disabilities to fill out their petition forms or for retaining a voter's information in case the voter needs to be reached to cure the form. *See supra* Section I. They also face potential RICO liability for a wide and undefined array of potential "irregularities" that may occur in petition circulation. *Id.* If they turn in too many forms with incorrect information, they face criminal investigation by the

state. *Id.* The evidence reflects that these provisions have in fact deterred members' participation in petition circulation. Lowe-Minor Decl. ¶¶ 13, 34. It is therefore reasonable that many eligible members have chosen to self-censor rather than walk this tightrope, and exacting scrutiny applies.

In support of the Criminal and OECS Investigation provisions, Defendants offer only a single sentence assertion that these provisions will assist "in prosecuting violations of Florida's election code by enabling law enforcement to locate, investigate, and interview petition circulators who engage in fraudulent practices." Mot. 10–11 (citing ECF 470-7 ("Bridges Decl.") ¶ 6). However, the declaration Defendants cite discusses only fraud by *paid* petition circulators (*see* Bridges Decl. ¶¶ 1, 4), which is clearly insufficient to warrant summary judgment against Plaintiffs who do not employ paid circulators.

### 4.    Ten-Day Return Timeline and Fines

Defendants' three-sentence defense of the Ten-Day Return Timeline and associated fines similarly fails. Defendants simply note that this Court upheld the provisions when it issued its first preliminary injunction order. But the Court made that determination based on the factual record before it at the time. Since that ruling, however, Plaintiffs have submitted evidence demonstrating that the Ten-Day Return Timeline and fines make petition circulation *impossible*. Lowe-Minor Decl. ¶ 29. And at any rate, rulings at the preliminary injunction stage have no bearing here.

*Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000) ("conclusions at the preliminary injunction stage are by nature preliminary . . . and therefore are not binding at summary judgment"); *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ("the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.").

Failure to comply exposes sponsors, whom the Plaintiffs work with closely, to extreme fines, damaging relationships and associations with those sponsors. Lowe-Minor Decl. ¶ 12. This gave Plaintiffs no choice but to cease petition circulation in light of HB1205. *Id.* ¶ 13; Proaño Supp. Decl. ¶¶ 32–33, 35. Thus, Plaintiffs have demonstrated at least a material dispute of fact, precluding summary judgment.

## B. Plaintiffs' Have Raised Triable Issues Regarding Their Freedom-of-Association Claim (Count II).

Defendants' argument that they are entitled to summary judgment on Plaintiffs' freedom-of-association claim (Count II), *see* Mot. 11, is woefully inadequate. Their primary argument is that Count II is "virtually indistinguishable" from Count I. *Id.* Defendants' only legal support for this proposition comes from a footnote in a case wherein the defendant acknowledged that the challenged law implicated core political speech and thus bore the burden of satisfying strict scrutiny. *See* Mot. 11 (citing *Citizens for Police Accountability Pol. Comm. v. Browning*, 572 F.3d 1213, 1217 n.6 (11th Cir. 2009)). As it was undisputed that the highest level of

scrutiny applied to the regulation, there was no need to analyze the freedom-of-association claim separately.  That is not the case here where the Defendants contend that strict scrutiny does not apply to the freedom of speech claim.

Here, Plaintiffs and their members who are not citizens or residents or have been convicted of a felony are prevented from both partaking in protected speech and associating with their organization, fellow members, and sponsors when it comes to circulating petitions.  *See supra* at Statement of Facts Section A. Consequently, Plaintiffs' free-speech- and associational claims are both valid and should proceed to trial.  *See Clean-Up '84 v. Heinrich*, 759 F.2d 1511, 1513 (11th Cir. 1984) ("[A]sking a voter to sign a petition is protected 'speech' and 'gathering at the polls to solicit signatures' is protected association.").

### C.    Defendants Are Not Entitled to Summary Judgment on Plaintiffs' Vagueness Claims (Count III).

Defendants' arguments for dismissal of Plaintiffs' vagueness claims similarly fall flat. To start, Defendants cite no legal precedent whatsoever. *See* Mot. 13–15. All Defendants do is raise conclusory assertions that the challenged provisions are clear on their face because Defendants say so. This is not enough.  A statute is unconstitutionally vague when "those who enforce the law or those who are subject to its enforcement must necessarily guess at its meaning and differ as to its application." *Fla. Action Comm., Inc. v. Seminole Cnty.*, 212 F. Supp. 3d 1213, 1224 (M.D. Fla. 2016) (citation modified).

Here, Plaintiffs claim that three aspects of HB1025 are vague, two of which fall within the scope of Defendants' Motion.

