## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

FLORIDA DECIDES HEALTHCARE,
INC., *et al*.,

       Plaintiffs,

                               Case No. 4:25-cv-00211-MW-MAF

v.

CORD BYRD, in his official capacity
as Secretary of State of Florida, *et al*.,

       Defendants.

_____/

_____

## THE SUPERVISORS OF ELECTIONS' PRETRIAL BRIEF

_____

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................3

INTRODUCTION...........................................................................10

ARGUMENT ...............................................................................12

I.    THE COST-RECOVERY PROVISIONS DO NOT VIOLATE THE FIRST
AMENDMENT. ............................................................................12

   A.    The Cost-Recovery Provisions Do Not Implicate the First
Amendment and Thus Are Not Subject to Strict Scrutiny...................12

   B.    Because the Cost-Recovery Provisions Do Not Regulate Speakers
or Their Speech, They Do Not Trigger Any Level of Scrutiny. ...........20

   C.    A "Severe Burden" Does Not Subject a *Biddulph*-Type Regulation
to Strict Scrutiny.....................................................................21

   D.    Even If a "Severe Burden" Could Subject a *Biddulph*-Type
Regulation to Strict Scrutiny, Plaintiffs Cannot Establish a Severe
Burden. .................................................................................26

   E.    The Cost-Recovery Provisions Are Not a Content-Based
Regulation of Speech................................................................32

   F.    What Other States Do—or Do Not Do—Is Irrelevant. .........................34

   G.    Signature Verification Fees Are Levied in Direct Proportion to the
Burden That Each Sponsor Imposes on Election Officials..................36

II.    THE COST-RECOVERY PROVISIONS DO NOT VIOLATE EQUAL
PROTECTION. ............................................................................37

   A.    The Cost-Recovery Provisions Are Subject to Rational-Basis
Review...................................................................................37

   B.    The Cost-Recovery Provisions Satisfy Rational-Basis Review............41

CONCLUSION .............................................................................47

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Celebrezze*,

    460 U.S. 780 (1983) ........................................................... 21, 38, 40, 41

*Arizona State Legislature v. Arizona Independent Redistricting Commission*,

    576 U.S. 787 (2015) ................................................................................34

*Bernbeck v. Gale*,

    829 F.3d 643 (8th Cir. 2016) .................................................................39

*Biddulph v. Mortham*,

    89 F.3d 1491 (11th Cir. 1996) .................................................... passim

*Buckley v. American Constitutional Law Foundation, Inc.*,

    525 U.S. 182 (1999) ......................................................... 14, 16, 17, 20

*Burdick v. Takushi*,

    504 U.S. 428 (1992) ........................................................... 21, 38, 40, 41

*Chicago Teachers Union, Local No. 1 v. Hudson*,

    475 U.S. 292 (1986) ...............................................................................46

*City of New Orleans v. Dukes*,

    427 U.S. 297 (1976) ...............................................................................42

*Clean-Up '84 v. Heinrich*,

    590 F. Supp. 928 (M.D. Fla. 1984) ............................................... 19, 20

*Cowen v. Georgia Secretary of State*,

    960 F.3d 1339 (11th Cir. 2020)................................................................41

*Democratic Executive Committee v. Lee*,

    915 F.3d 1312 (11th Cir. 2019)................................................................38

*Diaz v. Cobb*,

    541 F. Supp. 2d 1319 (S.D. Fla. 2008)....................................................42

*Dobrovolny v. Moore*,

    126 F.3d 1111 (8th Cir. 1997)........................................................ 17, 21

*Eggers v. Evnen*,

    48 F.4th 561 (8th Cir. 2022)........................................................... 20, 39

*Florida Decides Healthcare Inc. v. Florida Secretary of State*,

    No. 25-12370, 2025 WL 3738554 (11th Cir. Sep. 9, 2025)..................... 18, 19, 21

*Florida Hometown Democracy*, *Inc. v. Browning*,

    No. 4:08-cv-00373, 2008 WL 4081174 (N.D. Fla. Aug. 29, 2008) .....................40

*Florida State Conference of National Association for the Advancement of Colored*

    *People v. Lee*,

    566 F. Supp. 3d 1262 (N.D. Fla. 2021) ...............................................38

*Forsyth County v. Nationalist Movement*,

    505 U.S. 123 (1992)...................................................................... 25, 26

*Fulani v. Krivanek*,

   973 F.2d 1539 (11th Cir. 1992)..............................................................41

*Gibson v. Firestone*,

   741 F.2d 1269 (11th Cir. 1984)..................................................... passim

*Hanover Township Federation of Teachers, Local 1954 v. Hanover Community*

   *School Corporation*,

   457 F.2d 456 (7th Cir. 1972)..................................................................31

*Hodel v. Indiana*,

   452 U.S. 314 (1981)...............................................................................37

*Illinois State Board of Elections v. Socialist Workers Party*,

   440 U.S. 173 (1979)...............................................................................40

*Initiative and Referendum Institute v. Walker*,

   450 F.3d 1082 (10th Cir. 2006) (en banc)...................................... passim

*Jacobson v. Florida Secretary of State*,

   974 F.3d 1236 (11th Cir. 2020)................................................... 38, 41

*Jones v. Markiewicz-Qualkinbush*,

   892 F.3d 935 (7th Cir. 2018)................................................. 18, 23, 39

*Kelly v. Macon-Bibb County Board of Elections*,

   608 F. Supp. 1036 (M.D. Ga. 1985).....................................................40

*Kendall v. Balcerzak*,

    650 F.3d 515 (4th Cir. 2011)..................................................................39

*Let's Help Florida v. Smathers*,

    360 So. 2d 494 (Fla. 1st DCA 1978)............................................. 35, 45

*Libertarian Party of Florida v. State of Florida*,

    710 F.2d 790 (11th Cir. 1983)...............................................................20

*Lubin v. Panish*,

    415 U.S. 709 (1974) ...............................................................................40

*Lujan v. Defenders of Wildlife*,

    504 U.S. 555 (1992)................................................................................31

*MacMann v. Matthes*,

    843 F.3d 770 (8th Cir. 2016)......................................................... 18, 21

*Marijuana Policy Project v. United States*,

    304 F.3d 82 (D.C. Cir. 2002) ...............................................................24

*Meyer v. Grant*,

    486 U.S. 414 (1988)..................................................................... passim

*Minnesota Senior Federation, Metropolitan Region v. United States*,

    273 F.3d 805 (8th Cir. 2001)................................................................42

*Missouri Roundtable for Life v. Carnahan*,

    676 F.3d 665 (8th Cir. 2012)........................................................ 18, 21

*Molinari v. Bloomberg,*

564 F.3d 587 (2nd Cir. 2009) ........................................................................ passim

*New State Ice Company v. Liebmann,*

285 U.S. 262 (1932) ...............................................................................34

*Obama for America v. Husted,*

697 F.3d 423 (6th Cir. 2012) ...................................................................38

*Prete v. Bradbury,*

438 F.3d 949 (9th Cir. 2006) ............................................................. 33, 34

*Reed v. Town of Gilbert,*

576 U.S. 155 (2015) ...............................................................................34

*Republican Party of North Carolina v. Martin,*

980 F.2d 943 (4th Cir. 1992) ...................................................................31

*SD Voice v. Noem,*

60 F.4th 1071 (8th Cir. 2023) ...................................................... 17, 25, 26

*Semple v. Griswold,*

934 F.3d 1134 (10th Cir. 2019) ................................................... 16, 18, 21

*Smith v. Arkansas State Highway Employees, Local 1315,*

441 U.S. 463 (1979) ...............................................................................31

*Solantic, LLC v. City of Neptune Beach,*

410 F.3d 1250 (11th Cir. 2005) ...............................................................33

*Taxpayers United for Assessment Cuts v. Austin*,

    994 F.2d 291 (6th Cir. 1993)............................................................. 17, 39

*Williams v. Pryor*,

    240 F.3d 944 (11th Cir. 2001)......................................................... 41, 43

*Williamson v. Lee Optical of Oklahoma, Inc.*,

    348 U.S. 483 (1955)...............................................................................43

*Ysursa v. Pocatello Educucation Association*,

    555 U.S. 353 (2009)........................................................................ 42, 46

## Constitutional Provisions

Fla. Const. art. XI, § 1 .........................................................................23

Fla. Const. art. XI, § 2(a).....................................................................23

Fla. Const. art. XI, § 3 .........................................................................25

Fla. Const. art. XI, § 5(e) .....................................................................25

## Statutes

Fla. Stat. § 99.097(1) (2025)................................................................45

Fla. Stat. § 99.097(2) (2025)................................................................45

Fla. Stat. § 100.371(7)(a) (2025) .................................................... 31, 44

Fla. Stat. § 100.371(14)(b) (2025) ........................................ 32, 43, 44, 45

Fla. Stat. § 100.371(14)(c) (2025) .......................................................44

Fla. Stat. § 100.371(14)(c)3.d. (2025) .................................................43

Fla. Stat. § 100.371(14)(c)5. (2025) ...........................................................43

Fla. Stat. § 100.371(14)(d) (2025) .............................................................44

Fla. Stat. § 100.371(14)(e) (2025) .............................................................44

Fla. Stat. § 100.371(14)(g) (2025) .............................................................44

Fla. Stat. § 100.371(14)(h) (2025) .............................................................43

Fla. Stat. § 129.201(5) (2025)...................................................................47

**Regulations**

Fla. Admin. Code R. 1S-2.008 ..................................................................45

Fla. Admin. Code R. 1S-2.0091(2)(b) ........................................................45

Fla. Admin. Code R. 1S-2.0091(5)...............................................................44

Florida's sixty-seven Supervisors of Elections respectfully offer this trial brief in opposition to Plaintiffs' challenge to the provisions of House Bill 1205 that relate to signature verification fees.[1]

### INTRODUCTION

The cost of signature verification can be paid by taxpayers or petition sponsors, or both. With respect to statewide initiative petitions, the Legislature determined that these costs should be borne by sponsors who avail themselves of the initiative process to advance their political objectives, rather than by local taxpayers. The Supervisors take no position on the policy of that choice, but supports the Legislature's authority to make it.

