IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

4:25-cv-211-MW-MAF

FLORIDA DECIDES HEALTHCARE,
INC., et al,

      Plaintiffs,

CORD BYRD, in his official
capacity as Secretary of
State of Florida, et al.,

      Defendants.
_____

30(b)(6) DEPOSITION OF

FLORIDA DECIDES HEALTHCARE

(Holly Bullard)

Tuesday, December 9, 2025

9:30 a.m. - 3:14 p.m.

LOCATION:

HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK
119 South Monroe Street, #500
Tallahassee, FL  32301

STENOGRAPHICALLY REPORTED BY:

SANDRA L. NARGIZ
RPR, CM, CRR, CRC, CCR-GA

1    APPEARANCES: (Appearing In-Person or via Zoom.)

2      ON BEHALF OF PLAINTIFF FLORIDA DECIDES HEALTHCARE:

3        SOUTHERN POVERTY LAW CENTER
         PO Box 10788
4        Tallahassee, FL 32302-2788
         850.408.4840
5        BY: KRISTA DOLAN, ESQUIRE
         krista.dolan@splcenter.org

6
         ELIAS LAW GROUP LLP
7        1700 Seventh Ave., Suite 2100
         Seattle, Washington 98101
8        206.656.0177
         BY:  HARLEEN K. GAMBHIR, ESQUIRE
9        hgambhir@elias.law

10     ON BEHALF OF THE PLAINTIFF FLORIDA RIGHTS TO
       CLEAN WATER:
11
         CAMPAIGN LEGAL CENTER
12       1101 14th St. NW, Suite 400
         Washington, DC 20005
13       918.576.4318
         BY: HEATHER SZILAGYI, ESQUIRE (Via Zoom.)
14       hszilagyi@campaignlegalcenter.org

15
       ON BEHALF OF THE DEFENDANT FLORIDA DEPARTMENT OF
16     STATE:

17       HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK
         119 South Monroe Street, #500
18       Tallahassee, FL  32301
         850.508.7775
19       BY: MARTIN WOLK, ESQUIRE
         mwolk@holtzmanvogel.com
20       BY:  MOHAMMAD O. JAZIL, ESQUIRE
         mjazil@holtzmanvogel.com
21
         FLORIDA DEPARTMENT OF STATE
22       500 S. Bronough Street
         Tallahassee, FL 23999
23       850.245.6511
         BY: BILAL FARUQUI, ESQUIRE (Via Zoom.)
24

25

1    APPEARANCES:   (Continued.)

2      ON BEHALF OF REPUBLICAN PARTY OF FLORIDA:

3        SHUTTS AND BOWEN
         215 S. Monroe Street, #800
4        Tallahassee, FL  32301
         850.241.1717
5        BY: KASSANDRA REARDON, ESQUIRE (Via Zoom.)
         kreardon@shutts.com

6
      ON BEHALF OF THE SUPERVISORS OF ELECTION OF
7    CHARLOTTE COUNTY, INDIAN RIVER COUNTY, LAKE
     COUNTY, LEE COUNTY, MANATEE COUNTY, MARION COUNTY,
8    MONROE COUNTY, PASCO COUNTY, SEMINOLE COUNTY:

9        GRAY ROBINSON
         301 S. Bronough Street, #600
10       Tallahassee, FL  32301
         850.577.9090
11       BY:  ANDY BARDOS, ESQUIRE (Via Zoom.)
         andy.bardos@gray-robinson.com

12

13    ON BEHALF OF THE SUPERVISORS OF ELECTION OF CLAY,
     MARTIN, OSCEOLA, PALM BEACH, POLK,  ST. LUCIE
14    COUNTIES:

15       GARDNER BIST BOWDEN DEE LAVIA WRIGHT PERRY &
         HARPER
16       1300 Thomaswood Drive
         Tallahassee, FL  32308
17       850.385.0070
         BY: JOHN T. LAVIA, ESQUIRE (Via Zoom.)
18       jlavia@gbkwlaw.com

19
      ON BEHALF OF SUPERVISOR OF ELECTIONS FOR GLADES,
20    HARDEE, HENDRY, OKEECHOBEE, LEVY, HOLMES COUNTIES:

21       HENDERSON, FRANKLIN, STARNES & HOLT, P.A.
         1715 Monroe Street
22       Fort Myers, FL 33905
         239.344.1168
23       BY: GERALDO F. OLIVO, III, ESQUIRE (Via Zoom.)
         Jerry.olivo@henlaw.com

24

25

```
1   APPEARANCES:  (Continued.)

2
     ON BEHALF OF SUPERVISOR OF ELECTIONS OF VOLUSIA
3    COUNTY:

4      VOLUSIA COUNTY ATTORNEY'S OFFICE
       123 W. Indiana Avenue
5      Deland, FL 32720
       386.736.5950
6      BY:SARAH JONAS, ESQUIRE (Via Zoom.)
       Sjonas@volusia.org
7
      ON BEHALF OF SUPERVISOR OF
8     ELECTIONS FOR BREVARD COUNTY.:

9      TESSITORE MARI SCOTT
       1485 International Parkway, #2031
10     Lake Mary, FL 32746
       321.363.1634
11     BY: FRANK MARI, ESQUIRE (Via Zoom.)
       fmari@tessmari.com
12

13    ON BEHALF OF SUPERVISOR OF ELECTIONS FOR BAKER,
      BAY, BRADFORD, CALHOUN, COLUMBIA, DIXIE, FRANKLIN,
14    GADSDEN, GULF, HAMILTON, JACKSON, LAFAYETTE,
      NASSAU, PUTNAM, SANTA ROSA, ST. JOHNS, SUMTER,
15    SUWANNEE, TAYLOR, WAKULLA, WALTON, WALTON
      COUNTIES:
16
       MARKS GRAY
17     1200 Riverplace Blvd., #800
       Jacksonville, FL 32207
18     904.398.0900
       BY:  SUSAN ERDELYI, ESQUIRE (Via Zoom.)
19     serdelyi@marksgray.com

20
      ALSO PRESENT:
21
       Zack Bennington, Holtzman Vogel (Via Zoom.)
22     Hailey Vanderlaan, AG's Office (Via Zoom.)

23

24

25
```

1                       I N D E X

2    WITNESS                                      PAGE

3    FLORIDA DECIDES HEALTHCARE                     6
     (Holly Bullard)
4
         Direct Examination by Mr. Jazil           6
5
         Direct Examination by Mr. Bardos         10
6
         Further Direct Examination by Mr. Jazil  82
7
         Cross Examination by Ms. Gambhir        143
8
         Further Redirect Examination by         154
9        Mr. Jazil

10       Direct Examination by Mr. LaVia         161

11   CERTIFICATE OF OATH                         163

12   CERTIFICATE OF REPORTER                     164

13   READ AND SIGN LETTER                        165

14   ERRATA SHEET                                166

15                   INDEX OF EXHIBITS

16   NO.          DESCRIPTION                      ID
     Exhibit 1  Notice of deposition of FDH     8
17
     Exhibit 2  Responses to second set of     37
18              interrogatories

19   Exhibit 3  Responses to first set of interrogs  51

20   Exhibit 4  FDH_0058823-0058834       91

21   Exhibit 5  Emerson declaration              117

22   Exhibit 6  Supplemental Responses to the   106
                Supervisors' Interrogatories
23
     Exhibit 7  Supplemental Respones to Interrogs  132
24              8 and 9 of SOEs

25

1    The following proceedings began at 9:30 a.m.

2              THE STENOGRAPHER:  Do you swear or affirm

3         that the testimony you are about to give will

4         be the truth, the whole truth, and nothing but

5         the truth?

6              THE WITNESS:  I do.

7    Thereupon,

8                   FLORIDA DECIDES HEALTHCARE

9                      (Holly Bullard)

10   having been first duly sworn or affirmed, as

11   hereinafter certified, testified as follows:

12                   DIRECT EXAMINATION

13   BY MR. JAZIL:

14        Q    Good morning, ma'am.  Can you please state

15   your name for the record.

16        A    Sure, my name is Holly Bullard.

17        Q    Ms. Bullard, where do you work?

18        A    I work at Florida Policy Institute.

19        Q    And what is the Florida Policy Institute?

20        A    The Florida Policy Institute is a

21   nonprofit research think tank in Florida.

22        Q    Where is it based?

23        A    It's based in Orlando.

24        Q    Okay.  And what's the -- this particular

25   nonprofit think tank do?

7

1    A    It does -- publishes a lot of research

2    around the state budget and policies related to

3    social advancement of things like health and

4    education and works on -- works and partners with

5    grassroots organizations.

6    Q    Okay.  How long have you been with the

7    Florida Policy Institute?

8    A    I've been with them seven and a half years

9    now.

10    Q    And, ma'am, have you ever been deposed

11    before?

12    A    No, I haven't.

13    Q    Okay.  So just a couple of ground rules.

14    This is not a memory contest, so if at any point you

15    want to refer to something, I'll see if I can find

16    it and show it to you.  Does that make sense?

17    A    Yes.

18    Q    This is also not an endurance contest.  So

19    if at any point you'd like to take a break, I only

20    ask that you answer the question that's pending and

21    then we'll take a break.  Does that sound fair?

22    A    Yes.

23    Q    And, ma'am, we have a stenographer sitting

24    to your right who's taking down everything you say

25    and that I say.  So let's both give audible answers

1    when appropriate; does that make sense?

2        A    Yes.

3        Q    And let's speak a little loudly so both

4    the stenographer, I, and our colleagues on Zoom can

5    hear.  Is that reasonable?

6        A    Yes.  Hello.

7        Q    And, ma'am, if you don't understand a

8    question of mine, please feel free to ask me for

9    clarification and I will do my best to clarify the

10    question.  Does that seem fine?

11        A    Yes.

12        Q    And if you don't ask for clarification,

13    I'll assume that you understood the questions I

14    asked; does that seem reasonable?

15        A    Yes.

16        Q    And, ma'am -- looking at my notes -- you

17    understand you're here as a corporate representative

18    of Florida Decides Healthcare?

19        A    I am, yes.

20            (Exhibit 1 was marked for identification.)

21            MR. JAZIL:  We'll go ahead and mark this

22        as Exhibit 1, Sandi.

23            Here you go, ma'am.

24            MS. GAMBHIR:  Can I jump in for a moment?

25            MR. JAZIL:  Sure.

1          MS. GAMBHIR:  My apologies.  Can we go off

2      the record for a moment?

3          MR. JAZIL:  Sure, we can go off the

4      record.

5          (Discussion off record.)

6  BY MR. JAZIL:

7      Q    Ma'am, do you see what we've marked as

8  Exhibit 1 in front of you?

9      A    Yes.

10      Q    Okay.  And can you confirm for me that

11  this is the 30(b)(6) depo notice for Florida Decides

12  Healthcare?

13      A    To the best of my knowledge.

14      Q    Okay.  If we go to page 7 of this document

15  and we look at topic 6 and 7.

16      A    Okay.

17      Q    Let me know when you're there.  Are you

18  there?

19      A    Yes.

20      Q    It's my understanding that you are going

21  to be testifying as a corporate representative for

22  Florida Decides Healthcare on topics 6 and 7; is

23  that right?

24      A    Yes.

25      Q    Okay.  And, ma'am, it's my understanding

1    that you've also been designated as the corporate

2    representative for the topics put forward by the

3    Florida Supervisors of Elections; is that right?

4        A    That's correct.

5        Q    And with the agreement of your counsel,

6    the lawyers for the supervisors are going to ask you

7    some questions first, and then I will follow up on

8    topic 6 and 7 on that deposition notice.  Does that

9    sound all right to you?

10        A    Yes.

11            MR. JAZIL:  Okay.  With that said, Andy,

12        all yours.

13            You're on mute, Andy.

14            MR. BARDOS:  Sorry about that.  Have we

15        marked that document as an exhibit, or are we

16        still at Exhibit 1?

17            MR. JAZIL:  We've marked it as an exhibit;

18        it's Exhibit 1.

19            MR. BARDOS:  Okay.  All right.  So my

20        first exhibit will be Exhibit 2.

21                    DIRECT EXAMINATION

22    BY MR. BARDOS:

23        Q    And good morning, ma'am.  My name is Andy

24    Bardos.  I'm an attorney for 10 Supervisors of

25    Elections.  Are you -- if I share my screen, will

1    you able to see a document that I share?

2            MR. JAZIL:  Yes.

3    BY MR. BARDOS:

4        Q    Are you close enough to be able to read

5    it?

6        A    If I go over there.  Yeah, that's fine.

7        Q    Okay.

8            MR. LaVIA:  Andy, before we get started,

9            would it be possible to move the mic a little

10           closer to the deponent?  You project very well.

11           She does not project quite as well.  Thank you.

12   BY MR. BARDOS:

13       Q    Okay.  Ma'am, are you here today to

14   testify on the topics designated by the Supervisors

15   of Elections in their notice of deposition?

16       A    Yes.

17       Q    Okay.  And what did you do to prepare to

18   testify on those topics?

19       A    I've reviewed a lot of documents related

20   to the campaign.  I talked to staff members of the

21   campaign and other executive committee members and

22   also prepared with legal counsel.

23       Q    Okay.  Apart from legal counsel, who did

24   you talk to in preparation for your testimony on the

25   topics noticed by the supervisors?

12

1          A    I spoke with Mitch Emerson, executive

2    director, Florida Decides Healthcare; and Sasha

3    Rosen at Outreach Team, a vendor for paid petition

4    collection.

5          Q    Okay.  Do you have a position with Florida

6    Decides Healthcare?

7          A    I do, yes.

8          Q    Okay.  What is your position with FDH?

9          A    I serve as chair of the committee, of the

10   executive committee.

11         Q    How long have you served as chair of the

12   executive committee?

13         A    Approximately two and a half years.

14         Q    Okay.  How many other members serve on the

15   executive committee?

16         A    Five.  There are five.

17         Q    Okay.  And so you've been the chair since,

18   would you say, the middle of 2023?

19         A    I would say the first half of 2023.

20         Q    Okay.  All right.  Now, recently, am I

21   correct in understanding that Florida Decides

22   Healthcare sponsored an initiative for placement on

23   the 2026 general election ballot?

24         A    That is correct.

25         Q    Okay.  And I might refer sometimes to "the

1    2026 campaign."  When I do that, I'm referring to

2    that effort to place an initiative on the 2026

3    general election ballot.  Does that make sense?

4        A    Yes.

5        Q    Okay.  When did FDH's 2026 campaign begin?

6        A    Can you clarify a little bit more?  I

7    don't quite understand the context of -- began, like

8    could you explain a little bit more?

9        Q    When did FDH decide to pursue an

10   initiative or sponsor an initiative for placement on

11   the 2026 general election ballot?

12       A    It would've been in approximately December

13   to January -- so January of -- would that be '24 --

14   of '24, so December to January of '24, right around

15   there.

16       Q    Okay.

17       A    Yeah.

18       Q    And so by that time you were chair of the

19   executive committee of FDH?

20       A    Yes.

21       Q    Okay.  What steps did FDH do once it

22   decided to pursue an initiative for the 2026 general

23   election ballot?

24       A    So steps included engaging in

25   conversations and briefings with stakeholders about

1    the aim of the initiative and the goal.  It included

2    regular planning meetings with the executive members

3    and their -- and their networks as well, so -- and

4    then also forming grassroots -- a committee of

5    grassroots groups interested to support the

6    volunteer collection.  So engaging in that.

7            So -- and then had hired -- it started to

8    plan out hiring, and what the infrastructure would

9    look like for the campaign.

10    Q    Okay.  At some point did FDH develop an

11    estimate or expectations as to how much money it

12    would have to raise in order to place the initiative

13    on the 2026 general election ballot?

14    A    Can you be more specific about timing?

15    I'd probably reiterate or ask more around that --

16    just generally or the time frame?

17    Q    So let's start at the beginning.

18    A    Okay.

19    Q    Was there -- was there a point in time

20    when for the first time FDH, having made the

21    decision to pursue -- to pursue an initiative for

22    placement on the 2026 ballot, developed an estimate

23    or some expectation of the amount of money it would

24    need to raise to be successful in placing that

25    initiative on the ballot?

1    A    So through 2024, the executive committee

2    spent a lot of time, in addition to the executive

3    director at that time, understanding what the

4    different inputs into that would be.  And then

5    started to, you know, form that and came up with a

6    good projection and estimate for fundraising and

7    planning purposes, in -- like the official one that

8    I would say -- or like the one that we were really

9    working on for planning and fundraising purposes was

10    in early 2025.

11    Q    Okay.  So until -- for the first year of

12    the campaign, from early '24 to early '25, FDH did

13    not have an estimate of the amount of money it would

14    need to place an initiative on the 2026 ballot?

15    A    That was very much sort of a fact-finding

16    period.  So in 2024, there was also other large --

17    there was ballots -- ballot initiative campaigns

18    also operating, and there was a lot of fact-finding

19    and talking to different vendors, et cetera, of

20    understanding, you know, projecting.  I think

21    that's -- that's what that time period was, was kind

22    of a fact-finding incorporating into that what --

23    Q    Sure.

24    A    -- would be a good -- if you were to ask,

25    do we have a solid budget that we could point to in

1    '24, I would say, you know; just we were building an

2    estimate and projections in 2024 and then to have

3    the final plan in early '25 for the budget.

4        Q    Okay.  And so in early 2025, what did FDH

5    project would be the amount of money it would need

6    to place an initiative on the 2026 ballot?

7        A    So could I ask for a specific time period

8    in 2025 you would be interested in?

9        Q    The first time that FDH came up with an

10   estimate of the amount of money it would need to

11   place an initiative on the ballot, what was that

12   amount of money?

13       A    So in -- to answer your question, around

14   $25 million for the phase one placing --

15       Q    Okay.  And what do you mean by phase one?

16       A    Ballot placement.

17       Q    Okay.  And then what -- is there a phase

18   two?

19       A    Yes.  So phase two would be engagement

20   with the public and what is colloquially known as

21   the "Yes Campaign" phase of a ballot initiative, so

22   post-placement.

23       Q    Does phase two begin once ballot placement

24   is secured?

25       A    Generally, yes, that would be correct.

1    Q    Okay.  And so in early '25, it sounds like

2    FDH came up with an estimate that a phase one

3    budget, meaning the budget needed to secure

4    placement of the initiative on the 2026 ballot,

5    would be $25 million?

6    A    Correct, early.  So that was February into

7    early March, yes.  Early 2025.

8    Q    February to early March.

9    A    Correct.

10    Q    And then did that estimate change in early

11    March?

12    A    To the best of my knowledge, a little

13    after that, actually.  So closer to May is when it

14    did change.

15    Q    Okay.  And to what did it change in May of

16    2025?

17    A    To an estimate of around 28 million.

18    Q    28 million.  Okay.  And then did the

19    estimate change at any point after that or did it

20    remain at 28 million for the remainder of the

21    campaign?

22    A    It changed again -- before the pivot for

23    our campaign to 2028, it changed again.

24    Q    Okay.  And when did that $28 million

25    estimate change?

1    A    To the best of my recollection, it was

2  right around like mid-August, right around August --

3    Q    Sure.

4    A    -- into early September when that top

5  line -- when I say top line number for the total

6  changed.

7    Q    Okay.  All right.  We will come back to

8  that in a moment.  But let's go back to the original

9  $25 million estimate.

10       Did that $25 million estimate consist of

11  any categories or components that break down?

12    A    Yes.

13    Q    Okay.  What were those categories?

14    A    Sure.  The primary category, paid petition

15  collection, so a firm that you partner with.  Also,

16  the quality review of petition collection, like

17  sorting of that, of those, petition verification; it

18  included what I will couch, what we would couch as

19  operations, so staffing for the campaign.  It

20  included communications; so polling is another area.

21       I believe that's it.  And if there's

22  anything missing -- oh, I'm sorry, litigation costs,

23  so, yeah.

24    Q    Litigation?

25    A    Yes, litigation.

1      Q    Okay.  And what was the breakdown of the

2  $25 million into those different categories?

3      A    Can you clarify what time period you're

4  talking about at this moment?

5      Q    The initial $25 million estimate, which I

6  believe you had said was in place from February

7  through May of 2025.

8      A    Okay.  The paid petition collection firm I

9  believe was at that juncture around 18 million.  The

10 litigation budget I believe was between a million

11 and 2 million.  And then the operations would have

12 been around a million to 2 million.  And then

13 verification fees I believe were right around --

14 under a million, but around -- in the range of 800

15 to 900 at that time period for our projections.

16     Q    Okay.

17     A    And communications -- I don't know if

18 you -- I could probably break down the -- so

19 communications, less than a million then at that

20 stage.  By that I mean polling.

21     Q    You said verification was 8- to 900,000?

22     A    In that range at that time period, it

23 might have been just a little bit -- right around

24 there, right around 800,000 at that time.

25     Q    Okay.  And then you said in May the

1    estimate increased from 25 to 28 million.  What was

2    the reason for the change?

3        A    Sure.  So that was -- that was as

4    legislative session was happening and there was a

5    bill moving in the legislature and that had

6    additional barriers to varying parts of the

7    campaign, so HB 1205.

8            And the $3 million increase was from an

9    increase in estimated price, essentially, from our

10   paid petition vendor due to their interpretation of

11   the cost increases for getting to our goal,

12   essentially.

13       Q    Okay.  So the 3 million would have been

14   part of the paid petition collection --

15       A    Correct.

16       Q    -- category within the budget?

17       A    Correct.

18       Q    I'm sorry, I didn't hear?

19       A    Oh, I'm sorry, correct, yes.

20       Q    Okay.  So that portion of the budget would

21   have increased from 18 million to 21 million?

22       A    I believe that was -- that was the range

23   that it ended up at.

24       Q    Okay.  Was there a certain time period

25   over which FDH felt that it needed to raise this

1  money?  For example, were you saying we need to

2  raise 28 million between this date and this date?

3      A    Okay.  I think I understand what you're

4  saying.

5      Q    Uh-huh.

6      A    So let me think about this.  So the budget

7  overall goal, so 28 million -- 28 million at that

8  point is the goal for essentially that -- it would

9  be spread out over time over the calendar year.

10  That was the aim.

11          So documents that you-all have seen most

12  likely had described that, of this is the goal for

13  the costs of attaining the phase one, getting on the

14  ballot by the end of calendar year 2025.  But there

15  are -- with campaigns and especially with paid

16  petitions in these types of campaigns, it's sort of

17  these week-to-week, month-to-month goals of trying

18  to stay on pace and understanding the costs of --

19  the type of pace that your paid vendor, as well as

20  supplementing from other ways that we -- that the

21  campaign collects and/or partners with volunteers to

22  do so.

