SOS REPRESENTATIVE JILLIAN PRATT


IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF FLORIDA

TALLAHASSEE DIVISION

CASE NO. 4:25-cv-211-MW-MAF

FLORIDA DECIDES HEALTHCARE,

INC., et al,

    Plaintiffs,

CORD BYRD, in his official

capacity as Secretary of

State of Florida, et al.,

    Defendants.

_____


REMOTE 30(b)(6)DEPOSITION OF

OFFICE OF THE SECRETARY OF STATE

(Jillian Pratt)

Monday, December 22, 2025

10:00 a.m. -  4:30 p.m.

LOCATION OF WITNESS:

    Via Zoom

Tallahassee, Florida

STENOGRAPHICALLY REPORTED BY:

SANDRA L. NARGIZ

RPR, CM, CRR, CRC, CCR-GA

1      APPEARANCES: (All appearing via Zoom.)

2      SOUTHERN POVERTY LAW CENTER

3      PO Box 10788

Tallahassee, FL 32302-2788

4      850.408.4840

BY: MATLETHA BENNETTE

5      matletha.bennette@splcenter.org

BY: AVNER SHAPIRO, ESQUIRE

6      avner.shapiro@splcenter.org

BY: KRISTA DOLAN, ESQUIRE

7      krista.dolan@splcenter.org

BY:  NICK STEINER, ESQUIRE

8

9      ON BEHALF OF THE PLAINTIFF FLORIDA RIGHTS TO

CLEAN WATER:

10      CAMPAIGN LEGAL CENTER

11      1101 14th St. NW, Suite 400

Washington, DC 20005

12      918.576.4318

BY:  MEL NEAL, ESQUIRE

13      mneal@campaignlegalcenter.org

BY:  SAMANTHA PERLMAN, ESQUIRE

14      sperlman@campaignlegalcenter.org

BY: HEATHER SZILAGYI, ESQUIRE

15      hszilagyi@campaignlegalcenter.org

BY: BRENT FERGUSON, ESQUIRE

16      bferguson@campaignlegalcenter.org

17      ON BEHALF OF LEAGUE PLAINTIFFS:

WINSTON & STRAWN LLP

200 Park Ave.

19

New York, New York 10166

212.294.2656

20

BY: GARY STOCKARD, ESQUIRE

GStockard@winston.com

21

BY: TYLER DATO, ESQUIRE

tdato@winston.com

22

23

24

25

1    APPEARANCES:  (Continued.)

2    ON BEHALF OF THE DEFENDANT FLORIDA DEPARTMENT OF

STATE:

3    HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK

4    119 South Monroe Street, #500

Tallahassee, FL  32301

5    850.508.7775

BY: RANDALL RABAN, ESQUIRE

6    rraban@holtzmanvogel.com

BY:  MOHAMMAD O. JAZIL, ESQUIRE

7    mjazil@holtzmanvogel.com

8    FLORIDA DEPARTMENT OF STATE

500 S. Bronough Street

9    Tallahassee, FL 23999

850.245.6511

10    BY: ASHLEY DAVIS, ESQUIRE

ashley.davis@dos.fl.gov

11

12    ON BEHALF OF ATTORNEY GENERAL UTHMEIER:

13    OFFICE OF THE ATTORNEY GENERAL

PL-01, The Capitol

14    Tallahassee, Florida 32399

850.414.3785

15    BY: BILL STAFFORD, ESQUIRE

william.stafford@myfloridalegal.com

16    BY:  SARA SPEARS, ESQUIRE

sara.spears@myfloridalegal.com

17    BY:  MARYSSA HARDY, ESQUIRE

maryssa.hardy@myfloridalegal.com

18      ON BEHALF OF THE SUPERVISORS OF ELECTION OF CLAY,

19      MARTIN, OSCEOLA, PALM BEACH, POLK,  ST. LUCIE

COUNTIES:

20      GARDNER BIST BOWDEN DEE LAVIA WRIGHT PERRY &

21      HARPER

1300 Thomaswood Drive

22      Tallahassee, FL  32308

850.385.0070

23      BY: JOHN T. LAVIA, ESQUIRE

jlavia@gbkwlaw.com

24

25

SOS REPRESENTATIVE JILLIAN PRATT

1    APPEARANCES:  (Continued.)

2      ON BEHALF OF THE ALACHUA SUPERVISOR OF ELECTIONS:

3

4
       ALACHUA COUNTY ATTORNEY'S OFFICE

       12 SE 1st Street

5
       Gainesville, FL 32601

       352.374.5218

6
       BY: BOB SWAIN, ESQUIRE

       bswain@alachuacounty.us

7      ON BEHALF OF SUPERVISOR OF ELECTIONS PINELLAS

8      COUNTY:

9
       PINELLAS COUNTY ATTORNEY'S OFFICE

       315 Court Street

10
       Clearwater, FL 33756

       727.464.3354

11
       BY: JARED D. KAHN, ESQUIRE

       jkahn@pinellas.gov

12     ON BEHALF OF SUPERVISOR OF ELECTIONS HILLSBOROUGH

13     COUNTY:

14
       HILLSBOROUGH COUNTY ATTORNEY'S OFFICE

       601 E. Kennedy Blvd., 27th Flr.

15
       Tampa, FL 33602

       813.272.5670

16
       BY: STEPHEN M. TODD, ESQUIRE

       todds@HCFL.gov

17     ON BEHALF OF SUPERVISOR OF ELECTIONS FOR GLADES,

18     HARDEE, HENDRY, OKEECHOBEE, LEVY, HOLMES COUNTIES:

19
       HENDERSON, FRANKLIN, STARNES & HOLT, P.A.

20      1715 Monroe Street

        Fort Myers, FL 33905

        239.344.1168

21      BY: KENDALL COUGHLIN, ESQUIRE

        kendall.coughlin@henlaw.com

22

23

24

25

1    APPEARANCES:  (Continued.)

2     ON BEHALF OF SUPERVISOR OF

3     ELECTIONS FOR BREVARD COUNTY.:

4     TESSITORE MARI SCOTT

5
      1485 International Parkway, #2031

      Lake Mary, FL 32746

6
      321.363.1634

      BY: FRANK MARI, ESQUIRE

7     fmari@tessmari.com

8
    ON BEHALF OF THE LEON COUNTY SUPERVISOR OF

    ELECTIONS:

9     MESSER CAPARELLO

10
      2618 Centennial Place

      Tallahassee, FL  32308

11
      850.222.0720

      BY: MARK HERRON, ESQUIRE

12    mherron@lawfla.com

13
    ON BEHALF OF SUPERVISOR OF ELECTIONS OF VOLUSIA

    COUNTY:

14     VOLUSIA COUNTY ATTORNEY'S OFFICE

15
      123 W. Indiana Avenue

      Deland, FL 32720

16
      386.736.5950

      BY:SARAH JONAS, ESQUIRE

17     Sjonas@volusia.org

18    ON BEHALF OF SUPERVISOR OF ELECTIONS FOR DESOTO,

19    FLAGLER, GILCHRIST, HIGHLANDS, JEFFERSON, LIBERTY

    MADISON AND UNION COUNTIES:

20          ROPER, TOWNSEND & SUTPHEN, P.A.

21          255 S. Orange Avenue, Suite 750

             Orlando, FL 32801

22          407.897.5150

             BY: PAUSHA TAGHDIRI, ESQUIRE

23          Ptaghdiri@roperpa.com

24

25

1          APPEARANCES:  (Continued.)

2          ON BEHALF OF SUPERVISOR OF ELECTIONS FOR BAKER,

3          BAY, BRADFORD, CALHOUN, COLUMBIA, DIXIE, FRANKLIN,

           GADSDEN, GULF, HAMILTON, JACKSON, LAFAYETTE,

4          NASSAU, PUTNAM, SANTA ROSA, ST. JOHNS, SUMTER,

           SUWANNEE, TAYLOR, WAKULLA, WALTON COUNTIES:

5

6          MARKS GRAY

           1200 Riverplace Blvd., #800

7          Jacksonville, FL 32207

           904.398.0900

8          BY:  SUSAN ERDELYI, ESQUIRE

           serdelyi@marksgray.com

9

10         ALSO PRESENT:

11          Hailey Vanderlaan, AG's Office

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    I N D E X

2    WITNESS                          PAGE

     OFFICE OF THE SECRETARY OF STATE          8

3    (Jillian Pratt)

4         Direct Examination by Mr. Shapiro        8

          Direct Examination by Ms. Szilagyi      135

5         Direct Examination by Mr. Dato        164

          Continued Direct Examination by       183

6          Mr. Shapiro

7    CERTIFICATE OF OATH                235

8    CERTIFICATE OF REPORTER               236

9    READ AND SIGN LETTER               237

10   ERRATA SHEET                    238

11              INDEX OF EXHIBITS

12   NO.      DESCRIPTION              ID

13   Exhibit 1`  Notice of taking deposition      10

14   Exhibit 2   SOS_0624756              126

     Exhibit 3   HB 1205                138

15   Exhibit 4   Emails, starts with SOS_0589671   152

     Exhibit 5   Email Reporting Known and Unknown  156

16          Violations

     Exhibit 6   12-2024 OECS report         177

17   Exhibit 7   12-2024 OECS report (duplicate)   185

     Exhibit 8   07-26-2024, PB, McVay email     203

18   Exhibit 9   08-14-2024, Email, Melendez     215

          to McVay

19   Exhibit 10  08-26-2024, OECS Request to     218

     Orange County-SOS

20
21
22
23
24
25

YVer1f

1          The following Zoom proceedings began at 10:00 a.m.

2              THE STENOGRAPHER:  Do you swear or affirm

3          that the testimony you are about to give will

4          be the truth, the whole truth, and nothing but

5          the truth?

6              THE WITNESS:  I do.

7          Thereupon,

8              OFFICE OF THE SECRETARY OF STATE

9                (Jillian Pratt)

10         having been first remotely duly sworn or affirmed,

11         as hereinafter certified, testified as follows:

12              DIRECT EXAMINATION

13         BY MR. SHAPIRO:

14         Q    Good morning, Ms. Pratt.

15         A    Good morning.

16         Q    My name is Avner Shapiro.  I am one of the

17    attorneys representing the Florida Decides

18    Healthcare plaintiffs.  I'm joined by my colleague,

19    Ms. Mat Bennette, who is going to be assisting to

20    show you some exhibits today.

21              So can you state your full name,

22    Ms. Pratt?

23         A    Jillian Elise Pratt.

24         Q    Have you been deposed before?

25         A    I have not.

1          Q    I'm sorry, I guess I can't hear you that

2     well.  I didn't quite catch what you said.

3          A    I said I have not been deposed before.

4          Q    Have you -- are you an attorney,

5     Ms. Pratt?

6          A    I am, yes.

7          Q    Have you taken or participated in taking

8     depositions?

9          A    I have, yes.

10         Q    You have?

11         A    Yes.

12         Q    Okay.  Roughly how many times?

13         A    Maybe five.

14         Q    Okay.  So you are familiar with the

15    process, but I would like to quickly go over some

16    ground rules.

17              Please let me know if you would like to

18    take a break, we can definitely do that.

19              For the benefit of the court stenographer,

20    who is making a record of this deposition, please

21    make sure your answers are verbal and audible; no

22    nods or shaking of the head.

23              Again, for the benefit of the

24    stenographer, it's important that you not speak over

25    another person.  Is that all understood?

1          A   Yes.

2              Q   And by the way, can you clearly hear me?

3      Am I coming across reasonably well?

4          A   Yes, you are.

5              Q   Great.  Please ask for clarification if

6      you don't understand or hear a question.  If you

7      answer a question, I'm going to assume you

8      understood it.  Is that fair?

9          A   Yes.

10             Q   Your counsel may object to a question.

11     You should answer the question anyway, if you

12     understand it, unless your counsel specifically

13     instructs you not to answer a question.  Is that

14     understood?

15         A   Yes.

16             Q   And finally, you are under oath today.  So

17     I would like to know if there is anything that would

18     interfere with your ability to provide truthful and

19     complete answers today?

20         A   Nothing.

21             MR. SHAPIRO:  Let me show you the first

22         exhibit with the assistance of Mat.

23             (Exhibit 1 was marked for identification.)

24

25

SOS REPRESENTATIVE JILLIAN PRATT

1       BY MR. SHAPIRO:

2          Q   Mat is going to be dropping exhibits into

3       the Chat as we go through today.

4              I can't see the exhibit.  Here we go.  All

5       right.

6              So the first page of this exhibit, if you

7       can read the title; do you see that?

8          A   Yes.  Would you like me to read it out

9       loud?

10         Q   No, you can read it to yourself and then

11      when you read the title, let me know.

12         A   I have read it.

13         Q   Great.  Are you familiar with this

14      document?

15         A   Yes, I am.

16         Q   And are you aware of the topics that you

17      are designated to answer that relate to this

18      document?

19         A   Yes.

20         Q   And what is this document?

21         A   This is Plaintiffs' Notice of Taking

22      Deposition of the Secretary of State under Federal

23      Rule of Civil Procedure 30(b)(6).

24         Q   I just broke the rule of not talking over

25      you.  I'm sorry about that.

SOS REPRESENTATIVE JILLIAN PRATT

1          A   That's all right.

2          Q   Do you understand that you're here today

3     as the corporate representative for the Secretary of

4     State?

5          A   I do.

6          Q   Okay.  We're now done with this document.

7     And are you prepared to testify as to the designated

8     topics in this notice of deposition?

9          A   I am prepared to testify to the topics

10    that my attorneys have said that I'm the appropriate

11    witness for.

12         Q   Okay.  Without disclosing any specific

13    conversations you had with your counsel, what did

14    you do to prepare for today's deposition?

15         A   I reviewed that notice.  I reviewed

16    several of the papers that were filed, filings in

17    this case.  I reviewed HB 1205, and I reviewed the

18    OECS reports that have been filed in the past few

19    years.

20             I think that's about it.  That is all I

21    can think of.

22         Q   And who did you speak to in the course of

23    preparing to testify?

24         A   I spoke to my attorneys, and that's it.

25         Q   Okay.  By any chance, did you have a

1    discussion with Mr. Brad McVay in relation to this

2    deposition?

3         A    I did.  I asked him one question, I'm

4    trying to remember what it was.

5             I think I was asking about his

6    recollection having to do with the expert witness

7    who filed, I guess, something after the reports.

8         Q    I missed that.  What is that?

9         A    I am trying to remember his name.  But I

10   did talk to Brad McVay.  I asked him a question as

11   to what he referred about who had been hired to go

12   back and conduct -- conduct, I guess -- I don't want

13   to call it texts, but to look through Orange County

14   and Palm Beach County numbers, and then to go

15   through and to verify or, I guess, to look at

16   signatures that were verified and that were not

17   verified.

18        Q    Got it.  Good to know.  Thank you for

19   that.

20             Next I would like to just go through some

21   terms I am going to be using over the course of this

22   deposition.  For convenience, I may refer to the

23   Secretary of State as the SOS, or the Secretary's

24   Office.  When I do that, I mean the Secretary of

25   State and staff, including you.

SOS REPRESENTATIVE JILLIAN PRATT

1          I may refer to the Department of State as

2     the department.  And when I do, I mean the

3     Department of State and its staff including you.

4          I may also refer to the Florida Office of

5     Election Crimes and Security as the OECS or your

6     office.  And when I do that, I'm including all the

7     staff of the OECS, including you.

8          Do you understand all that?

9     A   I do, yes.

10    Q   You are familiar with the OECS's

11    supplemental report issued on December 20, 2024, on

12    the investigation concerning initiative petition

13    fraud, correct?

14    A   I am, yes.

15    Q   For convenience, I will be referring to

16    that report as OECS's December 2024 report, or just

17    the December 2024 report.  Is that understood?

18    A   Yes, it is.

19    Q   You are also familiar with a final report

20    OECS issued on January 15th, 2025.  It also relates

21    to the issue of initiative petition fraud, correct?

22    A   Yes.

23    Q   And for convenience, I am going to refer

24    that report as OECS's January 2025 report or just

25    the January report.  Is that okay?

1          A   Yes.

2          Q   Okay.  When referring to both reports, I

3   will sometimes refer to them as the OECS reports.

4   Okay?

5          A   Okay.

6          Q   Now let's discuss your background.

7             What position do you currently hold,

8   Ms. Pratt?

9          A   I am the director of the Office of

10  Elections Crimes and Security.

11         Q   How long have you been in that position?

12         A   Since March of this year.

13         Q   Congratulations on the promotion.

14         A   Thank you.

15         Q   And what are your current job

16  responsibilities?

17         A   I oversee the Office of Election Crimes

18  and Security.  So I oversee the staff and all of our

19  investigations that we do.  We do preliminary

20  investigations into complaints that we receive about

21  potential violations of the election code.  And then

22  if there is sufficient evidence, after we have done

23  an investigation, my job is then to refer those

24  cases to law enforcement for further investigation.

25         Q   Who do you report to?

1    A   I report to the Secretary of State by

2    statute.  As far as time cards go, I report to the

3    chief of staff, Jennifer Kennedy.

4    Q   Who is your immediate supervisor?

5    A   The Secretary of State is my immediate

6    supervisor for purposes of my job duties.  But for

7    purposes of like time sheets and that kind of thing,

8    it's been designated to the chief of staff, Jennifer

9    Kennedy.

10    Q   Do you have oversight over others in the

11    office presumably?

12    A   I do, yes.

13    Q   In the office?

14    A   Yes, I do.

15    Q   When did you come to work at the OECS?

16    A   I came to work directly for OECS in March

17    of this year when I became the director.  But I

18    interacted and helped OECS for probably the year to

19    year and a half preceding that.

20    Q   And what were the positions you were in

21    the years preceding your arrival at OECS with the

22    department?

23    A   I was an assistant general counsel in the

24    General Counsel's Office.

25    Q   And how long were you in that position?

1          A    Approximately two years.

2          Q    And could you briefly describe your

3     educational and professional background?

4          A    Sure.  I went to Florida State for

5     undergrad and majored in criminology.  And then I

6     went to UF for law school.  I graduated in 2016.

7               And then I clerked for a judge on the

8     First DCA.

9               I was a prosecutor.

10              I shortly worked for a firm.

11              And then I clerked for a Federal District

12    judge for two years.

13              And then I worked for the Department of

14    Health before coming to the Department of State.

15         Q    Okay.  Thank you for that.  Now I would

16    like to get a better understanding of the

17    department's role typically in analyzing bills and

18    proposals and how the department interacts with the

19    legislature with regard to the issue of -- as it

20    relates to the election division and addressing

21    issues of fraud.

22              Does the department, including the office

23    you're now running, OECS, ever provide members of

24    the legislature and their staff with analysis of the

25    effects of a proposed bill?

1          A    I believe when asked, our office would do

2     that.

3              As it relates to this case, my

4     understanding is that we were not asked to that, and

5     so we did not provide anything to the legislature

6     other than the reports the OECS filed prior to the

7     legislature convening.

8          Q    Okay.  So is it -- from time to time do

9     legislators and their staff turn to the department

10    for guidance, advice on technical matters, or

11    analysis, when they are resolving a major piece of

12    election-related legislation?

13         A    I think that would be probably more of a

14    question for Maria Matthews.

15             I can say as it relates to OECS, that I

16    have not been asked to do that.  And my

17    understanding is the Department of State was not

18    asked to do that for HB 1205.

19         Q    Do you know if OECS has done that in the

20    past?

21         A    I do not, other than as it relates to

22    HB 1205, which OECS did not advise the legislature

23    on that.

24         Q    Is it your understanding that OECS has in

25    the past provided assistance to the legislature, or

1    do you have no idea?

2         A   With regard to other laws?

3         Q    Yeah, with regard to other laws that's

4    been developed in the legislature.

5         A   I'm not aware.

6         Q   Outside of OECS's December and January

7    reports, what, if any, communications, either

8    written or oral, has the department, including OECS

9    and its staff, had with the legislature or the

10   governor and their respective staffs about HB 1205

11   either before or after its enactment?

12         MR. RABAN:  I am going to object on

13         privileged information and communication with

14         the Governor's Office, and instruct my client

15         not to answer any questions regarding that

16         communication.

17   BY MR. SHAPIRO:

18         Q    Okay.  To the extent you can answer that

19   question and their communications outside -- that

20   does not relate to communications with counsel, if

21   you can answer that question.

22         A    Could you please repeat the question?

23         Q    Certainly.  Outside of OECS's December and

24   January reports, what, if any, communications,

25   either written or oral, has the department,

SOS REPRESENTATIVE JILLIAN PRATT

1    including OECS and its staff, had with the

2    legislators or the governor and their respective

3    staffs about HB 1205, either before or after its

4    enactment?

5        A    I am not aware of any conversations or

6    communications that we had with the legislature

7    during that time frame or any time frame about

8    HB 1205.

9        Q    So it's your testimony, if I understand it

10    correctly, that OECS, outside of these two reports,

11    did not provide any technical assistance, analysis,

12    at all of the impacts of HB 1205 or any feedback to

13    the legislature, is that correct?

14        A    That's correct.  The only caveat that I

15    will give is that I think in March of 2025, OECS did

16    file an additional, like, supplement to its report

17    by an expert.

18            But apart from that, OECS did not provide

19    any other feedback to the legislature about HB 1205.

20    And I don't believe that report had anything to say

21    about HB 1205.  But I just wanted to be clear

22    between that and then the other two reports that

23    referenced, that is all of OECS's communications to

24    the legislature.

25        Q    Got it.  Thank you for that.

1              I want to get a better sense of the type

2      of circulators your agency typically prosecutes for

3      initiative petition fraud.

4              You highlighted 14 paid petition

5      circulators.  When I say you, I mean the department,

6      OECS, highlighted 14 paid petition circulators who

7      was engaged in some type of initiative petition

8      fraud in OECS's January 2015 report, is that

9      correct?

10          A   We did highlight a number of individuals

11     that were prosecuted as a result of OECS referring

12     those cases to law enforcement.  But to be clear,

13     OECS does not prosecute any individual.

14          Q   Thank you for that clarification.

15              Now while the prosecutions of these

16     individuals were tied to just a few petitions, I

17     believe most, if not all, of them had been involved

18     in circulating well over a hundred petitions; is

19     that right?

20          A   I'm sorry, could you repeat that?

21          Q   Yeah.  So I am referring to the list, that

22     group of individuals who you referred for

23     prosecution and are discussed in the January 2015

24     report.

25              While the prosecutions themselves are tied

1    to and relate to just a few petitions, the

2    circulators that you are discussing in the report

3    who were referred and then prosecuted, am I correct

4    those individuals were circulating well over a

5    hundred petitions, that these are repeat offenders

6    who are circulating lots and lots of petitions?

7         MR. RABAN:  Object to form, but you can

8    answer.

9         A    I believe generally that is the case, that

10   those that we referred were suspected of committing

11   fraud against more -- more people than they were

12   actually prosecuted for.

13   BY MR. SHAPIRO:

14        Q    Is it fair to say that the 14 individuals

15   that are detailed in the January report circulated

16   well over a hundred petitions?

17        A    Yes, it is.

18        Q    What would you say was the average number

19   that these circulators were involved in circulating?

20        A    I would be speculating on the number.

21   From what I recall, I know that some of the most

22   egregious offenders could have upwards of a thousand

23   petitions that we suspected were fraudulent.

24        As far as circulating, they did circulate

25   thousands of petitions overall.

SOS REPRESENTATIVE JILLIAN PRATT

1      Q   All of the individuals that you are

2    highlighting in your January report who were

3    referred for prosecution, am I correct they were all

4    paid petition circulators?

5      A   Yes, I believe they were.

6      Q   What evidence is there in those reports

7    that there is a significant number of volunteer

8    circulators engaging in fraud?

9        MR. RABAN:  Object to the form.

10       You can answer.

11       A   I'm not sure if we discussed it in the

12    report because those that you are talking about were

13    paid petition circulators.  However, we do have a

14    number of referrals that we made to law enforcement

15    for volunteers, who were not paid.

16    BY MR. SHAPIRO:

17       Q   Is there any evidence in the report

18    related to volunteer circulators engaging in fraud?

19       A   I don't recall.  I would have to look

20    specifically at the report to see if we mentioned

21    it.  But I know at that time we did have a number of

22    volunteer petition circulators that, while we

23    couldn't necessarily identify the circulators

24    themselves, we had evidence of fraud committed by

25    volunteers.

24

SOS REPRESENTATIVE JILLIAN PRATT

1      Q    Turning to the HB 1205 itself, the statute

2    prohibits a person from collecting, delivering or

3    otherwise physically possessing more than 25 signed

4    petition forms other than their own or those of

5    immediate family members, unless the person is

6    registered as a petition circulator with the

7    Secretary of State.

8           Are you familiar with that language in

9    that statute and with that provision?

10      A    I am, yes.

11      Q    And what's your understanding of the

12    purpose of this provision in particular?

13      A    My understanding of the purpose of that

14    provision is laid out in our filings.  It's also

15    laid out in the whereas clauses of the statute

16    which, my understanding, overall is to prevent fraud

17    and to uphold the integrity of the electoral

18    process.

19      Q    So your understanding is this particular

20    provision, as opposed to the whole statute, but this

21    particular provision is that it principally relates

22    to fraud, addressing fraud and preserving the

23    integrity of, you said, the election system; did I

24    get you right on that?

25           MR. RABAN:  Object to the form.

1          A    Yes, that's correct.

2     BY MR. SHAPIRO:

3          Q    So you mentioning fraud, did OECS conduct

4     any studies, analysis or projections regarding the

5     likely impact of this provision either before or

6     after HB 1205 was enacted?

7          A    No, we did not.

8          Q    What evidence or data do you have that

9     registration of volunteers will prevent initiative

10    petition fraud?

11         A    As I said before, we have evidence of

12    volunteers in the past who we believe to have

13    committed fraud, but we were unable to identify them

14    because they were volunteers and, therefore, they

15    had not been registered with any sponsor.

16              So I think that having this new provision

17    gives OECS the ability to to know who is actually

18    distributing these petitions, if it's over 25 in

19    addition to themselves and their family members.  So

20    I think that's one way that we would be able to

21    identify and then potentially deter fraud in the

22    future.

23         Q    So you mentioned that prior to the

24    enactment of HB 1205, you were aware of some

25    volunteers engaging in petition fraud, is that

1        correct?

2            A    That's what we believe, yes.

3            Q    That's what you believe.  What do you mean

4        by that?

5            A    So there are different kinds of evidence

6        indicating fraud, but we had a number of volunteer

7        petitions that appeared to be in the same

8        handwriting, with the same pen, indicating that it

9        was the same person who had signed multiple

10       petitions.  Those signatures did not match the

11       registered voters' signatures that we had on file.

12               And so given all of that, we did suspect

13       that there was some fraud going on with volunteer

14       petitions.  We know that even though it is unlawful,

15       sometime petition circulators are paid per petition,

16       and we suspected maybe that was a reason why

17       volunteers were circulating fraudulent petitions.

18           Q    How many individuals did you suspect of

19       committing this type of fraud?

20           A    The problem with the volunteer petitions

21       is that we didn't know who were circulating them, so

22       I couldn't give you a number as to how many people

23       we thought could be involved.

24           Q    You said that you had identified at least

25       one individual with a handwriting that was

1    suspicious to you in some way.

2         My question is, was it just that one

3    individual or were there others that you had

4    identified?

5         A    We haven't been able to identify anyone.

6    However, we made, I think, about 80 volunteer

7    referrals within this past year.

8         Q    Let's go back to, again, I am asking you

9    prior to the enactment of the bill, how many

10   individuals had you identified at that point who

11   were volunteers that you suspected of petition

12   fraud?

13        MR. RABAN:  Object to form.

14        A    Like I said, we didn't know how many

15   individuals.  I can say it was more than one.    I

16   would say about, most likely, it appeared to be

17   several, but it could be -- it could be as few as

18   one.

19         We had no idea because they were volunteer

20   forms, so they didn't say on the form who was

21   distributing them.

22   BY MR. SHAPIRO:

23        Q    Your office has a practice of opening

24   preliminary criminal investigations into individuals

25   you suspect of engaging in petition fraud, correct?

25

SOS REPRESENTATIVE JILLIAN PRATT

1              MR. RABAN:  Object to form.

2         A   Correct.

3    BY MR. SHAPIRO:

4         Q   Had your office opened up any preliminary

5    criminal investigations into volunteer petition

6    circulators prior to the enactment of HB 1205?

7         A   Yes, we had.

8         Q   How many?

9         A   I believe upwards of 50.  It's anywhere

10   between that 50 and 80 number that I gave you

11   earlier, because all of those referrals of

12   volunteers, I believe, were made prior to the

13   passage of HB 1205.

14        Q   And do you know if any of those

15   individuals that you referred were charged with any

16   type of petition-related crime prior to enactment of

17   HB 1205?

18        A   For the volunteer forms that we referred,

19   no one was arrested, no one was prosecuted because

20   no one could be identified as the person who -- or

21   persons who distributed those petitions.

22        Q   Okay.  Let me represent to you that

23   sponsors, third-party organizations assisting

24   sponsors with ballot initiatives effort, have

25   testified in this case that because of this

SOS REPRESENTATIVE JILLIAN PRATT

1       provision related to requiring volunteers to

2       register if they are circulating more than 25

3       petitions, that they were required to end volunteer

4       petition calculation programs entirely and shift to

5       a distribution-only model in which volunteers

6       provide petitions to voters but do not collect them.

7               Were you aware of that testimony?

8       A    No, I was not.

9       Q    Prior to enactment or implementation of

10      this provision, did you or anyone else in the

11      department anticipate that its effect could be to

12      eliminate volunteer petition collecting activities?

13              MR. RABAN:  Object to form.

14      A    I'm sorry, could you repeat that question?

15      BY MR. SHAPIRO:

16      Q    Sure.  Prior to enactment of

17      implementation of this provision, did you or anyone

18      else in the department anticipate -- strike that.

19              Prior to enactment of implementation of

20      this provision, did you anticipate that its effect

21      could be to eliminate volunteer petition collecting

22      activities?

23      A    The department didn't anticipate that

24      happening because the department isn't the one that

25      actually wrote the bill.  So we weren't anticipating

SOS REPRESENTATIVE JILLIAN PRATT

1       anything.  We didn't know what the legislature was

2       going to do.

3            Q    Does your office know whether other states

4       have volunteers?

5                MR. RABAN:  Object to form.

6            A    I'm sorry, you cut out a little bit.

7       Could you repeat that?

8       BY MR. SHAPIRO:

9            Q    Sure.  Does your office know whether other

10      states have registered volunteers?

11               MR. RABAN:  Same objection.

12           A    My office is unaware of how other states

13      operate their constitutional amendment initiative

14      process.

15      BY MR. SHAPIRO:

16           Q    Has OECS issued any guidance on how it's

17      going to interpret this provision, including what it

18      means to be physically possessing more than 25

19      signed petition forms?

20           A    OECS has not issued any guidance.

21           Q    Is it OECS that would typically be the

22      office responsible for issuing guidance on these

23      issues?

24           A    The department would be responsible for

25      issuing guidance.  I think that it would probably be

SOS REPRESENTATIVE JILLIAN PRATT

1      done through the General Counsel's Office or the

2      Division of Elections, jointly, together, or with

3      the OECS.  And it would be done through the advisory

4      opinion process.

5          Q    Okay.  So, am I correct no component of

6      the department has yet issued guidance on this

7      provision?

8          A    Correct, as far as I know.  I know that

9      there is a training that each petition circulator

10     must take before they become registered as a

11     petition circulator.

12          I know Maria Matthews was involved in

13     designing that training, and so she would be more of

14     the person to be able to answer whether or not that

15     was addressed in the training.

16          Q    And do you know if the department is

17     planning on issuing any form of guidelines in the

18     future?

19          MR. RABAN:  Object to the form.

20          A    I am not aware of any.

21     BY MR. SHAPIRO:

22          Q    I have a hypothetical for you.  A person

23     attends a neighborhood meeting where petition forms

24     are being signed.  At the end of the meeting,

25     several attendees hand the person their signed forms

1    for safekeeping, while chairs are being put away.

2    For brief periods, the person is physically holding

3    more than 25 signed petition forms.  The person is

4    not registered as a petition circulator.  That's the

5    hypo.

6         Under HB 1205, the registration provision,

7    does that brief physical possession exceed what the

8    statute permits?

9         MR. RABAN:  Object to form.

10         A    I can say that OECS, again, is not

11    responsible for prosecuting individuals.  So

12    ultimately, it would be up to the prosecutors to

13    determine whether or not something like that would

14    be a chargeable offense.

15         I can say that OECS would not refer

16    something like that where it was only -- I don't

17    know what physical possession even means in that

18    circumstance.  Did they -- did that person have it

19    in hand?  Were they just on a chair?  I think I

20    would need more facts.

21    BY MR. SHAPIRO:

22         Q    Yeah, we are back in law school with

23    hypos.  How would OECS then decide -- strike that.

24         How does OECS interpret that particular

25    language in the statute that relates to physical

1       possession?

2           MR. RABAN:  Object to form.

3           A    It would be physical possession of more

4       than 25 petition forms for the same amendment,

5       within the same election or, I guess, election year.

6       So it would be, I guess, possessing more than 25, in

7       addition to your own and your own family members for

8       the same petition, for the same amendment, in that

9       same time frame of an election.

10      BY MR. SHAPIRO:

11          Q    How long would someone have to be in

12      physical possession of 25 or more petitions to be,

13      in the opinion of OECS, violating the statute?

14          MR. RABAN:  Object to form.

15          A    Again, that would be ultimately a question

16      for prosecutors as to whether or not someone has

17      violated that statute.

18      BY MR. SHAPIRO:

19          Q    You do have a standard for referral,

20      right?

21          A    We do, yes.

22          Q    And is your standard for referral based on

23      your understanding of what constitutes a violation

24      of the law?

25          MR. RABAN:  Object to form.

SOS REPRESENTATIVE JILLIAN PRATT

1        A    Yes.  And often what we will do is we'll

2     talk to law enforcement and prosecutors to get their

3     understanding of what a violation would be, because

4     we don't want to refer something if ultimately it's

5     not considered a violation of the law by

6     prosecutors.

7     BY MR. SHAPIRO:

8        Q    So you need to make some sort of

9     determination as to what you think is a violation

10     before you refer -- before you refer a matter,

11     correct?

12        A    Correct.

13        Q    Okay.  So in that context, I'm asking you

14     again, what would you -- you and your office --

15     consider to be a violation of the physically

16     possessing language in this particular provision?

17          MR. RABAN:  Object to form.

18        A    Because it would be physically possessing

19     forms, so it would be within their direct control as

20     opposed to someone else's.

21     BY MR. SHAPIRO:

22        Q    How long would someone have to physically

23     possess petitions for there to be a violation of

24     this provision?

25          MR. RABAN:  Object to form.

SOS REPRESENTATIVE JILLIAN PRATT

1      A   The statute just says physically possess.

2      It doesn't give a time frame.

3      BY MR. SHAPIRO:

4      Q   So in your view, at what point would you

5      consider this to be a violation?

6      A   When someone physically possesses, when

7      it's within their own direct control, more than 25

8      forms in addition to their own and their own

9      immediate family members.

10     BY MR. SHAPIRO:

11     Q   I am asking you to give me a time period;

12     specifically possessing it for five minutes, an

13     hour, two days?

14         MR. RABAN:  Object to form.

15     A   Again, I think ultimately it's up to the

16     prosecutor as to whether or not someone has violated

17     that and committed a crime.

18         If you are asking my personal opinion as

19     to physical possession, then that would be

20     possession for any time frame, as long as it's

21     within their direct control.

22     BY MR. SHAPIRO:

23     Q   Any time frame?  So any time frame

24     potentially could be a situation where you are going

25     to be referring that to law enforcement for

SOS REPRESENTATIVE JILLIAN PRATT

1        prosecution?

2                MR. RABAN:  Object to form.

3            A    Potentially.  But again, since we aren't

4        the ones who make the decision as to whether or not

5        to prosecute, you know, a referral is just that.  We

6        are letting law enforcement know what we think may

7        be a violation.  Ultimately the prosecutor will make

8        the decision as to whether or not to charge someone.

9        BY MR. SHAPIRO:

10            Q    Understood.  I am just interested in your

11        understanding in the first instance in terms of what

12        you think is appropriate for referring for

13        prosecution based on your understanding of the

14        statute.

15                MR. RABAN:  Is that question, Counsel?

16                MR. SHAPIRO:  I am trying to formulate

17            another question.  I think we may have

18            exhausted this area.  I am going to move on.

19        BY MR. SHAPIRO:

20            Q    Ms. Pratt, section 100.371, subsection

21        (4)(b)1 as amended by HB 1205, prohibits a person

22        from collecting signatures or initiative petitions

23        if he or she has been convicted of a felony and has

24        not had his or her rights to vote restored.  Are you

25        familiar with that provision?

1         A   I am, yes.

2              Q   And I should note at this time I may be

3     referring to individuals convicted of a felony as

4     returning citizen, and for convenience we'll be

5     referring to this provision as the returning citizen

6     ban.  Is that understood?

7              A   I'm sorry, the returning citizen ban?

8              Q   Yeah.  I am going to refer to what I

9     just -- the provision I just described to you as the

10    returning citizen ban.  Does that work for you?

11             A   Just to clarify, that's the felon

12    provision that you just read, correct?  Yes, that

13    works.

14             Q   Okay.  Great.  Prior to enactment of

15    HB 1205, did the department share any information or

16    data with the legislature showing that returning

17    citizens who have not had their rights restored were

18    more likely to commit fraud while gathering

19    petitions?

20             A   OECS submitted the reports to the

21    legislature.  I don't know if it specifically

22    addresses that, but we did include a number of

23    referrals that we made having to do with felons who

24    were violating election law.

25             Q   Would you repeat the last part of that

1        answer.

2            A    Sure.  In those reports, we did include a

3        number of individuals who were referred to law

4        enforcement because they were felons who whose

5        rights had not been restored and were violating the

6        election law by either registering to vote or by

7        voting.

8            Q    Do you know how many individuals you are

9        referring to?

10           A    I don't recall how many individuals we

11        referred.

12           Q    And do you know if any of those

13        individuals had convictions for crimes that did not

14        deal with dishonesty or deceit?

15           A    Yes, some of them were not crimes of

16        dishonesty or deceit.

17           Q    How many individuals?

18           A    I don't recall numbers.  I know for this

19        year, we have referred approximately 50 felons who

20        either registered to vote or voted, and some of

21        those were for crimes of dishonesty and some of them

22        were not.

23           Q    Okay.  So we are jumping ahead a little

24        bit.  This is post enactment, is that what you're

25        describing?

1     A   Pre and post, it's throughout this past

2   year.

3        Q   Okay.  So pre-enactment, how many

4   individuals who were convicted of felonies that did

5   not involve dishonesty and deceit were brought to

6   the attention of the legislature?

7        A   I don't recall.  I would have to rely on

8   what is stated in the reports.

9        Q   Nothing outside of the reports was brought

10   to the attention of the legislature, is that fair?

11        A   That's correct.

12        Q   Does the department have any reason to

13   believe or any evidence to suggest that individuals

14   convicted of felonies who have had their voting

15   right status restored are either more or less likely

16   to commit petition fraud than those convicted of

17   felonies whose rights have not been restored?

18        A   Well, in order to have your rights

19   restored as a felon, you either have to have

20   completed the terms of your sentence or, in cases of

21   murder or felony sex offenses, you have to have

22   received clemency from the clemency board.

23        And I think in either situation, one, when

24   you completed the terms of your sentence, you have

25   shown that you are attempting to either make amends

1    for what you have done, or at least to participate

2    in the legal process in a way that, you know, you

3    want your rights restored.

4         And for those whose have received

5    clemency, the board has looked at a number of

6    different factors.

7         So I think -- there is no -- we haven't

8    done any studies on whether or not felons whose

9    rights have been restored are more or less likely to

10   commit petition fraud.  But I do think felons who

11   had their rights restored have a better chance of

12   following the law because they have already followed

13   the law with regards to completing the terms of

14   their sentence.

15        Q   Do you have any reason to believe that --

16   do you have any reason to believe if the returning

17   citizen has completed their sentence, that they

18   would still be more likely to commit an offense in

19   the future than a returning citizen who had their

20   rights restored; is that a meaningful difference?

21        MR. RABAN:  Object to form.

22        A   Maybe because a difference between felons

23   who had rights restored and those who have not,

24   those who had their rights restored, like I said,

25   have either completed the terms of their sentence,

 1    which could include prison, it could include

 2    probation, fines and fees.  So if they have

 3    satisfied all of that, or if they satisfied the

 4    clemency board that they are deserving of clemency,

 5    then they've already shown that they are more likely

 6    to follow the law in that respect.

 7         There have not been any studies as to

 8    whether felons whose rights have been restored or

 9    more likely or less likely to commit fraud than

10    those who have not had their rights restored.

11         Q    Does the department know how many

12    returning citizens in Florida who are barred from

13    working in -- are barred from working as circulators

14    because of the HB 1205 ban?

15         A    Just to clarify, returning citizens are

16    those who are felons whose rights have not been

17    restored, is that correct?

18         Q    Correct.

19         A    No, I am unaware of the number of

20    individuals that would be impacted by HB 1205 in

21    that situation.

22         Q    And does the department know the number of

23    returning citizens in the United States who are

24    barred from working as circulators in Florida for as

25    long as this provision remains in effect?

1          A    So you are asking me -- I'm sorry, I am

2     just trying to understand the question.

3              Are you asking for the number of felons

4     whose rights have not been restored who are

5     registered petition circulators?

6     BY MR. SHAPIRO:

7          Q    I am trying to get a sense as to the

8     number of individuals in the country who are not

9     going to be able to have the opportunity to work as

10    circulators, if they so wish, in Florida because of

11    this particular ban.  Is that something --

12         A    I'm sorry, I am not --

13         Q    I'm sorry, I talked over you.  What did

14    you say?

15         A    I'm sorry, I talked over you.

16         Q    So if you can repeat your last answer.

17         A    I would say, I am so sorry, I talked over

18    you.

19         Q    If I understand you correctly, you have

20    not -- the department has not attempted to determine

21    how many people in the country may be affected by

22    this particular provision, is that correct?

23         A    That's correct.

24         Q    You mentioned earlier that since

25    enactment, there's been more individuals who have

1    been potentially affected by this provision who are

2    now not able to circulate petitions, is that

3    correct?

4              MR. RABAN:  Object to form.

5         A    I'm sorry, could you repeat that question?

6    BY MR. SHAPIRO:

7         Q    Yeah.  You mentioned earlier that there

8    were individuals who had been referred to law

9    enforcement post enactment of this bill who have

10   felony convictions in their past, correct?

11        A    Correct.

12        Q    And how many?

13        A    Since enactment, I would say approximately

14   30 or so.  To be clear, those are felons who have

15   been referred for violating the election code in

16   some way, not necessarily for petition fraud alone.

17        Q    And have you referred individuals for

18   prosecution for violating this provision that

19   prohibits returning citizens from working as

20   petition circulators?

21        A    No, I have not.

22        Q    Have there been any referrals relating to

23   this particular provision?

24        A    I don't believe so, not as of yet.

25        Q    Have there been any preliminary criminal

SOS REPRESENTATIVE JILLIAN PRATT

1     investigations opened up?

2          A   Not that I am aware of, no.

3          Q   What can you tell me about how the

4     department will go about enforcing this provision

5     going forward?

6          A   Well, I believe that when someone applies

7     to become a petition circulator, they are asked if

8     they are a felon and if their rights have been

9     restored.

10          And so if someone answers yes, I am a

11     felon but my rights have not been restored, then

12     they will not become a petition circulator.

13          However, if this is anything like we've

14     seen with registering to vote, I think that it's

15     likely that we'll see people who say either, I am

16     not a felon or my rights have been restored when

17     that, in fact, is not true.

18          The way we would find out about that,

19     there is a lot of different ways that we receive

20     complaints, but it could be from a member of the

21     public, it could be from someone who works with the

22     petition circulator, it could be one of the

23     supervisors of elections, it could come in a number

24     of different ways.  But then we would look to see if

25     someone has lied on the form when they registered to

SOS REPRESENTATIVE JILLIAN PRATT

1    become a petition circulator.

2        Q    Moving on.  HB 1205 also prohibits a

3    person from collecting signatures or initiative

4    petitions if the person is not a citizen of the

5    United States.  Are you familiar with that

6    provision?

7        A    I am, yes.

8        Q    Okay.  For convenience, I may refer to

9    that provision as the noncitizen ban, is that okay?

10       A    Yes, it is.

11       Q    What, if any, evidence, data or analysis

12   has the department developed or is the department

13   aware of that indicates banning all noncitizens from

14   circulating more than 25 petitions combats fraud or

15   increases transparency?

16       A    Something that we found in investigating

17   noncitizens, is that typically noncitizens and

18   nonresidents, for that matter, they can be harder to

19   track down than someone who does not have any ties

20   to another state or to another country that remains

21   in Florida.  So when we do have someone that we

22   suspect of committing fraud and we refer it to law

23   enforcement, we have seen law enforcement have

24   trouble tracking down and then eventually

25   prosecuting individuals who have left the state or

SOS REPRESENTATIVE JILLIAN PRATT

1    who are transient.

2        Q    Okay.  I guess that relates to the

3    difficulties you may have in prosecuting one type of

4    individual versus another type of individual.  My

5    question was slightly different.

6        I was asking whether there is any data, or

7    not, or evidence that suggests that noncitizens are

8    more likely to commit fraud than citizens?

9        A    I am not aware of any data that would

10    suggest that a noncitizen is necessarily more likely

11    to commit petition fraud, but we do have a number of

12    referrals of individuals who are noncitizens who

13    have registered to vote or who have voted illegally,

14    and so we have seen a number of noncitizens who have

15    committed fraud within elections.

16        Q    Presumably you also have examples of

17    citizens who committed fraud as well, right?

18        A    We do.

19        Q    Does the department have any evidence

20    suggesting that it's more challenging to prosecute

21    legal permanent residents for petition fraud than

22    U.S. citizens?

23        A    Not specifically with petition fraud, no.

24        Again, for those who are not citizens, it

25    is -- we have seen that it's more difficult

1    sometimes to identify where those individuals are

2    and to track them down, which prevents both

3    investigation and then future prosecutions.

4        Q    Just to be clear, when you are referring

5    to noncitizens who are challenging to, as you put

6    it, track down, you are not referring to legal

7    permanent residents who are not citizens, correct?

8        A    Right then I was referring to anyone who

9    is not a citizen, which would include long-term

10   permanent residents or anyone else who has not

11   become a U.S. citizen; so those who are here

12   legally, but those who have not gained citizenship.

13       Q    Let me see if I understand you correctly.

14   Are you saying that individuals who are here

15   legally, who are permanent legal residents, that you

16   have data to suggest that it's more challenging to

17   prosecute them than it is citizens?

18       A    I don't have data.  Like I said, we

19   haven't done any studies or analysis like that.  But

20   I do know that we have had situations where, you

21   know, long-term permanent residents are more

22   difficult to track down because they could be --

23   they may not have necessarily the same connections

24   to the state, or they have connections to other

25   areas.

1          So I think part of it is just, in looking

2     at it, someone who is a citizen here, who grew up

3     here, who doesn't have any connections to another

4     country, they are less likely to leave the country,

5     for example, and have someone to, you know, stay

6     with or those connections, than someone who does

7     have those ties outside of the United States.

8          Q    Does the department know how many

9     preliminary criminal investigations has been opened

10    up on petition circulators who are legal permanent

11    residents?

12         A    I don't have an answer for that, no.

13         Q    What steps is the department taking to

14    enforce this particular provision?

15         A    I am trying to remember if this provision

16    has been -- is still -- if it's actually being

17    enforced as of yet.  I know that things were put on

18    a hold for quite a while and, for some reason, from

19    what I can recall, this provision -- I am trying to

20    remember.

21         If it has gone into effect, if it has

22    indeed gone into effect, we would handle it the same

23    way I explained that we would handle felons who

24    answered the question, are you a felon whose rights

25    have been restored.

1        There will be a similar question on an

2     application to become a circulator to noncitizens

3     asking whether or not they are a U.S. citizen.  If

4     they answer no, then if the law has gone into

5     effect, they would not become a registered

6     circulator.

7        If they answer, yes, which if it turns out

8     that they are indeed not a U.S. citizen, then if we

9     become aware of it, then we would look into it and

10    see if there is sufficient evidence that that person

11    is not a citizen and that they did lie on their

12    application.  And then we would refer that to law

13    enforcement.

14       Q   Will the department be looking behind the

15    answers in the petition forms to determine whether

16    individuals are, in fact, noncitizens?

17       A   Can you explain what you mean by that?

18       Q   You just, if I understand you correctly,

19    you said that individuals who want to be circulators

20    are going to be affirming whether they are a citizen

21    in order to be able to register and circulate

22    petitions, and then you are going to look for that

23    form.

24       I am wondering are you going to look

25    behind their affirmance that they are citizens and

1      investigate in some way to determine whether they

2      are citizens, or are you just going to rely on what

3      they state in their petition?

4          MR. RABAN:  Object to form.

5          A    As far as OECS goes, in making criminal

6      referrals, then we very well could look at those

7      forms and then try to determine whether or not those

8      people are citizens before referring them.

9              As far as whether or not someone would

10     become registered, that's more of a question for the

11     division.

12     BY MR. SHAPIRO:

13         Q    When are you going to decide that you are

14     going to investigate whether someone is, in fact, a

15     citizen?

16         A    Typically we start investigating if we

17     received a complaint.  And like I explained before,

18     complaints can come from a number of different

19     sources.

20             We look at whatever is listed in the

21     complaint.  We do research to determine whether or

22     not that person is a citizen, which involves using a

23     Florida database, a federal database, speaking to

24     federal investigators, before we would ever make a

25     referral to law enforcement.

1       Q    Typically it's a complaint that triggers

2    additional investigation, is that correct?

3       A    Typically, yes.  There are some that are

4    internally generated.  And when I say internally

5    generated, I mean that OECS looks at different data

6    that we have and compares it -- like, for example,

7    we get lists of people who have newly become felons

8    and we'll compare that against, like, the list of

9    registered voters.  At least that's what the

10   division would do.

11          And then later on, we would compare it to

12   lists of people who have since registered to vote or

13   those who have voted since becoming a felon.

14      Q    Sorry, I talked over you.

15          Is it possible that you would try to

16   obtain, like, a list of legal permanent residents, a

17   database of legal permanent residents, and compare

18   that with data you have on individuals who are

19   trying to register as petition circulators?

20          MR. RABAN:  Object to form.

21      A    It is possible, yes, for OECS to do that

22   and then make referrals to law enforcement.

23   BY MR. SHAPIRO:

24      Q    And is it possible -- strike that.

25          And would the department consider

1      obtaining a list of individuals who are here on

2      temporary visas and comparing that with a list of

3      individuals who registered to be petition

4      circulators?

5          A   Yes, it is.

6          Q   Has the department issued any guidance to

7      sponsors as to what they should do to ensure

8      circulators working on their behalf complied with

9      this provision?

10         A   I am not aware of any guidance.

11         Q   Is it planning to do so?

12         A   I'm not aware of any guidance that the

13     department plans to issue, but I think that would be

14     more of a Division of Elections decision than OECS.

15             OECS would only be giving guidance to

16     individuals if they wanted to know whether or not we

17     considered something to be a crime.

18             So if we got a call from someone who said,

19     hey, I am thinking about registering but I am not a

20     U.S. citizen, is it okay if I register -- which we

21     haven't gotten any questions like that, but OECS

22     would be more apt to answer that than whether or not

23     they are from sponsors.

24         Q   Since HB 1205 took effect, how many

25     investigations has the department initiated or

1    participated in concerning alleged violation of the

2    ban on noncitizens working as circulators?

3        A    I believe one.

4        Q    Is that a case where there's a preliminary

5    criminal investigation that's been opened?

6        A    I'm sorry, could you repeat that for me?

7        Q    Did your office open a preliminary

8    criminal investigation into that case?

9        A    Yes, I believe so.

10        Q    Did you refer the case for criminal

11    prosecution?

12        A    Yes, I believe we did.

13        Q    And what were the circumstances

14    surrounding that case?

15        A    Without giving too much detail, I believe

16    it was a noncitizen who had registered as a petition

17    circulator.

18        Q    How did you identify that individual as a

19    noncitizen?

20        A    The way that we identify, we look through

21    the Florida database called DAVID; it's through the

22    Florida Department of Highway Safety and Motor

23    Vehicles.  And that will give us not necessarily the

24    entire answer, but will kind of give us the

25    beginning of looking into whether or not someone is

1          a citizen.

2                  So it will list what the Department of

3          Highway Safety and Motor Vehicles, what they know

4          about this person's citizenship.

5                  If it is someone who's a U.S. citizen, it

6          says U.S. citizen and typically our search will stop

7          there.

8                  If it says that someone is anything other

9          than a U.S. citizen, it will provide what is called

10         an A number, an alien number, that we can then use

11         to look through another database, which is called

12         the SAVE database, and that is through the federal

13         government.

14                 And the federal government is going to

15         have the best knowledge as to whether or not someone

16         is a citizen.  They will provide that.

17                 And then if that person is not a U.S.

18         citizen, we will then eventually make a referral,

19         with the caveat that we ask law enforcement to

20         continue looking into that person's A file, is what

21         it's called -- their alien file -- to make sure that

22         person indeed isn't a citizen, because citizenship

23         can be -- can happen so quickly.  You know, someone

24         can be naturalized within a moment, and we want to

25         make sure that someone who is a U.S. citizen is not

1     arrested, not -- you know, that they are not looked

2     into any further.

3          Q    Since implementation of this provision,

4     has the department attempted to measure the effect

5     of the provision on campaigns and the initiative

6     process?

7               MR. RABAN:  Object to form.

8          A    No, I am not aware of any attempts to do

9     that.

10    BY MR. SHAPIRO:

11         Q    I would like to, if we can get through one

12    more provision and take a break, if that works for

13    you, Ms. Pratt.

14         A    Yes, it does.

15         Q    Okay.  I would now like to discuss

16    HB 1205's ban on nonresidents collecting signatures

17    on initiative petitions.  Are you familiar with that

18    provision?

19         A    Yes, I am.

20         Q    I am obviously getting tired.

21              Do you know what purpose this residency

22    requirement was intended to serve?

23              MR. RABAN:  Object to form.

24         A    I believe the purpose, first, I would say

25    is laid out in our papers that we filed and, of

1    course, in the whereas clause by the legislature.

2        But my understanding is that it was to

3    prevent fraud and to uphold the electoral process.

4    BY MR. SHAPIRO:

5        Q    What evidence, information or data in the

6    two OECS reports indicate that nonresidents are

7    engaging in petition circulator fraud?

8        A    I have to rely on what is written in those

9    reports.  I know that we have certainly had

10    noncitizens -- I mean nonresidents who have been

11    involved in petition fraud, particularly people who

12    come into the state just for the purpose of

13    circulating these petitions and then go to another

14    state to circulate petitions for that state.

15        Q    Do the two OECS reports, the December and

16    January report, document any instances or examples

17    of nonresident petition circulators being prosecuted

18    for petition fraud?

19        A    I believe so.  I would have to look at the

20    reports to be sure, because I know that there were a

21    number of nonresidents that had been referred and

22    that were prosecuted.  I am just trying to recall

23    whether or not we listed them in the report.

24        Q    If you could identify what those instances

25    were, maybe during the break, it would be helpful if

1    you could identify any citizen, nonresident petition

2    circulator, actually being prosecuted for petition

3    fraud.  Okay?

4         A    Are you asking for their names?

5         Q    No, where in the report are they

6    identifying those who are nonresidents who have been

7    prosecuted for petition fraud?

8         A    I guess I would have to look back at the

9    report.  If you do have it, I would be happy to look

10   through it and let you know.

11        Q    It's kind of a long report, scrolling

12   through it may not work.  Maybe during the break,

13   if --

14             Does counsel or someone else have access

15   to this, because I don't know where in the report

16   there is an example of a nonresident who has been

17   prosecuted for petition fraud.  So that would be

18   news to me.  And I appreciate you identifying where

19   in the report that information is contained.

20        A    As I said, I can't recall whether or not

21   we included those in the report specifically.  Like

22   I said, I am happy to look through and see if we

23   did.  But I know that we did have a number of

24   nonresidents that were referred and I believe have

25   been prosecuted.

1       Q    When you say you have some individuals in

2    mind, are those individuals people who were referred

3    and prosecuted prior to enactment of the bill?

4       A    I believe there have been those from

5    before enactment and after enactment.  That doesn't

6    necessarily mean that those actions done by those

7    individuals were done after the enactment.

8           Sometimes it takes a while for us to get

9    information that someone has committed a crime, so

10   their actions may have taken place before the

11   enactment.  But I know that we have referred

12   individuals both before and after who are

13   nonresidents who were engaged in petition circulator

14   fraud.

15          Q    If I understand you correctly, though, you

16   are not sure if any individuals who are not

17   residents were actually successfully prosecuted and

18   convicted prior to the enactment of HB 1205 for

19   petition fraud, is that correct?

20          MR. RABAN:  Object to form.

21       A    I would, again, have to look back at the

22   reports to determine whether or not that's contained

23   within, but I do know that we have had a number of

24   individuals who are nonresidents who have been

25   engaged in petition circulator fraud that we

1    referred.  Whether or not they were prosecuted or

2    are going to be prosecuted is ultimately up to the

3    prosecutor, it's not up to our office.

4    BY MR. SHAPIRO:

5        Q   And you stated that outside of what has

6    been documented in the two reports, nothing was

7    forwarded to the legislature that relate to this

8    issue, correct?

9        A   Correct.

10       Q   Does your office have any -- does your

11   office believe it's more challenging to investigate

12   or prosecute individuals who are not Florida

13   residents?

14       A   Yes.

15       Q   Why is that?

16       A   So we have had a number of cases where law

17   enforcement has either been unable to identify where

18   an individual is located, or even if they have

19   identified where they are located, it is a process

20   to then get an out-of-state warrant for someone who

21   is out of state.

22            So we have seen a number of nonresidents

23   who have been hard to locate because they don't have

24   an address here in Florida where they reside.

25       Q   In other contexts, Florida does not bar

SOS REPRESENTATIVE JILLIAN PRATT

1    out-of-state individuals from participating in an

2    activity just because there is a risk that they may

3    engage in fraud, isn't that right?

4            MR. RABAN:  Object to form.

5        A    Could you give me some examples?

6    BY MR. SHAPIRO:

7        Q    Sure.  We don't prevent nonresidents from

8    opening a business in Florida because there is a

9    risk that the business may be defrauding people,

10    isn't that right?

11            MR. RABAN:  Object to form.

12        A    I am not aware of anything preventing

13    nonresidents from forming a business here in

14    Florida.

15    BY MR. SHAPIRO:

16        Q    How does law enforcement overcome the

17    challenge of prosecuting out-of-state fraudsters

18    outside the context of petition circulation?

19            MR. RABAN:  Object to form.

20        A    I don't know how they would go about doing

21    that.  I think as far as it relates to petition

22    fraud though, like I said, we have had instances

23    where it has been difficult to interview witnesses,

24    interview potential defendants, to locate them and

25    then to arrest them for petition fraud, just because

SOS REPRESENTATIVE JILLIAN PRATT

1      they do not have a permanent residence here in

2      Florida.

3      BY MR. SHAPIRO:

4          Q    What, if anything, makes petition

5      circulator different from other areas of fraud where

6      the state is able to successfully prosecute

7      individuals who are nonresidents?

8          MR. RABAN:  Object to form.

9          A    My guess is it's harder to prosecute any

10     nonresidents for any crime, but again, that's just

11     my personal opinion.

12         I think the legislature has looked at the

13     petition circulator situation and has determined

14     that it would be appropriate to exclude nonresidents

15     from becoming petition circulators.

16     BY MR. SHAPIRO:

17         Q    My understanding is that prior to HB 1205,

18     paid petition circulators already had to provide an

19     in-state address for service of process and to

20     consent to the jurisdiction of Florida courts, is

21     that right?

22         A    That they have to provide an address?

23     Yes.

24         Q    And do they have to -- did they have to

25     consent to the jurisdiction of Florida when they

1    were doing that, when they were registering?

2         A    I am unaware if they say that they are

3    consenting to the jurisdiction of Florida when they

4    sign up to be a petition circulator.  I was not

5    involved in designing the application or the

6    training to become a petition circulator.

7         Q    And whatever requirements existed before

8    paid petition circulators, that's now applying to

9    all individuals who have to register as petition

10   circulators, whether paid or volunteer, under HB

11   1205, is that correct?

12        MR. RABAN:  Object to form.

13        A    I believe the requirements -- the

14   requirements are different now under HB 1205, but

15   there is not a distinction between registered

16   petition circulators who are paid and those who are

17   unpaid.

18        MR. SHAPIRO:  Okay.  I think we have

19        arrived at a good stopping point.  So maybe we

20        can take five minutes.

21        Counsel, what do you say, how long a break

22   do you need?  Five, ten minutes?

23        MR. RABAN:  Your audio wasn't working when

24   I made an announcement at the beginning of the

25   deposition, but Ms. Pratt has a hard cutoff at

1      2:30.  So she has got a meeting at 3:00.  We've

2      got to be done by 2:30.

3          Let's take a 5-minute break instead of a

4      10-minute break so we can get back to the table

5      as fast as we can.

6          MR. SHAPIRO:  Thank you for that.

7          (A recess took place from 10:39 a.m to

8      10:47 a.m.)

9          MR. SHAPIRO:  Given the technical

10     difficulties and also the discussions we had

11     last week with Ms. Matthews, and the

12     recognition there are quite a few questions we

13     need to pose to Ms. Pratt today, I am wondering

14     whether we should also put aside some time

15     after Ms. Pratt's meeting today to complete

16     this.

17         I have a sense we are going to run out of

18     time, unfortunately.

19         MR. RABAN:  This is Randall, Counsel with

20     Holtzman Vogel for the Secretary.  So do you

21     anticipate needing more time beyond 2:30 today,

22     is that what I am hearing?

23         MR. SHAPIRO:  Yes.  And I am going to try

24     to go as quickly possible.  I have already

25     tried to skip over some material to become

1    conscious of the time that's been lost because

2    of technical difficulties.  But I do have quite

3    a bit of material to cover, and it will run

4    longer.

5        And there may be other questions that

6    other attorneys would like to ask.  One of the

7    challenges, we are not only trying to cover the

8    materials related to questions that were

9    originally directed to Ms. Matthews, now posing

10    to Ms. Pratt; there is another area of

11    questions that I need to have some focus on

12    Ms. Pratt that relates to some of the questions

13    that we originally wanted to pose to Brad McVay

14    who, as you know, were directed by the Court to

15    direct those questions to Ms. Pratt.

16        So there is just a lot of material to

17    cover, unfortunately.  And I would appreciate

18    your indulgence if you could find some time

19    after the meeting as well, it would be greatly

20    appreciated.

21        MR. RABAN:  Avner, I hear you and I

22    understand.  So let me just say this.

23        In terms of the 30(b)(6) corporate

24    representative, we provided Ms. Matthews.

25    Director Matthews was deposed, I think, for

1    around five and a half hours.  And then

2    Ms. Pratt was also being provided as an

3    extension to that 30(b)(6) deposition.

4        Seven hours is the cap, and I think we

5    have been gracious in making accommodations

6    today and providing another five hours for

7    Director Pratt to be deposed.

8        If we are talking about deposing her in

9    her individual capacity, because of the Motion

10   to Quash and the order that that motion was

11   granted, additional time to call her back to

12   the table to ask her more questions in her

13   individual capacity I don't think would be

14   proper either.

15       So I am inclined to say that we likely

16   will oppose any effort to get Director Pratt

17   back to the table for further questioning after

18   the 2:30 mark today.

19       That's my initial gut feeling, is that

20   that will be our position on that.  But I think

21   for the sake of today and to not take more

22   time, I think we should proceed, let's see how

23   much of your material that you can get through,

24   see how much of the material the other

25   attorneys on the call can get through, and then

1    we can have a conversation on whether or not

2    there is a basis to pull Director Pratt back

3    into another deposition.  We can handle that

4    outside of this meeting.

5        MR. SHAPIRO:  Okay.  All right.  Let's

6    proceed then.  And we'll try to pick up on this

7    discussion later.  Thank you.

8    BY MR. SHAPIRO:

9        Q    So we were -- let's move on to the

10    requirements related to disclosures of PII, personal

11    identifying information.

12        HB 1205 has information that relates to

13    disclosure of voter personal identifying

14    information, correct?

15        A    I'm sorry, yes.

16        I don't know exactly what you mean by

17    that.  I do know that when individuals fill out

18    petitions, there is a number -- there are a few

19    things that the department considers PII, namely

20    being the last four of that person's social, their

21    driver's license number, or their ID number,

22    whichever one they put, and the voter's signature as

23    well.

24        Q    Okay.  And that's in addition to the

25    previous ID that had to be provided -- correct --

SOS REPRESENTATIVE JILLIAN PRATT

1        previous PII that had to be provided on the form,

2        correct?

3            A    The signatures were always required, but,

4        yes, the last four of the social and then the

5        driver's license number or ID number, those are

6        additional fields that a voter must fill out.

7            Q    Do you know what the purpose or rationale

8        was to including this new PII provision in the bill?

9            A    As for the purpose, I would rely on what

10       the legislature laid out in its whereas clause as

11       well as any of the legal arguments that we laid out

12       in our papers.

13               But my understanding is that those fields

14       are required in order to better -- better ensure

15       that the individual who is filling out the petition

16       is, in fact, who they say they are.

17           Q    What evidence or data do you have that

18       inclusion of this information will prevent

19       initiative petition fraud?

20               MR. RABAN:  Object to form.

21           A    So in the past, the petitions that were

22       filled out that we believed fraudulently contained

23       information that is publicly available, you know,

24       someone's date of birth and their address typically

25       is publicly available.  The signature should not be

1    publicly available, but we suspect that some people

2    who are filling out these petition forms did have

3    access to some signatures.

4         And apart from that, sometimes signatures

5    can just look similar just by signing someone's

6    name.  For example, my own name, my signature looks

7    very similar to two other Jillian Pratts who are

8    registered voters.

9         Q    Would you agree with this statement, that

10    requiring voters who want to sign a petition to

11    share either their driver's license, state ID number

12    and the last four digits of their social security

13    number, in addition to name, address, county, birth

14    date, or voter reg and signature to anyone who holds

15    themselves as a petition circulator may, in fact,

16    lead to more incidence of fraud overall?

17         MR. RABAN:  Object to form.

18         A    Could you repeat that question, please?

19    BY MR. SHAPIRO:

20         Q    Sure.  Would you agree with the statement

21    that requiring voters who want to sign a petition to

22    share either their driver's license number, state ID

23    number or last four digits of their social security

24    number, in addition to the name, address, county,

25    birth date, or voter registration and their

1    signature with anyone who holds themselves out as a

2    petition circulator may, in fact lead to more

3    incidences of fraud overall?

4        A    I think in one way it reduces the

5    likelihood of fraud, because it ensures the person

6    filling out the petition is who they say they are,

7    because they have the information that is not

8    readily available.

9            I do think that it poses a risk in that

10   that is PII, that is then provided to a petition

11   circulator, and I think that is one of -- probably

12   one of the reasons why the legislature chose to

13   reduce the time that a petition has to be delivered

14   to the supervisor of elections office from 30 days

15   to 10 days of the time it is signed.

16       Q    Has the department's investigated this

17   additional risk and the extent this is an additional

18   risk to voters, that they may be subjected to fraud?

19       A    The department has not done any studies,

20   no.

21       Q    In your December report, you described an

22   audit of the petition verification procedures of

23   three counties where you identified instances of

24   where you believe they validated petitions that

25   shouldn't have been validated, correct?

1        A    Correct.

2        Q    And as I understand the report, during the

3    audit, among other things, OECS identified validated

4    signatures that didn't match the voter registration

5    signatures on file, is that correct?

6        A    That's correct.

7        Q    Can you identify any cases where a

8    circulator was successfully prosecuted for petition

9    fraud after submitting a fraudulent petition

10    containing a signature that, properly assessed,

11    would appear to match the voter's registration

12    signature on file?

13        A    I am not aware of any individual that has

14    been successfully prosecuted for forging a signature

15    that looks similar to the voter's signature, no.

16        Q    If signatures and the other PII the voters

17    have been required to provide prior to enacting

18    HB 1205 could be used to effectively establish

19    whether or not a petition is fraudulent, would there

20    be any need to require voters to provide additional

21    PII?

22        MR. RABAN:  Object to form.

23        A    I'm sorry, could you repeat that question,

24    please?

25

1      BY MR. SHAPIRO:

2          Q    Sure.  If signatures and the other PII

3      that voters have been required to provide prior to

4      enacting HB 1205 could already be used to

5      effectively establish whether or not a petition is

6      fraudulent, would there be any need to require

7      voters to provide additional PII?

8          MR. RABAN:  Same objection.

9          A    So again, I think that the addition of the

10     last four of the social security number and the

11     driver's license number or ID number were included

12     to ensure that whoever is filling out the petition

13     is who they say they are.  And I do think that those

14     fields do help protect against someone filling out a

15     petition fraudulently, because most of the time that

16     information isn't generally known to an individual

17     who is not the person who actually has that social

18     security number or driver's license/ID number.

19     BY MR. SHAPIRO:

20         Q    Has the department explored other methods

21     of making it harder to submit fraudulent initiative

22     petitions that would involve compromising voters --

23     that would not involve compromising voters' valuable

24     PII?

25         MR. RABAN:  Object to form.

SOS REPRESENTATIVE JILLIAN PRATT

1          A   The department hasn't considered any

2      alternatives, because this is not a law that was

3      written by the department, it was written by the

4      legislature.  And we were not asked our opinion on

5      what should or should not be included in the law.

6      BY MR. SHAPIRO:

7          Q   What feedback has the department received

8      about the voter PII disclosure requirements from

9      sponsors, members of the public, supervisors of

10     elections?

11         A   I am not aware of any feedback that we

12     received on that.

13         Q   Since HB 1205 took effect, have there been

14     any cases where circulators have been referred for

15     prosecution or prosecuted for submitting fraudulent

16     petitions where one or more of the petitions in

17     question contains a valid name, address, county,

18     registration, or date of birth where the PII that's

19     now required by HB 1205's PII disclosure provision

20     does not match?

21         A   I am not aware of any.  I do know that we

22     have referred individuals who have engaged in

23     suspected fraud of hundreds of victims, and so I

24     would have to look through each and every one of

25     those petitions to be sure.  But I can't recall any

1    off the top of my head that we referred.

2         Q    I'd now like to move on to what we refer

3    to as the 10-day rule.  HB 1205 also requires

4    sponsors to deliver petition forms to supervisors of

5    elections within 10 days after the voters have

6    signed petition forms.  Under the old rule, the

7    sponsors had 30 days, now it's down to 10 days.  Are

8    you familiar with the new 10-day requirement?

9         A    I am, yes.

10        Q    The statute states that sponsors shall

11   ensure that the petition is promptly delivered to

12   the supervisor of elections in the county in which

13   the voter resides within 10 days after the voter

14   signs the form.  Are you familiar with that

15   language?

16        A    Yes, I am.

17        Q    What constitutes "delivered" for purposes

18   of the statute?

19        MR. RABAN:  Object to form.

20        A    My understanding is that when it is

21   delivered to the supervisor of elections, in however

22   the supervisor has designated that they should

23   receive petitions.

24   BY MR. SHAPIRO:

25        Q    If a petition arrives in a supervisor's

1    P.O. Box on a Friday, and then the supervisor of

2    elections discovers that petition in their P.O. Box

3    on Tuesday, when would your department determine

4    that this petition was delivered, on what day?

5        MR. RABAN:  Object to form.

6        A   I believe the supervisor's office

7    delineates how exactly they should be receiving

8    these petitions.  I am unaware of any supervisor

9    that allows them to sit within a P.O. Box, but my

10   understanding would be if they are within the

11   supervisor's control -- and I think that would

12   include being in the P.O. Box -- that that would

13   mean that it's within their possession at that time.

14       My understanding, though, is that

15   supervisors are requiring delivery to the actual,

16   like, supervisor's location.  I could be wrong about

17   that though.

18   BY MR. SHAPIRO:

19       Q   So how would your office interpret that

20   rule in terms of when it's delivered if a P.O. Box

21   is used?

22       A   If the supervisor permits it to be

23   delivered to the P.O. Box, then my office would look

24   at it and say that it was delivered to the

25   supervisor at the time it was delivered to the P.O.

1        Box.

2            Q    Since HB 1205 took effect, how has the

3        department, and OECS in particular, gone about

4        enforcing the rule, 10-day rule?

5            A    The department, and OECS in particular,

6        has been investigating instances where it appears

7        that petitions were delivered beyond that 10 days.

8        We have not yet issued any fines, but the way that

9        we look at it is there is a stamp and every time a

10       supervisor's office receives one of these petitions,

11       they stamp in the date that they received it.  And

12       then we look at the date that the voter signs the

13       petition and determine whether or not that falls

14       within that 10 days.

15           Q    Do you know why the legislature shortened

16       the timeline from 30 to 10 days?

17               MR. RABAN:  Object to form.

18           A    I would say that if they laid it out in

19       the whereas clause, then that would have been their

20       reason.

21               The reasoning that I can see them doing

22       that is to shorten the amount of time that a

23       petition could be mishandled, misused, lost, or, you

24       know, personal identifying information could be

25       taken, shortening that amount of time that any of

1    those things could happen from 30 days to 10.

2              And then apart from that, I think that it

3    ensures that the supervisors of elections are able

4    to do their jobs in a timely manner.  Before they

5    were receiving these petitions sometimes very late

6    in the process, and they would receive a number of

7    petitions all at once, that they had to then go

8    through and process, and it was making things

9    difficult for the supervisors to do their jobs.

10   BY MR. SHAPIRO:

11        Q    These purposes that you have outlined go

12   beyond addressing fraud, so these are some other

13   goals?

14        MR. RABAN:  Object to form.

15        A    I'm sorry, what was the question?

16   BY MR. SHAPIRO:

17        Q    What you just outlined are a number of

18   purposes of this provision, and they do not seem to

19   directly relate to the issue of fraud, is that

20   correct?

21        MR. RABAN:  Object to form.

22        A    The first reason I think does relate to

23   fraud, in that it shortens the amount of time that

24   different people could have access to those

25   petitions and that personal identifying information

1       from 30 days to 10.  So it reduces the likelihood

2       that that information would then be retained or used

3       during that time frame.

4       BY MR. SHAPIRO:

5           Q   And what evidence does the department have

6       that shortening the time frame from 30 days to

7       10 days in some ways will result in less fraud?

8           A   We don't have any, like, studies that we

9       have done.  It's just based on my understanding of

10      some of the cases that we've looked at where

11      individuals have, you know, for example, kept not

12      just petitions necessarily but 3P registration

13      applications, and then they've been able to use that

14      information or they've been able to -- other people

15      have been able to have access to that information

16      because they are in the same location as that

17      petition circulator.

18          Q   At any point until today has the

19      department examined or in any way assessed whether

20      shortening the amount of time sponsors have to

21      deliver petitions to SOEs will reduce the amount of

22      fraud?

23          A   I am not aware of any.

24          Q   Are you aware that sponsors, generally

25      through their vendors, screen petitions in an effort

1    to identify potentially invalid and fraudulent

2    petitions?

3        A    I'm sorry, I missed the beginning part of

4    your question.

5        Q    You are aware that sponsors generally,

6    through their vendors, screen petitions in an effort

7    to identify potentially invalid and fraudulent

8    petitions, correct?

9        A    I have heard of vendors doing that.    I

10    don't know if that's the general practice.

11        Q    And are you aware that sometimes, through

12    sponsors' internal screening process, the sponsor

13    identifies fraudsters -- to use the language of your

14    office -- and brings those fraudsters to the

15    attention of state and/or local agencies and other

16    law enforcement, is that correct?

17        A    I am aware of sponsors becoming aware of

18    individuals that are registered to circulate

19    petitions for them being fraudsters, but I am not

20    aware of any of them notifying the state that those

21    are potential fraudsters that we should be looking

22    into.

23        Q    I think you may want to look at your

24    report -- maybe when we take a break -- Ms. Harriel

25    has brought to the attention of your office, does

1      that ring a bell?

2          A    It does.  I think you may be referring to

3      the individual who was not the sponsor, but I think

4      he was maybe the in-between who did deliver a stack

5      of petitions to the Department of State saying I

6      believe these are all fraudulent, yes.

7          Q    And you are aware that sponsors bring to

8      the attention of supervisors of elections petitions

9      that they have determined to be invalid, correct?

10         A    I am aware of that one situation where

11     someone, I think -- I forget his name -- but someone

12     who worked for a sponsor notified us, and to my

13     understanding, it was without the sponsor's

14     knowledge that he notified us, of those individuals.

15     But I am not aware of multiple sponsors letting the

16     department know of suspected fraudsters.

17         Q    So again, my question was, are you aware

18     that sponsors are routinely providing petitions that

19     they have determined to be invalid to supervisors of

20     elections?  Did you know that?

21         A    I know that they are supposed to provide

22     all signed petitions, including ones that they may

23     or may not have deemed valid, to the supervisors of

24     elections.

25         Q    I will represent to you that sponsors and

1    vendors providing them with ballot initiative

2    services have stated that it's harder to effectively

3    internally screen for fraud, now that the window of

4    time for delivering petitions has been shortened to

5    just 10 days.

6         For example, the CEO that has has been

7    providing ballot initiative services to Smart &

8    Safe, Meghan Cox, stated in her declaration, quote:

9    Because of the new 10 day deadline, Smart & Safe

10    must significantly curtail in-house quality control

11    operations, which will lead to increase invalidity

12    rates.

13         Do you take issue with the assertion by

14    sponsors and their vendors that the 10-day deadline

15    will actually make it harder for them to effectively

16    screen for invalid and potentially fraudulent

17    petitions?

18         MR. RABAN:  Object to form.

19         A    I have no reason to think that their

20    understanding of how they are able to conduct their

21    operations is incorrect, but I have no knowledge as

22    to how they internally conduct those investigations.

23    BY MR. SHAPIRO:

24         Q    Has the department attempted to examine

25    the number or percentage of petitions that were

1     delivered to SOEs after what is now the 10-day

2     deadline during past ballot initiative cycles?

3          A    We are aware of petitions being delivered

4     past the 30-day requirement, which was the previous

5     requirement, which therefore is past that 10 days

6     that HB 1205 put into effect.

7          Q    But there is some percentage of ballots

8     that were previously being submitted between 10 and

9     30 days, correct, after the petition was signed?

10         A    I am not --

11         Q    Has the department looked at this?

12         A    I'm so sorry.

13         Q    Has the department looked at the number of

14    petitions that are being submitted that were

15    submitted after 10 days in previous election cycles?

16         A    The department has not looked at that, no.

17         Q    Without doing that kind of analysis, is it

18    fair to say that you don't really have a sense as to

19    how much of a burden this new 10-day rule may impose

20    on sponsors?

21              MR. RABAN:  Object to form.

22         A    I don't know what kind of burden it would

23    impose on sponsors.

24    BY MR. SHAPIRO:

25         Q    Since implementing the provision, the

SOS REPRESENTATIVE JILLIAN PRATT

1     10-day rule, have you received any feedback from

2     SOEs, sponsors or members of the public?

3         A    Not that I am aware of, no.

4             Actually, let me take that back.  I am

5     aware of a few times when sponsors have notified the

6     department that they were unable to deliver

7     petitions within that 10 day time frame.  And I

8     think they were looking to -- there is an exception

9     in law that allows sponsors to deliver petitions

10    past that 10 days if it is impossible for them to

11    deliver it within that time frame.

12        Q    I would like to move on to the topic of

13    the provision in HB 1205 related to fines.

14            You are aware that HB 1205 includes both

15    increased fines and new types of fines for sponsors,

16    is that correct?

17        A    Correct.

18        Q    Is it correct that you are aware that

19    HB 1205 includes increased fines and new types of

20    fines for sponsors, is that correct?

21        A    Correct.

22        Q    Let's go through those fines individually.

23            HB 1205 imposes a 50,000-dollar fine on

24    the sponsor if the sponsor knowingly allows a

25    noncitizen or nonresident or returning citizen who

SOS REPRESENTATIVE JILLIAN PRATT

1    hasn't had his rights restored to collect petition

2    forms, is that correct?

3        A    Correct.

4        Q    Okay.  I may refer to this provision as

5    subsection (4)(g) just for convenience.

6            As far as you know, what's the purpose of

7    subsection (4)(g)?

8        A    I think the purpose is laid out in the

9    whereas clause by the legislature and anything that

10   we've put forth in our papers.

11           But my understanding is to prevent fraud,

12   I guess, knowing fraud from sponsors, so that

13   sponsors wouldn't knowingly hire people who were

14   ineligible to become petition circulators.

15       Q    What evidence or data do you have that the

16   fine, subsection (4)(g), will, in fact, go to the

17   purpose of combating fraud?

18       A    I don't have any evidence as of now

19   because we have not fined anyone for that.  But I

20   think that just reason would lead me to believe that

21   a monetary fine like that could deter a sponsor from

22   purposefully hiring someone that they know is

23   ineligible under the law.

24       Q    Is a sponsor required to independently

25   verify a circulator's eligibility to avoid being

84

SOS REPRESENTATIVE JILLIAN PRATT

1      deemed to have knowingly allowed an unauthorized

2      collector?

3            MR. RABAN:  Object to form.

4         A    Sorry, could you repeat that question,

5      please?

6      BY MR. SHAPIRO:

7         Q    Okay.  Is a sponsor required to

8      independently verify a circulator's eligibility to

9      avoid being deemed to have knowingly allowed an

10     unauthorized collector?

11           MR. RABAN:  Object to form.

12        A    That would be up to -- I don't believe so.

13     I think that that would not be a knowing violation

14     of that law if, you know, they have done

15     reasonable -- have reasonable hiring practices,

16     and --

17           You know, it would be one thing, if a

18     sponsor is told I am not a citizen, can I register

19     to vote -- or register to be a circulator -- if the

20     sponsor says yes, then that would be a knowing

21     violation.

22     BY MR. SHAPIRO:

23        Q    In the department's estimation, what

24     constitutes reasonable hiring practices for purposes

25     of screening to determine whether someone is a

1          noncitizen?

2                A    I think that's something that would

3          ultimately be determined as, like, a question of

4          fact.  But what I meant by that is I don't think

5          that it would -- I don't think that a sponsor can

6          just stick their head in the sand necessarily and,

7          you know, have -- making a list of people that they

8          know to have committed felonies in the past, for

9          example, and not give that list to the people that

10         are determining who should be hiring petition

11         circulators; like, if only some members of the

12         organization know and not others, I still think that

13         would be a knowing violation.

14               Q    So if an individual says they want to be a

15         circulator and the sponsor -- strike that.

16               If a person wants to be a circulator, is

17         there a -- and says that they are a citizen, and

18         says that they are not a felon, and says that they

19         are registered in Florida, can the sponsor take them

20         at their word, or what do they -- do they need to do

21         something to confirm that that is the case?

22               MR. RABAN:  Object to form.

23               A    I am going to need additional facts, like

24         does the sponsor, in fact, know that that person is

25         not a citizen or is not a resident or is, in fact, a

1    felon, based on past dealings with that person,

2    personal knowledge, any number of factors.

3    BY MR. SHAPIRO:

4        Q    So if we are dealing with a situation

5    where there is no -- the sponsor doesn't know this

6    individual, the individual is showing up for the

7    first time, there is no past history with regard to

8    this individual, and the individual says they want

9    to be a circulator and asserts that they are again a

10    citizen, they are registered, that they are -- that

11    they are -- that they haven't been convicted of a

12    felony.

13            Is there any additional obligation on the

14    part of the employer to determine whether this

15    individual is, in fact, eligible to serve as a

16    circulator?

17            MR. RABAN:  Object to form.

18        A    I don't believe so.  I think that if they

19    do become aware, though, of information that would

20    lead them to believe that that person is not a

21    citizen or is a nonresident or is a felon, that they

22    would then have to potentially look at whether or

23    not that person should remain as a circulator.  But

24    that's separate from the fine.

25

1      BY MR. SHAPIRO:

2          Q   When you say you don't believe so, is that

3      your personal view, or is that the position of the

4      Department on this issue?

5          A   If the department laid out its view in any

6      of the papers, then that is certainly the

7      department's view.

8              If it has not, then that is the view of

9      OECS and, therefore, I think the department, in that

10     we have not required sponsors to do anything

11     additional.

12             However, I know that rulemaking has not

13     taken place by the division, and they may have

14     different requirements in the future that I am

15     unaware of.

16         Q   When do you anticipate rulemaking will

17     take place there?

18         A   That would be a question for the division,

19     so that would be a question for Maria Matthews.

20         Q   Okay.  So how will the department go about

21     conducting investigations into this particular

22     prvision, the (4)(g) provision?

23         A   We would conduct our investigations the

24     same way that we conduct most of our investigations,

25     which is it would probably start out with the

1    complaint by someone who has knowledge as to what

2    has happened.

3           So it would be along the lines of probably

4    someone saying, I know that this sponsor is hiring

5    noncitizens that they know are not -- that they know

6    are not citizens, something along those lines.

7           And then we would, of course, need sworn a

8    statement from that individual, we would need to

9    question the sponsor, ask about what they did know

10   at that time.  And if we felt that there was

11   sufficient evidence to refer it to law enforcement,

12   we would.

13          But again, OECS does not decide whether or

14   not someone is prosecuted for a crime.

15          I'm so sorry, I am mixing things up.  This

16   is for a fine.

17          So we would look -- we would look at it

18   and OECS would determine whether or not there was

19   sufficient evidence that the sponsor knew that they

20   had engaged in hiring someone that they shouldn't.

21       Q    And as part of the process, would OECS

22   give notice and an opportunity to respond to the

23   sponsor before it imposes a fine?

24       A    I believe we would.  I know that in the

25   past, when we have fined sponsors, we would give

1     them Chapter 120 rights, at least we list that at

2     the end of our fine letters, so that if it is

3     something that is disputed, there would be an

4     opportunity for the sponsor to, you know, argue the

5     fine should not have been imposed at DOAH.

6          Q    I think you mentioned earlier that this

7     particular fine is not being levied on any sponsor

8     yet, is that correct?

9          A    That's correct.

10          Q    Let's move on to another fine provision.

11               HB 1205 includes fines for delivering

12     petitions to SOEs past certain deadlines.

13               100.371, subsection (7), imposes a

14     50-dollar a day fine for each day for forms

15     delivered more than 10 days after the voter signed

16     the petition.  Section 100.371 subsection (7)(a)2

17     imposes a hundred-dollar fine up to a maximum $5,000

18     for each petition signed by a voter on or before

19     February 1 of the year the general election is held

20     and received by the supervisor of elections after

21     the election deadline for submitting petitions.

22               Are you familiar with these new fines I

23     just described?

24          A    I am, yes.

25          Q    Am I correct that these fines can be

SOS REPRESENTATIVE JILLIAN PRATT

1        described as strict liability fines?

2                MR. RABAN:  Object to form.

3                A    Can you expand on what you mean by that?

4        BY MR. SHAPIRO:

5                Q    Meaning that you can be held liable for

6        delays, regardless of whether the individual is in

7        any way negligent, is that correct?

8                MR. RABAN:  Object to form.

9                A    My understanding there is an

10       impossibility, like a catchall, where if the sponsor

11       was unable to deliver that within those 10 days,

12       then they would not be fined.

13       BY MR. SHAPIRO:

14               Q    So that sort of goes to a force majeure

15       exception of a very difficult circumstance, is that

16       what you are describing?

17               A    I believe so.  I am describing the caveat

18       that is included within the law that allows for a

19       sponsor to let us know if something cannot be

20       delivered, if petitions cannot be delivered within

21       10 days because of impossibility.

22               Q    Has the department issued any guidelines

23       as to what constitutes impossibility?

24               A    No, it has not.

25               Q    Would you agree that notwithstanding that

SOS REPRESENTATIVE JILLIAN PRATT

1       impossibility exception, the plain language of this

2       statute would suggest that even if a sponsor is not

3       negligent, they may incur a fine in many instances,

4       is that correct?

5              MR. RABAN:  Object to form.

6          A   I mean, I guess it depends on what you

7       mean by negligent.  Like if a sponsor has not

8       delivered it within 10 days and doesn't have a

9       reason that it would have been impossible to do so,

10      then it sounds like that could be negligence to me.

11      BY MR. SHAPIRO:

12         Q   So if a sponsor misses the deadline

13      because they -- because -- because a circulator got

14      it to them later than they would have wanted them to

15      have gotten it to them and, therefore, the

16      circulator held on to the petition for too many

17      days, and that resulted in the petition arriving a

18      day late, is that the type of circumstance that

19      would or would not result in a fine?

20             MR. RABAN:  Object to form.

21         A   I would need more facts about why the

22      circulator did not deliver them to the sponsor in a

23      timely manner, and I think the sponsor would need to

24      express why it was impossible to get it to the

25      supervisor within 10 days.

1    BY MR. SHAPIRO:

2        Q   So if the explanation was the circulator

3    forgot to get the petition to the sponsor in a

4    timely manner, and so the sponsor only got the

5    petition on the tenth day, and by the time the

6    sponsor mailed it, it was late, how about that kind

7    of circumstance; is that a circumstance that would

8    result in a fine for the sponsor?

9        A   Yes, because the petition circulator is

10   supposed to act as a fiduciary to the sponsor, and

11   under your described circumstance, it sounds like

12   the petition circulator just did not deliver those

13   to the sponsor on their own accord.  And then the

14   sponsor had those on the tenth day and could have

15   delivered them to the supervisor of elections on

16   that tenth day but did not.

17       Q   Okay.  Let me change the hypo a little

18   bit.  The sponsor gets it on the 11th day from the

19   circulator.  Is the sponsor still liable?

20           MR. RABAN:  Object to form.

21       A   No, we would have to look at the facts and

22   circumstances.  But under this hypothetical, I

23   believe the sponsor would be liable for that fine

24   because I don't think that fits within

25   impossibility.

1    That is their fiduciary, who is acting for

2    the sponsor, failing to deliver that to the sponsor.

3    So in essence, it's like the sponsor was acting

4    itself and did not -- just did not get the petition

5    forms to the supervisor within that 10 days.

6    BY MR. SHAPIRO:

7    Q   So you would agree in that circumstance,

8    the sponsor was not negligent but the individual who

9    was acting on the sponsor's behalf in collecting

10    signatures was responsible; but the sponsor

11    themselves was not negligent, you would agree with

12    that?

13    MR. RABAN:  Object to form.

14    A   I wouldn't agree with that, because I

15    think then the petition circulator acts as a

16    fiduciary.  And so I think the sponsor takes on that

17    responsibility by choosing to hire these individuals

18    as petition circulators and, therefore, takes on the

19    responsibility of being late and turning in these

20    petitions.

21    Even though it was the circulator, that

22    circulator was acting for the sponsor.

23    BY MR. SHAPIRO:

24    Q   How about if it's a volunteer circulator?

25    A   When you say volunteer circulator, do you

1    mean an unpaid circulator who is registered with the

2    sponsor?

3    BY MR. SHAPIRO:

4        Q    Correct.

5        A    Then I think the answer is the same.

6        Q    What evidence -- strike that.

7            What evidence does OECS look to in

8    determining when to impose one of these fines?

9        A    This is the 10-day fine that you are

10    talking about?

11        Q    Correct.

12        A    OECS will look at when the forms were

13    signed, so the date as listed next to the signature

14    from the voter who signed the petition form.

15            We'd also look at the date that the

16    supervisor has stamped the petition as the day that

17    they received it.

18            We'd also look at the calendar to see when

19    the supervisor of elections office was closed,

20    because if it falls on a weekend or on a holiday,

21    for example, if that tenth day falls on one of those

22    days, then it would roll to the next day, because no

23    one can be expected to deliver something on a day

24    when the supervisor's office is closed, unless the

25    supervisor has for some reason designated their

1      mailbox, their P.O. Box as a way that they can

2      receive petitions.

3              And as I earlier said, I am not aware of

4      any supervisors doing that.  But if they did, I

5      think that might change that analysis a bit.

6          Q   Since the passage of HB 1205, have there

7      been fines levied against sponsors for late petition

8      forms?

9          A   Have not.  There are some that are under

10     review, but no fine letters have actually gone out.

11         Q   The same provisions in HB 1205 also

12     imposed thousands of dollars of fines on a sponsor

13     when a sponsor acted willfully to deliver petitions

14     late.  Are you familiar with those provisions?

15         A   Yes.

16         Q   How does the department define acting

17     willfully in the context of a sponsor delivering a

18     petition late?

19             MR. RABAN:  Object to form.

20         A   The department will look at how willfully

21     is defined in -- just like willfully is used in

22     other statutes.  I think that the department may

23     have laid out its legal opinion in its papers and,

24     if so, that's what I would certainly rely on in

25     trying to determine whether or not someone has

1          willfully done that.

2     BY MR. SHAPIRO:

3          Q    Do you know, do you need to show that the

4     sponsor wanted the petition to be delivered late?

5          A    I'm sorry, could you repeat that?

6          Q    Do you need to show that the sponsor

7     wanted the petitions to be delivered late in order

8     for it to be willful?

9          MR. RABAN:  Object to form.

10         A    Can you please pull up the language of the

11    statute for me so I can look at that, trying to

12    answer this question for you?

13         MR. SHAPIRO:  Mat, can you assist with

14    that, please?

15         MS. BENNETTE:  Yes, give me a second.

16    BY MR. SHAPIRO:

17         Q    Would it be okay if I read the language to

18    you?

19         A    Sure, it would be helpful to see it, yes,

20    I will try to remember as you read it.

21         Q    Okay.  A fine in the amount -- you want me

22    to read the entire provision?  I can read the entire

23    provision for you:  A fine in the amount of $100 per

24    each day late, up to a maximum of 5,000 for each

25    petition form collected by a sponsor or a petition

SOS REPRESENTATIVE JILLIAN PRATT

1    circulator, signed by a voter on or before February

2    1 of the year the general election is held and

3    received by the supervisor of elections in the

4    county in which the voter resides after the deadline

5    for special election; a fine in the amount of $5,000

6    for each such petition form received if the sponsor

7    or petition circulator acted willfully.

8        Is that helpful, Ms. Pratt?

9     A    It is.  It's hard to kind of keep all

10    that, as you are reading it, but my understanding is

11    that it's imposing a fine if those petitions are

12    delivered late; and if it is done willfully by the

13    sponsor, then there is an increased fine.

14        Is that correct?

15     Q    Correct.  That last sentence again is:

16    Fine in the amount of $5,000 for each such petition

17    form received if the sponsor or petition circulator

18    acted willfully.

19     A    Yes.

20     Q    Okay.  And my question to you is, do you

21    need to show that the sponsor wanted the petition to

22    be delivered late for it to be willful?

23        MR. RABAN:  Object to form.

24     A    Again, I would rely on what we laid out in

25    our papers.  I don't believe that you would have to

1    prove that the -- actually, I'm not sure.  I'm not

2    sure on that one.

3    BY MR. SHAPIRO:

4        Q    Has the department developed any

5    guidelines on this particular fine provision?

6        A    No, it has not.

7        Q    Is the department planning on developing

8    guidelines concerning the provision dealing with

9    willfully -- acting willfully as I described?

10        A    I am unaware of any plans to do so.  But I

11    would like to add, this may be included in the

12    training for petition circulators.

13        Again, I am not the person who was

14    responsible for drafting that, so I'm not sure, but

15    that would be Maria Matthews.

16        Q    To date, how many cases have there been of

17    sponsors being fined for willful delays?

18        A    None to my knowledge since the passage of

19    HB 1205.

20        Q    Okay.  HB 1205 also subjects sponsors to a

21    500-dollar fine for each petition form collected by

22    a petition circulator which is not submitted to the

23    supervisor of elections in the county in which the

24    voter resides.  The fine is increased to $5,000 if

25    the sponsor's failure to submit the form to the

1    right county was willful.

2         Are you familiar with that fine provision?

3         A   I am, yes.

4         Q   My understanding is this provision is that

5    the 500-dollar penalty is imposed on the sponsor,

6    regardless of whether the sponsor authorized, knew

7    or participated in the circulator's conduct, is that

8    correct?

9         A   Please repeat that.

10         Q   Yeah, my understanding of this provision

11    is that there is a 500-dollar penalty imposed on the

12    sponsor, regardless of whether the sponsor

13    authorized, knew of or participated in the

14    circulator's conduct, correct?

15         MR. RABAN:  Object to form.

16         A   That is my understanding as well.

17    BY MR. SHAPIRO:

18         Q   On Friday, Ms. Matthews stated a sponsor

19    would not incur a 500-dollar fine if a petition

20    should have been delivered to a County A where the

21    voter resides -- sorry, let me start again.

22         So on Friday, Ms. Matthews said that a

23    sponsor will not be incurring a 500-dollar fine if

24    there is a petition that should have been delivered

25    to County A, where the voter resides, but the form

1    was instead delivered to County B, because the voter

2    wrote County B on the petition form.  Is that

3    correct?

4        A    That's correct.

5        MR. SHAPIRO:  So maybe we should bring

6    that language up, Mat.

7        MS. BENNETTE:  Okay.  I am about to share.

8    BY MR. SHAPIRO:

9        Q    My question, as we are bringing up that

10    language, is that that does not appear to jell with

11    the plain language of the statute, given that the

12    statute states that a sponsor will be fined if the

13    petition is not delivered to the county where the

14    voter resides, and carves out no exception for

15    inadvertently delivering to the wrong county due to

16    voter error.

17        Maybe if you can see the language now on

18    your screen:  A fine in the amount of $500 for each

19    petition form collected by a petition circulator

20    which is not submitted to the supervisor of

21    elections in the county in which the voter resides.

22        So would you agree with me that your

23    answer does not seem to be consistent with the plain

24    language of the statute, which seems to go by where

25    the voter resides, not by what the voter put in

1       their petition form, correct?

2                MR. RABAN:  Object to form.

3            A   I think it goes to impossibility again.

4       We don't expect sponsors or their petition

5       circulators to deliver a petition form to a county

6       that is not correctly identified in the petition.

7       If someone has put Leon County, then we expect the

8       petition circulator or the sponsor to deliver it to

9       Leon County.

10               There is not a mechanism for a sponsor to

11      check every voter's address where they are

12      registered to vote.  In fact, some of them are

13      confidential and exempt under statute, and so it

14      would be impossible for a sponsor to determine that.

15               So it's not, in my opinion, inconsistent

16      with this statute.  It's consistent with the

17      exception that is set out in the statute.

18      BY MR. SHAPIRO:

19           Q   To date, how have you communicated your

20      interpretation of this statute to sponsors?

21           A   If asked, I would happily communicate it

22      to a sponsor.  I haven't been asked.

23           Q   So is the answer up to now, you have not

24      communicated this particular interpretation to any

25      sponsors in any form?

1           A    I'm not sure.  We may have communicated

2     this to the sponsor for the abortion amendment in

3     the last election, because we did fine them.

4               This is obviously a different amount for

5     this provision, but we did use the same analysis in

6     determining whether or not a petition was late to --

7     we used the same analysis then that we are using

8     now.

9     BY MR. SHAPIRO:

10          Q    Has the department clarified when sponsors

11    will or will not be fined in formal guidelines?

12          A    Not that I am aware of, no.

13          Q    Prior to enacting HB 1205, were there any

14    reported instances or complaints concerning sponsors

15    willfully delivering petition forms to the wrong

16    county?

17               MR. SHAPIRO:  I think we are done with

18    the -- with the particular exhibit for now.

19          A    I am trying to recall whether or not any

20    sponsors were alleged to have done that willfully.

21    I don't believe so, no.

22    BY MR. SHAPIRO:

23          Q    Let's move on to the next provision.

24               MR. SHAPIRO:  Mat, if you could take down

25    this previous provision.  Thank you.

1      BY MR. SHAPIRO:

2          Q    Section 100.371, subsection (10) as

3      amended by the bill, provides:  A sponsor will be

4      fined $5,000 if a person collecting petition forms

5      on their behalf signs another person's name or

6      ficticious name on a petition or fills in missing

7      information.

8              Are you familiar with that provision?

9          A    I am generally familiar with it.  It would

10     be helpful to see that language.

11             MR. SHAPIRO:  Okay.  Mat, if you could put

12         that up.

13     BY MR. SHAPIRO:

14         Q    Can you see that a sponsor of an

15     initiative petition or person collecting petition

16     forms on behalf of the sponsor of an initiative

17     petition may not mail or otherwise provide petition

18     form upon which any information about a voter has

19     been filled in before it is provided to the voter.

20     Do you see that?

21         A    I do, yes.

22         Q    The sponsor of -- okay:  The sponsor of an

23     initiative petition is liable for a fine in the

24     amount of $50 for each petition form that is a

25     violation of this subsection.

1          Do you see that?

2          A   Yes, I see that, I do.

3          Q   Great.  Is that penalty imposed on

4     sponsors, regardless of whether the sponsor

5     authorized, knew of or participated in the

6     circulator's conduct?

7          A   The answer would be the same about a

8     petition circulator being a fiduciary of the

9     sponsor.  And so the sponsor takes on the liability

10    that comes with the hiring of individuals to act on

11    their behalf.

12         Q   Okay.  So assuming -- accepting your

13    answer that, for the moment, that the circulator is

14    acting as a fiduciary.  I would like to know whether

15    the sponsor -- whether the sponsor will be held

16    liable for this fine, regardless of whether the

17    sponsor knew of or participated or authorized the

18    circulator's conduct?

19         A   I think this ultimately would be a

20    question that could be -- that could be challenged

21    if we did fine someone for that.

22         But yes, I think the sponsor is

23    responsible for hiring that person to collect

24    petitions and, therefore, doesn't need the direct

25    knowledge that that person is going out collecting

1      petitions; they've already given that permission to

2      do so.

3           Now if the sponsor had withdrawn that

4      permission, then that might be a different

5      situation.

6      Q   Ms. Pratt, I am simply asking a straight

7      forward question, and I don't want to get into the

8      issue of who is a fiduciary and the extent they are

9      a fiduciary, just a straight forward:

10          Isn't it true that the sponsor here can be

11     fined, even if the sponsor did not authorize or know

12     of or or participate in the circulator's conduct

13     when the violation occurred?

14     A   I'm sorry --

15     Q   When the violation occurred.

16     A   I'm sorry, I am not trying to be

17     difficult.

18          My understanding is that the sponsor has

19     consented to that person collecting petitions on

20     behalf of the sponsor.  So the sponsor, in effect,

21     is viewed to have known that that is occurring.

22     BY MR. SHAPIRO:

23     Q   Okay.  I gotcha.  Maybe we can break this

24     down a bit.

25          Can the penalty be imposed on the sponsor,

1    regardless of whether the sponsor participated in

2    the circulator's conduct?

3         A    In order for a circulator to be a

4    registered circulator with the sponsor, the sponsor

5    did participate in registering that circulator to

6    represent them on their behalf.

7             As far as whether or not the sponsor -- if

8    you are asking, like, the people who are at the very

9    top of whatever the sponsor's business entity is, I

10   don't think they have to have known -- I don't think

11   everyone within the sponsor has to have known in

12   order for the sponsor itself as an entity to be

13   considered to have known what a petition circulator

14   is doing.

15        Q    So in this case, we are talking about the

16   act of a circulator -- let's say -- give you an

17   example -- forging someone's name, correct?

18        A    Okay.

19        Q    Does the sponsor need to have known that

20   the circulator did that in order to be fined?

21             MR. RABAN:  Object to form.

22        A    Again, my answer would be that the

23   petition circulator is a fiduciary at that point,

24   and so the sponsor is considered to have known.

25             Now there is, I believe, a fail-safe

1    that's provided within the statute, that if the

2    sponsor becomes aware of a petition circulator who

3    is committing fraud, then they can let the

4    department know as soon as they know, as soon as

5    practicable I think is what the statute says.  And

6    if they have done that, then they will not be fined.

7    BY MR. SHAPIRO:

8        Q    Okay.  So you're saying that if -- they

9    would not be fined if they let the department know

10    as soon as possible when they learned that someone

11    has forged a signature on a petition?  Is that what

12    your testimony is?

13        A    It is difficult, not looking at the

14    statute before me, but that is my recollection of

15    what it says.

16            I would rely on what the statute actually

17    says and what our legal position has been laid out

18    as through our papers.

19        Q    Would you have the same position with

20    regard to filling in missing information on a signed

21    petition; if that is done by a circulator and then

22    the sponsor learns about it after the fact but then

23    immediately reports it, your testimony today is the

24    department would not fine the sponsor?

25            MR. RABAN:  Object to form.

1        A    My testimony is that we would follow what

2    the law says.  I think our legal analysis has been

3    laid out in our papers, and we would do that.

4            Like I said, it's difficult for me to

5    remember, as not looking at all these different

6    provisions, without the entire statute before me, to

7    tell you whether or not that's the exception.

8            That's what I recall from reading the

9    statute.  But I would really have to look at it more

10    closely to give you a better answer.

11    BY MR. SHAPIRO:

12        Q    We may -- trying to get through that

13    provision as well, so we may return to that.

14            How will OECS determine whether a person

15    has signed a petition for another person or has used

16    a fictitious name for purposes of fining the

17    sponsor?

18        A    We would use the same techniques that we

19    use for any other investigation.  We would need

20    evidence that that person has signed on someone

21    else's behalf, which that evidence could consist of

22    a witness coming forward and providing a sworn

23    statement, or it could also consist of comparing

24    signatures, handwriting, all different kinds of

25    penmanship, to determine whether or not someone has

1      signed something on someone else's behalf.

2          Q    If a sponsor reports that a circulator

3      filled in missing information and signed another

4      person's name on a petition form, could that report

5      supply the factual basis for assessing a

6      5,000-dollar fine on the sponsor with respect to

7      that petition?

8          A    Again, this goes back to my lack of being

9      able to remember exactly what the exception says.    I

10     thought that the exception says that if -- in the

11     statute -- says that if the sponsor tells us of a

12     violation, that they would not be fined, so long as

13     they did -- they told us as soon as practicable.

14         Q    Does the department have discretion to

15     decline to impose the 5,000-dollar fine when a

16     sponsor promptly reports circulator misconduct and

17     cooperates with investigators?

18         A    Yes, I think the fine is discretionary.

19         Q    As I noted earlier, the provision we are

20     discussing imposes a $5,000 fine on a sponsor if a

21     person fills in missing information on an already

22     signed petition.

23             So how broadly is the department going to

24     interpret that aspect of the provision?  What will

25     constitute filling in missing information?

1          MR. RABAN:  Object to form.

2          A    I think the information that would be

3     filled in includes any of the blanks that are in the

4     petition form itself; so name, address, date of

5     birth, date of signature, signature, last four of

6     the social, driver's license number or ID number,

7     and voter ID number and county.  Any of those, I

8     think, would violate that.

9          Q    So if a circulator notices that a voter

10    failed to include the county where the petition was

11    signed and added the county after the fact, would

12    that result in a fine for the sponsor if OECS were

13    to learn of that infraction?

14         A    I think it would depend on, again, the

15    facts and circumstances.

16         If the petition circulator filled out the

17    county, however, that would be a violation of the

18    statute.  So we would definitely look at it from

19    that perspective.

20         But whether or not we would fine the

21    sponsor would depend a lot on all of the

22    circumstances involved, including whether or not the

23    sponsor has told us of this violation if they

24    learned of it.

25         Q    I am now going to move on to another

SOS REPRESENTATIVE JILLIAN PRATT

1    provision in HB 1205 that relates to prefilled

2    petitions.

3        HB 1205 fines sponsors for the prefilling

4    of voter information on petition forms.

5    Specifically the statute states the following, I am

6    quoting here:  A sponsor of an initiative petition

7    may not mail or otherwise provide a petition form

8    upon which any information about a voter has been

9    filled in before it is provided to the voter, close

10    quote.

11        The statute goes on to state that, quote:

12    The sponsor of an initiative petition is liable for

13    a fine in the amount of $50 for each petition form

14    that is a violation of this subsection.

15        Are you familiar with that subsection?

16    A   I am, yes.

17    Q   If I understand correctly, it applies even

18    if the prepopulated voter information is accurate

19    and the voter personally reviews, validates and

20    signs the petition form, correct?

21    A   Correct.

22    Q   Under this provision, what constitutes the

23    impermissible prefilling of voter information on a

24    form?

25    A   It means prefilling any one of those

1    blanks in the form that I identified earlier before

2    the voter has had a chance to look at the form.

3        Q   So if the only prefilled part of the form

4    is the county, would that be enough to incur the

5    fine?

6        A   I believe it would, yes.

7        Q   How about the ZIP Code; if the ZIP Code is

8    the only thing that was prefilled, would that be

9    enough to incur a fine?

10       A   Yes.

11       Q   Since the enactment of HB 1205, has the

12   department fined a sponsor or person acting on a

13   sponsor's behalf for violating this provision?

14       A   We have not.

15       Q   And is this a provision where the

16   department has some discretion as to when to impose

17   a fine?

18       A   My understanding is that the department

19   always has discretion as to whether or not to impose

20   a fine.  If the department did not impose a fine, I

21   don't think there is any repercussion for the

22   department.

23       Q   We've now reviewed a whole number of fines

24   that can be imposed on sponsors, isn't that right?

25       A   I'm sorry, could you repeat that, please?

1          Q    We just reviewed a number of different

2    fines that can be imposed on sponsors.

3          A    Correct, we have.

4          Q    Do you know what -- do you know what the

5    purpose --

6               Sorry.  Sorry, Mr. Pratt, I talked over

7    you.

8          A    Sorry.

9          Q    Do you know what the purpose is behind

10    subjecting sponsors to all these new fines?

11               MR. RABAN:  Object to form.

12          A    I think the purpose is laid out by the

13    legislature in the whereas clause and as we laid out

14    in our papers.

15               My understanding is that those fines are

16    designed to reduce the amount of fraud that is

17    committed and to ensure that we have integrity with

18    our electoral process.

19    BY MR. SHAPIRO:

20          Q    Has the department ever evaluated or

21    examined the effect of new fines on sponsors along

22    the lines of those fines that were included in

23    HB 1205?

24               MR. RABAN:  Object to form.

25          A    The department hasn't engaged in any

SOS REPRESENTATIVE JILLIAN PRATT

1    studies that I am aware of.  I do know that the

2    department has fined sponsors before, and our hope

3    was that, in doing so, it would encourage the

4    sponsors to make sure that they are following the

5    law and that their petition circulators are

6    following the law.

7    BY MR. SHAPIRO:

8        Q    Has the department ever examined whether

9    these different fines may make the ballot initiative

10   process inaccessible to any sponsor lacking enormous

11   financial resources?

12           MR. RABAN:  Object to form.

13       A    Not to my knowledge, no.

14   BY MR. SHAPIRO:

15       Q    Beyond the December and January OECS

16   reports, did the department provide the legislature

17   with any analysis, data, input or feedback related

18   to these fines?

19       A    No.  Our only communications with the

20   legislature are included in those reports.

21       Q    I am going to move on to a different

22   topic.

23           You discussed the workings of the office

24   as directing OECS.  As I understand it, your office

25   opens what's called preliminary criminal

SOS REPRESENTATIVE JILLIAN PRATT

1    investigations of election fraud, including election

2    crimes committed by petition circulators, is that

3    correct?

4         A   That's correct.

5         Q   Prior to enactment of HB 1205, I know of

6    three kinds of petition circulator offenses your

7    office investigated and would open up as preliminary

8    criminal investigations.  I would like to go through

9    them and then perhaps you can tell me if there are

10   others that I'm missing.

11            There is Florida Statute, Section

12   817.568(2)(a), which deals with fraudulent use of

13   personal identification information, which is a

14   felony of the third degree.

15            There's Section 817.568(8)(a) that

16   concerns the fraudulent use of a deceased

17   individual's personal identification information,

18   which is also a felony in the third degree.

19            And there's Florida Statute, Section

20   104.185, subsection (2), which prior to HB 1205

21   concerned only the signing of another person's name

22   or ficticious name to any petition to secure ballot

23   petition for an issue.  Those are the three that I

24   am aware of.

25            Are there other statutes you would use to

1    combat petition fraud?

2         A   Not that I can think of off the top of my

3    head.  I will say any time we receive a complaint

4    about a potential criminal violation involving the

5    election code, we look at it; and if we determine

6    that it looks like there is a violation of statute,

7    we do also look at other statutes to see if it

8    potentially violates those as well.

9              So it would largely depend on the facts

10   and situations.  But those are the three statutes

11   that I can think of that would have to do with

12   petition fraud.

13        Q   What is the threshold for opening up a

14   preliminary criminal investigation into one of the

15   three offenses I detailed?

16             MR. RABAN:  Object to form.

17        A   The threshold, as far as looking at it

18   complete, we determine whether or not a prima facie

19   case has been alleged.  And in doing that, we look

20   to see if there's personal knowledge or some other

21   kind of objective evidence that we can look at to

22   determine whether or not a crime has potentially

23   been committed.

24   BY MR. SHAPIRO:

25        Q   What types of actions typically trigger

1    opening up a preliminary investigation?

2         A    Typically, for petition circulators, the

3    kinds of actions that we are looking at are signing

4    a petition on behalf of someone who has already been

5    deceased, that they could not have possibly signed

6    the petition; or it could be -- we have looked

7    through a stack of petitions that have been

8    submitted by the same circulator, and they are using

9    the same handwriting, and all of the signatures look

10   like they do not match those of the voters that we

11   have in our database.

12         Others that we might open up an

13   investigation into would include petition

14   circulators who -- sometimes we'll hear from other

15   petition circulators that they know that certain

16   people have been passing around petitions to try to

17   avoid a detection.  So there will be different

18   handwritings within the same stack of petitions but

19   none of them will match the voters' themselves.

20         Q    If you get a complaint someone has signed

21   a petition for them, would that result in you

22   opening up a preliminary investigation?

23         A    Yes.

24         Q    If a paid petition circulator has a high

25   invalidity rate and unusually high rejection rate,

SOS REPRESENTATIVE JILLIAN PRATT

1    could that trigger opening up a preliminary criminal

2    investigation?

3        A    It could, yes.

4        Q    How high does the rate have to be before

5    it triggers opening up a preliminary investigation?

6        A    There is not a specific percentage.  We do

7    look at all of the petition circulators that have

8    been circulating for that specific petition, and we

9    compare the invalidity rates to others.

10        So I know historically we have looked at

11    some of the more -- just some of the bigger

12    invalidity numbers, which we did when we were

13    investigating Palm Beach County and Orange County to

14    see what their invalidity rates were.

15        Q    Is it fair to say that you don't need to

16    have probable cause to charge someone with a crime

17    when you open up a preliminary investigation?

18        MR. RABAN:  Object to form.

19        A    We don't charge anyone with a crime.  We

20    are merely looking to see if this is something that

21    we would like to refer to law enforcement.

22        When we make a referral to law

23    enforcement, it has the same force and effect as if

24    you referred something to law enforcement.  So there

25    is a use for it in that that we have developed a

119

1    case, and I think that law enforcement can

2    definitely use our resources to determine whether or

3    not a crime has been committed.  But it has no

4    bearing on whether or not a decision is made to

5    charge an individual with a crime.

6    BY MR. SHAPIRO:

7        Q    If I understand you correctly, when you

8    open up a preliminary criminal investigation, that's

9    not a circumstance where you have developed evidence

10    establishing probable cause to charge someone, isn't

11    that correct?

12            MR. RABAN:  Object to form.

13        A    Correct.  We don't develop probable cause

14    to charge anyone.  But as far as just opening a

15    preliminary investigation, we may or may not have

16    what we believe to be probable cause.

17    BY MR. SHAPIRO:

18        Q    At what point would your office refer a

19    preliminary criminal investigation to the Florida

20    Department of Law Enforcement, FDLE, or the Office

21    of Statewide Prosecution for criminal prosecution?

22        A    We would certainly refer it if we believed

23    we did have something rising to the left of probable

24    cause.

25            Other times, we refer things to FDLE

1    because we believe that there likely is probable

2    cause, but further investigation needs to be done;

3    perhaps further witnesses need to be talked to in

4    order to develop probable cause to arrest someone,

5    which again is not our decision.

6        Q    So it's fair to say that is a standard

7    that is lower than probable cause before you refer?

8            MR. RABAN:  Object to form.

9        A    We can refer things that are lower than

10   probable cause.  Typically we try to refer things

11   where we believe that law enforcement could take

12   what we have referred and rely on it and then, if

13   they so choose, to prosecute.

14           But like I said, sometimes there are

15   situations where OECS has done an investigation, it

16   appears that someone has committed a crime, but OECS

17   feels that it would be more appropriate for FDLE to

18   reach out to particular witnesses, or to obtain

19   evidence that we are unable to obtain because we

20   don't have subpoena power.

21   BY MR. SHAPIRO:

22       Q    Would most or all of your preliminary

23   investigations of paid petition circulators end up

24   being referred to FDLE or the Office of Statewide

25   Prosecution?

SOS REPRESENTATIVE JILLIAN PRATT

1          A   I would say most but not all.

2              I think this year we've had about 300

3      complaints about petition circulators.  We referred

4      a little more than 200 of them.  And in total, those

5      involved over 1200 victims.

6          Q   So your office is keeping records of the

7      cases involving petition circulators that you are

8      referring to law enforcement?

9          A   We have to keep track of the complaints

10     that we receive because we have to submit a report

11     to the legislature, as you know, by January 15th of

12     each year.

13         Q   I know you just gave me some numbers

14     there, but during the 2024 election cycle and its

15     aftermath, roughly the end of 2023 to the beginning

16     of 2025, how many circulators did your office refer

17     to a law enforcement entity like the Office of

18     Statewide Prosecution?

19         A   It's a good question.  I would have to

20     look back at the reports where we delineate that.

21             I know from this past year, because I am

22     working on the report for this year, that's why I am

23     able to give those numbers.

24         Q   Could you give me those numbers again for

25     the past year?

1    A   Sure.  At present, which these are not

2    official numbers, we have received over 300

3    complaints about petition circulators.  We referred

4    over 200 of them.  And in total for those 200 that

5    we referred, 200-plus, there have been at least 1200

6    victims that we can identify.

7          Those numbers are not official, like I

8    said, and they may change.  But that's based on the

9    knowledge that I have currently based on our

10   accounting.

11   Q   What period of time is that?

12   A   From January 1st, 2025, until present.

13   Q   And when you say you received 300

14   complaints, could you describe very briefly what

15   kind of complaints we're talking about and from who?

16   A   Sure.  We received complaints from

17   supervisors of elections who suspect some kind of

18   petition fraud.  Often they suspect it because they

19   received petitions on behalf of deceased

20   individuals, or they have noticed a pattern in the

21   handwriting that they have received for certain

22   petitions, or they received complaints from members

23   of the public who have said, I did not sign this

24   petition.

25          There is a number of ways that we can

1   receive a complaint from that.

2       We also receive complaints from members of

3   the public who have found out that a petition was

4   submitted in their name, where they will then file a

5   complaint with us.

6       We have received multiple complaints where

7   people who have signed petitions have come to us

8   saying that they did sign the petition, but they

9   were told that the amendment would do the opposite

10   of what it would really do.  Just because we receive

11   a complaint does not mean that we then refer it to

12   law enforcement.

13       Q   Prior to enactment of HB 1205, how did

14   your office keep track of what happened to the

15   initiative petition cases it referred to FDLE and

16   the Office of Statewide Prosecution?

17       A   Prior to HB 1205, we, I believe, had an

18   internal tracking system, one that I have never

19   actually used because we recently implemented an

20   internal tracking system.  So we had a way of making

21   sure that we were able to, at the end of the year,

22   put on the report how many complaints we received

23   and their current status.

24       Q   So your office has a way and had a way of

25   tracking what became of cases involving initiative

1       petition circulators that your office referred to

2       for prosecution, is that correct?

3           A    That's correct.

4           Q    So you would know -- actually, let me back

5       up.

6               I have been saying you are referring your

7       cases to the Florida Department of Law

8       Enforcement -- I have been shorthanding to FDLE --

9       and also the Office of Statewide Prosecution.

10              Are those the two offices that you are

11      referring all your petition fraud cases to or are

12      there some cases where you're referring your cases

13      to some other offices?

14          A    For petition fraud cases, those are the

15      offices that we have been referring them to

16      typically.

17              On occasion, it's possible that we've

18      referred them to a state attorney's office, that is

19      a local state attorney's office.

20              We also refer a number of our cases to

21      federal agencies, but we have not done that with

22      petition circulator cases because that's a state

23      issue.

24          Q    So these other offices that you sometimes

25      refer cases to, are those in addition to referring

1       them to FDLE and the statewide prosecutor or is that

2       instead of, for petition fraud cases?

3           A   For petition fraud cases, we are referring

4       them to Statewide and FDLE and sometimes, like I

5       said, a particular state attorney's office.  It

6       could be in lieu of the Statewide Prosecutor's

7       Office, or it could be in addition to.  It really

8       just depends on facts and circumstances of that

9       case.

10          Q   But again, you have records that you keep

11      of what happened to all these cases after you

12      referred them, isn't that correct?

13          A   We currently keep track of that.  In the

14      past I know we have kept track up to the point that

15      something was referred and at the point when it

16      basically was with law enforcement and statewide.

17              Recently, as of this year, we have been

18      attempting to track all of our cases through the end

19      of the process, if someone has been arrested or

20      prosecuted.

21          Q   Do you know how many of the cases that you

22      referred, that you included in your report as having

23      been referred, do you know how many resulted in

24      actual charges and arrests?

25          A   I can't give you the numbers as of yet.

1     We are still calculating those.

2          Like I said, we moved to a new system this

3     year -- in fact, a few months ago.  And so we are

4     having to transfer every single one of our cases

5     over to that new system and then assign it a status

6     as to whether or not it has been referred.  And then

7     we have to talk to law enforcement and prosecutors

8     to determine where our referred cases are.

9          Q    Can you provide any estimate as to how

10    many of the 200 you referred were actually charged?

11         A    I can't provide an estimate at this point,

12    no.

13         MR. SHAPIRO:  I am now going to show you

14    what I marked as Plaintiff's Exhibit 2.

15         (Exhibit 2 was marked for identification.)

16    you know,

17         MR. SHAPIRO:  Mat, if you could bring up.

18    BY MR. SHAPIRO:

19         Q    If you could look at this exhibit.  This

20    document was produced by the Secretary's office and

21    the page has a Bates number which I am going to

22    scroll down.  If I could scroll down.  We seem to be

23    technologically challenged today.

24         You can see the SOS Bates number,

25    SOS_0624756 as the first number, the first page of

1        this exhibit.

2                Do you recognize this document?

3            A    I have never seen this document before.

4            Q    Okay.  It was produced by your office.  If

5        we scroll up, can you see that the "from" is from

6        Jonathan Bridges.

7            A    Yes.

8            Q    And the recipient is Brad McVay, and it's

9        dated July 18, 2024 at 4:25 p.m.

10               Do you see that?

11           A    I do.

12           Q    Okay.  You have no reason to believe that

13       this email is not what it purports to be, correct?

14           A    Correct.

15           Q    Okay.  And who is Jonathan Bridges?

16           A    Jonathan Bridges is one of the prosecutors

17       that works for the Statewide Prosecutors Office.

18           Q    So let's read the first paragraph there:

19       I compared the list below with our current smart

20       sheet and counted a total of 14 convictions.    I

21       believe four of these were PPCs -- that's presumably

22       referring to paid petition circulators -- and the

23       rest felon voters.  However, I was also able to

24       determine pretty easily that it's not completely up

25       to date.  I am going to enlist help from some of our

1    staff members to get it current as soon as possible.

2              So in that document, Mr. Bridges is

3    referring to a smart sheet.  What's that?

4         A   I'm not sure what it's referring to there.

5    I do know that Smartsheet is a website that you can

6    use that's similar to setting up spreadsheets

7    through Excel, but it's through a different

8    application called Smartsheet.

9         Q   Okay.  Mr. Bridges is saying that he

10   identified four convictions of paid petition

11   circulators.

12             Over how long a period of time is that, do

13   you know?

14        A   I don't know.  I think that that smart

15   sheet is referring to something that the statewide

16   prosecution must keep.  We have our own smart sheet,

17   but we didn't develop that until just a few months

18   ago.

19        Q   Okay.  I am now scrolling down to the next

20   page of this.  And can you see that there is a

21   "from" Jonathan Bridges, again, to Nathaniel Bahill.

22   The email was sent January 11, 2024, at 11:25 a.m.

23             Do you see?

24        A   I do, yes.

25        Q   Who is Nathaniel Bahill?

SOS REPRESENTATIVE JILLIAN PRATT

1           A    I am not clear, I've never heard of him.

2                I think, based on his email handle, that

3      he must work for the Attorney General's Office which

4      includes the Office of Statewide Prosecution, but

5      I'm not sure.

6           Q    Okay.

7                MR. SHAPIRO:  We are going to take a break

8           soon.  Let me first finish with this exhibit.

9      BY MR. SHAPIRO:

10          Q    If we scroll down, I would like to look at

11     the last paragraph.  It says:  According to legal

12     files, there are a total of 72 election fraud cases.

13     Most of these are out of the Tampa office, and I

14     believe a lot of them are open investigations.

15     Below is the list of 72, several of which are

16     already noted in my list above.

17               Do you see that paragraph?

18          A    I do, yes.

19          Q    And do you have a sense as to -- scroll

20     up.

21               Do you have a sense as to what Mr. Bridges

22     is trying to do here?  What is this email, what is

23     trying to be conveyed in this email?

24               MR. RABAN:  Object to form.

25          A    I'm not sure.  I think Jonathan Bridges

1    would be the best person to answer that.

2    BY MR. SHAPIRO:

3        Q    Let me read it again:  I am currently in

4    the process of putting together a smart sheet so we

5    won't have to do a fire drill every time we are

6    asked to produce these kinds of stats.  Below are

7    some previous notes I sent to Nick about election

8    case stats.  They are not completely up to date, but

9    should be recent enough to use.

10            So would you agree with me that this seems

11    to be an attempt to inventory stats related to

12    petition circulator cases that have been prosecuted?

13            A    Again, I was not involved in this email.

14    I don't think anyone from my office was.

15            But in looking at it, it appears that

16    Statewide is putting together a list of their cases

17    that they have identified, which is not necessarily

18    the same as OECS.

19        Q    And you saw that this was being provided

20    to Brad at the top, if you go back.  You saw this

21    was part of the production of the Secretary of

22    State, correct?

23            A    I understand that, yes, this was part of

24    production.

25            I was talking about on this email that may

1    have eventually been forwarded to someone from the

2    Department of State, it doesn't appear that anyone

3    is copied as a recipient on this email.

4        Q    You don't know if this information was

5    forwarded to OECS?

6        A    Like I said, I was talking about that

7    particular email.  It may have been forwarded to

8    OECS.  It does look like it was forwarded to Brad

9    McVay on July 18th at 4:25 p.m.

10        Q    Yes.  That's my impression as well,

11    because this is part of an email chain.

12            So I think you said you had no reason to

13    doubt the authenticity of this email chain, correct?

14        A    That's correct.

15        Q    Brad McVay used to have your job, correct;

16    he used to be director of OECS?

17        A    No, he was never the director of OECS.  He

18    was the Deputy Secretary of State and he oversaw the

19    director of OECS, which before me was Andrew

20    Darlington.

21        Q    Gotcha.  All right.  Thank you for that

22    correction.

23            He was involved in overseeing the efforts

24    of OECS.  And this was an email chain that was

25    forwarded to him, correct?

1      A    That's what it appears to be, yes.

2          Q    It seems -- would you agree with me that

3      it does seem to be an effort to inventory

4      individuals who have been charged for various types

5      of election crimes, correct?

6          MR. RABAN:  Object to form.

7          A    It appears to be an inventory of statewide

8      prosecution cases where they have, it looks like,

9      led to some kind of result.

10     BY MR. SHAPIRO:

11         Q    I would like to look at the list now at

12     the bottom, if you would.  Again in the last

13     paragraph, there is mention of 72 election fraud

14     cases.

15             We skim that list, there is 15 on page 3.

16     And if you could look at those 15, do you see, like

17     me, that there are two cases, 8 and 9, that are

18     circulator fraud cases; do you see that?

19         A    I see 8 and 9 where it says circulator

20     fraud.

21         Q    And 4 and 5 are bad petitions?

22         A    I'm sorry, you cut out.  They do say bad

23     petitions.

24         Q    4 and 5 are bad petitions, do you see

25     that?

1          A   Yes, I do.

2              Q   Do you see all the other cases have

3      nothing to do with petition fraud?

4              MR. RABAN:  Object to form.

5              A   I see that none of the others say the

6      words circulator, fraud or bad petition.  However, I

7      don't know if those that say appeal or that say

8      election fraud generally have anything to do with

9      petitions.

10     BY MR. SHAPIRO:

11             Q   Scrolling down, there is on the next page,

12     you can see the rest of the cases.  Do you see -- I

13     am showing you the first 51, I am going to scroll

14     down to the remainder.  Do you see none of the cases

15     have anything to do with petition fraud?

16             A   I see that none of them say the words

17     "petition fraud."  I don't know what is included

18     under "election fraud" or "elections" or "foster

19     election fraud."

20             "Grassfire," I believe, does have

21     something to do with petition fraud because that --

22     I know someone who was involved with the petition

23     initiative.

24             And then I don't know what "stribling"

25     election fraud is.  And those that say "voter

1    fraud," I don't have any reason to think they have

2    anything to do with petition fraud, but I don't have

3    any reason to think that they don't.

4        Q    Most of these on this page either say

5    "election fraud" or "voter fraud," and there appears

6    to be a different designation for "circulator fraud"

7    and "bad petition" that we saw earlier.

8        So would you agree with me this would

9    suggest there is something distinct from circulator

10    fraud and distinct from bad petition, given that

11    there is a -- that they are tagged differently as

12    election fraud and voter fraud?

13        MR. RABAN:  Object to form.

14        A    I would be speculating as to how they

15    differentiate between these cases, especially when I

16    look at Grassfire.  I believe that does have

17    something to do with petition fraud and they didn't

18    label it bad petition or petition fraud.  And so I

19    don't know that statewide is using consistent labels

20    in this email.

21    BY MR. SHAPIRO:

22        Q    And the last one on this list from 64 to

23    72, do you agree you don't see petition fraud or

24    circulator fraud on that list?

25        A    I agree.

1        Q    Okay.  We are done with that exhibit.

2            MS. DOLAN:  We are requesting a brief

3        recess.

4            MR. SHAPIRO:  Let's take a break.

5            (A recess took place from 12:50 p.m. to

6        1:15 p.m.)

7                DIRECT EXAMINATION

8    BY MS. SZILAGYI:

9        Q    Good afternoon, Ms. Pratt, I am Heather

10   Szilagyi, and I represent the Florida Rights to

11   Clean Water plaintiffs in this matter.  I hope you

12   had a chance to grab a bite of food during the

13   break.

14           So I spoke with Avner over the break.

15   Given our time constraints, I am going to take over

16   the questioning right now.  We also wanted to flag

17   that we'll be following up with your counsel after

18   this deposition about additional time for the

19   deposition as needed, but I don't want to spend time

20   hashing all that out right now.

21           Also with me today are Brent Ferguson and

22   Mel Neal from Campaign Legal Center, also

23   representing the Florida Right to Clean Water

24   plaintiffs.  So I am just going to be following up

25   on some of the questions and topics Mr. Shapiro

1    asked about this morning.  Does that sound good?

2        A   Yes, it does.

3        Q   Great.  So jumping right in, earlier you

4    mentioned that you had evidence of volunteer

5    circulators committing fraud, but you were not aware

6    of that evidence being included in the released

7    reports, is that correct?

8        A   That's correct, yes.

9        Q   So why would this evidence not be included

10   in the reports?

11       A   The reports are meant to update the

12   legislature on what we have done in the past year.

13   So to the extent that those were complaints that

14   were made and investigated, it would have shown up

15   on the report in the table that lists all of the

16   different cases that we have conducted throughout

17   the past year.

18           But whether or not it was specifically

19   discussed in the narrative part of the report, that

20   would have just been up to the authors.

21       Q   And what kind of factors do authors use in

22   determining what is put in a narrative of the

23   report?

24       A   Typically, it's highlights of what we have

25   been working on in the past year.

1          Q    And so it's fair to say if the

2     investigations into volunteers that committed fraud

3     weren't included in the narrative, did OECS consider

4     it an important issue that they thought was worth

5     providing to the legislature?

6          MR. RABAN:  Object to form.

7          A    OECS considers any one of its

8     investigations that we open to be important.  But as

9     to whether or not it's a focus of a report, my guess

10     is that there were certainly more cases where we

11     were able to identify the petition circulator, and

12     so those were the ones that we focused on in last

13     year's report as opposed to volunteers who we could

14     not identify.

15     BY MS. SZILAGYI:

16          Q    Turning back to your discussion that you

17     just brought up about not being able to identify

18     volunteers who turned in forms, is that correct?

19          A    Correct.

20          Q    So in your investigations, did you look to

21     see who had turned in these apparently fraudulent

22     petitions, not with their name on the form, but who

23     actually turned them into the supervisor?

24          A    We did attempt to do so, I think for some

25     of them.  I can remember one in particular -- I

SOS REPRESENTATIVE JILLIAN PRATT

1     can't remember now if this was petitions or if it

2     was voting registration applications.  But we were

3     able to identify that individual who just left them

4     with a supervisor's office.

5              Apart from that, I don't think we were

6     able to identify anyone.

7          Q    Okay.  What did you do upon identifying

8     the individual who left them with the supervisor's

9     office?

10         A    We referred that case to law enforcement

11    for further investigation.

12         Q    And you are not sure what happened after

13    that?

14         A    I believe it's still being investigated.

15         Q    And was that before or after HB 1205 was

16    enacted?

17         A    That would have been, I believe, after

18    HB 1205 came out but maybe before it actually went

19    into effect.  It would have been around the same

20    time period.

21         Q    Okay.  So I would like to pull up what I

22    think I will mark as Exhibit 3, if that's correct,

23    which is HB 1205 itself.

24              (Exhibit 3 was marked for identification.)

25

1        MS. SZILAGYI:  My colleague, Mel, will

2    share her screen.  Can you zoom in a little

3    bit, Mel?

4    BY MS. SZILAGYI:

5        Q    We are going to turn to section

6    100.371(3)(e) which is on page 11.  Can you see

7    that?

8        A    Yes, I can.

9        Q    And so are you familiar with the personal

10    use petitions created by HB 1205?

11        A    I am, yes.

12        Q    Okay.  And so do you expect that people

13    who are willing to commit fraud would register as a

14    petition circulator or would they be more likely to

15    use the personal use forms?

16        A    I would be speculating as to which they

17    are more likely to use.  I think both are likely,

18    given what we have seen in the past, which is that

19    we did see registered petition circulators who we

20    believed to have committed fraud, but we also saw

21    volunteers who we believe committed fraud.

22        Q    So turning back to the requirement we

23    discussed, which is down in section (4)(a) here

24    about individuals are required to register as

25    petition circulators if they plan to collect more

1    than 25 signed forms outside of themselves or their

2    family, is that right?

3        A    Correct.

4        Q    And so does the department have a process

5    for determining if someone submitted more than 25

6    forms in a way that violates HB 1205?

7        A    Our process would be very similar to any

8    of our other preliminary investigations.  It would

9    start with a complaint, some knowledge from someone,

10    some personal knowledge that would indicate someone

11    is suspected of violating this provision.  We would

12    then make sure we have a sworn complaint.

13        We would need more information, I am sure.

14    We will have to look at the petitions to see whether

15    or not those were signed by the individual

16    delivering the petitions or immediate family

17    members, and that would be more difficult to

18    determine.

19        If we did get to a point where we believed

20    that person had violated this provision, we would

21    refer it to FDLE for further investigation, and then

22    they would take it from there.

23        Q    So does the department track who turns in

24    personal use petitions in any way?

25        A    I don't believe there is a way to track it

 1    currently, in the sense that I don't think people

 2    who are distributing personal use petitions have to

 3    sign them.

 4         We are tracking them in the sense of if we

 5    receive a complaint about someone who may have

 6    violated this provision, then we would log that as a

 7    case, we would look into it, do a preliminary

 8    investigation and either decide to close it because

 9    of lack of evidence or refer it to law enforcement.

10         Q    Are there other ways you look into whether

11    someone submitted more than 25 personal use

12    petitions other than through a complaint that is

13    submitted?

14         A    Not at this time, no.

15         Q    Okay.  And you testified earlier that

16    sponsors are held responsible for the actions of

17    circulators because sponsors give permission to

18    petition circulators to collect petitions for that

19    sponsor, is that right?

20         A    Correct.

21         Q    Okay.  And so the law simply requires

22    individuals to register as circulators and then

23    select the petitions they wish to circulate, is that

24    right?

25         A    My understanding is that they register

1    with the Department of State, and then I think -- I

2    don't know, that would be more of a question for

3    Maria Matthews as to that process as to how someone

4    becomes a petition circulator.

5        Q   Okay.  So I guess my question is what do

6    you base your understanding that sponsors have a

7    relationship with circulators who are circulating

8    petitions on their behalf?  What do you base that

9    understanding on?

10        A   I believe -- and I could be wrong -- I'd

11    rely on the statute, but I believe it refers to

12    petition circulators as fiduciaries to sponsors.

13        Q   Okay.  So to your knowledge, does the

14    sponsor always give someone permission to collect

15    petitions on their behalf, or can a person circulate

16    petitions on behalf of the sponsor without the

17    sponsor's permission?

18        A   I know that to distribute personal use

19    petitions, the sponsor may not be aware.  But my

20    understanding was that they would be aware of

21    circulators that are circulating on their behalf.

22    So those are registered circulators.

23        Q   Okay.  So it's your understanding that all

24    registered circulators, the sponsor is aware of who

25    they are?

149

1           MR. RABAN:  Object to form.

2           A    I believe they are aware, or that they

3       have the ability to be aware.  They should be aware.

4       BY MS. SZILAGYI:

5           Q    Okay.  Moving on to another provision.

6               So earlier you mentioned that there was an

7       exception in the law for what was impossible for a

8       sponsor to comply with the law, is that correct?

9           A    Correct.

10          Q    And what does the sponsor -- excuse me,

11      start again.

12              What does the department consider

13      sufficient to meet the standard of impossibility?

14          A    It would be a factual determination.  And

15      so it would depend largely on the facts and

16      circumstances.

17              It would begin with a sponsor informing

18      the department why it was impossible for the

19      petitions to be delivered within the 10-day window,

20      for example.  So it would be largely just fact

21      determinant.

22          Q    Okay.  For one possible example; so if

23      sponsors rely on the mail to transport petitions

24      across the state and they are unable to return

25      petitions within 10 days, just because of how long

144

1    the mail takes to be delivered, does that satisfy

2    the impossibility standard?

3        MR. RABAN:  Object to form.

4        A    It could.  I think it would, again,

5    depends on the facts and circumstances.  I can

6    imagine one situation where they were not actually

7    delivered to -- put into the mail -- they weren't

8    actually mailed until the ninth day, for example.

9        That's different than we mailed them out

10    and, due to circumstances outside of our control,

11    the mail just was not delivered quickly enough.

12    That would present impossibility.

13        But again, it would just depend largely on

14    the facts and situations of that individual case.

15    BY MS. SZILAGYI:

16        Q    Okay.  I would like to turn to section or

17    subsection (11) here of HB 1205.

18        And so I would like to turn to another

19    provision you mentioned earlier, which is the last

20    sentence of subsection (11) which states:  If the

21    sponsor of an initiative petition discovers a

22    violation of this section and reports the violation

23    as soon as practicable to the Secretary, the sponsor

24    may not be fined for such violation.  Do you see

25    that?

149

1       A   Yes.

2       Q   And you remember discussing this earlier?

3       A   I do.

4       Q   Okay.  So who in the department is

5   ultimately responsible for fining the sponsor?

6       A   The Secretary of State, I think, is

7   responsible for fining, but he has designated that

8   duty to the Office of Election Crimes and Security.

9   We work in conjunction with the general counsel's

10   office and we also work with the Division of

11   Elections in the sense of we receive information

12   from them.  But ultimately, the Office of Election

13   Crimes and Security is the entity that puts forward

14   these fines.

15       Q   Okay.  Is it also the Office of Election

16   Crimes and Security that's responsible for assessing

17   whether a fine should be excused under subsection

18   (11) that we just read?

19       A   I think it can be.  I think if OECS

20   becomes aware of an impossibility -- or if OECS

21   becomes aware of a sponsor reporting a violation as

22   soon as practicable, we would not fine the

23   individual.

24       We are not the ultimate arbiter

25   necessarily in determining that because it is a

1    factual determination.  So if we did fine someone,

2    they would still have the ability to challenge that

3    further.

4        Q    Can you explain more what you mean by you

5    are not the ultimate arbiter of who is imposing a

6    fine in that situation?

7        A    Sure.  We are the people that would be

8    imposing the fine, but as to whether or not that

9    fine would hold, we provide whoever we are fining

10    with Chapter 120 rights.  And so it would be a

11    factual determination that if a sponsor wanted to

12    challenge, they would have the ability to do that.

13        Q    Okay.  And what does the department

14    consider to be a sufficient notification from the

15    sponsor under subsection (11) in order to be

16    absolved from liability from fines?

17        A    Again, it would be largely determined

18    based on the facts.

19            As far as the method of informing the

20    Office of Election Crimes and Security or, I guess,

21    the Secretary, there is not a method that's listed

22    here.  So it could be through writing, it could be

23    through phone call, it could be in person.

24        Q    Okay.  And so this provision that we are

25    looking at is separate from the impossibility

1    standard, correct, in that it just requires a

2    notification or report of the violation as soon as

3    practicable?

4              MR. RABAN:  Object to form.

5          A   It requires reporting the violation as

6    soon as practicable, if the sponsor of the

7    initiative petition discovers a violation of this

8    action.  So I think that first part of the sentence

9    is important.

10   BY MS. SZILAGYI:

11         Q   Okay.  So what is the Office of Election

12   Crimes and Security's process for tracking these

13   reports from sponsors when they come in?

14         A   If we receive a report from a sponsor, we

15   log it, and we then do an investigation, similar to

16   how we would do an investigation for a criminal

17   referral.  Although this would not be for a criminal

18   referral, it would look at the same kinds of

19   evidence that we would be looking at to determine

20   whether or not any other allegation is true.

21             And so we would talk to the sponsor, we

22   would want to talk to the individuals involved, get

23   a sworn statement.  And if we determined that the

24   violation had been reported as soon as practicable,

25   then no fine would be issued.

1      Q    And where are those notifications logged

2    as they come in?

3      A    They should be logged in our internal

4    tracking system which, as I spoke about earlier, we

5    developed and adopted within the past couple of

6    months.  So they are still a work-in-progress.  But

7    every complaint that we receive -- and that would

8    include a potential violation of this section -- we

9    would log, and then we would investigate the

10   violation and we would determine whether or not a

11   fine should be issued.

12     Q    Okay.  So you mentioned earlier that you

13   are investigating several instances where a sponsor

14   may be fined but haven't issued any fines yet since

15   HB 1205, is that correct?

16     A    That's correct.

17     Q    So as part of this investigation, does the

18   office check to see if the sponsor had provided an

19   earlier notice of the violation?

20     A    Yes, in the sense that we log every time

21   that we receive a notification that a sponsor is

22   telling us that they discovered a violation; we make

23   sure that we are keeping track of that before we

24   issue any fines.

25     Q    Okay.  And just to clarify one thing, when

SOS REPRESENTATIVE JILLIAN PRATT

1    the statute says the sponsor, quote, may not be

2    fined, if this notification precondition is met, do

3    you interpret this to mean that they are not allowed

4    to fine the sponsor, or that they have the

5    discretion not to fine the sponsor?

6            MR. RABAN:  Object to form.

7        A    I read that to mean that the sponsor shall

8    not be fined for that violation.

9    BY MS. SZILAGYI:

10        Q    And do all of the provisions of section

11    100.371 of Florida Statutes fall under this

12    exception?

13            MR. RABAN:  Object to form.

14        A    So I would rely on what legal position we

15    put forth in our papers.

16            My understanding is when it refers to this

17    section, it's referring to, I believe you said it's

18    section 371.011.  I don't know if that's right.  But

19    whatever statute this is referring to, it's

20    generally what the legislature refers to in the

21    section.

22    BY MS. SZILAGYI:

23        Q    I can give an example.  So if a sponsor

24    provides notice to the Secretary that it's

25    submitting forms in violation of the 10-day return

1    rule, does this mean that the Secretary will not

2    fine the sponsor because this notice was provided?

3        A    I'd have to look at the entire statute in

4    order to give you a proper answer on that.

5            But I believe, based on this provision,

6    that we would not be fining for that if they had

7    discovered it and then reported it -- or this is for

8    the 10-day --

9        Q    Correct.

10       A    -- 10-day notice?

11           I think there is another provision that

12   addresses that, not this one necessarily.

13           The other provision is whether or not it's

14   impossible to get petitions to the Supervisor of

15   Elections within 10 days.

16       Q    So is it your interpretation of HB 1205

17   that the impossibility provision you discussed

18   earlier applies to the 10-day return rule, but this

19   provision, subsection (11), does not apply to the

20   10-day rule?

21           MR. RABAN:  Object to form.

22       A    I would have to look back at this statute,

23   and I am happy to do so if you would like to scroll

24   up for me.  And then I can tell you what our

25   position is.

1          BY MS. SZILAGYI:

2                  Q    I don't have the impossibility subsection

3          in front of me, but we can find that.

4                  A    In order to determine what that specific

5          provision applies to that you were just talking

6          about, I would have to look at the very beginning of

7          that section and go all the way through because it

8          says it applies to that section.

9                  Q    Sure.  So that's on page 9, 100.371.

10                 A    Uh-huh.

11                 Q    This is 100.371, and then section we were

12         just discussing is subsection (11) of this section.

13                 A    Uh-huh.

14                 Q    So it's your position that anything within

15         100.371 would fall under subsection (11), notice

16         exception, am I getting that right?

17                 A    I would rely on the legal argument that we

18         put forth in our papers, but that is my

19         understanding, yes.

20                 Q    Okay.  So I think we can go back to

21         subsection (11) which is page 15.

22                    Can you tell me how specific the notice

23         needs to be from the sponsor regarding the violation

24         in order to trigger this subsection?

25                 A    I think they have to report the violation.

152

1        As far as specifics, I think that the statute speaks

2        for itself; we are not requiring more than that or

3        any less than that.

4            Q    Would you require it to provide the exact

5        date of the violation, for example?

6            A    I think they have to give us enough

7        information to identify what violation they are

8        talking about.  And in some circumstances, it may

9        mean that we ask for the date, in others they may

10       have given sufficient description to report that

11       violation to us.

12           MS. SZILAGYI:  Okay.  I would like to

13       introduce another exhibit I will mark as

14       Exhibit 4.

15           (Exhibit 4 was marked for identification.)

16           MS. SZILAGYI:  For my colleague's benefit,

17       the Bates stamp starts with 0589671.

18   BY MS. SZILAGYI:

19           Q    So this is Bates stamped on the bottom of

20       the first page SOS_0589671.  Do you see that?

21           A    I do, yes.

22           Q    So do you have any reason to doubt this is

23       a document produced from the Secretary as part of

24       discovery in this matter?

25           A    No, I don't.

SOS REPRESENTATIVE JILLIAN PRATT

1          Q    Okay.  Starting at the bottom of the first

2      page, do you see the email from Joseph Bonasia sent

3      to the Secretary's office?

4          A   I do, yes.

5          Q    And can you just take a look through this

6      email?

7              MS. SZILAGYI:  If you can scroll to the

8          top of it, the beginning of it, Mel.  Go down.

9      BY MS. SZILAGYI:

10         Q    If you can take a look through this email

11     and let me know when we can scroll and when you had

12     a chance to look.

13         A    Okay.  (Examining document.)  I am ready

14     to scroll down.  All right.

15         Q    Have you seen this email before?  I'm

16     sorry.  Continue, there is a little bit more.

17         A    I'm not sure if I personally have seen

18     this.  It may have been forwarded to me, but if it

19     was, that would have been included in the discovery

20     response.

21         Q    Okay.  So I would like to turn your

22     attention to the paragraph below the paragraph

23     numbered 2 which starts:  In addition, pursuant to

24     subsection (11) of Florida Statutes 100.371.  You

25     see that, right?

SOS REPRESENTATIVE JILLIAN PRATT

1          A   I do, yes.

2              Q    Okay.  So is it fair to say that this

3    email is reporting a potential violation of the

4    10-day rule?

5          A   Yes, it is.

6          Q   So if these petitions described by

7    Mr. Bonasia did violate the 10-day rule, would this

8    email suffice as a notification to the Secretary

9    that would absolve the sponsor of liability from a

10   fine?

11             MR. RABAN:  Object to form.

12         A   I believe it would.

13   BY MS. SZILAGYI:

14             Q    Okay.  And why do you say that?

15         A    Because it seems to be describing some of

16   an impossibility to comply with the 10-day rule.

17             It's saying that these were collected in

18   compliance with the law as it existed at the time,

19   which means that they were lawfully collected, and

20   they had not been turned in within that 10-day

21   timeframe because the law only required them to turn

22   it in within 30 days, and then the law changed.

23             So as far as I can tell, they are

24   describing impossibility in being able to turn these

25   in within 10 days.

1          MS. SZILAGYI:  Let's move on to another

2     exhibit, which we will mark 5, this will be

3     Exhibit 5, which begins Bates stamp

4     SOS-0589620.

5          (STENOGRAPHER'S NOTE: This document was

6     later stricken/replaced.)

7     BY MS. SZILAGYI:

8          Q    Do you see the Bates stamp at the bottom

9     of this first page?

10          A    I do, yes.

11          Q    So do you have any reason to doubt this

12     was a document produced by the Secretary's office as

13     part of discovery in this matter?

14          A    I don't.

15          Q    And looking at the email -- if you can

16     scroll up a little.  You see the email at the

17     bottom.  Again, it's an email from Joseph Bonasia to

18     the Secretary of State's Office, is that correct?

19          A    I see that, yes.

20          Q    Okay.  And can you scroll down, I will

21     give you a chance to look at this email.

22          MS. SZILAGYI:  Can you scroll some more?

23     This might be a similar exhibit to the one we

24     just looked at.  So just for the sake of time,

25     I am going to move on to one last -- we'll

SOS REPRESENTATIVE JILLIAN PRATT

1         strike this and move on to one last exhibit

2         which, is an email, the subject line is Right

3         to Clean Water Email Reporting Known and

4         Unknown Violations.

5              (Exhibit 5 was marked for identification.)

6              MS. SZILAGYI:  So I will mark this

7         Exhibit 5, if that's all right.

8     BY MS. SZILAGYI:

9         Q    Can you take a look at this email and let

10        me know when you had a chance to review it.

11        A    I reviewed it.

12        Q    So am I correct that this is an email from

13        Melissa Martin of the Florida Right to Clean Water

14        to the Secretary of State's email address?

15        A    That's what it appears to be, yes.

16        Q    Do you have any reason to doubt that that

17        is what it appears to be?

18        A    No, I don't.

19        Q    Okay.  So directing you to the last

20        sentence of the second paragraph which reads:  We

21        are aware, however, of multiple instances of our

22        volunteers receiving and having to immediately

23        submit signed petitions to SOEs which have violated

24        or will likely have violated the 10-day rule and/or

25        out-of-county rule.  Do you see that?

SOS REPRESENTATIVE JILLIAN PRATT

1          A    I do, yes.

2          Q    So does this email serve a sufficient

3    notice under HB 1205 that would absolve the sponsor

4    of fines for the violations described in the email?

5              MR. RABAN:  Object to form.

6          A    I don't think this is specific enough for

7    me to understand what violations they're reporting.

8              It says they are aware of multiple

9    instances of our volunteers receiving and having to

10   immediately submit signed petitions to SOEs which

11   have violated or will likely have violated the

12   10-days rule and/or the out-of-county rule.

13             I don't think that's specific enough to

14   give me information as to what Clean Water is saying

15   that they should not be fined for.

16   BY MS. SZILAGYI:

17         Q    Okay.  Understood.  We can take down this

18   exhibit.

19             And I will like to bring back up HB 1205,

20   which I think is Exhibit 3.  I would like to take a

21   look at section 100.371(3)(d) which is on page 10.

22   You can scroll up a bit.  It's right there.

23             So are you familiar with HB 1205's

24   requirement that all registered petition circulators

25   use petition forms that include the petition

1          circulator's affidavit?

2               A    I am.

3               Q    And the affidavit includes the

4          circulator's name, permanent address and petition

5          circulator number or barcode as laid out in the

6          statute in front of you, is that correct?

7               A    Correct.

8               Q    Okay.  So how is the information on this

9          affidavit used in connection with investigations by

10         the Office of Election Crimes and Security?

11              A    That information would be used any time we

12         receive a complaint about a petition or suspected

13         fraud about a petition that has that petition

14         circulator's affidavit.  We would look to see who

15         the circulator is and then take the investigation

16          from there.

17               It may involve interviewing that

18         circulator, although typically we would leave that

19         for law enforcement to do.  But we would use that as

20         kind of a starting point to try to understand who

21          was distributing these petitions.

22              Q    Okay.  So what do you use on the petition

23         circulator's affidavit to determine who was

24         circulating the petitions?

25              A    The circulator's name, their address, and

1        their circulator number or barcode.  We also use

2        their signature.

3            Q    Is there any other time, other than the

4        investigatory process you just described, when you

5        might need to use the information from the affidavit

6        to investigate fraud?

7            A    We would need to use it any time we're

8        investigating a crime that relates to a petition

9        circulator.  So if it was our belief that a petition

10       circulator had lied on their application, we would

11       use their name, their address, their circulator

12       number or barcode, and then their signature to

13       verify that that, indeed, is the individual that we

14       suspect of distributing those petitions.

15           Q    And are there any other uses for the

16       petition circulator's affidavit from the office's

17       perspective that come to mind?

18           A    There are a number of uses when it comes

19       to investigation and then potential prosecution,

20       which that does go beyond the Office of Election

21       Crimes and Security.  But I do view it as being

22       helpful to law enforcement if we do refer something

23       for them to be able to locate that individual more

24       readily.

25           Q    So is it fair to say that you are using

SOS REPRESENTATIVE JILLIAN PRATT

1     that information on this affidavit after a form that

2     is suspected of being fraudulent is submitted to a

3     supervisor of elections, for example?

4         A    We would use it in that circumstance, yes.

5         Q    Any other circumstances?

6         A    I guess anything relating to an

7     investigation involving a petition circulator, we

8     would use that information.

9             I can't think of another reason OECS would

10    use that information.  I don't know if the division

11    has any purposes behind using that, but that would

12    be more appropriately directed to them.

13        Q    Okay.  I want to ask a couple more short

14    questions about some of the other provisions we have

15    discussed earlier.  So if we can look at subsection

16    (8) on page 14.

17            So do you remember discussing this

18    provision earlier about filling in missing

19    information on a signed petition?

20        A    Yes.

21        Q    Okay.  And you testified that a circulator

22    filling in the county after a voter has signed a

23    petition would be a violation of this provision?

24        A    Correct.

25        Q    So does the department consider a

1    circulator filling in the name of the county on the

2    county line after the voter has signed it to be

3    fraudulent behavior?

4        A    The department considers it to be filling

5    in missing information on a signed petition, so the

6    language that is in this provision here.

7        Q    Understanding that you consider it to be a

8    violation of this statute, do you also consider it

9    to be fraud?

10        A    I think that would be a question for

11    prosecutors, as to whether or not that's something

12    they consider to be fraud.  I would have to talk to

13    them and see what their perspective is on the

14    matter.

15            But based on just my understanding of what

16    fraud is, it is essentially someone pretending to be

17    someone else.  And so I think it could go either

18    way, and that would definitely be a question for law

19    enforcement.

20        Q    Okay.  And do you recall testifying

21    earlier regarding the provision of HB 1205 that

22    requires the sponsor to return the petition to the

23    county in which the voter resides?

24        A    Yes.

25        Q    So if a voter does not fill in anything on

1    the county line, where should the sponsor return the

2    form to avoid a fine?

3        A    They should return it to the county in

4    which the city or the ZIP Code listed on the

5    petition, whichever supervisor's office it

6    corresponds to.

7        Q    Okay.  And one last question about the

8    10-day return rule that we discussed earlier.

9            Do you also remember discussing personal

10   use petitions just a few minutes ago?

11       A    Yes, I do.

12       Q    And do personal use petitions that voters

13   sign on their own and then send to the sponsor's

14   mailing address need to be turned in within 10 days

15   of the voter's signature under HB 1205?

16       A    Could you please scroll to the provision

17   that talks about that 10-day requirement?

18       Q    Sure, that's section (7)(a).

19       A    My understanding of this provision is that

20   this applies to circulators that are registered.  It

21   applies to a sponsor that collects petition forms or

22   uses a circulator to collect petition forms.  So it

23   wouldn't apply in a situation where someone signs a

24   personal use form and then turns it into the

25   supervisor themselves.  But it would apply in a

1      situation if the sponsor is collecting those

2      petition forms.

3          Q    And the sponsor collecting the petition

4      forms, does that include if the voter mails the

5      personal use petition to the supervisor's mailing

6      address which is on the petition form itself?

7          A    I would say yes, that's the sponsor

8      collecting the petition forms.

9          Q    Okay.  And since the 10-day return

10      deadline has been in effect, have there been more

11      violations of the return deadline than there were

12      prior to HB 1205?

13          A    I'm sorry, could you repeat that?

14          Q    Sure.  So you remember testifying earlier

15      that prior to HB 1205, the return deadline was 30

16      days for these paid petition circulators, correct?

17          A    Correct.

18          Q    And so since the new 10-day return

19      deadline has been in effect, have there been more

20      violations of the return deadline than when the

21      deadline was 30 days?

22          A    I don't know if there have been more or

23      less violations.  We are investigating a number of

24      potential violations for fines, but I don't think

25      that there is a way to determine whether or not

1    there have been more or less violations.  It was

2    just what we have become aware of.

3        Q    So based on the information you have

4    collected, you are not sure whether more forms that

5    violate the return deadline have been submitted

6    after enactment of 1205?

7        A    That's correct.

8            MS. SZILAGYI:  Thank you for your time.

9        In the interest of time, I am going to turn it

10        over to my colleague, Tyler.  Thank you.

11                DIRECT EXAMINATION

12    BY MR. DATO:

13        Q    My name is Tyler Dato, I am an attorney

14    with Winston Strawn.  I am here representing the

15    League plaintiffs.  I have with me my colleague Gary

16    Stockard.

17            Before I start, I just want to confirm you

18    understand you are here testifying today as one of

19    the corporate representatives of the Secretary of

20    State of Florida, correct?

21        A    I do, yes.

22        Q    You testified earlier that your office has

23    made roughly 80 referrals relating to what your

24    office believes are volunteers engaging in petition

25    fraud, is that correct?

1        A   That's correct.

2        Q   Okay.  And I want to clarify a few things

3    about those 80 referrals.

4            Those referrals are all related to the

5    petition collection process, not other voting law

6    violations, is that right?

7        A   That's correct.

8        Q   Okay.  And can you walk me through what

9    those referrals entail?  So each one of those 80

10   referrals, does each referral relate to a specific

11   violation of the law?

12       A   Sure.  So it really does depend sometimes

13   on how we receive the complaint.  Certain complaints

14   might just be related to one petition in particular;

15   like, for example, if a supervisor finds out that a

16   petition has been submitted on behalf of a deceased

17   person, and it was also submitted by a volunteer,

18   that might be one complaint that they send to my

19   office.  And that would form the basis of

20   potentially one referral.

21           But it could also be that a supervisor

22   sends my office a number of petitions related to

23   maybe a petition circulator in particular or, in

24   this case, volunteer forms that they suspect to be

25   fraudulent, and that could form its own referral.

1          So there are 80 referrals, which means

2    there are at least 80 petition forms that we

3    determined that likely had fraud and they were

4    volunteer forms.  But it was more likely -- more

5    than likely, it was more than 80 forms in total.

6          Q    So the 80 number, that refers to the

7    number of petition forms implicated by the various

8    complaints you received?

9          A    Not necessarily.  It really indicates the

10   number of complaints that we received or ones that

11   we have internally generated.  So one complaint

12   could be related to hundreds of forms, and that

13   could be one singular referral.  It just depends on

14   how we intake the complaints that we receive and

15   what they are complaining about.

16         Q    I am just trying to figure what the 80

17   numbers signifies.  Is the 80 number the number of

18   complaints you had?

19         A    It's the number of complaints that we then

20   referred to law enforcement involving volunteer

21   forms.

22         Q    Okay.  So that might implicate more forms

23   than just 80, but that's number of complaints that

24   you have referred?

25         A    Correct.

1          Q    Okay.  And you testified earlier that you

2    were not able to identify in connection with those

3    80 referrals any individuals associated with the

4    forms or the complaints, is that right?

5          A    That is correct.  I did mention one

6    situation where I can't recall if they were

7    petitions, or if they were registration

8    applications, a 3PVRO.  I know that we were able to

9    identify that person who dropped off a number of

10   those.  I just can't recall whether or not it was

11   petitions or registration forms.

12         Q    But the 80 number that you said earlier,

13   that was all petition related, correct?

14         A    Correct.

15         Q    And how were those referrals documented

16   within OECS?

17         A    As I indicated earlier, we have recently,

18   within the past few months, adopted a new case

19   management system.  And so the way that we log them

20   is each time we receive a complaint, we generate a

21   new number.  That is associated with that complaint.

22              We conduct an investigation.  All

23   documents associated with that investigation are

24   supposed to be added to that case file.  And then

25   any referrals that we make or decision to close the

1    case would also be in that file.

2        Q    Do you know for those 80 referrals that

3    you mentioned earlier, do you know if those case

4    files were produced to plaintiffs in this

5    litigation?

6        A    Anything that was supposed to be produced

7    in discovery was produced.  And if any of these

8    cases existed, I guess, prior to the request for us

9    to produce discovery, all of those files would have

10    been produced.

11        I can't guarantee that they were produced

12    in a form where it was organized, because that's

13    something that our new case management system has

14    done.  But all of those documents did exist prior to

15    us adopting this new case management system, and we

16    would have provided those.

17        Q    Okay.  You just mentioned that some of

18    them, some of those 80 referrals may have been

19    referred after this case began, after the enactment

20    of HB 1205, is that correct?

21        A    That's correct.

22        Q    Do you know how many of those referrals

23    came from before the enactment of HB 1205?

24        A    I believe most of them, if not all.  But I

25    believe most of them.

1      Q    What's your basis for saying that?

2      A    So my predecessor did refer volunteer

3    forms.  That is not typically my practice, unless I

4    can identify who the volunteer -- the alleged who

5    have committed fraud, if we can identify them, I

6    would go ahead and refer that.  But if there is not

7    much of a chance of identifying them, it less likely

8    that I would refer that.

9      Q    Sorry, when you say if you can't identify

10   a volunteer, then you wouldn't refer those cases or

11   you are less likely to refer those cases?

12     A    That has been my practice, because we have

13   a number of other investigations where we can

14   identify the individual we believe to have committed

15   a crime, and we would like to ask law enforcement to

16   look at those before we start asking them to try to

17   identify who these volunteers are.

18     Q    Okay.  So for these 80 referrals, what is

19   the basis for the department's understanding that

20   these are related to volunteer circulators?

21     A    These are forms that were specifically

22   identified as volunteer forms.  They were signed

23   prior to the passage of HB 1205.  Whether or not we

24   referred them before that date is a different

25   question, like you asked earlier, but they all say

1    that they were volunteer forms.

2        Q    Okay.  So it's just a type of form that

3    indicates to your office, that's your basis for

4    separating these into referrals that involve

5    volunteer circulators?

6        A    That's correct.

7        Q    Anything other than just the type of form?

8        A    For some of those cases, we may have

9    talked to the individuals that were alleged to have

10    signed them.  But no, I think that volunteer

11    designation is the only thing that would lead us to

12    believe that those are volunteer forms.

13        Q    Okay.  You testified earlier that there

14    were different kinds of evidence that indicated

15    potential fraud with these volunteer forms.  I think

16    you gave one example, which was a group of petition

17    forms that appeared to have been filled out using

18    the same pen and appeared to have the same

19    handwriting, is that right?

20        A    Correct.

21        Q    Do you recall, are there any other

22    examples?

23        A    Yes.  There are a few counties where the

24    supervisors send a letter every time a petition form

25    is validated or invalidated.  And so we have

1    received complaints from individuals within those

2    counties saying, "I never signed this petition" that

3    was invalidated.

4            And so sometimes we would look at those

5    and see that it was a volunteer petition, and that

6    would get referred to law enforcement for further

7    investigation.

8        Q    When you say supervisors send letters,

9    whether it's validated or invalidated, what do you

10    mean by letters?  Are they sending letters to the

11    voters?  Are they sending letters to your office?

12        A    They are sending letters to the voters.

13    HB 1205 now requires a supervisor to send a letter

14    every time a petition is validated, but there are a

15    few counties that also send a letter to the voter

16    when a petition is invalidated.

17        Q    And what you just referred to is you've

18    had instances of people who have received a letter

19    that says that their petition form was invalidated,

20    and they reached out and complained that they had

21    not signed the form?

22        A    That's correct.

23        Q    And you connected that to volunteer

24    circulators based on the fact that it was a

25    volunteer circulation form?

1       A    Some of them, not all.  We've also

2    connected them to petition circulators.

3       Q    And you said HB 1205 actually requires

4    these letters to be sent out now, right?

5       A    For any petition form that is validated,

6    yes.

7       Q    So those complaints would have necessarily

8    come after the enactment of HB 1205, correct?

9       A    Not necessarily.  Like I said, there are a

10    few counties that have actually gone beyond what

11    HB 1205 has done, and they actually went beyond that

12    prior to the enactment of HB 1205.

13            I can't recall which counties off the top

14    of my head, but I think there are about three that

15    have been sending out letters each time a petition

16    comes in, and whether or not it's validated or

17    invalidated, they will sent a letter to the voter.

18       Q    Do you recall how many such complaints you

19    had?  Out of the 80 complaints that were referred,

20    do you know how many were about these letters being

21    sent out and then responses to them?

22       A    I do not.

23       Q    Okay.  Going back to the example you

24    initially gave of the handwriting matching and the

25    same pen, do you recall roughly how many instances

1      of that example were in the group of 80?

2           A    I do not.

3           Q    Do you recall one specific example of that

4      happening?

5           A    I can recall several examples of petition

6      fraud happening with, I guess, coming from either of

7      those sources.  I can't pinpoint in particular

8      whether or not those are among the 80 that we

9      referred as volunteer forms.

10          Q    So you don't know whether any of the 80

11     involved either of those two examples?

12          A    They would have involved at least one of

13     those two examples.

14          Q    Are those the only two examples of

15     evidence of fraud that you all have come across in

16     making these referrals?

17          A    In relation to the volunteer forms, they

18     are either coming to us because a voter has said I

19     did not sign that form, or we are receiving some

20     kind of indication where we have looked at the

21     signatures, we looked at the handwriting, and we

22     determined that that voter is not, in fact, the

23     person who signed that.

24               That can also include deceased

25     individuals, which is kind of a separate category

1    but easy to determine whether or not that person

2    did, in fact, sign that petition.

3         Q    You have seen volunteer forms involving

4    deceased persons?

5         A    I believe we have.  I can't think of any

6    in particular off the top of my head.

7         Q    Okay.  So the group of 80 is some

8    breakdown between those three examples; the deceased

9    voter -- signature from a voter you determined to be

10    deceased, some indication from the handwriting or

11    pen use, or a voter complaint, is that right?

12         A    That's correct.

13         Q    And for example, the initial example you

14    gave, a group of petitions that had seemingly been

15    filled out using the same pen, same handwriting, so

16    let's say there was a group of 30 petitions that had

17    the same pen and handwriting.  Would that just be

18    one referral or would that be 30 different

19    referrals?

20         A    It would depend on how it came into us.

21    Typically, something like that is going to come in

22    as one complaint and we would consider that to be

23    one referral.

24              There are instances where -- and this is

25    not a volunteer form, but I can think of one

1    petition circulator, for example, who has maybe four

2    separate complaints and hundreds of victims were

3    within those four complaints.  So hundreds of

4    petitions within each one of those were complaints.

5        Q   Earlier you testified, I think, when you

6    were getting questions about the same topic earlier,

7    that even though it is illegal under the statute,

8    that your office thought that some of the volunteers

9    may have been being paid based on a per signature

10    basis, is that right?

11        A   That's right.

12        Q   What was your basis for that suspicion?

13        A   We based that suspicion on the fact that

14    we have received complaints from petition

15    circulators themselves, or other people who have

16    knowledge that circulators continue to be paid per

17    petition, at least in part.  And I am not saying

18    that every sponsor does this or is involved in this,

19    but we have certainly received allegations that

20    circulators have been paid per petition.

21            We -- it would be speculation, but we have

22    speculated that volunteers are likewise paid per

23    petition, because it would be easier to escape

24    investigation of signing other people's names if

25    there is nothing to really trace you, trace that

1        volunteer back to.

2                Q    You understand that a volunteer circulator

3        by definition is not compensated, correct?

4                A    They are not supposed to be, correct.

5                Q    So what you are saying is that these

6        volunteer circulators are not actual volunteer

7        circulators, that's your suspicion?

8                A    We have -- we speculated that.  That's not

9        something that has been proven because, like I said,

10       we are not able to really track these volunteers,

11       and so we are not able to then question them about

12       their activities.

13              But based on what we have seen with

14       registered circulators, we believe that it would

15       make sense for someone who wants to engage in crime

16       to hide, I guess, the trail of the fraud that they

17       are committing on these petitions.

18               Q    Okay.  And nothing about that the

19       suspicion has been included in any report, correct?

20               A    I would rely on what we've written in our

21       reports.  I don't believe so.

22               Q    And you haven't identified a single

23       individual that you think might have been paid per

24       signature when serving as a volunteer, correct?

25               A    Correct.

1          Q   I think you just testified in response to

2     some of my colleague from CLC's questions just now

3     that referrals regarding volunteers may have been

4     included in some of the tables of the report, is

5     that right?

6          A   That's correct.

7          Q   I want to take a look at one of those

8     reports in the tables.

9              MR. DATO:  So I will introduce, I believe

10        we are at Exhibit Number 6.

11             (Exhibit 6 was marked for identification.)

12    BY MR. DATO:

13        Q   I will try to share.

14        A   Can I clarify my answer on that real

15    quick?

16             The 80 I am talking about for this year

17    would not have been included in last year's report.

18    There may be other volunteer petitions that we

19    referred to law enforcement last year, but these 80

20    would only appear on the 2025 report.

21        Q   Okay.  So the 80 referrals that you spoke

22    about earlier that may or may not have occurred

23    before HB 1205's enactment, those were all from this

24    year?

25        A   Correct.

SOS REPRESENTATIVE JILLIAN PRATT

1    Q   What about 2024, how many instances of

2    volunteer circulator fraud did you come across?

3    A   I'm not sure of the number.  I would have

4    to go back and look, but I know that we had some.

5    Q   And none of those instances were mentioned

6    in the reports, correct?

7    A   I don't recall whether or not they were

8    specifically mentioned, but I don't believe that

9    they were because those were not cases that ended up

10   being prosecuted.  We couldn't identify the

11   individuals who were involved.

12   Q   Okay.  And is it your understanding that

13   the tables in the reports identify in any way that a

14   certain instance relates to a volunteer?

15   A   I don't believe it would distinguish

16   between a circulator or a volunteer.

17   Q   Okay.  And I can maybe save us some time.

18   If I put the table up here right now, can you tell

19   me which of the thousands of rows include any

20   connection to a volunteer circulator?

21   A   I cannot.

22   Q   Of the 80 referrals this year and

23   referrals in 2024 or 2023 related to volunteer

24   circulators, have you determined if there is any

25   connection to the League of Women Voters of Florida

1    or any of its members?

2        A    I am unaware of the League of -- I'm

3    sorry, Florida, is that what you said?

4        Q    The League of Women Voters of Florida?

5        A    I am aware who falls under that, but, no,

6    I am not aware of any case specifically involving

7    that organization.

8        Q    How about LULAC, The League of United

9    Latin American Citizens?

10        A    Same answer for that.

11        Q    Okay.  You are aware -- and I can put the

12    statute up here.  I am going to share this with you.

13    Can you see the statute right now?

14        A    Yes, I can.

15        Q    Okay.  You are aware that section

16    104.185(2), the provision of filling in missing

17    information, a person is liable for a felony of the

18    third degree if that person fills in missing

19    information on a signed petition, is that correct?

20        A    Correct.

21        Q    I believe you spoke about a similar

22    provision related to the fines earlier, right?

23        A    Correct.

24        Q    Okay.  And whether it's in regards to the

25    fines or the criminal provision here, would this

1    apply, filling in information, would this apply to

2    someone who helps a voter fill out a form who may

3    not be able to?  For example, someone with trembling

4    hands?

5        A    I think the same law that applies to,

6    like, mail-in ballots would apply to that as well.

7    But this says copies or retains a voter's personal

8    information, so I think if someone who is assisting

9    someone who has shaky hands, then retains their

10    social security number, I believe they will have

11    violated this section.

12        Q    I may have put up the wrong one.

13            I'm sorry, yeah, it is.  Sorry about that.

14    This is the provision that talks about filling in

15    missing information.

16        So as far as filling in missing

17    information, would assisting a voter who cannot fill

18    out their own form be a violation?

19        A    I think the same law that applies to

20    mail-in ballots or, you know, to voting in person

21    with assistance would apply here.

22        Q    What law is that?

23        A    I can't recall off the top of my head,

24    other than there are provisions for people who need

25    assistance due to physical disability, there is a

YVer1f

SOS REPRESENTATIVE JILLIAN PRATT

1    way for them to have assistance in signing their

2    name and putting their other information down when

3    registering or when voting.

4        Q    And is that exception anywhere written in

5    HB 1205?

6        A    Not that I am aware of.

7        Q    Do you know if it's been communicated to

8    the public in any way?

9        A    Other than the statutes and the rules that

10    provide people who need physical assistance help in

11    voting or registering to vote?  No.

12        Q    Okay.  And those statutes are not

13    referenced in HB 1205, correct?

14        A    Not that I am aware of.

15        Q    Okay.  I believe you answered questions

16    earlier about the provision of HB 1205 that now

17    requires volunteers to register if they are going to

18    collect more than 25 forms exclusive of their own

19    and personal close family members, correct?

20        A    Correct.

21        Q    Okay.  And I believe you testified that

22    the stated purpose for that is the prevention of

23    fraud, correct?

24        A    Correct.

25        Q    Okay.  And prior to the enactment of

1    HB 1205, are you aware of any evidence that showed

2    that volunteers collecting more than 25 petitions

3    were more likely to be associated with fraud than

4    volunteers who collected less than 25 petitions?

5         A    We don't have any data, but based on just

6    our reasoning, we look at -- you know, individuals

7    who submitted large numbers of petitions frequently

8    were suspected of also being involved in fraud.  And

9    so I think the same reasoning would apply to

10    volunteer forms.

11         Q    But you conducted no studies, you did no

12    research, you put together no statistical

13    information confirming that, correct?

14         A    Correct.

15         Q    Are you aware of any alternatives to

16    requiring volunteers to register that were

17    considered either by the legislature or the

18    Secretary?

19         MR. RABAN:  Object to form.

20         A    We were not consulted about this law, so I

21    don't know whether or not the legislature considered

22    any alternatives.

23         As far as the Department of State, we are

24    not able to consider any alternatives to that, that

25    which is provided in statute.  We are the ones who

SOS REPRESENTATIVE JILLIAN PRATT

1          have to enforce it.  So we are not adding or

2          subtracting anything from that statute.

3               MR. DATO:  I think that is all I have for

4          now.  I want to open it up to my colleagues --

5          I know we have a few minutes left -- to see if

6          anyone had anything else they wanted to follow

7          up on.

8               MR. SHAPIRO:  I am going to follow-up.    I

9          am having technical issues still that I have

10         not been able to resolve.

11              This is Avner Shapiro.  Can you hear me?

12              MR. RABAN:  Yeah.  Can we take just a

13         brief 2 to 3-minute break real quick, so I can

14         check with Director Pratt on the status of her

15         availability, just a brief moment?  Can

16         everybody give me just two minutes?

17              MR. SHAPIRO:  Absolutely.

18              (Discussion off record.)

19              CONTINUED DIRECT EXAMINATION

20         BY MR. SHAPIRO:

21            Q    Ms. Pratt, you will recall when we last

22         left the office, I showed you an exhibit that had

23         been sent to Brad McVay, an email that had been sent

24         to Brad McVay that was from prosecutors updating

25         Mr. McVay on various prosecutions, and there was a

SOS REPRESENTATIVE JILLIAN PRATT

1    list of a number of prosecutions that had been

2    pursued that related to election crimes.  Do you

3    recall that?

4         A    I do.

5         Q    Would you agree that this email suggests

6    that prior to enactment of HB 1205, Mr. McVay was in

7    touch with leaders of the Office of Statewide

8    Prosecution and with prosecutors who could furnish

9    him with data related to the number of paid

10   circulators who were being criminally investigated,

11   charged and convicted?

12        A    I would say that Brad McVay was in contact

13   with the Statewide -- Office of Statewide

14   Prosecution about petition circulator cases that

15   OECS had referred to statewide.  There may have been

16   others that statewide was not involved in because

17   sometimes there are State Attorney's Offices

18   throughout the state that choose to prosecute

19   election crimes themselves rather than having

20   statewide do it.

21        Q    I think you said earlier most prosecutions

22   do, in fact, go to Statewide, isn't that correct?

23        A    That is correct, for petition circulator

24   cases.

25             MR. SHAPIRO:  I am now going to show what

1          I am going to mark as Exhibit Plaintiff's

2     Exhibit 3 (sic).

3          MS. DOLAN:  I am sorry, Sandi, what

4     exhibit number are we on at this time?

5          MR. SHAPIRO:  Right, exactly, I am sorry.

6     I forgot.

7          THE STENOGRAPHER:  I believe the next one

8     will be Exhibit 7.

9          (Exhibit 7 was marked for identification.)

10        seven.

11    BY MR. SHAPIRO:

12        Q    Okay.  Ms. Pratt, take a look at the top

13    of this letter.

14        A    Yes, I see it.

15        Q    Scrolling down a bit to this page here.

16    If you can look at this page, do you see that?  Do

17    you recognize what that is?

18        A    I do.

19        Q    Do you recognize what this document is?

20        A    I do.

21        Q    Now I would like to go to -- it's going to

22    be the top of page 2 of Mr. McVay's introductory

23    letter.  And if you could take a look at that

24    paragraph.

25        A    Top of page 2 or top of page 3?

1        Q    I'm sorry, I think I may have gone too

2     far.  I have gone too far.

3            Let me take you back to the -- here we go.

4            If you look at this paragraph, do you see

5     a sentence here where I put my cursor.  It says:  In

6     addition to the arrests, OECS has to date opened

7     well more than a hundred preliminary criminal

8     investigations into individual paid petition

9     circulators and organizations involved in the

10    collection of petitions on behalf of FPF.

11           Do you see that?

12       A    I do.

13       Q    Now I am going to take you to another

14    page.  That's in the text of the introductory

15    letter, correct?

16       A    I believe so, yes.

17       Q    Now I am going to take you to language

18    that's in the report itself, in the executive

19    summary of the report itself.  I am scrolling down.

20           Do you see where it says:  Based on the

21    preliminary results of that investigation, the

22    number of FPF paid circulators who have committed

23    criminal activity in connection with Initiative

24    Petition 23-07 has now grown up to well over 100,

25    affecting many thousands of Floridians in most of

1    the state's counties.  Do you see that?

2        A   I do.

3        Q   Are the two paragraphs that I read to you,

4    or the sentences I read to you, are they both

5    referring to the same approximately 100 cases?

6        A   I would say it looks like they are

7    referring to approximately the same cases.  But the

8    second paragraph may also include those that have

9    not yet been referred, at least as of that time.

10        Q   So is it fair to say that these roughly

11    100 cases of circulators had not actually -- they

12    have actually not committed criminal activity?

13            MR. RABAN:  Object to form.

14    BY MR. SHAPIRO:

15        Q   And it would be more accurate to state

16    that these circulators were only under a preliminary

17    investigation for engaging in criminal activity as

18    Mr. McVay actually said in his introductory letter?

19            MR. RABAN:  Object to form.

20        A   I think that this sentence says that it's

21    based on the preliminary results of OECS's

22    investigation.  And so I think it's clear, based on

23    that, that it's not saying that 100 individuals have

24    been convicted of these crimes, but that is based on

25    the results of OECS's investigation.

1    BY MR. SHAPIRO:

2        Q   So I am again looking at that sentence in

3    the report.  It said:  Based on preliminary results

4    of that investigation, the number of FPF paid

5    circulators who have committed criminal activity in

6    connection with the initiative petition has now

7    grown to well over a hundred.

8        So that's not correct, right?  Those

9    individuals had not committed criminal activity;

10    they are just open investigations, isn't that right?

11        MR. RABAN:  Object to form.

12        A   I will say that those are individual who

13    have committed criminal activity.  We don't refer

14    people that we don't think have committed criminal

15    activity.

16        But I think that sentence specifically

17    says that it's based on the preliminary results of

18    OECS's investigation.  It's not saying that well

19    over a hundred people have been convicted in a court

20    of law, which I think is what you are getting at, to

21    say that they have committed criminal activity.

22        But I will say that it is accurate.

23        Q   Where in that sentence is there a

24    reference to open investigations or preliminary

25    investigations?

1          MR. RABAN:  Object to form.

2          A    It says:  Based on the preliminary results

3    of that investigation, the number of FPF circulators

4    who have committed criminal activity in connection

5    with Initiative Petition 23-03 has now grown to well

6    over hundred, affecting many thousands of Floridians

7    in most of the state's counties.

8          Q    I hear you.  I understand.  Sorry.  Sorry

9    to interrupt. Go ahead.

10          A    I am just saying I'm basing that statement

11    on the very beginning part of that sentence.

12          Q    Did your office refer all of the FPF

13    circulators -- it says in this report -- committed

14    criminal activity to law enforcement for further

15    investigation?

16          A    We referred, I think, over a hundred as

17    explained in that first sentence that you read.

18    Whether or not this well over a hundred -- I think

19    it includes that number, but it also includes

20    others.

21          Q    Of the 100-plus FPF circulators your

22    office identified in the report, how many of them

23    had been convicted of committing some type of fraud?

24          A    I'm not sure of that number.

25          Q    Do you know if it's more than two?

1          A   I believe it is.

2          Q   Are you positive it's more than two?

3          A   I am not positive, because I am not sure

4     what that well over a hundred refers to.  I would

5     have to see a list, and I would have to look through

6     it to determine where each of those cases has gone,

7     whether or not conviction has been obtained.

8          Q   The report consistently employs the phrase

9     "known and suspected fraudsters."  Are you familiar

10    with the use of that phrase?

11         A   I am, yes.

12         Q   How many of the known or suspected

13    fraudsters repeatedly referred to in the

14    introduction to the report and in the report itself

15    were convicted of committing fraud?

16         A   I don't know the number of those that have

17    been convicted as of this point.  However, I believe

18    that the known and suspected fraudsters refers to a

19    couple different things.

20              When it says known fraudsters, I think in

21    part that refers to a list that we obtained from, I

22    believe, Smart & Safe and Floridians Protecting

23    Freedom, and it was called the do-not-buy list,

24    which had a number of individuals that were known to

25    be engaging in fraudulent activities by the

1    sponsors.

2        Q    In his introductory letter, Mr. McVay

3    identifies individuals who are known fraudsters, and

4    the basis for concluding the individuals are known

5    fraudsters as unusually high rejection rates, as a

6    basis for concluding that someone is a known

7    fraudster.  Is that consistent with your

8    understanding?

9        MR. RABAN:  Object to form.

10        A    It is consistent with my understanding.

11    My understanding is that known fraudsters refers to,

12    like I said, a couple of things.  There is that

13    do-not-buy list.  There is also individuals that had

14    a high percentage of invalid petitions compared to

15    others that we then looked into in our investigation

16    that is discussed, where we went to Palm Beach,

17    County Orange County and Osceola, and then actually

18    compared the signatures on those petitions to the

19    signatures that we had on file for those voters.

20        And so at that point, we were able to

21    confirm for our purposes that certain individuals

22    had committed fraud, especially after we talked

23    to -- we talked to some of those individuals who

24    signed those petitions, or law enforcement did, and

25    they would confirm that they did not, in fact, sign

1    them.

2        Q   Would high rejection rates alone be a

3    cause for classifying someone as a known or

4    suspected fraudster?

5        A   I don't think in isolation that would be

6    enough.

7        Q   Could a negligent circulator, who is doing

8    a poor job of ensuring that voters completed their

9    forms accurately and would have a high rejection

10   rate, could that type of person also become a

11   suspected fraudster just based on that alone?

12           MR. RABAN:  Object to form.

13       A   Based on how many petitions that person

14   submitted and then, of course, the invalidity rate,

15   that may have given OECS reason to believe that that

16   person may have been engaged in fraud.  But we would

17   not have said that that person was engaged in fraud

18   unless we had looked into the petitions that that

19   person had turned in and had reason to believe that

20   the voters that are listed on those petitions are

21   not the voters who signed them.

22       Q   Would that alone be enough to have that

23   individual included in the list of 100-plus

24   individuals who are suspected fraudsters?

25       A   That may have been enough, depending on

1      the numbers.  It wouldn't be percentage alone.

2              For example, there are some individuals

3      who only circulate a few petitions.  If all of those

4      petitions are rejected as invalid -- it could only

5      be two or three petitions -- that's not the kind of

6      thing we were looking at when we did this

7      investigation.

8              It was more along the lines of these

9      people have submitted hundreds to thousands of

10     petitions, and the percentage of invalid petitions

11     exceeds that which is typical for these petitions.

12         Q    And were you seeing the cause for the

13     invalidation when you looked at the invalidation

14     rate, or were you just seeing the top line number of

15     how many petitions were invalid?

16         A    We were looking at petitions that were

17     invalidated because of signature or because of some

18     other information mismatch, not for failure to fill

19     in a specific field on that petition form.

20         Q    So if a large number of petitions were

21     rejected because they were submitted past the 30-day

22     deadline, are you saying that's something that

23     wouldn't trigger you classifying that the individual

24     is a suspected fraudster?

25         A    I am saying when we looked at those

1    petitions, if we did look at them to do signature

2    matching, it was only -- that would have nothing to

3    do with signature matching.

4         Whether or not that would contribute to an

5    individual's invalidity rate, yes, that would

6    contribute to their invalidity rate, which is why we

7    were looking at petition circulators across the

8    state and comparing them to other circulators,

9    because presumably, especially if you have hundreds

10    or even thousands of petitions, it should fall

11    somewhere in the same range as most petition

12    circulators that are submitting petitions.

13         Q    Is it fair to say that the December and

14    January reports provide almost no information about

15    volunteer circulators engaging in any kind of

16    wrongful or criminal acts?

17         MR. RABAN:  Object to form.

18         A    I think that's fair.

19    BY MR. SHAPIRO:

20         Q    The January OECS report highlighted 14

21    cases of paid circulators who were prosecuted for

22    petition fraud, correct?

23         A    I believe that's the correct number.

24         Q    Were any of these 14 circulators charged

25    and successfully prosecuted on the basis of

1      previously validated petitions?

2            A   I don't believe so.  I think for purposes

3      of this investigation, we were looking at petitions

4      that were invalidated, but that doesn't mean that

5      these petitions circulators had not committed fraud

6      in relation to validated petitions.

7            Q    So the answer is no, correct?

8            A   Repeat the question, please.

9            Q    Sure.  Were any of these 14 circulators

10      charged and successfully prosecuted on the basis of

11      previously validated petitions?

12            A   I don't believe so.

13            Q    How many of the individual fraudsters

14      discussed in the report were identified initially by

15      a sponsor as a potential fraudster who brought the

16      fraudster to the attention of local or state

17      authorities?

18            A   I am unable to give you a number to that.

19      I know that we did receive names of petition

20      circulators that supervisors thought were engaging

21      in fraud.  But we had other sources for believing

22      that these individuals were engaged in fraud.

23            It could have come from a voter

24      themselves.  It could have come from -- it could

25      have been initiated by the invalidity rate of that

1    petition circulator, that OECS then looked into and

2    discovered that some of the signatures appeared to

3    be fraudulent.

4        Q    Thank you, Ms. Pratt.  What work did you

5    do that directly related to either OECS's December

6    2024 report or its January 2025 report?

7        A    In my personal capacity?

8        Q    Correct.

9        A    I was one of the individuals that went to

10   Palm Beach County to look at the signatures for some

11   of those petition circulators.

12       Actually, let me start from before that.

13   I was one of the individuals who went through

14   invalidity rates of petition circulators and sorted

15   them from highest to lowest.  And then we also

16   looked at number of petitions that were submitted.

17       Then I went to Palm Beach County and was

18   part of the investigation there.  I was also part of

19   the investigation in Orange County, and I was one of

20   the individuals who was looking at signatures and

21   comparing them to those in the registered voter's

22   file.

23       I got COVID in the middle of that

24   investigation, and so I went back to Tallahassee,

25   but I was still involved in the Osceola

SOS REPRESENTATIVE JILLIAN PRATT

1          investigation as far as it relates to numbers,

2          gathering numbers from the others that were doing

3          the investigation there, and then I assisted in

4          drafting the reports.

5               MR. RABAN:  Counsel, we are going up

6          against the time for her meeting to start.  And

7          so if you want, is now a good time to pivot and

8          pause, or do you have another question you need

9          to get out?

10              MR. SHAPIRO:  We can definitely stop now.

11          And I appreciate you indulging with the extra

12          half just now, and we'll -- when should we

13          resume?  4:00 o'clock?

14              MR. RABAN:  I think 3:30 likely will give

15          us enough time.  And if we need more time, I

16          will certainly log back on -- I am not logging

17          out -- I will turn my camera back on and my

18          microphone back on and indicate whether or not

19          more time is needed.

20              (A recess took place from 2:56 p.m. to

21          3:30 p.m.)

22          BY MR. SHAPIRO:

23          Q   You and your office did an audit of three

24          different offices of Supervisors of Elections in the

25          context of preparing for this report, the December

1          2025 report, correct?

2              A   Correct.

3              Q   How did you decide on the three counties

4          you selected?

5              A   I think we selected them out of ease of

6          access.  Palm beach was selected because of their

7          method of storing information.  They had a very

8          easily accessible way to access their voter files,

9          which would include a petition that a voter had

10          allegedly signed, along with any signatures that are

11          on file for that voter.  So that's why Palm Beach

12          was selected.

13                 Orange County, I believe, was selected for

14          ease of access as well.

15                 And then Osceola was next door, and so I

16          think it just was a logical -- it's a logical county

17          to go into after Orange County.

18              Q   When you participated in the audits, what

19          training did you receive in verifying petitions

20          prior to participating in the investigations?

21              A   We all took a signature match training,

22          which was the same signature match training that an

23          employee of a supervisor's office must take before

24          validating signatures on petitions.

25              Q   Have you received any certifications

1    relating to the expertise of evaluating signatures?

2        A   I think certification comes at the end of

3    that course, but apart from that, no.

4        Q   Prior to taking that course, had you ever

5    received any training on how to evaluate signatures?

6        A   Personally I had not.

7        Q   When did you take that course?

8        A   I took it shortly before we started

9    looking at signatures.

10        Q   So is it fair to say that you had no

11    experience evaluating signatures prior to taking

12    that course?

13        MR. RABAN:  Object to form.

14        A   I think it's fair to say that that was not

15    part of my job duties until we started looking at

16    validating signatures for these petitions.

17        In addition to taking that course, I,

18    along with several of my colleagues from OECS, we

19    would -- we worked on validating or, I guess,

20    comparing signatures with each other to make sure

21    that we had the same ideas going forward, that we

22    all were under the same training and requirements

23    that were laid out in that signature training.

24        Q   Prior to taking that course, can you give

25    me an estimate of how many signatures you had

1    evaluated?

2         A    Prior to taking that course, I had not

3    evaluated signatures.

4         Q    What can you tell me about the experience

5    level of the other individuals who were auditing

6    with you?  How much experience had they had

7    auditing -- strike that.

8              How much experience had they had

9    evaluating signatures prior to taking the course and

10    participating in the audit?

11         A    I'm not sure exactly how much experience

12    they had.  Those were members of OECS.  At the time,

13    I worked in the general counsel's office.  So I know

14    that the people that I worked with from OECS had

15    taken the signature training course in the past, and

16    I believe that they had been involved in signature

17    comparison.  But to what extent, I'm not sure.

18         Q    Why did OECS decide that there was a need

19    to investigate whether SOEs were properly assessing

20    the validity of petitions?

21         A    OECS had received a number of complaints

22    alleging fraud having to do with petitions, as I

23    discussed earlier.  And in looking at those

24    petitions, OECS recognized that there was some

25    apparent fraud in those signatures, but there also

1    appeared to be some situations where fraud wasn't

2    necessarily present but the supervisors validated

3    signatures that they shouldn't have.

4         Q    So why did the supervisors forward

5    petitions to you that they had validated for

6    analysis?  Explain that.

7         A    So supervisors forwarded us those

8    petitions on our request.  OECS started to suspect

9    that some petitions that had been validated were not

10   necessarily proper.

11         It originally started because OECS

12   suspected fraud.  Once we received the petitions, we

13   also realized that while there was some fraud, there

14   were some instances where the supervisors were

15   validating signatures that they shouldn't have.

16         Q    How many complaints did OECS receive about

17   SOEs improperly validating petitions before they

18   started their investigation?

19         A    I am not sure how many we received.    I

20   can't think of any off the top of my head.

21         Q    So is it fair to say that this

22   investigation into validated petitions being

23   potentially fraud is something that is not coming

24   from complaints, but it's initiated by the

25   department?

1    A    I would say it's coming from both.  It

2    started with complaints about petitions that were

3    invalidated typically from supervisors, and they

4    believed those signatures to have been fraudulent.

5         Sometimes we also received complaints from

6    voters, and that could have been about invalidated

7    petitions or validated petitions because, as I noted

8    earlier, there are about three counties that send

9    out a voter letter every time a petition is

10   validated or invalidated in those counties.  So I

11   think it was based on those complaints that we

12   started looking at invalidated petitions.

13         We then started to look at the same

14   petitions that were validated for some of the

15   petition circulators that we were seeing a large

16   number of fraud with.  We suspected that some of

17   those petitions that were validated shouldn't have

18   been validated and, when we did look at them, that

19   was correct.

20   Q    Let's start now to discuss Palm Beach's

21   audit, and that's described on page 15 and 16 of the

22   report.

23         As I understand it, your office started

24   the process of auditing Palm Beach County's review

25   of petitions by identifying paid petition

SOS REPRESENTATIVE JILLIAN PRATT

1    circulators who had or may have circulated petitions

2    in Palm Beach County and were suspected fraudsters,

3    is that correct?

4        A    That is correct.

5        Q    I'm sorry?

6        A    Yes, that's correct.

7            MR. SHAPIRO:  I am now going to show you

8    what we're going to mark as Plaintiff's Exhibit

9    8, I believe.

10            (Exhibit 8 was marked for identification.)

11    BY MR. SHAPIRO:

12        Q    Let me represent to you that this is a

13    document that Palm Beach County provided Florida

14    Decides Healthcare plaintiffs in the course of this

15    litigation in response to a request for documents.

16            Have you seen this?  If you could review

17    this email and then if you could tell me if you have

18    seen this document before?

19        A    I believe I have seen this before.

20        Q    Can you tell me what it is?

21        A    It's an email from Brad McVay to Kate

22    Ellis.  I am not sure who that is.  I believe it

23    may -- she may be someone who works for the Palm

24    Beach SOE.  And it says:  Attached are a list of ten

25    circulators with their circulator number and

SOS REPRESENTATIVE JILLIAN PRATT

1    associated totals next to their names; and then

2    asked Kate if she could pull the 23-07 petitions

3    associated with these circulators, and to just pull

4    the petitions that were verified as valid.

5        Q    And do you have any reason to doubt that

6    this email is what it purports to be?

7        A    I do not.

8        Q    And are you familiar with this request

9    that Mr. McVay made to Ms. Ellis?

10        A    Yes.

11        Q    How did your office identify the

12    circulators you sent to Ms. Ellis?

13        A    Those circulators would have been

14    identified in, I think, one of three ways.

15        One is that we received a complaint from a

16    supervisor of suspected fraudulent activity by those

17    petition circulators.

18        Two would have been a complaint from a

19    registered voter who believed that their name had

20    been forged on a petition.

21        Or three, it would be a name that we had

22    come up with after looking at all of the petitions

23    that were validated and invalidated for particular

24    amendments, and then compared those rates and

25    numbers with other petition circulators to find some

205

SOS REPRESENTATIVE JILLIAN PRATT

1        of the offenders that -- I guess some of the people

2        that had the highest invalidly rates.

3              And actually, I believe there was one

4        other source of information for those names, and it

5        was anyone that the Statewide Prosecutor's Office

6        had either charged or was investigating for

7        potential fraud.

8        Q   The representative for the Supervisor of

9        Elections for Palm Beach has represented to us that

10       in response to Mr. McVay's request, the Palm Beach

11       SOE eventually provided OECS with a total of 380

12       petitions that their office had previously validated

13       prior to OECS's site visit.

14             Can you confirm that this is, indeed, the

15       case, and that the SOE for Palm Beach did, in fact,

16       submit 380 validated petitions to OECS in response

17       to Mr. McVay's request?

18       A   I don't recall whether or not Palm Beach

19       produced those to Mr. McVay.  I do recall that

20       Mr. McVay and I went to Palm Beach and then looked

21       at those petitions to determine whether or not we

22       thought there was fraudulent activity.

23       Q   Do you recall roughly how many petitions

24       were made available to you?

25       A   The way that the Palm Beach County system

1    works is that we were given the ability to search

2    for particular voter IDs, and it would pull up a

3    voter file, which would include any petitions that

4    were filed in that person's name.  And so we were

5    able to do that for the list of people that we

6    suspected to be engaged in fraudulent activity.  We

7    were able to look at some of those petitions that

8    were submitted by them.

9        Q    So if I understand you correctly,

10    Ms. Pratt, you were able to access however many of

11    the petitions you wanted to access that were

12    submitted by the circulators you were interested in

13    investigating, is that correct?

14        A    That is correct.  During that time frame,

15    we were able to access those.  However, we were only

16    in Palm Beach for a limited period of time, and that

17    system is limited to -- or at least it was --

18    limited to Palm Beach.  And so we weren't able to

19    necessarily look at every petition that we had

20    wanted to look at.

21        But we did have access to all of the

22    different circulators' petitions that we were

23    reviewing, and we did sample each one of the

24    petition circulators that we were interested in.

25        Q    How long were you there for?

1          A    We were there for a day.

2          Q    A full workday?

3          A    I believe so, yes.

4          Q    How long did it take you to review each

5     individual petition?

6          A    It would vary.  Some signatures were so

7     starkly different than any of the signatures that

8     were included in the voter's profile that we were

9     able to quickly conclude that it should not have

10    been validated.

11         There were others that we would look at

12    and thought that there was a possibility that they

13    had been, in fact, signed by the voter and those,

14    even if they were unclear, we put into a separate

15    category which was unclear.  We didn't count those

16    as petitions that should have been invalidated.

17         Q    Of the ones you personally reviewed, how

18    many did you conclude were invalid?

19         A    I don't recall the exact number or the

20    exact percentage.  I do know it was very, very high.

21    We were looking at specifically people that we

22    suspected to have engaged in fraud, and so I believe

23    it was higher than that about 20 percent number that

24    came out in our report when we looked at petitions

25    that were submitted just generally, not only by

1    fraudsters.

2        Q   And did you review -- strike that.

3            The petitions that you reviewed, did you

4    review them on your own, or did you review each

5    petition together with Mr. McVay?

6        A   I reviewed them together with Mr. McVay.

7    We each would come up with our own conclusion and

8    see if we were in agreement.  And we were in

9    agreement every time.

10        Q   What do you know about the individuals who

11    reviewed petitions for the Palm Beach -- strike

12    that.

13            When you said you reviewed signatures,

14    what were you comparing those signatures to?

15        A   We were comparing them to the signatures

16    that the supervisor's office had on file for that

17    voter.  And so my understanding is that every time a

18    voter signed a registration form, or signed when

19    they vote, that that signature was -- was copied and

20    put into the system that the supervisor has as one

21    of the registered voter's signatures.  So we

22    compared the signature on the petition to all of the

23    signatures that were on file for that voter.

24        Q   So you were basically comparing it to a

25    series of signatures, some -- and what were --

1    strike that.

2         These signatures you were comparing them

3    to, were they all from the voter registration file?

4         A    They were all included in Palm Beach

5    County's system, which is very similar to the system

6    that we use at the Department of State, which is

7    called FVRS, Florida Voter Registration System.  And

8    my understanding is that those signatures were all

9    the signatures that the supervisor had on file for

10    that voter.

11         So those are the signatures that they

12    would use to compare to a mail-in ballot, for

13    example.  They would use those exact same signatures

14    to look and see if someone is who they say they are

15    on the mail-in ballot.

16         Q    What do you know about how much experience

17    and training the Palm Beach SOE officials have who

18    review signatures at that office?

19         A    I believe they are required to take the

20    same training that I took and that they are then

21    able to validate signatures.

22         I am aware of, not necessarily just in

23    Palm Beach but all of the counties, hiring temporary

24    workers to do some of those signature validations.

25    And I think, as our expert laid out in our report

SOS REPRESENTATIVE JILLIAN PRATT

1    that was filed in March to the legislature, there

2    are different reasons why they may or may not have

3    validated signatures correctly.

4        Q   What do you know about the experience

5    level of the employees of Palm Beach who review

6    petitions?

7        A   Other than that they were required to take

8    the same signature matching course that I was, I'm

9    not aware of any other credentials they might have.

10       I do know that with the signatures that

11   Brad and I looked at, there were a number of

12   signatures that were validated that should not have

13   been validated.

14       Q   The representative of SOE Palm Beach has

15   represented to us that you and your colleague, Brad

16   McVay, did not consult with them when you were

17   reviewing petitions.  Is that right?

18       A   I don't know what they may have said to

19   you.  I know that we consulted them in the fact that

20   we asked if we could access their system.  They

21   allowed us to.  We did not ask them why did you

22   validate this signature, why did you not validate

23   this signature.

24       Q   You anticipated my next question.  Thank

25   you for that, Ms. Pratt, because I guess that's what

SOS REPRESENTATIVE JILLIAN PRATT

1         I was trying to get to.

2             Why didn't you ask them as to how they

3         were -- why didn't you ask them why they were

4         validating certain petitions when you were

5         concluding that they should have been invalidated?

6         A   The ones that we concluded should have

7         been invalidated were so clearly not the signatures

8         that were on file.  I mean, they were so starkly

9         different that we didn't feel a need to ask why

10        certain signatures were validated.  We could tell

11        that they should not have been validated, so it

12        didn't really matter what their reason was.  They

13        were very clearly different from signatures that

14        were on file.

15        Q   Did you not want to ask them how it was

16        they arrived at such an erroneous conclusion?

17             MR. RABAN:  Object to form.

18        A   That wasn't the purpose of our visit.  The

19        purpose of our visit was to look at individuals that

20        we suspected of fraud to see if their petitions were

21        properly validated or invalidated, and that was

22        that.  We did what we set out to do, and then we

23        went back to Tallahassee.

24        BY MR. SHAPIRO:

25        Q   Why wouldn't you want to confirm that

SOS REPRESENTATIVE JILLIAN PRATT

1    there wasn't some error on your part in terms of the

2    way these signatures are being evaluated by

3    consulting with individuals who arrived at a

4    different conclusion?

5         MR. RABAN:  Object to form.

6         A    As I said before, Brad McVay and I would

7    look at each signature individually, and then we

8    would come together with what each of our conclusion

9    was.  It would either be this signature should have

10    been validated, this signature should have been

11    invalidated, or it is unclear.

12         We were always in agreement every single

13    time when we looked at a signature, and so we did

14    not feel the need to ask the supervisor's office why

15    they validated signatures that should not have been

16    validated.

17    BY MR. SHAPIRO:

18         Q    How old or out of date could the

19    signatures on the voter registration file be that

20    you were comparing signatures on your petition forms

21    to?

22         A    They could be very old, but they would

23    never be out of date.  And what I mean by that is

24    every signature that that voter has had within their

25    profile, going back to the time they registered for

1     the very first time, all the way up until the last

2     time a signature was added, which could have been

3     very recently, but any time a voter updates their

4     signature, another signature is added to that voter

5     profile.

6          So we compared the signatures on the

7     petitions to each and every single one of those

8     signatures that are on file for the voter.  And if

9     it appeared to match any one of those signatures

10    that was on file, we would count it as something

11    that should have been validated.

12         Q    Is it possible that county officials at

13    some point accessed signatures that you didn't

14    access when you were comparing the petitions --

15         MR. RABAN:  Object to form.

16    BY MR. SHAPIRO:

17         Q    -- they had on file?

18         A    I don't believe so.  Palm Beach County

19    gave us access to their system, and they said that

20    those were the signatures that they looked at to

21    match petitions.  So we were looking at exactly the

22    same set of information that Palm Beach County had

23    to look at when they were validating these same

24    petitions.

25         Q    Now I am going to go back to Exhibit 7,

SOS REPRESENTATIVE JILLIAN PRATT

1    which is the December report OECS report.

2         Actually in the interest of time, do you

3    recall that the report talks of a sample of 41

4    petitions submitted by known or suspected fraudsters

5    that were in the Palm Beach analysis?

6         A   That sounds familiar.

7         Q   If I represent to you that the report

8    talked of 41 petitions being analyzed, does that

9    sound right to you?

10        A   That sounds about right.

11        Q   Why do you review and report only 41 in

12    the report when you had access to so many more for

13    an entire day?

14        A   I would have to look at what you're citing

15    from the report.  But based on my recollection, even

16    though we were there for the entire day, a lot of

17    the day was spent speaking with the supervisor about

18    how they stored things in their system, how they

19    verified signatures, and getting a sense for how

20    that process works prior to us actually looking at

21    signatures and doing any kind of analysis on them.

22        Q   Now Palm Beach County represented to us

23    that you never went back to them and identified

24    which of the petitions you actually reviewed, is

25    that true?

1          A   I believe we've never been asked for that,

2     but as far as I know, we have not provided that

3     information.

4          Q   Even up until today, you still have not

5     gotten back to them and told them which petitions

6     you thought should have been invalidated that they

7     validated, is that correct?

8          A   It's correct that I have not discussed

9     those with the supervisor's office, but I don't

10    believe we've ever been asked for those names.

11          MR. SHAPIRO:  I am now going to share with

12    you a document I'm marking as Exhibit 9.

13          (Exhibit 9 was marked for identification.)

14    BY MR. SHAPIRO:

15          Q   This is in the context of discussing the

16    Orange County audit.

17          Do you recognize this email at the top?

18    Actually, it would be easier to identify if I scroll

19    down, so let me scroll down.

20          Do you recognize this email to SOE

21    Gilzean?

22          A   I don't recognize that specifically.  It

23    appears to be an email from Brad McVay to the

24    supervisor, and it says:  Please see attached list.

25          Q   And do you have any reason to doubt that

1       this email isn't what it purports to be?

2          A    No, I don't.

3          Q    Let me represent to you that this is a

4       document that Orange County provided to FDH

5       plaintiffs in the course of this litigation in

6       response for to a request for documents.  And as you

7       said, on page 2 it includes an email from Brad McVay

8       to Orange County SOE Gilzean dated August 15, 2024,

9       at 10:43 a.m.  Do you see all that?

10         A    I do, yes.

11         Q    And as you noted, in the email Mr. McVay

12      writes the words "Please see attached list" and

13      "Thanks."  Do you see that?

14         A    Yes, I do.

15         Q    Let me represent to you that pages 3 and 4

16      of the exhibit is the list that was attached to

17      Mr. McVay's August 14 email.  Okay?

18         A    Okay.

19         Q    There is the top of the list and scrolling

20      down.  Do you have any familiarity with this list?

21         A    I do, yes.

22         Q    I am going to represent to you, Ms. Pratt,

23      that the total number of petitions that Mr. McVay

24      was asking for, if you add up all the requested

25      petitions in the attachment, it was 2,224.  Does

1          that number sound approximately right to you?

2              A   So, I guess -- I am looking at the

3          left-hand column where it gives the grand total.

4          Oh, so you are totaling the Orange County column?

5              Q   Correct.

6              A   That sounds correct.

7              Q   If we go to the top of the email chain, do

8          you see that there is an email from Lucy Melendez to

9          Mr. McVay?

10             A   I do, yes.

11             Q   And do you see it says:  Please find the

12         requested petition records on the link below.  Do

13         you see that?

14             A   Yes, I do.

15             Q   And let me further represent to you that

16         Orange County's representative testified that they

17         provided your office with very close to the total

18         number requested.

19                 Is that consistent with your understanding

20         of the county's response to McVay's request?

21             A   I am having trouble placing the timing of

22         Mr. McVay's request, whether or not it was before or

23         after we went to Orange County.  And I believe we

24         went to Orange County twice to do our audit.

25                 If this is after that time frame, then I

1    do not believe Orange County gave us all of the

2    petitions that we requested, because there was a

3    number of petitions, I believe upwards of 200, that

4    we never received, that had been validated by Orange

5    County.

6        Again, I am not sure if that's what this

7    email is referring to or where in the time frame

8    this took place.

9        Q    And if this was -- if this 8/16/2024 date

10    predates your visit, then what's your understanding

11    as to whether they did, in fact, provide your office

12    with the documents it requested?

13        A    If this predates our visits to Orange

14    County, then I would not doubt that they provided us

15    what we asked for.

16        The 200-plus that I was referring to are

17    actually delineated in the report.  The report

18    describes how we did not receive all the petitions

19    that we requested during our audit.

20        MR. SHAPIRO:  Okay.  I am now going to go

21    show you what I am marking as Exhibit 10.

22        (Exhibit 10 was marked for

23    identification.)

24    BY MR. SHAPIRO:

25        Q    If I scroll on this document, you'll see

1      there is a -- that this has a Bates number

2      SOS_0172123 on the first page of that document,

3      because this document is something that was provided

4      to us in the course of discovery by the Secretary of

5      State's Office.

6              Are you familiar with this?  If you could

7      take a look at the first page for a moment, and then

8      if you could tell me if you are familiar with this

9      document?

10          A   I don't recall if I have seen this email

11     before, but I am familiar with the request

12     generally.

13          Q   Okay.  Again, you have no doubt that this

14     is what it purports to be, correct?

15          A   Correct.

16          Q   Going to the text of the email, do you see

17     that Mr. McVay is providing Mr. Gilzean with two

18     attachments that have names of circulators.  There

19     is a reference to -- sorry -- there he's referencing

20     attachments in two places.  There is a reference in

21     the second bullet point, pull all of the petitions

22     that were validated on the first attachment, pull

23     District 9 only.

24              And then the last bullet point, Attachment

25     2, we need verified petitions from District 9 pulled

SOS REPRESENTATIVE JILLIAN PRATT

1    from these circulators.

2         Do you see that?

3         MR. RABAN:  Object to form.

4    A    I do.

5    BY MR. SHAPIRO:

6    Q    Scrolling down, do you see this table that

7    I have scrolled to?  Perhaps you can tell me what

8    that is.

9    A    It appears to be a table of petition

10   circulators for the Initiative 23-07, and it shows

11   the grand total of validated petitions for each one

12   of those circulators along with their circulator ID.

13   And then it also shows the number of petitions that

14   were validated for District 9 for those individual

15   petition circulators.

16   Q    You recall, if we go back up to the email,

17   Mr. McVay said in the second sentence of the second

18   bullet:  The highlighted names represent circulators

19   you pulled for us last time.  I need those pulled

20   again, only if they are in District 9 and if they

21   were validated petitions.

22         The nonhighlighted are new circulators.

23   Same thing:  Pull only verified District 9

24   petitions.

25         Do you see now this attachment relates to

SOS REPRESENTATIVE JILLIAN PRATT

1        that bullet point?

2            A   I do, yes.

3            Q   And if you scroll down, do you see that

4        the total number of petitions is 2,152?

5            A   I do see that total for District 9.

6            Q   I am going to represent to you that Orange

7        County's representative testified that the county

8        produced approximately the number of petitions

9        requested.  Can you confirm that to be the case?

10           A   I can confirm that they provided

11       approximately that number.  As I said, in the report

12       we discussed how Orange County did not provide us

13       200-plus petitions that they validated.  And we were

14       not able to look at those at all to determine

15       whether or not they existed or whether or not they

16       were properly validated.

17           Q   If you again go back to the top of this

18       email.  Again, the third bullet point says:

19       Attachment 2, we need verified petitions from

20       District 9 pulled from these circulators.

21               And then I represent to you that here's

22       the attachment, second attachment -- if you scroll

23       all the way down -- with a total of 983.

24               Do you see that?

25           A   I do, yes.

SOS REPRESENTATIVE JILLIAN PRATT

1        Q    And do you recall that this is the list

2    that was responsive to the third bullet point?

3        A    I don't recall that email in particular,

4    but it does appear that this would be responsive to

5    that third bullet point.

6        Q    I am going to represent to you that Orange

7    County has testified -- Orange County's

8    representative has testified that the county

9    provided Mr. McVay with approximately all of the

10    requested petitions, and that the county provided us

11    with documentation indicating that they provided

12    OECS with responsive files.  Are you taking issue?

13        A    I am not taking issue with that,

14    especially since they said they provided us

15    approximately all the petitions that we requested.

16    That is generally true.

17        But as we indicated in the report, there

18    were 200-plus petitions that were never provided to

19    us.

20        Q    Can you confirm that on August 27, 2024,

21    the day after Mr. McVay requested and received

22    petitions from Orange County, he, together with some

23    other OECS agents, went to the Orange County SOE

24    office to conduct an on-site investigation?

25        A    I don't recall the date of the on-site

1    investigation, but an on-site investigation was

2    done.

3         Q    Who were the other agents who joined

4    Mr. McVay for the onsite investigation?

5         A    I believe that there were two trips that

6    we made within a very short time period.  I was

7    present for both, except I was not present for the

8    latter half of the Orange County audit and then the

9    Osceola audit, as I indicated earlier because I got

10    sick.

11         The other people that traveled with us

12    were all members of OECS, including Andrew

13    Darlington, the former director, and then his

14    employees.

15         Q    I should have asked in the previous audit

16    of Palm Beach, was it just you and Mr. McVay?

17         A    Yes, that's correct.

18         Q    And what time, if you know, did the audit

19    on the 27th of August begin, what time of day?

20         A    I don't recall the time.

21         Q    Do you know if they were there for a whole

22    day?

23         A    The time frame is a little confused in my

24    mind because, like I said, there were two different

25    trips made to Orange County within the same time

224

1        frame.

2               The first trip, I don't recall having a

3        hotel, so it would have been for the day.  I believe

4        we left very early in the morning and came back well

5        after 5:00, like late in the evening.

6               The second trip, which would have been

7        shortly after that, I do recall staying in a hotel

8        room, so it was days long.  I don't recall exactly

9        how long because, again, I got sick and had to

10       return to Tallahassee.

11              And then that Orange County trip became an

12       Osceola audit.  So they were there for at least a

13       week, I believe.

14          Q   An Orange County representative testified

15       that Mr. McVay and the other officials there did not

16       consult with SOE officials when they were analyzing

17       petitions, is that correct?

18          A   It depends on what they mean by consult.

19          Q   I'm sorry, let me interrupt, I apologize.

20       You are absolutely right, I should have been more

21       precise in my language.

22              Did they consult about the validity of

23       petitions?

24          A   No.

25          Q   So when they came across verified

1    petitions they considered invalid, they did not in

2    any way seek to find out from Orange County

3    officials why it was that the county officials had

4    validated the petitions?

5        A    We did not seek the reason why they had

6    wrongfully validated petitions, no.

7        Q    I would like to go back to the December

8    2015 OECS report.  We can put that back up.  It's

9    Exhibit 7.

10       Do you see that the report states that of

11   the 2,216 petitions that Orange County SOE had

12   previously verified, your office concluded that 750

13   of them were, in fact, invalid.  Do you see that?

14       A    I see that, yes.  We concluded that 715

15   should have been invalidated.

16       Q    I am going to represent to you that Orange

17   County SOE's representative testified at her

18   deposition that no one from your office ever

19   mentioned these findings while they were onsite at

20   the SOE office.  Is that right?

21       A    That sounds correct.

22       Q    The report states that many of the

23   previously verified petitions were invalidated

24   because of a signature that clearly did not match

25   any signature on file, is that right?

1        A   That's correct.

2        Q   Why didn't OECS officials ask SOE

3    officials how it is that their office had arrived at

4    different conclusions vis-a-vis the signatures on

5    these petitions?

6        A   It wasn't relevant to what we were doing

7    in Orange County, which was trying to determine

8    whether or not petitions were properly validated by

9    that county.

10        Q   Okay.  While the report states many of the

11    715 petitions were invalidated because of an

12    assessment of the petition's signature, what were

13    all the other reasons that these petitions were

14    invalidated, to the extent you know?

15        A   So as this report states, many of the

16    petitions contained a signature that clearly did not

17    match any signature on file, and then, as it states

18    below, a number of the petitions contained

19    additional indicia of fraud, such as suspect

20    handwriting, indecipherable or incorrect spelled

21    names, incorrect date of birth, and circulator

22    affidavit signed date was after the signature was

23    obtained.

24        Q   Is it possible, for example, that some

25    petitions were deemed invalid only because the

1    voter's address did not match the address on file?

2        A    I don't recall invalidating any petitions

3    for that reason.  I believe the supervisors' offices

4    would have rejected that if it didn't contain the

5    correct address.

6            But like I said, I just don't recall us

7    looking at any that the only problem was the

8    address.  We were looking at signatures.

9        Q    Was there anytime that you invalidated a

10    petition for reasons unrelated to the signature,

11    entirely unrelated to the signature?  Did that ever

12    happen?

13        A    Not to my knowledge, no.  It may have been

14    part of the analysis along with the signature.  But

15    my recollection is that we were all looking at

16    signatures for each and every one of these petitions

17    that had been validated.

18        Q    Is it possible, for example, that some

19    petitions were deemed invalid because the date of

20    birth was wrong and it wasn't caught by the SOE's

21    office?

22        A    It's possible, yes.

23        Q    Is it possible that the OECS deemed one or

24    more of these petitions invalid because the day's

25    date was provided in the place on the form where the

1     petitioner was asked to provide their date of birth,

2     and it was missed by the SOE office?

3          A    Just making sure I understand your

4     question correctly.  I don't believe that petition

5     circulators were required to put their dates of

6     birth on the petitions at that time.  So the date of

7     birth, the only field that would be able to be

8     filled in for date of birth was the person who is

9     allegedly signing the petition.

10          Q    So if the person who allegedly was

11     supposed to sign the petition did not put the

12     correct date of birth, is that a possible ground for

13     concluding that this is an invalid petition?

14          A    It's certainly a possible factor that was

15     considered.

16          Q    Is it possible that OECS deemed one or

17     more of these petitions invalid because the voter

18     had written down an address that did not match their

19     address, the address that the voter had on file?

20          A    It's possible, but to my recollection,

21     that's not likely.  We were looking at signatures.

22     Dates of birth, I think, probably were also

23     considered.  But as far as addresses go, a voter can

24     change the address to which they are registered

25     frequently.  And my recollection, looking at these,

1    is that we were focused on looking at signatures.

2        Q    How many -- I'm sorry, I interrupted.

3        A    I'm sorry, I was just going to say we did

4    consider other factors as well, but I don't recall

5    invalidating anything because of just an address.

6        Q    How many of these petitions would you have

7    invalidated -- of the 715 -- would you have

8    invalidated purely on the ground of your review of

9    the signature?

10        A    Personally?

11        Q    Personally.

12        A    I didn't have a chance to examine all 715

13    petitions.  Of the ones that I reviewed, there were

14    a number that I would have invalidated if I were the

15    Supervisor of Elections Office.

16        Q    Of the petitions that you reviewed -- let

17    me back up.

18            How many petitions did you -- strike that.

19            Did you personally review the 715

20    petitions that were invalidated?

21        A    I personally reviewed some of the ones

22    that OECS determined should have been invalidated

23    that had not been invalidated.  I did not personally

24    review all 715.

25        Q    Okay.  Of that subset of the 715 that you

1    reviewed, how many of those would you have

2    invalidated purely on the basis of your assessment

3    of the signature?  All of them?  Most of them?  Some

4    of them?  None of them?

5         MR. RABAN:  Object to form.  You can

6    answer.

7         A    Out of the petitions that I personally

8    examined and compared the signatures to those that

9    we have on file, out of the ones I personally

10   reviewed, if we deemed those to -- if we said those

11   should have been invalidated, then that's the

12   conclusion I would have come to based on the

13   signatures.

14        MR. RABAN:  Avner, sorry to interrupt, but

15   it's probably 4:24 on my clock, so I just

16   wanted to give you a heads up that we are

17   quickly approaching that 4:30 cut off time.

18        So just if you can measure your questions

19   so that we can be done by the 4:30 cut off, I'd

20   would appreciate it.

21        MR. SHAPIRO:  I am trying.  I am trying.

22   Thank you for the heads up.

23   BY MR. SHAPIRO:

24        Q    I am not sure, Ms. Pratt, I still quite

25   frankly don't understand your answer.  I am hoping

SOS REPRESENTATIVE JILLIAN PRATT

1    for clarification.

2         Were any of these forms that you

3    evaluated, were there forms where you could have

4    concluded -- where you would not have invalidated

5    them, had you just been looking at the signature?

6    Did that happen?

7         A    Out of the ones I looked at, no.  If I

8    said that they should have been invalidated, it's

9    because the signature did not match any of those

10    that the supervisor had on file.

11         Q    How do you determine whether a signature

12    is indeterminate?

13         MR. RABAN:  Object to form.

14         A    The way that we classified indeterminate

15    signatures was if we had to look at a signature for

16    longer than a couple seconds to determine whether or

17    not it was valid, then we would put it in the

18    indeterminate category or the

19    it-should-have-been-invalidated category.

20         Q    What -- sorry.

21         A    I was going to say that just indicates we

22    were unsure as to whether or not it should have been

23    validated or invalidated.

24         Q    So again, what does indeterminate mean in

25    this report?

SOS REPRESENTATIVE JILLIAN PRATT

1          A    Again, it refers to the category of

2     signatures that OECS looked at and could not make a

3     determination quickly, within a matter of a couple

4     seconds, as to whether or not that signature should

5     have been validated or invalidated.

6          Q    Were there any petitions that were

7     indeterminate for reasons unrelated to signature

8     matching?

9          A    Not that I am aware of, no.

10          Q    Orange County has represented that OECS

11     has never informed the county which of the 2,216

12     petitions it reviewed as part of its Orange County

13     review that you concluded were invalid.  Is that

14     correct?

15          A    I am not aware of OECS informing Orange

16     County which petitions we looked at.  I think Orange

17     County would know which petitions we looked at based

18     on the ones we requested for them to pull.

19               But as for the ones we actually found that

20     should have been invalidated rather than validated,

21     I don't think we provided that list to Orange

22     County, no.

23          MR. SHAPIRO:  Okay.  Well, this is

24     probably a good place to stop.  We have two

25     more minutes of the time.  I didn't get through

1    everything.

2        And I thank you for taking the time to

3    chat with us.  I am going to have to look at

4    what's left of material that hasn't been

5    covered and reflect on whether we covered

6    enough ground here that I have a sense of what

7    your testimony would be with regard to

8    specifically the remaining county, Osceola.

9        And it can be that the answers you

10    provided with regards to the first two counties

11    kind of illuminate what your answers would

12    likely be with regard to the remaining county.

13        So I will take a look at that, and also

14    look to see what other questions I wasn't able

15    to ask.  But I think we have gone to the end of

16    this hour and I want to respect your time,

17    Ms. Pratt, at this time.

18        So thank you also for being patient with

19    my technological challenges, which have been

20    enormous.  And I am sure it's unpleasant to

21    have to talk to a disembodied voice for a

22    little while.  I am really very sorry about

23    that.

24        THE WITNESS:  No need to apologize.  Thank

25    you so much.

SOS REPRESENTATIVE JILLIAN PRATT

1           MR. RABAN:  We would like a copy of the

2       transcript.

3           THE STENOGRAPHER:  Is the original

4       ordered?

5           MR. SHAPIRO:  We, too, would like a copy

6       of the transcript.

7           (Proceedings concluded at 4:30 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OATH

2

3        STATE OF FLORIDA        )

4        COUNTY OF LEON          )

5             I, the undersigned authority, certify that

6        JILLIAN PRATT, as representative of the OFFICE OF

7        THE SECRETARY OF STATE, remotely appeared before me

8        on December 22, 2025, and was duly sworn.

9

10

11            SIGNED AND SEALED on December 28, 2025.

12        IDENTIFICATION: Driver's license.

13

14

15

16            SANDRA L. NARGIZ

              RPR, RMR, CRR, CRC, CCR-GA

17            snargiz@comcast.net

              Commission #HH239213

18        EXPIRES: APRIL 18TH, 2026

19

20

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2          STATE OF FLORIDA    )

3          COUNTY OF LEON      )

4                I, SANDRA L. NARGIZ, Registered

5          Professional Reporter, certify that I was authorized

6          to and did stenographically report the remote

7          deposition of OFFICE OF THE SECRETARY OF

8          STATE(Jillian Pratt); that a review of the

9          transcript was requested, and that the foregoing

10         transcript, pages 1 through 234, is a true record of

11         my stenographic notes.

12                I further certify that I am not a

13         relative, employee, attorney or counsel of any of

14         the parties, nor am I a relative or employee of any

15         of the parties' attorney or counsel connected with

16         the action, nor am I financially interested in the

17         action.

18                DATED on December 28, 2025.

19

20

21

22                    SANDRA L. NARGIZ

                      RPR, RMR, CRR, CRC, CCR-GA

23                    Notary Public in Florida

                      snargiz@comcast.net

24

25

1    December 28, 2025

2    RANDALL RABAN, ESQUIRE

     rraban@holtzmanvogel.com

3

4    RE:  FLORIDA DECIDES HEALTHCARE, et al vs. CORD

     BYRD, et al.

5    Case No.  4:25-cv-211-MW-MAF

     Deposition of OFFICE OF THE SECRETARY OF STATE

6    (Jillian Pratt)

     on December 22, 2025

7    Dear Counsel:

8    As your client/witness did not waive reading and

9    signing, please arrange for them to read this copy

     of the transcript.  The errata sheet for them to

10   fill out, date and sign is on the following page.

11   If the witness does not read and sign the transcript

     within a reasonable amount of time (or 30 days if

12   Federal), the original transcript may be

     filed with the Clerk of the Court.  If the witness

13   wishes to waive his/her signature now, please advise

     by emailing me informing me that they wish to waive.

14

15   Very truly yours,

16   Sandra L. Nargiz, RPR, RMR, CRR, CRC, CCR-GA

17   snargiz@comcast.net

18

19

20

21

22

23

24

25

1                    ERRATA SHEET

2          DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

3      In Re:  FLORIDA DECIDES HEALTHCARE, et al vs. CORD

       BYRD, et al.

4          Case No.: 4:25-cv-211-MW-MAF

       OFFICE OF THE SECRETARY OF STATE

5          (Jillian Pratt)

       December 22, 2025

6      PAGE   LINE      CHANGE          REASON

7      _____

8      _____

9      _____

10     _____

11     _____

12     _____

13     _____

14     _____

15     _____

16     _____

17     _____

18     _____

19     Under penalties of perjury, I declare that I have

       read the foregoing transcript of the above

20     proceeding and I hereby swear that my testimony

       therein was true at the time it was given and is now

21     true and correct, including any corrections and/or

       amendments listed above.

22     Signature of Witness:_____

Dated this_____day of _____, 2025.

email to: snargiz@comcast.net

24

25

(4)(b)1 36:21                120 89:1 146:10

Exhibits

(4)(g) 83:5,7,16 87:22          1200 121:5 122:5

Exhibit 1 - 12-01-2025, FDHs'    (7) 89:13          1205 12:17 18:18,22
19:10 20:3,

Not-Depo, SOS, Rule 30b6                8,12,19,21 24:1 25:6,24
28:6,13,

(7)(a) 162:18

7:13 10:23                      17 32:6 36:21 37:15 41:14,20

(7)(a)2 89:16          45:2 52:24 58:18 61:17 62:11,14

Exhibit 2 - 07-18-2024 Email,          66:12 70:18 71:4 72:13
73:3 75:2

Bridges to McVay,        (8) 160:16          81:6 82:13,14,19,23 89:11
95:6,

Prosecutions 7:14 126:14,15                11 98:19,20 102:13
111:1,3

0                112:11 113:23 115:5,20 123:13,

Exhibit 3- HB 1205

17 138:15,18,23 139:10 140:6

Exhibit 4- SOS_0589671        0589671 152:17          144:17 148:15
150:16 157:3,19

161:21 162:15 163:12,15 164:6

Exhibit 5-

168:20,23 169:23 171:13 172:3,8,

RTCW Email Reporting Kno        1          11,12 181:5,13,16 182:1
184:6

wn and Unknown Violations

1205's 55:16 72:19 157:23

Exhibit 6 - OECS Report, Dec.    1 10:23 89:19 97:2          177:23

2024 7:16 177:10,11        10 69:15 73:5,7,13 75:7,14,16        12:50 135:5

Exhibit 7 - OECS Report,        76:1 77:1,7 80:5,9 81:5,8,15 82:7,

Dec. 2024 7:17 185:8,9 213:25      10 89:15 90:11,21 91:8,25 93:5        14 21:4,6
22:14 127:20 160:16

143:25 150:15 154:25 157:21        194:20,24 195:9 216:17

225:9

162:14 218:21,22

Exhibit 8 - 07-26-2024, FB, 216:8

McVay email 7:17 203:8,9,10

Exhibit 9 - 08-14-2024, Email, Melendez to McVay 7:18

215:12,13

Exhibit 10 - 08-26-2024, OECS Request to Orange Cnty-SOS 7:19 218:21,22

**$**

$100 96:23

$5,000 89:17 97:5,16 98:24 103:4 221:19

109:20

$50 103:24 111:13

$500 100:18

**(**

(10) 103:2

73 132:19,18 131:21 202:21

10-day 73:3,8 75:4 80:14 81:1,19 82:1 94:9 143:19 149:25 150:8, 154:4,7,16,20 156:24 162:8,17 163:9,18

10-days 157:12

10-minute 63:4

100 186:24 187:5,11,23

100-plus 189:21 192:23

100.371 36:20 89:13,16 103:2 149:11 151:9,11,15 153:24

100.371(3)(d) 157:21

100.371(3)(e) 139:6

104.185 115:20

104.185(2) 179:16

10:00 8:1

10:39 63:7

10:43 216:9

10:47 63:8

15th 14:20 121:11

16 202:21

18 127:9

18th 131:9

1:15 135:6

1st 122:12

**2**

2 126:14,15 153:23 183:13 185:22,25 216:7 219:25

2,152 221:4

2,216 225:11 232:11

2,224 216:25

20 14:11 207:23

200 121:4 122:4 126:10 218:3

200-plus 122:5 218:16 221:13 222:18

(11) 144:17,20 145:18 146:13

150:19 151:12,15,21 153:24        11 128:22 139:6                    2015 21:8,23 225:8

(2) 115:20                        11:25 128:22                      2016 17:6

(4)(a) 139:23                     11th 92:18                        2023 121:15 178:23

2024 14:11,16,17 121:14 127:9
220:14,20,23 221:5,20

128:22 178:1,23 196:6 216:8

222:20

2025 14:20,24 20:15 121:16

122:12 177:20 196:6 198:1

23-03 189:5

23-07 186:24 204:2 220:10
216:9

25 24:3 25:18 29:2 30:18 32:3
143:3 146:2,

33:4,6,12 35:7 45:14 140:1,5

141:11 181:18 182:2,4

27 222:20

27th 223:19

2:30 63:1,2,21 65:18

2:56 197:20

**3**

3 132:15 138:22,24 157:20 185:2,

25 216:15

3-minute 183:13

30 43:14 69:14 73:7 75:16 76:1

77:1,6 81:9 154:22 163:15,21

4:30 230:17,19

983 221:23

**5**

2025 14:20,24 20:15 121:16

5 132:21,24 155:2,3 156:5,7

5,000 96:24

5,000-dollar 109:6,15

5-minute 63:3

50 28:9,10 38:19

50,000-dollar 82:23

50-dollar 89:14

500-dollar 98:21 99:5,11,19,23

51 133:13

5:00 224:5

**6**

6 177:10,11

64 134:22

**7**

219:23,25

**A**

a.m 63:7

a.m. 8:1 63:8 128:22

ability 10:18 25:17

12 206:1

abortion 102:2

absolutely 183:17 224:20

absolve 154:9 157:3

absolved 146:16

accepting 104:12

access 57:14 68:3 76:24 77:15
198:6,8,14 206:10,11,15,21

210:20 213:14,19 214:12

accessed 213:13

accessible 198:8

accommodations 65:5

174:16,18

accord 92:13

30(b)(6) 11:23 64:23 65:3          7 185:8,9 213:25 225:9          accounting 122:10

30-day 81:4 193:21          715 225:14 226:11 229:7,12,19,     accurate 111:18
187:15 188:22

                              24,25                              accurately 192:9

300 121:2 122:2,13

                              72 129:12,15 132:13 134:23          act 92:10 104:10 106:16

371.011 149:18

                              750 225:12                          acted 95:13 97:7,18

380 205:11,16

3:00 63:1                                                          acting 93:1,3,9,22 95:16 98:9

                                        8                         104:14 112:12

3:30 197:14,21

                                                                  action 147:8

3P 77:12                       8 132:17,19 203:9,10

                                                                  actions 58:6,10 116:25 117:3

3PVRO 167:8                        8/16/2024 218:9                      141:16

                              80 27:6 28:10 164:23 165:3,9          activities 29:12,22 176:12

          4                    166:1,2,5,6,16,17,23 167:3,12     190:25

                              168:2,18 169:18 172:19 173:1,8,

                              10 174:7 177:16,19,21 178:22          activity 60:2 186:23

187:12,17

4 132:21,24 152:14,15 216:15                                     188:5,9,13,15,21 189:4,14
204:16

                              817.568(2)(a) 115:12               205:22 206:6

41 214:3,8,11

                              817.568(8)(a) 115:15                acts 93:15 194:16

4:00 197:13

4:24 230:15                                                      actual 74:15 125:24 176:6

                                        9

4:25 127:9 131:9                                                  add 98:11 216:24

                              9 132:17,19 151:9 215:12,13

added 110:11 167:24 213:2,4 130:15

adding 183:1

addition 25:19 33:7 35:8 66:24 68:13,24 71:9 124:25 125:7 153:23 186:6 199:17 169:4 170:9

additional 20:16 51:2 65:11 67:6 69:17 70:20 71:7 85:23 86:13 87:11 135:18 226:19 180:5,19

address 59:24 61:19,22 67:24 68:13,24 72:17 101:11 110:4 156:14 158:4,25 159:11 162:14

163:6 227:1,5,8 228:18,19,24 229:5

addressed 31:15

addresses 37:22 150:12 228:23 160:12

addressing 17:20 24:22 76:12 38:19 43:13

adopted 148:5 167:18

alien 54:10,21

allegation 147:20

allegations 175:19

alleged 53:1 102:20 116:19

allegedly 198:10 228:9,10

alleging 200:22

allowed 84:1,9 149:3 210:21 21 182:9

alternatives 72:2 182:15,22,24

amended 36:21 103:3

amendment 30:13 33:4,8 102:2 123:9

amendments 204:24

amends 39:25

American 179:9

appears 75:6 120:16 132:1,7 134:5 156:15,17 215:23

220:9

application 49:2,12 62:5 128:8 159:10

applications 77:13 138:2 167:8

applies 44:6 111:17 150:18 151:5,8 162:20,21

apply 150:19 162:23,25 180:1,6,

applying 62:8

appreciated 64:20

approaching 230:17

appropriately

approximately 17:1 187:5,7 217:1 221:8,11 222:9,15

apt 52:22

adopting 168:15

advice 18:10

advise 18:22

advisory 31:3

affected 42:21 43:1

affecting 186:25 189:6

affidavit 158:1,3,9,14,23 159:5,

16 160:1 226:22

affirm 8:2

affirmance 49:25

affirmed 8:10

affirming 49:20

aftermath 121:15

afternoon 135:9

agencies 78:15 124:21

agency 21:2

amount 75:22,25 76:25 77:20,21
96:21,23 97:5,16 100:18 102:4

103:24 111:13 113:16

analysis 17:24 18:11 20:11 25:4
45:11 47:19 81:17 95:5 102:5,7
108:2 114:17 201:6 214:5,21

227:14

analyzed 214:8

analyzing 17:17 224:16

and/or 78:15 156:24 157:12

Andrew 131:19 223:12

announcement 62:24

answers 9:21 10:19 44:10 49:15

anticipate 29:11,18,20,23 63:21

87:16

anticipated 210:24

anticipating 29:25

arbiter 145:24 146:5

area 36:18 64:10

areas 47:25 61:5

argue 89:4

argument 151:17

arguments 67:11

arrest 60:25 120:4

arrested 28:19 55:1 125:19

arrests 125:24 186:6

arrival 16:21

arrived 62:19 211:16 212:3 226:3

arrives 73:25

arriving 91:17

aspect 109:24

assertion 80:13

anytime 227:5

agents 222:23 223:3

apologize 224:19

agree 68:9,20 90:25 93:7,11,14
100:22 130:10 132:2 134:8,23,25
184:5

agreement 208:8,9 212:12

appeal 133:7

ahead 38:23 169:6 189:9

appeared 26:7 27:16 170:17,18
196:2 201:1 213:9

asserts 86:9

assessed 70:10 77:19

apparent 200:25

assessing 109:5 145:16 200:19

apparently 137:21

assessment 226:12 230:2

assign 126:5

assist 96:13

SOS REPRESENTATIVE JILLIAN Index:
PRATT assistance..bit

assistance 10:22 18:25 20:11     availability 183:15                202:11 214:15
230:12 232:17

 180:21,25 181:1,10

                              average 22:18                basically 125:16 208:24

assistant 16:23

                              Avner 8:16 64:21 135:14 183:11     basing 189:10

assisted 197:3            230:14

                                          basis 66:2 109:5 165:19 169:1,19

assisting 8:19 28:23 180:8,17    avoid 83:25 84:9 117:17 162:2        170:3
175:10,12 191:4,6 194:25

                                          195:10 230:2

assume 10:7              aware 11:16 19:5 20:5 25:24 29:7

                         31:20 44:2 45:13 46:9 49:9 52:10,   Bates 126:21,24
152:17,19

assuming 104:12

                         12 55:8 60:12 70:13 72:11,21      155:3,8 219:1

attached 203:24 215:24 216:12,    77:23,24 78:5,11,17,20 79:7,10,

                                          beach 13:14 118:13 191:16

 16                15,17 81:3 82:3,5,14,18 86:19

                                          196:10,17 198:6,11 202:24 203:2,

                         95:3 102:12 107:2 114:1 115:24

attachment 216:25 219:22,24                      13,24
205:9,10,15,18,20,25

                         136:5 142:19,20,24 143:2,3

 220:25 221:19,22                          206:16,18 208:11 209:4,17,23

                         145:20,21 156:21 157:8 164:2

                                          210:5,14 213:18,22 214:5,22

attachments 219:18,20      179:5,6,11,15 181:6,14 182:1,15

                                          223:16

                         209:22 210:9 232:9,15

attempt 130:11 137:24                      Beach's 202:20

attempted 42:20 55:4 80:24      B          bearing 119:4

attempting 39:25 125:18                      began 8:1 168:19

attempts 55:8         back 13:12 27:8 32:22 57:8 58:21

63:4 65:17,17 66:2 82:4 105:5          begin 148:17 223:19

attendees 31:25          121:20 124:4 130:20 137:16          beginning 53:25
62:24 78:3

                        139:22 150:22 151:20 157:19          121:15 151:6 153:8 189:11

attends 31:23          172:23 176:1 178:4 186:3 196:24

attention 39:6,10 78:15,25 79:8     197:16,17,18 211:23 212:25          begins 155:3
153:22 195:16          213:25 214:23 215:5 220:16

                                      behalf 52:8 93:9 103:5,16 104:11
                        221:17 224:4 225:7,8 229:17

attorney 9:4 129:3 164:13                    105:20 106:6 108:21 109:1

                        background 15:6 17:3          112:13 117:4 122:19
142:8,15,16,

attorney's 124:18,19 125:5                    21 165:16 186:10

 184:17                bad 132:21,22,24 133:6 134:7,10,

                        18                    behavior 161:3

attorneys 8:17 12:10,24 64:6

 65:25                Bahill 128:21,25          belief 159:9

audible 9:21          ballot 28:24 80:1,7 81:2 114:9     believed 67:22 119:22
139:20

                        115:22 209:12,15          140:19 202:4 204:19

audio 62:23

                        ballots 81:7 180:6,20          believes 164:24

audit 69:22 70:3 197:23 200:10

 202:21 215:16 217:24 218:19     ban 37:6,7,10 41:14 42:11 45:9          believing
195:21
 223:8,9,15,18 224:12          53:2 55:16

                                      bell 79:1

auditing 200:5,7 202:24          banning 45:13          benefit 9:19,23 152:16

audits 198:18          bar 59:25          Bennette 8:19 96:15 100:7

August 216:8,17 222:20 223:19     barcode 158:5 159:1,12          bigger 118:11

authenticity 131:13          barred 41:12,13,24          bill 17:25 27:9 29:25 43:9
58:3

authorities 195:17          base 142:6,8          67:8 103:3

authorize 105:11          based 33:22 36:13 77:9 86:1          bills 17:17
                        122:8,9 129:2 146:18 150:5

authorized 99:6,16 104:5,17
110:5

161:15 164:3 171:24 175:9,13

226:21 227:20 228:1,6,7,8,12,22

authors 136:20,21          176:13 182:5 186:20 187:21,22,

24 188:3,17 189:2 192:11,13       bit 30:6 38:24 64:3 92:18

95:5

birth 67:24 68:13,23 72:18

SOS REPRESENTATIVE JILLIAN

Index:

PRATTbite..circulators

105:24 139:3 153:16 157:22      camera 197:17                      169:7 229:12
185:15

                              Campaign 135:22              change 92:17 95:5 122:8
228:24

bite 135:12

                              campaigns 55:5              changed 154:22
blanks 110:3 112:1

                              cap 65:4              Chapter 89:1 146:10
board 39:22 40:5 41:4

                              capacity 65:9,13 196:7      charge 36:8 118:16,19
119:5,10,

Bonasia 153:2 154:7 155:17                                      14
                              cards 16:2

bottom 132:12 152:19 153:1                              chargeable 32:14
                              carves 100:14
155:8,17

                                              charged 28:15 126:10 132:4
                              case 12:17 18:3 22:9 28:25 53:4,

Box 74:1,2,9,12,20,23 75:1 95:1                              184:11 194:24 195:10
205:6

                              8,10,14 85:21 106:15 116:19

Brad 13:1,10 64:13 127:8 130:20      119:1 125:9 130:8 138:10 141:7      charges
125:24

131:8,15 183:23,24 184:12      144:14 165:24 167:18,24 168:1,3,

                              Chat 11:3

203:21 210:11,15 212:6 215:23      13,15,19 179:6 205:15 221:9

216:7                                              check 101:11 148:18 183:14

                              cases 15:24 21:12 39:20 59:16

break 9:18 55:12 56:25 57:12      70:7 72:14 77:10 98:16 121:7      chief 16:3,8

62:21 63:3,4 78:24 105:23 129:7      123:15,25 124:7,11,12,14,20,22,

135:4,13,14 183:13              25 125:2,3,11,18,21 126:4,8

                                              choose 120:13 184:18

                              129:12 130:12,16 132:8,14,17,18      choosing 93:17

breakdown 174:8

133:2,12,14 134:15 136:16

Brent 135:21          137:10 168:8 169:10,11 170:8          chose 69:12

178:9 184:14,24 187:5,7,11 190:6          circulate 22:24 43:2 49:21
56:14

Bridges 127:6,15,16 128:2,9,21          194:21          78:18 141:23 142:15
193:3

129:21,25

catch 9:2          circulated 22:15 203:1

briefly 17:2 122:14

catchall 90:10          circulating 21:18 22:4,6,19,24

bring 79:7 100:5 126:17 157:19

category 173:25 207:15 231:18,          26:17,21 29:2 45:14 56:13
118:8

bringing 100:9          19 232:1          142:7,21 158:24

brings 78:14          caught 227:20          circulation 60:18 171:25

broadly 109:23          caveat 20:14 54:19 90:17          circulator 24:6 31:9,11
32:4

44:7,12,22 45:1 49:2,6 53:17 56:7

broke 11:24          Center 135:22          57:2 58:13,25 61:5,13
62:4,6

brought 39:5,9 78:25 137:17          CEO 80:6          68:15 69:2,11 70:8
77:17 84:19

195:15          85:15,16 86:9,16,23 91:13,16,22

certification 199:2          92:2,9,12,19 93:15,21,22,24,25

bullet 219:21,24 220:18 221:1,18

94:1 97:1,7,17 98:22 100:19

222:2,5          certifications 198:25

101:8 104:8,13 106:3,4,5,13,16,

burden 81:19,22          certified 8:11          20,23 107:2,21 109:2,16
110:9,16

115:6 117:8,24 124:22 130:12

business 60:8,9,13 106:9          chain 131:11,13,24 217:7

132:18,19 133:6 134:6,9,24

chair 32:19          137:11 139:14 142:4 158:5,15,18

C          159:1,9,10,11 160:7,21 161:1

chairs 32:1          162:22 165:23 175:1 176:2 178:2,

calculating 128:1

196:1

calculation 29:4

calendar 94:18

158:1,4,

call 13:13 52:18 65:11,25 146:23

159:16

called 53:21 54:9,11,21 114:25

21:2,5,6 22:2,19

 128:8 190:23 209:7

26:15 28:6

challenge 66:17 146:2,12

203:25 220:12 226:21

challenged 104:20 126:23

challenges 64:7

challenging 46:20 47:5,16 59:11

chance 12:25 40:11 112:2

135:12 153:12 155:21 156:10

10,20 184:14,25 192:7

circulator's 83:25 84:8 99:7,14

104:6,18 105:12 106:2

14,23,25

circulators

23:4,8,13,18,22,23

SOS REPRESENTATIVE Index:

JILLIANcirculators'..concerned

PRATT

41:13,24 42:5,10 43:20 48:10        Clean 135:11,23 156:3,13 157:14        190:15

49:19 51:19 52:4,8 53:2 56:17

                                clear 20:21 21:12 43:14 47:4        communicate 101:21

61:15,18 62:8,10,16 72:14 83:14

                                129:1 187:22

85:11 93:18 98:12 101:5 114:5                                communicated 101:19,24
102:1

115:2 117:2,14,15 118:7 120:23        clemency 39:22 40:5 41:4        181:7

121:3,7,16 122:3 124:1 127:22

128:11 136:5 139:19,25 141:17,

                                clerked 17:7,11        communication 19:13,16

18,22 142:7,12,21,22,24 157:24        client 19:14        communications
19:7,19,20,24

162:20 163:16 169:20 170:5                                20:6,23 114:19

171:24 172:2 175:15,16,20 176:6,    clock 230:15

7,14 178:24 184:10 186:9,22                                compare 51:8,11,17 118:9

                                close 111:9 141:8 167:25 181:19

187:11,16 188:5 189:3,13,21                                209:12

                                217:17

194:7,8,12,15,21,24 195:5,9,20                                compared 127:19
191:14,18

196:11,14 202:15 203:1,25 204:3,    closed 94:19,24

                                                204:24 208:22 213:6 230:8

12,13,17,25 206:12,24 219:18        closely 108:10

220:1,10,12,15,18,22 221:20                                compares 51:6

228:5                        code 15:21 43:15 112:7 116:5

                                                comparing 52:2 108:23 194:8

                                162:4

circulators' 206:22                                196:21 199:20 208:14,15,24

                                colleague 8:18 139:1 164:10,15        209:2 212:20 213:14

circumstance 32:18 90:15        177:2 210:15

91:18 92:7,11 93:7 119:9 160:4                                comparison 200:17

                                colleague's 152:16

circumstances 33:13 92:22

compensated 176:3

110:15,22 125:8 143:16 144:5,10

colleagues 183:4 199:18

complained 171:20

152:8 160:5

collect 29:6 83:1 104:23 139:25

complaining 166:15

citing 214:14

141:18 142:14 162:22 181:18

complaint 50:17,21 51:1 88:1

citizen 37:4,5,7,10 40:17,19 45:4

collected 96:25 98:21 100:19

116:3 117:20 123:1,5,11 140:9,12

47:9,11 48:2 49:3,8,11,20 50:15,

154:17,19 164:4 182:4

141:5,12 148:7 158:12 165:13,18

22 52:20 54:1,5,6,9,16,18,22,25
167:20,21 174:11,22

collecting 24:2 29:12,21 36:22

166:11

57:1 82:25 84:18 85:17,25 86:10,

45:3 55:16 93:9 103:4,15 104:25

204:15,18

21

105:19 163:1,3,8 182:2

complaints 15:20 44:20 50:18

citizens 37:17 41:12,15,23 43:19
122:3,14,15,16,22

collection 165:5 186:10

102:14 121:3,9

46:8,17,22,24 47:7,17 49:25 50:2,
165:13 166:8,

123:2,6,22 136:13

8 88:6 179:9

collector 84:2,10

10,14,18,19,23 167:4

171:1

citizenship 47:12 54:4,22
175:2,3,4,14 200:21

collects 162:21

172:7,18,19

201:16,24 202:2,5,11

city 162:4

column 217:3,4

complete 10:19 63:15 116:18

Civil 11:23

combat 116:1

completed 39:20,24 40:17,25

clarification 10:5 21:14 231:1

combating 83:17

192:8

clarified 102:10

combats 45:14

completely 127:24 130:8

clarify 37:11 41:15 148:25 165:2

commit 37:18 39:16 40:10,18

completing
40:13

177:14

41:9 46:8,11 139:13

compliance 154:18

classified 231:14

committed 23:24 25:13 35:17

complied 52:8

46:15,17 58:9 85:8 113:17 115:2

classifying 192:3 195:23

comply 143:8 154:16

clause 56:1 67:10 75:19 83:9     139:20,21 169:5,14 186:22

113:13     187:12 188:5,9,13,14,21 189:4,13   component 31:5

191:22 195:5

clauses 24:15     compromising 71:22,23

committing 22:10 26:19 45:22

CLC's 177:2     concerned 115:21

107:3 136:5 176:17 189:23

110:23 119:5 120:10 157:2

SOS REPRESENTATIVE JILLIAN

Index:

PRATT

concerns..county's

concerns 115:16

concerns 115:16

constitutional 30:13

100:3,4 101:1 106:17

111:20,21

113:3 115:3,4 119:11,13 124:2,3

conclude 207:9,18

constraints 135:15

125:12 127:13,14 130:22 131:13,

concluded 211:6 225:12,14

consult 210:16 224:16,18,22

14,15,25 132:5

136:7,8 137:18,19

138:22 140:3 141:20 143:8,9

231:4 232:13

consulted 182:20 210:19

147:1 148:15,16 150:9

155:18

concluding 191:4,6 211:5

156:12 158:6,7 160:24

163:16,17

consulting 212:3

228:13

164:7,20,25 165:1,7 166:25

contact 184:12

167:5,13,14 168:20,21 170:6,20

conclusion 208:7 211:16 212:4,

8 230:12

contained 57:19 58:22 67:22

171:22 172:8 174:12

176:3,4,19,

226:16,18

24,25 177:6,25 178:6 179:19,20,

conclusions 226:4

23 181:13,19,20,23,24

182:13,14

context 34:13 60:18 95:17

184:22,23 186:15 188:8

194:22,

conduct 13:12 25:3 80:20,22

197:25 215:15

23 195:7 196:8 198:1,2 202:19

87:23,24 99:7,14 104:6,18 105:12

106:2 167:22 222:24

contexts 59:25

203:3,4,6 206:13,14

215:7,8

217:5,6 219:14,15 223:17 224:17

conducted 136:16 182:11

continue 54:20 153:16 175:16

225:21 226:1

227:5 228:12

conducting 87:21

CONTINUED 183:19

232:14

confidential 101:13

contribute 194:4,6

correction 131:22

confirm 65:21 164:17    191:21,23    control 34:15 35:7,21 74:11    correctly 20:10 42:19 47:13

205:14 211:25 221:9,10 222:20    80:10 144:10    49:18 58:15 101:6 111:17 119:7

206:9 210:3 228:4

confirming 182:13    convenience 13:22 14:15,23

37:4 45:8 83:5    corresponds 162:6

confused 223:23

convening 18:7    counsel 10:10,12 12:13 16:23

Congratulations 15:13    19:20 36:15 57:14 62:21 63:19

conversation 66:1    135:17 197:5

conjunction 145:9

conversations 12:13 20:5    counsel's 16:24 31:1 145:9

connected 171:23 172:2

conveyed 129:23    200:13

connection 158:9 167:2 178:20,

25 186:23 188:6 189:4    convicted 36:23 37:3 39:4,14,16    count 207:15 213:10

58:18 86:11 184:11 187:24    counted 127:20

connections 47:23,24 48:3,6

188:19 189:23 190:15,17

conscious 64:1    counties 69:23 170:23 171:2,15

conviction 190:7    172:10,13 187:1 189:7 198:3

consent 61:20,25    202:8,10 209:23

convictions 38:13 43:10 127:20

consented 105:19    128:10    country 42:8,21 45:20 48:4

consenting 62:3    cooperates 109:17    county 13:13,14 68:13,24 72:17

considered 34:5 52:17 72:1    copied 131:3 208:19    73:12 97:4 98:23 99:1,20,25

106:13,24 182:17,21 225:1    100:1,2,13,15,21 101:5,7,9

copies 180:7    102:16 110:7,10,11,17 112:4

228:15,23

corporate 12:3 64:23 164:19    118:13 160:22 161:1,2,23 162:1,3

considers 66:19 137:7 161:4 198:13,16,    191:17 196:10,17,19

correct 14:15,21 20:13,14 21:9    17 203:2,13 205:23

213:12,18,22

consist 108:21,23

22:3 23:3 25:1 26:1 27:25 28:2    214:22 215:16 216:4,8

consistent 100:23 101:16    31:5,8 34:11,12 37:12 39:11    24 218:1,5,14
217:4,23,    221:7,12 222:7,8,

134:19 191:7,10 217:19    41:17,18 42:22,23 43:3,10,11    10,22,23
223:8,25 224:11,14

47:7 51:2 58:19 59:8,9 62:11    225:2,3,11,17 226:7,9
232:10,11,

consistently 190:8

66:14,25 67:2 69:25 70:1,5,6    12,16,17,22

constitute 109:25    76:20 78:8,16 79:9 81:9 82:16,17,

18,20,21 83:2,3 89:8,9,25 90:7    county's 202:24 209:5
217:16,20

constitutes 33:23 73:17 84:24    91:4 94:4,11 97:14,15 99:8,14    221:7 222:7

90:23 111:22

COS REPRESENTATIVE JILLIAN

Index:

PRATTcouple..depending

couple 148:5 160:13 190:19    date 67:24 68:14,25 72:18 75:11,    deemed 79:23 84:1,9 226:25

191:12 231:16 232:3    12 94:13,15 98:16 101:19 110:4,5    227:19,23 228:16 230:10

127:25 130:8 152:5,9 169:24

court 9:19 64:14 188:19    defendants 60:24

186:6 212:18,23 218:9 222:25

courts 61:20    226:21,22 227:19,25 228:1,6,8,12    define 95:16

cover 64:3,7,17    dated 127:9 216:8    defined 95:21

COVID 196:23    dates 228:5,22    definition 176:3

Cox 80:8    Dato 164:12,13 177:9,12 183:3    defrauding 60:9

created 139:10    DAVID 53:21    degree 115:14,18 179:18

credentials 210:9    day 74:4 80:9 82:7 89:14 91:18    delays 90:6 98:17

92:5,14,16,18 94:16,21,22,23

crime 28:16 35:17 52:17 58:9    delineate 121:20

96:24 144:8 207:1 214:13,16,17

61:10 88:14 116:22 118:16,19

222:21 223:19,22 224:3    delineated 218:17

119:3,5 120:16 159:8 169:15

176:15    day's 227:24    delineates 74:7

crimes 14:5 15:10,17 38:13,15,    days 35:13 69:14,15 73:5,7,13    deliver 73:4 77:21 79:4 82:6,9,11

21 115:2 132:5 145:8,13,16    75:7,14,16 76:1 77:1,6,7 80:5    90:11 91:22 92:12 93:2 94:23

146:20 147:12 158:10 159:21    81:5,9,15 82:10 89:15 90:11,21    95:13 101:5,8

184:2,19 187:24    91:8,17,25 93:5 94:22 143:25

150:15 154:22,25 162:14 163:16,    delivered 69:13 73:11,17,21

criminal 27:24 28:5 43:25 48:9    21 224:8    74:4,20,23,24,25 75:7 81:1,3

50:5 53:5,8,10 114:25 115:8    89:15 90:20 91:8 92:15 96:4,7

116:4,14 118:1 119:8,19,21    DCA 17:8    97:12,22 99:20,24 100:1,13

147:16,17 179:25 186:7,23    143:19 144:1,7,11

deadline 60:5,14 61:2 89:21

187:12,17 188:5,9,13,14,21

91:12 97:4 163:10,11,15,19,20,21    delivering 24:2 80:4 89:11
95:17

189:4,14 194:16

164:5 193:22                    100:15 102:15 140:16

criminally 184:10

deadlines 89:12                delivery 74:15

criminology 17:5

deal 38:14                     department 14:1,2,3 16:22

current 15:15 123:23 127:19                    17:13,14,18,22 18:9,17
19:8,25

dealing 86:4 98:8

128:1                                          21:5 29:11,18,23,24 30:24 31:6,

dealings 86:1                  16 37:15 39:12 41:11,22 42:20

cursor 186:5

44:4 45:12 46:19 48:8,13 49:14

deals 115:12

curtail 80:10                                  51:25 52:6,13,25 53:22 54:2 55:4

deceased 115:16 117:5 122:19        66:19 69:19 71:20
72:1,3,7 74:3

cut 30:6 132:22 230:17,19

165:16 173:24 174:4,8,10        75:3,5 77:5,19 79:5,16 80:24

cutoff 62:25                                   81:11,13,16 82:6 87:4,5,9,20

deceit 38:14,16 39:5

90:22 95:16,20,22 98:4,7 102:10

cycle 121:14

December 14:11,16,17 19:6,23        107:4,9,24 109:14,23
112:12,16,

cycles 81:2,15            56:15 69:21 114:15 194:13 196:5     18,20,22 113:20,25
114:2,8,16

197:25 214:1 225:7                119:20 124:7 131:2 140:4,23

142:1 143:12,18 145:4 146:13

D          decide 32:23 50:13 88:13 141:8        160:25 161:4 182:23
201:25

198:3 200:18

209:6

Darlington 151:20 223:13

69:16 84:23

data 25:8 37:16 45:11 46:6,9

47:16,18 51:5,18 56:5 67:17

83:15 114:17 182:5 184:9

143:15

database 50:23 51:17 53:21

54:11,12 117:11

Decides 6:17 205:14

decision 36:4,8 52:14 119:4

120:5 167:25

declaration 80:8

decline 109:15

department's 17:17

87:7 169:19

depend 110:14,21 116:9

144:13 165:12 174:20

depending 192:25

depends 91:6 125:8 144:5
166:13 224:18

deposed 8:24 9:3 64:25 65:7

deposing 65:8

deposition 9:20 11:22 12:8,14
13:2,22 62:25 65:3 66:3
19 225:18

depositions 9:8

Deputy 131:18

describe 17:2 122:14

describes 218:18

describing 38:25 90:16,17
154:15,24

description 152:10

deserving 41:4

designated 11:17 12:7 16:8

118:25 119:9 148:5

developing 98:7

difference 40:20,22

differentiate 134:15

differently 134:11

difficult 46:25 47:22 60:23 76:9
90:15 105:17 107:13 108:4
140:17

difficulties 46:3 63:10 64:2

digits 68:12,23

direct 8:12 34:19 35:7,21 64:15
104:24 135:7 164:11 183:19

directed 64:9,14 160:12

directing 114:24 156:19

directly 16:16 76:19 196:5

disputed 89:3

distinct 134:9,10

distinction 62:15

distinguish 178:15

distribute 142:18

distributed 28:21

distributing 25:18 27:21 141:2
158:21 159:14

distribution-only 29:5

District 17:11 219:23,25 220:14,
20,23 221:5,20

division 17:20 31:2 50:11 51:10
52:14 87:13,18 145:10 160:10

do-not-buy 190:23 191:13

DOAH 89:5

director 13:9 16:17 64:20 65:7,    documents 11:14,16,20 12:6
73:22 94:25 145:7

16 66:2 131:16,17,19 183:14    56:16 126:20 127:2,3 128:2

designation 134:6 170:11    223:13    152:23 153:13 155:5,12
185:19

203:13,18 215:12 216:4 218:25

designed 113:16    disability 180:25

219:2,3,9

designing 31:13 62:5    disclosing 12:12

documentation 222:11

detail 53:15    disclosure 66:13 72:8,19

documented 59:6 167:15

detailed 22:15 116:15    disclosures 66:10

documents 167:23 168:14

detection 117:17    discovered 148:22 150:7 196:2    203:15 216:6
218:12

deter 25:21 83:21    discovers 74:2 144:21 147:7    DOLAN 135:2 185:3

determinant 143:21    discovery 152:24 153:19 155:13    dollars 95:12

168:7,9 219:4

determination 34:9 143:14    door 198:15

146:1,11 232:3    discretion 109:14 112:16,19

doubt 131:13 152:22 155:11

149:5

determine 32:13 42:20 49:15    156:16 204:5 215:25
218:14

50:1,7,21 58:22 74:3 75:13 84:25    discretionary 109:18    219:13

86:14 88:18 95:25 101:14 108:14,

discuss 15:6 55:15 202:20    drafting 98:14 197:4

25 116:5,18,22 119:2 126:8

127:24 140:18 147:19 148:10    discussed 21:23 23:11 114:23    drill 130:5

151:4 158:23 163:25 174:1 190:6    136:19 139:23 150:17 160:15

driver's 66:21 67:5 68:11,22

205:21 221:14 226:7 231:11,16    162:8 191:16 195:14 200:23

71:11,18 110:6

215:8 221:12

determined 61:13 79:9,19 85:3

dropped 107:9

146:17 147:23 166:3 173:22

discussing 22:2 109:20 145:2

174:9 178:24 229:22

151:12 160:17 162:9 215:15

dropping 11:2

determining 85:10 94:8 102:6
144:10 180:25

discussion 13:1 66:7 137:16

due 100:15

136:22 140:5 145:25

183:18

duly 8:10

develop 119:13 120:4 128:17

discussions 63:10

duties 16:6 199:15

developed 19:4 45:12 98:4

dishonesty 38:14,16,21 39:5

Index:

PRATTduty..EXAMINATION

duty 145:8

eligible 86:15

88:20 113:25 192:16,17

195:22

206:6 207:22

eliminate 29:12,21

E

engaging 23:8,18 25:25 27:25

Elise 8:23

56:7 164:24 187:17 190:25

earlier 28:11 42:24 43:7 89:6

Ellis 203:22 204:9,12

194:15 195:20

95:3 109:19 112:1 134:7 136:3

else's 34:20 108:21 109:1

enlist 127:25

141:15 143:6 144:19 145:2 148:4,

12,19 150:18 160:15,18 161:21

email 127:13 128:22 129:2,22,23

enormous

114:10

162:8 163:14 164:22 167:1,12,17

130:13,25 131:3,7,11,13,24

ensure 52:7 67:14 71:12 73:11

168:3 169:25 170:13 175:5,6

134:20 153:2,6,10,15 154:3,8

113:17

177:22 179:22 181:16 184:21

155:15,16,17,21 156:2,3,9,12,14

200:23 202:8 223:9

157:2,4 183:23 184:5 203:17,21

ensures 69:5 76:3

204:6 215:17,20,23 216:1,7,11,17

early 224:4

ensuring 192:8

217:7,8 218:7 219:10,16 220:16

ease 198:5,14

221:18 222:3

entail 165:9

easier 175:23 215:18

employee 198:23

entire 53:24 96:22

108:6 150:3

214:13,16

easily 127:24 198:8

employees 210:5 223:14

entity 106:9,12 121:17 145:13

easy 174:1

employer 86:14

erroneous 211:16

educational 17:3

employs 190:8

error 100:16 212:1

effect 29:11,20 41:25 48:21,22

enacted 25:6 138:16

49:5 52:24 55:4 72:13 75:2 81:6

escape 175:23

enacting 70:17 71:4 102:13

105:20 113:21 118:23 138:19

163:10,19

effectively 70:18 71:5 80:2,15

effects 17:25

effort 28:24 65:16 77:25 78:6

132:3

efforts 131:23

egregious 22:22

election 14:5 15:17,21 17:20
200:1,3 212:2

24:23 33:5,9 37:24 38:6 43:15

81:15 89:19,21 97:2,5 102:3

115:1 116:5 121:14 129:12 130:7

132:5,13 133:8,18,19,25 134:5,12

145:8,12,15 146:20 147:11

131:1

158:10 159:20 184:2,19

election-related 18:12

elections 15:10 31:2 44:23 46:15
39:13 45:11 46:7,19

52:14 69:14 72:10 73:5,12,21
67:17 77:5 83:15,18

74:2 76:3 79:8,20,24 89:20 92:15
94:6,7 108:20,21 116:21

94:19 97:3 98:23 100:21 122:17
136:4,6,9 141:9

enactment 19:11 20:4 25:24

27:9 28:6,16 29:9,16,19 37:14

38:24 42:25 43:9,13 58:3,5,7,11,

18 112:11 115:5 123:13 164:6

establish 70:18 71:5

168:19,23 172:8,12 177:23

181:25 184:6

estimate 126:9,11 199:25

estimation 84:23

end 29:3 31:24 89:2 120:23

121:15 123:21 125:18 199:2

ended 178:9

231:3

enforce 48:14 183:1

enforced 48:17

enforcement 15:24 21:12 23:14

34:2 35:25 36:6 38:4 43:9 45:23

49:13 50:25 51:22 54:19 59:17

60:16 78:16 88:11 118:21,23,24

119:1,20 120:11 121:8,17 123:12

124:8 125:16 126:7 138:10 141:9

158:19 159:22 161:19 166:20

169:15 171:6 177:19 189:14

essence 93:3

essentially 161:16

establishing 119:10

evaluate 199:5

evaluated 113:20

evaluating 199:1,11 200:9

evening 224:5

eventually 45:24 54:18

205:11

evidence 15:22
23:6,17,24 25:8,

11 26:5
49:10 56:5

88:11,19

119:9 120:19

135:18 145:11 150:15 166:9
182:1

197:24 205:9 229:15
209:13

electoral 24:17 56:3 113:18
8:12 135:7

eligibility 83:25 84:8

191:24

enforcing 44:4 75:4

engage 60:3 176:15

engaged 21:7 58:13,25 72:22

147:9,9 176:14 173:15

exact 152:4 207:19,20

EXAMINATION

164:11 183:19

Index: examine..fill

examine 80:24 229:12          explored 71:20               FDH 216:4

examined 77:19 113:21 114:8    express 91:24                FDLE 119:20,25
120:17,24

 230:8                                         123:15 124:8 125:1,4 140:21

                    extension 65:3

examining 153:13                              February 89:19 97:1

                    extent 19:18 69:17 105:8 136:13

examples 46:16 56:16 60:5      200:17 226:14               federal 11:22 17:11
50:23,24

 170:22 173:5,11,13,14 174:8                              54:12,14 124:21

                    extra 197:11

exceed 32:7                                    feedback 20:12,19 72:7,11 82:1

                                              114:17

exceeds 193:11                    F

                                              feel 211:9 212:14

Excel 128:7

                    facie 116:18              feeling 65:19

exception 82:8 90:15 91:1

 100:14 101:17 108:7 109:9,10    fact 44:17 49:16 50:14 67:16      feels 120:17

 143:7 149:12 151:16 181:4      68:15 69:2 83:16 85:4,24,25

                    86:15 101:12 107:22 110:11    fees 41:2

exclude 61:14                    126:3 143:20 171:24 173:22      felon 37:11 39:19
44:8,11,16

exclusive 181:18                 174:2 175:13 184:22 191:25      48:24 51:13 85:18
86:1,21 127:23

                    205:15 207:13 210:19 218:11

excuse 143:10                    225:13                      felonies 39:4,14,17 85:8

excused 145:17                    factor 228:14              felons 37:23 38:4,19
40:8,10,22

                                              41:8,16 42:3 43:14 48:23 51:7

executive 186:18                 factors 40:6 86:2 136:21 229:4

                                              felony 36:23 37:3 39:21 43:10

exempt 101:13                    facts 32:20 85:23 91:21 92:21      86:12 115:14,18
179:17

exhausted 36:18                    110:15 116:9 125:8 143:15 144:5,

14 140:15                         left 86:16

exhibit 10:22,23 11:4,6 102:18

factual 109:5 143:14 146:1,11       Ferguson 135:21

126:14,15,19 127:1 129:8 135:1

138:22,24 152:13,14,15 155:2,3,    fail-safe 106:25              ficticious 103:6
115:22

23 156:1,5,7 157:18,20 177:10,11

failed 110:10                fictitious 108:16

183:22 185:1,2,4,8,9 203:8,10

213:25 215:12,13 216:16 218:21,    failing 93:2                 fiduciaries 142:12

22 225:9

failure 98:25 193:18         fiduciary 92:10 93:1,16
104:8,14

exhibits 8:20 11:2                              105:8,9 106:23

fair 10:8 22:14 39:10 81:18

exist 168:14                 118:15 120:6 137:1 154:2 159:25   field 193:19 228:7

existed 62:7 154:18 168:8         187:10 194:13,18 199:10,14       fields 67:6,13
71:14

221:15                      201:21

figure 166:16

expand 90:3                 fall 149:11 151:15 194:10

file 20:16 26:11 54:20,21 70:5,12

expect 101:4,7 139:12       falls 75:13 94:20,21 179:5           123:4 167:24 168:1
191:19

familiar 9:14 11:13 14:10,19 24:8    196:22 198:11 206:3
208:16,23

expected 94:23

36:25 45:5 55:17 73:8,14 89:22       209:3,9 211:8,14 212:19
213:8,

experience 199:11 200:4,6,8,11      95:14 99:2 103:8,9 111:15 139:9     10,17
225:25 226:17 227:1

209:16 210:4                157:23 190:9 204:8 214:6 219:6,       228:19 230:9
231:10

expert 13:6 20:17 209:25         8,11                     filed 12:16,18 13:7 18:6
55:25

familiarity 216:20          206:4 210:1

expertise 199:1

family 24:5 25:19 33:7 35:9       files 129:12 168:4,9 198:8

222:12

explain 49:17 140:4 201:6

    140:2,16 181:19

explained 48:23 50:17 189:17

    fast 63:5

explanation 92:2

filings 12:16 24:14

fill 66:17 67:6 161:25 180:2,17

    193:18

filled 67:22 103:19 109:3 110:3, 174:3 181:18

16 111:9 170:17 174:15 228:8 231:2,3

filling 67:15 68:2 69:6 71:12,14

focus 64:11 137:9

107:20 109:25 160:18,22 161:1,4

179:16 180:1,14,16

fills 103:6 109:21 179:18

final 14:19

finally 10:16

financial 114:11 232:19

find 44:18 64:18 151:3 204:25 188:4 189:3,12,21

217:11 225:2

findings 225:19

finds 165:15

fine 82:23 83:16,21 86:24 88:16, 23 89:2,5,7,10,14,17 91:3,19

92:8,23 94:9 95:10 96:21,23 97:5, 24:16,22 25:3,

11,13,16 98:5,21,24 99:2,19,23 27:12,25

203:13 209:7

Floridians 186:25 189:6 190:22

focused 137:12 229:1

follow 41:6 108:1 183:6

follow-up 183:8

food 135:12

force 90:14 118:23

forged 107:11 204:20

forget 79:11

forging 70:14 106:17

forgot 92:3 185:6

form 22:7 23:9 24:25 27:13,20 28:1 29:13 30:5 31:17,19 32:9

33:2,14,25 34:17,25 35:14 36:2

12,15,17 173:9,17

182:10 192:9 212:20

formulate 36:16

forward 44:5 105:7,9 108:22

145:13 199:21 201:4

forwarded 59:7 131:1,5,7,8,25

153:18 201:7

foster 133:18

found 45:16 123:3

FPF 186:10,22

frame 20:7 33:9 35:2,20,23 77:3, 6 82:7,11 206:14 217:25 218:7 223:23 224:1

frankly 230:25

fraud 14:13,21 17:21

22:11 23:8,18,24

10,13,21,25 26:6,13,19

40:21 46:4 44:25 49:25 50:4

100:18 102:3 103:23 104:16,21 43:16

37:18 39:16 40:10 41:9

51:20 55:7,23 58:20 60:4,11,19

107:24 109:6,15,18,20 110:12,20 46:8,11,15,17,21,23

45:14,22

61:8 62:12 67:1,20 68:17 70:22

111:13 112:5,9,17,20 145:17,22 58:14,19,

56:3,7,11,18 57:3,7,17

71:25 73:14,19 74:5 75:17 76:14,

146:1,6,8,9 147:25 148:11 149:4, 67:19 68:16

25 60:3,22,25 61:5

21 80:18 81:21 84:3,11 85:22

5 150:2 154:10 162:2 76:12,19,23

69:3,5,18 70:9 72:23

86:17 90:2,8 91:5,20 92:20 93:13

77:7,22 80:3 83:11,12,17 107:3

fined 83:19 88:25 90:12 98:17    94:14 95:19 96:9,25 97:6,17,23

113:16 115:1 116:1,12 122:18

100:12 102:11 103:4 105:11    98:21,25 99:15,25 100:2,19

124:11,14 125:2,3 129:12 132:13,

106:20 107:6,9 109:12 112:12    101:1,2,5,25 103:18,24 106:21

18,20 133:3,6,8,15,17,18,19,21,

114:2 144:24 148:14 149:2,8    107:25 109:4 110:1,4 111:7,13,

25 134:1,2,5,6,10,12,17,18,23,24

157:15    20,24 112:1,2,3 113:11,24 114:12

136:5 137:2 139:13,20,21 158:13

116:16 118:18 119:12 120:8

fines 41:2 75:8 82:13,15,19,20,22 164:25 166:3

159:6 161:9,12,16

129:24 132:6 133:4 134:13 137:6,

89:11,22,25 90:1 94:8 95:7,12 176:16

169:5 170:15 173:6,15

22 143:1 144:3 147:4 149:6,13

111:3 112:23 113:2,10,15,21,22 189:23

178:2 181:23 182:3,8

150:21 154:11 157:5 160:1 162:2,

114:9,18 145:14 146:16 148:14, 192:16,17 194:22

190:15 191:22

24 165:6 165:19,25 166:12 170:2,

24 157:4 163:24 179:22,25
201:1,12,

7,24 171:19,21,25 172:5 173:19

13,23 202:16 205:7 207:22

fining 108:16 145:5,7 146:9     174:25 180:2,18 182:19 187:13,

211:20 226:19

150:6     19 188:11 189:1 191:9 192:12

193:19 194:17 199:13 208:18     fraudster 191:7 192:4,11
193:24

finish 129:8     195:15,16

211:17 212:5 213:15 220:3

fire 130:5     227:25 230:5 231:13

fraudsters 60:17 78:13,14,19,21

firm 17:10     formal 102:11     79:16 190:9,13,18,20
191:3,5,11

192:24 195:13 203:2 208:1 214:4

fits 92:24     forming 60:13

fraudulent 22:23 26:17 70:9,19

flag 135:16     forms 24:4 27:20 28:18 30:19     71:6,21 72:15 78:1,7
79:6 80:16

31:23,25 32:3 33:4 34:19 35:8

Florida 8:17 14:4 17:4 41:12,24     115:12,16 137:21 160:2
161:3

49:15 50:7 68:2 73:4,6 83:2 89:14

42:10 45:21 50:23 53:21,22     165:25 190:25 196:3
202:4

93:5 94:12 95:8 102:15 103:4,16

59:12,24,25 60:8,14 61:2,20,25     204:16 205:22 206:6

111:4 137:18 139:15 140:1,6

62:3 85:19 115:11,19 119:19     fraudulently 67:22 71:15

149:25 157:25 162:21,22 163:2,4,

124:7 135:10,23 149:11 153:24

8 164:4 165:24 166:2,4,5,7,12,21,

156:13 164:20 178:25 179:3,4     Freedom 190:23

22 167:4,11 169:3,21,22 170:1,

CCS REPRESENTATIVE JILLIAN

Index: PRATT

frequently..highlight

frequently 182:7 228:25

Friday 74:1 99:18,22 80:2,15

front 151:3 158:6

full 8:21 207:2

furnish 184:8 20:3,8,

future 25:22 31:18 40:19 47:3 87:14

FVRS 209:7

G

gained 47:12 150:16 157:3,19, 14,16

Gary 164:15

gathering 37:18 197:2 182:1

gave 28:10 121:13 170:16 172:24 174:14 213:19 218:1

general 16:23,24 31:1 78:10 89:19 97:2 145:9 200:13

gracious 65:5

graduated 17:6

grand 217:3 220:11

granted 65:11

Grassfire 133:20 134:16

Great 10:5 11:13 37:14 104:3 136:3

greatly 64:19

grew 48:2

ground 9:16 228:12 229:8 123:13,

group 21:22 170:16 173:1 174:7,

grown 186:24 188:7 189:5

guarantee 168:11

guess 9:1 13:7,12,15 33:5,6 46:2 57:8 61:9 83:12 91:6 137:9 142:5 146:20 160:6 168:8 173:6 176:16 199:19 205:1 210:25 217:2

hard 59:23 62:25 97:9

harder 45:18 61:9 71:21

Harriel 78:24

hashing 135:20

HB 12:17 18:18,22 19:10 12,19,21 24:1 25:6,24 28:6,13,17 32:6 36:21 37:15 41:14,20 45:2 52:24 55:16 58:18 61:17 62:10,14 66:12 70:18 71:4 72:13,19 75:2 81:6 82:13,14,19,23 89:11 95:6,11 98:19,20 102:13 111:1,3 112:11 113:23 115:5,20 17 138:15,18,23 139:10 140:6 144:17 148:15 23 161:21 162:15 163:12,15 168:20,23 169:23 171:13 11,12 177:23 181:5,13,16 184:6

head 9:22 73:1 85:6 116:3 172:14 174:6 180:23 201:20

heads 230:16,22

General's 129:3

generally 22:9 71:16 77:24 78:5
203:14

103:9 133:8 149:20 207:25

219:12 222:16

102:11

generate 167:20

generated 51:4,5 166:11

Gilzean 215:21 216:8 219:17

give 8:3 20:15 26:22 35:2,11

53:23,24 60:5 85:9 88:22,25

96:15 106:16 108:10 121:23,24

125:25 141:17 142:14 149:23

150:4 152:6 155:21 157:14

183:16 195:18 197:14 199:24

230:16

giving 52:15 53:15

goals 76:13

good 8:14,15 13:18 62:19 121:19

135:9 136:1 197:7 232:24

gotcha 105:23 131:21

118:4 191:5,14

138:12

government 54:13,14

governor 19:10 20:2

Governor's 19:14

guidance 16:10 30:16,20,22,25

31:6 52:6,10,12,15

guidelines 31:17 90:22 98:5,8

183:11 189:8

gut 65:19

H

half 16:19 65:1 197:12 223:8

hand 31:25 32:19

handle 48:22,23 66:3 129:2

hands 180:4,9

159:22

handwriting 26:8,25 108:24

117:9 122:21 170:19 172:24

173:21 174:10,15,17 226:20

handwritings 117:18

happen 54:23 76:1 227:12 231:6

happened 88:2 123:14 125:11

192:2,9 207:20

happening 29:24 173:4,6

happily 101:21

Health 17:14

Healthcare 8:18

hear 9:1 10:2,6 64:21 117:14

heard 78:9 129:1

hearing 63:22

Heather 135:9

held 89:19 90:5 91:16 97:2

104:15 141:16

helped 16:18

helpful 56:25 96:19
97:8 103:10

helps 180:2

hereinafter 8:11

hey 52:19

hide 176:16

high 117:24,25

higher 207:23

highest 196:15 205:2

SOS REPRESENTATIVE Index:

JILLIANhighlighted..indication

PRATT

highlighted 21:4,6 194:20      218:23                    impossible 82:10 91:9,24
 220:18                                    101:14 143:7,18 150:14

                       identified 26:24 27:4,10 28:20

highlighting 23:2        59:19 69:23 70:3 101:6 112:1      impression 131:10
                       128:10 130:17 169:22 176:22

highlights 136:24                               improperly 201:17
                       189:22 195:14 204:14 214:23

Highway 53:22 54:3                              in-between 79:4
                       identifies 78:13 191:3

hire 83:13 93:17                               in-house 80:10
                       identify 23:23 25:13,21 27:5 47:1

hired 13:11           53:18,20 56:24 57:1 59:17 70:7      in-state 61:19
                       78:1,7 122:6 137:11,14,17 138:3,

hiring 83:22 84:15,24 85:10 88:4,               inaccessible 114:10
                       6 152:7 167:2,9 169:4,5,9,14,17
 20 104:10,23 209:23

                       178:10,13 204:11 215:18      inadvertently 100:15

historically 118:10      identifying 57:6,18 66:11,13      incidence 68:16

history 86:7          75:24 76:25 138:7 169:7 202:25
                                            incidences 69:3

hold 15:7 48:18 146:9      IDS 206:2

                                            inclined 65:15

holding 32:2          illegal 175:7

                                            include 37:22 38:2 41:1 47:9

holds 68:14 69:1      illegally 46:13          74:12 110:10 117:13 148:8
                                            157:25 163:4 173:24 178:19

holiday 94:20          imagine 144:6
                                            187:8 198:9 206:3

Holtzman 63:20          immediately 107:23 156:22
                       157:10

                                            included 57:21 71:11 72:5 90:18

hope 114:2 133:17

hoping 230:25

hotel 224:3,7

hours 65:1,4,6
17:22

hundred 21:18 22:5,16 186:7
79:22

188:7,19 189:6,16,18 190:4

hundred-dollar 89:17

hundreds 72:23 166:12 175:2,3
193:9 194:9

hypo 32:5 92:17

hypos 32:23

hypothetical 31:22 92:22

I

ID 66:21,25 67:5 68:11,22 71:11
110:6,7 220:12

idea 19:1 27:19

ideas 199:21

impact 25:5

impacted 41:20

impacts 20:12

impermissible 111:23

implementation 29:9,17,19
55:3

implemented 123:19

implementing 81:25

implicate 166:22

implicated 166:7

important 9:24 137:4,8 147:9

impose 81:19,23 94:8 109:15
112:16,19,20

imposed 89:5 95:12 99:5,11
104:3 105:25 112:24 113:2

imposes 82:23 88:23 89:13,17
109:20

imposing 97:11 146:5,8

impossibility 90:10,21,23 91:1

98:11 113:22 114:20 123:22

133:17 136:6,9 137:3 153:19

176:19 177:4,17 192:23 207:8
209:4

includes 82:14,19 89:11 110:3
129:4 158:3 189:19 216:7

including 13:25 14:3,6,7
19:8 20:1 30:17 67:8
110:22 115:1 223:12

inclusion 67:18

inconsistent 101:15

incorrect 80:21 226:20,21

increase 80:11

increased 82:15,19 97:13 98:24

increases 45:15

incur 91:3 99:19 112:4,9

incurring 99:23

indecipherable 226:20

independently 83:24 84:8

indeterminate 231:12,14,18,24

252:7

identification 10:23 115:13,17    92:25 101:3 143:13 144:2,12

126:15 138:24 152:15 156:5    145:20 146:25 150:17 151:2    indicating
26:6,8 222:11

177:11 185:9 203:10 215:13    154:16,24

indication 173:20 174:10

Index:

PRATT

indicia..isolation

indicia 226:19                     111:6,12 114:9 123:15,25 133:23    212:11 215:6
225:15,23 226:11,

                          144:21 147:7 186:23 188:6 189:5    14 227:9
229:7,8,14,20,22,23

individual 21:13 26:25 27:3 46:4

                          220:10                     230:2,11 231:4,8,23 232:5,20

53:18 59:18 65:9,13 67:15 70:13

71:16 79:3 85:14 86:6,8,15 88:8    initiatives 28:24          invalidating 227:2
229:5

90:6 93:8 119:5 138:3,8 140:15

                          input 114:17                 invalidation 193:13

144:14 145:23 159:13,23 169:14

176:23 186:8 188:12 192:23      instance 36:11 178:14        invalidity 80:11
117:25 118:9,12,

193:23 195:13 207:5 220:14                        14 192:14 194:5,6 195:25
196:14

                          instances 56:16,24 60:22 69:23

individual's 115:17 194:5       75:6 91:3 102:14 148:13 156:21    invalidly 205:2

                          157:9 171:18 172:25 174:24

individually 82:22 212:7                        inventory 130:11 132:3,7

                          178:1,5 201:14

individuals 21:10,16,22 22:4,14                    investigate 50:1,14 59:11
148:9

                          instruct 19:14

23:1 26:18 27:10,15,24 28:15                        159:6 200:19

32:11 37:3 38:3,8,10,13,17 39:4,    instructs 10:13

13 41:20 42:8,25 43:8,17 45:25

                                         investigated 69:16 115:7 136:14

46:12 47:1,14 49:16,19 51:18

                          intake 166:14              138:14 184:10

52:1,3,16 58:1,2,7,12,16,24 59:12   integrity 24:17,23 113:17        investigating
45:16 50:16 75:6

60:1 61:7 62:9 66:17 72:22 77:11                        118:13 148:13 159:8
163:23

78:18 79:14 93:17 104:10 122:20    intended 50:22

205:6 206:13

132:4 139:24 141:22 147:22        interacted 16:18

167:3 170:9 171:1 173:25 178:11                      investigation 14:12
15:23,24

182:6 187:23 188:9 190:24 191:3,    interacts 17:18                47:3 51:2 53:5,8
108:19 116:14

4,13,21,23 192:24 193:2 195:22                      117:1,13,22 118:2,5,17
119:8,15,

                    interest 164:9 214:2          19 120:2,15 138:11 140:21
141:8

196:9,13,20 200:5 208:10 211:19

212:3                      interested 36:10 206:12,24    147:15,16 148:17 158:15
159:19

                                  160:7 167:22,23 171:7 175:24

indulgence 64:18              interfere 10:18          186:21 187:17,22,25
188:4,18

                    internal 78:12 123:18,20 148:3    189:3,15 191:15 193:7
195:3

indulging 197:11

                                  196:18,19,24 197:1,3 201:18,22

ineligible 83:14,23          internally 51:4 80:3,22 166:11    222:24 223:1,4

information 19:13 37:15 56:5    interpret 30:17 32:24 74:19      investigations
15:19,20 27:24

57:19 58:9 66:11,12,14 67:18,23    109:24 149:3                28:5 44:1 48:9
52:25 80:22 87:21,

69:7 71:16 75:24 76:25 77:2,14,    interpretation 101:20,24 150:16    23,24 115:1,8
120:23 129:14

15 86:19 103:7,18 107:20 109:3,                      137:2,8,20 140:8 158:9
169:13

21,25 110:2 111:4,8,18,23          interrupt 189:9 224:19 230:14      186:8
188:10,24,25 198:20

115:13,17 131:4 140:13 145:11      interrupted 229:2

152:7 157:14 158:8,11 159:5

                                  investigators 50:24 109:17

160:1,8,10,19 161:5 164:3      interview 60:23,24          investigatory 159:4

179:17,19 180:1,8,15,17 181:2      interviewing 158:17

182:13 193:18 194:14 198:7                      involve 39:5 71:22,23
158:17

205:4 213:22 215:3          introduce 152:13 177:9        170:4

informed 232:11    introduction 190:14    involved 21:17 22:19
26:23

       31:12 56:11 62:5 110:22 121:5

informing 143:17 146:19 232:15    introductory 185:22 186:14    130:13 131:23
133:22 147:22

       187:18 191:2    173:11,12 175:18 178:11 182:8

infraction 110:13

       invalid 78:1,7 79:9,19 80:16    184:16 186:9 196:25
200:16

initial 65:19 174:13    191:14 193:4,10,15 207:18 225:1,    involves 50:22

initially 172:24 195:14    13 226:25 227:19,24 228:13,17

       232:13    involving 116:4 121:7 123:25

initiated 52:25 195:25 201:24    160:7 166:20 174:3 179:6

       invalidated 170:25 171:3,9,16,

initiative 14:12,21 21:3,7 25:9    19 172:17 193:17 195:4 202:3,6,    isolation 192:5

 30:13 36:22 45:3 55:5,17 67:19    10,12 204:23 207:16 211:5,7,21

 71:21 80:1,7 81:2 103:15,16,23

SOS REPRESENTATIVE JILLIAN

Index:

PRATTissue..license/id

issue 14:21 17:19 52:13 59:8
76:19 80:13 87:4 105:8 115:23
124:23 137:4 148:24 222:12,13

issued 14:11,20 30:16,20 31:6
52:6 75:8 90:22 147:25 148:11,14

issues 17:21 30:23 183:9

issuing 30:22,25 31:17

it-should-have-been-
invalidated 231:19

J

January 14:20,24,25 19:6,24
138:3,8 183:5,
21:8,23 22:15 23:2 56:16 114:15
121:11 122:12 128:22 194:14,20
196:6

jell 100:10

Jennifer 16:3,8
149:14

jillian 8:9,23 68:7

kinds 26:5 108:24 115:6 117:3
130:6 147:18 170:14

knew 88:19 99:6,13 104:5,17

knowing 83:12 84:13,20 85:13

knowingly 82:24 83:13 84:1,9
179:2,4,8

knowledge 54:15 79:14 80:21
86:2 88:1 98:18 104:25 114:13
116:20 122:9 140:9,10 142:13
175:16 227:13

L

label 134:18

labels 134:19

lack 109:8 141:9

lacking 114:10

laid 24:14,15 55:25 67:10,11
75:18 83:8 87:5 95:23 97:24
107:17 108:3 113:12,13 158:5

laws 19:2,3

lead 68:16 69:2 80:11 83:20

86:20 170:11

leaders 184:7

League 164:15 178:25

learn 110:13

learned 107:10 110:24

learns 107:22

leave 48:4 158:18

led 132:9

left 45:25 119:23
22 224:4

left-hand 217:3

legal 40:2 46:21 47:6,15 48:10
51:16,17 67:11 95:23 107:17
108:2 129:11 135:22
151:17

legally 47:12,15

job 19:13,23 16:6 191:15 192:8   199:23 209:23

199:15                                          legislation 18:12

                           language 24:8 32:25 34:16

jobs 76:4,9              73:15 78:13 91:1 96:10,17 100:6,   legislators 18:9 20:2

                     10,11,17,24 103:10 161:6 186:17   legislature 17:19,24

18:5,7,22,

joined 8:18 223:3          224:21              25 19:4,9 20:6,13,19,24 30:1

jointly 31:2          large 182:7 193:20 202:15          37:16,21 39:6,10 56:1
59:7 61:12

Jonathan 127:6,15,16 128:21                    67:10 69:12 72:4 75:15
83:9

                     largely 116:9 143:15,20 144:13      113:13 114:16,20 121:11

136:12

129:25              146:17              137:5 149:20 182:17,21 210:1

Joseph 153:2 155:17          late 76:5 91:18 92:6 93:19 95:7,   Leon 101:7,9

judge 17:7,12          14,18 96:4,7,24 97:12,22 102:6

                     224:5                    letter 170:24 171:13,15,18

July 127:9 131:9                            172:17 185:13,23 186:15
187:18

                     Latin 179:9              191:2 202:9

jumping 38:23 136:3

                     law 15:24 17:6 21:12 23:14 32:22   letters 89:2 95:10

171:8,10,11,12

jurisdiction 61:20,25 62:3      33:24 34:2,5 35:25 36:6 37:24      172:4,15,20

                     38:3,6 40:12,13 41:6 43:8 45:22,

          K              23 49:4,12 50:25 51:22 54:19      letting 36:6 79:15

                     59:16 60:16 72:2,5 78:16 82:9      level 200:5 210:5

                     83:23 84:14 88:11 90:18 108:2

Kate 203:21 204:2

                     114:5,6 118:21,22,24 119:1,20      levied 89:7 95:7

keeping 121:6 148:23          120:11 121:8,17 123:12 124:7

                                    liability 90:1 104:9 146:16 154:9

                     125:16 126:7 138:10 141:9,21

Kennedy 16:3,9

                     143:7,8 154:18,21,22 158:19      liable 90:5 92:19,23 103:23

kind 16:7 53:24 57:11 81:17,22      159:22 161:18 165:5,11 166:20      104:16
111:12 179:17

92:6 97:9 116:21 122:15,17 132:9   169:15 171:6 177:19 180:5,19,22

license 66:21 67:5 68:11,22

136:21 158:20 173:20,25 193:5    182:20 188:20 189:14 191:24

71:11 110:6

194:15 214:21

lawfully 154:19

license/id 71:18

UCS REPRESENTATIVE JILLIAN PRATT

lie 49:11

lied 44:25 159:10

lieu 125:6

likelihood 69:5 77:1

likewise 175:22

limited 206:16,17,18 228:18

lines 88:3,6 113:22 193:8

link 217:12

list 21:21 51:8,16 52:1,2 54:2 65:23,24

85:7,9 89:1 127:19 129:15,16

130:16 132:11,15 134:22,24

184:1 190:5,21,23 191:13 192:23

205:24 223:6,25

203:24 206:5 215:24 216:12,16,

19,20 222:1 232:21

listed 50:20 56:23 94:13 146:21

162:4 192:20

lists 51:7,12 136:15 99:18,22

litigation 168:5 203:15 216:5

local 78:15 124:19 195:16 96:24

214:16

lots 22:6

loud 11:9

lower 120:7,9

lowest 196:15

Lucy 217:8

LULAC 179:8

M

made 23:14 27:6 28:12 37:23 62:24 119:4 136:14 164:23 204:9

mail 103:17 111:7 143:23 144:1, 7,11

mail-in 180:6,20 209:12,15

mailbox 95:1

mailed 92:6 144:8,9

mailing 162:14 163:5

marking 215:12 218:21

Martin 156:13

Mat 8:19 10:22 11:2 96:13 100:6 102:24 103:11 126:17

match 26:10 70:4,11 72:20

117:10,19 198:21,22 213:9,21

225:24 226:17 227:1

231:9

matching 172:24 194:2,3 210:8

232:8

material 63:25 64:3,16

materials 64:8

matter 34:10 45:18 135:11

152:24 155:13 161:14 211:12

232:3

matters 18:10

Matthews 18:14 31:12 63:11

64:9,24,25 87:19 98:15

142:3

maximum 89:17

locate 58:23 60:24 159:23    mails 163:4    Mcvay 15:1,16 64:13
127:8

131:9,15 183:23,24,25 184:6,12

located 59:18,19    majeure 90:14    187:18 191:2 203:21 204:9

location 74:16 77:16    major 18:11    205:19,20 208:5,6 210:16
212:6

215:23 216:7,11,23 217:9 219:17

log 141:6 147:15 148:9,20 167:19    majored 17:5    220:17 222:9,21
223:4,16 224:15

197:16

make 9:21 34:8 36:4,7 39:25    Mcvay's 185:22 205:10,17

logged 148:1,3    50:24 51:22 54:18,21,25 80:15    216:17 217:20,22

logging 197:16    114:4,9 118:22 140:12 148:22

167:25 176:15 199:20 232:2    Meaning 90:5

logical 198:16    meaningful 40:20

makes 61:4

long 15:11 16:25 33:11 34:22    means 30:18 32:17 111:25

35:20 41:25 57:11 62:21 109:12    making 9:20 50:5 65:5 71:21

76:8 85:7 123:20 173:16 228:3    154:19 166:1

128:12 143:25 206:25 207:4

224:8,9    management 167:19 168:13,15    meant 85:4 136:11

long-term 47:9,21    manner 76:4 91:23 92:4    measure 55:4 230:18

longer 64:4 231:16    March 15:12 16:16 20:15 210:1    mechanism 101:10

looked 40:5 55:1 61:12 77:10    Maria 18:14 31:12 87:19 98:15    meet 143:13

81:11,13,16 117:6 118:10 155:24    142:3    meeting 31:23,24
63:1,15 64:19

173:20,21 191:15 192:18 193:13,

mark 65:18 138:22 152:13 155:2    66:4 197:6

25 196:1,16 205:20 207:24

210:11 212:13 213:20 231:7    156:6 185:1 203:8    Meghan 80:8

232:2,16,17    marked 10:23 126:14,15 138:24    Mel 135:22 139:1,3
153:8

lost 64:1 75:23    152:15 156:5 177:11 185:9

203:10 215:13 218:22    Melendez 217:8

lot 44:19 64:16 110:21 129:14

Melissa 156:13

member 44:20

members 17:23 24:5 25:19 33:7
35:9 72:9 82:2 85:11 122:22
123:2 128:1 140:17 179:1 181:19
157:8
200:12 223:12

mention 132:13 167:5

mentioned 23:20 25:23 42:24
43:7 89:6 136:4 143:6 144:19
148:12 168:3,17 178:5,8 225:19

mentioning 25:3

met 149:2

method 146:19,21 198:7

methods 71:20

microphone 197:18

middle 196:23

mind 58:2 159:17 223:24
37:22 38:3 40:5
46:11,14

155:1,25 156:1

moved 126:2

216:11

Moving 45:2 143:5

multiple 26:9 79:15 123:6 156:21

murder 39:21

N

names 57:4 175:24 195:19 204:1
205:4 215:10 219:18 220:18
226:21

narrative 136:19,22 137:3

Nathaniel 128:21,25

naturalized 54:24

Neal 135:22

necessarily 23:23 43:16 46:10
47:23 53:23 58:6 77:12 85:6

note 37:2 155:5

noted 109:19 129:16 202:7

notes 130:7

notice 11:21 12:8,15 88:22
148:19 149:24 150:2,10 151:15,
22 157:3

noticed 122:20

notices 110:9

notification 146:14 147:2
148:21 149:2 154:8

notifications 148:1

notified 79:12,14 82:5

notifying 78:20

notwithstanding 90:25

number 21:10 22:18,20 23:7,14,
21 26:6,22 28:10
41:19,22 42:3,8 44:23

minutes 55:12 62:20,22  102:10    150:17  149:23  150:126 166:9   50:16 54:10
56:21 57:23 58:23

183:5,16 232:25                172:7,9 201:2,10 206:19 209:22    59:16,22 66:18,21
67:5 68:11,13,

misconduct 109:16         needed 135:19 197:19             22,23,24 71:10,11,18
76:6,17

                                                80:25 81:13 86:2 110:6,7 112:23

mishandled 75:23        needing 63:21              113:1 122:25 124:20
126:21,24,

mismatch 193:18        negligence 91:10         25 158:5 159:1,12,18
163:23

                                                165:22 166:6,7,10,17,19,23

missed 13:8 78:3 228:2      negligent 90:7 91:3,7 93:8,11    167:9,12,21 169:13
177:10 178:3

misses 91:12            192:7                180:10 184:1,9 185:4 186:22

                    neighborhood 31:23        188:4 189:3,19,24 190:16,24

missing 103:6 107:20 109:3,21,                  193:14,20 194:23 195:18
196:16

25 115:10 160:18 161:5 179:16,    newly 51:7              200:21 202:16 203:25
207:19,23

18 180:15,16                        210:11 216:23 217:1,18 218:3

                    news 57:18

misused 75:23                        219:1 220:13 221:4,8,11 226:18

                    Nick 130:7              229:14

mixing 88:15

                    ninth 144:8                numbered 153:23

model 29:5

                    nods 9:22                numbers 13:14 38:18 118:12

moment 54:24 104:13 183:15              121:13,23,24 122:2,7
125:25

219:7                noncitizen 45:9 46:10 53:16,19

                                166:17 182:7 193:1 197:1,2

                    82:25 85:1

monetary 83:21                                204:25

                    noncitizens 45:13,17 46:7,12,14

months 126:3 128:17 148:6      47:5 49:2,16 53:2 56:10 88:5

167:18                                          O

                    nonhighlighted 220:22

morning 8:14,15 136:1 224:4

nonresident 56:17 57:1,16          oath 10:16

motion 65:9,10              82:25 86:21              object 10:10 19:12 22:7 23:9

Motor 53:22 54:3        nonresidents 45:18 55:16 56:6,      24:25 27:13 28:1
29:13 30:5

                        10,21 57:6,24 58:13,24 59:22      31:19 32:9 33:2,14,25
34:17,25

move 36:18 66:9 73:2 82:12                          35:14 36:2 40:21 43:4 50:4
51:20

 89:10 102:23 110:25 114:21      60:7,13 61:7,10,14

SOS REPRESENTATIVE JILLIAN

Index:PRATT

objection..paragraph

55:7,23 58:20 60:4,11,19 61:8     27:23 28:4 30:3,9,12,22 31:1
217:4,16,23,24 218:1,4,13 221:6,

62:12 67:20 68:17 70:22 71:25     34:14 53:7 59:3,10,11 69:14 74:6,     12
222:6,7,22,23 223:8,25

73:19 74:5 75:17 76:14,21 80:18     19,23 75:10 78:14,25 94:19,24     224:11,14
225:2,11,16 226:7

81:21 84:3,11 85:22 86:17 90:2,8     114:23,24 115:7 119:18,20
232:10,12,15,16,21

91:5,20 92:20 93:13 95:19 96:9     120:24 121:6,16,17 123:14,16,24

                                   order 39:18 49:21 65:10 67:14

97:23 99:15 101:2 106:21 107:25     124:1,9,18,19 125:5,7 126:20

                                   96:7 106:3,12,20 120:4 146:15

110:1 113:11,24 114:12 116:16     127:4,17 129:3,4,13 130:14

                                   150:4 151:4,24

118:18 119:12 120:8 129:24     138:4,9 145:8,10,12,15 146:20

132:6 133:4 134:13 137:6 143:1     147:11 148:18 153:3 155:12,18
organization 85:12 179:7

144:3 147:4 149:6,13 150:21     158:10 159:20 162:5 164:22,24

154:11 157:5 182:19 187:13,19     165:19,22 170:3 171:11 175:8

                                   organizations 28:23 186:9

188:11 189:1 191:9 192:12     183:22 184:7,13 189:12,22     organized
168:12

194:17 199:13 211:17 212:5     197:23 198:23 200:13 202:23

213:15 220:3 230:5 231:13     204:11 205:5,12 208:16 209:18     originally
64:9,13 201:11

                             212:14 215:9 217:17 218:11     Osceola 191:17 196:25
198:15

objection 30:11 71:8

                             219:5 222:24 225:12,18,20 226:3     223:9 224:12

objective 116:21              227:21 228:2 229:15

                                   out-of-county 156:25 157:12

obligation 86:13              office's 159:16

                                   out-of-state 59:20 60:1,17

obtain 51:16 120:18,19     offices 124:10,13,15,24 184:17

                             197:24 227:3     outlined 76:11,17

obtained 190:7,21 226:25

obtaining 52:1

occasion 124:17

occurred 105:13,15 177:22 131:23

occurring 105:21

OECS 12:18 14:5,7,20 15:3 16:15,16,18,21 17:23 18:6,15,19, 22,24 19:8 20:1,10,15,18 21:6,11, 13 25:3,17 30:16,20,21 31:3 32:10,15,23,24 33:13 37:20 50:5 51:5,21 52:14,15,21 56:6,15 70:3 75:3,5 87:9 88:13,18,21 94:7,12 108:14 110:12 114:15,24 120:15, 16 130:18 131:5,8,16,17,19,24 137:3,7 145:19,20 160:9 167:16 184:15 186:6 192:15 194:20 196:1 199:18 200:12,14,18,21,24 201:8,11,16 205:11,16 214:1 222:12,23 223:12 225:8 226:2 227:23 228:16 229:22 232:2,10, 15

official 122:2,7

officials 209:17 213:12 224:15, 16 225:3 226:2,3

on-site 222:24,25 223:1

onsite 223:4 225:19

open 53:7 115:7 117:12 118:17 119:8 129:14 137:8 183:4 188:10, 24

opened 28:4 44:1 48:9 53:5 186:6

opening 27:23 60:8 116:13 117:1,22 118:1,5 119:14

opens 114:25

operate 30:13

operations 80:11,21

opinion 31:4 33:13 35:18 61:11 72:4 95:23 101:15

overcome 60:16

oversaw 131:18

oversee 15:17,18

overseeing 131:23

oversight 16:10

**P**

p.m. 127:9 131:9 135:5,6 197:20, 21

P.O.

pages 216:15

paid 21:4,6 23:4,13,15 26:15 61:18 62:8,10,16 117:24 120:23 127:22 128:10 163:16 175:9,16, 20,22 176:23 184:9 186:8,22 188:4 194:21 202:25

Palm 13:14 118:13 191:16

opportunity 42:9 68:22 69:4    196:10,17 196:6,11
202:20,24

OECS's 14:10,16,24 19:6,23    203:2,13,23
205:9,10,15,18,20,25

20:23 21:8 187:21,25 188:18    oppose 65:16    206:16,18 208:11
209:4,17,23

196:5 205:13

opposed 24:20 34:20 137:13    210:5,14 213:18,22
214:5,22

offenders 22:5,22 205:1    223:16

opposite 123:9

offense 32:14 40:18    papers 12:16 55:25 67:12
83:10

oral 19:8,25    87:6 95:23 97:25 107:18 108:3

offenses 39:21 115:6 116:15    113:14 149:15 151:18

Orange 13:13 118:13 191:17

office 8:8 13:24 14:4,6 15:9,17    196:19 198:13,17 215:16 216:4,8    paragraph
127:18 129:11,17

16:11,13,24 17:22 18:1 19:14

Index: PRATT

paragraphs..petitions

132:13 153:22 156:20 185:24      permission 105:1,4 141:17      125:2,3
127:22 128:10 130:12

186:4 187:8                142:14,17                133:3,6,15,17,21,22
134:2,7,10,

                                              17,18,23 137:11 139:14,19,25

paragraphs 187:3            permits 32:8 74:22

                                              141:18 142:4,12 144:21 147:7

part 37:25 48:1 78:3 86:14 88:21      person 9:25 24:2,5 26:9 28:20      157:24,25
158:4,12,13,22 159:8,

112:3 130:21,23 131:11 136:19      31:14,22,25 32:2,3,18 36:21 45:3,    9,16
160:7,19,23 161:5,22 162:5,

147:8 148:17 152:23 155:13      4 49:10 50:22 54:17,22 69:5      21,22
163:2,3,5,6,8,16 164:24

175:17 189:11 190:21 196:18      71:17 85:16,24 86:1,20,23 98:13
165:5,14,16,23 166:2,7 167:13

199:15 212:1 227:14 232:12      103:4,15 104:23,25 105:19      170:16,24
171:2,5,14,16,19

                                108:14,15,20 109:21 112:12      172:2,5,15 173:5 174:2
175:1,14,

participate 40:1 105:12 106:5                              17,20,23 179:19
184:14,23 186:8,

                                130:1 140:20 142:15 146:23

participated 9:7 53:1 99:7,13      165:17 167:9 173:23 174:1      24 188:6 189:5
193:19 194:7,11,

104:5,17 106:1 198:18      179:17,18 180:20 192:10,13,16,    22 195:19
196:1,11,14 198:9

                                17,19 228:8,10                  202:9,15,25 204:17,20,25
206:19,

participating 60:1 198:20                              24 207:5 208:5,22 212:20
217:12

200:10                  person's 54:4,20 66:20 103:5      220:9,15 227:10
228:4,9,11,13

                                109:4 115:21 206:4

passage 28:13 95:6 98:18                              petition's 226:12

169:23                  personal 35:18 61:11 66:10,13

                                75:24 76:25 86:2 87:3 115:13,17      petition-related 28:16

passing 117:16            116:20 139:9,15 140:10,24 141:2,

                                              petitioner 228:1

past 12:16 16:20,25 25:12 27:7    11 142:18 162:9,12,24 163:3

39:1 43:10 67:21 81:2,4,5 82:10    180:7 181:19 196:7    petitions
21:16,18 22:1,5,6,16,

85:8 86:1,7 88:25 89:12 121:21,    23,25 25:18
26:7,10,14,17,20

personally 111:19 153:17 199:6

25 125:14 136:12,17,25 139:18    28:21 29:3,6 33:12
34:23 36:22

207:17 229:10,11,19,21,23 230:7,

148:5 167:18 193:21 200:15    37:19 43:2 45:4,14 49:22
55:17

9

56:13,14 66:18 67:21 69:24 71:22

pattern 122:20    persons 28:21 174:4    72:16,25 73:23 74:8
75:7,10 76:5,

pause 197:8    7,25 77:12,21,25 78:2,6,8,19

perspective 110:19 159:17    79:5,8,18,22 80:4,17,25
81:3,14

pen 26:8 170:18 172:25 174:11,    161:13

82:7,9 89:12,21 90:20 93:20 95:2,

15,17    13 96:7 97:11 104:24 105:1,19

petition 14:12,21 21:3,4,6,7 23:4,

penalty 99:5,11 104:3 105:25    13,22 24:4,6 25:10,25 26:15    111:2
117:7,16,18 122:19,22

27:11,25 28:5 29:4,12,21 30:19    123:7 132:21,23,24
133:9 137:22

penmanship 108:25    31:9,11,23 32:3,4 33:4,8 39:16    138:1 139:10
140:14,16,24 141:2,

people 22:11 26:22 42:21 44:15    40:10 42:5 43:16,20 44:7,12,22    12,18,23
142:8,15,16,19 143:19,

50:8 51:7,12 56:11 58:2 60:9 68:1    45:1 46:11,21,23 48:10 49:15    23,25
150:14 154:6 156:23

76:24 77:14 83:13 85:7,9 106:8    50:3 51:19 52:3 53:16 56:7,11,17,    157:10
158:21,24 159:14 162:10,

117:16 123:7 139:12 141:1 146:7    18 57:1,2,7,17 58:13,19,25 60:18,    12 165:22
167:7,11 174:14,16

171:18 175:15 180:24 181:10    21,25 61:4,13,15,18 62:4,6,8,9,16    175:4
176:17 177:18 182:2,4,7

188:14,19 193:9 200:14 205:1    67:15,19 68:2,10,15,21 69:2,6,10,    186:10
191:14,18,24 192:13,18,

206:5 207:21 223:11    13,22 70:8,9,19 71:5,12,15 73:4,    20
193:3,4,5,10,11,15,16,20

6,11,23 74:2,4 75:13,25 77:17    194:1,9,6,12
195:1,3,5,6,11

people's 175:24    81:9 83:1,14 85:10 89:16,18    196:16 198:19,24
199:16 200:20,

percent 207:23    91:16,17 92:3,5,9,12 93:4,15,18    22,24
201:5,8,9,12,17,22 202:2,7,

94:14,16 95:7,18 96:4,25 97:6,7,    12,14,17,25 203:1
204:2,4,22

percentage 80:25 81:7 118:6    16,17,21 98:12,21,22 99:19,24
205:12,16,21,23 206:3,7,11,22

191:14 193:1,10 207:20    100:2,13,19 101:1,4,5,6,8 102:6,    207:16,24
208:3,11 210:6,17

period 35:11 122:11 128:12    15 103:4,6,15,17,23,24 104:8    211:4,20
213:7,14,21,24 214:4,8,

138:20 206:16 223:6    106:13,23 107:2,11,21 108:15    24 215:5
216:23,25 218:2,3,18

109:4,7,22 110:4,10,16 111:4,6,7,    219:21,25
220:11,13,21,24 221:4,

periods 32:2    12,13,20 114:5 115:2,6,22,23    8,13,19
222:10,15,18,22 224:17,

permanent 46:21 47:7,10,15,21    116:1,12 117:2,4,6,13,15,21,24    23
225:1,4,6,11,23 226:5,8,11,13,

48:10 51:16,17 61:1 158:4    118:7,8 120:23 121:3,7 122:3,18,    16,18,25
227:2,16,19,24 228:6,17

24 123:3,8,15 124:1,11,14,22    229:6,13,16,18,20 230:7
232:6,

12,16,17                 possess 34:23 35:1              186:7,21 187:16,21
188:3,17,24
                                            189:2
phone 146:23             possesses 35:6
                                            prepare 12:14
phrase 190:8,10          possessing 24:3 30:18 33:6
                         34:16,18 35:12              prepared 12:7,9
physical 32:7,17,25 33:3,12
35:19 180:25 181:10      possession 32:7,17 33:1,3,12       preparing 12:23
197:25
                         35:19,20 74:13
physically 24:3 30:18 32:2                              prepopulated 111:18
34:15,18,22 35:1,6       possibility 207:12
                                            present 122:1,12 144:12 201:2
pick 66:6                possibly 117:5              223:7
piece 18:11              post 38:24 39:1 43:9         preserving 24:22
PII 66:10,19 67:1,8 69:10 70:16,    potential 15:21 60:24 78:21       pretending
161:16
21 71:2,7,24 72:8,18,19       116:4 148:8 154:3 159:19 163:24
                                            pretty 127:24
                         170:15 195:15 205:7
pinpoint 173:7
                                            prevent 24:16 25:9 56:3 60:7
                         potentially 25:21 35:24 36:3
pivot 197:7                                       67:18 83:11
                         43:1 78:1,7 80:16 86:22 116:8,22
place 58:10 63:7 87:13,17 135:5     165:20 201:23              preventing 60:12
197:20 218:8 227:25 232:24
                         power 120:20              prevention 181:22
places 219:20
                         PPCS 127:21              prevents 47:2
placing 217:21
                         practicable 107:5 109:13 144:23     previous 66:25 67:1
81:4,15

plain 91:1 100:11,23        145:22 147:3,5,24        102:23 130:7 228:15

Plaintiff's 126:14 185:1 203:8        practice 27:23 78:10 169:3,12        previously 81:8
195:1,11 205:12

225:12,23

plaintiffs 8:18 135:11,24 164:15        practices 84:15,24

168:4 203:14 216:5                                        prima 116:18

Pratt 8:9,14,22,23 9:5 15:8 36:20

Plaintiffs' 11:21                55:13 62:25 63:13 64:10,12,15        principally 24:21

65:2,7,16 66:2 97:8 105:6 113:6

plan 139:25                135:9 183:14,21 185:12 196:4

prior 18:6 25:23 27:9 28:6,12,16

29:9,16,19 37:14 58:3,18 61:17

planning 31:17 52:11 98:7        206:10 210:25 216:22 230:24

70:17 71:3 102:13 115:5,20

plans 52:13 98:10                Pratt's 63:15                123:13,17 163:12,15
168:8,14

169:23 172:12 181:25 184:6

point 27:10 35:4 62:19 77:18        Pratts 68:7

198:20 199:4,11,24 200:2,9

106:23 119:18 125:14,15 126:11

Pre 39:1                        205:13 214:20

140:19 158:20 190:17 191:20

213:13 219:21,24 221:1,18 222:2,   pre-enactment 39:3                prison 41:1

5

preceding 16:19,21                privileged 19:13

poor 192:8

precise 224:21                probable 118:16 119:10,13,16,

pose 63:13 64:13                23 120:1,4,7,10

precondition 149:2

poses 69:9                                probation 41:2

predates 218:10,13

posing 64:9                problem 26:20 227:7

predecessor 169:2

position 15:7,11 16:25 65:20                Procedure 11:23

prefilled 111:1 112:3,8

87:3 107:17,19 149:14 150:25

procedures 69:22

151:14

prefilling 111:3,23,25

proceed 65:22 66:6

positions 16:20

preliminary 15:19 27:24 28:4

43:25 48:9 53:4,7 114:25 115:7    proceedings 8:1

positive 190:2,3

116:14 117:1,22 118:1,5,17

process 9:15 24:18 30:14 31:4

119:8,15,19 120:22 140:8 141:7

40:2 55:6 56:3 59:19 61:19 76:6,8     126:7 127:16,17 161:11 183:24     purpose 24:12,13 55:21,24

78:12 88:21 113:18 114:10          184:8                     56:12 67:7,9 83:6,8,17 113:5,9,12

125:19 130:4 140:4,7 142:3                                181:22 211:18,19

protect 71:14

147:12 159:4 165:5 202:24

purposefully 83:22

214:20                 Protecting 190:22

purposes 16:6,7 73:17 76:11,18

produce 130:6 168:9          prove 98:1

84:24 108:16 160:11 191:21

produced 126:20 127:4 152:23     proven 176:9          195:2

155:12 168:4,6,7,10,11 205:19

provide 10:18 17:23 18:5 20:11,     pursuant 153:23

221:8

18 29:6 54:9,16 61:18,22 70:17,

pursued 184:2

production 130:21,24          20 71:3,7 79:21 103:17 111:7

114:16 126:9,11 146:9 152:4     put 32:1 47:5 48:17 63:14

66:22

professional 17:3

181:10 194:14 218:11 221:12     81:6 83:10 100:25 101:7

103:11

profile 207:8 212:25 213:5     228:1                123:22 136:22 144:7

149:15

151:18 178:18 179:11 180:12

programs 29:4          provided 18:25 64:24 65:2 66:25

182:12 186:5 207:14 208:20

67:1 69:10 103:19 107:1 111:9

prohibits 24:2 36:21 43:19 45:2                225:8 228:5,11 231:17

130:19 148:18 150:2 168:16

projections 25:4          182:25 203:13 205:11 215:2     puts 145:13

216:4 217:17 218:14 219:3

promotion 75:15

221:10 222:9,10,11,14,18 227:25

promptly 73:11 109:16        232:21

**Q**

proper 65:14 150:4 201:10        providing 65:6 79:18 80:1,7

108:22 137:5 219:17

properly 70:10 200:19 211:21                quality 80:10

221:16 226:8            provision 24:9,12,14,20,21 25:5,

16 29:1,10,17,20 30:17 31:7 32:6    Quash 65:10

proposals 17:18        34:16,24 36:25 37:5,9,12 41:25    question
10:6,7,10,11,13 13:3,

proposed 17:25        42:22 43:1,18,23 44:4 45:6,9    10 18:14
19:19,21,22 27:2 29:14

48:14,15,19 52:9 55:3,5,12,18    33:15 36:15,17 42:2 43:5
46:5

prosecute 21:13 36:5 46:20        67:8 72:19 76:18 81:25 82:13    48:24 49:1
50:10 68:18 70:23

47:17 59:12 61:6,9 120:13 184:18    83:4 87:22 89:10 96:22,23 98:5,8    72:17
76:15 78:4 79:17 84:4 85:3

prosecuted 21:11 22:3,12 28:19    99:2,4,10 102:5,23,25 103:8        87:18,19 88:9
96:12 97:20 100:9

56:17,22 57:2,7,17,25 58:3,17    108:13 109:19,24 111:1,22        104:20 105:7
121:19 142:2,5

59:1,2 70:8,14 72:15 88:14    112:13,15 140:11,20 141:6 143:5    161:10,18
162:7 169:25 176:11

125:20 130:12 178:10 194:21,25    144:19 146:24 150:5,11,13,17,19    195:8
197:8 210:24 228:4

195:10        151:5 160:18,23 161:6,21 162:16,

19 179:16,22,25 180:14 181:16    questioning 65:17 135:16

prosecutes 21:2

provisions 95:11,14 108:6        questions 19:15 52:21 63:12

prosecuting 32:11 45:25 46:3    149:10 160:14 180:24        64:5,8,11,12,15
65:12 135:25

60:17        160:14 175:6 177:2 181:15

prvision 87:22        230:18

prosecution 21:23 23:3 36:1,13

43:18 53:11 72:15 119:21 120:25    public 44:21 72:9 82:2 122:23    quick 177:15
183:13

121:18 123:16 124:2,9 128:16    123:3 181:8

129:4 132:8 139:15 184:8,14
144:11

quickly 9:15 54:23 65:24

publicly 67:23,25 68:1

207:9 230:17 232:3

prosecutions 21:15,25 47:3

183:25 184:1,21

pull 66:2 96:10 138:21 204:2,3

quote 80:8 111:10,11 149:1

206:2 219:21,22 220:23 232:18

prosecutor 17:9 35:16 36:7 59:3

quoting 111:6

pulled 219:25 220:19 221:20

125:1

purely 229:8 230:2

R

Prosecutor's 125:6 205:5

purports 127:13 204:6 216:1

prosecutors 32:12 33:16 34:2,6
23:9 24:25

219:14

RABAN 19:12 22:7

SOS REPRESENTATIVE JILLIAN

Index: PRATT

Randall..registration

27:13 28:1 29:13 30:5,11 31:19    reasons 69:12 210:2 226:13          189:12

32:9 33:2,14,25 34:17,25 35:14     227:10 232:7

                                                reference 188:24 219:19,20

36:2,15 40:21 43:4 50:4 51:20

                           recall 22:21 23:19 38:10,18 39:7

55:7,23 58:20 60:4,11,19 61:8                        referenced 20:23 181:13

                           48:19 56:22 57:20 72:25 102:19

62:12,23 63:19 64:21 67:20 68:17

                           108:8 161:20 167:6,10 170:21       referencing 219:19

70:22 71:8,25 73:19 74:5 75:17

                           172:13,18,25 173:3,5 178:7

76:14,21 80:18 81:21 84:3,11                         referral 33:19,22 36:5
50:25

                           180:23 183:21 184:3 205:18,19,

85:22 86:17 90:2,8 91:5,20 92:20                        54:18 118:22 147:17,18
165:10,

                           23 207:19 214:3 219:10 220:16

93:13 95:19 96:9 97:23 99:15                        20,25 166:13 174:18,23

                           222:1,3,25 223:20 224:2,7,8

101:2 106:21 107:25 110:1

                           227:2,6 229:4          referrals 23:14 27:7 28:11 37:23

113:11,24 114:12 116:16 118:18

                                                43:22 46:12 50:6 51:22 164:23

119:12 120:8 129:24 132:6 133:4    receive 15:20 44:19 73:23 76:6

134:13 137:6 143:1 144:3 147:4                        165:3,4,9,10 166:1
167:3,15,25

                           95:2 116:3 121:10 123:1,2,10

149:6,13 150:21 154:11 157:5                        168:2,18,22 169:18 170:4
173:16

                           141:5 145:11 147:14 148:7,21

182:19 183:12 187:13,19 188:11                        174:19 177:3,21
178:22,23

                           158:12 165:13 166:14 167:20

189:1 191:5 192:12 194:17 197:3,   195:19 196:19 201:16 218:18   referred
13:11 21:22 22:3,10

14 199:13 211:17 212:5 213:15                            23:3 28:15,18 38:3,11,19
43:8,15,

220:3 230:5,14 231:13

                        received 39:22 40:4 50:17 72:7,

                                    17 56:21 57:24 58:2,11 59:1

                        12 75:11 82:1 89:20 94:17 97:3,6,

Randall 63:19                              72:14,22 73:1 118:24 120:12,24

                        17 122:2,13,16,19,21,22 123:6,22

                                    121:3 122:3,5 123:15 124:1,18

                        166:8,10 171:1,18 175:14,19

range 194:11                              125:12,15,22,23 126:6,8,10

                        198:25 199:5 200:21 201:12,19

                                    138:10 166:20,24 168:19 169:24

rate 117:25 118:4 192:10,14     202:5 204:15 218:4 222:21

                                    171:6,17 172:19 173:9 177:19

193:14 194:5,6 195:25

                        receives 75:10             184:15 187:9 189:16 190:13

rates 80:12 118:9,14 191:5 192:2

                        receiving 74:7 76:5 156:22     referring 14:15 15:2
21:11,21

196:14 204:24 205:2

                        157:9 173:19                 35:25 36:12 37:3,5 38:9 47:4,6,8

rationale 67:7                              50:8 79:2 121:8 124:6,11,12,15,

                        recent 130:9

                                    25 125:3 127:22 128:3,4,15

reach 120:18

                        recently 123:19 125:17 167:17     149:17,19 187:5,7
218:7,16

reached 171:20             213:3

                                    refers 142:11 149:16,20 166:6

read 11:7,8,10,11,12 37:12 96:17,   recess 63:7 135:3,5 197:20     190:4,18,21
191:11 232:1

20,22 127:18 130:3 145:18 149:7

                        recipient 127:8 131:3         reg 68:14

187:3,4 189:17

recognition 65:12

regard 17:18 19:2,3 66:7 107:20

readily 69:8 159:24

recognize 127:2 185:17,19          register 29:2 49:21 51:19 52:20

reading 97:10 108:8

215:17,20,22          62:9 84:18,19 139:13,24 141:22,25 181:17 182:16

reads 156:20

recognized 200:24

ready 153:13

registered 24:6 25:15 26:11

recollection 13:6 107:14 214:15

30:10 31:10 32:4 38:20 42:5

real 177:14 183:13          227:15 228:20,25

44:25 46:13 49:5 50:10 51:9,12

realized 201:13          record 9:20 183:18          52:3 53:16 62:15 68:8 78:18

85:19 86:10 94:1 101:12 106:4

reason 26:16 39:12 40:15,16          records 121:6 125:10 217:12          139:19 142:22,24 157:24 162:20

48:18 75:20 76:22 80:19 83:20

reduce 69:13 77:21 113:16          176:14 196:21 204:19 208:21

91:9 94:25 127:12 131:12 134:1,3

212:25 228:24

152:22 155:11 156:16 160:9          reduces 69:4 77:1

192:15,19 204:5 211:12 215:25          registering 38:6 44:14 52:19

225:5 227:3

refer 13:22 14:1,4,23 15:3,23          62:1 106:5 181:3,11

32:15 34:4,10 37:8 45:8,22 49:12

reasonable 84:15,24          53:10 73:2 83:4 88:11 118:21          registration 25:9 32:6 68:25

119:18,22,25 120:7,9,10 121:16          70:4,11 72:18 77:12

138:2 167:7,

reasoning 75:21 182:6,9          11 208:18 209:3,7 212:19

123:11 124:20,25 140:21 141:9

159:22 169:2,6,8,10,11 188:13

PRATT rejected..return

rejected 193:4,21 227:4          202:22 207:24 209:25 214:1,3,7,   research 50:21
182:12

                          11,12,15 218:17 221:11 222:17

rejection 117:25 191:5 192:2,9                          reside 59:24

                          225:8,10,22 226:10,15 231:25

relate 11:17 19:20 22:1 59:7                          residence 61:1

                          reported 102:14 147:24 150:7

 76:19,22 165:10

                                   residency 55:21

                          reporting 145:21 147:5 154:3

related 23:18 29:1 64:8 66:10

                          156:3 157:7          resident 85:25

 82:13 114:17 130:11 165:4,14,22

 166:12 167:13 169:20 178:23     reports 12:18 13:7 15:2,3 18:6     residents 46:21
47:7,10,15,21

 179:22 184:2,9 196:5          19:7,24 20:10,22 23:6 37:20 38:2    48:11 51:16,17
58:17 59:13

                          39:8,9 56:6,9,15,20 58:22 59:6

relates 14:20 17:20 18:3,15,21                          resides 73:13 97:4 98:24
99:21,

                          107:23 109:2,16 114:16,20

 24:21 32:25 46:2 60:21 64:12                          25 100:14,21,25 161:23

                          121:20 136:7,10,11 144:22

 66:12 111:1 159:8 178:14 197:1

                          147:13 176:21 177:8 178:6,13     resolve 183:10

 220:25

                          194:14 197:4

relating 43:22 160:6 164:23                          resolving 18:11

                          represent 28:22 79:25 106:6

 199:1                          resources 114:11 119:2

                          135:10 203:12 214:7 216:3,15,22

relation 13:1 173:17 195:6     217:15 220:18 221:6,21 222:6     respect 41:6
109:6

                          225:16

relationship 142:7

respective 18:10 20:2

representative 12:3 64:24 205:8

released 136:6

210:14 217:16 221:7 222:8

respond 88:22

relevant 226:6
203:15

224:14 225:17

response 153:20 177:1

representatives 164:19

205:10,16 216:6 217:20

rely 39:7 50:2 56:8 67:9 95:24

97:24 107:16 120:12 142:11

responses 172:21

represented 205:9 210:15

143:23 149:14 151:17 176:20

214:22 232:10

responsibilities 15:16

remain 86:23

representing 8:17 135:23

responsibility 93:17,19

remainder 133:14

164:14

responsible 30:22,24 32:11

remains 41:25 45:20
104:23 141:16 145:5,

request 168:8 201:8 203:15

93:10 98:14

204:8 205:10,17 216:6 217:20,22

7,16

remember 13:4,9 48:15,20 96:20

219:11

108:5 109:9 137:25 138:1 145:2

responsive 222:2,4,12

160:17 162:9 163:14

requested 216:24 217:12,18

218:2,12,19 221:9 222:10,15,21

rest 127:23 133:12

remotely 8:10

232:18

restored 36:24 37:17 38:5
39:15,

repeat 19:22 21:20 22:5 29:14
40:3,9,11,20,23,24 41:8,10,

requesting 135:2

17,19

30:7 37:25 42:16 43:5 53:6 68:18
83:1

17 42:4 44:9,11,16 48:25

70:23 84:4 96:5 99:9 112:25

require 70:20 71:6 152:4

163:13 195:8

result 21:11 77:7 91:19 92:8

required 29:3 67:3,14 70:17 71:3

110:12 117:21 132:9

repeatedly 190:13

72:19 83:24 84:7 87:10 139:24

154:21 209:19 210:7 228:5

resulted 91:17 125:23

repercussion 112:21

requirement 55:22 73:8 81:4,5

results 186:21 187:21,25

188:3,

report 14:11,16,17,19,24,25

139:22 157:24 162:17

17 189:2

15:25 16:1,2 20:16,20 21:8,24

22:2,10 23:2,12,17,20 56:10,23    requirements 62:7,13,14 66:19    resume
197:13

57:5,9,11,15,19,21 69:21 70:2    72:8 87:14 199:22    retained 77:2

78:24 109:4 121:10,22 123:22

requires 73:3 141:21 147:1,5    retains 180:7,9

125:22 136:15,19,23 137:9,13

161:22 171:13 172:3 181:17

147:2,14 151:25 152:10 176:19    return 108:13 143:24
149:25

177:4,17,20 186:18,19 188:3    requiring 29:1 68:10,21 74:15    150:18 161:22
162:1,3,8 163:9,

189:13,22 190:8,14 194:20    152:2 182:16    11,15,18,20 164:5
224:10

195:14 196:6 197:25 198:1

returning 37:4,5,7,10,16 40:16,    Sandi 185:3                sends 165:22
19 41:12,15,23 43:19 82:25

satisfied 41:3            sense 21:1 42:7 63:17 81:18

review 95:10 156:10 202:24                129:19,21 141:1,4 145:11
148:20

satisfy 144:1

203:16 207:4 208:2,4 209:18                176:15 214:19

210:5 214:11 229:8,19,24 232:13   save 54:12 178:17

sentence 39:20,24 40:14,17,25

reviewed 12:15,17 112:23 113:1    school 17:6 32:22            97:15 144:20 147:8
156:20 186:5

156:11 207:17 208:3,6,11,13                187:20 188:2,16,23
189:11,17

screen 77:25 78:6 80:3,16

214:24 229:13,16,21 230:1,10                220:17

100:18 139:2

232:12

sentences 187:4

screening 78:12 84:25

reviewing 206:23 210:17

separate 86:24 146:25 173:25

reviews 111:19            scroll 126:22 127:5 129:10,19      175:2 207:14
133:13 150:23 153:7,11,14

rights 36:24 37:17 38:5 39:17,18    155:16,20,22 157:22 162:16        separating
170:4

40:3,9,11,20,23,24 41:8,10,16      215:18,19 218:25 221:3,22

series 208:25

42:4 44:8,11,16 48:24 83:1 89:1

scrolled 220:7

135:10 146:10                serve 55:22 86:15 157:2

scrolling 57:11 128:19 133:11

ring 79:1                service 61:19

185:15 186:19 216:19 220:6

rising 119:23                services 80:2,7

search 54:6 206:1

risk 60:2,9 69:9,17,18

role 17:17

roll 94:22

room 224:8

roughly 9:12 121:15 164:23
172:25 187:10 205:23

routinely 79:18

rows 178:19

rule 11:23,24 73:3,6 74:20 75:4

115:11,15,19 139:5,23 144:16,22

81:19 82:1 150:1,18,20 154:4,7,

148:8 149:10,17,18,21 151:7,8,

16 156:24,25 157:12 162:8

11,12 157:21 162:18 179:15

rulemaking 87:12,16
68:19

rules 9:16 181:9

run 63:17 64:3
92:1 93:6,23

running 17:23
103:1,

serving 176:24

seconds 231:16 232:4

set 101:17 211:22 213:22

Secretary 8:8 11:22 12:3 13:23,
24 16:1,5 24:7 63:20 130:21
131:18 144:23 145:6 146:21

setting 128:6

sex 39:21

149:24 150:1 152:23 154:8

155:18 156:14 164:19 182:18

shaking 9:22

219:4

shaky 180:9

Secretary's 13:23 126:20 153:3
155:12

Shapiro 8:13,16 10:21 11:1

section 36:20 89:16 103:2

19:17 22:13 23:16 25:2 27:22

28:3 29:15 30:8,15 31:21

32:21

33:10,18 34:7,21

35:3,10,22 36:9,

16,19 42:6 43:6 50:12

51:23

55:10 56:4 59:4 60:6,15

61:3,16

180:11

62:18 63:6,9,23 66:5,8

71:1,19 72:6 73:24 74:18 76:10,

secure 115:22

16 77:4 80:23 81:24 84:6,22 86:3

security 14:5 15:10,18 68:12,23

87:1 90:4,13 91:11

71:10,18 145:8,13,16 146:20

94:3 96:2,13,16 98:3 99:17

100:5,

158:10 159:21 180:10

8 101:18 102:9,17,22,24

11,13 105:22 107:7 908:11

Security's 147:12

**S**

113:19 114:7,14 116:24 119:6,17

seek 225:2,5

120:21 126:13,17,18 129:7,9

Safe 80:8,9 190:22

130:2 132:10 133:10 134:21

seemingly 174:14

135:4,25 183:8,11,17,20 184:25

safekeeping 32:1
194:19

select 141:23

185:5,11 187:14 188:1

Safety 53:22 54:3

197:10,22 203:7,11 211:24

selected 198:4,5,6,12,13

212:17 213:16 215:11,14

218:20,

sake 65:21 155:24
232:23

send 162:13 165:18 170:24

24 220:5 230:21,23

sample 206:23 214:3
100:7

171:8,13,15 202:8

share 37:15 68:11,22

sending 171:10,11,12 172:15

139:2 177:13 179:12

215:11

sand 85:6

sheet 127:20 128:3,15,16 130:4    18 94:13,14 97:1 107:20 108:15,    someone's
67:24 68:5 106:17

20 109:1,3,22 110:11 117:5,20

sheets 16:7                                    sort 34:8 90:14

123:7 140:1,15 156:23 157:10

shift 29:4                160:19,22 161:2,5 169:22 170:10    sorted 196:14

171:2,21 173:23 179:19 191:24

short 160:13 223:6                                SOS 13:23 126:24

192:21 198:10 207:13 208:18

shorten 75:22                226:22                SOS-0589620 155:4

shortened 75:15 80:4            significant 23:7            SOS_0172123 219:2

shortening 75:25 77:6,20        significantly 80:10            SOS_0589671 152:20

shortens 76:23                signifies 166:17            SOS_0624756 126:25

shorthanding 124:8            signing 68:5 115:21 117:3        sound 136:1 214:9
217:1

175:24 181:1 228:9

shortly 17:10 199:8 224:7                        sounds 91:10 92:11
214:6,10

signs 73:14 75:12 103:5 111:20    217:6 225:21

show 8:20 10:21 96:3,6 97:21        162:23

126:13 184:25 203:7 218:21                        source 205:4

similar 49:1 68:5,7 70:15 128:6

showed 182:1 183:22            140:7 147:15 155:23 179:21        sources 50:19
173:7 195:21

showing 37:16 86:6 133:13        209:5                speak 9:24 12:22

shown 39:25 41:5 136:14        simply 105:6 141:21            speaking 50:23
214:17

shows 220:10,13            single 126:4 176:22 212:12        speaks 152:1

213:7

sic 185:2                                special 97:5

singular 166:13

sick 223:10 224:9                            specific 12:12 118:6,8 151:4,22

sit 74:9                157:6,13 165:10 173:3 193:19

sign 62:4 68:10,21 122:23 123:8

141:3 162:15 173:15 174:2

191:25 228:11

61:13 79:10 86:4 105:5 144:6

signature 66:22 67:25 68:6,14

146:6 162:23 163:1 167:6

69:1 70:10,12,14,15 94:13 107:11

110:5 159:2,12 162:15 174:9

175:9 176:24 193:17 194:1,3
176:8

198:21,22 199:23 200:15,16

208:19,22 209:24 210:8,22,23

212:7,9,10,13,24 213:2,4 225:24,

25 226:12,16,17,22 227:10,11,14

229:9 230:3 231:5,9,11,15 232:4,

7

smart 80:7,9 127:19 128:3,14,16

signatures 13:16 26:10,11 36:22

45:3 55:16 67:3 68:3,4 70:4,5,16

Smartsheet 128:5,8

71:2 93:10 108:24 117:9 173:21

191:18,19 196:2,10,20 198:10,24

199:1,5,9,11,16,20,25 200:3,9,25

201:3,15 202:4 207:6,7 208:13,

SOE 203:24 205:11,15 209:17
79:3,12

14,15,21,23,25 209:2,8,9,11,13,

210:14 215:20 216:8 222:23
85:5,

18,21 210:3,10,12 211:7,10,13

224:16 225:11,20 226:2 228:2
88:4,9,19,23 89:4,7

212:2,15,19,20 213:6,8,9,13,20

site 205:15

situation 35:24 39:23 41:21

situations 47:20 116:10 120:15

144:14 201:1

skim 132:15

139:16

skip 63:25

slightly 46:5

spelled 226:20

130:4 190:22

social 66:20 67:4 68:12,23 71:10,

17 110:6 180:10

specifically 10:12 23:20
35:12

37:21 46:23 57:21
111:5 136:18

169:21 178:8 179:6
188:16

207:21 215:22

specifics 152:1

speculated 175:22

speculating 22:20
134:14

speculation 175:21

speculation 175:21

spend 135:19

spent 214:17

spoke 12:24
135:14 148:4

177:21 179:21

sponsor 25:15 78:12

82:24 83:21,24 84:7,18,20
86:5

15,19,24 86:5

214:15,21 226:4 227:8,10 226:21     SOE's 226:17 227:20                 56:16,19
91:2,7,12,22,23 92:3,4,

 229:1 230:8,13 231:15 232:2                                 6,8,10,13,14,18,19,23
93:2,3,8,

                          SOES 77:21 81:1 82:2 89:12         10,16,22 94:2
95:12,13,17 96:4,6,

signed 24:3 26:9 30:19 31:24,25     156:23 157:10 200:19 201:17         25
97:6,13,17,21 99:5,6,12,18,23

 32:3 69:15 73:6 79:22 81:9 89:15,                          100:12 101:8,10,14,22
102:2

sponsor's..supervisor

103:3,14,16,22 104:4,9,15,17,22
133:24

105:3,10,11,18,20,25 106:1,4,7,

11,12,19,24 107:2,22,24 108:17
189:7 219:5

109:2,6,11,16,20 110:12,21,23

111:6,12 112:12 114:10 141:19

142:14,16,19,24 143:8,10,17

144:21,23 145:5,21 146:11,15

147:6,14,21 148:13,18,21 149:1,

4,5,7,23 150:2 151:23 154:9

157:3 161:22 162:1,21 163:1,3,7
114:1 182:11

175:18 195:15

sponsor's 79:13 93:9 98:25

106:9 112:13 142:17 162:13

sponsors 28:23,24 52:7,23 72:9
113:10

73:4,7,10 77:20,24 78:5,17 79:7,

15,18,25 80:14 81:20,23 82:2,5,9,

15,20 83:12,13 87:10 88:25 95:7

187:15 194:8 195:16 209:6

state's 155:18 156:14 187:1

stated 39:8 59:5 80:2,8 99:18
181:22

statement 68:9,20 88:8 108:23
147:23 189:10

states 30:3,10,12 41:23 45:5
48:7 73:10 100:12 111:5 144:20
225:10,22 226:10,15,17

statewide 119:21 120:24 121:18
123:16 124:9 125:1,4,6,16 127:17
128:15 129:4 130:16 132:7
134:19 184:7,13,15,16,20,22
205:5

stribling
187:1

stricken/replaced 155:6

strict 90:1

strike 29:18 32:23 51:24 85:15
94:6 156:1 200:7 208:2,11 209:1

229:18

studies 25:4 40:8 41:7
69:19 77:8

subject 156:2

subjected 69:18

subjecting
113:10

subjects 98:20

submit 71:21 98:25 121:10

98:17,20 101:4,20,25 102:10,14,                                           156:25 157:10 205:16

                        statistical 182:12

 20 104:4 111:3 112:24 113:2,10,                                   submitted 37:20
81:8,14,15

 21 114:2,4 141:16,17 142:6,12      stats 130:6,8,11

                                                98:22 100:20 117:8 123:4 140:5

 143:23 147:13 191:1            status 39:15 123:23 126:5          141:11,13 160:2
164:5 165:16,17

sponsors' 78:12                 183:14                    182:7 192:14 193:9,21
196:16

                                                206:8,12 207:25 214:4

spreadsheets 128:6              statute 16:2 24:1,9,15,20 32:8,25

                        33:13,17 35:1 36:14 73:10,18      submitting 70:9 72:15
89:21

stack 79:4 117:7,18              91:2 96:11 100:11,12,24 101:13,    149:25 194:12

                        16,17,20 107:1,5,14,16 108:6,9

staff 13:25 14:3,7 15:18 16:3,8                          subpoena 120:20

                        109:11 110:18 111:5,11 115:11,

 17:24 18:9 19:9 20:1 128:1

                        19 116:6 142:11 149:1,19 150:3,    subsection 36:20
83:5,7,16

staffs 19:10 20:3               22 152:1 158:6 161:8 175:7        89:13,16 103:2,25
111:14,15

                        179:12,13 182:25 183:2          115:20 144:17,20 145:17
146:15

stamp 75:9,11 152:17 155:3,8

                                                150:19 151:2,12,15,21,24 153:24

                        statutes 95:22 115:25 116:7,10

stamped 94:16 152:19                            160:15

                        149:11 153:24 181:9,12

standard 33:19,22 120:6 143:13                  subset 229:25

                        stay 48:5

 144:2 147:1

                        staying 224:7              subtracting 183:2

starkly 207:7 211:8

                        stenographer 8:2 9:19,24 185:7      successfully 58:17 61:6
70:8,14

start 50:16 87:25 99:21 140:9                           194:25 195:10

143:11 164:17 165:16 196:12       STENOGRAPHER'S 155:5

197:6 202:20                                    suffice 154:8

                              steps 48:13

started 199:8,15 201:8,11,18                    sufficient 15:22 49:10
88:11,19

 202:2,12,13,23

                              stick 85:6              143:13 146:14 152:10 157:2

                              Stockard 164:16              suggest 39:13 46:10 47:16 91:2

starting 153:1 158:20

                                                        134:9

starts 152:17 153:23          stop 54:6 197:10 232:24

                                                  suggesting 46:20

state 8:8,21 11:22 12:4 13:23,25    stopping 62:19

 14:1,3 16:1,5 17:4,14 18:17 24:7                    suggests 46:7 184:5

                              stored 214:18

 45:20,25 47:24 50:3 56:12,14                    summary 186:19

 59:21 61:6 68:11,22 78:15,20    storing 198:7

 79:5 111:11 124:18,19,22 125:5                    supervisor 16:4,6 69:14
73:12,

                              straight 105:6,9

 130:22 131:2,18 142:1 143:24                    21,22 74:1,8,22,25 89:20
91:25

 145:6 164:20 182:23 184:17,18    Strawn 164:14              92:15 93:5
94:16,19,25 97:3

SOS REPRESENTATIVE JILLIAN

Index:

PRATT

supervisor's..told

98:23 100:20 137:23 150:14      178:18 220:6,9                things 48:17 66:19
70:3 76:1,8

160:3 162:25 165:15,21 171:13                                88:15 119:25 120:9,10
165:2

tables 177:4,8 178:13

204:16 205:8 208:20 209:9                                    190:19 191:12 214:18

214:17 215:24 229:15 231:10      tagged 134:11

thinking 52:19

supervisor's 73:25 74:6,11,16    takes 58:8 93:16,18 104:9 144:1

third-party 28:23

75:10 94:24 138:4,8 162:5 163:5

taking 9:7 11:21 48:13 199:4,11,

198:23 208:16 212:14 215:9                                   thought 26:23 109:10 137:4

17,24 200:2,9 222:12,13

175:8 195:20 205:22 207:12

supervisors 44:23 72:9 73:4

74:15 76:3,9 79:8,19,23 95:4

talk 13:10 34:2 126:7 147:21,22      215:6

161:12

122:17 170:24 171:8 195:20                                   thousand 22:22

197:24 201:2,4,7,14 202:3        talked 42:13,15,17 51:14 113:6

thousands 22:25 95:12 178:19

120:3 170:9 191:22,23 214:8

supervisors' 227:3                                           186:25 189:6 193:9 194:10

supplement 20:16                talking 11:24 23:12 65:8 94:10

threshold 116:13,17

106:15 122:15 130:25 131:6

supplemental 14:11              151:5 152:8 177:16          tied 21:16,25

supply 109:5                    talks 162:17 180:14 214:3    ties 45:19 48:7

supposed 79:21 92:10 167:24     Tallahassee 196:24 211:23    time 16:2,7
18:8 20:7 23:21 33:9

166:6 176:4 226:11        224:16                55:2,11,20,23 57:2
63:14,18,21

                                        64:1,18 65:11,22 69:13,15 71:15

surrounding 53:14        Tampa 129:13

                                        74:13,25 75:9,22,25 76:23 77:3,6,

suspect 26:12,18 27:25 45:22     technical 18:10 20:11 63:9 64:2     20 80:4
82:7,11 86:7 88:10 92:5

 68:1 122:17,18 159:14 165:24     183:9                116:3 122:11 128:12
130:5

 201:8 226:19                            135:15,18,19 138:20 141:14

                       techniques 108:18        148:20 154:18 155:24 158:11

suspected 22:10,23 26:16 27:11

                       technologically 126:23        159:3,7 164:8,9 167:20 170:24

 72:23 79:16 140:11 158:12 160:2

                                        171:14 172:15 178:17 185:4

 182:8 190:9,12,18 192:4,11,24     telling 148:22        187:9 197:6,7,15,19
200:12 202:9

 193:24 201:12 202:16 203:2

                       tells 109:11        206:14,16 208:9,17 212:13,25

 204:16 206:6 207:22 211:20

                                        213:1,2,3 214:2 217:25 218:7

 214:4            temporary 52:2 209:23        220:19
223:6,18,19,20,23,25

suspicion 175:12,13 176:7,19     ten 62:22 203:24        228:6 230:17 232:25

suspicious 27:1        tenth 92:5,14,16 94:21        timeframe 154:21

swear 8:2        terms 13:21 36:11 39:20,24        timeline 75:16

sworn 8:10 88:7 108:22 140:12     40:13,25 64:23 74:20 212:1     timely 76:4
91:23 92:4

 147:23            testified 8:11 28:25 141:15     times 9:12 82:5 119:25

system 24:23 123:18,20 126:2,5     160:21 164:22 167:1 170:13

                       175:5 177:1 181:21 217:16 221:7   timing 217:21

 148:4 167:19 168:13,15 205:25

 206:17 208:20 209:5,7 210:20     222:7,8 224:14 225:17        tired 55:20

 213:19 214:18        testify 12:7,9,23        title 11:7,11

Szilagyi 135:8,10 137:15 139:1,4   testifying 161:20 163:14 164:18   today 8:20
10:16,19 11:3 12:2

 143:4 144:15 147:10 149:9,22

testimony 8:5 20:5 29:7 107:12, 63:13,19,21 65:6,16,21
77:18

151:1 152:12,16,18 153:7,9

23 108:1                      107:23 126:23 135:21 164:18

154:13 155:1,7,22 156:6,8 157:16

215:4

164:8                  text 186:14 219:16

today's 12:14

texts 13:13

T                              told 84:18 109:13 110:23 123:9

thing 16:7 84:17 112:8 148:25    215:5

170:11 193:6 220:23

table 63:4 65:12,17 136:15

Index: top..verbal

top 73:1 106:9 116:2 130:20          154:21,24 164:9 197:17          112:18 113:15
141:25 142:6,9,20,

 153:8 172:13 174:6 180:23                                      23 149:16 151:19 161:7,15

                        turned 137:18,21,23 154:20

 185:12,22,25 193:14 201:20                                    162:19 169:19 178:12
191:8,10,

                        162:14 192:19

 215:17 216:19 217:7 221:17                                    11 208:17 209:8 217:19
218:10

                        turning 24:1 93:19 137:16

topic 82:12 114:22 175:6                              understood 9:25 10:8,14 14:17

                        139:22

                                              36:10 37:6 157:17

topics 11:16 12:8,9 135:25

                        turns 49:7 140:23 162:24

                                              United 41:23 45:5 48:7 179:8

total 121:4 122:4 127:20 129:12

                        Tyler 164:10,13

 166:5 205:11 216:23 217:3,17                         Unknown 156:4

 220:11 221:4,5,23          type 21:1,7 26:19 28:16 46:3,4

                                      unlawful 26:14

                        91:18 170:2,7 189:23 192:10

totaling 217:4

                                      unpaid 62:17 94:1

                        types 82:15,19 116:25 132:4

totals 204:1

                                      unrelated 227:10,11 232:7

                        typical 193:11

touch 184:7

                                      unsure 231:22

                        typically 17:17 21:2 30:21 45:17

trace 175:25

                        50:16 51:1,3 54:6 67:24 116:25   unusually 117:25 191:5

track 45:19 47:2,6,22 121:9      117:2 120:10 124:16 136:24

update 150:11

123:14 125:13,14,18 140:23,25    158:18 169:3 174:21 202:3

148:23 176:10                                    updates 213:3

tracking 45:24 123:18,20,25          U          updating 183:24

141:4 147:12 148:4

uphold 24:17 56:3

trail 176:16          U.S. 46:22 47:11 49:3,8 52:20

54:5,6,9,17,25          upwards 22:22 28:9 218:3

training 31:9,13,15 62:6 98:12

198:19,21,22 199:5,22,23 200:15   UF 17:6

V

209:17,20          Uh-huh 151:10,13

transfer 126:4          ultimate 145:24 146:5          valid 72:17 79:23 204:4
231:17

transient 46:1          ultimately 32:12 33:15 34:4          validate 209:21 210:22

transparency 45:15          35:15 36:7 59:2 85:3 104:19

145:5,12

validated 69:24,25 70:3 170:25

transport 143:23                    171:9,14 172:5,16 195:1,6,11

unable 25:13 59:17 82:6 90:11    201:2,5,9,22

202:7,10,14,17,18

traveled 223:11          120:19 143:24 195:18          204:23 205:12,16
207:10 210:3,

trembling 180:3                    12,13 211:10,11,21 212:10,15,16

unauthorized 84:1,10

213:11 215:7 218:4 219:22

trigger 116:25 118:1 151:24    unaware 30:12 41:19 62:2 74:8          220:11,14,21
221:13,16 225:4,6

193:23          87:15 98:10 179:2          226:8 227:17 231:23
232:5,20

triggers 51:1 118:5          unclear 207:14,15 212:11          validates 111:19

trip 224:2,6,11          undergrad 17:5          validating 198:24 199:16,19

trips 223:5,25                    201:15,17 211:4 213:23

understand 10:6,12 12:2 14:8

trouble 45:24 217:21          20:9 42:2,19 47:13 49:18 58:15    validations 209:24

64:22 70:2 111:17 114:24 119:7

true 44:17 105:10 147:20 214:25          validity 200:20 224:22

130:23 137:7 158:20 164:18

222:16

truth 8:4,5

truthful 10:18

Tuesday 74:3
80:1,14

turn 18:9 139:5 144:16,18 153:21

176:2 189:8 202:23 206:9 228:3    valuable 71:23

230:25

vary 207:6

understanding 17:16 18:4,17,
24 24:11,13,16,19 33:23 34:3

Vehicles 53:23 54:3

36:11,13 56:2 61:17 67:13 73:20    vendors 77:25 78:6,9

74:10,14 77:9 79:13 80:20 83:11

verbal 9:21

90:9 97:10 99:4,10,16 105:18

US REPRESENTATIVE JILLIAN

Index:

PRATT

verification..years

verification 69:22

vote 36:24 38:6,20 44:14 46:13
51:12 84:19 101:12 181:11

window 80:3 143:19

verified 13:16,17 204:4 214:19
208:19
219:25 220:23 221:19 224:25
225:12,23

Winston 164:14

withdrawn 105:3

voted 38:20 46:13 51:13

witnesses 60:23 120:3,18

verify 13:15 83:25 84:8 159:13

voter 66:13 67:6 68:14,25 70:4
72:8 73:13 75:12 89:15,18 94:14

Women 178:25 179:4

verifying 198:19

97:1,4 98:24 99:21,25 100:1,14,

wondering 49:24 63:13

versus 46:4

16,21,25 103:18,19 110:7,9
111:4,8,9,18,19,23 112:2 133:25

word 85:20

victims 72:23 121:5 122:6 175:2

134:5,12 160:22 161:2,23,25
163:4 171:15 172:17 173:18,22

words 133:6,16 216:12

view 35:4 87:3,5,7,8 159:21

174:9,11 180:2,17 195:23 198:8,

work 16:15,16 37:10 42:9

viewed 105:21

9,11 202:9 204:19 206:2,3 207:13

129:3 145:9,10
196:4

violate 110:8 154:7 164:5

208:17,18,23 209:3,7,10 212:19,
24 213:3,4,8 228:17,19,23

work-in-progress 148:6

violated 33:17 35:16 140:20

voter's 66:22 70:11,15 101:11

workday 207:2

141:6 156:23,24 157:11 180:11

162:15 180:7 196:21 207:8

worked 17:10,13 79:12
199:19

violates 116:8 140:6

208:21 227:1

200:13,14

violating 33:13 37:24 38:5 43:15,

voters 29:6 51:9 68:8,10,21

workers 209:24

18 112:13 140:11

69:18 70:16,20 71:3,7,22 73:5

117:10 127:23 162:12 171:11,12 52:8

violation 33:23 34:3,5,9,15,23

178:25 179:4 191:19 192:8,20,21 136:25

35:5 36:7 53:1 84:13,21 85:13

103:25 105:13,15 109:12 110:17, 23 111:14 116:4,6 144:22,24 145:21 147:2,5,7,24 148:8,10,19,

works 37:13 44:21 55:12 127:17

voting 38:7 39:14 138:2 165:5 22 149:8,25 151:23,25 152:5,7,11

154:3 160:23 161:8 165:11 180:18

writes 216:12

violations 15:21 156:4 157:4,7 163:11,20,23,24 164:1 165:6

walk 165:8

vis-a-vis 226:4

visas 52:2

visit 205:13 211:18,19 218:10 227:20

visits 218:13

Vogel 63:20

volunteer 23:7,18,22 26:6,13,20 27:6,19 28:5,18 29:3,12,21 62:10 93:24,25 136:4 165:17,24 166:4,

website 128:5

20 169:2,4,10,20,22 170:1,5,10, 12,15 171:5,23,25 173:9,17

174:3,25 176:1,2,6,24 177:18

178:2,14,16,20,23 182:10 194:15

working 41:13,24 43:19

53:2 62:23 121:22

202:6

voters' 26:11 71:23 117:19

203:23 206:1 214:20

180:20 181:3,11

W

writing 146:22

written 19:8,25 56:8 72:3 176:20

181:4 228:18

wanted 20:21 52:16 64:13 91:14 96:4,7 97:21 135:16 146:11 183:6

206:11,20 230:16

warrant 59:20

Water 135:11,23 156:3,13 157:14

ways 44:19,24 77:7 122:25

141:10 204:14

week 63:11 224:13

weekend 94:20

workings 114:23

worth 137:4

wrong 74:16 100:15 102:15

142:10 180:12

wrongful 194:16

wrongfully 225:6

wrote 29:25 100:2

Y

year 15:12 16:17,18,19 27:7 33:5

38:19 39:2 89:19 97:2 121:2,12,

whichever 60:22 162:5                    21,22,23 125:21 126:17
126:3

volunteers 23:15,25 25:9,12,14,                     136:12,17,25
177:16,19,24

25 26:17 27:11 28:12 29:1,5 30:4,    willful 96:8 97:22 98:17 99:1        178:22
10 137:2,13,18 139:21 156:22

157:9 164:24 169:17 175:8,22    willfully 95:13,17,20,21 96:1        year's 137:13
177:17

176:10 177:3 181:17 182:2,4,16        97:7,12,18 98:9 102:15,20

                                       years 12:19 16:21 17:1,12

Z

ZIP 112:7 162:4

zoom 8:1 139:2