**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

FLORIDA DECIDES HEALTHCARE, INC,)
et al.,                         )
                                )
            Plaintiffs,         ) Case No: 4:25cv211
                                )
        v.                      ) Tallahassee, Florida
                                ) February 11, 2026
CORD BYRD, in his official      )
capacity as Secretary of State  )
of Florida, et al.,             )
                                )
                                ) 8:29 AM
            Defendants.         ) Volume III
_____ )

**TRANSCRIPT OF BENCH TRIAL PROCEEDINGS**
**BEFORE THE HONORABLE MARK E. WALKER**
**UNITED STATES CHIEF DISTRICT JUDGE**
**(Pages 653 through 971)**

Court Reporter:          MEGAN A. HAGUE, RPR, FCRR, CSR
                         111 North Adams Street
                         Tallahassee, Florida 32301
                         megan.a.hague@gmail.com

*Proceedings reported by stenotype reporter.*
*Transcript produced by Computer-Aided Transcription.*

**APPEARANCES:**
**For Plaintiffs Florida Decides Healthcare:**

King Blackwell Zehnder & Wermuth PA
By:  FREDERICK STANTON WERMUTH
     QUINN RITTER
     Attorneys at Law
     fwermuth@kbzwlaw.com
     qritter@kbzwlaw.com
25 East Pine Street
Orlando, Florida 32801

Elias Law Group
By:  BEN STAFFORD
     Attorney at Law
     bstafford@elias.law
1700 Seventh Avenue
Suite 2100
Seattle, Washington 98101

Southern Poverty Law Center
By:  AVNER MICHAEL SHAPIRO
     KRISTA A. DOLAN
     Attorney at Law
     avner.shapiro@splcenter.org
     krista.dolan@splcenter.org
3710 Raymond Street
Chevy Chase, MD 20815

Elias Law Group
By:  HARLEEN K. GAMBHIR
     Attorney at Law
     hgambhir@elias.law
250 Massachusetts Avenue
Suite 400
Washington, DC 20001


**For Intervenor Plaintiff Safe & Smart:**
Stearns Weaver Miller
By:  GLENN BURHANS, JR.
     HANNAH E. MURPHY
     CHRISTOPHER R. CLARK
     Attorneys at Law
     gburhans@stearnsweaver.com
     hmurphy@stearnsweaver.com
     crclark@stearnsweaver.com
106 East College Avenue, Suite 700
Tallahassee, Florida 32301

**APPEARANCES (cont'd):**

**For Intervenor Plaintiff League of Women Voters of Florida:**

Democracy Defenders Fund
By:  SPENCER KLEIN
     Attorneys at Law
pooja@statedemocracydefenders.org
spencer@statedemocracydefenders.org
600 Pennsylvania Avenue SE
Unit 15180
Washington, DC 20003

Winston & Strawn, LLP
By:  GEORGE E. MASTORIS
     Attorney at Law
gmastoris@winston.com
200 Park Avenue
New York, New York 10166

**For Intervenor Right to Clean Water:**

Campaign Legal Center
By:  ROBERT BRENT FERGUSON
     HEATHER JEAN SZILAGYI
     ELLEN MARGARET BOETTCHER
     ALEXIS DENAE GRADY
     WILLIAM "LIAM" KYLE HANCOCK, III
     MELISSA LAUREN NEAL
     Attorneys at Law
     bferguson@campaignlegalcenter.org
     hszilagyi@campaignlegalcenter.org
     eboettcher@campaignlegalcenter.org
     agrady@campaignlegalcenter.org
     whancock@campaignlegalcenter.org
     mneal@campaignlegalcenter.org
1101 14th Street NW
Suite 400
Washington, DC 20005

**APPEARANCES (cont'd):**

**For Defendant James Uthmeier:**

Florida Attorney General's Office
By:  WILLIAM STAFFORD, III
     SARA SPEARS
     MARYSSA SAVANNAH-LYNN HARDY
     Attorneys at Law
sara.spears@myfloridalegal.com
william.stafford@myfloridalegal.com
maryssa.hardy@myfloridalegal.com
119 South Monroe Street, Suite 500
Tallahassee, Florida 32301

**For Defendant Cord Byrd:**

Holtzman Vogel Baran, et al.
By:  MOHAMMAD O. JAZIL
     MARTIN C. WOLK
     RANDALL M. RABAN
     Attorneys at Law
     mjazil@holtzmanvogel.com
     mwolk@holtzmanvogel.com
     rraban@holtzmanvogel.com
119 South Monroe Street, Suite 500
Tallahassee, Florida 32301

Florida Department of State
By:  ASHLEY DAVIS
     General Counsel
     ashley.davis@dos.myflorida.com
R.A. Gray Building
500 South Bronough Street
Tallahassee, Florida 32399

**For Defendant Intervenors Republican Party:**

Shutts & Brown, LLP
By:  TARA PRICE
     BENJAMIN GIBSON
     Attorneys at Law
     tprice@shutts.com
     bgibson@shutts.com
215 South Monroe Street
Suite 804
Tallahassee, Florida 32301

**APPEARANCES (cont'd):**

**For Defendant Supervisors of Elections:**

GrayRobinson PA
By:   ANDY V. BARDOS
       JAMES T. MOORE JR.
       Attorneys at Law
       andy.bardos@gray-robinson.com
       tim.moore@gray-robinson.com
301 South Bronough Street
Suite 600
Tallahassee, Florida 32301

**P R O C E E D I N G S**

(Call to Order of the Court at 8:29 AM on Wednesday, February 11, 2026.)

THE COURT:  We are on the record in day three of the bench trial in Case Number 4:25cv211.

We finished with Mr. Earley's, that is, Supervisor Earley's, testimony late yesterday evening.

Mr. Bardos, I cut off your colleague when he was going to do the summary only because I was trying to make sure we could finish the testimony yesterday.  I know it is relevant for other reasons, but it seemed that the new information that he focused on went to the equal protection claim as it relates to the different treatment for a ballot initiative versus local-issue petitions and candidate petitions.

So just when I go back -- so I cut him off from his summary.  I realized it could pertain to other things as well because there's an overlap in the facts and some of the issues, but it seemed to me that that was part of the primary focus.

Was there something else that I should have been focused in on when I was listening to the testimony?

MR. BARDOS:  Yes, Your Honor.  I think two things really.  One is the distinction between initiative petitions and candidate and local-issue petitions.  The other is just to give the Court a sense of the burdens that Supervisors are under: The labor, time, effort that goes into verifying, and the

appropriateness of the verification fee in light of that.

THE COURT:  Certainly.  And we had had some testimony about the burdens before, and certainly there was -- it was a more exhaustive discussion with Mr. Moore's examination.  And I was listening for that as well, but it was that added to other testimony as opposed to plowing new ground.

So it sounds like I was gleaning what I was -- you wanted me to glean from the examination.

I'll make plain, everybody, I encourage you to continue to summarize.  I was only doing that at the end of the day so that we could finish the testimony of Supervisor Earley.

All right.  My understanding is the next witness to be called is Melissa Martin, who is Witness No. 9 for the plaintiffs.  Is that correct?

MS. SZILAGYI:  Yes, Your Honor.

THE COURT:  All right.  You can call Ms. Martin.

MS. SZILAGYI:  Your Honor, Heather Szilagyi for the Right to Clean Water plaintiffs.  We call Melissa Martin.

(Ms. Martin entered the witness stand.)

THE COURT:  Ma'am, if you'll remain standing and raise your right hand.  My courtroom deputy is going to swear you in.

**MELISSA MARTIN, PLAINTIFFS' WITNESS, DULY SWORN**

THE COURTROOM DEPUTY:  Please state your name for the record.

THE WITNESS:  Melissa Martin.

THE COURTROOM DEPUTY:  Thank you.

MS. SZILAGYI:  Your Honor, Ms. Martin is the campaign coordinator for Florida Right to Clean Water.  Ms. Martin's testimony will address Right to Clean Water standing as well as Ms. Martin's standing as an individual plaintiff and the burdens that the challenged provisions impose on Right to Clean Water and Ms. Martin.

Ms. Martin testified during the second preliminary injunction hearing, so I've endeavored to streamline her testimony, but I still plan to go over some background information to provide a background for her testimony today.

Her testimony is relevant to Counts One through Seven of plaintiffs' operative complaint.  So I'd like to start by establishing some background information about Ms. Martin.

DIRECT EXAMINATION

BY MS. SZILAGYI:

Q.   Good morning, Ms. Martin.

A.   Good morning.

Q.   Can you start by telling me briefly about your educational background?

A.   Sure.  My undergrad was at the U.S. Naval Academy in Annapolis, and I went to law school at Barry University School of Law.

Q.   When did you graduate from law school?

A.   2007.

Direct Examination - Ms. Martin

Q.   Can you tell me briefly about your professional background?

A.   Sure.  I was a commissioned Marine Corps officer out of the Naval Academy.  I served as an executive administrator of sorts until they sent me to law school through a legal education program.  So I served the remainder of my service time as a judge advocate with the Marine Corps.  And since then -- since retiring, I have not been employed but working full-time as a volunteer.

Q.   When did you retire from the Marine Corps?

A.   2014.

Q.   Did you become a member of the bar after graduating from law school?

A.   Yes.

Q.   Where was that?

A.   In Florida.

Q.   And -- so you testified that since you retired from the Marine Corps you've been involved in volunteer work.

     Did any of that volunteer work involve organizing volunteers?

A.   Yes.

Q.   About how many years of experience do you have organizing volunteers?

A.   Well, it would have been since 2015 since I started in the advocacy realm.

Q.   Where did you grow up?

A.    I grew up in the Orlando area, more specifically the city was Longwood, right next to Wekiwa Springs.

Q.    Did you attend school in Florida up until -- including high school?

A.    Yes.

Q.    And you testified that you attended the U.S. Naval Academy for college.

Did you join the Marine Corps right after college?

A.    Yes.

Q.    Were you stationed away from home for parts of your Marine Corps service?

A.    Yes.

Q.    Were you registered to vote during your Marine Corps service?

A.    The entire time, yes.

Q.    Where were you registered to vote?

A.    With Florida.

Q.    Where did you move after retiring from the Marine Corps?

A.    Back to the Central Florida area in Cocoa.

Q.    Why did you move to Cocoa?

A.    It was central to everything I wanted for my children, which was near bodies of water, the Indian River Lagoon and the beaches, but close enough to home that we could visit family.

Q.    Where do you live now?

A.    We live in Eugene, Oregon.

Q.   When did you move to Oregon?

A.   The summer of 2020.

Q.   So are you a resident of Oregon?

A.   Currently, yes.

Q.   Why did you move to Oregon?

A.   For various reasons, but the final reason was that my husband had received a job offer there.  But it was a compelling time in the summer of 2020 where I did not feel that where we were living was the safest or most nurturing for our children.

Q.   And do you still maintain personal ties to Florida?

A.   I do.

Q.   What are those?

A.   Well, my mother and sister and all the family, many, many, cousins, a very good group of friends in networks within the regional area of Central Florida and also the circles of environmental advocacy.  We also live -- not live.  We also own land in Florida still.  I'm still an attorney in good standing with the Florida Bar.  That's it.

Q.   Since moving to Oregon, do you visit Florida?

A.   Yes.

Q.   About how often?

A.   As often as I can.  So between two or five times a year.

     MS. SZILAGYI:  Your Honor, my next questions pertain to Ms. Martin's role within Right to Clean Water and the basic structure of Right to Clean Water.

Direct Examination – Ms. Martin

BY MS. SZILAGYI:

Q.   So, Ms. Martin, what is your current title in Right to Clean Water?

A.   I am a campaign coordinator with Florida Right to Clean Water.

Q.   Is Right to Clean Water a registered political committee in the state of Florida?

A.   Yes.

Q.   When did the political committee form?

A.   In early 2022.

Q.   When did you first become involved with the political committee?

A.   I had been there since its formation.

Q.   In what capacity were you involved when the political committee formed?

A.   I was more in an advisory role, because I did live 3,000 miles away.  So I was there for all the meetings and provided some insight and advice.

Q.   What did you advise on?

A.   Strategies primarily.

Q.   What kinds of strategies?

A.   Strategies of how to develop the best way forward regarding how to run a bootstrap campaign, how to lead and manage and inspire and recruit volunteers.  So strategically, operationally, and tactically all the above of how to run a

grassroots campaign.

Q.   And did Right to Clean Water sponsor a proposed constitutional amendment for the 2026 general election ballot?

A.   Yes.

Q.   And were you the campaign coordinator for the entirety of the 2026 initiative campaign?

A.   Yes.

Q.   Does Right to Clean Water pay any petition circulators?

A.   No.

Q.   So what are the positions within the volunteer hierarchy related to petition circulation operations?

A.   If we were to start top down, I am a volunteer.  Then we have regional coordinators who manage or at least are responsive to issues within multiple counties in our region.  Then we have county captain/lead ambassadors, more or less like the super volunteers, that are engaged, you know, on a frequent or routine basis.  We have folks that are authorized agents that might not be considered a lead ambassador or a county captain, and everyone else is an ambassador if they are registered with the campaign and work on behalf of the campaign and receive our training.  Others we consider volunteers.

Q.   Let's take a couple of those in a little more detail.

     What is an authorized agent?

A.   An authorized agent is a volunteer that lives in the county where they receive signed petitions.  At the time before 1205,

they would help to perfect them and submit them to the SOE, also letting us know -- reporting how many they submitted and any other interchange they -- exchange that they have with the SOE staff.

Q.   We'll turn to perfecting in a little bit, but can you explain in more detail what an ambassador is?

A.   Yes.  And I forgot one element regarding the authorized agent.

The SOEs often ask for a letter of authorization from the campaign to authorize a certain person on behalf of the campaign to submit -- submit the signed petitions.

So an ambassador is someone that registers with the campaign as a volunteer.

Q.   You testified about Clean Water's ambassador training just a moment ago and during your preliminary injunction, but I have a couple of specific questions.

So in training Right to Clean Water ambassadors, do you train them on details of the clean water amendment?

A.   Yes.

Q.   Why is that?

A.   It's important that they are able to answer any questions that the -- frequently asked questions at least and to understand what they're talking about.

Q.   Do you train them on how to interact with voters?

A.   Yes.

Q.   And how do you instruct them to share information about the initiative?

A.   The training on this approach with potential signers includes basic attention-getting scripts.

We also talk about how it can be important and critical to share their own story if there's time and, you know, they're the judges of the moment, but if they want -- if a voter wants to know more about it, oftentimes a personal story helps.

But very -- normally we have a set of talking points that usually resonate with most voters, and then if they still have any questions, the volunteer would have or ambassadors would have the frequently asked questions understood.

Q.   And prior to HB 1205, how did this training address legal requirements around petition circulation?

A.   The training primarily focused on the fact that we were not able to touch the signature block or the date signed block in the petitions, but everything else was more practice based, meaning to help ensure that the forms were signed legibly and to remind the voter -- the signer that their signature needed to match what the SOE has on record, things like that.

Q.   So you've testified about this, but in your role as campaign coordinator, are you familiar with Clean Water's volunteer operations?

A.   Yes.

Q.   And do you communicate with Right to Clean Water's

volunteers?

A.    Yes.

Q.    What do you communicate with them about?

A.    All things.  So from strategy to planning to things that might happen that needs attention, the feedback of things that happen.

For instance, you know, a voter asks a question that nobody understands or knows the answer to, so that would be forwarded up, and we create the answer; we ensure that the FAQs are updated, and ensure that the rest of the volunteers know how to handle that situation.

So anything that comes up that's remotely related to the campaign.

Q.    How frequently do you communicate with volunteers?

A.    On a -- starting with the regional coordinators, we meet on a weekly basis.  For the county captains and lead ambassadors, we have an operations meeting every other week, so twice a month.  On a monthly basis -- and this is really during the time that we were in full operations.  On a monthly basis, we would hold an "all ambassadors" meeting, and also the -- for new joins we have a monthly offering of a -- an orientation brief to get everyone on board and ramped up.

Q.    And to clarify, you participate in those meeting that you just testified about?

A.    Mostly, yes.

Q.    And do you supervise volunteer activities?

A.    To a degree, yes.

Q.    What does that entail?

A.    I -- to include the -- being on call at all times, 24/7, for any questions that might come up up and down what I'll call the chain of command, I help to make sure that the -- that chain of command is sufficiently trained to handle situations as much as possible.  So it's an indirect supervision, but if something pops up, you know, we'll handle it as well as possible.

Oftentimes the volunteer will communicate directly with me because everyone knows the official email address, and so they are -- they felt -- they feel free to communicate with me with any issue.  So that happens quite a bit as well.

Q.    Do you play a role in overseeing any reporting processes with volunteers?

A.    Yes.

Q.    What is that?

A.    As far as reporting the numbers of submitted petitions, that is a form that I can see the results of.  As the authorized agents report, they fill in the form, and I can see the results of that.

MS. SZILAGYI:  Your Honor, this next set of questions pertains to Ms. Martin's personal experience circulating petitions.

BY MS. SZILAGYI:

Q.   Ms. Martin, have you circulated Right to Clean Water's petition in Florida?

A.   Yes.

Q.   And did you circulate Right to Clean Water petitions in Florida while you were a resident of Oregon?

A.   Yes.

Q.   About how many times?

A.   Including the '24 campaign or '26 campaign?

It would be just about every time I come home -- or come back to Florida, so that would be two to five times a year.

Q.   Approximately how many times did you circulate the petition for the 2026 campaign?

A.   I wasn't as able to do so in the '26 campaign, but at least two or three times.

Q.   And do you know approximately when was the last time you circulated Clean Water's petition?

A.   I believe it was April of 2024 when I was asked to speak in a couple of conferences or seminars, whatever they called it. So April 2024.

Q.   Where do you typically collect petition signatures?

A.   For me the typical scenario is in those speaking opportunities.  When I'm able to, though, I would prefer to circulate in places where the public are, like the community festivals or fairs or things like that.  It's more bang for your

buck.

Q.   Do you have examples of circulating at those public spaces?

A.   Yes.

Q.   Can you share them?

A.   Absolutely.  So there was one time in Titusville that they had a car show, and I was there visiting folks at the time so grabbed a clipboard and helped to circulate petitions.

Q.   Why do you circulate Right to Clean Water's petition?

A.   I -- there are few things I really believe in, and this is -- this is one of them, because I have studied the problem set and understand that the only way to systemically take care of Florida's waters, or any waters really, for its people and for future generations, is through the constitutional amendment approach, because that is the only way that the political system would correct itself.

Q.   And why are Florida's waters important to you?

A.   I am made of Florida molecules, and I feel at a very core and soul level that this needs to happen, even though I don't live here.

Q.   So can you walk me through your typical process for soliciting signatures for Clean Water's petition?

A.   My typical process is, again, outside of the speaking opportunity and letting them know that I have a clipboard of blank petitions with me, you are welcome to -- and inviting them to sign it.  But in the normal scenario, I would be in a

place -- again, a public area where I would be -- you know, where there is foot traffic.  I would situate myself in a place that's, you know, not annoying to people, but they can hear me when I ask if they would like to sign for the Right to Clean Water.  That would normally get a positive response, but oftentimes you'll get a group of people where one person is very excited and the rest are rolling their eyes because they are having to stop.

But when they are all there, they oftentimes are amenable to listening to why Florida needs the Right to Clean Water and how important it is to them specifically and things like that.

Q.   Are you familiar with Florida House Bill 1205?

A.   Yes.

Q.   How does HB 1205 affect your personal ability to circulate petitions?

A.   I am not able to touch a petition.

Q.   So you testified about your plans to circulate petitions in 2025 during the preliminary injunction hearing, so I won't have you repeat all of that, but I'll just ask:  Have you circulated petitions in Florida since HB 1205 was enacted?

A.   No.

Q.   When you are visiting Florida, could you be as effective at speaking about the Right to Clean Water campaign without circulating petitions?

A.   Absolutely not.

Q.   Why is that?

A.   Because I would just be one of the many, many voices and headlines that Florida is doomed.  So if I don't offer hope as part of my message, there is no need or use for it.

Q.   If the prohibition on nonresidents circulating petitions were lifted, would you plan to circulate petitions in Florida in the future?

A.   Absolutely.

MS. SZILAGYI:  Your Honor, my next questions focus on Ms. Martin's knowledge of Clean Water's petition-gathering activities based on her role as campaign coordinator.

BY MS. SZILAGYI:

Q.   So, Ms. Martin, does Right to Clean Water have active petition-gathering efforts right now?

A.   No.

Q.   Did Right to Clean Water have active petition-gathering efforts immediately prior to HB 1205?

A.   Yes.

Q.   And where is Right to Clean Water's headquarters address located?

A.   Fort Myers, Florida.

Q.   And what purpose does this address serve?

A.    It's the address associated with the political committee, and it's also -- it served as the reception point and distribution point for signed petitions.

Q.   Is this the address that's printed on Right to Clean Water's petition forms?

A.   It is.

Q.   When Right to Clean Water is undertaking active petition-collection efforts, do volunteers organize petition circulation opportunities?

A.   Yes.

Q.   And how do they do that?

A.   They -- oftentimes they are on the lookout for opportunities, so they are able to identify community large-scale public events and plan accordingly.  And sometimes they heard from someone that something is happening and they, you know, on the spot organize to meet the opportunity of the day.

Q.   What are some typical locations for organizing petition circulation?

A.   Typical locations as an ongoing best practices is for those farmer's markets and community fairs and festivals, sometimes sports events.

Q.   How far in advance are these opportunities generally organized?

A.   Usually they have weeks, if not months, to organize them.

Q.   Does Right to Clean Water have a goal in common with the voters who sign the Clean Water petition?

A.   Yes.

Q.    What is that goal?

A.    To help save and protect Florida's waters from now and into the future.

Q.    And let's talk through what happens to a Clean Water petition after it's signed.

A.    Okay.

Q.    Which volunteers are responsible for submitting signed petitions to a Supervisor of Election?

A.    We are -- we either depend on authorized agents as described before or the folks in Fort Myers would be mailing out the signed petitions to the respective SOEs.

Q.    So in some cases was it Clean Water's understanding that Supervisors required individuals authorized by the campaign to submit petitions?

A.    Many of them did, yes.

Q.    Okay.  So let's walk through some scenarios.  If an ambassador collects a petition from a voter whose address is in the same county as the ambassador, what are the main ways that petition would get delivered to the relevant Supervisor?

A.    If it's an ambassador, they probably know and understand the chain of command or the point of contact near them to deliver it next to.  So that could be the county captain or lead ambassador or the authorized agent themselves; sometimes they are all in one person.  So if they are an ambassador, they should know the next person to deliver it to.

Q.   And then what would that person do with the petition?

A.   They would probably drop it off in general or coordinate with the person to deliver the signed petitions.

Q.   And you've mentioned Fort Myers.  Are there scenarios in which petitions would be mailed there?

A.   Yes.

Q.   Like what?

A.   In the sense that if they for some reason aren't able to directly drop off to -- the signed petitions to someone they know in county, more or less everything else goes through Fort Myers, because they either don't know about it or it's too difficult to get it to the next person.

Q.   If an ambassador collects a petition from a voter whose address is in a different county, what are the main ways that petition is delivered to the relevant Supervisor?

A.   The main way is to send it through Fort Myers for redistribution.

Q.   And based on your knowledge as campaign coordinator, do volunteers affiliated with other organizations also circulate Right to Clean Water petitions?

A.   Yes.

Q.   What are some examples?

A.   Examples of volunteers that are not associated?  I'm sorry. I can't hear.

Q.   Correct; volunteers affiliated with other organizations.

A.    Yes, yes.

So volunteers that might be members of a local chapter of a state organization or just a local group, perhaps a youth group, will want to help, and sometimes we know about it and sometimes we don't.

Q.    Can these volunteers submit signed petitions directly to Supervisors?

A.    It depends on the Supervisor.  Mostly not.

Q.    Okay.  In cases where it can be delivered directly to a Supervisor, would Clean Water ever have control of the petition?

A.    In those case, no.

Q.    Is it common for other organizations to submit petitions to Supervisors without the involvement of Right to Clean Water?

A.    I would say it happens routinely, so in that sense it's common.

Q.    Okay.  And if it's not delivered directly by the volunteer who collected the petition, what happens with it?

A.    It would hopefully make its way through Fort Myers, or to the right person in-county.

MS. SZILAGYI:  And, Your Honor, my next questions relate to Right to Clean Water's initial response to HB 1205.

BY MS. SZILAGYI:

Q.    Ms. Martin, other than initiate litigation, what did Right to Clean Water do immediately after HB 1205 was enacted?

A.    We had to suspend operations immediately after.

Q.    What does it mean to suspend your operations?

A.    That means we put out an all call to stop collecting petitions.  The reason was that we didn't know exactly how the law was going to affect us or meant in some cases.  So we were trying to get under it and wanted to minimize, if not eliminate, any liability to ourselves and our volunteers.

Q.    How did you communicate the suspension to your ambassadors?

A.    We used all platforms, so that includes email, the website, social media.

Q.    Were you able to communicate the suspension of your campaign to volunteers who collected petitions on behalf of Clean Water but are not affiliated with Clean Water?

A.    Not in every case.  So if they were following us in some capacity or subscribed to our email, yes.  If not, no.

Q.    Are you aware of whether any voter signing Right to Clean Water petitions after the announcement of the suspension of your campaign?

A.    Yes.

Q.    And how did you become aware of this?

A.    We had to handle a situation where a batch of signed petitions came in after -- that were signed after May 2nd.  And so the question was, What do we do?  And the answer was, Process it immediately.

Q.    Were any petitions sent to the Fort Myers mailbox?

A.    Yes.

Q.    After you suspended your campaign?

A.    Yes.

Q.    How did you become aware of this?

A.    It was brought up in a meeting.

Q.    So in your experience, what level of control can Clean Water exert over the actions of supporters who are not registered as volunteers with the campaign?

A.    We do not have control.  We don't really have control ever over volunteers because -- but the control factor is much less when we're not able to ensure that they're registered and trained and provided guidance.

Q.    So after the suspension of your campaign, did you attempt to restart operations at any point after HB 1205 was enacted?

A.    Yes.

Q.    When was this, approximately?

A.    This was in July time frame.

Q.    Okay.  So we'll get to the individual components of HB 1205 in a moment, but can you explain what operational changes you implemented in order to begin collecting petitions again?

A.    Well, first and foremost we had to re-register everyone. And so I had sent out a form to our registered ambassadors email distribution list and that had asked them to re-register.  And if they did re-register, they would go through certain questions to answer to give us -- it was our due diligence to comply with the law and to understand who's left, who's willing to collect

any, meaning to include the 25-limit personal use petition, and also had intended to register with the State.

And so that was our first step.

Q.   So you mentioned re-registering volunteers.

Do you mean re-registering with the organization, Right to Clean Water, or with the State?

A.   Yes, with us, with the Right to Clean Water campaign.

Q.   Okay.  And so were you able to get the campaign to the same place it was before HB 1205 when you restarted?

A.   No.

Q.   Why not?

A.   Many volunteers left, and importantly, a very good chunk of our lead ambassadors, county captains, authorized agents did not want to register with the State.

Q.   Based on your plan for HB 1205, when did you project to gather a majority of the signatures you needed?

A.   We had projected to gather -- the uptick was designed to manifest in September time frame.

Q.   And what plans did you have to manifest this uptick?

A.   To get there, we were planning a statewide tour to visit and have -- hold these in-person events throughout the state, but focusing on the communities that clearly have water issues, to ensure that we are able to raise awareness and support, including the idea of recruiting volunteers, perhaps donations, but definitely get the engines roaring for what would become a

September output.

Q.   When were you planning on these events taking place?

A.   The events were aimed at May before it got too hot, but that time frame.

Q.   And when did you start planning these events?

A.   We started talking about it in the December before, so December of 2024, and continued to plan and prepare by phone call and emails of -- well, by phone call mostly, but -- I was trying to find headliners for regional events that people would respond to and resonate with.  That was probably January, February time frame.

Q.   And when did you change these plans?

A.   Soon after we provided the presentation of the spring plan overall, we had decided that the likelihood of 1205 being enacted as law was going to dramatically affect our operations.  And as it became more and more likely, we decided to scrap that plan.

Q.   When are a majority of petition signatures typically collected in campaigns like Clean Water's?

A.   There's usually in the off-years, meaning the odd years, we -- there's -- the general understanding is it really kicks up in the September time frame and continues to just exponentially go up.

Q.   Just to make sure it's clear, what do you mean by "odd years?"

A.   Odd years are the nonelection years.  Mostly because the same volunteers who normally help to collect petition signatures are also the same that are heavily involved with political campaigning for elections, political candidate elections, so we don't expect them to fully focus on the initiative during that time.

Q.   What do you base the knowledge of this September time frame uptick on?

A.   We -- from years of talking with professional consultants on the issue, they have -- they've had years of experience, we've had plenty of conversations with experienced organizers of these types of campaigns and similar campaigns.

Q.   And so was it your expectation for Right to Clean Water that you would experience an uptick in the September time frame?

A.   We were planning on it, yes.

MS. SZILAGYI:  Your Honor, my next set of questions --

THE COURT:  Counsel, before you turn onto the next question.

You were asked about uptick and time frame, and the question specifically was framed in terms of you expected to collect a majority of the petitions starting in the September time frame; is that correct?

THE WITNESS:  Yes, sir.

THE COURT:  "Majority" can mean a lot of things, but it generally means to me 50 percent or more.

THE WITNESS:  To clarify --

THE COURT:  What do you mean by "majority," because it -- do you mean vast majority, all 95 percent?  That's -- I need some clarity --

THE WITNESS:  Understood.

THE COURT:  -- on that.

THE WITNESS:  So between the bracket of time between September and December, we expected to be able to have such a craze statewide that there would be sufficient scale of excitement and action.  So the time frame I -- the majority would have started in September but kind of like -- mathematically perhaps the majority would be in the November time frame, December, but it is that type of expected on-ramp.

THE COURT:  And I ask so it's clear that page 54 of the pretrial stip says I can take judicial notice of the constitutional initiatives database.

Is that correct, Counsel?

MS. SZILAGYI:  Yes.

THE COURT:  And it's my understanding that Clean Water collected slightly over 51,000 petitions before it ceased collection efforts?

THE WITNESS:  Yes, sir.

THE COURT:  Counsel, you may proceed.

MS. SZILAGYI:  Your Honor, my next set of questions is relevant to the provisions of HB 1205 challenged by Right to

Clean Water, starting with the registration requirement.

BY MS. SZILAGYI:

Q.   So, Ms. Martin, are you familiar with HB 1205's requirements related to petition circulator registration?

A.   Yes.

Q.   And what is your understanding of those requirements?

A.   That anyone that would like to circulate more than 25 petitions would need to register with the State.

Q.   And have you, yourself, attempted to participate in the circulator registration process?

A.   Yes.

Q.   When was this?

A.   It was after the Court had said that the nonresidents would be able to circulate petitions, and that's when I registered or tried to.

Q.   And walking through the registration process, what was the first thing you had to do?

A.   The first thing was to go through a series of slides for training.

Q.   Can you describe your experience with the training?

A.   What I recall was the fact that it went through the basic gist of requirements and the penalties if you don't fulfill those requirements.  And I recall that there were some conflicting points in my mind.  And so that's what I recall, the training.

Q.   And what happened after the training?

A.   I had taken the quiz and I missed one, and I don't know which one I missed, so that actually concerned me more.  Because with how heavy the penalties are, I don't know what point of the law I don't understand because there was no feedback of what I missed or any explanation.

Q.   So did you feel that the quiz prepared you to circulate petitions?

A.   I feel that it made me less confident because of the unknown factor.

Q.   What do you mean by "the unknown factor?"

A.   The unknown of what I don't understand about the law as a lawyer.

        MS. SZILAGYI:  I'd like to bring up Right to Clean Water Plaintiffs' Exhibit 287.

BY MS. SZILAGYI:

Q.   Ms. Martin, what is this document?

A.   This looks like an email that I sent to the initiative's email address, initiative's office.

Q.   When did you send it?

A.   On July 11, 2025.

        MS. SZILAGYI:  I move to admit Right to Clean Water Plaintiffs' 287 which has no objections.

        THE COURT:  One moment, please.

        (Pause in proceedings.)

MS. HARDY:  No objection, Your Honor.

THE COURT:  Without objection, 287 is admitted.

(PLAINTIFFS' EXHIBIT RTCW-287:  Received in evidence.)

BY MS. SZILAGYI:

Q.   Do you see in the middle of the second page where you wrote:  *I'd like to know which quiz question I got wrong so I do not inadvertently violate the law?*

A.   Yes.

Q.   Did you ever receive a response to this email?

A.   No.

MS. SZILAGYI:  We can take this down.

BY MS. SZILAGYI:

Q.   Were you able to become registered as a petition circulator during the period where this Court's injunction was in place?

A.   No.

Q.   Why not?

A.   I had asked also about the address requirement for service process.  I am connected to Florida through various addresses, but I needed to understand more what they're looking for for service of process purposes.  And I wasn't willing to give my family's address for this issue, and I wasn't sure if the campaign headquarter's address would suffice.

Q.   And so moving on to discuss Right to Clean Water's petition circulators, in your role as Right to Clean Water's campaign coordinator, do you regularly solicit feedback from volunteers?

A.   Yes.

Q.   How do you solicit this information?

A.   Through meetings or emails, sometimes just general posts when we're looking for feedback on certain issues.

Q.   Did you collect information about whether Clean Water's volunteers would be willing to register to circulate petitions after HB 1205?

A.   Yes.

Q.   How did you collect this information?

A.   Primarily through an email to the registered ambassador's email list that we had and had asked them point-blank, What are your plans? and, If you are interested in registering, here's the form.

Q.   And why did you collect this information?

A.   To better comply with the law and to understand where we were status-wise in order to plan around what we had left.

Q.   And so did the information you collected inform your plans for the campaign after the registration requirement went into effect on July 1st?

A.   Yes.

     MS. SZILAGYI:  So I'd like to pull up Right to Clean Water Plaintiffs' Exhibit 70.

BY MS. SZILAGYI:

Q.   And, Ms. Martin, what is this document?

A.   It looks like a response to that email I was just referring

to.   That was sent on 28 June, 2025.

Q.   So is -- the email on the bottom, did you send that email?

A.   Yes.

Q.   And is this the email you just testified about regarding collecting information from Clean Water volunteers?

A.   It is.

Q.   Who did you send the email to?

A.   I sent it to the list of 720-something registered volunteers, registered ambassadors, that we had on file.

Q.   And when did you send this email?

A.   I sent it on June 24th of 2025.

        MS. SZILAGYI:  I'd move to admit Clean Water Plaintiffs' Exhibit 70.

        THE COURT:  Any objection?

        MR. RABAN:  No objection, no.

        THE COURT:  Without objection, Exhibit 70 is admitted.

    (PLAINTIFFS' EXHIBIT RTCW-70:  Received in evidence.)

        MS. SZILAGYI:  Now I'd like to pull up Clean Water Plaintiffs' Exhibit 72.

        THE COURT:  Oh, wait a second.

        Give me one second, please.

    (Pause in proceedings.)

        MS. SZILAGYI:  No problem.

        THE COURT:  The last -- I thought all the plaintiffs' exhibits were --

MS. SZILAGYI:  Right.  I apologize, Your Honor.

THE COURT:  So there's separate sets for each plaintiff group.

My apologies.  So I need to change -- 287 was not 287 -- the first 287 on 623-1.  I need to flip to --

MS. SZILAGYI:  We're trying to get you a page number.  I don't have it with me.

THE COURT:  Give me one moment, please.

(Pause in proceedings.)

THE COURT:  I mean, that's what's confusing -- maybe I do see a 287.

Give me one moment, please.

(Pause in proceedings.)

THE COURT:  I believe it was -- this was the email between Mel Martin and SOS, so it was 287 on page 147.

Just so the record's clear for any reviewing court, the DX numbers, though, they're going to be separate numbers also for the Supervisors; correct?

MS. SZILAGYI:  I believe so, Your Honor.

MR. BARDOS:  Yeah, I'm sorry.  The defendants' exhibits are sequential throughout.  The Supervisors' exhibits are the last 12 but they're consecutive.

THE COURT:  Okay.  Just because I don't want there to be a problem with what's marked and what we're doing, so -- so I've got 287, and the next one you put up -- 287 was admitted

without objection.

What was the next one?

MS. SZILAGYI:  70 of Right to Clean Water plaintiffs.

THE COURT:  70.  I realize when I was reading the description that there was -- they were not all in order.

70 is on page 121.

And was there any objection to 70?

MR. RABAN:  No, Your Honor.

THE COURT:  Without objection, 70 is admitted.

My problem is I want to have a clean record of what's being admitted.

MS. SZILAGYI:  Thank you, Your Honor.

BY MS. SZILAGYI:

Q.   And now we're looking at Right to Clean Water Plaintiffs' Exhibit 72.

So, Ms. Martin, what is this document?

A.   This is another response to that email sent by one of our ambassadors on June 25th, 2025.

Q.   How do you know the email is from a Clean Water ambassador?

A.   The only way to respond to that email would have been from our registered ambassador list.

MS. SZILAGYI:  I'd move to admit Plaintiffs' Exhibit 72 -- Clean Water Plaintiffs' Exhibit 72.

THE COURT:  Without objection -- counsel was shaking his head "no objection" -- 72 is admitted.

(PLAINTIFFS' EXHIBIT RTCW-72:  Received in evidence.)

MS. SZILAGYI:  Next I'd like to bring up Clean Water Plaintiffs' Exhibit 73.

BY MS. SZILAGYI:

Q.   Ms. Martin, what is this document?

A.   This is a response to the same email sent by one of our ambassadors on 24 June 2025.

MS. SZILAGYI:  Move to admit Plaintiffs' Exhibit 73.

MR. RABAN:  No objection.

THE COURT:  Without objection, Exhibit 73 is admitted as well.

I'm just going to call it Clean Water 73.  And, again, both 72 and 73 are on page 121 of ECF No. 623-1.

(PLAINTIFFS' EXHIBIT RTCW-73:  Received in evidence.)

MS. SZILAGYI:  Now, I'd like to bring up Right to Clean Water Plaintiffs' Exhibit 143.

THE COURT:  Counsel, you may proceed.

BY MS. SZILAGYI:

Q.   Ms. Martin, what is this document?

A.   This is another email response to my original email from Tiffany Grantham, who is one of our regional coordinators on 24 June 2025.

MS. SZILAGYI:  I move to admit Clean Water Plaintiffs' Exhibit 143.

MR. RABAN:  No objection.

THE COURT:  Without objection, 143 is admitted.  It's on page 130 of 623-1.

(PLAINTIFFS' EXHIBIT RTCW-143:  Received in evidence.)

BY MS. SZILAGYI:

Q.   And, Ms. Martin, you just testified that Ms. Grantham was a regional -- is a regional coordinator for Right to Clean Water?

A.   Correct.

Q.   Was Ms. Grantham an active Right to Clean Water volunteer prior to HB 1205?

A.   Yes.

Q.   Did she continue to be an active volunteer after HB 1205?

A.   No.

Q.   How so?

A.   She decided not to.  It was too much, and she actually -- even though she still held the role and -- as a point of contact between volunteers in the southeast region in the campaign, her role was much -- much reduced to -- for her to look to other things to do with her time.

Q.   In your role as Right to Clean Water's campaign coordinator, do you regularly answer questions from volunteers?

A.   Yes.

Q.   I'd like to bring up Right to Clean Water Plaintiffs' Exhibit 74, which is the last in the series of these.

And so, Ms. Martin, what is this document?

