**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

FLORIDA DECIDES HEALTHCARE, INC,)
et al.,                        )
                               )
              Plaintiffs,      ) Case No: 4:25cv211
                               )
         v.                    ) Tallahassee, Florida
                               ) February 12, 2026
CORD BYRD, in his official     )
capacity as Secretary of State )
of Florida, et al.,            )
                               )
                               ) 9:02 AM
              Defendants.      ) Volume IV
_____)

**TRANSCRIPT OF BENCH TRIAL PROCEEDINGS**
**BEFORE THE HONORABLE MARK E. WALKER**
**UNITED STATES CHIEF DISTRICT JUDGE**
**(Pages 972 through 1238)**

Court Reporter:              MEGAN A. HAGUE, RPR, FCRR, CSR
                             111 North Adams Street
                             Tallahassee, Florida 32301
                             megan.a.hague@gmail.com

*Proceedings reported by stenotype reporter.*
*Transcript produced by Computer-Aided Transcription.*

**APPEARANCES:**
**For Plaintiffs Florida Decides Healthcare:**

King Blackwell Zehnder & Wermuth PA
By:  FREDERICK STANTON WERMUTH
     QUINN RITTER
     Attorneys at Law
     fwermuth@kbzwlaw.com
     qritter@kbzwlaw.com
25 East Pine Street
Orlando, Florida 32801

Elias Law Group
By:  BEN STAFFORD
     Attorney at Law
     bstafford@elias.law
1700 Seventh Avenue
Suite 2100
Seattle, Washington 98101

Southern Poverty Law Center
By:  AVNER MICHAEL SHAPIRO
     KRISTA A. DOLAN
     Attorney at Law
     avner.shapiro@splcenter.org
     krista.dolan@splcenter.org
3710 Raymond Street
Chevy Chase, MD 20815

Elias Law Group
By:  HARLEEN K. GAMBHIR
     Attorney at Law
     hgambhir@elias.law
250 Massachusetts Avenue
Suite 400
Washington, DC 20001

**For Intervenor Plaintiff Safe & Smart:**

Stearns Weaver Miller
By:  GLENN BURHANS, JR.
     HANNAH E. MURPHY
     CHRISTOPHER R. CLARK
     Attorneys at Law
     gburhans@stearnsweaver.com
     hmurphy@stearnsweaver.com
     crclark@stearnsweaver.com
106 East College Avenue, Suite 700
Tallahassee, Florida 32301

**APPEARANCES (cont'd):**

**For Intervenor Plaintiff League of Women Voters of Florida:**

                              Democracy Defenders Fund
                              By:  SPENCER KLEIN
                                   JACOB KOVAS-GOODMAN
                                   Attorneys at Law
                              pooja@statedemocracydefenders.org
                              spencer@statedemocracydefenders.org
                              jacob@democracydefenders.org
                              600 Pennsylvania Avenue SE
                              Unit 15180
                              Washington, DC 20003

                              Winston & Strawn, LLP
                              By:  GEORGE E. MASTORIS
                                   TYLER MATTHEW DATO
                                   SAMANTHA I. OSAKI
                                   NATHAN C. GREESS
                                   JOHANNA RAE HUDGENS
                                   Attorneys at Law
                              gmastoris@winston.com
                              tdato@winston.com
                              sosaki@winston.com
                              ngreess@winston.com
                              jhudgens@winston.com
                              200 Park Avenue
                              New York, New York 10166


**For Intervenor Right to Clean Water:**

                              Campaign Legal Center
                              By:  ROBERT BRENT FERGUSON
                                   HEATHER JEAN SZILAGYI
                                   ELLEN MARGARET BOETTCHER
                                   ALEXIS DENAE GRADY
                                   WILLIAM "LIAM" KYLE HANCOCK, III
                                   MELISSA LAUREN NEAL
                                   Attorneys at Law
                              bferguson@campaignlegalcenter.org
                              hszilagyi@campaignlegalcenter.org
                              eboettcher@campaignlegalcenter.org
                              agrady@campaignlegalcenter.org
                              whancock@campaignlegalcenter.org
                              mneal@campaignlegalcenter.org
                              1101 14th Street NW
                              Suite 400
                              Washington, DC 20005

**APPEARANCES (cont'd):**

**For Defendant James Uthmeier:**

Florida Attorney General's Office
By:  WILLIAM STAFFORD, III
     SARA SPEARS
     MARYSSA SAVANNAH-LYNN HARDY
     Attorneys at Law
sara.spears@myfloridalegal.com
william.stafford@myfloridalegal.com
maryssa.hardy@myfloridalegal.com
119 South Monroe Street, Suite 500
Tallahassee, Florida 32301

**For Defendant Cord Byrd:**

Holtzman Vogel Baran, et al.
By:  MOHAMMAD O. JAZIL
     MARTIN C. WOLK
     RANDALL M. RABAN
     Attorneys at Law
     mjazil@holtzmanvogel.com
     mwolk@holtzmanvogel.com
     rraban@holtzmanvogel.com
119 South Monroe Street, Suite 500
Tallahassee, Florida 32301

Florida Department of State
By:  ASHLEY DAVIS
     General Counsel
     ashley.davis@dos.myflorida.com
R.A. Gray Building
500 South Bronough Street
Tallahassee, Florida 32399

**For Defendant Intervenors Republican Party:**

Shutts & Brown, LLP
By:  TARA PRICE
     BENJAMIN GIBSON
     Attorneys at Law
     tprice@shutts.com
     bgibson@shutts.com
215 South Monroe Street
Suite 804
Tallahassee, Florida 32301

**APPEARANCES (cont'd):**

**For Defendant Supervisors of Elections:**

GrayRobinson PA
By:   ANDY V. BARDOS
      JAMES T. MOORE JR.
      Attorneys at Law
      andy.bardos@gray-robinson.com
      tim.moore@gray-robinson.com
301 South Bronough Street
Suite 600
Tallahassee, Florida 32301

**P R O C E E D I N G S**

(Call to Order of the Court at 9:02 AM on Thursday, February 12, 2026.)

THE COURT:  We are back on the record in Case Number 4:25cr211 for day four.

We have the twelfth witness that's going to be call, a Tom Perez.

Before we do that, one thing that would be helpful to the Court -- and I'm going to give an example.  Yesterday we heard testimony from a witness that would relate to a First Amendment claim that she was fearful because she had to disclose her private information.

And perhaps the defense says, Judge, she was just lying.  I don't know if that's going to be the argument.  I suspect the argument is going to be it's not an objectively reasonable fear on that claim.  It seems like a lot of the issues here aren't so much that the facts are in dispute, but it's, Judge, how you ought to apply the law.  And that may have been a bad example.  I was just trying to come up with a quick example this morning.

What I need for y'all to do -- and I don't -- I'm not trying to create busy work -- is I'd like for when you do your closing arguments to start with a modified version of what people are supposed to do in motions for summary judgment and responses that they never do, even though the rules require it,

which is to identify the disputed facts.

Here -- and it doesn't have to be done one way. It could be done issue by issue and that may be easier, like at the beginning to say, Judge, we believe -- that doesn't mean you are right, But, Judge, we believe you need to resolve or make findings as to these three points as to this claim.

It would be helpful for me to know -- and, again, it also focuses things, because, again, a lot of these things I think are more a question of how do you apply the law or, like, Judge, that's what she said. She said she was fearful, and she said she stopped because she didn't want to disclose her information, but that's not objectively reasonable and here's why. Let me know if you believe, Judge, as a threshold question you have got to determine whether the witness is a liar or not, or, Judge, no, that's not what we are arguing. What we are arguing is it's not objectively reasonable.

That would be incredibly helpful to me. So you can flag for me, each side, when you believe there is a factual dispute that I need to resolve.

I think that's clear, but I'll just pick on two lawyers, starting with Mr. Jazil.

MR. JAZIL: Yes, Your Honor, that's clear. Thank you.

THE COURT: Mr. Wermuth.

MR. WERMUTH: Yes.

THE COURT: All right. And, again, it's up to you how

you do it, although I would think you'd want to be good advocates and try to persuade me as a -- first before you -- one side or the other, or both, go to the Eleventh Circuit.  For me it would just be more helpful -- rather than having some laundry list of facts at the beginning, it would be much more helpful with each section.  And I suspect some of y'all are going to take different sections and take the lead on different sections.  It would just be very -- more helpful for me to do it that way, say, as to this question.

And there may be some overlap.  I understand.  Just as we noted before, those factual disputes also apply to this question.  But if you do it within the sections, flagging that for me, that would be incredibly helpful; okay?

All right.  The plaintiffs can call their next witness.

MS. BOETTCHER:  Your Honor, Ellen Boettcher for the Right to Clean Water plaintiffs.

Before I call Mr. Perez to the stand, to streamline testimony I would like to move to admit all of Right to Clean Water's Plaintiffs' exhibits that have not been objected to by either party.

THE COURT:  Hold on one minute.  I've got to flip to your section.

Oh, y'all are at the very end.  So hold on.

I'm looking at 623-1, and I believe your exhibits

start on page 110, Exhibit 1, which was not objected to, which is the online user guide; is that correct?

MS. BOETTCHER:  Yes, Your Honor.

THE COURT:  All right.  And so let me find out, does the defense -- any exhibits, starting with 1, to which there was no objection, does the defense have some objection they believe they can make now, having not made it previously?

MS. HARDY:  No objection, Your Honor.

THE COURT:  All right.  So 1 is -- I'm sorry.  RTCW 1 is admitted.  That's on page 110.

(PLAINTIFFS' EXHIBIT RTCW-1:  Received in evidence.)

MS. BOETTCHER:  Your Honor, I have a list, if that's helpful.

THE COURT:  What would be helpful is for you to hand me the list --

MS. BOETTCHER:  Yes, Your Honor.

THE COURT:  -- so that I can compare it and I -- we are not talking past each other in rapid-fire succession and torturing the court reporter.

What I'm going to do is hand this to the courtroom deputy when I'm done.

And let me ask the -- Mr. Jazil, is anybody from the defense side -- and anybody can speak up.  I'm not sure what your objection would be since you waived it by not making it before.

But are y'all objecting to any of the exhibits for which there is not an objection identified on 623-1?

MR. JAZIL:  No, Your Honor, no objections beyond whatever we made on --

THE COURT:  Okay.  So what I'm going to do is I'm going to verify that -- thank you for the list -- 76 and 77 are admitted.

79 through 87 are admitted.

93 through 106 are admitted.

108 and 109 are admitted.

111 through 113 are admitted.

116 is admitted.

118 and 119 are admitted.

122 through 131 are admitted.

133 through 136 are admitted.

138 through 142 are admitted.

145 is admitted.

147 through 149 are admitted.

151 through 154 are admitted.

156 and 157 are admitted.

159 through 165 are admitted.

167 through 170 are admitted.

173 through 176 are admitted.

179 through 183 are admitted.

185 through 198 are admitted.  Although I thought 194

was already admitted, but I could be wrong.

201 --

THE COURTROOM DEPUTY:  You are correct, Judge.

THE COURT:  And I was just letting everybody know I was paying attention.

201 to 208 are admitted.

210 through 220 are admitted.

222 through 266 are admitted.

268 through 275 are admitted.

277 through 284 are admitted.

288 through 303 are admitted.

And, finally, 305 through 339 are admitted.

(PLAINTIFFS' EXHIBITS RTCW-76 TO 77, RTCW-79 TO 87, RTCW-93 TO 106, RTCW-108 TO 109, RTCW-111 TO 113, RTCW-116, RTCW-118 TO 119, RTCW-122 TO 131, RTCW-133 TO 136, RTCW-138 TO 142, RTCW-145, RTCW 147 TO 149, RTCW-151 TO 154, RTCW-156 TO 157, RTCW-159 TO 165, RTCW-167 TO 170, RTCW-173 TO 176, RTCW-179 TO 183, RTCW-185 TO 193, RTCW-195 TO 198, RTCW-201 TO 208, RTCW-210 TO 220, RTCW-222 TO 266, RTCW-268 TO 275, RTCW-277 TO 284, RTCW-288 TO 303, RTCW-305 TO 339:  Received in evidence.)

MS. BOETTCHER:  Thank you, Your Honor.

THE COURT:  I'm handing a copy of what I just read to the courtroom deputy.  She's also going to save a copy for the court reporter.

Counsel for Clean Water gets the gold star for today.

That's the protocol that we are going to follow for unobjected to or other groups of exhibits that y'all have agreed to.

I need a copy for the Court, just like I was handed by Clean Water; I need a copy for the court reporter, and I need a copy for the courtroom deputy. I'm not going to admit documents en masse unless you follow that protocol. So we'll have to wait and do it later.

It's just too hard and too cumbersome to have you say it, me say it, the court reporter type it.

So thank you for doing it. That was much more efficient and easier on my staff.

MS. BOETTCHER: Thank you, Your Honor.

THE COURT: Before we go to any -- the next matter, I'll let everybody know that that's a large number of exhibits. I left a copy on the clerk's table in front of the clerk's bench with exhibits that were admitted through yesterday. So if anybody ever wants to check what exhibits have been admitted Ms. Milton McGee has been updating the list each day, and she hands it to me, and I go and replace the old copy on the clerk's table.

I know, folks, that seems tedious, but I don't want to try to do this at the very end of the bench trial when everyone wants to go home. So that's why I try to keep up with the exhibits and give y'all a chance to make sure that we are all on the same page.

All right.  Counsel, do you have another matter?

MS. BOETTCHER:  I don't, Your Honor.

THE COURT:  All right.  You can call your witness.

MS. BOETTCHER:  I would like to call Thomas Perez to the stand.

(Mr. Perez entered the witness stand.)

**THOMAS PEREZ, PLAINTIFFS' WITNESS, DULY SWORN**

THE COURTROOM DEPUTY:  Please state your name for the record.

THE WITNESS:  Thomas H. Perez.

THE COURT:  Thank you.

MS. BOETTCHER:  Your Honor, I'm calling Mr. Perez to testify about Right to Clean Water's claims regarding the ten-day return deadline, registration requirement, and the affidavit requirement.

For the Court, I will first ask Mr. Perez questions to establish background information about Mr. Perez and his involvement with Right to Clean Water.

DIRECT EXAMINATION

BY MS. BOETTCHER:

Q.   Good morning, Mr. Perez.

A.   Good morning.

Q.   Are you a resident of Florida?

A.   Yes, I am.  I live in Titusville.

Q.   And what county is that in?

A.    That's in Brevard.

Q.    Are you currently affiliated with Florida Right to Clean Water?

A.    Yes, I am.

Q.    When did you first become involved with Right to Clean Water?

A.    I became involved in 2021.  We had a charter amendment that we were trying to introduce into the -- Titusville's charter for the Right to Clean Water, and what triggered that was a big sewage spill.  At the time I used to work for the Titusville Environmental Commission.  I was with them for about seven years.

And this commission provided many, many good recommendations to the council, but they were not going anywhere, so we were kind of frustrated.  And when this happened, this kind of put us over the top.  So four individuals, including myself, created a PAC so that we could create this petition.  So we went forward with that, and we managed to get it on the ballot.

Q.    And did your local work with this ballot initiative in Titusville prompt you to become more involved statewide?

A.    Yes.  Once the City managed to get it on the ballot and we won, you know, that November, I was able then to transition to the state amendment effort.

Q.    And what are your current roles within the statewide effort

for Right to Clean Water?

A.   Currently I am the Central Florida regional director, east Florida regional director.

Q.   And do you also have a county-level role?

A.   I do.  I am a captain for Brevard.  I was not able to, I guess, convince somebody to take over my previous duties as a captain.

Q.   When did you first become a county captain?

A.   For the '24 campaign.  So in '22, I was asked if I would be a captain for Brevard.

Q.   And what does your role as county captain entail?

A.   Pretty much everything that we ask of an ambassador.  So we train the ambassadors as well.  We coordinate, you know, our efforts, publish weekly calendars of events so that we can determine who can be where, for example.  Deliver petitions to the SOE, deliver petitions to ambassadors, all of those things.

Q.   And prior to HB 1205, did that role also include circulating petitions?

A.   Oh, yes.  That was central to everybody's duties.

Q.   And you mentioned that you have become a regional director.

     When did you become a region director?

A.   I became a regional director for the '24 campaign.  So in -- after, you know, the previous campaign did not make it to the ballot, I was asked if I would step up.

Q.   And what does your role as regional director entail?

A.    Well, it's coordinating with all of the counties that I'm responsible for, trying to make sure everybody is on the same page, you know, understands how we do things, so sharing a lot of information.  And that runs the gamut, you know, from making sure people understand how important it is to have the correct demeanor, you know, to how to collect petitions.  Most people, this is totally new.

Q.    And you mentioned that you oversee some counties.

How many counties do you oversee?

A.    I oversee seven counties.  They include Lake, Indian River, Brevard, of course, Volusia, Osceola, Orange.

Q.    I think there is one more, but that's okay.

Approximately where are all these counties located?

A.    All surrounding Brevard, east Central Florida.

Q.    And about how many hours per week do you spend volunteering for Right to Clean Water?

A.    I'd say minimum 40.

Q.    Do you get paid for your time working on Right to Clean Water's campaigns?

A.    No, I do not.  You could not pay me to do this kind of work.  It's -- you know, we do it because it's necessary.

Q.    And turning, for the Court, to Mr. Perez's volunteer recruitment.

Mr. Perez, prior to HB 1205, how would you recruit volunteers?

A.   Well, I might start out by saying, you know, Clean Water is a common good.  It's important to all of us.  We are vessels of walking water.  Okay.  We are mostly water.  A right to clean water is a -- well, it requires protecting, okay, this common good, and that's why we're seeking a right, okay.  And it's logical, and in a sense it's fundamental, you know.  Clean water is an existential need for life.

Q.   And prior to HB 1205, did you ever recruit volunteers on the spot while you were circuiting Right to Clean Water petitions?

A.   Yes.  I mean, I did that everywhere I went.  So if I was lucky, you know, I would manage to convince somebody to actually follow through, you know, and join, you know.  So in order to save myself some time, if somebody was very interested I would provide them with a card.  That they way could call me rather than me calling them, because a lot of times it was just -- you know, didn't work out, you know.  They realized that it wasn't something they really wanted to do or whatever.

Q.   Do you have an example of recruiting a volunteer on the spot right while circulating Right to Clean Water petitions?

A.   Yes.  During early voting we had a lot of the early voting stations manned with somebody that would be collecting petitions, and this one fellow showed up at our Titusville location.  I was not there, but the ambassador that was there, you know, did what I would do, struck up a conversation, and

they were interested; they weren't working at the time.  One of the few people that was actually young, most of our volunteers are, you know, in their 70s and 80s.

And I was given his name.  I called him and told him where I would be the next day.  And he joined me and he pretty much helped us during that whole early voting period and then got a job and that was that.

Q.    Do you have another example of that?

A.    Yeah.  Like I said, I carry petitions everywhere and I spoke to everybody, pretty much, about it.  And pickleball is one of the things that I enjoy, and at pickleball I managed to, you know, strike up a conversation with this woman.  And she said, You know, I've been looking for somebody -- something that I could do, you know, to, I guess, give back, kind of thing, you know, to help.

Q.    And when are volunteers usually most committed, right at the beginning after recruitment or later down the road?

A.    I'm sorry.  Could you repeat that?  I couldn't hear it.

Q.    Okay.  When are volunteers usually most -- I'll start over.

When are volunteers usually most committed, right at the beginning after you recruit them or later down the road?

A.    Yes, right at the very beginning.  You know, I mean, most people haven't done this kind of work and it's not natural, I don't think, to anybody.  Although there was one person that I remember kind of just took it and ran with it, you know.  And

again, you know, the person was with us for a short time and that was done.  But, you know, you get some really interesting people when you are doing this kind of work.

So, yes, at the very beginning.  And then typically, you know, they realize, you know, this is hard, going up to a stranger, you know, and having a pitch which usually takes a little bit of time to feel comfortable with, to make sure that people understand what you're asking of them, but yet aren't alarmed, because when you go up to a stranger, you know, it's like they are put off by, you know, you are approaching them.

So it takes a little bit of practice, the right demeanor, getting a sense of what the individuals -- I guess, where he is, if he's in a rush, you know, all those things.

Q.   And did HB 1205 impact your ability to recruit new volunteers.

A.   Yes, it pretty much stopped our campaign pretty early.

You know, I mean, it doesn't take long to realize that this is just too difficult.  It was difficult anyway, you know, and this made it very, very difficult to continue.

Q.   And would it be as productive to have an unregistered volunteer walk alongside a regular circulator and talk about Right to Clean Water's message while the regular circulator circulated the petition?

A.   You might think that might work, but volunteers are a very limited resource.  In other words, we don't have enough to do

the work.  So if you were to introduce a second volunteer to just talk to the individual, it would be taking twice, you know, the resources that you might use to collect a petition, and maybe even more because of the fact that you've got three people, then you start a discussion, you know, between all three.  And so I do not think that would be effective or productive.

Q.   And would it be as productive to have an unregistered volunteer talk with voters about Right to Clean Water's message and encourage them to print and sign the petition at home?

A.   I don't believe so.  And the reason for that is we do that anyway, even before HB 1205.

Okay.  Somebody is approached; they are in a hurry.  You know, you might say, Hey, you know, here's a petition, you know, after you spoke with them or whatever.  And I don't believe most of those got back to us, because people take them home, if the petition makes it home, you know, not crumpled and what have you.  And they may put it aside because now there is no need to get it done right away.  And, you know, I mean, we are all that way, you know, somebody asks us to do something and if we don't do it on the spot -- I mean, that's part of sales, I think, you know.  You try to get that person to buy now.

Q.   And in your experience would operating in that manner impact the -- would it impact Right to Clean Water's ability to get its constitutional amendment on the ballot?

A.   Yes, yes, very much so.  It's just -- it's not effective, it's not productive to the level that we would need in order to make it happen.

MS. BOETTCHER:  For the Court, my next questions to Mr. Perez are relevant to Right to Clean Water's claims related to the ten-day delivery deadline.

BY MS. BOETTCHER:

Q.   Mr. Perez, are you familiar with HB 1205's ten-day deadline by which petition circulators must submit signed petition forms to the county in which the voter resides?

A.   I am.

Q.   How has the ten-day deadline impacted Right to Clean Water's operation?

A.   Well, again, it made it very difficult.  And we did try to see how that would work.  One individual called me up saying, Hey, I'd like to collect petitions at this particular event, and although, you know, it wasn't my intention because of who it was that was asking me, I met them, brought them petitions, and I collected the petitions with them.  We collected, maybe, a couple hundred, you know.  And when we got those back, we started going through them, we had a large number of counties, okay.

So now these petitions have to be collated, put in envelopes, addressed, taken to the post office, and mailed.

Now, this campaign is a grassroots campaign.  We don't have

large dollars, so the issue of having to send something out right away means that we can't be efficient.  We can't hold small batches of petitions until we have more so that we can send them out, you know, with time rather than, you know, every day sending out petitions because they have a ten-day limit.

So the resources just there to be able to meet the ten-day requirement.

Q.   And about when did you and this other volunteer attempt to test the ten-day deadline?

A.   Say it again?

Q.   When did you and this other volunteer attempt to test the ten-day deadline?

A.   I believe it was right around in June of last year.

MS. BOETTCHER:  Caroline, could you please pull up what's been admitted as Right to Clean Water Plaintiffs' Exhibit 153.

BY MS. BOETTCHER:

Q.   Mr. Perez, do you recognize this document?

A.   Yes, I do.

Q.   What is it?

A.   Every week I would put out a -- a calendar, and I usually would start out by reviewing the prior week and how we did.  So it starts out by reviewing the prior week, which was collecting petitions at an event called the Orlando Wetlands which occurred every other year.  And this particular year we collected 389

petitions that were spread across 20-odd counties, okay.

Q.   And what is the date of this email?

A.   February 26th of 2025.

Q.   Prior to HB 1205, was it typical to collect signed petition forms from voters registered in multiple counties at the events you attended for Right to Clean Water?

A.   Yes, and this would have been an example of that.

Q.   How does HB 1205's requirement to send signed petitions to the county in which the voters resides within ten days impact your ability to circulate petitions at such an event?

A.   Well, it just makes it very, very difficult.  You know, there's -- it's difficult to do all these requirements within ten days.  You're bound to not make it.  I mean, everybody has experienced mail taking three, four, five days, okay.

And here at the time we would take the petitions and mail them, like I said, in batches -- hopefully not one or two at a time because it's just too time-consuming -- to the captain in the other corresponding county, okay.  And they would then, in turn, deliver them, okay -- not mail them, deliver them to the Supervisors of Elections.

One of the things that we did as a result of this requirement, ten-day requirement, was that we eliminated that middle step and still -- the middle step of mailing it to -- or taking it to the captain in the other county, yeah.

Q.   And even when you eliminated that middle step, were you

able to comply with the ten-day deadline?

A.   Didn't feel comfortable meeting that deadline at all.

Q.   So you mentioned volunteer time increases.

Are there any costs that would be associated with meeting this ten-day deadline?

A.   Yeah.  I mean, as I said, you know, these are grassroots who are all volunteers, so we are not on 24/7, you know.  And this would require everybody to drop whatever they are doing, okay.  And there's no way you can expect that of people that aren't being paid.  You know, I'm very passionate, but I have my limits as well.  And, you know --

Q.   Would you say this is likely to increase or decrease Right to Clean Water's expenses on stamps and envelopes?

A.   Oh, it would definitely increase it.  You know, I mean, as I said, you know, we are now being required to literally mail things every day if we were collecting petitions.  And that's not what we used to do.  And that requirement alone -- you know, there aren't enough people in this grassroots campaign to be able to do all of these things in time.

Q.   How does the ten-day deadline impact Right to Clean Water's ability to get its constitutional amendment on the ballot?

A.   It would make it very, very difficult.  I mean, it was difficult anyway, okay, but this would make it much more difficult.

MS. BOETTCHER:  For the Court, my next questions to

Mr. Perez are relevant to Right to Clean Water's claims related to the volunteer circulator registration requirement.

BY MS. BOETTCHER:

Q.   Mr. Perez immediately after HB 1205 went into effect, did you plan on registering as a petition circulator?

A.   I did not.  You know, my initial impression was that this was just too difficult.  You know, I've been doing this for some years now, and just knowing -- sensing what was being, you know, called for, required of us, just was daunting, you know.

And when you think about the penalties alone, you know, making sure that you are doing the right thing, it was very chilling on the whole campaign.  So we had a very small group to begin with, and certainly we started losing people, because, you know, this is something that, you know, they don't want to sign up for.

Q.   And did you later change your initial decision not to register as a petition circulator?

A.   Yes.  I realized that as, you know, one of the leaders that we really needed to know what was involved in order to counsel others that might be interested and -- because there were some passionate people that just, you know, wanted to keep going. And that way I could counsel them as to, you know, the requirements and what they could look forward to, you know, how to stay out of trouble if they decided to continue.

Q.   Are you now registered as a Right to Clean Water petition

circulator?

A.    I am.  Like I said, I wanted to, you know, determine what was involved in the process.

Q.    And have you circulated petitions at all since you have registered?

A.    I have not.

Q.    And why is that?

A.    Well, I realized that nothing had changed.  You know, the more I got into it, the more I realized that, you know, this is not something that these volunteers are able to surmount, you know.  What's being asked was too difficult.

Q.    Do you remember approximately when you decided to attempt to register as a petition circulator?

A.    Yes, it was in the first days of July.

Q.    And is that 2025?

A.    Yes.

Q.    About how long did it take for your application to register as a petition circulator to be approved?

A.    About a week, maybe a little longer.

Q.    So I'd like to walk through the registration process step by step.

      What was the first step of the registration process?

A.    The first step was a tutorial made up of PowerPoint slides that took, I think, just under an hour to complete.

Q.    And can you describe that tutorial.

A.    Yeah.  It involved four different parts dealing with the law -- it was all HB 1205 -- and it was followed up with a test.

Q.    Great.  You anticipated my next question.

What was the next step of the registration process?

A.    There was a test, which, I think, took maybe 20 minutes or so, and I believe it involved 20 questions, and you had to get an 80 percent grade in order to pass.

Q.    And did you pass the test?

A.    I did, by the skin of my teeth.  I did pass with 80 percent, and I was interested in understanding what I got wrong in order to be able to, you know, see -- understand the law better, and there was no way of seeking that out.

Q.    So did you know what questions you had gotten wrong?

A.    I did not.  I couldn't -- there was no way to determine that.

Q.    The test did not explain to you which answers you had gotten wrong?

A.    That's correct.

Q.    And what was the next step of the registration process after this test?

A.    The next thing was I had to take the last page of the application and sign it, which required me to print it off, scan it after I signed it, okay, and then email it back.

Q.    And approximately when did you submit the signed application?

Direct Examination - Mr. Perez

A.   Okay.  The time that I did the test and I completed that portion of it, and it required me to do this scan, I had other things to do, and I knew that was going to take me a little while.  It's not often that I, you know, sit on the scanner and do that, but I had other things to do so I dropped it.  Came back to it maybe a day or two later and scanned it, signed it, submitted it, and in a few hours I got back a denial; I was not approved.

        MS. BOETTCHER:  Caroline, could you please pull up what's been admitted as Right to Clean Water Plaintiffs' Exhibit 76.

        And could you zoom in on the top, please.

        THE WITNESS:  Oh, thank you.

BY MS. BOETTCHER:

Q.   Do you recognize this document, Mr. Perez?

A.   Yes, I do.

     It is the notice that I received from the Division of Elections telling me that the incorrect form was uploaded, to upload a signed, up-to-date registration summary form to complete the registration.

Q.   And what date was this email sent?

A.   July 2nd.

Q.   And does the email give any more instruction on how to correct the, quote, "incorrect form uploaded," end quote?

A.   No.  It did not, and it was really perplexing because I'm

saying, What did I get wrong?  So I went through the iterations of doing it again and receiving at least one or two more denials.

And I then called, tried to get through to the Division of Elections.  I called at least two different numbers, finally got somebody to answer.  And at that point they gave me the name of somebody else to call, so I called them, left a message.

They called me back, I think, the next day.  I explained to them, you know, my circumstances, that I was getting this denial and I believe I did everything correctly, and they said, well, that they would get back to me.

So they got back to me a day or two later, and they said, Try redoing the form and signing it, but mail it on the same date that you sign it.  And when I did that, it went through.

MS. BOETTCHER:  So we can take this exhibit down, Caroline.

BY MS. BOETTCHER:

Q.   Mr. Perez, you mentioned another denial letter.

MS. BOETTCHER:  Caroline, could you please pull up what's been admitted as Right to Clean Water Plaintiffs' Exhibit 77 and zoom in on the top.

Thank you.

BY MS. BOETTCHER:

Q.   Is this the email you were referencing, Mr. Perez?

A.   Yeah.  This is a copy of the previous email but dated

July 8th.

Q.   And did this email give you any more information on how to correct the, quote, "incorrect form uploaded," end quote?

A.   No, it did not.  It said exactly the same thing, that incorrect form was uploaded, to upload again signed, up-to-date registration summary.

MS. BOETTCHER:  You can take this down.  Thanks, Caroline.

BY MS. BOETTCHER:

Q.   So you mentioned calling a few different numbers, and you were eventually able to speak with someone.  And she advised you on what to do.

Can you restate what she advised you to do to correct this incorrect form uploaded?

A.   Yeah.  She -- it almost sounded like they weren't sure.  She said to try redoing it, but scan it and send it on the same day that I signed it.  So I had to sign it anew, with the new date, and so I had to go through the process of scanning it one more time, but doing it all in the same day.

Q.   And did you change anything else about the application you submitted apart from that date?

A.   No, that was it.

Q.   Did the person you spoke to point to any written rule or guidance requiring that changed date?

A.   No, she did not, and in the website there was no

information to that effect.

Q.   And so after you submitted that, you know, new form with the changed date, were you approved?

A.   Yes, and, you know, the response took a few hours.

Q.   And approximately when was your application approved?

A.   Well, once it was submitted, it was approved that same day, some hours later.  I suspect it may have been another day later from July 8th, maybe the 9th.

        MS. BOETTCHER:  And for the Court, my next questions to Mr. Perez are relevant to Right to Clean Water's claims related to the affidavit requirement.

BY MS. BOETTCHER:

Q.   Mr. Perez --

A.   Uh-huh.

Q.   -- once your registration was approved, were you given access to a personal petition circulator form to circulate Right to Clean Water's petition?

