**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

FLORIDA DECIDES HEALTHCARE, INC,)
et al.,                         )
                                )
            Plaintiffs,         ) Case No: 4:25cv211
                                )
        v.                      ) Tallahassee, Florida
                                ) February 10, 2026
CORD BYRD, in his official      )
capacity as Secretary of State  )
of Florida, et al.,             )
                                ) 8:30 AM
            Defendants.         ) Volume II
_____)

**TRANSCRIPT OF BENCH TRIAL PROCEEDINGS**
**BEFORE THE HONORABLE MARK E. WALKER**
**UNITED STATES CHIEF DISTRICT JUDGE**
**(Pages 338 through 652)**

Court Reporter:              MEGAN A. HAGUE, RPR, FCRR, CSR
                             111 North Adams Street
                             Tallahassee, Florida 32301
                             megan.a.hague@gmail.com

            *Proceedings reported by stenotype reporter.*
        *Transcript produced by Computer-Aided Transcription.*

**APPEARANCES:**
**For Plaintiffs Florida Decides Healthcare:**

                    King Blackwell Zehnder & Wermuth PA
                    By:  FREDERICK STANTON WERMUTH
                         QUINN RITTER
                         Attorneys at Law
                         fwermuth@kbzwlaw.com
                         qritter@kbzwlaw.com
                    25 East Pine Street
                    Orlando, Florida 32801

                    Elias Law Group
                    By:  BEN STAFFORD
                         Attorney at Law
                         bstafford@elias.law
                    1700 Seventh Avenue
                    Suite 2100
                    Seattle, Washington 98101

                    Southern Poverty Law Center
                    By:  AVNER MICHAEL SHAPIRO
                         KRISTA A. DOLAN
                         Attorney at Law
                         avner.shapiro@splcenter.org
                         krista.dolan@splcenter.org
                    3710 Raymond Street
                    Chevy Chase, MD 20815

                    Elias Law Group
                    By:  HARLEEN K. GAMBHIR
                         Attorney at Law
                         hgambhir@elias.law
                    250 Massachusetts Avenue
                    Suite 400
                    Washington, DC 20001


**For Intervenor Plaintiff Safe & Smart:**
                    Stearns Weaver Miller
                    By:  GLENN BURHANS, JR.
                         HANNAH E. MURPHY
                         CHRISTOPHER R. CLARK
                         Attorneys at Law
                         gburhans@stearnsweaver.com
                         hmurphy@stearnsweaver.com
                         crclark@stearnsweaver.com
                    106 East College Avenue, Suite 700
                    Tallahassee, Florida 32301

**APPEARANCES (cont'd):**
**For Intervenor Plaintiff League of Women Voters of Florida:**

Democracy Defenders Fund
By:  SPENCER KLEIN
     Attorneys at Law
pooja@statedemocracydefenders.org
spencer@statedemocracydefenders.org
600 Pennsylvania Avenue SE
Unit 15180
Washington, DC 20003

Winston & Strawn, LLP
By:  GEORGE E. MASTORIS
     Attorney at Law
gmastoris@winston.com
200 Park Avenue
New York, New York 10166

**For Intervenor Right to Clean Water:**

Campaign Legal Center
By:  ROBERT BRENT FERGUSON
     HEATHER JEAN SZILAGYI
     ELLEN MARGARET BOETTCHER
     ALEXIS DENAE GRADY
     WILLIAM "LIAM" KYLE HANCOCK, III
     Attorneys at Law
     bferguson@campaignlegalcenter.org
     hszilagyi@campaignlegalcenter.org
     eboettcher@campaignlegalcenter.org
     agrady@campaignlegalcenter.org
     whancock@campaignlegalcenter.org
1101 14th Street NW
Suite 400
Washington, DC 20005

**For Defendant James Uthmeier:**

Florida Attorney General's Office
By:  WILLIAM STAFFORD, III
     SARA SPEARS
     MARYSSA SAVANNAH-LYNN HARDY
     Attorneys at Law
sara.spears@myfloridalegal.com
william.stafford@myfloridalegal.com
maryssa.hardy@myfloridalegal.com
119 South Monroe Street, Suite 500
Tallahassee, Florida 32301

**APPEARANCES (cont'd):**

**For Defendant Cord Byrd:**

                              Holtzman Vogel Baran, et al.
                              By:  MOHAMMAD O. JAZIL
                                   MARTIN C. WOLK
                                   RANDALL M. RABAN
                                   Attorneys at Law
                                   mjazil@holtzmanvogel.com
                                   mwolk@holtzmanvogel.com
                                   rraban@holtzmanvogel.com
                              119 South Monroe Street, Suite 500
                              Tallahassee, Florida 32301

                              Florida Department of State
                              By:  ASHLEY DAVIS
                                   General Counsel
                                   ashley.davis@dos.myflorida.com
                              R.A. Gray Building
                              500 South Bronough Street
                              Tallahassee, Florida 32399

**For Defendant Intervenors Republican Party:**

                              Shutts & Brown, LLP
                              By:  TARA PRICE
                                   BENJAMIN GIBSON
                                   Attorneys at Law
                                   tprice@shutts.com
                                   bgibson@shutts.com
                              215 South Monroe Street
                              Suite 804
                              Tallahassee, Florida 32301

**For Defendant Supervisors of Elections:**

                              GrayRobinson PA
                              By:  ANDY V. BARDOS
                                   JAMES T. MOORE JR.
                                   Attorneys at Law
                                   andy.bardos@gray-robinson.com
                                   tim.moore@gray-robinson.com
                              301 South Bronough Street
                              Suite 600
                              Tallahassee, Florida 32301

**P R O C E E D I N G S**

(Call to Order of the Court at 8:30 AM on Tuesday, February 10, 2026.)

THE COURT:  Please take your seats.

We are back on the record for day two of the bench trial in Case Number 4:25cv211.

Are we waiting on anybody?  I know that we've got some lawyers that are going to come in or out.

No?  Okay.

If I -- I'm not going to ask every time that you -- I promise you won't offend me.  If you know we are waiting on somebody, because I know it's hard to get through court security and we have other matters, just raise your hand and say, Judge, we are waiting on X.  That way I don't have to do it every time.

Another housekeeping matter, I think I've now got the correct list that I'm working from.  I believe the most recent iteration of the plaintiffs' exhibit list is 623-1 -- is that correct -- the amended consolidated trial exhibit?

MR. WERMUTH:  That's correct, Your Honor.

THE COURT:  All right.  And, Mr. Jazil, the one that I'm using for y'all is 621-1.

Is that correct --

MR. JAZIL:  Yes, Your Honor.

THE COURT:  -- for DX numbers?

MR. JAZIL:  Yes, Your Honor, it is.

THE COURT: All right. Those are the two I'm using and for any reviewing court if they want to follow.

What I did -- and I'm going to go ahead and put it on the table in front of the clerk's bench -- I checked my list of admitted exhibits against those of Ms. Milton McGee, and I just highlighted them. So if anybody has any questions about what is or is not admitted, right now her list and my list are the same. And I'll do that each morning, but I'll update it.

Ms. Milton McGee, please do not discard this sheet because that way I don't have to check -- I only have to check new things that are admitted each day with you.

But if anybody has any questions, that way you can make sure that everything you think has been admitted has been admitted.

If you look at it and you believe you admitted something and it's not on the list -- again, I'm comparing Ms. Milton McGee's and my list -- then you need to bring it up on the record, and we can always do a search with the court reporter to see if it was or was not admitted.

I'm doing this for y'all's benefit, because I know there are a lot of moving parts in a trial, and I don't want you to get to the end of the trial, close, and think something was admitted that wasn't.

I'll try to do what I did yesterday. I did it a couple times. I think I did it with Mr. Bardos at one point

where I said, Are you seeking to admit that exhibit? I'll try to do that, but sometimes I forget if you bring it up. And I know that it's clear that y'all intend to bring them in. I just want to make sure that everything you intended to admit got admitted.

As I understand it, we're going to start with -- let me find my list. One moment, please.

We are going to start with a witness in the courtroom, and then we've got two that are appearing remotely; is that correct?

MR. WERMUTH: That's correct, Your Honor.

THE COURT: So just those housekeeping matters. I will not do that every morning, but I just wanted to let you know that's the protocol we are going to follow so that you can make sure that the exhibits you seek to admit -- or thought you admitted have been admitted.

Any other housekeeping matters before we hear from the first witness?

Hearing nothing, plaintiff can call your next witness.

MS. GAMBHIR: Your Honor, the FDH plaintiffs call Mr. Juan Ardila.

(Mr. Ardila entered the witness stand.)

**JUAN ARDILA, PLAINTIFFS' WITNESS, DULY SWORN**

THE COURTROOM DEPUTY: Please state your name for the record.

THE WITNESS:  Juan Ardila.

THE COURT:  Please be seated.

This is the microphone.  Please make sure and talk into it.

THE WITNESS:  Appreciate it.

Thank you.

MS. GAMBHIR:  Your Honor, Mr. Ardila worked at an organization that organized volunteers on behalf of FDH's 2026 campaign.  His testimony will go to Counts One through Four of the FDH plaintiffs' operative complaint.

DIRECT EXAMINATION

BY MS. GAMBHIR:

Q.    Good morning, Mr. Ardila.

A.    Good morning.

Q.    Mr. Ardila, where are you currently employed?

A.    I'm currently employed at an organization called People Power for Florida Empowerment Fund.

Q.    And where were you employed immediately prior to that organization?

A.    A precursor organization called People Power for Florida.

Q.    And what was People Power for Florida?

A.    Yeah.  So we were a youth-led civic engagement organization that was focused on increasing youth voter turnout and civic engagement as a whole all across the state.  We did that by doing voter registration and also collecting ballot petitions

for amendments that, you know, we thought that young people were -- cared about and then also voter education around elections.

Q.   And where did People Power for Florida operate?

A.   We were a statewide organization, but primarily we were focused around college campuses and -- around college campuses.

Q.   And does your current organization have a similar mission and geographic scope?

A.   Yes.

Q.   How long were you employed with People Power for Florida?

A.   Four years.

Q.   And what was your position with that organization?

A.   Yeah.  So I started as an organizing fellow, and then I was briefly a regional coordinator.  But for the majority of those four years, I was the organizing director.

Q.   And what were your primary responsibilities as organizing director?

A.   Yeah, so I oversaw this statewide program of organized -- student organizing fellows on campuses across the state that were -- you know, I was training to lead weekly events on -- on and off campuses, targeting young people and also mobilizing volunteers of our volunteer network from all across the state. So I was in charge of managing those volunteers, training them, and also our paid staff, too.

Q.   And what role, if any, did People Power for Florida play in

Direct Examination - Mr. Ardila

efforts related to Florida Decides Healthcare's ballot initiative?

A.   Yeah.  We helped collect petitions and later distribute petitions.

Q.   Mr. Ardila, if I ask you about HB 1205, do you know what I'm referring to?

A.   Yes, I do.

Q.   Okay.  So this morning I'd like to discuss your experience with managing volunteers and your organization's work with FDH before and after HB 1205 went into effect.

A.   Sounds good.

Q.   Okay.  So let's start with your background.

     Mr. Ardila, when did you first start working on a political campaign?

A.   2019.  I was in college.

Q.   And have you worked on campaigns each year since then?

A.   Yes, each year since then, every cycle.

Q.   What sorts of roles have you held on those campaigns?

A.   All sorts of roles, from entry-level paid canvassing to regional manager to state director.

Q.   And has your work on those campaigns ever involved managing volunteers?

A.   Yes.

Q.   Has your work on those campaigns ever involved managing volunteers for a ballot initiative effort?

Direct Examination – Mr. Ardila

A.    Yes.

Q.    And has your work on those campaigns ever involved managing paid staff?

A.    Yes, it has.

Q.    Mr. Ardila, have you observed any differences in managing volunteers versus paid staff in the context of political campaigns?

A.    Yes, definitely.  I would say that specifically volunteers, they're volunteering their time, their spare free time, their limited free time to a cause that they very much are passionate about and they want to genuinely make a difference.

And so with volunteers, we always have to consistently show them that their impact and their effort is -- their effort is having an impact and it's worth their time to continue volunteering.  And so we really have to meet expectations where they are at with their time commitment, with what they are physically able to do, and always consistently show them that they are making an impact, because that's, you know -- that's why they are getting involved, and they want to see they are making an impact, versus paid staff who we have the added incentive of, you know, you are getting paid for your time.

Q.    So let's turn to People Power's work with FDH.

First, what is FDH?

A.    Yeah, FDH is a campaign that is trying to get Medicaid expansion on the ballot here in Florida.

Q.    When did you first get into contact with FDH?

A.    December 2024.

Q.    Who did you get in contact with?

A.    It was the outgoing campaign director.

Q.    And did People Power's volunteers begin collecting petitions for FDH sometime thereafter?

A.    Yes.  About a month after, like end of January, our volunteers started collecting.

Q.    And did People Power's volunteers also collect petitions for any other initiatives in 2025?

A.    Yes.

Q.    Which once?

A.    Right to Clean Water.

Q.    And, Mr. Ardila, what was the general management structure for People Power for Florida's volunteer efforts during 2025?

A.    Yeah, so as organizing director I primarily oversaw our volunteer management statewide.  But, like I said, we had organizing fellows on college campuses across the state.

      And so a lot of the actual events that -- were hosted by our volunteers -- or our organizing fellows, and they would directly manage the volunteers.  But then for our -- we had a volunteer -- a super volunteer -- I'm sorry -- volunteer leader program -- volunteer leader program where we had volunteers from across the state in areas maybe that our fellows weren't hosting regular events that I would personally, through our training

program, train and manage so that they could lead volunteers --
they would lead events in their own community.

Q.   Just to make sure I'm tracking, so People Power had paid
staff primarily near college campuses that would organize events
for volunteers?

A.   Correct.

Q.   And then they would have volunteer leaders in other parts
of the state with whom you'd work directly?

A.   Correct.

Q.   And over the course of 2025, how many organizing fellows
did People Power have?

A.   Eight.

Q.   And approximately how many People Power volunteers worked
on ballot initiative-related efforts over 2025?

A.   About 300.

Q.   And does that number include the volunteer leaders that we
discussed?

A.   Yes.

Q.   Mr. Ardila, prior to HB 1205, did People Power offer
different types of training on petition collection?

A.   Yes.

Q.   What were those types?

A.   So we had two types of training.  So one way -- one form of
training is for a volunteer that's just signed up to join us at
an in-person event; they would arrive and get trained by our

organizing fellows.

And then for our -- we also offered a virtual volunteer training for our volunteer leaders where it would be -- it would be virtual, a little bit more in depth, and we would -- you would be able to be ready to lead your own event after that.

Q.   Let's talk about the virtual training first.

What kind of information was covered in that training?

A.   Yeah.  So in this training we covered the background of the amendment process, why this is something that is -- you know, something that we are doing, what the process -- like how many ballots -- how many signatures we need to get on the ballot, examples of other ballot initiatives.

And then we also talked about -- we also talk about the actual form itself and what you need to collect from a voter for it to count.  And then a large portion of that is also walking you through -- walking the volunteers through what that kind of conversation looks like, what the actual effects of the Medicaid expansion will be in Florida if we get this passed, really why it's importance.  And then also go through frequently asked questions that we get from potential voters so that we can make that -- those conversations as effective as possible.

Q.   So you mentioned that the training included some discussion of Medicaid expansion.

Could you briefly explain about that?

A.   Yeah.  So this was a significant part of the training, but

we would focus on the -- like I said, the effects of -- the potential effects of Medicaid expansion, compare it to other states that have already updated their eligibility and show the economic effects, the health care effects.  And then also provide the historical context of the Medicaid expansion fight here in Florida that has been going on for over a decade.  And then also, like I said, frequently asked questions because we know there's a lot of questions that people have about Medicaid expansion when you first talk to them.  And so we really want to make sure that volunteers are equipped and ready to answer those.

Q.   And Mr. Ardila, about how much of the training was focused on the material you just described?

A.   Like half the training, yeah.

Q.   So now let's talk about the in-person training.

     About how long was that?

A.   About 15 minutes.

Q.   And what was contained in that training?

A.   So we would walk them through the actual form itself, show them what is required from a potential voter, help answer any questions that the volunteer may have about the amendment itself.  And then the volunteer will get a chance to observe already trained and experienced volunteers and organizing fellows actually have these conversations so that that they can more effectively, you know, start collecting themselves.

Q.   And, Mr. Ardila, were the trainings required before a volunteer could collect petitions?

A.   Yes.

Q.   Why?

A.   Because we wanted to make sure that we were being as effective as possible in our conversations and increasing the amount of petitions we are getting per event, and also ensuring that they're -- we weren't missing any information from the forms or anything like that.

Q.   And Mr. Ardila, during 2025, prior to HB 1205, about how frequently did people host petition collection events organized by fellows?

A.   Multiple times a week.  On a weekly basis, yeah.

Q.   At what types of locations did those fellow-hosted events take place?

A.   Yeah, all kinds.  So throughout the week we had reoccurring events happening on those major college campuses.  And then on the weekends we would do community events, so, like, farmer's markets, parades, festivals, but also nightclubs, bars, coffee shops, places like that, where we can meet young people where they are at.

Q.   And at what types of locations did the volunteer leaders collect petitions?

A.   Yeah.  So they were not as focused on campuses, but they would do also, like I mentioned, local farmer's markets or local

parades and rallies in their own communities, but they would also do more personal events like getting petitions from their neighbors next door, or bringing them to their granddaughter's dance recital or soccer practice, that kind of thing.

Q.   And, Mr. Ardila, once a People Power volunteer gathered a petition, what was the next step?

A.   Yeah.  So I estimated we have like the super volunteer --

     (Reporter requests clarification.)

     THE WITNESS:  So the volunteer leaders that were hosting events on their own, they were trained to drop those petitions off at their local FDH hubs.  And they -- we would help them connect to the local FDH hubs.  And so they were frequently submitting them there and picking up more.

     Before a volunteer who was volunteering in person at a fellow-lead event, our fellow would make sure that at the end of the shift they would all -- all the petitions were in our fellow's hands and then they would go to the local hub and drop it off there.

BY MR. GAMBHIR:

Q.   And, Mr. Ardila, prior to HB 1205, about how many volunteers collected petitions with People Power each month in 2025?

A.   50 to 100 per month.

Q.   And do you know how many petitions People Power's volunteers collected each month in 2025 prior to HB 1205 taking

Direct Examination - Mr. Ardila

effect?

A.    I know how many from our fellow-lead events.  And those are about a thousand per month, yeah.

Q.    And would it be fair to approximate that that number would be higher if one included petitions collected by the volunteer leaders as well?

A.    Yes, definitely.

Q.    Prior to HB 1205 being enacted, as organizing director for People Power, were you preparing for that volume of petitions collected per month to increase over 2025?

A.    Yes.

Q.    Why?

A.    Because we were planning on hiring more staff and -- across the state, so we were going to be able to host more frequent events for volunteers, so that's one reason.  And then also we always see an uptick in engagement on college campuses in the fall because there's thousands more new students that arrive in the fall.

Q.    Prior to HB 1205 being enacted -- oh, sorry.

      Did you ever circulate petitions yourself?

A.    Yes, I did.

Q.    About how times did you circulate petitions in 2025 before HB 1205 went into effect?

A.    Like 40 to 50 times.

Q.    And where did you circulate petitions?

A.   All the places I just mentioned, so college campuses.   I went -- I did parades and rallies, also concert venues as well. Yeah.

Q.   Did you ever observe others collect petitions?

A.   Yes.

Q.   About how many times in 2025 prior to HB 1205 passing?

A.   Same, around 40 to 50.

Q.   Did volunteer circulators every report back to you about their experiences and interactions with voters in the field?

A.   Yes, frequently.

Q.   Mr. Ardila, based on the experiences we just discussed, in your observation, what would an interaction between a volunteer circulator for FDH and a voter typically look like?

A.   Yeah, I can walk you through that.   But basically it would start by our volunteer asking someone at an event if they would like to take a second to sign the Medicaid expansion petition. And I would say, like almost every single time, people had a follow-up question of what -- like, What does that mean?   What is Medicaid expansion?

     And so our volunteer then would be trained to talk to them about the current state of Medicaid expansion, explain the context of Obamacare and Florida being one of the only states that hasn't updated its eligibility, and then explain that, We can do something about it by taking action right now, and you can help us get there.   And then we would ask them right now to

take a second to sign it.

And then, you know, from there we might get a follow-up question about -- like, people might be worried about the cost, and so our volunteers are prepared to talk about examples of other states who have already updated their eligibility and explain that there is actually a lot of positive effects for the economy.  And then, again, we would really emphasize, you know, Take a second right now.  You'll help us get this on the ballot, and you'll have an immediate impact.

That's usually how it goes for the most part, yeah.

Q.   And how long would a typical interaction between a volunteer circulator and a voter last?

A.   Yeah.  I would say typically around two to three minutes, but, like I said, with this specific issue, you know, it's -- people always have follow-up questions.

And then even if they -- after you explain, you know, they remember that the fight for Medicaid expansion that's been going on in Florida, because it has been something that's been, you know, in the -- in the -- it's been a fight that's been going on for over a decade in Florida.  So sometimes people remember that and they want to talk about it.

But also health care is a very personal issue, so it's also more common for us in these conversations specific to this amendment that people bring up personal anecdotes, personal stories from them or a family member or a loved one who's gone

through something really tragic or traumatic with the health care industry, and explain, you know, why that's important to them. And so that usually makes the conversation last longer than that, and I'd say that's a little bit more common definitely for this issue, for this amendment.

Q.   Mr. Ardila, did you ever observe a voter who initially seemed reluctant to sign the petition who, after this type of conversation, ended up signing?

A.   Yes, definitely.

Q.   Can you give an example?

A.   Yeah. I was pretty frequent for -- I mentioned that a lot of our work is focused on college campuses and targeting young people. Young people, in our experience, don't necessarily know what the Medicaid expansion fight is or don't remember the Obamacare fight from 15 years ago.

     And so a lot of people that we start talking to are -- they don't even know what I'm talking about so they're not really interested. But once you explain it to someone, all the impacts of it, the amount of people that would benefit from it, it's really common for us to see someone go from no interest or never heard of it to excited to sign it and excited to see it hopefully be on the ballot.

     And then also people that, you know, are more reluctant to sign it but we explain that we just want to get this on the ballot and, you know, maybe they're not sold on it yet, but

they'll sign it just to give -- so we can, you know, give a chance to the state, the citizens to vote on it.

Q.   And, Mr. Ardila, based on your personal experience, did voters appear to understand that volunteer circulators were advocating for Medicaid expansion?

A.   Yes, definitely.  It would be clear to me from talking to one of our volunteers that we are -- that they're advocating for it and -- yeah.

Q.   Why is that?

A.   Because this -- like I said, this is a very personal issue, and so a lot of our volunteers are very much motivated and passionate about this issue.  And when we explain all the statistics and impacts, the passion really comes through.  And if you're, you know, not really passionate about this issue or care this much about this issue, the conversation isn't going to be as effective, and so I would say that it's pretty clear when you talk to our volunteers that they are very passionate about this issue and they're advocating for it.

Q.   Mr. Ardila, based on your experience with political campaigns generally and with ballot initiative efforts specifically, have you observed any difference in voter outreach efforts that involve an immediate opportunity for action versus those that do not?

A.   Yes, definitely.

Q.   What's that difference?

A.    Yeah.  So we -- in this work we're always -- we always train our organizers to have an immediate call to action, an immediate way for people -- a potential voter to take action.

Because, like I mentioned, we are trying to get more young people involved in the voting process, more civically engaged. And in order to do that, we want to show them that participating is accessible and it's not complicated.  And that's why we do these ballot initiative -- a big reason why we do these ballot initiatives, because it's a really, like, easy way to show a potential voter that this -- you taking action right now is easy, accessible, and it's going to have a direct impact versus, you know, having not a direct call to action of, like, Okay, great.  Thank you for caring about Medicaid expansion, you know. Stay in touch.  We'll send you updates on it.

People are not going to be as engaged.  They're not going to, you know, feel like their vote is impactful or their voice is being heard, yeah.

Q.    Okay.  I'd like to turn to the impact of HB 1205 on People Power's volunteer program.

Mr. Ardila, did People Power change its volunteer efforts due to the provisions of HB 1205 that went into effect in earlier May, 2025?

A.    Yes.

Q.    And did it then change its volunteer efforts further due to the provisions that went into effect in July of 2025?

A.    Yes.

Q.    Okay.  Let's talk about each of those provisions in turn, starting with the ten-day return deadline.

Before HB 1205, to your knowledge, was there any deadline for the submission of petition forms collected by volunteers?

A.    No.

Q.    And is it your understanding that HB 1205 created a ten-day return deadline for all petition forms regardless of whether they were collected by volunteer or paid circulators?

A.    It was not clear, but we erred on the side that it did apply to volunteers.

Q.    Why did you do that?

A.    Out of safety and concern for our volunteers.  We always prioritize, you know, keeping our volunteers protected and safe, so --

Q.    And, Mr. Ardila, did People Power change its operations and its guidance to volunteers when this provision went into effect?

A.    Yes.

Q.    How?

A.    So we had to update our training materials for new volunteers to include the new laws that are going into effect. And we changed the instruction to mail in the forms directly to the campaign within 24 to 48 hours in order for us to guarantee that we hit the ten-day return window.

And so we had to do that to update our new volunteer

materials, but then we also had to retroactively reach out to all the volunteer leaders who we've already trained in the past year and explain to them the changes and make sure that they understand the new policy of turning them in within 48 hours.

Q.   What, if anything, was the impact of this new guidance?

A.   Yeah.  So definitely an added cost for us with staff time and also with postage and envelopes, because now instead of dropping them off at hubs, volunteers were having to mail them more frequently directly to the campaign, and so we were assisting with the cost of that.

But then also for our volunteer recruitment and retention effort, you know, a lot of frustration, a lot of concern from volunteers really affected volunteer morale and willingness to continue to volunteer or do more volunteering, especially for volunteers who had done collection and now we told them that they couldn't do that anymore.

It was, like, confusion, frustration that we had to deal with with our volunteers and tried to pivot.

Q.   And, Mr. Ardila, are you aware that HB 1205 expanded the definition of racketeering activity to include, quote, "a violation of the Florida Election Code relating to irregularities or fraud involving issue petition activities?"

A.   Yes.

Q.   And, Mr. Ardila, do you have an understanding of what actions are prohibited by that provision?

A.    I would say, no; it's unclear to me.

Q.    Why is that?

A.    Because it talks about irregularities and for us when we're trying to interpret that, we're not sure if a volunteer makes a genuine mistake on a form or two, does that -- is that enough to be considered an irregularity where then our volunteer, our campaign, our organization can be liable for that.  It was not -- not clear -- clear to me.

Q.    And, Mr. Ardila, did the possibility of a racketeering charge raise any concerns for you?

A.    Yes.

Q.    And are you aware of any of People Power's staff or volunteers expressing concerns about criminal liability under HB 1205?

A.    Yes.

Q.    How are you aware of those concerns?

A.    Because I had volunteers express those concerns directly to me, staff expressed the concerns directly to me, and then volunteers expressed it to my staff and then relayed to me.

Q.    Okay.  Let's talk about the provisions that took effect on July 1st, starting with the volunteer registration requirement.

      Is it your understanding that HB 1205 requires volunteers to register with the State in order to collect more than 25 petitions, excepting immediate family members?

A.    Yes.

Q.   And prior to HB 1205, did People Power have fellows and volunteers who collected more than 25 petitions and were not paid for petition collection?

A.   Yes.

Q.   About how many of People Power's volunteers collected more than 25 petitions in 2025 prior to HB 1205?

A.   Yeah.  I would say, like, 2 to -- 200 to 250.

Q.   And what is that estimate based on?

A.   Based on the total number of volunteers that helped with petitions last year.  I would say more than half of them, even if they just volunteered one time, collected 25.  And then if they volunteered more than one time, then they definitely collected over 25.

Q.   And, Mr. Ardila, are you aware that HB 1205 makes it a third-degree felony to collect, deliver, or otherwise physically possess more than 25 signed petition forms without registering as a circulator?

A.   Yes.

Q.   What, if any, impact did the threat of criminal prosecution from this provision have on People Power's recruitment efforts?

A.   Yeah.  So for our volunteer leader trainings, you know, we had to change the training material to reflect these new provisions, and so once we got to the section of, like, we can't collect -- we're not collecting anymore, and if you collect -- if you have more than 25 petitions on you, then you could be

charged -- or you could be liable for crimes, then there was lots of concerns.  Immediately, every time that we explained that, people were like, What?  I collected more than 25 every time.  Like, what do you mean we can't do that?  There's a lot of confusion and frustration coming from the volunteers.

And I mentioned the volunteer leaders because we recruit them and they sign up to take action, and we got them this far and then it's, like, another hurdle for us to then show them that, you know, there's these -- there's a new hurdle for you.  You can't collect them.  You can't collect more than 25.

And so that was a consistent barrier for us, a hurdle for us that we had to try to overcome when training and recruiting new volunteers for sure.

Q.    And, Mr. Ardila, did you ever observe any individuals sign up for the training and after an exchange like you just described no longer decide to volunteer?

A.    Yes, definitely.  Definitely.

Q.    Mr. Ardila, based on your experience managing volunteers for a ballot initiative efforts, do you think a registration requirement would have any impact on volunteers' willingness to circulate petitions?

A.    Yes, for sure.

Q.    What impact?

A.    Yeah.  So I -- I was mentioning that our volunteers are doing this out of the goodness of their heart and giving their

limited free time to a cause that, you know, they think -- they care about and they think they can make even the smallest impact towards, and so we want to make it as easy as possible and accessible for them to do that.

And then adding this added step of having to register with the State and potentially be liable for all these fines or criminal charges is not a reasonable expectation for someone who is just trying to spend their free time working on a cause that they are passionate about.  It's just way too high of an expectation for someone who's a volunteer, yeah.

Q.    And, Mr. Ardila, based on your experience, would a registration requirement inhibit potential new volunteers from circulating petitions spontaneously?

A.    For sure.

Q.    Why is that?

A.    Yeah, because it's very common for us to -- for people to sign up -- see our event that's happening tomorrow on their campus and sign up and come out to join us for the first time, or maybe they met us on campus today, and they want to come back later today or come back tomorrow.

You know, young people want to get -- like they -- when they see something -- when they learn something about something they're passionate about, they want to get involved immediately, and we don't want to create any more barriers or hurdles for them to get involved because then that's going to turn people

off.

So it would definitely inhibit us from -- if someone signed up -- learned about us on campus today, wants to come back tomorrow and help us, it would inhibit us from allowing them to do that. We'd have to explain to them that, Okay. Great. Thanks for your interest in helping. We have to register with the State. You have to do a training. It's just -- it would -- yeah, it would prohibit that. It would -- too much time.

Q.   And, Mr. Ardila, have you observed any specific examples of what you just described?

A.   Yes, definitely.

Q.   Can you please explain?

A.   Yeah. I would say this definitely happened. We do a lot of events, events around the move-in weekends of campuses, for example, and so it was, like, multiple days of events. And we meet a lot of new people there and so it's common -- it happened last year where we met someone who was really excited to meet us and sign the petition.

And they asked if we were going to be here tomorrow, and we're like, yeah, and so they came -- or later today even, and they came back and started helping us, you know, collect petitions from other students, which, you know, if -- if they had to do a training or registration, it wouldn't be -- you know, they wouldn't be able to.

Q.   Let's turn next to the restrictions on who is eligible to

circulate petition forms, starting with the ban on nonresident circulators.

Are you aware of any People Power volunteers who are residents of a state other than Florida and who circulated FDH petitions before July 1st?

A.    Yes.

Q.    How are you aware?

A.    Because we had a lot of student volunteers, and some were out-of-state students, so their residency was still in other states.

Q.    And in your view are there any barriers to People Power verifying the state of residency of all its volunteers?

A.    Yes.

Q.    What --

(Indiscernible crosstalk.)

THE WITNESS:  Yeah.  There's a potential added cost for us to verify with Secretary of State or the Supervisor of Elections if that's their real identity and their real address. But then also it's -- volunteers have a reasonable expectation that they should give their name and maybe their email and number to volunteer but not necessarily their full legal address or copy of their ID.  Again, it's an unreasonable expectation for volunteers to do that.  And so that would be a hurdle for us to onboard and recruit new volunteers, for sure.

BY MS. GAMBHIR:

Q.   Mr. Ardila, are you aware of any non-U.S. citizens who volunteered with People Power and circulated FDH petitions before July 1st?

A.   Yes.

Q.   How are you aware?

A.   Because they were volunteers, and they told -- voluntarily told that information to our staff.

Q.   And was People Power aware of the citizenship status of each of its volunteers?

A.   No.

Q.   Why not?

A.   Because it's not something that we ask them.  It was not a requirement at all to provide us that information when you signed up to volunteer.

Q.   Any other reasons?

A.   And it would just be an unnecessary hurdle, a barrier for volunteers to do that, but then also would be an added cost for us if we had to verify their status.  And we want to make it as -- we want to reach -- we're a statewide organization that wants to reach people all across the state in every community, and so we don't want to create barriers to volunteers to get involved.  And so that means volunteers who maybe aren't citizens yet that want to still make an impact, we don't want to create a barrier for them.

Q.    And, Mr. Ardila, before HB 1205, did People Power have any volunteers with felony convictions whose rights had not been restored?

A.    Not that I'm aware of.

Q.    And why weren't you aware?

A.    Because this is another thing that we didn't ask volunteers or require them to attest to when they signed up to volunteer.

Q.    And from your own personal experience, would there be any impediments to determining whether a volunteer had a felony conviction?

A.    Yes.  And so if we had to do a background check for every volunteer, that would be timely and costly for our organization. And, again, it would create another barrier for people to get involved and volunteer, and we want to make it as accessible as possible.  And that includes people who maybe have previously been in prison.

Q.    And did FDH change its guidance to People Power regarding volunteer circulation in advance of the volunteer registration requirement and circulator eligibility restrictions going into effect on July 1st?

A.    Yes.

Q.    What was the new guidance?

A.    That we were to cease all volunteer collection efforts and begin doing petition distribution instead.

Q.    Could you please describe petition distribution?

A.    Yeah.  So unlike the circulation or collection, we weren't actually collecting the petitions and turning them in ourselves, our volunteers.  We were giving out petitions with prestamped envelopes so people would then turn them in on their own, and we would instruct them to do it on their own.

Q.    So when did People Power change its volunteer efforts to distributing petitions instead of circulating petitions?

A.    The start of July.

Q.    And in your experience, how did that distribution method compare to volunteer circulation?

A.    Yeah.  It was much less effective, for sure.

Q.    Let's talk a bit more about that.

      First, did the distribution method impact People Power's costs?

A.    Yes.  So there was added cost there because of the prestamped envelopes that we were providing for volunteers.  And so we had to -- that was an added cost of postage and then additional cost of staff time putting together those packages and mailing them out to all of our volunteers who were still going to be leading events.  And so there was, like -- all those were added costs, yeah.

Q.    And did the distribution method impact People Power's ability to recruit and retain volunteers?

A.    Yes, definitely.  So starting with the retaining volunteers, I mentioned that we had volunteer leaders who we had

trained at the beginning of the year to lead petition collection efforts on their own, and they were doing it. And a lot of them were, you know, collecting petitions frequently.

And so it was very frustrating for us -- for volunteers to hear that they can't do that anymore, and so that very much affected our efforts in getting them to continue being volunteers, because they wanted us -- one of the things that I mentioned was that volunteers want to see that their time is valuable and actually making an impact. And when you have petitions that you're collecting on a weekly basis, you can visibly see your impact.

And so now with the distribution, this being the only option, we -- you can't really see that impact. Volunteers are very frustrated. They're not sure if there's any -- even if they give someone the petition and see them sign it, there's not a guarantee that gets turned in correctly or on time or they remember to do it. And so there was definitely, definitely a big morale issue with volunteers that we were -- that were coming back.

And then for new volunteers, definitely a lot more difficult to get a volunteer that was interested in leading their own events. Then we show them that they can't collect, it's common for them to be, like, I thought I could collect; this seems like it's not going to be effective; I'd rather not try at all.

(Reporter requests clarification.)

THE WITNESS:  It's not going to be effective.  I'd rather, you know, not try at all to lead my own event.

Yeah.  Thank you.

BY MS. GAMBHIR:

Q.   Did changing to the distribution method affect People Power's ability to measure its impact on voters?

A.   Yes.

Q.   How so?

A.   So before with collection or circulation, we could at the end of each event be able to see exactly how many petitions we got signed and submitted.  Volunteer leaders could see that. And we could very much measure how many petitions we were collecting and how our impact -- how much our impact -- how much our work was having an impact on the petition effort.

Q.   Did People Power attempt to track how many petitions its volunteers distributed?

A.   Yes.  We tried to have a rough estimate of -- we instructed volunteers to try to count how many petitions they distributed, but it was a much more rough estimate.

Q.   About how many petitions per month did People Power's volunteers distribute?

A.   200 to 500, yeah, around there, a month.

Q.   And, Mr. Ardila, what impact did changing to the distribution method have on volunteers' communications with

voters?

A.    Yeah.  So I mentioned the morale issue, and so that really affects, you know, volunteers who are still coming back. They're going into these conversations much more defeated already because they're not going to be able to -- before they know that if they can put a little extra effort into this conversation, then they can see a visible impact.  That's taken away from them.

And so it was a lot more defeated attitudes coming from volunteers because, you know, maybe they try to have a good conversation, and then a voter is, like, Oh, I'll just -- I'll take it and I'll read about it later.  And then they're, like, Well, how did I know if they did it?  I'm like -- I try to reassure them that, you know, hopefully they'll do it; they're probably going to do it.  But there's no way for me or them to verify that they did it.

And so these conversations -- you have to have a lot of passion, like I mentioned, to really talk effectively about it. And so they were coming into these conversations much more defeated and with less energy, and so we found ourselves having to try to motivate them more and stuff, but yeah.

Q.    Mr. Ardila, are you aware of any volunteer leaders who stopped collecting petitions after People Power switched to the distribution method?

