**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

FLORIDA DECIDES HEALTHCARE, INC,)
et al.,                         )
                                )
            Plaintiffs,         ) Case No: 4:25cv211
                                )
        v.                      ) Tallahassee, Florida
                                ) February 9, 2026
CORD BYRD, in his official      )
capacity as Secretary of State  )
of Florida, et al.,             )
                                )
                                ) 8:33 AM
            Defendants.         ) Volume I
_____ )

**TRANSCRIPT OF BENCH TRIAL PROCEEDINGS**
**BEFORE THE HONORABLE MARK E. WALKER**
**UNITED STATES CHIEF DISTRICT JUDGE**
**(Pages 1 through 337)**

Court Reporter:           MEGAN A. HAGUE, RPR, FCRR, CSR
                          111 North Adams Street
                          Tallahassee, Florida 32301
                          megan.a.hague@gmail.com

          *Proceedings reported by stenotype reporter.*
      *Transcript produced by Computer-Aided Transcription.*

**APPEARANCES:**

**For Plaintiffs Florida Decides Healthcare:**

King Blackwell Zehnder & Wermuth PA
By:  FREDERICK STANTON WERMUTH
     Attorney at Law
     fwermuth@kbzwlaw.com
25 East Pine Street
Orlando, Florida 32801

Elias Law Group
By:  BEN STAFFORD
     Attorney at Law
     bstafford@elias.law
1700 Seventh Avenue
Suite 2100
Seattle, Washington 98101

Southern Poverty Law Center
By:  AVNER MICHAEL SHAPIRO
     KRISTA A. DOLAN
     Attorney at Law
     avner.shapiro@splcenter.org
     krista.dolan@splcenter.org
3710 Raymond Street
Chevy Chase, MD 20815

Elias Law Group
By:  HARLEEN K. GAMBHIR
     Attorney at Law
     hgambhir@elias.law
250 Massachusetts Avenue
Suite 400
Washington, DC 20001


**For Intervenor Plaintiff Safe & Smart:**

Stearns Weaver Miller
By:  GLENN BURHANS, JR.
     HANNAH E. MURPHY
     CHRISTOPHER R. CLARK
     Attorneys at Law
     gburhans@stearnsweaver.com
     hmurphy@stearnsweaver.com
     crclark@stearnsweaver.com
106 East College Avenue
Suite 700
Tallahassee, Florida 32301

**APPEARANCES (cont'd):**

**For Intervenor Plaintiff League of Women Voters of Florida:**

Democracy Defenders Fund
By:   SPENCER KLEIN
          Attorneys at Law
pooja@statedemocracydefenders.org
spencer@statedemocracydefenders.org
600 Pennsylvania Avenue SE
Unit 15180
Washington, DC 20003

Winston & Strawn, LLP
By:   GEORGE E. MASTORIS
          Attorney at Law
gmastoris@winston.com
200 Park Avenue
New York, New York 10166

**For Intervenor Right to Clean Water:**

Campaign Legal Center
By:   ROBERT BRENT FERGUSON
          HEATHER JEAN SZILAGYI
          ELLEN MARGARET BOETTCHER
          Attorneys at Law
          bferguson@campaignlegalcenter.org
          hszilagyi@campaignlegalcenter.org
          eboettcher@campaignlegalcenter.org
1101 14th Street NW
Suite 400
Washington, DC 20005

**For Defendant James Uthmeier:**

Florida Attorney General's Office
By:   WILLIAM STAFFORD, III
          SARA SPEARS
          Attorneys at Law
sara.spears@myfloridalegal.com
william.stafford@myfloridalegal.com
119 South Monroe Street, Suite 500
Tallahassee, Florida 32301

**APPEARANCES (cont'd):**

**For Defendant Cord Byrd:**

        Holtzman Vogel Baran, et al.
        By:  MOHAMMAD O. JAZIL
            MARTIN C. WOLK
            RANDALL M. RABAN
            Attorneys at Law
            mjazil@holtzmanvogel.com
            mwolk@holtzmanvogel.com
            rraban@holtzmanvogel.com
        119 South Monroe Street, Suite 500
        Tallahassee, Florida 32301

        Florida Department of State
        By:  ASHLEY DAVIS
            General Counsel
            ashley.davis@dos.myflorida.com
        R.A. Gray Building
        500 South Bronough Street
        Tallahassee, Florida 32399

**For Defendant Intervenors Republican Party:**

        Shutts & Brown, LLP
        By:  TARA PRICE
            BENJAMIN GIBSON
            Attorneys at Law
            tprice@shutts.com
            bgibson@shutts.com
         215 South Monroe Street
        Suite 804
        Tallahassee, Florida 32301

**For Defendant Supervisors of Elections:**

        GrayRobinson PA
        By:  ANDY V. BARDOS
            JAMES T. MOORE JR.
            Attorneys at Law
            andy.bardos@gray-robinson.com
            tim.moore@gray-robinson.com
        301 South Bronough Street
        Suite 600
        Tallahassee, Florida 32301

**P R O C E E D I N G S**

(Call to Order of the Court at 8:33 AM on Monday, February 09, 2026.)

THE COURT:  We are on the record in Case Number 4:25cv211.  We are here for a bench trial.

To let everybody know, we replaced the microphone system in the courtroom, and it's -- we are having some issues, so bear with us.

Let me -- I'm loath to ask, but let me find out.  Is there something we need to take up before plaintiff calls its first witness?

MR. WERMUTH:  Yes, Your Honor.

Fritz Wermuth for the Florida Decides Healthcare plaintiffs.

We do have our list of witnesses that we have set out for today at ECF 622, but we have an issue of the OECS reports that we filed a brief on last Wednesday.  It's --

THE COURT:  Why do I need to decide that now?

MR. WERMUTH:  You actually do not.

THE COURT:  I don't.  Call your first witness.

MR. WERMUTH:  Okay.

Well, we do have a couple of preliminaries, though.  I know that we've been in discussions with Mr. Jazil, and he's agreed that the testimony at the preliminary injunction hearing should be, basically, part of it -- the trial record, and so the

Florida Decides Healthcare plaintiffs will be submitting Dr. Acosta as our first witness.

THE COURT: Are we going to repeat any of that testimony?

MR. WERMUTH: That's not our intention. So the intention is to give you the testimony that she had -- that she gave before and focus on updates, and I believe the same is true of the -- of the other plaintiffs who have had witnesses testify in the previous preliminary injunction.

THE COURT: I'll do my best. I've started a -- there were several thousand -- a couple of thousand pages of depos, and I realized there -- not every word was highlighted, but I'm doing my best to get through those. And, obviously, I'll have to go back through the transcript as well.

I understand that there was something filed at the appellate level that said, Let's don't reach the issues of the merits of the preliminary injunction. Let's punt to Judge Walker.

It's interesting that one judge can digest thousands of pages and have a bench trial easier than three judges can review my preliminary injunction order, but be that as it may, I'll do my best to review the voluminous record.

MR. WERMUTH: And in terms of the designations, because of this issue with the OECS reports, some of those decisions are in the form of a proffer. So they are being

conditionally offered. And we can specify those to you Your Honor.

THE COURT: Okay. We can do this later. What I don't want to do is get too bogged down in that right now.

What I want to do is get some evidence on, and then later in the day we can, perhaps, do that. It just seems to me that we don't need to do that immediately.

MR. WERMUTH: Yeah.

THE COURT: Although, let me -- I do want a preview from Mr. Jazil.

Mr. Jazil, are you arguing that the reports come in or that all the underlying data and appendices come in?

MR. JAZIL: Your Honor, I've argued that the reports come in. For the appendices and the data I have separate arguments that I can address at the appropriate time, if it's now or later.

THE COURT: So you believe those come in as well?

MR. JAZIL: As a record of the fact that we received complaints, yes, not for the truth of the underlying facts in the complaints.

THE COURT: Well, doesn't the report itself indicate you received complaints?

MR. JAZIL: Yes, Your Honor, it does.

THE COURT: So why, then, does including all the underlying data -- wouldn't it be cumulative to have the

underlying data consistent with that?  I mean, isn't that the whole point of having a report, to summarize what you got and what the findings were?

MR. JAZIL:  Fair point, Your Honor.  That is correct. To the extent that Your Honor finds it to be cumulative, we don't need to have it in.

THE COURT:  Cumulative only if it's being offered for that limited purpose and, in fact, reports were received.  And, of course, if somebody said no reports were received, then suddenly they become more relevant, but that would be a different issue.

MR. JAZIL:  Sure, Your Honor.

And what I'd like to do with my case-in-chief is to talk about some of the individual complaints that were received, talk about what actions were taken by the department and others after receiving those complaints.  So I think those would be nonhearsay purposes for the individual bits of the report.

THE COURT:  Turning to Mr. Wermuth since -- and we are not going to have a -- I just sort of want to be thinking about it.

So like, for example, I read the deposition which was filed from the Attorney General's office where y'all questioned witnesses and drilled down on -- questioned the witness and drilled down on, Well, these people -- how do you know, for example, this person wasn't a resident?  They may have been a

resident at the time you arrested them.  They moved to Montana after the alleged acts that gave rise to the criminal case. There were noncitizens and so forth.  So y'all drilled down on the underlying data.

As I understand your position is, Judge, we did that because we didn't know if you were going to allow the reports in.  If you don't allow the reports in, then we wouldn't be pursuing that.  If you did, we would.

Is that --

MR. WERMUTH:  Yeah, if you allowed the reports in, we would be drilling down on some of these issues to demonstrate, basically, the complaint didn't result in the sort of problem that the OECS report made it out to be in the --

THE COURT:  And the remedy isn't tailored to address the problem.

MR. WERMUTH:  That's true.

THE COURT:  That's assuming it's subject to heightened scrutiny rather than rational basis.

MR. WERMUTH:  But I think at the same time, Your Honor, you know, the fact that the reports were made or complaints were made -- you know, if we're dealing with a rational basis test, I don't think you need to have all of 900 pages of complaints.

THE COURT:  Well, the only reason why I'm asking about the underlying data is since y'all were going through person by

person and a handful of prosecutions, it seemed to me y'all were going -- so, Judge, if -- I guess this is my question:  If I'm allowing the reports in under 803(8), are you -- you still believe that the underlying data should be kept out; correct?

MR. WERMUTH:  I do.  And it's because the -- the defendants have produced to us, basically, some records of prosecutions of a limited number of individuals, and, otherwise, they claim privilege over that.  This gets to our motion in limine.

THE COURT:  Well, I read that what they did is they claimed privilege over pending investigations; correct?

MR. WERMUTH:  Pending investigations, yes.

THE COURT:  And then they -- and I read the depo.  But then they answered questions about those prosecutions that were complete --

MR. WERMUTH:  Yes.

THE COURT:  -- up to and including this person got probation; this person pled to this; what were they charged with.  There were 105 petitions associated with the person, but only ten counts.

I mean, I read the depo.  I know it's a crazy thought, but I actually do read the stuff that y'all submit.  I'm quite confident that the three-judge panel will read all the documents in the case and every word of every depo as well when they decide that -- to disregard my findings of fact.

But you're going to rely on, Judge, we don't believe the underlying data.  We're going to be relying on that.  So it comes down to, Are you going to let any of it in?  And if you allow the reports in, you're going to allow the underlying data in.  Correct?

MR. WERMUTH:  Yes.

THE COURT:  All right.  We might as well do this now since I've just spent ten minutes doing it.

MR. WERMUTH:  Well, in terms of timing, Your Honor, the first witness that would be affected by this issue is Dr. Herron, and he's anticipated to testify on Wednesday.

So for him, it's a question of whether we are going to proffer all of the reasons the OECS reports are untrustworthy, and if the Court rules that the OECS reports don't come in, his testimony would be, like, 15 minutes, but, otherwise, chapter and verse of how many ways the OECS report is untrustworthy, then it's going to take a little bit longer.

THE COURT:  Well, you certainly can make a proffer as to why it's trustworthy.

I do have to say when we start off with the assumption that there's a statutory requirement to generate reports and we start with the assumption that the government is acting in bad faith, is there going -- what's the evidence -- just give me a brief proffer now.  What's going to be the type of evidence we are relying on that the government was acting in bad faith when

pursuant to Section 97.022(7) they were generating these reports?

MR. WERMUTH:  Well, the -- I can take you through my argument, if you want to go ahead.

THE COURT:  Just generally.  It helps me so that -- when I hear the proffer later.  And I read your papers, but I want to make sure I understand exactly what you are arguing.

MR. WERMUTH:  The issue with the report is -- this is primarily focused on the interim report, which is a one-off report that was prepared.  It's not prepared pursuant to the annual -- the annual issue of issuing a report.  It doesn't include factual findings.  All it is is preliminary in nature.  That's all of the remit of -- the OECS has.  All they do basically is refer accusations and complaints to the law enforcement or the Office of Statewide Prosecution.

THE COURT:  Wouldn't that be relevant for purposes of rational basis review?  It doesn't mean that it's rational; it doesn't mean that you automatically lose, but if information submitted up the food chain, doesn't it matter enough, or no?

MR. WERMUTH:  Well, I think at that point it's a question of these reports are extremely long, and these reports include matters relating to all different things.  And in this instance we have -- if you're -- if just the point is that complaints were made, that can be made quite simply without dumping into the record a mass of complaints of -- you know, of

ambiguous nature that we don't know what they -- what they cover; we don't know what the resolution was.

You know, the only resolution we really know is in the 20-odd cases where there's been a judgment against an individual for fraud in a specific context, and that's it.

THE COURT:  I think I understand your position.

Mr. Jazil, we're not -- I'm not ruling on it now, but anything else you want to add just so that we frame the issue?

MR. JAZIL:  Yes, Your Honor, just a couple of points to frame the issue.

Number one, Your Honor, DX1 is HB 1205 itself, the whereas clause --

(Reporter asked for clarification.)

MR. JAZIL:  DX1, Defendants' Exhibit 1, is House Bill 1205, the whereas clause of the report -- of the bill mentioned the report.  So that goes to our nonhearsay purpose.  The Legislature got these reports and did something about it.

Second, Your Honor, these reports --

THE COURT:  So the answer to my first question was, Judge, that regardless of what they want to do in terms of challenging them, if they got them and they relied on them, if there's any rational basis review, it would be properly in front of you?

MR. JAZIL:  Yes, Your Honor.

And, Your Honor, 803(8), both subsections, the

compendium of the reports made pursuant to an obligation, as you point out, 97.022(7), we have an obligation to do this.

The reports also go to the Governor, the Senate President and the House Speaker, so the underlying assumption on untrustworthiness will come down to, Hey, we're lying to the three most important politicians in the state, and, Your Honor, that cuts against the presumption of good faith that applies.

The reports --

THE COURT: Which appears to be a nonrebuttal presumption in the Eleventh Circuit, but go ahead.

MR. JAZIL: Well, Your Honor, Judge Oregon and I had this colloquy in an argument. I am sensitive to the fact that the presumption as it's been stated is a difficult one to overcome, but that is what the Eleventh Circuit has said. And then the *Skrmetti* case -- pardon me -- the *Alexander* case and the U.S. Supreme Court has doubled down on this notion of presumption being a very strong one.

So, Your Honor, I would say that the --

THE COURT: Or it may just turn on whose ox is being gored, but go ahead.

MR. JAZIL: So, Your Honor, those are my principle points. And then the reports themselves, to the extent that they reference actually individual complaints from the Supervisors, those were done pursuant to the Supervisors' obligations to create these records, send them over to OECS.

Or they were done pursuant to FDLE's obligations to have these complaints and send them over to OECS and OECS combined them.  There's nothing that says that one government agency can't rely on the work of another government agency as part of its reports.  Otherwise, after an airport -- after an airplane crash, the NTSB can rely on what the FAA did, and that's just not the law.

So, Your Honor, one, nonhearsay purpose; two, to the extent there is a hearsay purpose, I believe we fall under the exceptions under 803(8), both subparts.

MR. WERMUTH:  Your Honor, I can take you through again chapter and verse as to why Mr. Jazil's arguments are incorrect under the -- under controlling law in the Eleventh Circuit.  But the point is is that if HB 1205 is where Mr. Jazil started, if it says that they relied on OECS reports and the preliminaries of the statute or the whereas clauses, then what's the need of actually seeing the reports?  I mean, if we're talking about rational basis review, kind of what do you need, I mean?

THE COURT:  Well, because if -- there may be other --

MR. WERMUTH:  Yeah.

THE COURT:  I mean, your argument is it's not subject to rational basis review; correct?

MR. WERMUTH:  It's not subject to that.  But I'm saying it would be irrelevant in that instance, but at the -- at the point that we're dealing with, the trustworthiness of the

report --

THE COURT:  Well, the details of the report become more relevant if it's subject to a heightened review; correct?

MR. WERMUTH:  The details of the report become very clearly hearsay problems that are -- I mean, right now the details of the report are -- if Mr. Jazil wants to bring in evidence of crimes, he can bring in evidence of crimes without bringing in this OECS report that basically is a report of matters that the OECS doesn't do.

It doesn't do investigations.  It doesn't do prosecutions.  And so this isn't a document prepared by an organization with the legal duty to prepare, you know, these sorts of investigations.

THE COURT:  Well, there's a difference between whether they have a legal duty to prepare the report versus is this the type of report and investigation they typically conduct.  I think those are two very different things, but --

MR. JAZIL:  Your Honor, if I may, a couple of points. I hear my friend making arguments about OECS's limitations and how Dr. Herron's going to point out the limitations.  To me, that goes to weight, not admissibility, number one.

Number two, to the extent that intermediate scrutiny applies, I hear the argument --

THE COURT:  Well, he's saying it only goes to inadmissibility.  He says it goes to inadmissibility insofar as

it would suggest that it's less trustworthiness, which is part of the analysis; correct?

MR. JAZIL:  It is, Your Honor.

THE COURT:  I'm not saying you lose, but it is part of the analysis.

MR. JAZIL:  It is, Your Honor.  And I'm saying it goes to weight; it doesn't go to admissibility at the end of the day because --

THE COURT:  But if you decide -- your point is, Judge, you could decide that it satisfies the trustworthiness such that it comes in, but then it becomes a weight argument after that?

MR. JAZIL:  Yes, Your Honor.

And second, Your Honor, the other side has filed a motion in limine to say that intermediate scrutiny applies and so we should be limited to whatever material was before the Legislature, which is what the *Brumby* case from the Eleventh Circuit said.

(Reporter requested clarification.)

MR. JAZIL:  *Brumby*, B-r-u-m-b-y.

And, Your Honor, if some level of heightened scrutiny applies, then the reports become more important, not because of the truth, but because whatever they said is what the Legislature had before it as it was crafting the bill.  So when you're applying some version of heightened scrutiny --

THE COURT:  So I guess I got something right when I

said that a minute ago, that it becomes more relevant?  I thought I just said that a few minutes ago.

MR. JAZIL:  Yes, you did, Your Honor.  And so my point is it becomes more important under their paradigm, their preferred paradigm, and so I think that's critical.

And, finally, the third point, Your Honor, is this: As a practical matter, this is a bench trial, My clients have every interest in making this go quickly.  And to the extent that Your Honor has the reports in evidence and Your Honor does not find them to be terribly insightful, that'll be reflected in the order, and we'll live with that.

That's all I have, Your Honor.

MR. WERMUTH:  Well, Your Honor, as I said --

THE COURT:  Mr. Wermuth wants me to exclude them so the Eleventh Circuit remands for me to reconsider it in light of the reports.

Go ahead, Mr. Wermuth.

MR. WERMUTH:  Well, or just I -- I invite you not to take Mr. Jazil's opportunity to put a whole bunch of information into the record and argue it afresh at the Eleventh Circuit.

MR. JAZIL:  And, Your Honor, recognizing, again, this is a bench trial, if my friends are open to this, I am willing to withdraw every objection I have, with the exception of the declaration to the deposition, and let's just get on with the testimony so --

THE COURT: I'm not going to require either side to do that, although I was going to -- and I'll go ahead and do it now. I've now done exactly what I said I wasn't going to do.

But there are a lot of, like, relevance, for example, objections. And I can tell y'all that if this were a jury sitting over here, I would agonize over relevance objections and 403 objections. I can tell you for a bench trial I'm not. And if the Eleventh Circuit wants to come back and tell me I was wrong, they can certainly tell me I'm wrong.

But as it relates to relevance and 403 objections, chances are I'm going to allow it in and say I can separate the wheat from the chaff and so can the Eleventh Circuit. So I did want to give y'all that as some guidance. That doesn't mean everything comes in. I'm not requiring y'all to agree to admit everything. There's going to be certain, I understand, pitched battles over, like, the reports and so forth.

But I would encourage y'all to focus on the materials that you truly think should not properly be considered by this Court or the Eleventh Circuit as opposed to things on the margin based on 403 or relevance, because I can tell you right now, as a bench trial it's going to -- if it's 403 and relevance, it's going to come in and I can review it.

I can consider your closing arguments, and any panel on the Eleventh Circuit certainly can consider whether they should dismiss voluminous materials as irrelevant as well. But

I just -- that's my guidance to you on that point.  But, again, I'm not demanding that y'all en masse admit everything.

And I can also tell you my general view of 803(8) is just because you get in the report on the plane crash or just because you get in the report on the maritime accident doesn't mean every interview and every document that was ever introduced in any case file comes in wholesale.

But that's -- I'm not -- that's just my general view of 803(8).

Doesn't mean that you don't do the initial evaluation, Mr. Wermuth, of whether or not it passes muster and the report comes in under 803(8); whether the underlying data comes in is a different issue.

I guess that's as much guidance as I can give you at this point.  I'll hear y'all's proffer on the OECS reports later and I'll rule on that, but it helps at least get a preview from both sides as it relates to that issue.

MR. JAZIL:  Your Honor, would you like a written filing on that, or are we okay with the arguments made just now?

THE COURT:  I'm okay with the arguments y'all are making.  If you want to file something else on the record, you can file something else on the record.

Let me also make clear, I'm not going to limit anybody -- I've already said that I'm not artificially limiting what you can file in your closing arguments.  There's a lot of

material here.  I did encourage y'all to edit what you submit to the Court.  I, as a general rule, find mental diarrhea on a paper is not particularly helpful to the Court or any reviewing court, so I'd edit it, but I'm not artificially limiting you in that regard.

And same thing here, anybody that ever wants to file any sort of written memorandum during the course of these proceedings, have at it, and I'm not going to limit you in what you want to put on the record; okay?

MR. JAZIL:  Your Honor, also the defendants on my side have conferred, and we'd like to invoke the rule of sequestration under Rule 615 and the added instruction under subpart (b) that says that witnesses shouldn't have access to the trial record at the end of the day.

MR. WERMUTH:  I think that's fine, except for our corporate representative, Mitchell Emerson, I imagine would be excluded.

THE COURT:  Well, the rule of sequestration has been invoked.  Everybody knows what that means.  You need to instruct your witnesses.  I don't know who the witnesses are, so you need to make sure that if somebody comes in, you ask me for a brief pause so we can get them out of the courtroom.  So have the witnesses leave.  If anybody violates the rule, they could be subject to sanctions up to and including having their testimony struck.

Further, they're not to read the transcript or discuss the testimony, so you can't do it either way, either directly or indirectly, during the course of the proceedings until after they have testified and are no longer going to be recalled.

MR. JAZIL:  Thank you, Your Honor.

MR. WERMUTH:  Okay.  And the folks at Right to Clean Water have a couple of preliminaries they'd like to cover.

THE COURT:  Okay.

MR. WERMUTH:  I believe having to do with just the offering of PI -- preliminary injunction testimony into evidence.

THE COURT:  Well, let me, number one, verify:  Does everybody on the plaintiffs' side, if you -- I want to do this easier because I'm not going to spend a week doing roll calls. So the easier way to do it is I'm going to do each side, and raise your hand -- I know this is not school.  I'm not treating you like you're, you know, in elementary school, but it's just going to be the easiest way to do it.

With issues like this, does everybody on the plaintiffs' side agree that the testimony from the preliminary injunction hearing is admitted?  If you don't, raise your hand.

I saw no hands being raised on the plaintiffs' side.

And you're holding something, Mr. Wermuth.

MR. WERMUTH:  Oh, no.  I was just --

THE COURT:  I thought you were offering the transcript

into evidence or something.  It should already be on the docket; correct?

MR. WERMUTH:  I would like to offer you some case law for the argument that we're going to do later, but we can do that.

THE COURT:  Certainly.

That's why I said we're doing a preview.  I want to know what the sides' arguments are and then we'd revisit it. But I also don't -- we've got witnesses here and a courtroom full of people.  I shudder to think how the billable hour wheel is turning right now.

So the record's clear, I had -- the gallery's completely packed with lawyers so you can -- is that case law that you want to offer for that later, because, obviously, I'm going to listen to the testimony.  I'll have to read it either at lunch or this evening along with the 2,000 pages of depositions that I'm trying to get through.

MR. WERMUTH:  Yes, Your Honor.

THE COURT:  Let me hear from the defense side. Anybody on the defense side object to the testimony from the preliminary injunction hearing being made part of this record so that we are not going to repeat that information?

MR. JAZIL:  Your Honor, my understanding is everyone on the defense side agrees with that.

Also, Your Honor, we read Rule 65(a)(2) as allowing

for some of exhibits that were properly admitted and would have been admitted at trial to also come in.  This was the appearance card from Ms. Cecile Scoon.

THE COURT:  Well, the question is, is it the testimony as well as all exhibits that were introduced at the hearing that both sides want introduced?

MR. JAZIL:  Your Honor, as I read Rule 65(a)(2), anything properly admitted that would have been admitted at trial comes in.  So it would include the one exhibit that was admitted under seal, which was Ms. Scoon's appearance card at Florida Decides.

THE COURT:  Mr. Wermuth.

MR. WERMUTH:  I'm just standing up.

THE COURT:  Do you disagree that it's the exhibits as well?

MR. WERMUTH:  Agreeing that it's the exhibits, yes. Particularly the one that Mr. Jazil --

THE COURT:  All right.  So both sides agree it's the testimony and exhibits admitted at the preliminary injunction hearing.  Nobody has said anybody to the contrary.

MR. JAZIL:  Your Honor, just to be clear, the exhibits that would have been admitted at trial.  So at the PI stage, Your Honor took in declarations, for example.  Those wouldn't be admissible at trial, but Your Honor also took in --

THE COURT:  No, I wasn't saying -- because the

declarations were not --

I get it.

MR. JAZIL:  Yeah.

THE COURT:  I was -- I should have clarified.  I meant anything that would have otherwise been admissible that I admitted and heard.  But the declarations are something that would be rank hearsay that would not otherwise be admissible, but was under *Levy* admissible at a preliminary injunction hearing.  Everything else is admitted.

Do you agree, Counsel?

MR. WERMUTH:  I agree.

THE COURT:  All right.  Sorry.  I was trying to get forward.  I think we were all saying the same thing, I just could have been more specific.

MR. JAZIL:  And I apologize for misunderstanding, Your Honor.

THE COURT:  No worries.

MR. WERMUTH:  Ready for our first witness?

THE COURT:  Wait, I thought you said Smart & Safe -- I'm sorry -- right to Clean Water had something to say.

MS. SZILAGYI:  Your Honor, Heather Szilagyi, Right to Clean Water plaintiffs.

We just wanted to note for the Court and for everyone's awareness, that understand the rule and sequestration has been invoked, and we have our corporate representative here

on behalf of Right to Clean Water, and happy to give the name if it needs to be designated.

THE COURT:  Does defense wish to be heard on the corporate -- the corporate reps I was going to allow in.

MR. JAZIL:  No, Your Honor, we don't wish to be heard on that.

THE COURT:  All right.  Without -- that goes for all the plaintiffs and -- the corporate reps for the plaintiffs can be in the courtroom.

Okay.

So let me find out, anything else I need to hear from the League before we move forward?

MR. MASTORIS:  Your Honor, with respect to the declarations, we were trying to avoid any duplication of the information which is contained in the declarations that were attached to the summary judgment opposition.  I understand now those are to be out and we have to call those witnesses live.

THE COURT:  Well, anything in summary judgment is not in front of me.  They were talking about the preliminary injunction hearing and declarations.  But we took testimony. But if you are saying if there was something that was in a declaration that was not covered through the testimony, then the declarations are not in.

However, if it's somebody testified and -- for example, Ms. Scoon testified, but she also had a declaration.

So I'm not -- if there is something in her declaration that wasn't cover in the testimony I'm -- I can't recall -- it's been so long ago.  But the declarations themselves are not in front of me.

MR. MASTORIS:  Okay.  That's fine, Your Honor.  We understand that.

With respect to the declarations that came in on summary judgment, though, those are in front of you?

THE COURT:  No, nothing that was in summary judgment is in front of me --

MR. MASTORIS:  Okay.

THE COURT:  -- until you put it in front of me.

MR. MASTORIS:  Okay.  Thank you, Your Honor.

THE COURT:  Anything from Smart & Safe?

MR. BURHANS:  No, Your Honor.  Thank you.

THE COURT:  All right.  So that's the four plaintiffs.

Any other housekeeping matters from defense counsel before we move forward?

MR. JAZIL:  No, Your Honor.  Thank you.

THE COURT:  All right.  Thank you.

All right.  So let me find out -- I've got an email list starting with Acosta.

Are those still the witnesses you are calling in that order?

MR. WERMUTH:  Yes, Your Honor.  Florida Decides

Healthcare plaintiffs is calling first Dr. Acosta, and Ms. Dolan is going to be doing the questioning of the witness.

THE COURT:  All right.

You may call your first witness.

MS. DOLAN:  Good morning, Your Honor; Krista Dolan on behalf of Florida Decides Healthcare.

THE COURTROOM DEPUTY:  Raise your hand.

**ANA-CHRISTINA ACOSTA GASPAR DE ALBA, PLAINTIFFS' WITNESS,**

**DULY SWORN**

THE COURTROOM DEPUTY:  Please state your name for the record.

THE WITNESS:  Ana-Christina Acosta Gaspar De Alba.

I'm happy to spell that for you.

THE COURT REPORTER:  The last name, for sure.

Yeah.  Acosta, A-c-o-s-t-a, space, G-a-s-p-a-r, space, D-e, space, A-l-b-a.

MS. DOLAN:  Your Honor, Dr. Acosta was the organizing director for FDH and oversaw volunteer operations.  Her testimony will go to Counts One through Three of our operative complaint.  And I'll provide guideposts throughout.  We'll be starting with background which will provide foundational testimony for all counts.

And as we just handled, the PI testimony has been admitted.  I will try and streamline as much as possible, but I did want to refresh the Court's memory and lay a little bit of

foundation, but I have streamlined any PI testimony as much as possible.

Direct Examination – Dr. Acosta

DIRECT EXAMINATION

BY MS. DOLAN:

Q.    So good morning, Dr. Acosta.

Were you previously employed by Florida Decides Healthcare?

A.    Yes.

Q.    And if I call Florida Decides Healthcare, "FDH," will you understand?

A.    Yes.

Q.    What were the dates of your employment with FDH?

A.    March of this year through -- sorry -- March of last year through October of last year.

Q.    All right.  March of October of 2025 through October of 2025.

And while you were employed with FDH, what was your position?

A.    I was the organizing director.

Q.    What were the primary responsibilities of your position?

A.    Primarily I was responsible for all of our volunteer activities, working with all of our coalition partners, coordinating our hubs, but I was also involved at a broad level with pretty much every aspect of our campaign.

THE COURT:  Counsel, if I could, let me interrupt.  I

forgot to add with housekeeping matters, there were two more pro hac vice motions, Powers and Clark. Those are background posted and granted. So to the extent Attorneys Powers and Clark intend to speak, they have been admitted pro hac vice.

Counsel, you may proceed.

MS. DOLAN: Thank you, Your Honor.

BY MS. DOLAN:

Q. Where were you based while in that position?

A. I was in Orlando.

Q. And, very briefly, what positions did you hold prior to FDH?

A. I've held a number of organizing and campaign positions. Most recently previous to this was the Harris-Walz campaign. I was the deputy organizing director. I worked for the Biden campaign, Human Rights campaign, Palm Beach Democratic Executive Committee.

Q. In addition to paid work --

(Reporter requests clarification.)

BY MS. DOLAN:

Q. In addition to paid work, have you worked with ballot initiative campaigns in a volunteer capacity?

A. Yes.

Q. How many ballot initiatives in either paid or volunteer capacity over the course of your career?

A. Roughly half a dozen.

Q.    And which of those positions, your prior positions, were based in Florida?

A.    All of them.

Q.    And all the ballot initiatives that you've worked, were those also in Florida?

A.    Yes.

Q.    Have you ever circulated petitions before?

A.    Yes.

Q.    For how many campaigns?

A.    Probably almost all of those, so maybe five out of the six.

Q.    As part of your role with FDH, how often did you speak with volunteers about circulation?

A.    On a daily basis, seven days a week.

Q.    I want to discuss several topics with you:  FDH's 2026 campaign launch, your operations before and after 1205, the impact of 1205 on the FDH's campaign, and the decision to suspend the campaign.

A.    Okay.

        MS. DOLAN:  Your Honor, Dr. Acosta will next testify about FDH's 2026 campaign launch, which goes to Counts One through Three of the operative complaint.

BY MS. DOLAN:

Q.    First, what is FDH?

A.    So Florida Decides Healthcare is a political committee formed specifically to pass this ballot initiative.

Q.   How could you describe its mission?

A.   Like I said, the primary and really the sole mission is to get this ballot initiative passed.

Q.   And is FDH currently seeking to place its proposed amendment on the ballot?

A.   So the '26 campaign was suspended.  The '28 campaign just began this month.

Q.   Let's discuss the '26 effort.

A.   Okay.

Q.   When did FDH launch it's 2026 campaign?

A.   So the campaign would have launched at the beginning of the cycle, so that would have been February of 2024.

Q.   Can you describe what the 2026 effort involved?

A.   Sure.  So, the campaign, like I said, started February of 2024.  It really did not heat up until the next year.  That's pretty typical for a grassroots campaign like ours.  We were running a pretty robust volunteer program to collect petitions prior to HB 1205, distribute them after.  We also launched paid circulators, hired campaign staff, started fundraising.

Q.   You mentioned this a little bit.  You mention there was a year to heat up and that was typical.

     Why is that?

A.   So with the grassroots campaign like ours, we have to rely pretty heavily on volunteers, especially at the start.  And those volunteers coalition partner during what we consider an on

year in election.  So the even year are focused on electoral priorities; they are working on whatever elections are coming up.

They have much more time and much more energy to dedicate towards a grassroots campaign with a ballot initiative in the off year, so the odd year.  So that's a very typical timeline.

Q.   You joined FDH in March of 2025.

What did you do to get up to speed for your role as organizing director?

A.   So I spoke to the previous executive director, Jake Flaherty, before he transitioned out of the role, you know, reviewed a bunch of documents, figured out where everything was at.

Q.   Did you learn about prior election cycles?

A.   Yes.  And that was also in communication with one of our cochairs especially, Holly Bullard.

Q.   Did you review any materials from prior campaign efforts?

A.   Yeah.  And any materials they had on hand, I reviewed them at some point.

Q.   So I think you've already alluded to this, but prior to 2026, did FDH exist?

A.   Yes.  So FDH was originally formed at the end of 2018.

Q.   And do you know how many times FDH attempted to get on the ballot since 2018?

A.   So 2018, that would have been for the 2020 cycle.  That was

really the only effort that was made prior to this.

It still existed in, you know, '22, and '24, but it was not a serious effort.

Q. How did the 2026 effort compare to prior cycles?

A. It was really the first time we were going full throated and making the real -- the real push. It was the first time we, as I mentioned, brought on paid staff, I mean, a full campaign staff; the first time we brought on paid circulators. Certainly the largest volunteer engagement.

Q. What made FDH decide to mount a more significant effort in 2026?

A. Sure. So just backing up a little bit, that first run was very much a trial balloon to see where we can get, see how far we can go.

The next one, which would have been, you know, collecting into -- starting in 2020, obviously there was COVID, so really didn't do anything there.

For the '24 cycle, the original idea was to mount a full effort at that point, but when it became clear that the abortion effort was going to move forward, FDH essentially stepped aside. It's part of the ecosystem that, you know, running too many of these at once is going to stretch people too thin to really do a full-throated attempt. So really this was the time. And also the current climate with what was happening with health care overall in the country certainly helped.

Q.    And you mentioned that FDH hired more staff.

How many paid staff did FDH have for 2026?

A.    So we had seven FDH staff.

Q.    How did that compare to prior years?

A.    It was the most by far, to my understanding.  We've only ever had an executive director actually working with FDH prior to this.

Q.    You also mentioned that you were doing volunteer recruitment.  In those efforts do you have some mechanism for determining how many people sign up to be volunteers?

A.    To some extent.  You know, the volunteer ecosystem, you never have a great number, a perfect number.  What you have is direct volunteers who are working with us, so going directly through FDH.  I can tell you that was over a thousand, just based on emails and mobilized sign-ups, those sorts of direct points of impact.  We also had indirect volunteers through our coalition partners, and that's an estimate based on how many coalition partners we had.

So at a very conservative estimate, I would say we had over 2,000.

Q.    Of the indirect?

A.    Yes, so 3,000 total.

Q.    Thank you.

And how did volunteer recruitment compare to prior efforts in 2026?

A.    As I mentioned, it was the most robust program we've ever run.  At our peak, we had over 100 coalition partners, over 50 hubs.  We were really firing on all cylinders, especially prior to HB 1205.

Q.    Did the campaign set targets for volunteer collection of petitions before HB 1205?

A.    Yes.  Really our first main target and the only one prior to HB 1205 was to hit 100,000 petitions total by the end of April, the idea being that 70,000 of those were paid and 30,000 of those were volunteer.

Q.    And did the campaign meet that target?

A.    We did, yes.

        MS. DOLAN:  Your Honor, Dr. Acosta will next testify about FDH's volunteer operations before HB 1205, which goes to Counts One through Three of the operative complaint.

BY MS. DOLAN:

Q.    Okay.  Let's turn to FDH's efforts pre-1205.

      You testified that you ran FDH's volunteer program.

      Did FDH also use paid circulators?

A.    Yes.  So we launched paid circulation really in April of 2005.

Q.    Prior to the cycle, had FDH used paid circulators?

A.    No.

Q.    Who was responsible for that program?

A.    So that program was run by the outreach team.  They were

the vendor we hired to do that.

Q.   And you mentioned a vendor, but what is the outreach team?

A.   Sure.  So they do what I would, you know, broadly categorize as direct voter contact work.  That includes working on a number of ballot initiatives as well as electoral work, and that electoral work they've done in Florida.

Q.   How did FDH go about selecting the FDH team as its vendor?

A.   We interviewed probably a half a dozen different vendors.  And in that process, we -- they clearly came out at the top.  They were a very trusted partner.  They had a good reputation as reliable, as honest brokers, and they were also very mission driven.  They really cared about the issue, not just, I'm going to gather a bunch of papers and hopefully get you on the ballot, but actually pushing forth Medicaid expansion specifically.

Q.   When did FDH begin its paid circulator program?

A.   So the hire was made at the end of March, and we would have launched paid circulating really in force in April.  We maybe had one day in March where a handful of people went out.

Q.   What were the reasons that FDH decided to engage in paid circulation for 2026?

A.   As I said, it was really the first serious full-throated effort being made.  And in a grassroots effort like ours, you're hopeful you're going to get 100,000, 200,000, maybe in an amazing situation 300,000, petitions from volunteers.  The reality is you need well over a million in order to qualify for

the ballot, and, realistically, the ecosystem demands having paid circulators to do that.

Q.    What was the scope of work the outreach team was hired to do?

A.    So we actually put two contracts in place for them.  The first was for a smaller scope of 70,000 by the end of April.  As I mentioned, we had that overall goal of 100,000.  And then the second contract was for the remainder, for about a million petitions by the end of the year.

Q.    For that first scope of work, why that many signatures by that date?

A.    There were a number of factors.  We were working with the vendor and specifically, like, the heads of that -- the outreach team to come up with a realistic number, something they felt was obtainable but also that would certainly push the envelope and see that they could actually get this done.  So it was very much considered a pilot program and a proof of concept.  And, also, like I said, we wanted that 100,000 total.  So that was part of the mathematics there.

Q.    And did they complete that initial scope?

A.    Yes.  They actually exceeded it.

Q.    How did FDH oversee the outreach team's efforts?

A.    So we met with them regularly twice a week, Mitch Emerson, myself, a number of our campaign staff, and then, like, the leadership team of the outreach team.  So we had biweekly

meetings.  And when we weren't meeting with them, we were on the phone with them, texting with them, emails, very constant communication.

Q.   Moving on to the volunteer program, what, if any, training did FDH provide to its volunteers?

A.   So we ran online training, so Zoom trainings, three times a week.  We also had on-demand trainings.  They were encouraged but not required.

Q.   Why were they not required?

A.   A number of our volunteers were very experienced.  They had been working, you know, ballot initiatives for many cycles, and the process really hadn't changed.  I know I myself wouldn't have felt I needed training, and that was true for a lot of our volunteers.

Q.   Who created the training that FDH offered?

A.   I did.

Q.   And outside of training offered by you directly, were there any other means for volunteers to obtain training?

A.   Yeah.  They -- you know, we had printed materials as well that were available at our hubs.  We also provided a bunch of materials to our coalition partners.  Some of them ran their own trainings.  Some of them would ask us to come to some of their trainings.  And also just anyone could also reach out, email, call, whatever they needed.

Q.   I want to turn to an exhibit, Dr. Acosta.  The courtroom

technician is projecting the first page of a document that's been marked FDH Plaintiffs' Exhibit 518.

And if you need him to scroll through that training just to take a quick look, please do.

Do you recognize this document?

A.    Yes.

Q.    How do you recognize this document?

A.    I created it.

Q.    And what is this?

A.    So this is one of our training decks.  It was a constantly involving document.  But based on the logo -- I can tell it's a pretty earlier one -- this was the training that we provided for our volunteers both online, like, while we were actually presenting it, but then also provided them the deck.

Q.    Was this record kept in the regular course of business by FDH?

A.    Yes.

Q.    And was creating presentations such as this a regular practice of FDH?

A.    Absolutely.

MS. DOLAN:  I'd like to move to admit this as an exhibit.

MR. JAZIL:  No objection, Your Honor.

THE COURT:  Without objection, Exhibit 518 is admitted.

(PLAINTIFFS' EXHIBIT FDH-518:  Received in evidence.)

BY MS. DOLAN:

Q.   Okay.  Turning to page 6, what information are you providing on this slide?

A.   So this is an overview of some important information about Medicaid expansion that we wanted the volunteers to have at their fingertips, information about --

THE COURT:  Excuse me.  Just so the record is clear, Mr. Jazil, you're taking lead, and I want to make plain with the other defense lawyers I'm not in any way keeping anybody from speaking.  I'm going to assume if I hear no objection that nobody else has anything they need to add.  If you do, just raise your hand.  The same thing will hold true for the plaintiffs when the defense are putting on witnesses.

We're streamlining it.  That's great, but I also want to make sure I'm not cutting anybody off.

Counsel, you may proceed.

MS. DOLAN:  Thank you, Your Honor.

THE WITNESS:  Sorry.  Could you repeat the question?

BY MS. DOLAN:

Q.   You were just talking about what information is on this slide.

Why did you want volunteers to have this information at their fingertips?

A.   Yeah.  It was important for them to know why we were doing

this, right.  It was important for them to have this information to provide to voters to be able to communicate about the issue and really be our first ambassadors on the ground with the talking points about Medicaid expansion.

Q.   Now, turning to page 13, what information is provided on this slide?

A.   So these were some ideas for -- at this point we were still doing collection -- ways that volunteers could go about petition collection, places they could go, really just approaches.

Q.   And thank you for clarifying that.

     You mentioned this is when there was still collection.  Is this training specifically before HB 1205?

A.   Yes.

Q.   And you provided some ideas for places to collect.

     Do you also train on collection methods?

A.   Absolutely.  It was really important for us to be able to share best practices and make sure that volunteers who were on these trainings and who were receiving any of our materials knew what those best practices were.

Q.   So what are the best practices for signature collection?

A.   Right.  So, again, just to clarify, this is collection. Obviously, this all changes after HB 1205.

     Our best practices were you would go up to a voter, ideally with a clipboard, be able to hand them the clipboard so that they could fill out the petition.  As they are filling it out,

you are engaging them in conversation, right.  You are talking about the issue; you are explaining why this matters; you're hopefully getting good buy-in from them so not only do they sign it, but they get others to sign it, maybe volunteer themselves. And you're also checking, you know, that they are filling everything in correctly to help that validity rate.

Q.   What did FDH train volunteers to say when approaching potential signers about Medicaid expansion?

A.   Yeah.  So we wanted them to explain what Medicaid expansion was.  It's not something that everybody just innately understands.  So we wanted them to talk about, you know, what it does, who would benefit from it, the fact that it would actually save the State money, the fact we're one out of ten states that don't have it, those sorts of talking points while they were engaging the voters.

Q.   And what, if any, training did volunteers receive on answering questions or concerns about Medicaid?

A.   Sure.  So we provided FAQs as things came up.  Certainly, they need to reach out to myself or my organizers if they had any questions that came up that they weren't prepared on.

But, you know, going back to those talking points, we wanted them to have that information so that they could answer those questions, and those would develop as the campaign moved on based on the feedback we were getting from the ground.

Q.   I'd like to move on to the next exhibit.

Dr. Acosta, the courtroom technician is projecting the first page of a document that's been marked FDH Plaintiffs' Exhibit 445.

Do you recognize this document?

A.    I do, yes.

Q.    How do you recognize it?

A.    I was involved in its creation.

Q.    And what is this document?

A.    So this is an update and an overview of our volunteer program for key stakeholders of the campaign.

Q.    And what was the purpose of this document?

A.    Really to provide an update and just give them a sense of the mission on the ground, what the initiative was doing, how much, you know, volunteers were getting engaged with the process, and just give them the sense of the campaign.

Q.    Was this record kept in the regular course of business by FDH?

A.    Yes.

Q.    And was creating these types of handouts a regular practice of FDH?

A.    Yes.

MS. DOLAN:  I'd like to move to admit Exhibit 445, and I do not believe there were any objections noted by any defendants.

THE COURT:  Without objection, 445 is admitted.

(PLAINTIFFS' EXHIBIT FDH-445:  Received in evidence.)

BY MS. DOLAN:

Q.   And how was the --

THE COURT:  So the record is clear, what counsel was referring to is if you don't object to the exhibits on the pretrial stip, they're admitted and the objection would be waived.

Go ahead.

MS. DOLAN:  Thank you, Your Honor.

BY MS. DOLAN:

Q.   How is this document disseminated?

A.   This would have been emailed out to those key stakeholders.

Q.   When you said it was sent to key stakeholders, would that include coalition partners?

A.   So this would have included some coalition partners, some potential funders, our executive committee, things like that.

BY MS. DOLAN:

Q.   Okay.  A bullet on the first page mentions storytellers and ambassadors.

Who were those storytellers?

A.   So these were everyday Floridians, right.  It was an important part of our campaign to have everyday Floridians telling their story about why this issue was important to them. Maybe they fell in the coverage gap.  Maybe they were making $50 too much to get health care.  And those would range from people

who just reached out to us because they knew we were doing this and wanted to make sure they told their piece of the story, to, you know, folks we met while we were out gathering petitions who were, like, Actually, this would affect me, and volunteers themselves as well and also just folks that our coalition partners identified.

Q.   And how were they communicating that narrative to the public?

A.   So depending on which group, right.  So some of them would be communicating it to us so that we would then share it with our volunteer network, our coalition partners, social media, eventually, hopefully, get it on paid media as well.  But also we had, as I mentioned, volunteers who were doing this.  So they would share those stories while they were out in the field collecting petitions.  You know, this would be one of the things that would come up in the regular course of asking someone to sign.

Q.   Turning to page 3 of this document, can you tell us what's being described in the second paragraph regarding how you interact with people while collecting signatures?

A.   Yeah.  It's really highlighting the idea we are building a relationship, right.  As I mentioned, our volunteers and later our paid circulators are really the first foot soldiers on ground.  They are the first people that everyday voters are hearing from about the issue.  So we want to make sure that they

are communicating, you know, why it's urgent, these specific stories to really humanize the issue and doing more than just being, like, Hey, sign this paper; now go away.

It's also building towards the YES Campaign, right. Eventually, if you are actually able to get on the ballot, you want to make sure that there is that recognition beforehand.

Q.   When you say "YES Campaign," can you just describe what you mean by that?

A.   Yeah, absolutely.  So there's two parts of the campaign process.  Part one is gathering the petitions to get on the ballot.  Once you are on the ballot, then you move into part two, which is the YES Campaign, to get 60 percent of the vote in November.

Q.   And this also mentions that you listen to people's health care stories.

Who listens to those health care stories?

A.   The volunteers and us as a campaign as well.  It was really important for our volunteers to have that engagement agreement, right.  Someone comes up to you and says, Oh, actually, I think, like, this would help affect me.  I think I'm in the coverage gap.  Tell me more.

It was really important to have that human interaction.  It was essential for the voter to feel heard, but also for the volunteers it was a very empowering thing to be like, Oh, my gosh.  What I'm doing actually matters and helps

people.

Q.   How did the campaign use those stories?

A.   As I mentioned, a number of ways.  We would post stuff on social media.  We would provide them to our volunteers and coalition partners as key examples that they could point to in the course of gathering further petitions, and the plan was to eventually have them on paid media as well.

Q.   And were these storytelling and signature-gathering activities that volunteers engaged in continuous throughout FDH's campaign?

A.   Yeah.  This is a cornerstone of, I would say, any grassroots campaign, hopefully, and it's an important part to continue throughout the process.

Q.   You mentioned this earlier, but did you have contact with volunteer circulators in the field during the campaign?

A.   Every day.

Q.   What method did you use to communicate with them.

A.   So with our direct volunteers, I would regularly send emails, sometimes even text messages, with -- also running the trainings, right.  They would also call, text, email, pull me over on the side of the street if they saw me, just about anything.

Q.   Did circulators report back to you about their experiences and interactions with voters in the field?

A.   Yeah.  They would report back to me or my organizers, as

well as report to coalition partners who would then tell me about it.

Q. Did you take any action as a result of these communications about circulators' experiences?

A. Absolutely. As I mentioned when we were looking at the training deck, it was an evolving process. Our process would evolve based on that feedback. If there were questions that were coming up regularly, we would adjust the training accordingly. If they were stories that were really impactful, we'd add them to the training deck, and we would adjust accordingly.

Q. And did you personally circulate this cycle on behalf of FDH before 1205?

A. I did, yes.

Q. When you personally circulated petitions, how often did voters engage in a back-and-forth discussion with you before deciding whether to sign?

A. In deciding whether to decide, it was pretty frequent. In -- just in the general course of once they even decided or were still on the fence, it was almost every single time.

Q. Did you observe others in the field circulating?

A. Yes.

Q. And when you observed others circulating, how often did you see voters engaging in discussion before signing?

A. Likewise, it was a pretty frequent thing to have a voter

engage in discussion even if they had already agreed to sign, learning more about the process, learning more about what this actually meant.

Q. Have you personally ever changed a voter's mind through these conversations?

A. Absolutely. You know, I'm a pretty experienced person collecting petitions, and it is really crucial in that initial moment to explain why -- what this is, right. Again, as I said, people don't necessarily know what Medicaid expansion is.

They look at it. They say, Oh, this is going to cost us money.

And I would say, No, no. Let me explain. It will actually save you money. Here's how. Do you realize 40 states have already opted in?

We'd have these long engagements, and they'd go, Oh, well, this is going to save people money and save lives. Why wouldn't I sign? They'd go ahead and sign.

Q. Did FDH view the circulation process itself as a way to build support for Medicaid expansion?

A. Yeah. Our campaign really starts there, right. As I mentioned, the goal was to eventually get to paid media, but you know that that's a process. So that initial everyday interaction with voters was really, really crucial.

Q. You talked about direct and indirect volunteers.

Before 1205 did FDH use any other methods for signature

collection?

A.   Yes.  So we had, as I mentioned, paid circulators.  We also had a very limited run of a mail program.  We ran it, I think, twice in the '24 cycle prior to HB 1205.  We also had voters, you know, that would submit the petition themselves, and then we also had an online form where a voter would request the petition either to print or to be mailed to them prior to HB 1205 that was a prefill.

Q.   Did FDH also use hubs?

A.   Yes, we centralized our activities through the hub system.

Q.   Can you describe what a hub is?

A.   Yeah.  So there are different kinds of hubs, and, obviously, this will -- it got restructured very heavily post-1205.

       But sticking to pre-1205, some of our hubs were sort of serve-yourself stations where -- and then some of them were staffed by volunteers.  Overall, the idea was this is a place where a volunteer could go get blank petitions; if it was a staffed one, talk to someone there a little bit more about the initiative, pick up also any other materials, one-pagers, things like that, go out, circulate the petition, come back with the completed petitions.  And then the hub would centralize the mailing of those petitions in to us, either -- originally to our PO Box, later to TallyED.

Q.   Prior to the full implementation of 1205 on July 1st, how

many hubs did FDH have?

A.    We had over 40.

Q.    You just referenced TallyED.  What is TallyED?

A.    So TallyED was our quality control and data aggregation.

Q.    Who hired TallyED?

A.    FDH hired TallyED originally in 2024.

Q.    Do you know where TallyED is based?

A.    I believe they are based in Jacksonville.

Q.    And you mentioned that TallyED provided quality control and data aggregation?

A.    Yes.

Q.    And I believe you also mentioned a prefilled form?

A.    Yes.

Q.    Okay.  Let's talk about that first.  Describe how that worked.

A.    The prefill?

Q.    Yes.

A.    So the idea was this was a link where any voter could go on there, put in some basic information, their name and their county, and it would provide them the opportunity to either print a prefilled petition or request that one be mailed to them with a return envelope.  This petition had everything filled out other than their signature and the date, and the information came from public records from state files.

Q.    Before 1205 how many voters used that link to generate a

prefilled form?

A.   This wasn't really our primary mode of gathering petitions, so about a thousand, maybe a little less.

Q.   And you also mentioned they provided data aggregation services?

A.   Yes.

Q.   Could you describe that?

A.   Sure.  So there are folks who are more likely to sign petitions just based on some demographic information:  Are they very frequent voters?  Have they signed petitions previously?  Things like that that are part of the public record.

So what TallyED would do was they would aggregate a list of those most likely supporters and do a mailing to them with, prior to HB 1205, those same prefills.

Q.   Where did TallyED obtain the information used to prefill the forms?

A.   So this was public record from state voter files.

Q.   And before 1205 approximately how many prefilled petitions did FDH distribute through data aggregation?

A.   So there were two mailings of about 5,000 each, so 10,000.

Q.   Do you know the validity rate for that program?

A.   The validity rate was incredibly high, over 90 percent. Probably closer to 95.

Q.   How does that compare to blank forms?

A.   Much higher.  I mean, blank forms, there's always going to

be some human error, folks who forget to fill in county and write USA or, you know, reverse a couple of numbers in their address, things like that. With these forms really the only thing that could go wrong is signature. So, like I said, it was much, much higher.

Q. Okay. Turning to petition return times, before 1205 did FDH require volunteers to return signed forms within a certain time frame?

A. We did not. There was not any requirement to from the State. So when I started as organizing director, I did start asking our hubs to get them submitted to us on a two-week rolling basis, so every two weeks.

And, obviously, we always want volunteers to get them to us as soon as possible, to the hubs at least, but, you know, things happen. People have lives. They work an event on Saturday. It's busy Monday. They will get them in on Tuesday, and that was fine.

Q. Now, you mentioned that TallyED also provided quality control?

A. Yes.

Q. What do you mean when you say "quality control"?

A. So TallyED reviews every petition that came in, right. That was for paid or volunteer. They would look through them, and prior to HB 1205, when they were still allowed to, they would -- for example, if someone left "county" empty, they would

fill in the county, right, Broward.  Okay.  Great.

They would also flag for us any issues that were reoccurring.  So, for example, we had one of our hubs where a lot of the petitions were coming in with highlighter.  Maybe the SOE is not going to accept those as valid petitions.  We would flag those types of issues to myself for volunteers, to the outreach team for paid.

He would then collect all of the petitions, you know, by SOE, by county, and mail them in with the attached payment for them to be processed.

Q.   What did you do with the information flagged for you?

A.   We were able to course correct, right.  So going back to the example of the highlighter, he let me know.

I immediately reached out to that hub lead.  I said, Hey, stop highlighting your forms.

She said, Great.

And that was the end of it.

Q.   And for which petitions did TallyED provide these quality control services?

A.   All of them, paid and volunteer.

Q.   Why did you choose to route all petitions through TallyED?

A.   It was a way to centralize things, right, to make sure that the process was running smoothly and in a timely and efficient manner.  But it was also a way for us to be able to do that sort of course correction, right.  If all the petitions are being

reviewed by one organization, it's a lot easier to catch those sorts of common human errors.

Q.   Did that change post-1205?

A.   No.  It definitely got streamlined and a lot tighter and a lot harder to maintain, but we did continue it.

MS. DOLAN:  I'm going to move on to a new topic, Your Honor.  Dr. Acosta will testify about the impact of 1205 on FDH's volunteer operations, which goes to Counts One through Three of the operative complaint.

BY MS. DOLAN:

Q.   Okay.  I'd like to turn to the impact of 1205 on FDH's volunteer program.

When did HB 1205 pass?

A.   May 2nd of 2025.

Q.   Did some provisions take effect immediately?

A.   Yes, some went into immediate effect, and the rest went into effect in July.

Q.   Do you recall what provisions went into immediate effect?

A.   Sure.  So there were a number of them.  One of them was the ten-day turnaround to submit petitions.  Another was that we can no longer fill in anything on the petition, and then there was just a lot around criminal fines and liabilities.  We could also no longer use prefilled.

Q.   Before we get into the individual provisions, how did FDH prepare to implement these immediate changes?

A.    So we knew the law was likely to pass towards the end of session, so we actually started running a few light drills with the outreach team in preparation.  But we also ultimately shut them down for a while when the law passed to make sure that they were in compliance, so we just paused our paid operations completely.

On the volunteer side, I got a communication out as soon as humanly possible, called a coalition call pretty quickly, was also just on the phone a lot that weekend.

Q.    Turning to specific provisions, let's start with the ten-day return time.

A.    Sure.

Q.    Before 1205 how long did sponsors have to return petitions from paid petition circulators?

A.    So for paid circulators it was 30 days.

Q.    What about from volunteers?

A.    As I mentioned, there was no restriction on the timeline for volunteers prior to this.

Q.    And did this ten-day return time apply to petitions from both paid and volunteer circulators?

A.    That was a tricky question.  We weren't sure, honestly. There was a question around who was being counted as a circulator, because the circulator petition and the definitions were all changing.  We knew for sure it applied to paid, and we were operating under the idea that it may apply to everybody.

We weren't really sure.

Q.    The courtroom technician is projecting the first page of a document that's been marked FDH Plaintiff Exhibit 442.

Do you recognize this document?

A.    I do, yes.

Q.    How do you recognize it?

A.    This is an email I sent out to, it looks like, our coalition partners.

Q.    When did you send this email?

A.    It looks like May 6, 2025.

Q.    And just to clarify, you said you sent this email.  Is your email reflected in the "From" line?

A.    Yes, that is my email.

Q.    What prompted you to send this email to volunteers at that time?

A.    So May 6, this is a follow-up to the coalition call -- as you can see in the body of the email -- to make sure that they had all of the information they needed following the passage of HB 1205 in terms of what needed to immediately change with the volunteer program.

MS. DOLAN:  I'd like to move to admit as an exhibit.

THE COURT:  It was not objected to, correct?

MR. JAZIL:  Yes, Your Honor.  No objection.

THE COURT:  Without objection.  It's admitted.

(PLAINTIFFS' EXHIBIT FDH-442:  Received in evidence.)

THE COURT:  This is 442; correct?

MS. DOLAN:  Correct.

BY MS. DOLAN:

Q.  What changes were you communicating to volunteers in this email?

A.  The main one was around -- well, there were two.  The main one was around turnaround time.  So previously, as I said, we were asking the hubs to mail in every two weeks.  At this point we wanted them to mail in everything as soon as they got their hands on it, within 24 hours.

And we also were asking them to make sure not to fill in or correct any missing information, and then no one used the prefills.

Q.  Why the return within 24 hours?

A.  As I said, we were unsure about the timeline and the sort of nebulous nature of where volunteers fell on this before HB 1205 went into full effect.  So we wanted to be as cautious as possible, and in that overabundance of caution, we wanted them to get everything in as fast as possible.

Q.  Did you receive any communications from volunteers about the 10-day timeline?

A.  Yes.  I'm sure there's some emails, many phone calls, many texts.

Q.  Turning to the next exhibit, the courtroom technician is projecting the first page of a document that's been marked FDH

Plaintiffs' Exhibit 449.

Do you recognize this document?

A.    Yes.

Q.    What is it?

A.    This is an email to me from -- it looks like one of our coalition partners?

Q.    When did you receive this email?

A.    It looks like June 4th.

MS. DOLAN:  I'd like to move to admit as an exhibit.

THE COURT:  Any objection?

MR. JAZIL:  No objection, Your Honor.

THE COURT:  Without objection.  It's 449; correct?

MS. DOLAN:  Correct, Your Honor.

THE COURT:  It's admitted.

(PLAINTIFFS' EXHIBIT FDH-449:  Received in evidence.)

BY MS. DOLAN:

Q.    Before you received this email, was this volunteer actively collecting petitions for FDH?

A.    Yes.  As I mentioned, it looks like she was a coalition partner.

THE COURT:  Hold on one second.

Sir, you don't have to stand.  There are two chairs in front of the gallery.  You can sit in one of the chairs or the chairs, either one, that's fine, wherever you are more comfortable.

Go ahead.

BY MS. DOLAN:

Q.   What concerns was this volunteer expressing?

A.   So this was pretty typical.  She was concerned about our ability to -- or her ability and our ability to get these petitions turned around fast enough, so within the ten days.

Q.   Based on your records and knowledge as organizing director, after receiving this email did this volunteer, quote, "continue" collecting petitions?

A.   She did not.

Q.   Based on the timing and your communications with this volunteer, what was your understanding of why they stopped collecting?

A.   She did not believe that the processing time could be handled, right, that we would get these petitions in within the ten days.

Q.   Why couldn't volunteers take petitions directly to the Supervisors of Elections?

A.   So Florida Decides Healthcare did not have undue burden, so we are required to include payment with every single petition we submitted for verification.  And there were also some -- at this point some restrictions on who could actually just drop any petitions off at the SOEs, so the petitions had to come to us first, not to mention for our record keeping and knowledge of how the campaign was going it was important.

Q.   And are you aware that HB 1205 makes sponsors liable for late-delivered petition forms at $50 a day for each day the petition is late?

A.   I am, yes.

Q.   What concerns, if any, did you have about using volunteers given that FDH would be responsible for paying fines if volunteers delivered forms late?

A.   We had a lot of concern.  You know, the concern stated here is pretty accurate, right?  It's a really tight timeline from the volunteer gets it to the hub, the hub gets it to TallyED, TallyED gets it to the SOE, and we were very worried about the fines.

Q.   Turning to prefilled petitions, you testified earlier that through TallyED FDH had a prefilled petition program?

A.   Yes.

Q.   After 1205 could FDH continue using prefilleds?

A.   No.  We actually had to pull down the online link for over two months while it was revamped to just provide a blank form, and then we had no prefilleds at all.

Q.   And are you aware that HB 1205 makes it a third-degree felony to fill in missing information on a signed petition?

A.   I am, yes.

Q.   How, if at all, has this criminal provision impacted your ability to recruit volunteers?

A.   It made everyone very nervous, right?  Human error is

common and people make mistakes with things like that, especially if they've been doing it for a number of cycles.  We were just very worried about -- you know, volunteers were repeatedly telling us that they were very worried about their own liability as individuals as well as organizational liability for coalition partners.

Q.   And are you aware that HB 1205 expands the definition of racketeering activity to include petition-related conduct?

A.   Yes.

Q.   Have volunteers or circulators expressed concerns to you about potential criminal liability under that provision?

A.   Yes.  Again, there was a lot of concern about individual, organizational, who was going to be liable, what if I just made, you know, a normal human mistake.

Q.   How, if at all, did those concerns factor into your decision about how to run FDH's petition drive?

A.   They were a huge factor.  Certainly our volunteerism dropped.  We lost at least one hub from this and, ultimately, when HB 1205 went into full effect, we had to shift to distribution and stop collection altogether, in part because of this.

Q.   Dr. Acosta, the courtroom technician is projecting a document that's been marked FDH Plaintiffs' Exhibit 506.

Do you recognize this document?

A.   Yes.

Q.    What is this document?

A.    So this was an email to myself from a volunteer, I think probably a coalition partner.

Q.    And when did you receive this email?

A.    May 8th.

MS. DOLAN:  I'd like to move to admit as an exhibit.

THE COURT:  Any objection to 506?

MR. JAZIL:  No objection, Your Honor.

THE COURT:  Without objection, 506 is admitted.

(PLAINTIFFS' EXHIBIT FDH-506:  Received in evidence.)

BY MS. DOLAN:

Q.    What concerns is this volunteer expressing in the email?

A.    Sorry.  Can you scroll down a little bit on this one?  I'm just trying to remember if this is the whole email.

Okay.  Just making sure.

Yeah.  She was letting us know that there was concern about the penalties.  My recollection is this is one of our hubs, and so the question of liability had a dual nature, right?  It was their personal concern as well as the concern for the organization that was hosting the hub.

Q.    Did you receive similar concerns from other volunteers around this time?

A.    Very frequently.  My phone was ringing nonstop.

Q.    How did FDH attempt to address these types of concerns?

A.    We did the best to go to legal counsel and ask, you know,

what we can tell folks, what we knew, and try and get guidance in terms of the answers to some of their questions and provide those answers as much as possible, you know.  We tried to assuage fears but not always successfully.

Q.    Were you able to provide volunteers with clear answers about their potential criminal liability?

A.    We were not.  You know, as I said, we did the best we could, but we did not have clear answers as there was some ambiguity in the law.

Q.    Okay.  And you mentioned additional provisions took effect on July 1st.

What were those?

A.    Yes.  So there were quite a number of them.  The ones that come to mind off the top of my head were regarding who was eligible to be a circulator.  So it was limited to U.S. citizens, Florida residents, nonfelons, also changed the definition of a petition circulator.

So previously only paid staff -- paid circulators, rather, who were being paid to circulate the petition were required to register as circulators.  This now made it so everybody had to if they were going to circulate more than 25 petitions, and then there was also some additional provisions that went into effect as well.

Q.    You already mentioned the change in definition in the eligibility restrictions.

What were those restrictions?

A.    The eligibility ones?

Q.    Apologies.

What are those restrictions, the eligibility restrictions?

A.    Yes.  So this limited eligibility, as I said, to U.S. citizens, Florida residents, nonfelons.

Q.    You testified at length at the PI hearing about barriers to verifying residency for volunteers, so we won't repeat that here.

A.    Okay.

Q.    Did FDH have any nonresident volunteer circulators before July 1st?

A.    We did, yes.

Q.    Do you know about how many?

A.    It's hard to give you exact numbers.  As I've said, there's direct volunteers; there's indirect volunteers, but we were definitely hearing about it.

Q.    And you alluded to this, but why can't you give me a total number?

A.    Yeah.  As I said, we've got direct volunteers, indirect volunteers.  It's also just not something we were asking people, right?  We knew it was the case that we had snowbirds, and we knew we had students, so we definitely knew we had some.  We were certainly hearing about it, but we didn't have a full accounting.

Q.    And what about noncitizens?  Are you aware of any noncitizens who circulated in a volunteer capacity on behalf of FDH before 1205?

A.    Yes.  Again, we heard from coalition partners.

Q.    And do you know how many?

A.    Same answer; we don't really keep those sorts of records, and we also weren't asking that question also, direct volunteers versus indirect volunteers.

Q.    Did you have a reason to note that information before 1205?

A.    Absolutely not.

Q.    Did FDH verify citizenship for volunteers before 1205?

A.    No.

Q.    Why not?

A.    We had no reason to and also how would we have, right? It's not like we had E-verify at all of our hubs or on our website before somebody printed the petition to volunteer.

    Also it's just a very invasive thing, right?  You're coming in to volunteer, give of your time; I'm going to make you prove that you're a citizen, like, they're never going to come volunteer with us again.

Q.    From your experience, are there any other impediments that there would be to inquiring of somebody's citizenship?

A.    Yeah.  As I said, the -- the very idea of being able to have a way to verify it.  Even if all of our volunteers came through our hubs, you're now asking volunteers to do vetting of

other volunteers.  The cost on that's going to be insane. There's -- yeah, it's just not feasible.

Q.    And before 1205, did FDH have any volunteers who had felony convictions and whose rights had not been restored?

A.    Yeah, we believe so.

Q.    Do you know how many?

A.    Nope, same answer.  We didn't have those sorts of records. We certainly didn't ask those sorts of questions.

Q.    From your experience, what impediments would there be to determining whether someone has a felony conviction?

A.    Again, are we going to run background checks on all our volunteers?  I'm not really sure how we would even logistically manage that, never mind the cost on that.

Also volunteers usually come in.  They're, I'm here.  I'm ready to volunteer right now.  Yes, please prove to me that you do not have a felony.  Let's just run a background check, come back in three days and volunteer with us then.

The likelihood of that was not very high.  But, again, also you have direct volunteers; you have indirect volunteers. There's no way.

Q.    What about any impediments to determining whether their rights have been restored?

A.    That is an ongoing question that we've been having since that amendment passed of, you know, how do we make sure that folks know whether their rights have been restored or not, what

they have to go through for that.  It's not an easy thing to figure out.

Q.   What impact did the circulator eligibility requirements have on FDH's volunteer circulator program?

A.   It completely killed our program.  We had to stop volunteer collection altogether and move to a distributive model.

Q.   What is a distributive model?

A.   Sure.  So because we could no longer collect, but also even possess or handle more than 25 petitions, the best we could do is have a volunteer go up to a voter, hand them the petition and a blank prepaid prefilled envelope and ask them to mail it in.

Q.   Did the pivot to that model, have an impact on FDH's ability to get out its message?

A.   Incredibly so, yeah.

That moment of time when you have someone's attention while they are filling out a form is completely lost, right?  And without that sort of entryway into the conversation, we weren't able to have those conversations.  We also just had a lot less people willing to engage.

Q.   Did you track return rates for the distribution program?

A.   I did, yes.

Q.   Do you have a sense of what your return rate was for the distribution program?

A.   Sure.  So just to backtrack a little bit, right, just because it's important to think about the distinctions here and

even how we were getting petitions out, with collection, all of those petitions came back to us through the hubs.  Those hubs were then able to report out, you know, I'm sending in 40 this week, I'm sending in 200 this week; whatever, and we were able to have a constant communication chain with them of how much was coming in from each of those hubs.

Now, because none of those petitions were coming back to the hubs, of course, the best we could do was track how many envelopes we had sent out into the world and how many of them were coming back.

Q.   And are you able to quantify that?

A.   Yes.  The return, it was exceedingly low, well under 10 percent.

Q.   And again, you alluded to this, but how does that compare to your rate for one-to-one circulation?

A.   Well, with one-to-one circulation it was, if not 100 percent, pretty damn close, because all of the petitions that were being signed were being then collected back up by the circulators; those circulators were then bringing them back to the hubs; the hubs were then mailing them all in.  That's pretty much everybody.

Q.   And are you aware of HB 1205's $50,000 fine to sponsors who knowingly allow an ineligible circulator to collect petitions?

A.   Yes.

Q.   As the person responsible for FDH's compliance with this

provision, how do you interpreter what actions would trigger this fine?

A.   That was also a huge concern because we're -- you know, if one of the volunteer leads who I've trained to be at a hub knowingly lets someone do something, would that mean that we as FDH knowingly knew?  I don't know.  If one of our coalition partners did it, would that count as knowingly?  We were unclear.

Q.   How did that uncertainty affect FDH's operations?

A.   Again, it was one of the decision-making factors to move to a distributive model.

Q.   Turning to the registration requirement.  Did you communicate with volunteers about the registration requirement?

A.   Yes.

Q.   Prior to 1205, did FDH have volunteer circulators who collected more than 25 petitions?

A.   Yes.

Q.   What percentage of FDH's volunteers collected more than 25 petitions prior to 1205?

A.   Again, I can't give exact numbers but based on my own personal experience and what we were getting back in terms of returns versus estimates on volunteers, the majority.

Q.   Based on your communications with volunteers, was there confusion about how the 25-petition requirement would apply?

A.   Yes, that was one of the provisions that I think caused

some of the most confusion.

Q. Dr. Acosta, the courtroom technician is projecting FDH Plaintiffs' Exhibit 499.

A. Okay.

Q. Do you recognize this document?

A. Yes.

Q. What is this?

A. So this was an email exchange between myself and one of our coalition partners.

Q. And when did you receive this email?

A. May 25th.

MS. DOLAN: I'd like to move to admit as an exhibit.

THE COURT: Any objection to 499?

MR. JAZIL: No objection, Your Honor.

THE COURT: Without objection, Exhibit 499 is admitted.

(PLAINTIFFS' Exhibit 499: Received in evidence.)

BY MS. DOLAN:

Q. What questions does this volunteer have about the 25-petition rule?

A. So this was a very common question we had. Is it 25 at a time? Is it 25 ever? If I went out to collect them, does that make them my 25? But also maybe I'm handling them, does that make them my 25?

Just a lot of uncertainty around the idea of that 25

limitation.

Q.    At the time you received this email, had the registration requirement taken effect yet?

A.    No.

Q.    Based on your communications with volunteers, did they express confusion about whether the requirement was already in effect?

A.    Yeah.  This was true, I think, for most of the provisions that went into effect in July, and certainly true for this one.

Q.    After it did take effect, did you continue to receive questions about the registration requirement?

A.    Yes.

Q.    What types of questions were volunteers asking?

A.    Very similar -- you know, had volunteers who would say, well, I definitely collected more than 25 before, does that now count against me?  Are we all going to have to register?  I'm not going to do this if I have to register.  Just a lot of concern and confusion.

Q.    Were you able to provide volunteers with clear answers about who needed to register under this threshold?

A.    No.

      This is one of, again, the reasons we moved to distribution.

Q.    And you've already answered this, but just to confirm, FDH switched to distribution because of the registration

requirement?

A.   Yes.

Q.   Did the distribution method impact FDH's costs?

A.   Heavily.  It was much, much more expense to run than petition collection.

Q.   Why?

A.   So as I mentioned, one of the things we had to do was provide pre-addressed, prepaid envelopes to all of our coalition partners, all of the hubs, even just casual volunteers who wanted to get involved.

     Doing so required printing these envelopes, having them centralized and sent to me, and then my daily mailing them out to whoever needed them, to then only have, as I mentioned, less than 10 percent come back.  So a lot of cost with very little return.

Q.   Have you yourself engaged in petition distribution?

A.   Yes.

Q.   How often?

A.   I definitely did it a few times, you know, a good chunk of tries.  I definitely wanted to see what the experience was like and then just in the regular course of business.

Q.   What impact, if any, did the distribution method have on your communication with voters?

A.   It made it very tough.  You know, I'm a pretty experienced person doing this, and even I could not engage most of them in

communication.

Q.   Based on your personal experience, why were you unable to have a conversation with a voter when handing them a petition?

A.   Handing them basically hands them the out, right?  If I hand it to you, you are like, Great, I'll deal with this later, and I just walk away, and I'd be like, Wait, let me tell you more.  And it was not happening for the most part.

Q.   Did you observe the distribution method in the field?

A.   Yes.

Q.   When you observed volunteers using the distribution method, were they able to have conversations with voters?

A.   They had a very similar issue.  You know, I'm not saying we were never able to, but it was very, very limiting.  And we were all trying different ways to do it, but the fact is because we couldn't even handle the petition, it really restricted what we could do.

Q.   Are you aware that HB 1205 makes it a third-degree felony to collect, deliver, or otherwise physically possess more than 25 signed petition forms without registering as a circulator?

A.   Yes.

Q.   What impact, if any, has this criminal provision had on your ability to recruit volunteers?

A.   As I mentioned, one of the things that had to go away was effectively the hub system as we knew it, right?  The hubs then just became a place for people to pick up blank materials,

mostly those envelopes.  So we were no longer able to run the hubs effectively.  We also just had less people willing to engage.  I think part of the reason a lot of volunteers liked to engage is that conversation aspect.  And with no longer being able to do that, they got frustrated and didn't want to engage.

Q.    You mentioned that the registration provision killed your volunteer circulator program, as did the eligibility provision.

Would either of these provisions absent the other have killed your volunteer circulator program?

A.    Yes.

Q.    Why?

A.    Each of them restricted the way volunteers could engage with us in a way that we couldn't really mitigate, right?  I can't suddenly figure out how to make sure everyone is a U.S. citizen, non-felon, Florida resident.  And likewise, I can't make sure that everyone registers and is following all the rules of the registration the way that a paid circulator would.

Q.    Okay.  And HB 1205 also required new petition forms as of July 1st; is that correct?

A.    Yes.

Q.    What additional voter information does a petition require?

A.    So the petition now requires that the voter include either their driver's license -- presumably state ID, although it doesn't say that on the form, or the last four digits of their social security number.

Q.   Earlier you testified about your quality control processes.

Did these processes provide any data for the campaign?

A.   Yeah.  One of the things specifically with the new form that came back is that there were folks who were submitting it without that section filled out.

Q.   How did you train volunteers to handle voter concerns about providing this information?

A.   I mean, frankly, a lot of the volunteers themselves had these concerns, so it was tough.  But, you know, we said, If somebody specifically asks you about it, explain that it's a requirement of the State.  You know, the concern about having your personal information going in an envelope to some place you don't know was one that a lot of our volunteers voiced.

MS. DOLAN:  Okay.  This is the last section of testimony for Dr. Acosta.  She will testify about suspension of FDH's 2026 campaign, as well as the pivot to 2028, which goes to Counts One through Three of the operative complaint.

THE COURT:  One moment, please.

Counsel, you may proceed.

MS. DOLAN:  Thank you, Your Honor.

BY MS. DOLAN:

Q.   Let's talk about the cumulative effect of all of these provisions.

Can you explain how those provisions impacted FDH's 2026 campaign?

A.    Ultimately it killed our '26 campaign and we had to suspend.

Q.    When did that happen?

A.    September, I believe, 25th of 2025.

Q.    As of the date of suspension, how many signed petition forms had FDH submitted?

A.    So our best record was about 127,000.

Q.    Who made the decision to suspend?

A.    There was a lot of discussion between the team, myself, you know, our cochair, Holly Bullard.

(Reporter requests clarification.)

        THE WITNESS:  Yes.  Holly Bullard, B-u-l-l-a-r-d.

        And ultimately Mitch Emerson, the executive director made the decision.

BY MS. DOLAN:

Q.    Was it a single provision of 1205 or the combined effect of multiple provisions?

A.    A combined effect.

Q.    After the suspension, did you have any involvement in transition planning for FDH's future work?

A.    Yeah.  As I mentioned, I stayed into mid-October, so I was involved with the transition and figuring out sort of next steps for 2028.

Q.    What did that transition work involve?

A.    Primarily, it was pivoting our coalition and volunteers,

right?  We were -- up until the end we were still saying, We are going to do our best to get there.  And so, having to then break the news that we were going to have to suspend the campaign but also make sure that they remain engaged going into the 2028 cycle.

Q.    This is our last exhibit.

The courtroom technician is projecting what's been marked as FDH Plaintiffs' Exhibit 527.

Do you recognize this document?

A.    I do, yes.

Q.    What is it?

A.    So this is an email I sent to our coalition partners following the suspension of the campaign.

Q.    And what was the purposes of this email?

A.    So this is an email I sent them after our grassroots call to let them know that we were suspending in case they weren't able to attend, but also to let them know that FDH was going to try again for the 2028 ballot and that we desperately needed them to stay involved.

Q.    And you sent this after the suspension announcement?

A.    Yes.

Q.    Was this record kept in the regular course of business by FDH?

A.    Yes.

Q.    Was creating grassroots updates such as this a regular

practice of FDH?

A.   Yes.

MS. DOLAN:  I want to move to admit as an exhibit.

THE COURT:  Any objection?

MR. JAZIL:  No objection, Your Honor.

THE COURT:  Without objection, it's admitted.

I'm sorry.  That, again, Counsel, was?

MR. JAZIL:  527, Your Honor.

THE COURT:  527.

MS. DOLAN:  Thank you.

(PLAINTIFFS' EXHIBIT FDH-527:  Received in evidence.)

BY MS. DOLAN:

Q.   Turning to page 2, the email mentions continuing to count on volunteer support.

Why did you communicate this message to volunteers?

A.   Ultimately with a grassroots campaign like ours, it starts and ends with volunteers, right?  If you don't have the volunteer program, you don't get the money to run the paid program.  You aren't able to get any of it done.  You also don't get the support on the ground or the overall voter interest.

It was essentially that we not use the coalition that we had built up and that we were able to maintain them going into the 2028 cycle so that we stood a chance.

Q.   Did you leave your role shortly after this email?

A.   I did, yes.

Q.   And since leaving your role, have you remained in contact with FDH's leadership?

A.   Yes.

Q.   How often are you in contact?

A.   Pretty regularly.  Perhaps too much.

Q.   In general terms, what subject areas are covered in those communications?

A.   You know, plans for 2028, what the thinking is, certainly what next steps are as we -- as they launch back up here in February.

Q.   And based on your transition work and ongoing contact with leadership, do you have knowledge of FDH's current activities and plans for 2028?

A.   Yes.

Q.   After suspending the 2026 petition operations, did FDH continue to engage in activities related to Medicaid expansion?

A.   Yes.  There was still ongoing communication with our volunteers, presumably also with donors, making sure that we, as I said, were continuing the momentum going into '28.

Q.   And how is FDH maintaining relationships with volunteers?

A.   A number of things:  Calls, emails, social media postings, grassroots calls with the coalition partners.

Q.   And what are those 2028 plans?

A.   Well, they are largely dependent on what happens here.  But as of right now, the move has been to a digital program using

that TallyED link, which, of course, no longer provides a prefill, to just provide a blank petition to be mailed to the voter, and then they -- with a return envelope for them to send it back.

Q.   Based on your knowledge, did FDH communicate these ongoing activities and plans to volunteers?

A.   Yes.

Q.   If 1205's provisions regarding registration remain in place, how will that continue to affect volunteers' ability to participate in the 2028 campaign?

A.   It will severely, severely limit it.  As we talked about, you know, collection was great.  When we had to move to distribution, it was not great, and it was very limiting already.

     The reality is distribution was not effective.  So now they've had to go even one step further away from that, and so there's not that level of direct interaction with voters beyond, Here's a link; good luck.

Q.   And what about the eligibility requirements?  If they remain in place, how will that continue to affect volunteers' ability to participate in the 2028 campaign?

A.   Same answer.  Without that -- you know, with that still in effect, can't do collection, can't really even do distribution effectively, so all we have is a digital link.

Q.   How will the provisions cumulatively affect FDH's ability

to reach voters in 2028 if they remain in effect?

A.    Super, super limited.  It's -- again, like, just going back to the idea that volunteers are foot soldiers on the ground, they are the first people talking to voters about the issue, they can't do that anymore.

MS. DOLAN:  Your Honor, if I can have a moment to confer with my co-counsel?

THE COURT:  Certainly.

(Discussion was held.)

MS. DOLAN:  I'll pass the witness.

THE COURT:  All right.  We are going to take a break in just a moment.

Let me circle back.  I mentioned earlier in my discussion with Mr. Wermuth and Mr. Jazil that I had read a deposition.  This morning I knew we were going to talk about the admissibilities of the report.  So let me circle back.  That was Jonathan Bridges, the 30(b)(6) AG's witness, which is ECF No. 597-1.

I also reviewed prior to today, knowing that Dr. Acosta was going to testify, Holly Bullard's, 30(b)(6) witness for FDH, which is ECF No. 618.

If y'all know somebody that's coming -- and I just can't physically read 2,000 pages tonight.  But if there are people you know that are coming up, and it would be helpful for me to read those depositions on a particular day because it

would be consistent with the presentation, if y'all could please flag those for me.  Sometimes I can guess, and, like, it was appropriate for me to read Bullard's deposition prior to Dr. Acosta's.  But that would be helpful to me as well because it will help me know the best depos to read each evening.

So, for example, I know that with the 30(b)(6) witness for FDH that the goal was to collect 1.3 million; that the budget started at 25 million and went to 28; that they only collected about 10 percent of the fundraising goals and then what happened.  And so I've read that depo, so I'm familiar with that testimony as well.

But to the extent y'all can do that, it helps frame the issues for me.  And it will be helpful for me to read depos in context, consistent with what you're presenting.

We'll take a ten-minute break.  And when we come back, we'll hear the cross-examination.

Thank you.

(Recess taken at 10:17 AM.)

(Resumed at 10:31 AM.)

THE COURT:  Mr. Jazil, you may proceed.

CROSS-EXAMINATION

BY MR. JAZIL:

Q.   Good morning, Dr. Acosta.

A.   Good morning.

Q.   Dr. Acosta, I'd like to start by talking generally about

Florida Decides Healthcare.

So if my understanding of your testimony is accurate, Florida Decides Healthcare, which -- created its local committee in 2018; right?

A.   Yes, at the end of 2018.

Q.   And, again, my understanding of your testimony is that Florida Decides Healthcare did not get on the ballot in 2020; right?

A.   Correct.

Q.   It did not get on the ballot in 2022; right?

A.   No.

Q.   It did not get on the ballot in 2024; right?

A.   No.

Q.   And it did not get on the ballot for 2026?

A.   Correct.

Q.   You said some of those efforts in 2022 and 2024 were serious efforts?  Did I hear that right?

A.   So I believe what I said was the only real effort that was made was for that first cycle, for the 2020 cycle.

Q.   So the only real effort that was made was for the 2020 cycle, but y'all stayed a political committee for those remaining cycles; correct?

A.   Correct.

Q.   So the only real effort in 2020, do y'all remember how many signatures you got for that effort?

A.   90,000.

Q.   90,000.

A.   Yes.

Q.   And you got fewer than 90,000 signatures for the remaining efforts; correct?

A.   Correct, because we were not really mounting an effort.

Q.   For the 2028 effort that's now ongoing --

A.   The one that just started?

Q.   Yes, ma'am.

     Do you know how many signatures y'all have gotten for that effort?

A.   I do not.

Q.   Do you know how many employees Florida Decides Healthcare has for that effort?

A.   I have an estimate.

Q.   Are you yourself someone who's been hired for the 2028 effort?

A.   No.

Q.   No.

     But the 2028 effort is ongoing; correct?

A.   Yes.

Q.   And the 2028 effort is relying on a model where voters can go on the Florida Decides Healthcare website and get a petition; correct?

A.   They can request a petition be mailed to them.

Q.   Okay.  And the expectation is voters will take that petition and mail it back; right?

A.   Yes, it includes a return envelope.

Q.   Okay.  And the budget for the 2028 effort is $18 million; correct?

A.   I really wouldn't know.  I'm not involved.

Q.   Who would know?

A.   For '28?

Q.   Yes, ma'am.

A.   Yeah, I'm not sure.

Q.   Would it be Mitch Emerson who knows?

A.   I would assume so.

Q.   Do you know whether the expectation for the 2028 effort is to get on the ballot?

A.   I'm sure that is the hope, absolutely.

Q.   But, again, you haven't --

A.   Well, I moved on to different work.

Q.   Doctor, I'd like to focus back on the 2026 effort.

A.   Sure.

        MR. JAZIL:  Can we put up DX 1569, please?

        And, Your Honor, may I approach the witness with a physical copy of the document as well?

        THE COURT:  You may.

BY MR. JAZIL:

Q.   Now, Doctor, this is a Florida Decides Healthcare

Plaintiffs' Objections and Responses to Defendants Supervisors of Elections' Second Set of Interrogatories; right?

A.   Looks like it, yes.

Q.   If you scroll -- if you go to the -- near the end of it, can you see who signed this thing on behalf of Florida Decides Healthcare?

A.   Page 11?

Q.   Yes, ma'am.

A.   Yes.

Q.   Who signed it?

A.   Mitch Emerson.

MR. JAZIL:   Okay.  Can we go to the page with the chart?  Right here.

Let's go to the page before this one for a moment.

Now, here the question that's being asked of Florida Decides Healthcare is:  *During the initiative campaign that you suspended in September 2025, how many petition forms did you collect -- by week and by month -- in support of the initiative entitled "Provide Medicaid Coverage to Eligible Low-Income Adults"?  For purposes of this interrogatory, "petition forms" includes all petition forms regardless of their validity or invalidity.*

Do you see that one?

A.   Yes.

Q.   Let's go to the next page, the answer.

We've got an objection, and then there's a sentence in the middle of the paragraph that says:  *FDH kept track of the total number of petitions that it submitted to the Supervisors of Election each week that were received either from volunteers or from paid circulators.*

Do you see that, ma'am?

A.    Yes.

Q.    And then we've got a chart -- and you can flip through it -- pages 2 and 3, that lists out the petitions submitted; right?

A.    Yes.

Q.    And in the left column, we have got the date the petitions were submitted; correct?

A.    Yes.

Q.    And on the right column, we have the number of petitions submitted; true?

A.    I believe these were, yeah, submitted to the SOEs.  Yes.

Q.    Okay.  And if we go to the very end on page 3, we've got the total 126,840.

Do you see that?

A.    Yes.

Q.    And this is consistent with your testimony earlier that y'all submitted approximately 120,000?

A.    127,000, I believe.

Q.    127,000.

A.    Yes.

Q.    Okay.  Let's focus on page 2 for a moment.

A.    Sure.

Q.    Let's look at the date range that goes 6-11-2024 all the way through 5-5-2025.  Let's focus on that date range for a moment.

You agree with me in June of 2024 HB 1205 was not in effect; correct?

A.    In June of '24, no, it was not in effect.

Q.    And it wasn't in effect in January of 2025; right?

A.    Correct.

Q.    And it wasn't in effect in March of 2025; right?

A.    Correct.

Q.    And it wasn't in effect in April of 2025; right?

A.    Correct.

Q.    And it went into effect when?

A.    May 2nd.

Q.    May 2nd.  Okay.

So during that period where HB 1205 was not in effect, you were free to engage in the volunteer activities that you described earlier with my friend; correct?

A.    Correct.

Q.    And during that time, you did not collect anywhere near 100,000 petitions; correct?

A.    We did.  This is submitted to the SOEs.

Q.    Submitted to the SOEs from volunteers or paid circulators; right?

A.    Yeah.  And there's definitely a time lag in this.  But yes.

Q.    Okay.  But you'd agree with me that if I add the numbers from June all the way through May 5th, 2025, that does not add up to 100,000; right?

A.    Correct, because we were not required to submit volunteer ones by a certain timeline.  So up until that point we were mostly holding on to them to submit in bulk.

Q.    Okay.  Understood.

But your goal for the effort was to submit 100,000 petitions by May of 2025?

A.    Our goal was to collect.  So these are raw numbers of what we had coming into us.

Q.    Okay.  So your goal was to collect but not to submit 100,000 petitions by May 1?

A.    That is correct.

MR. JAZIL:  Okay.  We can take that down.

BY MR. JAZIL:

Q.    Ma'am, do you know what the budget for the 2026 campaign was when the campaign initially started?

A.    When it initially started, no.

Q.    Does 25 million sound about right?

A.    Probably, yes.

Q.    Do you know how much the campaign raised between November

of 2024 and the end of the campaign in September 2025?

A.    I do not know the cumulative number.  Like, the money part was not really me to that point.

Q.    Understood.  The money part wasn't you, but you would agree with me that it was nowhere near 25 million; right?

A.    Well, correct.  To be fair, our budget had to keep changing as HB 1205 was going into effect.  So there were many versions of it.

Q.    Understood.

So you'd also agree with me that the best place for me to figure out how much y'all collected would be the Department of State's website --

A.    Yes.

Q.    -- where the contributions were reported; correct?

A.    Sure.

Q.    Now, ma'am, you said that the money part wasn't you; right?

A.    Correct.  I had a very high-level understanding, but not the minutiae of it.

Q.    Your specific role was organizing director for FDH between March 2025 and October of 2025; correct.

A.    Correct.

Q.    And prior to this appointment -- I know you talked about volunteering for other campaigns, but prior to this appointment at FDH, you never had a formal role with any initiative campaign?

A.   No.   I was a hub lead for a few of them.

Q.   So you were a volunteer as a hub lead?

A.   Well, it was in my -- in certain cases, it was in my paid capacity working for the Palm Beach County Democratic Executive Committee as a volunteer hub for them.

Q.   Okay.   But no one at one of the citizen initiatives hired you prior to FDH?

A.   Correct.

Q.   And as a hub lead at these facilities when you worked on the other initiatives, you weren't supervising individuals, were you?

A.   Supervising is a strong word when dealing with volunteers. I was dealing with the volunteers.

Q.   But you were responsible for tasks, not making sure that individuals did things they were supposed to; correct?

A.   I mean, I definitely was responsible for making sure the petitions coming in looked valid and, you know, saying, Hey, make sure they're filling in this part.   So I would definitely consider that as some level of oversight over the volunteers.

Q.   Okay.   Could you discipline volunteers as the hub lead?

A.   In general one does not think about volunteers as someone you would ever discipline.

Q.   Because they come and go as they please; right?

A.   Because they are volunteers, and they're giving of their time to help a cause.   You know, they really don't have reason

to do anything wrong.  Really it's always human error issues that you deal with.

Q.  And you have no way of controlling whether, when, or how a volunteer returns a petition; right?

A.  Well, it's a communication issue, right.  If you are running a good campaign like ours, you let them know what the expectation is.  Do they always meet it?  No.  They're volunteers.  But you certainly -- if you set guidelines, most volunteers will do their absolute best to meet those.

Q.  But you can't control them; right?

A.  Well, no.  They're volunteers.

Q.  So you can't control whether, when, and how they return petitions; right?

A.  Control, no.

Q.  Okay.  And, again, your role as the organizing director was just to run the volunteer programs; right?

A.  That was my primary role was running the volunteer program and coordinating with our coalition partners.

Q.  Okay.  And the paid petition circulation was done by The Outreach Team; right?

A.  Yes, they managed that.

Q.  And they managed that.

So let's talk a bit about the volunteers that you manage.

FDH did not maintain a complete list of its volunteers ever, did it?

A.    Correct.

Q.    And so you did not keep track of how many volunteers were Florida residents or nonresidents; right?

A.    No, we never asked that question.

Q.    And you never did background checks to see whether a volunteer was a felon or not?

A.    Correct.

Q.    Did you know that The Outreach Team did background checks before hiring paid circulators for FDH?

A.    Yes.

Q.    And as a general rule The Outreach Team did not hire felons as circulators; true?

A.    Correct.

Q.    Now, ma'am, you also did not track how many signed petitions an individual volunteer collected for this; right?

A.    Correct.  We had no reason to.

Q.    So you don't know how many petitions any individual volunteer collected?

A.    Any individual volunteer?  Some of them I know, but --

Q.    Were you a volunteer?

A.    For this campaign?

Q.    Yes, ma'am.

A.    Yeah, prior to starting, sure.

Q.    How many petitions did you collect as a volunteer for this campaign before starting?

A.    Somewhere in the hundreds.

Q.    Okay.  Other than for yourself, do you know how many petitions a volunteer collected?

A.    Yeah.  So when I would go out with volunteers to observe them, I would certainly keep track of that, and also what was coming in from our hubs you could get a sense, for sure.

Q.    But the organization itself never kept track of how many petitions an individual volunteer collected?

A.    Never had reason to.

Q.    And you testified about this, but just so I'm clear, there is no mandatory training for volunteers?

A.    Correct.

Q.    You did, however, have a training program; right?

A.    Yes.

Q.    And this training program ran about 45 minutes to an hour?

A.    Depending on the session, but, yes.

Q.    Have you taken the state's online training for paid circulators?

A.    I did not register as a circulator, so I did not take the training, but I am familiar with it.

Q.    Okay.  Do you know how long that training takes?

A.    Again, it depends on how long it takes a person to get through the materials and how familiar they are with it.

Q.    So you can't tell me whether 45 minutes to an hour is about the time it takes to get through that training?

A.   I cannot.  I would assume if you're pretty experienced --
no idea.  Like, it might take you longer; might take you a lot
less; it depends.

Q.   Okay.  And if I understood your testimony correctly, once
you have volunteers -- and this is pre-HB 1205?

A.   Okay.

Q.   The volunteers collect the petitions and then they're
supposed to return them to the volunteer hubs; right?

A.   For the most part, yes.

Q.   For the most part?  Okay.

A.   Yeah.

Q.   And at these volunteer hubs, prior to you taking over, the
petitions would stay at the hubs until there were batches of
about 50 petitions, and then they were sent over to a FDH PO
Box; right?

A.   That's correct.

Q.   And then the petitions went from the FDH PO Box to TallyED;
right?

A.   Correct.

Q.   And then they went from TallyED to the Supervisor of
Elections; right?

A.   Correct.

Q.   And then when you took over in March of 2025, you decided
to cut down the amount of time that petitions stayed at a hub;
right?

A.    Yes.

Q.    And instead of waiting for batches, you decided that petitions should get put in the mail within two weeks; right?

A.    Yes.

Q.    14 days; right?

A.    Yes.

Q.    And you cut out the PO Box in the middle; right?

A.    Right.

Q.    And you went straight to TallyED; right?

A.    Yes.

Q.    And TallyED was supposed to get it to the Supervisors?

A.    Correct.

Q.    And you made these changes to get petitions from the voters' hands to the Supervisor of Elections' hands quicker; right?

A.    That wasn't really the main factor at this point.  It was a factor.

Q.    Okay.  So it was a factor?

A.    Yeah.  I mean, the main reason was for our own tracking purposes to have a sense of momentum.  As I mentioned, also, you know, we were really in the on-year for petition collection at this point, so the process was ramping up.  You want to get everything as streamlined as possible.

        MR. JAZIL:  Okay.  Let's take a look at Ms. --
Dr. Acosta's deposition, please, page 37, line 3 to 6.

BY MR. JAZIL:

Q. Dr. Acosta, you were deposed in this case; right?

A. Yes.

Q. So let's go to line 3.

*Question: And you made those changes so that a form would get from a voter's hands to the Supervisor's hands quicker; right?*

*Answer: Sure.*

MR. JAZIL: Let's take that down.

THE WITNESS: As I said, it was a factor.

BY MR. JAZIL:

Q. Okay. Doctor, are you familiar with Blue Panhandle Coalition?

A. Yes.

Q. They are a coalition partner of Florida Decides Healthcare; right?

A. Yes.

Q. And are you familiar with an incident with the Blue Panhandle Coalition at the Fred Levin Fest in 2025?

A. I'd hesitate to call it an "incident," but, yes.

Q. Okay. What's your understanding of what happened?

A. My understanding is the volunteers were very eager. They went forward to people. They were like, Hey, maybe don't interrupt the lunch line. They were asked to leave; they did.

Q. It wasn't just a lunch line, right? The Fred Levin Fest

was handing out goods to families in need; right?

A.   Yes.

Q.   And the complaint about your coalition partners was that they were interfering with the event; right?

A.   Right.

MR. JAZIL:   Okay.   Let's take a look at FDH Exhibit 422.

THE COURT:   Mr. Jazil, before -- it was marked, but was it your intent to make the responses to the second set of interrogatories, DX 1569, part of the record?

MR. JAZIL:   Yes, Your Honor.   I'd like to move it into evidence.   I was going to do it at the end, but I'll do it now.

MS. DOLAN:   No objection.

THE COURT:   Without objection, DX 1569 is admitted.

So it's clear, this is not what would happen in a jury trial and we'd publish it, but we're doing it on an expedited basis, and, without objection, DX 1569 is admitted.

(DEFENDANTS' EXHIBIT 1569:   Received in evidence.)

BY MR. JAZIL:

Q.   So, Doctor, I'd like to take us back to FDH Exhibit 442.

Do you recall testifying about this?

A.   Yes.

Q.   And this was sent out May 6, 2025; right?

A.   Yes.

Q.   So this is after HB 1205 became law?

A.    Yes, and when it was in partial effect.

Q.    And so I'd like to zoom in on the second paragraph.

This is the communication you had to your volunteers; true?

A.    Yes.  It's a little blurry.

Thank you.

Q.    And here it says -- this is after the law went into effect: *The main takeaway should be that petition collection can continue.*

Do you read that?

A.    Yes.  At this point because it wasn't in full effect.

Q.    Okay.

A.    We could continue.

Q.    But after it became law but before it was in full effect, your message to the volunteers was that petition collection can continue?

A.    Yes.  We collected it through the end of June.

Q.    Now I'd like to go to Defendant's Exhibit 121.

Doctor, take a look at that.

Doctor, I see you're struggling to read it.

A.    Yeah, it's a little blurry.  Sorry.

Q.    May I hand you a paper copy?

A.    That would be great.  Thank you.

        MR. JAZIL:  Your Honor, may I approach?

        THE COURT:  You may.

        THE WITNESS:  It's a little blurry on the screen.

Thank you very much.

BY MR. JAZIL:

Q.   All right.  Doctor, let me know when you've had a chance to look at it.

A.   All right.

Q.   Okay.  Now, Doctor, we see at the bottom right that this document has a Bates number, FDH0000880; right?

A.   Yes.

Q.   That means it came from FDH's production in this case to us; right?

A.   Yes.

Q.   And if we take a look at the "From" line at the very top of this document, it's got your name --

A.   Yes.

Q.   -- Ana-Christina Acosta and an email address; right?

A.   Correct.

Q.   And that's your email address?

A.   Yes.

     MR. JAZIL:  Your Honor, I'd like to move this into evidence.

     MS. DOLAN:  We object to the extent it's offered for the truth of the matter asserted.

     THE COURT:  I think I know your response.

     Response?

     MR. JAZIL:  Your Honor, it's a -- it's the party's

statement, and to the extent I get something in here that's their statement, it's not hearsay.

MS. DOLAN:  Your Honor, there's a portion of the email that's from another volunteer not from Dr. Acosta, so for that portion of the email.

THE COURT:  All right.  I'm going to admit it as -- the portion that's the email from the deponent.  To the extent the rest of it comes in so it makes sense, the balance of the depo -- balance of the exhibit, I'd consider it for that purpose.

(DEFENDANTS' EXHIBIT 121:  Received in evidence.)

BY MR. JAZIL:

Q.   Okay.  Let's ask some questions about this.

Doctor, do you know Debbie Deland?

A.   Yes.

Q.   She is one of your coalition partners; right?

A.   Yes.

Q.   And she's on the signature block at the very end of this email; right?

A.   Yes.

Q.   And we see that this email was sent from you to her July 5th; right?

A.   The reply, yes.

Q.   And her email to you is also sent July 5th, if we scroll down after your signature?

A.    Yes.

Q.    Okay.  So this conversation was had on July 5th, 2025; true?

A.    Yes.

Q.    And temporally that's after HB 1205 went into effect?

A.    Into full effect, yes.

Q.    Into full effect; right?

A.    Yes.

Q.    And this is Debbie Deland giving you an opportunity to edit comments that she is going to be making to her team; right?

A.    Correct.

Q.    And you, in fact, made edits and bolded them in this document; right?

A.    I can't see the bold -- I don't know that the bolding is my edits.

Q.    Okay.  So let's take a look at the very top email from you to Debbie Deland:  *Hi, Debbie* --

A.    Oh, yeah, I did.  Okay.

Q.    So she gave you an opportunity to edit this document; true?

A.    Yes.

Q.    And in this document, if we go to the second page, the very end, it says:  *The new procedures are not onerous so we should continue our drive to get petitions completed and mailed by the voter.*

       Do you see that, ma'am?

A.   Yes.

Q.   All right.  You had an opportunity to edit this document for Ms. Deland to her members; true?

A.   Correct.  It was not onerous for the volunteer.

Q.   Okay.

        MR. JAZIL:  Your Honor, I have no further questions but my understanding is my colleagues on the defense side have additional questions.

        THE COURT:  Okay.

                    CROSS-EXAMINATION

BY MR. STAFFORD:

Q.   Good morning, Dr. Acosta.

A.   Good morning.

Q.   I promise I won't keep you here much longer.  I know you've been up there awhile.

A.   I appreciate it.

Q.   I just had a couple of questions.

     Your job with FDH was an organizing director?

A.   Yes.

Q.   Was part -- and part of that job was helping to organize the campaign?

A.   The volunteer portion especially, yes.

Q.   Okay.  But prior to that, the FDH had designed a campaign to get the requisite number of signatures?

A.   Prior when?  Sorry.  Could you clarify?

Q.   Prior to you starting in March.

A.   So there was not an organizing program in the same way prior to my starting.

Q.   Okay.  Well, the campaign was -- the purpose of the campaign was to get the requisite number of signatures, and there was a particular way that FDH wanted to go about doing that; is that a fair statement?

A.   Yes.

Q.   Is it also a fair statement that that -- the organizing or the design of that campaign was based on the statutes that existed at the time --

A.   Yes.

Q.   -- prior to -- I mean, mainly prior to 1205?

A.   Correct.

Q.   Okay.  Is it a fair statement that part of the difficulties that FDH faced that you're saying resulted from 1205 is changing the design of the program to get signatures to account for HB 1205?

A.   So just to clarify, are you asking if the part of the -- part of the issue we had getting on the ballot is because things kept changing?

Q.   Correct.

A.   Yes, that was certainly a major factor.

Q.   Would it be a fair statement that if the regime set forth in 1205 was in place prior to beginning the 2026 campaign,

chances are the program would have been designed differently in order to get the number of signatures?

A.   Well, I mean, that's still something that's being worked through even for the '28 cycle of how one does that.  But, yes, the program that we ran would not -- we would not have been able to run that program.

Q.   I remember you saying something about going digital.

So would it be a fair statement to say if the 2026 campaign had 1205 to take into account prior to the campaign beginning, it would have been designed differently than it was now?

A.   Yeah.  To be candid, we're still figuring out what that looks like, the current campaign staff is.  So, sure.

Q.   Now, given that, would it be a fair statement that -- and I know you're not involved in the 2028 campaign, at least at this point -- that we don't know -- or FDH doesn't know how effective a campaign -- I guess the newly designed campaign, taking into account 1205, it would be speculation to say how effective that campaign would be?

A.   Not entirely, given we did run some level of digital programming prior to this.  But parts of it, sure.

MR. STAFFORD:  Thank you, Ms. Acosta.  I have no further questions.

THE COURT:  Anything else from any of the defense lawyers?

Hearing nothing, redirect?

MS. DOLAN:  None, Your Honor.

THE COURT:  You may step down.

(Dr. Acosta exited the witness stand.)

THE COURT:  Plaintiff can call its next witness.

MS. GAMBHIR:  Your Honor, Harleen Gambhir for the FDH Plaintiffs.

The next witness will be Mr. Jordan Simmons.

(Mr. Simmons entered the witness stand.)

THE COURT:  Sir, if you'll remain standing and raise your right hand to be sworn.

**JORDAN SIMMONS, PLAINTIFFS' WITNESS, DULY SWORN**

THE COURTROOM DEPUTY:  Please state your name record.

THE WITNESS:  Jordan Simmons.

THE COURTROOM DEPUTY:  Thank you.

THE COURT:  Please take your seat, sir.

MS. GAMBHIR:  And, Your Honor, Mr. Simmons is a plaintiff from the FDH -- of the FDH plaintiffs and acted as a paid circulator for FDH's paid circulation vendor.  He's a non-Florida resident and will be offering testimony relevant to Counts One through Four of the FDH plaintiffs' operative complaint.

                    DIRECT EXAMINATION

BY MS. GAMBHIR:

Q.   Good afternoon, Mr. Simmons.

A.   Good afternoon.

Q.   Mr. Simmons, where are you currently employed?

A.   The Outreach Team.

Q.   And what is The Outreach Team?

A.   The Outreach Team is a field firm that specializes in mobilizing, organizing, and strategizing with voters.  We do things like voter registration, door-knocking campaigns, and ballot initiatives.

Q.   And how long have you been employed with The Outreach Team?

A.   Since September of 2023.

Q.   And what is your current position?

A.   I'm a project director.

Q.   And how long have you been in that position?

A.   Since July 2024.

Q.   And what are the primary responsibilities of your position?

A.   So the primary responsibilities I oversee are field campaigns.  So I manage our in-office operations; I collect signatures; I do voter registrations, and, basically, I oversee different projects that we run.

Q.   And did you serve as a project director for Florida Decides Healthcare during the 2026 campaign?

A.   Yes, I did.

Q.   And, Mr. Simmons, are you a resident of Florida?

A.   I am not a resident of Florida.

Q.   Where are you a resident?

A.   I'm a resident of Missouri.

Q.   And were you a resident of Missouri during the entire time you worked with FDH's campaign?

A.   Yes, I was.

Q.   And did HB 1205 cause you to alter your work with FDH's campaign?

A.   Yes, HB 1205 did cause me to alter my work with the campaign.

Q.   How so?

A.   I was no longer able to gather signatures under the provisions.  It also changed just the nature of my work and how I was able to run our field offices.

Q.   So, Mr. Simmons, we'll be walking through a few topics: Your background and experience on ballot initiatives, the setup and structure of The Outreach Team's work for FDH, and the impact of HB 1205 on paid circulator operations.

     Sound good?

A.   Sounds good.

Q.   Okay.  So let's talk about your campaign experience.

     When did you start working on political campaigns?

A.   I started working on political campaigns in 2018.

Q.   And how many campaigns have you worked on in total?

A.   Roughly 15 to 20.

Q.   And have you had the same role in each campaign?

A.   No, I have not.

Q.   What different roles have you had?

A.    So I initially started off as a canvasser, so doing petition circulating and door-knocking campaigns.  I became a team lead and then a director on those campaigns.  As a director, just overseeing our offices and then eventually working my way up and became a project director overseeing whole campaigns.

Q.    And how many states have you worked in for those campaigns?

A.    Seven or eight.

Q.    And how many campaigns have you done in Florida?

A.    Only one, the FDH campaign.

Q.    And of the total number of campaigns you've worked on, how many were ballot initiative campaigns?

A.    About ten.

Q.    And of those, how many did you actually collect petitions?

A.    I collected petitions on every one of them.

Q.    And does that include across the various roles that you had?  You still collected petitions for every one?

A.    Yes.

Q.    And for each of these campaigns, were you working at The Outreach Team?

A.    No, I was not working at The Outreach Team.  I previously worked at FieldWorks, which is a similar organization that does field campaigns.

Q.    And when did you switch from one to the other?

A.    September of 2023.

Q.   All right.  Let's turn to your work with FDH.

First, what is FDH?

A.   Florida Decides Healthcare is a coalition that was working to put Medicaid expansion on the ballot in 2026.

Q.   And how did you become involved in FDH's campaign?

A.   I became involved in the campaign because I worked at The Outreach Team, and because of my experience on ballot initiatives and working on Medicaid expansion in particular, I came onto the FDH campaign.

Q.   And what was your role for FDH's campaign?

A.   Project director.

Q.   And when did that role begin?

A.   It began in March of 2025.

Q.   When did your work on FDH's campaign end?

A.   It ended in August of 2025.

Q.   Was that around the time that The Outreach Team stopped working with FDH as well?

A.   Yes, it was.

Q.   And what were your responsibilities as project director for FDH?

A.   So my responsibilities as project director included hiring our salaried staff in our Central Florida offices.  I collected signatures, and then I also managed the team of circulators going out and collecting petitions.

Q.   And what was the general management structure for The

Outreach Team's work for FDH?

A.   The general management structure from top to bottom started off with Marc Walsh as a VP who oversaw just getting the campaign in general.  Then we had our national program director who basically oversaw the entire state of Florida.  Then we had project directors, like myself.  Each of us had one region in Florida, so mine being Central Florida.  And then from there, we had our in-office directors and then our circulator staff, so canvassers and team leaders.

Q.   And how many circulators would operate out of each office at the peak of The Outreach Team's operations for FDH?

A.   At the peak of operations, roughly 25 to 35 people.

Q.   About how many offices were operating at that peak?

A.   At the peak we had three offices operating.

Q.   And how many circulators were operating at the lowest point of The Outreach Team's operations?

A.   At the lowest point of operations, we actually paused our operations.  So it went all the way down to zero.  We completely downsized right before the passing of HB 1205.  Then from there, we got up to about ten people per office.

Q.   After HB 1205 passed, did the rate of sending out circulators ever reach the same volume per day again?

A.   It did not reach the same volume again.

Q.   And, Mr. Simmons, did you have a role in hiring for The Outreach Team's operations for FDH?

A.    Yes, I did have a role in hiring.  I managed hiring the salaried directors for our Central Florida offices.

Q.    And did you look for any qualities in particular during the hiring process for directors?

A.    Yes, I did.

Q.    What were those?

A.    The qualities I looked for was previous campaign experience, particularly working on ballot initiatives, and then just any relevant experience across any kind of campaign or involvement with the issue.

Q.    And were any of the directors that you hired residents of states other than Florida?

A.    Yes.

Q.    How about how many?

A.    Of the directors that I hired, there were three from states other than Florida.

Q.    And was it important to you to hire those individuals in particular?

A.    It was important for those particular individuals.

Q.    Why?

A.    One of them had managed ballot initiative campaigns before. One of them had managed a quality control operation on ballot initiative campaigns.  And the third person actually got his start as a canvasser on ballot initiative campaigns, so he had experience collecting signatures.

Q.   And did The Outreach Team's directors engage in petition circulation?

A.   Yes, they did.

Q.   And to your knowledge, prior to HB 1205, did The Outreach Team require circulators for FDH to be Florida residents?

A.   Prior to HB 1205, they did not require that.

Q.   What about to be U.S. citizens?

A.   They required people to be authorized to work, but we did not require that they be U.S. citizens.

Q.   What about to either have no felony record or to have their rights restored?

A.   That was not a requirement.

Q.   To your knowledge, why didn't The Outreach Team have those requirements?

A.   So The Outreach Team is an organization that prioritizes diversity.  So allowing people from all walks of life to work on these campaigns is important.  And then in regards to people being from out of state, just having the extra experience is valuable.  So hiring people with a broad range of experience is important.

Q.   Mr. Simmons, once The Outreach Team hired a circulator, what would that circulator's first day look like?

A.   So their first day they would come in office for an orientation, basically where we talk to them about how to do the job and tell them about the issue, and things like that.

From there, they would go out into the field where they would be trained by a director or team leader on how to actually collect signatures.  Once they are trained up, they would start canvassing on their own, and then we would build their schedule out.

Q.    So let's start with the in-office orientation.

Who designed that orientation?

A.    I designed the orientation, along with other people on our leadership team.

Q.    And what did that orientation cover?

A.    The first thing that orientation covered was the ballot initiative itself and the importance of expanding Medicaid in Florida.  We also --

(Reporter requests clarification.)

THE WITNESS:  The ballot initiative itself, and the importance of the campaign in Florida.

From there, we covered how to collect signatures and gave people some dos and don'ts and pro tips of signature gathering.

BY MS. GAMBHIR:

Q.    And you mentioned that the ballot initiative itself was the first topic.

Why did you start with that topic?

A.    It was important to make sure that our staff understood the mission and the reason that we were doing this campaign, and

then, along with that, being able to explain the issue came with just knowing about it first.

Q.   And what was next step after that orientation?

A.   The next step after orientation would be in-the-field training where staff could go out with a director or a team leader who would demonstrate how to collect signatures and actually train them on doing the signature gathering.

Q.   And did you ever conduct one of these training shifts?

A.   Yes, I did.

Q.   About how often did you do so?

A.   At the outset of the campaign, I did these training shifts almost daily.  And then as we grew and hired other team leaders and people like that, I would probably do them once per week.

Q.   And could you briefly, please, describe the training shift?

A.   Yeah.  So the training shift would start with me going out and demonstrating how to get a signature.  So I would actually talk to the voter and engage with them about the issue and gather a signature myself while the trainee just observed that whole process.

     After a while of them seeing me get a few signatures and how I handle these conversations, the trainee would then collect themselves.  I would give them feedback, and then once they feel comfortable, they'd be allowed to canvass on their own.

Q.   And, Mr. Simmons, you mentioned that you would actually collect petitions during the training shift; correct?

A.    Yes.

Q.    Was it necessary for you to collect petitions during the training shift?

A.    Yes, it was necessary.

Q.    Why?

A.    It was necessary so that circulators understood the process and actually see a demonstration.  People tend to learn better when they are seeing how something is done, not just being told to do it, and it also allowed me to collect signatures, which was the goal of the campaign.  So I was contributing to what we were doing.

Q.    Mr. Simmons, could you have simply talked to the voter about Medicaid expansion and then had the new recruit collect the petition?

A.    No, I could not have done that.

Q.    Why?

A.    Doing it that way doesn't give the circulator the opportunity to actually learn.  The whole process is conversational.  So by me demonstrating and me collecting signatures, I'm showing the circulator how to have these conversations and then, along with actually the act of collecting the signature, allows the circulator to see then how to get a quality signature by walking the voter through the form itself and them actually seeing that whole process.

Q.    You mentioned a quality signature.  What do you mean by

that?

A.   So what I mean by quality signature is just someone filling out the form properly, making sure that it's legible; there's no missing fields on the form, and just, like, the voter is actually a registered voter, like, the whole process of it.

Q.   And how do you demonstrate how to get a quality signature?

A.   The way I demonstrate it is by talking to the voter and then walking them through the form.  Something I tend to train people on, I'm, like, you need to treat people like a kid, just walk them step by step through the whole form.

Q.   Mr. Simmons, did circulators go through any additional in-office trainings after that first day?

A.   Yes, they did.  Something The Outreach Team really prioritizes is ongoing training so that people are consistently improving at doing the job.  So after their first day, each morning staff would come in, and then we would do what's called a skill session, just covering different aspects of the campaign and training them up further on it.

Q.   And who designed those skill sessions?

A.   I designed them, along with the rest of the leadership team at The Outreach Team.

Q.   Mr. Simmons, the courtroom technician will project a document that's been marked FDH Plaintiffs' Exhibit 562.

     Do you recognize this document?

A.   Yes, I do recognize this document.

Q.    How do you recognize this document?

A.    I created it.

Q.    And what is this document?

A.    So it's a rebuttals training, basically how to overcome different objections that people may encounter in the field.

Q.    And did The Outreach Team create this type of document in the typical course of its business?

A.    Yes, we did.  Across most of our campaigns one of those further trainings that we do is a rebuttals training based on different campaigns' talking points.

        MS. GAMBHIR:  Your Honor, we move to admit FDH Plaintiffs' Exhibit 562 into evidence.

        THE COURT:  Any objection?

        MR. JAZIL:  No objection, Your Honor.

        THE COURT:  Without objection, 562 is admitted.

    (PLAINTIFFS' EXHIBIT FDH-562:  Received in evidence.)

BY MS. GAMBHIR:

Q.    Mr. Simmons, can you explain a bit more about why this document was created on this topic in particular?

A.    Yeah.  So it was created on this topic in particular because our staff wanted to know better talking points and how to further talk to voters in the field.  A part of signature gathering is having conversations.  So just the initial training would broadly cover the issue and explain what Medicaid expansion is.  This particular training gives examples of things

that are common in the field and how to actually talk about them in that way.

Q.   And, Mr. Simmons, over the course of your work with FDH, did you observe circulators' interactions with voters?

A.   Yes, I did.

Q.   Approximately how many of those interactions did you observe?

A.   Anywhere from 80 to 100.

Q.   And over the course of your work with FDH, approximately how many voters did you personally collect petitions from?

A.   Probably about 100 or so.

Q.   And based on your experience collecting petitions and observing others collect petitions for FDH, what percentage of interactions between a voter and a circulator involved the discussion about Medicaid expansion.

A.   If I had to put a percentage to it, I'd say really close to 100 percent.  99 percent of the time we are talking about Medicaid.

Q.   And how long would a typical interaction be between a circulator and a voter?

A.   Anywhere from three to five minutes, I would say.

Q.   And what types of questions did voters typically ask circulators?

A.   Typical questions would be things like, Why is Medicaid expansion important?  How would this affect me?  Would it cost

me income or, like, raise my taxes? things like that.  And then also, like, Why are we out there doing this?  Why can I not sign a petition online? things like that.

Q.   Did you ever observe a voter who initially seemed reluctant to sign a petition who after a conversation ended up signing?

A.   Yes, absolutely.

Q.   Can you give any examples?

A.   Yeah.  Some of the most common examples are people not understanding, like, the tax implications or, like, how this would cost them.  And then another thing would be just, like, our circulators and -- including myself would kind of share our personal stories with Medicaid, and the voters having a better understanding on it because they see how the person working the issue is related to the issue itself.

Q.   And were The Outreach Teams circulators identifiable as associated with Medicaid expansion in any way during their interactions with voters?

A.   Yes, absolutely.  We wore bright red T-shirts that said "Florida Decides Healthcare."

Q.   And based on the experiences that we just discussed, do you think voters understood that you and other Outreach Team circulators were expressing a particular message?

A.   Yes.

Q.   What was that message?

A.   The message was the importance of expanding Medicaid and

putting it on a ballot for the voters of Florida to decide in 2026.

MS. GAMBHIR:  We can take the exhibit down.

Thank you.

Your Honor, Mr. Simmons will now testify to the impact of HB 1205 on himself and The Outreach Team's work with FDH, which relates to Counts One through Four of the FDH plaintiffs' operative complaint.

BY MS. GAMBHIR:

Q.  Mr. Simmons, I'd like to talk about The Outreach Team's operations for FDH's campaign prior to HB 1205.  We talked a bit about training new circulators.  Now I want to talk about the petitions themselves.

What would happen with the petitions once they were collected?

A.  Yeah.  So once petitions were collected, they'd be brought back to the office where the circulators would do what's called a debrief.  So the directors would review the circulators' forms, visibly just checking to make sure they are complete, talk to the staff about their day.

And then the petitions would go to our in-office quality control team who would do a further visual review, and from there they would upload them to our remote quality control team. And after a certain point, the petitions would be then emailed to our third-party validation team, who would then mail them to

the individual counties.

Q. And did you ever debrief circulators?

A. Yes.

Q. About how often?

A. Daily.

Q. What does debriefing involve?

A. So debriefing involves the circulators giving the petitions over to the director, where I would visually go through all the signatures they collected. From there, after looking at the signatures, I would talk to the circulator about their day, any feedback on things that the voters talked to them about that day, along with feedbacks on their location, and just, like, building their schedule, additional trainings, things like that.

Q. And you mentioned that after debriefing, the petitions went to an in-office quality control team?

A. Yes.

Q. What would that team do?

A. So what that team would do was check over the forms for completeness, and if there was any missing information that could be filled in, they would correct it. From there they would upload the forms to our remote quality control team.

Q. And I believe the next witness will testify regarding the remote validation, so let's now return to the impact of HB 1205 on The Outreach Team's work with FDH.

Mr. Simmons, are you aware that HB 1205 passed on May 2,

Direct Examination – Mr. Simmons

2025?

A.   Yes, I'm aware.

Q.   And did The Outreach Team adjust its operations at all in the time immediately before HB 1205 was passed?

A.   Yeah, we definitely adjusted our operations.

Q.   How so?

A.   We downsized our team just pretty broadly.  Scaling down was super important so that we could make the necessary adjustments.  With HB 1205 about to pass, we wanted to make sure we changed our processes a bit, and doing that when we have a team as large as we originally did would have been extremely difficult.

Q.   During what time period did that scaling down happen?

A.   The scaling down happened roughly in the one to two weeks prior to HB 1205 passing.

Q.   And can you explain what the nature of that scaling down was?

A.   Uh-huh.  So we scaled down our circulators.  We went from around 100 or so people -- 100, 150 people a day to maybe 30 to 40 at peak -- 30 to 40 people.  We adjusted how we sent petitions off.  We adjusted just, like, our overall paper flow and just changed the processes.

Q.   And do you know why The Outreach Team instituted this downsizing?

A.   Yes.  The reason we instituted the downsizing was so that

we could make the necessary changes without doing it at such a huge scale.  When there's -- when everything is being reorganized and there's hundreds of people going out each day, it's very difficult compared to if you just have 30 to 40 people.

Q.   Okay.  Turning to the specific provisions of HB 1205, starting with the ten-day return time before HB 1205, what was your understanding of how long sponsors had to return petitions from paid circulators?

A.   Yeah.  So prior to HB 1205, I believe we had a 30-day turnaround window.

Q.   And before HB 1205, where did The Outreach Team mail its completed petitions for FDH?

A.   We mailed the completed petitions to TallyED, which is, like, a third-party validation team.

Q.   And before HB 1205, about how often did The Outreach Team mail out the completed petitions to TallyED?

A.   Roughly every 10 to 15 days.

Q.   And did that timeline change when HB 1205 took effect?

A.   Yes, it did change.

Q.   How did it change?

A.   We went from mailing, basically, biweekly to mailing every single day.

Q.   And did changing from that biweekly turnaround to a daily turnaround affect The Outreach Team's work?

A.    Yes, it definitely affected our work.

Q.    How so?

A.    The first part is, like, the financial implications. Mailing stuff every single day, a bunch of small packages, can get pretty expensive.

      Then along with that, we had to shift how we circulated. Previously we might have gone further out, but because we were mailing every single day, we had to make sure the petitions were brought back to our offices, and we were going to send them the next day.

      Then along with that, it kind of adjusted the timing of how we would work from the lens of the post office is closed on Sunday and UPS has these different hours, so we'd have to kind of scramble sometimes to make sure we are mailing the petitions off.

Q.    And, Mr. Simmons, did the ten-day rule impact the extent to which The Outreach Team could spread FDH's message?

A.    I would say it definitely did.

Q.    Why?

A.    Because -- so sometimes we would do what's called an overnight canvass.  So, for instance, our Tampa office might have gone further out to, like, Orlando or St. Petersburg and collected signatures there and then brought them back the next day to be processed in our office.  But because we had to mail petitions every single day, prioritize that happening, we

couldn't spread the message and go do these overnight canvasses or go further out because we had to make sure that everything was being mailed the next day so we could meet that ten-day turnaround.

Q. Now let's turn to some of HB 1205's criminal provisions.

Mr. Simmons, are you aware that HB 1205 makes it a third-degree felony to fill in missing information on a signed petition?

A. Yes, I'm aware of that.

Q. And prior to HB 1205, did The Outreach Team staff ever fill in missing information on FDH petitions?

A. Yes, we did fill in missing information.

Q. What types of information?

A. Things like missing counties or missing cities.

Q. And, Mr. Simmons, are you aware that HB 1205 expands the definition of racketeering activity to include, quote, "a violation of the Florida Election Code relating to irregularities or fraud involving initiative petition activities"?

A. Yes, I'm aware of that.

Q. Mr. Simmons, do you have an understanding of what actions are prohibited by that provision?

A. I don't have a full understanding of it because I don't know all of the Florida election laws related to petitioning, but I did not want a RICO charge.

Q.   Did the possibility of a racketeering charge affect your willingness to circulate petitions?

A.   Absolutely.

Q.   And in your role managing staff, did you have conversations with directors and circulators about HB 1205?

A.   Yes, I did.

Q.   What concerns, if any, did the staff express to you about criminal liability under HB 1205?

A.   The biggest concern came from our out-of-state folks who were on the campaign because they were concerned with violating election law and having these criminal penalties, along with some of the fines that were, like, aligned with those penalties.

And it just -- our staff in general became kind of wary of signature gathering knowing all the extra things that HB 1205 brought.

Q.   Okay.  So let's talk about the circulator eligibility requirements.

Did HB 1205 also restrict who is eligible to circulate petition forms?

A.   Yes, it did restrict people.

Q.   What are those restrictions?

A.   So the restrictions included people who were from out of state, like myself, could no longer gather signatures; people who were noncitizens could no longer gather signatures, and then as well as those folks who may have had felons who did not have

their rights restored could no longer gather signatures.

Q.   And, Mr. Simmons, were you impacted by HB 1205's ban on nonresident circulators?

A.   Yeah.  I'm from Missouri, so I wasn't able to gather signatures in Florida anymore.

Q.   And did your work on FDH's campaign change because of the nonresident ban?

A.   Yes, it did change.

Q.   How so?

A.   So prior to HB 1205, I was able to participate in the signature gathering.  And then, like I mentioned, that debrief process, being able to physically review the signatures, is something I stopped being able to do with the new provision.

Q.   Do you know of any other non-Florida resident circulators for FDH who were impacted by the ban?

A.   Yes, I do.  On a director level, who are like our salary people brought in to manage these offices, I know of probably eight to ten people.

And then from the hourly circulators, I only oversaw our Tampa operation, so I know of at least two people there, but I'd imagine there are more people across the state.

Q.   And do you know of any nonresidents who were planning to work with The Outreach Team for FDH but were prevented from starting because of HB 1205?

A.   Yes, I do.  So initially I was going to oversee our Central

Florida operations, and I was hiring for that.  Part of that process was bringing in alumni, so there were at least five other people who weren't from Florida who would have then came and worked on this campaign.

Q.   And, Mr. Simmons, why were you bringing in alumni for those roles?

A.   Again, just the experience.  People who have ballot initiative experience in particular is like -- it's such a strong trait in this work, so bringing in people with that relevant experience is really important.

Q.   Mr. Simmons, what about the noncitizen ban?  Are you aware of any noncitizens who circulated for The Outreach Team on behalf of FDH before HB 1205?

A.   Yes, I'm aware.

Q.   How are you aware?

A.   So there were at least two people in the Tampa office who during their whole onboarding process I noticed had passports from different countries, so it just kind of came up in conversation.

Q.   And before HB 1205, did The Outreach Team work with any individuals with felony convictions whose rights had not been restored?

A.   Yes.

Q.   And how do you know that?

A.   So I know it just because -- well, it came up

conversationally with one person, but along with that The Outreach Team as an organization is very inclusive during the hiring practices.  So I'm sure, aside from the person I talked to about it, statewide it's something that's relatively common with our hiring.

Q.   And from our experience on ballot initiative campaigns generally, are there any potential benefits to employing circulators who have felony convictions?

A.   Yeah, absolutely.  I would say the benefits come from being able to talk to people from all walks of life, right?  A crime shouldn't kind of just define somebody from not being able to work.  And being able to go out and talk to people from various backgrounds, it's super important, so those people have that aspect.

And then kind of anecdotally, people who maybe have these prior convictions tend to be really grateful when they have a job that actually lets them work and then they end up working a lot harder, I notice.

Q.   So in sum, Mr. Simmons, what impact did the circulator eligibility requirements have on The Outreach Team's campaign for FDH?

A.   The circulator eligibility requirements impacted the campaign in a few ways.  It impacted our ability to hire people from out of state, so we weren't able to bring on some of the original folks who were slated to join this campaign.

It impacted our in-office staff because there were people across the state who couldn't work the campaign anymore.

And then just the recruitment in general, it changed our recruitment practices from being as inclusive as we are to being really selective with how we would bring people on.  And that made a huge difference just in how we would have scaled up our operations compared to post-HB 1205.

Q.   Okay.  And, Mr. Simmons, HB 1205 also required new petition forms as of July 1st; is that correct?

A.   That is correct.

Q.   And what additional voter information does the current form require that the prior version did not?

A.   It requires either the last four digits of a social security number or a driver's license number to be provided by voters.

Q.   And once this requirement took effect, did you observe any change in the voter's willingness to sign petitions?

A.   Yeah, absolutely.

Q.   What was that change?

A.   People became more hesitate, so -- signature gathering isn't something that's new in Florida, so people sign petitions, right?  But once they saw that they had to put the last four of their social, voters would be pretty hesitant to fill that information out.

Something that even myself experienced was people being

resistant because, like, is this a scam?  Some person's approaching me at a parking lot to get a signature -- which that's not totally uncommon, but now you're asking for the last part of the social.

Then along with that I would see a pretty significant drop in our rates, particularly amongst our Black and Brown staff, where people would be a little bit more resistant towards them because they do think someone's going to use the information maliciously.

Q.   Are you aware of any voters who declined to sign a petition because this information was required?

A.   Yes, absolutely.

Q.   And did you ever experience that yourself?

A.   I did experience it myself.

Going into the field and getting signatures, I'd have voters who would look at the petition, be willing to sign and then see and say, Oh, my last four of my social, I don't want to put that, so I'm not signing anymore.  So it was pretty common.

Q.   All right.  Mr. Simmons, let's talk about the cumulative effect of all of these provisions.

A.   Okay.

Q.   Can you explain how together these provisions impacted The Outreach Team's work for FDH's 2026 campaign?

A.   Yes.  So with all these provisions they impacted our work because we scaled down, and then after downsizing we never

scaled back to the size of our original operations.

We weren't able to expand our operations across the entire state like we planned on doing.  It also limited our hiring practices because we couldn't hire people that we otherwise would have hired, from people with previous felony convictions and people out of state.

And then just the drop in the signature-gathering rates definitely impacted how we would have previously been able to spread this message and actually get the signatures.

Q.   And did The Outreach Team eventually suspend its work with FDH for the 2026 campaign?

A.   Yes, we did suspend our work.

Q.   Approximately when did that happen?

A.   So we suspended our work in the latter half of August, maybe the first week of September.

Q.   Did you also halt your work for FDH around that time?

A.   Yes, I did.

Q.   And, Mr. Simmons, was FDH halting its campaign the only reason you stopped working for FDH?

A.   Not entirely.  Given the criminal and, like, financial implications of HB 1205, had we gone on with HB 1205 being in effect, I likely would have stopped just because I didn't -- I don't want to go to prison.  I don't want a RICO charge.

Q.   And, Mr. Simmons, if the provisions we spoke about today were not in effect, and if you had an opportunity to work with a

future FDH campaign, would you take it?

A.   Oh, yes, absolutely.  If the provisions weren't in effect, I would definitely take the opportunity to work on this cause again.

Q.   And why is that?

A.   So Medicaid expansion is, like, really important to me personally.  Like I said, I was on this campaign because it's an issue I've worked on.  I was on Medicaid when I was a kid.  My grandparents needed to move my grandma into a nursing home, like, years back, and Missouri at the time had not expanded Medicaid.  And if we had, then my grandma and grandpa wouldn't have had to, like, spend down all their assets to get my grandma in a nursing home.  So that was something -- seeing that was like super impactful to me.

     And then just working on Medicaid expansion in Missouri and that passing and just seeing how proud my family was was super important, and I've also done the same cause in South Dakota, same kind of ballot initiative process.  So it's an issue that personal really matters to me.

     And then along with that just, like, I think it's important for the people of Florida to have an opportunity to decide if they want to expand Medicaid.

     Aside from the cause of, like, why I care about it, right, I do think voters should be able to decide these kind of things.

Q.   Thank you, Mr. Simmons.

A.    Uh-huh.

MS. GAMBHIR:  I pass the witness, Your Honor.

THE COURT:  Cross-examination.

CROSS-EXAMINATION

BY MR. WOLK:

Q.    Martin Wolk for the Secretary of State.

Hello, Mr. Simmons.

A.    Hello.

Q.    So you spoke about your work on ballot initiatives in the past.

Mr. Simmons, you've worked on ballot initiatives in a number of different states; correct?

A.    Yes, that's correct.

Q.    And you've worked on ballot initiatives in Missouri?

A.    Yes.

Q.    And you've worked on a ballot initiative in South Dakota?

A.    Yes.

Q.    And you've worked on a ballot initiative in Nevada?

A.    Yes.

Q.    And you've worked on a ballot initiative in Massachusetts?

A.    Yes.

Q.    And you've worked on a ballot initiative in Arizona?

A.    Yes.

Q.    And you've worked on a ballot initiative in California?

A.    Yes.

Q.   And you've worked on a ballot initiative in Oklahoma?

A.   Yes.

Q.   And Florida is the latest state you've come to work on a ballot initiative in?

A.   Since Florida I've now worked in California again on a ballot initiative, but, yes, prior to that, yeah.  Prior to, like, two weeks ago, Florida was the most recent state.

Q.   So you're back in California working on another ballot initiative there?

A.   Yes.

Q.   Understood.

     Did I miss any states in that list?

A.   I don't think so.

Q.   Thank you.

     And you were paid to work on all of these ballot initiatives; correct?

A.   Yes, I was paid.

Q.   Understood.  Thank you.

     Now, Mr. Simmons, you're a resident of Missouri; correct?

A.   I am a resident of Missouri.

Q.   And you were a Missouri resident the whole time you worked for the Florida Decides Healthcare campaign?

A.   Yeah, I was a resident of Missouri the whole time I worked on Florida Decides Healthcare.

Q.   And you stopped working for the Florida Decides Healthcare

campaign on September 1st, 2025?

A.    That's correct.

Q.    Understood.

And HB 1205's regulation on nonresident petition circulators took effect on July 1st, 2025?

A.    Yes.

Q.    Yes?

A.    I believe so, yes.

Q.    And there's a two-month difference between July 1st and September 1st?

A.    Yes, this is true.

So I was able to continue working on the campaign after the resident ban, but my job was changed, like the nature of how I -- basically the structure of how my job worked was changed during that course of time.

Q.    Thank you for the explanation.

But you continued to support -- to work and support the Florida Decides Healthcare for two months after the nonresident regulation took effect?

A.    Uh-huh.

Q.    Thank you.

During the Florida Decides Healthcare campaign, you worked with one petition circulator personally who had a felony conviction; correct?

A.    Yes.

Q.   And that petition circulator had their record expunged?

A.   Yeah, I believe so.

Q.   And that petition circulator had their voting rights restored?

A.   Yes.

Q.   And that petition circulator continued to work as a petition circulator after July 1st, 2025?

A.   Yes, he did.  But it's because, like I mentioned, his rights were restored, but that's not really the case with other felons who might have worked on the campaign who didn't have their rights restored, so -- yeah.

Q.   But personally you don't know any other people with felony convictions who had to stop work after HB 1205?

A.   I don't, but I was only overseeing the Tampa office, and our operation was statewide.  So I'd imagine, just given our typical hiring practices, there were other people who were impacted by this that I just personally wasn't aware of.

Q.   The Outreach Team, they perform background checks for petition circulators that they hire; correct?

A.   Yes, this is true.

Q.   And these background checks check for felony convictions?

A.   Yes, they do.  But it's not just like -- we check for felony convictions, and some people who have felonies are able to work for us, other people are not.  It just depends on the type of charge.

Q.   The Outreach Team has refused to hire people in the past to be petition circulators because they have a felony conviction?

A.   Not just because of felonies; it can be other nonfelony convictions that we didn't hire people for.

Q.   But because they had a conviction, they were not hired to be a petition circulator?

A.   Yes.  And then just to -- kind of broader context, some campaigns that are ballot initiatives, we have that background; other campaigns we work on we don't do the background check.  It varies based on our client's request.

So some campaigns -- like the California campaign, we didn't have background checks, the one I just mentioned a second ago.

Q.   But The Outreach Team does background checks in states besides Florida as well; correct?

A.   Yes.  But, again, it does vary on the client's requests. Some clients don't mind if we have no background checks; other ones do, so it varies.

Q.   Understood.

In terms of citizens, you mentioned that you know of two noncitizens who worked for The Outreach Team during the Florida Decides Healthcare campaign.

A.   Uh-huh.

Q.   And did you check the citizenship status of these individuals before testifying today?

A.    What do you mean by that?

Q.    Did you check whether these -- these two individuals were -- became citizens since you last interacted with them before testifying?

A.    No, I have not checked that.

Q.    So it's possible that those two petition circulators are citizens now; correct?

A.    I mean, it's possible, but it's equally possible that they are still noncitizens.

Q.    Understood.

And if they became -- if they were citizens, they would be able to circulate petitions in Florida under HB 1205?

A.    They would.  But, again, like, this is just two individuals.  We are hiring people -- we hire people across the whole state.

So I was in the Tampa office, for instance, and I'd imagine in other offices, maybe Pensacola or Miami, there's other people who are noncitizens who still would not be able to work.  So these two individuals, while they could have gained their citizenship in the last six or so months, there's probably other people who are impacted who are still not citizens.

Q.    That's your speculation.  Personally you don't know any other petition circulators who are noncitizens?

A.    Correct.  And I also don't know that these circulators have gained their citizenship since August.

Q.   Understood.

Now, you mentioned the training that Florida Decides --
that The Outreach Team does.

MR. WOLK:   Could we -- Mr. Bennington, could you pull
up FDH Exhibit 562?

BY MR. WOLK:

Q.   Now, Mr. Simmons, when training petition circulators, does
The Outreach Team do role-playing exercises?

A.   Yes, we do.

Q.   So The Outreach Team doesn't always use real life practice
in order to teach petition circulators?

A.   So we do role-plays, but the role-plays are pulled from
that real life experience.  And the role-plays are kind of meant
to mimic what would happen in real life.

So the training in-person and with actual voters is
significantly more important than the role-plays that we do,
like the one demonstrated on the screen.

The role-plays are meant to expand upon the skills, and
they are usually taken from experiences that happen in the field
with voters.

Q.   Understood.

But you wouldn't need to -- you could teach someone how to
collect a petition signature using role-playing without actually
collecting someone's petition signature?

A.   No, I wouldn't say that at all, the reason being is the

signature-gathering process -- when training anybody to do anything -- like, I wouldn't say, Let's go learn how to ride a bike. I'm going to do a role-play on how to ride a bike for you. Similarly, if you are training somebody in the field, the circulator witnessing that full process of gathering a signature and then also seeing how those conversations are had is leaps and bounds above any kind of role-play that we could do in the office with people who aren't actually voters. So going into the field, gathering the signature, having the conversation is much more important. We couldn't just teach somebody through role-play because it's just not the same.

Q. So you couldn't teach a petition circulator how to collect signatures on the form -- how to collect a completed form using role playing?

A. I wouldn't say so. You can show them how -- and it's, like, again, back to kind of how I mentioned riding a bike; you can role-play how to ride a bike, or you can actually ride the bike and show someone how to do it. And it's two different things.

Q. Mr. Simmons, nothing in HB 1205 prohibits a nonresident from handing out a blank petition form to a voter after telling them about the initiative and asking them to submit the petition; correct?

A. Not to my knowledge.

Q. And nothing in HB 1205 prohibits someone with a felony

conviction from handing out a blank petition form to a voter after telling them about the initiative and asking them to submit the petition?

A.   No.   But kind of the process that you're referencing here, if I was to give a petition to a voter and say, Hey, go submit this, the likelihood of them actually submitting it -- I mean, I don't know.  I'm not a mathematician to know the percentages, but I'd imagine it goes down significantly because the voter then has to take that blank petition, fill it out, and then go figure out how to turn it in themselves versus our people collecting the signatures and doing that on their behalf. Significantly different.  If somebody takes a petition home, they might spill coffee on it and it never gets submitted versus if they do it with our circulators, we actually are turning them in.

And then along with that, the volume and scale to collect the number of signatures that we need to collect -- if I was to give a petition to every single person in this room, I'd imagine maybe 15 actually make it where they're supposed to make it versus if I was to go collect the signatures myself and FDH is collecting those signatures, we then can turn them in.

So I do understand what you are saying.  I just want to make it clear that that wouldn't be anywhere near as effective.

Q.   Sure.  And thank you for the explanation.

But under the legal requirement of HB 1205, someone with a

felony conviction could bring a blank petition form to a voter, tell them all about the Florida Decides Healthcare initiative, and then ask them to complete and submit the petition; correct?

A.   They could do that, yes.

Q.   And the same for noncitizens; nothing in HB 1205 prohibits a noncitizen from handing out a blank petition form and telling the voter about the initiative and asking them to submit the form; correct?

A.   Yeah, they could do that.  But just, again, kind of what I mentioned, that actually happening -- from them giving somebody the petition to the petition being submitted, it changes.  I would say it changes extremely dramatically, just the likelihood of it actually being submitted.

Q.   All right.  Understood.

          MR. WOLK:  Thank you.  No further questions.

          MR. STAFFORD:  All right.

          THE COURT:  Hold on.  I think we may have more cross.

                    CROSS-EXAMINATION

BY MR. STAFFORD:

Q.   It's still morning.  So good morning, Mr. Simmons.  How are you?

A.   I'm good.  How you doing?

Q.   I'm Bill Stafford.  I'm here on behalf of the Florida Attorney General's Office.

A.   Uh-huh.

Q.   I just had a couple of questions.

Now, when The Outreach Team was hired to come work in -- well, strike that.

The Outreach Team does these sorts of campaigns in other states; correct?

A.   Yes, we do.

Q.   Okay.  And in coming up with the plan to get the requisite number of signatures for a particular issue for a particular state, you take into account the statutes, the laws in effect in that state at that time; correct?

A.   I'm not on the side of the team who does all the legal review for each state.  But, yes, we do check those processes wherever we're going to be working at.  And even on this campaign, as we kind of planned for working it, we had an understanding that HB 1205 may pass.

Q.   Okay.  So you are saying that The Outreach Team factored 1205 -- HB 1205 into its plan?

A.   Not entirely.  We were just aware of it.  So, like, as we started the process, we were aware that this may pass.  We didn't fully factor into it.  We started our operations as we typically would in most states.  But after the passing and, like, slightly prior to the passing, we did change some things around.

Q.   And had HB 1205 been -- you know, been definitely in effect at the time the campaign began here in Florida, the plan would

have been a little bit different; would you agree with that?

A.   I'm not on the team that actually makes the decisions of if we take a campaign or not, so I can't say how the plan would have been different.  I mean, it's speculation, but it could have been that if HB 1205 was in effect at the time with all the provisions, I'd imagine we might not have even taken the campaign on, just given how much -- significantly more difficult, right.  So, like, I don't know how the planning would have gone for that question.  Like, I'm probably not the person to answer it, to be honest with you.

Q.   Now, you mentioned, and correct me if I'm wrong, that one of the reasons that you joined this campaign is you believe in the goals of the amendment and Medicaid expansion in general?

A.   Yeah, absolutely.  It's something I care about.

Q.   And you -- part of your job was to hire circulators to assist in the effort to collect signatures?

A.   No.  So my role -- I hired our salaried staff, so the directors who were in office.  I didn't actually directly hire our circulators who were going out into the field personally.

Q.   Now, one of the last things you were asked about was whether or not HB 1205 would prevent noncitizens and nonresidents from handing out a petition and asking them to fill it out and return it.

     Would -- under your understanding, would 1205 permit noncitizens and nonresidents from going out to an event,

speaking with people, handing them a blank form, having them fill it out and returning it to, like, a table with the volunteer -- or with the circulator there and handing it to him rather than handing it to a nonresident or noncitizen?

A.   I don't -- could you kind of rephrase that slightly different?  I don't think I'm fully understanding what you're saying.

Q.   That's perfectly understandable with the way I ask questions.

But I've heard talk about some of these campaigns utilizing what they call tabling, where they have a table set up.

A.   Uh-huh.

Q.   And they also have circulators that go out.

A.   Uh-huh.

Q.   Is that --

A.   Okay.

Q.   Do you understand that as well?

A.   Yeah, I'm following you.

Just to kind of describe back what you're describing, so if I was to be -- let's just assume I'm a Florida resident; you're not a Florida resident.  You talk to the people, kind of get the signatures, and then hand them back to me, is what you're saying?

Q.   Correct.

A.   Yeah.  So to answer your question then, that could happen,

but the effectiveness of that also does go down, right.  Going and talking to somebody and then bringing them to talk to this other person versus just having the conversation yourself isn't as effective.

MR. STAFFORD:  Thank you very much.

THE COURT:  Anything else from the defense?

Hearing nothing, redirect?

MS. GAMBHIR:  Thank you, Your Honor.

REDIRECT EXAMINATION

BY MS. GAMBHIR:

Q.   Mr. Simmons, you were asked a few questions about a process of handing a voter a blank petition and asking them to mail it in themselves.

A.   Uh-huh.

Q.   Did you ever conduct that sort of process in working for FDH's campaign?

A.   I've never conducted that sort of process on any ballot initiative campaign.

Q.   And in your view is that sort of process different than collecting a petition signature yourself?

A.   Yeah, in my view that process is significantly different, just given -- the collecting of signatures is -- I mean, it's part of the political process, first off.  So, like, being part of that process is important and actually doing that act.

But then, again, the thing is it limits the risk of this

petition or the signature not actually being turned in to the State, right.  Like, if somebody -- if I was to give you a petition and say, Hey, go fill this out and then submit it on your own time, you might take it home and then spill soda on it, and it never goes where it's supposed to go.

Q.   And, Mr. Simmons, based on your experience collecting petitions from voters, circulation petitions, what makes the petition circulation process different?

A.   What makes it different is by collecting a signature from a voter, you are able to engage in a conversation and actually spread the message a bit more.  Like, having that conversation with someone, they might go -- like, I've had quite a few occasions where I've talked to somebody about the issue and I collected the signature, and then they are like, Hey, I'm going to bring my friend over to come sign the petition, too, because what you said is super important.

It also changed the process quite a bit because the act of getting a signature itself, like doing that process -- if I'm able to walk a voter through the form and confirm that they are filling it out correctly, then that's much different than saying, Hey, go fill this out, and they may fill out the form somehow the wrong way.  It impacts quality is, I guess, what I'm getting at here.

MR. GAMBHIR:  Thank you, Mr. Simmons.

Thank you, Your Honor.

THE COURT:  You can step down, sir.

Thank you.

THE WITNESS:  Thank you.

(Mr. Simmons exited the witness stand.)

THE COURT:  We are not going to start a new witness with just five minutes to go.  So we'll take a lunch break. We'll take an hour lunch, and we'll come back at 1 o'clock.

Court is in recess.

Thank you.

You can go about your business.

(Recess taken at 11:57 AM.)

(Resumed at 1:01 PM.)

THE COURT:  All right.  We are back on the record.

The plaintiffs can call their next witness.

MS. DOLAN:  Your Honor, we are calling Marc Walsh.

(Marc Walsh entered the courtroom.)

THE COURT:  Sir, if you'll remain standing and be sworn by my courtroom deputy.

**MARC WALSH, PLAINTIFFS' WITNESS, DULY SWORN**

THE COURTROOM DEPUTY:  Please state your name for the record.

THE WITNESS:  Marc Walsh.

THE COURTROOM DEPUTY:  Have a seat and pull up as close as you can to the microphone.

MS. DOLAN:  Your Honor, Mr. Walsh is the vice

president of -- for campaigns at The Outreach Team.  And he oversaw the paid circulation efforts of FDH's campaign.  His testimony will go to Counts One through Three of the operative complaint, and I'll provide guideposts throughout.

We'll be starting with background which provides foundational testimony for all counts.

DIRECT EXAMINATION

BY MS. DOLAN:

Q.   Good afternoon, Mr. Walsh.

Where are you currently employed?

A.   The Outreach Team.

Q.   What is The Outreach Team?

A.   We are a national field vendor, so organizations or campaigns hire us to run paid field operations from volunteer organizing to voter registration to door-to-door canvasses and signature gathering for ballot initiatives.

Q.   How long have you been employed with The Outreach Team?

A.   Since 2016.

Q.   What is your current position?

A.   Senior vice president of campaigns.

Q.   How long have you been in that position?

A.   Since November of 2025.

Q.   Can you briefly describe your positions with The Outreach Team prior to your current position?

A.   Yes.  I started as a consultant/project manager in 2016,

and in that role I managed individual campaigns, individual field campaigns.  And then sometime around 2020 became the vice president of campaigns where I oversaw most if not all of our campaigns across the country.  And that's what I do in my current role.

Q.   You started to describe, but what are the primary responsibilities of your position?

A.   To ensure that we are delivering on a set of agreed-upon deliverables on budget, on time, and then providing strategic advice to clients for how to carry out field campaigns.  The best messaging, the best tools, the appropriate budget level, things like that.

Q.   I believe you also mentioned overseeing field staff.

What percentage of your responsibilities involves overseeing field staff performance?

A.   It's a big part of the job.  You know, maybe around 50 percent of the job is overseeing a large team of state directors, project directors who are actually on the ground running our campaigns.

Q.   What did you do prior to working with The Outreach Team?

A.   I started in 2009, 2010 working on a congressional campaign, and after that worked for an organization where we -- civic engagement organization running large scale volunteer operations, primarily on college campuses.

Q.   And how many years of experience do you have working on

campaigns?

A.   A little bit under 20; I think 16 or 17.

Q.   How many campaigns have you worked on in total?

A.   It's really challenging to count, but it's in the hundreds.

Q.   For the campaigns that you've worked in your current role, did you oversee primarily paid staff or volunteers?

A.   Both.  I don't know if the split is exactly equal.  Probably slightly more paid staff.  But I've overseen a lot of large-scale volunteer operations and large-scale paid field campaigns.

Q.   And of those campaigns, how many were in Florida?

A.   As best I can remember, three.

Q.   In how many states have you worked campaigns?

A.   It's somewhere in the neighborhood of 40.

Q.   How many of those campaigns for ballot initiative campaigns?

A.   As best I can remember, 11.

Q.   And for the ballot initiative campaigns specifically, how many states were those in?

A.   Seven or eight states.

Q.   For the campaigns that weren't ballot initiatives, what types of campaigns were they?

A.   They fall into three primary campaign types.  So first is volunteer organizing, so working to -- with -- typically with a group of volunteers, put pressure on elected officials to make a

designation one way or another on an issue.

The second category is -- is door-to-door canvasses, so those are often for Get Out the Vote for a particular candidate or an organization or a PAC supporting a candidate.  And then -- and then voter registration, so third-party voter registration where we send paid staff into the field and into public high-traffic areas and help people to register to vote.

Q.   So for these other types of campaigns, are you generally working with field staff?

A.   Yes.

Q.   And with regard to working with field staff, are there ways in which other types of campaigns are similar to ballot initiative campaigns?

A.   Yes.  They are more similar than different, particularly as it relates to kind of key performance indicators, so looking at which -- which kind of metrics go into ultimately hitting the deliverable that we've agreed to with a client.  So things like how -- you know, what does our recruitment pipelines look like?  What is field performance looking like?  So kind of measuring and assessing how our field staff are doing relative to a plan is very, very similar.

And then also just like the day-to-day operations of how our offices are set up, how our staffing is structured, et cetera, is very similar.

Q.   And I'll want to talk about KPIs with you shortly, but I

want to go to over ballot initiative campaigns generally, the scope of Outreach's work for FDH, Outreach's paid circulator operations both before and after 1205, as well as the impact of 1205 on those operations.

MS. DOLAN: Your Honor, Mr. Walsh will be testifying about ballot initiative campaigns generally, which goes to Counts One through Three of the operative complaint.

BY MS. DOLAN:

Q. Speaking of ballot initiative campaigns broadly, how does Outreach Team typically become involved in a campaign?

A. Typically, it's one of a couple ways. So first is that there's some public request for a proposal process or RFP process. We submit a proposal, interview, and are selected to run the field operations.

Second is that we often, you know, are referred by somebody who we've worked with in the past on a ballot initiative campaign and may know folks at -- you know, know folks who are looking to launch a ballot initiative campaign, and we get a direct introduction.

And then third is that past clients often hire us to -- who we've worked with on other types of work hire us to run ballot initiative campaigns.

Q. When you launch a new campaign, how do you go about staffing it?

A. We start with -- with ballot campaigns -- ballot initiative

campaigns.  Specifically, we start by hiring our senior-most leadership.  So those are state directors and project directors, and in every case we hire folks who have experience with us, who have worked with us, typically more than just one ballot initiative but at least one ballot initiative campaign with us, to take the senior-most positions.

And then from there we fill out a set of remaining roles. So we will start, first and foremost again, by filling leader -- lead director positions to run our campaign offices.  Often we fill those with folks who have worked with us previously.  And then we fill each of our individual offices with three to five deputy directors.

And then once we have the leadership, kind of salaried staff, team in place, we build out -- we recruit for and hire and train hourly circulators to go in the field and circulate petitions.

Q.   You mentioned that state or project directors typically have worked for you before.

Is that always the case?

A.   It is always the case on ballot initiative signature-gathering campaigns.

Q.   Why is it the case that they have worked for you before?

A.   It is a particularly high-trust job.  The stakes are very high because qualifying or not qualifying is pass-fail, and if you don't have somebody who can communicate information up the

chain properly about how likely we are to qualify or not qualify, you can find out that information at the very end.

But then also the -- just the ability to have enough attention to detail to navigate the complexities and the legal requirements of running a ballot initiative campaign while also having the skill set to drive product at a very, very large scale is a unique skill set, and because these are so high stakes and high pressure, it -- we just wouldn't -- we would never entrust that with somebody we are working with for the very first time.

Q.   So having the prerequisite that managers have worked for you before, are you always able to fill those project director roles?

A.   Yes.  I mean, if we don't have somebody who we know who works for us who is ready to go and run a signature-gathering campaign, we won't submit the proposal or take on the project.

Q.   And you went into this a little bit, but can you describe the general management structure of a circulator or canvasser team for a field campaign?

A.   Yep.  So we have the state director who is bottom line responsible for qualifying the initiative on budget, on time. So they are kind of driving the key performance indicators top to bottom while managing a team of project directors.

Our project directors are often responsible for -- have a similar set of responsibilities to the state director but at a

smaller scale.  So they will oversee two, three, four offices, and they are responsible for, again, hitting the deliverables on time, on budget within that smaller scale of offices.

And then each office is staffed with a lead canvass director who is in charge -- bottom line responsible for hitting the goals for that individual office or that entity.  Reporting to that lead director is four deputy canvass directors.  Each of those four canvass directors has a unique responsibility.  So the four responsibilities on a signature campaign are -- to handle our kind of payroll and administration is one.  To be in charge of training and onboarding and field support is second.  Third is somebody in charge of quality control, and then, fourth, we often have an additional kind of training director or somebody who supports the rest of the roles.

And then each of those people who I just mentioned is required to go out and actually canvass and circulate, both to lead by example but also to, you know, fine-tune our messaging, ensure that we're answering questions correctly that the public might ask or want to know about the initiative.  So it's important that they are actually out in the field also.

Q.   For a management team of that size, what size is the campaign like?

A.   So -- could you ask that question one more time?

Q.   Sure.  No problem.

You're describing a very large management team.

A.    Yeah.

Q.    What types of campaigns are -- typically require that size management team?

A.    A statewide ballot initiative, for example, is one type of campaign that would require that level of management where -- we would ultimately get to a place where that team of management is overseeing thousands and thousands of hourly circulators and hundreds and hundreds of team leads who are hourly circulators with a little bit additional responsibility.  So this may be spread over 8 to 12 different offices across the state with thousands and thousands of staff working for them.

Q.    Do you decide the size of the management team based on the number of field staff a given campaign will require?

A.    Yes.  We think that any one person can only adequately manage six to seven people at any given time.

Q.    What is the minimum number of managers a campaign might have?

A.    Probably two -- one or two on a very, very small-scale campaign.  So if we're, you know, tasked with going out and sending 100 shifts into the field to knock 700 -- or 7,000 doors or something like that, that may be a management team of one or two folks.

Q.    How many circulators would you need in the field to scale up for an initiative the size of Florida Decides Healthcare?

A.    In the field on a given day, we would be looking at -- I'm

having trouble remembering the exact kind of number we had in our plans here, but it is in the thousands.

Q.    And how many team leads would that require?  Again, a general estimate is okay.

A.    250 to 300.

Q.    And how many deputy directors would that require?

A.    45 or 50.

Q.    And how many lead office directors?

A.    10 to 13.

Q.    And project directors?

A.    Three to four.

Q.    And if you could just remind us which of those roles you require to have prior experience with you.

A.    The state director and at least some number of the project directors is nonnegotiable, and then we would require at least on a -- the way that we scale operations is that we -- we don't start with that huge of a team.  We start a lot smaller.  We test our systems.  We ensure that compliance is tight, that quality control is tight.  We want to run that kind of testing phase and scalability phase with a very -- with a much smaller, higher trust team of folks.  So we would require in that case that three -- our first two or three lead directors are also alumni of ours, experienced with us, and have run signature drives.

      And then we would fill out at least some of those deputy

director positions with folk who are also experienced with us. Then when the office is scaled, those folks kind of branch out. We've trained up a leadership team in that first office that can kind of take it over and steward it while we go and launch new operations.

Q.   How typical is it for statewide campaigns to rely on out-of-state managers?

A.   It's near universal.

Q.   Of the campaigns you have worked on, how many relied on out-of-state managers?

A.   I think all of them, but there may be one or two that I can't remember.

Q.   Do you attempt to recruit in-state managers?

A.   We do recruit in-state managers in all cases.

So while a good chunk of those folks who are filling out our initial leadership positions are alumni of ours and in state, we also do recruit local new folk who we can train up to get to a place where they are ready to run the operation.  So in all cases we have a mix of, you know, folks who have worked with us in the past and new folks.

Q.   And are you familiar with other vendors who do work similar to The Outreach Team?

A.   I am.

Q.   How are you familiar with them?

A.   You know, I think the first part of my job is just

understanding our competition and who is out there in the market and how they operate.

But then I also you know, attend conferences and other things where professionals in this space gather and talk shop.

I also -- you know, we sub out to other folks to do this work who are in our industry.  Folks sub to us to do this work who are in our industry.  So we sometimes have formalized professional relationships.

And then we have a lot of staff who work for us who have worked at other field vendors who do similar work previously and may have, you know, kind of told us how things work at other places.

Q.   What do you mean when you say "sub out"?

A.   Hire a subcontractor.

Q.   And so for similar vendors, what do you know of their hiring practices?

A.   For similar vendors the hiring practices are similar.  So folks who are running statewide ballot initiatives of this scale I think -- every reputable firm that I know of starts with a small set of high-trust, experienced folks who know their systems and who can launch the campaign from a strong foundation.

Q.   And do you know whether they also use out-of-state managers?

A.   I don't know for sure, but -- I don't know with 100 percent

certainly, but I know at least some of them do.

Q.   Based on your experience managing ballot initiative campaigns across dozens of states, is it feasible to run an effective paid circulator program in Florida using only Florida residents for a statewide campaign?

A.   That would not be possible for us unless we had done multiple statewide ballot initiatives in Florida previously.

Q.   Why not?

A.   Because we simply don't have a set of people who happen to be from Florida who we can -- who have worked with us to qualify ballot initiatives previously.

Q.   Is Florida unique in this respect, or is this true in other states as well?

A.   This is true in other states as well.  Our management team who make up that set of high-trust folks who have done this with us before almost in every case come from the ranks of the states where we have hired them as local hires to support existing staff, and they've made their way up from that state.

Q.   What risks arise if you place inexperienced managers into those roles?

A.   To our -- to our kind of business practice, the biggest risk is financial.  So a very small decrease in the "per hour" rate that a circulator is collecting signatures in the field can lead to millions and millions and millions of dollars in added costs over the course of a long period of time.

And then there's also a lot of legal and compliance risks involved, and we especially know that folks who we don't necessarily trust or maybe who don't trust us are going to be a little bit slower to report things that they feel might not be right or something that they are, like, a little bit nervous about, whereas somebody who works with us understands the stakes will report those things very quickly.  We can solve problems before they cascade into very big problems.

MS. DOLAN:  Your Honor, Mr. Walsh will be testifying about The Outreach Team setup of paid circulator operations for Florida Decides Healthcare before HB 1205, and this testimony goes to Counts One through Three of the operative complaint.

BY MS. DOLAN:

Q.   Mr. Walsh, how did Outreach Team become involved in the Florida Decides Healthcare campaign?

A.   If my memory serves correctly, we were asked by Mitch Emerson at some point either -- I think somewhere around January of 2025 to submit a proposal.  We submitted that proposal, met with Mitch a couple of times, and then were selected to be the vendor to qualify the initiative.

Q.   And who is Mitch Emerson?

A.   He was the campaign -- he is the campaign manager for Florida Decides Healthcare.

Q.   If I say FDH, will you understand that to mean Florida Decides Healthcare?

A.   Yes.

Q.   And what was The Outreach Team's role for this campaign?

A.   Our role was to qualify the initiative.

Q.   When did that role begin?

A.   We began preparing for and setting up operations in late February or early March of 2025 and then began signature collection, I think, either like very, very late March or very early April of 2025.

Q.   Is that role still ongoing?

A.   It is not.

Q.   When did you stop collecting signatures for FDH?

A.   Towards the end of August of 2025.

Q.   And why was that?

A.   The campaign suspended operations.

Q.   Okay.  The courtroom technician is projecting the first page of a document that's been marked FDH Plaintiffs' Exhibit 443.

     Do you recognize this document?

A.   I do.

Q.   How do you recognize it?

A.   This is our agreement between The Outreach Team and Florida Decides Healthcare, and we -- I was involved in the drafting phase of this and have looked at it several times since.

          MS. DOLAN:  And I'd like to move to admit this as an exhibit.  And no parties have objected.

THE COURT:  Since no parties objected, it's admitted.

(PLAINTIFFS' EXHIBIT FDH-443:  Received in evidence.)

BY MS. DOLAN:

Q.   Am I correct that the contract includes two statements of work?

A.   Yes.

Q.   Whose decision was it to split the work into two parts?

A.   We were asked to split the statement of work into two parts with the -- with Statement of Work A being intended to prove viability, that we were capable of scaling from scratch to a point where we could show that we were hitting each of our KPIs and kind of prove that we were able to scale beyond that.  And it's very, very common that agreements are structured this way on signature-gathering campaigns.

Q.   And I'll direct you to page 8 of the document.

Do you see where it says "Statement of Work A"?

A.   I do.

Q.   What did Statement of Work A entail?

A.   Gathering at least 70,000 raw signatures, which are -- any signature -- any person in Florida who fills out an initiative petition is considered a raw signature, as compared to a valid signature, which meets our internal requirement that it is, by all of our measures, very likely to be counted by the county supervisors.

Q.   And what was the time frame for this scope of work?

A.    Roughly a month, from April 1st to May 2nd.

Q.    Turning to page 10, what was the contract amount for Statement of Work A?

A.    A little bit more than a million dollars.

Q.    Was all of that due at once?

A.    No, there was --

Q.    Well --

A.    There was an initial payment due of $200,000 and then three subsequent payments, the last of which was due after we finished collection.

Q.    Did The Outreach Team complete the statement of work as outlined in A?

A.    Yes.

Q.    And did FDH complete its payment to The Outreach Team for the statement of work?

A.    Yes.

Q.    Based on the targets in Statement of Work A, how many circulators did you need to deploy?

A.    In total, we had somewhere in the neighborhood of 350 circulators hired during this period, and we were sending out about 150 every day in late April.

Q.    Now, turning to page 13, do you see where it says "Statement of Work B"?

A.    I do.

Q.    What does Statement of Work B entail?

A.    Collecting 1.3 -- or a little fewer than 1.4 million raw signatures by December 7th of 2025.

Q.    Was that 18 million due at once?

A.    The payment of $18 million was not due at once, no.

Q.    Does this statement of work also reflect a payment schedule?

A.    Yes.

Q.    Okay.  Turning to page 16, what was that schedule based on?

A.    It was a similar construction to the first schedule, so some upfront payment.  And then as we scaled and we continued to prove that this was feasible and going well, additional payments were due.  I think in total there were 11 payments.

Q.    And you mentioned that the scope was to collect 1.3.

      Are you aware what the requirement is for signature collection in Florida?

A.    I can't remember the exact number, but it is over 900,000 valid signatures.

Q.    And so why do you collect more than what is necessary?

A.    You will never have a 100 percent validity rate or -- yeah.  You'll never have a 100 percent validity rate.

Q.    And what would it have taken operationally to scale up from Statement of Work A targets to the Statement of Work B targets?

A.    We would have gone from 3 offices to 10 to 12 offices.  We would have -- our project director scope of work would have expanded.  We would have recruited from 300 circulators to a

couple thousand circulators.  We would have spread out across the state and ultimately collected enough signatures statewide and in the 14 congressional districts to qualify.

Q.   What is the purposes of scaling in this way?

A.   It's impossible to train people faster than that.  So, you know, four people cannot effectively train a thousand people, and so we need to bring people on only -- only as we have the capacity to actually train them effectively to be good messengers to get quality signatures, et cetera.

Q.   Was The Outreach Team ever able to scale up to reach those targets?

A.   We were not.

Q.   Did The Outreach Team complete the statement of work as outlined in B?

A.   No.

Q.   Okay.  Turning to the specific circulator operations, how did The Outreach Team go about setting up its paid circulator program for FDH?

A.   We started by identifying and bringing on our state director and project directors.  Each of those folks were --

THE COURT:  Counsel, can you hold on for one second?

MS. DOLAN:  Sure.

THE COURT:  I need two minutes.

Thank you.

(Recess taken at 1:31 PM.)

(Resumed at 1:34 PM.)

THE COURT:  My apologies.  I had a family emergency, and I thought it was easier for me to take a five-minute break than to recess for half a day or something.

So, Counsel, you may proceed.

MS. DOLAN:  No problem, Your Honor.  I hope everything is okay.

THE COURT:  Thank you.

BY MS. DOLAN:

Q.   Mr. Walsh, I think you were in the middle of an answer, so we'll just ask the question again --

A.   Thank you.

Q.   -- and have you restate.

How did The Outreach Team go about setting up the paid circulator program for FDH?

A.   We started by hiring a state director and three or four project directors.  Each of those first five senior leadership staff was -- had experience with us working on multiple previous initiatives.  Then the five of us, plus a set of other support staff and trusted staff of ours, met in a hotel room in Connecticut and laid out the entire thing.  So we prepared all the materials.  We reviewed all of the rules and regulations of initiatives in Florida, and we created additional hiring materials.  We then filled out our first three lead director and 12 deputy director positions, the vast -- the majority of which

were filled, again, by alum who have worked these with us in the past. We created circulator advertisement materials, posted on job boards like Glassdoor and Indeed and recruited circulators.

Q.    Where across the state did The Outreach Team operate?

A.    We had offices in -- one in Pensacola, one in Tampa, and one in Miami.

Q.    Could you describe what a field office is?

A.    Yeah. It's a physical location that the five directors and all of the circulators in that location show up to every day, so it's a physical office building.

Every day circulators arrive in the morning. We do training and campaign announcements every single day for every single circulator. So folks hear updates about the campaign. We go over Frequently Asked Questions in the field. So a lot of time voters in the field will have a lot of questions about how the initiative works. We give overviews on all of that information.

And then every single day every single circulator receives a training in-office on a skill that we are working on or how to answer a specific question that a voter might have.

They then go into the field around 11:30 or noon. We micromanage where our circulators go. So each circulator is assigned to a specific site. They go to that site. They canvass or gather petition signatures for 12 -- or for five hours.

They then come back to the office, you know, have a debrief with the director where they talk through, you know, how were the interactions?  What were folks saying?  What kinds of questions did voters have?

We then review each person's petition sheet for accuracy, quality.  Circulators fill out their affidavits at the bottom of the form.  They hand those forms over to a director, who then begins our back-end quality control process from there.

Q.   All right.  We'll talk about that process in a little bit shortly.

A.   Sure.

Q.   Did your managers collect petitions for this campaign?

A.   Yes, every one of them.

Q.   Did your managers physically possess petitions?

A.   Yes, every day.

Q.   And it sounds like it was, but just to be clear, the management structure of the FDH team, was that similar to the management structure you described earlier for large statewide campaigns?

A.   Yes.

Q.   Okay.  Turning a little bit to recruitment, how does The Outreach Team go about recruiting circulators?

A.   We post jobs.  So on job boards, listservs, college bulletins, et cetera, we post jobs.  Folks apply for those jobs. When they apply, they're invited to a -- an interview, a group

virtual interview.  They hear an overview of the campaign.
They -- we tackle some frequently asked questions.  They just
then go into a one-on-one interview with a recruiter.

If they meet our qualifications for the job, they are
offered a job.  Then they are required to complete a background
check.  After they complete a background check, they arrive in
office and start their first day with about an hour and a half,
two hours of paid training before going out into the field and
shadowing and working right alongside a manager for their first
day.

Q.   What's included in those qualifications?

A.   The one kind of overarching qualification that we require
of all of our staff is that they demonstrate that they care
about issues or specifically the issue that we're working on.
Because we think that folks who care about the issue are
actually better at explaining it and motivate people -- motivate
voters in the field to sign more than folks who are just doing
it for a job.

But beyond that, they are required to have strong
communication skills, to be timely, to display a strong work
ethic, yeah.

Q.   Are managers involved in the recruitment process?

A.   Yes.  We have a recruitment team that works virtually and
kind of manages a lot of the logistics, but our management team
is bottom line responsible for staffing out the office with the

appropriate people.

Q.   And do you attempt to recruit in state for circulators?

A.   Almost exclusively.  You know, we -- in this case, like, we had an office in Pensacola, so there were folks who just saw our job advertisements in Alabama, for example, and came across the border for a job, but for the most part we recruited in-state circulators.

Q.   And you talked about this a little bit, but how did The Outreach Team recruit managers for this particular campaign in particular?

A.   Well, first we started with folks who already worked for us or very recent alumni, so those were just one-on-one phone calls to ask if they were available.

     And then we posted jobs in Miami, Tampa and Pensacola, and in each location we interviewed maybe a dozen to 20 people and ultimately hired one to two people locally in each place.

Q.   How many managers did Outreach Team onboard for this campaign?

A.   I can't remember the exact number, but it was just under 20.

Q.   And how many of those managers were out of state?

A.   Around 75 percent.

Q.   In addition to the circulators The Outreach Team recruited directly, were there any other sources of paid circulators working on the campaign?

Direct Examination - Mr. Walsh

A.    Yes.  We had a subcontractor, UpCard, who we worked with on several drives previously in other states, and we hired UpCard to collect a small percentage of the overall petition signatures that we were collecting.

Q.    Why did The Outreach Team choose to use a subvendor?

A.    It is best practice to spread risk and to make sure that we have a pressure valve in case any individual office or operation is not going well for whatever reason.  Recruitment is tough for folks -- you know, we've hired the wrong people.  We have an operation that's already going that has our systems and protocols in place that can scale up to meet the need.

Q.    And who made the decision to hire UpCard?

A.    It didn't -- at the time, it didn't really feel like a decision.  It's a standard practice for us and they are the subvendor that we have used historically.

Q.    And what was UpCard's scope of work?

A.    UpCard's scope of work -- without remembering exact numbers in Statement of Work A, they were responsible for about 25 percent of our total collection.

      And in Statement of Work B, they were responsible for 5 percent of our collection.

Q.    And you've mentioned that you worked with them several other times?

A.    Uh-huh.

Q.    Are you familiar with their operations?

A.    Yes.

Q.    How?

A.    I regularly meet with their two officers, so during the launch of this campaign a couple times a week on average to, you know, go over locations and to talk about how many folks they were onboarding, how many people they were bringing on, where they were going to be, what kinds of numbers, and ultimately petition cards delivered to our office we should expect and when.

And then I've just -- I've worked with them a lot in -- in one case on a short campaign we worked right alongside each other in the same office.

Q.    Do you know how many people they staffed to this campaign?

A.    It was around 15.  I don't know the exact number.

Q.    And was that for circulators and managers?

A.    Yes.

Q.    So their entire team was 15?

A.    15 to 20, yeah.

Q.    Do you know how many of those people were out-of-state residents?

A.    I don't know, but most, if not all, of them.

Q.    Okay.  I want to talk to you about training of Outreach Team's managers.

Does The Outreach Team offer training to its managers?

A.    Yes.

Q.    Who trains Outreach Team's managers?

A.    Me and our state directors and project directors.  I train, you know, state directors, and then we all together train the lead directors and deputy directors.

Q.    Is that training required?

A.    Yes.

Q.    What does it entail?

A.    It's about a week long.  We cover everything from, you know, management best practices, how do you get the most out of people, how do you drive performance in the field, how do you drive the rates that we care about most.

      Then the whole administrative component, how do you manage our payroll and process, you know, clock-ins and clock-outs, reimbursements and things like that?

      And then we spend an entire day on campaign messaging and how to deliver the message:  What are the facts of the initiative that we're working on?  What kinds of questions might voters have?  How do we answer those questions?

      And then during the training, we -- our managers go out in the field and actually circulate for an entire shift and we, you know, look -- use that as a learning opportunity to refine our training for circulators.

Q.    Are there training materials for managers?

A.    Yes.

Q.    And who creates those?

A.   Originally me; I think that there's a small set of us -- small set of state directors and me and maybe a couple of our other senior leadership who update them from time to time.  But, yeah, it's a standard set of materials that I wrote the original version of.

Q.   And what topics, generally speaking, are covered by those materials?

A.   So, like I said, it's a lot of, like, management best practice:  How do you train people effectively?  How do you conduct one-on-one meetings?  We train our managers to actually -- on how to go out and into the field and observe a circulator doing the job, give them feedback and actually show them in the field how to do a better job.

And then a lot of our training -- our entire training model is built around role-plays or kind of -- or pretending in a classroom-style setting that you're having certain kinds of interactions and actually acting that out and giving feedback on how a manager might improve.

Q.   Are those role-plays based on real-world scenarios?

A.   Yes.

Q.   And we heard about training of circulators from Mr. Simmons, but are you also familiar with Outreach Team's circulator training program?

A.   Yes.

Q.   How?

A.   I wrote a lot of the training material and sat in on a couple of circulator trainings during the launch of the Florida Decides campaign.

Q.   And once training is complete, do you stay involved in circulator operations?

A.   Very much so, yes.

Q.   In what ways do you stay connected to circulator's daily work?

A.   I join regular weekly calls with their managers where we discuss performance and what's going well and not going well. But then more than that, our circulators are in a group chat that is kind of going all of the time, and I am also in those group chats.  And so at least once a day or a couple times a day, I go into each of the circulator group chats and see if there are any themes or things that voters are asking about that maybe our circulators don't have answers to.

     I try to get a sense of, like -- especially early on -- how is the public receiving this?  Are there concerns that folks might have?  Are there any barriers to our circulator's success? And then also, like, just -- I'm also looking for, like, how are our managers interacting in those chats, and are they, you know, giving good advice and good, kind of, over-text training?  Are they actually going out and solving problems?  So I'm very involved in the day-to-day.

Q.   And what kinds of interactions were in those chats?

A.   A lot of different types, you know:  People telling funny stories of things they ran -- folks they ran into; hey, I'm struggling with this, I'm struggling with that.

There were a lot of instances where, you know, like, circulating on this issue in particular, on Medicaid and health care, is very, very deeply personal to folks in Florida and so -- and each individual case is actually quite different.

And voters know their own health care situation a lot better than any circulator or anybody else can, and so there were a lot of very detailed and specific questions that voters had about, How would this law impact my life?

In particular, those questions came up when there were -- in the news there was a lot of talk about federal cuts to health care, and Medicaid specifically, and folks were curious how this interplays with that, and so --

Q.   What did you do with the information you received in the chats?

A.   Well, first, I would see if a manager would answer and answer it correctly.  Oftentimes we knew answers that circulators maybe didn't, so we could answer things directly. If there were instances where we didn't know the answer or there was a very specific or complicated question about health care policy, which is a complicated issue, we would go to the campaign, to FDH's campaign, and ask specific policy questions.

Q.   Did the information from the chats impact your training in

any way?

A.   Yes.   When things became -- I talked earlier about every day every circulator does a little bit of training.  When things in the chats became regular, we would then design a quick training on that thing that became regular.

Sometimes it was skill based so, hey, we're noticing that a lot of people are having trouble in these types of fast-paced sites, so we would run a training on smiling and waving better.  And then oftentimes it was policy related:  A lot of people are having questions about, you know, Does this impact me? and we would run a training and train our circulators on how to talk about this with voters.

Q.   Okay.  We heard from Mr. Simmons about what happens to a petition from the time it's signed to the time it returns to the office.

What happens to a petition after a manager scans it in?

A.   After a manager scans in the petition, it -- we have a remote quality control team who reviews every single signature, line signature, you know, petition by petition by petition.

First, they check to make sure that all the fields are filled out.  They check to make sure that the person who signed the petition is a voter matched to the voter file, so likely to be counted by the state.  They ensure that the circulator affidavit is filled out correctly, and then they look for any anomalies or patterns like, you know, this circulator has six

straight voters who forgot to put the county, and so they indicate different flags for individual circulators to design individualized training programs around.

Q.   Who employs members of the quality control team?

A.   The Outreach Team.

Q.   Why do you all use an external quality control team?

A.   These folks are -- our quality control team who does quality control on our own petitions is a year-round, full-time quality control team.  We have dozens and dozens, if not hundreds, of clients where we do third-party quality control for them.

So these are for signature efforts but more often for voter registration and voter contact campaigns.  Our third-party quality control staff, that's their full-time, year-round job is to check registrations or petition circulators, and so we just -- we know they're good.  They're highly, highly trained, and it wouldn't make sense to do it any other way.

Q.   After quality control reviews the petition, what happens next?

A.   After quality control reviews the petition, prior to 1205, petitions would -- any -- first of all, any petition that had any really simple issues with it, often like the circulator affidavit, they forgot to put a date on it or actually forgot to sign it, we would cure those so that a voter who wanted to make their voice known was not left out of the process because our

circulator made a small error.

After that, they were put into a box and stored for 15 days before we mailed them out.  Over the course of those 15 days we would often go back into that box to show individual circulators patterns of things that they were -- needed to work on.  So, like I mentioned before, this circulator tends to have a bunch of people that don't have their county put down.  We would actually show them their past petitions and practice with them filling it out correctly.

Q.   How long did your quality control process take before HB 1205?

A.   Somewhere around 48 hours.  The goal is always 24 hours, but it's often just a little bit longer than that.

Q.   And how long did the entire process take from when a circulator returned with petitions to when they were mailed to -- well, where -- what did you do with petitions from the box?

A.   We mailed them to TallyED, which was the third-party auditing firm that Florida Decides hired to do an additional check on our petitions.

It took 15 days for us to mail to TallyED.

Q.   So you said 15 days, but it sounds like your quality control process is done sooner.  So why the additional time?

A.   Like I said, the single biggest thing was that very, very small things, like circulator affidavits, we could cure them so

that we weren't just sending petitions that were easily fixable by the circulator themselves in to county offices just to be rejected.

But then, again, going back through the boxes and actually showing circulators what they're producing and why a signature was valid or invalid by using the actual petition itself is a really valuable training tool, and it allows us to improve individual circulator's validity rate in the field.

Q.   And turning to performance tracking, before 1205 what -- you mentioned the term "KPI."  First of all, what is KPI?

A.   It's a key performance indicator.  So, yeah, key performance indicator.

Q.   And before 1205, what KPIs did you track with respect to your circulator operations?

A.   There are three primary KPIs.  First is recruitment related, so the recruitment pipeline:  Do we have enough people applying for the job?  Are enough people interviewing for the job, and showing up for their first day of work for us to scale to the degree we need?

Second is signatures per hour in the field.  So, our entire budget and ability to qualify on this timeline is based on an assumption that a circulator in a paid hour can collect X number of signatures.

If we are falling short of that, we may need to make budget adjustments.  If we are ahead of that, we might need to open the

twelfth or thirteenth office, so we are tracking that.

And finally is validity rate. So, of the petitions that are signed, what percentage of those do we expect to be counted by the supervisors when we turn them in.

Q.   Okay.  Let's start with the ability to recruit.

Pre-1205 were you meeting your recruitment targets?

A.   Yes, exceeding them.

Q.   And what about the field performance?

A.   Yes.  Our -- ultimately the kind of bottom line number of valid signatures per clocked-in hour was slightly ahead of where we expected it to be by a very little bit.

Q.   What was your validity rate before 1205?

A.   It was in the low 80 percent range, but I can't remember exactly.

Q.   How, if at all, did you use verified signature data in managing operations?

A.   Could you ask that again?

Q.   Yes.  Yes.  What, if at all, did you use the verified signature data for in managing your operations?

A.   Oh, knowing exactly where we stand is critical to running the operation efficiently.  So each congressional district -- for example, the 14 -- in 14 congressional districts you have to meet a certain threshold.  So if we assume -- if we are short on the valid signature number in that congressional district, we have to keep collecting signatures in that congressional

district until we are done.  As soon as we are done with enough buffer to feel comfortable, we can close operations in that district and reallocate those resources somewhere else.  And if we are slightly off in our assumptions there, there are major, major cost implications.

Q.   Okay.  I want to turn to the impact of HB 1205.

MS. DOLAN:  Your Honor, Mr. Walsh will be testifying about the impact of 1205 on FDH's paid circulator operations, which goes to Counts One through Three of the operative complaint.

BY MS. DOLAN:

Q.   Mr. Walsh, the courtroom technician is projecting a document that's been marked FDH Plaintiffs' Exhibit 505.

Do you recognize this document?

A.   Yes.

Q.   How do you recognize it?

A.   I am CC'd on this document, and I helped Haylee Becker who wrote this email.  I helped her draft this or talked to her about it as she was drafting it.

Q.   You mentioned you're CC'd.  Is your email the highlighted email on the screen?

A.   Yes.

Q.   Who is Haylee Becker?

A.   She is our state director.

Q.   Who does she report to?

A.    Me.

Q.    What is the date on this email?

A.    April 28th, 2025.

Q.    Was it The Outreach Team's regular practice to send operational update emails?

A.    Yes.

Q.    And was this email created in the ordinary course of The Outreach Team's business?

A.    Yes.

MS. DOLAN:  I'd like to move to admit this as an exhibit.

THE COURT:  Any objection?

MR. WOLK:  No objection, Your Honor.

THE COURT:  Without objection, 505 is admitted.

(PLAINTIFFS' EXHIBIT 505:  Received in evidence.)

BY MS. DOLAN:

Q.    Looking at that first bullet under Top Line, what does this email describe regarding office operations?

A.    This describes slowing operations to a halt at the end of April, beginning of May, yeah.

Q.    Okay.  Turning to page 2 of the document, under the Looking Ahead Section.

What happened with Outreach Team's staffing levels?

A.    At this point in the campaign we were -- we had about, you know, a little more than 150 circulators going out every single

day.  By -- I can't remember the exact date, but maybe by May 2nd we spent a few weeks with zero circulators going out into the field.  After 1205 passed we had to regroup and, you know, change a lot of our operational practices, put new practices into place.  And then the idea was to slowly ramp up and test our scalability again just as we had done at the very beginning of the campaign to make sure that all those new systems could hold up to scale.

Q.   And at the time you paused, how many signatures per week were you collecting?

A.   I can't remember.

Q.   That's okay.

When you paused collection, did the deadline to submit signatures change?

A.   No.

Q.   How did the pause affect the time remaining to collect signatures?

A.   It just meant that we had fewer weeks to finish the job with the same end date.

Q.   What did that mean for your operation?

A.   It first and foremost added a lot of cost.  So we had -- you know, we were -- we had a large overhead without any production.  So we were paying the salaries of 20 people on the ground, plus a bunch of support staff.  We were paying office rent and, you know, contracts with the printing company for, you

know, high-volume printers in each of our offices.  So a lot of overhead without any actual product was racking up costs.

But then the biggest cost driver for us in the slowdown is that it would require us on the back end to scale more quickly, which means that our trainer-to-trainee ratio would be worse, so fewer trainees per trainer.  And in turn we projected that our per-hour signature collection rate was going to go down, which means that we were required to spend more paid hours in the field to finish the job.

Q.   I think you alluded to it, but just to clarify a little bit, the speed -- how does the speed at which you scale affect that per signature cost?

A.   One tracker can get one trainee to be good enough at the job to hit their performance indicator pretty easily, but when one trainer is forced to train four or five people in a day, they are going to -- those four or five people are going to take significantly longer to get up to the level that we need folks to be at.

Q.   And how many circulators would normally have been in the field at this stage of the campaign?

A.   In the May -- April or May?

Q.   At the time you took the pause.

A.   Yeah.  A little more than 150 per day and growing every single week.

Q.   And after the pause when you scaled down, were you ever

able to scale back up to that level?

A.   We were not.

Q.   Okay.  Turning to specific provisions, are you aware that HB 1205 shortened the time to return signed petitions to ten days?

A.   Yes.

Q.   And did The Outreach Team's operation change to accommodate this requirement?

A.   Yes.

Q.   How?

A.   We -- the biggest difference on the ten-day requirement was that we were -- when we scan petitions in at night, we put them immediately into a box to be mailed first thing the next morning, overnight mailed to TallyED.  And so quality control was not finished before petition signatures were out of our office.  So any curable errors we no longer had the ability to cure.  And then we could no longer use the physical petitions as a training tool to improve our circulators' validity rate and other things.

Q.   How, if at all, did that impact costs?

A.   It increased costs first and foremost because the daily -- just daily overnight mail is expensive across many offices for a long period of time.  But then more than that, any previously curable petition signature from circulator or affidavit error, whatever, we no longer had in office, we could not cure those.

So those were otherwise valid signatures that we just had to go collect again because we had mailed them off and they weren't going to be counted by registrars.

Q.   And are you aware that HB 1205 increased fines for late-submitted petitions?

A.   Yes.

Q.   Do you know what those fines are?

A.   I believe that they were $50 a day up to 250 -- I cannot remember.  I know the maximum fine was $2,500 for late petitions.

Q.   Are you aware of any late-submitted petitions by paid circulators in this campaign?

A.   Yes.

Q.   What were the reasons for these late submissions?

A.   The one that I remember most vividly, we had a shipment lost in UPS where our tracking number just wasn't pulling anything up -- they weren't being delivered, and it was finally delivered a couple days late.

Q.   Were there any other reasons for late-submitted petitions?

A.   Yeah.  The -- it's not uncommon that voters or signers themselves make mistakes.  And a common mistake that voters make is to put in incorrect county.  So if a form says Orange County but it's due in Pinellas County, but the voter is actually registered in Pinellas County, when it says Orange County.  But our quality control process is not finished yet.  We don't know

that that's a Pinellas County voter.  So we mail that petition to Orange County.  The Orange County registrar intakes it, stamps it in, however their process works, as on time.  Once they finally process it, they realize that it's a Pinellas County voter, send it to Pinellas County where it is then delivered late to the correct county.

Q.   Is it your understanding that fines can be imposed for late-submitted petitions under the circumstances you just described?

A.   That is my understanding, yes.

Q.   And what is that understanding based on?

A.   As this was happening, a set of our staff made calls to various registrars and asked their staff what happens in this case, and a couple of those folks who would answer the question told us that that would be marked as late.

Q.   When you say "registrars," are you meaning Supervisors of Elections?

A.   I am.  Thank you.

Q.   Turning to prefilled petitions, are you aware that HB 1205 prohibits individuals from prefilling petitions or filling in missing information on completed petitions?

A.   Yes.

Q.   And you already mentioned that The Outreach Team used to cure petitions.

     How often did that kind of circulator affidavit error,

county error occur?

A.    It's very common, particularly in a circulator's first couple of days, that either a voter would fill out a form perfectly and the circulator would miss the affidavit or, like, be flipping through their papers too quickly and just miss one in the stack.  Very common in folks' first couple of days.

More commoner than that is voters making very, very small errors.  So, one of the more common ones is writing USA for county because it looks like country.  There are a lot of small innocuous errors that voters make all the time.

Q.    And are you aware that HB 1205 makes it a third-degree felony to fill in missing information on a signed petition?

A.    Yes.

Q.    How, if at all. has this penalty provision affected Outreach Team's operations?

A.    It -- we stopped doing any curing, so we just turned in petitions that presumably were not going to be counted that were almost perfect.

Q.    Okay.  What changes did 1205 make with regard to retention of certain information on petitions?

A.    We were no longer allowed to retain scanned copies of petitions, and especially we weren't allowed to scan any -- there was specific information listed in the law like last four of social security number, driver's license number.

Q.    You mentioned that Outreach Team scanned these petitions.

Why did Outreach Team retain this information before 1205?

A.    For quality control purposes.

Q.    And how did remaining petition information assist your quality control efforts?

A.    We often -- well, first of all, like, just the ability to go back and -- like I mentioned before, the ability to go back and look at an individual circulator's performance as a set of documents, which is ultimately what their performance is, is really critical for training purposes.

But then also the -- in managing the duplicate signers.  So by the time you get enough signatures -- oftentimes voters will sign a petition twice because they don't know they've signed it. We can actually train circulators to look up whether that voter has signed the petition previously by retaining some of the information.

Q.    Does the statute define what it means to retain voter information?

A.    No.

Q.    What did Outreach Team do to try to understand the scope of this prohibition?

A.    I mean, it was really confusing.  So we just -- we took the most conservative possible approach, which meant that we set up a new -- we worked with the Florida Decides campaign to set up an intake form so that all -- so that we could scan petitions directly to the campaign itself to retain them.  The campaign

itself would then give our quality control team temporary access to that set of scanned petitions.  They would perform the quality control, and then they would -- FDH would remove access from our quality control team and from our field team so that we could no longer access the scanned information.

Q.   And are you aware that HB 1205 expands the definition of racketeering activity to include, quote, "a violation of the Florida Election Code relating to irregularities or fraud involving issue petition activities"?

A.   Yes.

Q.   Does the statute define what irregularities or fraud involving issue petition activities means?

A.   I don't think so, no.

Q.   Did The Outreach Team know what conduct would trigger racketeering liability versus ordinary election code violations?

A.   No.

Q.   What, if anything, did The Outreach Team do to try to understand the scope of this prohibition.

A.   Well, first of all, we had to do some work to convince folks to continue working for us.  This scared people.  But more than that, we just had to take the most conservative approach to every possible interpretation and I think probably go overboard in our operational security.

Q.   Okay.  Let's talk about the circulator eligibility requirement.

First, how did 1205 change the definition of a petition circulator?

A.   It defined a petition circulator as anyone who, if I'm remembering correctly, circulates or possesses more than 25 petitions.

Q.   Do you recall how a circulator was defined before 1205?

A.   I don't.

Q.   Did HB 1205 also restrict who is eligible to circulate petition forms?

A.   Yes.

Q.   What are those restrictions?

A.   Folks were required to register with the State, finish a State-run training program, and be a United States citizen and a Florida resident.

Q.   Did they also restrict people with felony convictions?

A.   Yes.

Q.   And before 1205 did The Outreach Team hire any individuals who had felony convictions whose rights had not been restored?

A.   Yes.

Q.   Do you know how many?

A.   A small number, under ten, I think, but I'm not exactly sure.

Q.   And in terms of the residency requirement, you testified that about 75 percent of The Outreach Team's managers for this campaign were out of state.

What impact did the circulator eligibility requirements have on Outreach Team's operation?

A.   First, you know, a big chunk of petition signatures that we were counting on those staff to collect were not going to be collected by them.

The training program for circulators got worse.  Folks in their first couple of days who are circulating are much quicker to learn when they watch somebody very experienced doing it.  So if they are being trained by somebody in a role-play setting but then don't actually get to see it in real life, the training program suffers.

And then the possession of petitions, like what it actually -- it was hard to know what it means to possess petitions, first of all.  Like, we had questions about whether when you're working at a desk where the drawer is filled with petitions that have been filled out, like, are you in possession of those petitions.  We're not sure.

We at one point experimented with some of our out-of-state managers, like, literally walking around their office with their hands behind their back for an entire day to see how effective they could be.  So there were big ramifications of this part.

Q.   And are you aware that HB 1205 makes it a third-degree felony to collect, deliver, or otherwise physically possess more than 25 signed petition forms without registering?

A.   Yes.

Q.    And what impact, if any, did this criminal provision have on Outreach Team's recruitment efforts?

A.    Our out-of-state managers were scared.  They, first of all, didn't -- weren't 100 percent sure what it meant to be compliant and how they could do it exactly.  So --

Q.    And HB 1205 also required new petition forms as of July 1st; is that correct?

A.    Yes.

Q.    What information did the new form require?

A.    Either the last four digits of a social security number or a Florida driver's license number.

Q.    What, if anything, did you anticipate about voter reactions to the new form?

A.    We just -- we know from experience that the more personal information that you -- that the State requires somebody to put, the less likely a voter is to participate.

Q.    Did you provide training to circulators on the new form requirements?

A.    Yes.

Q.    What did that training entail?

A.    Our approach to this and the way that we trained on it was to focus on the message, get people excited about the issue of Medicaid expansion, talk to them about health care and their personal health care, get them to agree to sign the petition, and then attempt to get them to fill out the information while

breezing over it, hoping that they don't notice that we are asking them for it.

Q.   Why did you train them to present it that way?

A.   Because we know if we ask people to pull out their driver's license number and write it on a piece of paper that a -- some decently sized percentage of voters will say no.

Q.   If a voter still had concerns after that, what were circulators trained to do?

A.   We were trained to tell folks that we won't -- you know, we don't retain -- we don't do anything with this information.  We are just -- this is an official legal document, and it's something that the State requires; to do a second, a third, a fourth ask, attempt the other thing if they wouldn't do one thing, and then ultimately give up at some point.

Q.   Did circulators report to you about voter responses to the new form?

A.   Yes.

Q.   And what did they report?

A.   That every circulator who went out on this every day had at least one or some number of interactions where folks were uncomfortable putting this information on a piece of paper with a person they met three minutes ago.

Q.   Are you aware of any instances where voters declined to provide the information?

A.   Yes.

Q.   Do you have a sense of how many?

A.   No, but it was fairly regular.  One per person per day was probably about right.

Q.   Has HB 1205 affected The Outreach Team's willingness to work on Florida ballot initiative campaigns?

A.   Yes.

Q.   How?

A.   I think that the financial risk associated with doing so with particularly the fines that in some cases are out of our control means that we would need contractual limits on our liability that are nonstandard to be able to take on this effort in this state again.

Q.   You said "nonstandard."  Does Outreach Team require similar contractual liability provisions in other states?

A.   Not to the degree that we would in Florida because the risk here is so high.

Q.   Based on your experience in the petition circulation industry, what impact does the availability of experienced professional firms have on a ballot initiative campaign's ability to succeed?

A.   First of all is the scalability.  A -- without paid circulators gathering, 1.3 million of anything is almost -- probably impossible.

     And then I think more than that the -- volunteers have so much passion and care so much and are good, effective

communicators with people in their lives and about issues, but they are not required in the way that paid staff are to go through a training program, to learn and understand, you know, policy nuances and how to describe those to voters. And I think you miss out on the real public education component of a campaign of this scale where, you know, a couple thousand circulators are having one-on-one public education conversations with, you know, a million and a half Floridians. There's lost value in that.

Q. So based on what you were just saying, in your opinion does the experience and quality of petition circulators affect how effectively a campaign communicates its message to voters?

A. Yes.

Q. And can you just explain that relationship a little bit more?

A. Could you ask it a different way?

Q. Sure. The -- you said it affects how effectively a campaign communicates. Why is that?

A. There's no other point in a campaign where 1.5 million people are going to have one-on-one, individual conversations about the issue. So a paid staff can be told exactly what to say and how to say it, so the message delivery is going to be consistent, right, truthful, et cetera, and so -- and there's value in that for the campaign.

MS. DOLAN: That's all I have, Your Honor.

THE COURT:  Cross.

CROSS-EXAMINATION

BY MR. WOLK:

Q.    Good afternoon.

      Mr. Walsh, Florida Decides Healthcare isn't the first ballot initiative that you've worked on in Florida; correct?

A.    Yes, that's right.  I -- it is the first that I've worked on in the signature-collection phase.

Q.    You worked on the ballot initiative in Florida in 2016?

A.    Yes.

Q.    And that ballot initiative was for expanding solar energy.

      Was that the subject?

A.    Yes.

Q.    And for that campaign, you worked on college campuses -- you went to college campuses to work?

A.    Yes.

Q.    And you were working to convince students to support the initiative?

A.    I can't remember if it was support or oppose, but, yes, we were working to get out the vote for either yes or no.  I just don't remember which one it was.

Q.    You were working with students that convinced them one way or the other on the initiative?

A.    Correct.  That's right.

Q.    For your work on that campaign would you go to public

spaces on campus and have conversations with people about the initiative?

A.   Yes.

Q.   And would you sometimes set up a table in a public space to have conversations with people about the initiative?

A.   Yes.

Q.   You call this tabling; correct?

A.   Yes.  And we call other things -- we call -- anytime that we are out in the public talking to folks about an issue, we call it tabling, regardless of whether there's an actual physical table or not, but yes.

Q.   Okay.  So that was the whole -- the whole range of activities you did on campuses.

     And for your work in that campaign, you didn't collect signatures to qualify the initiative for the ballot?

A.   That's right.

Q.   But you were having people sign petitions to express their position on the initiative?

A.   It was a pledge-to-vote card that they signed, yes.

Q.   So it was a sort of petition that they were --

A.   Yes.

Q.   -- expressing themselves, like, their position on?

A.   That's right, yep.

Q.   And nothing in HB 1205 prohibits the kind of work that you did on the solar energy initiative?

A.    That's -- I think -- I think that's right.

Q.    And in the ballot initiative campaigns that you've worked on in the past, sometimes you've worked in support of the initiative?

A.    Yes.

Q.    And sometimes you've worked in opposition to an initiative, as in like the solar energy initiative?

A.    If I'm remembering correctly, yes, but, yeah, we advocate for and against initiatives as part of our work.

Q.    And for a campaign in opposition to an initiative, your work would involve conversations with voters about the initiative?

A.    Yes.

Q.    And would you go door to door in neighborhoods speaking to voters about the initiative as part of the campaigns in opposition?

A.    In some cases that might be a tactic we deploy.  Yeah, we do door-to-door campaigns.  I can't remember if we've ever done door-to-door on a ballot initiative, so I don't know if we've done that.

Q.    And for a campaign in opposition to a ballot initiative, you would have people sign petitions?

A.    We might have folks sign something to indicate their position, but it would not be an initiative petition signature.

Q.    The petitions wouldn't be ballot qualification petitions;

Cross-Examination – Mr. Walsh

correct?

A.    That's right.

Q.    And nothing in HB 1205 prohibits the kind of work that you did for those campaigns?

A.    Well, no, but the issue has to be on the ballot for us to run those campaigns.  So something making it harder for the issue to get on the ballot does impact our ability to then want to Get Out the Vote effort on that initiative.

Q.    But in terms of the interactions with voters, the conversations, the door-to-door campaign, nothing in HB 1205 prohibits that kind of work?

A.    That's right, yeah.

      I do think the nature of those conversations is usually pretty different, but nothing would prevent us from doing it.

Q.    The actual conversations; correct?

A.    Correct.

Q.    So Florida Decides Healthcare hired The Outreach Team to support an amendment to the Florida State Constitution; correct?

A.    Yes.

Q.    And The Outreach Team isn't registered as a business entity in Florida?

A.    Correct.

Q.    The Outreach Team is registered as an entity in New York; is that correct?

A.    I think so.  I can't remember if we're registered in

Delaware or New York, but one of those.  I think it's New York.

Q.   So The Outreach Team is registered as an entity in either New York or in Delaware?

A.   Yeah.  I think it's New York.

Q.   Okay.  And where do you work from?

A.   I work from Connecticut.

Q.   Okay.  And you mentioned that The Outreach Team subcontracted with another contractor called UpCard?

A.   Yes.

Q.   And UpCard was doing work for -- also for the Florida Decides Healthcare campaign to collect valid petitions?

A.   Yes.

Q.   And UpCard is based -- where is UpCard based?

A.   California.

Q.   So UpCard is based in California?

A.   Yes.

Q.   And the Florida Decides Healthcare campaign agreed to pay The Outreach Team about $20 million to help us campaign?

A.   Yes.

Q.   How much has Florida Decides Healthcare actually paid The Outreach Team to date?

A.   I don't know the exact number, but it's around 2 1/2 million.  It might be a little more than that.  I can't remember the exact number.  I'm sorry.

Q.   So out of $20 million that the Florida Decides Healthcare

campaign agreed to pay The Outreach Team, to date they've paid you about 2 1/2 million?

A.    Yeah.  I don't remember the exact number, but it's somewhere in that neighborhood and -- yeah.

Q.    For the Florida Decides Healthcare campaign, The Outreach Team hired about 430 to 450 petition circulators to work on the campaign; correct?

A.    Yes.

Q.    And of these petition circulators working for the Florida Decides Healthcare campaign, a high percentage of them were Florida residents?

A.    That's right.

Q.    I believe you said during your direct examination that the petition circulators that The Outreach Team hired for the Florida Decides Healthcare campaign were almost exclusively Florida residents; correct?

A.    Yeah.  They were overwhelmingly Florida residents, yes.

Q.    And you would say that more than 400 of the 430 or 450 petition circulators working on the campaign were Florida residents?

A.    I think so.  Around 400 or a little more, sure.

Q.    Were any of the petition circulators that The Outreach Team hired for the Florida Decides Healthcare campaign noncitizens?

A.    Yes.

Q.    But you only know about five petition circulators who were

not citizens?

A.    Yes.

Q.    And did you check the citizenship status of these individuals before testifying today?

A.    I did not.

Q.    So is it possible that they are now citizens since you last interacted with them, these petition circulators?

A.    Sure, that's -- it's possible.  I think, yeah, it seems unlikely, but it's possible.

Q.    Now, The Outreach Team conducts background checks for the petition circulators it hires; correct?

A.    Yes.

Q.    And part of that background check is checking whether someone has a felony conviction?

A.    Yes.

Q.    And as a general matter, before The Outreach Team has not hired people to be petition circulators in the past because they had a felony conviction?

A.    I would say it's not the fact that they have a felony conviction that prevents them; it's the nature of what kind of felony and how recent it was is our determining factor.

Q.    So The Outreach Team has refused to hire some people in the past to be petition circulators because they had some kind of felony conviction in their record?

A.    We have -- yes, certain specific charges that are -- don't

seem conducive to the work that we do.

Q.   The Outreach Team provides training for petition circulators; correct?

A.   Yes.

Q.   And training is mandatory for a petition circulators?

A.   Yes.

Q.   And the training for petition circulation lasts two to two and a half hours?

A.   That's the -- that's the initial day one training.  But a petition circulator -- our training -- every single petition circulator gets some training every single day.  So the number of hours that an experienced trained -- that an experienced petitioner has in training is many, many, many hours.

Q.   So The Outreach Team provides training to petition circulators just about every day, some sort of training?

A.   Yes.

Q.   And you help prepare the training materials for petition circulators?

A.   Yes.

Q.   And The Outreach Team also provides training for petition campaign managers; correct?

A.   Yes.

Q.   And the training is mandatory for managers?

A.   Yes.

Q.   And the training for managers lasts, you said, about one

week during your direct examination?

A.   Yes.

Q.   So based on your experience working on ballot initiatives, you believe that training is important for petition circulators?

A.   Yes.

Q.   You're aware of cases of fraud among petition circulators for The Outreach Team over the years; correct?

A.   Yes.

Q.   And The Outreach Team keeps track of the validity rate for the petitions it submits?

A.   We do.

Q.   So The Outreach Team kept track of its validity rate for the Florida Decides Healthcare campaign?

A.   I'm sorry.  Could you ask that again?

Q.   Sure.

     The Outreach Team kept track of this validity rate for the Florida Decides Healthcare campaign?

A.   Yeah.  We kept track of our internal validity rate, which is our assumption of what will be counted -- our projection of what will be counted, yes.

Q.   And before HB 1205 went into effect, The Outreach Team's petition validity rate for the Florida Decides Healthcare campaign was 80 percent?

A.   In that range -- in that neighborhood, yes.

Q.   And after HB 1205 went into effect, The Outreach Team's

petition validity rate was 81 to 82 percent?

A.    That's right.  But worth saying that it was on a much smaller scale with our smallest set of best circulators.  Those individual circulators undoubtedly had a higher validity rate than our team average when we had 150 people.  So I think that it's safe to say that their individual validity rate went down a little bit with the passage of 1205.

Q.    But the overall validity rate went up after HB 1205?

A.    Yes, again, on a much smaller scale.

Q.    And nothing in HB 1205 would prohibit a nonresident circulator from -- or a nonresident from handing out a blank petition form to a voter after telling them about the initiative and asking them to submit the petition; correct?

A.    Nothing would prevent that, but that is not a feasible way to collect 1.3 million signatures.

Q.    Even though most of your petition circulators for the Florida Decides Healthcare campaign were Florida residents?

A.    Yes.

Q.    And nothing in HB 1205 would prohibit someone with a felony conviction from handing someone a blank petition form and telling them about the initiative and asking them to submit it?

A.    I'm not sure if it says anything about that.

Q.    And nothing in HB 1205 would prohibit a noncitizen from handing out a blank petition form to a voter and telling them about the initiative and asking them to submit the petition?

A.    I think that's right, yeah.  And we know from experience running these kinds of scaled campaigns over a very long period of time that if we are not standing with somebody as they complete something, the percentage of those forms that will be returned as complete is shockingly low.

MR. WOLK:  I think those are my questions.

Thank you.

THE COURT:  Any other cross from any of the other defense lawyers?

Hearing nothing, redirect.

MR. STAFFORD:  Yes, Your Honor.  I'm saying I have no questions.

THE COURT:  That's what I thought.

Occasionally I can read the room, contrary to what my wife says.

Redirect.

REDIRECT EXAMINATION

BY MS. DOLAN:

Q.    Just a couple of points of clarification, Mr. Walsh.

First of all, you mentioned The Outreach Team does employ people who have felony convictions --

A.    Yes.

Q.    -- but disqualifies certain types of felonies.

Would fraud, for instance, be one of those disqualifying convictions?

A.   Yes.

Q.   And I want to ask you about the pledge cards you referenced.

Why would you have a voter sign a pledge card?

A.   It's an important campaign tactic to get contact information so that we can remind them again.  So it's purely for the purpose of getting a phone number and allowing us to follow up with additional messaging.

Q.   And we talked about the feasibility of handing someone a form and talking to them about an initiative.

In your experience, what does handing someone a form without collecting that form do to your ability to communicate with that voter?

A.   It -- it -- like, the ability to communicate with the voter about the issue is a process that happens over the course of somebody signing it.

So if you're -- if you're standing on a street corner and somebody is just handing out flyers, you might take one, but you're not going to stop and talk to them.  But if the ask is, Hey, you need to talk to me and this is going to take a second, that's where the education happens.

So as somebody is filling it out, that's when they often say, Oh, yeah, so this is health care.  Actually, here is my situation.  Can you -- I'm signing this, but can you tell me what happens in my situation?  That is lost entirely with the

hand -- with the pamphlet version of a signature drive.

MS. DOLAN:  No further questions.

THE COURT:  You can step down.

(Mr. Walsh exited the witness stand.)

THE COURT:  We'll take a ten-minute break.  When we come back, we'll hear from the fourth witness.

Thank you.

Court is in recess.  Don't wait on me.  Come back and be in your seats at 2:48.

Thank you.

(Recess taken at 2:38 PM.)

(Resumed at 2:51 PM.)

THE COURT:  You can call your next witness.

MR. STAFFORD:  Your Honor, the FDH plaintiffs call Mitch Emerson.

(Mr. Emerson entered the witness stand.)

THE COURTROOM DEPUTY:

**MITCHELL EMERSON, PLAINTIFFS' WITNESS, DULY SWORN**

THE COURTROOM DEPUTY:  Please state your name for the record.

THE WITNESS:  Mitchell Emerson, or Mitch.

THE COURTROOM DEPUTY:  Thank you.

MR. STAFFORD:  Your Honor, I plan to focus on two related topics with Mr. Emerson:  First, FDH's finances and operations, which is foundation for the impact and burdens on

FDH's associational speech interest imposed by the petition verification elements of HB 1205 as well as the other provisions.

Second, I'll address FDH's current status and plans for continuing its campaign under the current restrictions of HB 1205.

Our theory is that the burden imposed by HB 1205's provisions is cumulative.  The verification fee issue intersects with other issues.  And so while I'll endeavor not to repeat prior witness testimony, I do expect Mr. Emerson's testimony to touch on other challenged provisions of HB 1205, including in particular the volunteer circulation registration requirements, the ten-day return rule, and the criminal penalties provisions, and circulator eligibility requirements.

                DIRECT EXAMINATION

BY MR. STAFFORD:

Q.   Mr. Emerson, what is your current job?

A.   I am the -- can you hear me alright?  Sorry.

     I am the executive director, campaign manager for Florida Decides Healthcare.

Q.   Mr. Emerson, is Florida Decides Healthcare a 501(c)(4) nonprofit corporation?

A.   Yes.

Q.   If I call Florida Decides Healthcare FDH today, will you know what I'm talking about?

A.   Yes.

Q.   How would you describe FDH's mission?

A.   We are attempting to expand Medicaid access for Floridians through the citizen-led ballot initiative process.

Q.   How long have you been the executive director of FDH?

A.   About a year.

Q.   Where are you based now?

A.   I'm based in Orlando.

Q.   And is this your first position with a political campaign?

A.   No, it is not.

Q.   What kinds of campaigns have you worked on in the past, Mr. Emerson?

A.   Going back to 2007, I've worked on presidential campaigns, gubernatorial, senate, what we would call coordinated campaigns where it's multiple campaigns across the state, congressional, local, and legislative campaigns as well.

Q.   Were any of these other positions that you held based in Florida?

A.   The majority of them, yes.

Q.   And you are the executive director or campaign manager of FDH.  Is this the first time that you have led a campaign?

A.   No, it is not.  I've managed numerous different campaigns.

Q.   What are the primary responsibilities of your current position?

A.   Overseeing all the operations of Florida Decides

Healthcare, whether that is managing the staff, the communications, overseeing field operations and fundraising, sort of all the different aspects.

Q.   Is FDH -- strike that.

Will FDH's proposed amendment be on the 2026 ballot?

A.   No, it will not.

Q.   Is FDH currently seeking to place its proposed amendment on the 2028 ballot?

A.   Yes, we are.

Q.   Do you recall what specific month you started with FDH?

A.   It was in February of 2025.

Q.   And, to your knowledge, had FDH obtained any campaign contributions before you joined the organization?

A.   To the best of any knowledge, I believe they had raised about $1.8 million prior to my starting.

Q.   Mr. Emerson, the courtroom technician I'll ask to project the first page of a document that has been marked as FDH Plaintiffs' Exhibit 463.

Do you see that document on the screen, Mr. Emerson?

A.   Yes.

Q.   Do you recognize this document?

A.   Yes.  This -- yes.

Q.   What is this document?

A.   This would be a presentation that we would give to potential donors or partner organizations, laying out our

current strategy and plan for the campaign.

Q.   Was this presentation kept in the regular course of business by FDH?

A.   Yes.

Q.   Was creating presentations such as this a regular practice of FDH?

A.   Yes.

        MR. STAFFORD:  Your Honor, we move to admit Exhibit 463.

        MR. JAZIL:  No objection.  Your Honor.

        THE COURT:  Without objection.  463 is admitted.

    (PLAINTIFFS' EXHIBIT FDH-463:  Received in evidence.)

BY MR. STAFFORD:

Q.   Mr. Emerson, what was this document used for?

A.   Again, we would do presentations to potential partner organizations and potential donors to just kind of lay out what our path would be and campaign in an attempt to either grow the coalition or secure donations.

Q.   Did this presentation document ever change over time?

A.   Yeah.  It was constantly in flux based on the circumstances of the campaign at any given time, or depending on the audience that we were talking to.

Q.   If we could move to the fifteenth page of this document, it's marked FDH 51327 in the bottom right.

A.   Uh-huh.

Q.    Do you see the line that reads "Overall program budget for ballot placement, $18,952,800"?

A.    Yes.

Q.    What does "budget for ballot placement" mean?

A.    So for a citizen-lead ballot initiative, you really are working in two phases of a campaign.  The first phase is primarily focused on getting the petition requirement met, so we're communicating with folks and talking with the overall goal of getting petitions to then get on the ballot while we are also educating about the issue and going forward for that phase.

Q.    And what's the second phase that you are referencing?

A.    So once we had secured enough petitions that were validated by the various Supervisors of Elections and received an amendment number, we would then shift to Phase 2, where we would then be focusing on communicating with voters in a manner to Get Out the Vote is what we call it, or GOTV, for our ballot initiative.

Q.    And this slide talks about ballot placement.  Is that Phase 1 or Phase 2?

A.    This would be Phase 1.  Looking at this, I would assume this was probably March.

Q.    And at this time in March, Mr. Emerson, were you sure that it would ultimately cost FDH $18.9 million and change to make the ballot?

A.    That was just our best estimate at time.  We had been

Direct Examination - Mr. Emerson

speaking -- sorry.  Can y'all hear me?

MR. JAZIL:  Actually, I can't.

THE WITNESS:  I'm so sorry.

MR. JAZIL:  If you can speaker louder, that would be helpful.

THE WITNESS:  I'm not used to shouting, sorry.

So that was our best statement at time.  You know, we had spoken to potential vendors and trying to understand what the path would be based on what we were assuming.

BY MR. STAFFORD:

Q.   And why is this an estimate rather than a fixed known cost?

A.   There can be a number of different variables.  Again, others have spoken to this, but the validity rate of petitions. You know, in some instances we were assuming a certain number of polls that we might run; maybe we need more, maybe we need less, things like that.  The circumstances on the ground could change.

Q.   And Mr. Emerson, on the same page do you see the entries for Operations, Staffing, Overhead, Polling and Research, two other categories?

A.   Yes.

Q.   Were the sub-dollars that are in those categories -- were those fixed costs or were those subject to change over time?

A.   Those were also variable, and again, depending on the presentation.  When we are presenting this, we are trying to get a very broad overview, and depending on the situation, either in

the meeting they could say, you know, Well, this doesn't address one thing, or, Where is this in that?  We can answer that question or follow up with further conversation.

Q.   Mr. Emerson, is the way that these various items are categorized into four bullets -- is that something that was subject to change over time in presentations such as this?

A.   Yes.  It would change depending on, again, a number of factors.

Q.   Was it important to FDH to be precise down to the cent when creating this kind of presentation?

A.   No.  It's -- again, you're having to make estimates based on assumed costs and just using experience and, you know, proposals from different potential vendors of what those costs would be.  But that would obviously change over time.

Q.   And in your experience is the way that FDH approached projecting estimated costs unusual for a campaign?

A.   No, this is a very standard practice.

THE COURT:  Let me ask a question.

As part of projections for this particular campaign as reflected in the proposed budget that's on the screen, did you consider and research other successful voter initiatives and how much had been raised and spent by other groups?

THE WITNESS:  Yes.

THE COURT:  And was this consistent with what it was costing to get ballots on the --

THE WITNESS:  Yeah, this was fairly consistent with it.

Again, the circumstances on the ground can change. And then, you know, the cost for a paid circulator hour has gone up fairly considerably.  But those sort of things can change. But overall, if there are certain assumptions -- again, the litigation, Supreme Court review, would talk to attorneys, and based on their past experience.  But those circumstances could change.  But I had many conversations with other folks who had done this in the past and have personal relationships with different individuals.  So, that's what the estimate would be based on.

THE COURT:  Thank you.

BY MR. STAFFORD:

Q.   Turning your attention to the process of petition verification, to your knowledge, what are FDH's major obligations in handling a petition, rather, after a person signs one of the petitions?

A.   Every signed petition must be turned in to the Supervisor of Elections, and then, depending on the circumstances, a fee paid for the verification cost.

Q.   To your understanding, can FDH choose not to turn in a signed petition?

A.   No, every petition must be turned in.

Q.   To your knowledge, what are FDH's obligations to turn in

signed petitions if it doesn't have the funds to pay a verification fee?

A.   I'm sorry.  Could you repeat the question?  I apologize.

Q.   Sure.  To your knowledge, what are FDH's obligations to turn in signed a petition if it doesn't have the funds to pay the verification?

A.   You must turn in all signed petitions to the Supervisors of Elections.

Q.   Mr. Emerson, at any point in 2025, did you receive notice that Supervisors of Elections were changing the per-petition verification fee charged to initiative sponsors?

A.   Yes.

Q.   And prior to receiving notice of those changes, had you formulated an estimate for how much FDH would need to pay in verification fees alone to obtain placement on the ballot?

A.   Yes.

Q.   What was that estimate on an overall total petition verification cost basis over your entire campaign?

A.   We estimated $910,000.

Q.   Okay.  Can we agree to call that $910,000 figure the pre-HB 1205 verification fee estimate?

A.   Yes.

Q.   Okay.  So let me ask you about how you developed that pre-HB 1205 verification fee estimate.

What are the basic inputs that went into that calculation?

A.   So first we would try to make our best estimate as to what the average cost per petition would be looking at where we would get the majority of our petitions from.  Because the costs pre-HB 1205, there was a variation by counties, so we could assume where we would be getting the bulk of our petitions.  And we got to about 70 cents, I believe was the average per petition cost that we were assuming.

We then would assume about 1.3 million petitions needed to be collected and turned in to ensure that we got to the requisite number of verified petitions across the state.

Q.   Let me unpack that a little bit.

How do you how many petitions FDH would need to have verified at a minimum?

A.   That was from the Division of Elections.

Q.   And do you know what the minimum number of validated signature petitions you needed for 2026 -- what that number was?

A.   880,062, I believe.

Q.   Okay.  In your experience, is every petition that is signed and submitted validated?

A.   Absolutely not.

Q.   In your experience, what are some reasons why a given petition might not be validated?

A.   Most commonly is user error.  We've heard a lot of testimony today about this, but one of the most common ones is when people are filling it out, for whatever reason they put

country instead of county.  So people will write Orlando, Florida, USA, rather than Orlando, Florida, Orange County.  So that's a very common one.

Another very common one is a signature not matching.  In this instance it can be for a number of different reasons, but one very specific example is my partner, she got her driver's license at 16 and never updated her signature.  When she filled out her signature for her driver's license, she put a little heart over the I.  So, when filling out a petition or sending in, you know, a vote-by-mail ballot, I always have to remind her, Make sure you put the little heart over your I.  And also signatures can just change over time, so if folks aren't updating them, they don't necessarily match.

Q.    You mentioned a 1.3 million petition number.  Why that particular cushion as a target that you were working towards?

A.    Looking at past ballot initiative campaigns and some of the estimates, we were assuming around 65 percent validity rate as our target.  Again, that number can change.  Volunteers tend to have a higher validity rate, but that number also can -- will decrease over time.  So even if you start with a relatively high validity rate, I believe as Marc testified to a moment ago, you know, if someone signs a petition in, you know, February of 2026 and we are still collecting petitions in November of 2027, they may not remember if they signed the petition or not, so they will sign a second one in that instance.

Q.    You mentioned doing a calculation to determine the average cost.

How do you know how much Supervisors of Elections are charging for a verification fee?

A.    That number was available on the Division of Elections website.

Q.    And in your experience is that website updated immediately with updated fee information from Supervisors?

A.    In my most recent experience, no, it was not.

Q.    What do you mean?

A.    Once the fees began to change following the passage of HB 1205, the Division of Elections website was not reflecting each individual county as we were getting notification of the fee changes.

Q.    You mentioned that the average verification fee estimate you came up with was 70 cents.  Is that a hard average across all of Florida's counties?

A.    No.  Again, we would look at where we would expect to get the majority of your petitions.  So part of that is just based on population size where there is, you know, a higher population in Miami-Dade, Broward, Palm, Orange County, Hillsborough, Pinellas, Duval, Leon, what have you, as well as some of the surrounding suburban county.  So if you are collecting petitions in Orange County, you are likely to get some petitions from Seminole and Osceola, what have you.

Q.    And then correct my math if I'm wrong here, Mr. Emerson, but 70 cents times 1.3 million petitions equals an estimate of $910,000?

A.    I don't have a calculator either and it's been a long day, but I will assume that that is correct.

Q.    As executive director of FDH, do you believe that FDH could pay $910,000 in verification fees over the course of its campaign?

A.    Yes, absolutely.

Q.    Why?

A.    Well, again, up to that point the campaign prior to my coming on board had raised 1.8 million, but we knew that this was a very polar issue.  There -- the polling had consistently had us in the high 60s and 70s.

    We were also in a situation where the national dialogue at the time was -- especially around health care with, like, HR 1, which was being passed at the federal level -- the research we saw showed that Medicaid as a policy had actually never been polling higher, so this was a very popular issue, and the conversations we would have with potential donors was reflecting that.

Q.    At the time that FDH was ramping up its own campaign, were you aware of any other states that attempted to pass Medicaid expansion through ballot measures?

A.    Yes, there were several other states -- Oklahoma, Idaho,

Maine, Nebraska -- that had all previously passed, but no other was currently doing so during the 2026 cycle.

Q.   How did that knowledge of past success in other states affect FDH's own operations?

A.   We knew that in every state that had the opportunity to vote on Medicaid expansion through ballot initiative had passed. So we were very confident that once we got through Phase 1, we would have a fairly clear path on Phase 2 for actually getting the requisite votes needed in November to pass.

Q.   Mr. Emerson, do you know whether prior to HB 1205 FDH paid the verification fees associated with the petitions it submitted?

A.   Yes.  Whenever we sent in petitions -- so this has already been covered, but the petitions would go to our internal auditor, who would then send the petitions to the various county Supervisors of Elections along with a check for payment for said petition validation.

Q.   Okay.  Before we turn to the verification fees after HB 1205, I want to discuss FDH's plans to communicate with the public.

        MR. STAFFORD:  And I'll ask the courtroom technician to project the first page of the document that's been marked as FDH Plaintiffs' Exhibit 462.

BY MR. STAFFORD:

Q.   Do you see this document, Mr. Emerson?

A.    Yes.

Q.    Do you recognize this document?

A.    This would be another one of the presentations that we gave.

Q.    And was this presentation kept in the regular course of business by FDH?

A.    Yes.

Q.    Was creating presentations such as this a regular practice of FDH?

A.    Yes.

          MR. STAFFORD:  Your Honor, we move to admit Exhibit 462 into evidence.

          MR. JAZIL:  No objection, Your Honor.

          THE COURT:  Without objection, 462 is admitted.

     (PLAINTIFFS' EXHIBIT FDH-462:  Received in evidence.)

BY MR. STAFFORD:

Q.    Mr. Emerson, do you recall about when this document was created?

A.    By the logo I know it would have been after March, but if you'd scroll through it, I can probably give you a better estimate.

     It's smaller now.

Q.    You need it blown up a little bit more, Mr. Emerson?

A.    Just keep going because there's (indiscernible).  Sorry.

Q.    Whereas I always tell you it's not a memory test, but it

is.

A.    All right.  Stop.

So -- yeah, this would have been, I would assume, April, around sometime in April.

Q.    April 2025?

A.    2025, yes.

Q.    What was this document used for, Mr. Emerson?

A.    This would have been our communication strategy.  We had always had an intention to have a digital communication talking to voters about the need for Medicaid expansion.  With an issue as complicated as health care and specifically Medicaid expansion, we wanted to make sure that we were educating folks about what Medicaid expansion is, who fell into the proverbial Medicaid coverage gap, how it would benefit all people, whether or not you fell into the gap and different voters based on circumstance.

And in this instance when we were thinking of that plan early on, we were aware of the potential of what was HB 1205 passing.  So we had decided that we would also include a section starting off with addressing whatever the final result of that legislation would be, because that was constantly changing and there was different bills in the House and Senate.  We didn't know what the end result would be, so we wanted to make sure we would first address the public on what that -- the consequences of that legislation was.

Q.   And I see that the bullets here are numbered by weeks.

Did you plan for FDH's communication efforts that have been described here to begin at a particular time?

A.   Yes, we were assuming, you know, following the -- whenever HB 1205 would eventually pass, sometime after that.  So realistically around June, late spring, early summer, I guess.

Q.   You mentioned having some response to what ultimately became HB 1205.

Is that what's being described in Week 1 here?

A.   Yes.

Q.   And then if you look at the bullet points listed after Phase 2, Educational and Human Impact, could you briefly summarize the kinds of communications that you intended to correspond with those bullets?

A.   Yes.  So we had been in communication with a number of different folks who had different stories.  The best way of communicating in terms of educating people around an issue is, first, face-to-face, person-to-person conversation.

But what's most compelling if you have to do one-way sort of conversation through digital means or what have you is having someone who was affected and can share their story as to how they are currently affected under the system and how there would be benefits if Medicaid expansion were to pass.

So we had been talking to folks about sharing their stories and were planning a situation where we would have everyone come

together.  We would have our digital firm come film them, and then with that content in the can, as it's called, where you just have a bulk amount of content created over a few days of filming these individuals, we could then edit that footage so that, you know, one week we would be talking about one issue; the next week we would talk about how it affected veterans or rural communities, what have you.

Q.   What was the plan for distributing this footage?

A.   We would put it on digital platforms, primarily social media.  When you do that sort of plan, what the strategy would have been was putting things on primarily social media at first, but we could see what we would call organic engagement.

So, you know, we had a lot of different compelling stories. One in particular was a family where -- I'll try to keep it brief.  Essentially, the mother fell into the coverage gap.  She was a caregiver for her mom.  Her son got into a dream college, but he decided to forgo going to school so he could stay home and help provide for the family.  So we were going to have that sort of story filmed, and with that we might use a piece of that and then add to that story over time.

But while I might find that story compelling, perhaps the story of a veteran who was lacking in health care actually did better numbers on organic engagement, and we could put more funds behind that to promote it and, you know, amplify that specific message.

Q.   Were you going to film these videos using actors?

A.   No.  We, again, had been already been -- already been collecting stories of individuals who fell into these circumstances, and so we would bring them all together.  It's just logical to have everyone come to one location and film that over a couple of days.

Q.   Did FDH ultimately execute this week-by-week communication plan?

A.   No, we did not.

Q.   Why not?

A.   Once HB 1205 passed in the final version, we realized that it completely upended our plans, our budget, and ultimately we couldn't get ourselves in a situation where we were expending resources on something like this while we needed to figure out what paths were available to us to get the requisite number of petitions to actually get on the ballot, which is the ultimate goal.

          MR. STAFFORD:  Can we go to the next slide of this presentation?

BY MR. STAFFORD:

Q.   And, Mr. Emerson, do you see at the very bottom the last line is *Grassroots video montage of everyday Floridians supporting expansion*?  Can you describe what that's referring to?

A.   So as volunteers and partner organizations might be out

collecting petitions, we would try to collect footage of them doing so and eventually compile a list to show the momentum and enthusiasm that we would be seeing on the ground.

Q.   Did FDH make this grassroots video montage?

A.   No, we did not.

Q.   Why not?

A.   Same thing, the budget implications that we were facing. As we were trying to find a path to still continue just to get the requisite number of petitions, we didn't want to invest in anything beyond that.  So we wanted to focus on what we could do to focus our communication purely on means of getting petitions collected.

Q.   If we could go to the second-to-last page of this presentation, it's 48906 in the bottom right.

A.   Uh-huh.

Q.   What is this page describing, Mr. Emerson?

A.   Our existing budget gap for running some of the programs that we were hoping to run, as well as paid circulators and --

Q.   And let me direct you in particular to that last line, *Medicaid Expansion Story Film.*

Is that that week-by-week communication effort we were talking about?

A.   Yes.

Q.   Mr. Emerson, for each of the public communication efforts that we've talked about set out in this presentation, did you

intend those activities to occur during the ballot placement phase of FDH's campaign?

A.    Yes, these were all for Phase 1.

Q.    So, Mr. Emerson, what was the overall impact of HB 1205 on FDH's plans to communicate with the public in 2025?

A.    It completely dismantled our entire plan of how we would do that in terms of the educational portion as well as our communication strategy for collecting petitions.

Q.    Mr. Emerson, why not just raise more money to spend on this communication effort?

A.    When trying to raise funds for a campaign and we're communicating with donors, we've had -- I would still say I have had numerous conversations with folks from my start with the campaign in February of 2025 where in many cases the sentiment from the donors was concern over what was happening in the Legislature, because I can't recall when HB 1205 was initially introduced.

But even at the time of my coming on board there was at least rumor that there was something coming, and there was a lot of concern among donors to where, essentially, even if they gave a commitment, which is common in campaigns, you know, We'll commit to doing something, they would essentially say, We'll wait to see what comes out of the Legislature.

So once the final version of HB 1205 passed with all of its various provisions, it became very difficult to continue.

MR. BARDOS:  Objection, Your Honor.  Move to strike the testimony about what donors told him as hearsay.

MR. STAFFORD:  Your Honor, this is not being offered for the truth of the matter asserted.  It's going to the effect on the listener and the campaign speech plans.

THE COURT:  Well, I'm going to overrule the objection on other grounds.  I'll allow it for the only purpose to explain why they were doing what they were doing and didn't believe they could -- they were going to have trouble raising additional funds, but for that limited purpose only.

You can proceed.

MR. STAFFORD:  I'll ask the courtroom technician to project the first page of the document that's marked Exhibit 460.

THE COURT:  So it's clear, it's not -- it's not effect on the listener, but it's explaining --

MR. STAFFORD:  Future acts.

MR. ROSENTHAL:  -- conduct of a party moving forward.

MR. STAFFORD:  Understood, Your Honor.

BY MR. STAFFORD:

Q.   Mr. Emerson, do you see the document here that's projected up on the screen?

A.   Yes.

Q.   Do you recognize this document?

A.   Yes.  This would be a prospectus for Florida Decides

Healthcare.

Q.    What is a prospectus?

A.    Similar to the presentation, this would be something that we would print to have at the same sort of meetings where we meeting with prospective donors or coalition partners to lay out the plan for the campaign.

Q.    Is preparing prospectuses such as this a regular practice of FDH?

A.    Yes.

Q.    Is maintaining prospectuses such as this something that FDH does in the regular course of its business?

A.    Yes.

        MR. STAFFORD:  Your Honor.  We move to admit Exhibit 460?

        MR. JAZIL:  No opposition, Your Honor.

        THE COURT:  Without opposition, Exhibit 460 is admitted.

    (PLAINTIFFS' EXHIBIT FDH-460:  Received in evidence.)

        MR. STAFFORD:  If we can turn to page 8 of this document.  That's 55447 in the bottom right.

BY MR. STAFFORD:

Q.    Mr. Emerson, what is this page describing?

A.    So this would have been the prospectus after the passage of HB 1205.  This is talking about our perceived path forward following HB 1205 and what our best estimates would be in terms

of additional costs and changes to our overall budget plan and how we would attempt to move forward.

Q.   Do you know when this version of the document was created, Mr. Emerson?

A.   I would assume May just because this is seemingly right after we were first trying to assess what the financial implications of HB 1205 would be.

Q.   Let's look at the section of the document that starts *Immediate Financial Impacts Due to New Law* that's been blown up here.

     Can you please explain what the bullet immediately below *Immediate Financial Impacts Due to New Law* is referring to?

A.   So the cost of pausing paid signature-collection operations we estimated around 500,000.  I believe Marc went into detail about where those costs would come from.  But, essentially, the most valuable resource on a campaign is time and what happens when you are unable to do petition collection.

     And to hit a point that Marc also made earlier, as we are not collecting petitions to make sure that we are abiding by HB 1205 and that we were in a position to do so, we still, you know, have to pay for the management, like, salaried staff, office space, et cetera.  So there was those costs, but then also making up the difference of necessary petitions in the future.

Q.   And how about the second bullet point there:  *Revised cost*

*of full scale paid collection campaign*?  What's that talking about?

A.   This was our estimate at the time.  Again, our original proposal estimates were around 18 to 19 million.  It would shift it to 26 million was our estimate at that time.

Q.   How about *Petition compliance systems revamp*?  What's that referring to?

A.   So a number of different things.  Again, these have been testified to already.  But the system to ensure that -- you know, for scanning documents, things like redacting software to make sure that we weren't scanning anything or doing anything that wasn't following the new law.  So just revamping that system.

Q.   If we can go to the next page of the document.

And under the header "Phase 1:  Petition and Qualifying," there's a line that begins*:  By our estimation*, and continues, *we need to collect approximately 1.3 million signatures to ensure qualification.*

Is this referring to your pre-HB 1205 verification estimate of how many petitions you needed?

A.   Yes.

Q.   And then the last line in that paragraph reads:  *The revised Phase 1 budget is approximately 28 million, with over 25 million allocated to petition collection efforts, more than 1 million dedicated to petition verification by Florida's*

*Supervisors of Elections, and 2 million of legal,*

*administrative, and fundraising costs.*

What does this line reflect?

A.   So, again, the additional costs for the paid circulation program, the verification fees, which were still unknown -- we knew that there would be changes, but we were essentially basing it off still the 910,000 number -- and then new legal fees and substantive costs.

Q.   And, Mr. Emerson, there's been prior testimony on costs, and I'm not going to ask you to repeat it.  But could you briefly summarize why we're going from 19 million to 26 million in this estimate?

A.   Essentially to accommodate all the different provisions of HB 1205 from the ten-day rule, from having to shift because -- knowing at this time that our volunteer program was going to change, because, obviously, previously, we would have volunteers out collecting petitions, and we would assume a certain amount of them would be collected by volunteers which would lower the amount needed for paid circulator hours, not knowing how this was all going to actually play out, and if we were going to be able to find a way for volunteer engagement to continue, we would assume that a lot of that would have to shift to the paid.

Q.   At any point during the 2026 campaign, did the anticipated verification fee estimate that you've walked us through change?

A.   Yes.

Q.    And I think you mentioned that you received some communications from Supervisors of Elections.

When did you first learn of the Supervisors charging higher verification fees?

A.    It was sometime in June.  I just remember I was here because it was during one of the preliminary injunction hearings.  So it was sometime in June.

Q.    And how did you learn of fee increases?

A.    I got an email from one of the Supervisors of Elections -- I can't recall which county -- essentially saying that they were raising the rate moving forward.

Q.    And did it come as a surprise that you were receiving notice of verification fee updates at that point?

A.    I mean, I knew it was part of HB 1205, so it wasn't that type of surprise, but I was surprised by the amount and learning how to (indiscernible).

Q.    Mr. Emerson, from your experience working on various kinds of campaigns in Florida, are you aware of whether there's any other kinds of campaigns other than statewide ballot measure campaigns that require verification of petitions?

A.    Yeah.  There's municipality initiatives, county initiatives; there are petitions that are gathered by electoral campaigns for candidates where they collect petitions they'd get on the ballot.

Q.    And, to your knowledge, is there a fee to pay for

verification of those petitions?

A.   Yes, it's 10 cents.

Q.   Mr. Emerson, to your knowledge, did the verification fees for those other kinds of campaigns increase in 2025?

A.   No, they did not.

Q.   Mr. Emerson, after the new fees started to take effect, did you formulate an updated estimate of how much FDH would need to pay in verification fees alone to qualify for the ballot?

A.   Yes.

Q.   What was your estimate for the total verification fees across the entire period of the campaign?

A.   So the total fee would have been about $4.5 million.

Q.   Okay.  And let me refer to that as the post-HB 1205 verification fee estimate.  And let me ask about how you developed that estimate.

     What is the -- we talked about a calculation when you did this before the fee increases; right?

A.   Yes.

Q.   Can you walk us through your calculation, taking into account the fee increases?

A.   Again, a lot of it is coming up with your best estimate. We arrived at about $3.50.

Q.   How did you come up with that?

A.   Based on what we were seeing from the various counties, again, it was challenging because it was an estimate, and the

fees were not just changing and updating from the pre-HB 1205 to post-HB 1205, but, in some instances counties might say, We're going to charge X amount moving forward; then they would say, Actually, we're going to charge Y amount moving forward.  So we just needed to make our best estimate and arrived at about $3.50.

Q.   And was that 3.50 estimate across all Florida counties you had new information for?

A.   No.  Again, we are look at where we're most likely to collect the bulk of our petitions.  So the same counties that I listed before.

Q.   And about what -- when in time were you creating this updated estimate?

A.   Over the course of -- starting from June through July.

Q.   And 1.3 million times 3.50 gives you 4.5 million?

A.   Yes.

Q.   And was that 3.50-per-petition calculation that you did in the June/July time frame an estimate or a known fixed number?

A.   It was absolutely an estimate.

Q.   And why couldn't FDH calculate the precise average petition cost after the updates had been made?

A.   Again, those costs continued to change over time, so we did not know what the final number would be.

Q.   If you assumed the actual average cost per petition was 3.37 post-HB 1205 instead of 3.50, what effect would that have

on your decision-making on behalf of FDH?

A.    So 3.50 from 7 is about a 500 percent increase.  3.37 is fairly close to that.  So it's still millions of dollars of an additional line item.  So it, overall, would not have impacted it.

Q.    Let's talk about payment on verification fees.

Mr. Emerson, do you know when verification fees are due after you submit a particular signed petition?

A.    In my experience, we always just paid as soon as possible.  And for Florida Decides Healthcare, we would include the fee along with the petitions as they were being submitted.  So I know that it would be very soon.

There were some instances where something like a voter would, you know, get their own petition.  You could print it out at different times from our website or from the department -- Division of Elections.  So someone might print one out, turn it in to a Supervisor of Elections.  This occurred before HB 1205.  And in those instances, we would get notification from the Supervisor of Elections that we needed to pay the fee as soon as possible.

Q.    When you worked on other campaigns prior to FDH, was there a practice of when you paid verification fees?

A.    We would always try to pay as soon as they were submitted.  In some instances, depending on different campaigns -- again, if they're being turned in by volunteers, we would try to pay them

as quickly as possible.

And one instance I can recall there was a situation where petitions had been turned in.  It was near the end of a quarter.  This was for a campaign for a candidate.  So we were trying to see if we could pay the petitions after the filing to, you know, have more money, cash on hand in our report.  But in that instance it was a matter of a few days, but, essentially, it was always just as soon as possible.

Q.   Mr. Emerson, was it your understanding that a campaign such as FDH could pay verification fees whenever it wanted to after turning in a petition?

A.   No.

Q.   Why not?

A.   Potential risk of them being -- facing fines, being invalidated, or -- on a campaign, the verification process, you know, it's unclear as to when the timeline starts.  We know we have to turn everything in.  There's, like, a 60-day sort of turnaround for verification, if that timeline starts from the moment they receive the petition or from the moment they receive payment.  And as a campaign, particularly a citizen-lead ballot initiative where for our, you know, path to success and for donors and just public awareness, a lot of times they would look at what the Division of Elections would be reporting.  And since there's a lot on that, we want to make sure we're getting this going as quickly as possible.

Additionally, we don't want to get into the situation -- because for every county, you know, there are usually multiple citizen-lead ballot initiatives that are underway at the same time, along with all the other petitions that we've already discussed.  So we don't want to get caught up in a backlog because we know there is a final end date where if petitions hadn't been validated, you would not qualify.

MR. STAFFORD:  I'll ask the courtroom technician to project a document that has been marked as FDH Plaintiffs' Exhibit 377.

BY MR. STAFFORD:

Q.   Do you see this document, Mr. Emerson?

A.   Yes.

Q.   Do you recognize this document?

A.   Yes.

Q.   Do you see in the "to" line, that's mitch@floridadecideshealthcare.org?

Are you familiar with that email alias?

A.   Yes.  That's my email.

Q.   And do you see in the "from" line that the email appears from an address at the votehillsborough.gov domain?

A.   Yes.

Q.   Are you particular with that domain?

A.   Yes.

MR. STAFFORD:  Can we scroll all the way to the bottom

of this document?

BY MR. STAFFORD:

Q.    Do you see the highlighted line:  *Written communications to or from the Supervisor of Elections regarding business constitute public records*...?

Did I read that correctly, Mr. Emerson?

A.    Yes.

MR. STAFFORD:  Your Honor, we move to admit Exhibit 377.

MR. JAZIL:  No objection, Your Honor.

THE COURT:  Without objection, 377 is admitted.

(PLAINTIFFS' EXHIBIT FDH-377:  Received in evidence.)

BY MR. STAFFORD:

Q.    Mr. Emerson, let me direct you to the first sentence of the second paragraph of this document.  It reads:  *We have made several attempts to reach you regarding this update as well as an outstanding balance on your account but have not been successful.*

Do you know what the phrase "outstanding balance on your account" is referring to?

A.    This would be the difference -- because, again, at that time we were always submitting our petitions with the verification costs, but given that this was changing and we did not know where the end result would be, we would just include the pre-HB 1205 payment, and this would be the difference

between that -- I don't recall what exactly Hillsborough Supervisors of Elections were charging, but the difference between pre-HB 1205 and $2.96.

Q.   Why was FDH at this time paying the old verification fee rather than the new information that you've been provided?

A.   Several different reasons.  One, to our understanding the verification fees were still changing and could change up until the end of September.

Additionally, we were just, you know, considering there might be a preliminary injunction where maybe it would be the old fees.  We wanted to make sure we were acting in good faith, trying to pay what we knew the costs would be at a minimum but adjusting for the difference.

Q.   If you turn your attention to the next sentence after the currently highlighted portion:  *To avoid any delays in processing your petitions, which could result in penalties or fines from the State, I ask you to contact the office.*

Do you know what penalties or fines from the State this is referring to?

A.   Could be a number of different ones, but the assumption at the time would be the penalties or fines could be those that were passed along with HB 1205 in the amount of $50 a day per day that a petition was late.

Q.   And what was your understanding from this email of what would happen if you didn't pay the additional amount that was

being requested?

A.    That those fines would start accruing and whatever other penalties there were.

Q.    Mr. Emerson, I'll ask the courtroom technician to project a document that has been marked as FDH Plaintiffs' Exhibit 378.

Do you see this document, Mr. Emerson?

A.    Yes.

Q.    Do you recognize this document?

A.    Yes.

Q.    Do you see the -- let me scroll to the bottom first.

That's the same -- the "To" line, mitch@FloridaDecidesHealthcare.org, that is your email alias?

A.    Yes.

Q.    And who is this document from?

A.    It appears to be from the Glades County -- someone at the Supervisor of Elections of Glades County.

Q.    And if you scroll to the top email on this page, it's, "To Zack Whitson."

Do you know who Mr. Whitson is?

A.    He was our vendor for TallyED, our internal auditor.

Q.    Could you spell TallyED for the court reporter, Mr. Emerson?

A.    T-a-l-l-y and then capital E-D.

So it is pronounced in a lot of weird ways.  I didn't name it.

Q.   And there's a D at the end?

A.   Yes, E-D.

Q.   All right.

Is this the first time that you've seen this email, Mr. Emerson?

A.   No, it is not.

Q.   How have you seen this email before?

A.   It was forwarded to me from Zack.

MR. STAFFORD:  Your Honor, we move to admit Exhibit 378 into evidence.

MR. JAZIL:  No objection, Your Honor.

THE COURT:  Without objection, 378 is admitted.

(PLAINTIFFS' EXHIBIT FDH-378:  Received in evidence.)

BY MR. STAFFORD:

Q.   Do you see the line in this top email here starting with the third sentence:  *The petition we received will be marked invalid if we do not get the correct amount*?

Do you have an understanding of what this meant, Mr. Emerson?

A.   That if we did not pay, they would mark it as invalid.  So if we did not pay the increased fee, that they would just mark it as invalid.

Q.   And please do keep your voice up, Mr. Emerson.

A.   I'm sorry.

MR. STAFFORD:  If I could ask the courtroom technician

to project a document that has been marked Exhibit 546.

BY MR. STAFFORD:

Q.   Do you see this document, Mr. Emerson?

A.   Yes.

Q.   Do you recognize this document?

A.   Yes.

Q.   Is that your email address in the "To" line, the mitch@FloridaDecidesHealthcare.org email alias?

A.   Yes.

Q.   And do you see in the "From" line that the email appears to come from an address from the lee.vote domain?

A.   Yes.

Q.   Are you familiar with that email domain?

A.   That would be from the Lee County Supervisor of Elections office.

         MR. STAFFORD:  Plaintiffs offer Exhibit 546.

         MR. JAZIL:  No objection, Your Honor.

         THE COURT:  Without objection, 546 is admitted.

    (PLAINTIFFS' EXHIBIT FDH-546:  Received in evidence.)

BY MR. STAFFORD:

Q.   And can you look at the fourth paragraph from the bottom of this email.

    Do you have an understanding of what this portion of the email is referencing?

A.   They are saying that if we do not pay the full amount for

the petition that they would return the petition to the campaign, so they would send it back.

Q. And do you know if the ten-day return deadline for petitions would be affected if a Supervisor returned a petition to you?

A. That is -- our understanding was that if -- again, there was some examples that were listed earlier, but if a petition was returned to the campaign, it would be treated as though it had not been received by the respective Supervisor of Elections, so then the fines, fees, penalties, et cetera, would start accruing from the time it was supposed to have been submitted. And, obviously, this is saying we had to pay within a week.

MR. STAFFORD: Okay. You can pull down the exhibit.

BY MR. STAFFORD:

Q. Mr. Emerson, did FDH itself directly send all signed petitions to Supervisors?

A. As I said earlier, that was our attempt, but, no, and there were several instances where voters would take it upon themselves to send it to the Supervisors of Elections or a volunteer might, in an attempt to be helpful, drop them off at a Supervisor of Elections. So there were different ways it could be turned in.

Q. Do you know if FDH itself was charged a verification fee if a voter or volunteer dropped off a petition directly?

A. In any instance where a petition was submitted to a

Supervisor of Elections, we were charged the fee.

Q.   As you were receiving notice of these fee verification increases, what impact did you believe that these increases would have on FDH's ability to speak to voters?

A.   It completely upended our entire plans of Phase 1 for petition collection.  It put us in a very difficult situation.

Q.   Why was that?

A.   Essentially, we were in a situation where -- again, for the petition-collection phase of a campaign, our goal is to communicate with voters, to educate them around the issue that we are, you know, attempting to get in front of them on the ballot with the goal being to collect the petitions we need for getting the requisite number verified so we would then be on the ballot.

So anytime we would have what we would consider a successful conversation with a voter, we would then have to pay a fee of an average of -- estimate of $3.50.

Q.   What was your understanding of what triggered that obligation to pay the fee?

A.   The moment that we had that conversation and the voter signed that petition.  And when we turned it in to be verified, we would then have the fee.

Q.   What was the implication of being charged a verification fee every time a circulator successfully persuaded a voter to sign one of your petitions?

A.    It put us in a Catch-22 sort of situation because, again, this was a fairly substantial increase that where if we were -- whether we had volunteer or paid, every time -- you know, we want to get as many petitions as we can as quickly as possible, but we would need to make sure that we had the budget available to pay the fees as we were getting these petitions.

So I'm using the example for paid circulators.  As we're trying to raise the funds and increase the total number of hours of the paid circulators to go collect petitions, we make an estimate as Marc was testifying to about how many petitions we assume they'll collect per hour.

And if we tried to budget out, okay, we raised enough money so we want to start scaling up again and moving forward, we would be in a situation where if they overperformed their goal by, you know, a significant amount maybe they're, you know, getting petitions at some event, and there's a very high return on successful conversations -- we could then be immediately required to pay additional fees that we had not appropriately budgeted for on that timeline.

So essentially every time we had a conversation, we were, again, in a Catch-22.  We needed to have the money for the hours for circulation, but also the more that we were doing that, the more we would be charged, so we had to have a lot more fundraising upfront.

Q.    Why not cut that Gordian Knot by just using volunteers?

A.   Because, again, for volunteers, every volunteer petition that would have been collected and submitted would have also the same sort of fee of $3.50.

Also, as testified to by Dr. Acosta -- and, I think, everyone who's testified today has in some degree touched on this -- because we didn't have the ability to have volunteer circulators in the way that we would have traditionally had at a scale that would have been needed to get to 880,000 verified petitions, in either case we would still be charged a fee.

So doors -- essentially when you're trying to plan out a ballot initiative campaign, you're trying to figure out the best path to get there as quickly and as cost effectively as possible, and HB 1205 just kept closing the doors to us.

Q.   Mr. Emerson, did you, yourself, sign FDH's petition with regard to the 2026 campaign?

A.   Yes.

Q.   What did signing the petition signify to you?

A.   So, for me, personally signing that petition was a very personal and important moment.  I got into the -- my career in politics because of my experience with the health care system.

When I was in middle school, my cousin -- she was 2 years old at the time -- Ashley, she was diagnosed with a brain tumor and didn't come from -- didn't have a lot of means.  We were living in a multigenerational household, and living in this sort of situation we did what everyone would do in that situation,

which was sell what we could, borrow, beg, do whatever we could to try to get her the treatment we needed.

And we had found a program that specialized in her specific type of brain tumor, and when we had gotten enough funds to be able to provide her the care that she needed, she was starting to get better; but, unfortunately, when we could no longer afford it, we were in a -- Ashley and her mom were in a situation where -- didn't have health insurance.  There was no -- I don't need to get into all of it, but there was a preexisting condition so she didn't have access to other forms of health care, so not long after that treatment ended, Ashley died.

And seeing that situation where you see someone -- Ashley's mom -- grieving not just the loss of her child, but her and our whole family grieving because a child was lost that, by all accounts, could still be alive today if there was changes and a better policy for how we -- people were able to get access to health care.

It made it very clear to me at a young age that health care policy and things like this are not just abstract, but they have real life-and-death consequences.  And this petition for Medicaid expansion -- when I started in politics in 2007, it was for then Barack Obama's -- Senator Barack Obama's presidential campaign.  I was working to help pass the Affordable Care Act which created Medicaid expansion availability.  And signing this

petition was sort of a culmination of being able to do something about this policy.  And signing a citizen-lead ballot initiative -- you know, there's a lot of different ways people get involved in politics, but this is something where you know when you are signing a petition it actually has an opportunity to participate in democracy and affect policy on a very direct level, and it is something that is deeply personal.

As we've talked about, and others have testified to, when we are going out trying to collect petitions, there's no shortage of people who have health care stories that, you know, want to do something about it but don't necessarily know what actions they can take.  And being able to present someone with an opportunity to say, By signing this petition, you actually can have a direct effect on policy.

It is something where it is important as the campaign for one, educating them on the policy, hearing those stories, recruiting volunteers and getting more people engaged in this campaign.  And it's a -- you know, very personal issue for people, and for myself, I'll say.

Q.   Mr. Emerson, the next set of questions I have is around the end of FDH's 2026 campaign.

What was the deadline for qualifying for the 2026 ballot by submitting enough ballot signatures?

A.   February 1st, 2026, about a week ago.

Q.   Did FDH actively collect signatures up until that

February 1st, 2026 deadline?

A.    No, we did not.

Q.    Why not?

A.    After HB 1205 was initially passed, the substantial level of changes put us in a situation where we knew that it would be incredibly difficult to move forward, just from the moment of passing, and we were trying to understand the law.  We had hope that, one, with litigation -- and I didn't even know what the term even meant at the time, but preliminary injunctions, maybe we could pause parts of it, try to figure out what a path would be moving forward to be able to collect the requisite number of petitions that we needed.

And there were so many different aspects of HB 1205 that it was sort of death by a thousand cuts, where we continued to try to find a way to keep the operation going, but, frankly, by the time we got into late August, early September, it was just abundantly clear that we were not -- or at least for me it was clear that we were not going to be able to be successful in ramping up -- everything back up on a scale that would get us on that -- the ballot for 2026.

Q.    So what did FDH do in that time frame?

A.    We announced that we would no longer be circulating petitions or collecting any petitions with the goal of getting on the ballot for 2026.

Q.    Would it be fair to say that you suspended your campaign?

A.   Yes, we suspended all of our operations in terms of communicating with voters while collecting petitions and talking to folks and instead tried to shift to 2028.

Q.   Who made the decision to suspend FDH's 2026 campaign?

A.   While there was a number of conversations, you know, we would talk to, you know, The Outreach Team about what -- you know, what it -- what we would need, what it would look like, and talking to folks on our executive committee or coalition. And going over it, ultimately it was my decision to have to suspend the campaign.

Q.   When was that decision made?

A.   September -- it was September, around mid-September that everyone agreed with the decision.  But yeah, it was a very difficult decision to make.

Q.   How did FDH announce the decision to suspend its campaign?

A.   We spoke with our coalition partners, our donors, our volunteers, and ultimately we did press conferences and announced publically that we were going to be suspending the campaign.

Q.   Mr. Emerson, you mentioned a February 1st, 2026 deadline. To your knowledge, did any citizen-proposed constitutional amendments qualify for the 2026 ballot?

A.   No, they did not.

Q.   Mr. Emerson, as Florida Decides Healthcare's executive director, why did FDH suspend its campaign for the ballot in

2026?

A.   Essentially, HB 1205 put us in a situation where there were so many different -- it's not -- sorry.  I normally speak in metaphor, which I am told is not the correct way to do court.

But it just put up so many challenges that we were facing, again -- sorry -- but a death by a thousand cuts, but we wanted to try to keep moving forward.  By the time we got to September, it -- we just couldn't continue, even though we knew that the need was great in Florida.  And, again, for an issue like that, we wanted to try to find a path to keep moving forward no matter the circumstances, with the hope that we might be able to find some way around this, or different legal changes, because it's a situation where getting this in front of the voters had always been successful, so we were just trying to continue.

And ultimately the -- the increase of verification fees put us in a situation where, even if we -- because we were in conversations with several folks that are donors, organizations, that were still becoming more and more interested in doing this because of the loss of the ACA premium tax credits, which is a whole nother thing, that were potentially being interested.  But we just knew that the situation was not going to be able to work.

Q.   Mr. Emerson, you've mentioned HB 1205, but as you were making the decision to suspend FDH's 2026 campaign, were there any particular provisions of HB 1205 that you had in your mind?

A.    I'm not an attorney and I can't recall all of the provisions, but there were several of them that were putting us in that situation.

Again, the inability to have the volunteer circulators to the way we have always had with being able to have volunteers going out and collecting petitions -- that was no longer available to us.  The changes to the requirements for ten days and the potential risk of fees if we made a mistake, which was also part of the concern, because even if we had the funds to scale up quickly, it wouldn't decrease the possibility of some type of error where, you know, package -- UPS is late or something, where any one of these single issues could cause -- even if we had the funds come in, we would face bankruptcy and, you know, be in a situation where we couldn't do it.

So the verification fees, the ten days, the -- I can't recall all of them, but there were so many different parts of it.

Q.    Mr. Emerson, let me direct your attention to the 2028 ballot, and this will be my final set of questions.

To your understanding, does FDH intend to --

THE COURT:  Counsel, before you turn to another topic, let me ask a question.

I've read the 30(b)(6) depo excerpts of Holly Bullard, and I'm trying to figure out if you had approximately 100,000 -- or gathered 100,000 by May, and the goal was 100,000 per

month -- which math is not my strength, but June through January.  You'd collect -- you'd still be almost half a million short in terms of the goal of 1.3.  So I'm trying to reconcile what you projected before the changes and the rate at which you were going to collect and the goal if there was a sea change that kept you from meeting the 1.3 million goal.

THE WITNESS:  So on a ballot initiative campaign everything is we would call -- we talk about it as a ramp; it's scaling up.

THE COURT:  The more you collect, the more people will donate -- I mean, that is a more -- you collect and submit, you expect more money coming in; the more money comes in, the faster you can grow and so, Judge, when you say 100K a month, that's what Ms. Bullard said.  It's not a flat line, that's just a general goal.  If you are collecting at that rate, you would expect both the revenue, that is, the donations, as well as the numbers collected to keep going up.

THE WITNESS:  Yeah.  Essentially -- again, I'm not -- I'm not entirely familiar with the deposition, and the all parts of it, so whatever Hollywood is referring to it.

But essentially the volunteer program scales up, right?  People get more excited and more folks are engaged as they are doing this.  So the volunteer operation scales up.  And then as you are raising more funds, the paid circulators are able to, you know, continually ramp up because you are raising

more money, the path to success becomes clear.

You know, when you are in the final -- really the bulk of petitions in fundraising comes in Q3, Q4, because that's when you are really close.  So even if you are behind a little on schedule but you need an extra 100,000, the reason that it's important to have a --

THE COURT:  So when would Q3 be?  That's what I'm trying -- when you say a little behind, the gap between 100,000 and 1.3 million is not a small gap; it's the Grand Canyon.  So I'm trying to figure out, if you are talking about quarter three and quarter four, those would be the last six months before the February deadline.

A.    Sorry.  I'm also --

(Reporter requested clarification.)

THE WITNESS:  Essentially, because we are looking to the quarter going up until February, we try to plan so that we are submitting all of our petitions in a traditional quarter by the end of December.  But you can continue to try to turn in petitions up through, you know, January.  So looking at it that way and continuing to scale up throughout that process, because you want to -- I'm sorry.  I speak -- but sprint to the finish line, right?  Like, you are trying to make sure that you get the petitions that you need.  And as a momentum is building, you can continue to scale up.  And with paid circulators, the part of the benefit of why you want to have a paid circulator program is

volunteers, you can't just turn on, turn off in that same sort of way. But if we know we are short in one congressional district, we can redeploy to a certain area. Or if we are, you know, broadly speaking, a certain number short, we can raise the funds to move the numbers up.

(Reporter requests clarification.)

THE WITNESS: To move the number to get the petitions we need.

Sorry.

THE COURT: Fair enough. I just -- so the record is clear, since I read the deposition and I'm going to have to consider all the testimony, I wanted to give the witness a chance to respond to what I was considering based on having read the deposition.

Counsel, you may proceed.

BY MR. STAFFORD:

Q. Mr. Emerson, before I move on to 2028, what impact did HB 1205 have on your ability to continue to ramp up in the May, June time frame?

A. I mean, it killed it. We -- again, as was already testified. We had to -- you never want to stop your paid circulation. We covered that as to why, but I can go through it all again. But you never want to stop the paid circulation. You are essentially now paying without any petitions coming in. So there is that portion.

Additionally -- I don't know if this has already been covered so I guess I'll get into it -- from the volunteer perspective, when HB 1205 was first passed and there's potential criminal charges, RICO, you know, all these different things, there was an immediate sense of, Can we volunteer anymore? Should we volunteer in taking that kind of risk?

So when that happens, we, you know, have to talk to volunteers, and that slows it down again.  And every time we hit one of those pauses, it kills the ramp.  A campaign -- sorry, but we talk about it as like a skateboard ramp where it's very low, starts to come up, and then it really hits a peak and gets to a height.

So every time we hit a new challenge, it immediately stopped it.  And they even when, you know, the racketeering charges -- I don't know how to talk about it in all lawyer. Sorry.  But when there was the preliminary injunction on the racketeering charges, we still have had to have the time to then go communicate with all of our volunteers that that was no longer something that they had to immediately fear.  So we have to go through all that process.

THE COURT:  Let me make sure I understood your testimony.

As I understood you testimony, We didn't expect to have collected a ton by May.  We expected to collect the vast majority of what we would collect after May.  With the passage

of HB 1205, it effectively smothered the infant in the crib and we were never able to do anything.

THE WITNESS:  Essentially, yes.

THE COURT:  All right.

THE WITNESS:  I want to -- 'cause, you know, I've been warned many times to be, you know, in court on this.  But when you are asking about it for the -- the original path that you were talking about for pre-HB 1205, yes, that -- that was what smothered -- post-HB 1205 we were already dealing with.

THE COURT:  I understand.

Counsel.

BY MR. STAFFORD:

Q.   Mr. Emerson, does FDH intend to seek placement of its initiative on the 2028 ballot?

A.   Yes, we do.

Q.   What general steps has FDH taken toward the 2028 campaign here about a week after the deadline for the last one?

A.   We have been communicating with the coalition partners that we were continuing to grow from 2025 to let them know to be prepared to be engaged.

We have been trying to keep the hubs that were available to us and let them know, depending on the outcome of this trial, you know, there might be opportunity for their engagement.

But we've done some press, you know, letting folks know that we are going to seek getting on the 2028 ballot again.

Essentially the real -- in terms of what matters of communication for getting petitions, we're trying the -- a digital method where we have a link where folks can request a petition so that they can -- if they request a petition, we will mail them a petition along with a return envelope so that they can fill it out and return it.  We are trying this out.

Q.   Let me pause you there.  I'll ask you some more questions about that, Mr. Emerson.

Does FDH have a budget for the 2028 election cycle yet?

A.   No, we don't.

Q.   Why not?

A.   We don't know what the circumstances will be.  A part of that is also just based on this trial and what the final ruling will be.  We are just trying to, you know, have a way to keep folks engaged, aware of the issue.

You know, there's a crisis in terms of health care with the loss of the premium tax credits.  But essentially there is a health care crisis that is already starting to get a little bit into the news.  We expect it to grow more over time.  So we want to make people aware that this is an opportunity that is available to them.  So we wanted to have some means of giving people the ability to sign the petition under the current rules.

Q.   And has FDH at this point had an opportunity to reflect on how best to try to run a campaign under the current rules?

A.   We've had some time to try to figure out a path.

Q.    Does FDH currently plan to use paid circulators in its 2028 campaign?

A.    Under the current rules, no, we do not.

Q.    Why not?

A.    Well, first, the verification fees.  As soon as we decide to use paid circulators, it's essentially a 4 1/2-, give or take, million-dollar line item on our budget as soon as we start doing that, so --

Q.    Why is it your understanding that you wouldn't have to pay verification fees if you don't use paid circulators?

A.    We can file for hardship if we only use volunteers.  So for now, depending -- again, we're basing all of our -- by -- trying to move forward under the existing laws -- rules of HB 1205.  So under those guidelines, we are just not going to be able to do that.  So we're looking at filing hardship and trying to figure out a way to do it without paid circulator.

Q.    Does that mean FDH has no intention to use paid circulators with regard to its 2028 campaign?

A.    It would depend on the result of this trial, but assuming we are under the current rules, then, no, we would not use paid circulators.

Q.    And if you were not under the current rules, would you intend to use paid circulators?

A.    Yes.

Q.    What provisions of HB 1205 impact your decision on behalf

of FDH as to whether to use paid circulators in the 2028 campaign?

A.   Again, I'm not an attorney, and despite having been fairly intimately involved, I may not list them all because, again, there's so many different provisions of this.

But to my understanding, the final ruling will make a determination on things including like what's already happened with the preliminary injunction, so, like, the racketeering charges but also the ten-day rule, the fees, criminal penalties. Obviously, the verification costs increase.  I'm trying to think -- also who can and can't be a circulator, because as we heard from Marc, one of the issues that we have is if a paid circulator -- if we were to try to do that moving forward, the challenge of having paid circulators and having the requisite staff making sure that we have people who can be paid circulators and their management team, so who can and can't participate in that process, would limit us in who we could hire, and we want to make sure we are hiring the best people we can.

Q.   So if you're not intending to use paid circulators, are you intending to use volunteers to circulate petitions with regard to the 2028 campaign?

A.   So when you say "circulating," no.  We are not planning -- as of right now, again, the only plan we are currently looking into is this digital program.  We are also looking at

potentially in the future doing some other type of mail program. But, no, we would not be using volunteer circulators.

Q.    Why do you not plan to use volunteer circulators?

A.    Well, again, as Dr. Acosta had already testified to earlier, one, we can't -- this is a very long answer.  Sorry.

The -- we can't make volunteers sign up for doing the registering with the State, putting them liable for all of the potential criminal financial penalties of being treated as though they were paid staff.  So if we were to do -- you know, one, we can't make that happen, but even if we were able to, we would still need to then implement the management of volunteers, because they are volunteers, to try and oversee that type of program.

So we are in this situation where, again, we had to revamp an entire program from a, you know, large, very, you know, well-respected organization in terms of how they would do a paid circulator program.  Trying to have those sort of systems in place for volunteers is just impossible.  So we would not be able to use volunteer circulators when they are being held to the standards of staff and trying to move to that.

Q.    Rather than a digital program, why not have somebody handing out blank petitions to voters?

A.    Again, trying to be brief for myself and everyone else here, this has already been kind of testified -- there's been testimony on this already, but, essentially, when you hand

someone a petition with the hope that they will, you know, take my -- you know, send it in and doing what we refer to as a distributive model, a number of things can happen.

One, the return rate that we saw was incredibly low. People can have -- even if they mean well, they put it in their pocket; they forget when they get home and throw it in the laundry; it falls out, what have you -- I'm not trying to go -- the thing that -- for someone who has been doing campaigns for a long time in every aspect of every type of campaign, in particular, though, citizen ballot initiative, part of the role of the campaign is to try and make it as easy as possible for someone who wants to participate in democracy in one form or another to do so. And part of the reason when we send out the petitions to folks instead of having them printed is a lot of folks now don't have printers. So we want to make it so that they don't have to pay for postage, do the things. We're trying to make it as easy as possible for them.

And when we are having a conversation, it's much easier to say, you know, We are going to talk to you about this issue. We'll help you fill out the form, and then you fill it out, and we'll take care of all the rest for you. All of those options have been removed from us. We can't communicate with people on -- in the way that we always have been able to and that is most effective in a campaign.

Q. Why not just have the person at a table and the voters can

return signed petitions to the person at the table who is a volunteer?

A.   Well, again, part of the -- my understanding of HB 1205 is no one can possess those petitions without them being a circulator.  So if we were to do that, I genuinely don't -- so would they have to have volunteers going back and then having -- we are still in the same situation.  We would have to have one circulator who would then be, in theory, responsible for all the petitions as they were coming back in.  I don't -- the law is fairly, you know, opaque, as far as I can tell, unclear.

But, essentially, if the people are coming back and trying to turn them in to one location, we still get into the same situation where there's a circulator.  That's part of the reason we were trying to have it be an envelope, so that, in theory, we are not in possession of the petitions; they are being sent through the mail.  We can't have that all coming back to our table.

Q.   How does it affect the way that FDH is communicating with voters if it is using a digital program in the way that you described?

A.   Any sort of communication, digital -- again, we've also been talking about mailing petitions and seeing if that comes back -- that's all a one-way conversation.  We are, you know, essentially saying, Here's some information we hope you support.

That's not how any sort of democracy or engagement on a

campaign works.  It's a two-way conversation.  You've heard testimony about this already, so I don't want to go through it all.  But, essentially, we go; we have a conversation.  We say, Hey, I'd like to talk to you for a minute, talk about this petition, talk about what its effects are.  People stop.

If they are interested, then they might have some questions.  You know, Well, I don't fall into the Medicaid coverage gap.  How would this affect me?  Oh, I have this, you know, personal health care story.  This is something I'm really passionate about.

Well, you can come and join the campaign doing all these sort of things and being able to say, you know, as -- you know, from my own personal story, making people aware of the fact that right in that moment you are having a conversation about an issue, and you can take a direct action right then to do something about it, and that has been removed from us.

Q.   Mr. Emerson, setting aside whether FDH ultimately makes the ballot or not, if you look at the number of petitions you were collecting in the April 2025 time period, how many direct interactions were your circulators having with voters, ballpark?

A.    Thousands, thousands a day.  I mean, from April -- looking at the numbers, again we were sending, per Marc's testimony, you know, 150 circulators.  We had volunteers.  Our volunteer numbers were actually growing every day, so we were having thousands of conversations a day, tens of thousands at some

point, I'm sure.

Q.    Thank you.

MR. STAFFORD:  No further questions at this time.

THE COURT:  We are going to take a break.

THE WITNESS:  Sorry?

THE COURT:  That was not directed at you, sir.

We are going to go ahead and take a ten-minute break, and I -- when we come back, we'll start cross-examination.

Thank you.

(Recess taken at 4:21 PM.)

(Resumed at 4:31 PM.)

THE COURT:  You can proceed.

MR. JAZIL:  Thank you.  Apologies, Your Honor.

CROSS-EXAMINATION

BY MR. JAZIL:

Q.    Good afternoon, Mr. Emerson.

I'd like to pick up where my friend Mr. Stafford, Ben Stafford, left off.  I'd like to start with the interactions that you have with voters.

As I understood your testimony, a circulator or a volunteer goes up to a potential voter, and they build a rapport with them; right?  They introduce themselves and say, Hey, I'm out here collecting for this particular initiative; right?

A.    Yes.

Q.    And then once you've built the rapport with the potential

voter, the signatory, you explain your initiative some more; right?

A.   So, yes.  In theory, the -- especially for Phase 1 of the campaign where you are trying to have conversations and particularly like -- sorry.  I'm going to use campaign vernacular.  What we would talk about is high-traffic canvassing.  Essentially, you are going to a farmers' market, let's say, and you're trying to approach people and have a conversation, because pre-HB 1205 the goal is to get that wet signature and going in and having these conversations just in public.

So when we're doing that, it's difficult to be, like, you know, walking around, Hey, I want to talk to you about health.  But if you have a petition and a clipboard, you're stopping them with a purpose and saying, like, Hey, can I talk to you for a minute?  We have this, and talk about that.

Q.   I got it.  So you're at a farmers' market.  You approach someone with a clipboard with a petition on it.  You ask them for a moment of their time.

A.   Uh-huh.

Q.   And then you start talking about the initiative; right?

A.   Yes.

Q.   And you tell them about all the virtues of the initiative; right?

A.   Yes.

Q.   And you try to get them to sign the petition that you have on the clipboard; right?

A.   Yes.

Q.   And my understanding is that you all wait while someone fills out the petition on the clipboard; right?

A.   No.  You're not waiting; you're engaging with them.  During that process, you're also helping ensure that they are filling it out correctly.

Q.   Okay.  So you're there with the person as the person is filling out the petition; you're talking to them about the initiative some more, and they are filling out the petition; correct?

A.   Yes.

Q.   Okay.  So tell me if HB 1205 prohibits this next step.

So after the person has filled out the petition on the clipboard and you are talking to them --

A.   Uh-huh.

Q.   -- HB 1205 does not prohibit you from then handing to the person an addressed, prepaid envelope where the person could put their petition and mail it themselves; right?

A.   No, it does not prohibit that.

Q.   It does not prohibit that; right?

And you'd be handing the person with their last four of the Social Security number an envelope where that person themselves can mail it to the Supervisor of Elections; right?  HB 1205

wouldn't prohibit that?

A.    No, it does not prohibit that.

Q.    Okay.  Got it.

Now, let's move on to the 2028 cycle.

You guys are trying to get on the ballot for the 2028 cycle; correct?

A.    Correct.

Q.    And you've got an approach where you are telling people to go on the website and get a petition to send in; correct?

A.    Yes.

Q.    Do you think you are going to make the ballot with that approach?

A.    I think that we are trying to find a way moving forward. Given the stakes of this issue, we want to try to make sure that we are utilizing the time between now whenever we have a final ruling to make sure that we are continuing to move forward and try to keep collecting petitions.

But I do not know -- I've never -- this has never been done before, but we're trying to make sure that we have some means of doing this.  There's a lot of challenges that we face.  Again, by not having prefilled petitions, for example, we don't know what the validity rate realistically is going to be.  We are trying to identify alternative techniques, but this was something -- because we have hard deadlines, we wanted to make sure we were utilizing your time as effectively as possible in

the interim while we await the results of this.

Q.    I appreciate all that.

But here's my question.  Assume HB 1205 does not go away.  HB 1205 is the law of the land.

A.    Uh-huh.

Q.    Do you believe you can get on the 2028 ballot with the approach that you are taking now?

A.    That approach alone, honestly, I don't know.  We haven't seen the results, but I -- I -- in my experience, I would be very concerned about it until we can try to find other means of doing it.

Q.    Okay.  And did y'all at any point during the 2026 campaign use a similar approach where you told people to download the petition from the website and turn it in themselves?

A.    We had one, but it wasn't our main focus.  Our primary focus was traditional campaigning in terms of volunteer circulators, paid circulators.

Q.    Okay.  But you did use a similar approach in the 2026 cycle?

A.    We had something up, but, honestly, we weren't really using it.  For the 2026 cycle, you know, we were following what has been traditionally how these ballot initiatives go.  But we were operating under those assumptions where we kind of built some connection, get a coalition going, and then start the ramp to move up.

In this instance it doesn't really afford us the opportunity to build that said ramp because we limit how we can -- it's not something that's scalable, if that makes sense.

Q.   All right.  We'll circle back to the mail program in a minute.

You talked about on direct with Mr. Stafford that it was because of HB 1205 that y'all couldn't get on the ballot for 2026; right?

Did I understand that testimony correctly?

A.   More or less, yes.

Q.   Okay.  But you all are a registered political committee; true?

A.   I'm not an attorney.  I think so, yes.

Q.   Okay.  And you've been a registered political committee since 2018; right?

A.   Yes, that's my understanding.

Q.   Okay.  So HB 1205 wasn't on the books in 2018; right?

A.   I'm -- I'm not -- I don't know what you mean.  I'm sorry.

Q.   HB 1205 was not --

A.   Oh, no --

Q.   -- the law --

A.   -- HB 1205 was not the law in 2018.  I apologize.  Yes.

Q.   And it was not the law in 2020?

A.   No.

Q.   It was not the law in 2022?

A.    No, it was not.

Q.    It was not the law in 2024?

A.    No, it was not.

Q.    And you did not get on the ballot in 2018, 2020, 2022, or 2024; right?

A.    When a committee is formed, it does not mean it's immediately going to start.  I believe that the -- I was not here so I can't really speak to the whole process that was happening before my time in 2025, but, to my understanding, they were looking at different times, because you try to figure out what the circumstances are going to be so that you have the best opportunity.  I think that there was a lot of conversation around an effort going in 2024, as an example, like getting on the 2024 ballot.

Q.    Sure.  I appreciate that.

So can you remember my question?  Did you get on the ballot?

A.    No.  I answered "no."  I was trying to give the context of --

Q.    Thank you.  We'll move on to the next question.

Sir, as I understood it, your goal for this particular cycle in 2026 was to collect 1.3 million signatures; right?

A.    I mean, the goal was to get 880,062 valid signatures.  We assumed it would be 1.3 million.  But if the validity rate is higher or lower, it depends on what the --

Q.   So the goal was 1.3 million of all signatures and approximately 890,000 validated signatures; correct?

A.   Yeah, more or less.

Q.   I'd like to share with you Defendant's Exhibit 109.

MR. JAZIL:  If we can pull it up.

Your Honor, may I approach the witness with a copy as well?

THE COURT:  You may.

BY MR. JAZIL:

Q.   Now, Mr. Emerson, this is like FDH Exhibit 460 that you discussed with Mr. Stafford.

MR. STAFFORD: Apologies.  Mr. Jazil, do have a copy?

Oh, there we go.  Sorry.  It hadn't been played.

BY MR. JAZIL:

Q.   And this is like Exhibit FDH-460 that you discussed with Mr. Stafford, but go ahead and take a look and familiarize yourself with the document and look up at me when you are done.

A.   Okay.

(Pause in proceedings.)

THE WITNESS:  Okay.

BY MR. JAZIL:

Q.   And if we look at the bottom right, it's got a Bates Number which begins with FDH, and then it's got a series of numbers.

Do you see that?

A.   I'm sorry.  Which page am I looking at?

Q.   If you start looking at page 2 --

A.   Page 2, okay.

Q.   -- and every page after that.

A.   Okay.  Yes.  FDH 0005 -- that number?

Q.   Yes, sir.

A.   Yeah, yeah.

Q.   And this means it was part of your production to us in this case; right?

A.   I'm going to guess yes.  I don't --

Q.   Have you seen this document before?

A.   Yes.

        MR. JAZIL:  Okay.  Your Honor, I'd like to move DX 109 into evidence.

        MR. STAFFORD:  No objection.

        THE COURT:  Without objection, DX 109 is admitted.

     (DEFENDANTS' EXHIBIT 109:  Received in evidence.)

BY MR. JAZIL:

Q.   Go to the second-to-last page of this document.

     The one that says "Campaign Timeline and Budget."

A.   Got it.

Q.   All right.  And, sir, here this is Bates labeled FDH 0058833, just so the record is clear.

     If we look at the portion in the middle --

A.   Uh-huh.

Q.   -- it says:  *To qualify for the 2026 ballot, we must*

*collect 891,523 verified signatures.  By our estimation we need to collect approximately 1.3 million signatures to ensure qualification.*

Do you see that?

A.   Yes.

Q.   And then if we take a look at the very top of this document.

A.   Uh-huh.

MR. JAZIL:  Zoom out for a minute.

BY MR. JAZIL:

Q.   On the timeline it says by May 1 the goal is to collect 100,000 petitions; right?

A.   Yes.

Q.   And you created this document -- we can pull out of this.

Let's go to the middle section again.

This document was created after HB 1205 passed and we know that because it says:  *As circumstances evolved, including our fight over the draconian nature of HB 1205, Florida Decides Healthcare conducted a comprehensive review of the most efficient and cost-effective methods for qualifying our initiative for the ballot.*

Do you see that, sir?

A.   Yes.

Q.   And then it goes on to talk about, "an innovative pilot mail program."

Do you see that?

A.    Yes.

Q.    And then if we go to the next paragraph, it talks about how:  *After testing the program, the results exceeded our expectation*s.

Do you see that?

A.    Yes.

Q.    And this is the program where people would download their petitions and mail them back; right?

A.    No.

Q.    What was your mail program, this "innovative pilot mail program?"

A.    Essentially what we were doing was targeting a mail program where we would -- rather than the download and request, we would mail the petition and include a chase program where we would have folks texting and calling to have them -- to try to encourage them to turn them in.  So that was what that program was.

Q.    Okay.  So this program, this "innovative pilot mail program," cut out the volunteers who would be collecting the petition and returning it; right?

A.    Yes.

Q.    And it cut out the paid petition circulator who would be collecting the petition and giving it to the Supervisor; right?

A.    For that specific program, sure.

Q.   And after testing the program, the results exceeded your expectations, true?

A.   The return rates were higher than what we were expecting, but the reality is this was part of an idea -- this is, again, a document meant for fundraising, so we were talking about it in the context of, like, there's other avenues in addition to the paid circulator program, but this would still rely heavily upon paid circulators.

     Again, most of the time as we're going through this and we're talking about how, you know, it's innovative, we're trying to present a situation where we can talk about it to try to get to a path for 2026.

Q.   Let's look at another page from this document.

     Let's go to the page Bates labeled FDH 0058831.

          MR. JAZIL:  If we can zoom in on the Topline Achievements here.

          THE WITNESS:  Uh-huh.

BY MR. JAZIL:

Q.   Now, it says:  Your Topline Achievements include 200,000 petitions collected.

     Do you see that?

A.   Yes.

Q.   Okay.  Can we go to DX 1569?

A.   Uh-huh.

Q.   And you were here for Dr. Acosta's testimony earlier today?

A.   Yes.

Q.   And she testified, as you will recall, about how in her estimation FDH collected approximately 127,000 petitions; right?

A.   That is correct.

Q.   And that's the number we see in DX 1569 if we go to page 3 --

A.   Uh-huh.

Q.   -- at the very bottom; right?

A.   Yes, that is correct.

Q.   Okay.  So the goal for your program in 2026, for the 2026 cycle, was to collect 1.3 million petitions?

A.   Yes.

Q.   And y'all collected 127,000 or 200,000 petitions depending on which number we believe; right?

A.   Well, we actually collected those.  The number of 200,000, to my recollection, I -- again, seeing this one -- because we had different versions -- but based on that number, I'm assuming this was something that we had made later when we had been trying the distribution method, and we had an assumption of how many we were going to get turned in.  As it turned out, the result was much lower than we were expecting.

Q.   Okay.  Got it.

Now, let's go to another goal.

My understanding is that your budget at one point was for $25 million for the 2026 petition-gathering effort?

A.   I can't recall every time because the budget shifted a lot. We started at 18.9 and then --

Q.   Okay.  Do you know whether Florida Decides Healthcare designated Holly Bullard as the corporate representative in this case to talk about the budget?

A.   That's my understanding.

Q.   Okay.  Do you know whether or not she was deposed in this case?

A.   Yes.

Q.   Okay.  Let's pull up Ms. Bullard's deposition, please, and go to page 16.

     And we'll go to lines 9 through 14.

     *Question:  The first time that FDH came up with an estimate of the amount of money it would need to place an initiative on a ballot, what was that amount of money?*

     *So in -- to answer your question, around 25 million for the Phase 1 placing.*

     Do you see that?

A.   I see that, yes.

          MR. STAFFORD:  I'm going to object on completeness grounds.  There is an errata to this deposition at Docket 618-1, page 167 of that document, regarding the portion that Mr. Jazil just walked through.

          MR. JAZIL:  Your Honor, I'm happy for that to be read into the record for the sake of completion.

Cross-Examination - Mr. Emerson

THE COURT:  What's the errata sheet say?

MR. STAFFORD:  Your Honor, I'd have to pull up the errata sheet to be able to read it into the record.

THE COURT:  It's just a different number?  You don't have to read it in the record.  Is it just a different number?

MR. STAFFORD:  Yes.

THE COURT:  I've read the deposition and the number moves --

MR. STAFFORD:  Yes.  It's the same page.  There's a correction to -- 19 million is the original estimate.

MR. JAZIL:  Okay.

THE COURT:  Hold on folks.  Is there -- does anybody disagree based on the 30(b)(6) it was anywhere from 18 something to up to 30 something, depending on the phase?  Isn't that what the deposition said?

MR. JAZIL:  28 is, I think, the high mark.

MR. STAFFORD:  Yeah.  19 to 25, Your Honor.

MR. JAZIL:  I thought it was higher than 25, but, Your Honor, I'll move on.

MR. STAFFORD:  There's no dispute among the parties that Ms. Bullard testified, that there's an errata to it, that that's her testimony.

THE COURT:  But the errata went -- didn't go to what the top end range was, the point that -- I mean, we can talk about how many angels can fit on the head of a pin, but

ultimately I though it was -- I'm sorry.

And I don't know where I got the number 30.  It was -- between 25 and 28 was the top end and approximately 3 million was collected; isn't that what the testimony was?

MR. STAFFORD:  I believe that's correct, Your Honor.

MR. JAZIL:  Yes, Your Honor.

THE COURT:  Okay.

BY MR. JAZIL:

Q.  All right.  So the goal was to collect somewhere from 19 to $28 million for this project; correct?

A.  Yes, depending on -- sorry.  It all depended on time, because obviously the budget had to change as we were trying to make adjustments.  So the fact is we were continually trying to fundraise with the goal of getting on the ballot in 2026 because this is an issue we wanted to put before the voters as soon as possible, given the stakes of the issue.

So as it got later -- from the beginning we were facing challenges of, you know, what was going to come out of the Legislature.  When something came out, a lot more became harder. We were dealing with the issues of trying to raise the funds around that amount, because even if we had commitments, they would say, you know, We want to see what comes out of the Legislature.

Q.  Got it.  And the amount y'all raised between November 2024 and September 2025 was 2.9 million according to your best

estimate?

A.   I don't recall offhand.  I'm not trying -- I generally not -- I'm sure if you're saying it, there's probably some sort of record that you're pulling from campaign finance funds, but I just don't recall the exact amount.

Q.   Okay.  Let's take a look at Defendant's Exhibit 112, please.

     Now this is titled:  "Florida Decides Healthcare Plaintiffs' Supplemental Responses to Interrogatories Nos. 8 and 9 in Defendants' Supervisors of Elections' First Set Of Interrogatories."

     Do you see that, sir?

A.   Yes.

Q.   And if we go to the -- refer back to the verification page -- which is page 5 -- do you see that the answers are verified by Holly Bullard; right?

A.   Yes.

Q.   And she is the campaign chair for Florida Decides Healthcare; right?

A.   Yes.

Q.   If we go to Question 9 -- I'll let you read that to yourself for a moment.

A.   I'm -- is this the question or her answer, just so I can try to answer?

Q.   I'll just let you read that for a moment.

I'd like to read the answer.

THE COURT:  Mr. Jazil, while he's reading it to himself, what was -- you said this was DX 112.  Was -- were the interrogatories Exhibit 7 to a deposition, because I'm just having a hard time.

MR. JAZIL:  Yes, Your Honor.  They were Exhibit 7 to Ms. Bullard's deposition, but it was Defendant's Exhibit 112 for trial purposes.

THE COURT:  I understand.  I was just looking for it to be designated as interrogatories, but the way -- so it's clear for any reviewing court, if they're looking at the exhibit list, 596-1, it's going to be listed as an exhibit to a deposition, not as interrogatory responses, which is fine, but that's -- I wanted to make sure I was looking at the right thing based on how it was labeled.

BY MR. JAZIL:

Q.   And, sir, if we take a look at the answer to this interrogatory.

A.   Okay.

Q.   First full paragraph: *FDH further states that its contributions are publically available at the following link.*

And then that's the link to the Department of State's campaign finance database; right?

A.   I would assume to.

Q.   So taking a step back, Florida Decides Healthcare is a

political committee; right?

A.    Yes.

Q.    And as a political committee, its contributions and its expenditures are reported to the Florida Department of State; right?

A.    Yes.

Q.    And y'all have an outside accounting firm to do your reporting to the Department of State; right?

A.    Yes.

Q.    And so the Department of State's website, their campaign finance database, would be the best place for anyone to find out how much the contributions were for Florida Decides Healthcare; right?

A.    Yes.  I mean, I assume.

Q.    And would it surprise you to learn that if I go to that database, that shows that the contributions for Florida Decides Healthcare for its entire existence have been approximately $1.5 million?

A.    I'm sorry?  The entire contributions have been 1.5 million?

Q.    For the entire existence of Florida Decides Healthcare, from its beginning in 2018 to now, there's been approximately $1.5 million.

      Would it surprise you to learn that?

A.    Yes.

Q.    Okay.  Now, sir, there's some talk from --

A.   Wait.  Hang on.

Q.   -- both you and --

A.   I'm sorry.

          THE COURT:  No question's pending.  He'll ask you a question.

          THE WITNESS:  I'm sorry.

BY MR. JAZIL:

Q.   Now, sir, there's some discussion by both you and the other witnesses of Florida Decides Healthcare about the confusion related to what provisions of HB 1205 mean and how they work; right?

A.   Yes.

Q.   And one of the examples I heard -- and you correct me if I'm wrong, but I heard an example of a voter possibly putting in the wrong county on their form; right?

A.   Yes.

Q.   And so if a voter, for example, puts in Leon County on their form but they really live in Wakulla County, what is your policy for delivering that form?  Are you going to deliver it to Leon where the voter has listed their address, or are you delivering it to the county that, according to your voter rolls, is the correct one, Wakulla?

A.   I mean, our policy as of right now, I believe, to the best of my recollection with the HB 1205, we would send it to whatever listed county is what they have.

Q.   Okay.  And I also understood that you guys have some concerns that you might be fined for sending the form to the wrong account in that circumstance --

A.   Yes.

Q.   -- did I get that right?

Did you at any point seek out advice from the Florida Department of State through their advisory opinion process or by just calling up their division director to ask how to address the situation?

A.   Yes.

Q.   You did?

A.   Yes.

Q.   So y'all submitted an advisory opinion?

A.   I don't know what that is.

Q.   Okay.  So you don't know what an advisory opinion is.

Did you call up Maria Matthews, the division director, and ask her how to deal with this situation?

A.   At different times I believe we've called, and we also, you know, had conversations with, you know, our counsel because, again, I'm not an attorney --

Q.   I understand that, sir.  I'm asking did you specifically call up Maria Matthews, email her and ask about this?

A.   I don't recall.  It's possible.  I certainly spoke with different Supervisor's offices, but I don't remember if I called Maria Matthews.

Q.   Do you know who Maria Matthews is?

A.   Division of Elections.  Yeah.

Q.   That's right.

And you've never heard of the advisory opinion process under Florida law before me mentioning it here?

A.   It's not ringing a bell.  I'm sorry.  I mostly just would try to reach out to the Division of Elections, like, through the website, get, you know, contact information via Google or what have you, call and try to get clarity on the questions.  But frankly, at this point post-HB 1205, a lot of it was just communicating through our counsel or whoever to reach out.

MR. JAZIL:  All right.  I have no further questions.

Thank you.  Mr. Emerson.

Thank you, Your Honor.

THE COURT:  Anything else from defense?

MR. BARDOS:  Briefly, Your Honor.

THE COURT:  Certainly.

CROSS-EXAMINATION

BY MR. BARDOS:

Q.   Good afternoon, Mr. Emerson.  I'm Andy Bardos.  I represent 11 Supervisors of Elections.

So do I understand correctly that FDH began his campaign for the 2026 ballot in February of 2024?

A.   Yes, I would assume.

Q.   Okay.  I believe I heard you testify that by May 1st of

2025, FDH had collected 100,000 petitions.

A.   No, I did not testify to that.

I don't remember -- I don't recall testifying to that we collected 100,000 petitions by May 1st.

Q.   You didn't testify that by the end of April FDH had collected 100,000 petitions?

A.   I -- I might have made an estimate at that time that we believed we had collected.  But, again, the process at the end of April, we were still trying to account for some of the volunteer petitions.  There were petitions that were collected before I came on board.  We were still trying to assess what was -- actually had been collected.  So we had assumed -- because, if I recall, at some point we were under the impression that we had collected that many, but as it turns out there were not that many, I think, actually raw signatures collected.  But I don't recall testifying to that today, but it's possible I said that at some point because we were trying to get this operational.

Q.   Okay.  So to be clear, your testimony here today is not that -- you are not testifying here today that FDH collected 100,000 petitions by the end of April, 2025; correct?

A.   Correct.

Q.   Okay.

A.   I mean, we certainly did not do that.

Q.   All right.  So you also testified about the $28 million

budget.  And you testified, if I remember correctly, that the budget shifted around at times to different numbers.  And so I'd like to show you Defendant's Exhibit 1566, please.

Okay.  And this is FDH's Objections and Responses to Defendants Supervisor of Elections First Set of Interrogatories.

Do you see the document?

A.  Yes.

Q.  Okay.  Do you recall this document?

A.  Not offhand, but I'm assuming this is one of the -- I think they're depositions or something.

Q.  Okay.  Let's go to page 20, please.

Do you see that you verified this document?

A.  Yes.

Q.  Is that your signature?

A.  Yes.

Q.  And you attested to the answers under penalty of perjury?

A.  Yes.

Q.  Okay.  Let's go to page 8 of this document, please.

Interrogatory Number 5.  Let's look at the first line of the response.  It says, *When FDH began its campaign for the 2026 ballot, the fundraising target was $28 million for its campaign to qualify its initiative for the 2026 ballot.*

Do you see that?

A.  Yes.

Q.  Okay.  And this is inconsistent with your testimony today

that the number began at $19 million and then moved to 25 and then finally to 28; correct?

A.    Yes.

Q.    Okay.  All right.  But regardless of whether we go with 19 or 25 or 28, the signature verification, the portion of that budget was always $910,000; correct?

A.    Sorry.  From pre-HB 1205 it was 910,000?

Q.    So whether it was a $19 million budget or up to $28 million budget, the signature verification fee portion was always $910,000?

A.    No.  By the time we were raising the budget, post-HB 1205, we later estimated it would be about $4 1/2 million.

Q.    Okay.  But the $28 million budget only reflects $910,000 for the signature verification fees; correct?

A.    I don't -- I don't recall -- if I could see the deposition. I can't remember.

Q.    Let's look back at your response.  Again on page 8, to interrogatory Number 5.

That's where you mention a $28 million budget, and you provide a breakdown; correct?

A.    Yes.

Q.    And you say that that $28 million consists of $25 million for petition collection efforts; correct?

A.    Yes.

Q.    And you mention $2 million for anticipated legal,

administrative and fundraising costs; correct?

A.   Yes.

Q.   And approximately $1 million for signature verification; correct?

A.   Yes.

Q.   And that's that $910,000 you talked about?

A.   I would assume so, but I'm -- at the time when I was doing this I -- I must have been not appropriately reading it, like, wrote it out or done it correctly, because for that level of budget from the original amount, it was 910,000 post-HB 1205. By the time we got to June or July, it was the 4.5 million where we adjusted our estimate based on the inflated costs of the verification.

     So -- but, yes, I see that that's what I wrote.

Q.   Okay.  So I didn't quite understand.

     So are you saying that your $28 million budget does or does not reflect $910,000 for signature verification?

A.   It does not.

Q.   Okay.  And so your testimony now is that that budget includes $4 1/2 million for signature verification?

A.   Approximately, yes.

Q.   Okay.  And this budget, the $28 million budget, came about in May of 2025; correct?

A.   The -- as of May?

     Honestly, it wouldn't have come about in May.  It would

have come about more into June or July.

Q.   Okay.  So if your corporate representative testified that the budget was increased to $28 million in May of 2025, you would disagree with that testimony; correct?

A.   I guess.  The -- as I am currently demonstrating, it was difficult to keep track of as the budget was constantly fluctuating at what point what costs were being subsumed.  So I would say I would -- you know --

Q.   So are you saying you would agree or disagree with the testimony of your corporate representative that the budget was increased to $28 million in May of 2025?

A.   I guess disagree.

Q.   Disagree?  Okay.

And you know that the signature verification fees didn't begin to increase until July of 2025; correct?

A.   Yes.  Again, it would -- it would depend on the content in which someone was testifying, because in actuality we might of -- I think in the prospectus we were looking at earlier we were talking about raising it to 25 million, at which point in that prospectus that we were looking at it as 1 million, but then we did not fully account for the petition fee.  We knew that they might increase, but we didn't know what --

Q.   Let me stop you right there.

My question was simply whether signature verification fees began to increase in July of 2025.  Correct?

A.   Well, we started getting notification of them in June, but, yes.

Q.   Yes.  Okay.

And so if your corporate representative testified that the reason for the increase to $28 million was to account for the increase in the cost of petition collection as opposed to verification, you would disagree with that testimony as well; correct?

A.   Again, it would depend on the content, because when we -- when we are talking about this in the campaign, sometimes it kind of gets lumped -- all gets lumped together in terms of what the --

(Indiscernible crosstalk.)

BY MR. BARDOS:

Q.   I just need to know whether you would disagree with that testimony.

(Indiscernible crosstalk.)

A.   Can I see the testimony so I can kind of have it in context?  I'm trying to keep up, but it's --

BY MR. BARDOS:

Q.   Now, your $910,000 budget for signature verification was based on two estimates:  One, the need to collect $1.3 million, and the other your estimate that the average cost of signature verification was 70 cents per petition; correct?

A.   No, it was to collect 1.3 million petitions at 70 cents a

Cross-Examination - Mr. Emerson

petition.  Not $1.3 million.

Q.    I'm sorry.  I couldn't hear you.

A.    It was 70 cents a petition, 1.3 million raw petitions.  You said dollars, not petitions.

Q.    1.3 million times 70 cents, correct?

A.    1.3 million times 70 cents, yes.

Q.    And 70 cents, I believe you testified on direct, was an estimate and not necessarily precise; correct?

A.    Correct.

Q.    Okay.  And so if in this case the parties have stipulated in their pretrial stipulation that a reasonable estimate of the average per-petition cost of verification was 87 cents before HB 1205 took effect, you wouldn't dispute that; correct?

A.    I mean, they are both estimates, so I couldn't dispute what someone else's estimate would be.

Q.    You wouldn't dispute the stipulation that the average per petition cost was 87 cents?

A.    No.

Q.    Okay.

      (Reporter requests clarification.)

          MR. BARDOS:  87 cents, yes.

          THE COURT:  Counsel, before you move on, were you seeking to admit DX1566 or were you just asking --

          MR. BARDOS:  Yes, Your Honor, I would.

          THE COURT:  Any objection to DX1566?

MR. STAFFORD:  No objection, Your Honor.

THE COURT:  Without objection, it's admitted.

(DEFENDANTS' EXHIBIT 1566:  Received in evidence.)

MR. BARDOS:  Thank you, Your Honor.

BY MR. BARDOS:

Q.   Okay.  So back to the budget.  You had a goal to raise between 19 and $28 million.  And ultimately FDH in the first three quarters of 2025 raised $2.88 millions; correct?

A.   Again, I -- I can't recall the exact amounts raised at different points, but --

Q.   Okay.  Let's see whether Defense Exhibit 1566 refreshes your recollection.

And let's take a look at page 4, please.

Okay.  Do you see in that first full sentence on page 4 it says FDH raised approximately $2.88 million in contributions over the first three quarters of 2025?

Do you see that?

A.   Yes.

Q.   And does that refresh your recollection about the amount that FDH raised over the first three quarters of 2025?

A.   Yes.

Q.   Okay.  And so you don't dispute that it was $2.88 million; correct?

A.   I guess not.

Q.   Okay.  And that -- FDH fell short of its $19 million goal

and it's $25 million goal and it's $28 million goal; correct?

A.   Yes.

Q.   Okay.  In fact, it ultimately raised barely one-tenth of the $28 million that it set out to raise to qualify its initiative for the ballot; correct?

A.   Yes.  We certainly fell short of our fundraising goal.

Q.   And then in July of 2025, to reduce its expenditures, FDH began to shift away from the use of paid petition circulators and instead opted for a mail program for distributing petition forms; correct?

A.   We were attempting to find alternative paths because we were hopeful that if we could raise additional funds -- I'm -- I'm trying to give context -- whatever -- but --

     But we -- as Marc was testifying to earlier, when we shut down and we didn't have a circulators, we wanted to keep those operations available to us so if we raised the funds we could ramp them back up.  We were trying to find alternatives because we were operating under a whole new set of rules that we'd never seen before, so we were trying to see if there were different ways.  And we were shifting to try to keep it alive so that we had the opportunity to go forward.

Q.   Okay.  I just want the basic facts.

     So in July of 2025, FDH shifted away from paid petition circulation to a mail distribution program; correct?

A.   Yeah.  We were trying it while we were seeing what the

options were, so --

Q.   So yes.

(Indiscernible crosstalk.)

A.   We didn't have the funds and the ability to do that at the time.  We were trying to figure out alternatives.

Q.   So is the answer yes?

A.   Yes.  Sorry.

Q.   Okay.  And it did that to reduce its expenditures; correct?

A.   For a number of different reasons.  To reduce expenditures, but also we were just trying to find alternatives how we could effectively communicate under HB 1205.

Q.   Let's take a look at page 9 of Defendants' Exhibit 1566. At the top of the page it says:  *In July of 2025, FDH launched a pilot program distributing blank petitions by mail to voters. FDH hoped that this program would reduce its signature-gathering budget...*

Do you see that?

A.   Yes.

Q.   And that's accurate; correct?

A.   Yes.

Q.   Okay.

And so FDH would mail blank petition forms to voters together with return envelopes, and they'd reach out to those voters to encourage them to complete and return the petition forms; correct?

A.    Yes.  And I mean --

Q.    This mail distribution program enabled FDH to reduce its budget by $10 million; right?

A.    We were -- we had tried a pilot program.  We believed that if we could use that pilot program and scale back -- because, again, we're trying to find something that was scalable in the timeline of the -- before the, you know, deadline for collecting petitions -- that that would actually reduce our budget if we were able to do it this way instead of entirely relying on paid circulators.

So that was -- our hope is if we could successfully expand that program, we might be able to not be entirely reliant upon paid circulators, but --

Q.    So, Mr. Emerson, I just want you to focus on the question that I'm asking and that is:  The mail program enabled FDH to reduce it's budget by $10 million; correct?

A.    We thought if that was able to be successful we would have tried it, but we weren't able to, you know.

Q.    Okay.  So your testimony today is that it did not enable FDH to reduce its budget by $10 million?

A.    If it was successful, it would have been approximately $10 million cheaper than if we had gone under the original plan of purely relying on paid circulators.

Q.    I'm asking not would of or could of.  I'm asking whether it did.  Did the --

A.    Well --

Q.    I'm asking whether the mail program reduced FDH's budget by $10 million.

A.    The -- our projected budget.  Because when you are saying a budget, some people talk about budgets in terms of actual dollars and cents.  These were all estimates and projections, so we were basing that off of one pilot program that we thought might provide an opportunity.  So we were going to see if we could find that and make that scalable while also trying to keep the option of paid circulators.  Again, we were just trying to adapt.

Q.    Okay.  Let's look at page 9 again of your interrogatory answers, Defendant's Exhibit 1566:  *Before terminating its 2026 campaign in September of 2025, FDH had reduced its signature-gathering budget by approximately $10 million to reflect the anticipated reduced costs of distributing petitions by mail, as opposed to through paid circulators.*

A.    Yes.

Q.    Is that statement correct?

A.    Yes.

Q.    Okay.  And FDH has described its mail program as successful; correct?

A.    Yeah, the pilot program seemed to have been working, but there's issues with the mail program in terms of timing.

Q.    One of the reasons that FDH shifted from paid petition

circulators to mail distribution was that FDH was not raising enough money to pay its paid petition circulators; correct?

A.   That's correct.

Q.   And even after successfully reducing its budget by $10 million, FDH still faced a significant budget shortfall; correct?

A.   Yes, correct.

Q.   On September 1st, 2025, to further reduce its expenditures, FDH suspended its paid petition circulator program; correct?

A.   Yes.

Q.   And later that same month FDH suspended its campaign for the 2026 ballot altogether; correct?

A.   Yes.

Q.   Now, FDH's failure to raise more than a fraction of the $28 million that it set out to raise was a factor in FDH's decision to suspend its campaign; correct?

A.   Yes.

Q.   And when FDH suspended its campaign, it understood that it would be unlikely to raise the additional $25 million or so that it estimated it would need in order to achieve ballot placement; correct.

A.   Yes.

Q.   All right.  I thought I heard you testify on direct that FDH has not yet set a budget for its 2028 campaign.  Is that right?

A.    That's correct, yes.

Q.    Let's take a look at Defendant's Exhibit 1566 again at page 12, and your response to Interrogatory No. 9 says:  *FDH has pivoted its fundraising efforts to the 2028 election cycle.  It currently aims to raise approximately $18 million, with the presumption that it will need to utilize a petition distribution model due to continuing restrictions imposed by HB 1205 as currently enforced.*

     Do you see that?

A.    Yes.

Q.    Okay.  And so FDH currently has a goal of raising $18 million; right?

A.    At the time we were looking at it through a mail program, so that was at that time how we were looking at budgeting it out.  Part of the reason we're shifting to digital in this interim while we await the result of the trial is the mail program has certain costs.  This is one way of trying to ensure that we can both pilot a new program, see if it's effective, and then assess based on that what our budget and pathway would be.

Q.    Okay.  So FDH does or does not have a fundraising goal of $18 million for its 2028 campaign?

A.    I mean, while I would love to raise $18 million, I wouldn't say that that's our specific goal.  We're still figuring out what opportunities are available to us.

Q.    Okay.  So it's no longer your goal to raise approximately

$18 million, but you have not supplemented or amended this interrogatory answer; correct?

A.   I don't believe so.

Q.   Okay.

A.   I'm sure at the time this was probably what we were looking at and thinking exclusively about the mail program being our potential path for 2028, but, again, as we've had time to kind of assess what our options are, we were going to be trying this new digital program and then, based on that assessment, make adjustments.

Q.   If your corporate representative also testified that your fundraising goal for the 2028 election is -- or campaign is $18 million, that testimony would be incorrect as well?

A.   It was likely correct at time, but circumstances have been changing.

Q.   Okay.  All right.  So let's talk about your estimate on the -- your $4.5 million estimate.

     I believe that was based on an estimate of $3.50 per petition; correct?

A.   Yes.

Q.   And here, too, the parties have a stipulation, and if the parties have stipulated that the average -- a reasonable estimate of the average per-petition cost of signature verification now under current fees is $3.37, you wouldn't dispute that estimate; correct?

A.    Nope.

Q.    Okay.  Now, you also talked with -- with counsel on direct about deadlines for submitting petition forms and for payment of the fee as well; correct?

A.    Yes.

Q.    Okay.  The Supervisors are not enforcing any deadline for the payment of signature verification fees; correct?

A.    I'm sorry.  Can you repeat the question?

Q.    Sure.

       Would you agree with me that the Supervisors of Elections are not enforcing any deadline for the payment of signature verification fees?

A.    Honestly, I don't know.  The whole correspondence over the course of the summer as the numbers were fluctuating, I don't know offhand what that -- the deadline is on --

       (Indiscernible crosstalk.)

BY MR. BARDOS:

Q.    Let's take a look at Defendant's Exhibit 1569, please.

       And these are FDH's Objections and Responses to Defendants Supervisors of Elections' Second Set of Interrogatories.

       Do you see that?

A.    Yes.

Q.    Okay.  And I believe this is already in evidence.

             THE COURT:  It is.

BY MR. BARDOS:

Q.   Let's go to the verification page.  Let's confirm -- I believe you verified these interrogatory responses as well.

     Okay.  Do you see this on page 11?

A.   Yes.

Q.   Is that your verification?

A.   Yes.

Q.   And your signature?

A.   Yes.

Q.   Did you read these responses before you signed this verification page?

A.   Yes.

Q.   Okay.  And you read them carefully?

A.   I -- yes.

Q.   You always read interrogatory answers carefully when you verified them in this case; correct?

A.   I would do my best, yes.

Q.   Okay.  And you only verified them because you thought the answers were true; correct?

A.   Yes.

Q.   Okay.  All right.  Let's go to page 4, please.

     And under your response to Interrogatory No. 2, you say: *As Plaintiffs understand the Supervisors' interpretation of relevant statutes, the Supervisors are not currently enforcing any deadline for payment of signature verification fees.*

Do you see that?

A.    Yes.

Q.    Okay.

A.    But this was for 2026.

Q.    Yes.

A.    Okay.  Sorry.  That's where -- I know -- sorry.  That's where my confusion was.  I thought you were just talking about moving forward we can just pay whenever we wanted, and I was, like, that's --

Q.    Well, you haven't submitted any signatures for the 2028 campaign yet, have you?

A.    No, no, we haven't.  But I was just confused on what you were asking.  Sorry.

Q.    And you're aware that from July 2025 through September of 2025, there was a moratorium on signature verification; correct?

A.    Yes.

Q.    And during that three-month moratorium period, or at least a portion of that period, FDH was still collecting petitions and submitting them to the Supervisors of Elections; correct?

A.    Yes.

Q.    It was during that same three-month period that the Supervisors increased their verification fees; is that right?

A.    Yes.

Q.    Okay.  And even after the Supervisors had increased their verification fees, FDH continued to pay the pre-increase fee;

correct?

A.   Yes.   That's what we sent along with the petitions when we were submitting them.

Q.   Okay.   FDH never paid the full fee after the increase; correct?

A.   I don't believe so, no.

Q.   Okay.   And despite that, despite the fact that FDH never submitted full payment with its petitions, FDH was never fined for not paying its full signature verification fee by any specific deadline; correct?

A.   To my understanding, there was some negotiation between our counsel and Supervisor of Elections' counsel and that, as a result, we did not pay the increase or the fines.

Q.   So there was a discussion between your counsel and Supervisors' counsel; correct?

A.   That's my understanding.

Q.   And both before that and after that FDH was never fined for its failure to submit full payment by any particular deadline; correct?

A.   Again, that's correct.   We would have our -- when we would get these emails, we would communicate with our counsel who communicate with the Supervisors of Elections.

Q.   I'm justing asking you whether FDH was fined for not submitting full payment with the verification -- with its signature.

A.    No, we --

Q.    Okay.

A.    Throughout the entire campaign we did everything we could to avoid any fines, penalties, and tried to abide by the law.

Q.    Okay.  And FDH was not fined for failing to pay the full verification fee with the petitions it submitted to the Supervisors; correct?

A.    Correct.

Q.    Correct.  Okay.

All right.  You also talked about an email in which one Supervisor's office and staff member from the Supervisor's office said that, If you don't pay the fee, the petition will be marked invalid.

Do you recall that?

A.    Yes.

Q.    Okay.  But you don't expect the Supervisors to go ahead and verify and validate petitions when you haven't paid the fee; correct?

A.    No.

Q.    Okay.  And one of the emails that you discussed mentioned that the Supervisor might return petition forms to you if you don't pay the petition -- the verification fee; correct?

A.    Yes, there was -- I mean --

Q.    Those petition forms were not sent back to you; correct?

A.    No, they weren't.  There was, again, more -- I wasn't part

of all the negotiations between our counsel and the Supervisors' counsel, so I just know that was the result.

MR. BARDOS:  Those are all the questions I have. Thank you.

THE WITNESS:  Okay.

MR. JAZIL:  Your Honor, as a matter of housekeeping, I neglected to move Defendant's Exhibit 112 into evidence.  This was the FDH supplemental responses to Interrogatories 8 and 9.

THE COURT:  Any objection, Mr. Stafford?

MR. STAFFORD:  No objection, Your Honor.

THE COURT:  Without objection, DX 112 is admitted.

(DEFENDANTS' EXHIBIT 112:  Received in evidence.)

THE COURT:  Any other questions from defense counsel to the witness?

None.

Redirect?

REDIRECT EXAMINATION

BY MR. STAFFORD:

Q.   Mr. Emerson, Mr. Jazil asked you some questions about the total number of contributions that FDH had received.

Do you recall that?

A.   Yes.

MR. STAFFORD:  Your Honor, the parties have stipulated that the Court can take judicial notice of the data that's on the Division of Elections website regarding contribution

information.  I'll ask to put on the screen the contribution report for FDH of the total life cycle of its existence.

And so showing this for the committee name:  *Florida Decides Healthcare, All Contribution Data*.

BY MR. STAFFORD:

Q.   So this is all from all data to the present.

A.   Okay.

Q.   Mr. Emerson, do you see here it indicates that Florida Decides Healthcare has received total contributions of 5,785,688.18?

Do you see that, Mr. Emerson?

A.   Yes.

Q.   Does that refresh your recollection as to how much FDH has received in total contributions?

A.   That was correct as of December -- or the end of December, 31st, yeah.

Q.   Okay.  Mr. Emerson, you testified, I believe, that you don't know for sure whether the digital petition program that you contemplate in 2028 would be successful.

Why would you plan to use a petition distribution approach where you're not 100 percent confident it will work?

A.   We are having to come up with ways of operating under HB 1205 that, to my knowledge, no one has ever had to operate under in any capacity, and there's nothing akin to it in other states.  So we are trying to find ways to abide by the law and

move forward.

We know that there are certain aspects of it, like -- you know, we've started putting up the link. You know, we are getting in requests. I don't believe we've started sending any of them out yet. We don't know what the return rate is as of now. We don't know what the validity rate is since we can't prefill as we could pre-HB 1205.

So we are still ostensibly trying to figure out what options are available to us since all normal ways of communicating and collecting petitions are, you know, not available to us. So we are trying to adapt as we await the result of this trial.

Q. Mr. Emerson, are you familiar with a verification moratorium under HB 1205?

A. Yeah.

Q. What's your understanding of that?

A. From July 1st to September 30th, there was a moratorium where no petitions would be verified by the Supervisors of Elections, and that was part of HB 1205.

Q. You were asked -- I'm sorry. Go ahead.

A. No, I'm coughing, trying not to cough in her ear.

Q. You were asked some questions by Mr. Bardos about the Supervisors' enforcement of petition verification fee requirements.

Do you remember that?

A.   Yes.

Q.   Was it your understanding that there was an arrangement with regard to payment and verification fees during the period of time that Supervisors were not actually verifying the petitions?

A.   Can you repeat the question?  I'm sorry.

Q.   Was it your understanding that there was an arrangement with Supervisors about paying verification fees during the moratorium?

A.   Yes.  My understanding, again -- there was some level of understanding because we were getting these -- I will -- they were threatening sort of emails where they were, like, Give us -- you know, You owe us this, or this consequence or that consequence.  I, of course, would talk to our counsel who I know would talk to the Supervisors' counsel.  And so that was my understanding.

Q.   Mr. Emerson, do you know whether the Supervisors have generally disclaimed an intention to enforce the petition verification fee requirements?

A.   I don't offhand, no.  Sorry.

          MR. STAFFORD:  Thank you very much.

          No further questions.

          THE COURT:  You may step down.

     (Mr. Emerson exited the witness stand.)

          THE COURT:  Let me hear from Plaintiffs' counsel.

Are we still sticking with the -- we got through four of the ten witnesses that were identified for today.  Are we starting with A-r-d-i-l-a tomorrow?

MS. GAMBHIR:  Yes, Your Honor.  Mr. Ardila is ready to begin tomorrow, or now, if the Court wishes to move forward.

THE COURT:  Yeah.  We're not going to -- I can't keep the court staff here for a nonemergency past 5:30 on a regular basis.  I have to do it with juries deliberating and so forth. So we are going to break in just a minute for the evening.

I think this morning I counted 40 lawyers in the courtroom, and I'm going to keep emphasizing that over and over because I have a staff of three.  And I know I'll be getting phone calls about, Judge, why haven't you entered the order within 30 seconds of closing the evidence and hearing -- reading the closing arguments?

I don't have the benefit of having 40 lawyers in the courtroom plus others outside the courtroom.  So what's going to help me -- and so I'm going to -- y'all can tell me when you are going to do it.  If you've got 40 lawyers, folks can be working on some briefing issues.

I want to start with something I raised in one of my orders, which is whether or not for purposes of this analysis I consider the cumulative impact of changes to the law.  I've reviewed the footnote -- I believe it was in the pretrial stip -- where the plaintiffs' lawyers cite the *Pierce* case,

P-i-e-r-c-e, which is 44 F.4th 853, a Ninth Circuit case from 2022, where they -- the Ninth Circuit equates petition initiatives with candidate ballot access.  And I read that.

This is as far -- and then I, of course, am familiar with -- I believe it was the Supervisors cite the *Gibson* case out of the Eleventh Circuit, which is 741 F.2d 1268, an Eleventh Circuit case from 1984, which suggests that those are not the same animals and they're different, meaning petition initiatives and candidate ballot access.

Further, we have the footnote from the Eleventh Circuit, footnote 10 -- and I'll spell it for the court reporter -- B-i-d-d-u-l-p-h, which is 89 F.3d 1491, 1501, which is the pinpoint page, footnote 10, where the Eleventh Circuit, again, distinguishes candidate ballot access from petition initiatives.

I'm not -- and it's a little bit more complicated than that.  I'm just using that as a shorthand.  So I want somebody to brief that issue because it seems to me it's going to be pretty significant in terms of how this Court evaluates these claims.

When can somebody get me a memo from each side?

MR. JAZIL:  Your Honor, if the Court is open to this, I'd like to address this as part of the posttrial brief in the written closing.

MR. WERMUTH:  We anticipate being able to do that by

Wednesday.

THE COURT: We can wait for pretrial -- I mean, posttrial briefing with all of this. I'm letting y'all know what I'm trying to do is read everything now and start outlining the issues that I have so that I can evaluate meaningfully the testimony and focus on what matters. So that's the spirit in which I'm asking, because, again, it's not like y'all magically just dump 250 pages of closing arguments and I just digest everything in the record all at once. And, again, I don't have the benefit of having legions of lawyers to do all that for me, and this is not my only case.

But y'all can address it as part of the closing. I'll tell you what I'm going to do. I'm going to tell y'all things you need to address in your closing arguments. That's one. And we are going to do this throughout, because there's certain things -- and you can say, Judge, I don't think that's relevant and here's why. Fair enough, but I still need you to answer the question.

The next question I've got is I've got the stay order. So what binding effect, if any, does it have? I think there's case law that sidesteps that issue, and then there's some other cases that talk about it. In fact, there's one of my cases where the Eleventh Circuit explicitly said that they need not address it but then cited a case that suggests what, if any, binding effect it has. But that was binding effect on the

merits panel of a -- the merits panel of the stay panel, which is slightly different than how it binds me or to what extent would it be persuasive.

So, I mean, in the stay order they said that this -- and it's not every issue, but the one issue that was addressed with respect to citizens and nonresidents, it's not subject to strict scrutiny, but that assuming it's expressive conduct, which they raised an issue for -- I heard the questioning, and I know the defense is going to make that argument as well that it's not expressive conduct; it's simply conduct -- but it would meet intermediate scrutiny.

So what do I do with the stay panel's ruling?  Is it simply persuasive?  Not persuasive?  Does -- I think -- I'm assuming the argument would be, Judge, it may be persuasive, but if you have a different quantum of evidence in this proceeding that was before the court or the Eleventh Circuit that considered -- that is, the stay panel considered it, then, Judge, all bets were off if you suddenly have different facts before you.

But anybody want to tell me what your position is with respect to the stay order?

MR. JAZIL:  Your Honor, I'll confess I've been on both sides of the issue, so I want to look back to see what I've said and make sure --

THE COURT:  Oh, the Eleventh Circuit has been on both

sides of it, too.  And they tend to apply it differently depending on whose ox is being gored.  I'm well aware of that.

MR. JAZIL:  I think it's highly persuasive.  I just need to figure out why in the papers to you.

THE COURT:  Are you taking the position -- I guess it would be is it binding?

MR. JAZIL:  And, Your Honor, the position I've taken with Judge Hinkle in the past -- and I'll brief this further -- is that as a practical matter on a preliminary injunction when you get to the merits panel, the merits panel decision becomes binding oftentimes on the subsequent panel that hears the appeal from the final judgment, because if it's a prior panel opinion that's published, it ends binding the merits panel from the final judgment.  The stay panel is a little different.

But I will --

THE COURT:  Well, in the case that was cited, the *Jacobson* case, what they were talking about was the merits panel versus the stay panel, and they were citing language that suggested, well, it's a preliminary finding based on an incomplete record, which would suggest the merits panel would not be bound by.

MR. JAZIL:  And so, Your Honor, the best example I have --

THE COURT:  That is, that it was only substantially likely -- not substantially likely to succeed on the merits

since they -- or I guess it could be either way, either granting or denying the stay.

MR. JAZIL:  So to unpack that, Your Honor, the best example of this is the Amendment 4 litigation in front of Judge Hinkle where there was a ruling at the preliminary injunction stage which was appealed.  A stay was denied, I believe.  And then a panel heard the appeal of the PI, so not the stay, but a panel heard the stay of the PI.  The test was substantial likelihood for success on the merits.

However, as a practical matter, it ended up being a published decision.  And on the substantial likelihood for success on the merits, the court laid out what the legal framework would be.  And then that case went initial en banc, in part because there was a concern that the PI merits panel legal decisions in the published opinion would be binding on a subsequent panel.

So, again, Your Honor, I'll flesh this out in greater detail, but you're right; substantial likelihood for success is the test.  However, if they are addressing legal issues and it's in a binding decision, there is an Eleventh Circuit local rule or maybe an IOP that talks about how the --

THE COURT:  That would be a merits panel.

MR. JAZIL:  Yes, Your Honor.  The merits panel from the final judgment would --

THE COURT:  Well, we don't have that because they, of

course, punted in this case.  So we don't have the merits.

MR. JAZIL:  In part because of us, Your Honor.  The Smart & Safe friends filed the motion, which we didn't oppose, to put off briefing because we thought the trial would happen before we would get the appeal resolved.

THE COURT:  Which is a remarkable statement.

MR. JAZIL:  That's how the cookie crumbled, Your Honor.

THE COURT:  Uh-huh.

MR. JAZIL:  I blame Ms. Murphy.  It was her idea.

THE COURT:  The court reporter can put "Judge scowls" as part of the transcript.

Mr. Wermuth?  Judge, not binding?  Persuasive?

MR. WERMUTH:  Not binding.

THE COURT:  Well, Mr. Jazil didn't say he thought it was a stay decision; even if it was published, it was binding. Correct?

MR. JAZIL:  Your Honor, I do believe that's right.  I reserve the right to be wrong after I put pen to paper, but I do believe that's right.

THE COURT:  And does it -- does it matter -- because most of the cases that I'm aware of are dealing with whether another appellate panel, not whether or not the trial court, is bound in the case by what -- the same case.  So there's case law that talks about is another panel in another case bound by

something in a preliminary injunction order, and then there's a case like you mentioned, the Amendment 4, the same case, but in both of those instances it's what impact does it have on the Eleventh Circuit, not what impact does it have on the trial judge in the same case.

Does that alter the analysis?

MR. JAZIL:  It may alter the analysis, Your Honor. And here I'm reaching to the attorney fees cases that deal with -- attorneys' fees cases that talk about successive PI stage, and then they ultimately say, Hey, well, that's not really prevailing because the trial court hasn't had a chance to complete its work; the trial court still needs to hear evidence in slightly different posture.

That said, Your Honor, I go to Judge Hinkle who cut the Gordian Knot on this issue somewhat in the Amendment 4 case. I may be misquoting him slightly, but his analysis was, This is the Eleventh Circuit's most recent recitation of how to deal with these issues.  If you think I'm not going to follow this, you got another thing coming.

THE COURT:  I'm familiar with what Judge Hinkle said, but not binding.

MR. JAZIL:  Not binding.  However, again --

THE COURT:  It may be persuasive.

MR. JAZIL:  Very persuasive is, I suppose, the way Judge Hinkle cut the Gordian Knot.

THE COURT: Well, the question is not whether it persuades you, it's whether it persuades me what he did.

MR. JAZIL: Fair enough.

THE COURT: Anything else from Plaintiffs' counsel?

MR. FERGUSON: No, Your Honor. This is Brent Ferguson for the Right to Clean Water plaintiffs.

I will just note that we briefed this a bit on the motion for summary judgment and agree with Your Honor that there is not a case directly on point for the reason you said. We think the -- the material in the DNC case -- or Democratic Executive Committee about the tentative nature of stay panel opinions is pretty good evidence for the fact that a stay panel opinion is not binding on this Court. And we are happy to brief that.

THE COURT: Let's set it aside whether it's binding, but whether I agree with it or not, or whether or not I think it was pure hooey, nonsense, it's pretty strong in terms of being persuasive if two active members of the Eleventh Circuit have said X. It's not subject to strict scrutiny, for example; right?

MR. FERGUSON: Your Honor, I would agree that you need to pay attention to it. I would say in this situation with very quick briefing, one of the reasons for the different standards applied to stay panel briefing is the rushed nature of the decision. There are a couple of points that we will get into in

our briefing where --

THE COURT:  Well, wasn't my -- one of my colleagues recently lambasted because he didn't divine what the Supreme Court was thinking for its reasoning in an unpublished one-sentence no-explanation opinion?

MR. FERGUSON:  I think I know what you are talking about.  I think so too.

THE COURT:  I'm pretty sure my colleague did since he felt the need to apologize.  I wouldn't have apologized.

MR. FERGUSON:  Your Honor, I will point out that there were some misunderstandings of facts in HB 1205, including whether, for example, the 25-petition limit applies -- or allows non-US citizens or nonresidents to collect any petitions at all.

And so that's -- I think that's just one example of the -- some of the leeway we have to give in this situation.

THE COURT:  And y'all can address this as part of your closing.

Anybody else want to -- and, by the way, that was Judge Jung in September of '25 apologizing to Judge Gorsuch who took umbrage with what Judge Jung did as part of the shadow docket.

But I suspect we were referring to the same incident, right?

Anybody else, thoughts, binding, persuasive?

All right.

Yes, sir.

MR. BARDOS:  On a different issue, if I may.  So tomorrow Supervisor Earley will testify.  The plaintiffs have designated portions of his deposition.  We objected to that in the exhibit list attached to the pretrial stipulation on the ground that he'll be here as a live witness, and he doesn't need to testify twice, once by deposition, once in person, so I wanted to raise that issue with Your Honor.

THE COURT:  Is he a party?

MR. BARDOS:  He is a party, yes.

THE COURT:  What's the rule that you can't -- we just had this witness testify and we introduced his interrogatory responses.  I'm not familiar with a rule that says you can't introduce a party's deposition if they are testifying.

MR. BARDOS:  I believe, Your Honor, that there are courts that have held that whenever a witness is here in person, all of the questions should be asked of the live witness and the deposition shouldn't come in, even if Rule 32 otherwise allows it.

THE COURT:  What's the -- I'm not familiar -- what's the reasoning?

MR. BARDOS:  The reasoning is simply that live testimony is always preferred over a written transcript, and everybody is present and everybody has the ability to examine and cross-examine in person where the Court has the opportunity

to observe the witness and, therefore, there is no need to submit some of the testimony in writing and the rest of it in person.

THE COURT:  Plaintiffs' counsel want to be heard?

MR. WERMUTH:  Well, as an adverse party it can be, I suppose, used by us if we'd like to use it.  But I don't think Mr. Early could offer it or the Supervisors could offer it on behalf of Mr. Early.

THE COURT:  You've made your objection.  I can tell you that's -- you can use a party's deposition.  And just because the party is called as a witness doesn't mean you can't use their deposition.  And I'm -- so --

MR. BARDOS:  Thank you, Your Honor.

THE COURT:  -- overruled.

All right.  Anything else?

MR. JAZIL:  Your Honor, I've been informed that my calculation of the data from the Department of State's website was indeed incorrect.  I had a user error.

So I'd like to make the record clear on that.  I wasn't trying to mislead the Court.

THE COURT:  Well, this would go back to when you're -- the last hearing where your colleague on the other side with the -- shoot -- where did we have it -- Smart & Safe suggested that you engaged in hara-kiri.

MR. JAZIL:  Hopefully this isn't quite that bad,

Your Honor.

THE COURT:  I guess this is the equivalent of that.

MR. BURHANS:  That's a little stern, Judge.

THE COURT:  I'm sorry?

MR. BURHANS:  That's a little stern.

THE COURT:  I think I actually said that on the record is why I'm --

MR. JAZIL:  Yes, you did.

THE COURT:  All right.  Yeah.  It was obvious, so -- I mean, obviously I'm paying attention to what's going on in the courtroom.  You and your client were scurrying around looking at documents at the point it came up.

MR. JAZIL:  Yes, Your Honor.

THE COURT:  But I do have to say in fairness, I tried to do it and I didn't do it right either.  Actually, it was my law clerk and she didn't do it right either.  But I'm in charge of my office, so we tried to do the same thing.  So I certainly understand.

MR. JAZIL:  So the mistake I made, Your Honor, for the record, is I did not unclick the 500-response limit for my search.

THE COURT:  Everybody is shaking their head "yes" in the affirmative.  That would cause a problem.

All right.  We've got -- let me find out, how many witnesses of the plaintiffs do you anticipate total?

MR. WERMUTH:  Four for tomorrow, if that's the question.

THE COURT:  No, no, no, I meant total witnesses.  I'm just trying to figure out -- so at some point I can figure out how far behind we are.

MR. WERMUTH:  I do not think we are behind.  I think we are right on schedule.  But I think we can take a poll and I can get you an answer.

THE COURT:  Y'all can tell me tomorrow morning.  Here's the reason why I'm asking:  If somebody says, We have got ten, it's because I asked you to list ten, not that you expected to get through ten today.  That would have been a better question; correct?

MR. WERMUTH:  Yes.

THE COURT:  It's because I asked you to list ten, not because you thought you'd get through all ten today; right?

MR. WERMUTH:  That's correct.

THE COURT:  That would have been the better question.

And we're trying to work with my calendar, because I know we lose Monday as well, that is, next Monday.

All right.  I appreciate everybody's hard work and patience.  Court is in recess.

See you back tomorrow morning at 8:30.

(Proceedings recessed at 5:49 PM on Monday, February 09, 2026.)

* * * * * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. Any redaction of personal data identifiers pursuant to the Judicial Conference Policy on Privacy is noted within the transcript.


/s/ Megan A. Hague                          2/9/2026

Megan A. Hague, RPR, FCRR, CSR         Date
Official U.S. Court Reporter

**I N D E X**

PLAINTIFFS' WITNESSES                          PAGE

ANA-CHRISTINA ACOSTA GASPAR DE ALBA
Direct Examination By Ms. Dolan                29
Cross-Examination By Mr. Jazil                 84
Cross-Examination By Mr. Stafford             105

JORDAN SIMMONS
Direct Examination By Ms. Gambhir             108
Cross-Examination By Mr. Wolk                 137
Cross-Examination By Mr. Stafford            146
Redirect Examination By Ms. Gambhir           150

MARC WALSH
Direct Examination By Ms. Dolan               153
Cross-Examination By Mr. Wolk                 204
Redirect Examination By Ms. Dolan             214

MITCHELL EMERSON
Direct Examination By Mr. Stafford            217
Cross-Examination By Mr. Jazil                276
Cross-Examination By Mr. Bardos               297
Redirect Examination By Mr. Stafford          318


**E X H I B I T S**

| PLAINTIFFS' EXHIBITS | OFFERED | RECEIVED |
| --- | --- | --- |
| FDH-377 | 249 | 249 |
| FDH-378 | 252 | 252 |

| PLAINTIFFS' EXHIBITS (cont'd.) | OFFERED | RECEIVED |
|---|---|---|
| FDH-442 | 58 | 58 |
| FDH-443 | 168 | 168 |
| FDH-445 | 45 | 45 |
| FDH-449 | 60 | 60 |
| FDH-460 | 239 | 239 |
| FDH-462 | 231 | 231 |
| FDH-463 | 220 | 220 |
| FDH-499 | 72 | 72 |
| FDH-505 | 189 | 189 |
| FDH-506 | 64 | 64 |
| FDH-518 | 41 | 41 |
| FDH-527 |  | 80 |
| FDH-546 | 253 | 253 |
| FDH-562 | 120 | 120 |
| FDH-527 | 80 |  |

| DEFENDANTS' EXHIBITS | OFFERED | RECEIVED |
|---|---|---|
| 109 | 284 | 284 |
| 112 | 318 | 318 |
| 121 | 103 | 103 |
| 1566 | 305 | 305 |
| 1569 | 100 | 100 |