1239

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

FLORIDA DECIDES HEALTHCARE, INC,)
et al.,                         )
                                )
            Plaintiffs,         ) Case No: 4:25cv211
                                )
          v.                    ) Tallahassee, Florida
                                ) February 13, 2026
CORD BYRD, in his official      )
capacity as Secretary of State  )
of Florida, et al.,             )
                                )
                                ) 8:38 AM
            Defendants.         ) Volume V
_____)

**TRANSCRIPT OF BENCH TRIAL PROCEEDINGS**
**BEFORE THE HONORABLE MARK E. WALKER**
**UNITED STATES CHIEF DISTRICT JUDGE**
**(Pages 1239 through 1478)**

Court Reporter:          MEGAN A. HAGUE, RPR, FCRR, CSR
                         111 North Adams Street
                         Tallahassee, Florida 32301
                         megan.a.hague@gmail.com

*Proceedings reported by stenotype reporter.*
*Transcript produced by Computer-Aided Transcription.*

**APPEARANCES:**
**For Plaintiffs Florida Decides Healthcare:**

                              King Blackwell Zehnder & Wermuth PA
                              By:  FREDERICK STANTON WERMUTH
                                   QUINN RITTER
                                   Attorneys at Law
                                   fwermuth@kbzwlaw.com
                                   qritter@kbzwlaw.com
                              25 East Pine Street
                              Orlando, Florida 32801

                              Elias Law Group
                              By:  BEN STAFFORD
                                   Attorney at Law
                                   bstafford@elias.law
                              1700 Seventh Avenue
                              Suite 2100
                              Seattle, Washington 98101

                              Southern Poverty Law Center
                              By:  AVNER MICHAEL SHAPIRO
                                   KRISTA A. DOLAN
                                   Attorney at Law
                                   avner.shapiro@splcenter.org
                                   krista.dolan@splcenter.org
                              3710 Raymond Street
                              Chevy Chase, MD 20815

                              Elias Law Group
                              By:  HARLEEN K. GAMBHIR
                                   Attorney at Law
                                   hgambhir@elias.law
                              250 Massachusetts Avenue
                              Suite 400
                              Washington, DC 20001


**For Intervenor Plaintiff Safe & Smart:**
                              Stearns Weaver Miller
                              By:  GLENN BURHANS, JR.
                                   HANNAH E. MURPHY
                                   CHRISTOPHER R. CLARK
                                   Attorneys at Law
                                   gburhans@stearnsweaver.com
                                   hmurphy@stearnsweaver.com
                                   crclark@stearnsweaver.com
                              106 East College Avenue, Suite 700
                              Tallahassee, Florida 32301

**APPEARANCES (cont'd):**

**For Intervenor Plaintiff League of Women Voters of Florida:**

Democracy Defenders Fund
By:  SPENCER KLEIN
     JACOB KOVAS-GOODMAN
     Attorneys at Law
pooja@statedemocracydefenders.org
spencer@statedemocracydefenders.org
jacob@democracydefenders.org
600 Pennsylvania Avenue SE
Unit 15180
Washington, DC 20003

Winston & Strawn, LLP
By:  GEORGE E. MASTORIS
     TYLER MATTHEW DATO
     SAMANTHA I. OSAKI
     NATHAN C. GREESS
     JOHANNA RAE HUDGENS
     Attorneys at Law
gmastoris@winston.com
tdato@winston.com
sosaki@winston.com
ngreess@winston.com
jhudgens@winston.com
200 Park Avenue
New York, New York 10166


**For Intervenor Right to Clean Water:**

Campaign Legal Center
By:  ROBERT BRENT FERGUSON
     HEATHER JEAN SZILAGYI
     ELLEN MARGARET BOETTCHER
     ALEXIS DENAE GRADY
     WILLIAM "LIAM" KYLE HANCOCK, III
     MELISSA LAUREN NEAL
     Attorneys at Law
bferguson@campaignlegalcenter.org
hszilagyi@campaignlegalcenter.org
eboettcher@campaignlegalcenter.org
agrady@campaignlegalcenter.org
whancock@campaignlegalcenter.org
mneal@campaignlegalcenter.org
1101 14th Street NW
Suite 400
Washington, DC 20005

**APPEARANCES (cont'd):**

**For Defendant James Uthmeier:**

> Florida Attorney General's Office
> By:  WILLIAM STAFFORD, III
>      SARA SPEARS
>      MARYSSA SAVANNAH-LYNN HARDY
>      Attorneys at Law
> sara.spears@myfloridalegal.com
> william.stafford@myfloridalegal.com
> maryssa.hardy@myfloridalegal.com
> 119 South Monroe Street, Suite 500
> Tallahassee, Florida 32301

**For Defendant Cord Byrd:**

> Holtzman Vogel Baran, et al.
> By:  MOHAMMAD O. JAZIL
>      MARTIN C. WOLK
>      RANDALL M. RABAN
>      Attorneys at Law
>      mjazil@holtzmanvogel.com
>      mwolk@holtzmanvogel.com
>      rraban@holtzmanvogel.com
> 119 South Monroe Street, Suite 500
> Tallahassee, Florida 32301
>
> Florida Department of State
> By:  ASHLEY DAVIS
>      General Counsel
>      ashley.davis@dos.myflorida.com
> R.A. Gray Building
> 500 South Bronough Street
> Tallahassee, Florida 32399

**For Defendant Intervenors Republican Party:**

> Shutts & Brown, LLP
> By:  TARA PRICE
>      BENJAMIN GIBSON
>      Attorneys at Law
>      tprice@shutts.com
>      bgibson@shutts.com
> 215 South Monroe Street
> Suite 804
> Tallahassee, Florida 32301

1243

**APPEARANCES (cont'd):**

**For Defendant Supervisors of Elections:**

                              GrayRobinson PA
                              By:   ANDY V. BARDOS
                                    JAMES T. MOORE JR.
                                    Attorneys at Law
                                    andy.bardos@gray-robinson.com
                                    tim.moore@gray-robinson.com
                              301 South Bronough Street
                              Suite 600
                              Tallahassee, Florida 32301

1244

**P R O C E E D I N G S**

(Call to Order of the Court at 8:38 AM on Friday, February 13, 2026.)

THE COURT:  All right.  We are on the record, day five, in Case Number 4:25cv211 of the bench trial.

I know we are starting about seven minutes late.  I was trying to handle some housekeeping matters.

I've been handed some additional exhibits that plaintiffs are admitting, FDH exhibits that were not objected to.

The following exhibits are admitted:  43, 61, 64, 65, 67 through 69, 77 -- Victoria.

THE COURTROOM DEPUTY:  Yes.

(Discussion was held.)

THE COURT:  80 to 83.

It has 143 listed.  It was previously admitted, so it's now double admitted.

243, 247, 397, 401, 442 through 447.

I'll note that 442, 443, and 445 were previously admitted, so they are now doubly admitted.

487 to 492, 507, 513, 514, 515, 517, 564, 571 through 578, 580, 582, and 594.

Mr. Wermuth, did I read that correctly?

MR. WERMUTH:  You did, Your Honor.  Thank you.

(PLAINTIFFS' EXHIBITS FDH-43, FDH-61, FDH-64 TO 65, FDH-67

TO 69, FDH-77, FDH-80 TO 83, FDH-243, FDH-247, FDH-397, FDH-401, FDH-444, FDH-446 TO 447, FDH-487 TO 492, FDH-507, FDH-513 TO 515, FDH-517, FDH-564, FDH-571 TO 578, FDH-580, FDH-582, FDH-594:  Received in evidence.)

THE COURT:  I've got a copy; my courtroom deputy has a copy and is updating the exhibit list now.

(Pause in proceedings.)

THE COURT:  All right.  I'll tell the lawyers what I did when we were going over some housekeeping matters when I was asking some folks some scheduling questions before we got on the record.

We have a list updated of the exhibits through yesterday on the clerk's desk.  I'd ask that each side review that so that we can -- I don't want to try to do this at the very end of the trial.  So let's make sure everybody -- if you have any objections, let me know by the end of the day about the exhibits through yesterday.

Obviously, we can go through the same procedure on Tuesday when we reconvene based on the exhibits that are admitted today.

The next witness, my understanding, is Dr. Smith. I've got a list of witnesses after that.

And you hope to put on five witnesses today, Mr. Wermuth; is that correct?

MR. WERMUTH:  That is correct.  We anticipate getting

1246

through Karen Patricio, who is going to be the last witness, and she's also appearing by Zoom.

THE COURT:  All right.  I will let everybody know we are going to stop at 5:00 o'clock today.  Obviously -- like yesterday, we went over a couple of minutes but within reason. We are not going to stay until 6:00 or 6:30 this evening.

After those witnesses, I have five additional witnesses listed.  Are there -- I've only required you to identify ten witnesses at a time.  That is in tranches.

Are there additional witnesses, or do we think at this juncture that this is where we are at?

And I'm not pressuring anybody.  I'm just asking.

MR. MASTORIS:  Your Honor, there maybe one additional witness after the ten, but I think at that point plaintiffs will be ready to rest.

THE COURT:  All right.  And just so I'll know, in terms of -- assuming, hope springs eternal -- that Ms. Patricio testifies by Zoom and we finish that testimony, with respect to witnesses six through ten, what's your best guess about how long you will need to put on those five or six additional witnesses, assuming you have an additional witness?

MR. MASTORIS:  Hope does spring eternal.  I am hopeful we'll be able to get through all of them on Tuesday.  There's a slight possibility we may have a small hangover on Wednesday morning.

THE COURT:  I suspect we'll have -- they'll run over some on Wednesday morning.

And then, Mr. Jazil, you said you have your folks ready to go on Wednesday; is that right?

MR. JAZIL:  Yes, Your Honor, we do.

THE COURT:  All right.  And I'll remind everybody that I reshuffled my schedule, my criminal trial calendar.  I'm not encouraging you to take longer, but I want to make plain I'm not rushing or artificially limiting the defense.  I freed up Monday and Tuesday of the following week, so I'm not going to -- if we run over -- I'm not going to force anybody to come back three weeks from now or a month from now.  I changed my trial calendar to build in some extra time, a buffer.

MR. JAZIL:  Thank you, Your Honor.

THE COURT:  All right.  Before we jump into the next witness, are there any other housekeeping matters?

MR. WERMUTH:  No, Your Honor.

THE COURT:  All right.

And so I believe it's Mr. Shapiro is on deck.

MR. SHAPIRO:  Yes, Your Honor.

THE COURT:  Mr. Shapiro, you can call your next witness.

MR. SHAPIRO:  Thank you, Your Honor.

Florida Decides Healthcare plaintiffs call Dr. Dan Smith as our next witness.

(Dr. Smith entered the witness stand.)

**DANIEL A. SMITH, PLAINTIFFS' WITNESS, DULY SWORN**

THE COURTROOM DEPUTY:  Please state your name for the record.

THE WITNESS:  Daniel A. Smith.

THE COURTROOM DEPUTY:  Thank you.

MR. SHAPIRO:  Your Honor?

THE COURT:  Hold on one second.

Yes, sir.

MR. SHAPIRO:  Our witness, Dr. Smith, is an expert witness, and he's going to be providing testimony that is relevant to Counts One through Five of Florida Decides Healthcare plaintiffs' amended complaint.  He's also going to be providing signposts over the course of his testimony.

Your Honor, I should note at the outset that we intend to make a proffer.  You'll recall, Your Honor, that you had concluded that while it was appropriate to hear the bulk of Dr. Smith's testimony at trial, you excluded a portion of his testimony that related to the legislative intent.  So --

THE COURT:  My preference is that we isolate that and do that and we identify it, and you certainly can make a proffer, and if the Eleventh Circuit decides I should have let it in, that way it's good to have a record of what would have been presented.

But let's just make sure we sort of segregate the

Direct Examination - Dr. Smith

proffer from the rest of the testimony.  That will make things easier for everybody.

What's your -- are you planning on doing that upfront or at the end?

MR. SHAPIRO:  No, that was my plan, Your Honor, segregate it and put it at the end of his testimony.

THE COURT:  That would be my preference.  I wasn't going to force you to do that.

So what we'll do is, we'll get through all of his testimony we'll have a clean break in the testimony, and then you can say, Judge, we're going to proffer what we would have presented had he been permitted to testify.

I'll leave it to the defense whether or not -- I mean, you are preserving your objection to it in toto.  The question is do we want to get into form objections when it's simply a proffer.  I'll leave that up to you.  I'm not sure that's necessary.  But if y'all want to do that, I'm happy to rule on objections beyond the admissibility.  I'm not really sure that's necessary, but if y'all feel strongly about it, then have at it.

MR. SHAPIRO:  Thank you, Your Honor.

THE COURT:  All right.  Counsel, you may proceed.

DIRECT EXAMINATION

BY MR. SHAPIRO:

Q.   Dr. Smith, if you could please introduce yourself to the Court.

A.   Yes.  My name is Daniel A. Smith.  I'm a professor of political science at the University of Florida.  I am the president of Election Smith, a consulting firm in Gainesville. My testimony today is on my own behalf and not that of the University of Florida.

Q.   Dr. Smith, you've been retained as an expert by --

     (Reporter requests clarification.)

BY MR. SHAPIRO:

Q.   Doctor, you've been retained as an expert by counsel for the Florida Decides Healthcare plaintiffs; is that correct?

A.   That's correct.

Q.   What issues have you been asked to examine in this case?

A.   Three areas:  First, I was asked to assess how the provisions of HB 1205 challenged by the FDH plaintiffs individually and collectively burden sponsors, petition gatherers, and voters engaged in the initiative process in Florida.

Q.   Dr. Smith, could you please --

A.   Second.

Q.   I'm sorry.

A.   Sorry.  Second, I was asked to assess how these challenged provisions that are -- that the defense is asserting are combating fraud and increasing transparency.

     And, lastly, I was asked to determine how these -- the legislative process and the intent of lawmakers in the passage

of HB 1205.

Sorry for the interruption and --

Q.   I'm sorry to have interrupted you.

Dr. Smith, could you please summarize your educational and professional background?

A.   Yes.  I received undergraduate degrees in 1988 from Penn State University in history and political science.  I received my master's degree and Ph.D. in 1994 from the University of Wisconsin-Madison.

Before becoming a professor at the University of Florida in 2003, I was tenured at the University of Denver.  I became a full professor in 2010 at the University of Florida.  I've held a variety of administrative posts.  Most recently, I was chair, for seven years from 2017 to 2024, of the Department of Political Science.

Q.   And, Doctor, what is your area of expertise?

A.   I'm a scholar of state and local politics.  I have focused intensely over the last 30 years on the politics of direct democracy on legislative decision-making, particularly with respect to direct democracy and the adoption of laws and regulations.

I have focused for the last 15 years on voting rights and electoral politics.  Generally, it's looking at how do institutions across the 50 states affect political participation and political behavior, broadly speaking.  But, again, focusing

on electoral politics, voting rights, and policies, how they differ across states and within states.

Q.   And to what extent have you examined the decision-making processes of legislatures?

A.   Sure.  I've written several peer-reviewed academic articles on the adoption of various elector rules, including those dealing with direct democracy, including dealing with fraud in the ballot petitioning-gathering process.  I'm the co-author of a leading textbook, *State and Local Politics:  Institutions and Reform*, that deals with these various types of decision-making, including a chapter on state legislatures.

Q.   Dr. Smith, you mentioned direct democracy as an area of focus of your work.

Could you please describe that in greater detail?

A.   Sure.

I've written two books on direct democracy using both case study.  Qualitative methods, as well as quantitative methods, looking at the adoption of ballot measures in one case, looking at antitax limitation ballot measures.  That was a 1998 book.

I wrote a book called *Educated by Initiative* co-authored by Carline Tolbert, published in 2024, that looked across the 50 states, those that have and use direct democracy and the various type of secondary effects, educative effects of when citizens have the opportunity to participate as citizen lawmakers.

I've written dozens upon dozens of articles on direct

democracy, looking at how these various institutions affect political behavior, including turnout, civic engagement, joining interest groups, making campaign contributions.

Again, those are primarily quantitative studies, but I've also done qualitative comparative studies looking at direct democracy and ballot petition efforts.

Q.   Now, you mentioned comparative studies.

To what extent has your work involved comparing direct democracy practices in the different states?

A.   It's essential.  I guess there are a couple exceptions where I'm looking within a state and looking at patterns within a state having to do with ballot measures and voting patterns. But, by and large, I'm looking across states that use the initiative process, that have the initiative process.  I wrote an article in the discipline's top journal, *American Political Science Review,* that looked at the adoption of direct democracy, more of a historical.  But it was actually a quantitative study on the adoption and the decisions that led to states adopting direct democracy more than a century ago.

So the studies are using methods that are used in the discipline appropriate to the questions and the theorizing that I'm doing.  They can be qualitative case studies.

They can be quantitative methods as well.

Q.   To what extent have you examined the operation of direct democracy in Florida in the course of your work?

A.   One of the conditions of being a trailing spouse coming to the University of Florida after having tenure in Colorado was I was only going to go to a state that had direct democracy.

I had just written a book in 1998 on direct democracy.  My wife was underemployed.  She got a job at the University of Florida.  And the Gators were smart enough to, you know, want to keep her, and the only way to do that was to bring me along.  So I've been there on her coattails, and it was because my one condition was I'm going to one of the other states that has direct democracy.

And Florida -- I had just written on David Biddulph and the tax cap committee in the 1990s, so I was very familiar with the efforts to limit terms of lawmakers and other things going on in Florida.  So Florida was fertile ground for me to continue as a scholar of direct democracy.  And, in fact, the first the class I taught at the University of Florida was a course on direct democracy.  And I have taught that course continually since that time, most recently this last fall.  That course was scheduled before this litigation.  It was scheduled back in December.

So I have been very familiar with Florida direct democracy as a scholar, as someone who is teaching classes on this, and Florida is very much a part of my milieu of working in this case.

Q.   Has some of your scholarly work related to Florida as well?

A.   Yeah, absolutely.  I already mentioned the tax limitation

article, as well as reference in my book with David Biddulph and the tax cap committee in the 1990s.  I wrote an article with -- she's now an editor at *Reason Magazine*.  She's a very strong republican libertarian.  But we investigated the relationship in 2008 between the gay marriage ban and the campaign -- successful campaign for Barack Obama in Florida, and trying to understand that dynamic.

But Florida is, obviously, as an initiative state, part of all of those comparative studies I've done looking at states with the initiative process and those that don't.

Q.   What academic or professional work have you done that relates specifically to different practices and laws states have employed to combat voter fraud and increase transparency in the ballot initiative process?

A.   I've written several articles and book chapters.  Probably the most notable is a book chapter, I think it's called *Defending the Will of the People?*  And it's looking at comparative across states on regulations on the initiative process that came out in the 2012 edited volume on election law.  That was the dedicated chapter to direct democracy.

I've written other articles that have looked at the regulation of the process, including looking at questions of voter fraud in ballot petition campaigns.  So there is a book on voter fraud.  And I have a chapter co-authored with Todd Donovan that looks empirically at questions of petitions validated and

invalidated in the state of Washington.

Q.   Doctor, what is your experience as an expert witness in federal and state cases?

A.   It's pretty extensive.  In the early 2000s I was first employed as an expert in cases out of California that are a series of cases in which I worked for the California attorney general defending their campaign finance disclosure laws for ballot issue campaigns.

I continued doing that work in Colorado, similar type of defense with the state of Colorado, working with the Republican attorney general at the time to defend their laws on campaign finance disclosure and also their ban on paying circulators for per-petition circulation.

In Florida, I worked very closely with Ashley Davis.  She was with the Secretary of State's office at that time in the *Worley v. Detzner* case.  We won in federal court here.  We won on appeal in the Eleventh.  I think, you know, the Supreme Court let that decision hold.

That case dealt with Florida's very strict disclosure law for ballot issue committees of having to, down to the penny, list the contributions and expenditures in ballot issue campaigns.

So I've worked with defendants, and I've also worked with plaintiffs.  I've worked with gaming interests that were trying to defend the signatures, and we did so successfully in state

court in Maryland with a slots machine case of defending those signatures that were being challenged by the defendants.

Again, I've worked with other plaintiff groups and, you know, this is just with respect to direct democracy.

Q.   Thank you for that, Doctor.

MR. SHAPIRO:  Your Honor, at this time I'd like to note that the -- this expert's resume was just admitted this morning.  It's Exhibit 43.

And at this time I'd also like to tender Dr. Smith as an expert in the field of political science qualified to opine on the issues the FDH plaintiffs have asked him to address as well as the following subjects:  The way changes to election-related laws affect political behavior; the history of direct democracy in the United States, in Florida in particular; current direct democracy practices in different states of the United States; the different practices and laws states have employed to combat voter fraud and increase transparency in the ballot initiative process; and the decision-making process of legislatures, especially in Florida, in relation to election-related legislation.

MR. RABAN:  No objection, Your Honor, except for on the last point, as --

THE COURT:  It's subject to the proffer, my proffer?

MR. RABAN:  Yes, sir.  Yes, sir.

THE COURT:  I understand.  Thank you.

You may proceed.

MR. SHAPIRO:  Thank you, Your Honor.

I'd ask our courtroom technician, Mr. Livingston, to display what's been marked as Dr. Smith Demonstrative Exhibit A, slide 1.

BY MR. SHAPIRO:

Q.   Do you recognize what's on this slide?

A.   Yes, I do.

Q.   Can you tell me what it is?

A.   Yes.

THE COURT:  Let me note one thing.  I know we -- there was an objection to one set of demonstrative aids earlier used by Mr. Wermuth, and we addressed that.  There's been some other demonstrative aids that have been used.

If you have demonstrative aids that have been used that were unobjected to, then y'all need to -- I need these marked as Court's exhibits, so you need to get with Ms. Milton McGee so we have a record of what you showed.

I forgot to say that before.  This is not directed at you, sir, Mr. Shapiro.  I just forgot to say that because, I believe, yesterday -- oh.  We've got two so far, SSF's Demonstrative Aids 1 and 2.  I believe those are the only ones that have been used so far.

So we'll have this marked as FDH Demonstrative Aid 1, okay.

Thank you.

MR. SHAPIRO:  Thank you, Your Honor.

BY MR. SHAPIRO:

Q.    Doctor, if you could proceed and tell me what it is.

A.    Yes.  These are my four main opinions in my October report. The first main opinion is in Florida, as in other states, the initiative process is a core form of expression, political expression, assembly, and participation.

The second is prior to HB 1205's enactment, Florida's pre-1205 transparency and antifraud framework regulating sponsors and petition gatherers was stringent and more than adequate.

The third main opinion, each of the challenge provisions severely burden and restrict the initiative process, and, collectively, they eviscerate the initiative process making it accessible to only the most select moneyed interests.

And the fourth main opinion is, individually and collectively, the challenged provisions do not meaningfully advance the defendants' stated goals of combating fraud and increasing transparency.

Q.    And as you've read these opinions, do they accurately reflect the opinions you hold in this case?

A.    Yes.

Q.    And did you discuss these same opinions in your October 24, 2025 report?

Direct Examination - Dr. Smith

A.    They are all drawn from that report, yes.

Q.    Doctor, what sources did you examine when developing these opinions?

A.    Over all three reports, I drew on a variety of sources. First, I drew on my knowledge as a scholar of direct democracy, the history of Florida's initiative process, the histories of initiative process used in the other states that allow direct democracy, and the regulations that have been placed on those states over time.

Probably most notably, I focused on the text of HB 1205 and companion bills looking at the decision-making and legislative reasons for that bill.  I looked at publically available information from lawmakers and other officials discussing direct democracy preceding and during that period of time in 2025 when the bill was being enacted.

I focused on and utilized quite a bit of data; data from the State of Florida from the Division of Elections dealing with campaign finance information, dealing with signatures that were submitted to Supervisors of Elections in issue campaigns in Florida, focusing on data from the U.S. census and other publically available data, including from Ballotpedia, a reputable source, and other agencies that have collected data; my own knowledge with respect to other expert reports that I've provided in this court having to do with voting and elections, more generally, and some legislation that has been passed.

I'm probably forgetting a few other items, but they are all documented in my three reports.

Q.   Dr. Smith, could you please describe the principles or methods that you used in coming to your opinions?

A.   Yeah.  I used the same methods that I've used over the last 30 years as a scholar of state politics.  I was attracted to state politics as a grad student because of the variation across the states and yet having very similar context.

They're all governed by federal laws and yet there's variation.  And as a political scientist, we're looking for variation.  We're looking to leverage that comparative process of trying to understand underlying trends, underlying principles and identifying, in many cases, outliers.

As I said, I'm interested in how institutions lead to different types of political behavior and political participation.  And it's a very fertile ground, the 50 states, to be able to look at different institutions and how they may lead to this.

And so that was one of the core reasons why I looked at direct democracy.

Q.   So, Doctor, so in addition to the comparative method, and we'll get back into that, were there other methods that you used as well in your analysis?

A.   Yes.  Absolutely.  I mean, my scholarship is driven by questions and theories and testing them, and those require

different types of methods.  Some of them are qualitative cases; some of them are quantitative statistical analyses; some are using event history models; some are using time series models; some are using comparative cases, and that's usually when there's a smaller "N," smaller number of cases, where you can't use statistical methods.

We call it the comparative method.  In one instance, it's looking at similarly situated states, so looking at similar cases to --

Q.    Doctor, I just want to be clear that I understand the different methodology used in this case.

Before we talk about the comparative method, to be clear, did you say you used a quantitative as well?

A.    Yes.  I've used both quantitative and qualitative in this case.

Q.    Okay.  And in addition to the quantitative and qualitative method, there is the comparative method that we'll discuss.

Any other methodologies used or any other sources used?

A.    Sure.  I look -- historically, I look at different regulatory policies and the changes over time in this case, as I think I mentioned earlier.

I've looked at, you know, tweets and legislative hearings.  These are all things that political scientists, including myself, have engaged with with respect to trying to understand various situations and how they may be similar or different.

Q.    Now let's discuss the comparative method that you've mentioned now a few times in greater detail.

How accepted is this methodology in political science in the study of direct democracy?

A.    It's been around for decades upon decades.  Probably a 1971 article by Arend Lijphart was the kind of key article that talked about this comparative method.  I happen to use a most similar systems design that allows you to kind of bracket off all the noise, eliminate cases that are completely different units, and focus on those units and focus on, you know, similar goals and motivations and try to understand, in this case, thinking about different types of policies, even though they're all of the same environment.

So to be able to find this most similar systems and identify durable patterns, durable outliers is something that is core to the study of comparative politics.  It's often used in state politics.  It's often used in comparatives across countries.

Q.    And what work have you specifically done in your academic work that relates to the comparator method in peer review?

A.    Yeah, very much so.  My first book was a comparative of looking at tax limitation ballot measures and the emergence of these following Prop 13 in California in 1978, comparing it to other similar-situated states that had tax limitation ballot measures in the 1970s through the 1990s and identifying what

were the motivations; what were the causes; why did these emerge; why did State Legislatures not do something rather than allowing citizens to take over the reins, like Howard Jarvis in 1978 in California or Doug Bruce in Colorado in the late 1980s, 1990s, and David Biddulph here in Florida; what were the motivations; what led to it; how were these processes all similar -- states that allowed direct democracy and changes to the constitution -- but the different politics that were driving them.

Q.    Using this methodology, can you as a political scientist answer the question when does a regulatory scheme clearly get the balance wrong and impose too great a burden on political discourse or access to the ballot?

A.    Yes, absolutely you can.

It is a -- think of this as a seesaw and -- with the fulcrum and looking at regulatory policies, that the state has an interest in eliminating fraud and increasing transparency in this case.

Just like in my other analyses on state politics and looking at the adoption of voter ID laws or looking at the adoption of online voter registration or different types of vote-by-mail regimes, the state has an interest. It can be a very strong interest with lots of barriers, or it can be lighter in that.

But the fulcrum has to balance with respect to the interest

of those who are affected, whether it's, in this case, sponsors and petition gatherers, but in all cases voters:  Where are those burdens?

And so we can definitely identify, kind of, where that balance is and whether states are at the extreme, whether they're outliers with respect to this type of public policy.

Q.   And what is the significance of when you identify an outlier?

A.   Yeah.  I think it leads to understanding that tradeoff and whether or not, then, there are burdens that are in place on the affected parties that are outweighing what the actual policy is supposed to do, right?

So if the states who are extreme outliers are doing things very different from other states that have the exact same interest -- they don't want to have voter fraud, so they're interested in voter ID.  What happens if you make it so extreme? Is that actually dealing with voter ID or is it doing something else that's going to affect the party of interest, in that case voters?

Same kind of thing can be applied with respect to direct democracy.  Yes, every state that has the initiative process does not want to have petition fraud.  They want to have transparency so we can understand the process and have it open, just like open government.

The question is when those burdens become so heavy that the

affected parties can't -- can no longer participate, they can no longer engage in the process effectively.

Q.   Okay.  Doctor, now I'd like to --

THE COURT:  I have something before you turn to your next question.

I think I wrote something down wrong, Dr. Smith, and -- you were talking about, I thought, an article that I wrote down "Defending the Will of the People," and the article I found -- and it may -- "Direct Democracy:  Regulating the Will of the People."

THE WITNESS:  That's it.

THE COURT:  Okay.

THE WITNESS:  Yes.

THE COURT:  So slightly --

THE WITNESS:  Probably around 2012.

THE COURT:  Okay.  Fair enough.

THE WITNESS:  Sorry.  It's an edited volume and some clever title by half.

THE COURT:  No problem.  I just wanted to make sure I was looking at the right thing.

THE WITNESS:  Sorry, Your Honor.  Yes.

THE COURT:  Thank you.

Go ahead.

BY MR. SHAPIRO:

Q.   Doctor, I'd now like to now discuss with you the basis for

each of the opinions you've provided.

So, again, your first main opinion is that the initiative process, quote, "is a core form of political expression, assembly and participation," close quote.

