**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

FLORIDA DECIDES HEALTHCARE, INC,)
et al.,                        )
                               )
            Plaintiffs,        ) Case No: 4:25cv211
                               )
        v.                     ) Tallahassee, Florida
                               ) February 13, 2026
CORD BYRD, in his official     )
capacity as Secretary of State )
of Florida, et al.,            )
                               ) 1:36 PM
            Defendants.        )
_____)

**TRANSCRIPT OF OFFER OF PROOF PROCEEDINGS – BENCH TRIAL**
**TESTIMONY OF DR. DANIEL SMITH**
**BEFORE THE HONORABLE MARK E. WALKER**
**UNITED STATES CHIEF DISTRICT JUDGE**
**(Pages 1 through 34)**

Court Reporter:            MEGAN A. HAGUE, RPR, FCRR, CSR
                           111 North Adams Street
                           Tallahassee, Florida 32301
                           megan.a.hague@gmail.com

          *Proceedings reported by stenotype reporter.*
      *Transcript produced by Computer-Aided Transcription.*

**APPEARANCES:**
**For Plaintiffs Florida Decides Healthcare:**

King Blackwell Zehnder & Wermuth PA
By:  FREDERICK STANTON WERMUTH
     QUINN RITTER
     Attorneys at Law
     fwermuth@kbzwlaw.com
     qritter@kbzwlaw.com
25 East Pine Street
Orlando, Florida 32801

Elias Law Group
By:  BEN STAFFORD
     Attorney at Law
     bstafford@elias.law
1700 Seventh Avenue
Suite 2100
Seattle, Washington 98101

Southern Poverty Law Center
By:  AVNER MICHAEL SHAPIRO
     KRISTA A. DOLAN
     Attorney at Law
     avner.shapiro@splcenter.org
     krista.dolan@splcenter.org
3710 Raymond Street
Chevy Chase, MD 20815

Elias Law Group
By:  HARLEEN K. GAMBHIR
     Attorney at Law
     hgambhir@elias.law
250 Massachusetts Avenue
Suite 400
Washington, DC 20001


**For Intervenor Plaintiff Safe & Smart:**
Stearns Weaver Miller
By:  GLENN BURHANS, JR.
     HANNAH E. MURPHY
     CHRISTOPHER R. CLARK
     Attorneys at Law
     gburhans@stearnsweaver.com
     hmurphy@stearnsweaver.com
     crclark@stearnsweaver.com
106 East College Avenue, Suite 700
Tallahassee, Florida 32301

**APPEARANCES (cont'd):**

**For Intervenor Plaintiff League of Women Voters of Florida:**

                              Democracy Defenders Fund
                              By:  SPENCER KLEIN
                                   JACOB KOVAS-GOODMAN
                                   Attorneys at Law
                              pooja@statedemocracydefenders.org
                              spencer@statedemocracydefenders.org
                              jacob@democracydefenders.org
                              600 Pennsylvania Avenue SE
                              Unit 15180
                              Washington, DC 20003

                              Winston & Strawn, LLP
                              By:  GEORGE E. MASTORIS
                                   TYLER MATTHEW DATO
                                   SAMANTHA I. OSAKI
                                   NATHAN C. GREESS
                                   JOHANNA RAE HUDGENS
                                   Attorneys at Law
                              gmastoris@winston.com
                              tdato@winston.com
                              sosaki@winston.com
                              ngreess@winston.com
                              jhudgens@winston.com
                              200 Park Avenue
                              New York, New York 10166


**For Intervenor Right to Clean Water:**

                              Campaign Legal Center
                              By:  ROBERT BRENT FERGUSON
                                   HEATHER JEAN SZILAGYI
                                   ELLEN MARGARET BOETTCHER
                                   ALEXIS DENAE GRADY
                                   WILLIAM "LIAM" KYLE HANCOCK, III
                                   MELISSA LAUREN NEAL
                                   Attorneys at Law
                              bferguson@campaignlegalcenter.org
                              hszilagyi@campaignlegalcenter.org
                              eboettcher@campaignlegalcenter.org
                              agrady@campaignlegalcenter.org
                              whancock@campaignlegalcenter.org
                              mneal@campaignlegalcenter.org
                              1101 14th Street NW
                              Suite 400
                              Washington, DC 20005

**APPEARANCES (cont'd):**

**For Defendant James Uthmeier:**

                        Florida Attorney General's Office
                        By:  WILLIAM STAFFORD, III
                             SARA SPEARS
                             MARYSSA SAVANNAH-LYNN HARDY
                             Attorneys at Law
                        sara.spears@myfloridalegal.com
                        william.stafford@myfloridalegal.com
                        maryssa.hardy@myfloridalegal.com
                        119 South Monroe Street, Suite 500
                        Tallahassee, Florida 32301


