1479

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

FLORIDA DECIDES HEALTHCARE, INC,)
et al.,                          )
                                 )
            Plaintiffs,          ) Case No: 4:25cv211
                                 )
        v.                       ) Tallahassee, Florida
                                 ) February 17, 2026
CORD BYRD, in his official       )
capacity as Secretary of State   )
of Florida, et al.,              )
                                 )
                                 ) 8:34 AM
            Defendants.          ) Volume VI
_____  )


**TRANSCRIPT OF BENCH TRIAL PROCEEDINGS**
**BEFORE THE HONORABLE MARK E. WALKER**
**UNITED STATES CHIEF DISTRICT JUDGE**
**(Pages 1479 through 1741)**


Court Reporter:           MEGAN A. HAGUE, RPR, FCRR, CSR
                          111 North Adams Street
                          Tallahassee, Florida 32301
                          megan.a.hague@gmail.com

        *Proceedings reported by stenotype reporter.*
    *Transcript produced by Computer-Aided Transcription.*

**APPEARANCES:**
**For Plaintiffs Florida Decides Healthcare:**

                    King Blackwell Zehnder & Wermuth PA
                    By:  FREDERICK STANTON WERMUTH
                         QUINN RITTER
                         Attorneys at Law
                         fwermuth@kbzwlaw.com
                         qritter@kbzwlaw.com
                    25 East Pine Street
                    Orlando, Florida 32801

                    Elias Law Group
                    By:  BEN STAFFORD
                         Attorney at Law
                         bstafford@elias.law
                    1700 Seventh Avenue
                    Suite 2100
                    Seattle, Washington 98101

                    Southern Poverty Law Center
                    By:  AVNER MICHAEL SHAPIRO
                         KRISTA A. DOLAN
                         Attorney at Law
                         avner.shapiro@splcenter.org
                         krista.dolan@splcenter.org
                    3710 Raymond Street
                    Chevy Chase, MD 20815

                    Elias Law Group
                    By:  HARLEEN K. GAMBHIR
                         Attorney at Law
                         hgambhir@elias.law
                    250 Massachusetts Avenue
                    Suite 400
                    Washington, DC 20001


**For Intervenor Plaintiff Safe & Smart:**
                    Stearns Weaver Miller
                    By:  GLENN BURHANS, JR.
                         HANNAH E. MURPHY
                         CHRISTOPHER R. CLARK
                         Attorneys at Law
                         gburhans@stearnsweaver.com
                         hmurphy@stearnsweaver.com
                         crclark@stearnsweaver.com
                    106 East College Avenue, Suite 700
                    Tallahassee, Florida 32301

**APPEARANCES (cont'd):**

**For Intervenor Plaintiff League of Women Voters of Florida, et al:**

                              Democracy Defenders Fund
                              By:  SPENCER KLEIN
                                   JACOB KOVAS-GOODMAN
                                   Attorneys at Law
                              pooja@statedemocracydefenders.org
                              spencer@statedemocracydefenders.org
                              jacob@democracydefenders.org
                              600 Pennsylvania Avenue SE
                              Unit 15180
                              Washington, DC 20003

                              Winston & Strawn, LLP
                              By:  GEORGE E. MASTORIS
                                   TYLER MATTHEW DATO
                                   SAMANTHA I. OSAKI
                                   NATHAN C. GREESS
                                   JOHANNA RAE HUDGENS
                                   Attorneys at Law
                              gmastoris@winston.com
                              tdato@winston.com
                              sosaki@winston.com
                              ngreess@winston.com
                              jhudgens@winston.com
                              200 Park Avenue
                              New York, New York 10166

**For Intervenor Right to Clean Water:**

                              Campaign Legal Center
                              By:  ROBERT BRENT FERGUSON
                                   HEATHER JEAN SZILAGYI
                                   ELLEN MARGARET BOETTCHER
                                   ALEXIS DENAE GRADY
                                   WILLIAM "LIAM" KYLE HANCOCK, III
                                   MELISSA LAUREN NEAL
                                   Attorneys at Law
                              bferguson@campaignlegalcenter.org
                              hszilagyi@campaignlegalcenter.org
                              eboettcher@campaignlegalcenter.org
                              agrady@campaignlegalcenter.org
                              whancock@campaignlegalcenter.org
                              mneal@campaignlegalcenter.org
                              1101 14th Street NW
                              Suite 400

1482

Washington, DC 20005

**APPEARANCES (cont'd):**

**For Defendant James Uthmeier:**

                              Florida Attorney General's Office
                              By:  WILLIAM STAFFORD, III
                                   SARA SPEARS
                                   MARYSSA SAVANNAH-LYNN HARDY
                                   Attorneys at Law
                              sara.spears@myfloridalegal.com
                              william.stafford@myfloridalegal.com
                              maryssa.hardy@myfloridalegal.com
                              119 South Monroe Street, Suite 500
                              Tallahassee, Florida 32301

**For Defendant Cord Byrd:**

                              Holtzman Vogel Baran, et al.
                              By:  MOHAMMAD O. JAZIL
                                   MARTIN C. WOLK
                                   RANDALL M. RABAN
                                   Attorneys at Law
                                   mjazil@holtzmanvogel.com
                                   mwolk@holtzmanvogel.com
                                   rraban@holtzmanvogel.com
                              119 South Monroe Street, Suite 500
                              Tallahassee, Florida 32301

                              Florida Department of State
                              By:  ASHLEY DAVIS
                                   General Counsel
                                   ashley.davis@dos.myflorida.com
                              R.A. Gray Building
                              500 South Bronough Street
                              Tallahassee, Florida 32399


**For Defendant Intervenors Republican Party:**

                              Shutts & Brown, LLP
                              By:  TARA PRICE
                                   BENJAMIN GIBSON
                                   Attorneys at Law
                                   tprice@shutts.com
                                   bgibson@shutts.com
                              215 South Monroe Street
                              Suite 804
                              Tallahassee, Florida 32301

1483

**APPEARANCES (cont'd):**

**For Defendant Supervisors of Elections:**

                         GrayRobinson PA
                         By:  ANDY V. BARDOS
                              JAMES T. MOORE JR.
                              Attorneys at Law
                              andy.bardos@gray-robinson.com
                              tim.moore@gray-robinson.com
                         301 South Bronough Street
                         Suite 600
                         Tallahassee, Florida 32301

**P R O C E E D I N G S**

(Call to Order of the Court at 8:34 AM on Tuesday, February 17, 2026.)

THE COURT:  We are on the record in Case Number 4:25cv211.  We are here for day six of the bench trial.  Plaintiffs will continue to call witnesses.

Before I hear anything from the first witness, any housekeeping matters?

MS. HUDGENS:  Not from the plaintiffs, Your Honor.

MR. JAZIL:  Nothing from the defense either, Your Honor.

THE COURT:  All right.

Plaintiff can call their next witness.

MR. GREESS:  Good morning, Your Honor.  Nathan Greess.

The League of Women Voters calls Ms. Christine Poff to the stand.

(Ms. Poff entered the witness stand.)

THE COURT:  Would you remain standing, ma'am.  She's going to swear you in.

Thank you.

**CHRISTINE POFF, PLAINTIFFS' WITNESS, DULY SWORN**

THE COURTROOM DEPUTY:  Please state your name for the record.

THE WITNESS:  Christine Poff.

THE COURT:  Could you spell your last name for the

record?

THE WITNESS:  P-o-f-f.

THE COURTROOM DEPUTY:  Thank you.

THE COURT:  Please take your seat, ma'am.

If you'd like some water, we put a bottle of water there.

And it's Mr. Greess?

MR. GREESS:  Yes.

THE COURT:  Mr. Greess, you may proceed.

MR. GREESS:  Thank you, Your Honor.

Ms. Poff is a nonresident of Florida and a member of the League of Women Voters.  Ms. Poff will offer testimony today regarding HB 1205's impact on her ability to engage in petition circulation in Florida as a member of the League, her past circulation activities, and her plans to circulate petitions absent the restrictions of HB 1205.

Her testimony will go to the League of Women Voters standing in this action, as well as Counts One, Two, and Four.

And Ms. Poff will first testify regarding some of her general background, her residency, and her connections to Florida.

DIRECT EXAMINATION

BY MR. GREESS:

Q.   Good morning, Ms. Poff.

Could you please just again state your first and last name

for the record for?

A.    Christine Poff.

Q.    Thank you.

      Ms. Poff, how old are you?

A.    I'm 66.

Q.    Are you currently employed?

A.    No, I'm retired.

Q.    Where do you live?

A.    I live in Boston, Massachusetts.

Q.    Do you spend a significant amount of time in Florida?

A.    I do.

Q.    Are you a resident of Florida?

A.    I'm not officially a resident.

Q.    Okay.  Do you intend to become a resident of Florida?

A.    No just spending my winters here, like a snowbird.

Q.    Okay.  And you said you are a resident of Massachusetts.

      Are you also a registered voter of Massachusetts?

A.    Yes.

Q.    And you mentioned you split your time between Massachusetts and Florida.

      Can you tell me sort of how you split your time?

A.    Sure.  I spend a little time here in the fall, in October and November, a few weeks, and then I'm here January, February, March, and sometimes some of April.

Q.    Okay.  So right now, being February 2026, are you currently

Direct Examination - Ms. Poff

staying in Florida?

A.   Yes.

Q.   And how long have you been coming for this sort of January-to-April time frame that you just referenced?

A.   Two years for the extended sort of a third of a year since I retired.

Q.   So in connection with your retirement, is your -- is your stay in this January-to-April time frame somewhat connected with that retirement?

A.   Yes.  I was able to do a little bit of hybrid, you know, work off -- far away from where I usually work when I was here last year, and then I fully retired.

Q.   And do you expect to keep coming down to Florida for this January-to-April time frame?

A.   I do.

Q.   Do you expect that time frame maybe to extend?

A.   It may, a longer period in the fall and probably through April in coming years.

Q.   So when you are down here in Florida, where do you live?

A.   I stay in Gulfport, which is a small city next to St. Petersburg.

Q.   Can you tell me a little bit about the Gulfport community and what brought you down to the Gulfport community?

A.   Sure.  I have a really close friend from the Boston area that I've known for 35 years that -- we raised our two boys

together, and she moved here -- she moved here about eight years ago and had always encouraged me to come visit.  And then I have a few other friends who live in town, and I'm -- have a large and growing social network there now that I'm spending more time.

Q.    So separate from this new and growing Gulfport community that you just referenced, is there anything else prior to that that has drew you down to Florida?

A.    My parents lived here for 25 years until they died, and I spent a lot of time -- they were -- they lived in the Fort Myers/Naples area.  And at first I would just bring my children to visit their grandparents a few times a year, and then as they grew older and sicker, I spent a lot more time here.

I -- you know, my mother died in 2012, and the last two or three years of her life, I was here every other month and then every month and then for weeks at a time.  And then my father died in 2020, and, again, the last few years of his life I spent a lot of time here.

And they lived in a sweet little sort of neighborhood, cul-de-sac, for the whole 25 years, and I knew the neighborhood -- the neighbors well, and I'm still in close contact with them.  It was a really nice community.  I relied on them to help care for my parents when I wasn't there.

Q.    Do you have an estimate of sort of the approximate years

you were coming consistently to Florida in connection with your parents?

A.    They moved here in the mid-to-late '90s, and then my father died in 2020.

Q.    Did you feel connected to that community down in Naples/Fort Myers?

A.    I did.  I did.  You know, I was very -- you know, I really got -- the neighbors had all lived there for the same amount of time, were all older, not as old as my parents, but, you know, stayed in touch with me.  It was just really helpful that they had such a tight-knit little community and neighborhood.

        MR. GREESS:  Your Honor, Ms. Poff will next testify regarding her membership and volunteer work with the League of Women Voters of Florida, her involvement in and advocacy for ballot initiatives in both Florida and Massachusetts, and, more broadly, her involvement in civic life and public policy in both states.

BY MR. GREESS:

Q.    Now, Ms. Poff, are you a member of the League of Women Voters of Florida?

A.    Yes.

Q.    And are you a member of any sort of specific chapter within the statewide League?

A.    The St. Petersburg area chapter.

Q.    Is that the chapter that encompasses your -- Gulfport?

Direct Examination – Ms. Poff

A.   It does, yes, and a couple of the small towns around St. Petersburg.

Q.   Are you a member of any chapters of the League of Women Voters outside of Florida?

A.   No.

Q.   And if I reference the League, will you understand that to refer to the Florida chapter?

A.   Yes.  That's what we all call it.

Q.   Thank you.

     How long have you been a member of the League?

A.   Two years.

Q.   And how did you first hear about the League?

A.   I was looking for a way, knowing that I was going to be spending time here -- and I visited Gulfport a few times before I came for the chunk of time in the winter.  I was looking for a way to be politically involved and active.

     And my close friend here connected me to someone else she knew, who connected me to someone else she knew.  And I met someone who is very active in the League and was spearheading one of the ballot questions that the League was closely involved in two years ago, and she pulled me in right away and was thrilled to have another volunteer and member.

Q.   So is this ballot question what initially drew you to the League would you say?

A.   Yes.

Q.   Is there anything else that sparked your interest in the League that drew you to them?

A.   Well, I really appreciated that it was a nonpartisan organization; that it was a group of smart, interesting, politically active women that were delightful to spend time with and get to know.

Q.   Are you a volunteer with the League?

A.   Yes.

Q.   Is any of the work that you do at the League in any sort of paid capacity?

A.   No, we are all volunteers.

Q.   Do you pay dues to the League?

A.   I do.

Q.   Why do you pay dues to the League?

A.   Well, I believe that it's really important to support the organizations that you are part of, and it just deepens your attachment or support and connection and belief in the work they do.

I -- personally, when I make a donation or join an organization or a group, it's often one that has a personal connection to me.  I support the youth programs that my kids were involved in when they were younger; I support some other local groups and organizations that I care about and that represent or -- issues that are dear to my heart.

Q.   So you mentioned ballot initiatives and petition

Direct Examination - Ms. Poff

circulation, which I'll get back to in a second.

Sort of separate from that, what other sort of work do you do with the League in Florida?

A.    You know, I like to be helpful and a good "Do-Bee" volunteer.  I -- last winter I was very involved in some street rallies and protests that the League -- I helped to organize some with the woman that I first connected with in St. Petersburg.

I attend a lot of their educational sort of forums and programs.  It's really helped me to learn more about the issues and policy of -- you know, efforts going on in Florida.

I often volunteer to, you know, help out at events.  I set up the chairs; I sit at the front table and sign people in; I bring brownies, whatever is needed.

Q.    Do you remember the last League event you attended?

A.    Yeah.  Not this past weekend but the weekend before was their big annual policy, agenda-setting event where I think there were 50 or more women.  And the different committees, some of which I'm part of, present their agenda for the year, and we all rank which ones are the most important to us and that we hope they'll pursue and the ones that we want to be involved in.

And I, again, helped with that, got there early, cleaned up afterwards, fixed the microphone when it wasn't working.

THE COURT:  Maybe you can help us out with ours.  We've had some issues.

Thank you.

Counsel, you may proceed.

MR. GREESS:  Thank you.

BY MR. GREESS:

Q.   Before your involvement in the League and in any organizations sort of within this Gulfport community, do you recall the first time you were involved in politics or public policy in the state of Florida?

A.   Well, the first time was when my parents were alive.  When there was a presidential election, I would -- a presidential year when I was visiting, I would sneak away during their afternoon nap and go to the campaign office of the presidential candidate I was supporting and just -- I just showed up and made phone calls and offered to stuff envelopes or help in whatever way was needed.

Q.   Were you just down here for the presidential year, or were you down here and it happened to also be a time that you could get --

A.   Oh, it just happened to be a -- you know, if I was here in the fall -- I was always here in the fall at some point, because I was here a lot, and it was just -- you know, in the spring I would go kayaking; in the fall I would go to the campaign office.

Q.   So besides your work with the League, are you involved in any other groups in Florida?

A.    There are a couple that I've connected with.  The first group I was involved with before I met people in the League was Equality Florida, and I came to Tallahassee with a friend and participated in their lobby days when the Legislature was meeting.

Last year I got very involved with a group called Voter Action Pinellas to -- and worked on the -- just to try to get out the vote for the local Gulfport election.  It's another nonpartisan group.

And this year I've been working a little bit with Gulfport for Democracy, a new organization, and just joined this year in committee.

Q.    So you mentioned ballot initiatives and ballot signature collection a little bit earlier.

Have you collected signatures in support of ballot initiatives in Massachusetts before?

A.    Yes, several times.

Q.    And approximately how many ballot initiatives have you collected signatures for?

A.    I think four.

Q.    I won't ask you to run through every single one, but if you can remember maybe the first one you collected for.

A.    Yeah, the first time was two decades ago, I think, 2014, and it was -- my paid work has always been in the environmental -- or often been in the environmental and public

health world, and I -- it was for an expanded bottle bill to -- which would address litter and expand the 5-cent deposit for water bottles and soda bottles, other kinds of sports drinks, and would have helped eliminate more of the litter in waterways and parks and streets and sidewalks.

Q.   How many signatures do you estimate you collected for the bottle bill in 2014?

A.   I was very involved in that and worked hard for several months.  Hundreds, probably a thousand.

Q.   What about the most recent initiative in Massachusetts that you had worked on?  Do you recall that one?

A.   Yes.  It was a few years ago, and I didn't collect quite as many but a few hundred for a taxation question that would increase revenues for public school and mass transit.

Q.   I want to shift from Massachusetts back down to Florida, where you are staying now, and discuss HB 1205.

     Are you aware of HB 1205?

A.   Yes.

Q.   Okay.  And what's your understanding of what HB 1205 is?

A.   My understanding is that it has -- it adds many limitations to the regulations or procedures for getting a citizen initiative on the ballot.

Q.   And do you have an understanding of whether HB 1205 directly affects your ability to participate in the petition-circulation or signature-collection process?

A.   Yes.  I'm not allowed to according to the law.

Q.   How do you understand it that you are not allowed to participate in that process?

A.   Because I'm not an official resident of Florida.

Q.   Okay.  Have you worked in support of any ballot initiatives in the state of Florida?

A.   I did work hard on Question 4, which was to prevent the abortion ban from going into effect.

Q.   And are there any ballot initiatives in this sort of last round, the 2026 round, that you support?

A.   Well, last winter I was learning, because the League was taking this on, the Clean Water petition and also the Medicaid expansion.

Q.   Okay.  I want to start with Amendment 4 which you mentioned you spent a fair amount of time working towards.

What work did you do to get Amendment 4 on the ballot?

A.   So at the -- in the fall, after I had been here for a visit and learned a little more about it from Boston, when I'd returned home, I did some more research online and found the petitions and sent them to several friends down here and called them and told them -- you know, asked them to fill it out and send it in.  I wasn't part of any official signature collection effort, and I'm not sure if they did it, but I just wanted it to get on the ballot.

Q.   And this would have been the fall of 2023?

Direct Examination - Ms. Poff

A.    Yes.

Q.    Okay.  Why don't you know for certain whether or not they submitted the petitions or whether the petitions went to where they were meant to go, if sent?

A.    Well, I didn't hound them.  I know that a lot of friends who - my sort of social circle is not as politically active, and I just didn't know if they would take the time or effort.  It was a complicated process, and I wasn't there to collect them and help them and walk them through it in person on the ground. And I just -- you know, I followed up and asked them once, but I just felt uncomfortable hounding them.

Q.    You mentioned you weren't there on the ground to collect them?

A.    Right.

Q.    Did you -- why didn't you circulate on the ground -- circulate petitions?

A.    Well, I arrived in January right when the petition collection had ended, when they'd met the threshold for how many signatures were needed.  So I was hoping that I would get to it in January, but I wasn't able to.

Q.    Do you recall around when Amendment 4 achieved the requisite number of signatures -- or petitions to get on the ballot?

A.    I think it was the end of 2023, so December 31st, and I arrived a few days later.

Direct Examination – Ms. Poff

Q.   Before Amendment 4 achieved that requisite number of petitions to be placed on the 2024 ballot, did you intend to circulate petitions for that amendment when you did arrive in Florida?

A.   Yes.

Q.   And what work did you do in support of Amendment 4 when you were in Florida?

A.   So in the -- that winter, you know, I talked it up to people that I knew socially and said, This is coming on the ballot next fall.  Then I came down in the fall a little earlier than usual for a couple of weeks before the election and worked with the League.  That's how I really connected with the League, because they were spearheading the Get Out the Vote effort in the St. Petersburg area.  And I worked in several neighborhoods every day for two straight weeks, maybe a little longer, knocking on doors.

     We had -- you know, I assumed I would knock on at least 30, 40 doors a day, sometimes as many as 100.  And I think on one of the weekend days I went to one of the St. Petersburg -- there was a big Halloween street fair, and I tabled and walked the street and gave out information and encouraged people to vote.

Q.   So ignoring for a moment the restrictions that you've identified that are part of HB 1205, this election cycle, 2026, did you intend to support any ballot initiatives that were up?

A.   Well, last year -- last winter when I was here, I was

learning about the League's effort for two of them, the Clean Water one and the Medicaid expansion.  And so I had hoped when I was down here this winter that I would be able to be involved.

Q.   Let's -- let's start with the Medicaid expansion initiative.

What makes you feel strongly about circulating petitions in support of Medicaid expansion?

A.   Well, Massachusetts has expanded Medicaid, and it's been really successful.  If you compare -- I've done a bunch of public health work, and if you compare the health outcomes for people in the states that have expanded Medicaid versus the states that haven't, the outcomes are much better.

And then I just have some personal experiences.  When I was -- one of my jobs when my children were little -- the organization I worked for didn't have a good family health care plan, health coverage, and so my two boys were on Medicaid for a few years.  And it was really important they got vaccinated; they went to their annual physicals; when they got sick, I could get health care for them.

And then I had my own experience.  As I was moving from paid work to retirement and more freelance work that wasn't for just one organization that could give me health coverage.  I -- Medicare kind of screwed up my coverage.  I don't know if I did something wrong; they did something wrong, but I went for two months, almost three months, without coverage.  And I was

almost 66 years old, and it was – I was panicked because I didn't have health care coverage, and I had -- I had health needs that I couldn't meet during that time that had to be delayed.

And I just -- so I just care deeply about this issue. I think it's really important and really benefits states and would benefit Florida if a lot of older friends who are really worried about what will happen to them when they may have to go into a nursing home and what if there isn't Medicaid coverage for them -- some of them don't have a lot of resources. So I just -- yeah. I just think it's -- and it's money that comes from the federal government. So it's kind of a win-win financially for the state.

Q.   Are those older friends that you just referenced friends that are sort of part of this growing Gulfport community --

A.   Yes.

Q.   -- you've been discussing?

I want to turn to the Clean Water amendment and ask you the same question.

What makes you feel strongly about circulating petitions for the Clean Water?

A.   Well, as I've said, I've done environmental work a bunch of my life. And in Massachusetts we've -- over the decades that I've lived there, I've watched the cleanup happen for the Boston Harbor and the Charles River, which are two bodies of water that

surround the city.  And especially the Charles River, I participate every January -- every July -- not January -- every July when it's hot in a special Charles River swim, and we all go and jump -- I recruit my friends, and we all go and jump off the dock and swim in the Charles River.  That used to be completely polluted.

When I -- I rowed crew in college on the river, and there were jokes that if you had a cut and a drop of water got in it, you would -- you would need to go to the hospital for tetanus shots or you could die.  That was the urban myth, that you could die from the Charles River if you rowed crew on it.  So it's just really exciting that now I swim in it every summer.

And I'd like to see that in Florida.  Gulfport is surrounded by some nature preserve areas that I really enjoy; I walk in; I bike in; I go bird watching.  It's also right on the coast, and there's a big, long beach area.  Again, there's -- it's unclear if it's safe to swim there.  Some people say, Oh, yeah, no problem.  And you see kids in the water.  And then other people say, Oh, my God, you cannot swim in that water; it's really not clean.  And who knows, you know, if I'm taking a risk when I swim off the beach in Gulfport, and I'd love to know for sure and see it cleaned up.

Q.   So if you were permitted to circulate petitions for Right to Clean Water and the Medicaid expansion initiative, would you do so?

A.   Yes.

Q.   You mentioned before -- in connection with door knocking and getting out the vote on Amendment 4, you mentioned a fair that you were at.

Did you have specific plans as to where you would circulate petitions for the Right to Clean Water initiative and the Medicaid expansion initiative?

A.   Yes.  I appreciate doing it with an organization and knowing that the League was going to do that, because I learned a lot about those issues from the League last winter.  I would take their direction of where it would be helpful and sign up to do it.  But if -- I sort of modeled what I've done in Massachusetts.  I would go to the front of Publix or ALDI's on a busy Saturday morning or in the evenings after work when people are shopping.  It's a great opportunity and a way to do it. There are lots of street fairs in St. Petersburg.  There's a Tuesday market in Gulfport with -- that's packed -- the main street is packed with people, and I would go there.

Q.   You've done other sorts of political work in, for example, the market days that you mentioned or the street fairs?

A.   With Voter Action Pinellas last winter I did a lot, encouraging people to vote and to make sure they requested their mail-in ballot, because there was a newer law that said that if -- they were to re-request your ballot every two years for mail-in.

Direct Examination - Ms. Poff

Q.   Before you were barred from participating in the circulation process, how many signed petitions did you expect that you'd be able to collect at these various locations you just identified?

A.   Probably a few hundred.

Q.   Now, given HB 1205, do you intend to circulate petitions at all this coming year?

A.   No.

Q.   And why is that?

A.   Because I'm not allowed to as a -- because I'm not an official resident here.  I am -- I think -- I can't register to be a collector is my understanding.  And if I tried, I think any signatures I got would be thrown out, and that would be an exercise in futility, and I think I could be arrested.  I'm not quite sure the ultimate penalty, but I think I could be arrested or fined.

Q.   Now, if the Secretary of State, for example, or the Attorney General, or your local Supervisor of Elections was to suggest to you that because you're not a permanent resident of the state of Florida you have absolutely no place to be involved of the civic life of this state through petition circulation, how would you respond to that?

A.   Well, more and more I feel like Florida is my other home, and it's really frustrating that I can't quite -- I can't participate in all the ways that I would like to.  You know, I

spend at this point a third of my year here in a deep and growing community of people that I care a lot about. I've been connected through my family for years to Florida. There isn't any other place in the U.S. where I spend a lot of time or have those kind of connections. And I care about the people here that I'm close to and would want better policies for them.

And I love being involved and active. You know, some retirees play pickleball. I, you know, Get Out the Vote. So, yeah, I would just be disappointed and frustrated.

Q. Thank you, Ms. Poff.

A. Thanks.

MR. GREESS: No further question. I pass the witness.

CROSS-EXAMINATION

BY MR. WOLK:

Q. Good morning, Ms. Poff.

A. Good morning.

Q. Ms. Poff, you're a resident of Massachusetts; correct?

A. Yes.

Q. So you're not a Florida resident?

A. Not an official one, although I spend a third of my year here and may be spending more time as the years go on.

Q. And you come to Florida for part of the year?

A. I do, three months or more.

Q. Okay. Now, Ms. Poff, you said that in 2024, you volunteered for the Amendment 4 campaign; correct?

A.   Yes, I did.

Q.   And for your work with that election, you did door-to-door canvassing?

A.   Yes.

Q.   And about -- when you were doing the door-to-door canvassing for Amendment 4, about how many houses would you go to per day?

A.   I -- you know, a smaller day would be 30 and on a busier day would be 100.

Q.   So up to 100 houses when you were doing this door-to-door canvassing for Amendment 4?

A.   Right.  It was mostly on the weekends when people were home throughout the day that I would do a couple of shifts of 30 or a few more.

Q.   And what would your interactions with voters look like when you were doing this canvassing?

A.   You know, lots of time people aren't home when you are knocking on doors, and so you just leave the slip of paper and you don't really get to engage very much.  And when someone was home, I would ask them if they are planning to vote and tell them about the ballot question and ask their opinions about it, and engage in a usually really brief conversation about the question and encourage them to vote in support.

Q.   And you also mentioned that you would -- as part of the Amendment 4 campaign, you would hand out information to voters;

correct?

A.    When -- when someone wasn't home, yeah, I would leave a little -- it's like a -- they call them door handles, just a little piece of paper that fits over the doorknob.

Q.    Okay.  And you also mentioned that for the Amendment 4 campaign you did some tabling; correct?

A.    Yes.

Q.    What would -- what would the tabling that you did involve?

A.    Talking to people who are at a street fair.  You know, sometimes you could have a more meaningful conversation and sometimes it was very -- very brief and minor.  But you were -- I was encouraging them to vote in support of preventing the abortion ban from going into place.

Q.    And did you collect any petitions for the Amendment 4 campaign in the 2024?

A.    I didn't actively collect them.  I encouraged -- I sent them to a few friends and encouraged them to fill them out and submit that.

Q.    So you did the door-to-door canvassing going between -- you said, like, 30 to 100 houses per day, and then just handing out information to voters and tabling.  That's what you did for the Amendment 4 campaign?

A.    Right.

Q.    You did that without handing out petitions?

A.    Right.  Because it was already established and on the

ballot.

Q.   So nothing in HB 1205 would prevent you doing that sort of work; correct?

A.   No, it would allow me to do that.

It wouldn't allow me to do the really important initial piece of making sure a question got on the ballot.

Q.   Understood.

And then, Ms. Poff, you are interested in supporting the Medicaid expansion initiative and the Right to Clean Water initiative; correct?

A.   Yes.

Q.   Did you -- did you encourage any Florida voters to sign the Medicaid expansion initiative?

A.   I just began to sort of chat with friends about it, because I only learned about it last winter and was just understanding it myself.

Q.   Okay.

A.   So I was in the educating myself mode rather than educating others.

Q.   Okay.  So did you -- did you tell any friends, like, Hey, this is a good initiative, like, any of your friends in Florida. You should sign the initiative or support this initiative?

A.   I wasn't there yet.  So I was learning about it and I just didn't quite know enough.  And I had the experience with the question 4 of talking to friends and not knowing if they had

filled out the form.  And then my social circle in Gulfport is just not that politically active.  I feel like they need more handholding than just telling them to go fill out this petition. They need more support and help to actually do it.  They just wouldn't do it on their own.

Q.   How about the Right to Clean Water initiative?  Did you encourage any Florida voters to sign that initiative?

A.   No.  I just explained that I said it was coming up and there might be an opportunity.  And, you know, I'd be walking with a friend, at Clam Bayou, this beautiful nature preserve, and we'd notice litter in the waterways and a funky algae that I thought might be pollution or chemical, and I'd say, Oh, I think this Clean Water amendment may be coming up, and you live here full time; you could vote for it if it gets on the ballot, and I'm hopping it will.

Q.   Nothing in HB 1205 would prohibit you from speaking in support of Medicaid expansion to your friends in Florida; is that correct?

A.   Right.  I just really would like to be able to collect the petitions to know that it will get on the ballot.  It feels like a really important first step.

Q.   But in terms of having those conversations with your friends down here or with other Florida voters at theirs, nothing in HB 1205 will prohibit that sort of conversation; correct?

A.   I could have those conversations, yeah.

Q.   And the same would go for the -- for Clean Water rights in Florida, nothing in HB 1205 would prohibit you from speaking to them here in Florida about the right to Clean Water and encouraging that -- those sorts of policies?

A.   Uh-huh.

Q.   So you can come down to Florida from Massachusetts as many times as you want, and you can have as many conversations about these issues as you want; correct?

A.   Yes.

Q.   Now, Ms. Poff, is it fair to say that you want to be, like, politically involved here in Florida?

A.   I do.  I am.

Q.   And is that why you want to circulate petitions in Florida?

A.   I want to see important issues get addressed, and often a really powerful way to do it is to have these citizen initiative ballot questions.  It, you know, allows the populous a more Democratic process and engagement.

Q.   Are you registered to vote in Florida?

A.   No.

Q.   And that's because you decided to make Massachusetts your state of residence; correct?

A.   It's been my state of residence for 35 years and where I raised my children and where my family is.

     So it will stay my primary residence, but I spend a lot of

time here.

Q.   Thank you.

MR. WOLK:  No further question, Your Honor.

THE COURT:  Thank you.

Redirect, Mr. Greess?

