**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

FLORIDA DECIDES HEALTHCARE, INC,)
et al.,                        )
                               )
            Plaintiffs,        ) Case No: 4:25cv211
                               )
        v.                     ) Tallahassee, Florida
                               ) February 18, 2026
CORD BYRD, in his official     )
capacity as Secretary of State )
of Florida, et al.,            )
                               )
                               ) 8:30 AM
            Defendants.        ) Volume VII
_____)

**TRANSCRIPT OF BENCH TRIAL PROCEEDINGS**
**BEFORE THE HONORABLE MARK E. WALKER**
**UNITED STATES CHIEF DISTRICT JUDGE**
**(Pages 1742 through 1952)**

Court Reporter:            MEGAN A. HAGUE, RPR, FCRR, CSR
                           111 North Adams Street
                           Tallahassee, Florida 32301
                           megan.a.hague@gmail.com

            *Proceedings reported by stenotype reporter.*
        *Transcript produced by Computer-Aided Transcription.*

**APPEARANCES:**
**For Plaintiffs Florida Decides Healthcare:**

                              King Blackwell Zehnder & Wermuth PA
                              By:  FREDERICK STANTON WERMUTH
                                   QUINN RITTER
                                   Attorneys at Law
                                   fwermuth@kbzwlaw.com
                                   qritter@kbzwlaw.com
                              25 East Pine Street
                              Orlando, Florida 32801

                              Elias Law Group
                              By:  BEN STAFFORD
                                   Attorney at Law
                                   bstafford@elias.law
                              1700 Seventh Avenue
                              Suite 2100
                              Seattle, Washington 98101

                              Southern Poverty Law Center
                              By:  AVNER MICHAEL SHAPIRO
                                   KRISTA A. DOLAN
                                   Attorney at Law
                                   avner.shapiro@splcenter.org
                                   krista.dolan@splcenter.org
                              3710 Raymond Street
                              Chevy Chase, MD 20815

                              Elias Law Group
                              By:  HARLEEN K. GAMBHIR
                                   Attorney at Law
                                   hgambhir@elias.law
                              250 Massachusetts Avenue
                              Suite 400
                              Washington, DC 20001


**For Intervenor Plaintiff Safe & Smart:**
                              Stearns Weaver Miller
                              By:  GLENN BURHANS, JR.
                                   HANNAH E. MURPHY
                                   CHRISTOPHER R. CLARK
                                   Attorneys at Law
                                   gburhans@stearnsweaver.com
                                   hmurphy@stearnsweaver.com
                                   crclark@stearnsweaver.com
                              106 East College Avenue, Suite 700
                              Tallahassee, Florida 32301

**APPEARANCES (cont'd):**

**For Intervenor Plaintiff League of Women Voters of Florida, et al:**

Democracy Defenders Fund
By:  SPENCER KLEIN
     JACOB KOVAS-GOODMAN
     Attorneys at Law
pooja@statedemocracydefenders.org
spencer@statedemocracydefenders.org
jacob@democracydefenders.org
600 Pennsylvania Avenue SE
Unit 15180
Washington, DC 20003

Winston & Strawn, LLP
By:  GEORGE E. MASTORIS
     TYLER MATTHEW DATO
     SAMANTHA I. OSAKI
     NATHAN C. GREESS
     JOHANNA RAE HUDGENS
     Attorneys at Law
gmastoris@winston.com
tdato@winston.com
sosaki@winston.com
ngreess@winston.com
jhudgens@winston.com
200 Park Avenue
New York, New York 10166

**For Intervenor Right to Clean Water:**

Campaign Legal Center
By:  ROBERT BRENT FERGUSON
     HEATHER JEAN SZILAGYI
     ELLEN MARGARET BOETTCHER
     ALEXIS DENAE GRADY
     WILLIAM "LIAM" KYLE HANCOCK, III
     MELISSA LAUREN NEAL
     Attorneys at Law
bferguson@campaignlegalcenter.org
hszilagyi@campaignlegalcenter.org
eboettcher@campaignlegalcenter.org
agrady@campaignlegalcenter.org
whancock@campaignlegalcenter.org
mneal@campaignlegalcenter.org
1101 14th Street NW
Suite 400

Washington, DC 20005

**APPEARANCES (cont'd):**

**For Defendant James Uthmeier:**

Florida Attorney General's Office
By:  WILLIAM STAFFORD, III
     SARA SPEARS
     MARYSSA SAVANNAH-LYNN HARDY
     Attorneys at Law
sara.spears@myfloridalegal.com
william.stafford@myfloridalegal.com
maryssa.hardy@myfloridalegal.com
119 South Monroe Street, Suite 500
Tallahassee, Florida 32301

**For Defendant Cord Byrd:**

Holtzman Vogel Baran, et al.
By:  MOHAMMAD O. JAZIL
     MARTIN C. WOLK
     RANDALL M. RABAN
     Attorneys at Law
     mjazil@holtzmanvogel.com
     mwolk@holtzmanvogel.com
     rraban@holtzmanvogel.com
119 South Monroe Street, Suite 500
Tallahassee, Florida 32301

Florida Department of State
By:  ASHLEY DAVIS
     General Counsel
     ashley.davis@dos.myflorida.com
R.A. Gray Building
500 South Bronough Street
Tallahassee, Florida 32399

**For Defendant Intervenors Republican Party:**

Shutts & Brown, LLP
By:  TARA PRICE
     BENJAMIN GIBSON
     Attorneys at Law
     tprice@shutts.com
     bgibson@shutts.com
215 South Monroe Street
Suite 804
Tallahassee, Florida 32301

1746

**APPEARANCES (cont'd):**

**For Defendant Supervisors of Elections:**

                              GrayRobinson PA
                              By:   ANDY V. BARDOS
                                    JAMES T. MOORE JR.
                                    Attorneys at Law
                                    andy.bardos@gray-robinson.com
                                    tim.moore@gray-robinson.com
                              301 South Bronough Street
                              Suite 600
                              Tallahassee, Florida 32301

                              Office of the Supervisor of Elections
                              Miami-Dade County
                              By:   OREN ROSENTHAL
                                    Attorney at Law
                                    oren.rosenthal@votemiaimidade.gov
                              2700 NW 87 Avenue
                              Miami, Florida 33172

**P R O C E E D I N G S**

(Call to Order of the Court at 8:30 AM on Wednesday, February 18, 2026.)

THE COURT:  All right.  We are back on the record in Case Number 4:25cv211 for day seven of a bench trial.

When we broke yesterday, I believe counsel for the plaintiffs indicated that there were two additional witnesses.

MR. MASTORIS:  That's correct, Your Honor.

THE COURT:  And I don't see Mr. Dato.

MR. MASTORIS:  He's with one of the witnesses, but I understand there's a few housekeeping items to be discussed.

THE COURT:  All right.  But before we have Dato, do we have Osaki for González?

MR. MASTORIS:  I believe --

UNIDENTIFIED SPEAKER:  Yes, we do.

MR. MASTORIS:  -- also in the witness room.

THE COURT:  Fair enough.  I just didn't see the two lawyers.

And then my understanding is after that, Mr. Bardos, you are calling a witness.

MR. BARDOS:  Yes, Your Honor.  Mr. Rosenthal will be conducting the direct.

THE COURT:  Oh, I'm sorry.  That's -- I'll change my -- I'm sure that's what they were trying to communicate with me when I -- so I should have amended it.  Fair enough.

Mr. Rosenthal, just -- no limit.  Trials are fluid. What's your best guess of how long?

MR. ROSENTHAL:  30 minutes, Your Honor.

THE COURT:  Okay.  And then Mr. Jazil got put at the card table with Mr. Bardos.

There are -- three of the four additional witnesses are yours, and then Mr. Wolk is doing the fourth witness.

Is this the final lineup, these four?

MR. JAZIL:  Yes, Your Honor.

THE COURT:  And so I'll know, best guess on Bridges?

MR. JAZIL:  An hour or less, Your Honor.

THE COURT:  Mr. Wolk, best guess on Gladson?

MR. WOLK:  About an hour, Your Honor.

THE COURT:  All right.  And best guess on Ms. Matthews, Mr. Jazil?

MR. JAZIL:  Your Honor, can I get back to you on Matthews and Ms. Pratt?  We are trying to iron out a few ways to perhaps shorten the testimony.

THE COURT:  Okay.  No worries.

I guess the better way of asking this -- I'm just trying to figure out where we are at.  It sounds like the plaintiffs should be done sometime this morning, and we should finish Molina this morning and maybe start Bridges.

How far do y'all expect the defense to get today? Assuming you start at 10:00 o'clock this morning, how many of

your witnesses do you think you'll get through by the end of the day today?

MR. JAZIL:  Your Honor.  We are hopeful to get through three:  Mr. Rosenthal's witness and the two prosecutors, Mr. Bridges and Mr. Gladson.

THE COURT:  All right.  And there's a potential to finish on Thursday or end of Friday?

MR. JAZIL:  One hopes, yes, Your Honor.

THE COURT:  All right.  Fair enough.

And I'm not -- like I said, I moved the calendar around because I wasn't rushing y'all.  So the record is clear, I moved a criminal trial for Monday and Tuesday to make sure that there was plenty of time for the defense to put on their cases.  I'm just trying to get our best guess of when we are going to finish up.

Fair enough.

Both sides -- Mr. Jazil, you can stay up.

I have Mr. Wermuth who will speak, and if the other plaintiffs want to chime in, they can, that is, plaintiffs' counsel.

I had previously set a deadline for closing arguments at 5:00 p.m. on March 9th.  Since we are on schedule to finish this week, does that still work for everybody?  But if it doesn't, I'm happy to hear from either side as to why that doesn't work for them.

MR. WERMUTH:  I think that works for the plaintiffs.

MR. JAZIL:  It works for us too, Your Honor.  Thank you.

THE COURT:  All right.  So we'll keep that date.

Then I -- counsel had indicated that there were some housekeeping matters.

Counsel, are you bringing them up or somebody else?

MR. MASTORIS:  No.  I think, Mr. Wermuth will address them.

MR. WERMUTH:  All right.  Well, actually --

MR. MASTORIS:  Or not.

MR. WERMUTH:  -- the housekeeping issues we were going to raise had -- is the issue that Mr. Jazil has mentioned about efforts to work out a deal on the exhibits that would resolve the length of both Matthews and Pratt, and then Heather has an issue as well, I guess.

THE COURT:  Hold on.  Hold on one second.

Y'all, I'm not requiring -- so the record is clear, I'm not requiring anybody to agree to anything.  It's great if you do; if you don't, you don't.

And so it's clear, I was clearly joking, lest there's an appellate judge that doesn't have a sense of humor, when I praised Mr. Stafford for having a short or no cross yesterday. I'm not requiring anybody to pass; I'm not requiring anybody to stipulate to anything.  I'm just trying to interject some humor.

When you've got 40 lawyers in a room in a contentious matter, I think it's important to try to lower the temperature, which was the only reason I was doing that.  I think Mr. Stafford, who is shaking his head yes, understood the spirit in which I made the statements.

I just -- Lord knows what will end up in an appellate opinion.

Mr. Wermuth.

MR. WERMUTH:  So the issue that Ms. Szilagyi was going to raise had to do with the designations.

MS. SZILAGYI:  Well, there are actually two things we want to raise, both of which should be quick.

One is that Right to Clean Water plaintiffs want to move to admit four of our exhibits without objections.

THE COURT:  Hold on one second.

I'm looking at Right to Clean Water's.  I'm looking at ECF 623-1, and y'all's exhibits, I believe, begin on page 111.

Yes, ma'am.

MS. SZILAGYI:  Great.

So the four exhibits are Right to Clean Water 184, 199, 200, and 209.

THE COURT:  Are there objections to those four exhibits?

MS. SZILAGYI:  The only objections were plaintiffs, and we're waiving them.

MR. JAZIL:  Your Honor, assuming we didn't list objections next to them, we are not raising objections now.

THE COURT:  And there are no objections?

MS. SZILAGYI:  Correct.

THE COURT:  All right.  So Right to Clean Water's 184, 199 -- give me one second --

(Pause in proceedings.)

THE COURT:  -- 200 and 209 are admitted.

And I'll note that there were no defense objections listed on 623-1.  What was confusing me is we are so far into the document and I didn't have the headers.  It appeared there was an objection, but those were plaintiffs' objections, not defense objections.

(PLAINTIFFS' EXHIBITS RTCW-184, RTCW-199, RTCW-200, AND RTCW-209:  Received in evidence.)

MS. SZILAGYI:  And then I think our colleagues similarly --

MS. HUDGENS:  Yes.

Your Honor, the League would also like to join the exhibit party.  We have four --

THE COURT:  Hold on one second.  Let me get there.

MS. HUDGENS:  Okay.  I have a list for Your Honor as well.

THE COURT:  Oh, that would be great.  Thank you.

MS. HUDGENS:  May I approach?

THE COURT:  Yes, ma'am.

I thought a fun exercise would be to have everybody -- whoever can spell the last lawyer's last name wins a prize, without looking at their sheet.

Give me one moment, please.

(Pause in proceedings.)

THE COURT:  All right.  The first is on -- this is 623-1, ECF number.

First is plaintiff -- I'm sorry -- League Exhibit 16, to which there was no objection, and it's found on page 96 of the exhibit list.

The next is League 58, to which there was no objection on the exhibit list.  That's on page 102.

Additionally, League 64, which is also found on page 102 of the exhibit list, 623-1.  Again there was no objection, so it's admitted.

And, finally, Exhibit 67 on page 103 of 623-1, to which there was no objection identified on the exhibit list.

MR. JAZIL:  Your Honor, that's correct with one little asterisk.  For Exhibit Number 67, my friends on the other side have said they are replacing the exhibit that was provided to us with a new one.  The new one is going to redact the home address for Liz Lindsey, and we are okay with that, Your Honor.

THE COURT:  All right.  So a modified exhibit that was listed as Exhibit 67, that is, with the redaction.

MS. HUDGENS:  That's correct, Your Honor.

THE COURT:  Those exhibits are now admitted.

(PLAINTIFFS' EXHIBITS LEAGUE-16, LEAGUE-58, LEAGUE-64, AND LEAGUE-67:  Received in evidence.)

THE COURT:  Anything additional from the League?

MR. MASTORIS:  No, Your Honor.

THE COURT:  And then I have counsel who doesn't want to be left out of the party.

Yes, sir.  What's up?

MR. FERGUSON:  Just very quickly, Your Honor.

Brent Ferguson for the Right to Clean Water plaintiffs.

We spoke -- since the State is starting today, I want to address the scope of cross-examination.  We spoke some at the pretrial conference about for efficiency only calling each witness once, and we spoke about it especially with regard to Supervisor Earley, not calling him twice.

I just wanted to confirm that the same will hold for the defense witnesses today; that it's possible that some cross questions will go outside the scope and for efficiency we would only --

THE COURT:  You are saying instead of having to recall the witness in rebuttal or something?

MR. FERGUSON:  That's correct.

THE COURT:  Mr. Jazil.

MR. JAZIL:  Your Honor, I disagree with that approach. I expect my directs to be very targeted.  To the extent that they want to ask questions on cross that are consistent with the direct, that's fine.  If they think they need to call someone back in their rebuttal case, the rebuttal case is limited by what I put on.

So with due respect, I do not think that's the appropriate approach.  I expect them to rest their case, and I expect to put on my case, which will be a very targeted one.

THE COURT:  All right.

MR. FERGUSON:  Your Honor, a couple of responses.

We did subpoena Director Matthews and Director Pratt. My understanding from the pretrial conference was that the scope applied to all witnesses on both sides.

THE COURT:  What day did you subpoena them for?

MR. FERGUSON:  I believe we sent the subpoenas just for the first day of trial for convenience, but I would have to -- I would have to double-check.

THE COURT:  Y'all can certainly call the witnesses, and we can take a break if you don't want to -- I mean, what I said was if both sides were calling the witness.

But Mr. Jazil's point about rebuttal is correct, that rebuttal would be true rebuttal.  So if you were saying, Judge, we want to examine this witness in rebuttal, you would be limited by the scope of his direct.  There's no such

limitations, though, if you want to call the witnesses in your case-in-chief.

MR. FERGUSON: Right. Okay. I'll confer with my colleagues, and we will make a decision before the plaintiffs' case has rested.

Thank you.

THE COURT: And I'm happy to again have them here, and we can take as long as we need.

MR. FERGUSON: Thank you, Your Honor.

MR. WERMUTH: We have one further issue having to do with designations.

MR. STAFFORD: I think, Your Honor, we can actually hold on that issue and see if we can resolve something in a way that will make that easier. So we'll address that at a different time.

THE COURT: Fair enough.

All right. Anyone else have anything else they need to take up before we hear from Witness González?

All right. Hearing nothing, we'll need to get counsel here with the witness.

(Pause in proceedings.)

(Ms. González Herrera entered the witness stand.)

**CECILIA GONZÁLEZ HERRERA, PLAINTIFFS' WITNESS, DULY SWORN**

THE COURTROOM DEPUTY: Please state your name for the record.

THE WITNESS:  Cecilia González Herrera.

THE COURT:  Thank you.  Ma'am.

MS. OSAKI:  Your Honor, League plaintiffs are offering Ms. González's testimony to support Counts One, Two, Three, and Five, in particular to describe her experiences as a noncitizen member of the League of Women Voters of Florida.

I will start by establishing her background.

DIRECT EXAMINATION

BY MS. OSAKI:

Q.   Good morning, Ms. González.

A.   Good morning.

Q.   To start, are you currently affiliated with the League of Women Voters of Florida?

A.   I am.

Q.   When I refer to the League of Women Voters of Florida, do you mind if I shorten that to the League?

A.   Yes, that's okay.

Q.   How long have you been a member of the League?

A.   I joined in September of 2023.

Q.   What does being a member entail?

A.   As a member, you're expected to fully engage in different activities, including, but not limited to, attending events, joining planning sessions, and promoting the values of the League.

Q.   Do those events include petition circulation?

A.    Yes, they do.

Q.    Do you bring any particular set of skills to your work as a League volunteer?

A.    Absolutely.  I am a significant younger member than the average members of the League.  Aside from that, I'm also fully bilingual, both Spanish and English, which allows me to be able to reach way more members in our community.

Q.    Do you hold any leadership positions for the League?

A.    At the time I serve as an appointed board member in my local chapter League in Orange County.

Q.    Okay.  What does being an advisory board member entail?

A.    So as the name established, I'm expected to advise my local chapter from planning to fundraising and strategy, to messaging, to events and different activities that we are going to do through the year.

Q.    To be clear, do you have a paid position with the League?

A.    No, it's 100 percent volunteer.

Q.    Why did you decide to join the League?

A.    I think in my case I joined because it's so close to the issues I care about.  My parents and I flee Venezuela almost nine years ago due to political persecution, and protecting democracy is very close to my heart.

My parents have been instrumental in making sure that I understand institutions can crumble, and when I learn from the League a few years ago that they have a nonpartisan approach to

defending democracy and advocating for voters everywhere, I say, This is where I could use my skills to still give back to the community, to give back to this country, and to also protect democracy in the place that I now call home.

Q.   I'd like to talk about your residency and legal status next.

Where do you currently live, Ms. González?

A.   I currently live in Washington, D.C.

Q.   How long have you been there?

A.   I moved to the District in November of 2025.

Q.   Why did you move to D.C.?

A.   So as far as my current role at Latino Justice PRLDEF, I oversee the Southeast region, and as far an expansion program, we have decided to engage in a -- programming in the Virginia area, which required me to temporarily relocate to the DMV area.

Q.   When you describe this as a temporary living arrangement, what did you mean by that?

A.   That the reason why I moved to D.C. was to expand the programming that we were doing.  At completion and successful ending, I will plan to return to Florida.

Q.   You plan to return to Florida.  Why is that?

A.   Here where I have everything.  Both my parents and my younger brother still live in Kissimmee.  My friends, the people that I love and that helped me become the person I am now, are all living in Central Florida or -- and across the Sunshine

State.  So this is where I want to continue my career and where I would like to have a family.

Q.   Now, have you lived anywhere else aside from Kissimmee, Washington, D.C., and Venezuela?

A.   No.

Q.   When did you say you and your family moved to Kissimmee, Florida?

A.   We moved in July of 2017.

Q.   Would you ever move back to Venezuela?

A.   No.  And I talk about it from the perspective that it's not safe for neither my parents or I to return safely to Venezuela.  The regime is still in power, the regime that has been persecuting my parents.  So there is a safety component, and there's also the fact that this is where I have grown as an adult.  This is where I went to college and a proud Knight from the University of Central Florida.

      (Reporter requested clarification.)

         THE WITNESS:  Central Florida.  And now I have built a career in the States.  So I don't see myself going back to Venezuela.

BY MS. OSAKI:

Q.   Just to underscore the point, what is your legal status in America?

A.   I'm applying under my dad's asylum case, and I'm also receiving a temporary protection status.

Q.   So to be clear, are you a citizen of the United States of America?

A.   I am not.

Q.   I'd like to talk a little bit about your education and employment background.

     What is your educational background?

A.   I went to Valencia College, community college, to get an associate degrees in art.  Then after that, I went to the University of Central Florida to get a bachelor's in political science with a minor in Latinx studies, and I did my honors --

     (Reporter requested clarification.)

          THE WITNESS:  Latinx studies, and I got an honors thesis on policy in the state of Florida.

BY MS. OSAKI:

Q.   You mentioned working for PRLDEF.  What does that stand for?

A.   The Puerto Rico Legal Defense Education Fund.

Q.   And what is your role and how long have you been there?

A.   I currently serve for the voting rights advocacy coordinator.

Q.   And how long have you been there?

A.   I joined the organization December 2023.

Q.   So you've been there for over two years?

A.   Correct.

Q.   Where does PRLDEF do work?

A.   The headquarters are based in New York, and we have a regional office in Houston and one in Orlando.

Q.   Is this is a full-time job?

A.   It is a full-time job.

Q.   Is it remote or is it in person?

A.   It is a hybrid method.  So I'm expected to be in the field, and so in person, a certain amount of days a month, and the rest of my work can be conducted remotely.

Q.   So just to be clear, does your work still bring you to Florida?

A.   Quite often.  Matter of fact, two weeks ago I was here at the state capitol working on a bill in committee in the Senate -- in the State Senate.

Q.   So it's still part of your role?

A.   It is part of my job.  It's expected that I come to Florida regularly.

Q.   Now, before you started at PRLDEF, what did you?

A.   I did a mix of grassroots democracy.  I did campaign work, electoral campaign work, that got me working for state races, senatorial races, then switched to grassroots work to --

     (Reporter requested clarification.)

          THE WITNESS:  Grassroots work that involved community outreach, registering voters, and a mix of community engagement work.

BY MS. OSAKI:

Q.   Have you ever worked or gone to school as an adult in any place other than Florida?

A.   No.

Q.   Do you work or have you ever worked with volunteers as part of your employment?

A.   Yes, the last eight years of my career.  It all happened while recruiting, training, and managing volunteers.

Q.   And this is to advance advocacy efforts?

A.   Yeah.  Most of them being issue-oriented campaigns.

Q.   Okay.  Now, based on your experience planning and overseeing volunteer efforts, what are some factors that help improve voter engagement?

A.   So there's a few.  One of the most importance being how easy you make it for both people in the equation, both the volunteer and the voter or the person you are reaching.  The simple you make the process, the easier it is for engagement and the more effective the results are.

Q.   In your experience as a person who's overseeing many advocacy efforts, would simply talking to a potential voter about a petition be an effective form of advocacy?

A.   No, because when you are -- because when you are thinking about effective, you want results, tangible results, whether they're numbers that you can manage as how much petitions has you been collected, how many calls has you make, how many doors

has you knocked.  So you want to make sure the metrics are also being accomplished as long as you creating general connection with the people you're reaching.

Q.   Now, what about handing a potential signer a blank petition form and asking them to submit it on their own?  Would that be an effective form of advocacy?

A.   It will not because I have no guarantee that I will be able to, one, receive the form back from the voter I just handed to or that they will actually fill it out.

Q.   Thank you.  I'd like to talk a little bit more about your ties to Florida.

Of all the places your family could have chosen to live, why did they select Kissimmee, Florida, in particular?

A.   Yes.  When my parents were forced with the fact that we needed to flee Venezuela for my parents and my brother and I safety, Venezuela -- Florida was the clear place to come for a handful of reasons:  One of those weather; one of those being the community.  In Florida, having home of the diverse community, like, for so many immigrants all the way from Puerto Rico, Cuba, and now Venezuela -- there's a lot of Venezuelans all across Florida, especially South and Central Florida -- that was a factor that my parents took into consideration because their ultimate goal was for my brother and I to assimilate quite soon.  So they told us by moving to Florida, a place that will seem familiar, a place that we have

visited in the past as tourists, it will be easier for us to feel home.

And to the date, I think that that was correct.  My brother joined middle school.  I was able to get a job and go back to college.  And quickly I was learning the language, making friends, getting myself involved in numerous volunteer groups. And now I don't imagine living anywhere else but Florida.

Q.   So it sounds like that plan -- your parents' plan did, in fact, bear out, that you did become integrated in the community in Kissimmee, Florida?

A.   Yes, it did.

Q.   You mentioned earlier being part of the League.

Do you consider that part of your community as well?

A.   100 percent.  I consider the women in the League to check key element in the support network I now have, which is a combination of fellow Venezuelans, fellow UCF alumni, now members of the League who are -- some of them serve as my mentors.  Some of them serve as the people that just check on me regularly, sort of like some extra grammies that I now have.

Q.   Are there any other groups or associations in Florida that you would describe as comprising your community as well?

A.   Yes.  And I think I will fail to list them all, but they all go from Casa Venezuela, which is a grassroots Venezuelan group, to the Girl Scouts of Central Florida.

(Reporter requested clarification.)

Direct Examination - Ms. González Herrera

THE WITNESS:  Girl Scouts of Central Florida.  I also have my alumni network at UCF.  I have the Global Shapers. That's an initiative for the work economic forum.  They have a chapter in Orlando.  Many of these groups are the people I still talk daily.

