**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

FLORIDA DECIDES HEALTHCARE, INC,)
et al.,                         )
                                )
            Plaintiffs,         ) Case No: 4:25cv211
                                )
        v.                      ) Tallahassee, Florida
                                ) February 19, 2026
CORD BYRD, in his official      )
capacity as Secretary of State  )
of Florida, et al.,             )
                                ) 8:31 AM
            Defendants.         ) Volume VIII
_____ )

**TRANSCRIPT OF BENCH TRIAL PROCEEDINGS**
**BEFORE THE HONORABLE MARK E. WALKER**
**UNITED STATES CHIEF DISTRICT JUDGE**
**(Pages 1953 through 2174)**

Court Reporter:            MEGAN A. HAGUE, RPR, FCRR, CSR
                           111 North Adams Street
                           Tallahassee, Florida 32301
                           megan.a.hague@gmail.com

*Proceedings reported by stenotype reporter.*
*Transcript produced by Computer-Aided Transcription.*

**APPEARANCES:**
**For Plaintiffs Florida Decides Healthcare:**

King Blackwell Zehnder & Wermuth PA
By:  FREDERICK STANTON WERMUTH
     QUINN RITTER
     Attorneys at Law
     fwermuth@kbzwlaw.com
     qritter@kbzwlaw.com
25 East Pine Street
Orlando, Florida 32801

Elias Law Group
By:  BEN STAFFORD
     Attorney at Law
     bstafford@elias.law
1700 Seventh Avenue
Suite 2100
Seattle, Washington 98101

Southern Poverty Law Center
By:  AVNER MICHAEL SHAPIRO
     KRISTA A. DOLAN
     Attorney at Law
     avner.shapiro@splcenter.org
     krista.dolan@splcenter.org
3710 Raymond Street
Chevy Chase, MD 20815

Elias Law Group
By:  HARLEEN K. GAMBHIR
     Attorney at Law
     hgambhir@elias.law
250 Massachusetts Avenue
Suite 400
Washington, DC 20001


**For Intervenor Plaintiff Safe & Smart:**
Stearns Weaver Miller
By:  GLENN BURHANS, JR.
     HANNAH E. MURPHY
     CHRISTOPHER R. CLARK
     Attorneys at Law
     gburhans@stearnsweaver.com
     hmurphy@stearnsweaver.com
     crclark@stearnsweaver.com
106 East College Avenue, Suite 700
Tallahassee, Florida 32301

**APPEARANCES (cont'd):**

**For Intervenor Plaintiff League of Women Voters of Florida, et al:**

                          Democracy Defenders Fund
                          By:  SPENCER KLEIN
                               JACOB KOVAS-GOODMAN
                               Attorneys at Law
                          pooja@statedemocracydefenders.org
                          spencer@statedemocracydefenders.org
                          jacob@democracydefenders.org
                          600 Pennsylvania Avenue SE
                          Unit 15180
                          Washington, DC 20003

                          Winston & Strawn, LLP
                          By:  GEORGE E. MASTORIS
                               TYLER MATTHEW DATO
                               SAMANTHA I. OSAKI
                               NATHAN C. GREESS
                               JOHANNA RAE HUDGENS
                               Attorneys at Law
                          gmastoris@winston.com
                          tdato@winston.com
                          sosaki@winston.com
                          ngreess@winston.com
                          jhudgens@winston.com
                          200 Park Avenue
                          New York, New York 10166

**For Intervenor Right to Clean Water:**

                          Campaign Legal Center
                          By:  ROBERT BRENT FERGUSON
                               HEATHER JEAN SZILAGYI
                               ELLEN MARGARET BOETTCHER
                               ALEXIS DENAE GRADY
                               WILLIAM "LIAM" KYLE HANCOCK, III
                               MELISSA LAUREN NEAL
                               Attorneys at Law
                               bferguson@campaignlegalcenter.org
                               hszilagyi@campaignlegalcenter.org
                               eboettcher@campaignlegalcenter.org
                               agrady@campaignlegalcenter.org
                               whancock@campaignlegalcenter.org
                               mneal@campaignlegalcenter.org
                          1101 14th Street NW
                          Suite 400
                          Washington, DC 20005

**APPEARANCES (cont'd):**


**For Defendant James Uthmeier:**

                              Florida Attorney General's Office
                              By: WILLIAM STAFFORD, III
                                  SARA SPEARS
                                  MARYSSA SAVANNAH-LYNN HARDY
                                  Attorneys at Law
                              sara.spears@myfloridalegal.com
                              william.stafford@myfloridalegal.com
                              maryssa.hardy@myfloridalegal.com
                              119 South Monroe Street, Suite 500
                              Tallahassee, Florida 32301

**For Defendant Cord Byrd:**

                              Holtzman Vogel Baran, et al.
                              By: MOHAMMAD O. JAZIL
                                  MARTIN C. WOLK
                                  RANDALL M. RABAN
                                  Attorneys at Law
                                  mjazil@holtzmanvogel.com
                                  mwolk@holtzmanvogel.com
                                  rraban@holtzmanvogel.com
                              119 South Monroe Street, Suite 500
                              Tallahassee, Florida 32301

                              Florida Department of State
                              By: ASHLEY DAVIS
                                  General Counsel
                                  ashley.davis@dos.myflorida.com
                              R.A. Gray Building
                              500 South Bronough Street
                              Tallahassee, Florida 32399


**For Defendant Intervenors Republican Party:**

                              Shutts & Brown, LLP
                              By: TARA PRICE
                                  BENJAMIN GIBSON
                                  Attorneys at Law
                                  tprice@shutts.com
                                  bgibson@shutts.com
                              215 South Monroe Street
                              Suite 804
                              Tallahassee, Florida 32301

**APPEARANCES (cont'd):**

**For Defendant Supervisors of Elections:**

                              GrayRobinson PA
                              By:  ANDY V. BARDOS
                                   JAMES T. MOORE JR.
                                   Attorneys at Law
                                   andy.bardos@gray-robinson.com
                                   tim.moore@gray-robinson.com
                              301 South Bronough Street
                              Suite 600
                              Tallahassee, Florida 32301

                              Office of the Supervisor of Elections
                              Miami-Dade County
                              By:  OREN ROSENTHAL
                                   Attorney at Law
                                   oren.rosenthal@votemiaimidade.gov
                              2700 NW 87 Avenue
                              Miami, Florida 33172

**P R O C E E D I N G S**

(Call to Order of the Court at 8:31 AM on Thursday, February 19, 2026.)

THE COURT:  We are on the record in Case No. 4:25cv211 for day eight of a bench trial.  I've got counsel present.

I want to address some housekeeping matters.

And it's my understanding the defense has two additional witnesses; is that correct?

MR. JAZIL:  Yes, Your Honor.

THE COURT:  All right.

In terms of housekeeping matters, I want to circle back to yesterday.  I think the record is clear on what my ruling was, but I want to add a little bit more meat to the bone so it's clear about what my ruling was, for example, on the packet of materials from the State attorney.

Let me start with I understand why the question may have been asked about whether somebody has a duty to collect data, for example, under the public records exception, but I want to make plain that clearly there's a world of difference between Florida law that requires public records should be maintained and the scope of the public records exception to hearsay.  The two are not coterminous in terms of the scope of those two principles.

Moreover -- and I don't want to belabor the point, but Mr. Wermuth was absolutely right when he said, Judge, it's not

that it's a public record generally, setting aside Chapter 119 that makes that exception apply.  Here are all the requirements for and the limited amount of information that would come within that exception.  He was absolutely right, and if it wasn't clear, I was acknowledging that argument and the limited scope of the public records exception.

I'd also pause here to note that, as I noted, that just because something doesn't come in as a -- en masse, a group of documents, as a public record doesn't mean you can't ask questions about it.

Also, while there may be those, including folks in this courtroom, that think I speak just to hear myself talk, I ask the questions of the State attorney for a reason that I ask. How many people -- how many complaints have you had?  How many people were charged?  How many people were convicted?  How many cases are pending?  That's the exact information that the Legislature required to be reported, and it's also information that certainly the witness had personal knowledge about and could testify about and, obviously, had reviewed materials in his office to be able to answer those questions in terms of the number of prosecutions and so forth.

I'd also note that just because you can't hand in a packet of documents doesn't mean I'm holding either side to some unreasonable standard.

Let me pause here to say that in this court and in

state courts, every day criminal judgments are introduced, that is, certified criminal judgments.  There's all kinds of documents that can be introduced to show charges and convictions.  That information -- but that doesn't mean that you just introduce the -- a file on a particular case from a State attorney's office.  Those are two different things.

Also, the idea that somehow this information can't get -- be gathered I categorically reject.

I was a public defender in 1998 where our IT systems were not nearly as good as they are today, and as a brand-new assistant public defender, I challenged a prosecution as vindictive prosecution.

And it wasn't rocket science.  I went down to IT.  We plugged in the statute number and the subsection, and I was able to pull every case that -- which there weren't that many -- again, hence the argument of vindictive prosecution, that had been brought under that particular subsection.

I then again, not rocket science, went and pulled the probable cause arrest affidavits to look at the underlying facts that related to that and presented the material to a Judge Hall in a motion to dismiss for vindictive prosecution.  And I recall still what Judge Hall said:  Mr. Walker, this took some work.

Yeah, it took some work.  I had to look and read -- I know it's a crazy thought -- probable cause affidavits to match up what the charges were with the allegations to establish that

nobody for the similar facts had ever been charged in the history of the Second Circuit.

So if I could do that in 1998 with one guy, public defender, no resources, this idea that we can't marshal admissible evidence to answer those questions I just categorically reject.

I wanted -- the witness testified to the numbers and facts he certainly could. So I want to point out that I provided some guidance about how the information could come in. I've now offered some examples of the way other information can come in.

I also wanted to make plain that I'm not holding anybody to any unreasonable burden. It seems to me that if a criminal defendant who has got a public defender who is in his 20s can gather that sort of information, surely the State of Florida, with all its resources, can.

Let me also circle back. Mr. Wermuth and company took umbrage with me allowing a witness to talk about, generally, information regarding what was reported to him. As I noted, I would not, nor did I, let the witness engage in some narrative description of what everybody had told him related to a specific case. However, consistent with the Eleventh Circuit case law, you can explain -- I got this information -- I used the BOLO as an example. You can explain generally, This is the information I got and why I took the actions that I took. That is not

barred based on a hearsay objection.

There's a line between when does it become, This is information I received which explains the actions I took, versus engaging in a narrative description.  Counsel for the defense did not do that and neither did the witness, which is why I thanked the witness for not embellishing or adding a bunch of additional information.  He simply answered the questions that he had been asked.

And I think I fairly articulated my answer to why simply because the -- in certain instances the privilege had been asserted as it relates to ongoing information, why I allowed the information that I did in.  I think I explained that you cannot not disclose documents claiming privilege and then talk about those document.  That's not what happened.

I cabined what -- and defense counsel, to their credit, they limited their inquiry to what I had said based on a ruling.  And I had cabined what could come in consistent with my view that if you turned over the documents and the information was free to be discussed, then that was -- did not fall within the ambit of the protective order or my order on the motion in limine.

I don't want to belabor the point.  I think I've made it clear why I said what I did.

Also -- I'll circle back -- I try my best under Rule 103 of the Rules of Evidence to note when I've made a

definitive ruling so people don't have to continue to object. I'm not doing that because I'm trying to have somebody waive somebody for purpose of appeal. I'm doing it so they don't waive it for purpose of appeal, but we don't belabor the point and keep revisiting the same objection.

All right. And if I think of some other things I want to clarify, I'll do that later.

Let me find out with respect to the next two witnesses -- Ms. Matthews and Ms. Pratt -- do I need to address the OECS report issue before we hear from them, or, No, Judge, that's not going to be necessary because we can do that afterwards, because it's not going to be something that's going to become a feature of their testimony?

MR. STAFFORD: My understanding from Mr. Jazil is that it would be a feature of their testimony, and so we do think that makes this a live issue. It could be addressed now. If more conducive to the proceedings here, it can be addressed through additional admission, and then we could take up the issue afterwards. But we do have various objections to these reports.

THE COURT: All right. Let me circle back.

Mr. Jazil, I'm not in any way limiting anybody. Just as I have asked every lawyer with every witness, what's your best guess of how long you are going to have with Ms. Matthews and Ms. Pratt?

MR. JAZIL:  Your Honor, Director Matthews should be short, 30 minutes.  Director Pratt will be longer, hour and a half.

THE COURT:  Okay.

All right.  So we have some time.

Let's -- I know you filed your -- meaning the plaintiffs, filed a trial brief regarding DX 2, DX 3, and DX 4, which is ECF No. 649.  You also filed ECF No. 650, which is the notice of filing exhibits in support of the trial brief on those same three exhibits.

Y'all help me -- and I am not going to apologize.  I have got a lot going on, so maybe I should know this already.  I've got a -- what's been referred to as the interim report, and then I've got the report that incorporates by reference the interim report.  I thought -- and if I'm using the wrong nomenclature, y'all can let me know.  My understanding based on what been presented and the arguments I've heard thus far is DX 2 is what's been called the interim report; DX 3 is the -- no.  I'm sorry.  DX 3 is the interim report.  DX 2 is the report that incorporates by reference DX 3; is that right?

MS. PRICE:  Your Honor, DX 4 is the interim report.  DX 3 is the final report that incorporated DX 4, and DX 2 is the OECS report from the prior year.

THE COURT:  I got it.

And so the record -- I should have just looked at

621-1.  It has the dates.  So had I looked at the dates, that would have made sense.  I just want to make sure we framed it to make things easier on any reviewing court.  I'm looking -- referring now to 621-1, page 2, what's been called the interim report is DX 4.

The report, then, that we've heard incorporated by reference, DX 4, is DX 3.

And then DX 2 is the report from the year before.

MR. STAFFORD:  And just for clarity, Your Honor, because of the size of the files, DX 3 is broken across two of the entries, 650-2 and -3.

So apologies for making this complicated.  DX 2 is found at 650-1.  That is the January 2024 report.

DX 3 is found at 650-2 and -3.  That's the January 2025 report.

DX 4 is found at 650-4.  That is the December 2024 interim report.

THE COURT:  All right.  And you're referring to ECF No. 650, which I had referenced earlier, where I said you had filed exhibits in support of the trial brief, which is ECF No. 649.

Thank you.

All right.  So we've got something filed by the plaintiffs.  I can hear from plaintiffs if you want to add something to what you filed in the written papers, and then I

can hear the government's response.  It seems to me since you have already made your position known in papers, I'd rather hear the government's response and then have you reply; but if you want to add something at the outset, you can.

MR. STAFFORD:  Your Honor, I would ask to make a few points up front.  I will defer the bulk of the argument to being in response.

Setting aside the question of whether this is a public record under 803(A), our understanding is that the government's view -- or the defendants' view here is that the bulk of the report comes -- or the reports come in under 803(A), that the appendices to those reports would not be offered for the truth of the matter asserted, and that the audit, which is found at DX 4 and discussed throughout DX 3 in various places, would also not be offered for the truth of the matter asserted.

Mr. Jazil can correct me if I misstated that.

Setting up the question of whether this is admissible -- or these reports are admissible under 803(8), each report consists in large part of hearsay within hearsay.  That's true in the body of the report.  It's certainly true in the appendices.

So to give an example, if we could display DX 3, ECF 650-2, the second paragraph of the exact --

THE COURT:  Hold on one second.  It's not up.

MR. STAFFORD:  And this will be the second paragraph

of the executive summary once we have that displayed.

(Pause in proceedings.)

MR. STAFFORD:  Okay.  So the second paragraph of the executive summary here on page 6 of the document talks about allegations made by Supervisors, electors, and even FPF contractors, subcontractors, and paid circulators.  All of that is hearsay within hearsay.

If we go to page 21 of the same document, just one other example of this issue --

THE COURT:  Well, Counsel, let me -- here's the rub. It doesn't mean it all comes in, but just labeling something hearsay on hearsay, wouldn't that preclude findings under 803(A) -- if I cast the net that broadly and I construe -- because any time you make a finding, it's hearsay by implication.  I mean, you can't have a finding in any report, plane crash, ship wreck, anything, your findings are based on interviews and data.  So it's by definition hearsay by implication.

So if we just call everything hearsay or multiple layers of hearsay, then that would affect -- and that would preclude the admission of any findings under 803(8), I've just effectively, if that's the scope of my ruling, eliminated 803(8) as an exception to hearsay.

MR. STAFFORD:  And, Your Honor, that is certainly not our position.

THE COURT: Because it's by definition hearsay, which is why we are talking about 803(A).

MR. STAFFORD: And, Your Honor, the issue here is --

THE COURT: Hold on.

MR. STAFFORD: I apologize.

THE COURT: In 803(8), the finding itself, because it's a written out-of-court statement, is hearsay. By definition, it's going to be based on something else, so it's always going to be hearsay within hearsay because it's hearsay by implication because you are summarizing information and data; right?

So that doesn't answer the question -- that may mean I don't include the underlying data. It may mean that there may be gratuitous hearsay added within it.

But let me cut to the chase because this is what I really need to help you -- and Mr. Jazil can -- we are going to have a record. These are attached, and any reviewing court can look at these and decide that we are going to rewrite 803(8) and that the State can just introduce everything en masse and that we can just call it, We are not offering it for the truth of the matter asserted, arguably one of the most abused arguments to try to get in inadmissible evidence.

But help me to understand, why don't the data that they were supposed to collect, how many people were charged, how many people -- I mean, how many reports, how many people were

charged, and conclusions related to those questions, why would I not allow those parts of the report in?

And let me make plain, this would be far more difficult if this were a jury trial, but it's not. It's a bench trial. So this idea that I can, in a bench trial -- and I don't think this is some special rule that Judge Walker has come up with, but it's not uncommon for a trial court in a bench trial to say: This is all that I'm considering because this is all that falls within the ambit of the directive, and it would be information that was collected and findings. I can consider that. That's all I'm considering. I'm not considering the rest of it.

Again, I mean, we are rewriting all kinds of law. Apparently everything is government speech now in the Eleventh Circuit, including apparently -- I don't know -- maybe even what I'm saying right now.

So I get it. The law is evolving and changing. So maybe we'll just decide 803(8) allows everything in en masse; not the law, never has been, but maybe that will be the new rule in the Eleventh Circuit.

But what I don't understand is why wouldn't I at least let that information in, and is not properly before me, numbers and conclusions related to those numbers?

And to the extent there is hyperbole -- I know it's shocking there is going to be hyperbole in these reports. But,

look, if it's a jury, I'd have to redact it, exclude it, or maybe I can't redact it, so I have to exclude the document; but I can ignore it.  I'm not sure the Eleventh Circuit will, but I'd ignore it because I'm not going to rely on nonsense.

But why isn't that the proper thing for this Court to do?  Just to cut to the chase.  I consider the numbers and the findings, which is what 803(8) allows.

MR. STAFFORD:  So, Your Honor, part of our challenge, very long reports, that's certainly not how the State has sought to introduce these and --

THE COURT:  That's why I'm cutting to the chase --

MR. STAFFORD:  Correct.

THE COURT:  -- and Mr. Jazil can make his record about, Judge, we get it all in, and we get in all the underlying data, and we are going to say, Judge, we are really not offering it for the truth of the matter asserted.  We are just introducing the underlying data that would support the findings, which seems to be absolutely introducing it to support the truth of the matter asserted.

But be that as it may, why would I not just do that?

MR. STAFFORD:  Let me try to cut to the chase as well.  There's tables in two of the reports, not the interim report.  It has numbers and figures.

The issue under 803(8) is that if you go through those tables, most of them are actually talking about reporting of

other agencies.  SOE reports, reports of other agencies, those don't come in as OECS.

THE COURT:  And that's what Mr. Wermuth made the point the other day that 803(8) isn't -- doesn't incorporate by reference other agencies and other agencies' reports.  I got it.  So I don't consider that.

But, surely, there is somewhere where they sum up the data and have findings in these reports.

MR. STAFFORD:  I think the place that they sum up the data, it's different in the different report.  It's not in the interim report at all.

There is a sum-up of data in DX 2 and DX 3.

The sum-up of data is largely, because of the function of how OECS operates as a clearinghouse to some extent of other agencies, the sum-up is largely a sum-up of other agencies' findings, not things within the observation of OECS itself.

The second, there is a column --

THE COURT:  Hold on.  At some point the rule of reasonableness has to apply to this Court construing 803(8).  How else would you do it?  It just seems to me as a practical matter -- I mean, this is not heads you lose, tails you lose for the government either.  If you charge an entity with the responsibility of reporting data, they are going to gather the data from other folks and then report on it.  And so I don't understand why somehow that takes it out of the ambit of 803(8)

simply because they've gotten the data from other --

MR. STAFFORD: There's certainly nothing wrong with the State of Florida setting up an agency that works that way. The question is whether that allows an OECS report to be a conduit for submitting hearsay from other agencies. They could go and submit the data from the other agencies. To the extent this is just a recitation of evidence that they have gathered under the *Hines* case, 886 F.2d at 302, Eleventh Circuit, 1989, you can't do that.

Records of other agencies are not public records of an agency simply because they are handed --

THE COURT: Absolutely. But if you take that data and create a new document based on that data, isn't that exactly what 803(8) would allow, which is different than just simply reporting information from others?

You gathered from all the State attorneys' information that you are now reporting on. Isn't that what 803(8) would permit?

MR. STAFFORD: To extent that what the report actually said -- and I don't think this is what it said -- OECS has received 500 referrals. We pass that along, right. That statement might meet the components of the public records exception.

The issue is that the way this report operates, even in the tables that are, I think, the closest to what the Court

is talking about, there's a summary of the allegation.  So if they said:  We've received 500 referrals.  We've reported that over.  Those are the total numbers.  If that's what it said, I don't think I would be standing here.

THE COURT:  Don't we have -- you're telling me that data is not contained in the report.  I understand there is a lot of extra information, which, again, a jury is not going to be able to -- we couldn't redact all the extra information, and we'd spend three days doing it.  It could confuse the jury when you submit a document where you've got just a minor bit of information.  There's a 403 argument, that even with the limiting instruction, the jury is going to see a 300-page report where 299 of the pages are redacted, and there's only a sentence here or there.  I get it, we would have arguments.

But for the Court, you are telling me there is nowhere where I can just look in this, and that limited information, where I ignore the commentary about it, would be in the report?

MR. STAFFORD:  Your Honor, where the Court should look for that kind of information, if we take 650-1, which is DX 2, at page 13, it's a section entitled Report entailing information on investigations of alleged law violations or irregularities.

It includes summary level information, case status codes, and then a lengthy table with a case breakdown.  The case breakdown starts in this particular document at page 16.

The issue that we have here is, to the extent that

there is, for example, row 6 of the table on page 16, it is summarizing a citizen referral on what -- or civilian referral on what the nature of that civilian referral is.

So our position on this table would be portions of it are just reflections of the allegations. To the extent that what we are talking about is OECS report and it's overall numbers --

THE COURT: Hold on one second.

But column number 2 is -- hold on -- is source, which is 7A under the provision -- the Legislature's provision; right?

The alleged nature of the irregularity reported is column number 3, which is B.

The county is column number C.

Whether it was referred to an agency or another is County No. 5, and the status, 6, is (e).

And this is all -- those -- doesn't this table -- why does this table not overlap with 97.022(1)(7)?

MR. STAFFORD: It does overlap with that. This is what OECS is tasked with doing.

So let me try to make this simple. Our concern is really Column B of this table and the extent that information is being reported elsewhere. If this table in DX 2 and DX 3 was all that came in to evidence as a public record and the rest of it is excluded, I think that would satisfy plaintiffs' concerns, Your Honor.

THE COURT: All right. So you have answered my question, Yes, Judge, if there is data that is collected that's consistent with what they were charged to do, then that would come in.

Then the question becomes, does some -- is there somewhere else in the report -- because this would then be the findings -- where they take this and there's a summary of this information.

MR. STAFFORD: Your Honor --

THE COURT: In other words, here's the number of people that were charged; here's the number of people that were convicted, because it seems to me that that's the sort of findings and conclusions that also comes in under 803(8).

MR. STAFFORD: Your Honor, I think it's in the same section of the report. If Your Honor looks at Column E, it has the status, and then at the beginning of these sections, there's complaints received independent initiative investigations --

THE COURT: Hold on. Can you put it up so I can see it?

MR. STAFFORD: Absolutely.

If we could put up -- yeah, it's page -- I am -- let me -- I think you have DX 3 up right now. Let me, again -- you have DX 2 open right now?

Okay. Thank you so much. I will get the appropriate portion of DX 2 so we can all be looking at this.

So for page -- there we go.  If you could just scroll up a little bit.

THE COURT:  And let me say that any code or explanation of what information comes in so you can read the tables would also come in.

MR. STAFFORD:  Your Honor, in our view, what Your Honor is describing would be found in this particular section of the OECS report.  This is DX 2 that we are looking at.

THE COURT:  What's the page number in DX 2?

MR. STAFFORD:  The page number is page 13 of ECF No. 650.

THE COURT:  For any reviewing court, when we use ECF numbers, the ECF numbers are not necessarily going to be the same as the page number of the report.  So we are going to use the ECF numbers so it's easier to find because it's at the top of the ECF document.  An example would be 650-1, page 13 of 360.

MR. STAFFORD:  Correct.  And the header is the Section II, "Report Detailing Information on Investigation of Alleged Election Law Violations or Irregularities."

THE COURT:  Let me ask you that:  Somewhere did they define those things?  In other words, did they -- and this is for a different purpose, but I'm interested since they said in that opening paragraph that they are talking about --

MR. STAFFORD:  Your Honor, my recollection is that

term is not defined, but I'm not 100 percent confident in that regard.

THE COURT:  Fair enough.

If anybody can show me that later, that would interest the Court.

MR. STAFFORD:  And then --

THE COURT:  So that's clear, that was the heading of Subsection II on 650-1, 13 of 360, where they use the terms "violations of election law or irregularities."

MR. STAFFORD:  And then we were looking at 650-2.  I would draw the Court's attention in 650-1 -- sorry -- did I misstate?  Sorry.  We just looked at 650-1.

If we could look at 650-2, and if we can scroll up here to have the beginning of this, we would find the same section at page 29 of ECF 650-2.

I do not believe that DX 4 contains this section of the report, because it is a supplemental interim report.

So we would, in the interest of streamlining, agree that this one section of the report meets 803(8).

The balance of it we think is, essentially, a regurgitation and a characteristic of other people's work, hearsay within hearsay, and also characterizations that do not meet the elements of factual findings.

The *Beech Aircraft* case certainly says that those factual findings might be characterized as an opinion.  We think

that the engine wasn't fully operational.  The issue here is that by its -- the terms of its mandate under 97.022, OECS is tasked with conducting preliminary investigations.  Each of these reports emphasizes that they contain preliminary findings.

And the last thing I'll say here, Your Honor, is that the *Toole v. McClintock*, 999 F.2d at 1434 and 35, holds -- and it excluded reports under 803(8) that contained only proposed findings because, according to the Eleventh Circuit, quote: *Rule 803 makes no exception for tentative or interim reports subject to revision of review.*  And that's exactly what these reports are from the OECS.

