# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

FLORIDA DECIDES HEALTHCARE,
INC., et al.,

*Plaintiffs/Intervenor-Plaintiffs*,

v.

No. 4:25-cv-211-MW-MAF

CORD BYRD, in his official capacity as
Secretary of State of Florida, et al.,

*Defendants/Intervenor-Defendant.*

## THE SECRETARY, ATTORNEY GENERAL, AND INTERVENOR-DEFENDANT'S WRITTEN CLOSING

# TABLE OF CONTENTS

**Introduction** ........................................................................................................... 1

**Statement of the Case and Facts** ........................................................................ 1

**I.    The backdrop against which the Florida Legislature acted** ................. 1

A. House Bill 1205 and its Whereas Clauses ...................................................... 1

B. Office of Election Crimes and Security Reports ......................................... 4

**II.    Trial testimony confirmed many of the legislature's findings** ........... 11

A. Jillian Pratt ..........................................................................................................11

B. Jonathan Bridges ...............................................................................................17

C. William Gladson .................................................................................................20

D. Mark Earley ........................................................................................................22

E. Meghan Cox .......................................................................................................23

F. Marc Walsh ..........................................................................................................28

**III.    Plaintiffs challenge several of HB 1205's provisions** ..............................28

A. Petition Circulator Eligibility Provisions .....................................................29

B. Fines Provisions .................................................................................................34

C. Criminal Provisions ...........................................................................................35

D. Financial Impact Statement and Ballot Placement Provisions ...............37

E. Verification Provisions ......................................................................................39

F. One Amendment Provision ........................................................................43

G. Misdemeanor Notice Provision ...............................................................43

H. Full Amendment Provision .......................................................................44

I. Petition Completion Provision ..................................................................44

J. Circulator Affidavit Provision...................................................................44

K. Ten-Day Return Deadline .........................................................................45

L. OECS Investigative Provision ..................................................................46

**Argument** .................................................................................................................47

I.     **HB 1205 regulates conduct—not speech—and thus doesn't run afoul of the First Amendment's free speech protections**.................................47

A. If speech is implicated at all, rational basis applies here .........................47

B. Plaintiffs miss the mark in their attempt to lump together speech and conduct.................................................................................................................51

C. The stay panel agrees with Florida's approach of separating speech from conduct.................................................................................................................58

D. HB 1205 satisfies intermediate scrutiny even if it applies .......................59

E. HB 1205 satisfies exacting scrutiny, as well ..............................................65

F. This Court should follow the stay panel's decision...................................67

II.    **There's no standalone claim for freedom of association under the First Amendment**........................................................................................70

III.   **The content-based claims don't work**........................................................71

IV.   **The compelled speech claims don't work; it's government speech** ..73

V.    **The procedural and substantive due process claims fail** ......................74

    A. Procedural Due Process ...............................................................................75

    B. Substantive Due Process ..............................................................................76

VI.   **The vagueness and overbreadth challenges fail** ....................................77

    A. Vagueness........................................................................................................77

    B. Overbreadth ...................................................................................................84

VII.  **The equal protection challenges fail** ...........................................................85

VIII. **Scope of relief, standing, and mootness issues for Plaintiffs**...............88

    A. Background Law ............................................................................................88

    B. Sponsor Plaintiffs .........................................................................................90

    C. League Plaintiffs ...........................................................................................91

    D. Problems for Specific Provisions ..............................................................92

    E. Scope of Relief...............................................................................................94

**Conclusion**...............................................................................................................................94

**Local Rules Certification** ...............................................................................................97

**Certificate of Service** .......................................................................................................97

**Introduction**

Plaintiffs present a scattershot of constitutional theories to take down House Bill 1205 but, at its core, theirs is a First Amendment case. It's a First Amendment case premised on the notion that talking just isn't enough. Plaintiffs insist that they must talk about proposed constitutional initiatives *and* collect signed petitions from voters *and* deliver those petitions to supervisors of elections. That simply isn't what the First Amendment guarantees. Talking is speech. Everything that follows is conduct. HB 1205 imposes no restrictions on the speech. Its regulation of the conduct that follows remains firmly moored to Florida's compelling interest in preventing fraud in the citizen-initiative process and improving public confidence in that process. This Court should enter judgment for Defendants.

**Statement of the Case and Facts**

**I.      The backdrop against which the Florida Legislature acted.**

**A.** Article XI, section 3 of the Florida Constitution "reserve[s] to the people" the "power to propose the revision or amendment of any portion or portions of th[e] constitution by initiative," provided the initiative "embrace but one subject and matter directly connected therewith." Florida is one of only fifteen states that allow their citizens to change the constitution through the initiative process. Tr.1292:19-23 (Smith). "Nothing in the [U.S.] Constitution requires" "any" "State to provide for ballot initiatives." *Little v. Reclaim Idaho*, 140 S. Ct. 2616, 2617 (2020) (Roberts, C.J., concurring with three others in granting of stay). And the Supreme Court has recently signaled that

1

"neutral, procedural regulation[s]" don't present a First Amendment question at all. *Id.* at 2616. "Even assuming that the state laws" "implicate the First Amendment, such reasonable, nondiscretionary restrictions are almost certainly justified by the important regulatory interests in combating fraud." *Id.* at 2617.

In 2025, the Florida Legislature enacted and the Governor of Florida signed into law House Bill 1205. DX 1. The bill regulates the collection and delivery of signed citizen-initiative petitions. It concerns neutral, procedural regulations. Nothing in the bill prevents anyone, anywhere or at any time, from talking about the subject of a citizen initiative.

The legislature said that it was "compel[led]" to act because of "[e]vidence of fraud related to the process of gathering signatures on petitions for constitutional amendments." DX 1 at 6 (HB 1205, § 1). Findings included as part of HB 1205 further detail the legislature's reasons for enacting the bill. They include the following:

- "[I]nvestigations conducted by the Office of Election Crimes and Security have shown that agents of political committees sponsoring initiative petitions engaged in illegal and fraudulent activities while gathering petition signatures in the lead-up to recent elections." DX 1 at 4.

- "[T]he evidence brought forward indicates numerous instances of petition circulators being paid per signature, signing petition forms on behalf of deceased individuals, forging or misrepresenting voter signatures on petition forms, using voters' personal identifying information without consent, committing perjury, and swearing false oaths." DX 1 at 4.

2

- "[D]espite the fiduciary duty prescribed by Florida law, sponsors of initiative petitions have failed to cooperate with investigations and have attempted to deflect responsibility for the actions of petition circulators to contractors and subcontractors, with the sponsors denying that they have custody or control of documents requested by state officials." DX 1 at 5.

- "[S]ponsors, contractors, and petition circulators have blatantly attempted to evade investigation by delegating key aspects of petition activities to out-of-state entities, who then subcontracted with other individuals who were even further outside the reach of Florida authorities." DX 1 at 5.

- "[E]vidence provided to the Office of Election Crimes and Security by supervisors of elections in several counties showed that petition circulators submitted petition forms on behalf of more than 50 deceased Floridians." DX 1 at 5.

- "[I]nformation provided to the Office of Election Crimes and Security from multiple supervisors of elections and individual Florida voters showed that petition circulators committed perjury and swore false oaths by distributing petition forms with pre-signed attestations to groups of unregistered circulators, who then obtained signatures outside the registered circulator's presence." DX 1 at 5.

- "[I]nvestigations revealed that after petition forms were signed and submitted by voters, petition circulators tampered with the signed forms by using a website to obtain missing personal identifying information, and then filled in the incomplete petition forms." DX 1 at 5.

- "[I]nvestigations indicated that some otherwise valid petition forms were obtained by fraud, with circulators misleading prospective signatories by telling them that the amendment did something other than what was described in the ballot summary or amendment language, or not showing the signatories what was on the ballot at all." DX 1 at 5.

- "[E]vidence showed that petition circulators were able to obtain the four necessary elements of personal identifying information required on petitions—name, address, voter registration or birthdate, and signature—using publicly available data to commit identity theft and

3

complete dozens, hundreds, or even thousands of petitions without ever actually circulating a petition." DX 1 at 5-6.

- "[T]he Office of Election Crimes and Security received complaints from many Florida voters whose information was fraudulently submitted on forms for at least four initiative petitions circulated for inclusion in the 2024 General Election." DX 1 at 6.

- "[M]any of those complaints arose because some supervisors of elections notified a voter when a petition form bearing his or her name was rejected, which prompted such voters to contact the supervisor of elections or the Office of Election Crimes and Security to report potential fraud." DX 1 at 6.

- "[A]t least one sponsor of an initiative amendment circulated during the 2024 General Election cycle settled a complaint with the Office of Election Crimes and Security for violations related to the petition process and agreed to pay $164,000 in fines." DX 1 at 6.

- "[E]xisting fines and penalties levied against petition sponsors engaging in, encouraging, or, at the very least, turning a blind eye to illegal activities related to the petition process appear to be inadequate deterrents." DX 1 at 6.

**B.** Though no member of the Florida Department of State or its Office of Election Crimes and Security spoke with the Florida Legislature or its staff about HB 1205, Tr.2012:21-2013:8 (Matthews), the legislature had before it OECS's reports. *See* DX 2, 3, 4. OECS has a statutory obligation to provide reports to the legislature "[b]y January 15 of each year." Fla. Stat. § 97.022(7). The reports must detail, among other things, "the total number of complaints received and independent investigations initiated" by the office. Fla. Stat. § 97.022(7). They must also include the "number of complaints referred to another agency for further investigation or prosecution"

4

(because the office doesn't itself prosecute crimes), specifics about "each alleged violation or irregularity investigated" (including "the source"), the "law allegedly violated" or the "nature of the irregularity," the county affected, and the status of the investigation or the resulting criminal case. Fla. Stat. § 97.022(7).

Three of OECS's reports are relevant here because they predate the enactment of HB 1205 on May 2, 2025. DX 1 at 28. They are the January 15, 2024, report, the December 20, 2024, report, and the January 15, 2025, report.

The **January 2024 report (Doc.653-1)** discussed fraud related to the citizen-initiative process. Among other things, it reported to the legislature the "arrest of a Marion County woman for personal identification fraud related to paid constitutional petition initiatives" in August of 2023, where the woman was "charged with 16 counts of fraudulent use of personal identification information." Doc.653-1/DX 2 at 6. "[T]hree petition circulators who forged signatures, submitted duplicate signatures on behalf of voters, and signed for deceased voters" were reported to have been arrested in October 2023. Doc.653-1/DX 2 at 6. Five circulators "were charged with a total of 92 felony counts of theft of personal identifiable information and false swearing of voter registration information" in December 2023. Doc.653-1/DX 2 at 6.

OECS also investigated credible complaints related to a proposed initiative in 2023 concerning "at least 32 individual paid petition circulators," concerning activities in "at least 35 Florida counties," and affecting "over 1,500 Florida voters as potential victims." Doc.653-1/DX 2 at 9-10. The laws allegedly violated included "acts of identity

5

theft—using voters personal identifying information to complete the initiative petition and then forging a voter signature." Doc.653-1/DX 2 at 10. The circulators had low verification rates yet "[a]ll of the 32 circulators mentioned ha[d] at least some petitions that have been verified as valid." Doc.653-1/DX 2 at 10.

Finally, OECS identified for the legislature its investigations into a pay-per-signature model for circulators, and the late delivery of citizen-initiative petitions. Doc.653-1/DX 2 at 10-11.

The **December 2024 report (Doc.653-3)** updated an interim report created in October 2024. Doc.653-3/DX 4 at 1 n.1. It discussed an investigation OECS initiated after receiving complaints about the abortion initiative sponsored by Floridians Protecting Freedom, which was the initiative discussed in the January 2024 report to the legislature. Doc.653-3/DX 4 at 1-2.

OECS again noted arrests and criminal sentences. Take George Andrews. Doc.653-3/DX 4 at 12-13. OECS told the legislature that Mr. Andrews submitted a total of 1,906 petitions for Floridians Protecting Freedom's initiative, with 964 being invalidated, but was then charged with twenty felony counts (ten counts of criminal use of personal identification information and ten counts of signing another person's name or a fictitious name). Doc.653-3/DX 4 at 12. Mr. Andrews pled guilty and was sentenced to "25.8 months." Doc.653-3/DX 4 at 12. Similar information was provided for Jamie Johnson, Andre Salazar, and Donna Harriel, all of whom collected petitions for the same abortion-related citizen initiative. Doc.653-3/DX 4 at 13-16.

6

The December 2024 report also told the legislature that the four circulators who were arrested submitted "2,854 petitions" that the supervisor of elections "verified as valid and counted toward the total number" required for ballot placement. Doc.653-3/DX 4 at 17. To be more precise, validated petitions are those verified as valid by the supervisors of elections and counted for the total number of signatures required to place an initiative on the ballot; invalidated petitions are those deemed "invalid due to omissions, mismatching information, or other noncompliance with Florida Statutes." Doc.653-3/DX 4 at 16.

OECS reported on the results of an audit of validated petitions as well. The audit looked at petitions submitted (and then validated) by individuals who met one of four criteria: (1) they "were the subjects of a complaint" alleging fraud "by an elector or Supervisor," (2) they "submitted a petition in the name of a deceased individual," (3) they "were implicated by an admission from a defendant or cooperating witness," or (4) they "had an invalid rate substantially higher than the state average." Doc.653-3/DX 4 at 18.

Employees of the Florida Department of State conducted the audit. Doc.653-3/DX 4 at 18. Each had "a valid and up-to-date signature match training certificate." Doc.653-3/DX 4 at 18.

Three counties were selected for the audit: Palm Beach, Orange, and Osceola. Doc.653-3/DX 4 at 19-21. Orange County was used twice, with the second audit looking at "all verified petition forms," i.e., *not* just those from the individuals who met

7

one of the four selection criteria. Doc.653-3/DX 4 at 20. The status codes and status

descriptions, and the results reported to the Florida Legislature, are as follows:

Status Code. Doc.653-3/DX 4 at 19.

| Status Code | Status Description |
|---|---|
| Valid | Agree with Supervisor's decision to validate |
| Invalid | Do not agree with Supervisor's decision to validate; highly confident the petition is invalid |
| First review indeterminate | Validity is questionable; requested second reviewer |
| Missing | Missing or defective scan; OECS unable to make a determination |

Palm Beach County. Doc.653-3/DX 4 at 19.

| | |
|---|---|
| Total Verified Petitions Reviewed | 41 |
| Valid | 21 |
| Invalid | 15 |
| First review indeterminate | 5 |
| Missing | 0 |

Orange County 1. Doc.653-3/DX 4 at 20.

| | |
|---|---|
| Total Verified Petitions Reviewed | 2,216 |
| Valid | 1,214 |
| Invalid | 715 |
| First review indeterminate | 287 |
| Missing | 0 |

Orange County 2. Doc.653-3/DX 4 at 21.

| | |
|---|---|
| Total Verified Petitions Reviewed | 9,672 |
| Valid | 6,840 |
| Invalid | 2,017 |
| First review indeterminate | 815 |

8

| Missing | 341 |
|---------|-----|

Osceola County. Doc.653-3/DX 4 at 21.

| Total Verified Petitions Reviewed | 1,378 |
|---|---|
| Valid | 1,153 |
| Invalid | 102 |
| First review indeterminate | 123 |
| Missing | 0 |

The **January 2025 report (Doc.653-2)** incorporated by reference the results of the audit. Doc.653-2/DX 3 at 21. It also reported that audits would remain ongoing, though now "in a variety of counties" "utilizing experts in the fields of statistics and forensic document examination." Doc.653-2/DX 3 at 22.

The January 2025 report built on prior reports in other respects too. Doc.653-2/DX 3 at 5. The cases of George Andrews, Jamie Johnson, Andre Salazar, and Donella Harriel were again discussed. Doc.653-2/DX 3 at 12-16.

OECS also noted new arrests and the results from those arrests as appropriate. Natalie Marrero was discussed. Doc.653-2/DX 3 at 16. She was a circulator for the recreational marijuana petition and was charged with "32 felony counts: 16 felony counts of Criminal Use of Personal Identification Information" and "16 felony counts of False Swearing/Submission of False Voter Registration Information." Doc.653-2/DX 3 at 16. She pled "no contest" to nineteen of the counts. Doc.653-2/DX 3 at 16. Jessica Humphreys submitted "a total of 3,980 marijuana petitions across the state," of

9

which "2,064 were invalidated," and was charged with "68 felony counts," though the "case [wa]s ongoing" when OECS submitted its report. Doc.653-2/DX 3 at 16-17. Nelson Stone submitted "582 marijuana petitions and 2,333 casino gambling petitions across the state," and was arrested on five felony counts of "Fraudulent Use of Personal Identification Information Concerning a Deceased Individual" and later "pleaded guilty to all charges." Doc.653-2/DX 3 at 17.

In addition, Yenay Ramos, Haggi Amirally, Henos Joseph, Zachary Dworsky, Colton Brady, Krisharia Williams, and Jill President were all arrested and charged with crimes resulting from their petition gathering activities. Doc.653-2/DX 3 at 17-20. These arrests were made across the state. Doc.653-2/DX 3 at 17-20. The first three pled out to the charges and cases remained ongoing for the other four at the time that OECS provided its report to the legislature. Doc.653-2/DX 3 at 17-20.

Fines were discussed too. In 2024 alone, Floridians Protecting Freedom was assessed "$186,000 in civil fines" after receiving three separate fine letters. Doc.653-2/DX 3 at 24.

OECS also provided a "case breakdown" table to the Florida Legislature. It included approximately 500 matters from throughout the state, usually referred from supervisors, that concerned "Initiatives; procedure for placement on ballot." Doc.653-2/DX 3 at 122-51. That's almost certainly an undercount because petition fraud can be charged as a false swearing crime or submission of false voter registration. Doc.653-2/DX 3 at 12-20.

