**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

FLORIDA DECIDES HEALTHCARE,
INC., *et al*.,

      Plaintiffs,

                                Case No. 4:25-cv-00211-MW-MAF

v.

CORD BYRD, in his official capacity
as Secretary of State of Florida, *et al*.,

      Defendants.

_____/

_____

**THE SUPERVISORS OF ELECTIONS' POST-TRIAL BRIEF**

_____

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

DISPUTED ISSUES OF MATERIAL FACT ..................................................................... 4

FINDINGS OF FACT ..................................................................................................... 5

    Florida's Initiative Process .....................................................................5

    Signature Verification...............................................................................6

    The Cost-Recovery Provisions ...............................................................7

    Florida Decides Healthcare ..................................................................10

    Smart & Safe Florida ............................................................................20

    Dr. Daniel A. Smith ...............................................................................23

    Supervisor Mark Earley and Imaltzin Molina.................................28

    Additional Witnesses.............................................................................43

CONCLUSIONS OF LAW...............................................................................................44

    I.    PLAINTIFFS' CHALLENGES TO THE COST-RECOVERY PROVISIONS ARE MOOT. ....................................................................44

        A.    SSF Presented No Evidence of Concrete Plans to Launch a New Campaign. ......................................................44

        B.    SSF Did Not Prove That Increased Verification Fees Will Curtail Its Ability to Speak. ....................................52

        C.    FDH Presented No Evidence of Concrete Plans to Launch a New Campaign. ......................................................53

    II.    THE COST-RECOVERY PROVISIONS DO NOT VIOLATE THE FIRST AMENDMENT. ..........................................................................55

i

A. The Cost-Recovery Provisions Do Not Implicate the First Amendment.............................................................55

B. Because They Do Not Implicate the First Amendment, the Cost-Recovery Provisions Do Not Trigger Any Level of Scrutiny.............................................................63

C. Plaintiffs' "Severe Burden" Standard Does Not Apply............64

D. Plaintiffs' "Severe Burden" Standard *Is* the *Anderson-Burdick* Standard—Which Does Not Apply............................69

E. Plaintiffs Failed to Establish a Severe Burden.........................70

F. FDH's "Cumulative Impact" Theory Is Misguided..................76

G. Plaintiffs' Remaining Arguments for Heightened Scrutiny Are Flawed ..................................................................81

  1. The Cost-Recovery Provisions Are Not a Content-Based Regulation of Speech...........................81

  2. What Other States Do—or Do Not Do—Is Irrelevant.................................................................84

  3. Verification Fees Are Proportional to the Burden That Each Sponsor Imposes on Election Officials.........86

III. THE COST-RECOVERY PROVISIONS DO NOT VIOLATE EQUAL PROTECTION. .......................................................................87

A. The Cost-Recovery Provisions Are Subject to Rational-Basis Review..........................................................................88

B. The Cost-Recovery Provisions Satisfy Rational-Basis Review. ........................................................................92

IV. IF THE COURT FINDS LIABILITY, THEN RELIEF SHOULD BE LIMITED TO THE PARTIES THAT SUCCESSFULLY CHALLENGED THE COST-RECOVERY PROVISIONS...................................................99

CONCLUSION ...............................................................................100

Florida's sixty-seven Supervisors of Elections respectfully offer this post-trial brief in support of the constitutionality of HB 1205's Cost-Recovery Provisions—the provisions that govern signature verification fees.[1]

## INTRODUCTION

The cost of petition verification can be paid by taxpayers or initiative sponsors, or both. With respect to initiative petitions, the Legislature determined that these costs should be borne not by taxpayers, but rather by the sponsors who avail themselves of the initiative process to advance their political objectives. The Supervisors take no position on the policy of that choice, but support the Legislature's authority to make it.

The Cost-Recovery Provisions comply with the First Amendment. Verification fees have increased by $2.50 on average, but the First Amendment does not condemn state initiative regulations merely because those regulations make initiative campaigns more difficult or more expensive. What matters is that verification fees do not regulate speech. They do not regulate the interactive aspect of petition circulation or any direct, one-on-one communications with voters. Instead, verification fees reimburse county election officials for the resources they expend to process petition forms—*after* the

---

[1] In this brief, "Plaintiffs" refers to Florida Decides Healthcare, Inc.; Mitchell Emerson; and Jordan Simmons (together, "FDH") and Smart & Safe Florida ("SSF"). The other Plaintiffs do not contest the new provisions regarding signature verification fees. The "Cost-Recovery Provisions" are sections 99.097(4)(a) and 100.371(14)(b) and (f) of the Florida Statutes, as amended by HB 1205, and section 7(3) of HB 1205.

exchange with the voter, *after* the collection of the petition form, and *after* the petition form's delivery to the elections office, long after any protected speech has concluded.

Plaintiffs' equal-protection claim fares no better. Because no fundamental right is affected, rational-basis review applies. Under that lenient standard, the Legislature's choice passes muster. Placing the cost of verification on sponsors conserves public resources and ensures that taxpayers are reimbursed for the costly and labor-intensive work of verification. It protects taxpayers from the forced subsidization of political agendas with which they might deeply disagree. And it encourages sponsors to take precautions to ensure that voters fill out petition forms correctly and completely. That the Legislature addressed initiatives without also changing the rules for other petitions does not render these provisions unconstitutional. A legislature may act incrementally.

This case is *not* about the State's authority to charge a per-petition verification fee. Plaintiffs do not challenge the pre-HB 1205 requirement that initiative sponsors pay the actual cost of verification—which also differed from the 10-cent fee paid by candidates. Thus, Plaintiffs tacitly admit that charging initiative sponsors a higher fee is constitutionally permissible. Plaintiffs allege only that the *true* cost is now *too much*, since HB 1205's new requirements, such as sending verification notices, have added to the cost of verification. Plaintiffs frame their challenge as a line-drawing exercise regarding the *amount* of the fee and not around the simple question they have already conceded: whether a State may require sponsors to pay the actual costs of verification.

2

The line-drawing challenge does not end there. Each county is different: their verification fees differ, ranging from $0.50 to $4.50, as do the number of petition forms received by each county.[2] In seeking an across-the-board, one-size-fits-all declaration that the Cost-Recovery Provisions are invalid, Plaintiffs ignore these county-specific distinctions.

This case is *not* about HB 1205's consistency with the Florida Constitution. Plaintiffs do not allege that the Cost-Recovery Provisions deny a state-law right to an initiative process or violate article XI of the Florida Constitution, which creates the initiative process. For this Court's purposes, it makes no difference that the challenged provisions reside in Florida's Election Code and not in the Florida Constitution itself.

This case is *not* about the correctness of any county's calculations of the actual cost of verification. Plaintiffs do not claim that the Supervisors miscalculated that cost.

The Cost-Recovery Provisions come with no fines or criminal penalties. They do not dictate the internal workings of the petition-circulation effort. Nor do Plaintiffs allege that the Cost-Recovery Provisions are vague. Plaintiffs' dispute comes down to a matter of expense, plain and simple—an expense that Plaintiffs do not want to pay.

But this Court need not even reach the merits. Plaintiffs' campaigns are over, and neither FDH nor SSF presented evidence of concrete steps or concrete plans to

---

[2] The size of the fee increase also varied. One county (Sumter) did not increase its fee.

launch a new campaign. Because Plaintiffs did not establish a concrete, particularized, and imminent injury, their challenges to the Cost-Recovery Provisions are moot. On this record, any opinion on the validity of those provisions would be purely advisory.

The Cost-Recovery Provisions merely prescribe post-circulation requirements that allocate to participants in the initiative process the costs that *someone* must bear. Plaintiffs' concern that they might not raise enough money to pay the fees does not establish a federal constitutional violation. Their attempt to convert a cost-allocation measure into a speech restriction—and to treat *any* regulation of their activities as a regulation of speech—should be rejected. Neither the First Amendment nor the Equal Protection Clause compels local taxpayers to subsidize Plaintiffs' political campaigns.

The sixty-seven Supervisors respectfully request judgment in their favor as to the Cost-Recovery Provisions.

## DISPUTED ISSUES OF MATERIAL FACT

At trial, this Court requested that the parties identify disputed issues of material fact in their post-trial briefs. As to the Cost-Recovery Provisions, the Supervisors agree that the parties' dispute centers primarily on questions of law and on the application of the law to facts that are largely undisputed. For example, whether Plaintiffs have a live claim turns rather on the sufficiency of the evidence to establish a concrete, imminent injury than on the resolution of any purely factual dispute. While the Court's resolution of this case might require it to draw inferences on which the parties would

4

disagree, the Supervisors respectfully submit that the material facts, as set forth below, are not seriously contested.

## FINDINGS OF FACT

### Florida's Initiative Process

1.    Amendments to the Florida Constitution may be proposed by initiative. Fla. Const. art. XI, § 3.

2.    To qualify for ballot placement, an initiative petition must be signed (i) in the State as a whole, by a number of electors equal to eight percent of the number of votes cast statewide at the last presidential election; and (ii) in each of at least one-half of Florida's congressional districts, by a number of electors equal to eight percent of the number of votes cast in the district at the last presidential election. Fla. Const. art. XI, § 3.

3.    All signatures must be submitted and verified by February 1 of the year in which the general election is held. Fla. Const. art. XI, § 5(b); Fla. Stat. § 100.371(1)(a).

4.    In 2026, the number of valid signatures needed statewide to qualify an initiative for ballot placement was 880,062. ECF No. 596 at 23 ¶ 7.

5.    Even before HB 1205 was enacted, initiative campaigns were very expensive. T2 at 518:11–20, 519:3–5; T5 at 1423:13–22.

6.      The signature threshold and the cost necessarily associated with the collection and submission of so many petition forms unavoidably render initiative campaigns expensive. T2 at 518:21–519:2. Plaintiffs' expert witness, Dr. Daniel A. Smith, testified that the signature threshold of 880,062 valid signatures, plus the requirement of geographic distribution among those signatures, requires a massive effort. T5 at 1424:1–5.

7.      In 2026, no initiatives qualified for placement on the ballot. T1 at 261:20–23.

**Signature Verification**

8.      Before a signature on a petition form may be counted toward the number required to place an initiative on the ballot, a Supervisor of Elections must determine whether the signature on the petition form is valid. Fla. Stat. § 99.097; ECF No. 596 ¶ 40.

9.      Each Supervisor must post the "actual cost of signature verification" on his or her website. Fla. Stat. § 100.371(14)(f).

10.     Before the Supervisor verifies the signature, the initiative petition's sponsor must pay the Supervisor the cost posted on the Supervisor's website. Fla. Stat. § 99.097(4)(a).

11.     The Supervisor must then promptly verify the signature within 60 days after receipt of the petition form and payment and processing of the verification fee. Fla. Stat. § 100.371(14)(b).

12.     In the case of petition forms received fewer than 60 days before the February 1 deadline, the Supervisor must promptly verify the signature within 30 days after receipt of the petition form and payment of the verification fee. *Id*.

### The Cost-Recovery Provisions

13.     On May 2, 2025, Governor DeSantis signed HB 1205 into law. ECF No. 596 at 22 ¶ 1; Ch. 2025-21, at 28, Laws of Fla.

14.     Most of HB 1205's provisions, including its amendments to sections 99.097 and 100.371(14)(b) and (f), took effect on May 2, 2025. Ch. 2025-21, § 21, Laws of Fla.

15.     HB 1205 requires Supervisors of Elections periodically to transmit petition forms to the Division of Elections, first in digital and then in physical form. *Id*. § 6 (codified at Fla. Stat. § 100.371(14)(d)).

16.     HB 1205 also requires a Supervisor to provide a verification notice to any voter whose signature appears on a petition form that the Supervisor verifies as valid. *Id*. (codified at Fla. Stat. § 100.371(14)(e)).

17.     HB 1205 defined the actual cost of signature verification to "include operating and personnel costs associated with comparing signatures, printing and all

postage costs related to the verification notice . . . , and transmitting petition forms"

to the Division of Elections. *Id*. (codified at Fla. Stat. § 100.371(14)(f)).

18.    HB 1205 imposed a three-month moratorium on signature verification

from July 1 to September 30, 2025. *Id*. § 20(1).

19.    HB 1205 also provided that, by October 1, 2025, a Supervisor "may

increase the cost of signature verification pursuant to the amendments" that HB

1205 made to section 100.371(14)(f). *Id* § 7(3). It further provided that the

Supervisor "shall post the cost of signature verification on his or her publicly

available website as soon as such cost is determined." *Id*.

20.    Between July 2025 and October 1, 2025, the Supervisors increased

their verification fees in accordance with HB 1205. T1 at 315:14–23; T2 at 630:16–

19.

21.    The Supervisors' verification fees differ from county to county and

range from $0.50 to $4.50. ECF No. 596 at 37 ¶ 43.

22.    For statewide initiative petitions, a reasonable estimate of the average,

per-petition cost of verification is $0.87 before and $3.37 after the verification-fee

increases—an average increase of $2.50 per petition. ECF No. 596 at 40 ¶ 44.

23.    These estimates are based on calculations performed by Dr. Michael

Herron, an expert witness, and take into account the geographical distribution of

8

petitions collected during two recent initiative campaigns. ECF No. 596 at 40 ¶ 44; T3 at 901:13–909:15.

24. Dr. Herron reviewed data on the Department of State's website to determine the number of valid petitions verified in each county in connection with the abortion and marijuana initiatives that appeared on the 2024 ballot. PX-FDH-37; T3 at 901:13–902:9.

25. Dr. Herron multiplied the number of valid petitions verified in each county by that county's verification fee and then aggregated these amounts across counties to determine the total statewide cost to verify all valid petitions. T3 at 902:10–16.

26. Dr. Herron thus concluded that the total cost to verify all valid petitions submitted in support of the abortion amendment was $857,322 before and $3,359,858 after the verification-fee increases. PX-FDH-37; T3 at 902:17–903:3.

27. The total number of valid petitions submitted in support of the abortion amendment was 997,035. T3 at 903:10–904:2.

28. Thus, the per-petition cost to verify all valid petitions submitted in support of the abortion amendment was $0.86 before and $3.37 after the verification-fee increases. T3 at 904:6–18, 907:4–9.

29. Applying the same methodology, Dr. Herron concluded that the total cost to verify all valid petitions submitted in support of the marijuana amendment

9

was $912,174 before and $3,488,691 after the verification-fee increases. PX-FDH-37; T3 at 907:14–20, 909:3–8.

30.    The total number of valid petitions submitted in support of the marijuana amendment was 1,033,770. T3 at 908:2–14.

31.    Thus, the per-petition cost to verify all valid petitions submitted in support of the marijuana amendment was $0.88 before and $3.37 after the verification-fee increases. T3 at 908:19–22, 909:3–15.

32.    In June and July 2025, FDH estimated that the average, per-petition cost of verification would rise to $3.50, but FDH's executive director, Mitchell Emerson, admits that this estimate was "absolutely an estimate" and that, because the costs were in flux, "we did not know what the final number would be." T1 at 244:6–245:23.

## Florida Decides Healthcare

33.    In February 2024, FDH began its campaign to place an initiative amendment on the 2026 ballot. DX-1566 at 2; T1 at 297:22–24.

### *FDH's Petition-Collection Efforts*

34.    FDH's goal was to collect 1.3 million signed petitions—valid and invalid—during its 2026 campaign. DX-1566 at 3; ECF No. 618-1 at 29:10–15, 32:22–25; T1 at 225:23–227:25.

10

35.   FDH estimated that, to collect 880,062 valid signatures, an initiative sponsor should submit 1.3 million signed petition forms (valid and invalid). ECF No. 596 at 40 ¶ 44.

36.   This estimate was based on an assumption that 33 percent of all signed petition forms would be found invalid. DX-1566 at 3.

37.   Dr. Herron agreed that an initiative sponsor could achieve ballot placement with fewer than 1.3 million petitions—for example, if the sponsor has a lower invalidity rate than the 1.3-million estimate assumes. T3 at 905:5–23, 906:23–907:1.

38.   Sometime before HB 1205 took effect, FDH budgeted $910,000 for signature verification. DX-1566 at 3; T1 at 225:9–19.

39.   Mr. Emerson "absolutely" believed that FDH could pay $910,000 in verification fees. T1 at 229:6–9.

40.   FDH's goal was to collect 100,000 signed petitions by May 1, 2025, and to reach 200,000 by June 1, 2025, and 300,000 by July 1, 2025. ECF No. 618-1 at 32:15–33:14, 35:4–22.

41.   FDH first submitted signed petition forms to Supervisors of Elections in June 2024. DX-1569 at 2.

42.     FDH submitted only 25,864 signed petitions by May 1, 2025, and only 74,640 by June 1, 2025, and 102,307 by July 1, 2025. DX-1569 at 2–3; ECF No. 618-1 at 30:22–31:9, 37:15–39:1, 41:4–10, 43:8–17.

43.     Mr. Emerson testified that FDH did not collect 100,000 signed petition forms by May 1, 2025: "I mean, we certainly did not do that." T1 at 297:25–298:24.

44.     When HB 1205 was enacted on May 2, 2025, more than one year after FDH began its campaign, FDH had submitted less than 2 percent of the total number of signed petitions it had set out to submit (25,864 of 1,300,000). DX-1566 at 3; DX-1569 at 2–3. The evidence does not support an inference that HB 1205 curbed a robust signature-collection effort.

45.     During its entire 2026 campaign, FDH submitted only 126,840 signed petitions (valid or invalid). DX-1569 at 2–3; ECF No. 618-1 at 29:10–15, 37:15–39:1, 41:4–10, 43:8–17.

46.     FDH collected only 74,519 valid signatures in its 2026 campaign—8.5 percent of the 880,062 valid signatures required statewide. DX-1561.

47.     FDH also failed to qualify an initiative in 2018 and 2019, when it collected only 90,250 valid petitions. DX-1566 at 2; DX-1561.

