**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

FLORIDA DECIDES HEALTHCARE,
INC.; MITCHELL EMERSON, in his
individual capacity; JORDAN SIMMONS,
in his individual capacity,

          Plaintiffs,

                            Case No.: 4:25-cv-00211-MW-MAF

v.

CORD BYRD, et al.,

          Defendants.

---

**SMART & SAFE FLORIDA'S POST-TRIAL BRIEF**

---

## I.  BACKGROUND

### A. Floridians' right to amend the Florida Constitution by citizen initiative.

The Florida Constitution begins with a foundational premise: "All political power is inherent in the people." Fla. Const. Art. I, § 1. In 1968 the Florida Constitution was amended to enshrine the people's right to amend their state constitution:

> SECTION 3.  Initiative.—The power to propose the revision or amendment of any portion or portions of this constitution by initiative is **reserved to the people**, provided that, any such revision or amendment, except for those limiting the power of government to raise revenue, shall embrace but one subject and matter directly

1

connected therewith. It **may be invoked by filing with the custodian of state records a petition containing a copy of the proposed revision or amendment, signed by a number of electors** in each of one half of the congressional districts of the state, and of the state as a whole, equal to eight percent of the votes cast in each of such districts respectively and in the state as a whole in the last preceding election in which presidential electors were chosen.

Article XI, § 3 ("Section 3").[1]

To place the citizen initiative in context, the Florida Supreme Court has often noted "that sovereignty resides in the people and the electors have a right to approve or reject a proposed amendment to the organic law of this State." *Advisory Op. to Att'y Gen. re Limits or Prevents Barriers to Local Solar Elec. Supply*, 177 So. 3d 235, 241-42 (2015); *Floridians Against Expanded Gambling v. Floridians for a Level Playing Field*, 945 So. 2d 553, 560 (Fla. 1st DCA 2006) ("It is well settled that the people of the state have a right to amend their Constitution"). Former Florida Justice Canady confirmed that "one of the most important rights enjoyed by the people of Florida under our constitution is the right to vote on constitutional amendments proposed through the initiative process." *Advisory Op. to Att'y Gen. re Medical Marijuana I,* 132 So. 3d 786, 819 (Fla. 2014) (Canady, J., dissenting).

---

[1] All emphasis in quotations is added unless otherwise stated.

The citizen initiative is the People's means of enacting public policy where their elected leaders are unwilling or unable to do so. "The right to amend the constitution is available to the people if their representative body steps too far out of line." *In re Amendment to Integration Rule and Bylaws of Florida Bar, Dues*, 358 So. 2d 1363, 1367 (Fla. 1978) (Adkins, J., dissenting).

Yet, despite this constitutional guarantee, the Florida Legislature has been legislating the right of Floridians to amend their constitution out of existence. Death by a thousand paper cuts—the statute regulating citizen initiatives has been amended four times in the past six years, each time further and further restricting this central right. *See* Ch. 2019-64 § 3, Laws of Fla.; Ch. 2020-15 § 3, Laws of Fla.; Ch. 2022-73 § 13, Laws of Fla.; Ch. 2025-21 § 6, Laws of Fla.

### B. Smart & Safe's efforts to amend the Florida Constitution.

Smart & Safe is a registered Florida political committee sponsoring the citizen initiative entitled "Adult Personal Use of Marijuana." The Adult Personal Use of Marijuana petition form was approved for use in the 2026 General Election by the Secretary of State pursuant to § 100.371(2) Fla. Stat. (2024) on January 14, 2025, and assigned Serial No. 25-01. ECF No. 596 ¶ 63; **SMART & SAFE Trial Exhibit 1**. Smart & Safe also attempted to sponsor a second proposed amendment entitled "Home Cultivation of Medical Marijuana," submitted to the Secretary of State on May 8, 2025, for placement on the 2026 General Election ballot or, if not successful

in making that ballot, then on the 2028 General Election ballot. *Id.* ¶ 63; **SMART & SAFE Trial Exhibit 4**.

Obtaining the requisite number of petitions necessary to place an initiative on the ballot is no small task, requiring Smart & Safe to hire Groundgame Political Solutions ("Groundgame") as a field vendor to manage the paid circulator effort for 25-01. Trial Tr. 1073:25 – 1074:6. Smart & Safe's corporate representative, and CEO of Groundgame, Meghan Cox, hired experienced professional petition circulators, who started collecting petitions in March 2025. *Id.* 1074:7-8, 1093:4-12. Groundgame ran background checks on all potential circulators, guided new employees through state registration process and trained them, then managed the circulation, collection, and organization of signed petitions for submission. *Id*. 1074:12-22. Once collected, reviewed, counted, and organized by Groundgame, the signed petitions were turned over to Vanguard for additional counting, verification, and overnight mail delivery and payment to the various Supervisors of Elections ("Supervisors"). Tr. 1102:20 – 1103:11.

### C.  HB 1205 completely upended the rules in the middle of the cycle.

On May 2, 2025, the Florida Legislature passed, and the Governor signed into law HB 1205—a sweeping regulation of the citizen initiative petition circulation process. *The Florida Senate*, https://www.flsenate.gov/Session/Bill/2025/1205. By May 2, 2025, Smart & Safe had set up 12 initial offices around the state, *Id.* at

1086:2-7, hired managers and roughly 1,300 professional petition circulators, *Id.* at 1090:6-16, and was collecting about 78,000 signatures a week. *Id.* at 1107:23 – 1108:11. HB 1205 totally upended the rules of the game in the middle of Smart & Safe's efforts.

Among other things, HB 1205 enacts the following unconstitutional provisions (the "Challenged Provisions"):

*1. Ten-Day Delivery Requirement* – Petition sponsors must submit every signed petition they receive to the Supervisor for the county in which the voter resides, within ten days after the voter signed the form. § 100.371(7)(a), Fla. Stat. (2025); HB 1205 at 714-723. This requirement, shortened from thirty days, (i) requires the redeployment of petition circulators from communicating with the public to processing operations to meet the Ten-Day Delivery Requirement, (ii) effectively precludes sponsors from sending petitions to voters by U.S. mail, and (iii) renders any meaningful quality control impossible, increasing invalidity rates and otherwise exposing sponsors to severe and punitive fines.[2] This artificial

---

[2] HB 1205 also mandates that a Supervisor notify the Office of Election Crimes and Security ("OECS") where the percentage of petition forms deemed invalid by the Supervisor exceeds a total of 25 percent of the petition forms received during the particular reporting period. § 100.371(14)(g), Fla. Stat. (2025); HB 1205 at 939-966. OECS, in turn, "shall conduct a preliminary investigation … to determine whether the invalidated petitions are a result of fraud or any other violation of this section 100.371." *Id*. HB 1205 authorizes OECS to report its findings to the statewide prosecutor or state attorney for the relevant judicial circuit. *Id*.

deadline has nothing to do with protecting ballot integrity and unduly burdens sponsors' free speech. It also comes with significant and punitive fines:

a. Failure to submit the petitions within 10 days of the voter's signature subjects the sponsor to strict liability for daily fines of $50 per day per petition without any cap, as well as $2,500 per petition where the circulator acts willfully. § 100.371(7)(a)(1), Fla. Stat. (2025); HB 1205 at 724-730. No exception is provided where the delay is not the sponsor's fault, such as mail delays, when a voter misdates the petition, or when a voter signs the petition and then fails to mail it back to the sponsor for several days (or weeks, as has occurred).

b. Failure to submit signed forms prior to February 1 of the general election year subjects the sponsor to strict liability for daily fines of $100 per day, up to $5,000, per petition. § 100.371(7)(a)(2), Fla. Stat. (2025); HB 1205 at 731-738.

c. Failure to submit the petition form to the supervisor of elections for the county in which the voter resides subjects the sponsor to a fine of $500 per petition, and $5,000 per petition where the sponsor or petition circulator acted willfully. § 100.371(7)(a)(3), Fla. Stat.

6

(2025); HB 1205 at 739-744. No exception is provided where the voter identifies the wrong county in their petition. These fines have the effect of chilling sponsors' First Amendment rights.

2. *Non-Resident Prohibition* – A person may not collect, possess, or deliver signed initiative petitions if he or she is not a Florida resident. § 100.371(4)(b)3., Fla. Stat. (2025); HB 1205 at 598-603. For each non-resident that the sponsor knowingly allows to collect petitions, the sponsor is liable for a $50,000 fine. § 100.371(4)(g); HB 1205 at 676-79. A non-resident who collects, delivers, or otherwise possesses signed petitions simultaneously commits a misdemeanor of the second degree and a felony of the third degree. § 104.187, Fla. Stat. (2025); HB 1205 at 1323-1326; § 104.188(2), Fla. Stat. (2025); HB 1205 at 1329-41. Signed petition forms submitted by non-residents "must be invalidated and may not be counted toward the number of necessary signatures for placement on the ballot." § 100.371(14)(h); HB 1205 at 967-970. The prohibition unduly burdens First Amendment rights of sponsors who engage circulators and directly violates sponsors' right of freedom of association.

3. *FIS Compelled Speech* – For initiatives submitted to the Secretary after May 2, 2025, the Financial Impact Statement ("FIS")—an analysis of the financial impact of a proposed amendment drafted by a government committee (§

100.371(13)(a) (2025))[3]—must be contained on petition forms. The FIS must also be contained on forms for initiatives submitted prior to May 2, 2025, but for which the FIS is remanded by the Florida Supreme Court for redrafting. § 100.371(13)(d), Fla. Stat. (2025); HB 1205 at 1087-1089, 1113-1116. The drafting and content of the FIS is entirely controlled by the government committee. This violates sponsors' First Amendment rights by forcing them to carry the government's message alongside its own.

4.    *Additional Amendment Prohibition* – HB 1205 prohibits a sponsor from sponsoring more than one amendment. Not only is this an outright ban on core political speech bearing no relation to ballot integrity, the provision is vague and ambiguous. The act provides: "The sponsor of an initiative amendment may not sponsor more than one amendment …." § 100.371(2), Fla. Stat. (2025); HB 1205 at 492-493. It is unclear whether that applies to sponsoring more than one amendment (i) at a given time, (ii) for a particular general election, or (iii) ever. Regardless, this is an outright ban on sponsors' core political speech.

5.    *Mandatory Decertification Provision* – The Secretary of State must rescind the certificate of ballot position if an advisory opinion by the Florida

---

[3] The committee is convened by the President of the Senate and the Speaker of the House of Representatives, jointly. § 100.371(16)(c), Fla. Stat. (2025); HB 1205 at 1045-1047.

Supreme Court deems the initiative petition invalid based upon, among other things, a non-compliant FIS. § 16.061(1); Fla. Stat. (2025) § 100.371(15), Fla. Stat. (2025); HB 1205 at 981-984. Requiring the Secretary to rescind the certificate of ballot position based on the FIS—a statement drafted by the government, over which the sponsor has no control—would impermissibly burden Smart & Safe's free speech on grounds entirely unrelated to protecting ballot integrity.

6. *Onerous Registration Requirements* – HB 1205 prohibits any person who is not registered as a petition circulator with the state from "collecting, delivering, or otherwise physically possessing more than 25 signed petition forms" in addition to those collected on behalf of family. § 100.371(4)(a), Fla. Stat. (2025); HB 1205 at 584-597. The registration process outlined in HB 1205 requires applicants to complete training on several topics. § 100.371(4); HB 1205 at 657-675. While neither the newly amended statute nor any promulgated rule grants the Division of Elections (the "Division") the authority to require applicants to take a quiz, the training implemented by the Division on June 1 requires applicants to correctly answer 80 percent of twenty multiple choice questions to proceed. If applicants score under 80 percent, they are prohibited from registering as petition circulators. For each person that the sponsor knowingly allows to collect petitions without registration, the sponsor is liable for a $50,000 fine. § 100.371(4)(g); HB 1205 at 676-79. Each person who collects, processes, delivers, or otherwise

9

possesses more than 25 signed petitions without being registered somehow simultaneously commits a misdemeanor of the second degree and a felony of the third degree. § 104.187, Fla. Stat. (2025); HB 1205 at 1323-1326; § 104.188(2), Fla. Stat. (2025); HB 1205 at 1329-41. "Each signed petition form submitted by an ineligible or unregistered petition circulator must be invalidated and may not be counted toward the number of necessary signatures for placement on the ballot." § 100.371(14)(h); HB 1205 at 967-970. These registration requirements make it impermissibly difficult for sponsors' circulators to register to collect petitions, burdening the sponsors' First Amendment rights to free speech and association.

