# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

|  |  |
|---|---|
| FLORIDA DECIDES HEALTHCARE, INC., *et al.*,<br><br>    *Plaintiffs*,<br><br>v.<br><br>CORD BYRD, in his official capacity as Secretary of State of Florida, *et al.*,<br><br>    *Defendants*. | Case No. 4:25-cv-00211-MW-MAF |

## <u>FLORIDA RIGHT TO CLEAN WATER PLAINTIFFS' CLOSING TRIAL BRIEF</u>

**TABLE OF CONTENTS**

I.   Introduction ..........................................................................................1

II.  Brief Summary of Facts..................................................................4

III. Standing ..............................................................................................10

A. Legal Standard...................................................................................10

B. RTCW Plaintiffs Have Standing ....................................................13

   i.   Registration Requirement ......................................................15

        1. RTCW Has Associational Standing to Challenge the
           Registration Requirement .................................................15

        2. RTCW Has Organizational Standing to Challenge the
           Registration Requirement .................................................17

        3. RTCW Plaintiffs' Injuries from the Registration
           Requirement Are Traceable to All Defendants and
           Redressable by the Requested Relief..................................20

   ii.  Affidavit Requirement ..........................................................21

        1. RTCW Has Associational Standing to Challenge the
           Affidavit Requirement .......................................................21

        2. RTCW Has Organizational Standing to Challenge the
           Affidavit Requirement .......................................................33

        3. RTCW Plaintiffs' Injuries from the Affidavit Requirement
           Are Traceable to All Defendants and Redressable by the
           Requested Relief.................................................................33

   iii. Petition Circulator Restrictions.............................................34

        1. Melissa Martin Has Standing to Challenge the Non-Resident
           Restriction...........................................................................34

        2. RTCW Has Associational Standing to Challenge the Petition
           Circulator Restrictions .......................................................35

3. RTCW Has Organizational Standing to Challenge the Petition Circulator Restrictions.............................................36

4. RTCW Plaintiffs' Injuries from the Petition Circulator Restrictions Are Traceable to All Defendants and Redressable by the Requested Relief..................................38

iv. Severe Fines on Sponsors .........................................................39

1. RTCW Has Standing to Challenge the 10-Day Return Deadline and Petition Delivery After February 1 Fines ......40

2. RTCW Has Standing to Challenge the Wrong County Delivery Fine .......................................................................45

3. RTCW Has Standing to Challenge the Filling in Missing Information and Pre-Filling Petitions Fines .......................46

4. RTCW Has Standing to Challenge the Ineligible Petition Circulator Fine .................................................................49

5. RTCW Plaintiffs' Injuries from the Severe Fines on Sponsors Provisions Are Traceable to Defendants and Redressable by the Requested Relief...................................51

v. Arbitrarily Invalidated Petitions .............................................52

1. RTCW Has Third-Party Standing to Challenge the Arbitrarily Invalidated Petitions Provision.........................52

2. RTCW Has Organizational Standing to Challenge the Arbitrarily Invalidated Petitions Provision.........................55

3. RTCW Plaintiffs' Injuries from the Arbitrarily Invalidated Petitions Provision Are Traceable to Defendants and Redressable by the Requested Relief...................................56

IV. Merits....................................................................................................57

A. Infringement of Core Political Speech (Counts I & II)......................57

i. Factual Background ................................................................57

ii.    Legal Standard ...............................................................59

    1.  Strict Scrutiny Is the Appropriate Standard of Review for Each of the Challenged Provisions ......................................59

        a.  Petition Circulation Activities Are Political Speech Protected by the First Amendment ................................59

        b.  If the Court Declines to Apply Strict Scrutiny to Any Challenged Provision, Intermediate Scrutiny Is Required.......................................................................68

    2.  The First Amendment Prohibits Overbroad Laws...............69

iii.    Challenged Provisions ..............................................................69

    1.  Volunteer Registration Requirement (Including Personal Use Petition Restrictions)...........................................................69

        a.  Factual Background......................................................70

        b.  Strict or Exacting Scrutiny Applies to the Registration Requirement.................................................................77

            *1.  The Registration Requirement in H.B. 1205 Mirrors Those Pre-Registration Requirements Invalidated by the Supreme Court and the Eleventh Circuit.............77*

            *2.  The Registration Requirement Is Subject to Strict Scrutiny Because It Prohibits Anonymous Speech ....87*

        c.  The Registration Requirement Fails Any Appropriate Level of Scrutiny and Is Overbroad ..............................88

    2.  Affidavit Requirement .........................................................95

        a.  Factual Background......................................................95

        b.  Strict or Exacting Scrutiny Applies to the Affidavit Requirement.................................................................96

        c.  The Affidavit Requirement Fails Any Appropriate Level of Scrutiny and Is Overbroad.......................................101

3. Petition Circulator Restrictions..........................................106

    a. Factual Background....................................................106

    b. Strict Scrutiny Applies to the Petition Circulator
       Restrictions .........................................................106

    c. The Petition Circulator Restrictions Fail Any Appropriate
       Level of Scrutiny and Are Overbroad ..........................109

B. Infringement of Right to Association (Count III) ............................118

    i.     Legal Standard ....................................................118

    ii.    Challenged Provisions ............................................119

        1. Petition Circulator Restrictions......................... 119

        2. Registration Requirement & Affidavit Requirement.........120

C. Equal Protection (Count IV) ............................................122

    i.     Factual Background ...............................................122

    ii.    Legal Standard ....................................................123

    iii.   Non-U.S. Citizen Restriction ....................................123

D. Unconstitutionally Vague (Count V)....................................126

    i.     Legal Standard ....................................................126

    ii.    Registration Requirement and Personal Use Petition
        Restrictions.......................................................127

E. Procedural Due Process (Count VI)....................................132

    i.     Legal Standard ....................................................134

    ii.    Arbitrarily Invalidated Petitions Provision............................134

F. Substantive Due Process (Count VII) ..................................139

    i.     Factual Background ...............................................139

        1. 10-Day Return Deadline Fine..........................142

iv

2.  Petition Delivery After February 1 Fine ............................148

3.  Wrong County Delivery Fine...............................................149

4.  Filling in Missing Information Fine ...................................150

5.  Pre-Filling Petitions Fine .................................................151

6.  Ineligible Petition Circulator Fine ....................................152

ii.  Legal Standard .......................................................................154

iii.  The Severe Fines Provisions Fail Strict Scrutiny ...................157

iv.  The Severe Fines Provisions Are Arbitrary and Irrational
      Government Action that Fail Even Rational Basis Review....160

v.  The Arbitrarily Invalidated Petitions Provision Violate
      Substantive Due Process ..........................................................166

G. Cumulative Effects of Challenged Provisions ...................................167

H. Scope of Relief ...................................................................................168

V.  Conclusion .................................................................................................169

## I.    Introduction

The Florida Constitution protects the right of Floridians to band together to propose amendments to the constitution themselves, without the input of the Florida Legislature. Fla. Const. art. XI, § 3. Rather than embrace people-led initiatives as an expression of the will of the people, the Florida Legislature has attacked popular democracy in Florida time and time again, responding to successful initiatives by layering increasingly onerous requirements and procedures onto the initiative process that undermine the right of the people to decide how they want to be governed. H.B. 1205 is the latest in a long series of legislative attacks on the initiative process. It makes a process that was already extremely complex and onerous for grassroots initiative sponsors virtually impossible.

Relevant here, H.B. 1205 imposes (1) a provision making it a felony for volunteer circulators to circulate more than 25 petitions unless they pre-register with the government (**Registration Requirement, including Personal Use Petition Restrictions**); (2) a requirement that circulators disclose personal information on the petition form they circulate to voters (**Affidavit Requirement**); (3) **Petition Circulator Restrictions,** which bar circulation by non-Florida residents (Non-Resident Restriction) and non-U.S. citizens (Non-U.S. Citizen Restriction); (4) **Severe Fines on Sponsors,** which impose staggering fines on ballot initiative sponsors regardless of their culpability; and (5) an **Arbitrarily Invalidated**

1

**Petitions** provision, which requires a voter's petition to be invalidated based solely on the circulator's purported ineligibility without providing the voter with notice of the invalidation.

These provisions (collectively, the "Challenged Provisions") have concretely injured and continue to injure Florida Right to Clean Water ("RTCW") and Melissa Martin (collectively, "RTCW Plaintiffs"). At trial, the RTCW Plaintiffs showed that each of the provisions directly impairs RTCW's ability to reach enough voters to get its constitutional amendment on the ballot. These provisions have forced RTCW to halt operations because they have restricted the number of volunteers who are willing or able to circulate for RTCW, have exposed RTCW to fines which would bankrupt the organization, and have placed RTCW's volunteers at risk of criminal prosecution. And despite halting operations, RTCW nonetheless remains liable for fines stemming from violations of H.B. 1205 from circulators who continue to operate without RTCW's knowledge or consent.

While each Challenged Provision is unconstitutional on its own, the cumulative burden of the impacts is overwhelming. *See infra* Section IV.G. Acting together, they stifle protected speech and snuff out the possibility of constitutional change.

That burden is obvious even from a quick overview of two of H.B. 1205's provisions. Under the new law, volunteers are prohibited from engaging in core

2

political speech subject to the strongest First Amendment protections unless they first undergo a State-created training, pass a test, and submit an application that must be approved by the State, with no processing timeline. And if they are approved, they must show their name and home address to anyone who they ask to sign a petition. In *Buckley v. American Constitutional Law Foundation*, the Supreme Court unequivocally held that a requirement that a petition circulator be a registered voter—no matter how simple it was to register to vote—was a pre-condition on speech that was subject to exacting scrutiny and violated the Constitution. 525 U.S. 182, 195 (1999). The Court likewise invalidated a law requiring circulators to display their name while circulating petitions. *Id*. at 198. Here, RTCW Plaintiffs demonstrated at trial that petition circulator applications are routinely denied for immaterial reasons and are subject to delays in processing and complications in the approval process, curtailing those would-be circulators' speech. They likewise demonstrated that circulators are unwilling to forfeit their constitutionally-protected anonymous speech.

None of those burdens were necessary for a volunteer organization like RTCW. RTCW Plaintiffs and other sponsors who operate with volunteer circulators rigorously follow the rules. At trial, the State tried to cast all volunteers, non-U.S. citizens, and non-Florida residents as bad actors responsible for widespread misconduct. But the evidence simply is not there. The State put forth no evidence of

3

petition circulation misconduct from volunteers or non-U.S. citizens, and the few examples of issues with paid, non-resident circulators were successfully identified and prosecuted under Florida law predating H.B. 1205.

Even more troubling, the Challenged Provisions are not targeted at addressing the small amount of misconduct that has occurred in the paid circulation context. Rather, these provisions would achieve their unstated purpose: to make it even harder for Floridians to band together to propose constitutional amendments to Florida voters. Thus, the Challenged Provisions should all be permanently enjoined.

## II.    Brief Summary of Facts

RTCW is a registered Florida political committee that sponsored an initiative for the 2026 general election entitled "Right to Clean and Healthy Waters." ECF 596, Joint Pre-Trial Stipulations ("Joint Stips") ¶ 76. Melissa Martin is RTCW's Campaign Coordinator. *Id.* ¶ 83. RTCW's address is in Fort Myers, Florida. *Id.* ¶ 77. RTCW circulates petitions in an effort to place a constitutional amendment on the ballot which, if approved by voters, would "create[] an enforceable, fundamental right to clean and healthy waters, authorizing a person to sue for equitable relief when a State executive agency, by action or inaction, allows harm or threat of harm to Florida waters." *Id.* ¶ 78; RTCW Ex. 69.

RTCW is a grassroots initiative, operated entirely by volunteers who both organize the campaign and circulate its petitions. Joint Stips ¶¶ 79–80; Trial Tr. vol.

4

3, 665:5–666:13 (Martin). Volunteers who sign up indicating to RTCW that they would like to volunteer and collect petitions are called "ambassadors." Joint Stips ¶ 81. RTCW trains its volunteers. Trial Tr. vol. 3, 666:14–667:20 (Martin); ECF 278, Second Preliminary Injunction Hearing Transcript ("PI Hr'g Tr.") at 132:2–16, 142:25–143:3 (Martin); RTCW Exs. 79, 81–85, 163. Prior to H.B. 1205, RTCW volunteers operated statewide. PI Hr'g Tr. at 130:11–131:18 (Martin). Because RTCW is entirely reliant on volunteers, it adopts flexible petition operation methods to accommodate the nature of volunteering. Trial Tr. vol. 3, 664:19–665:1, 697:8–11 (Martin).

H.B. 1205's overlapping, burdensome provisions forced RTCW to stop all petition collection. Trial Tr. vol. 3, 677:23–680:14 (Martin). In part, that is because RTCW volunteers, including those who spontaneously volunteer to collect petitions at the last minute or during petition circulation events, have never been previously required to register with the State. *See* Trial Tr. vol. 2, 400:23–401:20 (Pereira Bonilla); Trial Tr. vol. 4, 988:19–990:3 (Perez). Many who would otherwise volunteer are unwilling or unable to do so because of H.B. 1205's Registration Requirement. *See* Trial Tr. vol. 3, 680:8–14 (Martin); PI Hr'g Tr. at 142:1–24 (Martin); *see also* Trial Tr. vol. 3, 775:14–25 (Haller); Trial Tr. vol. 4, 1035:20–1036:5 (Ciera Cox); RTCW Exs. 72–73.

5

Voluminous evidence at trial showed that registration is a burdensome process in which applicants must take State-mandated training, pass a test, and then print, sign, scan, and upload a form to complete the application. *See infra* Section IV.A.iii.1.a. Applicants routinely struggle with this process and are often rejected for immaterial reasons based on rules that are not available to the public. *See id.* The Division of Elections often takes days and sometimes weeks to approve petition circulation applications. *See id.*

Once registered, petition circulators are required to circulate petition forms that include a "Petition Circulator's Affidavit," which is pre-printed with the circulator's full name and home address. *See* Fla. Stat. § 104.188(2); Fla. Stat. § 100.371(3)(d)(1); Trial Tr. vol. 4, 1002:24–1003:19 (Perez); RTCW Ex. 75. Petition circulators often hand the petition to the voter at the beginning of their conversation, such that the voter has access to the Petition Circulator's Affidavit throughout the conversation. *See, e.g.*, Trial Tr. vol. 4, 1003:20–1004:3 (Perez). There is no legal way for a circulator to avoid sharing their address with potential signatories, even if they have a sensitive address that is protected from disclosure by Florida law. The State will only redact protected addresses after a petition is submitted if it is subject to a public records request. Trial Tr. vol. 8, 2042:21–2043:11, 2044:24–2045:7

6

(Matthews); ECF 620-3, Deposition of Maria Matthews ("Matthews Dep.") at 185:12–186:21.[1]

H.B. 1205's Petition Circulator Restrictions also directly injure RTCW Plaintiffs in several ways, as discussed *infra* Section III.B.iii.–iv. RTCW's Campaign Coordinator, Plaintiff Melissa Martin, is a resident of Oregon who can no longer circulate petitions for her own initiative because of the Non-Resident Restriction. Joint Stips ¶ 82; Trial Tr. vol. 3, 672:14–21 (Martin). And RTCW volunteer, Ramón Pereira Bonilla is a non-U.S. citizen who can no longer circulate RTCW petitions because of the Non-U.S. Citizen Restriction. Trial Tr. vol. 2, 409:4–14 (Pereira Bonilla). RTCW will also be subject to $50,000 fines *per violation* of these restrictions, even when the circulator operates without RTCW's knowledge or consent. *See infra* Section IV.F.i.6.

Prior to H.B. 1205, volunteer circulators did not have a statutory deadline by which they were required to deliver signed petitions to Supervisors of Elections ("Supervisors" or "SOEs"). Matthews Dep. at 177:11–15. RTCW employs diverse

---

[1] Citations to deposition designations throughout this document refer to the ECF filings that reflect Plaintiffs' designations (in yellow highlight) and Defendants' counter-designations (in gray highlight), as further modified by the Court. *See* Trial Tr. vol. 7, 1794:8–1795:11, 1795:24–1796:10, 1797:16–19; Trial Tr. vol. 8, 2170:17–2171:8, 2171:24–25. Citations to deposition designations and counter-designations refer to the deposition transcript page numbers, which are the gray numbers in the top center of the page, not the blue ECF page numbers.

methods to collect petitions in ways that are accessible to its volunteer base, with petitions often being transferred through the mail and several RTCW points of contact, depending on the availability of local volunteer leaders and SOE policies governing who can turn in petitions. Trial Tr. vol. 3, 675:4–677:19 (Martin). This makes the 10-Day Return Deadline imposed by H.B. 1205 virtually impossible for RTCW to meet in most circumstances. Trial Tr. vol. 3, 703:24–706:22 (Martin); Trial Tr. vol. 4, 992:12–993:7 (Perez). Moreover, RTCW can be fined for violations of the 10-Day Return Deadline which result from circulators operating without its knowledge or consent. *See infra* Section IV.F.i.1. This, along with H.B. 1205's other criminal penalties and ruinous financial liability, made it extraordinarily burdensome for RTCW to operate, to the extent it can do so at all.

At trial, Defendants failed to demonstrate any evidence of fraud occurring in the ballot initiative process that would warrant the burdensome and punitive Challenged Provisions, or indeed any problem inherent in the initiative petition process that has been addressed *at all* by the Challenged Provisions. Prior to H.B. 1205, Florida law already proscribed fraudulent petition activity and provided criminal penalties for any violations. *See* Fla. Stat. § 104.185. And Florida law likewise already proscribed using another person's personal identification information without their consent. *See* Fla. Stat. § 817.568; ECF 620-1, Deposition of Jonathan Bridges ("Bridges Dep.") at 36:4–37:19. Furthermore, individuals who

8

believed that their signatures may have been forged, misrepresented, or not delivered to an SOE could already file a complaint, and such forgery and misrepresentation were already illegal. *See* Fla. Stat. § 100.371(9); Form for Complaint Against Petition Circulator, Fla. Div. of Elections (Oct. 2021), https://perma.cc/4GPC-J2YU. In fact, Defendants repeatedly relied on H.B. 1205's WHEREAS clauses to justify the law's restrictions in deposition testimony, but these clauses largely recite purported violations of existing laws or other concerns left unaffected by H.B. 1205.[2] And to the extent Defendants rely upon the OECS reports and audit (DX Exs. 2–4)[3] as evidence of fraud in the petition process,[4] Defendants have failed to tie those documents and the related WHEREAS clauses back to any of the Challenged Provisions here. Thus, rather than providing new tools to prevent fraud, H.B. 1205

---

[2] For example, the WHEREAS clauses assert that instances of fraud were uncovered when a Supervisor of Elections notified a voter of a *rejected* petition, FDH Ex. 166 at 6, but H.B. 1205 only requires Supervisors to notify voters of *validated* petitions, Fla. Stat. § 100.371(14)(e).

[3] As the Court ruled at trial, the admission of these exhibits was limited to a "narrow set of information and data," namely the number of complaints and referrals, conclusions, findings, and other information OECS was obligated to report by statute. *See, e.g.*, Trial Tr. vol. 9, 2184:4–11, 2187:12–25.

[4] The Court should not rely on the reports and "audit" for the myriad reasons explained by FDH Plaintiffs' expert witness Dr. Michael Herron at trial. *See, e.g.*, Trial Tr. vol. 3, 804:3–8 (Dr. Herron) (concluding that OECS's methodology was "unreliable").

serves only to make the petition initiative process more burdensome for sponsors and circulators.

Defendants failed to provide any evidence that volunteer, rather than paid, circulators are difficult to locate, investigate, or indeed are the source of any fraud at all that justifies H.B. 1205's interventions. *C.f.* Trial Tr. vol. 7, 1890:8–1893:8 (Bridges); Trial Tr. vol. 7, 1948:2–4 (Gladson). Nor did Defendants prove that the Challenged provisions address any purported issues with volunteer circulators. *C.f.* Trial Tr. vol. 7, 1896:6–1899:7 (Bridges). Defendants also failed to put forward evidence that non-U.S. citizens and non-residents are the source of fraud or are difficult to locate and investigate. *C.f.* Bridges Dep. at 231:21–25. On balance, Defendants' unsupported claims cannot justify any of the Challenged Provisions.

## III.  Standing

### A. Legal Standard

To establish standing, a "litigant must prove (1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020) (citation omitted). In First Amendment cases, this standard is "most loosely applied." *Pittman v. Cole*, 267 F.3d 1269, 1283 (11th Cir. 2001).

A plaintiff satisfies the injury-in-fact requirement by showing that it "has sustained" a direct injury already as the result of a challenged law, *Corbett v. Transp.*

*Sec. Admin.*, 930 F.3d 1225, 1232 (11th Cir. 2019) (citation modified), or that it is "immediately in danger of sustaining some direct injury." *Lynch v. Baxley*, 744 F.2d 1452, 1456 (11th Cir. 1984) (citation modified); *see also, e.g.*, *City of S. Miami v. Governor*, 65 F.4th 631, 636–37 (11th Cir. 2023). A plaintiff also satisfies this injury-in-fact requirement when it is the direct "object" of the challenged regulation. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992) (where the plaintiff is an object of government action, "there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it"); *Diamond Alt. Energy, LLC v. Env't Prot. Agency*, 606 U.S. 100, 114–15 (2025); *Mirabelli v. Bonta*, No. 25A810, 2026 WL 575049, at *3 (U.S. Mar. 2, 2026).[5] Organizations like RTCW may establish standing by showing that a law "directly impedes" the organization's "ability to accomplish [its] mission[]." *Fla. State Conf. of Branches & Youth Units of the NAACP v. Byrd*, 680 F. Supp. 3d. 1291, 1308 (N.D. Fla. 2023) ("*NAACP v. Byrd I*").

In addition to proving standing through direct injury, organizational standing is established if a group must divert time and resources to counteract the harms

---

[5] The Supreme Court recently opined that "plaintiffs must have a 'personal stake' in a case to have standing to sue." *Bost v. Ill. State Bd. of Elections*, 146 S. Ct. 513, 519 (2026). In *Bost*, the Court held that candidates have a "personal stake" in cases challenging unlawful election rules which threaten their chances of success in elections as well as "the overall fairness of the electoral process." *Id.* at 528.

inflicted by each of the Challenged Provisions. *See Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341–42 (11th Cir. 2014); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) ("there can be no question" that showing is made where a defendant's conduct has "perceptibly impaired" plaintiff's ability to carry out its activities by causing a "drain on [its] resources."). The Supreme Court recently clarified the *Havens* standing framework in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024) ("*AHM*"). Under *AHM*, an organization establishes injury when it shows the defendant's "actions directly affected and interfered with [the plaintiff's] core business activities." *Id.* at 395 (citing *Havens*, 455 U.S. at 379). As opposed to the *AHM* plaintiffs, who could not establish standing "simply by expending money to gather information and advocate against" the challenged actions, the Court noted that in *Havens* the plaintiff had standing because the defendant's actions impaired its core activities as "not only [] an issue-advocacy organization, but also operat[ing] a housing counseling service." *Id.* at 394–95 (citation modified).

Separately, an organization establishes associational standing if (1) its members[6] would have standing to sue on their own; (2) the interests at stake are

---

[6] As this Court recognized in its Order on Plaintiffs' Motion for Preliminary Injunction, ECF 283 at 12 n.11, RTCW uses the terms "ambassadors" and "volunteers" rather than "members," but these volunteers possess the requisite "indicia of membership" in RTCW to qualify as members for associational standing purposes. *See Hunt v. Wash. Apple Adver. Comm'n*, 432 U.S. 333, 344–45 (1977) (constituents steered the organization's activities); *Doe v. Stincer*, 175 F.3d 879, 886

12

related to the organization's purpose; and (3) the participation of individual members is not required. *See Dream Defs. v. Governor of the State of Fla.*, 57 F.4th 879, 886 (11th Cir. 2023).

## B. RTCW Plaintiffs Have Standing

RTCW Plaintiffs proved at trial that they have standing to challenge each of the Challenged Provisions.[7] Although RTCW's 2026 campaign has ended, RTCW faces imminent injury from the Challenged Provisions because RTCW remains a registered political committee with intent to run a campaign for ballot placement in 2028. *See* Trial Tr. vol. 3, 739:6–17 (Martin).[8]

_____

(11th Cir. 1999) (same). RTCW ambassadors and volunteers qualify as members because they "possess the means to influence [RTCW's] priorities and activities," *Doe*, 175 F.3d at 886. They do so by initiating and participating in petition circulation efforts, providing input into RTCW's activities, influencing RTCW's messaging, and spreading RTCW's message. *See, e.g.*, PI Hr'g Tr. at 126:14–130:10.

[7] "[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. F. for Acad. & Institutional Rgts., Inc.*, 547 U.S. 47, 52 n.2 (2006). That remains true of plaintiffs participating in the case as intervenors. *See Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 435 (2017).

[8] And if there were any question, RTCW's injuries are not moot because they are capable of repetition, yet evading review. *See Meyer v. Grant*, 486 U.S. 414, 417 n.2 (1988) (holding that the case was not moot despite the initiative's failure to qualify for the ballot because the injury was capable of repetition, yet evading review). Just like in *Meyer*, RTCW "continue[s] to advocate" for its amendment "and plan[s] future attempts to obtain the signatures necessary to place the issue on the ballot," *id.*, such that its injuries are not moot. *See* Trial Tr. vol. 3, 739:6–17 (Martin).

Although evidence shows that RTCW's campaign was and remains viable,[9] neither Plaintiffs' standing (nor the merits of Plaintiffs' claims) depend on the likelihood of success of their campaign. The myriad of injuries to Plaintiffs' ability to speak and to the ability of the organization to operate satisfy the requirements for standing without any additional requirement to prove that it would have achieved ballot placement absent H.B. 1205. *See Bost*, 146 S. Ct. at 521–22 (Article III does not require a plaintiff to show that a challenged practice will be outcome determinative to establish standing); *Meyer*, 486 U.S. at 417 n.2 (noting case was not moot without considering likelihood of success of a future initiative).

Even assuming that RTCW was unlikely to succeed—for example, because its amendment is unpopular—this is all the *more* reason to find that the speech of its volunteers is constitutionally protected. *See, e.g.*, *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995); *Roth v. United States*, 354 U.S. 476, 484 (1957)

---

[9] Here, the evidence at trial proves that RTCW collects petitions entirely through the use of volunteers and has collected approximately 150,000 petitions over the course of two campaign cycles, all while raising only approximately $100,000. Trial Tr. vol. 3, 741:21–742:12 (Martin). And in the 2026 election cycle, prior to being forced to shutter its campaign by H.B. 1205, RTCW was planning an aggressive push to garner additional statewide support and was already on track to exceed the valid petitions collected during its previous campaign. Trial Tr. vol. 3, 680:15–682:15, 739:18–740:6 (Martin); Trial Tr. vol. 4, 1004:4–25 (Perez); *see also* RTCW Exs. 99–103, 106. RTCW was an active, viable campaign that was unable to continue to operate under the new regime of H.B. 1205. As explained *supra* Section III.B., this is more than enough to establish standing.

("All ideas having even the slightest redeeming social importance—unorthodox ideas, controversial ideas, even ideas hateful to the prevailing climate of opinion— have the full protection of the [First Amendment] . . . .").

### i. Registration Requirement

For the first time, H.B. 1205 requires not only paid circulators, but uncompensated volunteers who wish to collect more than the restrictive Personal Use Petition limit to register with the State as a petition circulator. *See, e.g.*, Fla. Stat. §§ 100.371(4)(a), 100.371(14)(h), 104.188(2).[10] Plaintiffs have both organizational and associational standing to challenge the Registration Requirement.

### 1. RTCW Has Associational Standing to Challenge the Registration Requirement

The Registration Requirement has chilled previously active RTCW volunteers from circulating petitions, and RTCW volunteers would have standing in their own right to challenge the Registration Requirement. As described in detail *infra* Section IV.A.iii.1., the registration process involves a State-created "training" and test, along with a gauntlet of technical submission requirements, that applicants must satisfactorily complete prior to being granted permission to circulate petitions. These

---

[10] Prior to H.B. 1205, only paid petition circulators were defined as "petition circulator[s]" subject to registration requirements. Fla. Stat. § 97.021(28) (2022). But H.B. 1205 expands that definition to cover all circulators, including volunteers. Fla. Stat. § 97.021(28). H.B. 1205 also adds a host of additional requirements to the registration process that further burden volunteers.

burdens have chilled RTCW volunteers from circulating petitions. *See* ECF 283, Order on Pls' Mot. for Prelim. Inj. ("PI Order") at 16–17; PI Hr'g Tr. at 135:17–136:2 (Martin); Trial Tr. vol. 3, 680:8–14, 692:5–18, 694:2–12 (Martin); Trial Tr. vol. 3, 773:15–17 (Haller); Trial Tr. vol. 4, 996:4–997:11 (Perez). And those RTCW volunteers who were willing to attempt to register faced significant hurdles in doing so. Trial Tr. vol. 4, 997:12–1002:8 (describing a registration process that required a test and took approximately one week to complete due to unclear technical submission requirements and delayed responses from Division of Elections); Trial Tr. vol. 3, 686:13–22, 740:9–17 (Martin). These burdens, which all RTCW volunteers will be subject to should they attempt to register in the future, also constitute an injury-in-fact. *See Lynch*, 744 F.2d at 1456 (standing where challenged conduct would persist absent injunction); *Lujan*, 504 U.S. at 561–62.

RTCW volunteers are also chilled from circulating petitions because of the serious criminal liability associated with even inadvertently running afoul of the law's requirements. *See* PI Order at 17; Trial Tr. vol. 3, 779:16–780:3 (Haller); Trial Tr. vol. 4, 1038:7–1040:24 (Ciera Cox) ("If I accidentally make a mistake, that could very much result in jail time per these petitions."); Trial Tr. vol. 3, 685:1–13 (Martin) (concern about not learning the correct answers to test questions in light of criminal penalties); RTCW Ex. 287; Trial Tr. vol. 3, 685:14–686:10 (Martin) (asking Division of Elections which test question was answered incorrectly "so I do not

16

inadvertently violate the law" and never receiving response); Trial Tr. vol. 4, 997:4–16, 998:5–18 (Perez) (not able to determine which test questions he got wrong "to understand the law better"); RTCW Ex. 70 ("I don't want to be subject to potential civil/criminal penalties").

Finally, RTCW volunteers are chilled from circulating petitions because the Registration Requirement forces them to surrender their anonymity. Trial Tr. vol. 3, 775:14–25 (Haller); Trial Tr. vol. 4, 1035:20–1036:5 (Ciera Cox); RTCW Exs. 72–73; *see also infra* Section III.B.ii.

