**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

FLORIDA DECIDES HEALTHCARE,
INC., et al.,

      *Plaintiffs*,

   v.

CORD BYRD, in his official capacity as
Secretary of State of Florida, et al.,

      *Defendants*.

Case No. 4:25-cv-211-MW-MAF

## FDH PLAINTIFFS' WRITTEN CLOSING STATEMENT AND POST-TRIAL BRIEF

**TABLE OF CONTENTS**

TABLE OF ABBREVIATIONS AND DEFINED TERMS .....................................8

INTRODUCTION ........................................................................................9

BACKGROUND ........................................................................................12

I.   FACTUAL BACKGROUND.................................................................12

    A. Background on Ballot Initiatives in Florida .....................................12

        1. Florida's initiative process provided a vital means for political speech and association...................................................................12

        2. Florida stringently regulated its initiative process prior to HB 1205. .....................................................................................15

        3. No evidence suggests that petition fraud threatened the integrity of Florida's initiative process. ...................................................16

        4. The primary "evidence" before the Legislature on petition fraud consisted of biased reports and unreliable exaggerations. .......................18

    B. HB 1205...............................................................................23

        1. HB 1205's Challenged Provisions each individually severely burden speech and association without any justification. ........................24

            a.  Circulator Eligibility Restrictions .....................................24

            b.  Registration Restrictions .................................................27

            c.  Ten-Day Return Provisions...............................................32

            d.  Verification Fee Provisions...............................................36

            e.  Voter Personal Identifying Information ("PII") Disclosures ..............43

            f.  Sponsor Fines Provisions and New Criminal Provisions....................45

2

2. In combination, HB 1205's Challenged Provisions effectively gut the ability of sponsors, circulators, and voters to engage in speech and association related to the initiative process. ......................................51

3. HB 1205's provisions, individually and in combination, severely impact the FDH Plaintiffs...............................................................53

   a. FDH .............................................................................................53

   b. Mitchell Emerson .......................................................................72

   c. Jordan Simmons .........................................................................73

II. PROCEDURAL BACKGROUND ........................................................76

ARGUMENT .............................................................................................77

III. FDH PLAINTIFFS HAVE STANDING FOR ALL CLAIMS ALLEGED IN THE OPERATIVE COMPLAINT. ..........................77

A. Plaintiffs have standing for their First Amendment speech claim (Count I)...........................................................................................78

  1. Injury-in-Fact...................................................................................78

   a. Circulator Eligibility Restrictions ..............................................79

   b. Registration Restrictions ............................................................81

   c. Ten-Day Return Provisions.........................................................82

   d. Verification Fee Provisions.........................................................83

   e. Voter PII Disclosures Requirement ...........................................84

   f. Sponsor Fines Provisions and New Criminal Provisions....................85

  2. Traceability.......................................................................................87

  3. Redressability ..................................................................................90

B. Plaintiffs have standing for their First Amendment association claim (Count II). ......................................................................................93

    1. Injury-in-Fact..................................................................................93

        a. Circulator Eligibility Restrictions .......................................93

        b. Registration Restrictions ....................................................94

        c. Ten-Day Return Provisions.................................................95

        d. Verification Fee Provisions.................................................95

        e. Voter PII Disclosures Requirement .....................................97

        f. Sponsor Fines Provisions and New Criminal Penalties .......98

    2. Traceability and Redressability ....................................................99

C. Plaintiffs have standing for their First Amendment substantial overbreadth claim (Count III)..............................................................99

    1. Injury-in-Fact..................................................................................99

        a. Circulator Eligibility Restrictions .......................................99

        b. Information Retention Felony ............................................100

        c. RICO "Irregularities" Definition.......................................100

    2. Traceability and Redressability ..................................................101

D. Plaintiffs have standing for their Fourteenth Amendment void-for-vagueness claim (Count IV). ........................................................102

    1. Injury-in-Fact................................................................................102

        a. Information Retention Felony ............................................102

        b. RICO "Irregularities" Definition.......................................103

    2. Traceability and Redressability ..................................................104

E. FDH has standing for its Fourteenth Amendment equal protection claim (Count V). ......................................................................104

   1.  Injury-in-Fact...............................................................................104

   2.  Traceability and Redressability ...................................................105

IV.    FDH PLAINTIFFS SHOULD PREVAIL ON EACH OF THEIR CLAIMS. ...............................................................................................106

A. The Challenged Provisions violate FDH Plaintiffs' First Amendment speech rights (Count I). ...............................................................106

   1.  Standard of Review .....................................................................106

      a.  Exacting scrutiny applies to Plaintiffs' First Amendment speech claim. ....................................................................106

         i.  The stay panel's order on the preliminary injunction is not binding on this Court's merits decision. ...................................107

         ii.  The stay panel's order on the preliminary injunction is not persuasive. .................................................................108

         iii. The Court should apply exacting scrutiny to the provisions considered by the stay panel. .....................................110

         iv. The Court should apply exacting scrutiny to each of the Challenged Provisions................................................117

      b.  If exacting scrutiny does not apply, at minimum intermediate scrutiny applies.......................................................119

      c.  If neither exacting nor intermediate scrutiny applies, *Anderson-Burdick* does. ..............................................124

      d.  In applying the standard of review, the Court should consider the cumulative and individual impact of each Challenged Provision.................................................................126

   2.  The Challenged Provisions impermissibly burden the FDH Plaintiffs' speech rights without advancing any State interest..............129

a. Circulator Eligibility Restrictions ......................................129

b. Registration Restrictions ....................................................138

c. Ten-Day Return Provisions ................................................143

d. Verification Fee Provisions ...............................................147

e. Voter PII Disclosures Requirement ...................................157

f. Sponsor Fines Provisions and New Criminal Provisions..................160

B. The Challenged Provisions violate FDH Plaintiffs' First Amendment association rights (Count II). .......................................................165

1. The First Amendment's right to expressive association protects sponsors, circulators, and others who join together to advance shared political goals through ballot initiatives.....................................166

2. *Dale* provides the appropriate standard of review for the FDH Plaintiffs' expressive association claims.................................169

3. The Challenged Provisions significantly affect and burden the FDH Plaintiffs' associational rights. .......................................177

a. Circulator Eligibility Restrictions and Registration Restrictions.......................................................................178

b. Voter PII Disclosures Requirement ...................................180

c. Remaining Challenged Provisions ....................................181

C. The Circulator Eligibility Restrictions, Information Retention Felony, and RICO "Irregularities" Definition are unconstitutionally overbroad (Count III). .......................................................................183

1. Standard of Review .............................................................183

2. Circulator Eligibility Restrictions ......................................184

3. Information Retention Felony ..............................................188

4. RICO "Irregularities" Definition ............................................................190

D. The Retaining and Racketeering Provisions are void for vagueness (Count IV)....................................................................................................193

1. Standard of Review ...............................................................................193

2. RICO "Irregularities" Definition..........................................................194

3. Information Retention Felony ...............................................................200

E. The Verification Fee Provisions violate FDH Plaintiffs' right to equal protection (Count V).................................................................................201

V. FDH PLAINTIFFS ARE ENTITLED TO THEIR REQUESTED RELIEF. ....................................................................................................207

CONCLUSION .....................................................................................................210

LOCAL RULES CERTIFICATION ...................................................................213

CERTIFICATE OF SERVICE ...........................................................................213

APPENDIX A .......................................................................................................214

APPENDIX B .......................................................................................................215

## TABLE OF ABBREVIATIONS AND DEFINED TERMS

| | |
|---|---|
| FDH | Florida Decides Healthcare, Plaintiff |
| LULAC | League of United Latin American Citizens, Plaintiff-Intervenor |
| OECS | Florida Department of State's Office of Election Crimes and Security |
| RTCW | Right to Clean Water, Plaintiff-Intervenor |
| Supervisors | Supervisors of Elections |
| Secretary | Secretary of State |
| SSF | Smart and Safe Florida, Plaintiff-Intervenor |

**INTRODUCTION**

Florida Decides Healthcare ("FDH") seeks to expand Medicaid coverage to nearly four million Floridians via a State constitutional amendment. *See* DX 109. To that end, its circulators were engaging in "thousands of conversations a day" with voters in an effort to persuade them to sign FDH's petition. *See* Tr. at 274:18–276:1. But in May 2025, Florida enacted HB 1205. Because of how HB 1205 restricted and burdened its speech, within a few months FDH was not engaged in petition circulation at all. HB 1205 made it all but impossible for FDH to speak and associate with voters through petition circulation. By "closing avenues of expression," HB 1205 "suppress[ed] . . . protected speech." *CAIR-Found., Inc. v. DeSantis*, No. 4:25cv516-MW/MJF, 2026 WL 613468, at *1 (N.D. Fla. Mar. 4, 2026).

That violates the Constitution. It really is that simple. And this Court need not get lost in debates over how many angels can fit on the head of a pin (what is process, what is speech, what is conduct?) to get there. Rather, as the Supreme Court found long ago, "the solicitation of signatures for a petition involves protected speech." *Meyer v. Grant*, 486 U.S. 414, 422 n.5 (1988). States must regulate petition circulation with "due regard for the reality" that it "is characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues, and for the reality that without solicitation the flow of such information and advocacy would

9

likely cease." *Id.* (quoting *Village of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632, (1980)).

Simply put, when a state creates an initiative process, it creates an avenue for its citizens to engage in protected speech and association. *See Republican Party of Minn. v. White*, 536 U.S. 765, 788 (2002) ("If the State chooses to tap the energy and the legitimizing power of the democratic process, it must accord the participants in that process . . . the First Amendment rights that attach to their roles." (citation omitted). That means that states cannot regulate their initiative processes in ways that "significantly inhibit communication with voters about proposed political change, and are not warranted by the state interests." *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 192 (1999).

FDH Plaintiffs do not demand a right to change Florida's Constitution, but they do seek protection of the First Amendment rights they exercise in attempting to do so. *Baker v. City of Atlanta*, 164 F.4th 850, 868 (11th Cir. 2026) (Newsom, J., dissenting) (recognizing a "stand-alone First Amendment interest in participating in the signature-gathering process itself—in going through the motions, so to speak"). The FDH Plaintiffs think Medicaid expansion is a matter of life-or-death. Whether or not their initiative ultimately qualifies for the ballot, the FDH Plaintiffs deserve the right to say: "The effort was worth it—we made our voices heard, we got our message out, we planted the seed." *Id.* at 869 (emphasis omitted). Plaintiffs

10

respectfully request that this Court recognize that right.

Here, the FDH Plaintiffs explain how HB 1205's provisions operate independently and cumulatively to severely burden speech and association without any legitimate justification. They demonstrate why certain provisions of HB 1205 are unconstitutionally overbroad and vague. And they illustrate how HB 1205 burdens the FDH Plaintiffs' fundamental rights by burdening statewide initiatives— and statewide initiatives only—with crushing petition verification fees. Plaintiffs also respond to specific questions raised by the Court during trial, as outlined in the chart below.

| Question Raised by the Court | Short Answer | Further Explanation |
|---|---|---|
| Is the Eleventh Circuit stay panel's opinion binding on this Court? Is it persuasive? | No. | Section IV.A.1.a |
| If intermediate scrutiny applies to Plaintiffs' claims, should this Court scrutinize the Legislature's justifications for the Challenged Provisions? | Yes. | Section IV.A.1.b |
| Should this Court consider the cumulative impact of the Challenged Provisions? | Yes. | Section IV.A.1.d |
| What are the disputed factual issues in this case? | | Appendix A |
| What weight, if any, should this Court give to the OECS's reports? | | Appendix B |

**BACKGROUND**

I.    **FACTUAL BACKGROUND**

**A. Background on Ballot Initiatives in Florida**

   **1. Florida's initiative process provided a vital means for political speech and association.**

Since 1968, Florida's Constitution has reserved to the people, "the power to propose the revision or amendment of any portion or portions of [the state] constitution by initiative." Fla. Const. art. XI, § 3; *see also* ECF No. 596 ("Joint Stips.") at 22. Since that time, Floridians have proposed 428 initiative petitions, of which 44 have qualified for the ballot. Joint Stips. at 25.

Florida's initiative process operates as a "core form of political expression, assembly, and participation." Tr. at 1267:2–1270:13, 1277:16–1279:10 (testimony from Dr. Dan Smith[1]). Initiative processes provide opportunities for political discussion and engagement, promote organizing around political issues, and increase participation in elections. *See id.* Political discourse and organizing are central to the

---

[1] During trial and, without objection, the Court accepted Dr. Dan Smith, professor and former chair of the political science department at the University of Florida, Tr. at 1251:10–15, as an expert witness qualified to testify on the way changes to election-related laws affect political behavior; the history of direct democracy in the United States, and in Florida in particular; current direct democracy practices in different states of the United States; and the different practices and laws states have employed to combat voter fraud and increase transparency in the ballot initiative process. *Id.* at 1257:12–1258:1. Dr. Smith based his opinions on well-established social science methodology that he and other political scientists routinely use when studying U.S. election laws, including election laws related to direct democracy.

initiative process, regardless of whether the initiative ultimately gets on the ballot or is enacted into law. *Id.* at 1269:20–1270:13.

The initiative process brings together several types of participants. Initiative sponsors draft proposed measures and lead campaigns to qualify those measures for the ballot, including by coordinating signature collection efforts, conducting public education, and bearing the financial and legal responsibilities of compliance with state regulations. *See id.* at 218:2–4, 225:9–22, 223:19-224:24. For sponsors, the process of signature gathering is intertwined with the process of building a movement of supporters of the initiative; both to garner the support necessary to qualify the measure for the ballot and, ultimately, secure passage of the proposed measure. *Id.* at 46:18–48:13, 50:18–23, 221:4–17, 695:3–7, 770:23–771:3.

Petition circulators, both paid and volunteer, engage directly with voters to educate them about the subject of the ballot initiative while collecting the signatures necessary to qualify for the ballot. *See id.* at 121:13–21 (Mr. Simmons testifying that 99% of FDH circulators' conversations with voters that he observed or experienced involved discussion about Medicaid expansion); *id.* at 356:11–359:18 (Organizing Director for FDH's partner organization describing the substantive nature of the interactions during petition circulation). For circulators, "[t]he whole process is conversational": engaging with a voter, persuading them to sign the petition, and collecting the voter's signature comprises a unified, interactive exchange. *See id.* at

13

118:12–24; *id.* at 120:22–23; *id.* at 215:9–216:1 (senior staff member of FDH's paid circulation vendor testifying that the ability to communicate with the voter about the issue "is a process that happens over the course of somebody signing it"). The process is also expressive, as circulators often persuade voters to support the initiative's placement. *See id.* at 50:4–17 (FDH's former Organizing Director testifying that she has changed voters' minds over the course of a conversation); 393:23–394:4 ("[W]e are very much expressing a specific position and an impact that your vote is going to have."); *id.* at 358:6–359:2 (voter who was initially reluctant would sign after engaging in conversation with a circulator); FDH PX 562.

Voters, in turn, understand petition circulators to be expressing a message. Tr. at 122:20–123:2, 359:3–18. In signing a petition, voters also express support for and associate themselves with the sponsor and its efforts to place the initiative on the ballot. *See, e.g.*, *id.* at 257:14–259:19 ("[Y]ou know when you are signing a petition it actually [is] an opportunity to participate in democracy and affect policy on a very direct level."); *id.* at 359:19–360:17.

Initiative processes can be especially impactful in states where one party has a supermajority in the state legislature and dominates state government. In such states, the initiative process enables residents to engage in political discourse and organize around and potentially vote on issues that are disfavored by the governing clique. *See id.* at 1279:24–1284:14. Florida is an example: in the years prior to HB

14

1205's enactments, a "steady stream" of initiatives that the state legislature had "refused to [act] on" received strong public support and qualified for the ballot. *See id.* at 1284:19–24; *see also id.* at 1285:2–1286:3 (listing examples).

### 2. Florida stringently regulated its initiative process prior to HB 1205.

Florida has steadily added regulatory hurdles to the initiative process over the past forty years. From 1983 to 2022, the State thrice reduced the validity period of initiative petition signatures, required initiative sponsors to register as political committees, prohibited compensation for petition circulators based on the number of petition forms gathered, imposed penalties for failure to register as a paid circulator, mandated that petitions collected by paid circulators be delivered within a thirty-day timeframe, created a private right of action to challenge petitions gathered by paid circulators, and increased the criminal penalties for signing a fictitious name or another person's name on a petition form. *See* Joint Stips. at 25–27; *see also* Tr. at 1289:3–1305:4.

These regulations meant that, even prior to HB 1205, Florida circumscribed its initiative process more aggressively than any state with a similar initiative process. *See id.* at 1292:16–1305:4; *see also id.* at 1291:14–1292:6 (explaining that Florida was unique in terms of requiring individual petition forms for each voter, requiring those forms be returned within a specific timeframe, and requiring sponsors to pay a per-petition verification fee).

**3. No evidence suggests that petition fraud threatened the integrity of Florida's initiative process.**

The trial record establishes that "fraud" related to petition circulation in Florida is "a rare event" that does not threaten the integrity of the initiative process. *See id.* at 1320:14–19; *see also id.* at 1398:16–21. Prior to HB 1205, Florida had a robust system for verifying petitions and detecting, investigating, and prosecuting petition-related fraud. As Dr. Smith, a leading scholar on the initiative process who has published peer-reviewed articles on fraud in petition-gathering, summarized it: "the system in place was working" pre-HB 1205. *Id.* at 1399:7–1400:6.

Florida law tasks Supervisors of Elections with petition validation, which is the process of confirming that a lawful Florida voter signed each petition, and that the form contains all required information. *See* Fla. Stat. § 99.097. The Court received credible testimony from four Supervisor of Elections offices on this process. The Supervisors testified that before reviewing signatures, their employees undergo the State's signature verification training course as well as county-specific training. *See* ECF No. 597-4 at 31:11–14, 36:16–20 (Osceola County); ECF No. 597-5 at 28:16–29:7 (Orange County); ECF No. 597-6 at 32:24–33:11 (Leon County); Tr. at 1805:1–8 (Miami-Dade County). Supervisors' processes prior to HB 1205 were "rigorous" and "effective in properly validating petitions." Tr. at 482:1–7; *see also id.* at 1816:21–25, 1827:18–24; ECF No. 597-4 at 32:6-14; ECF No. 597-5 at 30:2–13; ECF No. 597-6 at 31:12–15. Some experienced Supervisor employees will

16

have verified many thousands of petitions in their careers. Tr. at 1804:22–25. Each testifying Supervisor affirmed that their processes are reliable and that they stand by their office's validity determination. ECF No. 597-4 at 31:11–14, 32:6–14; ECF No. 597-5 at 29:22–30:1, 31:9–17; ECF No. 597-6 at 34:14–24; Tr. at 1816:23–25. Indeed, the Leon County Supervisor testified that he was not aware of even a single instance where his office had validated a signature that the voter in question had not signed, or where a voter had been tricked into signing a petition they did not wish to sign. Tr. at 482:11–25.

Florida already provided multiple avenues for reporting and investigating petition-related fraud prior to HB 1205. Supervisors could refer issues to the Secretary of State's Division of Elections ("DOE") and Office of Election Crimes and Security ("OECS"), which could in turn make referrals to federal law enforcement, Florida's Attorney General, State Attorneys, or the Florida Department of Law Enforcement. *See, e.g.*, ECF No. 597-7 at 132:2–9; Tr. at 2134:2–7. Law enforcement could also receive reports directly. *See* ECF No. 597-1 at 242:23-243:19.

These existing mechanisms adequately addressed the "rare" instances of petition-related fraud and ensured the integrity of the petition process. The record before the Court shows that fewer than two dozen petition fraud-related convictions occurred over the past two years, compared to the tens of millions of petition

17

signatures collected for various initiatives. *See* Tr. at 1320:21–25, 1876:6–9. Moreover, in many of those cases, Florida prosecutors sought minimum sentences, including probation, or chose to charge the individuals with lesser offenses than were available, indicating that existing criminal penalties were more than adequate. *See, e.g.*, ECF No. 597-1 at 73:15–22, 74:1–75:21, 76:12–23 (Andrews); *id.* at 96:22–98:20, 100:1–16, 104:7–105:24 (Johnson); *id.* at 116:15–117:20 (Salazar); *id.* at 138:18–139:9 (Harriel); *id.* at 167:10–168:12 (Amirally); *id.* at 173:10–174:12 (H. Joseph); *id.* at 184:6–185:11 (Dworsky); *id.* at 203:4–204:11 (Pierce); *id.* at 207:3–23 (McCutcheon); *id.* at 209:16–210:16, 218:5–219:3 (McCalister). Overall, petition-related fraud was a relatively negligible issue that the State had sufficient tools to address. There is no evidence that an initiative has ever qualified for the ballot in Florida as a result of the submission of fraudulent petitions.

### 4. The primary "evidence" before the Legislature on petition fraud consisted of biased reports and unreliable exaggerations.

The Florida Legislature adopted HB 1205 based on flawed, biased reports that were generated as elements of State leadership attempted to quash citizen initiatives during the 2024 campaign cycle. *See* ECF No. 609 at 5–9 (describing the State-led campaign against Amendments 3 and 4, with reference to *Floridians Protecting Freedom, Inc. v. Ladapo*, 754 F. Supp. 3d 1165, 1171 (N.D. Fla 2024)). The "whereas" clauses of HB 1205 repeatedly invoke "investigations conducted by" and "evidence provided to" OECS, *see* DX 1 at 4–6 (H.B. 1205 (Laws of Florida),

18

https://perma.cc/7XUE-JXJF), but OECS and the Division of Elections confirm that the only information provided to the Legislature in relation to HB 1205 is encompassed in OECS's reports to the Legislature. *See* ECF No. 620-2 at 24:22–25:7; ECF No. 620-3 at 40:24–41:15, 47:12–48:7; *see also* ECF No. 653-1 (DX 2) ("January 2024 Report"), ECF No. 653-2 (DX 3) ("January 2025 Report"), ECF No. 653-3 (DX 4) ("December 2024 Interim Report").

As an initial matter, OECS is not a law enforcement agency and does not have authority to prosecute individuals. *See* Fla. Stat. § 97.022(1)(b), (2), (4), (7)(d). OECS is permitted to receive reports from individuals and governmental actors, such as the Supervisors, *id.* § 97.022(1)(a), but no entity is required to make reports to OECS, except in a single, narrow circumstance created by HB 1205, *id.* § 100.371(14)(g). OECS may "conduct *preliminary* investigations into alleged violations," but can do no more than refer its reports to law enforcement for further action. *See id.* § 97.022(2) (emphasis added).

The OECS reports before this Court are rife with hyperbole, hearsay, and material irrelevant to initiative petitions. The January 2024 and January 2025 Reports contain, in part, information OECS is required to report to the Legislature, the bulk of which concerns alleged election law violations not related to initiatives. *See, e.g.*, ECF No. 653-1 (DX 2) at 15–162 (referencing 1220 of 1339 total election-related complaints as not regarding alleged crimes related to petitions, and no

reported conviction for petition fraud); ECF No. 653-2 (DX 3) at 31–174 (referencing 1618 of 1918 total election-related complaints as not regarding alleged crimes related to petitions, and eight reported convictions for petition fraud). The remainder of those Reports consists of extraneous hearsay-within-hearsay, such as news articles, a September 2005 report from a federal commission, press releases by other State entities, and proffers made by third parties to entities other than OECS. *See, e.g.*, *id.* at 608–26, 715–67, 722–864. The Reports reflect that, as of the time HB 1205 was passed, only eight individuals had actually been convicted for petition-related violations and only six additional cases were pending. *See generally* ECF No. 653-2 (DX 3) at 13–20.

OECS also submitted its first-ever "interim" report to the Legislature in October 2024, describing an unprecedented "audit" the office conducted during the 2024 campaign cycle. *See* ECF No. 653-3 (DX 4) at 1 n.1 (noting the December 2024 Interim Report is a revision to the October 2024 report); *id.* at 16–24 (describing the audit). OECS claimed it conducted the audit to "determine the extent and methods of the fraud" associated with Amendment 4 and to "identify recommendations to strengthen the integrity of the petition process." *Id.* at 18. As discussed below, the Court has already excluded OECS's extrapolations based on the audit. Appendix B to this brief explains in detail why this Court should not give any weight to the audit itself, as to OECS's characterizations of the petitions that it

reviewed directly, and its recommendations based on the audit. In short, OECS's audit was unreliable, cannot be verified based on the record before this Court, and appears to have been motivated by a desire to quash an ongoing ballot initiative. *See* App'x B.

OECS began the audit by creating a list of so-called "known or suspected fraudsters," which included circulators arrested for suspected fraud as well as circulators who simply had high invalidity rates. *See* Tr. at 2095:16–2099:4. Between August and October 2024, OECS employees visited Supervisors' offices in Palm Beach, Orange, and Osceola Counties, and reviewed a non-random subset of validated petitions submitted by those circulators, a step that the Supervisors universally characterized as "unusual." ECF No. 597-4 at 51:14–20; ECF No. 597-5 at 51:17–22; ECF No. 597-6 at 59:14–16. OECS's employees, after only one signature validation training, unilaterally determined that the Supervisors had incorrectly validated some petitions, without consulting the Supervisors regarding OECS's process or conclusions. ECF No. 597-4 at 71:1–12, 75:21–77:3; ECF No. 597-5 at 65:18–66:1, 66:16–19, 75:4–14, 78:2–16, 80:21–81:10; ECF No. 597-6 at 69:20–70:4, 71:18–22, 74:15–23. None of the examined petition forms are in evidence, so this Court has before it only OECS's say-so that it disagreed with the determination of the State entities tasked with verifying petition signatures; primarily determinations that handwriting on petition forms matched voter

21

signatures on file. In weighing the OECS's say-so, the Court should consider that (1) OECS never followed up with the Supervisors to seek re-verification of the petition forms in question, because, according to OECS's Director, that was not the "purpose" of the audit, *see* Tr. at 2146:21–24, and (2) the October 2024 Interim Report was released just days before a lawsuit was filed seeking to strike Amendment 4 from the ballot on the basis of the contents of the report. *See* App'x B.

OECS also claimed that its review of petitions supported a "projected statewide invalidity rate of 14.8%" for already-validated petitions. *See* ECF No. 653-3 (DX 4) at 23. This Court has already excluded OECS's extrapolations as "beyond junk science" and "bear[ing] no relation to any proper statistical analysis." *See* Tr. at 1999:8–2000:16; *see also id.* at 809:17–811:4, 811:5–812:9, 814:15–815:6, 817:21–819:9, 829:24–830:13, 831:25–837:3, 841:22–845:1 (testimony of Dr. Michael Herron[2] regarding the methodology OECS used to estimate statewide invalidity rate); *id.* at 848:7–13, 849:13–854:3, 854:4–868:16 (testimony of Dr. Herron regarding methodology OECS used to estimate within-state invalidity rates); *id.* 869:20–872:11 (testimony of Dr. Herron reflecting that Defendants' expert, Dr.

---

[2] The Court accepted Dr. Michael Herron, a tenured professor of political science at Dartmouth College, Tr. at 797:14–18; FDH PX 13, as an expert in election administration and statistical methodological analysis, Tr. at 800:11–18. The Court credited Dr. Herron's analysis, including Dr. Herron's analysis of the methodology of the OECS report.

Brunell, agreed that OECS's selection method "will, in fact, bias [its] estimates [of statewide invalidity rates], as Professor Herron says"); *id.* at 2117:3–4 (OECS Director conceding "that the extrapolation was not done in the most mathematically sound way"). In sum, the evidence before the Florida Legislature prior to HB 1205's passage was this: a handful of petition-related convictions weighed against millions of Floridians' participation in the initiative process; OECS's second-guessing of experienced Supervisors regarding petitions not in the record, and junk-science extrapolations from localized petitions that were improperly selected in a manner that biased and inflated the OECS's claims.

## B. HB 1205

HB 1205 became law on May 2, 2025. Joint Stips. at 22. The law makes numerous changes to Florida's citizen initiative process. HB 1205's Challenged Provisions[3] operate independently and cumulatively to burden the speech and association of statewide initiative sponsors, circulators, and voters, without meaningfully advancing the State's stated goals of combatting fraud and increasing transparency. *See* Tr. at 1259:4–23 (Plaintiffs' expert reiterating this conclusion). The FDH Plaintiffs in particular have been severely impacted by each of the Challenged Provisions and by their cumulative effect.

---

[3] For the sake of consistent references, the FDH Plaintiffs use the terms adopted in the Joint Pretrial Stipulation.

### 1. HB 1205's Challenged Provisions each individually severely burden speech and association without any justification.

### a. Circulator Eligibility Restrictions

The Circulator Eligibility Restrictions categorically prohibit the following individuals from circulating petitions: persons who are not residents of Florida, are not citizens of the United States, or have been convicted of a felony and have not had their voting rights restored. Fla. Stat. § 100.371(4)(b); *see also* Joint Stips. at 30. Petitions submitted by such individuals are rejected even if signed by Florida voters. Fla. Stat. § 100.371(14)(h); *see also* Joint Stips. at 30. Any individual who violates this requirement commits both a second-degree misdemeanor, Fla. Stat. § 104.187 (2025), and a third-degree felony, *id.* § 104.188(2); *see* Joint Stips. at 41. In addition, initiative sponsors are liable for a $50,000 fine for each person they knowingly allow to collect petitions in violation of these prohibitions. Fla. Stat. § 100.371(4)(g); *see also* Joint Stips. at 41–42.

The Circulator Eligibility Restrictions prevent upwards of four million people with ties to Florida or an interest in Florida politics from engaging in petition circulation. *See* Tr. at 1307:1–9 (highlighting Census data showing that approximately 9% of Floridians, roughly 2 million individuals, are noncitizens); *id.* at 1307:10–1308:5 (uncontested testimony indicating that approximately 1 million Floridians have felony convictions and have not had their rights restored); *id.* at 1308:6–23 (citing data related to students and individuals with second homes in

Florida who may not be residents). The restrictions also inject "friction" into the initiative process, by creating barriers that discourage individuals from acting as circulators, whether actually excluded or not, and by imposing significant compliance burdens on sponsors. *See id.* at 1310:18–1312:22.

There is no justification for the Circulator Eligibility Provisions' broad, categorical bans on petition circulation. No evidence indicates that nonresidents, noncitizens, or individuals convicted of felonies are more likely than the general population to commit petition fraud. *See* Tr. at 2136:23–2137:25; ECF No. 620-3 at 214:19–217:22. Nor does any evidence indicate that fining sponsors $50,000 for using circulators in those categories will deter fraud. *See* Tr. at 2138:6–10.

The Legislature had no evidence before it regarding noncitizen circulators when it passed HB 1205. *See generally* ECF Nos. 653-1, -2, -3 (DX 2, 3, 4). Defendants have suggested that criminalizing petition circulation by noncitizens might be justified because of noncitizens' "ties to family members or their prior country of association," ECF No. 620-3 at 193:3–194:1, but the record reflects the inaccuracy of that generalization, *see, e.g.*, Tr. at 1720:3–13 (witness testifying that she was brought to United States when she was two and has never resided anywhere but Florida); *id.* at 1758:18–1759:4, 1760:9–20 (witness testifying that his family fled Venezuela due to political persecution and cannot return because it is unsafe, and has no intention of doing so).

As to nonresidents, the record does not include a single example of Florida law enforcement failing to assert jurisdiction over a nonresident individual accused of petition fraud. Nor does the record establish whether any petition circulators Defendants arrested outside of Florida were or were not Florida residents at the time they were circulating petitions. *See, e.g., id.* at 1873:1–2, 1902:21–1903:4. Prior to HB 1205, paid circulators were already required to provide an in-state address and consent to Florida's jurisdiction when registering. *See* Fla. Stat. § 100.371(4)(c)–(d) (2024).

As to individuals with felony convictions whose rights have not been restored, the Circulator Eligibility Restrictions' categorical prohibitions apply regardless of the nature of a person's conviction, *see* Tr. at 213:5–20, 214:19–215:8, and regardless of the amount of time that has passed since the conviction. Defendants state tautologically that a felony conviction "already indicates somebody has violated the law at least once." *Id.* at 214:1–8. But Defendants have not identified any research or data demonstrating that this broad category of individuals is more likely than the general population to engage in petition fraud. *See id.* at 2137:21–25; *see also* ECF No. 620-3 at 214:19–217:22.

Plaintiffs' expert Dr. Smith confirmed that he was not aware of any studies that have found individuals with felony convictions unrelated to fraud or crimes of dishonesty, nonresidents, or noncitizens more likely than the general population to

submit fraudulent petitions. *See* Tr. at 1320:5–1324:7; *see also id.* at 1323:14–16 ("There are no studies out there, and for good reason, is that this linkage is so attenuated that I can't even theorize about what would be the reason [for these categories of individuals to commit fraud].").

Florida has not instituted these categorical bans on petition circulators for local initiatives or candidates. *See id.* at 1319:5–1320:4. Nor have states with similar ballot initiative processes come anywhere close to instituting similarly broad exclusions. *See id.* at 1312:23–1319:4. Even in states that excluded one or two of the same categories, the impacted population within the state was much smaller. For example, North Dakota prohibits noncitizens from serving as petition gatherers, but its noncitizen population is much smaller than Florida's. *See id.* at 1312:23–1313:19. As Plaintiffs' expert, Dr. Smith, explained, when a jurisdiction adopts a practice that is an extreme outlier compared to its past practices, practices in analogous circumstances, or the practices of similarly situated jurisdictions, this suggests the jurisdiction is not addressing the stated problem. *See id.* at 1264:14–1266:2. All told, the Circulator Eligibility Restrictions burden sponsors, circulators, and the initiative process and do not meaningfully advance the goals of combatting fraud or increasing transparency. *See id.* at 1305:12–1306:2.

### b. Registration Restrictions

The Registration Restrictions require all circulators, regardless of whether

27

they are circulating in a paid or volunteer capacity, to register with the Department of State if they "collect, deliver, or otherwise physically possess" more than 25 petition forms, excluding their own or that of an immediate family member. Fla. Stat. § 100.371(4)(a); *see also* Joint Stips. at 29. Florida had never before required volunteer circulators to register with the State. *See* Joint Stips. at 27–28.

The registration process requires volunteers to complete multiple, mandatory steps before circulating petitions. Individuals seeking to volunteer as petition circulators must now submit an online application that requires, among other personal information, the applicant's address, and a driver's license number or Florida identification card number, or the last four digits of the applicant's Social Security number. *See id.* at 28; *see also* Fla. Stat. § 100.371(4)(c)(2). The applicants then undergo a mandatory training that warns of "specific criminal penalties to which a petition circulator may be subject for violating" Florida law. Fla. Stat. § 100.371(4)(f). Applicants must then take an exam and achieve a score of 80% or higher. *See* Joint Stips. at 30. The exam is available in only English, *see* Tr. at 1325:2–1236:2, although the Division of Elections Director claims it is "available" in Spanish because an applicant can use an online translator tool, *see id.* at 2014:20–2015:3, 2040:4–14. After warning applicants of the risk of criminal penalties for violating circulation rules, the State's test module does not explain what questions applicants got wrong. *Id.* at 998:4–18, 2041:6–18. This leaves even those citizens

28

willing to register fearful of what they might not understand about circulation requirements. *See id.* at 998:13–18; *see also* FDH PX 243 at 35:9–21, 36:10-14. Applicants must then print, sign, scan, and upload materials for an additional application and wait for the Department of State to process the application. *See* Joint Stips. at 30; Tr. at 2035:9–18. HB 1205 does not require applications to be processed within a particular timeframe, nor is there any requirement for the Department of State to respond to applicants' questions within a particular timeframe, or at all. *See id.* at 2027:7–2029:12. Registered volunteers must include their name and address on every petition form they circulate, *see* Fla. Stat. § 100.371(3)(d)(1), and this information is subject to public records requests absent an individual-specific exemption, *see* ECF No. 620-3 at 214:19–217:22, 218:12–21.

Petitions submitted by individuals who do not complete these steps are not counted. Fla. Stat. § 100.371(14)(h); *see also* Joint Stips. at 30. Volunteers who violate these requirements commit a second-degree misdemeanor, Fla. Stat. § 104.187 (2025), and a third-degree felony, *id.* § 104.188(2), *see* Joint Stips. at 41, ostensibly leaving to the State's discretion whether they might be punished by 60 days or 5 years in prison. And sponsors who knowingly allow individuals to collect petitions without registering are liable for a $50,000 fine for each violation. *id.* § 100.371(4)(g); *see also* Joint Stips. at 41–42.

The Registration Restrictions fail to define what it means to "otherwise physically possess" more than 25 petition forms. For example, they do not specify whether physical possession would encompass working at a desk that has petitions stacked on top of it, or whether it includes transporting others' petitions in a car. The Secretary's representative testified that the latter category constituted possession within the meaning of the provision, but this interpretation has not been published anywhere. *See* ECF No. 620-3 at 140:21–141:7. In fact, the Department of State has not issued any formal guidance or advisory opinions as to this point, even though Supervisors sought clarification from the Department. *See id.* at 56:6–57:24, 58:8–59:8, 62:3–64:7, 137:21–140:3.

There is no evidence to indicate that volunteers who collect more than 25 petitions are more likely to commit petition fraud than volunteers who do not. Tr. at 2138:16–20; ECF No. 620-3 at 210:10–213:20. In fact, Defendants have not identified any instance of a volunteer submitting a fraudulent petition form. *See* Tr. at 2160:3–5. Defendants admitted the single complaint that has been submitted regarding a volunteer petition form did not establish that a volunteer, rather than a voter, provided erroneous information. *See id.* at 2120:10–2123:2 (OECS Director agreeing that Defendants had "no way of identifying who the bad actor is"); *see also id.* at 2160:6–2162:5 (admitting that Defendants have "no evidence, other than the fact they filled out a volunteer form, that they are, in fact, volunteers"). Defendants

30

also acknowledge that a fraudulent actor could submit personal use petition forms without registering with the State, *see* ECF No. 620-2 at 147:23–148:14; Tr. at 1896:7–1899:11, 2162:6–16, suggesting that the Registration Restrictions would not solve even hypothetical concerns about detecting fraud by unpaid circulators.