The first involves the civil and criminal penalties associated with a petition circulator "fill[ing] in missing information on a signed petition."  Fla. Stat. §§ 100.371(8), 104.185(2).  For example, Plaintiffs are concerned that they would be subject to felony liability if they assist a disabled voter with the form.  Lowe-Minor Decl. ¶ 32.  Defendants do not address these vagueness concerns, which involve voters that require some form of assistance.  *See* Mot. 13.

The second claim of vagueness concerns Section 100.371(b)(9), where a petition circulator who "retains a voter's personal information . . . for any reason other than to provide such information to the sponsor of the initiative petition" commits a third-degree felony.  The provision does not define what it means to "retain" a voter's personal information, or specify how long a volunteer may possess personal information before it is deemed "retain[ed]."  Proaño Supp. Decl. ¶ 30; Second LWVFL Decl. ¶ 50.  And "for any reason other than to provide such information to the sponsor" leaves an open question about whether a volunteer can still retain a voter's petition form if they plan to simply turn in the form directly to the supervisor, rather than to the sponsor.  Second LWVFL Decl. ¶ 50.  Again, Defendants do not address these particular concerns.  Mot. 13.  The facts here are similar to Plaintiffs' allegations in *Florida Action Committee*, where the challenged

ordinance failed to identify with specificity where it applied, contained criminal penalties without a scienter requirement, and invited arbitrary enforcement. 212 F. Supp. 3d at 1214–25. Plaintiffs here set forth facts; they identify undefined phrases that are facially unclear; they describe conflicting potential interpretations that replicate the "guess at its meaning" problem condemned in *Florida Action Committee*; and they identify draconian criminal penalties without a scienter requirement. *Id.* at 1224. Accordingly, Plaintiffs have adequately set forth material facts to survive summary judgment.

### D. Defendants Are Not Entitled to Summary Judgment on Plaintiffs' Overbreadth Claim (Count IV).

Defendants' attack on Plaintiffs' First Amendment overbreadth claim is merely a reprise of their misbegotten arguments against Plaintiffs' free-speech claims and fails for the same reason. A law is overbroad under the First Amendment when "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010). The first step in this analysis is to determine the actual scope of the statute: "What activities, by what actors, do the laws prohibit or otherwise regulate?" *Moody v. NetChoice, LLC*, 603 U.S. 707, 724 (2024). The scope of the Challenged Provisions is exceedingly broad: they regulate everything from who can circulate petitions, to what must be done to circulate, to how many petitions can be circulated without registration, to what can be done while circulating, to when

31

petition forms must be returned, to when the state must investigate supposed malfeasance.

Next, the Court must determine "which of the laws' applications violate the First Amendment, and to measure them against the rest." *Moody*, 603 U.S. at 725. There is no difficulty determining which of the Challenged Provisions' applications violate the First Amendment: the answer is almost all of them. As discussed above, the Challenged Provisions inhibit circulation by volunteers wishing to do nothing more than lawfully circulate petitions, an activity recognized by the Supreme Court to be "core political speech." *Buckley*, 525 U.S. at 186. For instance, the categorical bans exclude all non-citizens, non-residents, and felons from petition circulation, irrespective of whether they are paid, how many petitions they wish to gather, and the risk of fraud individual circulators pose.

By contrast, Defendants are unable to point to any record evidence regarding "the rest"—that is, any instances where the provisions regulate *unprotected* speech. At most, Defendants suggest in conclusory fashion that a few of HB1205's applications may involve fraudulent speech. *See United States v. Hansen*, 599 U.S. 762, 769 (2023). But this is insufficient on its own and when compared to the concrete examples of First Amendment-chilling applications described above. Turning again to the example of the categorical bans, Defendants point to *zero* instances of fraud by non-citizen circulators. Meanwhile, Plaintiffs have non-citizen

members that wish to engage in lawful petition circulation.  At the very least, there exists a factual dispute as to HB1205's legitimate scope.

Defendants fail to engage in this overbreadth analysis at all.  Instead, they assert tautologically that because HB1205 supposedly regulates conduct rather than speech, it cannot possibly impact protected speech more than unprotected speech. This conduct-not-speech argument is not supported by the law or the record, (*see* discussion *supra* Section II.A(i)), thus making summary judgment inappropriate.