Against that backdrop, Plaintiffs ask this Court to invalidate the recent statutory amendments that govern signature verification fees (the "Cost-Recovery Provisions"). Notably, Plaintiffs do *not* challenge the pre-HB 1205 requirement that sponsors pay the "actual cost" of signature verification—which also differed from the 10-cent fee paid by candidates. In doing so, Plaintiffs tacitly admit that charging statewide initiative sponsors a higher fee proportioned to the number of signatures is constitutionally permissible. They allege only that the *true* cost is now *too much*, since HB 1205's new

---

[1] In this brief, "Plaintiffs" refers to Florida Decides Healthcare, Inc.; Mitchell Emerson; and Jordan Simmons (together, "FDH") and Smart & Safe Florida ("SSF"). The other Plaintiffs do not contest the new provisions regarding signature verification fees.

requirements, such as mailing verification notices to petition signers, have increased the cost of verification. Plaintiffs' frame their challenge as a line-drawing exercise regarding the *amount* of the fee and not around the simple question they have already conceded: whether a State may require sponsors to pay the actual costs associated with signature verification.

Plaintiffs cannot prevail on that claim because the initiative process is a state-created procedure that States have broad discretion to regulate. The Cost-Recovery Provisions do not restrict speech or implicate a fundamental right, but rather prescribe post-circulation requirements that allocate to sponsors the costs that *someone* must bear. Plaintiffs' attempt to convert this cost allocation into a speech restriction—and to treat *any* regulation of their activities as a regulation of speech—should be rejected.

Plaintiffs' First Amendment claim fails because the Cost-Recovery Provisions do not regulate direct, one-on-one communications with voters. Courts distinguish the regulation of speech elements of petition circulation—which implicates core political speech—from a State's general initiative regulations, which do not. The Cost-Recovery Provisions fall firmly in the latter domain. That these provisions might increase the cost of an initiative campaign does not transform the Cost-Recovery Provisions into a First Amendment violation.

Plaintiffs' equal-protection claim fares no better. Because the Cost-Recovery Provisions do not implicate a fundamental right, rational-basis review applies. Under

that deferential standard, the Legislature's choice passes muster. Placing the cost of verification on sponsors is rational: it protects public resources and ensures that Supervisors are reimbursed for the actual, labor-intensive work of verification. That the Legislature addressed statewide initiatives without simultaneously changing rules for candidate or local-issue petitions does not render these provisions unconstitutional. The Legislature may act incrementally.

The Cost-Recovery Provisions regulate neither speakers nor their speech. They simply allocate the cost of a state-created process to those who participate in it. Plaintiffs' concern that they might not raise enough money to pay the signature verification fees does not prove a federal constitutional violation. On the contrary, their request to enjoin the Cost-Recovery Provisions would require taxpayers to subsidize a political campaign—a result that neither the First Amendment nor the Equal Protection Clause demands.

## ARGUMENT

### I.    THE COST-RECOVERY PROVISIONS DO NOT VIOLATE THE FIRST AMENDMENT.

#### A.    The Cost-Recovery Provisions Do Not Implicate the First Amendment and Thus Are Not Subject to Strict Scrutiny.

The Cost-Recovery Provisions regulate the initiative process, not speech, and therefore do not raise a First Amendment issue. In the context of initiative petitions, federal courts distinguish between laws that regulate speakers or their speech, such as

the statute challenged in *Meyer v. Grant*, 486 U.S. 414 (1988), and general initiative regulations that do not regulate speakers or their speech, such as those challenged in *Biddulph v. Mortham*, 89 F.3d 1491 (11th Cir. 1996). While the former regulates core political speech and triggers strict scrutiny, the latter regulates only state-created rights and does not implicate the First Amendment. *Gibson v. Firestone*, 741 F.2d 1269, 1273 (11th Cir. 1984) (distinguishing between "the rights of candidates to offer themselves for public office and the rights of voters to vote for or against those candidates" and "wholly state-created procedures by which issues that might otherwise be considered by elected representatives may be put to the voting populace"). "Although the First Amendment protects political speech incident to an initiative campaign, it does not protect the right to make law, by initiative or otherwise." *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1099 (10th Cir. 2006) (en banc); *accord Biddulph*, 89 F.3d at 1500 (explaining that an initiative sponsor has "no constitutionally-protected right to place issues before the Florida electorate." (quoting *Gibson*, 741 F.2d at 1274)).

The key question therefore is whether the Cost-Recovery Provisions fall on the *Meyer* side or the *Biddulph* side of the line. Those two cases, and the many that follow them, place the Cost-Recovery Provisions squarely on the *Biddulph* side.

In *Meyer*, the Court invalidated a state statute that criminalized the payment of compensation to petition circulators. It explained that the "circulation of an initiative petition of necessity involves both the expression of a desire for political change and

a discussion of the merits of the proposed change." 486 U.S. at 421. As a result, "the circulation of a petition involves the type of interactive communication concerning political change that is appropriately described as 'core political speech.' " *Id.* at 421–22. The challenged law restricted "political discourse" through "direct one-on-one communication" between petition circulators and individual voters and therefore was subject to, and failed, strict scrutiny, which is "well-nigh insurmountable." *Id.* at 425.

Later, in *Buckley v. American Constitutional Law Foundation*, *Inc.*, 525 U.S. 182 (1999), the Court applied strict scrutiny to three state statutes that directly regulated petition circulators: a prohibition on individuals other than registered voters from circulating petitions, a requirement that each petition circulator wear a name badge, and a requirement that initiative sponsors report the names, addresses, and compensation of all paid circulators to the State. *Id.* at 186. Each statute placed a regulation directly on speakers who communicated messages to voters. The Court observed that petition circulators, like "handbill distributors, . . . seek to promote public support for a particular issue or position" through voter interaction. Restrictions aimed at petition circulators raised First Amendment concerns and were subject to strict scrutiny. *Id.* at 194, 197–98.

In contrast, in *Biddulph*, an initiative sponsor claimed that Florida's rules for judicial review of initiative petitions violated his First Amendment rights. The sponsor argued that because judicial review of an initiative—and the risk of removal from the

ballot—came only after a "costly and time-consuming" petition-circulation process, sponsors faced a "financial gamble" and a "deterrent effect" that dissuades them from petition circulation. 89 F.3d at 1496. The court concluded, however, that this did not "implicate First Amendment concerns." *Id*. at 1500. In doing so, the Court recognized a distinction between "regulation of the circulation of petitions," which is core political speech, "and a state's general initiative regulations." *Id*. at 1497. Stated differently, *Meyer* drew an "explicit distinction between a state's power to regulate the initiative process in general and the power to regulate the exchange of ideas about political changes sought through the process." *Id*. at 1498 n.7. The court rejected the sponsor's reliance on *Meyer*, explaining that, while a State is "limited in the extent to which it can permissibly burden the communication of ideas . . . that occurs *during petition circulation*," it remains "generally free to regulate its own initiative process." *Id*. at 1498 (emphasis added). Thus, the First Amendment neither requires States to make their initiative processes "the most efficient or affordable," *id*., nor subjects an initiative process to scrutiny "simply because the process is burdensome to initiative proposal sponsors," *id*. at 1497. Indeed, the court explained that the right to place an initiative on the ballot derives "from wholly state-created procedures" and that there is "no constitutionally-protected right to place issues before the Florida electorate." *Id*. at 1500 (quoting *Gibson*, 741 F.2d at 1274). For that reason, "states maintain broad discretion in fashioning initiative mechanisms," and "[m]ost restrictions a state might

15

impose on its initiative process" do not implicate the First Amendment. *Id.* at 1500–01.