23          Essentially, there was that -- it was a

24  goal for the calendar year of '25.

25          Yes, I think that answers your question.

1    Q    Yes.   Okay.   So the 28 million was a goal

2    for calendar year 2025, correct?

3    A    Correct.

4    Q    Okay.   Okay.   And how much did FDH

5    ultimately raise in calendar year 2025?

6    A    I know -- from November 1st to -- to

7    September -- as in the request and the types of

8    questions, it said from November.   So that's what I

9    feel most comfortable sharing, but -- or not

10   sharing, but that's what I feel most comfortable

11   reflecting as I kind of think through it, exactly to

12   January; but from November 1st to September -- to at

13   least right around the pivot, it was two-point --

14   right around $2.9 million of contributions to FDH.

15   Q    From November 1st --

16   A    Correct.

17   Q    -- of 2024 --

18   A    Correct.

19   Q    -- through the suspension of the campaign?

20   A    Yes.

21   Q    I'm sorry, so I'll just ask again so the

22   record's clear.   So you're saying that you -- FDH

23   raised $2.9 million between November 1st of 2024 and

24   the suspension of this campaign in September of

25   2025?

1    A    Yes.  Yes.  Estimated that, yes.

2    Q    So it raised approximately 1/10th of what

3  it set out to raise?

4    A    Given -- like the time periods don't

5  necessarily match up, if that makes sense, when you

6  said --

7    Q    Uh-huh.

8    A    Because our goal was 28 from -- 28 million

9  total from that snapshot in time in May for the

10  end -- through the end of the calendar year versus

11  what I had just responded, which was from November

12  1st, '24, to suspension.  So it's not exactly

13  aligned in terms of the time period.

14         THE WITNESS:  I need a napkin.

15  BY MR. BARDOS:

16    Q    So let me clarify that.

17    A    Yes.

18    Q    I thought before that you testified that

19  the goal was to raise 28 million within calendar

20  year 2025.  Is that accurate, or was the goal to

21  raise 25 or 28 million from some other point in

22  time?

23    A    It would have been through the end of

24  calendar year '25, from the time point when that

25  budget's over.  So if it was the May

1    snapshot-in-time budget, it would have been through

2    the end of that calendar year.  So, yes.

3        Q    Okay.  And when -- okay, so in February

4    you decided that the budget would be 25 million.

5    And then in May you decided it would be 28 million.

6            When you decided in May that it would be

7    28 million, was that 28 million to be collected

8    between May and the end of the calendar year, or was

9    that 28 million beginning at some earlier point in

10    time?

11        A    Between May and the end of the calendar

12    year.

13        Q    Okay.  Okay.  So the 25 -- the original

14    $25 million budget was to -- the goal was to raise

15    25 million from February of 2025 through the end of

16    the calendar year.  And then the $28 million budget

17    was to raise $28 million from May of 2025 to the end

18    of the calendar year; is that correct?

19        A    Yes.

20        Q    Okay.  Got it.  Now, you mentioned that

21    there was a -- an estimate for petition verification

22    of, I believe, 8- to $900,000.  Did that estimate

23    change at any point during the campaign?

24        A    Yes.

25        Q    Okay.  When did that estimate change?

1          A    To the best of my knowledge, in our budget

2     projections, to share out with stakeholders,

3     starting in mid- to late July, it did change.

4          Q    Okay.  And we'll come back to that in more

5     detail.  But just briefly, what was the reason for

6     that change?

7          A    Sure.  So within a legislation that

8     passed, HB 1205, it had basically increases in fees

9     possibilities with the supervisors.  And within

10    right around July is when we were getting all of the

11    different notices from different supervisors about

12    the different types of increases they were doing to

13    the fees.  And so that was sort of the first time we

14    had a good snapshot of what the -- what the actual

15    increases would be from the new legislation, and so

16    we could start to do math.

17         Q    And you mentioned a range of 8- to

18    900,000.  Is there a more precise figure, or was it

19    always a range of 8- to $900,000?

20         A    Could you clarify what time period --

21    previous to what?

22         Q    So I believe you testified that your

23    estimate of what the signature verification fees

24    would require before the HB 1205 changes was 8- to

25    $900,000.

1          Was there a more precise estimate that FDH

2  had, or was the estimate always a range of 8- to

3  $900,000?

4      A    With that, I don't recall the exact

5  number.  I would have to refresh my memory on some

6  of the documents you shared before.  But that's my

7  best answer.

8      Q    Okay.  How did FDH calculate that range --

9      A    Okay.

10     Q    -- of 8- to $900,000?

11     A    Okay, so for the range that we estimated

12 previous to the change on the verification fee

13 increase, that -- it has to do with experience and

14 understanding of a few different factors that then

15 feed into sort of a formula, if you will, to come up

16 with the -- an estimate, which it would always be a

17 range for varying reasons.

18          The first thing that you would do would be

19 to look at -- you would look at the different types

20 of collection your campaign is going to be, you

21 know, undertaking.  So if you're going to be

22 relying, for example, on volunteers, you would have

23 a good estimate -- or try to estimate the

24 verification rates of the types of -- of the

25 petitions that volunteers collect for your campaign.

1            There is some history with, you know, in

2     2024, there was a fairly large volunteer collection

3     of a different campaign.  So collecting information,

4     to the best of our knowledge, of the verification,

5     you know, say, the rate of -- compared to how many

6     you collect, and then as you sort and then you

7     actually -- it actually comes up to be a verified

8     petition.

9            So for volunteers, it would be one

10    estimate of how many would actually be verified in

11    the end.  And then with a paid petition group that

12    you would hire, you'd also look at their rates of

13    validity of their petitions.  So use those types of

14    estimates as your inputs.

15            So percentagewise, if you were to say

16    we're going to do the vast majority or the large

17    bulk of our -- or expect to get petitions, the vast

18    bulk of them, with paid petitions group, you'd look

19    at the history of their verification rates, sort of

20    the validity rates of their type of collection.

21    That's one input.

22            And then same with volunteers, in general.

23            And so those are two inputs into how you

24    would go from how many you would expect to collect

25    at the beginning, so our -- sorry -- it's a bit like

1    of a formula, so it's taking me a little bit of time

2    to describe it.

3              So you have these two inputs of the

4    validity rates for the two different types of groups

5    of inputs for the collection of -- of petitions.

6              And then you would take an estimate -- or

7    look at the cost for verification by different

8    counties.  So you would know that of, like, the cost

9    by a county, depending on where those petitions

10   would be.  And then you would conceptualize often

11   with the campaigns; it's -- outside of the need to

12   hit a certain amount of congressional districts

13   around the state, you know you have to do that, and

14   then you also have -- you can get other petitions in

15   anywhere in the state, and the vast majority of

16   campaigns are going to then focus on population

17   centers.

18             And so you could make a good guess as to,

19   okay, the price of verification in those large

20   population centers, such as Miami-Dade, Palm Beach,

21   Broward, possibly Orange, et cetera, like a focus

22   there.

23             So you take the price of those -- of

24   verifying petitions in those counties.  And then

25   it's basically a formula or -- an estimate, let's

1    just say -- not a formula, an estimate for looking

2    at validity rates for different types of -- of

3    different collections; and then also looking at

4    the -- a broad estimate for where you would be

5    collecting, and so the cost of, like, Miami-Dade,

6    for example, or another large population center that

7    you would factor into that.

8            I think the answer is -- I mean, I could

9    continue, I guess.

10        Q    Okay.  Sounds pretty complex.  So let me

11   talk -- let me ask you a little bit about the

12   petition gathering then.  So my understanding is

13   that FDH decided at some point that it would need to

14   collect 1.3 million petitions; is that correct?

15        A    Yes.

16        Q    Okay.  And my understanding further is

17   that that estimate is based on a goal of or an

18   expectation that 20 percent of FDH's validated

19   petitions would be collected by volunteers, and

20   80 percent of FDH's validated petitions would be

21   collected by paid petition circulators; is that

22   accurate?

23        A    I believe so, to the best of my knowledge.

24        Q    Okay.  And then my understanding further

25   is that FDH or its consultants had some expectation

1    as to what the error rate would be for petitions

2    collected by volunteers and what the error rate

3    would be for petitions collected by paid petition

4    circulators; is that accurate?

5        A    I would say "expected" is a little -- I

6    would say "estimate," like a very good estimate

7    based on history and some factors that -- informed

8    estimate.

9        Q    Okay.  Okay.  So estimate.  Otherwise,

10   that's accurate?

11       A    Correct, yes.

12       Q    Okay.  And then is it also accurate that

13   the 1.3 million petition figure was arrived at by

14   considering the 20 percent that would be collected

15   by volunteers, plus some additional amount

16   accounting for the error rate, the 80 percent to be

17   collected by paid petition circulators and then some

18   additional amount accounted for that error rate.

19   And that would bring us to 1.3 million; is that

20   accurate?

21       A    Yes.

22       Q    Okay.  Now, with respect to the

23   1.3 million figure, did FDH have benchmarks at

24   different points in the year that -- where it would

25   expect to have collected a certain amount, or did it

1    just have a single goal of 1.3 million for the end

2    of the collection effort?

3       A    To the best of my knowledge, we had rough

4    benchmarks over time, after paid petition collection

5    started.

6       Q    Okay.  When did paid petition collection

7    begin?

8       A    I believe -- I'm sorry, to the best of my

9    knowledge, late March, early April.

10       Q    Of '25?

11       A    Of '25, sorry.

12       Q    Okay.  And so what then were the rough

13    benchmarks?

14       A    To be honest, I don't feel -- I'm not

15    quite sure.  I wouldn't want to misspeak.  I'd have

16    to refresh my memory from documents.

17       Q    Is there a document that would provide the

18    answer to that question?

19       A    Yeah.

20          THE WITNESS:  Can I make an inquiry?

21          MS. GAMBHIR:  Answer the question.

22       A    Yes.

23          MR. BARDOS:  Okay.  Counsel, is that a

24       document that you can provide to us?

25          MS. GAMBHIR:  Let me confer with the

1       witness for a moment.

2               (Discussion off record.)

3               MS. GAMBHIR:  I believe there is.  I'm

4       just taking a look.

5               Counsel, I'm showing the witness the

6       document that plaintiffs produced,

7       Bates-stamped FDH_0058833.

8               MR. BARDOS:  Okay.  Thank you.

9   BY MR. BARDOS:

10      Q    Did there come a point in time -- well,

11  let me ask you, now that you have the document, does

12  that refresh your recollection as to what those

13  benchmarks were?

14      A    Yes, a little.

15      Q    Okay.  What were the benchmarks?

16      A    So for -- a little bit of clarity, which

17  would be, at what point are you saying the

18  benchmarks, right?

19              So similar to budget, like which period of

20  time would I be thinking at this juncture -- or

21  which time period?

22      Q    I guess any time period other than -- so

23  we know you wanted to raise 1.3 million, or collect

24  1.3 million petitions by the end of the campaign.

25      A    Yeah.

1          Q    Any sort of benchmark previous to that

2    where you said we want to raise X number of

3    petitions by Y date?

4          A    Right.  For March and April, all right,

5    that's when I can recollect assigning, sort of, some

6    of these rough benchmarks.  And by -- we had a

7    benchmark for the beginning of May to -- it was an

8    aim of collecting a hundred thousand.

9          Q    Okay.  So 100,000 total by May 1st of

10   2025?

11         A    Yes, that was an early benchmark.

12         Q    Okay.  And just to be clear, is this paid

13   petition collections only or all collections?

14         A    This context would be all collections.

15         Q    Okay.  All right.  So 100,000 by May 1st.

16   Did you have any other benchmarks?

17         A    At this -- so, again, sort of the snapshot

18   of that time period of when this document that I'm

19   referring to -- let me -- just for context, if

20   that's okay; I'm going to explain context, which

21   would be if you were to say what did FDH look at

22   benchmarks on -- in August, moving forward, you --

23   benchmarks change week to week.  They're fluid, just

24   as a budget is.

25              So just as these budgets that are

1    projections of what it would take in terms of to get

2    onto the ballot, it's the same thing.  So this is

3    one of the reasons why it's fluid and a little

4    bit -- hence, my answers.

5          So for that snapshot in time, I would

6    couch that sort of earlier that summer in this

7    campaign with a benchmark of a hundred -- basically

8    a hundred thousand additional for the next few

9    months because we were ramping up to look for

10   momentum in that time period.  And I do not believe

11   that there is similar benchmarks -- basically, at

12   this point in time, right around early May of the

13   concept being a hundred thousand, I believe it was a

14   hundred thousand a month, and then at that juncture

15   we had to kind of stop the projections.

16         It was very difficult to create benchmarks

17   with a lot of unknowns from, like, the fallout of

18   HB 1205, of understanding.  So I do know that we had

19   that goal of some benchmarks, about a hundred

20   thousand a month, until the end of June, in which

21   case, that time period -- I say time period -- so

22   May and June, like early June, late May, it became

23   more fluid to ascertain what benchmarks would be,

24   given -- we didn't know the impact -- of, like, the

25   true impact of what the bill, the varying provisions

35

1    would be.

2         So that's the best answer I have for you

3    at this juncture.

4         Q    Okay.  All right.  So just to summarize,

5    so I understand --

6         A    Yeah.

7         Q    -- or so I know -- that I have a clear

8    understanding.  There was an initial benchmark that

9    by May 1st of 2025, FDH would have collected 100,000

10   petitions; from the beginning of time through

11   May 1st of 2025, valid or invalid, 100,000

12   petitions; is that correct?

13        A    Yes.  As reflected on the document that I

14   shared, yes.

15        Q    Okay.  And then there was a subsequent

16   benchmark of collecting 100,000 per month for May

17   and June?

18        A    At least, so at least a hundred thousand a

19   month.

20        Q    Okay.  Per month for May and June,

21   correct?

22        A    A general goal to do so, yes.

23        Q    And then my understanding of your

24   testimony is that after that the point, it became

25   more fluid or more uncertain because you were trying

1    to understand the impacts of the new legislation; is

2    that accurate?

3        A    Right, into -- I recall mid-May being very

4    difficult to ascertain additional benchmarks and

5    to -- correct.  That would be the time period, if

6    you're saying which time period is that.  It was

7    really sort of just mid-May, what are -- what is the

8    fallout, how do we interpret that into benchmarks?

9        Q    Okay.  At what point -- or did FDH at some

10   point realize that it was not meeting its petition

11   collection benchmarks?

12       A    Yes.

13       Q    Okay.  And did it realize, for example,

14   that it had not met its May 1st benchmark of

15   collecting 100,000 petitions?

16       A    I don't -- I don't recall conversations

17   with that being a major discussion point.  This

18   was -- my recollection was that at that juncture,

19   early May, we had made pretty good -- we were making

20   pretty good progress.

21            But we did not have any discussions

22   saying, you know -- basically because, as I

23   mentioned before in this testimony, that benchmarks

24   are general goals; and so if you're meeting, you

25   know, a general goal, momentum towards that.  That

 1    was not in conversation around that -- that point

 2    you mentioned, that I recall.

 3            MS. GAMBHIR:  Counsel, would right now be

 4        a good moment for a quick break?

 5            MR. BARDOS:  I'm sorry?

 6            MS. GAMBHIR:  Would now be a good moment

 7        for a break?

 8            MR. BARDOS:  Yes, that works.

 9        Ten minutes?

10            MS. GAMBHIR:  That's great.

11            MR. BARDOS:  Okay.

12            (A recess took place from 10:24 a.m. to

13        10:40 a.m.)

14    BY MR. BARDOS:

15        Q    Before the break, we were talking about

16    petition collection benchmarks.  I put a document

17    into the Chat which is -- has a filename Exhibit 2.

18    I'd like to mark that as the next exhibit.

19            (Exhibit 2 was marked for identification.)

20    BY MR. BARDOS:

21        Q    And I understand you have a copy of it.

22    It's FDH's Objections and Responses to Defendants'

23    Supervisors of Elections Second Set of

24    Interrogatories.  Do you see that document?

25        A    Yes.

38

1    Q    Okay.  Have you seen that document before?

2    A    Yes.

3    Q    Okay.  If you'll turn to pages 2 and 3 of

4    that document, there's a table that shows -- in one

5    column, it says "Date," and in the other column, it

6    says, "Petitions submitted."  Do you see that table?

7    A    Yes.

8    Q    Okay.  Okay.  So what does that table

9    represent?

10   A    This represents a table of petitions

11   submitted from a vendor from Florida -- a vendor for

12   the campaign, submitted to SOEs from the actual

13   vendors, so, yes.

14   Q    So who is the vendor?

15   A    TallyED, T-A-L-L-Y-E-D.

16   Q    And does this table represent -- is it a

17   complete list of all petitions that FDH submitted to

18   the supervisors?

19   A    I don't know.

20   Q    Do you know whether FDH submitted more

21   than 126,840 petitions to the supervisors?

22   A    Not to my knowledge.

23   Q    Okay.  All right.  So you believe that

24   this shows -- is a complete count of the petitions

25   that FDH submitted to the supervisors?

1       A    Yes, to the -- yes.

2       Q    And the date that is showing in the "Date"

3   column, is that the date on which the petition was

4   submitted to the supervisors?

5       A    Yes, to the best of my knowledge, that is

6   true, yes.

7       Q    Okay.  And so who -- if we wanted to see

8   whether FDH met its petition collection benchmarks,

9   we could look at this table to determine how many

10  petitions FDH had submitted by any given point in

11  time to Supervisors of Elections in Florida?

12          MS. GAMBHIR:  Objection, Counsel.  I'm

13      just going to object to the concept of

14      "benchmarks."  I don't believe those were the

15      scope of the topics that were provided in the

16      supervisors' notice.

17          MR. BARDOS:  Okay.  Well, the witness has

18      provided plenty of testimony about benchmarks,

19      so you can go ahead and answer.

20      A    Could you repeat the question?

21  BY MR. BARDOS:

22      Q    Sure.  So if we wanted to see whether FDH

23  met its petition collection benchmarks, we could

24  look at this table to determine how many petitions

25  FDH had submitted by any given point in time?

```
 1        A    No.

 2        Q    Okay.  Why not?

 3        A    Your question was, you all have

 4   collection, full, and this chart is about petitions

 5   submitted to SOEs.  So, no.

 6        Q    Okay.  So your point is there might have

 7   been some petitions that would have been collected

 8   but not yet submitted at a certain point in time?

 9        A    No.

10        Q    Sorry?

11        A    No.

12        Q    Okay.  So then explain what point you're

13   making.

14        A    As mentioned in this response to

15   interrogatory number 1, mentions volunteers,

16   received from volunteers and broadly -- the FDH

17   campaign works on collection goals from varying

18   different sources.  So one being paid petition

19   collection, another being volunteer collection and

20   collection from partner groups in a broad network of

21   hubs, and also individuals in Florida submitting on

22   their own.  And that would not be necessarily in

23   this document.  "Collected" and "submitted" are

24   different things.

25        Q    Okay.  So what does -- which of those
```

1    categories of petitions does "submitted" not

2    include?

3        A    I don't know.

4        Q    Do you know whether there are any

5    categories of petitions that are not included and

6    submitted?

7        A    To the best of my knowledge, at least --

8    to the best of my knowledge, volun- -- individuals

9    submitting on their own directly to a SOE would not

10   be reflected.

11       Q    Would not be reflected in the table --

12       A    Correct.

13       Q    -- that we're looking at?  Okay.  And

14   would the table reflect petitions gathered by both

15   paid petition circulators and volunteers?

16       A    I don't know.

17       Q    Okay.  I think you testified earlier that

18   you thought that this table was a complete count of

19   the petitions that had been submitted.  So I guess

20   I'm just trying to figure out if there's anything

21   that's not included here?

22       A    Before, you asked about collected versus

23   submitted.  And I was trying to -- I was seeking

24   clarification around collected goals versus

25   submitted in this document -- in this chart here.

1    Q    Okay.  All right.  So it's still not clear

2    to me whether there are any petitions, FDH

3    petitions, that were submitted to supervisors that

4    are not reflected in this table.  Do you know

5    whether there are?

6            MS. GAMBHIR:  Objection, I believe the

7        witness answered that question, Counsel.

8            MR. BARDOS:  Okay.  Well, she can answer

9        again.  It's not clear to me.

10   A    Can you repeat it?

11   BY MR. BARDOS:

12   Q    Sure.  Were there any petitions submitted

13   to supervisors that are not reflected in this table?

14   A    I don't know.  I'd like to ask

15   clarification specifically on something, if that's

16   okay?

17   Q    Sure.

18   A    You said "FDH petitions."  Can you clarify

19   what you mean by FDH petitions?

20   Q    Petitions for the initiative that FDH

21   sponsored, the Medicaid petition.

22   A    So could you repeat the question again?

23   I'm sorry.

24   Q    Sure.  So were there any FDH petitions

25   submitted to supervisors that are not reflected in

1    this table?

2          A     Individuals in Florida that go to the

3    SOE's website and print it out on their own because

4    they've seen -- recently seen the campaign mentioned

5    in the news, and they send it directly to their SOE,

6    that would not be reflected if they did not send it

7    to this -- this vendor to be processed.

8          Q     Okay.  So does this table reflect only

9    those petitions that the vendor submitted?

10         A     Yes.

11         Q     Okay.  And did the vendor submit petitions

12    that FDH volunteers collected?

13         A     Yes.

14         Q     Okay.  So then petitions collected by

15    volunteers would be reflected in this table,

16    correct?

17         A     To the best of my knowledge.

18         Q     Okay.  And I believe you said your paid

19    petition circulation effort began -- what was it,

20    March or April of 2025?

21         A     Correct.

22         Q     And this table does include some petitions

23    that were submitted before that time, correct?

24         A     Correct.

25         Q     So would that indicate also that petitions

1    collected by volunteers are included in this table?

2        A    Correct.

3        Q    Okay.  Now, with respect to fundraising,

4    did you have benchmarks for fundraising like you did

5    for petitions?

6        A    It's hard to answer that, so I'm going to

7    say I'm not sure the way -- ask for clarification

8    because you said the first -- the second clause

9    added to the first clause was your qualifier.  I

10    would seek clarification.

11        Q    Sure.  So my understanding is that at some

12    point in time early in 2025, FDH decided that it

13    needs to raise $25 million by the end of calendar

14    year 2025.  And then a little bit later in the year,

15    around May of 2025, it decided it needs to raise

16    28 million between that point in time and the end of

17    calendar year 2025.