A.    This is a document that looks like it was an email to me from someone in Lee County.

Q.    And who is this -- I'm sorry.  Excuse me.

Is this email from a Right to Clean Water volunteer?

A.    My recollection of the guardian ad litem volunteer that we have -- I believe I know who this is, yes.

Q.    Okay.  Is this the kind of question you typically field from volunteers?

A.    Yes, all the time.

MS. SZILAGYI:  I move to admit Right to Clean Water Plaintiffs' Exhibit 74.

MR. RABAN:  No objection.

THE COURT:  Without objection, 74 is admitted.

(PLAINTIFFS' EXHIBIT RTCW-74:  Received in evidence.)

BY MS. SZILAGYI:

Q.    And how did --

MS. SZILAGYI:  We can take this down.

Thank you.

BY MS. SZILAGYI:

Q.    How did Right to Clean Water alter its planning in response to emails like this from the volunteers?

A.    With the prevalence of confusion, without us being able to definitively answer, we felt like we were in too much limbo. That created too much liability for all concerned.  So it was a big part of our decision to eventually suspend operations for

good.

Q.   And approximately how many active ambassadors did Right to Clean Water have immediately prior to HB 1205?

A.   We had a varying degree of ambassadors and volunteers being active.  I would say as the lead ambassadors and county captains and authorized agents, et cetera, that level of volunteerism, we had at least 30 people that were involved in the infrastructure of our operations.

Q.   To the best of your knowledge, about how many of these active volunteers registered with the State as petition circulators after HB 1205?

A.   From that list, a very small fraction.

Q.   And do you know exactly who registered with the State as a petition circulator for Right to Clean Water?

A.   No.

Q.   Why not?

A.   There's no feedback loop between the State and the campaign regarding who is registered on our behalf.

        THE COURT:  Y'all can continue.

BY MS. SZILAGYI:

Q.   How has the registration requirement impacted the number of petitions Right to Clean Water has been able to collect?

A.   Say again?

Q.   How has the registration requirement impacted the number of petitions Right to Clean Water has been able to collect?

A.    It has drastically reduced our ability to collect signatures.

Q.    How has the registration requirement impacted the spread of Right to Clean Water's message?

A.    Similarly, without the volunteers out there in the public exchanging information, there's much less ability for any expression to go on about the -- about the cause.

Q.    And turning to volunteers affiliated with other organizations that collect Right to Clean Water petitions, does Right to Clean Water communicate with these organizations about the support they provide to Clean Water's petition circulation efforts?

A.    Sometimes, but not all the time.

Q.    And how does Right to Clean Water use the information it does receive from supporting organizations to inform its campaign strategy?

A.    We use all information available to determine how, when, where, and why we devote our resources that we have.

Q.    And did Clean Water obtain any information from these organizations about whether their volunteers were -- who had previously collected Clean Water petitions were planning to continue to do so after HB 1205?

A.    I don't know.  We tried to spread the word as well to our supporting organizations and, again, through emails.  We have our own internal list.  We have the subscriber list from the

website.  We have social media.  So we did fan out and ask folks what they were planning to do to help.

Q.   And did you learn whether or not volunteers who had previously supported the effort were planning to continue to do so?

A.   Yes.

Q.   And what did you learn?

A.   I learned that there were many organizations that knew enough of the law that said, No thanks, and walked away.

Q.   And what action did Clean Water take in response to that information?

A.   That was, again, part of our consideration and decision-making process to suspend operations.

Q.   Is part of Right to Clean Water's mission to educate the public about its amendment?

A.   Big part of our mission is, yes.

Q.   And so is part of the goal to encourage individuals to participate in petition circulation in their communities?

A.   Yes.

Q.   How so?

A.   We ask everyone who cares about Florida waters to understand what this initiative offers and spread the word on our behalf.

Q.   And did Clean Water try to maintain direct control over all of these individual collection efforts?

A.   To the best of our ability and for the purpose of ensuring everyone had what they needed, like training and guidance and supplies.

Q.   Were you able to maintain direct control over all of these individual collection efforts?

A.   Not at all.

Q.   And why not?

A.   It's the nature of volunteerism and grassroots campaigning. It's very organic and spontaneous and things happen that are derived from inspiration at the moment or wherever -- whatever is happening.

It's like -- I would just point from an example.  The state parks issue, it was a couple of years ago.  That had driven a lot of people out in -- you know, to protest the issue that was going on, and lots of volunteers wanted to collect Right to Clean Water signatures at those protests.  So there was some organizing that happened in various places to get -- to make that happen.

So that didn't necessarily come from us.  It was more like a distributed inspiration organization piece that we don't have control over and we don't want control over because we want to, you know, ensure that the numbers are continuing to grow in the scale that we need.

Q.   So if you require direct control over all of these efforts, how would this impact the effectiveness of your campaign?

A.   It would be detrimental to our campaign to try to control everything.

Q.   Why is that?

A.   Again, the grassroots -- since we don't have millions and millions of dollars to pay people to take care of this, we are dependent -- 100 percent dependent on the good graces and time and energy of volunteers.

Q.   And so staying on the registration requirement but talking about how it applies to individuals who don't collect signed petitions, do you handle them in other ways?

A.   Uh-huh.

Q.   Prior to HB 1205, did Right to Clean Water have volunteers who would typically deliver or physically possess more than 25 signed petitions that they did not collect themselves?

A.   Yes.

Q.   And what are the common situations that would take place?

A.   Oftentimes, in addition to the folks actually collecting them, the people involved in the chain of custody, per se, the folks that -- the county captains or the lead ambassadors or the authorized agents, they would oftentimes deal with batches of signed petitions before it gets submitted.

Q.   And what role did this play in Right to Clean Water's infrastructure?

A.   That was our infrastructure, so we depended on all the people from the input point of collecting the signatures to the

process -- through the processing, to include everyone who was associated with checking mailboxes and further processing the signed petitions.

Q.   So how has the registration requirement affected Clean Water's operations with respect to these volunteers who handle signed petitions?

A.   It took our infrastructure of approximately 30 folks in that -- in those types of roles down to a handful.  So it devastated our infrastructure of operations.

Q.   And so talking about the Fort Myers mailbox that you mentioned earlier, prior to HB 1205, how many people typically staffed this mailbox?

A.   There was a cluster of volunteers that ranged between, you know, six or eight that had devoted the -- or committed to checking the mailbox and sorting through the petitions and at the time perfecting them, you know, if it made sense.  For instance, they had to mail out the signed petitions to all of the counties, and in the counties that didn't have the authorized agents, the perfection would have to happen in Fort Myers before sending it to the Supervisor.  So if there was an authorized agent, they would be able to send it out to that person.

Q.   Just to clarify, about how many people were in that cluster of volunteers you mentioned?

A.   About six or eight people.

Q.   And, to your knowledge, after HB 1205, how many registered volunteers are available to staff the Fort Myers mailbox?

A.   After 1205?

Q.   Correct.

A.   One poor person.

Q.   And how has this impacted Clean Water's operations with respect to the Fort Myers mailbox?

A.   We've been abusing her this whole time because we've asked her to check the mailbox as frequently as possible, but, like, one -- you know, daily if possible, but as much as she possibly can to help process these petitions because there's no one else left in Lee County that were willing to register with the State.

Q.   And why do you ask her to check the mailbox so frequently?

A.   Because we're trying to comply with the ten-day rule as much as possible.

Q.   And we'll talk more about that in a few minutes.

     Finally, with respect to how the registration requirement impacts Clean Water's costs, prior to HB 1205, how did Right to Clean Water distribute blank petition forms to its volunteers, generally speaking?

A.   We had -- one of our regional coordinators had found a good deal in Titusville to print out in bulk the blank petitions for us.

Q.   And what would you do after printing in bulk?

A.   We would send them to active clusters of volunteers in

boxes of either 2,500 or 5,000.

Q.   And how does the registration requirement affect how Clean Water is able to distribute blank petition forms to its registered circulators?

A.   Well, the registration -- so the two forms currently available are registered circulators who would necessarily need to print locally through FedEx or Kinkos, or whatever, and that would be much more expensive than the 2-cents-a-page rate that we were enjoying, for instance.  And then you have a personal use.  That's still -- since we are not able to really bulk print and bulk ship, it's very localized, and that's just much more expensive.

MS. SZILAGYI:  And, Your Honor, I expect the next portion of testimony to be relevant to Clean Water's challenge to the fines provisions of HB 1205, starting with the ten-day petition return requirement and related fines.

BY MS. SZILAGYI:

Q.   So, Ms. Martin, prior to HB 1205, was Right to Clean Water ever subject to fines for the late delivery of petitions?

A.   No.

Q.   Why not?

A.   There was no time requirement for volunteer circulators.

Q.   And Right to Clean Water only used volunteer circulators?

A.   That's correct.

Q.   Prior to HB 1205, did Right to Clean Water advise

volunteers to immediately submit individual petitions to the Supervisor as soon as they were processed?

A.    Yes, in the sense that -- you know, in as reasonable a time as possible for the volunteers, knowing that they're volunteers and we needed to make things ultimately convenient and user friendly for them so they would continue volunteering.

Q.    So what specifically was Clean Water's advice on when volunteers should turn around signed petitions?

A.    We asked folks to do it as soon as they possibly could, to deliver it to the next person and/or to send it in the mail to Fort Myers.

Q.    And was the campaign's practice to submit larger batches of petitions to Supervisors?

A.    Yes.

Q.    And why was this?

A.    I would say in most cases the authorized agents, or whomever, on behalf of the campaign would be interfacing with the Supervisor.  In more instances than not, they would request that we save -- we keep it in batches and submit them in batches.

Q.    When you say "they would request," who are you referring to?

A.    The folks inside of these offices, it would be more convenient for them to have us submit our signed petitions in batches versus one or two at a time.  And so we wanted to make

things as easy as possible for these folks, so that's what we would do.

Q.   To your knowledge, at any point did any Supervisor's office request that the campaign submit Clean Water petitions more quickly?

A.   No.

Q.   And based on your experience, about how long on average did it take for signed Clean Water petitions to be submitted to Supervisors prior to HB 1205?

A.   Before 1205 -- again, in -- there's a spectrum of situations here.  So the range would include a matter of days, like two or three days, if the same person is -- that's collecting is also the person that's submitting them to the -- to the Supervisor of Elections.  So there would just be the perfecting time in between.

But, by and large, outside of those rare circumstances, we would have folks usually mailing them in within a couple of weeks to Fort Myers.  Fort Myers would on a weekly basis perfect what came in through the mail.

And then some would be sitting in the -- the office where we sort each of the petitions by county, and if it seemed like the county had enough of a batch, you know, to send, then that would then be sent to that county SOE.

Q.   And are you familiar with HB 1205's deadlines to return signed petitions?

Direct Examination - Ms. Martin

A.    Yes.

Q.    What is your understanding of this requirement?

A.    That the time that -- or the date that the signer had signed the petition to the date that the SOE is receiving the signed petition, it cannot exceed ten days.

Q.    And how has this requirement affected your operations?

A.    Directly and severely.

Q.    How so?

A.    It has -- it has created a devastating effect on our operations because, again, it's treating volunteers as if they are getting paid and, therefore, have to comply, and that's not what volunteers do.  They help when and if they can.  They are driven by passion, but if they're treated otherwise, then they do other things.

So the nature of the volunteer organization is we ask that they do it in a reasonable time.  They understand.  It's like a mutual respect relationship, and if we don't respect them, then they are not going to respect us or provide help.

Q.    And, to your knowledge, since HB 1205 was enacted have Right to Clean Water petitions been submitted in violation of the ten-day return deadline?

A.    Yes.

Q.    And has Right to Clean Water adopted protocols to try to meet the ten-day return deadline?

A.    Yes.

Q.   What are those?

A.   As soon as you see a signed petition, you immediately process it.

Q.   And what does processing it involve?

A.   If they are aware -- like, ambassadors, they should be aware of the local point of contact in county if they are receiving the signatures from that county.  Then they immediately deliver it to that person; outside of that, immediately mail it to Fort Myers.

Q.   Have these protocols been successful?

A.   No.

Q.   Why not?

A.   They are still -- they still come in late oftentimes, and when we immediately turn around, like the same day usually of -- these petitions go directly to the county SOE, it looked, you know, in many cases they are likely going to be late because maybe they are at Day 7 or Day 8 or something like that.  But it's highly likely that they are generally going to be late.

Q.   Just to make sure I understand, what do you mean by "they still come in late"?

A.   They still come in late because they -- despite the volunteers maybe, you know, collecting and, you know, finding -- assuming that the post office is open the next day, they put it in the mail.  Again, if they're not working, they put it in the mail during the day, and three or five days later it reaches

Fort Myers.  Sometimes that's -- there's a small sliver of possibility that we would comply because it does take three or five days to mail it back to -- even directly to the SOE.  And that's assuming the person -- our poor volunteer in Fort Myers checks the date -- checks the post office the day it arrives and turns it around the same day.  So it's a little tight.

Q.   Does the day a petition is collected, say a weekend versus a weekday, affect how quickly it can be returned?

A.   Yes.

Q.   Why is that?

A.   We lose -- we lose the Sunday; we lose any holidays that might be there, but it counts against us.

Q.   Is asking voters to return signed petitions themselves a viable option for the campaign?

A.   In some cases there might be some county SOEs that allow for that.

Q.   For the campaign as a whole, is it a practice that Right to Clean Water plans to adopt?

A.   No.

Q.   Why not?

A.   Because most county SOEs still require the authorized agent for the Fort Myers address to be submitting them.

         MS. SZILAGYI:  I'd like to show Right to Clean Water Plaintiffs' Exhibit 78.

BY MS. SZILAGYI:

Q.   Ms. Martin, do you recognize this document?

A.   Yes.

Q.   Did you create this document?

A.   Yes.

Q.   What is it?

A.   It's to track the -- it's called the headquarter's mailing list where you are tracking who is authorized in which counties as our authorized agents or someone that would be able to at least receive the batches of signed petitions that are mailed from Fort Myers.

        MS. SZILAGYI:   So I move to admit Clean Water Plaintiffs' Exhibit 78, which has no objection.

        MR. RABAN:   No objection.

        THE COURT:   Without objection, 78 is admitted.

    (PLAINTIFFS' EXHIBIT RTCW-78:   Received in evidence.)

BY MS. SZILAGYI:

Q.   Ms. Martin, what does the third column reflect?

A.   That third column is the -- a column that we added later because it was simpler to track by county.  We were tracking the county SOEs that would be able to receive the personal-use petitions directly from the voter or any petitions.

Q.   When you said "added later," when approximately was that?

A.   That was after 1205, definitely.  We were trying to understand our ability to go forward in the July time frame.

Q.   And how did you use this information to inform your operational strategies after HB 1205?

A.   We focused in on the -- we were planning an email campaign because it was cost-effective for us.  But we wanted to know which counties to focus that -- those resources for, and so we would go to the counties that had the number of potential signers for us, and that would be in a county that the SOE would receive the signed petitions directly from the voter.

MS. SZILAGYI:  You can take this down.

BY MS. SZILAGYI:

Q.   So talking specifically about petitions mailed to the Fort Myers mailbox, how long on average did it take for a petition to arrive at Fort Myers prior to HB 1205?

A.   Generally be, you know, from a few days to a couple of weeks, sometimes one or two months.

Q.   And assuming a petition was completed correctly prior to 1205, what was the range of time that it could take for the petition to be mailed from Fort Myers to the appropriate Supervisor?

A.   It can range from a few days to a couple of weeks.

Q.   And does Right to Clean Water generally need to mail the petitions again after they arrive at Fort Myers to submit them to the SOE?

A.   Yes.

Q.   And are you confident in the amount of time that it will

take these petitions to arrive at the Supervisor's office after you mail them again?

A.    Not at all.

Q.    Why not?

A.    Just the mailing system is not as dependable as it used to be.  So we've heard many cases where it takes a little while longer than the three days that we used to have.

Q.    And how have the financial costs that Right to Clean Water has incurred from mailing changed as a result of the ten-day rule?

A.    The cost of mailing has exponentially increased because we would have to mail things one or two forms at a time, sometimes more but on a very frequent basis, instead of being able to sort and batch and do things to cut costs.

Q.    Based on your experience as campaign coordinator, do you believe Clean Water is able to develop processes that ensure petitions are submitted within ten days?

A.    The only scenario that we would be able to comply with ten days is if the authorized agent was also the ambassador that collected lots of petitions, and I don't see there being that many power volunteers like that.  We have a couple on our team, but it's a rare situation.  So outside of that, it's an impossibility to believe that we would have an operation able to comply with the ten-day rule.

Q.    If voters could turn in their signed petitions directly to

Supervisors, do you believe Clean Water could have a successful campaign at the scale needed in order to secure ballot placement?

A.    That would help, but it would definitely not be the crux of our campaign.

Q.    Why not?

A.    The crux of our campaign is the scale of volunteers out and collecting signatures among the public.

Q.    Are you aware of the fines associated with the late delivery of petitions under HB 1205?

A.    Yes.

Q.    I'd like to show --

MS. SZILAGYI:  And I apologize, Your Honor.  Now we are going to FDH Plaintiffs' Exhibit 166, which is in that first set of Plaintiffs' exhibits.  We endeavored not to put HB 1205 on the exhibit list too many times.

BY MS. SZILAGYI:

Q.    And looking at Section 100.371(7)(a)(1), which is on page 14 -- so do you see Section (7)(a)(1)?

A.    Yes.

Q.    What is your understanding of this section?

A.    That for every day a petition is late outside of the ten-day rule, we would receive a $50 fine per petition.

MS. SZILAGYI:  And I would move to admit FDH Plaintiffs' Exhibit 166.

THE COURT:  Any objection?

MR. RABAN:  No objection, Your Honor.

THE COURT:  Without objection, Plaintiffs' Exhibit 166 -- the general FDH Plaintiffs' 166 is admitted.

(PLAINTIFFS' EXHIBIT FDH-166:  Received in evidence.)

BY MS. SZILAGYI:

Q.   So how has the potential financial liability from these fines affected Right to Clean Water's operational planning?

A.   Just this rule could tank us due to the nature of the operations are spread out and volunteer-based, and without the scale of super volunteers like I described before, being the same person wearing all hats, it would be impossible to sustain.

Q.   And is Right to Clean Water aware if it will be fined for any late petitions it has submitted since HB 1205 was enacted?

A.   I don't know.

Q.   Why not?

A.   I -- there's no -- again, there's no feedback to the sponsor, to us, regarding any actual violations.  We don't know -- for instance, there are some petitions that we know that we submitted that were in violation, and there were many that could have been a violation, but we don't know.  So we just don't know.

Q.   And when do you anticipate understanding your financial liability for late petitions from the 2026 campaign cycle?

A.   Until someone from the State tells us otherwise, I guess

the statute of limitations, whatever that is.

Q.    How does this impact your planning for the future?

A.    It's directly impacted our ability to not just plan for the next step, but to invite donors and supporters of such a plan.

Q.    And did Right to Clean Water seek guidance from the Secretary of State at any point after HB 1205 was enacted related to the ten-day return provision?

A.    No.

Q.    Just to clarify, did you -- so did you receive guidance from the Secretary of State?

A.    Sorry.  No, I -- yes, I did not receive guidance that I asked for.

Q.    Okay.  So to clarify, did you seek guidance from the Secretary of State at any point --

A.    Seek.

Q.    -- prior to HB 1205?

A.    Yes, we sought guidance.  Yes.

        MS. SZILAGYI:  So I'd like to pull up -- now we're back to Right to Clean Water Plaintiffs' Exhibit 132.

BY MS. SZILAGYI:

Q.    And, Ms. Martin, do you recognize this document?

A.    Yes.

Q.    What is it?

A.    It is -- it's a document from Joe Bonasia, who at the time was serving as our director of operations and communications,

and to -- a communication to Ms. Davis, Ashley Davis, on -- to understand 1205 issues.

MS. SZILAGYI:  Can we take a look at the second page?

BY MS. SZILAGYI:

Q.   And so you said this email was send by Joe Bonasia; is that correct?

A.   Yes.

Q.   Did you help draft this email?

A.   Yes.

MS. SZILAGYI:  I move to admit Right to Clean Water Plaintiffs' Exhibit 132, which has no objections.

MR. RABAN:  No objection.

THE COURT:  Without objection, 132 is admitted.

(PLAINTIFFS' EXHIBIT RTCW-132:  Received in evidence.)

BY MS. SZILAGYI:

Q.   What was the purpose of this email?

THE COURT:  Counsel, let me ask you, it's been about an hour and 45 minutes.  How much longer do you think you have?

MS. SZILAGYI:  Certainly less than that, but I think it would be a good time for a break.

THE COURT:  All right.  We'll take a break then.

Let me flag one issue for you, and I suspect I know what your answer is because I asked some questions and I wasn't suggesting it was determinative of anything.

But one thing, since there's been some questioning

through this trial regarding numbers collection, collection data, I'm assuming -- it's your position that the likelihood of success of getting on the ballot is immaterial to this Court's analysis, I'm assuming, one.  If do you stop me from speaking, the fact that I may or may not have gotten on the ballot is immaterial, I'm assuming that's --

MS. SZILAGYI:  That's correct, Your Honor.

THE COURT:  -- your position.

And secondly, related to that, I'm assuming your argument would be just because there are other hurdles or greater hurdles to a ballot initiative is immaterial to determining whether additional hurdles or barriers are severe within the meaning of the law.

MS. SZILAGYI:  That's correct, Your Honor.  And I'm happy to ask some additional questions about it.

THE COURT:  You don't have to ask additional questions.  I was just saying that obviously y'all need to flesh that out, and maybe not waste too much ink, but flesh that out in your papers.

MS. SZILAGYI:  Understood.  Thank you, Your Honor.

THE COURT:  Let's take a ten-minute break.  We'll come back at 10:00 o'clock.

Thank you.

(Recessed at 9:49 AM.)

(Resumed at 10:07 AM.)

THE COURT:  We're back on the record.

Let me say, though, to defense counsel, my sort of general exchange with counsel for the plaintiff about the success of getting on the ballot, their position being that it would be immaterial, a burden, I wasn't in any way suggesting you automatically jump to burden.  I'm well aware of the position of the defense lawyers that many of these things are process and so you -- and don't implicate speech so you'd never even get to the question of burden.  I wasn't trying to oversimplify it.

And I -- I don't want to do this now, but I will note that there's -- along the lines of what that evidence means, if anything, I'll have some further directions for everybody that I want y'all to address, but we'll deal with that later.

MR. JAZIL:  Thank you, Your Honor.

THE COURT:  Counsel, you may proceed.

BY MS. SZILAGYI:

Q.   Ms. Martin, before the break we were talking about Right to Clean Water Plaintiffs' Exhibit 132.

And you testified that you helped write this email; correct?

A.   Yes.

Q.   So what was the purpose of this email?

A.   This was when the -- well, 1205 was enacted and so we were able to review the final version.  We conducted a legal review

amongst other attorneys associated with the campaign, and these are some of the questions that we felt needed to be answered.

Q.   And do you see the email at the top of the first page?

A.   Yes.

Q.   Who's that email from?

A.   Ashley Davis.

Q.   And what does it say?

A.   It says:  *Good morning, we'll review and get back to you as appropriate.*

Q.   To your knowledge, did Right to Clean Water ever receive a response to this email?

A.   No.

Q.   Okay.  We're done with this exhibit.

To your knowledge, do individuals always make Right to Clean Water as the sponsor aware that they are collecting petitions on your behalf?

A.   No.

Q.   And are there challenges related to returning petitions within ten days when they are collected by volunteers who are not known to Right to Clean Water?

A.   Yes.

Q.   What are those challenges?

A.   The challenge is that the folks that are out there inspired by the cause and want to do something and take action and print out their own petitions and circulate them, whether it's among

their friends, family, or neighborhood, they are not always familiar with the ideal process for processing them and so may just be resigned to mail the batch and whatever they collect to the Fort Myers address without knowing about 1205 or the constraints.

Q.   And my next set of questions relate to HB 1205's fines for petitions filed in a county other than the county in which the voter resides, so I'd like to bring back up FDH Plaintiffs' Exhibit 166, which is HB 1205.

So looking at Section 100.371(7)(a)(3), do you see that section, Ms. Martin?

A.   I do.

Q.   And what is your understanding of this section?

A.   That for each petition form that is submitted to the wrong county SOE, that would be a fine to us for $500.

Q.   And have Supervisors notified Clean Water of petitions misfiled in the incorrect county since HB 1205 was enacted?

A.   I do recall in an instance a county SOE letting us know that they had a couple of petitions that were filed in the -- you know, incorrectly, but we don't know how they got there because our authorized agent wasn't submitting petitions at the time in that county.

Q.   And when you mean -- when you say you don't know how they got there, does that mean you don't know who submitted them?

A.   I'm not sure how they were -- how they got to the SOE.

Q.   Okay.  And what happened when you received this notification?

A.   We immediately planned for addressing the situation, which would have entailed sending a check to them so they can mail it to us in Fort Myers or to have someone to pick them up.  And we ultimately resolved for someone to pick them up.

Q.   And are you aware of any fines that Clean Water has incurred as a result of a petition being misfiled in an incorrect county?

A.   I am not aware.

Q.   And why not?

A.   We're not receiving any notices like that.

Q.   Who would you expect to receive those notices from?

A.   I expected to receive some sort of notice from either the SOE or someone from the State to let us know that something was known to be a violation.

         MS. SZILAGYI:  So, Your Honor, I'd like to turn to the provision of HB 1205 that prohibits individuals from filling in missing information on a petition form.

BY MS. SZILAGYI:

Q.   So, Ms. Martin, are you familiar with HB 1205's prohibition on individuals filling in missing information on a petition form?

A.   I am.

Q.   And what's your understanding of this provision?

A.    My understanding is that no one except the voter can fill out anything on the petition forms.

Q.    And are you familiar with the fines associated with filling in missing information on petition forms under HB 1205?

A.    Yes.

        MS. SZILAGYI:   And so I'd like to bring back up HB 1205, Exhibit 166.

BY MS. SZILAGYI:

Q.    And, Ms. Martin, do you see the section starting with Number 8 toward the bottom of the page?

     Can you review this section.

     So what is your understanding of the sponsor's liabilities for a fine under this section?

A.    For any petition found to have been with missing information filled on a signed petition, that would be a $5,000 liability for the sponsor.

Q.    And prior to HB 1205, did Clean Water volunteers fill in missing information on signed petition forms?

A.    Yes.

Q.    What did Clean Water call this process?

A.    Perfecting.

Q.    And what information would volunteers perfect?

A.    The information that would help to maximize the likelihood it would be a validated petition; for instance, easy fixes would be the county line where the oftentimes "USA" would be there

instead of the actual county, things like that.

Q.    Were there ever situations in which a voter left the county line on the form blank?

A.    Yes.

Q.    And in order to send the petition to the correct county, what is your understanding of where a volunteer should send the signed petition if the county line is blank?

A.    The volunteer could look at the address and the city to figure it out so -- or look it up.

Q.    So the volunteer would need to look up the county for where to send the petition, but would not be able to write it on the form?

A.    Correct.

Q.    And what is your understanding of whether signed petitions that do not have a county filled in will be validated by the SOE?

A.    It depends on the SOE, but we've heard many SOEs say that any -- any missing information or inaccuracies or irregularities like that would be -- would render it invalid.

Q.    And, to your knowledge, did volunteers for Right to Clean Water ever modify the signature line of a signed petition form?

A.    Absolutely not.

Q.    What do you base that knowledge on?

A.    That it was a -- the practice and one of the very first things that we would train volunteers about, and it wouldn't --

it's almost counterintuitive that it's an issue for folks, but we wanted to make sure that everyone knew that the SOEs over the years have been great with the idea of correcting information outside of the signature block and the date and sign block.

Q.   So then a similar question:  To your knowledge, did volunteers ever modify the date of the signature on the signed petition form?

A.   No.

Q.   And what do you base that on?

A.   Practice and observation.

Q.   And why did volunteers perfect signed petitions forms?

A.   To fulfill the intent of the signer; the voter intended to sign the petition and wanted to be counted by the State as having supported this petition, and so we were trying to perfect that intent by doing our best to ensure that the form would be valid.

Q.   And why was this important to the Clean Water campaign?

A.   Well, in large respect it was our fiduciary duty to handle these petition forms in such a manner, fiduciary duty to the voter and to the process itself, so that's why primarily it was important to us.

     Operationally, of course, we're trying to save as many petitions as possible because they're valuable.

Q.   And prior to HB 1205, were you aware of any reason not to perfect petitions?

A.   No.  In fact, it was common practice between us and the SOEs.

Q.   And what level of control does Right to Clean Water have over circulators who might fill in missing information on petition forms?

A.   If they were trained by us, that level of control; otherwise, no control.

Q.   And if permitted, would Right to Clean Water continue perfecting petitions?

A.   Yes.

        MS. SZILAGYI:  Your Honor, my next set of questions related to fines is about HB 1205's prefilled petitions provision.

BY MS. SZILAGYI:

Q.   Ms. Martin, are you familiar with HB 1205's prohibition on distributing petition forms with the voter's information prefilled on the form?

A.   I am.

Q.   What is your understanding of this provision?

A.   That any prefilled information on a form is prohibited.

Q.   And if information on a form is prohibited, what is your understanding of the consequence for the sponsor?

A.   I honestly don't remember the actual fines or penalties, but it's not good.

        MS. SZILAGYI:  We can bring up FDH Plaintiffs' Exhibit

166.

BY MS. SZILAGYI:

Q.   And so do you see the section toward the top of the page beginning with the Number 10?

A.   Yes.

Q.   Can you review that section?

(Pause in proceedings.)

THE WITNESS:  Yes.

BY MS. SZILAGYI:

Q.   And so what is your understanding of that section?

A.   It would be a $50 fine for each petition form that violated that section.

Q.   And has Right to Clean Water ever distributed petitions to potential signatories that had been prefilled with some of the voter's information?

A.   Yes.

Q.   And how did Clean Water distribute these prefilled petitions?

A.   We had an agreement with TallyED and had arranged where they would provide a link to a site where voters could access their own information and request a form be sent to them by either email or mail, and that form would be prefilled with their own information.

Q.   And so what is TallyED?

A.   TallyED is a business that provides these types of services

for campaigns, especially initiative campaigns.

Q.   And you testified that they provided a link; correct?

A.   They did, yes.

Q.   And did Right to Clean Water distribute that link?

A.   We did.

Q.   How?

A.   Primarily through all of our -- well, all of our platforms. So that included email, website, and social media.

Q.   And what was the goal of using TallyED?

A.   The goal was to access and reach certain voters that we wouldn't otherwise be able to reach to provide an opportunity for them to more easily gain access to a form that they can either print out or receive in the mail, fill out and mail in.

Q.   And when did Right to Clean Water start using TallyED?

A.   I believe it was the winter of -- so early '25, late '24. So between December, January, and February time frame.

Q.   And did Right to Clean Water stop using TallyED?

A.   Yes.

Q.   When was this?

A.   As we were approaching the likelihood of 1205, we said, Please stop.

Q.   And why was that?

A.   Because it would be a direct violation of the law.

Q.   And had Right to Clean Water planned to continue distributing prefilled petitions through TallyED for the rest of

Direct Examination – Ms. Martin

the 2026 ballot initiative cycle?

A.   We did.  We had a portfolio of ways that we would be able to, especially passively, receive signed petitions.

MS. SZILAGYI:  And, Your Honor, I expect -- I'm sorry.

BY MS. SZILAGYI:

Q.   Let me ask one more question, Ms. Martin.

Why did Right to Clean Water plan to continue using TallyED for the rest of 2026?

A.   It was cost effective.

MS. SZILAGYI:  Your Honor, I expect the next set of testimony to relate to HB 1205's provisions regarding non-U.S. citizens and nonresidents.

BY MS. SZILAGYI:

Q.   So starting with noncitizens, Ms. Martin, are you familiar with HB 1205's requirements related to U.S. citizenship?

A.   I am.

Q.   What is your understanding of these requirements?

A.   That nonresidents are not -- or noncitizens, et cetera, are not able to circulate petitions.

Q.   And are you aware of any non-U.S. citizens who collected Clean Water petitions prior to HB 1205?

A.   Yes.

Q.   How many are you aware of?

A.   One right now.

Q.   And so you're not aware of whether any other non-U.S.

citizens collected Clean Water petitions prior to HB 1205 other than one?

A.    No, I'm not.

Q.    And why not?

A.    That was not a question that we asked or we needed to ask because everyone needs the right to Clean Water.

Q.    And are you aware of any non-Florida residents other than yourself who circulated Clean Water petitions prior to HB 1205?

A.    I only believe that we did because we associated with volunteers who were not always in the state throughout the year. They would say that, you know, they'll be able to help when they are in-state again, that type of communication.

So whether or not they were residents -- I know that at least in one instance they were not -- this person was not a registered voter in Florida.

Q.    And so when you say these people spent some part of the time in state and out of state, what do you mean by that?

A.    Snowbirds.  So they would be between two states or more throughout the year.

Q.    Okay.  And so we've talked about both noncitizens and nonresidents.

Does Right to Clean Water wish to associate with noncitizens as petition circulators?

A.    Absolutely.

Q.    Why is that?

A.    Reach.  We have -- in Florida it's, like -- I don't know -- between 20 or 25 percent of Floridians are immigrants, and so we even created forms that were in the Spanish language and Haitian Creole language to reach these communities -- it was important -- and oftentimes the communities that are most endangered or suffer the most under poor or shortsighted policymaking when it comes to water and other environmental issues.  So we thought it was important to be able to reach them.

Q.    And why specifically does Right to Clean Water wish to associate with noncitizens as circulators?

A.    As circulators, they're the best spokespeople for the cause, more than someone that doesn't look or sound like them.

Q.    And does Right to Clean Water wish to associate with nonresidents as petition circulators?

A.    Yes.

Q.    Why is that?

A.    Nonresidents, to include the snowbirds or even the college students, they are in Florida for whatever reason.  They should have the right to Clean Water as well.  And every person that is -- has any connections with Florida, whether they are a full-time resident and don't leave the state at all or if they're visitors, like tourists, you know, everyone has a stake in the cleanliness and the safety of water.  So we open up that aperture pretty widely.

Q.    And bringing back up FDH Plaintiffs' Exhibit 166, which is HB 1205, I'd like to look at Section 100.37(14)(g).

So can you review that section here, Ms. Martin?

A.    Yes.

Q.    And so what is your understanding of this section?

A.    The sponsor would be held liable for $50,000 for every person we knowingly allowed to collect petition forms on behalf of us.

Q.    And so what actions has Right to Clean Water taken in response to HB 1205's noncitizen and nonresident restrictions?

A.    It was part of our re-registration process to ask those questions in the beginning of the form -- whether they are U.S. citizens, whether they are Florida residents, whether they're -- they have a felony that -- you know, they did not have their rights restored yet -- to ensure that we would do our best to comply with the statute.

Q.    And does the fact that the statute imposes a fine when a sponsor knowingly allows an individual to collect forms on their behalf in violation of the law allay any concerns you have about this fine provision?

A.    Not at all.

Q.    Why not?

A.    Well, because we don't have control over everyone that is able to collect personal-use petitions or even register with the State.  We don't know who's out there.

Q.   Okay.  So what role does Right to Clean Water, as a ballot initiative sponsor, play in the process of an individual registering with the State as a circulator?

A.   We have no role except if people wanted to register with the campaign, collect more than 25, then we tell them, You need to go register with the State.  But outside of that, we have no control.

Q.   Is Right to Clean Water made aware when an individual applies to register to circulate Clean Water petitions?

A.   Unless they tell us directly and we trust them, no.

Q.   Is Right to Clean Water made aware when an individual's application to circulate Clean Water petitions is approved?

A.   No.

Q.   So what level of control does Clean Water have over who registers to circulate Clean Water's petitions?

A.   Control?  We have zero control.

Q.   If someone registered as a circulator on behalf of Clean Water without your knowledge, would you be able to conduct your internal registration process with that person?

A.   No.

Q.   And what type of control would you have over their activities?

A.   Depending on the situation, we would -- and assuming that they're still volunteers, we would ensure that they receive the training and guidance that all ambassadors need and have for

proper advocacy of the cause and making sure that they have what they need when talking with potential signers.

Q.   To clarify, I wanted to ask if someone registered with the State as a circulator on behalf of Clean Water without your knowledge, what type of control would you have over their activities?

A.   Apologizes.  Zero control over their activities.

Q.   So pulling up Right to Clean Water Plaintiffs' Exhibit 268 -- I'm sorry.  I apologize -- 286, Ms. Martin, what is this document?

A.   This looks like a document that was an email exchange between a David Phanor and his email to the initiatives main email address.

Q.   And when was this email sent?

A.   This was sent to them on July 10, 2025, and the response from the Initiatives Office was July 11, 2025.

          MS. SZILAGYI:  I move to admit Right to Clean Water Plaintiffs' Exhibit 286 which has no objections.

          THE COURT:  Without objection, 286 is admitted.

     (PLAINTIFFS' EXHIBIT RTCW-286:  Received in evidence.)

BY MS. SZILAGYI:

Q.   Do you see where it says:  *I'm very interested in working a few of the current circulating petitions*; and then:  *I'm a noncitizen but have all the required work documents and identification*?

A.   Yes.

Q.   And do you recognize -- or apologies.

        MS. SZILAGYI:  Can we look at the email itself.

BY MS. SZILAGYI:

Q.   And who did you say sent this email?

A.   David Phanor.

Q.   Do you recognize that name?

A.   No.

Q.   Do you recognize the email address that this email was sent from?

A.   No.

Q.   To your knowledge, has this individual had any direct contact with the Clean Water campaign?

A.   No.

Q.   And which petitions does it list an interest in circulating?

A.   It looks like he was interested in circulating Florida Decides Healthcare, Florida Right to Clean Water, and Smart & Safe Florida.

Q.   Do you know if this individual became a registered petition circulator at any point on behalf of Right to Clean Water?

A.   I do not know.

        MS. SZILAGYI:  I'd like to pull up Right to Clean Water Plaintiffs' Exhibit 304.  I think it's a two-page document.

And, actually, if we could scroll to --

BY MS. SZILAGYI:

Q.   Well, first, what is this document, Ms. Martin?

A.   This is another email exchange between someone named Amed Bamba in the Initiatives Office for the State.

MS. SZILAGYI:   If we could go to the second-to-last page Bates stamp ending 48 and continuing to the next page, 49.

BY MS. SZILAGYI:

Q.   Who is this email at the bottom from?

A.   Amed Bamba.

MS. SZILAGYI:   So I'd move to admit Right to Clean Water Plaintiffs' Exhibit 304 which has no objections.

THE COURT:   Without objection, 304 is admitted.

(PLAINTIFFS' EXHIBIT RTCW-304:   Received in evidence.)

BY MS. SZILAGYI:

Q.   Do you recognize the name Amed Bamba?

A.   No.

Q.   And do you recognize the email address this email was sent from?

A.   No.

Q.   And what does this email say?

A.   The original email says -- well, introduces himself as:  *I Amed Bamba living in Miami and I want to be a petitioner but I am not citizen.  I have found your email by registering online. Can I have more information concerning the process?*

Q.   And then looking at the next email from this same account, starting at the bottom of the page Bates stamp ending 47 -- and do you see that email starting at the bottom of page Bates stamp ending 47 and continuing to the next page?