A.   Yes, I was.  I was given an account to which I would go and obtain the circulator's form.

Q.   And how do you access this circulator's form?

A.   I have to go online; I have an account number that was given to me, and when I do that, the form becomes available, uh-huh.

        MS. BOETTCHER:  Caroline, could you please pull up what's been admitted as Right to Clean Water Plaintiffs' Exhibit

75.

BY MS. BOETTCHER:

Q.    Do you recognize this document, Mr. Perez?

A.    Yes, I do.  It is my personal petition circulator form.

Q.    And is it your understanding that you are required to use this petition form to circulate petitions as a registered circulator?

A.    Yes.

        MS. BOETTCHER:  Caroline, could you please zoom in on the box labeled "Petition Circulator's Affidavit"?

BY MS. BOETTCHER:

Q.    Mr. Perez, is this your full name listed on this form?

A.    It is.

Q.    And, Mr. Perez, after it says "address," what is covered by the black box on this form?

A.    My home address.

Q.    Were your full name and home address preprinted on the circulator registration form?

A.    Yes, they were.

Q.    So if you were circulating this petition form to voters, would your potential signatory be able to see your full name and home address?

A.    Yes.

Q.    When you're having a conversation with a potential signatory, when would you hand them this petition form?

A.    I would hand it to them right away as I was, you know, talking to them, giving them the pitch of what this is all about to get them to sign the form.

Q.    And, Mr. Perez, right before HB 1205 went into effect, how was the progress of Right to Clean Water's 2026 campaign?

A.    It was picking up momentum significantly.  In the month of April, I alone, by myself, collected over a 1,060 petitions.  And I didn't set out to do that, but it was just everything that was happening.  People were more engaged, I think, because of everything that's happening in the political world, okay.

So people were interested in doing something, and when you presented them with a Right to Clean Water petition, it appeared to make sense all of a sudden on its own, you know, didn't have to do a lot of explaining.

Q.    And what did you expect to occur in the final months of Right to Clean Water's 2026 campaign?

A.    Well, considering how everything's been going, I expected that to just continue gaining steam.  One of the things that I discovered in my Titusville days -- that went right down to the wire, and we made the ballot in the last three weeks.  We collected over half the required petitions and it was exactly that.

When these campaigns start, they kind of are a flat line and then they start getting some momentum; then they actually, you know -- if we're lucky -- take you over the top.

Q.    Thank you, Mr. Perez.

MS. BOETTCHER:  Your Honor, may I have one moment to confer?

THE COURT:  Certainly.

MS. BOETTCHER:  Thank you.

(Discussion between the attorneys.)

MS. BOETTCHER:  I have no further questions on direct.

THE COURT:  That you think, Counsel.

Cross?

CROSS-EXAMINATION

BY MR. JAZIL:

Q.    Good morning, Mr. Perez.

A.    Good morning.

Q.    Mohammad Jazil for the Florida Secretary of State.

Sir, I'd like to make sure I understand a few things about your role with Right to Clean Water.

If we can go to Document 535 that was filed in this case. It's the disclosures that your lawyers filed here.

MR. JAZIL:  If we can go to page 6 of these disclosures in Right to Clean Water, paragraph 2.

BY MR. JAZIL:

Q.    Sir, it says here that you served in an unpaid volunteer capacity as Right to Clean Water's county captain for Brevard County; true?

A.    Yes.

Q.   And as regional director for east Central Florida; true?

A.   Correct.

Q.   And is there anything else in this disclosure seem inaccurate to you?

A.   Yes, correct.

Q.   So this an accurate description of what you did for Right to Clean Water; fair?

A.   Yeah.  For what's there.  You know, details might be expanded upon, but yes.

Q.   Fair enough.

          MR. JAZIL:  And we can take that down.

BY MR. JAZIL:

Q.   Sir, as I understood it, you ended up registering as a petition circulator for Right to Clean Water; right?

A.   Correct.

Q.   And you said it was during the first few days of July; right?

A.   Correct.

Q.   And we saw the email chain where you submitted your application for the first time to the Department of State on July 2nd, I believe was -- did I get that right?

A.   Yes.

Q.   And then there was some back and forth, but you ended up getting registered around July 8th or 9th?

A.   9th.

Q.    9th.

And you'd agree with me that House Bill 1205 went into effect completely July 1 of 2025; right?

A.    Yes.

Q.    And so you were registered --

A.    Requiring the registration in July 1, yeah.

Q.    Yes, sir.  And so you attempted to register right after the entire bill went into effect --

A.    Correct.

Q.    -- correct?

And so it was around the July 4th holiday that you were trying to register, a couple of days before and a couple of days after; right?

A.    Correct.  It was, I believe, a weekend too, so.

Q.    Yeah, there was a weekend in there, too; right?

A.    Yeah.

Q.    Sir, I also listened to your testimony about the paid circulator form, that if you choose to use, you can use now; right?

A.    Uh-huh.

MS. BOETTCHER:  Objection, Your Honor.

Did you say "paid petition circulator form"?

MR. JAZIL:  Pardon me.

The --

THE COURT:  Sustained.  He's correcting his question.

Go ahead.

BY MR. JAZIL:

Q.   You testified about the petition circulator form that you can use now; right?

A.   Yes.

Q.   And, sir, as you were talking about your petition circulation efforts in the past, you talked about how you would sign up people wherever you found them?

A.   Yes.

Q.   And that included at pickleball games; right?

A.   Yes.

Q.   Did I understand that?

A.   Uh-huh.

Q.   And, sir, when you walk up to someone, you try to build a rapport with them?

A.   Correct.

BY MR. JAZIL:

Q.   And if during that process that person is open to listening to your message, then you engage with them further; right?

A.   Yes.  I would try to recruit them.  You know, if I had the feeling that, hey, this people -- or this person is genuinely interested -- you know, like I said, that one person just came back to me and said, You know, I've been wanting to do something, give back, and this is something that I can do.

Q.   I appreciate that, sir.

And if you're working at one of these events and you come across someone who is wearing a Pave the Planet T-shirt, for example --

A.    A what T-shirt?

Q.    A Pave the Planet T-shirt.

A.    Pave the Planet?

Q.    Let's assume the T-shirt says "Pave the Planet."  You are not going to engage with that person to try to get them to sign a Right to Clean Water --

A.    I engage with everybody.

Q.    Okay.

A.    Everybody.  No matter what they look like, what they are dressed.  You know, I have a vivid examples of -- because everybody is so different, you know.  And, you know, what you see isn't always what you get.  And that is difficult to get by because we all have biases.  But when you start doing this work, you know, your goal is to make a million petitions, and it's not going to happen if I start choosing and, you know, trying to figure out, Well, who's likely to sign this?  There is no way to tell.

Q.    I appreciate that, sir.

And just sticking with that interaction with someone, if during the first few moments of that interaction that person appears to be hostile to you; they are just not open and listening to you, do you continue to engage or do you walk on to

the next person that you can engage with and possibly collect a petition from?

A.   I thank them and I say, Hey, if you want more information, here's a card, okay, and move on.

Q.   And in that instance where you are thanking them, you don't necessarily hand them a petition before moving on, right; you hand them a card?

A.   Well, if they will accept the card, okay.

Typically there's no point in giving them a petition.  With the card they have access to the petition if they want it.

But if they are hostile to me or not receptive, I'm not going to waste my time.

Q.   Understood, sir.

MR. JAZIL:  I'd like to go through a couple of exhibits that have already been admitted into evidence.

Can we pull up Right to Clean Water Exhibit 92, please?

BY MR. JAZIL:

Q.   Sir, at -- this is one of the exhibits that was already introduced into evidence.  I'd like to focus on the header. It's got Joseph Bonasia on there.

Do you see that, sir?

A.   Correct.

Q.   You know Joseph Bonasia?

A.   Yes, I do.

Q.   It's got David Moritz on there.  You know David Moritz, sir?

A.   I do.

Q.   It's got Karl Deigert on there.

     Do you see that, sir?

A.   I know all these people.

Q.   You know all these --

A.   That aren't --

          MS. BOETTCHER:  Objection.  Your Honor, this has not been admitted into evidence.

          THE COURT:  One moment, please.

     (Pause in proceedings.)

          THE COURT:  92 was not admitted into evidence.  Y'all objected to it.

          MR. JAZIL:  All right.  Your Honor, we can take it down.  I can make my point with something else.

          Can we go to Exhibit 98, which I believe is in evidence?

          We'll go to Right to Clean Water's Exhibit 98.

          Can we zoom in on the top, please?

BY MR. JAZIL:

Q.   Okay.  Sir, is this your email address at the very top in the "From" line?

A.   It is.

Q.   And we talked about how you already know Joseph Bonasia;

right?

A.    Correct.

Q.    Do you know Paul McClease?

A.    I do.

Q.    Do you know Liz Lindsay?

A.    I do.

Q.    And you know all three of these people through your work with Right to Clean Water?

A.    Correct.  All these people are, yes, involved with the Right to Clean Water.

        MR. JAZIL:  And if we zoom out for a moment.

BY MR. JAZIL:

Q.    So, sir, this is an email where you're providing a list of events?

A.    Correct.

Q.    And you're sending this email to only three people; right?

A.    Correct.  Those three people are also regional directors.

Q.    So those three people are regional directors?

A.    Uh-huh.

Q.    That means they have some kind of leadership role in the organization; right?

A.    Yes.

        MR. JAZIL:  Can we go to Exhibit 109, Right to Clean Water Exhibit 109, which is also in evidence?

        I apologize, Your Honor.  I'm not that quick of

writing down the numbers.

THE COURT:  No worries.

And let me say, Counsel, thank you.  If y'all will just do what you are doing so it will save time.  I know you look back, they are giving you thumbs up.  That's just a lot cleaner and faster.  So thank you y'all for cooperating with each other.

BY MR. JAZIL:

Q.   And, sir, this is already in evidence.  This is an email from Liz Lindsay to Melissa Martin and yourself; correct?

A.   Correct.

Q.   And here Ms. Lindsay is telling both you and Ms. Martin that you updated the list of SOEs that replied to her inquiry about accepting signed petitions directly from register voters; right?

A.   Correct.

Q.   And y'all entrusted Ms. Lindsay with reaching out to SOEs to compile this information; right?

A.   Actually, I started compiling this information and Liz kind of was doing the same thing.  So, you know, obviously we weren't -- I was trying not to duplicate this effort, so I kind of stopped and let her continue it.  And the purpose of that was to determine SOEs' willingness to accept petitions directly from the voter that was completing it.

Q.   Okay.  Understood.

MR. JAZIL:  And let's take a look at an example of Ms. Lindsay reaching out to the Supervisors.

Can we pull up Right to Clean Water 152?

BY MR. JAZIL:

Q.   And, sir, this is an email that's been admitted in evidence.

MS. BOETTCHER:  Yes.

BY MR. JAZIL:

Q.   And it's from Ms. Lindsay to the Pinellas Supervisor of Elections and the Secretary of State.

Do you see that?

A.   Yes.

Q.   And is this an example of one of these interactions that you were initially having with the Supervisors and Ms. Lindsay started having with the Supervisors?

A.   Yes.

MR. JAZIL:  I'd like to go back to page 5 at document 535 that was filed in this case.

BY MR. JAZIL:

Q.   Sir, so you know Ms. Lindsay; correct?

A.   Yes.

Q.   Let's take a look at the description that's been provided, for what Ms. Lindsey does, by your lawyers in this case.

MR. JAZIL:  If we go to page 8.

(Discussion was held.)

BY MR. JAZIL:

Q.   Sir, go ahead and take a look at Ms. Lindsey's description here, and let me know when you are done reading it.

A.   Thank you.  Okay.

Q.   Does that description look accurate to you?

A.   Yeah.

MR. JAZIL:  Now let's go to Defendant's Exhibit 1544.

MS. BOETTCHER:  Objection, Your Honor.

This is an email that was discussed with Melissa Martin yesterday.  Object to foundation and hearsay.

MR. JAZIL:  Your Honor, may I ask the witness some questions and try moving it in a little later?

THE COURT:  You can.

So it's not being admitted; it's not being published to the Court, and it's not in evidence, but he certainly can ask a witness about questions to lay a foundation.

MR. JAZIL:  Now, sir, if we can zoom in on the second portion of this email.

BY MR. JAZIL:

Q.   Now, this is Liz Lindsay's email address; right?  The same one from the past few emails we looked at; correct?

A.   Yep.

Q.   And here she's reaching out to the Secretary of State's office; right?

A.   Correct.

Q.   And she, as we saw in Exhibit 152, also reached out to the Secretary of State's office.

A.   Okay.

MR. JAZIL:  Your Honor, now I'd like to move this exhibit into evidence.

MS. BOETTCHER:  Objection to hearsay.  This is not the statement of a party opponent, and objection to foundation as well.

MR. JAZIL:  Your Honor, I believe I've laid the foundation for this being the statement of a party opponent.  We talked about Ms. Lindsey's role in the organization; we saw the disclosures about Ms. Lindsey's role in the organization; we saw their emails; we heard from the witness about Ms. Lindsey's role --

THE COURT:  Where is this witness on the pecking order?  I guess, for example, that would be like asking one of my law clerks about what my authority is.

Where was the last witness that testified regarding this document in the pecking order in leadership versus this to comment?  Because what I heard before was somebody higher in the food chain that said, We had a problem with this person because they are not supposed to reach out to the Secretary of State.  We are supposed to discuss this as a group of leadership, is I thought what the testimony was.  So where does this witness fall -- and by giving her description, how does that description

alone mean she's empowered to speak as an agent on these matters, notwithstanding the prior testimony we heard from somebody else that was high on the food chain?

MR. JAZIL:  Understood, Your Honor.  And here's my response to that.  Your Honor --

THE COURT:  That's not a ruling.  I'm just saying it seems to me that's the issue crystalized for the Court.

MR. JAZIL:  Understood, Your Honor.

And the prior testimony we had from Ms. Martin was she was a campaign coordinator, and she walked us through how the organization was structured.  My understanding is after the campaign coordinators come to regional directors, both Ms. Perez -- Mr. Perez and Ms. Lindsey are regional coordinators.  We also then saw examples of materials entered into evidence by the plaintiffs where Ms. Lindsey is communicating directly with the Department of State and the Supervisors of Elections.  These are not draft emails, these are actual email correspondence.

THE COURT:  Do we know if those emails, though, were discussed as a group and approved?  I thought that that was the question that was put before the Court before.

MR. JAZIL:  Pardon me, Your Honor?

THE COURT:  I thought the issue before the Court before was, Yes, we do as a group, once we've discussed it, reach out to the Secretary of State.  The problem with this

particular email and this particular person was they were circumventing that rule and going rogue was the testimony before the Court.

I've heard nothing from this witness to rebut that, so all he's done is confirm what I already knew, which is where her -- what her role was, because I knew what her role was. She was a regional person, so -- and he hasn't talked about people's authority and how they communicated with the Secretary of State and whether there was protocols in place internally to regulate who was speaking to the Secretary of State on behalf of this organization.

So I'm not sure that he adds anything new. I'm not ruling. I'm just -- it seems to me the issue still is what do I do with the fact that I've got somebody else involved in that process saying, This was a problem and you weren't supposed to send emails unless it was discussed and approved as a group.

MR. JAZIL: Two points, Your Honor. Number one, I don't recall Ms. Martin's testimony being quite that definitive. I understood her testimony to be, We've had some problems -- we've had some talks with her, not that, We stopped her from sending these things.

Two, Your Honor, the material that has now been put into evidence and the material we have seen shows that she was, in fact, having correspondence. No one stopped her. She was having correspondence. The witness has also told us that he

used to be the point person talking to the Supervisors of Elections and he passed the baton off to Ms. Lindsey.

And, Your Honor, taking all of this together suggests that she -- so if we're taking up a corporate organization, you've got the Boeing CEO on one end; you've got the janitor of Boeing on the other end; Ms. Lindsey falls somewhere in the middle.

And based on what correspondence she's had, they're -- not draft correspondence; those are final positions. These are the entities' final positions corresponding with elections officials. Based on the correspondence we had that has been put into evidence, it shows she's closer to the CEO than the janitor, and she has the authority to talk about these issues, and so I believe that should come in as a party opponent.

THE COURT: I don't think I ever suggested anything or even hinted at that she was being cast as a janitor. I think -- you haven't lost yet, but I just want to, again, circle back to the question I asked, because that entire monologue was nonresponsive.

And I don't mean that to be unkind, and it doesn't mean you're going to lose. I just -- the issue isn't is this somebody in the hierarchy of this organization. That's a given, and that was true when your colleague was trying to admit the document.

The issue is -- and he stopped, so I never ruled on

anything.  The issue was does it matter that I've got testimony suggesting that there's supposed to be a discussion and a group approval before we send out something to the Secretary of State.

You can take umbrage with how that's cast, but -- that doesn't mean you lose, but that was the issue.  The issue for the Court has never been is this person higher in the food chain than the most basic volunteer or, as you cast it, a janitor.

The question was what do you do if I'm ruling on whether somebody is an agent and can speak if there is evidence that you're not supposed to speak for the agency unless it's approved.  So, for example, if somebody from -- the assistant manager at Publix issues a statement when asked by, you know, the local newspaper a question, and Publix has a protocol in place that you are not supposed to speak to the press at any point unless you've cleared it with the press office, would that be a problem to argue that that person's statement binds the Publix?

I think it would depend on the statement.  I think it would be -- for example, be within the scope of their duties, so it might not even matter because the scope of their duties, for example, was to supervise all the employees.  So, yes, they knew that there was water on the floor, and they didn't have enough employees to clean it up so they told them not just to be bothering.

So, arguably, even if there was some policy "don't

talk to the press" in place, that wouldn't be determinative of the issue, but it just seems to me that's the issue; not where are you in the hierarchy, but does it change anything if you have testimony that there is a rule that bars it.

MR. JAZIL:  Your Honor, this is my best answer for that.  At the end of the day, I think what we're talking about goes more to the weight that you should put on it rather than its admissibility.

Because we have examples of this person now having this correspondence, and so this person had actual or apparent authority to have this correspond on behalf of the entity with various elections officials, so I think it should come in as a party opponent because of the past practice, what has happened. The testimony from Ms. Martin would go to what weight you give it.  If you believe Ms. Martin's testimony to be credible --

THE COURT:  Well, it's got to be admissible for me to give weight to it.  The rule of agency doesn't say you're a little bit pregnant.  You're either pregnant or you're not; you're either an agent or you're not.

And I'm not aware of any rule or case discussing the applicability of that rule that says, Well, it may not be an agent but just admit it and then determine what weight you're going to give it.  That doesn't mean you lose.  I'm just taking umbrage with casting it as weight.

But, Counsel, help me to understand; they're high up.

We've now had a ton of emails, which I didn't think we saw before, where she's communicating with the Secretary of State. So given her position, and the fact that the record is replete with her reaching out, why does the comment of the prior witness saying, We've asked her not to do this without talking to us -- why does that somehow mean she doesn't have the authority to speak when it was just generally there may have been a problem? And it wasn't with that particular email, for example, just the idea that it was generally an issue.

And I'd pause here to point out we never had this discussion the last time we were admitting this, which is why we're having it now.

MS. BOETTCHER:  Yes, Your Honor.

So Ms. Martin testified that Ms. Lindsey was not authorized to speak on behalf of Right to Clean Water.  These emails, you know, were not shown to Ms. Martin to kind of rebut that comment.

Mr. Perez is not --

THE COURT:  Well, did she say she wasn't allowed to speak, or did she say that, Reaching out to the Secretary of State was problematic because we wanted everybody to talk together first?

MS. BOETTCHER:  Yes, Your Honor.

THE COURT:  Did she say that that email was sent before she talked to anybody, and did she identify that

particular email as an example of where she had not been authorized to speak, or did she just say it generally?

MS. BOETTCHER:  Yes, Your Honor.

I believe she said that she was not authorized to speak to the Secretary of State because they had not had a discussion about that email being sent to the Secretary of State in particular.

THE COURT:  All right.  Anything additional?

MS. BOETTCHER:  Your Honor, you know, Mr. Perez is not the campaign coordinator of Right to Clean Water; Ms. Martin is, and Ms. Martin already testified about this document.

THE COURT:  All right.  Before we move on, anything else?

MR. JAZIL:  Your Honor, reading from the disclosures, Ms. Lindsey has knowledge of RTCW's efforts to gather petition signatures and how the challenge laws will affect and has already affected RTCW in their own petition circulation activities.  The documents speak for themselves and, Your Honor, the transcript of what Ms. Martin said is the best reflection of what she said.

THE COURT:  What I'm going to do, I'm going to go pull what she said, so you're not -- you don't need to -- you're just trying to use the witness to bring the topic up again; you're not trying to ask him about that document; correct?

MR. JAZIL:  Correct, Your Honor.

THE COURT:  So what I'm going to do is I'm not admitting it, but I'm going to go read that portion of the transcript, yeah.

MR. JAZIL:  And reserve ruling?

THE COURT:  Right.  Right.  Right.  I'm reserving ruling.

If I wasn't going to read the transcript, I'd just deny, so, yeah, that was implicit in my comment.

MR. JAZIL:  And, Your Honor, just to be clear and just to be clear to Mr. Perez, I wasn't trying to disparage anyone with the janitor-CEO paradigm I'd set up.  That was just for discussion purposes.

THE COURT:  Mr. Jazil, you don't have to apologize for being a lawyer and elitist.

MR. JAZIL:  And it was for Boeing, Mr. Perez, not for your organization.

So those are all the questions I have.

Thank you.  Mr. Perez.

THE WITNESS:  Oh, thank you.  I have to go to the bathroom.

THE COURT:  We'll take a break so you can use the restroom and -- all right.

THE WITNESS:  I'm still in the hot seat though?

THE COURT:  Yeah.  Just don't talk to anybody.  You're going to go take a restroom break and come back and we'll finish

you up, okay.

THE WITNESS:  Okay.  I thought I was done.

MS. BOETTCHER:  Your Honor.

THE COURT:  You can do a redirect; I'm just letting the man go to the bathroom.

MR. WERMUTH:  I was going to say that I have no redirect, Your Honor.

THE COURT:  Oh, you have no redirect?

Okay.  Fair enough.

Mr. Perez -- anybody else have any questions?

Nobody had?

You're free to go, sir.  They don't have any follow-up questions --

THE WITNESS:  Oh --

THE COURT:  -- so thank you.

THE WITNESS:  -- even better.

(Mr. Perez exited the witness stand.)

THE COURT:  I'm sorry, Counsel.  I just -- I thought you were saying, I just have one more question.  I'm, like, Mr. Perez and I are older gentlemen, you know.  It's -- sometimes that's not -- I'm not going to make him wait.

All right.  Let me, though -- before we break, Mr. Jazil, I'm going to put the onus on y'all.  Surely, since you're moving it in, somebody can print me the four relevant pages.

I'm not going to -- it takes me too long to go through it, and I'm just not going to do it.  We've got plenty of time.  We're going to be here another week.

MR. JAZIL:  For the exhibit, Your Honor, or for the Melissa Martin portion?

THE COURT:  Her portion of it, just print -- no, just have somebody -- somebody can print off and just get it to me by tomorrow.  I don't care.

MR. JAZIL:  Understood.  Thank you.

THE COURT:  All right.  Thank you.

All right.  Court's in recess for ten minutes.

(Recess taken at 10:21 AM.)

(Resumed at 10:41 AM.)

THE COURT:  My apologies.  I had something else to take care of.

Plaintiffs can call their next witness.

MS. NEAL:  Your Honor, one piece of housekeeping. We'd like to request that Mr. Perez -- his sequestration end.

THE COURT:  Any objection?

Without objection, he can appear in the courtroom.

MS. NEAL:  Thank you.

Right to Clean Water plaintiffs call Ciera Cox to the stand.

(Ms. Ciera Cox entered the witness stand.)

THE COURTROOM DEPUTY:  Please remain standing and

raise your right hand.

**CIERA COX, PLAINTIFFS' WITNESS, DULY SWORN**

THE COURTROOM DEPUTY:  Please state and spell your name for the record.

THE WITNESS:  Ciera Cox, C-i-e-r-a C-o-x.

THE COURTROOM DEPUTY:  Thank you.

THE COURT:  Counsel, before you proceed -- Mr. Jazil, this is the list of the exhibits for you and your colleagues if -- it's a cheat sheet if you want to ask about some other exhibits.  It was a long list, I know.

Counsel, you may proceed.

DIRECT EXAMINATION

BY MS. NEAL:

Q.   Good morning, Ms. Cox.

A.   Good morning.

MS. NEAL:  Your Honor, I'm calling Ms. Cox to testify about Right to Clean Water's claims regarding the volunteer circulator registration requirement, the circulator affidavit, personal-use petition, and the ten-day deadline.  These are Claims One, Two, Three, Five, and Seven of Right to Clean Water's operative complaint.

BY MS. NEAL:

Q.   Ms. Cox, I'm going to start with questions about your background and your involvement with Right to Clean Water.

Ms. Cox, where do you live?

A.    The Florida Keys.

Q.    Are you familiar with the ballot initiative sponsor floridarighttocleanwater.org, also known as Florida Right to Clean Water?

A.    Yes.

Q.    How are you familiar with Florida Right to Clean Water?

A.    I started as a volunteer, worked up -- worked my way up to county captain and resulted in being the regional coordinator for Monroe County.

Q.    When did you first become involved with Right to Clean Water?

A.    Around 2021.

Q.    And were you involved in both of Right to Clean Water's statewide petition collection cycles?

A.    Yes.

Q.    What is your current position with Right to Clean Water?

A.    Regional coordinator for Monroe County.

Q.    What does the role of regional coordinator entail?

A.    Coordinating volunteers between the Upper, Middle, and Lower Keys, coordinating supplies for said volunteers between those areas, picking up supplies and petitions from said volunteers from the different areas within the Florida Keys, going to different passive locations for passive petition collection, and perfecting petitions to be returned to our Supervisor of Elections office in Key West.

Q.   Are any of the roles you discussed earlier -- volunteer, county captain, regional coordinator, are any of those roles a paid position?

A.   No.

Q.   Before HB 1205, what locations in Monroe County did Florida Right to Clean Water volunteers collect petitions?

A.   The entirety of the Florida Keys.

Q.   What types of places would Right to Clean Water collect petitions in Monroe County?

A.   Different events between the Upper, Middle, and Lower Keys, in front of Winn-Dixie with a table set up as well, and different businesses that allowed the petition to be actively -- excuse me -- passively collected at their businesses.

Q.   In Monroe County, who collects petitions for Right to Clean Water?

A.   Myself and other volunteers within Monroe County.

Q.   Are all of those volunteers affiliated with Right to Clean Water as members or ambassadors?

A.   No.

Q.   What organizations are those volunteers affiliated with?

A.   Monroe County Democrat Party volunteers, League of Women Voters volunteers, and other concerned citizen within the Florida Keys.

Q.   So to clarify, are you aware of people circulating the Right to Clean Water petition who are not ambassadors or

otherwise directly affiliated with Right to Clean Water?

A.    Yes.

Q.    As regional coordinator do you have direct control over those unaffiliated individuals?

A.    No.

Q.    Next we are going to discuss your own circulation activities and the burden HB 1205 imposes on those activities.

      Ms. Cox, have you personally collected petitions for Right to Clean Water?

A.    Yes.

Q.    How many petitions have you personally collected?

A.    Around a thousand.

Q.    And about how many petitions did you personally collect for the 2026 petition cycle?

A.    A few hundred.

Q.    By a few hundred -- could you quantify that further?

A.    2- to 300 petitions.

Q.    Where did you yourself typically collect petitions?

A.    Events in and around the Upper Keys as well as Winn-Dixie.

Q.    At those events where you were collecting petitions, can you walk me through step by step a typical interaction with a potential signer?

A.    At certain events I would be walking around with my Right to Clean Water shirt on, either that or a Right to Clean Water button that states that I'm a volunteer, with a clipboard with

blank petitions on it as well as the legislation behind that in case they need it, and a smile, and they would get the petition via the clipboard.

At other events we would be at a table with other affiliations. Either myself or a different volunteer would be sitting at that table with our petitions, said legislation, and flyer wearing either their Florida Right to Clean Water shirt or their button and collecting petitions that way.

Q. You mentioned you also collect petitions at Winn-Dixie.

What does your collection look like there?

A. Setting up a table near the entrance of Winn-Dixie, and on the table there are two different identifying factors, one being a posterboard advertising Florida registered voters, and the second sign on that table being our Florida Right to Clean Water yard sign as well clearly stating that this is for the right to clean water.

Q. Do you have conversations with voters while circulating?

A. Yes.

Q. What do you generally discuss when you are circulating the Right to Clean Water petition?

A. Communicate loss of character, the myriad of ways pollution in our waters affects my county personally and that of the state as well, anything that really truly affects our county and how this legislation would help us and give us the protection that we need.

Q.    Do you hand the voter the petition?

A.    Yes.

Q.    Do voters ever ask you questions about the Right to Clean Water amendment?

A.    Yes.

Q.    What questions do voters ask you about the Right to Clean Water amendment?

A.    The potential ways that it could protect us, the ways that it could be used to further environmental protections within the state as well, and how it would potentially affect our county.

Q.    Did you ever observe a voter who initially seemed reluctant to sign the petition but after a conversation decided to sign it?

A.    Yes.

Q.    What is your general message to convince people who are on the fence to sign the Right to Clean Water petition?

A.    It usually boils down to two different things, one being the most primary.  Anyone who lives in the state of Florida owes their livelihoods to the ecosystems that have made this state. Every single person who lives here owes them that.

       Second, this petition is solely to get it on the ballot. We are not voting on this legislation at this time.

Q.    Based on your experience circulating the Right to Clean Water petition, do you think voters understood that you were expressing a particular message about the amendment?

A.    Yes.

Q.    What was that message?

A.    This is for the Right to Clean Water.

Q.    Did the number of opportunities you had to share your message about the Florida Right to Clean Water ballot initiative change after HB 1205 was enacted?

A.    Yes.

Q.    How did the number of opportunities you had to share your message change?

A.    It diminished greatly.

Q.    Why did the opportunities diminish?

A.    We stopped circulating petitions.

Q.    How would you describe your level of involvement in Right to Clean Water prior to HB 1205?

A.    I would usually spend about five to eight hours a week of work hours.

        MS. NEAL:  My next questions to Ms. Cox are relevant to Right to Clean Water's claims related to the registration requirement and circulator affidavit.

BY MS. NEAL:

Q.    Ms. Cox, have you circulated any petitions since HB 1205 went into effect?

A.    No.

Q.    Are you familiar with the requirement that anyone who plans to circulate more than 25 petitions, other than to their own

immediate family members, must register as a circulator with the State?

A.   Yes.

Q.   What is your understanding of the registration requirement?

A.   You must register with the State if you intend to collect more than 25 petitions.

Q.   What is your understanding of what happens after you register with the State to be a petition circulator?

A.   You have your own serial number for your own petitions that you have for your ballot initiative, as well as your personal address and your name at the bottom of each form of your petitions that you get collected.

         MS. NEAL:  Ms. Segal, can you please pull up the Right to Clean Water Plaintiffs' Exhibit 75, which has already been admitted?

         Your Honor, may I approach?

         THE COURT:  You may.

BY MS. NEAL:

Q.   I'm going to go to the --

         MS. NEAL:  Or, Ms. Segal, can you zoom in on the box labeled "Petition Circulator Affidavit"?

BY MS. NEAL:

Q.   Ms. Cox, do you see the "Name" and "Address" lines on this form?

A.   Yes.

Q.    Was that -- what does that indicate to you?

A.    That this is the person who is collecting this petition and that is the address he lives at.

Q.    And can you please read --

MS. NEAL:  Ms. Segal, can you please zoom in on the "Notices" box?

BY MS. NEAL:

Q.    Ms. Cox, can you please read the bullet point in the "Notices" box?

A.    *This form becomes a public record once filed with the Supervisor of Elections.*

Q.    What does that indicate to you, Ms. Cox?

A.    That once a petition is actually registered with your Supervisor of Elections office that your name and personal address become public file.

Q.    Whose name and address becomes public record?

A.    The petition gatherer.

MS. NEAL:  Thank you, Ms. Segal.