A.    Yes, definitely.

Q.    Can you give some examples?

A.    Yeah.  So I mentioned our volunteer leader program.  We had some very strong volunteer leaders who were leading recurring events.  And so I think of Nick over in Tampa who was leading a monthly youth outreach night at a local nightclub in Tampa.  And so once a month they would set up a table, like, right inside the club where people came in, and he would talk to people about Medicaid expansion and collect signatures.

And so in -- when we switched to the distribution method, you know, it was not an event that we can continue doing after Nick tried it again because of the nature of having to instruct someone to take a petition with them and carry an envelope with them the rest of the night.  You know, people were -- once they found that out, they were, like, I can't take this; I'm not going to take the petition, because there's no way -- people don't even bring bags sometimes with them.  And so it was not going to be an effective way for us to really do that because people weren't going to just carry the envelope with them all night and go bar to bar with an envelope and then remember to do it the next day.  And so -- so, yeah.  That's why I stopped that.

And I would also give an example of another volunteer named Megan who -- she was over in Seminole County north of Orlando, and she was also doing regular events about once a month.  And it was focused on, like, local rallies that were happening

throughout the year last year.  And then once we switched to circulation and she tried that, you know, it just wasn't working and so she stopped doing it.

Q.   Okay.  And HB 1205 also required new petition forms as of July 1st; is that correct?

A.   That's correct.

Q.   And what additional voter information does the petition form now require that the prior version did not?

A.   So I believe it added an extra line that requires either a Florida's driver's license or the last four of your Social.

Q.   And has People Power observed any change in voters' willingness to sign petitions since this requirement took effect?

A.   Yes.  And I would say that it's -- I mentioned that our work is focused a lot around college campuses and young people. Much more common for young people to not know the last four of their Social, or they don't have their ID on them.  And so it's very common now with that added line that we get to that point and the student doesn't have that, and we are unable to -- to, you know, help them fill it out.

And then, generally, for those two items, we always get much more questions and concerns about, Well, why are you asking for this? versus a name and address and birthdate.  People are much more comfortable -- like, used to people asking for that. But then asking for that ID and/or Social, you know, it raises

concern, and it's much more people have questions and flags about those that we have to try to overcome.

Q.   And has People Power observed any voters who declined to sign the petition upon learning that they need to provide that information?

A.   Yeah.  I would, again, talk about the students, and I've seen it where they just don't know it, don't have their ID and then they don't know the last four.  And then it's, Well, we can't help you anymore.  And then there's no guarantee that I see that student again, so yeah.

Q.   Mr. Ardila, did FDH ultimately suspend it's 2026 campaign in September 2025?

A.   Yes.

Q.   And did People Power end its volunteer efforts for FDH around the same time?

A.   Yes.

Q.   And are you aware that FDH is attempting to qualify its initiative for the ballot in 2028?

A.   Yes.

Q.   Mr. Ardila, if HB 1205's provisions stay in place, will your organization organize volunteers to act as petition circulators for FDH in the 2028 cycle?

A.   No.

Q.   Why not?

A.   Because of the -- we're still worried about the potential

criminal liability for our volunteers and our organizations, and it's not, you know, something that we want to subject our volunteers to.

Q.   And, Mr. Ardila, if HB 1205's provisions stay in place, will your organization organize volunteers to distribute petitions for FDH in the 2028 cycle?

A.   No.

Q.   Why not?

A.   Still concerns about the criminal charges, but then also the -- with the provision still in place, we view the campaign as being much more difficult to be successful to get on the ballot.  And we have, you know, limited resources, and we want to make sure that our -- we are investing in -- investing in -- our volunteers in campaigns that we're going to have the most impact -- that we can have the most impact.  So as long as this provision is in place, we don't believe we are going to be able to have the most impact on it.

Q.   And, Mr. Ardila, if HB 1205's provisions did not exist, would your organization organize its volunteers to act as petition circulators for FDH in the 2028 cycle?

A.   Yes, definitely.

Q.   Why is that?

A.   Because this is an issue that very much our volunteers are very passionate about.  It's an issue that would be a -- really important for Floridians all across the state, and we also know

that Medicaid expansion is very much a popular issue among young people that we want to get more civically engaged.  It cuts across voters, nonvoters, party affiliations.

And so if this is an issue that we can help get on the ballot and we view it as -- if the restrictions are lifted, as something that we can really help get on the ballot, it's going to really be very much a motivator for our volunteers.  And for young potential voters, it's going to very much -- we think it's going to increase the likelihood to go vote.  So yeah.

Q.   Thank you, Mr. Ardila.

MS. GAMBHIR:  Your Honor, I pass the witness.

THE COURT REPORTER:  I need a break.

THE COURT:  Let's take a two-minute break.

(Recess taken at 9:24 AM.)

(Resumed at 9:24 AM.)

THE COURT:  All right.  We are back on the record.

Got water for the witness.

Cross-examination can commence.

MR. JAZIL:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. JAZIL:

Q.   Good morning, sir.

A.   Good morning.

Q.   My understanding is that you are the organizing director for People Power for Florida; right?

A.    Correct.

Q.    And that organization is a political committee; right?

A.    Yes.  The organization that I worked for last year is a political committee, correct.

Q.    So you don't work for that organization anymore?

A.    I work for a new organization.

Q.    Okay.  So a new organization.

And when you were working on the Florida Decides Healthcare initiative, that was for the old organization; right?

A.    Correct.

Q.    Okay.  All right.

So focusing on the old organization, People Power for Florida, it was a committee focused on promoting civic engagement and increasing voter registration and empowerment; right?

A.    Correct.  Yeah.

Q.    Okay.  So part of its job was to do voter registration; right?

A.    Part of it, correct.

Q.    And did y'all use volunteers for the voter registration?

A.    Yes.

Q.    Are you aware of the fines and criminal penalties that apply if someone forges information on a voter registration form?

A.    Yes, I'm aware.

Q.   And your organization continued doing the voter registration efforts despite the criminal penalties that went in place a few years ago; right?

A.   To a more limited capacity, but we did.

Q.   But you still did it?

A.   To a more limited capacity, yeah.

Q.   And, sir, People Power for Florida, is that a volunteer-driven organization?

A.   I mean, we have volunteers -- a strong volunteer network, but we also have paid staff.

Q.   So when you worked for them, you were paid staff?

A.   Yes.  Correct.

Q.   But you also have volunteers; right?

A.   Correct.

Q.   And is it the volunteers who go out and collect voter registration forms and petition initiative forms?

A.   It's both.

Q.   It's both.

     So when you were doing these collections, you were doing these as a paid employee of the company?

A.   The voter registrations?

Q.   Let's start with voter registrations.

     Did you, as a paid employee of this company, collect voter registration forms?

A.   Sometimes at our events, yeah.

Q.    How often?

A.    Me personally?

Q.    Yes, you personally.

A.    Like once a month at least.

Q.    Okay.  And once a month when you were collecting voter registration forms, how many did you collect?

A.    It really depends on the event.  It could be 1 or 2, could be 20, 50.  Yeah, it depends on the event.

Q.    So in that one event for the month, you might have collected 1 or 2 or 20 voter registrations forms?

A.    Yeah.  It really depends on the event.

Q.    All right.  And how often did you personally as an employee of the company collect petition forms?

A.    Specifically for Florida Decides Healthcare?

Q.    No, just any petition forms, any citizen initiative forms. How often did you personally collect petition forms?

A.    Around the same, yeah.

Q.    So once a month?

A.    Yeah, potentially.

Q.    And if in that month you were collecting voter registration forms, did you not collect petition forms?

A.    No.  I would say there would be most -- most of the time -- if we are working on a campaign -- if we are helping with Medicaid expansion or the abortion amendment, we'd be doing both.

Q.   Okay.  So your once-a-month work in the field you would be collecting voter registration forms and petition forms at the same time; right?

A.   Yeah.

Q.   And you would be collecting petition forms for multiple initiatives; right?

A.   Sometimes.

Q.   Okay.  Did you last cycle collect initiatives for -- petition initiatives for anyone other than the Florida Decides Healthcare initiative?

A.   Like I mentioned, just Right to Clean Water.

Q.   Okay.  And the cycle before that did you collect any initiatives for anyone?

A.   2023 the abortion initiative, yes.

Q.   Okay.  So your once-a-month trip into the field, you're collecting voter registration forms and petition forms for whomever it is your organization is supporting at the time; right?

A.   That's right.

Q.   Okay.  And how many initiative forms would you collect in your once-a-month trip to the field?

A.   More than the voter registrations, but, like, maybe 20 to 50, sometimes more.

Q.   20 to 50?

A.   Yeah.

Q.   What's the low end of that figure?

A.   The lowest possible, like the worst event?

Q.   Sure.

A.   Maybe five.

Q.   Okay.  Maybe five?

A.   Five.  Yeah, that would be a really bad event.

Q.   So it depends on the event; right?

A.   It really depends on the event.

Q.   It depends on the traffic of the event; right?

A.   The traffic of the event, the weather of the event. There's a lot of factors, but yes.

Q.   So lots of factors go into how many petitions you are going to collect; right?

A.   And voter registrations.  But yeah.

Q.   And voter registrations.

     And they're similar; right?  You're approaching someone for getting them to register to vote, and you're approaching someone to see if they'll fill out a petition form; right?

A.   It's somewhat similar, but it's different.  Yeah, it's a different ask.

Q.   But you'd agree in both instances you have to approach the person and introduce yourself; right?

A.   That's right.

Q.   And you have to in both instances build a rapport with the person so they don't walk away; right?

385

Cross-Examination – Mr. Ardila

A.   That's right.  Yeah.

Q.   And in both instances you have to engage the voter enough to where they will listen to you and wait for the ask of signing a piece of paper; right?

A.   That's right.

Q.   And in both instances once the paper is signed, then you do something about the signed piece of paper, whether it's putting it into an envelope or handing it to a Supervisor; right?

A.   That's right.

Q.   Okay.  So we can separate those two components.  There's the front end where you are introducing yourself to the person, building rapport, getting them to engage; right?

     An audible answer, sir.

A.   Yes.

Q.   And there's the back end where once they have signed the form, you are going to do something about the form; right?

A.   Correct.

Q.   Okay.  Now, sir, your volunteers -- how many volunteers does your organization have?

A.   Like last year there was just over 500 people who volunteered and completed a shift with us.

Q.   Okay.  So total last year 500 people volunteered?

A.   Yeah.  Just over 500, yeah.

Q.   Okay.  And do you guys keep a list of these volunteers?

A.   Yeah.

Q.   You have a list of these volunteers.

And do you know how often these volunteers engaged in one of your events?

A.   Yeah.

Q.   And how often do these volunteers who are not paid engage in your events?

A.   I would say a lot of them come at multiple times, so two or three times, but a lot of -- some of your volunteers are, like, 10, 20 times a year.

Q.   Okay.

A.   But yeah.

Q.   So let's break that down.

Some of your volunteers show up to an event two, three times a year; right?

A.   Yeah.

Q.   And some of them show up to ten times a year; right?

A.   Or even more.

Q.   And these people who show up ten times or more, these are your super volunteers?

A.   Primarily, yes.

Q.   And you guys have approximately 25 super volunteers; right?

A.   This past year, yeah.

Q.   And to be clear, this is for the organization --

A.   So --

Q.   -- you worked for this past year?

A.    -- this past year, but not necessarily that just because they volunteer a lot, they become a super volunteer or a volunteer leader.  Those 25 that I mentioned were volunteers who were leading events on their own.  So we had more than 25 who did multiple events or up to ten events, but they may be just showing up to already-organized events.  Those 25 were leading their own events in their community.

Q.    Okay.  So these 25 volunteers were leading their own events in their community?

A.    Right.

Q.    And of these 25 volunteers, did any of them lead events after HB 1205 passed?

A.    Way less, but, yes, a small amount.

Q.    How many of the 25?

A.    Well, I mentioned the two in my testimony who were -- who did it and then stopped.  But, yes, they tried.

Q.    Okay.  So how many?  Two?

A.    Two.

Q.    Okay.  So two of your super volunteers led events after HB 1205 was passed; correct?

A.    They tried to.  They attempted to and then stopped after one try.

Q.    So those two only led one event?

A.    Each.  So one each.

Q.    So they did one event each, those two?

A.    Yeah.

Q.    And your understanding of why they stopped is what?  Your conversation with them?

A.    Yeah.

Q.    And when was your conversation with them?

A.    Well, I talked to them leading up to the event to make sure that they knew the new guidance and then, you know --

Q.    Okay.

A.    -- after the event as well.

Q.    So when was that?  When was it that you had this conversation?  When were the events?

A.    July.

Q.    July?

A.    Yeah.

Q.    July when?

A.    End of -- I'm not sure.  At some point at the end of July, yeah.

Q.    And no conversations with these super volunteers about other events since then; right?

A.    Yeah.  I mean, they've been asking if they -- if there's any changes to the law yet because they want to go back to collection.  So --

Q.    Okay.

A.    -- there's that.

Q.    Got it.

And, sir, at -- any of your super volunteers, approximately 25 -- any of them ever get charged with an infraction or a crime after HB 1205 was passed?

A.    No, not that I'm aware of.

Q.    Were you yourself ever charged or accused of a crime or infraction after HB 1205 was passed?

A.    No, but that's, you know, because we changed our policies for the -- to the abundance of -- to protect our volunteers, for the safety of our volunteers.  So we took extra precautions.

Q.    Okay.  And you talked about the increased costs with the approach that Florida Decides Healthcare implemented late in their cycle, which was talking to a voter, handing them a petition, and then, after they sign it, handing them a prestamped envelope.

Do you recall that testimony?

A.    Yeah.

Q.    And if I understood correctly, an increased cost was the --

(Reporter requested clarification.)

Q.    So you discussed earlier in your testimony the approach Florida Decides Healthcare took late in their petition-gathering cycle, which was the approach of handing a voter a form, having them sign it, and then giving the voter a prestamped envelope.

Do you recall that?

A.    Yep, distribution.

Q.    And as part of that, you talked about the increased costs

that were associated with that approach for your organization; right?

A.   Correct.

Q.   And that increased cost, if I understood it, was the cost of a prestamped envelope; right?

A.   Yes, but also the cost of putting -- like, mailing those prestamped envelopes to our different volunteer leaders.  So there's an added cost there.

Q.   Okay.  So -- and you also talked about the cost of having people put together the packets with the prestamped envelopes. Did I understand that correctly?

A.   Staff time.

Q.   Staff time.

     And this work was done by your paid staff or your volunteers?

A.   Led by our paid staff.

Q.   Okay.  But the volunteers helped out with that?

A.   I mean, we have some volunteers who helped with the -- who helped with putting together supplies.

Q.   Okay.  And the volunteers aren't paid; right?

A.   No.

          MR. JAZIL:  All right.  I have no further questions, Your Honor.

          Thank you.

          THE COURT:  Mr. Stafford.

MR. STAFFORD:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. STAFFORD:

Q.   Good morning.

A.   Good morning.

Q.   I promise I'll be quick.

If I remember -- if I recall from your testimony, you mentioned that -- some concern that -- some of the people in your organization approached about signing petitions after 1205 passed and went into effect was a concern about providing identifying information, either the driver's license number or the last four; is that --

A.   That's correct.

Q.   Did I get that correct?

A.   Yeah.

Q.   Do you know whether or not that concern was the concern of providing that information to your organization or providing that information to the state?

A.   I think it's just who they are able to provide it to.  They just have concern of why we are asking who -- if it's the State, if it's me, if it's an organization, they are just concerned in general about where -- whoever is collecting the information, what are they doing with it, you know.

Q.   You are aware, are you not, that in order for somebody to vote, that information -- that identifying information has to be

on record with the State; correct?

A.    Correct.

Q.    So the only one that would have the information now that wouldn't have it before would be your organization; is that a correct statement?

A.    Yeah.  But they don't -- they are not -- like, the potential voter doesn't know that.  But, yeah, that's where their concern lies.

Q.    And you also mentioned concern about criminal charges; is that correct?

A.    Correct.

Q.    Are you aware that the criminal charges or the definition -- or the redefinition of racketeering activity to include election-related matters requires that the activity be related to a violation of the Florida Election Code?  Is that your understanding?

A.    Yeah.  My understanding is that it's -- uses the word "irregularities" and -- yeah, I think it's irregularities.

Q.    Be it irregularities or fraud, it has to be tied to a violation of Florida Election Code?

A.    Correct.

Q.    Are you aware of any member of your organization, paid or volunteer staff, that's ever been charged with violation of Florida Election Code?

A.    No.

MR. STAFFORD:  Thank you.  That's all I have.

THE COURT:  Anything else from the defense?

Hearing nothing, redirect?

REDIRECT EXAMINATION

BY MS. GAMBHIR:

Q.   Mr. Ardila, just a few questions.

A.   Yeah.

Q.   To clear up the record, where are you currently employed?

A.   At a new organization called People Power for Florida Empowerment Fund.

Q.   What type of organization is that?

A.   A nonprofit.

Q.   And where were you previously employed?

A.   A defunct organization called People Power for Florida, which was a political committee.

Q.   Do both organizations share the mission of mobilizing young individuals on political causes?

A.   Yes.

Q.   And, Mr. Ardila, you testified about your organization doing both voter registration and petition collection; is that correct?

A.   That's correct.

Q.   Now, Mr. Ardila, are there any differences between petition collection and voter registration in your view in the type of message they convey?

A.    Yes, definitely.

I would say that for the petition we are very much expressing a specific position and an impact that your vote is going to have.

I think the voter registration is very much an administrative ask.  It's very much, There is an election.  You should update your address, but not so much of, like, why.

I think the petition goes the extra way of, like, Not only should you register, but this is why you should register and why you should vote this year and why you should be more civically engaged.  So I think it's even more -- it's more personal and it's tied to a specific issue so it has an additional ask of Not only become civically engaged, but for this specific reason.

Q.    And Mr. Ardila, you were asked questions about the racketeering-related provisions.

Do you remember that?

A.    Yes.

Q.    Mr. Ardila, do you have an understanding of whether irregularities is the same or different than a charge under the Florida Election Code?

A.    No, I think it's -- that's where the confusion lies, I think.

Q.    And finally, Mr. Ardila, when you were speaking about Megan, I believe you said that she stopped after the switch to circulation.

Did you mean the switch to distribution?

A.    Yes, that's what I meant.  I meant the switch to distribution.  That's what I meant, in July, yeah.

MS. GAMBHIR:  Okay.

Thank you.  No further questions, Your Honor.

Thank you.

THE COURT:  All right.  It's been well over an hour.  What we are going to do is go ahead and get the next witness set up, which is by Zoom, I believe; is that correct?

MR. WERMUTH:  Yes.

THE COURT:  Let's get -- y'all can take a break and then let's get that set up.  We'll take a ten-minute break.

Thank you.

(Recess taken at 9:41 AM.)

(Resumed at 9:57 AM.)

THE COURT:  Before we start with the next witness, let me ask briefly.  Mr. Wermuth, I asked at the close of business if you had a rough estimate of the total number of witnesses.  We've heard from five so far.  This is witness number six.  It's just so I can sort of keep track of where we're at.

MR. WERMUTH:  I do not have that final number yet.  We have a little bit of shifting around in a later schedule, but I do know we're on track, so that's good we're on schedule.  And I will be in a position to give you that final number hopefully --

THE COURT:  It doesn't need to be a final number, just

best guess 5:00 tonight.

MR. WERMUTH:  About 20.

THE COURT:  About 20?

MR. WERMUTH:  Yeah.

THE COURT:  All right.  You were able to phone a friend.  So about 20.

And do we have any idea from the defense side -- I know y'all are different, but just -- it makes it easier.  I'm just lumping y'all all together.

Does the defense have a rough idea of how many witnesses y'all are calling?

MR. JAZIL:  Your Honor, six.

THE COURT:  Okay.  And, again, I'm not holding anybody to that.  I'm not going to cut you off if you call 7 or you call 21.  I just -- so I can kind of keep track of where we're at.

And I know that some witnesses are, obviously, going to be longer than others, so it's not a -- just a pure question of numbers.  So y'all don't need to add that clarification.

All right.  Plaintiff can call their next witness.

MS. GRADY:  Good morning, Your Honor.  Alexis Grady for Florida Right to Clean Water plaintiffs.

Plaintiffs call Ramon Pereira Bonilla.

(Mr. Pereira Bonilla entered the Zoom.)

THE COURT:  Sir, this is Judge Walker.  Can you hear me?

THE WITNESS:  Sure can.

THE COURT:  All right.  If you could, are you able to see the courtroom?  It should be a split screen.  On one side is a lawyer standing behind a podium and the other is the old fella, which is me, sitting underneath a seal flanked by the American flag and the flag of the great state of Florida.

THE WITNESS:  Yes, sir.

THE COURT:  All right.  I ask you that because it's important you understand the importance that this is -- while you're not here in the courtroom, this is a federal court, and you understand the significance of this matter and that you are here appearing in federal court, even though you're not physically present.

Is that correct?

THE WITNESS:  I sure do.

THE COURT:  All right.  If you'll raise your right hand, please.

**RAMON PEREIRA BONILLA, PLAINTIFFS' WITNESS, DULY SWORN.**

THE COURT:  You can put your hand down.

If you could, state your name and spell your first and last name for the record.

THE WITNESS:  My name the Ramon Eduardo Pereira Bonilla.  My first name is spelled R-a-m-o-n, and my last name is spelled P-e-r-e-i-r-a space B-o-n-i-l-l-a.

THE COURT:  Thank you, sir.  And just to let you know,

I've told my court reporter she can ask directly for you to repeat something if she doesn't hear. It's challenging enough to make a record. It's even harder when it's by Zoom.

So please let the lawyer finish their questions, and they're going to let you finish your response before they ask another question.

I've asked everybody to turn off their mics, and I'm going to turn off my mic as well to make it easier on the court reporter.

So now your lawyer's going to ask you some questions, and then once she's done, we'll turn it over to the other side.

Counsel you may proceed.

MS. GRADY: For the Court, I expect Mr. Pereira Bonilla's testimony to relate to plaintiffs' challenge to the ban on non-US citizens circulating petitions and Mr. Pereira Bonilla's personal circulation activities.

DIRECT EXAMINATION

BY MS. GRADY:

Q. I'd like to start by asking a little bit about your background.

Were you born in the United States?

A. No, I was not born in the United States.

Q. When did you move to the United States?

A. I moved to the United States from Caracas, Venezuela, in 2006.

Q.   And what is your current citizenship status?

A.   I am a legal permanent resident of the United States.

Q.   Where do you live now?

A.   I live in Orlando, Florida, in the Alexan -- or in the Mills 50 District.

Q.   How much of your life have you lived in Florida?

A.   About 17 years.

Q.   Is it fair to say you've lived in Florida for the majority of your life?

A.   Yes.

Q.   Why have you chosen to continue living in Florida?

A.   So for the first -- for the first half of my life until I was an adult, I wasn't able to choose where I live, obviously.

     After graduating high school in 2019, I ended up in Los Angeles for a couple of years and then in Boston for a couple more.  I really loved those cities.  They were great, very culturally vibrant and walkable, but I ultimately chose to move back to Florida, specifically Orlando, in 2022, because I felt like our country was headed in a very dark direction, and we were very polarized and unable to speak to each other.

     And I felt like the kind of politics that we were going to need that extended past the kind of left-right paradigm and focused more on a class basis would be very useful in Florida. And Florida, specifically Orlando, would be a great place to sort of test out that theory and get involved with organizing,

so I chose to move back to Orlando, specifically to get involved with the organizing community.

Q.   Would you describe yourself as an organizer?

A.   Absolutely.

Q.   What does organizing mean to you?

A.   Organizing, like the name implies, is about taking groups of people who are disorganized, dis-congruent and putting them into groups and helping them, frankly, recognize their own power.

It's about working people, health care workers, service workers, fast food workers, even professionals like lawyers and doctors recognizing that they have as much power in this system as elected officials do when they're able to come together and put together campaigns and pressure to change the system in a way that benefits their lives and gives them the dignity that they deserve.

Q.   And does your organizing work include petition circulation?

A.   Yes.

Q.   Let's focus on petition circulation.

Are you familiar with the ballot initiative sponsor Florida Right to Clean Water, also known as Right to Clean Water?

A.   Yes.

Q.   How are you familiar with Right to Clean Water?

A.   Early in 2023, I was at an event where someone from the Right to Clean Water approached me and asked me to sign the

Right to Clean Water petition.  Of course I denied because I am unable to sign petitions, but I was very interested in what they were talking about and what the amendment proposed.  It really resonated with me, and so that's how I became acquainted with the Right to Clean Water.

Q.   And was this 2023 event the first time you became involved with Right to Clean Water?

A.   Yes.

Q.   And was it the first time that you circulated petitions for Right to Clean Water?

A.   Yes.  So after they shared with me a little bit about what the Right to Clean Water amendment did, I felt very excited and called upon to help get this amendment on the ballot.  I always felt like even though I personally wasn't able to sign petition ballots, I would be able to make up for that by getting more people to sign for it than just myself.

     And so at this event I took a clipboard, spent a little bit of time talking about what the amendment actually did, and then I joined that volunteer right then and there and started collecting ballot petition signatures at the event we were at.

Q.   And did you receive any guidance from the Right to Clean Water representative before you started circulating the Right to Clean Water petitions?

A.   Yes, absolutely.  After I made it aware to this volunteer that I wanted to circulate the petition, we spent about ten

Direct Examination – Mr. Pereira Bonilla

minutes or so going over two main things.  First was, in general, how are petitions collected and the process for getting signatures, so going over the ballot synopsis, putting down your date of birth, address, your county, not your country, and making sure the signature is legible and hopefully matches what's on the voter file.

And then the second half was specific to the Right to Clean Water amendment and why the amendment was necessary with the current state of play in Florida was with the right to clean water and water purity testing.

And after about ten minutes or so, they sent me on my way to collect signatures at this event that we were at.

Q.   And to confirm, did you collect petitions for Right to Clean Water during the 2024 to 2026 election cycle?

A.   Yes, I did.

Q.   Approximately how many petitions did you collect on behalf of Right to Clean Water during the 2024 to 2026 cycle?

A.   I'd say more than 200, less than 500.

Q.   And how many of those petitions did you collect in 2025?

A.   Somewhere between 60 to 100.

Q.   And were the remainder of the petitions circulated in 2024?

A.   2023 and 2024, yes.

Q.   Have you circulated petitions for other ballot initiatives as well?

A.   Yes.  I have circulated petitions for Medicaid expansion,

recreational marijuana, and the right to bodily autonomy.

Q.    Have you circulated petitions for multiple ballot initiatives at the same time?

A.    Yes, I have.

Q.    Were you ever circulating Right to Clean Water amendment petitions and for bodily autonomy at the same time?

A.    Yes, I have.

Q.    Let's talk about your petition circulation activity with Right to Clean Water in a little bit more detail.

      Why did you decide to circulate Right to Clean Water petitions?

A.    Yeah.  When I first heard that in the state of Florida we didn't have a right to clean water, which basically means that our state had various levels of testing and purification depending on what city and county you lived in, I was very shocked and surprised.  Living in the richest country in the world in a state that has some of the best water quality in the world, when you talk about our aquifers and our springs, it felt very shocking and surprising and infuriating that we couldn't -- depending on where you lived, you didn't know if the water that you used to cook, bathe, and drink is up to standard and would keep you safe.

      From a personal level, even more so.  I own a paddleboard, and I love spending time in Florida's nature, particularly the springs in Central Florida, like Rainbow Springs, King's

Landing, and Blue Springs.  And so knowing that I could help contribute to, in a way, keeping those places clean and safe also resinated deeply with me.

And so for those two main reasons I felt like it was going to be something that I wanted to get involved with and help get on the ballot.

Q.   You mentioned collecting Right to Clean Water petitions during the most recent effort to get the amendment on the 2026 ballot.

How often did you collect petitions for Right to Clean Water?

A.   In the year -- so this would be, obviously, prior to the ban taking place in early May.  So in those first five months of 2025, I would say I collected about once a month, once every two months for Right to Clean Water.

Q.   And in 2024?

A.   In 2024, about the same, maybe a little more.  Maybe about once a month more consistently since it was an active election year.

Q.   Where did you typically collect Right to Clean Water petitions?

A.   Typically, it would be at large events like large protests, also at kind of, like, fun events like tailgates or festivals, like Pride events or, for example, Central Florida Earth Day or Vet Fest where large amounts of people are there.

Also, we would collect petitions at smaller organizing events like town halls for elected officials.

And then, lastly, there were also -- at times we would collect petitions at -- during canvassing events for elected officials, and we would go door to door collecting or spreading news about the election and then also asking folks to sign the petitions.

Q.    What was your process for circulating Right to Clean Water petitions?

A.    Yeah.  For Right to Clean Water specifically, I would first introduce myself.  I would say, Hello.  My name is Ramon, and I'm here with Right to Clean Water.  And then I would ask folks a question, and I'd ask them if they knew that in the state of Florida we didn't have the right to clean water.

Most times people would be very shocked and kind of drawn in by that.  And they'd sort of ask, What?  What are you talking about?  And then I would give them a follow-up clarification and explain, similar to what I just did, that in the state of Florida there isn't a standard for water purification or treatment, and so depending on the city that you're in, you could be living somewhere where your water could harm you or somewhere where your water is completely safe to drink.

And then from there, people would usually notice a clipboard in my hand and usually ask to sign themselves, or I would explain to them that they could do something by signing

and then explain to them the -- clearly explain to them the ballot petition process, that by signing, they were not voting one way or the other; they were just simply stating their desire to have this amendment be on the ballot so that people could vote for it in November.

Q.    What did you do with the Right to Clean Water petitions after they were signed?

A.    Yeah.  So as soon as someone signed a petition on the top of my clipboard, I would first verify to make sure that the information was legible and that it kind of passed that first standard.

From there, I would take that petition and put it at the bottom of my stack underneath all the unsigned petitions so that I wouldn't lose it.  And then at the end of my shift, or whenever we were done collecting petitions, I would take the full stack of unsigned and signed petitions with the clipboard over to my supervisor and let them know that the unsigned petitions were at the bottom and the signed petitions were at the top.  And that would be it.

Q.    Did you ever take any signed Right to Clean Water petitions with you after an event?

A.    No, never.

I actually had a funny experience where we were at a tailgate at UCF.  It was one of the bigger ones.  It was quite hectic and loud.  And I couldn't find my supervisor after being

done with our shift for the day, and I was texting her.  And she said, Oh, you can just hold onto the petitions and give them to me the next time you see me.  And I told her that I did not want to do that because I had well over 100 petitions with me that were signed.  And to me it's a very big responsibility, and I didn't want to risk losing or misplacing them.  So I went out of my way to spend a little longer at that event to try to find her and give her the petitions before heading home.  So I never took any petitions with me that were signed home.

Q.   And did you typically sign up with the Right to Clean Water campaign in advance to circulate petitions?

A.   No.  I actually never -- I can't recall signing up with the Right to Clean Water ahead of time to circulate petitions.  The Right to Clean Water folks were just ever present at the events that I was at, and so whenever I would see them, I would sign up -- or not even sign up, but ask to circulate petitions right then and there.

It never really occurred to me to sign up because I was running into them so often and circulating so many other petitions that it never felt like a need to do that alone and independently.

Q.   And was it important to you to be able to circulate petitions without signing up for events?

A.   Yeah, definitely.  As an organizer, one of the things that I'm always mindful of is burnout and stretching myself too thin,

especially in the 2024 cycle.  There were so many things going on and so many candidates to worry about getting elected and so many issues to fight for and be involved in that it was -- it didn't really make sense to sign up to exclusively circulate Right to Clean Water petitions when I was doing so many other things at once.

And like I mentioned, because I was already running into these folks so frequently, I didn't really need -- have the need to sign up specifically for Right to Clean Water.  I was usually doing Right to Clean Water and other petitions or I was already at an event for another reason and the Right to Clean Water folks were there.  So it made sense to be able to petition.

So it was very important to me that I could sort of on the fly, ad hoc do petition circulating.

Q.    And did you personally observe other volunteers joining in to circulate Right to Clean Water petitions at events when they were made aware of the opportunity?

A.    Absolutely, yeah.  It was very, very common for volunteers or organizers to circulate petitions on the fly.  Oftentimes, we show up to events looking for things to do and ways to get even more involved.  Even, you know, to this day, I am not able to circulate petitions, unfortunately.  But with the large protests that we have, like the No Kings protest, which I'm involved in putting together, I see my friends oftentimes show up empty handed, and then people are handing them clipboards to help

spread the word either for candidates or for different petition amendments.  So it's something that's incredibly common in this space.

Q.   Okay.  Let's talk about HB 1205.

     Are you familiar with Florida House Bill 1205?

A.   I am.

Q.   Are you familiar with the law's ban on noncitizens circulating petitions?

A.   I am.

Q.   What is your understanding of that provision?

A.   My understanding of the law is that noncitizens like myself are unable to collect petition signatures or circulate them, even just, like, hold them.  So, yeah, that's my understanding of the law.

Q.   What was your immediate reaction to HB 1205?

A.   My immediate reaction was shock but not necessarily surprise.  I was already aware of other initiatives and laws that the Florida Legislature had passed to disenfranchise noncitizens like myself.  In years prior, the Legislature had passed a law to prevent noncitizens from registering voters. And so this law was part of a larger pattern of behavior that was well established in the Florida Legislature, but it was still shocking and difficult to take in.

     My emotions ranged from a deep sadness to a deep frustration and anger.  Coming from a country like Venezuela,

which is what you recognize as an authoritarian and totalitarian regime with very limited democratic participation, it felt as though I was sort of backtracking into those -- into that state.

And, you know, I came to this country quite a long time ago, but I still remember the reasons why I did, and it was because my mother felt that we needed to be at a place where we could actually participate in the democracy that we were a part of. And despite not being a citizen this entire time, I've always found ways to participate in this beautiful tapestry that we call American democracy. And although I haven't been able to vote directly, I certainly have been able to make my voice heard. And one of the ways which I've been able to make my voice heard in particular had been through petition circulating. So I was very heartbroken to have heard that that law -- that bill passed the Legislature and became law.

Q.   Did you change your behavior as a result of HB 1205?

A.   Yeah.  Absolutely.

You know, there -- as an organizer, I'm always looking to never waste someone's time, and we live in a culture where we are constantly inundated with information on the political state of the world.  A lot of it is very negative, and so as an organizer, whenever I am informing someone, I am educating someone, it's usually about something that's not so great.

Like the fact that you don't have the right to clean water in Florida isn't that great, but the point of organizing is to

give someone the ability to do something.  It's to help them recognize their power.  And so I could share this bad news with people but then give them an ability to do something about it right then and there.

After HB 1205 became law, I no longer had that ability, and so I stopped circulating petitions entirely.  And particular issues like Medicaid expansion, the right to clean water, bodily autonomy, while those issues are still incredibly important to me and something that I hope to fight for in other ways, there really aren't many ways to fight for these issues without a constitutional amendment to the Florida Constitution through a petition ballot.  So I haven't really just approached people and talked about the issue because there isn't much that they can do about it right then and there.

And, you know, obviously, people can still sign the petition on their own if they do the work of going online, printing it, signing it, and then sending it in to their Supervisors of Elections office.  But as any organizer can tell you, the bar for someone doing that is incredibly high, and it's being incredibly motivated, and most people, while they might care about the issue, won't go that far to do that much.

Q.   When did you last circulate initiative petitions prior to HB 1205?

A.   Yeah.  The last time I circulated ballot petitions was the day before the law took effect, so May 1st, 2025.  We were

having a symbolic demonstration outside of the Orange County jail, and we were circulating the Right to Clean Water and a Medicaid expansion.

Q.   Did you have plans to continue circulating initiative petitions in 2025?

A.   Yeah, most definitely.

You know, we -- we took a lot of losses in 2024.  We had some amendments that made it onto the ballot and others that didn't make it onto the ballot at all, and then we had some that when they made it onto the ballot, they didn't pass.  And so as an organizer, as a -- as an immigrant, I am never one to give up, and so I really wanted to, you know, give it another shot and learn -- take the reflections and learnings from the previous cycle and apply those to the new cycle and readdress our tactics and our strategies so that we could be successful this time around.  So I had many plans to circulate petitions.

And also one last thing I'll say is even early on in 2025, we could see that there was a large sentiment against the current presidential administration beginning to form and talks of mass protests were beginning to happen, and we've seen so many mass protests occur in 2025 and 2026 already.  So these mass protests were also going to be a clear opportunity to collect many signatures for quite a number of ballot initiatives.

Q.   And when did you plan to circulate petitions in 2025?

A.    Yeah.  Like I mentioned, particularly at mass protests, which are always great opportunities to circulate petitions since people are attending and looking for something to do and they are very excited.

But also the other types of events like I mentioned, nonpolitical events like tailgates and also festivals like Central Florida Earth Day or Veg Fest, and then also more political events but that are a smaller audience, like political town halls, or meet-and-greets with elected officials, or even just mingles that organizations tend to have.

Those were all going to be opportunities to circulate petitions where I was planning on circulating the petitions that year.

Q.    And did the opportunities you had to share your views about Right to Clean Water's ballot initiative change after HB 1205 was enacted?

A.    Yeah.  Definitely.

Like I mentioned earlier -- you know, when I'm talking to my friends, it's one thing.  My friends are always going to listen to me.  But when you are talking to a stranger in the street, they really want to give you as little of their time as possible.  They are probably on their way to go do something, and the fact that they even stopped for you in the first place is already a miracle.

If all I can say to someone is, Hey, we don't have the

right to clean water in Florida.  That's terrible.  I know you hate it as well.  Here's what you can do.  When you get home, fill out this piece of paper and then print it and then mail it, and then hopefully it works out, it just doesn't resonate with people.  It's a waste of my time; it's a waste of their time.

And so it's been severely limiting in my ability to talk about the Right to Clean Water because, again, as an organizer my goal isn't just to inform people; it's to give them tools to be able to impact the system that they're a part of and want to change.  And when I'm not able to give them those tools and provide it to them in a way that is accessible and actionable, then my ability to talk about the issue at all is severely limited.