What are the bases for this first opinion?

A.    Sure.  Much of this is grounded in the scholarly literature.

My book *Educated by Initiative* in 2004 laid a marker for trying to understand direct democracy, not just for the substantive issues that are put on the ballot and that are adopted or not, but for what are these indirect -- some people call them -- spillover effects, or what I call them, educative effects.

What is it when you have a process in place in some environments and not others that might lead citizens to become more engaged in the political process?  They are now being asked to be citizen lawmakers.  They are being asked to think about issues, take their time, sign petitions to qualify measures for the ballot.

How does that affect their knowledge, their engagement, their willingness to join groups because of that conversation, their willingness to give campaign contributions, and, perhaps, most important, their -- how it affects them to turn out to vote?

Not all individuals who are registered to vote and who are

eligible to vote participate.  We know that.  That's because many of them are not terribly excited about Republicans or Democrats, and they know voting a third party is a wasted vote. So they can actually participate by putting issues on the ballot that have not been talked about that might have majority or even super-majority support but are not being addressed by a legislature to become more engaged.

And we know from studies after studies -- and there have been a lot of efforts to try to knock that book off its pedestal thrown at it -- we know that turnout is higher in states that use the initiative process, and we know that that's particularly true in midterm elections.  And it's particularly true among people who don't normally participate, what we might call peripheral voters, or in Florida inactive voters, people who are not generally interested in Republicans and Democrats but might be interested for a particular issue coming out to vote.

Those studies -- there have been dozens upon dozens of peer-reviewed studies that have cut this many different ways, and they all kind of show that states that use the initiative process are different with respect to that core political engagement that the initiative process allows or actually demands of citizens.

Q.   And how does this positive, I think what you phased as educational effects --

A.   Educative.

Direct Examination - Dr. Smith

Q.    Educative.  Excuse me, Doctor.

How does that affect the electorate's understanding of issues?

A.    Yeah.  The process of direct democracy is really personal and interpersonal.  It is a constant dialogue and conversation between sponsors and their petition gatherers who are out there, either paid or in voluntary -- or in voluntary capacity trying to convince people to sign a petition to be able to have their voice heard by placing an issue on the ballot.  This is a dialogue that is constant.  It's a very high barrier to achieve getting 880,000 signatures that qualify a measure.  It takes a lot of energy.

Some scholars -- Clayton Nall and his colleagues in an *American Journal of Political Science* article in 2018, that I cite in one of my reports, calls petition gathering a form of political recruitment, and it's very similar to recruiting to other types of organizational efforts where it is demanding of a petition gatherer to be able to convince someone to put information on a petition and engage in the process.

My own work has done that.  I have a study that looks at the local level where I was able to get data on people who signed a petition to actually overturn a pro-LGBT issue in Gainesville, Florida, and trying to understand who signs. That's actually the name of the article with my former graduate students -- who are both doing great -- in a 2018 article *Who*

*Signs?*

And it really is trying to understand, you know, that dynamic of why might people take their time.  One of the things we find is a lot of people sign that petition on Sundays, probably in church when they were being told that this issue is on the ballot, and we need -- so this is face-to-face communication by petition gatherers who wanted to challenge this progressive LGBT protection law by putting it on the ballot.

They were successful.  They qualified it for the ballot, even though they had lots of problematic signatures, but it failed at the polls.  But their voice was heard, and people were engaged and energized by that ability to actually say something that the city commission wasn't hearing from their protests.

Q.   Doctor, perhaps you can go a little bit more into the mechanics of how the initiative process itself promotes discourse in political engagement.

A.   Sure.  I mean, petition gatherers have different techniques; they have different ways of engaging potential voters.  But the one thing that is constant is they are out in the streets; they are out on the corners, except Publix that can ban them from -- depending on the content of the speech, the state Legislature made that clear back in the 2000s.

But they are out there in the public square after people register to vote or at the DMV convincing them, trying to say -- and I've done that.  I've been a petition gatherer in Wisconsin.

It's different techniques to get people engaged.  Sometimes it's, Hey, this is just a chance to have this issue voted on.  You don't necessarily have to support it.

But it's a process.  It's a dialogue that is very much, you know, core to becoming more of a citizen with an active opportunity to engage as opposed to every two or four years voting for elected representatives.

Q.   In all of the states you studied, does the initiative process always involve voters filling out and signing petitions in the presence of petition circulators?

A.   That always happens.  It's not exclusive.  There are other ways, but that is the dominant way that petitions get placed on the ballot is by person-to-person intercommunication in which a petition gatherer is out there convincing individuals, maybe after church, maybe at a market, maybe outside the DMV.

It is an engagement in which there is a conversation, a constant discussion, and it allows people then to kind of bring that home and think about it:  Oh, yeah, I signed this petition today.  Have you thought about doing it?

So it is definitely face to face, and that is by far the bulk of the type of ways the petitions get qualified for the ballot.

Q.   And do you know of any state that has an initiative process that does not have this sort of filling out of the ballot -- of the petition and signing the petition in front of the circulator

as an element or a part of the process?

A.   If -- I'm pretty familiar with these laws.  The only exception to that was in Colorado during COVID when they allowed electronic petitions to be circulated, but that was later not allowed, I believe, by the courts.  But that was a -- one little exception to this rule because of concerns in Colorado of public health and the ballot petition process.

Q.   What's the relationship between filling out the petition form and signing it in front of a circulator with this more educated electorate?

A.   Yeah, it is core to that process of becoming a fuller citizen, where you are becoming educated about an issue; you are becoming more knowledgeable about it; you are thinking critically about it; you may be discussing it with other individuals; you are excited about the possibility of having that issue make it on the ballot and voting on it.

In fact, I have a study with a colleague, Janine Perry, where we actually -- she was at the University of Arkansas -- where we compared Arkansas and Florida and then also local issues in Florida on whether or not people who sign a petition are more likely to vote.

And we actually find a positive relationship, particularly among peripheral voters, those who are not regular voters, some of whom are inactive, typically, but because of that issue they -- that they signed that petition, they came out and voted.

So it really has this dramatic effect on making citizens whole with respect to not just being passive, but being engaged as citizen lawmakers.

Q.    I think you anticipated my next question by referencing the article that you wrote that relates to this topic.

Are there any other articles that you would identify that relate to -- so the -- the act of petition circulation in particular?

A.    Yeah.  It's -- the one that is by Clayton Nall and his coauthors in the AJPS that I mentioned, again, this idea that this is a form of recruitment.  They don't look at turnout, but they look at how the process of getting people to sign petitions gets them as part of a cause.  It's bigger than themselves, of just signing.  So I think it's difficult to look at.

There's some other studies that have looked at at the aggregate level is turnout higher in counties, say, where there's a greater share of petitions that have been signed that then leads to higher turnout.  That's a study by Fred Boehmke and Mike Alvarez that looks in California at where do the signatures come from.  And they can control for other things and find that when there are signatures on these ballot petitions, there is greater turnout in those areas.  That's aggregate data.

My study is actually individual-level data, which, you know, has its advantages as well.  Clayton Nall's is looking at actual individuals who are signing these petitions.

Q.   What are they --

THE COURT:  Hold on one second.

You may be getting into it, but does part of your testimony and report deal with turnout -- the difference between off-year elections and presidential elections as it relates to ballot initiatives?  Is it -- the numbers -- are the numbers different, generally?

THE WITNESS:  Yes.  I mean -- so, again, when -- a couple articles that I wrote prior to 2004, when *Educated by Initiative* came out, we were looking over time and looking at different ways of thinking about direct democracy:  Does a state have the initiative process?  Does it not?  Does a state use the initiative process?  Does it not?  Does it have it and not use It.

Those articles we looked both aggregate in terms of overall turnout in -- I think it was from about 1970 to about 2000 -- of looking at a turnout in presidential year's midterm elections. We found about a 1 percentage point increase in presidential years, controlling for everything else, at about a 2 percent point increase in turnout for states that use the initiative process in midterm elections.

Other people have thrown everything at that study, updating the data, folks who I know are very critical of that study, and they persistently find that in midterm elections turnout is higher.  It happens to be even higher when it's morality-based

issues, ones that are really, you know, juicy, and people can make easy decisions on yes or no at the polls.  Those issues seem to prime people even more to being -- turn out to vote.

So that -- of all the different effects, that midterm turnout and particularly among peripheral voters, folks who are -- we know from their vote history, we know from the survey data they are not people who turn out to vote those are the folks who are most activated in terms of that opportunity to participate that they have decided not to participate in states that don't have the initiative process.

THE COURT:  What's an example of a morality-based issue?  I think I know, but I don't want to guess.

THE WITNESS:  Yeah.  For instance, I wrote a study with former students on looking at the gay marriage measures in 2004.  That happened to be a comparative study looking at turnout in Ohio and Michigan.  Looking across the counties where the support for these morality issues were higher, we found there was higher turnout.  We've done that with individual-level survey data.

THE COURT:  I'm assuming abortion would be deemed --

THE WITNESS:  Abortion is another very, you know, good example.  That, you know, wasn't kind of really the coin of the realm at the time in the mid 2000s when I was doing this work.

But right now I'm doing a study of trying to understand what was the effect of the ten states that had

abortion regulation measures on the ballot in 2024.  It's a really difficult question because you have to be able to isolate what's the closest comparison?  And so in this case we are identifying counties and even precincts and the turnout rates in states that had the measure on the ballot in 2024 and states that didn't.  And so we are finding a small effect that these things did generate turnout.  It's not a massive effect, but it's a presidential election, and we shouldn't expect a massive effect when people are driven largely by the presidential campaign.  It's the midterm elections where we see this biggest effect.

THE COURT:  And before he turns back to his next topic, just out of interest, did your report include, or does your -- do your studies cover talking about the overview of states that do or don't have the process, but still don't use it where states -- governments are actively engaged in campaigning against the measures?  Is that part of the --

THE WITNESS:  Yes, without question, it's in there.  I exclude -- and maybe we'll talk about this later.  I exclude some states that, quote/unquote, "have direct democracy," like Mississippi.  Mississippi changes its constitution in 1992 to have Constitutional initiatives just like Florida.  They happen to have a technical provision in there that said that you have to have this -- an equal number of signatures from the six different congressional districts.  Mississippi lost one.  They

only have five.  They no longer have the initiative process.  So on some maps you'll see Mississippi having the initiative process, others not.

Illinois technically has constitutional amendments, but it's for just legislative institutional change.  It's very limited.  And so I think they've had one measure on the ballot since 1978 when they adopted -- or 1981 when they adopted it.  It's effectively not an initiative state.  So I think it's important to think not only is it an initiative state or not an initiative state, but it's also, do these states utilize the initiative process?  Because there is something -- going back to this point of the mechanism, yeah, you are in an initiative state, but if you can't use it, suddenly that effect of the institution is lost.

BY MR. SHAPIRO:

Q.    His Honor's questions cause me to want to pose another question, Doctor.

Chris, is there -- can you -- have you measured the difference in the quantum of speech in states that have this initiative process compared to those that do not?

A.    Yeah.  I mean, that's a very broad question.  It makes me, you know, think broadly.

The quantum of speech can be measured by political scientists many different ways.  We can look at it in terms of speech as association:  Are you more likely to join a group?  My

own work, that of many other scholars, have found durable patterns across states that use the initiative that don't -- that those that do use it, citizens are -- individuals are more likely to join groups.  They are more likely to make campaign contributions, broadly speaking, because of that activity.

So that's one quantum of speech in terms of using your money, using your voice, and joining an association.

I'm sure there are other types of speech.  I'm not thinking of any off the top of my head in terms of measuring that.  We've talked about turnout.

There are really interesting studies with respect to the ability to decipher campaign ads.  Citizens -- it's a fascinating study.  I was one of the reviewers of it and thought, you know, this is really clever -- where they did, experiments and gave people the opportunity to review particular ballot measure languages, and they found that the folks who were living in states that use the initiative process had an easier time getting through the message and distilling what was trying to be framed by that message.

So, again, it cognitively allows citizens to move from that passive to more active type of citizenry.  And it has all these salutary, you know, benefits of, for instance, higher turnout, particularly about the -- for the people who don't normally turn out.

And I think that's -- you know, again, this argument that I

made in 2004 was steeped in the academic literature from the 1910s and 1920s, when direct democracy was first on the scene in the United States, where there was this whole cause of discussion -- Florida element adopted direct democracy in 1912 because there was a split in the Legislature; there was frustration with the Legislature, and groups on -- the Democrats and a few Republicans were pushing for that.

So there is an effort to talk about why that was needed because of not having the voice of ordinary people being expressed.

THE COURT: One more. As part of the report -- and maybe it's not covered in the report, but I'm not sure if your studies you have talked about would include this. Are there -- has anybody analyzed -- because you've talked about these morality-based issues, has anybody analyzed whether or not, from a political viewpoint standpoint, the ballot initiatives are driven by more than one side or the other; that is, ballot initiatives that actually make it that are viewpoint-driven skewed to one end of the political spectrum or the other? And has that been analyzed?

THE WITNESS: That's a great question, and it's one that I certainly do write about in my report, but I also have written broadly about.

Almost axiomatically issues that make it on the ballot -- there are a few exceptions -- are ones that the

entrenched interests of a state legislature are opposed to. This could be Democratic-controlled legislatures.  So when I was in Colorado and the Democrats were controlling, Republicans were using the initiative process because they weren't getting the light of day.  They wanted to have --

(Reporter requests clarification.)

A.    -- the light of day for their issues, so they turned to the initiative process to put a -- in 1994, a ban on allowing discrimination, effectively, of landlords and others against gay and lesbian couples.  That went all the way up to the U.S. Supreme Court.  I think it was --

(Reporter requests clarification.)

A.    *Evans,* E-v-a-n-s.  In the U.S. Supreme Court.

But this was because the Democrats were controlling.  And the same thing is going on in Florida.  It's effectively a cartel -- when there's a cartel interest to protect the monopoly over the legislative process, whether it's Republicans doing that in control of a state legislature or Democrats doing it. This is what Woodrow Wilson called, back in 1911 when he was running for president, direct democracy is the safety valve.  It is a gun behind the door that should not be used very often, but it's a mighty good persuader, that you allow citizens to be able to go and collect petitions, have to have a certain quantum, a very high number to be able to qualify because -- and they are going to do it only -- usually only if there is a median voter

who is in favor of those issues that are not being heard by the Legislature.

And so, I mean, we can talk about, you know, the many issues in Florida in which that's the case. I mean, we do not have smoking in our public facilities because the Legislature refused to respond to those concerns. And so in 2000, that measure was put on the ballot by a coalition of health organizations, and that measure passed with, I want to say, 73 percent of the vote.

We had that in 2004 with respect to minimum wage increase, something that the Legislature continually did not allow to see the light of day and so went to the petition process. It passed with 71 percent of the vote. Oh, it passed again in 2020, when inflation had overcome the increase in minimum wage.

So we see this pattern. And what I want to emphasize is that it is contextual. It has to do with that monopoly control. And when you have a monopoly control, these, the cartel interests, that do not want to relinquish their control over the legislative process, this is when states that have the initiative tend to be using the process. There are lots of studies that have seen that pattern over time. And it can be Republican or Democratic control that is leading to that use by citizens. And so the issues that are being discriminated against by the Legislature lead to those issues being circulated and qualified for the ballot.

So there is -- going back to your point, there is this content of the speech that is being excluded when you crack down on the initiative process because now it's just the monopoly control of the Legislature that's doing it.

THE COURT:  Did the studies or does your research show that that becomes even more pronounced if you have a supermajority?

THE WITNESS:  Yes.  I mean, we can look over time at when those studies -- so --

THE COURT:  By that I meant a supermajority in the Legislature.

THE WITNESS:  Yeah.  So --

THE COURT:  Whether it's left or right.

THE WITNESS:  There are a lot of factors that lead to the use of initiative.  One of the leading ones is whether or not there is control of a legislature, monopoly control.  And the reason is obvious, is that if you have split control of a legislature, there's more dialogue, more discussion, more compromise.  When there is that cartel interest that wants to not relinquish the agenda, it goes up.

And so John Matsusaka at USC has done a lot of studies --

(Reporter requests clarification.)

A.   M-a-t-a-s-u-k-a [sic].

-- and has written several studies.  It's really difficult

to do because you are looking over time.  You have to be able to combine different datasets with respect to legislative control. Sometimes there are splits within that majority, right, that there might be a Libertarian wing in a Republican party, or a more socially conservative Democrat part of a party over time that doesn't lead to a perfect relationship.

There are other reasons, too, we can talk about.

BY MR. SHAPIRO:

Q.   Thank you, Doctor.

And Your Honor's anticipated a portion of my direct examination.

So thank you for that, Your Honor.

But if you could clarify the term "cartel," the cartel interest.

A.   Right.  Political scientists use this term when they talk about a one-party rule in a state legislature, that they have the interest of controlling the agenda, killing off alternative proposals, not allowing those to -- those proposed legislation to have a hearing, or killing it off in committee.  And that is something that makes sense.  Lawmakers want to be able to control public policy through representative government.

The fact is that in Florida, the Constitution, since 1968, guarantees the right of citizens to be able to bring policies to the public to vote.  It's Article VI of the Constitution.  And if you look at that historical record of that 1966

constitutional revision committee that had some lawmakers, had some other prominent individuals, it was lead by Chesterfield Smith, who has a nice portrait in the University of Florida law school. He was the chairman of that, an old panhandle Democrat, no liberal.

But they realized one of the main problems with this cartel of the Democratic party in the 1950s and 60s was other issues weren't being heard. And it became the most important issue and the one that had the most support in this large committee -- I think there were 38 members -- so have the right of citizens to be able to sign petitions and put them on the ballot for fellow citizens to vote on, because of that cartel interest, that monopoly power that was not going to allow for other types of changes that were being demanded by the public.

Q. And to bring this back to Florida in recent years, to what extent has the initiative process been a vehicle for political discourse in organizing around issues out of favor with the dominant political party?

A. In my response to Judge Walker, I mentioned a couple of these issues. But, again, we have seen a steady stream of issues that the Legislature has had the opportunity, they have had, certainly, the public demand. We've seen it in terms of public opinion polls, support for different issues that the Legislature refused to enact on.

Q. Can you be specific as to which issues have come up in

recent years?

A.    Sure.  In recent -- since the 2000s, I've already mentioned the smoking ban in public places.  There was a class size reduction measure.  Again, the Legislature refused to do that, but in public schools there's now a limitation on number of students.

We've had the -- the minimum wage measures that I mentioned.

We had redistricting in 2010.  After one effort was failed because of a technicality, the group came back in 2010.  That measure -- after the higher threshold of 60 percent passed with a supermajority, those measures, Amendments 5 and 6, dealing with both legislative and congressional district efforts.

Again, the Legislature, this cartel interest had no interest in devolving any of its control over the legislative process, but the citizens thought otherwise.  You don't get to 60 percent with just Democrats, just no party affiliations.  You also get Republicans who are supporting that issue.  I think that's what's important to think about, is this is a cartel interest that's not even necessarily representative of the party in control.  It's a very small interest that's keeping their hands on the agenda and not allowing any movement away from that.

So those are all some.

We had Amendment 4 in 2018.  Here's an election which

Ron DeSantis gets elected, and a supermajority of people say individuals with felony convictions should have their voting rights restored, right?

So these are all things that -- there are exceptions, and I'm not -- I'm not here to say that there aren't exceptions. There was a measure in 2020. I don't know who paid for it, because that's another issue. There was no transparency in who actually collected the signatures and how they paid it. That's something that the State decided not to investigate, but that measure in 2020 was to say that we should have a constitutional amendment to only allow citizens to vote.

Of course, it was gratuitous. It was an effort to try to gin up the electorate to turn out the vote in that 2020 election who sympathize with that -- which is most people in Florida and, certainly, most voters think that, yes, only citizens should be voting, since that was the law already.

But it was -- it could have been done by the State Legislature. They decided to let some group -- who we actually don't know who collected the signatures. It's not publically available. It's -- it was all in-kind contributions, which I thought was very clever, but, again, frustrating from a scholar's standpoint -- but that measure passed, and it was clearly something that the Republican Legislature was in favor of. They could have put it on the ballot themselves. They decided to use it for the educative effects.

Q.   Just to clarify, how could they have put it on the ballot, as you say, themselves?

A.   Sure.  They had a supermajority in the Legislature, and they could have passed it in both chambers to put a legislatively referred amendment on the ballot.  I'm sorry for not being clear on that.

Q.   And is that one of the reasons why it's less attractive to the dominant party to use the initiative process?

A.   Sure.  They can do the exact same thing by putting constitutional amendments on the ballot than the citizens can do with the initiative process.

         THE COURT:  Counsel, we're going to take a break. It's been about an hour and 15 minutes.  And just because I am -- can't type as fast as my court reporter, you referred to President Wilson's quote about the safety valve, but then you said something about "the gun behind," and I can't read my own handwriting.

         THE WITNESS:  So his quote -- you know, I have this actually in the first chapter of *Educated by Initiative*. Woodrow Wilson argued the initiative process is "the gun behind the door; a mighty good persuader that should be used infrequently."

         And he made that statement when he was out in Colorado campaigning, and Colorado had just adopted the initiative and referendum process in 1910.  And Woodrow Wilson was no fan of

direct democracy as a political science professor from Virginia, conservative, and Governor of New Jersey. But when he was out in Colorado, he knew how to read the public, and the public was adamant about allowing citizen initiatives to go forward. In 2012, there were 32 measures on the ballot in Colorado, that first year where they used the process.

And Woodrow Wilson understood why people were so in favor of it, because the Legislature was not being responsive to the citizenry. So it was this "gun behind the door, a mighty good persuader to be used," you know, "with limited use."

THE COURT: All right. And with that, we'll take our morning break. I'll see everybody back in ten minutes.

Thank you.

(Recess taken at 9:47 AM.)

(Resumed at 10:04 AM.)

THE COURT: All right. We're back on the record.

Yes, sir?

MR. MASTORIS: One small housekeeping matter, we just wanted to disclose to the Court that Juan Proaño, CEO of LULAC, is here. He's the corporate representative for LULAC, so I think the exception to the rule applies.

THE COURT: Everybody agrees. Thank you.

All right. Counsel, you may proceed.

MR. SHAPIRO: Thank you, Your Honor.

Mr. Livingston, could you please display FDH

Demonstrative 1, slide 3?

BY MR. SHAPIRO:

Q. And, Doctor, I'm showing you what you've previously identified as your second main opinion, and it stated that:

*Prior to HB 1205's enactment, Florida's pre-HB 1205 transparency and antifraud framework regulating sponsors and petition gatherers was stringent and more than adequate.*

Is that correct, that's your second main opinion?

A. Yes.

Q. On what do you base that opinion?

A. Yes. I base it on several -- several issues, several bases. I'm happy to talk about the regulations that Florida had prior to HB 1205 and how they were stringent and adequate to combat fraud and enhance transparency.

I can talk about how Florida was an outlier prior to this time with respect to those regulations compared to other states that are similarly situated. Yeah, so I'm happy to go through those and other provisions.

Q. Okay. Were there any other factors?

A. Let's see -- yes, I'm sure there are other factors. It's just slipping my mind right now after the break --

Q. Okay. I'll --

A. -- and jumping to this.

Q. -- ask you about this specifically as we go through this.

Let's start with the first of those.

What are some of the main laws and regulations that Florida Legislature had already adopted to counter fraud in the petition process prior to HB 1205's enactment?

A. Sure. I think one of the main things to think about when you talk about the 15 states that have initiated constitutional amendment process is that Florida is the only state that has one signature, one name, one address, one birth date of a single registered voter on a petition form.

None of the other states do that. They have multiple lines in which individuals are doing this. And that's because Florida, unlike any of the other states, already had a process in place in which each individual petition had to be vetted by a Supervisor of Elections with this information from the registered voter. That, again, is something that really regulates fraud in a way that stands out.

Florida had already regulated petition gatherers. Paid petition gatherers had to register with the State. They had to sign an affidavit on a registration -- not only when they registered attesting but also on each petition they had to have an affidavit that all the information was correct.

Florida had already put a ban on paid signature gathering by the signature with no incentive structure, that you had to pay signature gatherers hourly.

Florida had other provisions in place. So Florida put fines on sponsors with respect to late petitions that were

coming in, ones that came after the deadline, either a 30-day window or by the February 1st deadline.  Florida already had a criminal statute in place for petition gatherers committing fraud.

So these were all things that the State was doing to regulate the process.  There are many others that I could go into, but I think those were the ones that were geared towards regulating fraud and enhancing transparency.

I think I mentioned earlier about campaign financing and the lawsuit I was involved with.  That was defending Florida's disclosure law in which all the dollars coming in and all the dollars coming out of an initiative campaign had to be reported with very strict guidelines.

Q.    Thank you for that, Doctor.

I think you stated earlier that one of the bases for your conclusions was that Florida was already -- already an outlier to a degree.

What are you basing that on?

A.    Right.  If you go down those type of provisions, most other states did not have those provisions in place.  As I mentioned, no other state has an individual petition coming in that has to be validated in realtime with a 30-day window at the time.

No other state has a restriction on when a petition had to be provided to the authority that's going to vet those, except for a deadline that was fixed for all groups.  So you could be

collecting signatures -- and, generally, what happens in these states is that there are boxes and boxes of petitions that are delivered on that deadline for the state agency.

Another thing is that Florida is unique -- and I didn't mention this in my previous list, but it's unique in terms of having sponsors have to pay for the validation of petitions.

Q.   Let me stop you there if I can before you kind of go into the specifics of how it's different.

Did you arrive at this conclusion that it is different from other states by applying your comparator methodology?

A.   Oh, absolutely.  As I've mentioned, I've written articles on looking at comparative systems across the states.  I have used that comparative method that we talked about earlier.

Q.   It's the same methodology?

A.   Same methodology.

Q.   Okay.  So what states did you compare Florida to when it comes to analyzing its initiative process pre-enactment of HB 1205?

A.   Yes.  I made the decision to be as conservative as possible to compare Florida to its most similar states, and that is 15 states in total, including Florida, that have the constitutional guarantee in the state constitutions to allow citizens to amend their state constitution.

I've eliminated three that do that because they are outliers.  I mentioned Mississippi earlier.  That is

functionally not -- does not have the initiative process because of a technicality.

I eliminated Illinois because it's restricted to just legislative institutional change.

And I restricted Massachusetts that has been an indirect initiative process. So when citizens start collecting petitions for a constitutional amendment, it actually goes to the legislature to have to consider.

So I eliminated those. I also eliminated six other states that only allow statutory initiatives. And I did so because if I included those other states, the basis of comparison is not the same. Those states that only have statutory measures, do not have the same concern over what kind of issues are going to make it to the ballot because they can't change the constitution. And legislatures can always come back and alter a state statute if it has been passed.

It's much more difficult for the amendments of a state legislature to overcome a constitutional amendment that has been passed by citizens, so I limited my scope to 15 states, a very conservative approach of looking at the most similar systems.

Q.    I see.

I interrupted you to an extent, but you were beginning to tell us why you concluded that Florida already had an initiative process more restrictive than these other similarly situated states.

1294

Direct Examination - Dr. Smith

A.   Yes.  I could go down that list in terms of these provisions.  One that I didn't mention was the fact that sponsors in Florida must pay for every petition to be validated or potentially invalidated by a Supervisor of Elections.  The fees are set by those Supervisors.

That is completely anomalous to other states.  Other states generally allow the petition gatherers to start petitioning once they've been approved.  Two states that I can identify actually charge petition sponsors to pay for that privilege of being able to circulate.  California, which has a very similar kind of cost structure in terms of what it costs to qualify a measure and to push it, it's $2,000 that a sponsor has to pay to be able to start collecting signatures.  Montana is $3,800.

No other state charges sponsors to initiate a campaign after being approved, and no other state, including those two that I mentioned, has the sponsor actually have to pay.  It's the State that is validating.  The State is taking on that cost.  So that's another one of these comparisons with respect to restrictions.

Yeah, some other states did have places in -- laws in place prior to HB 1205 that put criminal penalties on petition gatherers, but certainly not on sponsors, and Florida didn't do that prior to HB 1205 either.  Some of them put fines on petitions, but not like Florida was doing prior to 1205.  So Florida was an outlier.

1295

Direct Examination - Dr. Smith

It was similar in other cases in terms of having a geographic requirement, but that has nothing to do with fraud. That has to do with a measure having broad appeal in terms of collecting signatures from across a state. So a lot of other states have a geographic requirement.

A lot of other states have a threshold of, say, 8 percent or 10 percent of the previous election, but there's variation in there. It's very difficult to compare that as opposed to actually a raw number of signatures.

Q. So, Doctor, you have been mentioning some costs: Costs related to --

A. Yeah.

Q. -- the fee provision and costs related to some fines Florida already had pre-enactment of HB 1205.

What's the relationship between these costs and the -- and antifraud regulations?

A. Yeah. So one of the other bases that I use in terms of thinking about the impact of these regulations is what is the actual cost to run a campaign -- an initiative campaign.

The American Bar Association, Florida chapter, had a study in the early 2000s when Florida was thinking about putting other restrictions on the initiative process, including the 60 percent threshold, which it successfully did. They had a study that looked at what did campaigns cost.

And if you go back to the 1976 campaign that led to the

adoption of the Sunshine Amendment in Florida, which is still in effect, that ballot issue campaign cost a total of $45,000.  If you look at campaigns in the 1990s -- again, this was a mix of conservative measures but also liberal measures -- the overall cost got up to about a million dollars.  But, remember, the cost of validating those petitions was 10 cents a signature, and so that was a fraction of the overall qualification costs.

Fast-forward today, we are looking at campaigns that are exceeding $100 million in 2024 that are successfully qualifying for the ballot, and a good chunk of that is just for getting the signatures past this very high threshold of 880,000 valid signatures, but also then validating those signatures and the costs therein.  So we've seen that go well above the rate of inflation, exponential rising costs.