**For Defendant Cord Byrd:**

                        Holtzman Vogel Baran, et al.
                        By:  MOHAMMAD O. JAZIL
                             MARTIN C. WOLK
                             RANDALL M. RABAN
                             Attorneys at Law
                        mjazil@holtzmanvogel.com
                        mwolk@holtzmanvogel.com
                        rraban@holtzmanvogel.com
                        119 South Monroe Street, Suite 500
                        Tallahassee, Florida 32301

                        Florida Department of State
                        By:  ASHLEY DAVIS
                             General Counsel
                             ashley.davis@dos.myflorida.com
                        R.A. Gray Building
                        500 South Bronough Street
                        Tallahassee, Florida 32399


**For Defendant Intervenors Republican Party:**

                        Shutts & Brown, LLP
                        By:  TARA PRICE
                             BENJAMIN GIBSON
                             Attorneys at Law
                             tprice@shutts.com
                             bgibson@shutts.com
                        215 South Monroe Street
                        Suite 804
                        Tallahassee, Florida 32301

**APPEARANCES (cont'd):**

**For Defendant Supervisors of Elections:**

                          GrayRobinson PA
                          By:  ANDY V. BARDOS
                               JAMES T. MOORE JR.
                               Attorneys at Law
                               andy.bardos@gray-robinson.com
                               tim.moore@gray-robinson.com
                          301 South Bronough Street
                          Suite 600
                          Tallahassee, Florida 32301

**P R O C E E D I N G S**

(Call to Order of the Court at 1:36 PM on the  13th day of February, 2026.)

MR. SHAPIRO:  I'd like to, Mr. Livingston, if you can, put up Plaintiffs' Exhibit Number 48.

PROFFER DIRECT EXAMINATION

BY MR. SHAPIRO:

Q.   Now, Dr. Smith, as part of your investigation into the motives of the elected officials and sponsors for enacting HB 1205, did you develop this table here?

A.   Yes.

Q.   And what does it show?

A.   It shows my analysis of data that I collected between January 1, 2023, through mid-June 2025 of tweets and retweets of Republican lawmakers and other elected officials having to do broadly with direct democracy issues.

Q.   And what's the significance of what you found here?

A.   What I did was take these 196 tweets that I was able to identify with -- legislators with publically available Twitter accounts on X.com that fell within these dozen or so terms that I identified as being linked to direct democracy, ballot issue, amendment, and so forth.

I coded them as to whether or not they dealt with issues of fraud in the direct democracy process, whether they were opposed broadly to the initiative process, or whether they were opposed

specifically to Amendments 3 and 4, which were on the November 2024 ballot.

And then I separated them in terms of the timeliness of the tweets as to whether or not they happened in the period prior to Ron DeSantis's post on Twitter, on X, on January 27, 2025, immediately prior to the legislative session, and those that happened after that period, during this period from 2023 through -- January through June of 2006 --

Q.   What are you --

A.   -- 2025.  I'm sorry.

Q.   And, Doctor, what are you finding?

A.   Well, it's quite clear from this Table 4 that I identified zero tweets from these elected officials prior to Governor DeSantis's own tweet that dealt with concerns over broadly understood petition fraud here in Florida.

The balance were substantively opposed to either the legalization of recreational marijuana, Amendment 3, or the reproductive rights, Amendment 4, 81.4 percent of those 172 prior to his tweet, or the balance were broadly opposed to direct democracy of the initiative process.

After that period of time and Governor DeSantis's tweet, in those subsequent six months or so, we see the percentage change dramatically where suddenly these same Republican officials, elected officials, were much more concerned about petition fraud, something that they expressed no interest, including

Governor DeSantis, prior to that January 27th tweet.

70.8 percent were over concerns about petition fraud, and the balance were either opposed to the substance of 3 and 4, those amendments on the November ballot, or opposed broadly to the initiative process.

MR. SHAPIRO:  Mr. Livingston, if you could please display the first page of what's been marked as FDH Plaintiffs' Exhibits 49 to 58.  It's a series of exhibits, and if you could just show the first page.

And if I may approach the witness, Your Honor, with a stackful of exhibits?

THE COURT:  You may.

MR. SHAPIRO:  Thank you.

BY MR. SHAPIRO:

Q.   Do you recognize those ten documents?

A.   Yes.

Q.   And what are they?

A.   They are screenshots of Twitter posts from these Republican officials that I mentioned.  I would note that I see that I have a typo on the first one.  It's a -- not a state Senator.  She's a state member of the House of Representatives.  It's correct in the text of the document.