MR. GREESS:  Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. GREESS:

Q.   Ms. Poff, just very briefly.

You spoke about get out the vote efforts in relation to Amendment 4.

Do you recall that?

A.   Yes.

Q.   What in your understanding is the first step to getting an initiative on the ballot?

A.   It's collecting signatures for a petition to get it on the ballot.

Q.   Are you able to have conversations door-to-door about an initiative that doesn't make it to the ballot?

Let me --

A.   Yes.  Yes.

Q.   In the fall, if --

A.   Uh-huh.

Q.   -- an initiative doesn't get the requisite number of signatures, are you going door-to-door saying, Vote for this

initiative?

A.    No.

Q.    That's because the initiative doesn't make it to the ballot?

A.    Right.  It doesn't exist yet.

Q.    Is it your understanding that those conversations then don't happen door-to-door?

A.    Yes, they don't happen.

Q.    Why do you want to specifically engage in petition circulation as a way of getting involved in supporting these important issues that you've discussed?

A.    Just what you are implying, which is that you don't raise the issue; you don't bring it to the populous's attention and voter's attention; you don't engage meaningfully in discussion about it, and you don't make it a real thing that voters can vote for if it's not on the ballot.

     So it's just a really, really crucial first step.

Q.    Thank you.

          MR. GREESS:  No further questions.

          THE COURT:  Thank you, ma'am.  You can step down.

          THE WITNESS:  Thank you so much.

     (Ms. Poff exited the witness stand.)

          THE COURT:  Ms. Hudgens, I believe, is calling the next witness.

          MS. HUDGENS:  That's right, Your Honor.

Ms. Hudgens for the League plaintiffs.  We are calling Ms. Jessica Lowe-Minor.

(Ms. Lowe-Minor entered the witness stand.)

THE COURT:  Ma'am, if you'll remain standing and raise your right hand.

**JESSICA LOWE-MINOR, PLAINTIFFS' WITNESS, DULY SWORN**

THE COURTROOM DEPUTY:  Please state your name and then spell your last name for the record.

THE WITNESS:  Jessica Lowe-Minor.  My last name is spelled L-o-w-e hyphen M-i-n-o-r.

THE COURTROOM DEPUTY:  Thank you.

MS. HUDGENS:  Your Honor, Ms. Lowe-Minor is the current president and a member of the League of Women Voters of Florida.  Her testimony will go to standing and Counts One through Five of the League's complaint and, where relevant, as Ms. Lowe-Minor testifies I'll provide more specific guideposts for the Court's reference.

DIRECT EXAMINATION

BY MS. HUDGENS:

Q.   Ms. Lowe-Minor, where do you currently reside?

A.   Tallahassee, Florida.

Q.   And how long have you lived there?

A.   About 25 years.

Q.   Are you a Florida resident?

A.   Yes.

1513
Direct Examination - Ms. Lowe-Minor

Q.   Have you been a Florida resident for all 25 years?

A.   42 years, my whole life.

Q.   Are you currently employed?

A.   Yes.

Q.   Where do you work?

A.   I work for a nonprofit organization called Braver Angels.

Q.   And what is Braver Angels?

A.   So Braver Angels is a national organization that reduces political polarization and helps people across political differences learn to talk to each other better.

Q.   And what's your role at Braver Angels?

A.   I'm the director of debates.

Q.   Aside from your employment with Braver Angels as the director of debates, are you also involved in the League of Women Voters of Florida?

A.   Yes, I'm on the board of directors.

Q.   And what is the League of Women Voters of Florida?

A.   So the League is a nonpartisan organization that's existed for over 100 years to help engage people in the democratic process.

Q.   You said over 100 years.  When was it formed?

A.   So the League was founded in 1920 in anticipation of the ratification of the 19th Amendment, and it was founded to help kind of empower the soon-to-be enfranchised female voters of the country to understand their role as voters, to understand public

1514
Direct Examination - Ms. Lowe-Minor

policy issues, and to be able to be informed citizens.

Q.   And you mentioned it was initially formed to empower women in the democratic process?

A.   Yes.  We didn't start accepting men into the organization until the 1970s, but have welcomed men and women in the organization since.

Q.   And you mentioned you're on the board of directors.

What is your involvement on the board of directors for the League of Women Voters?

A.   So I serve as the president.  It's a volunteer elected position, and I was elected to that role in June of 2025.

Q.   And that is for the League of Women Voters of Florida?

A.   Yes, that's correct.

Q.   Are there local or national leagues as well?

A.   Yes.  So the organization is a tri-federated organization, so there is a national level, a state level -- we have state presidents in all 50 states -- and also there are local chapters around the country.  There's about 800 plus around the country, and 35 here in Florida.

Q.   And are you also a member of the League of Women?

A.   Yes.  I've been a member since 2010.

Q.   And why did you become a member of the League of Women Voters?

A.   So I originally cane into the League of Women as a staff member.  I was hired as staff in June of 2010.  And I ended up

working for the state League for five years -- well, almost five years, and then found new employment, but have continued with the League in a membership capacity and a volunteer capacity since then.

Q.   And so from 2010 to the present you've been a member of the League?

A.   Yes.

Q.   And can you walk through what your roles were throughout that period of time?

A.   Yeah.  So from 2010 until the end of 2014, I was the executive director for the League of Women Voters of Florida. And then, again, I took a new job, but I stayed involved as a member, and I believe in 2015 joined the League of Women Voters of Tallahassee board.  I was their secretary, I think, for about a year.

Then I was nominated to serve on the national board for the League of Women Voters of the United States.  I was elected to is that board in June of 2016.  I served for two years as a director, two years as a treasurer, and two years as a vice president.  So I rolled off the national board in June of 2022. Then I was essentially a member and not serving in any particular capacity.

And then kind of in the spring of 2025, I was approached by the nominating committee for the League of Women Voters of Florida to see if I would consider accepting the nomination for

president for the state League.  And I did, and was elected in June of 2025 to that position.

Q.    And you stayed a member even though you weren't serving in leadership roles; is that right?

A.    Yes.

Q.    And why did you stay a member of the League of Women Voters of Florida?

A.    Well, I love the organization.  I felt very supportive of and committed to the organization's mission.  So, you know, the League's role of helping engage citizens in the democratic process, empowering voters, helping to make sure that people have the information that they need to be informed citizens, that's a really important mission to me and one that I have always stayed committed to.

Q.    And you mentioned that you became president in June of 2025?

A.    Yes.

Q.    Is that current position as president a paid position?

A.    No, no.  It's a volunteer role.

Q.    Okay.  But you mentioned being staff in 2010.

A.    Yes, that's true.

Q.    So how many positions at the League across Florida are paid?

A.    Oh, we have three paid staff within the state organization. So we have a paid executive director, a communications director,

and kind of a program and events director.

And then for the most part everybody else in the organization -- we have some contract kind of vendors, so a contract bookkeeper, but for the most part everybody else in the organization works on a volunteer basis.

So we have a board of directors that currently has 13 people on it, and then all of our local organizations, our chapters, are over -- overseen by volunteer boards.

Q. As president of the League -- well, first of all, if I say "League," will you understand that I mean the League of Women Voters of Florida?

A. Yes.

Q. As president of the League, what are your responsibilities?

A. So I serve as the primary spokesperson for the organization when I'm available. I communicate with our members and with our local League leaders across the state about issues that are of priority to the state organization.

I coordinate with the board and with the executive director to ensure that the organization's primary objectives and goals are met and that the organization is in compliance.

Q. Do you also speak with members or participate in League events?

A. Yes, regularly.

Q. You said that part of your role is making sure that the primary objectives and goals of the mission is met.

What is the League's mission?

A.    So our formal mission is to empower voters and defend democracy, and we do that through kind of two primary mechanisms.  So we have an education fund that focuses on voter engagement, voter information.  We put out a voter guide.  We put on candidate forums and events and so kind of anything that we can do to help equip the electorate to be ready to cast an informed vote and to know when elections are, what they need to bring, you know, to the polls to vote, that type of thing.

And then we also have an advocacy arm that's our membership organization, and that organization works primarily on public policy issues.  We conduct studies and we also advocate for public policies at the Legislature and also through petition gathering and through the ballot initiative process.

Q.    And why is petition gathering part of the advocacy arm and not part of that education fund arm?

A.    Yeah, so we have positions that our organization has adopted on various public policy topics and kind of advocating for positive changes.  What we view as positive changes to our state constitution is a major focus for us in terms of ultimately helping to bring about the type of, you know, state constitution and state government that, you know, we would see as beneficial to the majority of Floridians here.

So that's -- you know, we're -- we're studying public policy topics, and then we're working through both the

Legislature but also through petition gathering and the ballot initiative process to bring those policy changes into being.

Q.   And how -- you said the advocating is important to the League, but how would you rank petition gathering in terms of the importance to the League?

A.   Oh, it's a core function of what we do.  It's really important to our members to be able to communicate with, you know, fellow voters, with citizens across the state about issues that, you know, we've studied that we think are important to help people realize kind of what's happening within the state of Florida.

A lot of people, obviously, are very busy.  You know, public policy can feel very nerdy and wonky and so, you know, this is a chance for our members to help bring those concerns kind of to people in real time so that folks understand how this impacts our lives here in Florida.

MS. HUDGENS:  Your Honor, I'll now be asking the witness about both her and the League's involvement in -- their role in the petition-circulating process prior to HB 1205 going into effect before getting into HB 1205.

BY MS. HUDGENS:

Q.   Ms. Lowe-Minor, I'm going to ask about the process for petition gathering step by step in a moment, but, generally speaking, how would you describe the role that the League plays when it comes to petition circulation?

A.    So we provide a structure for our members who are interested in these issues.  We provide a structure for them to have conversations with their fellow Floridians about these topics, and we also provide guidance to them so that they know how to go about this in the best way and so that they're prepared to answer questions, that they're prepared to, you know, ensure forms are complete and that they ultimately get submitted to the right place.

Q.    Is the League currently circulating petitions?

A.    No, we are not.

Q.    When did it stop?

A.    So we have not been engaged in any petition gathering since HB 1205 went into effect on July 1st.

Q.    And was that because HB 1205 went into effect?

A.    Yes, directly.

Q.    So let's talk about the specific process for the League's petition gathering prior to HB 1205.

      So before HB 1205 went into effect, if there was a ballot initiative that was being sponsored, how does the League decide whether or not to get involved with that initiative?

A.    Yeah.  So we have had initiatives where we were very involved from the outset and even the kind of conception of the initiative and where a member of our organization has served on the steering committee for, you know, the political committee that was advancing the petition.

1521

Direct Examination - Ms. Lowe-Minor

In most instances, though, kind of a ballot initiative campaign is already underway and that entity reaches out to our organization and says, Hey, we would love for the League of Women Voters to support this.  You know, is this something you all would consider endorsing?

At that point, we have a process where our board would look at our adopted positions on that topic and determine whether or not the goals of the initiative were consistent with our organization's positions.  And if they were, the board would endorse the initiative and would authorize our members to, you know, get engaged in petition collection on behalf of the League.

Q.   And you mentioned that they were -- sometimes the League is involved in the steering committee prior to an initiative becoming a ballot initiative?

A.   Yes.

Q.   Does the League ever itself sponsor petitions?

A.   No, we're not a political committee.

Q.   Okay.  So after the League determines that it wants to endorse a particular initiative, what does the League do next?

A.   So once we have determined that a ballot initiative is kind of consistent with our goals as an organization and our public policy priorities, we would inform our members, our local League leadership, our members, that, you know, this is now an initiative that we're supporting and that, you know, they're

eligible to collect petitions.

We would also put on one or multiple kind of education events for our members about that initiative.  It might be a lunch and learn; it might be an all-member call; it might be, you know, multiple all-member calls.  We usually try to record them as well so they're available on our website, but those are opportunities for our members to understand kind of the nuts and bolts of the petition.

So what -- you know, what's the status quo in terms of that public policy issue?  What is this initiative seeking to change?  What's the constitutional language?  You know, when would it be implemented? those types of logistical questions.

And then we also talk about best practices for petition gathering and kind of some tips and suggestions for the best way to go about petition gathering.

So that's typically what we would do, and then our local members would take it from there.

Q.   And in your experience, what do the local members do as the next step after having received that guidance from the League?

A.   Yeah, so often our local members will organize events in their communities to collect petitions kind of as a group.  So we do have members who would collect petitions individually, like when they're out and about.  They might just have a clipboard that they take around with them on their daily events, but most of the time our members kind of will organize group

petition-gathering activities.

So there might be a parade, for instance, that's happening, and a member would say, Hey, I'm going to be at this parade on Saturday at 9:00. Anybody who wants to collect petitions, like meet me on the corner of Adams Street and Monroe, and I'll bring extra copies of the petitions and clipboards and we can go from there.

And then everybody would, you know, arrive at the appointed time; they would get their materials. And that person who organized the drive is usually serving as the point person, and they'll provide some training to folks kind of on the spot. So they'll walk through things like, you know, Hey, these are mistakes that people often make completing the form, so, you know, make sure to be mindful of that.

We encourage our members to kind of stand near the voter while the voter's completing the form to make sure before the voter walks away that the form's completed. We talk to our members about, you know, questions that voters often ask and so to be ready to answer those questions.

And then we often will encourage our members, too, to have League collateral with them when they're out talking to people so if somebody is really interested, for instance, in the League's work, you know, we encourage folks to have membership brochures or things that they could use to potentially recruit, you know, members into the organization as well.

Direct Examination - Ms. Lowe-Minor

Q.   You said that typically there's events that are group events for petition gathering; is that right?

A.   Yes.  So, you know, some folks are really confident in petition gathering and go out and do it on their own, but a lot of times having a group event that's organized by the League feels more accessible.  It feels less intimidating to -- you know, especially if you're petition gathering for the first time to have others around you who have done it before.  And, you know, it also helps kind of logistically to have someone who's brought the clipboards, brought the extra copies of the petitions, brought extra pens.  You know, that kind of structure is just helpful, especially for volunteers.

Q.   That was going to be my next question.

     So the League is the one providing the printed petitions, the clipboards, that sort of resources?

A.   Yes, that's correct.

Q.   And you mentioned that on the day of the event the point person would show up to the event and provide guidance on the petition process itself?

A.   Yes, yes.

Q.   Once the point person has given that sort of introduction and the guidance on how to actually go about doing the petition collection, what happens at that point after they've done that?

A.   Yeah.  So after people feel comfortable with kind of the content of the petition and, you know, they feel confident that

they could answer questions that voters might have, and they also have all their supplies, then the group usually disperses and people walk around the event talking to citizens.

So, you know, they'll approach people and say, Hi, I'm so-and-so with the League of Women Voters and we're collecting petitions on X.  Have you heard of this? and kind of initiate conversations.

Usually in a kind of large event many of our volunteers can collect 25 to 50 petitions in a few hours and, you know, we'll usually meet back at an appointed time and turn in all of their completed forms to the point person, who then coordinates turning in the petitions to the petition sponsor.

Q.    I want to turn back to the point person in a moment.

But when the volunteers are going out to engage for -- in petition gathering on behalf of the League, are any of them getting paid?

A.    No.  No.  We don't pay the point person or our volunteers, like, nobody in the organization receives compensation for petition gathering.

Q.    From the League?

A.    From the League, that's correct.

Q.    Do they, to your knowledge, receive any compensation from the sponsor?

A.    No, I do not believe that anybody has been compensated by anyone.

Q.    And so has the League ever received payment by the sponsor for its work in gathering petitions?

A.    No, not for petition gathering.

Q.    And you mentioned that after gathering petitions, they may gather 25 to 50 petitions; is that right?

A.    That's probably common for, you know, if you're at a large event where there's a lot of opportunity to connect with people.

Q.    And is that per person or --

A.    Yes, that would be per person.

Q.    And so the -- and how many volunteers would you say is at a typical organized event?

A.    Probably between 10 and 20.

Q.    And they -- you said they go back to the point person after they've gathered the petitions, is that --

A.    Yes, that would be common.  And usually one person from the League -- and, again, it's usually the point person who organized that day's kind of activity, but they would gather up all of the signed petitions from everyone and they would coordinate returning those petitions to the ballot sponsor.

Q.    And so that point person then, are they holding onto the 25 to 50 signed petitions for each of the 10 to 20 people at the event?

A.    Yes.  Hopefully they have a large stack of petitions that they're going to be returning.

Q.    And you mentioned as well that the volunteers receive

guidance to, you know, try to check the form before it comes back to the point person.  Why is that?

A.   Well, so there's a few places on the form where people often will make an error so -- sometimes people forget to date the form or they forget to sign the form, so we always kind of encourage our volunteers before the voter walks away to, like, look over and make sure that the form is complete.

And also the form asks for people's county, and a lot of times people see that and they just write "USA."  And so they are reading "country" even though it says "county."  So we encourage, you know, our petition gatherer volunteers to kind of be mindful and to be looking for that, because once the voter walks away, it's a lot harder to reach out to get them to, you know, correct anything.  So if you can do that before they walk away, you know, then you're much more likely to have a valid petition.

Q.   If there is an error on the petition or it's incomplete after the voter walks away, does the League do anything to correct those errors or fill in the missing information?

A.   So if we have contact information for the voter, like let's say they also signed up to be on our mailing list or they also filled out a membership brochure at time they completed a petition, then we would be able to get in touch with them and say, Hey, we noticed this was incomplete.  Do you want us to, you know, meet you somewhere, or should we send this to you?  Or

how do you want to resolve this?  But if we don't have contact information for them, then, you know, it might be impossible to actually get the form corrected.

Q.   So after that process where the point person gathers all of the petitions and attempts to correct any of the missing information or incorrect information, where does the -- where do the petitions go from the League after that?

A.   So the point person would be returning them to the petition sponsor, and sometimes there are drop-off offices that ballot initiative campaigns will organize, you know, throughout the state.  And so if there is a drop-off location kind of relatively close to that League member's house, you know, they would try to deliver the petitions in person.  That's always the least expensive if we can manage it.  If there isn't a convenient drop-off location, then the point person would coordinate taking those to the post office or to FedEx and would have them mailed to the sponsor organization.

Q.   And in your understanding, does the sponsor then send it off to the Supervisors of Elections in the correct district?

A.   Yes, that's my understanding; that the sponsoring organization then kind of goes through the petitions, makes sure that they're complete, ensures they are not duplicate petitions, and then sends them to the right Supervisor of Elections office.

Q.   Why does the League send it to the sponsor and not directly to the Supervisors of Elections?

Direct Examination - Ms. Lowe-Minor

A.    Well, so if we're collecting them -- I mean, A, we wouldn't necessarily know, for instance, if somebody had inadvertently signed it twice, whereas the sponsor organization is keeping track of those types of things.

We also -- you know, we frequently look for opportunities to collect where there's going to be a lot of voters, you know, so a large community festival or a parade or a concert, a tailgate, those types of events.  And there's often people there from, like, a lot of different Florida counties, and so, you know, we would have to be organizing which county, you know, each voter is from and then send it to the right SOE, as opposed to just putting them all into one envelope and sending them to one place, which is what we do now.  That would be a lot of coordination and, again, all volunteers.

Q.    So you mentioned volunteers.  Is that why they don't take the time to do that extra work of finding the correct districts?

A.    I mean, I think, yeah, anything that we can do to streamline the process for volunteers we want to.  We don't want to create extra work for them and extra opportunities for there to be, you know, complications.  So, yeah, we want it to be as simple as possible.

Q.    And could the League pay somebody to do that work if it's not going straight to the sponsor?

A.    Oh, we don't have the money to do that.  So, you know, if we had a significant infusion of funds in theory, but that's not

Direct Examination - Ms. Lowe-Minor

something that is practical according to our current budget.

Q.    Prior to HB 1205, was the League required to send signed petitions back within a certain time frame?

A.    So I don't remember that.  There was a requirement for sponsors, I believe, that was 30 days, and I think we tried to work towards that for sure.  But I don't recall us feeling pressured about time frames previously to the adoption of HB 1205.

Q.    And in your experience with the League, approximately how long does it take typically for the League to turn in petitions after an event to the sponsor?

A.    Well, so it's usually a few days if we are able to hand-deliver it to a drop-off location.  So if the sponsoring organization has an office nearby, then, you know, again, our volunteers try to get those delivered very quickly.

If it's a situation where we have to mail it, we always try to pay for the least expensive mail possible.  So, you know, that might be the bulk mail that takes ten days or, you know -- and that's plus the time it takes for our volunteer to be able to find time to go to the post office.

MS. HUDGENS:  Your Honor, I'm now going to ask Ms. Lowe-Minor about her personal experience in petition circulation.

THE COURT:  One moment.

We'll go ahead and take a break now.

MS. HUDGENS:  Sure.

THE COURT:  Thank you very much.  I appreciate it.

And let me say I appreciate -- Mr. Greess, Ms. Hudgens, and Mr. Wolk, y'all are speaking at a good cadence. It's easier for everybody involved and both witnesses as well. Thank you for speaking slowly and distinctly.  It makes it a lot easier on the court reporter and the judge.  So thank you.

We'll be back in ten minutes.

MS. HUDGENS:  Thank you, Your Honor.

(Recess taken at 9:41 AM.)

(Resumed at 9:51 AM.)

THE COURT:  We are back on the record.

Counsel, you can continue with your examination.

MS. HUDGENS:  Thank you, Your Honor.

So I'll now elicit testimony from Ms. Lowe-Minor about her personal experience as a petition circulator.

BY MS. HUDGENS:

Q.   Ms. Lowe-Minor, have you been involved in petition circulating with the League?

A.   Yes.

Q.   What are some of the initiatives that you've gathered petitions for as a member of the League?

A.   So I've collected petitions for Amendments 5 and 6 in 2010, for Florida's Water and Land Legacy in 2014.  I collected petitions for what became Amendment 4 in 2018 to restore voting

rights to former felony offenders.  I was involved in collecting petitions for an initiative in 2020 to open Florida's primary system.  I collected petitions in 2024 for the reproductive rights amendment that was on the ballot, and I also have collected petitions for Florida Decides Healthcare for the Medicaid expansion initiative that's currently trying to get on the ballot.

Q.   And so when you say "that's currently trying to get on the ballot," do you mean that you are currently circulating for that?

A.   No, I have not circulated as an individual since HB 1205 went into effect.

Q.   So when you were circulating for Florida Decides Healthcare, was that part of the last cycle?

A.   Yes, that's correct.

Q.   Had you done any petition circulation prior to joining as a League member?

A.   No, I don't believe that I ever did.

Q.   Where do you personally prefer to gather petitions?

A.   So I have done a lot of petition gathering for the League, so I feel very comfortable gathering petitions and will usually carry a clipboard with blank petitions around in either my computer bag or in my car.  And so when I'm talking to, really, anyone about the League, if they seem interested, I'll say, Oh, we are currently collecting petitions for this.  Would you like

1533
Direct Examination - Ms. Lowe-Minor

to sign?

I'll also take petitions to public meetings that I go to. I'm a member of a book club, so I'm bring petitions to my book club meetings and ask if folks want to sign.

It's a regular part of my day-to-day life.

Q.   Do you gather petitions at League events -- League-organized events?

A.   Yes.  So I've been to many, you know, tabling kind of activities that the League had organized -- farmer's markets, Downtown Getdown, Springtime Tallahassee -- and have collected petitions formally on behalf of the League with other League members.

Q.   And when you're at a League event gathering petitions, are there ways that you identify yourself as a League member?

A.   So typically I and also most of our volunteers wear very large buttons that say "League of Women Voters," so when we're kind of at a group event, we will be wearing those.

Normally, the first thing we say to people are, Hi.  I'm so-and-so with the League of Women Voters and we're collecting petitions on this.  Do you have a minute to talk about it?

Q.   And I think you said you see other volunteers, between 10 -- let me get the number right -- at these events -- 10 to 20 people at the League events?

A.   Yeah.  They can be bigger or smaller, but that's probably about the average size.

Q.   And are they also identifying themselves as League of Women Voters in your observation?

A.   Yes.  And sometimes we are all wearing T-shirts, so, yeah, very visible.

Q.   As a petition gatherer, how do you engage with a potential voter to see whether or not they're willing to sign a petition?

A.   Yeah.  So, I mean, typically I'll see somebody and smile. If somebody smiles back or at least they don't turn around and walk away, then I'll feel comfortable to approach.

     And, you know, I'll introduce myself.  I'll ask them if they've heard about the initiative, you know, or would they like to learn more.

     Sometimes people ask, Well, what do I have to do?  You know, they might be in a rush.  They might only have a minute, and so, you know, I'll quickly explain, you know, what's going on and give them an opportunity to sign if they choose.

Q.   And are there ever times when you approach someone and they ask what they have to do in order to sign a petition?

A.   Yes, definitely.

Q.   And what do you tell them?

A.   Usually I tell them, Oh, you know, it just takes a minute; that we're collecting petitions to get something onto the ballot so that voters will be able to vote, you know, up or down on the initiative in the next general election.

     You know, sometimes people say, Oh, well, you know, if I

1535
Direct Examination - Ms. Lowe-Minor

sign the petition, does that mean I have to vote for it?

I say, No.  You know, you are just signing to get it onto the ballot so that voters can make a decision and you can vote, you know, however you choose.

And I think most people like the idea of at least helping to get something kind of into the conversation so that voters can make a decision.

Q.   Have you collected petitions from people who are not sure whether they'll support it in the -- if it were to make it onto the ballot?

A.   Yes, yeah.  I've definitely heard people say, Well, I don't know if I'll vote for this, but I'll at least sign it to put it on the ballot.

Q.   And have you yourself ever signed a petition for something you yourself don't then intend to vote for if it were on the ballot?

A.   I don't know that I have.  I have signed candidate petitions for candidates that I knew that I likely wouldn't support, but I don't think that I've signed a petition amendment or a petition initiative, but -- not that I can recall, yeah.

Q.   And when someone does decide to sign a petition, you mentioned having had conversations with them about the initiative.

Does that conversation with the voter stop when they've decided to sign?

A.   No.  So normally when, you know, they are standing filling out the form, we'll be chatting about, you know, if they have questions about the initiative; you know, why is the League supporting it, kind of what do I think about it.  Sometimes people ask about the petition gatherer's own opinion on it.  Or, you know, they'll ask questions about the League of Women Voters:  What do you guys work on?  What's the League of Women Voters do?

     So, you know, during the time that they are signing, it's also an opportunity to talk, and if they seem particularly interested in our work or they, you know, would like to be involved themselves, we encourage them to sign up to be on our email list or to become a member or also to come out and volunteer with us, you know, at future events.

Q.   In your experience, how long does a typical voter interaction take to gather a petition?

A.   So just, like, quickly.  It could take, like, a minute or two if they are just like, Hey, I'm in a real rush, but I'll sign.  And, you know, Here you go, and off they go.  But if we are having a good conversation and, you know, people are feeling friendly, it might be a five- or ten-minute conversation.

Q.   And based on what you've seen at these events with other petition gatherers, is that the process that you've seen them engage in?

A.   Yes.

Q.   And you said that it's usually 10 to 50 petitions that are gathered at those events?

A.   Yeah, I would say anywhere, you know, between 25 and 50 for, like, a two- or three-hour volunteer shift would be common.

Q.   So would that include yourself?  You've gathered between 25 and 50 at an event?

A.   Yes.

Q.   Have you ever been a point person at an event to gather back the petitions?

A.   I have, yes.

Q.   And how many petitions have you gathered back as the point person at a League-organized event?

A.   So the last time I served as point person was for Florida's Water and Land Legacy amendment, which I believe was on the ballot in 2014.  There was an office here in Tallahassee, and so that's why I remember, like, gathering everything and taking it back to that office.  But I would estimate that there were probably between 100 and 150 petitions that I, like, collected back from members to then turn in.

Q.   And as the point person taking back the 150 petitions, did you do that quality check that you mentioned earlier to see if there was missing information?

A.   Yes.  So I looked through to make sure that everything was complete, and I don't remember having to remedy any forms at that time, like having to contact anyone to fix forms.

1538

Direct Examination - Ms. Lowe-Minor

Q.    And your experience as a petition circulator was as a member; is that right?

A.    Yes.

Q.    Is it only League members that can participate with the League in a League-organized petition-gathering event?

A.    No.  So we do welcome volunteers who are nonmembers.

So frequently what happens is that someone who is a member hears about the, you know, volunteer opportunity.  They might show up to collect petitions, but they've brought their spouse or they've brought a friend with them.  And then that person, you know, doesn't just want to stand around.  They are, like, interested in helping too.

So we'll train that person, you know, right then and there. We'll kind of let them know, This is what's going on with this ballot initiative; this is what this initiative would do; these are questions you might get, and this is how, you know, people should fill out the form and what to look for.  And that person is able to help us as well.

Q.    Is there a benefit to the League of allowing volunteers beyond just the membership to collect petitions with the League?

A.    Yeah.  You know, we are, A, expanding the number of people who are ultimately helping to have these conversations and hopefully advance this measure to the ballot, but, B, we are hoping that those folks have a very good experience volunteering with us and that they really enjoy it and they think that this

is fun and that they want to become members.  And that does happen, that folks kind of come in for the first time as a volunteer through a friend or a spouse, and then they end up joining the organization.

Q.   Are you personally aware of any people who had first volunteered at a petition-gathering event and then became a member of the League?

A.   Yes.

Q.   What does it mean to become a member of the League?

A.   So we are a dues-paying organization, so you do have to pay a financial contribution.  I believe our minimum join level is $20 a year.  But many of our members do join at kind of like a higher contribution than that.  But, you know, at a minimum you have to pay dues and kind of attest that you would like to be a member, and you fill out a membership form.

Q.   And is petition gathering something that the League uses to promote the League activities?

A.   Yeah.  So we often are communicating with members and with the public about, you know, the impact of our work, and we'll include pictures of, you know, our members with their clipboards, smiling, you know, at events.

     That's a way to demonstrate to the community that, Hey, the League was out there doing this, and, you know, we'd love for you to join; we'd love for you to come do this as well.  So it's a way to promote our organization for sure.

1540

Direct Examination - Ms. Lowe-Minor

Q.   And you mentioned that members pay some financial amounts in dues to become a member.

     Does that impact the League's budget?

A.   Yes.  About 35 percent of our advocacy funds, our membership -- our budget is comprised of membership, so 35 percent of our budget.

Q.   And have you seen any impact on the level of membership in the year before HB 1205 went into effect to this past year after it went into effect?

A.   So we have seen a decrease in membership over the past year from -- we monitor membership on a kind of year-to-year basis from January 31 to January 31.  So that's the date that we kind of freeze membership for the purpose of evaluating, you know, membership increase or decrease.  And our membership, you know, unfortunately, has gone down somewhat since HB 1205 went into effect.

Q.   And so you're saying from the time of January 31st, 2025 --

A.   Uh-huh.

Q.   -- to January 31st, 2026, the membership has gone down?

A.   That's correct.

Q.   Okay.  And do you attribute any of that to HB 1205?

A.   Yes, we certainly think it's reasonable to assume that that's had a negative impact on our membership.  Our members are looking for, you know, kind of high-engagement, meaningful activities that they can take to improve their communities, and

I think this is something that a lot of our members really cherished. So the fact that that's no longer something that, you know, we're engaging in I think has been very detrimental to our membership.

Also, because we're not out there as visibly, we're not able to recruit new members. And so, you know, to be out there having conversations while we are doing petition gathering and then also invite people to join us as members, you know, we're not having as many opportunities to do that, and so I think that's hurt us.

And, overall, I mean, given the political climate and kind of what's going on, people are looking for ways to add value to the democratic process. I think that we would have expected to see our membership increase over this time. And so the fact we are seeing a decrease is a real concern, and we do think that it's attributable to this.

Q. In addition to paying dues, do members separately provide individual donations?

A. Yes.

Q. And as president do you have an understanding of what's happened to individual member donations from that January 31st time period last year to the January 1st time period this year?

A. Yes. Our overall budget has shrunk so the donations part of our budget is smaller than it was last year.

Q. Getting back to petition circulating, during your time as a

Direct Examination - Ms. Lowe-Minor

member, have you ever been made aware of any complaints from anyone about the behavior of the League's volunteers with respect to petition gathering?