BY MS. OSAKI:

Q.   Are there any other community ties in Kissimmee that we haven't yet covered?

A.   No.  I will reinforce that I have my chosen family that live in Central Florida.  The friends that have grown up with me now as an adult, I have seen them get married; I have seen them buy a home, and I wish to see them having -- bringing their first kids, hopefully.

Q.   Thank you.

MS. OSAKI:  Your Honor, the next part of this testimony will go to the noncitizen ban and the new criminal provisions.

THE COURT:  Give me one moment, please.

(Pause in proceedings.)

THE COURT:  I'm sorry.  Counsel, you may proceed.

MS. OSAKI:  Thank you, Your Honor.

BY MS. OSAKI:

Q.   Ms. González, are you familiar with HB 1205?

A.   Yes, I am.

Q.   How did you become familiar with HB 1205?

A.    Due to the nature of the work that I currently perform, I was being aware of these now law when it was a bill in the House, but I also hear from my work channels and as well from the newsletter that we receive as members of the League that we received in our email about different news what is going on in the Legislature, and then things we as members should be aware.

Q.    Are you aware of HB 1205's bar on the participation of noncitizens and petition circulation?

A.    Yes, I am.

Q.    And are you aware of HB 1205's new criminal liability provisions for unregistered individuals who collect, deliver, or otherwise physically possess more than 25 signed forms?

A.    Yes, I am.

Q.    Before HB 1205 went into effect, did you participate in Florida's ballot initiative process?

A.    Yes, I did.

Q.    In what capacity?

A.    As a volunteer with the League collecting petitions for the access to Clean Water.

Q.    Now, what is that initiative, this Right to Clean Water initiative?  And why did you volunteer with the League to circulate petitions for it?

A.    Yeah.  So one of the reasons why I decide to get involved in that particular initiative is because as a noncitizen, as a person that got relocated to Florida, I found myself surprised

about the fact that individuals who help creating democratic processes that eventually will come into the ballot and that all Floridians will be able to vote on it.

So I realize that was an avenue for me to support democracy without having to vote and to also protect our natural resources that we have here in the Sunshine State.

Q.   Now, before HB 1205 went into effect, when you met voters while petitioning at League events, how did that look?

A.   So for most of those interactions they will be at a table. Voter will come and ask, What are you up to?  We'll explain that we're from the League of Women Voters, what are we doing currently, and we will share some initiatives that we are currently supporting, including, but not limited to, the access to Clean Water.

I will ask them, Are you aware?  If they were to say no, I will come to, like, explaining how it will be possible for them to help get the initiatives on the ballot to put in front of so many other Floridians to eventually make their voice heard.

And the conversation will go, in many cases, about how they feel unmotivated about engaging in the democratic processes in general where they feel disconnected.  And I will use this as an opportunity to empower them and tell them, like, Well, this is an opportunity.  It takes less than five minutes.  You're not voting for it.  You're just helping getting these a step closer to the voters.

And from that I will talk to the voter in case that they seem interested in joining the League.  I will say, Well, we do these and many other stuff.  Would you like to hear more?  Would you like to register?  We have a sign-up sheet.  We can get a member reaching out.

And a lot of those interactions will go like that.

Q.   What did those sign-up sheets look like?

A.   We will have a clipboard with a piece of paper where we will collect their phone number or their email and their full name and whether they're interested in attending a League event or becoming a member of the League.

Q.   And also at these tabling events it sounds like you had meaningful conversations with potential voters; is that right?

A.   Yes, I will talk to voters as well as talk to my fellow League members, because you are never alone at these table.  There's usually two to three League members.  And we will use these as opportunities to gather and, like, continue collecting.

Q.   You mentioned that you'd be sitting with other League members at these tables.

So you also interacted with them?

A.   Yes.  Those are the times where you actually get to catch up, what is going on with their grandkids, what is going on with college, for them to see what we have been missing between one event and another and things that get lost in emails and just text.

Q.   Now, we talked about how you've collected for the Right to Clean Water in the past.

So before HB 1205 went into effect, did you have specific plans again to collect petitions for the Right to Clean Water this year?

A.   Yes, I had planned.

Q.   And tell me a little bit about those plans.  Were there, for example, particular petition circulation events that you had in mind?

A.   Yes, absolutely.

As a board member, I have committed five hours a month to League-related business.  Part of that work has been attending events, volunteering with tabling, tabling being one of the most popular opportunities; one of those being through our hot topics conversations, which are monthly luncheons that we bring in speakers in to talk about an issue.  But we also set tables around the room with different organizations and different initiatives, and that being one of the opportunities where we collect petitions.

Q.   Can you name some of those events, the bigger events that you would attend?

A.   Yeah.  Those events are called hot topics, and they have a different topic every month?

Q.   Do you attend festival, that kind of thing as well?

A.   Yeah.  We will do community outreach, like, we'll have --

like, Orange County usually have a committee fair in the fall so. We'll have a table there before the beginning of the school year. We'll also set up tables in these community outreach events.

Q. And these fairs and festivals, are these events that the League attended every year?

A. Yeah, they have attended regularly.

Q. How did you plan to make time for this given your work schedule?

A. Well, I will say I do have a very flexible schedule that allows me to move things around, especially when you work remotely like I do. And with the idea that I want to also be present in my family as much as I can for birthdays and special occasions, I work my calendar around switching longer weekends to come down to Orlando and meet both professional needs, family/friends, social, and League needs.

Q. After HB 1205 went into effect, did your plans change?

A. Yes, they did.

Q. Why?

A. I stop all my intentions to volunteer petition collection.

Q. And why did you stop all of your plans to collect?

A. Due to, like, the criminalization nature of the bill, the law.

Q. What about the criminalization of this bill would have affected you specifically?

A.   As someone who's not a U.S. citizen, and I don't have a permanent status in this country, committing potential crime/felony could jeopardize mine and my parents' asylum case in the country.

Q.   When exactly did you stop circulating petitions?

A.   As early as the bill became law in July.

Q.   Of 2025?

A.   2025.

Q.   Thank you.

     If HB 1205 were lifted, what would you do?

A.   If all the provisions on the law were to be lifted, I will start my plans again to engage in petition circulation.

Q.   For any initiative in particular?

A.   For the access to clean water for sure.

Q.   Thank you.

     How, if at all, has being unable to circulate petitions because of HB 1205 affected your ability to interact with other League members?

A.   It have high impact.  Especially it's a little demoralizing to see an opportunity that I used to have to be able to naturally engage with my community and to my fellow League members being taken away.  Because, one, it reduce the chances I have to engage in volunteering to see some of the people regularly and also seeing voters, helping them.  It does feel quite -- I don't want to use the word "demotivated," but it

feels demotivating seeing something that I used to enjoy doing being taken away.

Q. And you mentioned before that the League was part of your community?

A. Yes, they are.

Q. So not being able to interact with them, has that had any other kind of personal effect?

A. Yeah. There's these -- what I use the word demoralizing. These are people that I will see in regular basis due to, like, volunteering opportunities to events. And by me not attending these events, it means that I don't get to see them often and, like, personally sometimes I feel that I don't know when the next time I will see them, if I will see them at all.

Q. Now, is there any other way -- just to wrap things up.

Is there any other way in which HB 1205 has affected you?

A. It does frustrate me because petition collection have been one of the ways I have found to fully engage to be part of this community, to feel that I belong. And it is frustrating that I cannot fight for so many of the issues that I care for such as the access to clean water.

Q. As a noncitizen in particular, is there any particular way in which this impacts you?

A. Well, it's taken -- as a noncitizen myself, it's taking one of the very little avenues I had to engage and protect democracy.

Q.   Thank you, Ms. González.

          MS. OSAKI:  No further questions.

          THE COURT:  Thank you, ma'am.

          Mr. Stafford.

          MR. STAFFORD:  Very briefly, Your Honor.

                    CROSS-EXAMINATION

BY MR. STAFFORD:

Q.   Good morning, Ms. González.  How are you?

A.   Good morning.  I'm doing good.

Q.   I want to just -- I have a few brief questions for you.

     As I understand it, you -- one of the things you like to do when you volunteer with the League is engage with voters; is that -- or people that you come across?

A.   That is correct.

Q.   And talk about the -- I guess in this case the Right to Clean Water amendment?

A.   Yes.

Q.   Is there -- to your understanding, is there anything in HB 1205 that would prevent you from engaging a voter or talking to them saying, This is what this amendment is about.  This is why you should support it?

     Is there anything in 1205 that would prevent you from doing that?

A.   My understanding, there's nothing preventing me from engaging as of my full knowledge is.  But there is also my

expertise on the volunteer average that tells many if my engagement is not effective, it's not effective.

And in order for it to be effective, I need to be able to have a result out of that interaction. Because in order to just talk, I could just talk all day, but we go there with a purpose, which is defending and promoting this initiative.

(Reporter requested clarification.)

THE WITNESS: Promoting this initiative.

BY MR. STAFFORD:

Q. And, again, under your -- with your understanding of 1205, is there anything that would prevent you from handing a personal-use petition to a person that you've engaged with?

A. There is nothing preventing me from engaging, but there is not full understanding that that person will fill out the form or it will just go be wasteful.

Q. I believe you testified about -- I guess, sitting at a table. I guess I've heard that referred to as tabling.

A. (Nods head up and down.)

Q. And correct me if I'm wrong, but when you sit at a table on behalf of the League, people come and approach you or approach the table and you explain the -- what you're there for and the reasons why they should support the amendment or at least support having it on the ballot; is that correct?

A. That is correct.

Q. And prior to 1205, you would have -- you would give them a

petition and they would fill it out and then you would sign as the circulator?

A.    Prior to the bill getting into effect, we'll be helping the voter fill it out, like, guiding them through the petition, and then it will get collected at the table and a member from voter services committee will handle them all to their final destination.

Q.    Okay.  And after 1205, you can still -- you can hand someone a petition; you can help them fill it out by telling them, you know, You need to fill this space out.  You did that wrong, but the only thing you can't do is take that petition back from them and sign as a circulator?

A.    That being the case, I have no -- nothing that confirm that I know the voter will actually return that form to either the Supervisor of Elections or it may get lost in their car dropping their kids, so that form then would be wasted.

Q.    And I believe you also talked about making calls on behalf of petitions; is that -- did I understand that correctly?

A.    I didn't use it to the extent of petition.  I use it as an example of activities I have performed while managing volunteers in my past.  It was used to elaborate my professional experience.

Q.    Okay.  And that -- was that the same with knocking on doors?

A.    Yes.  Those are -- have been activities that I listed that

I have performed with volunteering in the past, not exclusively to the League.

Q.   And to your understanding, there's nothing in 1205 that would prevent you from doing that on behalf of a petition?

A.   It's not my understanding.

Q.   Thank you very much.

MR. STAFFORD:  I have nothing further, Your Honor.

THE COURT:  Thank you.  Before redirect, give me one second.

(Pause in proceedings.)

THE COURT:  Counsel, I'm sorry.  I'm taking notes. I'm just not a good typer and my handwritten notes are too hard to --

Counsel, you may proceed.

MS. OSAKI:  Thank you, Your Honor, very briefly.

                    REDIRECT EXAMINATION

BY MS. OSAKI:

Q.   Ms. González, while nothing would technically stop you from sitting at a tabling event that the League hosts, would you feel comfortable personally doing so given what you know about HB 1205 and its criminal provisions?

A.   I will not, especially because I will be taking that space from someone else that can actually fulfill all the requirements as a volunteer shift.

And I say this because when we volunteer, you want to make

sure that you're checking all the items on the list, that you're able to fully help voters, and that you're making the process easy for both you as a volunteer and the person you're reaching as a voter.

So by me not being able to fully engage in volunteering activities, being sitting at the table is taking a shift away from a fellow volunteer that could be available.

(Reporter requested clarification.)

THE WITNESS:  Available.

BY MS. OSAKI:

Q.   And would you personally feel safe being at that table at this petition-circulating event given the ban on noncitizens?

A.   I will be not.

Q.   Now, talking to folks generally about an initiative, as opposing counsel suggests, would that been an effective form of advocacy?

A.   It would not be.  It will only be putting a seed, but it doesn't involve the watering.  It doesn't involve the growing as a plant.  And when we are cultivating our relationship, we also want to see results out of the seed that we want.  We want to be able to grab the fruits of it, and talking is just not enough.

Q.   And you're saying this based off your experience?

A.   Yeah.  I have seen it through the years in my career.

Q.   Got it.

Thank you very much.

MS. OSAKI:  No further questions.

THE COURT:  One moment, please.

(Pause in proceedings.)

THE COURT:  Thank you, ma'am.  You may step down.

(Ms. González exited the witness stand.)

THE COURT:  For the benefit of the court reporter, we're going to go ahead and take a quick break.

And, Ms. Osaki, I had a quick question for you.

We're on break.

(Recess taken at 9:15 AM.)

(Resumed at 9:32 AM.)

THE COURT:  All right.  Mr. Dato, before you call the next witness, is your -- the rest of your crew still trying to figure out what they are going to do?

MR. DATO:  I believe that's correct, Your Honor.

MR. MASTORIS:  I think that's right.  I think we should have it figured out by the next break.  We have to have it figured out by the next break.

THE COURT:  Okay.  No problem.

MR. MASTORIS:  Thank you, Your Honor.

THE COURT:  All right.  Mr. Dato, you can call your next witness.

MR. DATO:  Thank you, Your Honor.

The League plaintiffs call Alice Newlon.

THE COURT:  Ma'am, if you'll remain standing and raise

your right hand to be sworn.

Thank you.

**ALICE NEWLON, PLAINTIFFS' WITNESS, DULY SWORN**

THE COURTROOM DEPUTY:  Please state your name, then spell your last name for the record.

THE WITNESS:  Nancy Alice Newlon.

Nancy Alice, traditionally, and N-e-w-l-o-n.

THE COURTROOM DEPUTY:  Thank you very much.

THE COURT:  Thank you, ma'am.  Please take your seat.

MR. DATO:  Your Honor, Ms. Newlon is a current member of the League of Women Voters of Florida and sits on the board of the League of Women Voters of Manatee County.  The testimony will go to the League's standing in Counts One through Four of the operative complaint.

DIRECT EXAMINATION

BY MR. DATO:

Q.   Ms. Newlon, where do you live?

A.   I live in Bradenton, Florida.

Q.   What county is that in?

A.   Manatee County.

Q.   Ms. Newlon, how old are you?

A.   80 years old.

Q.   Are you a registered voter?

A.   I am.

Q.   Where are you registered to vote?

A.    In Florida in Manatee County.

Q.    How long have you lived in Florida?

A.    19 years.

Q.    I'm going to ask you a few questions now about the League of Women Voters of Florida.

Are you a member of the League of Women Voters of Florida?

A.    I am.

Q.    And if I refer to the League of Women Voters of Florida as just the League, you'll understand what I'm referring to?

A.    Yes, I will.

Q.    How long have you been a member of the League?

A.    Ten years.

Q.    And aside from the League, are there any other civic or volunteer organizations that you've been a member of?

A.    Yes.  The American Association of University Women; I've done a lot of volunteer work for the county as a docent in a local preserve, and the Rotary.

Q.    Are you a member of a political party, Ms. Newlon?

A.    Yes.

Q.    Which party?

A.    Republican.

Q.    Why did you become a member of the League?

A.    When I moved to Florida, they had a number of programs that -- that addressed local issues, state issues that were really good, and I'd attend those.  I was impressed and I joined

Direct Examination - Ms. Newlon

them.

Q.    And why have you maintained your membership for the last decade?

A.    I really liked the League's position in terms of they are nonpartisan; they never support a candidate or a party, so we can look at issues from the standpoint of the facts and not have pressure in any way.  I think we do wonderful work at helping citizens understand issues, helping them with their ability to vote and vote intelligently.

Q.    Have you held any leadership roles with the League?

A.    I have.

Q.    Which ones?

A.    I've -- for a year and a half I was a natural resources chair.  For one year I was vice president, and for six years I was president.

Q.    And those positions were with the League of Women Voters of Manatee County?

A.    Correct.

Q.    Aside from your leadership roles, what other activities have you participated in with the League?

A.    Well, I up -- I changed their accounting system.  I redid the website.  We also started a very active program tabling at different events.  So as an outreach we weren't doing that before, and we do that now.

Q.    Any other activities that you participate in with the

League?

A.    Petition collecting.

Q.    And you mentioned tabling.  What do you mean by that?

A.    At various events, like it might be a festival, it might be a school, or a college, we set up a table, we have voting information, and we have advocacy information, and we'll have petitions there to get constitutional amendments on the ballot.

Q.    I'm going to ask you a few questions now about petition circulation.

      Have you personally circulated petitions --

A.    Yes.

Q.    -- to get citizen initiatives on the ballot?

A.    Yes.

Q.    Which initiatives have you circulated petitions for?

A.    To limit the number of bullets in a clip, open primaries, expansion of Medicaid, a constitutional amendment to guarantee abortion care, and the constitutional right to Clean Water.

Q.    And for each of those initiatives, were you circulating petitions with the League?

A.    Always with the League.

Q.    Where do you typically circulate petitions?

A.    Festivals, farmer's markets, at libraries, or when tabling.

Q.    And can you walk me through the process of how you go about approaching a potential voter to get their signature?

A.    So you go up with your clipboards and you're -- you're --

in a friendly manner, and maybe notice their dog or their shirt or something, and then you ask if they know about that issue. You talk to them some about the issue and ask them if they would be willing to sign the petition.

Q.   Okay.  And if the voter agrees to sign the petition, what do you do next?

A.   Then as -- you know, you put it in the back of the clipboard, and then at some point you take a number of them, put them together, and then at the end of the day one person will take them to -- either submit them to a -- the -- they mail them to the sponsor of the amendment or send them to a hub.  There's been a few initiatives that had hubs.

Q.   And while the voter is actively filling out a form, what do you do?

A.   We look at it to make sure that they are filling it out properly.  A lot of times they'll miss a slot or they'll interpret county to mean country, and so you get them to correct it.

Q.   And I want to be clear here I'm talking about prior to the enactment of House Bill 1205.

     Did you ever assist voters in filling out petition forms?

A.   Yes, especially older people, but also sometimes people with disabilities would not have legible handwriting and they would ask me to fill it out for them, which I would do, and then they would sign it.

Q.    Would you ever sign the form on behalf of the voter?

A.    Absolutely not.

Q.    I think you mentioned that at the end of the day you collected all the petitions in one place?

A.    Yes.

Q.    And when -- once the voter had completed and signed the form, did you ever just ask the voter to turn the petition form in themselves?

A.    No.

Q.    And how about providing the voter with pre-addressed envelope with a stamp on it and asking them to just mail it in on their own?

A.    We didn't do that.  We've had experience before that really pointed out to us that that doesn't work.  When we -- when I first joined the Manatee League, we did not have the ability to process a credit card, so when we would be -- and I started doing a lot more events, evening events with speakers, speaking at different events, there would be people that wanted to join. And I had the paper forms and an envelope, and they really wanted to join and we'd give -- I'd give it to them and it would -- I mean, I can't even remember one that ever came back. Maybe some did.  About eight months later we got a credit card processor and 100 percent of them joined.

Q.    You can process the payment right then and there?

A.    They just filled out the form; I took that with me; we

processed the credit card payment right there.

Q.    Did you ever circulate petitions by yourself?

A.    Never.

Q.    Why not?

A.    We -- first, we could check each other's work, so there would always be two of us.  And the second thing is we could cover more people; we could fan out and cover more territory. The third thing is there's an element of safety having two of us.

Q.    And when you are at an event or a festival like some of the ones you described, about how many petitions would you be able to circulate -- signatures would you be able to collect in a given day?

A.    If it's a really good one, like, let's say the Bradenton Market -- that was really a fruitful one for us -- I could collect 30 to 40.  That -- we would usually have three people, you know, both ends and one in the middle for people coming in on the side street.  And we would -- we would always get over 100, you know, more -- it's just depending on the day and the people involved in the -- the issue involved.  But we definitely could be over a 100, hundreds, yeah.

Q.    And, Ms. Newlon, did you ever encounter any incidents while circulating petitions?

A.    Yes.

Q.    Can you tell me about that?

A.   Early on in collecting for the right to abortion care, there's a local smaller botanical park, we set up -- another member and I set up near the entrance on the public way with a sign indicating that we were there to keep abortion legal, and a woman, her husband, and their adult daughter took great offense to it.  And she started screaming, following us.  To anybody that wanted to sign it, she would be screaming about, you know, Don't sign this.  You are killing babies.

The husband was very, agitated.  He went in, came back and said that he had called the sheriff and the sheriff was coming.  And I said, That's not possible.  We are on public land.

Then she went away a little bit later and then came back and said all her friends were going to come there and make sure that they overwhelmed us.

Q.   How did you feel there in that incident?

A.   It was -- it was disturbing.  It was threatening.

Q.   And if you had been volunteering alone that day, would you have continued to circulate?

A.   No.

Q.   And how would you feel if those individuals could have access to your name and address associated with the initiative you were circulating for?

A.   That would just be terribly frightening.

Q.   And how about if those individuals had access to the names and addresses of every circulator who was circulating for that

initiative?

A.    If that were to happen, I don't know that we could get volunteers.  People would be afraid on an issue, like abortion care, that somebody would get every name, who's collecting, how much, and target them.

Q.    Did you ever experience any other incidents while circulating?

A.    Yes.

Q.    Can you tell me about that?

A.    It was at a Scottish festival in Lakewood Ranch.  There was three of us, and I was collecting for the expansion of Medicaid.  I went over to a side area where there was a group that were set up in folding chairs, and a guy to -- that is in the center part of the circle really got quite agitated and said, These people don't need the assistance.  They all say they don't have the money for it, but they drive fancy cars and they come up and they all have iPhones.  And it was a big guy.  But he was -- he just was really agitated about it.

Q.    Were you able to keep circulating petitions in that area?

A.    I left that area.  I moved on to another area closer -- to where other -- another person was collecting.

Q.    How did that experience make you feel?

A.    Well, it was threatening.  I didn't know what he was capable of.

Q.    And if you were alone that day, would you have felt

comfortable continuing to circulate petitions?

A.    No.

Q.    Would you want that individual to have access to your name and address associated with the initiative?

A.    Absolutely not.

Q.    Sorry?

A.    Absolutely not.

Q.    How about the names and addresses of every other circulator who circulated for Medicaid expansion?

A.    No.  I would be afraid of not only the people that are opposed to the issue, but I would be afraid that -- also the government being opposed to it and might target us.

Q.    Ms. Newlon, have you ever received payment for circulating petitions?

A.    No.

Q.    And of all the activities that the League participates in, why do you chose to circulate petitions?

A.    This process enables the voters of Florida to be able to speak out on an issue that the Legislature will not move on. And these are issues that are of profound importance, whether people have insurance or not, whether or not people have the right to abortion care.  And so they are important to me; they are important to the League.

Q.    Ms. Newlon, I have a few questions now about House Bill 1205.

Are you familiar with House Bill 1205, or HB 1205?

A.   Yes.

Q.   Are you currently circulating petitions?

A.   No.

Q.   Why not?

A.   Because of HB 1205.  I feel not only that I have the right to circulate those petitions, so I should not ask for permission from the State, but I also feel that it's a threat to my security.

Q.   You talked about asking permission.  We are going to go through a few provisions of HB 1205 now.

Are you aware that you could continue to collect more than 25 petitions if you register with the State as a circulator?

A.   Yes.

Q.   Are you aware that if you do register, you have to include your name and address on every petition form that you circulate?

A.   Yes.

Q.   Have you registered as a circulator with the State, Ms. Newlon?

A.   No.

Q.   Why not?

A.   I don't want someone that is opposed to the issues to have my name and address on that form.  I don't want the State potentially to delay my approval because they don't support that issue.  I don't want to be targeted potentially from this State

because they oppose the issue I'm collecting petitions for.

Q.   And do you take issue with having to register in the first place?

A.   Yes.

Q.   And you mentioned a fear of your security.

Are you also worried about criminal liability?

A.   Yes.

Q.   And are you aware that HB 1205 makes it a third-degree felony to fill in missing information on a signed petition?

A.   Yes.  And that is something that really is necessary when we are out there because there are people that need that assistance.

Q.   And are you willing to continue circulating petitions if that provision is in place?

A.   No.

Q.   And are you aware that HB 1205 also makes it a third-degree felony to physically possess more than 25 signed petitions without registering as a circulator?

A.   Yes.  And that's also a problem, because when we are out, there's two or three of us; there's sometimes different shifts, and to figure out whether somebody is going over that 25 -- also, I mean, we -- we take those -- those petitions together, and it just would be very hard for us to determine, whoops, somebody is over 25 and they are not registered.  And we don't even know if we have to mail them separately.

Q.   So would you feel comfortable trying to circulate and collect at least 25 petitions if that law is still in place?

A.   No, I don't want to take any of those risks.

Q.   Just a few more questions, Ms. Newlon.

If HB 1205 were not in effect, would you return to circulating petitions?

A.   Yes.

Q.   Which ones?

A.   I would be collecting petitions on the expansion of Medicaid and the constitutional right to clean water.

Q.   And where would you collect signatures for those petitions?

A.   The same places I did before, you know, festivals and tabling.

Q.   And why would you continue to circulate petitions?

A.   Because this is a right that the citizens passed.  It gives us the ability to speak what things that are important to us and to citizens of the state, and I would continue to do that.

MR. DATO:  One moment, Your Honor.

THE COURT:  Certainly.

(Discussion between the attorneys.)

MR. DATO:  I have no further questions.  I'll pass the witness.

THE COURT:  Cross-examination?

CROSS-EXAMINATION

BY MR. STAFFORD:

Q.    Good morning, Ms. Newlon.  How are you?

A.    Morning.  Good.

Q.    I just have one question for you.

You testified earlier about a time when the League wasn't able to process credit cards, and in that -- if I'm understanding it, that's what you did -- what you did there was then hand them -- hand the person a membership application and ask them to fill it out?

A.    And ask them to fill it out, an envelope.  All they needed to do was go home, fill out a check, and put it in the mail, and they didn't.