So certainly more arguments and nuances and rabbit holes to go down in a 900-page -- or hundreds of pages of reports, but those are our primary arguments.  That's what we would agree would come in.

THE COURT:  I believe in your argument a separate subissue, which would certainly be factual findings that could also include conclusions, would be based on any statistical analysis that were done, which was a slightly different issue; correct?

MR. STAFFORD:  Yes.  And in that regard, among other things, we would -- our position would be that would be untrustworthy.  I believe the defense's expert essentially said that our expert erred by concluding they were trying to do an unbiased study.

THE COURT:  No.

(Indiscernible crosstalk.)

THE COURT:  Right, he erred by saying it should have been unbiased.

MR. STAFFORD:  Correct.

THE COURT:  I got it.

MR. STAFFORD:  So that is our concern.

It's also outside the agreement of OECS, contains various hearsay statements and other issues.

And also my understanding -- and, again, Mr. Jazil can correct me -- is that --

THE COURT:  And you're relying, for example, in cases where the Eleventh Circuit has repeatedly said, quote, *Placing otherwise inadmissible hearsay statements by third parties into a government report does not make the statements admissible.*

MR. STAFFORD:  Certainly, Your Honor.

THE COURT:  Okay.  I understand your argument.

Mr. Jazil.

MR. JAZIL:  Thank you, Your Honor.

Your Honor, Mohammad Jazil for the State.

My understanding is my friends for the intervenors were also planning on moving these reports into evidence, so they may have something to add.

Your Honor -- I believe Your Honor understands my argument for trying to get all the reports in.  I understand

Your Honor's colloquy with my friend earlier about where that stands. I simply note that we are still moving for that, and I understand where the Court is on that.

I would ask for a definitive ruling under 103(b) so that I don't have to keep trying to offer for the same reason over and over again, if Your Honor is amenable to that.

THE COURT: Absolutely.

MR. JAZIL: And I want to make sure I'm not waiving anything. So for the appellate record, I want to make clear I'm not waiving anything by engaging in the colloquy, but I do want to answer some of Your Honor's questions.

Your Honor, I understand my friends to be agreeing that the data about the things that OECS was supposed to do should come in, the tables, et cetera, but there's nothing in the organic statute for OECS 97.022 says that this data must be laid out in chart form. There are examples in the report where similar data is laid out and narrative data is still there.

THE COURT: Let me pause here. I was not limiting it to that. In fact, I believe I repeatedly said, To the extent that information that I said properly came in and properly came as findings, even if it was colored by some hyperbole, that I was going to admit that.

So I don't think I said anything that was suggesting that I was simply limiting it to the tables. In fact, I stopped and said, If you have information that explains the tables and

explains the terms and explains how it was gathered, that comes in.

And to the extent there are other summaries of that information, which is why I specifically asked and counsel for the plaintiffs gave one example of where there was other information that summarized the data, meaning this is the number of complaints, these are the numbers of referrals, et cetera, I wasn't suggesting only that one page came in. I said, Wherever that information is, I'm going to review it.

So when I review the closing arguments and I'm considering what's properly before me, I was trying to -- I'm not going to go through these reports line by line and redact what I am or am not considering. I would have to do that if it was going to a jury. I'm not doing that now.

But it seems to me what I was trying to do, so it was clear and everybody can make their record of what I was considering, anywhere in these reports, consistent with my ruling, that that information is found, that's fair game for me to look at it, and I intend to look at it, and I intend to consider it for purposes of ruling on the issues before this Court and certainly the Eleventh Circuit.

What I'm doing is also excluding -- I'm not going to consider any hyperbolic statements; I'm not going to -- because it would be a 403 issue; I'm not going to consider the underlying hearsay; and I'm also not going to consider anything

that is tentative or interim.  What I am going to consider is the conclusions and findings wherever those are found in the reports.

MR. JAZIL:  Understood.  Thank you, Your Honor.

THE COURT:  And the information summarizing the data that goes to those conclusions, with the one caveat we are going to have to talk about, the statistical analysis, separately.

MR. JAZIL:  Understood, Your Honor.  Thank you.

And for the interim issue and the cases discussing the interim issue, I've always understood them as talking about draft reports.  So if I have got a draft report from someone that the agency itself hasn't seen fit to, you know, put its name on and share with others, if that shouldn't go out and be considered as part of this assessment.

THE COURT:  Let me read directly from the Eleventh Circuit, what they've said.  They've said that, *Rule 803 makes no exception for tentative or interim reports subject to revision and review.*

And so if it's a report that's closed out and this is -- we are sending this over and it's done, but if it says it's subject to revision and review, that's the standard.

MR. JAZIL:  Understood, Your Honor.

Here I'm focusing on the interim report.  The interim report itself was amended once.  The interim report was then incorporated by reference into the final report that the agency

sent.

So if we are taking all that together, I think, in my mind, it's fair to say that the interim report, despite the name "interim" stamped on it, by having it incorporated by reference after the changes that were made in December should be --

THE COURT:  Let's be practical, though.  Let's -- I'm not just saying -- when I say that, I'm not disagreeing with your argument.  What I'm saying is let's cut to the chase.

What's different -- for both my benefit and whatever panel gets this case, what's different between the numbers and conclusions in the interim report?  Is it additional information in the interim report about the total number of reports, total number of prosecutions, total number of convictions and stuff? Is that different?

I'm just trying to -- as a practical matter, because I'm going to want to look and I suspect any reviewing court would want to look, I'm just trying to figure out -- I mean, we may be talking about how many angles fit on the head of a pin, which is probably a bad example because there are those that would say that's the important question, I guess.

Anyway, is there -- is there a quantum of information that I wouldn't have if I didn't consider it?

MR. JAZIL:  Your Honor, we believe there is a quantum of information you wouldn't have.  I haven't gone back and done a red line between the final --

1984

THE COURT:  I can say for now, I'm going to -- if there's additional information in the interim report, data of the type that I'm talking about that wasn't -- I find, because it's been incorporated by reference in the final report, that data by incorporation I'm going to consider.

Having said that, I'll have to look, and nobody is like -- I mean, for example, Judge, here's this table of information, report information that was only incorporated by reference; it's not in the final report.  Because it was incorporated by reference in the final report, I'm going to consider it.  I just -- right now nobody is able to point to me an example.  But if there is such an animal, then I'll consider it.

MR. JAZIL:  Understood, Your Honor.

Your Honor, also the discussion about the dropoff rate, the congressional and statewide averages of invalidity issues, I simply note for the Court that as I read the interim report, that appears on pages 18 through 19, if -- I simply note that.  That was the focus of the untrustworthiness related testimony from Dr. Herron.

THE COURT:  Well, I guess there is two problems with that.  One, it's borderline shocking to me, based on the testimony that's been introduced, not just by the plaintiffs but also by the defense, that we are conflating invalidity with fraud.  I mean, they are just two different animals.

MR. JAZIL:  Your Honor, I hope to clarify that with one of our witnesses on the stand today to talk about what it is that we are doing in the audit and how the audit came about, what they were trying to do, et cetera.  So I hope to counter some of that testimony with --

THE COURT:  Look, the invalidity can matter in terms of a different issue.  I didn't say it wasn't relevant.

MR. JAZIL:  Sure.

THE COURT:  It's relevant to explain -- and I do actually listen to testimony, so I think I can -- you know, I'm not the sharpest tool in the shed, but I think I understand why I'm supposed to hear certain information.  I'm paying attention to it.

But if you change the law because there's certain concerns we have, because we want to make sure that this is an open and transparent process and that if somebody, for example, wants their -- if I sign a ballot initiative, it ought to be counted.  If folks are gathering them from me and I think that I'm actually voting to get a ballot initiative on the ballot and it's discounted because somebody screws up, we want to make sure that it's fixed and that there's a mechanism to make sure that every true ballot initiative is counted, and we've got all these rules and we are implementing them because we are trying to make sure that's done and done properly, that's one thing.  And I understand why that may be relevant, but I think that's

different than just lumping everything under the umbrella of it's fraud.

That was the only comment that I was making in that regard.

MR. JAZIL:  Understood, Your Honor.

Your Honor, the OECS reports also have complaints from the Supervisors of Elections.  We heard from Supervisor Earley, for example, that they are under an obligation to provide these referrals to OECS.  They are also in the attachments, referrals from OECS to law enforcement, and OECS has an obligation to refer these things to law enforcement.

Your Honor --

THE COURT:  Why does that make it an 803(8) document that comes in?

MR. JAZIL:  Your Honor, quick search this morning. Here's the closest case I found, and I'll read from it, Your Honor.  It's *United States versus Central Gulf Line,* 747 F.2d 315, and the pin cite is 319.  And here the Fifth Circuit from 1984 -- so this is not binding on this Court, but regardless, it's --

THE COURT:  Even the ones that are binding apparently aren't binding in the Eleventh Circuit anymore.  I've found that out.

But go ahead.

MR. JAZIL:  Your Honor --

THE COURT:  You just don't cite them, if the district court cites them, if you don't like them, that's apparently the way you handle those.

But go ahead.

MR. JAZIL:  Your Honor, the Court said:  "The records sought to be admitted must be made from matters within the personal knowledge of the public official making the record or his agent or someone with a duty to report the matter to a public official."

In here, if the Supervisors have an obligation to report the complaints to the Secretary of State's office --

THE COURT:  That's why their conclusions come in, but does that case say the underlying data comes in?

MR. JAZIL:  That's why the conclusions come in; the underlying data being the form --

THE COURT:  The referrals themselves, the documents that shows the referrals.  I mean, the fact that you have a thousand referrals comes in, I've already said that.

MR. JAZIL:  Okay.

THE COURT:  That ship -- the plaintiffs, to the extent they're arguing otherwise, that ship had sailed.  They lose.

But what I don't -- the case you are reading from, it seems to me that that's roughly akin to -- I mean, just stating the rule, that if you have a report, it's got to be based -- and it's based on a duty to report, you can -- that information can

be considered, and it can be collated, and we can come up with conclusions.

MR. JAZIL:  Fair point, Your Honor.

And here, if I may, I'd like to pivot for a moment.

Your Honor, if the --

THE COURT:  I mean, that's the rule itself that says that; right?

MR. JAZIL:  Yeah.  If the underlying data comes in -- and I guess my question is, why can't the complaint form itself that the OECS attached to the report come in through the nonhearsay purpose of saying, Here are examples of complaints we got.  And they list out, for example, the Supervisors to show that it's not just one Supervisor; it's a Supervisor -- a complaint could be from Mark Earley, a medium-size county, or --

THE COURT:  That information came in.  Didn't I say that we've got the tables that show that these are the counties they are coming from, these are the different -- who's referring it.  I've absolutely.  So please -- although, again, even when I explicitly say things like "I'm not considering the history of recidivism in Florida," and I explicitly say that in my order, you then read the opinion that says that's what I relied on.

But I'll try again, the Eleventh Circuit if they are listening, I absolutely am not excluding that information.  I've already said who the referring agency is, where it's coming from, the county, the general nature of the allegations, that

absolutely comes in.  That information has been gathered, and it's put in these tables, and it's put in other parts of the report summarizing it.  That's 803(8).

The question becomes -- and I read the language before -- is that that 803(8) doesn't mean all that other stuff, that is the underlying information and documents come in.  And I am I'm not aware of any case that says it does.

In fact, I think the Eleventh Circuit -- and I quoted earlier -- teaches us that doesn't mean you just bring in wholesale all the inadmissible hearsay.

MR. JAZIL:  Understood, Your Honor.

Your Honor, you also had a question about the language in the OECS reports that was referencing irregularities.  I simply note that that language is being taken from 97.022 of the Florida Statutes which talks about OECS's remit as assessing election law violations or election irregularities.  That phrase is in the statute.  The only --

THE COURT:  It's also before me in one of the claims about the RICO statute.  I was just trying -- and I said it was unrelated to this question of admissibility.

I was just interested, because it could actually help the defense, quite frankly, is it defined -- did somebody talk about what it is elsewhere?  Because, as you know, in the preliminary injunction I ruled in your favor on a number of things because I said you don't have to have the most tortured

reading to create vagueness.  So I ruled against the plaintiffs on a number of issues regarding language.

So I thought it would be helpful for me in analyzing the RICO statute if I had some information in terms of this is how we read it.

That's the only reason why I asked that question.

MR. JAZIL:  Understood.

MS. PRICE:  Your Honor, if I may for just a moment?

THE COURT:  Sure.

MS. PRICE:  Sorry.  I'm losing my voice now.

I'd just like to say intervenor defendant echoes the arguments of the Secretary of State.  And it sounds like -- and I just want to confirm what Your Honor would like is, after this case, us to be able to go through each of the reports and identify the portions that we believe are admissible and the reason for that just so that you've got something --

THE COURT:  I'm not going to require you to do that.

MS. PRICE:  Okay.

THE COURT:  What I'm telling you is what would be helpful in your closing arguments is to reference the -- this is more about me giving y'all guidance about what I -- not only in my ruling, so it's clear what my ruling is for any reviewing court, but also to give y'all guidance; that while I'm not going line by line through it now, I absolutely agreed with Mr. Jazil's statement that you are not limited to the table.  If

there is information elsewhere that's consistent with that type of information, I'm going to consider it.

So there's going to be places, for example, that may -- this is a silly example, but I'm going to use it.  The table says there are 500 complaints in the Fifth Circuit, and then there's somewhere else that says those 500 are broken down this way by county, and so forth.  I mean, there's clearly going to be other information in the report that has a more granular level of some of the information that's in the report, for example.  That's just an example of where I'm going to consider that, and that would fall within the ambit of my ruling.

I'm not going to require y'all to -- because you may not be relying on every bit of it.  I'm not going to require y'all to go through the exercise of highlighting these documents and say, Judge, we believe this is consistent with your ruling as to all these documents.

I'd rather y'all focus on, This is the information that supports our position and why we win on these various issues.  And what's going to be helpful is you're just going to reference the page number on ECF of those documents.

For me, mechanically, though -- and I'll hear from y'all -- it would be easier for me, I think, and easier for the Eleventh Circuit if we had one document and we were all using the same document.

So is there a reason why we couldn't just use the

latest filing today?  Or we can separately do it if y'all want one that doesn't have any highlighting on it --

MS. PRICE:  Thank you, Your Honor.

THE COURT:  -- as a separate -- so these are the reports, and then -- so I'd rather you do that, so that way everybody is making the same citations for my benefit and the Eleventh Circuit.  That would be helpful.  But I'm not going to make you go through and highlight everything.  I mean, you are going to highlight it in your argument and say, This is the information we are relying on, and that's good enough for me.

MS. PRICE:  Yes, Your Honor.

And if I can ask another question for clarification?

THE COURT:  Certainly.

But if you can do that by just doing the same reports that he did as clean reports, just do those as a filing today. And I'm letting both sides know we are going to use the ECF number -- not the page numbers in the document, but we are going to use the ECF numbers for each of those reports.  So it will be, like, 700-1, page 30 of 47, whatever it is.  They are bigger than that, but whatever.  I was giving an example.

So can you file the reports by the close of business today?

MS. PRICE:  Yes, Your Honor, we can do that.

THE COURT:  And we'll do that.  And whatever that ECF numbers is, let's use those.

MS. PRICE:  Thank you, Your Honor.

THE COURT:  I'm sorry.  Next?

MS. PRICE:  That's okay.

If I could just ask one question for clarification?

THE COURT:  Sure.

MS PRICE.  It sounds like -- and like I said, I just wanted to clarify -- that the statutory elements that the Legislature required from, you are going to consider where those are in the reports, and they don't necessarily all need to be together in the same place for those be considered?

THE COURT:  Absolutely not.  I absolutely agree with what you just said, they don't have to all be in the exact same place.

MS. PRICE:  Okay.  Thank you very much, Your Honor.

THE COURT:  I also want to make plain that I'm not saying you can't -- under 803(8), you can't have a summary and findings that are slightly different than simply a table of numbers.  That is not my holding at all.  803(8) would allow you to independently take the information and then report findings. In fact, I think that's part of what the plaintiffs took exception to here is, Judge, if you are simply spitting out information that somebody else gave you, that's what they were saying was a problem.

So that's why I want to turn next to the limited amount of information, which, Ms. Price, you pointed out

throughout the examination of the UF professor, and so forth, that when we are talking about the reports, Well, Judge, that's just a few pages of the report.

I'm sorry.  It wasn't the UF professor.  It was our Dartmouth professor, although Dartmouth is sort of the UF of the northeast.

But, anyway, I'm not suggesting you can't have that sort of data.  You certainly could.  A different issue is, does that data come in, and that's a separate issue.

MS. PRICE:  Yes, Your Honor.

Thank you.

MR. STAFFORD:  Your Honor, plaintiffs understand the Court's ruling.  Just three quick points that are related to that.

In terms of the scope of what OECS is reporting, we would just draw the Court's attention to 97.022(7) which references the scope of OECS's remit, which --

THE COURT:  I think that's what I referenced earlier.

MR. STAFFORD:  Correct, which is largely reporting numbers.  Again --

THE COURT:  Which tracks the tables that we were talking about earlier and I gave examples of column by column is consistent with (7) in the various ABCDs.

Go ahead.

MR. STAFFORD:  In terms of the preliminary issue that

we referenced, certainly, again, there was an interim report, but if we look at DX 3 -- this is the January 2025 annual report at 650-2 ECF page 22 -- there's a reference to OECS reporting the preliminary results of the audit are incorporated by reference.  If we go to page 23, it references that the audit is ongoing, OECS's future plans.  This as well is a preliminary report.  Same issue under the Eleventh Circuit decision.

And the third and final point is with regard to the scope of the Supervisors' responsibilities to report information to OECS.  We are not aware of any statutory basis that the Supervisors must report information to OECS.  Certainly they can, but we don't understand them to be under a legal duty to report each and every concern that they have of this kind to OECS.  It's defense -- it's the defendants' burden to prove that element of 803(8).

THE COURT:  I thought the incorporation by reference, and this is preliminary, the audit, was dealing with the statistics, not dealing with the other data.

MR. STAFFORD:  The specific portion that I just read is referencing the audit.  That is correct, Your Honor.  If you look at the --

THE COURT:  But so it's clear to any reviewing court and it's clear for me, because I want to make sure that I'm -- we are talking about the same thing, is the audit -- are we talking about the numbers of complaints, charges, convictions,

pending cases?  Or when we say "audit," are we talking about, Well, we ran the numbers to determine the number of fraudulent or invalidated petitions is much greater than we thought?

MR. STAFFORD:  In that particular portion, that I just referenced, Your Honor, I believe it is the latter, the audit that was conducted in DX 4.

With regard to the broader issue, I'll just call the Court's attention to --

THE COURT:  Wait a second.

But if I'm excluding that information, I don't see how that changes my ruling that it incorporates by reference; it's therefore saying the other information is final if it's consistent with the information I've allowed.

MR. STAFFORD:  If the Court is excluding the audit, then I would agree.

THE COURT:  Let me -- and let's just cut to the chase, because the audit is talking about invalidated petitions that were previously validated, which is a different issue than what we were talking about in the tables and the information I was letting in.

I keep carving out and saying the -- what we are now calling the audit, so we are all on the same page, is a different question for the Court.

I also will note, as is consistent with everything I've said on the record today -- and, by the way, I think

consistent with case law.  This is not Judge Walker just creating something from whole cloth, although who knows what the ultimate conclusion will be in that regard.

But 803(8) does not say it's an all or nothing. 803(8) doesn't say every bit of information and underlying data comes in, as suggested by the defense, nor does it say if there's portions that needs to be struck, that means that you can't consider portions that don't need to be struck.

I mean, you don't disagree with that, do you, Counsel?

MR. STAFFORD:  We certainly agree with that general proposition.

THE COURT:  Which is why I'm letting in what I let in.

But let me just cut to the chase with the audit.  It's not -- I don't even -- I find that the -- Dr. Herron; correct?

MR. STAFFORD:  Dr. Herron.

THE COURT:  I find that Dr. Herron was credible.  I found that his conclusions regarding the audit were well-founded.  I have to say, as I alluded to the other day, it's when you are -- literally, as pointed out by the plaintiffs, the expert that was reviewing his work didn't take exception with his analysis of why the statistical analysis was flawed; correct?

MR. STAFFORD:  That is my understanding.

THE COURT:  Nor did they take exception to his view of why that information would result in a skewed conclusion;

correct?

MR. STAFFORD:  That is my understanding.

THE COURT:  Well, right now what we've got is we were -- he was asked and he had in his rebuttal -- I don't have the rebuttal witness and I don't have the rebuttal report.  So it's clear, all I've got for me now is his supplemental report responding to the rebuttal expert, and I don't believe I've heard anybody to the contrary.

Have I, Ms. Price?

MS. PRICE:  No, Your Honor.  I would just say --

THE COURT:  And by the way, I want to make plain you don't have to put on the rebuttal expert.  Cross-examination certainly can undermine somebody's conclusions or their statements.  And so, you know, it doesn't matter who calls a witness, and it doesn't necessarily matter what they said on direct.  Cross-examination can certainly undermine that.

But go ahead, Ms. Price.

MS. PRICE:  Thank you, Your Honor.

I'm not disagreeing with what you just said.  However, I would note that Dr. Herron's opinion was cabined to portions of page 18 and 19, which dealt with extrapolation and trying to do statistical calculations based on audits that were done.

So I would not -- I would reject the idea that the plaintiffs have presented evidence that calls into question the trustworthiness of the audits of Palm Beach County, Orange

County, and Osceola County that were done.  I think Your Honor will hear evidence -- more evidence regarding that today.  And I know that that's not necessarily fraud, because it's -- it's indications of invalidity, and so Your Honor can take that for what it's worth, and we can make our arguments in closing.

But I would just like to make that argument that Dr. Herron's opinion is cabined to those two pages.

THE COURT:  Let me make plain what -- so it's clear what I'm excluding.

The idea that you are going to identify fraud or fraudsters and then you are going to take a -- that subset of people and then you are going to take a -- nonrandom, cherry-picked some of theirs and then from that you are going to use -- then control it with an adjustment from a subset of one county to produce a number to suggest a statewide or a local -- or a particular area's error rate and the number was in excess of 16 percent, that's an idea that almost a fifth of all validated petitions are -- statewide should not have been validated.

It's that extrapolation which is beyond junk science.  It is -- bears no relation to any proper statistical analysis.  His review in that regard is spot on, and the idea under 803(8), when the critique of that was, Well, you are trying to -- it's not yielding an -- unbiased numbers, because we are trying to present an argument about why we are justifying something, is

exactly what 803(8) doesn't allow.

So even if it -- there was some debate about whether or not anybody, including a first-year student at UF taking statistics, would do a model that way. The answer is absolutely not. And I think I was spot on when I asked the doctor, although he didn't like my language, You'd be failed? So if you are going to fail a first-year student undergrad at UF for that statistical analysis, there is no way it's the type of statistical analysis that any court would accept. It is beyond junk science.

And then when you add to that the conclusion of the rebuttal expert that it's designed to be biased, it's mind-boggling that anyone would say that that will come in, but perhaps the Eleventh Circuit will say that's just fine and dandy. I don't know. But not in my court until I'm told I have to consider such absolute nonsense in terms of the numbers.

Now, separate and apart from that information, I think it's clear what I was just talking about. I don't think it's -- you are saying, Judge, we respectfully disagree -- that's fine -- as to that information. And I think I've done a fair -- when I say "fair," I think I've fairly articulated what universe of information I'm talking about.

Let's start there. Have I -- you may not agree that the conclusion is fair, but have I fairly articulated what I'm saying is the scope of what I'm excluding?

MS. PRICE:  Yes, Your Honor.  I'm not making an argument right now with regard to those portions at page 18 and 19 that you just described.

THE COURT:  What beyond that are you saying would come in?

MS. PRICE:  Beyond that that I'm saying would come in is what data the extrapolation was based on.

In fact, this is an investigation and a series of investigations that OECS did itself.  So, again, it goes to invalidity.  As Your Honor has said, there's some relevance there, and we can make our arguments.  But plaintiffs have offered no evidence that would suggest there is any untrustworthiness, and, as Your Honor said, you made a ruling --

THE COURT:  Go ahead and tell me -- what are we talking about just at a 30,000-foot-up view?  Judge, let me give you an example of the data that I'm talking about.

MS. PRICE:  I believe what Your Honor is going to hear today and has heard already is that OECS was concerned that individuals that it believed were committing fraud were also having petitions validated that should not have been.

THE COURT:  Sure.

MS. PRICE:  So that's how the investigation started in Palm Beach County.

Then they went to Orange County, and they wanted not just to sample larger information -- a series of petitions based

on that same data.  Then they said, Well, let's take a look at this if we're not limiting it to people that we think are known or suspected fraudsters at all, like just in general.

THE COURT:  And are these the tables you're talking about, because I recall the testimony?  There were tables that showed that -- and I'm -- I want to make sure that I characterize it.  They said fraud or fraudsters, the number that were validated, the number that were invalidated, and there was a third bullet.

MS. PRICE:  Yes, Your Honor, to the extent that some were fraudsters and some were just, Give me a cross section of everybody so can see, if we don't limit the scope, just what's out there.  Do we have an issue with petitions being validated that should not be?

THE COURT:  I understand that.  So that is different in kind than what I was talking about, which is -- that information.  Although, while he didn't talk about the statistical analysis, Dr. Herron did talk about, I don't -- I don't know what this means because we are not told, for example, how many of these were mismatched signatures, how many of these were -- you didn't fill in data, so we don't really know why they were invalidated and so forth.  So I recall the documents, the tables, and I recall the arguments back and forth in terms of that.

He did challenge, though, I thought, through his

testimony, the methodology used to generate the numbers that -- these are the numbers that would have been invalidated because it was -- everything was just jumped into one number. I thought he did challenge that methodology.

MS. PRICE: Your Honor, I remember him talking about selecting on the dependent variable, but I believe you'll hear testimony today that OECS was transparent with exactly what it was doing. It told the reader when it was reviewing petitions that it suspected might be from people who they thought were frauds; it told the reader when they were reviewing a cross section of Floridians.

I would note that Dr. Herron said he had an absence of information, and plaintiffs coming here with an absence of information cannot call into question the trustworthiness of an official report from the government. And I believe Your Honor will hear additional information from --

THE COURT: So wait. Ms. Matthews or Ms. Pratt were the ones that were assembling the information?

MS. PRICE: Ms. Pratt, Your Honor. You'll hear information directly from her. She was directly involved and directly assembled the reports.

THE COURT: Okay.

Counsel.

MR. STAFFORD: Your Honor, I think there is a more fundamental issue here, which is all of this is contained in a

supplemental interim report in an audit that the subsequent report says is ongoing.  So under the Eleventh Circuit's case law, the interim report is preliminary, subject to change, inadmissible.

THE COURT:  So, Judge, in addition to saying that the other information was subject to change, namely, the percentages where it was slightly broken down that we were talking about earlier, the statistics, this information also falls within the ambit of that.

MR. STAFFORD:  It falls within the ambit of that issue, which is why the interim report does not include the table reporting out the annual information that OECS compiles.

THE COURT:  They are going to say, Ah, we incorporated it by reference.