10

## II.    Trial testimony confirmed many of the legislature's findings.

Trial testimony confirmed much of the legislative findings included as part of HB 1205 and the findings from the OECS reports. This testimony came from Jillian Pratt, the Director of the Office of Election Crimes and Security; Jonathan Bridges, Chief Assistant Statewide Prosecutor; William Gladson, State Attorney for Florida's Fifth Judicial Circuit; Mark Earley, Supervisor of Elections for Leon County; and Plaintiffs' own witnesses such as Meghan Cox and Marc Walsh.

**A. Jillian Pratt** worked on the OECS reports, advised OECS as a lawyer, and participated in the audits that OECS conducted. HB 1205's findings—its whereas clauses—are consistent with her own understanding of the concerns with the citizen-initiative process. As are the OECS reports. Tr.2083:4-9; Tr.2083:13-21.

Specific to the January 2024 report, Director Pratt explained that initiative fraud was a concern for the abortion and the gambling initiatives. Tr.2085:17-20. Petitions signed by deceased individuals were among the issues of concern, Tr.2085:21-25, as were mismatching signatures, Tr.2086:1-3. And the actions of just thirty-two circulators potentially affected over 1,500 petitions. Tr.2087:7-11.

For the January 2025 report, Director Pratt confirmed the statutorily-mandated information in the report. Tr.2087:12-2088:8. She further explained that "one of the big focuses [of the report] was petition fraud." Tr.2087:19.

11

Director Pratt proceeded to discuss the audit mentioned in the December 2024 report, which the January 2025 report incorporated by reference. She explained the impetus for the audit, its methodology, and put the results in context.

*First*, the impetus. Things began with a complaint from a petition circulator responsible for hiring other circulators. This circulator personally delivered to OECS more than 600 petitions that he suspected of fraud. Tr.2088:19-24; Tr.2089:11-14. The petitions were for the abortion initiative sponsored by Floridians Protecting Freedom. Tr.2090:14-17. OECS "looked at those petitions and determined that a large number of them were likely fraudulent." Tr.2090:1-2. That determination was "based on looking at the handwriting in the petitions" and "[f]requently" finding that "it was the same handwriting over and over again." Tr.2090:4-6. "[A] lot of [the petitions] were [submitted] in alphabetical order," as well, "which led [OECS] to believe that the circulators were possibly going off of some list of voters." Tr.2090:6-8. Some signatures on the petitions didn't match the signatures available in a voter's file. Tr.2090:8-13.

As Director Pratt explained, OECS then wrote to Floridians Protecting Freedom's counsel, Hank Coxe, to inform the organization about the alleged fraud and to fine the organization for late-delivered petitions. Tr.2090:18-20; Tr.2091:8-23. The sponsor never challenged the assessment of the fine before an administrative law judge and instead paid much of the fine. Tr.2091:24-2092:4.

OECS also received a "do-not-buy" or "do-not-hire" list for an organization responsible for circulating petitions for Floridians Protecting Freedom. Tr.2092:5-15.

12

This was a list of individuals that, per OECS's understanding, the sponsor's agent wouldn't work with because the individuals on the list had either "committed fraud" or were "suspected" of having "committed fraud." Tr.2092:14-15. But when cross-referenced with the Department of State's list of registered petition circulators, fifty-five of the individuals were still registered for Floridians Protecting Freedom, and collected 8,800 petitions between them. Tr.2092:16-25; Tr.2093:11-16; Tr.2093:21-25.

*Second*, the methodology. The audit began with an assessment of the validated petitions of certain circulators, as detailed in the December 2024 report. Tr.2103:21-25; Tr.2100:9-2101:25. Director Pratt explained that the fourth category of circulators (those with high invalidity rates) excluded individuals collecting only a few petitions but didn't exclude individuals with high invalidity rates because of sloppy work, i.e., those with a high invalidity rate because of missing information. Tr.2095:22-2096:24. Implicit in her testimony and that of others was this: sloppy circulators shouldn't be submitting too many forms because, armed with the voter rolls with the requisite information, responsible sponsors can police this issue themselves. Sponsors have much of the information they need to choose to part ways with circulators submitting petitions with missing information—sponsors can fire a sloppy circulator after he submits the first batch of petitions rather than paying the circulator for ten more batches. *See* Tr.2018:21-2019:17 (Matthews discussing wide access to voter rolls, which provide a voter's name and address); Tr.2021:12-21 (Matthews explaining that the Florida driver's license

13

number, state identification number, social security number, and signature aren't made public though other information is made public).

*Third*, the context. Director Pratt explained how the counties were chosen for the audit as part of an iterative process. OECS began by looking at petitions from suspected bad actors to see whether invalid petitions were being verified as valid. It did this on a small scale. After finding that invalid petitions were being verified as valid, OECS then assessed petitions on a larger scale in a large county. OECS next assessed whether the invalidity rates differed between petitions submitted by suspected bad actors and all circulators. Finally, it looked at the issue in a smaller county to see whether there was a problem. More specifically:

Palm Beach County was chosen first because it "was very organized," with a "simple process" for pulling relevant petitions and voter information and a "system" that allowed OECS to look at a petition and a voter's signature side by side on a screen. Tr.2104:4-13. In addition, the county had provided OECS "with leads of potential petition fraud the entire year." Tr.2104:6-8.

Based on its review in Palm Beach County, OECS concluded "that there was fraud that was getting through," i.e., "fraudulent petitions were being validated." Tr.2104:15-17. OECS came to this conclusion after looking at forty-one petitions; that was "the number that [two people from OECS] were able to get through while [they] were there." Tr.2106:9-10. The focus at this stage was only on petitions submitted by "those who had been arrested" or "those referred to [OECS] by different Supervisors

14

throughout the state," not the high invalidity category. Tr.2105:22-2106:4. Verified petitions were deemed invalid only when signatures didn't match. Tr.2107:9-16.

Next, OECS went to Orange County. This county was centrally located in the sense that OECS personnel from Tallahassee and its then-Director Darlington, who lived in Miami, could travel back and forth from it. Tr.2108:18-21. Orange County's supervisor also "welcomed" OECS and its personnel and gave OECS access to "what [it] needed." Tr.2108:22-23.

The audit in Orange County had between five to ten people working on it, Tr.2110:10-13, compared to the two for Palm Beach County, Tr.2107:1-2, though all OECS's personnel had taken the same signature-matching course that the supervisors' staff take, Tr.2110:14-19. Petitions from circulators with high invalidity rates were considered as part of this review, together with the other categories of problematic circulators. Tr.2109:10-16. Invalidity was still determined based on mismatching signatures, with issues like missing information only being flagged. Tr.2110:7-9.

OECS came back to Orange County—the Orange 2 audit. This time OECS didn't focus on petitions submitted by petition circulators in one of the four categories. It looked generally at petitions validated by Orange County for voters within a congressional district regardless of the circulator. Tr.2112:17-2115:23; *see also* Tr.2110:20-2111:7.

15

Finally, OECS went to Osceola County. It was close to Orange County, and OECS went there to "get an idea of whether or not what [it] saw in Orange County was happening in a smaller county." Tr.2116:4-10.

Director Pratt provided testimony apart from the reports too. She discussed concerns with volunteer circulators prior to the enactment of HB 1205. While OECS generally focused on paid petition circulators, the office was concerned that volunteers might have been engaging in fraud. Tr.2119:21-2120:9. That's because the office had "received some petitions on volunteer forms that were on behalf of deceased individuals that could not have signed" on the date "identified in those petitions." Tr.2120:6-8. She discussed a specific example from Hernando County. Tr.2121:7-20. And though Director Pratt conceded that the fraud could have been committed by the volunteer or the person who filled out the form, she said it was difficult to identify the bad actor in such a case. Tr.2122:13-20. That's partly because the pre-HB 1205 volunteer forms didn't include the volunteer's name, thereby depriving OECS of one of two names needed for an investigation. *See* RTCW 170 (form).

Since the enactment of HB 1205, and consistent with one of the law's new voter notification provisions, Director Pratt also said that her office received approximately 5,000 signed affidavits from voters saying that their petitions were improperly verified for a citizen initiative. Tr.2123:6-2124:2. Of those, approximately 600 have been for petitions submitted on personal use forms for Florida Decides Healthcare's initiative

16

(100) and Smart & Safe's initiative (500), i.e., forms that don't disclose the names of the people collecting the signed forms. Tr.2124:3-10.

Asked about referrals to law enforcement in the past year, Director Pratt testified that there were 337 such referrals for petition-related issues. Tr.2125:11-13. Referrals aren't made in every case, she said. OECS tries "to reach the level of probable cause" before making a referral; "sometimes [it's] not able" to make a referral "depending on what witnesses" say and "what evidence [it's] able to obtain." Tr.2134:8-18.

**B. Jonathan Bridges** is one of the prosecutors who receives referrals from OECS. Tr.1858:6-10. As Chief Assistant Statewide Prosecutor, Mr. Bridges oversees a team of lawyers responsible for prosecuting election-related crimes, including petition-related issues. Tr.1854:7-16; Tr.1854:19-21; Tr.1855:7-10. His office also works closely with the Florida Department of Law Enforcement to investigate these crimes, including those related to the citizen-initiative process. Tr.1855:11-1856:5. It's received "dozens upon dozens, possibly in the hundreds" of referrals for petition fraud. Tr.1864:10-16.

As Mr. Bridges explained, the Statewide Prosecutor investigates both individuals and signature-gathering businesses within Florida and those outside the state. Tr.1856:10-13; Tr.1856:23-1857:5. Investigations within Florida are easier because FDLE serves as the primary investigative arm for the prosecutors; both FDLE and the Statewide Prosecutor have jurisdiction within the state, not outside of it, which makes it difficult to obtain evidence and testimony from outside the state. Tr.1857:9-21. Also, for in-state investigations, the prosecutors send out two FDLE agents to interview

17

witnesses, with agents usually interviewing people located near them. Tr.1884:4-14. Out-of-state investigations require more time from the FDLE agents, who may be gone for days rather than hours on an investigation, and coordination with law enforcement in other states to avoid "blue-on-blue problems." Tr.1884:15-1885:7. Out-of-state arrests are similarly complicated with coordination and extradition requirements making it a more tedious process compared to in-state arrests. Tr.1885:9-24.

Put simply, out-of-state work is just more resource intensive for the Statewide Prosecutor compared to in-state work, and doesn't always yield the best results. Tr.1886:21-1887:11. Mr. Bridges offered specific examples.

There's PCI Consultants, the "company that was contracted by Floridians Protecting Freedom to gather petitions for the abortion initiative." Tr.1876:24-1877:2. It's located in California. Tr.1877:3-4. When Mr. Bridges and his team "figured out through [their] investigations that some of [their] suspects worked for PCI, [they] attempted to subpoena records—employment records from PCI to prove up identity, to prove that these suspects were actually gathering petitions." Tr.1877:5-13. After some difficulty, PCI turned over its "do not buy" list to the prosecutors, which is "a list of paid petition circulators who have been blackballed, banned from the industry." Tr.1879:2-10. Mr. Bridges and his prosecutors used the list to cross-reference suspects they already had from the Department of State's referrals, and to potentially add to their list of individuals suspected of petition fraud. Tr.1879:11-19.

They subpoenaed a company called Grassfire, LLC, for similar reasons, as part of the investigation into Smart & Safe's petition gathering efforts for the marijuana initiative in the 2022 to 2024 cycle. Tr.1881:6-1882:1. Though at one point registered to do business in Florida, Grassfire administratively dissolved and relocated to California, with its owner moving to Hawaii. Tr.1882:2-10. After some back and forth, the owner only gave the Florida prosecutors "what he wanted to give [them]," "not everything that [the prosecutors] had sought in [their] subpoena." Tr.1882:11-16.

For both PCI and Grassfire, Mr. Bridges explained he and his office were trying to get information on employees, many of whom were non-residents. Tr.1882:17-25.

Mr. Bridges went on to discuss specific arrests. He discussed Alexandria Tatem, a registered circulator for Smart & Safe's most recent marijuana initiative. DX 10 at 1. She's not a Florida resident. DX 10 at 2. She's a resident of Texas. DX 10 at 2. She was arrested outside of Florida. Tr.1883:11-13. Investigating and arresting Ms. Tatem outside the state "slowed the investigation" into potential fraud related to the marijuana initiative "significantly," and "hampered [the Statewide Prosecutor's] ability to seek out the true facts as they occurred." Tr.1883:24-1884:2. Mr. Bridges also testified about the arrests of the following petition circulators: Rakia Pope, George Andrews, Jamie Johnson, Alexander Francis, Andres Salazar, Donella Harriel, Nelson Stone, and Zachary Dworsky. Tr.1867:16-1875:3.

At the time of his testimony, and looking back for a two-year period, Mr. Bridges said that a dozen individual defendants had been convicted for crimes related to petition

19

fraud. Tr.1875:4-12. There have been no acquittals and no instances of a prosecutor dropping a case after charging a defendant for petition fraud. Tr.1875:14-22. "[P]robably 12 to 20" cases related to "paid petition circulator defendant[s]" remain pending throughout the state. Tr.1875:23-1876:5. His office also has "at least 60 open investigations of paid petition circulators right now." Tr.1876:16-17.

Mr. Bridges further explained that his office focused on concerns raised about paid petition circulators. Volunteers weren't charged for petition fraud before HB 1205. That's because the volunteer referrals came with less information than the paid petition circulator referrals—without the name for the person circulating the petition, the Statewide Prosecutor decided to focus his resources on other cases with more leads. Tr.1886:21-1888:10. But with additional information on the petition circulator forms required by HB 1205, regardless of whether a circulator is being paid, Mr. Bridges expects his office to be "more efficient and more accurate" in investigations concerning volunteer circulators. Tr.1888:11-20.

**C. William Gladson** similarly discussed the resource constraints he faces as the State Attorney for Florida's Fifth Judicial Circuit. His office's ninety-five lawyers handle approximately 41,000 complaints every year, Tr.1945:10-12, from a circuit with 1.5 million people, Tr.1929:7-8, including the large retirement community called The Villages, Tr.1909:16-1910:3. Though the office has seven sworn investigators that work on whatever issues Mr. Gladson and his prosecutors choose to "help the cases move along," Tr.1929:5-20, the office "typically" relies on law enforcement agencies to do its

investigations, Tr.1945:15-21. Still, Mr. Gladson's office has investigated cases and prosecuted people for petition-related fraud.

The issues Mr. Gladson's office came upon concerned forged petitions—the fraudulent use of personal identification information and perjury. Tr.1912:9-13. His office prosecuted, for example, a petition circulator named Maria Bautista after receiving a complaint from Wesley Wilcox, the Supervisor of Elections for Marion County. Tr.1913:21-1914:6; Tr.1916:12-17. Ms. Bautista was convicted of thirteen counts of fraudulent use of personal identification information. Tr.1917:9-18.

But in other investigations, such as for a circulator named Daviann Dunn, Mr. Gladson's office referred the matter to OECS. Tr.1921:22-1923:2. That's because the investigative trail again led to PCI Consultants, the California-based company collecting petitions for the abortion initiative, and Mr. Gladson thought that another state agency was "better capable of investigating" the matter. Tr.1922:11-1923:2.

Mr. Gladson also explained that his investigations were helped along by the work done by the supervisors within his circuit. Even before HB 1205, at least three of these supervisors, and perhaps all of them, would send letters to voters suspected of having their information misused or forged. Tr.1923:19-1924:8. Mr. Gladson's office would then use these letters to help identify possible victims and suspects. Tr.1924:12-25. Ms. Bautista's case began and progressed to a guilty verdict with the help of just such letters from the supervisors to voters. Tr.1925:1-16.

**D. Mark Earley**, Supervisor of Elections for Leon County, discussed fraud, as well. His office submitted, for example, a complaint to OECS concerning a paid petition circulator for Smart & Safe who submitted a petition on behalf of a dead voter. DX 656 (complaint); DX 838 (cover e-mail); Tr.576:9-581:24. A redacted version of that complaint even appeared in OECS's January 2025 report. Tr.580:1-581:24 (discussing complaint that begins at Doc.653-2/DX 3 at 419).

There was also a complaint where one of Supervisor Earley's own employees was the victim. A circulator for Smart & Safe submitted a petition purporting to be that of the employee but which the employee had not signed; the signature was forged and one of the victim's colleagues flagged the signature for the victim who then reviewed it and flagged it as a mismatch. DX 794 at 4; *see also* Tr.588:1-589:15; Tr.589:20-590:19.

In November of 2023, Supervisor Earley's office shared other concerns with OECS, as well. In a cover e-mail for complaints related to third-party voter registration organizations, and a 3PVRO circulator named Royal Shepherd, the supervisor's office told OECS that they "have developed improved techniques to find and document cases like this one." DX 836 at 1. Cases "like this one" included petition fraud cases with future complaints "against paid petition circulators working in 2021 and 2022 on behalf of the 21-16 Limited Authorization of Casino Gaming constitutional initiative petition sponsored by Florida Voters in Charge." DX 836 at 1. Supervisor Earley's office later submitted those complaints, which concerned circulators being paid per petition for a gaming-related initiative where lots of money was being spent. Tr.583:15-584:16.

22

Turning back to 3PVROs and Mr. Shepherd. Here, Supervisor Earley acknowledged that 3PVRO activity is like gathering citizen-initiative petitions in that both involve a circulator trying to get a voter to sign a form and then submit that form to a supervisor's office. Tr.554:17-555:8. From there, the supervisor's office verifies whether the information on the form is correct. Tr.555:9-11. For a voter registration form, assuming the information is correct, the person is added to the voter roll. Tr.555:12-15. For a citizen-initiative petition, assuming the information is correct, that petition is counted as valid. Tr.555:16-19. But if someone like Royal Shepherd submitted petitions to Mr. Earley's office—an office that's complained about Mr. Shepherd to FDLE, OECS, the local sheriff, and the local state attorney—his office would take a hard look at those petitions. Tr.556:5-557:5. That's not so different from what OECS decided to do with its audit, at least in the beginning, when taking a harder look at petitions submitted by certain individuals. *See* Doc.653-3/DX 4 at 18.