***FDH's Fundraising Efforts***

48.     In March 2025, FDH estimated that, to secure ballot placement, it would need to raise $19 million by the end of the campaign's ballot-placement phase

12

on February 1, 2026. T1 at 220:8–221:21; ECF No. 618-1 at 14:19–15:10, 16:9–17:9, 24:3–19, & Errata.

49.     In arriving at this estimate, FDH evaluated the amounts that successful initiative campaigns had raised and spent and concluded that a $19-million estimate was fairly consistent with those amounts. T1 at 223:18–224:13.

50.     By May 2025, after HB 1205's enactment, FDH increased its budget estimate for the ballot-placement phase to $28 million. T1 at 239:13–242:8; PX-460; ECF No. 618-1 at 17:10–17, 19:25–20:17, 23:18–24:19, & Errata; DX-1566 at 8; DX-1567 at 3.

51.     The $28 million budget reflected an increase in the estimated cost of the paid collection campaign but continued to reflect a $910,000 estimate for verification fees. T1 at 240:25–241:5, 241:22–242:8; DX-1566 at 8; ECF No. 618-1 at 19:25–20:17.

52.     The $28 million budget consisted of $25 million for petition collection and $2 million for legal, administrative, and fundraising costs, in addition to the signature-verification budget. DX-1566 at 8; DX-1567 at 5.

53.     On cross-examination, Mr. Emerson testified that the increase to $28 million came about in June or July, rather than May, and reflected more than the original $910,000 budget for signature verification, but his testimony on direct and

13

the documentary evidence suggest otherwise. T1 at 300:4–302:13; DX-1566 at 8; DX-1567 at 5.

54. From January 1, 2025, to September 25, 2025, when FDH suspended its campaign, FDH raised only $2,859,578.77. DX-1559.

55. FDH raised only 4.4 percent of this amount ($126,804.86) before HB 1205 took effect on May 2, 2025, and 95.6 percent of this amount ($2,732,773.91) on or after that date. DX-1559. The evidence does not therefore support an inference that HB 1205 stunted FDH's fundraising.

56. Mr. Emerson admitted that FDH raised barely one-tenth of the $28 million it set out to raise and "certainly fell short of [its] fundraising goal." T1 at 306:3–6.

57. In July 2025, to reduce its expenditures, FDH began to distribute petition forms by mail. DX-1566 at 4, 6, 9; ECF No. 618-1 at 59:10–60, 61:6–17, & Errata. FDH mailed blank petition forms and return envelopes to voters and then contacted those voters to encourage them to complete and return the petition forms. T1 at 307:22–308:1.

58. This shift to mail distribution allowed FDH successfully to reduce its budget by $10 million. ECF No. 618-1 at 59:10–60:1; DX-1566 at 4, 6, 9.

59. FDH shifted to mail distribution and away from paid petition circulation in part because FDH was not on track to raise the $28 million it needed

and was not raising enough money to pay its paid petition circulators. ECF No. 618-1 at 62:6–13, 63:19–25; T1 at 309:25–310:3.

60.    Both before and after it shifted to mail distribution and successfully reduced its budget by $10 million, FDH faced a "significant budget shortfall." DX-1566 at 4; T1 at 310:4–7.

61.    FDH described its mail-distribution program as successful and stated that the results exceeded its expectations. T1 at 285:14–286:18; ECF No. 618-1 at 66:6–25 & Errata. Mr. Emerson testified that the mail-distribution program "seemed to be working." T1 at 309:21–24.

62.    On September 1, 2025, to further reduce its expenditures, FDH discontinued its paid petition circulation altogether. DX-1566 at 4, 6; T1 at 310:8–10.

63.    FDH suspended its campaign on September 25, 2025. DX-1569 at 8; T1 at 310:11–13.

64.    On direct, Mr. Emerson testified that FDH suspended its campaign because of HB 1205. T1 at 261:24–262:22. On cross, when asked whether FDH failed to achieve ballot placement because of HB 1205, Mr. Emerson responded in a more qualified way: "More or less, yes." T1 at 281:6–10.

65.    Mr. Emerson later conceded that FDH's failure to raise more than a fraction of the money it sought to raise was one reason why FDH suspended its campaign. T1 at 310:14–17; ECF No. 618-1 at 72:3–19.

66.    When it suspended its campaign, FDH understood it was unlikely to raise the $28 million it estimated it needed to achieve ballot placement. ECF No. 618-1 at 72:3–19; T1 at 310:18–22.

67.    Neither Mr. Emerson nor Holly Bullard—FDH's corporate-deposition witness—testified that, but for the increase in verification fees, FDH would not have suspended its campaign. *See* T1 at 261:24–263:17, 310:11–22; ECF No. 618-1 at 70:23–72:18.

### The 2028 Initiative Cycle

68.    Mr. Emerson testified at trial that FDH intends to seek placement of an initiative on the 2028 ballot. T1 at 268:13–15.

69.    Mr. Emerson testified that FDH has taken several "general steps" toward a 2028 campaign. T1 at 268:16–269:6.

70.    First, FDH has asked its coalition partners to "be prepared" to be engaged. T1 at 268:18–20.

71.    Second, FDH has informed its hubs—meeting places for volunteers and petition pickup and drop-off points, DX-1566 at 18—that there "might" be an opportunity for their future engagement. T1 at 268:21–23.

16

72.    Third, FDH has "done some press" to let people know that it plans to try again in 2028. T1 at 268:24–25.

73.    Fourth, FDH has considered a digital method of petition distribution; under this model, FDH would mail petition forms and return envelopes to voters who request them online. T1 at 269:1–8.

74.    FDH previously estimated that it would need $18 million to place an initiative on the 2028 ballot, DX-1566 at 12; DX-1568 at 2; ECF No. 618-1 at 73:5–25, but now claims it does not have a budget for the 2028 cycle, T1 at 269:9–10.

75.    Mr. Emerson testified that he does not "believe" FDH still has a goal to raise $18 million, since FDH no longer expects to conduct a mail-distribution campaign, but rather expects to rely on digital distribution. T1 at 311:11–312:3.

### The Timing of Payment of Verification Fees

76.    FDH admits that the Supervisors are not enforcing any deadline for payment of verification fees. DX-1569 at 4.

77.    Mr. Emerson testified, however, that he did not believe an initiative sponsor could pay the verification fee at any time after submitting a petition form. T1 at 247:9–12.

78.    Mr. Emerson pointed to three emails from county elections offices that, according to Mr. Emerson, suggest that sponsors must pay verification fees within

17

the same 10-day deadline that applies to the sponsor's submission of petition forms. T1 at 248:8–254:13.

79.    In one, the Call Center and Training Manager for the Hillsborough County elections office notified FDH of the fee increase and of FDH's outstanding balance and requested that FDH contact the office to "avoid any delays in processing your petitions, which could result in penalties or fines from the state." PX-FDH-377.

80.    Mr. Emerson testified that FDH was never fined for failure to pay the full verification fee. T1 at 317:3–8.

81.    In another email, the Glades County Supervisor of Elections notified FDH that the verification fee had increased and that, if FDH does not pay the remainder of the fee, then a petition form "will be marked invalid." PX-FDH-378.

82.    Mr. Emerson testified, however, that he would not expect a Supervisor to verify and validate petition forms without payment of the verification fee. T1 at 317:10–19.

83.    In the third email, an Administrative Assistant for the Lee County elections office notified FDH that the elections office would not continue to hold, but rather would return to FDH, petition forms submitted without full payment. PX-FDH-546.

84.    Mr. Emerson testified, however, that the petition forms were not returned to FDH. T1 at 317:20–318:2.

18

85.    After the Supervisors increased their verification fees, FDH never paid the increased fees, but instead submitted only partial payment based on prior fees. ECF No. 618-1 at 79:7–14.

86.    Thus, during the moratorium period, FDH continued to pay the pre-HB 1205 verification fees and, even after the fee increases took effect, never paid the full verification fee. T1 at 315:17–316:6.

87.    No state or county election official ever fined or otherwise penalized FDH for its failure to submit full payment by the 10-day deadline. ECF No. 618-1 at 79:15–80:15; T1 at 317:3–8.

88.    The Supervisors of Elections do not levy fines. T2 at 527:11–22.

89.    Supervisor Earley testified that the timing of a sponsor's payment of the verification fee does not determine whether a petition form was submitted timely. T2 at 631:15–18.

90.    Supervisor Earley is unaware of any Supervisor's office that has deemed a petition form late because the sponsor did not pay the verification fee by the 10-day deadline for submission of the form. T2 at 631:19–22.

91.    Similarly, Imaltzin Molina, Assistant Deputy for Voter Services for the Miami-Dade County Supervisor, testified that receipt of the verification fee does not affect the 10-day deadline to submit initiative petition forms. T7 at 1803:21–25, 1808:14–16.

19

**Smart & Safe Florida**

92.    SSF is a political committee that sought to place an amendment on the 2026 ballot. T4 at 1073:16–24.

93.    At trial, SSF presented the testimony of Meghan Cox, a political consultant. T4 at 1070:9–11.

94.    Ms. Cox is employed by Groundgame Political Solutions, LLC. T4 at 1072:16–17, 1165:2–4. She is Groundgame's founder, owner, and chief executive officer. T4 at 1072:25–1073:3.

95.    Ms. Cox is based in Phoenix, Arizona, and Groundgame is registered in Delaware. T4 at 1165:2–1166:2.

96.    Groundgame was the vendor that managed SSF's paid petition circulator effort. T4 at 1073:25–1074:6.

97.    Groundgame was a subcontractor to SSF. T4 at 1166:6–15. SSF contracted with Vanguard Field Strategies, which in turn contracted with Groundgame. T4 at 1166:6–15.

98.    Between August 2022 and December 2025, SSF paid Vanguard more than $70 million. DX-1563. Since March 2025, Groundgame has been paid $35 million for its work on SSF's campaign. T4 at 1171:17–19.

20

99.    When asked why SSF could not simply raise more money to pay the increased verification fees, Ms. Cox responded: "If only it were that easy." T4 at 1154:2–5.

100.    Between August 6, 2022, and September 30, 2025, SSF raised $179,604,057.49 in total contributions. DX-1570 at RFA1.

101.    Trulieve, Inc., contributed $170,914,882.12 of that amount (95.2 percent). DX-1570 at RFA4.

102.    Trulieve continued to make large contributions to SSF in the fourth quarter of 2025: $2 million on October 10; $6.6 million on October 17; $500,000 on November 19; $3.3 million on November 25; $4.1 million on December 8; $4.075 million on December 16; and $6.3 million on December 29. DX-1562.

103.    Between August 2022 and December 31, 2025, SSF raised $206,480,838.50. DX-1562; T4 at 1225:21–1226:6. Of this amount, Trulieve contributed $197,790,466.13, or 95.8 percent. DX-1562. In all, Trulieve wrote 22 checks for at least $5 million each and 47 checks for at least $500,000 each. DX-1562. Trulieve's largest contribution was a $22 million check written on October 22, 2024. DX-1562. Trulieve wrote 27 checks for more than $3.25 million each, DX-1562—the amount of the increase in verification fees if a sponsor collects 1.3 million petitions, ECF No. 596 at 40 ¶ 44.

21

104. Still, Ms. Cox testified that she believed SSF struggled to raise money. T4 at 1223:4–5.

105. When asked whether SSF plans to offer an amendment "in a future cycle," Ms. Cox responded: "I believe so." T4 at 1082:18–20.

106. When asked whether SSF plans to pursue ballot placement in 2028, Ms. Cox responded: "Unknown variables." T4 at 1161:5–11.

107. Ms. Cox identified two of those variables as the outcome of this litigation and budget constraints. T4 at 1161:5–11.

108. When asked whether SSF has a political committee active to seek ballot placement in 2028, Ms. Cox responded: "That is—I do not know yet." T4 at 1164:19–21.

109. Ms. Cox testified that, during the last four months of SSF's campaign (October 2025 through January 2026), SSF paid an average verification fee of $3.64. T4 at 1151:15–1152:2. But Ms. Cox provided no information about the geographic distribution of those signatures or whether, at that late stage of the campaign, SSF was targeting specific counties or congressional districts.

110. Ms. Cox suggested that, to collect 880,062 valid petition forms, a sponsor should collect 1.9 to 2 million petition forms, which assumes a statewide validity rate of only 44 to 46 percent. T4 at 1147:21–1148:7.

22

**Dr. Daniel A. Smith**

111.   Dr. Smith, an expert witness, employed what he described as a "comparative method"—a comparison of States to identify trends, principles, and outliers. T5 at 1261:3–1262:9.

112.   In comparing States, Dr. Smith looks for States that are similarly situated. T5 at 1262:7–9, 1263:14–1264:9.

113.   Dr. Smith espoused a Most Similar Systems Design (MSSD) to eliminate cases that are completely different units and to focus on differences within the same environment. T5 at 1263:1–13.

114.   Dr. Smith opined that Florida is the only State that requires initiative sponsors to pay for verification of each petition form and therefore represents an "extreme deviation from the norm." T5 at 1359:5–18, 1389:15–17, 1390:14–1391:3, 1425:21–24.

115.   However, Dr. Smith is not opposed to the verification of each petition form individually, as opposed to verification by statistical sampling. T5 at 1420:25–1421:3. He admits that statistical sampling is not as thorough a process as the verification of each petition form individually. T5 at 1421:4–7.

116.   Dr. Smith, moreover, has "no problem" with the Supervisors charging a fee to pay for the functions that he considers to properly constitute "verification." T5 at 1421:14–1422:18.

23

117. Dr. Smith agreed that verification of initiative petitions is an incredibly important task, T5 at 1420:21–24, and that Supervisors must be able to pay for the incredibly important task of verifying petition forms individually, T5 at 1421:10–13.

118. Dr. Smith expressly declined to opine that Florida's verification fees are too high. T5 at 1390:4–13, 1391:7–10.

119. Instead, Dr. Smith opined that the verification fees are burdensome and that, for the "average citizen group," the fees are "prohibitive." T5 at 1390:4–13.

120. But Dr. Smith agrees that, even before HB 1205 was enacted, initiative campaigns were expensive. T5 at 1423:13–22.

121. Dr. Smith testified that, by 1990, some initiative campaigns already cost more than $1 million, T5 at 1423:23–25, and that, even before HB 1205 was enacted, the cost of some initiative campaigns exceeded $100 million, T5 at 1424:6–11.

122. Dr. Smith agreed that, in recent years, the cost of initiative campaigns has ranged from seven to nine figures. T5 at 1424:18–1425:20.

123. Dr. Smith's observation that Florida is the only State that requires sponsors to pay for verification of each petition form was part of his comparative analysis, which involves a comparison of similarly situated States. T5 at 1425:21–1426:6. But the States that Dr. Smith compared are not similarly situated.

24

124.    Dr. Smith identified 15 States, including Florida, that authorize their state constitutions to be amended by initiative. T5 at 1426:7–15.

125.    Dr. Smith agreed that, of those 15 States, only four—Florida, Ohio, Oklahoma, and Nebraska—verify petition forms individually rather than by statistical sampling. T5 at 1426:16–20, 1427:1–4.

126.    Dr. Smith agreed that it is impossible to know whether the 11 States that use statistical sampling would charge a verification fee if they were required to verify each petition form individually, as Florida does. T5 at 1426:21–25.

127.    Dr. Smith also agreed that the signature thresholds in Ohio, Oklahoma, and Nebraska are not close to Florida's threshold of 880,062 valid signatures. T5 at 1427:5–8.

128.    Ohio, Oklahoma, and Nebraska have lower signature thresholds than Florida in part because they have much smaller populations. T5 at 1427:5–12.

129.    According to the 2020 decennial census, Florida has a population of 21,538,187 people, while the populations of Ohio, Oklahoma, and Nebraska are 11,799,448 people, 1,961,504 people, and 3,959,353 people, respectively. U.S. CENSUS BUREAU, https://data.census.gov/profile; T5 at 1427:13–22.

130.    Florida does not use statistical sampling to verify initiative petition forms because the First District Court of Appeal held that the Florida Constitution

requires initiative petition forms to be verified individually. T5 at 1427:23–1428:3; *Let's Help Fla. v. Smathers*, 360 So. 2d 494, 496 (Fla. 1st DCA 1978).

131. The decision to verify initiative petition forms individually rather than by statistical sampling was therefore not a discretionary choice of the Legislature. T5 at 1428:4–6.

132. Dr. Smith testified that the invalidity rates of local-issue petitions can be as high as or higher than the invalidity rates of initiative petitions, but in support he referenced only a single municipal petition effort (City of Gainesville) and testified that its invalidity rate was less than 30 percent. T5 at 1360:6–1361:24.

133. Dr. Smith agreed that a per-petition verification fee creates a cost disincentive for sponsors to submit defective forms. T5 at 1429:17–1430:9. The fee incentivizes sponsors to do their due diligence to make sure that voters fill out petition forms correctly and completely. T5 at 1430:10–15, 1431:7–12, 1435:3–20.

134. Sponsors have an incentive to submit quality petitions that will advance their goals and to avoid paying for verification of invalid petitions. T5 at 1433:2–7, 1435:20–23.

135. Dr. Smith agreed that an incentive to ratchet up quality control, if possible, is built into an increase in verification fees. T5 at 1431:20–23.

26

136. The sponsor or petition circulator might be unable to verify the accuracy of all information on a petition form, such as the voter's social-security digits. T5 at 1432:6–10.

137. But a sponsor could train its petition circulators, when the voter returns the petition form, to review the form and ensure that the voter completed all required fields. T5 at 1432:11–15, 1434:6–11.

138. Likewise, a sponsor could train its petition circulators to ensure that the information the voter provided in each field is plausibly responsive to the information requested (*e.g.*, the county field contains a county's name). T5 at 1432:16–1433:1, 1434:12–16.

139. Cynthia Haller, who has circulated petition forms for Florida Right to Clean Water, testified that her goal is to collect as many petition forms as possible, so she does not take much time to review petition forms to ensure that voters fill them out correctly and completely. T3 at 765:17–19, 782:16–784:1.