7.    *Voter Notice and Verification Costs* – § 99.07(4)(a), Fla. Stat. provides that candidates and sponsors of local issues to be placed on a ballot must pay Supervisors of Elections "10 cents for each signature checked or the actual cost of checking such signature, whichever is less." However, in "the case of a petition to place a statewide issue on the ballot, the person or organization submitting the petition must pay the supervisor in advance the cost posted by the supervisor pursuant to s. 100.371(14)(f) for the actual cost of checking signatures to place a statewide issue on the ballot." *Id.* Furthermore, beginning October 1, 2025, Supervisors are required to send each voter for whom a signed petition form is verified, a notice giving the voter the opportunity to send that form to the Office of Election Crimes and Security stating the signature on the verified signed petition

was misrepresented or forged. This must be done by forwardable mail with a postage prepaid preaddressed envelope. § 100.371(14)(e), Fla. Stat. (2025); HB 1205 at 865-924. The actual costs of verifying petitions include "operating and personnel costs associated with comparing signatures, printing and all postage costs related to the Voter Notice required by paragraph (e), and transmitting petition forms to the division." § 100.371(14)(f), Fla. Stat. (2025); HB 1205 at 925-938. "No later than October 1, 2025," Supervisors "may increase the cost of signature verification pursuant" to cover the costs of the Voter Notice. HB 1205 at 1183-88. These provisions are content based regulation on speech, increasing the dollar per signature cost of verifying citizen initiative petitions, thereby placing a more significant burden on those who petition on behalf of a citizen initiative to amend the Florida Constitution than those who petition on behalf of candidates and local referendum seeking placement on a ballot. This is also a violation of the Equal Protection clause.

## II. LEGAL ARGUMENTS

### A.  Smart & Safe has standing to challenge HB 1205.

Smart & Safe has standing because (1) it has suffered an injury-in-fact (2) that is traceable to the defendant, and (3) can likely be redressed by a favorable ruling. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). First, an injury-in-fact is "concrete and particularized" and "actual or imminent." *Id.* To establish injury in a pre-enforcement challenge, a plaintiff must show (1) that they intend to engage in

protected activity that (2) "a law prohibits or otherwise unconstitutionally burdens" and (3) "that a credible threat of prosecution exists under that law." *HM Fla.-ORL, LLC v. Gov. of Fla.*, No. 23-12160, 2025 WL 1375363, at *3 (11th Cir. May 13, 2025). Second, traceability and redressability "often travel together." *Support Working Animals, Inc. v. Gov. of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021). For traceability, Smart & Safe must establish causation by showing that its injuries are connected with Defendants' conduct. *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1125 (11th Cir. 2019). For redressability, Smart & Safe must establish "whether the injury that a plaintiff alleges is likely to be redressed through the litigation." *Sprint Commc'ns Co., L.P. v. APCC Servs.*, 554 U.S. 269, 287 (2008) (emphasis removed).

      1.    *Smart & Safe faces fines from its 2025-26 efforts.*

HB 1205 creates severe, arbitrary, and cost-prohibitive fines, which Smart & Safe remains subject to in response to its petition collection activity in the 2025-26 cycle. Despite the onerous fines imposed by HB 1205, Smart & Safe engaged in, to the extent it could, protected activity that is now subject to fines.

*First*, failure to submit signed petitions within 10 days of the voter's signature subjects the sponsor to strict liability for daily fines of $50 per day per petition without any cap, as well as $2,500 per petition where the circulator acts willfully. § 100.371(7)(a)(1). Failure to submit signed forms prior to February 1 of the general election year subjects the sponsor to strict liability for daily fines of $100 per day,

up to $5,000, per petition. § 100.371(7)(a)(2), Fla. Stat. (2025). Failure to submit the petition form to the supervisor of elections for the county in which the voter resides subjects the sponsor to a fine of $500 per petition, and $5,000 per petition where the sponsor or petition circulator acted willfully. § 100.371(7)(a)(3), Fla. Stat. (2025). As to each of these, Smart & Safe has received zero notice from Supervisors of Elections or the Secretary of State informing it how many petitions have been received late. Tr. 2142:15-18; 1161:9-11. According to OECS Director Jillian Pratt's trial testimony, OECS plans on issuing fines for missed deadlines in 2025-26. Tr. 2151:5-16. Additionally, given the reports Smart & Safe has received regarding late petitions, and its evidence that petitions collected and shipped to Supervisors were never received, OECS will issue fines to Smart & Safe for its petition collection activity in 2025-26. Tr. 1126-1134.

*Second*, Smart & Safe remains subject to fines for its use of non-resident circulators during the 2025-26 cycle. For each non-resident that a sponsor knowingly allows to collect petitions, the sponsor is liable for a $50,000 fine. § 100.371(4)(g). While Smart & Safe immediately terminated the employment of non-residents following HB 1205's passage, it rehired 45 non-resident during the time between this Court's preliminary injunction prohibiting enforcement of the Non-Resident Prohibition on August 21, ECF No. 375, and the Eleventh Circuit's stay panel order staying that injunction pending appeal on September 9, USCA11 Case 25-12370 97-

13

1 (the "Injunction Period"). Tr. 1157:4-16. Eventually, those 28,000 petitions were invalidated at the direction of the Secretary. *Id.* at 1159:22 – 1160:14. Although Ms. Pratt stated that OECS will not impose fines for the use of non-resident circulators during the Injunction Period, Smart & Safe takes little comfort that she will not be countermanded.[4] Thus, absent relief from this Court, Smart & Safe faces the real threat of a $2,250,000 fine for its use of non-resident circulators.

While the fines created by HB 1205 are significantly more burdensome than those imposed in previous cycles, Smart & Safe was also fined for missing the pre-HB 1205 30-day deadline. ***See* SMART & SAFE Trial Exhibit 5**; Tr. 1103:25-1104:23. Where a plaintiff has been "cited for engaging in the very behavior he intends to repeat . . . . [law enforcement's] past conduct and its threat of future enforcement is enough to meet the injury-in-fact requirement." *LaCroix v. Town of Fort Myers Beach,* 38 F.4th 941, 947 (11th Cir. 2022). Because Smart & Safe has missed the Ten-Day Delivery Requirement, used non-resident circulators during the Injunction Period, and been fined in the past for missing the old 30-day deadline, a

---

[4] Smart & Safe must be provided the right to challenge any fine imposed by OECS through a hearing at the Division of Administrative Hearings. § 120.569, Fla. Stat. However, OECS retains final decision-making authority as to whether Smart & Safe's conduct requires imposition of said fine and the amount to be imposed. B*arfield v. Department of Health*, 805 So. 2d 1008 (Fla. 1st DCA 2001); § 120.57(1)(l), Fla. Stat. Thus, Ms. Pratt's suggestion that sponsors may find safe harbor in the "force majeure or impossibility" language of the fines provisions because they have an opportunity to dispute it before DOAH is no guarantee.

credible threat of prosecution exists under HB 1205. As such, Smart & Safe has established an injury in fact as to the Ten-Day Delivery Requirment and the Non-Resident Prohibition.

Each of the fines that Smart & Safe will be subject to are traceable to the Secretary of State, and redressable though an injunction. The Secretary is responsible for imposing fines incurred for violations of § 100.371 Fla. Stat. (2025). *See e.g.*, Fla. Admin. Code R. 1S-2.0091(2)(b). An injunction barring the Secretary of State from enforcing the (1) ten-day fine (100.371(7)(a)(1)); (2) the failure to submit signed forms prior to February 1 fine (100.371(7)(a)(2)); (3) the failure to submit the petition form fine (100.371(7)(a)(3)); and (4) the $50,000 per petition circulator non-resident fine (100.371(4)(a)) would redress Smart & Safe's injuries by protecting it from crippling fines.

### 2. Smart & Safe's rights will continue to be violated if HB 1205 is not enjoined.

Despite the passing of the deadline to make the ballot for the 2026 general election, this case is not moot, because the controversy is "capable of repetition yet evading review." *Meyer v. Grant*, 486 U.S. 414, 417 n.2 (1988). Much like the initiative in *Meyer,* "the initiative sought by [Smart & Safe] has not been enacted. [Smart & Safe], however, continue[s] to advocate its adoption and plan[s] future attempts to obtain the signatures necessary to place the issue on the ballot. Consequently, it is reasonable to expect that the same controversy will recur between

15

these two parties, yet evade meaningful judicial review." *Id.* Other courts have applied the same reasoning to ballot access cases. *Swanson v. Worley*, 490 F.3d 894, 903 (11th Cir. 2007) ("Although the 2002 election cycle has passed, it is well settled that ballot access challenges fall under the 'capable of repetition, yet evading review' exception to the mootness doctrine.") (collecting cases). So long as "there is a reasonable expectation that 'materially similar' circumstances will recur," the case is not moot. *Hall v. Sec'y, Alabama*, 902 F.3d 1294, 1298 (11th Cir. 2018)

Not only is there a reasonable expectation that harm caused by HB 1205 will recur, the harm has also yet to stop. HB 1205 currently inhibits Smart & Safe's ability to sponsor an initiative for the 2028 cycle, because if HB 1205 is not enjoined, the risk of penalties and costs of compliance "could be cost prohibitive." Tr. 1161:5-11. If Smart & Safe did sponsor an initiative for the 2028 general election, whether that be Adult Personal Use or Home Cultivation of Medical Marijuana, it would continue to be injured by each of the Challenged Provisions. Ms. Cox testified about Smart & Safe's efforts to comply with each provision to avoid crippling fines. *See generally,* Tr. 1161:5 – 1162:1. Further, if Smart & Safe were to sponsor an initiative, it would have to pay the Verification Costs. Tr. 1147:5-16.

Each of these injuries is traceable to Defendants:

- The Secretary is responsible for imposing fines for violations of the Ten-Day Deadlines and the Non-Resident Prohibition, Fla. Admin.

16

Code R. 1S-2.0091(2)(b), and managing the registration of petition circulators. 100.371(4)(c)8, Fla. Stat. (2025).

- The Supervisors are responsible for invalidating petitions collected by non-residents and charging Verification Costs. 100.371(14)(b)-(c), Fla. Stat. (2025).

- The Attorney General and State Attorneys are responsible for enforcing criminal penalties against unregistered circulators. §§ 16.56(1)(c); 104.187; 104.188(2), Fla. Stat. (2025).

Thus, an injunction barring each of the Defendants from enforcing their charged provisions would redress Smart & Safe's related harms.

> 3. *The Additional Amendment Prohibition and FIS Compelled Speech provision injure Smart & Safe.*

*First,* the Additional Amendment Prohibition mandates that "the sponsor of an initiative amendment may not sponsor more than one amendment…." § 100.371(2), Fla. Stat. (2025). As explained by Ms. Cox, on May 8, 2025—about five months after the Secretary approved Smart & Safe's First Proposed Amendment, petition 25-01—Smart & Safe submitted a Second Proposed Amendment to the Secretary. *See* **SSF Exhibit 3, 4**; Tr. 1078:24 – 1079:5. Shortly thereafter, the Division informed Smart & Safe that unless it withdrew its second petition by Friday, May 23, the Division would deem Smart & Safe's current petition, 25-01, abandoned. *Id.* As such, Smart & Safe was given a Hobson's choice

17

of continuing to pursue a proposed amendment for which it had already invested millions of dollars and thousands of manhours or withdraw the Second Proposed Amendment, forgoing the opportunity to sponsor it in the 2026 election cycle. *Id.*

Smart & Safe has sufficiently established that the Division, by enforcing the Additional Amendment Prohibition has injured Smart & Safe by denying it the right to sponsor a citizen initiative. This is not a pre-enforcement challenge. This is not a claim of potential future injury; rather, the injury is ongoing in nature and therefore there is nothing speculative about it. *Cf. Clapper v. Amnesty Intern. USA,* 568 U.S. 398, 401 (2013). Smart & Safe was expressly denied the opportunity to sponsor both the First and Second Proposed Amendments. And this injury remains ongoing, as Smart & Safe remains unable to sponsor both Adult Personal Use and Home Cultivation of Medical Marijuana in the 2028 election cycle. Tr. 1080:22 – 1081:24. This injury is the direct result of the Division's enforcement HB 1205 and can be redressed by an injunction against the Secretary.

*Second,* the Financial Impact Statement provision requires that the FIS must be contained on petition forms for initiatives submitted to the Secretary after May 2, 2025. § 100.371(13)(d), Fla. Stat. (2025). Smart & Safe has sufficiently established an imminent injury caused by the Financial Impact Statement provision because any initiative it sponsors for the 2028 cycle must be circulated with the FIS. *Id.* The fact that Smart & Safe would, but for HB 1205, sponsor a proposed amendment in the

18

2028 cycle and be subject to the Financial Impact Statement provision is enough for it to be injured. *Id.*

### B. The stay panel opinion is not binding on this Court.

Although the Eleventh Circuit has not squarely addressed the precedential effect (if any) of a stay panel opinion on a district court, it has explained that a "stay-panel opinion *cannot* spawn binding legal consequences regarding the merits of the case." *Democratic Exec. Comm. of Fla. v. Nat'l Republican Senatorial Comm.*, 950 F.3d 790, 795 (11th Cir. 2020). And "an order granting a stay is not a final adjudication of the merits of the appeal," and "has no res judicata effect." *Hand v. Desantis*, 946 F.3d 1272, 1275 (11th Cir. 2020) (cleaned up). This, at the very least, suggests what other circuits have explicitly held: interim panel opinions do not bind district courts. *See Homans v. City of Albuquerque*, 366 F.3d 900, 903 (10th Cir. 2004) (holding that two-member panel opinion regarding an emergency injunction did not bind the district court on a subsequent trial on the merits).