These RTCW volunteers have suffered an injury-in-fact and would have standing to sue in their own right. *See infra* Section III.B.i.3. Because the other elements of the associational standing test are easily satisfied, RTCW has standing to challenge the Registration Requirement. *See supra* Section III.A.

### 2.  RTCW Has Organizational Standing to Challenge the Registration Requirement

RTCW is directly injured by the Registration Requirement, which has led to fewer volunteers circulating petitions on its behalf, a reduction in the spread of RTCW's message, and a reduced ability to secure ballot placement. *See* PI Order at 17; Trial Tr. vol. 3, 694:24–695:7 (Martin). These obstacles "directly impede" RTCW's ability to accomplish its mission. *NAACP v. Byrd I* at 1308 (citation modified).

As discussed *supra* Section III.B.i.1., ambassadors who directly volunteer with RTCW have been largely unwilling to register with the State as petition circulators. *See* Trial Tr. vol. 3, 694:2–12 (Martin) ("a very small fraction" of the most engaged volunteers registered with the State). RTCW is also heavily reliant on volunteers who are affiliated with other organizations who collect petitions on behalf of RTCW; the unwillingness of these organizations to participate and of their volunteers to register further harms RTCW. Trial Tr. vol. 3, 676:18–677:5, 695:8–696:13 (Martin); *see also* Trial Tr. vol. 6, 1520:18–1521:12 (Lowe-Minor); RTCW Ex. 93.

The Registration Requirement also makes it impossible for RTCW to benefit from on-the-spot or spontaneous volunteering, upon which it also heavily relies as a grassroots, all-volunteer campaign. Trial Tr. vol. 3, 697:1–698:7 (Martin). Because individuals must be registered as circulators on behalf of a particular initiative prior to circulating petitions, the Registration Requirement inhibits spontaneous and short-term speech. PI Hr'g Tr. at 142:1–24 (Martin); Trial Tr. vol. 2, 400:23–401:20, 408:15–409:3 (Pereira Bonilla); Trial Tr. vol. 3, 674:4–14, 697:1-18 (Martin); Trial Tr. vol. 4, 988:19–989:7, 989:19–990:10 (Perez). This further reduces the number of petitions RTCW is able to collect and the number of people it is able to recruit to its cause. Trial Tr. vol. 4, 988:19–989:7 (Perez) (describing new volunteer who circulated petitions "the next day" and for a short time afterward before getting a job

18

and ceasing volunteering), Trial Tr. vol. 4, 989:19–990:10 (Perez) (explaining that volunteers are most engaged "at the very beginning").

Not only has the Registration Requirement prevented RTCW from collecting petitions, but it has decimated the remainder of its volunteer operation. In order to ensure petitions are delivered to the appropriate Supervisor, RTCW relies on volunteers who process and deliver signed petitions that they did not collect themselves. Trial Tr. vol. 3, 698:12–699:3 (Martin). Because the Registration Requirement applies to these volunteers as well, RTCW's entire infrastructure has been dismantled because its volunteers are unwilling to register and fulfill these crucial roles. Trial Tr. vol. 3, 699:4–700:15 (Martin). For example, RTCW's headquarters address is a P.O. Box in Fort Myers, Florida. Trial Tr. vol. 3, 673:19–25 (Martin). Prior to H.B. 1205, approximately six to eight volunteers staffed the mailbox to ensure that signed petitions were processed and delivered appropriately. Trial Tr. vol. 3, 699:23–25 (Martin). After the implementation of H.B. 1205, only one of these volunteers became a registered circulator, massively impairing the operations of the RTCW mailbox. Trial Tr. vol. 3, 700:1–12 (Martin).

As a sponsor that does not pay circulators, RTCW is entirely reliant on volunteers collecting petitions on its behalf. The unwillingness of volunteers across the board to register was "a big part of [RTCW's] decision to eventually suspend operations for good." Trial Tr. vol. 3, 693:20–694:1, 695:8–696:13 (Martin).

Finally, the Registration Requirement directly and substantially increases the financial costs associated with the operation of RTCW's campaign. Prior to H.B. 1205, RTCW was able to print volunteer petition forms in bulk and distribute them across the State. Trial Tr. vol. 3, 700:17–701:12 (Martin). But because Petition Circulator forms are personalized to the individual circulator, *see infra* Section III.B.ii., the confluence of the Registration Requirement and Affidavit Requirement would force RTCW to print smaller batches locally, at a much greater expense per petition. Trial Tr. vol. 3, 700:17–701:12, 740:18–741:12 (Martin).

**3. RTCW Plaintiffs' Injuries from the Registration Requirement Are Traceable to All Defendants and Redressable by the Requested Relief**

RTCW's injuries from the Registration Requirement are traceable to the Secretary, who is responsible for developing and implementing the registration process. Fla. Stat. § 100.371(4). RTCW's injuries are also traceable to the Supervisors of Elections and the Secretary, who are required to invalidate petitions submitted by RTCW volunteers in violation of the Registration Requirement. *See* Fla. Stat. § 100.371(14)(h). RTCW's injuries are also traceable to the State Attorneys, who are responsible for enforcing the criminal provisions associated with the Registration Requirement, Fla. Stat. §§ 104.187, 104.188(2), and the Attorney General, who has authority to institute civil enforcement proceedings for a violation of the Registration Requirement, Fla. Stat. § 100.371(11).

20

RTCW's injuries would be redressed by a permanent injunction prohibiting Defendants from enforcing the Registration Requirement. RTCW Plaintiffs have standing.

## ii. Affidavit Requirement

Plaintiffs have both organizational and associational standing to challenge the Affidavit Requirement, which requires registered petition circulators, including uncompensated volunteers, to circulate petitions that prominently include their full name and home address.

### 1. RTCW Has Associational Standing to Challenge the Affidavit Requirement

RTCW has associational standing to challenge the Affidavit Requirement on behalf of its volunteers because its volunteers would have standing to sue in their own right. RTCW's volunteers have suffered an injury-in-fact as a result of the Affidavit Requirement, which prevents petition circulators from engaging in anonymous speech.

It is undisputed that the Division of Elections makes an individualized Petition Circulator form available to each registered circulator that they must use to circulate petitions. Matthews Dep. At 61:2–11 ("But you've registered now as a petition circulator and you have to use the petition circulator form when you're circulating."); Trial Tr. vol. 4, 1002:15–1003:8 (Perez); RTCW Ex. 75. This Petition Circulator form includes that circulator's full name and home address, which are

21

prominently pre-printed on the "Petition Circulator Affidavit" section of the form. FDH Ex. 166 (Fla. Stat. § 100.371(3)(d)); RTCW Ex. 75; Trial Tr. vol. 4, 1003:9–23 (Perez); Trial Tr. vol. 8, 2018:24–2019:7 (Matthews). As such, it is not possible for a registered circulator to circulate petitions without surrendering their anonymity by displaying their full name and home address to every person they ask to sign a petition.[11] As discussed in detail *infra* Section IV.A.iii.2., even circulators with home addresses protected from public disclosure by Florida law cannot have that address redacted on their Petition Circulator form before distributing it to the public. *See, e.g.*, Trial Tr. vol. 8, 2042:21–2043:11, 2044:24–2045:7 (Matthews); Matthews Dep. at 185:12–186:21.

This bar on anonymous speech has chilled RTCW volunteers from engaging in petition circulation. Volunteers are not willing to circulate petitions because they value their privacy and do not wish to make their full name and home address readily available to anyone who might take their Petition Circulator form. PI Hr'g Tr. at 136:11–137:8 (Martin) (describing volunteer who did not want to register as a circulator because of the Affidavit Requirement); Trial Tr. vol. 3, 776:8–25 (Haller)

---

[11] While Defendants' counsel represented to this Court during the June 30, 2025 preliminary injunction hearing that the circulator's affidavit need not include the circulator's name and address prior to providing the petition form to the potential signatory, PI Hr'g Tr. at 248:5–16, Defendants themselves have since unequivocally confirmed that exactly the opposite is true. *See, e.g.*, Matthews Dep. at 185:12–186:21; RTCW Ex. 75.

(volunteer describing efforts she takes to protect privacy of her address); RTCW Ex. 70 (email from RTCW ambassador stating "I will not be volunteering to circulate Clean Water petitions after June 30 because: 1) I don't want to provide my personal information on every petition"); RTCW Ex. 72 (RTCW ambassador stating "I will not be willing to circulate petitions due to my personal address being listed publicly"); RTCW Ex. 73 (RTCW ambassador stating "I don't want my name and address being made public record"); RTCW Ex. 74 (RTCW volunteer "opted out from Water Petitions because I have a protected address (former Guardian ad Litem)").

Volunteers are further chilled from circulating petitions with the Affidavit Requirement in place because they fear harassment or other risks to safety from distributing their full name and home address to strangers. PI Hr'g Tr. at 137:9–138:18 (Martin) (describing personal experience being harassed for supporting "good governance, environmental conservation and clean water" as part of candidate platform); Trial Tr. vol. 3, 774:23–775:1, 776:1–7, 777:1–778:9 (Haller); Trial Tr. vol. 4, 1035:20–1036:16, 1037:10–1038:4 (Ciera Cox).

The evidence establishes that the Affidavit Requirement prevents anonymous speech and has chilled previously active RTCW volunteers from participating in petition circulation. The only question that remains is whether the law requires this

23

Court to determine whether that chill is objectively reasonable in order to find standing.

Precedent is clear that a plaintiff wishing to engage in anonymous speech has standing if a law prevents them from doing so; no reasonableness or rationality litmus test applies. The Supreme Court's clearest expression of that principle is in *Buckley*, where the Court found it sufficient that a name badge requirement identifying petition circulators—akin to Affidavit Requirement here—limited the number of people willing to circulate petitions. 525 U.S. at 198. While a showing of harassment can be evidence that supports standing, the Court did not, and has not since, required that a chill on First Amendment rights be tied to a particularized fear of harassment before a plaintiff has standing. *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (1995) ("quite *apart from any threat of persecution*, an advocate may believe her ideas will be more persuasive if her readers are unaware of her identity") (emphasis added); *Buckley*, 525 U.S. at 198 n.19 (crediting testimony: "And, I won't wear the badge because I don't think it's right"); *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 166–67 (2002) (explaining interest in anonymous speech including an interest that is "motivated . . . merely by a desire to preserve as much of one's privacy as possible") (quoting *McIntyre*, 514 U.S. at 341–42); *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 617 (2021) (rejecting argument that "a facial challenge cannot succeed

24

unless a plaintiff shows that donors to a substantial number of organizations will be subjected to harassment and reprisals" and holding that "[s]uch a demanding showing is not required" where law is not narrowly tailored to an important interest). *C.f. John Doe No. 1 v. Reed*, 561 U.S. 186 (2010) (analyzing constitutionality of disclosure provision as merits issue, not standing issue).

In *(WIN) Washington Initiatives Now v. Rippie*, 213 F.3d 1132 (9th Cir. 2000), the plaintiff challenged a Washington law requiring disclosure of names and addresses of paid petition circulators. The State defended the law on the grounds that timing of the required disclosure meant that harassment of the petition circulators was unlikely. *Id.* at 1138. But the Ninth Circuit explained that "the State's focus on whether the disclosure requirement has led to the harassment of petition circulators [was] misleading" because the plaintiff "offered unrebutted evidence that the disclosure requirement . . . has discouraged would-be petition circulators from engaging in that activity." *Id.* The Court also concluded that "[e]ven when it does not have the effect of facilitating harassment, the disclosure requirement chills speech by inclining individuals toward silence." *Id.* Similarly, in *Dakotans for Health v. Noem*, 543 F. Supp. 3d 769 (D.S.D. 2021), *aff'd*, 52 F.4th 381 (8th Cir. 2022), the court held that a ballot initiative committee had standing to challenge a disclosure requirement for paid circulators solely because the restriction could

25

"limit[] the pool of circulators who carry [its] message" without assessing whether the disclosure requirement would lead to harassment. *Id.* at 778.[12]

Caselaw that imposes a reasonableness standard does so to address a wholly different matter: whether the *fear of prosecution* from engaging in protected speech is reasonable or merely subjective. *Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1428 (11th Cir. 1998); *see also Dream Defs. v. Governor of the State of Fla.*, 57 F.4th 879, 887 (11th Cir. 2023). This makes sense. If a party cannot credibly believe that a statute will be enforced against them, that party cannot be injured. That is a different question than whether a plaintiff's speech is chilled by a law that *is* being actively enforced against them.

In *Pittman v. Cole*, the Eleventh Circuit applied *Wilson* and addressed whether three judicial candidates and the Christian Coalition of Alabama had standing to challenge an advisory opinion promulgated by the Alabama Judicial Inquiry Commission (JIC) regarding a questionnaire created by the Christian Coalition. The court concluded that the plaintiffs had standing simply because their speech was chilled and there was a credible threat of enforcement of the advisory opinion:

> We conclude that the plaintiffs have made a sufficient showing that their First Amendment rights were chilled as a result of the JIC's advisory opinion. The chill was evidenced by the unwillingness of the judicial candidates to respond to the Christian Coalition questionnaire,

---

[12] The court later determined that the committee's evidence of potential harassment was "not strong," *id.* at 784, but granted a preliminary injunction after applying exacting scrutiny. That decision was affirmed by the Eighth Circuit. 52 F.4th 381.

or their withdrawal of previous responses, following the issuance of the JIC's advisory opinion, and the Christian Coalition's concomitant inability to receive responses from otherwise willing speakers. The fact that speech was chilled is undisputed by the JIC, although it does dispute the cause of the chill—arguing that the Canons of Judicial Ethics rather than its advisory opinion caused any chill. We conclude that the chill resulting from the JIC's advisory opinion satisfied the injury in fact requirement and was objectively reasonable because the advisory opinion created a sufficiently credible threat of prosecution.

*Pittman v. Cole*, 267 F.3d 1269, 1284 (11th Cir. 2001).

Just as in *Pittman*, it is "undisputed" that RTCW volunteers have been chilled from engaging in protected speech as "evidenced by [their] unwillingness" to register as circulators and circulate petitions because of the Affidavit Requirement. 267 F.3d at 1284 (citation modified). And here, it is not only objectively reasonable, but undisputed, that Defendants are enforcing the Registration Requirement and Affidavit Requirement.[13] *See, e.g.*, Matthews Dep. at 61:2–11; Trial Tr. vol. 8, 2018:24–2019:7 (Matthews); Trial Tr. vol. 4, 1002:15–1003:8 (Perez); RTCW Ex. 75; Bridges Dep. at 259:5–260:21 ("What we would typically do is examine the specific facts and circumstances of each case and make the best decision we could.");

---

[13] In *Wilson*, the court found there was no credible threat of prosecution because "there was no evidence regarding specific threats or actions" of attempted enforcement against the parties "for engaging in protected speech." Defendants had also "repeatedly and consistently taken the position" that the rules did not apply to plaintiffs' activities. *Wilson*, 132 F.3d at 1428–29. That is not the case here, where RTCW volunteers are forced to comply with the Affidavit Requirement in order to circulate petitions as registered petition circulators.

27

Fla. Stat. §§ 104.187, 104.188. There is therefore no question as to whether there is a "credible threat of [prosecution];" the law plainly applies to the conduct of RTCW volunteers who would register as circulators and circulate petitions containing the Affidavit. *C.f. Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1120 (11th Cir. 2022) (analyzing objective chill where question is whether plaintiffs' activity falls within ambit proscribed by statute).

Because it cannot be disputed that RTCW volunteers' speech has been chilled by the Affidavit Requirement, and there is no question that the Affidavit Requirement is being enforced, Plaintiffs have standing. Defendants can point to no case—because there isn't one—that extends the Eleventh Circuit's precedent and requires that, *where a statute that is being enforced chills First Amendment activity*, that chill must result from a fear of harassment—or any other privacy concern—that is objectively reasonable before a petition circulator has standing.[14]

---

[14] Cases that suggest without deciding that states may have leeway to impose certain disclosure regimes on petition circulators to protect to integrity of the ballot initiative process have done so in discussing the merits, not standing. *See Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 167 (2002). And as noted below, *infra* Section IV.A.iii.2., those cases involved disclosure that is separated from the moment of speech, rather than in face-to-face interactions. As discussed *infra* Section IV.A.iii.2., Defendants have not pointed to any case where a court has upheld a requirement that petition circulators or similarly situated individuals must surrender their anonymity at the time of speech.

While Plaintiffs need not demonstrate an objectively reasonable fear of harassment to establish standing, they have nevertheless done so here. The Affidavit Requirement requires registered circulators to distribute their full name and home address on every petition form that they circulate. RTCW volunteers have objectively reasonable reasons to refrain from petition circulation to protect their privacy and their safety from the hundreds or thousands of strangers who would gain access to their name and address because of the Affidavit Requirement. *See* Trial Tr. vol. 3, 766:11–16 (Haller) (collected hundreds of RTCW petitions, including approximately 200 for 2026 cycle); Trial Tr. vol. 4, 1030:8–17 (Ciera Cox) (collected approximately 1,000 RTCW petitions, including approximately 200–300 during 2026 cycle); Trial Tr. vol. 4, 1004:4–10 (Perez) (collected more than 1,000 petitions in April 2025 alone).

RTCW volunteers—like all ordinary people—do not typically hand out their home address to strangers on the street. *See, e.g.*, Trial Tr. vol. 3, 787:9–14 (Haller). Even if volunteers could accurately discern from a short encounter who they could trust with such sensitive information, the goal of petition circulation is to collect enough signatures to make the ballot. *See* Trial Tr. vol. 2, 417:9–21 (Pereira Bonilla); Trial Tr. vol. 3, 783:20–23 (Haller); Trial Tr. vol. 4, 990:20–992:3, 1009:1–20 (Perez). The evidence establishes that RTCW volunteers often use the petition form to initiate conversation, distributing petition forms early in a

29

conversation to grab attention. Trial Tr. vol. 3, 766:24–767:10 (Haller); Trial Tr. vol. 3, 789:19–790:5 (Haller) (voters sometimes take clipboard with petition during interaction, before their views are ascertainable); Trial Tr. vol. 4, 1003:20–1004:3 (Perez).

Furthermore, RTCW volunteers don't discriminate in who they approach or engage; to do so would be ineffective and counterproductive. Trial Tr. vol. 4, 1009:1–20 (Perez) ("But when you start doing this work, you know, your goal is to make a million petitions, and it's not going to happen if I start choosing and, you know, trying to figure out, Well, who's likely to sign this? There is no way to tell."); Trial Tr. vol. 3, 768:9–769:1 (Haller) (experience with voters who are initially reluctant but then sign petition after conversation); Trial Tr. vol. 4, 1032:11–22 (Ciera Cox) (same); Trial Tr. vol. 4, 1036:6–16 (Ciera Cox) (don't always know whether voter who takes petition form agrees with amendment). It is objectively reasonable for RTCW volunteers to choose not to circulate petitions that include their full name and home address.[15]

---

[15] This is true even assuming that RTCW volunteers could accurately ascertain whether or not a particular voter is interested in signing the petition prior to distributing the form to the voter. *See* Trial Tr. vol. 3, 781:10–14 (Haller). Not only does the evidence establish that RTCW volunteers have been chilled from petition circulation because such tactics would render petition circulation ineffective, but it is objectively reasonable to feel unsafe providing one's full name and home address to a stranger after a brief interaction, no matter how pleasant that interaction may have been. Among other things, there is no reason to believe that a voter's

30

If this isn't enough, RTCW volunteers' experiences circulating petitions establish their objectively reasonable fear of harassment. In circulating petitions in public places, volunteers have interacted with potential signatories who have made them feel unsafe. Trial Tr. vol. 3, 777:1–778:9 (Haller) (describing experience feeling unsafe by behavior of potential petition signatories after handing them petition prior to H.B. 1205 and unwillingness to circulate petitions that include her name and address); Trial Tr. vol. 4, 1036:24–1038:4 (Ciera Cox). Particularly in the context of these experiences while circulating petitions, it is objectively reasonable that RTCW volunteers are chilled from exposing themselves to further interactions with the public where their name and home address would be accessible.

Finally, volunteers whose home address is protected from public disclosure by Florida law have additional reasons to refrain from petition circulation under H.B. 1205. *See* RTCW Ex. 74 (RTCW volunteer unable to circulate RTCW petitions because they "have a protected address (former Guardian ad Litem)"); Trial Tr. vol. 6, 1546:2–20, 1547:10–1548:10, 1550:15–1551:9, 1602:3–1603:4 (Lowe-Minor).[16]

---

willingness to sign a petition correlates with their trustworthiness with highly sensitive personal information. *See, e.g.*, Trial Tr. vol. 6, 1551:10–24 (Lowe-Minor).

[16] The League of Women Voters of Florida collected RTCW petitions prior to H.B. 1205, and Ms. Lowe-Minor had plans to circulate RTCW petitions herself, but for H.B. 1205. Trial Tr. vol. 6, 1577:24–1578:2, 1578:6–9 (Lowe-Minor).

If a circulator with a protected address submits a written request for redaction to the Secretary of State, that request is distributed to Supervisors of Elections, and "[i]f the Supervisor gets it," the address should be redacted *once the petition form becomes a public record*. Trial Tr. vol. 8, 2020:9–2021:10 (Matthews); *see also* Matthews Dep. at 186:13–21. But petition forms do not become public record until after they are signed by a voter, submitted to a Supervisor, and a request for the record is made. Trial Tr. vol. 8, 2042:21–2043:11, 2044:24–2045:7 (Matthews); Matthews Dep. at 186:8–15; RTCW Ex. 75 (Petition Form stating "This form becomes a public record once filed with the Supervisor of Elections"). According to the Director of the Division of Elections herself, this means that registered circulators with protected addresses would be forced to distribute forms to the public with that address on them. Trial Tr. vol. 8, 2042:21–2043:11, 2044:24–2045:7 (Matthews); Matthews Dep. at 185:12–186:21.

RTCW volunteers' unwillingness to circulate petitions under the aforementioned circumstances is eminently reasonable, and they would have standing to sue in their own right. *See infra* Section III.B.ii.3. Because the other elements of the associational standing test are easily satisfied, RTCW has standing to challenge the Registration Requirement. *See supra* Section III.A.

32

## 2. RTCW Has Organizational Standing to Challenge the Affidavit Requirement

RTCW also has organizational standing to challenge the Affidavit Requirement. As detailed above, *supra* Section III.B.ii.1. the Affidavit Requirement has directly reduced the number of volunteers circulating RTCW's petition, reducing both the number of petitions it collects and the spread of its message. In conjunction with the Registration Requirement, the Affidavit Requirement also significantly increases the costs associated with operating RTCW's campaign because it requires printing smaller batches of individualized petitions locally, rather than bulk printing blank petitions centrally and distributing them throughout the State. Trial Tr. vol. 3, 700:17–701:12, 740:18–741:12 (Martin) (explaining that it might be possible to continue bulk printing "if it was just the empty affidavit without any information"). These harms directly impair RTCW's ability to carry out its mission and constitute an injury-in-fact that supports organizational standing. *See NAACP v. Byrd I* at 1308.

## 3. RTCW Plaintiffs' Injuries from the Affidavit Requirement Are Traceable to All Defendants and Redressable by the Requested Relief

RTCW's injuries from the Affidavit Requirement are traceable to the Secretary, who is responsible for developing and implementing the registration process, including developing the Petition Circulator's form that includes the Affidavit. *See* Fla. Stat. §§ 100.371(3)(d), (4). RTCW's injuries are also traceable to the Supervisors of Elections and the Secretary, who are required to invalidate

33

petitions submitted by a RTCW volunteer in violation of the Registration Requirement, part of which requires inclusion of the Affidavit. *See* Fla. Stat. § 100.371(14)(h). RTCW's injuries are also traceable to the State Attorneys, who are responsible for enforcing the criminal provisions associated with the Registration and Affidavit Requirements, Fla. Stat. §§ 104.187, 104.188(2), and the Attorney General, who has authority to institute civil enforcement proceedings for a violation of the Registration and Affidavit Requirements, Fla. Stat. § 100.371(11).

RTCW's injuries would be redressed by a permanent injunction prohibiting Defendants from enforcing the Affidavit Requirement.

### iii.  Petition Circulator Restrictions

RTCW has both organizational and associational standing to challenge the Non-Resident Restriction and Non-U.S. Citizen Restriction (collectively, "Petition Circulator Restrictions"). *See* PI Order at 13–15. Plaintiff Melissa Martin also individually has standing to challenge the Non-Resident Restriction. *See* PI Order at 8–9.

#### 1. Melissa Martin Has Standing to Challenge the Non-Resident Restriction

Plaintiff Melissa Martin has standing to challenge the Non-Resident Restriction, which completely bars her from circulating petitions, including in support of the initiative for which she volunteers as Campaign Coordinator. *See* PI

Order at 8–9; Fla. Stat. § 100.371(4)(b)(2). Ms. Martin is a resident of Oregon who has deep ties to Florida. Trial Tr. vol. 3, 670:2–20, 661:7–663:22 (Martin).

Before H.B. 1205, Ms. Martin circulated RTCW petitions when she visited Florida. Trial Tr. vol. 3, 670:2–20 (Martin); PI Hr'g Tr. at 146:15–147:11 (Martin). Ms. Martin had plans to circulate RTCW petitions in 2025, but she was forced to cancel those plans because of H.B. 1205. Trial Tr. vol. 3, 670:12–20, 672:14–21 (Martin); PI Hr'g Tr. at 146:15–147:11 (Martin). She would continue to circulate RTCW petitions if she were not barred by the Non-Resident Restriction. Trial Tr. vol. 3, 673:5–8 (Martin). As such, Ms. Martin has suffered an "injury in fact" that is "concrete and particularized" and "actual or imminent [rather than] hypothetical." *See Lujan*, 504 U.S. at 560 (citation modified). Because Ms. Martin's injuries are traceable to Defendants and redressable by a permanent injunction, *infra* Section III.B.iii.4., Ms. Martin has standing.

### 2. RTCW Has Associational Standing to Challenge the Petition Circulator Restrictions

As this Court previously found, RTCW has associational standing to challenge the Petition Circulator Restrictions because it has non-resident and non-U.S. citizen volunteers who would otherwise circulate the RTCW petition but are prohibited from doing so. *See* PI Order at 12. First, Ms. Martin is injured, as described directly above, Section III.B.iii.1., as are other non-resident volunteers.

35

*See* Trial Tr. vol. 3, 726:7–19 (Martin) (describing RTCW volunteer who was a "snowbird" and not registered to vote in Florida).

Second, RTCW has standing to challenge the Non-U.S. Citizen Restriction on behalf of its volunteers, including Ramón Pereira Bonilla. PI Order at 12; Trial Tr. vol. 3, 725:20–726:24 (Martin); Trial Tr. vol. 2, 409:4–421:24 (Pereira Bonilla); Fla. Stat. § 100.371(4)(b). Mr. Pereira Bonilla is a legal permanent resident of the United States and Florida resident who is barred from circulating petitions by the Non-U.S. Citizen Restriction. Trial Tr. vol. 2, 399:1–10, 409:5–14 (Pereira Bonilla). He has circulated petitions on behalf of RTCW, including up until the day before the effective date of H.B. 1205, and would continue to do so if he were not prohibited by the Non-U.S. Citizen Restriction. Trial Tr. vol. 2, 400:23–402:22, 420:14–421:24 (Pereira Bonilla).

### 3. RTCW Has Organizational Standing to Challenge the Petition Circulator Restrictions

RTCW has established both a direct injury and diversion-of-resources injury from the Petition Circulator Restrictions. As such, RTCW has organizational standing to challenge the Restrictions.

RTCW is directly injured by the Petition Circulator Restrictions, which reduce the number of volunteers collecting RTCW petitions and "directly impede[]" RTCW's ability to accomplish its core mission. *NAACP v. Byrd I* at 1308. RTCW has lost volunteers who planned to collect petitions because these volunteers are not

36

U.S. citizens or Florida residents. Trial Tr. vol. 3, 725:20–24, 726:22–24 (Martin); Trial Tr. vol. 2, 412:4–413:13 (Pereira Bonilla); Trial Tr. vol. 7, 1767:14–1768:6, 1770:1–1772:15 (González Herrera); Trial Tr. vol. 6, 1495:19–1496:13, 1498:22–1503:16 (Poff); Tr. vol. 5, 1448:13–1452:10 (Proaño). This reduction in volunteers has "limi[ted] the number of voices who will convey the initiative proponents' message," which in turn makes it less likely that [its] initiative proposal would garner the signatures necessary to qualify for the ballot." *Buckley*, 525 U.S. at 194–95, 210–11. The Petition Circulator Restrictions have also hindered RTCW's ability to recruit new volunteers. Trial Tr. vol. 3, 728:9–16 (Martin). The loss of RTCW's volunteers—its lifeblood—has directly diminished the organization's speech, reach, and ability to make the ballot.

The Petition Circulator Restrictions have also caused RTCW to divert its limited resources. Prior to H.B. 1205, RTCW never vetted its volunteer circulators' citizenship or residency. Trial Tr. vol. 3, 728:9–16 (Martin).  Because of the Petition Circulator Restrictions, RTCW has had to expend time and resources to verify its volunteers' residency and citizenship status and educate its volunteers to avoid a $50,000 fine. Trial Tr. vol. 3, 728:9–730:7, 733:22–734:4 (Martin); Fla. Stat. § 100.371(4)(g). After H.B. 1205, RTCW discontinued its reliance on its existing volunteer lists and conducted a new internal registration process that asked its ambassadors whether they were non-U.S. citizens or non-residents. Trial Tr. vol. 3,

37

679:12–680:7, 728:9–16 (Martin) (explaining that this re-registration process was essential for RTCW to comply with the law and avoid incurring fines); PI Hr'g Tr. at 147:16–148:19 (Martin) (explaining that RTCW viewed the re-registration process as "due diligence"). The time spent developing these protocols and training volunteers on these new restrictions would otherwise have been spent recruiting and training new volunteers, organizing petition drives, generating support from the public and other tasks. Trial Tr. vol. 3, 679:17–681:17 (Martin).

### 4. RTCW Plaintiffs' Injuries from the Petition Circulator Restrictions Are Traceable to All Defendants and Redressable by the Requested Relief

RTCW Plaintiffs' injuries from the Petition Circulator Restrictions are traceable to all Defendants. The Secretary of State oversees the circulator registration process, which requires prospective circulators to disclose, under penalty of perjury, whether they are U.S. citizens and Florida residents. Fla. Stat. §§ 100.371(4)(b), (4)(c)(7)–(9). The Secretary of State is also responsible for enforcing H.B. 1205's $50,000 fine related to the Petition Circulator Restrictions. Fla. Stat. § 100.371(4)(g).