Plaintiffs' expert Dr. Smith testified that the Registration Restrictions create "friction" in the initiative process by discouraging prospective volunteer circulators who are concerned about providing information to the State and by imposing compliance burdens on sponsors. *See* Tr. at 1324:16–1327:19. The registration requirement is particularly burdensome on the approximately two million individuals in Florida with limited English-speaking skills (comprising nearly 9% of the State's population), because the mandatory training and test are currently provided in English only. *See id.* at 1325:15–1329:9.

Florida is an outlier in instituting these processes. Of the fourteen states with similar ballot initiative processes, only one requires volunteers to register, and even that state does not require completion of a training or a test. *See id.* at 1324:19–1330:5. Florida also does not impose these registration requirements on circulators for local initiatives or candidate petitions. *See id.* at 1330:11–20. Dr. Smith credibly testified that the Registration Restrictions will reduce the quantum of petition circulators and political discourse and do nothing to address the purported problem

31

of petition fraud, as individuals seeking to commit fraud can use the personal-use petition to do so. *See id.* at 1305:12–20, 1324:10–14, 1326:13–1327:10.

### c. Ten-Day Return Provisions

Prior to 2019, Florida law imposed no return deadline for signed petitions. Joint Stips. at 30. In 2019, Florida placed a 30-day deadline on the return of signed statewide initiative petitions submitted by paid circulators. *Id.* The Ten-Day Return Provisions revised the deadline for submission of signed petition forms from 30 days from the date of signing, or the next business day if the office is closed, to 10 days, without account for office closures on non-business days. Joint Stips. at 33; *see also* Fla. Stat. § 100.371(7). The provisions increased the fine for late submission of a petition from $50 for each late petition to $50 for each day each petition is late, with no cap on the resulting fine. *See* Joint Stips. at 33. A fine of $2,500 per form is imposed "if the sponsor or petition circulator acted willfully." *See id.* at 31.

The provisions also revise the requirements regarding where a petition must be submitted. Prior to HB 1205, sponsors were required to submit completed forms "to the supervisor of elections for the county of residence listed by the person signing the form." Fla. Stat. § 100.371(11)(a) (2022); *see also* Joint Stips. at 32–33. Even so, petitions subject to the 30-day deadline were deemed timely if received by *any* Supervisor in that time. *See* Fla. Admin Code r. 1S-2.0091(2)(c); *see also* Joint Stips. at 33. In contrast, HB 1205 requires petitions to be returned specifically to "the

32

county in which the voter resides." Fla. Stat. § 100.371(7)(a). Sponsors are fined $500 for any petition "not submitted to the supervisor of elections in the county in which the voter resides." *Id.* § 100.371(7)(a)(3). A fine of $5,000 is imposed "if the sponsor or petition circulator acting on its behalf acted willfully." *Id.* § 100.371(7)(a)(3). HB 1205 also retained the requirement that a sponsor submit petitions to the Supervisor "for the county of residence listed by the person signing the form," creating an ambiguity in cases where a voter mistakenly lists a county other than where they reside. By virtue of the Registration Restrictions, the Ten-Day Return Provisions apply to petition forms submitted by paid and volunteer circulators alike. Joint Stips. at 33–34.

The Ten-Day Return Provisions provide that fines "may be waived upon a showing that the failure to deliver the petition form promptly is based upon force majeure or impossibility of performance," Fla. Stat. § 100.371(7)(b), but no guidance exists as to how this provision applies, including in the case of mail delays not in a sponsor's control, *see* Tr. at 2141:18–2143:6. Defendants maintain the force majeure and impossibility exceptions are "fact dependent" and disagreements with their determination must be challenged at the Division of Administrative Hearings. *See id.* at 2078:19–2079:4.

Compliance with the Ten-Day Return Provisions is based on when the Supervisor receives a petition, which means timeliness can turn on a particular

Supervisor's processing practices outside of a sponsor's control. *See* ECF No. 620-3 at 93:15–96:5.

The Ten-Day Return Provisions do not specify how the return deadline applies in cases where petitions are submitted to one county and rerouted to another. *Id.* at 162:12–164:13, 166:3–15. The Division has issued no statewide guidance informing Supervisors whether to send petitions with an incorrect county back to the sponsor or to the correct county. *Id.* at 159:9–22. Thus, a misfiled petition could be returned to the sponsor and then forwarded while the original ten-day clock runs, such that a sponsor would likely incur fees for both a misfiled petition and a late-submitted petition. *See id.* at 159:9–161:22, 158:2–159:3.

The Department of State has not developed any guidelines on the circumstances in which heightened fees for a sponsor or circulator acting "willfully" apply. *See* ECF No. 620-2 at 105:4–6. The Secretary's representative was "not sure" whether a sponsor must have *intended* to submit a petition late in order for the heightened fines to apply. *See id.* at 104:15–105:2.

There was no evidence before the Legislature that the Ten-Day Return Provisions serve any purpose. *See* Tr. at 2138:11–15; *see also* ECF No. 620-3 at 184:7–185:13, 207:25–209:2, 210:2–213:20. No studies suggested that petitions returned within ten days are less likely to be fraudulent than petitions returned later. ECF No. 620-3 at 210:10–213:20. Indeed, the Secretary's representative agrees that

a late-filed petition may not be fraudulent and could simply be late. *See id.* at 210:10–213:20. Petitions returned after the ten-day deadline are still counted, Fla. Admin. Code r. 1S-2.0091(2)(b) (2021); the only consequence of a late return is that the sponsor is fined.

The Ten-Day Return Provisions will undermine sponsors' ability to help root out potential fraud by limiting their ability to complete internal screening. Tr. at 1350:20–1352:12. Plaintiffs' expert Dr. Smith found that, in three counties during the 2024 campaign cycle, sponsors submitted the vast majority of petitions between 11 and 30 days after the petitions were signed. *See id.* at 1347:17–1350:18. He also found that the petitions submitted within zero to ten days after signing had a much higher invalidity rate than those submitted between 11 to 30 days. *See id.* These findings suggest that sponsors will struggle to meet the ten-day return deadline without compromising internal screening, which means that sponsors will be forced to choose between higher rejection rates for invalid petitions versus a $50-a-day (or higher) fine for late-submitted petitions. *See id.* at 1351:20–1352:3. The Department of State did not conduct any study on the burdens on sponsors or volunteers that might result from compressing the petition return period from 30 to ten days. *See* ECF No. 620-3 at 206:10–207:21.

Florida is an outlier as to the Ten-Day Return Provisions. No other state has anything close to a ten-day return deadline for initiative petitions. *See* Tr. at 1353:23–

1354:13. All other states with initiative processes have a single deadline for submitting petitions, allowing sponsors to submit hundreds of thousands or millions of petitions at one time. *Id.* at 1354:5–13. Florida also employs a single deadline for local issue and candidate petitions. *See id.* at 1355:7–15. Each of these data points indicates that the Ten-Day Return Provisions burden sponsors, circulators, and the initiative process without meaningfully combating fraud or increasing transparency. *See id.* at 1305:12–20, 1346:4–6.

### d.  Verification Fee Provisions

The Verification Fee Provisions authorize the Supervisors to dramatically increase the fees charged to sponsors to verify petitions for statewide initiatives. *See* Fla. Stat. §§ 100.371(14)(f), 99.097(4)(a). As mentioned, Florida law tasks the Supervisors with verifying whether a petition is valid. *Id.* § 99.097(3)(a). Supervisors calculate and collect the signature verification fee that a candidate or initiative sponsor must pay before a petition is verified. *Id.* §§ 100.371(14)(b), (f), 99.097(4)(a); Ch. 2025-21, § 7(3), at 23, Laws of Fla. Prior to HB 1205, Florida required statewide initiative sponsors to pay "the actual cost of signature verification incurred by the supervisor." Fla. Stat. § 100.371(11)(a) (2022). Candidates and local initiatives were—and still are—required to pay the lesser of ten cents or the actual cost. Fla. Stat. § 99.097(4)(a).

HB 1205 redefines the "actual cost" of signature verification to pass along

various overhead costs to initiative sponsors and authorizes Supervisors to calculate the new per-petition cost, update and post it online, and collect it from statewide ballot initiative sponsors. *See* Ch. 2025-21, § 5, at 8, Laws of Fla. (indicating statewide initiative sponsors must pay the cost that Supervisors calculate under Fla. Stat. § 100.371(14)(f)); Ch. 2025-21, § 7, at 23, Laws of Fla. (authorizing Supervisors to "increase the cost of signature verification" pursuant to Fla. Stat. § 100.371(14)(f) "[n]o later than October 1, 2025"); Ch. 2025-21, § 6, at 18, Laws of Fla. (authorizing Supervisors to increase costs annually and setting out the new definition of "actual cost").

HB 1205's definition of "actual cost" includes three inputs that have resulted in dramatically higher fees for statewide initiatives. These are: "[1] operating and personnel costs associated with comparing signatures, [2] printing and all postage costs related to the verification notice required by paragraph (e), [3] and transmitting petition forms to" Florida's Division of Elections. Fla. Stat. § 100.371(14)(f). These latter two post-verification inputs reflect processes created by HB 1205. HB 1205 provides that *after* a Supervisor verifies—via handwriting comparison—that a voter signed a petition, the Supervisor must mail a notice asking the voter to return a form, by prepaid-postage, if they believe their verified signature was "forged" or otherwise misrepresented ("Voter Verification Notice"). *See id.* § 100.371(14)(e)(1). HB 1205 also requires Supervisors to "electronically transmit" and physically deliver all

37

received petition forms to the Division of Elections. *Id.* § 100.371(14)(d)(1)–(2).

The Supervisors dramatically raised verification costs charged to statewide sponsors once the Verification Fee provisions took effect. *See* Joint Stips. at 37–39. The parties agree that for statewide ballot petitions, the average, per-petition cost of verification jumped from approximately $0.87 to $3.37. *Id.* at 40. Under this estimate, the average fee increased by 287.356% under HB 1205.

The Verification Fee Provisions mean that qualifying a statewide initiative for the ballot now costs millions of dollars more than before HB 1205. The minimum number of valid signatures needed to qualify a measure for the ballot in 2026 was 880,062. Joint Stips. at 23–24. However, sponsors must submit more than that number, because not all petitions are validated. The FDH Plaintiffs estimate that (at least prior to HB 1205) a sponsor would need to submit a minimum of around 1.3 million petitions to make the ballot. *Id.* at 40. This estimate closely tracks the validity rates of prior initiative campaigns. FDH PX 39; Tr. at 893:8–895:12. Using the previous estimates, the FDH Plaintiffs estimate that the post-HB 1205 cost of verifying 1.3 million petitions is $4,381,000.

The FDH Plaintiffs also note, however, that validity rates have diminished under HB 1205's regime. Plaintiff-Intervenor Smart & Safe Florida submitted 1,755,000 petitions "and some change" during the 2026 cycle and still did not qualify for the ballot. *Id.* at 1147:18–20. The cost of verifying 1,755,000 petitions

using the estimates set out above is $5,914,350.

Verification fees for local initiative and candidate petitions are capped at ten cents per petition, *see* Fla. Stat. § 99.097(4)(a), even though the actual cost of verifying such petitions is much higher. *See, e.g.*, Tr. at 1843:10–1845:22 (confirming that verifying a local initiative or candidate petition "most definitely" requires the Miami-Dade Supervisor to incur more than ten cents in staff costs). HB 1205's expanded definition of "actual cost" does not apply to local initiative or candidate petitions. *See* Fla. Stat. § 99.097(4)(a). Florida law also allows local initiatives and candidate petitions to save on verification costs by using random sampling, an option that is unavailable to statewide initiatives. *See id.* § 99.097(1)–(2).

Florida law also imposes a fiduciary duty on statewide initiative sponsors, requiring them to submit all signed petitions to Supervisors, *see id.* § 100.371(7)(a), but does not create a similar fiduciary duty for local initiatives or candidates, who can therefore choose not to submit petitions for validation if they cannot afford the verification fee.

Florida law purports to offer relief to petition sponsors who would suffer an undue burden due to signature verification fees, but for most sponsors, that route is a dead end. Section 99.097(4)(b) provides that if an initiative sponsor "cannot pay [signature verification fees] without imposing an undue burden on personal

39

resources or upon the resources otherwise available to such . . . organization," the sponsor, "upon written certification of such inability given under oath to the supervisor, is entitled to have the signatures verified at no charge."

This waiver was extended to initiative sponsors in the wake of *Clean-up '84 v. Heinrich*, which enjoined an earlier version of Section 99.097 that did not provide an effective alternative to payment of signature verification charges. 590 F. Supp. 928, 932–33 (M.D. Fla. 1984), *aff'd*, 759 F.2d 1511 (11th Cir. 1985). The Legislature subsequently, however, tied the availability of the waiver not to the sponsor's ability to pay the required fees but, instead, its ability to pay "*any* person . . . to solicit signatures on a petition." Fla. Stat. § 99.097(6)(a) (emphasis added). And if a sponsor uses a fee waiver but later pays even one petition circulator, the fee waiver "is no longer valid and a fee for all signatures previously submitted to the supervisor of elections and any that are submitted thereafter shall be paid" by the sponsor. *Id.* § 99.097(6)(b).

All told, the Verification Fee Provisions mean that statewide initiative sponsors must currently pay an average of $3.37 in verification fees each and every time a voter associates with the sponsor's opinion that the electorate should consider the subject of the petition, unless the sponsor forswears paying anyone to circulate petitions. In contrast, local initiative and candidate petitions can pay a capped ten-cent fee, utilize random sampling to lower costs, or forgo submission altogether.

40

The fee scheme created by the Verification Fee Provisions is not justified, both in terms of the purported "actual cost" charged to statewide initiatives and in terms of the disparate treatment of statewide initiative petitions versus local initiative and candidate petitions.

First, Supervisors have posted fees that reflect a maximalist view of the "actual cost" of "operating and personnel costs associated with comparing signatures." Fla. Stat. § 100.371(14)(f). In particular, Supervisors appear to be charging statewide initiative sponsors for administrative costs that would arise regardless of whether a sponsor was attempting to qualify an initiative. *See* Tr. at 1842:12–1844:4 (explaining that posted verification fee includes portion of staff members' salaries even though those individuals would receive same salary regardless of whether they verified petitions); *see also* FDH PX 595 at 13 (reflecting that Glades County's verification fee passes portion of employee retirement and benefits costs to sponsors); *id.* at 14 (reflecting that Hardee County includes employer and employee shares of retirement, Social Security, and Medicare payments). Supervisors have also acknowledged that the posted fees represent a range of estimates for inputs whose costs cannot be truly ascertained. *See, e.g.*, Tr. at 509:18–23, 1831:23–1833:9.

Second, each of the three components of the "actual cost" of signature verification under Section 100.371(14)(f) themselves reflect unjustified processes

41

targeted only at statewide initiatives. "[O]perating and personnel costs" for verifying statewide petitions now include the costs of implementing the Circulator Eligibility Restrictions, *see* Tr. at 1808:25–1809:19, the Voter PII Disclosures Requirement, *see id.* at 1809:20–1811:3, and the Ten-Day Return Provisions, *see id.* at 1811:4–1812:5 – requirements that HB 1205 has imposed only on statewide initiatives. There is likewise no justification for the requirement that Supervisors send voters whose petitions have been validated the Voter Verification Notice: Each of the Supervisors who testified in this case affirmed that their pre-HB 1205 verification processes are reliable and that they stand by their office's validity determination. *See* ECF No. 597-4 at 31:10–14, 32:6–14; ECF No. 597-5 at 29:22–30:1, 31:9–17; ECF No. 597-6 at 34:14–24; Tr. at 1816:23–25. And there is no evidence that forcing the Supervisors to scan each petition and also send each petition to the State in electronic and physical copy is necessary to combat fraud.

Florida's verification fee scheme is a clear outlier. No other state requires initiative sponsors "to pay for their own qualification and validation of each petition." Tr. at 1359:15–18. And Defendants have not provided any evidence that the risk of petition fraud or even petition invalidity is greater in the context of statewide petitions as compared to candidate or local petitions. In fact, the FDH Plaintiffs' expert testified that local initiatives can have as high, if not higher, invalidity rates as compared to statewide initiative campaigns. *Id.* at 1360:15–

1361:24. The Verification Fee Provisions burden statewide initiative sponsors without meaningfully combatting fraud. *See id.* at 1305:12–20, 1346:4–6.

### e. Voter Personal Identifying Information ("PII") Disclosures

HB 1205 requires voters to provide additional personal identifying information ("PII") to sign a petition. Florida law already required voters to provide their full name, address, and either their voter registration number or date of birth. Fla. Stat. § 100.371(11)(a)(3) (2022). Voters now must also provide their Florida driver license number or identification card number, or the last four digits of the voter's Social Security number, as well as an attestation that the voter is a registered Florida voter and is petitioning the Secretary of State to place the proposed amendment on the ballot. *Id.* § 100.371(14)(c); *see also* Joint Stips. at 41.

The petition form now also includes a notice that the form "becomes a public record upon receipt by the supervisor." Fla. Stat. § 100.371(3)(a)(4). The Division of Elections Director testified that voters' driver's license number, Florida identification number, Social Security number, and signature would be redacted before the form would be produced in response to a public records request, *see* Tr. at 2021:12–2022:8, but even accepting that testimony, post-hoc redaction at the time of a public records request does nothing to prevent the use or disclosure of PII in the period between the form's receipt and any such request. Moreover, the petition form itself does not state that PII will be redacted, does not specify the conditions under

which the form would be released to the public, and does not suggest that there are *any* circumstances in which particular information might be redacted before release. *See* Fla. Stat. § 100.371(3)(a)(4).

No evidence indicates that the additional identifiers required by the Voter PII Disclosures are necessary to detect fraud. *See* ECF No. 620-2 at 77:2–15. In fact, requiring additional PII on petitions creates a new risk of fraud, because bad actors may attempt to circulate petitions as a means of obtaining voters' Social Security numbers or State identification numbers. *See* Tr. at 1341:23–1343:6, 1344:25–1346:1. The National Institute of Standards and Technology notes that Social Security numbers should be requested only when "vitally necessary" and should not be subject to procedures that could result in unauthorized access to the data. *Id.* at 1340:10–18.

The Voter PII Disclosures will also prevent hundreds of thousands of voters from expressing their support for and associating with statewide initiatives. Approximately 600,000 Floridians are registered voters but do not have a Social Security number, driver's license, or Florida identification number listed on their voter registration form; if they were to similarly omit this information from their petitions, the petitions would be invalidated. *See id.* at 1343:12–1344:24, 1809:20–1810:6. In addition, Supervisors may incorrectly invalidate petitions if they do not have the information on file or have outdated information. *See id.* at 1343:20–24.

44

The Voter PII Disclosures create "friction" with respect to voters involving themselves in the initiative process. *Id.* at 1345:24–1346:1. Academic studies indicate that increasing the amount of PII voters must provide results in voters being less willing to participate in the political activity at issue. *Id.* at 1339:15–21.

Florida is once again an outlier as to this requirement: no state with a similar initiative process requires this type of PII on petition forms. *See id.* at 1341:6–12. Nor does Florida require this information on local initiative or candidate petition forms. *See id.* at 1341:13–22. The provision imposes a burden on petition circulation without advancing any anti-fraud objectives. *See id.* at 1305:12–20, 1338:19–21.

### f.  Sponsor Fines Provisions and New Criminal Provisions

Finally, HB 1205 imposes a raft of hefty fines on initiative sponsors and new criminal penalties for petition circulators. The Sponsor Fines Provisions include:

- The above-mentioned $50,000 fine on sponsors for each person the sponsor "knowingly allows to collect petition forms" in violation of the Circulator Eligibility Restrictions and Registration Restrictions, *see* Fla. Stat. § 100.371(4)(g) ("Non-Authorized Circulator Fine");

- The above-mentioned fines on sponsors related to the Ten-Day Return Provisions, *see id.* § 100.371(7)(a)(1)–(3) ("Ten-Day Return Requirement Fines" and "County Return Requirement Fines");

- A fine on sponsors of $5,000 for each petition on which a circulator "fills in missing information on a signed petition," or signs another person's name or a fictitious name, *see id.* § 100.371(8) ("Petition Fill-in Fine");

- A fine on sponsors of $50 for each petition mailed or otherwise provided to a voter on which any information about the voter has been filled in before provided to the voter, *see id.* § 100.371(10) ("Prefilled Petition Fine").

The New Criminal Provisions include:

- The above-mentioned second-degree misdemeanor, *id.* § 104.187, and third-degree felony, *id.* § 104.188(2), for circulators who fail to comply with the Circulator Eligibility Restrictions and Registration Restrictions ("Unregistered Circulator Misdemeanor" and "Unregistered Circulator Felony");

- A felony of the third degree for circulators who "cop[y] or retain[] a voter's personal information . . . for any reason other than to provide such information to the sponsor," *see id.* § 100.371(9) ("Information Retention Felony");

- Adding "[a] violation of the Florida Election Code relating to irregularities or fraud involving issue petition activities" to the definition of "racketeering activity" in Fla. Stat. § 895.02(8)(d) ("RICO 'Irregularities' Definition"). Under Florida law, "racketeering activity" is a first-degree felony punishable by imprisonment up to 30 years and fines of up to $10,000. *See id.* §§ 895.04, 775.082(3)(b), 775.083(1)(b). Any person committing "racketeering activity" is also subject to various civil penalties set out in Fla. Stat. § 895.05.

- A felony of the third degree for a circulator who "fills in missing information on a signed petition," *see id.* § 104.185(2) ("Petition Fill-in Felony").

The RICO "Irregularities" Definition is not currently in effect because it was preliminary enjoined by this Court as unconstitutionally vague. Joint Stips. at 22.

Last week, the Florida Legislature amended Section 895.02 to strike the RICO "Irregularities Definition" and to add a new provision expanding "racketeering activity" to efforts "to commit, to attempt to commit, to conspire to commit, or to solicit, coerce, or intimidate another person to commit [a]ny crime under . . . Section 104.185, [Section] 104.186, [Section] 104.187, or [Section 104.188], relating to issue petition activities." *See* H.B. 991, § 30, 2026 Leg. (Fla.).

*Sponsor Fines Provisions*

46

The Department of State has not issued any formal guidance or policies regarding the imposition of the New Sponsor Fines. *See* ECF No. 620-3 at 108:23–110:14. Section 100.371, which contains each of the New Sponsor Fines, includes a purported "safe harbor" stating that "[i]f the sponsor of an initiative petition discovers a violation of this section and reports the violation as soon as practicable to the secretary, the sponsor may not be fined for such violation." Fla. Stat. § 100.371(11). But no written guidance specifies what constitutes sufficient sponsor notice to trigger this subsection's protection. *See* ECF No. 620-3 at 174:9–178:21.

The New Sponsor Fines make sponsors liable for conduct by circulators even if the sponsor is not aware of such conduct, *see* ECF No. 620-2 at 112:25–113:14, and even if the circulator registers and circulates without the sponsor's knowledge, *see* ECF No. 620-3 at 154:18–156:17, 157:2–23. In general, states with ballot initiative processes similar to Florida do not make sponsors liable under this type of fines scheme, nor does Florida apply a similar scheme to candidates or local initiatives. *See* Tr. at 1358:25–1359:4.

The lack of justification for the Non-Authorized Circulator Fine, Ten-Day Return Requirement Fines, and County Return Requirement Fines is addressed in the sections above. The remaining fines and criminal provisions are addressed here.

The Petition Fill-In Fine applies regardless of what type of information is filled in, such that a sponsor could be fined $5,000 if a circulator or other individual

conducting quality control fills in a missing "county" field or cures a form where the voter had mistakenly written "USA" in the county field. This type of minor voter error frequently occurs. *See, e.g.*, *id.* at 53:24–54:5, 194:23–195:10, 226:21–227:3, 1526:25–1527:16. By preventing the cure of such forms, the Petition Fill-In Fine will result in the invalidation of petitions that voters intended to be counted, and in fact were signed and dated by lawful registered voters.

The Petition Fill-in Fine does not include any exemption for assisting voters with disabilities or other voters who cannot fill out a form themselves. ECF No. 620-3 at 202:4–205:10. The Department of State has not issued any guidance explaining whether any such assistance is permitted, though the Secretary's representative acknowledges that some voters may need assistance filling out a form. *See id.*

As to the Prefilled Petition Fine, Defendants have not identified any evidence linking prefilled petition forms to fraud. Defendants acknowledge that even conduct unrelated to fraud, such as prefilling an accurate zip code on a petition form, can trigger a fine. *See* ECF No. 620-2 at 119:1–10.

*New Criminal Provisions*

Defendants have not presented any evidence that the criminal penalties that existed prior to HB 1205 were insufficient to combat petition-related fraud. In fact, the State chose to undercharge individuals in several of the handful of petition fraud-related cases that have occurred and typically sought minimum sentences, often

limited to probation. ECF No. 620-1 at 73:15–22, 74:1–75:21, 76:12–23 (Andrews); *id.* at 96:22–98:20, 100:1–16, 104:7–105:24 (Johnson); *id.* at 116:15–117:20 (Salazar); *id.* at 138:18–139:9 (Harriel); *id.* at 167:10–168:12 (Amirally); *id.* at 173:10–174:11 (H. Joseph); *id.* at 184:6–185:11 (Dworsky); *id.* at 203:4–204:11 (Pierce); *id.* at 207:3–23 (McCutcheon); *id.* at 209:16–210:16, 218:5–219:3 (McCalister). Nevertheless, HB 1205 instituted new criminal provisions. These criminal provisions burden sponsors and circulators but do not meaningfully combat fraud or increase transparency. *See* Tr. at 1305:12–20, 1355:17–22.

The lack of justification for the Unregistered Circulator Misdemeanor and Unregistered Circulator Felony is addressed in the sections above. The remaining criminal provisions are addressed here.

As to the Information Retention Felony, Defendants have not pointed to any guidance explaining whether "retaining" voter information "for any reason other than to provide such information to the sponsor" might include, for example, legitimate efforts to conduct quality control and ensure circulators are collecting complete forms. Nor is there any guidance indicating whether the definition would include an individual who delivers a form directly to a Supervisor's office, rather than to the sponsor.

As to the RICO "Irregularities" Definition, the State has not provided any clarity at all. The term "irregularity" is not defined in any statute or regulation. *Id.* at

49

2153:1–9. The Department of State has not published a definition of the word "irregularities," and the OECS Director is not aware of any other Florida State agency having done so. *See id.* at 2155:7–16. The Department of State has not published any guidance that law enforcement officers could rely on to determine what "irregularities" can serve as predicate acts for criminal liability under the racketeering statute. *See id.* at 2158:21–2159:3. Nor has it published guidance for the public that would allow petition sponsors or circulators to know whether a petition they collected contains an irregularity. *See id.* at 2159:4–8. OECS has not developed an internal definition of "irregularities." *See id.* at 2156:19–2157:7.

When asked whether she considers all violations of the election code to be "irregularities," the OECS Director's testimony was "I think sometimes, and—I'm not sure—maybe all the time." *Id.* at 2154:2–5. Thus, a voter mistakenly writing "USA" instead of their county is "[p]otentially" an irregularity; a voter neglecting to fill in their petition completely is "[p]otentially" an irregularity; and "maybe potentially" a Supervisor validating "too many petitions that maybe should have been invalidated" is an irregularity. *See id.* at 2154:19–2155:2, 2156:5–14. The OECS Director added that while "[s]ome violations are criminal, and others are not," all "would be considered irregularities." *See id.* at 2153:10–14.

Florida is an "extreme deviation from the norm" in expanding the definition of racketeering to encompass violations of its election code "relating to irregularities

50

or fraud involving issue petition activities. *See id.* at 1355:16–22. No other state in the country with a similar initiative process does the same. *See id.* at 1355:23–1356:8. Indeed, Florida does not extend the same concept to other forms of petition circulation. *See id.* at 1356:9–23.

The Petition Fill-In Felony suffers from the same lack of justification as the Petition Fill-In Fine.

**2. In combination, HB 1205's Challenged Provisions effectively gut the ability of sponsors, circulators, and voters to engage in speech and association related to the initiative process.**

HB 1205's impact is even greater than the sum of its parts. Each challenged provision compounds the burdens imposed by the others, such that speech and association in support of a statewide initiative is now so burdensome, expensive, and criminally risky that very few, if any, initiatives will be able to operate, much less qualify for the ballot. *See* Tr. 1259:13–16 (Plaintiffs' expert opining that "each of the challenge[d] provisions severely burden and restrict the initiative process, and, collectively, they eviscerate the initiative process making it accessible only to the most select moneyed interests"); *Note to Press: 2026 Constitutional Amendment Petition Campaigns*, Fla. Sec'y of State (Feb. 1, 2026), https://dos.fl.gov/communications/press-releases/2026/note-to-press-2026-constitutional-amendment-petition-campaigns/ [https://perma.cc/JA65-MQDG]

(indicating that no statewide initiatives qualified for the 2026 ballot).[4]

The Challenged Provisions act together to quell petition circulation. The Circulator Eligibility Restrictions and New Criminal Penalties reduce the pool of individuals able or willing to act as circulators. Tr. at 63:15–21; *id.* at 197:6–23; *id.* at 364:14–365:13; *id.* at 365:14–17. The Registration Restrictions discourage volunteers from acting as circulators, *id.* at 365:18–367:8, and make using volunteer circulators riskier by extending the Ten-Day Return Provisions' submission requirements, Sponsor Fines, and New Criminal Provisions to encompass petitions collected by unpaid volunteers. *See* Joint Stips. at 33–34. Since even a handful of failures to comply with the stringent requirements imposed by the Challenged Provisions can result in large penalties, a sponsor is incentivized to use paid circulation by employees it has authority over to reduce liability, *see* Tr. at 94:3–14 (explaining that volunteers will generally try to follow direction, but that sponsors cannot control them), which means it cannot obtain an undue burden waiver, *see* Fla. Stat. § 99.097(6)(b), and so will need to pay millions more in fees due to the Verification Fee Provisions, Joint Stips. at 40; FDH PX 39; Tr. at 893:8–895:12. Voters, for their part, will be discouraged from signing petitions due to the Voter PII Disclosures Requirement, Tr. at 134:15–18; *id.* 201:15–22; *id.* at 201:23–202:3; *id.*

---

[4] The Court may take judicial notice of government websites. *See R.S.B. Ventures, Inc. v. FDIC*, 514 F. App'x 853, 857 (11th Cir. 2013).

at 376:7–377:2; *id.* at 377:3–6, and may be confused by the Voter Verification Notice and mistakenly invalidate their signature, *id.* at 485:4–490:11; FDH PX 143. The end result is far less engagement and collective action than would have occurred if any one of the Challenged Provisions had taken effect alone. Given their interconnection, none of the Challenged Provisions operates in a vacuum.

### 3. HB 1205's provisions, individually and in combination, severely impact the FDH Plaintiffs.

#### a. FDH

Florida Decides Healthcare ("FDH") is a political committee that seeks to expand eligibility for Medicaid in Florida through the passage of a statewide ballot initiative. Tr. at 31:23–25. FDH was founded in 2018 and first sought ballot placement during the 2020 cycle. *Id.* at 33:20–34:3. The organization made its "first . . . real push" in the 2026 cycle. *Id.* at 34:4–25. It hired several staff members and built a statewide network of volunteers, including approximately 1,000 that signed up directly with FDH and over 2,000 that volunteered with FDH's more than 100 coalition partners. *Id.* at 35:1–36:4. FDH also engaged a paid circulation firm for the first time during the 2026 cycle. *Id.* at 36:22–23. That firm, the Outreach Team ("TOT"), opened three offices led by managers experienced in petition collection for ballot initiatives, with plans (prior to HB 1205) to open more throughout the state. *Id.* at 170:21–171:3.

Prior to HB 1205's passage, FDH had good prospects for qualifying its

initiative for the ballot. The organization raised over $1.6 million over the first two quarters of 2025. *See Campaign Finance Database: Contribution Records*, Fla. Dep't of State, Div. of Elections, https://dos.elections.myflorida.com/campaign-finance/contributions/; *see also* Joint Stips. at 54 (stipulating that the Court may take judicial notice of the Secretary's Campaign Finance Database). It met its initial target to collect 100,000 petitions by the end of April 2025. Tr. at 36:5–12. FDH trained both its volunteer and paid circulators to engage substantively with voters while collecting petitions, recognizing that petition circulation is a uniquely powerful communicative moment in a ballot initiative campaign. *See id.* at 42:1–4 (circulators are "first ambassadors on the ground with the talking points about Medicaid expansion"); *id.* at 42:25–43:6 ("[Y]ou are talking about the issue; you are explaining why this matters"); *id.* at 121:22–122:23 (Mr. Simmons testifying that voters commonly asked questions about Medicaid expansion); *id.* at 203:19–24 ("There's no other point in a campaign where 1.5 million people are going to have one-on-one, individual conversations about the issue."); *id.* at 356:11–359:2 (describing substantive, educative nature of conversations). Using these conversations with voters, FDH had identified "storytellers" whose experiences with lacking Medicaid coverage could be highlighted for a multi-week public education effort, including by publishing digital content and a longer-form video on the need for Medicaid expansion, and was working with a vendor on filming these public

54

communications. *See* FDH PX 462; *see also* Tr. at 230:18–237:25.

HB 1205's Challenged Provisions had a catastrophic impact on FDH, kneecapping its ability to engage with voters through petition circulation and imposing financial liability so burdensome that FDH ultimately terminated its efforts to qualify an initiative for the 2026 ballot. In the weeks leading up to May 2, 2025, when HB 1205's Ten-Day Return Provisions, Sponsor Fine Provisions, and New Criminal Provisions would take effect, as HB 1205 was moving toward passage, TOT scaled down its petition collection from sending out approximately 150 circulators each day to a full operational pause from which it never fully scaled back up. *Id.* at 134:24–135:9, 189:21–190:8, 191:19–192:2. The operational pause cost FDH an estimated $500,000. *See* FDH PX 460 at 8; Tr. at 238:12–240:24. It also increased the estimated cost of TOT's paid circulation efforts from between 18 and 19 million to 26 million. *See* FDH PX 460 at 8; Tr. at 240:25–242:22.

FDH also changed its guidance for volunteers when these provisions took effect, asking that volunteers mail petitions within 24 hours of collection to facilitate compliance with the Ten-Day Return Provision, which created severe financial and logistical burdens for volunteers. Tr. at 61:3–25 (FDH's Organizing Director testifying that voter concerns about turnaround time were common); *id.* at 62:1–12 (FDH concerned about using volunteers with this timeline because of concern about fines); *id.* at 361:2–362:18 (explaining logistical burdens imposed on FDH's

55

volunteers). When HB 1205's Circulator Eligibility Restrictions and Registration Requirements took effect on July 1, 2025, FDH suspended volunteer circulation altogether, and instead asked volunteers to distribute blank petition forms and prepaid envelopes to voters to complete and mail independently. *See id.* at 370:25–371:11. This "distribution model" resulted in significantly fewer substantive conversations between volunteers and voters, and in some cases led volunteers to cease efforts altogether. *Id.* at 70:11–13, 370:17–24, 371:9–11; *see also id.* 272:21–273:24, 274:18–275:16.

Supervisors also began posting and requesting payment of dramatically higher per-petition verification fees when the Verification Fee Provisions took effect on July 1, 2025. Tr. at 243:1–11 (Mr. Emerson testifying that he began receiving notice of increased fees during June 30, 2025, preliminary injunction hearing). In light of all of these obstacles, FDH announced the suspension of its 2026 campaign on September 25, 2025. Tr. at 77:24–78:4, 260:25–261:3. FDH is now seeking to place its initiative on the ballot for the 2028 election but is facing considerable hurdles due to HB 1205. *See id.* at 219:7–9, 268:13–15. Notably, FDH currently does not plan to use paid or volunteer circulators for its 2028 campaign, due to the Challenged Provisions. *See id.* at 270:1–272:20. Instead, FDH plans to mail blank petition forms to voters in hopes that they will complete and return the forms. *See id.* at 268:16–269:6, 271:20–272:2; *see also id.* at 272:21–274:17 ("We can't communicate with

people . . . in the way that we always have been able to and that is most effective."). In sum, FDH went from having "thousands of conversations a day" with voters prior to HB 1205, to no direct conversations at all. *See id.* at 274:18–276:1.

Below is a summary of how the Challenged Provisions harmed FDH individually and in combination.

*Circulator Eligibility Restrictions*

The Circulator Eligibility Restrictions "completely killed" FDH's volunteer circulation program and severely undermined its paid circulation program. *See* Tr. at 69:3–6, 198:24–200:5.

Prior to HB 1205, FDH's volunteer base included non-Florida residents, noncitizens, and individuals with felony convictions whose rights had not been restored. *Id.* at 66:11–13, 67:1–4, 68:3–8, 368:3–10. The Circulator Eligibility Restrictions categorically excluded these individuals from circulating, which meant that FDH could not benefit from using circulators "from all walks of life" who could "talk to people from various backgrounds." *See id.* at 132:6–14.