### E. Defendants Are Not Entitled to Summary Judgment on Plaintiffs' Equal Protection Claim (Count V).

Plaintiffs rely on members and volunteers who are non-citizens to help in petition gathering.  Proaño Supp. Decl. ¶¶ 16–18, 20; Lowe-Minor Decl. ¶ 16; Gonzalez Decl. ¶¶ 4–5.  Defendants argue that this restriction falls within the "Equal Protection Clause's political function exception."  Mot. 15.  They are wrong.  In Defendants' cited case, the Court reiterated that while statutes discriminating on the basis of alienage are generally subject to strict scrutiny, a "narrow" political-function exception exists only for important "elective and nonelective" government positions "whose operations go to the heart of representative government."  *Bernal v. Fainter*, 467 U.S. 216, 216 (1984).

Here, petition circulators are not "positions whose operations go to the heart of representative government."  They are more like notaries, which fall outside of

the exception as held in *Bernal*. *Id.* at 216–17.[5]  This Court has expressly rejected the argument that the political-function exception applies to third-party voter registration organizations. *Fla. State Conf. of Branches & Youth Units of the NAACP v. Byrd*, 680 F. Supp. 3d 1291, 1312 (N.D. Fla. 2023).  Thus, strict scrutiny applies.

Defendants cite two cases that are legally and factually inapposite—both involved a ban on financial contributions to political campaigns that was challenged under the First Amendment but not the Equal Protection Clause.  Mot. 15 (citing *OPAWL v. Yost*, 118 F.4th 770 (6th Cir. 2024); *Bluman v. FEC*, 800 F. Supp. 2d 281 (D.D.C. 2011)).  And Defendants otherwise fail to satisfy their strict-scrutiny burden of demonstrating that the non-citizen ban "advance[s] a compelling state interest by the least restrictive means available," *Bernal*, 467 U.S. at 219, especially given that their only declarant is "unaware of any investigations involving non-citizen petition circulators."  ECF 470-4 ¶ 17.

## CONCLUSION

For these reasons, this Court should deny Defendants' Motion.

---

[5] Defendants acknowledge that "non-citizens who work for the government may collect and handle sensitive voter information," Mot. 16, but try to distinguish them on the grounds that these employees must undergo background checks to determine that they are lawfully in the United States.  But if the legislature wished to bar non-citizens without lawful status, it could have simply narrowed the non-citizen ban to that specific class.

Dated: October 28, 2025          Respectfully submitted,

*/s/ George E. Mastoris*
GEORGE E. MASTORIS**
gmastoris@winston.com
SOFIA ARGUELLO*
sarguello@winston.com
JOHANNA RAE HUDGENS*
jhudgens@winston.com
TYLER DATO**
tdato@winston.com
SAMANTHA OSAKI**
sosaki@winston.com
NATHAN C. GREESS*
ngreess@winston.com
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
Telephone: (202) 294-6700

SPENCER KLEIN**
spencer@statedemocracydefenders.org
POOJA CHAUDHURI**
pooja@statedemocracydefenders.org
SOFIA FERNANDEZ GOLD**
sofia@statedemocracydefenders.org
NORMAN EISEN**
norman@statedemocracydefenders.org
TIANNA MAYS*
tianna@statedemocracydefenders.org
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Ave. SE, Suite 15180
Washington, DC 20003
Telephone: (202) 594-9958

JON GREENBAUM**
jgreenbaum@justicels.com
JUSTICE LEGAL STRATEGIES PLLC
P.O. Box 27015
Washington, D.C. 20038

Telephone: (202) 601-8678

GERALD E. GREENBERG
Florida Bar No. 440094
ggreenberg@gsgpa.com
SHANE GRANNUM
Florida Bar No. 1055050
sgrannum@gsgpa.com
GELBER SCHACHTER & GREENBERG, P.A.
One Southeast Third Avenue, Suite 2600
Miami, FL 33131
Telephone: (305) 728-0950
E-service: efilings@gsgpa.com


\* *Pro hac vice* applications forthcoming
\*\* *Pro hac vice* granted
*Counsel for All Plaintiffs*

## <u>LOCAL RULE 7.1(F) CERTIFICATION</u>

The undersigned certifies that this memorandum complies with word limits set forth in N.D. Fla. Loc. R. 7.1(F), and contains 7,969 words which includes the headings, footnotes, and quotations, but does not include the case style, signature block or Certificates of Word Count and Service.

<u>s/ George Mastoris</u>
GEORGE MASTORIS**
gmastoris@winston.com

*** Pro hac vice granted*
*Counsel for Intervenor-Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 28, 2025, I electronically filed the foregoing through the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

<u>s/ George Mastoris</u>
GEORGE MASTORIS**
gmastoris@winston.com

*** Pro hac vice granted*
*Counsel for Intervenor-Plaintiffs*