Other circuits embrace the same distinction, declining to subject *Biddulph*-like initiative regulations to First Amendment scrutiny. In its en-banc decision in *Walker*, 450 F.3d at 1099–1101, the Tenth Circuit explained that the laws challenged in *Meyer* and *Buckley* "specifically regulated the process of advocacy itself: the laws dictated *who* could speak . . . or *how* to go about speaking." *Id*. at 1082 (emphases in original). It emphasized the "crucial difference between a law that has the 'inevitable effect' of reducing speech because it restricts or regulates speech, and a law that has the 'inevitable effect' of reducing speech because it makes particular speech less likely to succeed." *Id*. at 1100. The court rejected the argument that the latter implicates the First Amendment, reasoning that, under Plaintiffs' contention, "every structural feature of government that makes some political outcomes less likely than others—and thereby discourages some speakers from engagement in protected speech—violates the First Amendment." *Id.*; *accord Semple v. Griswold*, 934 F.3d 1134, 1142 (10th Cir. 2019) (holding that a requirement to collect signatures in each State Senate district "does not give rise to a cognizable First Amendment claim," even if it "makes it more difficult and costly to amend the Colorado constitution"); *Molinari v. Bloomberg*, 564 F.3d 587, 600 (2nd Cir. 2009) (distinguishing a law that "reduces speech because it restricts or regulates speech" from one that "reduces speech because it makes particular speech

less likely to succeed," and holding that only the "former implicates the First Amendment").

A comparison of the regulations challenged in other initiative cases makes plain how this Court should treat the Cost-Recovery Provisions. On the *Meyer* side, courts have applied First Amendment scrutiny to regulations that:

- Prohibited payment of petition circulators (*Meyer*);

- Prohibited anyone other than registered voters from circulating petitions (*Buckley*);

- Required petition circulators to wear name badges (*Buckley*);

- Required the names, addresses, and compensation of paid petition circulators to be reported to the State (*Buckley*); and

- Prohibited petition circulation in the twelve months preceding a general election (*SD Voice v. Noem*, 60 F.4th 1071 (8th Cir. 2023)).

Each of these laws regulated the communicative element of initiative campaigns. In contrast, in the *Biddulph* camp, courts have found that the following regulations did not implicate the First Amendment:

- State procedures for judicial review of ballot measures and their removal from the ballot (*Biddulph*);

- Signature-verification procedures (*Taxpayers United for Assessment Cuts v. Austin*, 994 F.2d 291, 297 (6th Cir. 1993));

- State's calculation of the signature threshold (*Dobrovolny v. Moore*, 126 F.3d 1111 (8th Cir. 1997));

- State's requirement of a supermajority vote to adopt ballot measures (*Walker*);

17

- City's power to repeal or amend laws adopted by initiative (*Molinari*);

- Procedures for the State's preparation of summaries of ballot measures (*Missouri Roundtable for Life v. Carnahan*, 676 F.3d 665 (8th Cir. 2012));

- City's power to implement an ordinance while an initiative to repeal the ordinance is underway (*MacMann v. Matthes*, 843 F.3d 770, 778–79 (8th Cir. 2016));

- State's limit on the number of local referenda that may appear on a ballot (*Jones v. Markiewicz-Qualkinbush*, 892 F.3d 935, 936–38 (7th Cir. 2018));

- State's requirement that signatures be gathered in each State Senate district (*Semple*); and

- State's requirement that signed petition forms be submitted to election officials within 10 days (*Florida Decides Healthcare*, ECF No. 189).

The recent opinion of a stay panel in *Florida Decides Healthcare Inc. v. Florida Secretary of State*, No. 25-12370, 2025 WL 3738554 (11th Cir. Sep. 9, 2025), supports this distinction. There, the court considered a statute that prohibited non-citizens and non-residents from collecting petition forms. The court explained that the statute did not "restrict any speech elements of the petition-circulation process," *id*. at *4, or bar non-citizens and non-residents from engaging with voters in "informative and perhaps persuasive speech," *id*. (quoting *Meyer*, 486 U.S. at 422 n.5). Instead, the statute's "restrictions kick in only after a voter has been convinced to sign the petition form." *Id*. Because "attempts to persuade a Florida voter occur before—not after—

the voter decides to sign a petition form," *id*. at \*5, the statute's "post-signature residency and citizenship provisions" did not "sweep into any aspects of the circulation process that actually implicate 'the exchange of ideas about political change,'" *id*. (quoting *Biddulph*, 89 F.3d at 1498 n.7). The panel decision concluded that the statute did not implicate "the type of interactive communication concerning political change . . . described as 'core political speech'" by the *Meyer* Court. *Id*. at \*4 (quoting *Meyer*, 486 U.S. at 421–23).

Signature verification fees fall squarely in the *Biddulph* camp. The Cost-Recovery Provisions do not regulate petition circulation, the identity of speakers, or their speech. They do not regulate the communicative element of the initiative process or direct, one-on-one communications between petition circulators and voters. Instead, they impose a post-circulation processing requirement that allocates to sponsors the costs incurred by election officials to verify signatures. Like the 10-day deadline that this Court considered at an earlier stage of this litigation, the Cost-Recovery Provisions "kick in after petition circulators have already engaged with voters and gathered completed petitions." ECF No. 189 at 21 n.4. In enacting the Cost-Recovery Provisions here, the Legislature exercised "the power to regulate the initiative process in general" and not "the exchange of ideas about political changes sought through those processes." *Biddulph*, 89 F.3d at 1498 n.7. Plaintiffs' reliance on *Meyer* is misplaced.[2]

---

[2] Plaintiffs hang their hat on *Clean-Up '84 v. Heinrich*, 590 F. Supp. 928 (M.D.

In sum, the Cost-Recovery Provisions do not regulate circulators or their direct one-on-one communications with voters, but rather establish "post-petition-gathering process requirements" that could make the initiative process "more expensive and less efficient"—a distinction this Court has recognized. ECF No. 189 at 18–21. Because the Cost-Recovery Provisions do not regulate speakers or their speech, strict scrutiny does not apply.

### B. Because the Cost-Recovery Provisions Do Not Regulate Speakers or Their Speech, They Do Not Trigger Any Level of Scrutiny.

Having created the statewide initiative-petition process, the State "retains the authority to interpret its scope and availability." *Gibson*, 741 F.2d at 1273. Because the Cost-Recovery Provisions implicate only state-created rights to initiate proposed constitutional amendments, not First Amendment rights, no level of scrutiny applies.

The Eleventh Circuit took this approach in *Biddulph*. The court did not apply *any* scrutiny, including rational-basis review, to the challenged procedures, explaining that "[m]ost" initiative regulations "would not implicate First Amendment concerns."

---

Fla. 1984)—a 41-year-old Middle District order that predates *Meyer*, *Buckley*, and *Biddulph* and was decided on equal-protection grounds. The court's fleeting reference to the First Amendment in *Clean-Up '84* is not only dicta, but also presupposes that the First Amendment secures to initiative sponsors a right of ballot access. *Id.* at 933. Later decisions come to a different conclusion. *See, e.g.*, *Eggers v. Evnen*, 48 F.4th 561, 565 (8th Cir. 2022) (collecting cases); *Gibson*, 741 F.2d at 1272–73. Plaintiffs' reliance on *Libertarian Party of Florida v. State of Florida*, 710 F.2d 790, 793 (11th Cir. 1983), fails for a similar reason: that case concerned a minor-party candidate's access to the ballot, not a claimed First Amendment ballot-access right for initiatives.

89 F.3d at 1500. The court also rejected the *Anderson-Burdick* standard, explaining that an initiative's access to the ballot, unlike a candidate's, depends on state-created rights. *Id*. at 1500 n.10; *accord Fla. Decides Healthcare Inc.*, No. 25-12370 (Doc. 97-2 at 17 n.6).

Other circuits agree. In *Dobrovolny*, *Walker*, *Molinari*, *Carnahan*, *MacMann*, and *Semple*, the courts did not apply any level of scrutiny—not even rational-basis review—once they determined that *Meyer* was inapposite and the First Amendment was not implicated. Thus, in *Molinari*, the Second Circuit explained that the *Anderson-Burdick* framework did not apply in that case and that "[n]o balancing is necessary because plaintiffs do not have a viable First Amendment claim in the first place." 564 F.3d at 596.

Because the Cost-Recovery Provisions do not implicate the First Amendment, no scrutiny is warranted, not even rational-basis review. Whether the Cost-Recovery Provisions are consistent with the state-created right to pursue ballot measures is not a federal question, but one reserved for state courts. But even assuming rational-basis review applies, the challenged laws satisfy that deferential standard for the reasons set forth in Part II.B. below.

## C. A "Severe Burden" Does Not Subject a *Biddulph*-Type Regulation to Strict Scrutiny.

Plaintiffs insist that strict scrutiny applies because, although the Cost-Recovery Provisions do not regulate speech, they "severely burden" speech. Plaintiffs claim the

increased fees increase their costs and strain their budgets and therefore deter potential sponsors from pursuing initiative-petition campaigns. Plaintiffs err as a matter of law.