18            Did FDH have fundraising goals at points

19    in time before the end of the calendar year?  So in

20    other words, we need to raise X dollars by Y date,

21    and Y date being something before the end of

22    calendar year 2025?

23        A    Yes.

24        Q    Okay.  What were those benchmarks?

25        A    Let's see.  A lot of numbers, and I know

1    that I would be able to jog my memory by looking at

2    a document.  Let me think which one that would be.

3                I'm fairly certain that in one of our

4    documents we have -- it might not be labeled -- how

5    did you phrase that?  So goals, right?  So that

6    there would be labels -- or I know that it's

7    something reflective of that, is in one of our --

8    the documents we shared.

9                But it would have been -- yeah, I guess

10   that's -- I would hate to -- I can give a range from

11   my brain, but it would be in one of the documents

12   provided, sort of what you're looking for.

13        Q    What is the range that you could provide?

14        A    Okay.  So in -- in May then -- again

15   because -- sorry, for clarity, at what time period

16   are you talking about?

17        Q    Any time where you had a goal or a

18   benchmark --

19        A    Okay.

20        Q    -- which could be any point in time.

21        A    Okay.  So for -- for early May, looking at

22   sort of a monthly goal for -- from early May into

23   early June, to the best of my recollection, the goal

24   would have been in the range of two to five --

25                Okay.  So for clarity, in May, right

1    around -- oh, my gosh.  Sorry, there's lots of

2    different time periods that things were very fluid,

3    and that's why it's difficult to kind of remember a

4    point in time.

5              If I was to think of a different -- so

6    for -- okay.  So for July, that's one that I'm more

7    comfortable responding to.  So for early July, we

8    would have had a goal for the following month as

9    reflected -- a goal of -- I think a range of 2 to

10   $3 million a month -- or in July, at least right

11   around 2 to $3 million.

12             Again, it was fluid, and so it would

13   change often.

14        Q    Did you have a goal for each month?

15        A    Can you clarify just a bit?  It's like --

16        Q    Did you have fundraising goals for time

17   periods?

18        A    Yes.

19        Q    Okay.  And were those time periods,

20   periods of calendar months or a certain number of

21   weeks?  Or what time periods did you use?

22        A    Mostly months.  Mostly months, yeah.

23        Q    Okay.  Calendar months?

24        A    Correct, yeah.

25        Q    Okay.  And what was the first calendar

1    month for which you had a fundraising goal?

2         A    To the best of my recollection, I believe

3    it was April or May -- April, May.

4         Q    And what was the last month for which you

5    had a fundraising goal?

6         A    Could you clarify a little bit?  You said

7    "the last month"?  What do you mean; when you were

8    in August, for August, does that make sense?  Can

9    you clarify a little bit?

10         Q    So the first month you said was either

11    April or May.  Did you have a fundraising goal for

12    each successive month after that?

13         A    Yes, and that was fluid.

14         Q    Okay.  And do you still have the

15    fundraising goal per month, or did that stop at some

16    point?

17         A    I guess that stopped.

18         Q    Okay.

19         A    Yeah.

20         Q    And so when did it stop?

21             MS. GAMBHIR:  I'm sorry, Counselor, could

22         I take just a very brief recess with the

23         witness?  I might be able to help here.

24             MR. BARDOS:  Is this a privilege issue?

25             MS. GAMBHIR:  No.  I'm asking for a break.

1          MR. BARDOS:  To discuss the testimony with

2     the witness?

3          MS. GAMBHIR:  To give her a moment to

4     collect her thoughts.

5          MR. BARDOS:  I'm sorry, to confer with her

6     about the substance of my questions and the

7     testimony?  Or just to take a break?

8          MS. GAMBHIR:  Just to take a break.

9          MR. BARDOS:  Okay.  I mean, do you plan to

10     talk to her during the break about the

11     testimony and the questions?

12          MS. GAMBHIR:  Not about the substance.

13          MR. BARDOS:  Let me finish the topic that

14     we're on, and then we can take a break if you

15     want.

16          MS. GAMBHIR:  Okay.

17   BY MR. BARDOS:

18     Q    So what was the last month for which you

19   had a fundraising goal?

20     A    I'm going to ask for a little clarity,

21   which -- because of the fluid nature of goals -- of

22   projections and goals, right?

23          So for -- are you saying the last month

24   that we created a new projection or the last month

25   that we have -- I'm asking for a little bit more

1    clarity on that on "last month you had a goal."

2         Q    So I believe you testified that you had a

3    fundraising goal for April or May of 2025 and that

4    you had fundraising goals for successive months

5    after April or May of 2025.

6              And all I want to know is what was the

7    last month for which you had a fundraising goal?

8         A    If I -- if I look at the goals that we

9    set, for example, in August, towards to, say, what

10   do we need to hit, or what was a -- what are our

11   goals for the subsequent months, there's a document

12   in the materials that you've been given that shows,

13   for example, a few million dollars a month through

14   the end of December, and that would be in the

15   August -- there was a presentation to stakeholders

16   in that document.

17        Q    Okay.  So through the end of December, so

18   did you have fundraising goals for each month

19   through December?

20        A    So in August -- again, things changed over

21   time.  So if we're talking about the August

22   presentation and goals setting, et cetera, then at

23   that time for August, then yes.

24        Q    Okay.  Did FDH meet its fundraising --

25   monthly fundraising goals?

1        A      For which -- just more -- more specifics,

2   please, I guess, or clarity around which goals?

3        Q      The fundraising goals, monthly fundraising

4   goals that we've been talking about.  Did FDH meet

5   those goals for any months?

6        A      Through -- so, yes, we did actually, yes.

7        Q      Okay.  Which months?

8        A      So that -- those would be the first

9   quarter, so the first quarter of '25.

10        Q      I believe you testified that the

11   fundraising, monthly fundraising goals began in

12   April or May of 2025.  Did you have monthly

13   fundraising goals before that time?

14        A      So for clarity, the monthly, sort of like

15   total goals versus funding to achieve certain goals

16   outside of like a total amount by month.

17              So, yes, so not a monthly goal as just a

18   total number, but an amount to achieve the goal of

19   retaining paid petition collection, for example.  So

20   goals around certain -- in the first quarter.

21        Q      So the goal was to have it up to meet

22   certain expenditures, like you have to pay a certain

23   amount for this or that?

24        A      Yes.

25        Q      Okay.  All right.  So I'm talking about

1    monthly fundraising goals.  When you say, okay, so

2    for May of '25, we'll raise X dollars; for June of

3    '25, we're going to raise Y dollars.  Did FDH meet

4    those monthly fundraising goals?

5        A    For which months?

6        Q    Of any month.  Did it meet the monthly

7    fundraising goal for any month?

8        A    To the best of my knowledge, after hitting

9    goals around, sort of, those abilities to get paid

10   petition collection -- and then April was a good

11   month, I remember, as well.  So --

12       Q    So are you saying that FDH met its monthly

13   fundraising goal for April of '25?

14       A    To the best of my knowledge, yes.

15       Q    What was the goal for April of '25?

16       A    I don't recall the exact amount for April.

17       Q    Okay.  Did there come a point in time

18   where FDH realized that it had a budget shortfall?

19       A    Can you define your definition of budget

20   shortfall?

21       Q    Let's take a look at an exhibit.

22            MR. BARDOS:  This will be Exhibit 3.

23            (Exhibit 3 was marked for identification.)

24            MR. BARDOS:  I added it to the Chat, and

25       I'm going to share my screen as well.

1    BY MR. BARDOS:

2        Q    Do you see this document entitled Florida

3    Decides Healthcare Plaintiff's Objections and

4    Responses to Defendants Supervisors of Elections'

5    First Set of Interrogatories?

6        A    Yes, it's sort of small, but I do see it.

7        Q    Okay.

8            MS. DOLAN:  Excuse me, Counselor, could

9        you drop that in the Chat one more time?  I

10       joined the Zoom so I can download, but I missed

11       the initial dropping of the document.

12           MR. BARDOS:  Okay.  I just did.

13           MS. DOLAN:  Thank you.

14   BY MR. BARDOS:

15       Q    All right.  So let's go to page 4 of this

16   document.

17           MR. JAZIL:  Andy, I've got paper copies of

18       this as well, so I can hand it out.

19           MR. BARDOS:  Okay.  Perfect.

20           MR. JAZIL:  What number is this?

21           THE STENOGRAPHER:  3.

22           MR. BARDOS:  This is Exhibit 3.

23           THE WITNESS:  Okay.

24   BY MR. BARDOS:

25       Q    Have you seen this document before?

1      A      (Examining document.)

2             Yeah, I believe so.  Yes.

3      Q      All right.  Turn to page 4, please.  And

4   the long paragraph at the bottom of that page on the

5   fifth line, there's a sentence that reads, "Even

6   after successfully reducing its budget for petition

7   circulation by $10 million, as explained below in

8   response to interrogatory number 5, FDH still faced

9   a significant budget shortfall."

10             Do you see that?

11      A      Yes.

12      Q      Okay.  Explain what significant budget

13   shortfall FDH faced?

14             (Brief pause.)

15      A      Can you repeat it one more time for me?

16   BY MR. BARDOS:

17      Q      Explain what significant budget shortfall

18   FDH faced.

19      A      As indicated here on this sentence?

20      Q      Yes.

21      A      Okay.  (Examining document.)

22             Hold on.  I am orienting myself in time

23   here.  Okay.

24             So to repeat back, this sentence says,

25   "Even after successfully reducing its budget for

1    petition circulation by $10 million, as explained

2    below in response to interrogatory number 5, FDH

3    still faced a significant budget shortfall."

4           And so this is meaning that general time

5    period of reducing the budget by $10 million, that

6    would have been August, September, so of millions of

7    dollars.

8        Q    Okay.  So what was the budget shortfall?

9        A    Campaigns kind of -- they run week to

10   week.  It is fluid is the response to an overall

11   budget.

12          And then an overall shortfall, it's

13   similar in that a shortfall for campaigns and

14   budgets and even projections, things like this,

15   are -- to define what I mean by fluid, is sort of

16   week to week.  So you are looking at your -- the --

17   what's coming -- the cost of, honestly, the next 7

18   to 10 days.  That's why campaigns are very

19   stressful.  There's a very short time period.

20          So to ask a little bit of clarity, if you

21   have anything additional for what you're meaning by

22   shortfall, given -- given that context.

23       Q    I just -- the word was used in your

24   interrogatory --

25       A    Okay.

55

1      Q    -- answer.  It's not my word.

2      A    Okay.

3      Q    So I'm trying to understand what you --

4  not you personally, but you, FDH -- meant when you

5  said that you had a significant budget shortfall.

6      A    At this time, with the reduction, after

7  successfully reducing it, it would have been a

8  shortfall in the short-term of a couple million

9  dollars, given the nature of the fluidness of what I

10 just mentioned.

11     Q    So is it a shortfall relative to the

12 $28 million goal, or is it a shortfall relative to a

13 monthly goal, or is it a shortfall relative to

14 expenses that are accruing; how do you measure

15 shortfall?

16     A    For this context, this means short-term,

17 so measuring a shortfall -- just to repeat, "Even

18 after successfully reducing its budget for petition

19 circulation by $10 million, as explained below in

20 response to interrogatory number 5, FDH still faced

21 a significant budget shortfall.  FDH, thus, did not

22 have enough money to (a) gather petitions and (b)

23 pay to have them circulated while otherwise running

24 a successful campaign."

25          So in the short-term, in this time period,

1    when we reduced that -- the budget circulation

2    after -- after moving to a different type of

3    circulation that was less -- we didn't want to do

4    that, to do this other paid circulation.  We were

5    sort of forced to due to circumstances of -- of 1205

6    and also related, that time period would have been

7    late July or early August as a general time frame

8    for this note that you're pointing to.

9             THE WITNESS:  And then can I take a break

10        after I finish?

11             MR. BARDOS:  I'm sorry?

12             THE WITNESS:  I just want to take a break;

13        is that okay?  I will finish the question and

14        then take a break.

15             MR. BARDOS:  Sure.  Go ahead and finish

16        the question, then we can take a break.

17             THE WITNESS:  Thank you.

18     A    Okay.  So the gap at that juncture would

19    have been looking just in over the few weeks of like

20    through August, essentially, and a gap of 2 to

21    $3 million, right around there.

22             And that's -- I'm sorry, you know what,

23    that's my answer there.  Yeah.

24             MR. BARDOS:  Okay.  Let's -- how much time

25        do you need for the break?

1              THE WITNESS:  Can you give me 5 minutes?

2       I'm going to go to the bathroom.

3              MR. BARDOS:  Yeah, of course.  Yeah.

4              (A recess took place from 11:25 a.m. to

5       11:32 a.m.)

6              MR. BARDOS:  Let me just say on the

7       record, Counsel.  I don't know how many

8       questions Mr. Jazil has, but it may well be

9       that we might need to go beyond 7 hours, given

10      how long it's taking to get to answers and the

11      silences that follow the questions.

12             So given how slow the pace has been, we

13      might need to take over 7 hours.  But that

14      depends on the questions that everyone else

15      has.

16   BY MR. BARDOS:

17      Q    All right.  So we were talking about the

18   budget shortfall.  When is the first time that FDH

19   realized that it has a budget shortfall?

20      A    So for -- for campaigns, to explain the

21   fluidity of this, of campaigns in general and FDH,

22   how we approached it is that you have a general

23   projection for the entire campaign and then month to

24   month, what it would most likely take; and then you

25   have actual vendors and needs in the very immediate

1    sense of the next 10 days or so.

2              And so in that vein, shortfalls would be

3    sort of a similar kind of approach where we never

4    really said, oh, we had like -- we have a shortfall.

5    It's you rejigger your projections and you say this

6    is what we did for the last, you know, weeks, and

7    then you shift in fluidity and you shift your

8    projections for the future.

9              And so I'm not trying -- I'm just trying

10   to explain that context because it's hard to give a

11   direct -- it's hard to answer directly what that is,

12   given how we approached things.  So you have general

13   projections and goals and however those things shift

14   over time.

15             And so with that, I just wanted to --

16   hopefully, if I could respond with that, I think

17   it'll speed things along to your point.

18             So okay.  So answer -- or ask the question

19   again, just repeat it real quick.

20   Q    So did there come a point when FDH

21   realized that it was not meeting its fundraising

22   goal, whether those are the monthly goals or the 28

23   or $25 million goal?

24   A    I wouldn't -- I wouldn't say it was an

25   exact point in time, but that, you know, over --

59

1    well, especially, you know, July and August, when

2    you shift those goals, right.  And so those

3    shifts -- you shift and you would increase some of

4    the needs on the back-end of the time period.

5              And so I would say the best answer to your

6    question would be around, you know, early August

7    when it was -- around early August is what I would

8    say to -- given the context of how you move goals

9    and you move projections, yes.

10   Q    Now, we talked earlier about reducing the

11   budget by $10 million because of the mail petition

12   circulation program.  When did that reduction of

13   $10 million take place?

14   A    So the campaign shifted in terms of

15   their -- sort of choice of type of collection and

16   vendors from The Outreach Team, which was our

17   preferred partner and vendor, given the nature of

18   the benefit of having all these people out there

19   talking to people and engaging with them.  But we

20   shifted right around the same time that I had just

21   shared, in August.

22             Yes, we started to shift in August to

23   utilize a different method of this mail method.  And

24   just given the nature of mail, that's how it

25   impacted the projected budget needs, right, by the

1    $10 million.  So around -- in August.

2        Q    August.  Okay.

3        A    Yes.

4        Q    But even before that, FDH had a

5    significant budget shortfall, correct?

6        A    We had a large goal of -- we had a large

7    goal of 28 -- you know, at $28 million that then

8    reduced by 10.  And that's a large goal that we were

9    working towards.

10        Q    In the interrogatory answer that we looked

11    at, it said that after the $10 million reduction was

12    made, FDH still faced a significant budget

13    shortfall.

14            So that would suggest that even before

15    that time there was a significant budget shortfall,

16    right?

17        A    So even -- so after successfully reducing

18    this budget by $10 million, and so that's when it

19    went from 28 to, you know, 18 and this is what it's

20    going to take to get to the ballot.  If we can -- if

21    we have to do this method, we must, but it's cheaper

22    and we're going to do this one effort.

23            That concept of the larger amount previous

24    to that was still a significant goal to reach by the

25    end of the year.  So was there a budget, you know,

1    gap that we were filling previous to the reduction

2    and the cost of $10 million?

3              Yeah, there was a gap that we were --

4    that's how campaigns work.  You know, I mean, every

5    week you have a gap.

6         Q    All right.  So you implemented this pilot

7    program.  Tell me --

8         A    Yes.

9         Q    -- a little bit about this pilot program

10   and what it consists of.

11        A    To the best of my knowledge, the pilot --

12   the pilot program was a vendor who we -- basically

13   mailed out the petition, blank petitions, and

14   then -- with the appropriate pieces of the envelope

15   for them, for individuals to return them.  And

16   then -- and then we also, you know, turned those in

17   at that juncture.  So it was a mail program.  Yeah.

18        Q    Uh-huh.  Okay.  And why did FDH shift to a

19   mail program?

20        A    Due to a lot of different factors, you

21   know, predominantly in HB 1205, looking at many

22   different factors, including cost increases, needing

23   to shift -- push down the cost of the budget or the

24   expenses, and basically try -- try to identify if

25   there was even an alternative to our preferred

1    method of collection, which is paid petition

2    volunteers through The Outreach Team and that

3    engagement with people that they can -- so --

4            Sorry, did I -- could you restate your

5    question or did I answer it?

6        Q    And one of the reasons that you shifted to

7    a mail program is that you were not on track to

8    raise $28 million, correct?

9        A    One of the reasons why -- at that point,

10    in the late summer, in -- like right around August

11    and July, after looking for this -- so, yes, I'm

12    just trying to give you accurate information.  So,

13    yes.

14        Q    Okay.  So you simply didn't have money or

15    you weren't raising money to pay your paid petition

16    circulators, and that's the reason -- or a reason

17    why you shifted to the mail program, correct?

18        A    There were -- I mean, it's hard to answer;

19    there's many different factors going into that

20    decision.

21            And so, you know -- many different factors

22    going into that decision, and, you know, one of them

23    being, you know -- it was just really -- it was

24    really difficult at that juncture, understanding the

25    increases of costs of paid petition after HB 1205

1    that they, you know, had a lot of uncertainty around

2    paid petitions with what they were doing with that

3    and moving forward with paid petition.

4            In addition, honestly, like week to week,

5    you know, cash flow of the campaign, you raise a lot

6    of money and you spend it immediately.  That's just,

7    like, what it is.  And so any kind of change that is

8    very uncertain.  Like if I put my headspace in July

9    and August, it's very much I'm getting personal

10   emails from SOEs increasing the costs of

11   verification, and the cash flow component to this --

12   there was a variety of reasons that would have

13   impacted, you know, the ability to have certainty

14   around fundraising for both the need around paid

15   petition and the verification costs that would go

16   alongside of that time period -- I'm sorry, in that

17   time period, and what we're thinking at that moment

18   of the campaign.

19       Q    And one of the big reasons why you

20   switched to a mail program is that you simply

21   weren't raising the money that you needed to raise

22   to pay your paid petition circulators; isn't that

23   right?

24       A    One of the reasons, yes.  One of the

25   reasons.

64

1      Q     And that was a significant reason?

2      A     Paid petition collection is the primary

3   cost of ballots -- of the ballot initiative

4   campaign.  And so yeah, that's the preferred method

5   that we wanted -- I'm sorry, uh-huh.

6      Q     Right.  But you weren't raising the money

7   to pay for it; is that right?

8      A     The -- right, the combined costs --

9   because you can't -- you can't -- the combined costs

10  of like petition collection in that vein and the

11  verification associated with July and August, the

12  costs of that basically forced us to think, like,

13  what are some alternative costs -- it was a less

14  costly, if not preferable method, which -- at that

15  juncture; because those things are, you know,

16  related.

17         You have -- that was also during -- well,

18  I'm sorry, I don't want to -- that was the answer to

19  your question.  You can continue.

20     Q     So how much -- how much of the $28 million

21  had you raised by the time that you switched to the

22  mail method?

23     A     Sure.  We had -- so for -- I mean, in

24  essence, right around -- just for time period's

25  sake, right, because I can go with the time period

65

1     that you're discussing of how much did you raise.

2     So if it's towards that overarching goal of the 28

3     before, would have been right around 5 to

4     $6 million, as well as -- because you, you know --

5         Sorry, I'm going to stop there and let you

6     ask --

7      Q   Did you say that you raised 5 to

8     $6 million?

9      A   So in between contributions and

10     commitments that, you know -- in a campaign, you

11     have money that comes in the door right away, so

12     overarching, this is how I would say that yes, 5 to

13     $6 million.  But that includes commitments that then

14     you're moving over time as well.  So this is why --

15     contributions.

16      Q   So I'm just talking about contributions,

17     money that you have in the door.  How much of the

18     $28 million had you raised by the time that you

19     switched over to the mail method?

20      A   If I may, that's not how campaigns work.

21     It's sort of a -- because the $28 million is also a

22     projection of like the future.  And so it's sort of

23     having a commitment that moves and -- like into

24     certain -- it's -- commitments are also paying for

25     the future, right, like you have a commitment.

1          So in terms of the amount of contributions

2  for the campaign, as stated before, was 2.9 million

3  in contributions.  And we had, as stated in some of

4  our documents that you've seen, additional

5  commitments that we were working on as well.

6          Q    Did you find the mail program to be an

7  effective method of collecting petitions?

8          A    It was okay.  It was just not our

9  preferable method.

10          Q    Would you consider it successful?

11          A    The results from that pilot I know we

12  viewed as an indicator that -- it was a choice that

13  we could, you know, explore at that time.  So -- it

14  depends on how you define success.

15          Q    Have you described it yourself in your

16  communications to donors as having been successful?

17          A    Yes.  Yes.

18          Q    You have.  Okay.  In what way was it

19  successful?

20          A    To the best of my knowledge, the --

21  basically a return rate.  So for mail, it would be

22  how many petitions do individuals return that

23  receive them from a mail-out, and the rate was

24  satisfactory, around 5 percent; I believe in that

25  range, yeah.

1          Q     Okay.  Did you do any analysis of whether

2     the mail method or the petition, the use of paid

3     petition circulators was more cost effective?

4          A     I think effectiveness from the get-go was

5     based on you -- you want to do the best, you know,

6     and most plausible thing that's going to get you to

7     the ballot.  And so that's -- it's hard to say

8     like -- it's because they're not apples to apples.