A.   Yes.

Q.   And what does that email say?

A.   It says that -- well, on August 20th, he says: *Good morning.  I have already created an account and pass the quiz successfully.  I want to circulate petition for adult person use of marijuana and right to clean and healthy water*, and provides his email.

Q.   Do you recognize the name Amed Bamba?

A.   No.

Q.   Do you recognize the email associated with this account?

A.   No.

Q.   And to your knowledge, has this individual had any direct contact with the Clean Water campaign?

A.   No.

Q.   Do you know if this individual became a registered petition circulator at any point on behalf of Right to Clean Water?

A.   No.

Q.   And what effect would a $50,000 fine have on Right to Clean Water?

A.   We would owe many thousands of dollars.

Q.   And how would that affect your campaign budget?

A.   It would immediately stop and kill us.

Q.   Why is that?

A.   Because we only -- we have less money in the coffers than that $50,000 fine.

MS. SZILAGYI:  Your Honor, my next set of questions pertains to HB 1205's provision regarding a sponsor reporting violations of law to the Secretary.

BY MS. SZILAGYI:

Q.   So, Ms. Martin, are you familiar with HB 1205's provision regarding a sponsor reporting violations of law to the Secretary?

A.   Yes.

Q.   So looking at HB 1205, which is FDH Plaintiffs' Exhibit 166, I'm looking at Section 100.371(11).

Could you review the last sentence of this section?

A.   Sure.

*If the sponsor of an initiative petition discovers a violation of this section and reports the violation as soon as practicable to the Secretary, the sponsor may not be fined for such violation.*

Q.   What is your understanding of this provision?

A.   It could go one of two ways.  The provision could be -- it could mean that once you report any known violations, we shall not be fined; and it also means we may or may not be fined, and we will never know.

Q.   And, to your knowledge, has Right to Clean Water received any guidance from the Secretary related to submitting a report under this subsection?

A.   No.

Q.   And what is your understanding of what a report under this section should entail?

A.   A report, to my understanding, is once we realize that we have, you know, violations going on such as the -- you know, violating the ten-day rule, we let the Secretary of State know as soon as possible.

Q.   And has Right to Clean Water ever reported a violation to the Secretary in an effort to avoid a fine?

A.   Yes.

     MS. SZILAGYI:  So I'd like to pull up Florida Decides Healthcare Plaintiffs' Exhibit 194.

     That's in the first set.

BY MS. SZILAGYI:

Q.   Ms. Martin, do you recognize this document?

A.   Yes.

Q.   What is it?

A.   It's an email sent to Secretary of State on September 29, 2025, from me.

Q.   Who sent the email?

A.   I did.

     MS. SZILAGYI:  And I move to admit FDH

Plaintiffs' Exhibit 194, which --

THE COURT:  Without objection, it's admitted.

(PLAINTIFFS' EXHIBIT FDH-194:  Received in evidence.)

BY MS. SZILAGYI:

Q.   Why did you send this email, Ms. Martin?

A.   It looks like we were violating the law, and under the notice provision, I owed them a report on everything that I knew and included issues of violating the ten-day rule and out-of-county rule.  I also added unknown issues because, one, we are not sure what counts as violations or what has been determined as violations.  So the definition of "violations" was unknown.

And also, I was trying to seek guidance on what level of detail they needed in this report, because there was no guidance on that.

Q.   And taking one step at a time, were you as precise as you believe you could have been about the violations you were aware of that you reported in this email?

A.   From my vantage point, yes.  That was without, you know, having a certain process in place to track all information of every petition that we touched.  You know, we know that we're -- it's hard to track all petitions, but -- especially when we are trying to push it out the door immediately, but -- can you repeat the question, because my mind trailed off?

Q.   Sure.  I can ask it in, perhaps a better way.

Are there certain situations where you may not know whether petitions submitted on behalf of Clean Water violated the law?

A.    Yes.

Q.    And why is that?

A.    Because we don't have control over all of the petitions -- the signed petitions that are submitted to the SOEs.

Q.    And so, for example, if you mail petitions to an SOE three days before the ten-day deadline, do you know whether they will be received in time?

A.    No.

Q.    So would you be able to notify the Secretary of a known violation before they arrived to the SOE office?

A.    No.

Q.    So what did you say in the last sentence of this email here?

A.    I asked for -- I asked them that they let me know what further information they may need -- or they may require at this time.

Q.    Did you receive any response to this email?

A.    No.

Q.    And so has this reporting provision in HB 1205 reduced Right to Clean Water's concerns about submitting petitions that violate the law?

A.    Not at all.

Q.    Why not?

A.   We are, again, held in limbo until we received -- receive exact guidance on what terms mean, what the process of determining certain terms entails, what the violation communication process entails, what the level of detail is required, and things like that.  And so until we have that level of detail, we are in a void of confusion.

Q.   And if you had that level of detail about what report is required, do you believe you would always know of violations of law before petitions were submitted to the SOE?

A.   Not at all.

MS. SZILAGYI:  And, Your Honor, my last set of questions pertains to Right to Clean Water's future plans to run an initiative campaign.

BY MS. SZILAGYI:

Q.   So, Ms. Martin, we've alluded to this, but did Right to Clean Water collect enough verified petitions to secure placement on the 2026 ballot?

A.   We did not.

Q.   Did Right to Clean Water suspend its 2026 campaign?

A.   Yes.

Q.   When did you do this?

A.   I believe it was in the September time frame.

Q.   And why?

A.   Because it was obvious that we did not have a viable way forward, and we did not want to exhaust our hardworking

volunteers any longer than necessary.

Q.    Why didn't you have a viable way forward?

A.    Because of the restraints and constraints of 1205, it was very obvious that there would be no functional volunteer operation, which is the crux of our viability.

Q.    And is Right to Clean Water still a registered political committee?

A.    Yes.

Q.    Will it remain registered as a political committee for the next election cycle?

A.    Yes.

Q.    And what are Clean Water's plans with respect to a 2028 initiative campaign?

A.    Highly contingent on this case, but we would love to try again.  And, again, the big year would be the off year.  So 2027 would be, you know -- ideally, if things work out in our favor, we would be able to ramp something up for that year.

Q.    And just speaking briefly about other campaigns Right to Clean Water has run, did Right to Clean Water run a campaign for the 2024 ballot initiative cycle as well as 2026?

A.    We did.

Q.    And about how many petitions did you collect in the 2024 cycle?

A.    Over -- a little over a hundred thousand.

Q.    So up until the point last year where HB 1205 was enacted,

how did the rate of collection compare in the 2026 cycle to the 2024 cycle?

A.   In the snapshot of when we initially suspended operations in May, we were ahead of when we were -- where we were in the '24 campaign.  So we expected a much bigger result, in addition to fact that we didn't have that statewide tour planned in '24.

Q.   And I would just -- if you'll permit, let me ask two follow-up questions about some of your earlier testimony.

You testified about attempting to register as a circulator when you were permitted by this Court's injunction; correct?

A.   Yes.

Q.   And did the registration process require a Florida address?

A.   Yes.

Q.   And how did this impact your ability to register?

A.   I couldn't figure out what -- you know, what address would be suitable to provide in that line, so I was stopped from being able to register.

Q.   And turning to one last topic, you also testified about being able to print blank petition forms in bulk prior to HB 1205; correct?

A.   Correct.

Q.   And are you still able to do so with your registered petition circulators after HB 1205?

A.   It wouldn't make sense because we -- we don't know who they are, and if we do know, then we would have to come up with a

local printing solution.

Q.   And why do registered volunteers have to locally print their own petition forms?

A.   Because they have the affidavit printed on their specific and special circulator petition.

Q.   Is that what requires you from not being able to print bulk blank petitions?

A.   That's correct.  So if it was just the empty affidavit without any information, it might be possible, but still it's a necessary -- I mean, it doesn't even make sense because there is so few people that were willing to register for the State -- with the State.

        MS. SZILAGYI:  Your Honor, may I confer for one moment?

        THE COURT:  Certainly.

   (Discussion between the attorneys.)

        MS. SZILAGYI:  No further questions, Your Honor.  I pass the witness.

        THE COURT:  Before I hear from -- the defense cross, let me verify.

        So during the 2024 cycle, you said it was approximately 100,000?

        THE WITNESS:  Yes.

        THE COURT:  And then how many this time just starting and suspending in May?

THE WITNESS:  We stopped -- we really didn't have very many after May, but we hit the 50,000 mark.

THE COURT:  And it's my understanding because it's also -- the parties have stipulated to it, the financial records.

It's my understanding for the lifetime of your organization you have raised less than 100,000?

THE WITNESS:  That's correct.

THE COURT:  So in terms of bang for the buck, it's less than 100,000, but for less than a hundred thousand with volunteers only, you've gotten over 150,000 signed.

THE WITNESS:  Yes, sir.

THE COURT:  I understand.  Thank you.

Cross.

MR. RABAN:  Randall Raban, Your Honor, appearing on behalf of the Secretary of State.

THE COURT:  Welcome.

                    CROSS-EXAMINATION

BY MR. RABAN:

Q.   Good morning, Ms. Martin.

A.   Good morning.

Q.   Ms. Martin, earlier you testified that you are not a resident of the state of Florida; correct?

A.   That's correct.

Q.   And you are currently a resident of the state of Florida;

is that right?

A.   Eugene.

Q.   Excuse me.  Eugene, Oregon; is that right?

A.   Eugene, Oregon, yes.

Q.   And you've lived in Oregon since 2020?

A.   That's correct.

Q.   And the last time you collected petitions in Florida was 2024; correct?

A.   Yes.

Q.   Spring of 2024?

A.   Spring of 2024.

Q.   All right.  When did Right to Clean Water suspend their campaign?

A.   In -- the first time was in May of 2025, and the second time was in the September time frame of 2025.

Q.   Okay.  So from -- so Right to Clean Water suspended their campaign the first time in May 2025?

A.   Uh-huh.  Yes.

Q.   And you hadn't collected a petition since April 2024; is that correct?

A.   That's correct.

Q.   Had you traveled to Florida or visited Florida since spring of 2024?  Or, better question, had you traveled to Florida or visited Florida from between April 2024 and May 2025?

A.   I honestly don't remember right now.

Q.   Okay.  Fair enough.

And right to Clean Water didn't keep track of the residency status of its volunteers; right?

A.   Before 1205, no.

Q.   I'm sorry?

A.   Before 1205, no.

Q.   Thank you.

So besides yourself and Ramon Bonilla, you don't really know how many Right to Clean Water volunteers were non-Florida residents; fair?

A.   That's fair.

Q.   Right to Clean Water also didn't keep track of which volunteers were U.S. citizens or non-U.S. citizens; is that right?

A.   That's correct.

Q.   So you don't really know how many Right to Clean Water volunteers were non-U.S. citizens?

A.   That's correct.

Q.   We are going to go ahead and look at Exhibit DX 1554.

(Pause in proceedings.)

MR. RABAN:  Your Honor, with your permission I'd proceed with other questions while they work on the exhibit issue and I'll circle back to this.

THE COURT:  Sure.

MR. RABAN:  Is that okay?

THE COURT:  Sure.

BY MR. RABAN:

Q.   And we are back.

Ms. Martin --

A.   Uh-huh.

Q.   -- do you see the document on your screen?

A.   Yes.

Q.   And can you see in the email below who sent the second email on this page on the bottom of this page?

A.   Yes.

Q.   Is it Liz Lindsey?

A.   It is.

Q.   And who is Liz Lindsey?

A.   She is one of the regional coordinators for the west central region of Florida.

Q.   Okay.  And did Ms. Lindsey send this email to the Division of Elections?

A.   And the Secretary of State, yes.

Q.   In the body of the email, it appears that there is a volunteer that was traveling abroad for over a month, and in this email there's concern expressed about receiving signed petitions from this volunteer after they've been traveling abroad.

Do you see that?

A.   Yes.  I haven't read it yet, but I will.

Q.   And the coordinator received these signed petitions on June 13th, 2025; is that right?

A.   That's what it says, yes.

Q.   And some of those petitions were signed before May 2nd, 2025; is that right?

A.   Yes.

Q.   So based on those dates, more than a month had passed between the time the petitions were signed and the time they were received; is that right?

A.   I'm sorry.  Say that one more time.  Apologies.

Q.   So based on the dates in the email, more than a month had gone by between the time that they had been signed and the time that they had been received; is that fair to say?

A.   It doesn't say when the petitions were signed.  I'm trying to reread it a few times to figure this out.  But it says that she just received signed petitions in the mail, which was the day before this email from a volunteer who was traveling abroad for over a month, so before May 2nd.  And that person is leaving immediately out of town again.  And Liz had told that person to send all the signed petitions to her directly so she can process them.  But I don't know when those petitions were signed.

          MS. SZILAGYI:  Your Honor, I would just object to this exhibit on hearsay and no -- lack of foundation grounds.

BY MR. RABAN:

Q.   So is there --

THE COURT:  Hold on a second.

The reaction is you're effectively reading an exhibit in that hasn't been admitted.  So I'll sustain that objection.  It needs to be admitted.  That doesn't mean you can't ask her questions about is she familiar with an incident.  If she says no, ask if it refreshes her recollection.  But you can't read something into the record that's not been admitted.

MR. RABAN:  Understood, Your Honor.  Fair enough.

So would you like me to -- I'd like to move to admit the exhibit, then, Your Honor.

MS. SZILAGYI:  Same objection.

THE COURT:  And I'm sorry.  If you could articulate your objection so he can respond again.

MR. RABAN:  Thank you.

THE COURT:  Hold on.  No, no.  She's going to articulate the objection.

MS. SZILAGYI:  Sure.  Object on the grounds of hearsay.  The individual who sent this email is not before the Court.  Ms. Martin is not on this email.  And so both foundation is lacking for that reason as well as hearsay.

THE COURT:  Why isn't it a statement of a party opponent?

MS. SZILAGYI:  Ms. Lindsey is not a corporate representative of Right to Clean Water.

THE COURT:  All right.  Your response to her objection

to hearsay?

BY MR. RABAN:

Q.   Mr. Martin, do you know --

THE COURT:  Hold on a second.

MR. RABAN:  Maybe I should trade places with Mr. Jazil, Your Honor.

So a party opponent doesn't need to be a corporate representative, Your Honor.

THE COURT:  No, it doesn't.  It has to be somebody that can speak and bind the party.  So it has to be an agent that can bind.

MR. RABAN:  Do you know this --

THE COURT:  Hold on.  So, Judge, what I'd like to do is lay the foundation and then try again.

MR. RABAN:  So you know --

THE COURT:  Hold on.  Is that right?

MR. RABAN:  I'm getting conflicting instructions.

THE COURT:  Well, I can tell you the only instructions you are going to follow are mine.  But -- and I don't mean that in a nasty kind of way.  I just meant that you can certainly -- the question is -- you want to ask her more questions, and that's fine.  So, Judge, I'm going to -- I'm not moving yet, I'd like to ask her some more questions before I move it in.  Is that --

MR. RABAN:  That's exactly what I was going to say.

THE COURT:  Perfect.

All right.  Go ahead.

MR. RABAN:  Do I need to repeat that or are we good to go?

THE COURT:  No, no, no.

MR. RABAN:  Okay.  Thank you.

THE COURT:  We are good.

MR. RABAN:  Now I'll ask my further questions.

BY MR. RABAN:

Q.   Ms. Martin --

A.   Yes.

Q.   -- do you know Ms. Lindsey?

A.   I do know Ms. Lindsey, yes.

Q.   Who is Ms. Lindsey?

I thought we'd already asked this, but please.

A.   Liz is another volunteer who represents the west central region of our campaign.

Q.   Okay.  So that is her role within Right to Clean Water is the west central region regional coordinator for the organization; correct?

A.   Right.

Q.   Okay.  So she's part of the organization and she has a prominent role in the organization; fair to say?

A.   She -- go ahead.

(Discussion was held.)

BY MS. DOLAN:

Q.    And based on this email, you trust her to ask questions to the Secretary of State and the Division of Elections; fair?

A.    That's not fair, actually.  We tightly control communications with the State, and we've counseled Liz on occasion to ensure that communications, even to SOEs, are properly discussed in the board meetings on a weekly basis, and usually those communications come from either myself or Joe Bonasia.

Q.    Understood.  Fair enough.

I'm going to move on.  So, moving on.

MS. SZILAGYI:  Your Honor, I would just like to clarify that the testimony that was read into the record has been -- will be struck as well on hearsay --

THE COURT:  I'm not striking it, but I'm not going to rely on it.  And, look, if a jury was here I'd tell them to disregard something if it was evidence they heard.  I'm not going to rely on something -- questions that were being asked for purposes of laying a foundation.  And so I'm not relying on it, and I think the appellate court would understand it's not properly before me either.

MS. SZILAGYI:  Thank you, Your Honor.

THE COURT:  Okay.

BY MR. RABAN:

Q.    Okay.  Ms. Martin --

A.    Yes.

Q.    -- moving on.

Right to Clean Water did not perform background checks for petition circulators; correct?

A.    That's correct.

Q.    So you don't really know how many Right to Clean Water volunteers were impacted by HB 1205's regulation on persons with felony convictions; right?

A.    Well, we wouldn't have asked about 1205 restraints before 1205.

Q.    So you didn't know how many individuals who were volunteers were convicted felons; is that right?

A.    Without their rights restored?  That's correct.  That's not a question that we try to burden our recruitment process with.

Q.    So you don't know how many volunteers that have felony convictions were impacted by HB 1205's provision; right?

A.    We do not know that number.

Q.    Right to Clean Water provided training for volunteers; correct?

A.    Yes.

Q.    And that training was mandatory?

A.    As mandatory as you can have a volunteer organization to have mandatory training, yes.

Q.    So if -- so did every single volunteer who circulated petitions on behalf of Right to Clean Water receive this

training?

A.    To our knowledge, yes.

Q.    To your knowledge.

And based on your experience working on ballot initiatives, you believe that training is important for petition circulators; correct?

A.    Yes.

And just to clarify my previous statements, if they were registered with us and considered themselves as ambassadors versus volunteers, they would have access to training or receive training.

Q.    And that training was provided by you directly; right?

A.    If not me, then other -- like, Joe Bonasia, who was director of operations and communications at the time, had run many meetings such as -- especially the orientation brief, the all hands -- all ambassadors meetings, and for a time the operations meeting as well.  And also he was chairing the weekly meetings.

So Joe or myself, yes.

Q.    Okay.  Before HB 1205, Right to Clean Water would perform internal quality checks for signed petitions; correct?

A.    Yes.

Q.    And checking a petition could take less than a minute; correct?

A.    Probably not.  But for experienced eyes, probably.

Q.   Okay.  How -- I think you had testified earlier that sometimes there wouldn't be a quality check on certain petitions; is that right?

A.   After 1205 we were not able to have the luxury of a quality check.

Q.   So before HB 1205 a quality check was standard for any petition that was signed?

A.   Yes, because every petition was very valuable to us.

Q.   Okay.  And in that case, depending on the experience of the individual doing the quality control check, it could take less than a minute?

A.   Yes.

Q.   And sometimes authorized agents would submit petitions to Supervisors of Elections on the same day that they were signed; right?

A.   In some cases, yes.

Q.   You had testified earlier that one of the critical components, I believe, of the mission for Right to Clean Water was to educate the public on the importance of the initiative; is that right?

A.   Yes, that's correct.

Q.   All right.  And you did so by communicating at conferences or hosting conferences and communicating directly with voters about the initiative; right?

A.   I think there's conflation between my personal interface

with folks I was getting signatures from and in general for the campaign.  But throughout, yes, all the above.

Q.   Okay.  And you would communicate the mission of Right to Clean Water in -- on your website?

A.   Yes.

Q.   And you would send out email communications; correct?

A.   Yes.

Q.   And you would engage in social media campaigns?

A.   Yes.

Q.   And you had -- and Right to Clean Water would focus on festival, fairs and places like car shows --

A.   Uh-huh.

Q.   -- with high amounts of foot traffic to engage the public and educate them about the initiative; is that right?

A.   Yes.

Q.   Is there anything about HB 1205 that would prevent you from sending out emails to inform individuals about the initiative sponsored by Right to Clean Water?

A.   Well, if you take it in whole, 1205 impacts our ability to have a viable campaign, and so, yes, it has a direct effect on our communications.

Q.   But it doesn't -- it doesn't prevent you from sending out an email informing a recipient of the email about the importance of initiative, does it?

A.   We can inform them of the importance of the initiative and

then in the same breath say, But the initiative is nonviable. So it would defeat the purpose of the communication.

Q.   Okay.  So if you chose to say it was nonviable, you could do that.  But, again, nothing prevents you from communicating the mission and purposes of the initiative for Right to Clean Water; right?

A.   We try to be truthful in our communications.  So the purpose of the communication is that there is hope in change, and that hope is in the form of this amendment and, therefore, that is -- you know, without that hope, there is no amendment and there's no need for communication.

Q.   Does anything in HB 1205 prevent you from walking up to somebody in the public and engaging them about the importance of Florida's Right to Clean Water?

A.   1205 does not impede my ability to talk to people about it, correct.

Q.   Thank you.

     Does -- and HB 1205 doesn't prevent you from posting anything on social media about the importance of the initiative; right?

A.   It's the same thing, reverting back to my earlier answer.

Q.   So talking -- again, I know we've talked about the suspension of the campaign, but I want to talk about the 2024 campaign just briefly.

A.   Sure.

Q.   So Right to Clean Water did try to get on the ballot for the 2024 cycle; correct?

A.   That's correct.

Q.   And the number of petitions gathered for that campaign were approximately 100,000 valid petitions; right?

A.   That's correct.

Q.   And the number of petitions that were gathered from September of 2023 until February 1st of 2024, that information is available on the Department of State website; correct?

A.   Yes.

     I'm sorry.  Can you say that one more time?

Q.   Sure.

A.   In my mind I was answering a question I thought I heard, but I just want to confirm.

Q.   Sure.  And I'll speak slower.

A.   Thank you.

Q.   Before Megan tells me to.

     And so --

     THE COURT:  That is Ms. Hague to you.

     Just trying to enter a little levity into it.

     MR. RABAN:  Thank you.

BY MR. RABAN:

Q.   So again, we've already established that Right to Clean Water attempted to get on the 2024 ballot; correct?

A.   Uh-huh.

Q.    And that it was not successful because it only obtained about 100,000 valid petitions; correct?

A.    Yes.

Q.    And the information regarding the number of petitions that were gathered from September 1st, 2023, until February 1st, 2024, is available on the Department of State's website; is that right?

A.    That is not right.

Q.    Okay.  Help me understand why not.

A.    Because they post the culminating amount of petitions. They don't post, like, a bracketed range of time for, you know, how much you had during this month, that month, that month, that month.

Q.    Do you have the information on how many petitions were gathered between September 1st and February -- September 1st of 2023 to February 1st of 2024?

A.    No.

Q.    You don't have that information?

A.    I don't have the information beyond recollection and impression of what we were witnessing.

        MR. RABAN:  Okay.  No further question, Your Honor.

        THE COURT:  Any other defense lawyers?

        And let me pause there briefly.

        Mr. Raban, good job.  For all the lawyers, you certainly can confer with co-counsel; that's entirely

appropriate.  And I just want to explain what I was doing before.

I wasn't suggesting you couldn't talk to co-counsel. What I was saying is in terms of the record I needed to just ask Mr. Raban, Are we still seeking to admit it, or are we asking some additional foundation questions?  That's all that I was saying when I said that I would -- it would be my decision what the process was.  I was in no way suggesting that y'all can't confer with co-counsel.  I would expect y'all to do that. That's entirely appropriate and keep doing it, okay?

MR. RABAN:  Understood, Your Honor.

THE COURT:  And so -- and just -- and I'm not trying to say you're a younger lawyer, Mr. Raban, but you are.

But for all the lawyers in the courtroom, I mean, there's more than one way of getting things, in and if at first you don't get it in, then you can certainly try again, and I promise I'm not going to bark at you.  I just want to make it clean what we're trying to do for the record; okay?

All right.  Counsel, you can proceed with your cross.

CROSS-EXAMINATION

BY MS. HARDY:

Q.   Good morning.

A.   Good morning.

THE COURT:  But I will say one last word.  Mr. Raban, your questions were easy to follow, thoughtful.  The court

reporter didn't want to strangle you and so good job.  It's not everybody that's asked questions in front of me have I been able to easily follow what they were asking; okay?

MR. RABAN:  Thank you, Your Honor.

THE COURT:  Thank you.

Counsel, you can proceed.

BY MS. HARDY:

Q.   Good morning.  Maryssa Hardy for the Attorney General.

So I just wanted to clarify a few points with you.

So you stated that you did not get enough signatures for the 2024 campaign; correct?

A.   That's correct.

Q.   And 1205 wasn't in effect at that time?

A.   That's correct.

Q.   And back to earlier, you talked about sending batches.

You would prefer to send larger batches as opposed to smaller batches when you receive petitions; correct?

A.   For two reasons.

Q.   Okay.  So when you receive petitions, you would hold them until you had a large enough batch to send to the Supervisors?

A.   Depends on the county.

Q.   But in certain counties you would hold the batches until you got a larger batch?

A.   In at least one county they had asked for us to wait until we got to 100 before submitting them and -- but other counties

are -- you know, usually the batches would be between 20 or 50.

Q.   So in either situation, you're just holding them until you get the requisite number; correct?

A.   Before 1205, yes.

Q.   Okay.  And you testified earlier that people generally don't change information on petitions; correct?

A.   Well, before 1205, only if it's necessary and it was correctable, but after 1205 there was zero perfecting.

Q.   And that was only based on the registered ambassadors that you regularly speak with; correct?

     (Reporter requested clarification.)

BY MS. HARDY:

Q.   Circulators that you speak with?

A.   That's based on my knowledge of all things.

Q.   But you haven't spoke with all volunteers that circulate petitions on behalf of Clean Water?

A.   Right.  Some of them I don't know.  Some of them are just not associated with the campaign.  Some have been in the past but aren't at the time that we need them.  You know, it varies, so it's not a 100 percent control measured issue.

Q.   Okay.  And the email that you -- the emails that you reviewed earlier on direct, you stated that you sent those emails to a registered ambassador; correct?

A.   Correct.

Q.   So you did not send those to all volunteers?

A.    Well, we -- that particular email went to the registered volun -- the registered ambassador list that we had a list of.

We did have a similar request for information and feedback that was pushed out over email our website and on social media.

Q.    But it's fair to say you didn't speak with all volunteers?

A.    That is fair to say.

Q.    Okay.  And you stated that on a similar point you have volunteers that collect the petitions for you, but there was really no supervision over them?

A.    That's correct.

Q.    Okay.  So they didn't experience any training that the registered ambassadors received; right?

A.    Before 1205 there wasn't a need because it was basically obvious that you -- if you believed in the cause and you wanted to see it happen, meaning qualify for the ballot, then you would circulate petition signatures.  And on the form it says "Send to Fort Myers," and you would have done your bit.

So I -- we don't have control over those types of spontaneous actions.

Q.    But they received no training or guidance on how to properly collect petitions; correct?

A.    Not from us.  They might have if they were associated with an organization that did have experience, so unknown.

MS. HARDY:  Those are all my questions.

THE COURT:  Thank you.

MS. SZILAGYI:  Just a couple questions.

THE COURT:  Redirect.

REDIRECT EXAMINATION

BY MS. SZILAGYI:

Q.   Ms. Martin, you just testified on cross about -- or that HB 1205 doesn't impede your ability to speak about the Right to Clean Water.

Is speaking about the initiative while circulating petitions different from speaking about the initiative in other ways?

A.   Yes.

Q.   Why is that?

A.   Because the -- when you're speaking with something actionable at the time with -- you know, considering the inconvenience you're asking of the person you're talking with to please stop and listen, you want to have worth and value of that time for that person by having the action available at that -- at that time and place.

So that's different than every other communication that's unilateral that you may or may not receive interchange from. Like on social media, you might have some comments, you know, but it's nothing as powerful as being able to say, There is a problem; here is the solution; you can do it now.  And that is exactly what we need and exactly what 1205 took away from us.

MS. SZILAGYI:  No further questions, Your Honor.

THE COURT:  You can step down.

Thank you.

THE WITNESS:  Thank you.

(Ms. Martin exited the witness stand.)

THE COURT:  Who is being called as the next witness?

MS. NEAL:  Hello, Your Honor.  Mel Neal for the Right to Clean Water plaintiffs.

I'm calling Cynthia Haller next.

THE COURT:  Just so I'll know, Ms. Neal, how long do you expect with Ms. Haller?  And I'm not limiting anybody; I'm just asking for planning purposes.

MS. NEAL:  Approximately an hour.

THE COURT:  All right.  Very good.  Let's bring in Ms. Haller.

That was just a more cryptic way of asking, Y'all believe y'all can get Ms. Haller on and accommodate Mr. Wermuth's request to do Mr. Herron's testimony today?

MS. NEAL:  Yes, Your Honor.

THE COURT:  That's all I was asking.

Thank you.

(Ms. Haller entered the witness stand.)

THE COURT:  Ms. Hardy, do I have this right, you're on deck to do the cross?  Is that right, ma'am?

MS. HARDY:  Yes, Your Honor.

THE COURT:  All right.  Thank you.

Ma'am if you'll remain standing, raise your right hand, my courtroom deputy is going to swear you in.

**CYNTHIA HALLER, PLAINTIFFS' WITNESS, DULY SWORN**

THE COURTROOM DEPUTY:  Please state your name for the error.

THE WITNESS:  Cynthia Haller.

THE COURT:  Please take your seat, ma'am.

MS. NEAL:  Good morning, Your Honor.  I'm calling Cynthia Haller to testify about Right to Clean Water's claims regarding the volunteer circulation -- circulator registration requirement, circulator affidavit, personal-use petition, and HB 1205's fines.

I expect her testimony will go to Claims One, Two, Three, Five, and Seven of Right to Clean Water's operative complaint.

THE COURT:  Thank you.

You may proceed, Counsel.

DIRECT EXAMINATION

BY MS. NEAL:

Q.   Good morning, Ms. Haller.

A.   Good morning.

Q.   Are you familiar with the ballot initiative sponsor FloridaRightToCleanWater.org, also known as Florida Right to Clean Water?

A.   I am.

Q.   How are you familiar with Florida Right to Clean Water?

A.   I have been a volunteer helper ambassador with the Right to Clean Water petition gathering.

Q.   Do you have a position with Florida Right to Clean Water?

A.   Can you repeat the question, please?

Q.   Do you have a position with Florida Right to Clean Water?

A.   Yes.

Q.   What is that position?

A.   Volunteer helper ambassador.

Q.   What does the role of ambassador entail?

A.   Educating voters about the petition amendment.

Q.   Is the role of ambassador a paid position?

A.   It is not.

Q.   When did you first become involved with Right to Clean Water?

A.   With the 2024 petition drive.

Q.   How many initiative cycles have you circulated petitions for Right to Clean Water?

A.   Two.

        MS. NEAL:  For the Court, I expect the next portion of Ms. Haller's testimony to address our own circulation activities and the burden that HB 1205 imposes on those activities.

BY MS. NEAL:

Q.   Since HB 1205 was enacted in May 2025, have you circulated petitions for Florida Right to Clean Water?

A.   I have not.

Q.   So let's talk about your petition circulation activity before HB 1205.

What counties have you collected petitions in person for Florida Right to Clean Water?

A.   In Seminole County, Volusia, Orange and Collier.

Q.   Why those counties?

A.   I have -- I live in Seminole, and I have friends and family in the other counties, and I went to Orange County to different events to collect petitions.

Q.   How many petitions have you personally collected for Right to Clean Water?

A.   Hundreds.

Q.   About how many petitions did you personally collect for the 2026 petition cycle?

A.   Roughly about 200.

Q.   Where do you typically collect petitions?

A.   With friends and family, my neighbors, church family, and at the different events that I went to collect.

Q.   What kinds of events do you circulate petitions at?

A.   I went to Alive at Five in Sanford, Sanford Porch Fest, the Fourth of July celebration in Geneva, the Vegan Festival in Orlando, the Earth Day Festival, different events like that.

Q.   Can you walk me through what typically happened while you were out circulating petitions?

A.    I would approach people who I -- you know, hopeful voters -- not everybody is a registered voter -- and introduced myself with my first name and hand a petition clipboard to them and then educate them about the petition, stating that basically I'm a helper with a grassroots nonpartisan petition to get the right to clean and healthy water on the Florida ballot for voters to vote on.

Q.    And you said you hand the petition form to the voter.

When do you hand the petition form over?

A.    At the beginning of the conversation.

Q.    What did you generally talk about with voters?

A.    That I live in -- you know, I'm a Florida resident.  It's for Florida resident voters for the petition drive, that it's important to get the petition on the ballot, that it required hundreds of thousands of petitions to get it on the ballot, and, you know, ask them, of course, if they are registered to vote in Florida and to let them know about -- you know, that I was well aware from different people and just from my own reading about the different issues with Florida water from the huge amount of manatee deaths that we had in the state, especially in the Indian River Lagoon; that we had issues with red tide, the blue algae; that the state really needs the right to clean and healthy petition drive, and things like that.

Q.    Did voters ever ask you questions about the Right to Clean Water amendment?

A.    They did.

Q.    What questions did voters ask you about the Right to Clean Water amendment?

A.    Did their signing a petition make a difference; when would it be -- when would they see it on the ballot to vote for; did -- you know, like, how many petitions had already been collected; you know, what would getting it on the ballot -- how would it help the state, you know, with clean water.

Q.    Did you ever observe a voter who initially seemed reluctant to sign the petition but then after a conversation decided to sign it?

A.    I did.

Q.    If someone was on the fence about signing, did you have a message for them?

A.    Yes.

Q.    What was that message?

A.    Well, I remember a specific situation -- or conversations being at the Fourth of July celebration in Geneva where I was talking with voters.  And, of course, I always had the full text amendment with me because I knew that was required.  So it was -- you know, just gave more specifics about the terms regarding the petition.  And I would let them know that it's nonpartisan, that I'm a conservative Republican in Seminole County, and I was, you know, volunteering my time because I felt it was very important to get this nonpartisan

petition on the ballot.

Q.    You testified earlier that you educate voters?

A.    Yes.

Q.    How do you educate voters about the Right to Clean Water amendment?

A.    That it's grassroots; it's nonpartisan; that hundreds of thousands of petitions are needed.  I showed them the -- obviously gave them the petition to review and then offered the full text amendment.

I also had, like, a picture printout of the FWC taking the manatee -- dead manatee out of the Indian River Lagoon; that information on the -- sorry -- the number of impaired body waters in the state and also the two -- well, depending on what cycle I was helping with, I had put op-eds ads in the *Orlando Seminole* circulation.  So they had published those for me.

And that -- so I had that printout, but I had -- so those articles were okay, but I also had an article from *Florida Sportsman*.  It was amazing.  So my family is basically a fishing family, as well as my husband's family.  So clean water is really important to us and for the industry also.  So I had that article, and I had those -- that information printed out with me that I would hand to voters.

Q.    Based on your experience circulating the Right to Clean Water petition, do you think voters understood that you were expressing a particular message?

A.   Yes.

Q.   What was that message?

A.   The message was that this was a ballot initiative that was citizen lead, basically, to get it on the ballot so that they could -- you know, voters could vote on it in the state, and it was really important to sign the petition to help with the, you know, gathering because there was so many hundreds of thousands needed according to the state law to get it on the ballot.

Q.   Before HB 1205, did you ever carry the Right to Clean Water petition with you when you were not at events for Right to Clean Water?

A.   I did.

Q.   Where did you carry the petition?

A.   Pretty much everywhere.  I had took it into work.  I used to work in physical therapy.  And I also took it into restaurants.  I would talk to the servers if there was time.

Q.   Did a server ever sign the petition on the spot?

A.   They did.

Q.   Did the number of opportunities you had to share your message about Florida Right to Clean Water's amendment change after HB 1205 became law?

A.   Yes.

Q.   How did the number of opportunities you had to share your message change?

A.   Well, I used the petition as a way to initiate conversation

with voters, and because I wasn't gathering -- or I was not gathering petitions after that law was signed, I didn't have the petition to start conversations with people.

Q.   Has HB 1205 limited your ability to connect with other Right to Clean Water members?

A.   Yes.

Q.   How so?

A.   Well, I also used to engage many hours -- my husband definitely would attest to that -- with online meetings, Zoom meetings with leadership of Clean Water, and just in talking about the language, talking about the importance of never touching the voter's signature and date signed.  And, obviously, I wasn't -- I didn't engage in that after House Bill 1205.

          MS. NEAL:  For the Court, my next questions of Ms. Haller are relevant to Right to Clean Water's claims related to the provision of HB 1205 that prohibits individuals from filling in missing information on a petition form.

BY MS. NEAL:

Q.   Ms. Haller, are you familiar with the process of individuals filling in missing information on a petition form?

A.   I am.

Q.   What does Right to Clean Water call that process?

A.   Perfecting petitions.

Q.   What does the process of perfecting entail?

A.   Looking over the petitions for inaccurate -- any inaccurate

information.

Q.    What information could you fill in on the form?

A.    So every -- well, not everybody -- not the voter's signature or date signed, but, say, you know, there was address information and where they ask for county, for some reason, people would -- some people would write "USA" thinking it said "country."  And I would just look at the city, and, obviously, in Seminole County I know where their cities are, and so I would cross off "country" and put just "Seminole."

Q.    Prior to HB 1205, did you perfect signed petition forms?

A.    I did.

Q.    Why did you perfect petitions?

A.    Because petition gathering is -- is pretty difficult, and I wanted the petitions to count.

Q.    Who told you to perfect petitions?

A.    The Right to Clean Water leadership went over what was the proper way of how to do that.

Q.    Before HB 1205, was it common practice to perfect petitions?

A.    Yes.

Q.    After perfecting, what did you do with the signed petitions?

A.    I would separate them into the different counties to make sure that they could get to the Supervisor of Elections office.

MS. NEAL:  For the Court, my next questions to

Ms. Haller are relevant to Right to Clean Water's claims related to the volunteer circulator registration requirement and affidavit requirement.

BY MS. NEAL:

Q.   Ms. Haller, are you familiar with HB 1205's requirement that anyone who plans to circulate more than 25 petitions other than through their own immediate member family members must register with the State to circulate petitions?

A.   Yes.

Q.   What is your understanding of this registration requirement?

A.   That your name and address would become public record; that if you had more than 25 petitions, you could -- if you weren't registered, it could be a felony.

Q.   Have you registered as a circulator since HB 1205 became law?

A.   I did not.

MS. NEAL:  I'd like to pull up Right to Clean Water Plaintiffs' Exhibit 75.

Your Honor, may I approach the witness with a paper copy?

THE COURT:  You may.

BY MS. NEAL:

Q.   Ms. Haller, what is this document?

A.   The Constitutional Amendment Initiative Petition Form For

Petition Circulator Use for the right to clean and healthy water.

MS. NEAL:  Your Honor, I move to admit Right to Clean Water Exhibit 75.  There are no objections to this exhibit.

MS. HARDY:  No objection, Your Honor.

THE COURT:  Without objection, Exhibit 75 admitted.

(PLAINTIFFS' EXHIBIT RTCW-75:  Received in evidence.)

BY MS. NEAL:

Q.   Ms. Haller, is this the version of the form that you used?

A.   It is not.

Q.   Is this a post-HB 1205 petition form?

A.   It is.

Q.   What form did you use?

A.   I used a form that did not have the driver's license or social security number and did not have petition circulator affidavit.