BY MS. NEAL:

Q.    Ms. Cox, have you registered as a circulator since HB 1205 became law?

A.    No.

Q.    Why not?

A.    For my own personal safety.

Q.    What do you mean by that?

A.   I do not wish to circulate petitions with my name and address on them and you can actually put that name and address to my face.  I would rather not have somebody find my address with the public record and come find me in the middle of the night because they have my address.

Q.   Do you have any concerns about having your address on the petition form you're handing to the potential signer?

A.   Yes, personal liability and personal safety reasons.

Q.   Do you have any concern about handing a petition with your name and address on it to someone who won't necessarily agree with the Right to Clean Water petition?

A.   Yes.

Q.   Do you always know whether someone agrees with the Right to Clean Water petition when you've handed them the petition?

A.   Not necessarily, because, again, this is purely to get it on the ballot, not necessarily the actual legislation itself.

Q.   How many Right to Clean Water ambassadors are there in Monroe County?

A.   Myself and one other.

Q.   As regional coordinator, are you aware of any other Right to Clean Water volunteers in the Keys that are registered with the State to circulate petitions?

A.   No.

Q.   Before HB 1205, did you collect petitions for other ballot initiatives?

A.    Yes.

Q.    Which ones?

A.    Women's rights and marijuana campaign.

Q.    And by "women's rights" are you referring to the abortion amendment, Amendment 4?

A.    Yes.

Q.    Did the people that you approached react differently to you based on which petition you were circulating?

A.    They can all be contentious issues within their own right.

Q.    So to clarify, based on your experience circulating, was the Right to Clean Water petition contentious with some people?

A.    Depended upon the person's interests and loyalties, yes, it would be very contentious.

Q.    Have you ever felt unsafe while circulating the Right to Clean Water petition?

A.    Yes.

Q.    What happened?

A.    The FUs that you get, the birds that you get, the disparaging comments, yeah.  It can make you feel very unsafe.

Q.    So to clarify, people were swearing at you, gesturing at you inappropriately?

A.    Yes.  Not consistently, but it happens.

Q.    Would you have wanted those people who curse and gesture at you, flip you off, to see your full name and address on a petition form you were holding at your table?

A.   No.

Q.   Why not?

A.   Personal safety reasons, again.  They might come and find me in the middle of the night with that address.

Q.   Let's next discuss Right to Clean Water's claims pertaining to the personal-use petitions.

Are you familiar with the personal-use petitions created by HB 1205?

A.   Yes.

Q.   What is your understanding of what happens if you circulate more than 25 petitions as an unregistered circulator?

A.   Potential legal liability.

Q.   What do you mean by "legal liability"?

A.   Third-degree felony.

Q.   Are you willing to circulate personal-use petitions?

A.   No.

Q.   Why not?

A.   Because of said potential of legal liability.

Q.   What about the personal-use petitions make you afraid of the felony liability?

A.   If I accidentally make a mistake, that could very much result in jail time per these petitions.

Q.   And does that potential felony liability affect your willingness to continue circulating petitions for Florida Right to Clean Water as an unregistered volunteer?

A.    Yes.

Q.    I'd like to next discuss your experience receiving feedback from other Right to Clean Water volunteers.

As regional coordinator, do you typically answer questions from volunteers?

A.    Yes.

Q.    How do you typically receive questions from volunteers?

A.    Depending upon the urgency of the question, either email, text message, phone call; one of those three avenues.

Q.    As regional coordinator, have you heard questions from other volunteers about the 25-petition limit for personal-use petitions?

A.    Yes.

Q.    What were those questions?

A.    One moment, please.

(Pause in proceedings.)

A.    Common questions would be if a petition -- excuse me -- a volunteer collects 25 petitions, for example, the Right to Clean Water, are they then, therefore, allowed to collect 25 petitions for, let's say, the marijuana campaign in the same ballot cycle, or is it simply 25 per initiative cycle within a ballot cycle. And also, how are the familial petitions verified within the 25 petition personal-use -- personal-use numbers.

BY MS. NEAL:

Q.    How have you responded to those questions from volunteers

about the 25 personal-use petition limit?

A.   By not having them collect petitions for the Right to Clean Water because of the potential of legal liability.

I have also advised our volunteers that, dependent upon which campaign initiative that they are also volunteering for, they need to speak with their head of boards for those campaigns for direct instructions of those campaign cycles.

Q.   Do you have questions about the 25 personal-use petition limit?

A.   Primarily the same questions that my volunteers have.

Q.   And you testified earlier that you have collected between 2 and 300 Right to Clean Water petitions for the 2026 general election?

A.   Uh-huh.

Q.   Do you know whether you can collect 25 personal-use petitions for the next Right to Clean Water initiative cycle?

A.   No, I don't know.

Q.   Why not?

A.   It is unclear at this time.

Q.   If HB 1205's 25-petition limit and associated criminal penalties were no longer in effect, would you continue to collect petitions for the Florida Right to Clean Water ballot initiative using personal-use petitions?

A.   Yes.

Q.   Next we are going to discuss the ten-day delivery deadline

and its impact on Right to Clean Water.

Are you familiar with HB 1205's requirement that signed petitions be returned to the Supervisors of Elections in the county where the voter resides within ten days of the petition being signed?

A.    Yes.

Q.    What is your understanding of what happens if it takes more than ten days for a signed petition to be submitted?

A.    It results in the campaign having a financial penalty upon each day that the petition is submitted late.

Q.    Based on your knowledge as regional coordinator, how has the ten-day delivery deadline affected Right to Clean Water's operations in Monroe County?

A.    Diminished it.

Q.    Before HB 1205, did you ever come into possession of already signed petitions that had been signed by the voter more than ten days before you received it?

A.    Yes.

Q.    Can you describe those instances?

A.    We -- the Florida Keys is 100 miles of linearly a straight curve.  Our county is not like other counties, wherein it is a square and you have a grid system that you can go to within that grid system.

Volunteers have to ferry petitions from the Upper, Middle and Lower Keys to me, because I am the regional coordinator, so

I can submit them to the Supervisor of Elections office. Dependent upon where those signed petitions are coming from within Monroe County is also a variable with how long it will take to get to me. Either they would be ferried to me in person or they would be mailed to me.

Q. Have you ever experienced -- we talked about those unaffiliated volunteers before. Have you ever received already ten-day late petitions from an unaffiliated volunteer?

A. Yes.

Q. What happened in that instance?

A. One of our Democratic Monroe County volunteers was at an event in the Lower Keys, and when they were done with the event, they were packing up. The packet of signed petitions that were to come to me were in a bag in the back seat of the car, and she just forgot that they were there, you know, just misplaced them. We are all human and a mistake happens. And it was in her car for about a month. And when she realized that they were in there, she immediately got them to me.

Q. Based on your experience as regional coordinator, could Right to Clean Water have prevented that from happening?

A. No.

Q. Are you always aware of when Right to Clean Water affiliated volunteers are out collecting petitions for Right to Clean Water?

A. No.

Q.    And based on your experience as regional coordinator, is Right to Clean Water in control of when nonaffiliated volunteers pass along signed petitions to you?

A.    No.

Q.    Why not?

A.    They are concerned citizens doing their civic duty and not necessarily affiliated with us, so they may not be going to -- more than likely may not be going to the monthly meetings or statewide calls that we have.  So they would -- they help in the ways that we all help each other.

      And Monroe County, it's not that any one of us volunteers are solely beholden to one campaign cycle within Monroe County. Our volunteers work on basically everything all at once, because when locals get together, it's a rare thing, so we would rather get as many things signed as possible in one go versus having one specific thing there.

Q.    And what ultimately happened to those petitions that were left in the car by the nonaffiliated Right to Clean Water volunteer?

A.    They sat in the car for about a month, and then she found them, called me, and we made time to meet up on that weekend to drop off the petitions to myself, and then I perfected them and sent them down to -- mailed them to the Supervisor of Elections' office in Key West.

Q.    If HB 1205 had been in effect at that time, what would have

happened to Right to Clean Water as a result of the nonaffiliated volunteer's actions?

A.    A financial penalty would have incurred for every single day that every single one of those petitions were late.

Q.    As regional coordinator, you said one of your responsibilities is to deliver signed petitions to the Monroe County Supervisors of Elections.

Before HB 1205, how did you do that?

A.    Solely through the mail.

Q.    And before HB 1205, how long did the typical process of going from signature to delivery take in Monroe County?

A.    Around a month, month and a half.

Q.    Why?

A.    Getting the petitions to me from different areas within the Upper, Middle, and Lower Keys, as well as our mail is routed to Miami-Dade and then it comes back to us, so that also adds additional time to the mailing system within our county.

As well as the Supervisor of Elections' office has standard business operating hours.  I work full time during those hours. I would rather not take off work in order to drive down the petitions to Key West.  I would rather mail them so that way I can keep working.

Q.    Are there any other reasons why you mailed signed petitions to the Monroe County Supervisor of Elections?

A.    Yes.  I also did not have a working vehicle that was stable

enough for me to drive down to Key West for about a year.

Q.   How far is the Monroe County Supervisor of Elections from where you live in Monroe County?

A.   93 miles south.

Q.   As regional coordinator, I guess you mentioned that you didn't have reliable access to a car for about a year.

Even if you had had reliable access to a car, how long would it take you to hand deliver petitions to the Monroe County Supervisor of Elections if you drove yourself?

A.   Round trip it would be about six to seven hours.  Going solely south it would be about two and a half to three hours.

Q.   Why does it take that long?

A.   Our county is unique in our geographical location, meaning our roads are, for the most part, in either direction one way. There are very few areas that have two-way directional traffic going in either direction at any one time.

With that comes unique challenges to our area.  If a major accident happens, that shuts down traffic with -- both ways for however long it takes to handle that situation.  If a bridge gets stuck open, that also creates delays and/or potential no travels, dependent upon what island you are on and where that bridge is and where you are stuck.

As well as we are the Florida Keys, and everyone loves the Florida Keys, myself included.  That also includes tourists who love driving very slowly, taking pictures of all the water they

are driving by going south.

Q.    Fair enough.

If someone does not have a car, how long would it take them?

A.    To take the bus from where I live in the Upper Keys, you would need to take one bus going south to Marathon, take a connecting bus in Marathon to Key West, and when once you are in Key West, get to the business district within Key West to get to the Supervisor of Elections office.  That could take anywhere from five to six hours, dependent upon connection times and aforementioned variables on our road.

Q.    When you mailed the signed petitions to the Monroe County Supervisor of Elections, how long did it take for the petitions to arrive?

A.    Anywhere from five to eight business days, potentially.

Q.    Why?

A.    Again, our mail gets routed up to Miami-Dade and comes back down to us, and there are only two road entrances into the Florida Keys.  So if there are major accidents on the stretch or Card Sound, that could also delay the mail as well for those shipping containers coming back in -- or -- excuse me -- semitrucks coming back in.

Q.    And so to clarify, when you mail something out of Monroe County, it goes to Miami-Dade County to go back to Monroe County?

A.   Yes.

Q.   And relying on your experience as regional coordinator to Monroe County, if you mail the signed petition to the Supervisor of Elections within -- with three days left in the ten-day delivery period, do you feel confident that the petition would arrive to the Monroe County SOE in time?

A.   No.

Q.   Why not?

A.   Too many variables out of my control.

Q.   Similar question:  If you mail the signed petition to the Supervisor of Elections with five days left in the ten-day delivery period, do you feel confident that the petition would arrive to the Monroe County Supervisor of Elections in time?

A.   No.

Q.   Again, why?

A.   Too many variables.

Q.   What are those variables?

A.   Road -- mail going up to Miami-Dade and coming back down to Monroe County, there is traffic, construction, all different kinds of things that could impact the roadways that would make the mail go late.

     And as regional coordinator of a grassroots movement that does not have many donations coming in, I would not feel comfortable with anything less than 100 percent success rate of Supervisor of Election petitions.

Q.   Based on your experience in Monroe County, when would Right to Clean Water need to mail the signed petition in order to meet the ten-day deadline?

A.   Day of signature.

Q.   Is it always possible to mail the signed petition form on the day the voter signs it?

A.   It could be a weekend when they sign.  It's -- Sundays the mail doesn't run, so that would take away time from that ten-day mark in order to get to the Supervisor of Elections office on time.  I would not feel comfortable.

Q.   How often do you have events on the weekend with Right to Clean Water?

A.   Like every weekend, basically, but that also depends on the amount of available volunteers willing to go to said events.

Q.   Do you ever get petitions from voters who registered in other counties in Florida?

A.   Yes.

Q.   Why?

A.   Everyone loves the Florida Keys.  If you're a registered Florida voter, and you're in Monroe County, and you're still willing to sign the water amendment petition, there's no lack of shortage for water protections that are needed within the entirety of our state of Florida.

Q.   What do you do with those signed petitions from voters who are registered in other counties?

A.   I mail them to someone that is similar to myself in the same capacity that I hold for Monroe County, dependent upon where that signature is from in the counties in the state of Florida.

So, for example, we have a lot of Miami-Dade day-trippers that come down on the weekend.  They sign a petition with a Miami-Dade address.  I'm going to look within our volunteer and/or regional coordinators within the state of Florida, whoever is in Miami-Dade, going to send them -- I'm going to mail them that petition for their county so that way they can, therefore, perfect it and go to that Supervisor of Elections office within Miami-Dade County, and vice versa for any other county within the state of Florida.

Q.   And when you mentioned volunteers and regional coordinators, was it Right to Clean Water affiliated folks you're mailing to?

A.   Uh-huh, yes.

Q.   In your experience, did those petitions mailed out of Monroe County to other counties usually arrive to the correct Supervisor of Elections within ten days?

A.   No, sir.

Q.   Why not?

A.   They -- the mailing system can be slow, but also the vast majority of the people working for the Right to Clean Water are volunteers, and we don't all stay at home 110 percent, 365 days

a year.

We may have volunteers who are out of town when that package gets delivered to their house, meaning that those petitions that are signed are now losing their ten days from that signature since a volunteer may not be home at that time in order to receive them.

Q.   Did voters ever write down an address on the petition form that was not their correct voter registration address?

A.   Yes.

Q.   How did that happen?

A.   Some people have second and third homes and put their physical address on the petition, but that does not mean that that is that person's voter's registered address.

So it could be that they have a second home in Monroe County, they put that address on the petition; however, they are actually registered in Miami-Dade County so it, therefore, has to go back to Miami-Dade.

Q.   What is your understanding of what happens when voters write down the wrong address on the petition form?

A.   It gets sent -- if it's a voter that has a different registered voter address, that petition would get sent to Fort Myers in order to be given to the correct area where it needs to go for the Supervisor of Elections office.

Q.   Who sends it to the Fort Myers address?

A.   Usually the Supervisor of Elections office.

Direct Examination - Ms. Ciera Cox

Q.   In your experience, would those petitions filed in the wrong county, based on the voter's error, make it to their correct Supervisor of Elections within ten days?

A.   No.

Q.   Why not?

A.   It would need to be mailed from the Supervisor of Elections office to Fort Myers, then, therefore, be mailed to whomever it's supposed to go to within the state.  Then it needs to be ferried, either physically in person or via the mail, to the correct Supervisor of Elections office.

Q.   So if I'm understanding correctly, the wrong petition -- or wrong county petitions go from the Monroe County Supervisor of Elections to the Fort Myers address to who?

A.   To whomever it would go to as far as someone such as myself.  So, basically, once it gets back to Fort Myers and we figure out what county it's supposed to technically go to, that volunteer and/or county captain and/or ambassador and/or county supervise -- excuse me -- or regional coordinator will then, therefore, get that petition and then they, themselves, either have to physically ferry that petition to the Supervisor of Elections office or mail that petition to the correct Supervisor of Elections office.  And that petition would still have the signature date of the original date that it was still signed.

Q.   Based on your experience as regional coordinator, is it possible for Right to Clean Water to generally meet the ten-day

deadline for signed petitions that are moving through Monroe County?

A.   No.

Q.   Next I have some questions about Right to Clean Water's passive petition collection.

You mentioned earlier that Right to Clean Water does passive petition collection in Monroe County.

Can you describe how that worked?

A.   Yes.  For example, we have a business in the Upper Keys, Eric's Outboard Marine.  They are an engine repair store who has intimate ties with the water and our community.  They feel strongly about this amendment and allowed us a bit of counter space at their business.

So what we would do is put a little paper tray there with the blank petitions, a flyer explaining what the amendment is about and why it's important, the legislation behind the flyer, and an envelope underneath all of that for signed petitions.

Once people walked into the business, they could look at the flyer, see it, sign it themselves if they chose to do so.

Then either myself or another volunteer would go to said location either weekly, biweekly or monthly, depending upon the output of said location.

Q.   What happened to Right to Clean Water's passive petition collection after HB 1205 became law?

A.   It became nonexistent.

Q.   Why?

A.   Because we have to physically see each individual petition signed.  We can no longer have a passive way of collection.

Q.   And can you imagine a scenario where Right to Clean Water could continue to do passive petition collection but not violate the ten-day deadline?

A.   We would need to ask volunteers to be sitting at Eric's Outboard Marine every single day waiting for someone to sign a petition and then, therefore, take that petition to the Supervisor of Elections office.

I cannot see a scenario where a volunteer would do that.

MS. NEAL:  No further questions, Your Honor.

THE COURT:  Cross-examination.

CROSS-EXAMINATION

BY MS. HARDY:

Q.   Good morning, Ms. Cox.

A.   Good morning, ma'am.

Q.   I'm Maryssa Hardy for the Attorney General.  I just have a few questions for you today.

So Right to Clean Water did not enforce a deadline for returning signed petitions; correct?

A.   No, ma'am.

Q.   And you talked a little bit about your volunteers.

So most of your volunteers aren't registered ambassadors; correct?

A.   Correct.

Q.   And they're not, basically, listed or registered with Right to Clean Water in any way?

A.   Correct.

Q.   And you haven't tried gathering signatures post-1205; right?

A.   Correct.

Q.   So you haven't tried to comply with any of the new provisions since they were enacted; right?

A.   No, because I haven't been gathering petitions.

Q.   Okay.  You stated that out of the registered ambassadors you have none are registered circulators; correct?

A.   Not at this point in time because of the HB 205 [sic].

Q.   But that does not include the volunteers that are not registered with you; correct?

A.   Correct.  None of the volunteers, though, have been collecting petitions since this has been enacted, though.

Q.   That you know of?

A.   Correct.

Q.   And you stated that sometimes you guys would go to businesses and -- or have a table outside of businesses; right?

A.   Inside and outside, but, yes.

Q.   And there's nothing in 1205 preventing you guys from still doing that to engage with voters; right?

A.   At least to a lot of conversations that do not have

definitive action tied with those conversations.

Q.    But there's nothing preventing you from engaging with the people at these businesses about the initiative, giving them blank forms or -- giving them blank forms or personal-use forms?

A.    It would, again, be a circular conversation.  There's -- I am not, myself, using these forms.  The volunteers in my county that I have active communications with on a weekly basis and/or daily basis are not collecting petitions because of the legal liability associated with them.  We are not willing to put any of our livelihoods on the line such as that.

Our county is very active in political endeavors in regards to our environment because of the island state that we are, basically.

So when Key West voted on a cruise ship limitation, and it was overturned by someone in North Florida, as a county we felt very defeated.  This constitutional amendment was our surefire way in order to enact lasting change for our environment in our county and our state.

That's a conversation that we have been having for many years that has still not resulted in the same protections that we talk about on a daily basis.

Q.    Right.  So there's nothing stopping you from speaking with the voters about these issues, and there's nothing stopping you from giving them a blank petition for them to fill out; correct?

A.    Correct.  Except I'm asking people to take time out of

their days to immediately sign that petition and mail that petition in in order to ensure 100 percent efficacy for our county as far as the ten-day rule.

Because of these changes within the legislation, we're not willing to put any petitions into circulation or even have them with us because of the potential campaign penalties in our county.

Q. You would agree that these liabilities only incur when they are signed -- when you are receiving a signed petition; correct?

A. Correct. And, therefore, we still have conversations with no definitive action.

Q. Okay. We can move on.

So I believe you testified today that there were times where you may have -- someone may have been harassing you and you were afraid to give them a form with your information on it; correct?

A. Yes.

Q. Isn't it fair to say that you would not give a form that has your information on it to someone who is harassing you or obviously wouldn't sign the form; right?

A. No.

Q. Okay.

A. No, because our county is a human family. Regardless of how they may feel or -- feel about me, I'm still going to have and push a human right for water for every single body,

regardless of their political affiliations.

Q.   Right.  But if somebody was outwardly harassing you, you would not give them the form; right?

A.   Yes.

Q.   Okay.

A.   Yeah.

MS. HARDY:  Okay.  Your Honor, may I confer?

THE COURT:  Sure.

MS. HARDY:  No further questions, Your Honor.

MR. JAZIL:  Your Honor, if I may briefly ask a few questions?

THE COURT:  Certainly.

CROSS-EXAMINATION

BY MR. JAZIL:

Q.   Hello, Ms. Cox.  Mohammad Jazil for the Secretary of State.

A.   I'm sorry.  Can you repeat that?

Q.   Sure.  Mohammad Jazil for the Secretary of State's office.

A.   Good morning.

Q.   Ma'am, I'd like to talk about Eric's Outdoor Marine [sic] and the passive campaign y'all ran.

Do you recall that testimony?

A.   Yes, I do recall that testimony.

Q.   And my understanding of that testimony is that Eric's Outdoor Machine [sic], before HB 1205 passed y'all had space on a counter where there were blank forms with some literature on

the initiative; right?

A.    Uh-huh.

Q.    And you also had the text of the initiative; right?

A.    Uh-huh.  Yes.

Q.    And the idea was for people to fill out the blank forms, leave them at Eric's, and a volunteer would come by from time to time and collect those blank forms; did I understand that right?

A.    Correct.

Q.    Is there anything in HB 1205 that stops y'all from having the blank forms at Eric's, together with prestamped envelopes, and then asking Eric's to just put the envelopes in their outgoing mail?

A.    No, it's just an extra step for a business that has already been more than kind enough to a grassroots movement.

      And it's Eric's Outboard Marine.

Q.    Thank you for the correction.

      Ma'am, I'd like to move on to another issue.

      My understanding is before HB 1205 passed you were circulating the state-approved volunteer form for the Right to Clean Water initiative; right?

A.    Correct.

Q.    And so you're familiar with that form; right?

A.    Yes.

Q.    And you'd agree with me that that form asks a voter for their name; right?

A.    Uh-huh.

Q.    Is that a "yes"?

A.    Yes.  Sorry.

Q.    And that form asks the voter for their address; right?

A.    Yes.

Q.    And that form asks the voter for either their voter registration number or their date of birth; right?

A.    Yes.

Q.    And that form asks for the voter's signature; right?

A.    Yes.

Q.    And so this is all the information you are asking of a voter under the old volunteer form when you approach them; right?

A.    Yes.

Q.    Okay.  Thank you.

      And, ma'am, do you recall your testimony where you talked about having to collect forms somewhere in Monroe County and then having to drive them to the Supervisor of Elections office in Key West?

A.    Yes.

Q.    Okay.  Let's pull up the Supervisor of Elections website real quick.

      Ma'am, is the Supervisor of Elections Sherri Hodies?

A.    Yes.

Q.    This is her website; right?

A.    Yes.

MR. JAZIL:  Let's scroll all the way down on this website.

BY MR. JAZIL:

Q.    And here you'll see that it lists the main office in Key West; right?

A.    Uh-huh.

Q.    Is that a "yes"?

A.    Yes.

Q.    It lists a branch office in Marathon; right?

A.    Yes.

Q.    It lists another branch office in Key Largo; right?

A.    Yes.

MR. JAZIL:  Okay.  Thank you.  No further questions.

THE COURT:  Anything else from the defense?

Hearing nothing, any redirect?

MS. NEAL:  Yes, Your Honor.

REDIRECT EXAMINATION

BY MS. NEAL:

Q.    Ms. Cox, you just discussed with Mr. Jazil about putting signed -- from the marina where you are doing passive petition collection, if you had voters put signed petition forms into the mail by themselves, would you feel confident that they would arrive to the Supervisors of Elections within ten days?

A.    No, not with the mail going from Monroe County back up to

Miami-Dade County and then back to Monroe County again.

Q.   And, Ms. Cox, Ms. Hardy asked you about the possibility of giving voters blank petition forms, and I want to clarify.

Is it correct that Right to Clean Water will get a ten-day fine only if they receive that petition back from the voter?

A.   Say that one more time.

Q.   I want to clarify:  Is it correct that Right to Clean Water will get a ten-day fine only if you receive the blank form back from the voter -- signed by the voter?

A.   If it's received after that ten-day mark, yes, from the Supervisor of Elections we'll get that fine --

Q.   So if --

A.   -- for the campaign.

Q.   Sorry.

If a voter takes the blank petition from you, signs it and then -- signs it and then doesn't turn it in or 10, 14, 15 days, would Right to Clean Water receive a fine for that?

A.   Once it's officially received by the Supervisor of Elections.  Whatever the date of signature is on each petition starts the ten-day clock for when it has to be at the Supervisor of Elections office in order to not receive a campaign fine.

Q.   So Right to Clean Water could be held responsible for fines for petitions that miss the ten-day deadline that only the voter ever held on to after it was signed by the voter?

A.   Yes, potentially.

MS. NEAL:  I'm all through, Your Honor.

Thank you.

THE COURT:  Thank you.

Ma'am, you can step down.

THE WITNESS:  Thank you.

THE COURT:  You've come a long way.  Have a safe journey home.

(Ms. Cox exited the courtroom.)

THE COURT:  Everybody sit down for a second because I don't want to forget something and I want to don't want to spend more time.

So it's clear there was an effort yesterday to introduce an exhibit and it was abandoned.  I went so far as when counsel sat down to say there is more than one way to get something in.  We then had another witness that was called today and revisited the discussion.

You didn't really have to recall a witness if it truly constituted a document that could be admitted as a party's statement because somebody was -- under 801(d)(2)(D) could make the statement then you didn't have to have another witness, but we revisited it.

We had a lively exchange.  But rather than everybody spend a lot of time, let me just cut to the chase, because when I said, Mr. Raban, there is more than one way to do things, I wanted everybody to articulate and not the Court to articulate

it, but we've got a lot of ground to cover, so I'm going to cut to the chase.

First, let me start with the opening statement about janitor versus CEO. And I'm not trying to be difficult about this. You can have a janitor whose statement can come in under 801(d)(2)(D). So if it's a Publix employee that's responsible for cleaning the floors and they make the same statement, I was asked to clean the floor and I forgot and I didn't, under 801(d)(2)(D) that person could make that statement. It's not whether you're authorized to make the statement, it's whether or not it's within the scope of your authority or agency. In this case that would have applied, for example, for the mop boy at Publix.

Moving on, the issue came up -- and let me just turn back to the facts of what Ms. Martin said. Ms. Martin was asked the question: And based on this email, you trust her to ask questions to the Secretary of State and the Division of Elections; fair?

And the response was: That's not fair.

And they talk about how, We tightly communicate. And I don't want you in generally -- not regarding a specific communication, We didn't want her to communicate without round tabling it. What the law is, I believe crystal clear -- and I went ahead and pulled cases because I wanted to make plain what the ruling was since both sides seemed energized about this

particular exhibit, so we had a good record.  And I didn't want to waste your time or my law clerk's time pulling cases.  But I knew it and I should have just said it earlier when Mr. Jazil tried again.

It doesn't really matter -- the law is crystal clear it's not whether you were authorized to make the statement.  That's not the standard under 801(d)(2)(D).  It used to be, and it was when I was in law school.  But the law -- which was when dinosaurs roomed the earth.  But the law has evolved, and it's no longer necessary to show that an employee or agent declarant possesses speaking authority tested by the usual standards of agency law before a statement can be admitted against the principal.  The question becomes is it a matter within the scope of their agency or employment made during the existence of the relationship.

So even the CEO issue -- I'll go to other spectrum.  Just because you are the CEO, if you have nothing to do with the hiring or firing of some HR issue, you can be senior and still not within the scope of your authority to pass on -- CEO is a bad example.  You can be a senior person and still not authorized to speak.  But the question isn't do you have the authority to speak.  It's within the scope of your employment.

Here, we've got somebody by virtue of her position who was collecting, monitoring others and was, in fact, and could communicate with the Secretary of State.  It was within her

scope of agency and it was concerning a matter within the scope of her agency because that's what she did.

So remind me what the exhibit number is?

MR. JAZIL:  It's Defendants' Exhibit 1554, Your Honor.

THE COURT:  DX 1554 for those reasons is admitted.

And I know this isn't a CLE, but I wanted y'all to go through that process and -- both sides, and I thought it was easier just to pull a case while I was listening to the testimony and announce the ruling.

(DEFENDANTS' EXHIBIT DX-1554:  Received in evidence.)

MR. JAZIL:  Thank you, Your Honor.

And, Your Honor, after the last witness concluded, my very smart colleagues reminded me to ask the Court to take judicial notice of the Monroe County Supervisor of Elections offices.  It's on a public website.  There are cases saying the Court can take judicial notice.

THE COURT:  Any objection?

It's also -- there's -- I would say a fortiori. There's some other reasons other than it's just on a public website, but any objection to me taking judicial notice of where the offices are?  That doesn't mean they are always open.  It doesn't mean -- it's simply taking judicial notice -- or they are staffed or they have a mailbox.  I don't know any of that. The only thing I'd be taking judicial notice of is are there, in fact, addresses listed at multiple places in Monroe County with

the Supervisor of Elections.

MR. FERGUSON:  As long as it's limited to that, we have no objection, Your Honor.

THE COURT:  Mr. Jazil only asked me to take judicial notice of where there were offices, and that's what I'm taking judicial notice of and nothing further.

MR. JAZIL:  Thank you, Your Honor.

THE COURT:  All right.  And then it's my understanding that next up is -- and we can take an early lunch because I know we have got a five-hour witness.  And I don't see the lawyer here.  He may be skulking around out in the hall somewhere.

MS. MURPHY:  Your Honor, Mr. Burhans is here and he's outside with our witness.

THE COURT:  So he is indeed skulking around outside.

MS. MURPHY:  We would ask to take an early lunch so she can be on the stand in one fell swoop.

THE COURT:  Just so it's clear, all the lawyers are very nice, and "skulk" connotes sinister actions.  I'm just teasing, less I be accused of attacking Ms. Murphy's colleague.

MR. JAZIL:  Your Honor, for the next witness we've been communicating to see if we can streamline the testimony by withdrawing the objections.  If we could have an extra ten minutes at lunch just to finalize for all the defendants to make sure that the testimony is streamlined, we'd very much appreciate it.

THE COURT:  I certainly will not stand between the two sets of lawyers trying to streamline something in this case.

So we would come back -- how about we come back at 12:55?  That gives you 15 minutes to chat and an hour for lunch.  It's really not a democracy; I'm not asking you to vote.  We are going to come back at --

MR. WERMUTH:  Thank you, Your Honor.

MS. MURPHY:  Thank you, Your Honor.

THE COURT:  -- at 12:55.  Apparently that's the appropriate way to handle things in Florida now.

MR. JAZIL:  Thank you.

THE COURT:  Court is in recess.

(Recess taken at 11:39 AM.)

(Resumed at 12:59 PM.)

THE COURT:  All right.  We are back on the record in Case Number 4:25cv21, the afternoon session of the fourth day of the bench trial.

Before we -- the next witness is called, there was some discussion prior to breaking for lunch that the parties were going to talk maybe about exhibits or something, maybe not.

MR. BURHANS:  Yes, Your Honor.

Good afternoon.  Glenn Burhans for Smart & Safe Florida.

We've conferred with counsel for the defendants.  There's an agreement to withdraw the objections and admit

Exhibits 1 through 5 and 7 through 17.

THE COURT:  Hold on one second.

MR. BURHANS:  Your Honor, we have a corrected sheet, if you'd like.

THE COURT:  That would be great.

MR. BURHANS:  Okay.  May I approach?

THE COURT:  You may.

MR. BURHANS:  And, Your Honor, those were Exhibits 1 through 5 --

THE COURT:  One moment, please.

Just so it's clear, we are talking about the SSF, which --

MR. BURHANS:  Page 91 --

THE COURT:  -- begins on --

MR. BURHANS:  -- of the joint stips.

THE COURT:  -- 91.

And so 1 through 5 are admitted without objection --

MR. BURHANS:  And 7 through 17.