Q.   Why do you feel it necessary for you to circulate petitions rather than just talk to people about the amendment?

A.   Yeah.  So to further clarify, it's ultimately a matter of reality and people's time -- how people spend their time.  Most people are not politically active; they're not really that politically aware.  And so when I am approaching someone on the street and am able to give them a petition that they can sign right then and there and kind of forget about the issue and not have to feel like there is something else that they have to do, it's a lot more accessible, easier, and impactful.  When I, on the other hand, can only approach someone, educate them about the issue, and then leave it on them to go and do something

afterwards, it is a much higher bar for effort.

And, frankly, from a working-class perspective, many of the people who I approach at these events I can tell are laborers, and they work quite hard. Most Americans are working a lot of jobs nowadays, and so it's difficult and almost unreasonable for me to ask them to take time out of their busy day instead of cooking dinner or spending that extra five to ten minutes with their child. To instead print out a petition, sign it, make sure it's filled out correctly, and then mail it in to their Supervisor of Elections' office is just unreasonable for me to ask.

And, therefore, the ability to collect the petition right then and there while I have that person's attention, while they're feeling fired up about the issue is significantly more impactful than simply asking them to do it on their own after we stop talking.

Q.   Since HB 1205 was enacted, have you ever tried to share your views about the initiative petitions without circulating?

A.   Yeah.  So there was a Pride event at St. Pete, which was, I think, a perfect example of this.  So I was there with the Medicaid expansion folks.  I made it clear to them that I wasn't going to be able to circulate petitions myself, but because I had a lot of experience circulating petitions in the past, they felt like it would be good to have me there to speak to people. They felt like I have that ability.  So I figured we'd give it a

try.  I would approach people, speak to them about the issue, and then I'd wave over my friend who would have a clipboard ready for them to sign.  This ended up being very ineffective and quite disastrous.

Even if at an event like a Pride event where you would imagine that people are to some degree politically activated and care about certain issues, they're mostly there to have fun, and they're mostly there to go on their way.  And so when I would approach someone, most people would say they weren't interested, but the people who would stop and talk to me and were interested in signing, as I waved my friend to come over, in the 10 or 15 seconds or so that they were coming, the person was like, You know what?  I'm good.  I'm just going to go do my thing.

So there was actually -- there were three of us total.  One person was -- or two people were citizens who could petition sign, and myself -- obviously, I couldn't.  So I was working with one of the citizens, and the other citizen was kind of on their own.  At the end of the day, we had just -- myself and the other citizen who were working together had just about as many petitions as the other individual who was working by themselves.

And so in volunteer organizing spaces, you're obviously -- you're obviously always constrained in your resources, both -- financial but also your people power.  And so to have three people but for two of them to have about the same results as just one is severely limiting and kind of counterintuitive to

maximizing your people power.

There are only so many hours in a day.  There's only so many things that I could be doing, and so for me to have spent all that time to only get about as much work with two people done as one person did felt like very ineffective and that I could be doing something else as an organizer.

Q.   And you mentioned individuals walking away when you went to get your colleague who was able to circulate petitions.

Why don't you just walk around together with someone who can circulate petitions?

A.   Yeah, it's another question of resources, right.  So I could be walking around with that person and getting -- like, having them sort of stand next to me like a ghost, and then when the person is ready to sign, I can turn them over.  But at that point it's a loss of -- loss of efficiency, because that person who is standing next to me like a ghost could be doing their own thing the entire time and circulating their own petitions.  So it's ultimately just limiting on the resources that we have. It's -- it's, again, severely limiting because that person could be collecting their own petitions, being more effective in that way.

And then I guess something else that I would want to mention is that when that person wasn't with me and they were off alone or off nearby in earshot doing their thing, sometimes I would ask to wave them over and they were in the middle of

getting a petition signed.  So it would also be limiting to them there because they had to wait to get the petition signed to come over, and the person I was talking to would lose interest at the time.

So both -- both of these hypothetical setups wherein someone is connected to me at the hip and just sort of standing by ready to go or where someone is within earshot and doing their own thing and then coming back, they're both very ineffective and severely limiting in terms of the resources that we have.

Q.   And prior to HB 1205 when circulating petitions, did you talk to voters about issues beyond just the right -- the petition that you were circulating?

A.   Yeah.  Absolutely.  So as I mentioned, most people are only going to give you about a minute or two of their time, but occasionally you have the very motivated and excited individuals who want to know more about what's going on, want to find ways to get plugged into the local organizing community.

And you can have those who maybe aren't so friendly but do want to have a spirited debate on particular issues.  I can recall a time where I had an over hour-long conversation with someone when I was circulating Amendment 4, which was the right to bodily autonomy.  We spoke about everything from, you know, fetal personhood to, you know, the right to housing and how that kind of correlates to, you know, housing someone in your uterus

for nine months for free and all these other philosophical debates, and kind of why and how things are the way they are.

I've had similar discussions that were probably just as long about the right to clean water as well that sprawled further beyond the right to clean water when we talk about, you know, corporate capture over Florida Legislature amongst both parties, how our beautiful state of Florida is continuously being destroyed by developers and all for the sake of their profit without providing better outcomes for people, and then helping them find -- helping these individual who are interested in talking about this, finding ways to get involved, whether it was coming up to the capitol and giving public comment or helping get folks elected and flipping seats in Central Florida.

Petition circulating was definitely one of the ways in which I was able to have extended conversations with people, and some of my strongest organizing allies today are people who I actually met petition circulating, who got involved because I happened to approach them at a UCF tailgate or at a -- you know, at another event out at Lake Eola.

Q.   You mentioned your organizing peers and allies.

Did your relationship to Right to Clean Water members change after HB 1205 was enacted?

A.   Yeah, unfortunately it did.  You know, I love my Right to Clean Water folks.  They're always going to have a special place in my heart, but most of my interactions with them were about

volunteering with them and doing work with them.  I would see them at an event, and I would say, Hey, it's me again.  Let me get a clipboard.  And then I'd get a clipboard and then I'd come back after an hour or so and tell them about some of the people who I talked to and whatnot.

I can't do that anymore.  So as much as I love them and I still occasionally say hi to them when I see them, I don't really talk to them as much or interact with them as much because the work that I do for them is no longer allowed under the law.

Q.   And if not for HB 1205, would you have continued collecting petitions for the Medicaid expansion amendment?

A.   Yeah, absolutely.

Q.   And if not for HB 1205, would you have continued collecting petitions for the Right to Clean Water amendment?

A.   Yes, absolutely.

Q.   Why would you continue collecting petitions?

A.   Yeah.  I mean, these issues are incredibly and deeply important to me.  You know, the Right to Clean Water in particular, it's a shame that, again, in the richest country in the world, in a state as abundant as Florida, we don't know for sure if we have the right to clean water.

I learned after HB 1205 had passed that there's actually a city in Orange County where I live that hasn't had clean water for years.  It's the city of Wedgefield, and there's some really

horrifying stories coming out of that place.  And I've met some of people who live there, and that kind of stuff touches your heart and never -- never really leaves you.

And to know that, really, the one remedy that they would have would be for the State of Florida itself to have a clear standard across the entire state for clean water.  You know, it's heartbreaking, but it's also motivating to want to continue to do something about it.

I wish I could collect more petitions for them.  I always tell my friends to circulate petitions, but similar to telling strangers to do something, you know, you never know if someone's actually going to do something, and it's better to do it yourself.

With Medicaid expansion in particular as well, that's something to me that, you know, the funding from the federal government is there.  We should be able to have that expansion, and there's -- there's just so many issues when they're put in this format, in the petition ballot format, that seem like common sense.

And most times people have a similar reaction to mine when I found out about them, like, it's a bit of shock, a bit of surprise and, Yeah, I'll sign this.  This should change for sure.  And so I would have loved to have continued to take that energy and channel it through petition ballot collection.

MS. GRADY:  Your Honor, I pass the witness.

THE COURT:  Thank you.

CROSS-EXAMINATION

BY MS. HARDY:

Q.   Good morning.  Melissa Hardy for the Attorney General's Office.

You testified today that you are a non-US citizen from Venezuela; correct?

A.   That is correct.

Q.   So is it fair to say that you have no -- there is no legal barrier for you returning to Venezuela?

A.   No, not really.  There is a legal barrier in the sense that I want to become a citizen of this country, and my understanding is that I'm not allowed to leave the country for a certain time period in order to qualify for naturalization.

Q.   But you are able to return to Venezuela if you wanted to?

A.   If I didn't want to become a citizen, but I do want to become a citizen, so I will not be returning to Venezuela until I do become a citizen.

(Reporter requested clarification.)

THE WITNESS:  I could return to Venezuela if I did not want to become a citizen, but because I do want to become a United States citizen, I will not be returning to Venezuela until I do become a citizen.

BY MS. HARDY:

Q.   Okay.  And a little bit about your background with the

Right to Clean Water.

You testified today that you volunteered on the spot at a community event; correct?

A.   That was the first time I volunteered with them, yes.

Q.   So you arrived at the event and you started collecting petitions that same day?

A.   I arrived at the event; they approached me asking me to sign the petition.  I denied to sign the petition because I am not a citizen and unable to do so.  But I expressed interest in the petition and expressed interest in being able to circulate the petition.

After we spent about 10 to 15 minutes or so talking about the petition and how to circulate it properly, then they gave me a clipboard, and I was able to collect petitions at that event.

Q.   But it's true that you started collecting petitions that day?

A.   I collected petitions the same day that I attended an event after receiving 15 minutes of training.

Q.   Okay.  And that was just -- as you stated, it was only a 10- to maybe 15-minute training?

A.   Yeah.  It was about 10 to 15 minutes explaining how to collect the petition, making sure that people's signatures were legible, that they put the correct information down, and then also explaining what the amendment itself did and what signing onto the petition did.  Rather than voting in favor of anything,

they were simply stating that they wanted this amendment to be on the ballot for 2024.

Q.   And that training didn't involve any registration process?

A.   No, that training did not involve me registering with the Right to Clean Water.

Q.   No application process?

A.   No, there was no application process.

Q.   And no background check of any kind?

A.   No, there was no background check.

Q.   Okay.  So it is your testimony that after 10 minute -- 10- or maybe 15-minute training, you were able to start collecting petitions, and so after this training there was no direct supervision?

A.   It was a small event, maybe 40 people or so, and so after I was trained, the person who trained me was within the same vicinity as me.  After I had collected the petitions for that day, maybe 15 or 20 or so, we went over them together and she was able to verify in terms of, like, handwriting and calligraphy, just making sure that things seemed legible.  So she reviewed the signed petitions after I turned them in.

Q.   But there was nobody with you while you were collecting petitions that day?

A.   No.  There was no one standing directly at my side as that would have been inefficient to the limited restraints we had as organizers and volunteers at the time.  We would have gotten

half as many petitions signed had there been two people for one clipboard as opposed to one person for one clipboard.

Q.   And there was no guidance outside of that?  There was no direct supervision?

A.   Sorry.  Can you repeat the question?

Q.   Oh, there was -- my last question was -- that you answered was that there was no supervision after that ten-minute training?

A.   No, I would disagree with that.  Again, the individual was in the same room as me.  It was, like, a large dining room, so she could always keep her eyes on me.  And after the event was over and we were reviewing the petitions together, she was able to give me feedback on, you know, if things were legible, if it seemed like I had collected the right information from individuals.

So there was supervision afterwards, and she would sort of float near me.  We would be in the same vicinity but not necessarily talking to the same exact person.

Q.   Okay.  And is it true that there was -- while you were volunteering there were sometimes moments where you would refer voters to other volunteers who could discuss the initiative more, who knew more about the initiative?

A.   Yeah, absolutely.  There was a time where I felt like I wasn't well-versed enough in the particular issue.  I would refer that individual to some of the volunteers or actual

workers for Right to Clean Water that were there.

I think I had one person ask me what the water purification standards were in Orange County specifically, something very detailed that I didn't have any understanding of, and so we actually walked over to the volunteer together, and she happened to know the answer.

And then I learned that answer at the time, which, again, is so niche that at this point I've forgotten it, but it was -- that is an example of a time where I did not have hyperspecific information that I could share with an individual so I referred them to a volunteer who was more well-versed.

Q.   So it's fair to say that volunteers had different roles sometimes in the gathering process?

A.   Yeah.  I would say it's fair to say that.

Q.   And you could still work with volunteers now who were able to circulate petitions; right?

A.   I could, yes.

Q.   Okay.  And you stated that your goal in attending these events was to provide voters with tools; right?

A.   That is correct.

Q.   And you can still inform them about the initiative; right?

A.   That is correct.  I think I would liken it onto fishing. You know, my goal is to teach someone how to get a fish.  If I just give them a fishing rod and then walk away and say, There's a bunch of fish in this pond, they may or may not catch it.

It's a similar -- very similar dilemma now to where I could by myself approach people and tell them that there's a form online that they could sign and then turn in to the Supervisor of Elections, but the bar for that is high in terms of the amount of work that it requires.

And, you know, most Americans don't even vote, so it's even more difficult to get them to fill out -- or rather not most Americans -- a lot of Americans don't vote, and so it's even higher standards to get them to fill out a petition and send it in to their Supervisor of Elections.

And then working with citizens who are able to sign and circulate the petition, it becomes incredibly inefficient, both for myself and for the person who's there who can collect the petitions, so that it truly just becomes a waste of time for us both.

Q.    Okay.  But the question was you can still inform them; right?

A.    Sure, I can inform them in the same way that I would inform them on social media or anywhere else.  It doesn't mean I'm giving them the ability to actually do something about it.

Q.    Okay.  And they can receive blank forms at these events still, right?

A.    As far as I know.  I never tried circulating blank forms and giving someone a blank form.  To me the law was unclear, so I never even touched blank amendments after HB 1205 came into

effect.

Q.    And you can also refer them to a registered circulator, right?

A.    I could refer them to a registered circulator, but most people -- I've never had a single person who I approached and said, Hey, go to that guy 20 feet away, actually walk to that person.  Most people just carry on and go about their way.

Q.    But it was your testimony that generally people want to sign these initiatives; correct?

A.    They want to sign them after you approach them and you have them speaking to you one-on-one.  People are very fickle and lose interest very quickly, especially if they're at a festival or another event where they're looking to have a good time and relax.  So if you don't give them something to do right away, they tend to lose focus and go about their way.

Q.    Okay.  Back to my previous discussion:  So you discussed tools that you can give them.

    You can also encourage them to be volunteers or registered circulators themselves, correct?

A.    Yeah.  So after folks would sign the petition and they would express interest in other ways to get involved, I would give them opportunities to get involved, like volunteering for organizations or becoming petition circulators themselves.

Q.    So isn't it true that you can help them in other ways outside of directly getting them to sign a petition, such as

getting them -- informing them about the petition, leading them to a blank petition form, or encouraging them to volunteer themselves?

A.   I know I'm the one being a witness here, but rhetorically I would ask:  You try giving someone something to do and then having them actually follow up.

Q.   The question was you're still able --

A.   Organizing work is very difficult, right.  Rhetorically, right, so you don't have to answer it.

THE COURT:  Hold on.  Y'all are not --

THE WITNESS:  The point is --

THE COURT:  Don't talk over each other.  You've said you think it's ineffective, and it doesn't work that way; correct?

THE WITNESS:  Yes.

THE COURT:  That was your answer.

Okay.  Ask your next question.

BY MS. HARDY:

Q.   Okay.  We can move on.

So you stated that you would attend different community events such as town halls and protests and discuss the initiatives there; right?

A.   Correct.

Q.   And you could still attend these events; correct?

A.   Correct.

Q.   And you can still inform voters about the initiatives at these events; right?

A.   Correct.  But when you're standing in front of a crowd of 10,000 people, and you point -- you say, Hey, there are going to be some petition circulators nearby.  Go find them and sign, you're going to have a very low success rate, as opposed to directly being able to approach people, capture them in front of you, and ask them to sign the petition.

Q.   But it's your testimony that you only had to do this process without gathering signatures yourself once; right?

A.   After HB 1205 took effect, yes.  I only attempted to collect -- well, spread the information and have someone nearby collect the actual petition signature at one event, which was St. Pete Pride, for about six hours or so.

Q.   And the issue there was that people didn't sign the petitions?

A.   The issue there was that people who had interest in signing the petition lost interest quickly after I had to wave down someone to come over and talk to them, sometimes taking as long as 30 seconds to come over.

Q.   So after 30 seconds people who were going to sign just decided not to?

A.   It's not that they just decided not to.  It's the fact that they were there to have a good time and were walking to get in line or go hang out with their friends.  And they didn't feel

like standing there waiting for someone to come over, and so they decided to say, Oh, I'll find you later, or, I'll sign later.  And then they ended up not signing.

Q.    Okay.  So just to clarify, the 30 seconds in between finding a registered circulator was the reason for them not signing the petitions?

A.    The wait time was the reason for them not signing the petition in that moment.

Q.    Okay.  Is it your testimony that the organizing work that you were doing before, attending these events, doing outreach work, you are still able to do that like you did at the Pride event; correct?

A.    Yes, I'm still able to do outreach work, but I'm not able to do impact-based work.  Like I mentioned in my testimony, I have not done any impact-based work around the right to clean water or the right for bodily autonomy because, short of constitutional amendments in the state of Florida, there isn't much that people can do.  And so rather than educating people on the issue and making them feel sad and not giving them something to do about it, I'd rather not bring up the issue at all unless I'm able to directly give them a tool to do something with.

Q.    Okay.  So unless you're gathering petitions, it is your testimony that you will not be engaging in any community events, even if it means you can just connect with voters?

A.    No, that's not my testimony at all.  I attend community

events all the time since HB 1205 has taken into effect, but I'm not talking specifically about Medicaid expansion or the right to bodily autonomy or the right to clean water with individuals because I myself am not able to give them a tool to do something about that with.

Q.    Okay.  One more question going back to your work with Right to Clean Water.

It was your testimony that you would never sign up for events; you would show up and start collecting petitions; correct?

A.    That's correct.

MS. HARDY:  Your Honor, one moment to confer with my colleague.

THE COURT:  Sure.  Take your time.

(Discussion between the attorneys.)

BY MS. HARDY:

Q.    Returning to your answer about returning to Venezuela, would you agree that the restriction is only that you can't leave for more than six months?

A.    I don't know.  My understanding from my research is that I couldn't leave at all.  So I haven't left to Venezuela since 2010.  I haven't left the United States at all since 2010.

Q.    So just to clarify, it is your position, though, that there is -- besides your personal wanting to be a citizen, there is nothing stopping you from returning to Venezuela?

A.    Yeah.    What's stopping me is that I don't want to risk travel affecting my eligibility to become a citizen, so I would not risk traveling at all.    I also don't have a passport.    I lost my Venezuelan passport a number of years ago.    So even risking going back to Venezuela to potentially get a passport to get back into the United States with is too much of a risk for me to go back into the country for.

MS. HARDY:    No further questions, Your Honor.

THE COURT:    Mr. Jazil.

CROSS-EXAMINATION

BY MR. JAZIL:

Q.    Good morning, sir.

I wanted to get some clarification on your testimony with my friend for Right to Clean Water earlier.    I understood you to say that you attended an event for Right to Clean Water where you collected over 100 signed petitions as a volunteer.

Did I understand that right?

A.    No, that's not correct.    I collected over 100 petitions over the 2023-2024 years.

Q.    Okay.

A.    And then between 60 to 100 in the year 2025 at various events.

Q.    Okay.    And help me understand the colloquy you had where you talked about having petitions with you; someone telling you you could take the petitions home, and you spending some time to

find the supervisor for the initiative to return the petitions. Help me to understand that component of your testimony.

How many petitions did you have in that moment?

A.    It's hard to say.  It was a tailgate.  It was one of the busier tailgates.  So somewhere between 25 and 50 signed petitions.

What happened -- it was the end of the tailgate.  People were all sort of funneling into the stadium, and I was having a hard time finding my supervisor.  They weren't where we were supposed to meet up.  I texted them, and they -- then they called me, and they told me that I could just head home with the petitions and I'd give it back to them next time I saw them.  I told her that I didn't really want to do that.  I didn't want to hang onto the petitions because I could lose or misplace them. And so I asked her to share her location with me on iPhone and -- or on Find My through the iPhone products, and then I was able to -- we were able to find each other and I could give her the signed petitions that I had.

Q.    Understood.  I'd like to break that down into chunks here.

So that was a UCF tailgate; right?

A.    Yep.

Q.    And this was an event where you were working as a volunteer for Right to Clean Water; right?

A.    Yep.

Q.    And you had somewhere between 25 to 50 signed petitions in

your possession; right?

A.   Yep.

Q.   And someone from Right to Clean Water said that you could just take these 25 to 50 petitions home with you and return them to the Right to Clean Water representative at a later time; right?

A.   That is correct.

Q.   But you decided to find the Right to Clean Water representative and return these petitions directly to her; right?

A.   Correct.

Q.   And of these 25 to 50 petitions, any of them signed by a relative of yours?

A.   No.  I don't have any relatives that go to UCF tailgates.

Q.   Okay.  Did you sign one of these 25 petitions?

A.   Most definitely did not.

Q.   Okay.  Sir, you also talked about how you are an organizer; right?

A.   (Nods head up and down.)

Q.   If you could give an audible answer.

A.   Oh.  Yes.

Q.   And you're politically engaged; right?

A.   Correct.

Q.   And your plan, if HB 1205 didn't pass, was to go to mass protest events to try to collect signatures.

Did I understand that right?

A.    That is correct.

Q.    And an example of a mass protest event that you gave was the No Kings protest; right?

A.    Correct.

Q.    And you'd agree with me that the mass protest events are different than the festivals you talked about with my friends earlier, like the Pride festival; right?

A.    Most definitely, yes.

Q.    And people are moved by spirit to come out to these mass protest events and are politically engaged at these events; right?

A.    They are, yes.

        MR. JAZIL:  All right.  No further questions, Your Honor.

        Thank you.

        THE COURT:  Anything else from the defense side?

        Hearing nothing, redirect.

                    REDIRECT EXAMINATION

BY MS. GRADY:

Q.    Just a few additional questions.

        How old were you when you moved from Venezuela to the United States?

A.    I was 6 years old.

Q.    When was the last time you visited Venezuela?

A.   I visited Venezuela in 2010 when I was 10 years old for a couple of months in the summer.

Q.   Do you have family or friends in Venezuela?

A.   No friends that I can think of, and my only family remaining in Venezuela that I still talk to is my grandmother.

Q.   Do you have any reason to go to Venezuela?

A.   Besides general tourism, not really.

I've been here my entire life.  Despite not being a citizen, I very much consider myself an American.  And I'm very, very excited to officially become a citizen so that I can vote and do all the other great things that American citizens get to do.

Q.   Had you circulated petitions for other issues prior to the first time you circulated for Right to Clean Water?

A.   Yes, I believe so, because I remember during the first half of that training that the Right to Clean Water volunteer was giving me, the training on how to get petitions signed and, in particular, making sure people put down their county and not their country under the county line, was something that rang similar to me in a training that I had done previously, I believe, for the right to bodily autonomy.

Q.   Did you consider yourself an experienced petition circulator the first time you circulated for Right to Clean Water?

A.   Yeah, experience in the sense I had done it before, and I'm

someone who actually really enjoys talking to strangers and getting to know people. So for that I tended to have a knack for petition circulating.

MS. GRADY: No further questions, Your Honor.

THE COURT: Thank you.

Thank you, sir, and good luck in your quest to become a U.S. citizen. You have a good day.

THE WITNESS: I appreciate it.

Thank you, Judge. Likewise.

THE COURT: Why don't we go ahead and take a quick break, since it's been over an hour, for the benefit of the court reporter, and we'll run a little past noon so we can hear from the next witness.

How long do y'all anticipate with the next witness?

MS. BENNETTE: Your Honor, we expect them to be less than an hour, depending on cross-examination.

THE COURT: Fair enough.

All right. Let's go ahead and take a quick break, we'll come back at 11:15 and finish this witness and break for lunch.

Court is in recess.

(Recess taken at 11:03 AM.)

(Resumed at 11:17 AM.)

THE COURT: All right. We are back on the record.

We have our next witness appearing by Zoom, and the

witness has an interpreter.

If my interpreter could please raise his right hand.

(The interpreter, Eduardo Arenas, was duly sworn by the Court.)

THE COURT:  If I could please have the witness raise his right hand to be sworn.

**HUMBERTO ORJUELA PRIETO, PLAINTIFFS' WITNESS, DULY SWORN**

THE COURT:  You can put your hand down.

We are now going to have a series of lawyers asking you questions.  If at any point the equipment malfunctions so you can't hear the interpreter or you need the lawyer to repeat a question, just raise your hand.  That will let us know there is a malfunction, or tell the interpreter if you need somebody to repeat a question, and they'll have them repeat a question.

THE WITNESS:  Got it.  Perfect.

THE COURT:  And I'll remind the lawyers it is more difficult to do this by Zoom.  It's even more difficult to do this by Zoom when there is an interpreter.  So we need to slow down the peace, speak slowly and distinctly.  Do not talk over the witness.  Let them -- the witness finish his response through the interpreter, and he's going to let you finish your question.

I'd really like to be seen and not heard, so please follow my directive so I don't have to admonish anyone.

All right.  You may ask your first question.

MS. BENNETTE:  Good afternoon -- good morning, Your Honor.  My name is Matletha Bennett, and I represent the FDH plaintiffs.

We call Mr. Humberto Orjuela Prieto, who will testify about his status as a lawful permanent resident, his past community outreach work, including registering voters and conducting community surveys, and his interest in circulating petitions for issues he cares about.

Mr. Orjuela Prieto is prohibited from circulating petitions under Section 6 of House Bill 1205 as codified in Section 100.3714B.  His testimony goes to Counts One, Two, and Three of the FDH plaintiffs' operative complaint.

DIRECT EXAMINATION

BY MS. BENNETTE:

Q.   Good afternoon, Mr. Orjuela Prieto.

Please state your name for the record and spell it.

A.   Good morning.  My name is Humberto Orjuela Prieto.

Q.   And can you please spell your name for the record?

A.   H-u-m-b-e-r-t-o, Humberto.

Q.   And where do you --

A.   Last name is O-r --

Q.   Sorry.

A.   -- O-r-j-u-e-l-a, Orjuela, and Prieto, P-r-i-e-t-o, Prieto.

Q.   Thank you.

And where do you currently live?

A.    I live in Orlando, Florida.

THE INTERPRETER:  Counsel, quick question from the interpreter.

Is the witness's testimony in Spanish also being heard in the courtroom, or am I able to interpret that simultaneously?

THE COURT:  We can hear both of you.

MS. BENNETTE:  We can hear both of you.

THE INTERPRETER:  I will interpret everything consecutively from the witness from here on out.  My apologies.

You can proceed.

BY MS. BENNETTE:

Q.    How long have you lived in Orlando, Florida?

A.    Four years.

Q.    Have you lived anywhere else in Florida?

A.    I spent three months in Palm Beach doing a job, but I've always lived in Florida.

Q.    And before moving to Florida, where did you live?

A.    I was in New York for a short time with my son and before that I -- I was in Colombia.

THE INTERPRETER:  I'm sorry.  Strike that.

THE WITNESS:  I was in New York for a short time with my son.  Before that I was living in Colombia.

BY MS. BENNETTE:

Q.    Were you born in Colombia?

A.    Yes, ma'am.

Q.   And when did you come to the United States?

A.   In late 2021.

Q.   What is your current immigration status?

A.   I'm a permanent legal resident.

Q.   I'd like to turn briefly to your work history.

     Are you currently working?

A.   Yes, ma'am.

Q.   Please describe the work you are doing now.

A.   Nowadays I'm working driving for Lyft and other delivery applications.

Q.   And since arriving to the United States, what kinds of jobs have you held?

A.   I worked at the Orlando airport as a driver.  I worked at UnidosUS.  I've worked at Poder Latinx.  I've worked at Mi Familia Vota.

          MS. BENNETTE:  Now we'll briefly discuss Mr. Orjuela Prieto's experience with outreach work in the community.

          THE WITNESS:  I've worked for other delivery applications.

          THE INTERPRETER:  Now you can proceed with your question, Counsel.

          MS. BENNETTE:  Sorry.

          Now we'll briefly discuss Mr. Orjuela Prieto's experience with outreach in the community leading up to his desire to circulate petitions.

BY MS. BENNETTE:

Q.   Mr. Prieto, you mentioned working with several organizations.  I'd like to talk about that work.

A.   Okay.

Q.   What position did you hold with UnidosUS?

A.   With UnidosUS I was a canvasser and canvasser captain.

Q.   And how long did you do that work?

A.   For eight or nine months during the year 2022.

Q.   Can you briefly explain what you did as a canvasser?

A.   As a canvasser, I helped citizens get registered so they could vote.  I helped out with the registration.

Q.   And what work did you do with Poder Latinx?

A.   I would also register citizens to vote.

Q.   And about how long did you do that work?

A.   With Poder I did it for about three months during the year 2024, and also with Unidos I did it in the year 2024.

Q.   What was your role with Mi Familia Vota?

A.   With Mi Familia Vota I also did work registering citizens to vote.

Q.   Was there anything else you did while working with these organizations?

A.   No.  I was occasionally driving for DoorDash.

Q.   And how were you compensated for this work?

A.   I was, again, paid by the hour.

Q.   Were there any roles you held that were unpaid or

volunteer?

A.   No.

Q.   When registering voters, who were the people you typically spoke with?

A.   With all the people in my community that were able to vote. We would select a road or a boulevard to station ourselves at, and we were -- would approach people and ask them if they wanted to register to vote.

Q.   Were there people who were eligible to register who did not speak English?

A.   Yes, many of them.

Q.   Why did you decide to help register voters?

A.   Well, first of all, it's a job, and, second of all, it's also important to help people register to vote.  A lot of people don't know how to do so.  So we would provide information, orientation, and registration.

Q.   You said you provide information.

     When you register voters, are you able to connect with people about issues they care about?

A.   Yes.

Q.   What kind of issues do you connect about?

A.   For voting in regard to their rights to vote.  Being that there were people that wanted to vote, however they were unable to vote due to crimes they had been charged with, so we had to inform them about that and also give them additional information

about matters that affect them.

Q.   And can you briefly describe what matters that affected them that you talked about?

A.   It was important for them to know where to go vote if they had a right to do so, also the age that they needed to have, 21 years old; that they must be citizen, and it was important for them to participate in elections regardless of their political party affiliation.

Q.   Have you ever been accused of fraud or misconduct in your outreach work?

A.   Never.

MS. BENNETTE:   I will now talk about Mr. Orjuela Prieto's experience with petition circulation, how he was unable to circulate petitions due to HB 1205 and how that impacted him.

BY MS. BENNETTE:

Q.   Mr. Orjuela Prieto, let's now turn to petition circulation.

Can you tell us what you understand petition circulation to be?

A.   Circulation of petitions involves informing citizens of these petitions and to gather signatures for the petitions so that these petitions can be added to the voting ballot and share this information which is useful to citizens.

Q.   Have you ever circulated ballot petitions in Florida?

A.   No.

Q.   Please explain why you are not circulating petitions.

A.    Because it is not yet legally allowed to do so.

Q.    And how did you come to learn that information?

A.    It was mentioned within the organizations that there was a possibility of circulation -- or circulating petitions. However, it was never done because it was not permitted by law still.

Q.    When you learned that you could not circulate petitions because you are not a U.S. citizen, how did that affect you personally?

A.    It affects me because -- because I now no longer had -- strike that.

      It affected me because I didn't have access to this work opportunity.  It was a job.  And also because it prevented me from circulating the petitions among the citizens.

Q.    And as someone who has worked in the community to register voters, did not being able to circulate petitions affect your ability to participate in your community?

A.    Yes, because they limit you by not allowing you to perform the job.  It affects my financial situation.

Q.    And if you had been legally permitted to do so, would you have circulated petitions?

A.    Yes.

Q.    Why would you have chosen to circulate petitions?

A.    Because petitions are a benefit to the community.

Q.    And what about petition circulation --

THE COURT REPORTER: Hold on.

THE INTERPRETER: Thank you, Counsel.

THE WITNESS: It is important to circulate the information and these petitions among the community so they can get to know about them.

BY MS. BENNETTE:

Q. Mr. Orjuela Prieto, are you aware of a petition related to expanding health care access in Florida?

A. I've heard about it. However, I haven't found -- I haven't learned about it fully in order to find out what this petition -- the circulation of this petition would be about.

Q. And if given the opportunity and legally permitted, would you want to circulate petitions for an effort like this to expand health care access?

A. Yes.

MS. BENNETTE: I will now discuss Mr. Orjuela Prieto's connection to his community and how he communicates to people through voter education and outreach.

BY MS. BENNETTE:

Q. I'd like to turn now to your connection to the communities you work with.

Based on your outreach experience, is it important for people to receive information from someone they can connect to.

A. Yes. It's fundamental for people to be able to receive information. That way can find out what their rights are.

Q.   Do you find that language and cultural background are a strong way to connect?

A.   Yes.  It's fundamental.

Q.   You mentioned earlier that you registered people to vote.

Did you also conduct any surveys or information with these individuals you talked to?

A.   I circulated surveys at a different time than when I was working circulating voter registration.

Q.   Yes.  And what were those surveys about?

A.   They were in reference to health care.  We would ask people if they had access to health care, if they received proper service.  We would ask them also if they had any limitations or any problems so we could inform the person conducting the survey.

Q.   Why is health care access an important issue to you and your community?

A.   Well, it's important for everyone to have access to health care.  There's people that are disabled.  There are also the elderly and other people that don't have proper or adequate access to health care.  So we try to help these people out.

Q.   And how would petition circulation help you communicate that issue to your community?

A.   Well, informing people about these petitions -- informing people about this petition is a way to help people out so that the petitions can be circulated and signed so that they can be

added to the voting ballots.

MS. BENNETTE:  Thank you, Mr. Prieto.

Your Honor, I pass the witness.

CROSS-EXAMINATION

BY MR. STAFFORD:

Q.   Good morning, Mr. Prieto.

A.   Good morning.

Q.   I am Bill Stafford.  I am with the Florida Attorney General's Office, and I have a couple of questions for you.

A.   Perfect.

Q.   As I understand it, you have not worked as a petition circulator in Florida; is that correct?

A.   That is correct.

Q.   Now, do you understand HB 1205, the law that we're talking about here today, only prevents you from circulating petitions -- or circulating more than 25 petitions?

A.   I have a vague idea about what this law is.  All I know is that it doesn't allow us to circulate petitions.

Q.   Do you understand that even under this law you can -- you would be able to talk to neighbors and other people about a particular petition like the expanding health care?

A.   Oh, yes, I could talk about these issues with my neighbors, yes.

Q.   Do you understand that under the law you could hand out blank petitions to your neighbors and other people and ask them

to fill out the petition and turn it in to their Supervisor, Supervisor of Elections' office?

A.   I believe that is what the law does not allow because that would be circulating the petition.

Q.   So it is your understanding that handing out a blank petition and asking the person you hand it to to fill that out and turn it in to somebody else, turn it in to the -- your local Supervisor of Elections -- your understanding is that would not be permitted by this new law?

A.   No, I don't know.

Q.   And also, as I understand it, and correct me if I'm wrong, you have not been -- you have not volunteered to register people to vote or to circulate petitions, that your positions have been paid with groups like Poder Latinx and UnidosUS?

A.   Yes, that's correct.

Q.   Okay.  And if these groups, Poder Latinx or UnidosUS, would pay you to encourage other people to fill out petitions but not to actually circulate them yourselves -- if they would pay you to do -- to do that, to talk about these petitions and why they are of benefit to your community -- if those groups would pay you to do that, would you do it?

A.   Well, if the law isn't approved, I don't think I would do it.

Q.   I understand that.

     The question that I had is if the -- if the groups that you

worked for in the past would pay you to do things that are permitted under the new law but don't involve petition circulating, would you consider doing that?

A.   Oh, yes, I would because it would be legally permitted.

Q.   Okay.

Now, as I understand it, you are originally from Columbia?

A.   Correct.

Q.   And you have been back to -- or how often have you been back to Colombia since you first arrived in 2020 or 2021?

A.   I've gone back for the Christmas holidays and eventually went over there as a family gathering or activity.  I have returned on occasion as well.

Q.   And do you understand as a permanent legal resident in the U.S. that you can travel abroad, travel to Colombia, for up to six months without affecting your status as a permanent legal resident?

A.   Yes.  Yes, sir.

MR. STAFFORD:  May I have one moment?

THE COURT:  Sure.

(Discussion between the attorneys.)

BY MR. STAFFORD:

Q.   Just one more -- I guess more a question of clarification.

You mentioned that you have gone back to Colombia for Christmas holidays and, I guess, other occasions.

Can you estimate how many times total you've been back to

Colombia?

A.   Every year I go back approximately twice, so I would say I've gone back about eight times.

MR. STAFFORD:  I have no further questions.

Thank you very much, Mr. Prieto.

THE COURT:  Anything else from the defense?

Hearing -- oh, yes.

Redirect.

REDIRECT EXAMINATION

BY MS. BENNETTE:

Q.   Mr. Orjuela Prieto, a couple of questions.

Are you a lawyer?

A.   No, ma'am.

Q.   Do you understand this law to ban you as a noncitizen from collecting signatures for petitions?

A.   Yes.

Q.   Even if you get paid, are issues like health care important to you?

A.   Yes, health care issues are very important.

Q.   In all the time you've registered people to vote, have you ever taken voter registration forms back to Colombia with you?

A.   Never -- I'm sorry.  Are you asking if I've ever taken them to Colombia?

Q.   Yes.

A.   Okay.  Yeah, never.

Q.   The Attorney General's counsel -- I'm sorry.  Scratch that.

You mentioned that you can talk to people about health care without having them sign a petition.

In your work -- your outreach work with voters, is it important for you to be there with the voters while they fill out forms?

A.   Yes.  Yes.  Because a lot of the times these persons don't know how to fill out the petitions properly, and it's important that when they fill out a voter registration that they place their signature on there as well.

MS. BENNETTE:  No further questions.

Thank you.

THE COURT:  Thank you, sir.

Thank you, Mr. Interpreter.

Y'all are free to go.  Have a pleasant afternoon.

THE INTERPRETER:  Thank you, Your Honor.

Good to see you as well.

(Mr. Prieto exited Zoom.)

THE COURT:  All right.  So let me find out.  He's not here right now, but perhaps co-counsel can let me know since Mr. Wermuth is not here.

How long do y'all expect with Mr. Earley?