Q.    And is there a relationship between the so-called antifraud provisions and these increased costs?

A.    Yes.  As in any regulatory scheme, when you start placing regulations on a business -- and the initiative process is a business.  It's a business not only in Florida, everywhere else.

In the 1990s, there was this lovely slogan "the initiative industrial complex" that David Broder, the former *Washington Post* writer, wrote about because he was talking about this explosion in California, that it is a business.  And when you start regulating business, it is going to raise the costs on those sponsors in terms of the contractors and the firms and the

petition gathering.

And there's a certain irony in the free state of Florida that we are regulating the heck out of ballot initiative campaigns when we are deregulating across a whole range of other things. So it is something that is definitely tied to the rising costs when you put all these provisions on sponsors and signature gatherers, paid and unpaid, making it more difficult to get to that already very high threshold that Florida has.

Q. What effect have these regulations had on the number of issues getting onto the ballot?

A. In 2004 -- before I answer this question, just a little aside. In 2004, I was asked to testify in the Florida State Legislature, and there was a bipartisan effort to put more restrictions on. And Senator Jim King -- who was a character -- talked about the Californication of the initiative process in Florida; that, you know, we now have pregnant pigs being banned in the constitution, you know, class sizes, smoking bans, things that should be statutory.

And I was asked to testify in that, and I said, Florida is not California. Florida does not nearly have the same type of initiative process in the usage because the restrictions are already very high.

And I suggested at the time Florida should just have a statutory initiative process, which they turned down. They were not entertaining that. They instead decided to put a 60 percent

threshold on the initiative process.  Florida is very low use relative to other states that have the initiative process and constitutionally guaranteed to the citizens of those states.  We can look at it a couple of different ways, and I did that in my report.

Q.    Okay.  Since the time that Florida first started tracking this issue, how many constitutional amendments has the Florida Division of Elections approved for circulation?

A.    I want to say the number is 128.

Q.    Well, let's -- I'm sorry.  Let's start from when they started tracking.

A.    When they started tracking.  In 1978 is when they started tracking.

Q.    So how many approved --

A.    I'm sorry.

Yeah.  So since 1978, there are 428 measures that have been approved since they started tracking.  I think I misspoke and said "128."  428.

Q.    How many of those --

THE COURT:  Counsel, can --

MR. SHAPIRO:  Yeah.

THE COURT:  When you say that number, though, does that account for somebody that goes through the process but doesn't raise a single dollar or collect a single ballot?

So, for example, the parties have said I can look at

the Secretary of State's site for amount of monies raised and so forth, and when I look at the ballot initiative website, a lot of them not a single ballot, not a single dollar.  So --

THE WITNESS:  So it does -- it would include those because those have qualified to go out and circulate, my knowledge is.

And so there are many that don't even get to that qualification stage of being able to be eligible to go out and collect signatures.

THE COURT:  But when you talk about these numbers, do you distinguish between those that are real efforts versus those that they don't even try?

THE WITNESS:  I don't want to go down that path of what is a real effort or not.  I don't know enough of the details of whether or not this group --

THE COURT:  Well, let me define real effort from my perspective.  If you don't collect a signal petition signature --

THE WITNESS:  Right.

THE COURT:  -- and if you don't raise a dollar.

THE WITNESS:  There are a lot of those as part of that group of 428, yes.

THE COURT:  Okay.

THE WITNESS:  Yeah.

The barriers are very high to start that.  The costs

are very high with respect to, you know, criminal and fines, so yeah.

But the 428 is since they started tracking the number of qualified groups to -- sponsors to go out and collect petitions.

THE COURT:  You talked about earlier when people may just try to start the process to message even if they didn't think they would be successful, and I certainly understand that.

If you don't raise money and don't seek petitions, based on your research what is that?

THE WITNESS:  I think it comes down to whether or not there is some support in the electorate for the issue.  I mean, I can tell you from being on the inside of different campaigns that the campaigns that are moving forward are the ones that have done some internal polling to get a sense of what -- the electorate.  If your issue is polling at 20 percent, you are not going to have success getting that on the ballot, much less passing it.

So there is a calculation that is done, and almost by definition the ones that you have suggested, Your Honor, of actually going forward and collecting have some type of public support that used to be 50 percent.  Now it has to be over 60 percent, because otherwise your effort --

THE COURT:  I've got it.  There is a host of reasons why you may not go get petitions --

(Indiscernible crosstalk.)

THE WITNESS:  But that's generally a logic that is going on for these.

THE COURT:  I've got it.

BY MR. SHAPIRO:

Q.   Okay.  Doctor, how many of those 428 measures that were approved actually made it onto the ballot?

A.   44 since 1978 have been approved to be placed on the ballot and were on the ballot.

Q.   And what do you think the significance is of that percentage?

A.   Yeah.  It's one out of ten.  It's really difficult to get qualified and approved to be placed on the ballot through all these regulations.  Going through the Supreme Court review, we haven't even talked about that.  Florida is different than other states in that regard.  So to pass all of those hurdles, we are talking one in ten.  It is not California.

MR. SHAPIRO:  Mr. Livingston, could you please display what's been marked as -- what we'll mark as FDH Plaintiffs' Exhibit 44?

BY MR. SHAPIRO:

Q.   Dr. Smith, do you recognize this document?

A.   Yes.

Q.   Without going into the details of what it is, can you tell me, generally, what is this -- what sort of data are you showing

here?

A.    Yes.  It is data I compiled that counts the number of measures placed on the ballot in these 15 states since the time of adoption.  Obviously, that time of adoption varies in terms of the year of the adoption of the initiative process.  And to normalize that, I took a two-year average of the number of issues on the ballot in these 15 states.

Q.    And you created the table?

A.    Yes.

Q.    What data did you rely on to create it?

A.    I relied on data publically available from Ballotpedia.  I should note that I provided my original data from my historical archival work to Ballotpedia 20 years ago.

Q.    Okay.

A.    So in some ways I created the data as well.

Q.    Doctor, is it a fair and accurate representation of the data it claims to show in this table?

A.    Yes.

Q.    Would experts in your field reasonably rely on the data you are providing in this table?

A.    Absolutely.  Experts use this in terms of looking at the usage of direct democracy, for instance.

        MR. SHAPIRO:  Your Honor, FDH plaintiffs move to admit FDH Plaintiffs' Exhibit 44 into evidence.

        MR. RABAN:  No objection, Your Honor.

THE COURT:  Without objection, Exhibit 44 is admitted.

(PLAINTIFFS' EXHIBIT FDH-44:  Received in evidence.)

BY MR. SHAPIRO:

Q.   What's the significance of this table, Doctor?

A.   Well, clearly, Florida doesn't have that many initiatives relative to other states, ten times less than California and Oregon, for instance.

To be fair, California adopted the initiative process in 1911; Oregon adopted it in 1902.  They have had a longer history.  That's why looking at the two-year average is very important; that despite that longer time in having the initiative process and using the initiative process, both those states are about four times higher than Florida's with respect to -- a little more than four times higher in terms of average two-year period.

Florida is not at the bottom with the 1.8 average.  There are a couple of other states that have a lower average, but it's clearly in the bottom tier of the actual usage of direct democracy.

It's almost exactly what Woodrow Wilson was talking about.  It's the gun behind the door that should be used sparingly.  It should be used only in the rarest of instances.  And 1.8 every two years seems to kind of fit that model.

Q.   But Florida already had the most restrictive environment, according to you.

1304
Direct Examination - Dr. Smith

Why wasn't it at the very bottom?

A.   That's a great question, and it's one that, I think -- you know, it's other factors that led to the actual use.  Florida is a battleground state, for most of my time being in Florida, certainly.  I came right after the 2000 election.  It's a place that all eyes are on.

Florida -- what goes on in Florida affects the rest of the country.  Ron DeSantis, Governor DeSantis, has made that -- you know, America is going to be Florida.  You know, he is very proud of that idea, that people are looking at what's going on here.

And so, as a result, there are lot of reasons why groups and interests, sponsors, petition gatherers, want to come to Florida to effect public policy, not just the people who are here permanently as residents.  It is a state that is a bellwether state.  Florida was one of the first states to adopt this ban on public smoking.  No one thought it was going to happen in Florida.  Florida was one of the first states to raise the minimum wage through the initiative process, Florida, the same election in which George Bush wins easily and John Kerry loses, a Democrat who supports minimum wage, is passed here.

And so what happens in 2006?  Other states put minimum wage -- sponsors put minimum wage on the ballot, because if it can happen in Florida, it can happen there.

So Florida attracts a lot of attention.  It is a reason why

maybe those regulations which are very high, higher than other states, can be exceeded by these interests, particularly those that are, you know, most able to do so, those that have the most resources to overcome those barriers.

Q.   All right.  Doctor, I'd now like to move on to your third and fourth main opinions.

MR. SHAPIRO:  And Mr. Livingston has anticipated my request by displaying FDH Demonstrative Exhibit 1, Slide 3, I believe -- 4.

Thank you for that.

BY MR. SHAPIRO:

Q.   And so your third major opinion -- main opinion was each of the challenged provisions severely burden and restrict the initiative process, and, collectively, they eviscerate the initiative process, making it accessible to only the most select moneyed interests.

And your fourth opinion was individually and collectively the challenged provisions do not meaningfully advance the defendants' stated goals of combating fraud and increasing transparency.

I'd like to discuss these opinions as they apply to the individual challenged provisions, Doctor.

Do your third and fourth opinions apply to the circulator qualification restrictions of HB 1205 that exclude noncitizens, persons with felony convictions who have not had their rights

restored, and nonresidents when circulating petitions?

A.    Yes.

Q.    And what do you base that opinion?

A.    Well, I base it on the fact that these are very high burdens and eliminate the number of individuals who are qualified to be petition gatherers.  I base it on, looking comparatively, doing my comparator analysis to the other 14 states with respect how they deal with these three categories, and I look at whether or not these regulations actually are going to reduce fraud and increase transparency as the defendants claim.

Q.    Let's go through those one by one, starting with the first one you say will affect the numbers of people who are going to be able to engage in circulating petitions.

What supports that assertion?

A.    Well, let's go through them sequentially.

Florida has a wholesale ban under HB 1205 on noncitizens being able to engage as petition gatherers.  This pertains to both volunteers as well as paid petition gatherers.

Florida has a lot of noncitizens.  A lot of my students at the University of Florida are not citizens.  They are here illegally.  A lot of my colleagues are on Green Cards or their spouses on Green Cards.  They are on a pathway to citizenship. They are wholly excluded, either paid or unpaid, to engage in this process.

When you look at the numbers, the Census Bureau puts it around 2 million individuals in Florida -- population of around 22 million -- around 9 percent of Floridians are not citizens. Most of them are here illegally.  Most of them are here and want to become citizens.  Most of them want to be able to engage in issues that affect their community.  Many of them want to get paid.  Some of them just want to do it voluntarily, but these individuals are all banned from being able to engage in the petition-gathering process.

When we look at the ban on individuals with felony convictions that haven't had their rights restored -- in this court I was an expert in the Amendment 4 litigation with respect to the restoration of voting rights.  In that report --

THE COURT:  Different judge, but go ahead.

THE WITNESS:  Different judge, Judge Hinkle. Different room.

Judge Hinkle -- when I presented my data from the 67 clerks of court -- it took me nearly a year to collect that data -- I identified over a million people in Florida who had a felony conviction that did not have their rights restored.  That number was not challenged by the State of Florida.

That data is a little old.  The censusing project, which tries to come up with a number, puts it at 935,000 people in Florida have a felony conviction without their rights restored.  Most of these individuals who have felony convictions

did not commit anything having to do with petition gathering, and yet they are banned from the process. We're talking about 5 percent of the voting age population is wholesale excluded from being able to petition, not only as a paid gather, but as a volunteer.

The third category: Nonresidents. Again, Florida is a place that a lot of people come to. I just wrote an article called "Welcome to the Free State of Florida" in which it talks about the migration patterns to Florida. Florida has a lot of migrants who are not residents. The National Home Builders Association places it around a million second homes in Florida. These are individuals who might have concerns about issues that want to participate in the political process, that might want to engage with their neighbors about issues that are of state importance.

It also involves people like my kids who are no longer Florida residents but might want to come down in the summer and make some money because they're not living for free, and they are banned from engaging as a paid petition gatherer in Florida because they're no longer Florida residents. My former students, including those who went through the political campaigning program, who might want to come back are not able to participate because of this wholesale ban against nonresidents.

I should also just say that this wholesale ban affects different communities in Florida differently. Hispanics -- 1 in

5 Hispanics in Florida are noncitizens.  They are concentrated in different parts of the state.  States -- the state requirement of having geographic distribution of signatures then disproportionately affects the type of individuals of who are going to be eligible to work as signature gatherers, paid or unpaid, in certain communities because they have a higher concentration in those areas.  South Florida a good example with Hispanics and noncitizen rates being much higher than the 20 percent that the Census Bureau puts out there.

When we look at people with felony convictions, we know that there are disparate impacts of the felony laws over time where you have people with felony convictions 30 years ago, disproportionately because of crimes such as, you know, a drug possession that are prohibiting them from engaging.  And these people live in communities, particularly African Americans in urban areas, disproportionately more likely to have a felony conviction that prohibits them from engaging as a volunteer or a paid petition gatherer.

And the same thing with nonresidents.  Nonresidents, there are disparate impacts in terms of where people who have, say, second homes or are coming down to college at major universities who are nonresidents who want to otherwise engage, paid or otherwise, and cannot do so in the process.

BY MR. SHAPIRO:

Q.   And what would be the combined effect of all three of these

exclusions on political discourse in the state of Florida?

A.    Yeah.  I've already mentioned the million or so felon -- individuals with felony convictions, the two million or so noncitizens -- those are -- actually, if you'll think of a Venn diagram, they don't intersect.  If you're a noncitizen and you committed a felony, you're probably not here anymore. Nonresidents being another million plus, individuals who want to come in to Florida to engage in political discourse and effect public policy excluded.

So we're talking -- it's a back-of-the-envelope estimate because I don't know where the Venn diagrams intersect.  But we're talking multiple millions of people, upwards of 4 million people, who are not permitted to be able to engage in a core form of political participation, which is engaging other individual citizens to sign a petition.

Q.    Doctor, in -- with regard to your expertise, what is the concept of friction?

A.    Sure.  Friction is a term that -- I tend to use a slightly different version.  I use it as a cost, a cost of voting.  I've written many articles about the cost of voting.  When you put restrictions in place, it leads to a decrease in that activity.

Friction is putting these restrictions in place.  And we haven't talked about the specific restrictions, which I'm happy to do with respect to the --

Q.    I will in a moment.  I just want you to define the term

"friction."

A.   So the friction is there in terms of putting up barriers that don't necessarily prevent wholly but certainly limit the likelihood of participating in a particular activity.  It's these costs that are individual and they are collective, and collectively they can be -- come to that point where they're exclusive -- exclusionary.

Q.   How does the concept of friction apply to the circulator qualification restrictions provisions in HB 1205?

A.   Yeah.  You are throwing sand into the wheels of petition sponsors when you create these type of wholesale bans on classes of individuals who cannot participate in core political activity.

Q.   Why is that?

A.   Because they are not going to -- if they know about it, those individuals are not going to participate.  If they don't know about it and do want to participate, it's putting barriers and burdens on sponsors to have to figure out who these individuals are.  So the friction is not only for those who want to participate as petition gatherers, voluntary or otherwise, it puts restrictions and these costs -- the friction as you like to say; costs as I would put it -- on the sponsors.  So now a sponsor has to determine whether or not a paid petition gatherer, oh, and also a volunteer is a citizen.

       I don't know how they do that.  There's no database that

sponsors have that can go and find out if an individual is a citizen.  Oh, maybe they have a passport or maybe, like millions people of Florida and across the country, who don't have a passport, don't have a birth certificate, how are they going to do this?  It creates a huge friction for those sponsors.

How do they determine whether an individual is a nonresident?  Are they going to take the statement of that potential petition gatherer who they're going to employ or who is voluntary that I'm actually a resident when, in fact, they're just visiting?

You know -- and the same thing with a felony.  It took me a year to figure out a database on individuals who had a felony conviction without their rights restored with lots of resources and a lot of staff to help me put that database together, and the State still has not created a database to identify individuals with a felony conviction.

I have no idea how a sponsor is going to determine whether an individual has a felony conviction and has had their rights restored or not.  That is all friction on the sponsor side with respect to these broad classifications that are going to limit the number of people who are able to help push a measure forward.

Q.   Doctor, moving to the second basis of your opinion, you indicated it was based also on your comparative analysis with the states.

A.   Yes.  One of the things that I do as a scholar is I look at state statutes and I look at comparing across state statutes. In this case I looked at the 15 states and their regulations on petition gathering.

We can go down the list of these.  In case of noncitizens, there are 11 states that do not put any restrictions on petition-gathering activities by noncitizens.  Florida is one of those other four states.  The other three states are very narrowly determined with respect to felony convictions.

Arkansas prohibits individuals with felony convictions from being a paid petition gatherer, but not a volunteer.  Colorado and North Dakota have bans, like Florida, on noncitizens being able to petition -- serve as petitioners.

But, again, the quantity of individuals affected by that in those states is much smaller than in Florida where you have 2 million individuals who are wiped out.  There aren't -- North Dakota doesn't even have a million people, you know.  So we are excluding these broad categories in Florida compared to those states.

Q.   Let me back up.

A.   Yeah.

Q.   Let me back up a second.

When you said that there are some states that have some version of this ban, what about the other states?

A.   No, those 11 -- 11 other states have no exclusion on

citizenship from petition gathering.

Q.   Okay.  Let's move on to the felony end.

A.   Yeah.  They --

THE COURT:  Before you do that, help me to understand the reasoning.  Florida does it; the other states don't.  How does that translate to -- that wouldn't in any way address -- let's stick with felons -- wouldn't in any way address or have an impact on limiting fraud?  Is that going to come next?  Is that the next part or --

THE WITNESS:  I'll talk about that.  That's my third point.

THE COURT:  Okay.  Fair enough.

THE WITNESS:  And I should say I misspoke just recently.

The three states, now that I think about it, that ban felons in whole or in part are Colorado, Oklahoma, and North Dakota.  I think I misspoke and said Arkansas, so I would like to correct the record on that.

BY MR. SHAPIRO:

Q.   If you want, you can check -- do you want to check your report just to confirm your --

A.   If I need to, I can --

Q.   Actually, let me --

A.   -- I suppose.

MR. SHAPIRO:  May I approach, Your Honor?

THE COURT:  You may.

THE WITNESS:  Colorado, Oklahoma -- we'll see.

Sorry about that.

THE COURT:  No worries.  The only reason why we have to do it is we're not -- and I understand it's hearsay, but in a bench trial if we had the reports in it would be a lot easier when we had to verify these types of details.  We don't, so we'll take the time to do it.

THE WITNESS:  Colorado, Oklahoma, North Dakota have a citizenship requirement.

BY MR. SHAPIRO:

Q.   That's the citizenship?

A.   Yes, that's the citizenship.

Q.   Okay.

A.   Turning to felony convictions and not having your rights restored, again, there are 11 states that don't have any statutory prohibition against individuals with felony convictions, unlike Florida's wholesale ban.

Arkansas has a ban on felony convictions from being able to be paid signature gatherers.  I should note that getting your rights restored as a felon after doing your time and service and paying your fees is such easier than Florida.  And they also don't have close to a million people in that category.

So Arkansas is one of those states.

And now that I have this in front of me, I don't have to

pull this out of something.

Oregon and Missouri also have bans on felons, but it's much more narrowly tailored to crimes that were committed and the rights not being restored, having to do with petition fraud and other types of honesty, so forgery.  So very much tailored to the act of engaging in the petition-gathering process.

With respect to the noncitizen -- I'm sorry -- the nonresident ban, again, Florida is out there with only two other states, so there are 12.

MS. PRICE:  I'm sorry.  I just have a request.  No problem with Dr. Smith referring to his report, but just each time he does that, can we just make that clear for the record?

THE COURT:  Sure.

If you'll just let us know --

THE WITNESS:  You know what?  I don't need to look at this.

THE COURT:  You are free to look at it.  Again, you are not expected to remember every number and every table.  If you need to refer to it, just let us know that you've referred to it.

THE WITNESS:  All right.  I'm not going to refer to it for this.

THE COURT:  I can promise you it doesn't undermine your testimony.  I'd love to give a test to every lawyer in this courtroom about whether or not they could memorize every data

point in a 200-page report, and any member of the Eleventh Circuit if they could remember every data point in a 200-page report.

So it doesn't in any way impact your credibility.  But just let us know --

THE WITNESS:  Sure.

THE COURT:  -- if you are referring to something.

Thank you.

THE WITNESS:  Yes.  I am referring to my report on those.

And on this one, referring to my report, only North Dakota and --

BY MR. SHAPIRO:

Q.   Although, when not you are not referring to your report --

A.   Okay.  I'm not referring to my report.

It's North Dakota and Oklahoma have restrictions on nonresidents being able to circulate petitions.

Again, the quantum of people affected -- you know, no offense to North Dakotans, they don't have a lot of people with second homes in North Dakota or Oklahoma.  This is not destination places where people are going to involve themselves in the political process as much as Florida.

So Florida stands out with respect to, you know, a million people with second homes, and a lot of folks who are coming here who are nonresidents who want to engage in petition gathering.

THE COURT:  And just so the record is clear, Ms. Price's point was well-taken.  But also so the record is not confusing, the doctor has not been reading from his report throughout these proceedings.  It just happened that he was just handed the report and was just referring to one data point.  All the other references to specifics has been done sans, without, a report.

But, go ahead.

MR. SHAPIRO:  Thank you, Your Honor.

THE COURT:  Otherwise, we'll read in an appellate opinion that he was reading from the report the whole time.  So I thought it was important to clarify it.

BY MR. SHAPIRO:

Q.   Doctor, are there any states that exclude all three of these categories, other than Florida?

A.   Florida stands alone as an extreme outlier with respect to this combination of all three.

Q.   And in your mind, how significant is this deviation from the norm?

A.   This is an extreme deviation from the norm in terms of the collectively, all three of these measures.

Q.   Why is that?

A.   Because it is excluding, in a state that has a high number of noncitizens, a high number of individuals with felony convictions whose restoration of rights have not been restored,

and a high number of nonresidents from engaging in this political process, more so than any of these other states with respect to the initiative process with the constitutional amendments.

Q.   And how does this set of exclusions compare to what the State of Florida is doing with regard to other petition gathering activities in the state?

A.   Yeah.  I think -- again, one of the things I do as a scholar is I look not only across states but within states and try to understand variations.  So one of the things that stands out is that the initiative process is not the only petition-gathering process in Florida.  That is very important.

     Candidates, including for governor, attorney general, all the way down to local offices, all engage in petition gathering to qualify for the office.

     The State of Florida has decided that in those cases we don't need to worry about noncitizens circulating petitions.  We don't need to worry about individuals with felony convictions circulating petitions, even though they are collecting the same information, even though we don't need to worry about nonresidents.  The same is true for local initiatives.  None of those bans are applied to petition gathering in these other areas.

     And I think that's very important to note, that they have decided to apply these broad categories of exclusions to one

form of petition gathering, even though these other petitions are very similar with respect to the information that is being obtained by a petition gatherer and being submitted to an authority to validate.

Q.   Doctor, you mentioned earlier that this is -- your conclusions regarding these exclusions are in part based on your understanding on whether these exclusions will have any affect on actually combating fraud.

Could you explain that, please?

A.   Yes.  I know of no study that has tried to assess whether or not these broad exclusionary categories are going to affect the ability of a state to detect fraud.

First of all, social scientists like myself tend to focus on issues that are a problem.  Yes, there is signature fraud in states with initiative process, including Florida, but it is a very small number relative to the overall number of petitions that are gathered -- that are gathered and that are validated or invalidated, not because of fraud, but just invalidated.  It is a small-end problem, and a very rare event.

Q.   What do you mean by "small-end problem"?

A.   There is not a very large quantity of these type of cases of, certainly, people who have been convicted of fraud with respect to the petition-gathering process compared to the hundreds of thousands, millions of signatures that have been collected over the years.  Tens of million of signatures have

been collected over the years.  A very small quantum of that.

And there are no studies doing this, but I think more importantly --

Q.    I'm sorry.  Let me stop you there.

When you say there's a small quantum, how does that relate to the absence of studies?

A.    Social scientists tend to study phenomenons that happen, not those that don't.  You know, it's just one of the mental tenets of our profession is we look at things out there in which there are data to analyze.  And when there are just exceptions, they are maybe interesting but very difficult then to be able to compare when you don't have the data on this thing.

So it's -- I don't know of a single study -- I've written a study that has looked at -- it's in the book on election fraud from 2008 or '9, or something like that, an edited study in which I actually got data on petitions that were submitted in the state of Washington, and tried to analyze whether or not signatures that were being submitted by paid petition gatherers who has signed an oath and affidavit versus volunteers had any higher rejection rate.  And I found, actually, no, they didn't.

I should note that I was hired as an expert by the plaintiffs who wanted to get a measure off the ballot because they were convinced that the folks who were qualifying that measure were engaged in petition fraud, so they hired me.  I got all the data from the Secretary of State's office, I did an

analysis of the 220,000 petitions, individual lines of things, and I found out there was no relationship between whether or not a paid petition gatherer was submitting signatures that were invalidated -- I'm not even talking about fraud, but just invalidated versus volunteers.  And they decided that they didn't want my report.

So I deviate a little there.

Q.   That study, though, I think it's relevant.  That study related to invalidation --

A.   Invalidation.

Q.   -- not fraud?

A.   Not even fraud.

Q.   So your testimony, if I understand you, there's a challenge there regarding analyzing fraud in retention to these categories.

A.   Right.

Q.   And, again, what is that challenge?

A.   The challenge is the availability of data, the transparency of that data, and making sure that we have data of the universe of petitions, not just those that are fraudulent.

So this is a classic social science issue that you want to select not off the dependent variable, you want to select off the whole universe or the random sample of that universe.  So to get those data are very difficult.  And, of course, I don't have, as a social scientist, the ability to determine whether a

petition is accepted or fraudulent or invalid, except for what the authority has said.

But I know of no study that has found that there's a relationship to people who have a felony conviction unrelated in almost all the cases to fraud or forgery or crimes of dishonesty and that they are more likely to submit a petition that is going to have fraud.

I have no knowledge of any study that has looked at individuals, paid or volunteer, who are nonresidents are more likely to submit a petition that is fraudulent.

And I have no knowledge on any individuals who are noncitizens who have submitted petitions that are somehow more likely to be fraud.

There is -- there are no studies out there, and for good reason, is that this linkage is so attenuated that I can't even theorize about what would be the reason. I mean, just think logically for a second. You are telling me that people who are noncitizens, even those who are here legally, are going to go out and engage in fraudulent activity? They are staying in their homes. They don't even want to go out in public right now. These are people who are here legally. Right? You are telling me that people who are coming down here are going to be more likely to engage in fraud in the petition-gathering process because of an issue or they are a second homeowner? It makes -- I can't even theorize what the argument would be.

And individuals with felony convictions -- you know, having a drug conviction from 30 years ago has absolutely no bearing, theoretically, about why they might want to be back in their community and collecting signatures as a volunteer to qualify a measure.

I just can't wrap my head around how I would even theorize to ask then relevant hypotheses if I -- even if I had the data.

BY MR. SHAPIRO:

Q.    Thank you, Doctor.

Now, putting those third and main -- fourth main opinions back up, Doctor, I'd like to move on.

Do those two opinions apply to HB 1205's volunteer registration provisions?

A.    Yes.

Q.    What do you base those opinions on?

A.    First of all, it's going to increase the burdens by increasing more friction.  We've already alluded to that with respect to the volunteer provisions.

And Florida, again, is an outlier when it comes to putting these restrictions on volunteers.

And also is also a -- it's a significant deviation from the norm, both comparatively but also within the state of Florida.

Q.    So let's go through those two one by one.

As to your first assertion that there will be a creation of significant friction, what is supporting your conclusions in

that regard?

A.   Yeah.  This volunteer registration, I'm still trying to
wrap my head around it.

     So in Florida you can get a volunteer petition form under
HB 1205, and collect signatures from your -- and petitions from
your family members, immediate family members, and then you go
out in your neighborhood and you have to be counting them and
make sure that you stop at 25.

     Because if you collect a 26th petition, somehow you now
then are going to have to face the State and become a regular
old petition gatherer, even though you're not being paid, and go
through quite onerous restrictions, a -- you have to register
with the State, provide personal information to the State.

     You have to take a test, and you -- I'm sorry -- a training
module, and then you have to take a test.  Oh, I should mention
that it's only in English.

Q.   How do you know it's only in English?

A.   Because I have gone to the website and I have looked at it.
I've had former students access it and actually take the test
and qualify in English.

Q.   How recently?

A.   Yesterday it was in English only.

     And yet that petition gatherer who's out there on the
street can have the petition in Spanish or in Haitian Creole.
They had to take -- as soon as they become the 26th petition,

Direct Examination - Dr. Smith

they have to go and take a test in English and a training module and, oh, all the other material only in English.

Again, I find that just -- to what end?  To what purpose?  These are the good actors.  These are the folks who want to abide by the law, who know the law and want to abide it.  There are going to be a lot of people who don't even realize -- I've got a petition.  Hey, I'm at church.  There are 50 congregants there.  They all want to sign.  Sorry.  You got to stop, even though I've got these petitions, and I've got to go and register in English.

So these are the good actors, and so it's really, you know, quite astounding.

Q.    Since you're talking about the good actors, how about the bad actors?

A.    Yeah.  What's ironic -- I mean, talking about my fourth opinion here -- is this going to deter fraud?  Oh, well, in fact, if you're a bad actor -- I think the State likes to call them fraudsters -- if you're a petition fraudster, you could go and take and download the volunteer petitions and you could download 10,000 of them.