But, yes, these are tweets that are selected from these 172 tweets prior to the pronouncement.

Q.   And did you obtain them from sort of downloading them?

A.    Yes, I downloaded all these tweets, including the others, from X.com through their public access.

Q.    And do experts in your field reasonably rely on these types of prime sources?

A.    Yes.  X.com, formally Twitter, is one of many social media platforms that political scientists use to understand motives, policy positions, and other issues with respect to their role as a lawmaker.

Q.    And what is it do you think these tweets show?

A.    Well, I think it's very clear that prior to that January 27, 2025 tweet where Ron DeSantis spoke very strongly about fraud in the initiative process -- and that's Exhibit Number 56, I believe -- *We can't allow rampant fraud to affect Florida's petition process*, that these Republican lawmakers and officials did not have a similar concern prior to that singling by the Governor.

Q.    What's the relevance of a few tweets by a relatively small number of individuals?

A.    Well, I did collect all the tweets from all the public accounts, some 110 individuals who had public accounts.  So it's not necessarily a small number.

I am showing these because these were examples of these individual lawmakers expressing a hostility towards direct democracy, either towards the substantive content of Amendment 3 and 4, which were on the ballot in 2024, November, or against

Proffer Direct Examination - Dr. Smith

the direct democracy process and ballot initiatives more generally.

MR. SHAPIRO:  And I should have said these are all being moved into evidence conditional to the proffer.

THE COURT:  The proffer exhibits are all going to be bundled together.  And you are going to have to tell me what the proffer exhibits are, and they are going to be segregated just like we segregate court exhibits, etc.

THE COURT REPORTER:  So admit them?

THE COURT:  So they are admitted for proffer only.

THE COURT REPORTER:  Thank you.

THE COURT:  And so you just sought to admit 49 through 58 for proffer only; correct?

MR. SHAPIRO:  Correct.  And before that it was 48.

THE COURT:  So 48 is admitted for proffer only, and 49 through 58 are admitted for proffer only.

(PLAINTIFFS' EXHIBITS FDH-48 to 58:  Received in evidence.)

MR. SHAPIRO:  And, Your Honor, if I may approach, I have another stack of documents?

THE COURT:  Certainly.

MR. SHAPIRO:  Mr. Livingston, if you would display the first exhibit in that bundle.  It's FDH Plaintiffs' Exhibits 61 to 69.

THE COURT:  61 through 69 are admitted for proffer only.

(PLAINTIFFS' EXHIBITS FDH-61 to 69:  Received in evidence.)

BY MR. SHAPIRO:

Q.   Dr. Smith, can you recognize that batch of documents?

A.   Yes, I do.

Q.   What are they?

A.   They are documents that I compiled for my October expert report.  They are my transcriptions from the audiovisuals provided by the Florida channel of legislative hearings, be they committee or on the floor, in both the House and the Senate in the 2025 legislative session.

THE COURT:  Counsel, can I see -- do you have 48 real quick?

I didn't get 48.

And just so we have a complete record, I'm looking at Exhibit 48, which are the -- I'm going to call them tweets.  There were a total of 196 tweets; correct?

THE WITNESS:  Correct.

THE COURT:  And I know you said you checked 110 public accounts.  Let's start with the big number.

How many members of the -- and these were 110 public accounts of only the majority, or 110 accounts of both the majority and the minority?

THE WITNESS:  Just the majority.  My exhibit has disappeared, but, yes, that's correct.

THE COURT:  So it's just the majority.

THE WITNESS: Just the majority, legislators and other statewide-elected officials.

THE COURT: All right. Well, that makes it -- do you know how many -- you checked 110 that would include members of the majority. But the Senate House and other statewide -- do you know how many members -- Republican members of the Senate there were, how many members of the House, and how many other statewide, so the total number of people?

THE WITNESS: Yes. I can tell you that there were 20 who made publically out of those 110. These 196 come from 20 individuals who have publicly available X accounts.

We can do it by substraction, the statewide officials who, if I recall correctly, which I think I do, who made pronouncements for Governor DeSantis, Attorney General Uthmeier, and Secretary -- no, I don't think I included Secretary of State Byrd because I included only elected officials. So it would have been those two.

THE COURT: All right. And how many -- so 2 of the 20. And then the other 18 were different House members and Senators?

THE WITNESS: Correct.