A.   No, never.

Q.   And have you ever been made aware of any criminal activity of your members regarding their petition gathering?

A.   No.

Q.   What about any investigations of the volunteer petition gatherers from the League?

A.   No, I've never heard of any investigations of the League members.

Q.   Have you become aware of any allegations of crimes that were committed by volunteer petition gatherers from the League?

A.   No.

        MS. HUDGENS:  Your Honor, I'd now like to walk through HB 1205 and its impact on the League and, where relevant, on Ms. Lowe-Minor.  And I will go through initially as a general matter and then walk through provision by provision, so that if there is a convenient breaking point, we can do that as well.

BY MS. HUDGENS:

Q.   Ms. Lowe-Minor, you mentioned earlier that the League had stopped circulating petitions in light of HB 1205; is that right?

A.   Yes, that's correct.

Q.   And how does HB 1205 implicate the League's activities such

that it decided to stop circulating petitions?

A.   Well, HB 1205 created kind of a whole slew of requirements that the organization didn't feel that we had the resources to comply with.  But, first and foremost, it made our members nervous about, you know, their ability to engage in petition gathering in a safe way.  I mean, there's criminal charges that are associated with HB 1205 and, I mean, felony criminal level charges.  And, you know, our members were very anxious and communicated with us regularly while the bill was moving through the legislative process that they were fearful about how it could impact them personally.

Q.   And how did you yourself become aware of HB 1205?

A.   So I was -- even though I wasn't on the board at the time that the bill was moving through the Legislature, I was on the email list, and I received kind of action alerts and communication from the state League about the bill as it was progressing through the process and saw that there were, you know, calls for the membership scheduled to discuss the impact, if it were to pass, and then also once it did pass kind of what the next steps for the organization would be.

Q.   And at the time that you became president in early June of 2025, had the League's petition-gathering efforts changed at all in light of HB 1205?

A.   So I believe at that time the right to Clean Water initiative had stopped doing petition gathering, and so the

League had been collecting petitions for Right to Clean Water. And when the initiative stopped collecting, our League members stopped collecting.

Florida Decides Healthcare was still trying to collect as many petitions as it could up until June 30th. And so even at the convention where I was elected in early June of 2025, you know, our League members were still collecting petitions for that and were still working towards that.

But there had been -- my understanding -- again, I wasn't on the board yet, but my understanding was that there had been kind of a board decision that once HB 1205 went into effect that the League's petition gathering would be ceasing. And in all of my conversations with members at convention and, you know, in the periods since, everybody seems to feel like that was the right decision given kind of the anxieties about the law.

Q.    And after becoming president, have you been part of any leadership conversations about whether the League would reengage in petition circulation?

A.    So we did have a conversation, actually, as recently as our February meeting just a couple of weeks ago -- a week ago related to petition gathering. And it was our understanding that Florida Decides Healthcare is trying to kind of reactivate and collect petitions to get onto the 2028 ballot. And so there was a discussion about whether or not, you know, we, as an organization, felt comfortable supporting that, and the board

definitely is still of the mindset that that's not something that we can do or could ask our members to do.

Q.    When you say "not something we can do or ask our members to do," are you referring to the implications of HB 1205?

A.    Yes.

Q.    And have you -- after becoming president, have you had conversations with members that impacted the League's decision not to engage in petition circulating?

A.    Yes.

Q.    And how did their concerns play into that decision not to reengage in petition circulating?

A.    So our members have a lot of concerns.  We are a membership organization, so, you know, ensuring that we're respecting the will of our members is very important to us.  But among, you know, the types of concerns that members have expressed to me, people are very concerned about having to register with the State in order to collect petitions.  People are concerned about making an inadvertent mistake and then having potential criminal felony-level, you know, liabilities or charges.  People are concerned about, you know, potentially losing their voting rights if they were to be, you know, found guilty of a felony.

You know, we work with a lot of folks who are trying to get their voting rights restored, and so we're familiar with how complicated that process is in Florida.  And so our members are really concerned that making a mistake in terms of petition

Direct Examination - Ms. Lowe-Minor

gathering could impact their own ability to vote.

Q.    I want to walk through some of the provisions, and we can talk about the member concerns more specifically.

But have -- since HB 1205 went into effect, have you circulated petitions?

A.    I have not, no.

Q.    And do you -- why not?

A.    Well, I mean, I share the concerns of our membership.  I'm worried about my own, you know, kind of self and my family.  I'm worried about some of the requirements for registration.  I'm actually married to a very wonderful man, but he is an elected official, and he's received threats against his life.  And his -- you know, it's scary, like, potential harassment.  So his information and my information as his spouse is exempt from public records.  And so having to register with the State, collect petitions, having our address on petitions that I would be distributing to people in the community, you know, that feels like we would be opening ourselves up to potential harassment.

So, yeah, there's a lot of fear on my part as an individual.

MS. HUDGENS:  Your Honor, I'm now going to walk through the registration and affidavit provision from HB 1205 regarding the personal information of circulators.

BY MS. HUDGENS:

Q.    Ms. Lowe-Minor, are you aware of a provision of HB 1205

that requires petition circulators to register with the Florida Secretary of State if they're planning to collect more than 25 petitions?

A.   Yes.

Q.   And are you aware that there's -- that as part of HB 1205, it requires petition circulators to include their home address, the last four digits of their social security number, and other identifying information to register?

A.   Yes.

Q.   And are you aware that HB 1205 also requires the registered petition circulator to include their name and personal address on the petition itself?

A.   Yes.

Q.   Did you hear member concerns regarding the requirements of HB 1205 regarding providing that personal information?

A.   Yes.  A lot of members expressed concerns about providing personal details.  There were concerns about potential identity theft.  There were concerns about retaliation -- potential retaliation, especially for folks who work in either, like, the state university system or, you know, the state government or our teachers.  You know, folks are very anxious about that and just kind of a sense that political speech is being monitored, and so they're worried about registering.

     There's also members who, you know, frankly -- and I agree with these members -- that they don't want to have to register

on principle, that they feel like petition gathering is something that they have a constitutional right to do and why should they have to register in order to do something that they should have a right to do as an American.

So, you know -- and then I also heard from folks who, like myself, have a public records exemption. You know, we have folks in our organization who are involved in law enforcement or who are, you know, involved in the court system in some way, and so their addresses are exempt from public records. And they're worried about how that would be managed under this law.

Q. What about people who haven't had -- don't have the public records exemption? Have you heard concerns from them?

A. Yeah. I mean, we had a member who -- we've actually had multiple members who've had maybe not the best experiences while they were out petition gathering, but, in particular, we had a member who was quite seriously harassed during the 2024 Amendment 4 campaign petition-gathering process.

And, you know, now we would be asking our members to go out to, you know, public environments and to be literally handing people our personal addresses when we're gathering petitions. And so if you had a bad experience, you know, or somebody was yelling at you or somebody was kind of threatened or you were feeling threatened by them, you know, now that person knows where you live. I mean, that's a real frightening scenario.

Q. And were those members' concerns -- I think you've

mentioned identity theft, retaliation, just not feeling that they should have to register, and harassment.

Are those concerns one of the reasons the League decided it would not reengage in petition circulation?

A.    Yes, absolutely.

Q.    Okay.  So let's walk through each of the concerns.

When you say "retaliation," what was the members' concerns about retaliation based on?

A.    Well, so we have a lot of members who are involved in kind of public education or, you know, work for the state university system as faculty members, as staff, and there have been instances in Florida of individuals within, you know, those employment settings who have lost their job because of political speech.  I mean, even as recently as a few months ago, people were terminated because of things that they had posted on social media about Charlie Kirk, for instance.

So, you know, I think there is a sense that people's political behavior is being monitored.  And especially if you work for the State in some capacity, there's caution about being involved in anything that could be, you know, used against you. And so, you know, if you were to be registered, for instance, to be collecting petitions in support of reproductive rights, is that something that could be seen or used against you in a -- you know, in an employment situation?

So we have had members who've told me that specifically,

Direct Examination - Ms. Lowe-Minor

that they were anxious.

Q.    You also mentioned a fear of identity theft.

What have members told you about why they fear identity theft?

A.    That's more, really, to just providing details, you know, your social security information, your address.  Somebody who you're out collecting petitions from, if they have your name and address, you know, could they try to open a credit card in your name?

So I think just general fear of, like, the more information about you is out there, potentially the more vulnerable you are to identity theft.

Q.    And you mentioned different types of harassment fears?

A.    Uh-huh.

Q.    You talked about the public exemption and fear regarding putting your information out there for that.  And you also talked about people who had other fears about public -- excuse me -- harassment.

What are those fears based on?

A.    Well, so, you know, we do have members in our organization who have told me that they work for the court system, that they would be very anxious to petition gather if they had to register and provide their address because they're exempt -- their address would otherwise be exempt from public records.  You know, I don't work for the court system, but I do fall into that

category where, like, I'm concerned about having my address exposed beyond what it already is because of, you know, my husband's role and the threats that he's received.

So, you know, we also have at least one member who talked to me about this because they have had domestic violence in their background and are anxious about -- again, they have a records exemption and that they are anxious that, you know, this could be a way in which their current address would be exposed to someone who might try to hurt them.

Q.   If you didn't have a records exemption, would you still have concerns about providing, for example, your address on the petition form?

A.   Yeah, because -- I mean, what if you are out talking to someone who, for whatever reason, you know, you either have a negative interaction with them or, I mean, even somebody could think, Hey, this person is very attractive.  Let me follow them home.  I now have their information, right.

So for whatever reason, having someone be able to know where you personally reside, especially if that's, like, a stranger and you haven't -- you know, that's a very frightening prospect for a lot of people.

Q.   And have any members that you've spoken with told you they wouldn't circulate petitions because of this requirement?

A.   Yes.

Q.   And members who said they feel like they shouldn't have to

register, how many people have you heard that concern from?

A.   More than ten.

     So folks who are just, like, This is a right that we have as Americans to petition our government.  That's a First Amendment constitutional right, and why should you have to register with anyone in order to do that?

Q.   Are you someone who also believes they don't have to -- shouldn't have to register before petition circulating?

A.   Yes.

Q.   Have members told you they would not register on that basis?

A.   Yes.

Q.   As a member of the League, would you be willing to circulate 25 petitions or fewer so that you don't have to provide your personal identifying information?

A.   No.  I think I should be able to exercise my constitutional right an unlimited number of times.  So, yeah, that's a very frustrating aspect to this law.

Q.   If other provisions of the law went away, but this provision requiring circulators to register to collect more than 25 petitions remained, would you, as president, recommend that the League recommend restart petition circulating?

A.   No, I think we would still choose not to do petition gathering.

Q.   Are you aware of -- that under HB 1205 you don't have to

register if you are circulating 25 petitions or fewer, not including your own petition and that of your immediate family?

A.    Yes.

Q.    Are you aware that HB 1205 makes it a third-degree felony to collect, deliver, or otherwise physically possess more than 25 petitions?

A.    Yes.

Q.    Did the -- did you have any concerns about this provision?

A.    Yes.  So we didn't have clarity -- I don't know that we still have clarity -- on kind of is that over the course of any petition's life?  I mean, is that a specific initiative but not a different initiative?  Is that all initiatives combined for one cycle?  Like, we are kind of confused about how the 25 is calculated.

And, you know, anything that involves felony criminal charges, we are taking very seriously.  And so whether or not we could collect 22 lawfully, still if we are asking our members to do something that puts them at risk, you know, we are just not going to do that.  We are not going to ask our members to do something that we are not 100 percent confident is going to be, you know, fully sound for them.  Like, that's an unacceptable level of risk of our organization and for our members.

Q.    If you were, say, at an event, Springtime Tallahassee, for example, and everybody there collected 25 petitions, would you feel comfortable as the point person at the end of the day

gathering those petitions?

A.   No, because if I had everyone's petitions in my hand, now I'm the felon.

So, yeah, that's -- that's scary.  We are not going to ask anybody to do that.

Q.   And does that concern -- the concerns you raised play a role in the League's decision not to circulate petitions?

A.   Yes.

Q.   Did you hear from other members in coming to that decision that they also had concerns about this?

A.   Yes.

Q.   Were -- were their concerns similar to the ones that you just raised?

A.   Yes, yes.  People are very concerned about the criminal liabilities and just the risk of running afoul of the law.

I mean, even in a situation where everybody there is planning to collect, you know, no more than 20 -- you know, let's say that someone who has six petitions signed, has a family emergency and they hand those petitions off to a friend who is also collecting, well, now that person has 26.  So that person is all of a sudden -- you know, has run afoul of the law.

So, yeah, the risks just feels too high.

Q.   And how many members would you estimate that you personally have heard this concern from?

A.   Multiple dozens.

1555
Direct Examination - Ms. Lowe-Minor

Q.    And how does it impact the League if members are only able to gather 25 petitions without registering?

A.    I just think it turns the entire activity of petition gathering from something that is, you know, an accessible and fun civic engagement activity into something that is very fraught, very nerve wracking, something that people don't want to do, something that's too complicated to manage.

And so it won't be something that we as the League can offer to -- to volunteers or to the public as a service, and that's a real shame.

Q.    And does it -- does that concern and provision impact the League's ability to retain or engage new members?

A.    Yes, absolutely.  We can't offer it as a way for people to get engaged, and it also prevents us from having conversations with individuals who might ultimately be interested in what we do and want to join.

MS. HUDGENS:  Your Honor, I'm going to move on to a different provision regarding criminal penalties for filling in missing information.

BY MS. HUDGENS:

Q.    Ms. Lowe-Minor, are you aware of the provision in HB 1205 that makes it a third-degree felony for anyone to fill in missing information on a signed petition?

A.    Yes.

Q.    Have you ever filled in missing information on a signed

petition?

A.    Yes.  So we frequently work with individuals who, for whatever reason, are -- maybe they are visibly impaired, maybe they are physically impaired, and can't complete the petition themselves.  And so, you know, for instance, if I was talking to someone who was blind but they were a registered voter, they were interested in completing the petition, you know, in the past our process has been to read to them the various fields of the form and allow them to dictate to us, you know, how to spell their name, what their address is, et cetera, et cetera.  And we would physically complete the form and then date it and then hand it to them so that they could make a mark or that they could indicate their signature to the best of their ability.

You know, we also work with folks who are disabled.  My own dad has had a stroke and so he is right-handed, but his right side was impacted by the stroke.  And so if I was helping him complete a petition, I would be filling it out at his kind of request.  And, you know, there's been very real fear that under this law making any kind of mark at all on the form, even if you are trying to help a disabled voter participate by completing the form, that that is, you know, unlawful under this.  And so that would be a real change to our practice.

THE COURT:  Counsel, before you ask your next question, let me clarify the filling in.

I'm assuming that was done before HB 1205?

Direct Examination - Ms. Lowe-Minor

THE WITNESS:  Yes.

THE COURT:  Counsel, if y'all could just clarify when you ask folks for that.  I don't want to have to advise anybody of their Fifth Amendment rights for anything they do to incriminate themselves.

MS. HUDGENS:  Yes, Your Honor.

THE COURT:  Thank you.

BY MS. HUDGENS:

Q.  So you have not engaged in petition circulating at all since HB 1205?

A.  That's correct.

Q.  And the League has not?

A.  The League has not either.

THE COURT:  And she said that previously, but I just meant --

MS. HUDGENS:  Okay.  Understood, Your Honor.

THE COURT:  -- if you ask somebody about filling in information, let's clarify when we are asking them.

MS. HUDGENS:  Absolutely.

BY MS. HUDGENS:

Q.  And you said there may be people who have disabilities or visual impairment.

Have you personally actually engaged in helping somebody sign a petition prior to HB 1205 in those circumstances?

A.  Yes.

Direct Examination - Ms. Lowe-Minor

Q.   And have members who have engaged in that process with voters prior to HB 1205 raised concerns with you regarding the -- this particular provision of the law?

A.   Yes.  We actually have a committee within the League that's focused on accessibility issues, and that committee in particular has raised this concern.  They work very closely with the disability rights community on voting accessibility issues, and so they've elevated this as a real concern for our organization.

Q.   And if only this provision remained but the other provisions of the law went away, would you want to circulate petitions under this restriction?

A.   No, because we wouldn't want to be in a situation where we were kind of forced to discriminate against voters who couldn't complete the petition with their own hand but who would otherwise want to sign.

     So not being able to help voters complete the form at their request, you know, that would be a real change of practice for us and a violation of our values in terms of voter inclusion.

Q.   And how does it impact the League that it can't help folks fill in -- or it doesn't believe that it can help people fill in the missing information for particular types of voters?

A.   Yeah, I think it -- it makes us feel like we're not able to be as helpful to voters that we would normally seek to be looking for ways to include in the process.

And I think for our members who have worked for a long time to develop, you know, skills around assisting voters despite physical ability, you know, that would be a sense of betrayal of the organization's values.

MS. HUDGENS:  Your Honor, I'm now going to turn to the provision regarding the criminal penalties for retaining voter information.

BY MS. HUDGENS:

Q.  Ms. Lowe-Minor, are you aware of the provision of HB 1205 that makes it a third-degree felony for someone to copy or retain a voter's personal information for any reason other than to provide the information to the sponsor?

A.  Yes.

Q.  And was this provision the reason why the League has not restarted circulating petitions?

A.  Yes.

So as I mentioned earlier, prior to HB 1205 when we were engaged in petition gathering, we often also had membership information or a sign-up form where folks, if they were interested in joining our email list or they were interested in hearing from the League about, you know, other things, that they could provide their email, that they could sign up to be a member.  And so, you know, this makes us anxious that if we are collecting a petition from someone we can't also have an opportunity for them to learn more about -- to sign up to learn

Direct Examination - Ms. Lowe-Minor

more about our organization or become a member.

Q.    And is that something that you've heard concerns from members about this specific provision?

A.    Yes, just that it's confusing.  And then also, again, that there is a felony-level charge associated with having an email sign-up at the same time that you are doing, you know, a petition collection.

Q.    And under the current law, if all the other provisions went away but this privileged information remained, would you recommend that the League resume petition circulating?

A.    No, because I think we wouldn't want to put our members at risk.

Q.    And how does it impact the League if they are not able to collect personal information like an email address when they are gathering petitions?

A.    Well, I mean, it undermines our ability to add folks into our network and to be able to communicate with them about other things.

     And, again, it -- it reduces our effectiveness as an organization if we are not able to help people to be aware of other things that are happening in the state or to invite them to join.  So...

Q.    Prior to HB 1205, other than the scenarios that you've just described, is there any other circumstance in which the League would have remained voter information from the petition?

A.    So we did not have a practice of keeping copies of petitions or anything like that.  So the primary way in which we would have had voter information is if they provided it at the time that they signed the petition, you know, again, they signed up for an email list or something like that.

Q.    If they had authorized you to have it?

A.    Correct.

MS. HUDGENS:  Okay.  Your Honor, I'll now ask about the ten-day deadline.

BY MS. HUDGENS:

Q.    Ms. Lowe-Minor, are you aware of the provision of HB 1205 that requires an initiative sponsor to deliver signed petitions to the Supervisor of Elections in the county in which each voter resides within ten days?

A.    Yes, I am familiar with that.

Q.    And does this provision play a role in the League's decision not to circulate petitions?

A.    Yes.

Q.    Why is that?

A.    Well, we, again, are a volunteer organization, you know, very small staff.  And when we're doing petition gathering, you know, we're relying on volunteers to return petitions or to mail petitions.  We don't have a budget for expedited shipping, so, you know, when volunteers have been returning petitions through the mail, they've been, you know, using whatever was the kind of

least expensive bulk mail rate, which might be a, you know, seven- to ten-business day kind of delivery.

And so to have to have our members really, you know, like, the next day try to get something back to a petition sponsor so that then the petition sponsor can get it to the correct Supervisor of Elections would require, you know, expedited shipping costs, as well as we would have to be spending a lot more staff time monitoring every petition event that's happening around the state under the League's name and making sure that, you know, we're tracking did those petitions get returned to the initiative sponsor so that they could then get returned to the SOE within ten days.  That's just a sense of urgency that I don't think we have the resources and the capacity to maintain.

And also if a voter themselves kind of gets halfway through the petition, you know, dates it and then goes, Hey, you know, actually I have to run, let me take this and I'll go return it myself, you know -- which does happen -- they might not return it for two months or three months and now a petition that's associated with us is now going to be turned in late no matter what.

So it just creates a lot of concern and opportunity for things to go wrong that then could reflect badly on our organization or cause us to incur, you know, penalties or cause our members to incur charges, like it's very scary.

Q.   We'll get to that portion of it in a second, but are you

aware of the penalties to the sponsor from this ten-day provision?

A.    Yes.

Q.    And that they can incur late fines because of it?

A.    Yes.

Q.    And that the League would not be responsible for those late fines?

A.    I'm glad that the League would not be responsible, but we also don't want the sponsor to incur fines because of our activities.

Q.    So that was going to be a question.

So if you're not incurring the fines for sending the petitions in late, why does that impact the League?

A.    Well, I mean, ultimately we're supporting the initiative because we want to see it go onto the ballot, and we want Florida voters to be able to have the opportunity to determine whether or not it will go into the constitution.

So any fines that are incurred by the sponsor because of us is -- you know, those are resources that are being misallocated in our opinion from opportunities to communicate with voters and educate voters about what the initiative does to having to pay late fines.  So we wouldn't want to cause the sponsor to have to, you know, lose resources in that way.

Q.    You'd mentioned earlier in the petition process prior to HB 1205 that a point person would go through and perform a check

of the petitions collected.

A.    Yes.

Q.    Would that be possible under this ten-day provision?

A.    I mean, I think under the ten-day provision we would just have to get forms back to the sponsor as quickly as possible, which would make it -- you know, any opportunity -- like, let's say we had a voter's contact information because they had, you know, given us an email address because they wanted to be on our email list.

So previous to HB 1205 going into effect, our process would have been to try to contact that voter and remedy the form, like meet with them to remedy the form or give them the opportunity to remedy the form.

If that time, you know, kind of limit is in effect, you know, we are just turning in forms even if we know that there is an error, like a missing field or something, because there really isn't an opportunity to connect with the voter if we have their contact information.

And so, yeah, we're kind of forced to turn in any forms we have as quickly as possible, even if those forms have an error. And then the sponsor has to turn those forms in, and if they end up having an error rate of 25 percent or more, then our organization is liable for investigations, so we're -- all of that sounds very scary.

Q.    If the other provisions went away, but there was still a

requirement to get the petition back to the correct Supervisor of Elections within ten days, would you recommend that the League reinstate the petition circulating efforts?

A.   No.   I think we would still feel like we couldn't comply.

Q.   And you'd mentioned the potential for an investigation.

Are you referring to the provision of HB 1205 that requires the Office of Election Crimes and Security to conduct an investigation into an initiative where the percent of invalid petition forms exceeds 25 percent?

A.   Yes.

Q.   And what are your concerns about those -- that provision?

A.   Well, I mean, certainly investigations feels fraught, irregularities feels undefined and this -- this law, you know -- in the past if we as a League collected a petition that, you know, we knew somebody forgot to date, or we knew somebody forgot to -- you know, they wrote "USA" instead of the county, if we had contact information for that voter, we would make reasonable effort to try to contact them.

But then, regardless, we would send that petition to the sponsor; the sponsor could then, if they knew that that was an invalid petition, they would only send petitions that they believed to be valid to the SOE to be verified, and then those -- the SOE is verifying each one to make sure that that petition's complete and that that voter is a registered voter.

And so under this, any mistake that you make in terms of

before a voter walks away, like if you don't catch it right away while they're there, you know, there's an opportunity to have something on the form that's blank or something on the form, right?

Well, so now sponsors have to turn that in no matter what, even if they know that, oh, someone forgot to date it, which people do all the time. People make -- you know, they leave a field blank or something.

So now they have to turn in everything, and then as soon as any of those, you know, mistaken forms end up being more than 25 percent, then everyone who's involved, including the volunteer petition gatherers, you know, they are potentially liable for investigations, which, you know, we don't want any of our members to feel like something that we're asking them to do as a civic duty or civic service is now going to, you know, result in them being investigated.

Q.   Ms. Lowe-Minor --

          MS. HUDGENS:  Your Honor, I'm going to speak about the racketeer influenced and corrupt organizations implications.

BY MS. HUDGENS:

Q.   Ms. Lowe-Minor, are you aware of the provision of HB 1205 that expands the definition of racketeering to include violations of the Florida Election Code that relate to irregularities or fraud involving petition activities?

A.   Yes.

Q.   And are there concerns about this provision, yours or the League's?

A.   Yes.  I mean, I'm not an attorney, so racketeering sounds very scary and mobster, and we just -- yeah, we don't want any of our members to have anxiety about things that the League is doing or that anything that we're involved in would be part of a racketeering investigation or charges.  That is not what the organization is about.

Q.   And based on the language of that provision, is this something that you as president feel that the League could provide sufficient guidance to its members to avoid liability under this provision?

A.   No.  I mean, we really don't know what would incur those charges, and things about that section feel very vague to us so, yeah, I don't think that we have the legal wherewithal to advise our members on how to avoid those charges, like, I don't even know what would bring about those charges, so we would just not gather petitions.

Q.   This may be answered in your last question, but I'll just ask it specifically.

So if the other provisions of HB 1205 went away, but this provision expanding the definition of racketeering under the -- under the law stayed the same, would you recommend to the League leadership that they reengage in petition circulating activities?

Direct Examination - Ms. Lowe-Minor

A.   No, I would not recommend that.

        MS. HUDGENS:  Your Honor, I'm going to speak now about the prohibitions on who is permitted to circulate petitions.

BY MS. HUDGENS:

Q.   Ms. Lowe-Minor, are you aware of the provision of HB 1205 that prohibits petition collection by noncitizens, non-Florida residents, and former felony offenders who've not yet had their voting rights restored?

A.   Yes, I am aware of that.

Q.   And were there concerns by the League regarding that provision of HB 1205?

A.   Yes, many concerns about all of those restrictions.

Q.   And let's start with the former felony offenders who've not yet had their voting rights restored.

     Do you have concerns on behalf of the League regarding their inability to circulate petitions under the law?

A.   Yes.  So we were very involved from the organization stage through the eventual passage of the effort to -- or in the effort to pass Amendment 4 in 2018, which was an effort to essentially create an automatic process for former felony offenders who had completed their sentence to their have voting rights restored.

     And, you know, prior to that amendment passing, you know, it was very, very complicated for former felony offenders to have their voting rights restored and, you know, there were

hundreds of thousands of folks who had completed their sentences, but only a handful, really, each year were having their voting rights restored on a case-by-case basis by the Florida cabinet and so -- on the executive clemency board.

So, you know, for that process we worked very closely with, you know, returning citizens, folks who fell into that category, including the organizer of that initiative, Desmond Meade. And were it not for those individuals -- who under this law wouldn't be able to even do petition gathering -- but were it not for those individuals, you know, that initiative I do not believe would have passed and would have actually even made it onto the ballot for Floridians to make a decision about.

And so on principle, you know, that's a population that we feel should absolutely be able to be engaged in talking with Florida residents, with citizens, about whether or not these types of issues should make it onto the ballot. I mean, ultimately, these were folks who didn't have the right to vote on that issue, but they were able to at least talk with citizens about putting it onto the ballot to have citizens make a decision.

And so, yeah, we feel very strongly about helping that population. We work with returning citizens now. We have a voting rights restoration action team that helps folks navigate the voting rights restoration process, and we 100 percent think that folks who are still working to have their rights restored

should be able to be involved in petition gathering and in public life.

Q.   And do you have members of the League who are returning citizens who have not yet had their voting rights restored?

A.   So we don't know.  We don't ask on our membership application if folks have their voting rights intact or not.  So we actually don't know if that -- if we have folks within our network who are members but who do not have their voting rights restored.

Q.   What about volunteers?  Do you know of any volunteers who have not had their voting rights restored?

A.   Yes.  We have had folks who we've been working with on voting rights restoration who have volunteered with us.

Q.   And as the president of the League, would you want to prohibit them from engaging in League activities after HB 1205?

A.   No.

Q.   Okay.  What about nonresidents and noncitizens?  Have you heard any concerns from members about provisions that prevent nonmembers and noncitizens from participating in petition gathering?

A.   Yes.  We have -- we do have nonresidents who are members of the League that we're aware of.  You know, Florida's a popular state for snowbirds, so there are folks who, you know, live up north for most of the year but are down here for the winter months, and they participate with the Leagues, you know, here

who have been engaged in petition gathering and would want to continue.

That's also a category that some students fall into. You know, they're registered to vote -- they're out-of-state students, but they're registered to vote at their, you know, family's address, but they're here for the year and they participate with the League of Women Voters on their campus. So, you know, that's a group that we would want to be able to engage in petition gathering the same as any other member.

And then also noncitizens, we do have at least one that we're aware of who has done petition gathering for us in a volunteer capacity.

Q.   And is that something that the organization -- you mentioned for former felony offenders returning that you don't ask that information of them when they become a member.

Do you ask your membership about information regarding where their permanent residence is or whether they're U.S. citizens?

A.   No.  So we actually don't have a way of capturing that information.  So we wouldn't know within our membership if there are folks who fall into those categories.

MS. HUDGENS:  Your Honor, I'm just going to ask Ms. Lowe-Minor now about the overall impact of the law and their inability to circulate petitions.

Direct Examination - Ms. Lowe-Minor

BY MS. HUDGENS:

Q.    Prior to HB 1205, were the League and its volunteer members ever subject to the restrictions that we've discussed?

A.    No.

Q.    And as president of the League, what impact does HB 1205 have on its members' ability to express their views on an issue that they care about?

A.    Well, I think, in terms of, you know, these types of categories of individuals, we have never in the past asked members for information regarding whether or not they fall into these categories, and we've included -- opportunities for volunteering have been open to all members.

So this would require us to say, Oh, well, you know, some members can do this, but others can't.  I mean, that would be a real change of culture and a change of practice for us and would discourage us from doing petition gathering.

Q.    Earlier you -- we've talked through some of the provisions and the difficulties that the -- that you said the League would have in complying with certain provisions.

Putting them all together, how does that impact the League's ability to comply with HB 1205?

A.    I think it just makes it impossible for us to do petition gathering as an organization or to encourage our members to do it on our behalf.  You know, we don't want to put anyone at risk of falling into legal jeopardy; we don't want to open our

organization up to investigations; we don't want to, you know, run afoul of the law.

And so, you know, all together this makes it, you know, next to impossible for volunteer groups like ours to do petition gathering as, you know, a civic service, as something that we're offering as a way to encourage more Floridians to be aware of what's happening and to, you know, help to put something forward for the entire electorate to make a decision about.

Q.    And under HB 1205, would you -- would you be -- would you, as president, want volunteer circulators -- strike that.

Why is it important to the League that it is helping its members to comply with the law?  Couldn't members just track this information for themselves?

A.    I mean, I think that members are petition gathering through the League because we are providing a structure and we are providing the guidance for how to do it correctly.  You know, we have members who want to do a good job.  They want to -- you know, they are spending time volunteering because they are wanting to improve their communities.

And so, you know, we are providing guidance on, you know, this is what this amendment does; here's information about, you know, the petition itself; this is how to make sure that someone's form is complete; here's a chance for you to come do it at -- you know, this Saturday alongside other members.  It's a social thing as well.

So, you know, without that guidance and structure, I think a lot of members would be maybe a little fearful or a little uncomfortable.  It feels like putting yourself out there to go talk to strangers, you know.  So I think the League plays a really critical role in creating, you know, a space and a structure for volunteers -- you know, for Floridians to be able to do this.

Q.   So, ultimately, in light of HB 1205, what role can the League play in petition circulation?

A.   I mean, I think we won't be able to play a role at all.

Q.   What does it mean to you personally that you can't -- or that you don't feel that you can circulate the petition with all of the potential consequences of HB 1205?

A.   So for me personally, it's a real loss.  I've seen and have been very proud to be involved in initiatives that the League endorsed, that we gathered petitions on and that we helped advocate for passage, you know, of initiatives that I have felt personally have made a really positive impact on this state.

I don't believe that Amendment 4 from 2018 would have become law were it not for the efforts of the League and, you know, our volunteers alongside many others around the state.

I know that -- Amendments 5 and 6 related to redistricting reform and prohibiting partisan gerrymandering.  I know those would not have made it onto the ballot and been able to be approved by Floridians were it not for the efforts of the

Direct Examination - Ms. Lowe-Minor

League.