Q.    Okay.  I just want to clarify that you never used that process for petitions, have you?

A.    No.

Q.    Okay.  Thank you very much.

A.    Because 100 percent I know we got the petition if we get them.

Q.    Thank you very much.

MR. STAFFORD:  I have no further questions.

THE COURT:  Any redirect?

MR. DATO:  No, Your Honor.

THE COURT:  Thank you, Ms. Newlon.  You have a good day.

(Ms. Newlon exited the witness stand.)

THE COURT:  One moment, please.

(Pause in proceedings.)

THE COURT:  Let me hear from plaintiffs' counsel.

MR. WERMUTH:  My colleague for Right to Clean Water has something to say.

MS. SZILAGYI:  Sure.

So we just want to -- Right to Clean Water plaintiffs, on behalf of plaintiffs, would like to move in plaintiffs' deposition designations and defendants' counterdesignations into evidence.  We discussed this at the pretrial conference.  We just want to make sure that is in evidence.

THE COURT:  Let me first find out, any objection from the defense?

MR. RABAN:  No, Your Honor.

THE COURT:  All right.  Without objection -- and they've already been filed on the record, both the designations and counterdesignations.

MS. SZILAGYI:  Correct.  So I have a list, if it's helpful, of where they are on the docket.

THE COURT:  Certainly.

MS. SZILAGYI:  And --

THE COURT:  One moment, please.

(Pause in proceedings.)

MS. SZILAGYI:  I would also note that there is one of

defendants' counterdesignations to which plaintiffs have made an objection, and that is described in the defendants' notice of filing the counterdesignations at ECF 620.

THE COURT:  Give me one moment, please.

So the following depo designations have been admitted -- I mean, counterdesignations -- 620-1, 620-2, 620-3. 608-4, 608-5, 608-6, and 608-7.

I've referred to some of those designations previously, and we had discussions regarding the inclusion of Supervisor Earley's depo designations, and I ruled on that objection.

With respect to Pratt, where do I -- it's on page 25, lines 8 through 15?

MS. SZILAGYI:  Correct.

THE COURT:  Where do I find her?

MS. SZILAGYI:  That is ECF No. 620-2.

THE COURT:  Give me one moment, please.

Oh, I'm sorry.  I already read that off at the top.

MS. SZILAGYI:  And just in case it needs clarity for the record, those -- plaintiffs' designations are highlighted in yellow and defendants' are in gray.

THE COURT:  Give me one moment, please.

(Pause in proceedings.)

MS. SZILAGYI:  I don't know if it would be helpful to note that the ECF numbers and the deposition page numbers are

different, and that caused me some confusion.

THE COURT: And so am I.

So is -- this 25, is that ECF 25 or --

MS. SZILAGYI: No. So there's, like, this gray number in the middle, and that's the actual deposition page.

THE COURT: I see it.

MS. SZILAGYI: I thought that might cause confusion. It did for us as well.

THE COURT: It's on ECF page 32.

MS. SZILAGYI: Right.

THE COURT: Give me one moment, please.

(Pause in proceedings.)

THE COURT: The question beginning on line 8 is: *What evidence or data do you have that registration of volunteers will -- registration of volunteers will prevent initiative petition fraud?*

The response was: *As I said before,* which is harkening back to some prior response, *we have evidence of volunteers in the past who we believe to have committed fraud, but we were unable to identify them.*

And the objection to the answer?

MS. SZILAGYI: Correct. So we -- plaintiffs designated only the portion above that, the question about these studies analysis or projections regarding the likely impact of this provision, and our position is that the counterdesignation

in lines 8 through 15 is not necessary for completeness.  It's an answer to a different question about a topic that we didn't designate, so that's why we objected.

THE COURT:  Judge, we can introduce it, because it's attributable to the party.  They don't get to introduce it because it would be hearsay --

MS. SZILAGYI:  Correct.

THE COURT:  -- and they don't -- it's under the rule of completeness that adds nothing to the prior response.

MS. SZILAGYI:  Correct.

MR. WOLK:  Your Honor, our position is that the designated lines as the counterdesignations, lines 8 through 15, goes to the completeness of the question asked by Mr. Shapiro that plaintiffs' designated about the OECS conducting studies analysis or projections about the impacts of the provision.

THE COURT:  Well, there's a difference between studies or what evidence and data.

I'm going to sustain the objection.  Lines 8 through 15 are struck.

MS. SZILAGYI:  Thank you, Your Honor.

MR. STAFFORD:  And, Your Honor, just one related issue on these deposition designations.

There are certain of these designations that plaintiffs have offered contingent on the admissibility of the OECS reports found at DX 2 through 4.  That is an issue that we

are attempting to resolve between the parties.  I do have a list of the designations that would be contingent if those reports do not come in.

THE COURT:  Well, why don't we address those depending on the reports.

MR. STAFFORD:  That makes perfect sense.

THE COURT:  Also, everybody needs to also be prepared -- I believe the seminal case on point, *Beechcraft*, discusses that it's not necessarily an all-or-nothing proposition either.  So you also need to be prepared that if part of a report comes in, but not all of the report, what happens.

MR. STAFFORD:  Understood, Your Honor.

And, again, this is an issue that we are trying to resolve between the parties that may obviate the need for further argument.

THE COURT:  I mean, I -- do y'all want some -- we haven't heard all argument, but I can also give y'all some guidance.  I mean, I think there is a world of difference between the interim report -- the portion of the interim report at issue versus what was incorporated by reference versus what was actually said in the final report and the challenge to the numbers.

And so I can tell -- what I'm going to need from the plaintiffs is if I agree with y'all's arguments, why would that

not be what I excluded as opposed to the reports in toto?  So that's what you are going to need to respond to me.

And for their part, the defense is going to have to explain to me -- I've got to say it's one of the astounding arguments I've ever had made in court in terms of evidence is that, Judge, our rebuttal expert's attack on plaintiffs' expert is -- of course, it's not going to be statistics subject to peer review.  It wasn't intended not to be biased when the very issue before this Court as it relates to those segments of the reports coming in under public record is trustworthiness.  It seems to me to be an incredibly odd argument that, Judge, it's okay that it's junk statistics, because it's intended to be biased.  It's mind-boggling that that's the response when the issue is trustworthiness.

But that's the best guidance I can give both sides as it relates to whether or not some or all of those reports come in.

Okay.  I'm sorry.  Some -- we had another person that wanted to -- so I've ruled on the one depo designations. They -- otherwise, they have come in.  We've identified them.

I'm going to hand the sheet to the courtroom deputy, in case my reading off of the numbers I inverted a number or something, for the benefit of the court reporter.

Let me hear from -- the next issue.

MR. FERGUSON:  Brent Ferguson for the Right to Clean

Water plaintiffs.

Just to follow up on the witness issue I raised earlier, Your Honor, the plaintiffs have conferred and don't plan to call any of the witnesses from the defense list in our direct case.  I would ask for efficiency that, if in the scope of cross-examination the issues come up that would be appropriate for a rebuttal case, we be allowed to ask those on cross-examination.

THE COURT:  Certainly.

And let me just say, in terms of rebuttal -- I'll have to hear from Mr. Jazil -- I mean, if somebody broaches a subject in a conclusory way, that doesn't mean that rebuttal would be limited in a conclusory way.  And also the rebuttal would -- could be -- although it would simply be cross-examination to respond to either credibility or questions raised, but I'll just -- I'll leave it at that.

But I want to make plain, rebuttal is different than plowing a new field that wasn't raised during the course of direct.

MR. FERGUSON:  Understood.

THE COURT:  All right.

So other issues regarding exhibits?  Designations?

Plaintiffs are comfortable that all of the exhibits that have been admitted are now identified on the list that's been generated by my courtroom deputy, or do y'all need to

double-check one last time?

MR. WERMUTH:  We are comfortable that it's complete.

THE COURT:  All right.  So you've got your exhibits. You've got your depo designations.  Both sides agree that the testimony from the preliminary injunction comes in as well as admissible exhibits, setting aside the declarations from the -- that were considered at the preliminary injunction stage. You've got the testimony you've introduced thus far.  We've set a deadline for closing arguments.

Anything additional from the plaintiffs before you rest?

MR. MASTORIS:  No, Your Honor.

MR. WERMUTH:  No, Your Honor.

THE COURT:  That's two of the four.

MR. FERGUSON:  No, Your Honor.

MS. MURPHY:  No, Your Honor.

THE COURT:  All right.  So all four plaintiffs rest.

All right.  So as I understand the defense case, we've got Mr. Rosenthal up first with Molina, and then we're going to try to get through Bridges and Gladson today.

Let me find out -- and, again, I want to make plain, I'm not requiring anybody to agree to anything, but I also don't know what's going to be the most efficient use of y'all's time and the Court's time.

Do y'all need -- do we need to take a break so y'all

can confer regarding Matthews and Pratt and exhibits?  Or y'all tell me.

I try to remember what it's like to be a lawyer, although it's been years that I wasn't on the bench.  So I don't necessarily expect y'all to go to 5:30 today and then spend hours tonight hashing something out and then not be able to meet with witnesses and so forth.  So I'm trying to be respectful, recognizing that's not the optimum way to make people confer.

MR. JAZIL:  Your Honor, I appreciate that.  I simply note that I have bosses more so than clients, and I need to get their approval for whatever it is we're doing.  And I'm hopeful I can do that by the end of the day today.  We don't need to take breaks --

THE COURT:  And that's what I was -- I didn't say that, but you've raised this before at prior proceedings with this Court.

So if at some point it's helpful to take a break to do that to streamline things, I'm happy to do that.  That was the only point.

MR. JAZIL:  Thank you, Your Honor.

THE COURT:  Okay.

All right.  We'll go ahead and have Mr. Rosenthal call Molina, and then we'll get through Molina and then we'll take a break.

Thank you.

(Supervisor Molina entered the witness stand.)

THE COURT:  Ma'am, if you'll raise your right hand to be sworn.

**IMALTZIN MOLINA, DEFENDANTS' WITNESS, DULY SWORN**

THE COURTROOM DEPUTY:  Please state and spell your name for the record.

THE WITNESS:  Sure.  My name is Imaltzin Molina.  First name is I-m-a-l-t-z-i-n.  Last name is M-o-l-i-n-a.

THE COURTROOM DEPUTY:  Thank you.

THE COURT:  Please take your seat, ma'am.

And you should have water over there if you need water.

THE WITNESS:  Thank you.

MR. ROSENTHAL:  Good morning, Your Honor.  The Supervisor defendants are presenting Ms. Molina's testimony, which will go to Florida Decides Healthcare and Smart & Safe First Amendment claims against the Supervisors as in regards to the petition verification fee.

DIRECT EXAMINATION

BY MR. ROSENTHAL:

Q.   Ms. Molina, where are you currently employed?

A.   I'm employed at Miami-Dade County Elections Department.

Q.   And what's your current job title?

A.   I'm the assistant deputy for Voter Services for Miami-Dade County.

Q.   How long have you served in that position?

A.   I have served in that position for almost 11 months.

Q.   And when did you first begin working at the Supervisor of Elections' office?

A.   I began my journey at the office in 2007, August of 2007.

Q.   Could you describe your current responsibilities as assistant deputy Supervisor of Elections for Voter Services?

A.   Sure.  I oversee voter registration, state eligibility, list maintenance.  I also process and oversee petitions: Candidate, local, and state initiative petitions.  I do analyze and I check the staff's usage of DAVID, which is a database that management uses to check identifications such as Florida driver's license, the last four numbers of the social security, date of birth, addresses that we do need to check for voter registration obligations, and now petitions.  And I also develop the operating budget for the division.

Q.   You mentioned that you oversee the verification of petitions.

     Have you personally verified petitions in the office yourself?

A.   Yes, I have since 2007.

Q.   Approximately how many petitions have you verified yourself?

A.   I don't have an exact number, but I can tell you they are in the thousands.

Direct Examination - Supervisor Molina

Q.   Okay.  Have you received any specialized training in relation to your job responsibilities?

A.   Yes, we do.  I do attend all the trainings.  We also receive trainings from the State.  We do have to have -- take a course every year on signature training, and every calendar, every four years -- no, actually, every two years, whenever we have a general election, we have to take a special course regarding petitions and regarding signatures verification.

Q.   Have you pursued any certifications in relation to your job?

A.   Yes.  I'm currently trying to pursue the FCEP, which is the Florida Certified Election Professionals certification.

Q.   Thank you.

     Ms. Molina, we are now going to discuss your experience with petition verification in Miami-Dade County.

     If I say statewide petitions, would you understand that to be statewide petitions for constitutional amendments on the ballot?

A.   Understood.

Q.   And when I say candidate petitions, will you understand that to mean petitions that candidates file either to get on the ballot or to have filing fees waived?

A.   Understood.

Q.   And when I say local petitions, would you understand that to mean either county or municipal initiative petitions?

A.   Understood.

Q.   Okay.  Are you familiar with the processing of statewide candidate and local petitions?

A.   Yes, I am.

Q.   Are there differences in the rules that apply to statewide petitions as opposed to candidate and local petitions?

A.   Yes, there are.

Q.   And can you briefly talk about your experience with candidate petitions?

A.   Okay.  Candidate petitions, in our experience, they're much easier to process.  We have experience that candidates do their research, and they do their homework.  Most of them require or ask for a list of the voters in their district, and they become familiar with that list.  And they actually go door to door asking for signatures on the petitions, and they do that themselves.

          MR. STAFFORD:  Objection; lack of foundation.

          MR. ROSENTHAL:  I can lay some foundation if you'd like, Your Honor.

          THE COURT:  You can certainly ask her the basis for the opinion she's offering regarding what candidates do and don't do.

BY MR. ROSENTHAL:

Q.   Ms. Molina, in your experience in the office, did you interact with candidates who were seeking to either qualify for

the ballot or have filing fees waived by the petition process?

A.    Yes, I did.  Before being an assistant deputy, I used to be the registration supervisor and also the registration manager.

And the -- first of all, we would get public record requests from these candidates asking for the list.  And they would pay -- it's a $20 fee.  They would get the list.  And then maybe two or three weeks after, they would come to our office.  And me being the voter registration manager or the registration supervisor, I would have to go and meet with them, and they would turn in the petitions, and they would say, Oh, I worked over the weekend.  I went door to door to canvass for these petitions, and here they are.

MR. STAFFORD:  I'm going to object on hearsay grounds if that's the basis of the foundation, Your Honor.

THE COURT:  Well, part of it is; part of it isn't.  I mean, the fact that people are requesting the list -- so she's laid a foundation.  I'm going to overrule the objection.

MR. ROSENTHAL:  Thank you, Your Honor.

BY MR. ROSENTHAL:

Q.    I'd like to talk a little bit about some of the unique rules for statewide petitions.

Are there requirements to scan statewide petitions?

A.    Yes, there are.

Q.    What are those requirements?

A.    Our office does checking by batches.  So every time we

receive petitions, that's considered an external batch.  Once we process and we quality-assure those petitions and we certify those petitions, they are scanned and sent to the State.

Q.   And is that a requirement of the new House Bill 125 -- or HB 1205?

A.   Yes, it is.

Q.   And do you have to do that for candidate and local petitions?

A.   No, we do not.

Q.   Are there deadlines that apply to when a sponsor has to turn in signed petitions for statewide petitions?

A.   Yes, there are.  They have to turn in those petitions within ten days of the voter signing the petitions.

Q.   Does the receipt of a petition validation fee affect the ten-day requirement?

A.   No, it does not.

Q.   What happens if a petition is turned in after ten days?

A.   We do process that petition.  We go ahead and validate it or invalidate it, depending if it meets the requirements, but we do need to report that particular petition as being late to the State.  So we do need -- at the end, once we are done processing again and quality-assuring the petition, we go ahead and put all the petitions that are late, and we have to scan those to the State.

Q.   Are there requirements that apply to statewide petitions as

it relates to circulators?

A.    Yes, there are.

Q.    And what are those requirements?

A.    The circulators need to be registered with the State.  From our understanding, they have to be approved by the State.  Once they are approved, they can begin circulating the petitions.

They also need to -- once they're done circulating, they need to date those petitions.  And we have to be very careful with the date because a date cannot be before the voter signs the petition.

Q.    And I apologize.  I missed a question.  I'd like to go back to the ten-day requirement.

A.    Sure.

Q.    Does the ten-day requirement apply to local and candidate petitions?

A.    No, it does not.

Q.    And does the circulator requirements apply to candidate and local petitions?

A.    No, it doesn't.

Q.    Okay.  Are there different roles that identification of the signer plays in the law between statewide and candidate and local petitions?

A.    Yes, there are.

Q.    And what are those?

A.    The difference between the candidates and the state

initiative petitions is that in the state initiative petitions, the signer needs to provide either their Florida driver's license or the last four numbers of their social security.

Q. And what happens if either of those are not provided?

A. We have to -- if they are not provided at all, then we invalidate the petition.

I also want to say that there's another difference between --

THE COURT: No, ma'am. There's not a question pending. He'll ask you a question.

THE WITNESS: Oh, I'm sorry about that.

BY MR. ROSENTHAL:

Q. And if there is a number for the social security or the driver's license number that is provided that doesn't match your record, what do you do?

A. That's when staff has to refer that petition to upper management. Upper management is the only staff that is -- has access to DAVID. We go ahead and we access DAVID, and we check to see if perhaps a driver's license has changed. If we confirm that it indeed is the same voter, we update the driver's license in the voter registration, and we continue processing the petition. If the driver's license does not match, then we have to invalidate the petition.

Q. Are you able to access DAVID to confirm a social security number that you don't have on file?

A.    Yes, we can.  On DAVID we have -- we can go ahead and confirm driver's license, social security, the last four, date of births, names, and address.

Q.    Okay.  Are there different requirements related to county or misfiled petitions for statewide petitions?

A.    Yes, there are.

Q.    And what are those requirements?

A.    So for state initiative petitions we receive -- when we receive them, we look up the voter in our database.  If the voter is registered and active in another county, we do not process that petition.  Staff has to put that petition aside.

When we quality-assure those petitions, we confirm that the voter is indeed registered in another county, and those are considered misfiled petitions.  So those petitions, again, we need to report them to the State, so they need to be scanned, reported to the State.

Additionally, because we want to make sure that the sponsor receives these petitions timely, we go ahead and stamp the date that we received those petitions, because we don't want -- to be fair, we don't want the other county to report them as late, because they're going to be late by the time we get it.

So we do date stamp it, and then we send the originals along with the letter to the sponsor, and we indicate also what county each voter belongs to.  We send that, so our office incurs postage, and we send that as soon as possible.  So as

soon as we certify the petition, we go ahead and send that to the sponsor.

Q.   And do you have to go through those processes for candidate or local petitions?

A.   No, we do not.

Q.   Okay.  Is there a difference in the time frame you have to review candidate and local petitions and statewide petitions?

A.   Yes, there are.

Q.   And what's that do?

A.   So for candidate petitions they usually let us know -- and these are much smaller quantities.  Some, for example, municipalities only require ten valid petitions, so they usually tell us that we have a week; we can do that within a day.

For state initiative petitions, anything that is turned in prior to December 1st our office has 60 days to process.

Now, after December 1st, our office only has 30 days to process, and the numbers are in much higher quantities.

Q.   Okay.  After a statewide petition is verified by your office, do you have to take any special steps for those petitions?

A.   After -- I'm sorry.  Can you repeat the question?

Q.   After a statewide petition is verified by your office, do you have to take any special steps for those petitions as it relates to the person who signed the petition?

A.   Yes, we do.

Like, for example -- if I understand the question correctly -- we need to check that the petition has the name, address. It has to have a county -- which the municipal petitions or the local initiative petitions, they don't have to have a county.

They need to be signed, dated. They need to be provided either the date of birth or their Florida voter registration number, and it also needs to be signed -- the circulator needs to sign and date these petitions.

Q. Do you also have to provide a notification to the voter for these petitions?

A. Yes. So once we verify that the petition is valid, and we quality-assure this petition, we go ahead and print the letters letting the voters know that we received the petition and the petition was accepted, and we do that daily.

Sometimes we incur overtime because we have to wait until the petitions have been processed and quality assured, so our mailroom has to wait for us to print those letters, and then they have to go ahead and insert the letters and then take them to the post office.

Q. And does that letter process apply to candidate and local petitions?

A. No, it does not.

Q. Okay. And after you verified statewide petitions, do you have to provide notification to any statewide agencies?

A.   Yes, we do.

Prior to December 1st we do need to post on our website the total number of petitions received for that period -- and that's monthly -- the number of valid petitions, the number of invalid petitions, and the total number of petitions that we have received for the particular state initiatives.  That's prior to December 1st.

Also we need to report -- if there's an aggregate number of more than 25 percent invalid petitions, we need to do a report to the office of OECS monthly.

After December 1st, both of those options have to be done weekly.

Q.   And do those notification requirements apply to candidate or local petitions?

A.   No, it does not.

Q.   Okay.  And what happens with the petitions that your office has received and processed at the end of the petition cycle?

A.   For state initiative petitions -- and that's what we're working on right now -- we have to send all those back to the State in boxes, and they have to receive it by March 15th.  So right now that's what we're working on in our office.

Q.   Given all these differences in the rules between candidate and local petitions and statewide petitions, are there any differences in the processes that your office has had to come up with in order to process these petitions?

A.   Yes.

Q.   And what are some of those differences in the processes?

A.   So, for example, with the ten-day rule, the batches were smaller that we received, but we still had to do a lot of organization.  In other words, we have to remove the petitions from the boxes, and we have to sort them by circulator.

Why do we have to sort them by circulator?  Because it's easier for staff to process.  It leads to less errors, and we want to minimize errors in our office.

The marijuana petition was just a 25-01, had five pages.  We had to make sure that each petition had the five pages.  If the petition didn't have five pages, we have to put them aside because that's an invalidation.  We have to invalidate because the petition is not complete.

And we also have to make sure that the circulator's there.  After we finish batching the petitions, we count them in batches of 50.  We do a total count, and we confirm if that's what the sponsor provided payment for.

If the sponsor did not provide enough payment, we would contact the sponsor.  And they're very receptive -- I do want to say that -- the sponsor is very receptive.  We never had an issue with a sponsor, and we would let them know if they were short or not.  We would continue sorting those petitions.  After sorting, we would have to give it to the person that's going to be doing the scanning.

Now, for these petitions the scanning needed to be -- we needed to do, like, a special -- let me see -- we had to more or less operate the scanner differently because we need to go ahead and put the external batch, the internal batch, when the petition is considered late. We don't have to do that with the local initiatives.

So after it scans, then we give it to a Supervisor that's well versed in Excel, and we have to add every single circulator and then we have to check with the State website if the circulator is valid or invalid at the time that they circulated the petition.

Believe it or not, a thousand petitions could take up to two days between the scanning and the sorting and the adding of the petition's name to the database. Once it's added into the database, we print cover sheets for the petitions. That way staff knows when the petition was received, et cetera.

The cover sheets also are for misfiled petitions, which are the out-of-county petitions, and also we have a cover sheet for the late petitions. So all that is preparation and staff still hasn't processed the petitions.

After all that is done, we go ahead and start assigning a batch to each person to process. They process that petition and then we quality assure. After we confirm that there's minimal errors or no errors -- because that is our goal, that there's no errors -- we certify the petition electronically to the State.

Q.   So given those differences in rules and processes, is there differences in the time it takes you to process candidate and local petitions and to process statewide petitions?

A.   Yes, there's major differences.

Like I said before, candidate petitions, we could do them within a day, but for state initiative petitions, a batch of a thousand, it will take us -- between the organization and everything, it could take us up to four or five days, depending.

Q.   Okay.  I'd like to talk about the volume of statewide petitions that you receive versus candidate and local petitions.

Approximately what percentage of the petitions you receive in your office are for statewide initiative petitions?

A.   This year we had about 85 percent that were statewide petitions.

Q.   And is that consistent over time or is that a number that changes?

A.   It's consistent.  It could range, 80, but it's more or less consistent.

Q.   Okay.  And are there differences in the validity rates between statewide petitions and candidate and local petitions?

A.   Yes, there are.

Q.   And what are those differences in the validity rates?

A.   Okay.  For state initiative petition this year the validity rate was at a 46 percent, which it improved from 2022, which they were at 40 percent.  So we saw an improvement in the

validity rate.

For local candidates, if it's a municipality, it's maybe a 95 percent. And if it's, like, a local initiative, it could be like an 85 percent validity rate.

Q. Okay. Let's talk a little bit about the resources that are required based on the differences in the candidate and local petitions and the statewide petitions.

Do processing statewide petitions require different resources than the candidate and local petitions?

A. Yes, they do.

Q. And could you explain how the staffing differs between candidate and local petitions and statewide petitions?

A. For candidate and local initiatives, we can handle the petitions with permanent staff with no overtime. Basically we work 8 to 5, and we're able to process everything timely, et cetera.

Now, with state initiative petition, due to the volume and all the requirements, we do need to hire temporary staff and we do incur overtime, permanent employees and also for temporary employees.

Q. Did you hire temporary workers to assist with statewide initiative petitions in this cycle?

A. Yes. We had to hire -- we had anywhere between 10 to 15 employees, temporary employees, during this cycle.

Q. And when were those employees hired?

A.    They began working in our office on September 22nd.  We brought them a week earlier because we wanted to provide enough training.  They went through a whole week of extensive training.

And they are still in our office because right now they are preparing the boxes to send to the State.

Q.    You mentioned you were involved in budgeting for this function.

How much money did it cost your office to hire those temporary workers during this cycle?

A.    Okay.  So right now we have spent up to $285,000.  That's not including the last month, January, which is the most expensive months, and also we incurred $15,000 in overtime for permanent employees.

Q.    And was that focused on all the petitions in the cycle or primarily only a few of the petitions in the cycle?

A.    The -- primarily it was the 25-01, which is the marijuana petition.

Q.    Okay.  And is that unusual to only have one active petition in a cycle?

A.    No, it's -- it is unusual.  I can tell you in 2022, we had three major petitions, so this year was unusual.

Q.    Does the lack of foreknowledge as to how many petitions you're going to have in a cycle, how much cost you're going to have for temporary and overtime employees affect your ability to budget for any particular year?