MR. STAFFORD:  It's incorporated by reference in a report that says the audit is ongoing.  So this is preliminary and excluded under the Eleventh Circuit's case law.

THE COURT:  Counsel.

MS. PRICE:  Thank you, Your Honor.

I would make a couple of comments to that.  One, the statute itself requires OECS to report on the status of the investigations it does.  It would not do that if it only wanted to hear from the OECS regarding to completed investigations.

Second, I would add that just because the entirety of an investigation that -- what OECS is conducting has not been

completed, that does not mean that the portions that they have already completed that they will not revisit have not been done.

It would be impossible for OECS to do a statewide audit of 67 counties. I mean, they're going to be lucky to do a couple counties a year, and so we're talking that none of that would be admissible for ten or more years. I mean, that's just not reasonable.

And I think that the data and the investigation that has been done thus far, which is complete -- yes, the data is ongoing, but OECS is very clear that it's ongoing going to new data, new counties, looking at new information, talking to new supervisors. That's different than, Here's what we're giving you, but we're not telling you that -- what we've given you. We're going to change that.

MR. JAZIL: Your Honor, if I may, to put a finer point on it. 97.0227 asks that OECS -- or, rather, tells OECS to have a report in by January 15th for the prior year.

And so the report that OECS provided January 15, 2025, for the prior year, which incorporated by reference the work that had been done before, is the final report for that period.

And the fact that the OECS report for January 15, 2025, mentions work they might be doing in the future doesn't detract from that because, again, their statutory obligation is to have a report done by that date, which they did, and that report done by that date incorporates by reference the -- that

issue point.

MR. STAFFORD:  And not to try the Court's patience, but the January 2025 report that Mr. Jazil was just referencing page 2 and 3 of the executive summary, at 650-2, says:  *OECS submits this 2024 annual report to policymakers and the legislative and executive branches in advance of the upcoming legislative special and regular sessions to summarize its preliminary findings.*

So that is what OECS describes what it is doing.

THE COURT:  I understand both sides' arguments.

MR. STAFFORD:  Thank you, Your Honor.

THE COURT:  And there are at least -- I'm going to let there be a proffer for Ms. -- by Ms. Pratt -- and, again, I'd have to rule on it definitively if we had a jury present.  It's just faster to hear the testimony, and then once I hear that testimony, I'll circle back and address this other piece of the pie, which is -- and if somebody could pull me those pages that we talked about before as an example -- you don't have to do that this second -- so I have it.

And so I think that's the one piece of the puzzle I haven't ruled on, which is, What about the data from these counties that we heard testimony about that have -- setting aside the statistics as it relates to super fraudsters, this is a different issue, which is the validation/invalidation rate when they went and did an audit of three specific counties which

is a related but different issue than what I've already ruled on.

MR. JAZIL:  So, Your Honor, is my understanding correct that Exhibits 2, 3, and 4 are now in evidence consistent with your rulings with 4 being subject --

THE COURT:  Portions of those exhibits are in evidence without me spending the next 6 months redacting 1,200 pages, yes.

MS. PRICE:  Your Honor, would you like a hard copy of that report?

THE COURT:  That'd be helpful.  That'd be helpful.

MS. PRICE:  Okay.

THE COURT:  We've admitted those exhibits in part.

(DEFENDANTS' EXHIBITS 2, 3, and 4:  Received in evidence.)

MR. WERMUTH:  Your Honor, if it would be easier, the reports are already in the docket.  They can be found at, I think, ECF 103.

THE COURT:  Y'all talk about that.  Don't -- I really don't want to have sausage be made in my presence.  I just -- if y'all agree that the three reports are clean and appear on an ECF number, we can come back and announce it, that that's what we're all using, and we don't need to refile them again.

What I was saying, and I agreed with Ms. Price that, Judge, we'd just as soon you not have highlighted, marked-up copies be the exhibit that we're relying on for purposes of this

Court's ruling, so we can talk about that later.

MS. PRICE:  Your Honor, may I approach?

THE COURT:  Certainly.

MS. PRICE:  Your Honor, these are pages marked at the bottom of DX 4, 12 through 20, with the understanding that portions of 18 and 19 the Court will not consider.  This is the entirety of section 2 that we've been talking about with the OECS audit.

THE COURT:  Thank you.

It's just easier than me pulling up big exhibits and scrolling through them --

MS. PRICE:  Of course.

THE COURT:  -- so thank you.

All right.  That was a fun evidence class.

And let me pause here to say since judges complain -- and I certainly have been known to admonish a lawyer for doing something improper -- on both sides during the course of these proceedings we've had new lawyers.  I've heard from my staff that some of them it was their first cross-examination on both sides and so forth, but I've got to say, for the lawyers that you haven't done this a lot, I've been incredibly impressed and you should be proud of the work you've done.

I'll note that the fewest objections and the cleanest record we have, quite frankly, was made by some of the youngest, that is, newest lawyers in the courtroom on both sides.  So

thank you for your hard work.  You should be proud of what you've done.

And it doesn't -- and I understand that some of them may have been less contentious witnesses, but you spoke slowly and distinctly; you asked appropriate questions.  There have been some very effective cross-examinations like I heard yesterday from at least one lawyer.  I think that may have been their first examination, so kudos to the younger lawyers.

And I'm not disparaging the more senior lawyers, but I just -- the younger lawyers, you've acquitted yourselves quite well so you should be proud of the work you've done.

All right.  It is ten of ten.

How long do y'all need as a break?  Who is putting on Ms. Matthews?

MR. JAZIL:  Me, Your Honor.

THE COURT:  Sir, it is I, Mo Jazil.  It was almost Shakespearean.

MS. PRICE:  Your Honor, if we could have ten minutes so I can take a comfort break and consult with Mr. Jazil.

THE COURT:  It's been a long -- and when we discuss legal issues, it's much harder on the court reporter.  We're going to take a 20-minute break.

We'll come back at 10:10.

MS. PRICE:  Thank you, Your Honor.

(Recess taken at 9:50 AM.)

(Resumed at 10:13 AM.)

THE COURT:  All right.  We are back on the record.

Any other matters we need to take up before we bring in the next witness?

MR. JAZIL:  Nothing from the defense, Your Honor.

MR. WERMUTH:  No, Your Honor.

THE COURT:  All right.  Thank you.

Let me pause here.  If we are still going -- nobody is obligated to do this, but I know that we lose some of the 50 lawyers at the end of the day -- I'm going to have light refreshments in chambers this evening when we are finished.  I think it would be nice if all the lawyers who have worked hard these last two weeks spend 10 minutes being polite and respectful to each other.

I'm not requiring anybody to attend.  There are some others that for other reasons, including religious reasons, can't attend.  I understand that.

But y'all are all welcome if you are around at 4:00 o'clock this afternoon or when we break at 5:00, if we go that long.  There will be light refreshments in chambers.

Mr. Jazil, you can call your next witness.

MR. JAZIL:  Thank you, Your Honor.

Maria Matthews.

(Director Maria Matthews entered the witness stand.)

THE COURTROOM DEPUTY:  Would you raise your right

hand, please?

**MARIA MATTHEWS, DEFENDANTS' WITNESS, DULY SWORN**

THE COURTROOM DEPUTY:  Please state your name for the record.

THE WITNESS:  My name is Maria Matthews -- Isabel Matthews.

THE COURT:  Counsel, you may proceed.

DIRECT EXAMINATION

BY MR. JAZIL:

Q.   Good morning, Director Matthews.

What do you do?

A.   I serve as the director of the Division of Elections for the Florida Department of State.

Q.   And how long have you done that?

A.   I have been in this position since January 2013.

Q.   And what do you do as the director of the Division of Elections?

A.   I oversee the Division of Elections, which serves as the -- thank you -- which serves as the administrative support arm for the Secretary of State in his role as the chief election official for the state of Florida.

Q.   Okay.  And who all do you interact with in your role as the director of the Division of Elections?

A.   Well, obviously, with the Secretary of State, the 67 Supervisors of Elections and their staff, the Legislature,

the -- any individuals, such as candidates or political parties or interested entities that involve any duties or activities under the Florida Election Code, voters.  I've -- you know, I speak with voters on the phone, through email communication.  I mean, I've been on the voter assistance hotline and talked to folks during election cycles.

Q.   And now before you became director, did you hold any positions in the Department of State?

A.   Yes, I served as the Bureau of Voter Registration Services chief from June until -- through December of 2012.

Q.   In total, how many years have you spent at the Department of State?

A.   Well, the Department of State, I have been there since -- I believe it's 2004.  I'm starting to date myself significantly here.  I started off as an assistant general counsel in the legal counsel's office before I became the bureau chief.

Q.   Director Matthews, in your role, do you from time to time testify before the Florida Legislature?

A.   It's generally been almost every year, but it's always going to be just when they ask.

Q.   Okay.  Did you testify before the Florida Legislature regarding House Bill 1205?

A.   No.

Q.   Did you answer any calls from staff about what became House Bill 1205?

A.   No.

Q.   Are you aware of anyone at the Department testifying about what became House Bill 1205?

A.   No.

Q.   Are you aware of anyone else at the Department answering calls or emails from legislative staff about what became House Bill 1205?

A.   No.

Q.   Director Matthews, were you and your office responsible for implementing the training-related portions of House Bill 1205?

A.   Yes.

Q.   And what's your understanding of what those training-related portions are?

A.   So the law required a new application process for petition circulators, and part of that application process involved training.  So we had to implement that as well.

Q.   Training for whom?

A.   Training for petition circulators.

Q.   Okay.  And House Bill 1205 passed May 2, 2025, and it was approved by the Governor the same day.

So focusing on this petition circulator training component, how long did y'all have to create this training for circulators?

A.   May 2, 2025, until June 1, 2025, which is when it had to be launched.

Q.   Was that task hard or easy?

A.   No, that is -- it involved, obviously, operational, substantive, and mostly IT.  So there's -- obviously, with any IT project, you have to figure out what the requirements are, what your current system is; if you have a structure already in place, how that can be, you know, adjusted or amended.  Then you have to do the development; then you have to do testing, and then you have to do -- and hopefully you successfully launch, which we did.

Q.   When did you launch?

A.   We launched June 1.

Q.   Remind us, what was the date the statute said you had to launch by?

A.   The application had to be launched by June 1.

Q.   Now, this training y'all put on for petition circulators, is there a test --

A.   Yes.

Q.   -- to -- and the training itself, is it compliant with the Americans with Disabilities Act?

A.   Yes.

Q.   Is the training available in Spanish?

A.   It's in -- in order to satisfy the ADA, we had to put it in an HTML or text part of it so that anyone can translate the program, the online training and testing.

Q.   Are you a Spanish speaker?

A.   Yes.

Q.   Did you test this to see whether or not the training was available in Spanish?

A.   Yes.

Q.   Has your office received any requests for a more formal Spanish language training that's not through the ADA feature?

A.   I am not aware of any specific requests.  If we receive one, then we will certainly accommodate.

Q.   Now, we talked about petition circulators going through training and a test.

How many people have registered as petition circulators since July 2nd, 2025?

A.   Currently we have, like, over 2,700 registered petition circulators.  Now, they could have started in -- June 1 between July 1, there was a period in which the program was available for them, so -- but, as of today -- or not today.  As of either yesterday or the day before, that number was over 2,700.

Q.   Okay.  So someone who took the training in June, do they have to take the training again in July and pass a test in July?

A.   No.

Q.   Why is that?

A.   Because they were grandfathered in.  Now, they still have to do the application, and if they want to circulate petitions going forward, they have to use the new forms.

Q.   In -- Director Matthews, who has been historically the Department's point person for dealing with voters who have

disabilities?

A.   It would be the Division of Elections through our voter assistance hotline, through an email inquiry, through a phone call directly to staff.

Q.   And do y'all make accommodations for disabled voters?

A.   Absolutely.

Q.   Does that include voters who are hoping to sign a petition?

A.   Yes.

Q.   Director Matthews --

THE COURT:  Mr. Jazil, before you move on, if you could ask -- as I understand it, there are currently 2,700 registered circulators.  If you could -- how many were registered before the new test?

BY MR. JAZIL:

Q.   Director Matthews, did you try looking up how many petition circulators were registered before HB 1205 passed?

A.   I did, but I wasn't able to get a firm figure.

Q.   Do you have a ballpark number at all?

A.   I don't want to be guessing.  I'd rather rely on what I'm able to pull.

Q.   And just to unravel that thread a little bit, before this cycle -- this 2026 cycle, we had the 2024 cycle; correct?

A.   Correct.

Q.   Would you expect more or less petition circulators in the 2024 cycle compared to the 2026 cycle?

A.   I would expect because -- of course, we have gubernatorial years, and we have presidential years.  A presidential year is 2024, and also depending on what initiatives were being circulated could have generated a lot more interest and would have involved potentially more petition circulators signing up to be registered.

MS. BENNETTE:  Objection, Your Honor, as to speculation.

THE COURT:  Overruled.

BY MR. JAZIL:

Q.   What petitions were circulating for citizen initiatives in the 2024 cycle?  Do you recall?

A.   The limitation of governing on abortion, interference in abortion, and then there was also another marijuana petition.

Q.   And then just shifting --

THE COURT:  Just to close the circle, Ms. Matthews, you've already testified about your background and how long you have been doing this.  Part of your work over the many years in your position, you're aware of fluctuations both in terms of voter turnout, as well as people being engaged, depending on whether it's an off year or a presidential election year; correct?

THE WITNESS:  Correct.

THE COURT:  Further, given your position, you've been working for long enough, there's been cycles where there are no

voter initiatives and sometimes where there's incredibly controversial initiatives as well; correct?

THE WITNESS:  Yes.

THE COURT:  So as I understood it based on the time you've been there, you were saying, Judge, what I've observed is during election year -- presidential election years and years where we have very controversial initiatives, the number of people engaged tends to go up in the ballot-initiative process; is that correct?

THE WITNESS:  Yes.

THE COURT:  And it's based on your experience and observations in your post and monitoring various elections both in on- and off-presidential election years that you base that on; correct?

THE WITNESS:  Yes.

THE COURT:  All right.  I understood what she was saying, and hence my ruling in overruling the objection.

Counsel, you may proceed.

MR. JAZIL:  Thank you, Your Honor.

BY MR. JAZIL:

Q.   And shifting gears, I'd like to talk about public records.

     Are the names of registered circulators public records?

A.   Yes.

Q.   What other information about registered circulators is a public record if there is a public records request under

Chapter 119 of the Florida Statutes?

A.   Well, it depends on what record they are asking for that relates to the petition circulator.  If it's the petition, then it's going to be whatever information is on that petition as relates to the circulator, because we are just talking about the circulator right now.  On the petition, the circulator's name needs to be on there and the address needs to be on there.

Q.   Okay.  Now, if the petition circulator is also a registered voter in Florida, does that address appear on the State's voter rolls?

A.   Yes.

Q.   And who can request a copy of the State's voter rolls?

A.   Anyone.

Q.   And does the State maintain a voter lookup feature on its website?

A.   It does.  It's supposed to be just narrowed to those voters who are looking up their own status, but yes.

            THE COURT:  I've got a question just out of interest.

            I know that, like, property appraisers and others are linked in with the Florida Statute, for example, that allows state court judges to seal their information.

            Does that extend to the Division of Elections or is that -- or are there no exclusions?

            THE WITNESS:  No, that also applies.  There are redactions, a request for address confidentiality that can occur

if you are one of a class -- high-risk professional that is recognized, hence a judge, law enforcement, firefighter, guardian ad litem.

THE COURT:  Not necessarily pertinent to what we are doing.  I was just interested if it extended that far.

MR. JAZIL:  Well, Your Honor, it is one of my questions.

BY MR. JAZIL:

Q.    If a petition circulator falls on a list of people whose information is exempt from the public records laws, Chapter 119, what part of the petition itself that the petition circulator is handing out can be turned over?

A.    So, first of all, I need to establish, there has to be a written request on file.

Q.    Sure.

A.    Whenever anybody wants this address protection, it has to be delivered to each and every agency that may have information on that person.  So, first of all, there has to be a request on file, and if that information is on file, then what will be redacted would be the person's address.

Now, also recognize that on this petition the circulator is also signing their name and that that's separate and apart from this address confidentiality.  That would be protected in the sense that it cannot be copied.

THE COURT:  Mr. Jazil, just outside out of interest.

So if somebody files that, for example, with the Supervisor of Elections and it says "unlisted number," for example, on your voter ID, you have to separately also go to the Secretary of State?

THE WITNESS:  What happens mostly is that the request is submitted to the Department of State.  We take it, and then we also send it down to the Supervisor of Elections.  If the Supervisor gets it, they are going to redact it in their system.

So it just depends on who's releasing -- who's been asked for the public record and who is releasing it.

BY MR. JAZIL:

Q.   So switching from the petition circulator to the voter, the voter fills out a petition form.  There's a public records request for all the petitions for an initiative.  What, if any, information on the voter's form that the voter has filled out gets redacted?

A.   So the voter's record, they have to, obviously, provide either a Florida DL or State ID or SSN, and then they have their signatures.  All three of them if they appear on there are protected automatically without having to request that that be the case.

Now, if this individual voter has requested an address confidentiality, then what will happen is the address will also be redacted.

And I should add, depending on the category of class

professional that you are asking, again, a voter -- every person who requests this has to state what class of high-risk professional they are claiming for this protection.

And the law, which is under chapter 119, tells you what categories of information will be redacted.  Mostly, it means the home address, the date of birth, and the phone number.  And then depending if you had other type of records, it could be other things, like photographs.

MR. JAZIL:  I have no further questions.

Thank you, Your Honor.

THE COURT:  Cross-examination.

CROSS-EXAMINATION

BY MR. FERGUSON:

Q.   Good afternoon, Director Matthews.  My name is Brent Ferguson.  I want to first ask a bit about the training you testified to a moment ago.

You mentioned that the training process was new after HB 1205 was enacted in May; is that right?

A.   Yes.

Q.   And then you had to quickly get a training ready for people who are going to register for the July 1st deadline; is that right?

A.   The application to register for -- had to be ready by June 1, and the training was part of that application, so, yes.

Q.   Okay.  But there was already a registration process in

place before HB 1205; is that right?

A.   Yes.

Q.   That registration process was for paid circulators before that?

A.   Yes.

Q.   Okay.  So the new element that you were testifying to to Mr. Jazil applied to the training itself; is that right?

A.   I'm sorry?

Q.   The new element that you had to get ready applied to the training itself and not the process of submitting an application and registering?

A.   No, that is not correct.

Q.   Okay.  Thank you.

     And after HB 1205 was enacted, what formal rules has the Division adopted concerning 1205's registration requirement?

A.   The requirements are pretty well set out in law.  We do have rules on the constitutional amendment process, but we have not updated those yet.

Q.   Okay.  So I would -- the rules on the registration process that you just referred to, were those adopted in 2021, the most recent version?

A.   Yes.

Q.   Do you remember?

     Okay.  And is that Florida Admin Code 1S-2.009?  And the part regarding volunteer circulators, is that 2.009(6)(b), if

you remember?

Maybe we can --

A.    Proceed with your -- yeah.

MR. FERGUSON:  Caroline, can you pull up the --

THE COURT:  It will pop up on the screen, Ms. Matthews.

MR. FERGUSON:  Okay.  Could you go back to the first page of this so we can see the title?

BY MR. FERGUSON:

Q.    Does this look like the -- well, okay.

A.    Yes.  It's listed as 1S-2.009.

Q.    Thank you.

MR. FERGUSON:  If you'd go to the second page now, Caroline.

BY MR. FERGUSON:

Q.    Can you see that highlighted portion, which is (6)(b)?

A.    Yes.

Q.    It says -- I'll wait a moment.

So it says:  *Volunteer petition circulators:  All other individuals who collect signatures, but not for compensation, for the purpose of a qualifying proposed constitutional amendment for ballot placement are not required to register with the Division of Elections.*

Did I read that correctly?

A.    Yes, that's what the rule said.

Q.   But that's no longer accurate; right?

A.   No.  Individuals do not have to register to circulate a petition until they reach the more than 25, excluding collecting for themselves and for their immediate family member.

Q.   Okay.  It's your testimony that this rule is currently accurate?

A.   No.  This -- I indicated the rule has not been updated.

Q.   Okay.  And is this rule still available on your website?

A.   Yes.

Q.   Okay.

     MR. FERGUSON:  Okay.  You can take that down.

     Thank you.

BY MR. FERGUSON:

Q.   Okay.  I want to just go back to the process of applying to be a registered circulator.  We just talked about formal rules in the Administrative Code.

     Does the division have any internal rules concerning this registration process?

A.   As I stated, the law is pretty detailed as to the registration process for a petition circulator.  Obviously, the law no longer uses the term "paid" versus "volunteer."

     And the online training program details a great deal of also what the requirements are for registering.

Q.   Okay.  So the answer is no, there are no internal rules?

A.   To answer your specific question, no.

Q.   Okay.

        MR. FERGUSON:   Caroline, can you pull up Clean Water Exhibit 76, please, which has already been admitted into evidence?

BY MR. FERGUSON:

Q.   Can you see that on the screen, Director Matthews?

A.   Yes.

Q.   Okay.  And this is an email from the initiatives' email within your office; is that correct?

A.   Yes.

Q.   And I'll give you a moment just to read it.

A.   I already read it.

Q.   Okay.  Great.

     Can you tell me what this email is?

A.   It appears to be an electronic-generated email response to a Mr. Perez who was attempting to register as a petition circulator in which he's informed that his registration has been denied.

Q.   Okay.

A.   And then the steps that he needs to do to complete that registration.

Q.   Thank you.

     Why was this application rejected?

A.   It says "incorrect form uploaded."

Q.   Okay.  And by "incorrect form," does that mean it's the

completely wrong document or that it's missing information?

A.   It could mean that they uploaded the wrong form.  I saw some of these in which a person was supposed to have uploaded their signature and instead they uploaded their tax form or their contract of employment with the sponsoring political committee.

Q.   Okay.  So it could be the completely wrong form.  Could it also be that it is the correct form with some error on it?

A.   It just says "incorrect form uploaded."  They have the opportunity to be able to ask further questions if they need to.

Q.   Okay.  But you can't determine from this email exactly the reason; is that right?

A.   It says "incorrect form," so I suspect that the entire form was not the right one.

Q.   Okay.  Do you believe that this email provides sufficient instructions for the applicant to fix the problem and resubmit?

A.   There are going to be a variety of reasons why someone's registration may be denied.  This seems pretty specific to me, so I don't know.  Again, they are able to follow up with our office and ask.

Q.   And that would be through an email or a phone call; is that right?

A.   This is a dedicated email inbox for initiatives, so, yes, and then they could have called.

Q.   Okay.  And that might take a bit of time to get a response

to get the specific reason; is that right?

A.   My understanding is my staff responds within the day or 24 hours or 48 hours at the most, but it can depend on volume.  It can also depend on when this email was sent.  If it was on a Friday, then, yeah, there's not going to be staff on Saturday and Sunday, so the earliest they may get a response is Monday.

Q.   Sure.

         MR. FERGUSON:  Caroline, could you pull up Clean Water Exhibit 305, please.

         And go to the last page, which is the bottom of the email chain.

BY MR. FERGUSON:

Q.   Okay.  Director Matthews, do you see that bottom email that's dated October 13th?

A.   Yes.

Q.   So this is a very similar email to the one we just looked at, right, rejecting an application?

A.   Yes.

Q.   Okay.  And then do you see the response -- so this first email is sent at 2:35 p.m. on October 13th; is that right?

A.   Yes, that's the date.

Q.   And then do you see the next one above it that's sent, I believe nine minutes later, that says they sent it signed already?

A.   Yes.

Q.    Okay.  Now we've got both pages of the exhibit up.

Do you see at the bottom of the first page there's a new email from your office dated October 20th that says:  "Good morning.  Apologies for the delayed response"?

A.    Yes.

Q.    Okay.  And that email is sent seven days after the latest email from the person trying to register; is that right?

A.    Yes.  That also happens -- yes, I'm sorry.

Q.    And so it's not always 24 hours -- a 24-hour delay when someone --

A.    In this particular case, that does not appear to have been the case.

Q.    Sure.

MR. FERGUSON:  Thanks, Caroline.  You can take that down.

BY MR. FERGUSON:

Q.    So you -- I believe you testified a moment ago that the response time will vary based on how busy your office is, and your office has different priorities, and so it just depends on that; is that right?

A.    I didn't mention priorities.

Q.    Okay.

A.    I just said simply that we have -- it can be a workload issue.  It could be staffing that we might not have had.  Staff might have been out sick.  I don't know the particulars on this

one case.

Q.   Sure.

    Given all those factors and staffing and how busy your office is, some of these delays are problems that are just unavoidable if there is a registration process; right?

A.   These same kinds of issues would be existing before or after HB 1205.  Again, I don't know what the facts are behind this particular --

Q.   Right.  Right.  And I'm not asking anymore about that specific document.

    And I think you just answered this, but my question is:  As long as there is a registration process, whether it be the one in 1205 or the preexisting one, because of staffing issues and your office being busy, there will always be some uncertainty in the amount of time that it takes to respond to someone who has questions?

A.   Yes, but it -- the registration process isn't exactly the same as it was before.

Q.   Sure.

A.   There's document uploads that now --

Q.   Right.

A.   -- have to be done, training that has to be done.

Q.   Right.

A.   So that has made it more involved.

Q.   Right.  So that's created more work for your office and

might affect the response time sometimes?

A.   Yes, if you are having to deal with other people with other issues.

        MR. FERGUSON:  Your Honor, I'd like to -- I'm sorry.

        Caroline, I'd like to pull up Clean Water Exhibit 296.

BY MR. FERGUSON:

Q.   Okay.  Director Matthews, do you recognize this form?

A.   Yes.

Q.   Could you tell us what this form is?

A.   This is a registration summary form that an individual who wants to register with the State as a petition circulator has to complete.

Q.   Okay.  This is a completed form; correct?

A.   I assume it's complete.  The confidential information is redacted out.

Q.   And this is -- is this form automatically generated after an applicant passes the test that you mentioned earlier?

A.   I'm sorry; your question?

Q.   Is this form automatically generated by your computer system after the applicant passes the test that you testified about earlier?

A.   I -- I'm not sure if this is actually generated before or after.

Q.   Okay.  Director Matthews, the -- this whole registration process takes place within your office; correct?

A.    Yes.

Q.    And you have, I think, three staffers within your office in the director's office who run this specifically?

A.    Yes.

Q.    Okay.  And you check in on how this process is going from time to time or frequently?

A.    Yes.

Q.    But you're unsure at what point this form comes up in the registration process?

A.    I'm not involved in the day-to-day, but I'm asking my staff as to what particular issues may -- and I just don't recall at what stage this form is actually generated.

      You're going to have to pass the test.  You're going to have to take the training program and pass the test before you can actually get a registration approved.

Q.    Right.  And so this form needs to be signed and then returned to the -- to your office to complete the registration process; is that correct?

A.    Yes, there's an --

Q.    Okay.

A.    -- upload process.

Q.    And so the -- I just want to make sure I understand the process for someone trying to register after passing the test.