**E. Meghan Cox**, an experienced circulator representing Smart & Safe, lent further credence to the legislature's concerns. Among other things, she discussed the organizational structure that sponsors of citizen initiatives use, the fraud they encounter, and how they themselves treat petitions from bad circulators.

*First*, the structure. Ms. Cox serves as the CEO of a company (Groundgame Political Solutions) registered in Delaware and for which she works from Phoenix, Arizona. Tr.1165:2-8. She also runs another company (Impact Advocacy Group)

23

registered in Delaware and for which she works from her home in Phoenix, Arizona. Tr.1165:16-1166:2.

Neither of Ms. Cox's companies has a contract with Smart & Safe, the sponsor of the citizen initiative for recreational marijuana. Tr.1166:3-8. One of Ms. Cox's companies (Groundgame) has a contract with another company called Vanguard Field Strategies, based out of Texas and run by Joe Williams from Texas. Tr.1166:10-25.

Joe Williams, who was designated the corporate representative of Smart & Safe along with Ms. Cox, explained at his deposition that he reports to a Robert Uithoven with a political consulting firm called Axiom Strategies, which is based in Kansas City, Missouri. DX 147 at Tr.19:7-19 (Williams). It was Mr. Uithoven who approved Mr. Williams's decision to hire Ms. Cox's company to run paid petition circulation for the Smart & Safe initiative. DX 147 at Tr.20:2-7 (Williams); DX 147 at Tr.27:1-6 (Williams). Mr. Uithoven is also the person who Mr. Williams went to for approval of funds needed for the Smart & Safe initiative. DX 147 at Tr.27:9-13 (Williams).

Incidentally, Mr. Williams doesn't own the company that he runs from Texas. The Garrison Management Group, based out of Kansas City, Missouri, owns Vanguard Field Strategies. DX 147 at Tr.14:24-15:2 (Williams). And it was Garrison's representative who signed for Vanguard in its contract with Smart & Safe. DX 147 at Tr.17:13-18:12 (Williams).

So, even before a circulator is hired, the structure from the top down looks like this: Smart & Safe (the Florida sponsor) → Axiom (the Missouri-based political

24

consulting firm) → Vanguard/Garrison (the Texas and Missouri companies) → Groundgame (the Delaware and Arizona company).

Of this group, Ms. Cox and her team at Groundgame work with the petition circulators gathering signatures in the field, DX 147 at Tr.20:2-4 (Williams), but they don't hire these circulators directly, Tr.1169:9-11. Groundgame instead hires coordinators, who then hire subcoordinators, who then hire the circulators in the field. Tr.1169:16-25. The coordinators are separate companies, with Groundgame having three main coordinators for its work on the Smart & Safe initiative. Tr.1167:15-22. One of the main coordinators is a company called Let the Voters Decide; it has ten subcoordinators, each of whom hires circulators in the field. Tr.1167:25-1168:15.

So, the structure from the bottom looking up is this: circulator in the field → subcoordinator (one of as many as ten per coordinator) → coordinator (one of three main coordinators) → Groundgame (the Delaware and Arizona company) → Vanguard/Garrison (the Texas and Missouri companies) → Axiom (the Missouri-based political consulting firm) → Smart & Safe (the Florida sponsor).

Ms. Cox's firm was paid $35 million for its work on Smart & Safe's most recent initiative. Tr.1171:17-19. Prior to HB 1205's passage, Ms. Cox explained that her budget for petition circulation was $13,932,319. Tr.1136:15-17. It increased to $18,350,499 after HB 1205 became law. Tr.1136:15-25. Approximately 2,600 paid petition circulators were hired from "[s]tart to finish" for the effort. Tr.1179:25-1180:1.

25

*Second*, the fraud. Ms. Cox and her team have also encountered fraud in their work. This was despite Smart & Safe requiring its circulators to be trained, Tr.1178:19-1179:4, despite conducting background checks that generally excluded felons, Tr.1179:5-1180:3, despite using a phone application called Deputy that tracks the location of circulators when they clock in and clock out, Tr.1202:17-1203:17, and despite Ms. Cox's efforts to have the "best of the best circulators," Tr.1090:21-1091:1.

Ms. Cox and her team kept track of the fraud. They maintained a text thread called "Back end MJ." DX 194 at 1; Tr.1187:13-24. It was through this thread that Ms. Cox fired a circulator named Lauren Benton after Volusia County "flagged" Ms. Benton "for fraud." DX 194 at 3; Tr.1191:15-25. Lakeera Porter was fired on the thread. DX 194 at 4-5; Tr.1192:1-6. So too were Priscilla Pierre and Chiquita Bradford. DX 194 at 6; DX 195 at 1; Tr.1192:7-1193:10. Ms. Cox confirmed that Alexandria Tatem, whom Mr. Bridges testified about, was a Smart & Safe circulator, a resident of Texas, hired through a subcontractor called Ballast Marketing, and fired after her arrest. Tr.1193:21-1194:15. Ms. Tatem was mentioned on the thread, as well. DX 195 at 5.

On the text thread, immediately after firing Lakeera Porter, Ms. Cox also told her team that "75% of the circulators are still clocking in and out at home," using the Deputy application, when they should "clock in and out" "on location." DX 194 at 4. Again, this is the application intended to ensure that circulators are doing their jobs at the locations assigned to them. Tr.1203:1-15.

26

Alexander Francis was a Smart & Safe circulator who was using the Deputy app. Tr.1203:18-1204:1. He was hired through a coordinator called National Ballot Access, a New York-based company. Tr.1204:2-8. He had an internal validation rate of around 76 to 86 percent, which Ms. Cox's team considered to be pretty good. Tr.1204:9-13. Indeed, based on Ms. Cox's internal quality control metrics, Mr. Francis was a good circulator, Tr.1204:14-16, whose work had never been flagged as problematic, Tr.1204:19-21. He was arrested for fraud. Tr.1204:17-18.

Ms. Cox explained that Smart & Safe also maintains a quality control log with a list of circulators suspected of fraud and the number of petitions impacted. DX 158; Tr.1197:16-1198:13. A portion of the list was provided with some of the redactions removed. DX 197. The partially unredacted list provides the names of thirty-four circulators and has the number of impacted petitions for most—though not all—the circulators. DX 197 at 2. That partial count still shows 2,967 "[p]etitions impacted" by fraud. DX 197 at 2; Tr.1199:18-25.

After the passage of HB 1205, Smart & Safe provided to the Department of State a list of forty-five circulators, though without the number of impacted petitions. DX 161. This was part of Smart & Safe's new duty to report violations or potential violations to trigger HB 1205's new safe-harbor provision. DX 160 (referencing Fla. Stat. § 100.371(11)).

*Third*, Smart & Safe's treatment of petitions from those suspected of fraud or arrested for fraud. This is how Smart & Safe treats petitions from bad circulators: they

27

don't count *any* of the petitions submitted by the circulator as valid for purposes of their internal validation count. Not one. Tr.1204:25-1205:14. But they don't tell the supervisors that the circulator might have submitted multiple batches of petitions before the problems were detected and that the supervisor's office should go back and take a hard look at those prior submissions; they simply assume that the supervisor's team would go back and look through the petitions themselves. Tr.1207:21-1208:1.

**F. Marc Walsh**, another experienced circulator working for Florida Decides Healthcare's initiative, also conceded that fraud happens in this line of work, including with his company called The Outreach Team. Tr.212:6-8. That's despite the work of the "remote quality control team" his company uses, Tr.183:17-184:17, and despite the background checks that his company does on petition circulators, Tr.140:18-20 (Simmons).

### III.    Plaintiffs challenge several of HB 1205's provisions.

In response to evidence of fraud in the citizen-initiative process that it had before it, which is consistent with the trial testimony in this case, the legislature made substantial changes to the initiative process through HB 1205. Four sets of Plaintiffs challenge many of these changes under various constitutional theories.

This closing attempts to group the provisions being challenged with the theories at issue and the relevant Plaintiffs. The groupings are the **Petition Circulator Eligibility** provisions, the **Fines** provisions, the **Criminal** provisions, the **Financial Impact Statement and Ballot Placement** provisions, the **Verification** provisions,

28

the **One Amendment** provision, the **Misdemeanor Notice** provision, the **Full Amendment** provision, the **Petition Completion** provision, the **Circulator Affidavit**, the **Ten-Day Return Deadline**, and **OECS's Investigative** powers.

**A.** The **Petition Circulator Eligibility** provisions implicate several sections of HB 1205. For the sake of clarity, the statute where the provisions have been codified is provided together with the changes in strikethrough and underline form. The list of Plaintiffs challenging each provision and their theories follows.

**1.** Florida Statutes § 97.021(28):

(28) "Petition circulator" means an entity or individual who collects signatures ~~for compensation~~ for the purpose of qualifying a proposed constitutional amendment for ballot placement. <u>The term does not include a person who collects, delivers, or otherwise physically possesses no more than 25 signed petition forms in addition to his or her own signed petition form or a signed petition form belonging to the person's spouse, or the parent, child, grandparent, grandchild, or sibling of the person or the person's spouse.</u>

League and RTCW Plaintiffs challenge this provision based on (1) First Amendment speech, (2) First Amendment association, (3) vagueness, and (4) overbreadth.

**2.** Florida Statutes § 100.371(3)(e):

<u>(e) A petition form distributed by a person other than a petition circulator must also include, in lieu of the Petition Circulator's Affidavit, the following notice:</u>

<u>This form is for PERSONAL USE only. Unless registered as a petition circulator, it is a third degree felony to collect, deliver, or otherwise physically possess more than 25 signed petition forms in addition to your own or those of immediate family members.</u>

29

League and RTCW Plaintiffs challenge this provision based on (1) First Amendment speech, (2) First Amendment association, (3) vagueness, and (4) overbreadth.

**3.** Florida Statutes § 100.371(4)(a):

(4)(a) Beginning July 1, 2025, unless registered as a petition circulator with the Secretary of State and issued a petition circulator number, a person may not collect, deliver, or otherwise physically possess more than 25 signed petition forms in addition to his or her own signed petition form or a signed petition form belonging to an immediate family member. This paragraph may not be construed to prohibit a person from distributing petition forms designated for personal use as described in paragraph (3)(e). For the purposes of this subsection, the term "immediate family" means a person's spouse, or the parent, child, grandparent, grandchild, or sibling of the person or the person's spouse signatures or initiative petitions for compensation unless the person is registered as a petition circulator with the Secretary of State.

FDH, League, RTCW, and Smart & Safe Plaintiffs challenge this provision based on (1) First Amendment speech, (2) First Amendment association, (3) vagueness, and (4) overbreadth.

**4.** Florida Statutes § 100.371(4)(b)1:

(b) A person may not collect signatures or initiative petitions if he or she:

1. Has been convicted of a felony violation and has not had his or her right to vote restored.

FDH and League Plaintiffs challenge this provision based on (1) First Amendment speech, (2) First Amendment association, (3) vagueness, and (4) overbreadth.

**5.** Florida Statutes § 100.371(4)(b)2:

(b) A person may not collect signatures or initiative petitions if he or she:

30

2. Is not a citizen of the United States.

FDH, League, and RTCW Plaintiffs challenge this provision based on (1) First Amendment speech, (2) First Amendment association, (3) vagueness, (4) overbreadth, and (5) equal protection.

**6.** Florida Statutes § 100.371(4)(b)3:

(b) A person may not collect signatures or initiative petitions if he or she:

3. Is not a resident of this state.

FDH, League, RTCW, and Smart & Safe Plaintiffs challenge this provision based on (1) First Amendment speech, (2) First Amendment association, (3) vagueness, and (4) overbreadth.

**7.** Florida Statutes § 100.371(4)(c)2:

(c)(4) An application for registration must be submitted in the format required by the Secretary of State and must include the following:

2.(b) The applicant's name, permanent address, temporary address, if applicable, and date of birth, Florida driver license or Florida identification card number, and the last four digits of his or her social security number.

League and RTCW Plaintiffs challenge this provision based on (1) First Amendment speech, (2) First Amendment association, (3) vagueness, and (4) overbreadth.

**8.** Florida Statutes § 100.371(4)(c)6:

(c)(4) An application for registration must be submitted in the format required by the Secretary of State and must include the following:

6. Whether the applicant has been convicted of a felony violation and has not had his or her right to vote restored, by including the statement, "I

31

affirm that I am not a convicted felon, or, if I am, my right to vote has been restored," and providing a box for the applicant to check to affirm the statement.

FDH and League Plaintiffs challenge this provision based on (1) First Amendment speech, (2) First Amendment association, (3) vagueness, and (4) overbreadth.

**9.** Florida Statutes § 100.371(4)(c)7:

(c)(4) An application for registration must be submitted in the format required by the Secretary of State and must include the following:

7. Whether the applicant is a citizen of the United States, by asking the question, "Are you a citizen of the United States of America?" and providing boxes for the applicant to check whether the applicant is or is not a citizen of the United States.

FDH, League, and RTCW Plaintiffs challenge this provision based on (1) First Amendment speech, (2) First Amendment association, (3) vagueness, (4) overbreadth, and (5) equal protection.

**10.** Florida Statutes § 100.371(4)(c)8:

(c)(4) An application for registration must be submitted in the format required by the Secretary of State and must include the following:

8. Whether the applicant is a Florida resident by asking the question, "Are you a resident of the state of Florida?" and providing boxes for the applicant to check whether the applicant is or is not a resident of the state of Florida.

FDH, League, and RTCW Plaintiffs challenge this provision based on (1) First Amendment speech, (2) First Amendment association, (3) vagueness, and (4) overbreadth.

**11.** Florida Statutes § 100.371(4)(c)9:

(c)~~(4)~~ An application for registration must be submitted in the format required by the Secretary of State and must include the following:

9. The signature of the applicant under penalty of perjury for false swearing pursuant to s. 104.011, by which the applicant swears or affirms that the information contained in the application is true.

FDH, League, and RTCW Plaintiffs challenge this provision based on (1) First Amendment speech, (2) First Amendment association, (3) vagueness, (4) overbreadth, and (5) equal protection.

**12.** Florida Statutes § 100.371(4)(f):

(f) A person may not register to collect signatures or initiative petitions until he or she has completed the training concerning the requirements for petition circulators. The training must be developed by the division and must be in an electronic format available on the division's public website. The training must, at a minimum, include the following:

1. An overview of the petition-gathering process.

2. An overview of the petition circulator registration requirements.

3. An explanation that the sponsor of an initiative amendment serves as a fiduciary to each voter who signs a petition.

4. An explanation that the Florida Election Code prohibits compensation or provision of any benefit based on the number of petition forms gathered or the time within which a number of petition forms are gathered.

5. The specific criminal penalties to which a petition circulator may be subject for violating the Florida Election Code.

League and Smart & Safe Plaintiffs challenge this provision based on (1) First Amendment speech, (2) First Amendment association, (3) vagueness, and (4) overbreadth.

**13.** Florida Statutes § 100.371(4)(g):

(g) The sponsor of the initiative amendment is liable for a fine in the amount of $50,000 for each person the sponsor knowingly allows to collect petition forms on behalf of the sponsor in violation of this subsection.

FDH, RTCW, and Smart & Safe Plaintiffs challenge this provision based on (1) First Amendment speech, (2) First Amendment association, (3) overbreadth, and (4) substantive due process.

**14.** Florida Statutes § 100.371(14)(h):

(h) A signed petition form submitted by an ineligible or unregistered petition circulator must be invalidated and may not be counted toward the number of necessary signatures for placement on the ballot.

FDH, RTCW, and Smart & Safe Plaintiffs challenge this provision based on (1) First Amendment speech, (2) First Amendment association, (3) overbreadth, (4) procedural due process, and (5) substantive due process.

**B.** Plaintiffs also challenge two **Fines**-related provisions in HB 1205. Those provisions, the groups challenging, and the constitutional theories are as follows:

**1.** Florida Statutes § 100.371(8):

(8) If a person collecting petition forms on behalf of a sponsor of an initiative petition signs another person's name or a fictitious name to any petition, or fills in missing information on a signed petition, to secure a

34

ballot position in violation of s. 104.185(2), the sponsor of the initiative petition is liable for a fine in the amount of $5,000 for each such petition.

FDH, League, and RTCW Plaintiffs challenge this provision based on (1) First Amendment speech, (2) First Amendment association, (3) overbreadth, and (4) substantive due process.

**2.** Florida Statutes § 100.371(10):

(10) A sponsor of an initiative petition or a person collecting petition forms on behalf of a sponsor of an initiative petition may not mail or otherwise provide a petition form upon which any information about a voter has been filled in before it is provided to the voter. The sponsor of an initiative petition is liable for a fine in the amount of $50 for each petition form that is a violation of this subsection.

FDH, League, and RTCW Plaintiffs challenge this provision based on (1) First Amendment speech, (2) First Amendment association, (3) overbreadth, and (4) substantive due process.

**C.** The **Criminal** provisions at issue in this case are as follows:

**1.** Florida Statutes § 100.371(9):

(9) If a person collecting petition forms on behalf of a sponsor of an initiative petition copies or retains a voter's personal information, such as the voter's Florida driver license number, Florida identification card number, social security number, or signature, for any reason other than to provide such information to the sponsor of the initiative petition, the person commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

FDH and League Plaintiffs challenge this provision based on (1) First Amendment speech, (2) First Amendment association, (3) vagueness, and (4) overbreadth.