140. In contrast, Groundgame seeks to recruit petition circulators who "have a great attention to detail" and "can ensure that petitions are filled out appropriately." T4 at 1086:24–1087:6.

141. Ms. Cox explained that the best petition circulators "passionately care about their validity rates." T4 at 1087:11–22.

142.   Groundgame seeks petition circulators who are "trained to know that they have to have all the petitions completely filled out and not leave spaces blank on them." T4 at 1087:11–22.

143.   Groundgame trains its petition circulators to make sure that a voter "filled out every piece" and to remind the voter to provide essential information, such as the date and the voter's county and signature. T4 at 1094:9–20.

### Supervisor Mark Earley and Imaltzin Molina

144.   Mark Earley is the Leon County Supervisor of Elections. T2 at 455:15–17.

### *The Verification Process*

145.   The Supervisor's office receives most petition forms by mail and some by hand delivery. T2 at 457:15–458:1, 597:15–24.

146.   The Supervisor's office records the date on which the petition form was received and the date of the voter's signature. Fla. Stat. § 100.371(14)(b)–(c); T2 at 460:9–11, 597:25–598:4, 610:16–18.

147.   This step ensures compliance with the requirement that sponsors and petition circulators submit petition forms within ten days after the date of the voter's signature. *See* Fla. Stat. § 100.371(7)(a).

148.   If a petition form is submitted more than ten days after the date of the voter's signature, then the Supervisor's office generates a report and submits a copy

28

of the untimely filed petition form to the Division of Elections. T2 at 598:16–25, 610:19–23, 623:15–20; Fla. Admin. Code r. 1S-2.0091(2)(b).

149.   Because the 10-day deadline to submit petition forms does not apply to candidate and local-issue petition forms, Supervisors are not required to record the date of receipt and generate reports of late submissions when it comes to candidate and local-issue petition forms. T2 at 598:16–599:12; T7 at 1809:14–16.

150.   The Supervisor's office determines the number of petitions received in each delivery. T2 at 597:15–24.

151.   Some petition forms consist of multiple pages. T2 at 458:10–12.

152.   The Supervisor's office must confirm that all pages of the petition form were submitted. T2 at 459:5–12, 473:11–18; T7 at 1815:10–14.

153.   Some petition forms are printed on both sides of a page, while others are printed only on one side. T2 at 459:13–19.

154.   Because candidate and local-issue petition forms are one-page forms, it is not necessary to confirm that all pages of the petition form were submitted. T2 at 610:4–12.

155.   Multi-page petition forms must be unstapled and sorted by hand to ensure that all pages fully detach and will scan properly. T2 at 458:13–459:4, 598:5–12, 599:17–21. Puncture holes created by staples can cause pages to cling together, causing paper jams in the scanning process. T2 at 599:17–24.

29

156.    Because candidate and local-issue petition forms are one-page forms, the unique challenges of multi-page petition forms are not present in the verification of candidate and local-issue petition forms. T2 at 600:10–13.

157.    Each petition form is scanned to create a digital image. T2 at 462:20–464:11. Each page of a multi-page petition form is scanned. T2 at 600:14–18.

158.    After scanning, the Supervisor's office maintains the paper copy of each petition form. T2 at 600:19–20.

159.    The scanned image of the petition form is imported into Voter Focus, the Supervisor's voter-registration software. T2 at 462:20–22, 603:1–15.

160.    In Leon County, the Supervisor's office refers to a digital image of the petition form during the verification process. T2 at 460:22–24.

161.    Verification is conducted in a module in Voter Focus. T2 at 464:19–24.

162.    In Leon County, staff usually search for the voter's date of birth first and review the resulting alphabetical list of voters to identify the voter who signed the petition. T2 at 465:1–3, 465:23–466:5, 523:22–524:7, 603:22–604:14.

163.    If staff cannot locate the voter in Voter Focus, then staff will search for the voter in the Florida Voter Registration System (FVRS), which is the statewide voter-registration database. T2 at 466:14–467:10, 523:22–524:7.

164. The Supervisor's office must confirm that the petition form includes the voter's address, date of birth, and signature, and the date of signature. T2 at 459:5–460:4.

165. Although a petition form must contain an address, it is not invalid merely because the address on the form does not match the address in the Supervisor's records. T2 at 465:23–466:13.

166. Initiative petition forms must include—and the Supervisors must verify—the voter's Florida driver-license or identification-card number or the last four digits of the voter's social-security number. Fla. Stat. § 100.371(14)(c)3.d.; T2 at 468:11–14.

167. Sometimes, the Supervisor's records do not include these numbers, or the number in the Supervisor's records does not match the number provided on the petition form. T2 at 468:11–469:25, 606:14–20.

168. In that case, staff access the Driver and Vehicle Identification Database (DAVID) maintained by the Department of Highway Safety and Motor Vehicles. T2 at 469:1–9, 606:21–607:1; T7 at 1810:13–1811:3.

169. DAVID provides the voter's name, address, date of birth, driver-license number, and social-security digits. T7 at 1810:24–1811:3.

170. Mismatches between the driver-license number on the petition form and the driver-license number in the Supervisor's records may result from Florida's

31

recent randomization and reissuance of driver-license numbers. T2 at 469:17–470:12; Ch. 2022-175, § 4, Laws of Fla. (codified at Fla. Stat. § 322.14(1)(a)).

171.   Candidate and local-issue petitions do not require the voter to provide a driver-license or identification-card number or social-security digits. T2 at 631:23–632:11. To verify candidate and local-issue petitions, it is not necessary to routinely search DAVID. T2 at 607:25–608:2.

172.   The Supervisor's office must confirm the correctness of the date of birth provided on the petition form and invalidate the petition form if the Supervisor's office cannot confirm the date of birth. T2 at 471:20–25.

173.   When verifying the signature on the petition form, staff sometimes references multiple signatures on file to confirm that the signature on the petition form is authentic. T2 at 474:21–475:4, 478:17–480:6, 613:12–21.

174.   The Supervisor's records often include multiple instances of a voter's signature, including signatures in poll books and on voter-registration applications. T2 at 478:17–480:6.

175.   The Supervisor's office evaluates whether the same voter previously signed another petition form in support of the same initiative—*i.e.*, whether the petition form is a duplicate. T2 at 614:5–8. Voters often submit duplicate petitions. T2 at 614:5–10.

176. Initiative petition forms distributed by petition circulators must include a petition circulator's affidavit that displays information about the petition circulator. Fla. Stat. § 100.371(14)(c)5., (14)(h).

177. The Supervisor's office must confirm that the petition circulator signed and dated the petition form and was validly registered when the voter signed the petition. T2 at 459:22–460:17, 476:1–8, 608:7–15; Fla. Stat. § 100.371(14)(c)5., (14)(h).

178. A petition circulator's registration status can change over time. T2 at 529:11–17, 608:22–23.

179. To determine whether the petition circulator was validly registered when the voter signed the petition, the Supervisor's office compares the date on which the voter signed the petition to a list of petition circulators that the State provides and regularly updates. T2 at 608:17–21, 610:19–611:3; T7 at 1816:7–11.

180. The petition-circulator requirements do not apply to candidate or local-issue petitions. T7 at 1809:17–19. To verify candidate and local-issue petitions, it is not necessary to verify any information regarding petition circulators. T2 at 610:1–3, 610:19–611:6; 631:23–632:11.

181. If the Supervisor's office receives a petition form signed by a voter registered in another county, then it must notify both the initiative sponsor and the Division of Elections. Fla. Stat. § 100.371(14)(b); T7 at 1811:12–16.

182. The Supervisor's office treats the petition form as "misfiled" and returns the petition form to the sponsor. T2 at 466:14–467:10, 611:22–24; T7 at 1811:17–1812:2.

183. Petition forms for statewide initiatives are much more often misfiled than candidate and local-issue petitions. T2 at 611:7–21.

184. A Supervisor who verifies a petition form as valid must mail a verification notice to the voter. Fla. Stat. § 100.371(14)(e); T2 at 485:1–11, 491:22–24, 614:17–20; T7 at 1812:22–1813:20.

185. The verification notice invites the voter to notify the Office of Election Crimes and Security (OECS) if the voter's signature was forged or misrepresented and provides the voter with a postage-prepaid form for that purpose. Fla. Stat. § 100.371(14)(e).

186. The prepaid postage is charged to the Supervisor if and when the voter mails the form to OECS. Fla. Stat. § 100.371(14)(e); T2 at 619:10–13.

187. The preparation of verification notices requires supplies, such as envelopes and return envelopes; paper for the notice; postage and return postage; and delivery of mailings to the post office. T7 at 1835:7–25.

188. To prepare the verification-notice mailings, the Supervisor's office relies on a large mail sorter and inserter—an expensive machine—and then feeds the envelopes through a postage meter. T2 at 615:8–13, 617:3–8.

189. Some counties stuff the envelopes themselves; others outsource the work. T2 at 616:20–23.

190. Upon OECS's receipt of a form, the Supervisor's office is informed and must invalidate the petition form. Fla. Stat. § 100.371(14)(e); T2 at 494:12–14, 618:25–619:9.

191. The verification-notice requirements do not apply to candidate or local-issue petition forms. T2 at 618:15–19, 633:4–8; T7 at 1812:22–1813:23.

192. If more than 25 percent of a sponsor's petition forms are found invalid in any month—or, between December 1 of each odd-numbered year and the following February 1, in any week—then the Supervisor must notify OECS. Fla. Stat. § 100.371(14)(g); T7 at 1814:8–12.

193. Because the invalidity rate for initiative petitions almost always exceeds 25 percent, the Supervisor's office must submit a report to OECS for each initiative petition for nearly all reporting periods. T2 at 624:6–16.

194. The requirement to report to OECS when the invalidity rate exceeds 25 percent does not apply to candidate or local-issue petitions. T2 at 633:25–634:7; T7 at 1813:24–1814:15.

195. Initiative petition forms must be verified within 60 days after receipt of the petition form and payment and processing of the verification fee (or 30 days in

the case of a petition form submitted fewer than 60 days before the February 1

deadline). Fla. Stat. § 100.371(14)(b); T2 at 620:1–9.

196.   These 60- and 30-day deadlines do not apply to candidate or local-issue

petitions. T2 at 620:10–19.

197.   Supervisors must electronically report data regarding initiative petition

forms to the Division of Elections. Fla. Admin. Code r. 1S-2.0091(5). This report is

called the Recordation of Verification Report. T2 at 624:20–625:10.

198.   Specifically, by the deadline to verify a petition form, the Supervisor

must report to the Division the initiative's serial number, the date of verification, the

number of verified signatures by congressional district, the number of invalid

signatures, and the petition circulator's registration number, if applicable. Fla.

Admin. Code r. 1S-2.0091(5).

199.   The Supervisor's office is not required to submit Recordation of

Verification Reports with respect to candidate or local-issue petitions. T2 at 626:5–

8.

200.   Each month, the Supervisors must post information online about each

active initiative, including the number of signatures submitted, processed, and

validated. Fla. Stat. § 100.371(14)(g); T2 at 625:11–626:4; T7 at 1813:24–1814:7.

201.   Between December 1 of each odd-numbered year and the following

February 1, these reports must be posted weekly. Fla. Stat. § 100.371(14)(g).

36

202. The Supervisor's office is not required to post information about candidate or local-issue petitions on its website. T2 at 633:14–18; T7 at 1813:24–1814:15.

203. Each month, the Supervisor's office must transmit digital images of all received initiative petition forms to the Division of Elections. Fla. Stat. § 100.371(14)(d).

204. Between December 1 of each odd-numbered year and the following February 1, these transmittals must be made weekly. Fla. Stat. § 100.371(14)(d).

205. Each transmittal must identify each petition form as valid or invalid. Fla. Stat. § 100.371(14)(d).

206. To comply with this requirement, the Supervisor's office uploads digital images of all petition forms to the Division of Elections, together with a .txt file that distinguishes valid from invalid petition forms. T2 at 621:17–622:21.

207. If a voter mails a form to OECS, and the Supervisor's office must change a petition form from valid to invalid, then the Supervisor's office must re-generate the .txt file to accurately distinguish valid from invalid petition forms. T2 at 618:20–619:9.

208. The Supervisor's office does not upload digital images of candidate or local-issue petitions. T2 at 623:12–14, 632:18–21.

37

209. By March 15 of each even-numbered year, the Supervisor's office must deliver all physical petition forms to the Division of Elections. Fla. Stat. § 100.371(14)(d); T2 at 623:15–23; T7 at 1814:16–21; T7 at 1837:17–21.

210. The transmittal of petition forms to the Division involves labor and shipping costs. T7 at 1837:17–24.

211. The requirement to transmit petition forms to the Division does not apply to candidate or local-issue petition forms. T2 at 623:15–23, 632:22–24.

212. Sponsors submit initiative petition forms in larger batches during the two months preceding the February 1 deadline, while candidate and local-issue petitions are submitted in a more gradual or well-proportioned stream. T2 at 620:20–621:10.

213. Ms. Molina testified that candidate petition forms usually arrive in much smaller quantities than initiative petition forms. T7 at 1812:6–17.

214. Supervisor Earley testified that the verification of a candidate or local-issue petition form is "very quick"—"under a minute." T2 at 619:23–25.

215. Supervisor Earley testified that the difference in the complexity involved in verification of initiative petition forms and verification of candidate and local-issue petition forms is "not even close": "Night and day." T2 at 632:15–633:3.

216. Ms. Molina also testified that candidate petition forms are much easier to process than initiative petition forms. T7 at 1806:5–16.

38

217.    Ms. Molina testified that there are "major differences" in the time it takes to verify an initiative petition forms and candidate or local-issue petition forms and that initiative petition forms take much longer to verify. T7 at 1817:1–8.

218.    From all standpoints, the verification of initiative petitions places dramatically more strain on Supervisor Earley's office than the verification of candidate or local-issue petitions. T2 at 621:12–16.

### *Invalidity Rates*

219.    In Leon County, approximately one-third of initiative petition forms are determined to be invalid. T2 at 627:22–628:4.

220.    For a long period of time, the invalidity rate in Leon County has been much higher among initiative petitions than among candidate or local-issue petitions. T2 at 644:2–16.

221.    During the 2026 cycle, about 20,000—or 55.6 percent—of the 36,000 petition forms that the Leon County Supervisor's office received in support of SSF's initiative were determined to be valid. T2 at 628:5–13.

222.    Supervisor Earley testified that the invalidity rate among initiative petitions has been "roughly the same" before and since HB 1205's enactment, and that it is unclear whether invalidity rates have increased or decreased since HB 1205 took effect. T2 at 644:2–16.

223.    Invalid petition forms can take more time to review. T2 at 628:14–18.

224. In Miami-Dade County, in 2022, only 40 percent of initiative petition forms were determined to be valid; in the most recent year, the validity rate was 46 percent. T7 at 1817:19–1818:1.

225. In contrast, in Miami-Dade County, approximately 85 percent of local-issue petition forms and 95 percent of municipal candidate petition forms have been determined to be valid. T7 at T7 at 1817:19–1818:4.

### The Volume of Submitted Petition Forms

226. During 2024 and 2025, approximately 80 percent of the petition forms that the Leon County elections office received were initiative-petition forms: approximately 46,000 initiative petition forms, approximately 11,000 candidate petition forms, and no local-issue petition forms. T2 at 626:15–627:6, 631:23–632:3.

227. Initiative petition forms have consistently represented approximately 80 to 85 percent of all petition forms that the Miami-Dade County elections office has received. T7 at 1817:9–18.

### Statistical Sampling

228. Supervisors may not use statistical sampling to verify initiative petition forms. T2 at 627:7–16, 634:8–11; *Let's Help Fla. v. Smathers*, 360 So. 2d 494, 496 (Fla. 1st DCA 1978); Op. Div. of Elections 03-04 (2003); Op. Div. of Elections 78-07 (2003).

40

229. In contrast, the proponent of a candidate or local-issue petition may elect verification by statistical sampling. Fla. Stat. § 99.097(1)–(2); Fla. Admin. Code r. 1S-2.008.

230. Without statistical sampling, the verification of initiative petitions is much more time-consuming. T2 at 627:17–21.

### *Verification's Impacts on the Elections Office*

231. Supervisor Earley testified that, if his office could not charge a verification fee, then either the taxpayers must bear the burden, or other activities in the elections office might suffer. T2 at 634:22–635:11.

232. Before HB 1205 was enacted, in Leon County, petition verification was performed by two full-time employees and, as needed, six temporary employees. T2 at 461:21–462:5.

233. Currently, 17 full-time employees focus on petition verification, including a core group of eight people who focus predominantly on petition verification. T2 at 462:6–11, 477:13–24, 629:16–630:3.

234. Supervisor Earley hired extra people to verify initiative petitions. T2 at 634:22–635:4.

235. During 2024 and 2025, the Leon County elections office incurred overtime to verify initiative petition forms, but not to verify candidate petition forms. T2 at 626:15–627:6.

41

236.    Before the deadline on February 1, 2026, a single initiative sponsor (SSF) submitted virtually all initiative petitions that the Leon County elections office received. T2 at 598:5–9.

237.    In Miami-Dade County, the elections office hired temporary staff and incurred overtime to verify all initiative petition forms. T7 at 1818:17–20.

238.    During the 2026 cycle, to verify initiative petitions, the Miami-Dade County elections office hired between 10 and 16 temporary staff, beginning in September 2025. T7 at 1818:21–1819:13.

239.    The Miami-Dade County elections office incurred $15,000 in overtime after December 1, 2025, and $285,000 for temporary staff through December 31, 2025. T7 at 1818:21–1819:13, 1834:19–22.

240.    The Miami-Dade County elections office verifies all candidate and local-issue petition forms without hiring temporary staff or incurring overtime. T7 at 1818:13–16.