But, the Eleventh Circuit has also indicated its decision in *Hand* may set up an "either/or scenario" for rare cases where a preliminary stay opinion could have precedential effect beyond the preliminary decision. *Democratic Exec. Comm. of Fla.*, 950 F.3d at 795, n. 2. However, the either/or proposition describes unique scenarios—not presented here—related to the precedential effect of published stay opinions (unpublished here) analyzing and applying legal precedent or in multi-suit

19

litigation involving the same parties where an interim ruling could have effects outside of the case. *See U.S. Navy Seals 1-26 v. Biden,* 72 F.4th 666 (5th Cir. 2023) (Graves, J. concurring in part) (discussing precedential effect of published interim opinions that analyze legal precedent); *U.S. v. Munsingwear, Inc.,* 340 U.S. 36, 40 (1950) (discussing the use of vacatur in multi-suit litigation involving the same parties). Regardless, the Tenth Circuit's *Homans v. City of Albuquerque,* 366 F.3d 900, 903 (10th Cir. 2004) is instructive.

In *Homans*, a motions panel of the Tenth Circuit granted a preliminary injunction after the district court refused to do so. *Id.* at 903. After remand to the district court, "the parties filed a joint motion for stipulated admission of evidence and expedited determination on the merits in district court." *Id.* The district court explained that it still believed the law at issue was constitutional, but "found the contrary conclusion mandated by the motions-panel's ruling." *Id.* Back on appeal, the Tenth Circuit disagreed, reasoning that "a motions panel's decision is often tentative because it is based on an abbreviated record and made without the benefit of full briefing and oral argument." *Id.* at 905. Further the Tenth Circuit held, "if the district court were bound in the manner suggested, then the decision of the motions panel would also bind the appellate panel reviewing the merits." *Id.* This is consistent with the Eleventh Circuit's view that a motions panel opinion is not binding on the subsequent merits panel. *Vann v. Citicorp Sav. of Illinois*, 891 F.2d 1507, 1510 (11th

20

Cir. 1990); *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1369 n.1 (11th Cir. 2022); *see also* 11th Circuit Local Rule 27-1(g).

The Court should view the stay-panel ruling for what it is—the opinion of two Judges of the Eleventh Circuit, persuasive but not binding. Notably, two other Judges on the Eleventh Circuit recently expressed conflicting views on the issues presented here. *Fla. Decides Healthcare Inc. v. Fla. Sec'y of State*, No. 25-12370, 2025 WL 3738554, at *8 (11th Cir. Sept. 9, 2025) (Abudu, J., dissenting) ("The political debates that citizen initiatives, and by extension the circulation of petitions, generate involve core political speech."); *Baker v. City of Atlanta*, 164 F.4th 850, 868 (11th Cir. 2026) (Newsom, J., dissenting) ("It seems to me that the plaintiffs have a separate, stand-alone First Amendment interest in participating in the signature-gathering process itself."). It thus falls on this Court to decide who has the better argument.

## C. The challenged provisions of HB 1205 violate Smart & Safe's First Amendment rights.

### 1. Legal Standards

First and foremost, "the circulation of a petition involves the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Meyer*, 486 U.S. at 421–22. In holding so, the U.S. Supreme Court did not parse out "circulation," distinguishing political discussion from the act of collecting a signed petition. Rather, the Court explained,

that "the solicitation of signatures for a petition involves protected speech… and any attempt to regulate solicitation would necessarily infringe that speech." *Id.* at 422. This is because the solicitation of signatures for a petition, like the solicitation of funds for charitable causes, "involve[s] a variety of speech interests— communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes—that are within the protection of the First Amendment." *Id.* Thus, any regulation must consider that the solicitation is "characteristically intertwined with informative and perhaps persuasive speech … and …*that without solicitation the flow of such information and advocacy would likely cease.*" *Id.* (quoting *Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 632 (1980)) (emphasis added); *see also Lichtenstein v. Hargett*, 83 F.4th 575, 586 (6th Cir. 2023) ("*Meyer* applied heightened scrutiny because the Colorado statute targeted speech by restricting the conduct that created the speech."). Realistically, if a sponsor cannot collect signatures in support of a citizen initiative, the flow of *information and advocacy* associated with the citizen initiative *would likely cease*. Thus, regulations that restrict the conduct of collecting signed petitions decrease political expression.

Following *Meyer* and *Buckley v. American Constitutional Law Foundation, Inc.* 525 U.S. 182, 199 (1999) ("*ACLF*"), in which the U.S. Supreme Court emphasized the burdens on the direct one-on-one communication between petition

22

gatherers and voters, , the Eleventh Circuit clarified the "narrow circumstances" in which a citizen initiative regulation would implicate First Amendment concerns. *Biddulph v. Mortham*, 89 F.3d 1491, 1500 (11th Cir. 1996). In *Biddulph*, the court warned that content-based regulations, those resulting in a disparate impact on certain political viewpoints, facially neutral regulations applied in a discriminatory manner, and regulations that impermissibly burden the free exchange of ideas would all trigger strict scrutiny. *Id.* At issue here are regulations that impermissibly burden the free exchange of ideas and are content based. "Unfortunately there is no bright line separating severe from lesser burdens." *ACLF*, 525 U.S. at 207 (Thomas, J. concurring). However, a law severely burdens speech when it limits "the overall quantum of speech available to the electorate." *Pest Comm. v. Miller*, 626 F.3d 1097, 1107 (9th Cir. 2010). Further, a regulation that "discourages people from serving as circulators… impose[s] a 'severe' restriction on First and Fourteenth Amendment rights." *Campbell v. Buckley*, 203 F.3d 738, 744 (10th Cir. 2000).

Regulations on petitioning that severely burden the free exchange of ideas trigger strict or exacting scrutiny. *See Meyer*, 486 U.S. at 420 ("[T]his case involves a limitation on political expression subject to *exacting scrutiny*"); *ACLF*, 525 U.S. at 204 (holding that circulator reporting requirements fail "*exacting scrutiny*"); *Biddulph*, 89 F. 3d at 1500 (explaining that "strict scrutiny" would apply if the state "impermissibly burdened the free exchange of ideas"); *Lichtenstein*, 83 F.4th at 586

23

("[W]hile *Meyer* used the phrase 'exacting scrutiny' to describe the governing test, the Court applied standards that today go by 'strict scrutiny.'"). Whether strict scrutiny—"the least restrictive means of achieving a compelling state interest"—or exacting scrutiny—"a substantial relation between the [] requirement and a sufficiently important governmental interest"—applies, the government must at least demonstrate that its regulation is "narrowly tailored to the government's asserted interest." *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021).

*First*, to survive strict or exacting scrutiny, Defendants must demonstrate that the state has a compelling or sufficiently important governmental interest. "It goes without saying that there is a 'substantial governmental interest in protecting the public from fraud.'" *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 612 (2021) ("*AFPF*") (quoting *Schaumburg v. Citizens for Better Environment*, 444 U.S. 620, 636, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980)) (applying exacting scrutiny to a California regulation requiring charities to disclose its biggest donors to the state). However, neither transparency nor efficiency in the efforts of combatting fraud is a compelling or sufficiently important governmental interests. *Id.* at 614-15 ("California's interest is less in investigating fraud and more in ease of administration… But the prime objective of the First Amendment is not efficiency." (citations omitted)).

24

*Second*, Defendants must demonstrate that HB 1205 is narrowly tailored to achieve its governmental interest. "Narrow tailoring is crucial where First Amendment activity is chilled—even if indirectly—'because First Amendment freedoms need breathing space to survive.'" *Id.* (quoting *Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 433 (1963)). For a regulation to be narrowly tailored, it must not "burden substantially more speech than is necessary to further the government's legitimate interests." *McCullen v. Coakley*, 573 U.S. 464, 486 (2014). A narrowly tailored law is "in proportion to the interest served." *McCutcheon v. Fed. Election Com'n*, 572 U.S. 185, 218 (2014). "Even a 'legitimate and substantial' governmental interest 'cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.'" *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 609 (2021) (quoting *Shelton v. Tucker,* 364 U.S. 479 (1960)).

Ultimately, if a provision (1) limits the overall quantum of speech available to the electorate, or (2) discourages individuals from becoming circulators, then the regulation must not burden substantially more speech than is necessary to further the government's compelling or important interest.

25

> 2.  *The Ten-Day Delivery Requirement unconstitutionally burdens Smart and Safe's core political speech.*
>
> a.  *Facts*

To make the 2026 ballot, Smart & Safe was required to collect, and have verified as valid, 880,602 signed initiative petitions from voters state-wide as well as to meet requisite number in at least half of Florida's twenty-eight Congressional Districts. Section 3; § 100.371(1), Fla. Stat. Prior to the passage of HB 1205, Smart & Safe had thirty days from the time a voter signed the initiative petition to submit it to the respective Supervisor of Elections for verification. § 100.371(7)(a)(1), Fla. Stat. (2024). With thirty days, registered petition circulators could collect signatures, mail them in to district offices or the central processing facility, and administrative staff could timely process and file Smart & Safe's petitions. In the 2024 cycle, Smart & Safe had less than 0.01% of its signed initiative petitions deemed late under the thirty (30) day deadline and paid a $121,850 fine. *See* **SSF Trial Exhibit 5**.

For the 2026 Cycle, Ms. Cox testified at trial that the logistics of gathering and processing the approximately 1.5 million petitions necessary to make ballot is no small matter, as circulators working in each county would gather petitions from voters residing in numerous counties—particularly at tourist centers such as Orlando or at major events. Tr. 1097:25 – 1098:15. Once gathered, circulators had to facilitate turn-ins of the petitions to a central caging facility in Orlando twice a week. *Id.* Under the Ten-Day Delivery Requirement, this forced circulators to drive at least

26

twice a week to the closest regional office (Jacksonville, Tallahassee, Orlando, Tampa, and various locations in South Florida) to turn in the petitions for sorting and counting, where other circulators would then physically transport the petitions to the central caging facility in Orlando. Tr. 1103:12-16; 1112:24 – 1113:10.

Once at the Orlando caging facility, circulators would separate the petitions by individual county and flag any deficiencies or suspicious issues for Supervisors, and Vanguard would obtain verification fee checks for all sixty-seven counties, triple count all petitions, and then overnight the petitions to all sixty-seven counties. Tr. 1102:20 – 1103:16; 1124:7 – 1125:23. The scale of this effort turned back-office operations from a part-time operation under the thirty-day clock into a non-stop effort running seven days a week under the Ten-Day Delivery Requirement. Tr. 1112:24 – 1113:10.

The Ten-Day Delivery Requirement drastically reduced Smart & Safe's time to deliver an initiative petition to the corresponding county supervisor from thirty (30) days to ten (10) days. The Ten-Day Delivery Requirement also removed the "next business day" language that would extend the deadline for initiative petitions that arrive on weekends or holidays. *Cf.* § 100.371(7)(a)(1), Fla. Stat. (2024). No official guidance has been issued from any entity charged with the enforcement of the Ten-Day Delivery requirement. Tr. 2141:4-7; 2142:7-9, 23-25; 2143:1-6. Despite shortening the time for sponsors to return signed initiative petitions, no provision of

HB 1205 increases the time for the county supervisors of elections to review and verify the signed initiative petitions or to ferret out fraud. Tr. 2143:7-15.

### b. First Amendment Injury to Smart & Safe

The Ten-Day Delivery Requirement dealt a crippling blow to Smart & Safe's ability to collect and file signed initiative petitions at all levels of its operation. Citizen initiative petitioning is a continuum of speech encompassing a variety of protected activities from field communications and advocacy to gathering, processing, and filing of petitions. This is so because the power to amend the Florida Constitution granted to Floridians expressly and necessarily involves filing the petitions with the state. Section 3 ("The power to propose the revision or amendment … of this constitution by initiative is reserved to the people … [i]t may be invoked by filing with the custodian of state records a petition … signed by a number of electors …."). That entire continuum is impacted by the Ten-Day Delivery Requirement.

*First,* at the field level, to comply with the exacting demands (or risk of fines) Smart & Safe's petition circulators were required to stop circulating petitions in the field and physically deliver signed petitions in-person to district hubs or Smart & Safe's central processing facility twice a week to ensure signed initiative petitions could be process, sorted and overnighted to the respective Supervisors' offices. Tr. 1115:1-9; 1123: 9-22; 1124:7 – 1126:14. Only registered petition circulators could

28

handle the signed initiative petitions. *See* § 100.371(4)(a) Fla. Stat. (2025) (prohibiting anyone other than a registered circulators from "physically possess[ing]" petitions). Lest the Court underestimate the sheer volume of signed initiative petitions traversing the state, Smart & Safe was required to spend approximately $70,000 on rental vehicles, gas, and registered circulators to traverse the state to physically collect all petitions from outlying counties and district offices to return the central processing facility for processing, payment, and delivery to the respective supervisors. *See* **SSF Trial Exhibit 13**, Tr. 1142:14 – 1143:1.