RTCW's injuries are also traceable to the Secretary of State and Supervisors of Elections who must invalidate a petition submitted by a non-resident or non-U.S. citizen. Fla. Stat. § 100.371(14)(h). In fact, the Secretary of State directed Supervisors of Elections to invalidate all verified petitions that were collected by

38

non-resident and non-citizen circulators who lawfully registered and turned in valid petitions in the period between this Court's preliminary injunction and the Eleventh Circuit's stay of that decision. Trial Tr. vol. 8, 2050:25–2052:7 (Matthews); Trial Tr. vol. 2, 530:7–532:4 (Earley). Finally, RTCW's injuries are traceable to the State Attorneys and Attorney General who are tasked with enforcing the criminal provisions prohibiting non-residents and non-U.S. citizens from circulating petition under H.B. 1205. Fla. Stat. §§ 100.371(7)(a)(11), (7)(g).

RTCW Plaintiffs' injuries will be redressed by a permanent injunction prohibiting the Secretary, the Supervisors of Election, the State Attorneys, and the Attorney General from enforcing the Petition Circulator Restrictions.

### iv. Severe Fines on Sponsors

RTCW has organizational standing to challenge H.B. 1205's Severe Fines on Sponsors as the direct "object" of the challenged provisions. *See Lujan*, 504 U.S. at 561–62; *Diamond Alt. Energy*, 606 U.S. at 114–15; *Mirabelli*, 2026 WL 575049, at *3. RTCW is potentially liable for each of the Severe Fines because H.B. 1205 imposes liability on the sponsor for violations incurred by registered circulators and circulators of Personal Use Petitions. Matthews Dep. at 98:18–99:15, 149:16–150:17, 151:2–23; ECF 620-2, Deposition of Jillian Pratt ("Pratt Dep.") at 92:9–10, 92:17–94:5. Though the Secretary has not yet assessed Severe Fines against RTCW or any other sponsor for the 2026 cycle, Trial Tr. vol. 8, 2150:2–6 (Pratt), "[a] threat

39

of future injury is sufficient to establish standing when 'the threatened injury is certainly impending or there is a substantial risk that the harm will occur.'" *Dream Defs. v. Governor of the State of Fla.*, 57 F.4th 879, 887 (11th Cir. 2023) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). Here, RTCW faces imminent imposition of fines for violations of these provisions because OECS is in the process of investigating fines for violations which occurred during the 2026 campaign cycle. *See* Pratt Dep. at 75:2–14; Trial Tr. vol. 8, 2150:2–6, 2151:8–16 (Pratt).

### 1. RTCW Has Standing to Challenge the 10-Day Return Deadline and Petition Delivery After February 1 Fines

H.B. 1205 imposes a $50 fine per day late for each petition form collected by "the sponsor or any petition circulator" that is delivered to the appropriate Supervisor of Elections more than 10 days after the voter signs the petition. Fla. Stat. § 100.371(7)(a). Prior to H.B. 1205, RTCW was not subject to fines for the late delivery of petitions because the law did not impose a deadline for petitions collected by volunteers. Fla. Stat. § 97.021(28) (2022); RTCW Ex. 136; Matthews Dep. 177:11–15; Trial Tr. vol. 3, 701:18–24 (Martin). The imposition of H.B. 1205's deadline has been extremely burdensome for RTCW. *See NAACP v. Byrd I* at 1147–48 (organization had standing to challenge provision which reduced timeframe in which it could submit voter registration applications by four days because of significant burden on organization). H.B. 1205 also imposes a $100 fine on sponsors

40

for each day late a petition form collected by "the sponsor or any petition circulator" is turned into the appropriate Supervisor of Elections after the February 1 deadline in a general election year. Fla. Stat. § 100.371(7)(a)(2).

RTCW is the direct object of these fines as "[a] sponsor that collects petition forms or uses a petition circulator to collect petition forms." Fla. Stat. § 100.371(7)(a); *see Lujan*, 504 U.S. at 561–62; *Diamond Alt. Energy*, 606 U.S. at 114–15; *Mirabelli*, 2026 WL 575049, at *3. Consistent with the statutory language of H.B. 1205, the Office of Election Crimes and Security ("OECS") considers Personal Use Petition forms that a voter mails to a sponsor for submission to be collected by "the sponsor" under Fla. Stat. § 100.371(7)(a), and thus subject to late delivery fines. Pratt Dep. at 162:7–163:8. Petition forms collected by circulators outside of RTCW's knowledge or control similarly risk financial liability for RTCW. *See infra* Section IV.F. The 10-Day Return Deadline and Petition Delivery After February 1 fines therefore impose severe financial liability on RTCW. RTCW has organizational standing to challenge the 10-Day Return Deadline because it "directly and severely" injures RTCW, despite the organization's best efforts to comply with this drastically shortened deadline. Trial Tr. vol. 3, 704:6–18, 704:23–706:12 (Martin); *see also* Trial Tr. vol. 4, 1051:24–1052:3 (Ciera Cox); Trial Tr. vol. 4, 992:12–993:7 (Perez).

The 10-Day Return Deadline has directly impeded RTCW's ability to accomplish its mission to get its initiative on the ballot. Trial Tr. vol. 3, 704:2–18, 711:7–12, 712:2–4, 738:19–739:5 (Martin); Trial Tr. vol. 4, 992:19–993:5, 994:11–14 (Perez); Trial Tr. vol. 4, 1051:24–1052:3 (Ciera Cox). For example, the 10-Day Return Deadline functionally prevents RTCW from employing a passive petition collection model at supportive businesses where voters review and sign petitions that are picked up by RTCW volunteers on a weekly, biweekly, or monthly basis. Trial Tr. vol. 4, 1052:6–1053:10 (Ciera Cox). This strategy to reach more potential signers is no longer possible because of the need to submit petitions so quickly. Trial Tr. vol. 4, 1052:6–1053:10 (Ciera Cox). The determination that it was not possible to enact protocols that would ensure compliance with the 10-Day Return Deadline while avoiding financial injury was a significant factor in RTCW's decision to suspend its 2026 campaign entirely. Trial Tr. vol. 3, 677:23–678:6, 709:8–710:8 (Martin); *see also* Trial Tr. vol. 4, 1051:24–1052:3 (Ciera Cox) (testifying that it was not possible for RTCW to generally meet the 10-Day Return Deadline for petitions moving through Monroe County).

Notwithstanding RTCW's campaign suspension and efforts to implement new procedures to comply with this provision, RTCW still faces direct injury because petitions have been submitted in violation of the 10-Day Return Deadline. Trial Tr. vol. 3, 704:19–705:11 (Martin). RTCW has already violated and knows that it will

42

continue to violate the 10-Day Return Deadline—regardless of its knowledge or culpability—when it restarts its campaign. Trial Tr. vol. 3, 704:19–705:11 (Martin); RTCW Exs. 165, 167–169, 152, 175; Trial Tr. vol. 4, 1050:7–1051:23 (Ciera Cox); Trial Tr. vol. 4, 994:11–14 (Perez).

RTCW is unaware of its financial liability with respect to the 10-Day Return Deadline and the Petition Delivery After February 1 fines because the Secretary has not yet assessed any fines for the 2026 campaign cycle. Trial Tr. vol. 8, 2150:2–6 (Pratt); Trial Tr. vol. 3, 711:13–712:1 (Martin). However, RTCW has organizational standing to challenge these provisions because OECS is actively investigating fines for violations which occurred during the 2026 campaign cycle, Pratt Dep. at 75:2–14, such that "there is a substantial risk that the harm will occur" from the Secretary's issuance of the late petition fines. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citation modified).

RTCW also has organizational standing to challenge the 10-Day Return Deadline because it has diverted resources to attempt to comply with the deadline and will need to continue diverting resources if the law stays in place. *See Fla. State Conf. of Branches and Youth Units of the NAACP v. Byrd*, 794 F. Supp. 3d 1131, 1147–48 (N.D. Fla. 2025) ("*NAACP v. Byrd II*") (organization had standing where it had to "overhaul its voter registration operations to avoid crippling fines" because of a shortened deadline). Most obviously, RTCW has incurred "exponentially

43

increased" mailing expenses in an attempt to comply with the 10-Day Return Deadline because it is now forced to mail petitions immediately to Supervisors of Elections rather than waiting to send petitions in larger batches. Trial Tr. vol. 3, 706:13–707:11, 709:8–14 (Martin); Trial Tr. vol. 4, 992:19–993:5 (Perez).

The 10-Day Return Deadline required RTCW volunteers to divert their limited time to overhauling RTCW's petition collection and submission protocols and away from collecting signatures that would help the organization achieve ballot placement. *See* Trial Tr. vol. 3, 700:1–15, 706:13–708:8, 709:15–710:8 (Martin) (describing volunteers' time spent inquiring whether SOEs would accept signed petitions directly from voters); RTCW Exs. 78, 108–109, 111, 116. And once in place, these new protocols required volunteers to divert their limited time away from signature collection and toward ensuring compliance with the 10-Day Return Deadline. *Compare* Trial Tr. vol. 3, 700:1–15, 704:6–706:6, 708:11–709:14 (Martin) (describing how the 10-Day Return Deadline has forced RTCW to spend more volunteer time on trips to the post office and RTCW's P.O. Box) *with NAACP v. Byrd II* at 1148 ("All of these changes—particularly the shortened time frame for returns and the switch to making more frequent deliveries to Supervisors of Elections offices—will likely eat away at members' time in the field registering voters, resulting in registering fewer voters."). Thus, like in *NAACP v. Byrd II*, RTCW "demonstrated a cognizable injury—including the cost of compliance and a

44

reasonable chill on [petition circulation]" as a result of the 10-Day Return Deadline. *NAACP v. Byrd II* at 1148.

### 2. RTCW Has Standing to Challenge the Wrong County Delivery Fine

H.B. 1205's Wrong County Delivery fine imposes a $500 fine on sponsors "for each petition form collected by a petition circulator which is not submitted to the supervisor of elections in the county in which the voter resides." Fla. Stat. § 100.371(7)(a)(3). The fine increases to $5,000 if the sponsor or petition circulator acted willfully. *Id.* RTCW faces a direct "impending" injury from Wrong County Delivery fines. *Susan B. Anthony List*, 573 U.S. at 158. Like the 10-Day Return Deadline, RTCW is aware of petitions delivered to the wrong county during the 2026 election cycle. Trial Tr. vol. 3, 717:16–22 (Martin). RTCW does not know who submitted the petitions incorrectly in this instance because RTCW's authorized agent was not submitting petitions in the county at the time. *Id.* However, RTCW is liable nonetheless for any resulting fines because the Secretary considers even unknown circulators to be fiduciaries of the sponsor—meaning "there is a substantial risk that harm [to RTCW] will occur." *Susan B. Anthony List*, 573 U.S. at 158 (citation modified); *see* Matthews Dep. at 149:16–150:17; Pratt Dep. at 92:9–10, 93:7–94:5.

Prior to H.B. 1205, it was typical for RTCW to collect petitions across a range of Florida counties at one event. *See, e.g.*, Trial Tr. vol. 4, 993:21–994:7 (Perez);

Trial Tr. vol. 4, 1048:11–1049:13 (Ciera Cox); RTCW Ex. 153. Now, a volunteer's simple oversight in mailing a signed petition to the wrong county while sorting and batching petitions to mail across the State can result in a $500 fine for RTCW. Fla. Stat. § 100.371(7)(a)(3). The impending financial harm of $500 per petition would be a substantial financial cost for the organization. *See* Trial Tr. vol. 3, 733:22–734:4 (Martin) (testifying that RTCW has less than $50,000 in its "coffers"). As in *NAACP v. Byrd II*, "Defendants' threatened enforcement" of the Wrong County Delivery fine constitutes an injury-in-fact because the fines will cause severe financial harm to RTCW. *NAACP v. Byrd II* at 1147.

### 3. RTCW Has Standing to Challenge the Filling in Missing Information and Pre-Filling Petitions Fines

H.B. 1205's Filling in Missing Information fine is imposed on sponsors "[i]f a person collecting petition forms on behalf of a sponsor of an initiative petition signs another person's name or a fictitious name to any petition, or fills in missing information on a signed petition, to secure a ballot position in violation of § 104.185(2)." Fla. Stat. § 100.371(8). A violation of this provision is $5,000 for each petition form. *Id.*

Similarly, the Pre-Filling Petitions Fine imposes a $50 per petition fine when a sponsor or "person collecting petition forms on behalf of a sponsor . . . mail[s] or

otherwise provide[s] a petition form" to a voter that has any voter information already filled in. Fla. Stat. § 100.371(10).

RTCW is directly injured by these provisions of H.B. 1205 because RTCW has had to "overhaul its" entire petition circulation "operations to avoid" these "crippling fines." *See NAACP v. Byrd II* at 1147–48. Prior to H.B. 1205, RTCW volunteers routinely filled in missing information on (or "perfected") signed petitions. Trial Tr. vol. 3, 719:17–720:1 (Martin); Trial Tr. vol. 3, 771:19–772:20 (Haller). For example, volunteers routinely "perfected" petitions by adding the correct "county" to the form where voters often mistakenly wrote the "country." Trial Tr. vol. 3, 719:22–720:1 (Martin); Trial Tr. vol. 3, 772:2–9 (Haller). Making such a correction was a common practice among citizen initiative campaigns and was permitted by Supervisors. *See* Trial Tr. vol. 3, 721:2–4, 721:24–722:2 (Martin); Trial Tr. vol. 3, 772:18–20 (Haller); Trial Tr. vol. 4, 1028:18–25 (Ciera Cox); Trial Tr. vol. 6, 1526:25–1527:16 (Lowe-Minor); Trial Tr. vol. 6, 1641:4–10 (Scoon); Trial Tr. vol. 6, 1695:16–22 (Chandler). Because at least some Supervisors of Elections do not validate forms if they include missing or inaccurate address information, RTCW volunteers engaged in the practice to "fulfill the intent of the signer" and "ensure that the form would be valid." Trial Tr. vol. 3, 721:12–16 (Martin); *see also* Trial Tr. vol. 3, 772:12–14 (Haller). Indeed, Florida law directs Supervisors of Elections not to validate petition forms where the voter's correct

47

county information is missing or incorrect. Fla. Stat. § 100.371(14)(c). Now, RTCW is liable for any violations of the Filling in Missing Information provision from circulators who utilize this commonplace practice, even if those circulators operate without RTCW's knowledge or consent. Trial Tr. vol. 3, 722:3–7 (Martin); *see* Matthews Dep. at 149:16–150:17; Pratt Dep. at 92:9–10, 93:7–94:5.

Prior to H.B. 1205, RTCW also distributed petitions to potential signatories with pre-filled voter information. Trial Tr. vol. 3, 723:13–16 (Martin); RTCW Ex. 101. RTCW retained a vendor, "TallyEd," to provide a service through which voters could request that a petition pre-filled with their information be sent to them electronically or through the mail. Trial Tr. vol. 3, 723:19–23 (Martin). RTCW retained TallyEd to expand RTCW's reach to voters they otherwise could not access, and the partnership increased RTCW's efficacy until H.B. 1205 foreclosed pre-filling. Trial Tr. vol. 3, 724:9–13 (Martin). Like the Filling in Missing Information fine, RTCW would be liable if a circulator outside of its knowledge or control sent a pre-filled petition on its behalf. *See* Matthews Dep. at 149:16–150:17; Pratt Dep. at 92:9–10, 93:7–94:5.

RTCW has directed its ambassadors to stop filling in missing information to avoid a $5,000 fine per form. RTCW Ex. 96. However, but for the Filling in Missing Information fine, RTCW would continue to perfect petitions because it needed every petition that its volunteers collected to be validated to make the ballot. Trial Tr. vol.

48

3, 722:8–10 (Martin); Trial Tr. vol. 3, 772:10–17 (Haller). Likewise, RTCW stopped its pre-filling partnership with TallyEd because of H.B. 1205, and it would have continued this partnership but for the Pre-Filling Petitions fine. Trial Tr. vol. 3, 724:17–725:9 (Martin). As such, RTCW also has organizational standing to challenge the Filling in Missing Information and Pre-Filling Petitions fines because they "directly impede[]" RTCW's "ability to accomplish [its] mission[]" of gaining ballot access for its initiative. *NAACP v. Byrd I* at 1309 (citation modified).

### 4. RTCW Has Standing to Challenge the Ineligible Petition Circulator Fine

H.B. 1205 also fines sponsors for ineligible individuals circulating petitions on their behalf. Ineligible petitions circulators include non-U.S. citizens, non-residents, and individuals with a felony conviction whose voting rights have not been restored. Fla. Stat. § 100.371(4)(b). Under the Ineligible Petition Circulator fine, "[t]he sponsor of the initiative amendment is liable for a fine in the amount of $50,000 for each person the sponsor knowingly allows to collect petition forms on behalf of the sponsor in violation of [subsection 100.371(4)]." Fla. Stat. § 100.371(4)(g). RTCW has organizational standing to challenge the Ineligible Petition Circulators fine because it faces "a substantial risk" of direct injury from the fine. *See Susan B. Anthony List*, 573 U.S. at 158. Any application of such a fine would shut down RTCW's operations because it could not cover even one $50,000 Ineligible Petition Circulator fine. Trial Tr. vol. 3, 733:22–734:4 (Martin). And

49

RTCW is at imminent risk of incurring a fine under this provision because RTCW does not receive notice when volunteers register to circulate RTCW petitions with the Division of Elections. Trial Tr. vol. 3, 729:8–13 (Martin). The organization has "zero control" over who registers to circulate petitions on its behalf. Trial Tr. vol. 3, 729:14–20 (Martin). At trial, RTCW demonstrated that non-U.S. citizens have attempted to register as RTCW petition circulators without RTCW's knowledge. *See* RTCW Ex. 268 (non-U.S. citizen attempting to register to circulate RTCW petitions); RTCW Ex. 304 (same); Trial Tr. vol. 3, 731:23–733:21 (Martin) (testifying that she was not aware that these individuals had attempted to register to circulate RTCW petitions nor was she aware whether they had been allowed to register). Despite RTCW's inability to control who is registered with the State or otherwise circulates petitions on its behalf, RTCW remains liable for all fines incurred as a result of this provision. Pratt Dep. at 84:23–85:13, 104:3–106:24, 141:15–143:3 (testifying that the OECS understands all petition circulators to be a fiduciary of the sponsor).

RTCW also has organizational standing because it has diverted resources in response to the Ineligible Petition Circulator provision. Like the voter registration organization in *Byrd*, RTCW has had to "overhaul its" entire petition circulation "operations to avoid crippling fines." *See NAACP v. Byrd II* at 1147–48. In response to the risk of financial liability, RTCW was forced to abandon its volunteer list and

establish an internal re-registration process for volunteers to attempt to determine their eligibility based on the new requirements of H.B. 1205. Trial Tr. vol. 3, 728:9–16 (Martin). The re-registration process required asking volunteers to indicate whether they were a U.S. citizen, a Florida resident, and whether they had a felony conviction. Trial Tr. vol. 3, 679:12–680:7, 728:9–16 (Martin); PI Hr'g Tr. at 147:16–148:19 (Martin). Prior to H.B. 1205, RTCW did not have to spend its limited time or resources assessing whether interested volunteers met set criteria beyond their interest in volunteering for RTCW and commitment to the ballot initiative. Trial Tr. vol. 3, 679:17–681:17 (Martin). And the time spent developing these protocols and training volunteers on these new restrictions would otherwise have been spent recruiting and training new volunteers, organizing petition drives, generating support from the public and other tasks. *Id.*

> ### 5. RTCW Plaintiffs' Injuries from the Severe Fines on Sponsors Provisions are Traceable to Defendants and Redressable by the Requested Relief

RTCW's injuries from the Severe Fines are traceable to the Secretary of State and Supervisors of Elections. The Secretary is responsible for imposing fines incurred for violations of H.B. 1205. Fla. Admin. Code r. 1S-2.0091(2)(b). The Supervisors are responsible for verifying petitions, which includes notifying the Division of Elections when petitions are misfiled and determining whether a petition was delivered and completed in accordance with H.B. 1205's new requirements. Fla.

Admin. Code r. 1S-2.0091; Fla. Stat. § 100.371(14). RTCW's injuries are redressable by a permanent injunction prohibiting the Secretary and the Supervisors from enforcing H.B. 1205's Severe Fines.

### v. Arbitrarily Invalidated Petitions

H.B. 1205 requires Supervisors of Elections to invalidate any signed petition form that is collected by an ineligible petition circulator, regardless of whether the petition is otherwise valid. Fla. Stat. § 100.371(14)(h). The voter whose petition has been invalidated does not receive notice of that invalidation. *See* Matthews Dep. at 168:16–169:20.

### 1. RTCW Has Third-Party Standing to Challenge the Arbitrarily Invalidated Petitions Provision

At trial, RTCW established that it has third-party standing to challenge H.B. 1205's Arbitrarily Invalidated Petitions provision on behalf of the voters whose RTCW petitions are invalidated. To assess third-party standing, courts determine (1) whether the plaintiff has an injury-in-fact giving it a concrete interest in the outcome of the case; (2) whether the plaintiff has a "close relation" to the third parties it seeks to represent; and (3) whether the third parties are hindered from asserting their own rights. *See Powers v. Ohio*, 499 U.S. 400, 410–11 (1991); *Young Apartments, Inc. v. Town of Jupiter*, 529 F.3d 1027, 1041–42 (11th Cir. 2008). RTCW readily satisfies this test.

52

First, RTCW has suffered an injury-in-fact from the Arbitrarily Invalidated Petitions provision because the invalidation of its petitions directly harms RTCW's ability to collect enough signatures to be placed on the ballot. *C.f. AHM*, 602 U.S. at 393 n.5 (third-party standing doctrine applicable where plaintiffs have an injury-in-fact). And there is no question that RTCW has a concrete interest in the outcome of the validation of these petitions, as that validation directly impacts RTCW's success. *See* Fla. Const. art. XI, § 3 (requiring sponsors to submit signed and verified petition forms totaling at least 8% of the number of voters who cast a ballot in the previous presidential election cycle in at least half of Florida's congressional districts to achieve ballot placement).

Second, RTCW has a "close relation" to the voters whose RTCW petitions have been arbitrarily invalidated because they share a "common interest." *Powers* 499 U.S. at 411, 413. In *Powers*, the Supreme Court held that a criminal defendant had a close relation to the jurors who were peremptorily struck from his trial because "the excluded juror and the criminal defendant have a common interest in eliminating racial discrimination from the courtroom." 499 U.S. 400, 413–14 (1991). Here, too, RTCW and the voters who sign its petition have a goal in common: "[t]o help save and protect Florida's waters from now and into the future." Trial Tr. vol. 3, 674:23–675:3 (Martin). Moreover, courts have found that this "close relation" exists where the litigant and the third party are regulated by the same

53

statutory scheme or practice, such that their interests in challenging that regulation are intertwined. *See Young Apartments, Inc.*, 529 F.3d at 1043 (finding a "sufficiently close relationship between [a landlord] and its tenants" where they were "targeted . . . through a single course of conduct intended to drive the tenants out of town and the landlords out of business.") (citation modified); *Tallahassee Bail Fund v. Marshall*, 717 F. Supp. 3d 1201, 1213 (N.D. Fla. 2024) (finding a "sufficiently close relationship" where a bail fund and its future clients share "an interest in upholding the Eighth Amendment's protection from excessive bail and, thus, in barring Defendant from enforcing" challenged law). Here, too, RTCW and the voters whose RTCW petitions are invalidated are similarly injured by the same statutory scheme: H.B. 1205's Arbitrarily Invalidated Petitions provision. Because of the shared interest in challenging this provision, RTCW "will be a zealous advocate of the legal rights at issue in the suit." *Young Apartments, Inc.*, 529 F.3d at 1043.

Third, the voters who sign RTCW's petition are hindered from asserting their own rights. *See Powers* 499 U.S. at 411. When otherwise valid petitions are invalidated because of the circulator's purported ineligibility, the voters are not notified of the invalidation. Matthews Dep. at 168:16–169:20; Trial Tr. vol. 2, 520:22–520:25 (Earley). These voters would therefore have no way to know that their RTCW petitions have been invalidated, thus hindering their ability to assert their own rights in court. *See Young Apartments, Inc.*, 529 F.3d at 1043 (instructing

54

that courts must "ask whether it 'would be difficult if not impossible for the persons whose rights are asserted to present their grievance before any court.'") (quoting *Barrows v. Jackson,* 346 U.S. 249, 257 (1953)). Because this "'genuine obstacle' hinders [voters] from asserting their rights, 'the party who is in court becomes by default the right's best available proponent.'" *Yellowhammer Fund v. Att'y Gen. of Ala. Steve Marshall*, 733 F. Supp. 3d 1167, 1183 (M.D. Ala. 2024) (quoting *Singleton v. Wulff*, 428 U.S. 106, 116 (1976)). RTCW has third-party standing.

### 2. RTCW Has Organizational Standing to Challenge the Arbitrarily Invalidated Petitions Provision

RTCW is also directly injured by the Arbitrarily Invalidated Petitions provision. The invalidation of otherwise-valid RTCW petitions directly harms RTCW by invalidating the signatures it needs to get its constitutional amendment placed on the ballot. *See* Fla. Const. art. XI, § 3. At trial, RTCW demonstrated that the Secretary instructs Supervisors of Elections to invalidate previously validated petitions from purportedly ineligible petition circulators pursuant to this provision, *see, e.g.*, RTCW Ex. 330, thus harming RTCW's ability to be placed on the ballot. The Secretary also instructed the Supervisors to invalidate all petitions circulated by circulators who were eligible during the pendency of this Court's preliminary injunction, but later became ineligible when the injunction was stayed, because of this provision. Trial Tr. vol. 8, 2050:25–2051:9 (Matthews); Trial Tr. vol. 8, 2150:7–2151:4 (Pratt). Thus, RTCW has been directly injured by the Arbitrarily Invalidated

55

Petitions provision, *see Corbett*, 930 F.3d at 1232, and it will continue to be directly injured by this provision as it leads its campaign for ballot placement in 2028. *See Lynch*, 744 F.2d at 1456.

### 3. RTCW Plaintiffs' Injuries from the Arbitrarily Invalidated Petitions Provision Are Traceable to Defendants and Redressable by the Requested Relief

RTCW's injuries from the Arbitrarily Invalidated Petitions provision are traceable to the Secretary of State and Supervisors of Elections. RTCW's injuries are traceable to the Secretary because he is responsible for determining the total number of verified valid signatures, "less any signatures that were invalidated pursuant to" the Arbitrarily Invalidated Petitions provision. Fla. Stat. § 100.371(15). As stated above, the Secretary also instructs the Supervisors to invalidate otherwise-valid petitions pursuant to this provision of H.B. 1205. *See* RTCW Ex. 330; Trial Tr. vol. 8, 2050:25–2051:9 (Matthews); Trial Tr. vol. 8, 2150:7–2151:4 (Pratt).

The Supervisors are responsible for validating petitions, which includes confirming whether a circulator was registered at the time the petition was signed. Fla. Stat. § 100.371(14)(b); ECF 608-4, Deposition of Mark Earley ("Earley Dep.") at 27:11–27:15; Trial Tr. vol. 2, 460:12–460:17 (Earley). The Supervisors will also invalidate otherwise valid petitions upon receiving instruction from the Secretary to invalidate those petitions pursuant to this provision of H.B. 1205. *See* Trial Tr. vol. 2, 531:8–18 (Earley); Trial Tr. vol. 8, 2054:2–19 (Matthews).

56

RTCW's injuries would be redressed by a permanent injunction from this Court prohibiting the Secretary and the Supervisors of Elections from enforcing H.B. 1205's Arbitrarily Invalidated Petitions provision.

## IV.   Merits

### A. Infringement of Core Political Speech (Counts I & II)

#### i.   Factual Background

Petition circulation is a core part of RTCW's mission. It is a fundamental way that the organization and its members spread their message and advocate for political change. While circulation of petitions involves distributing paper forms and collecting them, that activity is inextricably intertwined with the words that surround it.

When RTCW volunteers are circulating petitions, "that's their chance to educate the public" about why RTCW's initiative is "an important legal solution for water issues." PI Hr'g Tr. at 129:25–130:6 (Martin); *see also* Trial Tr. vol. 3, 766:24–767:7, 769:2–22 (Haller). Volunteers often "include their . . . personal reason in their initial pitch, because that helps to resonate with their fellow human being." PI Hr'g Tr. at 129:25–130:6 (Martin). For example, before he was barred from circulating, Mr. Pereira Bonilla would explain to voters that Florida has no right to clean water and explain that they could do something by signing a petition. Trial Tr. vol. 2, at 405:8–406:5 (Pereira Bonilla). Ciera Cox would explain "the

57

myriad of ways pollution in our waters affects" Monroe County. Trial Tr. vol. 4, 1031:17–25 (Ciera Cox).

H.B. 1205's restrictions are "severely limiting" on RTCW members' "ability to talk about the right to clean water because" their goals are to "give [Floridians] tools to be able to impact the system that they're a part of and want change." Trial Tr. vol. 2, 413:14–414:13 (Pereira Bonilla). Simply talking about the right to clean water and distributing petitions, without collecting them "just doesn't resonate with people," and would be a waste of time. *Id.* at 413:25–414:5. A circulator who tried to simply discuss RTCW's goals with potential signatories and then rely on another circulator to actually collect the signatures concluded that the method was "quite disastrous." Trial Tr. vol. 2, 415:17–416:13 (Pereira Bonilla). Asking voters to sign "while they're feeling fired up about the issue" is critical. Trial Tr. vol. 2, 415:2–16 (Pereira Bonilla); Trial Tr. vol. 4, 990:20–991:7 (Perez). As such, distributing blank petition forms or asking voters to go home to print and sign petitions themselves is not an effective or efficient strategy. Trial Tr. vol. 4, 991:8–992:3 (Perez). Such a strategy would also be incompatible with H.B. 1205's 10-Day Return Deadline. *See infra* Section IV.F.i.1.

The four provisions of H.B. 1205 challenged under Counts I and II—the Registration Requirement, the Affidavit Requirement, and the Non-U.S. Citizen and Non-Resident Restrictions—severely diminish the core political speech fundamental

to RTCW's mission. As described in more detail below, those provisions have prevented RTCW members and others from circulating petitions. Trial Tr. vol. 3, 680:8–14, 725:20–24, 726:22–25 (Martin); PI Hr'g Tr. at 136:11–137:8, 142:1–24 (Martin); Trial Tr. vol. 2, 409:15–411:14 (Pereira Bonilla); Trial Tr. vol. 3, 765:24– 766:1, 778:5–9 (Haller). Those obstacles not only prevent volunteers from exercising their First Amendment rights, but they have made it all but impossible for RTCW to gather enough petitions to qualify for the ballot. Trial Tr. vol. 3, 738:15– 739:5 (Martin).