The Circulator Eligibility Restrictions, particularly the Non-Authorized Circulator Fine, created significant financial risk for FDH to work with *any* volunteers, even those outside the restricted categories. FDH could not feasibly verify potential volunteers' compliance with the Circulator Eligibility Restrictions: the organization did not conduct background checks on volunteers and so had no

way to confirm residence, citizenship, or felony status. *Id.* at 368:11–24 (noting that FDH's paid circulation vendor had no access to E–Verify); *id.* at 369:6–25 (asking for citizenship information would be "an unnecessary hurdle [and] barrier" plus an added cost to attempt to verify); *id.* at 68:9–20 (explaining that FDH had no mechanism to verify the conviction history of volunteers and no means of conducting background checks); *id.* at 68:21–69:2 (noting that it is not easy to find out whether someone's rights have been restored); FDH PX 243 at 26:8–27:13 (explaining impediments to verifying residency). FDH's Organizing Director, who oversaw its volunteer program, credibly testified that attempting to verify potential volunteers' membership in these categories would be "very invasive" and deter volunteerism. *See* Tr. at 67:14–68:17. In addition, many volunteers circulated FDH's petitions in coordination with partner organizations rather than FDH directly, further exacerbating the difficulty of verification. *See id.* at 368:3–370:16. And finally, FDH was unclear on what would type of "knowledge" would be sufficient to trigger a fine; for example, it was not sure if it would be held liable if a coalition partner had knowledge but FDH did not, *see id.* at 70:22–71:8, or if a volunteer was confused about their residency or felony status and mistakenly reported to FDH that they were eligible, and FDH took no further action to verify their status.

Given these risks, FDH was forced to abandon volunteer circulation and shift to petition distribution. *Id.* at 69:3–6. That shift fundamentally altered FDH's and its

58

volunteers' speech and ability to associate with voters. FDH's volunteers no longer had voters' "attention while they [we]re filling out a form," and "without that sort of entryway into the conversation," the volunteers no longer had meaningful conversations with voters about the initiative. *Id.* at 69:12–19; *see also id.* at 74:22–75:16 (explaining that distribution gives voters "the out" to "just walk away" such that substantive conversation "was not happening for the most part"). FDH also lost the ability to reliably track petition return rates because of the distribution model. *See id.* at 69:20–70:10. By FDH's best estimates, return rates plummeted from nearly 100% under the traditional circulation model to less than 10% under the distribution model. *Id.* at 69:22–70:21. The distribution model was also much more expensive than petition collection, creating "a lot of cost with very little return." *Id.* at 74:3–15.

FDH had "a lot less people willing to engage" as volunteers because of the shift to distribution. *See id.* at 69:12–19, 75:17–76:5. For example, the Organizing Director of People Power for Florida, a civic organization that mobilized approximately 300 volunteers for FDH and frequently hosted petition-collection events, testified credibly that the distribution model created "a big morale issue" because volunteers could not "visibly see [their] impact." *See id.* at 371:22–373:3. Volunteers went into conversations "much more defeated and with less energy" because there was no way "to verify that" the voter actually returned the petition.

59

*See id.* at 373:24–374:21. Some of People Power for Florida's volunteer leaders stopped volunteering altogether after the shift to distribution. *See id.* at 374:22–376:3 (describing volunteer who had previously circulated petitions at a local nightclub and could not distribute petitions because "people weren't going to just carry the envelope with them all night . . . and then remember to [mail it in] the next day"). All told, People Power for Florida went from collecting more than 1,000 petitions per month prior to HB 1205 and planning to hire more staff in anticipation of that number increasing, to distributing only about a quarter of that number per month after HB 1205. *Id.* at 354:24–355:7, 373:16–23.

The Circulator Eligibility Restrictions also severely harmed FDH's paid circulation program. FDH's paid circulation vendor, TOT, required the senior leadership for FDH's campaign to have worked on at least one ballot initiative campaign, because of the "unique skill set" needed for such a "high-trust job." *See id.* at 157:23–159:16. This meant that TOT typically relied on out-of-state managers for its ballot initiative campaigns who met this prior experience requirement. *See id.* at 163:6–165:18. Approximately three-fourths of TOT's managers for FDH's campaign were from out-of-state. *See id.* at 176:21–22. After the Circulator Eligibility Restrictions took effect, those individuals could no longer collect petitions and or effectively train new hires. *See id.* at 199–21. The provisions also impacted TOT circulators who had felony convictions and whose rights had not been

restored, *see id.* at 198:17–22, and who were noncitizens, *see id.* at 131:11–19. Finally, the provisions limited the pool of individuals who could act as paid circulators and thereby disseminate FDH's message. For example, a Colombian-born lawful permanent resident of the United States testified that but for the Circulator Eligibility Provisions he would circulate petitions for FDH. *Id.* at 447:12–15.

For all these reasons, the Circulator Eligibility Restrictions contributed to FDH suspending its 2026 campaign. *See id.* at 77:24–78:18. The provisions will continue to harm FDH during the 2028 cycle. The Organizing Director of People Power for Florida confirmed, for example, that the organization will not mobilize volunteers to distribute petitions for FDH in 2028 if HB 1205 remains in place, due to concerns regarding volunteers' liability and due to HB 1205's effect on FDH's ability to "have the most impact." *See id.* at 378:4–17.

*Registration Restrictions*

The Registration Restrictions independently harm FDH and would have caused the end of its volunteer program even absent the Circulator Eligibility Restrictions. *See id.* at 76:8–17. The Registration Restrictions cut to the heart of FDH's volunteer program, as the majority of FDH's volunteers collected more than twenty-five petitions. *Id.* at 71:15–22.

FDH and its volunteers were uncertain about the scope of the Registration

Restrictions. For example, volunteers were unsure as to whether the twenty-five-petition limit applied to a particular moment or an entire campaign cycle, or whether it applied to only petitions the individual directly collected or any they might otherwise handle. *See* FDH PX 499; Tr. at 72:2–73:18. FDH was not able to give its volunteers clear answers. *Id.* at 73:19–21; *see also id.* at 364:14–365:13.

FDH ended its volunteer petition circulation program in part because of the Registration Restrictions. *Id.* at 76:6–17. FDH was unable to verify whether every volunteer met the requirements for registration and had properly registered. *Id.* at 76:11–17. And even if FDH could do so, requiring each potential volunteer to complete the State's registration process and risk criminal liability would have been too burdensome. *See id.* at 365:18–366:10. It would also make it impossible for individuals to spontaneously volunteer as petition circulators, as had occurred in the past. *Id.* at 366:11–367:24.

Because FDH could not, in good conscience, expose its volunteers (or itself) to criminal liability and penalties under the Registration Requirements and other related Challenged Provisions, FDH moved to the distribution model, as described above. Even with this modification, some would-be volunteers refused to even distribute petitions due to concern about the criminal penalties for unregistered circulators. *Id.* at 364:14–365:17.

*Ten-Day Return Provisions*

The Ten-Day Return Provisions harmed FDH by increasing costs, chilling volunteer participation, restricting the extent and geographic scope of petition circulation, and subjecting FDH to substantial fines for circumstances beyond its control.

FDH altered its volunteer circulator operations as soon as the Ten-Day Return Provisions went into effect on May 2, 2025. FDH asked its volunteers to mail petitions to FDH's quality control vendor within 24 hours of collection, rather than the previous timeline of every two weeks. *See* FDH PX 442; Tr. at 56:18–59:19. Coalition partners like People Power for Florida dedicated staff time to updating their volunteer training materials and contacting existing volunteers to inform them of the change. *See* Tr. at 361:20–362:16. They also incurred additional costs from mailing petitions more frequently. *Id.* at 361:20–362:16.

Even with this new guidance, volunteers expressed concern about FDH's ability to ensure submission within the newly compressed timeline. *See* FDH PX 449; Tr. at 59:20–61:16. At least one volunteer stopped circulating petitions due to this concern. FDH PX 449; Tr. at 59:20–61:16. FDH itself "had a lot of concern" about using volunteer circulators given the Ten-Day Return Requirement Fines. *See* Tr. at 62:1–12.

The Ten-Day Return Provisions also compelled FDH to alter its paid circulator operations. TOT paused circulation at the time of HB 1205's passage in

63

order to reconfigure its operations, including to ensure compliance with the shorter petition return timeline. *Id.* 189:17–190:8. This pause cost FDH an estimated $500,000, because TOT still needed to pay for salaried staff, office space, and the like even though circulators were not going out for shifts. *See* FDH PX 460 at 8; Tr. at 240:13–24.

TOT ultimately shifted from mailing petitions roughly biweekly to daily, which imposed a significant cost for daily overnight mail. Tr. at 127:1–5, 192:20–193:3. TOT also lost the opportunity to identify and fix curable petition errors caused by circulators, because it did not have time to finish quality control before petitions needed to be mailed out. *See id.* at 192:7–193:3. Finally, TOT was constrained in its ability to spread FDH's message: its circulators could no longer travel as far from TOT's offices because of the need to return quickly to process and mail petitions. *See id.* at 126:6–128:4. Prior to HB 1205, TOT's circulators had conducted overnight canvasses, for example traveling from Tampa to Orlando or St. Petersburg to circulate at major events. *See id.* The Ten-Day Return Provisions forced TOT to abandon these efforts and prioritize speedy return of petitions over broader outreach, limiting FDH's ability to disseminate its message across the State. *Id.* at 127:16–128:4.

The provisions also exposed FDH to fines based on factors outside of its control. For example, at one point UPS's tracking system failed for a shipment of

TOT-collected petitions, which were ultimately delivered late. *Id.* at 193:11–18. In other instances, voters would write the incorrect county on a petition; TOT would mail the petition to the listed county, and then in the time it would take for the listed county's Supervisor to mail the form to the Supervisor of the voter's county of residence, more than ten days would have passed. *Id.* at 193:19–194:6. Multiple Supervisors' employees informed TOT that the Ten-Day Return Provisions' fines *would* apply in such instances. *See id.* at 194:7–18.

*Verification Fee Provisions*

The Verification Fee Provisions profoundly harmed FDH, both in direct financial costs and by upending its financial planning. Prior to HB 1205, FDH had estimated that it would require approximately $910,000 in verification fees for the approximately 1.3 million petitions it estimated it needed to submit to qualify for the ballot. *See id.* at 225:9–22. After the Supervisors began to increase fees pursuant to the Verification Fee Provisions in mid-2025, that estimate shot up to $4.5 million. *See id.* at 244:6–12.[5] Essentially, every time FDH has "a successful conversation with a voter" that resulted in a signed petition, it "would then have to pay" the increased fee. *See id.* at 255:2–22. This nearly fivefold increase "completely upended" FDH's plans, budget, and path forward. *Id.* at 235:11–17, 255:2–14.

---

[5] FDH's midstream estimate of $4.5 million was remarkably close to the parties' stipulated estimate of $4,381,000, Joint Stips. at 40, reached after all counties finalized updating verification fees.

The new fees did not merely impose higher costs. They created what FDH's Executive Director Mitchell Emerson described as a "catch-22" budgeting dilemma. Because the Ten-Day Return Provisions require a petition to be submitted to Supervisors soon after a voter signed, and because verification fees are triggered by petition submission, *see* Fla. Stat. § 99.097(4)(a); Tr. at 254:23–255:1, scaling up circulation efforts risked immediate, unbudgeted fee exposure if circulators exceeded performance expectations. Tr. at 256:1–24. FDH received a range of guidance from Supervisors on the consequences of nonpayment or late payment of verification fees: some Supervisors' offices indicated that delayed payment "could result in penalties or fines from the State," *see* FDH PX 377; Tr. at 248:8–251:3, others that the petitions in question would be marked invalid, *see* FDH PX 378; Tr. at 251:4–252:22, and still others that the petitions would be returned to FDH, potentially risking liability under the Ten-Day Return Provisions, *see* FDH PX 546; Tr. at 252:25–254:12.

As noted above, FDH currently does not plan to use paid circulators for its 2028 campaign, because of the burden imposed by the Verification Fee Provisions on sponsors that use paid circulators. *See* Tr. at 270:1–272:20. Were the Verification Fee Provisions not in effect, FDH would use paid circulators for its 2028 campaign. *See id.* at 270:22–24.

*Voter PII Disclosures*

66

The Voter PII Disclosures discouraged voters from signing FDH's petition. *See id.* at 200:14–16 (explaining that "[t]he more personal information . . . that the State requires somebody to put, the less likely a voter is to participate"). Once the requirement took effect, many voters returned FDH's petition without the fields for the driver's license or identification number and Social Security number filled out. *Id.* at 77:1–5. Every one of TOT's circulators had at least one experience daily with a voter who was uncomfortable providing the information, with about one person per day refusing to provide the information at all. *Id.* at 201:15–202:3; *see also id.* at 133:16–134:18. Mr. Simmons observed "a pretty significant drop" in the collection rates among TOT's "Black and Brown staff" because "people would be a little more resistant towards them because they do think someone's going to use the information maliciously." *Id.* at 133:16–134:9. The Organizing Director of People Power for Florida confirmed that the new fields "raise[d] concern" for voters. *Id.* at 376:4–377:10. The organization focuses its work "around college campuses and young people," and noted that it was "very common" that young people who were interested in filling out the form could not because they did not have their identification or Social Security numbers at hand. *See id.* at 376:11–377:10. The new requirement thus undermined FDH's ability to associate with and communicate its message to voters.

*Sponsor Fines Provisions*

The Sponsor Fines Provisions created new, significant financial liability for FDH.

The **Petition Fill-in Fine** contributed to FDH's decision to end its volunteer circulation program and forced FDH to significantly change its paid circulator operations. Prior to HB 1205, FDH's volunteers had frequently filled in petition form fields that a voter might have mistakenly left blank, such as the county or zip code. *Id.* at 54:21–55:10, 194:19–195:10. When the Petition Fill-in Fine went into effect on May 2, 2025, FDH had to issue new guidance instructing its volunteers against doing so. *See* FDH PX 442; Tr. at 58:2–59:13. FDH's volunteers were deeply concerned about this provision and repeatedly communicated "that they were very worried about their own liability as individuals as well as organizational liability." Tr. at 62:20–63:6.

Prior to HB 1205, TOT's in-office quality control team would review petitions collected by paid circulators and, if necessary, fill in missing information such as a missing county or cure "small innocuous errors that voters make all the time" like "writing USA for county because it looks like country." *See id.* at 124:14–21, 128:5–14, 194:19–195:18. TOT stopped curing petitions in this way because of the Petition Fill-in Fine, which meant it "turned in petitions that presumably were not going to be counted that were almost perfect." *Id.* at 195:14–18; *see also id.* at 192:20–193:3 (discussing increased costs due to inability to cure petitions).

68

The **Prefilled Petition Fine** forced FDH to halt two promising programs it had begun before HB 1205 to supplement its core circulation efforts. In the first, voters could submit a request online to have a petition form mailed to them with several fields already completed based on state voter records, which the voters could then sign and mail in. *See id.* at 50:24–51:8, 52:12–24. About a thousand voters had used this method. *See id.* at 52:25–53:3. In the second program, a vendor identified voters likely to support FDH's mission and mailed them information about the initiative along with a prefilled petition form, *see id.* at 53:4–17. FDH had mailed out approximately 10,000 such petitions prior to HB 1205's passage. *Id.* at 53:18–20. The program had an "incredibly high" validity of over 90%, particularly compared to mailing blank forms that a voter might return with fields erroneously filled or left blank. *See id.* at 53:21–54:5. FDH was forced to abandon these programs due to the Prefilled Petition Fine. *See id.* at 56:18–23, 62:13–19.

*New Criminal Penalties*

FDH's paid circulation vendor had to alter its operations due to the **Information Retention Felony**. TOT had previously scanned all collected petitions it collected for FDH in order to conduct quality control. *Id.* at 195:25–196:15; *see also id.* at 183:13–184:17. For example, TOT would identify whether any of its circulators required additional training on how to properly instruct voters to complete petitions, and to determine whether voters had mistakenly completed

69

FDH's petition multiple times. *Id.* at 196:3–15. After HB 1205, TOT created a new procedure to scan petition forms and send the digital copies directly to FDH. *See id.* at 196:19–197:5. TOT took the "most conservative possible approach" with regard to retention because the statute was "confusing" in that it did not define what it means to retain voter information. *See id.* at 196:16–197:5.

The **RICO 'Irregularities' Definition** chilled the activities of FDH's volunteer and paid circulators. FDH's volunteers expressed "a lot of concern" regarding this provision, but FDH was not able to provide clear answers about the scope of liability. *See id.* at 63:7–65:9 (FDH's Organizing Director testifying that her "phone was ringing nonstop" with volunteers expressing concern); *see also id.* at 362:19–363:19 (People Power for Florida's Organizing Director testifying that it was "not clear" whether a volunteer's "genuine mistake on a form or two" would constitute an "irregularity" sufficient to trigger liability); FDH PX 506. At least one of FDH's partner organizations stopped acting as a "hub" for petition drop-offs. *See* Tr. at 63:15–21. Concerns about criminal liability under this provision ultimately factored into FDH's decision to shift to the distribution model. *See id.*

The RICO 'Irregularities' Definition also impacted FDH's paid circulators. Mr. Jordan Simmons had concerns regarding the provision, described *infra*, and also heard concerns from other TOT staff. *See id.* at 129:4–15. TOT did not know what conduct would trigger racketeering liability versus ordinary liability under Florida's

70

election code. *See id.* at 197:6–16. It had to "do some work to convince folks to continue working" and so took "the most conservative approach" in interpreting the provision. *See id.* at 197:17–23.

The **Petition Fill-In Felony** added the risk of criminal prosecution for FDH, its employees, and its volunteers, on top of the impacts of the Petition Fill-In Fine, described above.

*Cumulative Impact*

The Challenged Provisions did more than impose discrete administrative burdens: they reshaped FDH's campaign structure, message delivery, staffing model, and risk calculus in ways that ultimately proved fatal to its efforts to qualify for the 2026 ballot. The suspension of FDH's 2026 campaign is ultimately attributable to "the combined effect of the provisions" of HB 1205. *Id.* at 78:16–18.

The Challenged Provisions shrunk the pool of potential circulators, either through outright bans, burdensome compliance requirements, or new sources of financial and criminal liability that generated pervasive fear. The provisions reduced FDH's ability to reach and associate with voters by discouraging volunteer circulation, reducing the efficiency of paid circulation, and deterring voters via the PII mandate. The provisions also increased FDH's costs, by requiring more frequent mailing, reducing the efficiency of paid and volunteer circulation, and dramatically increasing verification fees.

These overlapping burdens altered the substance, reach, and effectiveness of FDH's speech and association. Petition circulation is a uniquely powerful communicative moment in a ballot initiative campaign. *See supra* Section I.A.1. HB 1205's Challenged Provisions diminished the quality and extent of FDH's message and obliterated its momentum at that critical moment. *See id.* at 263:21–268:9 (discussion between Court and Mr. Emerson on how HB 1205 "effectively smothered the infant in the crib"). The Challenged Provisions also altered the willingness of experienced national vendors like TOT to participate in Florida ballot initiative efforts absent extraordinary risk mitigation measures. *See id.* at 202:4–12 (explaining that in light of HB 1205, TOT will now require nonstandard contractual provisions to limit its exposure before undertaking work in Florida).

### b. Mitchell Emerson

Mr. Mitchell Emerson is FDH's Executive Director and Campaign Manager. *Id.* at 217:18–20. Mr. Emerson signed FDH's petition for the 2026 cycle. *Id.* at 257:14–16. For him, signing FDH's petition was a "personal and important moment" because of his family's history with inadequate healthcare coverage and his work to support passage of the Affordable Care Act. *See id.* at 257:17–259:19. When he attempts to sign FDH's petition for the 2028 cycle, Mr. Emerson will now need to disclose his driver's license number and Social Security number because of the Voter PII Disclosures. Fla. Stat. § 100.371(14)(c). He also faces increased liability for his

72

work with FDH, which could potentially fall within the scope of the conduct covered by the RICO 'Irregularities' Definition, which includes "conspir[ing] to commit, or . . . solicit[ing], coerc[ing], or intimidat[ing] another person to commit . . . violation[s] of the Florida Election Code relating to irregularities or fraud involving issue petition activities." *Id.* § 895.02(8)(d).

### c. **Jordan Simmons**

Mr. Jordan Simmons is a Missouri resident employed by FDH's paid circulation vendor TOT. Tr. at 109:1–25. Mr. Simmons served as a Project Director for FDH's campaign from March through August 2025. *Id.* at 109:19–21, 112:10–15. In that role, he oversaw TOT's operations in central Florida, managed in-office and circulator staff, participated in hiring and training, and circulated petitions. *See id.* at 112:19–113:9, 113:24–114:2, 117:3–118:11.

Medicaid expansion is an important issue for Mr. Simmons. *Id.* at 136:2–24. He was a Medicaid recipient as a child and, later in life, his grandparents experienced financial hardship in seeking healthcare because Missouri had not expanded Medicaid at that time. *See id.* Mr. Simmons worked on successful ballot initiative campaigns to expand Medicaid in Missouri and South Dakota, and he believes "it's important for the people of Florida to have an opportunity to decide if they want to expand Medicaid." *See id.* Mr. Simmons also brought considerable experience to FDH's campaign, as he has worked on about ten ballot initiative campaigns and has

73

circulated petitions in each. *See id.* at 110:18–111:18.

The Challenged Provisions prohibited Mr. Simmons from circulating petitions, subjected him to new criminal liability, and negatively impacted his ability to train others and manage FDH's paid circulation operations. *See id.* at 110:9–11, 129:1–3, 130:6–13. Mr. Simmons stopped working on behalf of FDH when TOT concluded its work for FDH in late August 2025. *See id.* at 135:10–17. He would have stopped working with FDH regardless had the campaign "gone on with HB 1205 being in effect," because the "criminal" and "financial implications" of the new law. *Id.* at 135:18–23. Mr. Simmons would "definitely take the opportunity to work on [FDH]'s cause again" if the Challenged Provisions were not in effect. *Id.* at 135:24–136:4.

The Circulator Eligibility Restrictions prohibited Mr. Simmons from circulating petitions because he is a Missouri resident. *Id.* at 129:18–130:5; *see also id.* at 118:2–11 (describing petition circulation as "contributing" to "the goal of the campaign"); *id.* at 121:9–123:2 (discussing his interactions with voters). The Circulator Eligibility Restrictions also precluded Mr. Simmons from effectively training FDH's paid circulators. Prior to HB 1205, Mr. Simmons had regularly conducted training shifts in which he circulated petitions as a "necessary" component of "showing the circulator how to have these conversations" and "how to get a quality signature by walking the voter through the form itself." *See id.* at

74

117:4–119:10. He had also "debrief[ed]" with paid circulators by reviewing their forms to ensure completeness. *See id.* at 123:16–124:15. The Circulator Eligibility Restrictions prohibited Mr. Simmons from engaging in these activities. *Id.* at 130:6–13. The Circulator Eligibility Provisions also prevented Mr. Simmons from hiring experienced nonresident managers for FDH's campaign, *see id.* at 130:22–131:10, 132:19–25, and prevented him from working with circulators who were noncitizens or who had felony convictions, *see id.* at 131:11–133:7.

The Ten-Day Return Provisions negatively impacted Mr. Simmons as well. *Id.* at 126:6–128:4. Because of the provisions, TOT shifted from mailing completed petitions biweekly to daily. *Id.* at 126:16–23. This shift caused increased mailing costs, forced TOT employees to "scramble" to mail petitions in time, and prevented Mr. Simmons and other TOT employees from traveling further from TOT's office to circulate petitions, because they "had to make sure that everything was being mailed the next day so [they] could meet that ten-day turnaround." *Id.* at 127:11–128:4.

The Voter PII Provisions made voters "resistant" to Mr. Simmons's petition gathering efforts. *See id.* at 133:8–134:18. After the new petition form went into effect, Mr. Simmons interacted with voters who were "willing to sign" FDH's petition but decided not to sign after seeing the newly required fields. *See id.*

The Petition Fill-In Fine and Petition Fill-In Felony prohibited Mr. Simmons

75

and his colleagues from "correct[ing]" petitions by filling in missing information such as counties or cities, as had been TOT's practice prior to HB 1205. *See id.* at 124:14–21, 128:10–14.

The RICO "Irregularities" Definition also affected Mr. Simmons's willingness to circulate petitions. *Id.* at 129:1–3. Mr. Simmons testified that he did not "have a full understanding" of what the provision covered, but "did not want a RICO charge." *Id.* at 128:21–25; *see also id.* at 135:18–23. He also testified that FDH's paid circulation team "became wary of signature gathering" because of criminal liability under HB 1205. *See id.* at 129:7–15.

## II.   PROCEDURAL BACKGROUND

Shortly after the Governor signed HB 1205 into law, the FDH Plaintiffs filed a complaint alleging violations of the First and Fourteenth Amendments to the U.S. Constitution. Compl., *Florida Decides Healthcare v. Byrd*, No. 4:25-cv-00211-MW-MAF (N.D. Fla. May 4, 2025), ECF No. 1.

The FDH Plaintiffs named Defendants Florida Secretary of State and Attorney General (together, "State Defendants"), as well as the Supervisors of Elections in each of Florida's 67 counties and the state attorneys for each of Florida's 20 judicial circuits.

Early in the litigation, several other plaintiffs intervened: Smart & Safe Florida, League of Women Voters of Florida, League of Women Voters of Florida

Education Fund, Inc., League of United Latin American Citizens, Cecile Scoon, Debra Chandler, and FloridaRightToCleanWater.org (collectively with the FDH Plaintiffs, "Plaintiffs"). The Republican Party of Florida ("RPOF") later intervened as a Defendant to defend the Challenged Provisions.

In September 2025, the FDH Plaintiffs filed a Third Amended Complaint, referred to here as the "FDH Operative Complaint." ECF No. 413, *see also* ECF No. 413-1 (appendix setting out provision challenged under each Count).

Trial occurred from February 9 to 20, 2026. The parties called 28 witnesses and admitted more than 150 exhibits.

**ARGUMENT**

**III.    FDH PLAINTIFFS HAVE STANDING FOR ALL CLAIMS ALLEGED IN THE OPERATIVE COMPLAINT.**

The FDH Plaintiffs have standing to assert each of their claims against the Challenged Provisions. As to each claim, one or more of the FDH Plaintiffs have demonstrated (1) that they have suffered an injury-in-fact that is (2) traceable to Defendants and that (3) can be redressed by a favorable ruling. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The bases for standing are listed in the following Table and discussed further below.

| Challenged Provision(s) | Transcript Citations Supporting FDH Plaintiffs' Standing |
|---|---|

77

| Circulator Eligibility Restrictions | 65:24–69:6, 69:7–70:21, 70:22:71:11, 74:3–75:16, 76:6–17, 82:19–24, 109:22–110:11, 115:4–20, 117:8–119:10, 124:2–13, 129:4–15, 129:16–133:7, 134:19–135:9, 135:24–136:4, 150:11–151:23, 163:6–21, 174:12–15, 176:17–22, 189:17–192:2, 197:24–200:5, 239:22–242:22, 259:25–17, 266:17–268:9, 367:25–370:16, 370:17–376:3, 377:17–379:9, 446:20–22, 445:25–446:1, 411:23–25, 412:1–6, 409:24–410:2 |
|---|---|
| Registration Restrictions | 69:7–70:21, 71:12–74:2, 74:3–75:16, 75:17–76:5, 76:6–17, 82:8–18, 239:22–242:22, 259:25–17, 266:17–268:9, 271:20–275:16, 363:20–367:24, 370:17–376:3, 377:17–379:9 |
| Ten-Day Return Provisions | 57:10–62:12, 63:14–65:9, 125:3–126:5, 126:6125:3–126:5–128:4, 189:17–192:2, 192:3–194:18, 239:22–242:22, 259:25–17, 266:17–268:9, 361:2–18, 377:17–379:9 |
| Verification Fee Provisions | 225:9–19, 230:10–17, 244:6–247:12, 259:25–17, 266:17–268:9, 270:1–271:19 |
| Voter PII Disclosures | 76:18–77:13, 133:8–134:18, 200:6–202:3, 257:14–16, 259:25–17, 266:17–268:9, 376:4–377:10, 377:17–379:9 |
| Petition Fill-In Fine and Petition Fill-in Felony | 54:18–55:7, 62:20–63:6, 63:14–65:9, 124:14–21, 125:3–126:5, 128:6–14, 194:23–195:18, 259:25–17, 266:17–268:9 |
| Prefilled Petition Fine | 52:9–54:5, 62:13–19, 63:14–65:9, 81:23–82:4, 259:25–17, 266:17–268:9 |
| Information Retention Felony | 63:14–65:9, 183:13–186:8, 187:15–188:5, 189:17–192:2, 195:19–197:5, 259:25–17, 266:17–268:9 |
| RICO "Irregularities" Definition | 63:7–14, 63:14–65:9, 63:14–65:9, 128:15–129:15, 135:18–23, 135:24–136:4, 197:11–23, 259:25–17, 266:17–268:9, 362:19–363:19, 377:17–379:9 |

## A. Plaintiffs have standing for their First Amendment speech claim (Count I).

### 1. Injury-in-Fact

To establish injury, a plaintiff must show they "suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent,

not conjectural or hypothetical." *Spokeo*, 578 U.S. at 339 (internal quotation marks and citation omitted). Injury-in-fact can be shown where an individual intends to engage in future conduct "affected with a constitutional interest" that is "arguably proscribed" by law, and where "the threat of future enforcement . . . is substantial." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159–64 (2014).

An organization suffers an injury in its own right where a challenged law imposes a "concrete and demonstrable injury to the organization's activities," with a "consequent drain on the organization's resources." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). For an organization to show injury-in-fact under an organizational standing theory, it must show a "concrete and demonstrable injury" to its activities. *Id.* The Supreme Court has held that "there can be no question" such a showing is made where a defendant's behavior has "perceptibly impaired" an organization's ability to fulfill its mission. *Id.* at 379.

The FDH Plaintiffs have suffered injury-in-fact due to each of Challenged Provisions' infringement on their First Amendment speech rights.

### a.  Circulator Eligibility Restrictions

The Circulator Eligibility Restrictions prohibit FDH from using petition circulators who are nonresidents, noncitizens, or who have felony convictions and have not had their rights restored. Individuals in each category have previously circulated petitions for FDH. Tr. at 66:11–13, 109:22–110:11, 367:25–368:10,

79

(nonresident circulators); *id.* at 68:3–5, 131:20–132:5, 198:17–22 (circulators with felony convictions whose rights had not been restored); *id.* at 67:1–4, 131:11–19, 369:2–8, 402:23–403:1 (noncitizen circulators). Moreover, when the Circulator Eligibility Restrictions took effect, FDH was forced to suspend its volunteer circulation program and instead instruct volunteers to distribute blank petition forms with prepaid envelopes for voters to complete and mail independently. FDH adopted this approach because it could not realistically verify whether potential volunteers complied with the statute's eligibility requirements. *See supra* Section I.B.3.a (citing Tr. at 67:14–68:17, 189:21–190:8, 191:19–192:2). As a result of this shift, FDH and its volunteers lost a critical opportunity to engage voters in real-time conversations about the ballot initiative while petitions were being completed. Petition return rates consequently plummeted to less than ten percent, forcing the organization to suspend its 2026 campaign altogether. *See supra* Section I.B.3.a (citing Tr. at 69:12–19, 77:24–78:18). The restrictions also dramatically reduced the capacity of FDH's paid circulation vendor, because three-fourths of its senior staff were no longer able to circulate petitions, undermining both the vendor's training infrastructure and its ability to engage voters directly. Tr. at 176:21–22, 199:1–11, 202:17–203:24.

These harms readily satisfy Article III's injury-in-fact requirement. The Eleventh Circuit recognizes that "[v]iolations of the right[] to free speech . . . are intangible harms that are also both direct and concrete." *Muransky v. Godiva*

*Chocolatier, Inc.*, 979 F.3d 917, 926 (11th Cir. 2020) (en banc). Likewise, government regulations that restrict how a plaintiff may engage in protected activity "almost invariably satisfy both the injury in fact and causation requirements." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024). And when government action forces an organization to curtail volunteer participation or otherwise alter its activities to avoid liability, that operational change itself constitutes a First Amendment injury. *See Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale* ("*FLFNB II*"), 11 F.4th 1266, 1287 (11th Cir. 2021). Because HB 1205 prevented FDH from using nonresidents, noncitizens, and individuals with felony convictions whose rights had not been restored to engage in the core political speech of petition circulation, the resulting impact to FDH's speech and the diminished petition return rates constitute a classic injury-in-fact.

### b. Registration Restrictions

HB 1205's Registration Restrictions similarly inflicted a First Amendment speech injury on FDH by forcing the organization to alter its core petition-circulation efforts. Most of FDH's volunteers collect more than twenty-five petitions during a campaign. Tr. at 71:15–22. Yet FDH could neither verify whether volunteers had properly registered nor provide clear guidance about the provisions' scope. As a result, FDH was compelled to abandon its volunteer circulation program and instead rely on a passive distribution model in which voters completed petitions

independently and mailed them back. *See supra* Section I.B.3.a (citing Tr. at 71:15–22, 72:2–73:18, 76:11–17). This shift dramatically reduced FDH's ability to engage voters in conversations about the ballot initiative. Such government-imposed restrictions on how an organization may engage in protected speech constitute a concrete injury-in-fact for the same reasons as apply to the Circulator Eligibility Restrictions. As the Eleventh Circuit has explained, violations of free speech rights are "direct and concrete" harms sufficient to satisfy Article III. *Muransky*, 979 F.3d at 926.

### c. Ten-Day Return Provisions

HB 1205's Ten-Day Return Provisions likewise burdened FDH's First Amendment activity by forcing its vendor, TOT, to abandon overnight canvassing trips and instead prioritize the rapid return of collected petitions to avoid statutory penalties. *See supra* Section I.B.3.a (citing Tr. at 126:6–128:4). Because overnight canvassing had allowed TOT to reach voters across further reaches of the State in a single trip, the restriction significantly curtailed FDH's ability to deploy circulators broadly and disseminate its message to voters statewide. *See supra* Section I.B.3.a. Likewise, the Ten-Day Return Provisions harmed FDH by forcing it to "reduce . . . petition gathering while at the same time spend[ing] more resources on expedited shipping and processing." *Fla. Decides Healthcare, Inc. v. Byrd*, 785 F. Supp. 3d 1086, 1098 (N.D. Fla. 2025); *see also* Tr. at 127:1–5, 192:20–193:3. These

compelled operational changes constitute a classic injury-in-fact. Government regulations that "require or forbid some action by the plaintiff almost invariably satisfy both the injury-in-fact and causation requirements." *All. for Hippocratic Med.*, 602 U.S. at 382. Because petition circulation is a core form of political speech, restrictions that limit how an organization may conduct that activity constitute a concrete First Amendment injury. *Muransky*, 979 F.3d at 926.

### d. Verification Fee Provisions

Because of HB 1205's Verification Fee Provisions, FDH was charged dramatically higher fees to verify petitions, with the average fee jumping from $0.87 to $3.37. Joint Stips. at 40. FDH faced more than $4.3 million in verification costs in order to validate enough petitions to qualify for the ballot. *See* Joint Stips. at 40; FDH PX 39; *see also* supra Section I.B.2.d. The Verification Fee Provisions forced FDH to abandon the use of paid circulators for its 2028 campaign because FDH cannot afford the substantial verification fees charged to sponsors who use paid circulators. *See supra* Section I.B.3.a (citing Tr. at 248:8–251:3, 270:1–272:20). This financial burden readily satisfies Article III. Tangible harms such as financial loss are among the clearest forms of injury. *Muransky*, 979 F.3d at 926. Moreover, regulations that "require or forbid some action by the plaintiff almost invariably satisfy both the injury in fact and causation requirements." *All. for Hippocratic Med.*, 602 U.S. at 382.

### e. Voter PII Disclosures Requirement

HB 1205's Voter PII Disclosures provision harmed FDH's ability to disseminate its political message by limiting the number of voters willing and able to divulge the newly required information. *See supra* Section I.B.3.a (citing Tr. at 200:14–16). Multiple individuals who were otherwise willing and in the process of signing FDH's petition did not sign because of these new requirements, including young people who did not have ready access to their Social Security number, driver's license number, or identification number, and including individuals concerned that their personal data might be used for malicious purposes. *See supra* Section I.B.3.a (citing Tr. at 133:16–134:9, 376:11–377:10).

Mr. Emerson was similarly harmed by the Voter PII Disclosures Requirement because he will now need to disclose his driver's license and Social Security numbers in order to sign FDH's petition. *See* Section I.B.3.b (citing Tr. at 257:14–16). The Supreme Court has long recognized that compelled disclosure requirements can burden expressive activity because of their "possible deterrent effect" on participation. *See Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 616 (2021). That deterrent effect constitutes a cognizable First Amendment injury.

HB 1205's Voter PII Disclosures provision harmed FDH's ability to disseminate its political message by limiting the number of voters willing and able to divulge the requested information. *See supra* Section I.B.3.a (citing Tr. at 200:14–

84

16). This includes young people, who often do not have ready access to Social Security numbers and other sensitive information, as well as those individuals concerned that their personal data might be used for malicious purposes. *See supra* Section I.B.3.a (citing Tr. at 133:16–134:9, 376:11–377:10).

### f. Sponsor Fines Provisions and New Criminal Provisions

HB 1205's Sponsor Fines Provisions—including the Petition Fill-in Fine and the Prefilled Petition Fine—contributed to FDH's decision to terminate its volunteer circulation program and forced FDH to discontinue programs that helped voters correctly complete petition forms. *See supra* Section I.B.3.a (citing Tr. at 53:21–54:5, 58:2–59:13). Before HB 1205, petitions collected by paid circulators could often be corrected when errors occurred, and FDH did not face the same risk of financial penalties for assisting voters during the petition process. *See supra* Section I.B.3.a (citing Tr. at 62:20–63:6, 124:14–21, 128:5–14, 194:19–195:18). Indeed, prior to HB 1205, TOT would often fill in missing, non-substantive information—such as counties or cities—when that information was readily accessible. *See supra* Section I.B.3.a. Similarly, FDH often mailed out petitions to voters with certain fields prefilled. *See* Tr. at 53:21–54:5. FDH benefitted from these prefilled petitions, which had a validity rate of over 90%, substantially higher than that of mailing blank forms that a voter might return with fields erroneously filled or left blank. *See id.*

When the "operation or enforcement" of a law would cause a reasonable

speaker to self-censor, a plaintiff has demonstrated an injury-in-fact. *See Henry v. Att'y Gen.*, 45 F.4th 1272, 1288 (11th Cir. 2022). And when government regulation forces an organization to curtail its expressive activities to avoid liability, that operational change itself constitutes a concrete injury-in-fact. *FLFNB II*, 11 F.4th at 1287. The Petition Fill-in Fine and Prefilled Petition Fine caused FDH and its vendors to self-censor and change operations, constituting an injury-in-fact.