At the outset, Plaintiffs point to no precedent that applied strict scrutiny to any *Biddulph*-style regulation. Courts reserve strict scrutiny for laws that directly regulate the communicative aspect of initiative campaigns—direct one-on-one communication between petition circulators and voters. In contrast, laws that regulate the initiative process generally but not speakers or their speech do not trigger heightened scrutiny, even if those laws make participation more difficult or expensive. Given the dearth of authority for Plaintiffs' position, if strict scrutiny could ever apply to a *Biddulph*-style law merely because of its deterrent effect, it must be an extraordinary case. This is not it.

*Biddulph* undercuts Plaintiffs' attempt to turn a burden into a First Amendment violation. The sponsor there claimed the challenged procedures subjected sponsors to a "financial gamble" and created a "deterrent effect" that dissuaded First Amendment activity. 89 F.3d at 1496. But the Eleventh Circuit declined to apply strict scrutiny and held that the First Amendment is not implicated whenever a law renders it "less likely" that a measure will achieve ballot placement. *Id*. at 1498 n.7. The First Amendment does not require States to establish initiative processes that are "the most efficient or affordable," *id*. at 1498, or require strict scrutiny "because the process is burdensome," *id*. at 1497.

22

Other circuits have reached the same conclusion. In *Walker*, the Tenth Circuit declined to apply strict scrutiny despite allegations that a supermajority threshold for voter approval created a "chilling effect" and "deter[red] them from exercising their speech rights." 450 F.3d at 1085, 1098. The Second Circuit rejected similar arguments in *Molinari*, despite record evidence that the challenged ordinance would make voters "less likely to participate in the referendum process." 564 F.3d at 590, 595. In *Jones*, the Seventh Circuit upheld a State's absolute prohibition against placement of more than three local referenda on the same election ballot. 892 F.3d at 936–38. Indeed, earlier in this case, Plaintiffs here presented evidence that the costs of compliance with a 10-day petition-form submission deadline would leave them with "less money to spend" on communication with voters. ECF No. 189 at 20; *see also* ECF No. 19-1 ¶ 25; ECF No. 91-1 ¶ 29. Yet none of the courts in these cases applied strict scrutiny.

These results makes sense. The initiative process is part of a State's *lawmaking* authority, and States have broad discretion to craft their own lawmaking processes, whether statutory or constitutional. Just as the First Amendment does not prohibit the three-fifths vote threshold for the Legislature to propose a constitutional amendment, Fla. Const. art. XI, § 1, or require the Constitution Revision Commission to meet more often than once every 20 years, *see id*. art. XI, § 2(a), merely because the removal of these impediments would generate more speech, it does not dictate the mechanics of the initiative method of proposing constitutional amendments, *see Walker*, 450 F.3d

23

at 1103 ("As we have already explained, the supermajority requirement at issue here is a regulation of the legislative process, not a regulation of speech or expression."); *Marijuana Pol'y Project v. United States*, 304 F.3d 82, 85 (D.C. Cir. 2002) ("The MPP, moreover, cites no case . . . establishing that limits on legislative authority—as opposed to limits on legislative advocacy—violate the First Amendment."). Principles of comity and federalism support *Biddulph*'s distinction between a State's regulation of the free exchange of ideas and its regulation of the exercise of its lawmaking power.

Plaintiffs ask the Court to engage in an intractable line-drawing exercise. They do not object to a total fee of $910,000, even though other sponsors might be unable to pay that much or even 10 percent of that amount. Still others, like SSF, might easily be able to pay many times more. While Plaintiffs do not deny Florida's right to impose *some* verification fee—or argue that Florida must calibrate its fee to each sponsor's financial outlook—Plaintiffs have not identified the constitutionally ordained limit on verification fees. Rather, they make *their* budgets the measure of constitutionality.

A State's regulation of its initiative process is not subject to First Amendment scrutiny merely because it is "burdensome," *Biddulph*, 89 F.3d at 1497, or is not "the most efficient or affordable," *id*. at 1498, or "imposes unnecessary costs," *id*. at 1500, or is not structured "in the most efficient, user-friendly way possible," *id*. at 1500–01. Any fee will necessarily impact the availability of funds for other campaign activities, but that alone does not make a regulation unconstitutional under the First Amendment.

24

Indeed, by Plaintiffs' logic, many initiative regulations would be subject to the nearly insurmountable strict-scrutiny standard. The requirement that a sponsor collect more than 880,000 valid signatures, or that the sponsor collect a minimum number of signatures in each of one half of Florida's congressional districts, Fla. Const. art. XI, § 3, or that an initiative receive the support of three-fifths of voters, *id*. art. XI, § 5(e), are perhaps the strongest deterrents to initiative campaigns. Yet courts have never held that such regulations implicate the First Amendment and are subject to strict scrutiny.

Plaintiffs' reliance on *Noem* is misplaced. There, the court concluded that South Dakota's deadline to file petitions—one year before the general election—implicated the First Amendment. It did so not merely because the statute "reduced the quantum of speech," ECF No. 356-1 at 18, but also because the deadline "effectively prohibits circulating petitions during the year prior to the election," "cabining core political speech in the form of petition circulation to a period no closer than a year before an election." 60 F.4th at 1078. The statute directly regulated the communicative aspect of the campaign. *Forsyth County v. Nationalist Movement*, 505 U.S. 123 (1992), is similarly distinguished. There, the Court held that a fee to provide security at demonstrations was content-based. To determine the size of the fee, the county considered the content of the demonstration and then determined the extent of security it believed would be necessary to provide security to a demonstration on that subject. The Cost-Recovery Provisions do not differentiate between messages and are not content-based.

Thus, neither *Noem* nor *Forsyth County* supports a challenge to the Cost-Recovery Provisions here.

**D.    Even If a "Severe Burden" Could Subject a *Biddulph*-Type Regulation to Strict Scrutiny, Plaintiffs Cannot Establish a Severe Burden.**

Next, as a factual matter, Plaintiffs cannot prove a severe burden on their First Amendment rights.

According to FDH's expert witness, Dr. Michael C. Herron, HB 1205 increased the average signature verification fee by **$2.48** per petition, from **$0.87** to **$3.35**. But this Court has already declined to apply strict scrutiny to a statute that allegedly imposed *even greater costs*. In declining to enjoin a 10-day deadline to submit petition forms, this Court referenced SSF's evidence that the deadline would increase SSF's per-petition costs by **$3.42**. ECF No. 189 at 20. SSF also insisted that it had "lost circulators, redeployed others, and . . . already seen a decline of 75% in signed petitions." *Id*. at 30. FDH similarly offered evidence that compliance with the 10-day deadline would force it "to divert limited resources away from outreach and signature collection to cover the escalating costs of compliance." ECF No. 19-1 ¶ 25. It argued (much as it does here) that the 10-day deadline and related fines had "disrupted [its] operations, drained resources, and chilled participation by circulators and volunteers." ECF No. 92-1 at 9; *accord id*. at 29–30. Despite alleging that the deadline imposed "a regime of chilling petition-signature gathering," this Court was unpersuaded that such

"post-petition-gathering processing requirements cross the line into one of the 'narrow circumstances' within which this Court must apply strict scrutiny." ECF No. 189 at 18 (quoting *Biddulph*, 89 F.3d at 1500). While this Court recognized that Plaintiffs' campaigns had "become more expensive" and a "riskier, more expensive endeavor," *id*. at 21–22, it nevertheless concluded that strict scrutiny did not apply. If a $3.42 increase does not severely burden speech and require strict scrutiny, then neither does a $2.48 increase.

Moreover, as a factual matter, Plaintiffs cannot prove that the Cost-Recovery Provisions severely burden their speech.

**Smart & Safe Florida.** For SSF, the increased signature verification fees are no more than the proverbial drop in a bucket. Since August 2022, SSF has raised an eye-popping $205 million—nearly all of it from one donor. For SSF, the increase in verification fees will hardly make a ripple. With its mammoth resources, SSF cannot prove that the increased fees will impair its ability to speak, let alone severely burden its speech.

**Florida Decides Healthcare.** FDH cannot prove a severe burden either—but for a different reason: it collects so few petitions that it will not incur verification costs exceeding the amount it budgeted for signature verification before HB 1205 ever took effect.

FDH budgeted $910,000 for signature verification before HB 1205 took effect. FDH's Objs. & Resps. to Defs. Supervisors of Elections' First Set of Interrogs. at 3 (Nov. 14, 2025). FDH challenges neither the pre-HB 1205 fees nor its budgeted cost of $910,000 to satisfy those fees.

At an average cost of $3.35 per petition, an initiative sponsor would need to submit 271,642 signed petitions for verification before it exceeds a $910,000 budget.