9     It's apples to oranges because the paid petition

10    collection just has so much more to it, right, and

11    that has so much more -- so many more benefits to it

12    that are hard to put like a very hard financial

13    number to it.

14               But a lot of campaigns, as evidenced

15    that -- lots of campaigns in Florida use paid

16    petition collection because it's -- there's more

17    flexibility, a surety around it.  So it's hard to

18    answer that because it's not sort of like just a

19    fiscal number.  There are other factors that would

20    go into making that decision of which -- or like how

21    much of each or something.  So, yeah.

22         Q    Did you evaluate whether your costs per

23    signed petition is more or less using the mail

24    method compared to the paid petition circulator

25    method?

1          A     You know, that I don't know.

2          Q     Okay.  Okay.  On this interrogatory that

3     you were looking at just before, let's go to

4     interrogatory number 4.  This is Exhibit 3.

5              I'm sorry, page 4.  Page 4, towards the

6     bottom of that page, it says that "The untenable

7     cost of petition verification was a material factor

8     in FDH's decision to suspend its 2026 campaign."

9              Do you see that?

10         A     Yes.

11         Q     Okay.  What were the other factors in

12    FDH's decision to suspend its 2026 campaign?

13         A     So in addition to the cost of petition

14    verification being a material factor in the decision

15    to suspend the campaign for 2026, other factors

16    broadly are, you know, predominantly other

17    provisions within HB 1205 and the impacts of

18    creating a ton of uncertainty or barriers or costs

19    in -- and that's it.

20         Q     Okay.  That's it; no other factors?

21         A     Oh, I'm sorry, by saying that's it, I just

22    meant that was the end of my sentence.

23         Q     Okay.  Are there any other factors?

24         A     You know, there's additional -- there's

25    probably some additional factors.  There were

1    probably some additional factors with the

2    predominant one being various factors of 1205,

3    including the verification.

4          Q    Okay.  What are those other factors?

5          A    I think that I could give a couple, I

6    guess.  They could go on for a long time.

7                Like one -- one would be perceptions of

8    potential donors at that time period of sort of --

9    Florida and campaigns in Florida and, you know, with

10   what might happen.  So perceptions around the

11   campaign, you know, in regard to the state and sort

12   of like uncertainties of ability to push -- I guess

13   it would be like a related factor to 1205 of

14   perceptions of, you know, a lot of this is -- don't

15   have perceptions from others on what is happening.

16   So it's -- one, I would say, would be factors -- one

17   factor would be sort of these donor perceptions of

18   the state and the possibility of engaging in it.

19                I mean, another factor is time, to be

20   honest.

21                And could I just clarify, like you're

22   talking about the factors outside of all of the

23   factors we've mentioned -- or is that -- I'm

24   correlating with HB 1205?

25         Q    Correct.

 1      A    Okay.   Time.   August is -- you get to the

 2  a point where in these campaigns there's limited --

 3  there's limited amount of time that would

 4  increase -- as we said, budgets are fluid,

 5  projections are fluid; and you get to a point where

 6  it becomes near impossible, unless you have sort of,

 7  you know, an endless amount of money or something,

 8  to achieve the goal, right?

 9           You're sort of like starting to say --

10  right around that time period, you know, it's sort

11  of an arduous time.

12           And -- and then that's all that I can

13  think of right now.

14      Q    Okay.   If you take a look at the top of

15  page 4 --

16      A    Yes.

17      Q    -- on the document that we were just

18  looking at, it says that "FDH raised approximately

19  $2.88 million in contributions over the first three

20  quarters of 2025."

21           Do you see that?

22      A    Yes.

23      Q    Was it a factor in the suspension of FDH's

24  campaign that it had raised approximately 1/10th of

25  what it set out to raise?

1        A    I wouldn't say it like that.  It's almost

2    looking at the remaining time that's -- so -- I'm

3    not trying to -- I'm just trying to be accurate.

4            Where -- rather than like looking

5    backwards, it's more about like looking forwards and

6    the possibilities of the future; and of the time

7    period of, okay, we had four or five months and we

8    have X to go.

9            And it wasn't necessarily -- it wasn't

10   exactly looking backwards to say, gee, in the past

11   this happened.  It was more a projection, given that

12   there -- with experience of understanding the state

13   of Florida and, you know, the previous year's

14   campaign, for example, that was successful to get on

15   the ballot, Amendment 4 around abortion rights.

16   They actually started -- we had started to raise

17   money even before they did, and that was one of my,

18   you know, factors in understanding some of this.

19           So it's because campaigns often are sort

20   of this -- not exponential exactly, but you have

21   this on-ramp of momentum and there's always kind of

22   these possibilities.  And, honestly, from that first

23   quarter up until May, we were even ahead of

24   Amendment 4 from last year.

25           So I say that to say that it's sort of a

1    -- I hate to say no -- and maybe you can reframe it

2    in another way.  I'm just trying to be accurate.

3        Q    Okay.  So my question is whether the fact

4    that you had raised only about 10 percent of what

5    you had set out to raise and had another 90 percent

6    to go was a factor in FDH's decision to suspend its

7    campaign?

8        A    Yes, at that juncture, when we decided to

9    pivot, the amount of money that we had on hand was a

10   factor, for sure, compared to commitments -- or not

11   commitments, I'm sorry.  It was the projections of

12   what would be needed to get on the ballot by that

13   time.

14       Q    Okay.  And did you understand then that

15   you would -- that you would not likely be able to

16   raise the additional $25 million or so that you had

17   set out to raise?

18       A    I'd say that it would be -- that it would

19   be unlikely, yes.  I guess, yes.

20       Q    Okay.  All right.  So at this point is FDH

21   pursuing a campaign to place an initiative on the

22   2028 ballot?

23       A    No.  Oh, I'm sorry, I'm really -- I'm kind

24   of unsettled.  I -- yes, we are.  Sorry.

25       Q    Okay.  Okay.  And is there any reason why

73

1    FDH is pursuing that initiative, other than to

2    maintain its standing in this litigation?

3         A    Yes, to advance the goals of Medicaid

4    expansion in the State of Florida.

5         Q    Okay.  And I understand that FDH has set a

6    goal to raise $18 million for the 2028 campaign; is

7    that accurate?

8         A    We are starting -- we have like beginning

9    framework of what that would look like for phase

10   one.  But there are so many -- to be honest, there's

11   so many uncertainties, including the outcome of this

12   litigation, and that would just go directly into

13   changing it.

14             So it would be a really big range.  So --

15   but I would call it more of like a beginning

16   framework for an estimate of the costs, not

17   necessarily a budget.

18        Q    And what is that estimate currently for

19   phase one?

20        A    So we had -- we basically are starting

21   with where we left off similarly with about an 18.6,

22   right around there, estimate.  But, again, it's

23   dependent on outcome of many uncertainties.  There

24   are too many factors in HB 1205 that could have

25   questions as to what that looks like.  So --

1          Q     Okay.  Is there something different about

2     the 2028 campaign that leads FDH to believe that it

3     can raise $18 million when it fell so far short

4     during its 2026 campaign?

5          A     So over the time period of this past year

6     and then running into the next -- so -- so yes would

7     be the answer but ...

8          Q     Okay.  And what is that, what are the

9     differences?

10         A     We have an infrastructure that is kind of

11    set and raring to go, if you will.  We have all

12    these relationships that are set with lots of

13    different, you know, major donors who understand the

14    impacts of what we're going through with 1205.  But

15    that -- essentially, you kind of set the stage and

16    you have the framework, you have everything that's

17    kind of raring to go.  And then it's a little bit

18    more -- as I said before, like time is what you need

19    for a campaign.

20              And so essentially, you know, there's

21    timing, a little bit more time to on-ramp for this.

22         Q     So the perceptions that you mentioned that

23    donors have that make them reluctant to contribute,

24    do you -- do they no longer have those with respect

25    to the 2028 campaign?

1          A     I can't -- I can't speculate that far; I

2     can't necessarily speculate on that.

3          Q     What are the steps that FDH has taken so

4     far in pursuing its 2028 campaign?

5          A     So we have an active executive committee,

6     and we meet regularly.  We also have a staff for the

7     campaign, including executive director, also

8     part-time field organizer and part-time associate to

9     support operations, to really -- to do so.

10               We also have monthly, like, key

11     stakeholder donor briefings that we've continued

12     regularly, and they are present right now, and like

13     discussed; and have had discussions around what

14     makes the most sense for decisions for '28; talked

15     to our counsel a lot about other kinds of decisions

16     of what makes the most sense for the filing,

17     et cetera.

18               And then a major part of what we're doing

19     right now is engaging with those same grassroots

20     partners and volunteers to keep that momentum alive.

21     And then we have sort of a form that you can fill

22     out to commit to sign when we do have a new

23     petition.  So perhaps other activities as well, but

24     I would throw those out there.

25          Q     Okay.  In the interrogatory answers -- and

 1    we can look at this if you'd like, but in the

 2    interrogatory answers it says that FDH's attempting

 3    to verify whether it can maintain its current

 4    political committee or whether it would need to form

 5    a new one.  Does that sound familiar to you?

 6        A    Yes.

 7        Q    Okay.  Has FDH made a decision about

 8    whether it will maintain its existing political

 9    committee or create a new one?

10        A    We're -- there's -- we're still discussing

11    that with counsel.

12        Q    Okay.  Are you currently fundraising?

13        A    Yes.

14        Q    Are you fundraising specifically to fund

15    the litigation?

16        A    Could you have a little clarity -- so

17    we're fundraising for litigation and more.  So --

18    but could you -- could you describe a little bit

19    more what you mean by that?

20        Q    Yeah, so are you telling your donors we're

21    raising money to fund litigation or we're raising

22    money to run a new campaign in 2028?  What's -- what

23    are donors saying is the purpose they're

24    contributing to?

25        A    So we're doing -- we are fundraising for

1    general, for everything.  And, honestly, it depends

2    on the donor and those communications for like

3    specific -- a good fundraiser knows who you're

4    talking to and what interests and what kind of

5    things that they would be interested in.

6          And so we have funded successfully, you

7    know, and working on donors who have interests in

8    all of our costs.  So, yes, including litigation and

9    also 2028 and yeah -- healthcare, you know,

10   essentially, working on those folks.

11   Q    Okay.  Do you know whether any supervisors

12   require initiative sponsors of FDH to pay a

13   signature verification fee within the same 10-day

14   deadline by which the petition form must be

15   delivered to the supervisor?

16   A    I -- it's unclear to me, and especially

17   given some communications from some supervisors that

18   would indicate that some of them -- that a petition

19   may not be valid or perhaps would fall outside of

20   the 10-day if the cost -- if we were to pay -- or

21   that the payment was involved in the 10-day deadline

22   in some sense.

23          So some of those questions are still

24   outstanding from my standpoint in that we had

25   discussions with counsel about them.

1       Q    Okay.  So let me show you an exhibit.

2  Actually, it's the exhibit we were just looking at,

3  I believe, and so it's Exhibit 3.

4          No, I'm sorry, Exhibit 2.

5          Okay.  When you refer to communications

6  from supervisors, are you referring to the documents

7  that are cited on pages 4 and 5 of Exhibit 2?

8       A    To be honest, I would have to see 4 and

9  5 -- or the cited, the piece that it's citing to

10  look at them.  But is that okay?

11       Q    Well, why don't you tell me, so --

12       A    Yeah.

13       Q    -- you mentioned communications from

14  supervisors that --

15       A    Oh, yeah, okay.

16       Q    -- you say make you uncertain.  What

17  communications are you referring to?

18       A    There's one from Hillsborough County and

19  there's one from Glades County that I know that are

20  in the responses.

21       Q    Okay.

22       A    I believe they are the ones -- are you

23  looking at something specific that I can look at

24  too?  Page 5?

25       Q    I can find the specific communications, if

1    that would help to look at that.

2        A    Yes, it would.

3        (Brief pause.)

4        Q    Okay.  I don't want to take up your time

5    with this, so we can come back to that later if

6    necessary.  But let me ask you this question.

7        Is it your understanding that during the

8    moratorium period, when FDH was still submitting

9    petitions to supervisors, it was not paying the full

10   posted signature verification fee, but instead it

11   was paying the fee prior to the increase?

12       A    Yes, that's my recollection, given we were

13   hopefully litigating the increase, and so that's my

14   recollection.

15       Q    Okay.  And during all of that time, if you

16   were submitting incomplete payment with the petition

17   forms, did the Secretary of State or any other

18   election officials ever fine or otherwise penalize

19   FDH for not submitting full payment within the

20   10-day period to submit petition forms?

21       A    I am uncertain of the outcome yet.  I

22   believe with the -- still trying to understand the

23   impacts of -- and have -- add clarity from what --

24   not to this -- I haven't heard of that to this point

25   and still trying to understand clarity with our

1    counsel as FDH as to what kind of penalties there

2    might be as --

3        Q    So I'm asking whether --

4        A    -- yeah.

5        Q    -- FDH has actually been fined or

6    penalized for submitting --

7        A    Okay.

8        Q    -- for failing to submit complete payment

9    within a 10-day period to submit petition forms.

10   Are you aware of FDH being fined or penalized by any

11   election officials in Florida or the Secretary of

12   State or any Supervisors of Elections for not

13   submitting complete payment within the 10-day period

14   to submit petition forms?

15       A    I'm not aware, no.

16       Q    Okay.

17            MR. BARDOS:  Okay.  I'd like to take a

18       quick break here.  I might be done.  I'd just

19       like to look over my notes, if that's okay.

20       And if we can reconvene in about 5 minutes.

21            I'm probably -- probably done.  I might

22       have a couple of additional questions, but a

23       5-minute break would help me wrap things up.

24            (A recess took place from 12:18 p.m. to

25       12:30 p.m.)

1   BY MR. BARDOS:

2       Q    Just one final question.  Do you know how

3   much money FDH has raised during the fourth quarter

4   of 2025?

5       A    So -- sorry, there's feedback -- raised

6   for contributions?  I believe the range -- in the

7   range of a hundred to 200,000 in the fourth quarter.

8            Sorry, you mean you October -- fourth

9   quarter of the year, right, October 1st through

10  December?  So up till this day in December, correct?

11      Q    Correct.

12      A    Opposed -- not -- all right.  Let me think

13  about that just a second.

14           In the range of right around --

15  contributions that we have -- I think in the range

16  of 100 to $200,000.

17           MR. BARDOS:  Okay.  Thank you.  I have no

18      further questions.

19           MR. JAZIL:  Do any of the other

20      supervisors have questions?  Hearing none, I

21      suggest we take a break until 1:00 for lunch.

22      Is that enough time?

23           MS. GAMBHIR:  Yes.

24           (A recess took place from 12:30 p.m. to

25      1:14 p.m.)

1          **FURTHER DIRECT EXAMINATION**

2    BY MR. JAZIL:

3          Q    Ma'am, I am going to pick up where my

4    friend Mr. Bardos left off but go about this

5    slightly differently.  And you and Mr. Bardos were

6    talking about funding for Florida Decides

7    Healthcare, correct?

8          A    Correct.

9          Q    Okay.  Florida Decides Healthcare is a

10   Florida political committee, right?

11         A    Yes.

12         Q    And as a Florida political committee,

13   Florida Decides Healthcare reports all of its

14   contributions to the Department of State, right?

15         A    Correct.

16         Q    And it also reports all of its

17   expenditures to the Department of State, right?

18         A    Correct.

19         Q    And do you use at Florida Decides

20   Healthcare an outside accounting firm to do your

21   reporting to the Department of State?

22         A    We do.

23         Q    Do you have any reason to doubt the

24   accuracy of the reports submitted by Florida Decides

25   Healthcare to the Florida Department of State?

1         A     No.

2         Q     Now, ma'am, looking at the contribution

3    figures for Florida Decides Healthcare, as reported

4    to the Florida Department of State, there are

5    contributions by the Florida Policy Institute.  Are

6    you -- do you know whether or not Florida Policy

7    Institute made contributions to Florida Decides

8    Healthcare?

9         A     I do, yes.

10         Q     Okay.  And these contributions exceed

11    $415,000; does that sound about right?

12         A     Could you gather what timeframe?

13         Q     Sure.  I see a contribution dated

14    5/21/2025 for $400,000 to Florida Decides Healthcare

15    from the Florida Policy Institute.  Does that --

16         A     Yes.

17         Q     -- sound right?

18         A     Yes.

19         Q     We also talked, prior to Mr. Bardos asking

20    questions, about how you work for the Florida Policy

21    Institute, right?

22         A     Correct.

23         Q     And what is your title at the Florida

24    Policy Institute?

25         A     My title at the Florida Policy

1    Institute --

2        Q    Yes.

3        A    -- is chief strategy and development

4    officer.

5        Q    Okay.  And as the chief strategy and

6    development officer, do you approve contributions

7    from the Florida Policy Institute to political

8    committees?

9        A    Can I clarify it right now?  Am I

10   testifying on behalf of FDH?

11       Q    No, I understand that.

12       A    As the corporate --

13       Q    But the question stands.

14       A    Okay.

15       Q    Do you approve contributions to political

16   committees in your role at the Florida Policy

17   Institute?

18       A    In my personal role as chief strategy and

19   development officer, I do not.

20       Q    Okay.  In your role as the chairperson for

21   Florida Decides Healthcare, did you seek funds from

22   Florida Policy Institute?

23       A    Yes.  And if I may, that there's --

24   Florida Policy Institute is one of many

25   organizations on the executive committee, and so

1    seeking funds from them, yes, and similarly all

2    executive committee member organizations.

3         Q    Okay.  So Florida Policy Institute is on

4    the executive committee of Florida Decides

5    Healthcare; did I understand that right?

6         A    Yes.

7         Q    Are there other entities that are on the

8    executive board for Florida Decides Healthcare?

9         A    There are, yes.

10         Q    Did those other entities also make

11    contributions to Florida Decides Healthcare?

12         A    To different extents, yes.

13         Q    And as chairperson of Florida Decides

14    Healthcare, do you yourself go to the board for

15    Florida Decides Healthcare before the entity makes a

16    request for contributions?

17         A    Do -- can you repeat that?  I --

18         Q    Sure.  As the chairperson for --

19         A    Yeah.

20         Q    -- Florida Decides Healthcare, do you go

21    to the board of Florida Decides Healthcare, asking

22    for permission for Florida Decides Healthcare to

23    seek funds from entities?

24         A    I wouldn't couch it like that, I guess.

25    It's not permission per se for Florida Decides

1    Healthcare to fundraise for each individual donor.

2        Q    Okay.  So who asks?  Who decides to ask a

3    donor for money for Florida Decides Healthcare?

4        A    It depends.  So like various individuals.

5        Q    Are you one of those individuals?

6        A    I would be one of those individuals, yes.

7        Q    Were you the one who made the ask of

8    Florida Policy Institute to make a contribution to

9    Florida Decides Healthcare?

10       A    Trying to be accurate.  I think in tandem,

11   yes, with my co-chair.

12       Q    Who is your co-chair?

13       A    So Scott Darius for Florida Voices for

14   Health, another executive committee member that's --

15   could we say co-chairs the executive committee -- of

16   the executive committee versus the PC that you're

17   mentioning --

18       Q    Okay.  So you're on the paperwork as the

19   chair of the political committee for Florida Decides

20   Healthcare, correct?

21       A    Correct, yes.

22       Q    And you said -- the other gentleman you

23   mentioned, what was his name?

24       A    Scott Darius.

25       Q    Okay.  Scott Darius and you serve as

1    co-chairs of the executive committee; did I --

2         A    Correct, yes.

3         Q    -- get that right?  And so as executive --

4    as, pardon me, as co-chairs of the executive

5    committee, do you and Mr. Darius go out and meet and

6    ask of people and entities to donate funds to the

7    political committee called Florida Decides

8    Healthcare?

9         A    We do, yes.

10        Q    Anyone else?

11        A    Outside of the executive committee?

12        Q    Outside of the two co-chairs of the

13   executive committee --

14        A    Oh, yes --

15        Q    -- does anyone go --

16        A    -- yes, yes.

17        Q    And is Mitchell Emerson one of the

18   individuals who goes out and asks for funds?

19        A    Yeah, he would be one.

20        Q    Anyone else?

21        A    Other members of -- okay, you said outside

22   of the executive committee.  So the executive

23   committee --

24        Q    Outside of you --

25        A    Okay.

1      Q    -- and Mr. Darius and Mr. Emerson, anyone

2  else?

3      A    Okay.  We did have some financing

4  consultants --

5      Q    Okay.

6      A    -- in varying parts of the year.  And so

7  that's their role, is to --

8      Q    Okay.  Do you recall the name of the

9  financing consultant?

10     A    Sure, so one would be through the

11  consultant of -- the name of that firm is called

12  Greenprint.

13     Q    Okay.

14     A    Her name's Brice.  And then another is

15  Steve Piakowsky, who's the -- I don't recall the

16  name, if he has like a consulting firm.

17     Q    Does it -- does the firm BTS Strategy

18  sound familiar?

19     A    It does sound familiar.  It does sound

20  familiar, yes.

21     Q    Would you mind pulling up what we marked

22  as Exhibit 3 now?

23     A    Sure.

24     Q    Okay.  And so the front of this says,

25  "Florida Decides Healthcare Plaintiff's Objections

1    and Responses to Defendant Supervisors of Elections'

2    First Set of Interrogatories," correct?

3         A    Yes, I'm sorry, I was reading -- yes.

4         Q    Okay.  And if we go to the very back of

5    this document, page 20.

6         A    Yes.

7         Q    You see it says Mitchell Emerson,

8    executive director and campaign manager, signed this

9    document?

10         A    Yes.

11         Q    Have you seen this document before, ma'am?

12    Before today?

13         A    I'm just checking.

14         Q    Okay.

15         A    (Examining document.)  Yes, yes, I have

16    seen this.

17         Q    Okay.  And if we go to Interrogatory 10 on

18    page 13 --

19         A    Yes.

20         Q    -- it asks to "identify the individuals,

21    including fundraising consultants, who are

22    responsible for or who have the most knowledge about

23    your budget and your fundraising efforts" --

24         A    Uh-huh.

25         Q    -- "including your fundraising

1    projections."

2            Do you see that?

3    A    Yes, the responses are -- to 10, yes.

4    Q    Yep.  And then the response listed

5    Mitchell Emerson first, right?

6    A    Uh-huh.

7    Q    And then it's got Holly Bullard; that's

8    you --

9    A    Correct.

10   Q    -- right?  It's got Audra Connell; you see

11   that?