Q.   Do you see the box labeled "Petition Circulator Affidavit"?

A.   Yes.

Q.   Do you see the name and address lines on this form?

A.   Yes.

Q.   Was that on the form that you used?

A.   No.

Q.   How would you feel if your name and address were printed on the circulator affidavit petitions you circulated?

A.   Uncomfortable and that it's a potential risk to my

security.

Q.    Okay.  We'll come back to that.

Do you see the "Notices" box?

A.    Yes.

Q.    Can you please read aloud the first bullet point in the "Notices" box?

A.    *This form becomes a public record once filed with the Supervisor of Elections.*

Q.    What does that indicate to you?

A.    That one's name and address would become public record.

MS. NEAL:  We can take this exhibit down.

Thank you.

BY MS. NEAL:

Q.    You testified earlier that you have not registered to circulate petitions with Right to Clean Water since HB 1205 became law.

Why not?

A.    Because I didn't -- well, I have a family, and I don't live in a gated community in Seminole County, and I didn't want the risk of just, you know, general public having access to my name and address.

Q.    And to clarify, those fears you just expressed was that you -- would that have happened as a result of you registering with the State to circulate petitions?

A.    Yes.

Q.    Why don't you want to share your name and address on the petitions you circulate?

A.    Privacy concerns and risk of harassment or possibly vandalism.

Q.    Why is your address privacy important to you?

A.    Because I love and care for my family and I just -- I don't want anything bad to happen.

Q.    What efforts do you take to protect the privacy of your address?

A.    So when I'm done reading magazines, like, you know, I receive in the mail, and I want to -- I just don't want to throw them away or recycle them.  I like to take them in to where I worked, like an assisted living facility and nursing home where I used to provide therapy services.  I would cut my name and address off.

     And, also, another recent example, I received a postcard from Seminole County about SB 180.  I was involved in the rural -- creating a rural enclave near my residence.  And the county sent a postcard about why they had to stop working on the rural enclave because of Senate Bill 180.  So I wanted to add that to Facebook, and I took photos of the postcard and I whited-out the -- or whatever color it was.  You know, just, like, made sure that somebody couldn't read my name and address before I put it up there, because if I want somebody to have access to my address, I will give that information to them.

Q.    Have you ever felt fearful of a potential signer while circulating the Florida Right to Clean Water petition?

A.    I have.

Q.    What happened?

A.    I was in Orange County.  I believe it was the -- an Earth Day festival.  And I approached a couple of males and introduced them -- you know, introduced myself with my first name, handed them the clipboard that had the petition on it, and was discussing -- started to discuss that I was collecting, you know, from signed voters -- excuse me -- registered voters.  And I was -- their body language and their language was suspect, and I was uncomfortable with that.  And I decided to back away from that situation just for my general well-being, get back to a bigger group of people where, you know, it was safe.

Q.    Did they say anything to make you feel fearful or unsafe?

A.    They did, but I don't recall the exact language.

Q.    At that time was your name or address on the petition you were circulating to those individuals?

A.    It was not.

Q.    How would you feel knowing the petition you had circulated and handed to them had your name and address on it?

A.    Uncomfortable and fearful and possibly feeling that something not good could happen.

Q.    And what do you mean by that?

A.    I -- everybody out in the public is not, you know, a great

person, so you don't always know who you are talking to.  So, I mean, possible physical harm, I mean, maybe harassment at my house, possible vandalism.  I just -- there's risks I'm not willing to take.

Q.   If not for HB 1205's registration requirement and your name and address being listed on the circulator affidavit, would you have continued collecting petitions for the Florida Right to Clean Water ballot initiative?

A.   Yes.

        MS. NEAL:  For the Court, my next questions to Ms. Haller are relevant to Right to Clean Water's claims related to the personal-use petition.

        Can we please pull up Right to Clean Water Plaintiffs' Exhibit 69?

        And, Your Honor, may I also approach?

        THE COURT:  You may.

BY MS. NEAL:

Q.   Ms. Haller, what is this document?

A.   It is the Constitutional Amendment Initiative Petition Form, For Personal Use Only, for the Right to Clean and Healthy Waters.

        MS. NEAL:  Your Honor, I move to admit Right to Clean Water's Exhibit 69, which had no objections to it.

        THE COURT:  Without objection, 69 is admitted.

        (PLAINTIFFS' EXHIBIT RTCW-69:  Received in evidence.)

BY MS. NEAL:

Q.   Ms. Haller, do you know who would use this form?

A.   A person collecting petitions for Clean Water.

Q.   Would that person be a volunteer or a registered circulator?

A.   A volunteer.

Q.   This is a post-HB 1205 form?

A.   Yes.

Q.   Can you please read aloud the text in the box labeled "For Personal Use"?

A.   *This form is for personal use only.  Unless registered as a petition circulator, it is a third-degree felony to collect, deliver, or otherwise physically possess more than 25 signed petition forms in addition to your own or those of immediate family members.*

Q.   What is your understanding of what happens if you circulate more than 25 petitions as an unregistered circulator?

A.   That you could possibly maybe face jail time or be charged with a third-degree felony.

Q.   Has that potential felony liability deterred you from circulating petitions for Right to Clean Water as an unregistered circulator?

A.   Yes.

Q.   Why?

A.   I am a gun owner in the state of Florida.  I also carry a

concealed carry permit. I do not -- I know we don't need one, but there are advantages to having a concealed carry permit, and I do not want a felony to destroy that right I have.

MS. NEAL: Your Honor, may I confer with --

THE COURT: You may.

(Discussion between counsel.)

MS. NEAL: Your Honor, I have no further questions. I'll pass the witness.

THE COURT: One moment, please.

(Pause in proceedings.)

THE COURT: Cross-examination.

CROSS-EXAMINATION

BY MS. HARDY:

Q. Good morning.

A. Good morning.

Q. My name is Maryssa Hardy for the Attorney General.

So you testified today that you do not want to register your -- you do not want to register because you do not want your information to be public record; correct?

A. Correct.

Q. Isn't it true that your information -- some of your personal information is already publically available?

A. Correct.

Q. And next you testified that you have a fear of harassment and vandalism in connection to your information being

registered; correct?

A.   True.

Q.   Have you ever experienced harassment or vandalism in connection to the Right to Clean Water initiative?

A.   No.

Q.   And you also stated that you have a fear of harassment from giving a form to a stranger that has your information on it; correct?

A.   True.

Q.   But isn't it fair to say that you could talk to a potential voter, see if they want to sign the initiative, and then give the form to them once they've agreed to sign and that there is not a danger?

A.   I suppose.

Q.   And you also testified today that during your circulating process you intend to express your message about the Clean Water initiative; correct?

A.   Can you repeat the question, please?

Q.   During -- while you're gathering signatures you intend to express your message about the Clean Water initiative; right?

A.   Yes.

Q.   And that involves sharing your personal testimony, sharing your articles, op-eds, and things like that?

A.   Yeah, sometimes.  I have that information with me, and sometimes I would share, yes.

Cross-Examination - Ms. Haller

Q.   Okay.  And nothing in 1205 prevents you from doing any of those; correct?

A.   I suppose.

Q.   You also testified that you may attend events and inform people about the initiative there; right?

A.   Yes.

Q.   And nothing prevents you from attending those events and doing what you were doing before?

A.   Well, I'm not collecting petitions at events.  So I use the petition basically as a -- to initiate a conversation with voters.

Q.   Okay.  So you could, for example, take a blank petition and initiate a conversation and talk about the initiative at a community event; correct?

A.   I suppose.

Q.   Okay.  And you testified today about minor errors that people may list on forms and that you would usually correct the county; correct?

A.   True.  Yes.

Q.   So isn't it fair to say that you could -- while they are filling out the form, you can emphasize that they need to correctly list the county and not the country since you said that it's a common issue?

A.   So I try to tell people -- you know, to give them the information to put down, and they're not always, you know,

listening to every word you say to follow it.  And you don't -- you know, you're engaging people who are busy for a couple of minutes, so it's not like you're checking over, like, a homework paper.

You know, it's easier to do a perfect -- perfecting petitions when you're in your own house and you're sitting down at the table, not while you are just talking with somebody. You're asking them, basically, to do something for the drive. So it's just to have a positive interaction.  It's not like you're looking to correct in front of them.

Of course you want somebody to put down all the information, but, I mean, this is, you know, people we are talking about.  They don't always do that.

Q.   Okay.  Well, before they walk away, you make sure that the signature and date is correct; right?

A.   Oh, signature and date was always something that they needed to list, yes.

Q.   So it's fair to say that as you check for the signature and the date, you can also check for the county?

A.   So because there's hundreds of thousands of petitions required, it was not -- your goal -- my goal, right, was try to collect as many petitions as I could and not spend -- you know, overspend too much time with one particular person.

Q.   But isn't the goal to get the correct information on the form?

A.   It is.  Agree.

Q.   Moving on.  So when you collect petitions, is there a specific time period where you would then send them to the appropriate next point of contact?

A.   Yeah.  I mean, I'm a wife, a mom, worked in physical therapy, did this as a volunteer.  So I would, like -- once I got maybe -- I don't know -- I think the first drive probably 100, then I would separate -- you know, separate them out and get them to where they needed to be.

Q.   Okay.  So --

A.   Could you repeat the question again?  Timewise I'm not sure I understand.

Q.   I was asking about the time period, but you answered -- you answered my question that you would usually wait until you have about 100 and then you would --

A.   Yeah.  I wasn't -- I didn't feel stressed to get them in under, like, a certain number of days.

Q.   Okay.  So until you reached about 100, they would -- you would just have them in your house and then --

A.   Right.

Q.   -- at a 100 you would then send them off?

A.   Right.

Q.   One second.

I guess my last question.  So you testified that you were not comfortable giving them -- giving any voter a form with your

information on; correct?

A.    Correct.

Q.    But you could give them a personal-use form; right?

A.    Yes, I guess you could, uh-huh.

Q.    And sorry.  I did have other questions.

You testified about the 25-petition liability.

And you're afraid of criminal liability from that provision; correct?

A.    Agree.

Q.    But would you agree that that criminal liability only incurs when you reach beyond 25 petitions?

A.    Yes, but my goal, obviously, as a petition gatherer, because so many were needed, was to get many more than that.

Q.    Okay.  But you could collect less than 25 without being a registered circulator; correct?

A.    Correct.

MS. HARDY:  May I confer with --

THE COURT:  Certainly.

(Pause in proceedings.)

MS. HARDY:  No further questions, Your Honor.

MR. JAZIL:  Your Honor, if I may briefly ask a couple of questions?

THE COURT:  You're a different defendant; right?

MR. JAZIL:  I am, Your Honor, but I want to be mindful of the time.

CROSS-EXAMINATION

BY MR. JAZIL:

Q.   Hello, ma'am.

     Mohammad Jazil for the Secretary of State.

     Ma'am, did I hear you say that you've drafted and published op-eds regarding the Right to Clean Water initiative?

A.   I did.  I did two of them.

Q.   Okay.  And you published those in the *Orlando Sentinel*?

A.   Yes.

Q.   And the *Orlando Sentinel*, you'd agreed with me, is a major newspaper in Central Florida?

A.   I would agree that is true.

Q.   And again, ma'am, just so the record is clear, these are op-eds about the Right to Clean Water initiative; right?

A.   Yes.

Q.   And they were published in your name; right?

A.   Yes.

Q.   And did you also publish something about the initiative in the *Florida Sportsman*?

A.   I did not.  It was an article somebody else had published, but I thought it was very well done.

Q.   Okay.  Ma'am, when you participate in these events -- these high-traffic events -- you mentioned a July 4th celebration.  Do you recall that?

A.   I do.

Q.   And when you walk up to someone at one of these events, do you introduce yourself to them?

A.   Yes, with my first name.

Q.   And you also tell them that you are a conservative voter from Seminole County; right?

A.   It depends.

Q.   But sometimes you do?

A.   I did, yes.

Q.   Do you wear a name badge at all when you have these interactions saying "Cynthia Haller from Right to Clean Water"?

A.   No.

Q.   Is your name written on any of the clipboards that you might have with you?

A.   No.

Q.   And, ma'am, you're the ambassador for Right to Clean Water. That's a title?

A.   Yes.

Q.   And who do you report to up in your chain of command as ambassador?

A.   There was a -- depending on the county -- what they called, like, a county captain and then a regional director.

Q.   Okay.  So your chain of command is a county captain and then a regional director; right?

A.   I guess if you're looking at, like, an org chart --

Q.   Yes, ma'am.

A.   -- an ambassador would be, like, a lower -- lower echelon, right, and then report to, like, a county captain.

Q.   And then the county captain would report to the regional coordinator?

A.   Regional director, yes.

Q.   But you as the ambassador were trusted to talk to voters about the initiative; right?

A.   Yeah.  I was educated on different aspects about the initiative and then, yeah, sure, trusted to get petition signatures, right.

Q.   And if voters had questions about the Right to Clean Water initiative, you were trusted to answer those questions about the Right to Clean Water initiative; right?

A.   Yeah.  I pretty much -- I mean, I'm not a lawyer, but I would try to educate or answer the questions as best I could.

Q.   And if you had questions or concerns that a voter had raised, would you go up your chain of command to figure out what the answer would be?

A.   Yeah.  I mean, depending on time, sure.  I mean, if a neighbor had a question, somebody who I see a lot, you know, I could get back to them; but if I'm just out at an event talking to people, I really can't get back to people because I don't know that person.

Q.   Understood.

     And did you ever go and ask your regional coordinator --

A.   Director.

Q.   -- director questions?

A.   Sure.

Q.   And did they provide you answers?

A.   Yes.

Q.   And to your understanding, was the regional director speaking for the organization when answering your questions?

A.   Yes.

MR. JAZIL:  No further questions, Your Honor.

Thank you.

THE COURT:  Redirect?

REDIRECT EXAMINATION

BY MS. NEAL:

Q.   Hi, Ms. Haller.

A.   Hello.

Q.   The op-eds you published, was your personal residential address in those op-eds?

A.   No.

Q.   You testified earlier that you begin the interaction with a voter by handing the petition to them.

Do voters ever grab the petition before you can actually have a conversation about the amendment?

A.   Sometimes they were on clipboards, and sometimes I just had them free.  But, yeah, they would take it because you're having an interaction.  It's kind of like, Oh, what's -- you know, what

do you have for me?

Q.   So it's possible someone could grab the clipboard before you've been able to ascertain their views about the Right to Clean Water initiative?

A.   Oh, absolutely.

Q.   And you testified earlier that -- how many petitions you've circulated during the 2026 ballot initiative.

     Did that number exceed 25?

A.   Yes.

Q.   So is it fair to say you've reached the 25 limit already for the 2026 ballot initiative?

A.   Yes.

          MS. NEAL:  No further questions, Your Honor.

          THE COURT:  Thank you.  Ma'am.  You can step down.

          THE WITNESS:  Okay.  Thank you.

     (Ms. Haller exited the witness stand.)

          THE COURT:  Counsel, if you want to retrieve your exhibit, please, that is the hard copy.  Thank you.

          We are not going to start a witness ten minutes before noon.  My understanding is witness Number 11 is Michael Herron, and we'll start with Michael Herron after lunch.

          Is that correct, Mr. Ritter?

          MR. RITTER:  That's correct, your Honor.

          MS. NEAL:  Your Honor, one housekeeping.  I would like to ask that Ms. Haller be allowed to remain in the courtroom

after sequestration, and now that she's testified we don't plan to call her again.

THE COURT:  Anybody planning on recalling her?

Hearing nothing.

MS. HARDY:  No objection.

THE COURT:  All right.  So she can remain in the courtroom.  Since she's not being recalled, she's is no longer subject to the rule of sequestration.  She can't talk to anybody else, but she's free to be here now.

MS. HARDY:  Thank you, Your Honor.

THE COURT:  That is, she can't talk to any other witnesses that are going to testify, but she certainly can remain in the courtroom.

All right.  We'll come back at 1:00 o'clock.

I thank you everybody for their patience and hard work this morning.  So we are back at 1:00 o'clock.

I'll remind you you can leave anything in the courtroom you want to leave in the courtroom, anything in the witness rooms you want to leave in the witness rooms.  And I'll see you back at 1:00 o'clock.

Thank you.

(Recess taken at 11:49 AM.)

(Resumed at 1:02 PM.)

THE COURT:  All right.  We are back on the record.

It's my understanding the plaintiffs' next witness is

Michael Herron.

MR. WERMUTH: That's correct. Florida Decides Healthcare plaintiffs call Michael Herron to the stand.

MS. PRICE: Thank you, Your Honor.

Defendants object.

About 12:30, 30 minutes before Dr. Herron is supposed to testify, we received one paper copy of a demonstrative exhibit. We have no electronic copy, have no ability to do any kind of control-find search.

It purports to have information, some of which is from his reports, some of which is from the interim report. There are slides that contain at least one information that I've never seen before since this data was not part of the expert report, nothing Dr. Herron testified about. I haven't been able to verify its accuracy.

There are a number of other slides which purport to contain data from both the interim report and the expert and combine it in a new method. I haven't been able to check that data and put that together.

You know, it's highly prejudicial. It's not reasonable for me to get this 30 minutes before his testimony when I'm trying to prepare.

THE COURT: Counsel.

MR. WERMUTH: The matters reflected that I'm going to cover in my discussion with you are direct quotations from the

OECS reports.  I'll point that out; the witness will point it out.

The other matters that are reflected in there, I'm going to present the exhibits that associate with it that are on the exhibit list.  All of this information is disclosed.  There are a few minor things that we can point out along the way.

THE COURT:  Well, let me ask -- let's just not make a bigger issue out of this.

Why isn't the easy answer you're using this as an outline; the witness can refer to it, but I'm not seeing it.

MR. WERMUTH:  That's fine.

MS. PRICE:  Thank you, Your Honor.

THE COURT:  So objection to it being used as an demonstrative aid, but it's going to be used to assist you and the witness in the presentation.

MS. PRICE:  Thank you, Your Honor.

MR. WERMUTH:  Well, I would like to present the actual quotations on the screen, if that's all right to you.

MS. PRICE:  Your Honor, can they do that from the actual exhibits themselves?

THE COURT:  Just -- why don't we do this.

Is there any way to turn off my screen?

THE COURTROOM DEPUTY:  Flip it over.

THE COURT:  Yes, there is.

So the record will reflect I flipped over my screen.

So if -- for ease of presentation, if you want to see it and the witness wants to see something that you are going to use as an outline, that it could refresh his recollection, I'll permit that, but we are not going to display things that are not a proper demonstrative aid that weren't previously disclosed to the Court.

MS. PRICE:  Your Honor, one more thing.  As far as the census data, that would be something in front of the witness.

THE COURT:  Object when it comes in if you don't think it's there.  They can respond to it.  We could be here all day if we were going to go through every question and answer of every witness.

MS. PRICE:  I appreciate that.  Thank you, Your Honor.

MR. BARDOS:  So Rule 107 requires illustrative aids to be filed with the Court.  So if we are not looking at it, does Your Honor still want the illustrative aid to be filed?

THE COURT:  No.  It's not a demonstrative aid.  It's just being used by the lawyer and the witness.  It's, essentially, an outline for his questions and their responses.

And to expedite things, I'm going to allow the witness and the lawyer to refer to it, but I'm not going to see it, so they don't have to dig a quote.

If somebody believes something is objectionable because it's not derived from the report or something that was previously disclosed, than y'all can make your objections.

MR. BARDOS:  Thank you, Your Honor.

MS. PRICE:  Thank you, Your Honor.

THE COURT:  Okay.  Thank you.

MR. WERMUTH:  May I have a moment?

THE COURT:  Certainly.

(Pause in proceedings.)

THE COURT:  My apologies.  On top of everything else, I'm having to order a sherwani for a wedding.

MR. WERMUTH:  Okay.

THE COURT REPORTER:  Do you know how to spell sherwani?

THE COURT:  It doesn't really need to be put on the record, but s-h-e-r-w-a-n-i, I believe.

I was just explaining why I was sending somebody out.

MR. WERMUTH:  Your Honor, Florida Decides Healthcare plaintiffs call Michael Herron to the stand.

(Dr. Herron entered the witness stand.)

THE COURT:  You can go ahead and remain standing and raise your right hand to be sworn, sir.

**DR. MICHAEL HERRON, PLAINTIFFS' WITNESS, DULY SWORN**

THE COURTROOM DEPUTY:  Please state your name for the record.

THE WITNESS:  Michael Charles Herron.

THE COURTROOM DEPUTY:  Thank you.

THE COURT:  You can put your hand down.

And if you need water, sir, we put two bottles over there for you.

DIRECT EXAMINATION

BY MR. WERMUTH:

Q.   Good afternoon.

Can you please state your name for the record?

A.   Sure.  Michael Charles Herron.

Q.   Okay.  Dr. Herron, we've been retained by the Florida Decides Healthcare plaintiffs as an expert witness in this case; is that right?

A.   Yes.

Q.   Did you bring some slides with you today to look at as we are going along?

A.   Yes, I did.

Q.   Do you have them with you?

A.   I have nothing with me right now.

Q.   Well, I'm going to show them to you on the screen, but not visible to the Judge.

Okay.  Dr. Herron, what were you retained to do in this matter?

A.   I was retained to do three things in this case.

One, to assess the reliability of the OECS methodology that it described in its interim report, that it's methodology is intended to estimate a statewide rate of petition invalidity among previously validated abortion petitions.  I was asked to

assess that.

I was asked to estimate the costs of what an abortion initiative petition analogous to 23-07 would cost in the matter of validated fees were this petition -- were this initiative to be active prior to the 2026 election using petition validation fees currently in effect.

And, three, I was asked to assess whether a report by the State's expert in this case by Dr. Thomas Brunell changed any of my conclusions pursuant to the first two points that I just mentioned.

MR. WERMUTH:  All right.  Please pull up Plaintiffs' Exhibit 13.

BY MR. WERMUTH:

Q.   Is this a copy of your current curriculum vitae?

A.   Yes, I believe so.

Q.   Have there been any changes or updates to your curriculum vitae since you disclosed your major expert disclosures?

A.   Nothing substantive.

Q.   Okay.  What degrees do you have?

A.   I have a bachelor's degree in mathematics and economics from Carnegie Mellon University.  I have a master's agree in political science from the University of Dayton.  I have a master's degree in statistics from Stanford University.  And I have a PDF also from Stanford University.

Q.   Let's talk about your experience as it relates to the work

you performed in this case.

What are your areas of professional research and experience?

A.   I would say right now I'm focused on election administration.

Q.   Okay.  And what does the study of election administration entail?

A.   I would say it's the study of the rules and procedures used to implement elections and how these rules and procedures affect eligible voters.

Q.   Okay.  Prior to this case, have you performed research regarding Florida's electoral system?

A.   Yes.

Q.   In what capacity?

A.   I've written papers on it as an academic and published these papers in peer-reviewed journals.

Q.   Generally how did you go about doing your prior analyses of Florida's electoral system?

A.    I would say I combined statistical analysis with publically available data.

Q.   What types of data have you reviewed in preparing your previous analyses of Florida's electoral system?

A.    In my careers as an academic, I used data from the State, meaning that Florida Department of State.  I often use copies of the Florida voter file.  I sometimes use data provided by

counties.  There are 67 of them in Florida.  And I sometimes use county-level data.  I sometimes combine these data with census data at various levels.  I sometimes use government reports.  Those types of data.

Q.   Okay.  Have any of your analyses of Florida's electoral system been published in peer-reviewed journals?

A.   Yes.

Q.   How does that previous work that you performed compare to your method of analysis in this case?

A.   I would say it's very similar.

Q.   Okay.  Have you previously served as an expert witness?

A.   Yes, I have.

Q.   Roughly how many times have you served as an expert witness?

A.   Putting aside that I never know exactly how to count these things, because sometimes when I work in a case I'm not disclosed, I would say a few dozen.

Q.   Have any of those cases involved challenges to election laws or election administration?

A.   Yes.

Q.   Have you testified before this Court?

A.   Yes.

Q.   In what cases?

A.   I testified before this Court in a case on Senate Bill 90 and then in the case on Senate Bill 7050.

Q.   Okay.

Have courts relied on your testimony in cases involving challenges to laws related to election administration and analyses of justifications for election-related laws?

A.   Yes.

Q.   And have you ever been rejected as an expert by a court?

A.   No.

Q.   Have your opinions -- has a court ever found your opinions to be unreliable?

A.   No.

MR. WERMUTH:  Your Honor, pursuant to Federal Rule 702, the Florida Decides Healthcare plaintiffs proffer Dr. Herron as an expert in election administration and statistical methodological analysis as defined by Dr. Herron in this case.

THE COURT:  Do you wish to voir dire the witness?

MS. PRICE:  No objection.

THE COURT:  Thank you.

You may proceed.

BY MR. WERMUTH:

Q.   Dr. Herron, do you have copies of your written reports with you today?

A.   No.

THE COURT:  Counsel, if I could, did you intend to admit his CV to which there was no objection?

MR. WERMUTH:  I did, Your Honor.

THE COURT:  Any objection to 13?

MS. PRICE:  No, Your Honor.

THE COURT:  Thank you.

(PLAINTIFFS' EXHIBIT RTCW-13:  Received in evidence.)

THE COURT:  And let me say to all the lawyers involved, I get why that wouldn't -- you might not want do that in a jury trial.  But in a bench trial, thank you, because it actually expedites matters not to have everybody spend half an hour reading their CV into the record.  And I hope both sides will extend the same courtesy to each other with respect to your exerts and their CVs.

BY MR. WERMUTH:

Q.   If you'd like to refer to your reports at any time, please let me know, and just let the Court know that you are referring to your reports.

THE COURT:  Also so the record is clear, since I'm not -- it's not being used as a demonstrative aid for me.  I'm handing him the hard copy of what you are going to use to put on the screen.  Okay?

MR. WERMUTH:  Okay.

THE WITNESS:  Thank you, Your Honor.

BY MR. WERMUTH:

Q.   Dr. Herron, in preparing your analysis in this case, did you review portions of the Florida Constitution?

A.   I did.

Q.   Which ones?

A.   I reviewed the portions of the Florida Constitution that are relevant to initiatives in the state.

Q.   Okay.  And did you review the authority of the Supervisor of Elections in regard to petition initiatives?

A.   Yes.

Q.   And did you review the statutorily required elements of initiative petition forms?

A.   Yes.

     And can I just say I'm having a little difficulty hearing because of the echo.

Q.   Oh, because of the echo?  But you can hear me in general?

A.   I think it's the speaker, actually.

     (Pause in proceedings.)

          THE COURT:  This is some advanced technology.  I flip a screen over so I can't see it, and I cover speakers with blankets.

          Did that do anything?

          Talk.

BY MR. WERMUTH:

Q.   Yes.  Can you hear me now?

A.   I think it's a bit better.  If you speak really loudly.

     The issue is that I'm sort of hearing it out of there and sort of hearing it here.  I think that's what's going on.

Q.    So can you hear me now?

A.    Yes.  I will let me know if you there are further issues.
Thank you.

Q.    Okay.  Did you review the bases on which Supervisors
invalidate initiative petitions?

A.    Yes, I did.

Q.    Dr. Herron, did you review portions of HB 1205 as part of
your analysis?

A.    Yes, I did.

Q.    All right.  And did you review portions of the interim OECS
report dated December 20th, 2024?

A.    Yes, I did.

Q.    What parts of the interim report did you analyze?

A.    I analyzed the part of the interim report that describes
the OECS audit of abortion petitions submitted in with the
initiative 23-07.

Q.    Okay.  And did you review portions of the annual OECS
report dated January 15th, 2025?

A.    I did.

Q.    And what parts of that did you analyze?

A.    I reviewed the part of the January report that describes
how the January report incorporates by reference the interim
report and then describes several -- and then takes some of the
material from the interim report and repeats it.  So I reviewed
that material.

Q.    Okay.  Previously you testified that you analyzed the OECS methodology for calculating a statewide invalidity rate.

Do you have an opinion as to the reliability of the OECS's methodology to estimate a statewide invalidity rate of previously validated petitions?

A.    Yes, I do.

Q.    And what is that opinion?

A.    The methodology is unreliable.

Q.    Okay.  Dr. Herron, at a high level how did you characterize the breakdown of the OECS's methodological steps for calculating a statewide rate?

A.    At a high level I broke it into four different steps.  At the first step, the OECS choose counties to audit; and the second step, the OECS chose petitions within those counties to audit; and the third step, the OECS developed a calculation called a drop-off rate; and then the fourth step, the OECS combined the drop-off rate with some other calculations to generate an estimate of a statewide invalidation rate among previously validated petitions.

Q.    Okay.  I believe you mentioned that you were referring to the validated abortion petitions in this analysis; is that correct?

A.    That is correct.

Q.    And, to your knowledge, which officials in Florida have the authority to and the responsibility for validating initiative

petition forms?

A.    Is it my understanding that the people of authority are the Supervisors of Elections.

Q.    All right.  And do you have an opinion regarding whether identifying an initiative petition form as invalid implies that fraud occurred?

A.    I do have an opinion on that.

Q.    What is that opinion?

A.    That identifying a petition as invalid does not imply that fraud occurred.

Q.    All right.  Did you analyze why the OECS considered any specific initiative petition forms invalid?

A.    No.

Q.    Were you able -- why not?

A.    Because in the interim report there isn't sufficient data that would allow me to analyze that sort of a thing.

Q.    All right.  Were you able to verify or replicate which specific petitions the OECS considered invalid?

A.    No.

Q.    And why is that?

A.    Because in the interim report there isn't sufficient data that would allow this.  And I think that applies as well to documents produced in this litigation.

Q.    Okay.  What data is contained in the interim report, if any, about which specific -- about which specific petition forms

the OECS identified as invalid?

A.   There is no such data.

Q.   What data would you expect to see for an election sequestration audit?

A.   The data that I would expect to see would be parallel to the data that I did see in what I call county audit reports that describe on a petition-by-petition basis which petitions were accepted or validated and for reasons -- and the reasons that they are not accepted for those ones that are not validated.

Q.   Okay.  Now, as to the first step of the OECS methodology that you mentioned, how do you know whether the OECS choose three counties in which to audit validated abortion petitions?

A.   I know it because that's what they wrote in the interim report.

Q.   And what are those three counties?

A.   Palm Beach County, Orange County, and Osceola County.

Q.   All right.  I'm showing you a slide.

     Where does this statement -- where does this statement in this slide come from?

A.   This statement here comes from the interim report on page 15.

Q.   Okay.

          THE COURT:  You should be able to see it on there.

          MS. PRICE:  One moment, Your Honor.

          THE COURT:  Yeah.  They are just going to switch

seats.

MS. PRICE:  Thank you.

MR. WERMUTH:  Actually, if you'd pull up DX 4 at page -- I think it's at page 2 or -- it's page 2 of the letter.

(Pause in proceedings.)

MR. WERMUTH:  My bad.  Not that.

THE COURT:  One thing that would help me is does the report say -- with respect to determining invalidity, are they just using the requirements before the House bill at issue, or are those before and after the House bill?

So, for example, is it -- are they using -- it's invalid because it doesn't include a social security number, or is it just using the requirements, again, before the changes under HB 1205?

THE WITNESS:  You're asking me?

THE COURT:  Yes.

THE WITNESS:  I don't think I know because the criteria aren't laid out.

THE COURT:  Okay.  So it's not just that the criteria -- it's not just that you don't know which individual petitions were invalid, you also don't know which standard they used -- I mean, which requirements they relied on to determine whether it was or was not invalid?

THE WITNESS:  Your Honor, that is correct.

So to be clear, I have no list that says, for example,

Here's the petition from Palm Beach County.  It was rejected for the following reason.  There is no such thing like that.

THE COURT:  I understood that from your testimony.  But the report doesn't start with some sort of proposition that the baseline is these were reviewed for compliance with, for example, Florida law through X date, for example?

THE WITNESS:  Not to my understanding, no.

THE COURT:  Okay.

MR. WERMUTH:  I'll just note that the OECS audit, as it were, was performed before HB 1205 was enacted.

THE COURT:  That was going to be my next question.

So it would be petitions evaluated for a prior initiative that would have been subject to the same requirements based on the date of the report?

MR. WERMUTH:  Yes.  I mean, that would be the -- that would be the inference, but, again, we don't know.

THE COURT:  I understand.

MR. WERMUTH:  All right.  And before we proceed any further, I mean, as we've all been discussing so far, we are only raising the OECS report for discussion purposes right now, and we have no intention of introducing it into evidence.  But we're doing this as a proffer to explain what it said for purposes of our --

THE COURT:  I understand.

And does -- just so I'll know for housekeeping, is

the -- are the defendants presenting a counter expert to argue why it's valid?

I'm just trying to figure you out when I'm going to ultimately rule on the final question and what I've got to consider.

MS. PRICE:  Your Honor, there will be an expert that will do a rebuttal report for Dr. Herron's report, but there will not be an expert on the actual OECS report itself. However, there --

THE COURT:  Well, if it's a rebuttal expert, they are going to explain why they don't think his report is right in terms of him attacking the report; correct?

MS. PRICE:  There will be that within the report, yes, Your Honor.

THE COURT:  Okay.  I got it.

BY MR. WERMUTH:

Q.   Dr. Herron, what did the OECS say about its basis for selecting Palm Beach County for its review?

A.   What the OECS wrote was twofold about its choice of Palm Beach County:

One, it said that Palm Beach County is sufficiently organized;

And, two, it said that it believes that there is sufficient fraud -- or substantial fraud in Palm Beach County and that is why it picked Palm Beach County to audit.

Q.   Okay.  From a scientific perspective, what is this method of selection known as?

A.   It's called selecting on the dependent variable.

Q.   What do you mean by "selecting on the dependent variable"?

A.   What I mean is that the goal of the audit, according to the OECS, is to generate an estimate of a statewide petition invalidity rate.  And in this case the reason that Palm Beach County was chosen on the basis of selecting on the dependent variable -- the reason I say this --

(Reporter requests clarification.)

THE WITNESS:  Excuse me.  I apologize.

The reason I say that Palm Beach County was chosen on the basis of selecting on the dependent variable was because the OECS wrote that it chose this county to audit because it already thinks that this county has substantial fraud, and that since estimating the rate of fraud is, in principle, the goal of the OECS investigation, this is an example of selecting a county because of a priori beliefs about the dependent variable, in this case the rate of fraud.

BY MR. WERMUTH:

Q.   Okay.  Do you have an opinion as to whether selecting Palm Beach on this basis to review and estimate rates of invalidity is a reliable method?

A.   I do have an opinion.

Q.   What is that opinion?

A.    It is not.

Q.    Why?

A.    Because selecting on the dependent variable leads to bias estimates, as is well known.

Q.    Okay.  I'd like to go to the next slide.

What does -- what did the OECS say about selecting Orange County for its review?

A.    It said, one, that -- on page 16 of the interim report, the OECS stated that it shows Orange County to review because it believes a priori that -- I'm summarizing here -- that Orange County is also the locus of substantial petition fraud; and, two, it said that Orange County is a populous county that's relatively close to Tallahassee.

Q.    Okay.  Did the OECS use the term "known or suspected fraudsters" in relation to selecting Orange County?

A.    Yes, it did.

Q.    Okay.  Are you familiar with the term "known and suspected fraudsters" in litigation -- in literature on election administration?

A.    No.  I would say in the scholarly literature on election administration the term "known or suspected fraudsters" would not -- is not used unless it's quoted from someone else using it.

Q.    Okay.  And from a scientific perspective, what would selecting a county based on known and suspected fraudsters be

known as as a method of selection?

A.   This is another example of selecting on the dependent variable.

Q.   Okay.  What does the second instance of selection on the dependent variable add, if at all, to your opinion whether the OECS methodology is reliable?

A.   I would say that the second example of selecting on the dependent variable reinforces or compounds my conclusion that the OECS methodology is unreliable.

Q.   Okay.  And you mentioned a second basis on which Orange County -- which the OECS selected Orange County; is that right?

A.   That is right.

Q.   And what is that basis?

A.   The OECS wrote, again on page 16, that Orange County is a populous -- "a populous county relatively near Tallahassee."

Q.   Okay.  Did you prepare a map in this matter?

     And I'd like to pull up Exhibit 16.

     Do you recognize the map in this image?

A.   Yes, I made it.

Q.   Okay.  And what does it reflect?

A.   This is map of Florida.  It's broken into the state's 67 counties.  Some counties are labeled.  I'll talk about that in a second.

     In addition, there are two dots.  One dot is green, and

that dot denotes the location of Tallahassee.  Another dot is orange.  That is the location of Orange County.  And the labeled counties are those that are as close to Tallahassee or closer than Orange County is, as the crow flies.

Q.   Okay.  Are some of these counties heavily populated, in your opinion?

A.   Yes.

Q.   You labeled -- which ones?

A.   I would say that Hillsborough is heavily populated.  Duval County is heavily populated.

I should point out that the OECS doesn't define "heavily populated," so I'm just going off of my own intuition.

I would say that Pinellas is also heavily populated.

THE COURT:  Ms. Price is standing.  Yes, ma'am.

MS. PRICE:  No, I'll save it, Your Honor.

THE COURT:  Can I ask all the lawyers -- surely, surely, if there has ever been anything in the history of the court system the Court could take judicial notice of, especially since I've lived in Florida for 58 years, is the location of the counties in Florida and the location of those counties relative to Tallahassee.  And I know, for example, that Taylor County is real small, and Duval County is real big.

Right?

MR. WERMUTH:  Yes, Your Honor.

THE COURT:  So it just seems to me -- we've now just

got an illustration of what I could take judicial notice for. So before we get too overwhelmed and everybody talking about this particular demonstrative aid and so forth, let's just take cognizance of the reality that I understand why saying Orange County is relatively close to Tallahassee is borderline silly.

But go ahead.

BY MR. WERMUTH:

Q.   Dr. Herron, do you have an opinion as to the second basis for selecting Orange County?

A.   I do have an opinion.

Q.   What is that?

A.   It's not very compelling.

Q.   All right.  We'll proceed ahead.

What did the OECS say about the basis for selecting Osceola County for its review?

A.   On page 17 of the interim report, the OECS explained that it chose Osceola County to review because its a priori belief is that there was low levels of petition fraud -- initiative petition fraud in this county.

Q.   Okay.  And from a scientific perspective, what is the basis for selecting Osceola County known as?

A.   This is another example of selecting on the dependent variable.

Q.   Okay.  And do you have an opinion as to whether selecting

on the dependent variable twice in one direction and once in the opposite direction cancels out the bias caused by selecting on the dependent variable?

A.    I do have an opinion on that.

Q.    And what is that opinion?

A.    It does not.

Q.    What does this third instance of selecting on the dependent variable add, if at all, to your opinion on whether the OECS methodology is reliable?

A.    Yeah.  It compounds my earlier concerns that I mentioned about selecting on the dependent variable and the choice of Palm Beach and Orange Counties.

Q.    Okay.  Let's move on to the second step you identified.

THE COURT:  Since most of these lawyers were involved, correct me if I'm wrong, wasn't this the very issue that was raised in SB 90 with the experts?  And didn't Chief Judge Pryor comment on selecting only some counties?

MR. JAZIL:  Yes, Your Honor.

THE COURT:  In other words, I believe Chief Judge Pryor said, and I quote:  *But the data from the three counties on which you relied*, which was the plaintiffs' expert in that case, *cannot support a meaningful representative analysis*.

MR. JAZIL:  Yes, Your Honor.