THE COURT:  -- and likewise 7 through 17, noting that some of those had objections, but they have been withdrawn.

MR. BURHANS:  Correct, Your Honor.

Your Honor, there's one exhibit, Exhibit 6, which my friend Mr. Jazil has just requested I lay some foundation for. That's not unreasonable, so we'll deal with Exhibit 6 when we get to it in the program.

THE COURT:  All right.  So basically all of the SSF exhibits, save Exhibit 6, have been admitted.

MR. BURHANS:  Correct.  Your Honor.

(PLAINTIFFS' EXHIBITS SSF-1 TO 5 AND SSF-7 TO 17:  Received in evidence.)

THE COURT:  Let me hand the list you just handed me -- oh, you already got one.  My courtroom deputy has it.

Again, I'll remind everybody we'll have an updated list tomorrow morning when you get here.

And so you can call your next witness.

MR. BURHANS:  Your Honor, Smart & Safe Florida calls Meghan Cox.

(Ms. Meghan Cox entered the witness stand.)

**MEGHAN COX, PLAINTIFFS' WITNESS, DULY SWORN**

THE COURTROOM DEPUTY:  Please state your name and spell it for the record.

THE WITNESS:  Meghan Cox, M-e-g-h-a-n C-o-x.

THE COURTROOM DEPUTY:  Thank you.

MR. BURHANS:  Your Honor, before we begin, I've got a binder of the exhibits that were just admitted.  It also includes Exhibit 6.  We'll get to that later.  But I'd like to provide a copy to the witness just --

THE COURT:  Certainly.

MR. BURHANS:  May I approach?

THE COURT:  You may.

DIRECT EXAMINATION

BY MR. BURHANS:

Q.   Good afternoon, Ms. Cox.

Please describe your education.

A.   Yes.  I have a bachelor's degree from Arizona State University in political science.

Q.   When did you get that degree?

A.   2008.

Q.   What is your profession?

A.   I'm a political consultant specializing in ballot access and ballot initiatives.

Q.   Could you briefly describe your experience with ballot initiatives and access issues?

A.   Yes.  I've worked in 35 states.  I have qualified dozens of initiatives for the ballot, dozens more of initiatives for municipalities and counties, and hundreds of candidates for the ballot.

Q.   When did you first start working on campaigns?

A.   In 2004.

Q.   Who was that for?

A.   Actually -- correction -- 2000.

Q.   2000?

A.   Yes.

Q.   And what election was that?

A.   Senator John McCain's presidential.

Q.    What was your position -- or what were your duties on Senator McCain's presidential campaign?

A.    Both communications and volunteer management.

Q.    Any other national campaigns that you've worked on?

A.    I worked on Bush-Cheney '04.  I've worked on every presidential cycle since then.  I have worked on governors races, U.S. Senate races, Congressional races.

Q.    When did you work on your first ballot initiative?

A.    In 2004.

Q.    What was that for?

A.    It was called No Taxpayer Money for Politicians sponsored by Congressman Jeff Flake, now former U.S. Senator Jeff Flake out of Arizona.

Q.    Thank you.

      Do you have any experience with initiatives in Florida?

A.    Yes.

Q.    Can you briefly describe those?

A.    I have worked on two ballot measures in Florida.

Q.    What are those?

A.    Smart & Safe Florida and then previously also worked on the previous medical marijuana campaign.

Q.    Was that the one in 2016?

A.    Yes.

Q.    The one for Smart & Safe is the current one for the 2026 general election; correct?

Direct Examination - Ms. Meghan Cox

A.    Yes.

Q.    Do you have any experience lecturing on the topic of initiatives?

A.    Yes.  I have given lectures at George Washington University, Arizona State University and the Yale campaign -- women's school campaign college.

Q.    What was that last one?

A.    Yale women's campaign management college.

Q.    And have you taken any type of specialized campaign training?

A.    Yes, I have gone through the Republican National Committee's campaign management school.

Q.    Briefly describe what that school entailed.

A.    The school oversees everything from budget analysis, fiscal analysis, campaign operations.

Q.    Where are you currently employed?

A.    Groundgame Political Solutions.

Q.    What is Groundgame?

A.    Groundgame is my own firm that I founded that specializes in ballot initiatives and field campaigns, basically boots on the ground, anything that interacts with a voters.

Q.    And does Groundgame have a political state or geographic area within which it operates?

A.    We work nationwide.

Q.    What's your position with Groundgame?

Direct Examination – Ms. Meghan Cox

A.    I'm the founder and owner.

Q.    Are you also CEO?

A.    CEO.

Q.    Briefly describe your day-to-day role as CEO of Groundgame.

A.    As CEO I'm very hands-on with our ballot initiatives.  I oversee budgets; I work directly with our client, and I help execute on our client contracts.

Q.    Do you have occasion to oversee field operations?

A.    Yes.

Q.    Briefly describe what you would do in that context.

A.    I organize on a high level all the processes and procedures for our field operations.

Q.    And do those field operations entail petition circulation gathering and processing?

A.    Yes.

Q.    Are you familiar with Smart & Safe Florida?

A.    Yes.

Q.    And what is Smart & Safe Florida?

A.    Smart & Safe Florida is the ballot initiative committee for 25-01.

Q.    That's the adult personal use of marijuana amendment?

A.    Yes.

Q.    And that's to get placement on the 2026 ballot; correct?

A.    Yes.

Q.    And what's the relation between Groundgame and Smart & Safe

Direct Examination - Ms. Meghan Cox

Florida?

A.    We are a field vendor.

Q.    And am I correct in understanding that Groundgame's role was to manage the paid petition circulator effort of the campaign?

A.    Yes.

Q.    And when was Groundgame retained?

A.    March of 2025.

Q.    Could you just give -- we are going to talk about some of this in greater detail later on, but just give a quick overview of the services that Groundgame provides for Smart & Safe.

A.    Groundgame predominately manages the field efforts for Smart & Safe Florida.  We oversee -- we created -- helped create contracts with our legal counsel making sure that we are in compliance with Florida law, oversee the process to make sure that all circulators are background checked; that they have gone through the appropriate state registration process to become petition circulators; that they are trained to be petition circulators.  Also, the filing process, making sure that we have everything organized, regional offices, created the offices, created the structures to make sure that we can print all of the petitions and get them back in for filing.

Q.    Filing to whom?

A.    The Supervisor of Elections.

Q.    You mentioned that Groundgame conducts training.

1075

Direct Examination – Ms. Meghan Cox

Q. Does Groundgame create the training materials used to train paid circulators?

A. Yes.

Q. Is it fair to say that you're very familiar with the Smart & Safe paid circulator field gathering operation?

A. Yes.

Q. In fact, you oversaw that; correct?

A. Yes.

Q. And you understand that you are testifying today as Smart & Safe Florida's corporate representative?

A. Yes.

Q. Have you had occasion to review the constitutional amendment in full text form and the ballot petition form?

A. Yes.

Q. Why don't we take a look at Exhibit 1, which has been entered into evidence.

Can you tell the Court what this document is?

A. Yes. That's the volunteer form for Smart & Safe Florida for 25-01.

Q. So the serial number is 25-01. Who issued that number?

A. The Secretary of State.

Q. And there's a date approved of January 14, 2025. Do you know what that means?

A. That's the date it was approved by the Secretary of State.

Q. All right. Now, this is the volunteer petition form prior

Direct Examination - Ms. Meghan Cox

the effective date of HB 1205; correct?

A.    Yes.

Q.    And so this is a one-page form; is that correct?

A.    Yes.

Q.    How does the post-1205 form compare to the single-page volunteer form?

A.    The post form has language attached to it.  It also contains both an area for the last four of the social to be entered as well as -- or a driver's license.

Q.    Of the voters?

A.    Yes.

Q.    Okay.  When you say the "language attached," what did you mean by that?

A.    I mean that the full language is attached to this petition.

Q.    So let's go to Exhibit 2 for a moment.

Do you recognize this document?

A.    Yes.  That's the full text.

Q.    Okay.  And so you're saying after the effective date of 1205, this full text is included in the petition form that voters review and sign; is that correct?

A.    Yes.

Q.    So that -- how many pages did that add?

A.    Five.

Q.    So is it five total pages?

A.    Yes.

Q.   Where it was one before 1205; is that correct?

A.   Yes.

Q.   Okay.  Now, this -- Exhibit 1 was the petition form that's used by volunteers.

     There's also a different form that's used by paid circulators; correct?

A.   Yes.

Q.   How does that form differ from Exhibit 1?

A.   The paid circulator form is only issued after they have taken a test with the Secretary of State.  It is issued directly by the Secretary of State.  It has their full name and their address included at the bottom.  It also includes their individual circulator number at the top, as well as a unique identifying bar code.

Q.   Is that bar code somehow tied to the particular paid circulator?

A.   Yes, each petition is assigned to a circulator, and only that circulator can circulate that petition.

Q.   How does the circulator obtain that petition form from the State?

A.   Secretary of State must provide it to them after they register.

Q.   What is a -- I know this is an odd question, but what is a paid petition circulator?

A.   A paid petition circulator is someone who is hired to

circulate petitions on behalf of an initiative.

Q.   Now, you said that they have to take a test.  Is that issued by the State?

A.   Yes.

Q.   And is there some training that they have to take before they take that test?

A.   They need to actually read through -- there's a training document online, and they need to read through it, ideally study it, and then they need to take the test and pass with 80 percent.

Q.   Okay.  And that training online you mentioned, is that the State of Florida's training?

A.   Yes.

Q.   It's the State of Florida's test that they have to pass; is that correct?

A.   Yes.

Q.   Okay.  So who created the paid circulator petition form?

A.   The Secretary of State.

     MR. BURHANS:  Your Honor, at this point I'm going to swing over to a discussion of what's been referred to in Smart & Safe's complaint as the additional amendment prohibition which relates to Counts One and Three of our operative complaint.

BY MR. BURHANS:

Q.   Now, Ms. Cox, do you know whether Smart & Safe attempted to sponsor more than one amendment for the 2026 cycle?

A.   Yes.

Q.   And in addition to 25-01, what was the other amendment or amendments that Smart & Safe sought to sponsor?

A.   It was -- I think the legal term of it or the official title was Home Use of Cultivation, yes.

Q.   Home Cultivation of Medical Marijuana?

A.   Yes.

        MR. BURHANS:  So why don't we bring up Exhibit 3, which has been admitted into evidence.

        Let's go to the second page for a second.

BY MR. BURHANS:

Q.   Do you recognize Exhibit 3?

A.   Yes.

Q.   And is that the proposed amendment for home cultivation of medical marijuana?

A.   Yes.

Q.   Now, if you go back to the first page of this exhibit, you see that this is an email from me to the Division of Elections?

A.   Yes.

Q.   What do you understand the purpose of this email was?

A.   You're representing Smart & Safe Florida as legal counsel, which is a political committee, asking to review the Home Cultivation of Medical Marijuana language in order to circulate the initiative.

Q.   So if -- if the document that I submitted to the State had

been approved, would a petition form similar to 25-01 have been approved by the Secretary?

A.   Yes.

Q.   Now, did Smart & Safe circulate any petitions for the Home Cultivation of Medical Marijuana?

A.   No.

Q.   Why not?

A.   Because, per my understanding, Secretary of State issued a letter back saying that if we did, that it would deactivate 25-01.

MR. BURHANS:  Okay.  Let's go to Exhibit 4, please, which has been admitted into evidence.

BY MR. BURHANS:

Q.   You'll see this is a series of emails.  I'd like to go to the third page of Exhibit 4, and that's an email from the Division of Elections dated Friday May 16, 2025.

It's addressed to me and it's signed by Maria Matthews; correct?

A.   Yes.

Q.   And who is Maria Matthews?

A.   She's the director of the Division of Elections.

Q.   Okay.  I'd like to draw your attention to the second paragraph, beginning with:  *Unless you withdraw the second petition (Home Cultivation of Medical Marijuana) by Friday, May 23, we will consider its submission a constructive*

*withdrawal of your current petition (Adult Use of Marijuana).*
*We will then proceed to determine whether the second submission*
*(Home Cultivation of Medical Marijuana) is sufficient in format*,
citing Rule 1S-2.009(2)(b) Florida Administrative Code.

Did I read that correctly?

A.   Yes.

Q.   And is this what formed your understanding that the State was requiring Smart & Safe to drop the Adult Use petition of 25-01 if it wanted to proceed with the Home Cultivation of Medical Marijuana petition?

A.   Yes.

Q.   And if you go to the above paragraph where it says:  *Smart & Safe Florida currently sponsors 25-01* -- if we skip to the next section, it says:  *Section 100.372 subsection (2), Florida Statutes, states that the sponsor of an initiative amendment,* *"may not sponsor more than one amendment."*

Did I read that correctly?

A.   Yes.

Q.   Do you understand what law Ms. Matthews was referring to?

A.   HB 1205.

Q.   So it's your understanding that HB 1205 created a new requirement that sponsors could not sponsor more than one amendment at a time?

A.   Yes.

Q.   And so what did Smart & Safe do when it was told by

Ms. Matthews that it had to pick one or the other?

A.    Smart & Safe removed the Home Cultivation of Medical Marijuana and withdrew it from submission.

Q.    So it proceeded with 25-01; correct?

A.    Yes.

Q.    As of May 16th, 2025, when Ms. Matthews sent that email, how many verified petitions had Smart & Safe obtained?

A.    I believe over 211,000 at that point in time.

Q.    And was that as reported on the Secretary of State's website?

A.    Yes.

Q.    So you understand that the Division of Elections knew that Smart & Safe had gathered over 211,000 verified petitions at the time it was told, Throw those in the trash if you want to go forward with Home Cultivation --

A.    Yes.

Q.    -- of Marijuana?

Okay.    Does Smart & Safe plan to offer the Home Cultivation of Medical Marijuana amendment in a future cycle?

A.    I believe so.

Q.    Are there any limiting conditions or factors that might prevent them from doing so?

A.    Well, under HB 1205 it cannot circulate two initiatives at once, so if that's the only one it wishes to go forward with, it could.    But if there's other issues it wanted to address, it

could not.

Q.    So, for example, if 25-01 does not appear on the 2026 ballot and Smart & Safe wants to run 25-01 again for 2028, it wouldn't be able to -- well, what would happen with respect to running the Home Cultivation amendment?

A.    They could not do both.

MR. BURHANS:  Okay.  Your Honor, I'd like to turn to a discussion testimony of the field operations of Smart & Safe Florida.  This will generally cover circulation gathering, submitting petitions.  And primary focus here is going to be with respect to the ten-day delivery requirement as referred to in the complaint, and the nonresident circulator prohibition as referred to the amended claimant, and the attendant fees for both of those provisions.  And it generally goes to Counts One, Two, Three, and Six.

BY MR. BURHANS:

Q.    Ms. Cox, I'd like you to take us back to kind of day one of Groundgame's work with Smart & Safe.  You've been retained. Give a brief overview of how the Smart & Safe petition gathering operation was stood up and launched.

A.    Absolutely.  So from day one we worked with our legal counsel to review the Florida law in depth to make sure that we understood every part and facet of ballot initiative law in Florida.

We then crafted our contracts -- we crafted our circulator

contracts, and we crafted our subcontractor agreements, as well as prepared all the different letters we might need for filing.

In addition to that, we worked on training.  We worked on budgets.  Spent a great deal at length thinking through how the budget would work in order to launch and deploy over a thousand circulators into the field.

Q.   And did I understand you correctly to say that -- I think the first thing you said was get with your lawyers to understand the scope of current Florida law; correct?

A.   Yes.

Q.   Is it fair to say that the -- you know, complying with Florida law was important and your program was developed around complying with the then-existing Florida law?

A.   Absolutely.

Q.   So what is the impact on your budgeting, your planning, your staffing, just generally, if the Legislature decides to change the law midway through your campaign?

A.   Well, the current budget is almost moot.  You have to go back and you have to look at how to adapt to the new law.

Q.   And we are going to talk about that in a little bit more detail.  I was just looking for the overview there.  So thank you.

(Reporter requests clarification.)

BY MR. BURHANS:

Q.   Did you also have occasion to hire managers for the field

team?

A.    Yes.

Q.    Tell me about the type of managers you were looking for to work for Smart & Safe.

A.    I wanted to build out the best program that we could and bring in the best field managers who had experience in ballot initiatives and petitions and personnel management.

Q.    Did it matter to you whether they were Florida residents or not?

A.    No.

Q.    Why not?

A.    Because experience -- just like I have experience in numerous states across the country, a lot of our managers have a lot of experience in numerous states across the country as well.

Q.    Now were -- were these managers that you hired -- were they unknown to you, or had you worked with them before?

A.    No, we absolutely had worked with them before and set out the best talent.

Q.    So briefly describe for the Court, with some of the relationships with managers that you hired based upon their experience, how long had you worked with some of those folks?

A.    Several of our managers worked with us for years, some over a decade.

Q.    And just ballpark, over how many campaigns might that entail?

Direct Examination – Ms. Meghan Cox

A.    Dozens.

Q.    In getting ready to launch, I think I heard you say you set up offices, but to confirm, you did set up offices; correct?

A.    Yes.

Q.    And how many of those were set up around the state of Florida?

A.    12 initial offices.

Q.    12 initial offices.

    Did that number change over time?

A.    Yes.

Q.    What happened?

A.    The offices changed based on congressional districts, and they also changed after HB 1205 based on where we needed to hire locals at.

Q.    Okay.  So do you recall how many offices Smart & Safe grew to for the ground operation?

A.    At any given time -- the height was about 17.

Q.    Okay.  We are going to talk a little bit more about those offices and the processes they are engaged in, but let me move on now to round out kind of the launch period.

    You got your managers.  You also are looking to hire the paid circulators; correct?

A.    Yes.

Q.    So describe that process.  But first, please tell the Court, what was the criteria you were looking for for the paid

circulators?

A.   We wanted the best paid circulators that are in the country.  The best circulators are typically outgoing; they have a great attention to detail; they can ensure that petitions are filled out appropriately.  They also respect the laws that -- and respect their contracts.

They have an ability to -- we wanted professional circulators that have a lot of petition experience that would work full time.  So they would commit to our drive, come out to Florida and stay the whole length of the campaign.

Q.   In addition to that, can you describe for the Court what you were looking for in the professional circulators with respect to, for example, validity rates?

A.   Yes.  Some of the top circulators do passionately care about their validity rates.  They are very competitive about it. They vet voters.  They approach people that look to be over 18 and they vet them.  They make sure that they are registered voters.  And we want those kind of people on our campaign.  Our only focus is getting valid signatures, so we want the people that are trained to vet voters the right way and are also trained to know that they have to have all the petitions completely filled out and not leave spaces blank on them.

Q.   Why did the petitions have to be completely and correctly filled out?

A.   If they are not filled out, then they are not considered

valid -- well, they are not considered -- they are considered deficient.

Q.   Now, if -- if the petition form doesn't have the full or -- the full information or the correct information, are they verified as valid by the Supervisors?

A.   No.  So we -- we separate those out for the Supervisors and we tell them that we know these to be deficient.  We still have to pay for those at the filing level to be -- to also confirm that what we already know is that they are deficient, but they are not verified and they are not accepted to be valid.  We know they are not valid; they know they are not valid; we still pay for them.

Q.   So invalid or deficient petitions is not going to help Smart & Safe get on the ballot; correct?

A.   No.

Q.   So aside from hiring these professional folks who have done these campaigns for years; they have attention for detail; they engage with voters, as you say; they have got high validity rates, what is it you can tell us in terms of their attrition or turnover rate with that professional circulator core?

A.   Having recruited professional circulators guarantees that you are going to have stability in your campaign.  So they are there to work; they are there to work full time.  And if they come from out of state, then they are usually there to work 40-plus hours a week, and they want to work that job.  That's

what they are there for.

Q.   Why is all that important?

A.   Because you can -- you can base your plans and your budgets and your campaign timelines off of a stable workforce.

Q.   I want to contrast your discussion of the professional circulators, many of whom you say came from out of state -- contrast that with kind of the -- you know, the first-timers, the one-timers, the local folks in Florida who might be newbies.

A.   Uh-huh.

Q.   Describe what you've observed with how they approach the job and their performance relative to their professionals?

A.   Oftentimes new people -- it is -- this is a very tough job. Being a petition circulator is extremely tough.  You need to be outgoing; you need to face rejection; people tell you "no" a lot; people might argue with you about policy; they might want to have different discussions, and so it's very intimidating to a lot of first-time hires to do this job.

     We can hire 100 people off of an Indeed ad and have one or two that will actually stick it out.  Often, too, they're working part-time.  They might have another job already, so they're not full-time labor, and they might only be able to work a few hours a week.

Q.   What impact, if any, does that have on your planning and operations?

A.   Well, predominantly when I look at a campaign, we try to

Direct Examination – Ms. Meghan Cox

focus on as many full-time hires as we can have, because full-time hires mean that they have more opportunity to talk to voters, more ability to work, more ability to gather signatures.

When we have a less stable workforce, you have to look at ways to encourage them to work more hours.

Q.   Did Groundgame conduct background checks on its circulator candidates?

A.   Yes.

Q.   Do you know how many?

A.   For the whole length of the campaign it was over 9,000.

Q.   Okay.  And do you know if there's a breakdown pre-1205 versus post-1205?

A.   Yes, so pre-1205 is about 2,000.

Q.   And how many paid circulators did that search yield, ultimately, that you hired?

A.   We ultimately hired roughly 1,300.

Q.   Okay.  And for the post-1205 period how many background checks and how many did that yield?

A.   It was roughly 7,000, 7,500, and that we hired about another 1,300.

Q.   Why run the background checks?

A.   Well, we have to run background checks to make sure that the circulator does not have a felony post-1205.

Now, pre-1205 that was a request of Smart & Safe Florida to really have the best of the best circulators and know what type

of circulators we had working on our behalf.

Q.    Now that we've hired the circulators, give us an overview of the training, please.

A.    So pre-1205 when I had the professional circulators out, we go over the contract that discusses the rules of Florida; we also go over talking points on the initiative so that they can answer questions for voters, and then also go over the petition itself to know that they -- what they can and can't do, make sure that they know that every piece has to be filled out in order for it to be considered complete.

Q.    Is there any explanation of what is permitted or prohibited under Florida law when you're doing the training?

A.    Yes.

Q.    Give some examples.

A.    So we've outlined that in contract, so we also say, again, You cannot be paid by signature; you're paid by the hour.  You have -- go through a lot of labor law and like what they can and can't do.  They're also trained on how to clock in and clock out in their timekeeping app that tracks their geolocation.

Q.    Does part of the training entail how to engage with voters who may not immediately jump to sign the petition?

A.    Absolutely.  And that is more for local hires that have never worked a petition before.  So our managers do role-playing and we engage with voters, like, for example -- like, walk through what the right pitch is.  And then if a voter says, Hey,

I'm not sure; I don't like that issue, we say, like -- they're instructed to say, you know, I understand, but why don't we let the Florida voters decide on this issue?  Would you be willing to put it on the ballot to let the Florida voters decide?  Even if you don't agree with the issue, you can vote against it on the ballot, but it's important to let voters decide.

Q.   So when you give training on how to discuss the amendment substantively to circulators, you give them training on how to think of different approaches that might appeal to the voter, why do that?  Why not just send the people out to chat voters up and stick a clipboard in their face?

A.   Well, we want them to know what our issue's about.  We want them to know that when approaching them we're saying, Are you a Florida resident?  Are you a Florida voter? and making sure that they understand that this is to get recreational marijuana on the ballot so they can vote on it in November.

Q.   Let's talk about pre-HB 1205 hiring.

Do you recall how many noncitizen circulators were hired?

A.   I believe it was 474.

Q.   Okay.  And those were your -- those were your nonresidents?  Were those what you were referring to as the "professional circulators?"

A.   Yes.

Q.   Okay.  But you also hired non -- you also hired Florida residents; correct?

A.   Yes.

Q.   Pre-1205 about how many did you hire?

A.   About 700.

Q.   Okay.  And when did -- when did Groundgame enter the field on behalf of Smart & Safe?

A.   I believe we were in the field the week of March 11th.

Q.   Okay.  So -- and was your workforce pretty steady between March and the beginning of May before 1205?

A.   Yes.

Q.   And so that would have been approximately, I think you said, maybe 11-, 1,200, something like that total?

A.   Yes.

Q.   Okay.  Do you know what your retention rate was at that point in time for your professionals?

A.   It was very high.

Q.   Okay.  Very high; greater than 70 percent?

A.   Yes, greater than 70 percent.

Q.   Okay.  So we've got our field team and we go out in the field sometime in March.

     Let's talk a little bit about how circulators -- in a little bit more detail how circulators communicate with the voters.

     First of all, when the Smart & Safe folks were out in the field, did they wear anything in particular?

A.   Yes.  We had badges for every single circulator.  They're

Smart & Safe badges.  They had their name on it, so their picture as well as their name.

Q.   So it's got the circulator name, the circulator picture, and the Smart & Safe logo?

A.   Yes.

Q.   Okay.  And they have to wear that every time they're out circulating?

A.   Yes.

Q.   So walk us through how -- how Groundgame trained the circulators to approach a voter and how that conversation might go.

A.   The conversation would go something like this:

Hi.  Are you a registered voter in the state of Florida?

And if the answer is yes, Great.  Would you be willing to sign my petition to legalize recreational marijuana and allow Florida voters to vote on it in November?

And if the answer is yes, Thank you, and then walk them through and make sure that they filled out every piece.

Oh, don't forget your county.  Make sure that you're signing and you're printing the date.

Q.   What if they say, No, I don't want to sign that.  I'm not interested in marijuana?

A.   We would say, It's okay, but are you still a -- are you a Florida resident and voter?

And if the answer is yes, then, Would you be willing to

allow others to vote on it?  If you don't like it, that's great. You have an ability to vote against it, but please allow Florida voters the right to vote on it.

Q.   In your experience, what type of responses did you get from voters when talked to about that?

A.   Plenty say, I don't agree with it, but, yes, I might go ahead and sign it just to vote against it.

Q.   Are the conversations that circulators have all the same with voters?

A.   They vary based on voter.

Q.   Do they also vary based on circulator?

A.   Absolutely.

Q.   How would you characterize in your experience the adeptness of the professional circulators in engaging voters versus the newbie local circulators?

A.   I would say a lot of our professional circulators can be a little bit of a policy wonk and, say, can talk in depth about the language; they want to show them the language, and they can answer questions.

And then I frequently get fielded questions back up about what -- some things that voters might have so we can put messages out on how to answer those as well.

Q.   So they've had the discussion and the voter says, Okay, I'd like to sign.  I know you said that the circulator walks the voter through the petition form, but I'd like you to take us

through in a little bit more detail about the information that is being requested.

And for this purpose it doesn't really matter pre- or post-1205?

A.   Absolutely.  No.  The voter is required to fill out every piece of the petition, so it requires a full name, an address, and them to sign and date, fill out the county.

Post-1205 it can be a lot trickier because they're requesting the last four of the Social or a driver's license, which a lot of people are reluctant to give.

So we saw our deficient signatures rise significantly because someone might say, Oh, yes, I'm willing to sign, but you're in front of a Target and, I don't know that I feel comfortable providing that level of information to someone I don't know.

Q.   When you say "Target," you mean the store?

A.   Yes, Target the store.  Sorry.

Q.   "Target" could have a different meaning in North Florida.

So as part of this discussion between circulator and voter, describe for the Court whether or not it's important to obtain the signed petition there on the spot as you've been engaging in the conversation.

A.   Absolutely.  Circulators have a fiduciary responsibility to have -- to talk to the voter, to get it filled out correctly, to get the petition filled out correctly, and also ensure that gets

turned in in a timely manner so that we can file them with the Secretary of Elections.

Q.   In your experience is there -- is there any relation between the amount of time passing between the communication and the voter signing the petition and whether or not it actually gets turned in?

A.   You would want to do that immediately.

Q.   Why is that?

A.   You would want to make sure that they're signing -- if they said they're interested in signing it, you do want to capture their signature and have them sign that petition, otherwise, you might not see them again.

Q.   And if you don't see them again, would Smart & Safe have any idea as to whether or not they turned in the petition?

A.   You have no guarantee.

Q.   Now, petition forms have to be verified by the Supervisors; correct?

A.   Yes.

Q.   And the sponsor is required by law to turn them in; correct?

A.   Yes.

Q.   And the sponsor is also required by law to pay a verification fee; correct?

A.   Yes.

Q.   So if a voter just takes a form and walks away with it, how

do you know what county supervisor to reach out to to pay some verification fee and at what time?

A.   You would have no idea.

So, for example, if you're in Orlando, that office might see voters from 67 different counties.  So it is frequent for voters across the state of Florida to frequent metro areas to go shopping, to go to games, et cetera.  And so just because you're in one location does not mean that they're in that county.  They can be from all over the state just shopping in that area.

And so we -- it is behooven to us that we want to capture that signature.  We want to have them keep that.  We want to immediately get that turned in, want to get it verified and get it sorted and make sure it gets to the correct county quickly.

Q.   Now -- and we are going to get to this in a little bit, but HB 1205 imposed a ten-day delivery requirement; correct?

A.   Yes.

Q.   And what was the requirement prior to 1205?

A.   It was 30 days.

Q.   So if the voter says, Well, thank you very much.  I enjoyed speaking with you.  I'm going to take the petition home and think on it, how can the sponsor ensure that that petition's going to get turned in on time?

A.   We cannot.

Q.   And is there a penalty for not turning it in within ten days?

A.    If that voter walked home that night with a petition in hand, signed it, and then went on vacation, forgot about it, and another month later is like, Oh, I should turn this in, and they had the previous date on it and they turn that petition in, say they mail it back to Smart & Safe, we're now faced with a penalty of $50 a day for every day over that ten days.

Even though we did not collect it; the voter had it in their hands the whole time, we're still faced with that penalty.

Q.    Is a petition -- do you know whether a petition turned in after the deadline, is that deemed invalid?

A.    No.

Q.    So if a petition is turned in on day 11, assuming it meets all the other requirements, it would be valid?

A.    Yes.

Q.    What about if it's turned in on the 31st day?

A.    Yes.

Q.    Or the 131st day?

A.    Yes.

Q.    So I want to under -- I want to make sure I understand the process.

The circulators are out there.  They engage with the voters.  They get a signed petition.  But is that -- is that all they're there to do?  I mean, what's the point of all of this?

A.    The point of all of this is to obtain valid signatures and get them filed with the SOEs, the Supervisor of Elections.

Q.   Okay.  So let's talk about kind of the next step on this journey.

     We've gotten circulators who have gathered a number of petitions.  They have to be turned in somewhere; correct?

A.   Yes.

Q.   And certain things have to happen to get them on file with the Supervisors; correct?

A.   Yes.

Q.   Okay.  So, first of all, let's start with kind of a basic concept about the day.  You mentioned that the circulators had a timekeeping app.

     What is that?

A.   It's called Deputy.

Q.   What is Deputy used for?

A.   Deputy is our timekeeping clock to track our hourly circulators.  They clock in; they clock out; they go on break. We keep everything organized by region and by team.  They can communicate with managers; we can send out communications, and we can have a geolocate on where those circulators are at.

Q.   Do they do any type of recording in Deputy with respect to encounters they've had or petitions that they've gathered?

A.   There is a section at the end of the day they can report how their day was.  So we ask them to report when they clock out how many signatures they gathered that day.

Q.   Is that used for any purpose?

A.   It is used to ensure that if they said they collected signatures that we have those in our hands, have not left them behind somewhere.  It is their fiduciary responsibility to get those turned in.  So if they say they've collected those petitions, we want to ensure that those are turned in.

Q.   Okay.  So let's keep this in the context of pre-HB 1205 when we had the 30-day time period to turn the petitions in. Correct?

A.   Yes.

Q.   So how did the circulator turn-in process work?

A.   We had signature turn-ins once a week.

Q.   And was that in person or in addition to other means?  How did that --

A.   Yes, always in person.  The circulator would either come in or, if they are in another part of Florida, would ship in their signatures, and then they were also paid once a week as well. So they sent everything in, timekeeping clock.  We ran payroll like clockwork, Saturday through Sunday.  And if they happened to get sick or they aren't able to make it to turn in, they can communicate with their manager and they could ensure that they got their petitions in.  Somebody could go pick them up.  But there wasn't -- we could ensure that we had everything in on time.

Q.   Thank you.

     Now, I heard you say that sometimes circulators would ship

petitions in.