Here is a better question.  Let me just ask what I'm trying to figure out.

What witnesses do y'all expect to get to this

afternoon?

MS. GAMBHIR:  Your Honor, we hope to get through Supervisor Earley's examination as well as Melissa Martin's today.

THE COURT:  Okay.  I've got -- Mr. Jazil, you are doing those crosses?

MR. JAZIL:  Your Honor, I believe Mr. Raban is going to take Ms. Martin, but I'll do Mr. Earley.  And I think Mr. Moore is also going to do some direct for the Supervisors while Mr. Earley is here.

THE COURT:  Okay.  All right.  Fair enough.

And I think I saw Ms. Price.  You have questions or --

MS. PRICE:  None today, Your Honor.

THE COURT:  Okay.  I think we've just got it -- oh, I'm sorry.  That's for Herron who is tomorrow.  My apologies.

All right.  Very good.  It doesn't matter.  Y'all can just stand up, whoever wants to ask questions.

All right.  Let's take a break for lunch.  Come back at 1:05.

Court is in recess.

(Recess taken at 11:58 AM.)

(Resumed at 1:07 PM.)

THE COURT:  Please take your seats.

You ready to go?

MR. WERMUTH:  I am, Your Honor.

THE COURT:  Call your next witness.

MR. WERMUTH:  Florida Decides Healthcare plaintiffs call Mark Earley, or Supervisor Mark Earley.

(Supervisor Earley entered the witness stand.)

**MARK EARLEY, PLAINTIFFS' WITNESS, DULY SWORN**

THE COURTROOM DEPUTY:  Please state your name for the record.

THE WITNESS:  Mark Earley.

THE COURTROOM DEPUTY:  Thank you.

<u>DIRECT EXAMINATION</u>

BY MR. WERMUTH:

Q.   Good afternoon, Supervisor Earley.

Are you ready to go?

A.   Sure.  Good afternoon.

Q.   Are you currently the Supervisor of Elections for Leon County?

A.   Yes.

Q.   And how long have you held that position?

A.   Since early January of 2017.

Q.   Okay.  And how long have you worked in the Leon County Supervisor's office over the course of your career?

A.   I think I'm in my 33rd year.

Q.   And prior to being elected the Supervisor of Elections in 2016, what other roles did you have in the Leon County Supervisor's office?

Direct Examination - Supervisor Earley

A.    I was essentially an OPS person with lever voting machines in '86 and '87.  '88 I became the voting machine custodian at that time when I was hired full-time.

I did webmaster stuff.  I've been mostly around voting systems and the technical aspects of our office.

Q.    When you say "OPS," you mean Operations?

A.    Temp help.  Yeah.  Came in as a -- but yeah.

Q.    Okay.

And you hold a number of state and national certifications related to election administration; is that right?

A.    I do, yes.

Q.    And you've previously served in all the executive offices of the state association for the Supervisor of Elections; is that correct?

A.    Correct.

Q.    Including you were the president in 2022 and 2023 cycle; right?

A.    Correct.

Q.    All right.  And for that state association, you're currently on the Rapid Response Team for legislative issues and the cybersecurity committee; is that right?

A.    Correct.

Q.    What are your responsibilities on the Rapid Response Team?

A.    It's to look at bill language, and sometimes the preliminary language for bills, to look for problems in being

able to implement whatever is -- the language of the bill says to make sure that whatever is passed we are able to make it happen in reality --

Q.    Okay.

A.    -- and give feedback to that regard.  And potentially we've written versions of the language, highlighted parts of the bills that appeared problematic that we thought the Legislature or their staff should address.

Q.    Okay.  And you don't need to go through them in detail, but you also serve on bodies involving election administration at the federal level; right?

A.    Yes.

Q.    Okay.  I'd like to talk to you about the verification process for petitions.

And turning to the verification process requirement required by HB 1205 for statewide initiative petitions, please describe for me how your office intakes initiative petition forms when they are first delivered to your office.

A.    Yes.  So forms can come into our office in various fashion.  By far the largest -- the main method for delivering those is through the United States mail.  Those come from the petition sponsors themselves.

We get a small volume or small number of petitions from the voters themselves.  Those are considered to be volunteer petitions, not circulator petitions.  Those can come in either

singly through the mail or singly from a voter from our counter.

Q.   And the petitions that you receive can vary in the number of pages they have when they arrive; is that correct?

A.   Yes.  That's a result of 1205.  But, yes, the full language text of the amendment has to be included.

Q.   Okay.  So that's an impact of 1205 is that you now are receiving, whereas before you were receiving petitions that were one page; is that correct?

A.   That is correct.

Q.   And now you're receiving petitions that are as much as five pages?

A.   That is correct.

Q.   So when multipage petitions arrive at your office, what logistics issues arise in your intake process?

A.   Several.  Some of that is just the volume, you now have five times the amount of paper to deal with.

     The petitions are stapled, because now a petition form is -- from a voter is more than one page, so those are always coming in stapled.  They have to be unstapled.  And we can go into the reasons for that later.  But as part of the unstapling process, when you staple pieces of paper together, sometimes they still are bound together because these holes kind of intertwine within the paper, so they have to be sorted by hand. We have to keep all of the pages together, and -- so they don't get separated, because we have to verify that the -- all of the

text of the amendment -- or at least to the best of our ability verify that all of that text is included with the front page which has the signatures and all of the information from the voter.

Q. Okay. Then under the verification process required by HB 1205 -- and we'll delve more deeply into the specifics -- but generally what is required for a Supervisor's office to validate a petition?

A. Okay. So to validate a petition, yeah, there's lots of things we have to do. As I said, first we have to make sure that -- to the best of our ability -- that all the pages are there is really how we do it.

Sometimes the petitions that are multipage are duplexed front and back; sometimes they're all just the front of multiple pieces of paper. So you can't just count the paper pieces in a packet; you have to check whether there's text on them or not. So sometimes it's three pages of paper, front/back, front/back, front, or sometimes it's five pages, which is just all five fronts, so that's a challenge.

Certainly we have to -- there's a lot of information that's on the petition itself that has to be validated.

We have to make sure the voter's address is at least there. We don't have to necessarily compare it to what's in the record.

We have to check the date of birth.

We have to validate either the Florida driver's license

number or ID or the last four of the Social for the voter.

We have to validate that the voter has signed it and validate the signature of the voter at some point in the process.

We have to validate or confirm that the petition circulator signed the petition form.

We have to validate the date of that signature of the circulator.

We have to record the signature date and the submission date of the petitions for other reasons.  That's not part of the validation, but it's part of our process of processing the form.

And it seems like I'm forgetting one.  I think -- I don't know if I mentioned that the circulator is a valid circulator at the time the voter signed the petition, because sometimes the circulator can be valid for a period of time but then become invalid, or even vice versa and become valid again, so that's a thing we have to check.

Q.   I realize there's a number of steps, and so we'll kind of go through those --

A.   Okay.  Yeah.

Q.   -- later, and we'll fill in the gaps.

And your office does the signature validation process using digital images now; is that correct?

A.   We do, yes.

Q.   And what is that process known as, where you physical --

scan first?

A.    It is ScanFirst, okay, yeah.

Q.    In fact, prior to HB 1205 isn't it true that most counties used physical ballot petitions in order to do the verification process?

A.    Yes, some -- yes.

Q.    Okay.  But now with HB 1205, all counties are required to scan the images; is that correct?

A.    Correct.

Q.    So the counties that did it by hand before had to go get scanners or repurpose their scanners for that purpose; correct?

A.    Correct.

Q.    And are there counties that don't have the technology to implement that ScanFirst process that you have?

A.    That's correct, yes.

Q.    Okay.  Because you need special software to do that?

A.    Yes.  ScanFirst allows you to do the verification process from the scanned images.  The reason it's called ScanFirst is because there's a scan after, which means you've handled the physical pieces of paper in your verification process, but you still -- as we'll go over later, I'm sure -- have to scan the images because you have to upload -- scan the forms because you have to upload them at some point to the Division of Elections.

Q.    Okay.  How do you staff the verification process in your office?

A.   That has changed over time.  Preliminary to 1205 we -- the process was a lot smoother, simpler.  So we had two full-time employees generally and a stable of maybe six temp employees that were generally employed in different areas of our operation but would come in and help with the petition process as needed.

Since then, we've now gone up to as many as 17 full-time employees with a primary -- their focus really on the petition verification process.  So the level of expertise within our team, I'll call it -- instead of staff -- was deemed it needed to be better, and so we aren't entrusting this, at least in our county, to temporary employees.

I can hit the reasons later or now, or however you want.

Q.   These 17 full-time employees, are they salaried?

A.   Yes.

Q.   Okay.  Let's discuss the specifics of the actual verification process after your office receives and scans the petitions.  And if I miss one, like I said, just let me know what I've missed along the way.

A.   Sure.

Q.   So am I right that your office imports the scanned images into your voter registration software?

A.   We do.  I would say you've already skipped a part.

Q.   Okay.  Well --

A.   Sure.  So the scanning process is a very complex process.  It takes a lot of time.  Using the words "we scan them in"

Direct Examination - Supervisor Earley

doesn't really just -- detail what really happens.

As we said, you get a lot of jams because the pages tend to bind together, at least with the multipage petitions. You have to fix the jams. We have -- we print a little bit of information on each piece -- on the lead piece of paper. So, therefore, the printhead needs to be cleaned; it gets dusty; it has to be repaired.

As we're scanning in, we -- there are two barcodes on the front page of the petitions. One represents the petition serial number; the other represents the circulator number. Our software scans those and actually uses that to name the image file that is the result of the scanning process.

Sometimes those barcodes aren't read and so it flags an error message with an image and so then we go find the piece of paper in the stack and, again, we have to keep the pages the same.

We then have an interface where we manually type in the missing number, whether it's the serial or the petition number, so that the file can be named properly. As part of that process, we developed software -- which is not easy to develop, but in conjunction with the vendor of our scan system, the software comes with it -- that we actually count the pages automatically as we're scanning it in. And it can look at fronts and backs and determine either -- whether it's duplexed or not, if all of the text pages are accompanying that front

page.

There's a naming convention we put together so that this could all be sorted out.  If the incorrect number of pages is there, it prefaces the name of the file with "rejected" because it's an automatic rejection, not all the pages are there.

Those images are sorted by circulator number into different directories so that we can kind of work in a batch.  That has implications further down the line, makes it somewhat easier.  But we have to do all of this ahead of time, so there's a lot of details like that, and then we have to put it back in the box, keeping all the pages together properly.

Q.   Okay.

A.   Sorry.

Q.   All right.  So after you've scanned it in --

A.   After we've done that.

Q.   -- you load it into your voter registration software; correct?

A.   Correct.

Q.   And there's a module in the voter registration software; correct?

A.   Yes.

Q.   And that is -- that enables you to do the validation process?

A.   Yes, the verification process.

Q.   Verification process.

Okay. And so in this process, you search the voter's name and date of birth; correct?

A.    Yes.

Q.    And you -- and sometimes the date -- the name does not match the name that you have on record, like somebody uses a nickname or their initials; is that right?

A.    Correct.

Q.    And sometimes the date of birth is blank or incorrect, such as -- or they may write the current date instead of the birth date?

A.    Sometimes they switch the signature date and the birth date or it's blank, yes.

Q.    Okay. And also a person signing the petition may not be a registered voter?

A.    Correct.

Q.    And these are all failure points that cause the petition to be invalidated; correct?

A.    Some of those are failure points, yeah. The majority I think of what you described were failure points.

Q.    Okay. Another item you search and check is the address of the voter; is that right?

A.    We validate that there is an address in the field.

Q.    Okay. And when you say that, you mean is it to validate that that's the right voter, or is that a way to search the voter?

A.   Usually not.  When -- so we bring the images in.  We have a list of images.  We have our petition verification module running, and we're matching image to voter.  We usually do a date of birth search first and look for a list of voters and match them up that way.

The address is important for two reasons:  One, it has to be on the page or that is a -- if it's blank, that's a failure point.

It's also important in our records because that determines which congressional district that petition is credited towards.  But if they don't match, that doesn't -- that's not necessarily a failure point, and it's a record that prevails for congressional district.

Q.   Okay.  And if that address is in a different county, for instance, what do you do with those petitions?

A.   Yeah, so if the voter has written down an address that's not in our county, that's considered to be a misfiled petition, and we record that essentially as an unknown voter because they're not in our county's voter records.

If we find an unknown voter, that can take the form of really two different versions.  One is they're not a registered voter in Florida.  Another version is that they are a registered voter in another county.  We handle those slightly differently.

And so if it's a registered voter in another county, we -- to determine that, we look it up in the statewide voter

registration system, FVRS.

(Reporter requested verification.)

THE WITNESS:  FVRS, Florida Voter Registration System. And if we find a match, then we have a special code -- it's a U-code, unknown voter -- but we include in that designation the county that they belong with and I believe the voter ID, so that eventually we have to send the ones that are resident in other counties back to the sponsor, and the sponsor sends it over to the new county.  But our encoding lets us communicate later on with that county as to various facets of it.

BY MR. WERMUTH:

Q.   And being here in Leon County, say, with the two universities we have here, is it fairly common for you to see a student at one of the universities sign a petition and put their dorm address?

A.   That's very common; we have that problem a lot.

Q.   And many times they're registered in a different county?

A.   Correct.

Q.   And so this is a fairly common instance of where you're going to get a petition; you'll look in your files, see that they're not registered in Leon County.  Because they're registered at home, and you've got to research that student and figure out, you know, where they live, where they're registered, if they're registered?

A.   That would be the type of search I was talking about before

with FVRS.

Q.   Okay.  And in that instance where you figure that out, that they do live in a different county, you don't forward that to the other county yourself?  You send it back to the sponsor?

A.   Early on -- and maybe this is in previous years -- sometimes counties did that and sometimes they didn't.  I think, for the most part -- I know we've standardized it where we send those back to the sponsor and then they send it back to the other county.  So that's how we do it, and I think most counties do it that way now.

Q.   Okay.  And another item you now check under HB 1205 is whether the voter's Florida ID or driver's license or the last four digits are listed and listed accurately; is that correct?

A.   Correct.

Q.   You hadn't checked that prior to 1205; right?

A.   Correct.  We -- the DL or the social security number, the last four, we didn't look at those before.

Q.   Okay.  And if those numbers are -- both numbers are missing, that's a failure point that leads to invalidation; correct?

A.   Yes.  There has to be at least one of those two on the petition form.

Q.   And your office may have, say, a driver's license number on file but not a social security number; correct?

A.   Correct.

Q.    And that voter may put their -- their last four digits of their social security number on the petition, and what do you do in that instance?

A.    Yeah.  So if they put one of those two numbers and it's missing in our system -- and sometimes we don't have either number in our system -- typically the first thing we do is we look them up in what's called DAVID, and it's the Driver and Vehicle Identification Database -- or Information Database, D-A-V-I-D.

Q.    Okay.  And does -- do all the employees in your office have access to this DAVID system?

A.    No, we've in the past tried to keep that to a very limited number because there are some liabilities and auditing processes to maintain our ability to use DAVID.  We've had to expand the number of employees even more than anticipated with the new requirements of 1205.

Q.    Okay.  Am I right that Florida is also implementing a new system under which the State's going to be randomizing or changing the way that they generate driver's license numbers?

A.    Yes.  So the driver's license schema, I guess you would say, has changed.  It became apparent to the Legislature that you could predict people's driver's licenses based upon their name and date of birth, so that wasn't a good secret identifier to uniquely identify a voter.

Q.    Okay.  And as a result, when you get petitions in -- and

you might get a petition with the new driver's license number, and it's going to be different from the driver's license number that you have on file; correct?

A.    Yes.  So what that really means is that sometimes a mismatched driver's license compared to our records and what's on the form doesn't mean it's a failure point.  We have to check -- if it doesn't match, we have to check in DAVID at the Highway Safety and Motor Vehicles Database to validate it, because we may have the old driver's license; or, frankly, we may have the new, but they're still using their old for some reason because they remember it.  So, yeah, it's complicated to validate that.

Q.    Okay.  So that's -- it's not a failure point, but it means that there's an ostensible mismatch and it requires you to take more steps to track it down?

A.    Yeah.  It's not necessarily an immediate failure point. There's more steps to determine whether it was not -- a match or not.

Q.    Okay.  And as a consequence, this will require, you know, research to ascertain whether it's a true mismatch or they've got a new driver's license?

A.    Correct.  Or whether our database was even wrong.

Q.    Okay.  And, again, the system that you use to do that research is DAVID?

A.    Yes.

Q.   Okay.  Now, you indicated that you expanded the pool of individuals who are -- who have access to DAVID.

But would you consider them all to be, you know, trusted senior staff?

A.   Certainly, yes.  We don't give people access to DAVID without that trust.

Q.   Okay.

A.   I don't hire people without that trust.

Q.   Okay.  And they are all salaried workers, obviously?

A.   Yes.

Q.   Okay.  Another item to check for is the signature date on the petition form; right?

A.   Correct.

Q.   And sometimes the voter may list their date of birth in there; is that right?

A.   Sometimes they switch the dates, yes.

Q.   And sometimes the person signing the petition may fail to list that date at all?

A.   Correct.

Q.   And those errors, again, are failure points that result in invalidation of the petition?

A.   Yes, if they switch the dates -- if the date of birth does not match either what's in our record or potentially if our record is wrong and we see it in DAVID as the right one.  But if it doesn't match that, then it's a failure point.

Q.   Okay.  I understand in past election cycles if a voter included a signature date that was the same date as their voter registration form, your office used to validate those petitions; is that right?

A.   Correct.

Q.   Okay.  And recently, however, I understand that you -- that the Supervisors were told by the Division of Elections that those petitions must be invalidated.

A.   Correct.

Q.   And what's the basis for that?

A.   You may have to ask them.  My understanding is that it's all -- is that it's impossible for -- let me rephrase.

A petition needs to be signed while the voter is a registered voter.  So if they are submitted at the same time, the thought is they can't have been a registered voter at the -- on the same date that they signed the petition because there's a little bit of a verification process that has to happen after you submit the form.

Q.   Okay.  And so the -- in that instance -- if you have organizations out, you know, in the community trying to both register voters and get petitions signed, in that instance if they're successful in getting somebody to sign both and the person wasn't registered before, their petition will be invalidated?

A.   Correct.

Q.    Relatedly, I understand that in past election cycles if a voter included a signature date on which the voter was listed as inactive on the voter roles, your office used to validate that petition; correct?

A.    Correct.

Q.    But recently the Division of Elections has directed the Supervisors to invalidation those petitions; right?

A.    Correct.

Q.    And that's another failure point?

A.    Correct.

Q.    Okay.  And another item you check is whether the petition contains the entire petition?

A.    Correct.

Q.    Which may be multiple pages, as you said before.

A.    Yes.

Q.    Okay.  And if all those pages aren't present, that petition will be invalidated?

A.    Correct.

Q.    Okay.  And when you have confirmed the voter's name, date of birth, the date they were registered at the date of signing and see the petition is complete and there are no other required items that are blank, then you proceed to check whether the signature on the petition matches the signature on file; is that right?

A.    Correct.  We also validate that the signature date was

within the range of validity for the circulator.  But yes.

Q.   Okay.  And sometimes the person writes a nickname that does not match their legal name on file; right?

A.   Correct.

Q.   And in that instance you're -- does that mean it gets invalidated in that instance?

A.   Generally no.  If --

Q.   Okay.

A.   -- we can't find anything that's close, then potentially it might, but it's -- we do a lot of looking to try and prevent an invalidation in that case.

Q.   Okay.  And sometimes the signature does not match because of being signed in printed script versus in cursive?

A.   There is a lot of ways that a signature can not match at least exactly, yes.

Q.   Okay.  Sometimes a signature is obscured such as by being rushed or not written on a firm and thick surface?

A.   Correct.

Q.   Okay.  And sometimes it simply does not match?

A.   Correct.

Q.   Okay.  And those are failure points that can result in the petition being invalidated for having a nonmatching or so-called "bad" signature?

A.   Potentially, yes.  In our training we are trained to take some of that into account, especially poor surfaces or even a

speedy signature, versus, you know, something we have on file that's maybe less speedy. And we have lots of -- in some instances -- frequently we have more than one image from a voter that we can compare to.

Q. Okay. That's something that as a skill set you've developed over time and skill of the people who do this kind of work on a day-in, day-out basis; right?

A. Correct. That's why we do the training and -- yes, that's correct.

Q. As to signatures, is it true that a voter's signature can change over time?

A. Yes.

Q. And from your experience, what are the reasons why signatures might change but it's still the same person?

A. Sure. Signatures can change because someone is aging and they are becoming more infirm, not as good dexterity control of their fingers. That's usually older folks or, you know, my age, et cetera.

Younger voters like my sons, their signatures change as dramatically, if not more so, over time sometimes. We have a lot of students. So we try and see the similarities there. Sometimes we may not be able to match it.

Another big reason signatures change is just, as you sort of alluded to, the rapidity or the care that the voter is using to sign the form.

Q.   Okay.  And another item you check for on these forms is if they were collected by a circulator and whether that circulator has completed a certificate, correct --

A.   Correct.

Q.   -- in full?

And that the circulator was registered on the date that the petition was signed?

A.   Correct.

Q.   And if that information is, say, missing at all, the date of the signature of the circulator, that's an invalidation point?

A.   Yes.  The circulator is supposed to sign, at least our understanding, the same time that the voter is signing it because it's testifying -- or attesting that they took that and signed it while the voter was there.

Q.   Okay.  And, ultimately, if the required information is included and the signature matches the signature on file, then you note in your system number of pages and that they had -- if they had the full text of the amendment, and the petition is validated at that point?

A.   Correct.

Q.   All right.  And I understand that -- when a question arises along that series of steps, is it true that the petition gets elevated to somebody more senior in the process to look at it?

A.   That was true more in the past than it is now because we've

found -- and it was somewhat unexpected.  We found that in a batch of petitions there's so much complexity that we really don't have the elevation process anymore.

We -- anybody in our petition verification process, our team, is trained now through all of the steps, including DAVID and researching in FVRS and multiname searches and all of these things, to be able to validate or invalidate a petition on their own.

So that was anticipated to be the case early on in -- like over the summer when we were coming up with a process, but really that's somewhat evolved somewhat unexpectedly to really it's all elevated.

Q.   Okay.  So now -- whereas before it might have been, like, 50 percent of the petitions were accelerated to a higher level, now it's effectively 100 percent?

A.   Effectively everybody is at the high level, yeah, which means the staff that would normally be that -- or in the past been that higher level, everybody on the team is trained to that.  And that's really the core eight people that I talked about of full-timers.  Some of the other -- I've got up to 17 -- they may be involved with removing staples and that kind of thing or helping with -- you know, if we get a big push.

Q.   Okay.  And you mentioned, obviously, the use of the system DAVID in this process.

As I understand it, some of the Supervisors in other

counties are not set up to access DAVID.  Is that -- is that your understanding before?

A.    I know that before 1205 some counties absolutely were not -- they hadn't gone through the process to be allowed to use -- or be verified users of DAVID.  They didn't want to take on that liability.

Q.    Okay.  And you mentioned the FVRS system as well, which is the Florida Voter Registration System.

Is it your understanding that not all the counties before used the FVRS system when they received petitions?

A.    That's absolutely true, yes.  I think many counties -- just if they weren't in their county, the voter was not a resident of their county -- a registered voter in their county, then they didn't do the FVRS search.

Q.    Okay.  So they just invalidated the petition?

A.    I think that's the case, yes.

Q.    All right.  I want to focus in a little on just the signature verification process.  You did mention this, and if you feel like that was sufficient, then that will be sufficient.

But how does your staff verify whether a signature on a petition is that of the voter in question?

A.    Certainly based on their training and their experience. They, of course, look at the image of the petition which has the signature on it.  It's captured.  We scan those at a high resolution so it's very clear what's on the paper, and then we

compare it to -- through the petition verification module screen. The signature appears there that we have on file. We typically have, like, the primary signature, which is generally the most recent that's on a voter registration application form.

If there's any doubt of a match or they aren't certain, they being a team member, they can look at a potentially whole long history of signatures that we've capture. There are very few forms we receive with a signature on it for a voter where we don't capture the form -- I mean the signature from the form.

But the ones that we can look at essentially are previous voter registration applications, which are generally -- we consider that to be the paper form. If a voter registers at the DMV, then really what happens is we get a capture of their signature from the DMV. And that's done on a signature pad. If someone registers online, essentially the DMV signature gets captured and brought over.

When somebody signs the poll book or signs in to vote, we'll say either election day or at early voting, it used to be they would sign a paper form. We would scan those in. But now it's all signature pads like we see in lots of places. It's a digital signature pad. Those are all captured, and those can all be referenced as part of the signature verification process.

We consider the signature on a vote-by-mail envelope, because essentially that's the voter signing in to vote. Those we look at also, you know, as long they're from a valid

vote-by-mail ballot.

We don't look at previous petition signatures, but -- so there's a large number of signatures we can potentially look at, and that's good as far as the training goes. You want to have a large number of known goods because, as we've spoken to, people's signatures can vary over time or circumstance.

Q. Okay. In the instances where you have a handwritten voter registration form, you also have the handwriting you can see; is that correct?

A. Yes, yes. Oh, you mean like the manuscript for other fields within the form is what you're talking about. Yes, yes.

We don't generally use that as part of the signature verification, but if for some reason we had a concern about fraud, then we would potentially consider that as maybe part of our fraud investigation.

Q. Okay. And just to be clear, every person who validates a petition form must first undergo training; correct?

A. Yes.

Q. Is it fair to say that the individuals that are on your staff and do this kind of voter -- voter -- I'm sorry -- petition validation process are fairly long-tenured individuals?

Correct?

A. Yes. I would say that they are very good at signature verification. Usually they've undergone training multiple times. You have to renew your training every election cycle.

So, essentially, after an even-numbered general election year, you have to take it again in advance of the next general election, and you have to begin signature verification within six months of having had the training or else you have to take the training again.  So you're either taking the training frequently or verifying signatures for a long period of time.

Q.   Okay.  And you're confident in the accuracy of the signature validation process that you have now?

A.   Yes.  Yes.

Q.   You were confident in the signature validation process that you had in the past; is that right?

A.   Yes.

Q.   And in what other instances does your office validate voter signatures other than in the statewide ballot measures?

A.   Lots of instances.  The main one probably is in vote-by-mail voting.  Before we can count a ballot, we have to validate the signature.  But also vote-by-mail requests, candidate petitions -- in our experience we don't get local initiative petitions -- change of address -- there's a lot of instances where the voter will correspond with us and we validate their signature.

Q.   You use the same staff who does the petition validation process to validate those signatures as well?

A.   Correct.  Anybody that validates signatures has to go through the training and meet the same requirements.

Q.   Okay.  And given your years of experience and familiarity with the systems we've discussed, you consider the statewide initiative petition verification process to be an effective process before HB 1205; is that correct?

A.   Effective in what way?

Q.   Effective in properly validating petitions.

A.   Yes, I thought it was pretty rigorous.

Q.   And if your office validates a petition -- it invalidates a petition, it's not necessarily evidence of fraud; is that right?

A.   Correct.

Q.   And you're not aware of any instance before HB 1205 where your office validated a statewide initiative petition but the voter in question did not actually sign it; right?

A.   Correct; I have not been made aware of any of that.

Q.   And you're not aware of any instance before HB 1205 where a voter informed your office that their signature had been forged on a petition that your office had validated; is that correct?

A.   Correct.

Q.   And you're also not aware of any instance before HB 1205 where a voter informed your office that he or she was tricked into signing a petition for a statewide initiative for which you validated the petition; is that right?

A.    I think if all -- yes, I've never heard that somebody complained about being tricked to sign a petition and then us having validated it, yes.

Q.    And given your experience working closely with other county Supervisors, do you think Supervisors are validating a significant number of petitions with fraudulent signatures?

A.    Currently or before, or both?

Q.    Before or both.

A.    I do not think we're validating fraudulent petitions, yes.

Q.    Okay.

A.    Not significant numbers.

Q.    Okay.  Can you explain how your office detects potential fraud in submitted petitions?

A.    So I will speak more before 1205.

There were some obvious instances.  And it sounds strange, but if you get a petition from someone who in our records was deceased, that would certainly be an indication that that person didn't sign the form.  It's rare that we have someone listed as deceased but really they're still up and active.  But sometimes our records can be wrong, but infrequently.

So that's an obvious instance of potential fraud that we would likely turn over to either FDLE or the Office of Election Crimes and Security, OECS.

Other than that, it's more patterns you see across petitions or across a certain circulator, either a high number of invalids, potentially, for a certain circulator or some data doesn't match sometimes.  And this is similar to the voter registration application fraud we might find, but sometimes the

484

Direct Examination - Supervisor Earley

driver's licenses seem to be off by a digit or two or Socials seem to be off by a digit or two.

Signatures can be not matching across multiple petitions. And so sometimes the signatures themselves look similar, like it was the same person signing. Sometimes it's a different pen, but sometimes it's the same pen, which is definitely an indication of potential -- likely fraud, likely fraud.

And sometimes, like we discussed briefly earlier, if even the handwriting for other parts of the petition, filling out the various fields, looks similar across multiple petitions, then that potentially can be indications of fraud. You're not supposed to fill out those fields for the voter. The voter is supposed to fill those out.

Q. In those instances you don't validate the petition; correct?

A. Yeah. Anything we are going to -- correct. Anything we turn over as likely fraud or anything we suspect to be fraud would certainly not be a valid petition.

Q. And if you identify an issue like that, you tell people at FDLE; is that correct?

A. Yes. We gather images and do a write-up on this, as we have done in the past, and submit that to either FDLE or the OECS, sometimes our local folks, but we tend to just go straight to the state level.

Q. When you say the "state level," you mean FDLE?

A.    FDLE or OECS, Office of Election Crimes and Security.

Q.    And when your office validates a petition, is there a new voter notice requirement that you have to send out a notice?

A.    Yes.  So after we validate a petition, House Bill 1205 requires us to send a notice to the voter that we have validated a petition in their name.  And there is an explanation on there that they have the opportunity to question whether -- or, essentially, suggest that they didn't sign it; they don't remember signing it; they think it's likely fraud involved.  So that gets sent to the Office of Election Crimes and Security by the voter.

Q.    I'd like to pull up Exhibit 143.

      Do you recognize this document?

A.    Yes.  That's the letter that I wrote to the voter to explain what this new notice was all about.

Q.    Okay.  This is a two-page document; is that correct?

A.    Yeah.  It's the front and back of the same piece of paper.

Q.    And you prepared this -- this document; is that correct?

A.    I did.

Q.    Okay.  And that's your signature on the bottom of page 1?

A.    Correct.

      MR. WERMUTH:  Okay.  I'd like to move Exhibit 143 into evidence.

      THE COURT:  Any objection?

      MR. JAZIL:  No objection, Your Honor.

THE COURT:  Without objection, 143 is admitted.

(PLAINTIFFS' EXHIBIT FDH-143:  Received in evidence.)

BY MR. WERMUTH:

Q.    Let's look at what it says.

In this notice on the first page you're telling the voter that your office has received a petition with the voter's name and signature; is that correct?

A.    Yes.

Q.    And that your office believes the petition is legal and valid?

Do you see that?

A.    Yes.

Q.    And that your office -- that you're sending this notice to the voter because a new Florida law requires it; right?

A.    Correct.

Q.    And then directly under those statements, there is a space for your office to complete and some information about the petition; right?

A.    Correct.

Q.    And then you're telling the voter that they do not need to take any action if they signed the referenced petition by stating in bold type:  *If you signed this petition, you do not need to take any action*; is that right?

A.    Correct.

Q.    And then you're also telling the voter under the bold

statement what the voter should do if the voter believes his or her signature was forged on the petition; right?

A.   Yes.

Q.   And you prepared the first page of this notice as a cover letter to the voter because you want voters to understand why you are sending the notice and what actions they can take as a result of the notice; right?

A.   That's why I wrote it.  I don't know whether it's -- which is the front and which is the back, whether it's a cover letter or not, but yeah.

Q.   It's a cover letter, yeah.

     And this cover letter isn't required by HB 1205; right?

A.   Correct; it's not required.

Q.   And then on the second page of this document is the formal voter notice required by HB 1205?

A.   Yes.

Q.   And you included on the bottom of page 2 that it is a second degree misdemeanor for a person to knowingly make a false official statement to make sure the voter knows the consequences of his or her action; is that right?

A.   Yes.  I think that 1205 requires that to be there.  I don't think that was an arbitrary decision.  But, yes, it's included, certainly.

Q.   Okay.  And you have many years of experience communicating with voters; is that true?

A.   Yes.

Q.   And would you say that you had a fair sense of what communications confuse voters?

A.   Yes.

Q.   Okay.  And based on your experience, do you think the statutory notice is likely to be confusing to the voters?

MR. JAZIL:  Objection, Your Honor.

THE WITNESS:  I was concerned that this notice --

THE COURT:  Hold on.

MR. JAZIL:  Objection, Your Honor.  Beyond personal knowledge.  We are speculating about what voters might or might not be confused by.

THE COURT:  Maybe I'm confused.

You are the Supervisor of Elections for Leon County; right?

THE WITNESS:  Yes.

THE COURT:  Your whole job is to interact with and be in charge of handling elections in Leon County?

THE WITNESS:  Yes.

THE COURT:  And your job is to make sure the laws are executed faithfully and the elections are run properly?

THE WITNESS:  Certainly.

THE COURT:  And part of that is for you to interact with and do things to help the community understand the elections of the people you're serving?

THE WITNESS:  I'm specifically tasked with educating the voters about --

(Indiscernible crosstalk.)

THE COURT:  All right.  Rather than waste time on foundation, overruled.  He can answer the questions.

MR. WERMUTH:  Okay.

BY MR. WERMUTH:

Q.   So you went out of your way to produce this letter to help guide voters into not making a mistake?

A.   This is a new notice to voters.  They have never seen this before, and I was concerned that they may not know what the notice meant and might be confused on what they should do with it.

Q.   On top of the second page of this notice, it indicates that a voter should return this notice "if you believe your signature has been misrepresented or forged on the petition listed below."

What do you understand it to mean for a person to have a signature misrepresented on a form?

A.    I think that's, to me, confusing language.  I think the "or forged" is pretty straightforward.  "Misrepresented or forged," yeah, I'm not sure I know exactly what "misrepresented" -- that's probably a legal term that means something to everybody in this room but me.  But I think "forged" is pretty clear.

Q.   Okay.  Given your experience in the dynamics of voters receiving official mail, do you expect that some voters will

sign and return this notice form even though they have, in fact, signed the petition at issue?

A.   I would say that when I first saw this form and as we were trying to institute 1205 into our process, I looked at the first line of this form and it said -- it doesn't say "if." It says: *Check the box below, sign, date, and return this notice to the Office of Election Crimes and Security.* There it says "if" after that. But if you are in a hurry and just trying to comply, you might just go ahead and sign it and send it off without understanding exactly why you were signing it and sending it off. That's why I wrote the letter on the other side to make that clearer.

Q.   Okay. And this whole notice that you -- that we've been talking about, the Supervisors of Election didn't request to have this notice created; correct?

A.   Correct.

Q.   Okay. Did you give any feedback or comments to the state officials about the notice requirement before the passage of HB 1205?

A.   Yes. During the writing of the bill and as it progressed through the Legislature, our association, like we talked about, the Rapid Response Team and our legislative committee, generally through our lobbyists, but sometimes individually straightforward to the Legislator or their staff, suggested that maybe that wasn't what we thought would happen. If the intent

was to look for fraud, maybe you were noticing people whose petition we received that we invalidated.

Q.   Okay.  So you viewed it as probably a better use of time to notice the people who you invalidated their petitions versus validated their petitions.

A.   That was basically our view, or at least certainly mine.  I think others shared it.  There would be hardships with that because sometimes the voters -- you wouldn't know who to send the notice to, potentially, for invalid forms.  But that -- it was a surprise that we would have to do this.

Q.   Okay.  And is it fair to say that your reaction was not a positive one to learning that the Legislature was going to force you to do this notice?

A.   Yeah.  Not necessarily as policy, but as -- yeah, we thought it was a little bit backward.

Q.   Okay.

A.   I thought it was a little bit backward, I will say.

Q.   If you were deciding whether to send notices to voters, you'd find more utility in issuing the notices to voters who you didn't validate their petition?

A.   Possibly, yes.

Q.   Okay.  Since October have you been sending out these notices to voters whose petitions your office has validated?

A.   Yes.

Q.   And when your office has sent out those notices, has the

notice been sent with the same form that we see here?

A.    Yes.

Q.    So you didn't make any material changes since we first saw it?

A.    Correct.  We did not.

Q.    Okay.  Are other Supervisors of Elections using this form?

A.    I know many ask to see my form.  I don't how many adopted it.  I think some did.

Q.    Okay.  Are you aware of any Supervisors who have -- who have told you that they plan to start using this form?

A.    Some had told me that early on.  I haven't kept track of that to see what actually had panned out.

Q.    Okay.  Are you aware of any other instance where Supervisors are required to send -- send prepaid postage to a voter via Florida mail with a prepaid postage for transmittal to a secondary addressee, as is the case with this form?

A.    No, that was new to our offices.

Q.    So the first of its kind?

A.    Correct.

Q.    All right.  If the Supervisor -- is the Supervisor required to verify the signature on the notice form if it is returned to confirm that it matches the voter's signature on file?

A.    No.

Q.    Okay.  It's because these notices don't come to you; correct?

A.    Correct.

Q.    Okay.  They go to the OECS?

A.    Correct.

Q.    And the OECS doesn't have the -- all the technical things that we've been talking about as a way to verify the signature of the person signing the form?

A.    Correct.

Q.    Okay.  So somebody could receive this letter in the mail, live in that same household with the person who has this -- who signed the petition form, and they can sign this form and send it back to the State; is that correct?

A.    I guess it's possible.

Q.    And you just wouldn't know that, right, because you don't know -- you are not checking the signatures on these forms coming back?

A.    We are informed when the OECS -- excuse me -- receives one of these notices.  They -- the OECS notifies the Division of Elections.  The Division of Elections sends us a data file saying, These voters have sent us the notice saying that they are disputing whether they signed the form or not.