Q.    Are you talking about the personal use?

A.    Yeah, the personal use.  Yeah, the personal use.  It's no longer volunteer; it's personal use.

You're not going to tell the State that you're a bad actor.  You're in here, and you want to go and -- you're just passionate

about this issue, or you want to get paid an hourly rate and have a good rate.

You're going to go out there and you're not going to register with the State.  You're going to use the personal petition, and you're going to collect and collect and collect; 25-signature limit be damned, and the State is not going to have any knowledge of that.

Q.    Who is being affected by this registration petition?

A.    Who's being affected?  It's the sponsors who are being affected, most notably, their efforts to recruit people.

You can imagine someone out there who's just signed a petition and said, Oh, I'd love to go and do this, too.  I want to go get my community involved.  I want to go do this.

So they go there, and they don't realize that there's a limit on this.  So the petition sponsors are going to be affected by the ability to go and recruit people to participate as volunteers now that they have all these onerous restrictions on them.  And it doesn't benefit the State at all in terms of combating fraud.

Q.    You stated earlier that the test is now being applied in English only.

What implications does that have in a state like Florida?

A.    You are excluding large swaths.  I'm not even talking about the noncitizen population or individuals with felony convictions or those who are nonresidents.  We still have million -- well,

we've got over 2 million registered voters who are by definition citizens who are Hispanic.  Some portion of them are limited English proficiency speakers.

We have individuals who are citizens who are registered voters who are Haitian, and they vote a Haitian Creole ballot, so we know that they have limited English proficiency.  These individuals are now being forced, even though they're citizens and otherwise qualified, if they want to be a petition gatherer as a volunteer to go through a test and through a training and through an application that's all in English.

So it's going to limit the quantity of available individuals who want to be able to be politically engaged in the process.

Q.   What effect is all that going to have on the total quantum of political discourse in the state?

What effect --

A.   Yeah.

Q.   -- would this provision have on that quantum of political discourse?

A.   It's necessarily going to reduce it.  It's going to reduce it because of that friction of individuals balking at wanting to become a volunteer on a petition-gathering campaign.

And I should note that no other state does this.  No other state has a restriction on volunteers that requires them to register and take a training module and take a test.

Q.   Well, I'll get to that in a moment, because you anticipated my next question which was you referenced the deviation from the norm with -- you reference both the other comparative states and the state's own practices.

Could you ex -- first of all, tell us how significant that deviation is.

A.   Sure.  There are a couple of states that do require volunteers to register, but they do not require them to take a training and pass an exam.

With respect to Florida, there is no registration; there is no training; there's no exam that you have to do to qualify a candidate running for governor as a volunteer.  There's no -- much less as a paid petition gatherer.

There is no registration or training or exam that you have to do if you want to qualify a local measure for the ballot.  So it is an extreme outlier with respect to this -- restrictions on volunteers engaged in the petition-gathering process for constitutional amendments.

Q.   And how does -- actually, Doctor, just for the record, would you mind, if you'll recall, just refreshing your recollection with the report to clarify the state or states that do have a registration requirement?

A.   Besides Florida?

Q.   Besides Florida.

A.   Missouri.

Q.    Missouri.  So Missouri is the only state; is that right?

A.    Yes.

Q.    Okay.  So there's only one state; is that correct?

A.    And that's to register, not to take a training module and pass a test for a volunteer.

THE COURT:  And so the record's clear, while you picked up your report at the behest of counsel, you did not have to look at your report, you knew it was Missouri; correct?

THE WITNESS:  I did know it was Missouri, yes.

BY MR. SHAPIRO:

Q.    And how does Florida deviate in this regard with its own practices?

A.    In terms of the local?

Q.    In terms of its own local -- in terms of its petition-gathering practices --

A.    And other --

Q.    -- in the state in another context?

A.    I think I mentioned this in passing, but none of these restrictions on volunteers apply to candidate petitions at any level or for local petition gathering.

Q.    Moving on to --

THE COURT:  Hold on one second.

We're going to go ahead and take a break for the benefit of the court reporter.  Everybody's talking fast and it's just harder to get a record.

I do have a couple of questions.  First, a suggestion, and if you think it's going to make a meaningful difference, you can let me know.

By way of a proffer on his opinions regarding intent, wouldn't it be just easier to mark his report as the proffer, or is there something going to be added to the proffer -- that way y'all can argue, Judge Walker was wrong.  We should have been able to present this.  These are the opinions he would offer.

That seems to me a more efficient way for him to do that proffer than to simply have him summarize his report.  I'm just trying to figure out --

MR. SHAPIRO:  Yes.

THE COURT:  I was trying to come up with a more useful, better use of our time.

MR. SHAPIRO:  Yes, Your Honor.

THE COURT:  Y'all can think about that and let me know.  One side or the other may disagree.  I was just trying to think about it.

And then I had a question when I was listening to the testimony because I'm trying to think about the claims that were being made.  I didn't understand that from the plaintiffs' complaint or from your pretrial stip -- and I'm not suggesting such an animal exists, but that y'all had made a viewpoint -- I'm going to just as a shorthand say a viewpoint motivation claim as a separate species of a First Amendment claim setting

Direct Examination - Dr. Smith

aside the severe burden on core political speech out of *Meyer* -- a la *Meyer* and *Buckley.*

Y'all can tell me later if I'm wrong, but I don't recall -- there's some case law that suggests there may not be such a claim, in any event, but I didn't understand that to be your claim. So I just want to make sure, as I'm listening to the evidence and taking notes, that I'm not confused about the scope of the plaintiffs' claim.

MR. SHAPIRO:  We can return and clarify that matter.

THE COURT:  You don't have to do it --

MR. SHAPIRO:  (Indiscernible crosstalk.)

THE COURT:  -- in the next 5 minutes, but I just wanted to flag that --

MR. SHAPIRO:  Thank you, Your Honor.

THE COURT:  -- and somebody let me know.

And then my question to defense counsel -- and, Dr. Smith, why don't you go ahead and take your break because -- let me ask them a question.

I don't think it matters that you're here, but just in an abundance of caution, why don't you go ahead and take your break and let me ask them a quick question.

THE WITNESS:  Thank you.

(Dr. Smith exited the courtroom.)

THE COURT:  And Ms. Price is standing, so I'll just ask her.

Ms. Price, because I don't want to oversimplify things, and I also don't want to misapprehend the arguments of either side, but it would be my understanding that first, Judge, as fascinating as the testimony may be, this testimony would have nothing to do with a rational basis review.

Do I have that wrong?

MS. PRICE:  You are correct, Your Honor.

THE COURT:  Then I'm assuming your argument would be while you have to have a real problem -- I'll use that as shorthand for intermediate scrutiny, likewise, this testimony would not be germane for purposes of intermediate scrutiny?

Is that correct?

MS. PRICE:  Subject to correction by Mr. Jazil, you are correct, Your Honor.

It was just a joke.  You're correct, Your Honor.

THE COURT:  So, Judge, this would only come in if you were applying strict scrutiny?

MS. PRICE:  Yes.

THE COURT:  Not come in, but I would only be looking at this for strict scrutiny?

Is that wrong?

MR. JAZIL:  Your Honor, that's correct.  It would go to whether or not there's a neat fit between the means and the ends.

THE COURT:  Which is strict scrutiny?

MR. JAZIL:  Yes.

THE COURT:  That would then turn on if I decided to respectfully not follow the stayed panel decision.

MR. JAZIL:  Yes, Your Honor, that's true.

I put an asterisk there in the motion that was filed as a preliminary matter before the trial started.  The plaintiffs were citing some strict scrutiny cases that dealt with redistricting.  There's a separate redistricting test.  I don't think they intended to cite the *Shaw* and *Miller* line of cases, different strict scrutiny tests.

But assuming strict scrutiny applies, then Your Honor is correct, the usual strict scrutiny.

THE COURT:  I'm not making that finding.  I'm just trying to make sure I understand your view.

So, Judge, we would need to cross because if you decide strict scrutiny applies, which we respectfully agree with Judge Lagoa it doesn't, but in an abundance of caution if you disagree with that, then that's why we would be crossing on this matter.

MR. JAZIL:  Yes, Your Honor.

THE COURT:  And I'm not making any findings.  I just wanted to make sure I didn't misapprehend everybody's argument.

And then sort of the flip side of that -- I don't need to hear from plaintiffs now, but you need to let me know through your closing arguments why any of this would matter if I don't

1335

apply strict scrutiny; okay?

And I'm not saying that in a derogatory or disparaging way.  I mean, I clearly believe it was subject to strict scrutiny, which was my order in the PI, but that's a different -- was a different day without the benefit of the thoughtful stay order -- or stay opinion.  I'm sorry.

MR. SHAPIRO:  In fact, I may want to -- Your Honor, I may want to take a brief break.

THE COURT:  I'm going to let y'all take a break.

And I also do want y'all to figure out the proffer.  I don't want to hamstring either side by trying to be efficient, but, on the other hand, if it's the goal of getting before any -- on a cross-appeal, for example -- that may not -- appeal or cross-appeal -- I don't want to read the tea leaves too much.

But whatever it would be, I don't -- the question is you want to be able to say to the Eleventh Circuit, Judge Walker got it wrong, and had we been able to present X, we would have had this other information.

If you need the live testimony versus the report on that point, you can let me know, but it was just a thought.

Let's take a ten-minute break.

MR. SHAPIRO:  Thank you, Your Honor.

(Recess taken at 11:15 AM.)

(Resumed at 11:33 AM.)

THE COURT:  We are back on the record.

Thank you for your patience.

MR. SHAPIRO:  Thank you, Your Honor.

THE COURT:  Have y'all chatted about any of those issues?

MR. SHAPIRO:  Yes, Your Honor, we have been chatting, and I think we are getting quite close to resolving them, at the very least sort of streamlining whatever proffer we would be making.  I think it is fair to say we may not have quite resolved it.  We may be up to -- getting ourselves up to lunchtime and be able to kind of work out whatever -- hopefully work out remaining --

MS. PRICE:  We can talk more at lunch.

THE COURT:  Y'all don't have to answer now.  You can come back after lunch.  It may just be faster to put on two hours of testimony.  I don't care.  I was just trying to figure out a way streamline to it.

MS. PRICE:  Thank you, Your Honor.

MR. SHAPIRO:  Thank you, Your Honor.

BY MR. SHAPIRO:

Q.    Doctor, moving on to --

THE COURT:  Counsel, I could ask -- and then I'm going to turn off my mic so the court reporter doesn't throw anything at me -- what's your best guess of how long you have?  And I'm only asking because of where we are at in the day.

MR. SHAPIRO:  I think I have another, I want to say --

it's hard to estimate.  I'd say maybe 45 minutes before I get to the proffer, maybe.

THE COURT:  Okay.  Maybe that would be a good time to break for lunch.  I don't want to go too long, but maybe we can get to that point, break for lunch, and then come back.

Thank you.

BY MR. SHAPIRO:

Q.   Doctor, moving on to HB 1205's personal identifying information provisions or PII provisions, are you familiar with that particular provision?

A.   Yes.

Q.   And, briefly, how has HB 1205 changed the PII, the disclosure requirements, for voters signing petitions?

A.   It's done three things.

First of all, it's added two new pieces of information that a prospective signer of a petition must add to a petition.  That is either your Florida driver's license or your social security number.  The statute says last four of your social security, but we can talk about some complications of that.

The second is that this form, the petition, is going to become a public record, available upon receipt by a Supervisor of Elections; and

Third, that it is to be prominently displayed on the petition itself that the information on this form is a public record.

Q.   When it says -- when you say "prominently displayed," where does that language come from?

A.   The text of HB 1205.

Q.   And you said there was a complication just now about the social security/license number requirement in the statute.

What's that all about?

A.   Yeah.  So if you actually look at the petitions, whether they are the individual petition or a paid petition-gathering petition, the form itself says "social security number."  It doesn't say "last four."  And so even though the statute says "last four," the forms that I have seen for the 2026 cycle, for instance, have just "social security."

Q.   Does the form have sort of the boxes?

A.   It's got four boxes, but, you know, presumably someone might put in the first four, the last four maybe, maybe the whole number because it says "social security number," not "last four."  So this is pretty concerning considering that the other information says quite clearly it's going to be a public record.

Q.   Doctor, do your third and fourth main opinions apply to the PII provision?

A.   Yes.

Q.   On what are you basing that opinion?

A.   First, this is going to reduce the quantity of engagement in the initiative process, reducing the likelihood of people signing a petition.

Second, this puts Florida as a significant deviation from the norm, both comparatively across states but also within Florida.

And, lastly, it not only doesn't deter fraud; it actually can enhance bad actors from engaging in fraud.

Q.   Starting with the first of those where you said it would reduce the number of voters participating in the process, on what do you base that?

A.   Providing personal identifying information on a document that says that this is going to be made a public record is going to have a negative impact on individuals' willingness to sign.

Q.   What about your experience -- your own personal experience, your experience as a social scientist, has reinforced that perception?

A.   Sure.  I mean, we have seen that with respect to voter registration efforts.  Individuals are very concerned about the publically available information that might make them vulnerable to hacking, for instance.  We have seen studies that have shown that as you increase the number of personally identifying information, people are more reluctant to engage in providing it.

Q.   Doctor, do you ever make FOIA requests?

A.   I make FOIA requests all time, and when I make FOIA requests, I do not have access to personally identifying information, except if I'm in a court where I've already had to

sign off that this is not to be disclosed.

It is redacted information on driver's license and social security number when I ask for information from the publically available voter file.  Those are expressly excluded in state law from being made public.

Q.   And when you say, as you just did a moment ago, that there is a very significant deviation from the norm in this particular practice, what do you mean?

A.   I think we can point to three things.

One, if you look at guidance from government agencies, such as the National Institute -- National Institute of Standards and Technology, a federal agency, they make it very clear in many of their reports, including ones that I cite in my own report from October, that this information -- publically identify -- you know, personally identifying information should be requested minimally, only when vitally necessary, and should definitely not go through a process in which it's moved from agency to an agency without proper standards in place.

So that is one aspect that --

Q.   Let me interrupt you there.

A.   Yeah.

Q.   This guidance from the National Institute of Standards and Technology, does it relate specifically to election administration as well?

A.   It does.  They have standards with respect to what state

agencies should be doing when it comes to personally identifying information, very strict in terms of how accessible, and it should be the transmission of that information and whether or not it's necessary at all.  And social security numbers are expressly mentioned in that.

Q.    Okay.  Can you compare it with, let's say, the other similarly situated states that you've mentioned before -- the other 14 similarly situated states?

A.    Florida is an extreme outlier.  None of the other 14 states require any of this personally identifying information on a ballot petition form from a voter, full stop.  They don't do that.

When it comes to other petition gathering activities in Florida, driver's license, social security number are not on those forms.

To qualify a candidate running for governor that information is not needed.

To qualify a local ballot petition that information is not needed, nor is it required.

So Florida is an outlier -- extreme outlier when it comes to comparatively as well as within its own state on other petition-gathering activities.

Q.    Dr. Smith, you just stated also that one of the bases for your opinion on this matter is that you don't think it will prevent fraud; you think it will increase fraud.

What do you mean by that?

A.    This law has now made ballot petitions more valuable to what the State likes to call fraudsters.  You have now added to a petition that has my full name, my address, my birthdate or voter identification number, my signature.  All these things were required prior.  All those things deterred fraud because Supervisor of Elections had enough points of information to determine whether or not I was a voter that signed that petition who was registered in that county at that time.

Now you've added two more pieces of information that a voter must provide at least one of them.  One is a Florida driver's license, and one is a social security number or maybe just the last four, unclear on the form.

You have now made this not only for potential bad actors in the signature-gathering process, as few as they may be, to incentivize collecting these forms -- and, again, this information is on both volunteer as well as on paid -- I'm sorry -- the personal use and the paid petition gatherers, but because it's a public record, you are now putting this information for individuals to be downloading information that effectively is putting me completely vulnerable if I sign that petition to some bad actor who has all this information.

It's like DOGE on steroids in terms of what they have done in terms of making data that has raised serious concerns from people on the right and left with respect to having personal

identifying information out somewhere in the ether.

So in both of those cases, you've increased the possibility of fraud, and I don't see any reason why that information is needed to actually deter fraud from the good actors who are collecting petitions and from the Supervisors of Elections who are charged with having to validate these petitions.

Q.   Why wouldn't it help Supervisors deter some level of fraud if they have this additional information?

A.   First, they don't need that information.  They have all the information on the previous disclosure of a signature signer on a petition than they need.

Second of all -- let's think this through.  In this court, and I believe in front of this judge, I received data from the Secretary of State in the SB 90 litigation.  In that, Maria Matthews and her staff reported that there were over 600,000 people who are legally registered in the state of Florida who have neither a driver's license or a social security number on the form.  You have now taken these people completely off the possibility of being able to have a petition validated because they don't have that information on record because they are legacy; they registered before that was required.

We are not even talking about the millions of people who have only one of those two forms and who don't -- the millions of people who don't have the other.  So if I'm a signer of a petition, I'm a good actor as a petition gatherer and I have put

in the last four of my social security number, there's a good chance that the information on file with the Supervisor of Elections doesn't have my social security number; it only has my driver's license. So you have now taken me as a valid potential signer and taken me off the possibility of being validated, because I registered correctly; I registered with my driver's license, and I put in my last four, and it's not a match.

Q.   So --

A.   And are other examples.

Q.   Okay.

A.   But wait. There's more.

You can imagine the scenario in which, oh, my social security number was compromised. I'm a registered voter. I have a new social security number. I put that on there. It doesn't match. I have gotten my new driver's license. Oh, we're all in Florida now required to get new driver's licenses. Guess what? They don't match with what's on file. And not everyone who is registering anew or re-registering has that information on file. So now you have a mismatch of a valid driver's license with information on file that's not.

All of these are scenarios in which you take good actors and valid petition signers and strike them from qualifying that measure, reducing their speech, reducing the number of people who can be engaged in the process.

Q.   With this type of provision in place, what types of

individuals may be attracted to becoming petition circulators?

A.    I mentioned earlier that if you're a bad actor, you could go and download petitions as a personal petition, not register with the State, and go out there, you know, on game day here at Doak Stadium or Ben Griffin Stadium and start collecting petitions.  You can go after -- beyond that 25 because you're a bad actor.

You are collecting petitions now that have information that is incredibly valuable to those who might in the black market want that information.  You've got name, address, birthdate, signature, social security, last four, or driver's license, information that has now made this form much more valuable for bad actors, fraudsters, as the State likes to call them, to become engaged in the process.  They may have absolutely no interest in actually qualifying a measure, but because the State has opened this up -- you might open this up to people who want to download data that is now publically available or that has been going from one agency to another and access this information.

Again, it doesn't reduce fraud in the petition-gathering process.  It has all these false positives with respect to people who are being identified as not eligible.  And as a result, it doesn't meet the State's intended interest of combating fraud.  And it puts a lot of friction with respect to signature gatherers, petition gatherers, and voters themselves

with respect to involving themselves in the process.

Q.    Dr. Smith, let's move on now to the ten-day delivery requirement.

Do your third and fourth opinions apply to HB 1205's ten-day delivery requirement?

A.    Yes.

Q.    And on what do you base those decisions?

A.    Similarly, this is going to reduce the number of individuals who are eligible to circulate -- who are circulating petitions because of the restrictions.  It's going to put burdens on sponsors.

Second, it's a significant deviation from the norm, comparatively, as well as within the state of Florida.

And, lastly, it doesn't meet the interests of the State with respect to reducing fraud.  In fact, it could actually lead to other problems.

Q.    Now, did you develop and then present some data that relates to this in your rebuttal report?

A.    I did, yes.

Q.    Let's start with that.

What data did you analyze in your rebuttal that relates to the ten-day delivery requirement?

A.    Yes.  After my initial report, counsel provided me with data from -- that it obtained from three Supervisors of Elections from three counties in Florida:  Osceola County,

Palm Beach County, and Orange County.

These data were spreadsheets that had individual-level data from the 2024 election cycle that had information about when petitions were signed that was entered by the Supervisor from the petitions themselves and when the petitions were received by the Supervisors and a determination of whether or not the petition was validated or not.

Q.   And this data related to what period of time and what election cycle?

A.   Yeah.  So it was the 2024 election cycle for the various campaigns that were out collecting signatures and turning them into Supervisors, yes.

Q.   And you may have said this already, but what counties is the data for?

A.   I'm sorry.  Orange County, Palm Beach County, and Osceola County.

Q.   So let's start with Osceola County, if we may.

Let the Court know if you need to refer to your report.

A.   We'll see.

Yeah.  So Osceola County, I received data.  We're talking about tens of thousands of individual rows of petitions that were received and were being databased by the Supervisor of Elections.

What I did was I determined, using statistical methods programming, whether or not the date of a petition signed by the

voter, as entered by Osceola County Supervisor staff, and -- whether or not this was between zero to 10 days or whether it was received 11 to 30 days.  I eliminated those that were over 30 days, because prior to SB -- I'm sorry -- prior to HB 1205, those wouldn't have counted anyway.  I eliminated those that came in and were recorded by the Supervisor before someone had signed a petition, clearly a clerical error, but I don't know which was which so I eliminated those.  I eliminated those that had no date of when a petition was signed by the voter, which is required on that form.

So I limited it to petitions that were recorded by the Supervisor of Osceola zero to 10 days and 11 to 30 days, two different categories, and I cross-tabulated that with whether or not the petition in each of those two categories was accepted or rejected.  Accepted as valid; rejected as invalid.

Q.    So what did you find?

A.    Well, I found that in Osceola County well over two times as many petitions came in in the 11- to 30-day window, a window that has now been shut under HB 1205 because it's zero to 10 days after the signature.  So over two times.  And that over two times as many of the petitions that came in zero to 10 days were invalidated.  So the ones in the zero to 10 days had a higher invalidation rate than the ones coming in 11 to 30 days.

Q.    Doctor, I think it's important for the Court to actually have some precision with regard to your findings there.

Could you turn to your rebuttal report, and I believe it's on page 12, where you have data concerning your -- concerning Osceola County?

A.    Yes.

Q.    And perhaps you can give the precise numbers.

A.    Sure.  Again, as I said on the record, 2024 election cycle, I said tens of thousands.  There were well over tens of thousands.  2.8 times as many petitions came in 11 to 30 days as in zero to 10 days.  We're talking about close to 30,000; 29,830 were submitted 11 to 30 days.  There were only 10,483.  And then on the second metric, those that came in zero to 10 days were 2.4 times more likely to be invalidated for some reason than the ones 11 to 30 days.

Q.    If we now look to Palm Beach County, what were your findings there?

A.    Since I have this in front of me, I won't round.  5.2 times as many petitions for those that were submitted to Palm Beach County came in 11 to 30 days after the voter signed a petition than those that were 0 to 10 days.  We're talking 124,055 were submitted 11 to 30 days, 23,666 were submitted 0 to 10 days, so 5.2 times as many.

And as I mentioned with respect to Osceola County, even a greater effect with respect to the invalid rate.  Those that came in 0 to 10 days were 7.7 times more likely to have an issue than those received 11 to 30 days after a voter signed.

Q.   And, finally, with regard to that last county, Orange County, what were you findings?

A.   Yes.  Orange County is kind of in the middle between these two counties.  My analysis shows that 3.6 times as many petitions for initiated constitutional amendments during this 2024 election cycle were submitted 11 to 30 days after a voter signed than zero to 10 days.  We're talking 191,556 were in the 11 to 30 days and 53,434 were submitted in zero to 10 days.

With respect to the invalid rate, again, nearly four times as many were -- had an issue with respect to the ones that were zero to 10 days after signed -- I think it was 3.9 percent.  I rounded it up in my report to 4 times -- than the time of 11 to 30 days.

So a very consistent pattern.  Petitions in these counties that came in 30 days down to 11 days after a voter signed, many more in terms of an overall quantity than those that came zero to 10 and, if we flipped it around, had a much higher validation rate than those that came in zero to 10 days.

Q.   Dr. Smith, what is the significance of these findings?

A.   I think there are a couple important points.  One, if you rush the process, you are going to have more invalid petitions.  Meaning that if sponsors and their petition gatherers, paid or volunteer, have to get these petitions in to the correct Supervisor of Elections, they have less time to do internal validation, less time to go back and reach out to someone who

had signed and said, Hey, you had forgotten to put in your birth date or your voter identification number.

We know that that is something that paid petition gatherers and their sponsors are really very good at doing in other states.  There's this internal process.  I've studied this.  I've written about these campaigns.  They are not interested in paying paid petition gatherers to collect signatures that are not going to get towards the quantum that is needed to qualify a measure.  They want to be as good as possible.  So that's one thing.

The other thing is that process has actually helped the State identify fraudulent petitions and gatherers, what they call fraud fraudsters.  This is because the sponsors themselves have identified, Boy, there are a lot of petitions coming back from this petition gatherer, who were -- who our firm is paying. Let's look more closely at what's going on here.  Let's alert the Supervisor of Elections that we think there is a problem here.

And so that's a very important point.

The third point is you're basically putting sponsors in a "dammed if you do and dammed if you don't" situation.  They can either rush to make sure they are hitting that ten-day period to get a signature and a petition form in there, and in doing so not vet it.  If they rush in there, there's going to be a higher rejection rate, as the data clearly shows, because of invalid

petitions.  If they vet the petitions and get them in late, they are looking at a $50-a-day fine for every petition that comes in after ten days under HB 1205.

So they are dammed if they do and damned if they don't.

And the State doesn't benefit from the internal regulation process of the sponsors that has the same interest as the State. They want to make sure measures are being validated, because their interest is qualifying the measure.  And they both have the similar goal of combating fraud.  But this violates that. It violates the incentive to do the internal vetting, but still smacking them $50 a day for petitions that come in.  Oh, more so if you are after the February 1st deadline, I should note.

Q.    Dr. Smith, with regard to this particular study that you just did, do experts -- and you've just been discussing with us -- do experts in your field reasonably rely on this type of data when they are developing findings and forming opinions on these issues?

A.    Absolutely.  Again, I have dozens of peer-reviewed articles other scholars rely on; data that is being provided by the State, or, in this case, by county agencies; all of my work on voter registrations, on vote-by-mail ballots, vote-by-mail ballots that have been rejected.  I believe I was before Judge Walker when we talked about -- this is now over a decade ago -- whether or not vote-by-mail ballot that come in after election day should have a chance to be cured.

Well, how did I come to those conclusions?  I used data from the counties about when ballots for absentee ballots came in and determined, Look, there is a large quantum, which is clear they submitted these before election day, but just because of the vagaries of mail, came in late.  It's the exact same type of data, individual-level data in this case, that can tell me when something happened and what the determination was.

We use this all time.  Is it perfect data?  No.  I mean, clearly I report in my -- in any rebuttal report, there are errors in that processing by a county of when a petition was actually signed.  It's not possible that someone signed a petition after it was received by the Supervisors.  That is a data entry error, or it's an error on the part of the voter of putting in 11-9 as opposed to 9-11, because maybe the convention is different for certain voters of putting day before month.

So there's error, but it's accounted for.  And if you look at a very conservative estimate, you can see that these data are important, and scholars like myself use it all the time.

Q.    Doctor, let's move on to what you said was your second basis for your opinions concerning this ten-day provision, which related to the extent of the deviation from a norm.

Could you explain that?

A.    Sure.

Again, we have to put Florida in context of these states that have constitutionally guaranteed ability to put initiated

amendments on the ballot.

Florida is alone in having the process in which a voter signs one petition as opposed to multiple registered voters signing a petition.

Florida standards alone in terms of having Supervisors validate these petitions as they come in in realtime sequentially.

Other states, the sponsors deposit in, you know, boxes like we have with counsel over here, thousands, tens of thousands, hundreds of thousands, millions of petitions with people's names on it that are then validated.  There is no 10-day rule or 30-day rule.  They have to get them in by the deadline, just like Florida used to do.

I don't think I mentioned this, but Florida used to have a deadline in which all petitions had to come in.  I think it was sometime in August.  And then the Legislature said, No, let's make it February 1st.  And then they said, Oh, yes, but you can't start -- you don't get a full two-year cycle, it's just when you start within that cycle.

So Florida has regulated that process in terms of the timing.  But what Florida has that is unique is that prior to HB-30 -- prior to HB 1205, it was a 30-day rule from signing to when it had to make it.  Now they've moved it down to a ten-day rule.  It reminds me with what they did with respect to voter registration forms where they moved down to a ten-day rule of

having to have voter registrations for third-party groups that was litigated in this federal court, I believe, by the Department of Justice at the time.

So they have moved it down to this -- which was struck down.  They have moved down to a ten-day rule, which aberrates from all other states.

It also doesn't apply to any other petition-gathering forms in Florida.  You have a deadline in which candidates have to be registered; you submit all the petitions at that time and then they are validated.  Local issues as well, they are submitted at the end of the road.  It doesn't matter how long the petition gatherers have been holding on -- or the sponsors have been holding on to this.  It's completely aberrant from -- it's a significant deviation from the norm, an extreme deviation from the norm, in fact.

Q.   Doctor, let's move on.

Do your third and four opinions extend to HB 1205's racketeering provision which expands the definition of racketeering activity to include, quote, "violations of the Florida Election Code relating to irregularities or fraud involving issue petition activities," close quote?

A.   Yet.  Florida is an extreme deviation from the norm.

Q.   What are you basing that opinion on?

A.   I'm basing it on looking across state provisions, statutes, regulations with respect to applying this racketeering code to

the industry, if you will, of petition gathering.  No other state has in this statute with respect to the constitutionally guaranteed opportunity for individuals to engage in amending their state constitution of holding sponsors to account with these racketeering, which is, you know, used for mob activities, as if, you know, you are now holding these sponsors accountable for something that a volunteer is doing.  It is so far out of the norm from these other states.