THE COURT: And do we know -- what's the -- and I can look it up and take judicial notice. Can somebody tell me, in that legislative session -- because I guess this would have been the folks that were elected -- and the timeframe is confusing to

me, because the session would have been in the spring, and so we said it was after the Governor starting talking in January before the session later in 2025.

When you say "before," what period from before?

THE WITNESS:  Yeah.  This is a good point.  I'm including anyone over this period of time from January 1st, 2023, through June -- I don't remember the exact date -- sometime in mid-June when session ended in 2025.

THE COURT:  Right.

THE WITNESS:  So you're absolutely correct.  This includes people who were elected officials prior to the 2024 general election, and those who may have won office and started in the legislative session in January 2025.

THE COURT:  But just to put some things in perspective, I have got two statewide individuals that are commenting in terms of the Senate and House.

Do you know what the composition in 2025 was of the State House and Senate in terms of dividing along party likes?  It's something I know we can pull up quickly, I'm sure.

THE WITNESS:  Sure.  I don't have the exact numbers in front of me, but of the 40 senators, there were somewhere around 30 Republicans.  Don't quote me exactly on this.

On the House side, of the 120 House members, there was somewhere around 81, 82.  I don't know exactly, but it's in that general --

THE COURT:  So we had approximately 110, plus or minus, Republican members of the Senate and House, and you had tweets from approximately 18 of them.

THE WITNESS:  Correct.

THE COURT:  And I didn't do the numbers, but when you go through the 196 tweets, are a large number of them attributable to the same people?  So, for example, he's now in Washington, but now Congressman Fine is a rather sort of Chatty Cathy, so one could see where maybe 195 of the 196 tweets could have belonged to him, not that he was the one commenting on this.

But do you have any idea of the 196 tweets, were a lot of them focused on just a handful of those 20?

THE WITNESS:  Repeat tweeters?

THE COURT:  Yes.

THE WITNESS:  Twitterers?

THE COURT:  Yes.

THE WITNESS:  Yes.  It was not evenly distributed across them.  You are absolutely correct, that there were some individual who were more likely to be expressing generally on Twitter and specifically about the initiative process.

THE COURT:  And some of the tweets would have been for people that were not -- were in 2023 and 2024, who may not have been in the Senate or the House in 2025; correct?

THE WITNESS:  That is certainly a possibility.  And I

don't have data on that.  That's a very interesting and good point.

THE COURT:  Okay.  No problem.  I just wanted to make sure I knew what the lay of the land was in that regard.

Go ahead.

Counsel, you may proceed.

All those proffered exhibits have been admitted.  And I'm holding the copy to give to the clerk, and that will be what she segregates and calls composite exhibits for proffer.

BY MR. SHAPIRO:

Q.   Dr. Smith, going back to that last bundle I provided you of exhibits, FDH Exhibits 61 through 69, how did you select these legislative statements?

A.   Yes.  I selected these legislative statements with respect to statements on the Floor or in a committee hearing in the House and the Senate in the 2025 legislative session that dealt with HB 1205 or its companion bills in either chamber.  They were selected because they stood out to me as deviations from what was clearly the leadership in both the House and the Senate from Republican leaders to sing from the same hymnal, which was, we need to regulate the initiative process because of fraudulent activities in petition gathering.

Q.   And, Doctor, in your experience as an expert who has experience analyzing the legislative record, how relevant are these examples of deviations from what you described as the

hymnal?

A.   I think they are very illustrative, because state legislators, particularly, especially those that have a very strong leadership, which Florida is a case in point, make sure that their members stay in line.  Johnnie Byrd, the former Speaker of the Florida House, referred to his flock of Republicans as "sheep."  They stayed in line.  And if they didn't, they got an office down in the basement of the State Capitol.

It is a very strongarm tactic to make sure on priorities, especially those of the Governor, for members to stay focused on what the hymnal or the playbook is.  In this case it was fraud.

Q.   Doctor, do experts in your field reasonably rely on these types of prime sources in forming opinions?

A.   Yes.

Q.   And very briefly, if you can very briefly summarize what these exhibits tell you about the motives of these legislators.

A.   Sure.

First of all, I think it's quite clear that these get to the motive, perhaps hidden behind the rhetoric coming from Governor DeSantis that the need to regulate the initiative process in 2025 was fraud.  And fraud of petition gatherers was only one of the stated goals.  We can see quite clearly, both prior to the legislative session and then even during the legislative session, that some members were openly hostile to

the initiative process, openly hostile to citizens using the initiative process to amend the Constitution, something that the State Constitution guarantees them the right to do, or they were hostile towards direct democracy itself and the substantive measures of those issues, in this case the legalization of recreational marijuana and reproductive rights.