And so I'm really proud that we've been involved in those things. I'm proud personally that I've been involved in those things, and it is a loss as a citizen to not be able to envision doing that in the future.

Q.    Thank you, Ms. Lowe-Minor.

I'll pass the witness.

THE COURT:  Let's do this.

Mr. Raban, you are up?

MR. RABAN:  Yes, sir.

THE COURT:  How long do you think -- it's been about an hour, so I'm probably going to take a break.

How long do you need just for planning purposes?  I'm not in any way limiting you.

MR. RABAN:  Your Honor, if we were take a break right now, I could get through my cross-examination before lunch.

THE COURT:  Okay.  We are going to go ahead and take a break.

Before we do that, let me inquire.  The next witness, Medrano, how long do we anticipate?

MS. HUDGENS:  I believe, Your Honor, that she's roughly 30 minutes for direct.

THE COURT:  Okay.

And how about Ms. Scoon?

MS. HUDGENS:  I believe over an hour, I believe,

but -- maybe between an hour and hour and a half on direct.

THE COURT:  So the goal is to maybe get through Chandler today; is that right?

MS. HUDGENS:  That's correct, Your Honor.  We want to get through Ms. Chandler before the end of the day.

THE COURT:  Okay.  And I'm not rushing anybody.  I'm just trying to monitor where we are at and what we are doing.

Thank you.

Court is in recess for ten minutes.

(Recess taken at 10:56 AM.)

(Resumed at 11:12 AM.)

THE COURT:  All right.  We are back on the record.

Mr. Raban is going to try to introduce all kinds of exhibits.

Go ahead, sir.

MR. RABAN:  No, Your Honor.  I said we'd be done before lunch, so no exhibits.

CROSS-EXAMINATION

BY MR. RABAN:

Q.   Be grateful that you weren't there for that, Ms. Lowe-Minor.  It was a wild ride.

Good morning, Ms. Lowe-Minor.  It's good to see you again.

A.   Yes.

Q.   My name is Randall Raban.

THE COURT:  Mr. Raban, the record will reflect you

actually won in the end.

MR. RABAN:  Thank you, Your Honor.

BY MR. RABAN:

Q.   I represent the Florida Secretary of State today and get to ask you a couple of questions on cross-examination.

So quick question for clarification right out of the gate here.  I believe it was your testimony that the League of Women Voters isn't currently sponsoring an initiative; is that correct?

A.   That is correct.

Q.   Okay.  So the League's involvement with initiatives in Florida, at least for the 2026 cycle, has been limited to providing support for initiatives that are sponsored by other groups; is that fair to say?

A.   That is correct.

Q.   Okay.  And do you know if the League has ever been the primary sponsor for a citizen initiative in Florida?

A.   Not to my knowledge.  We've served on the steering committee but have not served as the primary sponsoring organization.

Q.   Okay.  Do you know if the League has any intention to serve as a primary sponsor for a citizen initiative in the future?

A.   Not to my knowledge at this time.

Q.   Before July 1st, 2025, the League was collecting petitions for the Right to Clean Water initiative and the expansion of

Medicaid in Florida initiatives; correct?

A.    Yes.

Q.    Do you know how many petitions League members collected for these initiatives prior to July 1st, 2025?

A.    I do not know, no.

Q.    I believe you had indicated that you yourself had personally had concrete plans to circulate petitions for these two initiatives; is that right?

A.    Yes, that is correct.

Q.    Did you ever actually circulate any petitions for these initiatives prior to -- or strike that.

      Did you ever actually circulate petitions for these initiatives during the 2026 cycle?

A.    I believe that prior to the League ceasing petition-gathering activity, I did circulate petitions for the Medicaid expansion.  I do not recall circulating petitions for Right to Clean Water personally.

Q.    Okay.  And for the Medicaid expansion initiative, about how many petitions do you believe you had gathered personally?

A.    Probably two or three dozen.

Q.    Okay.  Are you familiar with HB 1205's requirement for circulators to register with the State if they collect more than 25 petitions from people outside their family?

A.    Yes.

Q.    In your complaint in this case, you state that because of

this requirement thousands of your volunteers would need to register as petition circulators.

Do you recall that?

A.   Yes.

MS. HUDGENS:  Objection, Your Honor, to the scope. She's not testifying as a corporate representative.

BY MR. RABAN:

Q.   Oh, I apologize.  My understanding, Ms. Lowe-Minor, is that you are here testifying on behalf of the League of Women Voters of Florida as a corporate representative.

Am I mistaken?

MS. HUDGENS:  She's testifying in her personal capacity, but that includes as president of the current League.

THE COURT:  Here's what we are going to do.  You can just -- you don't have to ask her as a corporate representative. You can just ask her if she's aware of the scope of the impact on volunteers.  So you can ask her her knowledge about that, and if she has no knowledge, then you move on.

MR. RABAN:  Okay.

BY MR. RABAN:

Q.   So before --

MR. RABAN:  Thank you, Your Honor.

BY MR. RABAN:

Q.   Before I move on, though, you were deposed in this case; correct?

A.   Yes.

Q.   And you were offered as a 30(b)(6) deponent on behalf of the League of Women Voters of Florida; correct?

A.   I don't know what that means.

MS. HUDGENS:  Your Honor, we --

BY MR. RABAN:

Q.   Corporate representative.

MS. HUDGENS:  -- she was designated as the 30(b)(6) witness on specific topics.

THE COURT:  But not on every topic and what they divided up?

MS. HUDGENS:  It was not divided up, but she was not designated as a corporate witness as to all things for all times.

THE COURT:  Did the topics include the number of volunteers and so forth?

MS. HUDGENS:  I don't believe it was as specific as that, Your Honor.  I have no problem with her testifying as to what she remembers from that exercise.

BY MR. RABAN:

Q.   And just the reason I ask is because if there's a moment in time where I would like to use your deposition --

THE COURT:  You certainly can use the deposition regardless of --

MR. RABAN:  Understood.

THE COURT: -- what capacity she's being offered up to now.

We are making this way more complicated than it needs to be.

MR. RABAN: Understood, Your Honor. I'll --

THE COURT: Not you. You are not, Mr. Raban. I meant just -- you can ask her. If she doesn't have knowledge, she can say that; if she does, you can follow up. And if she's saying something contrary to what she said at her deposition, you certainly can ask her about it.

MR. RABAN: Understood. Thank you, Your Honor.

THE COURT: Thanks.

MR. RABAN: I have a propensity for overcomplication, so --

THE COURT: Well, when I say "we," I was using the royal -- I wasn't -- that was not directed at you, Mr. Raban. That was the royal "we."

MR. RABAN: Thank you.

MS. HUDGENS: You might have been referring to me, Your Honor, and I apologize.

THE COURT: No worries.

BY MR. RABAN:

Q. So is it your -- so you are familiar with that provision of HB 1205 about the 25-petition limit; correct?

A. Yes.

Q.    And is it your understanding that because of this requirement thousands of your volunteers -- or the League's volunteers would need to register as petition circulators?

A.    It's my understanding that any member who is collecting more than 25 petitions would need to register, yes.

Q.    Is it your opinion that this requirement to register will deter voters from joining the League's petition-gathering efforts?

A.    Yes.

Q.    On May 8th the League's leadership told its members that it would as an organization stop circulating on July 1st, 2025; correct?

A.    I was not on the board at that time.

Q.    Are you generally familiar with the League deciding to discontinue circulation efforts on July 1st, 2025?

A.    Yes.  And what you are describing sounds accurate, but I just can't --

Q.    Sure.

A.    -- attest 100 percent.

Q.    And the League did, in fact, stop circulating petitions and gathering petitions on July 1st, 2025; correct?

A.    Yes, that is correct.

Q.    So it's difficult to know whether HB 1205 would have deterred volunteers from collecting petitions when the League of Women Voters discontinued their petition-gathering efforts on

the same day that HB 1205 went into effect; would you agree?

A.    I wouldn't agree.  We've heard from a lot of our members that they are concerned about the provisions in HB 1205.  And their fear about the law and its implications for them as individuals is why the League -- or in large part why the League chose to stop gathering petitions.  So the law is directly responsible for all of those individuals not being able to gather petitions.

Q.    Well, so -- so, if I understand correctly, there were members that expressed concerns about HB 1205?

A.    Yes.

Q.    Is that the reason why you decided to discontinue circulation efforts?

A.    Yes, in large part.  We heard directly from our membership that they had concerns.  And we also, as an organization, didn't feel that we had the necessary resources to comply and to enable our members to feel confident in the process.

Q.    Understood.

      Did you communicate with any of the sponsors prior to your decision to discontinue circulation efforts?

A.    I don't know.  By the time I was elected to the presidency in early June of 2025, Right to Clean Water had already stopped gathering petitions.  Florida Decides Healthcare was still collecting, and we were still supporting that.  But I believe Florida Decides Healthcare had already announced that it would

1584
Cross-Examination - Ms. Lowe-Minor

not be collecting petitions after July 1, regardless of what the League was doing.

Q.    Thank you for that clarification.

The League, as an organization, relies exclusively on volunteers.  I believe you've testified to that today already; correct?

A.    We do have three staff, so I don't want to discount them, but we are a largely volunteer-led organization, yes.

Q.    Right.

But you don't have to be a member of the League to serve as a volunteer petition circulator for the League; is that correct?

A.    That is correct.

Q.    In fact, anyone can serve as a volunteer petition circulator for the League; would you agree?

A.    Yes, we invite everyone to participate.

Q.    And in most cases the majority of volunteers who circulate petitions on behalf of the League aren't League members at all; would you agree?

A.    I would not agree with that.  I would say that the majority of our volunteers are members but that we invite interested members of the public who want to participate to join us, and we hope that they will eventually choose to join as members.

Q.    So you don't recall in your deposition -- or do you recall in your deposition that you had testified that the majority of volunteers circulating petitions for the League are not members

of the League?

A.   I do not recall saying that.

          MR. RABAN:  Let's pull up deposition transcript, page 29.

          So let's go to lines 13 through 16.

BY MR. RABAN:

Q.   Ms. Lowe-Minor, can you see that?

     Can you go ahead and read those lines for us, please?

A.   *So we do expect folks to volunteer with us, and, most usually, they aren't members.  So, you know, it is a reality that most of the people working with us aren't members, but we do --*

Q.   Sorry.  We may need to capture a few more lines.

A.   *-- when we teach our members about the petition and about the ballot, you know, the constitutional amendment being proposed, we are providing a historical background about the public policy issue at hand.*

Q.   Just to that point -- just to that point, so based -- does that help refresh your recollection on --

A.   Yes.

     (Indiscernible crosstalk.)

          THE WITNESS:  And I believe at this point we were talking about what happens if someone who is a spouse or a friend of a member comes along with the member to a volunteer effort.

BY MR. RABAN:

Q.   Yeah.

A.   And that we would train that person at that time.  So I believe in this context I was referring to those people who were brought along, those people aren't members, but they are, then, engaged in volunteering.

Q.   And that's exactly my question.

     So there are individuals who aren't members of the organization that are still volunteering and helping with the League's efforts to circulate petitions, even though they're not members; correct?

A.   That is correct.  However, I would not say that the majority of people who volunteer on behalf of the League are not members.  That would be an inaccurate assessment.

Q.   That's fair enough.

     So that helps clarify that portion of your deposition then.

     So the majority of volunteers circulating petitions on behalf of the League are members, you would say?

A.   Yes.  And I think in this instance, again, I was referring to those people who were then brought along --

Q.   Understood.

A.   -- who aren't members -- the majority of those people aren't members, but we are engaging them to volunteer.

Q.   Understood.

     So if I'm a member and I'm circulating petitions --

A.    Yes.

Q.    -- and I'm excited about it and I want my spouse or my neighbor or even a stranger to engage in this effort with me, I can invite them along and they can volunteer as part of that circulation effort; correct?

A.    Yes.

Q.    And the League doesn't do any background checks on these nonmember volunteers; correct?

A.    No, nor do we do background checks on our members.

Q.    And the members don't have to report back to League leadership if they have recruited these nonmember volunteers; correct?

A.    No.

Q.    Okay.  So does the League verify whether any of its members or these volunteers are citizens of the United States?

A.    No.

Q.    Do they verify whether any of their members or volunteers are residents of the state of Florida?

A.    No.

Q.    Does it know whether or not any of these volunteers or members are convicted felons?

A.    No, not unless they self-disclose or we are working with them to restore their voting rights, like, to navigate the voting rights restoration process.

Q.    Thank you.

But as part of your onboarding process or as part of your standard operating procedures, you're not inquiring as to whether or not these individuals have convict -- or have been convicted of felonies?

A.   That's correct.  It's not part of our application to become a member.

Q.   Earlier in your testimony today you had talked about activities that the League is engaged in on both the education side and the advocacy side --

A.   Yes.

Q.   -- do you recall?

A.   Yes.

Q.   And you had discussed conducting studies on policy issues --

A.   Uh-huh.

Q.   -- and discussing those studies as part of the group.

Does that sound right?

A.   Yes.

Q.   And advocating for legislation; correct?

A.   Yes.

Q.   You had discussed having conversations with voters about topics that are important to the League --

A.   Uh-huh.

Q.   -- does that sound right?

And you help instruct voters on how to fill out petitions

and how to submit them to the correct SOEs.

Does that sound right?

A.    I mean, we do do that, so yes.

Q.    And that you had even encouraged to -- you know, for individuals to attend high-traffic areas like parades, concerts, tailgates, maybe even a nonhigh-traffic area like a book club to educate potential voters about these issues?

A.    Yes.

Q.    Are you familiar with anything in HB 1205 that prevents League members or volunteers from engaging potential voters at a parade and discussing citizen initiative topics with them?

A.    Well, certainly under HB 1205 we couldn't do petition collection.

Q.    Understood.

But could you approach somebody and could you have a conversation with them about what the particular initiative is?

A.    We can have a conversation.  We are not able to help them complete the form and turn it in for them.

Q.    For them, right.

Let's say -- could you have a stack of blank petitions and hand a blank petition to a potential voter?

A.    We can do that, and then it becomes homework.  Like, we've taken something that is a service that we're providing, that we're helping someone to, you know, decide whether or not they want to help this get onto the ballot, and then we've made it

easy for them to do it, and it takes a minute or two of their time, and we are able to get it in and they can go about their live -- we've turned that into now something that, you know, they're having to remember one more item to do; they have to find a stamp; they have to return it to the right address.  It becomes a pain in the butt.

So I think our value as an organization is decreased in that case that we're not able to help the voter to the full extent we have been able do in the past.

Q.   Understood.  Understood.

And your opinion -- or the earlier testimony that it may be a pain in the butt, I certainly understand.

But there's nothing in HB 1205 that prevents you from engaging the potential voter in that manner; agreed?

A.   I just feel like the tenor of the conversation becomes different.

Q.   Okay.  What about -- does it prevent you from watching them fill out the petition and maybe even helping explain to them how to do it correctly?

A.   I think we would be able to do that.

Q.   Talking a little bit, Ms. Lowe-Minor, about training, the League provides training for each of its volunteer petition circulators; correct?

A.   We provide training to all of our members, and we also post information on our website and social media.  So it's available

to people who are interested.

But I'm not sure if you're talking about one-to-one training.  I'm not sure exactly what kind of training you're referring to.

Q.   Well, let me ask you this:  Does the League provide training to members prior to them engaging in petition circulation activities?

A.   Yes.

Q.   Okay.  And is that a requirement for these individuals to be able to circulate petitions?

A.   If they're wanting to circulate kind of under the auspices of the League, then, yes, we would be expecting them to, you know, join on a training call or to have watched, you know, a recording of the call.  Or if they are coming to kind of an in-person group, petition-gathering event like I just described that might happen at a festival, you know, they would be expected to hear the briefing and to be there for that information sharing, yes.

Q.   Sure.

So you provide this information on your website; correct?

A.   Yes.

Q.   And you provide opportunities for them to receive this training like you just described; correct?

A.   Yes.

Q.   So would you agree that being trained to be a circulator is

1592
Cross-Examination - Ms. Lowe-Minor

important?

A.    I think if you're going to be circulating on behalf of the League, we would want you to undergo our training, yes.

Q.    Sure.

Are you aware that HB 1205 requires petition circulators to receive training as well?

A.    Yes.

Q.    And that this training is available for free on the Division of Elections website?

A.    I did not know that, but that sounds good.

Q.    That's okay.

I have a couple of follow-up questions about your testimony earlier just about your general membership.

So you had testified earlier, I believe, that for the January 31st, 2025, to January 31st, 2026 period --

A.    Uh-huh.

Q.    -- that you had -- the League had experienced a decrease in membership.

Do you recall that portion of your testimony?

A.    Yes.  That is, unfortunately, true.

Q.    Okay.  Do you recall -- or do you know whether more people joined the League during the January 31st, 2024 to January 2025 period or fewer joined?

A.    So I actually don't know -- wait.  So from --

Q.    The cycle immediately preceding the one that you testified

about, did the League's membership go up or did it go down?

A.    Okay.  In the lead-up to -- from 2024 to 2025 --

Q.    Yes, ma'am.

A.    -- and then from 2025 to 2026?

Q.    Let's just look at the January 2024 to the January 2025 period.

Do you know whether League membership increased or decreased during that time?

A.    I believe during that time it increased from the year before.  So I believe we had, but I'm not 100 percent.  I would need to have the membership numbers in front of me.

Q.    That's okay.

So as League president, you're concerned about overall number of membership, I would imagine; would you agree?

A.    Yes.

Q.    Okay.  So has anybody ever told you that they are withdrawing their membership from the League because of HB 1205?

A.    I have not heard that specific sentence.  I have heard multiple members tell us how they were upset about the law and also upset about not being able to do petition gathering because of the law.

Q.    Would you attribute the decrease in membership solely to HB 1205?

A.    I think it's reasonable that that's a significant contributing factor, yes.

Cross-Examination - Ms. Lowe-Minor

Q.   Do you think it's the only reason?

A.   I mean, I would have expected that our membership over this period -- given kind of the political turmoil that the country is in, for lack of a better term, I would have expected that our membership would have increased.  And the fact that people are looking for ways to add value to the democratic process; they want to be engaged as citizens, I think the fact we have one of our previously most cherished volunteer activities no longer available, I think that does have an impact.

Q.   As an organization, have you conducted any analysis or have you done any polling or done any similar thing to determine the reason for the decrease in membership?

A.   Unfortunately, we don't have the money to do that, so, no, we have not.

Q.   Understood.

So would you agree that there may be other reasons why membership has decreased?

A.   I would concede that there are perhaps multiple reasons why membership fluctuates.

Q.   Thank you.

A.   I would say that this is an important factor.

Q.   Understood.

There are individual members within the League that -- well, strike that.

Let me ask you this question:  So earlier in your

testimony, I believe you had testified that there may be members within the League's organization that are concerned about sharing their personal information.  Is that fair to say?

A.    Yes.

Q.    Would you consider yourself -- well, and I -- strike that.

I believe that you had mentioned that you yourself or somebody that -- because of your husband's occupation and because of your position with the League that you yourself are concerned about sharing your personal information, like your address, for example; correct?

A.    Not particularly because of my position with the League, but, yes, because of my husband's occupation.

Q.    Understood.

Is your role with the League -- is that your day job?  Is that the only thing that you do to receive income?

A.    Well, I don't receive any income from the League.  So --

Q.    Fair point.

A.    -- it is a volunteer role.  So, no, it's not the only thing I do to receive income.

Q.    So let me ask a better question:  Are you a licensed Realtor in Florida?

A.    I am, yes.

Q.    And that license is currently active?

A.    Yes.

Q.    And as part of your license, were you required to get

1596
Cross-Examination - Ms. Lowe-Minor

licensed with the Florida Department of Business and

Professional Regulation?

A.   Yes.

MR. RABAN:  Can you go ahead and pull that website up.

BY MR. RABAN:

Q.   Do you know if certain -- well, actually, let me go ahead

and ask you a question about this.

So this is the DBPR, or Department of Business and

Professional Regulation, website.

Do you recognize that?

A.   Yes.

MS. HUDGENS:  Your Honor, just to clarify, we'd just

request that -- I'm looking at the screen -- that we not read

specific portions of this into the record.

THE COURT:  So I don't have to seal it -- you just ask

her if that's your address on the screen or so forth; otherwise,

we have to seal that portion of the record.

THE WITNESS:  This is my address on the screen.

BY MR. RABAN:

Q.   Is this your personal address?

A.   Yes.

MR. RABAN:  You can take that down.

Thank you for your time, Ms. Lowe-Minor.  I don't have

any additional questions for you.

THE WITNESS:  Thank you.

THE COURT:  Let me pause here to say, if there is anything that makes it into the record that y'all discover later where there is personal identification information, just let me know.  Whether or not it's not on some website or somebody doesn't matter to me at all.  I want to make sure that I have a clean record as it relates to that type of information, so I can seal if it makes it on.  If we can avoid putting it on so we don't have to seal it, that's fine, too.  As one who has had folks crawling over my wall at my house, when there is high-profile cases, I understand why people don't want their addresses published.

Counsel, you may proceed.

MS. HUDGENS:  Thank you, Your Honor.

REDIRECT EXAMINATION

BY MS. HUDGENS:

Q.   Hello, Ms. Lowe-Minor.  Just a few questions for you.

You were asked about the fact that the League does not ask its members whether -- when they sign up whether they're a citizen or a resident or a former felony offender who hasn't had their voting rights restored.

Do you remember that?

A.   Yes.

Q.   So does the League on a continuing basis check into whether or not someone is a citizen, a noncitizen, or a former felony offender who hasn't had their voting rights restored?

A.    No, that's not something that we would ask our members to disclose.  Members may choose to self-disclose at any point, but we don't ask that or, you know, repeatedly inquire into those categories.

Q.    Let's say the League was going to ask those questions.  What would be the cost to the League of doing that?

A.    Well, I think a lot of our members, even if they didn't fall into any of these categories, I think would feel that those questions were invasive.  So I think we would probably lose members, or certainly members would have objections from a principle or a privacy basis.

I also think we would probably have a lot of just nonresponses, because you can ask for something -- you know, if you've sent an email or something and you ask for information, that doesn't mean that you are going to get 100 percent compliance in terms of responses.  So then would we have to have a staff member try to call people for whom we don't have a response?  I mean, I just think practically to contact thousands of people to inquire as to their status I think would not be something that we could reasonably do from a resource perspective.

Q.    You talked about people maybe not responding or not wanting to respond on principle.

What impact would that have -- would you foresee that having on someone's willingness to volunteer with the League?

A.    I mean, I think it would dampen enthusiasm.  We may have folks who feel so outraged that they choose not to renew their membership, so that would be a loss in membership and revenue. But I think in general, you know, enthusiasm may wane and folks' willingness to spend time, you know, in service to the League when they could potentially work with another organization or do something else -- you know, I think we would lose volunteers and members.

Q.    And you mentioned the resources of the League to do this.

What would the cost -- financial cost be to the League of tracking members' status of citizenship and residence and voting restoration on a continuing basis?

A.    Can you repeat that?

Q.    Sure.  What would the financial cost be to the League in order to track their members' current status as to whether they are a citizen, a resident, or a former felony offender who has had their voting rights restored on a continuing basis?

A.    Yeah.  I mean, I think we would have to have at least one or multiple additional staff people to, like, follow up with members from whom we haven't gotten a response.  So that would be a direct financial cost.

And then I think indirectly members who were kind of principally opposed to the question or felt that it was invasive may chose not to renew or not to volunteer.  And so I think that would also be a cost to us.

Q.   You're talking about if they don't renew, then they wouldn't then be paying membership dues?

A.   Correct.

Q.   Ms. Lowe-Minor, you were also asked about talking to voters after HB 1205 and whether the League and its members would be permitted to have -- engage in certain conversations.

     Do you remember that?

A.   Yes.

Q.   And you were asked if they could, essentially, send someone home with a petition to fill out and send in themselves.

     Do you remember that?

A.   Yes.

Q.   Or to fill out with you, but then be responsible for sending in themselves.

     Do you remember that?

A.   Yes.

Q.   Okay.  And you mentioned that -- the tenor of the conversation becoming different in those circumstances.

     Do you remember saying that?

A.   Yes.

Q.   Why does the tenor of the conversation become different when you are telling someone they need to turn in this form themselves?

A.   Well, I think when you are talking to someone, and, Oh, what do I have to do?  Is what a lot of people will ask.  And so

what you can tell them is, It just takes a minute or two and you complete this form and, you know, hopefully if the petition gets, you know, enough sponsor - or enough signatures it can make it onto the ballot for Floridians to vote.  People are, like, Oh, that sounds great, you know.

But if, Well, what do I have to do becomes, Well, you have to fill this out and then you have to, you know, take this envelope and then you have to put a stamp on it and then you have to send it to, you know, the Supervisor of Elections' office, and -- you know, it just becomes a little overwhelming for people.  And I think many voters would be likely to be turned off and to feel like that was, you know, kind of an annoying interaction as opposed to, you know, one where it felt like someone was giving them, you know, kind of a service, an opportunity for them to make an impact but in an easy and accessible way.

Q.   And does that change impact the -- we'll talk about you personally -- your ability to express your opinions about Right to Clean Water, for example, or the Medicaid expansion in those situations where someone has now asked What do I have to do and gone through these steps?

A.   Yeah.  I mean, I personally don't like to annoy people. Like, I like for folks to feel happy after an interaction with me.  So I think I would be uncomfortable to have to, you know, kind of make somebody feel like I've just dumped a task on them

that they didn't necessarily ask for, and so now I might be hesitant to do that.

Q. You were also shown a web page showing your address. Do you recall that?

A. Yes. I've lived there for 12 years and have been registered as a Realtor for eight.

Q. In your understanding, when did the law pass to create an exemption for your home address?

A. Yes. So that's within the last year that that law passed and that we were eligible for an exemption. And my husband and I house hunting as part of, you know, a desire to be able to relocate and take advantage of the public records exemption that is now in existence.

Q. And is that because of the threats that your husband has previously received?

A. Yes. I mean, in the past we didn't have an opportunity for our address to be exempt from public records, but now that it is, you know, he has received threats and we actually as recently as two weeks ago heard from a constituent who, you know, was a friendly constituent of my husband's who wrote to Rick and said, you know, Have you seen this? And it's, like, Rick Minor's house on Google with a limit pin. So it is out there right now and we are aware of that and are seeking to move in order to be able to have our address kept out of the public domain.

Q.   And HB 1205's requirement to include it in order to collect more than 25 petitions, is that still concerning for you in the future given your current plans to relocate?

A.   Yes.

MS. HUDGENS:  I have no further questions, Your Honor.

THE COURT:  Thank you, ma'am.  You can step down.

THE WITNESS:  Thank you.

(Ms. Lowe-Minor exited the witness stand.)

THE COURT:  All right.  We are not going to start a witness with 15 minutes to go for lunch.  Why don't we come back at 1:00 o'clock.

It's my understanding we are going to hear from Ms. Medrano next?

All right.  Very good.

All right.  I hope everyone has a pleasant lunch.

Court is in recess until 1:00 o'clock.

Thank you.

(Recess taken at 11:47 AM.)

(Resumed at 1:02 PM.)

THE COURT:  All right.  We're back on the record.  We have the 19th witness ready to go.

Ma'am, if you'll raise your right hand.

**LYDIA MEDRANO, PLAINTIFFS' WITNESS, DULY SWORN.**

(Dr. Medrano enters the witness stand.)

THE COURT:  You can put your hand down, ma'am.

1604

Direct Examination – Dr. Medrano

And if you -- you can put your hand down.

And if you'll state your name for the record and spell your last name for the record.

THE WITNESS:  My name the Lydia Medrano, and my last name is M-e-d-r-a-n-o.

THE COURT:  Thank you, ma'am.

Counsel, you may proceed.

MR. KLINE:  Good afternoon, Your Honor.  Spencer Klein for the League of Women Voters of Florida plaintiffs.

Next we'll hear from Dr. Lydia Medrano concerning the impact of HB 1205 on LULAC's volunteer petition circulators.

This will go to Counts One through Four of the operative complaint.

DIRECT EXAMINATION

BY MR. KLINE:

Q.   We already have your last name on the record, Dr. Medrano, so let's start with --

     (Reporter requested clarification.)

BY MR. KLINE:

Q.   Dr. Medrano, in what city do you live currently?

A.   Excuse me?

Q.   Sure.  What city do you live in right now?

A.   Oh, I live in Tampa, Florida.

Q.   Okay.  Where were you born, Dr. Medrano?

A.   I was born in New York and raised in Puerto Rico.

Direct Examination – Dr. Medrano

Q.    Okay.  What was your first language?

A.    Spanish.

Q.    When did you first move to Florida?

A.    I've been in Florida since 1976, so 50 years.

Q.    Okay.  What is your highest level of education?

A.    I have a Ph.D in sociology and Latin American studies.

Q.    Where did you receive that degree?

A.    Excuse me?

Q.    Yeah.  Where did you go to school, Dr. Medrano?

A.    I went to school at the University of Florida.

Q.    Are you currently retired?

A.    Yes.

Q.    Okay.  What did you do before you retired?

A.    Before I retired, I used to work for Hillsborough County for 22 years.  I retire from there.

Q.    Okay.

A.    And before that, I used to work for the health department for a year.  And before that I worked for the International Division of Planned Parenthood of America.

Q.    Thank you, Dr. Medrano.

      How many years were you at Planned Parenthood for?

A.    Six years.

Q.    Are you a registered voter in Florida?

A.    Could you repeat, please?

Q.    Yes.  Yes, of course.

Are you registered to vote in Florida?

A.   Yes, sir.

Q.   Are you a member of the League of United Latin American Citizens?

A.   Yes, sir.

Q.   Also known as LULAC?

A.   Yes, sir.

Q.   Okay.  And it's all right if I call that LULAC?

A.   Yes.

Q.   Okay.  What do you understand LULAC's mission to be?

A.   Well, LULAC is the oldest Hispanic civil rights organization in the nation, and it's also the largest in terms of volunteer advocates, members.  And it basically has several programs we want to improve the location or achievement of Hispanics and improve their socioeconomic status.

We provide scholarships.  We do some advocacy for women for the elderly and youth, young adults.  And that's basically -- and we also work in protecting the civil rights of Hispanics that live in the United States, including Puerto Rico.

Q.   How long have you been a member of LULAC for?

A.   Over 25 years.

Q.   Have you held any leadership positions within LULAC?

A.   Yes.  I have been there for 25 years, so I was -- I was in the national board as vice president for the southeast region. I was the state director of Florida.  And I am in the women's

commission.  And currently I'm the state -- the district director in Tampa.

Q.   Okay.  And how long have you been the district director in Tampa for?

A.   Five years.

Q.   I want to learn just a little bit about LULAC districts and councils.  We heard a bit about this from Mr. Proaño before.

     But just briefly, can you explain what a LULAC district is?

A.   A district, it's a geographical area.  It could be a municipality or a county.  In my case, my area is Tampa.  And to form a district, you have to have three councils or more, and I have four.  There are four councils under my district.

Q.   Okay.  And can you explain briefly what LULAC councils are?

     Can you explain briefly what LULAC's councils are?

A.   A council is like a chapter.  It's a chapter or the organization, but they're small groups.  They're usually 10, 15, sometimes we have some that are 40, but I have, like -- in my district we have 15, and they usually are formed to do some activities that they're interested in because they're volunteers.

Q.   Dr. Medrano, what do you do as district director?

A.   As a circulator, I've been participating in a couple of projects, and what I did is collect signatures in the community.

Q.   And I'm going to talk about that in just a moment.

     I'm curious right now about what your responsibilities are

as the district director for LULAC Tampa Bay.

A.   Oh, my responsibility, sorry.  I'm a little bit (indicating) hard of hearing.

Q.   It's okay.

A.   As a district director, I coordinate the activities of these four councils, and the councils work in different areas. Some are interested in education, so they work with the superintendent of schools and they do things related to scholarships and things like that.

The other one is environmental council.  They do educate people about environmental changes and climate change.

And another one is a college student council, USF, and they do different things, because the students are in health and anthropology.  So every council do whatever -- they set their own agenda.  And we also work in immigration.

Q.   And you said there's a USF council, so that's based out of the University of South Florida?

A.   Yes.

MR. KLINE:  Dr. Medrano is next going to testify about her work collecting petitions in the time before HB 1205 passed.