A.   Yes, it does.  We have to be very careful.  As a matter of fact, I was just looking at the numbers.

When we did the budget for this year, we allocated 410,000 in budget for temporary help.  Why?  Because we based our numbers on back in 2022.

For the Office of the Supervisor of Elections, it's better to ask for money ahead of time than to go ahead and request for money because you ran out of money.

So when we're doing our budget, we need to make sure that we put in enough money because we don't want our Supervisor of Elections to go to the Board of County Commissioners to ask for more money.  So we have to be very analytical, and we have to develop the budget properly.

Q.   Okay.  I'd like to talk now specifically about Florida Decides Healthcare, which is the Medicaid initiative 18-16.

If I say Florida Decides Healthcare, would you understand it to be the Medicaid initiative?

A.   Understood, yes.

Q.   And if I say Smart & Safe Florida, would you understand that to be the marijuana initiative 25-1?

A.   Yes, sir.

Q.   For Florida Decides Healthcare, approximately how many petitions were received by that sponsor?

A.   Almost 20,000 petitions.

Q.   Did the sponsors cease submitting petitions at some point?

Direct Examination - Supervisor Molina

A.    Yes.  We did not receive any more petitions from them after -- I think the last time they turned in petitions was July 17th.

Q.    Okay.  And at what point did the office change the fees that were charged to these petition gatherers in relation to HB 1205?

A.    Our office did not start charging the new fee until October 1st.

Q.    So what fee was charged to all the petitions submitted by Florida Decides Healthcare?

A.    $1.15.

Q.    And that was the fee prior to HB 1205?

A.    Yes, it was.

Q.    Did Florida Decides Healthcare ever have a problem submitting those -- that fee for those petitions?

A.    No, they did not.

Q.    Did Florida Decides Healthcare ever complain that $1.15 was too much money to submit for those petitions?

A.    We never received a complaint, no.

Q.    If you received a petition that was self-circulated, how would you tell Florida Decides Healthcare that you received a self-circulated petition and they needed to pay the petition fees?

A.    So those are personal petitions, and we would go ahead -- we had a very good communication for all the sponsors.  I do

want to state that.

We would email the sponsor to let them know that we have received X amount of personal petitions, and they would go ahead and provide us with money.

Q. Did Florida Decides Healthcare ever overpay for petitions?

A. Yes, they did. The last petition batch that they sent, they did pay at 3.82. We did not charge the 3.82, so at the end of the cycle, which we prepared right now a memo to sent -- be sent to our finance department to reimburse them money.

So again, their petitions were all charged $1.15, so they have money now coming their way.

Q. Thank you.

And for Smart & Safe Florida, how many petitions did Smart & Safe submit to your office?

A. About 106,000.

Q. And what fees did the sponsor for Smart & Safe pay for those petitions?

A. So, again, anything that was mailed prior to October 1st they paid at a $1.15. Anything after October 1st they paid at 3.82.

Q. And of those 100,000, when was the deadline for you to report the verification of the petitions under the -- under HB 1205 in the constitution?

A. We have to have everything certified by 5 p.m. February 1st, which was a Sunday.

Q.   Okay.  And when did Smart & Safe stop submitting petitions to your office?

A.   We received about a thousand that Friday.  So that made us -- that made us incur overtime.  We had not planned to have to work both Saturday and Sunday.  But we do have to bring the 15 temps, all permanent staff, because we wanted to make sure that we processed, quality assured and certified those 1,000 petitions.

Q.   Did Smart & Safe Florida ever complain about either the prior fee or the current fee?

A.   No, they did not.

Q.   And did Smart -- how did Smart & Safe pay for those fees?

A.   They pay by check.  As a matter of fact, in December they sent us a check for, like, $20,000, which we sort of freaked out because we thought that we would be getting a whole bunch of petitions.  We contacted the sponsor and they wanted to let us know that they just wanted to make sure they had enough money in their account in case we received, you know, petitions from, like, personal use or to cover all the ones that we were going to be receiving at the end of the cycle.

Q.   Okay.

A.   So --

Q.   Do you ever charge a difference in the petition verification fee for statewide petitions based on the contents of the petitions?

A.   No, we do not.  To be honest with you, our staff is, like, tunnel-vision.  We don't read the petition.  We don't have time to read the petition.  We focus our attention on the requirements.

We do not read all the petitions.  We only read them as of order at the end if they make it to the ballot.  But we do not read the petitions, so we don't --

Q.   Okay.

MR. ROSENTHAL:  No further question, Your Honor.

THE COURT:  Mr. Jazil.

MR. JAZIL:  Your Honor, if I may briefly.

THE COURT:  Certainly.

DIRECT EXAMINATION

BY MR. JAZIL:

Q.   Morning, ma'am.

A.   Good morning.

Q.   Mohammad Jazil for the Secretary of State's Office.

Ma'am, if I understood your testimony correctly, you are familiar with the ten-day return deadline for petitions?

A.   Yes, I am.

Q.   And you worked at the Supervisor of Elections office prior to HB 1205 coming into the law; did I understand that?

A.   Yes, I did.

Q.   So are you also familiar with the 30-day return deadline for petitions that applied before HB 1205?

A.    Yes.

Q.    So here's my question for you:  Do you prefer the ten-day rule return deadline or the 30-day return deadline?

A.    Okay.  So to be honest with you, we were a little skeptical when, you know, the change was from 30 to 10, but now that we experience the 10, we prefer the 10.

Why?  Because the batches that we received are smaller and we are able to go ahead and plan, and -- instead of getting a surprise batch of 30,000 petitions, let's say, every 30 days. And we also find that with the 10 days there's not that many late petitions.

So, it's -- I think it's a good idea, the 10 days versus the 30 days.

MR. JAZIL:  Thank you.  No further questions.

THE COURT:  Anybody else from the defense?

Mr. Stafford, how long do you need?

MR. STAFFORD:  About 30 minutes, Your Honor.

THE COURT:  We'll go ahead and take a break, then.

All right.  Thank you.

(Recess taken at 10:38 AM.)

(Resumed at 10:49 AM.)

THE COURT:  All right.  We are on the record.

Counsel, you can begin your cross-examination.

CROSS-EXAMINATION

BY MR. STAFFORD:

Q.   Good morning, Mr. Molina.

You testified that the Miami-Dade Supervisor's office receives more statewide petitions to verify than it does candidate petitions; right?

A.   Yes, I did.

Q.   And more statewide petitions than local-issue petitions?

A.   Yes.

Q.   To confirm, verification fees are charged on a per-petition basis; right?

A.   Exactly.

Q.   Not based on the total number of petitions received?

A.   For state initiative petitions?

Q.   For any of those kinds of initiative or other petitions?

A.   Yes, it's per signature.

Q.   Now, all employees in your office who verify petitions have been trained on the process of doing so; correct?

A.   Yes, they have.

Q.   They all take State-required training required of employees verifying voter signatures?

A.   Yes, they do.

Q.   And you don't think that State-mandated training is inadequate, do you?

A.   No, I don't.

Q.   Now, with regard to statewide petitions, I want to make sure we understand the basic steps of the process.

First your office sorts and counts the petitions; correct?

A.   Yes, correct.

Q.   Next it prepares cover sheets and enters petitions into the voter registration system?

A.   No, we scan the petitions first after we sort them.

Q.   So that you can enter them into the voter registration system?

A.   Yes.  Well, into the database -- into an Excel spreadsheet and then into the voter registration.

Q.   Okay.  Then an employee in the office processes the petitions --

A.   Yes.

Q.   -- to determine whether the petition has all the required information on the form and it's signed by the voter?

A.   By the voter and the circulator.

Q.   A different employee then does quality assurance for all the petitions?

A.   A more experienced employee, yes.

Q.   And then, finally, the Supervisor reviews and certifies the petitions?

A.   The management, not the Supervisor of Elections. Management reviews, and we certify the petitions, yes.

Q.   Now, with regard to the process to verify candidate and

local-issue petitions, you segregate those petitions so they can be reviewed once they come into your office?

A.    Yes, we go ahead and we segregate them.  We also batch them in batches of 50, and we process those petitions.

Q.    And by processing them, you have to look them all up in the voter registration system?

A.    Yes.  Since they are candidate petitions, they are run by districts.  So we only have to look them up in the local database.  If they are not registered in Miami-Dade County, they are considered not registered.

Q.    So you have to determine whether all those petitions also have all the required information and the voter has signed it?

A.    Exactly, but the required information is much less.  They just need to have a name, an address, either the Florida voter registration number or date of birth, and it has to be signed and dated.

Q.    And your office has to look up all that information and make sure it matches?

A.    Yes, we do.

Q.    And you have to determine whether the voter resides in the county, district, or other area sought by a candidate, for example, for a candidate petition?

A.    Yes.  For example, the candidates, they run by districts.  So, again, we only have to confirm it in the local database.  There is two databases, local and Florida voter registration

system.

So for candidate petitions, we only search locally.  So if they are registered in Miami-Dade County, but they are not registered in the district, that's considered wrong district. If they are not registered in Miami-Dade County, that's considered not registered.

Q.   And then once the first employee has processed a petition, there is a quality assurance for candidate and local-issue petitions?

A.   Yes, we do.

Q.   And another more experienced employee also reviews those petitions?

A.   Exactly.

Q.   And then the same process where then they are reviewed and certificated at the end of the process?

A.    It's not the same process between the state initiatives and the local or candidate petitions.

Q.   Let me clarify my question.

A.   Yes.

Q.   Once the quality assurance is done, then there is a process of certifying the petition --

A.   Yes, there is.

Q.   -- correct?

A.   Yes, correct.

Q.   Now, your office currently charges 10 cents to verify a

local-issue initiative petition; is that correct?

A.    Yes.

Q.    And it charges 10 cents to verify a candidate petition?

A.    Yes.

Q.    And it charges 3.88 to verify a statewide initiative petition?

A.    3.82.

Q.    3.82.  Thank you.

A.    Yes.

Q.    And you announced that 3.82-figure would be the new charge on July 25th of 2025; am I right about that?

A.    No, I did not say that.

Q.    Didn't you announce that that would be the charge effective October 1st?

A.    October 1st, yes, not in July.

Q.    And you announced that on July 25th, 2025, that the 3.82 figure would be effective October 1st, 2025; is that correct?

A.    We posted it on our website.  We had maybe two or three different, and we finally agreed that the 3.82 was going to be the cost.

Q.    Well, let me ask you about that so we've got a clear record.

    On June 27th, 2025, your office initially posted that it would be raising the cost to 3.88; is that right?

A.    Yes.

Q.   And then on July 9th, 2025, your office announced that it would raise the cost to 4.45; is that correct?

A.   Yes.

Q.   And then on July 25th, 2025, the final figure of 3.82 was announced?

A.   Yes.

Q.   Okay.  Now, I think you said that you are responsible for the operating budget for petitions; is that correct?

A.   I assist.  I'm not responsible.  We have a Deputy Supervisor of Elections.

Q.   So you're familiar with the budget?

A.   I'm becoming familiar, yes.

Q.   Okay.  And your office prepares a series of calculations to determine what the current petition verification fee will be for statewide initiatives; right?

A.   Yes, we try our best.

Q.   And you do that by creating a petition cost flowchart setting out calculations?

A.   Yes.

Q.   Okay.  And when your office updates the petition verification fee, you create a new version of that flowchart?

A.   Yes, we do.

Q.   So, for example, to calculate costs, your office estimates how long it takes various kinds of employees to complete verification steps?

A.   All the steps, yes.

Q.   And each kind of employee is paid at a different salary rate; right?

A.   Yes.

Q.   You have one rate for temporary employees?

A.   Yes, we do.

Q.   One rate for election support specialists?

A.   Yes.

Q.   One rate for a supervisor?

A.   Yes.

Q.   One rate for ID verification?

A.   Yes.

Q.   A different rate for mail room staff?

A.   Exactly.

Q.   Immediately before HB 1205, I believe you said that there was a $1.15 cost to verify a statewide initiative petition?

A.   Yes.

Q.   Now, when we look at that $1.15 figure, it's fair to say that was an estimate; right?

A.   It was an estimate, yes.

Q.   Because it's based on estimates of how long it takes a given employee to complete a given task?

A.   Exactly.  And then 1205 was not in effect.

Q.   Am I correct that when your office calculates these estimates, both before and after HB 1205, your office uses

15-minute intervals; right?

A.    Yes, around 15 minutes.

Q.    So 15 minutes, 30 minutes, an hour, right --

A.    Yes.

Q.    -- are the delineations?

A.    Uh-huh.

Q.    So your office doesn't attempt to calculate how much staff spend down to the minute?

A.    No, we don't do it by minutes.

Q.    Okay.  Now, HB 1205 requires your office to follow some additional processes related to statewide ballot petitions; right?

A.    Yes.

Q.    And HB 1205 imposed some new costs on your office; correct?

A.    Yes, it does.

Q.    You are now required to verify each voter's driver's license or the last four digits of the social security number?

A.    Yes, we do.  If it doesn't match our database, yes.

Q.    And doing that takes staff time, so it adds to Miami-Dade's cost estimate for the verification fee?

A.    Yes, it does.

Q.    And that's not a process that's required of state or -- apologies.

      That is not a process required of local-issue or candidate petitions?

A.    No, it's not.

Q.    Now, HB 1205 -- actually, scratch that.

      You also talked about some overtime costs.

      Do you recall that testimony?

A.    Yes.

Q.    Now, your office is required by the State to verify statewide petitions within 60 days; is that correct?

A.    Yes.

Q.    And because the State imposes a deadline of 60 days, there might be occasions where your office works overtime to meet the deadline?

A.    Not for the 60 days.  Not for the 60 days.  We didn't have to work overtime for the 60 days.  We only worked overtime almost at the end.  We were very proactive.  We are very analytical.  We do not like to waste any money.

      So, basically, we do our calculations.  Our staff is very knowledgeable, and they are good workers, and we are able to do most of the work between 8:00 to 5:00.

      We only encounter overtime when we receive more petitions and they are closer to the deadline.  So the overtime is incurred more, like, when it's after December 1st, which is the 30 days.

Q.    Okay.  So before December 1st, 2025, your office did not work overtime --

A.    No.

Q.    -- to verify the petitions?

A.    No, they did not.

Q.    Okay.  Now, HB 1205 also imposes new costs on your office for processes that happen after your office has already verified a petition signature; is that correct?

A.    Yes.

Q.    So your office has to mail a notice to a voter whose petition your office has determined to be valid?

A.    Yes, we do.

Q.    And that means your office has to purchase the supplies necessary to mail those notices?

A.    Exactly.

Q.    Those supplies include envelopes?

A.    Yes.

Q.    Notification letters?

A.    Yes, the paper.

Q.    Postage?

A.    Yes.

Q.    Return envelopes?

A.    Yes.

Q.    Return postage?

A.    Yes.

Q.    Delivery costs?

A.    Delivery costs, it will be the overtime for the mailroom to deliver these to the post office.

Q.   Okay.  Scanning costs?

A.   Yes.

Q.   Data to store all that information?

A.   Yes.

Q.   Okay.  And those costs are added to the verification fee amount charged to sponsors of statewide initiatives; correct?

A.   Yes.

Q.   Your office also charges the estimated labor costs associated with sending these notices?

A.   Yes.

Q.   Notices are not mailed to voters who your office validates as signing local-issue or candidate petitions?

A.   No.

Q.   That's not a requirement the State has imposed?

A.   Exactly.

Q.   Until -- and under HB 1205, your office also has to electronically report data regarding statewide petition forms to the Division of Elections; right?

A.   Yes, we do.

Q.   That includes after your office has validated petitions?

A.   Yes.

Q.   So your office has to have all the petitions electronically scanned, as you said --

A.   Yes, we do.

Q.   -- is that correct?

And it has to transmit that data to the Division of Elections periodically?

A.   Yes, every time we certify a batch, we need to go ahead -- we actually send the text file along with the images to the State.

Q.   After you have already validated the petition?

A.   Exactly.

Q.   And those additional reporting processes take your office time to complete?

A.   Exactly.

Q.   And your office charges estimated labor costs associated with doing that post-verification work?

A.   Yes, some, yes.

Q.   Those additional reporting processes are not required with regard to local-issue or candidate petitions?

A.   No, they are not.

Q.   Okay.  Your office also has to periodically ship all statewide ballot petition forms that your office has received to the Division of Elections in hard copy; right?

A.   Exactly, at the end of the cycle, and that's what we're working on right now.

Q.   And there are labor and shipping costs associated with doing that work?

A.   There are labor, yes, and shipping costs.

Q.   You have got to ship these petitions in hard copy all the

way from Miami-Dade to Tallahassee?

A.    Yes, we do.  And we've done our research, and we try to use the least expensive, you know, route.

Q.    But given the number of voters in Miami-Dade County, is it fair to say your county may be shipping many thousands of petitions from Miami-Dade to Tallahassee?

A.    Yes, we -- approximately 127,000 petitions have to be sent.

Q.    These are 127,000 multipage petitions?

A.    Well, the only sponsor that had a multipage was 25-01.  The rest had one page.

Q.    Okay.  So hundreds of thousands of pieces of paper?

A.    Yes.

Q.    Many boxes of paper that you are mailing from Miami-Dade to Tallahassee?

A.    Yes.

Q.    That is a process that's conducted after your office is finished verifying the petitions at issue?

A.    Exactly.

Q.    And that's not a process that's required of a local-issue or candidate petitions?

A.    No, it's not.  When we do the local and the municipal, the city clerks actually pick up those petitions.  We don't incur any postage.

Q.    Okay.  And for candidate petitions, whether it's a statewide office or otherwise, all mailed?

A.   For state, we keep the petitions, and we just, you know, put them in record retention.  And, again, for municipal petitions, we go ahead and contact the city clerk, and they pick up those petitions.

Q.   Got it.  But none of them mailed from Miami-Dade to Tallahassee?

A.   No.

Q.   Okay.  So is it fair to say that HB 1205 makes it more time-consuming for your office to verify statewide ballot issue petitions as compared to local-issue and candidate petitions?

A.   I'm not here to say that.  We just have to follow whatever is required from us.

Q.   I understand.

But as a simple matter of fact, HB 1205 makes it more time-consuming.  There are more processes that your office has to follow; right?

A.   Exactly, yes.

Q.   And because of that HB 1205 makes it more costly for your office to verify statewide petitions as compared to local-issue and candidate petitions?

A.   Yes, it does.

Q.   HB 1205 authorizes your office to require sponsors of statewide petitions to bear additional costs?

A.   We are allowed to, yes.

Q.   And your office has used that authority to increase costs;

correct?

A.   Exactly.

Q.   And by contrast, your office cannot charge more than 10 cents to verify local-issue and candidate petitions?

A.   Exactly.  We have to follow what's in the Florida statute.

Q.   And your office's actual cost to verify candidate and local issue petitions is more than 10 ten cents, isn't it?

A.   Probably.  Again, we can process those petitions with our permanent employees, and we do not -- we don't access any overtime.

Q.   Okay.  Well, let me return to that in a moment.

A.   Uh-huh.

Q.   Now, your office is responsible for validating signatures of voters in a number of different contexts; right?

A.   Exactly.

Q.   We've talked about some of those contexts.

     Another example would be mail ballot envelopes; right?

A.   Exactly.

Q.   And your office validates voter signatures on mail ballot envelopes received by your office?

A.   Yes.

Q.   Your office receives many tens of thousands of mail ballots in an average election, I would imagine?

A.   From what I understand, yes, but I'm not well-versed in vote-by-mail.  That's not my forte.

Q.   Understood.  But you're familiar with that from your time in the office?

A.   Yes.

Q.   Voters don't pay a fee to your office to have their mail ballot envelopes -- for their signature verified on those?

A.   No, they do not.

Q.   Okay.  Now, your office pays the staff who validates signatures of voters on a salary basis, doesn't it?

A.   Can you repeat the question?

Q.   Your office pays the staff who validates signatures on a salary basis, doesn't it?

A.   No.

Q.   Does it pay some of the staff who verify petitions on a salary basis?

A.   If it's -- salaried employees are managers and assistant deputies.  Supervisors and election support specialists, they are hourly employees.

Q.   Understood.  And those folks are involved in verification of signatures --

A.   They are.

Q.   -- of statewide initiatives?

A.   Yes.

Q.   And they're paid on a salary basis?

A.   Yes.  For example, in my position, I've also processed petitions, and I'm salaried.  I don't get overtime pay.

Q.    And I think -- understood.

And I think, if I understood your testimony, salaried staff like you don't work exclusively on validation of statewide initiative petitions; right?

A.    We do have other job functions.  But to be honest with you, we -- if we have to meet a deadline, we do it ourselves.  Like, I have processed petitions.  I have quality-assured petitions.  I have certified petitions.

Q.    Understood.  But you also have other work over the course of a month or a year that you --

A.    Definitely, yes.

Q.    Okay.  Now, for purposes of calculating petition verification costs, your office reduces all salaries to an hourly rate?

A.    We don't take into consideration the salaries of, for example, employees like me.  We do only hourly employees.

Q.    The petition verification costs do not include the costs incurred by salaried employees in your office; that's your testimony?

A.    Except for the managers.

Q.    Right.  And the managers' salary --

A.    Yes.

Q.    -- if they are involved in the verification process, you reduce that to an hourly rate?

A.    Exactly.

Q.   Okay.  Now, let me ask you about how the staffing costs have changed in the recent years.

Ms. Molina, as -- am I correct that as of January 12, 2022, the lowest compensated employee in your office who was involved in verifying statewide petitions was paid the equivalent of 17.66 per hour?  Does that sound right?

A.   Or less, yeah.

Q.   I'm sorry?

A.   Yes.

Q.   Okay.  Thank you.

And the lowest hourly rate in your office of a person involved in the verification of statewide petitions, as of October 1st, 2025, was 28.70 per hour.  Does that sound right?

A.   Exactly.  That is the rate of the temporary employees, the agency.

Q.   Okay.  So that's more than an $11 increase in about a three-and-a-half-year period?

A.   Exactly.

Q.   Okay.  As of January 12, 2022, the highest compensated employee involved in the verification of statewide petitions in your office was paid the equivalent of 20.82 per hour; correct?

A.   Correct.

Q.   And as of July 25th, 2025, the highest hourly rate in your office of a person involved in the verification of statewide petitions was 42.93 per hour; right?

A.    That's correct.  Yes.

Q.    So that's an increase of more than $22 in a 35[sic]-year period per hour?

A.    Exactly.

Q.    Okay.  If we wanted to understand how a 28.70-per-hour rate translated to a fee-per-second rate, we could do some math to figure that out.

A.    Okay.

Q.    We could figure out how many seconds -- we could figure out how many seconds it takes to accrue 10 cents of cost at different hourly rates, couldn't we?

A.    I guess.

Q.    Now I'm not going to actually do this.  Don't worry.

A.    I don't have my calculator with me.

Q.    Instead, let me ask you this.

      Is it fair to say that staff whose hourly rate is 42.93 spend more than 10 seconds verifying a given signature in your office?

A.    Okay.  So that staff that gets paid the $42, they wouldn't be verifying signatures.  They would be either checking IDs and using the DAVID database or certifying these petitions.

Q.    Understood.

      And fair to say it takes them more than 10 seconds to complete their work with respect to statewide petitions?

A.    Most definitely, yes.

Q.   And is it fair to say that staff whose hourly rate is 28.70 spend more than 13 seconds for their role in validating or verifying a given signature?

A.   Yes.

Q.   And is it fair to say that it takes all the various staff involved in the process of verifying a local issue or candidate petition more than 13 seconds to do that work, soup to nuts?

A.   So local and candidate petitions?

Q.   Uh-huh.

A.   They could -- they could go ahead and do the research, because, remember, for candidate petitions there is not that many items that they need to check.  Notice I said that they only have to check the database locally.  They don't need to check the database in Florida.  They don't need to identify if that petitioner is registered, and they don't need to take out misfiled petitions or late petitions.

     So they could -- they could go ahead and do some research in seconds if they're fast enough.

Q.   But to batch the petitions, load them into the local registration system, verify the signature, do quality assurance, and certify the signature, that takes more than 13 seconds?

A.   Oh, most definitely, yes.

Q.   Okay.

A.   I'm talking about performing the research, let's say, in our database.

Q.   I understand.  Thank you for the clarification.

MR. STAFFORD:  No further questions at this time.

CROSS-EXAMINATION

BY MR. CLARK:

Q.   Good afternoon, Mr. Molina.  How are you?

A.   Fine.  Thank you.

Q.   I'm Christopher Clark, and I represent Smart & Safe Florida.

So first I want to thank you for reviewing all of our petitions that were sent in on February 1st.  Thank you.

During the course of reviewing initiative petitions this cycle, how did your office treat petitions signed by inactive voters?

A.   Okay.  So we were processing the petitions for all the voters, active and inactive.  And before we received an email from the State, those petitions were valid if they met all the requirements for those voters.

Q.   Okay.  As you sit here today, do you know if HB 1205 discussed inactive voters?

A.   As far as I know, no.

Q.   Okay.  And how did your office treat petitions gathered by nonresidents during this Court's injunction period?

And if you need the dates, I can provide them to you.

A.   What do you mean by "nonresidents"?

Q.   During the course of this case, this Court entered an

injunction that allowed nonresidents to collect initiative petitions. At some point in time, the Eleventh Circuit, for whatever reason, decided to stay that injunction, and nonresidents were no longer allowed to collect initiative petitions on behalf of sponsors.

HB 1205 does not allow nonresidents to collect petitions.

So my question to you is -- and I'll give you the dates -- for any petitions that were collected between July 8th and September 9th by nonresidents, how did your office treat them?

A.   Well, our office doesn't really know who the State has qualified or they have disqualified. What we do, whenever we are about to start processing a petition, we go into the State's website, and we download the list of circulators. And that list tells us if they are active or inactive or if they've been revoked. At the same time, our voter registration database tells us whether or not the circulator is active or inactive.

What our office did to avoid having to go back and forth is we told staff that whenever they were processing a petition and the database will tell them that the circulator was inactive to go see a manager, and the manager would confirm whether or not the circulator was active or inactive. And that prevented us from going back and forth.