      They need to -- they get this -- they need to review the information below and see that it's accurate; is that right?

A.    Before they submit it, yes.

Q.    Right.  And then they need to download it and print it, a paper copy; right?

And then they need to sign it in ink and date it --

A.    Yes.

Q.    -- is that right?

Okay.  And then they need to scan the signed version back onto a computer; right?

A.    Yes.

Q.    Okay.  And then they need to upload that version back to your computer system; is that right?

A.    Yes.  It's all online.

Q.    Right.  And that's the last step of the registration process?

A.    Once this is reviewed and everything is complete, then, yes, they will get a notice that will say either approved or denied.

Q.    Okay.  I know that you don't have all the background information on this specific application and that some of the information has been redacted.

But from what you can see on this form, is this a valid application that would be approved?

A.    Again, I don't know -- if you assume that the birth date is entered correctly, the SSN is -- or the Florida driver's license, let's say, they entered all 13 digits.

Q.   Right.

A.   If there's a signature there, it would appear, but, again, I -- I'm going to rely on --

Q.   Right, of course.

A.   -- the facts and circumstances surrounding this particular one.

Q.   Yeah, of course.

And I'm just asking to be clear about the information you can see.

A.   Right.  And the address, I mean, the address is going to have to be --

Q.   Right.

A.   -- a valid address --

Q.   Right.

A.   -- and it has to be Florida.

Q.   And how would a person complete this part of the registration process if they don't have a printer?

A.   They can take a picture and upload it and -- online, you know, through their phone.  I mean, the program is available even on the phone, so --

Q.   Didn't you testify they need to print it and sign a -- sign this form in ink?

A.   It is signed in ink.

Q.   Right.  So they printed it so they could sign it in ink; correct?

A.    Uh-huh.

Q.    So my question was --

(Indiscernible crosstalk.)

A.    Oh, I see what you're saying.

(Indiscernible crosstalk.)

A.    Yes, yes, I'm sorry.

I thought you were talking about once it's already signed, they could, yeah, upload it.  Yeah.

Q.    So my question is how they would complete it if they didn't have a printer.

A.    I would go to the library.

Q.    Okay.  So if they filled out this form on their computer but didn't have a printer, they could send it to themselves, go to the library and print it.

And then if they did that and signed it, they could go home and the next day they could scan and upload if they have a scanner?

A.    I'm sure they would find a way to submit it.

Q.    Okay.  You testified a bit about this, but could you tell me some of the reasons that applications are being denied?

A.    An application can be denied if it's incomplete.  It can be denied because the address is not a recognized address, or it could be that they have not provided a Florida address, could be that they didn't sign it, they didn't date it, they didn't -- again, you know, if the signature isn't on this form -- I think

maybe I need to be clear -- is that it can be attached as a separate document.

Q.   Okay.

A.   So -- so if they uploaded the application, but they didn't -- they didn't upload the signature, they uploaded some other document, that would also make the application incomplete.

Q.   Okay.  And could an application be rejected because this summary form we're looking at is -- was generated on a different day than it was signed?

A.   I believe that it has to be dated after it's generated -- I mean, on the date that it was generated or after.  Because what we found is petition circulators would send multiple petitions -- I mean, applications in because they were like, Oh, it's not happening fast enough or whatever, and they would just send multiple ones.  So we had to make sure that it was the -- the latest one.

     And then also when an individual once gets registered, they're able to generate a petition, so there's -- there's a correlation of the date.

Q.   Okay.  So you're saying that this date that's written in -- by the signature needs to be after the date where the form is generated -- or same day or after?

A.   Yes, that's my understanding.

          MR. FERGUSON:  Okay.  Caroline, could you pull up Exhibit 299.

BY MR. FERGUSON:

Q.   Okay.  If you can see --

MR. FERGUSON:  Sorry -- one moment.

(Pause in proceedings.)

BY MR. FERGUSON:

Q.   Okay.  If you see the first email sent here on the bottom, this was another rejection from your office, right, with that same incorrect form uploaded?

A.   Okay.

Q.   And then if you'll look at the email your office responded to.

A.   Yes, I've read that.

Q.   Okay.  And it says:  *The generated date on the upload form needs to match the most recent date you clicked the generate/download button and the whole form, not just the signature, needs to be visible.*

I'll wait until you're finished.

A.   Okay.

Q.   And considering this -- and, Director Matthews, we also heard testimony about the phone call an applicant made to your office essentially stating that there's a rule that the "generate date," the "signature" and the "upload date" have to all be on the same day; is that incorrect?

A.   I'm not sure I read it that way --

Q.   Okay.

A.    -- but --

Q.    Aside from this email, is it your testimony that that is not a rule that your office enforces?

A.    I would have to look at petitions -- you know, registrations that have been rejected for that reason to see if --

Q.    Okay.

A.    -- that exists.

Q.    How are applicants supposed to understand that rule before they send in their application?

A.    They -- they are asked -- they can ask as to what is deficient in their registration and then they receive the guidance that they have.

Now, if a petition circulator -- if my staff has any question about rejecting a petition then -- or a registration, then they will bump it up.

Q.    Okay.  So the clarity comes when they request assistance.

You would agree that there's nowhere in the training or your materials that explains that an applicant needs to match all of the dates on the form to the same day; is that correct?

A.    The -- any program that's, like, automated in that way, you're not going to be able to anticipate every possible scenario.  So that is why they are able to follow up with their questions as to what -- what they can do to make their registration complete so that it can be approved.

Q.    Okay.  So this is a rule that's created by your software system and not by your office?

A.    This is an operation of the system.

Q.    Director Matthews, do you remember testifying in your -- in a deposition in this case?

A.    Yes.

Q.    Okay.  And do you remember testifying that an applicant could start the application process and then stop for a while and then complete it weeks later?

A.    Yes.

Q.    Do you still believe that to be true?

A.    Yes, I think they can.  But information may have changed, and they have to do an update.

Q.    So they couldn't generate the form and then wait a few weeks later and then sign it and upload it because then the dates would be different; is that right?

A.    I apologize, but I'm not -- I don't -- can't speak to that right now.

Q.    Okay.

A.    I don't recall.

        MR. FERGUSON:  Give me just a moment.

    (Pause in proceedings.)

BY MR. FERGUSON:

Q.    Let's quickly go back to the test that you testified about.

    So that's a 20-question test and an applicant needs to pass

it with 80 percent or higher to become a registered circulator; is that right?

A.    Yes.

Q.    And you mentioned ADA compliance and availability of training and tests in Spanish.

Is the way that someone accesses a Spanish version to download the HTML version or copy it and put it into a translation application or something like that?

A.    It's available -- the textual part is available so they can use a translator widget to translate it into whatever language, whether it's Spanish or Creole.

Q.    Okay.  Is there a portion of your website that explains the availability of that?

A.    I don't recall.

Q.    Okay.  And the test -- was the test required by HB 1205?

A.    The -- the law did not explicitly mention a test component to the training program, but the law said that the training program shall at least include these things.

Q.    Okay.  And would you agree that the purpose of the test is to make sure that an applicant understands the training and applies the law correctly?

A.    The purpose of the training is to ensure that they have a full understanding of their role as a petition circulator and the registration process and the circulation process and the penalties associated with not following the law.

Q.   And that's true of the test in particular and not the overall training?

A.   The test questions were based on the training --

Q.   Okay.

A.   -- presentation.

Q.   And if an applicant passes with 80 percent, do they learn what they got wrong on their test?

A.   No, but they can take the test as many times as they want until they pass.

Q.   And that's how they would figure out what they're missing is by -- sorry.  Let me go back.

I'm only asking about someone who has passed.  So I understand that people can take it more than once, but I'm saying someone who has passed and -- let's say with 80 percent, so they miss four questions -- they don't learn what they got wrong; right?

A.   There is not that feedback, but the questions are based on the language in the training program.

Q.   Okay.  And so an applicant is not -- is just supposed to look back at the training and has no way of understanding whether they are misinterpreting criminal penalties or anything like that?

A.   At this point it doesn't, but we will certainly be looking to enhance that program.

Q.   Okay.  I want to briefly address the public disclosure of

addresses that you testified about with Mr. Jazil.

I believe you testified that if someone has an address protected by Florida law, then they need to, essentially, register and make that clear to the State and to the Secretary's office; is that correct?

A.   Yes.

Q.   Okay.  And that applies to people who might sign a petition form, a voter; is that right?

A.   It applies to anyone who provides information to a state government or at any local government -- state or local government in which information may subsequently be asked to be disclosed in a public records request.

Q.   Okay.  And so it would apply the same way to someone who is a registered circulator who, therefore, is required to put their name and home address on the form in the affidavit portion; is that right?

A.   Yeah, that -- nothing changes in -- with respect to the requirement for the petition circulator to have to put that information on there.  This -- this protection applies after when someone asks for a public record.

Q.   Right.  Okay.  So someone who has a protected address and is a registered circulator would need to put their name and address on the form, have a voter sign it or, you know, hundreds or thousands of voters, and then, once the completed petitions go to the Supervisors and eventually to your office, they would

need to submit a request to make clear that if there is a public records request their address would need to be redacted; right?

A.   Yes, unless there is already a request on file.

Q.   Sure.

A.   Maybe they're --

Q.   Okay.  And then your office would apply that preexisting address to anyone whose name and address were on the form?

A.   Yeah.  If it can be linked to it, yes.

Q.   And there's nothing they can do earlier in the process before it goes to a Supervisor or to your office?

A.   No, that's -- that's the way the law is right now.

Q.   Okay.

        MR. FERGUSON:  If you'll give me just a minute, Your Honor.

        THE COURT:  Certainly.  Thank you.

    (Discussion between the attorneys.)

        MR. FERGUSON:  No further questions.

        Thank you so much.

                    CROSS-EXAMINATION

BY MS. BENNETTE:

Q.   Good morning, Ms. Matthews.

A.   Good morning.

Q.   A couple of questions.

    You testified on direct about the process for redacting info on a petition form; correct?

A.    Yes.

Q.    And you're familiar with the language that is printed on the petition form?

A.    Yes.

Q.    And displayed on the petition form at the bottom, it states:  *This form become a public record once filed with the Supervisor of Elections*; correct?

A.    Yes.

Q.    And it also contains a notice that an improperly completed form will not be validated; correct?

A.    Yes.

Q.    So a voter filling out this form would have to fill out that form completely in order for it to be validated?

A.    Well, I mean, a form can be completely filled out, but it may have something that is incorrect, I mean, in terms of, like, the Florida driver's license doesn't verify or the SSN.

Q.    Of course.  And to that point, the driver's license or the SSN or ID has to be included on the form for it to be validated?

A.    That's correct.  The form is not even a public record until it is submitted.

Q.    Absolutely.  And nowhere on the form does it say that there is any info on the petition that will be redacted?

A.    No, that is correct.

Q.    And the request for redaction, as you mentioned, is done after the petition has already been collected and turned in?

A.   No, the redaction does not occur until there's a public records request for that public record.

Q.   Of course.

So at the time the information that is on the form is not redacted until there's a public records request for it?

A.   Until there's a public records request and there's a request on file, yes.

Q.   Thank you.

MS. BENNETTE:  No further questions.

THE COURT:  Ms. Murphy.

MS. MURPHY:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MS. MURPHY:

Q.   Director Matthews, good morning.  My name is Hannah Murphy. I represent Smart & Safe Florida.

Since September 2025, have you over email directed the Supervisors of Elections to invalidate petitions that they had previously verified as valid?

MR. JAZIL:  Objection, Your Honor.  This is beyond the scope of the direct.

THE COURT:  Response.

MS. MURPHY:  Your Honor, this line of questions relates specifically to verification costs.  As my colleagues have already discussed yesterday, we would be permitted to address issues that we would be able to bring up on rebuttal.

Based on Mr. Molina's testimony yesterday about verification costs, their predictability, and treating petitions gathered for citizen initiatives compared to candidate and local referendum petitions, this is going to go towards that.

MR. JAZIL:  Your Honor, as I understood that testimony, it was about verification costs for Miami-Dade County specifically, and I don't see the link here between Ms. Matthews' testimony and Mr. Molina's testimony about the Dade County-specific verification costs.

THE COURT:  All right.  I'm going to overrule the objection.

I'm going to give you, Ms. Murphy, some latitude, but it needs to be limited to that.  This is not going to be a fishing expedition about any fact that's ever been introduced, but you can ask her so she doesn't have to be recalled later about this limited amount -- this limited topic.

MS. MURPHY:  Of course, your Honor.

Thank you.

THE COURT:  Hold on.  Let me explain to Ms. Matthews.

Ms. Matthews, we are not going to turn this into an eight-hour cross-examination of you.  What I don't want to do, though, if there is some limited set of questions that is going to be asked of you that we have got to bring you back tomorrow.  So that's why I'm going to do it, so you don't have come twice; okay?

THE WITNESS:  All right.  Thank you.

THE COURT:  Counsel, you may proceed.

MS. MURPHY:  Thank you.

BY MS. MURPHY:

Q.   Okay.  Back to that first question, Director Matthews.  So since September 2025, have you, over email, directed Supervisors of Elections to invalidate petitions that they had already verified as valid?

A.   I'm sorry.  Did I understand you to say overemailed?

Q.   Yes, via email.  Did you send emails --

A.   Oh.  Okay.

Q.   -- to Supervisors of Elections --

A.   You mean via email; correct?

Q.   Sure.

A.   I just want to make sure you are not saying -- okay.

    There were a series of emails that went to Supervisors regarding petitions and verification, yes.

Q.   Okay.  On January 21st, 2026, did you via email tell Supervisors that they should incorporate the costs of reverifying petitions according to your directions via email -- pursuant to these emails from you into the, quote, actual cost of verification?

A.   Can you show me the particular --

Q.   Absolutely.

    MS. MURPHY:  Your Honor, may I approach?

THE COURT: You may.

Which exhibit is this?

MS. MURPHY: This is not an exhibit, Your Honor.

THE COURT: I'm sorry.

You can show it to the witness to refresh her recollection. That's fine.

BY MS. MURPHY:

Q. Director Matthews, did that refresh your recollection?

A. It did.

Q. So back to that question, on January 21st did you tell the Supervisors of Elections that they could incorporate the costs of reverifying petitions into the actual costs of verifying petitions?

A. To be exact, I would follow exactly what the wording is in the email. So if you want to read that rather than just possibly summarizing, because that's what I said.

MS. MURPHY: Is that okay?

THE COURT: If Mr. Jazil doesn't mind, we'll put it in verbatim.

MS. MURPHY: *Dear Supervisors* --

THE COURT: No, mark it as an exhibit.

MS. MURPHY: I'll mark this as Smart & Safe Exhibit 18.

Reading from this email --

THE COURT: Hold on.

Any objection to --

MR. JAZIL:  Your Honor, I'm not familiar with this email, so I'd prefer if we just read the statement.  I don't mind reading the --

THE COURT:  I'm not going to ask -- quibble, no, because if a witness says, I don't want to answer a question about it after refreshing my recollection; I want to go with it verbatim, it's going to come in verbatim.

So I'm introducing Smart & Safe's Exhibit 18.

(PLAINTIFFS' EXHIBIT SSF-18:  Received in evidence.)

THE COURT:  Let's put it on the screen, and let's read it.  That way there is no error in the reading of it.

MS. MURPHY:  Your Honor, we are going old school here.

THE COURT:  By "old school" you mean you are using ELMO.

And for any -- not to confuse anybody on the Eleventh Circuit, it's not the little red critter.  It's the overhead projector.

Elmo is red; right?

THE COURT REPORTER:  Yes.

BY MS. MURPHY:

Q.   So it says:  *Dear Supervisors of Elections:  Some of you have asked about the costs of reverifying petitions and any consequential duplicate petitions.  Such costs are a part of the actual cost of signature verification are entitled to -- are*

*entitled to pursuant to Section 100.371 Florida Statutes.*

*Respectfully, Maria Matthews, Esquire.*

A.    Yep.

        THE COURT:  She's asking if she read that correctly.

        THE WITNESS:  Yes.

BY MS. MURPHY:

Q.    We'll just go through a few examples of those emails.

        So on September 11, 2025, did you direct Supervisors to identify all petitions verified as valid that had been circulated by nonresident circulators pursuant to this Court's injunction?

        MR. JAZIL:  Objection, Your Honor.  This goes beyond the verification issue, which we are exceeding the scope of direct.

        THE COURT:  I believe Ms. Murphy was saying, I'm asking this to verify so we can attribute -- when we talk about the inflated costs that we're verifying that this was costs that increased pursuant to the directions of the Division of Elections; is that correct?

        MS. MURPHY:  That is correct, Your Honor.

        THE COURT:  On that limited basis, I'll allow it.

        MR. JAZIL:  Understood, Your Honor.

        Thank you.

BY MS. MURPHY:

Q.    So I'll repeat the question.  Did you, on September 11th,

2025, direct Supervisors to identify all petitions verified as valid that had been circulated by nonresident circulators pursuant to this Court's injunction?

A.   I do recall sending an email.  I don't recall the exact date.

Q.   Okay.  And did you direct the Supervisors to retroactively invalidate those petitions?

A.   I don't recall the specifics on it, but, yes, it would have had to have been, uh-huh.

Q.   On October 3rd, 2025, did you direct the Supervisors to invalidate petitions mailed to voters by Smart & Safe Florida?

A.   Yes, as to -- I don't recall the exact date again, but as to Smart & Safe petitions that were invalid.

Q.   And the Supervisors of Elections had already gone through their process to review for validation; correct?

A.   That was one verification process, yes.

Q.   Okay.  On December 23rd, 2025, did you direct Supervisors to invalidate petitions signed by inactive voters?

A.   Again, I don't recall the exact date of that email, but we did send an email out to that effect.

Q.   And that was based on a change in how the division interpreted the law?

A.   If I recall correctly, the email stated the basis for the position.

Q.   And that was approximately six weeks before the

February 1st deadline for Supervisors to process and verify as valid or invalid all of the petitions collected?

A.   Again, taking the date as what you said, that would have placed it about six to eight weeks before.

Q.   Do you know roughly how many petitions were invalidated pursuant to this?

A.   No, I do not have that figure.

Q.   How many emails like this did you send to the Supervisors between September 2025 and January 2026, roughly?

A.   I would have to look at my emails.

Q.   Okay.  Does around ten sound right?

A.   There were multiple emails that went out.

Q.   Multiple.  More than five?

A.   It depends.  I'd have to look at it.  I mean, maybe.  I don't recall.

Q.   Would it help refresh your recollection if I showed you a couple of those?

A.   I'll just go with more than five.

Q.   And do you know if Supervisors regularly reverify petitions that have already gone through the petition verification process?

A.   Yes, it can happen.

Q.   It can happen?

A.   Uh-huh.

Q.   Do you send similar emails directing Supervisors to

reverify candidate petitions?

A.    No.  I think we have only issued one email regarding, or maybe a clarification, on candidate petitions, no.

Q.    Okay.  Do you send similar emails directing Supervisors to reverify local referendum petitions?

A.    No, but the same principles apply.

Q.    And how did you decide to send these emails?

        MR. JAZIL:  Objection, Your Honor.  This goes beyond the Miami-Dade verification issue that's being rebutted.

        THE COURT:  I just -- what I'm going to do is cut to the chase because I thought I understood Ms. Matthews's testimony.

        Ms. Matthews, as I understood it, you send these emails out because you give directives to the Supervisors of Elections, and you thought you were following the law, and you're sending emails consistent with what your understanding the law would require; is that correct?

        THE WITNESS:  Yes, sir, absolutely.

BY MS. MURPHY:

Q.    Are these email --

        THE COURT:  Just so it's clear, I wasn't -- I think it was already implicit in Director Matthews's testimony, so I was just making explicit what was already implicit in her testimony so that we can move on.

        MS. MURPHY:  Thank you, Your Honor.

BY MS. MURPHY:

Q.   Are these emails independently binding on Supervisors?

A.   These emails are really just instructions and reminders to them of what the law is with respect to verifying.

Q.   Okay.  In some of these emails, did you instruct these Supervisors to go through and validate those petitions and report those numbers back to the Division of Elections?

A.   The emails were direction to them to do certain action and then to report what they had completed.  And also there was an ask for how many were reverified as invalid, but they were not completely compliant and consistent with that.

Q.   Okay.  And what would be the -- and this goes to the matter of whether or not Supervisors are doing what has been directed and to the costs that are associated with reverifying these petitions.

     What are the consequences if a Supervisor did not follow through with your directives in these emails?

A.   Well, I don't know that Supervisors wouldn't have followed. They all confirmed that they did.

          MS. MURPHY:  Your Honor, that's all the questions I have.

          Thank you.

                    CROSS-EXAMINATION

BY MR. DATO:

Q.   Good morning, Director Matthews.  Just a few questions for

you.

You mentioned during your testimony that a voter lookup feature -- that there's a voter lookup feature associated with the voter rolls; correct?

A.    Yes.

Q.    I think you said that voter names are included within that feature; is that correct?

A.    Yes.  You can enter your name, your date of birth -- and I forget what the other field is -- in order to look up to find out what your status is or whether you've -- the status of your request for a ballot or your precinct location.

Q.    And does the vote -- the information that's generated also include the address of the voter?

A.    It does.

Q.    But if a voter was also a petition circulator, the information included in that feature would not include any initiatives that they had circulated petitions for; correct?

A.    I'm sorry?  Just repeat your question.

Q.    Yes.

A.    I'm not sure I understood it.

Q.    If the voter you were looking up was also a petition circulator, the information in the lookup feature would not include any initiative that that voter had circulated for; correct?

A.    No.  The voter lookup is strictly to the voter registration

record.

MR. DATO:  Thank you.  No further questions.

THE COURT:  I believe that's each of our four plaintiffs.

Any redirect?

MR. JAZIL:  No, Your Honor.  Thank you.

THE COURT:  Thank you, Director.  And I hope you understand that I was trying to keep you from having to come back for that limited exchange.

THE WITNESS:  No, I do appreciate that.  I have a lot to do.

THE COURT:  You have a good day.

THE WITNESS:  Thank you.

(Maria Matthews exited the witness stand.)

THE COURT:  All right.  As I understand the -- and certainly it can be subject to change, Mr. Jazil, but at this juncture, is it correct that the last witness is Ms. Pratt?

MR. JAZIL:  Yes, Your Honor.

THE COURT:  And you're putting on Ms. Pratt?

MR. JAZIL:  Yes, Your Honor.

THE COURT:  And you said you need about an hour and a half?

MR. JAZIL:  Yes, Your Honor.

THE COURT:  All right.  And let me -- I've got Steiner, Ferguson, Clark, and Mastoris, so those are the four

that are --

MR. MASTORIS:  Yes, Your Honor.

THE COURT:  All right.  Rather than break up the testimony, what we are going to do is we are going to take our lunch break early like we did yesterday, and then we'll come back, and that way we can put on the witness.

Let me find out, right at this juncture, do plaintiffs, based on what you've heard so far, anticipate any rebuttal?  I understand subject to what Ms. Pratt testifies about, but right now anything from the League?

MR. MASTORIS:  No, Your Honor.

THE COURT:  Clean Water?

MR. FERGUSON:  No, Your Honor.

THE COURT:  Smart & Safe?

MR. BURHANS:  No, Your Honor.

THE COURT:  And I'm missing someone.

MR. WERMUTH:  Florida Decides Healthcare.

THE COURT:  Oh, I'm sorry.  Florida Decides Healthcare; nothing?

MR. WERMUTH:  No, Your Honor.

THE COURT:  All right.  So it sounds like we are on pace.

Are there exhibits, just as a housekeeping matter, that were not objected to or additional exhibits other than the ones we've already addressed?

MR. JAZIL:  Your Honor, there's DX 1, which is not objected to.  It's the legislation.  I'd move that into evidence.

THE COURT:  There was no objection, so DX 1 comes into evidence.

(DEFENDANTS' EXHIBIT 1:  Received in evidence.)

MR. JAZIL:  Then, Your Honor, we were going to move into evidence the deposition of Mr. Joe Williams in lieu of calling him.  This was Defendants' Exhibit 295.

My understanding is there is no objection to that.

MR. BURHANS:  No objection.

THE COURT:  And hold on.  So we are just going to -- are you going to post-- I just want to make sure any reviewing court -- are we going to have it marked as an exhibit, the depo in toto, or are you going to file it like we did the other depo excerpts?

MR. JAZIL:  It's the depo in toto.

THE COURT:  All right.  So without objection -- it's DX 295, you said?

MR. JAZIL:  Yes, sir.

THE COURT:  Without objection, DX 295 is admitted.

(DEFENDANTS' EXHIBIT 295:  Received in evidence.)

MR. JAZIL:  Then DX 296, which is Ms. Cox's 30(b)(6) deposition.  And my understanding, again, there is no objection.

MR. BURHANS:  No objection.

THE COURT:  All right.  Without objection, DX 295 and 296 are admitted.

(DEFENDANTS' EXHIBIT 296:  Received in evidence.)

THE COURT:  All right.  So the record is clear for any reviewing court, those are two depos that are marked as exhibits.  We have other depos that have been previously filed as ECF numbers as we've referenced before and put on the record that came in.

MR. BURHANS:  To be clear, it's to the deposition transcripts only, not the exhibits.

We are not objecting to the transcripts.  If counsel's intent is to include exhibits, we'll talk about that offline and report back.

MR. JAZIL:  Your Honor, that's fine.  We'll just include the exhibits for the sake of helping you figure out what they are talking about.  Is that --

THE COURT:  Well, here's what I'm going to do:  DX 295 and DX 296 are admitted.  The exhibits attached that -- what those exhibits should be are the actual transcripts.  If you believe any attachments need to come in, then y'all can address those separately.

MR. JAZIL:  Understood.

MR. BURHANS:  That's fine.

MR. JAZIL:  Your Honor, in lieu of calling Ms. Bullard, we are going to move in her deposition as well,

which is DX 294.

And my understanding is that my friends for Florida Decides Healthcare objected to Exhibit 10 and Exhibit 13 to that.

MR. WERMUTH:  Can I phone a friend?

THE COURT:  Sure.

(Pause in proceedings.)

MR. WERMUTH:  That's correct.

THE COURT:  All right.  So slightly different.  DX 294 is a deposition with accompanying exhibits.

DX 294 is admitted including exhibits, with the exception of Exhibits 10 and 13 to that deposition.

(DEFENDANTS' EXHIBIT 294:  Received in evidence.)

MR. JAZIL:  Yes, Your Honor.

THE COURT:  Anything additional?

MR. JAZIL:  I believe that's it.

THE COURT:  And there may be later.  I just wanted to go ahead and take care of the housekeeping matters.

MR. JAZIL:  Thank you, Your Honor.

THE COURT:  All right.  Anybody else wish to be heard at this point?

Okay.  Hearing nothing, I'll see everybody back at 12:30.  That gives you an hour and five minutes.

Court is in recess.

(Recess taken at 11:25 AM.)

(Resumed at 12:35 PM.)

THE COURT:  Someone's standing.

Yes, ma'am?

MS. NEAL:  Your Honor, Mel Neal for the Right to Clean Water plaintiffs.

We had one housekeeping item related to exhibits we were hoping to address before Ms. Pratt testifies.