35

**2.** Florida Statutes § 104.185(2):

(2) A person who signs another person's name or a fictitious name to any petition, <u>or who fills in missing information on a signed petition,</u> to secure ballot position for a candidate, a minor political party, or an issue commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

League Plaintiffs challenge this provision based on (1) First Amendment speech, (2) First Amendment association, (3) vagueness, and (4) overbreadth.

**3.** Florida Statutes § 104.187:

A person who violates <u>s. 100.371(4)(a)</u> ~~s. 100.371(3)~~ commits a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083.

League and Smart & Safe Plaintiffs challenge this provision based on (1) First Amendment speech, (2) First Amendment association, (3) vagueness, and (4) overbreadth.

**4.** Florida Statutes § 104.188(2):

<u>(2) A person who collects, delivers, or otherwise physically possesses more than 25 signed petition forms in addition to his or her own signed petition form or a signed petition form belonging to an immediate family member, and who is not registered as a petition circulator pursuant to s. 100.371(4)(a), commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.</u>

League, RTCW, and Smart & Safe Plaintiffs challenge this provision based on (1) First Amendment speech, (2) First Amendment association, (3) vagueness, and (4) overbreadth.

**5.** Florida Statutes § 895.02(8)(d):

36

(8) "Racketeering activity" means to commit, to attempt to commit, to conspire to commit, or to solicit, coerce, or intimidate another person to commit:

(d) A violation of the Florida Election Code relating to irregularities or fraud involving issue petition activities.

FDH and League Plaintiffs challenge this provision based on (1) First Amendment speech, (2) First Amendment association, (3) vagueness, and (4) overbreadth.

**D.** The **Financial Impact Statement and Ballot Placement** provisions provide as follows:

**1.** Florida Statutes § 100.371(3)(a)7:

(3)(a) Beginning July 1, 2025, the petition form must prominently display all of the following:

7. For a proposed amendment submitted to the Secretary of State after the effective date of this act, the financial impact statement.

RTCW and Smart & Safe Plaintiffs challenge this provision based on (1) First Amendment speech and (2) compelled speech.

**2.** Florida Statutes § 100.371(15):

(15)(12) The Secretary of State shall determine from the signatures verified by the supervisors of elections the total number of verified valid signatures, less any signatures that were invalidated pursuant to subsection (14), and the distribution of such signatures by congressional districts, and the division shall post such information on its website at the same intervals specified in paragraph (14)(g) (11)(c). Upon a determination that the requisite number and distribution of valid signatures have been obtained, the secretary shall issue a certificate of ballot position for that proposed amendment and shall assign a designating number pursuant to s. 101.161. The secretary must rescind the certificate of ballot position if an advisory

37

opinion issued by the Supreme Court pursuant to s. 16.061(1) deems the initiative petition invalid.

Smart & Safe Plaintiff challenges this provision based on (1) First Amendment speech and (2) overbreadth.

**3.** Florida Statutes § 100.371(16)(d):

(d) The financial impact statement must be separately contained on the petition form and the ballot and be set forth after the ballot summary as required in s. 101.161(1).

1. If the financial impact statement projects a net negative impact on the state budget, the ballot must include the statement required by s. 101.161(1)(b).

2. If the financial impact statement projects a net positive impact on the state budget, the ballot must include the statement required by s. 101.161(1)(c).

3. If the financial impact statement estimates an indeterminate financial impact or if the members of the Financial Impact Estimating Conference are unable to agree on the statement required by this subsection, the ballot must include the statement required by s. 101.161(1)(d).

4. If the financial impact statement was not produced or if the Financial Impact Estimating Conference did not meet to produce the financial statement, the ballot must include the statement required by s. 101.161(1)(e).

RTCW and Smart & Safe Plaintiffs challenge this provision based on (1) First Amendment speech and (2) compelled speech.

**4.** Florida Statutes § 100.371(16)(e):

(e)1. Any financial impact statement that the Supreme Court finds not to be in accordance with this subsection shall be remanded solely to the

38

Financial Impact Estimating Conference for redrafting~~, provided the court's advisory opinion is rendered at least 75 days before the election at which the question of ratifying the amendment will be presented~~. The Financial Impact Estimating Conference shall prepare and adopt a revised financial impact statement no later than 5 p.m. on the 15th day after the date of the court's opinion. <u>The sponsor of the initiative must refile the petition with the revised financial impact statement with the Secretary of State as a new petition.</u>

RTCW and Smart & Safe Plaintiffs challenge this provision based on (1) First Amendment speech and (2) compelled speech.

**E.** The **Verification** provisions being challenged in this case provide as follows:

**1.** Florida Statutes § 99.097(1)(b):

(b) Rules and guidelines for petition verification shall be adopted by the Department of State. Rules and guidelines for a random sample method of verification may include a requirement that petitions bear an additional number of names and signatures, not to exceed 15 percent of the names and signatures otherwise required. If the petitions do not meet such criteria or if the petitions are prescribed by s. 100.371, the use of the random sample method of verification is not available to supervisors.

FDH Plaintiffs challenge this provision based on (1) First Amendment speech, (2) First Amendment association, and (3) equal protection.

**2.** Florida Statutes § 99.097(4)(a):

(4)(a) The supervisor must be paid in advance the sum of 10 cents for each signature checked or the actual cost of checking such signature, whichever is less, by the candidate or, in the case of a petition to have a local issue placed on the ballot, by the person or organization submitting the petition. In the case of a petition to place a statewide issue on the ballot, the person or organization submitting the petition must pay the supervisor in advance the cost posted by the supervisor pursuant to <u>s.</u>

100.371(14) ~~s. 100.371(11) for the actual cost of checking signatures to place a statewide issue on the ballot.~~

FDH and Smart & Safe Plaintiffs challenge this provision based on (1) First Amendment speech, (2) First Amendment association, (3) content-based regulation, and (4) equal protection.

**3.** Florida Statutes § 100.371(14)(b):

(b) The supervisor shall record the date each submitted petition is received. If a signature on a petition is from a registered voter in another county, the supervisor must ~~shall~~ notify the petition sponsor and the division of the misfiled petition. The supervisor shall promptly verify the signatures within 60 days after receipt of the petition forms and payment and processing of a fee for the actual cost of signature verification incurred by the supervisor. However, for petition forms submitted less than 60 days before February 1 of an even-numbered year, the supervisor shall promptly verify the signatures within 30 days after receipt of the form and payment of the fee for signature verification.

FDH Plaintiffs challenge this provision based on (1) First Amendment speech, (2) First Amendment association, and (3) equal protection.

**4.** Florida Statutes § 100.371(14)(e):

(e) Beginning October 1, 2025, when the signature on the petition form is verified as valid, the supervisor shall, as soon as practicable, notify the voter by mail at the mailing address on file in the Florida Voter Registration System.

1. Such notice must be sent by forwardable mail with a postage prepaid preaddressed form, which may be returned to the Office of Election Crimes and Security. The notice must include contact information for the Office of Election Crimes and Security, including the telephone number, fax number, mailing address, and e-mail address. The notice must include

40

all of the following statements or information in substantially the following form:

NOTICE

A petition to place a proposed constitutional amendment on the ballot for the next general election, bearing your name and signature, has been received and verified by the Supervisor of Elections Office in… (insert County)….

The petition is for… (insert the petition serial number and ballot title)… and was signed on… (insert the date the voter signed the petition)….

Check this box ☐, sign, and return this notice to the Office of Election Crimes and Security if you believe your signature has been misrepresented or forged on a petition. The petition form in question will be invalidated and will not be counted toward the number of signatures required to place this proposed constitutional amendment on the ballot.

A notice being returned must be received by the Office of Election Crimes and Security on or before February 1… (insert the year in which the general election is held)….

…(Insert the voter's Florida voter registration number, and if applicable, the petition circulator's number)….

By signing below, I swear or affirm that my signature was misrepresented or forged on the petition form indicated in this notice.

…(Voter's Signature)… …(Date)…

This notice becomes a public record upon receipt by the Office of Election Crimes and Security. It is a second degree misdemeanor, punishable as provided in s. 775.082, Florida Statutes, or s. 772.083, Florida Statutes, for a person to knowingly make a false official statement pursuant to s. 837.06, Florida Statutes.

41

2. Upon receiving a completed notice, the Office of Election Crimes and Security shall transmit a copy of such notices to the division. The division shall deem the voter's petition form invalid.

FDH and Smart & Safe Plaintiffs challenge this provision based on (1) First Amendment speech, (2) First Amendment association, (3) content-based regulation, and (4) equal protection.

**5.** Florida Statutes § 100.371(14)(f):

(f) Each supervisor shall post the actual cost of signature verification for petition forms received more than 60 days before February 1 of an even-numbered year and for petition forms received less than 60 days before February 1 of an even-numbered year on his or her website, and may increase such cost, as necessary, annually on March 1 ~~February 2 of each even-numbered year~~. These costs include operating and personnel costs associated with comparing signatures, printing and all postage costs related to the verification notice required by paragraph (e), and transmitting petition forms to the division. The division shall also publish each county's current cost on its website. The division and each supervisor shall biennially review available technology aimed at reducing verification costs.

FDH and Smart & Safe Plaintiffs challenge this provision based on (1) First Amendment speech, (2) First Amendment association, (3) content-based regulation, and (4) equal protection.

**6.** This part of HB 1205 wasn't codified in the statutes. Ch. 2025-21 § 7(3) provides as follows:

(3) No later than October 1, 2025, a supervisor of elections may increase the cost of signature verification pursuant to the amendments made to s. 100.371(14)(f), Florida Statutes. A supervisor shall post the cost of signature verification on his or her publicly available website as soon as such cost is determined.

FDH and Smart & Safe Plaintiffs challenge this provision based on (1) First Amendment speech, (2) First Amendment association, (3) content-based regulation, and (4) equal protection.

**F.** Smart & Safe challenges the **One Amendment** provision, codified at Florida Statutes § 100.371(2), which says:

> (2) The sponsor of an initiative amendment <u>may not sponsor more than one amendment and must</u> ~~shall~~, <u>before circulating any petition forms</u> ~~prior to obtaining any signatures~~, register as a political committee pursuant to s. 106.03 and submit the <u>ballot title, ballot summary, article and section of the State Constitution being amended, and full</u> text of the proposed amendment to the Secretary of State<u>. The proposed amendment and all forms filed in connection with this section must, upon request, be made available in alternative formats</u>, ~~with the form on which the signatures will be affixed, and shall obtain the approval of the Secretary of State of such form~~. <u>Upon receipt, the Secretary of State shall assign the initiative petition a petition number and submit a copy of the proposed amendment to the Financial Impact Estimating Conference for review, analysis, and estimation of the financial impact of the proposed amendment. After the review by the Financial Impact Estimating Conference, the division shall publish the forms with the information provided for in subsection (3) and on which signatures for the initiative petition will be affixed</u> ~~The Secretary of State shall adopt rules pursuant to s. 120.54 prescribing the style and requirements of such form. Upon filing with the Secretary of State, the text of the proposed amendment and all forms filed in connection with this section must, upon request, be made available in alternative formats~~.

Smart & Safe's challenge is based on (1) First Amendment speech and (2) overbreadth.

**G.** The RTCW Plaintiffs challenge the **Misdemeanor Notice** provision, codified at Florida Statutes § 100.371(3)(a)5, which provides that:

> (3)(a) <u>Beginning July 1, 2025, the petition form must prominently display all of the following:</u>

5. A notice that it is a misdemeanor of the first degree to knowingly sign the petition more than once.

They do so based on First Amendment speech.

**H.** The RTCW Plaintiffs challenge the **Full Amendment** provision, codified at Florida Statutes § 100.371(3)(b), which provides that:

(b) The petition form must also include all of the following:

1. The full text of the proposed amendment.

2. The name and address of the sponsor.

3. The date received by the Secretary of State.

4. A bar code or serial number associated with the initiative petition.

They do so based on First Amendment speech.

**I.** FDH Plaintiffs challenge the **Petition Completion** requirement, codified at Florida Statutes § 100.371(3)(c)4, which provides as follows:

(c) The petition form must solicit and require all of the following information:

4. The voter's Florida driver license number or the voter's Florida identification card number issued pursuant to s. 322.051, or the last four digits of the voter's social security number.

They do so based on (1) First Amendment speech and (2) First Amendment association.

**J.** The **Circulator Affidavit** provision, codified at Florida Statutes § 100.371(3)(d), provides as follows:

44

(d) A petition form distributed by a petition circulator must also include all of the following:

1. The Petition Circulator's Affidavit with the circulator's name, permanent address, and petition circulator number or barcode.

2. The following statement, which must be signed and dated by the circulator:

By my signature below, as petition circulator, I verify that the petition was completed and signed by the voter in my presence. Under penalty of perjury, I declare that I have read the foregoing Petition Circulator's Affidavit, and that the facts stated in it are true, and that if I was paid to circulate or collect this petition, payment was not on a per signature basis.

League and RTCW Plaintiffs challenge this provision based on (1) First Amendment speech, (2) First Amendment association, (3) vagueness, and (4) overbreadth.

**K.** The **Ten-Day Return Deadline**, codified at Florida Statutes § 100.371(7)(a), provides that:

(7)(a) A sponsor that collects petition forms or uses a petition circulator to collect petition forms serves as a fiduciary to the voter elector signing the petition form and shall ensure, ensuring that any petition form entrusted to the sponsor or petition circulator is shall be promptly delivered to the supervisor of elections in the county in which the voter resides within 10 30 days after the voter elector signs the form. If a petition form collected by the sponsor or any petition circulator is not promptly delivered to the supervisor of elections, the sponsor is liable for the following fines:

1. A fine in the amount of $50 per each day late for each petition form received by the supervisor of elections in the county in which the voter resides more than 10 30 days after the voter elector signed the petition form or the next business day, if the office is closed. A fine in the amount of $2,500 $250 for each petition form received if the sponsor or petition circulator acted willfully.

45

2. <u>A fine in the amount of $100 per each day late, up to a maximum of $5,000, for each petition form collected by a sponsor or a petition circulator, signed by a voter on or before February 1 of the year the general election is held and received by the supervisor of elections in the county in which the voter resides after the deadline for such election. A fine in the amount of $5,000 for each such petition form received if the sponsor or petition circulator acted willfully.</u>

<u>3.</u> A fine in the amount of $500 for each petition form collected by a petition circulator which is not submitted to the supervisor of elections <u>in the county in which the voter resides</u>. A fine in the amount of <u>$5,000</u> <s>$1,000</s> for any petition form not <u>so</u> submitted if the sponsor or petition circulator <u>acting on its behalf</u> acted willfully.

FDH, League, RTCW, and Smart & Safe Plaintiffs challenge this provision based on (1) First Amendment speech, (2) First Amendment association, (3) vagueness, (4) overbreadth, (5) equal protection, and (6) substantive due process.

**L.** League Plaintiffs challenge **OECS's Investigative** ability, codified at Florida Statutes § 100.371(14)(g), which provides that:

<u>(g)</u><s>(e)</s> On the last day of each month, or on the last day of each week from December 1 of an odd-numbered year through February 1 of the following year, each supervisor shall post on his or her website the total number of signatures submitted, the total number of invalid signatures, the total number of signatures processed, and the aggregate number of verified valid signatures and the distribution of such signatures by congressional district for each proposed amendment proposed by initiative, along with the following information specific to the reporting period: the total number of signed petition forms received, the total number of signatures verified, the distribution of verified valid signatures by congressional district, and the total number of verified petition forms forwarded to the Secretary of State. <u>For any reporting period in which the percentage of petition forms deemed invalid by the supervisor exceeds a total of 25 percent of the petition forms received by the supervisor for that reporting period, the supervisor shall notify the Office of Election</u>

46

Crimes and Security. The Office of Election Crimes and Security shall conduct a preliminary investigation into the activities of the sponsor, one or more petition circulators, or a person collecting petition forms on behalf of a sponsor, to determine whether the invalidated petitions are a result of fraud or any other violation of this section. As authorized by ss. 97.012(15) and 97.022(1), the Office of Elections Crimes and Security may, if warranted, report findings to the statewide prosecutor or the state attorney for the judicial circuit in which the alleged violation occurred for prosecution.

They do so based on (1) First Amendment speech, (2) First Amendment association, (3) vagueness, and (4) overbreadth.

## Argument

### I.    HB 1205 regulates conduct—not speech—and thus doesn't run afoul of the First Amendment's free speech protections.

#### A. If speech is implicated at all, rational basis applies here.

Not one of the many provisions of HB 1205 being challenged keeps any person or organization from talking about an initiative. Speeches, e-mails, texts, phone calls, Tweets, and Instagram and Facebook posts remain unaffected. That matters.

Advocating for or against a proposed citizen initiative implicates speech. Collecting and delivering signed citizen-initiative petitions doesn't.

Juan Ardila agrees. In testifying about the typical interaction with a voter from start to finish, this Plaintiffs' witness said that he could separate the speech (the part where he's building rapport, explaining the proposal, and convincing someone to sign) from the conduct (the part where he's taking physical possession of a signed petition

47

or handing a person an envelope to mail the petition himself). Tr.384:21-385:17. There was no equivocation in his answers.

The Eleventh Circuit has also said that speech and conduct must be separated when it comes to citizen initiatives. It said so most recently in *Florida Decides Healthcare, Inc. v. Florida Secretary of State*, No. 25-12370, 2025 U.S. App. LEXIS 23431, at \*15 (11th Cir. Sept. 9, 2025), when granting a stay of one of this Court's preliminary injunction orders related to the **Petition Circulator Eligibility** provisions.