### Supervisors of Elections' Budgets

241.    By June 1 of each year, a Supervisor must submit a proposed budget to the board of county commissioners. Fla. Stat. §§ 129.03(2), 129.201(1); T1 at 542:6–13.

242. The Supervisor must provide the board with all relevant and pertinent information the board deems necessary to evaluate the proposed budget. Fla. Stat. § 129.201(3); T1 at 542:6–13.

243. Before it approves the Supervisor's proposed budget, the board may amend, modify, increase, or reduce any or all items of expenditure in the proposed budget. Fla. Stat. § 129.201(4); T1 at 542:6–13.

244. Once it approves Supervisor's budget, the board must include in the county budget the items of proposed expenditures set forth in the Supervisor's approved budget. Fla. Stat. § 129.201(5).

245. Verification fees are charged regardless of the content of the initiative, T7 at 1823:23–1824:7, and regardless of the petition form's validity or invalidity, T2 at 643:11–644:1.

246. Ms. Molina testified that, if an initiative sponsor failed to pay the verification fee in full, then her office would contact the sponsor to request payment. T7 at 1815:19–25. She testified that her office had "very good communication" with all initiative sponsors. T7 at 1821:20–1822:1.

### Additional Witnesses

247. Ciera Cox, a regional coordinator for Florida Right to Clean Water, repeatedly referred to an initiative petition as "legislation." T4 at 1028:2–9, 1031:1, 1031:6, 1031:24, 1032:22, 1036:16, 1052:16.

43

248.    Juan Ardila, who oversaw volunteer petition circulators engaged on FDH's campaign, agreed that petition collection can be separated into two components: (i) the front end, where the petition circulator introduces himself or herself to a voter, builds rapport, and engages with the voter; and (ii) the back end, where, once the voter has signed the petition form, the petition circulator does something with the form (*e.g.*, places the form in an envelope or hands it to a Supervisor). T2 at 384:12–385:17.

249.    Melissa Martin, a campaign coordinator with Florida Right to Clean Water, acknowledged that HB 1205 "does not impede [her] ability to talk to people about" the importance of Florida Right to Clean Water. T3 at 664:2–5, 755:12–16.

## CONCLUSIONS OF LAW

**I.    PLAINTIFFS' CHALLENGES TO THE COST-RECOVERY PROVISIONS ARE MOOT.**

### A.    SSF Presented No Evidence of Concrete Plans to Launch a New Campaign.

SSF's initiative campaign is over, and it offered no evidence of concrete plans to launch a new campaign. Because SSF did not establish that it will imminently be required to pay verification fees again, its challenge to the Cost-Recovery Provisions is moot.

To establish standing, a plaintiff must prove that it suffers an actual or imminent injury that is concrete and particularized, fairly traceable to the challenged conduct,

and redressable. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The existence of a "genuine, live dispute between adverse parties" ensures that federal courts do not issue advisory opinions, *Carney v. Adams*, 592 U.S. 53, 58 (2020), or exercise "general oversight of the elected branches of government," *id*. at 59 (quoting *United States v. Richardson*, 418 U.S. 166, 188 (1974) (Powell, J., concurring)). A plaintiff must maintain a personal stake in the outcome of the litigation from its commencement and through its continuance. *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980).

SSF presented no evidence that it faces a concrete, particularized, and actual or imminent injury. SSF paid verification fees during its campaign to place an initiative on the 2026 ballot, but that campaign concluded on February 1, when the Supervisors certified the number of valid signatures to the Secretary of State. *See* Fla. Const. art. XI, § 5(b); Fla. Stat. § 100.371(1)(a). It is now too late to submit more signatures for verification.

SSF does not seek retrospective relief with respect to the verification fees it has already paid. *See* ECF No. 439 (consenting to dismissal of damages claim); ECF No. 440 (dismissing damages claim). Without more, a past injury cannot support standing to seek prospective relief. *31 Foster Child. v. Bush*, 329 F.3d 1255, 1265 (11th Cir. 2003) ("When a plaintiff cannot show that an injury is likely to occur immediately, the plaintiff does not have standing to seek prospective relief even if he has suffered a past injury.").

As for a future campaign, the record does not reveal that SSF has any concrete plans. SSF presented the testimony of Meghan Cox, a political consultant who does business as Groundgame Political Solutions, LLC—the subcontractor that managed the paid-petition-circulator component of SSF's recently concluded campaign. FF ¶¶ 94–97.[3] When asked whether SSF plans to offer an amendment "in a future cycle," Ms. Cox responded hesitantly: "I believe so." FF ¶ 105. Then, when asked whether SSF intends to pursue a campaign in 2028, she responded even more mysteriously: "Unknown variables." FF ¶¶ 106. She referenced this litigation and purported budget constraints as examples of those unknown variables, but shed no light on the others. FF ¶ 107. (SSF raised more than $200 million during its 2026 campaign. FF ¶ 103.) Finally, when asked whether SSF has a "political committee active to try to get on the 2028 ballot," Ms. Cox disclaimed knowledge: "That is—I do not know yet." FF ¶ 108.

These obscure and non-committal responses by an SSF subcontractor fall well short of the concrete evidence needed to invoke this Court's subject-matter jurisdiction. In *Lujan*, the plaintiffs challenged a regulation that exempted federal-agency activities in foreign nations from certain safeguards against harmful environmental impacts. 504 U.S. at 558–59. To establish their standing, the plaintiffs claimed that they intended to visit foreign nations to observe their natural environment. *Id*. at 563–64. But this mere "profession" of an intent was too indefinite: the plaintiffs did not reveal

---

[3] "FF" refers to the Findings of Fact set forth above.

46

when they would travel abroad or outline any firm, concrete plans to do so. *Id*. at 564.

*Carney* also involved a plaintiff's stated intent to take action that would place the plaintiff in harm's way. There, the plaintiff challenged a state law that permitted only registered Democrats and Republicans to serve in certain judicial offices. 592 U.S. at 55–56. The plaintiff, a registered independent, testified that he would apply for any judicial position for which he considered himself qualified. *Id*. at 61. But the plaintiff had been an active, lifelong Democrat until he changed his registration days before he filed his lawsuit. *Id*. at 61–62. He was also no longer an active member of the Bar and had never taken any steps—before or after filing the lawsuit—to apply for a judgeship. *Id*. The Court was unconvinced that the plaintiff faced a "concrete, particularized, and imminent rather than conjectural or hypothetical" injury. *Id*. at 60 (internal marks omitted). The plaintiff did not demonstrate that, but for the challenged restriction, he would "likely . . . apply to become a judge in the reasonably foreseeable future"—in other words, that he was "able and ready" to apply. *Id*. (internal marks omitted). Under these circumstances, his "statement of intent" was insufficient. *Id*. at 64.

Similarly, in *Aaron Private Clinic Management LLC v. Berry*, 912 F.3d 1330 (11th Cir. 2019), the plaintiff challenged two statutes that restricted the availability of licenses to operate narcotic-treatment facilities. The plaintiff alleged that it "aspired to open a methadone clinic someday" and had formed a limited liability company to

47

serve as the management company for future methadone clinics. *Id.* at 1337. But the plaintiff offered no "specific and concrete facts" to suggest a "substantial probability" that, but for the challenged statutes, its "projects would come into existence." *Id.* In fact, the complaint failed to allege any "concrete steps" to suggest that the plaintiff "immediately intended to bring, and actually could bring, its clinic into operation." *Id.*; *accord Shen v. Comm'r, Fla. Dep't of Agric. & Consumer Servs.*, 158 F.4th 1227, 1244 (11th Cir. 2025) (concluding that plaintiff failed to show that a land-purchase restriction caused her an imminent injury, since she did not describe "specific plans" to purchase land, but only stated a concern for her future ability to purchase a home).

Here, the evidence of a live claim is even weaker. Like the plaintiffs in *Lujan*, *Carney*, and *Aaron*, SSF has no concrete plan. The record does not reveal when SSF will initiate a new campaign or what specific steps SSF has taken or will take to initiate a new campaign. And unlike the plaintiffs in *Lujan* and *Carney*—whose statements of intent, though conclusory, were at least certain and positive—Ms. Cox's testimony was vague and equivocal. Ms. Cox did not say that SSF *will* launch a new campaign— only that she *believes* it will. Nor did she disclose *why* she thinks so—or whether her belief is any better founded than a hunch, intuition, or speculation. Ms. Cox further testified that whether SSF tries again depends on unknown variables, but she offered only two examples of those unknown variables. The other variables remain shrouded in mystery—leaving the Court unable to evaluate the probability of future injury. Ms.

48

Cox did not even know whether SSF has an active political committee for the 2028 cycle.

The record does not reveal, for example, that SSF has settled on ballot language or amendment text or submitted a petition form to the State for approval. It does not reveal that SSF has developed a budget or a fundraising plan, begun to raise money for a 2028 campaign, or established fundraising or petition-collection benchmarks or goals. It does not reveal that SSF has established a website or developed any specific mechanism to distribute petitions. It does not reveal that SSF has conducted polling, hired any staff, recruited any volunteers, contracted with any consultants, or renewed its contracts with contractors and subcontractors, such as Vanguard and Groundgame.

The record thus contains no evidence that SSF has concrete plans to initiate a new campaign and subject itself to the payment of verification fees. It surely does not establish a substantial probability that SSF will do so in the immediate or foreseeable future.

Ms. Cox's testimony, moreover, carries little weight because the evidence does not reveal that Ms. Cox has any personal knowledge of SSF's plans.[4] Ms. Cox is not

---

[4] It makes no difference that Ms. Cox was SSF's corporate representative at trial. Federal Rule of Civil Procedure 30(b)(6) requires a corporate representative to testify *at deposition* "about information known or reasonably available to the organization," regardless of the witness's personal knowledge. At trial, however, no similar rule authorizes lay witnesses to testify from secondhand knowledge. Rather, at trial, the "corporate representative" designation only exempts the witness from the rule of sequestration. *See* Fed. R. Evid. 615(a)(2). Meanwhile, Federal Rule of Evidence 602

an officer of employee of SSF—only a subcontractor. SSF presented no evidence that Ms. Cox has any authority to make decisions for SSF or is privy to its decision-making process.

SSF cannot invoke the capable-of-repetition exception to sidestep the requirement of a concrete and imminent injury. The capable-of-repetition doctrine permits courts to decide moot claims—but only if the plaintiff establishes, *inter alia*, a "reasonable expectation or a demonstrated probability that the same controversy will recur involving *the same complaining party*." *Fed. Election Comm'n v. Wis. Right To Life, Inc.*, 551 U.S. 449, 463 (2007) (emphasis added); *accord Hall v. Sec'y, Ala.*, 902 F.3d 1294, 1305 n.9 (11th Cir. 2018) (holding that a candidate's claim was moot because the candidate failed to establish "a 'reasonable expectation' that he will run again and be subjected to the same or similar restrictions"). That is exactly what the record here does not show: that SSF will launch a new campaign and again pay verification fees.

The capable-of-repetition exception is inapplicable for a second reason as well. It applies "only in exceptional situations," *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983)—*i.e.*, where claims "truly evade review in an exceptional way," *Newdow*

---

requires lay witnesses who appear at trial to testify from their personal knowledge. *See Indus. Eng'g & Dev., Inc. v. Static Control Components, Inc.*, No. 8:12-cv-00691, 2014 WL 4983912, at *3 (M.D. Fla. Oct. 6, 2014) ("While Rule 30(b)(6) permits Newman's deposition testimony to be based on matters outside his personal knowledge, Rule 602 limits his trial testimony to matters that are within his personal knowledge.").

50

*v. Roberts*, 603 F.3d 1002, 1009 (D.C. Cir. 2010). To invoke the exception, a plaintiff must "make a full attempt to prevent" its claims from becoming moot. *Id.*; *accord Minn. Humane Soc'y v. Clark*, 184 F.3d 795, 797 (8th Cir. 1999). To this end, the plaintiff "must take advantage of legal avenues that would allow for litigation within the necessary time constraints," *Abdurrahman v. Dayton,* 903 F.3d 813, 817 (8th Cir. 2018), and "diligently use the tools it had to get more thorough, even if not complete, review," *Empower Texans*, *Inc. v. Geren*, 977 F.3d 367, 371 (5th Cir. 2020). The plaintiff must sue promptly, pursue preliminary relief and interlocutory appeals, and seek expedited treatment if necessary. *Armstrong v. FAA*, 515 F.3d 1294, 1296 (D.C. Cir. 2008). A plaintiff that does not act "quickly and resourcefully" cannot credibly assert that its claims evaded review because the duration of the challenged conduct was too short. *Dow Jones & Co.*, *Inc. v. Kaye*, 256 F.3d 1251, 1258 (11th Cir. 2001).

Here, the Supervisors increased their verification fees between July 2025 and October 2025. FF ¶ 20. SSF never moved for a preliminary injunction on this issue, even as it continued to collect petition forms and pay the fee. When FDH moved for a preliminary injunction to enjoin the Supervisors from enforcing the increased fees, SSF did not join. ECF No. 356. Because SSF did not exhaust all available avenues to secure relief while its claim was still live, it should not be heard to argue that its claims evaded review.

51

Because SSF's challenge to the verification fees is moot, the Court should enter judgment in the Supervisors' favor.

**B.      SSF Did Not Prove That Increased Verification Fees Will Curtail Its Ability to Speak.**

Even if SSF proved that it will initiate a new campaign, it failed to prove injury. SSF can easily pay the verification fees without any impact on its ability to speak. SSF is awash in money. It has ready access to seemingly endless resources. It did not show that it has a finite budget or that an increase in verification fees will detract from its communication with voters. Thus, it cannot claim harm to its First Amendment rights.

From August 2022 to December 2025, SSF raised more than $206 million. FF ¶ 103. It received nearly 96 percent of that amount from one wealthy patron, Trulieve, which contributed more than $197 million to SSF between August 2022 and December 2025. FF ¶ 103. These contributions included one check for $22 million, 22 checks for at least $5 million each, and 47 checks for at least $500,000 each. FF ¶ 103. Trulieve poured immense amounts of money into SSF from day to day and week to week: in the fourth quarter of 2025 alone, Trulieve made contributions of $2 million, $6.6 million, $500,000, $3.3 million, $4.1 million, $4.075 million, and $6.3 million. FF ¶ 102.

SSF's claim that it will be forced to scale back its petition-circulation efforts to pay the verification fees does not pass the straight-face test. Far from showing that an increase in verification fees will affect SSF's ability to speak, the record reveals that

SSF receives regular, multi-million-dollar cash infusions from Trulieve. There is no evidence that the increase in verification fees—$2.50 per petition, or $3.25 million to verify 1.3 million petitions—would impact SSF's petition-circulation efforts. Most likely, Trulieve will simply write another check. After all, $3.25 million is a drop in the bucket: during the 2026 campaign, Trulieve wrote 27 checks for more than $3.25 million each, FF ¶ 103, and $3.25 million is only 1.6 percent of the $197 million that Trulieve contributed.

SSF presented no evidence to demonstrate how the increase in verification fees will hinder its speech. Because SSF failed to prove that the increased fees will affect protected activities, it did not establish that it faces an actual or imminent injury to its First Amendment rights.

### C.    FDH Presented No Evidence of Concrete Plans to Launch a New Campaign.

FDH also failed to establish the existence of a live dispute. Its campaign is over, and the record does not establish a substantial probability that FDH will launch a campaign for the 2028 ballot. The evidence of FDH's intentions is vague and inchoate—not specific and concrete. FDH's challenge to the Cost-Recovery Provisions is moot.

Mr. Emerson testified that FDH intends to run another campaign—this time, for the 2028 ballot. FF ¶ 68. He testified that FDH has asked its coalition partners to "be prepared" and informed its hubs—which served as meeting places for volunteers and petition pickup and drop-off points—that there "might" be an opportunity for their

53

future engagement. FF ¶¶ 70–71. Mr. Emerson also testified that FDH has "done some press" to let people know of its plans for 2028, but did not describe the nature or extent of those efforts. FF ¶ 72. FDH does not have a budget for the 2028 cycle. FF ¶¶ 74–75.

Mr. Emerson failed, however, to outline any concrete plans or concrete steps that FDH has taken since it suspended its campaign in September 2025—more than four months before trial began. The record does not reveal that FDH has established fundraising or petition-collection goals or developed a website or other mechanism to distribute petitions, digitally or otherwise. It does not reveal that FDH has conducted polling, hired staff, recruited volunteers, contracted with consultants, or renewed its contracts with its vendors (tallyED and The Outreach Team). FDH admits it does not have a budget.

The mere fact that FDH has advised its coalition partners to "be prepared" and informed its hubs that there "might" be future opportunities does not show concrete plans, nor does Mr. Emerson's vague and non-descriptive assertion that FDH has "done some press." Under *Lujan*, *Carney*, and *Aaron*, this evidence is insufficient to enable the Court to conclude that FDH will again be required to pay verification fees and suffer a concrete and imminent injury. *See supra* Part I.A.; *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016) (defining "concrete" to mean "*de facto*" or "real" and not "abstract").

54

Courts "should not speculate concerning the existence of standing" or "imagine or piece together an injury sufficient to give plaintiff standing when it has demonstrated none." *Miccosukee Tribe of Indians of Fla. v. Fla. State Athletic Comm'n*, 226 F.3d 1226, 1229–30 (11th Cir. 2000). Here, the record requires speculation. With its campaign concluded, FDH has not carried its burden to establish that its challenge to the Cost-Recovery Provisions remains a live dispute. Because FDH's challenge to the verification fees is moot, the Court should enter judgment in favor of the Supervisors.

## II.    THE COST-RECOVERY PROVISIONS DO NOT VIOLATE THE FIRST AMENDMENT.

### A.    The Cost-Recovery Provisions Do Not Implicate the First Amendment.

The Cost-Recovery Provisions regulate the initiative process, not speech, and therefore do not raise a First Amendment issue.