*Second,* at the processing level, once the signed initiative petitions made it to the central processing facility, registered petition circulators would process all the signed petitions, review for accuracy and potential fraud, and handle all back-end operations including sorting and batching for submittal to the Supervisors. Tr. 1112:17 –1113:10. With a thirty-day return time, this was a part-time task, but under the Ten-Day Delivery Requirement, this became a seven-day-a-week task for registered circulators. *Id*. This effectively tripled the cost of compliance. *Id.* Again, this came at the expense of those registered petition circulators being in the field interacting with voters. Tr. 1114:21-25.

*Finally,* at the delivery and filing stage Smart & Safe had to overnight all signed petitions to the respective Supervisor's offices to *attempt* to even comply with the Ten-Day Delivery Requirement. Tr. 1117:14-25, 1118: 10-18. This increased the

29

cost of mail delivery ten-fold from roughly $42,000 the prior cycle to $435,776.42 for only the final few months of the 2026 cycle. Tr. 1146:12- 25. Compounding the compressed timeframe, the Ten-Day Delivery Requirement eliminated the reprieve provided for weekends, holidays, or office closures. This shortened Smart & Safe's time to file the signed initiative petitions with the respective Supervisors to less than 10 days. Despite overnighting the signed petitions several days in advance of the Ten-Day Delivery Requirement, Smart & Safe faces approximately $480,000 in late fees in Brevard County alone for mail delays (many delays falling on holidays, weekends, or office closures). *See* **SSF Trial Exhibit 14**. The potential fine Smart & Safe may face this cycle is exorbitant, and the risk of incurring more will chill Smart & Safe from sponsoring an initiative petition in the 2028 cycle. Tr. 1161:5-18.

> c. *Exacting scrutiny applies, and HB 1205 fails, because the Ten-Day Delivery Requirement severely burdens Smart & Safe's speech.*

Exacting scrutiny applies because the Ten-Day Delivery requirement severely burdens Smart & Safe's free exchange of ideas with voters and limits the quantum of political discussion with voters. *See Meyer, Biddulph, Buckley,* Tr. 1114:21-25. The Ten-Day Delivery Requirement fails exacting scrutiny in two ways. *First,* the Ten-Day Delivery Requirement drastically reduces the number of voters Smart & Safe could reach, because many petition circulators were required to spend valuable field time shuttling petitions across the state. *Second,* the decrease from thirty (30)

days to ten (10) days prevented the collection of initiative petitions far from major hubs by substantially decreasing the time available to collect and deliver signed initiative petitions, further limiting Smart & Safe's ability to make the issue a focus of statewide discussion. A key example of this is Monroe County, where it was nearly impossible to collect petitions from residents there and have them processed, delivered, and submitted on time. Tr. 1044:10 – 1049:21; 1118:1-9. Accordingly, the Ten-Day Delivery requirement fails exacting scrutiny.

> i.   *Defendants have no substantial, much less a compelling, interest in the Ten-Day Delivery Requirement.*

At trial, no evidence was provided demonstrating that the Ten-Day Requirement deterred, prevented, or assisted in the investigation of fraudulent activity. Nor did HB 1205 increase the time the individual Supervisors had to review and verify signed initiative petitions. Tr. 2143:7-15. The only evidence of a state interest Defendants could muster in support of the Ten-Day Delivery Requirement was the testimony of Ms. Imaltzin Molina, an employee at the Miami-Dade Supervisor, who indicated she preferred the Ten-Day Requirement, which made staffing her office easier for reviewing petitions. Tr. 1825: 2-13. This "administrative efficiency" is insufficient for establishing a compelling interest on behalf of the State. *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 614–15 (2021) ("Mere administrative convenience does not remotely reflect the seriousness of the

31

actual burden" that the Non-Resident Prohibition imposes on sponsors' speech and association rights.) (internal quotations omitted).

> ### ii. The Ten-Day Delivery Requirement is not narrowly tailored.

Finally, even if marginally easing one Supervisor's staffing considerations were a compelling interest for the Ten-Day Delivery requirement—it is not—or even if a scintilla of evidence were provided that the Ten-Day Delivery requirement assisted in reducing, preventing, or uncovering fraud—none was provided—the requirement is not narrowly tailored to achieve any governmental interest. Defendants cannot "merely rel[y] on a bare assertion of election integrity rather than evidence or a reasonable response connected to the" Ten-Day Delivery Requirement. *See SD Voice v. Noem*, 60 F.4th 1071, 1081 (8th Cir. 2023) (holding that filing deadline for petitions to amend the state constitution failed exacting scrutiny). Particularly where Defendants produced no evidence that Supervisors were unable to process signed petitions submitted under the 30-day delivery requirement, Defendants "failed to show to show the filing deadlines further an important regulatory interest." *See id.* at 1082 (The state "had no trouble complying with that deadline for many years."). Accordingly, the Ten-Day Delivery Requirement is not narrowly tailored and fails exacting scrutiny.

> 3. *The Non-Resident Prohibition unconstitutionally burdens Smart &*
> *Safe's core political speech.*

> a. *Facts*

The goal of any sponsor of a citizen initiative is to get a proposed amendment on the ballot. Tr. 1099:23-25. To do so, sponsors must "fil[e] with the custodian of state records a petition containing a copy of the proposed revision or amendment, signed by" the requisite number and geographical distribution of voters, Section 3, verified as valid by the Supervisors. § 100.371(1)(a), Fla. Stat. (2025). Smart & Safe, a committee with finite resources, endeavored to engage in the effort to collect valid signed petitions in a cost-effective manner. Tr. 1153:1-5. Paid circulators were its most successful avenue for doing so, and its most successful circulators were non-residents. Tr. 1087:2 – 1088:15. While the Non-Resident Prohibition may only regulate the "collection" of petitions after they are signed by the voter, the natural effect is that the only way non-residents can carry Smart & Safe's message is by leaving personal use petitions with the voter or talking to voters alongside a resident circulator. Tr. 1229:17 – 1230:16; 1233:10-21. Both endeavors cost money and are ineffective for collective valid signatures. *Id.* Consequently, Smart & Safe will not hire non-residents to carry its message at all. Tr. 1216:6-10.

> i. *First Amendment Injury to Smart & Safe*

To collect enough signed petitions to place the amendment on the 2026 general election ballot, Smart & Safe endeavored to hire the best field managers and

circulators available. Tr. 1085:3-23. These professional circulators have the training, experience, and right personality traits for the job, able to engage voters in one-on-one conversations that result in obtaining valid petitions for submittal to Supervisors. *Id.* at 1086:24-1087:22; 1089:10-22; 1091:20 – 1092:16. Ms. Cox knew that these professional circulators would obtain high quality signed petitions (e.g., containing all requisite information and elements), because she and her team had worked with them on past campaigns. 1085:19-23. Smart & Safe gave no mind to whether the personnel were Florida residents, caring more about having experienced and qualified circulators to carry its message and secure ballot placement. *Id.*; 1089:8-14.

Another benefit of hiring professional circulators was stability of workforce. Ms. Cox's team hired circulators who committed to staying in Florida and working full-time, regularly forty or more hours per week. Tr. 1088:16 – 1089:4. In comparison, less experienced circulators were less likely to stay for the duration of the campaign or work full-time. Tr. 1089:5-22. The ability to hire more full-time, experienced circulators results in more one-on-one conversations with voters. Tr. 1089:23 – 1090:5. Having a qualified, experienced and stable workforce cannot be overlooked as the sponsor's goal is to engage voters to obtain the requisite number and congressional district distribution of verified valid petitions to secure ballot

placement. Having to use inexperienced, infrequent or unreliable circulators, or having high turnover, impedes that goal. Tr. 1087:11-1090:5.

Before HB 1205, Smart & Safe hired 474 non-resident professional circulators. Tr. 1092: 20 – 1093:6. Smart & Safe also hired around 700 Florida resident professional circulators. *Id.* Altogether, Smart & Safe circulators had a roughly seventy percent employment retention rate. Tr. 1092:13-17. Between early March, when the field program began, and May 2nd, when HB 1205 was signed into law, Smart & Safe collected around 78,000 petitions per week—over 300,000 petitions per month. Tr. 1107:23 – 1108:14; 1110:20-23. Ms. Cox projected that Smart & Safe would have reached its goal of collecting enough petitions to qualify for the ballot by July 1, 2025. Tr. 1107:23 – 1108:14. Even accounting for the invalidation of over 200,000 mailed petitions, Ms. Cox expects that it would have taken less than one additional month to collect enough petitions to qualify the amendment for the ballot. Tr. 1229:11-16.

After HB 1205 was passed, Smart & Safe immediately terminated the employment of all 474 full-time, non-resident circulators. Tr. 1108:23 – 1109:7. At forty hours a week, that would mean Smart & Safe lost roughly *18,960 hours* of circulating petitions in the first *week* of HB 1205 going into effect. Smart & Safe went from collecting 78,000 petitions a week to 15,000 petitions a week. Tr. 1109:13-23. Though that entire difference may not all be attributable to the loss of

35

non-resident circulators, it certainly played a huge role in the decline. This is demonstrated by the uptick in petitions collected during the Injunction Period. Tr. 1160:10-14. During the Injunction Period, Smart & Safe was able to rehire 45 non-resident professional petition circulators. Over that 18-day period, working for 40 hours a week, those 45 petitioners worked roughly 4,628 manhours, and collected about 28,000 petitions. Tr. 1156:24 – 1157:16; 1160:10-14. That is a return of 6 petitions per person per hour.

In addition to the decrease in the number of circulators available, the Non-Resident Prohibition also increased costs for Smart & Safe to make up the difference. Ms. Cox testified that Florida residents (1) were more likely to work part-time, (2) were likely to collect fewer petitions per hour than professional, non-resident circulators, and (3) had higher turnover rates. Tr. 1143:2 – 1144:1. So Smart & Safe was having fewer conversations with voters and spending more money on things like training, background checks, and onboarding than it had before HB 1205. *Id.* While Smart & Safe may have had millions of dollars at its disposal, that amount of money simply was not enough to overcome the hurdles placed before it by HB 1205. Ms. Cox made multiple requests for additional funds to hire more staff and pay bonuses or higher rates to existing staff, but these budget requests were denied due to a lack of funds. Tr. 1154:1-19.

36

Smart & Safe tested what the Defendants regularly recommended as a reasonable alternative: hiring non-residents to simply hand out personal use petitions for voters to submit. *See e.g.,* Tr. 144:20-24. The results were unsuccessful. Despite non-residents working over 20,000 man hours and distributing 170,000 petitions, their efforts resulted in Smart & Safe receiving approximately 9,800 signed petitions. Tr. 1185:17-23, 1186:11-20. This is an overall return rate of 0.058 percent, Tr. 1230:5-10, or about 0.42 petitions per hour, Tr. 1186:17-20. Ms. Cox, with more than 20 years' experience, testified that that was a "terrible ROI [rate of return]" and would not recommend a sponsor engage in that type of effort in the future. Tr. 1230:12-16.

In the end, Smart & Safe has not made the ballot for the 2026 general election.

> ii. *Defendants failed to produce evidence that the Non-Resident Prohibition furthered <u>any</u> state interest, let alone a compelling one.*

While witnesses for Defendants testified at length about the process of receiving and investigating reports of petition circulator fraud, they testified about only a handful of circulators who were convicted of crimes, Tr. 1875:8-12, a dozen or so ongoing investigations, Tr. 1875:14-1876:5, and only **<u>one</u>** non-resident who was arrested (not yet convicted) for petition circulation fraud. Tr. 1872:15-1873:2. According to Jonathan Bridges, Alexandria Tatem was a non-resident petition circulator who was (1) caught and (2) arrested, despite being in Texas at the time of

37

her arrest. *Id.* The remainder of Mr. Bridges's testimony primarily addressed "that it's harder to investigate things out of state than in state." Tr. 1878:1-2; 1883:10-1885:24. The funny thing is, even Florida residents can leave Florida. Mr. Bridges testified about the difficulties of investigating Grassfire, a company hired to collect petitions. Tr. 1881:6-13. Grassfire administratively dissolved, and the owner moved to Hawaii. Tr. 1882:4-10. Despite that hurdle, Mr. Bridges's office did receive many of the records he sought via subpoena. Tr. 1882:11-16.