### ii.  Legal Standard

#### 1.  Strict Scrutiny Is the Appropriate Standard of Review for Each of the Challenged Provisions

##### a.  Petition Circulation Activities Are Political Speech Protected by the First Amendment

Laws restricting petition circulation for ballot initiatives "trench[] upon an area in which the importance of First Amendment protections is at its zenith." *Meyer v. Grant*, 486 U.S. 414, 425 (1988) (citation modified). Therefore, "the burden that [a state] must overcome to justify [such a] criminal law is well-nigh insurmountable." *Id.*

Thus, in *Meyer*, the Court invalidated a Colorado law prohibiting ballot initiative sponsors from paying petition circulators, reasoning that doing so would "limit[] the number of voices" who would spread the sponsors' message and "make[] it less likely" that the sponsors would "garner the number of signatures necessary to

place the matter on the ballot." *Id.* at 422–23. In *Buckley*, the Court struck down several other Colorado statutes regulating petition circulation, including a requirement that circulators be registered voters and a requirement that circulators wear name identification badges. 525 U.S. at 194–200. As in *Meyer*, the Court explained that the restrictions would reduce the number of people who would convey the sponsors' message and therefore reduce the size of the audience the initiative proponents could reach. *Id.* at 194–95, 197–98.

Here, the Registration Requirement, the Affidavit Requirement, and the Non-U.S. Citizen and Non-Resident Restrictions—fall squarely into the category identified by *Meyer* and *Buckley*: they restrict *who* may circulate petitions, "limit[] the number of voices" available to spread RTCW's message, and make it less likely that RTCW's initiative will qualify for the ballot. *Meyer*, 486 U.S. at 422.

Any argument that these Challenged Provisions are not subject to First Amendment protection must fail. In addition to disregarding the clear holdings of *Meyer* and *Buckley*, Defendants evince no "due regard for the reality" that, without the ability to circulate petition forms, RTCW's ability to educate the public and advocate for its constitutional amendment has been decimated. *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980); *see also League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, 720 (M.D. Tenn. 2019) ("[W]hile the civil penalties . . . are directed only at the paperwork aspect of a drive, the threat of

60

penalties is likely to have a chilling effect on the entirety of the drive, including its communicative aspects."). The availability of other avenues of expression simply has no bearing on whether the Challenged Provisions burden RTCW's most effective one. *C.f. Thornhill v. Alabama*, 310 U.S. 88, 95–96, 104 (1940). And "effective speech can be no less protected than impotent speech, lest the right to speak be relegated to those instances when it is least needed." *McIntyre*, 514 U.S. 334, 347 (1995) (citing *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949)).

Defendants are apparently content to have Plaintiffs abandon their most effective form of speech—petition circulation—and confine their speech to other avenues, such as social media posts or emails to supporters, or having conversations on the street without being able to collect signed petitions. *See, e.g.*, Trial Tr. vol. 3, 754:3–755:21, 762:5–24 (Martin); Trial Tr. vol. 3, 781:22–782:15 (Haller). Whether RTCW volunteers retain the ability to speak in other ways has absolutely no bearing on whether the Challenged Provisions have unduly curtailed their chosen, and most effective, means of speaking. As the Supreme Court observed:

> That appellees remain free to employ other means to disseminate their ideas does not take their speech through petition circulators outside the bounds of First Amendment protection. Colorado's prohibition of paid petition circulators restricts access to the most effective, fundamental, and perhaps economical avenue of political discourse, direct one-on-one communication. That it leaves open "more burdensome" avenues of communication, does not relieve its burden on First Amendment expression. . . . The First Amendment protects appellees' right not only to advocate their cause but also to select what they believe to be the most effective means for so doing.

61

*Meyer*, 486 U.S. at 424 (citations omitted).

The Eleventh Circuit's decision in *Biddulph v. Mortham* only reaffirms the conclusion that heightened scrutiny applies to the four provisions challenged here. *See* 89 F.3d 1491 (11th Cir. 1996). In *Biddulph*, decided before *Buckley*, the court "distinguish[ed] between regulation of the circulation of petitions—which is 'core political speech'—and a state's general initiative regulations." *Id.* at 1497. The court identified three categories of regulations of the initiative process that are "subject to strict scrutiny." *Id.* at 1500. One category is comprised of laws, like those in *Meyer*, in which "a state impermissibly burden[s] the free exchange of ideas about the objective of an initiative proposal." *Id.* By contrast, the law in *Biddulph* regulated the wording of an initiative's ballot title; it did not directly affect the speech intertwined with petition circulation. *Id.* at 1493, 1500. In its preliminary injunction decision, this Court correctly concluded that "[t]he residency and citizenship requirements . . . directly implicate [that] category," because they create "a severe burden on the free exchange of ideas about the petition initiatives." PI Order at 20, 23. The same is true of the Registration and Affidavit Requirements, as explained in more detail below. *See infra* Section IV.A.iii.1–2.[17]

---

[17] While Defendants may argue that "exacting" scrutiny should be applied instead of strict scrutiny, the Supreme Court has used the terms interchangeably. In *McIntyre v. Ohio Elections Commission*, the Court explained that the *Meyer* Court "unanimously applied strict scrutiny to invalidate an election-related law" before describing the "exacting scrutiny" standard. 514 U.S. at 346 n.10 & 347. The

The Eleventh Circuit's September 2025 stay opinion, *Florida Decides Healthcare Inc. v. Florida Secretary of State*, No. 25-12370, 2025 WL 3738554 (11th Cir. Sep. 9, 2025), which concerned only two provisions at issue in this case, should not affect this Court's decision for three reasons: (1) as Defendants admit, the stay order is not binding law; (2) obvious errors in the panel majority's opinion highlight its rushed nature; and (3) the panel majority misunderstood the statutes at issue in the Supreme Court's decisions in *Buckley* and *Meyer*, leading it to improperly distinguish H.B. 1205.

First, the stay order and opinion is not binding on this Court. Defendant Byrd's counsel acknowledged this reality on the record at trial. Trial Tr. vol. 1, 329:7–22. And while all parties agree that the Eleventh Circuit has not addressed the particular issue at hand, it has emphasized "the necessarily tentative and preliminary nature of a stay-panel opinion" and explained that a "stay-panel opinion *cannot* spawn binding legal consequences regarding the merits of the case." *Democratic Exec. Comm. of Fla. v. Nat'l Republican Senatorial Comm.*, 950 F.3d 790, 795 (11th Cir. 2020); *see also Hand v. Desantis*, 946 F.3d 1272, 1275 n.5 (11th Cir. 2020) (concluding that

Eleventh Circuit is no different. *See Biddulph*, 89 F.3d at 1498 ("The *Meyer* Court then applied strict scrutiny to the Colorado law . . ."). The Supreme Court has recently reiterated that laws reviewed under exacting scrutiny must be narrowly tailored to the state's interest. *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 608 (2021) ("[E]xacting scrutiny does not require that disclosure regimes be the least restrictive means of achieving their ends, it does require that they be narrowly tailored to the government's asserted interest.").

63

"[a]n order granting a stay . . . is not a final adjudication of the merits of the appeal, and therefore it has no res judicata effect") (citation modified).

A leading treatise states the rule precisely: "Rulings—predictions—as to the likely outcome on the merits made for preliminary injunction purposes do not ordinarily establish the law of the case, whether the ruling is made by a trial court or by an appellate court." 18B Fed. Prac. & Proc. Juris. § 4478.5 (3d ed.). A decision from the Tenth Circuit illustrates the rule. In *Homans v. City of Albuquerque*, 366 F.3d 900 (10th Cir. 2004), the court rejected the argument that the district court "was bound by the motions-panel ruling" on a question of law. *Id.* at 904. The court first noted that "that a decision as to the likelihood of success is tentative in nature and not binding at a subsequent trial on the merits." *Id.* at 904–05 (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). Further, "if the district court were bound in the manner suggested, then the decision of the motions panel would also bind the appellate panel reviewing the merits. This is not the rule." *Id*. at 905; *see also Grote Indus., LLC v. Sebelius*, No. 4:12-CV-00134-SEB, 2013 WL 53736, at *1 (S.D. Ind. Jan. 3, 2013) ("[W]hile we are entirely respectful of the Seventh Circuit panel's opinion, we are not bound by it as a precedential ruling because the appellate ruling was not a plenary decision of the Court on the merits, but a grant of emergency relief, based on its preliminary determination.").

64

Second, the panel majority's opinion should carry little weight here because it contains obvious factual errors, which is unsurprising because a stay panel reviewing a preliminary injunction ruling often lacks "the benefit of a fully developed record" and must decide based "on briefing and argument abbreviated or eliminated by time considerations." *Sherley v. Sebelius*, 689 F.3d 776, 782 (D.C. Cir. 2012). For example, the panel majority erroneously believed that the Non-U.S. Citizen and Non-Resident Restrictions "apply only to individuals who physically possess more than 25 already-signed petition forms," and relied on that point when comparing H.B. 1205 to other states' restrictions. *Fla. Decides Healthcare Inc.*, 2025 WL 3738554, at *5. But that is simply wrong: the restrictions prevent non-U.S. citizens and non-residents from collecting *any* petitions. *See* Fla. Stat. § 100.371(4)(b)(2)–(3). Further, the panel majority wrote that this Court's injunction was issued "[o]n July 8, 2025—one day before H.B. 1205 was set to take effect," 2025 WL 3738554, at *2, although the challenged provisions actually went into effect on July 1, one week before the injunction was issued. *See* PI Order at 1 n.1. While the latter error may have had no effect on the panel's legal analysis, it demonstrates the rushed nature of the decision.

Third and most fundamentally, the panel opinion was based on a misunderstanding of the laws at issue in *Meyer* and *Buckley*. The panel read *Meyer* and *Buckley* to conclude that the Colorado laws in question prevented "conduct [that]

65

would 'in almost every case involve an *explanation* of the nature of the proposal and why its advocates support it.'" *Fla. Decides Healthcare*, 2025 WL 3738554, at *4 (quoting *Meyer*, 486 U.S. at 421) (emphasis added). The panel then distinguished H.B. 1205, concluding that it regulated "who can *collect* signatures or initiative petitions," but did not prevent "persuasive speech." *Id.* (emphasis added) (citation modified). The problem is that the Colorado laws in question did the same thing. They literally only prevented physical circulation of petitions. As this Court also recognized in its preliminary injunction opinion, PI Order at 19 n.17, the Supreme Court's descriptions of the laws, quoted by the panel, simply recognized the reality that restrictions on petition circulation would inevitably affect speech, just like the laws here.[18]

Close consideration makes this point plain. Start with the statutory text: the law in *Meyer* said nothing about whether sponsors could pay people to discuss the

---

[18] As the Court in *Meyer* explained, "[o]ur recognition that the solicitation of signatures for a petition involves protected speech follows from our recognition in [*Schaumberg*] that the solicitation of charitable contributions often involves speech protected by the First Amendment and that any attempt to regulate solicitation would necessarily infringe that speech." 486 U.S. at 422 n.5. In fact, in *Meyer*, Colorado specifically argued that petition circulation was not protected by the First Amendment because collecting and validating petition signatures is "obviously governmental in nature" and "[t]he fact that a person voluntarily links his conduct with a speech component does not transform the conduct into speech." Br. for Appellants at 12, *Meyer v. Grant*, 486 U.S. 414 (1988) (No. 87-920), 1987 WL 880992. The Court explicitly rejected this argument. 486 U.S. at 424.

merits of a petition; it banned payment for "'the *circulation of* an initiative or referendum petition.'" 486 U.S. at 416 n.1 (quoting Colo. Rev. Stat. § 1-40-110 (1980)) (emphasis added). Likewise, the statute in *Buckley* provided that "[n]o section of a petition for any initiative . . . shall be *circulated* by any person" who is not a registered voter. Colo. Rev. Stat. § 1-40-112(1) (1998) (emphasis added). And to "circulate" a petition is to distribute "the approved drafts of the petitions for signature," 486 U.S. at 417, and then to "collect the signatures." *Am. Const. L. Found., Inc. v. Meyer*, 120 F.3d 1092, 1096 (10th Cir. 1997).

The Supreme Court and other courts have reiterated this same understanding of the Colorado laws at issue in *Buckley* and *Meyer*. As the *Buckley* Court described it, the ban on paid petition circulation in *Meyer* regulated "hired signature collector[s]." 525 U.S. at 196 n.17. And in *Biddulph*, the Eleventh Circuit itself explained that in *Meyer*, "the Court determined that the *circulation* of initiative petitions *and the concomitant exchange* of political ideas constitutes 'core political speech.'" 89 F.3d at 1498 (emphases added); *see also Project Vote v. Kelly*, 805 F. Supp. 2d 152, 162, 164 (W.D. Pa. 2011) (explaining that statutes in *Meyer* and *Buckley* "did not specifically limit or restrain 'speech'" but were "burdensome to potential speakers"); *id.* at 162 (statute in *Meyer* prohibited payment "for a canvasser's act of circulating a petition").

67

Because the stay order is not binding and because *Meyer* and *Buckley* require it, this Court should apply strict scrutiny to the four provisions challenged here.

### b. If the Court Declines to Apply Strict Scrutiny to Any Challenged Provision, Intermediate Scrutiny Is Required

If the Court declines to apply strict scrutiny to any of the Challenged Provisions, intermediate scrutiny is still appropriate because each provision unequivocally burdens some protected speech. If strict scrutiny is not applied, the State still must establish that the law "furthers an important or substantial governmental interest" that "is unrelated to the suppression of free expression," and that the burden on First Amendment speech "is no greater than is essential to the furtherance" of the government's interest. *United States v. O'Brien*, 391 U.S. 367, 377 (1968). Indeed, even the stay panel assumed for purposes of its analysis that intermediate scrutiny should apply, which requires that a law be substantially related to a sufficiently important government interest. *See Fla. Decides Healthcare*, 2025 WL 3738554, at *6. And while the *Anderson-Burdick* balancing test is inappropriate here, it would require the Court to "weigh the character and magnitude of the asserted First and Fourteenth Amendment injury against the state's proffered justifications for the burdens imposed by the rule, taking into consideration the extent to which those justifications require the burden to plaintiffs' rights." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318 (11th Cir. 2019).

## 2.  The First Amendment Prohibits Overbroad Laws

The First Amendment prohibits government abridgement of freedom of speech through the enactment of substantially overbroad laws. *See Bd. of Airport Comm'rs of City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 577 (1987). "A regulation that covers substantially more speech than the First Amendment allows is overbroad and thus invalid." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1125 (11th Cir. 2022). Thus, in determining whether a law is overbroad and thus invalid, a court must assess the scope of protected speech restricted by the law in question. *See id.*

### iii.    Challenged Provisions

#### 1. Volunteer Registration Requirement (Including Personal Use Petition Restrictions)

The Registration Requirement violates the First Amendment. While any requirement that individuals pre-register before engaging in protected speech is suspect, H.B. 1205's version—which involves a test and a confusing and error-prone application process—is even more burdensome than those the Supreme Court has invalidated. Nor can Defendants demonstrate that the requirement is narrowly tailored to a compelling interest: a defense witness admitted that the requirement does not help detect fraud. Trial Tr. vol. 8, 2162:23–25 (Pratt) ("Q. And so is it your testimony, your understanding that that provision would help to catch fraudsters? A. It's my understanding that -- no, I guess, no."). And the facts show that the law is

69

much more burdensome than necessary to allow the State to investigate petition circulators.

### a. Factual Background

H.B. 1205 requires all people who want to circulate more than 25 petitions (other than those signed by themselves or their immediate family) to pre-register with the State. Fla. Stat. § 100.371(4)(a).

The Division of Elections has not adopted new rules concerning the registration process. Trial Tr. vol. 8, 2023:14–22 (Matthews). As of February 2026, the rules concerning registration posted on the Division's website are inaccurate and were promulgated in 2021. Trial Tr. vol. 8, 2023:19–2025:9 (Matthews). Those rules inaccurately provide that volunteer petition circulators are not required to register with the State. *Id.* at 2024:19–25.

There are multiple steps required in the registration process, all of which apply equally to volunteers and paid circulators. First, an applicant must complete an application on the Division of Elections website that includes their "name, permanent address, temporary address, if applicable, date of birth, Florida driver license or Florida identification card number, and the last four digits of his or her social security number," as well as "an address in [Florida] at which the applicant will accept service of process." Fla. Stat. § 100.371(4)(c)(2)–(3). If that form is

70

properly submitted, the applicant gains access to an online training with slides that may take almost an hour to complete. Trial Tr. vol. 4, 997:23–24 (Perez).

After the training, the applicant must take an online test that consists of 20 questions. The applicant must answer 80% of questions correctly to pass the test, although they may retake the test if they fail. Trial Tr. vol. 4, 998:5–7 (Perez). If the applicant passes the test, they learn their score, but do not learn which questions they missed. Trial Tr. vol. 4, 998:9–18 (Perez); Trial Tr. vol. 8, 2041:12–24 (Matthews). The test and training are not available in Spanish or any other language, but "the textual part is available so [an applicant] can use a translator widget to translate it into whatever language." Trial Tr. vol. 8, 2040:6–11 (Matthews). Director Matthews did not recall whether anything on the Division of Elections website explains how to perform that translation operation. Trial Tr. vol. 8, 2040:12–14 (Matthews).

Passing the test is not the final step in the registration process. If an applicant passes the test, they receive a "Registration Summary Form." Trial Tr. vol. 8, 2031:10–12 (Matthews); RTCW Ex. 196. That form includes the form's "Generated on" date, an applicant's full name, birth date, e-mail address, SSN, Florida Driver's License or ID number, permanent address, and service address, as well as instructions for reviewing the form and a place to sign and date it. RTCW Ex. 296. The applicant must review that form to check for inaccuracies. Trial

71

Tr. vol. 8, 2032:22–2033:1 (Matthews). If the applicant believes that the form is correct, they must print the form, then sign and date the form in ink. Trial Tr. vol. 8, 2033:2–6 (Matthews). After signing and dating the form, the applicant must scan or photograph the completed form, then upload it to the Division of Elections' online system. Trial Tr. vol. 8, 2033:7–12 (Matthews). After that upload occurs, the applicant will learn by email whether they have successfully registered as a petition circulator. Trial Tr. vol. 8, 2033:13–17 (Matthews).

Although Director Matthews testified that the Division has no internal rules concerning the registration process, evidence demonstrates that many specific (but publicly unspecified) requirements exist. Trial Tr. vol. 8, 2025:17–25 (Matthews). For one, applicants apparently must generate the Registration Summary Form, sign the form, and upload it back to the Division's computer system all on the same date (the "same-date rule"), although application of the rule appears inconsistent and Director Matthews was unable to explain it. Trial Tr. vol. 4, 1001:13–1002:4 (Perez); Trial Tr. vol. 8, 2037:19–2038:13 (Matthews); RTCW Exs. 223, 251, 271, 282, 295, 296, 299, 305. The rule is "an operation of the system." Trial Tr. vol. 8, 2039:1–3 (Matthews). Further, applicants may not use an e-signature rather than an ink signature, which would allow them to submit the form even if they lack access to a printer. Trial Tr. vol. 8, 2033:4–5 (Matthews). Moreover, the address an applicant lists on their application must *exactly* match the address on their driver's license; any

72

minor difference, such as the existence of a comma, will lead to rejection. *See, e.g.,* RTCW Ex. 183.

The Division has rejected many applications from people seeking to register since H.B. 1205 passed. Many of those rejections come in a generic form email that contains the words "Incorrect form uploaded." *See, e.g.*, RTCW Exs. 199, 200, 216, 217, 223, 231, 282. While Director Matthews "suspect[ed]" that such an email means that the applicant has sent the entirely wrong form to the Division, Trial Tr. vol. 8, 2027:7–14 (Matthews), evidence demonstrates that the Division sends the "Incorrect form uploaded" email when forms fail to meet the Division's unwritten rules, such as the same-date rule. Trial Tr. vol. 4, 1001:13–1002:4 (Perez); RTCW Exs. 76, 77, 299.

RTCW volunteer Thomas Perez was unable to register as a petition circulator prior to the July 4th holiday weekend because of the same-date rule. After going through all the various required steps, he submitted an application on July 1st or 2nd. Trial Tr. vol. 4, 997:12–14, 999:17–22 (Perez). He received a rejection email on July 2nd that read: "Incorrect form uploaded. Upload signed, up-to-date Registration Summary form to complete registration." RTCW Ex. 76. He was "perplex[ed]" by the email because it lacked any information on how to correct the error. Trial Tr. vol. 4, 999:23–1000:3 (Perez). He submitted a new application at least once, and that

73

application was also denied. *Id.* at 1000:1–3. He received a new rejection email on July 8th with exactly the same message. RTCW Ex. 77.

Mr. Perez tried to call the Division of Elections several times, but he was at first unable to speak to an employee. Trial Tr. vol. 4, 1000:4–14 (Perez). Eventually, after calling the Division again, a Division employee answered. While the employee was initially confused about the denial, they explained that he should re-submit the form and "scan it and send it on the same day that [he] signed it." Trial Tr. vol. 4, 1001:15–22 (Perez). After re-doing the process according to those instructions about the same-date rule, Mr. Perez's application was approved on July 9th. Trial Tr. vol. 4, 1006:23–25 (Perez).

Aside from the same-date rule, many applicants have been rejected because the residential address listed on their application does not exactly match how the address is written in the U.S. Postal Service database or on their driver's license. *See, e.g.*, RTCW Exs. 181, 183, 196, 204, 215, 239, 244, 292. For example, one applicant was rejected because they included a trailer number under "Unit Type" on the application, but their driver's license did not include the trailer number. RTCW Ex. 181. Applicants often emailed the Division expressing confusion about the rejections based on address matching. *See, e.g.*, RTCW Exs. 181, 183, 215.

According to Director Matthews, because rules such as the ones described above are not communicated to applicants during the application process, the best

74

way for applicants to learn specific rules is to contact the Division through a phone call or email. Trial Tr. vol. 8, 2027:7–10, 15–24 (Matthews). While the Division endeavors to answer questions within 24 to 48 hours, it does not always do so. Sometimes callers have trouble reaching a person in the Division's office. Trial Tr. vol. 4, 1000:4–14 (Perez). It sometimes takes a week to answer emailed questions, and sometimes questions to the Division go completely unanswered. Trial Tr. vol. 8, 2027:25–2029:12 (Matthews); Trial Tr. vol. 3, 686:5–10 (Martin) (question about registration exam never received response); RTCW Ex. 305 (seven-day delay before Division email response).

Further, Division staff does not work on weekends or holidays, so no processing of applications occurs other than on business days. Matthews Dep. at 142:6–21. Other delays are due in part to increased workload due to H.B. 1205's Registration Requirement. Trial Tr. vol. 8, 2028:2–3, 2029:17–24 (Matthews). However, issues with the registration process are not solely because of the new law's requirements—any registration process would present issues causing delays. Trial Tr. vol. 8, 2030:3–18 (Matthews); RTCW Ex. 140 (paid circulator applicant experiencing delay in registration and inability to start work prior to H.B. 1205). Often, applicants who do contact the Division do not understand the Division's response and need to ask follow-up questions. *See, e.g.*, RTCW Exs. 182, 206, 215, 223.

H.B. 1205's Registration Requirement has reduced the number of volunteers circulating petitions and thereby reduced the quantum of speech in support of RTCW's petition and lessened its likelihood of qualifying for the ballot. Trial Tr. vol. 3, 680:4–14 (Martin); PI Hr'g Tr. at 139:21–140:11 (Martin). Those who decided to register have had to complete a training, pass a test, then complete a multi-step process and wait for approval from the State, reducing their ability to circulate petitions. Even if the approval is not delayed by several days or more, the registration process prevents new volunteers from spontaneously circulating more than 25 petitions; that spontaneous circulation regularly happened before H.B. 1205 was enacted. *See* Trial Tr. vol. 4, 988:19–989:7 (Perez); Trial Tr. vol. 2, 401:9–402:12, 407:10–409:3 (Pereira Bonilla); PI Hr'g Tr. at 142:4–21 (Martin).

For others who face common roadblocks during the application process, registration may take much longer. Some applicants whose registration was delayed have missed opportunities to circulate petitions because of the delay. *See* RTCW Exs. 228–29, 233, 235, 239, 240, 260.

The Registration Requirement has prevented other volunteers from circulating more than 25 petitions because they are unwilling to register with the State. That unwillingness to register may be due to legitimate fears of harassment. Trial Tr. vol. 3, 774:23–778:4 (Haller); PI Hr'g Tr. at 137:9–138:18 (Martin); Trial Tr. vol. 4, 1035:20–1036:16 (Ciera Cox). Others are unwilling to register with the State out

76

of a desire for anonymity or a philosophical opposition to being required to register before engaging in speech. Trial Tr. vol. 6, 1663:7–9 (Scoon); Trial Tr. vol. 6, 1704:2–7 (Chandler); Trial Tr. vol. 6, 1547:24–1548:4 (Lowe-Minor).

No state other than Florida requires volunteers to pre-register before circulating petitions. Missouri is the only other state that requires volunteers to register at all, and Missouri only requires registration by the deadline for submitting petitions to the Secretary of State. Trial Tr. vol. 5, 1329:19–1330:9 (Dr. Smith); Mo. Rev. Stat. § 116.080(1). Missouri also does not require training or a test as part of its registration requirement. Trial Tr. vol. 5, 1328:14–25 (Dr. Smith).

These basic facts about the Registration Requirement cannot be seriously disputed by Defendants, who, along with the text of H.B. 1205, are themselves the source of most of the factual record. The only issue, therefore, is whether the Registration Requirement comports with the First Amendment. It does not.

### b. Strict or Exacting Scrutiny Applies to the Registration Requirement

#### 1. The Registration Requirement in H.B. 1205 Mirrors Those Pre-Registration Requirements Invalidated by the Supreme Court and the Eleventh Circuit

Case after case decided by the Supreme Court and this Circuit establish that states may not require individuals to pre-register or obtain a permit before engaging in protected speech unless such requirements satisfy strict or exacting scrutiny. Such

77

pre-registration requirements are prior restraints on speech and have been uniformly invalidated regardless of how difficult it is to pre-register or how quickly registration can be accomplished.

The pre-registration requirement in *Buckley* is most directly on point here. In *Buckley*, Colorado passed a law requiring petition circulators to register to vote before gathering signatures. *See* 525 U.S. at 194. The Court invalidated that requirement because it would "limit the number of voices who will convey the initiative proponents' message and, consequently, cut down the size of the audience proponents can reach." *Id.* at 194–95 (citation modified). In particular, the Court emphasized that "[t]he ease with which qualified voters may register to vote . . . does not lift the burden on speech *at petition circulation time.*" *Id.* at 195 (emphasis added). And separately, the Court concluded that "the ease of registration misses the point," because some individuals simply choose not to register, a permissible choice protected by the First Amendment. *Id.* at 196.

Although *Buckley* alone would be enough, the Court's more recent decision in *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton* confirms that pre-registration requirements must pass "First Amendment scrutiny" to survive. 536 U.S. 150, 168 (2002). There, a village in Ohio made it a misdemeanor to "engage in door-to-door advocacy without first registering with the mayor and receiving a permit." *Id.* at 153. The Court applied heightened scrutiny for several reasons, including that

78

"requiring a permit as a prior condition on the exercise of the right to speak imposes an objective burden on some speech of citizens," including "patriotic citizens, who have such firm convictions about their constitutional right to engage in uninhibited debate in the context of door-to-door advocacy, that they would prefer silence to speech licensed by a petty official." *Id.* at 167. Separately, the law banned "a significant amount of spontaneous speech": someone "who made a decision on a holiday or a weekend to take an active part in a political campaign could not begin to pass out handbills until after he or she obtained the required permit." *Id.* at 167; *see also Thomas v. Collins*, 323 U.S. 516, 539 (1945) ("As a matter of principle a requirement of registration in order to make a public speech would seem generally incompatible with an exercise of the rights of free speech and free assembly.").[19]

The Eleventh Circuit, unsurprisingly, has come to the same conclusions as the Supreme Court. In *United States v. Frandsen*, the Court invalidated a federal regulation requiring people "to obtain a permit before making 'public expressions of views' in national parks." 212 F.3d 1231, 1233 (11th Cir. 2000). Concluding that the

---

[19] While the *Watchtower* Court recognized that in some circumstances, the "special state interest in protecting the integrity of a ballot-initiative process" may justify restrictions that affect a speaker's *anonymity*, that dicta was both narrow in scope and limited to the Court's discussion of anonymous speech. 536 U.S. at 167. It has no effect on the holding with regard to pre-registration requirements, which are analyzed separately. *See id.* at 167 ("*Second*, requiring a permit as a prior condition on the exercise of the right to speak imposes an objective burden . . . .") (emphasis added).

law "clearly constitute[d] a prior restraint on expression," the Court applied "a strong presumption against [its] constitutionality." *Id.* at 1237. And although the regulation required the superintendents of national parks to issue permits "without unreasonable delay," the Court explained that it "'fail[ed] to put any real time limits on the decision maker.'" *Id.* at 1240 (citation modified) (quoting *Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F.3d 1358, 1363 (11th Cir. 1999)). Thus, a superintendent who disagreed with the speaker's message "could allow the permit request to sit on his desk for an indefinite period of time—resulting in speech being silenced by inaction." *Id.*

Relying on *Buckley* and other Supreme Court cases such as *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781 (1988), the court in *League of Women Voters v. Hargett* preliminarily enjoined pre-registration and training requirements for voter registration drives in Tennessee. 400 F. Supp. 3d 706 (M.D. Tenn. 2019). The court there explained:

> Requiring a group seeking to effect political change to be a captive audience for a government-sponsored message before it can engage in constitutionally protected activity would plausibly have a chilling effect, particularly given that the Coordinator of Elections appears to possess broad discretion over the content of the training, including the severity of any warnings about workers' legal exposure as well as simply the amount of time that the training will take.

*Id.* at 727; *see also id.* at 726 ("[I]t is not clear why it is necessary that the information be provided to the coordinator of elections before a drive, rather than afterwards, either as part of handing in forms or as a timely separate submission.").