HB 1205's New Criminal Penalties—including the Information Retention Felony, RICO Irregularities Definition, and Petition Fill-In Felony—also forced FDH to take the "most conservative possible approach" to retaining petitions and prevented it from providing volunteers with clear guidance on the scope of their legal liability. *See supra* Section I.B.3.a (citing Tr. at 63:7–65:9, 196:16–197:5). As a result, at least one partner organization refused to stop acting as a "hub" for petition drop-offs and FDH was compelled to shift to an ineffective distribution model, limiting its ability to engage voters directly. *See supra* Section I.B.3.a (citing Tr. at 63:15–21).

Mr. Emerson is similarly harmed by HB 1205's New Criminal Penalties provisions because his work with FDH, which by its nature requires him to collaborate with others who are circulating petitions, may fall within the scope of RICO's 'Irregularities' definition. *See supra* Section I.B.3.b. Likewise, Mr. Simmons, was harmed by HB 1205's New Criminal Penalties provisions because,

86

had the campaign not been suspended, he would have refrained from engaging in petition-related activities simply because he "didn't want a RICO charge." *See supra* Section I.B.3.c. Without a full understanding of what actions the provision criminalized, Mr. Simmons was left unable to engage in his planned course of conduct. *See supra* Section I.B.3.c. As "[The Supreme Court has] held that a plaintiff satisfies the injury-in-fact requirement where he alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *LaCroix v. Town of Fort Myers Beach*, 38 F.4th 941, 947 (11th Cir. 2022) (quoting *Driehaus*, 573 U.S. at 159).

### 2. Traceability

Article III's traceability requirement merely requires Plaintiffs to show that their "injuries are connected with" Defendants' conduct. *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1125 (11th Cir. 2019) (alteration omitted) (quoting *Trump v. Hawaii*, 585 U.S. 667, 697 (2018)). Moreover, a plaintiff can show traceability where the injury suffered is "produced by [the] determinative or coercive effect" of the defendant's conduct "upon the action of someone else." *Bennett v. Spear*, 520 U.S. 154, 169 (1997); *see also id.* at 168–69 (admonishing that courts should not "equate[] injury 'fairly traceable' to the defendant with [an] injury as to which the defendant's actions are the very last step in the chain of causation"). "[W]here, as

here, a plaintiff has sued to enjoin a government official from enforcing a law, he must show, at the very least, that the official has the authority to enforce the particular provision that he has challenged." *Support Working Animals, Inc. v. Gov'r of Fla.* ("*SWA*"), 8 F.4th 1198, 1201 (11th Cir. 2021). "Traceability is not an exacting standard" and is "less stringent than the tort-law concept of proximate cause." *Walters v. Fast AC, LLC*, 60 F.4th 642, 650 (11th Cir. 2023) (internal quotations marks and citation omitted).

Here, the FDH Plaintiffs have easily satisfied the traceability requirement, because Defendants are the government officials with authority to enforce the provisions they are challenging.

The Secretary of State (the "Secretary") has authority to enforce the Circulator Eligibility Restrictions, Registration Restrictions, Ten-Day Return Provisions, Petition Fill-In Fine and Prefilled Petition Fine. Plaintiffs' injuries as to these provisions are traceable to the Secretary, who serves as Florida's chief election officer and exercises supervisory authority over the State's election laws. *See* Fla. Stat. § 100.371(11). The Secretary is responsible for overseeing the statewide initiative process, issuing guidance to local election officials, and ensuring enforcement of the election code, and may refer suspected violations of HB 1205 to the Attorney General for further enforcement. *See id.* §§ 15.13, 100.371(11). The

FDH Plaintiffs have therefore established traceability as to the Secretary of State for these provisions.

The Attorney General is the chief State legal officer and maintains the office of the statewide prosecutor. Fla. Const. art. IV, § 4(B). The Attorney General therefore has authority to enforce each of the New Criminal Penalties. Likewise, the Attorney General has concurrent jurisdiction, through the office of the statewide prosecutor, with the State attorneys to prosecute violations of criminal laws occurring in two or more judicial circuits. Fla. Const. art. IV, § 4(b). The Attorney General also plays a supervisory role in statewide election law enforcement. Specifically, the Attorney General may receive referrals from the Secretary regarding potential election law violations, and may oversee prosecution of such offenses. *See* Fla. Stat. § 100.371(11). Thus, an order enjoining the Attorney General from enforcing the New Criminal Penalties would redress the FDH Plaintiffs' injuries as to those provisions.

The State Attorneys are the prosecuting officers of all trial courts in Florida. Fla. Stat. § 27.02. The State Attorneys have authority to enforce each of the New Criminal Penalties. An order enjoining the State Attorneys from enforcing the New Criminal Penalties would therefore redress the FDH Plaintiffs' injuries as to those provisions.

89

The Supervisors of Elections are responsible for enforcing the Circulator Eligibility Provisions, Ten-Day Return Provisions, Verification Fee Provisions, and Voter PII Disclosure Requirements. Plaintiffs' injuries as to these provisions are traceable to the Supervisors. Florida law assigns Supervisors the duty to receive, verify, and certify petition signatures submitted in support of ballot initiatives. *See* Fla. Stat. § 100.371(14)(a)–(c). This responsibility includes recording the date each submitted petition is received. *Id.* § 100.371(13), (14)(c). Supervisors are also responsible for calculating and posting the "actual cost of signature verification for petition forms" on a regular basis. *Id.* § 100.371(14)(f). Supervisors are similarly responsible for charging statewide initiative sponsors this "actual cost" "in advance" of verifying each petition. *Id.* §§ 99.097(4)(a), 100.371(14)(b). Supervisors also must invalidate any petition signed by an ineligible or unregistered petition circulator and may not count the petition toward the number of necessary signatures for placement on the ballot. *See id.* § 100.371(14)(h). An order prohibiting Supervisors from enforcing the Circulator Eligibility Provisions, Ten-Day Return Provisions, Verification Fee Provisions, and Voter PII Disclosure Requirements would redress the FDH Plaintiffs' injuries as to those provisions.

### 3. Redressability

The FDH Plaintiffs' injuries are "likely to be redressed" by their requested relief. *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 287 (2008). In order

90

to satisfy this prong of Article III standing, Plaintiffs' redress need not be total, *Moody v. Holman*, 887 F.3d 1281, 1287 (11th Cir. 2018); a "substantial likelihood" of redressability will suffice. *Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 79 (1978). Furthermore, where, as here, plaintiffs have sued to enjoin a government official from enforcing the law, they must show only "that an injunction prohibiting enforcement would be effectual." *SWA*, 8 F.4th at 1201. Traceability and redressability "often travel together," so a similar analysis can apply to both prongs of standing. *Id.*

A plaintiff does not need to demonstrate that a favorable decision will "relieve [their] every injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) (emphasis omitted). They only need to show that a decision in their favor will "relieve a discrete injury to [them]self." *Id.* Even "the ability 'to effectuate a partial remedy' satisfies the redressability requirement." *Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021) (citation omitted).

FDH is the "object" of several of the Challenged Provisions, namely the Ten-Day Return Provisions, Verification Fee Provisions, and the Sponsor Fines Provisions, so there is "little question" that a judgment enjoining those provisions "will redress" FDH's injury. *Diamond Alt. Energy, LLC v. Env't Prot. Agency*, 606 U.S. 100, 112 (2025) (quoting *Lujan*, 504 U.S. at 561–62). Likewise, petition signers like Mr. Emerson are the object of the Voter PII Disclosures and circulators like Mr.

91

Simmons are the object of HB 1205's Circulator Eligibility Restrictions and New Criminal Provisions. Their injuries are therefore redressable by a favorable judgment on Count I.

FDH's injuries would also be redressed by favorable judgment on each of the Challenged Provisions that affect circulators and voters, namely the Circulator Eligibility Restrictions, Registration Restrictions, and Voter PII Disclosures. The trial record is replete with testimony from and regarding individuals who would circulate or sign FDH's petition were it not for the Challenged Provisions. *See, e.g.*, Tr. at 135:24–136:24 (Mr. Simmons explaining that he would want to circulate for FDH if the Challenged Provisions did not go into effect); *id.* at 378:4–379:9 (Organizing Director of People Power for Florida testifying that he would mobilize the organization's volunteers, who include noncitizens, to circulate for FDH if the Challenged Provisions were not in effect); *id.* at 376:11–378:10 (Organizing Director of People Power for Florida stating that individuals had been in the process of signing FDH's petition but stopped when they came to the new required PII fields); *id.* at 446:20–24 (Mr. Prieto, who is a noncitizen, explaining that he would circulate petitions if he was legally permitted to do so); *id.* at 201:15–202:3 (Mr. Prieto describing voters who would have signed FDH's petition but for the newly required fields). The Court can therefore make a "commonsense inference[]" that enjoining the Challenged Provisions affecting circulators and voters would also

92

redress FDH's injuries. *See Diamond Alt. Energy*, 606 U.S. at 116.

**B. Plaintiffs have standing for their First Amendment association claim (Count II).**

**1. Injury-in-Fact**

**a. Circulator Eligibility Restrictions**

HB 1205's Circulator Eligibility Restrictions also burdened the FDH Plaintiffs' associational rights by significantly impairing their ability to coordinate with volunteers and voters in furtherance of FDH's ballot initiative campaign. When the restrictions took effect, FDH was forced to abandon volunteer petition circulation and shift to a passive distribution model in which volunteers merely distributed blank petitions rather than collecting signatures directly. *See supra* Section I.B.3.a (citing Tr. at 69:3–6, 69:12–19). This change fundamentally altered the nature of FDH's interactions with voters. The result was a dramatic reduction in meaningful engagement between FDH and potential supporters of the initiative.

This interference with FDH's volunteer recruitment and participation constitutes a cognizable associational injury. The Eleventh Circuit has recognized that government action that deters or prevents volunteers from participating in advocacy efforts impairs an organization's ability to pursue its mission and therefore satisfies Article III standing. *See FLFNB II*, 11 F.4th at 1287. The Supreme Court has likewise emphasized that government action burdening participation in advocacy can infringe associational rights because of its "possible deterrent effect"

93

on participation. *See Bonta*, 594 U.S. at 616. The resulting impairment of FDH's mission is therefore sufficient to establish an injury-in-fact.

### b. Registration Restrictions

HB 1205's Registration Restrictions similarly burden FDH's associational rights because they strike at the core of FDH's volunteer program. The majority of FDH's volunteers typically collect more than twenty-five petitions during a campaign. *See supra* Section I.B.3.a (citing Tr. at 71:15–22). Yet because FDH could not reliably determine which volunteers had complied with the statute's registration requirements, the organization ultimately terminated its volunteer circulation program altogether. *See supra* Section I.B.3.a (citing Tr. at 76:6–17). Such interference with FDH's ability to recruit and engage volunteers constitutes a classic associational injury. Courts have recognized that an organization has standing where government action "impedes its ability to attract members . . . or to fulfill its purpose." *See Fla. Democratic Party v. Hood*, 342 F. Supp. 2d 1073, 1079 (N.D. Fla. 2004). Moreover, laws that deter individuals from participating in advocacy efforts burden associational rights because of their deterrent effect on participation. *Bonta*, 594 U.S. at 616. As the Eleventh Circuit has explained, being compelled to refrain from accepting volunteers in order to pursue an organization's mission is itself sufficient to establish standing. *FLFNB II*, 11 F.4th at 1287.

### c. Ten-Day Return Provisions

HB 1205's Ten-Day Return Provisions also burdened FDH's associational rights by disrupting how the organization coordinates with its volunteers to carry out its ballot initiative campaigns. Prior to HB 1205, FDH regularly deployed circulators on overnight canvassing trips that allowed volunteers to travel to further reaches of the State and engage with voters in person. *See supra* Section I.B.3.a (citing Tr. at 127:16–128:4). Because of the Ten-Day Return Provisions, FDH can no longer deploy circulators for purposes of overnight canvassing trips, significantly limiting its ability to mobilize voters. *See supra* Section I.B.3.a (citing Tr. at 126:6–128:4). This disruption of FDH's volunteer coordination and campaign operations constitutes a paradigmatic injury-in-fact. The Supreme Court has recognized that standing exists where government action "directly affect[s] and interfere[s] with" an organization's core activities. *See All. for Hippocratic Med.*, 602 U.S. at 395. Here, HB 1205 directly interferes with FDH's ability to coordinate volunteers and conduct its ballot initiative campaign, thereby burdening its associational rights.

### d. Verification Fee Provisions

HB 1205's Verification Fee Provisions burdened FDH's associational rights by authorizing Supervisors to charge the organization an increased verification fee that is triggered by the act of a voter choosing to associate with FDH by signing its petition. The Verification Fee Provisions also prevented FDH from engaging paid

95

circulators to support its 2028 campaign. *See supra* Section I.B.3.a (citing Tr. at 248:8–251:3, 270:1–272:20). As a result, FDH must significantly reduce the scale of its petition-gathering efforts and the number of individuals it can mobilize to support the initiative. These injuries constitute injury-in-fact for FDH's First Amendment associational rights claim.

An organization has standing where government action forces it to alter how it carries out its advocacy efforts. The Eleventh Circuit has recognized that organizations suffer injury when election laws compel them to divert resources or change their operations in response to regulatory burdens. *See Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014). Likewise, courts have held that an organization suffers injury when a law prompts it to "divert resources" away from its core mission. *See Dream Defenders v. DeSantis*, 553 F. Supp. 3d 1052, 1071 (N.D. Fla. 2021).

HB 1205's Verification Fee Provisions burdened FDH's associational rights by charging an increased fee triggered by each instance in which a voter chooses to associate with FDH by signing its petition. The Verification Fee Provisions also prevented FDH from engaging paid circulators to support its 2028 campaign. *See supra* Section I.B.3.a (citing Tr. at 248:8–251:3, 270:1–272:20). As a result, FDH must significantly reduce the scale of its petition-gathering efforts and the number of individuals it can mobilize to support the initiative.

96

### e. Voter PII Disclosures Requirement

HB 1205's Voter PII Disclosures Requirement burdened FDH's associational rights by deterring individuals from participating in FDH's ballot initiative campaign. Because voters must disclose sensitive personal information, including Social Security numbers and driver's license numbers, many individuals are unwilling or unable to provide the required information when signing petitions. *See supra* Section I.B.3.a (citing Tr. at 200:14–16).

Mr. Emerson is similarly harmed because he will now need to disclose his driver's license and Social Security numbers in order to associate with FDH's message through signing its petition. *See* Section I.B.3.b (citing Tr. at 257:14–16). Mr. Simmons is also harmed by the provisions because voters were less willing to associate with him and with FDH's message by signing FDH's petition because of the newly required information. *See supra* Section I.B.3.a.

The Supreme Court has long recognized that compelled disclosure requirements can burden the freedom of association because of their "possible deterrent effect" on participation in advocacy efforts. *Bonta*, 594 U.S. at 616 (emphasis omitted) (citation omitted). When government action discourages individuals from engaging with an organization, the resulting impairment of the organization's ability to mobilize supporters constitutes a concrete injury-in-fact. *Arcia*, 772 F.3d at 1341.

97

### f.  Sponsor Fines Provisions and New Criminal Penalties

Finally, HB 1205's Sponsor Fines Provisions and New Criminal Penalties burden the FDH Plaintiffs' associational rights by deterring circulators and partner organizations from participating in FDH's campaign. Because assisting voters in completing petition forms now exposes FDH and its circulators to significant financial penalties and criminal liability, FDH was forced to terminate its volunteer circulation program and other programs designed to help voters successfully complete petitions, like its efforts to cure petitions with minor fields missing, to retain digital scans of petition forms in order to identify ways its circulators can improve, and to send prefilled petitions to voters so they can more easily complete the petition. *See supra* Section I.B.3.a. These changes significantly reduced the number of individuals willing to associate with FDH.

Mr. Emerson is likewise injured by HB 1205's New Sponsor Fines and New Criminal Penalties provisions because he reasonably believes that aspects of his work might now subject him to liability given the statute's definition of "irregularities," thereby impairing his ability to associate with others in furtherance of the ballot initiative campaign. *See supra* Section I.B.3.b. Mr. Simmons was similarly affected by HB 1205's New Sponsor Fines and New Criminal Penalties provisions because the possibility of being exposed to racketeering liability affected his willingness to circulate petitions. *See supra* Section I.B.3.c.

The threat of criminal penalties can chill participation in protected political activity and therefore constitutes an associational injury. A plaintiff establishes standing where he intends to engage in First Amendment activity but refrains from doing so because of a credible threat of prosecution. *See Driehaus*, 573 U.S. at 158–59. Here, FDH, Mr. Emerson, and Mr. Simmons all face the risk of increased financial and criminal liability under the New Criminal Provisions.

### 2. Traceability and Redressability

The FDH Plaintiffs have established traceability and redressability as to Count II for substantially the same reasons as Count I. *See supra* Section III.A.2–3.

### C. Plaintiffs have standing for their First Amendment substantial overbreadth claim (Count III).

### 1. Injury-in-Fact

#### a. Circulator Eligibility Restrictions

HB 1205's Circulator Eligibility Restrictions injured Mr. Simmons, a Missouri resident, by prohibiting him from engaging in petition circulation *solely* because he was not a Florida resident. *See supra* Section I.B.3.c; *see also* Tr. at 130:2–13. HB 1205's Circulator Eligibility Restrictions also constrained FDH's ability to disseminate its message by prohibiting individuals like Mr. Prieto, a Colombian-born lawful permanent resident of the United States, from circulating petitions solely because he was not a U.S. citizen. *See infra* Section III.A.3 (citing Tr. at 446:20–24). These injuries are sufficient to support standing for a substantial

overbreadth challenge. *See Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973).

### b. Information Retention Felony

HB 1205's Information Retention Felony provision constrained FDH's ability to disseminate its message because volunteers and partner organizations feared that law enforcement might consider the prohibition on "retaining" voter information to encompass activities such as conducting quality control on petitions or delivering petitions to Supervisors. FDH was therefore forced to adopt conservative practices that impeded its use of paid circulators and caused it to terminate its volunteer circulation. *See supra* Section I.B.3.a (citing Tr. at 63:7–65:9, 196:16–197:5). This chilling effect constitutes a concrete injury sufficient to support standing for an overbreadth challenge. Courts have repeatedly recognized that the threat of arrest or criminal liability can deter individuals from participating in advocacy efforts, thereby impairing an organization's ability to mobilize volunteers and carry out its mission. *See FLFNB II*, 11 F.4th at 1287. Because HB 1205's criminal penalties caused FDH and its collaborators to restrict their participation in petition circulation—a core form of political speech—the provision inflicts a cognizable injury-in-fact sufficient to establish standing.

### c. RICO "Irregularities" Definition

HB 1205's RICO "Irregularities" Definition independently injured FDH by criminalizing a broad range of petition-related activities, including ordinary

procedural errors that occur during petition collection. Because the statute's definition is expansive and vague, FDH was forced to terminate its volunteer circulation program and shift to a passive distribution model to avoid potential liability. *See supra* Section I.B.3. The RICO "Irregularities" Definition also harmed Mr. Emerson by creating a credible threat that his ordinary responsibilities would expose him to criminal liability. *See supra* Section I.B.3.b.

Likewise, the RICO "Irregularities" Definition harmed Mr. Simmons because he did not know what conduct would trigger racketeering liability, and decided he would no longer work with FDH's campaign if the provision remained in effect. *See supra* Section I.B.3.c. These injuries satisfy Article III standing because HB 1205 created a credible threat of criminal liability that deterred FDH, Mr. Emerson, and Mr. Simmons from engaging in constitutionally protected activity. A plaintiff establishes injury-in-fact where he intends to engage in conduct "arguably affected with a constitutional interest" but refrains due to a credible threat of prosecution. *See Driehaus*, 573 U.S. at 158–59. Here, the sweeping reach of the RICO "Irregularities" Definition chills core First Amendment activity and deters individuals from participating in petition circulation.

### 2. Traceability and Redressability

The FDH Plaintiffs have established traceability and redressability as to Count III for substantially the same reasons as Count I. *See supra* Section III.A.2–3.

101

**D. Plaintiffs have standing for their Fourteenth Amendment void-for-vagueness claim (Count IV).**

### 1. Injury-in-Fact

#### a. Information Retention Felony

The Information Retention Felony provision forced FDH to take the "most conservative possible approach" to retaining petitions and, due to the statute's lack of clarity, prevented FDH from providing volunteers with clear guidance on the scope of legal liability. *See supra* Section I.B.3.a. As a result, FDH terminated volunteer circulation efforts. The Information Retention Felony provision also injured Mr. Simmons by creating a threat that routine petition activities could expose him to liability. This threat forced him to refrain from participating fully in petition circulation, a core First Amendment activity. *See supra* Section I.B.3.c.

These injuries are sufficient to establish standing for a void-for-vagueness challenge. Courts recognize that the central injury in such claims is the chilling effect created when individuals must choose between self-censorship and the risk of legal penalties. *See Pernell v. Fla. Bd. of Govs. of State Univ. Sys.*, 641 F. Supp. 3d 1218, 1266 (N.D. Fla. 2022) (explaining that the claimed injury in a vagueness challenge is "self-censorship or speaking with the risk of discipline"). Because the Information Retention Felony forced FDH and Mr. Simmons to curtail petition-circulation activities in order to avoid uncertain criminal exposure, they have suffered a concrete injury-in-fact.

### b.  RICO "Irregularities" Definition

HB 1205's RICO "Irregularities" Definition injured FDH by criminalizing a broad range of petition-related activities. Because the statute's definition is expansive and vague, FDH was forced to restrict volunteer participation to avoid potential liability, significantly limiting its ability to disseminate its message to voters. *See supra* Section I.B.3.a (citing Tr. at 63:7–65:9, 196:16–197:5). Additionally, HB 1205's RICO "Irregularities" definition independently injured Mr. Simmons by creating substantial fear and uncertainty surrounding petition-collection efforts, as he was aware that HB 1205 expanded racketeering liability but did not have a full understanding of what actions were prohibited under the provision. *See supra* Section I.B.3.c (citing Tr. at 128:21–25). Thus, he "likely would have stopped [collecting petitions] just because [he did not] want to go to prison." Tr. at 135:18–23; s*ee supra* Section I.B.3.c. Such self-censorship constitutes a paradigmatic injury-in-fact for purposes of a void-for-vagueness claim. When a law's lack of clarity forces individuals to refrain from engaging in constitutionally protected activity to avoid the risk of punishment, courts recognize that the resulting chilling effect satisfies Article III's injury requirement. *See Pernell*, 641 F. Supp. 3d at 1266. Because HB 1205's RICO "Irregularities" Definition forced FDH and Mr. Simmons to curtail petition-circulation activities to avoid uncertain criminal exposure, they have suffered a concrete injury sufficient to establish standing.

103

### 2. Traceability and Redressability

The FDH Plaintiffs have established traceability and redressability as to Count IV for substantially the same reasons as Count I. *See supra* Section III.A.2–3.

### E. FDH has standing for its Fourteenth Amendment equal protection claim (Count V).

### 1. Injury-in-Fact

HB 1205's Verification Fee Provisions injured FDH by imposing financial obligations that burden statewide initiatives' fundamental rights unequally as compared to local initiatives and candidates. Specifically, the statute requires statewide initiative sponsors like FDH to pay substantially increased fees in order to verify petition signatures, thereby conditioning participation in the initiative process on the ability to pay. *See supra* Section I.B.3.a (citing Tr. at 248:8–251:3, 270:1–272:20). Comparable financial burdens are not imposed on candidate campaigns or local initiative efforts. This disparity forced FDH to alter its campaign operations and abandon the use of paid circulators for its 2028 campaign, significantly impairing its ability to qualify its initiative for the ballot.

Such financial burdens readily satisfy Article III's injury-in-fact requirement. Tangible harms such as financial loss are among the most obvious forms of injury recognized by the courts. *See Muransky*, 979 F.3d at 926; *see also Pincus v. Am. Traffic Sols., Inc.*, 986 F.3d 1305, 1310 n.7 (11th Cir. 2021). Moreover, "[c]onstitutional injuries are prototypical concrete injuries," *Polelle v. Fla. Sec'y of*

*State*, 131 F.4th 1201, 1209 (11th Cir. 2025), *cert. denied*, 146 S. Ct. 298 (2025), and the Verification Fee Provisions dramatically infringe on FDH's First Amendment rights to speech and association, as well as its Fourteenth Amendment Equal Protection rights. Courts have recognized that laws conditioning participation in the electoral process on the payment of a fee raise serious equal protection concerns because they make "the affluence of the voter or payment of any fee an electoral standard." *Clean-Up '84*, 590 F. Supp. at 932 (citation omitted). Because HB 1205's Verification Fee Provisions impose substantial financial barriers that forced FDH to restructure its petition-circulation efforts, FDH has suffered a concrete injury sufficient to establish standing.

### 2. Traceability and Redressability

FDH's financial and constitutional injuries are directly traceable to the Supervisors' enforcement of the Verification Fee provisions and can be redressed by an order enjoining Defendants from enforcing those provisions against FDH. FDH's injury is "traceable only to [the] Supervisors of Elections and redressable only by relief against them" because "Florida law tasks the Supervisors, independently of the Secretary" of State or any other entity, with posting the so-called actual cost of petition verification for statewide initiatives and receiving fees from sponsors before conducting verification. *See Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1253–54 (11th Cir. 2020) ("Because the Supervisors are independent officials not subject

105

to the Secretary's control, their actions to implement the ballot statute may not be imputed to the Secretary [to] establish[] traceability."). An order enjoining the Supervisors from enforcing the Verification Fee Provisions against FDH would redress FDH's financial and constitutional injuries and maintain the status quo.

## IV. FDH PLAINTIFFS SHOULD PREVAIL ON EACH OF THEIR CLAIMS.

### A. The Challenged Provisions violate FDH Plaintiffs' First Amendment speech rights (Count I).

#### 1. Standard of Review

Each of HB 1205's Challenged Provisions severely burden interactive speech and therefore merit exacting scrutiny under *Meyer* and *Buckley*. To the extent the Court disagrees, the provisions should be at least subject to intermediate scrutiny as regulating expressive conduct or, as suggested by *Buckley* as to provisions not triggering exacting scrutiny, to the *Anderson-Burdick* standard as regulating ballot access.

#### a. Exacting scrutiny applies to Plaintiffs' First Amendment speech claim.

The Eleventh Circuit stay panel's opinion is neither binding nor persuasive. Supreme Court precedent makes clear that exacting scrutiny applies to the provisions considered in the stay panel's opinion and to each of the Challenged Provisions.

106

### i. The stay panel's order on the preliminary injunction is not binding on this Court's merits decision.

The Eleventh Circuit has not squarely addressed whether a stay panel's opinion on a preliminary injunction ruling binds a trial court's subsequent analysis of the merits. The Eleventh Circuit has, however, repeatedly held that motions-panel orders do not bind merits panels. *See, e.g.*, *Hand v. Desantis*, 946 F.3d 1272, 1275 (11th Cir. 2020) (explaining that "an order granting a stay is not a final adjudication of the merits of the appeal" and "has no res judicata effect" (citation modified)); *Jones v. United States*, 224 F.3d 1251, 1256 (11th Cir. 2000) ("[T]he 'law of the case' doctrine does not apply to an administrative ruling issued pending oral argument." (footnote omitted)).

The same reasoning should apply here: a stay-panel's opinion is "necessarily tentative and preliminary" and should not "spawn binding legal consequences regarding the merits of a case," including at the trial level. *Democratic Exec. Comm. of Fla. v. Nat'l Republican Senatorial Comm.*, 950 F.3d 790, 795 (11th Cir. 2020) (per curiam). As the Tenth Circuit has explained, "a motions panel's decision is often tentative because it is based on an abbreviated record and made without the benefit of full briefing and oral argument." *Homans v. City of Albuquerque*, 366 F.3d 900, 905 (10th Cir. 2004) (holding motions panel's ruling on question of law in preliminary injunction order was "not binding at a subsequent trial on the merits").

The stay panel's opinion is not binding for the additional reason that it concerned a preliminary injunction. *See* 18B *Wright & Miller's Federal Practice & Procedure* § 4478.5 (3d ed. 2019) ("Rulings—predictions—as to the likely outcome on the merits made for preliminary injunction purposes do not ordinarily establish the law of the case, whether the ruling is made by a trial court or by an appellate court." (footnote omitted)); *cf. Tully v. Okeson*, 78 F.4th 377, 381 (7th Cir. 2023) (holding that stay panel's ruling on preliminary injunction did not control merits panel even though it "rested on a point of law"). As even Defendants agree, *see* Tr. at 329:20–23, the stay panel's opinion does not bind this Court's consideration of the merits.[6]

### ii. The stay panel's order on the preliminary injunction is not persuasive.

The stay panel's opinion contains several misapprehensions of fact and law that demonstrate its tentative nature and render it unpersuasive. Chief among them is its misreading of *Meyer*, *Buckley*, *Biddulph*, and several other U.S. Supreme Court and Eleventh Circuit decisions, discussed *infra* Section IV.A1.a.iii. The stay panel's opinion conflicts with this earlier, binding precedent. *See Kurimski v. Shell Oil Co.*, No. 21-80727-CV, 2022 WL 2346364, at *2 (S.D. Fla. Jan. 19, 2022) (district courts

---

[6] Even if this Court finds that the stay panel's opinion is the law of the case, it should depart from the panel's decision because it "was clearly erroneous and [relying on it] would work a manifest injustice." *See Friedman v. Mkt. St. Mortg. Corp.*, 520 F.3d 1289, 1295 (11th Cir. 2008) (citation omitted).

108

"must follow the older precedent"); *cf. MacPhee v. MiMedx Grp., Inc.*, 73 F.4th 1220, 1250 (11th Cir. 2023) ("When faced with an intra-circuit split, we must apply the 'earliest case' rule, which states that 'when circuit authority is in conflict, a panel should look to the line of authority containing the earliest case, because a decision of a prior panel cannot be overturned by a later panel.'" (quoting *Morrison v. Amway Corp.*, 323 F.3d 920, 929 (11th Cir. 2003)).

The panel majority also mischaracterized other circuits' holdings. For example, the stay opinion cited *Voting for America, Inc. v. Steen*, 732 F.3d 382 (5th Cir. 2013), as an example of an appellate court that has held that *Meyer* does not "require[] that residency restrictions for petition circulators trigger heightened First Amendment scrutiny." *Fla. Decides Healthcare Inc. v. Fla. Sec'y of State*, No. 25-12370, 2025 WL 3738554, at *5 (11th Cir. Sep. 9, 2025). But *Steen* concerned voter registration drives and explicitly noted that such drives "are factually distinct from the circulation of petitions addressed by the Supreme Court in *Meyer* . . . and *Buckley*." 732 F.3d at 388–96. The stay opinion also cited *Lichtenstein v. Hargett*, 83 F.4th 575 (6th Cir. 2023), for the assertion that *Anderson-Burdick* balancing "is not appropriate in the free-speech context" and intermediate scrutiny should instead apply to ballot initiative regulations. *See Fla. Decides Healthcare*, 2025 WL 3738554, at *6 n.6 (internal quotation marks and citation omitted). But *Hargett* addressed absentee voting applications, not ballot initiatives, *see* 83 F.4th at 579,

and the Sixth Circuit *does* apply *Anderson-Burdick* balancing to "regulations of the ballot-initiative process" that do not merit exacting scrutiny. *Brown v. Yost*, 133 F.4th 725, 735–36 (6th. Cir. 2025).

And finally, the panel majority misinterpreted the Challenged Provisions. It stated that the Non-U.S. Citizen and Non-Resident Restrictions "apply only to individuals who physically possess more than 25 already-signed petition forms," and relied on that point when comparing H.B. 1205 to other states' restrictions. *Fla. Decides Healthcare, Inc.*, 2025 WL 3738554, at *5. But that is simply wrong: the Restrictions prevent noncitizens and nonresidents from collecting *any* petitions. *See* Fla. Stat. § 100.371(4)(b)(2)–(3).

For each of these reasons, the stay panel's opinion is not persuasive.

### iii. The Court should apply exacting scrutiny to the provisions considered by the stay panel.

The stay panel opinion runs contrary to U.S. Supreme Court precedent, the facts of *Meyer* and *Buckley*, and the trial record in this case. This Court should reject the panel's artificial division of petition circulation into protected and nonprotected components and apply exacting scrutiny to the Circulator Eligibility Restrictions and, as discussed in the next section, to each of the other Challenged Provisions.

The U.S. Supreme Court has consistently held that "[p]etition circulation . . . is 'core political speech,' because it involves 'interactive communication concerning political change'" and "First Amendment protection for such interaction . . . is 'at its

110

zenith.'" *Buckley*, 525 U.S. at 183 (quoting *Meyer*, 486 U.S. at 422, 425). The Supreme Court has never separated petition circulation into protected versus nonprotected components when conducting a First Amendment analysis. To the contrary, the Court has recognized that speech related to approaching voters and collecting their signatures cannot be unwound from the accompanying political, persuasive speech, because without the former, the latter would not occur.

*Meyer*'s holding rests on this very point. The Colorado law challenged there banned payment for "the circulate[ng] of an initiative or referendum petition," but said nothing about whether sponsors could pay individuals to discuss the merits of a petition with voters. 486 U.S. at 416 n.1 (quoting Colo. Rev. Stat. § 1-40-110 (1980)). The Tenth Circuit dissent and the Petitioner's Opening Brief in *Meyer* made precisely the argument that State Defendants mount here: that individuals were "simply forbidden to take the final step of obtaining the listener's signature" and "[i]t is thus conduct, not speech," that Colorado sought to regulate. *Grant v. Meyer*, 828 F.2d 1446, 1459 (10th Cir. 1987) (en banc) (Logan, J., dissenting); *see also* Petitioner's Opening Brief at 12, *Meyer*, 486 U.S. 414 (No. 87-920), 1987 WL 880992, at *12 (arguing that the statute regulated "nothing more than the . . . act of verifying signatures").

The Supreme Court disagreed. It explained that circulation "will in almost every case involve an explanation of the nature of the proposal and why its advocates

111

support it" and described trial testimony from a circulator about "his conversations with voters in an effort to get them to sign the petition." 486 U.S. at 421 & n.4. The Court then held that "the circulation of a petition involves the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Id.* at 421–22. The Court explained that this conclusion "follow[ed]" from *Schaumburg*, 444 U.S. 620, a case that held "that any attempt to regulate [charitable] solicitation would necessarily infringe [protected] speech." *Meyer*, 486 U.S. at 422 n.5 (citing 444 U.S. 620). The *Meyer* Court quoted *Schaumburg* for the proposition that because "solicitation is characteristically intertwined with" protected speech, "without solicitation the flow of such information and advocacy would likely cease." *Id.* (quoting 444 U.S. at 632); *see also Schaumburg*, 444 U.S. at 628 (rejecting argument that permit requirement for charitable solicitation was permissible because charity was "free to propagate its views . . . without a permit as long as it refrains from soliciting money"). Speech associated with collecting a voter's signature is the reason for the political speech involved in petition circulation: because "the component parts of a single speech are inextricably intertwined, we cannot parcel out the speech, applying one test to one phrase and another test to another phrase." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988) (citing *Meyer*, 486 U.S. at 422 n.5).

*Buckley* drove the point home. There, the United States Supreme Court

112

considered provisions of a Colorado statute that required petition circulators to be registered voters, required petition circulators to wear an identification badge bearing their name, and required initiative sponsors to report the names and addresses of all paid circulators and the amount paid to each circulator. *See* 525 U.S. at 186 (citing Colo. Rev. Stat. §§ 1-40-112(1)–(2), 1-40-121 (1998)). Colorado argued these provisions concerned only "the procedural aspects of the initiative process" and did not constitute "prohibitions on core expression." Petitioner's Opening Brief at 16–17, *Buckley*, 525 U.S. 182 (No. 97-930), 1998 WL 221384, at *16–17. It framed the provisions as "regulation[s] of the electoral process" that were justified by the need to prevent "fraud" and to "preserv[e] the integrity of Colorado's initiative process." *Id.* The Court rejected this purported distinction between protected and non-protected aspects of petition circulation, and instead asked whether "the restrictions in question significantly inhibit[ed] communication with voters about proposed political change," and if so whether they were "warranted by the state interests . . . alleged to justify those restrictions." *Buckley*, 525 U.S. at 192.