FDH has never come close to collecting 271,642 petition forms—and whether ever it will is wholly speculative. During its most recent (now suspended) campaign, FDH collected and submitted only 126,840 petitions, less than 10 percent of its stated goal of 1.3 million. FDH's Objs. & Resps. to Defs. Supervisors of Elections' Second Set of Interrogs. at 2–3 (Dec. 1, 2025); FDH Dep. at 29:10–15, 37:15–39:1, 41:4–10, 43:8–17. At $3.35 per petition, verifying 126,840 petitions would cost $424,914—an amount that fits comfortably within FDH's $910,000 signature verification budget.

FDH was behind schedule from the start. Its goal was to collect 100,000 signed petitions by May 1; 200,000 by June 1; and 300,000 by July 1, 2025. FDH Dep. at 32:15–33:14, 35:4–22. Although it began paid petition circulation by early April 2025, it submitted only 25,864 petitions by May 1; 74,640 by June 1; and 102,307 by July 1, 2025. FDH's Objs. & Resps. to Defs. Supervisors of Elections' Second Set of Interrogs. at 2–3 (Dec. 1, 2025); FDH Dep. at 30:22–31:9, 37:15–39:1, 41:4–10, 43:8–17.

A lack of fundraising—not the Cost-Recovery Provisions—was the source of FDH's difficulties. In March 2025, FDH estimated that, to secure ballot placement, it would need to raise $19 million by the end of the campaign's ballot-placement phase on February 1, 2026. FDH Dep. at 14:19–15:10, 16:9–17:9, 24:3–19, & Errata Sheet.[3] By May 2025, for reasons unrelated to verification fees, FDH increased that estimate to $28 million. *Id.* at 17:10–17, 19:25–20:17, 23:18–24:19, & Errata Sheet; FDH's Objs. & Resps. to Defs. Supervisors of Elections' First Set of Interrogs. at 8 (Nov. 14, 2025).

FDH fell far short. Over the first three quarters of 2025, and through the date it suspended its campaign on September 25, 2025, FDH raised only $2.88 million. *Id.* at 4; FDH's Objs. & Resps. to Defs. Supervisors of Elections' Second Set of Interrogs. at 8 (Dec. 1, 2025). FDH faced a "significant budget shortfall." FDH's Objs. & Resps. to Defs. Supervisors of Elections' First Set of Interrogs. at 4 (Nov. 14, 2025). In July 2025, FDH began to distribute petition forms by mail. *Id.* at 9; FDH Dep. at 59:10–60, 61:6–17, & Errata Sheet. Soon after, it discontinued its paid petition circulation. FDH's Objs. & Resps. to Defs. Supervisors of Elections' First Set of Interrogs. at 4, 6 (Nov. 14, 2025).

---

[3] Initiative campaigns are expensive, with or without HB 1205. FDH's expert witness, Dr. Daniel A. Smith, admits it, and FDH's $25 million, pre-HB 1205 budget estimate proves it. These facts refute FDH's narrative that HB 1205 is responsible for wiping out the grassroots initiative campaign. *See, e.g.*, ECF No. 356-1 at 26, 29.

FDH's corporate representative admitted that FDH shifted to mail distribution and away from paid petition circulation in part because FDH was not on track to raise the $28 million it needed and was unable to raise enough money to pay its petition circulators. FDH Dep. at 62:6–13, 63:19–25. This shift to mail distribution allowed FDH to reduce its budget by $10 million. *Id*. at 59:10–60:1; FDH's Objs. & Resps. to Defs. Supervisors of Elections' First Set of Interrogs. at 4, 9 (Nov. 14, 2025). FDH described its petition mail-distribution program as successful. FDH Dep. at 66:6–25 & Errata Sheet.

Still, FDH failed to raise the money it needed. FDH suspended its campaign at least in part because it had raised only about 10 percent of the amount it had set out to raise and because it was unlikely to raise the amount it needed. FDH Dep. at 72:3–19.

FDH's history underscores the speculative nature of its asserted injury and of the purported burden on its First Amendment activities. FDH failed to qualify an initiative in 2018 and 2019, when it collected only 90,250 valid petitions. FDH's Objs. & Resps. to Defs. Supervisors of Elections' First Set of Interrogs. at 2 (Nov. 14, 2025).

Although FDH now insists it will try again, with its sights set on the 2028 ballot, it estimates it will need $18 million to achieve ballot placement. *Id*. at 12; FDH Dep. at 73:5–25.

On this record, FDH cannot establish that the increased signature verification fees severely burden its First Amendment activities—or, for that matter, that it faces

an imminent injury-in-fact cognizable under the First Amendment. *See Lujan v. Defs.*

*of Wildlife*, 504 U.S. 555, 560 (1992). FDH cannot establish any reasonable likelihood

that it will collect enough signed petition forms to exceed its own $910,000 budget.

The First Amendment does not guard against the costs of the initiative process.

It does not "guarantee political success," *Republican Party of N.C. v. Martin*, 980 F.2d

943, 960 (4th Cir. 1992), or that "advocacy will be effective," *Smith v. Ark. State*

*Highway Emp., Loc. 1315*, 441 U.S. 463, 464–65 (1979) (quoting *Hanover Twp.*

*Fed'n of Tchrs., Loc. 1954 v. Hanover Cmty. Sch. Corp.*, 457 F.2d 456, 461 (7th Cir.

1972)). That the Cost-Recovery Provisions might make an initiative "less likely to

succeed" does not suggest a constitutional violation. *Molinari*, 564 F.3d at 600 (quot-

ing *Walker*, 450 F.3d at 1100).

Finally, FDH argues that the Cost-Recovery Provisions impose a severe burden

because the signature verification fees must be paid by the same 10-day deadline that

applies to the submission of collected petition forms—and that it does not always have

enough cash on hand. But this cash-on-hand argument is unfounded. While a sponsor

must submit a signed petition form within 10 days after collection, nothing requires it

to pay the fee within 10 days. *See* Fla. Stat. § 100.371(7)(a). A sponsor may pay later.

If the sponsor does not pay the fee when it submits the petition form, then the elections

office will hold the petition form until it receives full payment of the fee and will

verify the petition form after it receives full payment. The deadline to verify the form

begins to run once the elections office has received full payment. *Id*. § 100.371(14)(b).

In response, FDH relies on a few ambiguous emails sent by employees of county election offices. It claims these emails show that sponsors must submit full payment by the 10-day deadline to submit petition forms—or else. But the emails say no such thing. Meanwhile, FDH's corporate representative conceded that, although FDH never paid the increased fees during the moratorium period, but rather submitted only partial payment based on prior fees, no state or county election official ever fined or penalized FDH for its failure to submit full payment by the 10-day deadline. FDH Dep. at 79:4–80:15. There is no basis for FDH's assertion that initiative sponsors must pay verification fees immediately—even if they do not have enough "cash on hand."

Plaintiffs' contention that the Cost-Recovery Provisions severely burden their speech omits too many material facts and relies on too many assumptions to support a first-of-its-kind conclusion: that laws that regulate neither speakers nor their speech are nevertheless subject to strict scrutiny because of their deterrent effect on a state-created process. Strict scrutiny is therefore unwarranted as a matter of both law and fact.

### E.    The Cost-Recovery Provisions Are Not a Content-Based Regulation of Speech.

Finally, Plaintiffs argue that the Cost-Recovery Provisions are a content-based regulation of speech. This argument misfires for two reasons.

*First*, whether a speech restriction is content-based or content-neutral dictates the level of scrutiny that applies. *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1258 (11th Cir. 2005). But that inquiry assumes the challenged law is a speech restriction in the first place. The threshold question is whether the Cost-Recovery Provisions regulate speech and therefore implicate the First Amendment at all. They do not. As the Supervisors explain above, the Cost-Recovery Provisions apply only after the petition circulator has engaged with the voter and the voter has signed the petition form. The analysis ends before the Court must decide whether the challenged law is content-based.

*Second*, the Cost-Recovery Provisions are content-neutral; they apply equally to all statewide initiative provisions regardless of subject matter. Whether an initiative petition addresses abortion, crime, healthcare, insurance, or any other topic, the same Cost-Recovery Provisions apply.

Plaintiffs' claims that the Cost-Recovery Provisions are content-based because they do not apply to candidate petitions and local-issue petitions are unavailing. The Ninth Circuit rejected this contention in *Prete v. Bradbury*, 438 F.3d 949 (9th Cir. 2006). There, the plaintiffs challenged a prohibition on paying petition circulators on a per-petition basis, arguing that the law was content-based because it did not apply to candidate or recall petitions. *Id*. at 951, 968 n.25. The court disagreed and explained that, because the challenged law did not "regulate what can be said in an initiative" or

"adopt or reject any particular subject that can be raised in a petition," the challenged law was not content-based. *Id*.

The same is true here. The applicability of the Cost-Recovery Provisions does not depend on "the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). A regulation of initiative petitions is not content-based simply because it does not apply to local referenda. What matters is that the challenged law applies to all initiatives, regardless of content or a sponsor's message. For this additional reason, the Cost-Recovery Provisions are not subject to strict scrutiny.