12   A    Yes, yes.

13   Q    And then it's got Steven Paikowsky?

14   A    Yes.

15   Q    And it says the employer is BTS Strategy?

16   A    Oh -- okay.  You said "does this ring a

17   bell," I said "yes"; this is why.  That's his -- the

18   firm.

19   Q    Okay.

20   A    That he -- like, it's his firm, yeah.

21   Q    Okay.  And these would be the individuals

22   in response to Interrogatory 10 who would interact

23   with the donors and seek funds for the entity?  In

24   addition to your co-chair of the executive

25   committee?

91

1       A       Really, the whole executive committee also

2    engages in fundraising --

3       Q       Okay.

4       A       -- so --

5       Q       Okay.  Fair enough.  Mr. Paikowsky, do you

6    know where he's based?

7       A       South Florida.

8       Q       Okay.  And Greenpoint?

9       A       Print.

10      Q       Greenprint, pardon me.

11      A       Yeah.

12      Q       And who is the person at Greenprint?

13      A       Her name is Brice Barnes.

14      Q       Okay.  And do you know where Brice Barnes

15   is based?

16      A       Tallahassee.

17      Q       Tallahassee.  Okay.

18              MR. JAZIL:  Can we go ahead and get extra

19          copies of this?

20              Sandi, what exhibit are we on?

21              THE STENOGRAPHER:  The next will be 4.

22              (Exhibit 4 was marked for identification.)

23              MR. JAZIL:  4.  Okay.  I'm going to mark

24          as Exhibit 4 this document here.

25

1    BY MR. JAZIL:

2        Q    All right, ma'am, have you seen this

3    document before?

4        A    Yes.

5        Q    Okay.  If we look at the bottom right, it

6    says "FDH" and then it's got a series of numbers;

7    you see that?

8        A    I do, yes.

9        Q    And that denotes that this is part of

10   Florida Decides Healthcare's production in this

11   case, correct?

12       A    I think so.  I'm not aware of this.

13       Q    Okay.  Fair enough.  If you go to the page

14   that says FDH_0058833.

15       A    All right.

16       Q    Which is near the end.  Let me know when

17   you're there.

18       A    Yes.

19       Q    Okay.  And based on the Bates number that

20   was read by your counsel earlier in this deposition,

21   this is a page you referred to to refresh your

22   recollection about the 100,000 petition goal for

23   May 1st, 2025, correct?

24       A    Correct, the collected goal, correct.

25       Q    Okay.

93

1      A      Yeah, this is it.

2      Q      All right.  So this is it.  This is what

3  you used to refer to to refresh your recollection,

4  right?

5      A      Yes.

6      Q      And, ma'am, have you seen this document

7  before?

8      A      Yes, I have.

9      Q      Do you know who prepared this document?

10     A      Many individuals had a hand in it.

11     Q      Were you one of the individuals who helped

12  prepare this document?

13     A      Yes.

14     Q      Was Mr. Emerson one of the individuals who

15  helped prepare this document?

16     A      Well, we had several versions of this, so

17  I'm just going to refresh my memory about this one.

18          (Examining document.)  So, yes, we would

19  have reviewed this.

20     Q      Okay.  Did Dr. Acosta help prepare this

21  document?

22     A      Not to my knowledge.

23     Q      Okay.  Do you know when this document was

24  prepared?

25     A      Let's see.  Okay.  So this would have been

1    in August -- in earlier August, maybe.  Generally

2    speaking, would be around -- yeah, because looking

3    at this -- this is the document that we edited many

4    times over time.  And so to look at a certain piece

5    of it and go, oh, yeah, that makes sense for that

6    time period.  So ...

7        Q    So this is -- this document was prepared

8    in early August of 2025, correct?

9        A    Confirming.  (Examining document.) I mean,

10   I want to say like late July into early August, so

11   that time period.

12       Q    Okay.  So this document was prepared

13   sometime in late July to early August of 2025,

14   correct?

15       A    Yes, yes.

16       Q    Okay.  Well, let's take a look at the last

17   page of this document, ma'am.

18       A    Okay.

19       Q    And on the last page, there's a box that

20   says "PD.POL.ADV.paid for by Florida Decides

21   Healthcare, Inc."; do you see that?

22       A    I sure do.

23       Q    And you agree with me that PD.POL.ADV.

24   stands for "paid political advertisement" --

25       A    Yes.

95

1    Q    -- paid for by Florida Decides?

2    A    Correct.

3    Q    So this was a paid political advertising

4    prepared by Florida Decides Healthcare, according to

5    the disclaimer?

6    A    Yeah, we have this disclaimer on

7    donations, like small donations.  This is a

8    communication to donors, and so, yeah.

9    Q    All right.  And so, ma'am, you said this

10    was a communication to donors.  Do you know how many

11    donors this went to?

12    A    It went to donors and potential donors.

13    Q    Okay.

14    A    And, honestly, I wouldn't -- I could give

15    you a range, but ...

16    Q    And so what's the range of donors or

17    potential donors to whom this packet went?

18    A    The range would be 40 to a hundred.

19    Q    Okay.

20    A    Yeah.

21    Q    Forty to a hundred?

22    A    Yeah.

23    Q    Let's go back to page 58833 --

24    A    Okay.

25    Q    -- that you discussed with my friend

1    earlier.

2         A    Sure.

3         Q    Okay.  And in the box that says "Phase one

4    petition collection and qualifying, 89 percent," do

5    you see that, ma'am?

6         A    Correct.

7         Q    What's that 89 percent refer to?

8         A    I'll think about it for a second, but I'd

9    also note that there are typos that can sometimes be

10   pulled over from different versions, but I will also

11   reread this and evaluate that.

12             Petition collection -- okay.  (Examining

13   document.)  You know, I'm going to have to say I

14   don't know.

15        Q    Okay.  Is there someone else who would

16   know what that 89 percent means?

17        A    I don't know, to be honest.

18        Q    Would Mitchell Emerson know?

19        A    I'm not sure if he would know.  It

20   seems -- I mean, it seems like a misplacement.  I

21   don't think so.  89 percent.  Okay.  Again, these

22   are not like perfect documents.  This is a --

23   campaigns are fast moving and things move fast and

24   then go through varying -- I think that's an

25   artifact, but that's just my -- at this -- does that

 1    make sense, an artifact of something.  I -- I don't

 2    know if he would know, is the answer to your

 3    question.

 4         Q    Okay.  All right.  Let's take a look at

 5    the second full paragraph in that "Phase one

 6    petition collection qualifying" portion.  The one

 7    that begins with "Circumstances evolved"; do you see

 8    that paragraph, ma'am?

 9         A    Yes.

10         Q    If we read that first sentence and we get

11    to the clause that begins, "We authorized an

12    innovative pilot mail program that prioritizes a

13    mail-based petition distribution system, followed by

14    a targeted volunteer outreach mail-in chase program,

15    supplemented by streamlined, tightly managed

16    collection team."

17              Do you see that part?

18         A    I see that, yes.

19         Q    And this "innovative pilot mail program,"

20    is this the one that you were discussing with

21    Mr. Bardos earlier?

22         A    It is, yes.

23         Q    And describe to me how this works again,

24    just so the record's clear?

25         A    Sure.  So the vendor would do the printing

1    and have data.  So if you have data as in like the

2    targeted addresses for folks to send these to who

3    are potential signatories and voters and then mail

4    them to them with an empty petition in there, and

5    then they would have the opportunity, if they

6    choose, to have an envelope with postage.

7          And then that would go to -- would go to

8    the address that the vendor -- go back to the vendor

9    to sort and to get to the supervisors.

10   Q    Okay.  And then if I'm reading this clause

11   correctly, after the voter gets the blank form

12   delivered to them through the vendor, volunteers

13   reach out to the voter and encourage the voter to

14   return the form after the voter fills it out.  Am I

15   understanding that right?

16   A    That's the concept explained in this

17   document.

18   Q    Okay.  Is my understanding of the concept,

19   correct?

20   A    Yeah, your concept is.  Your understanding

21   of the concept explained in this document is

22   correct.

23   Q    Okay.  And tallyED was the vendor that was

24   sending the blank forms to voters; do I understand

25   that right?

1       A    Yes.

2       Q    And then if we take a look at the next

3  sentence, which is the third paragraph, "After

4  testing the program" -- so y'all tested this pilot

5  mail program, correct?

6       A    Yes.  Yes, describing the test, yes.

7       Q    And then it says here, "After testing the

8  program, the results exceeded our expectations"; do

9  you see that, ma'am?

10      A    Uh-huh.

11      Q    Is that true?  Did the results exceed your

12  expectations?

13      A    For -- so for -- donor -- pieces, you

14  know, that this is one, a donor piece, as we already

15  ascertained, right, that's the donor communication,

16  which has, you know -- sometimes it has a different

17  just viewpoint, not -- it's actually incorrect or

18  what have you; but you put your best foot forward in

19  donor communication, regardless of the campaign

20  you're on.

21           And so for -- did it exceed our

22  expectations?  I think limited -- my limited

23  knowledge of the results of that were that it met

24  expectations, and that's -- and then that's kind of

25  the end of my understanding of that, is that it

1    met -- it met expectations.  But, honest -- you

2    know -- anyway, so I'll stop there.

3        Q    Okay.  Let's take that apart.  What were

4    the expectations that FDH had for this pilot

5    program?

6        A    I'm sure that my knowledge is limited

7    about the expectations going in of sort of these

8    return rates.  When you're talking about mail,

9    that's basically the return rate for what you send

10   out.  And so I -- to be honest, my knowledge is

11   limited on the -- that piece of the expectations

12   versus I knew the pilot was happening and I knew the

13   results came back and that we were looking at this

14   time period of this document late July and then into

15   August, early August of evaluating the outcome of

16   that mail program pilot.

17       Q    Okay.  So who at FDH would be the most

18   knowledgeable person about the expectations for the

19   pilot mail program?

20       A    There is -- I don't know necessarily.  I

21   know there's a couple of pretty knowledgeable

22   people.  I guess like deciding between the two of

23   them, it would be hard.

24       Q    Just name both people.

25       A    Okay.

1    Q    Who were the two most knowledgeable?

2    A    Sure.  So Mitch Emerson --

3    Q    Uh-huh.

4    A    -- would be knowledgeable, and then AC

5    would be knowledgeable.

6    Q    Who is AC?

7    A    Oh, sorry, Dr. Acosta.

8    Q    Okay.  Got it.  And is this something that

9    either Mr. Emerson or Dr. Acosta were responsible

10   for, or was this issue outsourced to The Outreach

11   Team?

12   A    Which issue?

13   Q    The pilot mail program.

14   A    Running it was a vendor.  It was not The

15   Outreach Team.  It was tallyED.

16   Q    So tallyED is the vendor responsible for

17   running the pilot mail program?

18   A    Yes.

19   Q    And was tallyED the one responsible for

20   setting the expectations for the pilot mail program?

21   A    Could you flesh that out a little bit?

22   Q    Sure.  Did tallyED tell you -- and by

23   "you," I mean Florida Decides Healthcare -- what the

24   expected return rate would be for the blank mailed

25   petitions to voters?

1       A    To the best of my knowledge, there was

2   a -- an expected range, right --

3       Q    Okay.

4       A    -- from history of it, of this sort of

5   thing, but it's limited and used in terms -- versus

6   other more, kind of, considered tried and true

7   methods of collection for ballots -- of petitions.

8       Q    The tallyED data to you was limited about

9   how well this would work; am I understanding that

10  right?

11          MS. GAMBHIR:  Objection, on the scope of

12          the topics.  I know that there's some overlap

13          between the supervisors' topics and the

14          Attorney General's and Secretary's topics.  I

15          believe that this is a topic that Dr. Acosta is

16          prepared to testify on.

17          MR. JAZIL:  Counsel, this is a fundraising

18          packet that was sent to donors and potential

19          donors, and I think this falls within the ambit

20          of topic 6.

21          This is material that was being sent to

22          fundraisers -- pardon me, to donors.  And I'd

23          like to understand what it is that FDH was

24          sending to donors and what its expectation was

25          to communicate to donors.  So I think this is

1      within the scope of it.

2             So, Ms. Nargiz, do you mind reading the

3      last question?

4             (The requested portion was read.)

5      A    To my knowledge, the experience around

6      this was limited, hence we couch it as a pilot in

7      this document.

8      BY MR. JAZIL:

9      Q    Whose experience was limited?

10     A    So the vendors that we talked to from FDH.

11     Q    Okay.  So tallyED's experience was

12     limited, correct?

13     A    Limited, sort of like in -- relative to

14     what, right?  So relative from, if I were to say

15     Outreach Team's experience around paid petition

16     collection versus tallyED's experience of this pilot

17     program that was brand-new?  Then, yes, it was more

18     limited experience together -- you know, kind of

19     projected impacts and, like, return than what we

20     knew, more of kind of a sure thing from more

21     background and experience from our other vendor on

22     their paid petition collection.

23     Q    I'm sorry, I don't understand the answer.

24     I asked you whose experience was limited.  You're

25     commingling three different people's experience, so

1    whose experience with this effort was limited?  Was

2    Florida Decides Healthcare's experience with this

3    mail program limited?

4        A    Yeah, that was our first -- that was our

5    pilot --

6        Q    Okay.

7        A    -- in using it, yes.

8        Q    Was The Outreach Team's experience with

9    this mail program limited?

10       A    They did not engage in the mail program,

11   The Outreach Team.

12       Q    Was tallyED's experience with the mail

13   program limited?

14       A    To my knowledge, it was an innovative

15   program, so in that context, yes.

16       Q    Did you know if tallyED had ever run a

17   program like this before?

18       A    I -- I don't know, to be honest.

19       Q    Okay.  Ma'am, if we go back a few pages,

20   if we go to 58831.  Let me know when you're there.

21       A    Yes.

22       Q    Do you see the heading "Constituency

23   Outreach"?

24       A    Yes.

25       Q    You see a black box there that says "First

1   Amendment"?

2       A    I sure do, yes.

3       Q    Why was that redacted, ma'am?

4           MS. GAMBHIR:  Objection, calls for a legal

5       conclusion.  That determination was made by

6       counsel.

7           MR. JAZIL:  Okay.  Counsel, I have a right

8       under the case law to understand why it is you

9       believe that this particular redaction would

10      have an impact.

11          The witness can answer or she can answer

12      or you can put on the record why you believe

13      redacting portions of a paid political

14      advertisement is will chill speech, so go

15      ahead.

16          MS. GAMBHIR:  Sure.  So the First

17      Amendment privilege extends to information that

18      would result in a chill to a -- the

19      organization's associational efforts.  And that

20      includes the entities that -- individuals that

21      FDH sought to associate with.

22          And so the organizations listed in these

23      redacted portions, disclosing them to the State

24      would chill FDH's ability to associate with

25      those organizations in the future because of a

1      reasonable concern that that information would

2      be provided to the State.

3          MR. JAZIL:  Okay.  So this would list

4      individual entities with whom FDH is doing

5      outreach; did I understand that right?

6          MS. GAMBHIR:  Either types of entities --

7      specific names of entities or types of

8      entities, correct.

9          MR. JAZIL:  Okay.  Is that the same

10     concern for the heading that says "Some of Our

11     Organizing Partners"?

12         MS. GAMBHIR:  Correct, that is a list of

13     entities.

14         MR. JAZIL:  And it is FDH's position, as I

15     understand it, that the disclosure of this

16     information that was on a paid political

17     advertisement would show FDH's ability to

18     associate with like-minded entities; am I

19     understanding that right?

20         MS. GAMBHIR:  Yes.

21         MR. JAZIL:  All right.

22  BY MR. JAZIL:

23     Q    All right, ma'am.  Do you know who Marc

24  Walsh is?

25     A    I do.

1      Q     Okay.  Do you know whether he's been

2   deposed in this case?

3      A     I do.

4      Q     Okay.  What's your understanding of who

5   Marc Walsh is?

6      A     He works at Outreach Team, one of our

7   vendors.

8      Q     Okay.  Do you know where he's based out

9   of?

10     A     I can't say for sure.  I kind of know.

11     Q     Is he based out of Florida?

12     A     Him, personally?

13     Q     Yes, ma'am.

14     A     Did he personally live in Florida?

15     Q     Does he live in Florida?  Let's start

16  there.

17     A     I do not believe Marc lives in Florida,

18  no.

19     Q     Does he have an office in Florida?

20     A     I'm -- I'm not sure.

21     Q     Do you know where his company, The

22  Outreach Team, is based out of?

23     A     I think they have -- I think they -- I

24  don't know what they would consider.  I think they

25  have offices in different parts of the country.

1    Q    Okay.  Mr. Walsh told us that his company

2  had a contract with Florida Decides Healthcare for

3  $20 million.  Does that sound right to you?

4    A    It does, yes.

5    Q    Okay.  And he also told us The Outreach

6  Team was paid a little bit north of $2 million for

7  his work to date for Florida Decides Healthcare;

8  does that sound right?

9    A    Yes, yeah, right around there.

10    Q    All right.  Ma'am, who at Florida Decides

11  Healthcare chose to hire The Outreach Team?

12    A    It was -- they were chosen by our

13  executive director, in consultation with our former

14  executive director.

15    Q    Okay.  Were you part of the

16  decision-making process?

17    A    Yeah, like finalizing decisions, if that

18  makes sense.  Like approving a decision presented to

19  you.

20    Q    And then you mentioned an executive

21  director and a prior executive director.

22    A    Yeah.

23    Q    Would you name those individuals for me,

24  ma'am?

25    A    Sure.  The current -- our current

1    executive director, Mitch Emerson --

2        Q    Okay.

3        A    -- and the former, Jake Flaherty.

4        Q    Okay.  Do you know why The Outreach Team

5    was hired?

6        A    Yeah.  So we hired The Outreach Team

7    because they have a really great track record in --

8    and have -- really a number 1 -- from our standpoint

9    was that they were mission-aligned, meaning that

10   they understood the important goal that we were

11   trying to achieve around healthcare and had that

12   vision of kind of movement building and engaging

13   with the executive committee over time and had

14   flexibilities; sort of a mission-oriented

15   organization that also had experience and put them

16   far ahead of others, basically, to us, so -- of

17   having experience.

18           And then also this engagement and ability

19   to -- yes, mostly like, all things being equal, the

20   mission-oriented nature of them and being able to

21   leverage down for that first time period of petition

22   collection, and also engage in like those

23   conversations with our voters.

24           And it was very valuable, and they were

25   also very --

1          So anyway, so yeah, that's in general.   I

2    can stop there.

3          Q    Okay.  Fair enough.

4          A    Yeah.

5          Q    And, ma'am, if I understood Mr. Walsh's

6    testimony correctly -- and you tell me if I've got

7    this wrong -- Florida Decides Healthcare hired The

8    Outreach Team prior to the passage of HB 1205,

9    correct?

10         A    We did, yes.

11         Q    And Florida Decides Healthcare entered

12   into a contract with The Outreach Team prior to the

13   passage of 1205, correct?

14         A    Yes.

15         Q    And Florida Decides Healthcare, as part of

16   its contract with The Outreach Team, agreed to pay

17   The Outreach Team approximately $20 million for its

18   petition-gathering efforts prior to the passage of

19   HB 1205, correct?

20         A    So a caveat being you only pay for work

21   that's done.

22         Q    I understand.

23         A    -- like agreeing.  So and that's -- it's

24   over time to that total.

25         Q    Okay.  So the caveat that you only pay for

1  work that's actually done, the contract called for

2  The Outreach Team to be paid $20 million, correct?

3       A     And I believe -- and I do believe that

4  that was -- it was a bit of an -- just like many

5  things in campaigns, it's an estimate.

6            (Clarification by the court reporter.)

7       A     Oh, I'm sorry.  That $20 million at that

8  juncture, just like all the budget numbers, are your

9  best-faith estimate on what it would cost as you are

10  paying over time alongside them to then get to that

11  total goal.  But that was the concept, yeah.

12  BY MR. JAZIL:

13       Q     Understood.

14       A     Yeah.

15       Q     So when the contract was entered into, the

16  expectation that Florida Decides Healthcare had was

17  to pay The Outreach Team approximately $20 million

18  to help the Florida Decides Healthcare initiative

19  get on the ballot for 2026, correct?

20       A     To the best of my knowledge.  However,

21  I -- the actual contract language, because it was

22  fluid over time, that initial piece --

23       Q     Yeah.

24       A     Generally, within -- it sounds reasonable

25  to me.  However, I'm not -- because I -- personally

112

1  I didn't sign the agreement.

2      Q    Fair enough.

3      A    Generally, around there.  It sounds good.

4      Q    Okay.  Understood.  Ma'am, you also talked

5  to my friend Mr. Bardos about how there was a goal

6  of collecting 1.3 million signatures, correct?

7      A    Uh-huh.

8      Q    And these are raw signatures, correct?

9      A    Uh-huh.

10     Q    And by raw signatures --

11     A    Yes.

12     Q    And by raw signatures, I mean signatures

13 that your team collects but that have not actually

14 been verified by the Supervisor of Elections, right?

15     A    Yes, with the caveat of broadly there's a

16 lot -- there are folks out there who often are on

17 their own outside of our campaign.  So if we're

18 talking about our campaign --

19     Q    Uh-huh.

20     A    -- kind of directly or indirectly

21 collecting, there's also individuals in the state of

22 Florida who can also print out and may care about

23 your cause and can print it.  So I just want to add

24 that caveat.

25          But -- so, yes, the answer is because that

1   was a generally good target.

2        Q    Who told y'all that was a generally good

3   target, 1.3 million raw signatures?

4        A    I don't think anyone like -- I don't think

5   anyone told us.  I think we estimated that.

6        Q    How'd you get to that estimate?

7        A    Sure.  You're going to make me do math

8   again.

9        Q    Do you need a scratch pad or -- well, I'll

10  say this.  If you take 900 --

11       A    I can do it.  It's just going to be

12  tortuous for all of you.

13       Q    So here, I'll represent to you if you take

14  900,000, divide that by 1.3 million, you get about

15  70 percent.

16       A    Right.

17       Q    Did you expect there to be a 70 percent

18  validity rate for the raw signatures that you-all

19  gathered as part of this petition-gathering effort?

20       A    I believe -- so it depends on the mix of

21  the type of collections.

22       Q    Okay.

23       A    So that would have been an average of the

24  types of collection, right, to add it to the total.

25  So sometimes volunteer collection looks a little bit

1    different than paid petition collection validity and

2    then also over time mail.