THE COURT:  Okay.  So I'm going to guess the law once again, in this circuit, at least, depends on whose ox is being

gored.

Counsel, you can proceed.

MR. WERMUTH:  Okay.

THE COURT:  Because I'm quite confident that there may be a different review of selecting certain counties --

MR. WERMUTH:  Okay.

THE COURT:  -- depending on, again, what case is before what court.

But go ahead.

BY MR. WERMUTH:

Q.   All right.  Let's move on to the second step you analyzed -- or you identified in analyzing the OECS methodology.

So what is the second step you analyzed in reviewing the OECS methodology?

A.   The second step was one in which the OECS selectively sampled abortion -- or validated abortion petitions in Palm Beach, Orange, and Osceola Counties to review.

Q.   Okay.  And how do you know whether the OECS selectively sampled and audited petitions submitted in the three audited counties?

A.   They said as much.

Q.   Okay.  I'd like to move on.

So what did the OECS say in the cover letter of the interim OECS report about why it selected these three counties?

A.   In the cover letter to its interim report, the OECS stated

that it selected within Palm Beach, Orange, and Osceola County

petitions submitted by what it considered to be known

fraudsters.

Q.    Okay.  And could you quote right what the OECS said was

the -- was their definition of known fraudsters?

A.    According to the OECS, again on page 2 of the transmittal

letter, they defined -- excuse me -- they defined known

fraudsters that is, quote, "Individuals identified by

Supervisors of Elections or law enforcement for previously

submitting suspected forgeries or deceased elector signatures or

those with unusually high rejection rates," end quote.

Q.    Okay.  What is this method of selection known as?

A.    This is an example of selecting on the dependent variable.

Q.    Okay.  And do you know whether the OECS was successful in

selecting petition circulators they characterized as having high

rejection rates?

A.    I do know, yes.

Q.    Did you perform an analysis to test whether the OECS --

OECS actually selected petitions on this basis?

A.    Yes, I did.

        MR. WERMUTH:  All right.  I'd like to pull up

Exhibit 17.

BY MR. WERMUTH:

Q.    Do you recognize this document?

A.    I do.

Q.    What is it?

A.    It is a collection of three bar plots, and I made this for the purpose of my initial report in this litigation.

Q.    Okay.  Does this reflect an analysis you perform to test the OECS's basis for selecting petitions?

A.    Yes.

Q.    What kind of plot is this?

A.    Each of these -- the three plots are called bar plots, and they consist of sequences of bars.

Q.    Okay.  And why -- what -- why are there three subplots on this figure?

A.    There are three subplots because each one corresponds to one of the audited counties in the OECS investigation.

Q.    Okay.  And what do the heights of the gray and black bars in each subplot represent?

A.    The height of each bar corresponds to a circulator who submitted at least 20 abortion initiative petitions, and the height corresponds to acceptance rate for the circulator within a particular county.

Q.    Okay.  And what do the black bars represent?

A.    The black bars identify those circulators whose petitions were audited by the OECS, or I should say some of whose petitions were audited as -- by the OECS as part of its investigation.

Q.    And what do the gray bars represent?

A.   The gray bars represent circulators whose petitions weren't audited.

Q.   Okay.  And what did you notice in these analyses?

A.   In general, I noticed that the gray bars are further to the right of the bar plots.  If you can -- you can see that the bars are ordered and that the black bars -- I think -- if I said "gray," excuse me -- the black bars are further to the right, which means that the circulators whose acceptance rates were lower tended to be those who were audited.

        MR. WERMUTH:  Okay.  At this point, Your Honor, I'd like to introduce Exhibit 17 into evidence.

        MS. PRICE:  No objection.

        THE COURT:  Without objection, Exhibit 17 is admitted.

    (PLAINTIFFS' EXHIBIT FDH-17:  Received in evidence.)

BY MR. WERMUTH:

Q.   Do you know whether this basis of a selection had a statistically significant effect?

A.   Yes, I do.

        THE COURT:  Is that up on the screen, 17?

        MR. WERMUTH:  It is up on the screen.

        THE COURT:  Give me one second.

    (Pause in proceedings.)

        MR. WERMUTH:  And I won't advance to the -- I'll tell you when I'm advancing to the next slide, Your Honor.

        THE COURT:  What I can do is I did discover rather

than breaking my screen, I can just turn it on and off.  So that's -- when I flipped it over in some sort of wild flourish --

MR. WERMUTH:  Yes.

THE COURT:  -- I should have just hit the on/off button.

MR. WERMUTH:  The magic of technology.

THE COURT:  Give me one second.  I'm just trying to take some notes, which would make my order easier later.

BY MR. WERMUTH:

Q.   All right.  Do you know whether the basis of selection had the statistically significant effect?

THE COURT:  Go ahead.  Answer that, and then I'll have a question.

THE WITNESS:  Yes, I do.

MR. WERMUTH:  Your Honor.

THE COURT:  Before I ask Ms. Price a question, if you can just in layman's terms tell me what you want me to glean from this.

THE WITNESS:  What I would say, Your Honor, is that looking at any of the particular plots -- because they all are structurally the same -- they show -- you can't see, I believe, given the resolution, all the bars.  But each bar corresponds to an individual circulator in a county, and the bars are colored based on whether the circulators are audited.

So what I would say you should look for is this pattern that I mentioned, which is that are the black bars further to the right, because if they are, that would mean that circulators whose acceptance percentages are lower were more likely to be audited.

THE COURT:  All right.  Bottom line, you're auditing people that had problems in the past which skews your results.

THE WITNESS:  That is one way to interpret this, yes.

THE COURT:  Well, if I interpret it wrong -- I'm just trying to -- why do you want me to glean something other than what I just said?

THE WITNESS:  Well, I just want it to be clear that when you say "in the past," this is actually the abortion initiative.  So these were people who were -- circulators who were audited in the abortion investigation based on the abortion initiative.  I just wanted to be clear that "in the past" meant that particular initiative.

THE COURT:  And that's all I meant by -- it was a prior initiative is what I meant.  I wasn't trying to --

Ms. Price, one thing that'll help me -- and I'm -- it's just easier for me to do it this way so I kind of know where we're going, because y'all obviously know what you're going to present and I don't.

Does the report say that we did this evaluation and we're proposing that this -- our instances of fraud?  I keep

hearing the word "fraud" and "validation," so it seems to me you could just have something blank -- and I've already heard testimony from, for example, Supervisor Earley, I thought, that things were invalidated because information was missing.

Do I have that wrong?

MS. PRICE:  Yes, Your Honor.  So what this report looks at -- and if you look at what the OECS said they were trying to do is they started to get all this information -- complaints, reports -- about known -- people that they suspected to be fraudsters.  And they started to realize that some of these folks were actually having a large number of petitions validated.

And so they wanted to say, Well, let's see if we look at these particular fraud -- these particular people that we suspect have already had problems, let's look at the validated petitions, and let's see if there are any errors that we've seen there.

So this does not count the petitions the Supervisors have already determined are invalid; that's on top of this.

THE COURT:  I understand. Different question.

That goes to what they're doing and why they chose these people?

MS. PRICE:  Yes.

THE COURT:  I'm asking a different question.  I'm trying to just figure out -- I've got a report from a doctor

that says, I find within a reasonable degree of medical probability that there was medical malpractice because...; that's the conclusion.

So I'm just -- I'm starting 30,000 foot up. Is the suggestion -- because you could have somebody that's both committed fraud and is sloppy, and so you could have 50 fraudulent petitions, and you could have 5,000 petitions that just were missing data that was required.

And what I'm trying to figure out is, is that all lumped together here, or is it separated out? And what is the ultimate conclusion? That we're talking about validation results or just fraud, or both, and separating them out?

MS. PRICE: Your Honor, start with the caveat that the OECS report is very large and the part that Dr. Herron was asked to look at is very small in comparison.

The OECS audits for multiple counties, some were for folks that were suspected of fraud. They looked at validity; petitions that were valid and they determined whether some should have been marked invalid. That was not a conclusion by the OECS that those were fraudulent, but it was a conclusion that there may be something going on. This is by people who have had issues in the past, and we need to take a look at what's going on.

There's also comments in the report that the OECS found that the more populous counties seem to have more issues

than some of the smaller counties. The OECS also looked at, for at least one of the counties, all different types. It wasn't targeting -- or at least one of the reviews they did wasn't targeting just fraudsters; it was, Give me as many petitions as you can have. And so for that perspective, it wasn't just targeting that.

Again, looks at validity and is trying to identify, Are we having a problem with signatures getting verified that should not be verified? And, if so, you know, what is that reason and what are some recommendations we can make to the Legislature?

The actual part about a statewide average, it's literally --

THE COURT: Y'all can --

MS. PRICE: We'll get to that.

THE COURT: You can talk about that later.

MS. PRICE: I hope I've answered your question, Your Honor.

MR. WERMUTH: And, if I may, Your Honor, I do think the implication of this report is that invalidity equals fraud. In fact, opposing counsel's expert --

THE COURT: We can talk about that, and you can show me the report. I'm just flagging that that I'm going to want to hear that and understand the arguments as it relates to that more.

MS. PRICE:  Thank you, Your Honor.

THE COURT:  Counsel, you may proceed.

BY MR. WERMUTH:

Q.   Okay.  I'm not sure where I stopped.

But did you do an analysis to test whether OECS was actually successful in -- wait.

Do you know whether the basis of selection had a statistically significant effect?

A.   Yes.

Q.   And how do you know that?

A.   I conducted a statistical analysis of that.

MR. WERMUTH:  Okay.  I'd like to pull up Exhibit 27.

BY MR. WERMUTH:

Q.   Okay.  What is this?

A.   This is a table from my analysis of the matter that we're discussing, which is an analysis of whether an acceptance rate for a circulator is related to the likelihood that the circulator is -- was audited by the OECS.

Q.   Okay.  And please take us through this table and explain what it reflects and what we should be looking at to understand its significance.

A.   So this table contains estimates from what is called a logistic regression analysis or a logistic regression model.

The dependent variable in this model is whether a circulator was audited, which is either true or false, one or

Direct Examination - Dr. Herron

zero, because either a circulator had petitions that were audited in a particular county or didn't.  And a standard model to study dependent variables that take on two values like this is a logistic regression.

The independent variables for the model are "County," and two features for circulators, one of which is in the row called "Percent accepted," another which is in the row called "Log of total petitions."  The most important variable I would say is percent accepted.  That measures their acceptance rate for a circulator in a given county.

To the right of each variable is a coefficient estimate. Underneath that is another number in parentheses.  That's called the standard error.  This is a typical format for a table of this type.  The standard error measures -- is a measure of precision of the estimate.

There are asterisks next to the estimates in some cases. These are -- these asterisks correspond to significance levels. One star is .05; two stars is .01; 3 stars is .0001.  I would say given all of that, the key result is that the estimate under Percent Accepted is negative, meaning that the greater a circulator's acceptance rate, the less likely it was to be audited, all things equal, and that result is statistically significant.

Q.   Okay.  And why do you only reference two counties in this Table 4?

A.   Because there were three counties in the audit, and in a regression model like that, if you're studying three counties, you have to drop one.  And the choice of dropping or withholding a single county is without loss of generality.

So I happened to drop Orange County; it makes no difference which county was dropped.  And when I say "it makes no difference" I mean from the perspective of the percent accepted estimate, it doesn't matter which county was dropped.

MR. WERMUTH:  Okay.  At this time, Your Honor, I'd like to offer Exhibit 27 into evidence.

MS. PRICE:  No objection.

THE COURT:  Without objection, 27 is admitted.

(PLAINTIFFS' EXHIBIT FDH-27:  Received in evidence.)

MR. WERMUTH:  All right.  Let's pull up Plaintiffs' Exhibit 28.

BY MR. WERMUTH:

Q.   What is this table?

A.   This table is -- contains what are called "Average marginal effects" from the logistic regression that I just testified about.

Q.   Okay.  Please take us through this table and explain what it reflects and what we should be looking at to understand its significance at a high level.

A.   What this table contains are estimates on the percentage basis of the independent variables, county percent accepted, log

total petitions on the probability of being -- of a circulator being audited.

And the reason I made this table is because the previous tables of estimates that we just discussed correspond to my logistic model.  Logistic regressions are nonlineal models, and, as such, the estimates from them aren't directly interpretable.  This is well known.  And so one response to this -- or the standard response, I would say, is to compute marginal effects with a level of probabilities.

So in this table I have the -- each variable correspondences to a variable -- an independent variable from the previous table, and the estimates, along with their standard errors in parentheses, correspond to changes in probabilities.  So I would say the -- and I would say also that there are asterisks here.

I was more conservative in the asterisks because the average marginal effects are more important, I would argue.  So one star corresponds to a level of .01.  Two stars corresponds to a level of .001.

And what you can see, for example, in the "Percent Accepted" row is that the marginal effect estimate is .323 -- or, excuse me -- negative .323, and that means if a circulator's percent accepted rate goes up by 1, then it's -- the probability of being audited goes down by .323 percentage points.

Q.   Okay.  And is that result statistically significant?

A.     It is.

Q.     Okay.  And what does the negative 8.103 number in Palm Beach reflect?

A.     The negative 8 number, which is a magnitude large -- larger compared to the others, reflects the fact that there were not many petitions or circulators audited in Palm Beach County.

So earlier when we were discussing the bar plots and I had a discussion with Your Honor, we talked about what those mean. So if you remember, there weren't many black bars in Palm Beach County, and that's because the Palm Beach County audit only covered 41 total petitions and fewer circulators.

And so what this model says is that if you are a circulator in Palm Beach County, the probability of being audited in Palm Beach County is 8 percentage points lower, all things equal.

Q.     Okay.  How does this further round --

MR. WERMUTH:  At this point, Your Honor, I'd like to move Exhibit 28 into evidence.

THE COURT:  Any objection?

MS. PRICE:  No objection.

THE COURT:  Without objection, Exhibit 28 is admitted.

(PLAINTIFFS' EXHIBIT FDH-28:  Received in evidence.)

BY MR. WERMUTH:

Q.     How does this further round of selecting on the dependent variable add, if at all, to your opinion whether the OECS

methodology is reliable?

A.   I would say this is another -- petition selection is another form of selection on the dependent variable, and it compounds my earlier concerns about county choice that were also made based on selection on the dependent variable.

Q.   Okay.

THE COURT:  Let me just cut to the chase.  And I'm just a county judge, so I don't matter.

If you choose a county with problems and you choose a disproportionate number of folks with problems, then it's going to yield a number that suggests the problem is bigger than it otherwise would be?

THE WITNESS:  Yes, Your Honor.

THE COURT:  Is that --

THE WITNESS:  Yes, Your Honor.

THE COURT:  Okay.

MR. WERMUTH:  I think you are getting the point.

THE COURT:  No worries.  I went to UF, not Dartmouth, but I think I got it.

BY MR. WERMUTH:

Q.   Let's move on to the third step you identified in analyzing the OECS methodology.

MR. WERMUTH:  If you could turn off your monitor, Judge.

THE COURT:  Oh, I'm sorry.

BY MR. WERMUTH:

Q.   Okay.  What is the third step of the OECS methodology as you characterized it?

A.   The third step involves a calculation of what's called a drop-off rate which the OECS carried out using data from Orange County.

Q.   Okay.  How do you know whether the OECS calculated a drop-off rate?

A.   It's stated as such.  The term "drop-off rate" or "drop-off" is from the OECS interim report.

Q.   Okay.

(Indiscernible crosstalk between Court, witness, and Mr. Wermuth.)

MR. WERMUTH:  Would you have an objection to the Judge seeing this?  It's Footnote 13 out of the OECS interim report.

MS. PRICE:  One second, please.

THE COURT:  Oh, I didn't realize that wasn't on the record.

THE COURT REPORTER:  I didn't put it on the record.

THE COURT:  I was just asking if he taught at Dartmouth so it was clear that my last comment was not completely out of left field.

MS. PRICE:  Yeah, that's fine.

MR. WERMUTH:  Okay.

Ms. Price has graciously agreed to allow me to show

you this slide in order to reflect Footnote 13 in the interim
OECS report.

THE COURT:  Okay.

BY MR. WERMUTH:

Q.   All right.  Do you recognize the calculation in this slide?

A.   I do.

Q.   And what is it?

A.   This calculation at a high level is how the OECS
characterized it's drop-off rates, which it considers a way of
comparing invalidity rates of previously validated abortion
petitions associated with known or suspected fraudsters --
that's what KSF means, I believe -- with total invalidity rates,
which is what the OECS considered the invalidity rate overall.
And the drop-off calculation, the high levels, is simply a
change in -- a percentage change in percentages.

Q.   Okay.  Do you know where the OECS derived the 32.3 percent
rate?

A.   I do.

Q.   Where is that?

A.   When I said that the OECS audited Orange County, that
was -- there are actually two steps in the audit of
Orange County.  There is one called Orange County 1 and a second
one called Orange County 2.  These are the OECS names, by the
way.

So in OECS -- excuse me.  In Orange County 1, the OECS

chose petitions from known and suspected fraudsters, and it calculated an invalidity rate among previously validated petitions of 32.3 percent.

So the answer to your question is the source of 32.3 percent is the Orange County 1 audit that covered, in principle, all of Orange County.

Q.   Okay.  And do you know the congressional districts that intersect Orange County?

A.   I do.

Q.   What are they?

A.   Nine -- I have a map on this.

Q.   Okay.

A.   8, 9, 10, and 11, I believe.

Q.   Okay.

A.   I may be off by one.

Q.   Okay.  But I think you mentioned that this -- this sample of petitions came from the entirety of Orange County; is that correct?

A.   That is correct.

Orange County intersects four congressional districts, even if I got those number wrong, and this Orange County 1 audit covers the entirety of the county.

Q.   Okay.  And in this Footnote 13 of the interim OECS report, where does the 20.9 percent rate come from?

A.   The 20.9 percent rate is from the audit called

Orange County 2, and Orange County 2 was a second audit of Orange County, and that only covered the part of Orange County in the ninth congressional district.

So there, according to the OECS interim report, the OECS audited petitions in the part of Orange County in Congressional District 9, and it calculated an invalidity rate of 20.9 percent in that section or that part of Orange County.

Q.   Okay.  What understanding do you have, if any, regarding the purpose of calculating a drop-off rate?

A.   I think the purpose of a drop-off rate as described by the OECS in its interim report is to attempt to adjust for the fact that they -- that the OECS focused on known and suspected fraudsters to start.  And so the idea is, like, what is the difference in rates, percentages, if you start with a so-called fraudster invalidity rate -- and here I'm using the term "fraudster" as the OECS used it.  I wouldn't use this in my academic work -- versus an overall invalidity rate.  That's what the drop-off rate, I believe, is trying to get at.

Q.   Okay.  In your research as a social scientist regarding election administration, please tell us whether you've ever used a drop-off rate in any way -- in the way the OECS did.

A.   No.

Q.   What are the reasons why?

A.   I would say the reasons are twofold.

One reason is that if -- one reason is that this

835
Direct Examination - Dr. Herron

calculation I just described actually has what I would call, respectfully, an error in it -- a design error in that the numerator of this drop-off rate is 32.3 percent minus 20.9 percent. 32.3 percent is a rate for Orange County. 20.9 percent is a rate of Orange County -- of the part of Orange County in Congressional District 9. So subtracting those two rates doesn't really make any sense because the geographies are different. So I would not use a rate that combined geographies like that.

The second reason I wouldn't use a rate is that if I wanted to know what the invalidity rate is, assuming I could define this suitably, in any county was I would simply sample petitions there randomly rather than go through an exercise where I select in a funny way and then attempt to sort of correct for that selection. I wouldn't do that either.

So I would say the reasons are twofold.

Q.   Okay. In Footnote 13 of the interim OECS report, is the 20.9 percent number, which is identified as the Orange Total Invalid Period Rate -- is that, in fact, an Orange total invalidity rate as claimed?

A.   No.

Q.   Okay. And why do you say that?

A.   Because it isn't. It's because 20.9 percent is from Orange County 2. That's the name of the second audit of Orange County. And the Orange County 2 audit only covered the

part of Orange County that intersects Congressional District 9,
so, as such, since Orange County, as I earlier mentioned, as
it's known, intersects four congressional districts in Florida,
it wouldn't be correct -- or it isn't correct to call a rate
that is restricted to one congressional district a countywide
rate because it simply isn't.

Q.   Okay.  What type of error is this, in your opinion?

A.   My -- I would say that this is a design error as opposed
to, say, a calculation error, and I would say that because the
drop-off rate appears to be designed to subtract quantities,
32.3 percent and 20.9 percent, that actually are from different
geographies.  So I would call this a design error.

Q.   Okay.  What is this -- what is the result of this error in
terms of trustworthiness?

A.   I would say that this error -- this design error is another
reason that I believe that the OECS methodology is unreliable.

Q.   Okay.  How does this error by the OECS relate to the
problems you identified in the OECS's method for selecting the
first two steps in its methodology?

A.   The error I'm talking about here, which is the combining of
geographies that are different, that's independent of the
selection on -- on the examples of selection on the dependent
variable that I mentioned earlier in my testimony.

Q.   And how do these problems interact, if at all?

A.   I would say that they compound so that the geography

combination, or the improper geography combination here, compounds the selection on the dependent variable examples that I mentioned earlier today.

Q.    Okay.  I'd like to pull up Exhibit 19.

Do you recognize this figure?

A.    I do.  It is a map that I created.

Q.    Okay.  And please take us through what this map reflects.

A.    This map is intended to describe Orange County and how it's broken into congressional districts.  And it also shows some neighboring counties, just because they are neighboring Orange County.  And this shows that Orange County is broken down into four districts, as I mentioned.  I believe I said 8, 9, 10, 11 -- I hope I did because those are actually the correct ones as shown in this map.

So you can see that the ninth congressional district in Orange County is the southern part of the state.  I mean, it's basically southeast, but it's effectively southern.  And then Congressional District 10 covers the northern part of Orange County -- I should say north central.  And then Congressional District 8, Orange County, is the eastern part.  And Congressional District 11 is the western part of the county.

MR. WERMUTH:  All right.  At this time, Your Honor, I'd like to move into evidence Exhibit 19.

MS. PRICE:  No objection.

THE COURT:  Without objection, Exhibit 19 is admitted.

(PLAINTIFFS' EXHIBIT FDH-19:  Received in evidence.)

BY MR. WERMUTH:

Q.   And just for clarity, where did you say the petitions -- where did you say the OECS got its petitions for the Orange County 1 review?

A.   Orange County 1 covered the county -- Orange County.

Q.   Okay.  And where did the petitions for Orange County 2 come from?

A.   They came from the part of Orange County that intersects Congressional District 9.

Q.   Okay.  And what is the consequence of not having petitions from Congressional Districts 8, 10 and 11 in the Orange County 2 review for purposes of a drop-off calculation?

A.   Well, to the extent that the drop-off calculation is capturing an important idea, I would say that the assumption that Orange County -- that the part of Orange County that intersects Congressional District 9 can be combined in a calculation that covers the entity of Orange County is equivalent to an assumption that the part of Orange County in Congressional District 9 is representative of the entire county itself, including -- so representative of the place where Orange County intersects in Congressional District 8, represents where Orange County represents in Congressional District 10, and represents where Orange County intersects Congressional District 11.

Q.    What evidence or data, if any, did the OECS provide in the interim report to show that the area of Congressional District 9 in Orange County is representative of the portions of Congressional Districts 8, 10, and 11 in Orange County?

A.    There is no such data that the OECS provided.

Q.    From a scientific perspective, what does the absence of that evidence or data mean?

A.    That means that in some sense the OECS is extrapolating without foundation from part of Orange County -- when I say "part," I mean the part that intersects Congressional District 9 to the entirety of the county.

Q.    Okay.  And let's move on to step four of the methodology you analyzed.

    What is that step?

A.    In the fourth step of the OECS methodology, the OECS took the drop-off rate that I just described and then multiplied it by another value to generate an estimate for the statewide rate of petition invalidity among previously validated abortion petitions.

        MR. WERMUTH:  Your Honor, if you can turn off your monitor.

        Thanks.

        If you can pull up slide 18.

        All right.  If I could have a minute, Your Honor?

        THE COURT:  Certainly.

MR. WERMUTH:  Okay.

(Pause in proceedings.)

THE COURT:  While they are shuffling papers, one thing that would help me, what was the conclusion that is the purported statewide invalidity rate?

THE WITNESS:  14.8 percent.

THE COURT:  So the suggestion was that if you went back and looked at it, Houston, we have a problem because almost 15 percent of previously validated petitions were likely not valid.  That's what --

THE WITNESS:  Is that what I think the OECS is arguing?

THE COURT:  Yes.  Is that what the report says, that there is a 15 percent -- almost 15 percent error rate that wasn't identified by the Supervisors?

THE WITNESS:  I think -- I would say --

THE COURT:  Let me -- I want to say what I'm gleaning, and you tell me if this is wrong, and then both sides can tell me what they want me to get out of it.

It sounds to me like we've -- whether it's imperfect as you've suggested or flawed or perfect, they've gone through this analysis with an idea of saying, We've looked at these previously validated petitions and we now believe based on our analysis that there is an error rate of 14.8 percent on previously validated petitions.

Is that not what that means?

THE WITNESS:  Fair enough, your Honor.

THE COURT:  And when you say there's an error rate of 14.8 percent, what does that -- if you accept that premise, what does that mean?

THE WITNESS:  In other words, if one were to accept that, putting aside -- Your Honor, I don't have expertise in, like, how they actually did their discussion of -- analysis of signature verification, and so I just want to be clear I'm not engaging that issue at all.

But putting all of that aside, the implication is as you described, that 14.8 percent of petitions that were already validated by Supervisors of Elections actually shouldn't have been.  That would be the implication that one would draw.

THE COURT:  Okay.  That's what I thought.  I just wanted to make sure I wasn't gleaning something I shouldn't.

MR. WERMUTH:  Okay.  Are we good?

MS. PRICE:  Yes.

THE WITNESS:  Okay.  Your Honor, you can turn on your monitor for this because Ms. Price has agreed.

BY MR. WERMUTH:

Q.   All right.  What is this, Dr. Herron?

A.   So this is Footnote 16 from the interim report, and at a high level this is what you would call -- what I would call the OECS overall invalidity rates in the aggregate of Palm Beach,

Orange, and Osceola Counties.

Q.   Okay.  And take us through -- so what is the aggregate rate that they are calculating there?

A.   So in Footnote 16 there's -- a quotient, a division, and the numerator are three numbers, 15, 715, and 102.  These are numbers of petitions that the OECS believes are invalid.  They are previously validated, but the OECS believes they are invalid across Palm Beach County, Orange County, and Osceola County. And here when I say "Orange," I mean in Orange County 1 that I earlier discussed.  The denominator of the fraction is the sum of 41, 2,216, and 1,378.  Those are numbers of petitions that the OECS audited as part of -- excuse me -- the number of validated petitions that the OECS audited in the course of the Palm Beach County audit, its Orange 1 audit, and its Osceola County audit.  If you divide those two numbers, you get 22.9 percent.

MR. WERMUTH:  Okay.  And let's pull up Footnote 117, which is the next footnote.

BY MR. WERMUTH:

Q.   At a high level what does this reflect?

A.   At a high level this is the source of the number that Your Honor asked me about a few minutes ago, which is 14.8 percent.  It's the formula that the OECS used to calculate what it considers to be the invalidity rate across Florida among previously validated abortion petitions.

Q.    Okay.  And what type of statistical operation does this calculation reflect?

A.    It reflects extrapolation.

Q.    Okay.  And how many counties are there in Florida?

A.    67.

Q.    And how many counties are involved in the 22.9 estimate?

A.    Three.

Q.    And how many counties are involved in the 35.4 percent estimate?

A.    I would say -- well, the technical answer to that is less than one because it's the part of Orange County that's in Congressional District 9, but to be conservative I'll just say one.

Q.    Okay.  What evidence or data, if any, did the OECS provide in the interim report to show -- to show that the claimed invalidity rates in the combined Palm Beach, Orange, and Osceola Counties can be extrapolated to the entirety of Florida?

A.    There is no such evidence in the report.

Q.    Okay.  From a scientific perspective, what does the absence of that evidence or data mean?

A.    It means the extrapolation from these three counties -- Palm Beach, Orange, and Osceola County -- to the entity of Florida is without foundation.

Q.    Okay.  And what evidence, if any, did the OECS provide in the interim report to show the claimed drop-off rate based on

the part of Orange County that is in Congressional District 9 can be extrapolated to the entirety of Florida?

A.   There is no such data.  There is no such evidence in the OECS report.

Q.   And what does the absence of that evidence or data mean?

A.   That means that this calculation that generated 14.8 percent is effectively an extrapolation from one -- part of one county to the entirety of Florida, and that extrapolation is without foundation.

Q.   Okay.  Earlier you testified that the three counties in which the OECS selected to review validated petitions were selected on the dependent variable, and the petitions that the OECS selected to review in the three counties were also selected on the dependent variable; is that right?

A.   That is right.

Q.   How does the OECS --

          THE COURT:  Counsel, if you can -- hold on one second.

          MR. WERMUTH:  Yeah.

          THE COURT:  I'm your student at Dartmouth and I understood your testimony that if I generated this number that we've seen of 14.8 percent, you'd fail me; correct?

          THE WITNESS:  Your Honor, yes.

     (Indiscernible crosstalk.)

          THE COURT:  This would not be an acceptable way to -- it wouldn't hold up under peer review.

THE WITNESS:  That's a more polite way to put it, yes.

THE COURT:  I just want to find out.  Surely -- and if I'm wrong, you won't hurt my feelings.  And I'm assuming surely you could randomly select a sampling of counties based on size and randomly then do a sampling of petitions.  Would that be -- and I understand there is a lot more moving parts, but starting with that as the sort of big picture, it's -- is it possible then to be able to arrive at some sort of useful data doing it that way?

THE WITNESS:  The -- I think, if I'm following you correctly, the answer would be yes.  I think what you asked me, it was could you sample randomly among certain places in Florida.  And then -- were you asking about whether or not you could correct your estimates or --

THE COURT:  Well, no, no, I was just suggesting that I was anticipating a problem, which is why I said you'd randomly select not just counties, but if you randomly only selected small counties, that might be a problem, which is why I'm saying you'd have to randomly select counties of mixed size, and then within those counties randomly select petitions.

If that was the starting point based on your critique of this analysis, could you come up with a number?

THE WITNESS:  The answer is yes.  And the risk is exactly what you described, which is if you randomly selected counties with, say, probably 1 over 67 for each county, you

could easily end up with a lot of pandemic panhandle counties that are smaller, not populated. And then you would end up with some strange results, biased results.

However, with all due respect, where the audit went wrong in the beginning is you shouldn't pick counties to audit, you should pick petitions to audit. And so really what should be happening is that you randomly select petitions. And the OECS knows where --

THE COURT: So the better plan would be not to start with counties, but to randomly select petitions statewide.

THE WITNESS: Correct.

THE COURT: I understand.

Let me find out. It's been an hour and 25 minutes. Let me find out, how long do you think you have total, just --

MR. WERMUTH: I probably have another hour, but you shortcutted quite a bit of stuff.

MR. JAZIL: I'm sorry. Your Honor, I didn't hear the last part of what Mr. Wermuth --

MR. WERMUTH: Well, he just shortcutted part of any analysis for me, but I think I have another hour.

THE COURT: And let me say to everybody, I'm going to do it the same with Ms. Price's witness, if she's the one putting on. It just seems to me it's easier if the fact finder can ask questions so it's clear that I get it. I'm not doing that to be funny; I'm just doing it to say, Do I get it? If I'm

Direct Examination - Dr. Herron

wrong, tell me why. And it kind of moves things along.

We'll go ahead and take a ten-minute break and when we come back you can continue your examination.

(Recess taken at 2:25 PM.)

(Resumed at 2:40 PM.)

THE COURT: All right. We are back on the record.

Counsel, you may proceed.

MR. WERMUTH: Yes, Your Honor.

And I'd just like to clarify -- again, I know you get it. I just want to make clear on the record that this portion of Dr. Herron's presentation is being proffered only for purposes of the -- well, at this point only for purposes of assessing --

THE COURT: You're introducing it because you are challenging the admissibility of the reports, and I understand that, and I've deferred ruling on that until I hear everything.

MR. WERMUTH: Okay. Thank you, Your Honor.

BY MR. WERMUTH:

Q. All right. So we were just talking about the statewide invalidity rate that the OECS was calculating.

And other than in this case, please tell us whether you have ever seen extrapolation from 3 counties to 67 or from 1 county to 67 in analyzing aspects of election administration.

A. I cannot think of any example of extrapolation to that extent.

Q.    And why do you think that is?

A.    Because if a state like Florida is divided into 67 counties, I cannot imagine any sort of academic analysis that would look at 3 of the counties and then say that, from that, you now know about the entire state.  I just can't imagine something like that.

Q.    Okay.  Dr. Herron, apart from the OECS's statewide estimate methodology, did you analyze the reliability of other estimates in the interim report?

A.    Yes, I did.

Q.    And what were those?

A.    Those were estimates of within-state rates of petition invalidity among previously validated petitions.

Q.    Okay.  And how do you characterize the methodology that the OECS used for that purpose?

A.    I characterize it as consisting of five steps rather than four.

Q.    Okay.  And how do the first two steps of that methodology compare to the methodology that we've previously reviewed?

A.    They're the same.

Q.    Okay.  And what about the third step?

A.    In the third step of what in my report call the variant of the methodology -- and when I say "variant," I mean referring to within-state estimates.  In this third step, the OECS calculates an average of averages, and that step did not exist in the

statewide methodology.

Q.   Okay.  And what is the other aspect of this variant methodology that differs from the original methodology that you've talked about so far in your testimony?

A.   I would say that the other step that differs, which in my report I describe as the fifth step -- it occurs when the OECS takes the average of averages that I just mentioned, which came out of the third step, and multiplies it by a function of the drop-off rate that I earlier testified about.  And that product drop-off rate times average of averages the OECS claims to estimate within-state rates of petition invalidity among previously validated petitions.

Q.   Okay.  Let's focus on the first of those two steps that you mentioned were altered by this variant methodology.

     How do you know that the OECS calculated an average of averages using invalidity rates of previously validated abortion petitions submitted in three counties?

A.   I know this because I looked at the calculation that the OECS carried out, and it is an average of averages.

Q.   Okay.  I'd like to pull up Footnote 12 of the interim OECS report.

     Dr. Herron, what do you see there on your screen?

A.   I see Footnote 12 from the OECS interim report.

Q.   And take us through that calculation.

A.   So Footnote 12 involves a calculation of -- it's a

fraction, and the numerator of the fraction is the sum of 36.6 percent, 32.3 percent, and 7.4 percent.  Those are the Palm Beach, Orange 1, and Osceola County invalidity rates asserted by the OECS that I earlier testified about.

And then the denominator of the fraction is the number 3, and that refers to three counties.  And so what we have here is an average of those three rates, and the average of averages is 25.4 percent.

Q.   Okay.  And you mentioned it's an average of averages.

What do you think of the use of an average of averages?

A.   In general, it's not a good -- it's a bad idea.

Q.   Okay.  Do you have an example of the reason why you wouldn't use an average of averages?

A.   Yes, I do.  I put one in my report in this litigation.

Q.   Okay.  And can you kind of walk us through your -- the example that you gave us?

A.   Sure.

MR. WERMUTH:  If you can take us to the next slide.

And if you can turn this off, Your Honor.

Thanks.

It's Slide No. 24.

BY MR. WERMUTH:

Q.   All right.  Please proceed.

A.   Okay.  So it's not difficult to have an example -- to find an example in which an average of averages is misleading.  So an

example that I gave in my report is as follows:

Suppose you think about two counties -- and I'll just call one of them County A and the second one County B -- and suppose in County A there's one person, one eligible voter, and in an election this person votes. So that means the turnout rate is 100 percent.

And now think about County B, and that county has 99 eligible voters, and there is one person voting. And so that turnout rate is basically 1 percent. It's a little greater than 1 percent because they're 99 out of 100, but not much, 1.01.

So now we have two counties. If I combine them and I calculate an aggregate turnout rate, it's going to be 2 divided by 100, or 2 percent.

Okay. That's where that came from. Both counties had a turnout of two. County A had one person. County B had 99, total population 100, so 2 divided by 100, i.e., 2 percent.

Okay. So if I calculate an average of averages, I will average 100 percent and 1.01 percent, because those are the turnout rates in Counties A and B respectively, and that average of averages is 50.5 percent.

So what this simple example shows is that if you have two different, say, jurisdictions and you want to know the aggregate turnout rate, what you shouldn't do is compute an average of averages that would give you 50.5 percent. What you should instead do is combine the counties and calculate the correct, or

the true, turnout rate, which is 2 percent.

So in this example 2 percent is, of course, very different than 50.5 percent. And this example illustrates why and really explains why my answer to your question, like, should you use averages of averages, the answer is no. And this example shows you why.

Q. Okay. Is there evidence in the OECS report that the OECS was aware of how to do the calculation using an aggregate of averages?

A. Yes. I think there is evidence that the OECS is aware of basically what I just said.

Q. Okay. And if you can pull up Footnote 15 –- Footnote 16 of the OECS report.

MR. JAZIL: Pardon me, Counsel. Which OECS report?

MR. WERMUTH: The interim OECS report.

BY MR. WERMUTH:

Q. Dr. Herron, what does this reflect?

A. Footnote 16 is the OECS calculating an aggregate invalidity rate among previously validated petitions across Palm Beach, Orange, and Osceola Counties. Here I mean Orange 1. And you can see that results in a rate of 22.9 percent. I think I discussed this footnote earlier in my testimony.

And so this is effectively putting aside all the other issues of selection that I discussed and what exactly it means for the OECS to determine that a validated petition is invalid.

Putting all that aside, this is a way of combining Palm Beach, Orange, and Osceola Counties and calculating an overall invalidity rate.

MR. WERMUTH:  All right.  And could you pull up Footnote 12, please.

And this is in the OECS -- in the interim OECS report.

BY MR. WERMUTH:

Q.   Dr. Herron, please explain what the calculation is in Footnote 12.

A.   Well, Footnote 12 is what you asked me about a few minutes ago which started this discussion, and that is the average of averages.  So it's 25.4 percent.  And what I would say is that this number is different than the 22.9 percent that you just -- that we just discussed.  And that shows -- that is an example, and even here, that averages of averages are misleading.

And it also suggests that the OECS in some sense knew how to do the right calculation, but for -- in the variant of its methodology used an average of averages instead.

Q.   Okay.  And the result was?

A.   The result is a greater number:  25.4 percent.

Q.   Okay.  And how does this average of averages error compare to the previous issues you identified in the OECS selection of counties, selection of petitions, calculation of the drop-off rate, and extrapolation?

A.   It's a different issue entirely.

Q.   Okay.  Can you discern any legitimate basis for the OECS selecting an average of averages in this mathematical operation?

A.   No.

Q.   Okay.  Let's turn to the second step of the two steps that you identified as being added to the variant methodology in the OECS report.

MR. WERMUTH:  All right.  If you can go to --Your Honor, could you turn off your monitor, please?

THE COURT:  It's off.

MR. WERMUTH:  Okay.  Could you go to Slide 26.

BY MR. WERMUTH:

Q.   What is the next step of the methodology that the OECS changed?

A.   The last step of the variant methodology consists of a calculation where the OECS takes the average of averages that I just described, 25.4 percent, and multiplies it by the drop-off -- the complement of the drop-off rate from Orange County that I discussed earlier before the break.