A.    Yes.

Q.    Explain that a little bit.

A.    Well, so, for example, if I had circulators in Pensacola, that's -- it's quite a bit of a drive to Tallahassee.  So instead of driving, those circulators would just ship their petitions over to their manager.

These, again, are circulators that were known to us, circulators that have worked in the past for us.  They are not brand-new circulators, and so there's a high-level degree of trust that they would be shipping in their petitions.

Q.    So under the 30-day turn-in requirement, circulators could ship in their petitions and generally get there in time; is that right?

A.    They'd ship them to their manager to be processed, which meant they also are scanned in for internal verification; they are caged; they're sorted out by county.  Then it goes through our entire process to ensure that they are delivered to the SOEs.

Q.    Okay.  So you just mentioned caging.  Let's talk a little bit about that.

What is caging?

A.    Caging is more of a mail term, but it's the process of collecting the data, collecting the petitions in, ensuring that we are separating out those that are complete from incomplete,

separating them out by county.

And then -- then we go through several rounds.  So it's done first at the regional level, and then my operations managers pick those up and bring them back to Orlando to our Lake Mary office, and then that's -- all the different offices are merged together, and then they are double counted again or triple counted.  And then they are handed off to Vanguard where, again, another count occurs.

So you count up and make sure of the exact amount to write a check -- well, request the check from the committee to then send in to the SOEs and ship them off.

Q.   Can you describe for the Court where your regional offices were located?

A.   Yes.  We had regional offices in Jacksonville, Tallahassee, several in the Orlando area, several in South Florida, and several in Tampa.

Q.   Now, under the 30-day turn-in requirement, do you know whether petitions sometimes were turned in after 30 days?

A.   Very rarely.

Q.   Very rarely.

Are you aware that there was -- Smart & Safe received a violation letter relating to the 2024 campaign?

A.   Yes.

Q.   Okay.

MR. BURHANS:  Let's bring up Exhibit 5, please, which

has been admitted into evidence.

BY MR. BURHANS:

Q.   And, Ms. Cox, do you recognize this letter?

A.   Yes.

Q.   This is dated March 26, 2025?

A.   Yes.

Q.   And this relates to the 2024 campaign; correct?

A.   Yes.

Q.   When did the petition circulation effort for the 2024 campaign end?

A.   Over a full year prior to this letter coming out.

Q.   It had to be done by February 1st of 2024; correct?

A.   Yes.

Q.   So this letter is 15 months after that?

A.   Yes.

Q.   And if we can go down to the bottom paragraph, you'll note that there were 2,437 petition forms that were late under the 30-day time frame; correct?

A.   Yes.

Q.   And if we go to the next page, top of the page, you'll see there's a fine that was indicated.

     How much was that?

A.   Is $121,850.

BY MR. BURHANS:

Q.   Do you know whether Smart & Safe paid that fine?

A.   I believe so, yes.

MR. BURHANS:  I will state for the record that we worked with the State, and they knocked a few hundred bucks off because they realized we are not really late.  So we do appreciate that.

THE COURT:  That was just a side note to note their generosity?

MR. BURHANS:  A side note that we appreciate, you know, helping us save a buck here and there.  It is important.

MR. JAZIL:  And, Your Honor, just so the record is clear, that wasn't me knocking off the money.

THE COURT:  I understand, Mr. Jazil.  Your point is you would have added more to the bill.  Thank you.

MR. BURHANS:  The interest would have been accruing.

BY MR. BURHANS:

Q.   So that was a $181,000 fine under the 30-day return period; correct?

A.   It was 121,000.

Q.   121.  Thank you.

What do you expect will happen under the post-HB 1205 rule when you've got a ten-day return time?

A.   I believe it will be significantly higher.

Q.   The return time is now one-third what it used to be; correct?

A.   Yes.  And it doesn't even include holidays or weekends.

Q.    We are going to get to that, but thanks for reminding me.

So I'd like to turn your attention to Exhibit-- what's been marked as Exhibit 6.

And can you tell me what this document is?

A.    Yes, this is the 2024 cycle petitions submitted.

Q.    By Smart & Safe?

A.    By Smart & Safe, yes.

Q.    Okay.  And did you request a copy of this document or something like it?

A.    Yes.

Q.    And why was that?

A.    I wanted to see how it compared to this cycle, and I wanted to fully understand how all the numbers -- and everything about the initiative.

Q.    Where did this document come from?

A.    From Smart & Safe Florida.

Q.    So this is a record from their 2024 campaign?

A.    Yes.

Q.    And do you know whether this was created by an employee or agent of Smart & Safe during the campaign?

A.    I believe so.

Q.    And do you know whether or not the person who created this had knowledge of the contents when they created the document?

A.    Yes.

Q.    Do you know whether this was made during the 2024 campaign

at the time these numbers were being reported?

A.   Yes.

Q.   Do you know whether it's Smart & Safe's usual practice of business to maintain records such as this?

A.   Yes.

Q.   In fact, this is a pretty common document that any campaign you've worked on would have; correct?

A.   Yes.

Q.   Just looking at the top line numbers of 1.6 million turned in and accepted 1.024 million, do you know what those two numbers refer to?

A.   Yes.  So they turned in 1.604 million petitions and 1,024,752 were accepted by the SOEs, the Supervisors of Elections.  It was a 64 percent validity rate.

        MR. BURHANS:  Your Honor, I move Exhibit 6 into evidence.

        MR. JAZIL:  No objection from any of the defendants, Your Honor.

        Thank you.

        THE COURT:  Without objection, Exhibit 6 is admitted.

     (PLAINTIFFS' EXHIBIT SSF-6:  Received in evidence.)

BY MR. BURHANS:

Q.   Let's turn our attention now to the enactment of HB 1205.

     Well, before we talk about the effects of the law, prior to the effect of -- prior to HB 1205 being passed on May 2nd, what

was your projection in terms of when the paid petition circulation program would have met a sufficient number of verified-as-valid petitions to make the ballot in 2026 election?

A.   I believe we would have hit our number by July 1st.

Q.   And why is that?

A.   We were on track from the field side to be done between June 15th and July 1st, and they were also -- they were also in the field with multiple other measures as well.  So we believe all of our pacing -- we were doing 78,000 signature a week, so even cleaning up congressional districts, we believed that we were on track to be done by July 1st.

Q.   Is 78,000 a week -- is that something you believed was sustainable to run out the campaign?

A.   Yes.  It was actually growing.

Q.   Explain that.

A.   Well, so each week as we are hiring or training and circulators are becoming better with their pitch and better with locations to work, that number was increasingly growing week after week.

Q.   So you were on track to do, basically, over 300,000 petitions verified per month?

A.   Yes.

Q.   After HB 1205 was passed on May 2nd, what happened with Smart & Safe's field campaign?

A.   Well, immediately we had to terminate 474 of our

professional out-of-state circulators who were really holding down full-time hours out in the field, and we also had to immediately figure out how to enact the new laws.  And so with the ten-day turn-in clock, even our local residents were very worried about how to get their petitions in, and so we dropped down almost -- I mean, literally overnight to having 89 people in the field.

Q.   Did you actually shut down operations for a period of time to get oriented?

A.   We shut down operations on May 6th for a full day.

Q.   And just generally describe for the Court the issues that you were grappling with on that shutdown day in order to get back out in the field.

A.   Well, we were trying to understand -- because most everything we had was just the text and news articles.  So we were trying to understand what took place immediately when it was signed versus what took place on July 1st, what rules were which.  There were a lot of conversations we had with our legal counsel.  We had a lot of conversations around the cadence that everything had to be turned in.

So we immediately shut down operations.  We took -- we actually unenrolled everyone from Deputy to ensure that no out-of-state circulators could actually circulate petitions.  We took them off the system.  That way they could not clock in.  And we had to re-upload people back into the system.  So there

was a lot of movement, a lot of traffic as we tried to grapple and understand the law in realtime.

And I'll say I've never experienced that.  There are several initiatives that have changed in the Legislature in the middle of circulation, and those initiatives are usually grandfathered in, and the new initiatives that are filed after that have to follow -- are following the new set of rules.  But it was unheard of to change in the middle of a drive.

Q.   So you mentioned that you terminated the 474 nonresident circulators and lost another significant number of resident circulators; correct?

A.   Yes, yes.

Q.   So what was the end effect of losing all of those circulators on Smart & Safe's ability to communicate with voters about the initiative?

A.   Well, immediately dropped our ability to communicate with voters.  Without that many voices in the field about our initiative, we could no longer talk to as many voters and seek their signature to place the initiative on the ballot.

Q.   So prior to May 2nd, you were doing about 78,000 petitions a week.

How many were you doing immediately after?

A.   14- to 15,000 signatures a week, petitions.

Q.   So -- but -- did that just affect the field team, or did it have an effect on the back office team too?

A.   Well, so the back office --

THE COURT:  Counsel, can you hold on one second?

MR. BURHANS:  Sure.

(Pause in proceedings.)

THE COURT:  Counsel, you can proceed.  I'm just trying to take notes when I hear things I want to mark.

Okay.  Thank you.

MR. BURHANS:  Thank you, Your Honor.

BY MR. BURHANS:

Q.   I want to back up for a moment.

MR. BURHANS:  Actually, Madam Court Reporter, can you read back the last question and answer, please?

(The requested portion of the testimony was read back by the court reporter.)

BY MR. BURHANS:

Q.   So those petitions, those are raw petitions; correct?

A.   Yes.

Q.   And what do you -- what's the -- what do you mean by "raw"?

A.   "Raw" means that's just the physical form that's gross collected.  That doesn't mean that they are completely filled out correctly.  That doesn't mean there's -- that they're all valid.  We have to look at every single one of them.

We run it through an internal validation system. Oftentimes, a voter might forget to date it; they might forget to sign it; they might be missing information, so that's just

the gross.

And, again, we separate those out so we already know going -- when we're submitting them to the SOEs which ones are what we call deficient -- they're not filled out correctly -- and the ones that are complete.

Q.   And still they all have to go to the Supervisors of Elections for verification; correct?

A.   Yes.

Q.   So prior to HB 1205, did you have a forecast as to how many raw petitions you would need to gather in order to get at least 880,062 verified as valid petitions?

A.   The original field contracts were looking at gross amounts of 930 to 945,000, roughly, give or take.

For the field they did have a separate operation for mail and they look at different operations along the way based on finances.

Q.   Okay.  Thank you.

So you testified earlier that you took out -- you took the nonresidents not only out of the field, they were terminated so that they wouldn't be touching any petitions; correct?

A.   Yes.

Q.   And you also lost resident circulators; correct?

A.   Yes.

Q.   Did you also lose resident back-office people?

A.   Well, yes, so it was a mixture of both.  So before the

30-day rule, we had circulators that were also working back office. So they might work in the back office for two days a week and circulate for a few days a week.

Now, once the ten-day rule took effect, we needed back-office support to really function seven days a week. So that's facilitating turn-ins, trainings, scanning of petitions into Smart & Safe, and then also caging and separating out by each individual county, repeat, driving everything to Orlando to then be shipped out, so it was a repeat cycle. So overnight everything tripled in cost, triple amount of hours back office.

Q. Okay. Thank you.

And really what I'm trying to get at here is you had resident and nonresident circulators; correct?

A. Yes.

Q. And some of those resident, nonresident circulators also performed back-office functions; correct?

A. Yes.

Q. Now, after 1205 could you use the nonresident circulators to still perform the back-office operations which involves handling petitions?

A. Not after July 1st.

Q. So after July 1st you could only have Florida residents handling these petitions?

A. Yes.

Q. Okay. So let's get a little bit more explanation of with

this reduction in workforce, how did you adjust your staffing?

A.   Well, staffing, first of all, because we lost so many circulators, we had -- those that could circulate were back in the back office.  We had a really -- we spent the full -- that full week trying to figure out how to retool the budget based on the new current law, and so -- from what we understood the law to be.

And so that was -- again, it felt like triple the cost on everything.  Staff is now having to work overtime.  We're going to have to hire more staff for the back office; more costs in three-times-a-week trips to Orlando; more costs in toll roads. Everything was triple the cost than it was previously.

Q.   We're going to get to cost item.  I just want to talk about the staffing decision.

So, for example, under post-1205, the back-office folks handling petitions, did they have to be registered circulators?

A.   Yes.

Q.   So they had to be Florida residents and registered circulators in order to handle the back-office operations?

A.   Yes.

Q.   Okay.  So if you've lost circulators, and then you had to move the resident circulators that you had into back-office operations, what effect did that have on Smart & Safe's ability to communicate with voters in the field?

A.   It greatly decreased it.

Q.   Okay.  So let's talk a little bit about the ten-day return requirement in a little bit more detail.

First of all, did that ten-day delivery requirement affect Smart & Safe's ability to engage voters in the field?

A.   Yes.

Q.   How so?

A.   It took circulators out of the field by having them to spend more time in turn-in and getting into their offices than spending time talking to voters and collecting signatures.

Q.   Now, with respect to the ten-day delivery requirement, prior to HB 1205 were weekdays and holidays counted -- for example, in the 30-day time period, were they counted within the 30 days?

A.   No, it excluded weekends and holidays.

Q.   So you got the benefit of not having to turn in on a Saturday or a Sunday or a holiday?

A.   Yes.

Q.   Okay.  Now, under the ten-day time rule, did that -- the ten-day delivery requirement, did that change?

A.   Yes.  In the language it crossed out weekends and holidays, so ten days includes weekdays and holidays.  It's not business days; it's full ten days.

Q.   Are all Supervisors of Elections open on Saturdays or Sundays?

A.   No.

Q.    Are they open on holidays?

A.    No.

Q.    So if I understand you correctly, in any ten-day period, at least two of those days can't be used for turn in to the Supervisors, so isn't that effectively reducing the number of days you have to get them in timely?

A.    Yes.

Q.    And what about when you've got a holiday?  What happens there?

A.    They're closed on holidays as well.

Q.    So let's -- for example, let's talk about this past cycle.

Thanksgiving was on a Thursday; a lot of offices are closed Friday, Saturday, Sunday.

Christmas Day was on a Thursday; day after Christmas a lot of offices are closed Friday, Saturday, Sunday.

New Year's Day was also a Thursday; correct?

A.    Yes.

Q.    So what is the effect of the ten-day delivery requirement when in some weeks you're losing 40 percent of the days that you have to get it in on time?

A.    On our end they were shipped out and they sat in offices not received by the Supervisors.

Q.    Until when?

A.    In some cases -- I remember right before Thanksgiving there was a shipment that went out on the 26th, and it sat -- and we

did call around to see if offices would be open the day after Thanksgiving, and we understood several offices to be open, so we didn't really know that they would be closed.

But by receipts -- by the receipts, they were received on December 1st, which is the following Monday, which pushed us past the ten-day rule.

Q. Did that happen often?

A. It happened several times this cycle around the holidays.

Q. Okay. So earlier you mentioned that in Orlando, for example, circulators might gather petitions from people from all 67 counties.

Did I get that right?

A. Yes.

Q. And sometimes -- talk about the difficulty of that with respect to the ten-day delivery requirement under HB 1205.

A. Well, it would be impossible to regionalize the caging system to have, let's say, circulators just in Tallahassee file to only the counties around, which you would think would make sense under ten days.

No matter what, you have to get everything into a caging area to ensure that all counties are in; they're sorted; they're triple counted; the dollar amount is correct -- because we have to pay the SOEs in order for them to verify them -- and then shipped back out overnight to get -- make it to the SOEs within that ten-day time frame. It's a very logistical-heavy process.

Direct Examination - Ms. Meghan Cox

Q.   For, you know, some of the more, I'll say, remote or exotic counties, for example -- everybody's favorite -- Monroe, Key West, what difficulties would that present when you've got people signing petitions from places like that that are nowhere near a regional office?

A.   We had circulators we wanted to hire in Monroe, but it was impossible for us to facilitate figuring out how to get them into an office to turn in their petitions and then back into Monroe within a ten-day period.

Q.   So was there a change in Smart & Safe's shipping practices after the ten-day delivery requirement was enacted?

A.   Yes.  It went from normal U.S. Postal ground to UPS overnight.

Q.   Okay.  And do you know whether it mattered for timeliness purposes whether it was postmarked a certain day or actually checked in by the Supervisors on a certain day?

A.   By ten days it's when they're checked in by the Supervisors.

Q.   I'd like to direct your attention to what's been marked into evidence as Exhibit 8.

     Why don't we just scroll through a couple of these pages.

     Do you know what this document is?

A.   Yes.

Q.   What is it?

A.   It is our shipment incident report.

Direct Examination - Ms. Meghan Cox

Q.    And we've got batch numbers and counties.

What does that relate to?

A.    It relates -- so we have every shipment organized into batches, and this relates to the counties in which the date was shipped, the expected arrival date.

So, for example, number one says "Columbia."  It was shipped on the 9th.  This one, because it was ground, it was expected to be received by the 12th, but it arrived two days after that on the 14th.

Q.    Okay.  Thank you for that explanation.

Let's go to Exhibit 9.

Let's scroll through these pages a little bit, and let me know if you know what this document is.

A.    Yes.

Q.    What is it?

A.    So this is a report generated on a weekly basis based on major delays and missing packages.

So we have detailed reports showing the tracking labels of where packages have gone missing.

Q.    Okay.  So, for example, on page 2 what we are looking at -- we see there is a shipment to Apalachicola.

And this report was generated by getting information from where?

A.    From UPS.

Q.    The shipper?

A.   Yes, it's UPS.

Q.   So we see that the label was created on June 5th, 2025; correct?

A.   Yes.

Q.   It was dropped off at 4:33 p.m. that same day; correct?

A.   Yes.

Q.   And then they said, We have your package, at 7:50 p.m. that evening; correct?

A.   Yes.

Q.   Then there is no further information?

A.   No.

Q.   Do we know whether or not these packages ever made it to their destination?

A.   We do not.

Q.   I'm not going to belabor the point, but if we look at Exhibit 10, is that a similar type of report?

A.   Yes.

Q.   And Exhibit 11, that's another similar type of report?

A.   Yes.

Q.   And these packages, they -- what did they contain?

A.   They contained either checks or petitions.

Q.   So if the Supervisor doesn't get the petition or the check, what's the effect of that?

A.   They do not count it.  And if that petition does arrive, let's say, in 100 days, and it's lost and someone finally finds

Direct Examination - Ms. Meghan Cox

it, we are now faced with that fine over something -- of it being lost.

Q.   Through no fault of Smart & Safe?

A.   Through no fault of our own.

Q.   What are some other examples of why -- aside from getting lost by the shipper, what are some other examples of why the petition form might be submitted late?

A.   You know, we have seen cases where voters just write down the wrong date.  So it's not being submitted late, but they just happen to write down their birth date and sign '25 instead.  So we can't cross or change that, so we have to submit it.  But that's not -- it was not really collected late, but that's an example of a date that's going to count against us as being late.

     I would say another common occurrence is previously if a volunteer were to take a form and then never turn it in and forget about it and bring it back in, that could come in late.

     And then also, of course, these late petitions that were shipped out on our side overnight and then lost in transit.

     And, again, everything is tracked; it's documented.  So we know where they are at, but, unfortunately, that is out of our control.

Q.   Thank you.

     I'd like to turn to Exhibit 12.

          THE COURT:  Counsel, it's been about an hour and

15 minutes --

MR. BURHANS:  Oh, sure.

THE COURT:  -- for the benefit of the court reporter.

Just so I'll know -- not rushing you, just if you had to guess on your outline percentagewise, how far are you into your outline?  I'm trying to figure out this afternoon.

MR. BURHANS:  I'm well past the halfway point, Judge.

THE COURT:  Okay.  So the exhibit --

MR. BURHANS:  But this is the good stuff, so we may take it a little slow.

THE COURT:  I was told before it was going to be at least five hours, so it actually sped things up.

MR. BURHANS:  Yeah, we streamlined it.  We recognize that there's been a whole week of trial.  We're trying to stay out of (indiscernible) evidence and focus simply on Smart & Safe.

THE COURT:  The only reason why I was bringing it up is I was just trying to figure out where we were at this afternoon.

MR. BURHANS:  Understood.

THE COURT:  After yesterday I'm going to have a hard break this evening for the benefit of the staff, and I should have done that last night.

Also, my apologies to everyone.  I know there was a delay.  My computer just froze, so I was -- I'm trying to take

notes, and if it freezes, I can't.

In any event, we'll take a ten-minute recess.

Thank you.

MR. BURHANS:  Thank you, Judge.

(Recess taken at 2:16 PM.)

THE COURT:  Counsel, you may proceed.

MR. BURHANS:  Thank you, Your Honor.

BY MR. BURHANS:

Q.   Ms. Cox, earlier in our discussion I had told you and the Judge that we were going to get to some operational impacts of the ten-day delivery requirement, so let's go there right now.

I'd like you to describe for the Court what was the procedure for turning in petitions from circulators and how that process went from circulators through processing to get to the Supervisors of Elections.

A.   Yes.  So for -- we had two main turn-ins a week for our full-time workers and full-time petitioners, and then detail turns-ins for your part-time workers.

So every Sunday we took in petitions for petitions that were collected Thursday, Friday, Saturday, and Sunday.  And then every Wednesday we took in petitions that were collected on Monday, Tuesday, Wednesday.

Q.   Can I stop you right there?

MR. BURHANS:  Your Honor, I'd like to show demonstrative aid Number 1 that we've marked.  I provided it to

counsel and I don't think they have an objection.

MR. JAZIL:  No objection to the demonstrative, Your Honor.

THE COURT:  You may post the demonstrative aid.

MR. BURHANS:  So let's go to the next page.

BY MR. BURHANS:

Q.   Here if you would, Ms. Cox, we are looking at petitions signed on a Monday, Tuesday, or Wednesday.  Walk us through the process, please.

A.   Yes.  So, for example, the ones that are turned in on Wednesday, they are scanned; they are counted; they are sorted, and they are sent to Lake Mary.

Q.   What is Lake Mary?

A.   Lake Mary is actually the -- is our processing office in the Orlando suburbs.

Q.   And is that processing for all of the regional offices?

A.   Yes.

Q.   Thank you.

Please proceed.

A.   So all of our operational managers would pick up from all across the state on a very strict time schedule, and they each had their rounds.  So each picked up two or three offices and them came to Lake Mary.

Q.   Were they traveling by car?  How are they getting --

A.   By car, yes.

Q.    Okay.

A.    Once they are at Lake Mary -- and Lake Mary, again, is our processing office -- they are now merging all of the counties from their regional offices together.  And again, they are flagging for anything that would have been missed on first round at regional, anything that's deemed deficient, suspicious, anything that we want to notify and flag for the SOE is sorted with appropriate cover sheets attached.

And then also at Lake Mary, Vanguard also has their offices, so we are on the same floor and so we are able to take them over to them by Friday.

Vanguard also then counts them again.  They sort in case anything happened to the -- mislabel them into the wrong county.  They request and obtain verification fee checks from the committee.  And they send out overnight to all 67 county Supervisors.

Q.    And so if I understand what you said just now, petitions that were gathered Monday, Tuesday, Wednesday, were turned in to your regional offices, Groundgame's regional offices, on that Wednesday, and by Friday Vanguard had them, and then within 24 to 48 hours Vanguard had them in the overnight mail to the Supervisors; is that correct?

A.    Yes.

Q.    And did that same scenario --

MR. BURHANS:  Let's go to the next slide.

BY MR. BURHANS:

Q.   Does that same scenario play out for the petitions gathered on Thursday, Friday, Saturday, Sunday?

A.   Exact same process.

Q.   Thank you.

I just have a quick question.

With HB 1205, the sponsor's under a ten-day delivery requirement from the day that the voter signs the petition to get them timely turned in to the Supervisors of Elections; correct?

A.   Yes.

Q.   And within that ten days it goes through that entire process you just described; correct?

A.   Yes.

Q.   Does the ten-day delivery requirement change any time frame or process for the Supervisors of Elections to verify petitions?

A.   No.

Q.   I want to next direct your attention to Exhibit 12, which has been entered into evidence.

MR. BURHANS:   And if we can go to page 20 of this -- well, let's stop right here for a moment.

BY MR. BURHANS:

Q.   Tell us what this exhibit is.

A.   This sheet is package tracking updated shipping incident report.   So this would, again, track every batch, and if a

county had a delayed petition, it would track it on this sheet.

Q.   Now, does -- this sheet is not tracking individual petitions, is it?  It's tracking batches?

A.   Well, both.  So, for example, if I picked up one at random and said line 35, which is Leon County, 6-12-25, delayed arrival, we have a tracking number; it says it was petitions -- 116 petitions.  While it was shipped on 6-12 overnight, it was delivered on 6-16.

Q.   Okay.  Thank you.

I'd like to direct your attention specifically to page 20 of Exhibit 12.  And about halfway through the spreadsheet or -- is an entry for Brevard County, No. 92.

Do you see that first one?

A.   Yes.

Q.   What was the shipment date to Brevard?

A.   It was shipped on 11-26-2025.

Q.   How many petitions were included in that shipment?

A.   852.

Q.   Okay.  They were delivered when?

A.   12-1.

Q.   Okay.  Do you know what day of the week November 26, 2025 was?

A.   It was the Wednesday before Thanksgiving.

Q.   The very day before Thanksgiving; correct?

A.   Yes.  So it was Wednesday.  The day after is Thanksgiving.

Q.   So that Wednesday, the 26th, those petitions would have been gathered on the Monday, Tuesday, or Wednesday of that week; correct?

A.   Yes.

Q.   So that would have been Monday, the 24th; Tuesday, the 25th; Wednesday, the 26th; correct?

A.   No.  Actually, back to the process workflow, those were collected the Thursday, Friday --

Q.   Thank you.

A.   -- Saturday, and Sunday, and those came in on that Sunday night.

Q.   Thank you for clarifying that.

A.   You're welcome.

Q.   So if petitions in that batch that were collected the previous week didn't arrive until Monday, December 1st, would they have been outside the ten days?

A.   For those collected on 11-20 they would be.

Q.   Okay.  Let me just stop for a moment.

         MR. BURHANS:  Your Honor, may I approach?

         THE COURT:  You may.

BY MR. BURHANS:

Q.   I've got my phone open to the calculator app.  I'm just going to ask you to do a quick calculation for me.

     So we know that 852 petitions were delivered on December 1st; correct?

A.    Yes.

Q.    Let's assume that they were all signed on 11-20.

A.    Okay.

Q.    They would have been one day late; correct?

A.    Yes.

Q.    So if we had 852 petitions at one day late times $50 per day, what is 852 times 50?

A.    42,600.

Q.    So that's just for that batch, assuming they were all one day late; correct?

A.    Yes.

Q.    And you understand, Ms. Cox, that there are petitions that have been multiple days late; correct?

A.    Yes.

Q.    100 days late?

A.    Yes.

Q.    175 days late?

A.    Yes.

Q.    Let's go to Exhibit-- let's go to Exhibit 15.

      First let's go to Exhibit 14 -- I'm sorry -- just to get our head around this.  Exhibit 14 has been admitted into evidence.

      Do you know what this document is?

A.    Yes.  This exhibit is from Brevard County.

Q.    Let me stop you.

How do you know it's from Brevard County?

A.   Because when it was sent to me to review, we actually didn't have a cover sheet, and we went and looked up the individual voter names to see what county it was to then associate it with the correct county.

Q.   So what is -- what is this document from Brevard County depicting?

A.   It's the "Petition Received Report Greater Than 10 Days."

Q.   Okay.  Let's just go to the very first line item.  The voter's name is Bria Harris.

How many days late was that submitted after the signature date?

A.   133.

Q.   What's the next one?

A.   Savannah Johns.

Q.   And the next one?

A.   Jessica Poskus.

Q.   How many days after signature was Savannah Johns?

A.   112.

Q.   And Ms. Poskus?

A.   162.

Q.   And if we just page through this document for a few pages, we see that there are several petitions that were more than 100 days late; correct?

A.   Yes.

Direct Examination - Ms. Meghan Cox

Q.   Let me ask you a little bit about this.

     Do you see that there's a "Reason" column?

A.   Yes.

Q.   And you may see the first one says "misfiled/not registered"?

A.   Yes.

Q.   Do you know what "misfiled" means?

A.   I have a suspicion, but I don't know for sure.

Q.   What's your suspicion?

A.   That it potentially went to another county and it lingered and then it was redirected to the correct county.

Q.   Okay.  Now, what is the sponsor's obligation -- where must the sponsor send the petition?  To which county does the sponsor send the petition?

A.   The sponsor should send it to the correct county on the form.

Q.   So the sponsor -- is the sponsor required to send it to the county listed on the form?

A.   Yes.

Q.   Even if that county is incorrect?

A.   Yes.

Q.   Okay.  What does "accepted" mean, if you know?

A.   That means the county accepted it as a valid signature.

          MR. BURHANS:  Let's go to Exhibit 15, please.

BY MR. BURHANS:

Q.   So when we looked at the Smart & Safe mailing incident report, we looked at the Broward line item.  We saw that there were a number of petitions that -- well, that batch of 852 was delivered on December 1st; correct?

A.   Yes.

Q.   Okay.  So if we look a Exhibit 15 and you look at the voter's signature date on the first page, is there any signature date other than 11-20?

A.   This batch entirely looks like it's all signature date of 11-20.

Q.   At least on this first page; correct?

A.   Yes.

Q.   So they were delivered how many days after the signature date?

A.   11 days.

Q.   So that would be one day late under the ten-day rule; correct?

A.   Yes.

Q.   And if we go to the next page, we see similar entries where many of them are November 20th, but there are other dates; correct?

A.   Yes.

Q.   Okay.  Earlier than November 20th; correct?

A.   Yes.

Q.   So, for example, if we have Vivian Ader, A-d-e-r, just past the halfway point, 11-19-25, that was two days late; correct?

A.   Yes, sir.

Q.   And this exhibit goes on and has -- for several more pages; correct?

A.   Yes.

Q.   And it has similar examples of late-received petitions?

A.   Yes.

Q.   Now, what day was 11-20?  What day of the week was that?

A.   11-20 was a Thursday.

Q.   And so those petitions were dated on the Thursday.

     What day do we presume they were gathered?

A.   Well, we believe they would have come in through turn-in on 11-23, which is a Sunday.

Q.   So it was a Thursday gather, and it was turned in on Sunday the 23rd?

A.   Yes.

Q.   Okay.  So when would it have gotten to Vanguard by for overnighting?

A.   By our records, they were scanned in on the 23rd and 24th, delivered to Vanguard by the 25th.  And then from there, they would have shipped out on the -- they would have shipped out on the 26th.

Q.   Okay.  They were not received by the Supervisor in Brevard until December 1st; correct?

A.    Yes.

Q.    Making them untimely?

A.    Yes.

Q.    Do you have any reason to believe that Brevard is the only one of 67 counties in Florida where this occurs?

A.    No.

Q.    And so this was just one snapshot of one county in time; correct?

A.    Yes.

Q.    This holiday scenario played out over Christmas; correct?

A.    Yes.

Q.    It played out over New Year's; correct?

A.    Yes.

Q.    What is the importance of the time frame of New Year's, Christmas, Thanksgiving in terms of trying to gather petitions and make ballot by February 1st?

A.    Well, the unfortunate part is they fell in the middle of the week.  They didn't fall on a weekend.  So they fell in the middle of the week when offices were closed.

      Now, around the holidays and foot traffic, that's when circulators are out working very hard because they are working around when a lot of pedestrians are out shopping.

Q.    Is that -- is that a busy or slow time for petition gathering?

A.    It is very busy.

Direct Examination - Ms. Meghan Cox

Q.   Just let me check my notes here.

MR. BURHANS:  Let's go to Exhibit No. 13, please.

Can you blow that -- yeah.

BY MR. BURHANS:

Q.   Do you recognize this, Ms. Cox?

A.   Yes.

Q.   What is it?

A.   That is a working budget.

Q.   For whom?

A.   For Groundgame.

Q.   Who created it?

A.   I did.

Q.   Okay.  And I see -- can you explain the two sides of this?

You have a working budget dated 3-15-25 and you have got a revised/proposed budget.  Can you just explain conceptually what are the difference in these budgets?

A.   So a working budget is how I start when I craft a campaign and think of everything I might need in that campaign based on previous experience for budget and forecasting.