I'm trying to remember.  I think we may actually get an image of the form.  The reason I say that, I've received some things from voters where the voter has said, We signed the form. We want to change our mind.  We signed the form.  We don't like what the ballot is going to be about, but we want it to be on

the ballot. So we've seen some communication from voters. I can't remember for sure if that was a letter or an image of this form that had that text written in there, if that makes sense.

Q. Oh, okay. Oh, so you received an image of form and it says --

A. I'm trying to remember.

Q. -- I've changed my mind?

A. We've received something from voters with a written statement, that, yeah, they are trying to change their mind or they want it on the ballot but don't like the amendment. You know, voters do interesting things.

Q. Okay. And so that notice gets sent to the State, the OECS, and they direct you to invalidate the petition?

A. Correct.

Q. Now, how many times has this happened to you, do you recall?

A. That we've received an invalid --

(Indiscernible crosstalk.)

A. -- essentially the notice was sent to OECS?

Last I heard, it was a very small number. I think it was 29.

BY MR. WERMUTH:

Q. Okay. And did you actually look at those petitions again?

A. I don't know that I have, I think my staff may have, just to kind of confirm our process, yes.

Q.   And did you confirm that you believed the person who actually signed that form is the same voter?

A.   I don't think we had any more certainty or doubt.  I think we stood by our original conclusion that it was a valid petition and signed by the voter, yes.

Q.   Okay.  So you're convinced that the voter who sent that notice is the voter who signed the petition?

A.   At this point, yes, yes.

Q.   Do you think sending out to this notice form to all voters who signed the petition that you verified will make it more or less difficult to catch real fraud?

A.   Signing this notice, I'm not sure that it has any bearing really on fraud.  Potentially -- I guess my understanding was that this would be the potential basis for the OECS to search for fraud.

I may have been more concerned at the outset because I thought more of these notices would be sent to OECS that it would potentially inundate them with things they may need to investigate versus what we would see through our normal course of checking petitions that might be more likely to be fraud, so I was concerned about that.

The voters have done, I think, a fantastic job, for the most part.  There's not been many of these notices sent out of 30, 40,000 that Leon County has received, only 29.  That's a lot smaller number than I thought would be sent.  But, yeah, my

concern was that this would be indicators of fraud that were less likely to be real fraud.

Q.   Would it be fair to say that you're successful in your efforts to notify people that -- about this form with your cover letter?

A.   I am not sure I get all the credit.  I would probably give it to the voters.  And I'm not sure what the other rates of being -- of having that form sent to OECS for counties that didn't include a letter.  There was a more generalized version of the form that I think a lot of people used that didn't include a cover letter, but I don't know what their instances of referral to OECS was.

Q.   Leon County has increased its -- well, we are going to switch gears and talk about your verification fees.

So Leon County has increased its verification fee for statewide initiative petitions to $4.15; is that correct?

A.   Yes.

Q.   Okay.  Or was it 16 cents?  My bad.

A.   $4.15.149, I think, or something like that.

Q.   And on a -- on a single petition to be verified, what is that fee for?

A.   It tries to capture essentially everything from the receipt of a batch of petitions through the scanning, through the error checking, through the verification process, through the notices being sent to the voters, changes in technology that might of

had to have been done to make that possible, time for staff to do all of this, and then I guess finally at some point where we ship the physical forms back to the State, which is new.

Q.   Okay.  So after going through the process of scanning the petitions in and sending them off to the Department of State, you also have to ship the actual physical forms to them?

A.   Correct.

Q.   And the cost of that shipment is built into this verification fee?

A.   Yes, yes.

Q.   What was the signed -- the signature verification fee for statewide initiative petitions in Leon County before HB 1205?

A.   84 cents.

Q.   Okay.

MR. WERMUTH:  Let's pull up -- I'd like to pull up Exhibit 595.  And turn to page 23.

BY MR. WERMUTH:

Q.   Do you recognize the information on this slide?  I know it's a little --

(Indiscernible crosstalk.)

A.   Yeah.  It looks like our spreadsheets for calculating our cost.

BY MR. WERMUTH:

Q.   Okay.  And so is this the form that you use in order to figure out how to -- how much to charge for petition

verification?

A.   It looks like the spreadsheet we used, yes.

Q.   Is this a true and correct presentation of a fee calculation for your office?

A.   It looks like some of it is missing on the bottom.

Q.   We can scroll down.

A.   Yes, this looks like it.  Yeah.  That looks a lot better.

MR. WERMUTH:  Okay.

I'd like to move into evidence Exhibit 595.

MR. STAFFORD:  No objection, Your Honor.

THE COURT:  Without objection, 595 is admitted.

(PLAINTIFFS' EXHIBIT FDH-595:  Received in evidence.)

BY MR. WERMUTH:

Q.   Okay.  Let's look at how you calculated your current total costs per petition.

And we do that by looking at the last page of the document, which shows -- there's a clean copy of your current total costs right there; is that right?

MR. WERMUTH:  Can you scroll down to the bottom? Thank you.

BY MR. WERMUTH:

Q.   And this spreadsheet shows that it takes your office --

I'm sorry.  Maybe I'm mistaken as to where it is.

7 minutes and 75 -- 7.75 minutes; is that correct?

A.   7 minutes and 45 seconds was our estimate, yes.

Q.   Okay.  And that's to process one petition; is that right?

A.   At least for part of it.  I'd have to review, but I think that's all the staff time.

Q.   Okay.

A.   If that box would go away.

It's been awhile since I've looked at this petition form, but yes.

Q.   And under the heading Staff Time,(hourly, including benefits), does that term "Supervisor" mean you or is that Supervisor's staff?

A.   It's the Supervisor's staff.

Q.   And what staff falls in that category?

A.   Our full-time employees.

Q.   Okay.  So those are all salaried employees?

A.   Correct.

Q.   And, in fact, now you've said you've shifted pretty much the whole process over to salaried employees?

A.   Correct.

Q.   Okay.  So this number might actually be lower than the current -- what the current number would be?

A.   Which number?

Q.   Sorry.  This is the time -- this is the amount number, but before -- I guess we'll go through the numbers and we'll talk about it as we go.

And let's look at the entry "Assistants."

So what falls in the category of Assistants?

A.    Typically that would be the temp employees, possibly some lower-level staff if they weren't necessarily tiered, when I was trying -- when we were envisioning bifurcating the process with an initial review, and then things would be bounced up to a higher tier.  So the Supervisor was typically the higher paid either -- full-time employees.  Assistants could be temp or lower-paid employees.

Q.    Okay.  But now I understand that you've kind of shifted over to a model where basically all the individuals that would be involved in the petition verification process fall in the Supervisor category.

Is that right?

A.    They would probably just be lumped together as full-time employees because we don't have the bifurcated or two-tiered process.  So the hourly rate would be a blending of the two.  We are in the process of beginning this, but we have not readdressed our fee structure here.

Q.    Okay.  Do you anticipate that blending -- that blending process will involve having, you know, the average number increase?

A.    It will be somewhere between the 36.97 and the 18.75.

Q.    Okay.  And just as far as these individuals are concerned, the folks who fall in the Supervisor category, they would be paid their salary whether they reviewed petitions or not; is

Direct Examination - Supervisor Earley

that correct?

A.    Correct.

Q.    Okay.  And for any staff who aren't temporary, you'd be paying their compensation regardless of whether they are involved in petition verification; correct?

A.    Correct.

Q.    Okay.  And you've calculated this time based on 100 petitions to get an average that accounts for all the variables in validating petitions.

Let's go look at the -- if you move up the page to the "Staff Time for 100 Petitions."

Do you see that?

A.    Yes.  We based our time calculations on 100 petitions to try and give a broader spectrum to capture all the variations of complexity.  Some forms are relatively easy to verify and some are not.

Q.    Okay.  And it shows on this form the average hourly rate including benefits of those who fall under the term "Supervisor," and then it shows the average rate for all the people who fall under the Assistant; is that right?

A.    I think so, down at the portion we were showing before, it should be, yeah.

Q.    Okay.  But in this calculation as well, the bottom number is the $3.52 and the --

A.    I see it.

Direct Examination - Supervisor Earley

(Indiscernible crosstalk.)

BY MR. WERMUTH:

Q.    -- and 4.22 cents; is that right?  Or is that minutes?

A.    That's minutes.

Q.    Okay.

A.    Yeah, that's not the hourly rate.

Q.    But then it breaks it down in the dollars column next to it; correct?

A.    Yeah.  Like the $2.172 --

Q.    Okay.

A.    -- that's the cost for that 3.525 minutes for that staff level, the Supervisor staff level.

Q.    Okay.

A.    So it's kind of broken out from the 100 petitions to one petition as an average for that position.

Q.    And then the Assistants column, you assign $1.32 to the average cost for petition for the assistant works?

A.    Correct.  In this spreadsheet done last summer we did that, yes.

Q.    And you come up with a total of $3.49; is that correct?

A.    Add them together, yes.

Q.    Okay.  Of the roughly $3.50, about $2.17 is attributed to supervisor employees; right?

A.    Supervisor-level employees, yes.

Q.    In the upper right-hand side of the summary you note that

the first two line items for the acceptance of forms and for scanning and indexing the forms you also have a few -- and a few lines down you have the line item for retention.

And with each of those there are additional text on the side that says, Note - this was originally one number and now is a higher number.

Can you go to the right-hand side of the page?

A.    Yes.  So -- yes.

Q.    Why did you increase these amounts?

A.    This was reference to a previous version of this form.  We actually had several previous versions.

When we very first did this, we didn't anticipate multipage petitions, so I can't remember if this form, this calculation, resulted in the $4.70, which is what it originally -- what -- a midvalue we had.  Originally, I think we had $3.37 or $3.13 before we knew about the multipage.

Then we reassessed it once we knew about the multipage, and this note was taking into consideration the multiple pages and how that would cause more time to be required potentially.

And maybe in a later version -- I don't know which version this is, the 4.15 or the 4.70 -- I think it was the 4.15, but we decreased it again because part of the multipage complexity was in counting the number of pieces of paper and maybe looking at front and backs and all of that.

We -- our county found a technical solution to that, so we

went from low $3 and something -- we had 84, went to 3.13, I think it was, to 4.70 and then down to 4.15.49, or something like that.

The final one is the one we actually started assessing. I'm not sure anybody paid any of the other intermediate versions and, if they did, they were either credited, you know, back if it was 4.70. But this was just taking the changing, understanding, and technology approach to processing the forms primarily with reference to multipage forms.

Q. But the overall effect was that basically when you found out about the multipage form issue, it caused you to increase the average cost associated with validating 100 petitions?

A. Correct, at least to the middle part, and we pulled that back some when we found a technical way to count the pages.

Q. Okay. But from where you started first --

A. Yes.

Q. -- to where you ended, it was a higher number?

A. Correct.

Q. Okay. These tasks that your office must complete that we just discussed are all required by HB 1205; correct?

A. Yes.

Q. Okay. And as I understand it, before HB 1250 -- sorry. I said --

A. 1205.

Q. -- 1205, you did not upload all the petitions digitally to

the State; is that right?

A.    Correct.

Q.    And you did not assemble and send out the notice form we talked about?

A.    Correct.

Q.    And you did not need to physically ship all the petitions to the State by March of the even -- of the even-numbered year; is that right?

A.    Correct.

Q.    And these are all processes now required by HB 1205?

A.    Correct.

Q.    Okay.  And then you add the mailer total per petition and the labor total per petition and that's how you got the total cost for the petition of $4.1571?

A.    There's the number; 4.1571, yes.

Q.    Okay.  Now, HB 1205 instructs the Supervisors to charge the actual cost of signature verification; right?

A.    Correct.

Q.    And this exhibit, as you've indicated, reflects an estimate of the actual cost to verify petitions based on the assumptions that are set forth in the spreadsheet; is that correct?

A.    True.  I think they were good, professional, educated guesses, but yes.

Q.    And I understand that you used a previous iteration of this calculation to present at this supervisor summer conference to

walk -- to walk the supervisors through the charges in the petition process and the cost-estimating process; is that right?

A.   Correct; myself, another supervisor, and a high-level staff from another elections office.

Q.   Okay.  But you presented this as a model for how the supervisors could proceed to do their calculations?

A.   Yes.  That presentation was developed through many phone calls, large-scale phone calls, with a lot of supervisors and their professional staff, including some with the Division of Elections staff and some with the vendor whose software runs a majority of the petition verification process, trying to come up with a process that would work at least in some form for everyone.  And so we were trying to capture all the different costs that might be involved so not everyone would have to do this on their own.

MR. WERMUTH:  Okay.  I'd like to pull up Exhibit 146.

BY MR. WERMUTH:

Q.   Do you recognize this document?

A.   Yeah.  It looks like an email chain.

Q.   Does this appear to be a true and correct copy of a July 30, 2025 email string in which you were involved?

A.   Yes, it looks accurate.

Q.   And if we go down to the last page of this email string, the first email in time is a July 25, 2025 email from Alexandra Mosca, who I understand works in your office, and to others; is

Direct Examination - Supervisor Earley

that right?

A.   Correct.   That's a lot of our staff that were involved in the cost calculations.

Q.   And what is Alexandra Mosca's role in your office?

A.   Alexandra, or Alice, is a high-level staffer.   The primary, I guess, title is public information officer, so they're involved with a lot of communications.

Alice also is involved a lot with the legislative process. She used to work at the Division of Elections for a long time. And I tasked her with essentially being the pivot point for all of my different staff members that were bringing costs together to kind of bring all those costs together and then as a team, with her leading it, to come up with the cost structure, certainly upon later review by various people, including myself.

Q.   Okay.   And this email indicates that Leon County has updated its petition cost calculation due to some of these complexities of multipage petitions; is that right?

A.   Correct, yes.

Q.   And she addresses the adjustments we just discussed when we were looking at --

THE COURT:   Before we talk about what's in the document, are you admitting the document?

MR. WERMUTH:   Yes, Your Honor.

THE COURT:   We can't really read a document into the record that's not been admitted.

Any objection?

MR. JAZIL:  No objection, Your Honor.

THE COURT:  Composite Exhibit 146; correct?

MR. WERMUTH:  It's 146, yes.

THE COURT:  146 is admitted.

(PLAINTIFFS' EXHIBIT FDH-146:  Received in evidence.)

BY MR. WERMUTH:

Q.   And she addressed the adjustments we discussed when we were looking at Exhibit 143; is that right?

A.   Yes.  And certainly she drafted it, but it was based upon a lot of input so we all knew what was --

Q.   Actually, I'm sorry.  I referred to the wrong exhibit. It's Exhibit 595 is the one with the --

A.   The spreadsheet you're talking about?

Q.   Yes.

A.   That's what I was assuming you were referencing.

Q.   My apologies.

And that resulted in the increase of costs from the single-page petition of $3.13 to the multipage petition cost of $4.70.  This was the initial number; correct?

A.   Correct, yes.  So the initial was 3.13; the intermediate, as I spoke to you before, is 4.70, and then we later moved it back down.

Q.   Reverted to 4.15?

A.   Correct.

Q.   Okay.  And Ms. Mosca states towards the end of this email about trying to capture the additional costs due to multipage petitions:  *We won't know for certain until we can perform a complete study under real-world conditions.  But no matter what the solution we come up with, it's going to be more complicated, more error prone, laborious and expensive than the single-page forms;* is that right?

A.   That's what she said.  I think most of that's accurate.  I would say it's probably less error prone but more procedural hurdles to overcome, like jams and that kind of thing, and removing the staples.

Q.   And your office has had an opportunity to perform a complete -- has your office had an opportunity to perform a complete study under real-world conditions?

A.   We've certainly done all of the processing this past year.  We haven't reassessed the costs involved.  We intend to do that starting as soon as I can focus on that instead of this trial.

Q.   But the number that you currently have in Exhibit 595 is your best professional estimate of the cost to verify each petition?  Do you agree?

A.   It was the best professional estimate at the time that we made it, yes.  I think it's definitely going to change.  I don't know if it's going up or down.

Q.   Okay.  But that's the number you're charging now; right?

A.   Correct.

Q.   Okay.  I'd like to move on to talk about -- is it fair to say that the implementation of the new requirements for HB 1205 have been the most labor intensive of any legal requirement that you've encountered in your time at the Leon County Supervisor of Elections office?

A.   I would say it's certainly one of the tougher undertakings, especially with the time constraints involved.  A lot of things had to be solved or at least partially solved in a very short period of time.

There's other examples.  You know, rolling out early voting is a big undertaking, dealing with hurricanes.  But, yeah, for something that's purely legislatively driven with a very short time frame it was quite the challenge for everybody in the state.

Q.   I got it.  But in recent memory, this is the toughest thing you've had come across your table?

A.   It ranks up high, yes.

Q.   I'd like to move on to talking about security.

The information required by HB 1205 for statewide initiative petitions -- we've been discussing so far in great detail that the information required for submissions such as, for example, a local candidate initiative -- wait.  Sorry.

The information required by HB 1205 for statewide initiative petitions we've been discussing is greater than the information required for other submissions such as local

candidate initiatives and local petition initiatives; right?

A.    Correct.

Q.    Okay.  And for candidate petitions as well?

A.    Correct.

Q.    And for those processes where the driver's licenses or the last four of the social security numbers are not included, you don't view those as insecure processes, do you?

A.    I do not view those as insecure processes.

Q.    Do you see a significant difference in the number of petitions submitted by campaigns that use paid circulators as compared to those who rely on volunteers?

A.    Yes.

Q.    Okay.  Can you think of any petition using unpaid volunteers that's qualified for a statewide ballot in the 30 years you've been in the Supervisor of Elections office?

A.    No.

Q.    With regard to the increased verification fee specifically, do you believe that those are -- that those fee increases make it more challenging for people to qualify measures for a ballot in Florida?

A.    Yes.

Q.    And you'd also agree that the extra data that needs to be put on petitions, as we've discussed today, means that there are more failure points for petitions; right?

A.    Yes.

Q.    And you'd also agree that the image upload requirement and the transmission of physical pieces of paper we discussed earlier increased the cost of that effort; right?

A.    Yes.

Q.    And you'd also agree that the notice process that we've been discussing today where the Supervisor must send the required notice to voters who have submitted a validated petition mostly will probably have a negative impact as there far -- as far -- there as far as getting on the ballot, because really all that can happen at that point are that things can be taken off the stack; is that right?

A.    I'm not sure I followed that.

Q.    I was trying --

A.    I think I might have.

Q.    I was trying to quote you from the past.

A.    Yeah.  It sounded like some of my words, but I'm not --

Q.    That the --

A.    What's the short version of that?  Don't quote me.  I get wordy, and I lose myself sometimes.

Q.    Is it fair to say that sending out this notice is going to have a negative impact on -- on the ability to get on the ballot for petition gatherers?

A.    Primarily, I think that its result will be to remove petitions that have already been validated off of the validated totals.

Direct Examination - Supervisor Earley

Q.   And you're confident that those petitions that were validated were, in fact, properly validated?

A.   Yes.

MR. WERMUTH:  Okay.  I'd like to bring up Exhibit 452, please.

BY MR. WERMUTH:

Q.   Do you recognize this -- this email?

A.   Yes.

Q.   Okay.  At least the part where you're the author there on December 23, 2025?

A.   Yes.

Q.   If we can go down to the bottom, the first email in that run, did you receive this email from Maria Matthews on December 25 -- 23, 2025?

A.   Yes.

MR. WERMUTH:  Okay.  I'd like to move Exhibit 452 into evidence.

MR. JAZIL:  No objections from me, Your Honor.

THE COURT:  Hearing none, the objection is -- I'm sorry -- Exhibit 452 is admitted.

(PLAINTIFFS' EXHIBIT FDH-452:  Received in evidence.)

THE COURT:  Mr. Wermuth, the court reporter is giving you the stink eye.

MR. WERMUTH:  Okay.

THE COURT:  How much longer do you need?

MR. WERMUTH:  I don't have much more, Your Honor.

THE COURT:  All right.  Let's go ahead and take a break, because it's been an hour and a half, and -- let's take a ten-minute break.

When we come back, you can finish.  Then we go into cross.

Thank you.

(Recess taken at 2:31 PM.)

(Resumed at 2:41 PM.)

THE COURT:  All right.  Everybody -- let them take their seats.

Hold on.

All right.  Everybody has taken their seats.

You can resume your examination.

BY MR. WERMUTH:

Q.  Let's go back to Exhibit 452.

All right.  We mentioned this previously, but is this the notice that informed you that you now have to invalidate petitions of voters who are inactive on the voter roles at the time they signed the petition?

A.  Yes.

Q.  Okay.  Is it fair to say that you disagreed with that decision?

A.  Yes.

Q.  Okay.  And that you viewed it as being inconsistent with

prior directives you've received from the Department of State?

A.   Yes.

Q.   Okay.  And the result of this, obviously, has now been that you've had to go back and invalidate previously validated petitions?

A.   Correct.

Q.   All right.  I'd like to move on to Exhibit 147.

Do you recognize this document as a series of text messages that you were involved in?

A.   Yeah, that's like what I submitted.  I'm trying to put it in context.

Q.   If you need to turn the pages, that's fine as well.  It's, I think, seven pages.

But this is the document that you produced or --

A.   Okay.  Yes.

Q.   -- the text images; correct?

A.   Yes.  I've read the whole thing now.  Yes, it's coming back to me.

MR. WERMUTH:  I'd like to move Exhibit 147 into evidence.

MR. JAZIL:  No objection, Your Honor.

THE COURT:  Without objection, 147 is admitted.

(PLAINTIFFS' EXHIBIT FDH-147:  Received in evidence.)

BY MR. WERMUTH:

Q.   All right.  On the first page of this exhibit, it looks

like this is a text exchange between you and Wayne Fusco; is that correct?

A.   Yes.

Q.   Who is Mr. Fusco?

A.   He's one of the senior staffers in St. Johns County.

Q.   Are you the speaker in the brown bubble?

A.   Yes.

Q.   And Mr. Fusco is the speaker in the gray bubble?

A.   He's the left; I'm to the right.

Q.   Okay.  And so at the bottom of the brown bubble, you see Mr. Fusco say:  *I don't see how someone without significant money is going to gather an appreciable number of petitions.*
     Do you see that?

A.   I think that was me, not Wayne.

Q.   Oh, that you texted.  I'm sorry.

A.   Right.

Q.   All right.  So what did you mean by that?

A.   It's costly to get a citizen initiative petition on the ballot, and if you don't have the money to do that, it's going to be very difficult to get an initiative petition onto the ballot.

Q.   Okay.  But this is in the wake of HB 1205; correct?

A.   This is post-1205, yes.

Q.   Okay.  So you're commenting in this on the new costs associated with HB 1205?

A.    Yes.

Q.    If we flip to the seventh page of this exhibit, this is a text exchange between you and Tracie Davis; is that correct?

A.    Correct.

Q.    Okay.  And if we look at your message in the brown again, you text Ms. Davis:  *You must be talking about the Strike All* amendment *for 7016, correct?*

A.    Correct, yes.  I think she sent me this without really talk -- she assumed I would know what she was talking about.

Q.    Yeah.  What is the strike-all -- what is the strike-all for 7016?

A.    It's hard to remember.  It's awhile ago, but I think 7016 was the first version of what became 1205.  7016 was the Senate version.  Then they had a strike-all amendment that significantly changed the language, and so I'm commenting about the strike-all.  And so that's -- she initiated the conversation, I think.  We've talked in the past through the legislative team we have.

Q.    Okay.  And 7016 is the predecessor to 1205; correct?

A.    Yes.

Q.    And you commented:  *I think they are trying to kill the ability to bring citizen initiative petitions to the ballot.*

      Is that right?

A.    I wrote that, yes, yes.

Q.    What did you mean there?

Direct Examination - Supervisor Earley

A.   In my opinion -- and, again, this is speaking to the policy, which is not what I advocate for in the Legislature or how I do my job.  But we were talking as just friendly folks that discuss these things that the added complexity would make it more difficult to get an initiative petition on the ballot.

Q.   Okay.  In your long years of experience, this was your initial reaction?

A.   Yeah, just watching -- yes, yes.

Q.   Okay.  Those are all the questions I have for you now.  Thanks.

THE COURT:  Before the cross-examination let me ask a quick question.

And maybe I've gleaned something from the prior testimony, exhibits I shouldn't have.

But it seems to me that prior to HB 1205 that it cost millions and millions of dollars to get on the ballot.  It was an incredibly expensive process before.

Is that -- am I missing something?

THE WITNESS:  I think that's accurate.  Before HB 1205 it was very expensive, yes, yes.

THE COURT:  And is it a fair -- from your experience as a Supervisor of Elections and having gone through this process over and over, part of it is the sheer volume of petitions that have to be submitted and the cost associated with collecting and submitting a million petitions?

THE WITNESS:  There's a massive -- yes, yes. Absolutely.

THE COURT:  And so these were additional costs to what was already an incredibly expensive proposition?

THE WITNESS:  Correct.  Absolutely.

THE COURT:  Anything additional before I turn it over to defense?

MR. WERMUTH:  But --

THE COURT:  I'll take one at a time and then Mr. Jazil can --

BY MR. WERMUTH:

Q.   But in your view, you know, this added cost was basically something you were seeing as the nail in the coffin for some?

A.   It might have been an evolutionary thing over several sessions, but certainly this was another hardship.

Q.   That's all the questions I have for you.

THE COURT:  And before I think we had another plaintiff that wanted to follow up.  I wanted the plaintiffs -- just as I do with defense, I want to have the plaintiffs asking any questions they have, and then we'll have the defense.

MR. HANCOCK:  Thank you, Your Honor.  Liam Hancock on behalf of the Right to Clean Water plaintiffs.

DIRECT EXAMINATION

BY MR. HANCOCK:

Q.   Good afternoon, Supervisor Earley.

Are you familiar with your office's work validating petitions for this most recent cycle?

A.   Yes.

Q.   Do any of the petition sponsors from that cycle have a 100 percent validation rate?

A.   No.

Q.   When a petition sheet is validated, you are required to send a notice to the voter under House Bill 1205; correct?

A.   Yes.

Q.   And that notice solicits a response from them if they suspect forgery of their signature?

A.   It enables them to send notice to the OECS that they suspect forgery or they don't remember signing the petition.

Q.   But if there is a failure point on the petition sheet, your office will invalidate that petition sheet?

A.   Correct.

Q.   And sometimes because of that failure point you are not able to identify a particular voter who corresponds to that petition sheet; correct?

A.   I'm not sure I understand that specifically, so repeat that.

Q.   If you invalidate a petition sheet, do you send a notice to the voter that you've invalidated a petition sheet on their behalf?

A.   We do not.

Q.   So your office does not solicit from voters to notify the OECS about potential forgery when their petition sheet is invalidated?

A.   That is correct.

Q.   Are you aware that under House Bill 1205 petition sponsors can be fined for petitions that are delivered to your office more than ten days after they are signed?

A.   Yes.

Q.   If a petition is delivered to your office more than ten days after it was signed, does your office still process and validate that petition?

A.   We verify it and determine its validity independent of whether it was late or not.

Q.   If it was late, would you count that petition towards the valid signatures an initiative sponsor is trying to achieve?

A.   If all of the other parameters were met, yes, it could be valid.

Q.   Before House Bill 1205, if a petition was signed on August 1st would it have made a difference to your office whether you received that petition sheet by August 11th or by September 1st?

A.   Would it have made a difference?  No.

In what regard?  I'm not sure I understand the full question.

Q.   Would it affect your office's procedures or their ability

to process that petition sheet?

A.   I believe that in -- previous to 1205 we still had a late submission.  Maybe I'm wrong about that, but I thought there was still a deadline for them to submit it to us.  But that might be as a result of 1205.  Frankly, I can't remember.

Q.   Do you have a rough recollection of what you think that deadline was?

A.   I thought it was 30 days as opposed to 10 days.

Q.   And would it make a difference to your office whether a petition sheet was returned within 30 days or within 10 days?

A.   As far as validity, no.

Q.   After House Bill 1205, is it your understanding that petition sponsors are generally attempting to return signed petition sheets to you as soon as they receive them?

A.   Yes.

Q.   In terms of your office's procedures, is it easier to process petition sheets as they are signed or in larger, more intermittent batches?

A.   I'm not sure that I could answer that.  Repeat it maybe.

Q.   Yeah.  Is it easier for your office to process petition sheets on a rolling basis as voters sign them or as part of larger, more intermittent batches?

A.   I'm not sure it makes a big difference either way.  We tend to batch them.  Especially with the added complexity, it's probably easier to put batches through because we are doing

chunks of scanning and then chunks of something else as we progress down the line.  It would be difficult, I think, to do individual petitions separately from a batch the way the process is structured now.  An example would be when we get individual petitions from a voter, we batch them together.

Q.    So even if petition sponsors are returning petitions on a rolling basis, your office will process them in larger batches?

A.    In batches.  Larger or smaller depends on other factors.

Q.    Does your office report petition sheets that are delivered to your office more than ten days after they are signed?

A.    Yes.

Q.    And who do you report that to?

A.    The Division of Elections.

Q.    Are you aware that under House Bill 1205 petition sponsors can be fined for petitions delivered to the wrong county?

A.    Yes.  Under certain circumstances, yes.

Q.    And does your office report petition sheets that are delivered to the wrong county?

A.    Yes.

Q.    Who do you report that to?

A.    The Division of Elections and to the sponsor.

Q.    How does your office determine whether a petition sheet was delivered to the wrong county?

A.    So through the whole process we get to the point where we are looking up the voter in our records.  We've talked about

different ways that's done.  Typically the first search is by date of birth.  We look to see if someone with the information matches to someone in our database, and if they don't, then we do a Florida Voter Registration System, FVRS, search to see if they are registered in another county.  And if they are registered in another county, we try and get that petition back to the sponsor, and the sponsor sends it to the correct county.

There's two versions of that, though.  Sometimes the voter indicates the incorrect county.  Like our students frequently say they are a resident of Leon County and give us a dorm address or whatever their student housing is, but really they are registered to vote in a different county.  In that instance, a fine likely would not be incurred because it's not the fault of the sponsor that it was misfiled.  The voter themselves indicated the wrong county.

There are other instances, and actually, much fewer now, where the voter actually indicated a different county, but it came to our county anyway.  That's the one that has incurred the fine.  That has gone down through this process, the instances of that, the frequency of that.

Q.    If a Leon County voter or -- I apologize.  If a voter from another county incorrectly lists Leon County on their petition sheet, would your office report that as a wrong county petition sheet?

A.    We would not report it to the State.  We would give it back

to the sponsor, though, to get it to the right county.  But that would not be a report for a misfiled -- what's it called? -- fine.

Q.    Have you received any guidance on how to treat petition sheets where a voter has indicated Leon County and the petition sheet is returned to Leon County, but they are, in fact, registered in a different county?

A.    There's certainly been discussions amongst the Supervisors offices and with the Division to not treat those as misfiled, thus requiring a fine.  But we still need to get it to the correct county.

Q.    Based on those discussions, is it your understanding that all counties are treating these petitions where the voter has indicated the incorrect county the same?

A.    I think they are all doing what I just described.

Q.    You testified earlier that in the past sometimes petition sheets delivered to the wrong county would be transmitted to your office directly by another Supervisor; is that correct?

A.    Yes.  Before 1205, yes.

Q.    Has that happened at all since 1205?

A.    I think it was early on, but that was becoming a problem for also getting the sponsor to send it to the right county. And in the two different versions of being misfiled, one was the voters causing the problem and one was due to the sponsor of the petition.  So we've tried to really standardize it, and we tried

to do that early on; you just send it back to the sponsor.

Q.    Have you received any petitions from sponsors that had previously been delivered to another county?

A.    Yes.

Q.    How did you know that those petitions had previously been delivered to another county?

A.    Most of this is standardized, I'm nearly certain.  This is not an area I'm an expert on, but I believe we are writing on the form itself that it was an unknown voter for us or misfiled, but here's the county it should go to.  And it may be even the voter registration number since we've already looked it up.

Q.    Is that the practice of other counties as well?

A.    I think at least a good percentage are doing that.  That was detailed -- or some version of that was detailed in a -- like a training symposium that we've had a lot of on this new process that was hosted, I think, by the Palm Beach County Elections where they came up with that concept.  And we liked it, so we are using it.

Q.    If your office receives a petition that bears a date more than ten days old, is it possible that petition could have previously gone to another county and been rerouted back to the petition sponsor?

A.    Yes.

Q.    Would you still report that as a late-delivered petition?

A.    No.  If we've determined that it hit a different county

first, we are relying on that initial county to determine lateness.

Q.   How would you determine if another county had initially received a petition?

A.   Like I say, there would be some indicator, typically on the form or through the paperwork.

I get the question.  I'm not sure how my staff and teams resolve that, but I think it's what I'm just saying, where there is a number typically written on the petition, at least from some counties.

Q.   Is it possible that some counties are not recording the date on which they originally receive the petition sheet before sending it back to the petition sponsor?

A.   I think it's possible.  And as it occurs to me, the State, we don't levy fines.  We report potential violations that would result in fines.  And so I guess if the initial county would report it as late and then the second county also reported it as late, I think that would be up to the State to determine the actual imposition of the fine.  And as has been discussed through various conversations and as this whole thing has evolved procedurally, the State has stated their position that it would not be considered late.

Q.   Are you aware that unpaid volunteers may be required to register as petition circulators under House Bill 1205?

A.   I don't know whether they are paid or not.  But, yes,

that's a possibility, I guess.

Q.   Are you aware that a volunteer who is not registered as a petition circulator is limited to collecting 25 petitions other than their own and their immediate family?

A.   Yes.

Q.   Do these unregistered volunteers use a different form when collecting petition sheets?

A.   There is a volunteer form.

Q.   Does your office track the number of personal use forms turned in by a single person?

A.   We do not.

Q.   If somebody appeared at your office and returned more than 25 personal use forms, would your office report that to anyone?

A.   We would likely ask that person -- we should ask that person why -- why they had so many petitions in their possession.  I don't think we've encountered that at all.  But, yes, if we suspected it, we would report it.

Q.   If your office asked somebody whether they were a registered petition circulator and they told you they were not, while in possession of more than 25 personal use petition sheets, your expectation is that your office would report that?

A.   If someone who was turning in volunteer forms had more than 25 forms or were returning on a regular basis that our staff started to recognize, we would report it as a potential violation of some sort.  I wouldn't call it fraud, but a

violation.

Q.    If an unregistered volunteer circulator came to your office carrying 25 Right to Clean Water petitions and 25 Medicaid expansion petitions, would you report that as a possible violation of House Bill 1205?

A.    I'm not sure whether -- that's a good question.  I don't know if the 25 limit is for one petition effort or total across all petition efforts.  I would think it's one petition effort, but that's something I haven't considered -- haven't experienced.

Q.    Earlier you mentioned that one of the potential failure points for a petition sheet is whether or not the circulator was validly registered at the time the voter signed; is that correct?

A.    Correct.

Q.    And that circulator's status can change over time?

A.    Yes.

Q.    How does your office treat a petition sheet where the circulator was valid at the time the voter signed but at some later point has become invalid?

A.    We treat each petition form individually.  So if a form was received and signed during a valid period for that circulator, it would not be invalidated for that cause, and we would assess all the other factors.

      If the petition was signed during a segment in time when

the circulator was not a valid circulator, then it would be an invalid petition.

Q.   But if the petition circulator was valid at the time the voter signed it, your office would verify that as a valid petition sheet?

A.   Assuming all other factors were okay.

Q.   Are you aware that portions of House Bill 1205 were preliminarily enjoined for a period of time?

A.   Yes.

Q.   What is your understanding of the scope of that preliminary injunction?

A.   I think there was only one, but it had to do with the validity of circulators dependent upon their Florida residency or U.S. residency.

Q.   And was your office processing and verifying petition sheets during the time of that preliminary injunction?

A.   The direct answer is no because we were in the moratorium when that was all being contested in the courts.  After October 1st, we were validating petitions because that's when the moratorium was lifted.  And our initial understanding was that for petitions gathered by circulators who had been questioned as to their eligibility, validity, whatever you want to call it, approval, as a circulator, if they eventually ended up being declared as an invalid circulator but had gathered petitions during the time frame when the Court had said that

they could collect petitions, which was then later overruled by another court, we were initially validating them again if all the other parameters were okay.

Q.   During that period of time where you were initially validating those petitions, did you send the required notice to voters that a petition in their name had been validated?

A.   I believe we did, yes.

Q.   Have any of those petitions since been invalidated?

A.   Yes.  Upon notification from the Division that the petitions we had validated for circulators who were deemed by the initial court ruling to be eligible, which was later overturned, we validated some that we had to go back and invalidate.

Q.   So even though there was a period of time where these petition circulators were considered valid, voters who signed their petition sheets ultimately had those petition sheets invalidated?

A.   Effectively, yes.  Yes.

Q.   And those voters for whom the petition sheet was initially validated, they would have received notices in the mail that a petition sheet was validated in their name?

A.   For the first time, yes, the first petition.

Q.   For the initially validated petition sheets for which you subsequently invalidated them, did you send any notice to voters that their petition sheet had been subsequently invalidated?

A.    No.   We would only have sent them notices if they had signed a duplicate or followed up and sent us another petition. And if we validated that one, we would send them a notice in that regard again for the new petition.

MR. HANCOCK:  I'll pass the witness.

THE COURT:  Anything else from any of the plaintiffs' lawyers?

Hearing nothing, I have one follow-up question for clarification.

I know you said, I believe, that you hadn't dealt with the issue and you hadn't really thought much about it but that your visceral reaction was that the 25 limit -- it wasn't clear to me if your initial visceral reaction was intuitively it meant 25 per cycle or 25 per issue per cycle.  It's not clear from your response when I looked at the realtime what your intuitive response was what you thought the rule was.

THE WITNESS:  I think it was somewhat unclear in the statute itself.  It would be impossible for us really -- there was no mechanism for us to track it over time.  So, really, the only way we would find evidence of exceeding the 25 was either just purely by chance that we -- one of my staff had received petitions over time that exceeded 25, which I think is the correct interpretation of that.  It's not an instance like you get 25 for this specific petition and then a week later come in with 25 more.  Our interpretation -- or my interpretation, and I

think it's shared, is that this was over the cycle for a specific petition effort.

THE COURT:  That was my question.

THE WITNESS:  Okay.