And Florida, of course, doesn't do that in any other petition-gathering activity.  I mean, the analogy, it seems to me, would be, oh, someone running for governor is now going to be held with these RICO statutes if a volunteer is out there collecting a petition and runs afoul of signing a petition or filling in information if that applied to them.  It's the candidate themselves who is now going to be subject to those racketeering provisions.  That's not the case.  That's not the case at local measures either.

So it is so far outside of the norm in terms of using these -- you know, this -- this very particular type of criminal investigation and -- towards this process, not only for the paid petition gatherers, but also for any volunteers who might be engaged in trying to express their, you know, opinions and participate in the political process.

Q.   Doctor, I'd like to move on to fines on sponsors.

MR. SHAPIRO:  Ms. Livingston, if you could display FDH

demonstrative Exhibit 2, please.

BY MR. SHAPIRO:

Q.   Dr. Smith, do you recognize what's being shown in this demonstrative exhibit?

A.   Yes.

Q.   Can you tell us what that is?

A.   Sure.  These are the fines on sponsors under HB 1205 that I detail in my expert report.

Q.   Do your third and fourth opinions in each of the challenged provisions apply to these new and increased fines the HB 1205 imposes on sponsors?

A.   Yes.

Q.   Why is that?

A.   Well, largely because this is a significant deviation from the norm in terms of putting fines on sponsors for activities of circulators, volunteer or paid.  Again, a sponsor now is facing specific fines from volunteers, say, who do not register after they've hit the 26th petition.

     You know, they are strictly liable to having to account for the activities of an individual who they may not even know.

Q.   Do any other states do that?

A.   No, no other state does anything like this.

     You know, there are some other states that have fines, but not like this.

     The ten-day deadline, again, you have a volunteer out there

collecting signatures and petitions; they are sick; they have to take care of an ailing parent; they have to go and travel; the petitions are on the counter; they have not gotten them in on the ten-day limit.  It's now the sponsor who is going to have to pick up a $50 a day for each late -- and if this person was willfully not submitting them, $2500.  Again, this is a volunteer that the sponsor doesn't know is out there doing this work on the behalf of the issue that they are passionate about.

So the filling out of fraud, yes, there are some other states that have issues with respect to the signature gatherer filling out information, but not on the sponsor.

The prefilling of forms:  The prefilling of forms is standard practice for candidates running for office.  They put in information on those forms.  I don't know if Judge Walker was a state judge at one point, but state judges when they are running have to fill out those petition forms to get on the ballot.  And it's prefilled.  Oh, you are in event in Alachua County.  It has Alachua County in there.  It's a signal that only Alachua County voters should do this.  You can't do that here.  You cannot fill in this information.

I don't see how that prevents fraud at all.  You know, it's actually limiting fraud by saying, Here's the queue.  This is only for people on Alachua County.  And yet it's the sponsor who is liable for that activity.

So all of these cases are an extreme deviation from the

norm.  It's an extreme deviation from the other 14 states, and it's an extreme deviation from within the state of Florida for other petition gathering, including candidates and local ballot petitions.

Q.   Doctor, let's move on to the increases to verification fees.

Do your third and fourth opinions on each of the challenged provisions also apply to these new fees HB 1205 imposes on sponsors for verifying petitions?

A.   Yes.

Q.   What is that based on?

A.   Again, Florida stands as an extreme deviation from the norm, both comparatively across the other states with initiated constitutional amendments, but also within Florida.

Florida is the only state, as I mentioned earlier, I think in my colloquy with Judge Walker, that requires sponsors of petitions to pay for their own qualification and validation of each petition.

It used to be 10 cents a signature.  Then counties were able to raise it.  Now they've raised it even more.  And no other state obligates the sponsors when petitioning government to have to pay for that petitioning process.

It's also the case that no candidate running for office in Florida who's petitioning to get on the ballot or -- you know, local ones do pay, but it's 10 cents a signature for local

initiatives, but not candidates -- I have to go and check that. I am not quite certain at this point whether candidates have to pay. They may have to pay 10 cents a signature as well for qualifying. That's something that I don't remember off the top of my head. That's probably in my report. I apologize.

Q. And now that we're talking about local initiatives, how does the validation process, and any work that you've done on the validation process, compare when it comes to local initiatives and these statewide initiatives in terms of the work that needs to be done?

A. Sure. Obviously, I've already discussed this, and I can discuss it more with respect to the costs for petition validation for state actor -- for sponsors trying to get state constitutional, it's very different from local.

Local ballot campaigns -- I've written about that. I have an article called *Who Signs?* that actually looked at data from a local initiative in Gainesville -- and it's very relevant here because it was the first study published that looked at petition-gathering activities at the individual level of who actually signs a petition. There were some studies that used aggregate data.

But what I did here was I got public records from Alachua County. I was able to determine at the individual level who signed a petition to overturn the city commission's pro-LGBTQ ordinance. These were groups that were conservative groups who

were opposed to it.

Going back to our cartel interests, the Gainesville City Commission is not a diverse commission when it comes to ideology.  They are left-leaning individuals, progressives. They were not listening to these groups, so they decided to take it to the initiative, just as the same kind of "gun behind the door."

They went out and collected signatures to overturn this ordinance, and I collected all the information of the people who signed the petition and divided it between, in this case, whether a petition came in and was valid or invalid and whether it came from citizens registered in Gainesville as posed to Alachua County.

What's very interesting is that there were a lot of invalid petitions, almost 30 percent for this local measure, which they had to pay for to validate, 10 cents a signature, whether or not they were accepted or not.  Why were there so many invalidated ones?  Because there are a lot of people who live in Alachua County who have a mailing address that is Gainesville but actually live outside the city limits.

Q.    So is it fair to say for this study you concluded that local initiatives can have high invalidation rates?

A.    They can have high invalidation rates, as high, if not higher, than a lot of initiative campaigns in the state, yes.

Q.    And what percentages do -- in these local contests do you

need in order to --

(Reporter requested clarification.)

BY MR. SHAPIRO:

Q.    In these local ballot initiative contexts, what thresholds do you need to meet in order to get a ballot measure enacted?

A.    Yeah, it varies across city and county ordinance, you know, these charter cities and charter --

Q.    I actually misspoke.

What thresholds do you need to meet in order to get on the ballot?

A.    Right.  It can be a very high threshold that varies across these jurisdictions.  In some places, we're talking tens of thousands, if not more, signatures to qualify a measure for the ballot, and so you're incurring quite a bit of costs.

Q.    If I may, Doctor, do you have a sense of what the percentages could be?  Are they the same?  Are they different from the --

A.    It really does vary across jurisdictions in terms of the signature threshold to qualify based on past voting registered voters.

Q.    Could they be the same or more?

A.    Yes, absolutely.

MR. SHAPIRO:  I'd ask the -- Mr. Livingston to please display what's been marked as FDH Plaintiffs' Exhibit 46 and 47.

BY MR. SHAPIRO:

Q.   Dr. Smith, do you recognize these two exhibits?

A.   Yes.

Q.   It's showing two tables.

What -- first, did you create these tables?

A.   Yes.

Q.   Are these tables in your report?

A.   Yes.

Q.   And without going into the substance of what they show, could you describe what these tables are?

A.   Yes.  Maybe counterintuitively, if we start with Table 3 and the last three columns, these are typical categories that scholars use to think about burdens on sponsors and petition gatherers to qualify a measure.

I use the 750,000 signatures because it is a real number as opposed to a percentage that is based on differing requirements across states.  Florida, I'm sure you've heard in this court the 880,000 or so valid signatures that are needed; that's based on 8 percent of the previous vote in a presidential election.

California has an 8 percent for constitutional amendments, but it's based on the last gubernatorial election.

California has probably close to 8 million more registered voters than Florida and yet the signature threshold is less because turnout in a midterm election in California is not nearly as high as turnout in a presidential election, just like in Florida.

So I used a real number here as opposed to these percentages, because the percentages are contingent on which election, right?  But it gives you an idea, all right.  There are a couple of states here that have this very high threshold.

I have a geographic distribution, which, again, comparing Florida is like other states here.

Q.    Well, we'll go to the substance, just -- if you generally just tell me what these different --

A.    Yeah.  Those last three categories or columns are general areas prior to HB 1205 that states had to get a sense of where does Florida rest.

Q.    And what are those other columns?

A.    The other columns -- which would be nine columns on Table 2 and Table 3 -- are actually looking at HB 1205 and me going across state statutes and regulations to determine, as we've already talked about these issues, whether or not other states have these.  And I realize that I don't have PII on here.

Q.    Right.

A.    I mean, I don't have, oh, one petition form per circulator, one name on a petition per circulator.  The PII is just so egregious that it didn't even dawn on me that I should put it in this table because no other state requires you to put your social security number or driver's license on a ballot petition.

So I did, you know, omit one.  That was not intentional; it was just an oversight.

So these other ones kind of give just binary -- does the state have it; does the state not have it?

Q.   Do experts in your field reasonably rely on this type of information when forming opinions?

A.   Yes.  They try to come up with the different classifications to be able to use the comparative method to compare whether states are similar or they're different on these different dimensions.

        MR. SHAPIRO:  Your Honor, we move to admit FDH Plaintiffs' Exhibit 46 and 47 into evidence.

        MR. RABAN:  No objection, Your Honor.

        THE COURT:  Without objection, 46 and 47 are admitted. Admitted.

    (PLAINTIFFS' EXHIBIT FDH-46 AND 47:  Received in evidence.)

BY MR. SHAPIRO:

Q.   So what do these tables to your mind show?

A.   First, that Florida is an extreme outlier, individually and collectively, when it comes to HB 1205 and regulating sponsors, petition gatherers and even voters with respect to their ability to petition government and to be able to engage politically. It's very clear that when you look individually at these, but then collectively, HB 1205 is way outside the norm.

    I think the other thing we need to think about is whether or not this advances -- these categories really advance the State's interest.  And I think my testimony today and in my

report makes it pretty clear that these do not do what the State thinks it does, which raises other questions of why they're putting these restrictions in place; restrictions that seem, when you think about the balance between the State's interest -- and, again, every one of these 15 states wants to regulate fraud in the initiative petition-gathering process.  They want to increase transparency.

Florida has layered on, over time and then with HB 1205, this sledge hammer of individual things which have made it virtually impossible for all but the most moneyed special interests to qualify.  And as a result, you've effectively created these barriers where even just being an initiative state is no longer really going to allow all of those positive secondary effects -- these educative effects that I talked about three hours ago -- from happening, because there's just no chance of being able to qualify a measure in Florida when you put these things individually and collectively.

Q.    Thank you, Dr. Smith.

MR. SHAPIRO:  With that I think we've concluded the testimony, apart from the proffer issue that we're going to discuss over lunch.

THE COURT:  All right.  Y'all can talk about it over lunch, and then let me know when you get back.

It is 12:25; we'll come back at 1:25.

MR. SHAPIRO:  Thank you, Your Honor.

THE COURT:  Thank you.

(Recess taken at 12:25 PM.)

(Resumed at 1:27 PM.)

THE COURT:  We are back on the record after lunch.

I'd remind everyone it's almost 1:30.  We are going to break at 5:00 o'clock promptly today.

Counsel, what says you?

MR. SHAPIRO:  Good afternoon, Your Honor.

So we have reached an agreement.  I think the approach we want to take is we are going to admit a large number of exhibits in addition to the proffer, but we are going to have some testimony.  We felt it was necessary to do that to develop the record that we needed.

THE COURT:  That's fine.  I wasn't insisting.  I was just suggesting that it was a way to expedite things.

But we need to segregate whatever it is that's being -- and I'm going to call it proffer -- I'm going to call it Composite Proffer 1.  I'm not going to rely on it.  It's not even going to go to me.  It's just going to be there that -- if this case ends up with the Eleventh Circuit and they want to refer to it, they have the proffer to refer to if they decide that I should have allowed in evidence regarding the intent of the Legislature as it relates to the claims as framed before this Court.

MR. SHAPIRO:  Two things, Your Honor.  One is that I

wanted to confirm that I have correctly articulated our agreement.

And, secondly, I think we will want to ask the Court to allow us to have some argument as to why maybe there should be some reconsideration as to why this evidence is, in fact, relevant in light of the fact that our complaint did have viewpoint discrimination claims embedded within it.

Your Honor had mentioned -- particularly with regard to the fee provisions, we were explicit about that, and the viewpoint discrimination aspects hopefully are implicit in other aspects of our claims.  So for that reason, you know, we --

THE COURT:  I've got to tell you, Counsel, I cringe when I hear that some claim is embedded in something or implicit in something.

MR. SHAPIRO:  Oh.  So --

THE COURT:  You're either -- and I hate to use the example, but I'm going to use it again:  You are either pregnant or you're not pregnant.

MR. SHAPIRO:  So with regard to the fee provision --

THE COURT:  You're not either pregnant or not, but somebody generally is either pregnant or not.

So I stand by my ruling that as it related to a facial challenge, there is not an *Arlington Heights* analysis, and for that reason I excluded.

I really, so it's clear, did not ask this question so

much as it related to the proffer as it did in light of some of the other testimony of the witness as it related to -- he used the word "cartel" and trying to -- depending on the -- who had the majority, trying to keep certain issues off started me thinking.  And then I looked back at the complaint, and I saw no such claim, never addressed any such claim in any prior iteration of this case.

And as I said as an aside, I also am not entirely 100 percent sure that that straightforward of a claim even exists.  I mean, there's case law that talks about, for example, how there's not a standalone disparate impact claim.

And I don't want to get into all the different permutations, but if y'all are going to ask me to reconsider some ruling, we need to do that later, and we need to do that through briefing.  If that means you feel like you have got to recall a witness if the moons align and suddenly you convince me that for some other reason -- I don't think you are going to convince me I was wrong based on what I ruled in the motion in limine.  If there's some alternative reason why it would be relevant, then we can revisit that.  But we are not going to do that today, because otherwise it would delay everything too long.

MR. SHAPIRO:  Thank you, Your Honor.

MS. PRICE:  Your Honor, the only thing I would add to that is that we, with Your Honor's indulgence, make the proffers

two separate proffers for clarity, because there are two different standards as to why the testimony is being excluded.

So defendants are not going to make any objections to any testimony or exhibits that come in under these proffers with the understanding, as Your Honor said, that it's not going to be considered as part of this court.  But we would like to make sure it's clear as far as when one begins and when one ends since it's two different issues.

THE COURT:  Well, I understand -- the first issue is, I think, pretty straightforward, which is if you have a -- if something you're saying is discriminatory on its face, do you even --

MS. PRICE:  I'm sorry.  I may have misspoken, Your Honor, and if I -- I'm sorry.  I was asking that for the legislative intent proffer that they want to make, we just make it clear that that's proffer No. 1.

And then to the extent they want to put in testimony in evidence with regard to the supplemental report, that we make it clear that's proffer No. 2, because there's two different reasons why the Court excluded, and it sounds like plaintiffs want to make another argument with regard to the supplemental report.  And so I just think for clarity on the record --

THE COURT:  Oh, I understand that.

MS. PRICE:  Yes.

THE COURT:  I was thinking something differently based

on the two different claims.

MS. PRICE:  Yes, Your Honor.

THE COURT:  And you are absolutely right.  There was -- the first issue was -- I ruled on legislative intent generally in *Arlington Heights*, and then later there was another motion that dealt with the supplement.

MS. PRICE:  Yes, Your Honor.

THE COURT:  I understand.

MS. PRICE:  Thank you, Your Honor.

MR. SHAPIRO:  And, Your Honor, I should probably note that counsel was kind enough to --

THE COURT:  Although I do have to ask, because there's been a number of references as it relates to the supplemental report to Ms. Matthews' directive to invalidate inactive voter signatures, that action was not plead and is not a separate claim in front of me, is it?

MR. SHAPIRO:  No, it's not, Your Honor.

THE COURT:  Okay.

MR. SHAPIRO:  They are arguing that it's relevant to --

THE COURT:  I understand.  It's the same thing when I say you don't have a claim because it was untimely in an employment case, but some of the evidence of that prior untimely claim may be germane to the timely claim if we've got the same decisionmaker and he did something based on race five years ago.

Even if it was untimely and not connected to the claim, it still may be evidence. I understand the distinction between a claim being made and whether it may be evidence otherwise germane to some other claim that is before me.

I understand. So if you'll just delineate -- do we have the exhibits, first of all?

MR. SHAPIRO: Yes, we do have the exhibits. We have --

THE COURT: Are you going through the exhibits with him as part of the proffer, or are we just en masse doing proffer exhibits?

MR. SHAPIRO: We are -- some of the exhibits we are putting up because he's going to have to explain what he did, but --

THE COURT: Fair enough.

MR. SHAPIRO: -- some of these exhibits we'll be able to -- just en masse be able to enter them in.

THE COURT: All right. We're spending more time talking about it than we are --

MR. SHAPIRO: Yeah.

THE COURT: We're going to do -- I want you to do a new thing. I want you to flag it. I don't care if you even open a while new thing. It just needs to say --

THE COURT REPORTER: It'll be part of the transcript, but just another examination.

THE COURT:  You need to do proffer -- some like some big bold division and say, "proffer," and then "proffer direct examination," so it's clear what's the proffer and everything else.  Okay?

MR. SHAPIRO:  One other thing, Your Honor.

THE COURT REPORTER:  Just one second.

THE COURT:  You got it?

THE COURT REPORTER:  I got it.

THE COURT:  I just want it to be clearly -- a clear demarcation that this is a proffer.

And what ought to happen is when we do the transcript, and if there is a transcript of the proceedings, the proffer transcript would be a separate -- not embedded in the transcript.  It should be a separate -- for example, I would have had a separate hearing if I was going to have a proffer.

Does that make sense?  Is that doable?

THE COURT REPORTER:  Yes.  So you want me to just make this, like, Volume 5A?

THE COURT:  That'd be great so it's clear what I'm getting, what I'm reviewing, and what's properly before me to consider for purposes of the claims that are before me versus we've made this proffer to have a complete record for the benefit of any reviewing court.

MR. SHAPIRO:  To help me move things along, Counsel was nice enough to allow me to ask leading questions just so you

are aware.

THE COURT:  That's fine.

*******************

(Offer of proof testimony of Dr. Smith transcribed separately.)

*******************

THE COURT:  Let's do this.  It seems to me -- and I don't know that you need to, but does anybody from the defense, before we get out of the proffer section, want to ask any follow-up questions?

As it relates to the supplement, I found in -- I think in shorthand that it was untimely; correct?

MS. PRICE:  Correct, Your Honor.

THE COURT:  And as to the --

MS. PRICE:  The supplement, you found that it didn't relate to any of the claims that are at issue.

THE COURT:  Oh, I'm sorry.

MR. SHAPIRO:  Your Honor --

(Indiscernible crosstalk.)

THE COURT:  I'm conflating it with another --

MS. PRICE:  Yes.

THE COURT:  -- case that I just had where it was both irrelevant and untimely.

So I found that it wasn't -- so consistent with the finding of intent before as to the claims pending in front of

me, I think I've -- as it relates to the supplement, that relates to actions by Ms. Matthews that are not directly -- that claim itself is not before this Court.  But to the extent it's evidence, it may be evidence, I guess, of something -- Ms. Matthews' intent, but I don't think I have anything else in front of me that suggests that emails or texts -- that she did that at the direction of somebody else whose intent would be pertinent for purposes of challenging the statute.  And then we've got the tweets and we've got the statements that were attributed to members of the House.

          Counsel, do you wish to ask any questions about those three subsets of information?

          MS. PRICE:  Your Honor, defendants don't have any questions, but I do want to make sure the record is clear that as a proud graduate of the University of South Florida and FSU Law that we tell truth too.

          THE COURT:  Fair enough.

          I'll make plain I was not vouching for the University of Florida generally.

          Let me find out, do we have anything else on the proffer?

          MR. MASTORIS:  Not on the proffer.

          THE COURT:  All right.  So we are going to get out of the proffer.

          Give me a second.

I'm handing the proffer exhibits that are proffer -- composite proffer exhibits to my courtroom deputy.

And I did not mark on them.

MR. MASTORIS:  So just one small housekeeping item, Your Honor.  I think we talked about earlier today we were prepared to go forward with four witnesses.  Three are here from out of town.  One flew in from the West Coast, two drove up from southern Florida.  They wouldn't want me to say so, but they are a little bit older and made the trip up today to testify today in person.

I'm not sure where this is going.  Given the length of the direct, I anticipate that Dr. Smith might be held over anyway over the weekend.  If that is, in fact, the case, we'd ask for the ability to go out of order.  We can get three witnesses up and down in two hours, I think, fairly easily.

THE COURT:  Well, let me do a couple of things first in that regard.

First, I want to make plain, I knew it was more complicated than simply not relevant.  I also had held as to the supplement that it wasn't related to an earlier opinion.  It was a little bit -- I knew there was some other aspect to it, and I hope everyone will forgive me because there's a bunch of moving parts here, and I've got a number of cases that are pending and issue a number of orders every day.

Let me find out.  As I understand it, playing the role

of Mr. Jazil is Mr. Raban.

And how long do you anticipate needing, sir?

MR. RABAN:  Your Honor, I'm not going to be trying to get anything into evidence today, so not four hours like the other day.  Probably just an hour among all defendants, Your Honor.

THE COURT:  So we are going to finish with this witness.

I can tell you I'm happy -- if we can't finish with all the other witnesses, I'm happy for them to appear by Zoom too.  I don't know what else to do.

MR. MASTORIS:  Okay.  That's fine.  I was going to ask for that next, Your Honor.  So thank you.

THE COURT:  What we can do is I'll get with -- we'll get through this witness so he can go back to Gainesville, and then we'll get through as many witnesses -- you might want to step out and figure out who feels the strongest about testifying live versus by Zoom or who it will be easier to testify by Zoom.  I don't know if you can do that or somebody else can go do that, but maybe that would be a good use for the next --

MR. MASTORIS:  I think that's sound advice.  Thank you.

THE COURT:  Very good.

All right.  It is.  It was a lot and part of it was because I was talking with my colorful references and talking

quickly.

So what we are going to do is take a five-minute break.  When we come back, we'll hear from all three of the defendants and their cross-examinations.

(Recess taken 2:28 PM.)

(Resumed at 2:36 PM.)

THE COURT:  Let's go ahead.  So your cross-examination may begin.

MR. RABAN:  Thank you.

CROSS-EXAMINATION

BY MR. RABAN:

Q.   Good afternoon, Dr. Smith.

A.   Good afternoon.

Q.   We've met before, but my name is Randall Raban.  I'm here on behalf of the Secretary of State.

Good to see have you again.

A.   Yes.

Q.   You had already testified earlier, but I just want to make sure that we're all on the same page.

You pointed out that you evaluate 15 states that permit citizen initiatives; correct?

A.   Correct.

Q.   And that Florida is one of those 15 states?

A.   Yes.

Q.   So the majority of states in the United States don't allow

citizen-initiated ballot measures at all; correct?

A.    Yes, that is true.

Q.    And your primary methodology, again, in way of review, in your report was to compare HB 1205's provisions to the laws of the other 14 states that permit citizen initiatives; right?

A.    That's part of my analysis.

Q.    Okay.  That comparative analysis that you engaged in that you discussed during your testimony; correct?

A.    Yes.  I wouldn't limit it just to post-HB 1205.  I've compared it also to prior to that, as my testimony today speaks to.

Q.    Fair enough.  Thank you for clarifying.

      You were asked to form an expert opinion in this case on the degree of burdens that HB 1205's provisions place on sponsors, petition gatherers, and registered voters; correct?

A.    That was one of the things I was asked to do, yes.

Q.    Okay.  And to make sure that I understood your prior testimony, you're saying that HB 1205's provisions are the most burdensome but not necessarily that they are too burdensome; is that fair?

A.    I would say individually and collectively they are the most burdensome across these 15 comparable states, yes.

Q.    But not that they are too burdensome; is that correct?

      MR. SHAPIRO:  Objection.  That's mischaracterizing his testimony.

THE COURT:  Overruled.  The witness can certainly tell the lawyer whether he agrees or not.  If this was a lay witness, I'd be more concerned.

But do you agree with that statement?

THE WITNESS:  So that's looking at this balance as to whether or not they're too restrictive with respect to the State's purported interest of combating fraud versus the restrictions placed on sponsors, petition gatherers, and voters, yes.

BY MR. RABAN:

Q.   Are you offering an opinion in this case as to whether or not they are too burdensome?  That's the question.

A.   Again, I did not offer that in my report.  I would say that, yes, they are too burdensome, as I spoke at the end of my testimony today.

I think I used the analogy of a sledgehammer as opposed to a scalpel, yes.

Q.   Thank you.

But in your report you don't try to provide a quantifiable value for that degree of burden; correct?

A.   That's correct.

Q.   So you say that you imply that these regulations are burdensome but, again, not how burdensome, just to make sure we are clear?

A.   I do make reference to how burdensome they are in every one

of the counts in which I go through and talk specifically about the burdens to sponsors, petition gatherers, or voters.

Q.   And you would agree that there's very limited evidence regarding how HB 1205 will actually impact petition gathering in practice; right?

A.   No, I don't think I would agree with that given how we've seen it in practice.

Q.   All right.  So do you think there's sufficient evidence to evaluate how HB 1205 will impact the petition-gathering efforts?

A.   I think we're getting evidence every day, every week since the February 1st deadline, certainly, for the 2026 cycle.

Q.   Mr. Smith -- excuse me -- Dr. Smith.  I mean no disrespect.

Dr. Smith, you were deposed in this case; correct?

A.   Yes.

Q.   And in that deposition -- during the deposition, didn't you say that due to very limited evidence, it would be difficult to measure the impact of HB 1205's provision on petition-gathering efforts?

A.   It is a difficult process, but it's one that I did through the comparative analysis approach in which I documented quite clearly the provisions that are extreme outliers in Florida.

I also have detailed how these provisions do not advance the stated goals of the State.

MR. RABAN:  Okay.  Can we pull up the deposition transcript for Dr. Smith, please, and go to page 41 of that

transcript.

BY MR. RABAN:

Q.   Okay.  Dr. Smith, this is page 41 of your deposition transcript.

     Can you see that on your screen?

A.   Yes.

Q.   And do you recognize -- I'll give you a chance to kind of look at the page just a brief minute and make sure that you're familiar with it.

     You reviewed your transcript after your deposition; correct?

A.   Yes.

Q.   Okay.  So I want to look at line 20 -- well, actually, let's start with line 14.

     Can you go ahead and read lines 14 through 19 for me?

A.   I'd like to just go back to the question that was asked of me.

Q.   Oh, sure.  That's absolutely fair.

A.   So we need to reduce that.

Q.   Look at -- I believe that question starts on line 10.

          MR. SHAPIRO:  Objection, Your Honor.  This is improper impeachment.  There is not a clear question on the floor here that he's trying to impeach with.

          THE COURT:  Counsel?

          MR. RABAN:  Yeah.  I can certainly ask the question.

BY MR. RABAN:

Q.   So let's go back and look at page 38, line 22.  And in line 22, the question was asked:  *And you said that there is very limited evidence as to the effectiveness of HB 1205's provisions; correct?*

     And the answer to that question was:  *So far, yes. Correct.*

     Do you see that?

A.   I do.

Q.   Okay.  And so later on we had a discussion about --

          THE COURT:  Hold on.  Hold on.

          MR. RABAN:  Oh, I'm sorry, Your Honor.

          THE COURT:  When was the deposition taken?

          MR. RABAN:  The deposition was taken on December 13, 2025, Your Honor.

          THE COURT:  Okay.  And so he just said, There's little evidence, but we're getting more every day.  And he said, We're getting more every day starting this year, which could -- he couldn't have possibly referenced at the time of his deposition unless he was clairvoyant.

          So how is what he said here in court different than what he said in response to that question?

          MR. RABAN:  That's a fair point, Your Honor.

          THE COURT:  All right.  Let's --

BY MR. RABAN:

Q.    So if we were to go back to that question, if I were to ask you that same question today, would it be the same or would it be different?

A.    And which of the questions now?

Q.    Would you agree that there's still very little evidence as to the effectiveness of HB 1205's provisions?

A.    No.  I think there is more evidence, as we'd already discussed.

Q.    Do you believe that there is enough evidence at this point to indicate or to be able to discern the impact of HB 1205's provisions on petition-gathering efforts?

A.    I missed the first part of that question.  Sorry.

Q.    Do you believe we have sufficient evidence at this time to be able to gauge the impact or determine the impact of HB 1205's provisions on the petition-gathering process?

A.    Yes.  I think we have much more evidence.  There will be more evidence to come, as public disclosure can be obtained and analyzed, that these burdens are severe with respect to the process here and are clearly more severe than the other 14 similarly situated states.

Q.    And since your deposition in December, have you conducted any analysis or have you undergone any investigation to gauge -- to gauge the impact?

A.    I'm trying to remember when my supplement report was.  But

I had data then on Osceola County, Palm Beach County, and Orange County to analyze rejections. Again, this was prior to HB 1205. I've had data to look at the costs of expenditures. Those data are just coming out. I haven't had time to do a full-blown analysis because I don't have all the data, but I can tell you the costs and the rejection rates have both gone way up with respect to HB 1205.

So there are some counties that have made these data publically available. We can see the rejection rates are much higher because of these new standards of having to match a social security number or a driver's license, and we know that the rates have gone up considerably for petition sponsors.

Q. Thank you, Dr. Smith.

Have you -- you have not conducted any analysis to determine whether specifically the restrictions based on citizenship can increase or decrease occurrences of fraud; correct?

A. I do not yet have data on that. I will refer back to my testimony that you are removing with respect to citizenships some 2 million individuals in Florida who could engage in the petition-gathering process. And as I said in my testimony and in my report, that this is going to be driving up the costs because you are removing these potential signature gatherers from the process.

Q. Yes, I remember your opinion.

But, again, the question: You haven't conducted any analysis on that issue to this point; correct?

A.   I have no data and I know of no data yet available -- maybe it will become available -- on noncitizens who are engaged in petition gathering in Florida.