So both in principle hostility and hostility towards the equal -- towards those two measures that were on the ballot and that got 57, roughly, percent of the vote. And it gets to the motivation. It also gets to the fact that, you know, when you have a supermajority, when you have this cartel interest -- in this case, Republicans control the process. If they wanted to put measures on the ballot, they have supermajority power to be able to do so, constitutional amendments. They don't like it when groups on the outside who they've shut down from the legislative process have the opportunity to circumvent the Legislature, particularly when you have issues that have broad public support across not only Democratic and no party affiliates, but also among Republican voters.

So I think it's those two major areas.

MR. SHAPIRO: Your Honor, may I approach the witness with another set of documents?

THE COURT: Certainly.

MR. SHAPIRO: And, Mr. Livingston, if you can display FDH Plaintiffs' Exhibit 72. This is FDH Plaintiffs' Exhibit 72,

which is the first in the series of tables, 72 to, I believe it is, 74.

THE COURT:  Plaintiffs' 72 through 74 are admitted for proffer only.

Thank you.

(PLAINTIFFS' EXHIBITS FDH-72-74:  Received in evidence.)

BY MR. SHAPIRO:

Q.   Doctor, did you create these tables?

A.   Yes, I did.

Q.   Are they part of the supplement report that you provided?

A.   Yes.  They are.

Q.   And very briefly, if you can describe what each of these tables show?

A.   Yes, they are --

THE COURT:  Hold on a second.

MS. PRICE:  I'm sorry.  I believe Mr. Shapiro is talking about the supplement report now, so I just want to make sure we are marking that for the record.

THE COURT:  We'll demarcate.  And I think the Eleventh Circuit probably can follow.  If you'll just note when we are talking about something in the supplement report, then the -- because you have a secondary issue with that, the Eleventh Circuit, I'm sure, can follow it.

MS. PRICE:  Thank you, Your Honor.

THE COURT:  They're the 12 wise people of the

Southeast.

BY MR. SHAPIRO:

Q.   Please continue.

A.   Yes, I created these tables.  They are part of my supplementary report.

Q.   Very briefly go through each of these tables and describe what they show, please.

A.   They all came from the same underlying data.  They come from a snapshot of the publically available Florida registration system that is sent to me every month.  This one happened to come in mid-January.  It's from a January 1st snapshot of registered voters in Florida through, currently, as of December 31st, 2025.

The first table shows the 16,019,855 individuals who are registered.  And of those, 2.6 million -- 2,678,995 have an inactive status, 16.7 percent of that 16 million or so registered voters at that time.

Q.   Could you --

A.   Yeah.  I think it's important to talk about active and inactive voters.  Inactive voters are voters who this coming November will be able to go and vote a regular ballot at the polls, no questions asked.  They will -- they have the ability to request an absentee ballot, no questions asked.  These inactive voters are not removed from the rolls.  It only means that they have not voted in the last two federal elections and

Proffer Direct Examination - Dr. Smith

not had any changes to their voter registration account.

Q.   And so why is the issue of inactive and active voters relative to your understanding of the motives of the State in this case with regard to the initiative process?

A.   On December 23rd, Maria Matthews sent out an email to Supervisors of Elections.  She's the Division of Elections director for the state of Florida.  That email explicitly said that Supervisors could not validate a petition assigned by a voter who was inactive moving forward, but also could not count towards the qualification of ballot measures inactive voters who had signed a petition prior to that December 23rd if they were inactive at that time.

Q.   And what's your understanding of the effect that would have on petition -- campaigns?

A.   Sure.  So we've already talked about noncitizens, the 2 point million individuals according to the census who can't work on campaigns.  We've talked about the felons who are, obviously, not registered voters, who haven't had their voter rights restored, who --

     (Reporter requests clarification.)

A.   - are not able to participate on ballot petitions, signature-gathering campaigns, as well as those who are nonresidents.  That's on the petition-gathering side of things. What we are talking about here is diminishing by almost 17 percent, over 2.6 million individuals who are registered to

vote in Florida who can vote in the next election, but according to Maria Matthews' directive aren't eligible to sign a petition to put a question on the ballot for that same election that they'd be able to vote in.

Q.   And with regard to the next two tables, if you could briefly describe those tables and what they show, tables Plaintiffs' Exhibit 73, and 74.

A.   Sure.  I simply took this total broken down by inactive and active and broke it down by the party registration of these individuals.  And as you can see, the inactive status when it comes to party is not evenly distributed across the electorate.

People with no party affiliation, NPA, it's almost one in four, 23.5 percent, of them have an inactive status, meaning they haven't voted by definition in either of the two last federal elections.  They're still on the rolls, and they haven't updated their information.  They could go and vote in November or any other upcoming election.