BY MR. KLINE:

Q.   First off, Dr. Medrano, what is an initiative petition?

A.   An initiative petition, it's a -- it's something that the community get together to work on in order to amend the Constitution.  We know that the legislation do the laws, but the

communities sometimes propose initiatives to deal with -- and they want some amendment in the Constitution, so they write a petition and they circulate it, people help collecting signatures, and then they go to election, to vote in the election.

Q.   In your 25 years as a member of LULAC, have you ever collected initiative petitions?

A.   I did, yeah.  I have done that.

Q.   Can you name a few examples of initiatives you have collected petitions for?

A.   I remember the last two that I worked.  One was with the voting restoration of rights for felons, that was one.

     And the other one was the most recent one, reproductive rights and abortion.

Q.   Why did you want to collect initiative petitions?

A.   All my work is community oriented, so any -- I want to support the community, and our purpose is to empower our citizens and engage the Hispanic community in what's going on in this society.

Q.   And you mentioned two initiatives that you were collecting petitions for.

     I think you mentioned first the Voting Rights Restoration for Felons initiative.

     How many petitions did you collect for that initiative?

A.   I never counted how many I did, but probably 100 or could

Direct Examination - Dr. Medrano

be more, 200, but I never counted them.

Q.    Okay.  How many petitions did you collect for the Reproductive Freedom initiative?

A.    About the same --

Q.    Okay.

A.    -- 100, probably, or 200.

Q.    Okay.  When you were collecting these petitions, were you doing so as a part of your work for LULAC?

A.    Yes.

Q.    Okay.  And when you were collecting these petitions, how would somebody know that you were doing this as part of your work for LULAC?

A.    I always wear a shirt with the LULAC logo, and when I approach people, I identify myself, I say who I am and what I'm doing.  I talk to them about the petition, and I hand them a petition so they can look at it, and if they need any clarification, they can ask me.

Q.    Okay.  Dr. Medrano, you -- so you -- so you mentioned that you're the director for the LULAC Tampa Bay district.

      Did you district ever discuss either of these initiative petitions as a group?

A.    Yes.  The district meets every other month, every two months, and during our meetings, people discuss the projects that they are working on.  They make a report, and we discuss all the things that we're doing, and we are always careful that

it's within our mission.

And we say -- you know, we ask for help from the other people -- other councils in trying to work together and we agree on the things that we want to work on.

Q.   Okay.  And did you -- did you discuss whether you wanted to work on the Voting Rights Restoration for Felons initiative?

A.   Yes.  We discussed them and we usually are in agreement to participate.

Q.   Okay.  And did you come to an agreement to participate in that initiative?

A.   Yes.

Q.   Okay.  And what about the Reproductive Freedom initiative? Did you also discuss whether you wanted to support that initiative?

A.   Yes.  We discussed it because that met our mission, LULAC's mission, which is we advocate for women's access to health care and also for women -- if the families try to make their own decisions based on their circumstances.

Q.   Okay.  And what was the results of the discussion among your district about the Reproductive Freedom initiative?

A.   Well, we all agreed it was part of our mission and we should participate.

Q.   Okay.  Where have you collected initiative petitions in the past?

A.   I look at the calendars and look at the events that are

going on around town, usually they have like multicultural festivals.  Because I'm bilingual, I like to participate because I can talk to people that have limitations with the language.

I go to multicultural festivals or fairs, or I go to a lot of meetings, or sometimes people ask me to talk about it in luncheons or things like that, and that's how I -- a lot of people know my work.

Q.    All right.  And you mentioned at these events you are speaking that you sometimes speak Spanish.

Are you speaking English and Spanish --

A.    Yes.

Q.    -- when you are attending these events and talking to voters?

A.    Yes.

Q.    Okay.  Have any organizations ever invited you to discuss these initiative petitions?

A.    Yes, uh-huh.

Q.    Okay.  Do you attend these events as a representative of LULAC?

A.    Well, I usually talk within our own councils.  We have four.

(Reporter requested clarification.)

A.    Yes, I go to different meetings in the community and attend different luncheons and activities in the community, and that's where I usually introduce the petitions that I'm working on.

Q.    Okay.  And did you say before you were there as a representative of LULAC?

A.    Yes.

Q.    Okay.  When you collected petitions, did you do so as a volunteer?

A.    Yes.

Q.    I want to go back to the beginning of 2025, so before HB 1205 passed.

      At that time before HB 1205, did you plan to collect initiative petitions?

A.    I had planned, but at this moment I'm not planning to.

Q.    Okay.  And we'll talk about right now in a little bit.

      But when you had those plans before HB 1205, were there any specific initiatives that you planned to collect petitions for?

A.    Beside those two, I was planning to work on the Florida Decides Healthcare.

Q.    Okay. Can you tell me a little bit about why the issue that Florida Decides Healthcare advocates on is important to you -- why Medicaid expansion is important do you?

A.    This is extremely important to Floridians because we have a lot of people that don't have health insurance and they are Florida residents, not only Hispanics, and Hispanics also have a need for -- especially this petition has to do with Medicaid, which is the insurance for the poor people.

Q.    Where did you plan to collect petitions in support of the

Florida Decides Healthcare issue?

A.    Where?

Q.    Where.

A.    Yes.  Well, I look at the calendar and see what events are going on during the time, and I visit organizations too.

Q.    Okay.  How many petitions did you plan on collecting in support of Florida Decides Healthcare?

A.    Right now I don't have any plans of collecting in this coming one.  I didn't sign up yet.  I'm not -- yes.

Q.    And so -- but in the time before HB 1205, was there a number that you had in mind of petitions that you wanted to --

A.    For the Florida care?

Q.    -- collect to support Florida Decides Healthcare?

A.    I would like to do -- if I could do 500, I would.

        MR. KLEIN:  Dr. Medrano is next going to testify about HB 1205's impact on her as a LULAC member with a focus on the registration requirement.  This will go to Counts One through Four of the operative complaint.

BY MR. KLEIN:

Q.    Dr. Medrano, are you familiar with HB 1205?

A.    Yes.

Q.    What is your understanding of what HB 1205 does?

A.    That's a new law that was signed last year, and it set a lot of rules for petition circulators.

Q.    Have you collected any signed petitions since -- well, I

think you had gone into this a little, but just to clarify, have you collected --

A.    No.

Q.    -- any signed petitions since HB 1205 passed?

A.    No.

Q.    To your awareness, have any LULAC members within your district collected petitions --

A.    No.

Q.    -- since HB 1205 passed?

A.    No.

Q.    Okay.  I want to talk a little bit about the registration requirement.

      Actually -- so, first, what is the registration requirement?

A.    The registration requirements?

Q.    Uh-huh.

A.    Well, you have to register with the State, and you have to give your name, your -- all your personal information, your address to be able to register with the State.

Q.    Okay.  And is it your understanding that this requirement only applies to people who collect more than 25 signed petitions from --

A.    Yes, I am aware of that.

Q.    -- from nonfamily members?

A.    Excuse me?

Q.   Yeah.  Sorry.  I was just finishing out the question.

Was it your understanding that this requirement only applies to those who collect more than 25 signed petitions from nonfamily members?

A.   Yes, sir.

Q.   Okay.  Have you registered as a circulator?

A.   I haven't registered.

Q.   Do you plan to?

A.   No.

Q.   Can you tell us a little about why not, why you don't plan to register as a circulator?

A.   Well, it has become very complicated, and to do 25 without registration, practically you are not helping that much.  If you have to do -- want to do more than 25, you have to register with the State.  You need to give information that I don't think is fair, because I'm concerned about my freedom of speech.  I am concerned that this information is going to be published and eventually is going to be used for political reasons.

People are going to know the causes that I work for, what I believe, and that can be used -- we live in a very divided world this time -- nowadays.  There is a lot of violence just in social media.  You say one thing, and you get 20 people responding to you.  So I -- at this point in my life, I don't want to get into that.

Q.   Okay.  Just a few more questions for you, Dr. Medrano.

I want to learn a little more about the process of collecting petitions from voters.  So you previously testified that you collected petitions at events.

When you do this petition collection, how does that work?

A.   Well, I -- as I said before, I wear a shirt with the LULAC logo, and I approach people and tell them that I'm collecting petitions for this -- let's say health care and Medicaid and handed the petition to them to read.  And I ask them, If you have -- need any clarification, let me know.  And that's how.

Q.   Okay.  Do the voters ever ask you questions when you're collecting signed petitions?

A.   Well, in the past, yes.

Q.   Can you tell us about a time when you've answered a voter's questions about an initiative?

A.   One that was a little bit more complicated was the one in the restoration of -- the voter rights restoration -- voting restorations for felons.  People would say, I'm not going to sign it.  I don't think felons should vote.

But then I explain to them that these are people that already completed their sentences; that they pay their fines, and they paid all their dues to society.  And one thing that was important was to let them know the felons that have committed murder were not included in this amendment, in this petition, and that make it easier to get signatures.

Q.   These conversations with voters about these initiatives, do

you think they are important to LULAC's work?

A.   Oh, yes.

Q.   Can you tell me a little bit about why --

A.   To be successful, you have to be able to explain it.

Q.   Yeah.  Can you just tell me a little bit about why you considered these conversations important to LULAC's work?

A.   Well, for all of us as a civil rights organization, it's important to defend the rights of people, of the average person that sometimes don't know their rights.  So that's one important role of LULAC in the community.  Once they become educated and understand what's going on, then it's -- they are engaged. Sometimes I invite them to join LULAC too.

          MR. KLEIN:  Okay.  Those are all the questions I have for now, Your Honor.  I pass the witness.

          Thank you, Dr. Medrano.

          THE COURT:  Cross.

                    CROSS-EXAMINATION

BY MR. WOLK:

Q.   Good afternoon.

A.   Good afternoon.

Q.   So, Dr. Medrano, you said that this past campaign cycle you were interested in supporting the Florida Decides Healthcare initiative.

     So is it correct to say that you support Medicaid expansion in Florida?

A.   I -- could you repeat the question?

Q.   Sure.

So this past campaign cycle you said that you were interested in supporting the Florida Decides Healthcare --

A.   Uh-huh.

Q.   -- initiative.

So you support Medicaid expansion in the state of Florida?

A.   Yes, sir.

Q.   Did you sign the Florida Decides Healthcare initiative yourself?

A.   If I sign before?

Q.   Did you sign the initiative petition for Florida Decides Healthcare?

A.   I don't understand your question.  Could you repeat -- rephrase it maybe?

(Pause in proceedings.)

THE COURT:  It would help if the lawyers were all loud like Mr. Jazil too.

And I mean that in the most affectionate sort of way.

(Pause in proceedings.)

THE COURT:  Ma'am, is this any better?

THE WITNESS:  Yeah.

BY MR. WOLK:

Q.   Better.  Okay.

Can you hear me well now?

A.    Yes, I can hear you.

Q.    Okay.  Let me know if I'm too quiet, and I can try to speak louder.

A.    Thank you.

Q.    So you testified that this past campaign cycle you -- you were interested in supporting the Florida Decides Healthcare initiative.

      Did you sign the initiative petition for that -- for Florida Decides Healthcare?

A.    No, I haven't signed anything for this cycle.

Q.    Did you -- when the Florida Decides Healthcare campaign was ongoing, did you encourage anyone else to sign the initiative?

A.    We talked about it, the petition, in my meetings, but we haven't started doing any work yet.

Q.    Okay.

A.    I just explained it, you know, what is involved to them, but we haven't signed up.

Q.    So in any of those conversations about the Florida Decides Healthcare initiative, did you encourage other Florida voters to sign the petition?  Did you say, Hey, this is a good idea, or, You should support this initiative?

A.    In the past petitions that I have participated, yes, but I haven't participated in the one in health care.

Q.    For Florida Decides Healthcare.  Okay.

      When you were supporting the petitions in the initiative

campaigns in the past and you had had these conversations about these initiatives, would you have these conversations with -- do you know how many people you would have these conversations with telling them to support the initiative?

A.    Probably 30.

Q.    30?

A.    Within our councils, no.

Q.    So 30 people at these meetings?

A.    Yes, in our meetings.  We are about 50 people.

Q.    Okay.

A.    But we talk about it in different times, because some people come in one meeting and others -- you know, to make sure everybody knows about it.  I also sometimes send emails with materials so they can read and prepare for the meeting.

Q.    Okay.  Under HB 1205, is it correct that you could still have these discussions with, you know, 30 or more people without having to register with the State?

A.    Yes.

Q.    Then you mentioned your participation in LULAC, and you've been a member of LULAC for 25 years.  You're currently the district director of LULAC in Tampa.

    And then you also served on LULAC's national board of directors; correct?

A.    Formerly, yes.  I was on the national board for four years.

Q.    For four years.  Okay.

So you've been -- so is it correct to say that you've been, like, publically connected, publically associated with LULAC?

A.    Yes.

Q.    And in terms of what LULAC does, like, what LULAC stands for, is it fair to say that LULAC's mission is to advance the economic condition, educational attainment, public influence, housing, health and civil rights of Latino Americans?

A.    Yes.

Q.    That would be correct?

A.    Yes.

Q.    Okay.  And would it be fair to say that LULAC is a platform to advocate for your community?

A.    Yes.

Q.    And would it be fair to say that LULAC takes public positions on policy issues?

A.    Yes.

Q.    Okay.  No further questions.

      Thank you.

A.    Thank you.

          THE COURT:  Any redirect?

          MR. KLEIN:  We don't have any further questions, Your Honor.

          Thank you, Dr. Medrano.

          THE COURT:  Thank you, ma'am.

          THE WITNESS:  Thank you.

THE COURT:  Have a very good day.

THE WITNESS:  Great.

THE COURT:  Please be careful stepping down.

(Dr. Medrano exited the witness stand.)

THE COURT:  Mr. Mastoris, you are on deck?

MS. HUDGENS:  We just need one minute.  The witness is coming in.

She's in the restroom, Your Honor.  She's on the way.

MR. MASTORIS:  We just need a couple of minutes. Thank you.

(Pause in proceedings.)

(Ms. Scoon entered the witness stand.)

THE COURT:  Ma'am, if you can raise right hand.

Thank you.

**CECILE SCOON, PLAINTIFFS' WITNESS, DULY SWORN**

THE COURTROOM DEPUTY:  Please state your name for the record.

THE WITNESS:  Cecile Scoon.

THE COURTROOM DEPUTY:  Thank you.

THE COURT:  Please take your seat.

Counsel, you may proceed.

MR. MASTORIS:  Thank you.

DIRECT EXAMINATION

BY MR. MASTORIS:

Q.   Good afternoon, Ms. Scoon.

A.   Good afternoon.

Q.   I was going to ask you to state your first and last name, but it appears that you are a minor celebrity around these parts.

MR. MASTORIS:  Before I get going with your examination, I just want to give a brief introduction as to what Ms. Scoon will be testifying about.

She is, as it appears most of you know, the former president and copresident of the League of Women Voters, Florida chapter.  Today, she's going to testify to what makes the League unique as a volunteer organization.  She'll testify as to her experience and the League's experience with the petition circulation process.  She will testify as to the impact of HB 1205 on her personally.  She will testify as to the impact of HB 1205 on the League as an organization and as an association. And her testimony will speak to Counts One through Five of the operative complaint filed by the League in this case.

BY MR. MASTORIS:

Q.   So, Ms. Scoon, could you tell the Court where you currently live?

A.   Panama City, Florida.

Q.   And how long have you lived there?

A.   41 years.

Q.   Where are you registered to vote?

A.   Bay County, Florida.

Q.   And you're a member of the League of Women Voters of Florida?

A.   Yes.

Q.   I'm going to refer to the League of Women Voters as League today.  Is that okay?

A.   Perfect.

Q.   When did you join the League?

A.   About 25 years ago.

Q.   And what is your current role with the League?

A.   I am cochair of the restoration of voting rights action team.

Q.   Have you previously held other roles with the League?

A.   Yes.

Q.   Could you briefly tell me what those were?

A.   I was the Bay County local president for the Bay County chapter for about eight years.  And then I got on the state board, and I was dual-hatted for a couple of years.  I was on the state board and the local president, and I've been on the state board for about -- a little -- maybe 10, 11 years.  And I was just a regular board member.  Then I was second vice president, first vice president; I was president by myself for two years; and I was copresident from, I think, '23 through '25 with Debbie Chandler.

Q.   Okay.  That's quite a CV.

     Have you ever been an action chair for the League in

Florida?

A.    Yes, I was action chair for restoration of voting rights for persons with felonies probably 2017, and I've sort of sat in that position and I'm kind of still in that position right now.

Q.    Have you been the action chair for any other efforts by the League?

A.    Medicaid expansion the first time.

Q.    As president and then copresident of the League in Florida, what were your primary responsibilities?

A.    I think one of the main functions is to be the spokesperson to the rest of the world.  And we say that the League speaks with one voice.  So taking direction from my board, we would select our issues that we wanted to work on that year, and I would be the statewide spokesperson on those issues and certainly on anything relating to voting.  That was, like, my external responsibility.

      Internally was to lead the board to communicate with our presidents.  We have 29 local chapters, and they love to have a very robust communication with their president, visit, write one-pagers on issues and things of that nature, just -- really just the well-being of the body, which the state president would utilize and work with leadership, the 29 presidents, across the state.

Q.    Okay.  So focusing on your external responsibilities, did you have any interactions with the State Legislature in your

role as president or copresident?

A.    Frequently.  In fact, I was very involved before I was president and copresident as action chair.  Restoration of voting rights, I think the year or two that that was up to bat, I probably testified somewhere between 8 and 12 times with the Legislature.  And this is a few years before I became president.

Once I was president, then I, on average, testified before the -- the State committees at the capitol, depending on the issues, 10 to 20 times a year and many visits to their offices to talk with the legislators directly about the League's positions on things and things of that nature.

Q.    Okay.  Those doors were open to you?

A.    Yes.

Q.    How many?

A.    Well, I was fortunate.  I inherited a team that had a fabulous reputation for academia, intellectual honesty, seeing both sides of the coin.  I've had many representatives say, I didn't think you were going to agree with me on that, you know.  But we were just like -- we just wanted the best outcome and didn't matter to us the party affiliation or anything.  And I think our ability to see the whole picture and our preparedness and our brand of just being open and wanting the best outcome and many times partnering with different sides of the political spectrum on things like solar power -- I was very involved with that.  And there were many Republicans who were all about that,

environmentalists, and they -- we would laugh.  We're, like, We're going to get along this week, and maybe next week we'll disagree.  But we just wanted to get the issue framed.

Q.    And staying on your external role as president and copresident for a moment, were you also involved in the League's recruiting efforts?

A.    Yes.

Q.    Could you tell me a bit about that?

A.    Right.  I didn't realize it at the time, but the media explosion upon my becoming the president of the State League was huge.  In that one year, there were -- and my communications director showed me -- there were over 100 articles, newspaper articles, TV things:  The first Black president of the League of Women Voters.

So it was very significant to a lot of people.  And talking over with my -- my leadership and myself, this was an opportunity for me to not only be the normal voice but get out a little bit more than maybe some of the other presidents had.  So we devised a stratagem.

Basically, I would go and visit as many of the 29 leagues as possible.  And I think that first two years I visited 21 of the 29.  And we had a whole plan that the local leagues were supposed to reach out to a group that they did not normally communicate with, and we were going to have dinner, tea, drinks where I could introduce the League and build the bridge between

the local League members and whatever organization that local League said, Hey, I'd like to get to know this group a little more, and just telling them our issues, what we were about, that we always presented both sides.

We actually got a lot of members through that process.  And there were three or four occasions where people were so motivated they literally became members digitally.  They would register and become a member while I was speaking.

Q.   So I think you touched upon this in your answer, but how would you describe, I guess, the overarching mission, the ethos, of the League?

A.   Well, you know -- and I get a little emotional about this.

Q.   Take your time.

A.   The League came from suffragettes, intelligent women who were not able to make decisions about their children and their family and everything like that.  And the group of women that led that whole charge were concerned about slavery.  They were abolitionists, and they were so upset that -- and many of them were Quakers.  They were so distraught that human beings could be owned and controlled by others they wanted to talk about it. They talked about it in their kitchen, and they wanted to talk about it in public.  Half of their husbands said, Go back to the kitchen.

In that moment, those women understood you can't take care of anybody else if you don't have a voice.  And so that's when

they started in earnest to fight for women's suffrage.

That element of understanding, if you don't have a voice, you're powerless, you can't protect anybody else, is present with the League nationally and is a major force with the League of Women Voters of Florida.

We understand from being excluded, historically, if the individuals in our state don't have a voice, their needs cannot be addressed.  That's our primary goal.

And the way we do that is we are prepared.  We present both sides.  We say to the citizen, you decide how you want to vote. You decide if you're up or down on this amendment.  We're just going to give you the basics, and we're going to assist you if we can in citizen petition gathering for you to express your vote.

So those two things run together, and the only way you can do that is if you do your homework and you're absolutely honest about the process and build trust.

Q.   Now, is the League a volunteer organization?

A.   Yes.

Q.   And how does that impact the League's work?

A.   We -- we are charged by the passion and commitment of volunteers, and they get excited when they are able to implement those issues that I just spoke about.

And the way our volunteers get excited is mission accomplished.  They want to do something; not happy to just

talk, they want to register a voter; they want to educate someone about the petition -- an amendment or whatever is on the petition that we are supporting and, if possible, have them fill it out -- if they agree -- and then turn that in. That's doing something.

Q. So one of the -- one of the activities -- one of the volunteer activities that members of the League take part in is registering -- I'm sorry -- circulating and collecting petitions for ballot initiatives; right?

A. Yes.

Q. How does that contribute to this overarching mission of giving people a voice?

A. Well, it is our goal and it has been our intent to go where citizens are, to attend events where they're already gathered, by -- by focus. Because in that moment, we'll usually have a table with League of Women Voters signs, like I'm wearing my pin -- and we even have bigger ones -- and so we're out there letting everybody know if you want information on these things, you can come to the League and we'll provide that.

So we're there and we see people -- they're really busy, for example, Fourth of July -- they're out there with their family, three or four clustered together, a couple of little ones. When they come to our table, which a majority come to our table, and they want to know something about the amendment, we have their attention for 5 to 10 minutes. And in that magical 5

to 10 minutes, they are asking us questions, and we are trying to answer.

There's this, like, almost cosmic connection with the individual who's being pulled by their family and by the other activities; face painting, balloons, cupcakes over there.  And many of our activities are that way.  But in that moment when we're talking to them, we are connecting and we are providing them a very powerful service.

And they have said, I am so grateful you're here.  Thank you for explaining that to me.  I would like to support the petition -- most of them -- and some, No, I don't agree with that, off they go.

Q.   So you are helping them to express themselves politically as well; right?

A.   Absolutely, and they say that to us.

Q.   So I think it's implicit in your last answer but it sounds like you have, in fact, engaged in petition circulation and collection yourself over the years; right?

A.   Many, many, many, many times.

Q.   Do you remember which initiatives you've collected petitions for over the years?

A.   Yes.  Solar amendment, my husband was the action chair for the state, so I helped him quite a bit; medicaid expansion, the first time and then this last time; restoration of voting rights, Amendment 4; right to an abortion; and clean water.

Direct Examination - Ms. Scoon

Q.   Have you ever collected more than 25 signed petitions in a single day?

A.   Frequently.

Q.   And for a single initiative?

A.   Many times.

Q.   Have you ever collected more than 100 petitions in a single day?

A.   Yes.

Q.   And for a single initiative?

A.   Yes.

Q.   Over the course of your time in the League, approximately how many petitions in total would you say you've collected?

A.   I estimate somewhere between 2,500 and 3,500.

Q.   And so given that you've collected for five petitions, that's around 600 to 900 petitions per initiative per cycle; right?

A.   If you were to even it up, but I think the larger amount was for Amendment 4, restoration of voting rights.

Q.   Have you ever collected less than 25 petitions for a given initiative in one cycle?

A.   Probably not.

Q.   Well, you said that you've collected petitions for Right to Clean Water.

     Did you collect more than 25 petitions prior to HB 1205 coming into effect?

A.    Yes.

Q.    And you also said that you collected petitions for the Medicaid expansion initiative.

Did you collect more than 25 petitions for that initiative this cycle prior to HB 1205 coming into effect?

A.    Yes.

Q.    Now, I'm not going to introduce this into evidence, but you do recall that you submitted certain declarations in this case, correct, Ms. Scoon?

A.    Yes, I did.

Q.    And do you recall in one of those declarations stating that you had, in fact, collected hundreds of petitions over the course of your time at the League?

A.    Yes.  I thought I said more than hundreds, but, yes.

Q.    Okay.  Is the number, in fact, in the thousands, like you just testified?

A.    Yes.

Q.    So to the extent that you said that it was in the hundreds prior, that was just an error in your prior declaration?

A.    Yes.

MR. MASTORIS:  And just for the record, I'm referring to Docket Number 174-4, which was Ms. Scoon's declaration submitted in the context of the preliminary injunction motion filed by the League.  That declaration was submitted in her individual capacity.

BY MR. MASTORIS:

Q.   Now, going back to the petition circulation process and your role in it, where would you typically circulate petitions? What sort of events?

A.   Well, we wanted to be thoughtful about taking the time of our volunteers.  They get excited when they're effective and they're doing things, so we actually made a matrix of some of the football games, for example, HBCU football games, and we would go there.

Fourth of July events, that was recommended for everybody across the state; big football games at FSU, UF, places where there would be a lot of people, Christmas parades, Veteran parades.

There was a local event in Bay County that we went to every year, the early childhood services event where there would be somewhere between 30 and 40 vendors that thousands of people would literally go to -- it's a two-day event -- every year.  We would always have a table, and we always had face painting because we knew we needed to draw the families.

Q.   Now, would you work with other League volunteers in collecting petitions at these events?

A.   Yes.  I would sit down and work directly with my members. I believe that anything I ask any of my members to do, I should be very familiar with the process; anything they did, I should do.

Q.   And you said "sit down," did you only collect petitions when you were sitting at a table?

A.   No.  We -- if we had enough volunteers to man or woman the table, then we'd say, You know, do you guys want to walk around the clipboards? because, again, we would have our big League of Women Voters pins on, and if -- sometimes there would just be a big expanse, the Bay County fair, whatever it was, so we would walk around.

     And if we had an opportunity to chat with someone, if they -- was a break in their conversation, we'd say, Hey, we're talking about all the different amendments, would you like to learn more about it?  And they'd say, Okay.

Q.   So when you walked around, did you typically walk around with another volunteer --

A.   Yes.

Q.   -- or by yourself?

     With another volunteer.

A.   It was our practice to walk with another volunteer.

Q.   And why was that the case?

A.   One, it was a good teaching moment.  We would try to pair an experienced petition gatherer with someone who is newer to the League, so there would be a way for that person to learn by seeing.

     And safety, if anything were to go awry, you would be there to assist and come up with ways to solve the problem, if

1637

Direct Examination - Ms. Scoon

anything popped up.

Q.   Okay.  I'm going to return to the safety point a little later today, but I want to focus for now on the process of circulating petitions.

So I think you said that you would engage people when you were on these walkabouts and talk to them about a given ballot initiative; is that right?

A.   Yes.

Q.   And what was that conversation like?  What would you say to a person who you approached about the ballot initiative for which you were circulating petitions?

A.   We would say, Are you familiar with the Right to Clean Water, for example, a petition?  They'd say, No, but I like that idea.  Can you tell me about it?  And so we would explain the process of citizens being able to sign to show that they wanted -- enough people had to sign to say that this could go on the ballot.

And I'd say, You know, it makes sense.  You don't want just something that ten people want to go on the ballot, you know; the ballot would never end, so it has to be a lot of people across the state.

Do you want to learn more about it? and they'd say -- most of the time -- Yes.

Q.   And then would you ask them to sign the petition?

A.   Yes.

1638

Direct Examination - Ms. Scoon

Q.    And after they signed the petition, what happened?

A.    Well, prior to 1205, they would give it to us.

Q.    Right.  And just to be clear -- thank you for clarifying -- these questions are all in the context of the world prior to HB 1205.  We'll talk about the post-HB 1205 world a little bit later in your testimony.

So with that assumption, what -- if you don't mind just repeating you answer.

You would ask someone to sign it, and then after they signed you would --

A.    They would give it back to us, and we would say we'll turn it in for you.

Q.    Now, did you hold on personally to all of the petitions that you collected over the course of a day gathering petitions at an event like this?

A.    No, because I would hold onto most of them, but I would return back to the main table and just check on things, how is everything?  Because, remember, I was for a long time dual-hatted.  So in Bay County I was the local president and they want to see their president and they want to tell me, Oh, so-and-so came by or whatever.

Q.    So just focusing, when you're walking around with another volunteer, right, or another couple of volunteers, were there times when you were walking around that, you know, you might need to use the restroom and you would hand your petitions

physically to the volunteer accompanying you?

A.   Yes.  If I had to be called away, or I had personal needs, that's exactly what I would do.  And I would ask my coworker, covolunteer, Would you hold onto these, and I may be delayed.  I got to pick up my kid from band or whatever.

And that person, usually a lady, would go back to the main table, and we had a box for petitions, and sometimes -- there were times when we had multiple petitions and there would be a box for each one.

Q.   Okay.  So during the time in between when you handed the petitions to your -- to your friend, to your volunteer who was accompanying you, and the time they got back to the table, that volunteer would physically possess both the petitions that you collected and the petitions that he or she had collected; is that right?

A.   That's correct.

Q.   And were there times when the volunteers with you asked if you might hold onto their petitions for a moment?

A.   That happened fairly frequently, again, because I was the local president, and so rather than having to go back to the table, they could give them to me, and I would take them back to the table.

Q.   So did you find yourself physically possessing a lot of other people's petitions?

A.   Oh, frequently.

Q.   And, I mean, I think again the answer is probably obvious, but if you don't mind clarifying for the record, I take it when you handed petitions to someone, they would often end up with more than 25 petitions in their possession; correct?

A.   Yes, we all did.

Q.   Okay.  And when -- strike that.

You mentioned tabling as well, and that seems to be another way in which volunteers from the League collected petitions.

Tell me a bit about the tabling process.

A.   Okay.  We would get there early, like all the other people tabling, and set up our tent and our table and chairs and put up our signs and lay out the different information sheets that we had, including citizen initiative forms for people to sign, voter registration forms, things of that nature.

And usually it would be two to three people at the table at minimum, that was the goal.  Because at these large events, six people can walk up to you at one time from two different groups and, again, they've got other things going on, they're being tugged, but they've chosen to come to us and they want information.

So we wanted to be at the ready to have the conversation; if they agreed, they would sign the petition.  We wanted to be ready.  So we would have enough people to do that.

Q.   And when someone decided or asked to sign a petition and -- you know, at the table, would -- where would that petition go?

Where would the signed petition go when a passerby said, I want to sign a petition for Right to Clean Water?

A.    Uh-huh.

Q.    What would you do with that petition once you received it?

A.    We would look it over and try to make sure that there were no errors or things that they could correct while they were still there.

So we would look it over, and if there was anything -- You left off a box or, Ma'am, it says "county," not "country," and then they would scratch off "USA" and put their county.

Q.    Would you also -- just for -- so the record is clear, would you also engage in the same sort of diligence process, the checking process, when you were walking around collecting petitions as well?

A.    Yes, we would absolutely look at what they filled out, because in the moment they could fix it.

Q.    So when you are sitting at a table and someone comes by and signs a petition and leaves it with you, who at the table is actually in physical possession of that particular signed petition?

A.    Well, the way it worked, we would sort of delegate -- the senior person at the table would be in charge, essentially, of the petitions and in charge of the table.  So that person -- and if I was there, that would be me.

But I had a Voter Services chair, and Voter Services is our

main committee at all local Leagues and state League.  That person would run the show, call me if there was a problem, text me, whatever, if I was milling about, and that person would be in possession of all of the petitions.

Q.   So it might vary over the course of a day; right?

A.   Yes.

Q.   Now, in all your years of engaging in petition circulation and collection activities, have you ever been at a table at which less than 100 petitions were collected?  Actually, strike that.

In all your years of circulating petitions and collecting them, have you ever been at a table at which less than 25 petitions were collected?