Q.   So if someone signed a nonresident's petition between September 8th -- excuse me -- July 8th and September 9th and they were active in the State's database, you would have

verified that petition had met all the criteria; is that correct?

A.    We would have had, yes.

Q.    Okay.  After the Eleventh Circuit, again, for whatever reason, invalidated this Court's injunction, did Miami-Dade go back and invalidate any petitions that were collected by nonresidents?

A.    If we received State notification, we did.

        MR. CLARK:  Okay.  No further questions, Your Honor.

        Thank you.

                    CROSS-EXAMINATION

BY MR. MASTORIS:

Q.    Good morning, Ms. Molina.  George Mastoris on behalf of the League of Women Voters and LULAC.  Just a few questions for you.

        During your direct testimony, you testified to a number of differences between the requirements for statewide petitions on the one hand and candidate and local petitions on the other.

        Do you recall that testimony?

A.    Yes, I do.

Q.    You mentioned, for instance, the ten-day requirement which applies to ballot initiative petitions but not to candidate petitions; correct?

A.    Correct.

Q.    Is it also true that noncitizens are allowed to circulate for local or candidate petitions but are not allowed to

circulate for statewide ballot initiative petitions?

A.   I wouldn't know that.  As a matter of fact, we don't -- we don't deal with the circulators.  So that's something that the State requires.

Q.   So you have no idea whether the person who circulated a petition that you're verifying was actually a citizen or not a citizen in your office?

A.   For candidate petitions they don't -- we don't -- they don't require a circulator, so there's nothing that we need to do.

Q.   Right.  So you wouldn't be able to invalidate a candidate petition which had been circulated by a noncitizen; correct?

A.   We wouldn't know.  We wouldn't know.

Q.   So you wouldn't be able to invalidate it; right?

A.   Exactly.

Q.   And, similarly, you would not be able to invalidate a candidate petition which had been circulated by someone who was not a resident of Florida because you wouldn't know that either; correct?

A.   We wouldn't know that either.  We go based on what the State provides us on the listing of the circulators.

Q.   And one more question for you.

You wouldn't be able to validate or invalidate a petition which had been circulated by an individual who committed a felony and had not had his or her voting rights restored; right?

A.    Exactly.  Again, we have to go by what the State provides us.

Q.    Thank you very much.

A.    You're welcome.

THE COURT:  Anyone else on this side?

Redirect?

MR. ROSENTHAL:  No, Your Honor, thank you.

THE COURT:  Thank you, ma'am.  You may step down.

(Supervisor Molina exited the witness stand.)

THE COURT:  Mr. Bardos?

MR. BARDOS:  May I take a moment to move several exhibits into evidence?

THE COURT:  I'll only note that Mr. Clark wins the wordsmith award for the lawyers today, and I'm going to crib the phrase "for whatever reason" before I explain anything the Eleventh Circuit does in the future.

Counsel, you may proceed.

MR. BARDOS:  Thank you, Your Honor.

I'd like to move in the remainder of the Supervisors' unobjected-to exhibits, and I do have a list.

THE COURT:  If you'll hand me the list, please.

MR. BARDOS:  Some of these exhibits were initially unobjected to and others were objected to, but the objections have been withdrawn.

THE COURT:  All right.  And these are the

Supervisor -- let me make sure that I've got the correct section.

These are not DX exhibits; correct?

MR. BARDOS:  They are defendants' exhibits, yes, Your Honor.  At the very end of the consolidated defendants' exhibit list, yes.

THE COURT:  Ah, okay.  Because some of them were separate categories is why I was asking.

So I'm looking at ECF No. 621-1, and the following exhibits are admitted to which there were no objections: DX 1561, DX 1564, DX 1567, and DX 1568.

Additionally, the following exhibits are admitted with the plaintiffs having withdrawn their objections:  DX 1559, DX 1560, and DX 1563.

(DEFENDANTS' EXHIBITS 1559, 1560, 1561, 1563, 1564, 1567, & 1568:  Received in evidence.)

MR. BARDOS:  Thank you, Your Honor.

And if I could also, we've already filed our deposition designations, but I would move those into evidence as well.  They're at ECF 618-1.

THE COURT:  The designations, 16 -- I'm sorry -- 618-1 are admitted.

MR. BARDOS:  Thank you, Your Honor.

THE COURT:  You have the sheet?  Do you need it?

THE COURTROOM DEPUTY:  I got it.

THE COURT:  Anything else additional from the Supervisors?

MR. BARDOS:  No, Your Honor, thank you.

THE COURT:  Thank you.

Mr. Jazil, you've got Bridges up next?

MR. JAZIL:  Yes, Your Honor.

THE COURT:  Rather than split up the examination, I'm inclined to break for lunch early and come back at 12:30.

When I say "I'm inclined," it should be more clear. We are going to break now, and we will come back at 12:30. That's an hour and ten minutes for lunch.

I appreciate everybody's thoughtful presentation and hard work.

Court is in recess.

I'll see you back at 12:30.

(Recess taken at 11:20 AM.)

(Resumed at 12:34 PM.)

THE COURT:  All right.  Mr. Jazil, you've still got Mr. Bridges followed by Gladson; is that right?

MR. JAZIL:  Yes, Your Honor.

THE COURT:  You can call your next witness.

MR. JAZIL:  Jonathan Bridges, Your Honor.

(Mr. Bridges entered the witness stand.)

THE COURTROOM DEPUTY:  Please raise your right hand.

**JONATHAN BRIDGES, DEFENDANTS' WITNESS, DULY SWORN**

THE COURTROOM DEPUTY:  Please state your name for the record.

THE WITNESS:  Jonathan Walter Bridges.

THE COURTROOM DEPUTY:  Thank you.  Take your seat.

Just try to move your chair as close to the microphone as you can.

THE WITNESS:  Yes, ma'am.

DIRECT EXAMINATION

BY MR. JAZIL:

Q.   Good afternoon, Mr. Bridges.

You're a lawyer?

A.   Yes, sir.  Good afternoon.  I am.

Q.   Where did you go to school?

A.   I went to the University of North Carolina at Chapel Hill.

Q.   When did you graduate from there?

A.   I graduated in 2008.

Q.   And you did a clerkship after that?

A.   Yes, sir.  I clerked for the chief judge of the North Carolina Court of Appeals.

Q.   And then you worked in a state attorney's office; is that right?

A.   Yes, sir.  I moved to Florida after that and worked at the Broward County State Attorney's Office in the 17th Circuit for four years.

Q.   At some point you joined the Office of Statewide

Direct Examination – Mr. Bridges

Prosecution; right?

A.    I did.

Q.    And how long have you been with that office?

A.    I've been with our office about 11 years now, in April.

Q.    And what's your current title?

A.    I'm a chief assistant statewide prosecutor.

Q.    And what are your responsibilities as chief assistant statewide prosecutor?

A.    I supervise a number of attorneys and oversee staff in our West Palm Beach office as well as around the state.  I also lead a couple of different task forces that our office operates and leads throughout the state of Florida.

Q.    What task forces?

A.    Well, one is the election crimes task force.  I've been overseeing that for over two years now, I think, two and a half or so.

      And then I also oversee the organized retail crime task force that we operate throughout the state as well.

Q.    And as the head of the election crime task force, do all the other lawyers reporting in that office report to you?

A.    Yes, sir.

Q.    Sir, are you familiar with how records are kept in your office?

A.    I am.

Q.    Are you familiar with Chapter 119 of the Florida Statutes?

A.   Yes, sir, I am.

Q.   Briefly, what's your understanding of the obligations 119 puts on your office?

A.   We have a legal obligation to maintain records and produce records upon request; we can't alter those records; we can't destroy those records because they are a public record.

Q.   And, sir, as the head of the election crimes task force, do you and your office investigate and prosecute election-related crimes?

A.   Yes, we do.

Q.   Has your office investigated and prosecuted crimes related to citizen initiative petitions?

A.   Yes, sir, we have.

Q.   And, briefly, tell us what kind of issues y'all have investigated and prosecuted.

A.   We have investigated and prosecuted cases involving identity theft, or the Florida Statute for it is the fraudulent use of personal identifying information.  We've investigated and prosecuted cases involving false affirmation or swearing on the petitions, of signing another person's name to the petitions, of altering or filling in information on the petitions.  We've investigated instances where petitioners were being paid per petition, which is also illegal under state statute.

Q.   Has your office ever investigated or prosecuted issues ballots related to deceased voters signing petitions?

A.   Yes.   I think of that under the larger group of identity theft cases.   There's been instances of deceased voters having their identities used, of, obviously, live voters having their identities used, of voters over the age of 60 having their identity used, all without their knowledge or consent.

Q.   Sir, when you're investigating these issues, do you investigate individuals who are suspected of committing these crimes?

A.   Yes, sir.

Q.   Do you investigate individuals who both -- who reside in the state of Florida or those who reside outside the state of Florida?

A.   Yes, we have.

MR. WERMUTH:   Objection, Your Honor.   I guess if we are going to start getting into specific individuals, you know, I will note that we have a certain universe of documents that have been produced by the State, and my understanding is all the individuals, you know, in those -- in those investigations, that there isn't any direct evidence that they are not residents.

THE COURT:   All right.   Your objection is noted.

Counsel, you may continue.

BY MR. JAZIL:

Q.   Have you also investigated business entities as part of your investigations into citizen initiative fraud?

A.   Yes, sir, we have.

Direct Examination – Mr. Bridges

Q.   Business entities within the state of Florida?

A.   Yes.

Q.   Business entities that might be outside of the state of Florida?

A.   Yes, sir.

Q.   And, sir, how, if at all, does your work differ when you are investigating someone within the state of Florida and someone outside of the state of Florida?

A.   Well, in general, it's easier to investigate individuals or entities that are within the state of Florida because our entities -- because our primary law enforcement investigators are Florida Department of Law Enforcement.  Their jurisdiction is within the state of Florida.  My jurisdiction is within the state of Florida.

So if I want to send a subpoena and enforce that subpoena, it's much easier for me to do within the state of Florida.  If I want to summon a witness to come and testify and give me evidence that I can use in a criminal investigation, that's much easier to do and accomplish within the state of Florida than going outside the state of Florida where I would have to take some additional steps.

Q.   So the work at your office, how does it begin?  How do you know to get the machinery rolling?

A.   You are talking about referrals?

So in particular with election crime cases, as I mentioned

before, we operate a task force in the state of Florida, and the primary members of that task force are the Department of State Office of the Election Crimes investigations, and FDLE, and then my office.

And typically the route that a case would take or a new investigation would take is we receive -- simultaneously to FDLE, we receive a referral from the Department of State.  And my understanding is they often get their information from the local Supervisors of Elections where there's been a voter outcry.  And I say that based on, you know, the evidence they present us.

FDLE will open an investigation on their end, and my office also opens a file or opens a formal investigation.  And we work together with FDLE; we provide them legal advice as they go through their investigation; we approve search warrants before they can be submitted to a judge; we review and approve arrest warrants before they can be submitted to a judge.  And the idea behind that is so that we are all on the same page when it comes time to file formal charges and provide, you know, opposing counsel with discovery and present the evidence in court.

Q.   Understood.

I'd like you to take a look at what we've marked as Defendant's Exhibit 331.

MR. JAZIL:  Your Honor, make I approach the witness with a copy?

THE COURT:  You may.

THE WITNESS:  Thank you.

BY MR. JAZIL:

Q.   Mr. Bridges, do you recognize this document?

A.   Yes, sir, I do.

Q.   How so?

A.   This is an email with several attachments that I received from the Department of State back in October of 2023, and this is kind of what we were just talking about with the referrals.

Q.   So this is an example of a referral?

A.   Yes, it is.

Q.   And is this the kind of record your office would maintain as part of its work?

A.   It is.  This would go in our file and become part of the records that we are obligated to keen.

MR. JAZIL:  Your Honor, I'd move Defendant's Exhibit 331 into evidence.

MR. WERMUTH:  Plaintiffs object to this exhibit as -- as not as public record and it has hearsay within hearsay issues.

MR. JAZIL:  Your Honor, two points.  One, I'm putting it in for the fact that it is an example of a referral that gets the machinery rolling, so a nonhearsay purpose.

And, two, I think he's also laid the foundation for a 803.8.  It's part of the activities of the office; they have a

legal obligation to keep this as -- under Chapter 119.

MR. WERMUTH:  This is a complaint from another agency. The issue is the statements must be based on the personal knowledge of the preparer or upon information provided from a duty to report.

This information is coming from a different source than the Attorney General's office.  They haven't demonstrated there was a duty to report this.

And then the hearsay within hearsay isn't cured by whether it's a public record or not.

And it contains statements that they are trying to use for the truth of the matter asserted.

MR. JAZIL:  Your Honor, I haven't used the statement for the truth of the matter asserted.  As I laid out before, it's an example of a referral.  These are the referrals that the office gets; these are referrals that the office keeps as part of its legal obligation.

THE COURT:  First, let me say that public records exception doesn't sweep so far as to suggest that anything that is forwarded and then held in a file by a statewide prosecutor or any other state agency automatically becomes a public record. That's just starting globally everything that comes in isn't automatically transformed into a public record.

Number two, as discussed previously, just because something can be a public record doesn't mean everything --

every subset and every statement within a record becomes a public record.

The idea that we've got -- and I want to hear from counsel.  If you are not entering it for the statement -- for the truth of the matter asserted, but as an example of the type of information received that they act on, that doesn't mean you can wholesale then introduce, or produce, or admit 50,000 page.

But what says you to the, Judge, it's being offered not for the truth of the matter asserted, but as an example of the type of information that we receive that results in us commencing an investigation?

Mr. Wermuth?

MR. WERMUTH:  What do I say about this?

THE COURT:  Yeah.  That would be another, Judge, we are not offering it for the truth of the matter asserted; we are offering it for the type of information we receive.

MR. WERMUTH:  Well, they are clearly making statements about their impressions of what it shows.  These are hearsay statements on the part of the underlying individual who is sending the email.

And in terms of it -- you know, going back to the public records issue, in order for this to be some sort of investigative file that would come in, it would need to be a real finding, a finding by an entity that --

THE COURT:  You already won on that argument.  So I

was asking for the response to, essentially, Judge, we are not offering what we are talking about as hearsay; we are offering it for truth of the matter asserted; we are just offering it to explain our actions?

MR. WERMUTH:  What is the relevance?  It's cumulative of the other information they are trying to get into evidence. And they are clearly trying to use it for a nonhearsay -- for a hearsay purpose.

THE COURT:  Anything additional, Mr. Jazil?

MR. JAZIL:  No, Your Honor.

THE COURT:  All right.  It's not a public record. Public records don't -- do you have any authority that suggests public records sweep that far, that exception to hearsay?

MR. JAZIL:  Not off the top of my head, Your Honor.

THE COURT:  All right.  If you can give me any authority that suggests that the exception to hearsay will sweep that far, I'll certainly review it.  I'm not aware of any such case law.

And it's also -- I agree with Mr. Wermuth's thoughtful arguments.  Just by saying it's not offered for the truth of the matter asserted doesn't mean you wholesale or get in documents. What you can do is ask this witness, Can you give me an example? Yes, we've got a referral for John Brown suggesting they did X. What did you do?

In that basis, while you cannot -- and the general

exception, for example, law enforcement taking action -- and there's -- case law is Legion coming from the Eleventh Circuit and happens in this courtroom every day in criminal prosecutions, you can ask somebody, What did you do?  We got a BOLO that said X.  That doesn't mean you get to give a two-hour narrative description of every bit of information every law enforcement officer ever received, but you can give general information that you received to then explain the conduct of law enforcement in response.

So you can do that, but that doesn't mean you get to wholesale introduce voluminous records, then, to explain what actions you took.

So the objection of the plaintiffs are well-taken. Sustained.

MR. JAZIL:  Your Honor, it's -- it's not in even to show that there was a referral?

THE COURT:  No, because he's also right that it's cumulative.  You can say, We got a referral.  I was trying to give you an example of what you can.

You can ask this witness if it refreshes his recollection:  Did you get a referral X?

Yes, we got a referral to John Brown.

What did it say?

John Brown likes to use dead people's identities.

What did you do?

We investigated.

So you can certainly introduce the underlying information.  I was trying to explain and offer an example of how you can do that, and I was recognizing that you can do that, as I allow federal prosecutors to do the very thing in this courtroom week on and week off, to -- that doesn't bar the information from being introduced based on a hearsay objection.

MR. JAZIL:  Understood, Your Honor.

BY MR. JAZIL:

Q.   Mr. Bridges, in your time at the Office of Election Crimes and Security -- in your time at the Office of Statewide Prosecution and heading up the task force on election-related crime, how many referrals have you gotten from the Department of State for the petition-related fraud issues?

A.   I don't know the exact number, but it is dozens upon dozens, possibly in the hundreds.

Q.   Possibly in the hundreds.  Okay.

Did y'all get a referral for someone named Rakia Pope?

A.   Yes, sir.

Q.   Do you know this petition circulator named Rakia Pope?

MR. WERMUTH:  Objection, Your Honor.

We -- this goes to the motion in limine issue to the extent that they're claiming that they are --

THE COURT:  Let me make plain, unless this was information that was withheld based on the assertion of

privilege, it falls outside the ambit of my ruling, but if it's -- so if --

MR. JAZIL:  It was disclosed, Your Honor.  It was disclosed.  The referral itself is disclosed in --

THE COURT:  Then I've already ruled it doesn't fall within the scope of the privilege.

MR. WERMUTH:  Well, I have to maintain my objection on that.

THE COURT:  You have maintained your objection.

Let me make plain, under Rule 103 I made a -- this is a definitive ruling so we don't have to have the same discussion over and over and over, and you haven't waived your objection.

I've already ruled that the -- both the agreed-to protective order, as well as this Court's ruling on the motion in limine, extends only to documents that were withheld or information that was withheld based on assertion of privilege. The government can't use it as a sword and a shield.  You can't not disclose information and then try to introduce the information to justify your actions at trial.

However, if you turn over documents, that is, the information that's being discussed and introduced has been disclosed, it doesn't fall within the ambit of this Court's prior ruling, which, as I noted before on the record, deals with documents that were withheld or information that was withheld.

MR. WERMUTH:  I guess the issue that -- I want to be

crystal clear about what I'm doing here.  There are documents on the privilege log of the Secretary of State that refer to this individual, and so the problem we've got is partial disclosure. It's a problem with sword and shield occurring.  They are talking about the referral; they are not giving us the case files.

THE COURT:  All right.  I -- actually, the bigger problem would have been an objection earlier -- that wasn't made -- to generalized discussions of, We've got all these claims from all these different sources, and we have testimony in the global sense, and then we've only turned over part of the information.  That does, arguably, fall within the ambit of running afoul of the sword and shield.

But the question also becomes, Can you give me an example of a referral?  And if he sticks to the information that was disclosed, I find it doesn't violate either the spirit or the letter of this Court's ruling.

So if Mr. Jazil wants to ask him about a question regarding a document that was turned over, then I'm going to permit him to do that.

And your objection stands.

MR. WERMUTH:  Yeah.  I guess the problem is we don't know what wasn't --

THE COURT:  I understand.  Your objection has been made, and just like Mr. Mastoris used the objection in *A Few*

*Good Men*, you've strenuously objected, but I've ruled, and we are going to move on.

But I'll tell Mr. Jazil that I'm going to cabin things. Just as I said that you don't get in documents wholesale by just rubber stamping them, public records, you also cannot circumvent either the protective order that you agreed to or this Court's ruling.

But if you are going to ask him about -- limited questions about what was turned over and not try to backdoor in information that the other side can possibly question about because you didn't turn over the information, then I need to know. Otherwise, that is the scope of my ruling. If you believe Mr. Jazil has gone beyond that, let me know.

Counsel.

BY MR. JAZIL:

Q.   Mr. Bridges, based on that referral for Rakia Pope --

THE COURT:  How do you spell his last name?

THE COURT REPORTER:  Actually, the first name too.

THE COURT:  Rakia.

MR. JAZIL:  Rakia is R-a-k-i-a; Pope, P-o-p-e.

THE COURT:  Thank you.

Go ahead.

BY MR. JAZIL:

Q.   Okay. So y'all got the referral for Rakia Pope.
     What did you investigate and charge Pope with?

A.     So Ms. Pope was a petition circulator gathering petitions on behalf of Smart & Safe for the 22-05 initiative, I believe, and our investigation revealed that --

MR. WERMUTH:  Objection.  Foundation.

THE COURT:  Overruled.

THE WITNESS:  -- that she had been, I guess, temporarily residing in the Jacksonville area.

FDLE went out and interviewed the voters whose names and information was used on the petition forms that, you know, Ms. Pope turned in without having the voters actually sign those forms.  They also went out and interviewed the company she worked for called Exedo Execs (phonetic) and learned that she had gone back to where she was from, which is Atlanta, Georgia.

MR. WERMUTH:  Objection.  Hearsay.

THE COURT:  Overruled.

He's -- what I'm allowing him to do is in a nonnarrative way generally summarize the information that was provided because he said it then led to charges, because he's then going to -- I believe, Mr. Jazil, you are representing to me he's then going to say, We filed charges in light of what I'm summarizing that was given to us from FDLE.

MR. JAZIL:  Yes, Your Honor.

THE COURT:  All right.  We are not going to -- other than the general summary, I've sustained the objection.

BY MR. JAZIL:

Q.   So what did y'all do after the investigation?

A.   FDLE presented us with an arrest affidavit.  We approved it to go to the judge.  It was signed, and Ms. Pope was arrested and charged with, I want to say, around five counts of identity theft.

Q.   Do you know a petition circulator named George Andrews?

A.   Yes, sir.

Q.   How do you know George Andrews?

A.   Mr. Andrews was circulating petitions for the abortion initiative, the Floridians Protecting Freedom group, and he and his roommate, Jamie Johnson -- we received a referral from Department of State through -- and then FDLE opened an investigation on both of these individuals.

Q.   Did you end up charging Andrews?

A.   Yes, we did.  We charged Mr. Andrews and his roommate, Mr. Johnson, with identity theft and false affirmation, I believe.

Q.   Do you know a petition circulator named Alexandria Tatem?

A.   Yes.  Ms. Tatem was a circulator gathering petitions -- I'm having a hard time remembering exactly which initiative that was for.

Q.   Did y'all charge --

          MR. WERMUTH:  Objection, Your Honor.

          It's the same issue again.  Ms. Tatem is listed

multiple times on the -- hundreds of times on the privilege log, and her case file has been withheld from us in this matter.

THE COURT: I'm allowing -- I want to make plain for the record what I'm allowing in is a brief description of, We got a referral; the referral related to X, and we charged this person.

I'm allowing the evidence in because it comes -- A, he's allowed to describe the process, which he's done, about how the case got to the statewide prosecutor. He's now offering examples of cases where, based on referrals from the Secretary of State and investigation of FDLE, people were charged and examples of what they were charged with. That type of information, as I understand, related to these individuals is part of the records that were turned over.

Mr. Jazil, correct?

MR. JAZIL: Yes, Your Honor.

THE COURT: And so I understand the plaintiffs' position, Well, Judge, we weren't able to challenge the underlying investigation and the details of those investigations, hence the sword-and-shield argument regarding privilege.

A few things. Part of this depends on -- that is, part of the Court's rulings would also turn on the level of review that I'm going to review things on. So that's a little bit tricky in terms of where we're at, but in light of the fact

that it's a moving target, what level of review these changes would be subject to, coupled with, I believe, the appropriate ruling on the scope of what can be introduced through this witness based on, Here's the general information we received and the actions we took, coupled with the -- for the reasons previously artificially, this limited type of information does not run afoul of the protective order of this Court's prior ruling.  I overrule the objections.

You've made the objection.  You've preserved it.  But let me make clear I'm not, as the fact finder -- and I can't imagine any reviewing court would accept this as evidence that, in fact, what the people were charged with was, in fact, ultimately what they did.  And so what I've got in front of me is evidence of we have this referral process.  These folks were -- based on the investigation were charged.

But as a fact finder, we still live in a system -- although I guess it's subject to change, like everything else -- where you are innocent until proven guilty, although, given the other constitutional protections we seem to disregard, that may end up in a trash heap of history as well.  But right now that's still the rule.

So I'm not considering that these people are guilty of these actions.  What I'm considering is there's a system in place for referrals; referrals were made; these are examples of referrals that were made, and actions were taken.

I understand your concern:  Judge, the implication is a judge signed off on it, so there must be some truth to it. And if this were in front of a jury, I'd worry about that, because you really can't get that stink out of the courtroom once the skunk has been set loose.

But both for me as a judge and for any reviewing court, I understand the distinction between somebody being charged and somebody being guilty, and I'm glad I still live in a country that the two aren't the same thing.  And I hope Mr. Jazil is not suggesting they are the same thing, and I don't believe he is.

Counsel, you may proceed.

MR. JAZIL:  Thank you, Your Honor.

BY MR. JAZIL:

Q.   Getting back to Ms. Tatem --

A.   Yes, sir.

Q.   -- just briefly tell us how it is you are familiar with Ms. Tatem.

A.   That was another referral we received from the Department of State, and FDLE and our office opened an investigation.

Q.   What was she alleged to have done?

A.   She was alleged to have been committing identity theft and signing voters names without their consent or permission, and I believe there were some deceased voter names in there.

Q.   And when y'all arrested her, where did you arrest her?

A.   She was arrested in Texas, and FDLE had to extradite her and bring her back to the Hillsborough County area from Texas.

Q.   Sir, are you familiar with a circulator named Alexander Francis?

A.   Yes, I am.

Q.   How so?

A.   Mr. Francis was another referral that we received from the Department of State.  FDLE opened their investigation, as did we, and eventually we --

MR. WERMUTH:  Objection, Your Honor, just to preserve it.  This is the same issue with Mr. Francis.

THE COURT:  For the same reasons articulated, overruled.

THE WITNESS:  We eventually obtained an arrest warrant for Mr. Francis, and that case is still pending.