THE COURT:  Sure.

MS. NEAL:  So Right to Clean Water Exhibit 181, the State has asked us to file this document under seal.  It has an unredacted address of a rejected circulator applicant, and in order to keep that address off the public docket, they've asked us to file it under seal.

THE COURT:  Without objection, it's filed under seal.

MS. NEAL:  Thank you.

THE COURT:  Thank you.

Before, Mr. Jazil, you call your next witness, I just want to give everybody some guidance, and it's consistent with what I've said before regarding other testimony before this Court.

Ms. Pratt who, of course, we have her deposition, and additionally through argument of counsel, it's -- we know that she was involved in going back and looking over petitions, and in the process, which is the subject of the -- what I'm going to call the subaudit, distinguishing the valid versus invalid for

three different counties versus the other information that I previously excluded.

Regardless of the admissibility of the report, or those subsections of the report, certainly Ms. Pratt can testify that We undertook to go and check behind in three counties to see when we identified folks that we questioned, these circulators and their petitions.  And when we went back and reviewed them, we found problems with petitions that had not previously been identified.

For example, in one county there was a limited -- in Palm Beach County, we checked 41 petitions, and of those we identified 15 that we invalidated because the signatures did not remotely match.

So certainly that information, separate and apart from the report, is admissible and those facts and who did what, and then the question becomes what do we do with that information.

That's different from the question about the methodology and what is the invalidity rates mean, which we can address separately.  But I just want to distinguish between, Does what we did come in?  Yes.

Why we did it, does it come in?  Yes.

Examples of what we were looking for and why we did it, is that admissible?  Of course, it is.

And examples that Ms. Pratt is familiar with because she was involved in the process and has personal knowledge, of

course it's admissible and relevant for a number of reasons. That's -- and, quite frankly, the numbers of what we reviewed and how many we invalidated seems to me to also be relevant.

Whether or not taking a subset of a subset, and which ones were picked and why you picked them, that certainly can suggest that -- question the value, generally, of any specific information you could extrapolate.

And as it relates potentially to the invalidity rate, I certainly can see where there could be some question as to the methodologies that relates to that final number and the methodology associated with that final number.

But I want to distinguish between general testimony, general observations, one; some of the data and information, two; and, third, the actual calculation and the methodology associated with that.

I think those are all three different things, and certainly the first bucket of information I described is admissible and is divorced from the report itself.

I'm just trying to give everybody some guidance on both sides so they know where I'm heading and what my thought process is.

Mr. Jazil, that may have been a completely pointless exercise, or do you have any questions about --

MR. JAZIL:  No questions.

Thank you, Your Honor.

THE COURT:  All right.

You can call your next witness.

MR. JAZIL:  Jillian Pratt is our next witness.

(Director Jillian Pratt entered the witness stand.)

**JILLIAN PRATT, DEFENDANTS' WITNESS, DULY SWORN**

THE COURTROOM DEPUTY:  Please state your name for the record.

THE WITNESS:  Jillian Pratt.

THE COURTROOM DEPUTY:  Thank you.

THE COURT:  Counsel, you may proceed.

DIRECT EXAMINATION

BY MR. JAZIL:

Q.   Good afternoon, Ms. Pratt.

Where do you work?

A.   I work at the Florida Department of State.

Q.   And what's your job title there?

A.   I'm the director of the Office of Election Crimes and Security.

Q.   When did you become the director of the Office of Election Crimes and Security?

A.   In March of 2025.

Q.   And what did you do before that?

A.   I worked in the general counsel's office at the Department of State, so I was an assistant general counsel.

Q.   When did you start in the general counsel's office at

State?

A.   In May 2024, I believe -- or May 2023.

I can't recall.  I was there about -- yeah, May 2023.
Sorry.

Q.   Fair enough.

And can you just briefly summarize for us the things that you did before going to the general counsel's office at the Department of State?

A.   Sure.  After I graduated law school in 2016, I clerked for a judge on the First District Court of Appeal, Judge Osterhaus, and then I was a prosecutor.

I worked at a law firm.  I clerked for a judge here for the District Court, the Northern District of Florida, Judge Allen Winsor, and then I went to the Department of Health, and then I ended up at the Florida Department of State.

Q.   Thank you, ma'am.

I'd like to focus on your time at the general counsel's office for a bit.

Who are your clients at the general counsel's office for the Florida Department of State?

A.   My clients were the Division of Library Services, Arts and Culture, Historical Resources, corporations, and then I also ended up being the attorney that assisted with the OECS, the Office of Election Crimes and Security.

Q.   Did you provide legal services to the Division of Elections

while you were at the general counsel's office?

A.   Not the Division of Elections, but I did for OECS.

Q.   Okay.  But are you familiar with the Division of Elections as well?

A.   Yes.

Q.   Okay.  And we'll talk about the intersection a bit, but, first, help me to understand, when was the Office of Election Crimes and Security created?

A.   In 2022.

Q.   And who created it?

A.   The Florida Legislature.

Q.   And is it a separate agency or is it housed within an agency?

A.   It's housed within the Florida Department of State.

Q.   And when you got to Department of State, who was the director of the Office of Election Crimes and Security?

A.   Andrew Darlington.

Q.   And do you know who he reported to?

A.   I do.

Q.   Who?

A.   Brad McVay.

Q.   And what was Mr. McVay's title?

A.   He was the Deputy Secretary of State for Legal Affairs, I believe.

Q.   And did -- who did you report to in the general counsel's

office when you got there?

A.   When I got there I reported to John Morris and I reported to Brad McVay.

Q.   And, ma'am, I think you said before you're familiar with the Division of Elections.

     What's your understanding of what they do?

A.   My understanding of what they do is that they administer elections, so they supervise the Supervisors of Elections and offer them assistance with administering elections.

Q.   And on a day-to-day basis, how does the Division of Elections interact with the Office of Election Crimes and Security?

A.   We interact quite a bit.  OECS uses some of the resources that belong to the Division, so we use their voter records.  I also ask Maria Matthews for advice, since she's been in elections for so long, and -- we interact quite a bit.  They give us complaints if Supervisors have sent them complaints.

Q.   Okay.  So you said you access their voter records.

     Do you access other databases through the Division of Elections?

A.   We access other databases.  I don't know if we access any others through the Division.  We do access some of their records having to do with petition circulators.

Q.   Ma'am, focusing on OECS, the portion of the Department of State of which you're the director, what are OECS's

responsibilities?

A.    Our responsibilities are to investigate any allegations of election crime that we receive, and then we also have an obligation to produce a report to the Legislature and to the Governor's office each year delineating what we've worked on within the past calendar year.

Q.    What is the organic statute that sets up OECS and delineates its responsibilities?

A.    I believe it's 97.022.

        MR. JAZIL:    And if I could use the ELMO.

        THE COURT:    Certainly.

BY MR. JAZIL:

Q.    Now, ma'am, I'd like to draw your attention to subsection (1)(a), which talks about:  *Receiving notices and reports generated by government officials or any other persons regarding alleged occurrences of election law violations or election irregularities.*

        Here's my question:  Do you, in fact, receive notices and reports generated by government officials?

A.    We do.

Q.    From whom?

A.    From Supervisors of Elections, from state attorneys, and then sometimes from just other government officials.

Q.    Okay.  And where do the bulk of these reports and notices come from?

A.    I would say the bulk come from the Supervisors and then citizen themselves.

Q.    And in the time that you've been the director of the Office of Election Crimes and Security, can you tell me how many Supervisors have sent notices, reports, complaints to you?

A.    I'm not sure of the exact number, but if not all 67 Supervisors, I would say it's close to that.

Q.    Now, when you get a complaint from a Supervisor of Elections, what form does it take?

A.    It can take the form of the complaint form that the Division of Elections produces.  But they can also complain to us verbally, in person or over the phone, and then sometimes we receive complaints through email.

Q.    And in your experience, do these complaints from the Supervisors come in a timely way, shortly after they learn of it?

A.    Yes, they do.

Q.    Now, subsection (1)(a) also talks about complaints from any other person.

      Do you see that, ma'am?

A.    I do.

Q.    Can you give me examples of other people who submit complaints?

A.    Sure.  We receive a lot of complaints from just ordinary citizens, so people with personal knowledge of an election crime

2070

Direct Examination - Director Pratt

occurring.  Sometimes it's family members, sometimes it's people who work with these people, or just people who have observed election crime occurring.

Q.    Okay.  And from your perspective, give us a sense of what kind of complaints you're getting from Supervisors and regular Floridians.

MR. CLARK:  Your Honor, for the record, I'd like it to be noted that it doesn't say "complaints" in 97.022(a).

MR. JAZIL:  Your Honor, I'm using it as a shorthand so I don't have to repeat notices and reports over and over again.

THE COURT:  Well, he noted it for the record; he didn't object, so please proceed.  There's nothing for me to rule on.

MR. CLARK:  I need to object.  I'm going to object and request he use the word --

(Reporter requested clarification.)

THE COURT:  He can use the -- your concern with the nomenclature is duly noted, but you can use the shorthand and it's -- that's fine.

THE WITNESS:  Can you repeat the question, please?

BY MR. JAZIL:

Q.    Give us a sense of the kinds of complaints you're getting from Supervisors and individual voters.

A.    Sure.  We receive complaints about a number of kinds of election crimes.  So often it is -- they're allegations that an

individual has voted who is ineligible to vote, so that would be for noncitizens or for felons, typically.

We also receive allegations that folks have voted twice either within the state of Florida or once within the state and once in another state for the same election.

We receive complaints about petition circulators alleging that, you know, they have forged a voter's signature.

And we receive just a number of complaints about 3PVROs as well.

Q.   And do y'all record these complaints as part of your responsibilities?

A.   We do.

Q.   Why?

A.   We are required to generate a report for the Legislature and the Governor's office each year, as I mentioned.  And in that report we have to list the number of complaints that we've received, the kinds of complaints we've received, their current status with our office, and then whether or not we've referred them to law enforcement.

Q.   And as director of OECS, are you familiar with how these complaints are logged?

A.   I am.

Q.   And do y'all at OECS even maintain up-to-date records of these complaints as part of your work?

A.   We do.

Q.    And do y'all log these complaints in after they're received?

A.    We do.

Q.    Now, you mentioned the reports that are shared with the Governor and the Legislature.

Are the complaints ever attached as part of the reports?

A.    We often attach them as exhibits of examples of the kinds of complaints that we've received in the past year.

Q.    How do you decide which complaints to attach?

A.    Typically we look to see what complaints have been representative of the types of crimes that we've investigated throughout the past year.

And so if we discuss something in the narrative portion of the report, usually we will try to provide an example of what we've looked at.

Q.    Does your office ever initiate independent inquiries concerning possible election law violations?

A.    We do.

Q.    And we'll get back to that in a second.

Here's my question first:  Regardless of whether you get a complaint through a government official, an individual, or through your own initiative, what do you do next?

You got a complaint; what happens next?

A.    We start by looking at the allegations contained within the complaint.  Sometimes we receive complaints about things that

have nothing to do with elections.  Those are immediately closed or sometimes they are sent to law enforcement if they truly are alleging a crime.

If it does allege an election law violation, we look at it to determine what kind of evidence law enforcement might need to investigate.  We look at -- we look at the evidence that we have, which typically we require personal knowledge from the complainant or someone who, I guess, knows the complainant, and then we get an affidavit from them.

We collect the voter records that are necessary, and then if there's sufficient evidence of a crime, then we refer it to law enforcement; if not, we close it.

Q.    And you said you refer it to law enforcement.

Can you be more specific of who the referrals are made to?

A.    Sure.  We refer most of our cases to FDLE and then federal agencies like the Department of Justice and the Department of State.  Then we also refer our cases to prosecutors, so that's typically going to be the state -- the Office for Statewide Prosecution and then state attorneys across the state and federal prosecutors.

Q.    Can you briefly explain to us what kind of cases you are referring to the federal prosecutors versus the state prosecutors?

A.    Sure.  We refer anything that is a federal crime to federal prosecutors.  Oftentimes, that's also going to be a state crime.

Typically this occurs when a noncitizen has registered to vote or has voted.  We refer that to the federal prosecutors, because they've been willing to take those cases, but usually at the same time we'll also refer them to state prosecutors.

Q.   In your time as director of OECS, have you made these referrals to federal prosecutors?

A.   I have.

Q.   Does your office issue any fines?

A.   Yes.

Q.   And help me to understand how that fits into what we've been talking about.

You've done the investigation; sometimes you make a referral.  When do you decide to issue a fine?

A.   We decide to issue a fine when we have received notice that there has been a fineable violation of the election code. Oftentimes this comes up when a petition or a voter registration application is delivered late to our office -- or to the Supervisor's office, and then we look to see if that is something that should be fined for.

Q.   How do you communicate this fine to the person that's potentially being fined?

A.   We communicate it in a letter.

Q.   And what happens next?

A.   So in that letter, we explain why we are fining that individual, and we usually attach -- like, if it's a petition

fine, for example, we attach the petitions that we are saying they should be fined for.

And then the next step is that the individual can pay the fine, or they can discuss with our office why they think they shouldn't pay the fine, or they also have the option of going to the Division of Administrative Hearings and challenging the fine.

Q.   Ma'am, are you familiar with Section 100.371 of the Florida Statutes that deals with ballot initiatives?

A.   I am.

Q.   I'd like to call your attention to subsection (7)(b).  I'm highlighting for you this subsection.

Are you familiar with this subsection?

A.   I am.

Q.   This subsection allows for "force majeure or impossibility of performance" to be considered as part of your decision to fine?

A.   That's correct.

Q.   And here's my question:  Did this part of the statute predate HB 1205?

A.   It did.

Q.   And how, if at all, does the "force majeure or impossibility of performance" language factor into your decision to fine someone when, for example, there's a storm?

A.   If we receive notice that a petition could not be delivered

to our office in a timely manner, for example, because of a storm, and we receive notice that that was either under force majeure or impossibility, we wouldn't fine.

Q.   Now, here's another example for you.  If someone says that they gave something to FedEx, the FedEx's next-day delivery guarantee, and they provide you all the relevant documentation, how would the "force majeure or impossibility" language in this subsection factor into your fining decision?

A.   We wouldn't fine for that.

Q.   Now, ma'am, there's also a subsection in here --

THE COURT:  Mr. Jazil, I think it was implied, but just so it's clear, you talked about a two-step process.

First y'all looked for fineable violations.  If you sent a letter, then people had an opportunity to dispute it.  Implicit in your testimony is that, Judge, we would try to look at these sort of impossibility things as -- from the get-go, but we also have the failsafe that if we miss something, you have an opportunity to dispute it.  So that would be a second way that somebody could challenge it.  So we'd hope we'd caught it, but if we don't, you can always dispute it.

Is that correct?

THE WITNESS:  That's correct, judge.

THE COURT:  Understood.

BY MR. JAZIL:

Q.   Now, Ms. Pratt, I'd like to call your attention to

subsection (11) of the bill.

Very last sentence, it reads: *If the sponsor of an initiative petition discovers a violation of this section and reports the violation as soon as practicable to the Secretary, the sponsor may not be fined for such violation.*

Do you see that?

A.   I do.

Q.   Do you know whether this particular part of the statute was added as part of HB 1205?

A.   I believe it was there before HB 1205.

Q.   You believe it was there before HB 1205?

A.   Correct.

Q.   Okay.  Now --

THE COURT:  Just to close the circle on that -- and I don't want to assume something.  If I'm assuming and it's wrong, let me know.

But I'm assuming that if a sponsor calls you and says, Oh, my gosh, somebody's -- they just realized their kid shoved something in their backpack and they just discovered it.  If you self-report, then you shouldn't be fined.  Is that --

THE WITNESS:  If the petition circulator reports it to the sponsor and the sponsor reports it to us, then, yes, that's correct.

THE COURT:  Okay.  I understand.

THE WITNESS:  Could I correct my testimony from the

last question that you just asked?

BY MR. JAZIL:

Q.   Go ahead.

A.   In thinking through, I don't believe this provision was in the statute before HB 1205 was implemented.

Q.   Okay.  My question, though, is this:  Do you, as the head of OECS, someone responsible for fining, read this as giving you discretion to fine a sponsor if the sponsor reports a violation as soon as practicable to the Secretary?

A.   I don't.

Q.   Why is that?

A.   The way that we read this statute is that -- when it says "may not be fined," we read that to say we are not permitted to fine a sponsor under that situation.

Q.   All right.  In setting aside the linguistics of this, we looked at two possible ways to get out from a fine, the force majeure or impossibility and the as soon as practicable; right?

A.   Right.

Q.   Would you agree with me that both of those excuses are fact dependent?

A.   Yes.

Q.   Now, if someone receives a fine letter and they reach out to you, talk to you about the impossibility and force majeure issue, or they tell you that it wasn't possible to comply as soon as practicable; you make a decision, but they disagree,

what happens next?

A.   If they disagree, they have the ability to challenge our findings at the Division of Administrative Hearings.  We provide their Chapter 120 rights at the end of each letter that we send.

Q.   And the Division of Administrative Hearings -- how does that Division of Administrative Hearings process work?  You send out the notice of rights.  What happens next if someone chooses to exercise this right?

A.   It's very similar to how a trial would proceed in court.  A complaint -- something similar to a complaint is filed.  There's something similar to an answer.  Both parties can engage in discovery, and then eventually there is something like a trial where the administrative law judge makes findings of fact.

Q.   The administrative law judge, does that administrative law judge work for the Department of State?

A.   No.

Q.   Who does the administrative law judge work for?

A.   So they work for the Division of Administrative Hearings, which is completely independent from the Department of State.

Q.   Ma'am, as a practical matter, after an administrative law judge holds a hearing, makes findings of fact, what, if any, power does the Department of State have to overturn those findings of fact?

A.   We wouldn't have the ability to overturn it ourselves.

Q.   Do you at the Division ever get to weigh the evidence

yourself as part of the administrative process?

A.    No.

Q.    Now, ma'am, you talked before and you looked at some language in 97.022 that talks about the office's ability to initiate investigations.

      Do you recall that?

A.    Yes.

Q.    What are some examples of investigations that your office has initiated?

A.    We've initiated investigations on our own for individuals that may or may not be registered to vote or may or may not have voted.  Specifically, we've done that with felons.  We've looked at lists of felons ourselves to determine whether or not they are registered to vote.  We've done the same thing with noncitizens.

      And then with petition circulators, we've looked at invalidity rates, and we've then looked into particular petition circulators based on that.

Q.    Ma'am, as the director of the Office of Election Crimes and Security, are you familiar with the reports your office creates?

      THE COURT:  Before you move on, let me ask a question.

      When you say based on "invalidity rates" -- again, I don't want to assume something intuitively -- that would be -- registered circulators have a number.  Is there something that y'all can access easily to say, If your registration number as a

circulator is 1001, we have got the following X number of petitions that have been invalidated associated with 1001?

THE WITNESS:  Yes, we are.  We are able to receive some spreadsheets from the Division of Elections.  It will list out each circulator number and then the number of petitions that were validated within the state and the number of petitions that were invalidated within the state for each respective petition circulator.  We can also get spreadsheets delineating all of that by county or by district.

THE COURT:  And just -- we had asked somebody else. I'm not sure if you know.

In reviewing invalidity rates and the other work you've done, do you have any idea of how many -- say, in 2024 how many registered circulators there were?

THE WITNESS:  I don't.

THE COURT:  Counsel, you may proceed.

MR. JAZIL:  Thank you, Your Honor.

BY MR. JAZIL:

Q.   Ms. Pratt, as the director of OECS, are you familiar with the reports your office puts out?

A.   I am, yes.

Q.   Ma'am, how many reports to the Governor and Legislature has OECS issued since January 1, 2024?

A.   Five reports.

Q.   And we are going to focus on three of those reports:  The

January 15th, 2024 report, the December 20, 2024 report, and the January 15, 2025 report.

But before we do, I'd like to pull up -- I think it's Exhibit 1, which is the law as approved and signed.

MR. JAZIL:  If we can go to pages 4 and 5, those side by side.

BY MR. JAZIL:

Q.   Ma'am, have you read HB 1205 as part of your work?

A.   I have.

Q.   And have you looked at the "whereas" clauses for HB 1205 --

A.   Yes.

Q.   -- as part of your work?

And as the director of OECS and someone who has worked on the OECS reports, is the information in these "whereas" clauses consistent with your understanding of how things were shaking out?

A.   Yes.

Q.   Okay.

MR. JAZIL:  You can take that down.

BY MR. JAZIL:

Q.   Now, the OECS report --

THE COURT:  Just so I'll know, because you might have to translate, was the last question -- phrased more directly, are you asking, Did your office follow the "whereas" clauses as directives and act consistent with that?  Or what was the --

"how did things shake out," I have no idea what that means.

MR. JAZIL:  Sorry.

BY MR. JAZIL:

Q.   So the "whereas" clauses -- the "whereas" clauses, you have read them; right?

A.   I have.

Q.   Is your understanding of what's laid out in those "whereas" clauses consistent with what you know as the director of OECS?

A.   Yes.

THE COURT:  If that's what you want to leave it at, that's fine.

BY MR. JAZIL:

Q.   Now, the information in those "whereas" clauses, again, as the director of OECS, do you know whether or not that information is coming from the reports that your office puts out?

A.   I do.  They are consistent with our reports and the information contained within them.

Q.   And do you know whether the "whereas" clauses is mentioned in your reports as well?

A.   I believe they do, yes.

THE COURT:  So it was clear, I was trying not to do the examination myself, but the -- you're trying to -- the law was passed, and the point is, you are saying that it was passed and based on information that was provided for them in part by

this witness's group; correct?

MR. JAZIL:  Yes, Your Honor.  Thank you.

THE COURT:  That's what I understood.  I just wanted to make clear that's what was being said.

Thank you.

BY MR. JAZIL:

Q.   Now, ma'am, I'd like to go to the January 15, 2024 report.

MR. JAZIL:  And we don't need to pull it up just yet. But, Your Honor, may I approach the witness with a copy of the reports --

THE COURT:  Sure.

MR. JAZIL:  -- sans the appendices?

THE COURT:  You can hand her whatever you want, because you may want to refresh her recollection with it or have her refer to it.

THE WITNESS:  Thank you.

THE COURT:  Ms. Pratt, the report and everything is voluminous, so if you need to look at something, all you have to do is say "I'd like to look at it" just as we've done with other witnesses, and you are free to look at it.  But if you'll let us know if you need to refer to something for some numbers or something.

THE WITNESS: Okay.  Will do.

THE COURT:  Thank you.

THE WITNESS:  Thank you.

BY MR. JAZIL:

Q.   Now, going to the January 15, 2024 report, ma'am, are you familiar with that report?

A.   I am.

Q.   Have you read that report?

A.   I have.

Q.   What were the big takeaways, from your perspective, from that report?

A.   One of the big takeaways from that report was that our office had discovered that there was some petition fraud going on within the state.  I believe -- and I would have to look back.  I believe we also talked about some issues with 3PVROs, which are third-party voter registration system -- systems, I think.

Q.   And focusing on just the petition circulation --

A.   Or organizations.  So sorry.

Q.   And focusing just on the petition circulation, do you recall which initiative y'all focused on as part of the January 2024 report?

A.   I believe we focused on both gambling and abortion.

Q.   What were the concerns that your office was highlighting to the Legislature?

A.   We had received some reports of petitions that were allegedly signed by deceased individuals, so that was one of our concerns.

We also had received some complaints from Supervisors about similar handwriting being present in petitions and then potential forgeries contained --

MR. STEINER: Objection, Your Honor. This is all hearsay.

THE COURT: I'm going to allow it and overrule the objection based on she's already said that she was -- her office was generating a report at the behest -- and, as I understand it, Mr. Jazil, you're asking her, what were your concerns, what were you basing it on to explain what actions she took; correct?

MR. JAZIL: Yes, Your Honor.

THE COURT: So I'll allow her, just as I have with others, to just explain generally, without a narrative description, what kind of information she was receiving so that she can explain why her office took the actions it took.

MR. JAZIL: Thank you, Your Honor.

BY MR. JAZIL:

Q. Now, in that report, did you your office tally up the number of circulators that were of concern?

A. I believe we tallied up the ones that we were aware of.

Q. And did you tally up the number of petitions that were at issue?

A. Yes.

Q. And do you recall how many petition circulators y'all tallied up and how many petitions?

A.   May I refer back to the report?

Q.   Please.  Please refresh your recollection, and I'll ask you the question again.

A.   May I clarify, are we referring to the January 2024 report?

Q.   Yes, ma'am.

A.   All right.

Q.   So, ma'am, how many circulators did you all note a concern about?

A.   Thirty-two.

Q.   And how many potential petitions were affected by these 32?

A.   Over 1,500.

Q.   And I promise we are going to get to the interim report. It will be the star of our show.  But before we do, I'd like to talk about the January 15, 2025 report.  Are you familiar with that report?

A.   I am.

Q.   And from your perspective, what was the focus of this particular report?

A.   I think one of the big focuses was petition fraud. Throughout the past year, we had conducted a series of audits of Supervisor's offices looking at petitions that had been verified as valid, and we started by looking at a number of known or suspected fraudsters is what we called them.  So these were petition circulators that had either been arrested for fraud or they had -- were suspected of fraud by Supervisors or their

invalidity rates were much higher than those seen across the state.

Q.    And this report would, again, have tallies of the number of petition circulators y'all were concerned about?

A.    Yes.

Q.    And was there a tally of the number of petitions y'all were concerned about in the report?

A.    Yes.

Q.    And you mentioned that this report built on the interim report or a prior report.  Did I hear that right?

A.    I don't know if I mentioned it, but it did build on a prior report.

Q.    You mentioned an audit?

A.    Yes.

Q.    Was the audit part of any other reports?

A.    The audit was also part of this interim report that you're referring to.  It was initially filed in October 2024, and then it was amended in December 2024.

Q.    And taking a step back, why is it the department felt the need to put together an interim report in October, which y'all later amended in December?

A.    We had received a complaint from a petition circulator who actually hired other petition circulators, and he delivered to our office more than 600 petitions --

            MR. STEINER:  Objection.  This is hearsay going

outside of the limits that Your Honor mentioned earlier.

THE COURT:  I'm going to allow the generalized statement that they received a complaint from a petition circulator, who was hired by another one, regarding up to 600 petitions.  That explains what they did, that statement, without getting into a granular detail.  So she can now be asked, Once you got that complaint, what did you do?

MR. JAZIL:  Your Honor, one more question, and then I was going to ask that.

BY MR. JAZIL:

Q.   What form did this complaint from the circulator take?  Did he fill out a form or what did he do?

A.   He personally came to our office, and he delivered those 600-plus petitions.

Q.   So you've got this.  What did you do next?

A.   So based on what he told us about the petitions, he suspected that all of them were fraudulent for a number of reasons, which we looked through and verified.  Some of those --

MR. STEINER:  Objection.  Hearsay.

THE COURT:  She can just talk about what you found as opposed to what he told you, so sustained in part and overruled in part.

BY MR. JAZIL:

Q.   So you got the complaints.  What did you and your office do next?

A.    Our office looked at those petitions and determined that a large number of them were likely fraudulent, and that was based on a few different things.