That's consistent with *Biddulph v. Mortham*, 89 F.3d 1491, 1498 n.7 (11th Cir. 1996), where the Eleventh Circuit explained that there's "an explicit distinction between" the regulation of "the initiative process in general" and "the power to regulate the exchange of ideas about political changes sought through the process." Because a state has "broad discretion in administering its initiative process," *Biddulph* said that regulations concerning the process of collecting initiative petitions must satisfy rational basis review, assuming First Amendment scrutiny is triggered at all. *Id.* at 1500. Heightened scrutiny "only" applies "in certain narrow circumstances," instances where the state (1) "enact[s] initiative regulations that [a]re content based or ha[ve] a disparate impact on certain political viewpoints," (2) "appl[ies] facially neutral regulations in a discriminatory manner," or (3) "impermissibly burden[s] the free exchange of ideas about the *objective* of an initiative proposal." *Id.* (emphasis added).

Put another way, under *Biddulph*, there's a difference between a regulation on the free exchange of ideas—the "objective of an initiative proposal"—and the process for

48

collecting petitions. *Id.* And it was the objective of an initiative proposal that was being regulated in *Meyer v. Grant*, a case about Colorado's ban on paid petition circulators. 486 U.S. 414 (1988). That's because Colorado's ban was broad. The law was so broad, in fact, that it prevented paid circulators from even approaching voters, discussing petitions, and encouraging voters to sign:

> Any person, corporation, or association of persons who directly or indirectly pays to or receives from or agrees to pay to or receive from any other person, corporation, or association of persons any money or other thing of value in consideration of or as an inducement *to the circulation of an initiative or referendum petition* or *in consideration of or as an inducement to the signing of any such petition* commits a class 5 felony and shall be punished as provided in section 18-1-105, C. R. S. (1973).

*Id.* at 416 n.1 (emphasis added) (quoting Colo. Rev. Stat. § 1-40-110 (1980)).

As one court within this circuit put it, "the statute at issue in *Meyer* directly regulated the conditions under which plaintiffs could *interact* with members of the public regarding an issue of political concern." *League of Women Voters of Fla. v. Browning*, 575 F. Supp. 2d 1298, 1321 (S.D. Fla. 2008) (emphasis added). That is the lens through which any snippets from *Meyer* concerning First Amendment law must be viewed.

The Supreme Court understandably found that the Colorado law at issue in *Meyer* violated the First Amendment. The law, in a real sense, "limit[ed] the number of voices who" would "convey" the petition sponsors' "message" and "therefore, limit[ed] the size of the audience they" could "reach," which "ha[d] the inevitable effect of reducing the total quantum of speech on a public issue." 486 U.S. at 422-23.

49

The same was true in a subsequent citizen-initiative case from Colorado, *Buckley v. American Constitutional Law Foundation*, 525 U.S. 182 (1999). The laws mentioned in that case were similarly broad and affected speech. The Court thus engaged in the same analysis. *See, e.g.*, *id.* at 188 n.2 ("No section of a petition for any initiative or referendum measure *shall be circulated* by any person who is not a registered elector and at least eighteen years of age at the time the section is circulated." (emphasis added) (quoting Colo. Rev. Stat. § 1-40-112(1) (1998))).

In both *Meyer* and *Buckley*, the citizen-initiative laws deemed unconstitutional touched on speech and not conduct. That difference comports with First Amendment case law, more generally. It's blackletter law that speech is afforded First Amendment protection. Conduct isn't. *Rumsfeld v. FAIR*, 547 U.S. 47, 60 (2006). A law that affects what a person "must *do*," as opposed to what a person "may or may not *say*," is a law that regulates conduct. *Id.* Those laws get rational basis review, assuming the First Amendment is implicated at all. *Reclaim Idaho*, 140 S. Ct. at 1216-17 (Roberts, C.J., concurring with three others in granting of stay) (casting doubt on whether First Amendment is implicated at all when it comes to "neutral, procedural regulation[s]").

The Supreme Court's broader First Amendment jurisprudence further supports the separation of speech from conduct. *FAIR*, 547 U.S. at 66. The Court has said: "We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *United States v. O'Brien*, 391 U.S. 367, 376 (1968).

50

This separation of speech from conduct plays out in other election contexts. Take third parties registering people to vote. There's a clear distinction between (1) a volunteer *speaking* to a voter, *talking* to the voter about the importance of voting, and *encouraging* the voter to register, and (2) a volunteer *possessing* the completed registration, *bringing* it to a supervisor of elections office, and *delivering* it on time. That's why "the collection and handling of" election forms, like "voter registration applications[,] is not inherently expressive activity" and not speech. *Browning*, 575 F. Supp. 2d at 1319. It's "simply" conduct, "an administrative aspect of the electoral process—the handling of voter registration applications by third-party voter registration organizations *after* they have been collected from applicants." *Id.* at 1322.

The provisions at issue here—every one of them—concern the process for collecting and delivering signed citizen-initiative petitions. None keeps a person from talking about an initiative. And, as discussed above, the legislature's goals of preventing fraud and improving the public perception of the initiative process offer compelling (and at the very least, rational) reasons for enacting these provisions.

### B. Plaintiffs miss the mark in their attempt to lump together speech and conduct.

Plaintiffs insist, however, that they must talk about an initiative *and* collect signed petitions *and* deliver those petitions. Talking isn't enough to exercise First Amendment rights, say Plaintiffs. Nor is collecting information through a pledge card. Nor is mailing

51

blank petitions to voters. Nor is using a chase program to remind voters to turn in their own petitions, just as with vote-by-mail ballots. That can't be right.

Plaintiffs' own witnesses have engaged in speech concerning citizen initiatives *without* collecting or delivering a single signed petition. Marc Walsh tabled on college campuses about initiatives without collecting a signed petition, Tr.204:9-205:16, though he did collect pledge-to-vote cards from students, Tr.205:17-19. Meghan Cox made over a million dollars opposing a Florida initiative without collecting a signed petition. Tr.1171:21-1175:25. Her team even won an award for their work along the way. Tr.1175:8-19. Mitchell Emerson discussed a program that cut out circulators entirely— one where voters could download petitions, fill them out, with Florida Decides Healthcare chasing the signed petitions to ensure their submission to supervisors of elections. Tr.284:12-15; Tr.285:14-286:7; Tr.286:11-25. This program exceeded Florida Decides Healthcare's expectations per one of the organization's own documents. DX 109 at 11 ("[T]he results exceeded our expectations.").

Plaintiffs' talk-collect-deliver argument suffers from other problems. Plaintiffs must concede (because of *Biddulph*) that not every regulation of the citizen-initiative process runs afoul of the First Amendment. Under Plaintiffs' theory, it's only the ones that impose *too much* of a burden on the process *without* a sufficient justification. If the burden is too high, then the justification must be compelling and the regulation narrowly tailored. This approach is problematic for several reasons.

*First*, Plaintiffs never provide a clear answer for when the burden becomes high enough to trigger this strict scrutiny. Is it when a provision is shown to require 1,000,000 additional signatures instead of 100,000 additional signatures? When it imposes costs exceeding $100,000,000 instead of $10,000,000? When it requires the use of 1,000 circulators instead of 100 circulators? Daniel Smith, PhD, never answered these questions, either. He doesn't like HB 1205. Fine. But he offered no quantifiable baselines for burdens already in place or thresholds at which the burdens—old or new—become too high. Tr.1380:19-21.

*Second*, political effectiveness can't be the de facto threshold for when a burden becomes too high. The First Amendment guarantees free speech, not that "advocacy will be effective." *Smith v. Ark. State Highway Emps., Loc. 1315*, 441 U.S. 463, 464-65 (1979). Measuring political effectiveness is also difficult. Not all initiatives are created equal. Some (like abortion) trigger strong feelings in voters and donors. Others don't. Compare the campaign contributions for Floridians Protecting Freedom ($121,766,030.11 for one election cycle) with the campaign contributions for Florida Decides Healthcare ($5,785,688.18 over multiple election cycles). Campaign Finance Database, https://dos.fl.gov/elections/candidates-committees/campaign-finance/campaign-finance-database/ (last visited March 13, 2026).

*Third*, the approach Plaintiffs put forward invites this Court to assess provisions *already in place* before HB 1205 and then determine whether *some combination* of the

53

provisions in HB 1205 pushes the *cumulative* burdens over the *undefined* threshold for unconstitutionality. That's unworkable.

Consider the injunction this Court would issue as a remedy under this theory: a redline of Florida law to excise (and perhaps replace) some combination of provisions to achieve the right constitutional balance. Maybe the ten-day return deadline would turn into a thirty-day deadline or a forty-day deadline, though the precise timeframe would be hard to pin down. That's a problem because injunctions can't be any "broader than necessary to remedy the constitutional violation." *Young Isr. of Tampa, Inc. v. Hillsborough Area Reg'l Transit Auth.*, 89 F.4th 1337, 1351 (11th Cir. 2024). "[I]njunctive relief must be tailored to fit the nature and extent of the established violation," especially when it comes to a state's citizen-initiative process. *Gibson v. Firestone*, 741 F.2d 1268, 1273 (11th Cir. 1984). That's because a state, "having created such a procedure, retains the authority to interpret its scope and availability." *Id.* Injunctions intruding on this state-created procedure and authority must remain mindful of "basic notions of constitutional jurisprudence and federalism." *Id.*

The three cases Plaintiffs cite for their novel theory don't support their position.

*Miller v. Thurston* involved an as-applied challenge to two of Arkansas's initiative rules. 967 F.3d 727, 736 (8th Cir. 2020). The argument was that "[i]n light of the COVID-19 pandemic," "enforcing the in-person aspect of these initiative petition rules impermissibly burden[ed] [the plaintiffs'] First Amendment rights to express their views on a political matter." *Id.* The COVID-19 pandemic was the factor considered, not pre-

existing regulations on the initiative process, and the court separately assessed the effect of the two provisions at issue. *Id.* at 737-39. There was no cumulative assessment. *Id.*

*Pierce v. Jacobsen* also remained focused on the two provisions being challenged. 44 F.4th 853, 858-59 (9th Cir. 2022). No other provisions were pulled into the mix as part of some cumulative analysis. One ultimately violated the constitution, per the Ninth Circuit. *Id.* at 860-63. The other didn't. *Id.* at 863-66.

*Swanson v. Worley* is different because it was about a candidate's right to get on the ballot. 490 F.3d 894, 902-05 (11th Cir. 2007). Only two provisions were at issue, not the cumulative burdens imposed by the whole of the election code. *Id.*; *see also Libertarian Party of Ala. v. Merrill*, No. 20-13356, 2021 U.S. App. LEXIS 34383, at *30 (11th Cir. Nov. 19, 2021) ("[h]aving attacked only a single statutory scheme," the plaintiff couldn't "argue now that the cumulative effect of other, unchallenged ballot access regulations renders the voter list law constitutionally infirm").

To the extent *Miller*, *Pierce*, and *Swanson* engaged in an *Anderson-Burdick*-like balancing of the burdens on the right to vote and the justifications for those burdens, such a balancing isn't appropriate in the citizen-initiative context. *See infra.*

*Finally*, Plaintiffs' talk-collect-deliver approach misreads *Meyer*, *Buckley*, and Plaintiffs' own out-of-circuit cases.

Start with *Meyer*. It concerned a prohibition on the "circulation of an initiative or referendum petition," signed or unsigned. 486 U.S. at 416 n.1 (quoting Colo. Rev. Stat. § 1-40-110 (1980)). As the Supreme Court put it, the regulation prevented paid

55

circulators from having "conversations with voters in an effort to get them to sign the petition[s]." *Id.* at 421 n.4. And, in *that* circumstance, given *that* statute, the Court said that the "circulation of an initiative petition" "involves both the expression of a desire for political change and a discussion of the merits of the proposed change." *Id.* at 421.

*Buckley*, 525 U.S. 182, concerned the same set of statutes from the same state that made no distinctions between the discussion of an issue (the speech that precedes the voter's signature) from the collection of completed petition forms (the conduct that comes after). By contrast, Florida's statutory scheme applies only to the latter.

Plaintiffs' preferred out-of-circuit cases also concern speech, not conduct. Take *We the People PAC v. Bellows*, and Maine's ban on out-of-state resident circulators. 40 F.4th 1 (1st Cir. 2022). The law there defined a "circulator" as someone who "*solicits* signatures for the petition by *presenting the petition to the voter, asking the voter* to sign the petition and personally witnessing the voter affixing the voter's signature to the petition." *Id.* at 4 (emphasis added) (quoting Me. Stat. tit. 21-A, § 903-A). Soliciting someone for a signature, asking them to support a cause, or circulating a blank petition for a coveted signature is speech. It requires "face-to-face, interactive communication" intended to convince another person to rally to a cause. *Id.* at 14. *Meyer* tells us that restricting such speech triggers heightened scrutiny. But placing the *signed* petition in an envelope and mailing it, or otherwise delivering it within a certain timeframe, is conduct.

Other out-of-circuit cases follow a similar pattern. The cases concern statutes that, unlike Florida's scheme, regulate speech. *See, e.g.*, *Yes on Term Limits, Inc. v. Savage*,

56

550 F.3d 1023, 1029 (10th Cir. 2008) (ban on "circulat[ing]" petitions, meaning speech); *Chandler v. City of Arvada*, 292 F.3d 1236, 1239, 1241 (10th Cir. 2002) (same); *Wilmoth v. Sec'y of N.J.*, 731 F. App'x 97, 99-103 (3d Cir. 2018) (same).

More fundamentally, and stripped of its standardless thresholds for political effectiveness, Plaintiffs' commingling of speech with conduct creates a paradigm with no limiting principle. Anything that touches the citizen-initiative process is speech, and such speech, they argue, must get heightened (even strict) scrutiny. Under Plaintiffs' approach, the *Buckley* affidavit would be considered a speech regulation and subject to heightened review, because it's part of the petition-circulation process. Yet the Supreme Court didn't see things like that. 525 U.S. at 198-99. And, under Plaintiffs' approach, *Buckley*'s "arsenal of safeguards"—laws that prevent fraudulently signing petitions— would all implicate speech and would have to withstand the heat of heightened review, because all such laws would touch on the petition-circulation process. *Id.* at 205.

There's a better answer and one the Eleventh Circuit has long recognized: "an explicit distinction" exists between "regulat[ing] the exchange of ideas about political changes sought through the process" and regulating the process itself. *Biddulph*, 89 F.3d at 1498 n.7. Only the former is speech subject to heightened scrutiny. *Id.* The latter is conduct and isn't subject to such scrutiny. And to put a finer point on it, circulators (and people in general) remain free to talk to whomever about whatever. They can even hover over a voter as the voter fills out a petition, and then hand the voter an envelope

57

with a stamp and the supervisor's address for the voter to mail. Tr.277:17-279:2 (Emerson). Speech and conduct can and should be separated here.

### C. The stay panel agrees with Florida's approach of separating speech from conduct.

A panel of the Eleventh Circuit recently agreed with Florida's framework. It read the Supreme Court precedents in much the same way as Florida. *Fla. Decides Healthcare*, 2025 U.S. App. LEXIS 23431, at *13-15. It distinguished the out-of-circuit cases in much the same way as Florida. *Id.* at *15-16. And it recognized that Florida's position remains firmly tethered to *Biddulph. Id.* at *16-18. In sum, there's no speech linked to the collection and delivery of signed petitions. Collection and delivery are pure conduct. In this way, as Plaintiffs' witness Mr. Ardila testified, the front-end speech is entirely separate from the back-end conduct that's regulated here.

Though "skeptical" of its applicability, the stay panel even subjected Florida's restrictions to the expressive conduct test from *O'Brien*, 391 U.S. 367. *Fla. Decides Healthcare*, 2025 U.S. App. LEXIS 23431, at *19. Florida's **Petition Circulator Eligibility** provisions, specifically its citizenship and residency requirements, satisfied this intermediate scrutiny test, per the panel. *Id.* at *20-24.

About the panel's skepticism. It's well-founded. Taking a signed sheet of paper from one place to another has no expressive component. It's not the same as burning an American flag to make a political point, *Texas v. Johnson*, 491 U.S. 397 (1989), burning a cross as part of a sick ritual, *Virginia v. Black*, 538 U.S. 343 (2003), or feeding people

in a park to critique the choices that society makes when spending money on bombs instead of food, *Ft. Lauderdale Food not Bombs v. City of Ft. Lauderdale*, 11 F.4th 1266 (11th Cir. 2021). Florida's rules for "collecting, delivering, or otherwise physically possessing signed petition forms" concern ministerial tasks intended to ensure that all forms get to elections officials so that they can be counted. *Fla. Decides Healthcare*, 2025 U.S. App. LEXIS 23431, at *19 (cleaned up). There's no expression involved in collecting and delivering signed forms to the government. There's no message about marijuana, healthcare, or anything else that's so intertwined with the task that it takes on an expressive component.

### D. HB 1205 satisfies intermediate scrutiny even if it applies.

Still, if the expressive conduct test and intermediate scrutiny apply, HB 1205's provisions pass constitutional muster. That's because "Florida undoubtedly has a sufficiently important, and even (as recognized by [this Court]) a 'compelling,' interest in combatting fraud in the petition-initiative process" and in maintaining the integrity of the citizen-initiative process; those are aims directed at noncommunicative conduct rather than any message. *Fla. Decides Healthcare*, 2025 U.S. App. LEXIS 23431, at *21; *see also Doe v. Reed*, 561 U.S. 186, 199 (2010). Information about fraud and electoral integrity was also before the legislature. The legislature included findings concerning

59

the same in HB 1205. *Supra.* Looking behind those findings in search of some "alleged illicit legislative motive" isn't appropriate. *O'Brien*, 391 U.S. at 383.