A State's regulation of the initiative process is not subject to First Amendment scrutiny merely because it is "burdensome," "imposes unnecessary costs," is not "the most efficient or affordable," and is not structured "in the most efficient, user-friendly way possible." *Biddulph v. Mortham*, 89 F.3d 1491, 1497–1501 (11th Cir. 1996). The First Amendment does not protect initiative sponsors from the expense of a campaign.

Rather, in the context of initiatives, federal courts distinguish between laws that regulate speakers or their speech—such as the statute challenged in *Meyer v. Grant*, 486 U.S. 414 (1988)—and general initiative regulations that do not regulate speakers

55

or their speech, such as those challenged in *Biddulph*. The former regulates political speech and triggers strict scrutiny, but the latter regulates only state-created rights and does not implicate the First Amendment. Under *Biddulph*, the dispositive question is *what does the regulation regulate*—not whether the regulation imposes expense that diminishes the availability of funds for other purposes, including petition circulation.

Thus, the Eleventh Circuit has distinguished "the rights of candidates to offer themselves for public office and . . . of voters to vote for or against those candidates" from the "wholly state-created procedures by which issues . . . may be put to the voting populace." *Gibson v. Firestone*, 741 F.2d 1269, 1273 (11th Cir. 1984) (distinguishing). "Although the First Amendment protects political speech incident to an initiative campaign, it does not protect the right to make law, by initiative or otherwise." *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1099 (10th Cir. 2006) (en banc); *accord Biddulph*, 89 F.3d at 1500 (finding "no constitutionally-protected right" to place issues before Florida's electorate (quoting *Gibson*, 741 F.2d at 1274)).

The key question therefore is whether the Cost-Recovery Provisions fall on the *Meyer* side or the *Biddulph* side of the line. Those two cases, and the many that follow them, place the Cost-Recovery Provisions squarely on the *Biddulph* side.

In *Meyer*, the Court invalidated a state statute that criminalized the payment of compensation to petition circulators. It explained that the "circulation of an initiative petition of necessity involves both the expression of a desire for political change and

56

a discussion of the merits of the proposed change." 486 U.S. at 421. As a result, "the circulation of a petition involves the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Id.* at 421–22. The challenged statute restricted "political discourse" through "direct one-on-one communication" between petition circulators and individual voters and therefore was subject to and failed strict scrutiny, which is "well-nigh insurmountable." *Id.* at 425.

Later, in *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182 (1999), the Court applied strict scrutiny to three state statutes that directly regulated petition circulators: a prohibition on individuals other than registered voters from circulating petitions, a requirement that each petition circulator wear a name badge, and a requirement that initiative sponsors report the names, addresses, and compensation of all paid circulators to the State. *Id.* at 186. Each statute placed a regulation directly on speakers who communicated messages to voters. The Court observed that petition circulators, like "handbill distributors, . . . seek to promote public support for a particular issue or position" through voter interaction. Restrictions aimed at petition circulators raised First Amendment concerns and were subject to strict scrutiny. *Id.* at 194, 197–98.

In contrast, in *Biddulph*, an initiative sponsor claimed that Florida's rules for judicial review of initiative petitions violated his First Amendment rights. The sponsor argued that because judicial review of an initiative—and the risk of removal from the

ballot—came only after a "costly and time-consuming" petition-circulation process, sponsors faced a "financial gamble" and a "deterrent effect" that dissuades them from petition circulation. 89 F.3d at 1496. The court concluded, however, that this did not "implicate First Amendment concerns." *Id*. at 1500. The court recognized a distinction between "regulation of the circulation of petitions"—which is core political speech— and a state's "general initiative regulations." *Id*. at 1497. In other words, *Meyer* drew an "explicit distinction between a state's power to regulate the initiative process in general and the power to regulate the exchange of ideas about political changes sought through the process." *Id*. at 1498 n.7. *Meyer* was inapposite because, although a State is "limited in the extent to which it can permissibly burden the communication of ideas . . . that occurs *during petition circulation*," it remains "generally free to regulate its own initiative process." *Id*. at 1498 (emphasis added). Thus, "states maintain broad discretion in fashioning initiative mechanisms," and "[m]ost restrictions a state might impose on its initiative process" do not implicate the First Amendment. *Id.* at 1500– 01.

Other circuits embrace the same distinction, declining to subject *Biddulph*-like initiative regulations to First Amendment scrutiny. In its en-banc decision in *Walker*, 450 F.3d at 1099–1101, the Tenth Circuit explained that the laws challenged in *Meyer* and *Buckley* "specifically regulated the process of advocacy itself: the laws dictated *who* could speak . . . or *how* to go about speaking." *Id*. at 1082 (emphases in original).

58

It emphasized the "crucial difference between a law that has the 'inevitable effect' of reducing speech because it restricts or regulates speech, and a law that has the 'inevitable effect' of reducing speech because it makes particular speech less likely to succeed." *Id*. at 1100. The court rejected the argument that the latter implicates the First Amendment, reasoning that, under plaintiffs' contention, "every structural feature of government that makes some political outcomes less likely than others—and thereby discourages some speakers from engagement in protected speech—violates the First Amendment." *Id.*; *accord Semple v. Griswold*, 934 F.3d 1134, 1142 (10th Cir. 2019) (holding that a requirement to collect signatures in each State Senate district "does not give rise to a cognizable First Amendment claim," even if it "makes it more difficult and costly to amend the Colorado constitution"); *Molinari v. Bloomberg*, 564 F.3d 587, 600 (2nd Cir. 2009) (distinguishing a law that "reduces speech because it restricts or regulates speech" from one that "reduces speech because it makes particular speech less likely to succeed," and holding that only the "former implicates the First Amendment").

A comparison of the regulations challenged in other initiative cases makes plain how this Court should treat the Cost-Recovery Provisions. On the *Meyer* side, courts have applied First Amendment scrutiny to regulations that:

- Prohibited payment of petition circulators (*Meyer*);

- Prohibited anyone other than registered voters from circulating petitions (*Buckley*);

- Required petition circulators to wear name badges (*Buckley*);

- Required the names, addresses, and compensation of paid petition circulators to be reported to the State (*Buckley*); and

- Prohibited petition circulation in the twelve months preceding a general election (*SD Voice v. Noem*, 60 F.4th 1071 (8th Cir. 2023)).

Each of these laws regulated the communicative element of initiative campaigns. In contrast, in the *Biddulph* camp, courts have found that the following regulations did not implicate the First Amendment:

- State procedures for judicial review of ballot measures and their removal from the ballot (*Biddulph*);

- Signature-verification procedures (*Taxpayers United for Assessment Cuts v. Austin*, 994 F.2d 291, 297 (6th Cir. 1993));

- State's calculation of the signature threshold (*Dobrovolny v. Moore*, 126 F.3d 1111 (8th Cir. 1997));

- State's requirement of a supermajority vote to adopt ballot measures (*Walker*);

- City's power to repeal or amend laws adopted by initiative (*Molinari*);

- Procedures for the State's preparation of summaries of ballot measures (*Missouri Roundtable for Life v. Carnahan*, 676 F.3d 665 (8th Cir. 2012));

- City's power to implement an ordinance while an initiative to repeal the ordinance is underway (*MacMann v. Matthes*, 843 F.3d 770, 778–79 (8th Cir. 2016));

- State's limit on the number of local referenda that may appear on a ballot (*Jones v. Markiewicz-Qualkinbush*, 892 F.3d 935, 936–38 (7th Cir. 2018));

60

- State's requirement that signatures be gathered in each State Senate district (*Semple*);

- State's requirement that, after collecting petition forms, the petition circulator execute an affidavit in the presence of a notary (*Miller v. Thurston*, 967 F.3d 727, 738–39 (8th Cir. 2020)); and

- State's requirement that signed petition forms be submitted to election officials within 10 days (*Florida Decides Healthcare*, ECF No. 189).

The recent opinion of a stay panel in *Florida Decides Healthcare Inc. v. Florida Secretary of State*, No. 25-12370, 2025 WL 3738554 (11th Cir. Sep. 9, 2025), supports this distinction.[5] There, the court considered a statute that prohibited non-citizens and non-residents from *collecting* petition forms. The court explained that the statute did not "restrict any speech elements of the petition-circulation process," *id*. at *4, or bar non-citizens and non-residents from engaging with voters in "informative and perhaps persuasive speech," *id*. (quoting *Meyer*, 486 U.S. at 422 n.5). Rather, the statute's "restrictions kick in only after a voter has been convinced to sign the petition form." *Id*. Because "attempts to persuade a Florida voter occur before—not after—the voter decides to sign a petition form," *id*. at *5, the statute's "post-signature residency and citizenship provisions" did not "sweep into any aspects of the circulation process that actually implicate 'the exchange of ideas about political change,'" *id*. (quoting *Biddulph*, 89 F.3d at 1498 n.7). Thus, the "type of interactive communication" that *Meyer*

---

[5] While the motions panel's stay order is not binding, the portions of the order that are discussed in this brief are consistent with precedent and therefore persuasive.

"described as 'core political speech'" was not implicated. *Id*. at *4 (quoting *Meyer*, 486 U.S. at 421–23).

The Cost-Recovery Provisions fall squarely in the *Biddulph* camp. The Cost-Recovery Provisions do not regulate petition circulation, the identity of speakers, or their speech. They do not regulate the communicative element of the initiative process or the direct one-on-one communications between petition circulators and voters. Instead, they impose a post-circulation processing requirement that allocates to sponsors the costs incurred by election officials to verify signatures. Like the 10-day deadline that this Court considered at an earlier stage of this litigation, the Cost-Recovery Provisions "kick in after petition circulators have already engaged with voters and gathered completed petitions." ECF No. 189 at 21 n.4. In fact, they apply only at the final stage of the petition-collection effort—long after any communication with voters has concluded—when the sponsor delivers petition forms to Supervisors for verification.

In enacting the challenged provisions, the Legislature regulated "the initiative process in general," not "the exchange of ideas about political changes sought through those processes." *Biddulph*, 89 F.3d at 1498 n.7. Any reliance on *Meyer* is misplaced.[6]

---

[6] Plaintiffs hang their hat on *Clean-Up '84 v. Heinrich*, 590 F. Supp. 928 (M.D. Fla. 1984)—a 42-year-old Middle District order that predates *Meyer*, *Buckley*, and *Biddulph* and was decided on equal-protection grounds. The court's fleeting reference to the First Amendment in *Clean-Up '84* is not only dicta, but also presupposes that the First Amendment secures to initiative sponsors a right of ballot access. *Id*. at 933. Later decisions come to a different conclusion. *See*, *e.g.*, *Eggers v. Evnen*, 48 F.4th 561, 565 (8th Cir. 2022) (collecting cases); *Gibson*, 741 F.2d at 1272–73. Plaintiffs'

In sum, the Cost-Recovery Provisions do not regulate circulators or their direct one-on-one communications with voters, but rather establish "post-petition-gathering process requirements" that could make the initiative process "more expensive and less efficient"—a distinction this Court has recognized. ECF No. 189 at 18–21. Because the Cost-Recovery Provisions do not regulate speakers or their speech, strict scrutiny does not apply.

### B. Because They Do Not Implicate the First Amendment, the Cost-Recovery Provisions Do Not Trigger Any Level of Scrutiny.

Having created the statewide initiative-petition process, the State "retains the authority to interpret its scope and availability." *Gibson*, 741 F.2d at 1273. Because the Cost-Recovery Provisions implicate only state-created rights to initiate proposed constitutional amendments, not First Amendment rights, no level of scrutiny applies.

The Eleventh Circuit took this approach in *Biddulph*. The court did not apply *any* scrutiny, including rational-basis review, to the challenged procedures, explaining that "[m]ost" initiative regulations "would not implicate First Amendment concerns." 89 F.3d at 1500. The court also rejected the *Anderson-Burdick* standard, explaining that an initiative's access to the ballot, unlike a candidate's, depends on state-created

---

reliance on *Libertarian Party of Florida v. State of Florida*, 710 F.2d 790, 793 (11th Cir. 1983), fails for a similar reason: that case concerned a minor-party candidate's access to the ballot, not a claimed First Amendment ballot-access right for initiatives.

rights. *Id.* at 1500 n.10; *accord Fla. Decides Healthcare Inc.*, 2025 WL 3738554, at *6 n.6.

Other circuits agree. In *Dobrovolny*, *Walker*, *Molinari*, *Carnahan*, *MacMann*, and *Semple*, the courts did not apply any level of scrutiny—not even rational-basis review—once they determined that *Meyer* was inapposite and the First Amendment was not implicated. In *Molinari*, the Second Circuit noted that the *Anderson-Burdick* framework did not apply in that case and that "[n]o balancing is necessary because plaintiffs do not have a viable First Amendment claim in the first place." 564 F.3d at 596.

Because the Cost-Recovery Provisions do not implicate the First Amendment, no scrutiny is warranted—not even rational-basis review. Whether the Cost-Recovery Provisions are consistent with the state-created right in article XI of the Florida Constitution to pursue initiatives is not a federal question, but rather a question reserved for state courts. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984).[7]

### C.    Plaintiffs' "Severe Burden" Standard Does Not Apply.

Plaintiffs insist that strict scrutiny applies because, although the Cost-Recovery Provisions do not regulate speech, they "severely burden" speech. Plaintiffs claim the

---

[7] Dr. Smith seemed most solicitous to defend the right conferred by article XI of the Florida Constitution. *See* T5 at 1390:6–13 ("But for the average citizen group that is out there trying to use that Eleventh Amendment (sic) guarantee under the Florida Constitution, that has been around for, you know, almost 60 years, it's prohibitive . . . .").

64

higher fees increase their costs and strain their budgets and therefore deter potential sponsors from pursuing initiative-petition campaigns. Plaintiffs err as a matter of law.

At the outset, Plaintiffs point to no precedent that applied strict scrutiny to any *Biddulph*-style regulation. Courts reserve strict scrutiny for laws that directly regulate the communicative aspect of initiative campaigns—direct one-on-one communication between petition circulators and voters. In contrast, laws that regulate the initiative process generally but not speakers or their speech do not trigger heightened scrutiny, even if those laws make participation more difficult or expensive. Given the dearth of authority for Plaintiffs' position, if strict scrutiny could ever apply to a *Biddulph*-style law merely because of its deterrent effect, it must be an extraordinary case. This is not it.

*Biddulph* undercuts Plaintiffs' attempt to convert a financial burden into a First Amendment violation. The sponsor there claimed the challenged procedures subjected sponsors to a "financial gamble" and created a "deterrent effect" that dissuaded First Amendment activity. 89 F.3d at 1496. But the court declined to apply strict scrutiny and held that the First Amendment is not implicated merely because a law renders it "less likely" that an initiative will achieve ballot placement. *Id*. at 1498 n.7. The First Amendment does not require States to establish initiative processes that are "the most efficient or affordable," *id*. at 1498, or require strict scrutiny "because the process is burdensome," *id*. at 1497.

65

Other circuits have reached the same conclusion. In *Walker*, the Tenth Circuit declined to apply strict scrutiny despite allegations that a supermajority threshold for voter approval created a "chilling effect" and "deter[red] them from exercising their speech rights." 450 F.3d at 1085, 1098. The Second Circuit rejected similar arguments in *Molinari*, despite record evidence that the challenged ordinance would make voters "less likely to participate in the referendum process." 564 F.3d at 590, 595. In *Jones*, the Seventh Circuit upheld a State's absolute prohibition against placement of more than three local referenda on the same election ballot. 892 F.3d at 936–38. Indeed, earlier in this case, Plaintiffs here presented evidence that the costs of compliance with a 10-day petition-form submission deadline would leave them with "less money to spend" on communication with voters. ECF No. 189 at 20; *see also* ECF No. 19-1 ¶ 25; ECF No. 91-1 ¶ 29. Yet none of the courts in these cases applied strict scrutiny.

These results make sense. The initiative process is part of a State's *lawmaking* authority, and States have broad discretion to craft their own lawmaking processes, whether statutory or constitutional. Just as the First Amendment does not prohibit the three-fifths vote threshold for the Legislature to propose a constitutional amendment, Fla. Const. art. XI, § 1, or require the Constitution Revision Commission to meet more often than once every 20 years, *see id.* art. XI, § 2(a), merely because the removal of these impediments would generate more speech, it does not dictate the mechanics of the initiative method of proposing constitutional amendments, *see Walker*, 450 F.3d

66

at 1103 ("As we have already explained, the supermajority requirement at issue here is a regulation of the legislative process, not a regulation of speech or expression."); *Marijuana Pol'y Project v. United States*, 304 F.3d 82, 85 (D.C. Cir. 2002) ("The MPP, moreover, cites no case . . . establishing that limits on legislative authority—as opposed to limits on legislative advocacy—violate the First Amendment."). Tellingly, at trial, Ciera Cox, a regional coordinator for Florida Right to Clean Water, repeatedly referred to an initiative petition as "legislation." FF ¶ 247. Principles of comity and federalism thus support *Biddulph*'s careful distinction between a State's regulation of a free exchange of ideas and its regulation of its own exercise of the lawmaking power.

For any sponsor that does not boast an unlimited budget, any verification fee will impact the availability of funds for other campaign activities, but that alone does not subject the fee to First Amendment scrutiny. This case illustrates one reason why. Here, Plaintiffs ask the Court to engage in intractable line-drawing exercises. They do not object to a total fee of $910,000, even though other sponsors might be unable to pay that much or even 10 percent of that amount. Still others, like SSF, might easily be able to pay many times more. While Plaintiffs do not deny Florida's right to impose *some* verification fee—or argue that Florida must calibrate its fee to each sponsor's financial outlook—Plaintiffs have not identified the constitutionally ordained limit on verification fees. Rather, they make *their* budgets the measure of constitutionality.