> b. *Exacting scrutiny applies, because the Non-Resident Prohibition severely burdens Smart & Safe's speech.*

HB 1205 unduly restricts Smart & Safe's ability to communicate with voters by barring an entire segment of the population from serving as petition circulators. The Non-Resident Prohibition unduly burdens Smart & Safe's speech for two reasons: First, it "limits the number of voices who will convey [Smart & Safe's] message and the hours they can speak and, therefore, limits the size of the audience they can reach. Second, it makes it less likely that [Smart & Safe] will garner the number of signatures necessary to place the matter on the ballot, thus limiting their ability to make the matter the focus of statewide discussion." *See Meyer*, 486, U.S. at 422. The vast majority of Circuit Courts of Appeals that have analyzed similar laws have found non-resident bans to violate the First Amendment. *See We the People PAC v. Bellows*, 40 F.4th 1 (1st Cir. 2022); *Wilmoth v. Sec'y of New Jersey*, 731 Fed. Appx. 97 (3d Cir. 2018); *Libertarian Party of Virginia v. Judd*, 718 F.3d

308 (4th Cir. 2013); *Krislov v. Rednour*, 226 F.3d 851 (7th Cir. 2000); *Nader v. Brewer*, 531 F.3d 1028 (9th Cir. 2008); *Chandler v. City of Arvada, Colorado*, 292 F.3d 1236 (10th Cir. 2002); *Yes On Term Limits, Inc. v. Savage*, 550 F.3d 1023 (10th Cir. 2008).[5]

While the Eleventh Circuit has yet to rule on this issue, the panel that stayed this Court's preliminary injunction on the Non-Resident Prohibition (the "Stay Panel") made a non-binding finding based on a limited record that Defendants were

---

[5] Only the Eighth Circuit Court of Appeals has concluded that a non-resident circulator prohibition does not unduly restrict speech. In *Initiative & Referendum Inst. v. Jaeger*, the court reasoned there were plenty of eligible circulators in the state for the sponsor to hire. 241 F.3d 614, 616 (8th Cir. 2001). The court went on to explain "many alternative means remain to non-residents who wish to communicate their views on initiative measures." *Id.* at 617. These conclusions are directly refuted by *Meyer* and *Buckley*. Each rejected the contention that alternative means of engaging in speech "lift[s] the burden on speech at petition circulation time." *Buckley*, 525 U.S. at 195; *see also Meyer*, 486 U.S. at 424. In fact, the Court concluded in *Meyer* that the "burden on First Amendment expression" was not mitigated "because other avenues of expression remained open." The Constitution protects the right "not only to advocate the cause but also to select what [the sponsor] believe[s] to be the most effective means for so doing." 486 U.S. at 424.

The *Jaeger* court similarly failed to apply the logic underlying its own precedent from *Bernbeck v. Moore*, which held that "the concerns raised by the prohibition of paid circulators in *Meyer* are identical to the effect of the voter-registration requirement …. In both instances, the laws 'limit the number of voices who will convey sponsors' message and the hours they can speak and, therefore, limit the size of the audience they can reach…'mak[ing] it 'less likely that [the sponsor] will garner the number of signatures necessary to place the matter on the ballot, thus limiting their ability to make the matter the focus of statewide discussion.'" 126 F.3d 1114 (8th Cir. 1997) (quoting *Meyer*, 486 U.S. at 422-23). That the reasoning underlying the holding by the Eighth Circuit in *Jaeger* is directly contradicted by *Meyer* and *Buckley*, as well as its own precedent, is reason enough to discard it.

39

likely to succeed on the merits. In doing so, the Stay Panel incorrectly applied *Meyer* and *ACLF*. Doc. 97-2. The Stay Panel made the case that exacting scrutiny need only apply to laws regulating the "political discussion of the issue the sponsor is seeking to put on the ballot" by "restricting speech elements of the petition-circulation process." *Id.* at 11. This reasoning misapplies the *Meyer* decision, which explained that the regulated conduct—paying circulators—and speech could not be disentwined, because without the regulated conduct, the "flow of such information and advocacy would likely cease." *Meyer,* 486 U.S. at 422 (quoting *Schaumburg,* 444 U.S. at 632). Similarly, the restriction of non-residents' ability to "collect, deliver, or otherwise physically possess" forms that are already "signed" restricts conduct from which information and advocacy would flow, because now sponsors like Smart & Safe will not hire non-residents to carry their message. The Stay Panel's arbitrary line between before and after signing a petition does nothing to mitigate the fact that (1) sponsors cannot hire non-resident petition circulators, and (2) sponsors will not hire non-residents to merely have conversations with or distribute petition forms to Florida voters as that has proven unsuccessful. Tr. 1230:12-16 ("We tried everything, and I would say no, not again."); *see also id.*, 1233:23-1234:12 (discussing effect of reducing number of circulators engaged in speech if non-residents were required to double up with residents who collected the signed petitions).

The Non-Resident Prohibition severely burdened Smart & Safe's speech by reducing the number of voices available to communicate its message. In particular, the prohibition prevented Smart & Safe from hiring its preferred messengers—skilled, trained, and capable full-time circulators, with a vested interest in producing collecting valid signed petition forms. In turn, Smart & Safe had to resort to spending more money on less effective, new, part-time circulators. Despite efforts to work within the confines of the prohibition by having non-residents distribute rather than collect petitions, Smart & Safe's ability to communicate its message was greatly hindered. Thus, unless the Non-Resident Prohibition is enjoined, any future citizen initiative efforts will necessarily exclude non-residents, severely burdening Smart & Safe's speech.

### c.  *The Non-Resident Prohibition fails exacting scrutiny.*

The state "bears the burden of justifying its restrictions," and "must affirmatively establish [] reasonable fit." *Bd. of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 480 (1989). No matter the purported justification, Defendants have failed to meet their burden.

While protecting the public from fraud can be a compelling governmental interest, *AFPF*, 594 U.S. at 612, the Non-Resident Prohibition is not narrowly tailored to do so. Defendants offered no testimony that would suggest non-residents are more likely to engage in petition circulation fraud. On the contrary, Ms. Cox's

testimony demonstrated that non-residents tended to be professional circulators who worked in the industry, with an incentive to have high validity rates to avoid being placed on Do Not Hire lists. Tr. 1088:16 – 1089:1. Meanwhile, Mr. Bridges testified that residents and non-residents alike have been accused of having committed fraud, investigated, and arrested. Tr. 1856:6-13. To the extent non-residents were arrested for committing fraud, Mr. Bridges only named one non-resident, Alexandria Tatem. *Id.* Banning all non-residents from collecting, delivering, or physically possessing signed initiative petition forms because one non-resident has been accused of petition fraud is hardly a sufficient fit necessary to be narrowly tailored.

That said, it is clear that the real interest Defendants rely on to justify the Non-Resident Prohibition is investigation efficiency. *See* Tr. 1857:6-21 ("It's easier to investigate individuals or entities that are within the state of Florida"); 1883:10-1885:24. First, this is not a sufficiently important governmental interest that can justify severely burdening petition initiative speech. As the Court made clear in *AFPF*, "the prime objective of the First Amendment is not efficiency… Mere administrative convenience does not remotely 'reflect the seriousness of the actual burden' that the [Non-Resident Prohibition] imposes on [sponsors' speech and] association rights." *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 614–15 (2021) (internal quotations omitted).

42

Second, the Non-Resident Prohibition is not narrowly tailored to address investigation efficiency because "there is a dramatic mismatch [] between the interest that [Defendants] seek to promote and the [] regime that [they have] implemented in service of that end." *See AFPF*, 594 U.S. at 612. Mr. Bridges testified at length regarding the difficulties of issuing subpoenas to out-of-state companies, but the difficulty of executing a subpoena on out-of-state companies is not ameliorated by the Non-Resident Prohibition. Tr. 1877:5-13; 1879:2-4. This is most clearly demonstrated with the fact that HB 1205 did not prohibit Smart & Safe from hiring out-of-state companies to manage their field program. Tr. 1166:9-25. HB 1205 did not do anything to address this purported problem. Nor would the Non-Resident Prohibition address difficulties of investigating resident circulators who leave the state of Florida. Just because "it's easier to investigate individuals or entities that are *within the state of Florida*" does not mean that Florida residents are unable to leave the state of Florida. *See* Tr. 1857:6-21. Mr. Bridges testified about this exact scenario when explaining why he struggled to subpoena records from Grassfire because the owner, who had been a Florida resident, moved to Hawaii. Tr. 1882:2-10. So not only does the Non-Resident Prohibition severely burden Smart & Safe's speech, but it failed to address Defendants' asserted investigatory difficulties.

4. *Verification Costs unconstitutionally burden Smart & Safe's core political speech.*

a. *Facts*

i. *First Amendment Injury to Smart & Safe*

It is undisputed that "before a signature on a petition may be counted toward the number required to place a statewide issue on the ballot, a Supervisor must determine whether the signature on the petition form is valid." ECF No. 596 ¶ 40 (citing Fla. Stat. § 99.097(3)(a)). Pursuant to HB 1205, the Supervisor cannot make that determination until the Verification Costs are paid:

> The supervisor **must be paid in advance the sum of 10 cents for each signature checked or the actual cost of checking such signature, whichever is less**, by the candidate or, in the case of a petition to have a local issue placed on the ballot, by the person or organization submitting the petition. In the case of a petition to place a **statewide issue on the ballot**, the person or organization submitting the petition must pay the supervisor **in advance the cost posted by the supervisor** pursuant to s. 100.371(14). . . .
>
> The supervisor shall promptly verify the signatures within 60 days **after receipt of** the petition forms and **payment and processing of a fee for the actual cost of signature verification incurred by the supervisor**. However, for petition forms submitted less than 60 days before February 1 of an even numbered year, the supervisor shall promptly verify the signatures within 30 days **after receipt of** the form and **payment of the fee for signature verification**.

*Id.* ¶ 41 (citing Fla. Stat. § 99.097(4)(a) (2025)); Fla. Stat. § 100.371(14)(b) (2025)).

Prior to the increased verification costs, the average petition verification fee was 87 cents, and after HB 1205 the costs increased to an average of $3.64 per petition. *Id.*; Tr. 1150:18-21; Tr. 1151:19-24. Ms. Cox testified at trial that Smart & Safe gathered and submitted approximately 1.6 million petitions to the Supervisors in 2024. Tr. 110:9-14. Applying that number of submitted petitions to the average verification costs, verification costs prior to HB 1205 would have cost roughly $1,392,000 before HB 1205, and $5,824,000 after HB 1205, an increase of over 400%. In addition to increased costs per petition, validity rates have decreased following passage of HB 1205—likely tied to the new requirement that voters include their drivers license number or social security number. Tr. 1147:24-1148:7; 1178:8-18. Thus, Ms. Cox testified that to run a successful campaign in 2028, she would advise Smart & Safe to collect and submit approximately 1.9 to 2 million signatures to have submitted enough valid signatures to qualify for the ballot. *Id.* At a rate of $3.64 per petition, the verification costs alone would amount to roughly $7,280,000.

The more than 400% increase in verification costs substantially burdens Smart & Safe's ability to verify petitions and, in turn, qualify for the ballot. The Verification Costs therefore place a financial barrier between the collection of petitions and their verification. By increasing the costs of participating in the process, the Verification Costs burden Smart & Safe's core political speech by making it significantly less

45

likely that it will have the funds necessary to sponsor an initiative in the future. Tr. 1161:5-11 (Ms. Cox testified that, due to budget constraints, it could be cost prohibitive for Smart & Safe to pursue a citizen initiative in 2028); *see also* Tr. 1259:13-16 (Dr. Smith opining that "each of the challenged provisions severely burden and restrict the initiative process . . . making it accessible to only the most select moneyed interests."); Tr. 1366:8-10 (Dr. Smith stating that "Florida has layered on, over time and then with HB 1205, this sledgehammer of individual things which have made it virtually impossible for all but the most moneyed special interests to qualify.").

This staggering difference in the verification fee is magnified by the fact that the "actual cost" for signature verification in the 2028 election cycle will be based on the costs incurred in the current cycle, and the Department of State caused a significant increase in those costs. Director Matthews admitted that she sent "more than five" emails directing the Supervisors to reverify, and invalidate, thousands of previously verified petitions in the months leading up to the petition deadline.[6] Tr.

---

[6] For example, Director Matthews ordered that approximately 28,000 verified as valid petitions gathered by nonresident circulators during the injunction period be re-reviewed and invalidated. Tr. 1159:6-1160:17; 1846:21-1848:8; 2050:25-2051:9. Similarly, Director Matthews directed the Supervisors to re-review and invalidate petitions signed by inactive voters that had previously been verified. Tr. 472:1-473:10; 514:17-515:2; 1846:11-20; 2051:17-24 Supervisor Earley testified that he disagreed with this "sudden change" to the Division's "original guidance and long-time process" that required invalidation of petitions submitted by inactive voters. Tr.