The Registration Requirement here is constitutionally indistinguishable from the laws struck down in *Buckley*, *Watchtower Bible*, *Frandsen*, and *Hargett.* As in *Buckley* and *Watchtower*, the requirement requires registration even for those who object to doing so—a choice that the First Amendment protects. *Buckley*, 525 U.S. at 195; *Watchtower*, 536 U.S. at 167 (explaining that "requiring a permit . . . imposes an objective burden on some speech of citizens," including those who object to the requirement); *see also* Trial Tr. vol. 6, 1547:24–1548:4 (Lowe-Minor); Trial Tr. vol. 6, 1663:7–9 (Scoon); Trial Tr. vol. 6, 1704:2–7 (Chandler). Separately, the requirement unequivocally prevents spontaneous speech, just like the prior restraint in *Watchtower*. Here, just like in *Watchtower*, plaintiffs "who made a decision on a holiday or a weekend to take an active part in a political campaign could not begin to pass out handbills until after he or she obtained the required permit." 536 U.S. at 167; *see also* Trial Tr. vol. 4, 997:12–14, 999:17–22 (Perez) (registration delayed beyond July 4th long weekend); RTCW Exs. 228–29, 233, 235, 239, 240, 260. And finally, the law here "fails to put any real time limits on the decision maker," just like the law invalidated in *Frandsen*, such that registration may be delayed for untold periods of time. 212 F.3d at 1240 (citation modified); *see, e.g.*, RTCW Ex. 292

81

("This has been ongoing for the last 17 days."); RTCW Ex. 305 (seven-day delay before Division email response).

All of this case law makes clear that *Biddulph*, 89 F.3d 1491, is inapplicable to the Registration Requirement. Most obviously, *Biddulph* was decided before *Buckley*, and *Buckley*'s discussion of the voter-registration requirement is clearly controlling. *See* 525 U.S. at 194–95. And *Biddulph* had nothing to say about pre-registration requirements; as noted, it applied more relaxed scrutiny to a regulation about the title of a ballot initiative, not about speech related to circulation itself. On that point, the Supreme Court has spoken clearly.

These cases also establish that in the pre-registration context, heightened scrutiny applies regardless of how heavily the law burdens the plaintiff. *See Buckley*, 525 U.S. at 195. This is especially true if the law bans spontaneous speech. *See Watchtower Bible*, 536 U.S. at 168. But if it were necessary to establish a heavy burden, the evidence here shows more than enough.

Registration requires a lengthy process littered with minefields for applicants who may be rejected for any number of unwritten rules. Applicants must complete an initial online application and submit it to the Division. If that application is accepted, the applicant must complete a training that takes around an hour. Trial Tr. vol. 4, 997:23–24 (Perez). After the training, the applicant must take an online test that consists of 20 questions. The applicant must answer 80% of questions correctly

82

to pass the test. Trial Tr. vol. 4, 998:5–7 (Perez). The fact that an applicant must undergo training and take a test before being permitted to engage in protected First Amendment speech is certainly enough to demonstrate that H.B. 1205 creates an unconstitutional burden.

While all of the initial steps are more than the First Amendment allows, the registration process *after* passage of the test may create the biggest obstacles. Applicants must download a "Registration Summary Form" with their personal information pre-filled. Because the Division requires applicants to sign and date that form in ink, applicants must print the form before signing and dating it. If an applicant does not have a printer, they may not sign the form electronically; instead, the Director of Elections suggests that they print the form at a local library. Once the form is printed, signed, and dated, the applicant must find a way to scan the form to upload it back onto their computer; no exceptions are made for applicants without access to a scanner or smartphone that can scan the document. And finally, the applicant must upload the form back to the Division's website. Trial Tr. vol. 8, 2031:9–2033:17 (Matthews).

In the best case scenario, the Division may approve a registration application 24–48 hours after the Registration Summary Form is submitted. But there are myriad reasons approval takes much longer. First, Division employees work normal business hours, so an application submitted on a Friday evening would have no

chance of even being initially reviewed until the following Monday. Matthews Dep. at 142:6–21. The wait would be even longer over a holiday weekend. Moreover, the Division's review takes longer than 24–48 hours if its employees are busy with other matters—there is no internal or external deadline for approval. Trial Tr. vol. 8, 2027:25–2029:9 (Matthews). Many applicants waited much longer than 24–48 hours before they were approved. Trial Tr. vol. 4, 997:12–19 (Perez); RTCW Exs. 292, 305.

Even more problematic are the delays caused by the Division's arcane and detailed set of rules, which even Director Matthews does not understand. Trial Tr. vol. 8, 2037:19–2038:13 (Matthews). For example, under the same-date rule, applications will seemingly be rejected unless three separate dates on the Registration Summary Form match: (1) the date the form is generated; (2) the date it is signed; and (3) the date it is uploaded back to the Division's website. Trial Tr. vol. 4, 1001:13–1002:4 (Perez); RTCW Exs. 223, 251, 271, 282, 295, 296, 299, 305. Thus, if an applicant generated a Registration Summary Form one evening after passing the exam and then went to the library the following day to print the form, their application would be rejected. Director Matthews was not only unable to explain the contours of the same-date rule at trial, she could not explain what purpose it serves, simply stating that it was an "operation of the system." Trial Tr. vol. 8,

84

2039:1–3 (Matthews).[20] And while she testified that the Division does not have any internal or unwritten rules about the registration process, evidence shows that applications are frequently rejected based on the same-date rule, making registration all the more burdensome. *See, e.g.*, RTCW Exs. 223, 251, 271, 282, 295, 296, 299, 305.

The Division also frequently rejects applications if there is any miniscule variation between the home address listed on the application and the one listed on the applicant's driver's license. While there are too many examples to list here, one application was rejected because the street listed on the application was "48 Terrace," while the driver license address said "48th Ter." The rejection led to a string of emailed questions over several days. RTCW Ex. 183. Another application was rejected because the applicant listed their trailer number under "Unit Type" on the application, while their driver license did not include the trailer number. RTCW Ex. 181. Another applicant received a form email rejecting their application and directing them to "Use USPS Zip Code (online) Lookup to verify address or format," and responded "Address was verified by usps lookup. This has been ongoing for the last 17 days." RTCW Ex. 292; *See also, e.g.*, RTCW Exs. 196, 204, 215, 239, 244.

---

[20] Indeed, Director Matthews had previously testified that applicants were allowed to start an application, set it aside for several weeks, then complete it later. Matthews Dep. at 137:7–11.

Instead of publicizing these rules and others, Director Matthews expects registration applicants to call or email the Division of Elections if their application is rejected. Trial Tr. vol. 8, 2027:7–10, 15–24 (Matthews). Yet answers to those inquiries may be delayed based on the Division's workload, and sometimes Division employees are unavailable to answer questions over the phone; even simple emailed questions sometimes do not receive a response for a week, or at all. Trial Tr. vol. 8, 2027:25–2029:12 (Matthews); Trial Tr. vol. 3, 686:5–10 (Martin) (question about registration exam never received response); Trial Tr. vol. 4, 1000:4–14 (Perez) (initially unable to speak to Division employee). Moreover, directions from the Division are often cryptic or confusing, leading to further delay. One email that rejected applicants often receive states that the applicant has uploaded the "incorrect form," even when they have uploaded the *correct* form with an apparent error on it. Trial Tr. vol. 4, 999:23–1000:3; 1001:13–19 (Perez) (email with "incorrect form uploaded" was "perplexing," and form was actually rejected because of same-date rule). When asked to review such a rejection email, Director Matthews could not discern the problem with the application and incorrectly "suspect[ed]" that the applicant had submitted the wrong form. Trial Tr. vol. 8, 2027:7–14 (Matthews).

Both the volume and content of the evidence establish the extraordinary First Amendment burden created by the Registration Requirement.

86

### 2. The Registration Requirement Is Subject to Strict Scrutiny Because It Prohibits Anonymous Speech

The Registration Requirement must be subjected to heightened scrutiny for a second reason: it prohibits anonymous speech protected by the First Amendment. It does so in two ways: (1) by triggering the Affidavit Requirement; and (2) because once a circulator is registered, the fact of their registration and their personal information becomes a public record. *See Constitutional Amendments/Initiatives*, Florida Division of Elections, https://perma.cc/P6HY-NWR4 (archived June 2, 2025) ("Information submitted to register as a petition circulator becomes public record, subject to any applicable exemptions . . . .").

*Buckley* is again on point. Separate from the voter registration and badge requirements, Colorado had enacted disclosure provisions requiring initiative sponsors to file reports with certain information about circulators and the payment they received. *See Buckley*, 525 U.S. at 201. The Tenth Circuit had invalidated the part of the disclosure requirement that "compel[led] disclosure of information specific to each paid circulator, in particular, *the circulators' names and addresses* and the total amount paid to each circulator." *Id.* The Court applied exacting scrutiny and affirmed, explaining that the requirement "forc[ed] paid circulators to surrender the anonymity enjoyed by their volunteer counterparts" and was "no more than

87

tenuously related to the substantial interests disclosure serves." *Id*. at 204 (citation modified); *see also McIntyre*, 514 U.S. at 347, 357.[21]

Here, the compelled disclosure of *all* circulators' names and addresses merits the same level of review as the analogous provision invalidated in *Buckley*.

### c. The Registration Requirement Fails Any Appropriate Level of Scrutiny and Is Overbroad

The Registration Requirement fails heightened scrutiny under controlling cases such as *Buckley*, *Watchtower Bible*, and *Frandsen*: the law is not narrowly tailored to a compelling State interest, and it would fail even if a lesser standard were applied.

Most importantly, Defendants have failed to proffer even a legitimate State interest served by the Registration Requirement. OECS Director Jillian Pratt testified that the Registration Requirement would *not* "help to catch fraudsters." Trial Tr. vol. 8, 2162:23–25 (Pratt). That conclusion makes sense: any person who wants to commit fraud could easily use the Personal Use Petition form that does not require the circulator to provide any identifying information. Trial Tr. vol. 8, 2162:12–14 (Pratt). And although Defendants will undoubtedly invoke the specter of fraud in briefing, no argument can alter that unvarnished testimony from their own principal witness.

---

[21] None of the analysis in *John Doe No. 1 v. Reed*, 561 U.S. 186 (2010), changes this conclusion, as discussed in more detail *infra* Sections IV.A.iii.b.–c.

Defendants' scattershot attempts to demonstrate the existence of volunteer fraud were utterly unsuccessful. Director Pratt testified that she "knew" volunteers were engaged in fraud because her office had received petitions on volunteer forms that were allegedly signed by deceased people. Trial Tr. vol. 8, 2120:3–11 (Pratt). However, these instances were not included in the OECS report because the report only "highlight[s] some of the main problems" the office had seen. Trial Tr. vol. 8, 2119:21–25 (Pratt). And more importantly, Director Pratt admitted that although they believed fraud had been committed using volunteer forms, her office was unaware of whether the "bad actor" was in fact a volunteer. Trial Tr. vol. 8, 2121:21–2122:20, 2160:2–22 (Pratt).

Similarly, Jonathan Bridges "ha[d] trouble remembering exactly" what kind of complaints he had seen "about volunteer circulators," but said that investigation was difficult because "there was nothing on the petition that showed who the volunteer was." Trial Tr. vol. 7, 1886:2–14 (Bridges). On cross-examination and at his deposition, Mr. Bridges confirmed that the only investigation into "volunteer circulators" in fact involved an instance in which a Supervisor of Elections received duplicate petitions, likely because a voter had received a pre-filled petition in the mail after already submitting a petition. Trial Tr. vol. 7, 1892:4–1893:8 (Bridges); *see also* Bridges Dep. at 256:11–15, 258:1–4 (testifying that same example involving duplicate petitions was office's only investigation involving volunteer).

89

By contrast, there was no concrete evidence that volunteer circulators attempt to engage in fraud; any attempt to introduce such evidence at trial, after testifying to the opposite in his deposition, should be rejected.

The inquiry should stop there. Having failed to identify a plausible State interest supporting the Registration Requirement, Defendants cannot salvage it. Yet even if the Court were to overlook Director Pratt's testimony and assess whether the Requirement is tailored to preventing fraud, Defendants would fail. It is plausible that *some* requirement that petition circulators identify themselves to the State could conceivably help fraud investigations, by providing the State with information about a circulator. But H.B. 1205's Registration Requirement is vastly broader than necessary to achieve that goal, for several reasons.

First and most obviously, the State need not require volunteer circulators to register and add their personal information to a petition form *before* circulating petitions. A requirement that petition circulators add some kind of identifying information to forms before submitting them to the State would serve the State's purported goal of assisting with fraud investigations while significantly reducing the burden on protected speech. The *Hargett* court made exactly this point about a similar requirement involving voter registration drives. 400 F. Supp. 3d at 726 ("[I]t is not clear why it is necessary that the information be provided to the coordinator of elections before a drive, rather than afterwards, either as part of handing in forms

90

or as a timely separate submission."). Indeed, Florida does have such a requirement applying to voter registration applications submitted by volunteers. *See* Fla. Admin. Code 1S-2.042(5)(c) (requiring third party voter registration organizations to include organization's identification number and registration agent's initials on forms before submission). And here the State has made no assertion that that such a narrower requirement is insufficient—indeed, its evidence supports this understanding. Trial Tr. vol. 7, 1888:14–20 (Bridges) (testifying that information about volunteer circulators will provide "more data points"), 1893:9–1894:8 (testifying that investigators can identify a person using their petition circulator number); Trial Tr. vol. 8, 2122:13–20 (Pratt).[22]

Further, the existence of Personal Use Petitions renders the Registration Requirement nonsensical. Any volunteer who wanted to avoid registering and wanted to submit fraudulent petitions could simply print unlimited Personal Use Petitions, which require no personal identifying information. *See* Trial Tr. vol. 8, 2162:6–2164:3 (Pratt). That volunteer, who is already willing to commit numerous

---

[22] Moreover, Missouri, the one other state with *any* kind of registration requirement for petition circulators only requires registration "on or before 5:00 p.m. on the final day for filing petitions with the secretary of state." Mo. Rev. Stat. § 116.080(1).

91

felonies by submitting fraudulent petitions, would certainly not be deterred from doing so by the Registration Requirement.[23]

The fact that there is a required training and test as part of the Registration Requirement adds to Defendants' narrow tailoring problem. While they have at times argued that training is necessary to inform potential circulators about the law, they have never attempted to show that a *test*—which is simply unheard of in the First Amendment context—is necessary to reduce fraud. Indeed, the Division of Elections seems to have created the training and the test and required applicants to pass with an 80% score without any consideration of the necessity or burden such a requirement would create. *See Hargett*, 400 F. Supp. 3d at 726–27 ("[T]he current record reflects no sufficient basis for requiring that registration workers and volunteers receive mandatory government training prior to assisting with voter registration."). The test does not even fulfill the Division's own stated goals. While Director Matthews testified that the purpose of the training and accompanying test

---

[23] Any assertion that the Registration Requirement is appropriately tailored because it allows circulators to circulate 25 petitions before registering must fail. A limitation on the *amount* of speech is not an acceptable form of tailoring; and regardless, the 25-petition cap severely limits most volunteers, who seek to spread their message to hundreds or thousands of people. *See, e.g.*, Trial Tr. vol. 2, 402:16–18 (Pereira Bonilla); Trial Tr. vol. 3, 766:11–16 (Haller); Trial Tr. vol. 4, 1030:8–17 (Ciera Cox); Trial Tr. vol. 4, 1004:4–10 (Perez). And given the number of signatures that sponsors must gather in Florida, none could rely solely on volunteers who collect 25 petitions or fewer. *See* Trial Tr. vol. 3, 709:25–710:8 (Martin).

is to ensure that circulators "have a full understanding of their role as a petition circulator" as well as "the penalties associated with not following the law," she also conceded that an applicant who passes the test but does not get every question correct has no way of understanding which questions they got wrong, including whether they have misinterpreted a criminal penalty. Trial Tr. vol. 8, 2040:15–2041:24 (Matthews). This is further evidence that the Registration Requirement is not appropriately tailored and is instead merely an obstacle to speech.

Defendants have likewise failed to show that the public disclosure component of the Registration Requirement—making all petition circulators' personal information available to the public—is tailored to any State interest. Any purported need to track circulators' information for investigatory purposes could be accomplished by maintaining a *non-public* list of circulators; Defendants have made no attempt to demonstrate otherwise. *See Buckley*, 525 U.S. at 204 (invalidating analogous disclosure provisions after applying exacting scrutiny).

All this demonstrates that the Registration Requirement must be invalidated under any form of heightened scrutiny, regardless of the burden it creates. Yet the evidence unequivocally shows that the law creates an overwhelming burden on RTCW and its members, further demonstrating that the law as applied here is not narrowly tailored to achieve its aims. Indeed, the evidence shows that Defendants have erected a labyrinthine process guaranteed to deter and delay registration: as

93

recounted above, applicants must not only undergo training and pass a test, they must perfectly complete the multiple steps of the application process that includes printing a form, signing it in ink, and scanning the completed form. Myriad unwritten rules, such as the same-date rule, may prevent completion of the process, and there is no guarantee that the Division of Elections will quickly answer questions or explain applicants' errors.

Thus, beyond any doubt, the Registration Requirement is not tailored to reducing fraud or achieving any other State goal—it exists as an obstacle to petition circulation. Likewise, it demonstrates that the requirement is overbroad: it "covers substantially more speech than the First Amendment allows" and is "thus invalid." *Speech First, Inc.*, 32 F.4th at 1125.

That heavy burden also demonstrates why intermediate scrutiny is inappropriate here: the restriction on First Amendment freedoms is far more than "incidental." *O'Brien*, 391 U.S. at 377. Yet even if some version of intermediate scrutiny were applicable, the result would be the same. As discussed, Defendants have not put forth even an "important" State interest in the Registration Requirement, *id.* at 376, disclaiming any intent to police fraud. Trial Tr. vol. 8, 2162:23–25 (Pratt). And even assuming that such an interest were present, the Registration Requirement is not tailored to meet that interest for the reasons described above: it requires pre-

94

registration rather than requiring circulators or sponsor groups to provide identifying information on submitted petitions.

And although the *Anderson-Burdick* balancing test is inappropriate here, the Registration Requirement would fail it for the reasons already discussed. The "magnitude" of RTCW's burden is extremely high, as explained herein. *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318 (11th Cir. 2019). Defendants have admitted that the requirement does not serve to prevent fraud. And if it did, that interest would not justify the burden—Defendants could construct a much less burdensome registration process that would still identify petition circulators on submitted petitions.

### 2. Affidavit Requirement

### a. Factual Background

As explained in detail *supra* Section III.B.ii., the Affidavit Requirement prevents anonymous speech by requiring registered circulators to circulate individualized petition forms pre-printed by the Department of State with the circulator's full name and permanent address. As such, only the legal question of the Affidavit Requirement's constitutionality remains. The Affidavit Requirement is akin to the requirement invalidated in *Buckley* that petition circulators wear name badges while soliciting signatures, and it is unconstitutional for much the same reasons.

95

### b. Strict or Exacting Scrutiny Applies to the Affidavit Requirement

As described in detail *supra* Section III.B.ii., a "ban on anonymous speech violate[s] the First Amendment." *Buckley*, 525 U.S. at 199 (citing *McIntyre*, 514 U.S. at 347, 357). Like the badge requirement in *Buckley*, the Affidavit Requirement "compels personal name identification at the precise moment when the circulator's interest in anonymity is greatest" and therefore "does not qualify for inclusion among the more limited election process identification requirements'" for which the Court had left room. *Buckley*, 525 U.S. at 199 (citation modified). [24] *Buckley* affirmed that requirements, including a name badge requirement, that "significantly inhibit communication with voters about proposed political change, and are not warranted by the state interests . . . alleged to justify those restrictions" violate the First Amendment. *Buckley*, 525 U.S. 182, 192; *see also Watchtower Bible*, 536 U.S. at 167 (reaffirming that "the fact that circulators revealed their physical identities did not foreclose our consideration of the circulators' interest in maintaining their anonymity"). Such restrictions "must be narrowly tailored to serve a compelling state interest." *Buckley*, 525 U.S. at 192 n.12 (citation modified).

---

[24] *See Watchtower Bible*, 536 U.S. at 167 (suggesting without deciding that the "special state interest in protecting the integrity of a ballot-initiative process" "may well" justify certain disclosure regimes, but emphasizing that "petition circulators seeking signatures in face-to-face interactions," as the petition circulators in *Buckley*, maintained their interest in anonymity).

Like the name badge in *Buckley*, the Affidavit Requirement imposes a severe restraint on speech. In *Buckley*, the Court relied on evidence that the badge requirement "limited the number of people willing" to circulate petitions, that circulators feared retaliation because of the name badge, and that "potential circulators were not willing to wear personal identification badges." *Buckley*, 525 U.S. at 197–98. The evidence put forward at trial demonstrates that the Affidavit Requirement similarly reduces the number of people willing to circulate petitions. *See supra* Section III.B.ii. Indeed, the evidence here suggests even more serious reluctance from RTCW volunteers, including from volunteers with whose home addresses are protected from public disclosure but who would be forced to reveal those addresses to circulate petitions. *See supra* Section III.B.ii.

In *McIntyre*, the Supreme Court held that a ban on anonymous leafletting violated the First Amendment. 514 U.S. 334 (1995). In *Biddulph*, the Eleventh Circuit referenced the Supreme Court's holding in *McIntyre* as an example of the Court applying strict scrutiny to a statute that "impermissibly burdened speech about changes at issue in referendum elections." 89 F.3d at 1500 n.9. And in *Buckley*, the Court recognized that the name badge requirement imposed an even "more severe" restraint on speech than the ban in *McIntyre* because "[p]etition circulation is the less fleeting encounter, for the circulator must endeavor to persuade electors to sign the petition." 525 U.S. at 199. So too here. RTCW volunteers engage in

97

conversations with prospective signatories that "involve[] both the expression of a desire for political change and a discussion of the merits of the proposed change," *id. See, e.g.*, PI Hr'g Tr. at 129:22–130:6 (Martin); Trial Tr. vol. 2, 401:11–16, 405:8–406:5, 410:18–411:14, 413:18–415:16, 418:11–419:19, 431:25–432:5 (Pereira Bonilla); Trial Tr. vol. 3, 666:17–667:12, 671:9–672:11, 672:22–673:4 (Martin); Trial Tr. vol. 3, 766:24–770:8, 782:7–11 (Haller); Trial Tr. vol. 4, 989:8–990:19 (Perez); Trial Tr. vol. 4, 1031:17–1033:3 (Ciera Cox).

And H.B. 1205's Affidavit Requirement is an even more intrusive violation of the First Amendment than both *Buckley*'s name badge and *McIntyre*'s ban on anonymous leafletting because it requires not only the petition circulator's full name, but their permanent home address to be displayed on each and every petition form that they circulate. Under H.B. 1205, petition circulators cannot solicit signatures without revealing this information to signatories at the exact moment when their "interest in anonymity is greatest." *Buckley*, 525 U.S. at 199.[25]

Volunteers use petition forms to initiate conversation with strangers, often distributing the form at the beginning of a conversation or throughout the process of convincing the voter to sign the petition. For instance, RTCW volunteer Cynthia

---

[25] For the reasons described *supra* Section IV.A.iii.1.b.2., the Affidavit Requirement also implicates broader anonymity concerns because it makes the circulator's name and home address on each petition a public record after submission to the Supervisor of Elections.

Haller testified that she "used the petition as a way to initiate conversation with voters." Trial Tr. vol. 3, 770:19–771:3 (Haller). *See also supra* Section III.B.ii. To accomplish their mission, RTCW volunteers engage with all voters, including those who are not outwardly receptive to their message. *Supra* Section III.B.ii. Petition circulation involves convincing voters who are initially resistant to sign a petition. *Supra* Section III.B.ii. Moreover, petition circulation often involves sitting at a table, where petitions typically sit out in public view. Trial Tr. vol. 4, 1029:8–13, 1030:20–1031:16 (Ciera Cox), *see also* Trial Tr. vol. 7, 1768:7–25 (González Herrera); Trial Tr. vol. 7, 1783:3–7 (Newlon). The typical process of petition circulation involves interacting with voters who take the petition to review during the course of a conversation, prior to agreeing to sign. Trial Tr. vol. 3, 789:19–790:5 (Haller).

The evidence therefore proves that any attempt by Defendants to distinguish the Affidavit Requirement and the *Buckley* name badge fails. Petition circulators indisputably must share their name and address with anyone who sees their petition form. This by necessity includes individuals who are disinclined to the cause as political speech, including petition circulation, inherently involves persuasion. *Buckley*, 525 U.S. at 199.

And even if petition circulators could realistically discern which strangers on the street could be trusted with their name and address (which is impractical for the reasons discussed *supra* Section III.B.ii., this would still result in an impermissible

burden on speech. *McIntyre* is instructive on this point. There, the Supreme Court invalidated a ban on passing out anonymous leaflets. Like leaflets, petition forms are not physical badges that one wears on their clothes, but the Supreme Court nonetheless held that requiring name identification on a leaflet advocating a political issue violated the First Amendment's right to anonymous speech. *McIntyre*, 514 U.S. 334. And as *Buckley* recognized, this harm is *heightened* in the context of petition circulation, which is "the less fleeting encounter." *Buckley*, 525 U.S. at 199. The *McIntyre* Court did not hold that it was permissible to require leafleteers to identify themselves by name because the author could simply choose to only hand leaflets to those who agreed with them; that is not how the First Amendment operates. The same holds true here.[26]

It is worth emphasizing that the Supreme Court's ruling in *John Doe No. 1 v. Reed*, 561 U.S. 186 (2010) does not modify this analysis. First, and importantly with respect to H.B. 1205's Affidavit Requirement, the challenge in *Reed* concerned post-signature disclosure of petition forms pursuant to a public records request. *Reed*, 561 U.S. at 191. As *Buckley* recognizes, this involves distinct considerations from

---

[26] Any suggestion by Defendants that permitting the circulation of a very limited number of Personal Use petitions that do not include a Petition Circulator's Affidavit mitigates the burden on the First Amendment is flatly wrong. *See supra* note 23.

disclosure at the time of speech, when "the circulator's interest in anonymity is greatest." *Buckley*, 525 U.S. at 199.

Second, even if *Reed* were applicable, the disclosure in *Reed* concerned petition *signatories* rather than petition *circulators*. Thus, the burden created by the disclosure differs from those at issue in *Buckley* (and here). *See Buckley*, 525 U.S. at 197–201. Indeed, in another case concerning public record disclosure requirements, the court explained that the State's reliance on *Reed* was misplaced, in part because "a signatory plays a far different role from that of a petition circulator," including, among other things, that the signatory "does not engage in communication with other voters" and is "vested with the power implicated by the initiative process." *Dakotans for Health*, 543 F. Supp. 3d at 787–88, *aff'd*, 52 F.4th 381 (8th Cir. 2022). Finally, unlike in *Reed*, this Court has before it specific evidence and argument that the disclosure of circulator information in general, not merely tied to a particular petition, will burden and has already burdened Plaintiffs. *C.f. Reed*, 561 U.S. at 200–01.

### c. The Affidavit Requirement Fails Any Appropriate Level of Scrutiny and Is Overbroad

The burden the Affidavit Requirement imposes on First Amendment rights is not narrowly tailored to a compelling State interest, and it would fail even if a lesser standard were applied. The only interests Defendants can arguably articulate in support of the Affidavit Requirement are in learning who circulated a particular petition and in ensuring that the circulator signs an oath attesting that the petition

101

was completed and signed by the voter in the presence of the circulator.[27] But there are myriad other ways to accomplish these goals without sacrificing the anonymity of the petition circulator.

Any interest possibly served by the Affidavit Requirement is not served by having the circulator's name and address *pre-filled* on the petition form that is distributed at the time of speech. Defendants have put forward no evidence, and have not even argued, that any State or county official has any use for the information on the Affidavit until after it is signed by a voter and submitted. Pratt Dep. at 157:19–160:12; Matthews Dep. at 184:19–185:4. This makes sense, because neither election officials nor law enforcement officials could come into possession of petition circulator forms until after they are signed by a voter and submitted to a Supervisor. As in *Buckley*, any State interest in a circulator's personal information would be served by a post-circulation disclosure requirement "that is separated from the moment the circulator speaks." *Buckley*, 525 U.S. at 198.

Another federal district court recently came to the same conclusion:

---

[27] To the extent that Defendants belatedly assert an interest in ensuring that that voter is aware of the identity of the individual who circulated the petition that they signed, this argument also fails. *See (WIN) Wash. Initiatives Now v. Rippie*, 213 F.3d 1132, 1139 (9th Cir. 2000) ("Although Washington has expressed its interest in full disclosure as a means to educate voters and promote confidence in government . . . there is no logical explanation of how a voter who signs an initiative petition would be educated in any meaningful way by learning the circulator's name or address . . . nor how that disclosure would assist a voter in judging the credibility of individual petition circulators. . . .") (citations omitted).

> [E]ven if one assumes that it is necessary for the operator of a voter registration drive to provide certain information to the state, it is not clear why it is necessary that the information be provided to the coordinator of elections before a drive, rather than afterwards, either as part of handing in forms or as a timely separate submission.

*Hargett*, 400 F. Supp. 3d at 725–26. As noted above, Florida already requires third-party voter registration organizations who collect voter registration applications to provide identifying information in this manner. Fla. Admin. Code 1S-2.042(5)(c) (requiring third party voter registration groups to include only the group's assigned identification number and the registration agent's initials on voter registration applications *after* voter completes the application and before the application is submitted to Supervisor or Division of Elections).[28]

As discussed *supra* Section IV.A.iii.2.b., *John Doe No. 1 v. Reed*, 561 U.S. 186 (2010) is readily distinguishable from the instant case. The State's interest in the disclosure of petition signatories (as in *Reed*) differs dramatically from the interest

---

[28] While post-signature self-identification is a more appropriately tailored intervention that would accomplish the State's purported objectives, registered petition circulators are also assigned a circulator number that is also printed on the top of the circulator form. FDH Ex. 166, Fla. Stat. § 100.371(d)(1); RTCW Ex. 75. The inclusion of that identifying information further demonstrates that there is no legitimate reason to require a circulator's name and address on the form. Neither OECS nor any other agency needs any information other than the circulator number or barcode to "see who the circulator is" and initiate an investigation. Pratt Dep. at 158:14–16; Matthews Dep. at 183:9–21; Trial Tr. vol. 7, 1893:9–1894:8 (Bridges) (access to circulator number provides Attorney General with personal information circulator used to register, including name and address).