The Supreme Court has thus forbidden the type of analysis in which the stay panel engaged—dividing petition circulation into a protected speech element and an unprotected signature solicitation or collection element. *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 n.10 (1995) (describing *Meyer* as "apply[ing] strict scrutiny to invalidate an election-related law making it illegal to pay petition

113

circulators *for obtaining signatures* to place an initiative on the state ballot" (emphasis added)). For this reason, federal appellate courts have repeatedly applied heightened scrutiny to state prohibitions on nonresident petition circulators.[7]

Even in contexts beyond circulator residency restrictions, federal appellate courts have applied *Meyer* and *Buckey* faithfully, rejecting States' efforts to "artificial[ly]" "separate petitioning into two steps," restrict the second step, "and then ignore the effects of that restriction." *Perez-Guzman v. Gracia*, 346 F.3d 229, 242 (1st Cir. 2003) (rejecting Puerto Rico's argument that a notarization requirement for petition signatures came "into play only after the voter has agreed to subscribe a petition and, thus, does not have First Amendment implications"; even though circulator was free to solicit support "[i]n principle," "in practice his rate of return [would] suffer because he cannot gather endorsing signatures on the spot"); *see also Initiative & Referendum Inst. v. U.S. Postal Serv.*, 417 F.3d 1299, 1311–12 (D.C. Cir. 2005) (holding First Amendment was implicated by U.S. Postal Service regulation that would require petition circulators on postal service property to direct people to sign at off-property locations and citing *Meyer* for the proposition that

---

[7] *See, e.g.*, *Pierce v. Jacobsen*, 44 F.4th 853, 862–63 (9th Cir. 2022); *Yes On Term Limits, Inc. v. Savage*, 550 F.3d 1023, 1027–28 (10th Cir. 2008); *We the People PAC v. Bellows*, 40 F.4th 1, 19–21 (1st Cir. 2022); *Wilmoth v. Sec'y of N.J.*, 731 F. App'x 97, 102 (3d Cir. 2018); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 316–17 (4th Cir. 2013); *Krislov v. Rednour*, 226 F.3d 851, 866 (7th Cir. 2000); *Chandler v. City of Arvada*, 292 F.3d 1236, 1244 (10th Cir. 2002).

"interactive communication comprises both the request for the signature and the signature itself . . . because the collection of signatures—particularly for an initiative or referendum ballot—is essential to accomplishing the circulator's purpose"). Simply put, petition circulation consists of a single "encounter" in which a "petitioner advocates" and "the signer expresses his support" by signing the petition. *Walker-Serrano ex rel. Walker v. Leonard*, 325 F.3d 412, 418 (3d Cir. 2003) (citing *Meyer*, 486 U.S. at 421–22). Indeed, Eleventh Circuit merits panels have accepted that the "gathering of signatures" for an initiative petition receives the highest First Amendment protection. *See Heinrich*, 759 F.2d at 1514; *Citizens for Police Accountability Pol. Comm. v. Browning*, 572 F.3d 1213, 1217 (11th Cir. 2009); *see also Baker*, 164 F.4th at 868 (Newsom, J., dissenting) (describing a "stand-alone First Amendment interest in participating in the signature-gathering process itself").

The trial record confirms that exacting scrutiny under *Meyer* and *Buckley* is appropriate in this case. Numerous witnesses affirmed that petition circulation is comprised of a singular, interactive communication that includes signature collection. *See supra* Section I.A.1 (citing Tr. at 118:12–24, 120:22–23, 215:9–216:1). The trial record disproves the State Defendants' argument that the Challenged Provisions do not burden speech because Plaintiffs remain free to speak about a ballot initiative's merits and to hand voters blank petitions with instructions on how to complete and submit them. Tr. at 42:25–43:6, 49:15–50:3, 74:22–75:7,

115

118:12–24, 120:22–23, 121:12–21, 151:12–18, 181:25–182:15. FDH did exactly that after the Challenged Provisions went into effect, and as a result, the quality and extent of FDH's and its circulators' speech suffered greatly. *See supra* Section I.B.3.a (citing Tr. at 70:11–13, 370:17–24, 371:9–11). And regardless, the fact that Plaintiffs "remain free to employ other means to disseminate their ideas does not take their speech through petition circulators outside the bounds of First Amendment protection," because "[t]he First Amendment protects [Plaintiffs'] right not only to advocate their cause but also to select what they believe to be the most effective means for so doing." *Meyer*, 486 U.S. at 424; *see also Riley*, 487 U.S. at 789 n.5 ("[A] statute regulating how a speaker may speak directly affects that speech."). Indeed, the trial record includes extensive testimony as to the FDH Plaintiffs' well-founded belief that using circulators that are nonresidents, noncitizens, or who have felony convictions can be particularly effective for the interactive speech of petition circulation. *See* Tr. at 163:6–12 (explaining that statewide ballot initiative campaigns "near universal[ly]" rely on out-of-state managers); *id.* at 444:9–16, 453:1–10 (explaining that noncitizen circulators are especially effective at reaching voters with limited English proficiency); *id.* at 132:6–18 (explaining that individuals with felony convictions are "able to talk to people from all walks of life … [and] from various backgrounds"). On the full trial record, there is no doubt that the Court should apply exacting scrutiny to the Circulator Eligibility Restrictions.

116

### iv. The Court should apply exacting scrutiny to each of the Challenged Provisions.

*Buckley* makes clear that exacting scrutiny should apply to each of the Challenged Provisions, not only the Circulator Eligibility Restrictions. At the preliminary injunction stage, this Court cited *Biddulph v. Mortham*, 89 F.3d 1491 (11th Cir. 1996) (per curiam), for the proposition that "a state's broad discretion in administering its initiative process is subject to strict scrutiny only in certain narrow circumstances," including, as relevant here, where a state "impermissibly burdens the free exchange of ideas about the objective of an initiative proposal." *Fla. Decides Healthcare, Inc.*, 785 F. Supp. 3d at 1100 (quoting *Biddulph*, 89 F.3d at 1500). This Court concluded, based on the preliminary record before it, that the Registration Restrictions and Ten-Day Return Provisions were not subject to strict scrutiny because the record did "not demonstrate that Plaintiffs' protected speech ha[d] been severely burdened because of the" provisions. *Id.* at 1101; *Fla. Decides Healthcare, Inc. v. Byrd*, 790 F. Supp. 3d 1335, 1357 (N.D. Fla. 2025), *stayed by* 2025 WL 3738554. The Court explicitly rejected the State Defendants' argument "that any 'process' regulation, however burdensome, is always subject to rational basis review." 785 F. Supp. 3d at 1101. The Court also disavowed the idea that "a 'process' restriction must effectively eliminate the ability to engage in the citizen initiative process to trigger strict scrutiny under *Meyer*." *Id.* at 1101 n.4. Instead, the Court explained it would ask whether the Plaintiffs' "speech is, in fact, severely

117

burdened by the" provisions at issue. *Id.*

The FDH Plaintiffs agree with this Court that so-called "process" restrictions on the initiative process can so severely burden protected speech that they merit strict scrutiny under *Meyer* and *Buckley*. Indeed, *Buckley*, which post-dates *Biddulph*, cites the provisions regarding judicial review of ballot title sufficiency at issue in *Biddulph* as an example of a permissible State regulation, and in the very next sentence emphasizes that "'no litmus-paper test' will separate valid ballot-access provisions from invalid interactive speech restrictions." 525 U.S. at 192 (citation omitted). Thus, *Biddulph* cannot be understood to create a bright line between speech restrictions that receive exacting scrutiny and process restrictions that receive lesser scrutiny. Instead, the Supreme Court acknowledged that there is "no substitute for the hard judgments that must be made" and instead the Court must "vigilant[ly]. . . guard against undue hindrances to political conversations and the exchange of ideas." *See id.* (citation omitted). *Buckley* also acknowledged that, in assessing whether a burden is severe enough to merit strict scrutiny, a court can consider whether the challenged provision "limit[s] the number of voices who will convey the initiative proponents' message and, consequently, cut down the size of the audience proponents can reach" and whether it "reduced the chances that the initiative proponents would gather signatures sufficient in number to qualify for the ballot, and thus limit[] proponents' ability to make the matter the focus of statewide

118

discussion." *See id.* at 194–95 (citation modified) (quoting *Meyer*, 486 U.S. at 423); *see also* Tr. at 263:21–268:2 (discussing how HB 1205 "smothered" FDH's campaign).

Here, the full trial record shows that each of the Challenged Provisions severely burdened the FDH Plaintiffs' core political speech, both by limiting the number of voices conveying FDH's message and by reducing the chances that FDH would gather signatures sufficient in number to qualify for the ballot. *See supra* Section I.B.3.a. Plaintiffs discuss these burdens in greater detail below. *See infra* Section IV.A.2.

### b. If exacting scrutiny does not apply, at minimum intermediate scrutiny applies.

The stay panel's opinion contemplates that intermediate scrutiny might apply to the Challenged Provisions. *Fla. Decides Healthcare Inc.*, 2025 WL 3738554, at *6. While the FDH Plaintiffs maintain that this Court should apply exacting scrutiny to each of the Challenged Provisions because they severely burden core political speech, at minimum the Court should apply intermediate scrutiny.

Courts apply intermediate scrutiny to "content-neutral regulations of expressive conduct," *see FLFNB II*, 11 F.4th at 1291, and to regulations that, "although directed at activity with no expressive component, impose a disproportionate burden upon those engaged in protected First Amendment activities." *TikTok Inc. v. Garland*, 604 U.S. 56, 68 (2025) (per curiam). To

determine whether conduct is sufficiently expressive under the former standard, courts ask whether an intent to convey a particular message is present and "whether the reasonable person would interpret [the conduct] as *some* sort of message, not whether an observer would necessarily infer a *specific* message." *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale* ("*FLFNB I*"), 901 F.3d 1235, 1240–41 (11th Cir. 2018) (citation omitted). The fact that such conduct is accompanied by speech does not mean the conduct loses its expressive character. *See id.* at 1243–44.

Each of the Challenged Provisions at minimum regulate expressive conduct. Each provision regulates an aspect of petition circulation, namely who may circulate (the Circulator Eligibility Restrictions and Registration Restrictions), the financial and criminal liabilities that trigger upon a circulator persuading a voter to sign a petition (the Ten-Day Return Provisions, Verification Fee Provisions, Sponsor Fines Provisions, and New Criminal Provisions), and what information is required as part of circulation (the Voter PII Disclosures). FDH, its circulators, and the voters who sign FDH's petition undoubtedly intended to convey a particular message, namely support for the Medicaid expansion initiative qualifying for the ballot. *See* FDH PX 446 (petition form with ballot title and summary). The record demonstrates that reasonable observers have understood FDH's circulators to be conveying a message. Tr. at 42:15–43:24, 45:18–46:17, 122:19–123:2. Even if the Court were to parse the issue more finely, the actions of an FDH paid staff member or volunteer in

120

collecting, reviewing, correcting, mailing, and paying for the verification of petitions communicates to reasonable observers that the individual engaging in conduct supported qualifying FDH's initiative for the ballot.

In addition, each Challenged Provision "impose[s] a disproportionate burden upon those engaged in protected First Amendment activities." *TikTok Inc.*, 604 U.S. at 68 (citation omitted). The Challenged Provisions impose disproportionate burdens on initiative sponsors, circulators, and voters who are attempting to engage in political speech by expressing support for the initiative's message and associating with each other. *See supra* Sections III.A.1.a–f, III.B.1.a–f; *see also Minn. Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 581 (1983) (striking down tax on sale of large quantities of newsprint and ink because tax had the effect of singling out newspapers). At minimum, the Court should apply intermediate scrutiny to the Challenged Provisions.

Under intermediate scrutiny, courts will sustain a content-neutral regulation "if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 495–96 (2025) (citation omitted); *see also United States v. O'Brien*, 391 U.S. 367, 377 (1968). Intermediate scrutiny "is deferential but not toothless" and "plays an important role in ensuring that legislatures do not use ostensibly legitimate purposes to disguise efforts to

121

suppress fundamental rights." *Paxton*, 606 U.S. at 495. In applying the standard, courts asks whether the challenged provisions "were designed to address a real harm, and whether those provisions will alleviate it in a material way," and whether the legislature has "drawn reasonable inferences based on substantial evidence." *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997) (citation omitted).

Intermediate scrutiny review therefore includes an assessment of the evidence before the legislative body at the time of enactment. The State's burden is to produce "evidence it 'reasonably believed to be relevant'" to the problem it was trying to address, and that evidence "must fairly support its rationale." *Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County*, 337 F.3d 1251, 1269 (2003) (alteration omitted) (citations omitted). Importantly, the State cannot "get away with shoddy data or reasoning." *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 438 (2002) (plurality opinion); *see also Flanigan's Enters., Inc. v. Fulton County*, 596 F.3d 1265, 1279 (11th Cir. 2010) (same). Further, "the process by which" the State "investigate[d] [the] perceived problem may not be a sham." *Flanigan's Enters.*, 596 F.3d at 1283. Moreover, plaintiffs must be "given the opportunity to cast direct doubt on this rationale with evidence of their own." *Peek-A-Boo Lounge*, 337 F.3d at 1269 (internal quotation marks and citation omitted). "If plaintiffs succeed in doing so, the burden shifts back to" defendants to justify the challenged provisions with additional evidence. *Id.* (internal quotation marks and citation omitted).

122

As discussed below, *see infra* Section IV.A.2, the State's evidence for each of the Challenged Provisions fails under intermediate scrutiny. HB 1205 was purportedly enacted to combat fraud threatening the integrity of the initiative process. *See* Ch. 2025-21, Laws of Fla., § 1. As an initial matter, "the risk of fraud or corruption, or the appearance thereof, is more remote at the petition stage of an initiative than at the time of balloting." *Meyer*, 486 U.S. at 427. Moreover, the State's evidence of fraud essentially amounts to less than two dozen initiative-related convictions over several years, many of which have little nexus to the actions regulated by the Challenged Provisions. *See supra* Section I.A.3; *see also Avitabile v. Beach*, 368 F. Supp. 3d 404, 420–21 (N.D.N.Y. 2019) ("[A] mere generalized appeal to public safety and crime prevention as the justification for a total and complete ban . . . is precisely the kind of 'shoddy reasoning' that even intermediate scrutiny forbids." (citation omitted)). Simply put, the fact that some people, somewhere, in the third most populous state in the country might on occasion violate a law related to petition circulation does not justify the State restricting the initiative process into oblivion. "Broad prophylactic rules in the area of free expression are suspect." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 683 (1994) (O'Connor, J., concurring and dissenting in part) (quoting *NAACP v. Button*, 371 U.S. 415, 438 (1963)). If Florida wants to prohibit fraud in the petition circulation process, it can criminalize fraud, as it has already done. What the State cannot do is cure the disease

by killing the patient.

### c. If neither exacting nor intermediate scrutiny applies, *Anderson-Burdick* does.

*Buckley* suggests that the *Anderson-Burdick* balancing test should apply to ballot initiative regulations that do not merit exact scrutiny. In *Buckley*, the Supreme Court quoted *Anderson* for the proposition that "no litmus-paper test will separate valid ballot-access provisions from invalid interactive speech restrictions." 525 U.S. at 192 (citing *Anderson*, 460 U.S. at 789–90). And Justice Thomas's concurrence reiterated that the "framework for assessing the constitutionality . . . of state election laws" is to apply strict scrutiny to "severe burdens on speech or association" and "less exacting review" to "lesser burdens." 525 U.S. at 206 (Thomas, J., concurring). Justice Thomas specifically cited both *Anderson* and *Burdick* in support of this proposition. *See id.* (citing *Burdick*, 504 U.S. at 434; *Anderson*, 460 U.S. at 788–90). Thus, *Buckley*'s majority opinion and concurrence contemplate that ballot initiative-related regulations will either be subject to strict scrutiny or to the *Anderson-Burdick* balancing test.

That this is the proper reading of *Buckley* is borne out in that case's procedural history. *Buckley* affirmed the Tenth Circuit's decision, which had utilized the same framework. *Buckley*, 525 U.S. at 190 (explaining that the Tenth Circuit "properly sought guidance from our recent decisions on ballot access"). In a later case, the Tenth Circuit described its decision in *Buckley* as follows: "[W]e addressed a

124

constitutional challenge to several procedures of the then-existing law of Colorado governing ballot initiatives. While, as discussed below, we struck down several provisions under a strict scrutiny analysis, we upheld other provisions under a balancing test." *Campbell v. Buckley*, 203 F.3d 738, 744 (10th Cir. 2000) (applying *Anderson-Burdick* to "single subject" rule and other titling requirements for initiative petition). As the Tenth Circuit noted in *Campbell*, the Supreme Court affirmed its judgment, concluding "that the Tenth Circuit correctly separated necessary or proper ballot access controls from restrictions that unjustifiably inhibit the circulation of ballot-initiative petitions." 203 F.3d at 744–45. *Buckley* must be understood to mean that initiative regulations that are not subject to higher forms of scrutiny are subject, at the least, to the *Anderson-Burdick* balancing test and not rational basis. Multiple circuits have so held. *Miller v. Thurston*, 967 F.3d 727, 739 (8th Cir. 2020); *Brown*, 133 F.4th at 735–36; *Angle v. Miller*, 673 F.3d 1122, 1126 (9th Cir. 2012) (applying balancing test but not expressly referencing *Anderson-Burdick*).

Biddulph predated *Buckley* and rejected the *Anderson-Burdick* test only in dicta. *See* 89 F.3d at 1500 n.10. The *Biddulph* Court declined to apply *Anderson-Burdick* because the plaintiff there had "not raised a right to-vote or freedom-of-association claim." *Id.* The court also mentioned that the case before it—concerning Florida's requirements for ballot titles—related to "the right to place an initiative on

125

the ballot," which *Gibson v. Firestone*, 741 F.2d 1268, 1273 (11th Cir. 1984), had made clear was "a right created by the state." 89 F.2d at 1500 & n.10. But *Gibson* did not preclude the possibility that ballot initiative-related regulations might implicate the federal right to vote or the right to association, nor did it preclude a legal standard that asks if a regulation places "an 'unreasonable burden' on [initiative proponents'] rights to ballot access." *Gibson*, 741 F.2d at 1273 n.8. *Gibson* merely noted that such considerations were not raised by the case before it, given the nature of the burdens asserted and relief sought. *See id.* at 1269, 1273 n.8. Thus, *Biddulph* and *Gibson* pose no bar to this Court following *Buckley*'s guidance and applying the *Anderson-Burdick* balancing test if it finds that neither exacting nor intermediate scrutiny apply to any particular Challenged Provision. *Buckley*, not *Biddulph*, controls this case.

> **d. In applying the standard of review, the Court should consider the cumulative and individual impact of each Challenged Provision.**

This Court can and must consider how the Challenged Provisions operate in relationship to one another, in addition to considering how they operate individually. This is an unremarkable proposition that reflects how courts evaluate regulatory burdens in a range of First Amendment contexts. *See, e.g.*, *Columbia Broad. Sys., Inc. v. Democratic Nat'l. Comm.*, 412 U.S. 94, 102 (1973) (explaining that First Amendment analysis of broadcasting regulation "must necessarily be undertaken

126

within the framework of the regulatory scheme that has evolved over the course of the past half century"); *Vote Choice, Inc. v. DiStefano*, 4 F.3d 26, 35 (1st Cir. 1993) (considering "cumulative effect" of campaign finance regulation in First Amendment challenge); *McGuire v. Marshall*, 741 F. Supp. 3d 1112, 1162 (M.D. Ala. 2024) (considering "cumulative impact on expression" of component parts of sex offender registration statute), *appeal pending sub nom. McGuire v. Att'y Gen.*, No. 11731 (11th Cir. argued Aug. 1, 2025); *see also June Med. Servs. LLC v. Gee*, 280 F. Supp. 3d 849, 870 (M.D. La. 2017) (collecting cases in First Amendment and other constitutional contexts for proposition that "courts have regularly considered the cumulative impact of restrictions," and concluding that the Court was "not obligated to look at each [challenged abortion regulation] in isolation").

The Supreme Court has provided explicit direction to this effect in the ballot access context. *See Schulz v. Williams*, 44 F.3d 48, 56 (1994) (explaining that "courts consider the alleged burden imposed by the challenged provision in light of the state's overall election scheme"). As explained in the previous sections, Eleventh Circuit precedent does not preclude this Court from taking guidance from such cases. *See supra* Section IV.A.1.a.iv.c.

Regardless, the actual burden imposed by each Challenged Provision can only be assessed in context. For example, the Court's assessment of the burden posed by the Ten-Day Return Provisions will necessarily implicate the Registration

127

Requirements' dramatic expansion of the pool of individuals to which deadline-related fines might attach, and the Circulator Eligibility Restrictions' prohibition on the use of experienced out-of-state circulators who could help sponsors comply with the new deadline.

Or suppose that Florida were writing on a relatively blank slate in regulating petition circulation. One year, Florida passes a law requiring sponsors to submit petitions in person, without placing any limitation on where submission sites may be, or on the number of approved submission sites. The next year, Florida passes a law making a lockbox on Marquesas Key the only approved submission site. In assessing whether the second law is constitutional, a court surely would not proceed as if the first law did not exist—otherwise, the burden the second law imposes simply could not be understood. Indeed, that's how other courts have approached the issue. *See, e.g.*, *League of Women Voters of Ark. v. Jester*, No. 5:25-CV-5087, 2025 WL 3231637, at *8 (W.D. Ark. Nov. 19, 2025) (assessing how "individually *and especially combined*, these new requirements [embodied in different laws] slow down the signature-gathering process significantly and deter both would-be petitioners and would-be canvassers from participating" (emphasis added)).

Were the Court to ignore these realities, it would not truly be considering the burdens imposed by the Challenged Provisions; instead, it would be considering the

128

burdens posed by isolated rules operating in a hypothetical vacuum.

### 2. The Challenged Provisions impermissibly burden the FDH Plaintiffs' speech rights without advancing any State interest.

#### a. Circulator Eligibility Restrictions

The Circulator Eligibility Restrictions severely burden FDH Plaintiffs' speech rights without advancing any State interest, much less a compelling one. The provisions "effectively ban" all nonresidents, noncitizens, and individuals with felony convictions whose rights have not been restored "from engaging in core political speech in the form of petition circulation in Florida." *Fla. Decides Healthcare, Inc.*, 790 F. Supp. 3d at 1352. They also "limit[] the number of voices who will convey" FDH's message and "the size of the audience [FDH] can reach" and "make[] it less likely that [FDH] will garner the number of signatures necessary to place [its] matter on the ballot" in the future, "thus limiting [FDH's] ability to make the matter the focus of statewide discussion." *Meyer*, 486 U.S. at 422–23.

The trial record establishes "what a severe burden" the Circulator Eligibility Restrictions place on the core political speech of initiative sponsors like FDH and their would-be circulators. *Fla. Decides Healthcare, Inc.*, 790 F. Supp. 3d at 1353 (detailing burdens at preliminary injunction stage); *see also supra* Section I.B.3 (summarizing harms established during trial). Sponsors like FDH can no longer use experienced, effective out-of-state circulators to connect with voters and to train in-state circulators through live demonstration. *See* Tr. at 176:21–22, 157:9–159:10

(stating that nearly 75% of the managers for FDH's paid circulation program were non-Florida residents and explaining that they were hired based on their skill and experience); *id.* at 117:8–119:190 (Mr. Simmons explaining why his training of circulators necessarily involved him collecting petitions); *id.* at 184:18–185:10, 191:1–18 (TOT executive explaining why TOT's managers needed to handle signed petitions for training purposes and why quality of training would deteriorate without that ability). That includes individuals like Mr. Simmons, who campaigned for a Medicaid expansion ballot initiative in his home state of Missouri and can speak personally to the benefits of enacting the policy. Tr. at 135:24–136:24; *see also Pierce*, 44 F.4th at 861 n.4 (describing the burden of a prohibition on "out-of-state circulators who may be able to testify to the impact in their states if their states have enacted similar laws").

Sponsors are also precluded from relying on noncitizen circulators, who can be integral to conveying the initiative's message to diverse communities, including communities with limited English proficiency. *See* Tr. at 67:1–4, 131:11–19, 369:2–5, 444:9–16, 453:2–10; *see also id.* at 446:20–22, 447:7–15 (lawful permanent resident from Colombia stating he would circulate petitions for FDH if permitted); *id.* at 402:23–25, 412:4–6, 420:11–13 (lawful permanent resident testifying that he had previously circulated FDH petitions and would like to continue). Similarly, sponsors cannot rely on individuals with felony convictions who have not had their

130

rights restored, even though such individuals can help the sponsor "talk to people from all walks of life . . . [and] from various backgrounds." *See id.* at 132:6–18.

Sponsors have thus "lost entire swaths of potential employees and volunteers." *Fla. Decides Healthcare, Inc.*, 790 F. Supp. at 1354. Nonresidents, noncitizens, and individuals with felony convictions have in turn lost the ability to engage in the core political speech of petition circulation. *See id.* And the burdens on speech extended even more broadly: FDH was forced to terminate its volunteer circulator program because of the difficulty of verifying compliance with the Circulator Eligibility Restrictions and the concomitant risk of criminal and financial liability for FDH and its volunteers. *See supra* Section I.B.3.a; *see also* Tr. at 69:3–6 (explaining that the Circulator Eligibility Restrictions "completely killed" FDH's volunteer program). In the absence of that program, FDH and its volunteers' ability to speak to and associate with voters suffered dramatically. *See supra* Section I.B.3.a.

"Given such a severe burden on the free exchange of ideas about the petition initiatives, Defendants must demonstrate that the residency and citizenship requirements are narrowly tailored to furthering a compelling government interest." *Fla. Decides Healthcare, Inc.*, 790 F. Supp. 3d at 1354. They have not done so.

Defendants justify the Circulator Eligibility Restrictions as necessary to combat fraud and ensure the integrity of the initiative process. But Defendants have

131

provided no evidence that nonresidents, noncitizens, or individuals convicted of felonies are more likely than the general population to commit petition fraud. *See* Tr. at 2136:23–2137:25; ECF No. 620-3 at 214:19–217:22. Nor have they provided any evidence that fining sponsors $50,000 for using circulators in those categories will deter fraud. *See* Tr. at 2138:1–15. Indeed, Defendants have not provided *any* evidence that any noncitizen has ever been convicted of petition fraud in Florida.

As to nonresidents, Defendants claim broadly that "it's easier to investigate individuals or entities that are within the state of Florida" because it is "much easier" to issue subpoenas in Florida rather than take "some additional steps" to issues subpoenas in other jurisdictions. *See* Tr. at 1856:23–1857:21. But the record does not include a single example of Florida law enforcement failing to assert jurisdiction over a nonresident individual accused of petition fraud. Indeed, Defendants have introduced evidence only that about a dozen total individuals were convicted of petition-related fraud over the past two years. Tr. at 1875:4–12.[8] The record does not make clear whether any of those individuals were actually nonresidents at the time

---

[8] Plaintiffs maintain that this Court should give little weight to even those portions of the OECS Reports that have been admitted into the record. To the extent the Court considers the reports, Plaintiffs note that the narrative of OECS's January 2025 Report references only 14 total resolved and pending criminal cases, with four resulting in guilty pleas (Andrews, Harriel, Stone, and Amirally), two resulting in unspecified pleas (Salazar, Joseph), two resulting in no-contest pleas (Marrero, Ramos), and six as pending (Johnson, Humphries, Dworsky, Brady, Williams, President). ECF No. 653-2 (DX 3) at 13–20.

they circulated petitions in Florida. *See, e.g.*, Tr. at 1873:1–2, 1902:21–1903:4 ("Once we got to her, she was living in Texas."). The unsurprising fact that individuals may eventually move to different states, and that law enforcement may have to enforce foreign subpoenas, does not justify each state banning nonresidents from engaging in First Amendment speech across state lines. Florida imposes the same kinds of obligations. *See* Fla. Stat. § 92.251 (setting out procedures that must be followed to enforce a "foreign subpoena" in Florida). One hopes that this does not mean that other states conclude that they should thereby ban Floridians from engaging in First Amendment speech or business activities across state lines. In any event, a state cannot sacrifice protected speech at the altar of administrative efficiency. *See Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 775 (2018). "[B]road prophylactic rules" like the Circulator Eligibility Restrictions "are generally disfavored and cannot survive." *Honeyfund.com Inc. v. Governor*, 94 F.4th 1272, 1281 (11th Cir. 2024) (citation omitted).

Further, not only does the purported interest of combating fraud (or for that matter increasing transparency) bear no relation to the circulator eligibility requirements, the quantum of actual fraud the state has uncovered is just not enough to justify such a severe burden on the petition process. Of the millions of petitions gathered and submitted by tens of thousands of circulators over the years, Defendants have identified only a handful of cases of individuals who were

133

convicted of petition-related fraud, involving a vanishingly small number of fraudulent petitions. Tr. at 1320:21–1321:1.

Moreover, the integrity of Florida's petition process has not come anywhere close to being threatened. The State's only discernable interest in the process by which statewide initiatives qualify for the ballot is ensuring that such measures have a sufficient amount of voter support before appearing on the ballot. Here, fraud has in no way undermined that interest. Indeed, at trial, the FDH Plaintiff's expert explained that very few measures made it onto the ballot in Florida even before enactment of HB 1205. *See id.* at 1301:6–9; FDH PX 44 (comparing the number of issues that qualified for the ballot in Florida versus other states with initiated constitutional amendments).

The issues that qualify for the ballot in Florida are issues that large swaths of the population support. For example, there is no doubt a large percentage of Florida voters had an interest in having the opportunity to vote in favor of the Floridians Protecting Freedom initiative in the 2024 cycle, given that initiative garnered over 57% of the vote after it was placed on the ballot.[9] FDH provides another example. FDH's Executive Director and Organizing Director both testified that an

---

[9] *See* Div. of Elections, *November 3, 2020 General Election, Constitutional Amendments, Official Results*, Fla. Dep't of State, https://results.elections.myflorida.com/Index.asp?ElectionDate=11/3/2020&DATAMODE= (last visited Mar. 18, 2026). The Court may take judicial notice of this official state website. *See supra* n.5.

overwhelming majority of Florida's voters support Medicaid expansion. *See* Tr. at 229:11–14; FDH PX 243 at 18:3–8; ECF No. 269-2. In fact, of the six citizen-initiated measures that made it onto the ballot in the last two election cycles, one received close to 50%, three received over 55% of the vote, and two passed with over 60% of the vote.[10] In sum, because no legitimate purpose is furthered by ratcheting up Florida's regulations against petition-related fraud, Florida cannot justify such a severe set of restrictions on the petition process. The restrictions undoubtedly fail strict scrutiny.

The Circulator Eligibility Restrictions also fail intermediate scrutiny. Under that standard, the restrictions at issue must "advance[] important governmental interests" and must not "burden substantially more speech than necessary to further those interests." *Paxton*, 606 U.S. at 471. The Circulator Eligibility Restrictions fail on both elements.

*First*, Defendants have not shown that the restrictions were "designed to address a real harm, and . . . alleviate it in a material way." *Turner*, 520 U.S. at 195. "[T]he government bears the burden of showing that the articulated concern has more than merely speculative factual grounds, and that it was actually a motivating

---

[10] *See* Div. of Elections, *supra* note 11; Div. of Elections, *November 5, 2024 General Election, Official Results*, Fla. Dep't of State https://results.elections.myflorida.com/Index.asp?ElectionDate=11/5/2024&DATAMODE= (last visited Mar. 18, 2026).

factor." *Flanigan's Enters.*, 242 F.3d at 986. Defendants have not made any showing to this effect for noncitizen circulators or circulators with felony convictions whose rights have not been restored. There is no record evidence concerning "harm" from such individuals, let alone such significant harm that it justifies entirely precluding them from petition circulation. As to nonresident circulators, Defendants point only to a handful of arrests outside of Florida and anecdotes related to nonresident *corporations*, *see* Tr. at 1867:24–1868:13, 1876:23–1879:4, 1902:19–1903:1, rendering any concerns regarding petition fraud by nonresident individuals "merely speculative."

*Second*, the Circulator Eligibility Restrictions "burden substantially more speech than necessary" to further any claimed interest in exerting jurisdiction over the populations in question. *Paxton*, 606 U.S. at 471. Under intermediate scrutiny, the Court cannot and need not countenance the State's argument that if any nonresident poses any additional enforcement considerations, ever, the State can bar all nonresidents from circulating petitions, always. The State had "an abundance of targeted alternatives" to wholesale banning all broad categories of individuals from petition circulation. *FLFNB II*, 11 F.4th at 1296. For example, the State could have considered such alternatives as requiring sponsors to keep records in Florida, or banning circulators who failed to comply with investigation from circulating in the future. "[T]he government is obliged to demonstrate that it actually tried or

136

considered less-speech-restrictive alternatives and that such alternatives were inadequate to serve the government's interest." *Billups v. City of Charleston*, 961 F.3d 673, 688 (4th Cir. 2020). Defendants have made no such showing. The Circulator Eligibility Restrictions thus fail intermediate scrutiny.

The Circulator Eligibility Restrictions also fail under the *Anderson-Burdick* framework because the burden placed upon the approximately four million individuals in Florida—almost 13% of the State's population—who can no longer engage in petition circulation, *see supra* Section I.B.1, is not "justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (citation modified); *see also Greater Birmingham Ministries v. Sec'y of State of Ala.*, 992 F.3d 1299, 1319 n.31 (11th Cir. 2021) (recognizing *Crawford*'s plurality opinion as controlling). In contrast to *Crawford*, here Plaintiffs have provided extensive "concrete evidence of the burden imposed" on sponsors and voters as well as the "magnitude of the impact" of the challenged regulations. *Compare supra* Section III, *with Crawford*, 553 U.S. at 200–02. The State's asserted interest in avoiding the inconvenience of foreign subpoenas is not sufficiently weighty to justify these burdens. The State has not articulated any legitimate interest supporting an outright ban on noncitizens and those with felony convictions.

The Circulator Eligibility Restrictions are unconstitutional under any

137

standard.

### b. Registration Restrictions

The Registration Restrictions impermissibly burden the FDH Plaintiffs' First Amendment speech without advancing any state interest and therefore should be invalidated under any level of scrutiny. The provisions create several hurdles that a volunteer must clear before they can engage in the core speech of petition circulation, including submitting their personal information to the State, undergoing a mandatory training available only in English, passing an exam available only in English, completing an application with components that must be printed, signed, and scanned, and waiting for the State to process the materials. *See supra* Section I.B.1.b; *see also* Tr. at 996:4–1002:8 (explaining difficulties encountered in registering); *id.* at 1791:19–1792:3 (explaining that volunteers are not comfortable circulating even fewer than 25 petitions due to penalties tied to the Registration Restrictions). These requirements make it impossible for would-be volunteers to spontaneously engage in petition circulation, cutting off an entire avenue of political speech. *See* Tr. at 366:11–367:8 (explaining that college students frequently spontaneously decide to engage in circulation).

Moreover, volunteers who complete these onerous steps must then include their name and address on every petition form that they circulate, *see* Fla. Stat. § 100.371(3)(d)(1), compromising their privacy and risking their safety in cases of

interaction with hostile voters. *See* Tr. at 1786:22–1787:23 (recounting being harassed while circulating and explaining that giving such individuals access to her name and address would be "terribly frightening"); *id.* at 1547:14–1549:5 (explaining that League members decided not to engage in petition circulation because of fear of retaliation at their workplaces, harassment while circulating, and identity theft).

The Registration Restrictions impose severe burdens on speech under several lines of First Amendment precedent. *First*, they operate as a prior restraint on speech akin to the ordinance requiring a permit for door-to-door canvassing that the Supreme Court invalidated in *Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton*, 536 U.S. 150 (2002). *See id.* at 167 (explaining that permit requirement effectively banned spontaneous speech, such that "[a] person who made a decision on a holiday or a weekend to take an active part in a political campaign could not begin to pass out handbills until after he or she obtained the required permit").

*Second*, by requiring registration with the State, the Registration Restrictions compromise volunteers' privacy and anonymity in a manner the Supreme Court has held "creates an unnecessary risk of chilling in violation of the First Amendment" in the context of compelled disclosure of donors' identities. *See Bonta*, 594 U.S. at 616 (internal quotation marks omitted) (quoting *Sec'y of State v. Joseph H. Munson*

139

*Co.*, 467 U.S. 947, 968 (1984)). And "speech and association interests . . . are more substantially impacted by restrictions on contributions of volunteer services than by" restrictions on monetary contributions. *Jacobus v. Alaska*, 338 F.3d 1095, 1122 (9th Cir. 2003), *overruled on other grounds by Bd. of Trs. of Glazing Health & Welfare Tr. v. Chambers*, 941 F.3d 1195 (9th Cir. 2019) (en banc); *see also id.* at 1125 (rejecting contribution limit on volunteer services as imposed a "severe burden on quintessential First Amendment activity"). No court would countenance a regulatory scheme that requires any person seeking to donate more than $100 to a political committee to take and pass a test demonstrating their knowledge of campaign finance law and then, only when the state gets around to it, will the person receive a license to make large donations. The "80-year-old retiree with the League of Women Voters who is at a shad bake" deserves at least as much First Amendment protection as the Chamber of Commerce. *See* Tr. at 2122:3–4.[11]

*Third*, the Registration Restrictions impose a severe burden on the core political speech of petition circulation under *Meyer* and *Buckley*. *See Dakotans for*

---

[11] The Registration Restrictions' requirement that volunteers use petition forms listing their name and address also compromises volunteer circulators' privacy and safety. That requirement is more akin to the provision the Supreme Court invalidated in *Buckley* that required public disclosure of paid circulators' names and addresses, than the name badge requirement the Court upheld. *See* 525 U.S. at 203–04 & n.23 (noting that the disclosure requirement "risked exposing the paid circulators to intimidation, harassment and retribution" (internal quotation marks and citation omitted)).

*Health v. Noem*, 52 F.4th 381, 390–91 (8th Cir. 2022) (holding that pre-circulation disclosure requirements of circulators' personal information "present[ed] severe burden on speech" and failed exacting scrutiny). The trial record reflects extensive evidence on how FDH was forced to terminate its volunteer circulation program because of the fear of criminal and financial liability created by the provisions. *See supra* Section I.B.3.a. FDH could not ensure that every volunteer circulating its petition had in fact completed the registration, nor could it monitor whether non-registered volunteers possessed fewer than twenty-five personal use petitions over a campaign cycle, even if it had clarity as to the scope of that requirement (which it did not). *See supra* Section I.B.3.a. The Registration Restrictions "killed" FDH's volunteer circulation program, and thereby placed a severe burden on its and its circulators' speech. *See* Tr. at 75:17–76:17.