### F.    What Other States Do—or Do Not Do—Is Irrelevant.

Plaintiffs and their expert, Dr. Daniel A. Smith, contend that, among the fifteen States that permit initiative amendments to their constitutions, only Florida imposes a per-petition verification fee. That fact might make good trivia, but it is hardly relevant.

*First*, a state law is not unconstitutional because it is uncommon. "States retain autonomy to establish their own governmental processes." *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 816 (2015). Far from frowning upon innovation and experimentation, the federal system established by the United States Constitution encourages it. *Id*.; *accord New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting) ("It is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory;

34

and try novel social and economic experiments without risk to the rest of the country.").

*Second*, Dr. Smith will concede that twelve of the fifteen States do not validate each individual petition form separately, but rather use statistical sampling techniques to ease the burden of verification. In Florida, however, an appellate court long ago interpreted the Florida Constitution to prohibit "a random or spot check" of initiative petition forms and to require each initiative petition form to be verified individually. *See Let's Help Fla. v. Smathers*, 360 So. 2d 494, 496 (Fla. 1st DCA 1978). Florida is thus one of only four States to require petition-by-petition verification, and Dr. Smith concedes that he does not know whether the twelve States that utilize statistical sampling would charge for verification if their constitutions required them to verify each petition individually.

The remaining three States that verify petition forms individually have much smaller populations than Florida. This Court may take judicial notice of the fact that, according to the 2020 census, Ohio has a population of 11,799,448—barely half of Florida's population (21,538,187)—while Nebraska and Oklahoma have populations of 3,959,353 and 1,961,504 people, respectively. *See* https://data.census.gov/profile. Dr. Smith acknowledges that these States have much lower signature thresholds than Florida does. Of course, the burden of verification in Florida is much greater than in States that verify only a small sample of petition forms or that have far lower signature

thresholds than Florida does. Thus, the fact that other States do not shift the burden of verification to sponsors sheds no light on the constitutional validity of the policies that govern Florida's initiative process.

### G. Signature Verification Fees Are Levied in Direct Proportion to the Burden That Each Sponsor Imposes on Election Officials.

FDH claims that Florida's signature verification is "levied in direct proportion" to First Amendment activity. ECF No. 356-1 at 22. It is not. Rather than being tied to speech, the fee is directly proportional to the burden that a sponsor places on election officials, based upon verification requirements established by legislative enactments.

Initiative sponsors and circulators engage in numerous interactions with voters that never result in a signed petition form. Those efforts to persuade include protected speech regardless of whether they succeed. The signature verification fee, however, is levied only when a Supervisor receives and must process a signed petition form. It therefore bears no direct or even approximate relationship to an initiative sponsor's protected speech.

On the other hand, the correlation between imposition of the fee and imposition of a burden on election officials is exact. The Supervisors incur costs only when signed petition forms are submitted for verification, and the verification fee is imposed only in those circumstances. Where no administrative burden is imposed, no fee is charged.

Finally, Plaintiffs propose no better way to reimburse election officials for the

burdens of verification. A flat fee that applies equally to all sponsors—regardless of whether the sponsor submits one petition or one million—would be an irrational way to make the public whole for the different burdens associated with different initiatives.

## II.    THE COST-RECOVERY PROVISIONS DO NOT VIOLATE EQUAL PROTECTION.

Plaintiffs claim the Cost-Recovery Provisions violate equal protection because the cost of verification is higher for statewide initiatives petitions than for candidate or local-issue petitions. This claim is subject to rational-basis review, which the Cost-Recovery Provisions satisfy. The greater burden that initiative verification imposes on the public justifies a higher fee. The Cost-Recovery Provisions protect the public fisc and ensure that significant public resources are not used to subsidize private initiative campaigns.

### A.    The Cost-Recovery Provisions Are Subject to Rational-Basis Review.

Because the Cost-Recovery Provisions do not implicate a fundamental right or suspect classification, rational-basis review applies. The Cost-Recovery Provisions are therefore entitled to "a presumption of rationality that can only be overcome by a clear showing of arbitrariness and irrationality." *Hodel v. Indiana*, 452 U.S. 314, 331–32 (1981).[4]

---

[4] The Orange County Supervisor does not join in Part II.A.

In some cases—specifically where differential burdens are imposed on the right to vote—the *Anderson-Burdick* balancing test provides heightened scrutiny. *Democratic Exec. Comm. v. Lee*, 915 F.3d 1312, 1319 (11th Cir. 2019) (concluding that *Anderson-Burdick* applies to elections laws that "treat voters differently in a way that burdens the fundamental right to vote" (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 429 (6th Cir. 2012))); *accord Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1261–62 (11th Cir. 2020) (concluding that *Anderson-Burdick* does not apply to an election law that "does not burden the right to vote"). But "when plaintiffs proffer no evidence that the challenged law burdens their right to vote, rational basis review applies." *Fla. State Conf. of NAACP v. Lee*, 566 F. Supp. 3d 1262, 1287 (N.D. Fla. 2021).

This is not a "ballot access" case involving the fundamental right to vote. While restrictions on *candidates*' access to the ballot implicate the right to vote, courts have rejected the argument that restrictions on *initiatives*' placement on the ballot affect the same rights.

Thus, in *Gibson*, the Eleventh Circuit explained that the initiative process does not implicate the right to vote. In rejecting a claim that the Florida Supreme Court's removal of an initiative from the ballot violated the right to vote, the court explained that the "rights of candidates to offer themselves for public office and the rights of voters to vote for or against those candidates" are "universally recognized as the lynchpins of our democratic form of government"—but that "no voters have been

denied the right to vote" by the removal of an initiative from the ballot. 741 F.2d at 1273. The right to place initiatives on the ballot, and to vote for or against initiatives, "derive from wholly state-created procedures by which issues that might otherwise be considered by elected representatives may be put to the voting populace." *Id*. The State "retains the authority to interpret [the] scope and availability" of its initiative procedure, and sponsors "can claim no constitutionally-protected right to place issues before the Florida electorate." *Id*.

Courts across jurisdictions have reached the same conclusion. *See*, *e.g.*, *Eggers v. Evnen*, 48 F.4th 561, 565–66 (8th Cir. 2022) (collecting cases and explaining that the "right to vote in an election of political representatives" is "fundamental," while the right to place initiatives on the ballot is "state-created" and "nonfundamental," and applying rational-basis review to an equal-protection challenge (quoting *Bernbeck v. Gale*, 829 F.3d 643, 645, 648 n.4 (8th Cir. 2016))); *Jones*, 892 F.3d at 937–38 (finding no federal constitutional right to propose initiatives); *Kendall v. Balcerzak*, 650 F.3d 515, 5123 (4th Cir. 2011) ("The basis for distinguishing the right to vote in a representative election . . . from the right to petition for referendum and initiative . . . is a sound one. The referendum is a form of direct democracy and is not compelled by the Federal Constitution."); *Austin*, 994 F.2d at 297 (applying rational-basis review and explaining that "no fundamental right is involved" in an equal-protection challenge to procedures for signature verification).

Thus, in *Biddulph*, the court rejected the application of the *Anderson-Burdick* standard to an initiative petition in the First Amendment context. 89 F.3d at 1500 n.10. It noted that "this case involves an initiative's access to the ballot, not a candidate's." *Id*. "This difference is material," the court concluded, "because . . . the right to place an initiative on the ballot is a right created by the state." *Id.* For the same reason, the *Anderson-Burdick* standard is inapplicable to an initiative's access to the ballot in the equal-protection context. *See Fla. Hometown Democracy*, *Inc. v. Browning*, No. 4:08-cv-00373, 2008 WL 4081174, at *3–4 (N.D. Fla. Aug. 29, 2008) (applying rational-basis review to an equal-protection challenge involving Florida's initiative process because the fundamental right to vote is "not implicated by Plaintiffs' ballot placement issues"); *Kelly v. Macon-Bibb Cnty. Bd. of Elections*, 608 F. Supp. 1036, 1038 (M.D. Ga. 1985) (explaining that "referendums, unlike general elections for a representative form of government, are not constitutionally compelled" and that this "is *not* a 'right to vote' case").

The ballot-access cases on which Plaintiffs rely concern candidates' access to the ballot. *See Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979) (explaining that a political party's right to associate implicates the right to vote since voters "can assert their preferences only through candidates or parties" (quoting *Lubin v. Panish*, 415 U.S. 709, 716 (1974))); *Anderson v. Celebrezze*, 460 U.S. 780, 786 (1983) ("The impact of candidate eligibility requirements on voters implicates

basic constitutional rights."); *Cowen v. Georgia Sec'y of State*, 960 F.3d 1339, 1344 (11th Cir. 2020) (explaining that "our precedent makes clear that it is the law in this circuit to apply *Anderson* to ballot-access requirements for all candidates"); *Fulani v. Krivanek*, 973 F.2d 1539, 1548 (11th Cir. 1992) (invalidating a statute that provided an undue-burden waiver of filing fees to major-party but not minor-party candidates).