3         Q    That's helpful then.

4         A    Yeah.

5         Q    And -- all right.  Those were the goals

6    that FDH set out with.  And my understanding is FDH

7    suspended its signature-gathering efforts for the

8    2026 ballot, correct?

9         A    Are those clauses related?  I'm sorry.

10        Q    They're not related.

11        A    Okay.

12        Q    Did Florida Decides Healthcare shut down

13   its petition-gathering efforts for the 2026 ballot?

14        A    Yes, we did.

15        Q    And when did Florida Decides Healthcare

16   make that decision?

17        A    So we -- we -- we announced the decision

18   on September 25th.

19        Q    Okay.

20        A    Yeah.

21        Q    So the decision to suspend collecting

22   petitions was announced on September --

23        A    25th.

24        Q    -- 25th of 2025, correct?

25        A    Correct.

1      Q    Okay.  And since then, you talked to

2  Mr. Bardos about the steps that Florida Decides

3  Healthcare has taken to try to get on the ballot for

4  2028?  Do you recall that?

5           MS. GAMBHIR:  Objection, to clarify.  Had

6       the Secretary cross-noticed the supervisors --

7           MR. JAZIL:  We had not.

8           MS. GAMBHIR:  -- list of topics?

9           MR. JAZIL:  We had not, but under the

10      deposition rules, the deposition testimony

11      proceeds as though it were at trial, so I would

12      get an opportunity to ask questions regardless.

13           That said, topic 6 talks about "the

14      efforts to place on the ballot, including the

15      ballot limited to the funding," and I'm trying

16      to figure out what the status of FDH's efforts

17      to place the citizen initiative on the general

18      election ballot is in 2026.  So I think this

19      still falls under topic 6.

20  BY MR. JAZIL:

21      Q    But go ahead, ma'am.  Do you recall that

22  conversation you had with Mr. Bardos about the steps

23  that Florida Decides Healthcare is taking to prepare

24  to collect signatures for the 2028 ballot?

25      A    About an hour ago?

1    Q    Yes, ma'am.

2    A    Yes.

3    Q    Okay.  And you went through a long list of

4    steps that were taken; do you recall that

5    discussion?

6    A    Yes.

7    Q    Okay.  Not to belabor the point, but do

8    you have a contract in place with The Outreach Team

9    to collect ballots for the 2028 -- pardon me, to

10   collect petitions for the 2028 ballot?

11   A    Not at this time.

12   Q    Do you have contracts with any other

13   vendors?

14   A    If you were to take a consultant as a

15   vendor?

16   Q    Yes, ma'am.

17   A    So then we have the consultants that serve

18   the campaign for community organizing.  So we have

19   contracts with our current folks, so with the people

20   who I had mentioned before.

21   Q    Okay.

22   A    Our organizing and administrative support.

23   There's like subcontractors, essentially.

24   Q    Have you done any polling to see whether

25   or not Medicaid expansion remains popular with the

1    electorate?

2         A    Over the last month?

3         Q    Yes, ma'am.

4         A    We -- we haven't, but I've been -- I've

5    seen a lot of other polling, you know.

6         Q    Has Florida Decides Healthcare done any

7    polling since September?

8         A    No.

9         Q    Okay.

10             THE WITNESS:  I'm just going to grab a

11        water.

12             MR. JAZIL:  I will get it.

13             THE WITNESS:  Thanks.

14             MR. JAZIL:  I believe we're on Exhibit 5.

15        Here you go, ma'am.

16             (Exhibit  5 was marked for

17        identification.)

18    BY MR. JAZIL:

19         Q    All right, ma'am.  So one of the topics

20    you have been designated for here is paragraphs 4

21    and 5 of this declaration.  I'll give you a moment

22    to read over paragraphs 4 and 5.

23         A    (Examining document.)

24         Q    So, ma'am, can you look at paragraph 4

25    first.  It talks about the "diversion of 2 to

1    $3 million"; you see that at the first sentence,

2    right?

3        A    Yes.

4        Q    And it says that "this money -- this is

5    money that we would otherwise spend on

6    communications that directly educate voters about

7    Medicaid and the need for Medicaid expansion."

8            Do you see that?

9        A    Yes.

10       Q    My first question is this.  How do you

11   communicate with voters?

12       A    Generally or like as this is mentioning,

13   you know, as this is intended?

14       Q    As that is intended.

15       A    So -- and to be explicit, like an early

16   concept was to have more sort of video making and

17   engaging with like broad communications.  We even

18   had -- remember, I think it was in March, we had had

19   a set time period from the get-go of paid petition

20   collection and to have sort of the systematic weeks

21   of like, you know, elderly folks or like seniors

22   and -- it just -- I could go on and on.  And the

23   different types of inputs into that being this

24   concept of sort of -- I know a longer sort of video

25   engaging, and then to push that out often with

 1    targeted educational.

 2              So this -- the concept of educating voters

 3    about Medicaid was, you know:  What is Medicaid?  So

 4    videos.  And what is the coverage gap?  How much

 5    money do you have to make in Florida to be kicked

 6    off of Medicaid?  Et cetera, What are the benefits?

 7    Et cetera, et cetera, et cetera.  So some of the

 8    just educational understanding of what Medicaid is

 9    and what Medicaid expansion is --

10        Q    Okay.

11        A    -- and then activities around that.

12        Q    Okay.  Understood, ma'am.  And was there a

13    specific budget amount allocated to such

14    communications?

15        A    I know earlier on, it would have been --

16    March, April, that time period, we had slotted a

17    million dollars to work on this -- this would be

18    considered sort of early messaging, phase one

19    messaging, and communications -- around that amount,

20    around a million dollars.

21        Q    And phase one included the petition

22    circulation efforts, correct?

23        A    Yes, the ballot placement would be --

24    until ballot placement, phase one, yeah.

25        Q    And is there a budget document that lays

1    out that a million dollars was allocated to the

2    types of communications referenced here in the early

3    part of 2025?

4        A    I mean, it would have been in a -- I know

5    we have a -- not like a -- not like a line-by-line

6    budget idea, but more of a presentation deck, if you

7    will.  Sort of like a -- so it was in the same -- I

8    had just said that there was a plan around different

9    communications.  It's in that same presentation like

10   around like comm.

11       Q    So the "same presentation," are you

12   referencing the presentation that we marked as

13   Exhibit 4?

14       A    No, this is later.  So this is -- this was

15   like from July/August.

16       Q    Okay.

17       A    So we didn't have that in here anymore.

18   This is more -- no, it's a different one.

19       Q    But if I understand your testimony

20   correctly, there was no formal budget where there

21   was a line item for communications, right?

22       A    So just to -- for context, sort of -- I

23   wouldn't couch it as, like, just from my perception,

24   of like an official budget, but the document that we

25   used to plan into -- have projections for and to

1  make decisions by, you know -- and that we engaged

2  around, that did have a mention of it in there.

3  But, yeah, so that --

4       Q    I appreciate the context --

5       A    Yeah.

6       Q    -- ma'am, but, again, as I understand it,

7  there was no formal budget document that had a line

8  item for the types of communications we talked

9  about, correct?

10      A    Sorry, could you explain -- like, what do

11  you mean by "formal budget document"?

12      Q    Does your organization create a budget?

13      A    Well, campaigns, because they go sort of

14  week by week, it would look sort of different than a

15  typical nonprofit, let's just say, versus a

16  campaign.  Things I had to learn about and

17  understand because you do sort of just week-to-week

18  sort of fundraising and funding out and everything.

19  So --

20      Q    So if I understand this correctly, your

21  organization does not keep a budget?  You have a

22  week-to-week list of things you might spend money

23  on; am I understanding that right?

24      A    I think the definitions are getting just a

25  little muddled of that.

122

1     Q     Okay.

2     A     So like --

3     Q     Let me ask you this.

4     A     Yeah.

5     Q     Does Florida Decides Healthcare have any

6   document in its possession that says "budget" on it?

7     A     Yeah, we do.

8     Q     Okay.

9     A     We have some, yeah.

10    Q     All right.  Whatever that document is, and

11  whenever that document was created --

12    A     Yeah.

13    Q     -- does that document have a line item for

14  communications and a number associated with the

15  expenditures expected for communications?

16    A     I -- to the best of my knowledge, there

17  does, but there's one --

18    Q     Okay.  So if there's a line item for

19  communications on a budget --

20    A     Yeah.

21    Q     -- what is that line item?  How much has

22  been allocated for communications?

23    A     So -- and that budget's -- the document

24  you're referring to and the one that I'm referring

25  to -- so we're on the same page -- is back in April,

123

1   March, April, right there; like April, that was one

2   that had an estimate for a million dollars --

3        Q    Okay.

4        A    -- for phase one.  And I say estimate -- I

5   believe was around a million dollars.

6        Q    And how did that estimate change over

7   time?

8        A    So -- okay, that was April.  In --

9   essentially in May, it did take a considerable

10  amount of time to understand -- try to understand

11  with counsel, where counsel was, like, there was so

12  much going on and to understand the implications of

13  a landscape that changed dramatically from April to

14  May, right?  That's the stake, like a line in the

15  sand there.

16            Because that was not -- communications was

17  not at that level, of the level that we were hoping

18  to have around the cool videos and all that jazz.

19  That was not part of the -- our -- the same

20  document, like this, that we had put forth in May

21  and in June, just because of a pivot and the need to

22  respond to some additional costs, you know,

23  connected to 1205.

24            So because these budgets are fluid -- and,

25  again, this is like campaigns do that, right.  It's

1    a fluid-over-time projection, and you have inputs

2    almost daily, it seems like, that change things.

3            And so, yeah, that's basically --

4            I'm sorry, did I answer your question?

5    Did you --

6        Q    Well, let's see.

7        A    Yeah, yeah.

8        Q    Let me try to unpack that.  So if I

9    understand it right, the communications line item on

10   your budget changed daily based on the inputs from

11   the campaign on a daily basis; am I understanding

12   that right?

13       A    On a daily basis would be new inputs from

14   like externalities, right --

15       Q    Uh-huh.

16       A    -- so information, things like that.  So

17   generally -- and it's not hard and fast -- but

18   generally, it would be every month we would, like,

19   relook at this.

20           And so for the communications, that line

21   item, that changed in May when we just struck that

22   line item for phase one essentially or just moved it

23   into kind of -- not moved it, but like shrinked

24   that -- those activities associated with that line

25   item into operations.

1           Because you'll see, you know, various --

2    with various versions that we updated over time,

3    that those different allocations would change them

4    out.

5           Q    So the million dollar line item from April

6    got stricken in May; am I understanding that right?

7           A    I -- I believe so for the June -- like the

8    communications around it in June, so for --

9           Q    Do you know --

10          A    -- yes, to the best of my knowledge, yes.

11          Q    Okay.  And do you know when in May it got

12   struck?

13          A    Let me think.  To the best of my

14   knowledge, it would be probably like the early half

15   of May, like not a hard and fast date.  It's more

16   like developing the next -- you know, your next

17   version.  So I would assume in mid-May --

18          Q    Okay.

19          A    -- so to my best estimate.

20          Q    Okay.  Fair enough.  And, ma'am, you

21   talked about videos.  You called them "cool videos"

22   that you guys planned on making.  Do you recall that

23   testimony?

24          A    I do.

25          Q    Who was going to be responsible for making

1    these cool videos?

2        A    So essentially hiring a firm, and the

3    concept was like -- I don't want -- sorry.  The

4    concept was hiring like a professional videographer

5    firm to engage with individuals stuck in the

6    coverage gap to detail their stories and to have a

7    very professional look to it to be part of the

8    educational.

9            So to the best of my knowledge, I don't

10   know if it had been like decided upon exactly, but

11   we have, you know, the comms director and working

12   through some firms that had worked previously with

13   folks.  So that's the concept.  It would be like a

14   professional communications firm.

15       Q    And was the bulk of the million dollars

16   allocated for communications going to be spent on

17   preparing the videos and then getting media buys for

18   those videos?

19       A    It was pretty early in that.  It was

20   pretty early.  And, I mean, to be honest, I don't

21   know if we had a ton of detail past those

22   expectations.  But that is what -- those are the

23   activities that you mentioned that would be part of

24   the overall budget.

25       Q    Okay.  So let me see if I can unpack that.

1    Did y'all have any concrete plans on how to spend

2    the million dollars that were allocated for

3    communications in early April 2025?

4         A    We did have -- we did have an outline for

5    the next few months -- like Q2, pretty much.  And

6    that would include things like ad placement, things

7    like that, like developing messaging around

8    education for Medicaid.

9         Q    Okay.

10        A    And then --

11        Q    So you guys had outlines, correct?

12        A    Yes.

13        Q    Did you have any contracts with vendors to

14   prepare the videos?

15        A    I don't believe so, no.

16        Q    Did you have any ad buyers lined up to

17   make sure that once you prepared the videos, you

18   could place them on television?

19        A    I don't think so, no.

20        Q    Did you have any plans to buy time on

21   YouTube or Facebook to place these communications?

22        A    No, but it was pretty early to do that.

23   Those -- especially the last two ones that you

24   mentioned so ...

25        Q    So it was pretty early and the plans

1   hadn't calcified yet; is that fair?

2        A    I would say beyond what those themed, you

3   know, pieces -- the Q2 themed pieces, I would say

4   that that was pretty good -- well planned out, but

5   then other quarters, no.

6        Q    Did you guys have actors lined up to

7   participate in the videos?

8        A    Oh, no, these are actual people in the

9   coverage gap.

10       Q    Did you identify the people in the

11  coverage gap that you would interview and make

12  videos of?

13       A    We worked -- we were working to identify

14  and work with folks on identifying the storytellers.

15  And we did identify storytellers, which I think are

16  even in some of these documents.

17       Q    And when you say storytellers, these are

18  individuals who are stuck in the coverage gap?

19       A    Correct.

20       Q    And you were working to identify them, is

21  what I heard you say?

22       A    Well, both.  Like we had -- I was trying

23  to -- okay.  So we had -- both have a certain amount

24  of storytellers.  And then as the campaign goes on,

25  and especially in March and April, where we were

1    working with paid -- The Outreach Team, they were

2    doing a really great job of engaging with voters and

3    that kind of two-way street with outreach, which is

4    a great benefit to us in March and April -- of

5    hearing from individuals because that's how you get

6    people's stories, is you talk to them.

7              And, in addition, a lot of our executive

8    committee, our -- well, there's a couple more

9    grassroots engagement people and they -- or people,

10   organizations.  That's part of their jobs, is to

11   kind of help identify.  So I would say it was both.

12   You know, we had some and also continued to identify

13   more storytellers, yeah.

14        Q    Okay.  And how many of the storytellers

15   that you planned to identify for this communication

16   effort had you identified in April 2025?

17        A    I guess a handful.

18        Q    And how many were you-all planning to

19   identify for this effort?

20        A    I don't know.  I wouldn't -- I don't think

21   we got there yet to identify how many storytellers.

22   You don't need hundreds of stories.  Like --

23        Q    Okay.

24        A    -- a few compelling ones move people and

25   move how they feel about a topic, so it was more of,

1     like, quality over quantity.

2          Q    Okay.  But you hadn't settled on the ones

3     you would use for the videos --

4          A    Correct.

5          Q    -- by that time, right?

6          A    Correct.

7          Q    Now, ma'am, we can move on to paragraph 5.

8     I'll let you read it.  Look up at me when you're

9     done.

10         A    (Examining document.) Okay.

11         Q    Okay.  And there's a sentence in the

12    middle of this paragraph, ma'am, that says, "As

13    mentioned, this is money that the campaign would

14    otherwise spend on communications with voters,

15    educational materials on Medicaid, and the need for

16    expansion digital media buys and other mediums of

17    communicating our message to the public."

18              Do you see that?

19         A    Uh-huh.

20         Q    I want to focus on digital media buys.

21         A    Okay.

22         Q    What's your understanding of what digital

23    media buys are?

24         A    Sure.  So it varies, but some would be

25    like ads placed via things like podcasts or what's

1    called programmatic ads via Google.  You see on

2    Google and can target the type of people that you

3    reach out to.

4            It kind of goes on from there, but, in

5    general, digital media buys would be things that are

6    not traditional media, so like not a paid

7    advertisement in the newspaper.

8        Q    Okay.  Can you tell me how much money

9    Florida Decides Healthcare spent on digital media

10   buys from its inception until now?

11       A    So what -- I'm just going to add some

12   context to that.

13       Q    Okay.

14       A    It's a little hard to answer direct --

15   well, I can't answer it, but -- so because part

16   of -- part of paid petition collection and also part

17   of like the pilot program was a lot of targeting via

18   our vendor.

19            So to be honest, in my head, when you're

20   asked what's she doing here, it's a person because

21   we have the paid petition, it's different methods of

22   getting out there.  And certain vendors probably did

23   use some paid petition -- or I'm sorry, digital

24   media buys.  Some of our vendors probably did use

25   some of those.  And so that's where I wouldn't know

132

1     that.

2              Not that I wouldn't know; I just -- I

3     wouldn't be able to give a good estimate, then

4     structure like what they're -- those digital media

5     buys.  Right, so there's that piece of just how

6     certain vendors reached out and used a lot of, hey,

7     you like Medicaid expansion?  Go ahead and engage

8     with this program.  So -- okay, sorry.

9         Q    So which of your vendors would have helped

10    you with the digital media buys?

11        A    Sure.  It would have been a vendor

12    called -- there's Mission Control, maybe.

13        Q    Okay.

14        A    And -- but, honestly, you know, there's a

15    couple.  There's Liftoff and then also Notally

16    probably did media, so -- digital media buys, and

17    digital.

18        Q    Did Florida Decides Healthcare do any

19    media buys through other vendors for traditional

20    media, such as newspapers or television?

21        A    Just earned media.

22        Q    Okay.  So no paid media buys in newspapers

23    then, right?

24        A    To the best of my knowledge, for TV and

25    for newspapers, for that time period that we're

1    talking about, November -- what time period?

2        Q    I'm talking about from the inception of --

3        A    Okay.

4        Q    -- Florida Decides Healthcare till now.

5        A    All right.  So to the best of my

6    knowledge, just earned media for TV and -- like

7    television, and then like newspapers.

8        Q    Okay.  So what's the answer?  Is there --

9        A    Oh, I'm sorry.

10       Q    Is there an amount that y'all spent on

11   television and newspapers?

12       A    Oh, so earned is just free.  So that's --

13       Q    Sure.

14       A    -- that's getting -- or so not -- not to

15   my knowledge, we didn't.  So I do not think so, no.

16       Q    So no money was spent on newspapers,

17   right?

18       A    Correct, no.

19       Q    And no money was spent on television,

20   right?

21       A    No.

22       Q    Okay.  And when you say there was "earned

23   media," those are media stories that cover your

24   petition efforts, right?

25       A    Correct.  Yeah, and related activities,

134

1    yeah.

2        Q    And do you track earned media in some way

3    at Florida Decides Healthcare?

4        A    To a certain extent, I believe so.

5        Q    Okay.  Help me understand that.

6        A    Yeah.  Okay.  There are tools out there

7    where you can -- that track earned media hits and

8    things like that.  I wouldn't be able to tell you

9    off the top of my head month by month the media

10    hits, like TV and newspaper, but we have the tools

11    to track that and --

12        Q    Okay.

13        A    -- yeah.

14        Q    And have you used the tools to track that?

15        A    I -- I don't know really.

16        Q    Who would know?

17        A    Other than the communications, the

18    communications teams.

19        Q    Okay.  Who is the communications team?

20        A    We had a communications director, and then

21    also, you know, the Mission Control, which we had as

22    a vendor.

23        Q    And who was your communications director?

24        A    Karol -- I'm sorry -- I'm low on blood

25    sugar right now.

1                    (Clarification by the court reporter.)

2          A    Oh, I'm sorry.  Karol and -- I'm just

3    blanking on her last name.

4    BY MR. JAZIL:

5          Q    It's all right.

6          A    She's in -- if you want to in the

7    documents, she's in here.

8          Q    Karol from communications?

9          A    Correct, yes.

10         Q    All right.  Fair enough.  This is not a

11   memory contest --

12         A    Okay.

13         Q    -- we were talking about.

14         A    Well, you said it before, and so I'm over

15   here like --

16         Q    It's not a memory contest.  If you know,

17   you know.  All right?  So Karol from communications

18   would track --

19         A    I know her name.  It's just not here.

20         Q    But Karol from communications would track

21   the earned media hits, correct?

22         A    Yes.

23         Q    And a hit is any time Florida Decides

24   Healthcare is mentioned in the media, correct?

25   Correct?

136

1     A     Yes, yes.

2     Q     And remember, she can't take down the

3  nods?

4     A     I'm sorry.

5     Q     All right.

6           MS. GAMBHIR:  The witness mentioned low

7     sugar.

8           MR. JAZIL:  Do you need a snack?  Do you

9     need a cookie?

10          THE WITNESS:  I just need -- yeah, like a

11    cookie and walk around a little bit and be

12    back.

13          MR. JAZIL:  How about we take five?

14          (A recess took place from 2:26 p.m. to

15    2:37 p.m.)

16          MR. JAZIL:  Ms. Bullard, I'd like to mark

17    this as Exhibit 6.

18          (Exhibit 6 was marked for identification.)

19  BY MR. JAZIL:

20    Q     All right.  Ms. Bullard, have you seen

21  this document before?

22    A     Yes.

23    Q     Okay.  Let's go to the end.  Do you see a

24  verification page on page 8?

25    A     Yes.

1    Q    And you see Mr. Emerson's name there,

2    right?

3    A    Yes, yeah.

4    Q    This is the Mitchell Emerson who works for

5    Florida Decides Healthcare, correct?

6    A    Correct.

7    Q    If we go to page 2, and the answer goes on

8    to page 3, are these the fundraising goals that

9    Florida Decides Healthcare had?  This is on page 3.

10    A    (Examining document.)  I'm sorry, I was

11    reading.  What was the question?

12    Q    Sure.  Let me ask you this.  Do you have

13    any reason to doubt the information in this

14    supplemental response to the Supervisors'

15    Interrogatory 5 as verified by Mr. Emerson?

16    A    No.

17    Q    Does Florida Decides Healthcare stand by

18    the answers Mr. Emerson gave in this supplemental

19    response?

20    A    Yes.

21    Q    Okay.  We'll move on.  This is --

22        MR. JAZIL:  This is 6, so this will be

23    Exhibit 7.  Here you go, ma'am.

24        (Exhibit 7 was marked for identification.)

25

1    BY MR. JAZIL:

2        Q    Ma'am, had you seen this document before,

3    ma'am?