And here, again, I would like to emphasize that I'm calling this the Orange County drop-off rate, but it really isn't the Orange County drop-off rate because it only covers part of Orange County.  I'll put that aside.  But basically multiplying those two steps -- those two quantities to generate estimates of rates of petition invalidity among previously validated petitions.

MR. WERMUTH:  Okay.  I'd like to pull up Footnote 14 in the interim OECS report.

And, Your Honor, I think you can turn on the monitor for yourself.

BY MR. WERMUTH:

Q.   Dr. Herron, what is this footnote?

A.   This footnote at a high level is how the OECS purports to estimate the petition invalidity rate among unaudited counties in Florida.

Q.   Okay.  And where does the 35.4 percent number come from?

A.   The 35.4 percent is the Orange County drop-off rate that I've spoken about earlier.

Q.   Okay.  And where does the 25.4 percent number come from?

A.   That is the average of averages.

Q.   Okay.  And what's the 16.4 percent number?

A.   That is the result of multiplying the complement of the drop-off rate by 25.4 percent, and substantively that refers to the quantity that the OECS uses to estimate the petition invalidity rate in unaudited counties in Florida.

MR. WERMUTH:  Okay.  Your Honor, if you can turn off your monitor again, please.

If we could go to Slide 28.

BY MR. WERMUTH:

Q.   So did the OECS calculate within-state invalidity rates in various congressional districts?

A.    Yes.

Q.    And one of those was Congressional District 9; correct?

A.    That is correct.

Q.    And what counties did they include in their analysis for purposes of calculation for calculating the invalidity rate in Congressional District 9?

A.    Congressional District 9 intersects three counties in Florida:  Orange, Osceola, and Polk.  And the OECS attempted to incorporate figures from both of these counties in its calculation of the Congressional District 9 invalidity rate.

Q.    Okay.  And how many petitions did they audit in Polk County?

A.    Zero.

Q.    Okay.  And yet what invalidity rate did they assign to Polk County?

A.    16.4 percent.

Q.    Okay.  And what was the resulting invalidity rate that was calculated for Polk County on the basis of invalidity rates in Orange, Osceola, and Polk County?

A.    11.7 percent.

Q.    Okay.  Do you have -- do you have an opinion as to whether this average invalidity rate that the OECS calculated is trustworthy or has any scientific basis?

A.    I do.

Q.    What is that?

A.   It does not.

Q.   Okay.  And why do you say that?

A.   Because Congressional District 9 intersects three counties, as I earlier testified -- one of which is Polk -- and the OECS audited a total of zero petitions in Polk, but it nonetheless asserted without foundation that the invalidity rate in Polk County is 16.4 percent.

That 16.4 percent figure comes from multiplying the drop-off rate or the complement of the drop-off rate with the average of averages of 25.4 percent.  There's no foundation for stating that the Polk invalidity rate is 16.4 percent, which means that there's no foundation for the Congressional District 9 estimate.

Q.   Okay.  Do you know whether the OECS used that same average invalidity rate calculation in extrapolating rates to other congressional districts and areas within Florida?

A.   Yes, that is my understanding that it did.

Q.   Okay.  What effect does the OECS's use of the invalidity rate calculation have in every estimate in which it's used?

A.   It renders the estimate unreliable.

Q.   Okay.  Let's go to Congressional District 20 calculation.

MR. WERMUTH:  All right.  Are you okay with us showing this to the Judge?

MS. PRICE:  If it's part of the OECS report, yes.

MR. WERMUTH:  It is.  Okay.

Your Honor, you can turn on your monitor.

BY MR. WERMUTH:

Q.    What does this statement reflect?

A.    This statement is the passage that is taken out of the OECS interim report.

Q.    Okay.  And what do they say about how they calculated the congressional -- the invalidity rate for Congressional District 20?

A.    According to this passage, Congressional District 20 intersects two counties in Florida, Broward and Palm Beach.  And what the OECS wrote is that it took information from the Palm Beach County audit, along with the drop-off rate that I've discussed, and then it says, quote:  *Applying the average total invalidity rate for Broward County,* end quote, result -- well, I'll continue as quoting -- *results in a projected CD invalidity rate of 18.2 percent,* end quote.

So to answer your question, this statement shows how the OECS combined Broward and Palm Beach County information to generate a Congressional District 20 invalidity rate.

Q.    Okay.  And how many petitions did the OECS review in Broward County?

A.    Zero.

Q.    And where did the OECS get an invalidity rate for Broward County?

A.    To the best of my understanding, what the OECS did is

assume that the invalidity rate in Broward County is 16.4 percent, which is the figure, again, that is based on the Orange County drop-off rate and the average of averages.

Q.   Okay.  And how does the OECS invalidity rate estimate for Congressional District 20 compare to the average total county invalidity rate in unaudited counties?

A.   It's greater; 18.2 percent's greater than 16.4 percent.

Q.   Okay.  And how many petitions did the OECS review in Palm Beach County?

A.   41.

Q.   And where are all those -- were all those petitions from Congressional District 20?

A.   No.

Q.   How do you know?

A.   Because I identified the residential addresses of the 41 individuals who submitted the 41 petitions, and I made a map and I identified where in Palm Beach County these 41 individuals -- where in Florida these 41 individuals reside.  And I looked to see if all of these people are in Congressional District 20, and they're not.

        MR. WERMUTH:  Okay.  I'd like to pull up Exhibit 21. It's FDH Plaintiffs' Exhibit 21.

BY MR. WERMUTH:

Q.   Do you recognize this document?

A.   I do.

Q.   What is it?

A.   It is a map of Palm Beach County that I made for the purposes of my report in this litigation.

Q.   Okay.  Is this what you were just referring to as your analysis?

A.   Yes.

MR. WERMUTH:  Okay.  And at this point, Your Honor, I would like to introduce Exhibit 21 into evidence.

MS. PRICE:  No objection.

THE COURT:  Without objection, Exhibit 21 is admitted.

(PLAINTIFFS' EXHIBIT FDH-21:  Received in evidence.)

BY MR. WERMUTH:

Q.   Do you know which -- so can you explain what those dots are?

A.   Yes.  Each dot in this map is a residential address of a Palm Beach County eligible voter who submitted an abortion petition.

Q.   Okay.  And do you know which of these petitions the OECS considered invalid?

A.   No.

Q.   Why not?

A.   Because they haven't specified that.

Q.   Okay.  So do you know whether the petitions the OECS considered invalid were even from Congressional 20 -- Congressional District 20?

A.   No, I do not know that.

MR. WERMUTH:  Okay.  I'd like to go on to --
Your Honor, if you could -- well, actually, let's go to the
portion of the OECS report that references the calculation for
CD 21.

BY MR. WERMUTH:

Q.   All right.  Dr. Herron, what does this portion of the OECS
report reflect?

A.   This portion of the OECS interim report reflects how the
OECS estimated the invalidity rate in Congressional District 21.

Q.   Okay.  And how did it go about doing that?

A.   Congressional District 21 intersects Martin, St. Lucie, and
Palm Beach County, and the OECS took the Palm Beach County
invalidity rate from its audit, and then they took the drop-off
rate that I've talked about before.

And, to my understanding, they then took 16.4 percent,
which is the figure based on the drop-off rate and the average
of averages, and then they put all that together to get a --
what they call a projected CD invalidity rate of 18.4 percent.

Q.   Okay.  And how many petitions did the OECS review in Martin
and St. Lucie Counties?

A.   Zero in Martin and zero in St. Lucie County.

Q.   And where did the OECS get the invalidity rate for
Martin County and St. Lucie Counties?

A.   It took 16. -- to the best of my understanding, it took

16.4 percent, which is a product of the drop-off rate based on Orange County. And, again, I'm saying Orange County; I don't really mean all of Orange County, but I keep saying this --

THE COURT: Subset of --

THE WITNESS: Thank you, Your Honor.

THE COURT: -- Congressional District 9, I got it.

THE WITNESS: Thank you.

And the average of averages, 25.4 percent, and that generated 18.4 percent.

BY MR. WERMUTH:

Q. Okay. And how many petitions did the OECS review in Palm Beach County?

A. 41.

Q. Okay. And were those petitions from Congressional District 21?

A. I apologize. I didn't hear the question.

Q. Were those petitions from Congressional District 21?

A. Not all of them were, no.

Q. Okay. And can you tell from the information in the OECS report whether the petitions from -- the OECS has considered invalid in Palm Beach County were from Congressional District 21?

A. No, I cannot tell.

Q. Okay. So what is your assessment of the calculations trustworthiness for Congressional District 21?

A.    It is unreliable.

Q.    Okay.  I'd like to go to the portion of the OECS report that deals with the calculation of CD 23.

Dr. Herron, is this a familiar pattern as to how they calculated the invalidity rate in Congressional District 23?

A.    Yes.

Q.    Okay.  And how did they go about doing that?

A.    Congressional District 23 intersects Broward and Palm Beach County.  To the best of my understanding, the OECS took the Palm Beach County audit of its 41 petitions, then they assumed that the Broward invalidity rate is 16.4 percent; they adjusted by the Orange County drop-off rate, and that generated what they call a projected CD invalidity rate of 18.5 percent.

Q.    Okay.  And is it correct they didn't audit any petitions in Palm Beach County, and you're not sure whether any of the petitions from Palm Beach County that they audited and considered invalid were from Congressional District 23?

A.    I believe you said Palm Beach County instead of Broward County at first.

Q.    Yes.

A.    And so it is the case that the OECS audited zero petitions in Broward County, and their 41 petitions were not all in Congressional District 23.

Q.    Okay.  To how many Congressional Districts did the OECS project to the 16.4 percent rate?

A.   I'll answer that question going out loud.  There are 28 total congressional districts in Florida.  There are -- there is one that -- CD 9 that the OECS estimates as having an invalidity rate under 16.4 percent, and then there are five that we have talked about, and there are two others that are more complicated to understand, so this leaves 20.

I subtracted -- I took 28, subtracted 8, effectively, got 20, so there are 20 congressional districts that, based on my understanding, the OECS would assume that the invalidity rate is 16.4 percent.

Q.   Okay.  Are there any congressional districts that the OECS did not use its methodology variant to calculate estimated invalidity rates?

A.   Yes.  There were two congressional districts that are a little different, say, a variant of a variant, and the OECS -- these congressional districts are contained entirely within counties.

Q.   Okay.  And let's look at how the OECS calculated Congressional District 10's invalidity rate.

Okay.  How did the OECS calculate the invalidity rate in Congressional District 10?

A.   In Congressional District 10, the OECS took the Orange County 2 audit, which covers Congressional District 9, and yielded an invalidity rate, according to the OECS, of 20.9 percent, and the OECS said that applied to Congressional

Direct Examination - Dr. Herron

District 10 in Orange County also.

Q.   Okay.  How many petitions from Congressional District 10 did the OECS review for this extrapolation?

A.   As far as I can tell, zero.

Q.   Okay.  And what area did the petitions from the Orange County 2 audit come from?

A.   Congressional District 9 out of Orange County.

Q.   Okay.  How does this estimate for Congressional District 10 compare to the estimates for the county invalidity rate of 16.4 percent for the unaudited counties?

A.   It's greater.

Q.   Okay.  And what is your -- can you discern any scientific basis to extrapolate a rate from Congressional District 9 in Orange County to Congressional District 10?

A.   No.

Q.   What is your assessment of the trustworthiness of this extrapolation?

A.   It is unreliable.

Q.   Okay.  I'd like to go on to Congressional District 22, its calculation in the interim OECS report.

How did the OECS go about calculating the invalidity rate in Congressional District 22?

A.   The OECS consulted their audit of Palm Beach County, which is 41 petitions, and then it adjusted its results in Palm Beach County by the drop-off rate that I already discussed,

Orange County or Congressional District 9 part of Orange County,

and it generated the figure 23.6 percent.

Q.   Okay.  And do you know how many --

THE COURT:  Counsel, if I'm following your questions -- because I just want to make sure that I'm -- I'm not making a finding.  I just want to make sure I'm following what you're trying to do.

One, Judge, the statewide rate is nonsense for the reasons explained, and those same problems bleed over into the district-by-district analysis and so those numbers are flawed as well.

Is that what I'm supposed to glean?

MR. WERMUTH:  It is, Your Honor.

THE COURT:  Okay.  I want to make sure that I was following.

MR. WERMUTH:  All right.  There is more to it, though.

BY MR. WERMUTH:

Q.   Do you have an opinion as to the trustworthiness or reliability of the reports estimate of Congressional District 22?

A.   I do.

Q.   What is that?

A.   It's unreliable.

Q.   Okay.  And why is that?

A.   Palm Beach County intersects four congressional districts,

and 41 petitions that were studied there -- or audited there are not all in Congressional District 22 that falls to the map that we discussed a few minutes ago, and so that means that it's not possible, I would say, or not legitimate to use the Palm Beach County audit.

In addition, there is no information as to whether the petitions -- according to -- found by the OECS -- or determined by the OECS -- or I should say claimed by the OECS to be invalid were in Congressional District 22.

And in addition, there are all the features of the drop-off rate that I'm not mentioning over and over. But that's why the 23.6 percent is unreliable.

Q.   Okay.  Now, taking all the OECS congressional district estimates together, how many are less than 16.4 percent?

A.   One.

Q.   And how many are above 16.4 percent?

A.   I would say five.

Q.   Okay.  And what is the OECS's statewide invalidity rate?

A.   14.8 percent.

Q.   How -- can you reconcile the OECS's statewide rate with the rates the OECS calculated for the entire -- for the entire area -- I'm sorry -- for all of the congressional districts?

A.   No.

Q.   Okay.  And are you aware that the entire state of Florida is covered by congressional districts?

A.    I am.

Q.    So what does that mean in terms of the comparison between the two rates that they came up with?

A.    I believe that the OECS report is internally inconsistent in that it states that it has a statewide invalidity rate of 14.8 percent, but it also says that the vast, vast majority of congressional districts' invalidity rates are either 16.4 percent or greater than 16.4 percent.  Insofar as all those numbers are greater than 14.8 percent, it's inconceivable that these two rates are consistent.

Q.    Okay.  What could the OECS have done if it just wanted to -- if it wanted to do this analysis in a better way?

A.    What I would have told the OECS is that the standard way to estimate invalidity rates, subject to all the caveats of what that means, is simply to randomly sample petitions and study them.

Q.    Okay.  You testified earlier that you reviewed the expert report of Thomas Brunell; is that right?

A.    Yes.

Q.    Please tell us whether any of Dr. Brunell's opinions led you to reconsider or change your opinion regarding the OECS's selection of counties or selection of petitions to audit.

A.    No.  To the extent that it had any effect, it reinforced my belief that the appropriate way for the OECS to have conducted its audit was via random sampling.

Q.   Okay.  I'd like to pull up -- now, just to aid in --

THE COURT:  Hold on one second.

(Pause in proceedings.)

BY MR. WERMUTH:

Q.   All right.  Now, just for purposes of showing what Dr. Brunell said about it and being clear about it, I'd like to pull up his report on the screen, pages 8 and 9.  It's toward the bottom.

THE COURT:  Mr. Jazil.

MS. PRICE:  Your Honor, can I have one moment?

THE COURT:  Certainly.

MS. PRICE:  Thank you.

BY MR. WERMUTH:

Q.   Okay.  Now, Dr. Herron --

THE COURT:  Hold on one second.  They are conferring.

MS. PRICE:  Thank you, Your Honor.

THE COURT:  Okay.

Counsel, you may proceed.

BY MR. WERMUTH:

Q.   What does Dr. Brunell say about your -- about your opinion about selecting on the dependent variable?

A.   Dr. Brunell agrees with my opinion.

Q.   Okay.  And where does he agree with that?

A.   I would say he agrees with it because he says so -- as much on -- in a passage that ranges from the bottom of page 9 up to

the beginning of page 10.

Q.    Okay.  And what exactly does he say?

A.    He says, quote: *Professor Herron objects to the methodology used by the OECS for their audit.  He points out that the organization erred when choosing counties because they were "on the dependent variable."  This is something social scientists want to avoid because it will, in fact, bias our estimates, as Professor Herron says.*

Q.    Okay.  And what are the consequences of selecting on the dependent variable?

MR. JAZIL:  Your Honor, under the rule of completion, I'd like to ask that the next two sentences be read as well.

THE COURT:  Counsel.

MR. WERMUTH:  We'll get there, yeah.  That's fine.

THE COURT:  Just go ahead and read them in now.

BY MR. WERMUTH:

Q.    Professor Herron, I guess you can read those in, the next two sentences.

A.    Right now?

Q.    Yeah.

A.    Quote: *However, that fear is far less relevant for our purposes here.  Professor Herron is assuming that the goal of the OECS audit is to compute an unbiased estimate of the proportion of accepted signatures that should have been rejected for the whole state of Florida.*

Q.   Okay.  What are the --

THE COURT:  Can I just -- so under the rule of completeness -- because I'm -- I suggest I'm not going to have a report that's not going to have -- come into evidence -- can somebody tell me what is the purported goal?  Can somebody go ahead and -- does the report say -- I think it's going to say on page 14 the goals of the OECS are made clear, colon.

Can you scroll to that for me, please?

(Pause in proceedings.)

MR. WERMUTH:  Okay.  Which part?

THE COURT:  So the first objective is to, quote, "determine the extent of fraud."  It says "extent and methods."

Y'all, this will be for argument later on.  I'm just --

MR. WERMUTH:  Okay.

THE COURT:  -- confused about how the numbers don't matter if one of the goals is to determine the extent of fraud, but somebody can explain that to me later.

MR. WERMUTH:  Yeah.

BY MR. WERMUTH:

Q.   Well, let's take it in order.

What are the consequences of selecting on the dependent variable that Dr. Herron -- that Dr. Brunell is referring to here?

A.   The consequence are estimate bias, as Dr. Brunell states,

and is as well known.

Q.   Okay.  And what direction is the bias in this instance?

A.   In this instance where there was selection of the dependent variable in terms of counties and then on selection of independent variable with respect to petitions within counties, the selection -- the direction will be upward bias in the sense of rates of asserted petition invalidity among previously validated petitions.

Q.   Okay.  So, basically, it just inflates the rates; right?

A.   I would say so.

Q.   Yes.

THE COURT:  Doctor, let me just ask.  As I understood it, what you are saying is he agrees with your challenges to the numbers and the calculations but says it doesn't matter based on their goals.

Is that the long and the short of it?

THE WITNESS:  Yes, Your Honor.

THE COURT:  All right.  I understand.

BY MR. WERMUTH:

Q.   Please tell us whether any of Dr. Brunell's opinions led you to reconsider, change your opinion that random selection is the proper method of selection to get an unbiased result.

A.   No.

Q.   Okay.  And why is that?

A.   Because it's well known that if you want unbiased estimates

of rates that you should sample randomly.

Q.    Okay.  And let's look at -- I believe you -- we have a second quote from Dr. Brunell's opinion, and it's on the page.

MR. WERMUTH:  But if you could -- Blake, if you could highlight the portion that we are going to talk about.

And, Your Honor, you actually referenced this.

BY MR. WERMUTH:

Q.    But, Dr. Herron, what does this reflect?

A.    This reflects the subject that we were just talking about with Your Honor, that -- here Professor Brunell is saying that the critique -- or the concern about selecting a independent variable, which he shares is really not relevant given that the OECS was not attempting to generate an invalid -- excuse me -- is not attempting to generate an unbiased estimate of invalidity rates of previously validated petitions.

Q.    Okay.  What opinion do you have of Dr. Brunell's critique?

A.    I think the critique is mistaken.

Q.    Okay.  And why do you believe it's mistaken?

A.    Because I read the interim report and I read how the interim report was described in the January 2025 report, and in it the OECS described what it believes are statewide estimates of invalidity rates and within-state estimates, and these statements can only make sense if they were intended to be unbiased in the first place.

Q.    Okay.

THE COURT:  Let me ask the --

MS. PRICE:  Your Honor, I just want to object to the extent he's talking about intent.

THE COURT:  Well, he's talking about the critique and why he -- why the critique doesn't change any of his opinions and why he disagrees with the critique, so overruled on that basis.

Let me ask what I think -- the question that matters would be based on the stated objective of the report, the proclivity of the Eleventh Circuit to treat the mere utterance of the word "fraud" as some magic talisman.

If the extent of fraud is the focus and the justification, does the report collapse, conflate, whatever term you want to use, invalidation with fraud?

THE WITNESS:  Are you asking me, Your Honor?

THE COURT:  Yes.

THE WITNESS:  Yes.

THE COURT:  Because that's -- to me, that's what somebody needs to show me in the report and we need to focus on. This may be argument, not the witness. But I need -- because I don't have the report in front of me, I need to know what does the report say.  I mean, the report could be entirely flawed. That could be information that's adding grist to the mill, whatever term you want to use, in terms of saying that this is a bad thing; we need to change the law.

But if fraud is going to be the focus, I need to know is fraud an invalidation; are those two things conflated. If they are, then I understand. Y'all can do that for argument later. I'm just, like, flagging it for you.

And while we're there flagging things, I want to circle back. I quoted Chief Judge Pryor. So it's clear why I did that was there was a reference, I believe, to your -- one of your prior analyses. When we talk about random samples versus statewide samples, in some instances -- if you only collect data from five counties, you're stuck with the five counties, and I'm guessing that that's a different animal; correct?

THE WITNESS: Sir, the example that you are describing -- since I don't work for the State, I, of course, can't compel anyone to give me any data. So, yes, if I am stuck --

THE COURT: But in that instance, you only had five counties; correct?

THE WITNESS: That is correct.

THE COURT: Fair enough. That's just for my own gratification that I was asking that question.

Counsel, you may proceed.

MR. WERMUTH: Okay.

THE COURT: But, of course -- and maybe I'll just start randomly quoting basic statistics books that weren't introduced or discussed in the record as part of my analysis in

this case.

But go ahead.

BY MR. WERMUTH:

Q.   Okay.   Why do you believe that Dr. Brunell's critique is mistaken?

A.   I believe it's mistaken for two reasons, one of which I mentioned before, which is that I -- my reading of the report is that the OECS intended for -- it wrote about statewide rates in a way that, in my opinion, wouldn't make any sense if they were not intended to be unbiased in the first place.

In addition, in any supplemental report in this litigation, I discussed the point that Your Honor just mentioned, which is the explicit goal is to study the extent of fraud, and to the extent that that is the goal as stated, then it needs -- you can't study the extent of a fraud in a state by studying selective locations and then extrapolating to the entirety of the state.   That's why.

Q.   Okay.   So if, as Dr. Brunell suggests, the OECS was not interested in getting unbiased samples, what is the implication for all of OECS's claims about invalidity rates?

A.   If Dr. Brunell is correct in the vein in which you are describing, then it follows that the OECS in its interim report wrote about biased estimates of invalidity rates as if they were unbiased.

MR. WERMUTH:   Okay.   Now, this portion of Dr. Herron's

testimony we are proffering as evidence in the case.

THE COURT: Well, the first was a proffer for me to deal with the issue of the reports and the trustworthiness of the reports and how I should rule on whether or not it's public record that comes in; correct?

MR. WERMUTH: Yes.

THE COURT: All right. And now you are going to introduce some substantive evidence.

One thing, let me just mark here -- and this is for argument, not for the witness. If I have to follow Judge Lagoa's thoughtful analysis in the stay order and it's subject to intermediate scrutiny and not strict scrutiny, if subject to scrutiny any at all -- because I understand the caveat it's all conduct and none of it is speech and it's not expressive conduct, potentially -- why does any of this matter?

Because for rational basis review, I don't care, do I?

Let's say the entire report is hooey, nonsense; rational basis, it wouldn't matter at all, would it?

MR. WERMUTH: I think at that point, Your Honor, what you are talking about is more of they've already put into HB 1205 that they relied on the OECS report.

THE COURT: And if it's intermediate scrutiny, do you get to go behind for intermediate scrutiny? Do you get to go behind the reports and --

MR. WERMUTH: Yes, you do.

THE COURT:  Well, that's something y'all are going to need to argue about.

MR. WERMUTH:  Okay.

THE COURT:  Okay.  I'm just flagging these as issues that I want y'all to address.  And some of these things when I'm flagging issues, it might be helpful if we have -- you're going to be able to amplify it and document it in your closing arguments, but it might be helpful for -- somebody hopefully is writing these down, because I'm not just talking here to hear myself talk and so that y'all can give me your, Judge, we are going to explain this in our closing arguments, but maybe at the end just say, Here's our position or our view, and that we'll flesh this out in our closing.

It would be helpful for me to know where y'all are going so that I can think about it while I'm waiting for your written closing arguments.

Again, I'm not expecting you to give me your final word and cite all the cases, or submit something in writing, but it would be helpful if y'all said, Judge, you asked us these ten points, and this is where we are going and what we expect to support in our closing -- written closing arguments.

MR. WERMUTH:  Okay.  Thank you.

THE COURT:  And for -- the next is going to go -- I believe he had testified about -- the third thing he was going to testify about was the -- the amounts -- the validation fees;

correct?

MR. WERMUTH:  That's correct.

THE COURT:  And is that the last category?

MR. WERMUTH:  It is.

THE COURT:  And just so I'll know, how long do you think you have on the validation?

MR. WERMUTH:  Very short.  15 minutes.

THE COURT:  I'm sorry?

MR. WERMUTH:  15 minutes.

THE COURT:  Okay.  Thank you.

And I'm not limiting anybody, I'm just trying to plan.

MR. WERMUTH:  Okay.

THE COURT:  Okay.  So we are now pivoting from the proffer related to the evidentiary question about the admissibility of the reports, both interim and final, as well as -- and now we are pivoting to testimony separate and apart from the proffer.

MR. WERMUTH:  Okay.

THE COURT:  And one thing that -- we talked a lot about the interim report, I'm assuming since there was an interim report, and the final report incorporates and relies on the interim report, is that --

MR. WERMUTH:  There's an interim report and there's what's called an annual report.

THE COURT:  Does the annual rely on and incorporate by

reference the interim report?

MR. WERMUTH:  It says it -- it says it's incorporating by reference the interim report.

THE COURT:  I'm just trying to find out is argument --

MR. JAZIL:  It does, Your Honor.

It does, and then it has some additional points.  But it does --

THE COURT:  So my question is, is the argument garbage in, garbage out:  Judge, we focused on an interim report and explained why we don't think it's valid through this witness, but because it's then adopted and made part of the final report, it's the same problem, we are just not repeating the testimony twice?

MR. WERMUTH:  Yes.

THE COURT:  I got it.

MR. WERMUTH:  There is no further analysis in the annual report, it's just the interim report.

THE COURT:  I got it.

MR. WERMUTH:  Okay.

THE COURT:  That would be argument.  He didn't do the analysis on the final report, Judge.  That would just be our argument as it relates to incorporating stuff we've already challenged in the interim report.

MR. WERMUTH:  Yeah, I believe his testimony was that he looked at the annual report and determined that it interim --

the interim report by reference.

THE COURT:  I got it.  I'm not saying I'm making any findings, I'm saying I understand the argument.

All right.  So let's go ahead and get on with his testimony regarding the validation fees.

MR. WERMUTH:  Yes.

BY MR. WERMUTH:

Q.   All right.  Dr. Herron, you mentioned that you were asked to produce an estimate of validation fees that a sponsor would need to pay under HB 1205's new fee regime to meet the threshold for placement on the ballot.

How did you go about doing that at a high level?

A.   At a high level, I gathered data published by the Florida Department of State on validated petitions that were submitted for abortion initiative 23-07.  I combined that information with current fees that are in place for validation -- petition validation within counties.  And then I also relied on a declaration about -- from Mr. Emerson in Florida Decides Healthcare regarding the importance of taking into consideration petitions that are not validated in the validation fee.

And, lastly, I verified -- I said "validate" again.  I verified some numbers in Mr. Emerson's declaration using county audit reports in regard to Florida.

MR. WERMUTH:  Okay.  Let's pull up Exhibit 36.

BY MR. WERMUTH:

Q.   Do you recognize this document, Dr. Herron?

A.   I do.

Q.   What is it?

A.   It is a chart that I made for my supplemental report in this litigation.

Q.   Okay.  And where did you get the data for this?

A.   I got the data from county audit reports which describe on a petition-by-petition basis how each submitted petition in the course of abortion initiative 23-07 was adjudicated, either validated or not.

     Whoops -- sorry.  I totally went off in the wrong direction.

Q.   Okay.

A.   These are petition validation costs.

     I apologize, Your Honor.

          THE COURT:  No worries.

A.   These come from data published by the Florida Department of State on what petitions cost to validate -- what submitted petitions cost to validate.  And I gathered data on the petition costs in 2024, and then I updated those costs when I could for some counties in 2026.

BY MR. WERMUTH:

Q.   Okay.  And what does it show?

A.   It shows that the petition validation costs in 2024 were

lower than in 2026.  I'll state that in another way.  It shows that after HB 1205 was passed up to present, which is early 2026, validation fees increased across 66 -- 67 counties in Florida, sometimes substantially.  And the one exception may be Sumter County, which is shown on this plot, which is Sumter County -- each point in this plot is a Florida County, and Sumter County is the point that is on the dashed 45-degree line.  I actually cannot confirm that that county did not increase its rates since 2024, but since I can't confirm it, I'm just assuming that it didn't.

So this figure shows how much each county increased its petition validation fees from 2024 to 2026.  And I should say as well that all these comparisons are in constant dollars.

Q.   Okay.

A.   And that's what this shows.

Q.   And what do the size of those little dot points mean?

A.   The size of each point, which each point corresponds to a county, is proportional to the total number of registered voters as of September 2025.

Q.   Okay.  And so what is the implication of the size of the dot?

A.   The implication is that the larger dots are the more populated counties.  And based on the constitutional rules in Florida about the requirement for validated petitions, it means that in general petition organizers have to gather more

petitions from the larger or more populated counties than from the smaller ones.  And you can see from the distribution of these dots that many of the large dots are -- have high validation costs in 2026.

MR. WERMUTH:  Okay.  At this time, Your Honor, I'd like to move Exhibit 36 into evidence.

MS. PRICE:  No objection.

THE COURT:  Without objection, Exhibit 36 is admitted.

(PLAINTIFFS' EXHIBIT FDH-36:  Received in evidence.)

MR. WERMUTH:  All right.  Let's pull up Exhibit 37.

BY MR. WERMUTH:

Q.   Okay.  Do you recognize this document, Dr. Herron?

A.   I do.

Q.   Looking at this Table 2 -- oh.  What is it, by the way?

A.   This is a table I made for my supplemental report.

Q.   Okay.  And, Dr. Herron, looking at this Table 2, I'd like you to take us through the numbers associated with the abortion petitions.

A.   All right.

Q.   So what does the $3,359,858 cost listed in the first column for the abortion amendment petition represent?

A.   This represents my estimate of what the abortion petition initiative -- abortion initiative, and that means 23-07, would cost based on the actual number of validated petitions submitted across Florida's 67 counties and based on current, as of early

2026, validation fees per petition that are imposed by counties.

Q.   Okay.  And is that the total validation costs, or what does that validation cost relate to?

A.   This validation cost reflects only petitions that were validated.  So the answer to your question is no, it is not a total validation cost.

Q.   Okay.  And same question for the $857,322 number.  What does that represent?

A.   That represents the cost of -- the validation costs of the -- of validated petitions submitted across Florida in abortion initiative 23-07 based on validation fee charges in place as of late 2024.

Q.   Okay.  And what do the last two columns reflect?

A.   Those columns labeled "Change" and "Percent," the first column is the difference in 2026 costs minus 2024 costs, roughly 2.5 million.  And the second is the percent, which is the percent it's changed from 2024 up to 2026.

Q.   Okay.  And what's that percentage change?  Sorry.

A.   292 percent.

Q.   Okay.  So the rate increase just for validated petitions was a 292 percent increase?

A.   Yes.

MR. WERMUTH:  Okay.  I'd like to move Exhibit 37 into evidence.

MS. PRICE:  No objection.

THE COURT:  Without objection, Exhibit 37 is admitted.

(PLAINTIFFS' EXHIBIT FDH-37:  Received in evidence.)

BY MR. WERMUTH:

Q.   Okay.  Did you assess the anticipated verification fees associated with both validated petitions and petitions that Supervisors determine to be invalid?

A.   Yes.

Q.   And how did you go about doing that at a high level?

A.   At a high level, I took the number of petitions that Mr. Emerson of Florida Decides Healthcare stated in a declaration would be needed at a minimum to place an abortion initiative -- or abortion referendum on the ballot, and then I used that number in conjunction with these costs to estimate a total validation cost for an -- the abortion petition initiative had it been run in 2026 under 2026 validation fees.

MR. WERMUTH:  Okay.  And so, Your Honor, if you can turn off your monitor for a moment.

If you can pull up slide 37.

THE COURT:  37 was admitted; right?

MR. WERMUTH:  Slide 37.

THE COURT:  Oh, slide 37.  I'm sorry.

BY MR. WERMUTH:

Q.   Okay.  Can you take us through your calculation of how you went from the total validation cost number in 2026 for validated petitions and came up with your final estimate for the cost to

validate -- the cost to achieve the minimum number of petitions required for ballot placement?

A.    Yes.  I took the figure that I described earlier, which is $3,359,858.  That was the validated costs for the abortion petition -- abortion initiative under 2026 validation fees and only accounting for validated petitions.  Then I deflated this quantity by the ratio of 880,062 divided by 997,035.

The reason I did that is because abortion initiative -- in abortion initiative 23-07, there were 997,035 validated petitions.  So I deflated the cost, recognizing that there were more petitions validated than necessary.  And that was the second step of my cross-calculation.

And then in the third step, I inflated by the fact that not all petitions are validated.  So under present conditions to have a petition -- an initiative lead to a ballot referendum requires 880,062 validated petitions.  So I scaled the previous cost estimate up by the ratio of 1.3 million to 880,062.  And that generates a figure of 4,380,804.

Q.    Okay.  And is that 4,380,804 number -- what does that represent?

A.    I consider that a conservative estimate of validation fees. And I say it's conservative because Mr. Emerson wrote in his declaration that his organization understands that it needs at least 1.3 million petitions submitted in order to have 880,062 validated.  And to be conservative, I'm using 1.3 million in my

calculations, but it's a minimum number.  And so, hence, my final cost calculation is the lower bound, or conservative.

Q.   Okay.  How confident are you that the $4,380,804 is a reasonable estimate of what a sponsor would need to pay in validation fees for petitions submitted to meet the minimum threshold to place an initiative on the ballot?

A.   I am confident that it is a conservative estimate.  And I'm also aware -- another reason that I expect that it's conservative is the fact that a petition that -- an initiative that misses the threshold by, say, one petition would result in a failed initiative.  And I believe that builds in an incentive for initiative sponsors to ensure they have way more than the minimum required, way more than the 880,062 because of the potential downside of missing that cutoff.  So that's another reason why I suspect that my figure, 4.4 million, roughly, is conservative.

MR. WERMUTH:  Okay.  If you can take down that slide and bring up Exhibit 39.

THE COURT:  Give me one second, please.

(Pause in proceedings.)

THE COURT:  Before you go on, let me go back to -- I think it was Exhibit 36, not 37.  When you listed the -- I believe -- was it actual cost for the marijuana and abortion, that is, the actual validation cost?

THE WITNESS:  Under 2024, Your Honor?

THE COURT:  Yes.  When it was, like, 800,000 or thereabouts, that number.

THE WITNESS:  Correct.

THE COURT:  And what was -- you then next to it had approximately 2 million.

What was that figure?

THE WITNESS:  That was a change between what I think it will be in 2026, if it were to exist in 2026 --

THE COURT:  That's what -- I'm trying to not mix apples and oranges.  And so from that I should have gleaned adjusted for today's dollars and everything that figure would be higher.  So without any changes or any new fees, based on those same fees, it would be north of 2 million.  And then the conservative figure -- now you're going with the new changes wrought -- it would be nearly double that -- or more than double?

THE WITNESS:  No, Your Honor, I don't believe that's correct.

THE COURT:  I just want to make sure I understand what the numbers are.  That's why I'm asking.

THE WITNESS:  So the change -- and I don't have the exhibit number in front of me.

THE COURT:  I think it was 36.

MR. WERMUTH:  It's actually 37.

THE COURT:  Oh, 37.  I'm sorry.

THE WITNESS:  The change in Exhibit 37 is due to the change in fees, not the change in value of the dollars.

THE COURT:  I got it.  So that would be the 2 million-plus-fee figure would have been adjusted for the new fees that are being passed on?

THE WITNESS:  Correct.

THE COURT:  So if you had done it now, that's what it would cost.  Help me -- that's why I'm asking the questions.

So help me to reconcile -- if you had done abortion and/or marijuana now, the adjusted figures were approximately 2 million plus under Exhibit 37; right?

THE WITNESS:  The adjusted -- the adjusted figures are, I think, if I'm following you, around 3.3 million.

THE COURT:  I'm sorry.  I don't have it up in front of me.  That's why I'm -- so 3 -- do you have it?

Just put it up, please.

MR. WERMUTH:  Okay.  The calculation?

THE COURT:  No, no, it was the one where you just had the chart.  You had here's what the validation fees were and here's what -- there were, like, literally two columns next to each other.

MR. WERMUTH:  You don't see it?  I'm sorry.  We had it up.

THE COURT:  Oh, I'm sorry.

MR. WERMUTH:  You had your monitor turned off.

THE COURT: Oh, okay.

Oh, when I was saying the 2-something figure, that was the change, not the cost.

One more time. So the cost in 2024 -- let's just stick with abortion -- was 857,322. That was the actual validation cost to get on the ballot; is that right?

THE WITNESS: No, that's the validation cost for validated petitions.

THE COURT: And I understand it's going to be higher because you also had to pay validation fees for invalidated. So the number is going to be higher that you actually spent on total. I got it.

And so then -- and I should slow down because I knew that based on the prior testimony. So then the cost in 2026 where you're going from 857 to 3.3 and change, that's going to be based on when you add in the new expenses associated with validation?

THE WITNESS: The new validation fees, correct, per county.

THE COURT: That are being passed on by the county back to the folks that are then billed per petition?

THE WITNESS: Correct.

THE COURT: Okay. And as I understood the conservative 4,380,804 figure, that was based on the number of petitions you would have to have at minimum, so it excludes the

fact you'd have more than the exact number because some will be invalidated?

THE WITNESS:  That is correct.

THE COURT:  All right.  What I'm trying to figure out -- and I think I know the answer -- the difference between the figures, and I'm looking at the cost, 226, the 3 million-plus figure, and the 4.3 million.

THE WITNESS:  The difference between that is the inflation due to the fact that a sponsor needs to submit more than the number of minimum required because some are invalidated, and the other issue with this was that long calculation.  There is some additional adjustment required because the number of validated abortion petitions in 2024 was not the minimum number; it was slightly more.  So I take the 3.3 million, roughly; I deflate it to correct for that, and then I inflate it again to correct for the fact --

THE COURT:  That you're going to have more.  Like others have testified, if we want to collect 900,000, we're going to have a target of 1.3 million.

THE WITNESS:  I wasn't in court, but, yes, I'll believe it.

THE COURT:  But that's why you'd adjust upwards?

THE WITNESS:  Yes.

THE COURT:  Okay.  I understand.

So this is an adjusted figure to reflect the reality

of what you'd have to do?

THE WITNESS:  The 4.3 million figure?

THE COURT:  Right.

THE WITNESS:  Yes.