When HB 1205 took effect, which is a Friday, I sat down in Florida and spent several days in our office trying to envision what that meant for the campaign both back office and local circulators.  So I pulled the actuals, and we budgeted every week.  Every week we went through what we had spent to date.  And I said, Okay.  Here's what we have spent to date, realizing

I might have been over the budget in some areas; I might have to eat some costs. But there's no way possible I can continue ahead and -- at all and hope to get -- based on what -- everything we knew about what that entailed, hope to stick to that budget and get the same amount of signatures, the same amount of hours as I initially had proposed when I first crafted this budget.

Q. So the initial budget wasn't sufficient to cover what the increased costs would be for HB 1205; is that correct?

A. No.

Q. Okay.

MR. BURHANS: So if we could scroll down a little bit. Here we go.

BY MR. BURHANS:

Q. What's the total budget you had planned for the Smart & Safe campaign prior to HB 1205?

A. It was $13,932,319.

Q. And what change occurred with the budget after 1205?

A. So the --

Q. Just the total -- I want you to start with the total number. We are going to get into the line items.

A. Sure.

The total change that I requested was $4,418,180.

Q. Increasing the budget to what?

A. It would have increased it to $18,350,499.

Q.    Thank you.

So before we get into the numbers, let's talk about a few things that occurred as a result of 1205.

For example, you testified that the petition went from one page to five pages.

A.    Yes.

Q.    Did that increase costs?

A.    Yes.

Q.    Okay.  You also talked about having to have more frequent turn-in times manned by staff; correct?

A.    Yes.

Q.    So I'm assuming that there were costs incurred -- cost increases incurred with that --

A.    Yes.

Q.    -- correct?

And, for example, how did you handle the workflow for the increase in paper from a one-page petition to a five-page petition?

A.    For example, our original printers that we'd budgeted for were leased, but they didn't have staplers.  So knowing that we had to change the entire petition, we had to go out and re-lease new printers that had allowance for staplers.

And then also I think at some point we realized we had leased every single commercial, industrial-sized printer in the state of Florida that was available for lease, and we had to

1138
Direct Examination - Ms. Meghan Cox

start purchasing printers.

The new petition at five pages, even on an industrial-speed printer, took 20 minutes to print 100 petition packets, which is essentially one ream of paper.

Q.   Let's walk through the budget differences a little bit.

So let's start with the background checks, for example.

A.   Uh-huh.

Q.   You're showing that in a bracket.

What does that $27,000 with respect to background checks represent?

A.   I realized at that point we were already over budget.

Q.   Is that a cost that went to Smart & Safe or did Groundgame eat it?

A.   Originally I said I was going to eat that cost.

Q.   Okay.  What about the printers?  There's that $32,000 line item for the printers.

A.   We were also -- we were also easting that cost as well, the original part.

Q.   Okay.  So let's move down a little bit.

We've got -- actually, let's go back to the top just very quickly.

You've got new costs of -- for Airbnbs of $3,600.

What does that represent?

A.   We were anticipating moving around locals into new locations.

Q.   Okay.

A.   So we had out-of-state workers that were currently, like, living in different parts of congressional districts, and we did not have anybody in those areas.  So we were looking for willing circulators that were local Florida residents to relocate temporarily into different parts of Florida into different congressional districts.

Q.   Okay.  And just so I understand the chart here, in the working budget for March 15th, 2025, you had $20,250 budgeted for Airbnb; correct?

A.   Yes.

Q.   But then when we move over to the revised budget, the actual spend for that line item was $14,133.40?

A.   Well, at that point in time, so --

Q.   Yes.

A.   -- on the actuals as of 5/2 we were already at 14,000.  And realizing that we were changing everything midstream, I was asking for a budget increase to that specific area so that we could relocate people into a different part of Florida.

Q.   Understood.

So the only increase above your original budget was the $3,600 occasioned by HB 1205; is that right?

A.   On that line item, yes.

Q.   Okay.  So then we've got the rental car line item for $3,700.

Direct Examination - Ms. Meghan Cox

What's that all about?

A.   Rental cars, we needed more cars.  Before a lot of the local circulators -- they had -- they might be using a friend or family member's car to move people around to other parts of Florida.  We needed to provide transportation, and so we asked for allowances for rental cars.

Q.   Now, if your folks were out in the field moving around large volumes of petitions, did you have to get vehicles to accommodate that?

A.   We had to do that as well.

Q.   Okay.  Is that included in the rental car cost?

A.   Yes.

Q.   Okay.  Let's go down.

We've got airfare for $3,200.  What does that represent?

A.   Airfare in some cases was to send circulators home.

Q.   The nonresidents?

A.   Yes.

Q.   Okay.  And what about the gas for coordinators and auditors, $9,600?

A.   So that we were already seeing increases and were projecting looking at what three-times-a-week trips back and forth from all around Florida would cost, and so we were just analyzing what we currently spent on tolls and gas and making projections of what we would need going forward.

Q.   Okay.  Now, there are two line items:  Office space

processing and office space new.

Processing office space was 5,600 and new office space was 30,000.

Can you briefly explain what that was all about?

A.    Yeah.  So one of the things we quickly realized -- we had several offices of -- our regional offices might have satellite offices just to take in turn-ins.  An example is I had a very large Tallahassee office.  It could sort and do all 67 regional sorts.

And then they had a satellite office in Tampa where they had previously worked with circulators they knew they could hire.  So the satellite office merely facilitated turn-ins, and then they were always bringing them back up to Tallahassee to do the full sort.

Under 30 days, that was fine; but under ten days we could no longer afford to spend the extra time to transport those Tampa satellite petitions back up to Tallahassee and, therefore, we had to invest in larger offices -- that is just one example -- but across Florida that could facilitate the full set of sorting at a regional level several times a week.

Q.    Thank you.

Let's move on to the next line item.  It seems like they're getting bigger here.

$252,000 for lodging for circulators.  Why would you need that if you no longer had out-of-state residents --

nonresidents, rather?

A.   Because the law was signed in on May 2nd, and we had literally just renewed Airbnbs on May 1st.  We utilized Airbnbs because it was far cheaper than hotels.

So, for example, I think that represented 100, 110, 115 people, and it was, like, 100 -- it's relatively low.  It's less than $100 a night when you average it out on a monthly basis.

But that's usually factored in down into my employment line item, and so this had just been a hard cost that I was never going to be able to recoup, and so I was asking for a reimbursement for that.

Q.   Thank you.

Let's go down the page, if we could.

Let's go down to line item for employee -- well, drivers, weekly pay for $70,000.

Please explain that and why it was necessary in light of HB 1205.

A.   So, again, this budget was also based on seven weeks, so this was a seven-week budget and this was planning on now having -- instead of having circulators that could no longer ship in -- like, let's say, I had Pensacola circulators; we had Gainesville circulators.

This is now drivers to drive and pick up turn-ins so circulators could stay out working and not having to spend all of their time driving back and forth to a field office to turn

in their petitions.

Q.    Thank you.  Now, the next one I want to talk about is employee hours including coordinator fees and profit.

A.    Yep.

Q.    That's $4,028,020.  Please explain what that is and why it was necessary in light of HB 1205.

A.    So one of the biggest challenges we had was knowing that a lot of our Floridians were part-time and so we would need to increase both their rate of pay as well as offer hourly bonuses to have them work longer.

We also knew that hiring a lot more local residents meant we're paying for a lot of -- we have to pay for every hour anyway, so it doesn't matter.  Like, whereas a professional circulator you can say, Okay, these guys are going to really work hard, and you can count on them.  If they put in an eight-hour day or a nine-hour day, they're going to actually get a lot of signatures.

Brand-new hires, you might work two hours and get one signature, like, they might work eight hours and get one signature.  We still have to pay every hour that exists.  So this represented knowing that we're going to have to have a lot more extra hours no matter what regardless of -- just because we're going to be dealing with a lot of local hires.  That turnover rate, we're paying for training time; they quit, start again.  They just -- they're collecting a lot less signatures an

hour.

Q.    Now, the post-1205 budget, that was built when?  When did you create this?

A.    The week following, so I think 5/6, 5/7.  I sat down looking at all numbers through 5/2 and was planning and forecasting going ahead.

Q.    Okay.  Now, did you manage the campaign to this budget?

A.    For the most part, yes.

Q.    Now, in particular, the employee hours at 4,028,000, was that the actual spend for this campaign?

A.    It ended up being a little higher than that.

Q.    Do you know how much higher it was?

A.    Because this budget ended up running through into July, it ran to about 4.5, 4.6.

Q.    Okay.  So rather than have 4.4 million increased costs due to HB 1205, it was closer to 5 million; correct?

A.    Yes.

Q.    I'd like to direct your attention to what's been admitted as Exhibit 7.

      Do you recognize this document?

A.    Yes.

Q.    What is it?

A.    This is our Smart & Safe expense tracker shipping invoice.

Q.    Okay.  So I want to focus in just on the post-HB 1205 time period.

So I want to draw your attention to shipment Number 18 dated May 9th, and the shipment type is listed as "UPS Next Day Air Early"; correct?

A.    Yes.

Q.    And the prior shipment, 17, was "Priority Mail Express"; correct?

A.    Yes.

Q.    Okay.  Why was there a change in the shipment type?

A.    Even though Priority Mail Express is USPS's version that says it'll be there between one and three days, we were finding shipments were not getting there.  This is supposed to be the next day version for USPS, and they were not getting there.  They were still held in their facility.

And so after numerous talks with the post office, it was switched over to UPS because -- and, again, Next Day Air Early at the earliest delivery time.

Q.    So when you talked about the USPS not getting there, just to remind the Court, are you referencing or indicating mail delays such as the ones that we saw memorialized in Exhibits 9, 10, 11, et cetera, that we talked about earlier?

A.    Yes.

Q.    Okay.  So you're familiar with Excel, are you not?

A.    Yes.

Q.    Do you know how to use the auto sum function on Excel?

A.    Very well.

Direct Examination - Ms. Meghan Cox

MR. BURHANS:  Okay.  Let's go to demonstrative Number 2.

I think, Counsel, this is where we highlighted --

MR. JAZIL:  No objection.

MR. BURHANS:  Thank you.

Let's go to the next one, please.

BY MR. BURHANS:

Q.   So picking up with the shipment date of May 9th where there was a switchover to UPS Next Day Air Early, is that when the post-HB 1205 shipment started going out?

A.   Yes.

Q.   Okay.  You'll see we've highlighted that shipment, and then we've highlighted the column going down.  Let's go all the way to the end.

You'll see there's a total at the bottom.

What is it?

A.   Spent $435,776.42.

Q.   And that was for overnight shipments to whom?

A.   To the SOEs, the Supervisor of Elections.

Q.   And did you, in fact, do the auto sum function on this demonstrative to come up with that number?

A.   Yes.

Q.   Okay.  How does $435,776.42 for the 2026 campaign relate to the shipping spent for the entirety of the 2024 campaign?

A.   That budget was roughly $42,000 for the entire campaign.

Q.   And how do you know that?

A.   I reviewed the -- I was able to get -- review and do cost comparisons.

Q.   Thank you.

Do you understand that HB 1205 called for an increase in verification fee costs?

A.   Yes.

Q.   And do you know when that would have taken effect?

A.   Roughly the first of October.

Q.   Okay.  So do you know sitting here today how many petitions Smart & Safe gathered and submitted to the Supervisors of Elections after October 1st of 2026 -- 2025?

A.   Roughly 611,800 petitions.

Q.   And how do you know that?

A.   Because I reviewed all the accounts that we had of what was submitted and the verification costs of what were paid.

Q.   Thank you.

If -- do you know how many raw petitions Smart & Safe submitted to the county Supervisors total?

A.   Yes.  It was roughly 1,755,000 and some change.

Q.   And what's the total number needed to make ballot for the 2026 election?

A.   Over 880,000.

Q.   If you were to advise a client in the 2028 election cycle as to how many raw petitions they would need to get to make

ballot -- assuming the numbers are roughly the same, you know, 800,000, maybe 900,000, in there -- what would you think would be a prudent raw signature number to obtain in order to assure the campaign of making ballot?

A.   Well, while we don't know our total numbers from the counties, I would advise my clients, any client, to get a healthy cushion and be closer to 1.9 to 2 million signatures.

Q.   Why so much?

A.   Because HB 1205, it's -- it -- it's taking out so many voters; for example, inactive voters.  Most voters don't know that they're inactive.

And so when they sign the petition and they say, Yes, I would sign that petition, they don't know they're inactive, and so they would have signed thinking that they're a registered voter.

Q.   Is that something you could screen for, though, in advance?

A.   You could.  I would include that -- either take them out of the voter file or highlight them on a chart to tell them they are inactive.  And they fight with you.  They will fight with you.  If you tell them they are not registered to vote, they will fight and say, Oh, yes, I am.  But we'd have to do that anyway.

Q.   Well, in your estimation of what a reasonably prudent buffer would be for gathering signatures, what effect, if any -- is there other requirements of HB 1205, for example, the

petition form requiring the driver's license number or the social security number?

A.   So that has a very big impact, because it's something that we don't have the data to track.  So we do not have the ability to know a voter's last four of their Social or their driver's license or identification number.  And so, therefore, we don't know what's valid.

So somebody could fill out the valid voter and fill out the entire form, and then invert the number on their social security number, thinking, Hey, I don't want to give this person in front of the grocery store all of my information.  Like, I believe it's going to the right place, but what if it's not?  They don't want to provide that information.

Or with Apple Pay, a lot of people run into a grocery store, and they don't even have their driver's license on them.  They left it in the car.  So we don't have the ability to ask them to pull out their license to write it down.

So oftentimes we've seen -- and I've seen this in other states, too, when they have had and subsequently removed that part about having the ID, is that people might invert the numbers.  And we do not know as a campaign committee that they are doing that.  We have no way to check.

So on our end, everything that we screen, everything that we see, we believe that that is a valid voter and those signatures should be counted.  We have no idea if they have

inverted those numbers or not or give us incorrect information.

Q.   As a professional campaign manager conducting field operations such as this, would you have any trepidation about the Legislature changing the law again midstream in the next cycle?

A.   Absolutely.

Q.   Now, I want to make sure I understand your testimony a few minutes ago.

We talked about the budget increase of nearly $5 million caused by HB 1205; correct?

A.   Yes.

Q.   We also talked about more than $400,000 in increased shipping costs occasioned by HB 1205; correct?

A.   Yes.

Q.   We also know that the verification costs have gone up significantly; correct?

A.   Yes.

Q.   As a matter of fact, are you aware that the parties have stipulated that the average pre-HB 1205 petition verification fee was, I think, 87 cents each?

A.   Yes.

Q.   And then the post-HB 1205 average was $3.37?

A.   Yes.

Q.   Okay.  That's a big increase, isn't it?

A.   Yes.  That's not even accurate.

Direct Examination - Ms. Meghan Cox

Q.   Well, I'm going to stop you there.  We don't have to get into the accuracy of -- what do you mean -- let me ask you: What do you mean by that?

A.   Well, when we --

MR. BARDOS:  Objection, Your, Honor.  This is a stipulated number that the parties have agreed to and now --

MR. BURHANS:  I'll withdraw.  I'll ask a new question.

THE COURT:  Wait.  Don't talk to each other.  Talk to me.

MR. BURHANS:  I'm sorry.  Yeah, I understand his point.

THE COURT:  He's withdrawn the question.

MR. BARDOS:  Yes, Your Honor.  Thank you.

BY MR. BURHANS:

Q.   You know -- I'm just asking you yes or no:  Do you know whether the parties in this case stipulated as to those two pre-HB 1205 and post-HB 1205 petition fees?

A.   Yes.

Q.   Do you know sitting here today what Smart & Safe paid on average per petition --

A.   Yes.

Q.   - post --

A.   I have all verification costs for both signatures and SOE submissions, and that average number was $3.64.

Q.   Thank you.

Direct Examination - Ms. Meghan Cox

Post-HB 1205?

A.   Yes, October 1st through January 30th.

Q.   So we talked about the increase in the budget by 5 million. We talked about the increase of --

THE COURT:  Counsel, I just have to --

MR. BURHANS:  I'm sorry.

THE COURT:  You said that -- but I just want to make sure, because I don't think I was hearing things.  I thought your testimony was you actually increased the budget by 4.4 million was your ask.

Did I get that wrong?

THE WITNESS:  That was the original ask, but what that -- we ended up having to ask for more and it ended up being closer to 5.

THE COURT:  Okay.  I got it.  Thanks.

BY MR. BURHANS:

Q.   Do you recall when you asked for more money for the budget?

A.   Right around July 1st.

Q.   Okay.  Do you recall specifically how many that was?

A.   It was another 600,000.

Q.   Thank you.

So we have those increased costs.  We talked about shipping cost, the verification fees, the increases.

What effect did that have on Smart & Safe's ability to go out and talk to voters?

Direct Examination - Ms. Meghan Cox

A.   It took away from those budgets.  Smart & Safe had dedicated budgets that it had for -- specifically for petition collection.  And it had dedicated budgets it would have for commercials and for the rest of campaign communications.  So it took away from the other budgets.

MR. BURHANS:  Madam Court Reporter, I may have missed part of the response.  Can you read back the response for me, please?

(The requested portion of the testimony was read back by the court reporter.)

BY MR. BURHANS:

Q.   So if I understand you correctly, having to spend more money on petition circulating efforts took money away from the ability to engage in other forms of communication such as advertising; correct?

A.   Yes.

Q.   What types of advertising are you generally familiar with in campaigns such as this?

A.   You would run digital campaigns, texting campaigns, commercials, mail campaigns, to expressly communicate about the initiative.

Q.   Would you characterize those as mass communications?

A.   Yes.

Q.   And the circulation communication is one-on-one; correct?

A.   One-on-one communication.

Q.    Thank you.

My friends with the State might ask why not just raise more money and spend more money?  Doesn't that solve the problem?

A.    If only it were that easy.  This wasn't an unlimited budget.

Q.    Did Groundgame ever ask for other increases in the budget beside the 600,000 we talked about earlier?

A.    Yes, several times.

Q.    Okay.  Why don't you give us a few examples of that.

A.    First example would have been right around Christmas, and knowing that so many staff wanted to take the time off for holidays, we asked for a Christmas bonus to encourage staff members to put in ten hours on Christmas Eve.

Q.    Do you know what that expense would have been?

A.    We projected between 100 and 125,000.

Q.    And was that expense approved or denied?

A.    It was denied.

Q.    Why was it denied?

A.    There was not funds for that.

Q.    Okay.  Were there any other examples of where Groundgame had sought to increase the budget to communicate more out in the field?

A.    Earlier in December there was another large request to look on increasing numbers throughout all the different congressional districts in both staff, labor hours.  And that was a

significant request.  I think -- I can't recall right off the top of my head, but it was around 10 or 12 million.

Q.   And you said that was early December.  Was there an associated time frame for that budget to be deployed to get petitions by a certain date?

A.   We were hoping to have every -- to have that budget completed and have as many signatures in the door to SOEs by December 31st.

Q.   Was that request for approximately 10 or $12 million approved or denied?

A.   Denied.

Q.   Okay.  Were there any other examples of where Groundgame made funding requests to increase the communications with voters?

A.   I asked for another million throughout the month of January.

Also, we were having major fatigue with circulators.  There was rain; there was weather, and we were trying to get more bonuses approved to -- for hourly bonuses to encourage people to work longer.  So we were able to track the data and, say, if I put an hourly bonus out and you work ten hours and you get a significant bonus, those part-time workers would go out and work those full ten hours.  And those would mean more voter communications and more signatures.

Q.   And was that budget increase approved or denied?

A.    Denied.

Q.    Why?

A.    There just wasn't room in the budget.

Q.    As the CEO of Groundgame managing the paid circulator program, why did you make those funding requests?

A.    I made those funding requests because I knew, looking at the data, that having those extra funds approved -- and I don't want to say that -- whenever I would ask for some of these significant ones there was no profit in it for me.  So bonuses were paid out directly on hours back out.  This was no profit on that for me.

So what it was, was to increase the amount of labor hours, man-hours in the field in order to increase our communications in order to obtain more petitions.  So all of those were all about getting people out to work and just squeezing every ounce out of them to talk to as many people as possible.

Q.    Thank you.

MR. BURHANS:  Your Honor, at this point in time we are getting into the final segment of my examination.  And we are going to be moving on to the discussion of the nonresident circulator prohibition and, in particular, your brilliant preliminary injunction.

BY MR. BURHANS:

Q.    So, Ms. Cox, you recall that this Court entered a preliminary injunction against the enforcement of the

nonresident circulator prohibition; correct?

A.   Yes.

Q.   And after we wept our tears of joy, what happened next?

A.   We immediately sought to bring back top circulators who were really good, had really high validity; we saw their numbers from before, really good, ones I knew could put in long hours and ones that had maintained high validity throughout the campaign --

Q.   How many --

A.   -- before HB 1205.

Q.   Thank you.

How many of those circulators were you able to bring back?

A.   Based on budget and based on constraints, 45.

Q.   So a little less than 10 percent of the original nonresident workforce?

A.   Yes.

Q.   Okay.  What were some of those -- you mentioned budget.

What were the other constraints you were alluding to?

A.   Just -- circulators were afraid to leave a current job they had.  A lot of them already took other initiative jobs, and if they left and something were to happen -- like, they were afraid of -- they were afraid of all the news -- like we were reading all these stories in the news, and, like, what if you make, you know, a small mistake or you don't get your petition on time, what kind of liabilities are they going to be liable to if --

for anything regarding all the different rules around HB 1205, like honest mistakes.

Q.   So when you brought back these 45 nonresident circulators, were they required to register with the State?

A.   Yes.

Q.   And how did that work?

A.   First thing is we contacted the -- they contacted the Secretary of State and asked to register.  And while there was a notice on the Secretary of State's site they could register, the form didn't actually allow them to register with an out-of-state address.

Q.   Was that ultimately fixed?

A.   It was fixed.  It took about a week of back and forth.  So an out-of-state circulator, it took them -- it took most of them over a week to actually get into the field.  They ended up communicating with the Secretary of State directly, emailing their information in.  Ultimately they took their test and the Secretary of State had to issue that petition to them.

Q.   Okay.  So just to refresh the discussion earlier, was it basically the same process; they took the test; they got their individual circulator number; they were issued the individual petitioner form; correct?

A.   Yes.

Q.   And it had the same information that we talked about earlier; their name, their address, their circulator number,

their bar code --

        (Reporter requests clarification.)

A.    Yes.

BY MR. BURHANS:

Q.    Okay.  Thank you.

        Silly question, I know, but why were the nonresident circulators issued petitions during the injunction period?

A.    Because according to injunction they were now allowed to work in the state of Florida.

Q.    To carry petitions; is that right?

A.    To carry petitions, correct.

Q.    Thank you.

        So if Smart & Safe Florida were told that petitions gathered by nonresident circulators during the injunction period would later be invalidated by the State, what, if anything, would Smart & Safe have done?

A.    We would have absolutely not have brought back out-of-state circulators and wasted the money on that.

Q.    Now, you understand that at some point the appellate court stayed this Court's injunction; correct?

A.    Yes.

Q.    And do you know what, if anything, the Secretary did with respect to the petitions that had been gathered by nonresidents during the injunction period and verified as valid by the Supervisors of Elections?

A.    Well, they didn't communicate to Smart & Safe, for starters.  They went out and issued reports to the SOEs to start invalidating their signatures without telling us.

Q.    When -- do you know when Smart & Safe learned of that?

A.    We learned on a tip, and we went and requested information on it.

Q.    Okay.  And do you know whether that was within the past month, two months?

A.    Yeah, it was in the past, like, month and a half.

Q.    Okay.  Do you know how many petitions that were gathered by nonresident circulators during the injunction period that were verified as valid by the county Supervisors but were invalidated pursuant to the Secretary of State's order?

A.    Approximately 28,000.

Q.    Did Smart & Safe have to pay the verification fee for those petitions?

A.    Yes.

Q.    Sitting here today, does Smart & Safe know the final count of signatures verified by the county Supervisors and reported to the Secretary of State?

A.    No, we do not.

Q.    Why not?

A.    For staters, several counties have not reported their final numbers of those that are verified and, two, there is pending litigation.

Q.   Meaning what about the pending litigation?

A.   There is pending litigation regarding both the injunction circulators as well as the inactive voters.

Q.   Okay.  Thank you.

Does Smart & Safe plan to pursue -- if Smart & Safe doesn't make the 2026 ballot with Petition 25-01, do they plan on pursuing it again in 2028?

A.   Unknown variables.  So for one, it would be pending litigation on HB 1205, and, two, budget constraints.  For example, we don't know yet how many fines and fees there are to face, and it could be cost prohibitive.

Q.   If you could just encapsulate what the impact of the ten-day delivery requirement on Smart & Safe's ability to communicate with voters was.

A.   Significant increases, just cost alone, just significant costs.  So not only did we have less time in the field to communicate with voters, it was a significant cost increase across the board.

Q.   And, similarly, just encapsulate the impact of the nonresident circulator prohibition on Smart & Safe's ability to communicate with voters in the field.

A.   It took away a very stable workforce of full-time workers and moved to a very unstable workforce of a constant turnover -- hiring, training, turnover of part-time workers that, Well, great.  They just didn't have the same -- it was just a

consistent unstable -- instability in our workforce.

Q.    Thank you.

MR. BURHANS:  I have no further questions, and I pass the witness.

THE COURT:  Okay.  It's been about an hour, so we are going to take a break.  I've got -- and you're not limited to this, but I had, Mr. Jazil, you doing the cross.  Is that correct?

MR. JAZIL:  Your Honor, that's correct.

But I've been told by my friends for the Attorney General's office, RPOF, and the Supervisors also have questions.  Their crosses will be substantially shorter than mine.

THE COURT:  So what order are y'all going in?

MR. JAZIL:  Your Honor, what order would the Court prefer?

THE COURT:  I don't care.

MR. JAZIL:  I'll go first.  Mr. Stafford, Ms. Price, and I think Mr. Bardos is the shortest cross, if Mr. Bardos is amenable to it.

THE COURT:  Okay.  All right.

Well, we'll take a break, and when we come back, how long -- and this is not a trick question.  How long will your, to borrower your colleague's adjective, brilliant cross last?

MR. JAZIL:  Well, Your Honor, if Ms. Cox and I dance well together, hopefully I'll get through in 40 minutes, and

then I can pass the witness to my friends.

THE COURT: I'm just trying to figure out, because I don't want another witness to stick around if we are not going to get to them. That's the only reason I'm asking.

Best guess, Mr. Stafford?

MR. STAFFORD: Ten to 15, Your Honor.

THE COURT: Best guess, Ms. Price.

MS. PRICE: Five to ten.

MR. BARDOS: Five to ten, Your Honor.

THE COURT: All right. So we -- and the other witness, Patricio, how long is that going to be?

MR. KOVACS-GOODMAN: 30 minutes on direct, Your Honor.

THE COURT: And, Mr. Kovacs-Goodman, how -- is that by Zoom or is she here?

MR. KOVACS-GOODMAN: By Zoom, Your Honor.

THE COURT: And is she waiting around for us?

MR. KOVACS-GOODMAN: I --

THE COURT: Here's why I'm asking. I try not to inconvenience folks. I just did a criminal trial where I had law enforcement sitting outside that there was no way we were going to get to them, so I'd say come back the next day because I didn't want three deputies sitting outside in the witness room for three hours when there is no way we were getting to them.

It sounds like we're going to be closer -- by the time we do this and any redirect, it's going to be close to 5:00 and

I'm breaking at 5:00.

So let me just -- I'm just going to call it.  We are not going to get to her, so let's notify her, and then y'all can rearrange; okay?

MR. KOVACS-GOODMAN:  Yes, Your Honor.

THE COURT:  Thank you.  And I'm not -- doing that not to be difficult, but I'm trying to be respectful of that witness' time.

So we'll take a ten-minute break and come back, and we'll start with the crosses.

(Recess taken at 3:33 PM.)

(Resumed at 3:43 PM.)

THE COURT:  You can begin your cross, please.

CROSS-EXAMINATION

BY MR. JAZIL:

Q.   Good afternoon, Ms. Cox.

A.   Good afternoon, Counsel.

Q.   So I'd like to start off where my friend left off.

Does Smart & Safe have a political committee active to try to get on the 2028 ballot?

A.   That is -- I do not know yet.

Q.   Okay.  Fair enough.

And, ma'am, you were introduced earlier in your direct as the corporate representative for Smart & Safe.

Do you remember that?

A.    Yes.

Q.    You told us that you're actually CEO of a company called Groundgame Political Solutions, LLC; is that right?

A.    That's correct.

Q.    And that company is registered in Delaware; right?

A.    Yes.

Q.    And you're based out of Phoenix, Arizona; right?

A.    Yes.

Q.    That's where you worked on the McCain campaign initially?

A.    Yes.

Q.    And you flew out here from Phoenix for this trial; right?

A.    Yes.

Q.    And you flew out here from Phoenix for a deposition in this case; right?

A.    Yes.

Q.    You're also running a company called Impact Advocacy Group; right?

A.    Yes.

Q.    And that, too, is based out of -- is registered in Delaware; correct?

A.    Yes.

Q.    And when you do work for Impact -- when you, yourself, do work for Impact Advocacy, you do it out of your office in Phoenix; right?

A.    My home.

Q.   Your home in Phoenix?

A.   Yes.

Q.   Okay.  Now, Impact Advocacy, one of your companies, does not have a contract with Smart & Safe; right?

A.   No.

Q.   In fact, Groundgame doesn't have a contract with Smart & Safe either; correct?

A.   Correct.

Q.   Smart & Safe -- pardon me.

     Groundgame has a contract with a company called Vanguard Field Strategies; right?

A.   Yes.

Q.   Vanguard Field Strategies is, then, the client for Groundgame Solutions, LLC?

A.   Yes.

Q.   And Vanguard Field Strategies is a company run by a gentleman named Joe Williams?

A.   Yes.

Q.   And you know Joe Williams?

A.   Yes.

Q.   And Mr. Williams hired your company to work on this initiative; true?

A.   Yes.

Q.   And Mr. Williams works out of Texas; right?

A.   Yes.

Q.   And do you know whether Mr. Williams got approval to hire you from a gentleman named Robert Uithoven at Axiom?

A.   I do not know.

Q.   You do not know.

     If you are asking for more money for this particular project for Smart & Safe, do you go through Joe Williams?

A.   I ask Joe Williams.

Q.   And do you know whether Joe Williams has to ask someone else?

A.   I don't know.

Q.   Okay.  Now, getting back to your company, your company itself does not contract with individual circulators; right?

A.   Yes and no.

Q.   Okay.  So let's explore that.

     My understanding is that your company works with coordinators; right?

A.   Yes.

Q.   And these coordinators are separate companies; right?

A.   Yes.

Q.   And you have three main coordinators for the Smart & Safe initiative; right?

A.   Yes.

Q.   And these coordinators then have subcoordinators; true?

A.   Yes.

Q.   And one of your three main coordinators -- you have three

main coordinators; right?

A.   Yes.

Q.   And one of your three main coordinators is a company called Let the Voters Decide; right?

A.   Yes.

Q.   And so Let the Voters Decide then has contracts with other subcoordinators; right?

A.   Yes.

Q.   And Let the Voters Decide has approximately ten subcoordinators; right?

A.   Yes.

Q.   Okay.  And the coordinators do hire circulators; right?

A.   Yes.

Q.   And the subcoordinators hire circulators, too; right?

A.   Yes.

Q.   Does your company Groundgame specifically hire a petition circulator to collect petitions on behalf of the Smart & Safe initiative?

A.   Every single person post-HB 1205 that is a Florida resident had to be registered as a circulator.

Q.   Okay.

A.   Now, they have also collected signatures.

Q.   Okay.  So are you saying that your company does hire individual circulators post-HB 1205?

A.   Every single one of my managers had to be a registered

Florida circulator.

Q.   Okay.  So your managers who work for you --

A.   Uh-huh.

Q.   -- at Groundgame, LLC, have registered as petition circulators?

A.   And back-office staff, yes.

Q.   And back-office staff?

A.   Yes.

Q.   But the individuals you have out in the field collecting signatures, did your company hire them?

A.   No.

Q.   Okay.  So taking aside and -- putting aside, rather, the managers that work for Groundgame and the back-office staff for Groundgame -- you with me so far?

A.   Uh-huh.

Q.   Put those aside.

     You've got circulators who can be hired by subcoordinators; correct?