THE COURT:  It's per cycle.  I understood that to be your testimony.  But it was also if it was limited to a specific petition effort, and that was what wasn't clear from your prior response.  And you've now clarified.

THE WITNESS:  Yes.  I think it's per petition effort, because the family could have 25 from this petition and then 25 for this other petition, yes.

MR. HANCOCK:  Could I clarify the point further, Your Honor?

THE COURT:  Certainly.

And let me make plain, I'm not asking.  It's not the witness's call to decide what the interpretation was.  It's just that -- and I know what I previously ruled about the natural reading.  I just want his -- I was interested in his visceral reaction.  It wasn't 100 percent clear if it was per issue and per cycle or just per cycle.  And that's why I asked that question, and he's now answered it.

But you may certainly follow up.

MR. HANCOCK:  Can we display FDH 166, please?

BY MR. HANCOCK:

Q.   Do you recognize this document?

A.   Yeah.  I don't look at this version very often.  But, yeah, it's the chapter version of the bill.

MR. HANCOCK:  Can we go to page 26, please?

BY MR. HANCOCK:

Q.   If we zoom in at the middle, do you see that subdivision (2)?

A.   At the top, yes.

Q.   Is there any language in this provision that would cabin the 25 petition form limit to a single petition sponsor?

A.   Not as I read it.  But I think the overall intent of this section was to allow people who are working for their family or neighbors to gather a petition on a specific topic.  That's how I read it.

Q.   If an unregistered volunteer circulator returned 25 petitions to your office for the Right to Clean Water petition and asked you whether they were allowed to go out and collect 25 more for the Medicaid expansion petition, would you advise them that they could do that while avoiding liability for a third-degree felony?

A.   I would likely tell them that I am not an attorney and they should either contact their attorney or the State.  But on the face of it, I would not tend to report them in violation is what I would -- barring some other directive from the State.

Q.   And earlier you testified that one of your mandates as an official is to help educate voters on election procedures;

correct?

A.   Yes.

Q.   But you would not feel able to educate a voter on how to navigate this provision as it relates to collecting petition signatures for multiple petition sponsors?

A.   I have not considered this in any regard until you've asked me about it.

Q.   Now that you've considered it, would you feel comfortable advising a voter on how to navigate the question of collecting petition signatures for multiple petition sponsors?

A.   I would repeat what I said just a few minutes ago, that I'm not their attorney.  There's potential for fines.  I would not necessarily think that limit was across all petitions, but they should contact the State if they were concerned.

Q.   So your advice to a voter would be that they should contact either an attorney or the State before proceeding to collect --

A.   If it was a voter -- I'm sorry.

     If it was a voter, I would offer to do that for them.  Like I say, I have not considered this.  And when I encounter things, especially with this bill, that are somewhat ambiguous, I think it's very worthwhile to dive deeper to get an answer.

Q.   Understood.

          MR. HANCOCK:  Thank you.

          THE WITNESS:  Is there any more water, Your Honor?

          THE COURT:  Sure.

CROSS-EXAMINATION

BY MR. JAZIL:

Q.   Good afternoon, Supervisor Earley.

A.   Good afternoon.

Q.   Supervisor Earley, I'd like to pick up where my friend left off.

If a voter has questions about how the election code works, you try to answer the questions; right?

A.   Yes.  If I'm confident of the answer, I would go ahead and answer it, but sometimes I will either phone a friend who is another Supervisor or I will ask the State.

Q.   So sometimes you will email or call up Director Matthews at the Division of Elections to ask a question on behalf of the voter; right?

A.   Sometimes, yes.

Q.   And you also encourage voters to seek advisory opinions from the State; right?

A.   For some things, yes.

Q.   So, for example, for the felon voter restoration effort, you are one of the ones who spearheaded the effort of encouraging individuals to ask for advisory opinions from the State to get certainty about how the law affects them; right?

A.   I think that was my idea, yes.

Q.   So if, for example, you have questions and concerns about the 25-petition limit, you might email or call up

Maria Matthews; right?

A.    I would likely call Maria or one of my other fellow supervisors with a lot of experience in this, yes.

Q.    And when you and your fellow supervisors look at these provisions in HB 1205, you are not reading them in isolation, right; you are reading the whole code to figure out what the intent is?

A.    Correct.

Q.    And going back to questions with Maria Matthews, I'd like to also touch on this late petition issue that was discussed.

My understanding is -- and you tell me if I'm wrong. My understanding based on your testimony is that if a voter puts Leon County on the petition form, but the voter really lives in Wakulla County, and that petition is delivered to Leon County within ten days of the voter signing, it's not considered late; right?

A.    Correct.

Q.    And y'all asked Maria Matthews for advice on this very issue; right?

A.    Correct.

Q.    And she told you it's not considered late; right?

A.    Correct.

Q.    And also, you asked Maria Matthews for advice on whether or not someone would be fined for the wrong county, a delivery on this issue; right?

A.    Yes.

Q.    And she said they wouldn't be fined for being -- for delivering it to the wrong county; correct?

A.    It wouldn't be considered misfiled if the voter indicated the wrong county and it was sent to that county.

Q.    So not late; right?

A.    Correct.

Q.    Not fined for the wrong county; right?

A.    Correct.

Q.    Okay.  If we can pull up -- actually, let's take care of a few other things first.

      The difference between active and inactive voters, what is it?

A.    If a voter -- so you're a registered voter.

Q.    Uh-huh.

A.    If you are voting fairly regularly, you are an active voter.

Q.    Okay.

A.    If you sign petitions and maintain your active status, you are an active voter.  If you call an office and do a change of address, you are an active voter.  If you don't have any communication with our office for two election cycles, or if we get an indication of an address change and we send something out to the voter trying to determine whether they still live there or not and we don't hear any response, then we send them a

notice saying, We are going to put you on inactive voter status. They are on that status for two more full election cycles. If we still have no activity from them, then they are removed from the rolls. But that period is when they are determined to be an inactive voter.

Q.   Got it.  So you don't hear anything from them for two election cycles; right?

A.   Correct.

Q.   And then you try to reach out to them and they still don't respond to your inquiries; right?

A.   Correct.

Q.   And that's the point when someone becomes inactive; right?

A.   Correct.

Q.   But a voter can become active again; true?

A.   Sure, certainly.

Q.   How does a voter become active?

A.   One obvious way is to go back and vote during the period of inactive -- or inactive status.

Q.   Or they can call up your office and say, Hey, I missed the mail, but I'm here to tell you I'm still in Leon County; right?

A.   Correct.  They do an address change at DMV and we get that. That makes them active.

Q.   Got it.

     We also talked a bit about signatures and how they change over time.  Do you recall that?

A.   Yes.

Q.   And signatures also change sometimes if someone gets married and they change their name; right?

A.   True.

Q.   Sir, here's my question to you:  Can voters update their signatures on file with you?

A.   Yes.

Q.   How?

A.   Just by submitting a form to update that with their new signature and stating that's a new signature.

Q.   Okay.

A.   Or any -- frankly, any subsequent signature we receive of the sort I described earlier updates their signature effectively, too, like on a new voter registration form.  They have to sign again at DMV and that gets transmitted to us.  A VBM certificate is not necessarily a signature update per se, but it's part of our record that we compare signatures to.

Q.   Okay.  And you brought up the -- the forms that the DMV -- the DAVID database, is that managed by DMV?

A.   Yes.  I think so, yes.

Q.   And your office has access to DAVID; right?

A.   Yes.

Q.   And do you know how many other Supervisors offices have access to DAVID currently?

A.   At this point I assume all of them do.

Q.   Okay.  And you can get access to DAVID by asking the State for access to DAVID; right?

A.   Yes.

Q.   FVRS, the Florida Voter Registration System, your office has access to it; right?

A.   All offices definitely have access to that, including mine.

Q.   All offices have access to that?

A.   Absolutely.

Q.   ScanFirst, this was the other software that was discussed.  Do you recall this?

A.   Yes.  It's as much of a process as software, yes.

Q.   But there is a software involved; right?

A.   Yes.

Q.   Now, how many counties have access?

A.   At this point, last I heard was 11, but I think more were getting it.  So I -- above that I don't know a specific fraction.

Q.   Okay.  How many counties have the option of getting something equivalent to the software your counties use?

A.   Aside from resource restrictions and budgetary restrictions or space restrictions, in theory all offices can potentially do it.

Q.   Okay.

A.   But real world gets in the way.

Q.   And sitting here you don't have an exact number of the

counties that have this software or its equivalent; right?

A.   Correct.

Q.   And you talked about resource constraints.

Resource constraints are specific to each office; right?

A.   Yes.

Q.   So for your office is the budget set by the Leon County government?

A.   We submit a budget.  We justify it.  Leon County approves it and gives us the money.

Q.   Okay.  And do you know how many of your fellow county supervisors have to go to their County Commissions for approval of budgets?

A.   All of them.

Q.   All of them.

So their constraints are dictated by the amount of money their county gives them; right?

A.   Correct.

Q.   We talked a bit about what OECS might have access to or not have access to.

Do you recall that testimony?

A.   Yep.

Q.   And OECS is housed under the Florida Department of State; right?

A.   Correct.

Q.   And do you know whether OECS has access to the Florida

Voter Registration System?

A.    I assume they do.

Q.    Okay.  Do you know whether OECS has access to DAVID?

A.    I assume they do.

Q.    Okay.  Do you know a database called SAVE?

A.    Yes.

Q.    What is your understanding of what the SAVE database is?

A.    The SAVE database is a federal-sponsored database primarily to give information about citizenship status, I guess is a short way to phrase it.

Q.    Yup.  And when you look someone up in the SAVE database, it has more than their citizenship status, right?  It's got other biographical details about the person; right?

A.    Yes.

Q.    And you got the SAVE database after working through the issue with the Department of State; right?

A.    Yes.

Q.    Do you know if the Department of State has access to the SAVE database?

A.    They definitely have access.

Q.    And who maintenances the SAVE database?

A.    The federal government.

Q.    Got it.

      We talked a bit about the petitions and how sometimes they are multipage petitions.

A.    Yes.

Q.    Do you recall that?

A.    Yes.

Q.    Let me switch gears for a moment and talk about vote-by-mail ballots.

A.    Yes.

Q.    Your office sends out vote-by-mail ballots to voters in every election cycle; right?

A.    Yes.

Q.    Can you approximate for me how many vote-by-mail ballots y'all send out every election cycle?

A.    It varies, but anywhere from 35,000 to 50-, 60,000.

      (Reporter requests clarification.)

A.    So in response to the previous question, which maybe you did, you asked how many vote-by-mails per election or per cycle? My answer was per election, not per cycle.

BY MR. WERMUTH:

Q.    Okay.  So your answer was what per election, sir?

A.    35,000 to near 60 sometimes.  In COVID it was, I think, upwards of 80,000.

Q.    Okay.  So let me drill down on that a bit.

      If you've got a presidential election, how many vote-by-mail ballots are y'all sending out for the presidential election?  Take out the COVID years.  Tell about the last presidential year.

A.    I think it was about 48,000.

Q.    So you all send out 48,000 ballots for presidential elections.

      Are the ballots multipage?

A.    In my county, usually not.  I think the last time was in 2012 we had a multidisciplinary page ballot.

Q.    But multidisciplinary page ballots happen; right?

A.    Yes.

Q.    If there is a lot on the ballot, you have more than one page for the ballot; right?

A.    True.

Q.    And when multipage ballots happen, you also process them; right?

A.    Yes.

Q.    And you process these 48,000, potentially, ballots in a matter of hours or days; right?

A.    It's nice if they aren't stapled, but yes, we do.

Q.    Now, sir, I'd like to talk a bit about Plaintiffs' Exhibit 147, which is FDH 147.

      MR. WERMUTH:  Okay.  Can we zoom in and make the text a little bigger?

      THE WITNESS:  Thanks.

BY MR. WERMUTH:

Q.    Okay.  So the first page we had Wayne FUSCO from St. Johns County?

A.   St. Johns -- yeah.  St. Johns.

MR. WERMUTH:  Okay.  Let's go to the next one.

BY MR. WERMUTH:

Q.   Okay.  So here we've got a text exchange with -- here we've got a text exchange with Allison Tant Richard.

Do you see that, sir?

A.   I do.

Q.   Who is Allison Tant Richard?

A.   She is my representative in the Legislature.

Q.   Okay.  And she serves in the Florida House?

A.   Yes.

Q.   Florida House.  Is she a Democrat or a Republican?

A.   I think she's a Dem.

MR. WERMUTH:  Let's go to the next one.

BY MR. WERMUTH:

Q.   Here on the right we've got a text exchange with Tracie Davis.

Do you see that, sir?

A.   Yes.

Q.   Who is she?

A.   She is now the Senator from -- or one of the Senators -- State Senators from the Duval County area.

Q.   At the time she was in the House; right?

A.   It's possible she was in the House before.  I can't remember exactly when that transitioned.

Q.    And she's a Democrat; right?

A.    Yes.

        MR. WERMUTH:  Okay.  Let's go to the next one.

BY MR. WERMUTH:

Q.    Here we have Tracie Davis again; right?

A.    Correct.

Q.    Let's go to the next one.

      We have Tracie Davis on the left and then we have Tina Polsky on the right.

      Do you see that?

A.    Yes.

Q.    And Tina Polsky is also Democrat; right?

A.    Frankly, I'm not sure.  I just truly don't know.

      It could well be that she is.

Q.    She doesn't represent you, does she?

A.    Correct.

Q.    She's a representative from South Florida?

A.    I think so.

        MR. WERMUTH:  Let's go to the next one.

BY MR. WERMUTH:

Q.    More texts with Tina Polsky?

A.    Yes.

        MR. WERMUTH:  Let's keep going.

        Let's go to the next one.

        Go to the next one.

BY MR. WERMUTH:

Q.    Let's stop here for a second.  And let me take a step back.

Sir, you were texting with Democrat members.  Tina Polsky we are putting a question mark on because you don't remember if she's a Democrat or a Republican.

But you are texting with the Democrat members of the Florida Legislature; right?

A.    Yes.

Q.    You were texting about HB 1205; right?

A.    Right.  They asked me their opinions -- my opinion a lot.

Q.    And Democrats are in the minority in the Florida Legislature; right?

A.    True.

Q.    The superminority, in fact; right?

A.    I believe that's true.

Q.    And that means that the Republicans in the Florida Legislature don't need a single vote from the Democrats to pass anything; right?

A.    I think that's true, yes.

Q.    Okay.

A.    Yes.

Q.    And you provided to us in discovery text exchanges with the superminority party in the Legislature; right?

A.    I -- yes, I provided texts with those who I had to provide texts with.

Q.   Okay.  So let's take a look at this last text with Tracie Davis.

And we established earlier that you're in the brown and the people you are texting with are in the dark gray; right?

A.   Yes.

Q.   And Tracie Davis says in that last text thread:  *Absolutely not...  But I'm so aggravated where Ramba saying you all are in support.*

Do you see that?

A.   Yes.

Q.   Okay.  Who is Ramba?

A.   David Ramba is our lobbyist for our association.

Q.   David Ramba is the gentleman y'all pay money to to go lobby on behalf of all the Supervisors in the state of the Florida Legislature; right?

A.   Our association pays, yes.  He's a Republican.

Q.   I appreciate that, sir.

A.   You're welcome.

Q.   And you are saying that Ms. Davis is so aggravated with Ramba saying "you all are in support."

In support of HB 1205, right?  That's what the reference is to?

A.   That's correct.

Q.   Okay.  We can take that down.

A.   I might say that we were somewhat aggravated with the way

it was being interpreted in the news.  We were in support of the changes being adopted that we had suggested; we are not commenting on our support pro or con for the entire bill.

Q.    Understood.

And, sir, we talked a bit about how implementing the changes brought about by HB 1205 was burdensome for your office; correct?

Do you recall that exchange with Mr. Wermuth?

A.    I had that exchange with almost everybody that would listen.

Q.    And he asked you whether or not this was the toughest thing y'all had ever implemented.

Do you recall that question?

A.    Sure.

Q.    And in the answer you brought up the mandatory early voting as something that was tough to implement; right?

A.    Yes, even though it started here, it was still tough to implement.

Q.    And, sir, were you working in elections at the time that mandatory early voting became required in Florida?

A.    Yes.  We were the first county to roll it out.

Q.    And y'all were doing mandatory early vote -- you all were doing early voting before it became mandatory; right?

A.    Correct.

Q.    And were you working with the association as early voting

was being rolled out statewide?

A.   A little bit.  I wasn't quite as involved, and then soon I went to the vendor world for a while.  But then I was really working to roll out early voting because we developed a product that made that easier to implement, Ballot on Demand.  So, yes, I was -- had a big hand it in from the vendor side.

Q.   And based on your involvement on the vendor side, and based on some of your involvement with the association when mandatory early voting was rolled out, do you recall some supervisors complaining about what they would need to do to make sure that they could come into compliance with the mandatory early voting statute?

A.   Yes.

Q.   And there were some who were complaining; right?

A.   Yes.

Q.   In fact, anytime the Legislature changes the election code, there's some supervisor who thinks that the changes being brought about are just going to be too difficult to implement; right?

A.   Anytime any legislative thing is rolled out; not every, but that happens often enough.

Q.   In fact, there were supervisors who called Senate Bill 90 a train wreck; right?

A.   Absolutely.

Q.   There were Senators -- not Senators pardon me --

supervisors who called Senate Bill 90 a train wreck?

A.   Yes.

Q.   There were supervisors who called Senate Bill 524 a train wreck?

A.   I can't remember 524, but probably.

Q.   Were there supervisors --

A.   I may have blocked it from my head.

Q.   Were there supervisors who called Senate Bill 7050 a train wreck?

A.   Yes.  There are train wrecks and there are train wrecks.

Q.   Understood.

     Supervisor Earley, I'd like to move on to a couple of other things.

          THE COURT:  We're not going to spend any more time talking about why Senate Bill 90 is a train wreck.

          You can proceed.

          MR. JAZIL:  Your Honor, this is why I'm talking fast. It's just tough to keep up with this crowd.

BY MR. JAZIL:

Q.   Sir, do you know a gentleman named Royal Shepherd?

A.   I don't know him personally, but I know of him, yes, absolutely.

Q.   How do you know him -- know of him, rather?

A.   He has been a gatherer of voter registration applications for various groups over quite a few years.  That's primarily the

way I know of him.

He came to my attention because he has a long history of suspected fraud involved with at least voter registration applications.

Q.   Okay.  In fact, you submitted a complaint to the Office of Election Crimes and Security, noting that this person was --

MR. WERMUTH:  Objection.

Objection, Your Honor.  Relevancy.

THE COURT:  Overruled as to relevancy.

BY MR. JAZIL:

Q.   In fact, Your Honor --

THE COURT:  He's an elected official.  You can call him "Your Honor."

THE WITNESS:  Thank you.

THE COURT:  Nobody voted for me.

THE WITNESS:  I would.

MR. JAZIL:  Once upon a time, Your Honor, people voted for you.

THE COURT:  The record will reflect I ran unopposed, but go ahead.

THE WITNESS:  You voted for yourself, then, by qualifying, sir.

BY MR. JAZIL:

Q.   Supervisor Earley, so your office submitted an OECS complaint form related to Royal Shepherd in the past; right?

A.   Yes.  I've submitted several fraud complaints either to FDLE or OECS and I think originally even to our state attorney and maybe our sheriff.  There's a history of that.

Q.   So you felt strongly about what Mr. Shepherd was doing and you complained to everyone you could think of; right?

A.   I tend to feel strongly, and I tend to complain.  Yes, I did in this instance.

Q.   And isn't it right, Mr. Earley, that Mr. Shepherd was submitting over a thousand forms -- in fact, 1,460 forms -- to your office for third-party voter registration efforts?

A.   That sounds right, if not more, yes.

Q.   Okay.  And your office was concerned that Mr. Shepherd was submitting forms on behalf of deceased voters; right?

A.   Yes.

Q.   And he was forging information on forms; right?

A.   It appeared to be the case, yes.

Q.   Okay.  And taking a step back, third-party voter registration and petition circulation, to your mind are there any similarities between those two processes from a circulator perspective?

A.   Somebody is out in the community gathering some document on behalf of a party to make an impact either on our office or the elections process in Florida.

One's to get people registered and one's to get an initiative petition on the ballot, but it involves some of the

same checks from our office, but voter registration applications involve less checks.

Q.   But in both instances someone's out in the community trying to get a voter to sign a form; right?

A.   Yes.

Q.   And then that person is getting that form to your office; right?

A.   Yes.

Q.   And then your office is trying to verify whether or not the information on the form is correct?

A.   Yes.

Q.   And then for the voter registration, assuming the information's correct, you put the person on the voter rolls; right?

A.   Correct.

Q.   And for the petition circulation for a citizen initiative, if the information's correct, you count that as a valid petition; right?

A.   Correct.

Q.   And in both instances your office is looking at information the voter provided on the form to assess whether or not it was, in fact, the voter who signed the form; right?

A.   Hopefully the voter provided, but yes.

Q.   Hopefully the voter provided.

     (Reporter requested clarification.)

THE WITNESS:  We are looking at information that we hope the voter provided, and we're looking for evidence that maybe they didn't.

BY MR. JAZIL:

Q.   Okay.  So Royal Shepherd, you felt strongly about him -- you complained to him -- to Jack Campbell who's your state attorney; right?

A.   Yes.

Q.   You complained to him, to your sheriff; right?

A.   I believe so, yes.

Q.   You complained about him to FDLE; right?

A.   Definitely.

Q.   You complained about him to OECS; right?

A.   Yes.

Q.   And was he ever arrested?

A.   I don't think so, no.

Q.   Okay.  But if Royal Shepherd is a registered petition circulator and he drops off a batch of petitions to your office, how is your office going to do anything differently, if at all?

A.   I won't be thrilled that he's dropping off forms from voters to me.  We treat every petition very carefully and review them very carefully.  His might be more suspect because of the long history we have with forms submitted from him.

Q.   So his might be more suspect, meaning you'll take a close look, make sure that this is, in fact, the voter who signed it?

A.   I would be careful to state that we take a close look at all of them, but, yes, certainly our attention would be intrigued, a weird way of saying that.

Q.   What was the answer, sir?

A.   That was a weird way of saying that, but yes.

Q.   Supervisor Earley, I'd like to talk about a couple of exhibits now.

I'd like to pull up Exhibit 838, Defendant's Exhibit 838.

MR. JAZIL:   Your Honor, I also have a copy.  May I approach the witness with a copy of this and the next exhibit I'll talk about?

THE COURT:   You may.

MR. WERMUTH:   I'm going to object to this document based on the motion in limine grounds as hearsay.

THE COURT:   What I'm going to do is conditionally admit it, and I'll hear further argument from the parties based on the motion in limine that we need to be heard generally; correct?

MR. WERMUTH:   Yes, sir.

THE COURT:   I don't want to stop the proceedings now to keep the witness here to have that hearing, so that's why I'm saying I'll conditionally admit it.

Let's have the question.  If you ultimately prevail on that issue, then obviously I will circle back and strike the exhibit and the testimony related to same.

I just don't -- in fact, we can -- if we're going to have a number of such exhibits with the next witness or something, then perhaps we break before the next witness. I just don't think it's fair to this witness for us to stop and have the legal argument for a half an hour.

MR. JAZIL: Understood, Your Honor. And this next segment is exhibits just like this.

THE COURT: I'm going to -- what I'm going to do is conditionally admit the exhibits subject to my ruling on the motion in limine.

MR. WERMUTH: I'd just like it noted that I'm objecting to them all.

THE COURT: And the record is clear you're not waiving an objection. I'm not trying to put anybody in a trick bag. I just -- I'm trying to do this efficiently, and, obviously, if there was a jury sitting in the box, I would have to do it outside the presence of the jury before. But I can listen to this and then follow my own instruction to disregard it if I deem that it's inadmissible after hearing your arguments; okay?

MR. WERMUTH: Thank you.

MR. JAZIL: Your Honor, may I also approach the witness with a related exhibit that goes with this, which is Defendant's Exhibit 656?

THE COURT: I'm sorry. Because I had not highlighted it yet, what was the last one?

MR. JAZIL:  It's DX 838, Your Honor.

THE COURT:  And what's the next one?

MR. JAZIL:  DX 656.  And I'll talk about them sequentially.

THE COURT:  You said DX 656; correct?

MR. JAZIL:  Yes, Your Honor.

THE COURT:  I'm putting a "C" for conditionally admitted to both DX 656 and 838.

MR. JAZIL:  Can we blow up the top of this document?

The -- just focus on 838 for now.

THE COURT:  And just so it's clear, I wasn't trying to be silly.  Y'all -- I was going to give y'all access to my marked-up exhibit list to compare it to what the courtroom deputy has, and I'm just -- was trying to explain my nomenclature so everybody knows that we would go back, and once I rule, I'll put an X through anything that's conditionally admitted.  That's simply the protocol I follow.

MR. WERMUTH:  If I may, Your Honor, can I just clarify that -- I mean, the motion in limine was granted, so we're -- it's not like it's pending at this point.

THE COURT:  Oh, I'm sorry.  I thought you were saying this was subject to --

MR. WERMUTH:  No.

THE COURT:  -- the argument we're having about the reports and the admissibility of reports and --

MR. WERMUTH:  Then I'm certainly glad that we've clarified this because, I mean, our position is this is covered by your existing order on the motion in limine having to do with matters that have not been disclosed to us as far as the investigations that they claim -- they asserted privilege over in this case.

THE COURT:  Oh, I didn't have any idea that's what we were talking about.  I thought these were subdocuments related to the -- that would have been mentioned in the report as opposed to something that was subject to privilege was asserted.

MR. JAZIL:  Your Honor, I disagree with my friend that this is subject to the motion in limine.  This is referenced in the OECS report on the motion in limine portion.

I'd simply note that at the very bottom right they're Bates labeled noting that these documents were produced.  These documents are also going to claims Supervisor Earley's office made.

To my knowledge, he has yet to raise an objection on ongoing investigations, and these documents were properly the subject of any deposition questioning.  I don't recall us raising an objection as to these documents that we produced.

MR. WERMUTH:  We have not had an opportunity to look at any -- any of the investigations they've asserted privilege over, and so I think what we should do --

THE COURT:  That's what I'm confused about.  I

understand if somebody said to this -- let's start with this witness.

Was this witness asked at his deposition about any investigation he was involved in in which a privilege was asserted?

MR. WERMUTH:  This particular witness?

THE COURT:  Yes.

MR. WERMUTH:  He wasn't asked about this document in his --

THE COURT:  I'm just asking generally did this witness assert a privilege about -- we are taking baby steps.

Did this witness assert a privilege about this investigation?

MR. WERMUTH:  This witness didn't assert a privilege. It's the --

THE COURT:  What I'm confused about then -- so we are talking about generally, and I know there generally was an assertion of privilege regarding ongoing investigations; correct?

MR. WERMUTH:  Yes.  Generally speaking, the Attorney General and the Secretary of State have asserted --

THE COURT:  Right.  I said what I said:  You can't hide behind it and suddenly bring it at trial.

But what I don't understand, based on what Mr. Jazil said, was if it was -- I specifically said -- and let me

quote -- *Defendants are barred from introducing any documents*
*that have been withheld based an asserted investigatory*
*privilege.*

My understanding from what Mr. Jazil said is that
Bates stamp was turned over.

So how does this fall within the ambit of my ruling?

MR. WERMUTH:  The problem we have is that all
documents subsequent to this are being held in privilege so we
don't have any idea what the investigation is behind the
curtain, and all we have is a very small set of final
adjudications that they didn't assert a privilege over and that
they produced as convictions.  And so we -- we don't have any
opportunity to look behind this, interrogate these issues.  It's
just a complaint.

THE COURT:  I just -- I'm still baffled as to how it
falls within the ambit of my order regarding documents that were
not turned over based on privilege when it, in fact, was turned
over.

MR. WERMUTH:  It was turned over, and we acknowledge
that.  The problem is that just the complaint was turned over,
nothing subsequent to the complaint.

THE COURT:  Well, then it would be a different -- I'm
not saying you might not have some issue to raise.  What I don't
understand is we were starting with the issue is it subject to
my order on the motion in limine, and my motion in limine didn't

say, I thought -- and correct me if I'm wrong.  My order on the motion in limine didn't say "and anything tangentially related, turned over or not."

So it doesn't mean that you lose; Mr. Jazil wins.  I'm just -- I'm starting with the threshold question, which is how would a document that was turned over fall within the ambit of my ruling.

And did I -- did y'all in your motion argue not only documents that weren't turned over but documents that we can't go behind because other documents were not turned over even if some documents were turned over?

I don't recall that in the motion, and I don't recall my order addressing that.

MR. WERMUTH:  I believe --

THE COURT:  So separate and apart from whether you have some independent objection, I'm just trying to figure out how it falls within the ambit of either what you requested or what I said in my order.

MR. WERMUTH:  I believe the framing of the motion -- we can go back and look at it in more detail, but the issue is that -- the point of the protective order was you can't talk about the investigation if you're withholding -- if you're withholding documents about the investigation based on privilege, and so it's really something that's coming from the protective order.

THE COURT:  Hold on.  Isn't all this -- these documents -- and correct me if I'm wrong, because I haven't read them.  I just see the first part of the first document DX838, the email the signature is on.

You're asking, as I would understand it -- and if I'm wrong, you can correct me, Mr. Jazil.  This is an example of where you've reported people for problems for fraud you find.  So this is emails initiated to verify that this secretary has, in fact, reported to the Office of Election Crimes and Security irregularities.

MR. JAZIL:  Yes, Your Honor.  And the thing that comes after it is the form they filled out and sent over to the Secretary of State's office on this.

THE COURT:  And so your question, Mr. -- or issue, Mr. Wermuth, is, Well, Judge, but we don't know if there was any follow-up, and we have no documents to ascertain whether or not this was or wasn't a problem.  So if you assert the privilege over the investigation and any subsequent issues but just turn over the original complaint, we don't have any way of challenging it?

MR. WERMUTH:  That's the point, and I'll note that the protective order that we -- that we have in this case says when you assert an investigatory privilege, those and other documents for such investigation matter may not be offered into evidence in this case.  That's our point.

These are related -- if they've got an investigation they have asserted privilege over, you can't bring in --

THE COURT:  That's a different issue about what my motion in limine was versus what the protective order was, which are two different things.

Give me one second, please.

(Pause in proceedings.)

MR. WERMUTH:  This language is quoted in your order.

(Pause in proceedings.)

THE COURT:  So the motion said:  *Plaintiffs now move in limine to bar defendants from --*

(Reporter requested clarification.)

THE COURT:  I'm just reading from the motion because it ultimately says:  *Plaintiffs move in limine to bar defendants from introducing at trial evidence or testimony regarding any undisclosed criminal investigation.*

MR. WERMUTH:  The point is if there is an ongoing criminal investigation that came from that and they are asserting privilege over it, then they can't talk about it.

THE COURT:  They can't talk about the investigation or evidence -- introduce evidence or testimony regarding an undisclosed criminal investigation, but isn't it a different issue -- for example, are you saying your protective order would preclude, for example, Supervisor of Election Earley being asked by Mr. Jazil, Have you forwarded complaints to the Office of

Election Crimes and Security? And let's set aside the exhibits. If it turns out that some of those may or may not have resulted in investigation, does the fact that pursuant to these regs he has forwarded complaints in his capacity, or somebody from his office, to the Office of Election Crimes and Security -- you're saying that would be precluded as well, even asking him if they've forwarded complaints?

MR. WERMUTH: That rule of generality is okay. But the difficulty we have is if the implication is, Oh, look, this matter was reported, and there's this pending -- there's this pending investigation out there that's going to demonstrate fraud, and we've had no opportunity in this entire case to interrogate and check out, you know, what the allegations are, what evidence is there of that, and they've asserted privilege over it, we are terribly prejudiced by this implication that this is a big problem that's being reported. They basically have us in a trick bag.

THE COURT: Mr. Jazil?

MR. JAZIL: With respect, Your Honor, we don't have them in a trick bag. These were documents that were disclosed. These were documents that detail complaints from Supervisors and elections officials that are being sent up the chain. What people up the chain do as part of the investigation of these things is separate and apart from the --

THE COURT: Were the investigations related to any of

these documents withheld?

MR. JAZIL:  Your Honor, I don't know every investigation that's ongoing or not, and to the extent that -- there might be investigations ongoing that implicate things that were disclosed or discussed as well.  If, for example, someone is trying to build a conspiracy case, that means I can't talk about the actual individual that Mr. Bridges might talk about in his deposition as being a person who has been arrested?  They read it way too far, Your Honor.

At the end of the day, these complaints were put together in a compendium and sent to the Florida Legislature.  The Legislature acted in reaction to that.  So regardless of whether or not they are true, regardless of whether or not the investigations were ironclad and were done by the greatest investigators in the known universe, the Legislature itself took these complaints --

THE COURT:  If we avoided the hyperbole, it would -- I think you are winning right now, Mr. Jazil, but I would tell you if you could avoid hyperbole, it would be helpful, because my -- I can tell you I hit the mute button as soon as I hear gross exaggerations.  So it doesn't have to be a perfect investigation.

The issue here is whether or not the protective order and this Court's ruling excludes documents that were turned over that could be related to something, which we don't know one way

or the other, resulting in an investigation.  That's the issue before me.

And certainly if -- it would be pertinent for cross-examination if it turned out that there were 19 cherry-picked complaints that were forwarded to the Office of Election Crimes and they were all summarily rejected because it turned out they were nonsense.  That certainly would be -- that doesn't mean you lose on the issue of whether or not you can talk about it, but it certainly would be pertinent, and it certainly would fall within the case law that talks about using it as a sword and a shield, that you have information that would completely undercut what's being suggested by what's being submitted.

But I think it is more complicated because I don't read in the motion or in my order -- I think I specifically talk about, both in the motion and the order, undisclosed documents and testimony and investigation.  It seems to me that the protective order -- neither the protective order nor the -- my order extends to documents that were disclosed regarding complaints.

MR. WERMUTH:  The problem, Your Honor, is that the language in the protective order on which you based your decision says:  *Those and other documents for such investigation matter may not be offered into evidence in this case.*

And our point is --

THE COURT:  My order, though, says:  *Plaintiffs' motion is directed at documents withheld and lines of inquiry plaintiffs attempted to explore during depositions but were blocked from doing so by defendants' assertion of privilege.*

My ruling was a lot narrower than that.

MR. WERMUTH:  But their waiver in that case is a lot broader because they agreed to this protective order with this language in it.  And the problem we have is that we've got this being presented.  Mr. Jazil has admitted on the record that he doesn't know whether this case went anywhere.  If it didn't go anywhere, it's completely irrelevant.  If it did go somewhere, we haven't had a chance to look at it.

THE COURT:  Well, it's not completely irrelevant.

Again, I'll say the same thing to you that I said to Mr. Jazil.  We should avoid hyperbole and overstatement because it's relevant if -- if I'm in the Florida Legislature and I get a list -- and because I've got a respected local Supervisor of Elections we see all the time because he is more likely to come across the street because he's the local Supervisor of Elections and I ask him or I see in a report, and he says, Yes, I forwarded multiple complaints based on fraud that I've discovered either specifically in the ballot petition initiative -- ballot initiatives or in -- that's why I overruled your objection on relevance to one guy with a thousand potentially questionable Royal -- a Mr. Shepherd -- voter

registrations.

Then why is that not relevant for purposes of what the Legislature considered in determining whether or not it should take action?

MR. WERMUTH:  These are voter registration matters for Shepherd, and they're not ballot petitions.

And, secondarily, I mean --

THE COURT:  Well, no.  But, I mean, I guess if I'm Representative Walker -- and believe me I'd never get elected. I couldn't get elected to dogcatcher, particularly in this community now, but -- and I'm sure there would be somebody that would be put to run against me and a lot of money thrown at him.

All right.  Mr. Jazil pointed at himself as Donor No. 1.

But I don't really see -- I understand there are two different things, but I really don't see how it's mixing apples and oranges.  If I'm a member of the Florida Legislature and I'm being asked to consider whether or not I want to vote on changes to the election code, and we're talking about fraud, and you've got pesky little federal judges that say, Well, just uttering the word "fraud" is not some magic talisman, then I say, you know, Where is the beef?  And I start finding out either from a local Supervisor of Elections or from the Office of Election Crimes and Security -- maybe even I go ask Ms. Matthews.

It seems to me that if they give me examples of fraud

generally in signatures, even if it's not the same type of document that's being used or submitted to an election office, that would be pertinent information for me to consider as I'm considering are we going to change the law to have extra layers of screening, for example, signatures to verify people, who they are.

Why wouldn't that be relevant? I'm sticking with the, Judge, your prior ruling was wrong regarding Shepherd.

MR. WERMUTH: In terms --

THE COURT: Not determinative, but why isn't it relevant?

MR. WERMUTH: In this instance, I mean, it depends on the standard of review, Your Honor, in part. But, I mean, ultimately our problem isn't limited to relevance. It's also -- the point is that we can't even interrogate what happened with this complaint at all.

And so if they're trying to prove up that basically --

THE COURT: Well, so it has zero value if I'm talking -- arguably, if I'm talking about a higher -- heightened standard of review. But for purposes of rational basis, it doesn't even matter if it's hooey, does it? Doesn't the law make clear if you've submitted information to the Legislature and they considered it after the fact, if it turns out it's wrong -- and isn't that like Case Law 101 on rational basis?

MR. WERMUTH: I understand your ruling on relevance.

THE COURT:  No, no, I meant even for the sense of, Judge, it's unfair to us.  How would it be unfair to you for rational basis unless it was communicated to the Florida Legislature there were all these complaints and they were all nonsense and were deemed unfounded?

I mean, if the Florida Legislature -- it wasn't communicated, the outcome, to them, what possible difference could it make for rational basis review?

MR. WERMUTH:  What possible way are we going to have to point out that there's no -- I mean, the difficulty we have here is that we don't have a way to interrogate what happened with this investigation.  And so we are stuck in a world in which you present complaints, and I guess -- what? -- they are the truth because we're withholding whatever -- I mean, if there's an ongoing investigation at this point, it's being withheld under privilege, right.

THE COURT:  All right.  Anything additional, Mr. Jazil?