Q.   And the same is true for the state residency requirement; correct?

A.   That is generally the same problem, that I have no data yet on the number of individuals who have been denied because they're not residents.

Q.   Thank you.

And for restrictions relating to felony convictions, you have no data to analyze whether such restrictions reduce fraud; correct?

A.   I currently have no available data on whether or not an individual is a convicted felon without their rights restored.

Q.   I believe in your testimony earlier that you had stated that Florida's regulations on petition circulators prior to HB 1205 was the most restrictive of any other state at that time; correct?

A.   I certainly made the statement that the regulatory regime in place prior to 1205 was collectively more restrictive than the other 14 similarly situated states.

Q.   And you would agree that the regulatory regime prior to HB 1205 allowed the State to identify fraud and prosecute

fraudsters; correct?

A.   Yes.

Q.   So fraud was occurring before HB 1205 was instituted; correct?

A.   As I have stated here and elsewhere, there is occasionally fraud in the initiative-gathering process.  It's a small quantum, a rare event, we might call it.

Q.   So just because HB 1205's provisions were more restrictive before HB 1205, it doesn't mean the Florida's approach at that time was ineffective; correct?

A.   I think my comparative analysis allows us to think about what similarly situated states who all have an interest in combating fraud in the petition-gathering process are doing. And we can look prior to HB 1205 or subsequent to see whether or not they were engaged in similar types of regulations since they all have the same goal, to eliminate fraud from the process.

     And what I stated going through each of those provisions, but also prior to HB 1205, is Florida had a regime in place that was more restrictive and more able to identify problems in the petition-gathering process, most notably a single petition per registered voter that is being evaluated by local election officials in realtime.

Q.   Thank you, Dr. Smith.

     HB 1205 requires petition circulators to be U.S. citizens; correct?

A.    Yes.

Q.    And you testified earlier that there are other states that have this requirement, the requirement for petition circulators to be U.S. citizens; right?

A.    Yes.  There are three other states.

Q.    I believe you testified it was Colorado, North Dakota, and Oklahoma?

A.    Correct.

Q.    Great.

But for these states you haven't conducted any analysis to determine whether that requirement resulted in more or less fraud in that state; correct?

A.    That's correct.  I don't know of any data on -- available on that.

Q.    Okay.  And for states that have restrictions on residency, you haven't conducted any analysis to determine whether this requirement has resulted in more or less fraud; correct?

A.    In the other two states, no, I have not.  I do not know of any data on that.

Q.    And what about for states that have restrictions on individuals with felony convictions serving as petition circulators?  You haven't conducted any analysis in those states to determine whether or not that resulted in more or less fraud; correct?

A.    I am only familiar with, as a scholar, what has gone on in

Oregon with their much more narrowly tailored restriction on petition gatherers and eliminating those from being able to be paid petition gatherers who have felony convictions related to petition fraud.

Q.   I understand.

So you would also agree that the fines and fees for violating HB 1205 are greater than those imposed in other states?  I believe that was your testimony; correct?

A.   Without question the fees are, and in most cases the fines, most all cases, yes.

Q.   And that was the case even before HB 1205; correct?

A.   Other states did have fines on petition gatherers who were found to be in violation, so Florida was not unique in that sense.

With respect to fees, Florida is the only state that requires sponsors to pay for the validation of each of their signatures that are being validated petitions.

Q.   So the fees and fines pre-HB 1205 are still greater in Florida than those of other states; right?

A.   Again, I will say that the fees, definitely.  That is categorically true.

The fines, other states did have fines on -- prior to HB 1205, that timing, on petition gatherers who were in violation.

Q.   Were any as great as Florida's pre-HB 1205?

A.   I can't sit here and tell you precisely -- Florida has, prior to 1205, gradations of fines, as you know.  And I can't opine that other states were not as commensurate as Florida's.

Q.   All right.  Are you offering an opinion, Dr. Smith, that the fines and fees under HB 1205 are too high?

A.   I don't think I've offered that.  They are burdensome.  As I've stated, if you are a moneyed interest and money is no object, you can probably attempt to overcome this.  But for the average citizen group that is out there trying to use that Eleventh Amendment guarantee under the Florida Constitution, that has been around for, you know, almost 60 years, it's prohibitive, both the fines and the now fees to have these petitions validated.

Q.   And you aren't offering an opinion on what the amount of fines or fees in a state should be to facilitate the direct democracy process -- you are not offering an opinion on what the sweet spot would be; correct?

A.   Florida has decided to create fees that are an extreme outlier.  No other states put fees on petition gatherers and their sponsors.  They have -- two states have decided it's good enough to create a barrier to entry that is not prohibitive, say, in California where they use the initiative a lot, $2,000 to start that process to collect signature; Montana, it's higher, for whatever reason, $3,800.

     No other state is requiring a fee to use your

constitutionally protected right to petition government to initiate that.  And no other state is having sponsors have to pay to have petitions from individuals validated.

Q.   But you don't have an opinion as to the fact that just because no other state is doing it that it would be overly -- strike that.  Let me start again.

But, again, you are not offering an opinion as to whether or not the fines and fees that are imposed under HB 1205 are too high, just to be clear?

A.   I have not calculated that.

Q.   Thank you.

Let's look at -- so HB 1205 doesn't prohibit noncitizens from promoting political issues in the sense that if they want to engage a member of the public on a particular issue that they are passionate about -- nothing prevents HB 1205 from approaching them and engaging them in a conversation about that issue; would you agree with that?

A.   So you are saying they don't have a petition with them?

Q.   Let's say for the sake of this question they don't have a petition with them; they can just approach them, and they can communicate with them and engage with them on this issue.

A.   In theory that certainly is possible, one would still hope, today.

Q.   Let's say that they have a blank petition form with them, can they approach them with this blank petition form, explain

the initiative to them and explain to them that they need to fill it out and submit it?  Could they do that?

A.    I'm not a lawyer.  The law is pretty explicit that a petition gatherer, paid or voluntary, cannot engage in soliciting signatures.

Q.    So what if they just hand them the petition, tell them what it's for, and walk away?

A.    I'm informing my opinion from an expert -- being an expert in other voting rights cases when it comes to registering voters and whether noncitizens can handle, solicit, collect.  It's very vague.  This law is extremely vague as well.  Again, I'm not a lawyer in terms of being able to opine vagueness and the extent of vagueness.  But if I were a noncitizen, and I read the text of HB 1205, I would not engage in any of that because I could be facing a felony.

Q.    Well, I appreciate the clarification, and perhaps it was an unfair question.  You are here as an expert and not an attorney, so I didn't ask for a legal opinion.  And so my apologies for that.

      But I do want to ask something a little bit more on the lines of voting.

      So are you aware of whether or not U.S. citizens are allowed to vote in the state of Florida, noncitizens?

A.    No, they are not allowed to vote.

Q.    What about non-Florida residents?  Are non-Florida

residents allowed to vote in Florida?

A.   No.   You have to be a resident of Florida.

Q.   So even if an initiative makes it on the ballot, noncitizens can't cast a vote in favor of that initiative on the ballot; correct?

A.   Unless they became a citizen between the time they were engaged in, you know, collecting petitions prior to HB 1205, yes.

Q.   And the same is true for non-Florida residents; correct?

A.   Yes, unless they became a registered voter by declaring they are a resident.

Q.   Earlier in your testimony you had mentioned that there may be a scenario where the Supervisors of Elections wouldn't be able to match a voter's driver's license or their Social Security number to a form that had been submitted to them.

     Do you recall that portion?

A.   Yes, that is absolutely correct.

Q.   And that that could impact as many -- I believe the number was around 600,000.

     Does that sound about accurate?

A.   That's de minimis with respect to the time that I received that data from the Secretary of State's office as part of discovery in the SB 90 litigation.  I don't know if that number has gone up, whether it's gone down.  It also is not including all those other possible non-matches that I discussed in my

testimony.

Q.   That's okay.

Are you aware of the DAVID database that's maintained by the Department of Highway Safety and Motor Vehicles?

A.   Absolutely.

Q.   Are you aware of the SAVE database?

A.   Yes.

Q.   Do you know whether Supervisors of Elections have access to these databases?

A.   They certainly have access to DAVE.

Q.   So would you agree that there is a way for the Supervisors to verify a voter's information if it doesn't match what's on the voter rolls?

A.   Not with the SAVE database.

Q.   What about with the DAVID database?

A.   They can see whether or not you have a driver's license, but it doesn't get to the point of whether or not the driver's license on file with --

(Reporter requests clarification.

Q.   With DAVE, D-A-V-E.

-- is the one that they have with respect to maybe on their person.

BY MR. RABAN:

Q.   So the database is DAVID, right?

And so -- but you are familiar that the Supervisors do have

access to it and that they can verify information on petitions that are submitted as part of their verification process?

A.    So two things.  One, you asked me about driver's license and Social Security numbers.  As I said, Supervisors do not have, necessarily, access to the SAVE database, a federal database.  And even if they did, that is not a record of everyone with respect to -- it's more with respect to people who are here on -- under certain types of immigration status.

The DAVE -- referred to both as DAVE and DAVID -- is available for Supervisors.  But if you read the plain text of HB 1205, it says nothing about them having to go and access an extra leg of work if a voter does not have information on file with them.

So there are millions of people in Florida.  This was -- probably has not changed much since the SB 90 and the SB 7050 litigation where I received data from the Secretary of State's office that is redacted in the public record that has whether or not an individual has a driver's license, a Social Security last four, or both.  There are millions of people who have one or the other.

And there's nothing in the legislation that I can see that necessitates a Supervisor of Elections from querying other databases as opposed to the Florida Voter Registration System.

Q.    So you don't know whether it's a common practice for them to check those databases in connection with the

petition-verification process?

A.   All I have is my knowledge as a scholar of electoral politics, direct democracy, but in this case particularly voting in elections in Florida.  There's a lot of variation across the 67 Supervisors in terms of how proactive they are going to be or how by the book they are going to be with respect to validating something.

Q.   Sure.

     Earlier you also testified on the ten-return requirement.

     Do you recall that portion of your testimony?

A.   Yes.

Q.   How many of the other states that have a citizen-initiative process have statistical sampling to verify signatures?  Ten, did you say?

A.   I have that in my report, the opportunity.  I'd be happy to have you refer to my table where I actually have the opportunity to do statistical sampling.

Q.   Uh-huh.

A.   I don't have that number fresh off my mind right now.

Q.   But some do; correct?

A.   Some do.

Q.   Okay.  And the way statistical sampling works in those states is that a subset of the petitions and the signatures on them is verified; right?

A.   I missed, because of the noise.

Q.   I apologize.

And the way that the statistical sampling works in those states is that a subset of the petition is collected and the signatures on them is verified; correct?

A.   The subset is randomly selected.

Q.   Randomly selected.  Thank you.

So every petition in that circumstance doesn't make it through the door for verification; correct?

A.   That's correct.

Q.   So the petition return deadline, whether 30 days or 10 days, doesn't really matter in that scenario; correct?

A.   It doesn't matter because the state laws in there have the deadline in which all petitions have to be there, not like Florida has, which is a particular window, 30 days prior to HB 1205 and now 10 days.

Q.   Understood.

A.   It has nothing to do with the random sampling.  It has to do with their law of when the petitions have to make it.

MR. RABAN:  Thank you.

Your Honor, may I confer with counsel?

THE COURT:  Sure.  Take your time.

MR. RABAN:  Thank you, Dr. Smith.  I don't have any further questions.

Your Honor, permission to pass the witness.

THE COURT:  Thank you.

CROSS-EXAMINATION

BY MS. PRICE:

Q.    Hello, Dr. Smith.  How are you today?

A.    I'm good.  Thank you.

Q.    My name is Tara Price.  I represent the intervenor defendant Republican Party of Florida.

      I have a few questions to ask you.

A.    My pleasure.

Q.    Dr. Smith, you testified earlier today that the amount of fraud in the petition process is very small; correct?

A.    It's a very small quantum, yes.

Q.    And I think on cross with my friend from the Secretary's office, you called it a rare event; correct?

A.    Yes, it's a rare event.

Q.    Can you explain to me how you reached that conclusion?

A.    I'm looking at the reports that have been filed, not only recently with the OECS, but also I follow petition fraud across the country as well as in Florida, ballot fraud more generally when it comes to voting, and I can count on one hand the number of criminal prosecutions that have been successful on petition-gathering fraud prior to this most recent cycle.

Q.    You mentioned that you get it from following the OECS, and then I wasn't clear about where you're getting your other information from regarding petition fraud.

A.    Sure.  Looking at -- across newswires, public accounts,

public records in other states that have evidence of petition-gathering fraud that have been successfully prosecuted.

Q.   Okay.  So then your testimony, then, is if the OECS isn't investigating it and successfully prosecuting it, fraud isn't happening?

A.   No, I don't think that's my testimony at all.

Q.   So you would then -- on the flip side, your opinion would be that fraud is happening even if the OECS is not catching it?

A.   In Florida fraud is very rare, as I said already, because you have safeguards in place prior to 1205.  You have the unique situation, as I've described, I think in detail, of one petition per one voter coming in.  Prior to HB 1205, you had name, address, signature, birth date or voter registration information.

    That information creates a unique identifier for an individual for a Supervisor of Elections to determine whether or not this petition is valid or invalid; and, if invalid, investigate whether or not it may be fraudulent.  And we have seen cases occasionally that have been identified through that process; it works.

    The other thing that I emphasize is that sponsors have absolutely no incentive whatsoever to push petitions that are fraudulent, to employ signature gatherers engaged in these activities.  They want to qualify measures; they do not want to have their measures not meet the threshold.

And they are the ones who are identifying to elected officials to -- like Supervisors of Elections, to state attorneys offices, to the Secretary of State that there might be problems. So the system in place was working, and it did identify these small quantums, and there's no evidence to suggest otherwise.

Q. Thank you, Dr. Smith.

That was not my question.

We previously spoke, and I asked you if your opinion was that there was no fraud if the OECS didn't investigate it or report it, and you said, no, you didn't agree with that.

The only other alternative is that there must be fraud out there that the OECS is not uncovering. Yes or no?

A. And I explained that, yes, there are small quantities which are being uncovered.

Q. Right. You're saying quantities that are being uncovered.

I'm asking you if it is your opinion that there are cases of fraud out there that are not being uncovered?

A. This is the same argument that I've heard in voting rights cases, that there's some unknown number of fraudulent votes being cast and that we just can't find them out so we must crack down on the process.

I mean, the evidence is actually on your side to discover this --

Q. Doctor --

A.    -- not for me to come up with some idea that there's all kind of ballot fraud.  There's no data out there.  It's on the State and its agents, the Supervisors of Elections, to be detecting.

Q.    Dr. Smith, respectfully, you're not answering my question.

What I'm asking you is that if you believe that OECS is not uncovering all examples of fraud or if they are uncovering all examples of fraud with regard to petition initiatives in Florida.

MR. SHAPIRO:  Objection.  Asked and answered.  I think that counsel just doesn't like the answer she's getting.

THE COURT:  Overruled.  The question is has every incident of fraud been uncovered?

THE WITNESS:  Perhaps.

BY MS. PRICE:

Q.    Are you willing to say with absolute certainty that that is the case?

A.    No.

Q.    Thank you, Dr. Smith.

You haven't spoken with any employees with OECS regarding their efforts with investigating initiative petition fraud?

A.    No, I have not.

Q.    You have not spoken with any employees at FDLE about their efforts to prosecute initiative petition fraud?

A.    No, I have not.

Cross-Examination - Dr. Smith

Q.    You have not spoken with any local state attorneys about their efforts to prosecute initiative petition fraud; correct?

A.    I have not spoken with them.

Q.    Dr. Smith, do you know when OECS was first created?

A.    Yes.

Q.    Does 2022 sound about right?

A.    Correct.

Q.    Do you know when OECS began investigating and reporting on suspected fraud with regard to petition initiatives?

A.    I assume the first day.

Q.    Are you aware of all the investigations relating to petition fraud that OECS has conducted during the time of its existence?

A.    No.  I'm certainly not aware of all of them.  I'm aware of what they have made public in their reports.

Q.    Every single investigation that they made public in the reports?

A.    Yes.  I've read those reports.

Q.    Okay.  You would agree that the OECS is statutorily required to produce those reports; correct?

A.    Yes, they are.

Q.    And they produce those annually?

A.    Sometimes more than annually.

Q.    Do you know if the OECS produced a report in January 2023?

A.    I don't remember the specific date.

Q.   Is that a report that you would have read?

A.   I have read the reports.

Q.   If you read that report, then you would be familiar with the investigations that the OECS documented within that report to the Legislature in January 2023?

A.   Correct.

Q.   And then you would also be familiar with any of the arrests that are documented in that report that were reported to the Legislature in January 2023; correct?

A.   Arrests, yes, correct.

Q.   What about January 2024?  Have you read the OECS's annual January 2024 report?

A.   Yes, I've read that.

Q.   So then you would be familiar with the investigations that the OECS documented relating to petition fraud within that report; correct?

A.   The investigations, yes.

Q.   And then you would also be familiar with the arrests that were documented within that report; correct?

A.   I'm familiar with their arrests.

Q.   And then you would be familiar with the fact that OECS has undergone investigations relating to petition initiatives besides abortion and marijuana, such as the gambling initiative; correct?

A.   That is correct.

Q.   What about the OECS's interim report from October 2024 and then updated in -- sorry -- December 2024?  Have you read that interim report?

A.   So this is not the annual report?  It's an interim report?

Q.   Yes.  Dr. Smith, I'm speaking about the interim report that was first published in October 2024 and then updated in December 2024.

A.   I read both of them.

Q.   Okay.  So then you would be familiar with the investigations that were documented relating to petition fraud in that report; correct?

A.   Yes, with regard to the investigations.

Q.   And you would be familiar with any arrests that were documented with relation to initiative petition fraud within that report; correct?

A.   Also arrests, yes.

Q.   What about the OECS's final annual report that came out in January 2025?  Have you read that report?

A.   Yes, I have.

Q.   So then you would be familiar with the investigations that were documented relating to petition fraud in that report; correct?

A.   Yes.  I'm very familiar with the investigations.

Q.   And then you'd also be familiar with the arrests that were documented within that report relating to petition fraud;

correct?

A.    I am familiar with the arrests.

Q.    Okay.  And as I understand it --

        (Reporter requested clarification.)

BY MS. PRICE:

Q.    And as we've gone through all these reports --

        (Reporter requested clarification.)

            MS. PRICE:  Oh, I'm sorry.

BY MS. PRICE:

Q.    As we've gone through these reports from the OECS, you would also be familiar with any convictions that were documented relating to petition fraud within those reports that were submitted to the Legislature; correct?

A.    Yes.

Q.    And as I understand it, you are not providing an expert opinion as to whether the OECS should have conducted any of those investigations on petition fraud; correct?

A.    I don't really understand the question.

Q.    Are you providing an expert opinion in this case as to whether the OECS should have conducted those investigations with regard to petition fraud?

A.    No, I'm not making an opinion on that.

Q.    And, similarly, you're not providing an expert opinion as to whether any of the arrests or convictions that were documented in the OECS reports -- whether those should have

happened or not; correct?

A.    Whether they should have happened?

Q.    Correct.

A.    No, I'm not opining on that.

Q.    Thank you.

Are you familiar with any statements from the OECS regarding the impact of HB 1205 on their ability to conduct investigations relating to petition fraud?

A.    I don't know what kind of statements.

Statements in the OECS's report?

Q.    I'm asking about any kind of statements.

Are you familiar with any statements from the OECS regarding the impact that HB 1205 has had on their ability to investigate petition fraud?

A.    No, I'm not familiar with those.

Q.    What about the same -- are you -- sorry.

(Pause in proceedings.)

BY MS. PRICE:

Q.    Are you familiar with the provision of HB 1205 that requires voters to receive a letter after a supervisor has validated a petition in their name?

A.    Yes.

Q.    You're not familiar with the number of -- oh, sorry.  Let me back up.

After the voter gets that letter, they have the ability to

send an affidavit to OECS as to whether they actually signed that petition or whether this was a case of a fraudulent signature; correct?

A.   I'm not sure what the exact language is because it varies across some of the counties on that letter that then goes to the OECS.  So I'm not sure if it specifically states that the voter thought these were fraudulent, so I'm not familiar with that, no.

Q.   Okay.  What is your understanding of what the letter informs the voter about?

A.   Well, it's really interesting that this letter is required under HB 1205 to go from Supervisors of Elections --

Q.   Sorry.

Dr. Smith, I'm asking you what -- your understanding of what the letter is about.

A.   I was just getting to that.

In terms of thinking about what this letter is, this is for people who have signed a petition that the Supervisors have validated all the information on there, and that all this information -- which presumably is including social security number, last four, or driver's license -- has been validated is now being sent to the OECS for review after it goes to a voter and says, Oh, I didn't sign this, right?

That is the process.  It goes to the voter, and the voter has an opportunity to sign an affidavit going there; correct.

Q.   That's what I'm asking you.

You're familiar that the voter could then sign an affidavit and send that to OECS saying, That is not my signature.  I did not sign this petition?

A.   Correct.

Q.   Are you familiar with a number of affidavits that OECS has received since the enactment of HB 1205 from voters saying, That is not my signature, and I did not sign this petition?

MR. SHAPIRO:  Objection, Your Honor.  I don't believe that those letters were produced to the plaintiffs in this case.

THE COURT:  Well, he can answer, and then if you have some other issue later.

Is that information that was provided to you?

THE WITNESS:  No.

BY MS. PRICE:

Q.   Thank you.

Dr. Smith, at one point you discussed the number of petition initiatives that the Secretary of State authorized for petition circulation; right?

A.   Yes.

Q.   And I believe you stated, and we discussed, since 1978 there was 428 that had been approved; correct?

A.   Correct.

Q.   And then you compared that to the number of petition initiatives that actually made the ballot, and I believe you

said 44 since 1978; correct?

A.   Correct.

Q.   Okay.  Do you know what's required in Florida for a ballot sponsor to have a petition initiative authorized to circulate petitions?

A.   It's changed over the years.

Q.   What is required?

A.   Over the years it's changed quite a bit.  It is --

THE COURT:  Hold on one second.

Are you asking him to -- every iteration or what currently is required?

MS. PRICE:  Your Honor, I'm not asking him every single iteration, but if there have been significant changes and it was --

THE COURT:  Well, why don't we start with, What are the current requirements? and then you can ask him, Were there -- what were the significant changes?  So that way it's clear what we're asking.

MS. PRICE:  Thank you, Your Honor.

THE COURT:  Thank you.

BY MS. PRICE:

Q.   Dr. Smith, can you -- are you aware of the current requirements?

A.   Generally, yes.

Q.   Okay.  Can you explain what those are?

1410
Cross-Examination - Dr. Smith

A.   Sure.  A petition sponsor has to register with the State; petition sponsor has to work on the language, the title, the summary.  That information gets conveyed to the Secretary of State, Attorney General's office for review, and it has to pass certain hurdles in order to be approved then for circulation.

Q.   What are those certain hurdles?

A.   Well, the title can only have 15 words.  The summary can only have 75 words.  It has to have a single subject to be determined.  There are others.  I'm not going to be able to recite them all off the top of my head, but there are quite a few hurdles for a sponsor to be able to get to that level to be able to initiate the signature-gathering process.

Q.   You say "hurdles."  These are guidelines that a ballot sponsor needs to abide by in order to have an approved initiative petition that they can circulate?

A.   Actually, that's not correct.  It's not just the guideline.  Sometimes they are overseen -- overlooked.

So, for instance, the classic case is in 2006 an effort to qualify a constitutional amendment for redistricting had, I believe it was, 81 words in the summary, and they went and collected the requisite number, and it was later then struck down because that process wasn't -- it didn't prevent it from initiating.

Q.   So then your testimony is that there's guidelines that ballot sponsors have to follow, but that won't necessarily

prohibit the Secretary of State from approving their petition initiative to go be circulated?

A.   I wouldn't call them guidelines.  They are very strict regulations, and these regulations are generally followed.  That is a classic example of one in which maybe it was recognized in terms of in violation of the 75 words, but they let them go out and collect signatures anyway.

Q.   What do you base that on, Dr. Smith?

A.   I've studied the issue of direct democracy and particularly the measures on redistricting.  I have a chapter that looks at the history about that.

Q.   Have you spoken with anybody at the Department of State who reviewed that and approved that petition for circulation?

A.   Back in 2006?  I have not talked to anyone.  It's well documented, and it was quite a dramatic turn of events.

Q.   But you've not spoken with anybody who actually approved that petition for circulation?

A.   No, I haven't talked to someone specifically about that.

Q.   Dr. Smith, you previously said the process has changed for getting an approval to circulate.

     Can you tell us what the process used to be before?

A.   Again, it has been modified in terms of the timing, the restrictions on how quickly the Secretary of State and the Attorney General have to respond, the Supreme Court has to respond.  All those things have been modified over time.  There

are probably other things I'm forgetting right now, but it has not been consistent.

Q.   Okay.  Let's get back to -- you talked about what was required in Florida.

Did you analyze what was required in the 14 other states with petition initiatives for ballot sponsors to be able to collect signatures?

A.   There are very different requirements across those states, so I'm generally familiar with them.  I did not document that because it was not part of the claims in HB 1205 that I was asked to look at.

Q.   Okay.  And do you remember the judge asked you how many of the 428 initiatives didn't raise money and didn't raise petitions?

A.   Yes.

Q.   Okay.  And you testified, I believe, that there are a lot of the 428 initiatives that don't raise money and don't circulate petitions; correct?

A.   I would say that that is more of a common occurrence more recently than in the past.

Q.   Well, about how many of the 428 initiatives would fall under that category?

A.   Well, unfortunately, the Secretary of State's data does not go back that far because of the public disclosure on dollars raised, dollars spent.  So there's no way to know that going

back in time beyond what the Secretary of State's website has for petition gatherers.

There's a several-step process that you have to do to identify who the sponsor was, be able to go to the campaign finance database and be able to identify that petition sponsor, and then go in and look at expenditures and contributions.

Q.   So you're saying you don't know how many of the 428 where they didn't raise any money or they didn't circulate any petitions?

A.   You know, I'm happy to go down these rabbit holes with you.

There is a great case in 2020 in which -- I mentioned the measure, the constitutional amendment to have only citizens be able to vote in Florida.

Again, I worked with the State of Florida to defend the campaign finance disclosure laws.  That measure -- if you go onto the database and you find the sponsor and you go to the campaign contributions and expenditures, it's all in-kind contributions to qualify that measure, and if you go and try to go any further, you can't figure out who made those in-kind contributions or where they got their money.  So it's not as easy and simple, because the system isn't set up that way.

Q.   About how many of the 428 can you not figure out whether they raised any money?

A.   Again, we are looking at, by definition, ones that the State was not regulating prior to that.  I don't have a perfect

count on that 428 prior to when that provision went into play.

I can tell you that if you look at the current ones that are certified for circulation, there are several that are not raising or spending any money.

Q.   About what year was the year that the Secretary of State has sufficient records for you to be able to look at that?  So, in other words, from 1978 to what year can you not tell me this information?

A.   It's very difficult because the Secretary of State's website has information where they just have not even the name of the sponsor.  So there's no way to be able to link that to the contribution/expenditure database.

I don't really want to hazard a guess on what year that actually is.  I don't know.

Q.   Would it be in the '80s?

A.   Probably more recent than that.

Q.   In the '90s?

A.   Again, the Secretary of State's office ratcheted up things moving into the 2000s.

Q.   Okay.  So 2000s.  Thank you.

And so, similarly, I'm guessing if you can't tell me anything before the 2000s, how much they raised, you probably can't tell us how many signatures they got as well; correct?

A.   Yeah, I do not know the -- we certainly do not have a database like we have now on that, correct.

Q.   Let's take a look at the number of 44 petition initiatives that made the ballot.

     Those are the numbers, as I understand it, of petitions that Florida voters since 1978 have been able to vote on; correct?

A.   Yes.

Q.   You would agree with me -- I think you mentioned some earlier -- that there are other reasons beside not submitting enough signatures that a petition initiative will not make the ballot; correct?

A.   Yes.

Q.   As -- but one example -- you would agree with me that the Florida Constitution itself requires that citizen initiatives contain a single subject; correct?

A.   That's correct.

Q.   Did you analyze how many citizen initiatives since 1978 collected sufficiently enough signatures but did not make the ballot because they contained more than one subject?

A.   I know it's not zero.

Q.   But you don't have a number; correct?

A.   I can think of some off the top of my head, but I do not have a comprehensive knowledge of all of them.

Q.   Thank you, Dr. Smith.

     By the same token, did you analyze how many citizen initiatives since 1978 collected enough signatures, but they did

not make the ballot because perhaps the ballot summary was not an accurate description of the text of the amendment?

A.   I have not done a thorough analysis of that, no.

Q.   Okay.  So to be clear, you cannot tell us the number of petition initiatives that submitted at least a thousand validated petition signatures, let's say, but were unable to qualify for the ballot based on an insufficient number of signatures alone?

A.   There are very few, but there -- it's not zero.

Q.   Dr. Smith, earlier you spoke with Mr. Raban regarding some of the databases that the Supervisors have access to.

     Do you remember that?

A.   Yes.

Q.   I believe one of them was a DAVID database.

     Do you remember that?

A.   Yes.

Q.   Have you used that database yourself?

A.   I do not have access to the DAVID database.

Q.   Okay.  Have -- and then I believe another one was the SAVE database?

A.   I certainly do not have access to the SAVE database.

Q.   Okay.  Are you familiar with all of the information about a person that's contained on the DAVID database?

A.   I'm familiar because I have accessed it with respect to other litigation I've been involved with.  I do not know if I

have all the fields.

Q.   Okay.  You wouldn't -- you wouldn't swear that you understand all of the information that's within DAVID?

A.   No.  I've seen limited parts of the database --

Q.   Okay.

A.   -- in court.

Q.   Is the same true for the SAVE database; you wouldn't be able to tell us all the information about a person that's available on the SAVE database?