They have been taken off the rolls with regard to being able to sign a valid petition.  They might be interested in an issue rather than a party.  It stands to reason that's the case for a lot of them.  Since they are not registered with a party, they're nonparty affiliates.  Yet there might be an issue that they're interested in, they no longer have the right to be able to sign a petition that's valid.

Democrats almost twice as likely as Republicans to also be

inactive.  Maybe they didn't like the 2022 candidates; maybe they didn't like the 2024 election candidates.  Doesn't mean that they're not interested in being able to participate and signing a petition to qualify a measure for a future election, an election, again, that they are legally able to vote a regular ballot in.

So I think it shows that the distribution across partisanship is such that individuals who might be more aligned with certain types of issues, more liberal issues, issues that the Republican cartel doesn't want to have heard in Tallahassee, are now excluded from being able to participate in the constitutionally guaranteed right for registered voters in Florida to be able to sign a petition and engage.

Lastly, it reduces the number of people out there for groups, sponsors, and their volunteer and paid petition gatherers to be able to actually engage with.  You're taking 2.6 million people from the pool of potential signers, making the costs even higher now for sponsors to be able to engage with the electorate because you're wiping out, you know, this 16.7 percent, 2.6 million people.

So a volunteer, when she's going in her neighborhood or going to her church, suddenly she has to work twice as hard -- or not quite twice as hard -- maybe six times as hard to be able to find a registered voter who is active as opposed to inactive.

These individuals might not even know that they have an

inactive status.

Q.    Doctor, you're focusing on the table on Exhibit 73.

How about Exhibit 74?

A.    Sure.  Just as there's --

THE COURT:  Hold on.  Before you go to that -- and this is for the supplement that I didn't permit, and we're talking about Exhibit 72 through 74.

You mentioned Ms. Matthews.  Is there anything in the record, anything you're going to rely on or put in your report or testified about, that suggested that Ms. Matthews did this at the direction of the Florida Legislature?

THE WITNESS:  Your Honor, I only have my experience working with Secretaries of States and their staff.  I can tell you when Kurt Browning was Secretary of State and I brought a group of elected officials from around the world to talk to him about the electoral process in 2012 -- it was before Detzner -- Secretary Detzner was replaced and Browning stepped down -- one of the participants asked, Who are you responsible to?  And he said, I have a constituency of one, the Governor.

It tells you the Secretary of State --

THE COURT:  But the Governor's not in the Florida Legislature.

THE WITNESS:  Not in the Florida Legislature, but he's the one sending the signal about what he thinks about direct democracy.  We've already talked about the Legislature moving

forward with HB 1205 following that directive; no indication that they were interested in questions of fraud prior to that.

THE COURT:  And there's no doubt the Governor seems to have a lot of strong views about a great many things, but -- so the Governor has strong feelings, and then we have a handful of tweets and a handful of comments by a handful of members of the Florida Legislature -- I understand that it may not smell right, but based on that, we're going to extrapolate that a supermajority of the Florida Legislature voted to kill the voter initiative process because they thought that this was a way to go against groups that they don't like.

I mean, that may be a fair supposition.  It may be a good guess, but, I guess, what I'm struggling with -- and I know that this issue is not right now before me because I've ruled -- but it just seems to me that if the long history of engage -- using a scalpel to slice and dice the election code session after session in response to every change in modality of voting for every minority group for decades, and the other evidence in SB 90 was not sufficient to -- in that case, not sufficient to establish intent, it's just hard for me to conceive of how I would say a handful of tweets by a handful of legislators would be the type -- the quantum of evidence that the Eleventh Circuit would find sufficient to establish intent.

THE WITNESS:  Fair enough.

I would say the --

THE COURT:  And I'm just asking -- I'm just trying to be direct and let's talk about the skunk in the room.

THE WITNESS:  Yep.

THE COURT:  Right.  I was not looking at you, Mr. Jazil.

THE WITNESS:  Fair enough, Your Honor.  Fair enough.

I think you identify, you know, this quantum as a handful, and I think you're correct.  It's a handful in terms of whether it's statements on the House floor or committee, statements that are publically available on X.com, or an action in December a month and a half before qualification of a measure; those are handfuls.

THE COURT:  And not addressing directly the issue on voting on this for X.

THE WITNESS:  Right.

THE COURT:  I mean, we literally have the Eleventh Circuit -- and I get it -- they say, You can't get discovery; you can't depose anybody; you ask for discovery directly from a legislator, you can't even get a discovery that a third party sent them from the Legislature.