A.   No.

Q.   And at the end of the day -- at the end of the event, what would you do with the petitions that you had gathered over the course of the day?

A.   Okay.  There's Bay County and then there's the state League.

Q.   So I'm asking -- that's a fair distinction, right.  So let's talk about the statewide process for, in fact, collecting petitions.

Is that fairly similar from event to event and chapter to chapter in terms of the tabling process you just described?

A.   Yes.  What would happen across the state is the local

president had authority over the whole event, and the local president, he or she, could delegate decision-making authority to the Voter Services chair.

So the local president and the Voter Services chair worked hand in hand, almost as partners, and depending on the size of the League and the size of the event, those two would have decided how we are going to transport the petitions, what's the next step. So that was left to the local president and the Voter Services chair to devise.

Usually what happened would be whoever was the senior person at the end of the day would take possession of all of the petitions, and at some point in the future, they would get with their team and probably review them to see if there were any errors that they had missed and whether they could reach the person, and then they would be sent usually to the sponsor.

Q.   And do you know that's what happened in jurisdictions around the state because you've personally traveled to those jurisdictions and observed this?

A.   I have personally traveled to those jurisdictions, observed it, and when I was there, I would sit at the table as a volunteer.

Q.   So you've collected petitions outside of Bay County where you live?

A.   All over.  And I wanted my members to understand I was just like them.  We all do this work.  It's essential to us and gave

a boost to the members because the president -- the state president or copresident is there working with them, and it just kind of energized everybody to have us all work together.

So I did it, and then I would get reports.  We have regular reports from our state presidents, and they would tell me, This is what we did, blah, blah, blah.  And later on, you know, was more formal reports, but there would always be a verbal.

Q.   So when the petitions that were gathered were shepherded back from the event to someone's house or someone's office at the end of the day, would there be one volunteer who would be in possession of all of those petitions for that period of time?

A.   Yes, the person who transported them and took possession after the civic event, that one person would be in possession of all.

Q.   And would they be in unique possession of all those petitions until those petitions were sent on to the sponsor of the initiative?

A.   Depending on the setup in that local League.  If their president or Voter Services chair authorized that lead person to send them off to the sponsor, then that would be done. Oftentimes, there was a review of all of them by more than one person.

Q.   Why was that review done?

A.   When this happens is when there's a big event.  People come from different counties, and when you get people from, you know,

four or five surrounding counties, you want to be sure that they put the right county down.  We've actually had citizens put the wrong county.  How that happened, I don't know.  I mean, we had people put "USA," "America," instead of a county.

But sometimes if they lived on the line, they actually -- someone would say, Hey, I know that address.  That's not in so and so county.  It's in this county.

So then you try to get the person and say, Can you fix that?

Q.    And why was the League interested in making sure those petitions were accurate?

A.    We did not -- we wanted to be sure that as many of the citizens -- their choice to sign the petition, that it counted.

Q.    Now, did you ever help individuals with disabilities fill out their petitions when you were collecting and circulating at an event?

A.    Yes.

Q.    Tell me about that.

A.    There were times when people had low vision or no vision or legally blind, and we would read -- ask the person, Can I help you by reading it to you?

And they would say, usually, Yes, please do that.

And I'd say, Well, do you want me to mark your answers on the form?

And they would say, usually, Yes, do that.

So that would be -- after getting their consent and their understanding, that's what we would do.

There were other times when people might have suffered a stroke or some condition where they'd lost the use of their arms or their hands or they're one-armed and all kinds of physical limitations like that, and we would, again, offer to assist them by verbally and -- communicating with them and filling out the form for them.

Q.    I'm asking a general question here.

But in the 25 years in which you've been circulating and collecting petitions, did you ever sign a petition for an individual you had spoken to, whether disabled or not disabled?

A.    Never.

Q.    Have you ever seen a League volunteer that you've worked with sign a petition for an individual without that person's consent?

A.    Never.

Q.    Have you ever seen a volunteer from the League ever sign someone else's petition, period?

A.    Never.

Q.    Have you ever seen someone from the League fill out petitions with the names of people who they haven't spoken to or who have not given their consent?

A.    No.

Q.    And you yourself have never done that, right, Ms. Scoon?

A.   I have not.

Q.   And I think it is -- in fact, I'm sure it is implicit in your last answer.  But is that true of the nonresident members of the League?

A.   Yes.

Q.   Is that also true of the noncitizen members of the League?

A.   Yes.

Q.   Is that true of the members of the League who have been convicted of felonies and not yet had their voting rights restored?

A.   That is correct.

Q.   You've collaborated with other volunteer groups who collected petitions as well, right, Ms. Scoon?

A.   Yes.

Q.   And have you ever seen one of those volunteers sign a voter's name on a petition without their consent?

A.   No, I have never.

Q.   Have you ever heard about anyone from the League or a volunteer organization outside the League even talk about doing something like that as a possibility?

A.   No, sir.

Q.   Now, returning to the League, you told me earlier it's a volunteer organization.

     So am I correct in assuming that means volunteers aren't paid or remunerated in any way to collect petitions?

1648

Direct Examination - Ms. Scoon

A.    That is correct.

Q.    But might they have other motivations to maybe bend the rules a little bit and collect as many petitions as possible without dotting their i's and crossing their t's?

A.    No.

Q.    They believe in these causes; right?

A.    Yes.

Q.    But why wouldn't they try to get as many petitions signed and submitted as possible?

A.    Every League member understands that our brand is our currency.  The trust that people have in us is what opens Senators' door, Representatives' doors.  Our comments are taken seriously when we testify.  There is no way that we would risk any -- anything to our reputation, to our name, to the trust that we have in the community by trying to take a shortcut.

     It's all about the citizens voicing their viewpoints when they sign the petition, and creating false petitions is totally against why we give up our Saturday afternoon gardening, why I don't go to an event with my granddaughter.  I'm not doing it for that.  I'm doing it for the idea that my efforts are going to give voice to the desires and the feelings of the citizen who is so busy.  They are so grateful, generally, to us for providing that opportunity, and creating fake stuff flies in the face of that feeling that I'm looking for and that my members are looking for.

Q.    In your quarter century with the League, Ms. Scoon, are you aware of any volunteers who have ever been prosecuted or convicted for election or petition fraud?

A.    None.

Q.    And are you familiar or have you heard of any members who have ever even been accused of fraud in the collection of petitions or in any election-related activities?

A.    No, sir.

Q.    So I'd like to move on now and talk a bit about your current petition circulation activities, such as they are.

      Are you currently collecting petitions for any initiatives?

A.    No, I am not.

Q.    Do you plan to collect any petitions in the future?

A.    No, sir.

Q.    Why not?

A.    Senate Bill 1205 had some terrible provisions in them for all circulators, and up until 1205, the League was not embroiled in what paid circulators had to do:  The registering, the fines, the fee, the directions.

      This was the first time the State failed to acknowledge, after years of acknowledging, that people who are volunteering have almost no incentive to make more petitions, and I think in part acknowledging our brand and our trustworthiness.  We never had to deal with that paperwork --

Q.    But for HB --

Direct Examination - Ms. Scoon

A.    -- but in 1205 --

Q.    I'm sorry.

A.    -- but in 1205, that changed.

In addition, the requirements got a lot more onerous, threatening, hard to do.  So, one, we were pulled under the tent of paid petition gatherers, which was a novel idea, and then everybody was basically facing draconian law changes.

Q.    Now, I think we spoke a little bit about your collection of petitions for the Medicaid expansion and Right to Clean Water.

But for HB 1205 having taken effect this past year, would you have collected additional petitions for Medicaid expansion?

A.    Yes.

Q.    And but for HB 1205 having been enacted and taken effect this past year, would you have circulated additional petitions for Right to Clean Water?

A.    Yes, sir.

Q.    Prior to HB 1205 being passed, had other members of the League collected petitions for those initiatives?

A.    Yes.

Q.    How many people do you know who collected petitions for those two initiatives?  Ballpark is fine.

A.    Somewhere -- that I know that communicated that to me, somewhere between 50 and 100.

Q.    And, to the best of your knowledge, are any of those people collecting petitions for Right to Clean Water today?

A.    No, they are not.

Q.    To the best of your --

A.    Not on behalf of the League.

Q.    And to the best of your petitions [sic], are any of those people collecting petitions on behalf of the League for the Medicaid expansion initiative?

A.    No, sir, they are not.

Q.    And is it your understanding that that has ceased because of HB 1205 being passed?

A.    That is correct.

Q.    Now, why would you have continued collecting petitions for Right to Clean Water, you personally?

A.    Why did I do that?

Q.    Yes, ma'am.

A.    Well, I think it's a great idea to ensure Clean Water.  I grew up in the Caribbean, went to the beach every day with my family.  The beach was down the street.  It was mom's free time. Dad would take the four kids, and we would swim in the pool, which was a part of the ocean.  And my little sister is here, and she knows.  And it was mom's break.  But it was almost, like, a mile, half a mile out.  It was less than 3 feet, so we called it the pool.

     So I believe in fresh water, clean water, the communities enjoying it without fear.  That's really important to me personally.

Q.   And why would you have continued collecting petitions for the Medicaid expansion ballot initiative had HB 1205 not passed?

A.   Well, Florida is similar to many of the islands in that people come to Florida to enjoy our beautiful waterways, the Gulf, the Bay.

Q.   I don't want to -- I want to just stop you for a second.

A.   Yeah.

Q.   I just want to repeat the question because you may not have heard me, or I may not have articulated it well.

I was asking why you would have continued circulating petitions for the Medicaid expansion.

A.   Oh, I apologize.

Q.   No, no, totally fine.

A.   Medicaid expansion -- I firmly believe that medical care is essential.  And what really woke me up in a really tragic and harsh way was a friend of mine was uninsured, and he would have breathing problems from time to time.  And he would hit up a doctor, who would take care of him, and they'd exchange a little bit of cash, but it was hit or miss in trying to get in.  And it pains me greatly to even say it today.  He got into a spiral, wasn't able to get to the doctor, and he died.

Q.   I'm sorry.

A.   At that point I'm like, Oh, well, this is real.  This person used to help me do my League work.  This person helped a lot of people, was a great person, and they had a different

outcome about something -- they could have lived if they had regular care, and they died --

Q.   So --

A.   -- because we don't have that network.

Q.   So given how important that initiative is to you personally and given how important clean water is to you personally, why did HB 1205 lead you to stop collecting petitions, just at a broad, like, 30,000-foot level?  What is it about the Bill?

A.   It is the limitations put on myself and League members.  If they wanted to do what we customarily did and gathered more than 25 petitions for any particular initiative, the registration application required personal information that made us feel very uncomfortable.  The penalties for making a mistake or doing anything wrong were very severe:  High fines, potential felony charges.  The time that you had to turn in the citizen initiatives signed went from 30 to 10.  The enforced standard if there were -- I think it was more than 25 invalid petitions --

Q.   Well, let's break it apart --

A.   Yeah.

Q.   -- how we do that?  Because there's a lot there, I think.

A.   Yeah.

Q.   And I want to make it a little bit easier for you --

A.   Okay.

Q.   -- and for everyone here today and for the court reporter.
     So let's start with the safety and privacy concerns that

you mentioned.

What were the safety and privacy concerns implicated, in your view, by HB 1205?

A.    Two parts of it.  One was the mandatory registration requirement that had to be done with the State that had your name, your address, and the last four of your Social.

Q.    When would that mandatory registration requirement kick in?

A.    If -- at the beginning, whenever you thought that you might collect more than 25 petitions outside of your family members.

Q.    Okay.  And so why was that information -- why was providing that information an issue for you?

A.    Well, that information, the last four of your Social, to my knowledge, was on no other documents that were publically available.  And in today's world, in the world of 2025, there are bad actors.  There are people out there who target people for threats, all kinds of potential fraud, just negative things because of your values and what you believe in.

And we objected to putting that kind of information out, requiring our members to do it, many of whom are in their late 70s and early 80s, many of whom are widows, many of whom live alone.  It's just, Hey, I don't need all of that information to go forward.  People objected to it, and it made them feel squeamish.

Q.    So I may not be understanding.

Are you talking about politically motivated bad actors or

just plain old everyday fraudsters who are in it for money?

A.    Both.   Both.   We felt that filling out that registration form made us susceptible to both.

And then the reason why you're filling out the form is because you want to gather more than 25 petitions.  So the thing works together in that you would be known for gathering petitions for a particular matter that someone may disagree with.

Q.    So that's the political part of it.  I just want to make sure that we've closed the loop on the, I guess, plain old everyday fraudster part of it.

A.    Yes.

Q.    Why was that a concern to you as a result of having to provide this information under HB 1205?

A.    Well, it's not information that League members had to provide in the past, and it was an invasion of our privacy.  We felt uncomfortable.

Q.    What were you worried a fraudster might do with that information?

A.    They -- many of our members are not as digitally savvy, so there could be -- and I've actually received some of these emails in the past.

Q.    So have I.

A.    Yeah.  Yeah.  There could be some kind of scam.  You know, We've looked over your records, and you are entitled to this

loan, or, you know, You won a check, or some kind of thing to entice an unwary League member.  And they might say, Oh, well, they have my information; they know where I live.  You know, They've got the last four of my Social on their application, and they're just saying click here.

And we've had situations where people have been duped, League members, in fact.  They've called me.  My computer has got a worm or it's been hacked.  Things like that have happened before to people I know.  And certainly League members have called me and said, You know, we felt that providing this additional information for ne'er-do-wells would be something that might mislead more people.

Q.   Thank you for that clarification.

And then the other category:  What about politically motivated bad actors?  What about providing this information made you worry for your safety or privacy when it came to those folks?

A.   Well, again, we feel that you would only be doing it because you intended to gather more than 25 petitions.  So if we went back to the numbers that we were generating before, someone who was politically motivated could say, Give me all the names and addresses and information of people who gathered 100 petitions on this.  And then there we'd be with our personal information public and people being able, if they wished, to target us for threats, bad actors, all sorts of things.

Q.   Okay.  And so it's the frequency with which your name might appear next to a given cause which might motivate people to target you, for instance?

A.   Exactly.

In addition to the registration form, which could be provided, I would imagine, with a public records request, the new system required you to sign an affidavit every time you took a citizens' initiative petition.  You had to sign your name, your address on the bottom.

So, again, someone could say, Who's -- they could just look at -- or they can make a request:  Who's done more than 150?  My main volunteers and myself would be in that category.  They would have information about us, and then they could go back to the registration form and pull out more.

Q.   I was going to ask, actually -- I mean, it seems that quite a few people know who you are.  But are your concerns the same as those as other members of the League when it comes to the exposure of the information, at least based on your understanding of the folks that you interact with?

A.   Yes.  That's what has been communicated to me, and that's how I feel.

Q.   And for -- is it true that for some of those members there might be less information about them out there in the public sphere today than there is about you?

A.   Yes.

Q.   You mentioned safety, and I think you've talked about one type of safety here.

Are you aware of any members of the League having been threatened because of their advocacy for a ballot initiative?

A.   Yes.

Q.   Could you give me an example?

A.   Well, one happened to me when I was action chair for health care expansion.  We held a forum at the local college, and somebody wrote on Facebook or something that, We're going to pay.  I'm going to make you pay for this.

And I don't remember exactly the other comments, but we took it to law enforcement.  And they said that is a threat.  And we took it as a potential physical threat because the person -- excuse me -- hold on.

Q.   Take your time.

THE COURT:  Why don't we do this:  It's been an hour and a half since we started because we had a witness before Ms. Scoon.  So we are going to go ahead and take a ten-minute break.

Thank you.

Court is in recess.

(Recess taken at 2:26 PM.)

(Resumed at 2:37 PM.)

THE COURT:  We're back on the record.

You may continue your direct examination.

Thank you.

MR. MASTORIS:  Thank you, Your Honor.

BY MR. MASTORIS:

Q.   Ms. Scoon, welcome back.

I think when we took a break, you were telling us about threats that you and members of the League had received in connection with the FDH Medicaid expansion issue; is that correct?

A.   Yes.

Q.   Other than that incident, have you or members of the League been threatened with respect to any other ballot initiatives for which you collected petitions?

A.   Yes.  I think it was in 2025 several League members and other volunteers were at a precinct and they were holding signs supporting Amendment 4, abortion rights.

Q.   Would that have been -- sorry to stop you.

Would that have been in 2025 or earlier?

A.   It could have been earlier, 2024, probably, yeah.  Thank you.

And they -- a couple of cars drove up in trucks and young men jumped out yelling at them, threatening them and brandishing machetes.

MR. MASTROIS:  So I think -- I had a conversation during the break with my colleagues, Mr. Jazil, Mr. Raban.  To try to expedite matters, I'm going to go ahead and introduce

what was previously I think admitted as part of the preliminary injunction hearing into evidence.  That's exhibit -- Defendant's Exhibit 256.  So I'll just do it as part of my direct case, if that's all right.

THE COURT:  What is it?

MR. MASTORIS:  It's a copy of a card.  Could we publish it?  I don't have a copy with me.

THE COURT:  Wait.  I thought the exhibits but not the declarations were already in evidence.

MR. JAZIL:  Yes, Your Honor, they are.  It was admitted under seal.  I don't know if it's convenient for the Court to have a consistent numbering system, and then when we submit the exhibits to the Court at the end of the trial to have it in that way.

THE COURT:  It's fine.  I just -- so it's -- it just needs to be clear what is part of the record and what's not part of the record.  But it was already part of the record, we're just going to remark it.

MR. MASTORIS:  So -- yeah.  I mean, if you -- I think it's really your preference.  We could remark it now or we could just bring it in as the previous exhibit.  But I think it was previously marked as Defendant's Exhibit 256 at the preliminary injunction hearing.

MR. JAZIL:  Your Honor, just a slight correction for my friend.  It was not marked as Defendant's Exhibit 256 at the

PI hearing.

MR. MASTORIS:  It's been marked for the trial?

MR. JAZIL:  It's been marked for trial as Defendant's Exhibit 256.

THE COURT:  Well, but 256 has not been admitted yet. In this trial it was admitted as part of the pretrial.  So why don't we do this:  Just -- it doesn't matter if something's in there more than twice, just so it's clear what we're talking about.

There's no objection from the government -- or the defense -- I'll call you generically "the government," but the intervenor as well.

DX 256 is admitted; right?

MR. MASTORIS:  No objection.

MR. JAZIL:  I agree.

THE COURT:  All right.  DX 256 is admitted.

(DEFENDANTS' EXHIBIT 256:  Received in evidence.)

MR. MASTORIS:  Thank you, Your Honor.

THE COURT:  So the record is clear, it's also elsewhere in the record, since we've incorporated by reference exhibits that would otherwise be admissible and the testimony from the PI hearing.

Go ahead, counsel.

MR. MASTORIS:  Thank you, Your Honor.

Could we show that exhibit?  Could we publish it?

1662

Direct Examination - Ms. Scoon

BY MR. MASTORIS:

Q.    Ms. Scoon, it should appear in front of you.

A.    Yes, I see it.

Q.    Ms. Scoon, do you recognize this document?

A.    Yes.

Q.    You see -- what is this document?

A.    It's an appearance record that you have to fill out if you want to speak before one of the committees at the Capitol.

Q.    What is the address that appears on the address line?

A.    That's my office address, 25 East 8th Street.

Q.    That isn't your home address; is that correct?

A.    That is correct.

Q.    Do the last four digits of your social security number appear on this document?

A.    No.

Q.    As far as you're aware, are there hundreds of copies of this document available as public records from the state of Florida?

A.    There's quite a few, but not hundreds.

Q.    And do you know if those would all be available or accessible in the exact same place online?

A.    No.  I wouldn't think they would be gathered in any way, shape, or form.  Maybe the -- there might be five or so per year when I would appear.

MR. MASTROIS:  Okay.  Thank you very much.  We can put

Direct Examination - Ms. Scoon

that away.

BY MR. MASTORIS:

Q.   Now, earlier I think you also mentioned some other issues with HB 1205 which caused you to stop collecting petitions.  I think you mentioned that it was a matter of principle.

     Could you elaborate on that as well?

A.   We don't -- League members and myself don't feel that we should have to register to talk to other citizens, to talk to Floridians about things of importance to them.

Q.   And why is that?

A.   That's our individual right under our citizens' initiative laws that preexisted 1205 and under the First Amendment of the United States Constitution.

Q.   And you also mentioned a third category, which was the risk of criminal liability investigations.  And I may have interrupted you previously, but are you aware of any penalties -- I think this is what you started to say -- pertaining to the collection of more than 25 petitions if you haven't registered as a circulator?

A.   Yes.  I think you could be charged with a third-degree felony and some very significant fines.

Q.   And is that provision something which is keeping you from, in fact, circulating petitions since HB 1205 was enacted?

A.   Yes.

Q.   What about filling in missing information for a voter?  We

talked a little bit about the help you gave disabled voters.

Are there penalties in the statute as far as you know for filling in missing information on a petition?

A.   I believe there are.

Q.   And do you know what those penalties might be?

A.   I believe it would be potentially charged with a third-degree felony and extensive fines.

Q.   And is the threat of that penalty also keeping you from, in fact, circulating petitions for initiatives --

A.   Yes, sir.

Q.   -- this election cycle?

A.   Yes.

Q.   You also mentioned, I believe, a ten-day return provision in the law.

Can you tell me about that?

A.   Well, that was a major change that we testified against. It used to be 30 days, and for some reason, the State said it's got to be in ten days.

So when the League would -- in the past would have a chance to look over the collected petitions, and if there was something that was fixable, that was an error, you had at least a chance to try to reach that person and have them come down and correct it.

There is no time now.  With the ten days, you've got to pretty much get it and turn it right back in, put it in the mail

right back in to the sponsor.  And so the amount -- the number of petitions that might be considered invalid go up with less time.

Q.    And so why does that matter?  Why does it matter how many petitions might be considered invalid under the statute?

A.    Well, the State thought it was to put in a cutoff.  If there were more than 25 percent, I believe, invalid petitions, then that would require an investigation by the Office of Election Crimes and Security people, and that was terrifying.

One, they could accuse us; they could fine the League; they could fine members.  We're here to help people.  We are not here to be terrorized ourselves and made examples of.  Again, in the community, people have said, You're the gold standard.

If they were able to bring the League down with accusations that would harm our brand, harm people's trust in us, it would be over.  We don't have big dollars to do lobbying parties for the Senators and invite them to dinner and things like that.  It's totally beyond our ability and beyond our interest, frankly.

And so we have to do everything to protect our name.  We have to protect our members.  I was not about to allow -- my members who are working to bring the voice of the citizens, have they themselves be attacked falsely or improperly because somebody said, You have more than -- 25 percent are invalid, when they are taking away our opportunity to try to get them

corrected.  You are getting squeezed on both ends.

Q.    Are you aware of any instances in which the OECS or the State of Florida actually took actions that might be viewed as retaliatory against people in connection with petition initiatives?

A.    I think I've heard people say that they felt that they were targeted for this or that reason, and I don't know all the particulars of the other voting rights groups.  But people do feel that they were targeted by the Office of Election Crimes and Security.

Q.    And when you say "they were targeted," they were targeted in connection with potentially invalid petitions?

A.    Just other statutes over the years that have been tightened, penalties have increased, criminal -- potential of criminal prosecution was built in that wasn't there before. There's been a sense that you are subject to prosecutorial discretion or indiscretion.

Q.    And that -- that threat of an OECS investigation, say, for having too many invalid ballots, is that something that stopped you personally from collecting after HB 1205 took effect?

A.    Yes.

Q.    And that's something that led to your decision as copresident, along with Ms. Chandler's decision?

      Actually, strike that.  I'll get to that a little bit later.

One more provision I wanted to ask you about.  Are you familiar with anything in the statute which deals with irregularities in petitions?

A.    Absolutely.

Q.    What is that?

A.    That is the RICO statute.  They put in 1205 that irregularities found by OECS and for voting violations or elections matters would be considered as a potential RICO violation.

Q.    So when you say "a potential RICO violation," you mean the RICO statute has -- I don't know how familiar you are, but -- are you familiar at all with the RICO statute?

A.    Generally.

Q.    Does the RICO statute define the racketeering activity?

A.    Yes --

Q.    The Florida Statute.

A.    -- I believe it does.

Q.    Did HB 1205 make any changes to the definition of racketeering activity in Florida's RICO statute?

A.    Yes, it elevated anything that was going on with, I believe, irregularities with elections to be something that could be considered a RICO violation.

Q.    Irregularities with elections or with petitions?

A.    With petitions.

Q.    Petitions.  And -- irregularities with petitions.

So why would that stop you from collecting petitions?

A.    Well, that's a major hammer, and from my perspective sitting in my seat, every year the legislators have come up with new laws that seem to be targeting the League.

We were and are the preeminent volunteer organization getting voter registration, gathering petitions, not paid.  So every time they increase the penalty, they criminalize actions, they require voter registration -- us to register with the State, they require us to put our names on documents, that's something they are doing to the League, and they are well aware of it.

And so given the way the laws have been written and some other things that have happened that we thought were outside of propriety -- for example, there have been allegations that the State used funding from one source to take ads against Amendment 4 abortion rights and they're -- those kinds of concerns, are they going to color in the lines?

Q.    So let me pause you right there, because I just want to make sure we don't, again, get too far off the topic that we are talking about.  We can revisit that in a moment.

A.    Okay.

Q.    But when it comes to RICO, when it comes to racketeering activity, does HB 1205 event define the word "irregularities"?

A.    No, it doesn't.

Q.    And does that lack of a definition cause you concern when

it comes to collecting petitions?

A.    Absolutely.

Q.    And why is that?

A.    They may say that an invalid petition is an irregularity. We don't know.  We don't know what is an irregularity.  We just know that it would be possible for a prosecutor to bring allegations against an individual League member or the League itself, which would be extremely hurtful and damaging to the individual and the entire League and all of our efforts.

Q.    Okay.  And so does that lack of a definition then, did that cause you to stop collecting petitions for HB 1205 as well?

A.    Yes.

Q.    We've heard from the Secretary's lawyers that nothing in the law as written requires you to register in order to talk to more than 25 voters about a given issue and then to hand those voters a petition and ask them to sign it.

Is that a feasible alternative?

A.    Absolutely not.

Q.    Why not?

A.    That is not real world.  You know, I've sat at many, many, many tables.  The way we are effective is we go to events that people are already attending.  There are other activities going on.  They walk up to us, and we've got their attention for five to ten minutes.  The reason why we have their attention is they want to do something with us.  They want to learn something, and

if they are convinced, they want to sign a document, and they want to hand it over to us to handle it.

They are not in a position, in the midst of all the things going on at the festival or fair, the little children they have to take care of, grandma, and all the other things -- they are not in a position to lock in their mind, I'm going to take this petition. I'm going to fill it out later, or, I'm going to put it in this envelope and I'm going to mail it. They are in a position to walk away from our table and completely wipe away their intent to follow through.

They are going to be immediately bombarded by the real world, and after that festival or fair is open -- over, they are going to be responding to all the things in their life that are demanding their attention: They're working two job; somebody is sick; got to buy some medicine; the car blew a tire. These are the lives of the people that we are trying to reach.

We are going to events where middle-class, lower middle-class people proliferate, and that is their life. They are not going to likely follow through if we give them a piece of paper and say, Mail it yourself.

Q.   Hold up.

A.   There's too many other things happening.

Q.   Let me ask you this:  What if you gave them a stamped envelope addressed to their local county Supervisor?  Wouldn't that fix the problem?

A.    It would not.

Q.    So your answer wouldn't change?

A.    No.  The magic is because where they connect and they really listen is because they are prepared to make a designation that we are going to activate by taking care of it and sending it off to the right group.  If you say "Fix it later, do it later," oh, okay.  Keep moving.

Q.    Thank you, Ms. Scoon.

I want to switch gears briefly and just talk about nonresident members of the League.

So since the passage of HB 1205, have you personally spoken to nonresident members of the League about the law and its impact on them?

A.    Yes.

Q.    Had any of those nonresidents previously circulated petitions?

A.    Yes.

Q.    Had any of them previously circulated petitions for Medicaid expansion or the Right to Clean Water?

A.    Medicaid expansion.

Q.    Could you describe that situation and tell me a bit about a nonresident volunteer who, in fact, had assisted with circulation efforts for Medicaid expansion?

A.    Yes.  He and his daughter came and wanted to help us, and we had them registering voters, informing returning citizens

about some of the opportunities to learn about whether they could register to vote or not, and to gather petitions from those who are already registered to vote; and the petition that they were working on was Medicaid expansion.

Q.    Who was this individual?

A.    Seth Chazin.

Q.    Where is he a resident?

A.    California.

Q.    Okay.  And does he have a home in Florida?

A.    No, he doesn't.

Q.    But he visits Florida?

A.    Yes.

Q.    Have you had any conversations with Mr. Chazin about his plans to circulate petitions after HB 1205 passed?

A.    Yes.

Q.    And did he tell you that he desired to circulate petitions for the League?

A.    Yes.

Q.    And did he tell you that he wasn't able to do so as a result of HB 1205?

A.    Yes.

Q.    Ultimately, was Mr. Chazin able to circulate petitions for HB 1205?

A.    No.

Q.    Switching gears once more, I want to talk a bit about your

experience as president and copresident of the League.

In that role, were there times when the League had to respond to new laws that had been passed by the Legislature?

A.    Well, yes, several times.

Q.    What -- what does the League typically do to address election laws or petition laws which implicate its activities?

A.    Well, the leadership in particular studies the laws ourselves, and we analyze it.  If we need help from the National League of Women Voters of the U.S., we may contact them to help give some background if anything had any connection with any federal laws.  We talk with our allies who are also studying new voter laws, like Southern Poverty Law Center, Legal Defense Fund, groups that we -- the Brennan Center, groups that we have a lot of confidence in their academics.  And if there are lawyers that we are working with that are voting rights lawyers, we might consult with them also.

Q.    Now, did HB 1205 pass while you were still serving as copresident of the Florida League?

A.    Yes.

MR. MASTORIS:  I'd like to show the witness League Plaintiffs' Exhibit 35.  I have paper copies.

May I approach, Your Honor?

THE COURT:  You may.

BY MR. MASTORIS:

Q.    So, Ms. Scoon, please take a moment and look over the

document that I just handed you.

A.    I see it.

Q.    Do you recognize this document?

A.    Yes.

Q.    What is this document?

A.    This is my copresident Debbie Chandler's response to one of our local League presidents who --

Q.    Are you -- I'm sorry.

A.    Her name is Sandy.

Q.    This is an email chain; correct?

A.    Yes.

Q.    Are you copied on this email chain?

A.    Yes, I am.

          MR. MASTORIS:  I would like to move Exhibit 35 into evidence.

          MR. RABAN:  No objection, Your Honor.

          THE COURT:  Without objection, it's admitted, although the viewer copied on the email is not an exception to the hearsay rule.  But there's no objection, so it's admitted.

          Exhibit 35 is admitted.

     (PLAINTIFFS' EXHIBIT LEAGUE-35:  Received in evidence.)

BY MR. MASTORIS:

Q.    So, Ms. Scoon, in this email chain there's an email from Mr. Easen and Ms. Frank to you and Ms. Chandler.

     Do you see that?  It's about halfway down the page.

A.    Yes.

Q.    And Mr. Easen and Ms. Frank write:  *Good afternoon.  Very informative Lunch and Learn today.  If the proposed citizen-led initiative legislation passes, how will it impact the current petition gathering for Right to Clean Water and Medicaid expansion.*

Do you see that?

A.    Yes.

Q.    And that email was sent on March 28, 2025.

Do you see that?

A.    Yes.

Q.    Do you recall receiving this email on March 28, 2025?

A.    I recall receiving it.  I don't sit here remembering it was on that day, but around that time.

Q.    Okay.  There's a reference to "Lunch and Learn" in the email.

Do you see that?

A.    Yes, sir.

Q.    What was the purpose of -- well, strike that.

Did the League -- what is a Lunch and Learn?  I'll start there.

A.    Sure.  A Lunch and Learn is something that was started a few presidents ago where we would try to host them every other week on a topic that would be helpful to our League members. Oftentimes, it was on proposed legislation, on information about

a particular amendment, pros and cons.  And sometimes we invite the pro, and then the next two weeks we'd invite the con, so that members could make up their own minds, you know, and be able to articulate both sides to citizens.