BY MR. JAZIL:

Q.   What was Mr. Francis charged with?

A.   A number of identity thefts.  I'm sorry.  I don't remember the exact number, but it was rather high.

Q.   Sir, do you know Andres Salazar?

A.   Yes, sir.

Q.   How so?

A.   That was another Department of State referral that FDLE investigated with us, and he was also charged with -- eventually arrested and charged with identity theft by my office.

Q.   Sir, are you familiar with a circulator named Donella Harriel?

A.   Yes.

Q.   How so?

A.   She was a paid petition circulator.

And I'm sorry.  I should have made that clear.  All these folks are paid petition circulators.

Her name was referred to us by the Department of State.  And same thing, FDLE opened an investigation; we advised them on that investigation, and she was eventually arrested and charged.

Q.   For what?

A.   Fraudulent use of personal identification information.  And I can't remember if she was formally charged with false affirmation or not.

Q.   Sir, do you know a petition circulator named Nelson Stone?

A.   Yes, sir.  Much the same as these other folks, he was a paid petition circulator.  He was gathering petitions on behalf of Smart & Safe.  His name referred by the Department of State to FDLE and to my office.  We investigated, obtained an arrest warrant, and charged him accordingly.

Q.   Sir, do you know a petition circulator named Zachary Dworsky?

A.   Yes, sir.  He was also a paid petition circulator, a referral from the Department of State.  We investigated, obtained an arrest warrant, and charged him.

Q. With what?

A. I believe that was also fraudulent use of personal identification information.

Q. And, sir, as I understood your earlier testimony, you've been in your role overseeing election-related crimes for two years; is that right?

A. Yes.

Q. In those two years, how many convictions have y'all obtained for petition circulator fraud?

A. I would -- gosh, I'm not sure of the exact number but over a dozen. And those are -- I'm talking about individual defendants, over a dozen individual defendants.

Q. Sir, are you familiar with a company called --

THE COURT: Counsel, hold on.

Just so I'll know and so the record is complete, since you have given us a list and some examples, if greater than a dozen had been convicted, how many were charged?

THE WITNESS: So, Your Honor, I don't think -- no cases have been nolle pros'd or there have been no acquittals. There are pending cases, cases that have been charged where they're still pending. And I'm sorry. I don't know the exact number, Your Honor.

THE COURT: You don't have to know because you said approximately a dozen. I'm just trying to figure out is there -- are there another dozen pending or are there another

million and a half pending?  Is there some range you can give me?

THE WITNESS:  Yes, sir.  There's probably 12 to 20 pending paid petition circulator defendant cases around the state right now.

THE COURT:  So between a dozen or so convicted, dozen-plus pending, and did I understand your testimony before there were hundreds of referrals?

THE WITNESS:  Yes, Your Honor.

THE COURT:  Counsel, you may proceed.

MR. JAZIL:  Thank you, Your Honor.

BY MR. JAZIL:

Q.   And I believe you answered one of the questions I was going to ask about acquittals.

Sir, how many ongoing investigations do y'all have?

A.   We have at least 60 open investigations of paid petition circulators right now.

Q.   And these are investigations that are open but where charges have not been filed; is that correct?

A.   Correct.

Q.   Sir, are you familiar with PCI Consultants?

A.   Yes, sir, I am.

Q.   How are you familiar with PCI Consultants?

A.   PCI Consultants was a firm or a company that was contracted by Floridians Protecting Freedom to gather petitions for the

abortion initiative a couple years ago.  They were a company that was not located in the state of Florida.

Q.    Where were they located?

A.    They were located in the state of California.

Q.    And what, if any, challenges did PCI Consultants' location in California create for your office as y'all were looking into them?

A.    So once we figured out through our investigations that some of our suspects worked for PCI, we attempted to subpoena records -- employment records from PCI to prove up identity, to prove that these suspects were actually gathering petitions on behalf of the company, getting paid by the company.

And the difficulty --

MR. WERMUTH:  Objection, your Honor.  This is not relevant.  HB 1205 doesn't preclude having companies outside the state of Florida.

THE COURT:  I think I know the response.

Your response?

MR. JAZIL:  If Your Honor knows the response, I guess I won't belabor the point.

THE COURT:  No, just go ahead so we've got a record. And I'm not making an argument for you.

Why is it relevant?

MR. JAZIL:  Sure, Your Honor.  Especially if -- especially if the rational basis standard review applies, this

Direct Examination – Mr. Bridges

testimony goes to show that it's harder to investigate things out of state than in state, which goes to the nonresidents portion.

I recognize PCI is not a person.  However, the testimony still makes the point that investigating things out of state is hard; there's challenges, et cetera.

MR. WERMUTH:  If PCI is not a person, then HB 1205 doesn't apply.

THE COURT:  For the reasons Mr. Jazil articulated, depending, again, on the level of review and what I'm reviewing, it could be relevant.

I'm going to admit it.  That doesn't mean that I'm relying on it.  It depends on the arguments and ultimately what I do.

So overruled at this juncture.

BY MR. JAZIL:

Q.   I'd like to show you what we've marked as Defendants' Exhibit 159.

MR. JAZIL:  Your Honor, may I approach the witness?

THE COURT:  You may.

THE WITNESS:  Thank you.

MR. WERMUTH:  Objection; hearsay.

THE COURT:  Well, let him try to explain what it is so I know what it is before I rule on it.

MR. WERMUTH:  I'm getting excited.

BY MR. JAZIL:

Q.    What are you looking at, Mr. Bridges?

A.    This is a document that we eventually received after having a difficult time executing our subpoena to PCI Consultants.

Q.    And what's your understanding of what this document is?

A.    This is a "do not buy" list.  This is a list of paid petition circulators who have been blackballed, banned from the industry, I don't know what the exact term is, but the companies that hire these people create these lists and say, Don't hire these folks to gather petitions for your company.

Q.    Okay.  And how, if at all, did y'all use this list as a part of your work at the Office of Statewide Prosecution?

A.    We utilized this list to compare with the referrals that we were receiving from the Department of State, you know, that originated with voter complaints of people utilizing their information without their permission.  We tried to cross-reference this list with a list of suspects that we had. And if we didn't have any of these folks on our suspect list, we looked into potentially adding them to the suspect list.

        MR. JAZIL:  Your Honor, I'd like to move DX 159 into evidence.

        MR. WERMUTH:  I object; hearsay.  This document is by one company who is not a party to this case.  They're giving it a hearsay purpose that somehow this is an indication that these individuals are engaged in improper conduct.

THE COURT: Well, let's distinguish it between his testimony versus the document. He said, We had a document that we got from a company that we used, and here's what we used it for, without identifying specifically who was on it.

I don't find that a hearsay objection is proper to the testimony explaining that he had a document and that's what they used it for.

Do you wish to be heard on that? Let's start with the testimony, setting aside the document.

MR. WERMUTH: No. I think --

THE COURT: I find the testimony is -- properly came in, and I don't have to go back and revisit that.

The question becomes whether or not the document, which is not -- it's a -- a tool that we used, but it's not a document created by -- and simply because it's in the files of the statewide prosecutor or state attorney, it doesn't transform it into a record that overcomes hearsay.

What's -- you've got the testimony in, but what's the reason why I would admit the exhibit itself?

MR. JAZIL: Your Honor, I got the testimony in. The exhibit itself is being utilized as the testimony to show -- to say, Hey, we had a hard-fought fight with PCI. We eventually got something from them. This something was important and valuable. It prompted us to look hard and --

THE COURT: I find the testimony is admissible. The

document is not.

Mr. Wermuth, anything additional?

MR. WERMUTH:  I was going to add to it, but you've already ruled that it's not admissible.

BY MR. JAZIL:

Q.   Sir, are you familiar with a company called Grassfire, LLC?

A.   Yes, I am.

Q.   What is Grassfire, and why is it that you're familiar with them?

A.   Grassfire is a company that was hired by Smart & Safe or one of their affiliates to gather petitions on behalf of the adult use of recreational marijuana petition, not this one from 2025, but the previous cycle.  I guess that was 2022.

Q.   And was your office looking into this company?

A.   Yes.

Q.   Why?

A.   For the same reasons that I described with PCI.  Once we started receiving referrals from the Department of State and looking into individual suspects, we learned, often through interviewing the suspects, that they worked for a company called Grassfire.

So in order to, again, prove up identity and obtain evidence that the suspect individuals were working for the company, were getting paid by the company and actually gathering these petitions themselves, we attempted to subpoena Grassfire

for employment records, records of payment, and so forth.

Q.    And what, if any, hurdles did y'all run into as you were issuing subpoenas?

A.    So Grassfire was a company that was registered to do business in the state of Florida, but prior to the Supreme Court finalizing the ballot initiative language, they were administratively dissolved and moved out of state, I think first to California, and now the owner lives in Hawaii.

So we had the same problems as with serving PCI and enforcing the subpoena with an out-of-state entity.

Q.    Did y'all ever get any records from Grassfire?

A.    The owner's name is Lee Vasch or Lee Vosch, V-a-s-c-h or V-o-s-c-h.  And in his interactions with our office, he kind of gave us what he wanted to give us, the materials.  So we did receive some materials but not everything that we had sought in our subpoena.

THE COURT:  Mr. Jazil, just so you can close the loop, the witness previously testified with PCI that the employees that they were trying to get the information of them -- many of them were, I believe, nonresidents of Florida was the testimony; correct?

And if that's true, was the same true of Grassfire?

BY MR. JAZIL:

Q.    Is the same true of Grassfire?

A.    Yes, sir.

THE COURT:  Just so the record is clear -- because your point, Mr. Jazil, was, Judge, it doesn't matter if it's not a person; we're investigating an entity so we can investigate people that are nonresidents of Florida that were working; correct?

MR. JAZIL:  Yes, sir.

THE COURT:  I understand.  So it's clear, that's why I was asking the question.

BY MR. JAZIL:

Q.   And let's make this more concrete.

We've talked about how Ms. Tatem is someone y'all arrested outside of the state; correct?

A.   Yes, sir.

Q.   Walk me through what, if any, challenges y'all encountered as you were investigating and arresting Ms. Tatem out of state.

A.   So a typical tactic for us in an investigation is to try to attempt to locate and interview the suspect.  And depending on what the suspect says, it changes the course of the investigation.  They may provide a defense that we feel is valid.  They may make admissions.  At the very least, we can verify that they are a real person who exists who possibly was employed by this company and gathered petitions on the company's behalf.

So when we were unable to locate Ms. Tatem in the state of Florida, it slowed the investigation significantly, and it

hampered our ability to seek out the true facts as they occurred.

Q.   All right.  So let's dumb this down a bit.

Suppose you have a suspect in Florida.  What's the interview with the suspect look like?  How many people go out?  How long does it take?

A.   FDLE's protocol –– we encourage them do this –– is they send out two agents at a time for safety purposes.  So that's two agents who, you know, can go and speak to someone in their region, locate, interview that person, and potentially move on to another interview or more interviews that day.

Q.   And you said FDLE agents in the regions.

Are the FDLE agents located throughout Florida?

A.   Yes, sir.

Q.   And contrast that with how it is y'all use your FDLE investigators to go interview a suspect out of state.

A.   Well, FDLE, before they just go to some other state and start interviewing people in that state, we want them to coordinate with local law enforcement to, you know, announce themselves so we don't have any blue-on-blue problems.  And there have to be travel arrangements made.  A lot of times the information –– the intel that we have as to where this individual is living in another state is not completely up to date or accurate.  So it is a much longer, more expensive time-consuming process that takes two of our investigators out

of the state for, you know, who knows how long.

Q.    Is it longer than a couple of hours that it takes to go interview someone within the region?

A.    Yes, sir.

And, I mean, I can think of cases where agents have had to go and search for suspects out of state more than once.  So, it may not just be a one-time trip either.

Q.    Okay.  So that's the interview process.

What about the arrest process?  How does that differ if the suspect is in the state versus out of the state?

A.    In the state -- my office has jurisdiction anywhere in the state, so we can appear in any state court in the state of Florida.  Same as FDLE, they can investigate and make arrests anywhere within the state.  So it's fairly straightforward.

Outside of the state, we -- you know, we will obtain a Florida arrest warrant for someone that we believe we have probable cause to arrest.  We'll ask a judge to give us a warrant for that.  But executing it out of state, again, involves coordinating with local law enforcement.  There will be an extradition process.  If the defendant does not waive extradition, then we have to obtain a governor's warrant and go through a somewhat tedious process of extraditing that person back to the state of Florida to be brought before the court that issued the arrest warrant.  It can be a tedious process.

Q.    Sir, we've been talking about eight petition circulators. I

would like to talk about volunteer circulators for a moment.

Has your office received referrals, complaints about volunteer circulators for petitions behaving badly?

A.    Yes.

Q.    What kind of issues?

A.    I believe that was with regard to filling out forms for voters or -- I'm having trouble remembering exactly what it was. I know that they've -- that we've received those complaints, but honestly, the investigation of those complaints has been difficult because --

Q.    Why?

A.    -- volunteers, up until the statute changed, were not required to provide any information that -- there was nothing on the petition that showed who the volunteer was, or who might have helped the voter fill out that form, or who might have turned that form in without asking the voter's permission to do it.

So a lot of those referrals never became formal investigations.  They are kind of dead in the water.

Q.    Sir, just one final set of questions to round this out.

How, if at all, do the resource constraints of your office dictate which cases you are going to decide to investigate and prosecute and which are not, in this area?

A.    So in the area of election crimes, you know, we have resources, but they are at some point finite.  And we try to

prioritize -- as I said, we've received dozens, if not hundreds, of these referrals from the Department of State, so an exercise that we have gone through with FDLE is trying to prioritize referrals and investigations where we have the most evidence, where there's someone who lives -- a petitioner that lives within the state that we can easily locate, that we can easily investigate or interview.  So a lot of our resources have been devoted to those.

And when we're asked to do things outside of the state like we were discussing earlier, it stretches those resources a little more thin.

Q.   And is your answer going to hold true when we are talking about volunteers versus paid petition circulators?

A.   Yes, yes.  I think the same would apply.

You are saying if -- we are talking about out-of-state folks?

Q.   No, sir.  So pre-HB 1205 you didn't have the names, right --

A.   Yes.

Q.   -- for the volunteers?

So how, if at all, do your resource constraints factor into you devoting resources to a volunteer case versus a paid petition circulator case?

A.   Right.  I mean, there is -- there would be a methodology of how to investigate a volunteer fraud referral, but it would

involve sending FDLE to go talk to these organizations that employ -- I guess I'm not using employ, the word, correctly, but organizations that utilize volunteers, trying to figure out who was volunteering that day; where were they located; do we have biographical information of that volunteer; is there, you know, a commonality among petitions that that volunteer may have touched; is there a motive or some reason that that volunteer would have, you know, turned in fraudulent petitions?

It's just the resources that we have don't lend themselves easily to conducting those sort of investigations pre-July 2025.

Q.   Are you familiar with the changes HB 1205 made to the volunteer petition circulator form?

A.   Yes, sir.

Q.   How, if at all, is that going to impact your office?

A.   It's just more data points.  It's more information that our investigators can utilize.  It's more information that, frankly, the Department of State can utilize in their preliminary review of voter complaints or Supervisor of Election complaints.

So my impression is that it will allow us to be more efficient and more accurate.

MR. JAZIL:  I have no further questions, Your Honor.

MR. WERMUTH:  Could we take a 15-minute break?

THE COURT:  We certainly can take a break.

Thank you.  Court is in recess.

(Recess taken at 1:26 PM.)

(Resumed at 1:44 PM.)

THE COURT:  Take your seats.

Thank you.

MR. WERMUTH:  FDH plaintiffs have no questions for this witness.

MS. BOETTCHER:  Ellen Boettcher for the Right to Clean Water plaintiffs.

We have a few questions for Mr. Bridges.

THE COURT:  Come on down.

                    CROSS-EXAMINATION

BY MS. BOETTCHER:

Q.   Good afternoon, Mr. Bridges.

A.   Good afternoon.

Q.   My name is Ellen Boettcher.

I have just a few questions for you regarding the topics you just discussed with Mr. Jazil.

So you discussed Alexander Francis with Mr. Jazil earlier this afternoon.

Was he a resident of Florida at the time he was circulating petitions?

A.   My understanding is, yes, he was living in the Orlando area at that time.

Q.   And you discussed Alexandria Tatem as well.

Was Alexandria Tatem a Florida resident while she was circulating petitions?

A.    I believe she was living in the Tampa area around that time, yes.

Q.    And you testified a little bit about the issues with volunteers.

Do you remember signing a declaration in this case in June 2025?

A.    Yes, ma'am.

Q.    And do you remember attesting in the declaration that you were aware of several duplicate petition signatures that had been submitted on behalf of Smart & Safe by volunteers where it had been an issue to identify the circulator?

A.    Yes, ma'am.  And I -- thank you.  I was having a little trouble remembering that earlier.

Q.    And do you remember testifying at your deposition that this was the only example in which your office investigated volunteer petition circulators for potential fraud?

A.    Yes.  Yeah, we haven't opened any formal investigations of volunteer circulators.

Q.    And do you remember testifying at your deposition that you didn't know whether there was any evidence that those individual voters intended to commit fraud in that instance with the prefilled petitions?

A.    I'm sorry.  Can you ask that again?

Q.    Sure.

So do you remember testifying at your deposition that you

don't know whether there was evidence that those individual voters intended to commit fraud in that example?

A.   The individual voters where volunteers collected their petitions.

Q.   So let's talk about it.

In that example, you described that voters were -- you believed that voters were sent prefilled petitions by Smart & Safe and then had submitted duplicate petitions to the Supervisors of Elections and that was, you know, what you believed to be volunteer fraud?

A.   Okay.  I'm sorry.  I was conflating the volunteer idea with -- I think of these as mail -- mail petitions, that people -- voters received in the mail.

Q.   Yes.

MS. BOETTCHER:  And, Caroline, if you could please pull up Right to Clean Water Exhibit 170, which has already been admitted.

I think what -- the conflation is understandable and I will attempt to point out why in a second.

BY MS. BOETTCHER:

Q.   So if you see at the top of what's on your screen, this is called a volunteer petition fraud [sic].

Do you see that at the top?

A.   Yes.

MS. BOETTCHER:  And if you zoom in on the petition

circulator's information box at the bottom -- we're going to try to do that.

BY MS. BOETTCHER:

Q.   Do you see where it says:  *This petition form is only to be collected by a volunteer or directly by the voter him or herself?*

A.   Yes, ma'am.

Q.   And so in that instance where you believed the prefilled petitions and the submission of duplicate petitions to be volunteer fraud, is it possible that this was a volunteer form submitted by the voter him or herself?

A.   So I'm aware of the instance that you're referring to.  The Palm Beach County Supervisor of Elections was receiving duplicate petitions on the Smart & Safe initiative, and it appeared that there was a petition that the voter had filled out by hand and signed, and then there was a petition that was preprinted with the voter's name and information that was also signed.

    And my response to the deposition question was we didn't have any evidence that the voters were intentionally submitting more than one petition to try to, you know, fraudulently bump up the numbers or anything like that.  It seemed to have just been a case of the voters being confused by the format in which they were receiving the petitions.

Q.   And so it is still your testimony that that was the only

investigation you're aware of involving volunteer petition circulators; is that correct?

A.   I didn't realize that those were volunteer circulators, but, yes, that's the only formal -- and that wasn't even a formal investigation by our office, to be honest with you.

Q.   And it might not even have been volunteer circulators; is that correct?

A.   I don't know.

Q.   Okay.  And if you have a petition circulator's number, are you able to figure out the name and address of the person associated with that number?

A.   Yes, with a caveat.  So when a paid petition circulator applies to become a paid petition circulator, they have to fill out a form on the Department of State's website.  They have a username, a password, and they -- pre-July of last year, they have to provide an address.

In the state of Florida, there's a portion for a "permanent address," and there's a portion for -- I think it says "service address."  There's also a place for them to put in a phone number and an email address, although that did not always seem to happen.

So we have information about an address that person has provided in order to receive a circulator number.  Our investigations have revealed that those addresses are not always accurate in the sense that, number one, they're not always, you

know, a home or a physical place that actually exists.

And, number two, not -- it's not an address where the circulator is living by the time that we are investigating them as a suspect.

Q.   And so if you have a number, you are able to figure out the person that is associated with that number; is that correct?

A.   Well, we have the information that I just described to you that's associated with the circulator number.

MS. BOETTCHER:  Okay.  May I have a moment to confer?

THE COURT:  Certainly.

(Discussion between the attorneys.)

BY MS. BOETTCHER:

Q.   That is all my questions for you.

Thank you, Mr. Bridges.

A.   Thank you.

THE COURT:  Anything from Smart & Safe?

MR. BURHANS:  No, Your Honor.  Thank you.

THE COURT:  And from our last group of plaintiffs?

MR. MASTORIS:  Yes, Your Honor, just a few questions.

THE COURT:  You're not Ms. Hudgens.

MR. MASTORIS:  I am not Ms. Hudgens.

I'm sorry.  We had a last-minute change in plans with everyone's permission.

THE COURT:  Y'all don't have to stick with the schedule.  I'm just -- to the extent the clerks and everybody

are identifying everybody, I wanted to make clear what was obvious.

Go ahead, sir.

CROSS-EXAMINATION

BY MR. MASTORIS:

Q.   Mr. Bridges, George Mastoris -- not Johanna Hudgens -- on behalf of the League and LULAC.

Just a few questions for you this afternoon.

First of all, before I begin, I just want to be very clear for the record, I will not be asking about any specific cases that your office has investigated.

So with that caveat out of the way, I think you testified earlier that HB 1205's registration requirement for people wishing to collect more than 25 petitions would help your efforts to investigate alleged fraud amongst volunteers; is that correct?

MR. JAZIL:   Objection, Your Honor.   Beyond the scope of direct.   There's no testimony about the 25-petition limit.

THE COURT:   Hold on.   Hold on.   Y'all just --

I believe the witness testified that HB 1205 generally helped investigating -- would help with investigation of volunteers because before it was almost impossible.

Did he not say that?

MR. JAZIL:   Yes, he did, Your Honor.

THE COURT:   The fact that he didn't break it down into

subsets doesn't make it outside the scope of direct.

MR. JAZIL:  Understood.

THE COURT:  Overruled.

MR. MASTORIS:  Thank you, Your Honor.

BY MR. MASTORIS:

Q.    Is that right that was part of your testimony?

The registration requirement under HB 1205 would make it easier to investigate alleged fraud amongst volunteers, right, sir?

A.    Yes, sir.

Q.    And the reason why that is is because a would-be fraudster would actually have to register and provide their name to the State; correct?

A.    Yes, sir.

Q.    And along with their name, that would-be fraudster would have to provide their permanent address; correct?

A.    Yes.  Yes, sir.

Q.    If they're registering as a circulator, that's part of the requirement; right?

A.    That's my understanding.

Q.    And that would-be fraudster would have to provide a temporary address if that's applicable; right, sir?

A.    Yes, sir.

Q.    And that would-be fraudster would have to provide their date of birth; right?

A.   Yes, sir.

Q.   And that would-be fraudster would have to provide their Florida's driver's license number; correct?

A.   Under the new statute, whatever the statute says is what they have to provide.

Q.   Yes, sir.

     And if they didn't have a driver's license, they'd have to provide their Florida ID card number, right, sir?

A.   Sure.

Q.   And on top of all that information, they'd also have to provide the last four digits of their social security number; right?

A.   I think it's an alternative, either --

Q.   To the ID number.  I think you're right; I stand corrected.

     But they would have that option as well; right?

A.   Yes, sir.

Q.   So the ability for you to actually investigate that person for fraud would rely on that would-be fraudster providing accurate information to the State willingly when they registered to become a petition circulator; right?

A.   Yes, same as all the other investigations we've had.

Q.   Right.

     And they would actually have to register, too; right?

A.   I'm not sure I understand that.

Q.   Well, in order for you to have any information from those

would-be fraudsters, they would actually have to register as petition circulators; correct?

A.   Yes, sir.

Q.   All right.  If they -- under HB 1205, my understanding is that petitioners or people wishing to petition or sign a petition for a ballot initiative can fill out a so-called personal-use form; is that right?

A.   That sounds right.

Q.   And that circulators wishing to collect less than 25 petitions could also just circulate personal-use forms to those 10 or 15 or 24 people; right, sir?

A.   Sure.

Q.   And there's nothing wrong with that; correct?

A.   Not under the statute.

Q.   So a would-be fraudster, even after HB 1205, would be able to use a personal-use form, forge someone's name and identity, and turn that in to the State; correct?

A.   Yes.

Q.   In fact, they could do that 100 times, right, and you would have no idea; correct?

A.   Someone who's registered --

Q.   No, sir.

     Someone who is not registered as a petition circulator, but chooses to use a personal-use form -- and apologies if my question was unclear -- but they could submit a personal-use

form and they wouldn't have to give any of their information to the State; right?

A.   I suppose so.

Q.   They could potentially circulate -- or submit -- excuse me -- 100 personal-use forms to the state and, again, not have to provide any personal information; right?

A.   That sounds right.

Q.   In fact, they could do it a thousand times with personal-use forms; they wouldn't have to provide their information to the State; correct?

A.   Yes, sir.

        MR. MASTORIS:  No further questions.

        THE COURT:  Hold on one second, Mr. Jazil, before you start jumping up.

        Anybody else on the plaintiffs' side?

        All right.

        MR. JAZIL:  Thank you, Your Honor.

                    REDIRECT EXAMINATION

BY MR. JAZIL:

Q.   Thank you, Mr. Bridges.

    Mr. Bridges, we talked about some fraudsters earlier in your direct; right?

A.   Yes, sir.

Q.   Folks like Tatem and Dworsky; right?

A.   Yes.

Q.   Folks like Pope; right?

A.   (Nods head up and down.)

Q.   Did these folks who you-all investigated and charged, did they fill out paid petition forms?

A.   They did.

Q.   And did you get their names and information from the paid petition forms that they filled out?

A.   Yes, we did.

Q.   And did you then cross-reference these names and information with Department of State's data?

A.   We did.

        MR. JAZIL:  Okay.  Your Honor, I'd also like to move into evidence DX 10, which is an unobjected to exhibit, which is Smart & Safe's admissions in this case.