One, it was based on looking at the handwriting in the petitions.  Frequently it was the same handwriting over and over again.  Also a lot of them were in alphabetical order, which led us to believe that the circulators were possibly going off of some list of voters.  And then looking at signatures, we were able to determine that they didn't match what we had on file, which is not all of the signatures that necessarily would be present in the County Supervisor's office, but we were able to determine that they had -- they were nowhere close to the ones we had on file for those voters.

Q.    Ma'am, so you've got the investigation y'all did on the 600.  Did you -- who is the sponsor for this particular initiative that you were looking into?

A.    It was Floridians Protecting Freedom.

Q.    Okay.  Do you recall writing a letter to Mr. Hank Coxe about this particular issue?

A.    I do.

Q.    If we can -- well, let me just ask you this:  Who was Mr. Coxe?

A.    I would have to look at the letter to remember exactly, but I believe he was the attorney representing Floridians Protecting Freedom.

Direct Examination - Director Pratt

Q.   Would it refresh your recollection to look at this letter?

A.   It would.

          MR. JAZIL:  If we can go to DX 4, page 221.

          Can you put the two pages on the screen?

BY MR. JAZIL:

Q.   Ma'am, does this refresh your recollection?

A.   It does, yes.

Q.   And who was Mr. Coxe?

A.   He was counsel of record for Floridians Protecting Freedom.

Q.   And did you all write a letter to Mr. Coxe?

A.   We did, yes.

Q.   Did you participate in the writing of this letter?

A.   I did.

Q.   Okay.  What was the point of sending this letter to Mr. Coxe?

A.   The point of sending this letter was twofold, I believe.

     One was to alert Floridians Protecting Freedom that we had received a number of petitions after the 30 days had expired from the time the voter had signed the petitions, so that was a fineable offense.  I believe we were fining them for $328,000.

     The other part of it was we wanted to alert Floridians Protecting Freedom of that individual who had come into our office and what we had found with those 600-plus petitions.

Q.   And did Floridians Protecting Freedom end up taking this issue to DOAH?

A.    They did not.

Q.    How did it resolve itself?

A.    It ended up settling out of court for -- I don't remember the exact amount.  I know it was in excess of $100,000.

Q.    Now, ma'am, in the interim report that y'all did, is there a do-not-buy list at all discussed in that report?

A.    There is.

Q.    And where did you get this from?

A.    We received it as we questioned one of the organizations that was circulated with Floridians Protecting Freedom.  This was a list that apparently was present within the industry that Floridians Protecting Freedom or their -- you know, the organizations that were associated with them had, and it was a do-not-hire list, essentially, that these were individuals known to have committed fraud or suspected to have committed fraud.

Q.    We established earlier that you have a record of the petition circulators; correct?

A.    Correct.

Q.    What did you do with the list and the records of the petition circulators that you know were registered in Florida?

A.    We compared that do-not-buy list against a list of circulators that were then registered with Floridians Protecting Freedom.

Q.    And how many of the folks that were registered as petition circulators appeared on the do-not-hire or do-not-buy list?

MR. STEINER:  Objection, Your Honor.  There is a lack of foundation here.  She doesn't have personal knowledge of who is and is not on the list.

THE COURT:  Overruled.  The question becomes not whether or not the underlying list was accurate, but she compared the two lists and how many showed up on her list when she did that; correct?

MR. JAZIL:  Yes, Your Honor.

THE COURT:  All right.  She can answer that question.

BY MR. JAZIL:

Q.   And how many showed up?

A.   I'm sorry?

THE COURT:  How many were on both lists?

THE WITNESS:  Thank you.

A.   I believe it was 55.  I'd have to look back at the interim report to give you that exact number.  Is that all right?

BY MR. JAZIL:

Q.   If you'd like to look at it to refresh your recollection, please do.

A.   My recollection has been refreshed.

Q.   Okay.  So how many individuals showed up on both lists?

A.   Fifty-five.

Q.   Do you know how many petitions these 55 folks collected?

A.   It was in excess of 8,000.  I believe it was in excess of 8,800.

MR. STEINER:  Objection.  Again, lack of foundation.

THE COURT:  Overruled.

My understanding from your testimony is, Judge, we compared those 55 names to our list, which I've already explained.  We can look at names and/or numbers for circulators and see how many we collected that's connected to their either name and/or number; is that correct?

THE WITNESS:  That's correct.

THE COURT:  Understood.

It's overruled.

BY MR. JAZIL:

Q.   Moving on.

Now, as you testified earlier, you provided the interim report to the Legislature the first time in October?

A.   Correct.

Q.   And you amended it in December?

A.   We did.

Q.   Why?

A.   There were a few numerical errors that needed to be corrected and then there were a few clerical grammatical mistakes.

Q.   And did y'all tell the Legislature what you were correcting?

A.   We did.  We had a list of the corrections that were made at the very end of the interim report that we submitted in December

of 2024.

Q.    And my understanding of your earlier testimony is y'all also conducted an audit that was reported on in the interim report?

A.    That's correct.

Q.    And let's take this audit step by step.

We've talked some about the "why."

Who did y'all rely on for the audit?

A.    We relied on the employees of OECS and then myself -- I still worked for the general counsel's office -- and then Brad McVay.

Q.    Did you use any outside help?

A.    We didn't.

Q.    And did you, yourself, participate in the audit?

A.    I did.

Q.    And can you be more specific about what role you played in this audit?

A.    Sure.  I helped plan the audit.  I was the one who went through and identified which petition circulators we would be looking at as potential fraudsters.

I also was --

THE COURT:  Let me ask you a question there, because I'm -- wrote it down earlier, and I don't want to forget, and I assume somebody's going to ask you on cross.

You had talked about the criteria for fraudsters or

folks identified as concerning, and you listed a number of things that you would look at, such as dead folks.

But the last category was invalidity rates, and I want to make sure that I understand that. Because invalidity rates, as I understand it, could be if I'm the sloppiest, laziest paid petitioner, and I never include an address on any of the petitions, I'd have a 100 percent invalidation rate, so I'd have the highest invalidation rate of anybody, even though there may be no allegation of fraud or not.

Did I misapprehend and was there something more to a high invalidation rate than just the invalidation rate connected to a particular petition circulator's number and name?

THE WITNESS: There was something more, because we did consider that. You know, if someone only submitted two petitions, and they were both invalidated, that's 100 percent invalidity rate. So what we were looking at --

THE COURT: Not just the number, I'm talking about the sheer number. Let's assume somebody collects a bunch of them, a thousand. That's why I used that example.

You'd have a high invalidity rate if you never included a single address or you never included whatever piece of information -- omitted multiple pieces of information or different pieces of information, how did you account for that?

THE WITNESS: We didn't account for that. The spreadsheets that we have, they don't say why something was

rejected, why -- if it was a signature issue or, like you said, if there was missing information.

THE COURT:  How do I know if you selected -- I believe you said it was 55?

MR. JAZIL:  Yes.

THE WITNESS:  Yes.

THE COURT:  If it's 55 individuals, how do I know that five of them were a bunch of mismatched signatures and that 50 of them were just sloppy bad folks so they had high invalidity rates?

How do I know what problems are associated with which people and which people had a high rate of invalidated petitions versus those that either had dead people or the other problems you identified as other categories you'd looked at, like they'd been charged?

THE WITNESS:  I think initially when you looked at them you wouldn't have been able to tell, but based on what our reports say, anyone that we've listed in our reports, those were people that we looked at, and we found that they had high -- high rates of fraud, essentially.

THE COURT:  And how did you get those people?  As I understood it, you went to three counties; correct?

THE WITNESS:  Uh-huh, correct.

THE COURT:  And how did -- what did you have them pull and then how did you select what you were looking at that was

pulled?

THE WITNESS:  We gave them a list of circulators which were people that had already been arrested for fraud, so that's one category.

THE COURT:  Right.

THE WITNESS:  The other would be people that were suspected of fraud based on complaints we'd received from Supervisors, for example, so similar handwriting, that kind of thing.

THE COURT:  Let's talk about the sample size because that can matter.

I'm assuming, based on prior evidence that's come before this Court and even the report itself, that the number of individuals that had been arrested, that was a smaller subset than the other categories; correct?

THE WITNESS:  Correct.

THE COURT:  Do you have any idea how many of the 55 had been arrested?

THE WITNESS:  I don't recall, but it was a smaller subset.

THE COURT:  And so you have that group; you then have the groups that were suspected of fraud because somebody, either individuals and/or like a Supervisor of Elections, had reported them?

THE WITNESS:  Correct.

THE COURT:  And the third category is we just had circulators whose names appeared to have a high rate of invalidity?

THE WITNESS:  Correct.

THE COURT:  But that's not all, as I understand it, because I want to make sure I understand, connecting the dots.

Judge, to even get on the list of 55, it was based on the list that we got that had the do-not-hire list; is that correct?

THE WITNESS:  Some of the individuals on that I think were considered, like, suspected of fraud, yes.

THE COURT:  But was everybody on the 55 -- I'm sorry.

That's actually a wrong -- I don't want to conflate two different things.

The people that -- because I -- that's my problem is I want to make clear because I don't think this is what happened.

When we talked about the 55 when you compared the list, that's a different subset of people than the three counties --

THE WITNESS:  Yes --

THE COURT:  -- they're picking; correct?

THE WITNESS:  -- that's correct.

THE COURT:  So that would have been the better way of asking the question.

Not everybody that was pulled by the three counties is

on some list that had been identified by a third party as fraudsters or suspected of fraud.  These were folks that, based on the criteria that you previously announced, dead people, arrested, high rate of invalidity, that y'all created separately from that; correct?

THE WITNESS:  Yes, we created separate lists.

THE COURT:  All right.  Counsel, you may proceed.

BY MR. JAZIL:

Q.   Before we go to the counties that were selected, the list of people that we're calling "fraudsters," were the arrests specific to the counties that y'all selected?

A.   Can you rephrase that?

Q.   Sure.

So we've got a list of people that we're going to go audit their petitions; right?

A.   Correct.

Q.   Those people that we're going to audit their petitions, they're in a couple of different categories is my understanding of your testimony; right?

A.   Correct.

Q.   And the first category is people who were arrested for fraud; right?

A.   Correct.

Q.   And they -- could they be arrested anywhere in Florida or is this specific to a county?

Direct Examination – Director Pratt

A.    They could have been arrested anywhere in Florida.

Q.    And then the second category that we have, the complaints from the Supervisors and others, did I --

A.    That's correct.

Q.    Are those complaints specific to the Supervisors in the counties that y'all selected or --

A.    No, they're not.

      For example, we would receive complaints from Supervisors in -- I mean, like I said, a number of counties.  It didn't have to be that county when we went to go look to see if there were petitions that were validated and circulated by that same circulator in Orange, Palm Beach, and Osceola.

Q.    And in the system that the Department of State keeps, can you figure out which counties a petition circulator is active in?

A.    Yes, we can.

Q.    So --

          THE COURT:  Help me to put a fine point on it.

          The first category of people that had been arrested, does your report -- because I thought that was one of the things you had to report.

          Does the report identify how many people had been arrested for a violation?

A.    I believe it does.  I don't think that it specifies all of the names of the individuals that were arrested.

THE COURT:  Do you know what the number is?

THE WITNESS:  May I check the report?

THE COURT:  You may.

MR. STEINER:  Your Honor, just for the record, plaintiffs would like to know what page --

THE COURT:  Sure.

MR. STEINER:  -- Ms. Pratt is referencing.

THE COURT:  She can tell us when she finds it.

THE WITNESS:  Your Honor, I'm not seeing the exact number.  I know it was at least 14 because we list out 14 individuals that were arrested.

I know in the previous reports, the one from 2023, January 2023, I think we had eight arrests in that report.

THE COURT:  Okay.

THE WITNESS:  So we would have been looking at really any arrests that had taken place.

THE COURT:  And that's statewide?

THE WITNESS:  Correct.

THE COURT:  And some subset of that number were part of the individuals that you were having Palm Beach County, Orange County, and Osceola County pulled; is that correct?

THE WITNESS:  That's correct.

THE COURT:  How many -- and maybe I'm just not reading because I've got it in front of me.

Counsel provided me with a hard copy earlier of some

of the pages of the audit.  How many -- does it say how many individuals -- I know how many petitions per county you looked at, the sampling, and what you did with each of them.

Do I know how many petitioners for each county had petitions pulled?

THE WITNESS:  I don't believe it's contained within the report.  I know that it was different for each county because certain circulators circulated in different areas, and we were only looking at the ones that had been verified as valid for those petition circulators, but I don't recall that being in the report.

THE COURT:  Now I feel better because I didn't see it. That's why I was asking.  Okay.

Counsel, you can move on.

BY MR. JAZIL:

Q.   Just rounding off this list of people who fall in the fraudster category, someone was arrested and they gave a name, they implicated someone else, was that person considered as part of your list of fraudsters?

A.   I'm sorry.  Could you repeat that?

Q.   Sure.  So if someone was arrested for petition fraud, and this person during the process of going through the criminal justice system gave up another name, was that person considered a potential fraudster?

A.   Yes.

Q.   Okay.  So we've rounded out the "who" that we've looked at for the audit initially.

     How did you pick three counties that were selected?

A.   Initially we started with Palm Beach.

Q.   And why?

A.   Because Palm Beach was very organized.  They had been providing us with leads of potential petition fraud the entire year, and their system allowed us to look at a petition on one side of the screen and then look at all of the signatures that they had on record for that voter on the other side of the screen.

     So it was just a very simple process of being able to pull those petitions and look at them very quickly.

Q.   And what did y'all conclude after looking at Palm Beach?

A.   We concluded, based on a small sample size, that there was fraud that was getting through, at least Palm Beach County, and that fraudulent petitions were being validated.

Q.   And we'll get back to how it is you came to that --

          THE COURT:  Counsel, you can just ask or I can ask later.  What I'm going to need help with -- not with a generalized view that, We determined based on our review that petitions were slipping through.

          I'm still stuck on the disconnect between fraudulent petitions versus invalidated petitions.  So help me to understand if -- in Palm Beach this was a small sampling.  If

none of them had been arrested and only one of them was somebody identified by another fraudster and the other 40 petitions came from individuals with high rates of invalidity, which would be anything that would invalidate a petition, without that, what does it mean otherwise?

So I just -- it seems to me I don't know who -- you say we rounded out who you selected.  It's completely unclear to me who was selected and distinguishing -- because you're taking a subset of petitions from petitions that were pulled from a subset of people, and that subset had been identified as you've been arrested, fingered by somebody that was arrested, or high rates of invalidity and so forth.

I just -- does that mean all those groups appeared in each group of clusters that was pulled, and then did they pull some petitions from each of those people?  I just don't know what any of that means.

MR. JAZIL:  Okay.

BY MR. JAZIL:

Q.   So in Palm Beach, you get their electorate system.

How is it that you pick the petitions that you are going to review?

A.   We based it on the list of petition circulators that we had put together.  I believe for Palm Beach, because it was early on, our list contained those who had been arrested and then those who had been referred to us by different Supervisors

throughout the state.  I don't think at that point we were looking at necessarily high validity rates.  I know that that did happen for Orange and Osceola.  I can't recall if we did that for Palm Beach.

THE COURT:  And then -- I guess the next question would be:  You pulled 41 petitions from Palm Beach.  How many did they give you, and how were the 41 selected out of that larger group?  Or was 41 it?  They pulled all 41.

THE WITNESS:  41 was the number that we were able to get through while we were there.  They didn't really have to pull petitions the same way that Orange and Osceola did because of their system.  So we were able to just look up voter IDs, and then we would be able to look at the petition and signatures.

THE COURT:  Okay.

BY MR. JAZIL:

Q.   You were able to look up voters IDs or --

A.   We were based on -- I think we got a list from them of the voter IDs of voters whose petitions had been validated for specific circulators.

Q.   Okay.

A.   So we would search for a voter ID.  Their profile would come up.  We'd have their petition that they allegedly signed, and then we'd have their signatures on the other side.

Q.   What was your process like to determine whether or not something should or should not have counted?

A.   So Brad McVay and I are the two people that went to Palm Beach, and we had a process of looking at the signature on the petition and then looking at all of the signatures that are on file in Palm Beach.  We would come up with our own conclusion as to whether or not we thought they were valid, invalid, or indeterminate, and then we would compare our answers to one another.  And we were same page for every single one of those signatures.

THE COURT:  Let me just cut to the chase on Palm Beach because I don't think I misapprehended anything.

But of the small set of 41 petitions reviewed, you invalidated 15.  As I understood the report, unlike the other two counties, all 15 that were invalidated were based on signatures that you found were not even close; is that correct?

THE WITNESS:  That is correct that they were based on signatures that weren't close.

I think for the other counties --

THE COURT:  Well, let's not talk about the others just yet.

THE WITNESS:  Okay.

THE COURT:  It seems to me we do have more information.  I want to be fair to you too, because I asked questions about I wasn't sure who did what and how you got the sampling size.

The flip side of that is for this small sampling, it

wasn't -- which supports your conclusion it wasn't based on people that just had high rates of invalidation based on technical errors.  Here the 15 you discounted were all 15 based on the mismatched signatures; correct?

THE WITNESS:  That is correct.

THE COURT:  Y'all can ask follow-ups about the other. I just -- I'm not sure how they were still selected, not sure exactly how many they got, but what did appear certain from the record is the 15 that were invalidated weren't based on just omitted information.  They were based on mismatched signatures is what I gleaned.  If somebody thinks it says something else, you can let me know later.

BY MR. JAZIL:

Q.   We looked at Palm Beach.

Where did y'all go next?

A.   We went to Orange County.

Q.   Why?

A.   Orange County was picked for a few different reasons.  One, it was central in the state, which was between Tallahassee and Miami where Andrew Darlington lived.  So he was traveling back and forth.

Another reason is the Supervisor welcomed us, and so they gave us access to what we needed.

THE COURT:  Is that still Bill Cowles?

THE PROBATION OFFICER:  It was -- the Supervisor?

THE COURT:  Yeah.

THE WITNESS:  I can't recall his name.  I don't --
whoever it was, he's not there anymore.

BY MR. JAZIL:

Q.   And remind us, who is Andrew Darlington?

A.   Andrew Darlington was the director of OECS.

Q.   Okay.  So you picked Orange County.

And, again, what is it that you were looking for in
Orange County?

A.   In Orange County, we had, again, a list of petition
circulators that were either known or suspected fraudsters.  So
they were people who had been arrested, people who had been
referred to us by Supervisors of Elections, and then people who
had high invalidity rates when compared to other petition
circulators in the state, and then also had submitted more than
just a handful of petitions.

Q.   What was the process like?  How did you get the petitions
and -- well, first let's start there.

How did you get the petitions that you were going to look
at for these bad actors?

A.   We had asked Orange County to pull them for us in advance
of our visit.  From what I can recall, they had pulled some of
them, but not all.  So we had to go through some of the boxes to
find the petitions that we wanted to look at.

What we would do when we got those petitions is we would

look at the signature that was on the petition, and then we would look in their computer system, which had all of the signatures that were on file for their voters.

We also would make note if we saw any other issue apart from signature, and that would be, like, missing date of birth, missing address, things of that nature.

But from my recollection, every petition that we determined should have been invalid was due to signature.  We just make note of the other issues.

Q.   And how many people were part of this audit in Orange County the first time?

A.   The first time I would say under ten of us.  I would say probably closer to five.

Q.   And did you all do some kind of training to see that you could match signatures?

A.   We did.  We took a signature verification course, and that's the same course that people at Supervisors of Elections offices are required to take before they can do any kind of signature verification.

Q.   Let me ask you this question:  Why not just take a look at all petitions that are available to Orange County, not just the ones from the bad actors, and assess whether or not bad petitions are being counted as valid?

A.   A couple of reasons.  One is that OECS is designed to look at crime, and so we were interested in seeing if any fraud was

getting through.  We didn't know if there was a problem.  That's kind of -- that's why we went to these counties.  We wanted to see are there petitions that look like they are fraudulent that have been verified as valid.

The other reason is just logistically we could not get through all of the petitions that had been submitted to Orange County with such a small team in that period of time.

Q.   And so you were in Orange County looking at just the bad-actor petitions.

When did you all decide to go to Osceola County?

THE COURT:  Well, there's a slightly different question.  Let me ask a question.

Why didn't you pull a subset and then pull a random -- why didn't you get a subset of folks that you had identified and then do a random sampling, as opposed to selecting specific petitions?

THE WITNESS:  We did after we looked at the list of known or suspected fraudsters and determined that there was a problem; that there were petitions that were getting through, some of which didn't necessarily look fraudulent.  So that's when we --

THE COURT:  I'm still confused because we keep saying, Mr. Jazil -- and I know we now live in an age if we call something -- if I call a donkey a cow, it becomes a cow if I say it enough, but -- in our fact-free society.  But we keep saying

"fraudsters" and "bad actors."

I thought you said in Orange County that a group that was pulled included those that just had a high rate of invalidity irrespective of whether or not it was signatures.  It could be missing data.

Did I misapprehend that testimony?

THE WITNESS:  You didn't misapprehend it.

We considered those to be suspected fraudsters, and ultimately determined that some of them were not engaged in fraud and that some were.  The way that we did that was looking at the petitions, like I said, that we pulled initially in Orange County.  Some of them looked like they weren't necessarily fraud, but they should have been rejected by the Supervisor's office because the signature wasn't a match.

THE COURT:  Okay.

BY MR. JAZIL:

Q.   Just to focus on the Judge's questions, in Palm Beach you didn't have the high invalidity category.

Did I understand that testimony correctly?

A.   I believe that's correct, yes.

Q.   And in Orange County you had the high invalidity category for the subset of people whose petitions you were looking at.

Did I understand that right?

A.   That's correct.

Q.   And just so we're clear, what was the funneling mechanism

as you were looking at this last category, the people with a high validity rate, to see whether or not they were bad actors or not?

A.    We looked at whether or not the signatures were a match. That was the first thing we looked at.  That was to determine whether or not it should have been verified as valid.

But then we also looked at other things like handwriting, for example.  Sometimes there would be a signature, for example, which would have just the first name or something on the signature line.  So we are not sure if that voter finished writing their signature and wanted that petition to be verified as valid, but we can tell it was the voter.  It wasn't the petition circulator that wrote that name.

Q.    Okay.

THE COURT:  Did you -- looking at the signatures, did you account for age?  So, for example, if your exemplar was for a person who was 80 or your exemplar was from a digital signature for somebody who registered to vote when they were -- the year before when they turned 18, did you account for that when you were looking at the signatures?

THE WITNESS:  We did.  We accounted for it in a number of different ways.  We looked at kind of the progression of signatures if there were multiple on file.  If there was only one on file, we would have been more likely to put that in the indeterminate category.

But something that the signature-matching course talks about is, like, shakiness of handwriting that can occur in older age, and we definitely accounted for that.

BY MR. JAZIL:

Q.   Okay.  And I'd still like to get back to this idea of the people with a low validity rate that are being -- that are having their submitted petitions assessed.

So for the people with the low validity rate, my understanding of your testimony is that you would take the petitions that were submitted by that person with the low validity rate and assess them to see whether or not the signatures matched on the petitions that they were collecting.

Did I understand that?

A.   That's correct.

Q.   And if the signatures were not matching, my understanding of your colloquy with the judge earlier was that it then makes you suspect them as a bad actor, fraudster, whatever word we are using?

MR. STEINER:  Objection; leading.

A.   So --

THE COURT:  Hold on one second.

THE WITNESS:  Sorry.

THE COURT:  It is leading, but -- so just ask her, Based on what the Judge said, could you explain moving forward rather than repeating.

But based on his leading question, if you could tell us -- do you agree with that? If not, why not; or if in part, yes, or if not in part, just -- you can respond.

THE WITNESS: I agree with it in part. I think what we considered to be suspected fraudsters initially was potentially people who had high invalidity rates. As we looked at their petitions in Orange County, we recognized that some of those circulators were likely not engaged in fraud. So they were not included on the list as people that --

(Reporter requested clarification.)

THE WITNESS: Some of them were as well. But we made the determination at that point to look at petitions more generally because of that, because we saw that there were petitions that were validated that shouldn't have but weren't necessarily because of fraud.

BY MR. JAZIL:

Q.   What do you mean by "we looked at petitions more generally?" When as part of your audit did you start looking at petitions more generally?

A.   We started looking at petitions more generally the next time that we went back to Orange County. It's referred, I think, as Orange 2 in the report. And we looked at the petitions that were validated for District 9.

Q.   And why that district?

A.   I think that we picked that district because it looked like

they had a lot of signatures that had been verified as valid. It was potentially meaningful in, you know, whether or not it ended up on the ballot, and so we looked at District 9.

Q.   And we talked about Orange 1, Orange 2.  Why is it y'all picked Osceola County?

A.   We picked Osceola for a couple different reasons:  One was that it close in location to Orange County.  The other was that it was a smaller county than Orange, and we wanted to get an idea of whether or not what we saw in Orange County was happening in a smaller county.

Q.   And anything different in the process that you utilized in Osceola from the process that was utilized in Orange County?

A.   No.

Q.   And here's my next question:  After getting the audit results from Palm Beach, Orange, and Osceola, did OECS staff try to extrapolate anything from these figures?

A.   We did, and it's in the report.  We extrapolated from those counties what we thought could be a statewide percentage.

Q.   Okay.  Are any of the members of the OECS staff who participated in this audit experienced mathematicians?

A.   No.

Q.   Statisticians?

A.   No.

Q.   So why try to do this extrapolation?

A.   I think the idea was just to get an understanding of

whether or not this seemed to be a problem within the state of Florida.

I recognize that the extrapolation was not done in the most mathematically sound way; but you can rely on the numbers that we provided, as far as these are the petitions we looked at, this is the number of petitions that we think should have been invalidated that had been validated by the Supervisors, and we recognize that this is a problem within the state.

Q.    And did OECS stop auditing initiatives after providing its January 15, 2025 report?

A.    No.

Q.    Are you all doing audits now?

A.    We have been, yes.

Q.    And tell me how those audits are different than the audits done in Orange and Osceola Counties initially.

A.    The audits are done a little bit differently in that the counties have been picked very randomly.  We've gone to a number of different counties and --

THE COURT:  I'm confused.  For this -- what she's talking about now, these audits, is this something after the reports that is now currently ongoing?

MR. JAZIL:  Yes, Your Honor.

THE COURT:  Okay.

A.    Yes, we've gone to a number of different counties across the state, both big and little.

MR. STEINER:  Objection.  Relevance.

THE COURT:  Are you sure?  Because I thought your argument was that it was a preliminary only, and we are now having them describe finalized audits that -- anyway, overruled. She can answer the question.

A.   We've been looking at petitions from different initiatives because it's been for the next election cycle, and we've -- we have done something similar in that we ask for petitions that have been verified as valid by a list of actually known fraudsters in this case is what we've done.  And after looking at those, if there appears to be a problem within that county, as in they are accepting a lot of these petitions that shouldn't be accepted, we've opened it up more generally and just start looking at petitions randomly.

MR. STEINER:  Your Honor, another objection.