"And H.B. 1205's chosen means" to address the identified problems "are substantially related to the important interest of preserving the integrity of the electoral process." *Fla. Decides Healthcare*, 2025 U.S. App. LEXIS 23431, at *21 (cleaned up). This substantial-relation standard requires the fit between the regulation and its objective to be "reasonable," not perfect, and certainly not "the single best." *Bd. of Trs. v. Fox*, 492 U.S. 469, 480 (1989). An "incidental restriction on alleged First Amendment freedoms" is okay so long as the restriction is "no greater than is essential to the furtherance of [the state's] interest." *O'Brien*, 391 U.S. at 377. The mere availability of an alternative "that might be less burdensome on speech" doesn't defeat the state's chosen regulation. *United States v. Albertini*, 472 U.S. 675, 689 (1985). The issue instead turns on whether the state's aims "would be achieved less effectively" without the regulations. *Id.*

Consider the **Petition Circulator Eligibility** provisions judged against the substantial-relation standard. The legislature identified in HB 1205 how circulators with fewer links to the state make it harder for the state to investigate fraud. *Supra.* The Eleventh Circuit already concluded that Florida's interest in investigating these issues would be achieved less effectively without the regulations that require circulators to be Florida residents and U.S. citizens. *Fla. Decides Healthcare*, 2025 U.S. App. LEXIS 23431, at *21-24. Mr. Bridges and State Attorney Gladson testified about the difficulties of out-of-state investigations. *Supra.* Witnesses and information are just harder to get to. *Supra*;

60

*see also* Tr.451:6-452:3 (Orjuela Prieto) (explaining that he's been back to Colombia approximately eight times in the four or so years since moving to the United States).

Florida's interests would also be less effectively achieved without the requirement that volunteers who collect more than twenty-five petitions register as circulators. This requirement allows the state to better identify a potential source of problems, especially for large batches of petitions, as Director Pratt and Mr. Bridges testified. *Supra.* Sponsors can seldom help identify bad actors who might be volunteering because the sponsors generally don't keep lists of their own volunteers. Tr.94:24-95:1 (Acosta); Tr.1053:23-1054:4 (C. Cox). Nor do sponsors control their volunteers. Tr.94:10-11 (Acosta); Tr.697:4-11 (Martin).

Keeping signed petitions away from felons—people already convicted of serious crimes—similarly furthers the state's interests in preventing fraud and improving public perception of the initiative process. This requirement should have a minimal effect on circulation companies. Both Ms. Cox and Mr. Walsh testified that they run background checks on their circulators and generally don't hire people with felony convictions. *Supra.* Regardless, over the course of the trial, no witness for Plaintiffs specifically identified a felon working as a petition circulator.

Yet, during this case, it's been argued that the First Amendment impact of the **Petition Circulator Eligibility** provisions is too great because they impose a prior restraint on speech. That's just wrong. An injunction that prevents an individual from speaking is a prior restraint. *Near v. Minnesota*, 283 U.S. 697, 721 (1931). A public

activities ordinance that requires a permit and fee payment—the amount of which has no criteria and is up to the administrator—is a prior restraint. *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130, 132-33 (1992). HB 1205's provisions that let people talk and text and Tweet are decidedly *not* prior restraints just because they keep certain individuals from collecting and delivering signed petitions under certain circumstances. Any First Amendment effect, if there is one, is only incidental.

The **Circulator Affidavit** also satisfies the substantial-relation standard. Again, as Director Pratt and Mr. Bridges explained, the information on the affidavit helps them in their investigative work regardless of whether a circulator is paid or a volunteer. *Supra.* Without these names and addresses, their investigations are hampered and the legislature's goals frustrated. *Supra.* And volunteers collecting petitions in bulk must now provide their names and addresses on an affidavit included with the petition. *Supra.*

The First Amendment effects of this affidavit are incidental at best. The Supreme Court spoke favorably about such affidavits in *Buckley* when approving Colorado's requirement. 525 U.S. at 188-89, 197-200. Colorado required "that circulators attach to each petition section an affidavit containing, *inter alia*, the circulator's name and address and a statement that he or she has read and understands the laws governing the circulation of petitions." *Id.* at 188-89 (cleaned up). According to the Supreme Court, the affidavit furthered the state interest in "reaching law violators" and "identify[ing]" and "apprehend[ing]" "petition circulators who engage in misconduct." *Id.* at 196, 198. It also "has" "immediacy" and "corresponding reliability," given that the "attestation is

made at the time a petition section is submitted." *Id.* at 196. "While the affidavit reveals the name of the petition circulator and is a public record," the Court acknowledged, "it is tuned to the speaker's interest as well as the State's. Unlike a name badge worn at the time a circulator is soliciting signatures, the affidavit is separated from the moment the circulator speaks." *Id.* at 198. "The affidavit, in contrast, does not expose the circulator to the risk of 'heat of the moment' harassment." *Id.* at 199.

To be sure, the circulator affidavit isn't like a badge worn while circulating. There's a funneling mechanism that shields the circulator from the heat of the moment and makes Plaintiffs' fears about the affidavit unfounded. Circulators choose where to collect petitions, whether a "Pride festival" or "mass protest events" like "No Kings." Tr.435:24-436:13 (Pereira Bonilla). From there, as Mr. Ardila explained, the first step is building a rapport with the voter. *Supra.* Forms with the circulator's name and address aren't handed out to people who seem threatening or nonreceptive. Tr.1010:5-12 (Perez) ("if they are hostile to me or not receptive, I'm not going to waste my time" and "there's no point in giving them a petition").

One of the factual disputes in this case centers on the reasonableness of Plaintiffs' fears about the circulator affidavit. Separate and apart from the funneling mechanism that helps shield circulators, some of the testimony on this issue came from two individuals who've readily shared their information on public speaker cards, available through the legislature's website. DX 255; DX 256; PI Tr.110:19-21 (Scoon). These cards have the bill being discussed listed on the top right. They include the

63

speaker's name, address, telephone number, and e-mail address. They say that they are public records. One of these individuals has her home address available through the Florida Bar. Tr.1711:20-1712:7 (Chandler). A separate witness said she feared giving out her address but that it's available on the internet because she's a realtor. Tr.1595:20-1596:21 (Lowe-Minor). Another said that she feared attaching her name to a controversial issue but then wrote two op-eds in the Orlando Sentinel about the issue under her name. Tr.786:5-17 (Haller).

And if the circulators—most of whom testified about their passion for the initiatives—signed petitions themselves, then their name, address, and affiliation with the issue are all public records that can be disclosed to anyone making a request. Tr.2018:21-2022:8 (Matthews).

Under the circumstances, "there is no reason to assume that any burdens imposed by disclosure of typical referendum petitions," or the circulator affidavits that have some of the same information, "would be remotely like the burdens [P]laintiffs fear in this case." *Doe*, 561 U.S. at 201. Nor should these feared burdens stand in the way of Florida safeguarding its citizen-initiative process "[e]ven when a referendum involves a particularly controversial subject." *Id.* at 214-15.

For the remaining provisions being challenged in this case, it's difficult to see how there's any expressive conduct involved. For example, return **Deadlines** and **Fines** for fraudulently filling out petitions don't involve the exchange of any political ideas or expressions. Nor is political speech or expression implicated under the

**Criminal** provisions when someone fraudulently signs a petition, steals a driver's license number or social security number, or engages in other misconduct. The same is true for the **Verification** provisions. The **Financial Impact Statement** concerns government speech on a government form—the election ballot. As does the **Misdemeanor Notice** on petition forms. And so, this Court has understandably found that only rational basis review applies to such provisions. Doc.189 at 22 (order on first preliminary injunction finding that "the challenged deadline and fine provisions are subject only to rational basis review").

### E. HB 1205 satisfies exacting scrutiny, as well.

HB 1205's provisions satisfy *Meyer*'s "exacting scrutiny," even if it applies to some of those provisions. 486 U.S. at 420. Exacting scrutiny isn't the same as strict scrutiny. Since *Meyer*, the Supreme Court has moved that test closer to the intermediate scrutiny test in that exacting scrutiny requires a "substantial relation between the" at-issue law "and a sufficiently important governmental interest." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021). And, as discussed in the intermediate scrutiny section above, the substantial-relation test is met for HB 1205's provisions that potentially fall within its ambit. *Supra*.

Still, even if exacting scrutiny is like strict scrutiny, HB 1205's provisions pass. As noted above, HB 1205's provisions serve compelling governmental interests—interests expressly mentioned in HB 1205's findings of fact. *Supra*. The Supreme Court has also said that preventing election fraud, and ensuring the integrity of the ballot, are

65

compelling governmental interests. *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006); *Brnovich v. DNC*, 594 U.S. 647, 685 (2021). So is "maintaining fairness, honesty, and order" in the election process. *Green v. Mortham*, 155 F.3d 1332, 1335 (11th Cir. 1998).

The question then becomes one about the weight of the evidence presented to the legislature, and the fit between the observed problem and the legislature's solution. One difference between an intermediate scrutiny analysis and an exacting scrutiny analysis would be the deference to the legislature as to the reliability of the OECS reports. Here, too, when it comes to fraud in the electoral process, even for strict scrutiny, the standards are different than those that ordinarily apply.

In various election-related contexts, the Supreme Court has held that (1) fraud prevention is neither an actuarial exercise nor a comparative dissertation and (2) the state can enforce its anti-fraud laws before further fraud-related harm is even committed. *See, e.g.*, *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 194-96 (2008) ("[t]he record contains no evidence of any such fraud actually occurring in Indiana at any time in its history," but "[w]hile the most effective method of preventing election fraud may well be debatable, the propriety of doing so is perfectly clear"); *Munro v. Socialist Workers Party*, 479 U.S. 189, 195 (1986) (the state "should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively"); *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 925 (11th Cir. 2023) ("Even if there were no evidence of voter fraud in Florida, our precedents would not require it before a bill like S.B. 90 could be adopted.").

66

The Supreme Court has also said "proof by documentary record" isn't needed where the nature of the "genuine and compelling" interest is rooted in the "concept of public confidence" and "integrity." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 447 (2015). That's because the concepts of "confidence" and "integrity" don't lend themselves to documentary proof. *Id.* And if these concepts don't lend themselves to documentary proof, then it follows that measures taken to improve confidence and integrity can't be judged using the traditional least-restrictive-means test. *See id.* How do you find the least restrictive means to achieve the immeasurable but compelling interests in improved confidence and integrity? You don't. In *Williams-Yulee*, the Court was satisfied that the regulation "advance[d] the State's compelling interest through the least restrictive means," because the state could have regulated more speech but didn't. *Id.* at 452.

Here, Florida could have done as Colorado did in *Meyer* and *Buckley*—attempt to regulate who can walk up to a voter and *talk* rather than just regulate who can *collect* signed petitions and *how* those signed petitions must be delivered. *Supra.* In this way, Florida, like the bar in *Williams-Yulee*, satisfies the least-restrictive-means test for strict scrutiny to the extent it might apply to some of HB 1205's provisions. Florida could have been more restrictive but wasn't.

### F. This Court should follow the stay panel's decision.

To avoid the problems inherent in Plaintiffs' preferred reading of *Meyers*, *Buckley*, and *Biddulph*, and the application of heightened scrutiny in these circumstances, this Court should follow the Eleventh Circuit stay panel's more sound approach and

separate the speech from the conduct. Whether the stay panel's approach is binding on the legal issues is up for debate. At the very least, that approach is highly persuasive. *See Fair Fight Action, Inc. v. Raffensperger*, 634 F. Supp. 3d 1128, 1228 n.80 (N.D. Ga. 2022).

In *Jacobson v. Florida Secretary of State*, for example, the Eleventh Circuit specifically sidestepped the question of whether an earlier stay panel's decision was binding on a legal issue under the prior-panel rule. 974 F.3d 1236, 1256 (11th Cir. 2020) (discussing *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318 (11th Cir. 2019)). Still, other panels of the Eleventh Circuit later treated that very same stay panel decision as dispositive of at least one issue of constitutional significance. *See, e.g.*, *Polelle v. Fla. Sec'y of State*, 131 F.4th 1201, 1230-31 & n.20 (11th Cir. 2025) (using *Lee* to explain that the *Anderson-Burdick* test doesn't require plaintiffs to plead and prove discriminatory intent); *Jones v. Governor of Fla.*, 15 F.4th 1062, 1065-66 (11th Cir. 2021) (same).

Granted, the question of whether a merits panel of the Eleventh Circuit must follow the legal conclusions of an earlier stay panel is a different question than whether a district court must follow the legal conclusions of a stay panel. As a practical matter, however, the legal framework provided by two active judges on the Eleventh Circuit, interpreting an earlier Eleventh Circuit case, should be followed. HB 1205's provisions should be judged against that framework. And when it comes to Plaintiffs' primary argument in the case—the one rooted in the First Amendment analysis from *Meyers*, *Buckley*, and *Biddulph*—this Court should rule for Defendants. *See Jones v. DeSantis*, 462 F. Supp. 3d 1196, 1208 (N.D. Fla. 2020) (referring to preliminary injunction opinion

68

and explaining that "the Eleventh Circuit's analysis is more important than anything included in this order") (reversed on other grounds).

*    *    *

A few words here about the facts. The parties may emphasize different facts but there's no real dispute about the *material* facts: fraud happens in the citizen-initiative process; it undermines public confidence in the process; and those pushing initiatives wish for the process to be simpler and more expedient, and any penalties associated with violating the law to be laxer.

To be sure, there remain disagreements about normative statements and the application of the law to the facts. Examples include Plaintiffs' claim that "perfecting" forms—a euphemistic term for changing or filling in information on a signed form that belongs to another—is a good thing. Tr.719:17-720:1 (Martin); RTCW 75 (petition form requiring attestation from voters). Defendants disagree. Plaintiffs say that the burdens imposed by the state are too severe when assessed collectively. Defendants say that it's impossible to judge which burdens (in combination or in themselves) are too severe without a baseline and a threshold for severeness. And, after all, Ana-Christina Acosta, the organizing director for Florida Decides Healthcare, even approved a communication to volunteers that said that HB 1205's "new procedures are not onerous." DX 121; Tr.103:14-105:4 (Acosta).

69

The fear-related discussion above is also representative of the kinds of disputes here. Plaintiffs will emphasize certain facts to argue that their witnesses' fears are reasonable. Defendants will emphasize others to show that they're not.

In the end, though, this case turns on the law and the application of the law to the material facts. Disputes about *im*material facts shouldn't matter. And arguments about whether the facts represent something good or bad, reasonable or unreasonable, constitutional or unconstitutional, concern the application of law to the facts.

## II.    There's no standalone claim for freedom of association under the First Amendment.

Moving on, Plaintiffs' First Amendment association claims don't add anything to the mix. They're virtually indistinguishable from their First Amendment political speech claims. Both claims involve allegations of circulators interacting with voters and circulators interacting with the named plaintiffs. Plaintiffs' associational concerns can therefore be advanced in their political speech claims. *See, e.g.*, *Citizens for Police Accountability Pol. Comm. v. Browning*, 572 F.3d 1213, 1217 n.6 (11th Cir. 2009) ("Plaintiffs contend that the Florida statute also infringes some on their First Amendment right to engage in political association. But even if true, the additional infringement has no material affect on the analysis otherwise applicable here; so we discuss it no further.").

To the extent Plaintiffs assert that *Anderson-Burdick* balancing applies to the standalone free association claims, the Eleventh Circuit already rejected that approach in citizen-initiative cases. *Biddulph*, 89 F.3d at 1500 n.10. The Eleventh Circuit has also

70

said that citizen-initiative cases are different from those concerning "the lynchpins of our democratic form of government: the rights of candidates to offer themselves for public office and the rights of voters to vote for or against those candidates." *Gibson*, 741 F.2d at 1273. *Anderson-Burdick* usually applies only to these cases concerning the lynchpins of the democratic form of government, not to citizen-initiative cases hoping to exercise state-created rights. And "the Constitution contains no universal 'cost-benefit balancing' provision." *Lichtenstein v. Hargett*, 83 F.4th 575, 593 (6th Cir. 2023).

It's also unclear with whom Plaintiffs wish to associate. If it's others who share their views on the soundness of a particular initiative, then all avenues remain open for Plaintiffs to talk about the initiative. If it's voters, then there's no First Amendment right to associate with voters through the ballot. That's because there's no First Amendment right to change a state's constitution through the initiative process. *See, e.g.*, *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1099 (10th Cir. 2006) (en banc) ("Although the First Amendment protects political speech incident to an initiative campaign, it does not protect the right to make law, by initiative or otherwise.").

## III.    The content-based claims don't work.

Smart & Safe makes content-based regulation claims against Florida Statutes §§ 99.097(4)(a), 100.371(14)(e), and 100.371(14)(f) and Laws of Florida Chapter 2025-21 § 7(3). These are all **Verification** provisions. The problem is that these provisions aren't content-based regulations. A content-based regulation of speech turns on the

71

"topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). It "draws distinctions based on the message a speaker conveys." *Id.*

The challenged provisions make no content-based distinctions. Verification costs don't turn on ideas or messages. Say that a group wants to enshrine a right to smoke. That group's content—its message about smoking—doesn't dictate the verification costs. Instead, if the group goes through a local referendum, it's subject to one cost formula, and if it goes through the citizen-initiative process for the state constitution, it's subject to another cost formula. The distinction thus turns on something other than content.

And rational reasons support the distinctions the law makes between citizen initiatives and candidate petitions and local referenda. The OECS reports detail concerns about the citizen-initiative process. *Supra.* HB 1205 also requires supervisors to engage in more anti-fraud measures for citizen initiatives, such as notifying voters through the mail that petitions were signed in their name. *See* Fla. Stat. § 100.371(14)(e). These additional steps, among other things, explain the difference in cost. The law being challenged thus includes the more-than-rational reasons for the distinctions.