Indeed, by Plaintiffs' logic, many initiative regulations would be subject to the nearly insurmountable strict-scrutiny standard. The requirement that a sponsor collect more than 880,000 valid signatures, or that the sponsor collect a minimum number of signatures in each of one half of Florida's congressional districts, Fla. Const. art. XI, § 3, or that an initiative receive the support of three-fifths of voters, *id*. art. XI, § 5(e), are perhaps the strongest deterrents to initiative campaigns. Yet courts have never held that such regulations implicate the First Amendment and are subject to strict scrutiny.

Plaintiffs' reliance on *Noem* is misplaced. There, the court concluded that South Dakota's deadline to file petitions—one year before the general election—implicated the First Amendment. It did so not merely because the statute "reduced the quantum of speech," ECF No. 356-1 at 18, but also because the deadline "prohibits circulating petitions during the year prior to the election," "cabining core political speech in the form of petition circulation to a period no closer than a year before an election." 60 F.4th at 1078. The law directly regulated the communicative aspect of the campaign.[8]

---

[8] *Forsyth County v. Nationalist Movement*, 505 U.S. 123 (1992), is similarly distinguished. There, the Court held that a fee to provide security at demonstrations was content-based. To determine the size of the fee, the county considered the content of the demonstration and then determined the extent of security it believed would be necessary to provide security to a demonstration on that subject. The Cost-Recovery Provisions do not differentiate between messages and are not content-based. Thus, neither *Noem* nor *Forsyth County* supports a challenge to the Cost-Recovery Provisions here.

Plaintiffs may not rebrand their free-speech claim as a freedom-of-association claim and thus subject the Cost-Recovery Provisions to more stringent scrutiny. The Cost-Recovery Provisions do not require or forbid Plaintiffs to associate with anyone or threaten or discourage anyone for associating with Plaintiffs. For similar reasons, in *Alabama State Conference of the NAACP v. Marshall*, 746 F. Supp. 3d 1203, 1238–40 (N.D. Ala. 2024), the court dismissed a freedom-of-association claim asserted by plaintiffs who challenged state-law restrictions on the distribution, collection, and delivery of absentee-ballot requests. Like freedom of speech, freedom of association does not guarantee that an initiative process will be easy, inexpensive, effective, and successful. And while *candidate* ballot-access restrictions might implicate a political party's freedom of association, since voters can assert their preferences only through parties or candidates, *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979), initiative sponsors have no similar right or enforceable expectation of access to the ballot, *Biddulph*, 89 F.3d at 1500 (quoting *Gibson*, 741 F.2d at 1273).

### D.    Plaintiffs' "Severe Burden" Standard *Is* the *Anderson-Burdick* Standard—Which Does Not Apply.

Plaintiffs contend that the Cost-Recovery Provisions impose a "severe burden" on speech and therefore must satisfy strict scrutiny. ECF No. 356-1 at 17–18. But the standard that Plaintiffs advocate *is* the burden-weighing *Anderson-Burdick* standard. *See Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) ("Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance

a compelling state interest."). In *Biddulph*, however, the court did not weigh burdens or apply the *Anderson-Burdick* standard. 89 F.3d at 1500 n.10; *see also Fla. Decides Healthcare Inc.*, 2025 WL 3738554, at *6 n.6 (same). Similarly, the Supreme Court did not apply a sliding-scale or burden-weighing standard in either *Meyer* or *Buckley*. At most, in *Buckley*, the Court observed in a passing footnote that its decision was "in keeping" with the approach advocated by Justice Thomas, whose concurring opinion expressly applied the *Anderson-Burdick* standard. *See Buckley*, 525 U.S. at 192 n.12.

For these reasons and the reasons more fully explained in Part III.A., the severe-burden standard that Plaintiffs advocate does not apply. Regardless of what Plaintiffs call it, that standard is the same *Anderson-Burdick* standard that the Eleventh Circuit has declined to apply to initiative regulations. The question here is not whether the Cost-Recovery Provisions "burden" speech in some amorphous way, but whether the challenged law regulates speakers or their speech. Because the imposition of a fee for administrative processing of initiative petition forms does not regulate either speakers or their speech, the Cost-Recovery Provisions are not subject to any First Amendment scrutiny.

### E.    Plaintiffs Failed to Establish a Severe Burden.

Even if the "severe burden" standard applies, Plaintiffs failed to prove a severe burden on their First Amendment rights.

70

HB 1205 increased the average signature verification fee by **$2.50** per petition, from **$0.87** to **$3.37**. FF ¶¶ 22–31. But this Court has already declined to apply strict scrutiny to a statute that allegedly imposed *even greater costs*. In declining to enjoin a 10-day deadline to submit petition forms, this Court referenced SSF's evidence that the deadline would increase SSF's per-petition costs by **$3.42**. ECF No. 189 at 20. SSF also insisted that it had "lost circulators, redeployed others, and . . . already seen a decline of 75% in signed petitions." *Id*. at 30. FDH similarly offered evidence that compliance with the 10-day deadline would force it "to divert limited resources away from outreach and signature collection to cover the escalating costs of compliance." ECF No. 19-1 ¶ 25. It argued that the 10-day deadline had "disrupted [its] operations, drained resources, and chilled participation by circulators and volunteers." ECF No. 92-1 at 9; *accord id*. at 29–30. Despite allegations that the deadline imposed "a regime of chilling petition-signature gathering," this Court was unpersuaded that such "post-petition-gathering processing requirements cross[ed] the line into one of the 'narrow circumstances' within which this Court must apply strict scrutiny." ECF No. 189 at 18 (quoting *Biddulph*, 89 F.3d at 1500). While this Court recognized that Plaintiffs' campaigns had "become more expensive" and a "riskier, more expensive endeavor," *id*. at 21–22, it concluded that strict scrutiny did not apply. If a $3.42 increase does not severely burden speech and require strict scrutiny, then neither does an increase of $2.50.

71

At trial, Plaintiffs did not establish that the Cost-Recovery Provisions severely burden their speech.

**SSF.** For SSF, the increased verification fees are no more than the proverbial drop in a bucket. Since August 2022, SSF raised an eye-popping $206 million—nearly all of it from a single donor. *See supra* Part I.B. For SSF, the increase in verification fees will hardly make a ripple. With its mammoth resources, SSF failed to prove that the increased fees will impair its ability to speak, let alone severely burden its speech.

**FDH.** FDH also failed to prove a severe burden on speech—but for a different reason: FDH collects so few petitions that it will not incur verification fees exceeding its pre-HB 1205 verification budget.

FDH budgeted $910,000 for signature verification before HB 1205 took effect. FF ¶ 38. It believes it could have paid $910,000 for verification and does not challenge the pre-HB 1205 fees. FF ¶ 39.

At $3.37 per petition, a sponsor would need to submit 270,030 signed petitions to exhaust a $910,000 verification budget.

FDH has never come close to collecting 270,030 petition forms—and whether ever it will is altogether speculative. During its 2026 campaign, FDH submitted only 126,840 petitions—less than 10 percent of its stated goal of 1.3 million. FF ¶¶ 34, 45. At $3.37 per petition, the cost to verify 126,840 petitions would be $427,450.80—an amount that fits comfortably within FDH's $910,000 signature verification budget.

FDH was behind schedule from the start. Its goal was to collect 100,000 signed petitions by May 1; 200,000 by June 1; and 300,000 by July 1, 2025. FF ¶ 40. But FDH did not collect 100,000 petitions by May 1; it submitted only 25,864 petitions by May 1; 74,640 by June 1; and 102,307 by July 1, 2025. FF ¶¶ 42–43. In fact, when HB 1205 was enacted on May 2, 2025, FDH had submitted less than 2 percent of the total number of petition forms it had set out to submit (25,864 of 1,300,000). FF ¶ 44.

A lack of fundraising—not the Cost-Recovery Provisions—was the source of FDH's difficulties. In March 2025, FDH estimated that, to secure ballot placement, it would need to raise $19 million by the end of the campaign's ballot-placement phase. FF ¶ 48.[9] By May 2025, FDH had increased its estimate to $28 million. FF ¶¶ 50–52.

FDH fell far short. Over the first three quarters of 2025, and through the date it suspended its campaign on September 25, 2025, FDH raised only $2.86 million. FF ¶ 54. It raised only 4.4 percent of that amount ($126,809.90) before HB 1205 took effect on May 2, 2025. FF ¶ 55. FDH faced a "significant budget shortfall." FF ¶ 60. In July 2025, to reduce expenditures, FDH began to distribute petition forms by mail. FF ¶¶ 57–58. It shifted to mail distribution and away from paid petition circulation in part because it was not on track to raise $28 million and could not raise the money it

---

[9] Regardless of HB 1205, initiative campaigns are expensive. Dr. Smith admits it, and FDH's original $19 million budget proves it. These facts refute FDH's narrative that HB 1205 is responsible for the extinction of the grassroots initiative campaign. *See, e.g.,* ECF No. 356-1 at 26, 29.

needed to pay its paid petition circulators. FF ¶ 59. Soon after, it discontinued its paid petition circulation. FF ¶ 62. On September 25, 2025, FDH suspended its campaign altogether, at least in part because it had raised only a small fraction of the amount it had hoped to raise and because it was unlikely to raise the amount it needed. FF ¶¶ 63–66. In all, FDH collected only 74,519 valid signatures in its 2026 campaign—a mere 8.5 percent of the 880,062 valid signatures required to qualify for the ballot. FF ¶ 46.

FDH's history also underscores the speculative nature of its asserted injury and of the purported burden on its First Amendment activities. FDH failed to qualify an initiative in 2018 and 2019, when it collected only 90,250 valid petitions. FF ¶ 47.

On this record, FDH failed to establish that the increased signature verification fees severely burden its First Amendment activities. FDH failed to show a reasonable likelihood that it will collect enough signed petition forms to exceed its own $910,000 budget.

The First Amendment does not guard against expense. It does not "guarantee political success," *Republican Party of N.C. v. Martin*, 980 F.2d 943, 960 (4th Cir. 1992), or that "advocacy will be effective," *Smith v. Ark. State Highway Emp., Loc. 1315*, 441 U.S. 463, 464–65 (1979) (quoting *Hanover Twp. Fed'n of Tchrs., Loc. 1954 v. Hanover Cmty. Sch. Corp.*, 457 F.2d 456, 461 (7th Cir. 1972)). The fact that the Cost-Recovery Provisions might make an initiative "less likely to succeed" does not suggest a constitutional violation. *Molinari*, 564 F.3d at 600 (quoting *Walker*, 450

74

F.3d at 1100); *accord Biddulph*, 89 F.3d at 1498 n.7 (noting that strict scrutiny does not apply merely because the challenged law burdens the "sponsor's ability to place a measure on the ballot").

Finally, FDH argues that the Cost-Recovery Provisions impose a severe burden because the signature verification fees must be paid by the same 10-day deadline that applies to the submission of collected petition forms—and that it does not always have enough cash on hand. But this cash-on-hand argument is unfounded. While a sponsor must submit a signed petition form within 10 days after collection, nothing requires it to pay the fee within 10 days. *See* Fla. Stat. § 100.371(7)(a). A sponsor may pay later. If the sponsor does not pay the fee when it submits the petition form, then the elections office will hold the petition form until it receives full payment of the fee and will verify the petition form after it receives full payment. The deadline to verify the form begins to run once the elections office has received full payment. *Id*. § 100.371(14)(b).

FDH admits that the Supervisors are not enforcing any deadline for payment of verification fees. FF ¶ 76. Nevertheless, it cites a few ambiguous emails that it claims suggest that sponsors must submit full payment by the 10-day deadline. FF ¶¶ 78–84. Whether payment must be made within any particular timeframe is a question of law, however, and no law requires sponsors to pay verification fees within any particular timeframe. The emails that FDH references, moreover, do not support its assertions. FF ¶¶ 78–84. Meanwhile, FDH's own witnesses acknowledged that, although FDH

75

never paid the increased fees during the moratorium period, but rather submitted only partial payment based on prior fees, no election officials ever fined or penalized FDH for its failure to submit full payment by the 10-day deadline. FF ¶¶ 85–87. Supervisor Earley and Ms. Molina testified that the timing of payment is irrelevant to compliance with the 10-day deadline to submit petition forms. FF ¶¶ 89–91. There is no basis for FDH's assertion that sponsors must pay immediately—even if they do not have cash on hand.

Plaintiffs' contention that the Cost-Recovery Provisions severely burden their speech omits too many material facts and relies on too many assumptions to support a first-of-its-kind conclusion: that laws that regulate neither speakers nor their speech are nevertheless subject to strict scrutiny because of their deterrent effect on a state-created process. Strict scrutiny is therefore unwarranted as a matter of both law and fact.

### F.    FDH's "Cumulative Impact" Theory Is Misguided.

FDH contends that, under the First Amendment, this Court must consider the "cumulative impact of all of Florida's restrictions on the initiative process." ECF No. 596 at 7 n.5. Presumably, FDH would have the Court weigh the burden imposed by each of Florida's initiative regulations, challenged and unchallenged; combine those disparate burdens; and then determine whether the cumulative burden exceeds some

76

undefined constitutional limit. This Court correctly treated FDH's novel and unworkable theory with skepticism. *See* ECF No. 595 at 4–5. It should now reject that theory.

The three cases that FDH cites—*Pierce*, *Swanson*, and *Miller*, ECF No. 596 at 7 n.5—offer it no support.

*First*, all three cases applied the burden-weighing *Anderson-Burdick* standard. *See Pierce v. Jacobsen*, 44 F.4th 853, 859–60 (9th Cir. 2022); *Miller v. Thurston*, 967 F.3d 727, 739 (8th Cir. 2020); *Swanson v. Worley*, 490 F.3d 894, 902–03 (11th Cir. 2007). In this circuit, however, the *Anderson-Burdick* standard does not apply to First Amendment challenges to initiative regulations. *Biddulph*, 89 F.3d at 1501 n.10; *see also Fla. Decides Healthcare Inc.*, 2025 WL 3738554, at *6 n.6. *Pierce*, *Swanson*, and *Miller* are therefore inapposite and reveal nothing about the appropriate standard here.

*Second*, in *Pierce* and *Miller*, the courts did *not* weigh a cumulative burden, as FDH claims. Far from combining the burdens imposed by different regulations, these courts examined different regulations on their own merits and separately measured the burden imposed by each. *Pierce* and *Miller* therefore refute Plaintiffs' contention.

In *Pierce*, the plaintiffs challenged two initiative regulations. One prohibited non-residents from collecting signed petition forms, and the other prohibited signature gatherers from being compensated on a per-petition basis. 44 F.4th at 858. The court separately examined the burden imposed by each regulation. It held that the residency

requirement imposed a severe burden and violated the First Amendment. *Id.* at 860–64. It then concluded that the pay-per-signature prohibition did not impose a severe burden or violate the First Amendment. *Id.* at 864–66. The court did not aggregate the two burdens, but rather determined the validity of each regulation according to its own burden.

The plaintiffs in *Miller* also challenged two initiative regulations. One required each initiative petition to be signed in the physical presence of a canvasser, while the other required the canvasser to complete an affidavit in the presence of a notary. 967 F.3d at 736. The court analyzed the two regulations separately. It concluded that the in-person signature requirement imposed a burden, but not a severe one, and satisfied First Amendment scrutiny. *Id.* at 737–38. It separately concluded that the in-person notarization requirement did not burden First Amendment rights at all, since notarization occurred after the interaction with the voter and did not involve a communication of ideas. *Id.* at 738–39. Thus, it was not subject to any First Amendment scrutiny. *Id.*

**Third**, *Swanson* concerned a *candidate's* right of access to the ballot—not an initiative's. As explained above, the Eleventh Circuit has long distinguished initiative regulations from candidate ballot-access restrictions and treats them differently. *Biddulph*, 89 F.3d at 1500; *Gibson*, 741 F.2d at 1273. The Eleventh Circuit has applied the *Anderson-Burdick* framework to candidate ballot-access restrictions—as it did in *Swanson*—but has not applied that burden-weighing standard to initiative regulations.

78

*Fourth*, even in *Swanson*, the court did not aggregate the burdens imposed by distinct initiative regulations, but rather considered together two initiative regulations that were functionally interrelated and operated in tandem to produce a single burden. Specifically, the plaintiffs complained that Alabama afforded them too little time to collect too many signatures. 490 F.3d at 896, 905–06. Thus, the plaintiffs challenged the combined effect of the signature threshold and the deadline to meet that threshold. *Id*. Courts have long recognized the interoperation of signature thresholds and signature-collection deadlines and have consistently analyzed them together. *Id*. at 906–07.

*Swanson* does not therefore suggest that courts should (i) weigh the burden of each regulation the State imposes on the initiative process; (ii) sum those burdens to determine the aggregate burden on the initiative process; (iii) devise a constitutional limit on the cumulative burden that a State may impose on the initiative process; and (iv) determine whether the cumulative burden the State imposes exceeds that maximum. In *Swanson*, the interaction of two regulations produced one burden; here, FDH urges the Court to aggregate the burdens imposed by disparate, functionally distinct regulations found throughout Florida law. *Swanson* does not support that contention.

FDH's theory is also hopelessly amorphous and painfully impractical.

*First*, it requires this Court to make subjective judgments about the cumulative impact of different regulations and to measure that impact against an undefined limit.

79

***Second***, if the Court must aggregate the burdens that different regulations impose, then it must also aggregate the importance of the state interests that justify those regulations. Under *Anderson-Burdick*, courts weigh a regulation's burdens against the importance of the state interest that justifies the regulation. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). But even if burdens can be aggregated, justifications cannot. There is no practical and principled way to combine a motley of different justifications for different regulations and weigh the cumulative importance of those justifications against a cumulative burden. Any attempt to assign a combined weight to a collection of diverse justifications for diverse regulations would quickly spiral into arbitrariness.