2050:8-2052:18. She then instructed the Supervisors that the costs associated with that reverification are part of the "actual cost of signature verification" that may be included in the Verification Cost pursuant to § 100.371, Fla. Stat. Tr. 2047:5-2050:5; Smart & Safe Trial Exhibit 18. As a result, sponsors must pay inflated fees next cycle based on the numerous reverifications ordered by the Division this cycle. *See* Smart & Safe Trial Exhibit 18, Tr. 1819:22-1820:5 (Ms. Molina testifying that she relied on information from a prior year to create her budget for the current year). The Verification Cost is also inflated by including costs associated with post-verification activities required by HB 1205. Tr. 1421:22-1422:12.

### ii. Citizen initiative petitions are treated differently from candidate petitions and local referendum.

The Verification provisions apply an entirely different statutory scheme to petitions seeking to amend the Florida Constitution than petitions seeking to place a candidate or local referendum on a ballot. § 99.097(4)(a), Fla. Stat. (2025). Significantly higher verification costs apply to citizen initiative petitions. *Id*. Supervisors are statutorily prohibited from charging more than $0.10 to verify candidate petitions and local referenda. § 99.097(4)(a), Fla. Stat. (2025). Even if the Supervisors' actual costs to verify the candidate and local petitions exceed $0.10,

---

514:17-515:6; 643:2-10 Smart & Safe has challenged the propriety of these directives in pending litigation. Tr. 1160:18-1161:3

they are precluded from charging more than the statutory rate of $0.10. Tr. 1840:3-8.

In addition to singling out citizen initiative petitions for charging the "actual costs" of verifying, HB 1205 imposes significant additional verification requirements that vastly increase the actual costs: Supervisors must (1) verify each voter's driver's license or the last four digits of their social security number (Tr. 1833:14-1834:1); (2) mail notices to each voter whose petition has been deemed valid (Tr. 1835:3-1836:10; 1835:11-15); (3) report statistics to the Division (Tr. 1835:16-1837:16); and (4) ship statewide ballot petition forms to the Division in hard copy (Tr. 1835:17-1839:7). HB 1205 then authorizes the Supervisors to require sponsors of statewide petitions to bear these additional costs. Tr. 1835:18-1840:2.

> b. *Exacting scrutiny applies, both because the Verification Costs severely burden Smart & Safe's speech and because they are content based.*

*First*, the Verification Costs severely burden Smart & Safe's speech by placing a significant financial burden on Smart & Safe. Given the massive price tag of simply verifying petitions, Smart & Safe is unlikely to have the funds to sponsor another initiative. While sponsors can file a certificate of "undue burden" in lieu of paying verification costs, that waiver prohibits the use of paid circulators. § 99.097(4)-(6), Fla. Stat. (2025). This gives Smart & Safe the Hobson's choice of either seeking the waiver and foregoing the use of paid circulators to bear the increased verification

costs and circulation workforce costs. It is not possible to collect enough petitions to make ballot without paid circulators,[7] but the Increased Verification Costs make it cost prohibitive to even try. As a result, exacting scrutiny applies. *See Meyer v. Grant*, 486 U.S. 414, 420 (1988) ("[T]his case involves a limitation on political expression subject to exacting scrutiny").

*Second*, the increased Verification Costs imposed on Smart & Safe consumed funds that had been budgeted for mass communications, thereby diminishing Smart & Safe's ability to engage in other forms of political expression. As a result, resources that would have otherwise been used for digital campaigns, texting campaigns, television and radio commercials, mail campaigns, and other forms of direct communication with voters were instead diverted to pay verification fees. Tr. 1152:22 – 1153:23.

---

[7] As recognized by Supervisor Earley, it is unlikely that a statewide initiative made ballot in the last 30 years using "unpaid volunteers" and he sees a "significant difference in the number of petitions submitted by campaigns that use paid circulators as compared to those who rely on volunteers." Tr. 511:9-16. Thus, in addition to paying millions of dollars in Verification Costs, sponsors must also pay petition circulators, along with other miscellaneous costs. Tr. 1150:9-4 (Ms. Cox testifying as to additional costs incurred due to HB 1205). Supervisor Early admitted that the Verification Cost "increases make it more challenging for people to qualify measures for a ballot in Florida" and that "the added complexity would make it more difficult to get an initiative petition on the ballot" Tr. 511:17-21; 518:4-6; 519:12-15. Supervisor Early also stated: "It's costly to get a citizen initiative petition on the ballot, and if you don't have the money to do that, it's going to be very difficult to get an initiative petition onto the ballot" in the "wake of HB 1205." Tr. 516:17 - 517:23

49

*Finally*, the Verification Costs are content based triggering exacting scrutiny. *See Biddulph v. Mortham*, 89 F.3d 1491, 1500 (11th Cir. 1996) (content-based regulations of initiative petitions trigger exacting scrutiny). The statutes regulating petition verification create a wildly different system for statewide issues as compared to candidates and local referendum. Not only are citizen initiative petitions subjected to several additional verification procedures, but the costs of those procedures are passed directly to sponsors. "A speech regulation is content based if the law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 171 (2015). Such is the case here, where the content of the petition—amending the constitution verses electing a candidate or passing a local referendum—is the basis for the regulations and who bears the costs. Consider the scenario in which the organization sponsors a citizen initiative and a local referendum. The "same sponsor—the same speaker—is subject to different regulations of their ballot title based on whether the petition seeks to change state law or local law." *League of Women Voters of Arkansas v. Jester*, No. 5:25-CV-5087, 2025 WL 3231637, at *19 (W.D. Ark. Nov. 19, 2025) (granting preliminary injunction in part because petition regulation was content based).

### c.    *Verification Costs fail exacting scrutiny.*

The Defendants failed to demonstrate any compelling state interest justifying the dramatically increased Verification Costs imposed by HB 1205 and then passing

that onto the sponsors. Ms. Molina, with the Supervisor office in Miami Dade, testified that many of the additional costs were attributable to the new verification procedures created by HB 1205. Tr. 1833:10 - 1840:1. Thus, Defendants seek to justify increased financial burdens on Smart & Safe by pointing to costs generated by the very regulatory scheme it enacted.

Even if Defendants had articulated a compelling interest, the increased Verification Costs of HB 1205 are not narrowly tailored to serve it. Rather than adopting targeted measures necessary to ensure the accuracy of petition verification, Defendants imposed sweeping additional procedures that dramatically increased the time and labor required of Supervisors. Those added procedures are what drove the increased Verification Costs charged to initiative sponsors. Tr. 1818:5 – 1819:5. Defendants presented no evidence that the existing verification framework was insufficient, nor did they demonstrate that the newly imposed requirements meaningfully improved the accuracy or integrity of the petition process.

The evidence before the Court demonstrates that HB 1205's inflated Verification Costs cannot survive exacting scrutiny. "With respect to fees, Florida is the only state that requires sponsors to pay for the validation of each of their signatures that are being validated petitions." Tr. 1389:15-17. Thus, Florida is breaking the norm by charging Verification Costs and further by allowing providing a cap for certain classes. *See also SD Voice v. Noem*, 60 F.4th 1071, 1083 (8th Cir.

51

2023) (the state did not offer "any legal basis for distinguishing the deadlines to submit petitions to initiate state statutes from petitions to amend the state Constitution."). In so doing, Defendants failed to identify a compelling interest justifying passing the dramatic increase in costs onto initiative sponsors.

### D. The Challenged Provisions Cumulatively Violate Smart & Safe's First Amendment Rights

      *1.    This Court may review the cumulative effect of a law.*

In adjudicating claims of infringement upon constitutional rights of any sort, courts routinely take a wider view and consider the cumulative impact of law or other government actions on constitutional rights. Courts are not required to, and the jurisprudence indicates that they should not, examine each discrete impact in isolation without an eye towards the whole. In other words, constitutional violations can result from a thousand papercuts, as the adage goes, even if one single "papercut" does not alone impede or deprive constitutional rights.

This principle has been memorialized by the U.S. Supreme Court in First Amendment cases. *See, e.g.*, *NAACP v. Button*, 371 U.S. 415, 430 (1963) (looking beyond the actions proscribed by the challenged legislation—solicitation of litigants—to the potential cumulative impact of preventing advocacy groups from engaging in "cooperative, organizational activity . . . to achieve legitimate political ends."); *In re Primus*, 436 U.S. 412, 431 (1978) (holding the restraint on speech to be unconstitutional when the larger cumulative effect was to hamper constitutional

52

rights, specifically the use of "litigation as a vehicle for effective political expression and association"); *Clingman v. Beaver*, 544 U.S. 581, 607–08 (2005) (O'Connor, J., concurring) ("A panoply of regulations, each apparently defensible when considered alone, may nevertheless have the combined effect of severely restricting participation and competition. Even if each part of a regulatory regime might be upheld if challenged separately, one or another of these parts might have to fall if the overall scheme unreasonably curtails associational freedoms.").

Although *Button* and *Primus* did not involve petition-gathering or elections, they did involve the practice of law, an area in which Defendants similarly have a compelling interest in regulating conduct to protect the public. Notwithstanding the leeway that is ordinarily given to govern these areas, the Supreme Court found that when the broader cumulative impact of such regulations stifles political speech, the law should not survive. *See Primus*, 436 U.S. at 436 ("precision of regulation must be the touchstone [when implicating] our most precious freedoms.") (quoting *Button*, 371 U.S. at 438).

First Amendment jurisprudence is not the only arena in which courts consider cumulative impacts—this scope of analysis can be found in criminal law,[8]

---

[8] *See, e.g.*, *Taylor v. Kentucky*, 436 U.S. 478, 487 n.15 (1978) ("Because of our conclusion that the cumulative effect of the potentially damaging circumstances of this case violated the due process guarantee of fundamental fairness in the absence of an instruction as to the presumption of innocence, we do not reach petitioner's

53

procedural due process,[9] employment law,[10] and the dormant commerce clause[11] (to provide a non-exhaustive list).

Where, as here, Smart & Safe has challenged multiple provisions of the legislation, it is appropriate for this Court to consider the cumulative impact of the challenged law when considering the burden upon Smart & Safe's constitutional rights rather than examining each individual impact in isolation. *See also N. Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204, 231 (4th Cir. 2016) ("Thus, cumulatively, the panoply of restrictions results in greater disenfranchisement than any of the law's provisions individually."); *cf. Libertarian*

---

further claim that the refusal to instruct that an indictment is not evidence independently constituted reversible error."). *See also Kyles v. Whitley,* 514 U.S. 419, 437-38 (1995) (examining materiality by looking to the "the cumulative effect of suppression"); *Strickland v. Washington*, 466 U.S. 668, 695 (1984) ("In making this determination, a court hearing an ineffective assistance of counsel claim must consider the totality of the evidence before the judge or jury.").

[9] *Goldberg v. Kelly*, 397 U.S. 254, 263-64 (1970) (conducting an inquiry into the cumulative impact of the various procedural irregularities to determine that constitutional due process had been violated).

[10] Hostile work environment claims are by their very nature a cumulative impact analysis. *See, e.g.*, *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (reiterating that in order to support a hostile work environment claim, discriminatory conduct must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.")

[11] *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970) ("Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree.")

54

*Party of Alabama v. Merrill*, No. 20-13356, 2021 WL 5407456, at *9 (11th Cir. Nov. 19, 2021) ("Having attacked only a single statutory scheme, the Party cannot argue now that the cumulative effect of other, unchallenged ballot access regulations renders the voter list law constitutionally infirm.")

> 2.   *Altogether, the Challenged Provisions severely burden Smart & Safe's core political speech.*

The full scope of the impact realized by each of the Challenged Provisions individually is examined in Section II.C. *supra*, but they also have additional cumulative effects. For the 2025-26 cycle, the Ten-Day Delivery Deadline combined with the Non-Resident Prohibition to have a more significant impact on Smart & Safe's speech than each working independently. As explained by Ms. Cox, Smart & Safe had to increase back-office staffing to comply with the Ten-Day Deadline, but only Florida residents could handle petitions. Thus, Smart & Safe had to take people away from talking to voters to process and deliver signed petitions. Tr. 1112:25-1113:24. For future petition cycles, the cumulative impact of fines and fees will operate together to completely chill any efforts to sponsor petitions. Smart & Safe is facing potentially millions of dollars in fines for missing the Ten-Day Delivery Deadline and using non-resident circulators and have had—and will in the future have to—pay millions more to verify petitions. There is thus no other conclusion than that the Challenged Provisions severely burdened Smart & Safe's core political speech, particularly when the cumulative impact of the Challenged Provisions is

considered. Tr. 1259:13-16 (Dr. Smith explaining that "each of the challenge provisions severely burden and restrict the initiative process, and, collectively, they eviscerate the initiative process making it accessible to only the most select moneyed interests"); *Id.* 1366:8-17 ("Florida has layered on, over time and then with HB 1205, this sledgehammer of individual things which have made it virtually impossible for all but the most moneyed special interests to qualify. And as a result, you've effectively created these barriers where even just being an initiative state is no longer really going to allow all of those positive secondary effects -- these educative effects … -- from happening, because there's just no chance of being able to qualify a measure in Florida when you put these things individually and collectively."))