103

in the disclosure of petition circulators (as in *Buckley*, and here). *See Buckley*, 525 U.S. at 197–201. In *Reed*, the Court found that disclosure served certain interests not at issue here, including identifying "inadequacies of the verification and canvassing process" where only a small percentage of signatures are checked, and generally ensuring that only valid signatures are counted. *Reed*, 561 U.S. at 198–99. Unlike in the instant case, these interests pertain to the disclosure of signatories, not circulators, and apply to a state with a different verification scheme than that of Florida. As the court explained in *Dakotans for Health*, "the State's interest in disclosing names of signatories (voters) is stronger than its interest in disclosing the identity (and other personal information) of ordinary petition circulators who are mere advocates for signing a petition." 543 F. Supp. 3d at 788. And again, *Reed* concerned the post-signature disclosure of petition forms through the public records process. 561 U.S. at 191. *Reed* thus does not support a finding that a State interest in disclosure is narrowly tailored when it requires the disclosure of the names and addresses of petition circulators at any time, let alone at the time of speech. *See Buckley*, 525 U.S. at 199.

Because it prevents anonymous speech and, like the name badge in *Buckley*, "discourages participation in the petition circulation process by forcing name identification without sufficient cause," the Affidavit Requirement fails to satisfy exacting scrutiny. *Buckley*, 525 U.S. at 199–200.

104

While the Affidavit Requirement is plainly subject to and fails strict scrutiny under Supreme Court precedent, it also fails to satisfy intermediate scrutiny because it does not "further[] an important or substantial governmental interest" that "is unrelated to the suppression of free expression." *United States v. O'Brien*, 391 U.S. 367, 377 (1968). As discussed above, the Affidavit Requirement imposes a direct burden on speech, not one that is merely "incidental." *Id.* And it is not the case that the burden on First Amendment speech "is no greater than is essential to the furtherance" of the government's interest. *Id.* Defendants have not and cannot put forward any justification for requiring Plaintiffs to sacrifice their anonymity at the time of speech when they themselves have no use for, or even a means to use, the information contained on the Petition Circulator's Affidavit until after it is submitted to a Supervisor of Elections.

And although the *Anderson-Burdick* balancing test is not appropriate here, the Affidavit Requirement would fail it. The Affidavit has unquestionably burdened the First Amendment rights of volunteer circulators. If this burden on core political speech is not severe such that strict scrutiny applies, it is at least very significant. On the other side of the ledger, Defendants have not put forward any serious justification for the Affidavit Requirement. While deterring and detecting fraud in the ballot initiative process is certainly a worthy goal, the Court must consider "'the extent to which those interests make it *necessary* to burden' voting rights." *Democratic Exec.*

105

*Comm. of Fla.*, 915 F.3d at 1322 (emphasis in original) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). Where Defendants cannot show that the *pre-circulation* identification of the full name and home address of petition circulators on the petition form facilitates fraud prevention, and a cure to the burden imposed on Plaintiffs' rights would serve the same purpose, they come out on the losing side of *Anderson-Burdick. See Democratic Exec. Comm. of Fla.*, 915 F.3d at 1322–26. These unjustified burdens also demonstrate that the requirement is overbroad: it "covers substantially more speech than the First Amendment allows" and is "thus invalid." *Speech First, Inc.*, 32 F.4th at 1125.

### 3.  Petition Circulator Restrictions

#### a.  Factual Background

As explained in *supra* Section III.B.iii., the Petition Circulator Restrictions limit RTCW's speech because the Restrictions prohibit non-U.S. citizens and non-residents from circulating any petitions. This prohibition limits thus the number of volunteers available to circulate petitions and advance RTCW's mission.

#### b.  Strict Scrutiny Applies to the Petition Circulator Restrictions

The Petition Circulator Restrictions limit core political speech by entirely prohibiting non-residents and non-U.S. citizens from circulating petitions. Fla. Stat. § 100.371(4)(b)(2). As a result of the Petition Circulator Restrictions, RTCW volunteer Ramón Pereira Bonilla and RTCW Campaign Coordinator Melissa Martin

106

are directly prohibited from circulating petitions in support of Right to Clean Water. *Supra* Section III.B.ii. This categorical prohibition necessarily limits RTCW's and its volunteers' core political speech, warranting strict scrutiny. *Buckley*, 525 U.S. at 194; *supra* Section IV.A.ii.; *see also* PI Order at 19–21. As RTCW demonstrated at trial, these restrictions on who may circulate petitions severely burden its speech by inhibiting RTCW's "communication with voters about proposed political change." *Buckley*, 525 U.S. at 192; Trial Tr. vol. 3, 725:14–727:25 (Martin); Trial Tr. vol. 2, 413:14–420:10 (Pereira Bonilla).

In *Buckley*, the Supreme Court invalidated a requirement that circulators be registered voters because it "limit[ed] the number of persons available to circulate and sign [initiative] petitions and, accordingly, restrict[ed] core political speech." 525 U.S. at 194. In reaching its decision, the Supreme Court relied on evidence which demonstrated that the requirement "cut[] down the number of message carriers in the ballot-access arena without impelling cause." *Id.* at 197. Like the registered voter requirement in *Buckley*, the Petition Circulator Restrictions fully exclude entire classes of individuals—non-residents and non-U.S. citizens—from engaging in petition circulation, including circulating Personal Use Petitions.[29] And,

---

[29] As noted in Section IV.A.ii., in its stay order, the majority panel erroneously stated that H.B. 1205 "does not bar noncitizens or nonresidents from distributing petition forms to Florida voters" because its provisions "apply only to individuals who physically possess more than 25 already-signed petition forms." *See Fla. Decides*

like the plaintiffs in *Buckley*, Plaintiffs here presented ample evidence at trial such that it is "scarcely debatable" that the Petition Circulator Restrictions restrict sponsors' core political speech and limit the number of people available to circulate petitions. *See* Trial Tr. vol. 3, 725:20–24, 726:22–24 (Martin); Trial Tr. vol. 2, 412:4–413:13 (Pereira Bonilla); Trial Tr. vol. 7, 1767:14–1768:6, 1770:1–1772:15 (González Herrera); Trial Tr. vol. 6, 1495:19-1496:13, 1498:22-1503:16 (Poff); Trial Tr. vol. 5, 1448:13–1452:10 (Proaño); Trial Tr. vol. 4, 1108:23–1110:23 (Meghan Cox); Trial Tr. vol. 6, 1570:17–1571:12 (Lowe-Minor) (collectively, describing the experience of non-residents and non-U.S. citizens who want to circulate RTCW petitions but are prohibited). As such, the strict or exacting scrutiny standard from *Meyer* and *Buckley* applies to the Petition Circulator Restrictions.

The Eleventh Circuit stay panel's analysis of the Restrictions under a lower standard of scrutiny should not change that conclusion. Even if this Court were bound to follow the stay order's legal reasoning—which it is not—the Eleventh Circuit's analysis of the Petition Circulator Restrictions was based on an incorrect understanding of their scope and function. *Supra* Section IV.A.ii. For the foregoing

---

*Healthcare Inc.*, 2025 WL 3738554, at *4–5, *11–12. This is incorrect; H.B. 1205 categorically bars non-residents and non-U.S. citizens from collecting any petitions, with no exception for Personal Use Petitions. Fla. Stat. § 100.371(4)(a). And regardless, even such an allowance for a limited amount of speech does not withstand scrutiny. *See supra* note 23.

reasons, in addition to not being bound by the stay panel's decision, this Court should evaluate the Petition Circulator Restrictions under the strict scrutiny standard.

### c. The Petition Circulator Restrictions Fail Any Appropriate Level of Scrutiny and Are Overbroad

The Petition Circulator Restrictions do not survive strict scrutiny because they "significantly inhibit communication with voters about proposed political change" without sufficient justification. *See Buckley*, 525 U.S. at 192.

This severe burden on the First Amendment is not justified by any compelling State interest. The best Defendants can do is gesture broadly toward fraud and the integrity of the ballot initiative process, but they put forth no convincing evidence that the Petition Circulator Restrictions actually serve those interests. The Supreme Court has recognized that "the risk of fraud or corruption, or the appearance thereof" is relatively "remote at the petition stage of an initiative," *Meyer*, 486 U.S. at 427, and the State has volunteered no real evidence of fraud occurring in the ballot initiative process emanating specifically from non-Florida residents or non-U.S. citizens, and no other valid interest that the Restrictions serve.

To level set, even a scratch beneath the surface of Defendants' examples of "non-resident fraud" reveal that they are not examples of non-resident fraud at all. A closer review of the testimony of Jonathan Bridges, chief assistant statewide prosecutor and the 30(b)(6) representative of the Office of the Attorney General,

109

makes clear that several individuals were in fact Florida residents when they were alleged to have committed fraud, thereby undermining Defendants' justification for the total ban on non-resident petition circulators. Bridges Dep. at 86:8–87:1, 95:22–96:13 (confirming Jamie Johnson is a Florida resident and that she has a Florida driver license); Trial Tr. vol. 7, 1889:23–1890:2 (Bridges) (confirming Alexandria Tatem was a Florida resident when she circulated petitions); Trial Tr. vol 7, 1889:17–22 (Bridges) (confirming Alexander Francis was a Florida resident at the time he was a paid petition circulator). In one instance—after acknowledging the individual's Florida residency—Mr. Bridges testified that the sole basis for that individual's purported non-residency was that he had simply mentioned to law enforcement that he intended to move to Montana. Bridges Dep. at 20:3–24. But the Non-Resident Restriction would not have prevented this individual or others from circulating petitions if they had been Florida residents when they circulated petitions, nor could it prevent individuals from later deciding to leave Florida. Defendants have also failed to produce evidence that the State has been unable to arrest or prosecute non-resident (or former resident) petition circulators who left Florida. Bridges Dep. at 231:22–25, 232:10–12.

Similarly, there is no record evidence *at all* that non-U.S. citizens have committed any misconduct related to petition circulation, let alone at higher rates than U.S. citizens. *See also* Trial Tr. vol. 5, 1323:8–25 (Dr. Smith) (expert witness

not aware of any study indicating non-U.S. citizens or non-residents are more likely to commit petition fraud). Mr. Bridges confirmed in his testimony that, to his knowledge, his office has never prosecuted a case against a non-citizen involving paid circulation of petitions, nor has his office filed any petition-related charges against a non-citizen. Bridges Dep. at 238:16–19; *see also* PI Order at 26–27. Likewise, Director Pratt confirmed OECS has no evidence that non-U.S. citizens are more likely to commit fraud than U.S. citizens nor is it more challenging to prosecute legal permanent residents for petition fraud. Trial Tr. vol. 8, 2136:6–2138:10 (Pratt); Pratt Dep. at 46:6–23. The only example of an investigation allegedly involving a non-citizen that Mr. Bridges could point to was what he described as a "spin-off investigation" into one non-U.S. citizen. Bridges Dep. at 238:20–239:8.

Even outside of specific examples, the State did not present any theory or analysis as to why non-citizens would be more likely to engage in petition-related fraud. When asked whether there is any data or evidence that suggests that non-U.S. citizens are more likely to commit fraud than citizens, Ms. Pratt admitted, "I am not aware of any data that would suggest that a noncitizen is necessarily more likely to commit petition fraud." Pratt Dep. at 46:6–11. And when asked whether her department has any evidence suggesting that it is more challenging to prosecute legal permanent residents for petition fraud than U.S. citizens, Ms. Pratt confirmed that it did not. Pratt Dep. at 46:6–11.

111

Defendants' additional justifications for the Petition Circulator Restrictions failed to hold up at trial. Defendants have previously speculated that non-U.S. citizens, such as Mr. Pereria Bonilla, are more likely to spontaneously leave Florida (and the United States) in some manner that facilitates petition fraud. ECF 473, SOS and AG Mot. for Summary Judgment ("Def. MSJ") at 5 (arguing non-citizens are difficult to locate and investigate "given their ties to other countries"). But Defendants have failed to support this bald assertion with evidence. When pressed, Director Matthews faltered, acknowledging that "not everybody is going to have family from their prior country" and that she "[doesn't] know what their ties may necessarily be." Matthews Dep. at 187:3–188:1. At trial, Defendants also unsuccessfully pressed RTCW's non-U.S. citizen witness, Mr. Pereira Bonilla, in an apparent attempt to demonstrate his ties to his birth country. But Mr. Pereira Bonilla has not visited Venezuela since the age of ten and does not even have a passport. Trial Tr. vol. 2, 432:20–433:7 (Pereira Bonilla). His ties are to the United States where he has lived since he was six years old. Trial Tr. vol. 2, 398:19–400:4 (Pereira Bonilla). Furthermore, Mr. Pereira Bonilla, like many legal permanent residents, is highly motivated to remain in the United States and follow the law because he wishes to become a U.S. citizen. Trial Tr. vol. 2, 422:4–23, 432:20–433:7 (Pereira Bonilla). The collective testimony of non-U.S. citizen and non-resident petition circulators established that, in fact, they are extremely conscientious petition circulators. Trial

112

Tr. vol. 2, 406:20–407:9 (Pereira Bonilla); Trial Tr. vol. 7, 1767:14–1769:25 (González Herrera); Trial Tr. vol. 5, 1448:13–1454:18 (Proaño). Any concern to the contrary is the creation of the States' imagination.

Defendants have also relied on the WHEREAS clauses within H.B. 1205 as evidence of the State's interest in prohibiting non-residents and non-U.S. citizens from circulating petitions. *See, e.g.*, Pratt Dep. at 55:21–56:3. But the relevant WHEREAS clause merely states that Florida did not previously limit petition circulation to Florida residents and U.S. citizens. *See* FDH Ex. 166 at 6.[30] This statement wholly fails to communicate *any* state interest in H.B. 1205's total ban on circulation for non-residents and non-U.S. citizens. And while Defendants may point to the fact that H.B. 1205 describes the State's interest in investigating "out-of-state entities," this is a completely separate issue from prosecuting non-resident and non-U.S. citizen *persons*—and one that is not even addressed by H.B. 1205.[31] Accordingly, the WHEREAS clause that describes the States' difficulties with investigating "out-of-state entities" draws no connection between these difficulties and petition circulation by non-residents or non-U.S. citizens. *See* FDH Ex. 166 at

---

[30] "WHEREAS, Florida does not currently restrict eligibility of persons to register as petition circulators, even in cases where such persons are not United States citizens, reside in another state, or have been convicted of a felony but have not had their right to vote restored[.]" FDH Ex. 166 at 6.

[31] For example, H.B. 1205 does not ban the use or involvement of out-of-state entities in the petition gathering process. *See* FDH Ex. 166.

113

5. This is because out-of-state entities and non-residents or non-U.S. citizens are entirely different things. Out-of-state entities are, by definition, out of state, whereas non-resident and non-citizen circulators are, by definition, in the state of Florida while circulating petitions. And out-of-state entities may very well hire Florida residents who are U.S. citizens, emphasizing that to the extent the legislature is concerned with out-of-state entities, it does not solve that problem by targeting non-residents or non-citizens. Accordingly, Defendants have provided no state interest justifying the Petition Circulator Restrictions.

Even if Defendants had demonstrated any compelling State interest justifying the Petition Circulator Restrictions, there is no basis to believe the Restrictions are narrowly tailored to serve those interests. To start, more narrowly tailored options exist. *See* PI Order at 27. Notwithstanding Defendants' failure to identify any actual challenges to the investigation of non-resident or non-U.S. citizen petition circulators, *see* Bridges Dep. at 231:22–25, 232:10–12, requiring circulators to consent to the jurisdiction of Florida courts and provide a service address is one option that many courts have recognized as a more narrowly tailored alternative than banning non-resident circulators entirely. *See, e.g.*, RTCW Ex. 186; *Nader v. Brewer*, 531 F.3d 1028, 1037 (9th Cir. 2008) (collecting cases).[32]

---

[32] The numerous courts recognizing this tailored alternative have not required the disclosure of an address for service of process to occur prior to engaging in

Furthermore, Defendants have failed to show any "connective tissue between" alleged petition fraud and "the state's proposed solution" in banning all non-U.S. citizens and non-residents from circulating petitions. *NAACP v. Byrd I* at 1313–1314; *see Hisp. Fed'n v. Byrd*, 719 F. Supp. 3d 1236, 1243 (N.D. Fla. 2024). As described above, Defendants have not introduced evidence to demonstrate that non-residents or non-U.S. citizens are more likely to commit fraud or make mistakes while circulating petitions, nor that they are in any way likely to flee the state of Florida in a manner that facilitates petition fraud. To the extent Defendants rely on the OECS reports and audit (DX Exs. 2–4) as evidence of fraud in the petition process,[33] Defendants have failed to tie those documents and the related WHEREAS clause back to the Petition Circulator Restrictions.

And even if the State had shown that some group of non-U.S. citizens or non-residents were more likely to make mistakes or commit fraud during the petition process—which it did not—the law is not narrowly tailored because it entirely prohibits all non-residents and non-U.S. citizens from circulating petitions, regardless of their ties to Florida or legal status. Fla. Stat. § 100.371(4)(b). The Non-

---

circulation, as H.B. 1205 does. *See Nader*, 531 F.3d at 1037; *Yes On Term Limits, Inc. v. Savage*, 550 F.3d 1023, 1030 (10th Cir. 2008); *Krislov v. Rednour*, 226 F.3d 851, 866 n.7 (7th Cir. 2000); *We the People PAC v. Bellows*, 40 F.4th 1, 20–21 (1st Cir. 2022).

[33] *See supra* notes 3–4 regarding the weight and admissibility of these exhibits.

115

Resident Restriction bars Ms. Martin even though she regularly travels to the State to see family, is a member of the Florida bar, grew up and attended school in Florida, and raised her family in Florida following her retirement from the Marine Corps. Tr. vol. 3, 661:9–662:15, 661:25–662:23, 663:10–22, 670:2–20 (Martin); PI Hr'g Tr. at 146:15–147:11 (Martin). The Non-U.S. Citizen Restriction likewise bans Mr. Pereira Bonilla from circulating petitions for RTCW even though he is a lawful permanent resident who is deeply engaged in his community and a nearly lifelong Florida resident with a vested interest in the State constitution. Trial Tr. vol. 2, 398:19–403:7, 413:14–420:10 (Pereira Bonilla). By categorically banning all non-residents and non-U.S. citizens, the Petition Circulator Restrictions are not narrowly tailored to any compelling interest, and therefore, fail strict scrutiny.

If this Court concludes that strict scrutiny is not appropriate and some form of intermediate scrutiny were applicable, the result would be the same. Defendants have not put forth any evidence or basis to believe the Restrictions serve any interest in fraud prevention or election integrity, let alone an interest that is substantially related to an important government interest. *See Fla. Decides Healthcare*, 2025 WL 3738554, at *6. As discussed above, H.B. 1205 itself contains no explanation or justification for its categorical prohibition on non-residents or non-U.S. citizens. And in the absence of an explanation for the Restrictions, Defendants have tried and

116

failed to draw a connection between the State's alleged difficulties prosecuting out-of-state entities and the Petition Circulator Restrictions.

And while the *Anderson-Burdick* balancing test is inappropriate here, *see supra* Section IV.A.ii., the Petition Circulator Restrictions also fail under this analysis. As described above, Defendants have overstated—and in some cases, failed to put forth any evidence of—the State's justifications for the burdens imposed by the Petition Circulator Restrictions. Further, Defendants have failed to demonstrate that the Restrictions have or could address the State's concerns about fraud in the petition circulation process. As such, the State's proffered justification does not "require the burden to plaintiffs' rights" imposed by the Restrictions. *See Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318 (11th Cir. 2019).

Finally, the Petition Circulator Restrictions are also overbroad because they "penaliz[e] a substantial amount of speech that is constitutionally protected." *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992). Even if Defendants could justify a burden on the speech of some non-Florida residents or non-U.S. citizens, it would not support applying the ban to people like Ms. Martin or Mr. Pereira Bonilla for the reasons set forth above.

## B. Infringement of Right to Association (Count III)

### i. Legal Standard

The First Amendment protects the right to "expressive association": the right to associate with others to promote ideas collectively. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984) ("[W]e have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends."); *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1158 (N.D. Fla. 2012).[34] Restrictions on the right to associate may be justified only by "regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *U.S. Jaycees*, 468 U.S. at 623 (collecting cases).

Plaintiffs wish to speak and act collectively with others to promote and advance RTCW's mission through the circulation of initiative petitions, *see, e.g.*, Trial Tr. vol. 3, 726:7–727:25 (Martin), but they are prevented from doing so

---

[34] Despite Defendants' previous arguments to the contrary, *see, e.g.*, Def. MSJ at 8–9, Plaintiffs' freedom of association claim is distinct from their infringement of core political speech claim. *See, e.g.*, *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1158 (N.D. Fla. 2012) (analyzing "speak[ing], encouraging others to register to vote," as "pure speech," as opposed to "speak[ing] and act[ing] collectively with others, implicating the First Amendment right of association").

because of the Petition Circulator Restrictions, Registration Requirement, and Affidavit Requirement. And for the same reason the State cannot justify those provisions' infringement on the freedom of speech, it cannot justify their infringement on the freedom of association. This infringement on RTCW Plaintiffs' associational rights is not justified by compelling state interests. And while heightened scrutiny applies to infringements on the First Amendment freedom of association, *see, e.g.*, *U.S. Jaycees*, 468 U.S. at 623, the infringements imposed by Petition Circulator Restrictions, Registration Requirement, and Affidavit Requirement fail at any level of scrutiny.

### ii.    Challenged Provisions

### 1.  Petition Circulator Restrictions

RTCW plainly engages in expressive activity. *See, e.g.*, Trial Tr. vol. 3, 726:7–727:25 (Martin) (describing RTCW's association with non-U.S. citizens and non-Florida residents to advance their collective goal of a right to clean water through petition circulation). The Petition Circulator Restrictions severely burden RTCW's expressive association by categorically barring association with non-U.S. citizens and non-residents who support its mission—including Mr. Pereira Bonilla and Ms. Martin—for the purposes of petition circulation. Trial Tr. vol. 2, 419:20–420:10 (Pereira Bonilla) (explaining that inability to volunteer for RTCW has made him unable to associate with the group); Trial Tr. vol. 3, 725:14–727:25 (Martin).

119

Though it had never previously sought to exclude—and has indeed welcomed—non-citizens and non-residents, *see* Trial Tr. vol. 3, 726:22–727:25, 744:2–4, 744:12–15 (Martin), RTCW set up protocols to prevent its association with non-citizens and non-residents as ambassadors in an attempt to avoid liability under H.B. 1205, Trial Tr. vol. 3, 679:17–680:7, 728:1–16 (Martin). Ms. Martin likewise demonstrated that these restrictions bar her from engaging with voters and associating with RTCW and its volunteers as a petition circulator. Trial Tr. vol. 3, 672:14–673:8 (Martin). H.B. 1205 thus impedes the expressive association of RTCW and Ms. Martin because it "interferes with individuals' selection of those with whom they wish to join in a common endeavor." *U.S. Jaycees*, 468 U.S. at 618.

The prohibition on non-citizens and non-residents associating with RTCW as petition circulators is not well-tailored to serve a compelling state interest. *See, e.g.*, *U.S. Jaycees*, 468 U.S. at 623. Even assuming that a lower level of scrutiny applies, the Petition Circulator Restrictions nonetheless unconstitutionally burden the right to associate without sufficient justification under both intermediate scrutiny and *Anderson-Burdick* analyses. *Supra* Section IV.A.iii.3.a.–b.

## 2. Registration Requirement & Affidavit Requirement

The same is true of the Registration and Affidavit Requirements. Those provisions infringe on RTCW's ability to associate with like-minded volunteers to promote its mission by deterring and even prohibiting volunteers from circulating

its petitions. *See supra* Section IV.A.iii.1.–2. The Registration Requirement also prohibits RTCW from associating with spur-of-the-moment volunteers who would join forces with the organization to circulate petitions but for the Registration Requirement. *See, e.g.*, Trial Tr. vol. 2, 400:23–401:20 (Pereira Bonilla); Trial Tr. vol. 4, 988:19–990:3 (Perez). And unregistered volunteers are limited in their ability to associate with RTCW and its members to circulate petitions because of the 25-petition limit. *See, e.g.*, Trial Tr. vol. 3, 785:10–13 (Haller) ("Q. But would you agree that that criminal liability only incurs when you reach beyond 25 petitions? A. Yes, but my goal, obviously, as a petition gatherer, because so many were needed, was to get many more than that.").

While RTCW associated with volunteers openly prior to H.B. 1205, the Registration and Affidavit Requirements have forced RTCW to exclude those who are either unwilling or unable to circulate its petitions under the new rules. *See supra* Section IV.A.iii.1.–2. These two restrictions therefore impede RTCW's expressive association because they restrict RTCW's "selection of those with whom they wish to join in a common endeavor." *U.S. Jaycees*, 468 U.S. at 618.

The Registration Requirement and Affidavit Requirement's infringement on RTCW's expressive association is not tailored to serve a compelling State interest. *See, e.g.*, *U.S. Jaycees*, 468 U.S. at 623. Even if a lower level of scrutiny applies, the restrictions nonetheless unconstitutionally burden the right to associate without

121

sufficient justification under both intermediate scrutiny and *Anderson-Burdick* analyses. *Supra* Section IV.A.iii.3.a.–b.

### C. Equal Protection (Count IV)

#### i.    Factual Background

H.B. 1205 prohibits non-U.S. citizens from circulating initiative petitions, including those with legal status in the United States such as legal permanent residents and Deferred Action for Childhood Arrival recipients ("Dreamers"). Fla. Stat. § 100.371(4)(b)(2). Because H.B. 1205 categorically prohibits non-citizens from "collect[ing] signatures or initiative petitions," non-citizens are prohibited from collecting even the 25 "personal use" petitions allotted to their citizen neighbors. Fla. Stat. § 100.371(4)(a).

As a result, previously active RTCW volunteers who are non-citizens are now prohibited from circulating petitions. For example, Ramón Pereira Bonilla, a RTCW volunteer and legal permanent resident who has lived in Florida since he was six years old, last circulated petitions on May 1, 2025—the day before H.B. 1205 was enacted. Trial Tr. vol. 2, 398:19–399:10, 410:16–412:3 (Pereira Bonilla). Overnight and despite his legal status, Mr. Pereira Bonilla's right to engage in this protected speech was eliminated.

122

### ii.    Legal Standard

"As a general matter, a state law that discriminates on the basis of alienage can be sustained only if it can withstand strict judicial scrutiny." *Bernal v. Fainter*, 467 U.S. 216, 219 (1984). The Supreme Court has developed a "narrow" "political function exception" to the rule that discrimination based on alienage triggers strict scrutiny. *Id*. at 220. That exception "applies to laws that exclude aliens from positions intimately related to the process of democratic self-government." *Id*. at 220–21. To determine whether a restriction based on alienage fits within the political function exception, the Supreme Court has devised a two-part test. First, courts examine "the specificity of the classification"—those that are over- or under-inclusive likely do not "serve[] legitimate political ends." *Id*. (quotation marks omitted). Second, the exception applies only to those "holding state elective or important nonelective executive, legislative, and judicial positions, those officers who participate directly in the formulation, execution, or review of broad public policy, and hence perform functions that go to the heart of representative government." *NAACP v. Byrd I* at 1311 (internal quotation marks omitted).

### iii.    Non-U.S. Citizen Restriction

The Non-U.S. Citizen Restriction violates the Equal Protection Clause because it facially discriminates on the basis of national origin and does not fall under the narrow political function exception. Defendants' only avenue to avoid

123

strict scrutiny is to argue that the political function exception applies, but both prongs of *Bernal*'s test demonstrate that the political function exception is not applicable here.[35]

The Non-U.S. Citizen Restriction fails the first prong of the *Bernal* test because it is "fatally underinclusive"—it bars non-U.S. citizens from circulating petitions, even though Florida law does not prevent legal residents from serving in other government roles, including those dealing with voting and elections. *See* Fla. Stat. §§ 106.24, 98.015, 97.057; *NAACP v. Byrd I* at 1312. Nor does Florida categorically prohibit non-U.S. citizens from donating to ballot initiative campaigns. Florida does not even exclude non-U.S. citizens from employment with the State government, provided that they complete a background check to verify their work authorization, which is a much narrower intervention than the categorical ban imposed by the Non-Citizen Restriction. Defendants offered no evidence at trial to demonstrate that there are "legitimate political ends" served by preventing non-U.S. citizens from circulating petitions while simultaneously allowing them to serve in these other capacities.

---

[35] For the reasons articulated *supra* Section IV.A.iii.3., the Non-Citizen Restriction fails to satisfy strict scrutiny because it facially discriminates on the basis of national origin and is not narrowly tailored to achieve a compelling State interest.

The provision also fails the second prong of the *Bernal* test. Petition circulators are not "public employees of any branch of state government," nor are they "directly" involved "in the formulation, execution, or review of broad public policy." *NAACP v. Byrd I* at 1312. Unlike the teachers or police officers discussed in *Bernal*, Florida law does not entrust petition circulators "with policymaking responsibility or broad discretion in the execution of public policy that requires the routine exercise of authority over individuals." 467 U.S. at 226. Instead, volunteer circulators are more akin to the notary publics and third-party voter registration workers at issue in *Bernal* and *NAACP v. Byrd I*, respectively, *see* 467 U.S. at 218; 680 F. Supp. 3d at 1299–1300.

Indeed, petition circulators cannot even influence public policy through the ballot amendment process alone. Whether a proposed ballot amendment ultimately becomes law is entirely dependent upon Florida voters who cast a vote in favor of or against the amendment at the appropriate election. Thus, non-citizen circulators are several steps removed from engaging in policymaking or executing policy. Plaintiffs demonstrated at trial that non-citizen circulators are acutely aware of this fact. Trial Tr. vol. 2, 400:23–401:20, 409:15–410:15 (Pereira Bonilla).

Because the Non-Citizen Restriction does not withstand strict judicial scrutiny, *see supra* Section IV.A.iii.3., nor meet either prong of the *Bernal* test, the Non-U.S. Citizen Restriction violates the Equal Protection Clause.

### D. Unconstitutionally Vague (Count V)

#### i.    Legal Standard

RTCW Plaintiffs have proven that the Registration Requirement and the Personal Use Petition Restrictions, including their related criminal penalties, are unconstitutionally vague. Under these provisions:

> A person who collects, delivers, or otherwise physically possesses more than 25 signed petition forms in addition to his or her own signed petition form or a signed petition form belonging to an immediate family member, and who is not registered as a petition circulator pursuant to § 100.371(4)(a), commits a felony of the third degree, punishable as provided in § 775.082, § 775.083, or § 775.084.

Fla. Stat. § 104.188(2); *see also* Fla. Stat. §§ 100.371(3)(e), (4)(a).[36]

The Fourteenth Amendment commands that a state shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. A vague law offends due process when people "of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. Gen. Const. Co.*, 269 U.S. 385, 391 (1926). A law is unconstitutionally vague if it does not "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited" or if it invites "arbitrary and discriminatory enforcement." *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972).