The Registration Restrictions are not tailored to meet any legitimate State interest. Defendants have not identified any instance of a volunteer submitting a fraudulent petition form. *See id.* at 2160:3–5. As this Court pointed out, even the single instance in which a complaint was filed concerning a volunteer petition form did not establish that a volunteer, rather than a voter, provided the erroneous information. *See id.* at 2120:10–2123:2 (OECS Director acknowledging "it could either be the person who is circulating the form or it could be the person who filled out the form"); *see also id.* at 2160:6–22 (admitting that Defendants have "no other

evidence, other than the fact they filled out a volunteer form, that they are, in fact, volunteers").

At any rate, that anecdote was not even before the Legislature. The OECS reports say nothing about supposed fraud by volunteer circulators. *See generally* 653-1, -2, -3 (DX 2, 3, 4). No studies or data indicate that volunteers who collect more than 25 petitions are more likely to commit petition fraud than those who collect fewer. *See* ECF No. 620-3 at 214:19–217:22. Both sponsors and volunteers have every incentive to ensure that volunteers follow the law and return valid petitions. *See Buckley*, 525 U.S. at 204 (noting that volunteers "motivated entirely by an interest in having the proposition placed on the ballot" are not "likely to accept false signatures").

If identifying potential instances of fraud by volunteer circulators was a concern, the Legislature could have simply instituted a volunteer form with an affidavit that did not make volunteers' addresses public record, similar to the provision approved in *Buckley*. *See id.* at 200. Instead, the State has subjected volunteers to a byzantine, invasive, and time-consuming registration process as a prerequisite for engaging in political speech. The record before this Court simply cannot justify such measures, whether under exacting scrutiny, intermediate scrutiny, *Anderson-Burdick*, or rational basis. The Registration Requirements violate the First Amendment.

142

### c. Ten-Day Return Provisions

The Ten-Day Return Provisions severely burden the FDH Plaintiffs' core political speech because they link potentially enormous fines directly to a circulator's success in convincing a voter to sign a petition. This chills the circulator's speech and, in some cases, causes it to cease altogether.

The First Amendment's protections for core political speech extend to regulations of seemingly non-speech activities without which the "the flow of . . . information and advocacy would likely cease." *Riley*, 487 U.S. at 796 (citation omitted); *see also supra* Section IV.A.1.a.iii–iv. Thus, the Supreme Court has struck down regulations that tied a charity's ability to solicit contributions to how much it paid its professional solicitors or to the percentage of its funds spent on charitable activities, because the Court "refused to separate the component parts of charitable solicitations from the fully protected whole." *Riley*, 487 U.S. at 785, 796; *see also Schaumburg*, 444 U.S. at 622; *Munson*, 467 U.S. at 950. In short, any burden on the circulation process itself implicates and burdens on First Amendment rights if it increases the likelihood that interactive speech that would otherwise occur will cease.

Even if this were not so as a general principle, HB 1205's operation makes the link between the Ten-Day Return Provisions and the core political speech of petition circulation undeniable. HB 1205 expressly requires sponsors to return every

143

petition signed by a voter. Fla. Stat. § 100.371(7)(a). Thus, the law ties any restrictions placed on the return of petitions directly to the "final exchange in the interactive communication," *Perez-Guzman*, 346 F.3d at 239, and the act of association with a voter, *see Reed*, 561 U.S. at 195. And because that is so, provisions that burden the submission of signed petitions make it more likely that sponsors will be punished in direct proportion to the amount they communicate with and associate with voters. And that, in turn, makes it that much more likely that "the flow of . . . information and advocacy w[ill] likely cease." *Riley*, 487 U.S. at 796 (citation omitted).

The trial record bears out how petition circulation cannot be "separate[d]" into "component parts" with regard to the Ten-Day Return Provisions. *Id.* The second a voter signs a petition, a ten-day countdown to the return deadline begins. Given the $50-per-day uncapped fine, minor delays have major consequences. For example, if FDH submits a batch of 1,000 petitions five days late due to volunteer return or mail delivery delay, it would incur a $250,000 fine. So given those dire consequences, FDH incurred a heightened logistical burden each time a voter chose to sign its petition. To overcome that burden, FDH's paid staff and volunteers were forced to spend more time and money than they otherwise would have, *see supra* Section I.B.1.c–d; *see also* Tr. at 126:16–23, 361:16–362:16, which directly constrained the amount and geographic extent of speech those individuals could engage in, *see, e.g.*,

144

Tr. at 127:6–10. Some volunteers stopped circulating altogether because they were concerned they could not comply with the compressed deadline. *See id.* at 61:7–25. FDH eventually terminated its volunteer program in part because of this same concern. *See supra* Section I.B.3.a.

FDH's concern was well-founded. As Dr. Smith testified, in at least three counties during the 2024 campaign cycle, sponsors submitted the vast majority of petitions between eleven and thirty days after the petitions were signed. *See* Tr. at 1347:17–1350:18. These findings suggest that fines under the Ten-Day Return Provisions are unavoidable under sponsors' pre-HB 1205 practices. Even if sponsors can change their processes in response to the new law—by speaking less frequently and mailing more frequently—sometimes petitions can be delayed or lost in the mail. *Id.* at 193:11–18. And whether such a situation counts as a *force majeure* sufficient to avoid the Ten-Day Return Provisions' fines seems to turn solely on whether the OECS Director believes it to be so. *Id.* at 2141:18–2142:12.

The Ten-Day Return Provisions fail exacting scrutiny. There was no evidence before the Legislature that the provisions serve *any* purpose. *See id.* at 2138:11–15; *see also* ECF No. 620-3 at 184:7–185:13, 207:25–209:2, 210:10–213:20. And there is evidence before this Court that they will actually make fraud more likely. *See* Tr. at 1346:20–1352:12. Even if this Court looks beyond what was before the Legislature, Supervisor Earley testified that it made no difference to his office

145

whether petitions are returned ten days after signing or 30 days after signing. *Id.* at 521:9–523:8. True, Ms. Molina testified that the Miami-Dade County Supervisor prefers a ten-day return requirement because the office receives smaller batches of petitions instead of "a surprise batch of 30,000 petitions." *Id.* at 1825:2–13. But that is an interest "in ease of administration," and "the prime objective of the First Amendment is not efficiency." *Bonta*, 594 U.S. at 614 (citation omitted).

The provisions fail under intermediate scrutiny and *Anderson-Burdick* as well. In enacting the Ten-Day Return Provisions, the Legislature considered no evidence at all. Tr. at 2138:11–15. And when the decision maker "fail[s] to rely on any evidence whatsoever" in enacting a restriction, that restriction fails intermediate scrutiny. *Peek-A-Boo Lounge*, 337 F.3d at 1266. In addition, "an abundance of targeted alternatives may indicate that a regulation is broader than necessary." *FLFNB II*, 11 F.4th at 1296. If administrative convenience is the goal—and it is the only goal with record support—the State could have given Supervisors more than 60 days to validate petitions, or required sponsors to submit petitions in smaller batches, or required sponsors to provide notice to Supervisors prior to sending large submissions, or potentially it could even have considered a less burdensome fine. Intermediate scrutiny does not require the State to adopt the least restrictive means, but it does require the State to at least consider whether a more targeted alternative would have sufficed to achieve its objective.

146

It also matters under intermediate scrutiny that no other state employs this type of regulation. *See* Tr. at 1353:19–1354:13. Every other state with an initiative process similar to Florida's manages to administer it without imposing a $50-per-day fee for every petition submitted more than ten days from signing—and, in fact, all the other states have a *single* deadline for submitting petitions, allowing sponsors to submit hundreds of thousands or millions of petitions at one time, which are verified collectively thereafter. *See id.* at 1354:5–13. And when "no other State" has adopted a law like the one at issue, it "raise[s] concern that the [State] has too readily forgone options that could serve its interests just as well." *McCullen v. Coakley*, 573 U.S. 464, 490 (2014). The Ten-Day Return Provisions fail intermediate scrutiny.

The Ten-Day Return Provisions similarly fail under the *Anderson-Burdick* framework, as administrative convenience is not a weighty enough interest to impose such severe burdens on sponsors' and circulators' exercise of First Amendment rights. *Anderson*, 460 U.S. at 789. And even if it were, the provisions are far from necessary to advance those administrative interests. In short, regardless of the standard of review, the Ten-Day Return Provisions violate the FDH Plaintiffs' First Amendment Rights.

### d. Verification Fee Provisions

The Verification Fee Provisions likewise severely burden the FDH Plaintiffs' First Amendment speech rights. Like the Ten-Day Return Provisions, the

147

dramatically higher verification fees authorized by HB 1205 are triggered every time FDH has "a successful conversation with a voter" that results in a signed petition. *See* Tr. at 255:2–22. The more frequently that FDH and its circulators engage in protected speech, the greater the financial burden that results for FDH. The Supervisors make much hay of the fact that Section 99.097(a) does not specify a particular payment deadline for verification fees, *see* ECF No. 589 at 31–32, but the trial record reflects numerous examples of Supervisors' offices threatening consequences for nonpayment, *see supra* Section I.B.3.a. And regardless, it is undisputed that payment is required for verification, *see* Fla. Stat. § 99.097(4)(a), and that the Verification Fee Provisions increased FDH's cost of verifying sufficient petitions to make the ballot by more than $3 million. *See supra* Section I.A.1.d. All parties agree that it now costs initiative sponsors, on average, nearly $4.4 million in verification fees alone to verify enough signatures to qualify for the ballot. Joint Stips. at 40. That burden was too great to bear: FDH ultimately suspended its campaign for the 2026 ballot.

The Verification Fee Provisions continue to burden FDH's speech as the organization pivots to the 2028 cycle. FDH currently does not plan to use paid circulators for its 2028 campaign because, as Mr. Emerson explained, "[a]s soon as we decide to use paid circulators, it's essentially a 4 ½-, give or take, million-dollar[s]" that the organization will eventually have to pay in verification fees. Tr.

148

at 270:1–8. Were the Verification Fee Provisions not in effect, FDH would use paid circulators for its 2028 campaign. *See id.* at 270:22–24. The provisions thus effectively impose a multimillion dollar fee for FDH to access its constitutionally protected right to use of paid circulators, thereby "restrict[ing] access to the most effective, fundamental, and perhaps economical avenue of political discourse, direct one-on-one communication." *Meyer*, 486 U.S. at 424. Like the outright ban on paid circulators considered in *Meyer*, the Verification Fee Provisions "limit[] the number of voices who will convey [FDH's] message and . . . the size of the audience they can reach," and they "make[] it less likely that [FDH] will garner the number of signatures necessary to place [its] matter on the ballot." *Id.* at 422–23.

The Verification Fee Provisions cannot survive under any level of scrutiny. Defendants suggest the increased verification fees are necessary to compensate Supervisors for the new processes instituted by HB 1205, such as mailing a Verification Notice to every voter for whom a petition has been verified, scanning each petition, and transmitting petition forms to the State in hard copy and virtually. *See* Fla. Stat. § 100.371(14)(f). But the State cannot impose costly prerequisites on the exercise of a constitutional right and then pass those costs to speakers in the interest of avoiding the expense itself. The Supreme Court has rejected the argument that a state may impose costs on a particular set of speakers because doing so would "help the State . . . avoid a drain on public resources." *Ariz. Free Enter. Club's*

149

*Freedom Club PAC v. Bennett*, 564 U.S. 721, 747 (2011). Similarly, the Eleventh Circuit has held that the State can impose only "nominal charges" on the exercise of First Amendment rights. *Cent. Fla. Nuclear Freeze Campaign v. Walsh*, 774 F.2d 1515, 1523 (11th Cir. 1985) (rejecting "imposition of unlimited charges" for administrative costs related to demonstration in city streets and parks); *id.* at 1523–24 (explaining that "conditioning the exercise of First Amendment rights" on the ability to pay, "without providing for an alternative means of exercising First Amendment rights, is unconstitutional"); *see also Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1323 (11th Cir. 2000) (discussing Eleventh Circuit "precedent requiring that the fees imposed on constitutionally-protected speech be nominal").

Setting aside whether Supervisors can truly ascertain the actual costs of verifying a petition, *see* Tr. at 509:18–23, 1831:23–1833:6 (describing range of estimates involved in calculating verification fees), Supervisors appear to also be charging statewide initiative sponsors for administrative costs that would arise regardless of whether a sponsor was attempting to qualify an initiative, *see id.* at 1843:1–1844:4 (explaining that verification fee includes portion of staffs members' salary even though those individuals would receive same salary regardless of whether they verified petitions); *see also* FDH PX 595 at 13 (reflecting that Glades County's verification fee passes portion of employee retirement and benefits costs

150

to sponsors); *id.* at 14 (reflecting that Hardee County includes employer and employee shares of retirement, Social Security, and Medicare payments). In Defendants' telling, then, the Verification Fee Provisions authorize Supervisors to tax sponsors' protected speech in order to recoup administrative costs that might be incurred regardless of how many petitions might be submitted. *See Murdock v. Pennsylvania*, 319 U.S. 105, 113 (1943) (holding the government cannot levy a revenue-raising fee on the exercise of a First Amendment-protected activity).

Even if the Court assumes that the increased fees reflect only the cost of verification under the Verification Fee Provisions' new procedures, and even if a government entity could impose non-nominal costs on speech, the procedures themselves cannot withstand scrutiny. Defendants provided no evidence that the Verification Notices are necessary to combat fraud; in fact, each of the Supervisors that testified affirmed that their pre-HB 1205 verification processes are reliable and that they stand by their office's validity determination. *See* ECF No. 597-4 at 31:11–14, 32:6–14; ECF No. 597-5 at 29:22–30:1, 31:9–17; ECF No. 597-6 at 34:14–24; Tr. at 1816:23–25. Nor have Defendants provided any evidence that forcing the Supervisors to scan each petition and also send each petition to the state in electronic and physical copy is necessary to combat fraud.

And even if these processes had some defensible purpose, forcing millions of dollars in new fees on every statewide sponsor is not a tailored remedy to address

151

what is, at most, a rare problem not unique to statewide initiatives and already addressed through various other existing means. *See Riley*, 487 U.S. at 795 (striking down statute aimed at regulating fraud in charitable contributions, noting state could enforce its existing antifraud law and observing, "[i]f this is not the most efficient means of preventing fraud, we reaffirm simply and emphatically that the First Amendment does not permit the State to sacrifice speech for efficiency"). Where the State seeks to charge a fee to exercise First Amendment rights, it bears the burden to show that fee is justified. *See Fly Fish, Inc. v. City of Cocoa Beach*, 337 F.3d 1301, 1315 (11th Cir. 2003) (holding total of $5,000 in licensing fees for four adult businesses was unconstitutional); *Pritchard v. Mackie*, 811 F. Supp. 665, 668 (S.D. Fla. 1993) (holding requirement that group obtain $1 million bond before holding rally "does not amount to a nominal charge"). The State has not borne its burden here.

Finally, the Verification Fee Provisions' status as outliers makes even more clear that they are not justified. No other state in the country requires petition sponsors to pay a per-petition validation fee. Tr. at 1359:15–18. Indeed, no other state in the country requires initiative sponsors to pay more than a few thousand dollars to file an initiative petition. *Id.* at 1294:1–19. Nor does Florida impose the same fees for verification of petitions for candidates or local initiatives, *id.* at 1359:23–1360:5, even though the Supreme Court has recognized that candidate

152

elections pose a greater risk of corruption than ballot initiative efforts, *see* 525 U.S. at 203–04. The Verification Fee Provisions severely burden core political speech without justification and thus cannot stand.

> *The Verification Fee Provisions are also an impermissible content-based restriction on FDH's speech.*

The FDH Plaintiffs' Operative Complaint pled that the Verification Fee Provisions represent a content-based regulation on speech. *See* ECF No. 413 ¶ 176 ("These provisions are irrational and content-based regulation on speech . . . ."); *id.* ¶ 203 ("The Voter Notice and Verification Fees provisions are content-based restrictions because they create one set of rules for the verification of signatures to place candidates and local initiatives on the ballot and a different set of rules for statewide initiatives.").[12]

"[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. Am. C.L. Union*, 535 U.S. 564, 573 (2002). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves

---

[12] To the extent there is any doubt as to whether the FDH Plaintiffs pled this standard, they note that "[a] complaint need not specify in detail the precise theory giving rise to recovery." *Evans v. McClain of Ga., Inc.*, 131 F.3d 957, 964 n.2 (11th Cir.1997) (per curiam); *see also Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1023 (7th Cir. 2018) ("As the Supreme Court and this court constantly remind litigants, plaintiffs do not need to plead legal theories.").

that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). A law can be facially content-based in that it "defin[es] regulated speech by particular subject matter" or "by its function or purpose"; "[b]oth are distinctions drawn on the message a speaker conveys, and, therefore, are subject to strict scrutiny. *Id.* at 163–64. Alternately, a law can be "facially content neutral" but nevertheless considered a "content-based regulation of speech" if it "cannot be justified without reference to the content of the regulated speech" or if it was "adopted by the government because of disagreement with the message the speech conveys." *Id.* (citation modified). Such laws "must also satisfy strict scrutiny." *Id.* at 164.

The Verification Fee Provisions are content-based regulations under either of the definitions set out in *Reed*. The provisions are facially content-based in that their new vastly expanded definition of "actual cost" applies only to statewide initiative petitions—that is, only if the message of a petition is that voters such amend the State constitution. Only statewide initiative petitions are subject to additional onerous requirements on Supervisors, such the Voter Verification Notice and the requirement to scan and transmit all petitions to the Department of State, that Supervisors are directed to pass costs on to sponsors. And only statewide initiative petition sponsors are charged more than ten cents per verified petition. *See* Fla. Stat. § 99.097. This is to say, Florida singles out sponsors advocating for an amendment

154

to Florida's constitution in a way it does not single out sponsors of local issue petitions or those seeking to qualify a candidate for the ballot. This is a content-based restriction on speech. *Buckley*, 525 U.S. at 209 (Thomas, J., concurring) (describing Colorado law as content-based where "Colorado's badge requirement does not apply to those who circulate candidate petitions, only to those who circulate initiative or referendum proposals"); *see also Nat'l Inst. of Fam. & Life Advocs.*, 585 U.S. at 777–78 (cautioning courts to be "deeply skeptical of laws that distinguish among different speakers, allowing speech by some but not others" because such laws "run the risk that the State has left unburdened those speakers whose messages are in accord with its own views" (citation modified)); *League of Women Voters of Ark.*, 2025 WL 3231637, at *18 (applying strict scrutiny to ballot measure regulation because it "singles out statewide measures for regulation while excluding local measures").

Even if the Court considers the Verification Fee Provisions to be facially content neutral, it should hold that they are nevertheless content-based regulations because they were "adopted by the government because of disagreement with the message the speech conveys," namely that Florida's constitution should be amended. *Town of Gilbert*, 576 U.S. at 164 (internal quotation marks and citation omitted). Plaintiffs acknowledge that the Court granted a pretrial evidentiary motion excluding testimony from Plaintiffs' expert Dr. Smith "concerning legislative intent,

155

motivation, or discriminatory purpose." ECF No. 588 at 2–3. However, that ruling focused on the fact that the FDH Plaintiffs' Equal Protection claim (Count V of their Operative Complaint, *see* ECF No. 413 ¶¶ 276–283) challenges the Verification Fee Provisions as facially discriminatory such that "an *Arlington Heights*-style analysis d[id] not apply." *See* ECF No. 588 at 2. On the other hand, it is well-established, under the First Amendment, that while evidence of a "a content-based purpose" is not *necessary*, such evidence "may be sufficient in certain circumstances to show that a regulation is content based." *Turner Broad. Sys., Inc.*, 512 U.S. at 642. Considering the Legislature's intent in enacting the Verification Fee Provisions, and HB 1205 broadly, is appropriate here to evaluate the FDH Plaintiffs' challenge to the provisions as content-based regulations on speech.

Plaintiffs have proffered extensive evidence on this point. *See* Tr. of Offer of Proof Proceedings (Feb. 13, 2026) (proffer of Dr. Smith's testimony on legislative intent); *see also* ECF No. 400-3 at 7 (communication from Supervisors document stating that HB 1205's sponsors were "trying to kill the ability to bring citizen initiative petitions"); ECF No. 400-3 at 9 ("[HB 1205's provisions] make it so only big money will ever be able to amend the state constitution."); ECF No. 423-6 at 2 (Supervisors' employee noting that new fee formula "seems like it has been added strictly to increase" costs); ECF No. 423-7 at 8 (Supervisors' employee observing that "trying to fully recuperate the cost isn't something we do with any of the other

156

work we do, including candidate petitions"); ECF No. 400-2 at 7 (Supervisors' employee stating that "this [law] is designed to be as expensive as possible").

Strict scrutiny therefore applies to the Verification Fee Provisions. And for the same reasons set out above, Defendants cannot establish the Verification Fees are narrowly tailored to a legitimate state interest.

### e.  Voter PII Disclosures Requirement

The Voter PII Disclosures Requirement burdens the speech rights of voters, sponsors, and circulators without advancing any legitimate interest. Signing a petition is "[an] expression of a political view [that] implicates a First Amendment right." *Reed*, 561 U.S. at 194; *see also Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 128 (2011) (referring to signing an initiative petition as "an inherently expressive act"). The Supreme Court applies exacting scrutiny when considering disclosure requirements for ballot initiatives. *See Reed*, 561 U.S. at 196 (requiring "a substantial relation between the disclosure requirement and a sufficiently important governmental interest" (citation modified)). "To withstand this scrutiny, the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Id.* (internal quotation marks and citation omitted).

Plaintiffs have established that the Voter PII Disclosures Requirement inflicts a serious burden on First Amendment rights. The FDH Plaintiffs presented

157

extensive, unrebutted testimony that numerous voters who were otherwise in the process of signing FDH's petition decided against doing so once they encountered HB 1205's new disclosure requirements. *See* Tr. at 201:15–202:3, 133:16–134:18 (explaining that FDH's paid circulators encountered at least one person per day who refused to provide the new information required by the Voter PII Disclosures Requirement); *see also id.* at 376:11–377:10 (testifying that it was "very common" that young people interested in signing the petition did not have the newly required information on hand); *id.* at 133:16–134:9 (describing "a pretty significant drop" in the collection rates among Black and Brown staff because voters were "resistant" to providing the information). The Voter PII Disclosures Requirement thus prevented those individuals from engaging in the political expression of signing a petition.

The requirement also harms FDH. It chills voters from engaging in speech with and associating with FDH at the exact moment the voters would otherwise be inclined to do so. *See id.* at 134:10–18. It also makes it more difficult for FDH to gather enough valid signatures "necessary to place the matter on the ballot, thus limiting [its] ability to make the matter the focus of statewide discussion." *Meyer*, 486 U.S. at 422–23. Numerous voters returned FDH's petition without the fields for the driver's license or identification number and Social Security number filled out, requiring FDH to submit and pay for verification of those forms even though they would be marked as invalid. *See* Tr. at 76:21–77:5. Even if voters provided the

158

information, the new fields create "more failure points," for example if a Supervisor has an outdated driver's license number on file for a certain voter. *See id.* at 511:22–25, 1343:7–1344:24.

There is no relationship between the Voter PII Disclosures Requirement and any legitimate government interest. Defendants provided no evidence that the additional identifiers are necessary to detect fraud. *See* ECF No. 620-2 at 77:2–15. As mentioned above, every Supervisor that testified in this case reiterated that their office's pre-HB 1205 petition verification processes are reliable. *See supra* Section I.A.3; *see also* FDH PX 147 ("The current process allows supervisors to find real fraud."). In fact, the evidence before this Court is that requiring additional PII on petitions creates a new risk of fraud, because bad actors may attempt to circulate petitions as a means of obtaining voters' Social Security numbers or state identification numbers. *See* Tr. at 1341:23–1343:6, 1344:25–1346:1.

The requirement fares no better under intermediate scrutiny. Defendants have not pointed to any evidence before the Legislature indicating the Voter PII Disclosures Requirement would prevent fraud. And, "rais[ing] concern that the [State] has too readily forgone options that could serve its interest just as well," *McCullen*, 573 U.S. at 490, Florida is once again an outlier: no state with a similar initiative process requires this type of PII on petition forms. *See* Tr. at 1341:6–12. Nor does Florida require this information on local initiative or candidate petition

159

forms. *See id.* at 1341:13–22.

Finally, the requirement fails under the *Anderson-Burdick* framework as well, because the burden it places upon all voters who wish to express their political views by signing a petition is not "justified by relevant and legitimate state interests sufficiently weighty to justify the limitation," given that the only evidence before the Court is that the requirement will only risk increasing fraud. *Crawford*, 553 U.S. at 191 (internal quotation marks and citation omitted).

### f. Sponsor Fines Provisions and New Criminal Provisions

Each of the Sponsor Fines Provisions and New Criminal Provisions burden the FDH Plaintiffs' speech rights without advancing any legitimate state interest.[13] The provisions chill the constitutionally protected speech of FDH, its employees, and its volunteers via the threat of severe financial and criminal liability. In *Riley*, the Supreme Court applied strict scrutiny to and invalidated a North Carolina law capping the fees of professional fundraisers because the "chill and uncertainty"

---

[13] The Non-Authorized Circulator Fine, Unregistered Circulator Misdemeanor, and Unregistered Circulator Felony are unconstitutional for the reasons discussed above regarding the Circulator Eligibility Restrictions and Registration Restrictions. *See* Section IV.A.2.a–b. The Ten-Day Return Requirement Fines and County Return Requirement Fines are unconstitutional for the reasons discussed above regarding the Ten-Day Return Requirement. *See* Section IV.A.2.c. This section discusses why each of the remaining provisions—the Petition Fill-In Fine, the Prefiled Petition Fine, the Information Retention Felony, the RICO "Irregularities" Definition, and the Petition Fill-In Felony—severely burden the FDH Plaintiffs' core political speech without justification and must be invalidated.

160

caused by the law "might well drive professional fundraisers out of North Carolina, or at least encourage them to cease engaging in certain types of fundraising . . . all of which will ultimately reduce the quantity of expression." 487 U.S. at 794 (citation modified). Here, the Sponsor Fines Provisions and New Criminal Penalties, including the RICO "Irregularities" Definition, have restricted the conditions under which FDH's paid vendor is willing to operate in Florida, *see* Tr. at 202:4–203:24, and have caused volunteers to cease engaging in petition circulation, *see supra* Section I.B.3.a. These provisions thus "limit[ed] the number of voices" who conveyed FDH's message and made it "less likely that [FDH would] garner the number of signatures necessary to place the matter on the ballot." *Meyer*, 486 U.S. at 423.

*Sponsor Fines Provisions*

The **Petition Fill-In Fine** prohibits FDH, its vendors, and its circulators from curing minor errors they previously would have corrected before submitting petitions. *See* Tr. at 128:5–14, 195:7–18. The fine chills the FDH Plaintiffs' petition circulation activities, as described above, and means that petitions that voters intended to be counted and that could have easily been cured will be invalidated. The Petition Fill-in Fine also limits FDH's ability to engage in interactive speech with voters who have disabilities or might otherwise need assistance filling out a petition, because the fine does not include any exemption for such voters. *See* ECF

161

No. 620-3 at 202:12–205:10.

The **Prefilled Petition Fine** forced FDH to terminate its programs to send partially prefilled petitions to voters who either requested such petitions or were likely to support FDH's cause. *See* Tr. at 52:3–54:5. The fine limited FDH's ability to express its message and associate with supportive voters. *Id.* at 56:11–23. It also forced FDH to abandon a form of petition distribution that resulted in high validity rates. *See id.* at 53:21–23. This Court should join with others that have found the mailing of prefilled political materials to constitute protected speech, *see VoteAmerica v. Schwab*, 121 F.4th 822, 834 (10th Cir. 2024) (concluding that mailing a prefilled mail-ballot application "is First Amendment speech"), and hold that HB 1205's prohibition on mailing prefilled petitions severely impacted FDH's ability to communicate and associate with voters most likely to support it.

The severe burden on speech imposed by the Sponsor Fines Provisions is not justified by any legitimate government interest. Defendants have not pointed to any evidence that the new language added to the Petition Fill-In Fine was necessary to address fraud. Nor have Defendants identified any evidence linking prefilled petition forms to fraud. *See* Tr. at 1892:8–24 (acknowledging that incident related to prefilled petitions described by Defendants did not have any indication of fraud).

The lack of tailoring of the Sponsor Fines Provisions is demonstrated by the fact that the provisions make sponsors liable for conduct by circulators even if the

162

sponsor is not aware of such conduct, *see* ECF No. 620-2 at 111:3–25, and even if the circulator registers and circulates without the sponsor's knowledge, *see* ECF No. 620-3 at 154:18–156:17, 157:2–23. Defendants admit that even conduct unrelated to fraud, such as prefilling an accurate zip code on a petition form, can now trigger a fine. *See* ECF No. 620-2 at 119:1–10. The extreme liability imposed by the Sponsor Fines Provision is an outlier: In general, states with similar ballot initiative processes to Florida do not make sponsors liable under this type of fine scheme, nor does Florida apply a similar scheme to candidates or local initiatives. *See* Tr. at 1358:25–1359:4.

*New Criminal Penalties*

The **Petition Fill-In Felony** violates the FDH Plaintiffs' speech rights for substantially the same reasons as the Petition Fill-In Fine. The "increased deterrent effect" from the criminal provision "poses greater First Amendment concerns than those implicated by the civil regulation." *Reno v. Am. C.L. Union*, 521 U.S. 844, 872 (1997).

The **Information Retention Felony** prohibits "retain[ing]" voter information "for any reason other than to provide such information to the sponsor." Fla. Stat. § 100.371(9). The statute appears to criminalize, for example, legitimate efforts to conduct quality control and ensure circulators are collecting complete forms. It also appears to criminalize delivering a petition form directly to a Supervisor's office,

163

rather than to the sponsor. The Information Retention Felony severely burdened FDH's speech by disrupting its paid circulation vendor's quality control and training processes, undermining FDH's ability to deploy effective circulators and collect petitions that would be validated. *See supra* Section I.B.3.a. It also severely burdened FDH's speech by chilling FDH's willingness to use volunteer circulators who might incur criminal charges under the provision. *See supra* Section I.B.3.a.

The **RICO "Irregularities" Definition** severely burdens the FDH Plaintiffs' speech rights without legitimate justification as well. The provision imposes sweeping criminal liability on those who "commit," "attempt to commit," "conspire to commit," or "solicit, coerce, or intimidate another person to commit," any "violation of the Florida Election Code relating to irregularities or fraud involving issue petition activities." Fla. Stat. § 895.02. The provision is unconstitutionally overbroad, *see infra* Section IV.C, and void for vagueness, *see infra* Section IV.D. Even apart from those infirmities, "the restriction is undoubtedly one on speech," for both FDH and its circulators. *Riley*, 487 U.S. at 794.

The severe burden on speech imposed by the New Criminal Penalties was not justified by any legitimate government interest. Defendants have not presented any evidence that the criminal penalties that existed prior to HB 1205 were insufficient to combat petition-related fraud. In fact, in the handful of petition fraud-related cases that have occurred, the State sought minimum sentences, including probation, or

164

chose to charge lesser offenses than were available. *See, e.g.*, ECF No. 596-1 at 73:15–22, 74:1–75:21, 76:12–23 (Andrews); 96:22–98:20, 100:1-16, 104:7–105:24 (Johnson); 116:15–117:20 (Salazar); 138:18–139:9 (Harriel); 167:10–168:12 (Amirally); 173:10–174:12 (H. Joseph); 184:6–185:11 (Dworsky); 203:4–204:11 (Pierce); 207:3–23 (McCutcheon); 209:16–210:16, 218:5–219:3 (McCallister). Nevertheless, HB 1205 instituted new criminal provisions that burden sponsors and circulators but do not meaningfully combat fraud or increase transparency. *See* Tr. at 1355:9–22. The provisions fail under any level of scrutiny.

## B. The Challenged Provisions violate FDH Plaintiffs' First Amendment association rights (Count II).

The Challenged Provisions violate the FDH Plaintiffs' First Amendment association rights, both facially and as applied.[14] The First Amendment right to expressive association protects the actions that sponsors, circulators, and others in the initiative process take to advance their collective political goals. This Court should evaluate infringements on those associational rights using the test articulated by the Supreme Court in *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000), which is detailed in the Standard of Review section below, and hold that each of the

---

[14] Under a tight timeframe and without the benefit of a developed record, the Eleventh Circuit stay panel did not address the FDH Plaintiffs' second claim and never even mentioned the word "association" in its opinion. *See generally Fla. Decides Healthcare*, 2025 WL 3738554. For the reasons discussed here, the associational claim is analytically distinct from its "Undue Burden on Core Political Speech" claim (Count I), discussed above, *see supra* Section IV.A.

Challenged Provisions impermissibly burden the FDH Plaintiffs' associational rights.

### 1. The First Amendment's right to expressive association protects sponsors, circulators, and others who join together to advance shared political goals through ballot initiatives.

The First Amendment includes a right to "expressive association." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984). In *Roberts*, the Court explained that "[a]n individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed." *Id.* at 622; *see also NAACP v. Patterson*, 357 U.S. 449, 460 (1958) (stating the "freedom to engage in association for the advancement of beliefs and ideas" is protected by the First Amendment right of expressive association).

Expressive association, sometimes referred to as political association, "is at the core of the First Amendment, and even practices that only potentially threaten political association are highly suspect." *McCloud v. Testa*, 97 F.3d 1536, 1552 (6th Cir. 1996), *quoted in*, *Krislov*, 226 F.3d at 860, *and*, *Lerman v. Bd. of Elections*, 232 F.3d 135, 146–47 (2d Cir. 2000). Safeguarding the right to expressive association is important, in part, because of the role it plays "in preserving political and cultural diversity and in shielding dissident expression from the suppression by the majority." *Roberts*, 468 U.S. at 622; *see also Bonta*, 594 U.S. at 606 (noting that expressive

166

association furthers "a wide variety of political, social, economic, educational, religious, and cultural ends, and is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority. (internal quotation marks and citation omitted)). Further, "[o]ur form of government is built on the premise that every citizen shall have the right to engage in political expression and association" and that the exercise of "basic freedoms in America has traditionally been through the media of political associations." *Sweezy v. New Hampshire ex rel. Wyman*, 354 U.S. 234, 250 (1957) (plurality opinion).

Participating in the ballot initiative process is a form of "associat[ing] with others in pursuit of . . . political . . .. . . political . . . purposes." *Roberts*, 468 U.S. at 622. Initiative sponsors bring together thousands of like-minded individuals, including employees, paid and volunteer circulators, coalition partners, and vendors to pursue the common objective of advocating for an issue, getting it onto the ballot and then enacted into law. In other words, pursuing an initiative campaign, by definition, requires thousands of individuals joining forces to work together in different capacities to express and achieve their shared political goal. There can be little doubt that effort triggers the First Amendment's associational protections. *See Delgado v. Smith*, 861 F.2d 1489, 1495 (11th Cir. 1988); *see also Dale*, 530 U.S. at 648–50.

Volunteering to support an initiative campaign is bound up with the right to expressive association. The Supreme Court has held that monetary donations supporting petition initiatives constitute protected association. *Citizens Against Rent Control/Coal. for Fair Hous. v. City of Berkeley*, 454 U.S. 290, 295 (1981); *see also Let's Help Fla. v. McCrary*, 621 F.2d 195, 199 (5th Cir. 1980) (same), *aff'd sub nom. Firestone v. Let's Help Fla.*, 454 U.S. 1130 (1982). And "the speech and association interests of both donor and donee are more substantially implicated by restrictions on contributions of volunteer services than by monetary contribution limits." *Jacobus*, 338 F.3d at 1122.

In particular, petition circulation, whether conducted by volunteer or paid circulators, implicates the right to expressive association. *See Lerman*, 232 F.3d at 146 ("[P]etition circulation bears an intimate relationship to the right to political or expressive association."); *Clean-up '84*, 759 F.2d 1511 (11th Cir. 1985) (affirming district court's holding that "gathering . . . to solicit signatures is protected association" (internal quotation marks and citation omitted)); *see also Reed*, 561 U.S. at 231 (Thomas, J., dissenting) ("The expressive political activity of signing a referendum petition is a paradigmatic example of the practice of persons sharing common views banding together to achieve a common end." (internal quotation marks and citation omitted)). The Court has, as an example before it, Mr. Simmons, who testified that he became involved with the campaign because of his deeply

168

personal connection to Medicaid expansion, Tr. at 112:5–9, 136:5–24, which has led him to work on multiple initiatives to expand Medicaid, *id.* at 136:5–24.

The same is true for a voter's act of signing a petition. When a voter signs a petition, they join with the circulator and the sponsor to express the opinion that the issue raised should be considered by the entire electorate. *Reed*, 561 U.S. at 195. Thus, "the very nature of a petition process requires association between the third-party circulator and the individuals agreeing to sign." *Voting for Am., Inc. v. Andrade*, 488 F. App'x 890, 898 n.13 (5th Cir. 2012); *see also Walker-Serrano ex rel. Walker*, 325 F.3d at 418 (describing petition circulation as the "encounter" in which a "petitioner advocates" and "the signer expresses his support"); *Perez-Guzman*, 346 F.3d at 239 (describing the "voter's official endorsement" as the "final exchange in the interactive communication"). Here again, the Court has the illustrative example of Mr. Emerson, who testified that his commitment to health care reform stems from a personal family tragedy that followed the loss of access to healthcare, and that signing FDH's petition was "an opportunity to participate in democracy and affect policy on a very direct level" with others. Tr. at 257:17–259:7.