In *Jacobson*, the court identified categories of laws that the Supreme Court and the Eleventh Circuit have evaluated under the *Anderson-Burdick* framework. 974 F.3d at 1261. These laws included restrictions on a "political party's or candidate's access to the ballot, which would interfere with voters' ability to vote for and support that party or candidate," and laws that "burden the associational rights of political parties by interfering with their ability to freely associate with voters and candidates of their choosing." *Id*. It did not suggest that an initiative's access to the ballot implicates the same fundamental rights and calls for the same heightened scrutiny as a candidate's.

With no showing that the Cost-Recovery Provisions place unequal burdens on the right to vote, the rational-basis standard applies to this equal-protection challenge.

## B.    The Cost-Recovery Provisions Satisfy Rational-Basis Review.

"Almost every statute subject to the very deferential rational basis scrutiny standard is found to be constitutional." *Williams v. Pryor*, 240 F.3d 944, 948 (11th Cir. 2001). Here, the Legislature had a rational reason to impose the fees that Plaintiffs contest: to protect the public fisc and to ensure that public resources do not subsidize

41

initiative campaigns. *See Diaz v. Cobb*, 541 F. Supp. 2d 1319, 1338 (S.D. Fla. 2008) (discussing the significant time, labor, and expense that signature verification imposes on election offices). The Cost-Recovery Provisions therefore shift to sponsors some costs associated with placing their initiatives on the ballot. In doing so, the Legislature aimed to "reduc[e] the strain on the public fisc," *see Minn. Senior Fed'n*, *Metro. Region v. United States*, 273 F.3d 805, 809 (8th Cir. 2001), and avoid subsidization of private political activity with public dollars, *see Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358–61 (2009) (concluding that a State's interest in avoiding "entanglement in partisan politics" and declining to fund "the expression of particular ideas" satisfied rational-basis review). These justifications easily satisfy lenient, rational-basis review.

FDH's expert witness, Dr. Smith, offers another rational basis for the signature verification fees. He explains that the increases in fees create a cost disincentive for sponsors to submit defective forms. Dr. Smith explains that increased costs encourage sponsors to do their due diligence and ensure that voters provide accurate information and complete all parts of the petition form. Otherwise, the sponsor knows it must pay the fee for verification of a petition form that the Supervisors will conclude is invalid.

That the Legislature did not address the cost of all signature verifications in the same way, such as costs associated with candidate and local-issue petitions, does not render the Cost-Recovery Provisions irrational. "[A] statute is not invalid . . . because it might have gone farther than it did." *City of New Orleans v. Dukes*, 427 U.S. 297,

305 (1976). The Legislature may advance interests incrementally, *Williams*, 240 F.3d at 948–50, or "select one phase of one field and apply a remedy there, neglecting the others," *Williamson v. Lee Optical of Okla. Inc.*, 348 U.S. 483, 489 (1955). That is all it did here.

The Legislature's decision to start with initiatives and to impose an actual-cost requirement on initiatives rather than candidate and local-issue petitions is rational. The verification of initiative petitions is more expensive, time-consuming, and labor-intensive for Supervisors than the verification of candidate and local-issue petitions. There are significant differences in rules, processes, and volume that make the time, expense, and labor associated with the verification of initiative petition forms greater than the time, expense, and labor associated with verification of other petition forms.

The following requirements—only some of which were created by HB 1205—apply to initiative petitions but not to other petitions. Each contributes to render the verification of initiative petitions more onerous than the verification of other petitions:

- Initiative petition forms must include—and the Supervisors must verify—the voter's Florida driver-license or identification-card number or the last four digits of the voter's social-security number. Fla. Stat. § 100.371(14)(c)3.d.

- Initiative petition forms distributed by petition circulators must include a petition circulator's affidavit that displays information about the petition circulator. Supervisors must verify that the petition circulator was validly registered when the signature was obtained. *Id*. § 100.371(14)(c)5., (14)(h).

- Initiative petition forms must be verified within 60 days after the Supervisor's office receives the petition form and payment of the signature verification fee. *Id*. § 100.371(14)(b).

43

- Each month, Supervisors must transmit digital images of all received petition forms to the Division of Elections. Between December 1 of each odd-numbered year and the following February 1, these transmittals must be made weekly. Each transmittal must identify each petition form as valid or invalid. *Id*. § 100.371(14)(d).

- By March 15 of each even-numbered year, the Supervisors must deliver all physical petition forms to the Division. *Id*.

- A Supervisor who determines a signature to be valid must mail a verification notice to the voter. The notice invites the voter to notify the Office of Election Crimes and Security (OECS) if the voter's signature was forged or misrepresented. It includes a postage-prepaid form for that purpose. The prepaid postage is charged to the Supervisor if and when the voter mails the form. Upon OECS's receipt of the form, the Supervisor must invalidate the petition form. *Id*. § 100.371(14)(e).

- Each month, the Supervisors must post information online about each active initiative, including the number of signatures submitted, processed, and validated. Between December 1 of each odd-numbered year and the following February 1, these reports must be posted weekly. If more than 25 percent of a sponsor's petition forms are found invalid in any reporting period, then the Supervisor must notify OECS. *Id*. § 100.371(14)(g).

- Supervisors must electronically report data regarding initiative petition forms to the Division. By the deadline to verify a petition form, the Supervisor must report to the Division the initiative's serial number, the date of verification, the number of verified signatures by congressional district, the number of invalid signatures, and the petition circulator's registration number, if applicable. Fla. Admin. Code r. 1S-2.0091(5).

- Supervisors must record the date on which each petition form was received. Fla. Stat. § 100.371(14)(b)–(c). This step ensures compliance with the requirement that sponsors and petition circulators submit petition forms within 10 days after the date of the voter's signature. Fla. Stat. § 100.371(7)(a).

- If a sponsor or a petition circulator submits a petition form after the 10-day deadline, then the Supervisor must electronically submit copies of the

untimely filed petition forms to the Division. Fla. Admin. Code r. 1S-2.0091(2)(b).

- If an initiative petition form was signed by a voter registered outside the county the Supervisor serves, then the Supervisor's office must notify both the petition sponsor and the Division of the misfiled form. Fla. Stat. § 100.371(14)(b).

The verification of initiative petition forms also differs from the verification of other petition forms in several additional respects.

*First*, the proponent of a candidate or local-issue petition may elect verification of a statistical sample of signed petition forms. *Id*. § 99.097(1)–(2); Fla. Admin. Code r. 1S-2.008. For obvious reasons, statistical sampling considerably decreases the time and expense of verification. In Florida, however, the Constitution has been interpreted to require each initiative petition to be verified individually. *Let's Help Fla.*, 360 So. 2d at 496. This difference in method vastly increases the relative burdens of verifying petition forms.

*Second*, on balance, a much larger percentage of initiative petition forms than candidate and local-issue petition forms are deemed invalid. Historically, about one-third of all initiative petition forms have been found invalid, whether because they are duplicates or for other reasons. Invalid petition forms take more time to verify and add to the costs and burden of verification.

*Third*, in general, Supervisors receive many more initiative petition forms than candidate and local-issue petition forms. For example, between January 1, 2024, and

45

December 31, 2025, the Leon County Supervisor of Elections processed nearly four times as many initiative petition forms (45,027) as candidate and local-issue petition forms (11,549). From May 1, 2023, to January 1, 2026, more than 75 percent of the 337,699 petition forms received by the Miami-Dade County Supervisor of Elections were initiative petition forms. Accordingly, the verification of initiative petition forms places a far greater burden on Supervisors than the verification of other petition forms.

Given these notable differences, it cannot be irrational for the Legislature, in stewardship of public funds, to require initiative sponsors to reimburse the public for the actual cost of verification, while allowing candidates (whose access to the ballot implicates the fundamental right to vote) and local-issue petition organizers to pay a reduced fee. The Equal Protection Clause did not constrain the Legislature to ignore these differences and require taxpayers to subsidize initiatives that many of them may strongly oppose. Yet that is what Plaintiffs demand: taxpayer support for their private political aims, with no means for the public to recoup the cost. States are "not required to assist others in funding the expression of particular ideas, including political ones." *Ysursa*, 555 U.S. at 358; *see also Chi. Tchrs. Union*, *Local No. 1 v. Hudson*, 475 U.S. 292, 305 (1986) ("[T]he quality of respondents' interest in not being compelled to subsidize the propagation of political or ideological views that they oppose is clear.").

Each Supervisor's operations are funded at a local level by each county's board of county commissioners, and those funds are included in the county's general fund

46

budget. *See* Fla. Stat. § 129.201(5). It was entirely rational for the Legislature to draw a distinction between requiring county governments to spend local tax dollars to fund petition verification for candidate petitions and local-issue petitions without requiring the same local governments to spend local tax dollars to subsidize statewide initiative petition verification. When coupled with the larger volume and higher invalidity rates of statewide initiative petition forms, the rational basis for requiring sponsors rather than local taxpayers to shoulder the costs of petition verification is readily apparent: local government tax dollars are better employed to fund public safety, transportation, and other critical local needs than to fund the political aspirations of statewide petition sponsors.