4        A    You asked me if I saw this document

5    before?

6        Q    Yes.

7        A    Yes, I have.  Yes.

8        Q    Okay.  And if we go to page 5, you

9    verified the answers to this interrogatory, correct?

10       A    Yes, I did, yes.

11       Q    Okay.  If we go to supplemental response

12   to Interrogatory 8 on page 2, it says that "FDH

13   currently aims to raise approximately $18 million

14   with a presumption that it will need to utilize its

15   petition distribution model due to continuous

16   restrictions imposed by HB 1205 as currently in

17   force."

18            Do you see that, ma'am?

19       A    Wait, what page are you on?  I'm sorry.

20       Q    This is page 2, supplemental response.

21       A    Could you point exactly where?  I'm sorry.

22       Q    Sure.  It's the paragraph that goes "FDH

23   has pivoted its fundraising efforts to the 2028

24   cycle"; do you see that, ma'am?

25       A    Yes.

1        Q    And then that paragraph goes on to say

2    that "FDH currently needs to raise approximately

3    $18 million"; do you see that, ma'am?

4        A    I do see that, yeah.

5        Q    If I understand that right, FDH's goal for

6    the 2028 cycle is to raise $18 million, correct?

7        A    Currently aimed to, given it's very much

8    in flux.  Currently at this moment, it's currently

9    aimed to raise approximately $18 million, is the

10    answer.

11        Q    Okay.  And that is less than the

12    $25 million goal that FDH had when it began the 2026

13    initiative, correct?

14        A    Yes, that is -- that is less than that.

15        Q    The next line on this response says that

16    "FDH has a small set of potential donors, a

17    prospectus containing a rough estimate or projected

18    costs for seeking placement"; do you see that,

19    ma'am?

20        A    I sure do, yeah.

21        Q    Okay.  What is "small set of potential

22    donors"?  How many do you mean by small?

23        A    Oh, less than 15.

24        Q    And how has the response been so far?

25        MS. GAMBHIR:  I will object on First

1        Amendment privilege about conversations with

2        potential donors.

3             MR. JAZIL:  I'm not asking about the

4        actual conversations.

5    BY MR. JAZIL:

6        Q    Have you gotten commitments for the

7    18 million?

8        A    Since November 24th --

9        Q    Yes, ma'am.

10       A    -- 2025?  That's a small time window,

11   right, because today is December 9th and so

12   November 24th.  We have gotten commitments.

13       Q    Okay.  Without telling me who made the

14   commitment, how much do you have in commitments for

15   the 2028 petition-gathering efforts?

16       A    Okay.  Well, we have a commitment in this

17   short time frame that you mentioned of basically

18   10 days for this document.

19       Q    Let me take a step back.

20       A    Yeah.

21       Q    For the entire 2028 petition-gathering

22   effort --

23       A    Okay.

24       Q    -- how much do you have in commitments?

25       A    To include -- because there's commitments

1    and then there's like contributions currently that

2    would count towards '28, if that makes sense.  So

3    it's like if it's going to be reported.  And a lot

4    of that will be reported on January for our

5    quarter -- for our last quarter.  And so it's just

6    adding those two things together, the contribution

7    and the commitment.

8        Q    Let's add the two together.

9        A    Okay.

10        Q    What's your number?

11        A    For the ballot for phase one, for all

12    of -- for what we had said as phase one, correct?

13        Q    For anything for 2028, what's your number?

14        A    Okay.  For -- okay.  Roughly 400,000.

15        Q    Okay.  And how much of that is

16    contributions versus commitments?

17        A    Oh, wait.  Can I edit that?  Sorry.

18        Q    Go ahead.

19        A    So the nature of campaigns -- things

20    rolling, you know, like -- so -- okay.

21            To this point, we have around a hundred

22    thousand in contributions that are essentially to

23    say in the door, right, towards that.  And then

24    commitments being in the realm more of like 1.1,

25    1.2.

1            I was missing -- there's a large

2    outstanding commitment.

3        Q    Okay.  But 1.1 or 1.2 million?

4        A    Yeah, I'm sorry, yes.

5        Q    All right.  Now, ma'am, is there any

6    answer that you gave to one of my questions or

7    Mr. Bardos' questions here today that you want to

8    amend, correct, modify, or otherwise change?

9        A    Not that I know of, no.

10        Q    It wasn't a trick question.

11        A    Okay.

12            MR. JAZIL:  And I have no further

13        questions and --

14            THE WITNESS:  Okay.

15            MR. JAZIL:  -- I pass the witness.

16            MS. GAMBHIR:  Are there any other

17        supervisors' counsel or anyone else before

18        redirect?

19            MR LaVIA:  Hey, Mo, and everyone, Andy had

20        to drop off.  Remember he had a doctor's

21        appointment?  So I am filling in if there is

22        any follow-up on behalf of the supervisors

23        after the redirect.

24            MR. JAZIL:  Okay.

25            MR LaVIA:  Thank you.

143

1                       CROSS EXAMINATION

2      BY MS. GAMBHIR:

3          Q    Ms. Bullard, how many members or

4      organizations are on FDH's executive committee?

5          A    There's seven.

6          Q    And early on today, you had some questions

7      about FDH's petition collection and you were asked

8      had FDH collected a hundred thousand petitions by

9      May.

10              Had FDH collected a hundred thousand

11     petitions by May?

12         A    Yes.

13         Q    Okay.  And, again, going back to the

14     discussion earlier in the day, you talked about how

15     early in 2025, FDH had a funding target of

16     25 million; was that correct?

17         A    Correct.

18         Q    And at that point in early 2025, did FDH

19     have a particular number for each month that it

20     planned to raise over the course of 2025?

21         A    Not that it -- not that it plans to raise

22     necessarily.  It has a goal of the overall amount

23     and has -- due to the nature of campaigns and what

24     that looks like, so you could have sort of targets

25     for month to month.  But the nature of campaigns are

1    that -- especially in that early period of the

2    quarter 1 of '25, you build momentum, and it's kind

3    of -- it's very hard to have a really hard

4    projection or benchmarks for further down the road.

5    So a plan for -- a plan to raise is harder to -- by

6    month, but we did -- you know, before May, we did

7    have a good estimate of targets.

8         Q    And there was some discussion about

9    benchmarks related to fundraising.  Is that a word

10   that you used?

11        A    No, we never would say "benchmarks" in

12   fundraising.  I don't think we used that before this

13   morning.  Yeah.

14        Q    And why wouldn't you use it?

15        A    You know, because, again, this is a fluid

16   effort, campaigns; how a benchmark kind of has this

17   concept of you either -- like you go or you don't

18   go, and if you meet it, and there's some sort of

19   penalty or just inability to move on past that

20   versus a -- like a target or a goal that you can

21   reevaluate consistently, depending on trends and

22   different opportunities and things like that.

23             So that's why we -- benchmark is not part

24   of my parlance in this effort.

25        Q    And how often did FDH's fundraising goals

1    change?

2        A    On average, it would be a shifting sort

3    of -- and there's goals -- sort of like top line

4    goals and then there's also shorter-term goals in

5    terms of just making more imminent payment.

6            So there are different types of goals that

7    you could have.  So we would shift them probably

8    monthly or sometimes more, depending on what

9    external factors would happen.

10           So, you know, if there was an external

11   factor that would change dramatically, like a cost

12   of something, that maybe would have to change a

13   projected budget needs or a gap in the middle of the

14   month, but on average monthly.

15       Q    Is it your understanding that this mode of

16   operating is typical for a campaign?

17       A    Yes.

18       Q    Why?

19       A    So for -- especially ballot campaigns,

20   this is for paid petition collection, and this type

21   of campaign, it's not something that you go into

22   with a set amount of money typically.  It's

23   typically grassroots groups coming with a goal.  And

24   you can fundraise, and then as soon as you

25   fundraise, you often pay the paid petition, so more

1    in chunks of like -- in chunks with the shorter time

2    periods, with the vendors often.

3              So it's a -- steps nature of it.  And it's

4    basically just how campaigns -- how ballot

5    petition -- grassroots ones, specifically,

6    citizen-led ones are typically run -- is to kind of

7    have money in/money out very quickly, and then

8    you're constantly reevaluating what the next steps

9    have to be.

10   Q    I'll ask a similar set of questions about

11   petition collection benchmarks.

12             You testified earlier that there was a

13   goal of collecting petitions, a hundred thousand

14   petitions by May 1st; is that correct?

15   A    Yeah, correct.  Where we have had a --

16   that initial part of our contract with Outreach Team

17   wherein the goal was to get 70,000 with them, and

18   then the goal was to then supplement with volunteers

19   to reach that hundred by May 1st.  And that was

20   great, successful, and through April, you know,

21   we -- that was --

22             Yeah, I'm sorry.

23   Q    And after May 1st, did you have a

24   particular target for petition collection by a

25   certain date?

1     A    Especially -- no, but especially after

2  May 1st, where anything that was previously

3  discussed would have been out the window anyway

4  because of the HB 1205 impacts and a lot of

5  discussions about what was possible in planning and

6  everything.

7          So to answer your question, after that,

8  nothing that was like a hard and fast sort of goal,

9  monthly goal.

10     Q    And you mentioned an initial phase of the

11  contract with The Outreach Team.  What was the time

12  period for that first phase?

13     A    I believe it was March and April, I

14  believe up until May.

15     Q    And about how much money was allocated for

16  that first phase?

17     A    About a million dollars for that phase.

18     Q    And for the second phase?  Was there a

19  second phase?

20     A    Okay.  So not in the way that the first

21  phase was.

22          Second -- it was sort of like we do this

23  first phase.  The concept is you're our vendor for

24  this paid petition; you know, we're in it together.

25  But this first phase is that, the 70 -- that time

1    period, and then would be reevaluated.

2           So no, not in the same way that there was

3    a phase one with them.

4        Q    Was there a budget discussed for a

5    potential phase two with The Outreach Team?

6        A    Yes, we had discussions about changes, and

7    we discussed the budget with them on -- by --

8    whatever would come after that first initial goal

9    for May 1st, 70,000.

10       Q    And, Ms. Bullard, earlier you were asked

11   about whether fundraising for the 2028 campaign

12   might be different than the 2026 campaign.  Are

13   there reasons unrelated to HB 1205 that might impact

14   fundraising for 2028?

15       A    I would say there are a few.  I could

16   speak to, you know, one or two of them.  Medicaid

17   expansion is the goal of this campaign, and so

18   therefore a lot of people who care about health or

19   healthcare in general would be the donors and

20   supporting that.

21           During the run up to -- I won't say run

22   up -- during the summer and fall, there was a lot of

23   conversations about federal policies and what would

24   take shape for healthcare, especially healthcare

25   coverage in the United States.  And it just so

1      happens that next year there's a lot of concern or

2      discussion around healthcare coverage, insurance,

3      especially through the ACA Marketplace.

4              And it just so happens also that a slim

5      majority of people who leverage ACA Marketplace

6      plans in Florida -- 51 percent, in fact -- are under

7      138 percent of the federal poverty level.  That is

8      actually the eligibility threshold for Medicaid

9      expansion.

10             And so a lot of people who might have

11     had -- might have been less clear about what is

12     taking shape next year for the tax credits and

13     Medicaid policy, it's becoming more and more of a

14     concern for many about a rising uninsured rate,

15     especially in Florida where it's projected to be one

16     of the top increases in uninsured rate in the next

17     couple of years, especially next year; and also the

18     impacts on ACA Marketplace -- via these impacts on

19     the ACA Marketplace.

20             So changes in healthcare policy are very

21     possible to drive -- is looking different for next

22     year than it was last year.  That is kind of

23     pointing in that direction.  And many polls show

24     healthcare top of people's mind right now.

25        Q    Ms. Bullard, can I direct you to what

1    Counsel has marked as Exhibit 2?

2         A    All right.  Okay.

3         Q    Ms. Bullard, what is the source of the

4    dates and the figures in this chart?

5         A    Is this chart on page 2 and 3?

6         Q    Page 2 and 3, thank you.

7         A    The sources are a vendor to FDH, tallyED

8    vendor.

9         Q    And does this chart reflect the petitions

10   submitted by that vendor to the Supervisors of

11   Election?

12        A    As they reported it, as they told us that

13   that's what this is, the vendor did.

14        Q    Is this the best source of information --

15   or does this reflect the best information that FDH

16   has about the petitions submitted to Supervisors of

17   Elections by the vendor?

18        A    Yes.

19        Q    To your knowledge, do the numbers here

20   reflect both petitions collected by FDH's paid

21   circulators and by volunteers that were submitted to

22   that vendor?

23        A    Yes.

24        Q    Do the numbers here reflect petitions that

25   may have been submitted by individual voters

1    directly to the Supervisors of Elections?

2        A    No.

3        Q    Do these numbers directly co-relate to --

4    at given time intervals -- to the number of

5    petitions that may have been collected by FDH's

6    volunteers?

7            Let me ask that another way.

8        A    Yeah, if you could clarify a little bit.

9        Q    Do you know whether the dates reflected

10   here indicate the date that the petitions were

11   mailed or submitted to the supervisors?

12       A    I do not know.

13       Q    Okay.  And then if I can direct you to

14   Exhibit 4, to the final page.

15       A    Okay.

16       Q    So you had discussed with opposing counsel

17   this portion near the end of the page marked "Paid

18   political advertisement"; do you remember that?

19       A    I do, yes.

20       Q    Do you know why that's on this document?

21       A    At the advice of counsel.

22       Q    What is your understanding of the reason

23   for this being placed in the document?

24       A    My understanding is that because this

25   document was prepared in part by -- time from people

1    that were paid by the campaign, but then also one of

2    our vendors helped to format it, et cetera, and they

3    spent time doing that.  Because money was attached

4    to creating it -- and that this is a solicitation to

5    individual donors like -- that it was necessary, and

6    that's my understanding.

7        Q    And was this document disseminated to the

8    public?

9        A    No.

10       Q    You talked about, during this deposition,

11   other versions of this document.  Were other

12   versions of this document disseminated to the

13   public?

14       A    No.

15       Q    And why is that?

16       A    Well, manyfold, I guess.  There's a lot in

17   here that we wouldn't want the general public to see

18   that is not -- it's privileged information for

19   conversations between us and potential donors.

20       Q    And I just have one last set of questions

21   about what we were talking about, about the fluidity

22   of campaigns.

23            Prior to HB 1205, what were FDH's hopes

24   for fundraising?

25       A    Okay.  So prior to HB 1205, in that -- so

1    January, February, March, April period, we had, you

2    know, a hope of raising $25 million for the phase

3    one, as we outlined in our documents.

4        Q    And you testified that a significant

5    portion of that amount FDH hoped to pay towards paid

6    circulation --

7        A    Oh, yes, uh-huh.

8        Q    -- paid circulation?  Had FDH raised

9    sufficient funds to pay for paid circulation, would

10   it have spent additional funds on anything else?

11       A    Yes.

12       Q    What would it have spent those funds on?

13       A    Some of the voter education materials and

14   engagement of that -- its engagement with community

15   members, outreach, whether that's sort of paid

16   digital outreach or the videos we had discussed

17   about compelling stories and sharing stories with

18   individual voters stuck in the coverage gap.  That

19   was definitely one of the things.  Perhaps

20   additional polling.

21       Q    Okay.

22            MS. GAMBHIR:  I am through.

23            MR. JAZIL:  I've got some brief

24       follow-ups.  Jay, I don't want if you want me

25       to go first or you want to go first?

154

1          MR LaVIA:  Go ahead, Mo.

2          MR. JAZIL:  Okay.

3               FURTHER REDIRECT EXAMINATION

4    BY MR. JAZIL:

5     Q    Ma'am, if we can go back to Exhibit 2,

6    page 2.

7     A    Yes.

8     Q    Okay.  So this is the chart you discussed

9    with my friend just now.

10    A    Yes.

11    Q    Who made this chart and put it into the

12   response to interrogatory number 1; was that you?

13    A    To the best of my knowledge, the chart was

14   made by our vendor.

15    Q    Okay.

16    A    And then counsel -- and then provided to

17   staff, and then we gave it to counsel who inserted

18   it into this response.

19    Q    Okay.  So to the best of your knowledge,

20   tallyED made this chart, correct?

21    A    Correct, yes.

22    Q    When was tallyED hired as a vendor for

23   Florida Decides Healthcare?

24    A    It was at -- so we hired them -- they do a

25   couple roles with us.

1    Q    Sure.

2    A    And it would have been in the fall of '24,

3  would have been an actual --

4    Q    Okay.  So fall of '24 meaning September

5  on?

6    A    Of '24?  I don't recall the exact date of

7  the contract.  I just know that it was right around

8  that time period, yes.

9    Q    Were they your vendor in June of '24?

10    A    I don't recall --

11    Q    Okay.

12    A    -- to be honest.  Yeah.

13    Q    To the best of your knowledge, they were

14  hired in the fall of 2024, right?

15    A    Correct.

16    Q    You would agree with me June is summer,

17  right?

18    A    Yes, I do.

19    Q    Okay.  So there's an entry here from

20  June 11th, 2024.  Who is responsible for providing

21  the data for that entry?

22    A    I personally -- I don't know.

23    Q    Does anyone at FDH know?

24    A    I don't know.  I think given that this

25  wasn't part of -- there may be other folks who do

156

```
 1   know.
 2        Q    Okay.  So sitting here today as the
 3   corporate representative for Florida Decides
 4   Healthcare, you don't know who was responsible for
 5   that particular entry, correct?
 6        A    I know that this chart came from our
 7   vendor.
 8        Q    Okay.
 9        A    Pretty much, yeah.
10        Q    Understood.  But you don't know who gave
11   your vendor the data for June 11th, 2024, right?
12        A    Oh, the vendor because they're the QR.  So
13   this was them reporting to us.
14        Q    So the vendor had the data from June 11th,
15   2024, even though they weren't hired until fall of
16   2024; is that right?
17        A    Wait -- no.  Okay.
18        Q    We had a Eureka moment, so let's go --
19        A    Okay.  I'm sorry.  Okay, so Zack had -- so
20   on the collection side, this pilot we mentioned,
21   that's one of the services with tallyED and then
22   also QR and sorting things.
23             And we have this current contract -- or I
24   don't say current because it's not current.  My
25   headspace is on this timeframe, right?  Okay.  So
```

1    we're discussing this period.

2              The contract I had mentioned to you where

3    we had come together with them in the fall of '24,

4    it is true that we had, you know -- that is true.

5    It is also true that like we had different smaller

6    engagements with him previous to that, but contracts

7    that actually expired.  So like there was a whole

8    period of time.

9         Q    So the "him" is Zack at tallyED?

10        A    Yes.

11        Q    And Zack at tallyED may have had a smaller

12   engagement with FDH in the summer of '24?

13        A    Yes.

14        Q    Okay.  And as part of that smaller

15   engagement with FDH in the summer of '24, Zack at

16   tallyED may have tallied the 3,826 number, right?

17        A    Yes.

18        Q    But you don't know for sure, sitting here?

19        A    You know, because of those dates, I can't

20   say that we have had a longer -- as any vendor does,

21   they like pitch you.  We had a smaller kind of

22   engagement with him because we did volunteer

23   engagements --

24        Q    Okay.

25        A    -- on fundraising -- so not -- I'm sorry,

1    collection, volunteer collections.  So some of that

2    may have been said, yes.

3         Q    And then earlier with my friend, my

4    understanding of your testimony is you don't exactly

5    know whether the date column is telling us the date

6    that the petitions were submitted to the supervisors

7    or the date that the petitions were submitted to

8    tallyED; did I understand that right?

9         A    No.  I -- well, okay.  I think --

10   confusion around -- not confusion, but like

11   petitions submitted, what's -- is it to supervisors

12   or, like, is it mailing, or is that they receive it

13   or, et cetera.  But -- because if it were to be

14   submitted to tallyED, it would be hundreds and

15   hundreds and hundreds of lines because that's the

16   nature of like volunteer collection.

17        Q    So what's your understanding of what the

18   date column is giving us the date for?

19        A    I don't -- I don't know.

20        Q    Okay.  Fair enough.  All right.  Changing

21   gears.  In talking to my friends about other

22   grassroots campaign, you used the word

23   "typically" --

24        A    Uh-huh.

25        Q    -- how grassroots campaigns typically do

1    things.  Do you recall that?

2        A    Sure.

3        Q    Okay.  Here's my question for you.  How

4    many ballot initiative campaigns have you worked on

5    before the Florida Decides Healthcare initiative?

6        A    I have not, like, worked on; I volunteered

7    with them.

8        Q    So this is the first campaign for which

9    you're an employee?

10       A    I'm not employed.

11       Q    Okay.

12       A    I'm chair.  Sorry.

13       Q    So this is the first campaign for which

14   you're chair --

15       A    Correct.  Yeah.

16       Q    Has there been any other campaign where

17   you had an official title or role?

18       A    No.

19       Q    And you said you've volunteered for other

20   campaigns in the past, correct?

21       A    Correct.

22       Q    What was your role as a volunteer for

23   these other campaigns?

24       A    Organizing, sort of like grassroots

25   organizing, collecting, stuff like that.

1      Q      Okay.  And how many campaigns had you

2   volunteered for, for ballot initiatives?

3      A      Two.

4      Q      Okay.  And where were those campaigns?

5      A      In Florida.

6      Q      And what were those campaigns?

7      A      The Amendment 4 campaign in 2024, and the

8   Amendment 4 campaign in 2018.

9      Q      Okay.  The Amendment 4 campaign in 2018 --

10     A      Yeah.

11     Q      -- was a felon vote restoration campaign,

12   correct?

13     A      Right, the rights restoration, correct.

14     Q      Okay.  And this was Desmond Meade's group,

15   right?

16     A      Florida Rights Restoration Coalition,

17   correct.

18     Q      And the Amendment 4 campaign in the 2024

19   cycle, this was the abortion-related --

20     A      Yeah.

21     Q      -- initiative?

22     A      Volunteer, correct.

23     Q      And for the Amendment 4 campaign in 2018

24   as a volunteer, did you supervise any other

25   volunteers?

1       A    No.

2       Q    For the Amendment 4 campaign in 2024, did

3   you supervise any volunteers?

4       A    No.

5       Q    Okay.

6            MR. JAZIL:  I have no further questions,

7       Mr. LaVia, all yours.

8            MR LaVIA:  Just a couple of quick

9       questions.

10                       DIRECT EXAMINATION

11  BY MR LaVIA:

12      Q    Good afternoon.  I represent six of the

13  supervisors.  Are you a volunteer chair of the

14  campaign?