THE COURT:  I got it.  I got it.  I was following it.

All right.  I just wanted to make sure.  I don't get to chat with you later, so I wanted to make sure I understood.

MR. WERMUTH:  Okay.  All right.  I'd like to pull up Exhibit 39.  All right.

BY MR. WERMUTH:

Q.    Do you recognize this table?

A.    I do.

Q.    And what is it?

A.    At a high level, this is a table that incorporates 20 Florida counties that contributed audit reports -- or that I was able to access audit reports.  And from each of these, the key result in this table is that for each county I calculated the ratio between submitted petitions and validated petitions.  I call that a scale factor.  And I calculated the various scale factors, and I used this to assess Mr. Emerson's scale factor in the declaration I mentioned earlier.

Q.    Okay.  And where did you go to get the data summarized in this table?  Or where did you get this data summarized in the table?

A.    These were from individual county audit reports in 20

Florida counties.

Q.    Okay.  And how did you determine whether petitions were validated or not for this chart?

A.    In each audit report a Supervisor of Elections would report on a petition-by-petition basis whether a petition was accepted or not.  They call it accepted.  I call it validated.  I think I mentioned that earlier.  So I count the number of accepted ones, or validated ones, and then I look at the total number and that gives me a scale factor.

        MR. WERMUTH:  Okay.  Your Honor, at this point I'd like to offer Exhibit 39 into evidence.

        MS. PRICE:  No objection.

        THE COURT:  Without objection, Exhibit 39 is admitted.

    (PLAINTIFFS' EXHIBIT FDH-39:  Received in evidence.)

        MR. WERMUTH:  Let's go to the last column.

        If you'd zoom out, please.

BY MR. WERMUTH:

Q.    What does the last column represent?

A.    The last column contains the scale factors that I was mentioning.  These are the ratios from submitted petitions to validated petitions.

Q.    Okay.  And if you look at the bottom of those rows, in the "Submitted" column right next to it, you see the number 1,223,055; is that right?

A.    Yes.

Q.    And is that the number of submitted abortion initiative petitions in the 2024 General Election cycle from these 20 counties?

A.    Yes.

Q.    Okay.  What is the total scale of -- scale factor of 1.4718 at the bottom?  Or how does it compare to Mr. Emerson's scale factor?

A.    It's almost identical.

Q.    Okay.  And what does that mean?

A.    That means that Mr. Emerson's use of 1.3 million is consistent with the experience across these 20 counties in terms of the validation rate of submitted petitions.

Q.    Okay.  Did Dr. Brunell provide any opinions that led you to reconsider or change your opinion regarding your estimate of the total validation fees we just discussed?

A.    No.

Q.    What critique, if any, did Dr. Brunell provide as to the basis of your validation fee estimate?

A.    His critique was twofold.  First, he said that we cannot really know what counties will be charging to validate initiative -- to validate petitions.

And, second, he said -- he offered a counterfactual in which every county charged $1 to validate initiative petitions.

Q.    Okay.  Do you have a response to Dr. Brunell's opinion?

A.    Yes.

Q.   What is that?

A.   The first -- so the first critique that Dr. Brunell made was that we can't know the petition validation fees, and, respectfully, that's actually incorrect, because the counties tell us -- actually, the Department of State does, too -- what the validation fees are, so that's knowable.

And so when I made the plot that we earlier discussed with validation fees, those were actual validation fees charged by Florida County Supervisors of Elections.  There's nothing theoretical about them, to the best of my understanding.

The response -- the second critique of Dr. Brunell, which is hypothetical, which -- hypothetical that he offered in which every county in Florida charged $1, I would say, respectfully, that's not really grounded in reality because there are no counties that charge $1, and, in fact, only one county that charges under $1, so that critique didn't -- that critique didn't mean much to me because it's not grounded in anything real.

Q.   Okay.  What impact did HB 1205 have on the validation fees in every county that published updated per-petition validation fees in 2025?

A.   To my understanding, they all went up.  And the only exception is Sumter County, which may have gone up, but I can't determine it, so for the moment I'm treating it as if it didn't go up.  So I would say, to answer your question, 66 of 67

counties raised their fees in the aftermath of HB 1205.

Q.   Okay.  And how could you characterize the magnitude of that increase?

A.   Some of the increases are substantial.

Q.   Okay.  What opinion do you have of -- oh, wait.  Sorry.

        MR. WERMUTH:  Can you pull up Exhibit 35?

BY MR. WERMUTH:

Q.   Do you recognize this exhibit?

A.   I do.

Q.   What is it?

A.   This is a bar plot.

Q.   Okay.  And what does it reflect?

A.   This is a bar plot that describes validation costs per petition within Florida counties in 2026 as -- i.e., to the best of my understanding currently.

        MR. WERMUTH:  Okay.  I'd like to introduce into evidence Exhibit 35.

        MS. PRICE:  No objection.

        THE COURT:  Without objection, Exhibit 35 is admitted.

    (PLAINTIFFS' EXHIBIT FDH-35:  Received in evidence.)

BY MR. WERMUTH:

Q.   So is it fair to say that your opinion did not change at all based on Dr. Brunell's critiques?

A.   That is correct.

        MR. WERMUTH:  Okay.  I have no further questions for

you at this time.

THE COURT:  We're going to have to take a break for the benefit of the court reporter.

Circling back to the question I asked all of y'all earlier about intermediate scrutiny, it seems to me that the U.S. Supreme Court in *Turner* from 1994 talks about intermediate scrutiny and suggests that you've got to show that it's a real harm but not engage in the underlying data collection that would be necessary for strict scrutiny.

So I'll need y'all to, in the context of the test, explain to me why that's not the right way to look at it under *O'Brien*, meaning the intermediate scrutiny test, and once you've got evidence that there is fraud and fraud is real, what necessary -- what beyond that would be necessary for establishing a real problem to be addressed in light of the standards set forth by the Supreme Court in *Turner*.

So -- and if you think I've improperly framed the issue, let me know, but -- and the reason why I'm asking that question was in light of one of Ms. Price's comments that, Judge, there's going to be other things in the report related to examples of fraud.  You heard from Supervisor of Election Earley talking about fraud.

And let me categorically say I think it's wrong to evaluate it under intermediate scrutiny, but the Eleventh Circuit has said what they said, and it wouldn't be the

first time that I thought they were wrong, but I do have to -- we'll talk about to what extent I'm bound by that.

But I'm just trying to give y'all some guidance, so if I've got it wrong, you can tell me why that isn't the standard and how I should apply it and where I'm missing the mark.

So same reason why I asked the witness, Am I following your opinion?  So I'm not doing this to torture anybody.  I'm doing it because I genuinely give y'all a chance to address it, and if I've -- again, if I'm asking the wrong questions, that's fine to tell me that, too; okay?

MR. WERMUTH:  Will do, Your Honor.

THE COURT:  All right.

Ms. Price, I'm not going to artificially limit you.  What's your best guess?

MS. PRICE:  Your Honor, I think Mr. Bardos is going to go first, and he's about 15 minutes.  That'll help because you just heard about the fees.  And then I'll go after that talking about the OECS report.  I'm guessing 45 to an hour, but I don't know, but I'll try to eliminate some of the stuff we've talked about before.

THE COURT:  Okay.  Very good.

And, again, I'm not artificially limiting anybody.  And, of course, it makes it easier because you're allowed to lead, so --

All right.  We'll take a ten-minute break.

Thank you.

(Recess taken at 3:59 PM.)

(Resumed at 4:09 PM.)

THE COURT:  All right.  I think we've got everybody back.

I've now got Ms. Davis here, so I'll go ahead and say it:  I read it in the *Tallahassee Democrat*.  Good luck to you with your application process.  We'd be lucky to have you on the First District.

MS. DAVIS:  Thank you, Your Honor.  I appreciate that.

THE COURT:  Counsel, you may proceed.

                          CROSS-EXAMINATION

BY MR. BARDOS:

Q.   Dr. Herron, my name is Andy Bardos.  I represent 11 Supervisors of Elections.

I'll be asking you some questions about the verification fees which you discussed towards the end of your direct examination.

MR. BARDOS:  Let's display Plaintiffs' Exhibit 37, please.

BY MR. BARDOS:

Q.   And, Dr. Herron, what I'd like to do is connect your analysis to the parties' stipulation regarding the average cost of verifying a petition form in the state of Florida.

And before I do that, I'd like to discuss some terminology.

First, I'll use "verify" or "verification" to talk about the process that the Supervisors go through to determine whether a petition is valid or invalid, and then "validate" to refer to a finding that the petition form is, in fact, valid.

Does that make sense?

A.    I think so.

Q.    Okay.  So the parties have stipulated in this case the average cost to validate a petition form -- statewide initiative petition form in the state of Florida was 87 cents before HB 1205 was enacted and is currently $3.37.  And what I'd like do is walkthrough your calculations to show how we get to those numbers.

So first -- like, we'll look here at Table 2, which is in Exhibit -- Plaintiffs' Exhibit 37, and I'd like to walkthrough the process by which you arrived at these numbers.

So do I understand correctly that you went to the Department of State's website -- first let's talk about the abortion amendment.  You went to the Department of State's website to look at the breakdown of valid petition forms -- a number of valid petition forms reported on the Department of State's website; is that correct?

A.    I believe so, yes.

Q.    Okay.  And on that page the number was broken down first by congressional district; is that right?

A.    I can't say if it was first by congressional district or

first by county, but it was broken down, I believe, by congressional district.

Q.   Okay.  And, in any event, it ultimately got to a breakdown by county; is that right?

A.   Subject to the fact I can't remember what was first, yes.

Q.   Okay.  So you -- the page reported for each county the number of petition forms that had been found to be valid; correct?

A.   Yes.

Q.   Okay.  And then you took that number and you multiplied it by the verification fee; is that right?

A.   Yes.

Q.   Okay.  And then you added the total number that you received for each county, and that became the number that you reported here in Table 2; is that right?

A.   Yes.

Q.   Okay.  So if we look at the abortion amendment, under the column "Cost, 2024," you report $857,000 -- I'm sorry -- $857,322; is that right?

A.   Yes.

Q.   And so that would have been, using your methodology of going county by county, the total cost of the -- of verification for the petition forms that were found to be valid; correct?

A.   Yes.

Q.   Okay.  And the number next to it, cost for 2026, $3,359,858

is the total cost of the -- of verifying the petitions that were found to be valid using today's verification fee; is that right?

A.    Yes, sir.

Q.    And the difference between those is reflected in the column entitled "Change"; correct?

A.    Yes.

Q.    Okay.  And so this is only for those petitions that were found to be valid; correct?

A.    Yes.

Q.    Okay.  And for the abortion amendment, the number of petitions that were found to be valid was 997,035; correct?

A.    That sounds about right, sir.

Q.    Okay.  Would it refresh your recollection to take a look at your deposition?

A.    I would like to know the exact -- if you want me to know the exact number, yes.

Q.    Let's do that.

        MR. BARDOS:  Do you mind if I approach, Your Honor?

        THE COURT:  Sure.

        THE WITNESS:  Thank you.

BY MR. BARDOS:

Q.    You're welcome.

    Dr. Herron, take a look at page 113, line 8, and feel free to look at the context and refresh your recollection.

A.    Yes, I believe you said 997,035.

Q.    Yes.  Is that correct?

A.    That is what's listed in my deposition, yes.

Q.    Okay.  So if we wanted to know the per-petition cost --

MR. BARDOS:  Can we have the exhibit back up, Zack?

BY MR. BARDOS:

Q.    If we wanted to know the per-petition cost in 2024, we would divide $857,322 by 997,035 petition forms; correct?

A.    The -- that would give you the validation cost per validated petition, correct.

Q.    Okay.  And that comes out to 86 cents; is that right?

THE COURT:  I've done the math.  It is.  I'll take judicial notice.  That's simple math.  I've got a calculator.

MR. BARDOS:  Fair enough.

BY MR. BARDOS:

Q.    And I have a calculator, too, Dr. Herron, if you'd like to use it.

THE COURT:  I'll -- you've got to round it up because it's .85 something, but it rounds up to 86 cents.

MR. BARDOS:  Excellent.  Thank you, Your Honor.

BY MR. BARDOS:

Q.    Then for the -- to determine, then, the amount for 1.3 million, you -- one way to do it would be to take the 86 cents and multiply that by 1.3 million; correct?

A.    Yes.

Q.    Okay.  Now, regarding that 1.3 million figure, you don't

have an opinion as to whether 1.3 million petitions is, in fact, the minimum number of petitions needed to qualify an initiative for the ballot; correct?

A.   I'm not sure I would say that's correct.

Q.   Okay.  You found that number, 1.3 million, in Mr. Emerson's declaration; correct?

A.   Yes.

Q.   And you don't know for a fact that it would be impossible to qualify an initiative for the ballot with only 1.2 million petition forms; correct?

A.   Well, since you said "impossible," yes, of course I can't possibly say it would be impossible.

Q.   Okay.

A.   But yeah.  So I'm not disagreeing that it is not impossible.

Q.   Okay.  So you're not saying that it is the minimum number needed to make the ballot; correct?

A.   I would say that I am not saying it is the minimum in the sense of your question about, like, is it possible that a number smaller than that would be sufficient.  Of course it's possible, just like you asked me is it impossible before.  So in the sense we are talking about the realm is it possible --

Q.   Fair enough.

And you don't know how Mr. Emerson arrived at the 1.3 million figure; correct?

A.   I would say that I don't know in the sense that he hasn't told me, but the last table that I was discussing in my direct examination when I was asked about the scale factor of around 1.47, that was extremely close to the scale factor used by Mr. Emerson.  That doesn't mean that I can necessarily confirm exactly what he did, but I notice that similarity; the scale factor implied by Mr. Emerson and the scale factor based on the data that I processed was almost the same.  So that would be rather coincidental.  So my -- I suspect, although I can't say I know for sure, that Mr. Emerson went through calculations similar to the ones I did to derive his 1.3 million figure.

Q.   Okay.  So you don't know how he did it, though?

A.   No.  I can only tell you that the coincidence in those -- the similarity between the scale factor that he used and the scale factor that I found in data is so close that it makes me suspect that that is what he did, but I cannot say that I know that because I don't know.

Q.   And you don't know of any legal requirement that a sponsor collect the minimum of 1.3 million petition forms; correct?

A.   No.  My understanding from my review of the Constitution is the 8 percent rule specifies the legal requirement for number of validated petition.

Q.   And if a sponsor is able to reduce its rate of invalidity, it could potentially qualify for the ballot with fewer than 1.3 million petition forms?

A.   I suppose, of course, that's possible.

Q.   Okay.  Now let's do the math on the marijuana petition as well.

THE COURT:  Counsel, the one thing you didn't do -- so it's clear, if you divide the 997,035, the number for abortion, into the cost for 226, it yields 3.369, so it rounds to 3.37. So I take it that's also consistent with the stipulation, both the cost of 2024 as well as what -- the extrapolated cost in 2026 based on new fees.

So the numbers correspond to the stipulation; correct?

MR. BARDOS:  Yes, Your Honor.  Thank you for filling that in.  And I meant to cover that, so thank you, Your Honor.

BY MR. BARDOS:

Q.   Let's do the same math for the marijuana amendment.

Is it fair to say that the figure on petition -- Plaintiffs' Exhibit 37 under "Cost, 2024," which is $912,174, reflects the cost of verifying the petition forms that were found to be valid using the fees that were in effect before HB 1205 was enacted?

A.   Yes, sir.

Q.   Okay.  And the -- to find the per-petition cost, again, we would divide by the number of petitions that were found to be valid; correct?

A.   We are talking the marijuana initiative this time?

Q.   Yes.

A.   Yes.

Q.   And do you recall the number of petitions that were found to be valid?

A.   I apologize.  I do not.

Q.   Okay.  Take a look again at your deposition.  If you'd like to try to refresh your recollection, take a look at page 116, line 24, please.

A.   I'm at that line.

Q.   Okay.  And does that tell you -- or does that refresh your recollection as to the number of petition forms that were found to be valid for the marijuana amendment?

A.   I believe so, yeah.

Q.   What is the number?

A.   1,033,770.

Q.   Okay.  And so to find the per-petition cost under pre-HB 1205 verification fees, we would divide $912,174 by 1,033,770 petitions; correct?

A.   Yes.

Q.   And that gives us 88 cents, I believe.  And -- so previously we --

        THE COURT:  The Court will take judicial notice that it's 88 cents.

        MR. BARDOS:  Excellent.

BY MR. BARDOS:

Q.   So we had -- under the abortion amendment, we had come to

86 cents; here it's 88 cents, and the stipulation splits the difference and makes it 87 cents.

And let's do the same math for the current verification fees.  So $3,488,691 divided by 1,033,770 petition forms comes out to $3.37.

That number would be the same as for the abortion; correct?

A.    I believe you divided 3,488,691 by 1,033,770?

Q.    Yes.

A.    And then asked me if that is the same number as the abortion cost divided by --

Q.    In other words, both of them come out to $3.37.

A.    I don't have a calculator in front of me.

THE COURT:  I will take judicial notice that when you divide the figures here as well it comes out to 3.374, so it actually is -- does not round up to 3.378.

MR. BARDOS:  Thank you, Your Honor.

No further questions.

THE COURT:  Mr. Bardos, before you escape, what I glean from that is, Judge, based on his figures from verification fees, we agree with Exhibit 37.  It's reflected in the stipulation.  What we take umbrage with is the higher figure because it could overstate it because you don't necessarily need 1.3 million to get on the ballot.

MR. BARDOS:  It's a couple of things, Your Honor.

Yes, a petition sponsor as a practical matter needs to

collect more than 880,000 petition forms.  The 1.3 million is an estimate, I would say, by Mr. Emerson of what he would need.  It might be more; it might be less.  It depends on the validity rate.

THE COURT:  And according to the OECS, it's probably 14 to 16 percent understated; right?  If the Supervisors were doing their job, the invalidation rate would be much higher; right?

MR. BARDOS:  I'm not involved in the OECS issue, so I'm familiar with those, Your Honor.  We are only defending on this portion of it.

THE COURT:  I understand.

MR. BARDOS:  The other point I was trying to make here is we did hear some testimony from Mr. Emerson about the per-petition cost that he had used which differed from Dr. Herron's numbers.  And so I was trying to kind of connect the dots between the stipulation and Mr. Herron's analysis, which we believe are more correct, closer to the truth than the numbers that we heard from Mr. Emerson.

THE COURT:  I understand.

Thank you.

MR. BARDOS:  Thank you, Your Honor.

THE WITNESS:  Your Honor, am I supposed to do something with this?

THE COURT:  No, you can just leave it right there.

Actually, are you going to need his depo for any reason?

MS. PRICE:  I might.

THE COURT:  Okay.  We can just leave it right there then.

MS. PRICE:  Thank you, Your Honor.

THE WITNESS:  Yes, Your Honor.

CROSS-EXAMINATION

BY MS. PRICE:

Q.   Tara Price on behalf of the intervenor Defendant Republican Party of Florida.

Dr. Herron, it's good to see you again.

A.   Nice to see you as well, Ms. Price.

Q.   This time in person.

I'm going to ask you a few questions about some of your expert opinions in this case.

You testified before you were retained by Mr. Wermuth on behalf of FDH plaintiffs specifically; correct?

A.   I believe so.

Q.   And you're being compensated at a rate of $650 per hour for your work in this litigation?

A.   That is correct.

Q.   And I believe you testified before, your primary research focus is on election administration; correct?

A.   I would say at the moment it is election administration,

yeah.

Q.    Okay.  I'd like to go ahead and ask some questions about your expert opinions relating to the OECS reports.

You testified earlier today about the OECS report that was initially issued on October 2024 and updated in December 2024.

Do you remember that?

A.    Yes, I did.  I -- but just to be clear, the interim report refers to the December 2024 report.

Q.    Yes.  Thank you.

So if I call that the interim report, you will be familiar with what I'm referring to?

A.    Yes.

Q.    Thank you.

And because that report was dated in October 2024 -- yes -- October 2024 and then updated in December 2024, that was before HB 1205 was passed; correct?

A.    Yes.

Q.    Several months before that was passed; correct?

A.    That is correct.

Q.    Okay.  And so if the audit was done before October of 2024, that wouldn't be able to be done based on the standards a year later in HB 1205; correct?

A.    Yes.

Q.    I'd like to go ahead and pull up Defendant's Exhibit 4, which is the OECS interim report.

And, Dr. Herron, you would agree with me that this report is more than 400 pages; correct?

A.   I can't remember if it's more than 400 or more than 500, but, yes, I would agree it's very long.

MR. WERMUTH:  I'm going to object to this coming into evidence.

THE COURT:  It's not in evidence, she's just going to ask him about it.  This is a response to the proffer, so this is basically a reply to proffer.

MR. WERMUTH:  Okay.  Well, then I object to the extent she's trying to go beyond -- the rule of completeness.

THE COURT:  All right.  Overruled.  I'm going to allow her -- you've challenged the trustworthiness of the report, and she can ask him about his opinions as it relates to the trustworthiness of the report.

If he doesn't have opinions about sections of the report, then it -- I'm going to sustain the objection, because if he doesn't have an opinion and hasn't offered an opinion, we are not here to talk about those; they would be beyond the scope of direct.

Counsel, you may proceed.

MS. PRICE:  Thank you, Your Honor.

BY MS. PRICE:

Q.   And so I would like to clarify.  As the Judge said, you were not asked to provide an expert opinion about the entirety

of the OECS interim report; correct?

A.    That is correct.  I was asked to perform an analysis of the methodology used in the audit.

Q.    And so if we scroll through to page 2 where it talks about the OECS's statutory requirement to provide an analytical report, you were not asked to provide an expert opinion about that; correct?

A.    I believe so.

      Can I just read through page 2 since you are asking me about it?

Q.    Absolutely.

A.    Actually, since -- are we going to do the whole letter?

Q.    If you'd like to read the whole letter, I'm happy with you reading the whole letter, Dr. Herron.

A.    I think, just to be clear, if you are going to ask me, I would like to read it.

Q.    Sure.

A.    So on the screen I believe I'm seeing page 2.

Q.    Yeah, I think we are on the wrong page.  I'm actually asking about page 2.

      Sorry about that.

            MS. PRICE:  Forgive us for a second, Your Honor.

            THE COURT:  No worries.

BY MS. PRICE:

Q.    Here we go.

So, Dr. Herron, specifically with this first paragraph under the Executive Summary, if you would like to take a look at that, please.

MR. WERMUTH:  I'm sorry.  I don't think this is the interim report.

BY MS. PRICE:

Q.   Have you read it, Dr. Herron?

A.   I apologize.  This is the interim report, I -- is that right?

Q.   Yes.

THE COURT:  Actually, I'm going to hit the fast-forward button on a little bit of this.

It's -- you've testified that your critique was of the audit; correct?

THE WITNESS:  Yes, Your Honor.

THE COURT:  And it didn't go beyond the audit; is that correct?

THE WITNESS:  Yes, Your Honor.

THE COURT:  All right.  So let's -- he's already limited his testimony to just the audit, and so let's ask him about the audit and his opinions about the audit.  And you can certainly ask him, That doesn't include X, Y, or Z, and that's argument for me, Judge, here's all the other things outside the audit.  But why do we need to explore things he didn't offer opinions about?

MS. PRICE:  Your Honor, I'm not asking -- thank you. I'm not asking to explore that.  What I'm trying to do is build a record of all the things that are a part of this report and how long and large this report is without going into detail that he did not have an opinion about.

THE COURT:  Why do you need to do that on cross?  It seems like that's argument for me.  That's why I asked you that question earlier about, I don't have the report in front of me; doesn't it cover a lot of other stuff?

If there's a reason why it matters because the other parts would impact his opinion, fair game.  I'll give you a thorough and sifting cross-examination.  But if it's just for you to say -- that's why I asked the question earlier, and it was a bit of a softball to you, hardball to the plaintiffs -- that under the standard for intermediate scrutiny isn't there other evidence of fraud?  Isn't there discussions of fraud? Whether or not the audit of statewide invalidation or not is not essential to that analysis based on the analysis set out by Judge Lagoa.  That's why I asked that question that way, because it dovetailed, and I think I explicitly said it was in light of a statement you made in response to one of my question, Well, Judge, it's not just this audit dealing with these figures both statewide and congressional district by congressional district, there's other, for lack of a better expression, meat on the bones as it relates to the OECS report that falls outside.

So even if you agreed that those -- that subset of information, those numbers, were wrong, that's not determinative of the report as a whole, as I --

MS. PRICE:  Yes, Your Honor.

THE COURT:  I said a lot more than you did, I think, but I thought I was following your logic.

MS. PRICE:  Yes, Your Honor.  I just want to make sure we are laying a proper foundation to be able to make that argument later.

THE COURT:  He's already said he didn't do any of that other stuff, so asking him about stuff he didn't review or have an opinion about is roughly akin to kissing your sister, a pointless exercise.

MS. PRICE:  I will not do that, Your Honor.  I will move on.

Thank you.

BY MS. PRICE:

Q.   Okay.  Let's go ahead and look at Section 2, which you were asked to provide an opinion about.  And that should start on page 12.

I want to ask you if that's correct.

Can you see that?

A.   I do.

Q.   And we'll go through this.  I'll tell you and you can correct me later if -- when I ask you at the end.  It starts at

12 and ends about page 20, is that correct, from your recollection, that it's about ten or so pages?

A.   I apologize.  What is "it"?

Q.   The section of the interim report that you were asked to provide an opinion on.

A.   I believe that sounds right, but I haven't committed those page numbers to memory.

Q.   We'll go page by page.

Thank you.

Is there anything on page 12 where Section 2 starts talking about the audit that you are here providing an opinion on?

THE COURT:  Does anybody have a hard copy?

MS. PRICE:  Um-hum.

THE COURT:  They are going to hand you a hard copy so you don't have to guess how many pages were in that section. You can flip through it, and then she's going to ask you page by page.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Thank you.

THE WITNESS:  Thank you.

THE COURT:  You wanted him to go to --

MS. PRICE:  It was already on.

Can I approach, Your Honor?

THE COURT:  Sure.  She's asking about Section 2, I thought.

MS. PRICE:  This is Exhibit 4, and I've turned it to Section 2, which was where we started the audit.

THE WITNESS:  Thank you.

May I just remove the interim report?

MS. PRICE:  Sure.

THE WITNESS:  Otherwise I'm afraid I'm going to tear it.

MS. PRICE:  Absolutely.  Absolutely.

THE WITNESS:  There we go.

Thank you.

BY MS. PRICE:

Q.  And to be clear, you're looking at the portions of the interim report that run from page 12 through page 20; is that correct, Dr. Herron?

A.  I'm -- Ms. Price, I'll be responsive to you.  What do you want me -- what should I look at right now?

Q.  The portions of the expert report -- I'm sorry.  The portions of the interim report that you removed from the binder, do they span from page 12 to page 20?

A.  No.

Q.  Okay.  What do the pages span from?

A.  They span from page 1 --

Q.  Okay.

A.  Which is the cover page, as I would describe it that way --

Q.  Okay.

A.    -- and then the end is page 20.

Q.    Okay.  Thank you.

Let's turn to page 12, please.

A.    Okay.  Thank you.  I'm at page 12.

Q.    Okay.  Thank you.

There is a portion of Section 2 talking about the OECS audit of validated petitions at the bottom of page 12.

I didn't hear any expert opinions on this portion of page 12.  I just want to make sure that's correct.

A.    I'm going to read this portion.  Is that okay?

Q.    Absolutely.

(Pause in proceedings.)

A.    Okay.  I've read the first paragraph in Section 2 on page 12.

BY MS. PRICE:

Q.    Okay.  And were you asked to provide an expert opinion on that first paragraph?

A.    I was asked to provide an opinion on the audit methodology, and I would say this is sort of a narrative motivating the audit methodology.  So I've -- I know -- I know the narrative.  Was I asked to evaluate the narrative?  Only, I think, to the extent that it related to the methodology.

Q.    Does it relate to the methodology?

A.    I suppose it depends on how you think about how the role of the narrative is.

Q.   Is there anything in this narrative that you consider inaccurate as a part of your expert opinion, Dr. Herron?

A.   I would say no, but I really -- I don't -- (indiscernible) okay.  There is nothing I consider inaccurate, but there are statements in this narrative that I couldn't verify.

So, for example, the first sentence what they were initially focused on, I wasn't sitting in their office, so I don't know what they were initially focused on.  So it's a narrative, I would say.

Q.   So you don't have an opinion on the narrative, an expert opinion?

A.   On the accuracy of the narrative, I -- to the extent that it's related to the audit, I suppose I'd think about it; but, no, I don't have an opinion on the particular timeline of events discussed in this narrative.

Q.   Thank you, Dr. Herron.

If we move to page 13, we'll see Section A that states signature verification standards, and that continues to the beginning of page 14.

You want to take a minute to take a look at that, please.

A.   Okay.  Ms. Price, I've read Section A starting on page 13 and going to page 14.

Q.   Thank you, Dr. Herron.

Would you agree with me that you were not asked to provide an expert opinion about anything within Section A?

A.    I would say that Section A concerns signature verification standards and training coordinated by the Florida Department of State, and I was not asked to provide an expert opinion on that.

Q.    Thank you, Dr. Herron.

And do you see on page 14, Section B where it states: *Audit methodology.*

A.    Yes, I see that.

Q.    And this is the part of report where you began working on your expert opinion; correct?

You at least read and reviewed as a part of creating your expert opinion; correct?

A.    No.  I would say I read -- I mean, the material that you just had me read on page 13, I read that as well.

Q.    Uh-huh.

A.    I would need to read that to know if it's -- if it engaged the subject of the audit.  So I wouldn't say that I didn't read that stuff because that would be wrong; I did.

Q.    I'm not saying that you didn't read that, Dr. Herron.  I -- we don't need to go back there.  I previously asked you if you had an opinion on that, and you said No.

So I'm asking about Section B, right, which it looks like you have an expert opinion on; correct?

A.    Right.  I just wanted to be clear when you said "where I started."  To be clear, I have to read the other material to know where to start, and so you could argue that I actually

started on page 1 and realized that part of the material is germane to the audit and part is not.

But I wouldn't want to be on record saying that I didn't start from the beginning because I needed to in order to know where the audit actually began.

Q.   Okay.  Fair enough.

You spoke -- you testified --

THE COURT:  Hold on.

Doctor -- and just so I can move things along -- what she's just doing is she's going through and wants to make sure that you've identified all the opinions you have.  And she's trying to say the opinions you have are related to this nucleus of statements or facts made in the audit report.

Ms. Price, do I have that wrong?

MS. PRICE:  Yes, Your Honor.  That's correct.

THE COURT:  So she's just trying to -- she could have said you're -- it's not that you didn't consider it; you could have considered thousands of pages of documents.

She's just saying as it relates to the report which sections of this report are you critiquing, is how I understand the questions.  And rather than asking it globally like that, she's going page by page.  So that's all she's asking you.

She's not saying, Did you not consider context or background information?  She's just trying to find out what part of the report physically are you critiquing and do your opinions

relate to.

So the methodology and the numbers that were calculated, both congressional district by congressional district as well as the validation error rate statewide, your opinions relate to this part of the report that are contained on these page.

Did I get that right, Ms. Price?

MS. PRICE:  Yes, Your Honor.  Thank you.

THE COURT:  Okay.  That's all she's asking.

THE WITNESS:  Yes.  Thank you, Your Honor.  That's very helpful because the word "nucleus," I think, encapsulates this well for me.  Because, obviously, the nucleus is the part about the methodology, but I considered the rest to understand the --

THE COURT:  Absolutely.  And I understand you're trying to be precise so somebody can't say you considered something out of context or whatever and so you had -- you had said you read the whole -- I mean, you had the whole report in front of you.  She's just trying to focus in on -- because later there's going to be an argument about, Judge, his opinions relate to page 9 through 17 -- whatever it happens to be; I just made up numbers -- and so that we're focused on that.  So I believe that's what she's asking.

MS. PRICE:  Yes, Your Honor.  Thank you.

THE COURT:  Okay.  Fair enough.

BY MS. PRICE:

Q.    You testified earlier about the phrase "known and suspected fraudsters"; correct?

A.    Yes, I did.

Q.    And I believe you stated that scholars -- scholarly literature in election administration, you don't find that phrase; is that correct?

(Reporter requested clarification.)

MS. PRICE:  Let me restate; my apologies.

BY MS. PRICE:

Q.    I believe you testified, Dr. Herron, that you don't find the phrase "known or suspected fraudsters" in scholarly literature on election administration; is that correct?

A.    I think what I said was that one wouldn't expect to find that unless one is quoting other documents.  Is there a single paper that one could find that uses it?  It's quite possible.  That is, of course, possible.

Would I use this in a serious academic study or would others?  Not in my opinion.

Q.    Okay.  And you would agree with me that the Office of Election Crimes and Security investigates allegations of crime, fraud, or irregularities regarding the election system; correct?

A.    I think you're asking me to make a legal judgment about what the OECS does, and I'm hesitant to do that.

Q.    What is your understanding of what the OECS does,

Dr. Herron?

A.   My understanding is that the OECS was created by legislation in Florida to -- there's a section in this report and another report that explains it more concisely -- to engage in, I'll say, analysis of election-related activities, but I -- yeah.

Q.   Is it fair to say you would agree with the purpose for the mission of OECS as it's stated in this report?

A.   Can you show me where it's stated?

Q.   Let's go to page 2, please.

MR. WERMUTH:  I'm just going to object that it's calling for a legal conclusion.  I think it'll be --

THE COURT:  No, it's not.  Overruled.

She's simply -- look, I get why a jury -- I'm thick, but I'm not that thick.

The question is, You're taking umbrage with the use of "fraud" and "fraudsters."  These people investigate fraud.  It's not unusual for it to be in the report, Doctor.  Why do you think it's so unusual to be in a report with people charged with the responsibility of investigating fraud?

Quite frankly, the witness and the lawyer are talking past each other, because the issue is whether or not you'd do a statistical analysis based on perceived fraud and fraudsters and why that would or would not be problematic as opposed to the nomenclature used by both the lawyer and witness, but I've got

it.

She's just asking you if they're charged with the responsibility of investigating fraud, is it really that unusual for them to use the word "fraud."

Right?

MS. PRICE:  Thank you, Your Honor.

THE WITNESS:  Yes, Your Honor.  I -- what I heard from your description is they are charged with that.  What I thought -- Ms. Price, I apologize.  Maybe I misunderstood your question -- is what they actually do do.  And I just wanted to be clear, I know what they are charged to do, but I'm a little more hesitant to take a position on what they actually do.

BY MS. PRICE:

Q.   No apology necessary, Dr. Herron.

Let's talk about your testimony earlier.

Do you remember reading from the letter in the interim report that talked about the term "fraudster"?

A.   Yes.  I believe it was on page 2.

Q.   But you didn't talk about how the term "fraudster" is used or defined on page 14 of the interim report, did you?

A.   In my testimony I don't believe I referred to that definition.  I might have in my report.  I can't recall.

Can you point me to where this is?

Q.   Let's take a look at page 14 under Section B.

It's going to start with the second paragraph.

If you'd like to take a look at that.

A.   I am there.

Q.   Okay.  Do you see how it states that OECS compiled what it calls the "list of known or suspected fraudsters"?

A.   I see in the middle of page 14, starting with the paragraph that begins "To these ends," then I believe it's what you just quoted, and then are A, B, C, D following that that I think is a more detailed -- well, I'll just say there's some detail of what the OECS means by "fraudsters."

And when I mention it's on page 2, it was -- I suspect from the -- on the OECS's perspective it's a summary of this material.

Q.   Since you read the summary, can you go ahead and read that part of page 14 that starts with:  *This list includes individuals who*...?

A.   Yes.  Should I do that right now?

Q.   Yes, please.

A.   Thank you.

Q.   I'm sorry, Dr. Herron.  Can you read that out loud?

A.   Quote:  *This list includes individuals who, A, were the subjects of a complaint alleging fraudulent petition circulation submitted to OECS by an elector or Supervisor.*

*B, submitted a petition in the name of a deceased individual.*

*C, were implicated by an admission from a defendant or*

*cooperating witness, or,*

*D, had an invalidity [sic] rate substantially higher than the state average,* end quote.

Q.   And it goes on on page 14 to talk about part of the OECS analysis.

And can you read that last sentence on page 14, please, out loud?

A.   Of course.

Quote:  *For each petition form analyzed, the auditor made one of four findings,* end quote.

Q.   And then can we go to page 15, please.

Do you see, Dr. Herron, how there's a little chart that has status codes and status descriptions?

A.   Yes.  It's at the top of page 15.

Q.   Okay.  And do you see how for "valid" the OECS says that's marked when the auditor agrees with the Supervisor's decision to validate?

A.   Yes, I see that.

Q.   Okay.  And for the code "invalid," that's where they do not agree with the Supervisor's decision to validate.  They're highly confident the petition is invalid; correct?

A.   Yes, correct in the sense of you are reading what is under "status description."

Q.   Correct.

And the next one under "status code" is:  *First review*

*indeterminate.*

Do you see that, Dr. Herron?

A.   Yes.

Q.   And the status description for that is: *Validity is questionable; requested second reviewer;* correct?

A.   That is the status description.

Q.   And then there's a status code for "missing"; correct?

A.   Correct.

Q.   And the description there states that it's either "missing" or "defective scan" or "OECS is unable to make a determination"; correct?

A.   What you just read is the status description for "missing."

Q.   Thank you.

Let's move on to the section underneath that on page 15 which talks about the OECS and Palm Beach County.

Do you see that, Dr. Herron?

A.   I do.

Q.   Dr. Herron, you agree that the OECS audited petitions in Palm Beach County that the Supervisor had -- the Supervisor or someone within their office had previously validated; correct?

A.   Yes.

Q.   And so that means there are other petitions that Palm Beach County Supervisors of Elections office had invalidated; correct?

A.   Well, it doesn't imply that, but I happen to know it's true.

Q.   Thank you, Dr. Herron.

And, in fact, all of the petitions that OECS audited that are discussed in this interim report were previously validated by someone who works in the Supervisor of Elections office; correct?

A.   Yes.  I refer to these as previously -- or as previously validated, and I simply use Supervisor of Elections because that is the office that, to my understanding, is responsible for validating petitions.  I don't have a position on who in an office did something.  I just use Supervisors of Elections.

Q.   Thank you, Dr. Herron.  I appreciate that clarification.

If I just say "Supervisor of Elections," you'll understand I mean someone within that office, correct, not necessarily the Supervisor themselves?

A.   Yes, I'll understand that.

Q.   Thank you.

And I believe you testified earlier that one of the reasons why OECS started with Palm Beach County was because they had evidence of substantial fraud there; correct?

A.   That's what OECS said, so, yes; that is, in fact, what OECS said.

Q.   And if we see here on page 15, they also state under Number 1:  *It's among the most organized Supervisor of Elections office in terms of cataloging and sharing evidence of petition-related fraud with OECS and county electors.*

Do you see that?

A.    I do.

Q.    Okay.  You haven't been to the Palm Beach County Supervisor of Elections office personally, have you, Dr. Herron?

A.    I may have been there once.

Q.    Okay.  Are you personally familiar with the specifics of how the Palm Beach County Supervisors of Elections office organizes and stores its signed petitions?

A.    No.

Q.    Are you personally familiar with the specifics of how other counties Supervisors of Elections offices might organize and store their signed petitions?

A.    No.

Q.    And if we look at page 15, we can see here in this chart that OECS reviewed 41 verified petitions in Palm Beach County; correct?