A.   Yes.

Q.   And the subcoordinators are hired by the coordinators; correct?

A.   Yes.

Q.   And the coordinators are hired by your company Groundgame, LLC; right?

A.   Yes.

Q.    And Groundgame, LLC, is hired by Joe Williams' outfit, Vanguard Field Strategies; right?

A.    Yes.

Q.    Okay.  And Vanguard Field Strategies, do you know whether or not Vanguard Field Strategies has a direct contract with Smart & Safe or not?

A.    I believe they do.

Q.    They do.

      But you don't know whether or not Mr. Williams for Vanguard has to communicate with Mr. Uithoven at Axiom, you don't know that?

A.    I do not know.

Q.    Okay.  Got it.

      Do now know what Axiom is?

A.    Yes.

Q.    Where is Axiom based out of, ma'am?

A.    I don't know where they're registered LLC-wise.

Q.    Okay.  But do you know whether they're based out of Missouri?

A.    I don't know.

Q.    Axiom is a national consulting firm; true?

A.    Yes.

Q.    They do work all over the country; right?

A.    They do.

Q.    And they're not based out of Florida; right?

A.    I don't know.

Q.    Okay.  Fair enough.

      Now, ma'am, you got paid for your work for Smart & Safe; right?

A.    Yes.

Q.    And between March 2025 and December 2025, which is when you were deposed, your company Groundgame received approximately $24 million to work on the Smart & Safe 2026 initiative; right?

A.    Yes.

Q.    That contract has now ended; right?

A.    Yes.

Q.    And you guys had a major push to get enough signatures before February 1; true?

A.    Yes.

Q.    So you were paid for that work; right?

A.    Yes.

Q.    So how much has your company been paid for its initiative work for Smart & Safe between March 2025 and now?

A.    I believe 35 million.

Q.    Got it.

      Now, ma'am, you also talked with my friend earlier about some of the work you did on other initiatives around the country; right?

A.    Yes.

Q.    You mentioned an initiative in 2016 in Florida; right?

A.   Yes.

Q.   You also worked for the opposition campaign for another initiative in Florida related to gambling; true?

A.   Yes.

Q.   And that was in 2022; right?

A.   Yes.

Q.   And you and Groundgame were working for the Seminole Tribe of Florida on that project; right?

A.   That was not my direct contract.

Q.   Were you working on behalf of the Seminole Tribe of Florida on that project?

A.   Yes.

Q.   But you did not collect any signatures for that particular project; correct?

A.   No.

Q.   But y'all were still working to oppose the gambling initiative; right?

A.   Yes.

Q.   You were messaging around the initiative; right?

A.   Yes.

Q.   You were educating voters about the initiative; right?

A.   Yes.

Q.   You were talking to them about the initiative in high-traffic areas; right?

A.   No.

Cross-Examination – Ms. Meghan Cox

Q.   You did not table?

A.   No.

Q.   You did not make signs?

A.   Not under my contract.

Q.   You did not pass out literature?

A.   No.

Q.   You didn't do this at farmer's markets?

A.   No.

Q.   You didn't do this at fairs?

A.   No.

Q.   You didn't do this at football games?

A.   No.

Q.   You didn't do this anywhere where there was high traffic?

A.   No.

Q.   Okay.  Can we go to Ms. Cox's deposition.

If we can go to page 26, line 8 to 13 first.  That's just to lay out the work y'all did for Seminole Tribe.  It says:

*Question:  Ma'am, how does working against an initiative differ from working for an initiative?*

*Answer:  And, I'm sorry.  I did misstate that.  So in Florida we did not collect signatures.  I did an analysis on putting together ballot measures for the Seminole Tribe.*

Do you see that?

A.   Yes.

Q.   Then we keep going on, line 16 to 18:  *We did opposition*

*that did not collect signatures.  We were opposed to the initiative gaming issues in Florida.*

Do you see that?

A.    Yes.

Q.    Now, when we go to page 27, line 15 -- pardon me -- line 5:

*When you say educate voters, how did you educate them?*

*Answer:  We educated voters by having people on the street and talking about the issues.  We also looked for violations within all the different circulations -- circulators of the opposing measures and looked to see if they were violating the law.*

*Question:  And so when you say "we spoke to," was it you and the team that spoke to voters in Florida against the initiative?*

*Answer:  I would say that we hired a lot of people to speak to voters.*

*Question:  How many?*

*Answer:  Several hundred.*

And this is ultimately (indiscernible) context.  Now, here's the question --

(Reporter requested clarification.)

BY MR. JAZIL:

Q.    Pardon me.

This is line 19.

*Question:  And to speak to voters, would you walk up to*

*voters at, say, a Publix parking lot and talk to them about the*

*initiative, or what form?*

*Yes.  They had tables out.  They had signs.  They had*

*literature, and they'd talk to any voter that was interested*

*about the issue.*

Do you see that?

A.   Yes, I do.

Q.   Okay.  And did you y'all win any awards for your work on this opposition campaign?

A.   We won an award as part of the whole campaign.

Q.   And that award was for what?

A.   It was for just the campaign in the ballot initiative section.

Q.   For educating voters on the issue and try to convince them to vote no on this particular initiative?

A.   We were included as part of the campaign team, yes.

Q.   And this award was your attempt to convince voters to vote no on the campaign; right?

A.   Yes.

Q.   And did y'all get paid for that opposition work?

A.   We did.

Q.   How much?

A.   I actually don't remember.

Q.   More than a million dollars?

A.   Yes.

Q.   But, again, you didn't collect any signatures for that
effort; correct?

A.   No.

Q.   Ma'am, you've worked on citizen initiative campaigns in
other states is what I heard; right?

A.   Yes.

Q.   My understanding is you've worked on over a dozen states
that actually have the citizen initiative method; right?

A.   Yes.

Q.   And you're familiar with the validity rates for signatures
from state to state; right?

A.   Yes.

Q.   In your estimation, the highest validity rates tend to be
in states like Massachusetts and Nebraska?

A.   Yes.

Q.   Those are the two states that come to mind as states with
high validity rates; right?

A.   Yes.

Q.   And by that I mean more of the raw signatures are accepted
as valid in those two states; right?

A.   Yes.

Q.   And then there are states that fall on the other end of
that spectrum; right?

A.   Yes.

Q.   And those states are Kentucky and West Virginia; right?

A.   Yes.

Q.   That's where more of the signatures get rejected from the raw number; right?

A.   Yes.

Q.   And Florida is in the middle; right?

A.   It's probably lower than the middle.

Q.   It's lower than the middle?

A.   Yes.

THE COURT:  Mr. Jazil, before you do that, let me educate everybody in my courtroom.  The way this is done -- because it hasn't been done right since y'all have been here.  To impeach a witness with a deposition, you first ask them, Didn't you tell me X at your deposition?

If they then deny it, you then confront them with the deposition and all the predicate question.  That's the way to impeach somebody with a deposition.

I know we don't have a jury present, but if everybody in the courtroom -- because the plaintiffs, I'm sure, will do it, too -- will follow the proper protocol for impeaching a witness.

BY MR. JAZIL:

Q.   So you were deposed in this case, ma'am?

A.   Yes.

Q.   You were under oath; right?

A.   Yes.

THE COURT:  You don't have to ask her that.  That's what you do next.  You say, At your deposition did you say X?  If she says no, you then ask her the follow-up questions.

This is not a CLE, but we're going to follow the rules.

MR. JAZIL:  Understood.

BY MR. JAZIL:

Q.   So, ma'am, at your deposition did you say that Florida, in your experience, tends to fall in the middle of that validity continuum?

A.   I thought it did at that point in time.  I've since changed my opinion based on seeing what the counties have submitted back to us.

Q.   What's a good validity rate in your mind?

A.   One more time.

Q.   What's a good validity for circulators?

A.   Good validity rate is 80 percent and above; 75 to 80 percent.

Q.   Ma'am, before HB 1205 was passed, you were training circulators before sending them into the field; right?

A.   Our firm was, yes.

Q.   And every petition circulator was required to attend a training?

A.   They were required to have a training.

Q.   Training was essential; right?

A.    Yes.

Q.    And the trainings lasted about 45 minutes to an hour; right:

A.    Give or take.

Q.    And before circulators were sent out into the field, there were background checks done?

A.    Yes.

Q.    And as a general matter you all weren't hiring felons to work on this initiative; right?

A.    Yes.

Q.    Meaning you were not hiring felons; correct?

A.    Well, it was -- before HB 1205, it was protocol that we ran background checks on everything.  And if somebody did have a felony, we looked at that individual circulator, especially if we knew them, and let's say they had a really old felony and they were a good circulator -- I've had a born again circulator who's very impassioned with his church; the felony was from over 20 years ago, and Smart & Safe said, Yes, that person can circulate.  So on occasion on a case-by-case basis they did allow circulators with a felony to circulate.

Q.    Got it.  But as a general rule, felons weren't being hired; right?

A.    Again, it was a case-by-case basis.  Several circulators were allowed to circulate that had felonies pre-HB 1205.

Q.    How many circulators worked on this project?

A.   Start to finish, approximately 2600.

Q.   And how many had felony convictions?

A.   Maybe a dozen.

Q.   Now, you were asked by my friend Mr. Burhans about the forms that are being used by petition circulators and how they are longer than the previous forms; right?

A.   You mean the petition form itself?

Q.   Yes, ma'am.

A.   Yes.

Q.   Because the petition text is being included; right?

A.   Yes.

Q.   And who wrote the petition text?

A.   I would believe Smart & Safe legal counsel did.

Q.   So the sponsor wrote the text; right?

A.   Yes.

Q.   And if the text is five pages long, it's because that's how the sponsor wrote the text?  The sponsor wrote five pages worth of text; right?

A.   Yes.

Q.   And, ma'am, prior to HB 1205 taking effect, was there a mail campaign by Smart & Safe to try to get petitions for this initiative?

A.   Yes.

Q.   And 5.6 million petitions were mailed to Florida voters; right?

A.   Yes.

Q.   And approximately 250 to 300,000 were returned and counted as valid; right?

A.   I don't know the exact number.  I think it was a little bit lower than that.

Q.   A little bit lower than 250?

A.   Yes.

Q.   But in that ballpark?

A.   Yes.

Q.   And in those mailers, the petition was sent out; right?

A.   Yes.

Q.   A return envelope was sent out; right?

A.   I don't know specifics on the mail.

Q.   Do you know whether the constitutional text was sent out?

A.   I don't know specifics on the mail.

Q.   Do you know whether those petitions that were initially counted were later rejected?

A.   I was aware they were rejected.

Q.   So those approximately 250,000 petitions that were initially counted were later rejected; right?

A.   Again, I don't know number.

Q.   You don't know the exact number --

A.   No.

Q.   -- but you'd agree with me that the ballpark is about 250,000?

A.    I heard it was lower than that.

Q.    Lower than 250,000?

A.    Yes.

Q.    What's your understanding of what that number is?

A.    Approximately 200,000.

Q.    Approximately 200,000.

      If y'all had those approximately 200,000 petitions count, would you have met the constitutional threshold to get on the ballot in 2026?

A.    Yes.

Q.    We talked a bit about the Home Cultivation of Medical Marijuana.  This was the second initiative.

      Do you recall that?

A.    Yes.

Q.    Does anything in Florida law prohibit the people behind the Smart & Safe entity from creating another political entity to run this Home Cultivation of Medical Marijuana initiative?

A.    I don't believe so.

Q.    So someone can create a Smarter & Safer political committee and run this initiative?

A.    I don't know.

Q.    Do you know of any impediments to doing that?

A.    Well, I'm not sure by law if they could have the same chairman, the same treasurer.  Like, I'm not sure those specifics of the law.

Q.   But you do know that a separate political committee can run this initiative; right?

A.   It's possible.

Q.   Ma'am, you were talking about how after HB 1205 went into effect your collection rate was cut down to 15,000 petitions per week.

Did I understand that right?

A.   Yes.

Q.   And this was from June to December; did I understand that right?

A.   June to roughly October.

Q.   June to October your -- this is a raw petition collection rate --

A.   Correct.

Q.   -- was cut down to 15,000 raw petitions per week; right?

A.   We did have more during the injunction period.

Q.   Okay.  So 15,000 is the average of that period?

A.   Average.  Give or take.

Q.   So you guys were collecting 15,000 petitions per week in May?

A.   Yes.

Q.   15,000 petitions per week in June?

A.   I believe so.

Q.   The same is true for July?

A.   I don't have my Excel spreadsheet, but I believe so.

Q.    And same all the way through October; right?

A.    Nope.  Until the injunction period, and that did increase for several weeks.

Q.    Okay.  So it went up, not down, during the injunction period?

A.    Barely.

Q.    Okay.

A.    It went up, but then it went back down again.

(Reporter requests clarification.)

A.    I said it went up during the injunction period when we were loathe to have out-of-state circulators to come back and circulate.  We were able to add in more full-time workers, but then it went back down again after they were no longer allowed to be here.

BY MR. JAZIL:

Q.    Understood.

And, ma'am, how many petitions were y'all collecting November through January?

A.    We had additional budget approved and funding increase, so we went up to, I believe, 25,000 and 30,000 signatures a week.

Q.    In November through January?

A.    Yes.

Q.    Okay.  And you had additional budget to go get these additional signatures; true?

A.    Yes.

Q.   Ma'am, do you also know that there was a door-to-door canvassing effort going on to collect signatures for this initiative?

A.   Yes.

Q.   And that was being run by Vanguard Field Strategies; right?

A.   Yes.

Q.   And their goal was to knock on over 100,000 doors; right?

A.   Yes.

     (Reporter requests clarification.)

BY MR. JAZIL:

Q.   They had -- their goal was to knock on over 100,000 doors; right?

A.   Yes.

Q.   And they had over 100 people working on this?

A.   I don't know how many people they had.  I know approximately how many man-hours they had.

Q.   How many man-hours did they have?

A.   20,000 man hours.

Q.   20,000 man-hours to knock on --

     (Reporter requests clarification.)

BY MR. JAZIL:

Q.   So 20,000 man-hours to knock on over 100,000 doors; right?

A.   Yes.

Q.   And were you involved in the decision to set the budget for that door-to-door canvassing effort?

A.   No.

Q.   Do you know whether or not as part of that door-to-door canvassing effort anyone was collecting a signed petition versus giving a form?

A.   I believe --

     (Indiscernible crosstalk.)

A.   -- that they were dropping off the form.  They were not collecting them.

BY MR. JAZIL:

Q.   Understood.

     And do you know how many signatures were collected from that canvassing effort?

A.   The ROI was absolutely terrible, and it collected less than 10,000 signatures with 170,000 approximate doors knocked.

Q.   So it collected 10,000 signatures?

A.   Less than 10,000.

Q.   "Less than 10,000," meaning zero, or less than 10,000 --

A.   I believe it was, like, 9 -- I'd say 9,800-ish.  Less than 10,000.  It was a rate of 0.42 an hour.  It was an ROI that we could not continue.

Q.   And when was this door-to-door effort done?

A.   I'm not quite sure the time frame.  It was a test.

Q.   Was it done during the holiday season?

A.   I don't know exactly the time, the dates.

Q.   So you can't tell me if it was done Thanksgiving or

Christmas?

A.   Unfortunately, I don't remember the exact dates.

Q.   Ma'am, I'd like to change gears for a moment.

MR. JAZIL:  And, Your Honor, if I may approach the witness and hand her a copy of certain exhibits?

THE COURT:  You may.

MR. JAZIL:  It will be Defendants' Exhibit 194, Defendants' Exhibit 195, Defendants' Exhibit 196, Defendants' Exhibit 158, Defendants' Exhibit 160, Defendants' Exhibit 161 -- 159 to 162.

THE WITNESS:  Thank you.

BY MR. JAZIL:

Q.   Ma'am, I'd like to start with 194.

A.   Okay.

Q.   This -- you see where it says on the top "Back end MJ"?

A.   Yes.

Q.   Do you recognize this text, ma'am?

A.   Yes.

Q.   And this is a text thread that includes you; right?

A.   Yes.

Q.   And a gentleman named Raj; right?

A.   Yes.

Q.   And it includes a gentleman named Matt Cohen; right?

A.   Yes.

MR. JAZIL:  Your Honor, I'd like to move 194 into

evidence.

MR. BURHANS:  Objection, Your Honor.  Hearsay.

MR. JAZIL:  Your Honor, these are party statements. It's a text thread that includes her, includes her team, and they are talking about how to go about doing their business.

MR. BURHANS:  I don't know exactly who -- I know he references Ms. Cox as being on the text chain.  I don't know that each of these people -- what it means that they are on her team, if they are field circulators or subs --

THE COURT:  Hold on.  Let's start with her statements.

MR. BURHANS:  Yes.

THE COURT:  Why her statements -- why do her statements not come in as a statement of a party?

MR. BURHANS:  Well, Groundgame is not a party.  And --

THE COURT:  You designated her as a 30(b)(6) witness, didn't you, or not?

MR. BURHANS:  Yes, on certainly topics.  But this conversation was not as -- she wasn't doing this in a corporate representative capacity.

And, Your Honor, I'm not -- I'm not concerned about any of the texts, and I'm not concerned about Ms. Cox's communications coming in, but I'd like to see some foundation as to these other folks and whether they --

(Indiscernible crosstalk.)

THE COURT:  Well, the other statements are going to

come in, so -- in context. Just like a defendant's statement came in last week, all their text messages, even though the people they are exchanging text messages were not coconspirators or were not codefendants. So it's to explain the statements that would otherwise come in.

So I can just tell everybody, I'm going to let it in because I can separate out the wheat from the chaff on -- her statements are going to come in. And the other statements are going to come in only so that it explains her statements.

MR. BURHANS: I understand your ruling, Your Honor.

Thank you.

THE COURT: Okay.

That's DX 194; correct?

MR. JAZIL: Yes, ma'am.

Pardon me.

THE COURT: I'm definitely not dancing with you, Mr. Jazil.

MR. JAZIL: It's been a long week.

THE COURT: You are awfully cute, but that's not going to happen.

(DEFENDANTS' EXHIBIT 194: Received in evidence.)

BY MR. JAZIL:

Q.   Ma'am, take a look at 195 and 196.

A.   Okay.

Q.   Are you on these text threads as well?

A.    I believe that we -- these are what we -- I produced.

Q.    Yes, ma'am.

A.    Yes.

        MR. JAZIL:  Okay.  Your Honor, I'd like to move in 195 and 196.

        MR. BURHANS:  No objection.

        THE COURT:  195 and 196 are admitted with the same limitation the Court previously announced.

        (DEFENDANTS' EXHIBITS 195 AND 196:  Received in evidence.)

BY MR. JAZIL:

Q.    All right.  Ma'am, let's go to Exhibit 194.

        What's "back end MJ" supposed to mean?

A.    That is just back-end operations.

Q.    Back-room operations for the marijuana initiative; true?

A.    For the field operations, yes.

Q.    And MJ is --

A.    Marijuana.

Q.    -- short for marijuana; right?

A.    Yes.

Q.    And Raj is someone who was working with you on this initiative; right?

A.    Yes.

Q.    And he was working with you through one of the coordinators called Let the People Vote; right?

A.    No, Let the Voters Decide.

Q.   Let the Voters Decide.  Thank you.

And Matt Cohen is someone who is also working on this?

A.   Yes.

Q.   And Matt Cohen worked for whom?

A.   Myself.  Groundgame.

Q.   Groundgame.

Okay.  So we see this on the first page on 194 --

A.   Uh-huh.

Q.   -- a big text in the middle.

Who is that coming from?

A.   That's coming from myself.

Q.   Okay.  And here you're laying out what you are going to do if there's suspected fraud; right?

A.   Yes.

Q.   If we go to page that's Bates Stamped 52 on this -- if you flip over a few pages, it's the third one.

Here the blue that says:  *Volusia County just flagged Lauren Benton for fraud --*

A.   Yes.

Q.   -- *Please terminate her...*, that's coming from you as well?

A.   Yes.

Q.   And above that is you sending a screenshot of a text exchange with Volusia County; right?

A.   Someone sent -- I believe someone sent that to us, and I said "Thank you" on it, or someone said it.

Q.    If we go to the next page, this is you asking your team to follow up to confirm that another circulator has been fired; correct?

A.    Yes.

Q.    Lakeera Porter; right?

A.    Yes.

Q.    If we scroll forward to the page Bates labeled 55, that's you in the blue saying a Priscilla Pierre needs to be fired; correct?

A.    Yes.

Q.    And that's because she's suspected of fraud; true?

A.    I don't recall specifically what happened with Priscilla Pierre.  If it's in here, then I'm sure you'll tell me.

Q.    Would it help to read your text which is two down to see whether -- same page, after the "Ok," would it --

A.    Oh.

Q.    -- help refresh your recollection to look at your text from earlier?

A.    Then yes.

Q.    Was she being terminated because of fraud?

A.    Yes.

Q.    Let's go to Exhibit 99 -- pardon me -- Defendant's Exhibit 195.

A.    I don't have a 190.  Oh, 195.  Sorry.

Q.    Here there's a reference to a Chiquita Bradford.

Do you recall who Chiquita Bradford was?

A.    Only from reading the text.

Q.    But do you know who she was?

A.    No.

Q.    Do you know whether she worked on this initiative at all?

A.    The text said we pulled 51 scans for fraud.  Then I believe she would have worked on the initiative.

Q.    And if members of your team thought that someone was committing fraud, you would instruct them to fire them; right?

A.    Yes.

Q.    You wouldn't wait for an arrest; right?

A.    We called the police.  Like, they weren't coming to arrest them, but we were not waiting.  We took action.

Q.    Let's go to page Bates Stamp 66 on this, which is third from the back.

      You're in the blue here again at the very bottom; right?

A.    Yes.

Q.    And this one is about a person named Alexandria Tatum; right?

A.    Yes.

Q.    You know Alexandria Tatum; right?

A.    Yes.  Not personally.

Q.    Understood.

      But you know that she was a circulator for this initiative; right?

A.   Yes, sir.

Q.   And she was, in fact, fired; right?

A.   Yes.

Q.   And she was hired through a subcontractor on this project called Ballast Marketing; right?

A.   Yes.

Q.   And you also know that she's not a Florida resident; right?

A.   Yes.

Q.   She's a resident of Texas; right?

A.   Yes.

Q.   Now, did y'all tell the authorities about Ms. Tatum before she was arrested?

A.   We did not know about Ms. Tatum because no SOE informed us about it.  So she only worked on the drive a short amount of time.  Unfortunately, we did not catch it.

Q.   Do you know how many petitions she collected in the short amount of time she worked on this project?

A.   Not off the top of my head.

Q.   Okay.  Fair enough.

     Now, ma'am, going back to Mr. Raj.

     Do you know his last name?

A.   Yes.

Q.   Is it okay if we refer to him as Mr. Raj?

A.   Yes.

Q.   Okay.  Now, Mr. Raj, what exactly was his job working with

you on this project?

A.   He was more process operations.  So he had ran the error table, made sure that all of -- background checks were completed and uploaded in it, searched down data.  It was more data management.

Q.   And as part of his data management jobs, he also kept a log -- a quality control log for your project; right?

A.   Yes.

Q.   And let's take a look at Exhibit 158, ma'am, if you have it there.

       MR. JAZIL:  Defendant's Exhibit 158, Your Honor.

       THE COURT:  Let me just circle back for one moment, because I was oversimplifying things and moved on because I didn't want to belabor the point.

       But counsel for the plaintiff is absolutely right that just because you're the corporate representative doesn't mean any statement you ever make automatically binds them.

       But this witness has said she was managing and directing the petition process as an agent for them, and so it would come in -- I just want to make plain that that's ultimately my ruling, that it's not just because she gave a 30(b)(6) depo, but based on the scope of her work under 801, the same rules that we discussed later.  That was the basis of my ruling.

       MR. BURHANS:  Thank you, Your Honor.  That's what I

understood you to mean, and I don't disagree with respect to Ms. Cox.  Whether this extends to other people's subs, subs of subs of subs, is a different story.

THE COURT:  I absolutely agree, and I said I wasn't going to parse out every other statement.  If this were a jury trial, I'd read through everything else.  But it comes in to explain her interaction with other people, and I need not drill down into who all the other people were.

Moreover, even if that wasn't my ruling, Mr. Jazil certainly could have asked her every question he asked her, and if she said no, hand her the same document to refresh her recollection about what she wrote.

So it's not a Rule of Evidence, but also at some point there's got to be a rule of reasonableness to expedite things, and that's why I did it the way I did it.  I -- just to make plain so nobody jumps up and says, Corporate representative, everything they've ever said from the beginning of time automatically binds the party, because that's not necessarily true.

MR. BURHANS:  Understood.  Thank you, Your Honor.

THE COURT:  Because it would be wholly inconsistent with our prior discussion about the scope of work you do and so forth.  So I was just -- I was moving on before, but -- so that any reviewing court, since I'm accused of many things, won't also accuse me of being schizophrenic based on our earlier

evidentiary -- our discussion of the Rule of Evidence.

Go ahead.

It's still in.  It doesn't change anything.

MR. JAZIL:  Understood.

Your Honor, I feel a little unwell.  May I have just five minutes?

THE COURT:  Oh, absolutely.

So everybody knows, my court reporter and I had to clean up vomit in the vestibule last week, and I'm not doing it again.

So, please, go.

MR. JAZIL:  I appreciate that, Your Honor.

(Recess taken at 4:23 PM.

(Resumed at 4:25 PM.)

MR. JAZIL:  Thank you, Your Honor.

BY MR. JAZIL:

Q.   Ma'am, would you mind taking a look at DX 158?

A.   Yes.

Q.   This is a quality control log that y'all created; right?

A.   Yes.

MR. JAZIL:  Your Honor, I'd like to move this into evidence.

MR. BURHANS:  No objection.

THE COURT:  158 is admitted.

(DEFENDANTS' EXHIBIT 158:  Received in evidence.)

BY MR. JAZIL:

Q.   Ma'am, the first column on here has a date that an issue was spotted by y'all; right?

A.   Yes.

Q.   And then the second column has a description of the issue; right?

A.   Yes.

Q.   The third column has a circulator's name listed in there; right?

A.   Yes.

Q.   And the final column has the number of petitions impacted; true?

A.   Yes.

Q.   And if you can take a look at Exhibit -- Defendant's Exhibit 197, if, perhaps, you have a copy of it.

          MR. JAZIL:  Your Honor, may I approach?

          THE COURT:  You may.

          THE WITNESS:  Oh, thank you.

BY MR. JAZIL:

Q.   Ma'am, this appears to be the same list but with some of the names unredacted; right?

A.   This one had names -- the one you just provided to me, they are redacted still.

          MR. JAZIL:  Your Honor, may I approach the witness?

          THE COURT:  You may.

One second, please.

(Pause in proceedings.)

BY MR. JAZIL:

Q.    So if we take a look at the second page on that list, it's got a lot of the names unredacted; correct?

A.    Yes.

Q.    And if we try to match up the number of petitions impacted between 158 and 197, you know that it's pulling from the same dataset; right?

A.    Potential -- I'm not sure if this was organized in a different way, but I would think so.

Q.    Okay.  So let's take a look at the incident on 3-28-2025. On both lists 63 petitions are affected?

A.    3-28?  Okay.

Okay.

Q.    Is that true?

A.    Could you repeat the question?

Q.    So if we take a look at the number of petitions affected by the incident on 3-28-2025, it's the same number of petitions that are impacted?

A.    Yes -- well, on both sheets, yes.

Q.    Okay.  And then on 195, if you go to the very bottom where it tallies up the number of petitions affected, can you tell us what that number is, ma'am?

A.    It says 2,967.

MR. JAZIL: Okay. Your Honor, I'd like to move 197 into evidence, as well.

MR. BURHANS: No objection.

THE COURT: Without objection, 197 is admitted.

(DEFENDANTS' EXHIBIT 197: Received in evidence.)

MR. BURHANS: Excuse me, Counsel, if I may, if we could have the trial tech person put up the exhibits as they're discussed.

Thank you.

MR. JAZIL: No problem.

BY MR. JAZIL:

Q.   Can you take a look at DX 160?

MR. JAZIL: Can you pull up DX 160?

BY MR. JAZIL:

Q.   Do you recognize the law firm here as your excellent lawyers in this case; correct?

A.   Yes.

Q.   And have you seen this email before, ma'am?

A.   I do not believe so, no.

Q.   Okay.

MR. JAZIL: Your Honor, I'm just going to ask to move DX 160 and 161 into evidence unless there's an objection.

MR. BURHANS: No objection.

THE COURT: Without objection, 160 -- you said 160 and 161?

MR. JAZIL:  Yes, Your Honor.

THE COURT:  They're admitted.

(DEFENDANTS' EXHIBITS 160 AND 161:  Received in evidence.)

THE COURT:  He's not going to ask you about things you don't know anything about.

MR. JAZIL:  I try.  I just don't have the capacity right now.

Your Honor, I'd like to move on from this module and move on to something else.

Can we pull up Smart & Safe's Exhibit 15?

THE COURT:  And it's in evidence?

MR. JAZIL:  It's in evidence, Your Honor.

BY MR. JAZIL:

Q.   Do you recall discussing this with my friend Mr. Burhans?

A.   Yes.

Q.   And this is the material that came from which county again?

A.   I believe -- I thought it was Brevard County.

Q.   Okay.  And this material didn't come to you directly; right?  It came to the Secretary of State's office; right?

A.   Actually, I don't know.  I got an email with this information.

Q.   Okay.  That Bates label on the bottom right, that doesn't match up with the FDH productions in this case; right, the ones we saw in the text messages before?

A.   I don't know.  I'm sorry.  One more time?

Q.    SOS and then you see the number on the bottom right?

A.    Oh, yes.

Q.    That doesn't match up with --

A.    No.

Q.    -- the numbering scheme of the documents you produced; correct?

A.    No.  I don't know.

Q.    So it didn't come from your files?

A.    No, it did not come from our files.

Q.    And did you go back and talk to the folks in Brevard County to figure out whether or not the information that you think is coming from Brevard County is accurate?

A.    No.

Q.    Did -- do you know whether or not the Department of State relied on this information to fine anyone in any way?

A.    I do not know.

Q.    Okay.  Ma'am, I'd like to take a minute to talk about the Deputy app that you have.

A.    Yes.

Q.    My understanding of the Deputy app is that it keeps track of when you clock in for work as a petition circulator; right?

A.    Yes.

Q.    And it keeps track of when you clock out for your work as a petition circulator; right?

A.    Yes.

Q.   And it's got geolocation, so you know where the person is when they're clocking in; right?

A.   Yes.

Q.   And it tells you where the person is when they're clocking out; right?

A.   Yes.

Q.   But it doesn't keep track of where the person is all throughout the day; true?

A.   No.

Q.   So if someone were to clock in at a place and then go to a coffee shop, you wouldn't know?

A.   No.

Q.   Ma'am, all of your petition circulators were using this app?

A.   They're required to use it.  However, you had one or two that had flip phones that did not have access, just due to their age, to be able to use an app on a phone.

Q.   Do you -- ma'am, do you know a gentleman named Alexander Francis?

A.   I know who he is; I do not know him personally.

Q.   Do you know whether he was using this particular Deputy app?

A.   I believe he was.

Q.   He was.

     And he was a circulator for Smart & Safe; true?

A.    He was.

Q.    And he was hired through Sharon Anjed with National Ballot Access, one of your coordinators; right?

        (Reporter requested clarification.)

            MR. JAZIL:   Sharon, S-h-a-r-o-n, Anjed, A-n-j-e-d.

BY MR. JAZIL:

Q.    And this coordinator was out of New York; right?

A.    Yes.

Q.    And Mr. Francis had an internal validation rate for your petitions of around 76 to 86 percent; right?

A.    Yes.

Q.    That's considered a pretty good rate; right?

A.    Yes.

Q.    So based on your own internal quality control metrics, he was a good circulator?

A.    Yes.

Q.    But he was arrested for fraud; correct?

A.    Yes.

Q.    And no one ever flagged his behavior to you before his arrest; right?

A.    No.

Q.    Do you know whether or not he was alleged to be signing up dead voters, among other things?

A.    I have read about that in the paper.

Q.    And, ma'am, we looked at a list that y'all have of people

suspected of fraud and people you fired; right?  True?

A.   Yes.

Q.   And we talked about Alexander Francis who was arrested for fraud; right?

A.   Yes.

Q.   And when y'all find out that someone is either suspected of fraud or arrested for fraud, you do not count any signature that they collected as valid in your internal tracking system; right?