MR. JAZIL:  Your Honor, if I'm still winning, I have nothing additional.  If I'm not, I'm happy to address the issues.

THE COURT:  And I apologize that I was conflating this with what I thought the reports issue was earlier.

I find it doesn't fall squarely within the ambit of either the protective order or this Court's ruling, although I

certainly understand, as it relates to the protective order, the argument that it falls within the spirit of the protective order.

For the reasons I've suggested through my questions, I find -- I would overrule the objection as it would go -- to the extent it would be subject -- to the extent I'm reviewing anything under rational basis, I find the objection to not being able to challenge what was submitted as complaints, if it was rational basis review, it's of no consequence because it doesn't matter if ultimately there's an investigation and what did or didn't happen.

As it relates to any more heightened review other than rational basis, I'll take it under advisement, and I'll tell you what I'm going to do. But it's going to come in for some purpose, and then the question is if I let it in for every purpose, I'll let you know by the conclusion of these proceedings.

So it's going to come in for rational basis. Whether or not it comes in for any other basis, I'll have to think about the argument, and I want to, quite frankly, go back and read the protective order and so forth.

MR. WERMUTH:  Thank you, Your Honor.

THE COURT:  Okay. But I just -- for the life of me -- if, for example, I had declared this was only subject to rational basis review, I don't see how your argument of not

being able to challenge complaints that were forwarded that were then identified as complaints to the Florida Legislature -- being able to go behind it, I don't know why that could possibly matter for rational basis review.

MR. WERMUTH:  Well, it -- it matters in the sense that we don't -- that we're coming in here with an understanding that the -- that they're not going to discuss pending investigations, and so, you know, our assumption is that if this is an investigation, they haven't disclosed it to us.  And so --

THE COURT:  And the fact of the matter is we don't know at this juncture.

MR. WERMUTH:  We don't know at this juncture.

THE COURT:  I understand.

So I'm conditionally admitting it, and I'll discuss the contours for what purpose I consider it before we finish.

MR. JAZIL:  Your Honor --

THE COURT:  How many of these are there, by the way?

MR. JAZIL:  Your Honor, I'd like to go through three of them with Supervisor Earley.

THE COURT:  So it's 656, 838.  What are the other three?

MR. JAZIL:  The others will be 836, Your Honor, and then 794, Your Honor.

THE COURT:  And they don't have related -- because the other one had two, 656 and 838.  836 and 794 don't have related

documents?

MR. JAZIL:  Your Honor, 836 and 794 are not related, and they don't have other related documents.

THE COURT:  That's what I was asking, because the first one you had two.

Same objection to 836 and 794?

MR. WERMUTH:  Yes.  And, in addition, cumulativeness. I mean, if this -- if you just need one of these to get past rational basis, you don't need to talk about ten of these.

And there's no evidence this email or its contents of the complaint have been presented to the Legislature.

MR. JAZIL:  I'll close that loop as well, Your Honor.

THE COURT:  All right.  At some point I have to accept that counsel is representing something to me in good faith, and it was represented to me in good faith, which is why I initially confused the issue that these were identified in the OECS reports, which is why I assumed it was -- this was part of what I said I was deferring ruling on before.

And that's been your representation, Mr. Jazil; correct?

MR. JAZIL:  Yes, Your Honor, for this document.  For 8 -- 656 shows up in the OECS report.

THE COURT:  Does 836 and 794?

MR. JAZIL:  8 -- Your Honor, I'll get back to you on that.

THE COURT: All right. Double-check. I'm going to conditionally admit them and they can be struck; okay?

MR. JAZIL: Okay, Your Honor.

THE COURT: And, again, if we had a jury present, this would not be the way to do it. I just don't want to keep Supervisor Earley here until midnight; okay?

MR. JAZIL: Understood.

BY MR. JAZIL:

Q. All right. Supervisor Earley, let's turn our attention back to Defendant's Exhibit 838. I'd like to focus your attention to the very top.

Do you see that this email is from Steven Usztok?

A. Usztok, yes.

Q. And do you know who Steven Usztok is?

A. He's on my staff.

Q. And he's emailing from a Leon County votes domain name; right?

A. Correct. Yes. He handles a lot of our fraud complaints.

Q. And he is using your office's domain name; right?

A. Yes.

Q. And you're copied on this email; right?

A. Yes.

Q. And this email is being sent to the Office of Election Crimes and Security; correct?

A. Yes.

Q.   And does your office regularly send complaints to the Office of Election Crimes and Security?

A.   Fairly regularly, yes, as needed.

Q.   And you said "as needed."  So as soon after you guys figure out that there is something to complain about, you tell OECS; right?

A.   Yes.  Once we get our facts together to support our concern, we send it off.

Q.   And as part of your job as the Supervisor of Elections for Leon County, you're responsible for all the records that are kept at that --

A.   In my office.

Q.   -- in your office; right?

A.   Yes.

Q.   And your office, in addition to just notifying OECS of complaints by email, also fills out forms; right?

A.   Yes.

Q.   And these are forms that y'all regularly fill out as part of your job responsibilities; right?

A.   Yes.

Q.   And you send these forms to OECS?

A.   Fraud complaint forms you're talking of?

Q.   Fraud complaint forms.

A.   Yes.  Yes.

Q.   So let's zoom out.

Let's take a look at this email. It says: *Our office is submitting an Election Fraud Complaint*... It lists the paid circulator against who the complaint is being submitted.

Do you see that, sir?

A. Uh-huh.

Q. And it provides a circulator number; right?

A. Yes.

Q. And it talks about a voter who has been affected; right?

A. Yes.

Q. And it notes the voter's voter registration number; correct?

A. Yes.

Q. And it talks about how this voter passed away but a form in their name was still submitted; right?

A. Our records indicate the voter passed away and was removed from the rolls prior to the signature date on the petition.

Q. Okay. So let's take a look at Defendant's Exhibit 656, which is the complaint form.

And, sir, on the complaint form we see that it's the same petition circulator who is referenced; correct?

A. Yes.

Q. And, sir, on the back of this form, if we go to the second page, at the very top you talk about how y'all received a form for a deceased voter; right?

A. Yes, we received a petition form dated after the date of

decease from the voter.

Q.   And if we zoom in on the second part, the "Statement of Facts" section, you've got the voter's name again; right?

A.   Yes.

Q.   It tells us that the voter was deceased as of August 6, 2022; correct?

A.   Yes.

Q.   And --

A.   August --

Q.   Go ahead.

A.   Yes.  August 6, 2022.  I'm sorry.

Q.   And then if you keep reading there, it says that the deceased voter managed to sign a form on September 29, 2022; right?

A.   Yes.  The form was submitted with that date of signature.

        MR. JAZIL:  And if we can zoom out and go to the top again.

BY MR. JAZIL:

Q.   Can you tell me which initiative petition and for which cycle this complaint was submitted?

A.   It was the previous cycle.  This was done in '23, so it would have been for the '24 ballot.  Their initiative number at the time was 2205.  It's usually good for two years.  So it's Smart & Safe Florida.

        MR. JAZIL:  And if we can go to DX 3 for a moment.

BY MR. JAZIL:

Q. Now, this is the cover page for the Office of Election Crimes and Security report from January 15, 2025. If we go and see the cover page for the report itself --

THE COURT: I'm sorry. Yes, sir?

MR. WERMUTH: I object, Your Honor. Basically, we have a pending objection on the OECS report at this point. And, you know, we haven't had a chance to go make our argument about its --

THE COURT: And as it relates -- this is DX 3; correct?

MR. WERMUTH: Yes, Your Honor.

MR. JAZIL: Yes, Your Honor.

THE COURT: And so that we don't have to bring the witness back, I'm going to conditionally admit it subject to ruling once I hear any additional argument.

(DEFENDANTS' EXHIBIT 3: Received in evidence.)

BY MR. JAZIL:

Q. Now, let's go to page 419 of this report.

Now, Supervisor Earley, do you see this redacted page from the OECS report; right?

A. Yes, I do.

MR. JAZIL: And I can hand the witness a paper copy of this portion as well, Your Honor.

If I may approach?

THE COURT:  All right.  You may approach.

BY MR. JAZIL:

Q.   And, sir, looking at this portion of DX 3 and DX 656, first, can you confirm for me that the stamp on the bottom left has the same date on it?

A.   It does.  February 1st, 2023.

Q.   And it's got the same contact information for you?

A.   Yes.

Q.   But the information concerning the petition circulator's name, number, and address is redacted; right?

A.   Correct.

Q.   If you go to the next page in this portion from DX 3 and you take a look at the back page of 656, can you confirm for me that the top of both of these forms under the "Violation" section is the same?

A.   It appears to be, yes.

Q.   Okay.  And take your time.  Take a look at the "Statement of Facts" section.

Are there enough indicators to tell you that this is the same form; it's just been redacted?

A.   Yes.  In looking at my signature that looks the same, yes.

Q.   And your signature has the same date on both of these exhibits; right?

A.   And it looks like the same version of my signature.

MR. JAZIL:  Okay.  We can take that down.

Let's take a look at Defendant's Exhibit 836.

And, Your Honor, if may I approach the witness with a copy?

THE COURT:  You may.

MR. JAZIL:  Your Honor, I'm giving the witness a moment.

(Pause in proceedings.)

BY MR. JAZIL:

Q.   Supervisor Earley, here we, again, have Steven Usztok from your office sending an email; right?

A.   Yes.

Q.   You, again, are copied on the email?

A.   Yes.

Q.   And the email is going to the Office of Election Crimes and Security?

A.   Yes.

Q.   And this, again, is an election fraud complaint that's being sent by your office; correct?

A.   It's at least part of it.  It doesn't include the form, but yes.

Q.   And I'd like to focus on the very last paragraph here.

Here your office is telling OECS that y'all have several additional potential issues of fraud, right?

A.   Yes.

Q.   And then the second-to-last sentence talks about how

several other complaints will be against paid petition circulators working in 2021 and 2022 on behalf of the 21-16 Limited Authorization of Casino Gaming constitutional initiative petition sponsored by Vlorida Voters in Charge.

Do you see that?

MR. WERMUTH: If --

THE COURT: Hold on one second. Yes, sir.

MR. WERMUTH: If Mr. Jazil is going to read this into evidence, then I'd just have to give my preservation objection on the same basis.

THE COURT: You've objected. It was conditionally admitted. If I strike it, it's all gone.

MR. WERMUTH: Okay.

BY MR. JAZIL:

Q. So, sir, here's my question: Are you familiar with the gaming initiative that was circulated a few years back?

A. Yes.

Q. And did your office, in fact, have complaints about the gaming initiative and how signatures were being collected for that initiative?

A. We did.

Q. What were those complaints?

A. It would be hard for me to call everyone up by memory, but I remember there was quite a number. And it seemed that it came from both sides of the effort that was for and against. It was

a lot of information coming out to voters then.  And we were --
there was a lot of money involved.  It appeared that there was
fraud going on, incentivizing, I think if I remember correctly,
circulators to get more petitions and then they -- like, they
were being paid by the piece, if I remember correctly.

Q.   Paid by the petition; right?

A.   Right.

Q.   Okay.  And you said there was a lot of money involved.
There was a lot of money involved on both sides of that issue,
to your recollection?

A.   Yes.

Q.   And one side, the pro side, was Sands Casino gaming
initiative, the for side?

A.   I can't remember specifically.

Q.   Do you recall if the Seminole Tribe was involved?

A.   In some fashion they were, yes.

Q.   Okay.  Fair enough.

     I'd now like to move to Defendant's Exhibit 794.

          MR. JAZIL:  And, Your Honor, if may I approach the
witness with the exhibit?

          THE COURT:  Sure.

          I'm assuming the hearsay objection that was made on
the report and the responses -- these were records he prepared
in the regular course of business?

          MR. WERMUTH:  Objection, Your Honor, for the same

basis of the objection on --

THE COURT:  You preserved your objection to all three of these documents, and I've said I've conditionally admitted them.  And I was asking the additional question so it's clear because there were other objections beyond the motion in limine.

MR. WERMUTH:  Yeah.  Hearsay.

THE COURT:  I understand the relevance.  I understand the 403.  I'm rejecting both of those.  I'm just assuming you are arguing these are public records because he prepared these in the regular course of his business.

MR. JAZIL:  Yes, Your Honor, public records and business records.  I believe I laid the predicate with the first document.  But I'm happy to --

THE COURT:  I just wanted to make -- so the record --

MR. WERMUTH:  To the extent there's hearsay within hearsay, I think we have an objection.

MR. JAZIL:  Your Honor, two points.  One, it's being provided for a nonhearsay purpose, which is complaints were made, not that everything that's in these complaints is true.

Two, they are also business records and public records.  So to the extent that you are going to glean something from it, it falls within the hearsay exception as well.  But the hearsay objection to public records does not extend to hearsay within hearsay, and it's obviously being offered for the truth of the matter asserted.

THE COURT:  I didn't -- are there quotes in here where they are quoting somebody beyond --

MR. WERMUTH:  We haven't seen the second page.

THE COURT:  -- summarizing based on -- because it appeared the last document was they are just summarizing, This is our complaint and our concern; correct?

MR. WERMUTH:  We haven't seen the second page --

THE COURT:  Well, I'm assuming it's consistent with the last document I just saw.

But let me just ask -- just verify with the witness, I believe the documents are a typed statement from the clerk's office, not a typed statement quoting others.

MR. JAZIL:  That is correct, Your Honor.  There are typed statements from the Supervisor's office.  This one has a typed statement from both the Supervisor and the complainant who worked in the Supervisor's office.

So this is -- this one is slightly different, but --

THE COURT:  Would the complainant's objection -- why is that not hearsay?

MR. JAZIL:  Your Honor, she's making a complaint and sending a form to the Supervisor of Elections.  She's also an employee of the Supervisor of Elections office.

MR. WERMUTH:  She's obviously sending a complaint in her personal capacity.

THE COURT:  Why is that portion still not hearsay?

MR. JAZIL:  Your Honor, if you believe that portion from the complainant talking about why she thinks something was wrong is hearsay, that's one thing.  The fact that she sent it to her immediate supervisor, Supervisor Earley, is another thing.  The fact that the complaint was sent --

THE COURT:  Well, the fact that your clients or the defense make statements -- they can admit them; you can't.  So I'm trying to figure out why the fact that an employee of a defendant makes a statement -- why is that somehow exempt from hearsay?

MR. JAZIL:  Your Honor, I'm not saying that it's because the employee of another defendant is making the statement.  This is an employee of another defendant who is -- part of her job is to go through and make sure that these things were done right, is talking about how during the course of her work things were not done right.  And I've got a guy on the stand --

THE COURT:  So you are saying it's a business record within a business record?

MR. JAZIL:  Yes, sir, a business record within a business record.

THE COURT:  All right.  I've conditionally admitted them.  We can tease this out later, because I'd like the witness to be able to see his new grandchild.

BY MR. JAZIL:

Q.   All right.  Supervisor Earley, have you had a chance to look at Defendant's Exhibit 794?

A.   Yes, I remember this.

Q.   Okay.  This is a complaint form that your office prepared; right?

A.   Yes.

Q.   And this is a complaint form related to which petition, sir?

A.   Smart & Safe Florida, which I think at the time was -- I don't remember the exact serial number.  I'm sure it's in here. But it's the marijuana initiative.

          MR. JAZIL:  Okay.  We can go to the second page.

BY MR. JAZIL:

Q.   At the very top it's got a summary of what happened; right?

A.   Yes.

Q.   And here you had someone forging a petition for an employee of your office; right?

A.   Yes.

Q.   And that petition was for the Smart & Safe initiative; right?

A.   Yes.

Q.   And y'all caught this problem; correct?

A.   Yes.

Q.   And Michelle Lewis, she works for you?

A.    Yes.

Q.    And what's her job in your office?

A.    She is part of the front office staff.  She may have actually been helping with the petition verification at the time.

Q.    So she was helping with the petition verification when she --

A.    There's a chance, yes, that she was, yeah, or somebody sitting right next to her was.

Q.    And how did y'all figure out that these petitions were forged?

A.    I think somebody was validating her petition.  It could have even been herself.  And just communication, Hey, I got a petition in your name, and it's like, What?  I didn't sign that petition.

Q.    Okay.  And let's take a look --

     (Indiscernible crosstalk.)

A.    It turned out not to be her signature.

BY MR. JAZIL:

Q.    Let's take a look at her signature, which is on Bates stamped SOS0098671.

A.    Yes.

Q.    This is the signature -- we see Michelle Lewis's signature right there; right?

A.    I do.

Q.   And then if we go to Bates labeled 98674.

A.   5 is better.

Q.   5 is better?

Let's go to 5.

And we see the signature there on the petition form that purports to be from Michelle Lewis; correct?

A.   Correct.

Q.   And when y'all are validating signatures, is it the mismatches that help identify potential fraud that's happening?

A.   That's certainly an indicator, especially when the signatures are involved.

Q.   So in this instance it was a mismatch of signatures that helped your office identify that there was potential fraud?

A.   Correct.  And the confluence of the fact that she was right there to back up the fact that she had never done it.  But yes.

Q.   And Michelle Lewis just happened to catch her own petition being forged?

A.   Her or her colleague right next to her did.  I remember it, yes.  It was quite the circumstance.

Q.   So if Michelle Lewis and her colleague hadn't caught the mismatching signature, would it have been caught?

A.   I think her --

(Indiscernible crosstalk.)

BY MR. JAZIL:

Q.   In that moment?

A.    It may not have been submitted for fraud, but I think it would have been -- I mean, it's our job to catch these.  And whether she was involved or not, it was caught.

Q.    In -- does your office catch 100 percent of mismatching signatures?

A.    I think we come pretty close.

Q.    But not 100 percent; right?

A.    Nobody is perfect.

Q.    And if you have tens of thousands of signatures being submitted, there's a possibility that a few fraudulent signatures can get through; right?

MR. WERMUTH:  Objection.  Speculation.

THE COURT:  Sustained as phrased.

BY MR. JAZIL:

Q.    And, sir, you talked about how it was either Ms. Lewis or one of the colleagues who flagged this issue?

A.    Yes.

Q.    So there was some notice given to Ms. Lewis that her signature may have been forged and then she did something about it; right?

A.    Correct.

Q.    And getting notice to people about things that are going wrong with their personal information is generally a good thing; right?

A.    Especially when things are going wrong, yes.

Q.   And then going back to vote-by-mail ballots, do y'all notify voters if they've made a mistake in their vote-by-mail process so they can come fix it, correct it?

A.   Yes, if we are going to reject a vote-by-mail ballot, we notify the voter and potentially give them the opportunity to cure the signature if they feel that they actually submitted it. And if not, then we would follow up with potentially a fraud investigation.

THE COURT:  That wasn't always the case, though, right?

THE WITNESS:  Yeah.  For us it wasn't required in statute forever.  Somebody made a wise decision in court that made that more of a statewide requirement.

THE COURT:  Go ahead, Mr. Jazil.  I couldn't help.

BY MR. JAZIL:

Q.   So even when things go completely right with vote-by-mail, you all still send correspondence to voters reminding them to renew their vote-by-mail request; right?

A.   Yes.  Every year it's -- every cycle it starts from zero again.

Q.   And it's not just that, your office sends a lot of communications to voters about best practices, things to look out for; right?

A.   We are required to send some things.  A lot of them we try and send by email because it's just a lot more efficient and

less costly.

Q.   So it fair to say that you believe that notifying voters, giving them more information, is generally a good thing?

A.   In general, yes.

          MR. JAZIL:  I have no further questions, Your Honor.

          And just so the record is clear, I was moving all those exhibits into evidence.  My understanding is --

          THE COURT:  They've all been conditionally admitted and we'll talk about it later.

          MR. JAZIL:  Thank you, Your Honor.

          No further questions.

          Anything else from the defense?

          MR. MOORE:  Yes, Your Honor.

          Mr. Moore.

          THE COURT:  I'm sorry.  My court reporter is asking for a break.  Mr. Moore, you lose.

          We'll take a ten-minute break.  When we come back, Mr. Moore, you can question the witness.

          MR. MOORE:  Thank you, Your Honor.

          THE COURT:  So I'll know, Mr. Moore, about how long -- do you have an estimate?  I'm not rushing you, I'm just --

          MR. MOORE:  I'd ballpark 45 minutes to an hour.

          THE COURT:  Okay.  All right.

          MR. MOORE:  With this Court's leave, Supervisor Earley is one of our primary witnesses, one of two, and we would

request leave to do our direct examination of Supervisor Earley today instead of having him come back next week.

THE COURT:  What's your --

MR. MOORE:  I would much prefer that, yes.

THE COURT:  And that includes your 45 minutes?

MR. MOORE:  Yes, Your Honor.

THE COURT:  All right.  We can finish with Earley, but I need to give the court reporter a break.

Thank you.

(Recess taken at 4:29 PM.)

(Resumed at 4:41 PM.)

THE COURT:  We are back on the record.

Mr. Stafford, you're standing.

MR. STAFFORD:  I promise I'm not making an objection, Your Honor.

I have maybe five to ten minutes of cross after Mr. Moore.

THE COURT:  Okay.

MR. MOORE:  Your Honor had asked for an overview of testimony.

THE COURT:  No, let's skip it so we can actually get to the testimony.

MR. MOORE:  Let's do it.

THE COURT:  We'll call it cross, and the Court's making a note that this is also -- I'm granting him leave to go

outside the scope of direct because we're not going to recall the witness consistent with my comments at the pretrial.

Counsel, you may proceed.

CROSS-EXAMINATION

BY MR. MOORE:

Q.   Supervisor Earley, you discussed your background with plaintiff's counsel earlier.  There's a few additional points I'd like to put on the record to round out your experience.

In your current position, what are your responsibilities?

A.   My responsibilities in a nutshell are carrying out federal and state law as it relates to elections and rule and advisory opinion as they apply.

Q.   You testified that you have going on 33 years of experience with the Supervisor's office.

Is that your only experience with Supervisors' offices in the state of Florida?

A.   No.  From January of 2002 through June of 2008, I was employed with a vendor after the 2000 recounts where I did a lot of support for a lot of the offices in the state and really across the nation.

And then in my role as FSC executive committee and everything like that -- and really I got -- continuation of my support role, I'd just get called into a lot of elections offices to help with stuff.

Q.   In your various capacities have you physically attended the

majority of the Supervisor office -- Supervisor of Elections

offices in the State of Florida?

A.   I've visited them, yes.

Q.   Have you been the recipient of any recognitions or awards?

A.   Yeah.  I was elected to the -- or the Elections Officials

Hall of Fame, the national hall of fame.

Q.   And how many individuals have been elected into that hall

of fame?

A.   Last I heard it was 32.

Q.   In your capacity with the Florida Supervisors of Elections,

do you participate on weekly calls concerning the changes to the

Voter Focus system?

A.   I do, yes.  We have a weekly FERS/IT call where it's a few

supervisors, myself, two others and then usually one other staff

member from another county, and then the vendor, VR Systems,

quite a few of their staff and then staff at the state level who

administer the FERS system.

Q.   And have you assisted other Supervisors of Elections in

operationalizing the requirements of House Bill 1205?

A.   Yes.

Q.   Supervisor, we're going to walk through the process that

your office uses to verify statewide initiative petition forms.

A.   Okay.

Q.   For shorthand I'll refer to it as statewide initiative

petitions, or I'll refer to those as either initiative petitions

or petitions.

If I'm asking about candidate petitions or local-issued petitions, I'll specify.

MR. MOORE: And, Your Honor, I'm cognizant of the ground that's already been covered by Mr. Wermuth. I might need to seek a little bit of leave to briefly address a topic that's been covered in order to put the topic in --

THE COURT: That's fine. You can do that faster than you can explain it to me.

MR. MOORE: All right.

BY MR. MOORE:

Q. Supervisor Earley, you testified earlier that the process, the verification process, begins with intake?

A. Yes.

Q. With respect to the receipt of initiative petitions, does your office have procedures or practices that they follow?

A. We do.

Q. Okay. And what are those?

A. When -- if it's -- the majority of our petitions are received through the mail. Those are from the sponsors. They're circulator petitions. So when we receive them, we validate the quantities. We note that in a smart sheet, which is a way we track these batches that are coming in from the post office.

On that it tells who -- what the petition circulator effort

is, the serial number, their version and their approximation of the quantity of petitions, and so we document all that. We certainly note the date of receipt because that's very important.

And then -- it's evolved somewhat, but we typically have some of our front office staff start removing the staples if it's from 25-01, the Smart & Safe effort, and really that's where all of our petitions currently are coming from -- or were until February 1.

So they get in the process of removing all the staples and we discuss separating the sheets so that they can scan properly on down the line.

We also validate that we have enough money in the account. Previously they would tend to pay as a batch was submitted, but now we tend to get payment ahead of time for the petitions.

Q.   You testified that if the petition is submitted more than ten days after the voter signed it that you have to notify the Division of Elections?

A.   Correct.

Q.   How do you do that?

A.   We generate a report. Originally, when we were trying to put all this together -- these are all new processes -- we were hoping to build a report that was kind of a push-button report that would compare the submission date with the signature date, that we have both of those captured by our system.

I don't think that report ever got built, so we developed our own sequel query. It's a sequel database query to highlight those for the various batches. So that generates a list of the petitions that were late based on our data entry.

And then we have to go and pull those petitions, because even though we've already scanned them once, we capture them as a separate scan so that -- and we scan those in and we upload those images and the report to the State as a batch for late submissions.

Q. Does your office have to check for that with candidate petitions or local-issue petitions?

A. No.

Q. You mentioned the Smart & Safe petition 25-01.

How many pages is that one?

A. It's usually five pages, sometimes it's three. There's five pages of text counting the form page.

Q. And if you could briefly summarize the challenges of multipage petition forms for your office.

A. Yeah. There's a lot of challenges with multipage petitions. Unstapling them is one; just the paper volume storing pages is another.

Scanning those in; again, the jams are a huge problem, I mean, truly. It's one of our big pain points. That's not present with single-page petitions.

We have to count the pages. I've talked already about the

hurdles we've gone through and how we found a solution.  I don't think -- I think other counties are actually physically counting the number of pieces of paper or looking front and back to make sure that that's -- everything is submitted properly.

     That involves storage issues, just digital storage because of the images.  At least for us I think that's somewhat less, and I don't believe we're actually capturing all five pages.  I think we can throw away the four after we counted them, but I don't think all counties can do that.  I'm sure they can't.

Q.   And we'll get to that point in just a minute, but just to close the loop on this.  Are candidate or local-issue petition forms multiple pages?

A.   They are not.

Q.   When it comes to scanning -- and you just touched on this -- do you scan the entire initiative petition form, including the text of the proposed amendment, or just the first page with the voter's information?

A.   We scan in the entirety of the form, all pages.

Q.   Do you keep the entirety of the form?

A.   We keep all the physical forms, yes.

Q.   How about in the digital images?

A.   I -- I think we decided or found a technical way not to keep the digital images.  We keep just the page 1s.

Q.   If you only keep the first page of the digital images, why do you scan all the pages?

A.    Because that's our method of validating the number of pages there are.  The scan process is how we're counting them.

Q.    When you scan the initiative petition forms, does your office use any specific formatting for the file names?

A.    We do.

Q.    Okay.  Why is that?

A.    It's a way really to -- for us to track which image goes with which box of petitions, the physical one.  But we use it more in depth to allocate certain batches of petitions to certain of our staff.

We try to send a batch just with one circulator because part of the process on the screen is to identify the circulator, but we built a checkbox in that.  It's the same as the previous one so we don't have to look that circulator up repeatedly for a whole bunch of petitions.  So that's one feature we built in, so we sort the images that way.

Also captured in there is if in the naming convention -- like I said earlier, if we don't count the right number of pages, it appends the word "rejected" to the file name.  That's important later on for us in the way we do it.

Then the next part is the petition serial number, then the circulator number.  Then we don't know the voter's record yet so we have an image number for that batch related to that circulator.  And then I believe it's the date of submission is the last thing, and it's a TIFF file format.

Q.    Okay.  Does using that naming nomenclature help you with the submission and data reporting requirement?

A.    Yes, definitely.  It allows us to keep things in batches. Our software, we built it, which is nice, to primarily sort into subdirectories for that submission date by circulator number.

Again, we get that from the barcode.  There's two barcodes, the square QR-type barcodes.  Our software's pretty good at reading all of those; occasionally it can't -- more than occasionally.

So if we're running a batch of, say, 100 through, we'll get errors pop up on our screen that this image didn't capture properly the number from the barcode, so we hand input that. Sometimes that means you need to go find the petition itself, you know.  Of course, there's jams and all those kind of things we're fixing and printhead problems.

But the naming convention allows us, like I say, to batch, but also then we pull the ones that have incorrect number of pages.  They're easy to find by doing an alpha sort, and this is really like looking at file manager in Windows, and you just drag those to a separate folder because we can reject those relatively quickly, assuming our software is accurate, and if there's an error there, we get notified so we can correct it.

So really the naming convention is something we designed in from the get-go to track these images as they progress through the whole process and to make our process more efficient.

Q.   Okay.  When you scan the initiative petition forms, are they saved directly to your Voter Focus software?

A.   Not initially, no, they are not.  They are saved in a file structure that is part of the scanning operation, and this is a good point.  It's been stated that we bring them into our voter regs.  Essentially we associate them with the voter registration file.  We have them on the screen.  That's not really the voter reg, and we have another screen and we're associating them based upon a search in the voter registration software.

Q.   And what does that process look like?

(Indiscernible crosstalk.)

A.   I say we batch the files, so we get a batch of images which are really sitting in a directory, and we pull up the petition verification screen in Voter Focus, which is the name of the software.

The first screen pops up; we say which circulator we're working with, and usually -- sometimes it's -- if a batch has a lot of individualized circulators, they're put in their own batch that's going to be, you know, more difficult to check because you have to find the right circulator every time from petition to petition, but -- so there's two ways.

We validate that the circulator was -- you know, we find that circulator, and we go from screen to screen, so we're -- or from petition to petition.  We normally search by the date of birth because we found that the names can vary so much that

really the date of birth is usually a nice easy number to capture and understand visually.

We put that in as our search criteria.  It pops up a list, an alphabetic list of voters, and that makes it much easier to generally find the voter.  And assuming we can find it pretty straightforward, we select one from that list, up pops their information, fills the screen --

(Reporter requested clarification.)

THE WITNESS:  I'm sorry.  So the list will populate voters, and assuming the name is easy to understand and we find a match, then we select that one and it pops up onto our screen. And then we go ahead and begin the process of inputting the signature date and, you know, verifying the driver's licenses and, you know, all the rest of it.

BY MR. MOORE:

Q.   You'd mentioned how you keep -- for multipage petitions how you keep the physical petition together.

Are there certain points in the verification process where that can become challenging?

A.   Yes, definitely.  It's a challenge just in when you first start taking the staples out and you're fanning the pages, you got to make sure you don't -- you know, people are human -- you don't drop the pages.  You got to keep everything in the right order.

When we get to the scanner part of this, pick them up, you

make sure you don't miss the last page when you're batching them going through, because you need to have them all together.  If there's a jam, that presents potentially a challenge in keeping the pages in the right order.

When you take them out of the outstack tray and put them back in the box, you need to make sure they're all organized properly.  A lot of this sounds simple, but when you're doing thousands of them, it gets to be a challenge.

If you have to go back to a petition in the box for many different reasons, then you've got to be careful about not upsetting the order.  So there's a lot of instances where that comes into play.

Q.   Generally speaking, does it take a significant amount of time to prepare and scan initiative petitions?

A.   Absolutely.

Q.   You testified earlier that if you cannot locate a voter in your Voter Focus system, sometimes you have to go to the Florida Voter Registration System.

Is using -- and I'll call that the FVRS, V as in Victor.

Is using the FVRS as straightforward as searching in your Voter Focus system?

A.   Not necessarily, no, no.  It's -- I think outside of the window you have to switch to an FVRS search.  If there's more --

(Reporter requested clarification.)

THE WITNESS:  FVRS.  It's always going to be FVRS,

yeah, always FVRS.

You get a lot more positives and so you have to sort through them.  Again, whether it's in our database or FVRS, there's variations on a name.  Sometimes people are married, so it's, frankly, an art form as much as a skill to do these searches.

BY MR. MOORE:

Q.   Going to the verification of the contents on the initiative petition form itself, you testified that you have to verify the voter's driver's license number, ID --

A.   Yes.

Q.   -- or the last four of their Social; is that correct?

A.   Yes.  Amongst other things, but yes.

Q.   And just to confirm, your system doesn't always have the voter's SSN?

A.   Correct.

Q.   And it doesn't always have the driver's license?

A.   Correct, it sometimes --

Q.   It doesn't always have one or the other?

A.   Or both; sometimes it's missing both, yes.

Q.   And you testified that if you can't match it in your system per the driver's license or the Social, you go to DAVID?

A.   Correct.

Q.   And just for the record, could you tell us who maintains DAVID?

A.   The DMV.

Q.   Okay.  Are there restrictions on what you can use DAVID for?

A.   Yes.

Q.   Have you fired employees for improper use of DAVID?

A.   We have.

Q.   Okay.  Before House Bill 1205, how many of your employees had access to DAVID?

A.   It was certainly a smaller number than have access now.  We try to keep that very much in check.

Q.   And why is that?

A.   To limit our liability.  We needed to protect our ability to use DAVID.

Q.   And has House Bill 1205 changed that?

A.   We've increased the number of people pretty dramatically that access DAVID.

Q.   Okay.  Why is that?

A.   Because of the complexity and the frequency we have to use DAVID.  We had looked at a two-tiered process, but that became -- every batch has what -- a complex number of petitions that we have to verify.

Q.   Are driver's license numbers or the last four of a Social required for candidate or local-issue petitions?

A.   No, they are not.

Q.   Do you have to routinely access DAVID to verify candidate

or local-issue petitions?

A.   No.

Q.   And if you can't match the driver's license number or the last four of the Social from the data that you see in your Voter Focus system or in DAVID, what happens?

A.   At that point it's a failure.

Q.   You testified early about circulators.  Specifically, you testified that your office looks to make sure that if the petition was collected by a circulator, that it was signed and dated by the circulator.

     Is that correct?

A.   Correct.  And -- yes.

Q.   And that your office verifies that the circulator was registered at the time the petition was signed --

A.   Correct.

Q.   -- correct?

     How does your office know whether a circulator was registered during the time the circulator collected the petition?

A.   We get regularly updated lists from the State that we can reference.

Q.   Can a circulator's registration be revoked?

A.   Yes.

Q.   Does it have any impact on your office?

A.   Yes.  On the first blush if it's revoked, then we can no

longer accept petitions, but sometimes the status has changed to revoked or not approved, or however you refer to it, kind of retroactively, and it impacts petitions we have already validated that we then have to go back and invalidate.

Q.    Okay.  So do you have to rescan petitions by that circulator using a new time period?

A.    We don't rescan, but we have to go back through our process and find those petitions in the batches and see again whether it was part of that date range or not.  So it's a great complication to the process, without a doubt.

Q.    Do you then have to update the data reports that you've already submitted accordingly?

A.    We do, yes.  We have to -- along with every upload of an image batch, there's a data file that identifies which of the petitions in that image file -- that collection of images were valid and invalid.  So if we change the status, we have to change the text file that goes up.

And then when you submit that, the text file is run through an error-checking algorithm at the State end, and it feeds back errors.  And we do get errors, and we have to figure out what those errors are.  And it's fairly cryptic because we haven't had a lot of time to really make this a nice fluid process.  So that error-checking analysis before we can certify to the State can get pretty complex and involve lots of people -- or several people.  Sorry.

Q.   Do you have to look at circulator information when verifying candidate or local-issue petitions?

A.   No.

Q.   You testified earlier that you checked to make sure that the correct number of pages of the petition initiative was provided to the voter --

A.   Yes.

Q.   -- or your process for approximating that.

A.   Correct.

Q.   Do you have to do that for a candidate or local-issue petitions?

A.   We do not.

Q.   If not all the pages are present for any individual initiative petition form, what does your office do?

A.   We invalidate the petition.

Q.   And you also testified that you check to see that the voter dated the initiative petition form; is that correct?

A.   Yes, the signature date.

Q.   If there's a date listed on the initiative petition form as the signature date for the voter, how does your office use that date?

A.   It's primarily used to determine whether the petition was submitted to us within the ten-day requirement.

Q.   Do you also use it for purposes of verifying that the circulator was registered when the petition was collected?

A.    Yes.  Absolutely.  And we check that -- the circulator's signature date should be the same as the signature date of the voter when they signed it.

Q.    And do you have to do that for candidate or local-issue petitions?

A.    No.

Q.    With respect to initiative petitions, I think your term was "misfiled," petitions that were filed with Leon County but the voter is not registered in Leon County.

Do you have to check for that with candidate or local-issue petitions?

A.    Much less.  If we are getting petitions for a candidate that is running across multiple counties, because some state-level -- like state Senate, state House, and some of the judgeships, you know, those need to be specific to our county, but those are much fewer in number, and we tend to see much fewer mistakes made.  So it has to be the right county, but that's our -- it's not a big issue with those.

Q.    So do you see more misfiles with initiative petition forms or with candidate or local-issue petition forms?

A.    In initiative petition forms, definitely.

Q.    And when you get an initiative petition form that is misfiled, do you notify anybody?

A.    Yes, we notify the sponsor and the State.

Q.    Does your office check for the voter's congressional

district with initiative petitions?

A.    Yes.  We -- that's, I believe, essentially done automatically based on the address we have on file for that voter once we identify the right voter.

Q.    Do you have to do that for candidate or local-issue petitions?

A.    No.  One exception.  If a local candidate is running for a single-member district, we have to check that, but usually, again, the candidates are very careful about that.  We don't find as many.

Q.    On the initiative petition form, let's say that a voter misreads the "county" slot and thinks it says "country," and they put in USA in the county spot.

    Is that the petition that your office would deem invalid for that basis?

A.    We don't.

Q.    So for "county," you check to make sure that's something that's filled in on the petition form?

A.    Yes.  I'm not sure that we even require that specifically.  I mean, it's a good indicator of what the voter -- where they think they live, but we really rely on looking the voter up in our database to determine that.

Q.    Is the same true for the "city" field on the initiative petition?

A.    An address has to be there.  Particularly that's part of

the address.