A.   I've never had access to the SAVE database.

Q.   Okay.  And you don't know how many Supervisors of Elections have access to the SAVE database; correct?

A.   I do not know, no.

Q.   Thank you, Dr. Smith.

     And, Dr. Smith, you testified earlier today about some of Florida's requirements with regard to the petition initiative process; correct?

A.   I missed part of that.  Sorry.

Q.   I'm sorry.  We've been talking today and you testified earlier today about some of the requirements that Florida has with regard to the petition initiative process; correct?

A.   Yes.

Q.   And you would agree with me that at least some of the Florida requirements that you compared to other states existed before HB 1205; correct?

A.   Perhaps in part, yes.

Q.   Well, for example, the multisignature on a form, you analyzed that, and that existed prior to HB 1205; correct?

A.   HB 1205 did not change that.

Q.   Thank you, Dr. Smith.

As I understand it, you have not analyzed whether any of the other 14 states have laws regarding the petition initiative process that Florida does not have; correct?

A.   I am generally familiar with other provision as a scholar of direct democracy who has been teaching this, who has been studying this, who has written several articles, including one on the will of the people or direct democracy in which I looked at different regulations.  So I am generally familiar.

Q.   I understand you are generally familiar, Dr. Smith.  I'm asking if whether you looked at whether other states have laws that Florida does not with regard to petition initiatives.

A.   For the purpose of this case, no, I did not do that.

Q.   Thank you, Dr. Smith.

Dr. Smith, you briefly talked about your rebuttal report, about how you reviewed petitions in Palm Beach County, Orange County, and Osceola County.

Do you recall that?

A.   Yes.

Q.   And that was regarding, if I understand correctly, the number of invalid petitions that were submitted between zero and

10 days as compared to 11 or 30 days?

A.    Correct.

Q.    And your analysis was based on whether the Supervisor of Elections office validated or invalidated that signature; correct?

A.    Correct.

Q.    Okay.  So you did not consider whether the OECS had determined that any of the validated petitions that you reviewed should have been invalidated; correct?

A.    That is correct.

Q.    And I believe you briefly talked about some of the internal vetting measures that some of the ballot sponsors have.

Do you recall that?

A.    Yes.

Q.    Does the State require ballot sponsors to internally vet signed petition forms?

A.    No.

Q.    So you cannot testify with absolute certainly that every ballot sponsor who the Secretary of State approves to circulate petitions conducts an internal vetting process; correct?

A.    Correct.

MS. PRICE:  No further questions.

Thank you very much for your time, Dr. Smith.

THE COURT:  Before we do that, how long do you have, Mr. Bardos, and how long do you have, Mr. Stafford?

MR. BARDOS:  I have about 15 minutes, Your Honor, maybe less.

MR. STAFFORD:  I have probably two minutes, Your Honor.

THE COURT:  Do you want to take a break now or do those first?  It's totally up to you.

MR. BARDOS:  I would appreciate a break, Your Honor.

THE COURT:  All right.  We'll take a break.

Thank you.

(Recess taken at 3:33 PM.)

(Resumed at 3:42 PM.)

THE COURT:  We are back on the record.

Mr. Bardos, you're up.

MR. BARDOS:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. BARDOS:

Q.   Dr. Smith, it's good to see you.  We've met before.  My name is Andy Bardos.  I represent 11 Supervisors of Elections.

I'll be asking you some questions about the verification fees that you discussed briefly on direct.

You would agree with me, Dr. Smith, would you not, that verification of initiative petition forms is an incredibly important task?

A.   Yes.

Q.   And you're not opposed to the verification of each petition

form individually as opposed to verification by statistical sampling; correct?

A.   I'm not opposed to it.

Q.   And statistical sampling is not as thorough a process as the verification of each petition form individually; correct?

A.   I would say it's not as thorough, but it can be very accurate.

Q.   Very -- I'm sorry?

A.   Very accurate.

Q.   Okay.  And Supervisors of Elections must be able to pay for the incredibly important task of verifying petition forms individually; correct?

A.   Yes, that's true.

Q.   And you don't have a problem with the Supervisors being authorized to charge a fee to help them pay for the effort to verify petitions; correct?

A.   I just want to be very careful, Mr. Bardos, of -- when we're talking about the verification, we're talking about the Supervisors' effort to verify petitions, not anything besides that.

     Is that how you've been referring to verifying petitions?

Q.   We might have different -- I don't know if we have different definitions of "verify," but I'm referring to verification fee and everything it pays for.

A.   Yeah.  Here's where I might differ with you, because prior

to HB 1205, there was a verification fee to validate petitions. We know that 1205 has done other things to that process post being received by a Supervisor.

And so when you characterize this as a verification fee, I want to be very clear in my response.

Are we talking about the Supervisor who makes that determination, or are we talking about other activities post that verification?

Q.    Okay.  So you might consider the voter verification notice, for example, as falling outside of verification.  Is that your --

A.    Correct.

Q.    And I might consider that as part of the verification process.

I'm simply asking you, as a general matter, you don't have a problem with Supervisors charging the fee to verify petitions; correct?

A.    Within my definition, I have no problem.

Q.    Fair enough.

Now, you would also agree that initiative petition campaigns are necessarily expensive; correct?

A.    No, they are not necessarily expensive.

Q.    Okay.  You would agree that even before HB 1205 was enacted a statewide initiative campaign was expensive?

A.    Again, they are expensive in Florida currently, not always

Cross-Examination - Dr. Smith

the case.  I've provided testimony to that.

Q.    Before HB 1205 was enacted, though, you agree that a statewide initiative campaign was expensive; correct?

A.    Well, I've given you actual data from the ABA with respect to 1970s, the 1990s.  We can look over time with the available data, given counsel's last representation of the limitations, which I agree, to show how it has gone up.

     So, again, it's -- this is a relative term, and I would not agree with the overall characterization.

Q.    Okay.  Do you remember your deposition being taken in this case?

A.    Yes.

Q.    Okay.  And do you recall saying in your deposition that even before HB 1205 was enacted a statewide initiative campaign was expensive?

A.    Well, again, probably relative to what we saw in the 2024 cycle, which was before HB 1205 went into effect.

Q.    Okay.  Do you recall making that statement in your deposition?

A.    Yes.

Q.    Okay.  And that was truthful testimony; correct?

A.    Yes.

Q.    Okay.  Now, in 1990, you would agree that the cost of initiative campaigns already exceeded $1 million?

A.    In some cases, yes.

Q.    And the signature threshold of 880,000 signed or valid petition forms, plus the requirement of geographic distribution among those petition forms, unavoidably requires a massive effort; correct?

A.    It requires a massive effort, yes.

Q.    And you referenced in your direct initiative campaigns that have costs in excess of $100 million; correct?

A.    Correct.

Q.    And in doing so, did you have in mind the 2024 campaigns for the abortion amendment and the marijuana amendment?

A.    Yes.

Q.    Okay.  Now, you would agree, though, that not all recent campaigns have cost $100 million?

A.    That is correct.

Q.    Okay.  And those $100 million campaigns in 2024 preceded HB 1205; correct?

A.    Those two, absolutely, yes.

Q.    Okay.  And there were campaigns in 2020 to place initiatives on the ballot as well; is that right?

A.    That is correct.

Q.    And four of them made the ballot; right?

A.    That is correct.

Q.    One that would require citizenship as a condition of voting; correct?

A.    Yes.

Q.    A minimum wage amendment?

A.    Yes.

Q.    One for open primaries?

A.    Yes.

Q.    And one that would have required voters to vote twice to approve a constitutional amendment before it would be finally approved; correct?

A.    That's correct.

Q.    And would you agree that in each of those four campaigns the sponsor received contributions, both monetary and in-kind, of less than $10 million?

A.    Yes.  If I recall correctly -- and I have gone over those, had my students go over it this fall -- that generally seems correct.

Q.    Okay.

A.    And the in-kind is an important, you know, note that I appreciate you making.

Q.    So campaigns -- the cost of campaigns has ranged from seven figures to nine figures; would that be fair to say?

A.    Sure.

Q.    Okay.  Now, you also mentioned that Florida is the only state that imposes a verification fee.

      Do you recall that?

A.    Yes.

Q.    Okay.  And you -- and this was part of your comparative

analysis; correct?

A.   Correct.

Q.   And in discussing your comparative analysis, you mentioned that it's important to -- or that what you do is you compare similarly situated states; correct?

A.   Yes.

Q.   Okay.  And if I recall correctly, there are 15 states that you say authorize their state constitutions to be amended by initiative; correct?

A.   There are three others which I've excluded and explained that, but the ones that I have mentioned in my testimony today in my report are those 15.

Q.   15.  Okay.

     And the 15 include Florida; correct?

A.   Correct.

Q.   Okay.  So of those 15, would you agree that only four verify initiative petition forms individually as opposed to using a statistical sampling method?

A.   I have that in my report.  Your characterization sounds correct.

Q.   Okay.  And, of course, we don't know whether the 11 states that use statistical sampling would or would not charge a verification fee if they couldn't use statistical sampling and instead had to verify each petition form individually?

A.   I certainly don't know that.

Q.    Okay.  And the other three states besides Florida that verify petition forms individually are Ohio, Nebraska, and Oklahoma; is that right?

A.    That's correct.

Q.    And the signature thresholds in those states are not close to Florida's threshold of more than 880,000 signatures; is that right?

A.    That is also correct.

Q.    And that's because those two states have much smaller populations than Florida does; correct?

A.    Population as well as what their standard is for some percentage of a previous election.

Q.    Okay.  And as of the last decennial census, Florida's population was a little north of 21 million; roughly?

A.    Yes.

Q.    Okay.  And Ohio's was about 10 million less than that; is that fair to say?

A.    I don't have that number off the top of my head.

Q.    And Oklahoma, less than 4 million?

A.    Sounds about right.

Q.    And Nebraska, less than 2 million?

A.    Again, sounds about right.

Q.    Okay.  And the reason that Florida does not use statistical sampling is because the First District Court of Appeal nearly 50 years ago decided that the Florida Constitution does not permit

statistical sampling in the case of statewide initiative petitions; is that right?

A.    That's correct.

Q.    Okay.  So that was not -- that was not a discretionary choice by the Legislature; correct?

A.    Correct.

Q.    Okay.  Now, you discussed the DAVID system, and the Supervisor's use of DAVID.  I just want to confirm, you don't have personal knowledge as to whether Supervisors of Elections do or do not use the DAVID system in the verification process when their own records don't contain a driver's license or Social Security number; correct?

A.    For the purposes of petition validation?

Q.    Yes.

A.    I do not have knowledge across the 67 counties, no.

Q.    Okay.  Now, would you also agree with me that a per-petition verification fee creates a cost disincentive for sponsors to submit defective forms?

A.    Can you say that one more time?  I want to make sure I have --

Q.    Yes.  Would you agree that a per-petition verification fee such as Florida has creates a cost disincentive for sponsors to submit defective forms?

A.    So can we flip that around?  So you're basically saying that sponsors have a disincentive to have their petition

gatherers submit a defective form because of those costs?

Q.   Yes.

A.   That's what you are saying?

Again, as I've testified here, sponsors do not necessarily have control over what volunteers are submitting.  They don't even necessarily have control over what paid petition gatherers are submitting.

Since they are being paid by the hour as opposed to by the petition, I don't think it is as clear of a relationship as you're implying here.

I have testified that they are not interested in having petitions that are invalidated.  Is it because of the cost and -- the higher costs?  So if we put $100 per petition, are you saying that they are going to be really, really careful?

I -- again, I'm not sure about that logic and how much it incentivizes a sponsor.

Q.   Okay.  Do you recall stating in your expert report that a per-petition verification fee creates a cost disincentive for sponsors to submit defective forms?

A.   I don't recall that.  If I wrote it there, then I certainly meant that.

         MR. BARDOS:  Zack, could we pull up Dr. Smith's October report?

         And let's go to page 65, please.

BY MR. BARDOS:

Q.   And take a look, Dr. Smith, at paragraph 120 where you write:  *Finally, structural safeguards in place prior to HB 1205 made fraud impractical.  Sponsors of initiated constitutional amendments were required to pay per-signature verification fees that funded SOE's manual checks, creating a cost disincentive, as I discuss below, for sponsors to submit defective forms.*

     Do you see that?

A.   Yes.

Q.   And you would agree that if petition verification comes with a financial cost, then a sponsor will do its due diligence to make sure that the voters has filled out the petition form completely; correct?

A.   Yes.  In this context I agree with what I stated there. And this is pre-HB 1205, yes.

Q.   Okay.  But the fact that it creates -- or this incentive didn't disappear because of HB 1205; correct?

A.   No, it didn't disappear.

Q.   Okay.  And if petition verification comes with a financial cost, then a sponsor will do its due diligence to make sure that the voter has filled out the petition form completely; correct?

A.   Again, you are inferring that a sponsor is going to have control as a principal over its agent, and I've already made it very clear that volunteers using the personal petition, the sponsor has absolutely no agency over that individual.

Q.    Is it your understanding that sponsors do provide training to their petition circulators?

A.    I was asked a similar question by either you or the previous counsel about what sponsors are doing or not doing and I didn't have a definitive answer.  I can't opine on what all sponsors are doing with respect to training.

Q.    Okay.  Do you recall whether in your deposition you said that if petition verification comes with a financial cost, that a sponsor will do its due diligence to make sure that the voter has filled out the petition form completely?

A.    As I was saying, they are certainly incentivized to do that as sponsors, yes.

Q.    All right.  Let me just go back to my question.  And I'm trying to determine whether you made this statement at your deposition.  I want to know whether at your deposition you stated that:  *If petition verification comes with a financial cost, then a sponsor will do its due diligence to make sure that the voter has filled out the petition form completely*?

A.    Yes, that is what I wrote in my report.

Q.    Okay.  And that's especially true if the sponsor is now paying even more for verification; correct?

A.    Well, there is an incentive built into that that you are going to ratchet up your quality control, if possible.  Yes.

Q.    Okay.  So you agree with that statement that it's especially true that sponsors will do their due diligence to

make sure that voters have filled out the petition forms completely if the sponsor is now paying even more for verification; correct?

A.    Again, there's an incentive for them to do that.  There are certainly -- there's certainly leakage in the process.

Q.    Okay.  And there's some things that sponsors might not be able to check on a form.  For example, they might not know the voter's Social Security number and be able to confirm that; correct?

A.    Absolutely.

Q.    Okay.  But a sponsor could potentially train its signature gatherers to -- when they take the form from the voter to at least look over the form to make sure that the fields are completed; correct?

A.    Yes.

Q.    And sponsor could also potentially train their signature gatherers to determine whether the information provided in the field is at least plausible responsive to the information that's being asked.  For example, a county is in the county field.

A.    Yes.  I mean, you are presuming the face-to-face interaction that I talked -- that is so important to the ability of petition gatherers to be able to engage in that process, that dialogue, that constant discussion.

So, yes, I agree that there is an incentive for petition gatherers, volunteer or paid, to be able to assure that that

Cross-Examination - Dr. Smith

information is filled in.  No way to validate any of it.

Q.   Right.  But there are things that the sponsor can do to attempt to ensure that those petition forms are properly completed?

A.   As I said here today and in my report, they have an incentive to submit quality petitions that are going to advance their goals, which is to quality the measures.

Q.   And not only do they have the incentive, there are steps that they can take to attempt to ensure that petition forms are properly completed; correct?

A.   But as we've just discussed, they do not have information about a Social Security number or a valid driver's license --

Q.   Right.

A.   -- much less where an individual is actually registered to vote or their birth date.

Q.   Okay.  Again, I'm not asking about the Social Security number.  We agree on that.

I'm asking whether, for example, a sponsor could train its petition gatherers to take a moment to look at that form and ensure that all the fields are complete?

A.   I'm --

(Indiscernible crosstalk.)

A.   As someone who is engaged as a petition gatherer, as someone who has watched and analyzed and written about petition gatherers, you know, there is a constant conversation, but there

is no way to assure that any of that information by the signer is perfectly filled out accurately and complete.

BY MR. BARDOS:

Q.   Again, that's -- I'm not asking whether the information on the form is correct.

I'm asking whether the sponsor can train its signature gatherers to take a few seconds to take a look at that form that they've received back from the voter to ensure that the right fields have been completed, meaning that there is information filled in those fields.

A.   Yes, I will agree with that.  Yes.

Q.   And they could take a moment to ensure that the information that's in those fields is at least plausibly responsible to what the petition form is asking.  For example, the county field contains the name of the county.  They could check that?

A.   Presumably, yes.

Q.   Okay.  And you agree that if the cost of verification increases, sponsors will try their best to make sure that the information a voter places on the petition form is accurate?

A.   As I wrote -- this is prior to HB 1205 -- there was certainly an incentive to provide Supervisors of Elections petitions that were as valid as possible.  And, for instance, in Florida, you used to be able to prefill information so you didn't even have to worry about the county, you would have prefilled that, and been in Alachua Counties with ALA, so that

that wasn't going to be missed or put in incorrectly for a voter.  That's no longer permissible.

Q.   Okay.  And if the sponsor knows that it will pay for the verification of rejected signatures, then the sponsor will make darn sure that the petition form is filled out correctly, to the extent that it can; correct?

A.   I think they are incentivized to do that.  Can they do that?  Absolutely not with respect to some of these new fields under HB 1205.

Q.   Some of the new fields.  Others perhaps so; correct?
     The old fields didn't go away; right?

A.   Right.

Q.   Those old fields are still there?

A.   No, there is no way to validate all of that as a petition gatherer, much less a sponsor.

Q.   Okay.

A.   But they can try.

Q.   That's right.

A.   I'll agree with you there, they can try.

Q.   Okay.  And the incentive we agree is there?

A.   There's an incentive with respect to those petition costs and not having to pay for petitions that are facially invalid before they are submitted, yes.

          MR. BARDOS:  Thank you, Dr. Smith.

CROSS-EXAMINATION

BY MR. STAFFORD:

Q.   Good afternoon, Dr. Smith.

I'm Bill Stafford, and I'm going to be the last of the defendants to cross-examine you today.  I work for the Attorney General's office.

If I understand -- if I understood your testimony earlier today, would you agree that direct democracy and citizen initiatives can operate as a safety valve for -- for citizens who don't believe that their voices are being heard?

A.   Do I agree with that?

Q.   Yes, sir.

A.   Yes.

Q.   Okay.  And would you agree that many of the -- or that petitions that have succeeded in Florida, several of those petitions have dealt with politically charged or emotionally charged issues such as abortion or gay rights?

A.   Yes.

Q.   Okay.  And other petitions have a whole lot of money behind them?

A.   That is true as well.

Q.   And in that environment, if petition sponsors or petition circulators were, you know, very much behind the -- were driven for the passage of these amendments, and they thought they could get away with petition fraud, would they have an incentive to do

1437

Cross-Examination - Dr. Smith

it?

A.   Again, this is a difficult question to respond to given that there are a lot of actors out there.  There are some bad actors.

I do not think sponsors of a petition-gathering effort are at all incentivized, as my conversation with Mr. Bardos was just evidence of.  They are trying to qualify these measures.  They are trying to get them on the ballot.  They have no incentive whatsoever to submit petitions that -- they have to pay for validation -- that are invalid, much less fraudulent, or that they are having volunteers or paid petition gatherers -- I guess the paid petition gatherers who they're paying to do this, they have absolutely no incentive to do that.

So I do not think that sponsors have any incentive whatsoever to do that.  The process in place is very strict with respect to evaluating these petitions by the Supervisors of Elections prior to HB 1205.

Q.   So your position is if a petition circulator or a sponsor thought they could get away with fraud, they would have no incentive to do it?

I believe your statement is -- correction, let me --

MR. SHAPIRO:  Objection.

(Reporter requested clarification.)

MR. SHAPIRO:  It's mischaracterizing his testimony.

THE COURT:  Overruled.  He can answer.

Let him complete his question and the doctor is free to answer it.  If he disagrees with the proposition, he'll let him know.

BY MR. STAFFORD:

Q.   If I understood your answer to the last time I asked this question, you said that the sponsors have no incentive because one of the reasons is because they -- the fraud would get caught or the petitions would not be verified.

A.   The reason is they want to qualify their measures --

Q.   Right.

A.   -- and so these are not going to go towards that signature threshold that they need to succeed.

MR. STAFFORD:  All right.  Thank you.

MR. MASTORIS:  Your Honor, briefly before we get to redirect.

Before we get to redirect, briefly, I'm just wondering about the timing again.  I'm not sure how long Mr. Shapiro has on redirect.  I'm cognizant of the fact that we have a 5:00 stop.

Mr. Proaño is here.  He's got about 25 minutes' worth of testimony.

THE COURT:  Let's ask him how long he has with redirect.

MR. SHAPIRO:  Your Honor, I can try to keep redirect short, and --

1439
Cross-Examination - Dr. Smith

THE COURT:  I'm not asking you to --

MR. SHAPIRO:  Your Honor, may I --

THE COURT:  It seems like we have a pretty good record, but if there's something you want to cover that's new or needs to be clarified -- it seems to me that, unlike a lay witness, an expert responds and clarifies responses on cross, but if there's something she didn't clarify and you need to clarify, then have him clarify it.

How long do you need?

MR. SHAPIRO:  Perhaps if you will, Your Honor, could you give me just a minute to -- just to see whether -- what I can dispense with?

THE COURT:  Just look at your notes.  We'll take a break.  That'll expedite things.  See, these are things I want to cover.

I'm not cutting anybody off.  I was just making the observation that redirect in a bench trial does not involve repeating points you want to make.  I'm not a jury.  You don't have to do that.  And just -- and just because something's said four times doesn't make me more likely to agree with it.

So -- but if you think there's something you need to clarify that this witness didn't have a chance to clarify, then that's certainly what you ought to do on redirect.

MR. SHAPIRO:  Thank you, Your Honor.

THE COURT:  We'll take a break.

Take a break, come back when you're ready, and we'll try to get the other witness on.

MR. MASTORIS:  Thank you, Your Honor.

(Recess taken at 4:09 PM.)

(Resumed at 4:15 PM.)

MR. SHAPIRO:  Thank you, Your Honor.  We have nothing further on redirect.

THE COURT:  Okay.  Very good.

So you are free to go.

Thank you, Doctor.  It's a pleasure.

THE WITNESS:  Thank you.  Good to see you.

(Dr. Smith exited the witness stand.)

THE COURT:  All right.  So Mr. Klein, who are we going to --

MR. KLEIN:  So we're going to start our case with Juan Proaño, the chief executive officer of the League of United Latin American Citizens, who will testify to the impact of HB 1205 on LULAC and its membership.

His testimony will go to Counts One through Five of the operative complaint, and I'll do everything I can to streamline this.

THE COURT:  All right.  Do we let everybody else go, all the other plaintiffs' witnesses?

MR. MASTORIS:  Yes, Your Honor.

THE COURT:  All right.  There's just -- I can't

imagine we're going to get anybody beyond --

MR. MASTORIS:  I'm pretty sure we're not getting past Mr. Proaño.

THE COURT:  Very good.  Let's bring in the witness.

Thank you.

(Mr. Proaño entered the witness stand.)

**JUAN PROAÑO, PLAINTIFFS' WITNESS, DULY SWORN**

THE COURTROOM DEPUTY:  Please state your name and spell your last name for the record.

THE WITNESS:  My name the Juan Proaño.  The last name is P-r-o-a-n-o.  The "N" is with the tilde.

THE COURTROOM DEPUTY:  Thank you.

DIRECT EXAMINATION

BY MR. KLEIN:

Q.   Good afternoon, Mr. Proaño.

A.   Good afternoon.

Q.   You have your name on the record.

Let's start with what is your current occupation?

A.   I am the chief executive officer of the League of United Latin American Citizens, or commonly referred to as LULAC.

Q.   Okay.  What city do you live in currently?

A.   I live in Miami, Florida.

Q.   Where were you born?

A.   I was born in Miami, Florida.

Q.   Okay.  And for how much of your life have you lived in

Florida?

A.   About half my life.

Q.   Okay.  Can you give us a brief rundown of your career history before becoming CEO of LULAC?

A.   Sure.

     After college I had an opportunity to work at a small technology company.  It was one of the first of ten employees. We grew that company to over 240 employees, raised over $400 million.

     And in 2002, I left to start my own technology company, which I managed for over 20 years before coming on board to be the CEO at LULAC.

Q.   Okay.  And do you also have a background in election work?

A.   I do.  My first client at my company back in 2002 was the Democratic National Committee, and I was charged with building their national voter file.  It was the first voter file of its kind, taking into account over 180 million registered and eligible voters and over 40 years of voting history.

     I went on to do that for the other campaign committees: The DSCC, the DCCC, worked on four presidential campaigns, and hundreds of campaigns out of state at a local, state, and federal level.

Q.   What motivated you to get involved in this line of work?

A.   I am a technologist by trade but very committed to civil rights, and having the opportunity to lead a Latino civil rights

organization was something that was very interesting to me because I felt like I could have an impact both at LULAC and also for our community.

Q. Okay. Let's turn to your position with LULAC.

What are your responsibilities as chief executive officer of the organization?

A. So my responsibilities are to oversee our day-to-day operations, which includes our staff, our finances, our programs, services, advocacy, litigation, and membership work across the country and in Puerto Rico.

Q. Mr. Proaño, can you tell me what LULAC is and what it does?

A. LULAC is the country's oldest Latino civil rights organization. It was founded in 1929 in Corpus Christi, Texas, basically doing the same work that the NAACP was doing in the South, but we were going it in the South and Southwest advocating for Latino civil rights.

Q. How has LULAC's membership grown since you became the CEO?

A. When I came on board in June of 2023, we had about 135,000 members. At the end of 2024, we had more than doubled that to 325,000 members, and at the end of 2025, over 575,000 members. So we have more than almost doubled it every year since then.

Q. Is LULAC active in the state of Florida?

A. We are active in the state of Florida.

Q. Can you tell me a little bit about LULAC's operations in the state?

1444

Direct Examination - Mr. Proaño

A.   Our operations in the state of Florida are very similar to the work that we do across the country.  We have a state director.  We have districts.  We have councils.  Each council has a council president, a secretary, and a treasurer, and we have individual members of those councils.

Q.   So you mentioned a few levels within LULAC Florida.  I want to just briefly go through two of them.  You mentioned a LULAC district.

     So what is a LULAC district?  How is it defined?

A.   A LULAC district is defined really just from a geographic area, which would include counties, for example, or several counties where we have a concentration of councils and members in the state.

Q.   Okay.  And then there are councils within districts; right?

A.   Yes, that's correct.

Q.   Okay.  What is a LULAC council?

A.   A LULAC council is a -- it's a chapter.  It's an association of individuals of like mind and interests that help support our overall mission, and so implementing program services, advocacy work, and also scholarship programs as well at a local level.

Q.   Okay.  What work does LULAC national do with the state LULAC?

A.   So we try and coordinate our efforts across the country.  So we have three board meetings.  Our state directors are part

of our national board meetings.  We have two national convenings:  Our legislative conference every year in Washington, D.C., typically in February, and then our national convention, which moves around the country.  In addition to that, we have virtual meetings where we coordinate our efforts from a programmatic perspective, services and advocacy as well, and then direct contact and discussions with our state leadership, our council presidents, and our individual members.

Q.   Okay.  And are members of LULAC councils also members of LULAC national?

A.   Yes, they are.

Q.   Okay.

     MR. KLEIN:  Mr. Proaño will next testify to LULAC's work on petition circulation prior to HB 1205.

BY MR. KLEIN:

Q.   Mr. Proaño, what work, if any, have LULAC's members done on petition circulation in the state of Florida?

A.   Our members are engaged in petition collection in the immediate past, for example, on the restoration of voting rights for convicted felons and also on the abortion rights initiatives.

Q.   Okay.  So LULAC members in Florida have collected petitions in support of both of those initiatives?

A.   Yes, they have.

Q.   And do local councils also engage in petition circulation

as a group?

A.    Yes, our councils are autonomous from the national operations, so they do have the ability to engage on these initiatives based on their interests and the interests of their members.

Q.    Does LULAC consider petition circulation to be important to its mission?

A.    It's critically important to our mission.

Q.    Okay.  Can you tell me a little bit about why?

A.    So if you go back to the founding of LULAC 97 years ago, in the South there was a lot of racial discrimination.  Latinos were required to pay a poll tax in the state of Texas.  They were kept or barred from public places.  There was segregation in public schools.

And so it has been a key component and one of the key pillars of our work to promote civic engagement from our members and to do litigation work really around the country where our community effectively is under attack.

Q.    Okay.  Turn to petition circulation specifically.

How does petition circulation factor into communicating your organization's message with the public to the extent it does?

A.    It's a critical part.  It's, you know, where we -- our boots are on the ground where we hear firsthand from our community, from our members in regards to the issues that impact

Direct Examination - Mr. Proaño

them, that interest them, and that concern them.

Q.    Next I want to turn to HB 1205.

Are you aware of HB 1205?

A.    Yes, I am.

Q.    How did you become aware of HB 1205?

A.    I think I first heard about it from some of our local leaders that were concerned about the legislation as it was being developed, and we have a public policy and research office in Washington, D.C., that also monitors this at a national level.

Q.    And what is your understanding of what HB 1205 does at a high level?

A.    HB 1205 has added significant restrictions, including requirements for individuals to actually register to be able to collect petitions, limits the ability for individuals to collect more than 25 petitions without registering.  And so it's just added another layer of burden to our members to actually engage in this process.

Q.    Okay.  And you previewed this a little bit, but why did LULAC bring this lawsuit?

A.    Because this is important to our members.  They want to engage, and for some of our members, it's the only way in which they can actually engage in civic participation.