And I get the hostility, *Arlington Heights*, and they're -- if I was a cynical person, I'd say there's some agenda there, but that's the result; you don't get any discovery.

THE WITNESS:  Right.

THE COURT:  But literally the Eleventh Circuit -- which are my overlords -- have said that we don't even care if the sponsors of the bill get up and say, This is what we're doing.  That doesn't tell you why all the other members of this supermajority voted the way they did, and so I'm not -- I get the challenges of mining intent.  It's hard; ask any federal prosecutor how hard it is to prove intent from circumstantial evidence.

And if you say you can't even get circumstantial evidence, which is the law of this circuit, then you have to turn to things like tweets, because that's all you got -- all you got left.  I'm just hard -- so that's why I wasn't disparaging you.  I was just, it seemed to me, talking about what as a practical matter I have in front of me.

THE WITNESS:  Listen, Your Honor, I agree completely.  It's the fact that there is a handful and not nothing that I think is indicative.

THE COURT:  What if they're just a handful of bad apples?

THE WITNESS:  Yeah.

THE COURT:  I mean, I would -- you're talking about people putting in the basement -- he's gone now, so I feel comfortable saying this -- Mr. -- Representative Sabatini spent some time in the basement over at the Capitol.

And I'm guessing you've already said -- and he seemed

to be singing from the same hymnal, so I'm not really sure why that happened.  But it seems to me that if you had asked people then -- I'm using an example of somebody that's no longer in office -- does he represent the will of the Republican party through his tweets?  I don't even think the Speaker would have said that Representative Sabatini's tweets represented -- you know, and I'm glad because one of his biggest tweets was that he thought it was a good idea to impeach me, would be his first act if he became a member of the U.S. Congress, which was only mildly amusing when he was defeated.

But I'm just trying to figure out what I read in as a judge if I'm looking at evidence and read into a handful of comments from a handful of people.

THE WITNESS:  You know, far be it for me to say that only Gators are truth tellers and -- but, you know, Representative Sabatini, a Gator; Alex Andrade, a Gator -- Alex Andrade said, No.  Governor DeSantis is going after the initiative process because he's afraid of ballot initiatives, right.

So there are some truth tellers out there who are willing to buck the cartel interest that controls them, willing to be in that basement office, willing to have someone run against them, not have the endorsement when they're running for higher office.  It is circumstantial without question because we don't have the data anymore to be able to be behind the scenes.

When I was at the University of Denver, we were able to soak and poke around the Capitol everywhere. We could go into chambers. We could go into the parties' offices. They were open to the public, and you could get a real sense of what the intent and what was the line that they were supposed to stick to.

And all I'm showing here are those deviations. They may just be a handful, but I think they are providing evidence, circumstantial as it may be, about what that underlying hostility was, even though the leadership said, This is not about killing off the initiative process. This is not about Amendments 3 and 4; this is about fraud.

THE COURT: I understand. And I want to make plain, I'm in no way disparaging circumstantial evidence because, unlike some of my colleagues on appellate courts, I'm mindful of the instruction I give every jury in every jury trial that there's no difference between the weight you can give circumstantial evidence and direct evidence.

So I was certainly not using circumstantial as in the pejorative or saying that it was somehow weak, and I know sometimes there's a tendency to say, well, it's just circumstantial. As far as the law is concerned, there's no direct evidence versus circumstantial evidence, and I understand that.

Here you wouldn't have the Legislature collectively

saying, That is our intent, so it's by definition going to be circumstantial unless the Legislature was dumb enough to pass a law saying, We're doing this because we don't like Hispanic voters, which is farfetched and silly.  That's just not going to happen.  So it's only going to be circumstantial evidence, which is typical when you're proving intent.

Counsel, you may proceed.

BY MR. SHAPIRO:

Q.   And, Doctor, just from the perspective of a social scientist, is looking at this type of data that you've been going through, these tables, as well as the legislative record, the few statements in the legislative record -- is that all consistent with the type of evidence that a social scientist, a political scientist such as yourself, reasonably relies on in forming opinions about motives of state actors?

A.   Yes.

Q.   Okay.  Now, to conclude, in addition to the evidence you just detailed; you've gone through a set of tweets and legislatures, you've gone through some legislative -- some statements by the legislators during the legislative debate, and you've looked at some tables that relate to active and inactive voters, and you've discussed Ms. Matthews' email; correct?

A.   Correct.

Q.   In addition to that, what other evidence, either direct or circumstantial, is there that supports your conclusions here

about the motives of the Legislature?