That's the kind of thing -- sometimes it would be a historical celebration.  Asian History Month we would do a program and invite speakers who could talk to us about some aspects of the Asian community.  Black History Month, similar things like that.

Q.   Do you have any recollection of a Lunch and Learn which was held on or around March 28, 2025?

A.   Yes.

Q.   And what is that recollection?

A.   We, Debbie and I, realized that this was coming up and people were very anxious about it, as you can tell by the tone of Ms. Frank, what she was writing to us.  So we thought, Let's dig in and talk about it.

So we approached several subject-matter experts who were on a panel, and then Debbie and I asked the panel questions to elicit information for the members to understand.  We were told and we learned that our members learned much better in a question/answer rather than here's a PowerPoint, PowerPoint, PowerPoint.  They like the give-and-take of a question/answer. So we tried to deliver content by asking subject-matter experts on-the-topic questions, and then there was a time for Q&A from

our members.

Q.    Okay.  And why were you discussing HB 1205 with your members?

A.    Well, it was passing through the committees and appeared to have a lot of steam, so we thought it might pass or some version of it might pass.  And we were in the midst -- the League had committed to having our local leagues actively gather petitions for Clean Water and Medicaid expansion, and so this was going to be very impactful if it passed.

Q.    Who is Ms. Chandler?

A.    She is the -- was my copresident when I was president, essentially, the second time.  She and I did that together.

Q.    Did you believe that the impact of HB 1205 would also create barriers for members of the League to collect petitions?

A.    Yes.

      MR. MASTORIS:  You can put that away as well.

BY MR. MASTORIS:

Q.    Was it important for the League to address the impact of HB 1205 with its members once the bill actually was enacted?

A.    Yes.

Q.    And how come?

A.    We wanted to alert our members to potential liability and to prepare them that at that point on the effective date it was our intent and our board members for the State League to direct our members to not gather any more petitions past the effective

date.

MR. MASTORIS:  Okay.  I'd like to show the witness another exhibit.

Your Honor, this is League Plaintiffs' Exhibit 2.

May I approach?

THE COURT:  You may.

Just so the record is clear, League Exhibit 35 is found on page 98 of 623-1.

And 2, which is, I think -- I believe is a -- is on page 93.

Any objection to League 2?

MR. RABAN:  No objection.

THE COURT:  Without objection, League 2 is admitted.

(PLAINTIFFS' EXHIBIT LEAGUE-2:  Received in evidence.)

MR. MASTORIS:  Thank you, Your Honor.

BY MR. MASTORIS:

Q.   Ms. Scoon, do you recognize this document?

A.   Yes.

Q.   And what is it?

A.   It is an email to me from one of our local leaders.  I don't remember if this was a local president or a leader in that local chapter that was dealing with voter services, but somebody at the time I knew well, and they were asking really good questions about the impact of Senate Bill 1205.

Q.   What is the date of this email?

A.   March 3, 2025.

Q.   And to whom is this email being sent?

A.   To me and Debbie.

Q.   And it copies -- does it copy anyone?

A.   Blake Summerlin was our communications director at the time.

Q.   The name of the sender is redacted here.  Do you have an idea of why that is?  Strike that.

     Is it because it's a member of the League that their name is being protected from public disclosure?

A.   Yes.

Q.   Did you receive other inquiries like this from members of the League with respect to HB 1205 after it was enacted?

A.   Yes.  After it was enacted and before, people were very concerned just -- no League member wants to face felony charges, RICO charges.  Nobody wants to bankrupt the League with having to defend criminal charges or any other fines.  So everybody was up in arms.  There were phone calls.  There were texts.  There were emails.

Q.   Could you give me an idea of the volume of those phone calls and texts and emails with respect to that time period, that is, the time period immediately after the bill took effect -- I'm sorry -- was enacted?

A.   That's all we talked about for maybe a month, you know, like, how do we communicate this?  What are our allies saying?

What should -- are the immediate steps we should do?  Who's going to write the one-pager that we send to our leaders?  Do we need to have a special powwow with them so everybody is on the same page?  What are the different ways that we can communicate to our leaders?  And then how can we disseminate all of the information all the way down to each individual member?

So understanding the content was step one; how to disseminate it the best way, step two; and how do we make sure it gets to every single member.

Q.   Was the impact of the law and the League's reaction to it discussed at the board level as well?

A.   Yes.

Q.   And did the League ultimately make any decisions with respect to petition circulation in light of HB 1205?

A.   Yes.  The plan was that we would have to cease doing citizens' initiative petition gathering for reasons that I testified to earlier, and that was the plan.

Q.   Okay.  At the time was the League working with any sponsors on specific ballot initiatives?

A.   Yes, we were working with Clean Water, and we were working with health care expansion.

Q.   So do you know when HB 1205 actually took effect?

A.   I think it was 1 July 2025.

Q.   Okay.  So it was enacted in early May of 2025; is that right?

A.    Yes.

Q.    And so during this two-month period, can you tell me what the League did with respect to petition circulation for the right to Clean Water initiative?

A.    The Right to Clean Water initiative contacted us immediately and said -- they requested that we cease collection once it passed on their behalf.  And, of course, we agreed.  We were doing it to help them.  We believed in it, but they were the mistress or master of their initiative, and we followed their directions.

Q.    Can you tell me what the League did with respect to its petition circulation and collection efforts for the Medicaid expansion initiative?

A.    Their directions to us at that time were different.  They asked us to continue collection and to immediately send it to the sponsor.

Q.    And how long did those efforts to circulate and collect petitions last with respect to the Medicaid expansion initiative?

A.    Up until the effective date.  So that would have been before July 1 we would have ended.

Q.    Did the League also make an independent decision to cease its petition circulation and collection activities?

A.    Yes --

Q.    Who made that decision?

A.    -- across the board.

Debbie and I with our board made that decision.  This was all transpiring when we were going to be transitioning to the new administration, the new president, who I think took over June the 8th of 2025.

Q.    And is that decision still in place?

A.    Yes.

Q.    It's still being adhered to?

A.    Yes, sir.

Q.    Does the League have any plans at this point in time to start collecting petitions again?

A.    No plans.

Q.    And why is that?

A.    The same threatening requirements and impediments are in place.  It has not been changed.

Q.    Thank you very much, Ms. Scoon.

MR. MASTORIS:  I will pass the witness.

THE WITNESS:  Counsel, you may proceed.

CROSS-EXAMINATION

BY MR. RABAN:

Q.    Good afternoon, Ms. Scoon.

A.    Good afternoon.

Q.    My name is Randall Raban.

Just a couple of questions for you.

Ms. Scoon, I believe you testified that it's the League's

mission to encourage voter participation, educate voters on issues of public import, and advocate for legislative changes and policies for the public good; is that correct?

A.    Yes.

Q.    Has the League ever opposed an initiative?

A.    I think we have.

Q.    And when the League opposes an initiative, do you explain to your members why you oppose that initiative?

A.    Yes.

Q.    Do you attempt to educate voters about why the League opposes the initiative?

A.    Well, there are many ways that you can oppose an initiative.

I can remember one or two instances when in our voter guide, which is for public consumption, we would put both sides of the issue, whatever it was, if it was an amendment, and links to the websites of the proponents and opponents.  And I think in the past the League would do a thumbs up; we agree with this, or thumbs down; we don't agree.

And that's pretty much how we communicated.

MR. RABAN:  Thank you, your Honor.  That is all the questions that I have.

Thank you for your time, Ms. Scoon.

MR. MASTORIS:  No redirect.

THE COURT:  Thank you, ma'am.  You may step down.

Have a good afternoon.

THE WITNESS:  Thank you.

(Ms. Scoon exited the witness stand.)

THE COURT:  Is it Ms. Dato -- I mean, Mr. Dato.  I'm sorry.  My bad.

MR. MASTORIS:  He'll be here in a moment.  I think he's with the next witness, Your Honor.

THE COURT:  No worries.

Mr. Stafford has been --

MR. STAFFORD:  Which one?

THE COURT:  No, the Stafford for the plaintiffs' side.  But we'll have both Staffords be the spokesman for both sides.

Are we still looking at four additional witnesses today -- four additional witnesses through the -- I'm sorry -- for plaintiffs?

MR. STAFFORD:  I'm actually going to defer to my colleague.  I think all the remaining witnesses are from the League.

MR. MASTORIS:  You scared me for a second.

Four in total.

THE COURT:  Four in total.

Who do we have here today?

MR. MASTORIS:  We have Ms. Debra Chandler.

THE COURT:  All right.  And so that's -- we're going to finish with Chandler?

MR. MASTORIS:  She should take us to the end of the day, yes, Your Honor.

THE COURT:  And how long do you expect Chandler to be?

MR. MASTORIS:  I would say about an hour on direct.

THE COURT:  And that's, again, Mr. Raban, who's now teacher's pet given the length of his cross.

MR. RABAN:  We would not take -- we don't anticipate taking longer than an hour on cross, certainly not.

MR. MASTORIS:  We may actually be able to put on our remote witness today, time permitting, Your Honor, after Ms. Chandler.

THE COURT:  All right.  Well, we're going to finish hard stop at five, so if we're close to five, we're just going to stop.  I just want to give everybody notice of where we're at.

The court reporter wants a break now, so I'm going to give her a break and then we'll get started in five minutes.

Thank you.

(Recess taken at 3:17 PM.)

(Resumed at 3:25 PM.)

THE COURT:  All right.  We are back on the record.

(Ms. Chandler entered the witness stand.)

THE COURT:  The plaintiff can call their next witness.

MR. DATO:  Thank you, Your Honor.

The League plaintiffs call Debra Chandler.

Debra Chandler is the former copresident and current member of the League of Women Voters of Florida.  Her testimony will go to her individual standing, the League's standing and Counts One through Four of the operative complaint.

Ms. Chandler, I'm going to start with a few questions about your background.

THE COURT:  I'm sorry.  She hasn't been sworn in yet.

Keep your seat.

THE COURTROOM DEPUTY:  Raise your right hand.

**DEBRA CHANDLER, PLAINTIFFS' WITNESS, DULY SWORN**

THE COURTROOM DEPUTY:  Please state your name for the record.

THE WITNESS:  Debra Chandler.

THE COURTROOM DEPUTY:  Thank you.

THE COURT:  Thank you, Ms. Milton McGee.

MR. DATO:  Your Honor, I'm happy to repeat the sign post if it will help the Court?

THE COURT:  You don't need to.

DIRECT EXAMINATION

BY MR. DATO:

Q.   Ms. Chandler, where do you live?

A.   I live in Lake Worth Beach, Florida, which is Palm Beach County.

Q.   How long have you lived there?

A.   I've lived in Palm Beach County most of my life.  I was

born there except for going away to school and such, and I've lived in my home in Lake Worth Beach for 25 years.

Q.   Are you registered to vote, Ms. Chandler?

A.   I am in Palm Beach County.

Q.   What do you do for a living?

A.   I am a retired attorney.

         THE COURT:  The best kind.

         THE WITNESS:  I agree.

BY MR. DATO:

Q.   Ms. Chandler, do you recall submitting a declaration in this case?

A.   I do.

Q.   You had a chance to review that declaration recently?

A.   I did, yes.

Q.   Is there anything in that declaration that you would like to correct or update?

A.   Yes, actually I would like to update it.

     At the time I signed it, which I believe was June of last year, I was a member of the Florida Bar in good standing.  I have since gleefully retired from the Florida Bar effective the end of July or August, right before the date where you paid your dues.  So I am now a retired attorney.

         THE COURT:  I can't resist.  I'm only six and a half years behind you, ma'am.

         Counsel, you can go ahead.

Direct Examination - Ms. Chandler

BY MR. DATO:

Q.   Ms. Chandler, what type of law did you practice?

A.   Primarily criminal.  I was an assistant public defender for a little over 25 years.  I dabbled after that.  I had 41 years of practice.

Q.   Despite your retirement, are you still involved in the legal community?

A.   I am.  You know, as most of you are lawyers you know, lawyers tend to gravitate to other lawyers, so most of my friends are involved in the legal community, are court reporters or bailiffs, or, you know, involved in the legal profession in some way, so, yes.

Q.   Are you still involved in any associations?

A.   I am.  I've had to give up full membership in some of them, but I'm an associate member in the criminal defense bar, a few of the criminal defense bars.

Q.   Ms. Chandler, I'm going to ask you a few questions now about the League of Women Voters of Florida.

A.   Okay.

Q.   Are you a member of the League of Women Voters of Florida?

A.   Proudly.

Q.   And if I refer to the League of Women Voters of Florida as just the League, you'll understand what I'm referring to?

A.   I will.

Q.   Why did you join the League?

A.    Actually when I was a child I remember watching the debates, the presidential debates, in the -- I guess the '60s and '70s, and the League sponsored most of them.  And I was just fascinated that there was this nonpartisan organization that was involved in politics, and I thought -- I was very interested in that.

Raising a family and working as much as I did, I didn't really have the opportunity to join the League until I stopped working as an assistant public defender, so I joined about ten years ago.

Q.    Do you remember when you did join?

A.    October of 2015, I believe.

Q.    And you've stayed a member since then?

A.    I have, yes.

Q.    Why have you been a member that long?

A.    The quality of the membership is just astounding.  I have met some of the most interesting, bright, caring, devoted, intelligent people that I have ever met, and it's just a pleasure to be around them.  You know, some of my best friends are now League members.

Q.    Is the League a partisan organization?

A.    No, absolutely not.

Q.    And does the League take any steps to confirm its nonpartisan nature?

A.    Very much so.  On all of our websites, our documents we

Direct Examination – Ms. Chandler

have a nonpartisan policy listed.  When we have meetings, at least in my local League, we always announce that we are nonpartisan.  What that means is that we do not advocate or endorse any particular party or candidate.  What we do do, however, is advocate on issues that our membership has studied and reached consensus on.

Q.   Ms. Chandler, have you held any leadership roles with the League?

A.   I have.  I've got several years of leadership in my local League, and I was appointed by Cecile Scoon when she was president of the League by herself to the board.  I think that was in 2022.  And then the following year, in 2023, I was nominated along with Cecile as copresident, and we were elected in June of 2023.

Q.   How long did you serve as copresident of the League?

A.   It's a two-year term.  Our term ended in June of last year.

Q.   As copresident, what were your primary responsibilities?

A.   The president is the face of the League, and the state League is primarily responsible for state issues.  We would advocate on state issues; we would lobby the State Legislature. There are 29 local Leagues in Florida, so we would visit them. We would, I guess, chair the board of directors.  We were responsible for all interviews, sign contracts, did the typical things a CEO would do.  We were a working board.

Q.   And aside from the leadership positions, what League

activities do you participate in?

A.    The typical League activities, I did them all:  Voter registration, petition gathering.  I helped organize forums: candidate forums, judicial forums.  I helped organize any legislative review, legislative preview, different events.  We have Hot Topics once a month where we get speakers in, and it's a lunch, and I would help organize that.  We would put on different educational programs.  We had a Lunch and Learn every two weeks.  We would run the board meetings.  There are many, many more things that we did, but I'd prefer not to remember.

Q.    Thank you, Ms. Chandler.

You mentioned petition gathering.  I have some questions now about your experience circulating petitions.

A.    Okay.

Q.    First off, since the enactment of HB 1205, have you circulated any petitions?

A.    I have not.

Q.    Going back to before HB 1205, was petition circulation important to you?

A.    It was.  It's a -- it's one of the primary forms of direct democracy, in my opinion, a cornerstone of our democratic republic.  I did it as often as time permitted.

Q.    And I misphrased my question.

Is it still important to you today?

A.    It is, yes, very much so.

1692
Direct Examination - Ms. Chandler

Q.   For which initiatives have you circulated petitions in the past?

A.   I think the first one that I worked on was the restoration of voting rights for returning citizens.  I worked on Medicaid expansion.  There were a couple of iterations of Medicaid expansion.  Clean Water, the right to reproductive freedom.  There may have been one or two others, but I'm not sure.

Q.   Have you personally circulated petitions in different ways?

A.   I have both informally and formally as a League member.

     Informally -- I was trained when I first joined the League to always be prepared, sort of like a Boy Scout.  So I have an accordion file folder that I normally keep in my trunk, and it has League forms in it.  So I have a membership application; I have our voter guide; I have the directory of elected officials; I would have whatever the petitions were that we happened to be circulating at the time, voter registration, change of address, request for vote by mail.  I mean, there were a bunch of different forms that I would keep in this accordion folder, but in there would also be the petitions.

Q.   And you talked about circulating individually.

A.   Uh-huh.

Q.   At what types of events would you do that?

A.   I -- in addition to being a member of the bar, I was also a member of a number of clubs and organizations.  So if I would go to a meeting, you know, a book club, for example, I would -- you

know, if the petition had just come out, I would cart my accordion folder into the book club meeting and ask if anybody wanted to sign the petition, and, you know, I would collect them right there.

Q.   Did you also participate in organized League circulation activities?

A.   I did, yes.

Q.   When you would circulate at those events, where did you typically circulate?

A.   Those would be typically done at civic events or community events.  So, for example, we have a five-day art festival and jazz festival called SunFest.  And it's five days, so we might circulate one or two days at that.

We would go to a Chamber of Commerce.  If they were having a yearly meeting or something, we might have a tabling event there; different parades and things in the community. Palm Beach County is one of the larger counties in the state.

And, you know, I've gone to the Muck Festival in Belle Glade and had petitions signed and -- so --

Q.   And when you would circulate at those League-organized events, did you typically circulate with other League volunteers?

A.   Absolutely.  There were always at least two of us -- almost at least always two of us.  I really don't remember a time when there weren't.  Sometimes there would be five or six or even

more of us.

Q.   And why was that?

A.   It was easier to do because the crowds were big, and, you know, we would be in contact with a lot of people.  Oftentimes people would travel in groups, so it was easier to have, you know, two or three people there to, you know, if -- because If one person was signing a petition, you know, then everybody else would typically sign the petition, assuming they were registered voters.  And so it was easier for us to kind of look over them and do a quick quality control check.

     And we'd also have people -- you know, we'd have certain people at the table.  Then we'd have other people that were walking, you know, along with the pedestrian traffic and trying to talk to people there as well.

Q.   And on days that you would circulate at these League-organized events, about how long would you do so?

A.   We would work in shifts, usually two to four hours depending on the time of year and the weather.  You know, sometimes in the summer it can be miserably hot, you know.  But typically two to four hours.

     Sometimes people would work back-to-back shifts if -- you know, if they wanted to, but our membership skews toward the older side and -- you know, so not always did they do long shifts.

Q.   And can you explain for me what you would typically do in

attempting to get someone to sign the petition?

A.    Sure.  It's sort of like anytime you meet a stranger and you want to talk to them, you, you know, kind of make eye contact.  You know, you ask, Can I chat?  Have you got a few minutes?  Do you know about Clean Water, for example?  Let me tell you -- you know, do you have a few minutes to chat about the Clean Water petition? or, you know, whatever the petition was we were talking about.  Do you know anything about it?

     You, you know, just kind of try to get them interested in your conversation, and, you know, that's basically how I did it. I haven't had a lot of trouble talking to strangers in my life, so it kind of works out.

Q.    Would you ask whether they are registered voters?

A.    Absolutely, because you can't -- a petition is not valid if it's not signed by a registered voter from Florida.

Q.    And if it was a registered voter and they agreed to sign, what would you do then?

A.    I would hand them the petition, show them the blanks they needed, you know, to fill out.  I'd try to caution them that it was asking for the county and not the country, because that's a typical mistake that people made over and over again, made sure they signed it, dated it, that kind of stuff.

Q.    And I am speaking specifically about prior to the enactment of HB 1205 right now.

A.    Uh-huh.

Direct Examination - Ms. Chandler

Q.    Have you ever assisted a voter in filling out their petition forms?

A.    Many times.  I would guess somewhere between 20 and 50 times easily.

Q.    In what circumstances?

A.    In South Florida, as I'm sure is true in most of the state, our population skews elderly, and elderly tend to have more physical disabilities.  A lot of people are sight impaired.  Several -- it's difficult for many people to write legibly, and they would often ask if we could help them fill out the form so that it would be legible to the Supervisors.

I've assisted people that --

THE COURT:  One moment, please.

(Pause in proceedings.)

THE COURT:  My apologies, ma'am.

Counsel, you may proceed.

THE WITNESS:  If we needed -- you know, if somebody -- for example, I remember a young woman who had a broken arm, and she couldn't write very well.  So I helped her fill out the form.

Blind people, people that are sight impaired, you know, they can't even see the form to fill it out, much less, you know, write the correct stuff in the blanks.

BY MR. DATO:

Q.    Would the voter always sign?

A.   Oh, absolutely.  I would never sign.  In fact, no League member would ever sign a form for a voter.

Q.   And once you did have a signed petition, what would you do with the form at that point?

A.   If -- if it was at the table, we would put it -- we would have some type of container, usually a box or something, and we put it in the box or container.

     If I was out with a clipboard walking amongst the pedestrian traffic, I might stick it at the bottom of my pile and wait until I made my way back to the table.  Then I would put all the completed forms in the box at that time.

Q.   Who would be responsible for all of the signed completed petitions that were in the box or the container?

A.   Really all the League members there.  You know, we would have one person that was designated to, you know, take the box at the end of the shift or the end of the night.  But, you know, all of us would, you know, watch over the box, because we would take turns.  You know, one person can't stand up for hours walking back and forth and -- you know, so we would take turns sitting and walking and stuff.

Q.   And, again, I'm now referring to prior to the enactment of HB 1205.

     Would there be times during these events that you would be in physical possession of more than 25 forms at a time?

A.   Absolutely.  Sure.

Q.    What about the volunteers that you were circulating with?

A.    All of us.  I mean, everybody sitting at the table, every -- I mean, we would all have either constructive possession or actual possession, joint possession.  I mean, any way you talk about it, we would be in possession of those forms.

Q.    And when you circulated at these League-organized events, Ms. Chandler, how many petitions would you typically collect in a single day?

A.    It would depend really.  If it was the beginning of a cycle and it was a new petition, easily a hundred, you know, if it was a big event.  If it was towards the end of the cycle, chances are that people had already signed the petition, and so we would get less.  But, you know, if it was a large event, obviously, we would get more signed petitions than if it was a small event.

Q.    And were there days prior to the enactment of HB 1205 that you would personally collect 25 or more signed petition forms in one day?

A.    Sure.

Q.    And you mentioned that at some of these events volunteers worked in shifts?

A.    Yes.

Q.    When one shift ended, what would happen with the signed petition forms?

A.    Most of the time they would be left for the end of the shift, but, occasionally, for example, if I knew I was going to

meet the sponsor representative, you know, within a day or two, I might take the ones from my shift and know I could give them to them -- to the sponsors rep, who was often also a League member, you know. But I would turn them over to the sponsor rep.

Q. And when the last shift would end, what would you or your fellow volunteers do with the signed forms?

A. Take them home. We would try to review them so that we could pull out the ones -- like, if it was not Palm Beach County, if it was a different county, we would try to flag those, you know, stick them in a pile separately to give to the sponsor if there was some information that was obviously missing that we weren't able to catch, you know, at the time. We would try to catch that stuff right away, but we weren't always able to. So sometimes people put the wrong information or omitted information. We would try to flag those for the sponsor as well.

Q. You would try to flag those at the event?

A. We would try to -- sure. If we could find it at the event -- if we noticed it at the event, the voter was right there, and we could say, Hey, excuse me, you need to put the date in, or, you know, You need to sign it, or, This is asking for the county not the -- not USA, that kind of stuff.

Q. Okay. And after the event, there was additional quality control?

1700
Direct Examination - Ms. Chandler

A.    Yes.  Yes.  This is pre-1205.  We would -- since the sponsor was charged for having each petition looked at, if there was an error, we would try very hard -- the sponsors, I'm sure would -- I know would because many of them were League members -- to cure it.

Q.    Okay.  And can you explain exactly how you'd try to cure those?

A.    We had this thing called the White pages back then, which is like a telephone book.  My grandchildren don't know what that is.

But, you know, we would look it up on Google -- look up the address on Google and try to cure the -- whatever the mistake is.  Because, you know, when somebody signs a petition, they believe that their voice is going to be heard and that their signature is going to be counted toward putting an issue on the ballot for all of the voters to decide.  And, you know, so we think it's pretty important.

Q.    Any other reason that it was important for the League to do a quality control check?

A.    Our reputation.  The League has a stellar reputation, in my opinion, for doing excellent work.  We are proud of the work that we do; we are proud of the fact that we're very accurate, and we don't want to do anything to tarnish that reputation either, you know, among the sponsors or among the organizations that collaborate with us.  You know, we care about what people

think about us.

Q.   And once the quality control checks were completed, what would you then do with the signed forms?

A.   Get them to the sponsor, yeah, or the sponsor's representative.

Q.   And what would the sponsor then need to do with the forms?

A.   I know that the sponsors that I dealt with would do an additional quality control.  They would verify to make sure that the person was indeed a registered voter.  Your know, they would, yeah, spend quite a bit of time doing additional quality control, and that was because of the cost of the Supervisor verifying the petitions.

Q.   And, eventually, are the sponsors -- where would they send the signed forms?

A.   Eventually, the signed forms would go to the Supervisor of Elections for the county that the voter lived in, which is why we separated the counties, you know -- which is why I did, because they -- the time limits were shorter because we had to get them to other counties.

Q.   And so in the context of these League-organized collection efforts, from the time of collecting the signatures to delivering them to the sponsor, about how long could that take?

A.   A week to ten days is, you know, reasonable.

Q.   Ms. Chandler, were you ever paid to circulate petitions?

A.   Absolutely not.  Nor were any of the League volunteers.  We

are a volunteer organization.  I wish I was paid for the work I did for the League.

Q.   Ms. Chandler, I now have some questions about your plans to circulate petitions in the future.

A.   Okay.

Q.   First, do you plan to circulate petitions going forward?

A.   Not unless HB 1205 is repealed or drastically changed.

Q.   And but for HB 1205, which initiatives would you have collected for?

A.   When HB 1205 was signed into law, I believe Medicaid expansion -- excuse me -- and Right to Clean Water were the two petitions that we were working on.  So I would work on those, and I would do it at the same places that I did before, the same events.

     Next week is the Lake Worth Street Painting Festival.  You know, it's a big deal and people come from all over the state to see it.

Q.   And what is it about HB 1205 that led you to decide not to collect petitions going forward?

A.   There are really two reasons.  The first one is privacy, and the second one is the criminal penalties and the fact that I am not confident I understand all -- fully all of the provisions of the law.

Q.   I am now going to go through some of the provisions of HB 1205 and ask you questions about them.

A.    Okay.

Q.    I'll start with the registration requirement.

A.    Okay.

Q.    And we can speak first to your concern about privacy.

Is it your understanding, Ms. Chandler, that you can collect more than 25 petitions if you registered as a circulator?

A.    Yes.

Q.    And do you know if there are any other provisions -- or do you know if there are any other effects of that provision?

A.    I know that I can collect more than 25 petitions if I register, but I have to put my name and address on each petition, which would directly link my personal information to the petition.  And my problem with that is -- I'm not a particularly panic-type person, but I'm getting older, and I have seen the times change and behavior change in the United States over the past several years.  I live by myself. I'm a widow.  I have a small dog that would likely lick your ankle as opposed to bite it.  I don't want my name and home address that closely linked to a potentially volatile issue.

You know, Clean Water may not be at the top of the list, but I could certainly see people getting upset over Medicaid expansion.  And I can just see, you know, the Internet screaming about illegal aliens getting free medical care under Medicaid expansion and that kind of thing.  And it scares me and it

scares other League members.

Q.    Aside from privacy, were there any other reasons you refuse to register?

A.    I'm not real happy about the government telling me who I can talk to and carry on a conversation with and directing the terms of that conversation, you know.  And I'm worried about the criminal penalties.

Q.    Did you register to become a petition circulator under HB 1205?

A.    No, I have not.

Q.    I've got a few questions now for you, Ms. Chandler, about some of the criminal penalties.

Without registering as a circulator, do you know whether you can still circulate petitions?

A.    I believe I can.  I believe I can collect up to 25 without registering as a circulator, and that would be over the two-year circulation period, I think.

Q.    And since the enactment of HB 1205, have you collected 25 petitions without registering?

A.    No.

Q.    Have you collected any petitions?

A.    No.

Q.    Why not?

A.    We were collecting for Medicaid expansion and Right to Clean Water when the bill was enacted, and almost immediately

Clean Water stopped collecting petitions and Medicaid expansion followed.  So there really aren't any petitions to collect.

Q.   And if you could continue to collect with those initiatives or others, would you have done so?

A.   Probably not because I'm just not -- I'm just not sure of the criminal -- the possible criminal penalties, and it's not worth the risk to me.

Q.   And we'll go through some of those criminal penalties.

Ms. Chandler, are you aware that HB 1205 makes it a third-degree felony to fill in missing information on a signed petition?

A.   I am.

Q.   Does that particular provision of HB 1205 concern you?

A.   Very much so.

Q.   Why is that?

A.   Well, as I stated before, I have helped people with various disabilities fill out the petitions.  What am I supposed to say to somebody that's sight-impaired and asks me to help them fill out the information?  I mean, you know, I have to tell them, No, I can't do that.  And I wouldn't even be able to tell them, You can get your friend to help you or something, because then I'd be abetting that third-degree felony.  I just -- I don't know what the limits of the law are as far as that is concerned.

You know, people with tremors that can't write adequately, somebody with a broken arm -- I just don't know what the limits

Direct Examination - Ms. Chandler

of the law are, and so I'm not willing to risk my reputation.  I certainly wasn't willing to risk my law license.  But, I mean, I wouldn't even want a criminal investigation of myself.

Q.   And are you aware that HB 1205 makes it a third-degree felony to copy or retain a voter's personal information?

A.   I am, and that's very concerning as well.

Q.   And why?

A.   When we tabled -- one of the things that was most enjoyable about tabling and collecting the petitions is frequently we would get new members of the League.  You know, we would, you know, strike up a conversation with them, and we would be talking about a particular issue, and, you know, they would join the League right on the spot.  And the information that we would collect from the League membership for them would be their name and address, their contact information, which would also be on the petition.

Q.   Did you feel comfortable taking that information with you under the rules of HB 1205?

A.   No.  I -- I wouldn't chance it.

Q.   Are you aware that HB 1205 makes it a third-degree felony to physically possess more than 25 signed petition forms without registering as a petition circulator?

A.   I am.

Q.   Does that particular provision concern you?

A.   It does.  As I talked about before, I understand what

Direct Examination - Ms. Chandler

constructive possession is.  I know what joint possession is.
You know, it was a normal occurrence to be in possession at some
of these events of more than 25 signed petitions.

Q.    And would you feel comfortable collecting petitions under
those rules?

A.    No.

Q.    I have a few questions for you, Ms. Chandler, about the
ten-day return deadline.

A.    Okay.

Q.    Are you aware of the consequences for turning in petitions
late?

A.    I am.  I believe it is $50 per petition per day.

Q.    And who pays those fines?

A.    The sponsor pays the fine.  They are -- they have the
direct consequence, but the League has an indirect consequence.

Because if the League delays or causes delay in getting the
forms in on time, the League's reputation is at stake, and it's
the League's reputation, it's my reputation if I'm the cause of
that.  And it's not just with the sponsor, it's also with our
partner organizations as well.

Q.    Based on your experience circulating petitions, do you
think it's feasible to turn in the processed petitions within 10
days to the SOEs?

A.    Not with any kind of real quality control, no, especially
for out-of-county petitions.

Q.    Ms. Chandler, I have a few questions now about the investigation provision of HB 1205.

A.    Okay.

Q.    Do you recall ever making good faith mistakes when circulating petitions?

A.    More times than I would like to admit to.

Q.    And I think you've spoken about some mistakes that voters make.

Do voters make mistakes as well?

A.    Yes.  I mean, it's very easy to misread these things, and to most voters, a petition is a legal document.

And, you know, my experience is when they're looking at legal documents, they tend to panic anyway.

Q.    Are you aware of any implications of making good faith mistakes based on HB 1205?

A.    Yes.  I think that it would -- my understanding is that HB 1205 requires that all petitions be sent to the SOE, even those where we know there are errors.

So -- and there is a threshold number percentage that triggers an investigation by the election police, the governmental agency in charge.  I mean, it's the election security and something.