        THE COURT:  DX 10 is admitted.

    (DEFENDANTS' EXHIBIT 10:  Received in evidence.)

        MR. JAZIL:  Can we pull up DX 10?

BY MR. JAZIL:

Q.   Sir, for Ms. Tatem, do you recall what citizen initiative she was collecting signatures for?

A.   I want to say it was recreational use marijuana, but --

Q.   Understood.

     And this is --

A.   But I'm not totally sure.  I apologize.

Q.   And this is Smart & Safe's admissions in this case.

The first one asks for Smart & Safe to admit that Alexandria Beatrice Tatem is a registered petition circulator for their number.

Is that Alexandria Beatrice Tatem the person that y'all investigated and charged?

A.    I'm sorry, again?

Q.    Is Alexandria Beatrice Tatem the person y'all investigated and charged?

A.    Yes.

Q.    Let's go to the second page of this thing.

It says here: *Admit that Alexandria Beatrice Tatem is not a Florida resident.*

*Response: Admit.*

*Request for Admission 3: Admit that Alexandria Beatrice Tatem is a resident of Texas.*

*Response: Admit.*

Do you see that, sir?

A.    Yes, sir.

Q.    Earlier on your cross-examination you were asked questions about Ms. Tatem's residence at the time she was arrested; right?

A.    Yes.

Q.    Do you know whether Ms. Tatem was, in fact --

MS. BOETTCHER:  Objection, Your Honor.

Misstates my testimony.  I did not ask --

THE COURT:  Hold on.  He can ask him a question.

I'm not --

MS. BOETTCHER:  It misstates my question.

THE COURT:  There's some other objections about this process, the way this is being done, but overruled as to -- he can certainly ask him if he believes he was mistaken about where she resided at the time or not.

BY MR. JAZIL:

Q.  Were you mistaken about where she resided at the time y'all were doing your investigation?

THE COURT:  That wasn't the question.

The question was where was she at the time she committed -- allegedly committed fraud.  That's not what the admission asked, and that's not what counsel previously asked. He may have been mistaken about that; I don't know one way or the other.

MR. JAZIL:  Okay.

THE COURT:  That's a different question.

BY MR. JAZIL:

Q.  Where was Ms. Tatem collecting signatures?

A.  In the Tampa Bay area.

Q.  Okay.  And do you know where Ms. Tatem was a resident of when y'all investigated her?

A.  Once we got to her, she was living in Texas.

Q.  Do you know where she was residing when she was collecting these signatures?

A.   I don't know for certain.

Q.   Did y'all ever turn up a Florida driver's license number for Ms. Tatem?

A.   I don't -- I'm sorry.  I don't recall.

MR. JAZIL:  No further question, Your Honor.

Thank you.

MR. MASTORIS:  Just maybe two questions within the scope of what Mr. Jazil asked about.

THE COURT:  I'll permit it.

MR. MASTORIS:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. MASTORIS:

Q.   Mr. Bridges, Mr. Jazil asked you a couple of questions --

(Reporter requested clarification.)

MR. MASTORIS:  I'm sorry.  I'll start again.

BY MR. MASTORIS:

Q.   Mr. Bridges, Mr. Jazil mentioned on his redirect two people that he said had been convicted and had, in fact, registered as circulators; correct?

Do you remember that question?

A.   I think he said "charged and registered."

Q.   You're right; I misspoke.

So let me start again.

Mr. Jazil during his redirect mentioned two people who had been charged and had, in fact, registered as petition

circulators.

Do you remember that?

A.    Yes, sir.

Q.    Both of those individuals were paid petition circulators; is that correct?

A.    That is correct.

Q.    So in order for them to be paid by the organizations for which they were working, they needed to register as circulators; right?

A.    We're talking about Ms. Tatem, and who was the other?  I'm sorry.

Q.    Ms. Tatem and I forget the other name.

THE COURT:  You can phone a friend.

MR. MASTORIS:  Thank you.

BY MR. MASTORIS:

Q.    And Dworsky.

A.    Dworsky.

I don't have a specific recollection as to Mr. Dworsky's arrangement, but I feel confident that he registered as a paid petition circulator.

MR. MASTORIS:  Thank you very much, Mr. Bridges.

THE COURT:  Any re-redirect as to that point?

MR. JAZIL:  No, Your Honor.  Thank you.

THE COURT:  Before we move on I do want to say something to Mr. Bridges.  I won't talk about some of the

leading questions and other questions that might have been objectionable, but I want to thank you.

All too often witnesses come in and offer more information and don't just answer the questions that were asked. Both on direct and cross you asked what you were asked. You didn't try to embellish or add information.

And I realize you're a member of the Bar, and I realize that you take your oath seriously, but I've had plenty of lawyers that have testified that felt the need -- not in this case, but in other cases, felt the need to embellish.

So thank you for your professionalism.

THE WITNESS: Yes, sir. Thank you, Your Honor.

THE COURT: You can step down.

THE WITNESS: Thank you.

(Mr. Bridges exited the witness stand.)

THE COURT: All right. Let me find out since we're now at -- going to be at witness three, which is William Gladson -- is that correct?

MR. JAZIL: Yes, Your Honor.

THE COURT: And you're not Mr. Wolk.

MR. WOLK: Yes, Your Honor, I am.

THE COURT: Are you still putting on the witness, Mr. Wolk?

MR. WOLK: I am, yes.

THE COURT: All right. Let me find out, where are we

at with figuring out what you are going to do with the last two witnesses and what we are going to do for the balance of the day, because it sounds like Gladson isn't going to take the balance of the afternoon.  It's okay if we finish early.  We are ahead of schedule, and I've, you know, had a number of issues I've had to address, so I wouldn't mind actually leaving slightly early.

But where are we at?  Do we know?

The only reason I'm asking is I don't want to break today at 3:30 if you are going to tell me Ms. Matthews is going to take two days to put on and Ms. Pratt is going to take two days to put on, because then I don't want to lose three hours, but if, Judge, you're right.  I can't tell you exactly how long we are going to be, but we are on schedule, and we should be able to finish out within the time set aside, then I'm happy to break even.

That's the spirit in which I'm asking the question.

MR. JAZIL:  Your Honor, it's the latter.  I think we are on track to still finish.  Hopefully the testimony is shorter, not longer.

THE COURT:  Okay.

All right.  Let me find out -- I know it depends on what you hear from Gladson, Matthews, and Pratt, but right now -- and we'll start in reverse order with Smart & Safe.

Right now do you anticipate calling any witnesses in

rebuttal?

MR. BURHANS:  Not yet, Your Honor, but we'd like to see what happens with the rest of the witnesses.

THE COURT:  I'm not -- this is not a "speak now or forever hold your peace."  It's just me trying to figure out where we are at.

Let me then hear -- you're here for?

MR. FERGUSON:  Right to Clean Water.  Same here, Your Honor.

THE COURT:  All right.  And it's okay if somebody says, Judge, we already know we are calling somebody.

So now we are at Florida Decides Healthcare.

MR. WERMUTH:  We currently do not expect to put on a rebuttal witness, but for the same reasons we don't know exactly what --

THE COURT:  Sure.  I'm just -- sometimes people say, Judge, I know we are calling a rebuttal witness already.

The League?

MR. MASTORIS:  Same for the League and LULAC.

THE COURT:  Okay.  All right.  So we don't know, which is fair enough.

So here's what we are going to do, even though we haven't been at it that long -- what time did we come back?

THE COURTROOM DEPUTY:  1:44.

THE COURT:  Oh, it hasn't been a long, but we are

going to take a quick break.

When we come back, Mr. Wolk will dazzle us with his direct examination, and then we will finish for the day.

Okay.  Court is in recess for five minutes.

(Recess taken at 2:07 PM.)

(Resumed at 2:17 PM.)

THE COURT:  All right.  Why don't we all -- Mr. Wolk is looking impatient.  He's tapping his foot.  He wants to get started.

MR. WOLK:  No, lots of patience.

THE COURT:  Hold on a second.

Let's get everybody in their seats.

We're not in that big of a hurry.

Ms. Hudgens, do we need to get your partner in crime?

MS. HUDGENS:  We can start without him, if that's okay.

THE COURT:  That's fine.

All right.  Call your next witness.

MR. WOLK:  Martin Wolk on behalf of the Secretary of State.

We call Mr. William Gladson to the stand.

(Mr. Gladson entered the witness stand.)

**WILLIAM GLADSON, DEFENDANTS' WITNESS, DULY SWORN**

THE COURTROOM DEPUTY:  Please state your name for the record.

THE WITNESS:  William Gladson.

THE COURTROOM DEPUTY:  Thank you.

DIRECT EXAMINATION

BY MR. WOLK:

Q.    Good afternoon, Mr. Gladson.

A.    Good afternoon.

Q.    So first question:  Mr. Gladson, what's your current position?

A.    So I am currently the state attorney for the Fifth Judicial Circuit of Florida.

Q.    And, Mr. Gladson, how long have you had that position?

A.    I was elected in January of 2021, so five and a half years, five years.

Q.    Which counties does the Fifth Judicial Circuit cover?

A.    Marion, Citrus, Sumter, Lake, and Hernando.

Q.    Within the Fifth Judicial Circuit are there any noteworthy communities?

A.    Our population is a lot of retirees.  So the largest community that is notable, I would say, would be The Villages, which is a retirement community that spans three contiguous counties.

Q.    And, briefly, what are The Villages?

A.    So it's just a retirement community that was envisioned to be kind of self-contained.  And it started off in Marion County, and it's grown and grown all the way into Sumter, and -- mostly

into Sumter and even into Marion County and Lake.

So it's just a very attractive place for people to retire, and there's a lot of people moving there every day.

Q.   And then going back to your work as a state attorney, what are your responsibilities as the attorney?

A.   So as state attorney, I've got some statutory duties and constitutional duties, but primarily my job is to prosecute criminal cases or decide what cases are not going to be prosecuted.

Q.   How many people do you oversee?

A.   Roughly 246.

Q.   And is everyone in your office a lawyer?

A.   No.

Q.   Can you give us an overview of the kinds of jobs in your office?

A.   Sure.  We have basically four primary divisions, I guess: We have prosecutors, of course; we have sworn investigators; we have victim advocates; and then we have a pretty large IT component.

There is also support staff, secretaries, things like that.

Q.   Now, for your office, for these people -- are you responsible for all these people and what they do?

A.   Yes.  It's my office, so I'm responsible for what happens.

Q.   And then what kinds of matters does your office handle?

A.   It's 99 percent criminal.

Direct Examination - Mr. Gladson

Q.    And does your office handle state violations, municipal violations?  What is the level of crime that your office deals with?

A.    So we are required to handle any misdemeanor or felony. And if it's a misdemeanor, that's a city ordinance.  If we have an agreement with the county or the city, then we will prosecute the ordinance violations as well.

Q.    Now, the violations that your office handles, does that include election-related crimes?

A.    It does.

Q.    And what in your definition are election-related crimes?

A.    So we've seen what you would call double voting, people voting twice.  We've seen forged petitions for ballot initiatives.  We've seen -- had a few people vote that were -- at least one I know of that was illegal.  I've had some -- it's primarily double voting and forgery.

Q.    And kind of getting into your office's work, when does your office begin an investigation into an election-related crime?

A.    So, typically, the complaint will come from the Supervisor of Elections in one of the different counties.  Sometimes they will call law enforcement and law enforcement will refer them to our office, but, typically, it comes from the Supervisor of Elections.

Q.    Do complaints ever come from citizens themselves?

A.    Sometimes via email.  They've got my email, and they will

email me and they'll copy everybody and make a complaint that way.

Q.   Has your office received complaints about citizen initiative petition fraud?

A.   We have.

Q.   And has your office investigated and prosecuted cases of citizen initiative petition fraud?

A.   We have.

Q.   In general, what kinds of petition violations has your office come upon?

A.   It's been fraudulent use of personal identification information, and it goes along with perjury, so it's forced petitions.

Q.   And then kind of speaking about, like, volume, how does the number of complaints for alleged petition fraud that your office has received compare to the number of complaints for other types of election-related crimes?

A.   So I would say that when the petition -- the ballot initiatives become an issue for constitutional amendment, then the complaints will increase significantly then.

        MR. STAFFORD:  I'm going to object to this question as vague to the extent the timeline at issue is unclear.

BY MR. WOLK:

Q.   Mr. Gladson, could you specify --

        THE COURT:  Hold on.  I didn't rule, Counsel.

If you are going to -- if you want to withdraw the question, the question is withdrawn.

Sustained.

You can rephrase the question.

BY MR. WOLK:

Q.   I was going to ask a follow-up question.

A.   Sure.

Q.   Mr. Gladson, could you specify the timeline when you say that there are specific times when the number of petition fraud complaints goes up?

A.   So I received -- in 2021, that's when I received some complaints -- a lot of complaints.

So that's -- and a lot, like not just -- I mean, occasionally, voter fraud complaints will trickle in to different offices.  That will happen every election cycle.  But I saw a lot when I first took office.

Q.   And what was ongoing in 2021 that was related to this influx of petition fraud?

A.   There was a gambling petition initiative and an abortion initiative -- petition initiative.

Q.   So are you familiar with someone named Maria Bautista?

A.   I am.

Q.   And I'm going to spell the name for the record, and I'll do this for anyone we discuss.

So the first name is Maria, M-a-r-i-a, and the last name is

Bautista.  It's spelled B-a-u-t-i-s-t-a.

So, Mr. Gladson, how are you familiar with Ms. Bautista?

A.   So Ms. Bautista -- I received a complaint from the Supervisor of Elections in Marion County alleging that some petitions that they had uncovered had been forged, and Ms. Bautista's name was on the bottom.  She was a suspect.

MR. WOLK:  Your Honor, I'd like to hand an exhibit to the witness.  Permission to approach the witness?

THE COURT:  Certainly.

MR. WOLK:  And, Mr. Bennington, if we could bring up Defendants' Exhibit 392.

BY MR. WOLK:

Q.   So, Mr. Gladson, do you recognize these documents?

A.   I do.

Q.   Can you go through these documents and tell us what they are?

A.   So the first document is an order denying the defendant's renewed judgment of acquittal.  That was something filed by defense counsel in the case that we prosecuted.

Second set is jury instructions with verdict forms that we prepared for trial.

There are -- let's see.  There's a chain of custody form for evidence.

There is a trial clerk's worksheet, a jury panel usage report, and a capias, and then a probable cause affidavit.  I

think that's it -- and an information.

Q.   And, Mr. Gladson, you mentioned this a couple of times in your -- when you were going through the documents, but did your office prepare any of these documents yourself?

A.   So we prepared the probable cause affidavit.  That was one of my investigators.  We prepared the jury instructions.  We do that in all criminal cases.  We would prepare the capias paperwork as well indicating the bond amount, asking the judge to sign off on issuing the capias.

I believe those are documents that we prepared -- the verdict forms as well.

Q.   And did your office prosecute this case?

A.   We did.

MR. WOLK:  Your Honor, we move Defendants' Exhibit 392 into evidence.

MR. STAFFORD:  Your Honor, object to portions of Exhibit 392 as hearsay within hearsay.  We do not object to the order denying defendant's renewed judgment of acquittal.  We do not object to --

THE COURT:  You're not objecting because we don't care or -- I can't take judicial notice of the facts of an order of another court.  I can only take judicial notice of the fact an order was entered.

So I'm just trying to figure out --

MR. STAFFORD:  Fair enough, Your Honor.  We object to

Exhibit 392 in its entirety.

THE COURT:  How is part -- a portion of a court file possibly admissible?

I mean, a judgment can be admissible.  But how -- I mean, I'm just -- I'm trying to figure out what's the theory behind you can just bring in part of a court file and introduce it into evidence.

MR. WOLK:  Your Honor, we withdraw moving the exhibit into evidence.

THE COURT:  Fair enough.

BY MR. WOLK:

Q.   So, Mr. Gladson, how was Ms. Bautista's case referred to your office?

A.   So I received an email from Wesley Wilcox, who is the Supervisor of Elections in Marion County.  He emailed me directly and asked me to look into it and gave me a brief summary of what he found.

Q.   And after you received this complaint, how did you investigate the allegations?

A.   So I assigned this -- I spoke to Mr. Wilcox, and I assigned this to an investigator named Jeff Pfannerstill in my office, who is one of my sworn investigators.

(Reporter requested clarification.)

THE WITNESS:  I think I can.  P-f-a-n-t-e-r-s-i-l-l.

So we gave -- I gave it to Jeff Pfannerstill and asked

him to investigate it, get with the Supervisor of Elections,

kind of figure out what happened, and see what we've got.

BY MR. WOLK:

Q.    And after this investigation, did your office charge

Ms. Bautista?

A.    We did.

Q.    And do you recall what Ms. Bautista was charged with?

A.    I do.

Q.    And what was the count or counts that Ms. Bautista was

charged with?

A.    We charged 16 counts of fraudulent use of personal

identification information.

Q.    Now, Mr. Gladson, you mentioned someone named Wesley --

        (Discussion between the attorneys.)

BY MR. WOLK:

Q.    Mr. Gladson, can you tell us what happened in the case?

A.    We got a conviction on 13 counts.  It was a day-long trial.

I remember that.  She was sentenced.

Q.    And what was the basis for the conviction?

A.    So there were 16 total counts --

        (Reporter requested clarification.)

        THE WITNESS:  There were 16 counts.  Each count was

the same with a different victim listed.  And then there were

two counts that included death certificates, for petitions that

had death certificates that indicated the person who purportedly

signed it died before the petition was signed.  So those were a couple of the counts.

We went to trial on all 16, got a conviction on 13.  We got a judgment of acquittal on three of them.

Q.   And do you recall any of the individuals who were the subjects of these fraudulent petitions?

A.   I do.  I recognized some of the names that were referred over just because I knew them personally.

Q.   Can you tell us any of these names of who these people were?

A.   Sure.  So Wesley Wilcox, I know him.  I've met his wife.

And Susan Slaughter was my former law partner's mother.

There's a person named Karen Hope, who is Laura Hope's mother-in-law.  She works for me, and her husband was my dentist.

There's Kelly Mosely [phonetic] who is a prosecutor with me, and her husband was a prosecutor.  He's in private practice, and her father was the chief judge for a long time.

So of the ones we charged, there were a bunch of names I recognized.

Q.   And, Mr. Gladson, you mentioned that there were two death certifications among the fraudulent petitions.

Is receiving petitions with signatures of deceased persons evidence of petition fraud?

A.   Yes.

MR. STAFFORD:  Objection; legal conclusion.

THE COURT:  Overruled.

BY MR. WOLK:

Q.   Mr. Gladson, in your experience as a prosecutor and a state attorney, would you say that petitions with signatures of deceased persons are strong evidence of petition fraud?

A.   I would consider it probably the most compelling evidence you are going to find.

Q.   And, Mr. Gladson, remind us, what was the outcome in Ms. Bautista's case?

A.   She was convicted and sentenced to prison.

Q.   And is Ms. Bautista currently in prison?

A.   I have not looked, but based on the math, she should still be there.

Q.   Mr. Gladson, are you familiar with someone named Daviann Dunn?

A.   I am.

Q.   How are you familiar with Mr. Dunn?

A.   That was another complaint we received regarding fraudulent or forged petitions.

Q.   How did you receive this complaint?

A.   That complaint came via regular U.S. mail to my office in Hernando County.

MR. STAFFORD:  Objection, for the record.  Same objection that Mr. Wermuth has made previously for this

individual.

THE COURT:  Overruled.

Counsel, you may proceed.

Actually, Counsel, one thing that would be helpful -- I know the answer to the question.  Before you move into talking more about Mr. Dunn, if you can please ask Mr. -- I can or you can just ask Mr. Gladson, so the record is clear, because any reviewing court might not know why some of these end up with a state attorney's office and some end up with the statewide prosecutor.  You don't have to ask now, but at some point ask him so it's clear in the record why that's so.

MR. WOLK:  Okay.  Maybe we can ask it now just to make it clear.

BY MR. WOLK:

Q.   Mr. Gladson, with these cases, how can some of them end up with your office and some of them end up with the statewide prosecutor's office?

A.   So the statute as it currently reads says they should be referred to the state attorney and the Office of Election Crimes and Security, which I think is staffed by the Florida Department of Law Enforcement.  And those cases are prosecuted by that office and the Office of the Statewide Prosecutor.

My understanding back in -- when this started was -- and it's always been that practice -- that the Supervisors of Elections would send them directly to me.

When this was going on, this particular case was going on and these issues were happening in 2021, I got so many that I asked my investigators to start referring them to the Office of Election Crimes and Security.  So that's how some of them get there.

And now I kind of -- unless I have a reason to, we are pushing them to the Office of the Statewide Prosecutor.

THE COURT:  Mr. Gladson, so it's clear --

THE WITNESS:  Yes, sir.

THE COURT:  -- there's concurrent jurisdiction.

THE WITNESS:  Yes, sir.

THE COURT:  So you can prosecute; statewide office can prosecute the same, and that would explain why you would push some of them to the statewide prosecutor.

THE WITNESS:  Yes, sir.

THE COURT:  I understand.

Counsel, you may proceed.

I just -- folks that aren't familiar with Florida and our system may not know that.

MR. WOLK:  Sure.  Thank you.

BY MR. WOLK:

Q.   Mr. Gladson, returning to Daviann Dunn.

So the first name is D-a-v-i-a-n-n, and the last name is D-u-n-n.

So how did your office receive this referral for Mr. Dunn?

A.    That came from the Supervisor of Elections in Hernando County.

Q.    And is Hernando County in your circuit?

A.    It is.

Q.    And does this referral -- what was the -- what was the issue in this referral?

A.    It was -- the Supervisor of Elections, her staff, had identified what they believed to be petitions that had been forged, fraudulently filled out and submitted.  So that's the basis of the complaint on Mr. Dunn.

Q.    And do you recall who Mr. Dunn worked for as a petition circulator?

A.    PCI Consultants.

Q.    And what is PCI Consultants?

A.    It's a petition-gathering or circulating firm, office. Their job, as I understand it, is to help to find people to circulate petitions to get them signed.

Q.    And from this referral, do you know where PCI Consultants is based?

A.    The referral indicated California.

Q.    What did your office do with this complaint?

A.    This one we forwarded to the Office of Election Crimes and Security.  I actually -- this particular one, an attorney in my office had, along with an investigator, I believe, and -- looked at it and shot it off to the other -- to the state agency that's

supposed to investigate some of these or better handle -- better capable of investigating some of them.

Q.    Mr. Gladson, are you familiar with someone named Joshua Perez?

A.    I am.

Q.    And I'm going to spell the name for the record.  So Joshua, J-o-s-h-u-a.  And Perez, P-e-r-e-z.

And how are you familiar with Mr. Perez?

A.    Similar to Mr. Dunn, that's a complaint that came to us from Shirley Anderson in Hernando County, the Supervisor of Elections.

Q.    And do you recall what the issue was in this referral?

A.    Same issue, as I recall.  It was a forged -- or purported to be forged signatures on petitions.

Q.    And what did your office do with this complaint?

A.    We referred that as well.

Q.    Where did you refer it to?

A.    The Office of Election Crimes and Security.

Q.    Now, Mr. Gladson, does the Supervisors of Elections in your circuit -- have they used any specific methods to investigate possible petition fraud?

A.    So the one thing that I've seen them do consistently is once they identify a batch of, let's say, suspected forged petitions and they contact our office, they'll send out letters to people that they believe may have had their information, you

know, used or misused in these petition forms.  That's the first thing that they do.  I'm not saying it's every county.  At least three of the counties in my circuit do that, probably all of them, but --

Q.   And do you recall which -- which of the three counties send these letters?

A.   Marion did; Lake did and does, and Hernando sent letters as well.

Q.   In your experience as state attorney for the circuit, did these letters help our office in this work?

A.   They did.

Q.   And can you explain how the letters helped your office in this work?

A.   So the letters helped us identify -- if you have, you know, a suspect that you think has been forging people's petitions and stealing their information and using it to turn these petitions in, if you're the Supervisor of Elections, you are going to contact that person and ask them, Did you sign this form?  Did you turn it in?  Were you here in Marion County or Sumter County at that time?  So those forms were mailed out to them asking if they did not sign it to contact the Supervisor of Elections.

     And from that pool of letters that were sent out, we started with a group of people that said either, Yes, I signed it, or, No, I didn't sign that and I want to prosecute it.

     So that's really the first step in these types of cases.

Q.    And, Mr. Gladson, can you recall any specific cases where these letters aided in your office's investigation of a case?

A.    Maria Bautista.

Q.    And how did the letters aid in the investigation of Ms. Bautista's case?

A.    So they identified first a group of people that said that they did not sign the petition, and from that group we sent our own letter -- our investigator sent a letter to them and said, We believe you were the -- You've indicated that you were the victim of some -- either a forgery or some stolen personal information.  Do you want to prosecute?  If so -- and then they swore so it or at least signed it and sent it back to our office.

       And from that group of returned petitions we decided which cases we were going to file, which charges we were going to file.

Q.    Mr. Gladson, in terms of investigating suspected petition fraud cases, what is -- is the evidence -- obtaining evidence different than prosecuting other types of criminal cases?

A.    Sure.  I mean, every case is different as it relates to different types of evidence, but these are unique because it typically relies on just a signature analyst saying yes or no. There's typically not going to be other information.  So you are not going to have video like you would in a burglary in a home and you are not going to have fingerprints, necessarily, like

you would on a stolen item or a stolen car.  So there's lots of evidence that we deal with all the time on regular criminal cases, and I say "regular" meaning the run-of-the-mill cases that come into the office every day.

These are -- like I said, these are a little bit different because you've got a forgery and then you've got these petitions that are returned with someone else's information -- which, don't get me wrong, people use other people's identification and we use that charge when we can.  We charge people with that whenever we can.  But that's how they are different.

Q.    And as a prosecutor -- as the state attorney, what sort of evidence would be most helpful when prosecuting or investigating a suspected petition fraud case?