THE COURT:  She hasn't given results, and I'm not going to -- and Mr. Jazil didn't ask for results, and so we don't have properly before me some study or audit that was done in terms of the results of those audits.

The sole question was, and what I permitted, was for her to explain the methodology has changed.  They are no longer using the methodology that was used at the time they generated the numbers regarding Orange 1, Orange County 2, Osceola, and Palm Beach.  It was on that basis that I allowed it, but other than what you're --

MR. STEINER:  Well, these audits were not produced in December.

THE COURT:  And that's why I said he doesn't get to backdoor in new numbers, and he didn't do that, and the witness didn't blurt anything out.  She was very careful.  And I thank you for not -- she answered the methodology questions, not the results questions.  So I allowed it in for -- the methodology change would seem to be your argument and your expert's argument, but I'll allow it in for that.

Counsel, you may proceed.

MR. JAZIL:  Your Honor, I was going to move on from audits unless Your Honor has additional questions.

THE COURT:  I don't have any additional questions.

BY MR. JAZIL:

Q.   We've been talking about paid petition circulators.  Are you aware of instances where your office received complaints about volunteer circulators pre-HB 1205 --

A.   Yes.

Q.   -- acting badly?

A.   We have.

Q.   Were volunteers discussed in the OECS reports?

A.   No.

Q.   Why not?

A.   For a few different reasons.  One is that in our reports, we highlight some of the main problems that we've seen

throughout the past year, and so we did discuss petition circulators that were acting badly.

The volunteers that may have been engaged in fraud, we weren't able to identify who they were. We did suspect that that was happening -- we actually knew that was happening because we received some petitions on volunteer forms that were on behalf of deceased individuals that could not have signed when it's identified in those petitions, but we didn't include it in our report.

Q. Do you recall any instances of a volunteer signing up a deceased person of a complaint that reached your office?

A. I do.

Q. What's your understanding of the complaint?

MR. STEINER: Objection.

MR. MASTORIS: Objection.

THE COURT: And the objection?

MR. STEINER: I was going to say hearsay.

MR. MASTORIS: Hearsay.

THE COURT: Response?

MR. JAZIL: Your Honor, I'm asking her for her understanding of a complaint that reached her office.

THE COURT: No. She said they had a reason to believe that volunteers generally and that that's why they are interested in volunteers. You now want to introduce specific information based on specific statements that were made. So I

sustain the -- I don't -- I wouldn't have sustained the objection to generally why she was concerned and that they got complaints, but what I will do is sustain the objection to eliciting a response about specifics about what somebody was told.

BY MR. JAZIL:

Q.    What county did you get the complaint from?

A.    I believe it was Hernando.

Q.    And what did you do after receiving this complaint?

A.    We verified the information that they had received.

So we looked at the individual that allegedly had signed the petition, and then we looked her up in DAVID, which is the DHSMV database for drivers who are, you know, registered in the state, and we were able to obtain the date that that individual passed away from DAVID.

Q.    So what conclusions did you reach after your investigation?

A.    The date that that individual had passed away was in the year preceding the date that she allegedly signed the petition.

So we concluded that there was fraud happening with volunteer petitions.

THE COURT:  Help me to understand, having sat through a couple hundred criminal trials and accepted the pleas for about 2,000 in state court, how do we distinguish between somebody is using somebody else's ID, somebody else is signing somebody else's name versus the volunteer did it?

So let me just give you a hypothetical that would be rooted in reality.

I've got an 80-year-old retiree with the League of Women Voters who is at a shad bake over on the coast celebrating the 4th of July, and she approaches people, and they give them -- isn't it possible that a perfectly innocent volunteer is duped by somebody that they collect information from at the shad bake?  Why does it necessarily mean the 80-year-old retiree with League of Women Voters is a fraudster?  It seems to me that both are equally plausible.  Fraud could be committed on both ends; both the person signing the petition as well as the person asking for it to be signed.  Why is that not so?

THE WITNESS:  I think you're right.  I think that it could either be the person who is circulating the form or it could be the person who filled out the form, you know, and then turn it in to a circulator.  They are volunteer forms, so they are not supposed to be distributed by paid petition circulators unless it's their own, I suppose.  But we have no way of identifying who the bad actor is in that situation.  We just know that there was fraud.

THE COURT:  I guess what I was taking umbrage with, somebody can say there is fraud associated with a volunteer petition as opposed to there is fraud associated with the volunteer.

But, in any event, I just felt obliged to defend the

80-year-old daughters of the American Revolution volunteer that was out at the shad bake.

But you can proceed, Counsel.

BY MR. JAZIL:

Q.   I'd like to move on to another topic.

Ms. Pratt, are you familiar with the requirement in HB 1205 that SOEs send letters to voters who had their petitions verified?

A.   I am.

Q.   And what's your understanding of what that letter is supposed to tell the voter?

A.   My understanding is that the letter is supposed to tell a voter any time a petition has been verified as valid in their name.  It will tell them the date that the petition was allegedly signed, who the circulator was, if there was a circulator, or if it was a personal use form, what the petition was for, what initiative, and then it provides the ability to the voter to let my office know whether or not they believe that their signature has been misrepresented or forged on the petition.

If they sign that form and put it in the mail, it comes to my office.

Q.   And has your office received those forms since HB 1205 passed?

A.   Yes.

Q. Approximately how many?

A. More than 5,000.

Q. And can you tell how many are related to petitions collected on the personal use form?

A. I can, yes.

Q. How many of those?

A. For the Medicaid initiative, it has been in excess of 100 petitions that were signed on personal use forms.

For Smart & Safe's initiative from this past election cycle, it has been in excess of 500 forms.

Q. And how, if at all, will receipt of these affidavits impact your office's work going forward?

A. It has helped my office greatly. It's also increased our work. Before HB 1205, a voter wouldn't necessarily know if a petition had been verified as valid in their name. There were a few counties that would send out letters to the voters in those circumstances, but most not.

Now voters are receiving these letters when a petition has been verified as valid in their name, and they can let my office know if they did not, in fact, sign that petition or if there was a misrepresentation associated with the petition that they signed.

Q. Ma'am, has your office made referrals to law enforcement in the past year for petition-related issues?

A. We have.

Q.    Can you approximate for me how many?

A.    May I please refer to my report from this past year?

Q.    Please do.

THE COURT:  And while she's looking, let me just note I should have used something other than shad bake.  That's generally associated with New England and Yankees.  I should have, I guess, said mullet.

MR. JAZIL:  Any kind of fish fry will do.

A.    My memory has been refreshed.

BY MR. JAZIL:

Q.    How many referrals has your office made to law enforcement in the past year for petition-related issues?

A.    337.

MR. JAZIL:  Your Honor, I have no further questions. I don't know if Ms. Price does.

THE COURT:  All right.  We are going to take a break.

And I thank everybody for their patience, and I promise we won't keep you here too long.

Thank you.

THE WITNESS:  Thank you.

THE COURT:  How long -- I'd like the plaintiffs' lawyers up, if you are going to have multiple people questioning, it might be helpful to make sure we are not overlapping.  If y'all were to review your notes and talk to your friends, how long would you like?  We are moving at a good

pace, so it doesn't sound like we are backed up.  How long would you like for a break?  I generally find this can expedite things rather than slow it down, but --

MR. STEINER:  Your Honor, I think 20 minutes should be fine.

THE COURT:  All right.  We'll take a 20-minute break.

And just so it's -- those that are reviewing my statements, also I should say they're not limited to New England because General Pickett was actually eating shad at a shad bake when his troops we are overrun at Five Forks and Appomattox was abandoned by the Army in Northern Virginia.

So there were shad bakes also in the south, maybe just not in Florida.

Court's in recess for 20 minutes.

(Recess taken at 2:09 PM.)

(Resumed at 2:31 PM.)

THE COURT:  We're back on the record in Case Number 4:25cv211 for the cross-examination of Ms. Pratt.

As I understand it -- I had the sheet here earlier -- is it still going to be Steiner, Ferguson, Clark and Mastoris?

MR. MASTORIS:  I think the order might be --

THE COURT:  I don't care what order you go in.

MR. MASTORIS:  That's fine.

THE COURT:  Mr. Steiner, you're up.  Since you're standing, you're up.

CROSS-EXAMINATION

BY MR. STEINER:

Q.   Ms. Pratt, my name is Nick Steiner.  I'm counsel with Southern Poverty Law Center for the FDH plaintiffs.

MR. STEINER:  Your Honor, and just to start before I jump into this, I wanted to add one disclaimer that I'm asking questions about -- or some questions, rather, about the OECS reports and wanted to make clear that I'm not opening the door for all of that evidence to come into the record.

THE COURT:  You oppose the introduction of anything regarding the reports and the reports themselves and your -- you and your entire side have made your position well known.

And, as I've said before, I have ruled, and my ruling is definitive under 103, with the exception of the subset, which is the information -- those portions of the report regarding the tables of the three counties that we just discussed, which I'll -- the evidence that was admitted is one thing, the testimony of the witness.

Whether that portion of the report comes in or not is a different matter, and we'll talk about that when we're done with the witness.

So, Counsel, with that caveat, and that applies to all the different plaintiffs and plaintiffs' lawyers, you may proceed.

MR. STEINER:  Thank you, Your Honor.

BY MR. STEINER:

Q.   Ms. Pratt, so you just testified about the do-not-buy list.
     Do you remember that testimony?

A.   I do.

Q.   And the do-not-buy list, to your understanding, is a list of people the sponsor doesn't want to hire; is that correct?

A.   It's a list of people that the sponsor may have hired in the past but no longer wants to hire based on potential fraud.

Q.   Okay.  So yes?

A.   Yes.

Q.   They don't want to hire these people?

A.   Correct.

Q.   Okay.  And the reason why the sponsor might not want to hire someone could be because they were convicted of fraud; right?

A.   Correct.

Q.   It could also be because they're negligent?

A.   Correct.

Q.   It could be because they're not filling out forms properly?

A.   Correct.

Q.   It could also be because they're just terrible at their job?

A.   Correct.

Q.   Okay.  Ms. Pratt, by statute the OECS is required to submit a report to the Legislature; correct?

A.   Correct.

Q.   And that report has to be submitted by January 15th of each year; is that right?

A.   Correct.

Q.   State law doesn't require OECS to submit an interim report in December, though; right?

A.   Correct.

Q.   State law also doesn't require OECS to submit an interim report in October either?

A.   Correct.

Q.   In fact, state law doesn't require OECS to submit any interim reports; is that right?

A.   That's right.

Q.   But your office, nonetheless, submitted interim reports in October and December of 2024; is that right?

A.   Correct.

Q.   You don't know of any interim reports OECS submitted to the Legislature prior to the October 2024 interim report; right?

A.   Correct.

Q.   The October 2024 interim report was released on October 11, 2024; is that right?

A.   That sounds right.  I would have to look back to see the exact date.

Q.   Okay.  So that was about three weeks before election day in 2024?

A.    I'm not aware of the dates.

Q.    Election day is in November, though; right?

A.    Yes.

Q.    Okay.  And so October is one month before November?

A.    Correct.

Q.    Okay.  On Election Day 2024, Amendment 4 that concerned the hot-button issue of abortion was on the ballot; right?

A.    I'm sorry.  Could you repeat that?

Q.    On Election Day in 2024, Amendment 4 that concerned the hot-button issue of abortion was on the ballot; is that correct?

A.    I believe that abortion was on the ballot.

Q.    And you're aware that the Governor and his Republican allies controlling the Florida Legislature was vocal opponents of Amendment 4?

A.    I'm generally aware but not of the specifics.

Q.    Okay.  The October 2024 interim report discussed Amendment 4 sponsors at length; is that right?

A.    Yes.  I believe we did discuss Amendment 4 -- the sponsor for Amendment 4.

Q.    Okay.  Prior to HB 1205's passage, no one at OECS testified about the bill at any state hearings; is that right?

A.    That's correct.

Q.    In the lead-up to its enactment, no one at OECS communicated with any legislators or their staff about anything related to HB 1205?

A.   Correct.

Q.   Or the initiative petition?

A.   Correct.

Q.   Or petition fraud?

A.   Correct, other than the reports that we submitted.

Q.   In the year leading up to enactment of HB 1205, the OECS transmitted to the Legislature the October and December 2024 reports, the January 2025 report, and the supplemental report in April 2025 prepared by an expert.

Does that all sound right?

A.   That does.

Q.   Okay.  Those four reports are the only communications you're aware of between your office and the Legislature concerning the initiative process and petition fraud; is that correct?

A.   I think it's the only communications within this time frame.  The only caveat that I'll add is we had a prior report to the ones we're talking about, and then we had the most recent one in January 2026 that also discussed petition fraud.

Q.   Okay.  But the January 2026 one was after HB 1205?

A.   That's correct --

Q.   Okay.

A.   -- yes.

Q.   So did you know that the -- it's your understanding that the Florida constitution provides that the statewide prosecutor

shall have prosecutorial power; is that right?

A.    That sounds right.

Q.    Did you know, and it's your understanding, that the constitution also creates state attorneys and gives them prosecutorial power?

A.    Yes.

Q.    And Florida Department of State is created by Florida Statute 20.10; correct?

A.    Sounds correct.

Q.    And OECS is part of the Department of State?

A.    That's correct.

Q.    And Florida law 97.022 says your office, quote/unquote, "shall employee nonsworn investigators"?

A.    Correct.

Q.    Is that your understanding?

       That means your office's investigators are not sworn law enforcement?

A.    That is correct.

Q.    And that means that your office's investigators are not authorized to make arrests for fraud or, for that matter, any kind of crime?

A.    Correct.

Q.    And to be clear, your office does not prosecute cases?

A.    Correct.

Q.    And your office does not get to decide if a case should be

prosecuted; is that also correct?

A.    Correct.

Q.    Okay.  So moving on to now what your office can do.

Under Florida Statute 97.022, your office, quote/unquote, "may review complaints"; is that right?

A.    Correct.

Q.    And it may conduct preliminary investigations?

A.    That sounds right.

Q.    A single complaint from someone who says that a petition was signed for them is enough for your office to open a preliminary investigation; is that correct?

A.    Correct.

Q.    And a circulator with a high invalidity rate could also be a reason to open a preliminary investigation?

A.    Correct.

Q.    And in order to open a preliminary investigation, your office does not require a finding of probable cause that a crime was committed; correct?

A.    Can you repeat that, please?

Q.    In order to open a preliminary investigation, your office doesn't require a finding of probable cause; is that correct?

A.    Correct.

Q.    And your office complete -- after your office completes a preliminary investigation, it has one of two choices, to either close the case or refer the case; right?

A.    Correct.

Q.    And if OECS refers the case, it can refer it to the Florida Department -- FDLE, or the Florida Department of Law Enforcement, or the statewide prosecutor or state attorneys; right?

A.    We can refer them to those, and then we can also refer them to federal agencies.

Q.    Okay.  And in order to refer a case, your office does not require a finding of probable cause of a crime to refer it; right?

A.    It's not required in every case.  I would say it's required in most.  We try to reach the level of probable cause.  The only thing is sometimes we are not able to depending on what witnesses we are able to talk to, what evidence we are able to obtain, because, like you said, we are not sworn law enforcement.  So sometimes it doesn't quite reach that level, but we think it may if law enforcement is able to investigate further.

Q.    Okay.  But you do not require probable cause of a crime to refer that case?

A.    Generally, we do not require it, no.

Q.    In 2024 you referred about two-thirds of your preliminary investigations; is that right?

A.    I would have to go back and look at the numbers.

Q.    Okay.  If you reviewed your deposition transcript that my

colleague, Mr. Shapiro, took of you on December 22nd, would that help refresh your recollection?

A.   It may.

MR. STEINER:  If you could pull up page 120 of Ms. Pratt's deposition.

BY MR. STEINER:

Q.   Looking at the bottom, line 22, the question from Mr. Shapiro reads:  *Would most --*

THE COURT:  No, just show her her answer, because you are just refreshing her recollection.

MR. STEINER:  Yes.

THE COURT:  You can show her anything and then --

BY MR. STEINER:

Q.   And ending on line 4 of page 121.

A.   I've read it.

Q.   Did that help refresh your recollection?

A.   Maybe.

Could you repeat the question for me?

Q.   Yeah.  So in this past year, you referred about two-thirds of your preliminary investigations?

A.   So this doesn't really refresh my recollection as to what we did in the past year, because when I was being deposed, we were still in the process of referring cases.  But at that time, yes, we had referred a little more than 200 of our complaints about petition circulators.  I think by this point we have

referred 337 within the year of 2025.

Q. Okay.

MR. STEINER: You can take that down.

Thank you.

BY MR. STEINER:

Q. The December 2024 and January 2025 OECS reports repeatedly discuss, quote/unquote, "known or suspected fraudsters." Does that sound right?

A. That sounds right.

Q. Nowhere in the report does it state how many of the known or suspected fraudsters were either arrested or convicted of fraud; right?

A. I would have to go back and look through the report.

Q. Okay. Well, I'll move on. It's fine.

The January OECS report highlights 14 -- only 14 cases where individuals were arrested for petition fraud; is that right?

A. That sounds right.

Q. And according to the report, only six of those 14 individuals were actually convicted; is that right?

A. I believe that's what the report says as of that time. Some were still in the process of being prosecuted.

Q. And pre-enactment of HB 1205, OECS report had no research or data demonstrating that non-U.S. citizens are more likely to commit petition fraud than U.S. citizens; is that right?

A.    We did not have any data.

Q.    And pre-enactment OECS had no evidence that prosecuting green card holders for petition fraud is more challenging that prosecuting U.S. citizens?

A.    We had evidence that noncitizens in general were more difficult to track down and obtain evidence from in relation to petition circulator cases.

Q.    So it's your testimony today that you had evidence that prosecuting green card holders for petition fraud is more challenging than prosecuting U.S. citizens?

A.    Not necessarily, no, no.  I'm sorry.  I was thinking about residency.

Q.    And to go back to my question, you have no evidence that prosecuting green card holders for petition fraud is more challenging?

A.    Other than the cases that we had looked at and determined that some were more difficult in part because they were out of the state, which that included noncitizens, but not specifically green card holders.

Q.    Okay.  Not specifically green card holders.

      Okay.  Pre-enactment OECS had no research or data demonstrating that felons without their voting rights restored are more likely to engage in petition fraud than nonfelons for people whose voting rights have been restored; is that right?

A.    I don't believe we have any data.

Q.    And pre-enactment OECS had no evidence or data indicating that fining a sponsor $50,000 for hiring a nonresident, non-U.S. citizen, or personal with a felony conviction would deter fraud; is that right?

A.    Could you repeat that, please?

Q.    Sure.  Pre-enactment, before HB 1205, OECS had no evidence or data indicating that fining a sponsor $50,000 for hiring a nonresident, non-U.S. citizen, or person with a felony conviction would deter fraud?

A.    Not any specific data.

Q.    And OECS had no -- pre-HB 1205 OECS had no evidence or data indicating that reducing the window to return a signed petition from 30 days to 10 days would reduce fraud in the petition process; is that right?

A.    Not any data.

Q.    And pre-enactment OECS had no data or studies to show that volunteers collecting more than 25 petitions are more likely to be associated with fraud than volunteers who collected fewer than 25 petitions?

A.    Not any data.

Q.    And pre-enactment OECS had done no studies to evaluate or examine whether these fines will make the ballot-initiative process inaccessible to any sponsor lacking enormous financial resources?

A.    That's correct.

Q.    And last question:  Pre-enactment OECS had not done any studies to evaluate or examine the impact these fines will have on sponsors?

A.    That's correct.

MR. STEINER:  No further questions.

CROSS-EXAMINATION

BY MR. CLARK:

Q.    Good afternoon, Ms. Pratt.

A.    Good afternoon.

Q.    How are you today?

A.    I'm good.  How are you?

Q.    I'm Christopher Clark, which I'm sure you know.  I represent Smart & Safe Florida.  I have a few questions for you today about what you do at OECS.

You're familiar with the HB 1205's ten-day rule; is that correct?

A.    I am.

Q.    Okay. And you're aware there are various fines associated with HB 1205 that are assessed to sponsors; is that correct?

A.    Correct.

Q.    Okay. And I believe I understand that OECS reviews various late petitions to determine whether or not a fine should be assessed against a sponsor; is that correct?

A.    Correct.

Q.    Okay. Would you agree with me that HB 1205 gives a sponsor

ten days, not business days, to return a petition; is that correct?

A.    That's correct.

Q.    Okay.  Do you recall if the prior version of the bill -- or version of the law allowed them to be a next-business-day exception if something arrived on a weekend?

A.    I don't recall if the law specifically, like, allowed that, but we allowed that as an office.

Q.    Okay.  So it's your testimony that if a petition were to arrive on the weekend, on a holiday, you would look to the next business day; is that correct?

A.    That is what we've done previously.

Q.    Okay.  But would you agree with me that HB 1205 does not specifically say that's something you can do?

A.    I don't recall seeing that in the statute.

Q.    Okay.  Do you know if HB 1205 talks about holidays, what you do?

A.    I don't recall seeing that in the statute.

Q.    What about if the office is closed?

A.    Same answer.

Q.    After 5:00 p.m. the tenth day, office closes then, same answer?

A.    That is a little different, I think, because if it is -- if it has been received by the office on the tenth day, then we couldn't fine for that.

Q.   Okay.  But it's my understanding that you guys go buy the date the supervisor stamps it as received; is that correct?

A.   That is typically what we have done in the past.

Q.   Okay.  All the things we've just talked about, is there any administrative rule that's been promulgated that would explain that to sponsors?

A.   No.

Q.   Is it solely in your discretion to make these kind of determinations?

A.   It would become a fact determination.  So, you know, we could impose a fine, but whether or not it would actually be upheld is a different question.

Q.   Okay.  So it's your testimony that, despite the law not addressing the issue, y'all look at it from a fact-intensative perspective; is that correct?

A.   We do, and we would also look at any relevant laws that would apply.

Q.   Okay.  Previously you testified that there is -- I guess impossibility and force majeure are two of the exceptions where a sponsor cannot be fined; is that correct?

A.   That's correct.

Q.   Do mail delays factor into either one of those?

A.   Yes.

Q.   Which one?

A.   I would say impossibility because if something is, like,

delivered to them -- you know, to the U.S. Post Office and then there is an issue, like a mail truck gets into an accident, that's not on the sponsor.

Q.    Okay.  So you'd agree with me it's impossible for the sponsor to control the mail?

A.    Yes.

Q.    Okay.  And has there been any rule issued by OECS or the Department of State addressing that issue?

A.    Not that I'm aware of.

Q.    Okay.  What you testified to today, is that how OECS plans to treat mail delays?

A.    Yes.

Q.    Okay.  Do you know if a sponsor is told if a petition is delivered late?

A.    I don't know if they are told by the Supervisor.

Q.    Okay.  Do you think at any point in time prior to a fine being issued they are told that the petitions are late?

A.    I'm not sure.

Q.    Okay.  Were you aware that Smart & Safe Florida only learned of late petitions through this litigation --

A.    No.

Q.    -- for this cycle?

    Do you know if OECS or the Department of State has issued any rulemaking about HB 1205 since the -- since it was enacted?

A.    OECS hasn't, and I don't think that the Department has.

Q.    Okay.  Has OECS or the Department issued any guidance on HB 1205, like official guidance, to a sponsor?

A.    I'm not sure what you mean by "official guidance."

Q.    Have they issued any -- any kind of directives to sponsors about how OECS will treat mail delays?

A.    I don't believe so.

Q.    Would you agree with me that in HB 1205 nothing increases the time a Supervisor has to review the initiative petitions after they receive them?

A.    I think that HB 1205 was put on pause for a bit, and that did extend the time that Supervisors had; but as it stands now, no, I don't think it does.

Q.    So it's still they have 30 days or, in some cases, 60 days after a sponsor pays for them to review them; is that correct?

A.    That sounds right.

Q.    Okay.  But for the sponsors to get them in, it was shortened from 30 to 10 days; is that correct?

A.    Correct.

Q.    Okay.  With Mr. Jazil y'all discussed a little bit about the Palm Beach audit and the other audits that you conducted; is that correct?

A.    Correct.

Q.    For selecting Palm Beach County, was the reason for potential fraud in Palm Beach County one of your reasons for selecting Palm Beach?

A.   It was.

Q.   Okay.  So you'd agree with me that OECS preselected counties to review, and potential fraud was one of the things that factored into that equation?

A.   I would agree that OECS preselected that county, yes.

Q.   Did you preselect Orange and I think it was Osceola?  Was that the other county?

A.   That was the other county.  I don't believe we preselected them like prior to looking at the petitions in Palm Beach, no.

Q.   Okay.  So how did you -- when you first decided to pick the three counties -- or is it did you just pick one first?

A.   We just picked one first.

Q.   Okay.  Then you decide to select two more?

A.   Then we decided to pick, I think, one more, and then it led into another.

Q.   Okay.  When you decided to pick the next two counties, those weren't, like, randomly selected; right?

A.   No, they weren't.

Q.   Okay.  So OECS decided what counties it wanted to review or was able to review; is that correct?

A.   That's correct.

Q.   Okay.  And then once you got to those counties, you picked out which petitions you wanted to review based on known or potential fraudsters, I think is how you said it; is that correct?

A.    That's how we started, yes.

Q.    Okay.  And, again, you didn't randomly select these counties; is that fair to say?

A.    I guess it depends on what you mean by "random."  I think Osceola -- it could have been any small county around Orange, but it felt maybe a little random, but I understand we did pick the counties.

Q.    Okay.  And prior to doing the signature audit, it's my understanding that your only previous training was the course you took before doing this; is that correct?

A.    That's correct.

Q.    Okay.  And prior to that, you had no additional experience reviewing signatures; right?

A.    I did not.

Q.    Okay.  In reviewing -- and I'm sorry.  Did you in person review all three counties, or were you only at a specific one?

A.    I in person reviewed at both Palm Beach and Orange Counties.

I got sick.  I got COVID, and so I was not present for the Osceola signature matching.  But that was taken back to the Department of State, so I was present for, I guess, the portion of it that took place after they left Osceola.

Q.    Okay.  In reviewing those petitions, I believe you said that you thought some were potentially invalid; is that correct?

A.    Correct.

Q.   Okay.  Does OECS have the power to invalidate petitions?

A.   No.

Q.   Okay.  Did you direct or request any of the Supervisors to invalidate the petitions you reviewed?

A.   No.

Q.   Okay.  After you reviewed the petitions and thought there were some discrepancies in some of the signatures, did you talk to the staff at any of those counties as to why they validated those signatures?

A.   I did not personally, no.

Q.   Okay.  Do you know if anyone from your office did?

A.   I'm not aware.

Q.   Okay.  When you're reviewing the signatures, do you know how long you spent reviewing each signature?

A.   It depended on the signature.  There were some that were very quick to determine, you know, whether or not it was a match or whether it should have been invalidated.  There were others that took us a little bit longer.  Typically, though, those would be put in the indeterminate category if we really couldn't make a determination after looking at them for a minute.

Q.   And even once you decided some were indeterminate, did you think about talking to the Supervisor staff about why they selected it to validate?