Even if it didn't, Supervisor Earley testified at length about the differences between the kinds of petitions. Among other things, he said that initiative petitions require circulators to be registered and for the supervisor to look up the registration, Tr.608:7-15 (Earley), but there are no such requirements for candidate or local issue petitions, Tr.610:1-3 (Earley). Misfiled petitions are an issue for initiative petitions, but

72

"[m]uch less" of one for candidate and local issue petitions. Tr.611:7-21 (Earley). There's a voter notification requirement complete with a prepaid form for the voter to return for one, but not the others. Tr.618:15-19 (Earley). The list goes on.

### IV.   The compelled speech claims don't work; it's government speech.

Smart & Safe also brings compelled speech claims against Florida Statutes §§ 100.371(3)(a)7, 100.371(16)(d), and 100.371(16)(e). All these provisions concern the **Financial Impact Statement**.

True, "the First Amendment stringently limits a State's authority to compel a private party to express a view with which the private party disagrees." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 219 (2015). But right now, Smart & Safe doesn't have any views with which to agree or disagree—it doesn't have any active initiative required to have a financial impact statement. And Smart & Safe doesn't know what statement the Financial Impact Estimating Conference would draft for an initiative. A ballot initiative could receive the following statement from the conference:

> THIS PROPOSED CONSTITUTIONAL AMENDMENT IS ESTIMATED TO HAVE A NET POSITIVE IMPACT ON THE STATE BUDGET. THIS IMPACT MAY RESULT IN GENERATING ADDITIONAL REVENUE OR AN INCREASE IN GOVERNMENT SERVICES.

Fla. Stat. § 101.161(1)(c). It could also receive no statement:

> THE FINANCIAL IMPACT OF THIS AMENDMENT, IF ANY, HAS NOT BEEN DETERMINED AT THIS TIME.

Fla. Stat. § 101.161(1)(e). At this time, it's too speculative to say.

73

More to the point, the **Financial Impact Statement** provisions don't compel speech—the petition form itself is government speech. Sure, some parts of the petition form involve petition sponsors' text. But the government nonetheless controls how the forms are formatted and what information is required to be on them. *See* Fla. Stat. § 100.371(3) (providing this information); *see also Walker*, 576 U.S. at 219-20 (concluding that "Texas's specialty license plate designs constitute government speech").

It's noteworthy that Smart & Safe doesn't challenge the fact that Florida can—and does—put a lot of information and statements on petition forms. The forms include the following statements: that "the form becomes a public record upon receipt by the supervisor," that "it is a misdemeanor of the first degree to knowingly sign the petition more than once," and that "the form will not be validated if all of the requested information is not completed." Fla. Stat. § 100.371(3)(a). A statement about the financial impact of a citizen initiative is another permissible piece of information that the state can put on the petition form.

As such, the compelled speech claims fail as a matter of law.

### V.    The procedural and substantive due process claims fail.

RTCW Plaintiffs make a procedural due process claim against Florida Statutes § 100.371(14)(h) (**Petition Circulator Eligibility** provision) and substantive due process claims against Florida Statutes §§ 100.371(4)(g) and 100.371(14)(h) (**Petition**

74

**Circulator Eligibility** provisions), 100.371(8) and 100.371(10) (**Fines** provisions), and 100.371(7)(a) (**Ten-Day Return Deadline**).

**A.** Starting with the procedural due process claim, the challenged provision states that "[a] signed petition form submitted by an ineligible or unregistered petition circulator must be invalidated and may not be counted toward the number of necessary signatures for placement on the ballot." Fla. Stat. § 100.371(14)(h).

RTCW Plaintiffs say there's a procedural due process violation because the provision "provides no notice or opportunity to be heard to a voter when their valid petition has been invalidated because the petition circulator who submitted the form was ineligible or unregistered, nor does it provide the voter with any opportunity to cure their petition by, for example, submitting a new petition not affected by the impermissible circulator." Doc.418 at ¶ 223. Not so.

Procedural due process only kicks in when there's a property or liberty interest at issue. The first problem for Plaintiffs is that they haven't clearly alleged whether the purported "state right to the petition initiative process" is a property interest or a liberty interest. Doc.418 at ¶ 220; *see also* Doc.418 at ¶¶ 160 (saying it's a liberty interest), 217 (saying it's both). Either way, the claim fails.

There's certainly no property interest in the petitioning process. Property interests can be created by state law, and a plaintiff must have "a legitimate claim of entitlement to it"—not just "an abstract need or desire" or "a unilateral expectation." *Morley's Auto Body v. Hunter*, 70 F.3d 1209, 1213 (11th Cir. 1995). And, at bottom,

75

petitions aren't property, and Plaintiffs have no entitlement to have their citizen initiative placed on the ballot.

There's also no liberty interest in the petitioning process. Plaintiffs misquote *Board of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972), for the proposition that a "liberty interest to which procedural due process rights attach may 'stem from an independent source such as state law.'" Doc.418 at ¶ 219. *Roth* says that's the case for *property* interests. The full quote is: "Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." 408 U.S. at 577.

*Liberty* interests, says *Roth*, are "guaranteed by the Fourteenth Amendment." *Id.* at 572 (cleaned up). And there's no Fourteenth Amendment right to the citizen-initiative process. Plaintiffs can't cite a case that says otherwise.

Because there's no property or liberty interest at issue, there's no purported procedural due process problem. This claim fails as a matter of law.

**B.** Turning to the substantive due process claims, to properly assert such a claim a plaintiff must identify a "right at issue" that's "deeply rooted in our history and tradition and essential to our Nation's scheme of ordered liberty." *Eknes-Tucker v. Governor, State of Ala.*, 80 F.4th 1205, 1220 (11th Cir. 2023) (cleaned up). This requires a "historical inquiry" and facts "specifically tied to the particular alleged right at issue."

76

*Id.* at 1221. Not only that, but the alleged right must be specific. A general right against punishment won't do. *See Morrissey v. United States*, 871 F.3d 1260, 1269 (11th Cir. 2017) (the right at issue was "whether a man has a fundamental right to procreate via an IVF process that necessarily entails the participation of an unrelated third-party egg donor and a gestational surrogate"—and not a general right to "procreation").

Plaintiffs have done none of what's required for a substantive due process claim—not for the **Petition Circulator Eligibility** provisions, not for the **Fines** provisions, not for the **Ten-Day Return Deadline**. Plaintiffs haven't conducted a historical inquiry. They haven't given a clear, specific description of the purported substantive due process right tied to the citizen-initiative process. They also don't cite any case law for this specific proposition.

## VI.    The vagueness and overbreadth challenges fail.

Plaintiffs raise vagueness and overbreadth claims related to the following: **Petition Circulator Eligibility** provisions, **Fines** provisions, **Criminal** provisions, **Financial Impact Statement and Ballot Placement** provisions, **One Amendment** provision, **Circulator Affidavit** provision, **Ten-Day Return Deadline**, and **OECS Investigative** provision. Each challenge fails.

**A.** Laws are vague when they lack a "core meaning"—when they are "utterly devoid of a standard of conduct." *SisterSong Women of Color Reprod. Just. Collective v. Governor of Ga.*, 40 F.4th 1320, 1327 (11th Cir. 2022).

77

Plaintiffs challenge the **Petition Circulator Eligibility** provisions and related **Criminal** provisions that involve circulator registration and the twenty-five petition personal use limit. Taking the issues in turn:

Plaintiffs assert that the petition circulator definition in Florida Statutes § 97.021(28) is vague because the definition "only includes people who 'collect[] signatures,' but the penalty provision applies to any person who 'collect[s], deliver[s], or otherwise physically possess[es]' petitions." Doc.418 at ¶ 87 (alterations in original). Not true. Take a look at the whole definition:

> (28) "Petition circulator" means an entity or individual who collects signatures for the purpose of qualifying a proposed constitutional amendment for ballot placement. The term does not include a person who *collects, delivers, or otherwise physically possesses* no more than 25 signed petition forms in addition to his or her own signed petition form or a signed petition form belonging to the person's spouse, or the parent, child, grandparent, grandchild, or sibling of the person or the person's spouse.

Fla. Stat. § 97.021(28) (emphasis added); *see also* Doc.418 at ¶ 80 (quoting the full definition). The circulator definition includes the same "collects, delivers, or otherwise physically possesses" language as the other provisions.

Plaintiffs also say that the twenty-five petition limit is vague. But this Court has already found that it isn't. As this Court put it, "Defendants' proffered construction is the only reasonable and readily apparent reading of the statute—i.e., that the 25-petition threshold applies per initiative, per election cycle." Doc.283 at 30 (order on motions for preliminary injunction). Supervisor Earley agreed with this Court at trial. Tr.532:6-533:11 (Earley). Here's one way to get to that natural reading:

- The Florida Statutes define a "[p]etition circulator" as someone "who collects signatures" for "*a* proposed constitutional amendment" before excluding those with twenty-five or fewer "signed" petitions. Fla. Stat. § 97.021(28) (emphasis added). Read in context, the definition and it's twenty-five petition exclusion are thus tied to "a" single proposed effort.

- Also, when someone registers as a petition circulator with the state, he indicates which initiative he's collecting petitions for. The registered circulator's information appears on every form specific to each effort for which the circulator registers. *See* Fla. Stat. § 100.371(4)(c)1. This recognizes that each initiative is treated as its own unique effort.

- Voters—including registered or unregistered circulators—can obviously sign a petition for every initiative being circulated, though care must be taken not to bundle together different petitions. *See* Fla. Stat. § 100.371(14)(a).

- And the voter's signature on each initiative petition expires after each election cycle, allowing the same voter to sign a new form for the same initiative during the next election cycle. *See* Fla. Stat. § 100.371(14)(a).

Taken together, this means that a person can register to collect as many petitions as he wants for as many initiatives as he wants. If he's a voter, that person can also sign a petition for every initiative being circulated in an election cycle, even if there are thirty or forty such initiatives in circulation. And if he's planning on collecting twenty-five or fewer petitions, excluding his own, for each of those thirty or forty initiatives during the election cycle, then he doesn't need to register as a circulator. The "25-petition threshold applies per initiative, per election cycle." Doc.283 at 30.

RTCW Plaintiffs also assert that the terms "collect, deliver, or otherwise physically possess" are vague. Doc.418 at ¶ 90. They ask "whether an individual could hand out any number of unsigned petitions" but "only retrieve ('collect') up to 25 from individuals outside of their immediate family." Doc.418 at ¶ 90. But all these terms ("collect," "deliver," and "otherwise physically possess") are tied to "signed petition forms," so it's clear that the twenty-five petition limit doesn't apply to blank forms. *See, e.g.*, Fla. Stat. § 100.371(4)(a).

As for the **Criminal** provisions specifically, it's true that "the Constitution tolerates a lesser degree of vagueness in enactments with criminal rather than civil penalties," but the Eleventh Circuit still "recognize[s] that absolute precision in drafting laws is not demanded." *High Ol' Times v. Busbee*, 673 F.2d 1225, 1229 (11th Cir. 1982). Each **Criminal** provision survives this constitutional standard.

Florida Statutes § 100.371(9), the provision on copying or retaining information, isn't vague. It's clear: it prevents "a person collecting petition forms on behalf of a sponsor of an initiative petition" from copying or retaining sensitive information on a completed petition, like "the voter's Florida driver license number, Florida identification card number, social security number, or signature." Fla. Stat. § 100.371(9).

FDH Plaintiffs rely on the preliminary injunction decision in *Florida State Conference of Branches & Youth Units of the NAACP v. Byrd*, 680 F. Supp. 3d 1291, 1320 (N.D. Fla. 2023), which dealt with Senate Bill 7050's retention provision. Doc.413 at ¶ 142. But that decision was vacated after the final order on the merits. 4:23-cv-215,

80

Doc.345 at 26-27 (N.D. Fla. Aug. 8, 2025). Plus, the 3PVRO provision in *NAACP* isn't the same as the provision here. The initiative-petition provision doesn't contain the "in compliance with this section" clause that this Court found ambiguous in *NAACP*. 680 F. Supp. 3d at 1318. For reference, the 3PVRO provision provides:

> If a person collecting voter registration applications on behalf of a third-party voter registration organization copies a voter's application or retains a voter's personal information… for any reason other than to provide such application or information to the third-party voter registration organization *in compliance with this section*, the person commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

Fla. Stat. § 97.0575(7) (emphasis added).

Plaintiffs contend that it's unclear what collecting petition forms "on behalf of a sponsor" means. Doc.431 at ¶ 149. But the meaning is obvious. "On behalf of a sponsor" means for the sponsor. After all, when someone registers to circulate petitions with the state, he indicates which citizen initiative he's collecting petitions for. *See* Fla. Stat. § 100.371(4)(c)1 (registration applications must include "[t]he information required to be on the petition form under s. 101.161, including the ballot summary and title as received by the Secretary of State").

Plaintiffs contend that they don't know what "copies or retains a voter's personal information, such as the voter's Florida driver license number, Florida identification card number, social security number, or signature" means. Doc.431 at ¶¶ 67, 149. Again, the meaning is obvious. "Copies" and "retains" means duplicating or keeping. And "voter's personal information" means the "voter's Florida driver license number,

81

Florida identification card number, social security number, or signature." That's the same information that a voter must put on the new petition forms, Fla. Stat. § 100.371(3)(c), *but* it's also the information that's *not* a public record, Fla. Stat. §§ 97.0585(2) (signature), 119.071(5)(a) (social security number), 97.0585(1)(c) (driver's license, Florida ID, and social security number), 119.0712(2) (motor vehicle record). If the statute governing what's required on petition forms changes *and* Florida's public records laws also change, then other non-public information would become like the list provided in HB 1205. Until then, the list provided in HB 1205 is the sum total of information that can't be retained.

Plaintiffs also say that they don't know what "fill[ing] in missing information" on a signed petition means. Doc.431 at ¶ 149. This isn't a strong argument. Again, when a voter signs a petition, he must include on the form a first name, last name, middle name, address, city, zip code, county, and then a signature, among other information. If a voter doesn't fill in these sections, it would be "missing information." And it makes it harder for an unscrupulous circulator to find people on the internet or the voter roll and fraudulently complete petitions using their information.

As for Florida Statutes § 895.02(8)(d)—the racketeering definition—the Secretary takes the same position as he did in his response to the first preliminary injunction motion. Doc.105 at 25-27. He emphasizes that, to the extent Plaintiffs raise concerns about the bounds of the racketeering definition, and its use of the word "irregularities," the word is tied to "violation[s] of the Florida Election Code." In this

82

way, only an irregularity that's also a violation of the election code triggers a racketeering claim. For example, a missed deadline that's excused because of force majeure would neither be a violation of the election code nor a predicate for a racketeering claim. Fla. Stat. § 100.371(7)(b) ("A showing by the sponsor that the failure to deliver the petition form within the required timeframe is based upon force majeure or impossibility of performance is an affirmative defense to a violation of this subsection.").

League Plaintiffs are the only ones to bring a vagueness claim against the **Circulator Affidavit** provision and **Ten-Day Return Deadline**. Doc.431 at ¶ 150. It's unclear what the problem is because they include no vagueness-related allegations against these provisions. The provisions themselves are clear. And they make sense— rational bases support the **Circulator Affidavit**, *see supra*, and the **Ten-Day Return Deadline**, *see, e.g.*, Tr.1824:18-1825:13 (Molina) (Miami-Dade County Supervisor's assistant deputy explaining why "the 10 days versus the 30 days" for returning petitions is a "good idea" beyond giving supervisors more time with petitions to identify potential problems and giving circulators less time with sensitive data).

League Plaintiffs are also the only ones to bring a vagueness claim against the **OECS Investigative** provision, saying that they don't know what "percentage of petition forms deemed invalid by the supervisor" means. Doc.431 at ¶ 149. The relevant portion of that provision states that:

> For any reporting period in which the percentage of petition forms deemed invalid by the supervisor exceeds a total of 25 percent of the

83

> petition forms received by the supervisor for that reporting period, the supervisor shall notify the Office of Election Crimes and Security.

Fla. Stat. § 100.371(14)(g). The provision is clear on its face. If the supervisor "receive[s]" one hundred "petition forms" during a reporting period, and if he "invalid[ates]" thirty, the supervisor must notify OECS. That's because a thirty percent invalidity rate exceeds HB 1205's twenty-five percent rate.

**B.** For an overbreadth claim, a plaintiff must establish that a law "prohibits a substantial amount of protected speech relative to its plainly legitimate sweep." *United States v. Hansen*, 599 U.S. 762, 770 (2023) (cleaned up). In other words, the plaintiff must present a "lopsided ratio"—identifying unconstitutional applications of the law compared to constitutional applications. *Id.* That's why overbreadth must be used "sparingly and only as a last resort." *Dream Defenders v. Governor of Fla.*, 119 F.4th 872, 880 (11th Cir. 2024) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973)).

The overbreadth claims aren't a good doctrinal fit. The challenged provisions regulate conduct, not speech. *See Fla. Decides Healthcare*, 2025 U.S. App. LEXIS 23431, at *19 (so stating for the non-citizen and non-resident provisions). It's extremely doubtful that the provisions regulate even "expressive conduct." *See id.*

Regardless, Plaintiffs haven't presented a lopsided ratio, showing constitutional applications of the provisions being outweighed by unconstitutional applications. That's insufficient to state an overbreadth claim. *See, e.g.*, *Yellowhammer Fund v. Marshall*, 733 F. Supp. 3d 1167, 1198 (M.D. Ala. 2024) (dismissing an overbreadth claim, noting that the

84

complaint didn't allege any constitutional applications of the challenged law); *Ala. State Conf. of the NAACP v. Marshall*, 746 F. Supp. 3d 1203, 1242 (N.D. Ala. 2024) ("SB 1 regulates *conduct*. It does not regulate any speech associated with the prohibited conduct" and "Plaintiffs have not plausibly alleged that SB 1 penalizes a substantial amount of speech that is constitutionally protected").