***Third***, FDH's theory requires the Court, in fashioning a remedy, to determine which of the many regulations that contributed to the cumulative burden should be invalidated to reduce the cumulative burden to a constitutional scope. An injunction that strikes down each and every regulation that contributes even one scintilla to the cumulative burden would hardly be a properly measured remedy. *See Young Israel of Tampa*, *Inc. v. Hillsborough Area Reg'l Transit Auth*., 89 F.4th 1337, 1351 (11th Cir. 2024) (explaining that an injunction must be "no broader than necessary to remedy the constitutional violation" (quoting *Newman v. Alabama*, 683 F.2d 1312, 1319 (11th Cir. 1982))).

This Court should accordingly reject FDH's unprecedented cumulative-burden analysis. A challenge to the Cost-Recovery Provisions does not require this Court to

80

conduct an in-depth investigation into the entire Florida Election Code. Nor does the validity of the Cost-Recovery Provisions depend on an exhaustive survey of Florida's other initiative regulations. This Court should decline to condition the validity of the Cost-Recovery Provisions on the weight of burdens imposed by unrelated regulations.

### G.    Plaintiffs' Remaining Arguments for Heightened Scrutiny Are Flawed.

#### 1.    The Cost-Recovery Provisions Are Not a Content-Based Regulation of Speech

Next, Plaintiffs contend that the Cost-Recovery Provisions are a content-based regulation of speech. This argument misfires for two reasons.

*First*, before it decides whether a regulation is content-based or content-neutral, a court must first decide the threshold issue whether the regulation implicates the First Amendment at all. *Computer & Commc'ns Indus. Ass'n v. Uthmeier*, No. 25-11881, 2025 WL 3458571, at *3–4 (11th Cir. Nov. 25, 2025) (concluding that the challenged law implicates the First Amendment before considering whether it is content-based or content-neutral). As explained above, the Cost-Recovery Provisions apply only after the completion of all communications between the voter and the petition circulator. The analysis ends, therefore, before the Court must decide whether the challenged law is content-based. *See Solantic*, *LLC v. City of Neptune Beach*, 410 F.3d 1250, 1258 (11th Cir. 2005) (explaining that the distinction between content-based and content-neutral regulations decides the level of scrutiny that applies to a regulation of speech).

***Second***, the Cost-Recovery Provisions are content-neutral; they apply equally to all statewide initiatives regardless of subject matter. Whether an initiative addresses abortion, healthcare, insurance, or any other topic, the same Cost-Recovery Provisions apply.

A law is content-based if the law (i) applies to particular speech because of the topic discussed or the idea or message expressed; (ii) cannot be justified without reference to the content of the speech; or (iii) was adopted because of the government's disagreement with the message the speech conveys. *Reed v. Town of Gilbert*, 576 U.S. 155, 163–64 (2015).

Plaintiffs' claims that the Cost-Recovery Provisions are content-based because they do not apply to candidate petitions and local-issue petitions are unavailing. The Ninth Circuit rejected this contention in *Prete v. Bradbury*, 438 F.3d 949 (9th Cir. 2006). There, the plaintiffs challenged a prohibition on paying petition circulators on a per-petition basis, arguing that the law was content-based because it did not apply to candidate or recall petitions. *Id*. at 951, 968 n.25. The court disagreed and explained that, because it did not "regulate what can be said in an initiative" or "adopt or reject any particular subject that can be raised in a petition," the prohibition was not content-based. *Id*.

The same is true here. The Cost-Recovery Provisions apply to all initiatives, no matter the topic or the sponsor's idea or message. The justifications that support the

82

Cost-Recovery Provisions—protection of the public fisc, protection of taxpayers from the subsidization of private political activities, and the incentivization of sponsors to ensure that petitions are correct and complete—have nothing to do with the content of initiative petitions. And the record does not prove that the Cost-Recovery Provisions were adopted because of disagreement with the message that any initiative conveyed.

*Third*, if the Cost-Recovery Provisions are content-neutral speech regulations, they are constitutional. "Content-neutral laws . . . are subject to an intermediate level of scrutiny because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue." *Free Speech Coal.*, *Inc. v. Paxton*, 606 U.S. 461, 471 (2025) (internal marks omitted). A content-neutral regulation of speech is constitutional "if it advances important governmental interests unrelated to the suppression of speech and does not burden substantially more speech than necessary to further those interests." *Id.* (quoting *Turner Broad. Sys.*, *Inc. v. FCC*, 520 U.S. 180, 189 (1997)).

The Cost-Recovery Provisions satisfy intermediate scrutiny. As discussed more fully below, *see infra* Part III.B., they advance important governmental interests. And the Cost-Recovery Provisions are sufficiently tailored to those interests. The only way to protect the public fisc and to prevent public subsidization of private political activity is to shift the cost from local taxpayers to the initiative sponsors whose political aims have necessitated the expenditure of resources. To survive intermediate scrutiny, the

83

State's choice of means need not be the least restrictive or the most appropriate. *Free Speech Coal.*, 606 U.S. at 496. A verification fee accomplishes the State's important interests in a plainly legitimate way. Therefore, even if the Cost-Recovery Provisions are subject to intermediate scrutiny, they are consistent with the First Amendment. *See id*. at 495–96 (concluding that a state law requiring certain commercial websites to verify the ages of all visitors satisfied intermediate scrutiny); *TikTok Inc. v. Garland*, 604 U.S. 56, 76–77 (2025) (concluding that a prohibition against Chinese control of domestically operated social-media platforms satisfied intermediate scrutiny).[10]

### 2. What Other States Do—or Do Not Do—Is Irrelevant.

Plaintiffs and their expert, Dr. Daniel A. Smith, assert that, among the fifteen States that permit initiative amendments to their constitutions, only Florida imposes a per-petition verification fee. That fact might make good trivia, but it is hardly relevant.

***First***, a state law is not unconstitutional because it is uncommon. "States retain autonomy to establish their own governmental processes." *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 816 (2015). Far from frowning upon innovation and experimentation, the federal system established by the United States

---

[10] For obvious reasons, Plaintiffs have never suggested that the Cost-Recovery Provisions restrict expressive conduct. There was nothing "inherently expressive" in Plaintiffs' payment of the lower, pre-HB 1205 verification fees. *See Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 66 (2006). The payment of those fees was transactional. But even if it were inherently expressive, the Cost-Recovery Provisions would be constitutional for the same reasons expressed in this Part II.G.1.

Constitution encourages it. *Id.*; *accord New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting) ("It is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country.").

**Second**, the other States that authorize their state constitutions to be amended by initiative are not similarly situated to Florida. Eleven of the fifteen States do not validate each petition form individually, but rather use statistical sampling techniques to ease the burdens of verification. FF ¶ 125. In Florida, an appellate court long ago interpreted the Florida Constitution to prohibit "a random or spot check" of initiative petition forms and to require each initiative petition form to be verified individually. *See Let's Help Fla. v. Smathers*, 360 So. 2d 494, 496 (Fla. 1st DCA 1978). Florida is thus one of only four States to require petition-by-petition verification, and Dr. Smith conceded that he does not know whether the eleven States that utilize sampling would charge for verification if, like Florida, they verified each petition form separately. FF ¶ 126.

The remaining three States have much smaller populations than Florida. Ohio has a population of 11,799,448—barely half of Florida's population (21,538,187)—while Nebraska and Oklahoma have populations of 3,959,353 and 1,961,504 people, respectively. FF ¶ 129. Dr. Smith agrees that these States have much lower signature

85

thresholds than Florida does. FF ¶ 127. Of course, the burden of verification in Florida is much greater than in States that verify only a small sample of petition forms or that have far lower signature thresholds. Dr. Smith emphasized that a comparative analysis considers only States that are similarly situated. FF ¶¶ 111–13, 123. Here, no State is.

Finally, Dr. Smith conceded that he is not opposed to the verification of each petition form individually and has no problem with the Supervisors charging a fee for verification (as he defines it). FF ¶¶ 115–17. He declined to opine that Florida's fees are too high and agreed that, even before HB 1205 was enacted, initiative campaigns were expensive, ranging from seven- to nine-figure propositions. FF ¶¶ 118–22. These concessions undermine any inference from Dr. Smith's testimony that Florida stands as an outlier. FF ¶¶ 115–22. The fact that other, differently situated States do not shift the burden to sponsors sheds no light on the validity of the Cost-Recovery Provisions.

### 3.    Verification Fees Are Proportional to the Burden That Each Sponsor Imposes on Election Officials.

FDH contends that the signature verification fee is "levied in direct proportion" to First Amendment activity. ECF No. 356-1 at 22. It is not. Rather than being tied to speech, the fee is directly proportional to the burden that a sponsor places on election officials, based upon verification requirements established by legislative enactments.

Initiative sponsors and circulators engage in many interactions with voters that do not result in a signed petition form. Those efforts to persuade also include protected speech, but no verification fee is charged. Conversely, the fee *is* charged even where

there is no First Amendment activity—as in the case of a forged or fraudulent petition form. The fee therefore bears no direct or even approximate relationship to a sponsor's protected speech.

On the other hand, the correlation between imposition of the fee and imposition of a burden on election officials is exact. The Supervisors incur verification costs only when petition forms are submitted for verification, and the verification fee is imposed only in those circumstances. If no administrative burden is imposed, no fee is charged.

Finally, Plaintiffs propose no better way to reimburse election officials for the burdens of verification. A flat fee that applies equally to all sponsors—regardless of whether the sponsor submits one petition or one million—would be an irrational way to make the public whole for the different burdens associated with different initiatives.

## III.   THE COST-RECOVERY PROVISIONS DO NOT VIOLATE EQUAL PROTECTION.

Plaintiffs claim the Cost-Recovery Provisions violate equal protection because the cost of verification is higher for statewide initiative petitions than for candidate or local-issue petitions. This claim is subject to rational-basis review, which the Cost-Recovery Provisions satisfy. The greater burden that initiative verification imposes on the public justifies a higher fee. The Cost-Recovery Provisions protect the public fisc, ensure that public resources are not used to subsidize private initiative campaigns, and incentivize sponsors to take care that the petition forms they collect are not defective.

87

### A.     The Cost-Recovery Provisions Are Subject to Rational-Basis Review.

Because the Cost-Recovery Provisions do not implicate a fundamental right or suspect classification, rational-basis review applies. The Cost-Recovery Provisions are therefore entitled to "a presumption of rationality that can only be overcome by a clear showing of arbitrariness and irrationality." *Hodel v. Indiana*, 452 U.S. 314, 331–32 (1981).[11]

In some cases—specifically where differential burdens are imposed on the right to vote—the *Anderson-Burdick* framework provides heightened scrutiny. *Democratic Exec. Comm. v. Lee*, 915 F.3d 1312, 1319 (11th Cir. 2019) (concluding that *Anderson-Burdick* applies to elections laws that "treat voters differently in a way that burdens the fundamental right to vote" (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 429 (6th Cir. 2012))); *accord Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1261–62 (11th Cir. 2020) (concluding that the *Anderson-Burdick* standard does not apply to an election law that "does not burden the right to vote"). But "when plaintiffs proffer no evidence that the challenged law burdens their right to vote, rational basis review applies." *Fla. State Conf. of NAACP v. Lee*, 566 F. Supp. 3d 1262, 1287 (N.D. Fla. 2021).

This is not a "ballot access" case involving the fundamental right to vote. While restrictions on *candidates'* access to the ballot implicate the right to vote, courts have

---

[11] The Orange County Supervisor agrees that the Cost-Recovery Provisions are subject to rational-basis review, but otherwise does not join in Part III.A.

88

rejected the argument that restrictions on *initiatives*' placement on the ballot affect the same rights.

Thus, in *Gibson*, the Eleventh Circuit explained that the initiative process does not implicate the right to vote. In rejecting a claim that the Florida Supreme Court's removal of an initiative from the ballot violated the right to vote, the court explained that the "rights of candidates to offer themselves for public office and . . . of voters to vote for or against those candidates" are "universally recognized as the lynchpins of our democratic form of government"—but that "no voters have been denied the right to vote" by the removal of an initiative from the ballot. 741 F.2d at 1273. The right to place initiatives on the ballot—and to vote on initiatives—"derive from wholly state-created procedures by which issues that might otherwise be considered by elected representatives may be put to the voting populace." *Id*. The State "retains the authority to interpret [the] scope and availability" of its initiative procedure, and sponsors "can claim no constitutionally-protected right to place issues before the Florida electorate." *Id.*

Courts in multiple jurisdictions have reached the same conclusion. *See Eggers v. Evnen*, 48 F.4th 561, 565–66 (8th Cir. 2022) (collecting cases and explaining that the "right to vote in an election of political representatives" is "fundamental," while the right to place initiatives on the ballot is "state-created" and "nonfundamental," and applying rational-basis review to an equal-protection challenge (quoting *Bernbeck v.*

*Gale*, 829 F.3d 643, 645, 648 n.4 (8th Cir. 2016))); *Jones*, 892 F.3d at 937–38 (finding no federal constitutional right to propose initiatives); *Kendall v. Balcerzak*, 650 F.3d 515, 5123 (4th Cir. 2011) ("The basis for distinguishing the right to vote in a representative election . . . from the right to petition for referendum and initiative . . . is a sound one. The referendum is a form of direct democracy and is not compelled by the Federal Constitution."); *Austin*, 994 F.2d at 297 (applying rational-basis review and explaining that "no fundamental right is involved" in an equal-protection challenge to signature-verification procedures).

Thus, in *Biddulph*, the court rejected the application of the *Anderson-Burdick* standard to an initiative petition in the First Amendment context. 89 F.3d at 1500 n.10. It noted that "this case involves an initiative's access to the ballot, not a candidate's." *Id.* "This difference is material," the court concluded, "because . . . the right to place an initiative on the ballot is a right created by the state." *Id.* For the same reason, the *Anderson-Burdick* standard is inapplicable to an initiative's access to the ballot in the equal-protection context. *See Fla. Hometown Democracy, Inc. v. Browning*, No. 4:08-cv-00373, 2008 WL 4081174, at *3–4 (N.D. Fla. Aug. 29, 2008) (applying rational-basis review to an equal-protection challenge involving Florida's initiative process because the fundamental right to vote is "not implicated by Plaintiffs' ballot placement issues"); *Kelly v. Macon-Bibb Cnty. Bd. of Elections*, 608 F. Supp. 1036, 1038 (M.D. Ga. 1985) (explaining that "referendums, unlike general elections for a representative

90

form of government, are not constitutionally compelled" and that this "is *not* a 'right to vote' case").

The ballot-access cases on which Plaintiffs rely concern candidates' access to the ballot, not the rights of initiative sponsors. *See Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979) (explaining that a political party's right to associate implicates the right to vote since voters "can assert their preferences only through candidates or parties" (quoting *Lubin v. Panish*, 415 U.S. 709, 716 (1974))); *Anderson v. Celebrezze*, 460 U.S. 780, 786 (1983) ("The impact of candidate eligibility requirements on voters implicates basic constitutional rights."); *Cowen v. Georgia Sec'y of State*, 960 F.3d 1339, 1344 (11th Cir. 2020) (explaining that courts in this circuit "apply *Anderson* to ballot-access requirements for all candidates"); *Fulani v. Krivanek*, 973 F.2d 1539, 1548 (11th Cir. 1992) (invalidating a statute that provided an undue-burden waiver of filing fees to major-party but not minor-party candidates).

In *Jacobson*, the court identified categories of laws that the Supreme Court and the Eleventh Circuit have evaluated under the *Anderson-Burdick* framework. 974 F.3d at 1261. These laws included restrictions on a "political party's or candidate's access to the ballot, which would interfere with voters' ability to vote for and support that party or candidate," and laws that "burden the associational rights of political parties by interfering with their ability to freely associate with voters and candidates of their

91

choosing." *Id*. It did not suggest that an initiative's access to the ballot implicates the same fundamental rights and calls for the same heightened scrutiny as a candidate's.

Because the Cost-Recovery Provisions do not burden the federal constitutional right to vote, and of course do not place unequal burdens on that right, rational-basis review applies.

### B.   The Cost-Recovery Provisions Satisfy Rational-Basis Review.

"Almost every statute subject to the very deferential rational basis scrutiny standard is found to be constitutional." *Williams v. Pryor*, 240 F.3d 944, 948 (11th Cir. 2001). Here, the Legislature had a rational reason to impose the fees that Plaintiffs contest: to protect the public fisc and to ensure that public resources do not subsidize initiative campaigns. *See Diaz v. Cobb*, 541 F. Supp. 2d 1319, 1338 (S.D. Fla. 2008) (discussing the significant time, labor, and expense that signature verification imposes on elections offices). The Cost-Recovery Provisions therefore shift to sponsors some costs associated with placing their initiatives on the ballot. In doing so, the Legislature aimed to "reduc[e] the strain on the public fisc," *see Minn. Senior Fed'n*, *Metro. Region v. United States*, 273 F.3d 805, 809 (8th Cir. 2001), and avoid subsidization of private political activity with public dollars, *see Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358–61 (2009) (concluding that a State's interest in avoiding "entanglement in partisan politics" and declining to fund "the expression of particular ideas" satisfied rational-basis review). These justifications easily satisfy lenient, rational-basis review.

92

FDH's expert, Dr. Smith, offered another rational basis for the verification fees. He explained that an increase in fees creates a cost disincentive for initiative sponsors to submit defective forms, encouraging them to do their due diligence and to ensure that voters provide accurate and complete information on petition forms. FF ¶¶ 133–35. Dr. Smith agreed that initiative sponsors could train their petition circulators, upon receipt of a petition form from the voter, to review the form and ensure that the voter completed all required fields and placed plausibly responsive information into each required field (*e.g.*, by placing a county's name into the county field). FF ¶¶ 137–38.

That the Legislature did not address the cost of all signature verifications in the same way, such as costs associated with candidate and local-issue petitions, does not render the Cost-Recovery Provisions irrational. "[A] statute is not invalid . . . because it might have gone farther than it did." *City of New Orleans v. Dukes*, 427 U.S. 297, 305 (1976). The Legislature may advance interests incrementally, *Williams*, 240 F.3d at 948–50, or "select one phase of one field and apply a remedy there, neglecting the others," *Williamson v. Lee Optical of Okla. Inc.*, 348 U.S. 483, 489 (1955). That is all it did here.