### E.  Other challenged provisions must be enjoined.

#### 1.    *Disparate Verification Costs violate equal protection.*

The Verification Costs burden Smart & Safe's core political speech in a discriminatory manner by applying significantly higher fees for the verification of statewide citizen initiative petitions than for verification of candidate or local referendum petitions. "Although asserting First Amendment rights under an Equal Protection claim may seem redundant, Plaintiffs' right to do so finds support in Supreme Court precedent and decisions of various circuit courts." *Dream Defs. v. DeSantis*, 553 F. Supp. 3d 1052, 1096 (N.D. Fla. 2021) (citing *e.g. R.A.V. v. City of St. Paul, Minnesota*, 505 U.S. 377, 384 n.4 (1992)).

As explained in Section II.C.4. *supra*, a successful campaign in the 2028 election cycle will likely require Smart & Safe to spend an *additional* $4.7 to 5 million on Verification Costs due to HB 1205 for an approximate total of $6,740,000 in Verification Costs alone to make ballot. This restriction is not applied in an equal manner to advocates of state petitions versus advocates of candidate and local petitions. A statutory cap is placed on the actual cost of verifying petitions for candidates and local issues such that the Verification Costs may not exceed ten cents per petition. *See* Fla. Stat. § 99.097(4)(a) (2025). If, for example, an advocate for a local issue submitted two million petitions, it would be required to pay $200,000 (*i.e.*, 2 million x $0.10) whereas advocates for a statewide petition that submitted the same number of petitions would be required to pay $6,740,000 (*i.e.*, 2 million x $3.37). This drastic disparity in cost violates the Equal Protection Clause.

Courts have applied heightened scrutiny in cases such as this that involve substantial infringement of a fundamental right, even where no suspect class was affected. *See, e.g. Harper v. Virginia State Bd. of Elections*, 383 U.S. 663 (1966) (holding poll tax was unconstitutional as inconsistent with the Equal Protection Clause; "where fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized and carefully confined."). Any classification that serves to "penalize the exercise" of a constitutional right is unconstitutional "unless shown to

be necessary to promote a compelling government interest." *Shapiro v. Thompson*, 394 U.S. 618, 634 (1969). Here, the lack of a cap on the Verification Costs provision improperly discriminates against citizen initiative petitions. Thus, Defendants must establish this provision promotes a compelling state interest.

While Ms. Molina testified that HB 1205 requires her office to follow additional processes related to statewide ballot petitions that are not required of local issues or candidate petitions, such as verifying the signer's driver's license or the last four social security digits, requiring circulator registration, and identifying whether a signer is registered – which additional processes increased the Verification Cost for statewide petitions, Tr. 1807:22 - 1808:9; 1833:10 - 1834:1; 1845:10-15; 1848:24 - 1850:2 – no evidence was introduced for why those additional processes are not also required for local issues or candidate petitions.[12] There was no evidence, for example, that local issue petitions are immune from fraud concerns. Rather, Dr. Smith testified that he did the first published study to look at individual petition-gathering activities related to a local issue petition in Gainesville and that "they had lots of problematic signatures" and "a lot of invalid petitions, almost 30 percent for

---

[12] In contrast, Supervisor Earley testified that his office was required to take extra steps under certain circumstances for candidate and local issue petitions too. Tr. 611:7 - 612:10; 618:11-14; 621:3-10. Supervisor Earley's testimony did not explain why the supporters of candidates and local issue petitions were not also required to pay for the additional costs associated with these extra steps.

this local measure." Tr. 1269:20-1270:10; 1360:15-21; 1361:8-24. Based on this study, Dr. Smith concluded that local initiatives "can have high invalidation rates, as high, if not higher, than a lot of initiative campaigns in the state." Tr. 1361:21-24. There is, therefore, no evidence that the additional processes required for statewide petitions, and the attendant increased costs, should not also be required of local issue petitions. *See, e.g., Shapiro v. Thompson*, 394 U.S. 618 (1969) (rev. on other issues) (finding statutory prohibition of welfare benefits to residents of less than a year created a classification that constituted an invidious discrimination denying them equal protection of the laws; though Defendants had a valid interest in preventing fraud, that interest applied to both classifications and therefore did not justify the distinction); *SD Voice v. Noem*, 60 F.4th 1071, 1083 (8th Cir. 2023) (the state did not offer "any legal basis for distinguishing the deadlines to submit petitions to initiate state statutes from petitions to amend the state Constitution.").

Regardless, the fact that Supervisors may incur more expenses verifying petitions for statewide issues due to state-mandated processes does not explain why the actual costs must be paid by one class and not the others. No rational basis exists for this distinction. *See, e.g., Rinaldi v. Yeager*, 384 U.S. 305 (1966) (holding unconstitutional a statute that attempted to preserve the public fisc by requiring prisoners who took an unsuccessful appeal to reimburse the State out of their institutional earnings for the cost of furnishing a trial transcript because it did not

59

require similar repayments from unsuccessful appellants given a suspended sentence, placed on probation, or sentenced only to a fine). Thus, HB 1205 violates Smart & Safe's rights under the Fourteenth Amendment to the United States Constitution, both facially and as applied to Smart & Safe.

### 2. *HB 1205' new FIS requirement is unconstitutional compelled speech.*

The Florida Constitution provides that a financial impact statement ("FIS") must be provided to the public regarding the probable financial impact of any amendment proposed by citizen initiative petition. Fla. Const. art. XI, § 5(c). However, the Florida Constitution does not require that the FIS be published in any particular manner – only that it be provided to the public "prior to the holding of an election." *Id*. For example, the FIS could be made available to the public for the months leading up to the general election on the Division "Initiatives/Amendments/Revisions Database" (available at https://constitutionalinitiatives.dos.fl.gov/), which provides access to each initiative's summary, full text, sponsor contact information, and signature status; or the FIS could be made available through the methods provided for the initiative financial information statement and/or summary. § 100.371(16)(g) Fla. Stat. (2025) (requiring the Department of State to furnish to the Supervisors a copy of the initiative financial information statements summary to be made available at each polling place and main office of the Supervisor); § 100.371(16)(h) Fla. Stat. (2025)

(requiring the Secretary of State and the Office of Economic and Demographic Research to "make available on the Internet each initiative financial information statement in its entirety" and requiring that the summary be posted on the Supervisors' websites as well as the publication or mailing required by § 101.20, Fla. Stat.). However, instead of using any such lesser restrictive means, HB 1205 requires that the FIS be published "on the petition form and the ballot." § 100.371(16)(d), Fla. Stat. (2025); HB 1205 at 1087-1089) ("FIS Compelled Speech Provision").

"As the Supreme Court has explained, government-required notices *are* content-based restrictions; by compelling individuals to speak a particular message, such notices 'alter the content of their speech.'" *Florida Rising Together v. Lee*, No. 4:21CV201-MW/MJF, 2021 WL 12301255, at *12 (N.D. Fla. Dec. 17, 2021) (emphasis original). And, as noted above, content-based regulations of the citizen initative process are subject to exacting scrutiny. *Biddulph*, 89 F.3d at 1500. The U.S. Supreme Court has rejected a similar disclosure framework, recognizing that "more benign and narrowly tailored options [were] available" than requiring professional fundraisers to disclose to potential donors at the outset of a solicitation the percentage of funds actually turned over to the charity. *Riley v. National Federation of Blind of N. C., Inc.*, 487 U.S. 781, 800 (1988). "For example, as a general rule, the State may itself publish the detailed financial disclosure forms it requires professional fundraisers to file. This procedure would communicate the desired

61

information to the public without burdening a speaker with unwanted speech during the course of a solicitation." *Id*. "These more narrowly tailored rules are in keeping with the First Amendment directive that government not dictate the content of speech absent compelling necessity, and then, only by means precisely tailored." *Id*.

The FIS is prepared by the Financial Impact Estimating Conference ("FIEC"), a group of government personnel appointed by the Governor and presiding Officers of the Florida Senate and House of Representatives. § 100.371(16)(c)1., Fla. Stat. (2025). Sponsors such as Smart & Safe have no control over the creation or content of the FIS. § 100.371(16)(a), Fla. Stat. (2025). Rather, Smart & Safe's involvement is limited to submitting information to the FIEC—a right that opponents may exercise as well. *Id*. Where there is disagreement regarding the probable financial impact of the proposed amendment, the FIS is not required to include both sides or limit the FIS to verifiable factual information.[13] This leaves significant leeway for the FIEC to present the FIS of proposed amendments with which it disagrees in an unfair and/or unflattering manner. This is particularly damaging where the FIS may contain up to 150 words (§ 100.371(16)(c)2., Fla. Stat. (2025)), whereas Smart &

---

[13] Regardless, "for First Amendment purposes, a distinction cannot be drawn between compelled statements of opinion and, as here, compelled statements of 'fact,' since either form of compulsion burdens protected speech." *Riley*, 487 U.S. at 782.

Safe's summary of the proposed amendment is limited to half that (*i.e.*, 75 words) (§ 101.161(1), Fla. Stat. (2025)).

Smart & Safe would be required to include the FIS with its petition, even if it disagreed with the FIS, and even if the FIS was worded to discourage people from signing it. Such forced dissemination is unconstitutional. *See Pacific Gas and Elec. Co. v. Public Utilities Com'n of California*, 475 U.S. 17-18 (1986). In *Pacific Gas*, the U.S. Supreme Court held that a state public utilities commission order that required a utility to place a third-party's newsletter in its billing envelope impermissibly burdened the utility's affirmative First Amendment rights by forcing it to "disseminate hostile views" and "associate with speech with which the utility may disagree." *Id.* at 2. Because of the order, the utility "may be forced either to appear to agree with the third-party's views or to respond." *Id*. "That kind of forced response is antithetical to the free discussion that the First Amendment fosters." *Id*. at 16. It "forces speakers to alter their speech to conform with an agenda they did not set." *Id*. at 9. While the utility did not have the right to be free from vigorous debate, it did have the "right to be free from government restrictions that abridge its own rights in order to enhance the voices of its opponents." *Id.* at 14. This remained true even though, unlike here, the third-party was required to state that its messages were not those of the utility. "The presence of a disclaimer . . . does not suffice to eliminate the impermissible pressure on the utility to respond." *Id*. at 16, n.11.

In sum, the *Pacific Gas* Court held that the utility could not be required to use its property (*i.e.*, the billing envelopes) to distribute a third-party's message, just as citizens may not be required to display a slogan on their license plates and thereby "use their private property as a 'mobile billboard' for the State's ideological message." *Id.* at 17 (quoting *Wooley v. Maynard*, 430 U.S. 705, 715 (1977)).[14] "Such forced association with potentially hostile views burdens the expression of views different from the utility's and risks forcing the utility to speak where it would prefer to remain silent. Those effects do not depend on who 'owns' the 'extra space' in the envelope owned by the utility." *Id.* at 18. Thus, the impermissible First Amendment effects could not be remedied by the Commission's determination that the extra space was owned by the ratepayers and not the utility. Similarly, Smart & Safe may not be required to use its property (*i.e.*, the paper the petition is printed on)[15] and its petition circulators to "distribute the message of another." *Id.* at 17-18.

---

[14] Similarly, the Miami Herald could not be required to distribute with its newspapers inserts owned and prepared by third-parties – the "constitutional difficulty" was "requiring the newspaper to disseminate a message with which the newspaper disagreed" and the "difficulty did not depend on whether the particular paper on which the replies were printed belonged to the newspaper or to the candidate." *Id.* at 18 (referencing *Miami Herald Pub. Co. v. Tornillo,* 418 U.S. 241, 256-257 (1974)).

[15] Extending the length of the petition greatly increases Smart & Safe's costs for paper. Tr. 1137:4-8 It also increases Smart & Safe's printer costs and the amount of time that it takes to print each petition packet. Tr. 1138:2-4, 1138:15-18

State Defendants' claim that the petition form is government speech and that the FIS Compelled Speech Provision is therefore not compelled speech is similarly unfounded. At most, the petition is a hybrid of government speech and the speech of both Smart & Safe and the voters that sign the petition. Regardless, the fact that a document is government speech does not mean it is immune from the compelled speech analysis. *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 219 (2015) (explaining that licenses are government speech but were still subject to the compelled speech analysis); *see also Wooley v. Maynard,* 430 U.S. 705, 715 (1977) (requiring an individual to use his car as a "mobile billboard" for the state's motto implicates First Amendment protections). "The very purpose of the First Amendment is to foreclose public authority from assuming a guardianship of the public mind through regulating the press, speech, and religion." *Riley*, 487 U.S. at 791. State Defendants have failed to establish a countervailing interest sufficiently compelling to justify the compelled speech, nor an overriding state interest. "Although the [] factual information might be relevant to the listener, and . . . could encourage or discourage[16] the listener from making a political [action], a law

---

[16] For example, the U.S. Supreme Court expressly recognized: "Campaigns with high costs and expenses carried out by professional fundraisers must make unfavorable disclosures, with the predictable result that such solicitations will prove unsuccessful." *Riley*, 487 U.S. at 799.