---

[36] This felony liability is defined, in part, in terms of compliance with the Registration Requirement under Section 100.371(4)(a).

126

Because the Registration Requirement and Personal Use Petition Restrictions inhibit core First Amendment activity, including petition circulation by RTCW and the volunteers who collect petitions on its behalf, "a more stringent vagueness test should apply." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982); *see also Smith v. Goguen*, 415 U.S. 566, 573 (1974) ("Where a statute's literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in other contexts."). Likewise, heightened review is required when a vague statute implicates criminal penalties. *See High Ol' Times, Inc. v. Busbee*, 673 F.2d 1225, 1229 (11th Cir. 1982). "When vagueness permeates the text of" a criminal law that "contains no *mens rea* requirement, and infringes on constitutionally protected rights," that law "is subject to facial attack." *City of Chicago v. Morales*, 527 U.S. 41, 55 (1999) (citation modified); *see Fla. State Conf. of NAACP v. Lee*, 576 F. Supp. 3d 966, 973 n.4 (N.D. Fla. 2021).

> ### ii.    Registration Requirement and Personal Use Petition Restrictions

The Registration Requirement and Personal Use Petition Restrictions are unconstitutionally vague because they do not provide eligible circulators wishing to engage in core political speech with sufficient knowledge about how to comply while avoiding criminal liability. Specifically, the 25-petition limit is unconstitutionally vague both because it does not give a person of ordinary

127

intelligence a reasonable opportunity to know what is prohibited and because it invites arbitrary and discriminatory enforcement. *See Grayned*, 408 U.S. at 108–09.

Evidence at trial confirmed that the bounds of the 25-petition limit are unclear and confusing to an ordinary person. Multiple circulators testified to the same questions about the 25-petition limit: Does the 25-petition limit mean 25 petitions per person, per initiative, or per person across all initiatives? How does the 25-petition limit apply if someone had already collected 25 petitions when H.B. 1205 went into effect? Does the 25-petition limit reset for each new ballot initiative cycle? Trial Tr. vol. 4, 1039:10–1039:23 (Ciera Cox); Trial Tr. vol. 1, 71:23–73:21 (Acosta); FDH Ex. 499 (25-petition limit confusion email from circulator); Trial Tr. vol. 6, 1553:4–22 (Lowe Minor).

And RTCW's injuries are not assuaged by any of Defendants' representations about the parameters of the 25-petition limit because of the very real possibility that State Attorneys or other individuals tasked with enforcement may interpret the limit differently. PI Hr'g Tr. at 143:14–145:18 (Martin); *see, e.g.*, ECF 246 at 26–28. Indeed, Defendants' construction is *not* "the only reasonable and readily apparent reading of the statute" as evidenced by the other reasonable and readily apparent readings of the statute identified by Mr. Bridges and Mr. Earley. *C.f.* PI Order at 30.

When asked, after being presented with the text of the law, whether collecting 25 signatures for RTCW's petition and later collecting 25 signatures for Smart &

Safe's petition violates the law, Jonathan Bridges, as the 30(b)(6) representative for the Florida Attorney General, testified: "I don't know the answer to that right now. I haven't been presented with that question before." Bridges Dep. at 258:18–260:21. That it is not immediately apparent to the 30(b)(6) representative of the Attorney General from the face of the statute whether an individual could collect 25 petitions for only one initiative or 25 petitions for multiple initiatives should be enough to demonstrate unconstitutional vagueness, especially where felony liability is at stake. *See Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1121–22 (11th Cir. 2022). This uncertainty from the Attorney General's Office further invites the kind of "arbitrary and discriminatory enforcement" that mocks due process. *Grayned*, 408 U.S. at 108–09.

Leon County Supervisor of Elections, Mark Earley, likewise testified at trial, "I don't know if the 25 limit is for one petition effort or total across all petition efforts. I would think it's one petition effort, but that's something I haven't considered." Trial Tr. vol. 2, 529:2–10 (Earley). When presented with the text of H.B. 1205, Mr. Earley also agreed that there was no language in the statute that would cabin the 25-petition limit to a single petition sponsor. Trial Tr. vol. 2, 534:8–10 (Earley). He then testified that he would recommend that unregistered petition circulators consult a *lawyer* to understand the parameters of the 25-petition limit in order to protect themselves from potential criminal liability. Trial Tr. vol. 2, 534:14–535:21 (Earley).

129

Mr. Earley is a seasoned election professional, and his confusion and trepidation about the confines of the 25-petition limit solidifies that the Registration Requirement and Personal Use Petition Restrictions are unconstitutionally vague in violation of the Fourteenth Amendment.

The trial record reflects that other Supervisors of Elections also reached out to the Division of Elections with similar questions about the 25-petition limit. Matthews Dep. at 50:6–51:12, 133:1–5; RTCW Exs. 323, 324 ("For a 'volunteer', is it one-time submission of 25 signed petition forms + self/family, or unlimited batches of 25 (+ self/family)? . . . Is this limit of possession and on registration requirements per amendment or per initiative amendment election cycle?"); RTCW Ex. 189. If Supervisors of Elections—experienced election officials who report violations of this law—had the same questions as petition circulators, it is evident that the text of the law is vague. Despite these questions, the Secretary of State has not issued any statewide guidance to either Supervisors of Elections or sponsors on this question. Matthews Dep. at 52:8–15, 133:1–18.

Moreover, the vagueness surrounding the 25-petition limit is further compounded by the statute's internal inconsistency about what types of activities involving signed petitions actually trigger a registration requirement. The definition of "petition circulator" only includes people who "collect[] signatures," Fla. Stat. § 97.021(28), but the penalty provision applies to any person who "collect[s],

130

deliver[s], or otherwise physically possess[es]" petitions. Fla. Stat. § 100.371(4)(a).

Thus, a person referring to the definition of a circulator would reasonably believe that registration is only required if they plan to collect petitions. As such, the statute sets a trap for the unwary volunteer who does not circulate petitions but offers to deliver petitions collected by others or to keep petitions in their custody for a period of time—perhaps, for example, safeguarding signed petitions while circulators at an event continue to collect more. Indeed, when presented with the scenario of a group of unregistered circulators who each individually collect signatures at a farmers' market, Mr. Bridges agreed that an unregistered person left holding more than 25 petitions collected by the other unregistered volunteers at the end of the day in their car would violate the statute. Bridges Dep. at 260:7–21. This inconsistency between the definition of petition circulator and the penalties associated with the 25-petition limit further exacerbates the lack of adequate notice about what conduct is proscribed by H.B. 1205. *See Bankshot Billards, Inc. v. City of Ocala*, 692 F. Supp. 2d 1343, 1351 (M.D. Fla. 2010), *vacated as moot*, 634 F.3d 1340 (11th Cir. 2011).

"Uncertain meanings" about the Registration Requirement and Personal Use Petitions, coupled with the criminal penalties for making a mistake, led many circulators "to steer far wider of the unlawful zone" and stop circulation activities altogether. *Grayned*, 408 U.S. at 109; Trial Tr. vol. 4, 1038:7–1040:19 (Ciera Cox); Trial Tr. vol. 3, 779:16–780:3 (Haller); Trial Tr. vol. 7, 1791:16–1792:10 (Newlon);

131

Trial Tr. vol. 6, 1663:14–24 (Scoon); Trial Tr. vol. 6, 1706:20–1707:6 (Chandler); Trial Tr. vol. 6, 1553:4–1554:25 (Lowe-Minor). The record is clear that not only are would-be petition circulators unsure of how to interpret the law, particularly in light of criminal liability, but election officials and law enforcement officials do not understand the parameters of the law either. If those tasked with enforcing the law's criminal penalties cannot tell what violates the law, then "it seems eminently fair to conclude that" circulators "can't either." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1121–22 (11th Cir. 2022).

As if this weren't enough, the criminal penalties associated with the Registration Requirement and Personal Use Petition Restrictions lack a *mens rea* requirement. Fla. Stat. § 104.188(2); Bridges Dep. at 261:10–262:13. This fact, combined with the direct infringement on circulators' First Amendment rights, and the incurable vagueness of the Registration Requirement and Personal Use Petition Restrictions, means both are facial violations of the Fourteenth Amendment. *City of Chicago v. Morales*, 527 U.S. 41, 55 (1999); *Fla. State Conf. of NAACP v. Lee*, 576 F. Supp. 3d 966, 973 n.4 (2021).

### E.  Procedural Due Process (Count VI)

Plaintiffs established at trial that the Arbitrarily Invalidated Petitions provision, Fla. Stat. § 100.371(14)(h), deprives Florida voters of credit for their valid signature with no notice or opportunity to be heard—a clearcut violation of

132

procedural due process. Even where a voter has done everything right, their voice in the initiative process will be silenced merely because a petition circulator has made some error related to their own eligibility or registration. But H.B. 1205 provides no mechanism to notify voters of this deprivation or to provide them with an opportunity to rectify it.

As a factual matter, the elements of Plaintiffs' claim are undisputed. County Supervisors are rejecting otherwise valid petitions merely based on a petition circulator's status. Trial Tr. vol. 2, 529:11–530:2, 530:7–531:18 (Earley). Then, these Supervisors do not provide any form of notice or process to voters whose otherwise valid petitions are invalidated. Trial Tr. vol. 2, 520:22–25, 531:19–532:4 (Earley).

Defendants have thus far only contested Plaintiffs' Procedural Due Process claim with meritless legal arguments. Previously, Defendants have contended that a voter's signature in support of placing an initiative on the ballot is not a "liberty interest" protected by the Due Process Clause. Def. MSJ at 13. But this is belied by both U.S. Supreme Court and Florida Supreme Court precedent, which hold the appropriate solicitude for State constitutional rights, like Florida's right to change the constitution via ballot initiative. *See Wilkinson v. Austin*, 545 U.S. 209, 221 (2005); *Browning v. Fla. Hometown Democracy, Inc., PAC*, 29 So. 3d 1053, 1063 (Fla. 2010). This Court has previously rejected Defendants' meritless legal

133

contentions, and it should do so again here. *See* ECF 529, Order on Motions for Summary Judgment at 1.

### i.     Legal Standard

To prevail on a procedural due process claim, a plaintiff must "prove three elements: "(1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." *Catron v. City of St. Petersburg*, 658 F.3d 1260, 1266 (11th Cir. 2011) (*quoting Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003)). "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." *Austin*, 545 U.S. at 221 (citation modified). The quintessential process due under the Constitution is notice of the deprivation and an opportunity to be heard or otherwise rectify the deprivation. *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950).

### ii.     Arbitrarily Invalidated Petitions Provision

Plaintiffs have established all three elements of their procedural due process challenge. First, Plaintiffs have shown that the Arbitrarily Invalidated Petitions provision deprives voters of the right to have their otherwise valid petitions counted. Testimony from multiple county supervisors and the Secretary of State establish that an otherwise valid petition can be—and has been—invalidated solely because the

134

petition circulator who collected it was unregistered or ineligible. Trial Tr. vol. 2, 529:11–530:2, 530:7–531:18 (Earley); Matthews Dep. at 164:6–24, 166:19–167:16; RTCW Exs. 326, 328, 330, 331, 332. Indeed, that is what the law requires: "A signed petition form submitted by an ineligible or unregistered petition circulator *must* be invalidated." Fla. Stat. § 100.371(14)(h) (emphasis added).

Voters unquestionably have a protectable liberty interest in having their otherwise valid signatures count toward placing an initiative on the ballot. The U.S. Supreme Court has expressly held that a protectable interest may be "created by state laws or policies." *Austin*, 545 U.S. at 221. Defendants' previous argument that there is "no liberty interest in the petitioning process," Def. MSJ at 12, therefore does not hold water. Again, "[s]tate law can be the source of a liberty interest" that "triggers due process protections." *Dorman v. Aronofsky*, 36 F.4th 1306, 1315 (11th Cir. 2022) (emphasis added). Defendants' observation that "[l]iberty interests . . . are 'guaranteed by the Fourteenth Amendment,'" Def. MSJ at 13 (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 572 (1972)), does not bear at all on the relevant issue: the permissible *source* of the liberty interests that the Fourteenth Amendment guarantees. As the Supreme Court has explained since *Roth*, "[a] liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." *Austin*, 545 U.S. at 221 (citation modified). The term "liberty," in

135

turn, "is not confined to mere freedom from bodily restraint" but rather "extends to the full range of conduct which the individual is free to pursue." *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).

Here, the Florida Constitution creates such a liberty interest in the right to amend the state constitution via an initiative. Fla. Const. art. XI, § 3. In so doing, the Florida Constitution uses the distinctive language of entitlement: "The power to propose the revision or amendment of any portion or portions of this constitution by initiative is reserved to the people." *Id.* The Florida Supreme Court has consistently recognized this fundamental right—and Floridians' entitlement to it. *See Browning v. Fla. Hometown Democracy, Inc., PAC*, 29 So. 3d 1053, 1063 (Fla. 2010) (recognizing "a state-created constitutional right" in the initiative-petition process); *Krivanek v. Take Back Tampa Pol. Comm.*, 625 So. 2d 840, 843 (Fla. 1993) ("Given its constitutional underpinnings, the right to petition is inherent and absolute."); *State ex rel. Citizens Proposition for Tax Relief v. Firestone*, 386 So. 2d 561, 566 (Fla. 1980) ("[T]he initiative petition method to amend the constitution is a fundamental right[.]").

The right to amend the Florida Constitution by initiative necessarily encompasses the right to have one's valid petition counted toward a ballot initiative. In the right to vote context, it is axiomatic that "[t]he right to vote includes the right to have the ballot counted." *Reynolds v. Sims*, 377 U.S. 533, 555 n.29 (1964). And

136

here, Florida has established a statutory procedure for exercising the constitutional right to an initiative whereby voters must sign petitions in order to put an initiative on the ballot. To exclude those statutorily required petitions from constitutional protection would render the right to an initiative a nullity.

Second, Plaintiffs established that State action—on the part of Defendants Supervisors of Elections and the Secretary of State—causes Plaintiffs' deprivation. Supervisors are responsible for determining whether petitions are valid and counted under the Arbitrarily Invalidated Petitions provision. Trial Tr. vol. 2, 459:5–460:17 (Earley); Matthews Dep. at 164:6–8; Fla. Stat. 100.371(14)(h). Further, they are the officials who check the eligibility and registration status of petition circulators when processing petitions. Trial Tr. vol. 2, 476:1–8 (Earley); Trial Tr. vol. 7, 1804:3–25 (Molina). And Supervisors have, at times, been directed by the Secretary's Division of Elections to invalidate certain petition forms to comply with the Arbitrary Invalidated Petitions Provision. Trial Tr. vol. 2, 530:7–532:4 (Earley); Trial Tr. vol. 8, 2050:25–2051:9 (Matthews). The Secretary is also responsible from determining the total number of verified valid signatures, "less any signatures that were invalidated pursuant to" the Arbitrarily Invalidated Petitions provision. Fla. Stat. § 100.371(15).

Third, Plaintiffs established that the process provided to these voters is constitutionally inadequate. Indeed, Plaintiffs established that no notice or process

137

is provided to voters when their petition is invalidated. Florida law does not require *any* notice to be provided to these voters. Trial Tr. vol. 2, 520:22–521:4 (Earley). Nor are county supervisors of elections providing notice. Trial Tr. vol. 2, 520:22–25, 531:19–532:4 (Earley); Trial Tr. vol. 7, 1813:10–20 (Molina); Matthews Dep. at 164:9–24. Without that notice, voters have no basis or reason to sign another petition. Indeed, one would expect voters to actively avoid doing so because it is a crime to knowingly sign the same petition twice. Fla. Stat. § 100.371(3)(a)(5).

There is no reason why Defendants cannot provide voters notice that their petition was rejected. H.B. 1205 already requires Defendants Supervisors of Elections to provide this notice to voters whose petitions have been validated. Trial Tr. vol. 2, 520:7–9 (Earley). There are far fewer petitions that are invalidated for *any* reason—let alone invalidated due to Section 100.371(14)(h)—than there are petitions that are validated, so notifying voters of their petition's invalidation in this circumstance would not add a significant administrative burden. *See* Trial Tr. vol. 2, 627:22–628:4 (Earley). If a voter's petition would otherwise be valid—but for the circulator's registration or eligibility status—Supervisors would have the same capability to mail them a notice about the disposition of their petition. Trial Tr. vol. 2, 490:13–491:21 (Earley).

138

### F. Substantive Due Process (Count VII)

Plaintiffs established at trial that the Severe Fines imposed on petition sponsors by H.B. 1205 violate foundational legal principles protected by substantive due process. In essence, H.B. 1205 suffers from a fundamental flaw: it assumes that all petitions submitted on behalf of a sponsor are somehow *controlled* by that sponsor. But that is simply wrong: as the law and the evidence shows, anyone in Florida can submit a petition with no involvement from the sponsor. Thus, fining the sponsor for an error in all instances is akin to fining the Republican or Democratic party for an error in a voter registration application, even if the error was made by the voter or an unaffiliated volunteer, not the party. Such strict-liability punishment is unconstitutional. The Severe Fines on Sponsors provisions also violate substantive due process because they impose impossible obligations on petition sponsors.

The Arbitrarily Invalidated Petitions provision also violates substantive due process by depriving voters of having their signed petitions counted based on the actions of others.

#### i. Factual Background

With respect to the Severe Fines on Sponsors provisions, RTCW established at trial that it is not in direct control of all individuals who circulate petitions on its behalf and that it is likely to incur financial penalty from actors outside its control. Defendants have conceded that circulators can incur financial liability for the

139

sponsor without the sponsor's knowledge or fault. Matthews Dep. at 149:16–150:17; Pratt Dep. 141:15–143:3, 162:18–163:8 (acknowledging sponsors may not have knowledge of those who distribute Personal Use Petitions but could still be fined for those petitions). This is because the law imposes liability on the sponsor when anyone registered with the State to circulate petitions on behalf of that sponsor, or anyone who distributes Personal Use Petitions that are returned to the sponsor, themselves incurs liability. *See* Fla. Stat. §§ 100.371(7), (8), (10). Consistent with this statutory text, the Secretary of State—who is responsible for assessing fines—considers registered circulators to be a fiduciary of that sponsor for the purposes of incurring fines. Matthews Dep. at 98:18–99:15, 149:16–150:17; Pratt Dep. at 92:2–10, 92:17–94:5, 106:3–6, 141:15–143:3, 162:18–163:8.

But RTCW has proven that this premise is simply not true, especially for volunteer petition gathering. RTCW does not have contact with all circulators who may register on its behalf and does not receive any notice from the Division of Elections about who is registered to circulate on its behalf. *See, e.g.*, Trial Tr. vol. 3, 676:23–677:19, 678:10–679:11, 694:17–18, 696:14–698:7, 716:18–717:5, 729:14–733:21 (Martin); RTCW Exs. 268, 304; Matthews Dep. at 150:12–17. Indeed, this is not a theoretical problem. Individuals have attempted or have registered on behalf of RTCW without its knowledge or involvement. RTCW Exs. 268, 304; Trial Tr. vol. 3, 729:14–733:21 (Martin). RTCW also demonstrated that it

140

benefits from volunteer networks outside of its control and that, unsurprisingly, it does not have any control over circulators who are not directly affiliated with RTCW. Trial Tr. vol. 3, 696:24–698:7, 722:3–7, 729:1–20, 730:3–7 (Martin); Trial Tr. vol. 4, 1029:14–1030:5 (Ciera Cox). This is supported by the testimony of other civic organizations outside of RTCW's control who established that their members also circulate RTCW's petitions. *See, e.g.*, Trial Tr. vol. 2, 349:9–13 (Ardila) (People Power for Florida); Trial Tr. vol. 5, 1448:13–19 (Proaño) (LULAC); Trial Tr. vol. 6, 1577:24–1578:2 (Lowe-Minor) (League of Women Voters of Florida); Trial Tr. vol. 7, 1783:10–17, 1792:5–10 (Newlon) (League of Women Voters of Florida); Trial Tr. vol. 7, 1767:14–19, 1770:3–6 (González Herrera) (League of Women Voters of Florida).

As such, RTCW's petitions are collected and even submitted to Supervisors of Elections without the involvement or direct knowledge of RTCW. *See, e.g.*, Trial Tr. vol. 3, 676:23–677:19 (Martin). For example, while RTCW temporarily suspended its operations following H.B. 1205's passage and communicated this to its registered ambassadors, there are likely other unaffiliated individuals who were not aware of the suspension and continued collecting petitions on RTCW's behalf, potentially resulting in violation of one or more of the challenged Severe Fines provisions. Trial Tr. vol. 3, 678:10–18 (Martin) (describing petitions mailed to RTCW's P.O. Box after the suspension of its campaign).

141

RTCW also established that the Severe Fines impose obligations on petition sponsors that are virtually impossible to ensure compliance with. Trial Tr. vol. 3, 704:23–706:16, 709:15–710:8 (Martin) ("The only scenario that we would be able to comply with ten days is if the authorized agent was also the ambassador that collected lots of petitions, . . . but it's a rare situation. So outside of that, it's an impossibility to believe that we would have an operation able to comply with the ten-day rule."); Trial Tr. vol. 4, 994:4–995:2 (Perez) ("You're bound to not make it. I mean, everybody has experienced mail taking three, four, five days, okay."); Trial. Tr. vol. 4, 1051:24–1052:3 (Ciera Cox).

Additionally, RTCW established the following facts about the individual Severe Fines.

### 1. 10-Day Return Deadline Fine

The 10-Day Return Deadline, Fla. Stat. § 100.371(7)(a)(1), imposes a particularly severe punishment that has had "a devastating effect" on RTCW's all-volunteer operations. Trial Tr. vol. 3, 704:6–11 (Martin). Unpaid circulators did not have a deadline to turn in signed petition forms to Supervisors of Elections prior to H.B. 1205. Trial Tr. vol. 3, 704:6–14 (Martin); Matthews Dep. at 177:11–15. Following H.B. 1205, Florida is the only state that requires signed petitions to be returned within a specific time frame (other than the overall ballot access deadline). Trial Tr. vol. 5, 1355:4–6 (Dr. Smith). Even without a deadline, RTCW instructed

142

its volunteers to submit signed petitions as soon as practicable and was never asked by Supervisors of Elections to turn in petition forms more quickly prior to H.B. 1205, and in fact was often asked to submit petitions in batches rather than individually on a rolling basis. Trial Tr. vol. 3, 701:18–24; 702:7–703:6. (Martin). But now RTCW is facing severe and compounding financial penalties for petitions that are turned in by individuals outside its control—a particularly difficult burden to surmount given RTCW relies heavily on generous but unpaid volunteer networks to circulate on its behalf. Trial Tr. vol. 3, 696:24–698:7 (Martin); Trial Tr. vol. 4, 995:4–11 (Perez); Trial Tr. vol. 4, 1029:14–1030:5 (Ciera Cox).

At trial, RTCW established that since H.B. 1205 was enacted, it has submitted petitions in violation of the 10-Day Return Deadline, in part due to unaffiliated volunteers mailing in already signed petitions that were dated more than 10 days earlier. Trial Tr. vol. 3, 678:15–679:2, 704:19–706:6 (Martin). RTCW's actual financial liability for the 10-Day Return Deadline is unknown as OECS continues to investigate violations and has not notified sponsors of any violations. But—despite its best efforts to immediately suspend its campaign—RTCW likely faces, at minimum, thousands of dollars in fines. RTCW Exs. 165 (if imposed on petitions signed before H.B. 1205, one single 37-day late petition could amount to approximately $1,850 in fines), 167 (approximately $4,200 in potential fines for six petitions signed on May 3, 2025 and returned the same month), 168 (approaching

143

tens of thousands of dollars in fines if OECS imposes fines on petitions signed prior to H.B. 1205 but returned after May 2, 2025), 169 (approximately $1,050).

RTCW Regional Ambassador Ciera Cox also testified to an instance where, prior to H.B. 1205, an individual from another organization accidentally held onto petitions in her car for longer than 10 days. Trial Tr. vol. 4, 1042:6–1044:4 (Ciera Cox). Ms. Cox testified that this was not something RTCW could have prevented and that she is not always aware when unaffiliated individuals are out circulating petitions for RTCW. Trial Tr. vol. 4, 1042:6–1044:4 (Ciera Cox). Trial testimony likewise established that organizations like the League of Women Voters—whose members frequently circulate RTCW petitions without RTCW's direct knowledge or involvement—mail signed petitions to sponsors and not directly to Supervisors of Elections, which further eats away at the 10-Day Return Deadline for RTCW. Trial Tr. vol. 6, 1528:4–1529:14 (Lowe-Minor). This practice is in fact generally required because signed petitions are required to be turned in by an authorized agent of the sponsor. Trial Tr. vol. 3, 675:7–15, 706:13–708:8 (Martin); RTCW Ex. 78; *see also* RTCW Ex. 149 (Supervisor acceptance of authorized agent form).

Though RTCW has issued new protocols to process petitions faster in response to H.B. 1205, individuals circulating outside the organization's knowledge or control may not be aware or able to turn in petitions within 10 days. Trial Tr. vol. 3, 704:23–705:3, 717:5 (Martin). However, RTCW would still be held responsible

144

for the violation and a $50 fine (that compounds each day the petition is delayed). Pratt Dep. at 92:2–94:5, 92:9–10, 92:17–94:5. Indeed, since the passage of H.B. 1205, petitions have been delivered to RTCW that were signed more than ten days earlier, and RTCW has received late or soon-to-be-late petitions at its Fort Myers address even after RTCW announced it had suspended its campaign. Trial Tr. vol. 3, 678:15–679:2, 704:19–706:6 (Martin) (testifying that petitions mailed to the Fort Myers address "still come in late oftentimes" and are "likely going to be late because maybe they are at Day 7 or Day 8" when received by RTCW); RTCW Ex. 167.

For similar reasons, RTCW has no control over whether a supportive voter sends their signed Personal Use Petition to RTCW's Fort Myers address quickly enough to comply with the 10-Day Return Deadline. OECS Director Jillian Pratt confirmed that, consistent with the statutory text, if a sponsor provides a blank Personal Use Petition form to a voter to mail to the sponsor themselves, then "that's the sponsor collecting the petition forms" within the meaning of Fla. Stat. § 100.371(7)(a). Pratt Dep. at 162:7–163:8. This means the sponsor is still liable for violating the 10-Day Return Deadline even if the sponsor did not receive a signed petition back from a voter—a voter the sponsor had no control over and no means to know that they were even signing the petition—before 10 days had lapsed since the date of signature. Pratt Dep. at 162:7–163:8. This means that RTCW is "very

145

likely going to be violating the ten-day rule in almost every instance" that a Personal Use Petition is submitted. PI Hr'g Tr. at 144:2–10 (Martin).

Even where petition sponsors do exercise control, the 10-Day Return Deadline presents independent impossibility issues. Plaintiffs established at trial that there are several reasons why—despite their best efforts—petition sponsors are not able to ensure that petitions arrive within the 10-Day Return Deadline.

Mailing petitions to Supervisors is often the only available means of delivery. Trial Tr. vol. 3, 708:21–709:7 (Martin); Trial Tr. vol. 4, 992:12–993:7 (Perez); Trial Tr. vol. 4, 1044:10–1046:11 (Ciera Cox). And petitions must generally be submitted to Supervisors by an authorized agent of the sponsor, preventing ordinary volunteers from immediately submitting petitions, even if they were physically able to do so. *See, e.g.*, Trial Tr. vol. 3, 675:7–15, 706:13–708:8 (Martin); RTCW Ex. 78 (tracking counties which require submission by sponsor and authorized RTCW agents available to submit in that county); RTCW Exs. 87, 97 (correspondence with Lee County); RTCW Ex. 108 (correspondence with Jackson County).

Taken together, this means that, by necessity, RTCW's operation depends on petitions being mailed to their headquarters' address (which is printed on petition forms), where they are processed by RTCW volunteers and sent on to Supervisors. Trial Tr. vol. 3, 673:19–674:3, 675:7–11, 676:4–17 (Martin); RTCW Exs. 69, 75. These mail trips can introduce significant bottlenecks outside of RTCW's control.

146

Trial Tr. vol. 3, 708:21–709:7 (Martin); Trial Tr. vol. 4, 994:4–995:2 (Perez). In some regions of the State, mail takes extended detours to sorting facilities outside the county where it is mailed. Trial Tr. vol. 4, 1046:12–1047:1 (Ciera Cox). In Monroe County, for example, RTCW expects that it would need to mail petitions on the date of signature to hope to comply with the 10-Day Return Deadline. Trial Tr. vol. 4, 1041:20–1042:5, 1047:2–1048:4, 1051:24–1052:3 (Ciera Cox) (testifying that it was not possible for RTCW to generally meet the 10-Day Return Deadline for petitions moving through Monroe County); *see also* Trial Tr. vol. 4, 1118:1–9 (Meghan Cox) (testifying Smart and Safe is unable to hire paid circulators in Monroe County because it would be "impossible" to comply with the 10-Day Return Deadline there).

And even in the best-case scenario, the typical duration of mailings means that even if volunteers process petitions immediately, there is no guarantee they will arrive by the deadline. Trial Tr. vol. 3, 704:23–706:6 (Martin); Trial Tr. vol. 4, 994:4–995:2 (Perez); Trial Tr. vol. 4, 1048:24–1050:6 (Ciera Cox); *see also* RTCW Ex. 143 (volunteer explaining that even vigilant volunteers will have "no promise that it will get there by the deadline"). Petitions are often gathered on weekends, which commonly introduce further delays in accessing or receiving mail services. Trial Tr. vol. 3, 706:7–12 (Martin); Trial Tr. vol. 4, 1048:7–14 (Ciera Cox). Furthermore, petitions are often collected from voters across the state at a single

147

event, introducing logistical complications that make processing and mailing signed petitions to RTCW's Fort Myers address and/or Supervisors of Elections more time consuming and impossible to accomplish within 10 calendar days from signature. Trial Tr. vol. 4, 992:8–995:11 (Perez); RTCW Ex. 153; Trial Tr. vol. 4, 1048:15–1050:6 (Ciera Cox). For example, at just one event in Orlando, RTCW collected 389 petitions from voters in at least 20 counties. Trial Tr. vol. 4, 993:21–994:1 (Perez); RTCW Ex. 153. Despite sorting and processing as quickly as possible, Regional Director Tom Perez "[d]idn't feel comfortable meeting [the 10-Day Return Deadline] at all." Trial Tr. vol. 4, 994:25–995:2 (Perez).