### 2. *Dale* provides the appropriate standard of review for the FDH Plaintiffs' expressive association claims.

While most challenges to laws regulating and affecting the circulating, gathering, and submitting of petitions to local election officials have focused on the right to engage in political speech, rather than the right to expressive association,

*see, e.g.*, *Meyer*, 486 U.S. at 415–28, in some of these cases, courts have examined expressive association claims. Through analyzing these and other cases involving association claims, the three-part test articulated by the Supreme Court in *Dale*, 530 U.S. at 640, comes into view as the appropriate standard for assessing Plaintiffs' association claims.

Where courts have evaluated expressive association challenges to provisions that interfere with the petition process, they have typically applied the strict scrutiny standard. In his concurring opinion in *Buckley*, Justice Thomas evaluated whether three statutory provisions—one allowing only registered voters to circulate initiative-petitions, a second requiring initiative-petition circulators to wear identification badges, and a third requiring initiative proponents to report names and addresses of all paid circulators—violated the plaintiffs' expressive associational rights. Justice Thomas applied strict scrutiny to all three provisions. 525 U.S. at 206, 214 (Thomas, J., concurring). He emphasized that while the registration requirement did not, in his view, directly regulate speech and was "too attenuated to constitute a 'severe burden' on core political speech," it nonetheless "encroached on association rights." *Id*. at 212. For that reason alone, he was prepared to evaluate the provision under strict scrutiny. *Id.*

In *Delgado*, the Eleventh Circuit did not explicitly state that it was applying a strict scrutiny standard of review to whether the Voting Rights Act's language

170

minority provisions applied to the petition process, but it implicitly did so on the grounds that the VRA "impos[ed] a substantial burden on the right of political association" of "private citizens seeking to further their own political goals." 861 F.2d at 1495. The court emphasized that "any degree of governmental hindrance upon the freedom of a given group of citizens to pursue the initiative petition process with whomever, and concerning whatever they choose must be viewed with some suspicion." *Id.* at 1494; *see also Buckley*, 525 U.S. at 192 n.11 ("Nothing in this opinion should be read to suggest that initiative-petition circulators are agents of the State . . . circulators act on behalf of themselves or the proponents of ballot initiatives.").

In *Clean-up '84*—which was affirmed by the Eleventh Circuit—the district court again applied strict scrutiny. *See* 590 F. Supp. at 930. It did so, however, only after finding that Florida's restriction on how close to a polling place a circulator could solicit a signature constituted a "substantial burden" on a sponsor's First Amendment rights, which included the sponsor's associational rights.

When other courts have evaluated associational protections in the petition process, they too have applied strict scrutiny. In *Lerman*, the Third Circuit applied strict scrutiny when evaluating New York's residency requirement for individuals circulating candidate nominating petitions after determining that the requirement "bears an intime relationship to the right to political or expressive association."

171

*Lerman*, 232 F.3d at 146–47. Only after settling on the highest level of scrutiny did the court find that that the residency requirement "substantially burdened" the right to political association. *Id.* at 147. In *Krislov v. Rednour*, the Seventh Circuit applied strict scrutiny to evaluate whether Illinois's residency requirement for circulating candidate nominating petitions impermissibly interfered with the right to expressive association after finding that the requirement "place[d] a substantial burden on the candidates' First Amendment rights by making it more difficult for the candidates to . . . associate in a meaningful way with the prospective solicitors for the purposes of eliciting political change, to gain access to the ballot, and to utilize the endorsement of their candidacies which can be implicit in a solicitor's efforts to gather signatures on the candidates' behalf." 226 F.3d at 862.

In recent years, the Supreme Court and other courts have landed on a test for evaluating most associational claims that is both consistent with the way courts have discussed expressive association claims in the petition process and provides greater clarity as to when to apply the highest level of scrutiny. The Supreme Court promulgated the new test for evaluating expressive association claims in *Dale*, a case involving a claim that New Jersey's public accommodations law prohibiting the Boy Scouts of America ("BSA") from excluding gay individuals from membership violated BSA's associational interests. 530 U.S. at 655–61.

172

The *Dale* test has three parts: First, a court must assess whether the group making the claim engaged in expressive association. *Id.* at 640. Second, the court must assess whether the state action at issue significantly affected or burdened the group's ability to advocate its viewpoints. *Id.* Third and finally, should a court find a significant effect or burden on the right to association, it must apply strict scrutiny and require both a compelling interest to justify the governmental practice and narrow tailoring. *Id.* at 648. While the Eleventh Circuit is yet to apply the *Dale* test, other circuits have. *See State Troopers Fraternal Ass'n of N.J., Inc. v. New Jersey*, 585 F. App'x 828, 831 (2014); *Circle Sch. v. Pappert*, 381 F.3d 172, 182 (2004); *Crowe v. Or. State Bar*, 112 F.4th 1218, 1233 (9th Cir. 2024), *aff'd in part, dismissed in part sub nom. Gruber v. Or. State Bar*, No. 23-35144, 2024 WL 3963834 (9th Cir. Aug. 28, 2024), *cert. denied*, 145 S. Ct. 2848 (2025). Using the *Dale* test to evaluate a regulation affecting the petition process will generally require a court to apply strict scrutiny, which—as discussed above—is consistent with how courts have typically assessed association claims involving petition process regulations. Since sponsors, circulators, and others involved in the petitioning process are groups engaged in expressive association geared toward advancing shared political goals, the first element of the *Dale* test will usually be a non-issue in petition process cases, and strict scrutiny applies under the *Dale* test if the state's regulation of the petition process significantly burdens or effects associational interests.

173

In contrast to association claims such as this one arising from the regulation of the petition process and most other expressive association claims, association claims involving the electoral process sometimes involve the application of standards of review less protective than the *Dale* test, such as the *Anderson/Burdick* test, *see, e.g.*, *Norma v. Reed*, 502 U.S. 279, 280, or the intermediate "exacting scrutiny" test. *See, e.g.*, *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 744 (2008); *see also Bonta*, 594 U.S. at 597. It should be noted, however, that even in electoral process cases, the Supreme Court has often applied strict scrutiny to expressive association claims involving less than a severe burden. *Buckley*, 525 U.S. 208–09 (Thomas, J., concurring) (reviewing Supreme Court election law cases involving associational claims and detailing electoral cases where Court applied strict scrutiny when the burden was less than severe); *NAACP v. Patterson*, 357 U.S. at 460–61 (explaining that "state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny" without first assessing the degree of burden).

The Eleventh Circuit's decisions in *Delgado* and *Biddulph* clarify that, instead of applying one of the more forgiving standards sometimes applied in electoral process cases, this Court should apply the *Dale* test, a standard more consistent with how courts have protected expressive association rights when evaluating laws impacting the petition process. In *Delgado*, the Eleventh Circuit agreed with the

174

Ninth Circuit, which had "reasoned and emphasized that the petition process is distinct from the electoral process," *Delgado*, 861 F.2d at 1496–97, explaining that "the petition procedure merely comprises the first step in a process which might ultimately result in an election" and "does not implicate the voting process itself." *Id.* at 1497. In *Biddulph*—an electoral process case involving a challenge to the State's presentation of an issue to voters on the official ballot, not a petition process case concerning the circulating, gathering, and submitting of petitions—the court distinguished cases like *Delgado*, involving claims that more directly impact associational interests. In footnote 8, *Biddulph* explained that *Delgado* cited cases involving "types of association and equal protection rights . . . not raised by Biddulph's claim," and that "[w]ere these rights directly burdened, strict scrutiny indeed might apply." *Biddulph*, 89 F.3d at 1499 n.8.

In *Delgado*, the court found that associational protections are greater in the petitioning process than in the electoral process because in the petitioning process the state has less of a legitimate interest in regulating or policing what is primarily "private citizens seeking to further their own political goals." 861 F.2d at 1495. The *Biddulph* court also recognized this distinction in footnote 8 of the opinion and when it stated that "[t]he 'governmental hindrance' referred to in *Delgado* is not the state's regulation of its initiative process in general but rather burdens on the petition circulation aspect of that process in particular." 89 F.3d at 1491 n.8; *see also*

175

*McIntyre*, 514 U.S. at 345–46, 346 n.10 (contrasting restrictions that "control the mechanics of the electoral process" with restrictions on "pure speech" and citing *Meyer* as an example of an "election-related" pure speech case that did not warrant *Anderson-Burdick* review).

As the Eleventh Circuit recognized in *Delgado* and *Biddulph*, the rationale for applying less protective tests in the context of electoral process cases simply does not apply in petition process cases such as this one. States have a heightened interest in how elections are run because they are responsible for determining their time, place, and manner. *See* U.S. Const. art. I, § 4; *Clingman v. Beaver*, 544 U.S. 581, 586 (2005) ("States [possess a] broad power to prescribe the Times, Places and Manner of holding Elections . . . ." (internal quotation marks and citation omitted)). But the same cannot be said of the petition process, which "does not relate directly to the casting of a ballot," *Delgado*, 861 F.2d 1493 (citation modified), and is a process primarily run by private citizens. In other words, the circumstances surrounding petition cases have much more in common with typical expressive association cases, such as *Dale*, where the activities the state has interfered with primarily involve private interests and actors. For this reason, this Court should apply the *Dale* test when assessing Plaintiffs' claims.

And finally, Defendants' primary argument against the application of strict scrutiny in the free speech context carries little weight in the expressive association

176

context. Defendants' claim that the Court must parse the "speech" portions of petition circulation from the "conduct" portions is misguided for the reasons set out above with regard to Count I. *See supra* Section IV.A. But regardless, expressive association takes on many forms and occurs whenever individuals join to advance a common political or other values-based interest. *See Dale*, 530 U.S. at 653–56. By its nature, associative protections are less susceptible to the defense that a challenged provision should not be subjected to strict scrutiny because it merely regulates conduct. Expressive association straddles the constitutional protections for free speech and assembly, and can embrace actions not tied to communication. *See* Ashutosh Bhagwat, *Associational Speech*, 120 Yale L.J. 978, 984–88 (2011). For this reason, when courts have examined associational protections, the issue comes down to whether the challenged provision either directly or indirectly burdens the common venture of advancing a shared political goal or value, irrespective of whether the burden impacted a particular form of communication.

### 3. The Challenged Provisions significantly affect and burden the FDH Plaintiffs' associational rights.

Section IV.A.2, *see supra*, details why the Challenged Provisions are not narrowly tailored to address the State's claimed interests. Below, Plaintiffs address how these provisions affect and burden the FDH Plaintiffs' expressive association rights.

177

### a.  Circulator Eligibility Restrictions and Registration Restrictions

The Circulator Eligibility Restrictions impermissibly affect and burden the right to expressive association of those seeking to engage with the petition process. *Buckley* held that Colorado's requirement limiting circulators to be registered voters impermissibly "limit[ed] the number of voices who will convey the initiative message and consequently cut down the size of the audience proponents can reach." 525 U.S. at 194–95 (citation modified). As discussed above, the Circulator Eligibility Restrictions also ban broad swaths of Florida's population from circulating more than twenty-five petitions, limiting both the number of voices conveying the initiative's message and dramatically reducing the number of people who can associate with each other to advance the common cause of placing Medicaid expansion on the ballot. *See supra* Section III.A.1.a.

Further, because FDH cannot feasibly verify compliance with these eligibility requirements for volunteers, *id.* at 67:14–68:26, 69:3–6, and risk invalidation of petitions, Fla. Stat. § 100.371(14)(h), and $50,000 per-circulator fines, *id.* § 100.371(4)(g), the provisions have effectively ended all of its volunteer circulator activities in Florida. In other words, the eligibility provisions have had the effect of preventing anyone interested in volunteering for FDH from attempting to circulate petitions—a quintessential associative activity. *See* Tr. at 67:11–68:2, 69:3–6, 370:17–371:11, 377:20–23, 378:4–7.

178

As with the Circulator Eligibility Restrictions, the evidence establishes that the Registration Restrictions also interfere with Floridians' associative rights by making it impossible for sponsors to run a volunteer circulator program. Like the eligibility provisions, the "friction" the registration provision creates for sponsors and volunteers makes operating a volunteer circulator program unworkable. *See id.* at 1324:16–18, 1325:9–15, 1328:11–22, 73:19–23, 75:21–76:7.

Defendants have suggested that if sponsors find registering volunteer circulators unworkable, they can continue their associational activities by using volunteers to distribute blank petitions to voters to return themselves. As an initial matter, this approach ignores that the purpose of petition circulation is for the *voter* to associate with the sponsor and its circulators through the act of signing the petition. Moreover, the evidence shows that forcing sponsors to merely distribute blank petitions severely undermines and burdens FDH's associational rights. At trial, Plaintiff's expert Dr. Smith, volunteer circulators, the senior staff of sponsors, and the senior staff of non-profits involved in supporting initiatives all testified to the centrality of circulators having a back-and-forth interactive discussion with voters while voters fill out and sign petition forms in their midst. *See supra* Sections I.A.1, I.B.3.a; Tr. at 1271:4–22, 1272:8–1273:3. These witnesses credibly testified that circulating petitions as opposed to merely distributing petitions provided circulators—and through them sponsors—with a much more effective means of

179

connecting with and associating with voters over core political ideas. *See supra* Sections I.A.1, I.B.3.a; Tr. at 1271:4–22, 1272:8–1273:3. This testimony establishes that for the voter, signing a petition in front of a circulator and then providing the form to the circulator is a form of engaging in political solidarity with a circulator and a campaign over a shared political cause. *See, e.g.*, Tr. at 1269:13–19, 1273:9–14. These associational rights are all significantly burdened if sponsors are left with no option but to replace their volunteer circulator programs with petition distribution programs.

### b.  Voter PII Disclosures Requirement

The Voter PII Disclosures Requirement significantly affects and burdens expressive association rights as well. The provision requires voters to provide their most sensitive PII data on petition forms and mandates that those forms include a "prominently displayed" notice that the PII they provide will "become a public record." *Id.* at 1337:8–25. These PII provisions disrupt what the Third Circuit has described as the associational "encounter" between the circulator and voter, *Walker-Serrano*, 325 F.3d at 418, and the First Circuit has called the "final exchange" in circulator/voter "interactive communication." *Perez-Guzman*, 346 F.3d at 239.

These provisions have obstructed the exercise of voters' associational rights. They menace voters into either not signing petitions or leaving blank those portions of the signed petition form requiring the most sensitive PII, which will in turn have

the effect of invalidating the form and nullifying the voters' attempt to associate with the campaign. *See* Tr. at 77:1–5, 133:16–24, 1809:20–1810:6 (confirming that petitions that omit the new fields will be invalidated).

### c. Remaining Challenged Provisions

The remaining Challenged Provisions also significantly burden the FDH Plaintiffs' expressive association rights. First Amendment protections of expressive association "are triggered not only by actual restrictions on an individual's ability to join with others to further shared goals," but also by laws or regulations that may have "a chilling effect on association." *Bonta*, 594 U.S. at 618–19. In *Dale*, the Court found that a law ran afoul of associational protections if it "affect[ed] in a significant way" the group's ability to advocate even if the law did not directly interfere with or regulate the group's ability to communicate its message. 530 U.S. at 648. Consistent with this approach, the Supreme Court has found that holding an organization liable for unlawful conduct it neither authorized nor ratified would impermissibly burden the organization's right to expressive association. *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 931 (1982).

Here, several of the Challenged Provisions, including the Ten-Day Return Provisions, Verification Fee Provisions, Sponsor Fine Provisions, and Criminal Provisions, "affect[] in a significant way" the association rights of sponsors, groups supporting initiatives, and circulators by compromising their ability to advocate and

engage in collective political action. *Dale*, 530 U.S. at 648. As explained above, *see supra* Section I.B.4.a, these provisions must be evaluated in the context of the existing scheme of petition process regulations. Dr. Smith explained that prior to enactment of HB 1205, it was already "really difficult to get qualified and approved to be placed on the ballot" in Florida, Tr. at 1301:12–13, with Florida in "the bottom tier" of similarly situated states, *id.* at 1303:16–19, and averaging just 1.8 enacted initiatives every two years, *id.* According to Dr. Smith and all the individuals testifying in this case who know most about what it takes to run an initiative campaign in Florida, the Challenged Provisions have made a difficult environment for initiatives much, much worse, such that now only initiatives backed by the most monied of interests have even a remote a chance of getting enacted. *See id.* at 1259:4–23, 1365:16–1366:17.

That means, on the front end, that many sponsors will never enter the fray. If sponsors know they cannot possibly afford extravagant verification fees and fines or convince volunteers to contribute their time or paid circulators to accept a role, then they will not tilt at the proverbial windmill. So where there was once a vibrant forum of expressive association—on abortion, voting rights, minimum wage, marijuana legalization, environmental issues, healthcare, taxes, schools, transportation and more—there will be silence. Florida has created a regulatory environment that does not just chill the freedom of expressive association, it freezes it to death.

182

Expressive association is inextricably intertwined with all aspects of the petitioning process: sponsors, circulators, and voters all associate together. The Court should give full consideration to this important constitutional right when ruling on the merits. *See Buckley v. Valeo*, 424 U.S. 1, 25 (1976) (per curiam) ("The right of association is a basic constitutional freedom, that is closely allied to freedom of speech and a right which, like free speech, lies at the foundation of a free society." (citation modified)); *see also Baker*, 164 F.4th at 868 (Newsom, J., dissenting) (finding a "stand-alone First Amendment interest in participating in the signature-gathering process itself").

### C. The Circulator Eligibility Restrictions, Information Retention Felony, and RICO "Irregularities" Definition are unconstitutionally overbroad (Count III).

The evidence at trial establishes that the Circulator Eligibility Restrictions, Information Retention Felony, and RICO "Irregularities" Definition are unconstitutionally overbroad.

#### 1. Standard of Review

A law is unconstitutionally overbroad "if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (internal quotation marks and citation omitted); *see also Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002). "The first step in the overbreadth analysis is to construe the statute." *Stevens*,

183

559 U.S. at 474 (citation modified). "[The] Court may impose a limiting construction on a statute only if it is readily susceptible to such a construction." *Id.* at 481 (internal quotation marks and citation omitted); *see also Boos v. Barry*, 485 U.S. 312, 330 (1988) ("[F]ederal courts are without power to adopt a narrowing construction of a state statute unless such a construction is reasonable and readily apparent."). The Court may consider impacts on both speech and association in its analysis. *See Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973) ("Overbreadth attacks have also been allowed where the Court thought rights of association were ensnared in statutes which, by their broad sweep, might result in burdening innocent associations.").

The overbreadth doctrine reflects that, "[b]ecause First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *Button*, 371 U.S. at 433 (describing "the danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application").

### 2. Circulator Eligibility Restrictions

The Circulator Eligibility Restrictions are unconstitutionally overbroad because they criminalize the participation of entire classes of individuals in the "core political speech" of petition circulation. *See Buckley*, 525 U.S. at 187; *see also supra* Section III.A.[15]

---

[15] First Amendment protections extend to noncitizens lawfully present in the U.S.

184

The construction of the statutes is not in dispute. "A person may not collect signatures or initiative petitions if he or she" (1) "Has been convicted of a felony violation and has not had his or her right to vote restored"; (2) "Is not a citizen of the United States" or (3) "Is not a resident of" Florida. Fla. Stat. § 100.371(4)(b). Petitions submitted by such individuals are rejected even if signed by Florida voters. *Id.* § 100.371(14)(h); *see also* Joint Stips. at 30. Any individual who violates this requirement commits both a second-degree misdemeanor, Fla. Stat. § 104.187 (2025), and a third-degree felony, *id.* § 104.188(2). *See* Joint Stips. at 41. And initiative sponsors are liable for a $50,000 fine for each person they knowingly allow to collect petitions in violation of these prohibitions. Fla. Stat. § 100.371(4)(g); Joint Stips. at 41–42.

There is no doubt that "a substantial number of [the] applications" of the Circulator Eligibility Restrictions "are unconstitutional." *Stevens*, 559 U.S. at 473 (citation omitted). The provisions criminalize petition circulation by upwards of four million people with ties to Florida or an interest in Florida politics, *see supra* Section I.B.1.a, not to mention myriad individuals who live outside the State. They require invalidation of petition forms signed by lawful Florida voters for reasons unconnected to the voters' eligibility or desire to support the petition's cause. And

---

and permanent residents. *See, e.g.*, *Bridges v. Wixon*, 326 U.S. 135, 148 (1945); *Bernal v. Fainter*, 467 U.S. 216, 202 (1984).

they impose heavy compliance burdens and extreme financial risk—$50,000 per violating circulator—on sponsors. *See* Tr. at 1311:8–1312:23; *supra* Section I.B.1.a. The chilling effect of these provisions is undeniable: FDH and several other plaintiffs before this Court suspended their volunteer circulation programs entirely to protect themselves and their volunteers from liability. Tr. at 69:3–6, 76:8–17, 371:6–8.

The FDH Plaintiffs maintain that the Circulator Eligibility Restrictions are unconstitutional in every application. Moreover, Defendants cannot point to *any* evidence that nonresidents, noncitizens, or individuals convicted of felonies are more likely than the general population to commit petition fraud. *See id.* at 2136:23– 2137:25; ECF No. 620-3 at 214:19–217:22.

The Legislature did not have any evidence regarding noncitizen circulators before it. *See generally* 653-1, -2, -3 (DX 2, 3, 4). Defendants' suggestion that banning the speech and association of noncitizen circulators might be merited because of "ties to family members or their prior country of association," *see* ECF No. 620-3 at 193:3–194:1, is an inaccurate overgeneralization. *See, e.g.*, Tr. at 1720:3–13 (witness who has resided in the United States since she was two and has never resided anywhere but Florida); *id.* at 1758:18–1759:4, 1760:9–20 (witness who has no intention of returning to Venezuela due to fear of political persecution).

Defendants claim the State has encountered difficulty in subpoenaing out-of-state corporations, but the record does not include a single example of Florida law

186

enforcement failing to assert jurisdiction over a nonresident individual accused of petition fraud. Nor does the record establish whether any petition circulators Defendants arrested outside of Florida were or were not Florida residents at the time they were circulating petitions. *See, e.g.*, Tr. at 1872:25–1873:2, 1902:21–1903:4.

Similarly, the State sweeps too broadly in prohibiting anyone with a felony conviction whose rights have not been restored from circulating petitions. The Circulator Eligibility Restrictions' categorical prohibitions apply regardless of the nature of a person's conviction, *see* ECF No. 620-3 at 213:16–20, 214:19–217:22, and regardless of the amount of time that has passed since the conviction. The State did not have any research or data demonstrating that this broad category of individuals was more likely than the general population to engage in petition fraud. *See* Tr. at 2137:21–25. And Plaintiffs' expert Dr. Smith testified that he was not aware of any studies that have found a relationship between individuals with felony convictions unrelated to fraud or crimes of dishonesty and a likelihood of submitting a petition that is going to have fraud, between nonresidents and fraud, or between noncitizens and fraud. *See id.* at 1323:3–13; *see also id.* at 1323:14–16 ("[T]here are no studies out there, and for good reason, is that this linkage is so attenuated that I can't even theorize about what would be the reason [for these categories of individuals to commit fraud].").

Even if the Court were to consider the restrictions constitutional insofar as they are applied to individuals who have actually committed petition-related fraud, these cases are vanishingly few. Defendants testified that in the past few years, approximately "a dozen" individuals have been convicted of petition-related fraud and "probably 12 to 20" cases are pending. *See id.* at 1875:23–1876:9. This small pool of cases cannot justify criminalizing the First Amendment-protected activity of millions of individuals.

There is no limiting construction the Court can apply to remedy the restrictions' unconstitutionality. For the reasons articulated here and above, *see supra* Section IV.A, the Court should find that Florida's categorical prohibition on nearly four million Floridians unduly burdens speech and unconstitutionally restricts association.

### 3. Information Retention Felony

The Information Retention Felony is also unconstitutionally overbroad. The provision makes it a third-degree felony for any person to "cop[y] or retain[]" a voter's personal information, including a driver's license number, identification card number, Social Security number, or signature, "for any reason other than to provide such information to the sponsor of the initiative petition." Fla. Stat. § 100.371(9). The provision appears to potentially criminalize a range of otherwise lawful actions

188

attendant to petition circulation, such as conducting quality control and packaging and transporting petitions for direct delivery to Supervisors' offices.

The trial record reflects such lawful activity: FDH's paid circulation vendor had previously scanned all collected petitions it collected for FDH in order to conduct its own quality control. Tr. at 195:25–196:15; *see also id.* at 183:13–184:17. For example, the vendor would identify whether any of its circulators required additional training on how to properly instruct voters to complete petitions, and to determine whether voters had mistakenly completed FDH's petition multiple times. *Id.* at 196:3–15. After HB 1205, the vendor ceased this activity given the Information Retention Felony's "confusing" formulation. *See id.* at 196:19–197:5. After all, it was retaining this information for its own training and quality assurance purposes, not to "provide such information to the sponsor." Fla. Stat. § 100.371(9).

FDH also terminated its volunteer circulation program altogether, in part because it could not provide its volunteers with clear answers about their criminal liability. *See* Tr. at 65:5–9. The Information Retention Felony could prohibit a volunteer from bringing petition forms back to a "hub" run by a coalition partner, because in an immediate sense the volunteer is "retain[ing]" the prohibited information for a reason other than providing the information to the sponsor. The provision also could prohibit the coalition partner for reviewing the forms in order to identify feedback to give volunteers, for the same reason. The Court can and

189

should consider these potential applications in assessing the provision's overbreadth. *See Button*, 371 U.S. at 432 ("[I]n appraising a statute's inhibitory effect upon [First Amendment] rights, [the Supreme] Court has not hesitated to take into account possible applications of the statute in other factual contexts besides that at bar.").

The Information Retention Felony is not "readily susceptible" to a limiting construction. *See Stevens*, 559 U.S. at 481. The Court should invalidate it as unconstitutionally overbroad and leave to the Legislature the task of enacting a more precise restriction.

### 4. RICO "Irregularities" Definition

The RICO "Irregularities" Definition does not have a plain and ascertainable meaning. For this reason, its reach is unconstitutionally overbroad, sweeping in a substantial amount of protected First Amendment activity relative to any legitimate application.

Because the provision's overbreadth is bound up with its vagueness, *see infra* Section IV.D, Plaintiffs leave the discussion here relatively brief. *See Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983) ("[V]agueness and overbreadth [are] logically related and similar doctrines."); *see also Button*, 371 U.S. at 432–33 ("The objectionable quality of vagueness and overbreadth does not depend upon absence of fair notice to a criminally accused or upon unchanneled delegation of legislative

190

powers, but upon the danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application.”).

The RICO “Irregularities” Definition amends Florida’s racketeering statute to make “violation[s] of the Florida Election Code relating to irregularities or fraud involving issue petition activities” a predicate offense for racketeering. Fla. Stat. § 895.02(8)(d). A person convicted of racketeering under Florida law faces up to thirty years in prison and, for organizations like FDH, civil consequences including dissolution and forfeiture. *See id.* §§ 895.04(1), 895.05.

Setting aside what “irregularity” might ultimately mean, the provision by its terms reaches *any* participant in the petition process whose conduct touches *any* Election Code provision. Given these severe consequences flow not just to the person coming the alleged “violation,” but to anyone who the State deems to “conspire” with such person, or who “solicit[ed], coerce[d], or intimidate[d] another person to commit” such violation, *id.* § 895.02(8), the practical effect is to subject the entire ecosystem of initiative activity to potential first-degree felony exposure. Indeed, the OECS Director testified that high petition invalidity rates, which she conceded was not in and of itself a crime, is an “irregularity” OECS investigates because “there’s the potential for crime, and so that’s why we look into it.” *See* Tr. at 2153:15–18. Or consider the following situation: A volunteer believes that a person may have signed another person’s name on a petition the volunteer circulated,

191

but knowing that the sponsor must turn in all signed petitions, gives the form to the sponsor with that information. Are the two conspiring to submit a fraudulent petition? The chilling effect on protected expression is not incidental to this provision; it is its inevitable consequence. Circulators actively engaged in FDH's petition campaign testified about their fears and hesitations about continuing their work specifically because of the threat of criminal liability under HB 1205. *See id.* at 129:1–3 (testifying that the possibility of a racketeering charge affected Mr. Simmons' willingness to circulate petitions); *id.* at 129:7–15 (testifying that nonresident staff on the campaign were concerned with the criminal penalties and staff "became kind of wary of signature gathering."); *id.* at 135:18–23 (testifying that the criminal penalties associated with HB 1205 would have led him to stop working on the campaign because he does not "want a RICO charge"); *id.* at 378:4– 17 (explaining that People Power for Florida will not organize volunteers to be petition circulators for FDH's 2028 cycle because of concerns about the criminal charges).

The State already criminalizes various conduct related to petition circulation. It already punishes sponsors, through various penalties, for failures to comply with the Election Code. The above provisions do not regulate fraud at the margins—they criminalize participation at the core. The Court should hold them to be unconstitutionally overbroad.

192

**D. The Retaining and Racketeering Provisions are void for vagueness (Count IV).**

In granting a preliminary injunction, this Court held that the FDH Plaintiffs were likely to prevail on their claim that the RICO "Irregularities" Definition is unconstitutionally vague. *See* ECF No. 189 at 26. The trial record renders that conclusion unassailable. The Court should hold that the RICO "Irregularities" Definition is void for vagueness and, for reasons similar to those discussed as to Count III, *see supra* Section IV.C.3, find the same as to the Information Retention Felony.

**1. Standard of Review**

The Fourteenth Amendment's Due Process Clause guarantees that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. This means that "[n]o one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes." *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939); s*ee also Dream Defs. v. Governor of Fla.*, 119 F.4th 872, 878 (11th Cir. 2024) ("A law is unconstitutionally vague if its prohibitions are not clearly defined." (citation omitted)). The State violates this right where "it tak[es] away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). In determining whether an ordinary person would understand what

conduct a statute prohibits, courts must consider whether persons of "reasonable intelligence" can "derive a core meaning." *SisterSong Women of Color Reprod. Just. Collective v. Governor of Ga.*, 40 F.4th 1320, 1327 (11th Cir. 2022).

Vagueness concerns are amplified in the First Amendment context "because an unconstitutionally vague law can chill expressive conduct by causing citizens to 'steer far wider of the unlawful zone' to avoid the law's unclear boundaries." *Keister v. Bell*, 29 F.4th 1239, 1258–59 (11th Cir. 2022) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972)). Vague laws can chill disfavored speech without expressly banning it. Thus, "standards of permissible statutory vagueness are strict in the area of free expression." *Button*, 371 U.S. at 432.

## 2. RICO "Irregularities" Definition

The RICO "Irregularities" Definition is as clear of a due process violation as this Court will ever see. Indeed, any law professor worth their salt would probably conclude that, were this law a classroom hypothetical, it would be far too obvious to include on an exam.

The provision is without doubt "so standardless that it invites arbitrary enforcement." *Johnson*, 576 U.S. at 595. It states that "'racketeering activity' means to commit, to attempt to commit, to conspire to commit, or to solicit, coerce, or to intimidate another person to commit . . . [a] violation of the Florida Election Code relating to irregularities or fraud involving issue petition activities." Fla. Stat.

194

§ 895.02(d). But the word "irregularity" is not defined anywhere in the Florida Election Code or in HB 1205. *See* Tr. at 2153:2–9. The Department of State has not published a definition of the word "irregularities," and the OECS Director is not aware of any other Florida State agency having done so. *See id.* at 2155:7–16. Nor are Plaintiffs.

The Department of State has not published any guidance that law enforcement officers could rely on to determine what "irregularities" can serve as predicate acts for criminal liability under the racketeering statute. *See id.* at 2158:21–2159:3. Nor has it published guidance for the public that would allow petition sponsors or circulators to know whether a petition they collected contains an irregularity. *See id.* at 2159:4–8.

OECS does not even have an internal definition of "irregularities" that it can provide to its employees or investigators. *See id.* at 2156:15–18. According to the OECS Director, staff within OECS do not know what an irregularity is when they see it, because they do not have the power to make that determination—only the Secretary does, and he has not memorialized a definition. *See id.* at 2156:19–2157:7.

The State seems to be making up the meaning of the provision as it goes. When asked whether she considers all violations of the election code to be "irregularities," the OECS Director's testimony was "I think sometimes, and—I'm not sure—maybe all the time." *Id.* at 2154:2–5. Thus, a voter mistakenly writing

195

"USA" instead of their county is "[p]otentially" an irregularity; a voter neglecting to fill in their petition completely is "[p]otentially" an irregularity; and "maybe potentially" a Supervisor validating "too many petitions that maybe should have been invalidated" is an irregularity. *Id.* at 2154:19–2155:2, 2156:5–11. The OECS Director added that while "[s]ome violations are criminal, and others are not," all "would be considered irregularities." *Id.* at 2153:10–14. In the criminal context, when life and liberty are on the line, the Constitution does not tolerate potential crimes, maybe crimes, or sort of crimes. "A government of laws and not of men can never tolerate that arbitrary power." *Sessions v. Dimaya*, 584 U.S. 148, 192 (2018) (Gorsuch, J., concurring); *see also Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972) ("Living under a rule of law entails various suppositions, one of which is that '(all persons) are entitled to be informed as to what the State commands or forbids.'" (quoting *Lanzetta*, 306 U.S. at 453)).

The FDH Plaintiffs cannot even look to other states' examples to try to divine a meaning for the provision. Florida is an "extreme deviation from the norm" in expanding the definition of racketeering to encompass violations of its election code "relating to irregularities or fraud involving issue petition activities." Tr. at 1355:16–22. No other state in the country with a similar initiative process does the same. *See id.* at 1355:23–1356:8. Indeed, Florida does not extend the same concept to other forms of petition circulation. *See id.* at 1356:9–17.

196

Given that those enforcing the provision do not know what it prohibits, it is unsurprising that ordinary people do not have "fair notice of the conduct it punishes." *See Johnson*, 576 U.S. at 595. The Court heard from many witnesses of "ordinary intelligence," including sponsors, paid circulators, and volunteer circulators, that they are confused by terms in the provision and do not understand what they mean. Tr. at 63:10–14 ("[T]here was a lot of concern about . . . who was going to be liable [under the racketeering provision], what if I just made . . . a normal human mistake."); *id.* at 196:16–197:5 (paid vendor testified that scope of retaining provision "was really confusing" to understand); *id.* at 197:14–16 (paid vendor did not know what conduct would trigger racketeering liability); *id.* at 362:19–363:1 ("unclear" to volunteer what actions are prohibited by racketeering provision); *id.* at 1566:21–1567:18, 1668:22–1669:9 (same).

Mr. Simmons testified that he does not "have a full understanding" of what actions are prohibited by the racketeering provision. *Id.* at 128:15–25. As a result, even if FDH had not halted its campaign, Mr. Simmons would have stopped working on the campaign because he does not "want to go to prison," or receive "a RICO charge." *Id.* at 135:18–23. Other circulators likewise testified that the threat of these penalties was reason enough not to circulate petitions at all. *See id.* at 63:15–21 (testifying that concerns about racketeering provision "were a huge factor" in FDH's decision to end its volunteer circulation program); *id.* at 197:6–23 (testifying that

197

racketeering provision "scared people"); *id.* at 378:4–17 (testifying that if HB 1205's provisions remain in place, FDH volunteer partner will not organize volunteers to act as circulators because of concerns about the criminal charges).

To the extent that Defendants may argue that a given sponsor or circulator should ask for clarification on whether a given action is or is not an irregularity, that does not remedy the provisions' facial vagueness. Although the existence of clarifying mechanisms can bolster a defense to vagueness, they do not eliminate the degree of precision required by the Due Process Clause altogether. *See Doe #1 v. Marshall*, No. 2:15-cv-606-WKW, 2018 WL 1321034, at *10 (M.D. Fla. Mar. 14, 2018). This is especially true of laws that impose criminal rather than civil penalties, where the consequences of imprecision are more severe. *Village of Hoffman Estates v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498–99 (1982).

While individuals could request an advisory opinion from the Secretary of State as a general matter, *see* Fla. Stat. § 106.23(2), the Secretary has no criminal enforcement authority.[16] *See, e.g.*, FDH PX 258 at 2 (denying Plaintiffs' request for

---

[16] The Right to Clean Water ("RTCW") Plaintiffs elicited testimony that they attempted to seek guidance from the Secretary of State on other provisions of HB 1205—they received none. *See, e.g.*, Tr. at 712:11–17, 715:18–716:12 (testifying that RTCW leader sought guidance about ten-day return provision and received no response other than an acknowledgement); *id.* at 736:5–15, 737:19–20 (RTCW leader explaining that she sought guidance on the level of detail required when self-reporting violations and confirming that she received no response); FDH PX 194 (email from RTCW leader to Secretary of State reporting potential violations of ten-day rule and out-of-county rule).

Case 4:25-cv-00211-MW-MAF   Document 667   Filed 03/19/26   Page 199 of 230

admission because the Secretary does not enforce criminal statutes). The entities that do are the Attorney General and the State Attorneys. As to the Attorney General, private citizens are not permitted to seek advisory opinions. *See* Fla. Stat § 16.01(3) (providing that the Attorney General must give an official opinion upon request of the Governor, cabinet member, a head of an executive branch, or various designated Legislative officers and may give an opinion upon request of Legislators, state officers, or officers in local governments); Informal Advisory Legal Opinion, 2009 WL 380454, at *1 (Fla. A.G. Feb. 12, 2009) ("Initially, I would note that the authority of the Attorney General to issue opinions is prescribed by statute and is limited to public officials on questions relating to their own official duties."); Informal Advisory Legal Opinion, 2014 WL 997036, at *1 (Fla. A.G. Mar. 11, 2014) (same).