Plaintiffs ask this Court to require the local taxpayer to shoulder part of the cost of their statewide campaigns. The Constitution does not forbid the Legislature's policy decision to require sponsors to bear the costs that result from their campaigns. Any member of the public who wishes to support these campaigns may do so by voluntary contributions.

## CONCLUSION

For these reasons, the Supervisors respectfully request judgment in their favor as to the Cost-Recovery Provisions.

Dated January 16, 2026.                    Respectfully submitted,


/s/ *John T. LaVia, III*                    /s/ *Andy Bardos*
John T. LaVia, III                          Andy Bardos
Florida Bar No. 0853666                     Florida Bar No. 822671
GARDNER BIST KING & WOOD                    J. Timothy Moore, Jr.
1300 Thomaswood Drive                       Florida Bar No. 70023
Tallahassee, Florida 32308                  GRAYROBINSON, P.A.
Telephone: 850-385-0070                     301 South Bronough Street, Suite 600
jlavia@gbkwlaw.com                          Tallahassee, Florida 32301
*Attorneys for Defendants, Supervisors of*  Telephone: 850-577-9090
*Elections for Clay, Martin, Osceola,*      andy.bardos@gray-robinson.com
*Palm Beach, Polk, and St. Lucie*           *Attorneys for Defendant, Supervisors of*
*Counties*                                  *Elections for Charlotte, Collier, Indian*
                                            *River, Lake, Lee, Manatee, Marion,*
                                            *Monroe, Pasco, and Seminole Counties*


/s/ *Geraldo Olivo*                         /s/ *Susan Erdelyi*
Geraldo F. Olivo, III                       Susan S. Erdelyi
Florida Bar No. 0060905                     Florida Bar No. 0648965
HENDERSON, FRANKLIN, STARNES                MARKS GRAY, P.A.
& HOLT, P.A.                                1200 Riverplace Blvd., Suite 800
1715 Monroe Street                          Jacksonville, Florida 32207
Fort Myers, Florida 33905                   Telephone: 904-398-0900
Telephone: 239-344-1100                     serdelyi@marksgray.com
jerry.olivo@henlaw.com                      *Attorneys for Defendants, Supervisors of*
*Attorneys for Defendants, Supervisors of*  *Elections for Baker, Bay, Bradford,*
*Elections for Glades, Hardee, Hendry,*     *Calhoun, Columbia, Dixie, Franklin,*
*Holmes, Levy, and Okeechobee Counties*     *Gadsden, Gulf, Hamilton, Jackson,*
                                            *Lafayette, Nassau, Putnam, St. Johns,*
                                            *Santa Rosa, Sumter, Suwannee, Taylor,*
                                            *Walton, Wakulla, and Washington*
                                            *Counties*

/s/ *Frank Mari*
Frank M. Mari
Florida Bar No. 93243
TESSITORE MARI SCOTT, PLLC
1485 International Parkway, Suite 2031
Lake Mary, Florida 32746
Telephone: 321-363-1634
fmari@tessmari.com
*Attorneys for Defendant, Supervisor of Elections for Brevard County*

/s/ *Robert Swain*
Robert C. Swain
Florida Bar No. 366961
ALACHUA COUNTY ATTORNEY'S OFFICE
12 Southeast 1st Street
Gainesville, Florida 32601
Telephone: 352-374-5218
bswain@alachuacounty.us
*Attorneys for Defendant, Supervisor of Elections for Alachua County*

/s/ *Devona Reynolds Perez*
Adam Katzman
Florida Bar No. 652431
Devona A. Reynolds Perez
Florida Bar No. 70409
BROWARD COUNTY ATTORNEY'S OFFICE
115 South Andrews Avenue, Suite 423
Fort Lauderdale, Florida 33301
Telephone: 954-357-7600
akatzman@broward.org
dreynoldsperez@broward.org
*Attorneys for Defendant, Supervisor of Elections for Broward County*

/s/ *Tiffiny Douglas Pinkstaff*
Tiffiny Douglas Pinkstaff
Florida Bar No. 682101
OFFICE OF THE GENERAL COUNSEL
117 W. Duval Street, Suite 480
Jacksonville, Florida 32202
Telephone: 904-255-5072
tpinkstaff@coj.net
*Attorneys for Defendant, Supervisor of Elections for Duval County*

/s/ *Dale A. Scott*
Dale A. Scott
Florida Bar No. 0568821
TESSITORE MARI SCOTT, PLLC
1485 International Parkway, Suite 2031
Lake Mary, Florida 32746
Telephone: 321-363-1634
dscott@tessmari.com
*Attorneys for Defendant, Supervisor of Elections for Citrus County*

/s/ *Christi Hankins*
Christi Hankins
Florida Bar No. 483321
ESCAMBIA COUNTY ATTORNEY'S OFFICE
221 Palafox Place, Suite 430
Pensacola, Florida 32502
Telephone: 850-595-4970
cjhankins@myescambia.com
*Attorneys for Defendant, Supervisor of Elections for Escambia County*

/s/ *Melissa A. Tartaglia*

Jon A. Jouben
Florida Bar No. 149561
Melissa A. Tartaglia
Florida Bar No. 116033
HERNANDO COUNTY ATTORNEY'S OFFICE
20 North Main Street, Suite 462
Brooksville, Florida 34601
Telephone: 850-754-4122
jjouben@co.hernando.fl.us
mtartaglia@co.hernando.fl.us
*Attorneys for Defendant*, *Supervisor of Elections for Hernando County*

/s/ *Jared D. Kahn*

Jared D. Kahn
Florida Bar No. 105276
PINELLAS COUNTY ATTORNEY'S OFFICE
315 Court Street, Sixth Floor
Clearwater, Florida 33756
Telephone: 727-464-3354
jkahn@pinellas.gov
*Attorneys for Defendant*, *Supervisor of Elections for Pinellas County*

/s/ *Oren Rosenthal*

Oren Rosenthal
Florida Bar No. 86320
MIAMI-DADE COUNTY SUPERVISOR OF ELECTIONS' OFFICE
2700 N.W. 87th Street
Miami, Florida 33172
Telephone: 305-499-8537
oren.rosenthal@votemiamidade.gov
*Attorneys for Defendant*, *Supervisor of Elections for Miami-Dade County*

/s/ *Sarah Jonas*

Sarah Jonas
Florida Bar No. 115989
VOLUSIA COUNTY ATTORNEY'S OFFICE
123 West Indiana Avenue
Deland, Florida 32720
Telephone: 386-736-5950
sjonas@volusia.org
*Attorneys for Defendant*, *Supervisor of Elections for Volusia County*

/s/ *Stephen M. Todd*

Stephen M. Todd
Florida Bar No. 0886203
HILLSBOROUGH COUNTY ATTORNEY'S OFFICE
601 East Kennedy Blvd., 27th Floor
Tampa, Florida 33602
Telephone: 813-272-5670
todds@hillsboroughcounty.org
*Attorneys for Defendant*, *Supervisor of Elections for Hillsborough County*

/s/ *Nicholas Shannin*

Nicholas Shannin
Florida Bar No. 9570
SHANNIN LAW FIRM, P.A.
214 East Lucerne Circle, Suite 200
Orlando, Florida 32801
Telephone: 407-985-2222
nshannin@shanninlaw.com
*Attorneys for Defendant*, *Supervisor of Elections for Orange County*

/s/ *Pausha Taghdiri*
Pausha Taghdiri
Florida Bar No. 1002857
ROPER, TOWNSEND & SUTPHEN, P.A.
255 South Orange Avenue, Suite 750
Orlando, Florida 32801
Telephone: 407-897-5150
ptaghdiri@roperpa.com
*Attorneys for Defendants, Supervisors of Elections for DeSoto, Flagler, Gilchrist, Highlands, Jefferson, Liberty, Madison, and Union Counties*

/s/ *Morgan Bentley*
Morgan Bentley
Florida Bar No. 0962287
BENTLEY GOODRICH KISON, P.A.
783 South Orange Avenue, Suite 300
Sarasota, Florida 34236
Telephone: 941-556-9030
mbentley@bgk.law
*Attorneys for Defendant, Supervisor of Elections for Sarasota County*

/s/ *Matthew Shaud*
Gregory T. Stewart
Florida Bar No. 203718
Matthew R. Shaud
Florida Bar No. 122252
NABORS, GIBLIN & NICKERSON, P.A.
1500 Mahan Drive, Suite 200
Tallahassee, Florida 32308
Telephone: 850-224-4070
mshaud@ngnlaw.com
gstewart@ngnlaw.com
*Attorneys for Defendant, Supervisor of Elections for Okaloosa County*

/s/ *Mark Herron*
Mark Herron
Florida Bar No. 199737
MESSER CAPARELLO, P.A.
2618 Centennial Place
Tallahassee, Florida 32308
Telephone: 850-222-0720
mherron@lawfla.com
*Attorneys for Defendant, Supervisor of Elections for Leon County*