15      A    Yes, in that -- yes.  Yes.

16      Q    So you're not compensated?

17      A    No, not for -- and I'm sorry, Holly --

18  that's Holly, right, versus FDH Corporation.  So

19  Holly is not compensated to work for -- or do my --

20  the chair, correct.

21           MR LaVIA:  Okay.  That's all I have.  No

22      further questions.

23           Ms. Bullard, thank you for your time.

24           MS. GAMBHIR:  And we would like to read.

25      Thank you.

1           (Proceedings concluded at 3:14 p.m.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1                    CERTIFICATE OF OATH

2

3    STATE OF FLORIDA          )

4    COUNTY OF LEON            )

5           I, the undersigned authority, certify that

6    HOLLY BULLARD, as corporate representative of

7    FLORIDA DECIDES HEALTHCARE, personally appeared

8    before me on December 9, 2025, and was duly sworn.

9

10

11          SIGNED AND SEALED on December 14, 2025.

12   IDENTIFICATION: Driver's license.

13

14

15

16                    SANDRA L. NARGIZ
                      RPR, RMR, CRR, CRC, CCR-GA
17                    snargiz@comcast.net
                      Commission #HH239213
18                    EXPIRES: APRIL 18TH, 2026

19

20

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2    STATE OF FLORIDA      )

3    COUNTY OF LEON        )

4              I, SANDRA L. NARGIZ, Registered

5    Professional Reporter, certify that I was authorized

6    to and did stenographically report the deposition of

7    FLORIDA DECIDES HEALTHCARE (Holly Bullard); that a

8    review of the transcript was requested, and that the

9    foregoing transcript, pages 1 through 162, is a true

10   record of my stenographic notes.

11             I further certify that I am not a

12   relative, employee, attorney or counsel of any of

13   the parties, nor am I a relative or employee of any

14   of the parties' attorney or counsel connected with

15   the action, nor am I financially interested in the

16   action.

17             DATED on December 14, 2025.

18

19

20

21             SANDRA L. NARGIZ
               RPR, RMR, CRR, CRC, CCR-GA
22             Notary Public in Florida
               snargiz@comcast.net
23

24

25

1    December 14, 2025

2

     HARLEEN K. GAMBHIR, ESQUIRE
3    hgambhir@elias.law

4    RE:   FLORIDA DECIDES HEALTHCARE, et al vs. CORD
           BYRD, et al.
5          Case No.  4:25-cv-211-MW-MAF
           Deposition of FLORIDA DECIDES HEALTHCARE (Holly
6          Bullard on December 9, 2025

7    Dear Counsel:

8    As your client/witness did not waive reading and
     signing, please arrange for them to read this copy
9    of the transcript.  The errata sheet for them to
     fill out, date and sign is on the following page.
10
     If the witness does not read and sign the transcript
11   within a reasonable amount of time (or 30 days if
     Federal), the original transcript may be
12   filed with the Clerk of the Court.  If the witness
     wishes to waive his/her signature now, please advise
13   by emailing me informing me that they wish to waive.

14
     Very truly yours,
15

16   Sandra L. Nargiz, RPR, RMR, CRR, CRC, CCR-GA
     snargiz@comcast.net
17

18

19

20

21

22

23

24

25

166

ERRATA SHEET

DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

In Re:  FLORIDA DECIDES HEALTHCARE, et al vs. CORD
BYRD, et al.
Case No.: 4:25-cv-211-MW-MAF
FLORIDA DECIDES HEALTHCARE
(Holly Bullard)

December 9, 2025

PAGE    LINE        CHANGE                      REASON

_____Please see attached_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Under penalties of perjury, I declare that I have
read the foregoing transcript of the above
proceeding and I hereby swear that my testimony
therein was true at the time it was given and is now
true and correct, including any corrections and/or
amendments listed above.

Signature of Witness: _____
Dated this 12th day of  January, 2026    ,2025.
email to: snargiz@comcast.net

Errata Sheet

| Page, Line | Change/Reason |
|---|---|
| 16, 14 | "$25 million" to "$19 million"/ Error; subsequent recall as reflected in FDH_0051327 and FDH_0052502 |
| 17, 6 | "Correct, early" to "$19 million" / Error; subsequent recall as reflected in FDH_0051327 and FDH_0052502 |
| 17, 13-14 | "So closer to May is when it did change." To "It changed to $20 million in April and then increased in May." / Error; subsequent recall as reflected in FDH_0054815 and FDH_0050784 |
| 18, 12 | "Yes." to "Yes, though the first estimate was about $19 million." / Error; subsequent recall as reflected in FDH_0051327 and FDH_0052502 |
| 19, 8-15 | Strike entire answer. Replace with "As of March, the budget for phase one broke down to approximately $16.5 million for petition collection, less than $1 million for operations, and additional costs for polling and research, litigation and Florida Supreme Court review, and petition auditing and verification." / Error; subsequent recall as reflected in FDH_0051327 and FDH_0052502 |
| 19, 22-24 | Strike entire answer. Replace with "I don't know if we had a consistent estimate for verification fees prior to May. As of May, it was about $1 million." / Error; subsequent recall as reflected in FDH_0051327, FDH_0052502, and FDH_0055448 |
| 20, 8 | "And the $3 million" to "Our estimate increased from about $20 million to about $28 million. And the $8 million" / Error; subsequent recall as reflected in FDH_0055342 |
| 20, 22-23 | Strike entire answer. Replace with "That portion of the budget increased from $19 million to $26 million, plus an additional $850,000 in compliance costs." / Error; subsequent recall as reflected in FDH_0055342 |
| 24, 11-12 | Strike entire answer. Replace with "Over the course of the ballot placement phase of the 2026 campaign." / Error |
| 24, 19 | "Yes" to "Both amounts were for the entire ballot placement phase of the 2026 campaign" / Error |
| 26, 4-7 | Strike entire answer. Replace with "I don't know if we had a consistent estimate for verification fees prior to May. As of May, it was about $1 million." / Error; subsequent recall as reflected in FDH_0051327, FDH_0052502, and FDH_0055448 |
| 39, 5-6 | Strike entire answer. Replace with "That is the date on which the petitions were mailed to the Supervisors." / Error |
| 46, 11 | "2 to $3 million" to "$5 million" / Error; subsequent recall as reflected in FDH_0050805 |
| 49, 9 | "August" to "May" / Error; subsequent recall as reflected in FDH_0050805 |
| 49, 15 | "August" to "May" /Error; subsequent recall as reflected in FDH_0050805 |
| 49, 20 | "August" to "May" /Error; subsequent recall as reflected in FDH_0050805 |
| 49, 21 | "August" to "May" /Error; subsequent recall as reflected in FDH_0050805 |
| 49, 23 | "August" to "May" /Error; subsequent recall as reflected in FDH_0050805 |
| 59, 22 | "August" to "July" / Error; subsequent recall as reflected in FDH_0056783 |

| 60, 1 | "August" to "July" / Error; subsequent recall as reflected in FDH_0056783 |
|---|---|
| 66, 3 | "in contributions" to "in contributions from November 1, 2024 to September 31, 2025" / Clarification |
| 66, 24-35 | "around 5 percent; I believe in that range, yeah" to "I can't recall the range" / Error |
| 88, 15 | "Piakowsky" to "Paikowsky" / Spelling correction |
| 105, 20 | "entities that – individuals" to "entities and individuals" / Transcription error |
| 106, 17 | "show" to "chill" / Transcription error |
| 110, 20-21 | "you only pay for work that's done" to "the contract was split into a Statement of Work A to collect at least 70,000 signatures and a Statement of Work B to collect an additional 1,385,000 signatures" / Clarification; subsequent recall as reflected in FDH_0003246 and FDH_0003252 |
| 119, 17 | "million" to "quarter of a million" / Error; subsequent recall as reflected in FDH_0048906 |
| 123, 2 | "million" to "quarter of a million" / Error; subsequent recall as reflected in FDH_0048906 |
| 123, 5 | "million" to "quarter of a million" / Error; subsequent recall as reflected in FDH_0048906 |
| 130, 16 | "expansion" to "expensive" / Transcription error |
| 132, 15 | "Notally" to "TallyEd" / Transcription error |
| 143, 17 | "Correct" to "$19 million" / Error; subsequent recall as reflected in FDH_0051327 and FDH_0052502 |
| 144, 11-13 | "never" to "rarely" and "we used" to "we often used" / Error; subsequent recall as reflected in FDH_0051327 |
| 153, 2 | "$25 million" to "$19 to $20 million" / Error; subsequent recall as reflected in FDH_0051327, FDH_0052502, and FDH_00554815 |

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

FLORIDA DECIDES HEALTHCARE,
INC., et al.

*Plaintiffs*,

v.

CORD BYRD, in his official capacity as
Secretary of State of Florida, et al.,

*Defendants*.

Case No. 4:25-cv-211-MW-MAF

## FLORIDA DECIDES HEALTHCARE PLAINTIFFS' OBJECTIONS AND RESPONSES TO DEFENDANTS SUPERVISORS OF ELECTIONS' SECOND SET OF INTERROGATORIES

Pursuant to Federal Rule of Civil Procedure 36, Plaintiffs submit this response to Second Set of Interrogatories to Florida Decides Healthcare Plaintiffs that Defendants Supervisors of Elections served on Florida Decides Healthcare on October 30, 2025.

## RESPONSE TO REQUESTS

**INTERROGATORY NO. 1**: During the initiative campaign that you suspended in September 2025, how many petition forms did you collect—by week and by month—in support of the initiative entitled "Provide Medicaid Coverage to Eligible Low-Income Adults"? For purposes of this interrogatory, "petition forms" includes all petition forms regardless of their validity or invalidity.

1

12/9/25  sn
FDH Rep Bullard
Ex. 2

**RESPONSE TO INTERROGATORY NO. 1**: Plaintiffs object to this request as unduly burdensome insofar as it requests information not maintained by FDH and for which FDH would need to make extensive inquiries. *See Procaps S.A. v. Patheon, Inc.*, No. 12-24356-CIV, 2015 WL 1608807, at *2 (S.D. Fla. Apr. 10, 2015) ("[A] party is not required to create evidence it does not have and is not required to do independent research in order to acquire information **merely** to answer interrogatories."). FDH kept track of the total number of petitions that it submitted to the Supervisors of Elections each week that were received either from volunteers or from paid circulators. FDH did not keep track of petitions that were submitted directly by voters to the Supervisors of Elections. Consistent with the foregoing objections, in response to Interrogatory No. 1, Plaintiffs provide the following numbers of petitions submitted by FDH as FDH maintained such records:

| Date | Petitions Submitted |
|------|--------------------:|
| 6/11/2024 | 3,826 |
| 1/14/2025 | 3,400 |
| 3/10/2025 | 5,762 |
| 4/18/2025 | 1,657 |
| 4/22/2025 | 4,595 |
| 4/29/2025 | 6,624 |
| 5/5/2025 | 3,000 |
| 5/6/2025 | 11,406 |
| 5/8/2025 | 934 |
| 5/13/2025 | 309 |
| 5/14/2025 | 3,928 |
| 5/15/2025 | 7,223 |
| 5/19/2025 | 1,967 |
| 5/20/2025 | 130 |

2

| | |
|---|---:|
| 5/21/2025 | 9,415 |
| 5/23/2025 | 7,138 |
| 5/28/2025 | 381 |
| 5/29/2025 | 1,113 |
| 5/30/2025 | 779 |
| 6/3/2025 | 36 |
| 6/4/2025 | 62 |
| 6/5/2025 | 2,183 |
| 6/11/2025 | 265 |
| 6/13/2025 | 605 |
| 6/18/2025 | 337 |
| 6/20/2025 | 2,585 |
| 6/25/2025 | 1,018 |
| 6/27/2025 | 7,382 |
| 6/28/2025 | 13,074 |
| 7/3/2025 | 6,277 |
| 7/8/2025 | 177 |
| 7/10/2025 | 383 |
| 7/15/2025 | 101 |
| 7/17/2025 | 737 |
| 7/22/2025 | 5,710 |
| 7/29/2025 | 245 |
| 7/31/2025 | 1,469 |
| 8/5/2025 | 204 |
| 8/6/2025 | 332 |
| 8/8/2025 | 175 |
| 8/11/2025 | 1,950 |
| 8/12/2025 | 1,140 |
| 8/14/2025 | 693 |
| 8/18/2025 | 1,556 |
| 8/20/2025 | 298 |
| 8/22/2025 | 499 |
| 8/25/2025 | 587 |
| 8/26/2025 | 324 |
| 8/28/2025 | 640 |
| 8/29/2025 | 664 |
| 9/9/2025 | 1,152 |
| 9/9/2025 | 393 |
| **Total** | **126,840** |

**INTERROGATORY NO. 2**: Do you contend that Supervisors of Elections impose or enforce a deadline for payment of signature verification fees? If so:

- specify the deadline;

- state all material facts that support your contention that the Supervisors impose or enforce that deadline; and

- specify all consequences of a failure to pay by the deadline.

**RESPONSE TO INTERROGATORY NO. 2**: As Plaintiffs understand the Supervisors' interpretation of relevant statutes, the Supervisors are not currently enforcing any deadline for payment of signature verification fees. However, the Supervisors have not yet affirmed that there is no deadline for payment of signature verification fees. In addition, the Supervisors have not affirmed that there are no consequences for failure to pay verification fees beyond the Supervisors not undertaking validation on petition forms.

Various Supervisors have also stated to Plaintiffs that petition invalidation and/or fines may result from either non-payment or untimely payment.

Specifically, some Supervisors have communicated to FDH that petitions are not considered "submitted" until payment accompanies the petitions, raising the possibility of government actors taking the position that FDH has not complied with HB 1205's 10-day return deadline unless it has enclosed verification fees along with submitted petitions. *See, e.g.*, FDH_0054067 from the FDH Plaintiffs' Fourth

4

Production to the Secretary of State. For example, the Hillsborough County Supervisor's Office communicated to FDH that "delays in processing" stemming from nonpayment "could result in penalties or fines from the state." *See* FDH_0053865 from the FDH Plaintiffs' Fourth Production to the Secretary of State. And the Glades County Supervisor's Office communicated to FDH that its petitions "will be marked invalid if we do not get the correct amount." *See* FDH_0053699 from the FDH Plaintiffs' Fourth Production to the Secretary of State.

These communications suggest that, at least in some Supervisors' view, if a petition is not followed closely in time by payment, that petition will be marked invalid—and that this could result in a penalty. They also suggest that in some Supervisors' view, if petitions are not "submitted" until payment is received, there may be a 10-day deadline to remit payment for signature verification under Fla. Stat. § 100.371(7)(a) (2025). Under this view, the consequences for late payment would be $50 per day after 10 days from when the voter signed the petition or $2,500 per petition if the sponsor willfully declined to submit payment. *Id.* § 100.371(7)(a)1. If a sponsor remitted payment after February 1 of the year a general election is held, the penalty would be $100 per day late up to $5,000 and a fine of $5,000 per petition if the sponsor acted willfully. *Id.* § 100.371(7)(a)2. Further, if a sponsor never remits payment, it might also be subject to $500 per petition or $5,000 if the sponsor acted

willfully. *Id.* § 100.371(7)(a)3. A sponsor might also be subject to civil enforcement actions under Fla. Stat. § 100.371(11) (2025).

**INTERROGATORY NO. 3**: Describe when and how you decided to suspend your campaign. At a minimum, your answer should:

- identify (by name and job title) each person involved in the decision-making process;

- each such person's role in the decision-making process;

- each communication in which you decided to suspend or discussed the possibility of suspending your campaign; and

- separately for each such communication, specify:

  o the date of the communication;

  o the means of communication (e.g., phone, email, etc.);

  o the topics discussed in the communication; and

  o the individuals who participated in the communication.

**RESPONSE TO INTERROGATORY NO. 3**: Plaintiffs object to Interrogatory No. 3 to the extent it calls for the disclosure of communications protected by the attorney-client privilege or for discussions of campaign strategy protected by the First Amendment privilege. *See, e.g.*, *In re Motor Fuels Temperature Sale Practices Litig.*, 641 F.3d 470, 481 (10th Cir. 2011) (holding First Amendment privilege protected trade groups and their members from disclosing

6

their communications regarding strategy for lobbying against a particular policy). FDH also objects to Interrogatory No. 3 insofar as it seeks information related to specific conversations or other agreements with donors, as well as campaign strategy related to specific donors, all of which are subject to the First Amendment privilege. *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2385 (2021) (recognizing First Amendment privilege applies to donor lists); *All. of Auto. Mfrs., Inc. v. Jones*, No. 4:08CV555-MCR/CAS, 2013 WL 4838764, at *5 (N.D. Fla. Sept. 11, 2013) (entering protective order regarding organization's solicitation of campaign contributions, lobbying-related communications, and efforts to support candidates).

FDH further objects to Interrogatory No. 3 as unduly burdensome and substantially overbroad in its scope in that it calls for "each communication" discussing the possibility of FDH suspending its campaign.

Consistent with the foregoing objections, in response to Interrogatory No. 3, Plaintiffs state that Mitchell Emerson, FDH's Executive Director and Campaign Manager, and Holly Bullard, FDH's Chairperson, were involved in the decision-making process.

As it relates to communications regarding FDH's decision, pursuant to Federal Rule of Civil Procedure 33(d), Plaintiffs refer the Supervisors to the documents that will be produced in response to Request for Production No. 6 in the Supervisors' First Set of Requests for Production. Plaintiffs further state that FDH informed its

7

staff and communications vendors between September 19, 2025 and September 23, 2025 that it was imminently suspending its campaign. FDH also informed key stakeholders by email on September 23, 2025 that it was imminently suspending its campaign. FDH officially announced the suspension of its campaign on September 25, 2025, via email announcements sent to several hundred supporters and grassroots coalition partners.

**INTERROGATORY NO. 4**: Explain your assertion that you have "suspended" your initiative campaign. *See, e.g.*, ECF No. 512 at 8. At a minimum, your answer should explain:

- whether the suspension is permanent;

-  if not, when and under what circumstances you might reinitiate your campaign; and

- why you have not withdrawn the initiative entitled "Provide Medicaid Coverage to Eligible Low-Income Adults" with the Division of Elections.

**RESPONSE TO INTERROGATORY NO 4**: FDH objects to Interrogatory 4 on the ground that "your initiative campaign" is vague.

Consistent with the foregoing objections, in response to Interrogatory No. 4, FDH has permanently suspended its campaign to qualify its initiative for the 2026 general election ballot and will not reinitiate it. FDH intends to pursue a campaign to qualify its initiative for the 2028 general election ballot. While FDH has

suspended any and all petition circulation efforts and will not reinstate such efforts for the 2026 general election ballot, FDH has not purported to "withdraw" the initiative entitled "Provide Medicaid Coverage to Eligible Low-Income Adults" because it is exploring whether it may pursue placement on the 2028 ballot under the same serial number. To the extent Interrogatory No. 4 requests greater detail on this subject, FDH objects that it calls for the disclosure of communications protected by the attorney-client, work-product, and/or First Amendment privileges.

**INTERROGATORY NO. 5**: State all material facts that support your assertion that you "had been on target to collect enough signatures to qualify for the 2026 ballot in the early part of this year, before HB 1205 took effect." *See* ECF No. 511-1 ¶ 30.

**RESPONSE TO INTERROGATORY NO 5**: Pursuant to Federal Rule of Civil Procedure 33(d), Plaintiffs refer the Supervisors to the documents that will be produced in response to the Supervisors' Third Request for Production and to documents already produced in response to the Secretary of State's Requests for Production that Plaintiffs will identify by bates number.

Plaintiffs also state that FDH had assembled 60+ community partners and 46 hubs for volunteer collection efforts before HB 1205 took effect. *See* FDH_0017728 from the FDH Plaintiffs' Fourth Production to the Secretary of State. FDH had also raised $1.97 million in contributions from its inception in 2018 to May 1, 2025. As

of April 23, 2025, it had secured $2 million more in additional commitments. *See id.* Based on FDH staff's prior experience with other initiative campaigns, and its rate of petition collection as it began to ramp up its circulation efforts, these resources were sufficient to gain the momentum necessary to collect sufficient signatures to qualify for the 2026 ballot, under the status quo that existed prior to HB 1205.

*{This space intentionally left blank. Signature block to follow on next page}.*

**VERIFICATION OF ANSWERS TO INTERROGATORIES**

I, Mitchell Emerson, believe, based on reasonable inquiry, that the foregoing answers are true and correct to the best of my knowledge, information, and belief. I verify as such under penalty of perjury under 28 U.S.C. § 1746.

_____
Mitchell Emerson
Executive Director and Campaign Manager
Date: December 1, 2025

Dated this 1st day of December, 2025

*/s/ Frederick S. Wermuth*
Frederick S. Wermuth
Florida Bar No. 0184111
Quinn Ritter
Florida Bar No. 1018135
KING, BLACKWELL,
ZEHNDER & WERMUTH, P.A.
25 E. Pine Street
Orlando, FL 32801
Telephone: (407) 422-2472
Facsimile: (407) 648-0161
fwermuth@kbzwlaw.com
qritter@kbzwlaw.com

Matletha Bennette (Fl. Bar. No. 1003257)
Krista Dolan (Fl. Bar No. 1012147)
SOUTHERN POVERTY LAW CENTER
P.O. Box 10788
Tallahassee, FL 32302-2788
Telephone: (850) 408-4840
matletha.bennette@splcenter.org
krista.dolan@splcenter.org

Bradley E. Heard*
Avner Shapiro*
Nick Steiner*
1101 17th Street, NW, Suite 550
Washington, D.C. 20036
bradley.heard@splcenter.org
avner.shapiro@splcenter.org
nick.steiner@splcenter.org

Ben Stafford*
ELIAS LAW GROUP LLP
1700 Seventh Ave., Suite 2100
Seattle, WA 98101
Telephone: (206) 656-0177
bstafford@elias.law

Emma Olson Sharkey*
Harleen K. Gambhir*
Nicole E. Wittstein*
Derek Zeigler*
ELIAS LAW GROUP LLP
250 Massachusetts Ave. NW, Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
eolsonsharkey@elias.law
hgambhir@elias.law
nwittstein@elias.law
dzeigler@elias.law

*Counsel for FDH Plaintiffs*
*\*Admitted Pro Hac Vice*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on December 1, 2025, I served a copy of the foregoing by electronic mail to all counsel of record.

/s/ *Frederick S. Wermuth*
Frederick S. Wermuth
Florida Bar No. 0184111