A.    Yes.  Just to be clear, I think you're looking at the table in the lower part of 15 when it refers to 41.  I mentioned this in my report, and we've gone back and forth.  I use the term "validated."  You can -- they say "verified."  Yes, 41.

Q.    Okay.  And the paragraph above that states that these 41 petition forms are a sample of validated petitions that it believes was submitted by known or suspected fraudsters; correct?

A.    I just want to be clear what I'm saying is correct.  What

you are asking me is -- I'll just read the sentence.

Q.    Okay.

A.    Quote:  *While there, OECS reviewed a sample of 41 validated petition forms submitted by known or suspected fraudsters,* end quote.

As far as I know, that's correct.

Q.    Thank you, Dr. Herron.

So you would agree with me, then, that OECS was transparent about the fact that it was targeting petitions in Palm Beach County that it suspected might have a higher invalidity rate; correct?

A.    I would -- I think the answer to that is yes.  They were transparent in the sense that they stated that these petitions were selected deliberately.  I referred to that as sample -- selection of independent variable.  Yes, they were clear about that.  They were transparent.

Q.    Thank you, Dr. Herron.

And you would agree with me that they state here -- I believe it's the last two sentences in that paragraph above the chart that says that the OECS auditors had 15 of the 41 petitions where the signatures did not match; correct?

A.    You mentioned the last two sentences, I believe.

Q.    Correct.

A.    So I'll just read them.  Quote:  *Perhaps most surprising was the number of signatures that did not match any signature on*

*file.  Fifteen signatures were not remotely close, while an*

*additional five warranted a secondary review,* end quote.

Q.   Thank you, Dr. Herron.

And if we look at the chart below that paragraph, we see here that OECS stated of the 41 petitions that it reviewed, there's an invalidity rate that it calculated of 36.6 percent; correct?

A.   Yes, that 36.6 percent appears in that table.

Q.   I believe you testified earlier today that you were not asked to provide an expert opinion or to determine individual petition validity in this case; correct?

A.   I'm not sure if I'd phrase it I wasn't asked.  I can imagine if this report had data that would allow me -- that would have allowed me to assess or to try to replicate or verify the OECS's determination, I imagine I would have been asked to do that, but the data aren't available.

Q.   Dr. Herron, would you agree with me that your expertise is not in validating petitions and determining which ones are valid?

A.   I would say that my expertise is not in signature matching, but I would also say that if I had a spreadsheet from the OECS and it listed the 41 validated petitions and it stated, for example, that one of them was invalidated on the basis of missing a residential address that I would, if I had access to these data, confirm, in fact, that the petition was missing a

residential address.

And I think that falls within my expertise because it requires simply confirming that what is stated in a hypothetical spreadsheet that, again, doesn't exist, is consistent with what I observe in these 41 petitions.  But none of the data that I'm describing in this hypothetical exists, so I couldn't do any of those exercises.

Q.   Dr. Herron, do you remember we had a deposition in this case?

A.   Oh, yes.

Q.   You were there?

A.   I was there.

Q.   And I was there?

A.   On Zoom.

Q.   Yes.  The court reporter was there?

A.   Yes.

Q.   And she was taking down all of your words; correct?

A.   I hope so.

Q.   You were under oath at the time; correct?

A.   Yes.

Q.   I'd like to pull up Defendants' Exhibit 198, please, which is your deposition, and turn to page 82, lines 13 through 23.

Actually, it's lines 13 through 25.

Do you see, Dr. Herron, where it states -- I'll wait for you to get there.

Are you there, Dr. Herron?

A.   I am.

Q.   Do you see where it states -- I asked you a question:  *Do you have an expert opinion regarding the individual petitions that OECS audited and whether those individual petitions should be validated or invalidated in Palm Beach County?*

And you stated:  *When you say "should be validated," I believe you are putting me in the position of someone whose job it is to validate petitions.  And I believe we talked about this earlier.  I could be mistaken, and my apologies if so.*

*But my expertises is not in validating petitions and determining which ones are valid.  I think that's the Supervisor's job in the state of Florida.*

THE COURT:  Sustained.  Improper impeachment.  The question you disagreed with was whether he had been asked to do that, and he said he couldn't do it.  He didn't say he was offering an expert opinion.  The question was different, was he asked.  Why is that --

MS. PRICE:  Your Honor, very respectfully, after that question I did ask if his expertise was in validating petitions and determining which ones are valid.  I used those exact words, Your Honor.  So just to that point --

THE COURT:  I got it.

MS. PRICE:  Fair enough, Your Honor.

THE COURT:  I got it.

MS. PRICE:  Thank you.

THE COURT:  And he said, No, I can't match signatures, but if you are asking if I had the data could I compare an address -- I got it.  I understand why you do that with a jury, but let's move on.

MS. PRICE:  Thank you, Your Honor.

BY MS. PRICE:

Q.   And to be clear, Dr. Herron, you are not taking a position in this case whether initiative petition mismatches that were identified by OECS for the Palm Beach County petitions are true mismatches or false mismatches; correct?

A.   I am not taking a position on that.  I have no data to speak to that question.

Q.   Thank you very much, Dr. Herron.

Let's go ahead and move on to the next page, which is page 16, and it starts with Orange County 1.

Do you see that, Dr. Herron?

A.   I do.

Q.   And if we look at page 16, we can see here that OECS states that it reviewed 2,216 verified petitions in Orange County; correct?

A.   Correct.  I am looking at the table in the middle of page 16.  I see 2,216 there.

Q.   And do you agree with me that the -- I'll point it out to you.  It looks like it's the second sentence under the heading

"Orange County 1" where the OECS disclosed that it sought targeted petitions from Orange County, correct, relating to -- the sentence before that -- known or suspected fraudsters; correct?

A.    Can you tell me where I should be looking?

Q.    Yes.  Dr. Herron, if you look at the heading "Orange County 1" -- do you see that there on page 16?

A.    Yes.

Q.    If you want to read that first paragraph to yourself, and then I'll ask you a question.

A.    Thank you.

      (Pause in proceeding.)

          THE WITNESS:  I read the paragraph.

BY MS. PRICE:

Q.    Okay.  And would you agree with me that the OECS disclosed it was seeking targeted petitions, specifically those from known or suspected fraudsters?

A.    I wouldn't use the word "disclosed."  I would simply say they wrote that.

Q.    Okay.  And would you agree with me that the OECS stated that instead of just a sample size, it was requesting all of the petitions that would fall within this criteria; correct?

A.    The OECS wrote that as well.

Q.    Thank you.

      And if we look at the chart below that, would you agree

with me that the OECS stated that an auditor did not agree with the Supervisor's verification for 715 of the 2,216 petitions? Correct?

A.   Yes, the OECS stated that.

Q.   Okay.  And you would agree the OECS stated they needed to give 287 of those 2,216 petitions a secondary review; correct?

A.   I agree the OECS stated that.

Q.   And then the OECS also stated that of the 2,216 validated petitions that they reviewed, they calculated an invalidity rate of 32.3 percent; correct?

A.   The OECS stated that.

Q.   Okay.  And the same as for Palm Beach is true for this section of Orange County 1:  You are not taking a position on whether these are true mismatches or false mismatches; correct?

A.   I would say that in this audit here it's not clear that the issue is a signature according to the OECS.  And I can say that because the second sentence above the table reads, quote: *Many of the petitions contained a signature that clearly did not match any signature on file,* end quote.

So your question was about false or true signature mismatches -- mismatches -- excuse me -- and I can't tell of the 2,216 that were reviewed and of the 715 that the OECS stated are invalid how many of those involved signatures.  I just -- I don't have any data on that.

Q.   My apologies, Dr. Herron.

When I stated "petition mismatches," I was referring to the OECS auditor's decision that they were either valid or invalid. So let me rephrase my question, please.

You are not providing an expert opinion as to whether the OECS auditor or auditors who reviewed Orange County 1 and determined that the verified petitions were either valid or invalid -- you're not providing an expert opinion on that, correct, as to the accuracy of that?

A.   I think my answer is similar to the one I gave before. I have no data that would allow me to offer a judgment on that. This data might exist. I don't have them.

Q.   Thank you, Dr. Herron.

Let's go ahead and move on to Orange County 2, which is at the bottom of page 16, and it carries on to page 17.

Do you see that?

A.   Yes.

Q.   And do you agree we can see here that the OECS stated it reviewed 9,672 verified petitions from Congressional District 9?

A.   Are we on page 16?

Q.   You can look at page 17 for that, Dr. Herron.

A.   Thank you.

Could you repeat the question?

Q.   Yes. The question is whether you agree with me that the OECS stated that it reviewed 9,672 verified petitions from United States Congressional District 9.

A.   From the portion of Congressional District 9 that is in Orange County, the OECS stated that it reviewed 9,672 petitions.

Q.   Thank you, Dr. Herron.

And if we look at the paragraph at the bottom of page 16, do you see where it talks about how the OECS decided to undertake a larger, more compensative review of all verified petition forms?

A.   Could you tell me where you are directing me, please?

Q.   Yes.  Dr. Herron, if you look at page 16 of the interim report under the heading "Orange County 2, U.S. Congressional District 9."

Do you see that?

A.   I see the heading.

Q.   If you look at the second sentence in that paragraph underneath the heading, do you see that it states:  *OECS decided* -- I'm sorry.  That's actually the first sentence after the first clause -- *OECS decided to undertake a larger, more comprehensive review of all verified petition forms.*

Do you see that, Dr. Herron?

A.   I do.

Q.   And do you see where after that it says it's not limiting its review to those submitted by known or suspected fraudsters; correct?

A.   Correct in the sense that is what is written, yes.

Q.   Okay.  And if we go back to the chart on page 17, do you

see the OECS stated that it did not agree with the Supervisor's verification for 2,017 of the 9,672 petitions?  Correct?

A.    That is what the OECS stated, correct.

Q.    And you would agree the OECS also stated that they needed to give 815 of those 9,672 petitions a secondary review; correct?

A.    What the OECS wrote was that these 815 that I believe you asked me about are classified as "first review indeterminate."

Q.    Thank you, Dr. Herron.

     And do you see where the OECS then calculated an invalidity rate of the 9,672 validated petitions of 20.9 percent?

A.    I see where the OECS stated that, yes.

Q.    And I just want to be clear that it's the same answer as was for Palm Beach and Orange County 1:  You are not providing an expert report as to whether -- you have no information as to whether any of these petitions matched, didn't match, should be validated, should be invalidated, anything on this topic?

A.    I'm very hesitate to say -- to answer "yes" when you said "anything on this topic."

Q.    Do you have an expert opinion on the accuracy of the numbers in the chart that's reflected at the top of page 17, Dr. Herron?

A.    I take the OECS report at face value.  I don't have the data to replicate or validate the numbers in that chart.

Q.    Thank you, Dr. Herron.

I'm just trying to make sure it's the same answer for each one as we go through.

Let's go ahead and move on to Osceola County, which is underneath on page 17.

Do you see that?

A.   Yes.

Q.   And if we look at page 17 under Osceola County, we see that in the chart OECS reviewed 1,378 petition; correct?

A.   That is what the OECS stated.

Q.   Thank you.

And if we look in the paragraph above the chart -- I believe it's in second sentence -- do you see where the OECS thought it would be helpful to compare results between Palm Beach County and Orange County, and it wanted to look at petitions submitted by known and suspected fraudsters in a smaller county?

Do you see that, Dr. Herron?

A.   I see what I think you are referring to is the second sentence in the first section under Osceola County.

Q.   And it's your understanding when you read that sentence that OECS is stating that it wanted to look at petitions from known and suspected fraudsters from a smaller county than Palm Beach County or Orange County; correct?

A.   It is my understanding that the OECS stated that, yes.

Q.   Thank you, Dr. Herron.

Dr. Herron, if we look at the chart again -- excuse me -- you would agree that the OECS stated that it did not agree with the Supervisor's verification for 102 of the 1,378 petitions; correct?

A.    That is what the OECS stated.

Q.    Thank you.

And below that the OECS stated they needed to give 123 of those 1,378 petitions a secondary review; correct?

A.    Just to be precise, they say "first review indeterminate." You're saying that's a secondary review.  That may be synonymous for the OECS, but just to be clear, my answer is they are saying these 123 petitions have a classification of first review indeterminate.

Q.    Let's go back to the chart at the top of page 15, Dr. Herron.

Do you see the status code for first review indeterminate?

A.    I do.

Q.    And so do you see where it states in part that there is a requested second reviewer?

A.    Yes.

Q.    And so would you agree with me, regardless of whether it's marked first review indeterminate or whether a second reviewer was requested that 123 petitions fall within that county for -- fall within that category for Osceola County?

A.    Yes.  I was responding to your -- what I thought was the

possibility that a second reviewer was -- actually occurred because you can't tell when first review indeterminate.

But if the question is are 123 Osceola County petitions associated with first review indeterminate? which is also equivalent to, quote: *Validity is questionable, requested second reviewer*, end quote, yes, I'd agree the OECS stated that.

Q.   Thank you, Dr. Herron.

And back to the chart on page 17 for Osceola County.

Do you agree with me that the OECS then calculated, based on its review, an invalidity rate of 7.4 percent?

A.   I -- what I would say is the OECS stated that, 7.4 percent for an invalidity rate.

Q.   Thank you.

And as was the case for Palm Beach County, Orange County 1, and Orange County 2, you do not have an expert opinion about the numbers -- the accuracy of the numbers that the OECS has stated under Osceola County for its review?

A.   I -- given the data that I have, I do not have an opinion on the accuracy of these counts that you have walked me through in the tables, and that applies to the other counties as well because there's no data that I have that would allow me to verify this.

Q.   And, Dr. Herron, do you remember we talked a little -- or you testified a little bit earlier -- at least there was discussion about the purpose of this report or some of the

objectives; correct?

A.    I'm not sure I would characterize it that way, if I'm remembering the part that you're referring to.

Can you tell me, please?

Q.    Well, I would just like to direct your attention to the first paragraph under "Analysis" under page 17.

Do you see that?

A.    I see the header for "Analysis."

Q.    Okay.  Can you read that first paragraph -- and you don't need to read the last sentence, which is the citation sentence -- aloud, please?

A.    Of course.  Right now?

Q.    Yes, please.

A.    Quote:  *Current Florida law places immense weight on signature verification.  Because all other required personal identifying information is publically available, a robust signature match procedure is the only real line of defense for ballot integrity.*

*Unfortunately, the preliminary results of OECS's audit indicate that some counties failed their statutory obligation to verify petition forms for initiative petition 23-07 in accordance with the standards,* subquote, *"governing signature matching"*, end subquote, *promulgated by Department of State*, end quote.

Q.    Thank you, Dr. Herron.

And if we turn to the top of page 18, the next page, do you see where the OECS calculates that it has reviewed and analyzed a total of 13,059 validated petition forms?

A.    I see where the OECS stated that, yes.

Q.    Okay.  And do you see underneath that where it states that it's determined that at a minimum 2,650 should not have been validated due to either statutory deficiencies or clear mismatch between the signature on the petition and the signature on file; correct?

A.    I see where OECS states that.

Q.    Okay.  And because this is just a calculation of all the numbers we've gone through, there's no reason to suspect that you have any data that would challenge the accuracy of these numbers; correct?

A.    I'm not sure what you're asking me.  Are you -- I'm not sure what you're asking me.

Q.    Let me ask again.

The same answer --

THE COURT:  Hold on.  One second.

She's just asking -- same question she's asked with all the other numbers.  Are you disputing any of the numbers because you don't have the data to dispute any of the numbers?

THE WITNESS:  The answer's no, I don't have the data to dispute any of the numbers, so I'm not --

THE COURT:  So you're not disputing any of those

numbers?

THE WITNESS:  I'm not disputing them, right.

MS. PRICE:  Thank you, Your Honor.

BY MS. PRICE:

Q.    And thank you, Dr. Herron.

Let's go ahead and talk about some of your criticisms of the methodology in the OECS report, Dr. Herron.

You earlier opined that the OECS statewide estimate for the petition invalidity upon previously validated abortion initiative petitions is unreliable; correct?

A.    Yes.

Q.    And just to be clear, you are not offering an alternative estimate; correct?

A.    An estimate of what?

Q.    You are not offering an alternative estimate of the statewide average of petition invalidity among previously validated abortion initiative petitions?

A.    I don't have -- I would give a similar answer to the one I gave before.  I don't have the data necessary to do that.

Q.    Thank you, Dr. Herron.

Let's talk a little bit about the idea of a drop-off rate.

You have testified earlier today about a drop-off rate.  I believe you've called it a design error.

Do you remember that?

A.    I called one aspect of the drop-off rate a design error,

that is correct.

Q.   You testified that you've never used the concept of a drop-off rate; correct?

A.   I testified -- when asked have I ever used a drop-off rate in the way that the OECS has used it -- that was the question -- I said, no, and then I explained why.

Q.   So you've used it in other ways?

A.   I haven't used any calculation that I called a drop-off rate, but the drop-off rate as the OECS used it, if it were calculated correctly, is simply a percentage change in percentages.

Have I ever calculated percentage changes in percentages? Quite possible, but not in the -- but not with the geography issue that they did; never done that.

Q.   Understood, Dr. Herron.

So taking that geography issue aside, you would agree with me that a person could use the concept of a drop-off rate the way that OECS has used it to calculate a reliable Florida-wide initiative -- I'm sorry -- a reliable Florida-wide invalid petition rate; correct?

A.   No.

Q.   You would -- would you agree with me, Dr. Herron, that if you had reliably estimated numbers, you could multiply the rate at which fraudsters generate invalid petitions times a drop-off rate to calculate a reliably estimated Florida-wide invalid

petition --

(Reporter requested clarification.)

MS. PRICE:  I'll start over again.  I'm sorry.

BY MS. PRICE:

Q.   Would you agree with me that if you had a reliably estimated number -- reliably estimated numbers, plural -- you could multiply the rate at which fraudsters generate invalid petitions times a drop-off rate to calculate a reliably estimated Florida-wide invalid petition rate?  Correct?

A.   I didn't understand your question about numbers because there is one drop-off rate.

Q.   Let me ask it again.

Would you agree with me that if one had access to or a reliable estimate of the Florida-wide rate at which fraudsters generate invalid petitions, and if one had access to or a reliable estimate of the Florida-wide drop-off rate, then one could calculate or reliably estimate the Florida-wide invalid petition rate?

A.   I'm trying to struggle with this -- think about this hypothetical here because it's so different than what I -- than what the OECS has.

If one had -- if one knew the fraudster -- using their OECS language -- invalidity rate, and if one knew the invalidity rate among previously validated petitions, and if one knew the overall Florida invalidity rate among previously validated

petitions -- I mean, if one had the second rate, then I don't understand what the estimation problem is.

Q.   Dr. Herron, do you think it would help if I refreshed your memory of a declaration that you gave earlier in this case?

A.   Sure.

MS. PRICE:  Your Honor, may I approach?

THE COURT:  You may.

THE WITNESS:  The issue here is --

MR. PRICE:  I'm sorry, Dr. Herron.

THE WITNESS:  Oh, I apologize.  I thought you asked me.

THE COURT:  She's going to ask, Does that refresh your recollection?  Yes or no?

BY MS. PRICE:

Q.   Dr. Herron, did I just hand you a copy of a declaration that you offered earlier in this case?

A.   I believe it was in this case.  It was the preliminary injunction declaration.  Does that count as in this case?

Q.   Yes.

A.   Then yes.

Q.   Thank you, Dr. Herron.

And having read that section, have you previously testified in this case that if you had reliably estimated numbers, both the rate at which fraudsters generate invalid petitions and a reliable drop-off rate, that you could calculate a reasonably --

I'm sorry -- a reliably estimated Florida-wide invalid petition rate?

A.   Okay.  Now I under -- okay.

     Thank you.  What is your question?

Q.   I'm asking, Dr. Herron, as to whether you've ever opined in the case that if you had reliably estimated numbers, both at the statewide level on which the rate at which fraudsters generate invalid petitions and a reliable drop-off rate, that you could use that to calculate a reliably estimated Florida-wide invalid petition rate.

A.   Did I previously testify to that?  Is that what you are asking me?

Q.   I'm asking if you previously stated that.

A.   I stated that in paragraph 26 and -- yeah, I stated that in paragraph 26.

Q.   Thank you, Dr. Herron.

          MS. PRICE:  May I approach, Your Honor?

          THE COURT:  Sure.

BY MS. PRICE:

Q.   Dr. Herron, you have another critique of the OECS methodology that I believe you stated before is OECS selecting on the dependent variable; correct?

A.   Yes.

Q.   And that's a term or a concept in social science; correct?

A.   I would say it's a term in statistical analysis including

social science.

Q.   Okay.  And I believe, as you testified earlier today, we heard that State expert Dr. Brunell agrees with you that social scientists want to avoid selecting on the dependent variable because it can lead to bias estimates; correct?

A.   I think what he says -- I don't remember the exact quote of Dr. Brunell, but it does lead to biased estimates in general.

Q.   And he agrees with you, correct, Dr. Herron, on that point?

A.   Yes.

Q.   He also agrees with you that if OECS wanted to develop an unbiased estimate for the entire state, then what it should have done is selected a large random sample of all after-validated signatures across the state; correct?

A.   I believe that Dr. Brunell agrees with me on that, yeah.

Q.   And you would also agree with me that the OECS never claimed in an interim report that it was conducting a random sample of validated petitions; correct?

A.   It definitely did not say it was conducting a random sample.

Q.   Thank you.

     Dr. Herron, I believe you earlier testified about the OECS annual report, the final report which was published in January 2015; correct?

A.   I believe I mentioned that the interim report is incorporated into the annual report of January 2025.

Q.   Correct.

And so you reviewed that portion of the final report; correct?

A.   The -- I reviewed that portion.  I'm calling it the annual report.  But, yes, I reviewed the January -- the portion of the January 2025 annual report that mentions that the interim report is incorporated by reference.

Q.   Thank you, Dr. Herron.

I'd like to pull up Defendants' Exhibit 3.

MS. PRICE:  And, Your Honor, to the extent the interim report is conditionally admitted, I'd like --

THE COURT:  This is all part of the proffer.

MS. PRICE:  Thank you, Your Honor.

BY MS. PRICE:

Q.   Dr. Herron, you may not remember, but would you agree this report also exceeds several hundred pages; correct?

A.   That is my recollection.

Q.   And I believe you just talked about how it incorporates part of the interim report.  Let's go ahead and look at pages 18 and 19.

And if you could like me to give you a hard copy, I'd be happy to do that.

A.   I think it's probably the best.

Q.   Okay.

MS. PRICE:  May I approach, Your Honor?

THE COURT:  You may.

BY MS. PRICE:

Q.   Dr. Herron, I'll give you a minute to review pages 18 and 19 from the annual report.

THE COURT:  You're asking to stop at page 19 and not read anything --

MS. PRICE:  Yes, Your Honor.

THE COURT:  So she's not asking you to read anything under the Legal Update.

THE WITNESS:  Yes, Your Honor.

BY MS. PRICE:

Q.   Yes, just Section B, please.

(Pause in proceedings.)

BY MS. PRICE:

Q.   Thank you, Dr. Herron.

Does this look like a portion of the annual report or the final report that you reviewed as a part of your expert opinion in this case?

A.   Yes, I would say this is part of the -- the January 2025 annual report.

Q.   That you reviewed?

A.   Yes.

Q.   Okay.  Thank you.

And it talks about the annual report -- I'm sorry.  It talks about the interim report and incorporates the interim

report; correct?

A.   Correct.  It incorporates it by reference.

Q.   And then at the bottom we see three bullets with some key figures; correct?

A.   I would say that we see three bullets.

Q.   Okay.

A.   Yep.

Q.   And the first bullet talks about how OECS has reviewed and analyzed 13,059 validated petition forms; correct?

A.   The OECS states that, yes.

Q.   Okay.  And it gives the number that it believes should not have been validated and the percentage of invalidity; correct?

A.   It states that, yes.

Q.   The next bullet it talks about how there is a wide range of invalidity rates between the three counties that it audited and the sample sizes; correct?

A.   It states that, yes.

Q.   And it provides despite that -- this is an average of what we found despite that wide range of samples and invalidity rates; correct?

A.   It states that.  You know my view about 25.4 percent, but I'll say it is stated here.

Q.   And it states that that percentage is based on a review of petition forms that were submitted by known or suspected fraudsters; correct?

A.    It states that the -- OECS states in the second bullet that these petitions were submitted by known or suspected fraudsters and validated by the Supervisor of Elections.  The OECS states that.

Q.    Okay.  And the next bullet, do you see where it talks about how the OECS states that there was one county where -- audited, and it was not limited to known or suspected fraudsters, and it cites that 20.9 percent average; correct?  Not average.  I'm sorry.  Let me restate this.

I'm just going to read it.  Do you see the next bullet states:  *In the one county where the audit was not limited to known or suspected fraudsters, OECS determined that 20.9 percent of petition forms that were validated by the Supervisor of Elections should have been rejected due to statutory deficiencies or a clear signature mismatch?*

Do you see that, Mr. Herron?

A.    I see that the OECS stated that.

Q.    And if we look at the first sentence of Section B, do you see how it talks about the OECS began investigating complaints and that's when it became concerned that invalid signatures were being validated by Supervisors of Elections?

A.    I see where the OECS states that, yes.

Q.    And then if we turn to page 19, the end of Section B, do you see where the OECS states that the audit is ongoing?

A.    The OECS states that.

Q.    Okay.  And then the next paragraph they talk about how they are analyzing petition forms; they are planning to in a variety of counties, including Alachua, Moore, and Palm Beach, and other counties?

A.    Are you referring to the audits that were scheduled for January 2025?

Q.    Yes.

A.    The OECS states that -- what you just described.

Q.    Okay.  And do you see how it states the OECS is going to review petition forms submitted by known and suspected fraudsters and statistically significant samples of all petition forms submitted; correct?

A.    This is totally silly, but it's actually "known or suspected fraudsters," not "and."  And I would say, yes, the OECS states that.

Q.    Thank you, Dr. Herron.

      Would you agree with me that nowhere in this Section B in the final report is there any discussion of a statewide average of invalidity?

A.    I would agree with you that the figure of 14.8 percent is not explicitly listed.  However, since the interim report was incorporated by reference -- I don't know the legal definition of that, so I don't want to be on record of saying that.  But my understanding is that essentially means that the interim report is part of this.  So if I understand that incorrectly, I

apologize.  But since it is part of this and since the interim report does discuss statewide estimates, my understanding is that means that the annual report also discusses statewide estimates.

Q.   Thank you, Dr. Herron.

I'm not asking you whether the interim report has been incorporated.  I'm asking you whether you see any discussion in Section B here of the statewide average of invalidity rates.

A.   Again, I -- there is no explicit language here.

THE COURT:  That's all she's asking.

THE WITNESS:  Okay.  Right.  Thank you.

BY MS. PRICE:

Q.   That's all I'm asking.

A.   I just want to make sure I understand.

THE COURT:  You are being precise.  You are a doctor, I understand.  That's all she was asking.

BY MS. PRICE:

Q.   Same question with regard to congressional district averages:  Would you agree with me that does not appear explicitly in Section B in the final report?

A.   Again, to be precise, there is no explicit discussion, notwithstanding the point that the interim report was incorporated by reference.

Q.   Thank you, Dr. Herron.

Just a few more questions.

Dr. Herron, you do not deny that the OECS has investigated people for violations of Florida election law; correct?

A.   No, I do not deny this.

Q.   Okay.

A.   But I'm not party to their investigations.

Q.   And you do not dispute that Supervisors of Elections have submitted information about potential fraudulent petitions to the OECS?

A.   The OECS stated that.  I have no data on the subject.  I take them at -- their word at face value, but that -- I can't -- I take their word at face value, but that's all I can say.

Q.   In fact, were you aware that Supervisor Earley has filed complaints with State officials regarding deceased voters and forged signatures?

A.   No, I don't have data on which Supervisors may have done this.  I don't have data on that.

Q.   Okay.  And you do not dispute that Florida voters themselves have submitted complaints about potential fraudulent petitions to the OECS; correct?

A.   I don't dispute it because I have -- the OECS stated that. I have no information on that, so --

Q.   Thank you.

And, Dr. Herron, you submitted your expert report that we've been talking about, the opinions -- let me start over. I'm sorry.

Dr. Herron, the opinions we've been discussing as a part of this cross come from your expert report that was submitted in October 2025; correct?

A.    In addition, the two supplemental reports in this litigation.

Q.    And you would agree with me that the Legislature passed and the Governor signed HB 1205 in May 2025?

A.    Yes.

MS. PRICE:  No further questions.

Thank you so much for your time, Dr. Herron.

May I approach, Your Honor?

THE COURT:  You may.

MR. WERMUTH:  Your Honor, I understand that you basically are at a hard stop right now.  I would do some redirect, but -- and it would probably be, like, 15 or 20 minutes, but I realize I can't probably do that right now.

(Discussion was held.)

THE COURT:  We'll take a five-minute recess.

(Recess taken at 5:39 PM.)

(Resumed at 5:44 PM.)

THE COURT:  All right.  Everybody please take your seats, Daylight is burning.

Redirect.

REDIRECT EXAMINATION

BY MR. WERMUTH:

Q.    Dr. Herron, I'm going to show you the chart for Palm Beach in the OECS report.

       Dr. Herron, I'm showing you this chart that -- Ms. Price asked you about this chart and whether this gives a -- I guess an accurate calculation of the percentage here.

       Is that right?

A.    I believe Ms. Price asked me if the OECS had these numbers, yes.

Q.    Okay.  Do you have an opinion as to whether selection on the dependent variable biased the percentage reflected in these charts that Ms. Price referenced?

A.    Yes.

Q.    Okay.  And what is that opinion?

A.    It means that 36.6 is biased up.

Q.    Okay.  I'd like to show you Exhibit 23.

       Do you recognize this exhibit?

A.    Yes -- yes, I do.

Q.    What is it?

A.    This is a table that I've prepared for my report in this litigation that at a high level analyzes the 380 validated abortion petitions that were given to -- that were given to the OECS as part of its audit in Palm Beach County.

       MR. WERMUTH:  Okay.  Your Honor, I would like to offer

Exhibit 23 into evidence.

THE COURT:  Any objection?

MS. PRICE:  Your Honor, I'm just wondering how this ties into the questions that I asked.

THE COURT:  I'm not going to make him -- I'm not going to make him recall the witness, so it's --

MS. PRICE:  (Indiscernible crosstalk.)

THE COURT:  If that's the only objection -- it's 23, correct? -- is admitted.

(PLAINTIFFS' EXHIBIT FDH-23:  Received in evidence.)

BY MR. WERMUTH:

Q.   How many petitions did the Palm Beach County -- Palm Beach Supervisor's office provide to OECS?

A.   380.

Q.   And what did you do, if at all, to determine whether the selection was random?

A.   What I did is I -- for the 380 petitions in Palm Beach County, I identified the circulator number for each one.  And the circulator number is listed in this table under the heading "Circulator number."

Then I calculated the number of petitions that were audited and not audited for each circulator -- the sum of that is number of petitions total for the circulator -- and that gave me a percent audited rate per circulator.

And then -- this is getting to your question -- I looked at

these percent audited rates that vary from zero up to roughly 38 percent, and I carried out a test about whether the auditing -- whether the selection of 41 from 380 was random. I used a Fisher test, which is a standard test given a contingency table of audited and not audited petitions, particularly when some of the cell numbers are small. So I used the Fisher test, and it rejects that the selection of the 41 from 380 is random based on circulator number.

Q. Okay. And so what does that mean in layman's terms?

A. That means that the OECS selected -- of the 380 petitions submitted in Palm Beach County that were then given to the -- that were validated and then given to the OECS, that the OECS selectively chose 41 to audit and they chose it in a nonrandom fashion.

Q. Okay. And so did the OECS basically pick a subset of circulators within the 380 that they were focused on?

A. I would say the answer is yes, given that some of the audited rates are zero.

Q. Okay. So if you are looking for fraud, and you start from what you believe is fraud, then you'll end up at a very high percentage; right?

A. Well, I think you're just -- I think what you're asking me is, like, what is the effect of selecting on the dependent variable. Here there's an additional element of nonrandom selection.

The OECS has not stated why it chose some circulators over others in a way that would allow me to analyze, like, why they picked them.  But I can tell you that the choice of 41 from 380 was not random, which is consistent with other elements of nonrandom sampling that I've talked about in my testimony today of counties and then of petitions within counties.

Q.   Okay.  And Ms. Price asked you about your declaration that you submitted in the preliminary injunction phase, and she was, I think, talking about your hypothetical about -- is that the law of total probability?

Is that what you were dealing with there?

A.   What she was asking me about is if the -- if a reliable drop-off rate were to exist, could one use it in a calculation as the OECS attempted.

And I wouldn't say that that was -- that was related to the law of total probability.  The sentence after I was directed to stop reading said this is based on the definition of a drop-off rate as the OECS created it, so I was using their framework.

And I didn't read that because I was directed to stop, and so I would say that that is simply a reflection of how the OECS defined its drop-off rate.

Q.   Okay.  Did you understand whether Ms. Price was basically asking if there was something -- if there was a reliable way to estimate a single fraudster rate in the state of Florida?

A.   I mean, if one knew who the fraudsters were --

hypothetical -- I'm using the word "fraudster" as the OECS would use it -- one could sample randomly from the petitions that they submitted.  That's how you would, in general, estimate a fraudster rate.  Again, putting -- not diving into the issues of what a fraudster is, but if one could identify a set of circulators of interest for any reason -- call them fraudsters or something else -- you could randomly sample the petitions submitted by them and then estimate rates.

Q.   Okay.  So you're not saying that there's any way to determine there's, like, a single rate at which a certain class of people turn in petitions that would be considered fraudulent?

A.   No.  I'm simply saying that if we wanted to define a class of individuals, and we sampled randomly from them, we could estimate rates.  That doesn't strike me as --

Q.   Okay.

A.   -- anything controversial.

Q.   Okay.  Thank you, Dr. Herron.

        MR. WERMUTH:  I have no further questions.

        THE COURT:  Thank you.  Y'all give me one moment.

    (Pause in proceedings.)

        THE COURT:  You're free to go.  Thank you.  Have a safe trip back.

        I got one court reporter, and I want to not go to zero, so we're going to start at 9:00 o'clock tomorrow.  I need to give her a spell.

If this was -- if they were unionized, they'd be striking given how much we've been using them lately.  So we're going to start at 9:00 tomorrow morning, okay?

MR. WERMUTH:  Thank you.

THE COURT:  Yes, sir.

MR. MASTORIS:  I apologize, Your Honor.  I know everyone has been here late already.

THE COURT:  Sure.

MR. MASTORIS:  We had one special scheduling issue for tomorrow.  The good news is we moved much quicker, I think, collectively than we anticipated.

The bad news is that the witness -- the only witness we can have prepared tomorrow, assuming the other plaintiffs finish, is slated to go two and a half to three hours, probably, on direct.  And by my calculation, we'll probably have about an hour left at the end of the day, maybe an hour and a half, (indiscernible), so I'm at a loss as to what to do.

THE COURT:  Are they here?

MR. MASTORIS:  She's not available on Friday either.  She's only available tomorrow or on Tuesday of next week, which is when we anticipated she would be coming.  She is local, so she can come tomorrow, but she's got an unavoidable conflict on Friday.

THE COURT:  What about the other witnesses?  Can they be shuffled?  I mean, that's why I brought this up earlier

today.  Had we followed the Judge Walker directive and taken the witnesses out of order, we wouldn't have had Dr. Herron here until 6:00 o'clock.

Is there -- can we flip some of the witnesses -- are any of the other witnesses being called tomorrow folks that are already here?

MS. MURPHY:  Your Honor, Smart & Safe has a witness that will (indiscernible) about five hours.  She's scheduled for tomorrow.

THE COURT:  Who's going first?

MR. FERGUSON:  Your Honor, Brent Ferguson for Right to Clean Water.

We're calling two witnesses first in the morning, both of whom should be relatively quick.

THE COURT:  Are all these witnesses out of town and -- I'm just trying to figure out if we can reshuffle the witnesses.

MR. FERGUSON:  Our two witnesses are in from out of town and have flights.

THE COURT:  The answer's no.  I don't -- I'm not trying to invent fire:  They're from out of town, no, Judge.

How about yours?

MS. MURPHY:  They're from out of town, yes, Your Honor.

THE COURT:  Do we have anybody else -- if we bump him to Tuesday, his witness, do we have anybody else quick that we

can start that's available tomorrow afternoon?

MR. MASTORIS:  We have one other witness who could potentially testify remotely tomorrow.  She was planning to go Friday, but we can make it happen tomorrow.  She's very short.

THE COURT:  Why don't we do that?

MR. MASTORIS:  We could do that.

THE COURT:  Just do that and move the other witness to Tuesday.  And if we get done a little bit early, the court reporter will come hug you.

MR. MASTORIS:  Thank you very much, Your Honor.

THE COURT:  I want to let everybody go home, so I'll see everybody back at 9:00 o'clock tomorrow.

Court is in recess.

(Proceedings recessed at 5:55 PM on Wednesday, February 11, 2026.)

* * * * * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. Any redaction of personal data identifiers pursuant to the Judicial Conference Policy on Privacy is noted within the transcript.


/s/ Megan A. Hague                          2/11/2026

Megan A. Hague, RPR, FCRR, CSR              Date
Official U.S. Court Reporter

**I N D E X**

PLAINTIFFS' WITNESSES                                              PAGE

MELISSA MARTIN
Direct Examination By Ms. Szilagyi                                  660
Cross-Examination By Mr. Raban                                      742
Cross-Examination By Ms. Hardy                                      758
Redirect Examination By Ms. Szilagyi                               762

CYNTHIA HALLER
Direct Examination By Ms. Neal                                      764
Cross-Examination By Ms. Hardy                                      780
Cross-Examination By Mr. Jazil                                      786
Redirect Examination By Ms. Neal                                    789

DR. MICHAEL HERRON
Direct Examination By Mr. Wermuth                                   796
Cross-Examination By Mr. Bardos                                     900
Cross-Examination By Ms. Price                                      911
Redirect Examination By Mr. Wermuth                                962

**E X H I B I T S**

| PLAINTIFFS' EXHIBITS | OFFERED | RECEIVED |
|---|---|---|
| FDH-13 | 801 | 801 |
| FDH-17 | 819 | 819 |
| FDH-19 | 838 | 838 |
| FDH-21 | 860 | 860 |
| FDH-23 | 963 | 963 |
| FDH-27 | 827 | 827 |
| FDH-28 | 829 | 829 |
| FDH-35 | 897 | 897 |
| FDH-36 | 884 | 884 |
| FDH-37 | 886 | 886 |
| FDH-39 | 894 | 894 |

971

| PLAINTIFFS' EXHIBITS (cont'd.) | OFFERED | RECEIVED |
|---|---|---|
| RTCW-69 | 778 | 778 |
| RTCW-70 | 688 | 688 |
| RTCW-72 | 691 | 691 |
| RTCW-73 | 691 | 691 |
| RTCW-74 | 693 | 693 |
| RTCW-75 | 774 | 774 |
| RTCW-78 | 707 | 707 |
| RTCW-132 | 713 | 713 |
| RTCW-143 | 692 | 692 |
| FDH-166 | 711 | 711 |
| FDH-194 | 736 | 736 |
| RTCW-286 | 730 | 730 |
| RTCW-287 | 686 | 686 |
| RTCW-304 | 732 | 732 |