A.   Internally we did not because we did not know the depth and scope of Mr. Francis.

Q.   So for your internal validation count, you don't count any signatures submitted by someone accused of fraud or arrested for fraud; right?

A.   I believe not, no.

Q.   If a signature gatherer submits ten batches of signatures -- right, you with me so far?

A.   Yes.

Q.   And each batch has a certain number of signatures that they're submitting to a Supervisor; right?

A.   Yes.

Q.   And you find out at batch Number 7 or 9 that someone is suspected of fraud, do you go back and tell the county Supervisors of Elections that, Hey, this person is someone we suspect of fraud, and you should go back and look hard at every batch they submitted before this?

A.    I don't quite follow.

Q.    Let me ask it another way.

Let's say hypothetically Alexander Francis submitted ten batches of petitions to the Supervisor of Elections.

A.    Yes.

Q.    Are you with me?

You find out at Batch Number 9 -- pardon me.

Let's -- you find out at Batch Number 10 that he's suspected of fraud and you terminate him; right?

A.    Yes.

Q.    And then for Batch Number 10 you turn it into the county Supervisors of Elections with a note of some kind saying that you suspect this person of fraud and, We're putting out a notice that this person is suspected of fraud; right?

A.    Yes.

Q.    Do you tell the county Supervisor that this person has submitted nine other batches before that and the county Supervisor should take a hard look at the nine previous batches?

A.    Well, we -- while we notice the Supervisor of Elections, we provide in the letter and say that this person -- we suspect the fraud; take a closer look.  We assume that they're going to go back through and take a hard look at all the petitions.

Being from out of state, post-HB 1205 I cannot physically go review those petitions.  As part of the contract and the law of HB 1205, you cannot take a photocopy of the petition, so

those go right to the campaign committee.

But we also provide the list through counsel to the Secretary of State's office, so I would only -- I could only assume the natural chain of progression is they're also notifying all the SOEs of those names, just like they did for all the out-of-state circulators for the injunction period.

Q.   So pre-HB 1205 did you provide anyone -- did you provide the Secretary of State a list of suspected fraudsters?

A.   We had that list.  We had created that form that we give to SOEs with the person's name on it before we started the campaign, so we worked out the language.

We always knew, since we have to flag anyone for fraud, that we're going to have those forms attached, so that was started from the very beginning.

Q.   So at the very beginning of the campaign you all started attaching a form to flag a suspected fraudster; right?

A.   Yes.

Q.   And that was attached to the batch that you were submitting to the Supervisor at the time; right?

A.   Yes.

Q.   And your assumption was that the Supervisor, if prior batches had been submitted, would go back and look through the petitions to see if petitions that were validated should not have been validated.

Did I understand that?

A.    That makes sense.

Q.    But after HB 1205, you have now also started giving a list to the Secretary of State of every person that you suspect of fraud; right?

A.    Yes.

Q.    And that is what we saw --

A.    It wasn't -- it had nothing to do with HB 1205, though.  We give it anytime.

Q.    Okay.  So the list like the one in Defendants' Exhibit 161, did you all submit a list like that to the Secretary of State before then?

A.    We provide those to counsel and anytime it's requested send them on.

Q.    Do you know if a list like that had ever been submitted to the Secretary of State before?

A.    I do not know.

        MR. JAZIL:  Your Honor, I have no further questions.

        With the Court's indulgence, may I be excused?

        THE COURT:  You may be excused.

        THE WITNESS:  I hope you feel better.

        THE COURT:  Mr. Stafford.

        MR. JAZIL:  Your Honor, I'm being told I forgot to move in Defendant's Exhibit 195 and 196.

        THE COURT:  I've got them highlighted.  They were moved in, I believe --

THE COURTROOM DEPUTY:  Yes.

THE COURT:  -- and my courtroom deputy is agreeing with me.  Whoever told you that erred.

MR. BURHANS:  No objection to those exhibits.

THE COURT:  They were already admitted.

Cross, Mr. Stafford.

MR. STAFFORD:  Thank you, Your Honor.

                    CROSS-EXAMINATION

BY MR. STAFFORD:

Q.   Ms. Cox, I want to go over a few things that you covered during your testimony, and I don't believe Mr. Jazil asked you about them.

     One thing you testified to early on was that one of the differences between the out-of-state circulators that were hired, either by you or one of your company's subcontractors, and the in-state circulators that were hired -- is it true that the -- when you or one of your companies hired out-of-state contractors, they were hired only on a full-time basis?

A.   No, many are part time.

Q.   Okay.  Even the out-of-state contractors?

A.   They should be full time unless they got sick.

Q.   Okay.  But the in-state, the Florida residents, would be -- you would allow part-time as well?

A.   Yes.

Q.   Okay.  And when you were talking about the need to hire

out-of-state circulators, was that because you could not find sufficient numbers of qualified petition circulators in the state of Florida?

A.   Yes.

Q.   They were not professional enough or not -- was it lack of experience?

A.   Not enough to work full time.  We wanted to build the best -- like, wanted to build a very large network of professional circulators that we've worked with in other states, that we knew their track record; we knew their validity; we knew their previous experience.

I have -- some of them I have years and years worth of knowing their knowledge and their validity, and I know I can count on them to come in and to work on this initiative.

Q.   So was based on their experience?

A.   Yes.

Q.   Okay.  Now, you also talked about a typical interaction with a voter in the -- for signing a petition -- and if I get any of this wrong, please let me know -- that the circulator would approach the person, ask if they were a Florida voter, ask -- then ask if they were willing to sign a petition to put the issue of recreational marijuana on the ballot, either because they agreed with the amendment or that they agreed that it should be placed on the ballot for Florida voters.  Then the circulator would walk the person through the form.

Is that -- did I get that right?

A. Yes.

Q. Okay. If the -- and if the circulator was a non-Florida resident and, therefore, was not able to actually handle the petition, they would -- they would still be able to approach the person and ask them if they were a Florida voter; correct?

A. Are you referencing post-HB 1205?

Q. Yes.

A. Oh. Okay.

Q. I'm sorry. That's my fault.

A. Okay. Apologies.

(Indiscernible crosstalk.)

A. Yes, theoretically.

BY MR. STAFFORD:

Q. Then they could ask them if they are willing to sign the petition?

A. Yes. But they could not handle the petition.

Q. Okay. And they could actually stand there while -- if they were handed a personal-use -- if the voter was handed a personal-use petition, your employee would be able to stand there and watch them fill it out and tell them if they potentially made a mistake?

A. We wouldn't want to do that.

Q. Okay. I wasn't -- I wasn't asking that.

A. Oh.

Q.   I was wondering if that was -- under your understanding of 1205 whether that would be permissible?

A.   Yes.

Q.   So only thing they couldn't do was after the petition was signed to actually carry that or hold it?

A.   Or file it.

Q.   Okay.  And your employee could hand them a envelope addressed to the Supervisor of Elections in that county?

A.   No, they could not.

Q.   You said they couldn't?

A.   No.

Q.   All right.

A.   That would require every single circulator to carry 67 different Supervisor of Elections envelopes at any given time, and enough to handle for every single one of them.

Q.   Okay.  If the -- if the encounter occurred in a particular county as of, you know, in a -- like, some sort of event or at a park, it would be more likely that the person -- that the form would go to that county Supervisor?

A.   At an event or a park it's even more likely you have people from surrounding counties in that event or park.

Q.   And, again, if this -- if the encounter -- if an out-of-state -- one of your out-of-state employees was speaking or -- encouraged that voter to submit the personal-use form, there would be no ten-day requirement for the Supervisor of

Elections?

A.    I believe there is a ten-day requirement no matter what form you use.

Q.    Okay.  That's your understanding --

A.    That's my understanding --

Q.    -- of 1205?

A.    -- of the law.

Q.    And if a personal-use petition is submitted as opposed to one -- a circulator petition, the fines for past ten-day submission would not apply?

A.    I'm not aware of that.

Q.    You are not aware of one way or another?

A.    I'm not aware that there wouldn't be fines for the personal-use petition.

Q.    And you talked about some of the problems with the -- with the enactment of 1205.

       Were part of those difficulties and problems that occurred because 1205 was enacted in the middle of a petition campaign?

A.    Yes.

Q.    So in a following campaign, those problems that were caused by midstream -- a statute, would not -- you would not face that in a subsequent petition, unless -- of course, unless the statute were changed?

A.    Unless it changes again, right.

Q.    Now, Smart & Safe, or your company, or the campaign as a

whole had notice prior to May 2nd of 2025 that 1205 was likely to be passed?

A.   I wasn't tracking it that closely.

Q.   You were not -- you were not tracking -- you didn't have --

A.   There were multiple renditions, and so we relied on hearing what was happening at the capitol, but there was multiple renditions going on.

Q.   Did Smart & Safe have access to lobbyists at the time?

A.   I'm not aware.

Q.   Say again?

A.   I'm not aware of that level of detail.  I did not work with the lobbying team.

Q.   Now, the professional circulators that were hired by or on behalf of Smart & Safe, you mentioned earlier that one of the things you hired them for was their experience.

    And does that mean that they kind of move -- that they work on multiple -- or various campaigns from time to time?

A.   Multiple initiative campaigns, yes.

Q.   In different states?

A.   Yes.

Q.   You also talked about -- there was some testimony about the -- what? -- approximate 200,000 petitions that were submitted while the stay was in effect.

    Do you recall that?

A.   I'm sorry.  Could you restate your question?

Q.    Certainly.

You had a conversation with Mr. Jazil about the -- when -- after this lawsuit was filed and the stay was enacted that you re-hired or attempted to re-hire some of your out-of-state circulators?

A.    Yes.

Q.    And then during that process obtained 200,000 petitions?

A.    No.

Q.    Okay.

A.    200,000 was the number on the mail campaign.

THE COURT:  It was 27,000 or something.

THE WITNESS:  Yeah.  It was like 28,000 with the injunction period circulators.

BY MR. STAFFORD:

Q.    So it was 21,000?

A.    28,000.

Q.    28,000.  Okay.

A.    Yeah.  27 or 28,000.

Q.    And when --

THE COURT:  I was just --

THE WITNESS:  Yea, I was like --

THE COURT:  -- I'm just showing I was listening was the only point.

THE WITNESS:  Thank you.

You're listening.

BY MR. STAFFORD:

Q.   And when those -- when the choice was made to re-hire those out-of-state circulators and have them continue circulating, that was done with the understanding that that stay could be lifted?

A.   No.  I mean, I thought -- we would not have brought them back if we thought that stay would be lifted and they would be rendered invalid.  We would not have spent the money for that.

Q.   You didn't think that was a possibility at all?

A.   No.

Q.   I was about to say -- yes, I can say finally.  You were -- you were asked some questions about folks collecting petitions on behalf of Smart & Safe being accused of or arrested or fired for fraud.

     Do you recall that?

A.   Yes.

Q.   Okay.  Do you know a rough number of how many people that was?

A.   I think approximately 58 to 60.

Q.   Okay.  Do you know the breakdown of in-state and out-of-state on those?

A.   The majority are in-state.

Q.   Okay.  Do you know the rough numbers?

A.   I think there were three or four out-of-state, but I don't know.  I didn't count.  I don't have a breakdown, that I recall.

MR. STAFFORD:  Thank you, very much, Ms. Cox.

THE WITNESS:  You're welcome.

MS. PRICE:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MS. PRICE:

Q.   Hello, Ms. Cox.

A.   Hello.

Q.   Good to see you again.

A.   Good to see you.

Q.   My name is Tara Price.

(Reporter requests clarification.)

MS. PRICE:  I'll go slower.

BY MS. POLIAK:

Q.   My name is Tara Price.  I'm an attorney with intervenor defendant Republican Party of Florida.

I'm going to ask you a few questions.

A.   Yes.

Q.   Thank you.

You have testified today about your role with field operations; correct?

A.   Yes.

Q.   Okay.  And on direct I believe you testified about the importance of having high-quality paid circulators; correct?

A.   Yes.

Q.   And with Mr. Jazil you testified about some people who were

suspected for fraud who worked for the 2026 campaign for Smart & Safe; correct?

A.    Yes.

Q.    Okay.  And in some of those instances, you've directed that those paid circulators should be fired; correct?

A.    Yes.

Q.    Okay.  And did you take any steps to make sure that those individuals who are suspected for fraud are not rehired?

A.    Once they are -- once we've issued them to be fired, they are placed on a do-not-hire list, and they are also placed in On Target, which is a verification form, on that list as well so they can't -- if they somehow showed up, then we would be able to notice that.

Q.    Okay.  About how many individuals are on that list, just ballpark?

A.    Actually, I don't know.

Q.    More than 20?

A.    Yes.

Q.    More than 50?

A.    Yes.

Q.    More than 100?

A.    Yes.

Q.    Is this a list that you share with other ballot sponsors in Florida, or is this a list that's specific to just Smart & Safe?

A.    It's a list that's specific to Groundgame.

Q.    To Groundgame.  Okay.

And does Groundgame use that list for any other Florida ballot sponsor beside Smart & Safe?

A.    No.

Q.    Thank you.

Would you expect that that list would include individuals from prior campaigns, like the 2024 marijuana initiative?

A.    That list has been put together by several people and research, looked online and said, If someone was convicted of fraud, we'd put them on that list too.

Q.    Have you ever heard of a man named Zachary Paul Dworsky?

A.    I have not.

Q.    That's Z-a-c-h-a-r-y, middle name Paul, last name Dworsky, D-w-o-r-s-k-y.

A.    No.

Q.    Okay.  So you would not know whether he was a paid circulator for the 2024 campaign who was arrested for petition fraud?

A.    I don't recall his name.

Q.    Do you recall whether that individual was hired for the 2026 campaign?

A.    I don't recall his name.

Q.    Okay.  Because he was arrested for petition fraud with the 2024 campaign, would you expect that his name would be on that list?

A.   Yes.

Q.   Are you familiar with a woman named Natalie Marie Marrero?

A.   No.

Q.   Last name is M-a-r-r-e-r-o.

So you would not know whether she was a paid circulator for the '24 campaign for the marijuana initiative and was arrested for petition fraud?

A.   No.

Q.   Do you know whether she was hired for the '26 campaign?

A.   I do not.

Q.   But you could expect that if she was arrested for the 2024 campaign for the marijuana initiative, that she would be on your list?

A.   She should be.

MS. PRICE:   No further questions.

CROSS-EXAMINATION

BY MR. BARDOS:

Q.   Good afternoon, Ms. Cox.  My name is Andy Bardos.  I represent eleven Supervisors of Elections.

I have some questions about verification fees.

So on your direct with Mr. Burhans, he asked you about verification fees, and you testified about the increase in verification fees.

A.   Yes.

Q.   And I believe you testified that the increased verification

fees would take away from your budget; correct?

A.   Yes.

Q.   And you also testified that Smart & Safe does not have an unlimited budget; correct?

A.   Yes.

Q.   And then when Mr. Burhans asked you why don't you simply go raise additional funds, your response was -- and I wrote it down -- *If only it were that easy;* correct?

A.   Yes.

Q.   Okay.  All right.  Let's take a look at Defendant's Exhibit 1570, please.

     And, Ms. Cox, this document is entitled "Smart & Safe Florida's Response to 65 Supervisor of Elections' First Requests for Admission."

     Do you see that?

A.   Yes.

Q.   Have you seen this document ever?

A.   Yes.

          MR. BARDOS:  Okay.  Your Honor, I would move Defendant's Exhibit 1570 into evidence.

          MR. BURHANS:  No objection, Your Honor.

          THE COURT:  Without objection, 1570 is admitted.

     (DEFENDANTS' EXHIBIT 1570:  Received in evidence.)

BY MR. BARDOS:

Q.   And, Ms. Cox, do you understand this document to be a

response by Smart & Safe Florida to certain requests that were made of it in discovery in this case?

A.    Yes.

Q.    Okay.  Let's take a look at Request for Admission Number 1.

It says:  *Admit that between August 6, 2022 and September 30, 2025 you -- meaning Smart & Safe -- received $179,604,057.49 in total contributions.*

Do you see that?

A.    Yes.

Q.    And do you see that the response is:  *Admit?*

A.    Yes.

Q.    Okay.  And let's take a look at Request for Admission Number 4, please.

And that request says:  *Admit that between August 6, 2022, and September 30, 2025, you received 170,914,882.12 in total contributions from Trulieve, Inc.*

Do you see that?

A.    Yes.

Q.    Okay.  So Smart & Safe didn't struggle to raise money, did it?

MR. BURHANS:  Objection, Your Honor.

Foundation for this witness's knowledge about the fundraising operation.

THE COURT:  Well, he's asking her to -- in light of that does she want to clarify her answers, and she can answer

however she wants.

Overruled.

BY MR. BARDOS:

Q.    Smart & Safe didn't struggle to raise money, did it?

A.    I believe it did.

Q.    You believe it did.

MR. BARDOS:  Okay.  Let's take a look, then, at Defendant's Exhibit 1562, please.

Okay.  And I'll represent to you that this is Smart & Safe's own campaign contribution report which appears on the website of the Department of State.

And, Your Honor, I would move this into evidence. There are exhibits on the list, but those have been withdrawn is my understanding.

THE COURT:  Any objection to 15 -- you said 62; correct?

MR. BARDOS:  1562, yes.

MR. BURHANS:  What time period is this for, Counsel?

MR. BARDOS:  The entirety of the Smart & Safe existence from August 2022 through the end of the fourth quarter of 2025.

MR. BURHANS:  All right.  No objection, Your Honor.

Thank you, Counsel.

THE COURT:  1562 is admitted.

(DEFENDANTS' EXHIBIT 1562:  Received in evidence.)

MR. BARDOS:  Thank you, Your Honor.

BY MR. BARDOS:

Q.   All right.  So before when we were looking at the request for admissions, the time period went through the end of the third quarter of 2025.

So let's begin with the fourth quarter of 2025, and we'll bring the numbers up to the present day.

MR. BARDOS:  Zack, if you could go to October of 2025, please.

BY MR. BARDOS:

Q.   Okay.  So let's see if -- there's an entry for October 10th of 2025.

Do you see that, Ms. Cox?

A.   Yes.

Q.   And you see that on that date Trulieve contributed another $2 million to the campaign.

Do you see that?

A.   Yes.

Q.   And then seven days later, Trulieve contributed another $6.6 million to the campaign.

Do you see that?

A.   Yes.

Q.   And then two days later, Trulieve contributed another half million dollars.

Do you see that?

A.    Yes.

Q.    And then six days later, it poured another $3.3 million into the campaign.

      Do you see that?

A.    Yes.

Q.    And then on December 8th, it contributed another $4.1 million to the campaign.

      Do you see that?

A.    Yes.

Q.    And then eight days later, it contributed another $4,075,000 to the campaign.

      Do you see that?

A.    Yes.

Q.    And then it took some time off for Christmas, and then on the 29th it contributed another $6.3 million to the campaign.

      Do you see that?

A.    Yes.

Q.    So in the fourth quarter, Trulieve contributed another 25 or so million dollars to the campaign; correct?

A.    Yes.

Q.    Now, you said on direct that you're familiar with the auto sum feature in Excel; correct?

A.    Yes.

Q.    Let's auto sum the contributions that Smart & Safe received through the end of the fourth quarter of 2025.

MR. BARDOS:  Zack, if you could do that.

BY MR. BARDOS:

Q.   And do you see that the total contributions from August 2022 through the end of the fourth quarter of 2025 exceed $206 million?

A.   I can see that, yes.

Q.   Okay.  So Smart & Safe didn't struggle to raise money, did it, Ms. Cox?

A.   I've not seen these numbers anywhere else than right now.

Q.   Okay.  Very good.

MR. BARDOS:  No further questions, Your Honor.

Thank you.

THE COURT:  Counsel, I had said we're going to stop at 5.

What kind of redirect do you have?

MR. BURHANS:  I don't think I even have 5 minutes, Your Honor.  I would rather not hold the witness over.

THE COURT:  Hold on.

(Pause in proceedings.)

THE COURT:  If it's truly that short, I will -- for the benefit of my staff, but you can go ahead.

I'm not going to hit you with a TASER if you go 6 minutes, but if you go 25 minutes, that's a lot more than 5 minutes.

MR. BARDOS:  Don't tase me, Bro.

That was a -- well, you're a Gator, you know.

REDIRECT EXAMINATION

BY MR. BARDOS:

Q.   So Ms. Cox --

THE COURT:  I don't think I want to be compared to him, but that's okay.

MR. BURHANS:  Fair.

THE COURT:  Wasn't that a White supremacist?

MR. BURHANS:  I wasn't making that comparison.  It involved a TASER and happened in Gainesville.

I'm going to stop on that.

BY MR. BARDOS:

Q.   So, Ms. Cox, you'll recall my friend Mr. Jazil had asked you about your being in Arizona and your company being in Arizona and somebody being in Texas.

Have you had any issues with responding to a subpoena to come give testimony in Florida?

A.   No.

Q.   In fact, you did, didn't you?

A.   Yes.

Q.   Okay.  Do you know if Mr. Williams did the same thing?

A.   I believe he was here, too.

Q.   Okay.  Notwithstanding the fact that subcontractors of Groundgame or sub-subcontractors of Groundgame hire petition circulators are -- who establish the criteria and the policies

and the requirements in the contracts and the accountability

metrics for those circulators?

A.    Groundgame as confirmed with Smart & Safe.

Q.    And now Mr. Jazil asked you how much did GPS get paid, and

you said $35 million; correct?

A.    I believe so, yes.

Q.    Did all that money go to Groundgame?

A.    No.

Q.    Where did that money go?

A.    To pay hourlies, hourly circulators and all the

administrations costs.

Q.    Now, Mr. Jazil asked you about there being circulators that

had some felonies.

      Do you remember that?

A.    Yes.

Q.    And you said that there are about 12 out of, perhaps, more

than 2,300 or so?

A.    Yes.

Q.    What types of felonies in those small circumstances would

have been allowed in terms of length of time from the

conviction, the nature, et cetera?

A.    It was at least a decade or older and usually old drug

possession charges, but we screen for anything that involved

fraud or anything that involved, like, a violent assault,

et cetera.

Q.   And so fraud and violent assault felonies would not have been hired as circulators?

A.   No.

Q.   Now, Mr. Jazil asked you about the mail campaign which yielded approximately 200,000 or so signed petitions; correct?

A.   Yes.

Q.   And Mr. Jazil asked you, Well, if those petitions had been validated, would Smart & Safe make the ballot?

     And you said yes, correct?

A.   Yes.

Q.   Outside of the post-HB 1205 world, before 1205 Smart & Safe Groundgame was getting how many petitions per week?

A.   78,000.

Q.   How long would it have taken Groundgame to make up 200,000 petitions in a non-HB 1205 world?

A.   Less than a month.

Q.   Mr. Jazil asked you about the door knocking campaign.

     Do you recall that testimony?

A.   Yes.

Q.   And you had told him that there were 170,000 doors knocked; is that correct?

A.   Yes.

Q.   And were petitions left behind?

A.   Yes.

Q.   So that was 170,000 petitions left behind; correct?

A.    Yes.

Q.    And you said less than 10,000 were returned.

      Did I get that correct?

A.    Yes.

Q.    Okay.  I just want to clarify because you said door knocks, but that's actually the petitions dropped?

A.    Yeah, petitions dropped.

Q.    If my math is correct, that's something less than 0.058 percent.

A.    Yes.

Q.    Do I have that right?

      How would you characterize that rate of return?

A.    A terrible ROI.

Q.    Would you ever recommend to a client that they engage in that type of campaign?

A.    We tried everything, and I would say no, not again.

Q.    Recall that Mr. Jazil asked you a number of questions about fraud, and in particular he was pointing out text messages about fraud; correct?

A.    Yes.

Q.    And those were text messages where GPS personnel were identifying fraud and taking appropriate actions; correct?

A.    Yes.

Q.    And Volusia County was mentioned as well -- as detecting fraud as well; correct?

A.   Yes.

Q.   And that was done without the strictures of HB 1205; correct?

A.   Yes.

Q.   Okay.  So let me ask you this:  If you had more than ten days to review petitions before they were turned in, what effect would that have on the Groundgame fraud detection system?

A.   It would be significant.  Right now petitions are processed and turned over within 24 or 48 hours, so we'd have a chance to look and see, establish cadence.

Is someone working with someone else?  Are they working together and exchanging signatures on each other's forms?  We could have an ability to look at petitions like I do in other states and look for fraud in a much -- with much more ease and much more certainty than at this fast-clipped pace.

Q.   Now, if Groundgame could have used experienced nonresidents such as you, what type of effect would that have on the fraud detection program?

A.   Significant.

Q.   How so?

A.   For example, I believe Alexander Francis, the whole reason that he was undetected was because he was a Florida resident.  He presented very well.  He went to law school, so he knew what he was doing, and he was submitting signatures in a way that was undetected.

Had I seen him in person and been able to see the scans, I would have spotted -- I think I feel pretty good that I could have seen -- if someone flagged it for me, I could have looked at all the petitions and spotted it in advance.

Q.   Let me ask you this:  In your 20-plus year career of being involved in initiative and referendum campaigns, how many petitions do you think you've reviewed over the years?

A.   Millions.

Q.   Would you want people with that type of experience to be able to help detect fraud for Groundgame?

A.   Yes.

Q.   Now, my friend Mr. Stafford from the Attorney General's office posed a scenario where you would have two Smart & Safe personnel out in the field talking to one voter at a time.

One would be the registered circulator that would sit there with the clipboard and the petition watching what's going on, while the other person, that would be the registered circulator; correct?

A.   Yes.

Q.   And while the other -- the professional circulator who's a nonresident can talk all they want with the voter.  And you said, Well, we wouldn't want to do that.

Now, you didn't get to finish the response so I'm going to ask you, why wouldn't you want to have two people talking to one voter at a time?

A.    Because you're duplicating --

MR. STAFFORD:  Your Honor, I object.  That was not my question.  The record will reflect that.

THE COURT:  Overruled.  He's -- it is what it is. He's asking this question why it wouldn't work; the predicate doesn't matter in terms of whether it's accurate or not.

MR. BURHANS:  By the way --

THE COURT:  Hold on.  Y'all don't need to talk to each other.

The issue is -- the question is:  Do you agree with that premise?  I don't care about the underlying predicate.

Do you agree with that premise?  That it's no big deal, just have two people, have ten people all doing it together?

THE WITNESS:  No.

THE COURT:  Why does that not work?

THE WITNESS:  It's very expensive, and it's duplicating efforts.  I mean, why would you pay to have an out-of-state circulator there when an in-state circulator -- or an out-of-state person there talking, and now you're paying two hourly positions' salary, expenses for lodging.  Like, that's very expensive, like, doesn't make any financial sense.

BY MR. BARDOS:

Q.    Leaving aside that it doesn't make any financial sense, if you have two Smart & Safe personnel talking to one voter at a time, how does that impact Smart & Safe's ability to reach more

voters?

A.   Well, that one-on-one conversation is at a micro level, not a macro level.  And so talking to one at a time and having two people talk to one is different than having two people talk to two people --

(Reporter requested clarification.)

THE WITNESS:  If you have two people talking to two voters, it's more than two people talking to one voter.

THE COURT:  Counsel, I've got it.  She previously testified, for example, when you reduce the number of people in the field, the number of circulators, you have fewer voices in the field.  She's covered this.

MR. BURHANS:  That's correct.  You got it.  Okay.

THE COURT:  I got it.

MR. BURHANS:  We're done, Your Honor.

Thank you very much.

THE COURT:  Let me apologize to Mr. Meyer.  Apparently he was rude to Senator John Kerry and that's the, "Don't tase me, Bro" incident at UF.  I was confusing him with an incident involving Richard Spencer, and I'm in no way suggesting Mr. Meyer was affiliated with or friends with Mr. Richard Spencer who a number of years later was at UF and involved other incidents, one of which involved a TASER.

I did not mean to conflate the two TASER incidents and otherwise disparage Mr. Meyer.

Tomorrow -- ma'am, you can step down.

Thank you.

THE WITNESS:  Thank you.

(Ms. Meghan Cox exited the witness stand.)

THE COURT:  Y'all are going to file a new list tonight of the witnesses?

Okay.  Very good.

And tomorrow I plan on breaking hard, fast, hitting the eject button for whoever is standing there like -- sort of Monty Python and the holy grail where you're thrown off the bridge at 5:00 o'clock because it's Valentine's Day weekend and we're breaking at 5; okay?

All right.  Go forth and do whatever it is you do.

MR. BARDOS:  Your Honor, are we convening at 9 tomorrow or back to 8:30?

THE COURT:  No, 8:30.

MR. BARDOS:  Thank you.

(Proceedings recessed at 5:13 PM on Thursday, February 12, 2026.)

*  *  *  *  *  *  *  *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. Any redaction of personal data identifiers pursuant to the Judicial Conference Policy on Privacy is noted within the transcript.

/s/ Megan A. Hague                        2/12/2026
Megan A. Hague, RPR, FCRR, CSR            Date
Official U.S. Court Reporter

1236

**I N D E X**

PLAINTIFFS' WITNESSES                                          PAGE

THOMAS PEREZ
Direct Examination By Ms. Boettcher              984
Cross-Examination By Mr. Jazil                   1005

CIERA COX
Direct Examination By Ms. Neal                   1027
Cross-Examination By Ms. Hardy                   1053
Cross-Examination By Mr. Jazil                   1057
Redirect Examination By Ms. Neal                 1060

MEGHAN COX
Direct Examination By Mr. Burhans                1070
Cross-Examination By Mr. Jazil                   1164
Cross-Examination By Mr. Stafford                1209
Cross-Examination By Ms. Price                   1217
Cross-Examination By Mr. Bardos                  1220
Redirect Examination By Mr. Bardos               1227

**E X H I B I T S**

| PLAINTIFFS' EXHIBITS | OFFERED | RECEIVED |
| --- | --- | --- |
| RTCW-1 | 980 | 980 |
| SSF-1 TO 5 | 1069 | 1069 |
| SSF-6 | 1107 | 1107 |
| SSF-7 TO 17 | 1069 | 1069 |
| RTCW-76 TO 77 | 982 | 982 |
| RTCW-79 TO 87 | 982 | 982 |
| RTCW-93 TO 106 | 982 | 982 |
| RTCW-108 TO 109 | 982 | 982 |
| RTCW-111 TO 113 | 982 | 982 |
| RTCW-116 | 982 | 982 |
| RTCW-118 TO 119 | 982 | 982 |

1237

| PLAINTIFFS' EXHIBITS (cont'd.) | OFFERED | RECEIVED |
|---|---|---|
| RTCW-122 TO 131 | 982 | 982 |
| RTCW-133 TO 136 | 982 | 982 |
| RTCW-138 TO 142 | 982 | 982 |
| RTCW-145 | 982 | 982 |
| RTCW-147 TO 149 | 982 | 982 |
| RTCW-151 TO 154 | 982 | 982 |
| RTCW-156 TO 157 | 982 | 982 |
| RTCW-159 TO 165 | 982 | 982 |
| RTCW-167 TO 170 | 982 | 982 |
| RTCW-173 TO 176 | 982 | 982 |
| RTCW-179 TO 183 | 982 | 982 |
| RTCW-185 TO 193 | 982 | 982 |
| RTCW-195 TO 198 | 982 | 982 |
| RTCW-201 TO 208 | 982 | 982 |
| RTCW-210 TO 220 | 982 | 982 |
| RTCW-222 TO 266 | 982 | 982 |
| RTCW-268 TO 275 | 982 | 982 |
| RTCW-277 TO 284 | 982 | 982 |
| RTCW-288 TO 303 | 982 | 982 |
| RTCW-305 TO 339 | 982 | 982 |
| DEFENDANTS' EXHIBITS | OFFERED | RECEIVED |
| 158 | 1197 | 1197 |
| 160 | 1201 | 1201 |
| 161 | 1201 | 1201 |

1238

| DEFENDANTS' EXHIBITS (cont'd.) | OFFERED | RECEIVED |
|---|---|---|
| 194 | 1189 | 1189 |
| 195 | 1190 | 1190 |
| 196 | 1190 | 1190 |
| 197 | 1200 | 1200 |
| 1554 | 1065 | 1065 |
| 1562 | 1223 | 1223 |
| 1570 | 1221 | 1221 |