Q.   Yeah.  And so the ZIP code would also fall under the address?

A.   Right.

Q.   What if there is a variation in the name as between the name on the initiative petition and the name in your database?  Does that render it invalid?

A.   We see it a lot.  If we can -- we go to great lengths to make sure that we find the right voter, and so we do a lot of searching, because names don't always match exactly what's in our records.

Q.   On the topic of signature verification, do you sometimes look at multiple signatures on file when verifying the signature on an initiative petition?

A.   Definitely, yes.

Q.   And why is that?

A.   Because people's signatures can vary either over time or just in the circumstance of them signing it, and that's part of our training.  You want to really to -- to do really good signature checking or verification.  It's nice to have a larger number of known valid signatures.

Q.   And I think I heard this in response to questions by plaintiffs' counsel, but could you confirm whether or not every employee or every team member of your staff that's involved in the verification process has the authority to deem a signature

as valid or invalid?

A.    Everyone that's checking signatures and really the core processing of a petition, yes.  The folks that take out staples, maybe not always, but they are not checking that part.

Q.    During the verification process, does your office check to see whether a valid petition has already been submitted for the voter?

A.    Yes, we look for duplicates.

Q.    Does that happen frequently?

A.    It does.

Q.    Is it possible for Supervisors of Elections in different counties to set up a process for verifying initiative petitions that differs from the process you have in your office?

A.    Certainly, yes, especially in all the preliminary concepts and the scanning and all that.  The verification screen is roughly the same.  But, yes, that's a small part.

Q.    You testified that if an initiative petition is deemed valid by your office that you must send a verification notice to the voter.

A.    Yes.

Q.    Okay.  When do you notify the voter?

A.    As soon as practicable I believe is the statute language.

Q.    Okay.  How have you operationalized that?

A.    For the most part we were doing it weekly, trying to keep that in line with our normal weekly mail-outs on Tuesdays.

Mail-outs are kind of a big process, and we have lots of mail-outs. So we tried to factor it in there.

Recently, in January, we got a request from the Division that we should do it much more frequently. They said, essentially, as soon as practicable means on the same day. There was some pushback on that, but we went to, essentially, daily, really ours happening the day after, generally.

Q. Can you tell us about the technical -- excuse me. Can you tell us about the technical process within your office for notifying a voter?

A. Yes. So once we finish a batch -- we tend to do this in the big batches -- we do an export from the voter registration system to the -- that can essentially be ingested by our -- we have a big mail sorter and inserter. We do a lot of mailings. We have a very great capability, especially for our size, to do vote-by-mail mailings and such.

So we have these big inserters that take the data file. We put the right different insertion parts, multiple envelopes. There's the outgoing envelope, the incoming envelope, or the envelope not that comes to us but goes to OECS. There's the letter/form. That all has to be assembled. So that data gets dropped to the inserter. We run that through. It does the insertion process.

That's one of the few parts of this process that actually runs real smoothly for us. A lot of other -- the other parts

are prone to error, but at this point we have kind of cleaned up the data.  So our insertion process goes great.

We take that from the outstack tray and feed it through our postage meter, and then also the envelopes that go to OECS have postage that was built in.  That was a very difficult hurdle to get over, figuring out how we do that, because it's a QR BRM, business reply mailing, and it turned out to be a QBRM, which we have never dealt with, because it's going to a secondary address, not back to our address.  So that's a special version that we all had to figure out.  And the addressing is somewhat different from every county, I think so that it can be assessed to the right county.  So it was -- the logistics behind that were extremely complicated and fraught with wrong turns.

Q.   So you print them in-house?

A.   Yes.

Q.   You stuff them in-house?

A.   We do.

Q.   And you do the posting in-house?

A.   Yes, we do.

Q.   Would it be an option to manually stuff the envelopes?

A.   Yes, many counties do that.  Many counties outsource it to a third party.  They give that data file to a vendor who does the insertion and the mailings.

Q.   You mentioned your mail inserter processes is one of the more smooth processes.

Does every county have a mail inserter?

A.   Definitely not.

Q.   How big is your mail inserter machine?

A.   We have two, and they are large.  They are 15 feet by 3 feet, and then there's an L-shaped extension that's maybe another 6 or 7 feet.

Q.   And is it a fairly expensive machine?

A.   Very.

Q.   On the QBRM, what was the process for establishing the account with the post office?

A.   It was long and drawn out.  We first had to get a valid version of the address that our notices would be sent to by the voter.  We got that from OECS, combined with inputs from the Division of Elections.  This was new to everybody.  Everybody was making mistakes.  And we changed that quite a few times before we could get our artwork approved.  Any mailing envelope has to be approved by the USPS also.  So the addressing was very difficult, surprisingly, but it really was.  A lot of mistakes made by all the parties involved.

We also had to set up an account for the QBRM.  The account is -- there's a fee for the account as well as postage when a piece hits the mail that gets assessed back to us.  The fee varies by your expected number of mail pieces that would be utilizing that thing, that QBRM.  I think we are at a relatively low level for those, but I think it's about 1,200 bucks a year

for that, $1,200.  And then, you know, again, there's the postage.

So all of that goes into generating this and making the process work.

Q.   Other than the QBRM process that you explained, are there other potential options available at counties to use in order to be able to prepay the form for mailing to OECS?

A.   Yeah.  I don't think there is many, but there are other options, one of which is counties just put a stamp on that extra envelope.

Q.   When your office verifies candidate petitions or local-issue petitions, do you have to send the voter a notification?

A.   We do, yes.

Q.   Okay.  When your office verifies candidate petitions and local-issue petitions, do you have to provide the voter with a prepaid form that they can submit to the Office of Election Crimes and Security?

A.   No, none of that happens.

Q.   Do you ever know if the voter completes the form and mails it to OECS?

A.   Yes.  We are supposed to get feedback.  The OECS is supposed to submit that to the Division of Elections.  They send, I believe, a data file to us notifying us of that.

Q.   Does this require any further action by your office?

A.    Yes.  When we receive those, we then have to go back kind of retroactively and then find the voter, change the record from valid to invalid, and then reupdate to the Division that batch. So we generate the text file again, go through the portal, upload that.  We don't have to upload the images, which is good, because the image uploads take a long time.  We don't have to do that again.  But we have to make sure the data file matches the right batch.  And then if there's errors generated, we have to troubleshoot that.

Q.    And does your office have to pay for the postage for the initial outbound mail to the voter as well as the preaddressed form to OECS?

A.    Yes.  I believe that's First Class Mail.

Q.    What was your reaction to learning that you could include those costs for the verification notice in the verification fee?

A.    I was glad we didn't have to pass that along to our taxpayers, our voters.

Q.    Setting aside the intake prescanning preparation -- the scanning, the reporting, and the submitting of the forms to the State -- just verifying the data on the petition form, how long can it take for a challenging petition form?

A.    Quite a few minutes.

Q.    How long does it take to validate a single-candidate petition?

A.    Certainly under a minute.  Those are very quick.

Q.    And is there a time period within which your office has to complete the verification of initiative petitions?

A.    Yes.  Depending on when they are submitted to us, if it's before, essentially, December 1, we have 60 days to get them verified as valid or invalid, or whatever other problem they may have.  After December 1, it's a 30-day window, and we have to have them completed at least as much as possible -- make every effort possible to have all of them done by February 1st, hard deadline there.

Q.    Are there comparable verification deadlines for candidate and local-issue petitions?

A.    Not an ongoing kind of turnaround deadline, but there is a deadline because we have to prep the ballots.  So we can't receive candidate petitions closer than 28 days, four weeks, from the election.  And then we, I believe, have seven days to finalize any of the petitions, but we typically get those, you know, much further out and in a very methodical way because candidates want to know whether they have to pay the fee or not.  And there's fewer of them, and it's easier to manage.

Q.    Are initiative petition forms submitted in larger batches to your office at certain times of the year?

A.    Typically, yeah.  They're submitted in larger batches in that December 1 to February 1 time frame.

Q.    And is that the same time period when you have fewer days in order to complete the verification process?

A.   Yes.  We have 30 days, or even less than that as it gets close to February 1.

Q.   And how does that compare with candidate petition submissions?

A.   Again, yeah, they usually come in in a more gradual or, you know, well-proportioned stream.  Occasionally we'll get some that turn in some late, but, you know, a lot of them try to get them to us in advance so that we can do the statistical sampling, whereas if they get to a certain number, we don't have to look at all the petitions.

Q.   And we'll get to sampling in just a minute.

Are verifying initiative petitions more of a strain on your office than verifying candidate or local-issue petitions?

A.   Dramatically more of a strain.

Q.   How about from a personnel standpoint?

A.   From every standpoint, yes.

Q.   You testified -- so we've -- we're up to the point of the process where you've determined that the petition is either valid or invalid.  If it's valid, you've mailed the verification notice.

Tell us about the process for submitting the digital images of the petition forms to the Division.

A.   Yeah.  So once we associate it with -- the image with a voter and we finish that batch, then we generate a text file report for the batch, because in the statute it says we have to

indicate which petition or, in this case, really, it's which of the images were valid or invalid for that batch. We need to make sure the same number is there so we haven't somehow messed something up in the file structure, what have you.

We generate the report. We create a zip file that contains all the images and that report. We upload it through the SOE portal, the Supervisor of Elections portal, to the Division. You know, there are certainly some bandwidth constrictors there. Oftentimes the uploads are pretty slow.

We got the authorization to not wait until the end of each period when everybody would be hitting it. We're now doing this as we progress through it and finish batches.

But -- so it's a slow process. We have to -- it's really one person doing all these uploads, one of our definitely more senior people. And they then get an error message back, if there is one, for the text file. That happens all the -- frequently.

And then you've got this big, basically, spreadsheet of data that you're trying to figure out what gave a hiccup on the Division's end, which data doesn't match the field requirements basically.

Q. Are there certain time frames by which you must upload the digital images to the Division?

A. Well, again, as soon as practicable. It's within the period, though. And before December 1, a period is a month.

After December 1, the period is considered to be a week.  We definitely try and do it more frequently than that just so we don't get behind because there's a lot of pressure to get all of this stuff done.

Q.   Is the upload process to the portal -- is that a quick process?

A.   No.  No.  Yeah.  The image upload -- these are big files, and so, you know, it takes awhile for the State to receive those.

Q.   And has the portal been down for maintenance at times?

A.   Yes.

Q.   Do you have to send scanned images of candidate or local-issue petitions to the Department of State?

A.   No.  No.

Q.   Other than submitting the scanned images to the Department, do you have to submit the initiative petition forms in any other format?

A.   We have to send the physical forms.  And I had forgotten, but if there is a late form, we rescan them in and send that as part of the late-reporting batch too.

Q.   Do you have to physically deliver the hard copies of candidate and local-issue petitions to the Department?

A.   No.

Q.   How would you describe the amount of staff time it takes for scanning and uploading the digital images to the portal and

transferring the physical copies to the Department?

A.    It's onerous.   There's a lot of -- yeah, the scanning process, especially the upload process, is demanding, the troubleshooting of the error messages, and just the upload time is -- it takes time.

Q.    Separate from submitting the digital image along with the text file regarding valid or invalid that you talked about, do you have to do any other -- do you have to submit any other data or reports to the Department of State in connection with initiative petitions?

A.    Sure, yes.   So there is the 25 percent invalid rate report which we submit at the end of each period.   It's very rare to find a period's worth of petitions for a specific petition serial number that doesn't meet the 25 percent.   So that's essentially every period we have to do that for every petition effort.

We -- like I say, the late reports, those are kind of on an ongoing process.   As we do a few batches, we'll do those. That's a big lift.

There is the -- I can't even remember the name of it. There's a periodic report we do to the State that kind of summarizes the ongoing petition effort, and then you give information about the serial number, the circulator, the number of valid petitions, the number of invalid petitions, things like that.

Q.   And is that called the Recordation of Verification report?

A.   That's it, yes.  I can never remember that name.

Q.   When do you have to submit those reports?

A.   Some of them at the end of the period, either monthly or weekly, depending on before or after December 1.

     The late reports is not really a -- that I found in statute, but we try and do that on a very regular basis, usually one or two a week for each petition effort.  It depends on the batch load we get.

     The recordation, that's at the end of the period.

     And then we also do a website upload to have that posted on our website.

Q.   Speaking of the website, are you required to put certain data reports on your website?

A.   We are.

Q.   Okay.

A.   Yes.

Q.   And how frequently do you have to put those on your website?

A.   I believe we do that at the end of each period also.

Q.   And, generally speaking, could you describe the types of data that you put on your website?

A.   Yes.  Especially for the website, we do, essentially, a summary or a running totals type of report for each petition effort.  And then we also give data for that individual period.

The running totals, it's the number of invalids and valids for each petition effort.

The -- I'm trying to think of the data for the periodic. It's very similar, but it's a little bit more detailed.

Q.    Okay.  Going back to the Recordation of Verification report, do you have to send a similar report to the Department of State for candidate and local-issue petitions?

A.    No, we don't do any of that.

Q.    Can all of your employees run the reports that contain the information that you are required to either put on your website or submit to the Department of State?

A.    We have a couple, but not all of them certainly, no.

Q.    I'm going to ask you a couple of questions now about the volume of petitions that you receive.

For calendar years 2024 and 2025, how many initiative petitions did your office receive?

A.    I think it was right around 46,000 --

Q.    Okay.

A.    -- and change.

Q.    And in verifying those, did you incur any overtime?

A.    Yes.

Q.    For that same time period, calendar year 2024 and 2025, how many candidate petition forms did your office receive?

A.    I think it was around 11,000.

Q.    Did your office incur any overtime in order to process

those candidate petitions?

A.   No.  No.

Q.   And, finally, how many -- in that same time period, how many local-issue petition forms did your office receive?

A.   We don't get many of those.  We haven't had any of those in a long time.

Q.   Earlier you had mentioned sampling.

A.   Yes.

Q.   Is that something that's available to your office for initiative petitions?

A.   No.

Q.   Okay.  So you have to verify every single-initiative petition?

A.   Sometimes more than once, but yes.

Q.   Is the sampling an option for candidate petitions?

A.   It is.

Q.   Does not being able to utilize sampling for initiative petitions have an impact on your office with respect to the time and expense involved in verifying?

A.   It certainly makes the verification process much more time-consuming.

Q.   As between candidate petitions on one hand and local-issue petitions and then initiative petitions on the other, do you typically see a difference in the rate of invalidity?

A.   Yes.  The initiative petitions are very often -- maybe more

often than not, invalid at least a third of the time.  There's

instances where that's not the case, but usually that's a good

error rate is a third failures or invalids.  Oftentimes it's

more than that.

Q.   For the 2026 cycle, how many initiative petitions did your

office receive from Smart & Safe?

A.   I think it was 36,000.

Q.   And how many of those were valid?

A.   Just over 20,000.

Q.   You are petty good at math.  What percentage is that?

A.   That's about four-ninths or five-ninths, 55 percent.

Q.   Then the remaining 16 were invalid?

A.   16,000, yeah.  So it's about 45 percent-ish.

Q.   Can invalid petitions take more time to review and add

costs to the process of verification?

A.   I would say yes, especially in the past.  With the new

requirements they all take a long time, valids and invalids --

or a large number do.

Q.   Has the verification of initiative petitions created a

strain on your IT resources from an overhead or personnel

perspective?

A.   Yes, definitely.

Q.   How so?

A.   We've had to develop our own software or our own

algorithms, our own queries, our own process for handling the

file structures and the naming conventions, interrelating our scan software to the petition process and developing a procedure around that.  We've also helped other counties in the state develop the overall process.  We've been pretty integral to a lot of that.  We interface with our vendor a lot, even more than just those weekly meetings on one.  For this we had a -- quite a few workshops where we would come together several times a week to try and build out the process.  It's been a big lift.

And on a daily basis as we are validating petitions, troubleshooting, generating new queries based on new requirements from the State, it's been an ongoing big, big lift.

Q.    And compared to prior years, you testified that you've changed the number of staff that you have devoted to the verification of initiative petitions; is that correct?

A.    Yes.  Yes.  For initiative petitions, yes, absolutely.

Q.    Did I hear you say that this in the past you've had two individuals?

A.    We typically have two full-time employee, FTEs, doing most of the work, actually.  Occasionally they would bring in temps, specially in that December to -- and January time period, that two-month period when the load usually got bigger.

Now we've got basically eight core people instead of two. Almost always all eight of them are involved, certainly at least six are involved, and that's pretty much all they do for the vast majority of the time.  And then when we get batches in to

unstaple and all of that, or if we get an unusually large batch or we are facing a crunch time, then we call in more of our full-time staff.

Q.   With respect to the verification fee, the statute required you to post your verification fees in advance?

A.   Yes.

Q.   So you'd agree that it necessarily requires you to make an estimate of that fee?

A.   Absolutely.

Q.   During your testimony in response to Mr. Wermuth, there was a reference to a $4.70 fee?

A.   Yes.

Q.   At the end of the day, was any sponsor required to pay that amount?

A.   No.

Q.   And did your office and many other Supervisor offices increase the verification fees over a period of three months from July 1st through October 1st?

A.    I think essentially all of them did, yes, including us.

Q.   Does every Supervisor's office receive the same volume of initiative petitions to verify?

A.   No, it varies greatly by office.

Q.   Does every Supervisor of Elections employ the same number of staff?

A.   No.

Q.   Do they compensate their staff in the same manner?

A.   No.

Q.   Do they have the same information technology systems?

A.   Definitely not.

Q.   Do they have the same physical equipment?

A.   No.

Q.   Is Taylor County Supervisor's office different than your office?

A.   Yes.

Q.   And is your office different than, say, Pinellas?

A.   Yes.

Q.   You've testified about a ten-day deadline that's triggered from the date of the signature to submit it.

A.   (Nods head up and down.)

Q.   In calculating whether a petition is late, is the time of payment a consideration?

A.   The time -- no, the time of payment doesn't factor in to the lateness.

Q.   Are you aware of any Supervisor's office that has deemed an initiative petition to be late if the payment is not made within ten days of the signature?

A.   No.

Q.   Supervisor, just for the sake of brevity, we are going to recap some of the major difference between how your office processes initiative petitions versus candidate or local-issue

petitions.

You testified that there's a difference in volume?

A.    Yes.

Q.    You testified that there's a difference in the data points on the petition forms themselves that you have to verify?

A.    Dramatic difference there, yes.

Q.    Which includes Socials, driver's license, requiring you to access DAVID.  There's also -- with respect to the circulator affidavit, you have to look that it's signed, dated, and that the circulator was registered at that time period?

A.    Yes to all of the above.

Q.    Does your office have any of those considerations with candidate or local-issue petitions?

A.    No.  With those regards, no, definitely not.

Q.    On multiple pages your office doesn't have to have any of those considerations for candidate petitions; correct?

A.    Correct.

Q.    With regard to the creation of the digital image and uploading it through the portal, you don't have to do that for candidates or local-issue petitions?

A.    Candidate, no, we don't.  They are very easy.

Q.    You don't have to physically submit the candidate or local-issue petitions?

A.    We do not.  We just keep them in retention.

Q.    Is there a difference in complexity involved in the review

of the initiative petitions versus candidate petitions or local-issue petitions?

A.    Night and day.  It's not even close, yes.

Q.    All the processes that we described with respect to the verification notice, the printing, the mailing, the mail merger, the postage, the stuffing, you don't have those considerations with candidate petitions, do you?

A.    Correct, none of that.

Q.    Do you have to provide the same type of information on your website with respect to candidate petitions?

A.    I don't remember --

      (Reporter requested clarification.)

BY MR. MOORE:

Q.    Do you have to provide the same level of information on your website in terms of data with respect to candidate petitions or local-issue petitions that you do for initiative petitions?

A.    We do not.

Q.    The level of data that you have to report to the Department of State varies; it's much more for initiative petitions than it is for candidate petitions; correct?

A.    Absolutely.

Q.    Or local-issue petitions?

A.    Again, I don't have much experience with local initiatives.

Q.    If you have more than 25 percent of petitions during a

reporting period that you find to be invalid for a sponsor, do you have to -- you have to report that to the Department of State?

A.    We do.

Q.    You don't have those same types of considerations for candidate petitions, do you?

A.    Correct, we do not.

Q.    And finally, you testified that you're unable to use sampling with respect to initiative petitions, but you can for candidate petitions; correct?  So that would be a difference?

A.    Yes.

Q.    In closing, has House Bill 1205 changed the process by which you verify initiative petition forms?

A.    It's completely transformed it.

Q.    Has it required dramatic changes to your software?

A.    Yes.

Q.    Has it required changes to your Voter Focus software as well?

A.    Yes.  Our scanning software and our Voter Focus software and our ballot -- or notice insertion software, building all that out.

Q.    If you couldn't charge the verification fee, how would that change what you are able to do?

A.    It would tax us as far as staffing.  I mean, we've had to hire extra people for this, so our staff is increased.  If we

couldn't do all -- if we couldn't get that money from the sponsors, we would either pass the burden on to the taxpayer if the county agreed to do it, or you would have to make decisions as to what things we could do in our office.

Q.   If the county commission declined to fund it, what would you do?

A.   We would do our best to get the job done.  We would probably have to work more overtime because we wouldn't have enough people on staff to do it during regular hours.  Other activities in our office might suffer some as we balance the loads.

          MR. MOORE:  Your Honor, may I confer with co-counsel real quick?

          THE COURT:  Sure.

     (Discussion between the attorneys.)

          MR. MOORE:  Thank you, Supervisor.

          THE COURT:  Before everybody jumps up, because this may not be possible, how long is your redirect going to be?

          MR. WERMUTH:  Less than ten minutes.

          THE COURT:  Do you want to forge ahead?  Can you?

          How long do you have?

          MR. STAFFORD:  Ten minutes at most, probably five.

          THE COURT:  All right.  We are going to try it, but we can't go more than about 15 minutes for the court reporter.

          Go ahead.

CROSS-EXAMINATION

BY MR. STAFFORD:

Q.   Good afternoon, Supervisor Earley.

A.   Good afternoon.

Q.   I promise -- I promised the Judge I'd be short, so I can't get away from that.

I recall early in your testimony seemingly ages ago, you mentioned that -- I think it was in connection to providing access to DAVID from your -- for your employees, you mentioned that you would do that with employees you trust.  And then you mentioned that, you know, you trust all your employees; you wouldn't hire them if you wouldn't trust them.

So you would agree that trust is very important?

A.   Yeah.  On my employee base, yes.

Q.   Is trust also important for petition circulators?  Would you like to have trust in those individuals?

A.   Sure, I guess, yes.

Q.   Okay.

A.   Anybody doing business with us.

Q.   And if there was something that could be done that could increase your trust or confidence in the petition circulators, would you generally think that's a good thing?

A.   Sure.

Q.   And is -- in your mind is accountability a part of the trust calculation?

A.    Yes, yes.

Q.    And would you agree that a petition circulator providing identifying information such as the last four of the Social or driver's license number -- could that or does that contribute to accountability?

A.    Yes.  So the voter provides those numbers.  I think it makes a more exact match when we are doing the verification of the petition and declaring it valid.

Q.    Okay.  You've spoken a lot about verification fees and what -- and we looked at the spreadsheet to show how those were calculated.

      And this is the first year you've had to calculate those fees; correct?

A.    First year we've had to put all of this together as an overarching process.

Q.    With a brand-new system, with the petition system.

      And you mentioned that -- mentioned using new -- potentially using new systems, standardization.  Would you think that doing that could cut down on your office costs for doing that?

A.    Potentially, yes.

Q.    Okay.

A.    Yes.

Q.    And do you think gaining -- your office gaining experience in this new process, would that contribute to lowering costs?

A.    I think it would tend to, yes.

Q.    Okay.  Is it reasonable to expect that as time goes on your cost for verifying petitions could go down or would go down?

A.    I think that's reasonable, yes.

            THE COURT:  Hold on.

            MR. WERMUTH:  Objection.  Speculation.

            THE COURT:  Overruled.  You can asking him simply based on his past experience implementing new policies does it generally get cheaper as you go along.

            MR. STAFFORD:  That's correct, your Honor.

            THE COURT:  As framed, overruled.

            You can answer that question.

            THE WITNESS:  Yes.  And I think that's displayed by we went from 3.13 to 4.70 then back down to 4.15 as we had --

        (Reporter requested clarification.)

            THE WITNESS:  I'm sorry.  $3.13 to $4.70 for our projected cost and back down to $4.15 as we found some technological timesavers, I guess you would say, for this -- for this point, counting the number of pages.

BY MR. STAFFORD:

Q.    You mentioned -- you also talked a little bit about signature verification and the training that your employees go through.

        Is -- other than -- or other than that training, is there any way that you have to verify the accuracy of a signature

match for a particular petition?

A.    I'm not sure how to answer that.  I mean, we go through the training and we have a bank of signatures that we consider known goods.

Q.    Right.

A.    And so we look at that.  We occasionally might also look at DAVID, the signatures there.  We do that occasionally.

Q.    But there's no way, I guess, unless a voter comes to you and says, This is my signature, to absolutely verify whether this -- your signature match is correct?

A.    Yeah.  Without the training and without some kind of a basis -- somewhat uniform basis across the state, it would be potentially less accurate.

Q.    You mentioned -- you talked about providing notice to the voter if they have a signature match?

A.    Uh-huh.

Q.    Do you recall that?

A.    Yes.

Q.    And would -- and you also mentioned that you would prefer to be able -- or you would prefer if the law required that there be a notice for a mismatch; correct?

A.    Yeah, with a caveat that I understand that might be very difficult to do.  So really it's more of a focus on the invalids than the valids is really what I'm getting at.

Q.    And if you had a way to accurately notify somebody of a

signature mismatch, you could do that without a law requiring you to?

A.   Yes.

Q.   Okay.

A.   Frankly, we sometimes do.  If we -- in the past we've requested -- especially in the vote-by-mail world -- signature updates from the vote.

Q.   In fact, the way you did it on your own was what -- the way the State ended up requiring, if I'm --

A.   Kind of the cure process, basically, yes, yes.

Q.   And, finally, without the notice of a signature match, is there any way for a voter to know that there's been a petition submitted in their name?

A.   Not unless they called us up and asked us.

MR. STAFFORD:  I hope that was under five minutes or at least under ten.

THE COURT:  Thank you.  You get the gold star, Mr. Stafford.

Redirect.

MR. WERMUTH:  Yes.

REDIRECT EXAMINATION

BY MR. WERMUTH:

Q.   Is it fair to say that the State through HB 1205 has some requirements just as to statewide initiative petitions that it hasn't imposed on local and candidate petitions?

A.   Yes.

Q.   Okay.  And those make it more expensive to your office to validate statewide initiative petitions?

A.   Yes.

Q.   And the State directs you to pass along those actual costs to sponsors of statewide initiative petitions?

A.   Yes.

Q.   But the State doesn't direct you to pass those same costs on to other petitions?

A.   Like candidate petitions, you mean?

Q.   Yes.

A.   Correct.

Q.   And for those candidate petitions, your office can't charge more than 10 cents per petition; right?

A.   Correct.

Q.   Even though it costs more than 10 cents per petition to validate those other local-issue and candidate petitions?

A.   It likely costs a little bit more than that, yes.

Q.   And we just had a discussion about cost potentially going down in the future?

A.   Potentially.

Q.   Do the salaries in your office go down in the future?

A.   Generally, no.

Q.   Generally they go up; right?

A.   Correct, yes.

Q.   Substantially sometimes.

     And I believe Mr. Jazil asked you about when somebody is confused about application of the law, they can ask the Division of Elections for clarification; right?

A.   Yes.

Q.   They can ask them for a -- some guidance on --

     (Indiscernible crosstalk.)

A.   An advisory opinion.

Q.   Is there a deadline when they have to respond to you about that guidance?

A.   In the felon's world --

Q.   No --

A.   If who has to respond to who?

Q.   If the Division of Elections has to respond to a request for clarifications about the law.

A.   In the felon world there is a deadline.

Q.   Okay.

A.   I think for everything else probably not.

Q.   Okay.  And I think we saw an example here today in Exhibit 452 having to do with invalidation of petitions that were for inactive voters.

     Previously the --

A.   Sure -- are you talking about the email?

Q.   Yes.

A.   I don't remember what 452 -- okay.  Yes.

Q.   Yes.

So in that instance it was a situation where the original guidance was that you validate the petitions of inactive voters; right?

A.   Yeah, original guidance and long-time process, yeah.

Q.   And the Division just changed its mind; right?

A.   It was a sudden change.

Q.   And you had to go retroactively back in time and invalidate those petitions; correct?

A.   Correct.

Q.   And the sponsors of those petitions had to pay you verification fees for those petitions that were invalidated; right?

A.   I don't think we reassessed another additional fee for those.  I'm pretty certain we did not.  Maybe other counties -- I heard some talk that other counties were looking at doing that.  We did not reassess.

Q.   True.  I'm just saying in terms of the fact that they were charged a verification fee for what were petitions that you validated; correct?

A.   Yes.

Q.   And then those petitions were thrown out?

A.   Yeah.  So we charge -- we don't charge a validation fee; we charge a verification fee.  So they're billed whether the petition is deemed valid, invalid, misfiled, unknown, what have

you.

Q.   And we talked a bit about validation rates; right?

A.   Yes.

Q.   And apparently the invalidation rates in the context of initiative petitions are higher; right?

A.   Yes.

Q.   And it's -- these statewide initiative petitions are ones that have more failure points; correct?

A.   Correct.

Q.   So that could well explain the difference in the invalidation rate; right?

A.   Yeah.  That invalidation rate has been much higher for a long period of time, but I don't -- I can't say specifically that the invalidation rate has necessarily gone up or down now. I've seen some evidence both ways, but it seems roughly the same over time for initiative petitions, roughly the same.

Q.   And the staff you currently have now doing the verification process, they also verify the vote-by-mail petitions that you get back?

A.   Some of them do, yes.

Q.   Vote-by-mail ballots; right?

A.   Yes, some of them do.

Q.   And you send out -- you sent out between 40,000 and 80,000 of those in elections in the last three election cycles?

A.   Yes.

Q.   Okay.   Now, Mr. Jazil asked you about a number of complaints that were issued regarding circulators of -- or, actually, canvassers for third-party voter registration; correct?

A.   He asked me about that and then showed me examples of petition --

Q.   And showed you some petition examples?

A.   -- issues, yes.

Q.   In each of those instances, the submission that the person made was not validated; right?

A.   Correct.

Q.   You determined all of them to be invalid?

A.   We found problems and notified for fraud.

Q.   So you caught that.

     And I believe we also had a discussion about multipage petitions and the complexity of handling those petitions; right?

A.   Yes.

Q.   And, in fact, those complexities caused you to increase the petition validation fee in your county; correct?

A.   Yes.

Q.   Okay.   You're aware that FDH's petition is a single-page petition; right?

A.   Yes.

Q.   But they're being charged the same price as a

multipage petition?

A.   Yes.

Q.   And for candidate and local-issue petitions, you don't have to look much in DAVID because you don't have the requirement of having a driver's license or the last four of a social security number on those petitions; right?

A.   Correct.

MR. WERMUTH:  I have no further questions.

THE COURT:  You can step down.

Thank you.  Have a pleasant afternoon.

(Supervisor Earley exited the witness stand.)

THE COURT:  All right.  I need to relieve the court reporter, so let me find out, Is there anything quickly -- and I mean quickly -- that we need to address.

MR. WERMUTH:  I just have one housekeeping issue.

Apropos of our discussion about, you know, following up on the motion in limine issue and also on the OECS report issue, we're going to -- we would like to submit supplemental briefing by tomorrow evening for you and then potentially have oral argument on the matter on Thursday, if that would work.

THE COURT:  We can certainly do oral argument on the reports and the issue that I said I was deferring on.

With respect to the four exhibits that were introduced today, other than reiterating what I've already heard, what are we going to do?

MR. WERMUTH: I think we're evaluating that at this point. I don't think it would be extensive.

THE COURT: I'm going to -- let's -- it would be helpful -- you can submit, and I'll read it before we have a hearing. It's helpful on the reports, but let me say I've gone back and I've -- while y'all were talking, I've gotten the protective order; I've reviewed the motion in limine, and I can tell you that disclosed documents do not fall within the ambit of the protective order or the motion in limine.

I further find that it's relevant, and I've explained why I thought it was relevant.

I also find that it's -- the probative value is not outweighed by the prejudice. I particularly find that type of analysis to almost be borderline odd in the case of a bench trial as opposed to a jury trial in terms of my capacity to separate the wheat from the chaff.

As it relates to hearsay, I misspoke because I was trying to do four things at once when I kept conflating a public record from a business record. I know the difference between the two, but I find it's a public record. I'm well aware of case law discussing the public record exception and talking about the trustworthiness of the record and underlying data.

As it relates to those four exhibits, I am satisfied that it constitutes a public record and, therefore, those four exhibits that were previously conditionally admitted -- 656,

838, 836 and 794 -- are admitted.

(DEFENDANTS' EXHIBITS 656, 794, 836, AND 838:  Received in evidence.)

THE COURT:  Your objection's well noted.  You renewed your objection.  The question for me is going to be the reports and information related to the reports.

In terms of any heightened analysis beyond rational basis in those four exhibits, since I don't know whether they're valid or not or any other data, I'm not really sure how it would contribute to any meaningful analysis in that regard, and so I guess I'll entertain further argument on that point.  But I just -- I'm loath to understand -- I've got some complaints that were made and they were forwarded on -- how that informs the fact that there were or were not actual problems without investigation.  I'm not really sure what that adds or doesn't add, but if y'all want to be heard on that later, you can tell me.

MR. WERMUTH:  Thank you, Your Honor.

THE COURT:  All right.  Anybody need -- Mr. Jazil, do you need any clarification?

MR. JAZIL:  Your Honor, if you'd like to hear how, if at all --

THE COURT:  Oh, no.  You need to put on your listening cap.  I didn't say I wanted to hear anything else.

MR. JAZIL:  I just want to understand the question,

Your Honor.

So it's -- so if you're considering the supporting material in the OECS report, and you're applying a heightened standard --

THE COURT:  No, no.  Those reports I haven't even addressed.  What I just addressed were your four exhibits you just introduced.

MR. JAZIL:  Got it.

THE COURT:  And I said they're coming in.  I went through all the different objections and explained why they were coming in.  I said my only pause was the argument, Well, Judge, we didn't have an opportunity to potentially secure information.  We don't know, because we don't know if there was an investigation.

And my response was, I'm loath to understand how -- if I'm doing a heightened review analysis how -- just because there was complaints without more really does much with that, so I'm not even sure why I need to address it.  But if Mr. Wermuth wanted to be heard further on that, I would entertain it.

MR. JAZIL:  Understood, Your Honor.  And I do not want to be heard further on that.

Thank you.

THE COURT:  Okay.  Good answer.

DX 3 is still conditionally admitted because that's what we haven't addressed, and it's the only thing that I still

have a "C" next to it.

MR. WERMUTH:  Thank you.

THE COURT:  Well, I have a "C" next to the other ones, but consistent with my practice, there's an "X" through the "C" if somebody's trying to see what is or is not admitted.

I promised the court reporter -- I've just got one last thing -- if I could see -- and I'm not in any way limiting anybody's participation, but if I can see Mr. Wermuth and Mr. Jazil quickly.

(Following conference held at sidebar at 6:01 PM.)

THE COURT:  It needs to be on the record, but I don't want to make a big deal out of this in the courtroom.  But I've been getting text messages for the last couple of days and it just ramped up.

I don't need to get into gory details, but my father just got put on a morphine pump, and he's got hospice, and so things have escalated.  I'm just going to have to maybe take an occasional break.  I'm going to be -- he should survive until the weekend so I can see him and then get through the next couple of days of trial.

But just so it's clear, I may have to, depending on if I get an email or a text message, just call a halt.

MR. JAZIL:  Judge, absolutely, and we're happy to reschedule things.

THE COURT:  No, no, we don't need to reschedule.  I

just want to let everybody know because -- I don't want to make a big deal of it on the record, but if I get a text message and have to leave, that's why.

MR. JAZIL:  I'm sorry to hear that, Your Honor.

MR. WERMUTH:  I'm sorry to hear that, Your Honor.

(Sidebar concluded at 6:02 PM.)

THE COURT:  All right.  I will see everybody back at 8:30 in the morning.

Thank you.

(Proceedings recessed at 6:02 PM on Tuesday, February 10, 2026.)

* * * * * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. Any redaction of personal data identifiers pursuant to the Judicial Conference Policy on Privacy is noted within the transcript.


/s/ Megan A. Hague                    2/10/2026

Megan A. Hague, RPR, FCRR, CSR          Date
Official U.S. Court Reporter

**I N D E X**

PLAINTIFFS' WITNESSES                                PAGE

JUAN ARDILA
Direct Examination By Ms. Gambhir                     345
Cross-Examination By Mr. Jazil                        379
Cross-Examination By Mr. Stafford                     391
Redirect Examination By Ms. Gambhir                   393

PLAINTIFFS' WITNESSES (cont'd.)                          PAGE

RAMON PEREIRA BONILLA
Direct Examination By Ms. Grady                          398
Cross-Examination By Ms. Hardy                           422
Cross-Examination By Mr. Jazil                           433
Redirect Examination By Ms. Grady                        436

HUMBERTO ORJUELA PRIETO
Direct Examination By Ms. Bennette                       440
Cross-Examination By Mr. Stafford                        449
Redirect Examination By Ms. Bennette                     452

MARK EARLEY
Direct Examination By Mr. Wermuth                        455
Direct Examination                                       519
Cross-Examination By Mr. Jazil                           536
Cross-Examination By Mr. Moore                           595
Cross-Examination By Mr. Stafford                        636
Redirect Examination By Mr. Wermuth                      640

# **E X H I B I T S**

| PLAINTIFFS' EXHIBITS | OFFERED | RECEIVED |
|---|---|---|
| FDH-143 | 486 | 486 |
| FDH-146 | 508 | 508 |
| FDH-147 | 515 | 515 |
| FDH-452 | 513 | 513 |
| FDH-595 | 498 | 498 |

| DEFENDANTS' EXHIBITS | OFFERED | RECEIVED |
|---|---|---|
| 3 | 580 | 580 |
| 656 | 648 | 648 |
| 794 | 648 | 648 |
| 836 | 648 | 648 |
| 838 | 648 | 648 |