Q.    Is LULAC currently encouraging its members to engage in petition circulation in Florida?

A.    No, we are not.

Q.    Okay.  Was that a conscious decision by the organization?

A.    It was.  It was a conversation that we had with our local leadership, our national president, general counsel and board, and something that, you know, we took a lot of time to think about before we made any final recommendation.

Q.    Can you tell me about what factored into that decision?

A.    A lot factors into it.  You know, first and foremost, the safety and privacy, certainly, of our members.  And so we've had cases for LULAC where some of our members have been targeted and persecuted as a result of their association with us and their work on civic engagement.

Q.    I'm going to turn briefly to the current initiative.  So in the months before HB 1205, early 2025, was LULAC planning to collect initiative petitions for any specific initiatives?

A.    Yes, we were.

Q.    Okay.  Can you tell me which ones?

A.    The Florida Decides Healthcare and the Clean Water initiative.

Q.    Okay.  And can you tell me a little bit about why the Florida Decides Healthcare initiative is important to LULAC?

A.    It's important to LULAC, but it's important to the Latino community across the state.  Florida is a state that over-indexes when it comes to its Latino population.  About 27, 28 percent of the Florida population are Latinos, or about

6.7 million Latinos.

About 16 or 17 percent of that population is uninsured, so you are talking about one in five Latinos in the state of Florida that are uninsured. And when you factor those are that uninsured and underinsured, that actually goes up to about 30 percent. So it is an issue that is of deep concern to our members, especially our elderly members.

Q.   Same question with regard to the Right to Clean Water initiative. Can you tell me why that's important to LULAC?

A.   We have a couple councils that are primarily focused on environmental issues. We've done service programs in the state around Hurricane Milton where our national president came in and convened. We actually have partnerships with FEMA to be able to help displaced immigrant communities, and so this really kind of sort of falls in line with the environmental work that they do.

Q.   Okay. Did your members in Florida have plans to collect petitions in support of these initiatives this year?

A.   Yes, they did.

Q.   What makes you say that?

A.   With our growing membership, we wanted to be strategic. We wanted to be more impactful. And with the leadership change here in the state of Florida with younger, more energized members, they had an interest to do more.

Q.   Okay. And did you hear from the members at all about their plans with regard to these initiatives?

Direct Examination - Mr. Proaño

A.    Yes, I did.  I spoke with many of them.

Q.    Okay.  Can you tell me what you heard?

A.    That they were obviously concerned about, you know, the Clean Water initiative.  They were concerned about access to health care in the state, and they were planning to organize themselves to actually participate.

Q.    Okay.  And what would this participation have looked like?

A.    I mean, the participation would effectively be our councils actually going out into the community as volunteers, and I think that's one of the things that differentiates our organization.

While there are dues-paying members, the dues are nominal. Young councils -- we have youth councils, which are basically high school kids.  They don't pay anything.  We have young adult councils in colleges and universities that pay about $20, and even our adult councils pay anywhere from 50 to $100.  But all the time that they dedicate to the organization is volunteer. They are not compensated for their work.  Generally they'd be going out into the community to collect these petitions.

Q.    Okay.  Thank you.

        MR. KLEIN:  Mr. Proaño will next discuss the noncitizen, nonresident, and registration provisions of HB 1205. This goes to Counts One through Five of the operative complaint.

BY MR. KLEIN:

Q.    Mr. Proaño, do you know what the noncitizen ban is?

A.    Yes, I am aware of it.

Q.   Okay.  What is your understanding of what this provision does?

A.   It restricts any noncitizen from actually collecting any petitions in the state of Florida.

Q.   Okay.  Does LULAC have noncitizen members?

A.   We do have noncitizen members.

Q.   Okay.  And speaking broadly, not just focused on petition circulation, what work do LULAC's noncitizen members do?

A.   Our noncitizen members do the same work that every other member does.  They help with our programs and services.  We have programs for Latino entrepreneurship.  We have programs on health care access, service programs, civic engagement programs.  They raise money for scholarships for college-bound students in the state.

Q.   Mr. Proaño, how would you rate the importance of LULAC's noncitizen members to the organization's overall work?

A.   It's critically important.  You know, LULAC was founded primarily to help Latinos better assimilate into American culture, and so many of our members are longtime citizens, been born here and have multiple generations, but more and more we've actually been growing and expanding with undocumented citizens, which would include folks that have asylee status, refugee status, TPS, or completely undocumented.

Q.   Okay.  And so can you tell us what work -- so I'm going to focus in now on petition circulation in particular.

Can you tell us about what work, if any, LULAC's noncitizen members have done circulating petitions in Florida?

A.    Around the two initiatives on Florida Decides Healthcare and the Clean Water initiative we had done a lot of strategic planning work, so me working with our partners and allies at a senior level, working with the CEO of the League of Women Voters, working with our local leaders to get them educated and informed on these specific issues, and beginning to do trainings with our partners and allies in anticipation of going out and collecting these petitions.

Q.    Okay.  Yeah.  Just to learn a little more about LULAC's noncitizen members, you had mentioned in the past that LULAC's members had circulated for the voting rights restoration initiatives and the reproductive freedom initiatives.

What role did LULAC's noncitizen members play in those, if any?

A.    They're very engaged on these specific issues, and I think it's important to understand the context of our noncitizen members.  In some cases they are part of a mixed-status family, and they have -- you know, they could have children that are U.S.-born citizens, for example, aunts and uncles as well.  And so they're really no different than anyone else other than the fact that they just don't have any legal documentation.

Q.    Okay.  And speaking about LULAC's noncitizens members again, do you have the sense that they have circulated petitions

Direct Examination - Mr. Proaño

in the past?

A.   They have circuited petitions in the past on the two initiatives that we discussed, which are the restoration of voting rights for convicted felons and also abortion rights in the state.

Q.   Okay.  Do you have any sense of whether these members plan to collect petitions in the future?

A.   Absolutely.

Q.   Okay.  So can you tell me a little bit about what you base that understanding on?

A.   Yeah.  It's my job to know what our members are actually doing, what they're thinking, what their interests are.  And I have had a lot of conversations with our members about their intent to be more engaged and, specifically, to go out and actually collect petitions on these two initiatives.

Q.   Okay.  Were there any specific initiatives that these members had referenced an intent to circulate petitions in support of?

A.   The Florida Decides Healthcare and the Clean Water initiative.

Q.   Okay.  Based on your experiences as LULAC's CEO, why is petition circulation important for LULAC's noncitizen members?

A.   It's important because for many of these folks in our community -- I'm not talking about just our members; I'm talking about Latinos in general -- it's the first time that they may

actually hear about it because they may not necessarily be as tuned in to what the media effectively is promoting or discussing on these specific issues.

So our organization does a lot of translation work to make sure that they have the most relevant, up-to-date information on how these issues will actually impact them.  And they're trusted leaders in the community.  LULAC members are teachers; they're police officers; they're elected officials, and they're the individuals that people go to for advice and counsel.

Q.    Okay.  And you've referenced this a little bit, but just to dig in just a small amount more.

What role do noncitizens play in helping LULAC get its message out to Florida voters, if any?

A.    They -- you know, they are our boots on the ground.  You know, they are the first connection that we actually have to the community.  And they go out into their communities where they live and where they work and they try to, again, educate residents, citizens about these issues.

Q.    Okay. How does protecting the rights of noncitizens factor into LULAC's mission?

A.    I mean, it's critically important because this is really one of the only ways in which they actually can participate in our governments.  It's a First Amendment right for them to be able to go out and petition our government.  They can't vote, and so this is one of the ways that they actually can engage.

Q.   So speaking from your experience as LULAC's CEO, you know, do you consider the protection of the rights of a noncitizen as important to LULAC's mission?

A.   Absolutely.

Q.   Can you say more about why?

A.   Again, it's really one of the few ways in which they actually can engage in this process.  And for many of them, these issues are really pertinent to them and their livelihoods.

Q.   Okay.  Turning to another provision, Mr. Proaño, do you know what the nonresident ban is?

A.   Yes, I do.

Q.   Okay.  Can you tell me what you understand it to do?

A.   Essentially, it does not allow any nonresidents to participate in petition collection in the state of Florida.

Q.   How does the nonresident ban impact LULAC's members?

A.   We do have LULAC members that live in Texas, for example, but have homes or second homes in the state of Florida, and they travel back and forth with regularity.  And for those that are typically engaged on these issues, it would restrict them from doing so.

Q.   Okay.  Have any LULAC members who primarily reside in a different state circulated petitions with LULAC in the past?

A.   Yes, they have.

Q.   Can you name a specific example?

A.   Yeah.  Our immediate past national president, Domingo

Garcia, has a home in Fort Lauderdale, Florida.  He and his family come here about six times out of the year for an extended period of time, and he's actually gone out and collected petitions before on the restoration of voting rights for convicted felons and abortion rights as well.

Q.   Okay.  To your understanding, what plans, if any, did Mr. Garcia have to collect petitions in Florida in the future?

A.   He's very supportive of our work, and so his plan was to come to the state of Florida and help join our efforts.

Q.   Okay.  Turning next to the registration requirement, Mr. Proaño, do you know what the registration requirement is?

A.   Yes, I do.

Q.   Can you tell me what you understand this requirement to do?

A.   It requires individuals to actually register with the State, providing their terrestrial information, which includes their address, city, state, phone number, ZIP code.

In addition to that, they have to provide the last four digits of their social security number; they have to present a Florida driver's license ID or some Florida ID, and they have to attest to the criteria, which includes that they are U.S. citizens, that they're residents of the state of Florida, that they don't have any convictions, if you will.  And then they have to sign this registration form --

Q.   And --

A.   -- under penalty of perjury.

Q.   -- is it your understanding, Mr. Proaño, that this requirement only applies to people who collect more than 25 petitions from nonfamily members?

A.   Yes.

Q.   Okay.

A.   That's correct.

Q.   Are you aware of any LULAC members who have collected more than 25 petitions in the past?

A.   I am.

Q.   Okay.  What do you base this awareness on?

A.   On conversations that I've had with our members and leadership in the state.

Q.   Okay.  What's the highest number of petitions you've seen a member collect for a single initiative in Florida?

A.   Hundreds.  It really depends on how much time they're willing to dedicate, if it's a couple of weekends or if it's something that they are committed to and plan to do it even for many months.

Q.   Can you speak to how common it was for this to occur?

A.   It's very common.  Our members are actually very, very dedicated.  We have members that have been members for 30, 40, 50 years.  And it never surprises me to find -- to hear these stories from our members.

Q.   Okay.  Are you aware of any LULAC members who have registered as circulators in Florida?

A.   No, no, no, I am not.

Q.   Are you aware of any who plan to register?

A.   I am not aware of any that plan to register.

Q.   Mr. Proaño, based on your experience as LULAC's CEO, can you tell us why your members aren't registering?

A.   There's a lot of concern, you know, especially with everything that's going on in our country today.  The burdens seem to be too high relative to the requirements to actually register.  Some just oppose the idea of having to register with the State in order to do these petition collections.  And many fear, you know, political targeting and harassment given the fact that this information would be publically available.

Q.   Okay.  So you reference at the end there political targeting and harassment.

     How has this threat of targeting and harassment against LULAC members changed over time?

A.   It's been very direct.  I mean, I get hate mail pretty regularly, phone calls to the office threatening me and my family.  We've had cases of members across the country, one in particular, Lydia Martinez, whose home was raided.  Her computer, cell phone, and her day planner was confiscated, which is where she has her contact and prescription information.  She was taken out at 6:00, 7:00 in the morning in her nightgown in front of her home, in front of her neighbors, in front of her friends, in front of a school where children were actually

Direct Examination - Mr. Proaño

coming and going to school, and publically humiliated.  It is -- it was a national story and *New York Times* cover it.  CBS covered it.  And it wasn't just her.  There were, I believe, 11 arrests on the same day -- or 11 searches and seizures on the same day that occurred.

Q.   So you mention this as an example of retaliation.

What did you understand this to be retaliation for, this specific incident?

A.   So in Lydia's case, she'd been a member for over 40 years.  And Lydia was a schoolteacher.  Her five brothers served in the military.  Her father was a business owner.  And she regularly for years, over a decade, has gone out and registered senior citizens.  That is something that she's done for LULAC for a very long time.  And the charge effectively was that she took money for gas and money for food while she went out and did this volunteer work.

Q.   Okay.  What are some other fears that LULAC members have communicated to you about third-party harassment or retaliation?

A.   Some of our members are, you know, diehard LULAC members, and they put it out there.  They put it on their social media.  They post about it.  Some of them are more quiet and considerate about their association with our organization but supportive, effectively, all the same.

But some of the things that we do is we work really hard to protect the privacy of our members.  Our membership list is not

public.  It's not something that we actually publish.  We do not collect information about the immigration status of any of our members.  And they're concerned that it could potentially be publically available.

Q.   And, Mr. Proaño, briefly, aside from this lawsuit, what has LULAC done to respond to HB 1205?

A.   Yeah.  We've worked to educate our members, you know, preparing them in anticipation that they could go out and do really good and important work in the community.  But we've also, you know, taken extra time to counsel them and make sure that, you know, no one puts themselves in, you know, legal jeopardy as a result, so a lot of education work.

Q.   Okay.  And have you in your role as LULAC CEO thought about what LULAC would do if it is successful in this lawsuit?

A.   We would double our efforts to actually go out and participate in this process.  I think it's an important process. I was born here.  I was raised here.  I have three children, two that go to public schools here, a mother, my brother, sisters -- I have a large family in the state that this also would impact them directly.

Q.   Okay.  Now going to the members and their work on circulating petitions, if LULAC is successful in this lawsuit, what do you think it would do to these members' willingness to circulate petitions?

A.   I think that they would be very excited to actually be able

to go back out into the community and do this work.

MR. KLEIN:  Okay.  That -- I pass the witness.

THE COURT:  Since nobody else is going to ask, I'm going to ask.

What happened to Ms. Martinez?

THE WITNESS:  She was never charged.  She still has not received her laptop, phone, and/or planner.  Attorney General Paxton has been very forceful in his efforts.  There were actually three arrests yesterday, and those arrests included not just community leaders, it also included elected officials and judges.

THE COURT:  And did I -- maybe I didn't recollect.

Ms. Martinez, this great threat in the state of Texas, she was, like, 87 or something?

THE WITNESS:  That's right.  She's 87 years old.

THE COURT:  Counsel, you may begin your cross-examination.

MR. RABAN:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. RABAN:

Q.   Good afternoon, Mr. Proaño.  How are you?

A.   Good afternoon.

Q.   So, Mr. Proaño, I believe you just testified that LULAC has a lot of members; correct?

A.   We do.

Q.    As of 2025, I think you had reached somewhere over the threshold of 575,000 members nationwide?

A.    Yes, that's correct.

Q.    Does LULAC maintain a membership?  I believe you said it does.

A.    We do.

Q.    Does this membership distinguish between LULAC members who are citizens of the United States and those who are not?

A.    No, we do not ask for, require, or store that information.

Q.    Okay.  Does it distinguish between LULAC members who are residents of the state of Florida versus those who are not residents of the state of Florida?

A.    We do have information relative to their residency, yes. We know which states and which councils they are associated with.

Q.    So if I'm understanding correctly, if I am a member of one of the councils in a state, it's assumed that I'm a resident of the state; correct?

A.    Yes.

Q.    But there isn't anything other than that to verify whether or not they actually have state residency?

A.    Other than collecting their home address and information in regards to their location.

Q.    Understood.

     Do you know how many of your members are noncitizens?

A.   No, I do not have a number on the number of noncitizens.

Q.   Do you know how many of your LULAC members are non-Florida residents?

A.   I have a count of the number of members that we actually have that are in the state of Florida, and I have a count of members on a state-by-state basis.

Q.   And, again, that would be based on the address that they have on file as a result of their membership --

A.   That's correct.

Q.   -- not necessarily their status as a resident of that state; correct?

A.   That is correct.

Q.   LULAC doesn't conduct background checks on people who want to become members, does it?

A.   No, we do not.

Q.   And LULAC doesn't know how many of its members are convicted felons; correct?

A.   No, we do not.  But we do have an oath that our members take that they will be good public citizens and that they will obey the law.

Q.   And that's an oath they take at the time they become members?

A.   Yes, it is part of our membership rule and guidelines, and we also publish a membership handbook as well.

Q.   Are they required to disclose to LULAC if, after making

that oath, they have subsequently been convicted of a felony?

A.    No, they are not.

Q.    And if they had been convicted of a felony prior to making that oath, are they required to disclose that felony to you?

A.    No, they are not.

Q.    So LULAC doesn't know if any of its members are felons; correct?

A.    As a national organization, we do not track that information.  But I will tell you that the way that the organization is structured in that we have these national convenings where we see each other, right?  We'll, have 7,000 to 8,000 members come to our national convention.

Q.    Sure.

A.    We have state conventions where our members will regularly meet.  We have council meetings where they will regularly get together.  We know these folks.  They are not just somebody on someplace in the ether.  We know them all and we know them by name, and we know their stories and we know their backgrounds.

Q.    Understood.

And this is more just for clarification:  There's a membership list, and it doesn't distinguish between, you know, U.S. citizenship -- we've established that -- or residency -- we've established that -- or whether they've been convicted of a felony.

But based on your interaction with members, you know some

who perhaps may fit one of those categories; correct?

A.    I'm sure there may be some.  I don't know any, but there may be a few.

Q.    Thank you.

And this line of questions is for clarification, for my understanding.

So LULAC had participated in citizen initiatives prior to the Florida Decides Healthcare and the Right to Clean Water initiatives; correct?

A.    Yes.

Q.    In the state of Florida?

A.    Yes.

Q.    And did I understand your testimony earlier when you said that in connection with those prior initiatives, LULAC members were collecting petitions in the state of Florida?

A.    Yes, that is correct.

Q.    Is that LULAC national members who came in to circulate petitions, or was that unique to just Florida members?

A.    Those are local members and initiatives taken on by our local leaders and councils.

Q.    Okay.  I believe -- and, again, this is for clarification. I believe during your deposition that you testified that prior to the Florida Decides Healthcare initiative that LULAC had not circulated petitions in the state of Florida.

Do you recall that statement?

A.    I do not recall that statement.

          MR. RABAN:  Okay.  Can we pull up Mr. Proaño's transcript, please?

          Let's go to page 25.

          THE WITNESS:  Yes, I have glasses.

          THE COURT:  You can put them on.

          THE WITNESS:  Thank you.

BY MR. RABAN:

Q.    Actually, so let's look at -- let's look at line number 9 --

A.    Uh-huh.

Q.    -- through 13.  It says -- referring to a paragraph in a complaint -- *Although LULAC has never directly collected petitions in Florida before.  This year they plan to mobilize its members to gather signatures for the Florida Medicaid expansion initiative.*

      So the way that I interpret that is that prior to the Florida Decides Healthcare initiative that LULAC had not directly collected petitions in Florida before.

      (Indiscernible crosstalk.)

A.    Sorry about that.  LULAC national has not, but that doesn't mean that our local LULAC members and councils haven't.

      I was speaking on behalf of LULAC national.

BY MR. RABAN:

Q.    Okay.  So understood.  So that helps clarify.

So your testimony is that you had engaged in petition circulation efforts, but only at the state level, not at the national level?

A.    That is correct.

Q.    Okay.  Thank you for clarifying.

And I believe it was -- tell me if you would agree with this statement:  That the local districts or the local councils have the authority to act pretty autonomously from the national organization.

Would you agree with that statement?

A.    100 percent.

Q.    So when the state council in Florida decides to support a citizen initiative, LULAC's national leadership doesn't necessarily need to approve that decision?

A.    That is correct.

Q.    Mr. Proaño, LULAC requires its volunteers to receive training before it allows them to collect petition; is that right?

A.    Yes, that is correct.

Q.    And this training includes mandatory training on the legal requirements for gathering petitions in the area that they are being gathered; correct?

A.    Yes.

Q.    And you would agree that volunteers shouldn't be allowed to go out and collect petitions until they know what the legal

requirements are; correct?

A.    Yes, that's correct.

Q.    Are you also aware that HB 1205 requires petition circulators to receive training?

A.    I am aware of that.

Q.    And that the State provides this training for free?

A.    I am aware of that.

Q.    You had mentioned earlier as part of your testimony that petition circulation is critical to LULAC's mission.

      Do you recall that?

A.    I do.

Q.    So are there any states in the United States that LULAC doesn't currently engage in petition-gathering efforts?

A.    That doesn't?

Q.    That does not.  Are there any states where LULAC does not currently engage in petition gathering?

A.    It varies on the states and the regulations in each state. So in Texas there aren't any statewide petitions, but there are local initiatives that occur.  California, there are statewide initiatives.  So it really depends on the state.

Q.    So, for example, if New Mexico was a state that didn't permit petition circulation or petition-gathering efforts, then you certainly wouldn't be engaged in petition-gathering efforts in that state; correct?

A.    That's correct.

Cross-Examination - Mr. Proaño

Q.   But do you have members that are in states like New Mexico and, like, in Texas?

A.   We do, yes, of course.

Q.   You testified that many LULAC volunteers are concerned about sharing their personal information; correct?

A.   Yes, I did.

Q.   Personal information, would that include the last four digits of their social security number perhaps?

A.   Their date of birth and their address as well, yes.

Q.   Is the reason why you believe that they are concerned is because some volunteers are either not U.S. citizens or they have family members or friends who are not U.S. citizens?  Is that correct?

A.   No, not -- no, not at all.  I'm concerned that they are actually now required to do so when previously they were not. It was a much more open process where they could engage.  But I am concerned about the use of the data and the availability of that data publically to third parties.

Q.   And specifically for why, I guess?

A.   I think at this point, certainly from a technology perspective, any data that you put -- make publically available is susceptible to any third-party bad actor that could potentially use it for fraud, you know, that would use it for scams, if you will, and our members would be highly susceptible to that.

Q.   So that fear of sharing that personal information isn't necessarily tied to whether they are a citizen or not, it's just the fear of having that information in the public in general?

A.   That is correct.

Q.   Do you know if there are any LULAC members who have a driver's license in the state of Florida?

A.   Of course.

Q.   Do you know whether or not it's required to obtain a driver's license for you to divulge your social security number as part of that process?

A.   One more time?

Q.   It could have been a much better question.

A.   Yeah.  Sorry.

Q.   So you are aware that there are members of LULAC who have Florida's driver's licenses; correct?

A.   I have a Florida driver's license, yes.

Q.   Okay.  As part of your application to obtain a Florida's driver's license, were you required to provide your social security number?

A.   I don't recall that I had to provide my social security number.

Q.   If it was a requirement to get a license to drive, would you have provided the Department of Motor Vehicles with that information?

A.   If it was a law and I was required to do so.  I believe I

Cross-Examination - Mr. Proaño

was only required to show residence.

Q.   And you could have chosen not to obtain a driver's license; fair?

A.   I think I need a driver's license to be able to conduct what I do on a regular basis, including taking my children to school.

Q.   I would like for there to be a day where I didn't have to drive and somebody drove me around.  But understood.

So are you -- are you aware of any members -- LULAC members who are registered to vote in the state of Florida?

A.   Yes, I am.

Q.   Do you know whether or not in order to register to vote in the state of Florida you need to provide the last four digits of your social security number?

A.   I am not aware of that.  I know you have to show your Florida identification.  But my driver's license does not have my social security -- last four digits of my social security on it.

Q.   If it was required to provide the last four digits of your social security number, would you still be willing to register to vote?

A.   It's a hypothetical.  I don't believe it should be required.  But for me, certainly voting is really important, and I am registered in the state.

MR. RABAN:  Your Honor, may I confer with counsel?

THE COURT:  Certainly.

(Discussion between the attorneys.)

MR. RABAN:  Mr. Proaño, thank you so much for your time.  I don't have any other questions for you today.

THE WITNESS:  Thank you.

MR. RABAN:  Your Honor, I'll pass the witness.

MR. KLEIN:  I would like to do some very brief redirect, if that's all right.

REDIRECT EXAMINATION

BY MR. KLEIN:

Q.   Mr. Proaño, my friend on the other side asked about the state-mandated training under HB 1205.

Do you recall that?

A.   Yes, I do.

Q.   And he also asked about the training that LULAC gives which is also mandatory; right?

A.   Sure.

Q.   What are your thoughts on the necessity of such a state-mandated training in light of the training that LULAC does for its members already?

A.   Well, LULAC does training in English and Spanish, so my first question would be is does the State actually have training in English and Spanish and provide all the materials in both languages?  In addition to that you have very large communities of Haitians and Creole and many languages that can potentially

Redirect Examination - Mr. Proaño

require support for folks that want to go out and collect these ballot initiatives.

Q.   And so do you consider this training to be -- do you consider the state-mandated training to be necessary in light of trainings that LULAC does?

A.   I think anything that is required by the State where it has government oversight -- because I would imagine you would have to register for the training, in addition to actually registering to actually collect the ballot petition, are a -- too much governance, too much oversight, too much government involvement in what really should be a First Amendment right.

Q.   Okay.  My friend on the other side also asked about the process for obtaining a driver's license in the state of Florida.

    Is it your understanding that to obtain a driver's license you need to disclose personal information like the last four of your Social and address on a form that's published on a website?

A.   I am not familiar with that.  And I did not know -- I do not believe that my driver's license information is available publically.

Q.   Okay.  Do you believe -- strike that.

    Mr. Proaño, is it your understanding that this information, upon obtaining a driver's license, would be published alongside causes that you support?

A.   Absolutely not.

1474

Redirect Examination – Mr. Proaño

MR. KLEIN:  Okay.  If I may have just a moment.

(Pause in proceedings.)

MR. KLEIN:  I have no further questions.

Thank you.

THE COURT:  Thank you.

Thank you for coming, sir, and I'm sorry to keep you waiting so long.  We didn't expect the first witness to last that long.

You have a safe travel home.

(Mr. Proaño exited the courtroom.)

THE COURT:  All right.  Briefly -- and "briefly" being the focus -- we've gotten through 16 witnesses.  It's my understanding we have nine more, I believe?

We don't have to -- don't give me an exact number.  That's --

MR. MASTORIS:  I figured they could all go today, Your Honor.

THE COURT:  There's also a holding cell waiting for you, Counsel, downstairs.

MR. MASTORIS:  Fair enough.

THE COURT:  So we are going to start promptly on Tuesday at 8:30.

Is there anything that anybody needs to tell me now quickly?

MR. JAZIL:  Your Honor, I was hoping we would get an

updated list from the plaintiffs on the witness order at some point.

THE COURT:  They have got a requirement from me to do that every evening, so nothing has changed.  I didn't withdraw my order.

MR. JAZIL:  Thank you, Your Honor.

THE COURT:  Y'all are going to -- I can, though -- we normally do it -- I forgot what time I put and I'm not going to pull up the order.

So somebody just tell me, when are you going to post it online, your witness list?

MR. MASTORIS:  I think we should be able to do that by Monday, if that's all right with defendants.

MR. JAZIL:  A day sooner would be better.

MR. MASTORIS:  Sorry.  We have all the names.  That's not a secret.  I think you have those already.  I think it's just the order we have work to out.  We'll try to do so as expeditiously as possible.

THE COURT:  Why don't you do this:  Why don't you re-file the list of remaining witnesses, one, with an asterisk that says, We may need to shuffle the witnesses.  And then it seems to me by Monday morning at 10 you can identify the order of witnesses.  Okay?

MR. MASTORIS:  That shouldn't be a problem.

Thank you, Your Honor.

THE COURT:  All right.

Other than Mr. Jazil, anybody else have any urgent business they need to bring before me before we break for the weekend?

Hearing nothing, I hope y'all have a pleasant weekend and enjoy your Valentine's Day, and I'll see you back on Tuesday at 8:30.

Court is in recess.

(Proceedings recessed at 5:04 PM on Friday, February 13, 2026.)

* * * * * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. Any redaction of personal data identifiers pursuant to the Judicial Conference Policy on Privacy is noted within the transcript.

/s/ Megan A. Hague                          2/13/26

Megan A. Hague, RPR, FCRR, CSR
Official U.S. Court Reporter

**I N D E X**

PLAINTIFFS' WITNESS                                    PAGE

DANIEL A. SMITH
Direct Examination By Mr. Shapiro                      1249
Cross-Examination By Mr. Raban                         1378
Cross-Examination By Ms. Price                         1398
Cross-Examination By Mr. Bardos                        1420
Cross-Examination By Mr. Stafford                      1436

JUAN PROAÑO
Direct Examination By Mr. Klein                        1441
Cross-Examination By Mr. Raban                         1461
Redirect Examination By Mr. Klein                      1472

**E X H I B I T S**

| PLAINTIFFS' EXHIBITS | OFFERED | RECEIVED |
|---|---|---|
| FDH-43 | 1244 | 1244 |
| FDH-44 | 1303 | 1303 |
| FDH-46 | 1365 | 1365 |
| FDH-47 | 1365 | 1365 |
| FDH-61 | 1244 | 1244 |
| FDH-64 TO 65 | 1244 | 1244 |
| FDH-67 TO 69 | 1244 | 1244 |
| FDH-77 | 1244 | 1244 |
| FDH-80 TO 83 | 1244 | 1244 |
| FDH-243 | 1244 | 1244 |
| FDH-247 | 1244 | 1244 |
| FDH-397 | 1244 | 1244 |
| FDH-401 | 1244 | 1244 |
| FDH-444 | 1244 | 1244 |
| FDH-446 TO 447 | 1244 | 1244 |
| FDH-487 TO 492 | 1244 | 1244 |
| FDH-507 | 1244 | 1244 |
| FDH-513 TO 515 | 1244 | 1244 |
| FDH-517 | 1244 | 1244 |
| FDH-564 | 1244 | 1244 |
| FDH-571 TO 578 | 1244 | 1244 |

| PLAINTIFFS' EXHIBITS (cont'd.) | OFFERED | RECEIVED |
|---|---|---|
| FDH-580 | 1244 | 1244 |
| FDH-582 | 1244 | 1244 |
| FDH-594 | 1244 | 1244 |