A.   Yeah, I think in my colloquy with Judge Walker, these points of data, be they the X.com, utterances, the statements in House committee, Senate committee, and House and Senate Floor debates, as well as the data from the State itself with respect to active and inactive voters, point towards the legislative intent of the Florida Legislature in the 2025 session to do effectively what Judge Walker suggested they want to do to the initiative process, like they've been doing with respect to voting rights in this state.

They are not going to come out and say, Everyone can vote except for Hispanic voters.  But they are going to make it more difficult with respect to access to the polls or other types of efforts.  They are not going to say that expressly.

Q.   To what extent is that, sir, consistent with the academic literature relating to the behavior of the cartel interest towards initiative processing?

A.   They have a supermajority, "they" meaning Republicans here in Florida.

I think it's axiomatic that this is the case in other states, and I've been studying this for 30 years.  Democrats who control the legislative process are a cartel interest there. They don't like direct democracy.

Q.   So how does that affect their behavior?

A.   They are hostile to direct democracy.  They are trying to

put restrictions in place. Most recently they are talking about putting a 55 percent threshold for passage of constitutional amendments.

It's the same here in Florida where the cartel interest is not interested in having a challenge to their power.

Q.   And how does -- do the provisions of HB 1205 themselves relate to your understanding of the motives of the Legislature?

A.   This is like a sledgehammer coming, rather than a scalpel, over the years. I've talked about prior to 1205 there were slices and slices and slices, some of it having to do with trying to regulate fraud, others just to raise the friction, the bar on both sponsors, petition-gatherers, as well as voters to participate. This is, effectively, like saying, Sorry. Blacks and Hispanics can't vote, when it comes to the initiative process.

Q.   So it shows you that -- the provisions of HB 1205, is it your view that they themselves are evidence of motive?

A.   Oh, absolutely it is. I mean, again, we have lots of different ways in terms of looking at the effects that I talked about earlier, but, you know, getting to motive is very difficult given the lack of available data for a social scientist to be able to investigate.

But I think what we see from what I've compiled it shows quite clearly their legislative intent.

Q.   And finally a bit of housecleaning. I neglected to have

you just review FDH Plaintiffs' Exhibit 74.

MR. SHAPIRO:  If you could put that up, please.

Thank you.

BY MR. SHAPIRO:

Q.   Can you very quickly tell us what this last table showed?

A.   Yes.  Sorry.  This is also from that snapshot of the Florida Voter registration as of January 1st, 2025.  I simply broke the active/inactive down by the 67 counties, and I ordered them by the percent inactive.

So you can see in some areas there are very few inactive voters.  The pool of eligible signers for a petition is greater there for sponsors and petition gatherers.  There are other counties that have a much higher inactive rate, making the pool of eligible voters, even those these are the same voters that can vote on election day who do not any longer have their, you know, Eleventh Amendment constitutional right in Florida that has been guaranteed to be able to participate in petitioning government by placing a measure on the ballot.

Q.   What are you finding in terms of which counties have higher numbers of inactive voters?

A.   Yeah, it's, oh, actually fairly correlated with race, ethnicity:  Osceola County, one of the counties with the highest number of Hispanic voters; De Soto County, Miami-Dade County all have well over 22 percent of inactive voters; Henry, Broward County, urban counties with heavy numbers of minority

voters, also with well over 20 percent; Okeechobee, Alachua County, up there in the one out of five as well.  So it's not constant across the 67 counties of Florida.

Q.   Thank you, Doctor.

MR. SHAPIRO:  If I could have a moment, Your Honor, to confer with my counsel?

THE COURT:  You may.

(Discussion was held.)

MR. SHAPIRO:  I have nothing further and pass the witness, Your Honor.

(The offer of proof testimony concluded at 2:23 PM on the 13th of February 2026.)

* * * * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. Any redaction of personal data identifiers pursuant to the Judicial Conference Policy on Privacy is noted within the transcript.

/s/ Megan A. Hague                          2/26/2026

Megan A. Hague, RPR, FCRR, CSR              Date
Official U.S. Court Reporter

**I N D E X**

<u>PLAINTIFFS' WITNESS</u>                                                    <u>PAGE</u>

Proffer Direct Examination By Mr. Shapiro            6

**E X H I B I T S**

<u>PLAINTIFFS' EXHIBITS</u>                              <u>OFFERED</u>    <u>RECEIVED</u>

| Exhibit | Offered | Received |
|---|---|---|
| FDH-48 to 58 | 10 | 10 |
| FDH-61 to 69 | 11 | 11 |
| FDH-72 | 18 | 18 |
| FDH-73 | 18 | 18 |
| FDH-74 | 18 | 18 |