Q.    And does that provision of HB 1205 concern you?

A.    Sure.  I mean, anytime anyone is under investigation it is extremely stressful both emotionally and financially.

Direct Examination - Ms. Chandler

I have seen many people under investigation, and I have witnessed them be very stressed, as I said, both physically and financially.  I've seen people lose their homes over investigations.

Q.   And would you be willing to circulate petitions with that provision in effect?

A.   No.

Q.   Ms. Chandler, I'm going to ask a few questions now about the RICO petition of HB 1205.

Are you aware that HB 1205 expands the definition of racketeering activity?

A.   Yes.

Q.   And do you know how it expands that definition?

A.   It makes the election crimes and security -- I think is the term.  Any irregularity can be used to fall under the RICO statute.  It adds it to the RICO statute.  It adds election irregularities to the RICO statute is probably the simplest way for me to explain it inartfully.

Q.   And you practiced law for quite a while.

Do you know what an irregularity is in that context?

A.   Not a clue.

Q.   And do you feel comfortable circulating petitions with that provision in effect?

A.   No.

Q.   Just a few additional question, Ms. Chandler.

You've spoken quite a bit about the impact of HB 1205.  If the law was repealed completely tomorrow, would you start circulating petitions again?

A.    Joyfully.

Q.    Why is that?

A.    I genuinely love meeting new people.  I love talking to people about political issues.  I love talking -- having conversations with strangers about joining the League and espousing on the virtues of the League and that is -- petition gathering is the perfect vehicle for doing that.

So that would make me very happy, and I would be at the street painting festival this weekend collecting petitions.

Q.    And do you feel that you can continue doing that with HB 1205 in effect?

A.    No, sir.

MR. DATO:  Give me one second.

THE COURT:  Certainly.

MR. DATO:  I tender the witness, Your Honor.

THE COURT:  Cross-examination.

CROSS-EXAMINATION

BY MR. RABAN:

Q.    Good afternoon, Ms. Scoon -- Chandler.

Good afternoon, Ms. Chandler.

A.    Good afternoon.

Q.    Thank you for spending some time with us today.

A.   We look alike so we're used to being confused.

Q.   Candidly, I would rather be hanging out with you than doing your cross-examination today, but here we are.

    I'm going to ask you a couple of questions.

A.   Okay.

Q.   Ms. Chandler, do you recall providing a declaration --

A.   I do.

Q.   -- for this case; correct?

A.   Yes.

Q.   And in that declaration, you mentioned that you were very protective of your personal information?

A.   I am.

Q.   And you also testified that you're not comfortable with your home address being available to anyone with the ability to look it up.

    Does that sound right?

A.   Tied to a particular issue.  I believe my testimony was that it was tied to a potentially volatile issue.

Q.   So --

A.   My home address has been public for years.  I was in the white pages.  I was in the bar journal, I mean.

Q.   I think you anticipated my next line of questioning, yes.

    So you acknowledge and understand that your address is currently publically available online?

A.   Oh, of course it is.  And the difference is that it's not

tied to, for example, Medicaid expansion where somebody who, you know, gets ahold of a petition and says, Oh, my God, this person is -- you know, she's trying to get aliens, you know, medical care or, you know, whatever.

More so under the abortion petition, which was even more volatile, that's what scares me is the linkage between my personal information and the issue.

Q.   Did you attend a Senate hearing where they discussed what was to become HB 1205?

A.   I did.  I believe I testified.

Q.   In fact, I'm going to pull up an exhibit and ask you a few questions about it.

MR. RABAN:  Can we pull up DX 255.

THE WITNESS:  Yes, that's -- I signed that.

BY MR. RABAN:

Q.   Do you recognize that document, Ms. Chandler?

A.   I signed it, yes.

MR. RABAN:  Okay.  I'm going to go ahead and request that DX 255 be moved into evidence.

MR. DATO:  No objection, Your Honor.

THE COURT:  Without objection, DX 255 is admitted.

(DEFENDANTS' EXHIBIT 255:  Received in evidence.)

MR. RABAN:  Thank heavens.

THE WITNESS:  We're easy.

THE COURT:  I'd like to note, given Mr. Raban's skill,

it wasn't objected to on the exhibit list, so it automatically came in.

But it's page 14 of 621-1.

MR. RABAN:  A joyful exercise nonetheless.

THE COURT:  Not meaning to take away from your skill or your success, Mr. Raban.

MR. RABAN:  Thank you, Your Honor.

BY MR. RABAN:

Q.   So, Ms. Chandler, you acknowledge that this is your handwriting?

A.   I do.

Q.   And what is this form?

A.   I think this is the form that you have to fill out if you want to speak at a hearing in front of the Legislature.

Q.   And did you speak to the Florida Legislature on March 10, 2025?

A.   I'm not sure of the date, but if you say that's when it was, I would trust you.

Q.   I only refer to March 10, 2025 --

A.   Oh, yeah.  I guess it is there.  Sorry --

Q.   Yes, ma'am.

A.   -- I didn't even see that.

Q.   And did you testify about what eventually became HB 1205?

A.   I did.

Q.   And is that your address there?

A.    It is.

Q.    And is that your personal address?

A.    It is.

Q.    Your residential address?

A.    Yes.

Q.    And --

A.    And my email.

Q.    And your email?

A.    Yes.

Q.    And your phone number?

A.    Phone number is there, too, yep.

Q.    Yes, ma'am.

      And this appearance form is filed with the Florida Senate as a public record; isn't that right?

A.    I'm sure it is.

Q.    In connection with a political issue; correct?

A.    It is.

Q.    Thank you for your time, Ms. Chandler.

A.    Not quite the same as being right on the same page, but I understand where you're going.

      MR. RABAN:  I don't have any further questions for you.  Thank you for your time.

      THE COURT:  Any redirect?

      MR. DATO:  Very briefly, Your Honor.

      If it's possible, put DX 255 back up, please.

REDIRECT EXAMINATION

BY MR. DATO:

Q.    Ms. Chandler, you were asked whether this form identifies a political cause?

Do you see any political cause listed on this form?

A.    Nope.

MR. DATO:  No further questions, Your Honor.

THE COURT:  Thank you so much, ma'am.  You have a pleasant day.

THE WITNESS:  Thank you.

(Ms. Chandler exited the witness stand.)

THE COURT:  A couple of housekeeping matters.

First, this morning I put the exhibit list that's updated on the clerk's bench.  We're moving at a fast clip, and I really don't want to have to delay these proceedings at the end of the week, so I need -- Mr. Stafford and Mr. Stafford, I'll put y'all in charge.

Somebody from each side needs to get with my courtroom deputy and verify that at least through last week we have an accurate list, and then we can do this exercise for just anything that's been added this week.  So y'all figure it out and designate somebody so we're not spinning in circles at the end of the week.

I thought I had this correct, but I could be wrong.

The next witness is going to be by Zoom?

MR. MASTORIS:  Yes, Your Honor.

THE COURT:  So we need to get that set up.

Who's handling that?

There I see him.

Mr. Kovacs, correct, Goodman?

MR. KOVACS-GOODMAN:  Yes, Your Honor.

THE COURT:  I got it.  It's hyphenated; right?

MR. KOVACS-GOODMAN:  Right.

THE COURT:  All right.  How long -- just what's your best guess of how long you've got?  I'm not rushing you; I'm just --

MR. KOVACS-GOODMAN:  Yeah, 25 or 30 minutes on direct, Your Honor.

THE COURT:  All right.  And that's -- Mr. Stafford is doing the cross.

How long do you think on cross?

MR. STAFFORD:  If I ask any questions, it'll be less than 5 minutes.

THE COURT:  All right.  Sounds like we can finish this witness.

So why don't we do this -- but let's get it set up, because I really don't want to --

THE COURTROOM DEPUTY:  It's set up.

THE COURT:  Is she here all ready to go?

THE COURTROOM DEPUTY:  Yeah, I can let her in.

THE COURT: Well, why don't we take a five-minute break to spare the court reporter, and we'll come back in 5 minutes and we'll all be ready to go.

And we'll finish this witness, then break for the day so y'all can take your break.

Thank you.

(Recess taken at 4:12 PM.)

(Resumed at 4:12 PM.)

THE COURT: I saw some of the lawyers scattering, and they may be leaving. I'm going to -- y'all can take your seats for one second.

You're going to indulge me because I'm going to take a moment privilege of the Court.

The record won't reflect this, the appellate court's not going to know, nobody's going to know, but I did want to recognize that -- I think it's half a dozen; it may only be five -- I haven't counted them -- but I asked Ms. Hudgens -- and I know we had Mr. Mastoris who's a senior litigator with Winston & Strawn -- in this age of big law, everything's driven by financial numbers and Am Law, et cetera, and it is -- speaks volumes about Winston & Strawn that they would send half a dozen lawyers because they have such a strong commitment to pro bono representation in public service.

And regardless of the merits of the case or how the case shakes out, I thought it was important to recognize that

because, again, that's not where our profession is going.  It's not what's typical of our profession, unfortunately, and it's a credit both to these lawyers individually as well as to their firm that they'd allow them to be here.

So thank you for being here.

MR. MASTORIS:  Thank you, Your Honor.  It means a lot.

THE COURT:  Court is in recess.

We'll take a 5-minute break.

(Recess taken at 4:14 PM.)

(Resumed at 4:24 PM.)

THE COURT:  Y'all take your seats.

(Ms. Patricio entered via Zoom.)

THE COURTROOM DEPUTY:  The witness is on Zoom.

THE COURT:  All right.  Everybody has to take their seat, though.

All right.  We are back on the record.

Counsel, you can call your next witness.

MR. KOVACS-GOODMAN:  Your Honor, Jacob Kovacs-Goodman for League and LULAC plaintiffs.

We call next Karen Patricio, a local LULAC leader in Central Florida.  She'll testify to the impacts that HB 1205 has had on her speech and advocacy as a noncitizen Floridian.  This will go to standing and Counts One through Five in the League and LULAC's operative complaint.

THE COURT:  Ma'am, this is Judge Walker.  Can you hear

me?

We have no audio.  We'll try again.

Ma'am, can you hear me?

THE WITNESS:  Yes, I can hear you.  Can you hear me?

MR. KOVACS-GOODMAN:  Are you able to speak a little more loudly?

THE WITNESS:  Yes.  Can everybody hear me?

Good afternoon.  I'm speaking from Orlando, Florida.

THE COURT:  Thank you.  If you could raise your right hand, ma'am.

**KAREN PATRICIO, PLAINTIFFS' WITNESS, DULY SWORN**

THE COURT:  Thank you. If you'll put your hand down.

And because we are doing this by Zoom, please let the lawyers finish their questions, and they are going to let you finish your answers.

I've told the court reporter to let everybody know if she needs them to repeat a question or an answer so we get a good record.

Thank you for your patience with us, ma'am.

Counsel, you may proceed.

MR. KOVACS-GOODMAN:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. KOVACS-GOODMAN:

Q.   Ms. Patricio, do you live in Florida?

A.   I do.

Q.    Where?

A.    In Apopka, Florida.

Q.    How old were you when you moved to the U.S.?

A.    I was about 2 when I moved to the U.S.

Q.    And where were you born?

A.    I was born in Mexico.

Q.    Are you a U.S. citizen?

A.    No.

Q.    What is your status in the U.S.?

A.    Currently I have DACA or deferred childhood arrival.

Q.    Have you ever resided in any state other than Florida since you moved to the U.S. when you were 2?

A.    No.

Q.    What is your current employment status?

A.    Currently I'm a student.

Q.    What are you studying?

A.    I'm getting my paralegal certification, but before that I was studying environmental policy.

Q.    And what is your previous employment experience?

A.    So I have a couple.  Recently I took the position of district director here at LULAC.  I am also council president.

      Before that I was working with a couple of -- excuse me -- of nonprofit organizations here in Central Florida who focus on environmental issues, immigration, various things just as a consultant.

Direct Examination - Ms. Patricio

Before that I worked at the Farmworker Association here in Apopka, Florida.

Q.   Sorry.  Ms. Petricio, could you just repeat that?  Start from that last sentence, please, for the court reporter.  Farmworker Association.

A.   Also worked at the Farmworker Association here in Apopka, Florida, and then before that I worked for the Florida Grant Coalition as a legal fellow, and then at the Mexican consulate in Orlando.

Q.   What were some of your responsibilities with the Farmworker Association?

A.   So I was an organizer at the time.  So my job position really ranged from any needs that the community had directly.  So it could be assistance with Medicaid, Medicare, legal assistance, issues with their bill.  Really any community needs that would arise from the community members we would just kind of take care of.  So, again, all the issues listed before, maybe some issues on voting, getting information, just really any needs of the community.

Q.   Were any of those environmental issues?

A.   Yeah.  Yeah, there was -- so because the Farmworker Association is based in Florida, a lot of their work that they do, obviously, does center around farmworkers, but also the environment, which is kind of why I got involved in all of the work that I do.

Q.    And what is your broader organizing background?

A.    Yeah.  So really I've been organizing since I was 15.
Again, I've lived here in Apopka my entire life, so I have just
kind of seen -- and, of course, I've seen my family grow and
then just do their work.  So they are farmworkers, construction
workers.  Really, all my organizing background came from the
immigration field just in, you know, my life and just kind of
the path that it's lead me on.

But within that immigration field and the work I've been
doing organizing with other community members, I've gotten to
expand my knowledge on different topics like, like I said,
environmental justice.  One of the things that we talk to out at
the farmworkers was the environmental dangers that we have when
it comes to Lake Apopka, which is, again, something that just
really sparked my interest.

(Reporter requested clarification.)

BY MR. KOVACS-GOODMAN:

Q.    And where do you get your drive to help people in your
community?

A.    So if I had to pin it down to one thing, I would say it
goes, again, back to my immigration journey.  Seeing the ability
that the community has to kind of pull together and help you and
assist you whenever you are down is really impactful.

And, again, me being able to give back to my community in
any way, just like how I was, you know, helped when I needed it,

to me is always going to be one of those things that pushes me to do my work.  But also seeing people power, seeing the ability that the community has to kind of come together and vocalize their needs and their wants and how we can be better for the community.

Q.   Are you currently a member of the League of United Latin American Citizens, or LULAC?

A.   I am.

Q.   And what is your current role in LULAC?

A.   So currently two roles.  So I'm a district director and also the council president for the Apopka council.

Q.   Are these volunteer positions?

A.   Yes, for both.

Q.   Now, do you know what an initiative petition is?

A.   I do.

Q.   What is your understanding of an initiative petition?

A.   So an initiative petition, as I've seen as an organizer, is a way that the community can come together and, again, vocalize their needs and their wants, especially when we are talking about legislation or talking to the Florida state government about these issues.  So a lot of the times in my range of work what we do, this is basically step one to making our voices heard at the state level.

Q.   And have you ever collected initiative petitions before?

A.   I have.

Q.   When did you start collecting them?

A.   (Audio feed glitch/indiscernible) about 2018.

Q.   And which ones did you collect initiative petitions for?

A.   It was going to be both Amendment 4, one in 2018, which is the restoring voting rights for returning citizens, and then the other one was the abortion -- the access to abortion.

Q.   And how would you go about collecting those petitions in the past?

A.   Usually, because of my line of work, I'm already involved with these other organizations or organizers, so -- and they are my friends.  So if I do have the capacity, if they are, you know, looking for volunteers or people to help out explaining the issues or the policies, then I would volunteer and help out in any way that I can.

Q.   And how would you decide which issues you would collect petitions for?

A.   Well, one -- I mean, personal -- personal problems and things that I see within my range of work is always going to be you know, things that I want to advocate for, but also my community needs.  If I'm seeing, you know, environmental damage or things that -- you know, things that we can help with or amplify the message, especially when they are damaging to the Florida resident population, then those are things that I always want to advocate for.

Q.   And where are some of the places you've collected

Direct Examination – Ms. Patricio

initiative petitions in the past?

A.   Well, normally they -- we collect them in public places where we are allowed to go.  So I would say some farmers' markets.  Here in Orlando we hit the Orlando Farmers' Market, which is an every Sunday market that -- it's just a little farmer's market.

     We do the FusionFest, which is, again, another local festival here in Orlando in the summer; the Mexican Independence Day festival the consulate has.  There's just a couple of organizations who we partner with who I've done work with previously who invite us out to kind of collaborate with them or again into these public spaces.

Q.   What do you talk about with petition signers when you are out in the community?

A.   Usually -- whatever item is on the initiative, usually we try to give them as much knowledge as possible, and then I (audio feed glitch/indiscernible).

Q.   Sorry, Ms. Patricio.  You are breaking up.  You are breaking up a little bit.

     Could we can start from the beginning?  So what do you think about --

     (Indiscernible crosstalk.)

A.   Can you hear me?

Q.   I think so.

     What do you speak about with petition signers?

Direct Examination - Ms. Patricio

A.   I'm sorry.  I can't hear you.  You are breaking up.

Q.   Oh.  Can you hear me okay?

     What do you talk about with petition signers when you are out collecting?

A.   Yes.  So, normally, whatever issue we're presenting them in the petition, I give them as much background knowledge as possible, but then also if they have any questions or if they need any follow-up.  Also, in my case, a lot of what we do is present information to them for the first time since most of the people I speak to are Spanish speaking.

Q.   Are there people that you need to translate for when you are out collecting?

A.   Absolutely.  I would say a giant portion of the community who we work with is Spanish speaking, and, like I said, the majority of the time when we are talking to them about legislation or anything that has to do with changes in government, it's usually one of the first times that they are hearing about it.

Q.   And did you ever speak about -- strike that.

     Were you ever paid to collect petitions?

A.   No.

Q.   Were you ever paid to circulate petitions?

A.   No.

Q.   And your positions -- both positions with LULAC are volunteer positions; right?

A.    Correct.

Q.    Okay.  How long have you been a member of LULAC?

A.    It will be about a year in May.

Q.    And how did you first get involved with LULAC?

A.    Yeah.  So during my time at the Farmworkers Association, I -- we had a giant accident that actually killed eight farmworkers and hurt 40 of them.  I was able to meet with Asia, the state director for LULAC, and we pulled resources together. We created a fundraiser for them, and we just -- we worked together on this project to help those farmworkers, so we just developed our relationship.

Q.    And what resonated with you and LULAC's mission?

A.    That it was a Latino-based organization who was fighting for our rights as Latinos in a way that we are understanding as Latinos.

Q.    And why was your specific district and those in your surrounding area created last year?

A.    Yeah.  So, I mean, last year there was a lot of things that just impacted the Latino community in general, but my colleagues and I -- we work in different fields, whether it be environmental, LGBT items, financial literacy, all these different topics that we saw that there was a need for the concentration on Latino groups, especially because we are Latino and we see what the needs are from our community since we are organizers, but we are also getting this background knowledge

from our -- our everyday jobs.  So we thought it was important to pull all our efforts together to be able to help our community better understand the landscape of what was going on.

Q.   So as a group of young organizers, what form of advocacy did you all want to use when you created the new LULAC districts last year?

A.   We really -- we thought of a lot of things, but one of the pillars of what we thought we were going to be able to do was collect petitions and be able to directly talk to our community about the issues that are -- that we're facing.

Q.   And you created these districts to make your voices heard, circulate petitions.  Then what changed?

A.   Then we got to hearing about HB 1205 and who would be limited to doing the work and in what capacity and how we were going to be able to do our work.  So as a team we talked about, you know, the limitations within the law and how it's going to impact our work, and we actually decided to just avoid that in general.

Q.   Okay.  We'll get more into that in a second.

So you wanted to circulate, but HB 1205 prevented you.

So what are some of the responsibilities you have as district director instead?

A.   Yeah.  So really my district director position is to amplify the work of my council as we are the one that leads the other two councils.  In our district, we have a total of three

councils.  So it's mine, the 7284, and then the other two who support.

So my work as district director is to, again, just make sure --

Q.   I'm sorry, Ms. Patricio.  Could you just repeat your council number, please?

A.   Yes, 7284.

Q.   Thank you.  Sorry.

A.   No, it's okay.

So my work as district director is to, again, make sure that all three councils are doing the work of amplifying our message, just making sure that we are doing advocacy.  Right now, due to our limitations, we've had to focus on other things, so we've been taking on items such as mental health support. We've been doing yoga sessions, meditation sessions.

Really our work has kind of steered in a different way right now than we would have hoped when we first initially started, but it's a little bit of what we do.

Q.   And how many people are on the leadership team in your district?

A.   In my district, it's going to be a total of nine.

Q.   And how about your role as president of local council, how is that different from your leadership role at the district level?

A.   Yeah, it's just a little bit more different because it's a

little bit more concentrated on the area that I'm working on. So I -- the other two districts, they are over in Seminole County and Osceola County. So I take care of everything that is Orange County.

And, again, it's a little bit more centralized just because it is within that region. But, again, it's taking care of community needs, any issues that arise, right now hosting the mental health support groups and the meditation/yoga sessions that we have. And then, obviously, I've defined the other ones.

Q. And so are you familiar with House Bill 1205, which passed in the 2025 Florida legislative session?

A. Yes.

Q. What is your understanding of HB 1205?

A. Yeah, HB 1205 is a law that creates new limits on who can collect petitions and what the outcomes of those either denied petitions or those that are handled incorrectly. So one of the things that it does is it bans noncitizens from collecting petitions, and then it binds you and -- depending on the charges, you can get prison time for doing so.

Q. Okay. I think maybe if you speak a little more loudly and slowly, that might help as we keep going.

Thank you.

So have you collected petitions since HB 1205 passed?

A. No.

Q. And before HB 1205 went into effect, did you have specific

plans to collect petitions this year?

A. Yes.

Q. What were they?

A. Well, like I said, as the districts -- when we were coming together, we were going to look at different efforts and see how we could also amplify the support that they needed or just continue helping, but we didn't have the chance to look into specifics as to what issues or what -- how we were going to handle it.

Q. And why have you stopped collecting after HB 1205 passed?

A. Well, my immigration status limits me to, you know, collecting petitions -- or not collecting petitions. And, also, I don't want to risk being in trouble or fined or, you know, harm my community in any way. So we just avoided the entire nature of it. And this is not just as a personal level but, like, as our districts.

Q. How many of the members in your district are similarly impacted and cannot collect petitions because of HB 1205?

A. I would say more than half, so looking at maybe 17 -- 16, 17.

Q. And have you noticed other impacts on these LULAC members in your district after the passage of HB 1205?

A. Yeah. So, like I said, when we were creating these councils, we were at the beginning of, you know, the structure, which is when we started to hear all of this, and we were

definitely seeing a loss in participation.  Members who were excited and really happy to kind of take part in this project and take part in these conversations, we're having a lot of trouble just even getting them back to the table to have discussions and even participate in these mental health therapies that we were having.

Q.   So when you say that HB 1205 diminished participation, what does that look like?

A.   Yeah.  Like I said, them participating and them being a part of the conversation is no longer as active as when we first started.  When we first got together, everyone was really excited, bringing in different ideas, talking about the process, talking about who else they could, you know, reach out to, who they could communicate with.

     And after we got knowledge of, you know, the limitations and who was able to partake in this, like I said, one, people stopped coming.  They stopped being present at the meetings, whether it was virtual or in person.  And then, you know, it's been really hard to just continue having them participate in any kind of way.  They just decided that, you know, if they can't even have a conversation with someone about the local issues that they are seeing, what's the point?

Q.   And how has HB 1205 impacted your personal goals or responsibilities at LULAC?

A.   Well, I would say that, again, creating petitions and

making people's voices heard, which is essentially what petition collecting is, was one of the pillars of why we created these LULAC councils and, initially, why I got involved with LULAC.

Like I said, one of the things that I really thought about and really just pushed me to join was that we are a Latino-centered organization who really focuses on these issues that we're seeing on the ground. And as an organizer, somebody who is working directly with the community and seeing these issues directly, like I mentioned earlier, the environmental issue, it -- you know, Lake Apopka wasn't just chemicals leaking into the lake. It was creating cancer. It was destroying the environmental -- or the environment. You know, the pesticides that the farmworkers are seeing, all of those things are stories and actual things that happen to people and affect our daily lives.

And so to be able to actually vocalize what I'm seeing in the community and showing that to the State and, you know, creating legislation that's going to help the community and the population is one of the things that really just pushed us to create these things. So for us it's been a giant impact on the work that we're going to be doing.

Q.   And how has HB 1205 impacted the reach of your personal advocacy?

A.   Listen, we're still doing, you know, workshops and talking to the community about these local issues. But when you talk

about, unfortunately, numbers and the amount of people who are actually getting out there and doing the work that needs to, you know, actually create change, that's -- that's where we really see impact.  You know, we can have conversations with as many people as possible, but when we talk about, like, let's say, petition collecting, it's something that, you know, is direct and we see the impact.  Right now, it's a little hard to tell.

Q.   And why is circulating initiative petitions important to you?

A.   Again, it just vocalizes what I'm seeing on the ground. And the -- to me I call it people power.  The amount of people who've seen these issues and understand that we can do better and that we do have to do better and them taking the first step to make their voices heard and come together as a community to address these issues, again, makes the most impact.  And I always encourage everybody in the community to be engaged politically and civically because it's one of the most important things that we have as people is to be engaged.

Q.   If HB 1205 were repealed, would you circulate initiative petitions?

A.   Yes.

Q.   One last question.

You mentioned 16 or 17 people in your district where you're a district director were similarly impacted.

Were they barred from circulating because they were

noncitizens -- or are noncitizens?

A.    Yes.

MR. KOVACS-GOODMAN:  Okay.  Thank you.

No further questions.

I pass the witness.

MR. STAFFORD:  Your Honor, heeding the observation that nobody has listened themselves into trouble, I will thank Ms. Patricio for her testimony and her service to the community. And I have no questions.

THE COURT:  Thank you.

Thank you, ma'am, and have a good day.  And we thank you for your patience waiting.  I know we've tried to get you here a couple of times.

So thank you.

THE WITNESS:  No, thank you.

(Ms. Patricio exited the Zoom.)

THE COURT:  I guess that means Mr. Stafford now has replaced Mr. Raban as the most favorite cross-examiner.

MR. STAFFORD:  That was actually part of the plan.

THE COURT:  All right.  It's my understanding the last two witnesses for the plaintiffs -- we're approaching 5:00 anyway -- we've got them lined up for tomorrow morning; is that correct?

MR. MASTORIS:  That is correct, Your Honor.

THE COURT:  He may be big law, but he doesn't take

directions well.

MR. MASTORIS:  I've had that problem since I was a kid.

That is correct.

THE COURT:  All right.  It's my understanding it's Ms. Osaki for Gonzales and then Mr. Dato is coming back for Newlon; is that right?

MR. MASTORIS:  That is also correct, Your Honor.

THE COURT:  And I see Mr. Dato.

What's your best guess?  I'm not limiting you.  I'm just trying to --

MR. DATO:  Yes.  It should be right around half an hour for direct, Your Honor.

THE COURT:  All right.  I thought I saw Ms. Osaki earlier, but, like Elvis, she's left the building.

MR. MASTORIS:  She has indeed.

THE COURT:  All right.  Does anybody have a best guess?

MR. MASTORIS:  I would guess it's around a half hour as well, Your Honor, on direct.

THE COURT:  And, Mr. Stafford, do you plan on -- and you certainly can do all the cross you want, but what's your best guess now?

MR. STAFFORD:  If the testimony on direct is as expected, I have few, if any, questions.

THE COURT:  Okay.  The main reason why I'm asking that is I don't see -- Mr. Jazil has also apparently left with -- not with Mr. Osaki, but has also left the building.

Oh, I'm sorry.  It's not -- well, no, I just want to find out -- because we've got two witnesses that are listed for the defense tomorrow.  I don't see Mr. Jazil here for Bridges, but I'm going to call on Mr. Wolk just because it's fun.

Do you have any -- since you're Mr. Jazil's keeper, do you have any idea -- who is Bridges?

MR. WOLK:  So Jonathan Bridges, he's in the office of the statewide prosecutor, and he came in from (indiscernible) to testify as to his duties.

THE COURT:  How long do you think that is?  Do you have any idea?  Have you participated in the prep?

(Discussion was held.)

MR. WOLK:  It'll probably be a couple of hours for his direct.

THE COURT:  All right.  And then how about Molina?

MR. WOLK:  So she's with the Supervisors of Elections.

THE COURT:  All right.  So y'all are not calling -- somebody else is calling Molina?

MR. WOLK:  That is going to be Mr. Bardos for her direct.

THE COURT:  All right.  Y'all are going to -- I just want to let y'all know that -- it sounds like we are going to

move pretty fast.  So y'all need to have folks ready to go.

And that's -- that -- the whole purpose of this is not to be difficult but to give y'all fair notice about when we expect to be done.  That was the only reason why I was doing that.  And so just be ready to call those witnesses.

Also, y'all are going to file this evening the additional witnesses y'all are calling.  Other than the two you've already listed, are y'all -- and it's fine.  You can tell me, No, Judge, we've changed our mind; we are now calling 20.  That's fine.  But I just -- before it was six.  Is there still -- is that still the best guess:  We're adding another four witnesses to the two we've already got?

MR. WOLK:  It's going to be six or less.  So we haven't increased the list.

THE COURT:  All right.  But y'all are going to -- because -- consistent with my rule that we have to list ten, this evening you're going to be listing your -- the remainder of your lineup; correct?

MR. WOLK:  We will, yes.

THE COURT:  Okay.  Fair enough.

All right.  Any other housekeeping matters that we need to take up at this time?

MR. MASTORIS:  Not for plaintiff, Your Honor.

THE COURT:  All right.

MR. STAFFORD:  And nothing from the defense,

1739

Your Honor.

THE COURT:  Thank you.

All right.  And please, again, I ask -- and it doesn't have to be Mr. Stafford and Mr. Stafford, but y'all need to have somebody look at the exhibits because this is -- again, I'm not -- this isn't about me.  It's about making sure that everything you think is in the record is in the record.  So that when you prepare your closing arguments, you're not surprised that something isn't in the record.  Okay?

MR. STAFFORD:  And, Your Honor, I think we are current through the end of last week.  So we'll continue to stay on pace.

THE COURT:  Okay.

And other than Mr. Stafford on the defense side, if y'all look at that too and make sure y'all are in agreement. Okay?

MR. STAFFORD:  We will, Your Honor.

THE COURT:  All right.  Thank you.

All right.  Y'all have a good evening.  I'll see you back at 8:30 in the morning.

Court is in recess.

   (Proceedings recessed at 4:57 PM on Tuesday, February 17, 2026.)

                    *  *  *  *  *  *  *

1740

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. Any redaction of personal data identifiers pursuant to the Judicial Conference Policy on Privacy is noted within the transcript.

/s/ Megan A. Hague                          2/17/26

Megan A. Hague, RPR, FCRR, CSR          Date
Official U.S. Court Reporter

**I N D E X**

| PLAINTIFFS' WITNESSES | PAGE |
|---|---|
| CHRISTINE POFF | |
| Direct Examination By Mr. Greess | 1485 |
| Cross-Examination By Mr. Wolk | 1504 |
| Redirect Examination By Mr. Greess | 1510 |
| JESSICA LOWE-MINOR | |
| Direct Examination By Ms. Hudgens | 1512 |
| Cross-Examination By Mr. Raban | 1576 |
| Redirect Examination By Ms. Hudgens | 1597 |
| LYDIA MEDRANO | |
| Direct Examination By Mr. Kline | 1604 |
| Cross-Examination By Mr. Wolk | 1618 |
| CECILE SCOON | |
| Direct Examination By Mr. Mastoris | 1623 |
| Cross-Examination By Mr. Raban | 1682 |
| DEBRA CHANDLER | |
| Direct Examination By Mr. Dato | 1686 |
| Cross-Examination By Mr. Raban | 1710 |
| Redirect Examination By Mr. Dato | 1715 |
| KAREN PATRICIO | |
| Direct Examination By Mr. Kovacs-Goodman | 1719 |

**E X H I B I T S**

| PLAINTIFFS' EXHIBITS | OFFERED | RECEIVED |
|---|---|---|
| League-2 | 1678 | 1678 |
| League-35 | 1674 | 1674 |

| DEFENDANTS' EXHIBITS | OFFERED | RECEIVED |
|---|---|---|
| 255 | 1712 | 1712 |
| 256 | 1661 | 1661 |