A.    In this particular -- and I'll refer to Bautista because I think it's -- it's -- she ended up indicating to the investigator on a recorded call, a recorded interview, That's me.  She pointed to her signature.  She essentially admitted to being the one who signed the bottom of the petition under that jurat that it has at the bottom.  So she admitted it, and she also admitted to doing it in the different counties where we had petitions turned in.

So with that, that was really good evidence -- you know, it wasn't a confession, but it was an admission that it was her that signed it.

Q.    And with regard to the letters that certain Supervisors of

Elections in your circuit will send, was this practice of sending letters in place before HB 1205?

A.   It was.

Q.   Mr. Gladson, are you familiar with someone named Trevon Johnson?

A.   I am, yes.

Q.   I'm going to spell the name for the record.  Trevon, T-r-e-v-o-n.  And then Johnson, J-o-h-n-s-o-n.

And how are you familiar with Mr. Johnson?

MR. STAFFORD:  Objection for the record.  Same issue as raised before.

THE COURT:  Overruled.

THE WITNESS:  That was another petition fraud referral to my office.

BY MR. WOLK:

Q.   And are you familiar with someone named Sydney Coleman?

A.   I am.

Q.   I'm going to spell the name for the record.

Sydney, S-y-d-n-e-y.  Coleman, C-o-l-e-m-a-n.

And how are you familiar with Ms. Coleman?

A.   She was also referred along with Mr. Johnson to my office.

Q.   Do you recall where you received these referrals from?

A.   I believe that was the Sumter County Supervisor of Elections office.  And I think they referred them -- if my memory serves me, they referred them directly to the Office of

Election Crimes and Security and also us. So we were both copied on that referral, basically letting us know somebody should do something and somebody should investigate this.

But that one came from -- those two came from Sumpter, I believe.

Q. And what was the issue in this referral?

A. It was the same. It was allegations of forged petitions.

MR. STAFFORD: Same objection for the record.

THE COURT: Overruled.

Just to close the loop, Mr. Gladson, do you know what happened -- I know you said you referred Dunn and Perez to the statewide prosecutor and that Johnson and Coleman went to the Office of Election Crimes directly.

Do you know what happened with any of those four?

THE WITNESS: I do not. I did not follow up.

THE COURT: I understand.

Also just to close the circle, you had indicated when you first became the elected state attorney in 2021, that there was an influx of complaints, I believe you said, related to the gambling initiative.

THE WITNESS: Yes, sir.

THE COURT: And in subsequent ballot initiative years did you also see an influx of complaints? And if so, to the same extent you saw in 2021?

THE WITNESS: I believe, yes, but not to the extent I

saw in 2021.

THE COURT:  Thank you.

Counsel, you can proceed.

BY MR. WOLK:

Q.   Mr. Gladson, how many investigators does your office have?

A.   I have seven sworn investigators.

Q.   And how many people are in your circuit?

A.   Current estimate is at 1.5 million people.

Q.   And do -- the investigators in your office, do they work on homicide cases?

A.   Yes.

Q.   Do your investigators work on robbery cases?

A.   Yes.

Q.   Are there any crimes that your investigators don't work on?

A.   Not really.  They will -- their job is to help the prosecutors and help the cases move along.  And they'll do any -- if I ask them or give them an assignment -- no matter what crime it is, if I ask them to investigate it or to assist a law enforcement agency to investigate it, they'll do that.  So it's the whole range of criminal cases.

Q.   And can you explain for us how -- what role -- or if prosecutorial discretion plays any role in how your office investigates and prosecutes complaints or cases that it receives?

A.   Sure.

Discretion for a prosecutor is important and our job as cases come in is to figure out right away as much as we can by reading the case whether it's going to be a prosecutable case or not.

We also have to take into consideration if there's a live victim in a particular case, because they have constitutional rights, statutory rights. So we try to prioritize cases and level of severity and also whether or not there's a victim that needs to be contacted, because with our resources, it needs to start there. It's kind of like a triage.

Q. And in petition fraud cases or cases of suspected petition fraud what sorts of evidence would help investigate or identify the victims in those cases?

A. Well, as we talked about before, the letters were, I think, critical because they allowed people to say, That was not me, so then we knew we had a real victim, so that was the first step.

But we -- we attempted all types of different ways to identify different items of evidentiary value on these types of cases. But Ms. Bautista admitting that that was her signature was, I think, critical in that trial that we had.

Q. Mr. Gladson, have you ever voiced concerns about fraud in the citizen initiative process to other government officials?

A. I have.

Q. And what situation or situations did you express concerns about the citizen initiative petition fraud?

A.   The time that comes to mind is in 2021 with the gambling initiative what we're talking about.  There were so many complaints that came in, and I had done some quick research and figured out that whatever deadline it was for these things to get on the constitutional amendment ballot was coming up.

And because I had so many coming in, I realized I couldn't -- personally this office could not deal with it, and I also suspected that it was in other counties.  I sent a letter to Attorney General Ashley Moody and let her know that I think this is happening everywhere because it's happening at least in all five of my counties.

MR. STAFFORD:  Objection to hearsay.

(Reporter requested clarification.)

MR. STAFFORD:  Hearsay.  This is offered for the truth of the matter asserted.  Objection to relevance if it's an expression of this witness's concern.

THE COURT:  Overruled in part and sustained in part.

What I'm more interested in is who he communicated it to, and he said he communicated it to the then-Attorney General Moody; correct?

THE WITNESS:  Yes, sir.

THE COURT:  And did you communicate it to any House -- members of the State House or State Senate?

THE WITNESS:  No, sir.

THE COURT:  All right.  I understand.

You can continue.

He's identified who he expressed his concerns to because -- I've already excluded evidence of intent, but to the extent somebody, meaning a reviewing court, determines I'm wrong, the plaintiffs have asserted who knew what and who was communicated what would be potentially relevant for purposes of the analysis, so it's on that basis I overrule the objection.

Counsel, you may proceed.

BY MR. WOLK:

Q.   And, Mr. Gladson, what were the concerns that you expressed in your letter to the Attorney General?

A.   I indicated in my letter that I received complaints from all five Supervisors of Elections regarding the same ballot initiative, and, in particular, I had a lot in Marion County.

So I wrote a letter that explained that and asked that the statewide prosecutor be assigned or at least told about it so they could look into it, along with the Florida Department of Law Enforcement.  It was basically a referral, like, Hey, this is going on in case you didn't know, at least from my perspective.

Q.   Mr. Gladson, is it typical for you to write to the Attorney General?

A.   No.

Q.   Why did you take that unusual step?

A.   For the reasons I explained.  It was -- it was increasing

in volume quickly.  There was a time issue as far as -- you know, as I recall, it was coming up, so, I mean, if there was fraud, then it needed to be looked at soon, quickly.

MR. WOLK:  Your Honor, I pass the witness.

THE COURT:  And before you do and before you step back, I have another question.

As I understood your description of the letters that were sent out by Supervisor of Elections and then you'd follow up on, those were letters sent to folks that are identified as potential victims; correct?

THE WITNESS:  Yes, sir.

THE COURT:  And so those were people identified as potential victims of invalidated petitions; correct?

THE WITNESS:  Correct.

As the Supervisor of Elections has staff and they examine, you know, what they -- each petition, and if they determine there might be an issue with the signature, they kind of flag it.

And then the letters that they sent out are ones where they believe that those people's information had been used or their named had been signed.

THE COURT:  So they essentially did -- the initial stage of the investigation is reach out to suspected victims --

THE WITNESS:  Yes, sir.

THE COURT:  -- to figure out are they, in fact,

suspected victims?

THE WITNESS:  Yes, sir.

THE COURT:  Because for you sort of the starting point would be to be able to identify somebody that could come in and say, No, that's not my signature --

THE WITNESS:  Yes, sir.

THE COURT:  -- which is why that was helpful to you?

THE WITNESS:  Yes, sir, absolutely.

THE COURT:  But it's in the context of reaching out to people that -- where petitions had been invalidated and there was suspected fraud?

THE WITNESS:  Yes, sir.

THE COURT:  I understand.

Thank you.

Anything further?

MR. WOLK:  No, Your Honor.

THE COURT:  All right.  Let me find out, do the -- I generally find if there are multiple lawyers that want to cross, if y'all huddle for a minute it expedites things.

So why don't the plaintiffs' counsels huddle so we can have a streamlined cross-examination, and then you can come back and ask your questions.

And thank you for your patience, Mr. Gladson.

THE WITNESS:  No problem.

THE COURT:  I actually think it will save time rather

than drag it out.

Thank you.

THE WITNESS:  I'm good with that.  Yes, sir.

(Recess taken at 2:57 PM.)

(Resumed at 3:06 PM.)

THE COURT:  If everybody will take your seats.

Thank you for your patience, Mr. Gladson.

THE WITNESS:  Yes, sir.

THE COURT:  Counsel, you can begin your cross.

MS. BOETTCHER:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MS. BOETTCHER:

Q.   Good afternoon, Mr. Gladson.

A.   Good afternoon.

Q.   My name is Ellen Boettcher, and I'm counsel for the Right to Clean Water plaintiffs.

I have a few questions for you regarding the topics you just discussed with Mr. Wolk.

You testified in your direct examination that you investigated Maria Bautista, Daviann Dunn, Joshua Perez, Trevon Johnson, and Sydney Coleman; correct?

A.   Well, some of those we got complaints on and referred them to other agencies, and some we investigated.

Q.   Of those five people, which did you investigate yourself?

A.   Primarily Ms. Bautista, and then the two from Hernando

County we preliminarily looked at.  I had an investigator assigned and a prosecutor before those were referred off as well.

Q.   And which were those two from Hernando County?

A.   Daviann Dunn and Joshua Perez.

Q.   And did you investigate Maria Bautista, Daviann Dunn, and Joshua Perez between January 1st, 2022 and the present?

A.   I'd have to look at the dates of when those letters came in to answer that question.

Q.   Okay.

MS. BOETTCHER:  Let's pull up DX 392.

THE COURT:  Why don't you just ask him which document, so you can scroll to it, that would help him refresh his recollection.  I'm not sure the motion denying judgment of acquittal is going to help identify when he started his investigation.

BY MS. BOETTCHER:

Q.   Which, document, Mr. Gladson, would refresh your recollection about Ms. Bautista?

A.   The document that came from -- oh, Ms. Bautista?

Q.   Yes, Mr. Gladson.

A.   That complaint came in via an email and a conversation I had directly with the Supervisor of Elections.

Q.   Do you remember about what year that happened?

A.   2021, maybe October, but I don't remember the exact date.

Q.   Were you investigating Ms. Bautista into 2022?

A.   That -- yes, that case remained open, I'm almost certain, into 2022.  We -- my recollection is that we filed it shortly before the statute of limitations was going to expire.

Q.   Okay.  And for Mr. Dunn which document would refresh your recollection?

A.   That would of -- the letter from Shirley Anderson, the Supervisor of Elections.

Q.   Okay.  I'm thinking it could be DX 857.

          MS. BOETTCHER:  If we could pull that up, Caroline.

          Thank you.

BY MS. BOETTCHER:

Q.   Is this the letter that you are speaking of?

A.   Yes, ma'am.

Q.   And what is the date at the top of this letter?

A.   November 1st, 2023.

Q.   Okay.  And for Mr. Perez what document would refresh your recollection?

A.   The same document, just with his name on it.

Q.   I think that will be DX 893.

A.   Yes, a letter from Shirley Anderson addressed to me at my Brooksville courthouse office.

Q.   And what is the date of this letter?

A.   January 22, 2024.

Q.   Do you remember answering interrogatory requests in this

case?

A.    I know our office worked -- yes, I know we did.  I did not, but we did.

Q.    Okay.

MS. BOETTCHER:  And if we could pull up, Caroline, the interrogatories sent on August 5th, 2025.

BY MS. BOETTCHER:

Q.    Do these look like the interrogatories sent to your office, Mr. Gladson?

A.    So looking at the style of the case and -- yes.  To say that I examined the interrogatories personally, I cannot say now.  We have an attorney that worked on that response.

Q.    Okay.

A.    It appears to be, yes.

Q.    And if we go to page 9 and look at the first instruction, it says that these interrogatories apply to the period from January 1st, 2022, through the present, unless otherwise limited or expanded.

Do you see that?

A.    Yeah, I can read it.  Yes, sir -- yes, ma'am.  Sorry.

Q.    Great.  And then if we go to Interrogatory No. 1 on page 14, do you see, Mr. Gladson, that your office was asked to identify and describe all investigations you have conducted related to fraud in connection with ballot initiatives?

A.    Yes.

Q.   And if we can turn to Interrogatory 2, Mr. Gladson, do you see that your office was asked to identify and describe all investigations you have conducted related to any other alleged election law crime or irregularities in connection with ballot initiatives?

A.   I see that.

MS. BOETTCHER:  Caroline, if you can please turn to the September 18th responses to interrogatories.

THE COURT:  Counsel, it will be helpful to the Court to tell me what's the date they would sign that cabins it on the other end.

MS. BOETTCHER:  Okay.

THE COURT:  Can you just tell me?  Let's -- if they were signed, and I suspect they weren't, on January 3, 2022, it would be a very small window that they are being asked about. So when were they signed?

MS. BOETTCHER:  I believe they were signed on September 18th, 2025, Your Honor.

THE COURT:  Okay.  Thank you.

BY MS. BOETTCHER:

Q.   And if we go to the response to Interrogatory No. 1, the response, if we look through them -- and I'm happy to give you time to read that -- lists Marietta Markett --

A.   Okay.

Q.   -- Sharisse Massey --

MS. BOETTCHER:  Go to the next page.

BY MS. BOETTCHER:

Q.   -- Rhonda Taylor, Latrell Owens, and Dujoin Haynes.

If we go to the next page, that's the end of the response to Interrogatory 1.

A.   Okay.

Q.   And so you did not discuss those five individuals on your direct examination, but you did discuss Maria Bautista, Daviann Dunn, and Joshua Perez; correct?

A.   Correct.

Q.   You did not list those three individuals -- Maria Bautista, Daviann Dunn and Joshua Perez -- in response to this interrogatory; correct?

A.   Correct.

Q.   And if we go to the response to Interrogatory No. 2, the response says:  *This office has no additional responsive cases beyond those articulated in response to Interrogatory 1 above*; correct?

A.   Correct.

MS. BOETTCHER:  And if we could go to the signature page from Chief Assistant State Attorney Walter Forgie.  It should be the previous page.

BY MS. BOETTCHER:

Q.   Did Chief Assistant State Attorney Walter Forgie have the authority to sign these interrogatory responses on behalf of

your office?

A.    Yes.

Q.    And is it -- is it still your testimony that more than the five people listed in response to Interrogatory 1 should have been included in that response?

A.    If I understand the question as it relates to the interrogatory, when I say "investigate," that case -- that complaint came; it was put in the system; it was given to a lawyer and an investigator to preliminarily look at it and then send it off.

So if -- but that's not an investigation like Jeff Pfannerstill did where he went out and interviewed witnesses and sent out letters and things like that.  Those were kind of in-and-out referrals right to the other agencies.

I don't know if that answers your question or not.

Q.    It does.

Except for Maria Bautista; correct?

A.    Correct.  I mean, we prosecuted Maria Bautista.

Q.    Your office investigated Maria Bautista after January 1, 2022; correct?

A.    I don't remember when her trial was, but we made our filing decision, and once we made our filing decision, I guess the investigation portion was over, but --

THE COURT:  I overruled the -- I sustained the objection.

Y'all can pull up the exhibit.  What was the date of the verdict?  The verdict is in that exhibit.  That could refresh his recollection.

MS. BOETTCHER:  D --

THE COURT:  No, no.

MR. JAZIL:  Your Honor, I have a copy.

THE COURT:  I've got it right here.

MS. BOETTCHER:  DX 392.

THE WITNESS:  The date of the verdict was July 30th, 2025.

MS. BOETTCHER:  We can take that down, Caroline.

BY MS. BOETTCHER:

Q.   So should Maria Bautista have been listed in these interrogatory responses?

A.   I mean, it appears -- I don't know when the end of the interrogatory -- I saw when it started, but I don't know when it ended, but --

Q.   Sure.  So if we pull up the --

THE COURT:  You already put that in the record that they were signed September 18th, 2025.

So the conviction -- verdict was July 30th, 2025, and the rogs were signed a month and a half later.

THE WITNESS:  Yep.

BY MS. BOETTCHER:

Q.   The period went through the present, so that would be the

date that they were signed.

A.    And I would, if I could, point out one -- one point too.

We charged fraudulent use of personal identification information.  We didn't charge under the petition fraud statute.

So when you take someone's identity, if you charge -- if you steal someone's social security number, you know, name, address, and you use it knowingly and willfully -- and that's what our charges were -- that may explain why when you put "petition fraud" under there, it wasn't under that one particular provision in the code, but it was, in fact, you know, 100 percent petition fraud.  It was the way we chose to charge it.

Q.    And we talked about Interrogatory No. 2.  Again, I'm happy to pull it up.  But that asked to identify and describe all investigations you have conducted related to any other alleged election law crime or irregularity in connection with ballot initiatives.

Do you believe that her crime falls under that scope of that interrogatory?

A.    I believe it was an election-related case, yes.

Q.    And your office did not include her -- Ms. Bautista on its responses to Interrogatories 2 or 1; correct?

A.    Not from what you've showed me, no.

Q.    And your office has not supplemented or amended these interrogatory responses; correct?

A.   Not that I'm aware of.

Q.   Of the five investigations that were listed in response to Interrogatory 1, they were all related to the casino gaming ballot initiative; correct?

A.   Yeah.  I mean, there was some that we -- I'd have to trust you on that.

     There's nothing on my screen, but there were some that were gambling and some that were abortion.  I just don't know.

          MS. BOETTCHER:  Okay.  If we could pull up the September 18th responses to Interrogatory 1, please.

BY MS. BOETTCHER:

Q.   There's Ms. Markett, Ms. Massey, Ms. Taylor, Mr. Owens, and Mr. Haynes.

     Are all five of those --

          THE COURT:  She's just directing your attention here --

          THE WITNESS:  Yes, sir.  I see it.

          THE COURT:  -- so we can expedite things.

          THE WITNESS:  Yes, I see it.

BY MS. BOETTCHER:

Q.   Are all five of those investigations related to the casino gaming ballot initiative?

A.   It indicates they are, yes.

Q.   And all five of these investigations were closed with no criminal charges filed; correct?

A.   I believe so, yes.

Q.   And so this interrogatory response lists five responses, five circulators, and in your testimony you testified about five more people.  Does that make ten?

A.   If there's five listed on here, and I testified about five other ones, that is ten.

Q.   Great.

How many investigations into every type of crime has your office brought in total since January 1st, 2022?

A.   I couldn't tell you.  I can tell you we had 41,000 complaints come through for 95 lawyers pretty much every year, between 40 and 41,000 complaints of all types.

Q.   Would you say that you've investigated more than 500 crimes in that time frame?

A.   So I'm going to be a little particular with answering that because we typically rely on law enforcement to do the investigations.  They're the ones who do the workup on the cases.

We are really not considered an investigating agency, so I can't imagine we have investigated ourselves anywhere near 500 cases.

THE COURT:  So are you asking how many they prosecute per year?

MS. BOETTCHER:  No, Your Honor.

BY MS. BOETTCHER:

Q.   I'm asking approximately how many investigations into every type of crime have you investigated since January 1st, 2022?

A.   I can't -- I couldn't even speculate.

Q.   Okay.

Thank you.

MS. BOETTCHER:  I'm going to confer briefly.

THE COURT:  Certainly.

Were those rogs in evidence that you asked him about, by the way, just so it's clear for the record?

MS. BOETTCHER:  They're not in evidence, Your Honor.

THE COURT:  Okay.  So my court reporter can refer to them, you were showing them which exhibit?

MS. BOETTCHER:  So it was not an exhibit, the rog responses.

THE COURT:  Well, no, I know, but is it marked as an exhibit?  I know you told me it wasn't admitted, but it was not even marked?

MS. BOETTCHER:  It was not marked.

THE COURT:  All right.  Just if you can later on give the couple of pages to the court reporter.  I'm just asking because she knows where to look for names.

MS. BOETTCHER:  Yes, I can absolutely do that.

THE COURT:  Thank you.

You can go confer with everybody.

Thank you.

(Discussion between the attorneys.)

BY MS. BOETTCHER:

Q.   Okay.  Thank you for your time, Mr. Gladson.

A.   You're welcome.

MS. BOETTCHER:  I am done.

I don't know --

THE COURT:  Thank you.  Anything else from Smart & Safe?

MR. BURHANS:  No, Your Honor.

THE COURT:  That was already Clean Water.

Anything from the League?

MR. OSAKI:  Briefly, Your Honor.

THE COURT:  Okay.  Thank you.

Oh, wait.  I skipped somebody.  I meant to say Florida Decides Healthcare.

And I almost looked at you, Ms. Osaki, and said, Why are you responding for the wrong plaintiff? so I'm sorry.  I was calling out the wrong name.

MR. STAFFORD:  The fault is here.

Nothing from us, Your Honor.

THE COURT:  All right.  Yes, ma'am, Ms. Osaki.

CROSS-EXAMINATION

BY MR. OSAKI:

Q.   Good afternoon, Mr. Gladson.

A.   Good afternoon.

Q.   Now, all the individuals you discussed on direct today are paid circulators; correct?

A.   It's my understanding, yes.

MR. OSAKI:  No further questions.

Thank you.

THE COURT:  Any redirect?

MR. WOLK:  No, Your Honor.

THE COURT:  All right.  Thank you for your patience with us, Mr. Gladson, and thank you for your time.

You have a good day.

THE WITNESS:  Thank you.

THE COURT:  Safe travels home.

THE WITNESS:  Am I free to --

THE COURT:  You're free to go.

THE WITNESS:  -- stay in the courtroom if I wanted to?

THE COURT:  Oh, you can stay in the courtroom, too, sure, although I don't think anything else is going to happen other than housekeeping matters.

THE WITNESS:  I didn't say I was.

THE COURT:  We talk about it's like watching paint dry, as you know.

(Mr. Gladson exited the courtroom.)

THE COURT:  All right.  As I understand, the parties are going to confer, and then we have two additional witnesses,

Matthews and Pratt, at this juncture.

Is that correct?

MR. JAZIL:  Yes, Your Honor.

THE COURT:  All right.  And let me know what your plans are in terms of, Judge, we're going to be able to figure everything out in the next hour or two, or, Judge, it would be better to start slightly later tomorrow.

What I don't want to do is show up tomorrow, not work on something else, and have y'all all be a circular firing squad.  I'd just as soon have y'all, you know --

MR. JAZIL:  Shoot now.

THE COURT:  No.  I'd rather give you time to discuss whatever it is you people discuss so that I don't have to waste my time tomorrow morning.

MR. JAZIL:  Your Honor, Mr. Ben Stafford and I have been playing a good game of tennis, so, you know, the ball's in his court and hopefully he'll strike it back to me soon.

THE COURT:  Stated otherwise, let me ask directly since objection, nonresponsive, sustained.

So the question is are you going to be ready at 8:30 in the morning?  I'm just trying to --

MR. JAZIL:  Yes, sir.  We'll be ready.

THE COURT:  We will reconvene at 8:30 for the next two defense witnesses.

Before everybody jumps up, let me make sure, anything

else from any of the plaintiffs lawyers?

Hearing nothing, court is in recess.

Thank you.

(Proceedings recessed at 3:26 PM on Wednesday, February 18, 2026.)

* * * * * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. Any redaction of personal data identifiers pursuant to the Judicial Conference Policy on Privacy is noted within the transcript.


/s/ Megan A. Hague                         2/18/26

Megan A. Hague, RPR, FCRR, CSR          Date
Official U.S. Court Reporter

**I N D E X**

PLAINTIFFS' WITNESSES                                PAGE

CECILIA GONZÁLEZ HERRERA
Direct Examination By Ms. Osaki                      1757
Cross-Examination By Mr. Stafford                    1774
Redirect Examination By Ms. Osaki                    1777

ALICE NEWLON
Direct Examination By Mr. Dato                       1780
Cross-Examination By Mr. Stafford                    1793


DEFENDANTS' WITNESSES                                PAGE

IMALTZIN MOLINA
Direct Examination By Mr. Rosenthal                  1803
Direct Examination By Mr. Jazil                      1824
Cross-Examination By Mr. Stafford                    1826
Cross-Examination By Mr. Clark                       1846
Cross-Examination By Mr. Mastoris                    1848

DEFENDANTS' WITNESSES (Cont'd.)                    PAGE

JONATHAN BRIDGES
Direct Examination By Mr. Jazil                    1853
Cross-Examination By Ms. Boettcher                 1889
Cross-Examination By Mr. Mastoris                  1895
Redirect Examination By Mr. Jazil                  1899
Cross-Examination By Mr. Mastoris                  1903

WILLIAM GLADSON
Direct Examination By Mr. Wolk                     1909
Cross-Examination By Ms. Boettcher                 1935
Cross-Examination By Mr. Osaki                     1947

**E X H I B I T S**

| PLAINTIFFS' EXHIBITS | OFFERED | RECEIVED |
| --- | --- | --- |
| LEAGUE-16 | 1754 | 1754 |
| LEAGUE-58 | 1754 | 1754 |
| LEAGUE-64 | 1754 | 1754 |
| LEAGUE-67 | 1754 | 1754 |
| RTCW-184 | 1752 | 1752 |
| RTCW-199 | 1752 | 1752 |
| RTCW-200 | 1752 | 1752 |
| RTCW-209 | 1752 | 1752 |

| DEFENDANTS' EXHIBITS | OFFERED | RECEIVED |
| --- | --- | --- |
| 10 | 1900 | 1900 |
| 1559 | 1851 | 1851 |
| 1560 | 1851 | 1851 |
| 1561 | 1851 | 1851 |
| 1563 | 1851 | 1851 |
| 1564 | 1851 | 1851 |

1952

| DEFENDANTS' EXHIBITS (cont'd.) | OFFERED | RECEIVED |
|---|---|---|
| 1567 | 1851 | 1851 |
| 1568 | 1851 | 1851 |