A.   That wasn't the purpose of our visit, no.

Q.   Earlier when you were talking to Mr. Jazil, I believe you

testified that in issuing the late fines, if a sponsor disagrees, they can go to the Department of Administrative Hearings; is that correct?

A.    Correct.

Q.    Okay.  And whenever -- so that would be basically a DOAH hearing; is that fair to say?

A.    Yes.

Q.    And if a sponsor goes there, it's because we are disputing the fact related to whatever your assessment of the fines is; is that correct?

A.    Correct.

Q.    Okay.  Under the statutory -- as I understand the statutory scheme -- you tell me if you disagree -- it's my understanding that OECS would have the power to -- let me back up.

      DOAH would issue a recommended order after a hearing on the issue; is that correct?

A.    To start with, yes.

Q.    And then, as I understand it, OECS could reject that if it has the substantive legal authority over the interpretation of those rules; is that correct?

A.    I'm not familiar with that.  I think that that would become a final order at some point; but, yeah, I'm not familiar with that.

Q.    So you don't know if it would become a final order if the department actually accepted it or rejected it?

A.    When you say accept or reject, what do you mean?

Q.    It's my understanding of how DOAH works is DOAH issues a recommended order --

A.    Uh-huh.

Q.    -- that your department would then look at the recommended order, and I believe it has substantive authority to deal with legal and factual issues, and you could reject that order and issue the Department's own final order?

A.    So this hasn't happened while I've been the director of OECS, but my recollection of how things work at DOAH is that we would be able to file objections, just as the sponsor would be able to, to the recommended order before it would become a final order; but we wouldn't have the ability to reject the order in total.

Q.    So you're unaware under Chapter 120 that the agency can reject the recommended order and issue its own final order?

A.    You can show me if you'd like.

Q.    Sure.  I can pull up the statute.

        THE COURT:  Counsel, this is really a legal --

        MR. CLARK:  Sure.  I'm happy to move on.

        THE COURT:  This is a legal argument for y'all to make.  You can make the legal argument.  And I also understand that there's not a gaggle of DOAH lawyers that work for free, and so the cost of counsel may be greater than the fine.  I mean, we live in the real world, and I get it.

So you can proceed.

MR. CLARK:  I just wanted the Eleventh Circuit to understand our position on the DOAH --

THE COURT:  That's why you can write it up in your closing argument, and that sounds like a good footnote to put in your closing argument.

MR. CLARK:  Thank you, Your Honor.

BY MR. CLARK:

Q.   Ms. Pratt, I'll move on.  Sorry.

A.   That's okay.

THE COURT:  I wasn't being dismissive of the point.

MR. CLARK:  Oh, no.  I understand, Your Honor.

THE COURT:  It's a good point, but we don't need to burn too much time on quizzing the witness about their understanding of how DOAH works.

BY MR. CLARK:

Q.   Ms. Pratt, we talked a little bit about the voter notice cards.

Do you recall those?

A.   Yes.

Q.   Ones that are mailed out?

A.   Yes.

Q.   Okay.  When your office receives them, do you verify that the signature on the voter notice card matches the voter file?

A.   We don't.

Q.    Last few questions.

Has OECS -- has your office issued any fines for violations of HB 1205 for this last cycle?

A.    No.

Q.    Do you have a deadline to do so?

A.    Not that I'm aware of.

Q.    Okay.  Are you aware that this Court previously had entered an injunction suspending portions of HB 1205?

A.    Yes.

Q.    And you're aware that the portion of that that I'm going to ask you about is the nonresident provision?  Are you familiar with that?

A.    I am.

Q.    So during the period of that injunction, sponsors were allowed to use nonresidents to collect petitions.  Is that your understanding?

A.    That is my understanding, but I wasn't present for --

Q.    Totally fine.

A.    -- for what happened earlier in the case.

Q.    That's fine.  I'm not going to ask you the legal significance of that, but I will ask you a couple more questions about that.

Are you aware that the Eleventh Circuit, for whatever reason, overturned that injunction?

A.    I am aware.

Q.   Okay.  And are you aware that Director Matthews requested all these Supervisors to invalidate petitions collected by nonresidents?

A.   Yes.

Q.   Okay.  Does OECS intend to fine sponsors that used nonresident circulators during this Court's injunction period?

A.   No.

Q.   And last question:  If OECS is going to issue fines for HB 1205, do you have an anticipated date when you'll do so by?

A.   I don't have an anticipated date.  I wanted to get through the report.  We've been working on some time letters, but it just depends on the nature of what we have going on in the office.

Q.   If past is precedent, is it going to be about 13 months like the last one we received or --

A.   I don't have a date for you.

        MR. CLARK:  Thank you, Ms. Pratt.  I don't have any further questions.

                    CROSS-EXAMINATION

BY MR. MASTORIS:

Q.   Good afternoon, Director Pratt.

A.   Good afternoon.

Q.   My name is George Mastoris with Winston & Strawn.  I'm here on behalf of the League of Women Voters and LULAC.  Just a few questions this afternoon.  I know you've spent quite a bit of

time testifying already.

Way back at the beginning of that testimony, I believe you talked a bit about the mission statement, if you will, of OECS, its purpose; right?

A.    Correct.

Q.    And you'd agree that includes identifying potential irregularities with petitions that are collected and submitted; correct?

A.    Correct.

Q.    I think Mr. Jazil showed you the statute which created OECS 97.022.  Do you recall that?

A.    He did.

Q.    I'm not going to quiz you.  I'm happy to put it up, but just a couple of questions.

Do you recall that it includes, quote, initiating independent inquiries and conducting preliminary investigations into allegations of election law violations or election irregularities in the state; correct?

A.    Correct.

Q.    And you also understand that OECS may, quote, review complaints and conduct preliminary investigations into alleged violations of the Florida Election Code or any rule adopted pursuant thereto and any election irregularities.  Is that your understanding?

A.    Correct.

Q.    Thank you.

Is the word "irregularities" defined in the statute?

A.    No.

Q.    The word "irregularities" isn't defined in the election code generally is it?

A.    I don't believe so.

Q.    And it's not defined in HB 1205, which is part of the election code; right?

A.    Correct.

Q.    So when evaluating whether a given petition has or is afflicted by an irregularity, what standards does OECS apply?

A.    OECS is permitted to look into any violations of the election code.  Some violations are criminal, and others are not.  So those would be considered irregularities.

Another irregularity that we would consider is when we look at high invalidity rates, for example, there is no crime in that; but there's the potential for crime, and so that's why we look into it.

Q.    So I just want to be very clear.  All violations of the election code as far as OECS is concerned constitute irregularities; is that right?

A.    I didn't say that, but we do look at the election code for, you know, violations, and we do consider the ones that involve OECS to be irregularities.

Q.    Okay.  I just want to be very clear; right?

A.    Sure.

Q.    So if something is a violation of the election code, does OECS consider that an irregularity or not?

A.    I think sometimes, and -- I'm not sure -- maybe all the time.

Q.    Well, give me some examples of what -- well, strike that.

You did say, I think, that any irregularities -- sorry -- any criminal violations of the election code would be considered irregularities; correct?

A.    I would consider that to be the criminal portion of the statute that you are reading.

Q.    Right.

A.    So we look at the crimes.

Q.    And those are irregularities; right?

A.    I think that the Legislature has to mean something with each word that they use, and they define -- they say "crimes," and then they say "irregularities," so I think they have to mean something different.

Q.    I'm trying to figure out what OECS means by irregularities. Can you give me an example?

A.    Sure.  When -- like I said, when we see a petition circulator with a very high invalidity rate, that's something that we want to investigate to see if there is a potential for fraud, or if, you know, there's another issue, maybe potentially involving a specific Supervisor of Elections office that is

accepting too many petitions that maybe should have been invalidated, we look into that.

Another irregularity would be if a sponsor is delivering petitions beyond the ten days that they are required to, that would be an irregularity that we can look into for a potential fine.

Q.   Okay.  And there's no publication of a definition of the word "irregularities" that's out there, you know, courtesy of OECS; right?

A.   That's correct.

Q.   Or courtesy of any agency of the Florida state government; right?

A.   I'm not sure.

Q.   All right.  But you're not aware of one sitting here today; correct?

A.   Correct.

Q.   You mentioned the failure to return petitions within ten days is one thing that OECS would consider an irregularity.

What about collecting -- the collection of more than 25 petitions by a circulator who hasn't registered, would you consider that to be an irregularity?

A.   I would consider that to be a potential criminal investigation because the Legislature has delineated that as a crime.

Q.   Sure.  Would you also consider that to be an irregularity?

Yes or no?

A.    No.

Q.    You don't think that's an irregularity?

A.    I would say that that's a crime.

Q.    What about a petition form which has been filled out with, let's say, the country, USA, instead of the county?

      Is that an irregularity?

A.    Potentially, yes.

Q.    What about a petition form which is missing certain information, would that be considered an irregularity?

A.    Potentially, yes.

Q.    And certainly the office has identified petitions like that and considered them to contain irregularities; right?

A.    Correct.

Q.    Does OECS have some sort of internal definition of irregularities that they give to their employees or their investigators?

A.    No.

Q.    So it's really you guys know it when you see it?

A.    We know what our office is able to investigate under the statute.  We, you know, act under the authority of the Secretary of State.  So whatever the Secretary of State has the authority to do, and if he's delineated that to us, then we can do that.

Q.    So the answer to my question is "yes"; right?

A.    Can you repeat the question?

Q.   Yeah.

In terms of figuring out what an irregularity is, it's just something that folks who work within OECS know when they see; right?

A.   I wouldn't agree with that necessarily.  Not everyone in OECS makes the decision; ultimately, it's going to be up to me and then the Secretary.

Q.   Okay.  And so for you, you've got certain things you consider irregularities, right?

You gave us a couple of examples; right?

A.   Correct.

Q.   And you've got some things that you don't consider to be irregularities for whatever reason; right?

A.   Correct.

Q.   And so the end of the day, what an irregularity -- and you haven't written that down anywhere; right?

A.   Nope.

Q.   Okay.  So what reside -- what counts as an irregularity resides in your head and nowhere else; is that right, Director Pratt?

A.   No.

Q.   Where else does it reside?  Where else can I find it?

A.   I feel like I've just told you.

MR. JAZIL:  Objection.  Argumentive.

MR. MASTORIS:  Withdrawn.

THE COURT:  Counsel, isn't the question -- and I don't know that anybody's posed it, so why don't I go ahead and pose it so I don't have to guess when I'm writing my order.

Is the question about what her definition is, where she would find it, or where law enforcement would find it and where members of the public?  Isn't --

MR. MASTORIS:  Right.

THE COURT:  -- the issue whether or not members of the public would know whether they're committing a crime or not under the RICO provision --

MR. MASTORIS:  Yes.

THE COURT:  -- and wouldn't the issue be whether law enforcement officers know they can or can't arrest somebody or not?

Isn't it guidance to law enforcement and guidance to the public that matters?

MR. MASTORIS:  Yes, Your Honor.  You just anticipated the next few questions I have.

THE COURT:  All right.

BY MR. MASTORIS:

Q.   So, Director Pratt, I'll put them on the record at least.

But there's nowhere that a law enforcement officer can look to figure out whether a petition contains an irregularity or not; is that right?

A.   I don't know.

Q.    But you haven't published any guidance that law enforcement officers could potentially rely on, as far as you know?

A.    That's correct.

Q.    And in terms of some member of the public who wants to know whether or not a petition they've collected contains an irregularity, they also wouldn't know that from anything OECS has published; right?

A.    That's correct.

Q.    I want to turn briefly to the question of volunteers.  And I think you had a bit of a colloquy with my friend, Mr. Jazil, about volunteer petition forms.

      Do you remember that?

A.    I do.

Q.    And I think that you explained to us that the OECS report from January 2024 doesn't contain any mentions of alleged petition circulation fraud committed by volunteers; is that right?

A.    That's right.

Q.    But you nevertheless testified that you had at least one example of a fraud that had been evident from a volunteer petition form; is that correct?

A.    That's correct.

Q.    Now, you've never identified any individuals who submitted fraudulent information on a petition form as actual volunteers; right?

A.    Can you repeat the question?

Q.    Sure.  I asked it poorly so I'll try again.

OECS hasn't been able to identify any actual volunteer who, in fact, submitted a fraudulent petition form; right?

A.    That's correct.

Q.    The only thing you have is some petition forms which contain fraudulent information on volunteer forms; right?

A.    That and I believe we may have had some complaints from Supervisors' offices as well.

Q.    You've had complaints about -- you've had complaints about specific people?

A.    About volunteer forms; not about specific volunteers.

Q.    About volunteer forms, not people; right?

A.    Correct, yes.

Q.    And there's no evidence that the folks who filled out those volunteer forms were, in fact, volunteers; right?

A.    Other than that they have filled out a volunteer form, that's correct.

Q.    That's the only thing, right?  You've got no other evidence, other than the fact they filled out a volunteer form, that they are, in fact, volunteers; correct?

A.    Correct.

Q.    And those volunteer forms, prior to HB 1205, could be downloaded from the Secretary of State's website; right?

A.    That's correct.

Q.   By literally anyone?

(Reporter requested clarification.)

BY MR. MASTORIS:

Q.   By anyone with a computer; right?

A.   Yes.

MR. MASTORIS:  Thank you for keeping me honest.

BY MR. MASTORIS:

Q.   So there's no way to tell if one of those volunteer forms was filled out, say, by a paid circulator; right?

A.   Correct.

Q.   There's no way to tell if one of those forms was filled out by a private citizen who might have supported a given ballot initiative; right?

A.   I said correct.  I don't know if there's no way.  I mean, we could look at handwriting.  There could be a way, but we have not found any one person who --

Q.   Right.  But, theoretically, someone could have downloaded a volunteer form and not been a volunteer and filled that out and submitted it; correct?

A.   Correct.

Q.   And that person might have been a private citizen who supported a given ballot initiative; right?

A.   Correct.

Q.   It might have also been a private citizen who opposed a given ballot initiative; right?

A.    Correct.

Q.    It could have been someone who was looking to cause trouble and suggest that there was some fraud in connection with a given ballot initiative; correct?

A.    Correct.

Q.    Now, today, I believe there's such a thing as a personal use form; is that right?

A.    Yes.

Q.    And that also can be downloaded by someone who wants to download it, right, from the Secretary of State's website?

A.    Yes.

Q.    And does that personal use form force someone who is collecting that petition to provide any information?

A.    No.

Q.    Just the person who's actually signing the form; right?

A.    Correct.

Q.    HB 1205 does have a registration provision; right?

A.    It does.

Q.    And so someone who fills out -- or who wants to collect more than 25 petitions is supposed to register; right?

A.    More than 25 petitions in addition to their own and their family members, yes.

Q.    And so is it your testimony, your understanding that that provision would help to catch fraudsters?

A.    It's my understanding that -- no, I guess, no.

Q.   I want to just go back to something that the Court mentioned a little while ago.

     Let's say somebody does the right thing and decides to register as a petition circulator and provides their name and the other identifying information as part of that process.

     Are you with me so far?

A.   Can you repeat it?

Q.   Sure.

     Let's say someone who wants to circulate and collect petitions decides to register as a petition circulator because they want to collect more than 25; right?

A.   Right.

Q.   And we can even say it's an 80-year-old lady; maybe she's not at a clam bake but at a plant sale, say, and, you know, she believes strongly in the cause that she is collecting petitions for.

     You with me so far?

A.   Sure.

Q.   There is nothing stopping somebody from, you know, filling out a petition form with information that isn't accurate; right?

A.   Correct.

Q.   Or even forging someone else's signature on that petition that she hands out; right?

A.   Correct.

Q.   And there's actually nothing stopping, you know, a number

Cross-Examination - Director Pratt

of people from doing that and giving the same volunteer circulator a whole bunch of fraudulent forms; right?

A.    Correct.

Q.    And if those get turned in, presumably OECS would begin an investigation?

A.    We would if we became aware of them.

Q.    And so that would be an investigation of that particular petition circulator; right?

A.    It may start that way, yes.

Q.    It might even be an investigation of the group for which she was circulating petitions; right?

A.    Correct.

Q.    And at that point in time, you wouldn't really -- I mean -- strike that.

        MR. MASTORIS:  Give me one second, just to check if I've got any other notes.

        THE COURT:  Certainly.

        MR. MASTORIS:  Thank you, Your Honor.

    (Discussion between the attorneys.)

        MR. MASTORIS:  Well, I've been advised by my esteemed colleagues not to say anything further and to let you go for the afternoon, so -- well, there might be redirect, of course, but thank you very much, Director Pratt.

        THE WITNESS:  Thank you.

        THE COURT:  Do we have anybody from the last remaining

defendant -- I mean plaintiff?

MR. FERGUSON:  Nothing from Right to Clean Water, Your Honor.

THE COURT:  All right.

Mr. Jazil, how much time do you need for redirect?

MR. JAZIL:  No redirect, Your Honor.

THE COURT:  Thank you, Ms. Pratt.

And I'm going to -- because I can say what I want to say, I'm going to go ahead and say it.  I appreciate -- and I said this to the last lawyer that took the stand -- you not embellishing and you answering the questions directly.

All too often I have folks that are professionals, such as yourself, that come in and just start inserting information and stuff, and you didn't do that, so I appreciate how you conducted yourself.  Thank you.

THE WITNESS:  Thank you very much.

(Director Pratt exited the witness stand.)

THE COURT:  Any additional exhibits or witnesses from the defense -- I'm sorry.  Ms. Pratt, you're free to go.

THE WITNESS:  Thank you.

(Director Pratt exited the courtroom.)

MR. JAZIL:  Your Honor, we'd like to move into evidence DX 9 and DX 254.

THE COURT:  Hold on one second.

MR. JAZIL:  My understanding is they're not objected

to.

THE COURT:  DX 9 there was no objection.  That's on page 2 of 621-1 -- that's ECF Number -- is admitted.

(DEFENDANTS' EXHIBIT 9:  Received in evidence.)

THE COURT:  I'm sorry.  What was the other?

MR. JAZIL:  Your Honor, it was DX 254.

THE COURT:  And DX 254 is on page 14 of ECF Number 621-1 and also had no objection, so it, likewise, is admitted.

(DEFENDANTS' EXHIBIT 254:  Received in evidence.)

THE COURT:  Let me just go ahead and cut to the chase before we get too far into the weeds.  I don't need 80 lawyers here tomorrow.

I certainly don't need folks to delay getting home or delaying their flights.  I know it's not easy flying in and out of Tallahassee, but if y'all would prefer, I'm happy to keep things open so you can go back through and check through the exhibits and confer with each other and just have a representative for each side show up tomorrow morning.

You don't have to do that.  I just -- if y'all are comfortable with what you -- this is the opposite of a judge being difficult.  This is me trying not to put anybody in a trick bag.

If y'all are concerned that, Judge, we really need to go back and look at the exhibits both sides, there may be things

that were unobjected to, I'm fine, and that seems to me something we can accomplish without having 47 lawyers in the courtroom, but I'm also happy to take a break now, and do it in half an hour.  I'm also happy to have y'all say, Judge, we're good and go forth and do whatever it is you people do.

MR. WERMUTH:  Your Honor, for the FDH plaintiffs, I think it would be helpful to wait until tomorrow and just make sure that we have everything taken care of in order to just make sure we don't have to come back to you.

THE COURT:  Are y'all able to have -- I know that you're not all one group and there's four different plaintiffs and four different groups of lawyers, but I meant what I said.

I'm not going to require -- Mr. Wermuth is an officer of the court, so if y'all all get together and say, We don't need to be here.  He can do it, and we've agreed to it, and we've agreed with Mr. Jazil -- same for the other side.

I don't need everybody here.  You are certainly allowed to be here.  But if everybody is on agreement on both sides, you can send one representative tomorrow.  I'm not trying to make anybody's life difficult.

But, Mr. Jazil, do y'all want to go back through your stuff one last time?

MR. JAZIL:  Sure, Your Honor.  Thank you for that opportunity.

THE COURT:  All right.  What time -- it doesn't matter

to me since we are not going to have -- I know I have another matter I need to address, but it doesn't matter to me what time we meet tomorrow, because it was blocked off for this trial.

Is there a preference for a time?

And, again, I want to be respectful of everybody's travel time and so forth.

MR. JAZIL:  I defer to my out-of-state friend.

THE COURT:  And, Mr. Wermuth, I could care.  I'm going to be --

MR. JAZIL:  Or out-of-town friend.  Sorry.

MR. WERMUTH:  I'd like the record to be clear.

THE COURT:  What did he call him?

MR. JAZIL:  Out of state.  He's not a nonresident.

MR. WERMUTH:  I'm a U.S. citizen and a resident.

THE COURT:  I think the Governor has just revoked your citizenship for the great state of Florida.

MR. WERMUTH:  I can't pass the naturalization test.  Sorry.

THE COURT:  What time would y'all like to meet?

MR. WERMUTH:  9:00 a.m. would be great.

THE COURT:  We'll meet at 9:00 a.m. in the morning.

And anybody who wants to come is free to come.  I just meant if you work it out on each side and have one spokesman, that's fine with me as well.

It seems is to me I've got one last evidentiary issue

that I need to address, which is the scope of what I'm going to consider, and I'll just call it the three-county audit.

Do I owe you other rulings?

MR. WERMUTH: I don't believe so, Your Honor.

THE COURT: All right. I'm going to go back and review.

MR. WERMUTH: But I do have a designation issue.

THE COURT: All right. Hold on.

I'm going to go back and review my notes. So tomorrow morning we are going to circle back and double-check on the exhibits, and I'm going to announce my ruling on the three-county audit.

MR. JAZIL: Your Honor, forgive me. I don't recall from this morning. The definitive rulings on the OECS reports went both ways, as I understood it.

THE COURT: Yes. So the only thing I left open was the testimony absolutely could come in; even some numbers could come in, but the conclusions or the, air quotes, statistical analysis regarding three counties, does that come in, that was the one issue that was left.

MR. WERMUTH: Understood.

And, Your Honor, the designation issue that I was going to raise is that plaintiffs would -- we had certain designations of deposition testimony that were contingent on the Court's decision regarding -- regarding the OECS report, and we

have a list of those designations that we are now withdrawing, because we are -- we understand your -- what you've told us so far as far as your ruling.

THE COURT:  If you'll hand those to me.

MR. WERMUTH:  Yes.

THE COURT:  And while I'm doing that, I noticed that the Secretary, Attorney General, and the intervenor of the Republican Party filed ECF Number 653.

Are those the clean reports that everybody is going to refer to, both plaintiffs and defense, when you are briefing this and for the Eleventh Circuit's benefit?

MS. PRICE:  Yes, Your Honor, that was our intention.

THE COURT:  All right.  So everybody is going to use -- so it will be, like, 63-1, 63-2 and then the page number and so forth.  So that's the operative set of reports that correspond to DX 2, DX 3, and DX 4.

The following designations are withdrawn as it relates to Jonathan Bridges -- do you have the ECF number on that?

My law clerk will find it -- that's why God made law clerks -- while I'm reading them into the record.

Page 7 -- is this page 71, line 2, to page 75, line 5?

MR. WERMUTH:  That's correct.

THE COURT:  Page 79, lines 1 through 9.

Page 94, line 17, through page 95, line 21.

Page 99, lines 1 through 20.

Page 117, line 20, through 118, line 8.

And page 138, line 7 through line 16.

Page 143, line 19, through page 144, line 8.

And page 145, line 1, through page 146, line 17.

And the Bridges' depo is ECF Number 597-1.

So I guess my law clerk will get paid this month.

Did I read that correctly, Mr. Wermuth?

MR. WERMUTH:  You did, Your Honor.

THE COURT:  I'll hand those designations to the courtroom deputy, who will give to it the court reporter.  So if I read too fast, she's got something to refer to.

Hold on one second.  One at a time.

Anything else, Mr. Wermuth?

MR. WERMUTH:  Nothing further.

THE COURT:  Yes, ma'am.

MS. SZILAGYI:  Your Honor, this was just a clarification to make sure we are looking at the same thing.  So ECF 620-1 is the designation of Jonathan Bridges that also includes defendants' counterdesignations.  So that's the final -- that includes defendants' counters.

THE COURT:  I'm sorry.  So I guess my law clerk is not getting paid.  And the record will reflect that counsel hurled my law clerk under the bus and then backed up over her.

So the Bridges depo, for any reviewing court, is ECF No. 620-1.

Thank you.

Although the other one that we cited should correspond, because that was plaintiffs' depo designations and what we were talking about being withdrawn.

Anything additional for the plaintiffs' side?

Nothing.

Defense side?

MR. JAZIL:  Nothing, Your Honor.  Thank you.

THE COURT:  Anybody else need to critique my law clerk?

All right.  Is everybody here?  I think -- are we all lawyers?  I don't know.  We don't have -- there are not reporters or others scampering around in the back, are there?

All right.  No one has to -- let me repeat, reiterate, and say again, no one has to.

I'm going to open the door to the courtroom, and I'm going to open the room to chambers.  There are a lot of you.  I didn't have this catered, but there's some small snacks and a fully stocked -- well, not fully stocked.  That overexaggerates.  It's not 1903.  There is a decently stocked bar of beer, wine, and so forth in my chambers.

I encourage those of you that wish to partake to enjoy each other's company.  You've worked very hard these past two weeks.  It's not easy being a lawyer; it's not easy being away from home; it's not easy practicing law, quite frankly.  So to

the extent y'all wish to break bread briefly, do so.

And I'd like to make plain, I think this is in keeping with we spend too little time being civil to one another and talking to one another, and that's my small effort to encourage people to work together and be -- treat each other with respect and dignity.

So y'all are free to leave.  You may have flights. But you are also free to stay.

Court is in recess.

(Proceedings concluded at 3:32 PM on Thursday, February 19, 2026.)

* * * * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. Any redaction of personal data identifiers pursuant to the Judicial Conference Policy on Privacy is noted within the transcript.


/s/ Megan A. Hague            2/19/26

Megan A. Hague, RPR, FCRR, CSR          Date
Official U.S. Court Reporter

**I N D E X**

DEFENDANTS' WITNESSES                              PAGE

MARIA MATTHEWS
Direct Examination By Mr. Jazil                    59
Cross-Examination By Mr. Ferguson                  70
Cross-Examination By Ms. Bennette                  91
Cross-Examination By Ms. Murphy                    93
Cross-Examination By Mr. Dato                     102

2174

DEFENDANTS' WITNESSES                                    PAGE

JILLIAN PRATT
Direct Examination By Mr. Jazil                          112
Cross-Examination By Mr. Steiner                         175
Cross-Examination By Mr. Clark                           187
Cross-Examination By Mr. Mastoris                        199


| DEFENDANTS' EXHIBITS | OFFERED | RECEIVED |
|---|---|---|
| 1 | 106 | 106 |
| 2 | 55 | 55 |
| 3 | 55 | 55 |
| 4 | 55 | 55 |
| 9 | 214 | 214 |
| 254 | 214 | 214 |
| 294 | 108 | 108 |
| 295 | 106 | 106 |
| 296 | 107 | 107 |


**E X H I B I T S**

| PLAINTIFFS' EXHIBITS | OFFERED | RECEIVED |
|---|---|---|
| SSF-18 | 97 | 97 |