In fact, the ratio is lopsided against Plaintiffs. It's plainly legitimate for the state to prevent fraud generally, fraudulent signings of petitions specifically, and voter information misappropriation. *See Buckley*, 525 U.S. at 205. On the other side, Plaintiffs fail to identify protected speech in which the challenged provisions prevent them from participating. *See, e.g.*, *League of Women Voters of Fla.*, 66 F.4th at 948. To put a finer point on it, errors in circulation, untimely delivery of petitions, or misappropriating voter information isn't speech, much less protected speech. The absolute safe harbor for anyone collecting twenty-five petitions also factors into the mix and makes overbreadth's "strong medicine" especially inappropriate. *United States v. Williams*, 553 U.S. 285, 293 (2008).

## VII.    The equal protection challenges fail.

Finally, Plaintiffs bring equal protection claims against several provisions. The equal protection claims can be broken into challenges against **Petition Circulator Eligibility** provisions concerning non-citizens, **Verification** provisions, and the **Ten-Day Return Deadline**.

85

The challenges to the **Petition Circulator Eligibility** provisions for non-citizens, specifically for the legal permanent residents who testified, fall under the equal protection clause's political function exception. That exception "applies to laws that exclude aliens from positions intimately related to the process of democratic self-government." *Bernal v. Fainter*, 467 U.S. 216, 220 (1984). As the Supreme Court put it, the "rationale behind the political-function exception is that within broad boundaries a State may establish its own form of government and limit the right to govern to those who are full-fledged members of the political community." *Id.* at 221.

As Plaintiffs themselves repeatedly emphasize, "[b]allot initiatives are the quintessential form of direct democracy." *OPAWL v. Yost*, 118 F.4th 770, 778 (6th Cir. 2024). Or, to use Plaintiffs' words, "direct democracy has played a vital role in Florida's political landscape" and "direct democracy has served as a crucial tool by which Floridians have constitutionalized some of their most treasured rights." Doc.431 at ¶ 1. In other words, petition circulators are "nonelective" "positions" that "participate directly in the formulation, execution," and "review" of "public policy." *Sugarman v. Dougall*, 413 U.S. 634, 647 (1973). Thus, "excluding non-citizens from certain activities can advance a compelling interest when those activities form part of the process of democratic self-government." *OPAWL*, 118 F.4th at 777-78 (cleaned up); *see also Bluman v. FEC*, 800 F. Supp. 2d 281, 287 (D.D.C. 2011) (Kavanaugh, J.) (upholding restrictions on foreign nationals contributing to political campaigns).

86

The non-citizen regulation also makes sense. True, non-citizens who work for the government may collect and handle sensitive voter information. But those workers undergo background checks. *See, e.g.*, Fla. Stat. §§ 435.01, *et seq.*, 448.09. There are no such checks for volunteers working on petition efforts, at the very least.

Plaintiffs argue that the **Verification** provisions and **Ten-Day Return Deadline** violate the equal protection clause because they create disparate treatment between petition sponsors, on one hand, and candidates seeking to appear on the ballot by petition and sponsors of local referenda, on the other hand.

Plaintiffs' claims don't work. If a law "neither burdens a fundamental right nor targets a suspect class," it "will" be "uph[e]ld" "so long as it bears a rational relation to some legitimate end." *United States v. Skrmetti*, 605 U.S. 495, 510 (2025). Here, the provisions should be upheld.

There's no burden on fundamental rights. In this case, Plaintiffs have no fundamental right to low-cost verification or the maximum time window to submit petitions. *See Biddulph*, 89 F.3d at 1500-01 (explaining that "the Constitution does not require Florida to structure its initiative process in the most efficient, user-friendly way possible"); *see also* Doc.189 at 22 (order on first preliminary injunction finding that "the challenged deadline and fine provisions are subject only to rational basis review"). Nor is "state petition sponsor" a suspect class, like race. And, as outlined in the discussion of the content-based challenges above, rational reasons support the distinctions between constitutional initiatives and candidate petitions and local referenda.

87

## VIII.  Scope of relief, standing, and mootness issues for Plaintiffs.

**A.** Scope of relief, standing, and mootness issues all linger for the many provisions being challenged by the four Plaintiff groups. That's especially so because Plaintiffs seem to raise facial and as-applied challenges to several of the provisions and attempt to seek statewide relief. To level set, the following points provide the backdrop.

*United States v. Salerno* provides the test for most facial challenges. It requires the challenger to establish that there is "no set of circumstances" under which the challenged law would be valid. 481 U.S. 739, 745 (1987). This is a demanding test.

*Trump v. CASA, Inc.* says that federal courts may not issue universal injunctions, those that block the application of a law to everyone and not just the plaintiffs properly before the court. 606 U.S. 831, 856 (2025). So, even if a law is facially unconstitutional, the corresponding injunction should apply only to the plaintiffs before the court. *Id.*

Standing is an irreducible constitutional minimum. It's Plaintiffs' burden to establish it though this Court has an independent obligation to determine its subject-matter jurisdiction under the case-or-controversy requirement. *Bischoff v. Osceola County*, 222 F.3d 874, 877-78 (11th Cir. 2000) (citing *United States v. Hays*, 515 U.S. 737, 742 (1995)). Plaintiffs' burden increases at each stage of the litigation as they work to establish (1) an injury-in-fact (2) that is traceable to Defendants and (3) that can likely be redressed by a favorable ruling. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).

In most cases, an organization can have standing to sue under two theories. First, an organization can have standing to sue in its own right to challenge conduct that

88

impedes its ability to attract members, raise revenue, or fulfill its purposes. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). Second, an organization can sue on behalf of its members "when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Greater Birmingham Ministries v. Sec'y of State of Ala.*, 992 F.3d 1299, 1316 (11th Cir. 2021) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

Only one Plaintiff needs to establish standing for each claim for this Court to have jurisdiction. *FAIR*, 547 U.S. at 52 n.2. But the injunctive relief shouldn't flow to Plaintiffs not properly before this Court—it shouldn't flow to those who've failed to establish an injury that an injunction is needed to remedy. *CASA*, 606 U.S. at 856.

Mootness also "derives directly from the case-or-controversy limitation because an action that is moot cannot be characterized as an active case or controversy." *Troiano v. Supervisor of Elections*, 382 F.3d 1276, 1282 (11th Cir. 2004). "If events that occur subsequent to the filing of a lawsuit or an appeal deprive the court of the ability to give the plaintiff or appellant meaningful relief, then the case is moot and must be dismissed." *Id.* There's a capable-of-repetition-yet-evading-review exception to mootness, but it requires a "reasonable expectation" that the same plaintiff will fall within the ambit of the same challenged regulations; that's "more than a theoretical

89

possibility" of repetition. *Hall v. Sec'y, State of Ala.*, 902 F.3d 1294, 1298 (11th Cir. 2018); *see also FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 463 (2007).

**B.** Working backwards, mootness remains a real problem for the three citizen-initiative sponsors who are parties to this case: FDH, RTCW, and Smart & Safe. There isn't a reasonable expectation that they'll fall within the ambit of the provisions being challenged. Ultimately, however, getting over the case-or-controversy hurdles is their burden. *See, e.g.*, *Miccosukee Tribe of Indians of Fla. v. Fla. State Athletic Comm'n*, 226 F.3d 1226, 1229-30 (11th Cir. 2000). Here's why their cases are moot.

FDH takes some election cycles seriously and others not so seriously. Though in existence since 2018, FDH's "only real effort" previously was for the 2020 election cycle when it got 90,000 signatures. Tr.85:2-86:6 (Acosta). We don't know whether FDH will mount a "real effort" for the 2026 to 2028 cycle. Mr. Emerson wants his coalition partners to "be prepared," Tr.268:18-20 (Emerson), and he's "done some press," Tr.268:24-25 (Emerson), but there's no budget for the upcoming cycle, Tr.311:11-312:3 (Emerson) (disavowing previous budget estimate). FDH is supposedly collecting signatures, but none have been validated in any county. Initiatives Database, https://constitutionalinitiatives.dos.fl.gov/Home/InitDetail?account=73891&seqnum=1 (last visited March 14, 2026); Tr.86:7-12 (Acosta) (doesn't know number of signatures collected); Tr.86:22-87:3 (Acosta) (discussing distribution model that cuts out petition circulators).

RTCW seemingly hasn't collected a single signature for this election cycle, either, which began on February 2, 2026. Initiatives Database, https://constitutionalinitiatives.dos.fl.gov/Home/InitDetail?account=80360&seqnum=2 (last visited March 14, 2026). RTCW also hasn't received a contribution since November 7, 2025. Campaign Finance Database, https://dos.fl.gov/elections/candidates-committees/campaign-finance/campaign-finance-database/ (last visited March 14, 2026). Ms. Martin, the Oregon resident who helps run the organization, hasn't been to Florida to collect a signature since 2024, and acknowledged that volunteers for this all-volunteer organization can't be controlled, making the plans of the volunteers inherently unpredictable. Tr.670:16-20 (Martin); Tr.697:4-11 (Martin).

Smart & Safe's witness, Ms. Cox, isn't even working on any initiative for the 2026 to 2028 cycle. Tr.1161:5-11 (M. Cox). "Unknown variables" was her response to a question about plans for the upcoming cycle. Tr.1161:8 (M. Cox).

**C.** Standing is a problem for League Plaintiffs because they don't sponsor initiatives. They only collect petitions for initiatives being sponsored by others. League of Women Voters said so. Tr.1577:6-23 (Lowe-Minor). LULAC talked only of supporting the initiatives of others, and a review of Florida's citizen-initiative website doesn't show them as having sponsored an initiative. Tr.1467:12-15 (Proaño). It's also unclear which initiative, if any, League Plaintiffs intend to collect petitions for in 2028. Without that testimony, and without specifics, League Plaintiffs' plans are too

91

speculative for them to have standing to pursue their claims. *See, e.g.*, *LaCroix v. Lee County*, 819 F. App'x 839, 841-43 (11th Cir. 2020) ("speculative" plans that lack "expected times, topics, locations, or surrounding context" aren't enough for standing).

**D.** There are other standing-related problems at a provision-specific level. For the **Petition Circulator Eligibility** provisions, no one has specifically identified a felon who works as a petition circulator and who would be barred from continuing to work because of HB 1205. That's not surprising. FDH Plaintiffs don't track the information. Tr.68:7-8 (Acosta). League Plaintiffs don't either—that's true of the League of Women Voters, Tr.1588:1-6 (Lowe-Minor), and LULAC, Tr.1463:13-18 (Proaño). Nor do RTCW Plaintiffs. Tr.751:3-17 (Martin). And Smart & Safe generally doesn't hire felons, at least before they commit a felony. *Supra.* That's also true of FDH's principal vendor. Tr.210:22-211:1 (Walsh). And the one person that Plaintiff Simmons knew to be a felon and that could be named had his record expunged and voting rights restored, falling outside the prohibition in HB 1205. Tr.139:22-140:11 (Simmons).

The **Ten-Day Return Deadline** and the **Fines** provisions present a problem. Plaintiffs must establish a "substantial likelihood" that these provisions will harm them. *Worthy v. Phenix City*, 930 F.3d 1206, 1215 (11th Cir. 2019). They haven't.

Pre-existing provisions of Florida law and a new provision in HB 1205 ameliorate the fines-related concerns associated with the ten-day deadline and many of the other provisions that trigger fines. Tr.2075:22-2076:3 (Pratt); Tr.2077:14-23 (Pratt); Tr.2078:6-10 (Pratt). More specifically, delivery-related fines, among others, "may be

waived upon a showing that the failure to deliver the petition form promptly is based upon force majeure or impossibility of performance." Fla. Stat. § 100.371(7)(b). And "if the sponsor of an initiative petition discovers a violation of" § 100.371 "and reports the violation as soon as practicable to the secretary, the sponsor may not be fined for such violation." Fla. Stat. § 100.371(11). Taken together, Florida law provides safeguards for sponsors who are diligent and who—through no fault of their own— may not be able to comply with certain requirements. There are still more safeguards because factual issues can be taken before an impartial administrative law judge, with the agency prohibited from reweighing the ALJ's factual findings. *See* Fla. Stat. § 120.57(1)(k)-(l); *see also Green v. Fla. Dep't of Bus. & Pro. Regul., Div. of Real Est.*, 49 So. 3d 315, 319 (Fla. 1st DCA 2010) (reversing agency action where the agency "reweighed the evidence and substituted its judgment for the findings made by the ALJ").

The rogue circulator scenario—where a person registers for an initiative, unbeknownst to the sponsor, and then forges signatures—doesn't give the sponsors standing to challenge the **Ten-Day Return Deadline** and the **Fines** provisions. Florida law accounts for this scenario: "The division may revoke a petition circulator's registration upon the written request of the sponsor of the initiative petition or if the circulator violates this section." Fla. Stat. § 100.371(4)(e). And the sponsors can attempt to avail themselves of HB 1205's safe harbor. So, it's unclear why fear of fines from the possible future actions of circulators who aren't in the sponsor's control would confer standing. *See, e.g.*, *League of Women Voters of Fla., Inc. v. Byrd*, 4:23-cv-216, 2023 U.S. Dist.

93

LEXIS 237881, at *10 (N.D. Fla. July 11, 2023) (faulting the plaintiffs for "assum[ing] (1) that the people they register to vote will report them on false grounds and (2) that the Florida Office of Election Crimes and Security will, based on those false grounds, bring actions against them").

For similar reasons, Plaintiffs haven't established standing for the **One Amendment** provision, the **Full Amendment** provision, the **Petition Completion** provision, or the challenge to **OECS's Investigative** powers. They haven't established a "substantial likelihood" of running afoul of these provisions in future efforts.

**E.** When it comes to the scope of any relief this Court might issue, that relief should be limited to Plaintiffs with standing to seek the relief to remedy the harms they've proven at trial. To state the obvious, this isn't a class action. The overbreadth claims shouldn't be the basis for any relief. So, there should be no broad injunction unless Plaintiffs can show that a broad injunction is necessary—that providing the kind of statewide relief being sought on some combination of citizen-initiative provisions is necessary for "complete relief." *CASA*, 606 U.S. at 851, 852-53.

## Conclusion

This Court should enter judgment for Defendants. In this case mostly about the First Amendment, the parties disagree about the legal framework that should apply. Defendants believe they have the better of the argument. Two active judges of the Eleventh Circuit agree. With a framework in place, there's no factual dispute about whether citizen-initiative fraud happens. It does. There's no dispute that millions are

spent on citizen initiatives. There's no dispute that collecting close to 900,000 valid signatures from around Florida requires a good organizational effort. There's no dispute that all initiatives aren't created equal. There's no dispute that while someone probably feels strongly about any given initiative, only some initiatives garner broad public engagement. There's no dispute that every circulator chooses to collect signatures. Some because they are moved by the issue. Others for money. But there *is* a dispute about whether a circulator's subjective fears about interactions are reasonable. There *is* a dispute about whether the burdens imposed by HB 1205 are too great. And there *is* a dispute about whether petition sponsors have done enough to maintain their claims. Taken as a whole, Defendants ask this Court to see things their way.

95

Dated: March 19, 2026

JAMES UTHMEIER
  *Attorney General*

/s/ William H. Stafford III
William H. Stafford III (FBN 70394)
  SPECIAL COUNSEL
Sara E. Spears (FBN 1054270)
  ASSISTANT ATTORNEY GENERAL
Complex Litigation Division
OFFICE OF THE ATTORNEY GENERAL
PL-01, The Capitol
Tallahassee, Florida 32399
(850) 414-3785
William.Stafford@myfloridalegal.com
Sara.Spears@myfloridalegal.com
ComplexLitigation@myfloridalegal.com

*Counsel for Florida Attorney General*


/s/ Benjamin J. Gibson
Benjamin J. Gibson (FBN 58661)
Daniel E. Nordby (FBN 14588)
Tara R. Price (FBN 98073)
Nicholas J.P. Meros (FBN 120270)
Kassandra S. Reardon (FBN 1033220)
SHUTTS & BOWEN LLP
215 South Monroe Street, Suite 804
Tallahassee, Florida 32301
(850) 241-1717
bgibson@shutts.com
dnordby@shutts.com
tprice@shutts.com
nmeros@shutts.com
kreardon@shutts.com
chill@shutts.com

*Counsel for Intervenor-Defendant Republican Party of Florida*

Respectfully submitted,

Ashley Davis (FBN 48032)
  General Counsel
FLORIDA DEPARTMENT OF STATE
R.A. Gray Building
500 South Bronough Street
Tallahassee, Florida 32399
(850) 245-6511
Ashley.davis@dos.fl.gov

/s/ Mohammad O. Jazil
Mohammad O. Jazil (FBN 72556)
Randall M. Raban (FBN 1055100)
Martin C. Wolk (FBN 1065532)
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 South Monroe Street, Suite 500
Tallahassee, Florida 32301
(850) 270-5938
mjazil@holtzmanvogel.com
rraban@holtzmanvogel.com
mwolk@holtzmanvogel.com
zbennington@holtzmanvogel.com

*Counsel for Florida Secretary of State*

96

## Local Rules Certification

I certify that this written closing argument complies with Local Rule 5.1 as to spacing and formatting requirements.

/s/ Mohammad O. Jazil
Mohammad O. Jazil

## Certificate of Service

I certify that on March 19, 2026, I electronically filed the foregoing with the Clerk of Court by using CM/ECF, which automatically serves all counsel of record for the parties who have appeared.

/s/ Mohammad O. Jazil
Mohammad O. Jazil