The Legislature's decision to start with initiatives and to impose an actual-cost requirement on initiatives rather than candidate and local-issue petitions is rational. The verification of initiative petitions is more expensive, time-consuming, and labor-intensive for Supervisors than the verification of candidate and local-issue petitions.

93

There are significant differences in rules, processes, and volume that make the time, expense, and labor associated with the verification of initiative petition forms greater than the time, expense, and labor associated with verification of other petition forms.

The following requirements—only some of which were created by HB 1205— apply to initiative petitions but not to other petitions. Each contributes to render the verification of initiative petitions more onerous than the verification of other petitions:

- Initiative petition forms must include—and the Supervisors must verify—the voter's Florida driver-license or identification-card number or the last four digits of the voter's social-security number. FF ¶¶ 166–71.

- Initiative petition forms distributed by petition circulators must include a petition circulator's affidavit that displays information about the petition circulator. Supervisors must verify that the petition circulator was validly registered when the signature was obtained. FF ¶¶ 176–80.

- Initiative petition forms must be verified within 60 days after the Supervisor's office receives the petition form and payment of the signature verification fee (or 30 days in the case of a petition form submitted fewer than 60 days before the February 1 deadline). FF ¶¶ 195–96.

- Each month, Supervisors must transmit digital images of all received petition forms to the Division of Elections. Between December 1 of each odd-numbered year and the following February 1, these transmittals must be made weekly. The Supervisors must therefore scan each initiative petition form, which, in the case of multi-page forms, requires unstapling and confirmation that each page of the form was received. Each transmittal of digital images to the Division must identify each petition form as valid or invalid. FF ¶¶ 151–58, 203–08.

- By March 15 of each even-numbered year, the Supervisors must deliver all physical petition forms to the Division. FF ¶¶ 209–11.

- A Supervisor who determines a signature to be valid must mail a verification notice to the voter. The notice invites the voter to notify the Office of Election

Crimes and Security (OECS) if the voter's signature was forged or misrepresented. It includes a postage-prepaid form for that purpose. The prepaid postage is charged to the Supervisor if and when the voter mails the form. Upon OECS's receipt of the form, the Supervisor must invalidate the petition form. FF ¶¶ 184–91.

- If more than 25 percent of a sponsor's initiative petition forms are found invalid in any month—or, between December 1 of each odd-numbered year and the following February 1, in any week—then the Supervisor must notify OECS. Because the invalidity rate almost always exceeds 25 percent, the Supervisor's office must submit a report to OECS for each initiative petition for nearly all reporting periods. FF ¶¶ 192–94.

- Each month, the Supervisors must post information online about each active initiative, including the number of signatures submitted, processed, and validated. Between December 1 of each odd-numbered year and the following February 1, these reports must be posted weekly. If more than 25 percent of a sponsor's petition forms are found invalid in any reporting period, then the Supervisor must notify OECS. FF ¶¶ 200–02.

- Supervisors must electronically report data regarding initiative petition forms to the Division. By the deadline to verify a petition form, the Supervisor must report to the Division the initiative's serial number, the date of verification, the number of verified signatures by congressional district, the number of invalid signatures, and the petition circulator's registration number, if applicable. FF ¶¶ 197–99.

- Supervisors must record the date on which each petition form was received. Fla. Stat. § 100.371(14)(b)–(c). This step ensures compliance with the requirement that sponsors and petition circulators submit petition forms within 10 days after the date of the voter's signature. FF ¶¶ 146–49.

- If a sponsor or a petition circulator submits a petition form after the 10-day deadline, then the Supervisor must electronically submit copies of the untimely filed petition forms to the Division. FF ¶ 148.

- If an initiative petition form was signed by a voter registered outside the county the Supervisor serves, then the Supervisor's office must notify both the petition sponsor and the Division of the misfiled form. FF ¶¶ 181–83.

95

Supervisor Earley and Ms. Molina testified that the verification of a candidate or local-issue petition form can be completed quickly—in less than a minute—while the verification of an initiative petition is a much more complex and time-consuming process. FF ¶¶ 214–17. The fact that initiative petition forms are submitted in larger batches as the deadline approaches, while candidate and local-issue petition forms are submitted in a gradual stream, magnifies the challenges incident to initiative petitions. FF ¶¶ 212–13.

The verification of initiative petition forms differs from the verification of other petition forms in several additional respects.

*First*, the proponent of a candidate or local-issue petition may elect verification of a statistical sample of petition forms. Fla. Stat. § 99.097(1)–(2); Fla. Admin. Code r. 1S-2.008. For obvious reasons, statistical sampling considerably decreases the time and expense of verification. FF ¶ 230. In Florida, however, the Constitution has been construed to require each initiative petition form to be verified separately. FF ¶¶ 228–29. This difference creates a vast disproportion in the relative burdens of verification.

*Second*, a much larger percentage of initiative petition forms than candidate and local-issue petition forms are deemed invalid. FF ¶ 220. In Leon County, only two-thirds of initiative petition forms are deemed valid; in Miami-Dade County, that number is even lower (40 to 46 percent). FF ¶¶ 219, 224. In contrast, in Miami-Dade County, about 85 percent of local-issue petition forms and 95 percent of municipal

96

candidate petition forms have been deemed valid. FF ¶ 225. As a general rule, invalid petition forms take more time to verify and thus increase the burdens of verification. FF ¶ 223.

*Third*, Supervisors receive many more initiative petition forms than candidate and local-issue petition forms. In 2024 and 2025, the Leon County elections office processed about four times as many initiative petition forms (46,000) as candidate and local-issue petition forms (11,000). FF ¶ 226. In Miami-Dade County, initiative petition forms have represented about 80 to 85 percent of all petition forms that the elections office has received. FF ¶ 227. The verification of initiative petition forms thus places a far greater burden on Supervisors than the verification of other petition forms.

*Fourth*, because the verification of initiative petitions places dramatically more strain on elections offices than the verification of candidate and local-issue petitions, FF ¶ 218, Supervisors have incurred significant personnel costs to process the influx of initiative petition forms. Supervisor Earley has hired extra people to verify initiative petitions. FF ¶ 234. Previously, two full-time and six temporary employees performed petition verification; now, eight people focus predominantly on petition verification and receive assistance as needed from nine more full-time employees. FF ¶¶ 232–33. The Leon County elections office incurred overtime to verify initiative petition forms, but not candidate petition forms, during the 2026 campaign. FF ¶ 235. In late 2025, to verify initiative petition forms, the Miami-Dade County elections office hired up to

97

16 temporary staff and paid them $285,000 through December 2025. FF ¶¶ 238–39. It also incurred $15,000 in overtime to verify initiative petition forms, while incurring no overtime and hiring no temporary staff to verify other petition forms. FF ¶¶ 239–40.

Given these notable differences, it cannot be irrational for the Legislature, in stewardship of public funds, to require initiative sponsors to reimburse the public for the actual cost of verification, while allowing candidates—whose access to the ballot implicates the fundamental right to vote—and local-issue petition organizers to pay a reduced fee. The Equal Protection Clause did not constrain the Legislature to ignore these differences and require taxpayers to subsidize initiatives that many of them may strongly oppose. Yet that is what Plaintiffs demand: taxpayer support for their private political aims, with no means for the public to recoup the cost. States are "not required to assist others in funding the expression of particular ideas, including political ones." *Ysursa*, 555 U.S. at 358; *see also Chi. Tchrs. Union, Local No. 1 v. Hudson*, 475 U.S. 292, 305 (1986) ("[T]he quality of respondents' interest in not being compelled to subsidize the propagation of political or ideological views that they oppose is clear.").

Each Supervisor's operations are funded at a local level by each county's board of county commissioners, and those funds are included in the county's general fund budget. FF ¶¶ 241–45. It was entirely appropriate for the Legislature to expect county governments to spend local tax dollars to verify candidate and local-issue petitions

98

without requiring the same local governments to spend local tax dollars to subsidize verification of statewide initiatives. When coupled with the larger volume and higher invalidity rates of statewide initiatives, the rational basis for requiring sponsors rather than local taxpayers to shoulder the costs of petition verification is readily apparent: local government tax dollars are better employed to fund public safety, transportation, and other critical local needs than to fund the political aspirations of statewide petition sponsors.

Supervisor Earley testified that a single political committee—SSF—submitted virtually all of the initiative petition forms that his office received before the February 1 deadline. FF ¶ 236. Surely the taxpayer was not required to bear the burden imposed by *one entity*—including extra staff and overtime—to support marijuana legalization.

Plaintiffs ask this Court to require the local taxpayer to shoulder part of the cost of their statewide campaigns. The Constitution does not forbid the Legislature's policy decision to require sponsors to bear the costs of their campaigns. Any member of the public who wishes to support these campaigns financially may contribute voluntarily.

## IV.    IF THE COURT FINDS LIABILITY, THEN RELIEF SHOULD BE LIMITED TO THE PARTIES THAT SUCCESSFULLY CHALLENGED THE COST-RECOVERY PROVISIONS.

If this Court concludes that the Cost-Recovery Provisions are unconstitutional, then it should grant relief only to the specific initiative sponsor or sponsors that (i) are parties to this action; (ii) challenged the Cost-Recovery Provisions in their pleadings;

99

(iii) proved the existence of a live claim; and (iv) carried their burden as to the merits.

*See Trump v. CASA, Inc.*, 606 U.S. 831, 837 (2025) (holding that, while an injunction may prohibit enforcement of a challenged law or policy against a plaintiff in a lawsuit, it may not bar "enforcement of a law or policy against *anyone*" (emphasis in original)).

## CONCLUSION

For these reasons, the Supervisors respectfully request judgment in their favor as to the Cost-Recovery Provisions.

Dated March 19, 2026.                                Respectfully submitted,

/s/ *John T. LaVia, III*
John T. LaVia, III
Florida Bar No. 0853666
GARDNER BIST KING & WOOD
1300 Thomaswood Drive
Tallahassee, Florida 32308
Telephone: 850-385-0070
jlavia@gbkwlaw.com
*Attorneys for Defendants, Supervisors of Elections for Clay, Martin, Osceola, Palm Beach, Polk, and St. Lucie Counties*

/s/ *Andy Bardos*
Andy Bardos
Florida Bar No. 822671
J. Timothy Moore, Jr.
Florida Bar No. 70023
GRAYROBINSON, P.A.
301 South Bronough Street, Suite 600
Tallahassee, Florida 32301
Telephone: 850-577-9090
andy.bardos@gray-robinson.com
*Attorneys for Defendant, Supervisors of Elections for Charlotte, Collier, Indian River, Lake, Lee, Manatee, Marion, Monroe, Pasco, and Seminole Counties*

100

/s/ *Geraldo Olivo*
Geraldo F. Olivo, III
Florida Bar No. 0060905
HENDERSON, FRANKLIN, STARNES
& HOLT, P.A.
1715 Monroe Street
Fort Myers, Florida 33905
Telephone: 239-344-1100
jerry.olivo@henlaw.com
*Attorneys for Defendants, Supervisors of Elections for Glades, Hardee, Hendry, Holmes, Levy, and Okeechobee Counties*

/s/ *Susan Erdelyi*
Susan S. Erdelyi
Florida Bar No. 0648965
MARKS GRAY, P.A.
1200 Riverplace Blvd., Suite 800
Jacksonville, Florida 32207
Telephone: 904-398-0900
serdelyi@marksgray.com
*Attorneys for Defendants, Supervisors of Elections for Baker, Bay, Bradford, Calhoun, Columbia, Dixie, Franklin, Gadsden, Gulf, Hamilton, Jackson, Lafayette, Nassau, Putnam, St. Johns, Santa Rosa, Sumter, Suwannee, Taylor, Walton, Wakulla, and Washington Counties*

/s/ *Frank Mari*
Frank M. Mari
Florida Bar No. 93243
TESSITORE MARI SCOTT, PLLC
1485 International Parkway, Suite 2031
Lake Mary, Florida 32746
Telephone: 321-363-1634
fmari@tessmari.com
*Attorneys for Defendant, Supervisor of Elections for Brevard County*

/s/ *Robert Swain*
Robert C. Swain
Florida Bar No. 366961
ALACHUA COUNTY ATTORNEY'S OFFICE
12 Southeast 1st Street
Gainesville, Florida 32601
Telephone: 352-374-5218
bswain@alachuacounty.us
*Attorneys for Defendant, Supervisor of Elections for Alachua County*

101

/s/ *Devona Reynolds Perez*
Adam Katzman
Florida Bar No. 652431
Devona A. Reynolds Perez
Florida Bar No. 70409
BROWARD COUNTY ATTORNEY'S OFFICE
115 South Andrews Avenue, Suite 423
Fort Lauderdale, Florida 33301
Telephone: 954-357-7600
akatzman@broward.org
dreynoldsperez@broward.org
*Attorneys for Defendant, Supervisor of Elections for Broward County*

/s/ *Tiffiny Douglas Pinkstaff*
Tiffiny Douglas Pinkstaff
Florida Bar No. 682101
OFFICE OF THE GENERAL COUNSEL
117 W. Duval Street, Suite 480
Jacksonville, Florida 32202
Telephone: 904-255-5072
tpinkstaff@coj.net
*Attorneys for Defendant, Supervisor of Elections for Duval County*

/s/ *Dale A. Scott*
Dale A. Scott
Florida Bar No. 0568821
TESSITORE MARI SCOTT, PLLC
1485 International Parkway, Suite 2031
Lake Mary, Florida 32746
Telephone: 321-363-1634
dscott@tessmari.com
*Attorneys for Defendant, Supervisor of Elections for Citrus County*

/s/ *Christi Hankins*
Christi Hankins
Florida Bar No. 483321
ESCAMBIA COUNTY ATTORNEY'S OFFICE
221 Palafox Place, Suite 430
Pensacola, Florida 32502
Telephone: 850-595-4970
cjhankins@myescambia.com
*Attorneys for Defendant, Supervisor of Elections for Escambia County*

/s/ *Melissa A. Tartaglia*
Jon A. Jouben
Florida Bar No. 149561
Melissa A. Tartaglia
Florida Bar No. 116033
HERNANDO COUNTY ATTORNEY'S OFFICE
20 North Main Street, Suite 462
Brooksville, Florida 34601
Telephone: 850-754-4122
jjouben@co.hernando.fl.us
mtartaglia@co.hernando.fl.us
*Attorneys for Defendant, Supervisor of
Elections for Hernando County*

/s/ *Jared D. Kahn*
Jared D. Kahn
Florida Bar No. 105276
PINELLAS COUNTY ATTORNEY'S OFFICE
315 Court Street, Sixth Floor
Clearwater, Florida 33756
Telephone: 727-464-3354
jkahn@pinellas.gov
*Attorneys for Defendant, Supervisor of
Elections for Pinellas County*

/s/ *Oren Rosenthal*
Oren Rosenthal
Florida Bar No. 86320
MIAMI-DADE COUNTY SUPERVISOR OF
ELECTIONS' OFFICE
2700 N.W. 87th Street
Miami, Florida 33172
Telephone: 305-499-8537
oren.rosenthal@votemiamidade.gov
*Attorneys for Defendant, Supervisor of
Elections for Miami-Dade County*

/s/ *Sarah Jonas*
Sarah Jonas
Florida Bar No. 115989
VOLUSIA COUNTY ATTORNEY'S OFFICE
123 West Indiana Avenue
Deland, Florida 32720
Telephone: 386-736-5950
sjonas@volusia.org
*Attorneys for Defendant, Supervisor of
Elections for Volusia County*

/s/ *Stephen M. Todd*
Stephen M. Todd
Florida Bar No. 0886203
HILLSBOROUGH COUNTY ATTORNEY'S
OFFICE
601 East Kennedy Blvd., 27th Floor
Tampa, Florida 33602
Telephone: 813-272-5670
todds@hillsboroughcounty.org
*Attorneys for Defendant, Supervisor of
Elections for Hillsborough County*

/s/ *Nicholas Shannin*
Nicholas Shannin
Florida Bar No. 9570
SHANNIN LAW FIRM, P.A.
214 East Lucerne Circle, Suite 200
Orlando, Florida 32801
Telephone: 407-985-2222
nshannin@shanninlaw.com
*Attorneys for Defendant, Supervisor of
Elections for Orange County*

/s/ *Pausha Taghdiri*
Pausha Taghdiri
Florida Bar No. 1002857
ROPER, TOWNSEND & SUTPHEN, P.A.
255 South Orange Avenue, Suite 750
Orlando, Florida 32801
Telephone: 407-897-5150
ptaghdiri@roperpa.com
*Attorneys for Defendants, Supervisors of Elections for DeSoto, Flagler, Gilchrist, Highlands, Jefferson, Liberty, Madison, and Union Counties*

/s/ *Morgan Bentley*
Morgan Bentley
Florida Bar No. 0962287
BENTLEY GOODRICH KISON, P.A.
783 South Orange Avenue, Suite 300
Sarasota, Florida 34236
Telephone: 941-556-9030
mbentley@bgk.law
*Attorneys for Defendant, Supervisor of Elections for Sarasota County*

/s/ *Matthew Shaud*
Gregory T. Stewart
Florida Bar No. 203718
Matthew R. Shaud
Florida Bar No. 122252
NABORS, GIBLIN & NICKERSON, P.A.
1500 Mahan Drive, Suite 200
Tallahassee, Florida 32308
Telephone: 850-224-4070
mshaud@ngnlaw.com
gstewart@ngnlaw.com
*Attorneys for Defendant, Supervisor of Elections for Okaloosa County*

/s/ *Mark Herron*
Mark Herron
Florida Bar No. 199737
MESSER CAPARELLO, P.A.
2618 Centennial Place
Tallahassee, Florida 32308
Telephone: 850-222-0720
mherron@lawfla.com
*Attorneys for Defendant, Supervisor of Elections for Leon County*