65

compelling its disclosure would clearly and substantially burden the protected speech." *Id.* at 798.

Requiring such compelled speech on the petition is not substantially related to any sufficiently important governmental interest propounded by Defendants at trial. Compelling a sponsor to also carry the State's message on its petition is particularly problematic given the State's recent weaponization of the FIS. *See, e.g., Floridians Protecting Freedom, Inc. v. Financial Impact Estimating Conference,* 2024 WL 3226027 (Fla. Cir. Ct. June 10, 2024) (holding the "FIS is inaccurate, ambiguous, misleading, unclear, and confusing, and is not limited to addressing the estimated increase or decrease in revenue or costs to state or local governments.").[17]

---

[17] Under HB 1205, Smart & Safe may not circulate future petitions until the FIS is completed and until the FIEC has at least 75 days (longer if the Legislature is in session) to complete the FIS. § 100.371(16)(b), Fla. Stat. (2025). If the FIS is (intentionally or unintentionally) not in compliance with § 100.371(16), the Florida Supreme Court will remand it to the FIEC for redrafting, which requires Smart & Safe to refile the petition with the revised FIS as a new petition triggering a new review by the Florida Supreme Court. § 100.371(16)(e), Fla. Stat. (2025). Because Smart & Safe has no control over the FIS language, it could conceivably become entrenched in an endless cycle of remands for redrafting, particularly if members of the FIEC oppose the proposed amendment. The U.S. Supreme Court held unconstitutional a statute that similarly "permitted a delay without limit" in *Riley*, 487 U.S. at 802. Similar to being unable to circulate petitions until the FIS issues, the fundraisers in *Riley* could not engage in solicitation until their license issued and, because the license was not required to issue "within a specified brief period," the State's purported interest did not justify the delay in being able to exercise speech. Regardless, even with a compliant FIS, Smart & Safe is unable – for months – to begin collecting petitions (*i.e.*, exercising its core political speech) since the petition must include the FIS. § 100.371(3)(a)7., (16)(e), Fla. Stat. (2025).

66

In short, pursuant to clear First and Fourteenth Amendment jurisprudence, Defendants may not force an individual or group to support a particular expression. The First Amendment prevents Defendants from punishing a person for refusing to articulate, advocate, or adhere to the State's approved messages. Nonetheless, HB 1205's FIS Compelled Speech Provision requires Smart & Safe to articulate the State's message by forcing it to contain the Financial Impact Statement on its petition. *See Riley*, 487 U.S. at 790, n.5 ("a statute regulating how a speaker may speak directly affects that speech."). Thus, the FIS Compelled Speech Provision is both facially unconstitutional and unconstitutional as applied to Smart & Safe.

### 3. The Mandatory Decertification Provision violates First Amendment rights of Smart & Safe.

"Upon a determination that the requisite number and distribution of valid signatures has been obtained, the secretary **shall issue a certificate of ballot position** for that proposed amendment and shall assign a designating number…." § 100.371(15), Fla. Stat. (2025); HB 1205 at 977-981 (emphasis added). This directive to place on the ballot an initiative receiving the requisite number and distribution of voter signatures is derived from the express text of article XI, sections 3 and (5)(b) of the Florida Constitution working in concert, and is self-executing. Section 3 provides:

> The power to propose the revision or amendment of any portion or portions of this constitution by initiative is reserved to the people, provided that, any such revision or amendment, except for those

67

limiting the power of government to raise revenue, shall embrace but one subject and matter directly connected therewith. It **may be invoked by filing** with the custodian of state records **a petition** containing a copy of the proposed revision or amendment, **signed by a number of electors in each of one half of the congressional districts of the state, and of the state as a whole**, equal to eight percent of the votes cast in each of such districts respectively and in the state as a whole in the last preceding election in which presidential electors were chosen.

Relatedly, Article XI, § 5(b) provides:

(b)    A proposed amendment or revision of this constitution, or any part of it, by initiative **shall be submitted to the electors at the general election provided the initiative petition is filed with the custodian of state records no later than February 1** of the year in which the general election is held.

*Id*. Nothing in the Constitution provides that, once an initiative satisfies the foregoing prerequisites to make ballot, it may be decertified.

Nonetheless, HB 1205 provides that, after enduring all the time, expense, and uncertainty of gathering enough verified petitions to make ballot, Smart & Safe faces decertification for noncompliance that is wholly beyond its control. Per HB 1205, "the secretary **must** rescind the certificate of ballot position if an advisory opinion issued by the Supreme Court pursuant to s. 16.061(1)[18] deems the initiative petition invalid" based upon, among other things, a non-compliant FIS. § 100.371(15), Fla. Stat. (2025); HB 1205 at 981-984.

---

[18] HB 1205 expands the issues to be addressed pursuant to § 16.061(1), Fla. Stat., to include "the compliance of the financial impact statement with s. 100.371(16)." HB 1205 at 416-417.

As discussed above, Smart & Safe has no control over the content of the FIS, much less whether it complies with the law. An opponent of the initiative could therefore intentionally sabotage the proposed amendment by purposefully imbedding a non-compliant FIS. Under such circumstances, Smart & Safe could never make ballot, no matter how hard it tried and no matter how many citizens wanted an opportunity to vote for the proposed amendment. Accordingly, requiring the Secretary to rescind the certificate of ballot position based on the FIS—a statement drafted by the government, over which the sponsor has no control— would nullify the hundreds of thousands of signed and verified petitions gathered by Smart & Safe through extensive communications to voters. The Mandatory Decertification Provision thereby impermissibly burdens Smart & Safe's free speech in a manner not intended, nor contemplated, by the Florida Constitution.

Ballot placement criteria that are **not rooted in the constitutional text** or necessary to **ensure ballot integrity** are unconstitutional. *Browning v. Fla. Hometown Democracy, Inc., PAC*, 29 So. 3d 1053, 1073 (Fla. 2010). As set forth above, § 16.061(1), Fla. Stat. (2025) and § 100.371(15), Fla. Stat. (2025), as amended by HB 1205, combine to impose criteria for ballot placement that are **not rooted in the constitutional text** of Sections 3 or 5 of Article XI. No evidence was presented to establish that mandatory decertification is necessary to **ensure ballot integrity**. Because the Mandatory Decertification Provision imposes ballot

69

placement criteria[19] that is not rooted in the constitutional text nor required to ensure ballot integrity, it should be found unconstitutional.

> 4. *The Additional Amendment Prohibition infringes the First Amendment rights of Smart & Safe.*

The Additional Amendment Prohibition in HB 1205 is a far cry from being a reasonable and necessary regulation. Not only is it an outright ban on core political speech bearing no relation to ballot integrity, but the provision is also vague and ambiguous. The Additional Amendment Provision provides: "The sponsor of an initiative amendment may not sponsor more than one amendment …." § 100.371(2), Fla. Stat. (2025). It is unclear whether that provision applies to sponsoring more than one amendment (i) at a given time, (ii) for a particular election cycle, or (iii) ever. Regardless, it is an outright ban on sponsors' core political speech in violation of the First Amendment.

At trial, Ms. Cox testified that Smart & Safe initially attempted to sponsor a second initiative for the home cultivation of medical marijuana. Tr. 1078: 24-25, 1079:1. After receiving an email from Maria Matthews, the Director of the Division of Election, informing Smart & Safe that "unless you withdraw the second petition (Home Cultivation of Medical Marijuana) by Friday, May 23, we will consider its submission a constructive withdrawal of your current petition (Adult Use of

---

[19] To make ballot, the Florida Supreme Court's advisory opinion must find the FIS is in compliance with § 100.371(16), Fla. Stat. (2025).

Marijuana)," Smart &Safe was forced to withdraw its second petition. Tr. 1080: 8-25; 108: 1-11; *see also* **SSF Trial Exhibit 4**.

This Additional Amendment Prohibition not only burdens Smart & Safe's ability to communicate and disseminate its message to the public, but the prohibition bars such communication from the outset, censoring the message sponsors want to convey to the public. Exacting scrutiny applies here. Where the "initiative process substantially restricts political discussion of the issue the sponsor is seeking to put on the ballot," the court should apply exacting scrutiny. *Biddulph*, 89 F.3d at 1498.

To survive exacting scrutiny, "there must be a substantial relation between the law and a sufficiently important governmental interest." *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) (citations and quotations omitted). "While exacting scrutiny does not require that the law be the least restrictive means of achieving its ends, it does require that it be narrowly tailored to the government's asserted interest." *Id.* at 608. Here, one can only speculate about the Defendants' purported interests, because Defendants did not offer any evidence or testimony explaining how this Additional Amendment Prohibition furthers a sufficiently important State interest or has a rational basis. Accordingly, HB 1205's Additional Amendment Prohibition violates the First Amendment.

## III.   CONCLUSION

**WHEREFORE**, for the foregoing reasons, Plaintiff Smart & Safe respectfully requests this Court enter judgment as follows:

A. Declare that the following Challenged Provisions of HB 1205 violate the First and Fourteenth Amendments:

i. the Ten-Day Delivery Requirement (§ 100.371(7)(a), Fla. Stat. (2025); HB 1205 at 714-744);

ii. the Non-Resident Circulator Prohibition (§ 100.371(4)(b)3., Fla. Stat. (2025); HB 1205 at 598-603); § 100.371(4)(g), Fla. Stat. (2025); HB 1205 at 676-79; § 104.187, Fla. Stat. (2025); HB 1205 at 1323-1326; § 104.188(2), Fla. Stat. (2025); HB 1205 at 1329-41; § 100.371(14)(h), Fla. Stat. (2025); HB 1205 at 967-970);

iii. the Voter Notice (§ 100.371(14)(e), Fla. Stat. (2025); HB 1205 at 865-924) and Verification Costs (§ 99.07(4)(a), Fla. Stat. (2025); § 100.371(14)(f), Fla. Stat. (2025); HB 1205 at 925-38; HB 1205 at 1183-88);

iv. the Additional Amendment Prohibition (§ 100.371(2), Fla. Stat. (2025); HB 1205 at 492-493);

v. the Mandatory Decertification Provision (§ 100.371(15), Fla. Stat. (2025); HB 1205 at 981-984);

72

vi. FIS Compelled Speech (§ 100.371(13)(d), Fla. Stat. (2025); HB 1205 at 1087-1089, 1113-1116);

B. Preliminarily and permanently enjoin Defendants Secretary of State and Attorney General from enforcing the foregoing Challenged Provisions;

C. Preliminarily and permanently enjoin Defendants County Supervisors from enforcing § 100.371(14)(h), Fla. Stat. (2025); § 100.371(14)(e), Fla. Stat. (2025); § 99.07(4)(a), Fla. Stat. (2025); § 100.371(14)(f), Fla. Stat. (2025);

D. Preliminarily and permanently enjoin Defendants State Attorneys from enforcing § 104.187, Fla. Stat. (2025); HB 1205 at 1323-1326; § 104.188(2), Fla. Stat. (2025); HB 1205 at 1329-41;

E. Retain jurisdiction to render any further orders that this Court deems necessary;

F. Award Plaintiff its reasonable attorneys' fees and costs as to Defendants Secretary of State and Attorney General as provided by 42 U.S.C. § 1988 and other law as applicable; and

G. Grant any and all other relief as this Court deems necessary and just.

Respectfully submitted this 19th day of March, 2026.

**STEARNS WEAVER MILLER**
**WEISSLER ALHADEFF & SITTERSON, P.A.**

  s/ Glenn Burhans, Jr.
**Glenn Burhans, Jr.**
Florida Bar No. 605867
**Bridget K. Smitha**
Florida Bar No. 709581
**Christopher R. Clark**
Florida Bar No. 1002388
**Liz Desloge Ellis**
Florida Bar No. 97873
**Hannah E. Murphy**
Florida Bar No. 1032759
**Matthew Bryant**
Florida Bar No. 93190
106 E. College Avenue, Suite 700
Tallahassee, Florida 32301
Telephone: (850) 580-7200
gburhans@stearnsweaver.com
bsmitha@stearnsweaver.com
crclark@stearnsweaver.com
lellis@stearnsweaver.com
hmurphy@stearnsweaver.com
mbryant@stearnsweaver.com
cacosta@stearnsweaver.com
abrantley@stearnsweaver.com
aruddock@stearnsweaver.com
*Counsel for Plaintiff, Smart & Safe Florida*

## LOCAL RULE 5.1 CERTIFICATION

The undersigned certifies on this 19th day of March, 2026, that this document

complies with font requirements set forth in Rule 5.1(C), N.D. Fla. Loc. R.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 19, 2026, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

<u>   s/ Glenn Burhans, Jr.        </u>
Attorney