These myriad factors make it impossible for RTCW to develop petition circulation protocols that comply with the 10-Day Return Deadline. *See* Trial Tr. vol. 3, 704:23–706:12, 709:15–24 (Martin).

### 2. Petition Delivery After February 1 Fine

For the same reasons as the 10-Day Return Deadline, RTCW has no ability to prevent individuals circulating outside its knowledge or control from turning in late petitions (*i.e.*, signed by a voter on or prior to February 1) after the February 1 deadline. Fla. Stat. § 100.371(7)(a)(2). RTCW can be held responsible for the Petition Delivery After February 1 Fine under the same circumstances as the 10-Day Return Deadline. Pratt Dep. at 89:10–24, 92:2–94:5. Moreover, Director Pratt's testimony that a voter mailing a signed Personal Use Petition form to the sponsor is

148

"the sponsor collecting the petition forms" within the meaning of Fla. Stat. § 100.371(7)(a) likewise applies to Subsection (7)(a)(2), the Petition Delivery After February 1 Fine. *See* Pratt Dep. at 162:7–163:8. Accordingly, a voter's own delay in sending their signed petition form to RTCW after the February 1 deadline could result in a financial penalty for RTCW of $100 per day late, up to $5,000. Fla. Stat. § 100.371(7)(a)(2).

### 3. Wrong County Delivery Fine

When it comes to the Wrong County Delivery fine, Fla. Stat. § 100.371(7)(a)(3), RTCW suffers from the same substantive due process problem as the other Section 100.371(7)(a) fines: RTCW is punished even when it has no way to prevent individuals circulating outside its knowledge or turning in petitions to the wrong county, *i.e.* a county other than where the voter resides. Pratt Dep. at 98:20–99:16.

Since H.B. 1205, RTCW petitions have been delivered to the wrong county without RTCW's knowledge or culpability. Trial Tr. vol. 3, 717:16–25 (Martin). Ms. Martin testified "we don't know how they got there because our authorized agent wasn't submitting petitions at the time in that county." Trial Tr. vol. 3, 717:16–22 (Martin). It is unknown how many other violations RTCW may have incurred via actors outside its control because it has yet to receive any notices from Supervisors of Elections or OECS. Trial Tr. vol. 3, 718:7–12 (Martin).

149

#### 4. Filling in Missing Information Fine

Prior to H.B. 1205, filling in missing information on petition forms other than the voter's signature and date was common practice among initiative petition campaigns and circulators. Trial Tr. vol. 3, 719:17–722:2 (Martin); Trial Tr. vol. 3, 771:19–772:24 (Haller); Trial Tr. vol. 6, 1526:25–1528:3 (Lowe-Minor); Trial Tr. vol. 6, 1641:4–16 (Scoon); Trial Tr. vol. 6, 1695:16–1697:2 (Chandler). For example, circulators would often fill in the correct county information in circumstances where voters inadvertently wrote "USA" on the form. Trial Tr. vol. 3, 772:2–9 (Haller); Trial Tr. vol. 6, 1526:25–1527:16 (Lowe-Minor); Trial Tr. vol. 6, 1641:4–10 (Scoon); Trial Tr. vol. 6, 1695:16–22 (Chandler). This practice, often referred to as "perfecting" or "quality control," was allowed and even encouraged by some Supervisors of Elections. Trial Tr. vol. 3, 720:14–19 (Martin). At least some Supervisors of Elections do not validate forms if they include missing or inaccurate address information. Trial Tr. vol. 3, 720:14–19 (Martin); *see* Trial Tr. vol. 3, 772:12–14 (Haller). Indeed, Florida law directs Supervisors of Elections not to verify petition forms where the voter's correct county information is missing or incorrect. Fla. Stat. § 100.371(14)(c).

Though RTCW has directed its ambassadors to stop filling in missing information to avoid a $5,000 per form fine, it has no control over unaffiliated individuals who may continue the once ubiquitous practice. Trial Tr. vol. 3, 722:3–

7 (Martin); Fla. Stat. § 100.371(8). Indeed, H.B. 1205 sets up a bizarre Catch-22, where circulators are no longer permitted to fill in the county name on the form if it is left blank—so it will be invalidated—but they still must look up the correct county to mail the form using the voter's address to avoid liability for an incorrect county submission. Trial Tr. vol. 3, 720:2–19 (Martin); Matthews Dep. at 200:25–201:7; Pratt Dep. at 111:22–112:6. Regardless, a sponsor could be fined under this provision even without direct knowledge of or culpability in a violation. Pratt Dep. at 105:3–106:24, 110:2–24. For instance, RTCW is subject to $5,000 fines if an individual collecting a petition on behalf of an immediate family member or another individual with a Personal Use Petition—an individual who RTCW would have no ability or reason to know even exists—fills in "missing information," such as the full legal name of their family member or friend signing a Personal Use Petition. Fla. Stat. § 100.371(4)(g); Trial Tr. vol. 3, 722:3–7 (Martin).

### 5. Pre-Filling Petitions Fine

RTCW could also be held financially responsible for the $50 Pre-Filling Petition Fine even though it is unable to prevent individuals outside of its knowledge or control from circulating pre-filled petitions. Fla. Stat. § 100.371(10); Pratt Dep. at 103:14–106:14. RTCW previously distributed pre-filled petitions to voters through its vendor TallyEd but stopped as a result of H.B. 1205. Trial Tr. vol. 3, 723:13–725:3 (Martin). Through TallyEd, RTCW was able to provide a cost-

151

effective service to voters where a petition form was sent electronically or via mail to voters with their pre-filled information. Trial Tr. vol. 3, 723:19–23, 725:6–9 (Martin). Though RTCW stopped this practice, it cannot prevent individuals outside of its control or knowledge from pre-filling petitions and incurring financial liability on its behalf.

### 6. Ineligible Petition Circulator Fine

If an ineligible circulator (including a non-Florida resident, a non-U.S. citizen, or a person with a felony conviction whose rights are not restored) collects a petition on behalf of RTCW, RTCW "is liable for a fine in the amount of $50,000 for each person the sponsor knowingly allows to collect petition forms on behalf of the sponsor." Fla. Stat. § 100.371(4)(g). The Ineligible Petition Circulator fine would immediately wipe out RTCW and stop the campaign because RTCW has less than $50,000. Trial Tr. vol. 3, 733:22–734:4 (Martin). The provision is unconstitutional as applied by Defendants here because they attribute knowledge to sponsors for the actions of unaffiliated volunteers who circulate petitions on their behalf, regardless of the sponsor's actual knowledge. *See* Pratt Dep. at 104:3–11.

Under the Secretary of State's petition circulator registration system, RTCW has no way to know who is properly registered as a circulator with the State because "[t]here's no feedback loop between the State and the campaign regarding who is registered on our behalf." Trial Tr. vol. 3, 694:17–18 (Martin); Matthews Dep. at

152

149:16–150:17 (acknowledging that a volunteer who is passionate about a particular petition could register to circulate that petition completely on their own volition without contacting the sponsor). Individuals register directly with the Division of Elections and independently select the initiatives for which they would like to circulate petitions. Matthews Dep. at 149:16–150:17. As a sponsor, RTCW has no role or insight into the process of individuals registering with the State as a circulator, especially because it does not employ or pay any circulators. Trial Tr. vol. 3, 665:8–9, 729:1–730:7 (Martin). As such, the Secretary's circulator registration process leaves RTCW in the dark about whether ineligible individuals have attempted to register or are registered on behalf of RTCW. *See* Matthews Dep. at 149:16–150:17.

Even still, RTCW demonstrated at trial that there are ineligible individuals who have registered or attempted to register with the State on behalf of RTCW. Two of these individuals are non-U.S. citizens who are ineligible to circulate under the Non-Citizen Restriction and attempted to register during the period that provision was enjoined. Fla. Stat. § 100.371(4)(b); RTCW Ex. 268 (individual identifying himself to the Secretary of State's Office as a non-U.S. citizen who wanted to circulate RTCW petitions); RTCW Ex. 304 (same). Ms. Martin testified that these individuals were unknown to and not in contact with RTCW. Trial Tr. vol. 3, 730:19–731:22, 732:3–733:21 (Martin). Following the Eleventh Circuit's stay of this Court's preliminary injunction, one of these individuals contacted the Secretary

153

of State's Office on October 20, 2025, to inquire about reactivating his circulator registration before he was informed that his citizenship status barred him from circulating petitions. RTCW Ex. 304. This email illustrates how an ineligible circulator could continue to collect petitions on behalf of RTCW without the sponsor's actual knowledge or culpability yet still incur a ruinous Ineligible Circulator Fine.

### ii.    Legal Standard

The doctrine of substantive due process "includes both the protections of most of the Bill of Rights, as incorporated through the Fourteenth Amendment, and also the more general protection against 'certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them.'" *DeKalb Stone, Inc. v. Cnty. of DeKalb*, 106 F.3d 956, 959 (11th Cir. 1997) (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)); *see also Mirabelli v. Bonta*, 146 S. Ct. 797, 803 (2026) (concluding plaintiffs were likely to succeed on substantive due process claims); *id.* at 804 (Barrett, J., concurring) (reaffirming that "*Dobbs* calls into question neither the doctrine of substantive due process nor the other unexpressed rights that the doctrine protects").

First, and central to substantive due process protections, is the principle that people cannot be "punished [by the government] without being personally guilty." *St. Ann v. Palisi*, 495 F.2d 423, 426–27 (5th Cir. 1974). This legal maxim requiring

154

"personal guilt is a fundamental element in the American scheme of liberty." *Id.* As a result, any imposition of punishment or deprivation of fundamental rights, based on the conduct of others rather than the person subject to government authority, must satisfy strict scrutiny. *Id.*; *see also Cook v. Stewart*, No. 1:13-CV-72-MW-GRJ, 2014 WL 12521335, at *5 (N.D. Fla. Apr. 22, 2014). While this "lack of personal guilt" line of substantive due process cases has developed primarily in the criminal law context, *see Scales v. United States*, 367 U.S. 203 (1961), the relevant predicate—punishment—has been found satisfied in certain civil cases, as well. *St. Ann*, 495 F.2d at 427 (suspension and transfer of students, a non-criminal burden, was "punishment" for substantive due process purposes); *Tyson v. New York City Hous. Auth.*, 369 F. Supp. 513, 518–19 (S.D.N.Y. 1974) (evictions based on the conduct of adult children not living in the tenants' households at the time of the wrongful conduct offended "personal guilt" requirement implicit within the concept of substantive due process).

Here, there can be no doubt that the Severe Fines Provisions constitute a form of punishment. First and foremost, the Florida Legislature said so. In enacting H.B. 1205, the Legislature expressly stated it was motivated by the view that "existing fines and penalties levied against petition sponsors . . . appear to be inadequate deterrents." FDH Ex. 166 at 6. As the Eleventh Circuit recently held, if a civil fine "serves either retributive or deterrent purposes, it is punishment." *United States v.*

155

*Schwarzbaum*, 127 F.4th 259, 270 (11th Cir. 2025) (citation modified). Indeed, the Severe Fines Provisions transparently do not serve any remedial function because the size and escalation of the fines—hundreds or thousands of dollars, growing by the day[37]—bear no relationship to the government's costs in reviewing or identifying petitions that are violative—which costs merely a handful of dollars. Trial Tr. vol 2, 505:12–15 (Earley); *see* RTCW Exs. 165, 167–169. Because RTCW has demonstrated that it faces punishment based on the actions of individuals with whom it does not have a substantial relationship or control over, including unknown circulators, voters, and unaffiliated volunteers, the Severe Fines Provisions are subject to strict scrutiny. *St. Ann*, 495 F.2d at 427.

Second, even where government action falls short of "punishment," the doctrine of substantive due process still protects against arbitrary and irrational government action arising from legislative acts. *See Kentner v. City of Sanibel*, 750 F.3d 1274, 1279–80 (11th Cir. 2014). While not subject to strict scrutiny, the

---

[37] RTCW Exhibit 167 demonstrates how the 10-Day Return Deadline Fine easily crosses the line from "legal burden" to "punishment." *Cook*, 2014 WL 12521335, at *5. On May 3, 2025, the day after H.B. 1205 was enacted, six RTCW petitions were signed by voters, though they were not turned into the Sarasota County Supervisor of Elections by a RTCW volunteer until May 27, 2025 after the 10-day deadline had lapsed. RTCW Ex. 167. Multiplying these six petitions by the $50 fine per day for 12 days late amounts to approximately $3,600 in potential fines for RTCW.

government still must establish a rational basis for its treatment of the general populace under the law. *See Cook*, 2014 WL 12521335, at \*5.

RTCW has established that the Severe Fines are a punishment so "devastating" that they were forced to halt their campaign. Trial Tr. vol. 3, 704:6–18 (Martin). Likewise, RTCW established that the possibility that individuals outside of its control incurred fines for RTCW without its knowledge or culpability is not remote. *E.g.*, RTCW Exs. 268, 304 (two unaffiliated non-U.S. citizens seeking to register as circulators on RTCW's behalf whom RTCW had no knowledge of); Trial Tr. vol. 3, 717:16–25. (Martin) (wrong county petition delivered without RTCW's knowledge); *see supra* Section IV.F.i.

### iii.    The Severe Fines Provisions Fail Strict Scrutiny

The Severe Fines fail strict scrutiny because Defendants can demonstrate no compelling State interest in enforcing any of the Severe Fines against RTCW for the violations of actors outside of its control or knowledge. Punishing a sponsor for the actions of unknown individuals cannot induce a change in behavior because the sponsor definitionally has no knowledge or control of the individuals engaging in violative conduct. To the extent Defendants argue that the fines combat fraud or makes sponsors follow the law, Pratt Dep. at 113:9–114:6 *but see* Pratt Dep. at 77:5–9, 77:18–23, 113:9–114:6, 160:17–161:19, punishing RTCW for the actions of individuals outside its control or knowledge is not narrowly tailored to achieve that

goal because "reasonable alternative means" exist. *St. Ann*, 495 F.2d at 427–428, n.24.

Most fundamentally, the Secretary could instead hold accountable those who are actually responsible for the violation. *See St. Ann*, 495 F.2d at 428. Indeed, this is largely what the State already does through criminal liability for the culpable party. *See, e.g.*, Fla. Stat. § 104.185. And instead of fining sponsors for actions outside of their knowledge or control, the Secretary could issue fines to the individuals who violate the Severe Fines provisions directly. With respect to the Ineligible Circulator Fine—and to the extent this Court does not otherwise find the Petitions Circulator Restrictions patently unconstitutional—the State has the tools to civilly or criminally enforce Fla. Stat. § 100.371(4)(b) to prevent ineligible individuals from registering or circulating petitions. Fla. Stat. §§ 100.371(11), 104.187.

And to the extent that Defendants argue the 10-Day Return Deadline promotes efficiency and promptness on the part of the sponsor, that provision is not narrowly tailored to serve that goal. In fact, Leon County Supervisor of Elections Mark Earley testified that the 10-day turnaround makes no difference to Supervisors in their validation process because even if sponsors or circulators are returning petitions on a rolling basis, the petitions are processed in batches. Trial Tr. vol. 2, 522:9–523:8 (Earley). Additionally, the 10-Day Return Deadline does not promote sponsor accountability or efficiency because the tight turnaround time guts sponsors' ability

158

to do their own internal quality check for errors or fraud. *See* Trial Tr. vol. 3, 704:23–705:18 (Martin) (testifying that RTCW has to immediately turn around petitions received at the Fort Myers address to comply with the 10-Day Return Deadline); Trial Tr. vol. 1, 192:11–19 (Walsh) ("And so quality control was not finished before petition signatures were out of our office. . . . And then we could no longer use the physical petitions as a training tool to improve our circulators' validity rate and other things."). Furthermore, the State could ensure such a goal is met through a longer deadline when applied to unregistered volunteer circulators.[38]

Ultimately, Defendants have failed to demonstrate a compelling state interest that is served by imposing the Severe Fines on RTCW for violations by actors outside its knowledge or control. However, to the extent the Court agrees there is one, the existence of several alternative ways of achieving such goals means that the Severe Fines fail strict scrutiny. *St. Ann*, 495 F.2d at 427–28.

---

[38] Prior to H.B. 1205, there was a 30-day return deadline for paid circulators. Fla. Stat. § 97.021(28) (2022). However, RTCW was not subject to a 30-day deadline and has never had a delivery return deadline because all of its petitions were collected by volunteers who did not have to register with the State before H.B. 1205. *Id.*; RTCW Exs. 135, 136; Matthews Dep. at 177:11–15; Trial Tr. vol. 3, 701:18–24 (Martin).

### iv. The Severe Fines Provisions Are Arbitrary and Irrational Government Action that Fail Even Rational Basis Review

Even if this Court concludes that the Severe Fines Provisions do not punish petition circulators for the actions of others, the Severe Fines still fail rational basis review under substantive due process because the State's structuring of the Severe Fines Provisions is arbitrary and irrational for multiple reasons.

First, the imposition of financial penalties for the conduct of individuals totally outside RTCW's control is irrational and arbitrary. *Cook*, 2014 WL 12521335, at \*5. The Severe Fines are not like other rationally-related economic regulations where a "fine for a false alarm may well encourage . . . alarm companies to more carefully train their customers." *Ga. Elec. Life Safety & Sys. Ass'n, Inc. v. City of Sandy Springs*, 965 F.3d 1270, 1276 (11th Cir. 2020). Instead, the Severe Fines are akin to "fining a homeowner for a neighbor's music being played too loudly." *Id.* at 1277. RTCW can scream from the rooftops that it does not want individuals to circulate without its permission, but it cannot "reduce [its] liability by cutting off" or "training" those individuals when they are totally outside its control or knowledge. *Id.* As detailed above, *supra* Section IV.F.i., the Severe Fines make RTCW strictly liable for violations by individuals outside of its control or knowledge, including unknown circulators who register with the State, unaffiliated volunteers, and even voters. That penalty is arbitrary and cannot serve a government interest in curtailing

160

the prohibited conduct because the sponsor does not control and cannot prevent that conduct.

Second, the Severe Fines Provisions impose requirements on petition sponsors that are impossible to ensure compliance with. The impossibility of compliance independently runs afoul of substantive due process and the protections against arbitrary and irrational government action. *See, e.g.*, *Rodriguez v. City of New York*, 623 F. Supp. 3d 225, 247–48 (S.D.N.Y. 2022) (striking down impossible parole conditions). As outlined above, *supra* Section IV.F.i.1., it is impossible for RTCW volunteers to comply with the 10-Day Return Deadline despite RTCW's best efforts to adopt new procedures to meet the deadline. And moreover, persons totally outside the control of petition sponsors can commit violative conduct and it is impossible for petition sponsors to prevent it. Because voters or petition circulators can circulate petitions on behalf of RTCW without its control or knowledge, it is impossible for RTCW to ensure compliance with all of the Severe Fines Provisions.

This impossibility issue cannot be saved by H.B. 1205's narrow, permissive, and contested savings clause. The savings clause provides that "force majeure or impossibility of performance is an affirmative defense to a violation of this subsection." Fla. Stat. § 100.371(7)(b). However, this "defense" is subject to several limitations. *First*, it can only be used to excuse failure to return a petition "within the required timeframe." *Id.* This means that, at best, this savings clause could only

161

protect petition sponsors from the 10-Day Return Deadline and the February 1 Deadline—it would have no application to any of the other Severe Fines Provisions. *Second*, it only provides that the fines "*may* be waived." *Id.* (emphasis added). As this Court found at the preliminary injunction stage, this only provides a permissive protection—not a mandatory one. *See* ECF 189, Order on First Mot. for Prelim. Inj. at 6. *Third*, the savings clause only applies "upon a showing" made by petition sponsors, Fla. Stat. § 100.371(7)(b), which means its application to any given fine is contested and uncertain. Moreover, in circumstances outside a petition sponsor's control, that sponsor likely will not have any information upon which to make such a showing because they are wholly uninvolved. Indeed, the Secretary of State's office confirmed that carelessness on the part of petition circulators does *not* provide a basis for petition sponsors to invoke the impossibility defense. *See* Pratt Dep. at 92:1–94:5. In a tacit admission of H.B. 1205's irrationality, the Secretary considers all petition circulators—paid or unpaid—to be fiduciaries of the petition sponsor even if the sponsor has had no knowledge of, contact with, or control over that circulator. Pratt Dep. at 92:1–94:5, 104:3–107:6.

For similar reasons, H.B. 1205 also is not saved by the self-reporting clause. That clause *permits* the waiving of fines if a petition sponsor discovers and reports a violation to the Secretary of State "as soon as practicable." Fla. Stat. § 100.371(11).

162

Like the impossibility savings clause, it is only a permissive waiver of fines—not a mandatory waiver of fines. *See* First PI Order at 6.

Even if the self-reporting clause were mandatory, it is not even clear from the statute how a petition sponsor provides notice that is sufficient to absolve them of financial liability, leaving the waiver within the discretion of the Secretary. *See* Trial Tr. vol. 8, 2139:15–2141:12 (Pratt) ("So, you know, we could impose a fine, but whether or not it would actually be upheld is a different question."). RTCW itself has attempted to provide notice to the Secretary of a violation and has sought guidance on whether this notice is sufficient or whether anything else is required— but has received no response. Trial Tr. vol. 3, 712:5–713:9, 715:18–716:12, 735:1– 738:10 (Martin); RTCW Ex. 132; FDH Ex. 194; *see also* RTCW Ex. 152. In response to questions about one of these notices that sought further guidance from the Secretary and garnered no response, the Secretary of State's Office confirmed in deposition testimony that the notice from RTCW was *not* sufficient to absolve it from financial liability. Pratt Dep. at 156:6–157:16.

And even if RTCW knew how to provide sufficient notice, it may not even have knowledge or warning of violative conduct because petitions may be turned in without the sponsor's control or knowledge. Indeed, that exact scenario has already happened to RTCW, where several petitions were turned in late or to the wrong county without RTCW's awareness until after the fact. Trial Tr. vol. 3, 717:16–

163

718:16 (Martin). Even when petitions are within RTCW's control, RTCW may not know whether they will violate the law upon submission, meaning it is impossible for RTCW to provide notice of the violation. Trial Tr. vol. 3, 737:7–738:10 (Martin) (explaining that if petitions are mailed to Supervisor three days before 10-day deadline, RTCW will not know if they will be timely submitted in order to report a violation); *see also* Pratt Dep. at 156:6–157:15 (explaining that notification of instances of possible violations are not "specific enough" to give sufficient notice to the Secretary).

Though the Ineligible Circulator Fine appears to limit a violation to instances where the sponsor "knowingly allows" a circulator to circulate on its behalf, this *mens rea* language does not solve the problem. Trial Tr. vol. 3, 728:17–25 (Martin). Director Pratt has represented that sponsors knowingly violate other fine provisions of H.B. 1205 without direct knowledge based on the Secretary's theory that circulators are always fiduciaries of the sponsor organization. *See, e.g.*, Pratt Dep. at 104:3–106:24. Director Pratt also testified that sponsors are necessarily intertwined with the circulator registration process because "[i]n order for a circulator to be a registered circulator with the sponsor, the sponsor did participate in registering that circulator to represent them on their behalf." Pratt Dep. at 106:3–6. Director Matthews—who oversees the registration process at the Division of Elections— similarly testified that circulators "sign up" for a sponsor and "there will be an

164

expectation that they may be hired." Matthews Dep. at 150:3–11. But this is simply not true. *See* Trial Tr. vol. 3, 729:1–730:7 (Martin). Directors Matthews and Pratt's misunderstanding underscores how holding sponsors legally responsible for unknown individuals who circulate on their behalf—as the letter of the law indisputably does— is irrational and arbitrary in violation of substantive due process. *Cook*, 2014 WL 12521335, at *5; *see also* Matthews Dep. at 149:16–150:17 (testifying that "the sponsoring political committee is actually going to be on the hook for the payment of the petitions that are submitted" while then acknowledging that circulators could register without any contact with a sponsor).

Under rational basis review, Defendants cannot demonstrate that enforcing the Severe Fines Provisions against RTCW is rationally related to any government interest. First, Defendants cannot show that imposing impossible requirements is rationally related to "increase[ing] transparency and accountability for sponsors of initiative petitions." FDH Ex. 166 at 6. There is no accountability or transparency involved if RTCW is arbitrarily penalized for violations of the Severe Fines Provisions when it does not control and cannot prevent them. *See Ga. Elec. Life Safety & Sys. Ass'n, Inc.*, 965 F.3d at 1277. Second, Defendants cannot show that imposing an impossibly short deadline serves any administrative benefit. Supervisors validate late arriving petitions anyway, and the timing of the late arrival

165

would not make a difference to their process. Trial Tr. vol. 2, 521:14–523:11 (Earley); *see supra* Section IV.F.iii.

> **v.    The Arbitrarily Invalidated Petitions Provision Violates Substantive Due Process**

The Arbitrarily Invalidated Petitions provision, Fla. Stat. § 100.371(14)(h), also violates substantive due process. First, it deprives voters of a fundamental right without any individual guilt on their part. As outlined above, the ability to support and place issues on the ballot in the initiative process is a fundamental right enshrined in the Florida Constitution. *See supra* Section IV.E. The deprivation of a fundamental right on the basis of someone else's conduct is subject to strict scrutiny. *Doe v. Moore*, 410 F.3d 1337, 1342–43 (11th Cir. 2005). And it is undisputed that Defendants are depriving voters of the right to have their otherwise valid petition counted based solely on the eligibility and/or registration status of petition circulators. Trial Tr. vol. 2, 529:11–530:2, 530:7–531:18 (Earley); Matthews Dep. at 164:6–24, 166:19–167:16. But, of course, Defendants have not shown that punishing voters as a means of regulating the conduct of petition circulators is narrowly tailored to *any* interest, let alone a compelling one. Any rationally tailored regulation of petition circulators should be directed toward petition circulators themselves—like the felony criminal penalties for failing to register that already exist. Fla. Stat. § 100.371(9); *see St. Ann*, 495 F.2d at 428.

166

Second, the provision imposes requirements on voters seeking to have their signatures counted that are impossible to comply with, since they have no means of verifying the registration status or eligibility of petition circulators. Indeed, even where voters signed petitions with presently eligible and duly registered circulators during the preliminary injunction period, their petitions were subsequently and retroactively invalidated merely based on the legal status of the petition circulator. Trial Tr. vol. 2, 530:7–532:4 (Earley); Trial Tr. vol. 8, 2050:25–2052:7 (Matthews). As a result, this provision could not even survive rational basis review because it is a form of arbitrary and irrational government action. *Cook*, 2014 WL 12521335, at *4.

### G. Cumulative Effects of Challenged Provisions

RTCW Plaintiffs maintain that none of the Challenged Provisions pass constitutional muster when viewed in isolation. But RTCW Plaintiffs also assert that the Court should not review each of the Challenged Provisions in isolation because they are part of a single, interrelated statutory scheme addressing the citizen initiative process. In this way, the interrelation of H.B. 1205's restrictions enhances the burden of each Challenged Provision. RTCW Plaintiffs incorporate and adopt the legal arguments advanced in Florida Decides Healthcare Plaintiffs' Written Closing Argument on this point. *See* FDH Brief, Sections I.B.2., IV.A.1.d.

167

**H. Scope of Relief**

This Court should declare that the Challenged Provisions violate the First and Fourteenth Amendments and should permanently enjoin Defendants from enforcing the Challenged Provisions. *Trump v. CASA, Inc.* presents no impediment to the relief Plaintiffs request. 606 U.S. 831 (2025). Such an injunction is necessary to provide "complete relief" to the Plaintiffs before this Court, *CASA*, 606 U.S. at 834, and is appropriate in the First Amendment context. "Complete relief" in the context of First Amendment challenges will necessarily be broader than in other contexts. *See Griffin v. HM Fla.-ORL, LLC*, 144 S. Ct. 1, 2 (2023) (statement of Kavanagh, J. and Barrett, J.) (First Amendment overbreadth challenge "present[ed] its own doctrinal complexities" which made it an "imperfect vehicle for considering the general question of whether a district court may enjoin a government from enforcing a law against non-parties to the litigation."); *Welty v. Dunaway*, 791 F. Supp. 3d 818, 843 (M.D. Tenn. 2025) ("*CASA* also does not address the need for broader injunctions in the First Amendment context. But the Supreme Court has repeatedly affirmed that when a law is unconstitutionally overbroad, 'all enforcement of that law' may be enjoined."); *see also Ams. for Prosperity Found.*, 594 U.S. at 605, 618 (rejecting argument that relief should have been limited to the parties because the "risk of a chilling effect on association is enough" to justify broad relief). Here, too, broad

168

relief is justified where the Challenged Provisions have chilled and will continue to chill protected First Amendment speech and association.

Further, because all additional Plaintiffs in this case are intervenors, any relief granted should extend to all Plaintiffs equally. *See Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433 (2017) (intervening plaintiffs need only establish Article III standing when they seek relief different from the existing parties).

## V. Conclusion

In sum, trial evidence established that the Challenged Provisions should be permanently enjoined.

Respectfully submitted this 19th day of March, 2026,

*/s/ Brent Ferguson*
Danielle Lang (D.C. Bar No. 1500218)*
Brent Ferguson (D.C. Bar No. 1782289)*
Sejal Jhaveri (N.Y. Bar No. 5396304)*
William Hancock (D.C. Bar No. 90002204)*
Heather Szilagyi (D.C. Bar No. 90006787)*
Ellen Boettcher (D.C. Bar No. 90005525)*
Melissa Neal (D.C. Bar No. 90018637)*
Alexis Grady (D.C. Bar No. 90017620)*
Samantha Perlman (Mass. Bar No. 715595)*
Simone Leeper (Fla. Bar No. 1020511)
Campaign Legal Center
1101 14th Street NW, Ste. 400
Washington, DC 20005
(202) 736-2200
dlang@campaignlegalcenter.org

169

bferguson@campaignlegalcenter.org
sjhaveri@campaignlegalcenter.org
whancock@campaignlegalcenter.org
hszilagyi@campaignlegalcenter.org
eboettcher@campaignlegalcenter.org
mneal@campaignlegalcenter.org
agrady@campaignlegalcenter.org
sperlman@campaignlegalcenter.org
sleeper@campaignlegalcenter.org

*Counsel for Plaintiffs FloridaRighttoCleanWater.org
and Melissa Martin*

\*admitted *pro hac vice*

**CERTIFICATE OF SERVICE**

I certify that on March 19, 2026, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record in this case.

*/s/ Brent Ferguson*
Brent Ferguson

**CERTIFICATE OF COMPLIANCE**

I certify that this document complies with the typeface and formatting requirements in Local Rule 5.1.

*/s/ Brent Ferguson*
Brent Ferguson