Even if private citizens could secure Attorney General advisory opinions, however, opinions of the Attorney General are not binding authority. *See, e.g.*, *Willens v. Garcia*, 53 So. 3d 1113, 1116 n.4 (Fla. 3d DCA 2011). Moreover, the Attorney General is under no duty to render an opinion on a timeline helpful to the citizen seeking guidance to circulate petitions for a time–bounded campaign. For example, the most recent AGO opinion was issued almost ten months after it was sought. Fla. Att'y Gen. Op. No. 2026-03, 2026 WL 478331 (Jan. 21, 2026).

---

As to the State Attorneys, Plaintiffs are aware of no formal mechanism by which a private party may even request such an opinion from a State Attorney. Even if one existed, given that Florida has twenty judicial circuits, and therefore twenty different State Attorneys, circulators would need to seek an opinion in every circuit in which they operate—and even then, each opinion would reflect only that prosecutor's independent exercise of prosecutorial discretion. An opinion obtained in one circuit would carry no weight in another, leaving a circulator who operates statewide subject to twenty independent and potentially conflicting interpretations of the same statute, with no assurance that compliance in one circuit provides any protection in the next.

The RICO "Irregularities" Definition undoubtedly violates the Fourteenth Amendment's Due Process guarantee and should be held void for vagueness.

### 3. Information Retention Felony

The Information Retention Felony is void for vagueness for similar reasons. The Court heard from witnesses of "ordinary intelligence" that they cannot ascertain the scope of conduct prohibited by the provision. *See* Tr. at 196:16–197:5 (paid vendor testified that provision "was really confusing" to understand); *id.* at 1569:9–1570:9 (League witness testifying that organization was unclear whether it could simultaneously collect petitions and ask voters to sign up for information to learn about or become a League member); *id.* at 1706:4–19 (same). This lack of clarity

200

risks arbitrary enforcement by law enforcement that could determine, for example, that a volunteer who delivers signed petition forms directly to a Supervisor's office has "retained" voters' personal information "for a[] reason other than to provide such information to the sponsor of the initiative petition." Fla. Stat. § 100.371(9). The Information Retention Felony has caused individuals "to 'steer far wider of the unlawful zone' to avoid the law's unclear boundaries," as reflected in the Plaintiffs' termination of their volunteer circulation programs. *See Keister*, 29 F.4th at 1258–59 (quoting *Grayned*, 408 U.S. at 109).

The "standards of permissible statutory vagueness are strict in the area of free expression." *Button*, 371 U.S. at 432. And the fact that there may be "some conduct that clearly falls within the provision's grasp," such as retaining voter information for fraudulent use, does not remedy a provision's unconstitutional vagueness. *See Johnson*, 576 U.S. at 602. The Court should hold that the Information Retention Felony is unconstitutionally vague.

### E. The Verification Fee Provisions violate FDH Plaintiffs' right to equal protection (Count V).

"[W]here fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized and carefully confined." *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966). When "a fundamental right . . . is involved, the court reviews the classification under strict scrutiny." *Gary v. City of Warner Robins*, 311 F.3d

201

1334, 1337 (11th Cir. 2002). "As the Supreme Court has recognized, to the extent that ballot-access requirements draw a distinction, the 'State must establish that its classification is necessary to serve a compelling interest.'" *Cowen v. Ga. Sec'y of State*, 960 F.3d 1339, 1346 (11th Cir. 2020) (quoting *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979)) (discussing state law that imposed different signature thresholds for candidates for different offices).[17]

As set out above, *see supra* Section IV.A-B, the Verification Fee Provisions implicate FDH's fundamental rights to speech and association because they are triggered by the act of a voter associating with FDH by signing its petition, *see* Fla. Stat. § 100.371(4)(a), and FDH is legally required to submit all signed petitions for verification, *see id*. Because the Verification Fee Provisions target statewide initiatives with prohibitive fees that they do not likewise impose on similarly situated local initiative sponsors and candidates, the classification must survive heightened scrutiny. The same is true because the provisions condition the exercise of fundamental First Amendment rights on the wealth of the sponsor. *See Clean-Up '84*, 590 F. Supp. at 928, 932–33.

---

[17] To the extent that a particular ballot access law might not implicate a fundamental right, "[t]his Circuit considers equal protection challenges to ballot-access laws under the *Anderson* test." *Cowen v. Ga. Sec'y of State*, 22 F.4th 1227, 1235 (11th Cir. 2022) (first citing *Indep. Party of Fla. v. Sec'y of Fla.*, 967 F.3d 1277, 1283–84 (11th Cir. 2020); and then citing *Fulani v. Krivanek*, 973 F.2d 1539, 1543–44 (11th Cir. 1992)).

*Clean-Up '84 v. Heinrich* held that a precursor statute to the provisions at issue here violated the Equal Protection Clause because it provided an effective fee waiver for some kinds of petitions but not for statewide initiative petitions. *See id.* at 928. The Middle District of Florida concluded that the then-operative version of Florida Statute Section 99.097 "unquestionably render[ed] access to the ballot by petitioners seeking to amend the Florida constitution dependent upon the wealth of those petitioners and the voters who support them." *Clean-Up '84*, 590 F. Supp. at 932. The Court explained that the "State therefore must sustain the burden of demonstrating that non-waiver of verification charges for petitioners is reasonably necessary, and this it has failed to do." *Id.* The Court was "troubled by the State's complete failure to justify the distinction section 99.097(4) dr[ew] between candidates and petitioners seeking to amend the constitution." *Id.* at 933.

For the same essential reasons outlined above with respect to Plaintiffs' First Amendment claims, *see supra* Sections IV.A-B, the Verification Fee Provisions cannot withstand review under the Equal Protection Clause. There is no justification for the differential treatment of statewide initiative petitions and other kinds of petitions.

First, and most obviously, the current version of Section 99.097 has the same fundamental flaw as the version the court struck down in *Clean-up '84*. The statute does not provide an effective waiver for those unable to pay the verification fees,

203

which now run into the millions of dollars. Joint Stips. at 40. This is because the waiver is tied not to the sponsor's ability to pay those fees but, rather, whether the sponsor exercises its constitutional right to utilize paid circulators, no matter how sparingly. *Compare* Fla. Stat. § 99.097(6), *with Meyer*, 486 U.S. at 428 (striking down statute prohibiting the payment of petition circulators). The fact that, for example, a sponsor might be able to pay one or two staffers to, on occasion, circulate petitions does not mean that it can afford to pay millions in verification fees. Consider FDH itself: if the organization hired even one paid circulator for the 2028 cycle, it could not apply for an undue burden waiver.

Second, there is no justification for the State singling out statewide initiative petitions for disfavored treatment. Whether the cost to verify a statewide petition and other forms of petitions is precisely the same or not, it is undisputed that validating any type of petition costs more than ten cents per petition. *See* Tr. at 641:13–18. Yet Florida law caps the amount that local initiatives and candidates must pay for petition verification at ten cents, and forces only sponsors who are advocating for changes to Florida's constitution to pay orders of magnitude more, including such things as operational overhead costs.

Take Miami-Dade County as an example. The lowest-paid worker in the office responsible for verifying petitions is currently paid $28.70 per hour. *Id.* at 1843:10–15. That is a rate of $0.00797 per second. So, in base salary costs alone, Miami-Dade

incurs ten cents of cost if such workers spend about 13 seconds verifying a petition. The highest paid work in the office is paid $42.93 per hour. *Id.* at 1843:23–25. At that rate, Miami-Dade incurs ten cents of cost if such workers spend about ten seconds verifying a petition. Suffice to say, it "[m]ost definitely" takes more than ten second to complete the entire process of verifying a local issue or candidate petition. *Id.* at 1845:5–22. But the Verification Fee Provisions force only sponsors who are advocating for changes to the state constitution to bear those expenses.

The disparate treatment of statewide initiative petitions versus local issue and candidate petitions cannot be explained on the grounds that the Supervisors are, in each instance, passing along the actual cost to the entity seeking petition validation. Rather, these differential costs—which are based on what a petitioner is advocating for—reflect a choice by the State to saddle statewide initiative petition sponsors with costs that it does not attempt to force candidates and sponsors of local issue petitions to bear.

Moreover, to the extent there are differences in the precise costs of validating statewide initiative petitions versus candidate and local issue petitions, those differences reflect the State's choices to discriminate between the different types of political efforts. This renders Defendants' justification for charging high costs to those advocating for changes to Florida's Constitution tautological: because the State has singled out statewide initiatives for disfavored treatment by adding procedural

hurdles and making its petitions more expensive to verify, that disfavored treatment justifies more disfavored treatment in the form of dramatically higher verification fees.

For example, the Verification Fee Provisions require Supervisors to send out verification notice letters only to voters who signed statewide initiatives that Supervisors validate, *see id.* at 1836:11–15, and it requires Supervisors to both electronically report and ship every hard copy petition form it receives—for some Supervisors, hundreds of thousands of pages—to Tallahassee, *see id.* at 1835:3–1838:20. If the State is forcing Supervisors to ship hundreds of thousands of pieces of paper across Florida, for one kind of initiative and not another, *of course* verification will be more expensive. Imagine a State law that requires Supervisors to haul every voter that signed a statewide petition in for a polygraph test as to whether the voter really signed the petition, but does not require the same for voters who signed candidate and local issue petitions. This choice would certainly make verification of statewide initiative petitions more expensive than local or candidate petitions. But the State's choice does not justify the burden placed upon initiative sponsors. Rather, it reflects the State's disparate treatment of sponsors who advocate for constitutional changes as opposed to those advocating for local issue initiatives or candidates.

206

The State has chosen a petition verification fee regime that violates the Fourteenth Amendment's Equal Protection Clause. The Court should hold the Verification Fee Provisions unconstitutional.

## V. FDH PLAINTIFFS ARE ENTITLED TO THEIR REQUESTED RELIEF.

Plaintiffs request a declaration that the Challenged Provisions independently and collectively violate the First and Fourteenth Amendments of the U.S. Constitutions. Plaintiffs further request a permanent injunction enjoining Defendants and anyone acting on their behalf from enforcing these provisions. Plaintiffs also request an award of Plaintiffs' costs, expenses, and reasonable attorneys' fees pursuant to, inter alia, 42 U.S.C. § 1988 and other applicable laws for all claims.

Plaintiffs are entitled to declaratory relief under 28 U.S.C. §§ 2201 and 2202. The Declaratory Judgment Act "gives the federal courts competence to make a declaration of rights." *Ameritas Variable Life Ins. Co. v. Roach*, 411 F.3d 1328, 1330 (11th Cir. 2005). The Act's purpose is "to settle 'actual controversies' before they ripen into violations of law or a breach of some contractual duty." *Hardware Mut. Cas. Co. v. Schantz*, 178 F.2d 779, 780 (5th Cir. 1949). Declaratory relief is appropriate to articulate the serious constitutional law issues presented in this case.

Plaintiffs are also entitled to permanent injunctive relief. "[T]o obtain a permanent injunction, a party must show: (1) that he has prevailed in establishing the violation of the right asserted in his complaint; (2) there is no adequate remedy

207

at law for the violation of this right; and (3) irreparable harm will result if the court does not order injunctive relief." *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1128 (11th Cir. 2005). In line with these factors, a plaintiff must show that a permanent injunction would not disserve the public interest and that the balance of hardships weighs in its favor. *Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1229 (11th Cir. 2017).

The FDH Plaintiffs meet this standard because they have established violations of their First and Fourteenth Amendment rights. Plaintiffs are irreparably harmed for the same reasons they have suffered injury-in-fact. *See supra* Section III. Because Plaintiffs will suffer irreparable harm, any remedies at law are inadequate. *See id.* at 1229.

Plaintiffs have also demonstrated that the balance of hardships weighs decidedly in their favor. The FDH Plaintiffs have shown their right to engage in speech and association surrounding petition circulation is eviscerated by the Challenged Provisions. *See supra* Section IV.A-B. "[T]his injury is not outweighed by any threatened harm to Florida because the government has 'no legitimate interest' in enforcing an unconstitutional law." *Honeyfund.com Inc.*, 94 F.4th at 1283. Indeed, "the public interest is served when constitutional rights are protected." *Democratic Exec. Comm. of Fla.*, 915 F.3d at 1327.

That is, where the State has enacted a solution in search of a problem, it is not

208

harmed by an injunction returning to the status quo, under which Supervisors of Elections verified each signed initiative petition, petition fraud was vanishingly rare, and initiative sponsors exercised their constitutional speech and association rights. The Court should enter such an injunction.

**CONCLUSION**

This Court should declare the Challenged Provisions of HB 1205 unconstitutional and enter a permanent injunction prohibiting Defendants from enforcing them.

In particular, the Court should declare that:

- The Petition Circulator Eligibility Restrictions, both individually and in combination with other challenged provisions, infringe on the FDH Plaintiffs' free speech and associational rights and are unconstitutionally overbroad under the First and Fourteenth Amendments and 42 U.S.C. § 1983;

- The Circulator Registration Requirement, both individually and in combination with the other challenged provisions, infringes on the FDH Plaintiffs' free speech and associational rights under the First and Fourteenth Amendments and 42 U.S.C. § 1983;

- The Voter PII Disclosures Requirement, both individually and in combination with the other challenged provisions, infringes on the FDH Plaintiffs' free speech and associational rights under the First and Fourteenth Amendments and 42 U.S.C. § 1983;

- The Ten-Day Return Provisions, both individually and in combination with the other challenged provisions, infringe on the FDH Plaintiffs' free speech and associational rights under the First and Fourteenth Amendments and 42 U.S.C. § 1983;

- The Sponsor Fines Provisions, both individually and in combination with the other challenged provisions, infringe on the FDH Plaintiffs' free speech and associational rights under the First and Fourteenth Amendments and 42 U.S.C. § 1983;

- The New Criminal Provisions, both individually and in combination with the other challenged provisions, infringe on the FDH Plaintiffs' free speech and associational rights and are unconstitutionally overbroad under the First and Fourteenth Amendments and 42 U.S.C. § 1983, and infringe on Plaintiff Jordan Simmons's right to due process under the Fourteenth Amendment and

210

42 U.S.C. § 1983 on grounds of vagueness; and

- The Verification Fee Provisions and Voter Verification Notice, both individually and in combination with the other challenged provisions, infringe on FDH's free speech and associational rights under the First and Fourteenth Amendments insofar as they impose a per-petition verification fee on statewide initiative petitions, or in the alternative, insofar as they redefine the "actual cost" of verification of initiative petitions; and also violate the Equal Protection Clause under the Fourteenth Amendment and 42 U.S.C. § 1983, insofar as they distinguish between statewide initiative petitions and other forms of petitions under Fla. Stat. § 99.097(4)(a) by charging uncapped "actual costs" to verify the former, and no more than ten cents to verify the latter.

Dated: March 19, 2026

_s/ Frederick S. Wermuth_
Frederick S. Wermuth
Florida Bar No. 0184111
Quinn B. Ritter
Florida Bar No. 1018135
King, Blackwell,
Zehnder & Wermuth, P.A.
25 E. Pine Street
Orlando, FL 32801
Telephone: (407) 422-2472
Facsimile: (407) 648-0161
fwermuth@kbzwlaw.com
qritter@kbzwlaw.com

Respectfully submitted,

Matletha Bennette, Fla. Bar No. 1003257
Krista Dolan, Fla. Bar No. 1012147
SOUTHERN POVERTY LAW CENTER
PO Box 10788
Tallahassee, FL 32302-2788
Telephone: (850) 408-4840
Matletha.bennette@splcenter.org

Avner Shapiro*
Bradley E. Heard*
Nicholas Taichi Steiner*
SOUTHERN POVERTY LAW CENTER
1101 17th St NW Ste 550
Washington, DC 20036
Avner.shapiro@splcenter.org
bradley.heard@splcenter.org
nick.steiner@splcenter.org

Ben Stafford*
ELIAS LAW GROUP LLP
1700 Seventh Ave., Suite 2100
Seattle, Washington 98101

211

Telephone: (206) 656-0177
bstafford@elias.law

Emma Olson Sharkey*
Harleen K. Gambhir*
ELIAS LAW GROUP LLP
250 Massachusetts Ave. NW, Suite 400
Washington, D.C. 20001
Telephone: 202-968-4490
eolsonsharkey@elias.law
hgambhir@elias.law

*Admitted *Pro hac vice*

*Attorneys for Plaintiffs*

## LOCAL RULES CERTIFICATION

I certify that this written closing argument complies with Local Rule 5.1 as to spacing and formatting requirements.

/s/ *Frederick S. Wermuth*
Frederick S. Wermuth
Florida Bar No. 0184111

*Attorney for Plaintiffs*


## CERTIFICATE OF SERVICE

I hereby certify that on March 19, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the counsel of record in this case.

/s/ *Frederick S. Wermuth*
Frederick S. Wermuth
Florida Bar No. 0184111

*Attorney for Plaintiffs*


213

## APPENDIX A

## List of Disputed Factual Issues

- The amount of fraud related to petition circulation that occurs in Florida.

- Whether the quantum of fraud related to petition circulation threatens the integrity of Florida's initiative process.

- Whether any of the petitions referenced in the December 2024 OECS Report, DX 4, were improperly validated by Supervisors of Elections, and if so whether any such petitions evinced fraud.

- Whether the nature and quantum of statewide initiative sponsors' and circulators' speech is different in traditional petition circulation versus when simply distributing blank petitions to voters.

- Whether the nature of a circulator's interaction with a voter is altered by the circulator's inability to collect the completed form.

- Whether the Secretary of State has provided the circulator training and test in languages other than English.

- Whether the burdens imposed by the Challenged Provisions compound and are greater than the sum of their parts.

214

## APPENDIX B

## Weight of the OECS Reports

In its 2024 Interim Report OECS described conducting an "audit" that concluded that a number of petitions were improperly validated by the Supervisors in Palm Beach, Orange, and Osceola County. Specifically, the Interim Report asserts that:

- At least 36.6% of petitions inspected in Palm Beach County should have been invalidated;

- At least 32.3% of petitions inspected in Orange County during an initial audit should have been invalidated;

- At least 20.9% of petitions inspected in Orange County associated with voters in United States Congressional District 9 ("CD 9") during a second audit should have been invalidated; and

- At least 7.4% of petitions inspected in Osceola County should have been invalidated.

ECF No. 653-3 (DX 4) at 19–21. In raw numbers, OECS claimed that 2,650 petitions were improperly validated, ECF No. 653-2 (DX 3) at 21, and more than 1,000 other petitions were "indeterminate." ECF No. 653-3 (DX 4) at 19–21. OECS concluded that "the preliminary results of OECS's audit indicate that some counties failed their statutory obligation to verify petition forms for Initiative Petition 23-07 [the reproductive rights initiative, hereinafter "Amendment 4"] in accordance with the standards 'governing signature matching' promulgated by Department of State." *Id.* at 21.

OECS then offered extrapolations of a supposed rate at which Supervisors statewide were improperly validating petitions. The Court excluded these extrapolations, but noted that testimony about what OECS did during its audit "comes in" and "then . . . becomes an issue of weight." Tr. at 2197:19–22. This section of FDH Plaintiffs' appendix addresses this issue, and why, given the record evidence, the Court should give no weight to OECS Director Pratt's testimony that Supervisors of Elections had improperly validated some petitions.

## I. The Petitions at Issue Were Properly Validated and Counted under Florida Law.

First, the Court should ascribe no weight to the interim OECS report's "numbers" (the purported number of invalid verified petitions) and OECS Director Pratt's related testimony because Florida law tasks Supervisors, not OECS, with validating petitions, and every petition at issue was validated—and remains validated—under Florida law. Supervisors are responsible for verifying petitions, including the verification of petition signatures. Fla. Stat. § 100.371(14). OECS has no power to invalidate petitions. Tr. at 2146:1–2. It did not direct or request any of the Supervisors whose petitions it "audited" to invalidate any of the petitions that OECS reviewed. *Id.* at 2146:3–4. The OECS report's numbers are thus incorrect unless, as a factual matter, county Supervisors validated a large number of petitions that voters, in fact, did not sign.

216

Accordingly, the Court cannot give weight to the interim OECS report's numbers, and Director Pratt's related testimony, unless it concludes that Supervisors failed to properly perform their statutory mandate. But as Defendants acknowledged in a different context, the Court must apply a "presumption of good faith" to the official acts of government officials. *Id.* at 14:3–7. And as the Court noted, the Eleventh Circuit has applied that presumption with vigor. *Id.* at 14:9–10. Thus, "[t]he presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14–15 (1926); *see also Giles Lowery Stockyards, Inc. v. Dep't of Agric.*, 565 F.2d 321, 326 (5th Cir. 1977) ("A presumption of validity is accorded to administrative bodies acting within their sphere of expertise." (citing *ICC v. Jersey City*, 322 U.S. 503, 512 (1944)).

There is no "clear evidence" here that the Supervisors of Palm Beach, Orange, or Osceola County improperly validated petition forms that were not signed by the voter. During trial, Defendants did not identify the specific petition forms that OECS reviewed. They did not identify which petitions were circulated by which circulators, or whether any circulators were convicted, arrested, or even referred to law enforcement for fraud with regard to any of those reviewed petitions.

217

Moreover, it is not clear on what basis OECS concluded that particular petitions might be fraudulent. Director Pratt testified that sometimes OECS thought a petition was fraudulent because the handwriting on the petition form did not match the signature on file, Tr. at 2104:14–17, 2107:9–16, but also that OECS sometimes thought the petition should have been invalidated due to mismatched signatures but was not fraudulent. *Id.* at 2112:7–14. She did not explain how OECS could tell the difference or what petitions she was talking about. Again, none of these petitions are in evidence. Stripped to its essence, then, the audit amounts to a report that OECS personnel second-guessed the determination of Supervisors that some (unidentified) signatures on petitions matched signatures on file using no discernible methodology.

As a simple evidentiary matter, particularly when coupled with the presumption of regularity that attaches to Supervisor validity determination, there is no basis to conclude that the OECS interim report identifies any improperly validated petitions. OECS's numbers should be given no weight by the Court. That is true even if the Court concluded that rational basis attached to FDH Plaintiffs' claims regarding any particular Challenged Provision. It is not rational for the Legislature to task Supervisors with petition verification and then presume that they have failed to do what the Legislature requires.

**II. The Circumstances Surrounding OECS's Audit Indicate the Court Should Give No Weight to OECS's Determinations as to Purported Improperly Validated Petitions.**

218

A more detailed analysis of the OECS audit process supports the conclusion that the Court should ascribe no weight to the OECS's assertions that Supervisors improperly validated petitions.

In considering the means OECS used to conduct its audit, the Court should consider its conclusions about the end result. To wit, that OECS utilized "junk science" to produce results that were inadmissible "absolute nonsense." Tr. at 1999:8–2000:16. In her direct examination, Director Pratt readily acknowledged that the staff who participated in the audit were not mathematicians or statisticians and did not do "the extrapolation in the most mathematically sound way." *Id.* at 2116:19–2117:8. OECS was not so self-effacing in its interim report, where it claimed that its audit "shed[] light on the true number of valid petition forms submitted" for Amendment 4, would result in "hundreds of more criminal referrals" and made it "imperative that the state consider major reforms to the initiative petition process to prevent groups from doing this ever again in Florida." ECF No. 653-3 (DX 4) at 23–24. It then "incorporated by reference" those results into its January 15, 2025 annual report that preceded HB 1205, ECF No. 653-2 (DX 3) at 21.

**A. Supervisors did not understand why OECS was reviewing properly validated petitions and were provided no information about OECS's conclusions.**

*Palm Beach County*

219

The OECS investigation began with Statewide Prosecutor Brad McVay sending an email to the Palm Beach Supervisor's office requesting certain petitions, all related to Amendment 4. ECF No. 597-6 at 49:2–7. OECS never requested petitions for any other initiative. *Id.* at 49:21–50:1. The Palm Beach County Supervisor's office did not "know what prompted the Department of State to make this request." *Id.* at 50:6–8, 50:20–24. The office was confused as to why Mr. McVay was requesting *validated* petitions, and asked him to clarify whether he meant to request invalid petitions. *Id.* at 58:13–59:13. In the office's view, "this was an unusual request." *Id.* at 59:14–16.

Mr. McVay visited the office on August 8, 2024, along with now-OECS Director Jillian Pratt. *Id.* at 65:9–11, 68:22–69:2. The two arrived "somewhere around lunchtime" and "left before the end of the workday." *Id.* at 68:14–21, 69:8–9. Though the Palm Beach County Supervisor's office provided Mr. McVay and Ms. Pratt with 380 petitions at Mr. McVay's request, ECF No. 597-6 at 71:7–11, the Interim Report mentions that investigators reviewed 41 petitions from Palm Beach County, ECF No. 653-3 (DX 4) at 19; and the Palm Beach County Supervisor's office does not know "which of these petitions the OECS determined to be invalid," "which of these petitions the OECS determined to be valid," or "which of these petitions the OECS determined to be first review indeterminate," ECF No. 597-6 at 74:15–23. After OECS's visit, the Palm Beach County Supervisor's Office never

220

reached out to the voters whose petitions OECS reviewed; the Palm Beach County Supervisor's Office does not know whether law enforcement or the Department of State did either. *Id.* at 75:6–14.

Though the interim OECS report says that "the audit began with a visit to Palm Beach County to obtain information about the county's storage of petitions and signature comparison process," the office does not recall being asked such questions, and believes "the Department of State is aware on how we catalog things." *Id.* at 81:14–82:13. The office was not asked to, and did not, make any changes to its validation processes based on the publication of the interim OECS report. *Id.* at 85:22–25.

*Orange County*

OECS looked next to Orange County. On August 15, 2024, Mr. McVay emailed then-Supervisor Glenton Gilzean, requesting 2,224 validated petitions associated with specific circulators for Amendment 4. ECF No. 597-5 at 49:16–50:3, 51:20–22. The office does not "know what prompted" the request, and like the Palm Beach office, considered the "request for valid petitions . . . unusual." *Id.* at 50:15–17, 51:17–22.

On August 27, Mr. McVay requested more petitions—but only from Congressional District 9. FDH PX 176 at 1–2; *see also* ECF No. 597-5 at 52:15–55:12 (discussing requests). The next day, OECS agents "arrived at the supervisor's

office and requested access to the local voter database." *Id.* at 55:13–22, 57:11–58:7. The office provided the agents "limited access" to the voter records. *Id.* at 59:4–60:1. During the visit, OECS staff were left alone in a meeting room, reviewing petitions, and office staff did not assist them and the office does not know how many petitions the agents reviewed. *Id.* at 65:18–66:1, 66:16–19.

The office never knew during the visit why OECS wanted to see the petitions or "the nature of their investigation." *Id.* at 66:20–66:23. Indeed, OECS never explained why they wanted to see "just District 9," *id.* at 71:20–72:1, and the office has no "sense of why" the OECS was specifically interested in District 9, *id.* at 72:11–13. Further, OECS never discussed its findings with the office. *Id.* at 75:4–14. OECS never informed the office which petitions it claims were valid, invalid, or indeterminate. *Id.* at 78:2–16, 80:21–81:10. The office never contacted any affected voters, *id.* at 84:19–24, and does not know whether the Department of State or law enforcement contacted any affected voters, *id.* at 84:25–85:5. The office made no changes to its validation process based on the interim OECS report. *Id.* at 85:10–13.

*Osceola County*

Finally, OECS went to Osceola County. While the Orange County "audit" was ongoing, Mr. McVay called Supervisor Arrington and "instructed her that he would be sending an email over because some of these, quote-unquote, fraudulent circulators" had submitted petitions in Osceola County. ECF No. 597-4 at 45:11–

222

46:4. Mr. McVay sent an email the next day requesting 1,032 validated petitions for Amendment 4. *Id.* at 47:9–15; FDH PX 182. Like the other offices, Osceola County found it "peculiar . . . that he was asking for validated petitions." ECF No. 597-4 at 51:18–20. With follow-up requests, the total number of petitions requested rose to 1,850. *Id.* at 54:24–55:11.

Then on September 6, 2024—the Friday before a three-day holiday— Supervisor Arrington was informed that an OECS agent would be coming that day. *Id.* at 57:6–7, 57:18–58:2–3. About two hours later, around 4:00 p.m., the OECS Director at the time, Andrew Darlington, arrived at the office with stated plans to stay and work over the weekend. *Id.* at 57:8, 57:11–13, 59:4–6. Supervisor Arrington denied Director Darlington access because the office's IT department was unwilling to allow unfettered access and because staff would have to stay at the office over the weekend to supervise the visit. *Id.* at 58:10–19, 59:8–9. Director Darlington was "aggravated with the answer" and demanded 818 more petitions, which were provided. *Id.* at 59:19–21, 60:1–13.

OECS visited the office again on October 2, 2024. *Id.* at 61:20–62:13. Though OEC's agents "did not disclose on what their procedures" were, they appeared to be comparing the digital petitions provided to signatures in the office's database. *Id.* at 67:22–68:9. Though OECS's agents did not ask for assistance, at one point an office employee did speak up when it appeared that the agents believed that one of the

223

petitions was improperly validated because the voter was registered in another county. *Id.* at 69:1–9. She explained that the voter was registered in Osceola County during the relevant time period, but had since updated their registration in another county—indeed, the system would not allow a user to validate a petition for someone who was not registered in the county at the time. *Id.* at 69:10–18.

The Interim Report claims that OECS reviewed 1,378 petitions from Osceola County. ECF No. 653-3 (DX 4) at 21. The Osceola Supervisor's office does not know why the report states this number, as the office provided 1,850 petitions for review, and thus does not know which petitions were reviewed, or which petitions OECS claims were valid, invalid, or indeterminate. ECF No. 597-4 at 75:21–77:3. OECS did not share any of its findings with the office and the office, as in the other counties, did not contact any of the affected voters and does not know if the Department of State or law enforcement contacted any of the affected voters. *Id.* at 77:4–15. The office did not change its procedures as a result of the investigation because it was "confident" in its existing process. *Id.* at 77:21–25.

Surely, if OECS believed that the Supervisors of Osceola, Orange, and Palm Beach Counties were so incompetent as to be validating a material number of fraudulent or invalid petitions it would want to tell them that, give them related information about OECS's conclusions, and ensure that those counties implemented process improvements. But Director Pratt confirmed that she never directed or

224

requested that Supervisors invalidate any petitions flagged in its audit and did not so much as ask why the Supervisors had validated them in the first instance. Tr. at 2146:1–12. Although the purpose of the audit was ostensibly to identify fraudulently procured petitions, and although OECS purportedly found evidence of fraud and improperly validated petitions, when asked why she did not follow up with Supervisors about petitions OECS found "indeterminate," Director Pratt testified "[t]hat wasn't the purpose of our visit." *Id.* at 2146:21–24.

**B. Trial testimony confirms OECS did not conduct a proper election audit and, instead, sought to generate a report that could be used to call Amendment 4's qualification for the ballot into question.**

As set out above, the record reflects that the Supervisors of Palm Beach, Orange County, and Osceola followed regular procedures and properly completed their responsibility to verify Amendment 4 petitions in 2024. By contrast, trial revealed evidence that the purpose of OECS's visits was to generate an "audit" as part of a broader statewide campaign against Amendment 4.

OECS's "audit" was presented as the centerpiece of an interim report that targeted Floridians Protecting Freedom, the campaign supporting Amendment 4. OECS had never generated such an "interim" report before, *id.* at 2129:11–19. The Interim Report was released a few weeks before Amendment 4 appeared on the ballot for the 2024 general election, *id.* at 2129:20–2130:5, in a similar timeframe as

225

when the State was spending millions on "a taxpayer-funded campaign against" Amendment 4. *Floridians Protecting Freedom, Inc.*, 754 F. Supp. 3d at 1171.

The Interim Report contained none of the information that OECS is statutorily required to report. *Compare* ECF No. 653-3 (DX 4), *with* Fla. Stat. § 97.022(7). For example, the Interim Report does not include the summary data and case breakdown set out in the two OECS annual reports in the record. *Compare* ECF No. 653-3 (DX 4), *with* ECF No. 653-1 (DX 2) at 12–162, *and* ECF No. 653-2 (DX 3) at 28–174. Nor did OECS publicly release information about the "audit's" processes or conclusions consistent with how proper election sequestration audits are conducted. As Dr. Herron explained with regard to why he was unable to validate OECS's conclusions as to particular petitions it reviewed, "[t]he data that [he] would expect to see would be parallel to the data that [he] did see in what I call county audit reports that describe on a petition-by-petition basis which petitions were accepted or validated and for reasons—and the reasons that they are not accepted for those ones that are not validated." Tr. at 805:11–806:9. OECS produced no such information.

Evidence also suggests that OECS set out to conduct an audit in order to cast doubt on Amendment 4. We know that OECS did not focus on a random sample of counties or a random sample of petitions within those counties. *See id.* at 2117:14–18, 2144:2–21. The Interim Report says that OECS selected Palm Beach County because it is "populous" and because OECS believed "there was evidence of

226

substantial fraud on the part of circulators submitting petition forms there." ECF No. 653-3 (DX 4) at 19–20. This method of selection, called selecting on the dependent variable, biases results. *See* Tr. at 810:1–811:4.

The Interim Report states OECS chose Orange County because it is "relatively near Tallahassee," whereas Director Pratt OECS selected Orange County because it was "central in the State . . . between Tallahassee and Miami" and because "the Supervisor welcomed us." *Compare* ECF No. 653-3 (DX 4) at 20, *with* Tr. at 2108:14–23. OECS then went back to Orange County a second time, to look specifically at petitions from the portion of Orange County that is in CD 9. Tr. at 211511–2116:3. Why the focus on CD 9? After all, the circulators whose petitions were under review had circulated in Orange County generally, not just in the portion of Orange County that falls within CD 9. *See* ECF No. 597-5 at 72:2–10. Indeed, the Orange County Supervisor had no sense of why OECS would be interested specifically in CD 9. *Id.* at 72:22–73:1.

Director Pratt explained at trial what OECS had not shared with the Orange County Supervisor at the time. OECS targeted CD 9 because "a lot of signatures . . . had been verified as valid" in that portion of Orange County and Director Pratt thought that "[i]t was potentially meaningful in, you know, whether or not [Amendment 4] ended up on the ballot, and so we looked at District 9." Tr. at 2115:24–2116:3.

227

Pause there. The sworn testimony of the OECS Director is that OECS, in conducting an investigation premised on the idea that validated petitions should be invalidated, targeted petitions that were "potentially meaningful" in terms of whether Amendment 4 qualified for the ballot. What did Director Pratt mean? Well, a scant five days after OECS released its Interim Report, a lawsuit was filed, premised entirely on OECS's Interim Report and its extrapolations, and arguing that Amendment 4 had not submitted enough petitions to make the ballot. *See* Compl., *Hoffman v. Barton*, No. 2024-CA-009157-O (Oct. 16, 2024), available at http://bit.ly/4bEU7lT. The complaint parroted OECS's extrapolations that this Court excluded as "absolute nonsense" and that Director Pratt now acknowledges were "not done in the most mathematically sound way." *Id.* ¶¶ 98–121. The lawsuit sought to disqualify Amendment 4 from the ballot on the grounds that it had failed to collect sufficient valid signatures in CD 9 and other congressional districts. *Id.* ¶¶ 121–26.

Director Pratt's testimony helps clarify why OECS visited Osceola County next—it is also in CD 9. Compare Director Pratt's testimony before this Court to the OECS's Interim Report, which asserts that "OECS believed it would be helpful to compare the results from Palm Beach County (1.5 million residents in 2022) and Orange County (3.2 million residents in 2022) with a smaller county where petitions submitted by known and suspected fraudsters accounted for a smaller number of validated forms." ECF No. 653-3 (DX 4) at 25. Director Pratt testified similarly on

228

this point in direct examination, *see* Tr. at 2116:4–10, but on cross-examination explained further that she thought it important to analyze "any small county around Orange." *See id.* at 2145:2–7. Notably, the lawsuit filed days after the release of the OECS Interim Report argued that Amendment 4's sponsors had submitted 2,918 more petitions than the minimum needed to qualify in CD 9, noted that the OECS audit to date had shown that "at a bare minimum . . . 2,849 [petitions in Congressional District 9] should not have been validated," and alleged that "when OECS concludes its audit of the validated petition forms within Congressional District 9, the number of improperly validated petition forms will demonstrate that Amendment 4 did not meet the constitutional minimum threshold for valid signatures in that Congressional District." *See* Hoffman Compl. ¶¶ 105, 107.

Putting together the OECS report with Director Pratt's testimony, the evidence shows that OECS sought to generate data that Supervisors had improperly validated enough petitions to call into question whether the Amendment 4 campaign had gathered enough petitions to qualify for the ballot in CD 9, with the OECS's extrapolation of its "findings" allowing similar arguments to made about other congressional districts. *See* ECF No. 653-3 (DX 4) at 22 (stating "[t]hese county figures, while based on a small sample size and subject to change with additional data, allow for extrapolation of invalidity rates by United States congressional district (CD)" and extrapolating across CD 9 and other CDs). OECS then rushed its

analysis out in an unprecedented "interim" report released weeks before election day, Tr. at 2129:17–2130:5, providing junk science that served as the entire factual predicate of a lawsuit brought just five days after the report's release, seeking to strike Amendment 4 from the ballot.

The Court is the finder of fact. It must determine what weight, if any, to give to OECS's efforts to second-guess the reasoned determinations of Supervisors that particular petitions were properly validated. Given the facts summarized above, whether because the "purpose" of OECS's visits to Supervisors was to generate a sham "audit" as the predicate for a lawsuit to disqualify Amendment 4 if it otherwise was approved by voters, or whether OECS's work was so shoddy as to be meaningless, or whether Defendants simply presented so little evidence that the Court cannot ascribe any weight to the Interim Report, the OECS's "audit" of validated petitions should be given no weight toward any assessment of any purported interest in preventing fraud or otherwise ensuring the integrity of the initiative process. The Court should determine either that Supervisors properly validated the petitions referenced in OECS's Interim Report, or that the record leaves the Court unable to credit OECS's analysis.