**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

FLORIDA DECIDES HEALTHCARE,
INC., et al.,

     *Plaintiffs*,

v.

                                   Case No. 4:25-cv-211-MW-MAF

CORD BYRD, in his official capacity as
Secretary of State of Florida, et al.,

     *Defendants*.

**LEAGUE PLAINTIFFS' WRITTEN CLOSING STATEMENT
AND POST-TRIAL BRIEF**

## Table of Contents

**Page**

**I.    PRELIMINARY STATEMENT**.......................................................1

**II.    BACKGROUND**...................................................................11

A.    Factual Background.................................................................11

i.    League Plaintiffs.....................................................................11

    1)    LWVFL................................................................................11

    2)    LULAC ..............................................................................16

    3)    Individual Plaintiffs.........................................................19

        a)    Cecile Scoon ..............................................................19

        b)    Debra Chandler..........................................................21

ii.    HB 1205's Enactment ........................................................22

    1)    Florida's History of Increasingly Restrictive Petition
        Circulation Laws.................................................................22

    2)    The Stated Rationales Underlying Many of HB 1205's
        Provisions Lack Empirical Support and in at Least One
        Instance have been Disavowed by OECS.............................26

        a)    The OECS Reports Cited by Defendants Lack any
            Reliable Indicia of Fraud, Including by Volunteer
            Circulators and Those HB 1205 Prohibits from
            Circulating, a Conclusion Buttressed by
            Defendants' Own Testimony.......................................26

        b)    Defendants have no evidence of any volunteer
            fraud.............................................................................32

            (i)    Defendants' witnesses concede there is no
                evidence of volunteer fraud............................ 32

i

　　　(ii)　The Reports contain no evidence of any
　　　　　volunteer fraud ................................................ 34

　c)　Defendants Have Not Adduced Evidence
　　　Regarding the Inefficiency of Extant Anti-forgery
　　　and Anti-fraud Laws. ................................................36

iii.　The Challenged Provisions...................................................38

　1)　The Categorical Bans .............................................................38

　2)　The Registration Restrictions...................................................42

　　a)　The Petition Circulator Definition Provision ...............42

　　b)　The Registration Requirement and Personal Use
　　　　Petition Restriction ...................................................43

　　c)　The Disclosure Requirement and Affidavit
　　　　Requirement...................................................................44

　　d)　Impact on League Plaintiffs...........................................47

　　　(i)　Fear of threats and harassment ........................ 47

　　　(ii)　Principled objection to asking the State for
　　　　　permission to speak ........................................ 52

　　　(iii)　Avoidance of third-degree felony charges ..... 52

　　　(iv)　League Plaintiffs' Decision to Stop
　　　　　Circulating ...................................................... 54

　3)　The Criminal Provisions .......................................................55

　　a)　The RICO Provision ....................................................55

　　　(i)　The Challenged Provision ............................... 55

　　　(ii)　Impact on the League Plaintiffs ...................... 56

　　b)　The Investigations Provision .......................................57

　　　(i)　The Challenged Provision ............................... 57

ii

(ii)    Impact on the League Plaintiffs ..................... 60

c)    The Missing Information Provision ............................62

(i)    The Challenged Provision ............................. 62

(ii)    Impact on the League Plaintiffs ..................... 63

d)    The Retention of Information Provision ......................65

(i)    The Challenged Provision ............................. 65

(ii)    Impact on the League Plaintiffs ..................... 65

4)    The Ten-Day Return Deadline and Related Fines .................66

a)    The Challenged Provision .............................................66

b)    Impact on the League Plaintiffs...................................67

B.    Procedural Background .......................................................................70

III.    **PRELIMINARY ISSUES** ..................................................................72

IV.    **LEAGUE PLAINTIFFS HAVE STANDING** .............................77

A.    Legal Standards .................................................................................77

B.    Argument ...........................................................................................78

i.    Individual Plaintiffs Cecile Scoon and Debra Chandler Have
Article III Standing ...........................................................................78

1)    HB 1205 Has Inflicted Concrete, Particularized Injuries in
Fact on Both Individual Plaintiffs by Chilling Their
Engagement in Constitutionally Protected Petition
Circulation ....................................................................................78

a)    The Registration and Disclosure Requirements
Forced Ms. Scoon and Ms. Chandler to Stop
Collecting Petitions, Thus Injuring Them ....................80

b)    The threat of criminal prosecution for "possessing"
more than 25 petitions without registering, filling

in missing voter information, or retaining voter information also qualify as injuries in fact. .................83

c)    The Individual Plaintiffs were also harmed by the vagueness of the statute's criminal provisions .............86

2)    Individual Plaintiffs' Injuries Are Traceable to Defendants and Redressable by This Court ...............................88

ii.    LWVFL Has Article III Standing.....................................89

1)    LWVFL Has Associational Standing to Challenge HB 1205  89

a)    LWVFL's Members Have Standing to Sue in Their Own Right and Have Suffered Harm under HB 1205.......................................................90

b)    LWVFL's Interests Are Germane to its Organizational Purpose, and Neither the Claims Asserted Nor the Relief Requested Require Individual Member Participation..................................92

2)    LWVFL Has Organizational Standing to Challenge HB 1205  93

a)    HB 1205 Impedes LWVFL's Ability to Attract Members, Raise Revenues, and Fulfill its Mission by Obstructing its Core Mission Activities ..................94

b)    HB 1205 Forced LWVFL to Divert Resources from its Core Mission Activities to Counteract HB 1205 ......................................................101

iii.    LULAC's Has Article III Standing .................................102

1)    LULAC Has Associational Standing to Challenge HB 1205  103

a)    LULAC members have independent standing to challenge HB 1205's Challenged Provisions .............103

b)    LULAC's interests are germane to its organizational purpose, and neither the claims asserted nor the relief requested require individual member participation. ...................................................107

2)    LULAC has organizational standing to challenge HB 1205 108

**V.    THE CHALLENGED PROVISIONS VIOLATE THE FIRST AND FOURTEENTH AMENDMENTS**........................111

A.    Legal Standards ...............................................................111

i.    HB 1205's Restrictions on Petition Collection Burden Core Political Speech and Thus Are Subject to Strict or Exacting Scrutiny (Count I).........................................................111

1)    Petition collection regulations that significantly limit one-on-one communications are subject to strict or exacting scrutiny ...............................................115

2)    Regulations that make it less likely that petitions will get on the ballot are also subject to heightened scrutiny ............116

ii.    Rational Basis Review Does Not Apply .........................................118

iii.    Petition Circulation Restrictions That Substantially Burden the Freedom of Association Are Subject to Strict Scrutiny (Count II) ...................................................120

iv.    Laws Are Impermissibly Vague when Those Who Enforce the Law or Those Subject to its Enforcement Must Necessarily Guess at Their Meaning (Count III).................................122

v.    A Statute is Overbroad When a Substantial Number of its Applications are Unconstitutional, Judged in Relation to the Statute's Plainly Legitimate Sweep (Count IV).............................123

vi.    The Non-Citizen Ban is Subject to Strict Scrutiny under the Fourteenth Amendment (Count V) ...............................124

vii.    The Court Can and Should Review the Cumulative Impact of the Challenged Provisions...............................................124

B.      Argument ...............................................................126

i.      The Categorical Bans Fail Under the First and Fourteenth
        Amendments ..........................................................127

        1)      The Categorical Bans Violate the Freedom of Speech
                Clause Under the First Amendment ....................128

                a)      The Bans Drastically Reduce the Pool of
                        Individuals Who May Engage in Petition
                        Circulation ..............................................128

                b)      The Categorical Bans Impose Severe Criminal
                        Penalties, thus Dissuading Core Political Speech ......132

                c)      The Categorical Bans Reduce the Likelihood That
                        an Initiative Will Qualify for Placement on the
                        Ballot .....................................................133

                d)      The State's Rationale for the Categorical Bans
                        Does Not Satisfy Even Some Lesser Level of
                        Scrutiny, Including Intermediate Scrutiny or Even
                        Rational Basis Review ...............................136

        2)      The Categorical Bans Violate the Right to Freedom of
                Association Under the First Amendment .............140

        3)      The Categorical Bans Are Overly Broad .............142

        4)      The Non-Citizen Ban Violates the Equal Protection Clause
                of the Fourteenth Amendment .........................143

ii.     The Registration Restrictions Violate the First and Fourteenth
        Amendments ..........................................................147

        1)      The Court should review the Registration Restrictions
                under strict or heightened scrutiny .....................148

                a)      Strict Scrutiny is Appropriate Because Violating
                        the Registration Restrictions Is a Felony ...............148

                b)      At the Very Least, Exacting Scrutiny Applies ...........150

c) No Authority Supports Rational Basis Review ..........161

2) The Registration Restrictions Fail Under Any Level of Scrutiny Applied .................................................................163

a) The Registration Restrictions Easily Fail Under Strict Scrutiny because Defendants Cannot Pass the "Least Restrictive Means" Test ............................163

b) The Registration Restrictions Fail Under Exacting Scrutiny Because Defendants Cannot Show the Provisions Were Narrowly Tailored............................164

c) The Registration Restrictions Are so Irrational and Untethered to the Facts That They Fail Even Under Rational Basis Review................................................175

3) The Registration Restrictions Fail as Unconstitutionally Vague .........................................................................177

4) The Registration Requirements Fail as Unconstitutionally Overbroad...................................................................178

iii. The Criminal Provisions Violate the First and Fourteenth Amendments.............................................................................181

1) The RICO Provision ...........................................................183

a) The Term "Irregularities" is a Constitutional Nullity ......................................................................184

b) OECS Conflates Invalidity with Fraud, Compounding the Vagueness Problem ......................186

c) The RICO Provision Chills Protected Speech and Induces Self-censorship................................................188

d) The RICO Provision Is Not Narrowly Tailored and Fails Under Any Level of Scrutiny ............................189

2) The Investigations Trigger Provision ..................................192

3) The Missing Information Provision......................................195

a)    The Missing Information Provision is Unconstitutionally Vague ...........................................195

b)    The Missing Information Provision Is Not Narrowly Tailored and Fails under any Level of Scrutiny ................................................................196

c)    The Missing Information Provision Chills Protected Speech and Induces Self-Censorship .........197

4)    The Retention of Information Provision .............................198

a)    The Retention of Information Provision Is Unconstitutionally Vague ...........................................199

b)    The Retention of Information Provision Chills Protected Speech and Induces Self-censorship ..........200

c)    The Retention of Information Provision Creates an Inescapable Catch-22 ....................................................201

d)    The Retention of Information Provision Is Not Narrowly Tailored and Fails under Any Level of Scrutiny ................................................................202

5)    Sum of the Criminal Provisions ...........................................203

iv.    The Ten-Day Return Deadline .......................................................205

1)    The Ten-Day Return Deadline and Fines Provisions Violate the Freedom of Speech Clause under the First Amendment ................................................................205

2)    The Ten-Day Return Deadline and Fines Provisions Violate the Freedom of Association Clause Under the First Amendment. ................................................................209

3)    The Ten-Day Return Deadline and Related Fines Are Unconstitutionally Overbroad ............................................210

v.    The Challenged Provisions, Reviewed Cumulatively, Are Unconstitutional ........................................................................211

**VI.    CONCLUSION**................................................................................214

## Table of Authorities

**Page(s)**

**Cases**

*A.M. Capen's Co. v. Am. Trading & Prod. Corp.*,
    202 F.3d 469 (1st Cir. 2000) ...............................................................67

*Alachua Cnty. Educ. Ass'n v. Carpenter*,
    757 F. Supp. 3d 1248 (N.D. Fla. 2024)........................................70, 97

*Am. Const. L. Found., Inc. v. Meyer*,
    120 F.3d 1092 (10th Cir. 1997)...........................................................69

*Ambach v. Norwick*,
    441 U.S. 68 (1979)..............................................................................141

*Ams. for Prosperity Found. v. Bonta*,
    594 U.S. 595 (2021)......................................................................*passim*

*Anderson v. Celebrezze*,
    460 U.S. 780 (1983).............................................................................216

*Arcia v. Fla. Sec'y of State*,
    772 F.3d 1335 (11th Cir. 2014).....................................................71, 96

*Ariz. Free Enter. Club PAC v. Bennett*,
    564 U.S. 721 (2011)......................................................83, 120, 139

*Ashcroft v. ACLU*,
    542 U.S. 656 (2004).............................................................................109

*Bennett v. Spear*,
    520 U.S. 154 (1997).......................................................................82, 171

*Bernal v. Fainter*,
    467 U.S. 216 (1984)......................................................................*passim*

*Bernbeck v. Moore*,
    126 F.3d 1114 (8th Cir. 1997) .......................................130, 188, 220

*Biddulph v. Mortham*,
    89 F.3d 1491 (11th Cir. 1996) .....................................................*passim*

x

*Bluman v. FEC*,
    800 F. Supp. 2d 281 (D.D.C. 2011) ...................................................................143

*Bowsher v. Synar*,
    478 U.S. 714 (1986)........................................................................................97

*Brown v. Socialist Workers '74 Campaign Comm. (Ohio)*,
    459 U.S. 87 (1982)..............................................................75, 145, 154

*Buckley v. Am. Const. L. Found.*,
    525 U.S. 182 (1999)...........................................................................*passim*

*Burdick v. Takushi*,
    504 U.S. 428 (1992)...................................................................................216

*Cabell v. Chavez-Salido*,
    454 U.S. 432 (1982)...................................................................................141

*Campbell v. Buckley*,
    203 F.3d 738 (10th Cir. 2000)................................................................115

*Chandler v. City of Arvada*,
    292 F.3d 1236 (10th Cir. 2002)................................................125, 217, 218, 221

*Citizens for Tax Reform v. Deters*,
    518 F.3d 375 (6th Cir. 2008)........................................................121, 129, 221

*City of Chicago v. Morales*,
    527 U.S. 41 (1999)...........................................................................182, 183

*City of Ladue v. Gilleo*,
    512 U.S. 43 (1994).......................................................................166, 171, 207

*City of South Miami v. Governor*,
    65 F.4th 631 (11th Cir. 2023).............................................................71

*Clean-Up '84 v. Heinrich*,
    759 F.2d 1511 (11th Cir. 1984) ........................................................116, 136, 198

*Colautti v. Franklin*,
    439 U.S. 379 (1979)...........................................................................118, 196

*Connally v. Gen. Constr. Co.*,
269 U.S. 385 (1926).................................................................117, 180, 201

*Craig v. Boren*,
429 U.S. 190 (1976)...........................................................................207

*Dakotans for Health v. Noem*,
52 F.4th 381 (8th Cir. 2022)..........................................................*passim*

*Davis v. FEC*,
554 U.S. 724 (2008)...........................................................................156

*Dem. Exec. Comm. of Fla. v. Nat'l Republican Senatorial Comm.*,
950 F.3d 790 (11th Cir. 2020)...............................................................66

*DeWeese v. Town of Palm Beach*,
812 F.2d 1365 (11th Cir. 1987).........................................................136

*Doe v. Reed*,
561 U.S. 186 (2010)...........................................................156, 157, 162

*FF Cosmetics FL, Inc. v. City of Miami Beach*,
866 F.3d 1290 (11th Cir. 2017).........................................................160

*First Nat'l Bank of Bos. v. Bellotti*,
435 U.S. 765 (1978)...........................................................................150

*Fla. Action Comm., Inc. v. Seminole County*,
212 F. Supp. 3d 1213 (M.D. Fla. 2016)..................................117, 180, 193, 201

*Fla. Decides Healthcare Inc. v. Fla. Sec'y of State*,
No. 25-12370, 2025 WL 3738554 (11th Cir. Sep. 9, 2025) .................68, 69, 143

*Fla. Democratic Party v. Hood*,
342 F. Supp. 2d 1073 (N.D. Fla. 2004)..................................................88

*Fla. State Conf. of Branches & Youth Units of the NAACP v. Byrd*,
680 F. Supp. 3d 1291 (N.D. Fla. 2023)...........................................*passim*

*Fla. State Conf. of N.A.A.C.P. v. Browning*,
522 F.3d 1153 (11th Cir. 2008) ..........................................................87

*Foley v. Connelie,*
　435 U.S. 291 (1978)..................................................................................140

*Ft. Lauderdale Food Not Bombs v. City of Ft. Lauderdale,*
　11 F.4th 1266 (2021)..................................................................................71

*Gale Force Roofing & Restoration v. Brown,*
　2021 WL 4958101 (N.D. Fla. June 29, 2021) ................................80, 82

*Garcia v. Stillman,*
　661 F. Supp. 3d 1168 (S.D. Fla. 2023) ...........................................72

*Gibson v. Firestone,*
　741 F.2d 1268 (11th Cir. 1984)................................................................122

*Grayned v. City of Rockford,*
　408 U.S. 104 (1972).................................................................184, 185

*Grote Indus., LLC v. Sebelius,*
　2013 WL 53736 (S.D. Ind. Jan. 3, 2013)................................................67

*Hand v. Desantis,*
　946 F.3d 1272 (11th Cir. 2020)................................................................66

*Harrell v. The Fla. Bar,*
　608 F.3d 1241 (11th Cir. 2010).................................................................72

*Havens Realty Corp. v. Coleman,*
　455 U.S. 363 (1982)..................................................................88, 95

*Henry v. Att'y Gen.,*
　45 F.4th 1272 (11th Cir. 2022)..............................................72, 77, 185, 192

*Hispanic Fed'n v. Byrd,*
　719 F. Supp. 3d 1236 (N.D. Fla. 2024).................................................142

*Homans v. City of Albuquerque,*
　366 F.3d 900 (10th Cir. 2004).................................................................67

*Hooper v. Bernalillo Cnty. Assessor,*
　472 U.S. 612 (1985).........................................................115, 136, 179

*Idaho Coal. United for Bears v. Cenarrusa,*
234 F. Supp. 2d 1159 (D. Idaho 2001)................................................................188

*Initiative & Referendum Inst. v. Jaeger,*
241 F.3d 614 (8th Cir. 2001).............................................................................221

*Initiative & Referendum Inst. v. U.S. Postal Serv.,*
417 F.3d 1299 (D.C. Cir. 2005) ........................................................158, 169, 171

*Kassel v. Consol. Freightways Corp. of Del.,*
450 U.S. 662 (1981).........................................................................................120

*Kolender v. Lawson,*
461 U.S. 352 (1983).........................................................................................180

*Krislov v. Rednour,*
226 F.3d 851 (7th Cir. 2000).......................................................116, 117, 137, 138

*League of Women Voters of Fla., Inc. v. Lee,*
576 F. Supp. 3d 1004 (N.D. Fla. 2021)..........................................................71, 96

*Lerman v. Bd. of Elections,*
232 F.3d 135 (2d Cir. 2000)...........................................................................*passim*

*Libertarian Party of Ala. v. Merrill,*
2021 WL 5407456 (11th Cir. Nov. 19, 2021) ...................................................122

*Lujan v. Defs. of Wildlife,*
504 U.S. 555 (1992)...........................................................................................70

*McCullen v. Coakley,*
573 U.S. 464 (2014).....................................................................................*passim*

*McIntyre v. Ohio Elections Comm'n,*
514 U.S. 334 (1995).......................................................................149, 150, 158

*Messina v. City of Fort Lauderdale,*
713 F. Supp. 3d 1292 (S.D. Fla. 2024) ............................................162, 171, 174

*Meyer v. Grant,*
486 U.S. 414 (1988).....................................................................................*passim*

*Miller v. Carson*,
   563 F.2d 741 (5th Cir. 1977)................................................................120

*Mo. Roundtable for Life v. Carnahan*,
   676 F.3d 665 (8th Cir. 2012)................................................................115

*Moody v. NetChoice, LLC*,
   603 U.S. 707 (2024)................................................................176, 201

*Murdock v. Pennsylvania*,
   319 U.S. 105 (1943)................................................................120

*NAACP v. Alabama ex rel. Patterson*,
   357 U.S. 449 (1958)................................................................116, 145, 150

*NAACP v. Button*,
   371 U. S. 415 (1968)................................................................110, 129, 156

*OPAWL v. Yost*,
   118 F.4th 770 (6th Cir. 2024)................................................................143

*Packingham v. North Carolina*,
   582 U.S. 98 (2017)................................................................110

*PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*,
   711 F. Supp. 3d 1325 (N.D. Fla. 2024)................................................................96

*PEST Comm. v. Miller*,
   626 F.3d 1097 (9th Cir. 2010)................................................................115

*Pierce v. Jacobsen*,
   44 F.4th 853 (9th Cir. 2022)................................................................*passim*

*Project Vote v. Kelly*,
   805 F. Supp. 2d 152 (W.D. Pa. 2011)................................................................70

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015)................................................................*passim*

*Reno v. ACLU*,
   521 U.S. 844 (1997)................................................................80, 146, 185, 188

xv

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
    487 U.S. 781 (1988)................................................................145

*Rumsfeld v. F. for Academic & Institutional Rts., Inc.*,
    547 U.S. 47 (2006)................................................................97

*SD Voice v. Noem*,
    60 F.4th 1071 (8th Cir. 2023)............................................. 112, 113, 130

*Sec'y of State v. Joseph H. Munson Co.*,
    467 U.S. 947 (1984)..........................................................155, 177

*Shaw v. Hunt*,
    517 U.S. 899 (1996)..............................................................162

*Shelton v. Tucker*,
    364 U.S. 479 (1960)..............................................................110

*Sherley v. Sebelius*,
    689 F.3d 776 (D.C. Cir. 2012) ...............................................68

*Smith v. California*,
    361 U.S. 147 (1959)..........................................................194, 200

*Solantic, LLC v. City of Neptune Beach*,
    410 F.3d 1250 (11th Cir. 2005).................................................160

*Southco, Inc. v. Kanebridge Corp.*,
    324 F.3d 190 (3d Cir. 2003).....................................................67

*Sugarman v. Dougall*,
    413 U.S. 634 (1973)..........................................................140, 143

*Swanson v. Worley*,
    490 F.3d 894 (11th Cir. 2007)...............................................121, 122

*Talley v. California*,
    362 U.S. 60 (1960)..............................................................150

*Term Limits Leadership Council, Inc. v. Clark*,
    984 F. Supp. 470 (S.D. Miss. 1997)............................................191

*Turner Broad. Sys., Inc. v. F.C.C.*,
512 U.S. 622 (1994)...............................................................117, 174, 207

*United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*,
517 U.S. 544 (1996).........................................................................71

*United States v. Ragen*,
314 U.S. 513 (1942).......................................................................118

*United States v. Stevens*,
559 U.S. 460 (2010)............................................118, 138, 178, 201

*United States v. Students Challenging Regul. Agency Procs. (SCRAP)*,
412 U.S. 669 (1973)........................................................................95

*Univ. of Tex. v. Camenisch*,
451 U.S. 390 (1981).......................................................................67

*Village of Hoffman Estates v. Flipside, Hoffman Ests., Inc.*,
455 U.S. 489 (1982)................................................................179, 183

*Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton*,
536 U.S. 150 (2002)................................................................*passim*

*We the People PAC v. Bellows*,
40 F.4th 1 (1st Cir. 2022) ......................................................*passim*

*Williams-Yulee v. Fla. Bar*,
575 U.S. 433 (2015).....................................................................109

*Williams v. Rhodes*,
393 U.S. 23 (1968).......................................................................120

*Wilson v. Seiter*,
501 U.S. 294 (1991).....................................................................120

*Wollschlaeger v. Governor*,
848 F.3d 1293 (11th Cir. 2017)...............................................77, 129

*Yes on Term Limits, Inc. v. Savage*,
550 F.3d 1023 (10th Cir. 2008)..............................125, 133, 217, 218

*Ysursa v. Pocatello Educ. Ass'n*,
  555 U.S. 353 (2009)................................................................126, 127

**Statutes**

Americans with Disabilities Act of 1990, Pub. L. No. 101-336, 104
  Stat. 327 ....................................................................................56

Fla. Stat. § 19.071 (2025)...........................................................40

Fla. Stat. § 97.012(15) (2022).....................................................50

Fla. Stat. § 97.021(28)................................................................35

Fla. Stat. § 97.0575(8)................................................................82

Fla. Stat. § 100.371 (2025)..................................................*passim*

Fla. Stat. § 100.371(2)(c) (1998) .........................................16, 17

Fla. Stat. § 100.371(3) (1998).....................................................16

Fla. Stat. § 100.371(3) (2019).....................................................17

Fla. Stat. § 100.371(4) (2025)..............................................*passim*

Fla. Stat. § 100.371(6)(a) (2002) ................................................16

Fla. Stat. § 100.371(7)............................................59, 60, 202, 203

Fla. Stat. § 100.371(8)..............................................118, 173, 192

Fla. Stat. § 100.371(9)........................................................*passim*

Fla. Stat. § 100.371(14)........................................................51, 190

Fla. Stat. § 104.185 (2022)....................................................29, 194

Fla. Stat. § 104.185 (2025)...................................................*passim*

Fla. Stat. § 104.185(2) (2022)......................................................55

Fla. Stat. § 104.187 (2025)....................................................36, 81, 149

Fla. Stat. § 104.188 ....................................................................82

Fla. Stat. § 104.188(2) (2025).................................................36, 144, 149, 173

Fla. Stat. § 119.011 (2025).................................................................................39

Fla. Stat. § 119.011(12) (2025)..........................................................................38

Fla. Stat. § 775.082(3)(b)...........................................................................48, 92

Fla. Stat. § 775.083(1)(b).................................................................................48

Fla. Stat. § 817.568 ......................................................................................200

Fla. Stat. § 817.568(2)(a) ..............................................................................29

Fla. Stat. § 817.568(8)(a) ..............................................................................29

Fla. Stat. § 895.02(5).......................................................................................48

Fla. Stat. § 895.02(8).................................................................48, 118, 181

Fla. Stat. § 895.02(8) (2025).........................................................................80

Fla. Stat. § 895.03 .........................................................................................181

Fla. Stat. § 895.03(3) (2025)..........................................................................48

Fla. Stat. § 895.04 .................................................................92, 118, 181

Fla. Stat. § 895.04(1).......................................................................................48

Florida Election Code ...............................................................................*passim*

Florida Public Records Law, Fla. Stat. ch. 119......................................................41

Florida RICO (Racketeer Influenced and Corrupt Organization) Act.............*passim*

**Other Authorities**

18B Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. Juris.
§ 4478.5 (3d ed. 2025)...................................................................................67

Due Process Clause.........................................................................174, 180, 184

Equal Protection Clause.............................................................................*passim*

Everglades Trust Fund, 1996 Fla. Const. amend. ......................................................15

Fla. Const. art. I...............................................................................................18

Fla. Const. art. II, § 7 ........................................................................................15

Fla. Const. art. III, § 20 .....................................................................................17

Fla. Const. art. VI, § 4 .......................................................................................17

Fla. Const. art. IX, § 1 .......................................................................................16

Fla. Const. art. X, § 17 ......................................................................................16

Fla. Const. art. XI, § 3 .......................................................................................15

H.B. 1205, 2025 Leg. (Fla. 2025) ...............................................................1, 61, 62

H.B. 1205 § 4, 2025 Leg. (Fla. 2025) ....................................................................35

H.B. 1205 § 6, 2025 Leg. (Fla. 2025) ............................................................*passim*

H.B. 1205 § 12, 2025 Leg. (Fla. 2025) ...................................................................55

H.B. 1205 § 19, 2025 Leg. (Fla. 2025) ...................................................................48

U.S. Const. amend. I ..............................................................................*passim*

U.S. Const. amend. V.........................................................................................174

U.S. Const. amend. VIII......................................................................................120

U.S. Const. amend. XIV .........................................................................*passim*

U.S. Const. art. III .............................................................................72, 83, 95, 96

xx

## I.    PRELIMINARY STATEMENT

People talk a lot about democracy these days, both in Florida and throughout the country.  We are assured, sometimes fervently, that its continued survival depends on one thing or another: for the press, it's journalism; for corporate America, it's capitalism; for technologists, it's progress and prosperity; for teachers, it's education; for lawyers, it's the rule of law.  And it's true—we can argue about the particulars, but all those things, if harnessed correctly (a big *if*, especially for the budding technologists out there), *are* important to a thriving democratic system.

But democracy in this country has also always depended upon something a bit simpler (and quintessentially American): showing up and doing the work. Registering to vote—and actually voting.  Reading up on the issues that matter to you and your community.  Attending town halls and councils, and engaging with your friends and neighbors while you're there.   Ringing doorbells in the rain (and sometimes being turned away).  And, to bring things back to this lawsuit, circulating petitions and collecting signatures for causes you believe in.

If we learned one thing at this trial (and, as the length of this brief underscores, we learned a lot more than one thing), it's that the members of the League of Women Voters of Florida ("LWVFL") and the League of United Latin American Citizens ("LULAC") (together with Individual Plaintiffs Ms. Debra Chandler and Ms. Cecile Scoon, the "League Plaintiffs") show up and do the work.  The volunteers—and yes,

1

they are all volunteers—who make up the LWVFL and LULAC rosters believe deeply in the importance of civic engagement, and their actions prove it.  As the trial testimony made clear, they give up weekends and weekdays to walk around—at parades and plant sales, clam bakes and county fairs—and talk to potential voters about ballot initiatives for which their organizations are circulating petitions.  (This past year, it was for Medicaid expansion and clean water).   Often, those conversations result in a signed petition; sometimes, they don't.  But, as the Supreme Court recognized in *Meyer v. Grant*, these volunteer circulators are by definition engaged in the kind of "core political speech" for which First Amendment protections "are at their zenith," in two different ways: they are making their voices heard on issues they care about, and they are increasing the chances that those issues get on the ballot and thus become the focus of statewide discussion.

Or at least they were, until last year.  In 2025, the State of Florida passed a law, House Bill 1205 ("HB 1205"), that rewrote the rules of engagement in ways that essentially eliminated the ability of volunteer organizations like LWVFL and LULAC to continue participating in the petition circulation process.  As a direct consequence, League Plaintiffs—and each and every one of the nine LWVFL and LULAC members we heard from at trial—have indisputably seen their constitutional rights abrogated in a manner only this Court can redress through the injunctive relief League Plaintiffs are seeking.

2

As the undisputed testimony adduced at trial showed, the effects of HB 1205 have been felt especially harshly by volunteers—like the League Plaintiffs' members. Its numerous provisions impose severe burdens on every phase of the Florida petition process, from the registration and training of potential petition circulators, to volunteers' ability to engage with voters and gather signatures when they're in the field, to the submission and verification of collected forms.

HB 1205 is far-reaching and onerous. It categorically bars entire swaths of people—including non-citizens, non-residents (like Florida's snowbirds), and certain individuals with past felony convictions—from participating in the constitutionally protected petition circulation process *at all*. It requires volunteer circulators who collect more than twenty-five petitions to identify themselves by name and home address at the same time they are collecting petitions—that is, when the response to their efforts is likeliest to be (as the court put it in *American Constitutional Law Foundation, Inc.* v. *Meyer*) "intense, emotional, and unreasoned" (a phenomenon several of League Plaintiffs' witnesses testified about based on their firsthand experience). 120 F.3d 1092, 1102 (10th Cir. 1997). It mandates that this type of personal information, along with home phone numbers, email addresses, and the last four digits of petitioners' social security numbers, are paired with the specific ballot initiatives for which a petitioner circulated and made publicly available, thus painting a bull's-eye on petitioners' backs for politically

3

motivated bad actors (and plain old grifters, as well). It demands that every signed petition be sent to election officials within ten days—an unreasonably short timeframe which leaves little time for verification, particularly by those volunteer organizations of limited means, like LWVFL and LULAC. And it categorically bars volunteers from helping voters to fill out their petition forms.

But that isn't all. H.B. 1205 purports to police compliance with these provisions restricting political speech—many of which Defendants' own witnesses admitted were vague or undefined—through a set of draconian criminal penalties. Collect more than twenty-five petitions without registering? Third-degree felony, up to five years in jail. Help an elderly gentleman with severe arthritis fill out a petition? Third-degree felony, up to five years in jail. Fail to catch errors on the petitions your organization collects because you've got to rush them off in order to meet the ten-day deadline? If those errors affect more than twenty-five percent of the petitions you collected, the Florida Office of Election Crimes and Security (OECS) automatically investigates your membership-funded organization. And last, but most assuredly not least: potential prosecution under Florida's RICO statute for "irregularities" in "petition activities." What does that mean, you may ask? As the Director of OECS acknowledged during trial, it's tough to say: the term has never been defined publicly (or even written down within OECS), but is something that is simply up to "her and then the Secretary [of State]." Indeed, an "irregularity" might

4

include a "petition form which has been filled out with…the country, USA, instead of the county" in which a voter lives—a mistake several of the League Plaintiffs' witnesses testified was quite common and which now raises the specter of heavy fines…and thirty years in jail. Day 8 (Pratt) Tr. 2155:7–2156:18.  For unpaid volunteers like the men and women of LWVFL and LULAC, these provisions make the prospect of circulating petitions—even for causes they passionately support— far too burdensome to undertake.  It is thus no surprise that, immediately upon the enactment of HB 1205, both organizations, as well as the Individual Plaintiffs, ceased all petition circulation activity.  The result: for the first election cycle since Florida began allowing citizens to place initiatives on the ballot through the petition process, not a single proposed constitutional amendment collected enough signatures to make it onto Florida's ballot.  However you define what democracy means, that is a loss.

The principal justification proposed for all of these restrictions—found in the text of HB 1205 itself—is the preservation of "ballot integrity" and the "prevention of illegal and fraudulent activities" relating to the petition circulation process.  *See* DX-1 at 1, 4–6.  As discussed below, the fact that the law's restrictions impinge upon core political speech means that they must be evaluated under some heightened level of scrutiny.  But under *any* of the appropriate evaluative standards, and regardless of whether they are evaluated cumulatively or separately, HB 1205's

provisions fail to pass the test when it comes to their impact on League Plaintiffs. Over nine days of trial, Defendants failed to adduce *any* evidence of volunteer petition circulators committing fraud or engaging in other petition-related misconduct. They provided no evidence that non-citizens or non-residents, such as LWVFL's Ms. Cecilia González-Herrera and Ms. Christine Poff, or LULAC's Ms. Karen Patricio, were more likely to commit petition fraud than other people. And, in candid—but ultimately devastating—testimony, both the Director of OECS and the leader of the Attorney General's Election Crimes Task Force admitted under oath that the petition registration provisions would be of no use in preventing fraud or catching motivated fraudsters.

This trial should spell the end of H.B. 1205, at least with respect to Ms. Scoon and Ms. Chandler, who are volunteers, and LWVFL and LULAC, which collect petitions exclusively through volunteers. Without any basis in fact, Defendants cannot even rationalize the Challenged Provisions (defined at **Appendix A**)—much less carry the far heavier burden of demonstrating that they are narrowly tailored to meet some compelling interest. At most, Defendants are left with the notion that incentivizing circulators via payment inherently creates the conditions for fraudulent conduct—a theory which has its own myriad evidentiary issues, but is in any event wholly inapplicable to the League Plaintiffs. Accordingly, they should be granted the injunctive relief they are seeking and allowed to go back to circulating petitions

6

and exercising their First Amendment rights—"joyfully," as Ms. Chandler memorably put it.  Day 6 (Chandler) Tr. 1710:1–15.

* * * * *

This brief proceeds in five main parts.  First, Section II introduces us to the LWVFL and LULAC, describing their rich history, animating principles, and former and current activities.  We meet six members of the LWVFL, including the Individual Plaintiffs, as well as three members of LULAC, and we hear about their participation in the petition circulation process and how HB 1205 impacted them. The Background also walks through HB 1205's enactment and each of the provisions challenged here, and it previews both the justifications Defendants offer for those provisions and the myriad ways in which the evidence adduced at trial demonstrated that those justifications dissolve upon the most cursory inspection.

Second, the brief addresses a question posed by the Court regarding the precedential weight of the stay opinion issued by the Eleventh Circuit.  As a threshold matter, the Eleventh Circuit's September 2025 stay opinion does not bind this Court—a point Defendants themselves conceded on the record at trial.  A stay-panel ruling on a preliminary injunction is necessarily tentative and preliminary; it cannot spawn binding legal consequences on the merits, particularly where the panel lacked the benefit of a fully developed trial record.  *See infra* Section III.

7

Third, the brief discusses standing. Section IV.B(i) demonstrates that both Individual Plaintiffs have standing to challenge HB 1205's registration requirements and criminal penalties. Both Ms. Scoon and Ms. Chandler were actively involved in collecting petitions prior to the passage of HB 1205, and both would have continued collecting petitions but for HB 1205. Their ability to speak and contribute to the democratic process was severely impaired by that statute's provisions, and the injunctive relief sought here would redress their injuries. Section IV.B(ii) establishes that LWVFL has both associational and organizational standing to challenge each of the provisions at issue here. Each of the witnesses to testify would have exercised their First Amendment rights but for the criminal provisions and registration requirements, while three were barred altogether from circulating as a result of the law's categorical bans on non-citizens and non-residents. *See infra* Section II. Additionally, LWVFL has been harmed by HB 1205 in its organizational capacity. Its ability to raise resources and attract new members has been negatively impacted, and it has been forced to divert substantial resources to address the impact to its core mission caused by HB 1205. The same things are true for LULAC, as discussed in Section IV.B(iii).

Next up is the bulk of the brief, which demonstrates that, based on the evidence adduced at trial, the Challenged Provisions violate the First and Fourteenth Amendments. The fourth section begins with a discussion of the applicable legal

8

standards on the merits—in particular, with respect to Count I of the Complaint (Freedom of Speech), why some form of heightened scrutiny is applicable to every one of those provisions under the Supreme Court's decisions in *Meyer* and *Buckley*, as well as their progeny. *See infra* Section V.A(i-iii); **Appendix B**. It then describes the legal standards applicable to each of League Plaintiffs' other causes of action: Count II (Freedom of Association); Count III (Vagueness); Count IV (Overbreadth); and Count V (Equal Protection). *See infra* Section V.A(iv-vii).

Fifth, while League Plaintiffs maintain that the Challenged Provisions can and should be reviewed in totality for their combined speech-restrictive effects (*see infra* Section V.B(v)), they explain that even if the Court reviews HB 1205 provision by provision, the challenged restrictions are both so onerous and so unjustified that each independently fails to satisfy constitutional requirements. The Categorical Bans suppress speech by prohibiting approximately four million Florida residents from circulating petitions based solely on their citizenship, residency, or criminal history. *See infra* Section V.B(i). The Registration Restrictions suppress speech by requiring volunteers seeking to make a meaningful impact (by collecting more than 25 signatures) to register with the State and disclose personal information in a public database—and they codify a "personal-use" loophole that irrationally punishes only law-abiding volunteers. *See infra* Section V.B(ii). The Criminal Provisions chill speech by threatening third-degree felonies for a host of inadvertent mistakes and

9

for routine assistance to voters. *See infra* Section V.B(iii). And the Ten-Day Return Deadline suppresses speech by creating conditions that inevitably lead to higher invalidity and reduced ballot initiative success. *See infra* Section V.B(iv). But, again, Defendants crucially produced no evidence that any person subject to these bans and restrictions has ever committed petition fraud, and every federal court to consider comparable laws has struck them down.

Finally, the brief concludes with two appendices. The first, **Appendix A**, defines each of the Challenged Provisions. The second, **Appendix B**, is meant to provide a more thorough exegesis of the correct standard of scrutiny to be applied to the various provisions of H.B. 1205, should the Court decide not to review them cumulatively (which it should). Specifically, **Appendix B** walks through more than a dozen circuit court decisions to demonstrate the types of provisions that have historically merited strict, exacting, or intermediate scrutiny. Not one of those applied a rational basis test to the types of provisions at issue here, as Defendants urge this Court to do.

## II.   BACKGROUND

A.   **Factual Background**

   i.   **League Plaintiffs**

      *1)   LWVFL*

The League of Women Voters of Florida, Inc. and the League of Women Voters of Florida Education Fund, Inc. (collectively, "LWVFL")[1] are nonprofit, nonpartisan organizations whose mission is to facilitate informed and active participation in government, increase understanding of major policy issues, and advocate for legislative changes and policies for the public good. *Joint Pretrial Stipulation*, Agreed Facts ¶¶ 69–70, ECF No. 596; Day 6 (Lowe-Minor) Tr. 1513:18–20; Day 6 (Chandler) Tr. 1689:21–1690:6; Day 6 (Scoon) Tr. 1630:9–14; Day 6 (Poff) Tr. 1491:1–6; Day 7 (Newlon) Tr. 1782:2–9. Jessica Lowe-Minor is the current President of LWVFL. *Joint Pretrial Stipulation*, Agreed Facts ¶ 72, ECF No. 596; Day 6 (Lowe-Minor) Tr. 1514:10–13.

LWVFL has its origins more than a century ago in the women's suffrage movement which eventually led to ratification of the Nineteenth Amendment. Day 6 (Lowe-Minor) Tr. 1513:18–1514:1; Day 6 (Scoon) Tr. 1629:14–16; *Joint Pretrial Stipulation*, Agreed Facts ¶ 66, ECF No. 596. Given its roots, it is hardly surprising that LWVFL has throughout its history prioritized civic engagement in support of

---

[1] Capitalized terms are defined in Appendix A.

"small-d" democratic issues, including ensuring that Florida's elections and ballot initiative process remain fair, free, and open. Day 6 (Lowe-Minor) Tr. 1516:9–12, 1518:2–14, 1519:6–16, 1522:2–6; Day 6 (Scoon) Tr. 1630:2–17. Put differently, LWVFL's core mission is to "empower voters and defend democracy." Day 6 (Lowe-Minor) Tr. 1518:1–3; *Joint Pretrial Stipulation*, Agreed Facts ¶ 71, ECF No. 596.

LWVFL has thousands of members in 29 local chapters across the state, spanning from Pensacola to the Keys, and six more on college campuses. Prelim. Inj. (Scoon) Tr. 74:9–13 (June 30, 2025); Day 6 (Chandler) Tr. 1690:21; Day 6 (Lowe-Minor) Tr. 1514:15–19, 1571:3–7; 1598:18–21. LWVFL does not discriminate with respect to who can become a member and thus encompasses Floridians of all backgrounds, including non-residents like Christine Poff and non-citizens like Cecilia González Herrera. Day 6 (Lowe-Minor) Tr. 1570:21–1571:12; Day 6 (Scoon) Tr. 1671:11–1672:24; Day 6 (Poff) Tr. 1486:12–15, 1489:19–24; Day 7 (González Herrera) Tr. 1757:12–19, 1761:1–3. Since the passage in 2018 of the Voting Restoration Amendment—for which numerous LWVFL volunteers circulated petitions—LWVFL has worked closely with individuals with felony convictions to restore their voting rights in Florida and plans to continue to do so in the future. Day 6 (Lowe-Minor) Tr. 1568:17–1570:2, 1570:12–13.

12

In pursuit of its century-old commitment to defend democracy and increase participation in the democratic process, LWVFL has long organized, supported, and otherwise facilitated participation in petition circulation.  Day 6 (Lowe-Minor) Tr. 1518:10–14, 1519:3–16; 1531:18–1532:7.  For over a decade, LWVFL has mobilized volunteers to collect thousands of petitions in support of citizen initiatives in Florida, including the Fair Districts Amendments in 2010, the Voting Restoration Amendment in 2018, and the Amendment to Limit Government Interference with Abortion in 2024.  Day 6 (Lowe-Minor) Tr. 1531:21–1532:7; Day 6 (Scoon) Tr. 1633:11–13.

When LWVFL decides to support a ballot initiative that aligns with the organization's values, LWVFL educates its members with respect to the proposed amendment and provides training on petition circulation to its members and volunteers.  Day 6 (Lowe-Minor) Tr. 1521:21–1522:17.  Local leaders and members then organize or identify community events at which they will circulate petitions (either individually or as a group), and the local LWVFL league will provide volunteers with necessary materials, such as blank petition forms and clipboards.  *Id.* at 1522:20–1523:7.  The organized events are open for both LWVFL members and non-member volunteers and often became an avenue for LWVFL to recruit new members and volunteers to participate in same-day petition circulation.  *Id.* at 1538:4–1539:8.

13

At the community events where LWVFL previously circulated petitions, volunteers would encounter voters and tell them about the initiatives on behalf of which LWVFL was circulating petitions. Often, the volunteers and the voters would have in-depth conversations about the initiative. Past LWVFL Co-President Cecile Scoon stated that when she was still collecting petitions, she might have had "5 to 15 minutes" with each voter, who would "ask questions, [because] they want to know what's going on. . . . And it's a really awesome moment where you are actually talking to a citizen." Prelim. Inj. (Scoon) Tr. 94:24–95:6.

LWVFL member Cecilia González Herrera also testified about the conversations she had with voters, and in particular disengaged voters, when circulating petitions: "[T]he conversation will go, in many cases, about how they feel unmotivated about engaging in the democratic processes. . . . And I will use this as an opportunity to empower them and tell them, like, [w]ell, this is an opportunity. It takes less than five minutes. You're not voting for it. You're just helping get[] these a step closer to the voters." Day 7 (González Herrera) Tr. 1768:19–25.

Prior to HB 1205, LWVFL volunteers, including Individual Plaintiff Ms. Scoon, usually collected more than 25 signed petitions for an initiative in one cycle, and often collected more than 25 signed petitions in a single day. Day 6 (Chandler) Tr. 1698:6–18 ("easily" collecting 100 signed petitions at a single event); Day 6 (Scoon) Tr. 1633:1–21 (more than 100 signed petitions in a single day); Day 6

14

(Lowe-Minor) Tr. 1525:8–9 ("25 to 50 petitions in a few hours"), 1526:4–9 (same), 1537:3–7 (same); Day 7 (Newlon) Tr. 1786:14–21 ("30 to 40" petitions personally and "always . . . over 100" between a three-person team); League PX-16, ¶ 5 ("several hundred petitions" for a single initiative). When volunteers circulated petitions together, whether at a festival, farmers market, or school event, the point person typically gathered between 100 and 150 signed petitions from the group of volunteers to submit to the sponsor. Day 6 (Lowe-Minor) Tr. 1537:17–19; *see also* Day 6 (Chandler) Tr. 1697:3–11; Day 7 (Newlon) Tr. 1786:16–21.

Petition circulators affiliated with LWVFL do not get paid a dime for their efforts: each and every one is a volunteer. Day 6 (Lowe-Minor) Tr. 1525:17–25; Day 6 (Chandler) Tr. 1701:24–25. Nor has LWVFL as an organization or its volunteers ever accepted or received any compensation from petition sponsors for its petition circulation work. Day 6 (Lowe-Minor) Tr. 1525:22–1526:3. Its members circulate petitions because they believe the initiatives for which they choose to circulate are important, and because they want to educate individuals about those petitions and see them on the ballot (and, eventually, added to the state constitution). Day 7 (Newlon) Tr. 1789:18–23; Day 7 (González Herrera) Tr. 1767:23–1768:6.

Although LWVFL has over the years seen hundreds of members and volunteers circulate and collect tens of thousands of petitions, none of those volunteers have ever been accused, investigated or convicted of any type of petition

15

fraud, and none of those petitions have ever been identified as potentially fraudulent. Day 8 (Pratt) Tr. 2160:3–22; Day 6 (Lowe-Minor) Tr. 1542:5–14; Day 6 (Scoon) Tr. 1649:1–8. Consistent with its peerless history and reputation, LWVFL has maintained a pristine record in this respect; not a *single* state witness testified (or could testify) otherwise.

### 2) LULAC

Founded in 1929, LULAC is the nation's oldest Latino civil rights organization. Day 5 (Proaño) Tr. 1443:12–16. LULAC's mission is to advance the economic condition, educational attainment, political influence, housing, health and civil rights of the Hispanic population of the United States. *Id.* at 1443:12–16, 1446: 10–185; Day 6 (Medrano) Tr. 1622:4–8; *see also* ECF 520-2 ("Proaño Supp. Decl.") ¶ 2.

LULAC has more than 575,000 members nationwide and thousands of members in Florida. Day 5 (Proaño) Tr. 1443:22–1444:21, 1462:1–2; Proaño Supp. Decl. ¶¶ 3, 5. LULAC maintains a membership list but keeps that list private. Day 5 (Proaño) Tr. 1459:25–1460:1.

In Florida, LULAC operates entirely through volunteers. *Id.* at 1450:15–16. The volunteer work is led by a state director. *Id.* at 1444:1–5. The state is divided into districts and within each district is divided into councils. *Id.* Each council has

16

a president, secretary, and treasurer, and includes individual members. *Id.* There are 431 LULAC councils nationwide and 17 in Florida. Proaño Supp. Decl. ¶ 4.

Civic engagement is one of the key pillars of LULAC's work. This originates from LULAC's efforts to combat segregation and discrimination in voting. Day 5 (Proaño) Tr. 1446:9–18. Initiative petition collection is among LULAC's civic engagement efforts in Florida. *Id.* at 1446:19–1447:1. Individual LULAC councils in Florida have circulated petitions for the Voting Restoration Amendment and the Amendment to Limit Government Interference with Abortion. *Id.* at 1445:16–24; Day 6 (Medrano) Tr. 1609:9–14, 1610:18–1611:22.

LULAC members who are not United States citizens have participated in petition collection. Day 5 (Proaño) Tr. 1452:24–1453:5. LULAC members who are not residents of Florida have also collected initiative petitions, including its immediate past President, Domingo Garcia, who resides in Texas but spends significant time each year in Florida. *Id.* at 1455:21–1456:5.

LULAC members collect petitions at community events such as multicultural festivals, fairs, and luncheons. Day 6 (Medrano) Tr. 1611:23–1612:25. LULAC members are trusted within their communities; oftentimes the first time a voter hears about the ballot initiative is through the LULAC petition collector. Day 5 (Proaño) Tr. 1453:21–1454:9. Bilingual members are able to engage with voters in English or Spanish. *Id.*; Day 6 (Medrano) Tr. 1612:8–11. For certain initiatives, individual

17

LULAC members collected more than 25 and, in some cases, hundreds of petitions. Day 5 (Proaño) Tr. 1457:7–23; Day 6 (Medrano) Tr. 1609:20–1610:6.

In speaking to voters, LULAC petition circulators address any concerns that voters would have about an initiative. For example, regarding the 2018 Voting Restoration Amendment, Lydia Medrano was able to allay the concerns of several voters by explaining that people convicted of murder would not be able to get their rights restored. Day 6 (Medrano) Tr. 1617:10–1618:12.

Prior to HB 1205, LULAC was planning to expand its initiative petition circulation efforts in Florida, including in support of the Florida Decides Healthcare Initiative and the Right to Clean Water Initiative. *Id.* at 1613:7–16; Day 5 (Proaño) Tr. 1448:13–19, 1449:16–1450:18. Non-citizen and non-resident members were planning to engage in petition collection. Day 5 (Proaño) Tr. 1452:24–1453:15; 1455:21–1456:9; Day 6 (Patricio) Tr. 1728:4–10.

The Florida Decides Healthcare Initiative is significant to LULAC because 16 to 17 percent of the Latino population in Florida is uninsured and about 30 percent of the Latino population is either uninsured or underinsured. Day 5 (Proaño) Tr. 1448:20–1449:7; *see also* Day 6 (Medrano) Tr. 1613:17–24. The Right to Clean Water Initiative is important to LULAC because there are Florida councils that focus on environmental issues and the organization has worked to assist communities displaced by natural disasters. Day 5 (Proaño) Tr. 1449:8–15.

18

### 3) *Individual Plaintiffs*

Individual Plaintiffs Cecile Scoon and Debra Chandler (the "Individual Plaintiffs") are LWVFL members, past Co-Presidents of LWVFL, and volunteer petition circulators in their own right. League PX-35 at 4; Day 6 (Chandler) Tr. 1691:18–1692:9, 1693:5–7; Day 6 (Scoon) Tr. 1625:7–23, 1633:11–13. From May 2023 through May 2025, Ms. Scoon and Ms. Chandler served as Co-Presidents of LWVFL, and Cecile Scoon served as President of LWVFL from 2021 to 2023. *Joint Pretrial Stipulation*, Agreed Facts ¶¶ 73–74, ECF No. 596; Day 6 (Chandler) Tr. 1690:7–16; Day 6 (Scoon) Tr. 1625:12–23. Individual Plaintiffs led LWVFL while HB 1205 moved through the Florida Legislature and was signed into law on May 2, 2025. Day 6 (Scoon) Tr. 1673:17–19, 1677:2–12; League PX-35 at 3–4. Both Ms. Scoon and Ms. Chandler have a long history of volunteering with LWVFL to circulate petitions for citizen-led ballot initiatives but stopped doing so as a result of HB 1205. Day 6 (Scoon) Tr. 1633:11–12, 1650:8–16; Day 6 (Chandler) Tr. 1691:15–17, 1692:1–19, 1702:6–17.

### a) Cecile Scoon

Ms. Scoon has been a member of LWVFL for approximately 25 years. Day 6 (Scoon) Tr. 1625:7–8. Over that time period, Ms. Scoon has collected between 2,500 and 3,500 petitions for citizen initiatives. *Id.* at 1633:11–13. Most recently, Ms. Scoon collected petitions in support of the Florida Decides Healthcare and Right to

Clean Water Initiatives because she believes in access to quality healthcare and water for Floridians. *Id.* at 1633:24–164:6, 1651:23–25, 1652:3–5, 1652:14–1653:2. After HB 1205 was enacted, Ms. Scoon stopped collecting petitions and suspended her future plans to collect petitions in support of those initiatives (or any others) until HB 1205 is no longer in effect. *Id.* at 1649:9–1650:16. That decision was driven both by the Registration Restrictions and the Criminal Provisions. With respect to the first, Ms. Scoon planned to collect more than 25 petitions for both the Florida Decides Healthcare Initiative and Right to Clean Water Initiative after July 1, 2025 but was anxious about the idea of providing her personal contact information and social security number to the State of Florida, let alone seeing that information become publicly available in a database which would also tell the reader what initiative she supported and how many petitions she had collected. *Id.* at 1650:8–16, 1665:13–1657:21. As for the second, Ms. Scoon was frightened about going to jail or being charged with racketeering (or, worse yet, seeing LWVFL indicted under Florida's RICO Act) because she helped a disabled or elderly person fill out a petition (which, prior to HB 1205, she had often done), or because someone she did not even know incorrectly filled out a petition she gave them. *Id.* at 1663:14–24, 1668:22–1669:12. For example, while circulating petitions before HB 1205 went into effect, Ms. Scoon assisted people with "low vision or no vision or [who were] legally blind," by "ask[ing] the person, Can I help you by reading it to you?" *Id.* at

20

1643:19–21.  Ms. Scoon would then "mark [their] answers on the form" if the voter so requested.  *Id.* at 1646:23–1646:2.  She also assisted "people who might have suffered a stroke or some condition where they'd lost the use of their arms or their hands." *Id.* at 1646:3–8.

### b)    Debra Chandler

Since joining LWVFL in 2015, Ms. Chandler has gathered hundreds of petitions for several citizen initiatives: the Voting Restoration Amendment, the Amendment to Limit Government Interference with Abortion, the Florida Decides Healthcare Initiative, and the Right to Clean Water Initiative.  Day 6 (Chandler) Tr. 1689:11–14, 1692:1–7.  Prior to HB 1205, Ms. Chandler, who is retired, collected petition signatures as part of her day-to-day routine—she almost always carried with her an accordion folder of petitions and LWVFL pamphlets—as well as with volunteer groups at community events, such as SunFest.  *Id.* at 1692:9–1693:19. When HB 1205 went into effect, Ms. Chandler stopped collecting petitions and has not registered as a petition circulator for several reasons: first, she objects to the idea of needing to obtain the State's permission to engage in the core political speech she views as the heart of petition circulation; second, she feels vulnerable and is frightened to publicly connect her home address with political causes; and third, she fears that she might accidentally violate HB 1205's numerous Criminal Provisions.

21

*Id.* at 1703:4–1707:6. If HB 1205 were no longer in effect, Ms. Chandler, freed of those concerns, would "joyfully" resume circulating petitions. *Id.* at 1710:1–4.

## ii.    HB 1205's Enactment

### 1)    *Florida's History of Increasingly Restrictive Petition Circulation Laws*

In 1968, Florida adopted a new state constitution that "reserved to the people" "[t]he power to propose the revision or amendment of any portion or portions of this constitution by initiative[.]" Fla. Const. art. XI, § 3; *Joint Pretrial Stipulation*, Agreed Facts ¶¶ 3, 4, ECF No. 596. Beginning in the 1990s, however, the Florida State Legislature has continuously sought to erode Floridians' ability to utilize that provision by erecting new barriers to petition circulation. It has typically done so following the circulation or passage of landmark initiatives with which the majority party in the State Legislature disagreed, suggesting that its goals in imposing those restrictions were motivated by politics or ideology rather than by a desire to provide for a more orderly, efficient, or transparent ballot initiative process. In the last three decades alone, the State Legislature has imposed the following restrictions:

- Following the 1996 appearance of Everglades conservation initiatives on the ballot,[2] the Legislature passed a law requiring paid circulators to disclose their

---

[2] Responsibility for Paying Costs of Water Pollution Abatement in the Everglades, 1996 Fla. Const. amend. (rev. to FLA. CONST. art. II, § 7) (approved by voters in general election of Nov. 5, 1996); Everglades Trust Fund, 1996 Fla. Const. amend.

22

names and addresses on each petition and moving up the deadline for the submission of signed petition forms.[3]

- After the people of Florida passed a universal pre-kindergarten amendment in 2002,[4] the Legislature enacted a suite of new requirements, including mandating that all initiatives disclosed estimated costs and revenues on the ballot; moving the petition deadline up to February 1 (from the next general election occurring more than 90 days after the ballot position was certified), notwithstanding the fact that Florida's statewide elections are not held until November; requiring additional voter information on petition forms; and allowing voters to revoke their signatures;[5]

---

(rev. to FLA. CONST. art. X, § 17) (approved by voters in general election of Nov. 5, 1996).

[3] Fla. Stat. § 100.371(2)(c) (1998) (requiring paid petition circulators to place their name and address on each petition form and requiring sponsors to ensure such disclosure); Fla. Stat. § 100.371(3) (1998) (setting deadlines for submission of signed petition forms for verification no later than 151 and 121 days prior to the general election).

[4] 4-Year-Old Pre-Kindergarten, 2002 Fla. Const. amend. (rev. to FLA. CONST. art. IX, § 1(b)-(c) (approved by voters in general election of Nov. 5, 2002) (establishing voluntary universal pre-kindergarten education for four-year-old children).

[5] Fla. Stat. § 100.371(6)(a) (2002) (requiring fiscal impact statement estimating revenue and cost effects of proposed initiative amendments); Fla. Stat. § 100.371(1) (2006) (constitutional amendments proposed by initiative shall be placed on the ballot, provided the initiative has been filed with the Secretary of State no later than February 1 of the year the general election is held); Fla. Stat. § 100.371(3)(c) (2007) (a supervisor may verify that a signature on a form is valid only if the form sets forth the purported elector's name, street address, county, and voter registration number or date of birth); Fla. Stat. § 100.371(6)(a) (2007) (an elector's signature on a petition

23

- Following the 2010 passage of the fair districts amendments,[6] reducing the length of signature validity from four years to two,[7] and

- After enactment of the 2018 Voter Restoration Amendment, requiring paid circulators to register with the Secretary (*see* Fla. Stat. § 100.371(3) (2019)) and imposing penalties for failure to register as a paid petition circulator, mandating that petitions collected by paid petition circulators must be delivered to a supervisor within 30 days after the voter signs the form; and creating fines for late or unsubmitted petitions (*Joint Pretrial Stipulation*, Agreed Facts ¶ 14, ECF No. 596 (citing Ch. 2019-64, § 3, Laws of Fla.)).[8]

The above-listed and other related laws helped ensure that fewer initiatives ascend to the ballot in Florida than any other state which allows its citizens to vote

---

form may be revoked within 150 days of the date on which he or she signed the petition form by submitting to the appropriate supervisor of elections a signed petition-revocation form).

[6] Congressional District Requirements, 2010 Fla. Const. amend. (rev. to FLA. CONST. art. III, § 20) (approved by voters in general election of Nov. 2, 2010) (establishing congressional redistricting standards prohibiting partisan favoritism and discrimination); Legislative District Requirements, 2010 Fla. Const. amend (rev. to FLA. CONST. art. III, § 21) (approved by voters in general election of Nov. 2, 2010) (establishing state legislative redistricting standards prohibiting partisan favoritism and discrimination).

[7] Fla. Stat. § 100.371(3) (2011) (each signature valid for 2 years).

[8] Voting Rights Restoration for Felons, 2018 Fla. Const. amend. (rev. to. FLA. CONST. art. VI, § 4(a)–(b)) (approved by voters in general election of Nov. 6, 2018) (restoring voting rights to most people with felony convictions upon completion of sentence, including parole or probation).

24

directly on constitutional amendments.  *See* FDH PX-44; *see also Joint Pretrial Stipulation*, Agreed Facts ¶ 10, ECF No. 596 (explaining that of the 428 petitions ever proposed in the State's history, only "44 (10.3%) have qualified for the ballot"). HB 1205, which was passed as an explicit response to the near-passage in 2024 of Amendment to Limit Government Interference with Abortion and Adult Personal Use of Marijuana Amendment,[9] made it much more difficult.  *See Joint Pretrial Stipulation*, Agreed Facts ¶ 21, ECF No. 596.  Not a single one of the 24 initiatives for which Floridians were collecting signatures qualified for the ballot this cycle.[10] *See* Note to Press: 2026 Constitutional Amendment Petition Campaigns, Fla. Dep't of State, (Feb. 1, 2026), https://dos.fl.gov/communications/press-releases/2026/note-to-press-2026-constitutional-amendment-petition-campaigns/.

As described in more detail below, HB 1205's broad reach and punitive restrictions, including onerous registration and delivery requirements, the

---

[9] Amendment to Limit Government Interference with Abortion, 2024 Fla. Const. amend. 4 (proposed rev. to FLA. CONST. art. I) (codifying abortion protections) (failed to achieve required 60% threshold in general election of Nov. 5, 2024); Adult Personal Use of Marijuana, 2024 Fla. Const. amend. 3 (proposed rev. to FLA. CONST. art. I) (legalizing recreational use of marijuana) (failed to achieve required 60% threshold in general election of Nov. 5, 2024).

[10] Just after the deadline at midnight on February 1, 2026, the state's Attorney General gleefully responded to this announcement with a parody of the Loony Tunes "That's all, folks" banner, tweeting "You hate to see it".  James Uthmeier (@JamesUthmeierFL), X (Feb. 1, 2026, at 8:22 PM ET), https://x.com/JamesUthmeierFL/status/2018132974345101426?s=20.

criminalization of assisting petitioners with their forms and handing petitions in late, and the expansion of the state's criminal racketeering statute to include violations of election law as well as other undefined "irregularities," have made Florida an "extreme outlier" among states that allow for constitutional amendments via citizens' initiatives. *See* Day 5 (Smith) Tr. 1318:16–17; *see* FDH PX-46 (noting the myriad restrictions that set Florida apart among comparator states); FDH PX-47 (similar). "[T]his sledgehammer" of a bill "ha[s] made it virtually impossible" to successfully pass a ballot initiative in Florida. Day 5 (Smith) Tr. 1366:8–11.

> ### 2) The Stated Rationales Underlying Many of HB 1205's Provisions Lack Empirical Support and in at Least One Instance have been Disavowed by OECS
>
> #### a) The OECS Reports Cited by Defendants Lack any Reliable Indicia of Fraud, Including by Volunteer Circulators and Those HB 1205 Prohibits from Circulating, a Conclusion Buttressed by Defendants' Own Testimony

The text of HB 1205 asserts that the Legislature's purpose in passing the bill was to protect ballot integrity and the initiative process by deterring, preventing, and penalizing purported fraudulent petition activities. *See* DX-1 at 1, 4–6. In particular, HB 1205 references and incorporates the findings of three Office of Election Crimes and Security ("OECS") reports—from January 2024 (DX-2), December 2024 (DX-4), and January 2025 (DX-3) (together, the "OECS Reports"). *See* DX-1 at 4. With the exception of the OECS Reports, the Legislature received no analysis, data,

26

or feedback from OECS; indeed, OECS Director Jillian Pratt confirmed that her office was not consulted and had no other communications with the Legislature regarding HB 1205.  Pratt Dep. 25:3–7, ECF No. 620-2 (testifying that the OECS "did not provide anything to the legislature other than the reports the OECS filed prior to the legislature convening").  Likewise, the Department of State's Division of Elections Director Maria Matthews confirmed that her office was "not asked for any input on this bill or law," and that "the OECS report that [legislators] had, and the whereas clauses [that constitute HB 1205's preambulatory clauses] would be the basis for any – anything that they provided in this chapter law."  Matthews Dep. 38:21–39:2, ECF No. 620-3.

Defendants' reliance on the OECS Reports as providing some rationale for HB 1205—particularly with respect to League Plaintiffs' claims—is wholly misplaced. [11]  To start, as noted above, OECS involves investigations, complaints, and prosecutions of paid circulators only. The Reports also lack evidence that non-citizens, non-residents, or people with felony convictions had committed fraud while

---

[11] Importantly, on February 20, 2026, the Court ruled that only a narrow set of information included within the OECS Reports qualifies under the public records exception under Federal Rule 803(8).  Specifically, "the number of complaints, the number of prosecutions, the outcome of the prosecutions, [and] where they were" was admitted into the trial record.  *See* Day 9 Tr. 2187:12–25.  References to non-admitted portions of the OECS Reports are not a statement as to their admissibility.  League Plaintiffs specifically address flaws with the Reports as per the Court's request.  *See* Day 7 Tr. 1798:19–1799:2.

27

serving as petition collectors. But even if the OECS Reports had any marginal relevance to the League Plaintiffs, their inherent unreliability renders them unable to justify HB 1205.

**First**, OECS chose to test for the incidence of fraud by choosing a sample made up of counties it believed had significant incidence of fraud. Day 3 (Herron) Tr. 810:8–811:4. As Plaintiffs' expert Dr. Michael Herron explained, and as Defendants' expert Dr. Brunell conceded,[12] this flawed methodology—known as "selecting on the dependent variable"—necessarily resulted in biased (and unreliable) outcomes. *Id.* at 830:9–13, 869:22–870:12, 872:2–10.

**Second**, the OECS extrapolated from just three counties—and in some instances a single county—to the entirety of Florida's 67 counties, without doing any work—or even articulating any potential basis—that might allow one to conclude that those counties were somehow representative of the state as a whole. *See Id.* at 843:8–844:14, 847:19–848:8. If anything, the fact that those counties were considered likely candidates for petition fraud based on past reports or their characteristics should have suggested the exact opposite—that they were *unrepresentative* of the rest of the state.

---

[12] OECS Director Pratt also admitted at trial that "the extrapolation was not done in the most mathematically sound way." Day 8 (Pratt) Tr. 2117:3–4. She also confirmed that no OECS staff who participated in the audit were "experienced mathematicians" or "statisticians." *Id*. at 2117:19–23.

28

**Third**, OECS's calculations are riddled with additional errors, including an erroneous calculation of the "drop off rate" that improperly combines data from two different geographic areas, as well as a misleading use of an "average of averages" that further distorts the results. *Id*. at 834:10–836:6, 849:15–854:3. Tellingly, all of these errors operate to increase the calculated prevalence of fraud in Florida. *Id*. at 830:2–13, 871:22–872:10.

Were all that not enough, as the Court pointed out at trial, the OECS Reports suffer from another fatal flaw: they conflate the concept of petition "invalidation" with "fraud," categorizing individuals as "known fraudsters" based on undefined "unusually high rejection rates" and mere suspicion of forgeries—not any adjudication of (or even prosecution for) wrongdoing. *See* Day 3 (Herron)Tr. 817:4–17; Day 8 Tr. 1984:22–25. But as Dr. Herron explained, merely "identifying a petition as invalid," as the Reports do, simply "does not imply that fraud occurred," as there are any number of innocent, non-fraudulent reasons a petition may be invalidated. Day 3 (Herron) Tr. 805:9–10. These include, e.g., a missing address, inadvertently incomplete information, or even a mismatch caused by the individual's signature changing over time—as they naturally do. *See, e.g.*, Day 3 (Herron) Tr. 805:7–9; Day 8 (Pratt) Tr. 2096:14–2097:17; Day 2 (Earley) Tr. 475:15–20. Defendants do not attempt to demonstrate otherwise. Day 3 (Herron) Tr. 805:24–806:9 (explaining that the OECS Reports provide no details whatsoever on why the

29

OECS overrode prior validation determinations, thus offering no basis whatsoever to distinguish between petitions that were invalid due to administrative errors versus those that were invalid due to actual fraudulent conduct).  The OECS Reports' circular reasoning—defining individuals as fraudsters based on rejection rates and then using their petitions to conjure up a "measurement" of "fraud"—renders their conclusions fundamentally unreliable and (as the Court aptly observed) means that the reports themselves present results "beyond junk science," with "no basis in any proper statistical analysis."  Day 8 Tr. 1999:10–21.

Given the OECS Reports' fundamental flaws and irrelevance to the League Plaintiffs' claims, Defendants are left with only conclusory assertions of a purported fraud interest in restricting Plaintiffs' access to ballot initiatives.  *See* DX-1 at 4–6 ("whereas" clauses outlining Defendants' purported interest in preventing fraud). Rather than provide any evidence of fraudulent activity tied in some ways to the restrictions in HB 1205, Defendants simply ask this Court to rely on their *ipse dixit* that their interest in preventing volunteer petition fraud was real. Stacked against that is a torrent of countervailing evidence, including a series of admissions from Defendants' own witnesses, who acknowledged that there was:

- No known instance of the State validating any fraudulently signed statewide initiative petition (*see, e.g.*, Day 2 (Earley) Tr. 482:11–14, 483:1–6);

- No data that non-citizens are more likely to commit petition fraud than U.S.

30

citizens (Day 8 (Pratt) Tr. 2136:23–2137:1);

- No data that individuals with a felony conviction and without their voting rights restored are more likely to commit petition fraud than individuals without a felony conviction or returning citizens who have had their voting rights restored (*see, e.g.*, Day 8 (Pratt) Tr. 2137:21–25; Day 5 (Smith) Tr. 1321:13–1323:20 (testifying that no study exists demonstrating any relationship between the broad exclusionary categories targeted by OECS—such as felony convictions or non-residency—and actual petition fraud));

- No data that non-residents are more likely to commit petition fraud than residents (*see, e.g.*, Day 8 (Pratt) Tr. 2138:6–10; Day 5 (Smith) Tr. 1321:13–1323:20 (testifying that no study exists demonstrating any relationship between the broad exclusionary categories targeted by OECS—such as felony convictions or non-residency—and actual petition fraud));

- No data that reducing the window to return petitions from 30 to 10 days reduces fraud (*see, e.g.*, Day 8 (Pratt) Tr. 2138:11–15);

- No data that HB 1205's 25 petition-threshold was designed to prevent fraud or catch fraudsters (*see, e.g.*, *id*. at 2138:16–20, 2162:23–25 (admitting no knowledge of any such data));

- No data that HB 1205's fine provisions would prevent fraud (*see, e.g.*, *id*. at 2138:6–10, 2139:1–4 (admitting no data); Day 7 (Bridges) Tr. 1898:15–

31

1899:11 (admitting to an understanding that HB 1205's petition circulation restrictions would not prevent fraud)).

Finally, and crucially, Defendants point to no evidence whatsoever of petition fraud ever committed by volunteers (*see, e.g.*, Day 8 (Pratt) Tr. 2159:14–18, 2160:3–5 (no data on fraud by volunteers); *id.* at 2122:13–19 (similar)). This is discussed more fully in the following subsection.

>b)   **Defendants have no evidence of any volunteer fraud**

>>(i)   **Defendants' witnesses concede there is no evidence of volunteer fraud**

Crucially, Defendants' own witnesses have repeatedly and readily conceded that there is no evidence—before or after HB 1205 went into effect—that volunteers have committed fraud. The OECS has never identified an actual volunteer who submitted a fraudulent petition form. Day 8 (Pratt) Tr. 2160:3–5. The State has never "opened any formal investigations of volunteer circulators." Day 7 (Bridges) Tr. 1890:17–18; *accord* Novoa Dep. Tr. 82:1–4, ECF No. 608-7 ("Q: So none of the people investigated by Mr. [Brad] McVay[,] [an OECS official] for that report were volunteer circulators? A: That's right. That's correct."). Mr. Bridges testified affirmatively that he had "not prosecuted any volunteer circulators." Bridges Dep. 272:15–16, ECF No. 620-1. And there is no dispute that the State is aware of no petition fraud committed specifically by League Plaintiffs and their members. *See, e.g.*, Matthews Dep. 196:4–24, ECF No. 620-3 (admitting to no awareness of any

"complaints or enforcement actions, compliance reviews or investigations [on] any alleged petition fraud related to LWVFL, LULAC, or their members); Bridges Dep. 267:4–12, ECF No. 620-1.

Without evidence of actual volunteers committing fraud, Defendants only remaining indication of potential fraud is the forms themselves. Day 8 (Pratt) Tr. 2160:10–14. But a volunteer petition form does not necessarily imply that a volunteer was responsible. First, volunteer forms are (and remain) available for download on the Secretary of State's website, meaning that literally anyone— volunteer, paid circulator, or even an individual intending to stir up trouble by filling out a form with false information—might be responsible for a suspect form. Indeed, Director Pratt acknowledged precisely this dynamic, testifying that problems with volunteer forms might be attributable to "the person who is circulating the form or it could be the person who filled out the form, you know, and then turn[s] it in to a circulator." *Id.* at 2159:14–18, at 2122:13–19. Second, and as discussed previously, the types of issues which made those volunteer forms "potentially fraudulent" might be explained by any number of other factors. Accordingly, the Court itself noted that potential issues with a volunteer petition do not equal volunteer fraud. *Id*. at 2122:21–2123:3.

Nothing else in the record ties volunteer petition circulators to fraudulent conduct. Tacitly acknowledging this fact, Defendants fall back on flawed, cherry-

picked evidence of *paid*-circulator fraud that has no bearing on Plaintiffs' case. *See, e.g.*, Day 7 (Gladson) Tr. 1948:2–4 (conceding testimony dealt only with paid circulators); Day 7 (Bridges) Tr. 1876:3–5 (similar), 1864:10–14, 1874:5–7 (testified that, as to individuals who had been referred by the Department of State for petition-related fraud issues, "[a]ll these folks are paid petition circulators"). Plaintiffs' witnesses testified time and time again that in all their years of experience working on ballot initiatives, they had neither seen nor heard of fraud committed by any volunteer. *See, e.g.*, Day 6 (Scoon) Tr. 1649:1–4 ("Q: In your quarter century with [LWVFL], Ms. Scoon, are you aware of any volunteers who have ever been prosecuted or convicted for election or petition fraud? A: None."); Prelim. Inj. (Acosta) Tr. 11:20–21, 22:7–18 (June 30, 2025) (no awareness of fraud by volunteers across multiple initiative campaigns, and no awareness of any "incentive for a volunteer to sign a petition that is not their own"); Prelim. Inj (Martin) Tr. 133:5–7 (June 30, 2025) (Q: "Are you aware of any Right to Clean Water volunteers engaging in fraud related to petition collection?" A: "No.").

### (ii) The Reports contain no evidence of any volunteer fraud

Defendants' failure to provide any concrete justification for HB 1205's onerous restrictions is particularly glaring in the case of volunteer petition circulators. Indeed, prior to the passage of HB 1205, volunteer circulators had never been subject to the sorts of blanket restrictions and registration requirements (let

alone potential criminal penalties for non-compliance) contained within that bill. The reason for this—and the historical lack of any evidence of circulation fraud by volunteers—is as simple as it is obvious: volunteers lack any financial incentive to commit petition fraud (and risk violating longstanding prohibitions on forgery and fraud). Small wonder, then, that Defendants have been unable to point to a single case of volunteer petition fraud over the entire 60-year history of direct democracy in Florida. *See e.g.*, Day 7 (Bridges) Tr. 1890:17–18, 1893:3–8; Day 8 (Pratt) Tr. 2160:3–5.

In light of the above, it should come as no surprise that the OECS Report, which purportedly formed the basis for HB 1205's sweeping changes contains no evidence of widespread volunteer fraud to justify the new restrictions. As Defendants readily admit, the OECS Reports discuss only investigations, complaints, and prosecutions against *paid circulators*. *See generally* DX-2 (stating no occurrence of suspected or prosecuted fraud against volunteers), DX-3 (same), DX-4 (same); *accord* Day 8 (Pratt) Tr. 2159:14–18 (Q: ". . . I think that you explained to us that the OECS report from January 2024 doesn't contain any mentions of alleged petition circulation fraud committed by volunteers; is that right?" A: "That's right."). The OECS Reports are silent on *volunteers* who circulate petitions. Therefore, the OECS Reports are wholly irrelevant to the League

35

Plaintiffs, who are volunteers and volunteer organizations. *See supra* Section II.A(i)(1)–(2).

> c)    **Defendants have not adduced evidence regarding the inefficiency of extant anti-forgery and anti-fraud laws.**

The trial record also reflects that to the extent that limited instances of paid-circulator petition fraud have occurred, the laws in place prior to 2025 were already effective at detecting, penalizing, and deterring it.

As numerous witnesses testified, laws in existence prior to HB 1205 already enabled the State to prosecute bad actors committing petition circulation fraud. The State already required paid petition gatherers to register with the State and sign circulator affidavits. *See* Day 5 (Smith) Tr. 1290:16–20. Florida law already provided criminal penalties for petition fraud. Fla. Stat. § 104.185 (2022); Day 5 (Smith) Tr. 1291:2–4. It already allowed individuals who believed their signatures to have been forged, misrepresented, or not delivered to an SOE to file a complaint. Fla. Stat. § 100.371(9) (2022). And it already empowered the OECS to investigate any instances of alleged petition fraud. *See* Fla. Dep't of State OECS, 2024 Annual Rep. (Jan. 15, 2025), https://dos.fl.gov/elections/integrity?os=vbkn42&ref=app. Given the comprehensiveness of these laws, it is unsurprising that Assistant Attorney General Jonathan Bridges, who leads a statewide task force on election-related crime, testified that his office was already identifying and prosecuting petition fraud prior to HB 1205. Bridges Dep. 51:24–52:8, 229:21–230:4, ECF No. 620-1. For

example, his office successfully prosecuted cases for the fraudulent use of others' identification information and for signing a fictitious name. *See* Bridges Dep. 36:4–37:19, 38:9–40:21, ECF No. 620-1 (testifying that the Attorney General had been able to file suit against alleged fraudsters under Florida Statute §§ 104.185(2), 817.568(2)(a), 817.568(8)(a)—statutes that were in place before HB 1205). At trial, Mr. Bridges confirmed that when suspected fraudsters "fill[ed] out paid petition forms," investigators "[got] their names and information from the paid petition forms that they filled out" and successfully "cross-reference[d] these names and information with Department of State's data." Day 7 (Bridges) Tr. 1900:3–14.

Defendants point to no studies or reviews demonstrating that the petition circulation laws in place at the time that HB 1205 was enacted were insufficient to address any gap. Instead, they purport to rely on wholly unsubstantiated speculation about how fraud might be "getting through" without detection. *See* Day 8 (Pratt) Tr. 2104:15–17. But the overwhelming evidence reflects that the "system in place [prior to HB 1205] was working, and it did identify these small quantums [of fraud that occurred]." *See* Day 5 (Smith) Tr. 1400:4–6. As Supervisor of Elections Mark Earley testified, based on his 33 years of experience in the Leon County Supervisor's Office, pre-HB 1205 laws were already "rigorous" and "[e]ffective." Day 2 (Earley) Tr. 455:20–22, 482:1–7. Tellingly, when asked whether he knew of supervisors ever validating a significant number of petitions with fraudulent signatures, Supervisor

37

Earley replied in the negative.  *See* Earley Dep. 54:24–55:6, ECF No. 608-4.  When asked whether he knew of a *single* instance in which a voter alleged that their signature had been forged on a validated petition, Mr. Earley confirmed that he did not.  *Id*. at 54:2–18.

### iii.    The Challenged Provisions

HB 1205 entirely prohibits three groups of individuals—those subject to the Categorical Bans—from circulating petitions.  It also essentially eliminated the distinction in the Florida Election Code between paid and unpaid petition circulators.  Day 8 (Matthews) Tr. 2025:19–21.  The regulatory scheme which previously applied only to paid petition circulators—plus the new provisions in HB 1205—now applies to volunteers and volunteer organizations.  *Joint Pretrial Stipulation*, Agreed Facts ¶ 26, ECF No. 596.

#### 1)    *The Categorical Bans*

HB 1205's Categorical Bans prohibit the circulation of petitions by non-residents of Florida (the Non-Resident Ban), non-U.S. citizens (the Non-Citizen Ban), and individuals who have been convicted of a felony and have not had their rights restored (the Former Felon Ban).  H.B. 1205 § 6, 2025 Leg. (Fla. 2025) (amending Fla. Stat. § 100.371(4)(b)); *Joint Pretrial Stipulation*, Agreed Facts ¶ 30, ECF No. 596.  League Plaintiffs have historically relied—and, prior to the enactment of HB 1205, had intended to rely—on individuals from each of these categories to

38

advance their missions by circulating petitions. Day 6 (Lowe-Minor) Tr. 1570:3–1571:12; Day 5 (Proaño) Tr. 1452:24–1453:5.

Because the Categorical Bans bar key segments of the League Plaintiffs' members from circulating petitions, HB 1205 necessarily reduces the pool of LWVFL and LULAC speakers. For example, non-resident LWVFL members who live in Florida during the winter months are ineligible to register as petition circulators under HB 1205. Day 6 (Poff) Tr. 1496:1–4. Many members, such as Christine Poff, have strong and longstanding ties to Florida and desire to be civically engaged. *Id*. at 1503:13–1504:6 ("More and more I feel like Florida is my other home. . . . I spend at this point a third of my year here in a deep and growing community of people that I care a lot about. . . . And I care about the people here that I'm close to and would want better policies for them. And I love being involved and active.").

Similarly, LULAC has members who primarily reside in other states but maintain homes in Florida and are often there. LULAC's prior national President, Domingo Garcia, resides permanently outside of Florida but has a home in Fort Lauderdale, Florida. Day 5 (Proaño) Tr. 1455:21–1456:9. Mr. Garcia has previously collected petitions in Florida and had planned to continue participating in LULAC's petition efforts but is now barred by HB 1205 from doing so. *Id.* HB 1205's Non-Resident Ban stands in their way.

39

Non-citizen members of LWVFL and LULAC have also previously collected signed petitions and desire to do so again—but HB 1205's Non-Citizen Ban stands in their way, too. Day 6 (Lowe-Minor) Tr. 1570:17–1571:13; Day 5 (Proaño) Tr. 1452:24–1453:5. Cecilia González Herrera, a non-citizen LWVFL member who previously collected petitions in Florida, testified that but for HB 1205, she (and other non-citizen members) would have collected petitions for the Right to Clean Water Initiative. Day 7 (González Herrera) Tr. 1772:11–14. Karen Patricio, a LULAC district director who resides in Florida but is not a United States citizen, previously circulated petitions for the Voting Restoration Amendment and the Amendment to Limit Government Interference with Abortion, and founded her LULAC district with the intention of continuing to circulate petitions for causes important to members of her district. Day 6 (Patricio) Tr. 1720:5–13, 1724:3–6, 1728:7–10. Yet the Non-Citizen Ban bars Ms. Patricio and half of the members from her LULAC district from doing so (*id.* at 1728:11–18, 1731:17–20), foreclosing "one of the only ways in which they actually can participate in our government" (Day 5 (Proaño) Tr. 1454:19–25).

These Categorical Bans also prevent League Plaintiffs from associating with individuals within these groups who share similar beliefs. Day 6 (Lowe-Minor) Tr. 1572:15–16; Day 7 (González Herrera) Tr. 1772:16–24. Not only are members of these groups barred from circulating petitions, but they also cannot participate in

40

petition circulation events with other members or help recruit energetic new volunteers from the excluded groups.  Ms. González Herrera testified that HB 1205 has had a "high impact" on her ability to interact with other LWVFL members, leaving her "demoralized" because petition circulation events used to provide her regular opportunities for such engagement—opportunities she no longer has.  Day 7 (González Herrera) Tr. 1772:16–24.  As a non-citizen, petition collection had "been one of the ways [she] found to fully engage to be part of this community"; HB 1205 has "tak[en] one of the very little avenues [she] had to engage and protect democracy."  *Id.* 1773:16–25.

Moreover, HB 1205 also precludes non-citizens, non-residents, and persons with a felony conviction and unrestored rights from serving as conduits between League Plaintiffs and the (often underrepresented) communities to which they belong.  Prelim. Inj. (Scoon) Tr. 83:21–85:18 (June 30, 2025).  LULAC's non-citizen members serve as the organization's "boots on the ground," educating other non-citizens about the issues that affect them.  Day 5 (Proaño) Tr. 1454:12–18.  Similarly, LWVFL has relied on its non-citizen members' language skills and cultural connections to reach communities with which the majority-White organization had few direct connections.  For example, Ms. González Herrera testified that she is "a significant[ly] younger member than the average member[]" of LWVFL and is "also fully bilingual, both Spanish and English, which allows [her]

41

to be able to reach way more members in [her] community." Day 7 (González Herrera) Tr. 1758:4–7; *see also* Prelim. Inj. (Scoon) Tr. 84:3–13 (June 30, 2025) (non-citizen members allowed LWVFL to "cross the bridge" and be "trusted" by "communities [where] [LVWFL members] don't necessarily look like the people [there]").

### 2) The Registration Restrictions

The Registration Restrictions include the Petition Circulator Definition Provision, the Registration Requirement, the Personal Use Petition Restriction, the Disclosure Requirement, and the Affidavit Requirement.

### a) The Petition Circulator Definition Provision

HB 1205 struck "for compensation" from the statutory definition of a "petition circulator," eliminating the distinction between paid and unpaid petition circulators. H.B. 1205 § 4, 2025 Leg. (Fla. 2025) (amending Fla. Stat. § 97.021(28)); *Joint Pretrial Stipulation*, Agreed Facts ¶ 26; Day 8 (Matthews) Tr. 2025:19–21 ("Obviously, the law no longer uses the term 'paid' versus 'volunteer.'"). As a result, the entire regulatory scheme—previously only applicable to paid petition circulators—now encumbers volunteers and volunteer organizations like League Plaintiffs. *Joint Pretrial Stipulation*, Agreed Facts ¶ 24; Matthews Dep. 66:21–67:1, ECF 620-2.

42

**b)    The Registration Requirement and Personal Use Petition Restriction**

HB 1205 requires *any* individual—paid and unpaid alike—who "collects, delivers, or otherwise physically possesses [] more than 25 signed petition forms" (excluding their own or that of an immediate family member) to register as a petition circulator with the Department of State.  Fla. Stat. § 100.371(4)(a) (2025); Day 8 (Matthews) Tr. 65:18–21; Matthews Dep. 66:21–67:1, ECF 620-3; *Joint Pretrial Stipulation*, Agreed Facts ¶ 27, ECF 596.  Unregistered individuals are limited by the Personal Use Petition Restriction such that they may only collect "petition forms designated for personal use," and no greater than 25 such personal use forms.  Fla. Stat. § 100.371(4)(a) (2025).[13]  Regardless of intent, any individual who fails to register and collects, delivers, or possesses more than 25 signed petitions commits a second-degree misdemeanor (Fla. Stat. § 104.187 (2025)) and a third-degree felony (Fla. Stat. § 104.188(2) (2025)).  *Joint Pretrial Stipulation*, Agreed Facts ¶ 49, ECF No. 596.

The Registration Restrictions in general and Personal Use Petition Restriction in particular fail to articulate to an ordinary person how the 25-petition threshold works.  Day 2 (Earley) Tr. 529:6–8; Day 6 (Lowe-Minor) Tr. 1553:13–14.  First, the

---

[13] Each personal use form must include a signed affidavit which certifies that violating the Personal Use Petition Restriction is a third-degree felony.  Fla. Stat. § 100.371(3)(e) (2025).

lack of a time period or context leaves League Plaintiffs and their volunteers to wonder if they are limited to collecting 25 signed petitions at one time, per day, per year, per cycle, or over the course of their lifetimes.  Day 6 (Lowe-Minor) Tr. 1553:9–11.  Second, volunteers cannot be sure if they are limited to collecting 25 signed petitions for a single initiative or if they are permitted to collect 25 signed petitions for multiple initiatives.  Day 6 (Lowe-Minor) Tr. 1553:11–13; RTCW PX-324 at 4.

**c)    The    Disclosure    Requirement    and    Affidavit    Requirement**

Petition circulators' private and personal information risks disclosure at two stages: at registration, via the Disclosure Requirement, and during petition collection, via the Affidavit Requirement.  When a prospective circulator seeks to register, they are subject to the Disclosure Requirement whereby, in their application, they must include their name, permanent and temporary address, date of birth, Florida driver license or identification card number, the last four digits of the applicant's Social Security number, and the ballot initiative for which the applicant intends to collect petitions.  H.B. 1205 § 6, 2025 Leg. (Fla. 2025) (amending Fla. Stat. §§ 100.371(4)(c)(1), (2)); RTCW PX-1 at 13; RTCW PX-225. The applicant must print, sign in ink, scan, and upload the form into the Department of State's application system.  Day 8 (Matthews) Tr. 2033:2–12.

44

An applicant must also complete an online training course, score at least 80 percent on a test, and apply to the Florida Secretary of State's office. Fla. Stat. §§ 100.371(4)(c), (f) (2025); RTCW PX-1; Day 8 (Matthews) Tr. 2032:13–15, 2039:24–2040:3; Matthews Dep. 53:16–22, 55:12–16, ECF 620-3; Day 4 (Perez) Tr. 998:5–7; Day 5 (Smith) Tr. 1325:14–15. The course, test, and application materials are only available in English. Day 5 (Smith) Tr. 1325:15–1326:2; Day 8 (Matthews) Tr. 2040:6–18.[14] Application approval is not guaranteed. Day 8 (Matthews) Tr. 2033:15–17; RTCW PX-76. Nor is a prompt decision because, at a minimum, the Division of Elections takes one to two days to process an application, but processing can take longer depending on the volume of applications and staff availability. RTCW PX-1 at 10; Matthews Dep. 151:7–9, ECF No. 620-3; Day 8 (Matthews) Tr. 2030:17–2031:3.[15]

---

[14] Applicants, whether they pass or fail the test, are not informed of which questions they answered correctly or incorrectly. Day 4 (Perez) Tr. 998:9–12 (explaining that Right to Clean Water volunteer Thomas Perez passed the registration test and wanted to know what he "got wrong in order to . . . understand the law better, [but] there was no way of seeking that out.").

[15] Division of Elections Director Maria Matthews acknowledged that the requirements of HB 1205 have increased the burden of processing applications, and applicants have waited a week or longer for approval or rejection. Matthews Dep. 150:16–18, 153:20–21, ECF No. 620-3; Day 8 (Matthews) Tr. 2029:1–13 (acknowledging the Department of Elections delayed an application process for seven days); *see also* Day 4 (Perez) Tr. 997:17–19; RTCW PX-305; RTCW PX-269; RTCW PX-317.

45

The Division of Elections maintains a database of all registered petition circulators and the petition forms requested by each.  Fla. Stat. §§ 100.371(6), 119.011(12) (2025); RTCW PX-1 at 2.  A circulator's name, address, and content of the ballot initiative may be obtained through a Public Records Request.  Day 8 (Matthews) Tr. 2018:21–23.

Registered petition circulators are then subject to the Affidavit Requirement whereby every petition form distributed to a voter by a registered petition circulator must include a signed affidavit bearing the circulator's name and permanent address.[16]  Fla. Stat. § 100.371(3)(d) (2025); *Joint Pretrial Stipulation*, Agreed Facts ¶ 32, ECF No. 596.  The petition circulator must attest under penalty of perjury that "the facts stated in [the Circulator Affidavit] are true[.]"  Fla. Stat. § 100.371(3)(d) (2025).  Once a signed petition form—including the signed affidavit—is submitted to the Supervisor of Elections, it becomes a public record "subject to Public Records Requests."[17]  Fla. Stat. §§ 100.371(3)(a)(4), 119.011(12) (2025); Day 8 (Matthews) Tr. 2019:3–7; Matthews Dep. 217:3–7, ECF No. 620-3; *Joint Pretrial Stipulation*, Agreed Facts ¶ 33, ECF No. 596.

---

[16] The personal use forms do not require an individual's name or permanent address to appear on the face of the form.  Fla. Stat. § 100.371(3)(e) (2025).

[17] A petition circulator wishing to redact their address must meet certain criteria and make a request to the Division of Elections.  Matthews Dep. 192:6–7, ECF 620-3.  Until a petition form is signed and submitted, however, it is not a public record and therefore may not be redacted.  *Id.* at 192:8–21.

### d)    Impact on League Plaintiffs

Under HB 1205, these volunteers must now register as circulators if they wish to continue—a process replete with costs and risks.  The price of participation in the civic life of the Sunshine State?  Public exposure of one's personal information and political activities to the public.

### (i)    Fear of threats and harassment

LWVFL and LULAC member volunteers will not register given personal safety risks—particularly those associated with publicly exposing one's name and permanent address alongside controversial political causes.  Day 6 (Lowe-Minor) Tr. 1547:16–23; League PX-16, ¶¶ 11–13; Day 5 (Proaño) Tr. 1558:6–12.  LWVFL members have and continue to forgo registration—and thus, collection of greater than 25 petitions—for fear of imperiling themselves, their families, and neighbors in an increasingly fraught and polarized climate.  Day 6 (Chandler) Tr. 1703:11–1704:1; Day 6 (Lowe-Minor) Tr. 1546:4–20.  Volunteers who either work for or are licensed by Florida state agencies fear retaliation for registering to circulate petitions for a political cause with which the State's leadership disagrees.  Day 6 (Lowe-Minor) Tr. 1549:9–24.  The increasing frequency of politically motivated threats and attacks makes the prospect of registering with the State even more frightening for volunteers.  Day 5 (Proaño) Tr. 1458:15–1459:5.  Indeed, the risk of political violence is "[o]ne of the main reasons" that LWVFL members will not

47

register to circulate petitions and agree to the public disclosure of their personal information.[18]  Prelim. Inj. (Scoon) Tr. 82:4–21 (June 30, 2025).

LWVFL members have previously been threatened and harassed while collecting petition signatures, and they now fear further escalation of these attacks given HB 1205's Registration Requirement, Disclosure Requirement, and Affidavit Requirement.  Day 6 (Lowe-Minor) Tr. 1548:13–17; Day 7 (Newlon) Tr. 1787:1–1789:12; League PX-16 ¶¶ 7–11.  For example, while collecting petitions for the Amendment to Limit Government Interference with Abortion in 2023, LWVFL member Heidi Davis was confronted by anti-abortion activists who wielded "big, horrible signs of dead baby pictures and Nazi symbols," shouted through a megaphone that she supported Nazis, and told her that "Nazis would have loved [her] at concentration camps because [she] would have helped kill people."  League

---

[18] Safety concerns are especially acute for LWVFL members whose home addresses are otherwise protected from public disclosure under Florida law—including members who work within the court system, serve as or are related to public officials, or have experienced domestic violence.  Day 6 (Lowe-Minor) Tr. 1550:20–1551; *see generally* Fla. Stat. § 19.071 (2025).  Those protections exist precisely because disclosure "would . . . jeopardize the individual's safety."  Florida Staff Analysis, S.B. 268 (March 31, 2025).  Yet under HB 1205, these members' addresses would nonetheless be exposed because a pre-printed petition circulator form which contains the address of the circulator is not a public record when circulated.  Therefore, it cannot be redacted.  Day 8 (Matthews) Tr. 2044:24–2045:7 ("[T]he redaction does not occur until there's a public records request for that public record.")  Their address would be exposed where an employee applying the Florida Public Records Law fails to identify or apply the appropriate redactions.  *See* Day 6 (Lowe-Minor) Tr. 1548:5–10.

PX-16 ¶¶ 5–11.  Critically, since those activists "did not know [her] name or . . . home address, . . . they could not track [Ms. Davis] down afterwards."  *Id.* ¶ 10. Under HB 1205, however, anyone Ms. Davis encounters while circulating petitions would "be able to see [her] name and home address" on her petition forms.  *Id.* ¶ 11. Ms. Davis has accordingly decided to stop circulating petitions: "Given the current climate of political hostility, as evidenced by my own harassment, this requirement is prohibitive; I care deeply about civic engagement but cannot put my own life at risk."  *Id.*

Alice Newlon, an 80-year-old LWVFL member and volunteer petition circulator, testified that her own experiences with harassment makes her unwilling to register as a petition circulator with the State.  Day 7 (Newlon) Tr. 1780:22, 1781:6–7, 1783:10–13, 1790:22–1791:1 ("I don't want someone that is opposed to the issues to have my name and address on that form . . . I don't want to be targeted potentially from this State because they oppose the issue I'm collecting petitions for.").

Ms. Newlon described threatening encounters she experienced while collecting petitions: one at a botanical garden where a woman and her family followed and screamed at her, and threatened to summon friends to join and "overwhelm" her (*id.* at 1787:1–14); another at a Scottish festival where a man became "really agitated" about petitions for the Florida Decides Healthcare

Initiative, leading Ms. Newlon to exit the area and rejoin her fellow volunteers (*id.* at 1788:10–21).    Ms. Newlon described this incident as "disturbing" and "threatening" because she "didn't know what he was capable of."  *Id.* at 1787:16, 1788:23–24.  She testified that if those individuals had access to her name and address, it would be "terribly frightening" personally; if those individuals had access to every circulator's personal information that "I don't know that we could get volunteers.  People would be afraid . . . that somebody would get everyone name, who's collecting, how much, and target them."  *Id.* at 1787:20–1788:5.

LULAC members have stopped petition collection activities as a result of HB 1205.  *Id.* at 1447:24–1448:1, 1457:24–1458:3; Day 6 (Medrano) Tr. 1614:25–1615:10.  LULAC members, like Dr. Lydia Medrano, also have decided not to register out of concern that providing their personal information will subject them to harassment.  Day 6 (Medrano) Tr. 1616:10–24.  LULAC's Chief Executive Officer, Juan Proaño, regularly receives hate mail and receives threatening phone calls at the office.  Day 5 (Proaño) Tr. 1458:13–19.  Lidia Martinez[19], who has been a LULAC member for more than 40 years and is 87 years old, had her home raided in the early morning hours resulting from voter registration efforts she engaged in as a LULAC member in Texas.  Law enforcement officials confiscated her computer, cell phone,

---

[19] The transcript incorrectly spells Ms. Martinez's first name as "Lydia."

50

and day planner, based on an allegation that she had sought reimbursement for gas and food while engaging in voter registration. *Id.* at 1458:13–1459:16, 1461:5–15.

Individual Plaintiffs shared their trepidation created by the Registration Restrictions. Day 6 (Chandler) Tr. 1703:11–1704:1; Day 6 (Scoon) Tr. 1654:10–23; Prelim. Inj. (Scoon) Tr. 96:24–97:3. Ms. Scoon testified that LWVFL had to hire security after it received a threat from someone who opposed its support for the Florida Decides Healthcare Initiative. Prelim. Inj. (Scoon) Tr. 96:24–97:3. Ms. Scoon also testified about an incident in which LWVFL members who were advocating for the Amendment to Limit Government Interference with Abortion were approached by a group of "loud and boisterous" men "waiving . . . machete[s]." *Id.* 97:21–98:3; Day 6 (Scoon) Tr. 1659:13–22. Ms. Chandler echoed similar serious concerns:

> I'm not a particularly panic-type person, but I'm getting older, and I have seen the times change and behavior change in the United States over the past several years. I live by myself. I'm a widow. I have a small dog that would likely lick your ankle as opposed to bite it. . . . I don't want my name and home address that closely linked to a potentially volatile issue.

Day 6 (Chandler) Tr. 1703:14–20. Even the Florida Decides Healthcare Initiative can be a volatile issue because people get upset claiming "illegal aliens getting free medical care under Medicaid expansion." *Id.* at 1703:22–25 ("And it scares me and it scares other League members."). Ms. Chandler connected HB 1205 to the new

51

dangers of registering as a petition circulator: "what scares me is the linkage between my personal information and the issue." *Id.* at 1712:5–7.

### (ii)    Principled objection to asking the State for permission to speak

Many of League Plaintiffs' members refuse to register as petition circulators on principle because they reject both the requirement to obtain permission from the State before advocating for their political beliefs and the State's regulation of their interactions with their community members. Day 6 (Lowe-Minor) Tr. 1547:21–1548:4, 1551:22–1552:18; Day 6 (Chandler) Tr. 1704:4–6; Day 7 (Newlon) Tr. 1790:6–8; League PX-16, ¶ 12.

### (iii)    Avoidance of third-degree felony charges

Multiple witnesses testified that they will not circulate petitions at all for fear of inadvertently committing a third-degree felony. Volunteers' concerns fall into two categories.

First, volunteers fear that their standard practices for circulating petitions violate HB 1205. In the past, LWVFL volunteers organized events to circulate petitions in groups, and one volunteer would gather all signed petitions at the end for quality checking and delivery to the sponsor. Day 6 (Lowe-Minor) Tr. 1526:13–19. Now, volunteers would violate HB 1205 if each volunteer collected 25 signed petitions and one point person assembled those forms for delivery. Day 7 (Newlon) Tr. 1791:19–24 ("[W]hen we are out, there's two or three of us; there's sometimes

52

different shifts," and "we take those . . . petitions together, and it just would be very hard for us to determine, whoops, somebody is over 25 and they are not registered."). The limit could easily be exceeded accidentally: at a group event "where everybody there is planning to collect . . . no more than 20" petitions, "let's say that someone who has six petitions signed, has a family emergency and they hand those petitions off to a friend who is also collecting, well now that person has 26." Day 6 (Lowe-Minor) Tr. at 1554:16–21. If that person were not registered as a petition circulator, they have now "all of a sudden . . . run afoul of the law." *Id.* at 1554:21.

Second, volunteers worry that a good-faith misinterpretation of the ambiguous Personal Use Petition Restriction and Registration Requirement could result in felony charges. Many volunteers have expressed confusion about how possession of 25 petitions is calculated and over what timeframe. *Id.* at 1553:9–13 (asking whether the 25-petition limit applies "over the course of any petition's life" or instead to "all initiatives combined for one cycle"); Prelim. Inj. (Scoon) Tr. 103:7–14 (June 30, 2025) (explaining that the Personal Use Petition Restriction is "not entirely clear" and asking: "What is the 25? Is it just that one petition or is it petitions for that entire year? Is it multiple petitions? Is it petitions from now to whenever?"). Indeed, after circulating petitions at a LWVFL event, volunteers "don't even know if [they] have to mail them separately" to avoid the threat of felony liability. Day 7 (Newlon) Tr. 1791:24–25.

53

Ms. Lowe-Minor summarized that members are "very concerned about the criminal liabilities and just the risk of running afoul of the law" for lack of understanding. Day 6 (Lowe-Minor) Tr. 1554:9–15. She concluded that "the risks just feel[] too high," a concern that "[m]ultiple dozens" of other League members have expressed to her. *Id.* at 1554:22–25.

### (iv)    League Plaintiffs' Decision to Stop Circulating

LWVFL and LULAC stopped encouraging their members to circulate petitions because of the new petition circulator requirements of HB 1205. Day 6 (Lowe-Minor) Tr. 1520:9–15, 1543:2–11; Day 5 (Proaño) Tr. 1448:8–12. As a result of member feedback and leadership discussions, LWVFL and LULAC determined they could not, in good conscience, encourage volunteer petition circulation knowing that their members would be forced to assume risks to their personal safety by making their home addresses public alongside information on political causes they support. Day 6 (Lowe-Minor) Tr. 1520:9–15, 1543:2–11, 1545:12–1546, 1548:18–1549:5, 1553:15–22; Day 5 (Proaño) Tr. 1447:24–1448:12, 1458:6–12.

Requiring volunteers to register in advance, and wait for approval, has severely limited LWVFL and LULAC's ability to expand their membership—and spread their message—through day-of volunteers at petition circulation events. Day 6 (Lowe-Minor) Tr. 1538:21–1539:4. LWVFL's ability to engage new volunteer

54

petition circulators and recruit new LWVFL members will decrease as a result of HB 1205. *Id.* at 1541:2–16; Day 5 (Smith) Tr. 1328:20–22 (noting increased "friction" to become a volunteer).

### 3) *The Criminal Provisions*

The Criminal Provisions include the RICO Provision; the Investigations Provision; the Missing Information Provision, and the Retention of Information Provision.

### a) The RICO Provision

### (i) The Challenged Provision

Through the RICO Provision, HB 1205 made any "violation of the Florida Election Code relating to irregularities or fraud involving issue petition activities" punishable as a "racketeering activity." H.B. 1205 § 19, 2025 Leg. (Fla. 2025) (amending Fla. Stat § 895.02(8)(d)); Matthews Dep. 133:19–24, ECF No. 620-3. Florida's state RICO statute, known as the Florida RICO (Racketeer Influenced and Corrupt Organization) Act, provides criminal penalties for "any person employed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering activity." Fla. Stat § 895.03(3) (2025).[20] A violation of the Florida RICO Act is a first-degree felony punishable by

---

[20] The term "enterprise" "means any individual, sole proprietorship, partnership, corporation, business trust, union chartered under the laws of this state, or other legal entity, or any unchartered union, association, or group of individuals associated in

imprisonment of up to 30 years and a fine of up to $10,000. Fla. Stat. §§ 895.04(1), 775.082(3)(b), 775.083(1)(b).

Neither HB 1205 nor the Florida Election Code define "irregularities." Day 8 (Pratt) Tr. 2153:2–9. Neither OECS nor any Florida state government agency has provided a written definition of "irregularities." *Id.* at 2155:7–16. OECS does not have an internal definition of "irregularities" on which employees and investigators rely, nor has not published any guidance defining "irregularities" related to "issue petition activities" for law enforcement. *Id.* at 2156:15–18, 2159:1–3. Members of the public remains in the dark, too, for OECS has not published a definition of "irregularities" such that one can understand whether a petition contains an irregularity subject to the Florida RICO Act. *Id.* at 2159:4–8. Ultimately—and concerningly—the decision of what qualifies as an irregularity rests with the Director of OECS and the Secretary of Elections. *Id.* at 2157:2–7.

### (ii)   Impact on the League Plaintiffs

League Plaintiffs and their volunteer members "don't know what is an irregularity" such that they may be subjected to first-degree felony charges for circulating petitions. Day 6 (Scoon) Tr. 1669:5; Day 6 (Chandler) Tr. 1709:10–21; Day 6 (Lowe-Minor) Tr. 1567:13–14 ("[W]e really don't know what would incur

---

fact although not a legal entity; and it includes illicit as well as licit enterprises and governmental, as well as other, entities." Fla. Stat. § 895.02(5).

56

[RICO] charges, and things about that section feel very vague to us[.]"). Given the uncertainty, "it would be possible for a prosecutor to bring allegations against an individual [LWVFL] member or [LWVFL] itself, which would be extremely hurtful and damaging to the individual and the entire League and all of our efforts." Day 6 (Scoon) Tr. 1669:5–9. This uncertainty—combined with the severity of first-degree felony charges—has made League Plaintiffs' members and volunteers too frightened to continue circulating petitions. Day 6 (Lowe-Minor) Tr. 1567:17–18 ("I don't even know what would bring about those charges, so we would just not gather petitions."); *id.* at 1567:3–4 ("[R]acketeering sounds very scary and mobster.").

Speaking on behalf of LWVFL, Ms. Lowe-Minor noted that "we don't want any of our members to have anxiety . . . that we're involved in [what] would be part of a racketeering investigation or charges." *Id*. at 1567:4–7. Since League Plaintiffs are unable "to advise our members on how to avoid [RICO] charges" and refuse to ask members to expose themselves to a first-degree felony, League Plaintiffs and their volunteers were compelled to stop circulating petitions altogether. *Id*. at 1567:3–18; Day 6 (Scoon) Tr. 1668:25–1669:12; Day 6 (Chandler) Tr. 1709:22–24.

### b) The Investigations Provision

#### (i) The Challenged Provision

Prior to HB 1205, the Florida Election Code merely *authorized* OECS to investigate suspected fraudulent petition forms. Fla. Stat. § 97.012(15) (2022). HB

1205, through its Investigation Provision, now *requires* OECS to investigate "the activities of the sponsor, one or more petition circulators, or a person collecting petition forms on behalf of a sponsor" for fraudulent activity or other violations when Supervisors of Elections invalidates 25 percent or more petition forms in a reporting period for a single ballot initiative.  H.B. 1205 § 6, 2025 Leg. (Fla. 2025) (amending Fla. Stat. §§ 100.371(14)(d), 100.371(14)(g)–(h)).

Leon County Supervisor of Elections Mark Earley testified that a petition form can be invalidated for a wide range of issues, many of which have innocent explanations wholly unrelated to fraud.  Earley Dep. 58:11–59:13, ECF No. 608-4.[21] With respect to signature mismatches, Supervisor Earley explained that there are "a lot of ways that a signature can not match at least exactly," including where it "is obscured such as by being rushed or not written on a firm and thick surface" or where the voter signed "in printed script versus in cursive."  Day 2 (Earley) Tr. 474:12–18. He further testified that a voter's signature "can change because someone is aging and they are becoming more infirm, not as good dexterity control of their fingers." *Id*. at 475:10–18.  Likewise, younger voters' "signatures change as dramatically, if not more so, over time." *Id.* at 475:19–22.  Indeed, "[a]nother big reason signatures

---

[21] Supervisors of Elections must verify voters' identity based on four pieces of information: (1) name, (2) address, (3) voter registration number or date of birth, and (4) signature match.  Fla. Stat. § 100.371(11) (2025); DX-4 at 10.

58

change is just . . . the rapidity or the care that the voter is using to sign the form." *Id.* at 475:23–25.

Turning to date-related errors, Supervisor Earley testified that voters sometimes mistakenly list their date of birth in the signature date field, noting that "[s]ometimes they switch the dates" and that, if "the date of birth does not match either what's in our record or potentially if our record is wrong . . . then it's a failure point." *Id.* at 471:14–25. Similarly, "[s]ometimes they switch the signature date and the birth date or it's blank." *Id.* at 465:11–12. Supervisor Earley further testified that if a voter's signature date matches the date of the voter's registration, the petition must be invalidated because, as the Division of Elections directed, the voter could not have been a registered voter on the same date they signed the petition, as "there's a little bit of a verification process that has to happen after you submit the [registration] form." *Id.* at 472:1–25. Likewise, Supervisor Earley explained that if a voter is listed as inactive—but not unregistered—at the time of signing, "the Division of Elections has directed the Supervisors to invalidat[e] those petitions." *Id.* at 473:1–10.

Additional failure points abound. A submitted petition must "contain[] the entire petition," which "may be multiple pages," and "if all those pages aren't present, that petition will be invalidated." *Id.* at 473:11–18. A difference between the circulator's and voter's signature dates triggers invalidation, too. *Id.* at 611:1–3

59

("[T]he circulator's signature date should be the same as the signature date of the voter when they signed it.").  Incomplete or missing voter addresses, a missing voter signature, or a voter who signed a form for the same petition twice—each of which can arise from simple human error rather than any intent to defraud—triggers invalidation.  Melendez Dep. 38:11–40:9, ECF 608-5; Earley Dep. 59:3–8, ECF No. 608-4 (voters frequently "don't think about what county they're in, they don't know whether they're a registered voter, they don't pay attention; they just juxtapose the date of birth and signature date, [or] they're not careful about their driver's license numbers.").

Given the range of possible mistakes, "initiative petitions are very often— maybe more often than not, invalid *at least a third of the time* . . . Oftentimes it's more than that."  Day 2 (Earley) Tr. 627:25–628:4 (emphasis added).

### (ii)    Impact on the League Plaintiffs

LWVFL volunteer circulators stopped circulating petitions due to the threat of being personally subjected to an OECS investigation for good-faith mistakes by themselves or others.  Day 6 (Lowe-Minor) Tr. 1565:5–1566:16.  For example, Ms. Scoon described the OECS investigations required at a 25 percent invalidity rate as "terrifying" and confirmed that that the "threat of an OECS investigation . . . stopped [her] personally from collecting after HB 1205 took effect."  Day 6 (Scoon) Tr. 1665:4–9, 1666:18–21.  Ms. Chandler also testified that "anytime anyone is under

60

investigation it is extremely stressful both emotionally and financially." Day 6 (Chandler) Tr. 1708:24–25. Ms. Chandler elaborated: "I have seen many people under investigation, and I have witnessed them be very stressed . . . both physically and financially. I've seen people lose their homes over investigations." *Id.* at 1709:1–4. As a result, Ms. Chandler is unwilling to circulate petitions with the Investigations Provision in effect. *Id.* at 1709:5–7.

Prior to the Ten-Day Return Deadline, discussed *infra* Section II.A.iii.4., LWVFL "would have a chance to look over the collected petitions, and if there was something that was fixable, that was an error, you had at least a chance to try to reach that person and have them come down and correct it. There is no time now." Day 6 (Scoon) Tr. 1664:19–24. With "less time" for volunteers to complete LWVFL's quality control process "the number of petitions that might be considered invalid go[es] up," and with it, the likelihood of an OECS investigation. *Id.* at 1665:1–9.

If the initiatives that League Plaintiffs' volunteer circulators supported "end up having an error rate of 25 percent or more, then our organization is [subject to] investigations . . . all of that sounds very scary." Day 6 (Lowe-Minor) Tr. 1564:21–24. Ms. Lowe-Minor stressed that "we don't want any of our members to feel like something that we're asking them to do as a civic duty or civic services is now going to . . . result in them being investigated." *Id.* at 1566:13–16. LWVFL leaders are also concerned that an investigation into LWVFL or its member volunteers "would

61

harm [LWVFL's] brand [and] harm people's trust" in the organization.  Day 6 (Scoon) Tr. 1665:4–19.

### c)      The Missing Information Provision

### (i)      The Challenged Provision

HB 1205 amended Section 104.185(2) of the Florida Statutes to make it a third-degree felony for "a person collecting petition forms on behalf of a sponsor of an initiative petition" to "fill[] in missing information on a signed petition."  H.B. 1205 § 12, 2025 Leg. (Fla. 2025) (amending Fla. Stat. § 104.185(2)); *Joint Pretrial Stipulation*, Agreed Facts ¶ 53, ECF No. 596.[22]

The statute does not define "missing information."  Director Pratt testified that the term encompasses "any of the blanks that are in the petition form itself; so name, address, date of birth, date of signature, signature, last four digits of the social [security number], driver's license number or ID number, [] voter ID number, and county."  Pratt Dep. 117:2–7, ECF No. 620-2.  The Division of Elections identifies violations based on whether information "looks like it was prefilled, or because it looks like the signature or the writing is different . . . than the voter's handwritten information."  Matthews Dep. 167:9–13, ECF No. 620-3.

---

[22] This language supplements the existing prohibition on signing another person's name or a fictitious name on a petition.  Fla. Stat. § 104.185(2) (2022).

OECS has not provided any guidance as to what (if anything) a petition circulator is permitted to do if confronted with a voter who cannot fill out a petition form themselves. Matthews Dep. 204:4–11, ECF 620-3. There is no exemption in HB 1205 that would allow a circulator to help a disabled voter fill out information on a form—not even a reference to ADA exemptions. Matthews Dep. 204:12–205:4, ECF No. 620-3; Pratt Dep. 188:4–6, 188:12–14, ECF No. 620-2. No information has been communicated to the public regarding the assistance petition circulators may provide to voters who are unable to complete the form themselves. Matthews Dep. 205:5–10, ECF No. 620-3; Pratt Dep. 188:7–11, ECF No. 620-2.

### (ii) Impact on the League Plaintiffs

Prior to HB 1205, LWVFL members assisted visually and physically impaired voters in completing petition forms. Day 6 (Lowe-Minor) Tr. 1556:2–13; Day 6 (Scoon) Tr. 1646:3–8. Volunteers helped voters with low vision or blindness by reading the forms out loud and filling in the missing information. Day 6 (Chandler) Tr. 1696:21–23; Day 6 (Scoon) Tr. 1645:14–1646:2; Day 6 (Lowe-Minor) Tr. 1556:5–13. In other circumstances, volunteers assisted voters who could not physically write due to a broken arm, a stroke, or age-related loss of dexterity. Day 6 (Chandler) Tr. 1696:7–11, 17–20; Day 6 (Scoon) Tr. 1646:3–8; Day 6 (Lowe-Minor) Tr. 1556:14–18; Day 7 (Newlon) Tr. 1784:22–25. Volunteers completed forms only with the voter's consent and direction, positioning the paper

63

and pen so the voter could mark the signature line themselves. Day 6 (Chandler) Tr. 1697:1–2; Day 6 (Lowe-Minor) Tr. 1556:10–13; Day 6 (Scoon) Tr. 1646:10–20; Day 7 (Newlon) Tr. 1785:1–2.

The Missing Information Provision precludes this assistance. Indeed, Defendants' own witnesses acknowledged that OECS has not provided any information on what circulators may do when a voter cannot complete the form themselves. Matthews Dep. 205:5–10, ECF No. 620-3; Pratt Dep. 188:7–11, ECF No. 620-2.

The threat of felony prosecution now prevents volunteers from circulating petitions. Day 6 (Scoon) Tr. 1664:6–10; Day 6 (Chandler) Tr. 1705:25–1706:3. Ms. Lowe-Minor expressed a "very real fear that under this law making any kind of mark at all on the form, even if you are trying to help a disabled voter participate by completing the form . . . [is] unlawful." Day 6 (Lowe-Minor) Tr. 1556:14–21. Ms. Chandler (a former criminal defense attorney), raised the same concern, and noted that even asking a disabled voter to enlist a friend to help could expose her to criminal liability for aiding and abetting. Day 6 (Chandler) Tr. 1705:20–1706:3.

As an organization, LWVFL refuses to create a situation where volunteers must deny help to voters who cannot "complete the petition with their own hand but who would otherwise want to sign." Day 6 (Lowe-Minor) Tr. 1558:13–16. Such discrimination is antithetical to LWVFL's core mission of making the democratic

64

process more accessible for voters. *Id*. at 1558:17–19, 1559:1–4.  LWVFL even has a committee that works "very closely with the disability rights community on voting accessibility issues." *Id*. at 1558:4–9.  Without clarity from the State, volunteers cannot be confident that assisting voters is legal, and League Plaintiffs are effectively barred from doing so. *Id*. at 1556:14–21.

### d)    The Retention of Information Provision

#### (i)    The Challenged Provision

Under HB 1205, Plaintiffs' members can be charged with third-degree felonies for retaining a voter's personal information—regardless of intent.  H.B. 1205 §6, 2025 Leg. (Fla. 2025) (amending Fla. Stat. §§ 100.371(9)).  Specifically, "[i]f a person collecting petition forms on behalf of a sponsor of an initiative petition copies or retains a voter's personal information, such as the voter's Florida driver license number, Florida identification card number, social security number, or signature, for any reason other than to provide such information to the sponsor of the initiative petition, the person commits a felony of the third degree."  Fla. Stat. § 100.371(9) (2025); *Joint Pretrial Stipulation*, Agreed Facts ¶ 51, ECF No. 596.

#### (ii)    Impact on the League Plaintiffs

The risk that members could face felony charges for even inadvertently "retain[ing]" a voter's personal information in violation of HB 1205 is a "reason why the League has not restarted circulating petitions."  Day 6 (Lowe-Minor) Tr. 1559:9–16.  Previously, LWVFL volunteers circulating petitions at public events would also

collect contact information from voters interested in joining LWVFL's email list or membership. *Id*. at 1559:17–1560:1. Now, however, merely keeping such a list—a once innocuous activity—could expose members to felony liability. *Id*. at 1560:2–7. Given that confusion and the associated risk, Ms. Lowe-Minor testified she would not recommend that LWVFL resume petition circulation, even if all other provisions of HB 1205 were repealed. *Id.* at 1560:8–12.

Beyond halting petition circulation, this provision undermines LWVFL's ability to "add folks into [its] network and to be able to communicate with them," reducing its "effectiveness as an organization." *Id.* at 1560:13–22. Ms. Chandler similarly testified that she previously recruited new members while tabling with petitions: she would "strike up a conversation with [the voter], and we would be talking about a particular issue," and that voter would "join [LWVFL] right on the spot," by providing "their name and address, their contact information, which would also be on the petition." Day 6 (Chandler) Tr. 1706:8–16. But now, due to HB 1205, Ms. Chandler "wouldn't chance" felony charges by collecting a potential member's information. *Id.* at 1708:17–19.

### 4) *The Ten-Day Return Deadline and Related Fines*

#### a) **The Challenged Provision**

HB 1205 requires sponsors to ensure petition forms are "promptly delivered to the supervisor of elections in the county in which the voter resides within 10 days

66

after the voter signs the form."  H.B. 1205 § 6, 2025 Leg. (Fla. 2025) (amending Fla. Stat. § 100.371(7)(a)).  Without regard for intent, failure to comply results in a $50 fine for each petition form *per day late* (with no maximum), a $100 fine per day for each late petition collected before February 1 of the applicable election cycle, and a $500 fine for each petition submitted to the wrong supervisor.  H.B. 1205 § 6, 2025 Leg. (Fla. 2025) (amending Fla. Stat. §§ 100.371(7)(a)(1)–(3)).  Prior to HB 1205, (a) the deadline to submit signed petition forms was 30 days, which also accounted for office closures and non-business days; (b) fines for late submission were only $50 in total per late petition, not per day; (c) forms could be submitted to the county listed on the form rather than where the voter resides; and (d) the return deadline applied only to paid petition circulator forms, not volunteer forms.  *Joint Pretrial Stipulation*, Agreed Facts ¶ 39, ECF No. 596.

### b)      Impact on the League Plaintiffs

When circulating petitions, LWVFL conducts a multi-step process to ensure quality control, as described in Section I(C)(3)(b),[23] which usually takes a "week to ten days."  Day 6 (Chandler) Tr. 1701:20–23.  Only then does the sponsor conduct

---

[23] *See also* Day 6 (Lowe-Minor) 1526:25–1527:24. Volunteers bring signed forms to a point person who reviews them "to see if there were any errors that they had missed and whether they could reach the person" to correct mistakes. Day 6 (Scoon) Tr. 1643:10–15.  The point person then returns the petitions to the sponsor, either a nearby drop off location or by mailing them.  *Id*. at 1643:15; Day 6 (Lowe-Minor) Tr. 1528:8–17.

their own review and ultimately deliver or mail the signed petitions to the supervisors of elections.  Day 6 (Lowe-Minor) Tr. 1528:20–23.

Preserving the quality control process is important to LWVFL because LWVFL "has a stellar reputation . . . for doing excellent work.  We are proud of the work that we do . . . [and] that we're very accurate and we don't want to do anything to tarnish that reputation either . . . among the sponsors or among organizations that collaborate with us."  Day 6 (Chandler) Tr. 1700:20–25.[24]  But the new Ten-Day Return Deadline makes it impossible for LWVFL to ensure petitions reach the correct supervisor of elections on time "with any kind of real quality control."  Day 6 (Chandler) Tr. 1707:21–25; League PX-16, ¶ 14 (describing the Ten-Day Return Deadline as "logistically impossible").  As a nonprofit organization, LWVFL cannot pay its share of late fines, track each petition's deadline and supervisor of elections, and expedited shipping costs to meet the return deadline.  Day 6 (Lowe-Minor) Tr. 1561:20–1562:13.

The Ten-Day Return Deadline would force LWVFL to turn in forms as quickly as possible, stripping volunteers of time to contact voters to correct mistakes.  Day 6 (Lowe-Minor) Tr. 1564:14–20.  In turn, the initiative is more

---

[24] *See also* League PX-16, ¶ 14 ("I took pride in meeting statutory deadlines prior to the enactment of House Bill 1205, both for myself and as a member and representative of the League, [but] I do not believe that anyone could reasonably do so now.").

likely to "end up having an error rate of 25 percent or more," and inevitably trigger a mandatory OECS investigation, as described in Section I(C)(3)(b) above. Day 6 (Lowe-Minor) Tr. 1564:21–22. Alternatively, if LWVFL follows its traditional, multi-step quality control process, petitions will inevitably arrive late and expose the initiative's sponsor to hefty fines. Day 6 (Chandler) Tr. 1707:21–25; Day 6 (Lowe-Minor) Tr. 1563:18–22. LWVFL maintains a close working relationship with sponsor organizations throughout the initiative process, from LWVFL members who serve on a sponsor's steering committee at the very conception of an initiative to evaluating and endorsing campaigns that sponsors bring to the League for support, after which the League mobilizes its members to collect petitions on the sponsor's behalf. Day 6 (Lowe-Minor) Tr. 1520:21–1521:12. Even individual volunteers will not circulate petitions under the Ten-Day Return Deadline to avoid incurring fines for the sponsor or harming LWVFL's reputation. Day 6 (Chandler) Tr. 1707:16–20.

Director Pratt admitted that the State does not "have any evidence" that shortening the time frame to deliver petitions to the Supervisor of Elections from 30 days to 10 days will result in less fraud, and that she was "not aware of any" studies or investigations by OECS assessing whether the shortened deadline "will reduce the amount of fraud." Pratt Dep. 84:5–9, 84:18–23, ECF No. 620-2. Bridges similarly "couldn't say" whether "a 10-day limit would be more effective [at]

deterring or detecting fraud than . . . a 15-day limit." Bridges Dep. 227:5–7, 227:11–15, ECF No. 620-1.  Expert analysis of Osceola and Palm Beach counties even showed the opposite effect of a shorter return deadline.  Petitions submitted within 0–10 days had significantly higher invalidation rates than those submitted between 11 and 30 days, suggesting that the additional time sponsors previously used for quality control improved petition validity.  Day 5 (Smith) Tr. 1348:17–23, 1349:16–25.[25]

## B.    Procedural Background

This lawsuit was first filed by Florida Decides Healthcare, Inc., Mitchel Emerson, and Jordan Simmons ("FDH Plaintiffs") on May 4, 2025.  League Plaintiffs intervened on May 13, 2025 (*see* ECF No. 86), shortly after HB 1205 was signed into law (*see Joint Pretrial Stipulation*, Agreed Facts ¶ 1, ECF No. 596).  This Court has twice granted preliminary injunctive relief to Plaintiffs.[26]  In its first order, issued on June 4, 2025, the Court enjoined Defendants from enforcing HB 1205's

---

[25] No other state with a constitutionally protected citizen initiative process even has a thirty-day return deadline, but rather, a single calendar date for all petitions signed during that election cycle.  Day 5 (Smith) Tr. 1354:5–17.

[26] Plaintiffs in this action consisted of FDH Plaintiffs, Smart & Safe Florida ("Smart & Safe Plaintiff"), League Plaintiffs, and FloridaRightToCleanWater.org and Melissa Martin ("RTCW Plaintiffs").  Poder Latinx, Yivian Lopez Garcia, and Humberto Orjeula Prieto ("Poder Plaintiffs") were previously plaintiffs but dismissed their claims against Defendants without prejudice on October 10, 2025. ECF No. 497.

RICO Provision expanding the definition of "racketeering activity," finding that the term "irregularities" in the provision provided no workable standard, as Defendants' own proposed construction would require a "standardless and discretionary determination" which "only lends itself to the mischief associated with an unconstitutionally vague statute that allows for arbitrary and discriminatory enforcement." ECF No. 189 at 26.

On July 8, 2025, the Court issued a second injunction prohibiting Defendants from enforcing the Non-Resident Ban and Non-Citizen Ban against Plaintiffs, finding that the provisions violated the First Amendment by barring "entire classes of people from participating in the core political speech that is central to [the initiative petition] process." ECF No. 283 at 28. The Eleventh Circuit subsequently stayed this Court's injunction of the Non-Resident Ban and Non-Citizen Ban, but did not address the injunction directed at HB 1205's RICO Provision. Order Granting Mot. to Stay Prelim. Inj. Pending Appeal, *Fla. Decides Healthcare, Inc. v. Fla. Sec'y of State*, No. 25-12370 (11th Cir. Sept. 9, 2025), ECF No. 97-2.

Since that time, there has been some limited motion practice, but the substantive contours of the case have remained the same. Defendants' motion to dismiss was granted solely on non-substantive grounds—specifically, the Court directed several of the Plaintiffs, including League Plaintiffs, to specify which factual allegations related to which of their causes of action—and a subsequent

71

summary judgment motion was denied in its entirety.  ECF No. 360; ECF No. 387; ECF No. 409; ECF No. 474; ECF No. 521; ECF No. 529.

This Court then presided over a nine-day bench trial.  *See generally* Days 1–9 Tr.  In support of their claims, Plaintiffs presented two expert witnesses, twenty-two fact witnesses, and hundreds of exhibits demonstrating HB 1205's impact on Plaintiffs' petition circulation activities, its chilling effects on speech, and the lack of adequate justifications for its enactment.  *See generally* Days 1–9 Tr.  In contrast, Defendants presented only five fact witnesses and fewer than forty exhibits, none of which offered any evidence of volunteer petition circulators.

### III.    PRELIMINARY ISSUES

The Eleventh Circuit's September 2025 stay opinion, which concerned only two provisions at issue in this case, should not affect this Court's post-trial decision for three reasons: (1) as Defendants admit, the stay order is not binding law; (2) obvious errors in the panel majority's opinion highlight its rushed nature; and (3) the panel majority misunderstood the statutes at issue in the Supreme Court's decisions in *Buckley v. Am. Const. L. Found.*, 525 U.S. 182 (1999) and *Meyer v. Grant*, 486 U.S. 414, 424 (1988), leading it to improperly distinguish HB 1205.

First, the stay order and opinion is not binding on this Court.  Defendants acknowledged this reality on the record at trial and in their reply briefs during the summary judgment briefing.  Day 1 Tr. 329:20–330:3; ECF No. 513 at 2; ECF No.

72

514 at 2. And while all parties agree that the Eleventh Circuit has not addressed the particular issue at hand, it has emphasized "the necessarily tentative and preliminary nature of a stay-panel opinion" and explained that a "stay-panel opinion *cannot* spawn binding legal consequences regarding the merits of the case." *Dem. Exec. Comm. of Fla. v. Nat'l Republican Senatorial Comm.*, 950 F.3d 790, 795 (11th Cir. 2020); *see also Hand v. Desantis*, 946 F.3d 1272, 1275 n.5 (11th Cir. 2020) (concluding that "[a]n order granting a stay . . . is not a final adjudication of the merits of the appeal, and therefore it has no res judicata effect") (quotation marks and citation omitted).

A leading treatise states the rule precisely: "Rulings—predictions—as to the likely outcome on the merits made for preliminary injunction purposes do not ordinarily establish the law of the case, whether the ruling is made by a trial court or by an appellate court." 18B Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. Juris. § 4478.5 (3d ed. 2025). A decision from the Tenth Circuit illustrates the rule. In *Homans v. City of Albuquerque*, the court rejected the argument that the district court "was bound by the motions-panel ruling" on a question of law. 366 F.3d 900, 904. The court first noted that "that a decision as to the likelihood of success is tentative in nature and not binding at a subsequent trial on the merits." *Id.* at 904–05 (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981), *Southco, Inc. v. Kanebridge Corp.*, 324 F.3d 190, 195 (3d Cir. 2003), and *A.M. Capen's Co.*

73

*v. Am. Trading & Prod. Corp.*, 202 F.3d 469, 473 (1st Cir. 2000)). Further, "if the district court were bound in the manner suggested, then the decision of the motions panel would also bind the appellate panel reviewing the merits. This is not the rule." *Id*. at 905; *see also Grote Indus., LLC v. Sebelius*, 2013 WL 53736, at *1 (S.D. Ind. Jan. 3, 2013) ("[W]hile we are entirely respectful of the Seventh Circuit panel's opinion, we are not bound by it as a precedential ruling because the appellate ruling was not a plenary decision of the Court on the merits, but a grant of emergency relief, based on its preliminary determination.").

Second, the panel majority's opinion should carry little weight here because it contains obvious errors, which is unsurprising because a stay panel reviewing a preliminary injunction ruling often lacks "the benefit of a fully developed record" and must decide based "on briefing and argument abbreviated or eliminated by time considerations." *Sherley v. Sebelius*, 689 F.3d 776, 782 (D.C. Cir. 2012) (citation omitted). For example, the panel majority erroneously believed that the Non-Citizen Ban and Non-Resident Ban "apply only to individuals who physically possess more than 25 already-signed petition forms," and relied on that point when comparing HB 1205 to other states' restrictions. *Fla. Decides Healthcare Inc. v. Fla. Sec'y of State*, No. 25-12370, 2025 WL 3738554, at *5 (11th Cir. Sept. 9, 2025). But that is simply wrong: the Non-Citizen Ban and Non-Resident Ban prevent non-U.S. citizens and

74

non-Florida residents from collecting *any* petitions.    *See* Fla. Stat. § 100.371(4)(b)(2)–(3) (2025).

Third and most fundamentally, the panel opinion was based on a misunderstanding of the laws at issue in *Meyer* and *Buckley*.  The panel relied on language in *Meyer* and *Buckley* to conclude that the Colorado laws in question prevented "conduct [that] would 'in almost every case involve an *explanation* of the nature of the proposal and why its advocates support it.'" *Fla. Decides Healthcare*, 2025 WL 3738554, at *4 (quoting *Meyer*, 486 U.S. at 421) (emphasis added).  The panel then distinguished HB 1205, concluding that it regulated "who can *collect* signatures or initiative petitions," but did not prevent "persuasive speech." *Id*. (emphasis added) (quotation marks omitted).  The problem is that the Colorado laws in question did the same thing: by their text, they only prevented physical circulation of petitions.  The Supreme Court's descriptions of the laws, quoted by the panel, simply recognized the reality that restrictions on petition circulation would inevitably affect speech, just like the law before this Court.

Close consideration makes this point plain.  Start with the statutory text: the law in *Meyer* said nothing about whether sponsors could pay people to discuss the merits of a petition; it banned payment for "'the *circulation of* an initiative or referendum petition.'"  486 U.S. at 416 n.1 (quoting Colo. Rev. Stat. § 1–40–110 (1980)) (emphasis added).  Likewise, the statute in *Buckley* provided that "[n]o

75

section of a petition for any initiative . . . shall be *circulated* by any person" who is not a registered voter. 525 U.S. at 188 n.2 (quoting Colo. Rev. Stat. § 1–40–112(1) (1998)) (emphasis added). And to "circulate" a petition is to distribute "the approved drafts of the petitions for signature" (*Meyer*, 486 U.S. at 417), and then to "collect the signatures" (*Am. Const. L. Found., Inc. v. Meyer*, 120 F.3d 1092, 1096 (10th Cir. 1997)).

The Supreme Court and other courts have reiterated this same understanding of the Colorado laws at issue in *Buckley* and *Meyer*. As the *Buckley* Court described it, the ban on paid petition circulation in *Meyer* regulated "hired signature collector[s]." 525 U.S. at 196 n.17. And in *Biddulph v. Mortham*, the Eleventh Circuit itself explained that, in *Meyer*, "the Court determined that the *circulation* of initiative petitions *and the concomitant exchange* of political ideas constitutes 'core political speech.'" 89 F.3d 1491, 1498 (11th Cir. 1996) (emphases added); *see also Project Vote v. Kelly*, 805 F. Supp. 2d 152, 162–64 (W.D. Pa. 2011) (explaining that statutes in *Meyer* and *Buckley* "did not specifically limit or restrain 'speech'" but were "burdensome to potential speakers" and the statute in *Meyer* prohibited payment "for a canvasser's act of circulating a petition").

### IV.    LEAGUE PLAINTIFFS HAVE STANDING

**A.    Legal Standards**

To establish standing, a plaintiff must show: (1) that they have suffered an injury-in-fact; (2) that is traceable to defendants; and (3) can likely be redressed by a favorable ruling.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).  For each challenged statutory provision, the standing inquiry ends once a single plaintiff demonstrates she can meet those elements.  *Alachua Cnty. Educ. Ass'n. v. Carpenter*, 757 F. Supp. 3d 1248, 1254 (N.D. Fla. 2024).

Organizational plaintiffs may demonstrate an injury-in-fact through either organizational or associational standing.  *League of Women Voters of Fla., Inc. v. Lee*, 576 F. Supp. 3d 1004, 1009 (N.D. Fla. 2021) (Walker, J.).  An organization has associational standing to sue on behalf of its members if it can demonstrate "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Id*. (citing *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 553 (1996) (citation omitted)).  This Court has found "[o]rganizations "can establish standing by demonstrating a direct injury to the organization or an injury based on a diversion-of-resources theory."  *Fla. State Conf. of Branches & Youth Units of the NAACP v. Byrd*, 680 F. Supp. 3d 1291, 1298

(N.D. Fla. 2023) (Walker, J.).  "For standing based on a diversion of resources, '[a]n organization suffers actual harm if the defendant's illegal acts impair [the organization's] ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts.'"  *Id.* (quoting *City of South Miami v. Governor*, 65 F.4th 631, 638 (11th Cir. 2023).  This includes diversion not only of funds, but also other resources, including volunteer time.  *Ft. Lauderdale Food Not Bombs v. City of Ft. Lauderdale*, 11 F.4th 1266, 1287 (11th Cir. 2021); *Arcia v. Florida Secretary of State*, 772 F.3d 1335, 1341 (11th Cir. 2014).  Both LULAC and LWVFL have standing under associational standard or organizational standing.

**B.   Argument**

    **i.   Individual Plaintiffs Cecile Scoon and Debra Chandler Have Article III Standing**

        ***1)   HB 1205 Has Inflicted Concrete, Particularized Injuries in Fact on Both Individual Plaintiffs by Chilling Their Engagement in Constitutionally Protected Petition Circulation***

A plaintiff suffers a cognizable injury-in-fact when government action chills her from engaging in expression she would otherwise undertake; in such cases, the resulting self-censorship is itself the constitutional harm.  *Garcia v. Stillman*, 661 F. Supp. 3d 1168, 1177 (S.D. Fla. 2023) ("self-censorship" to avoid enforcement consequences constitutes injury in fact); *see Henry v. Att'y Gen.*, Ala., 45 F.4th 1272, 1288 (11th Cir. 2022) (asking "whether [the] government policy would cause a reasonable would-be speaker to self-censor").  Courts apply this standard with

particular solicitude "where First Amendment rights are involved, lest free speech be chilled even before the law or regulation is enforced." *Harrell v. The Florida Bar*, 608 F.3d 1241, 1254 (11th Cir. 2010).

Individual Plaintiffs Cecile Scoon and Debra Chandler are veteran LWVFL members, past state copresidents, and active volunteer petition circulators. Ms. Scoon—a twenty-five-year member of LWVFL—collected initiative petitions for at least five ballot measures, routinely exceeded one hundred signed petitions in a single day, and estimates she collected between 2,500 and 3,500 signed petitions over the course of her time with LWVFL. Day 6 (Scoon) Tr. 1633:1–25. Similarly, Ms. Chandler—a retired career criminal defense attorney—circulated petitions for at least four ballot measures, could "easily" collect "a hundred" at a large event, and regularly possessed more than twenty-five signed petitions at organized events. Day 6 (Chandler) Tr. 1692:1–7, 1698:9–11, 1707:2–3.

Both Individual Plaintiffs were actively collecting for the Florida Decides Healthcare and Right to Clean Water Initiatives when HB 1205 took effect. Day 6 (Scoon) Tr. 1634:1–6; Day 6 (Chandler) Tr. 1702:10–12. Ms. Scoon had already exceeded twenty-five petitions for each initiative. Day 6 (Scoon) Tr. 1634:1–6. Neither has collected a single petition since. *Id.* at 1663:22–24; Day 6 (Chandler) Tr. 1691:15–17. Ms. Scoon testified clearly that her inactivity resulted directly from the law's passage. Day 6 (Scoon) Tr. 1649:9–1650:16. Similarly, Ms. Chandler told

79

this Court that she will not resume petition gathering "unless HB 1205 is repealed or drastically changed," but would do so "[j]oyfully" if it were.  Day 6 (Chandler) Tr. 1702:7, 1710:4.  The undisputed evidence adduced at trial shows that the Individual Plaintiffs' self-censorship (and thus their injuries) stemmed directly from multiple, independently sufficient provisions of HB 1205.

### a) The Registration and Disclosure Requirements Forced Ms. Scoon and Ms. Chandler to Stop Collecting Petitions, Thus Injuring Them

Compelled disclosure of personal information in connection with political advocacy creates a cognizable First Amendment injury when it exposes speakers to the risk of retaliation or harassment—and a plaintiff's decision to forgo expression rather than submit to such a requirement itself constitutes constitutional harm.  *See Buckley v. Am. Const. L. Found.*, 525 U.S. 182, 198–200, 214 (1999) (striking circulator identification requirement due to the risk of "chilling" the exercise of First Amendment rights through "recrimination and retaliation"); *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 616–17 (2021) (invalidating compelled-disclosure regime that created "unnecessary risk of chilling" First Amendment activity); *Dakotans for Health v. Noem*, 52 F.4th 381, 391 (8th Cir. 2022) (disclosure requirements for paid petition collectors were "a recipe for harassment, especially given the requirement for public disclosure of circulators'

80

phone numbers, residential addresses, and email addresses," and violated the First Amendment).

HB 1205's Registration Restrictions—namely the Registration, Disclosure, and Affidavit Requirements—inflicted exactly this type of chill on the Individual Plaintiffs' ability to collect petitions. To legally continue circulating after passage of HB 1205, Ms. Scoon and Ms. Chandler would have been forced to disclose their full names, permanent home addresses, and the last four digits of their Social Security numbers (the last of which appears "on no other documents that were publically [*sic*] available"). Day 6 (Scoon) Tr. 1654:4–14. The required per-petition affidavits—which, like the information above, also become public record—place the circulator's name and home address on every petition collected. Fla. Stat. § 100.371(3)(d) (2025); *Joint Pretrial Stipulation*, Agreed Facts ¶ 32, ECF No. 596. Together, these mandated disclosures would create a public trail linking the identity of the Individual Plaintiffs (as well as all other circulators) to specific political causes and showing precisely how actively they worked to promote those causes by gathering petitions. Day 6 (Scoon) Tr. 1657:5–14.

Ms. Scoon testified to her fear that this information would induce (and enable) politically motivated actors to threaten or even target her for her beliefs. *Id.* at 1656:19–25, 1657:5–9. Nor could such harm be caused solely by ideological opponents, as she pointed out; instead, that same information might be used by

81

cybercriminals and other bad actors engaged in phishing or spoofing scams targeting her (and other members of LWVFL, many of whom are senior citizens and thus particularly vulnerable to these types of attacks). *Id*. at 1654:10–1656:12; *cf. Brown v. Socialist Workers '74 Campaign Comm. (Ohio)*, 459 U.S. 87, 91–92 (1982). No wonder, then, that Ms. Scoon was not the only one with such concerns; as she testified, many other LWVFL members evinced similar fear upon learning about HB 1205's registration, affidavit, and disclosure requirements. Day 6 (Scoon) Tr. 1655:18–24.

Ms. Chandler was one of those members. During her testimony, she expressed similar concerns about the risks inherent in having to "put [her] name and address on each petition, which would directly link [her] personal information to the petition." Day 6 (Chandler) Tr. 1703:11–14. As Ms. Chandler explained: "I live by myself. I'm a widow. I have a small dog that would likely lick your ankle as opposed to bite it. I don't want my name and home address that closely linked to a potentially volatile issue." *Id.* at 1703:17–20. These are precisely the circumstances against which *Buckley* was designed to protect. *See* 525 U.S. at 198–200 (striking identification requirement due to risk of "recrimination and retaliation").

Moreover, the Supreme Court has recognized that a litigant's principled refusal to submit to this sort of disclosure or licensing requirement constitutes a separate cognizable injury even when no fear of retaliation exists. *See Watchtower*

82

*Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 165–67 (2002) (holding it "offensive . . . to the very notion of a free society" that a citizen must "inform the government of [her] desire to speak to" neighbors and "obtain a permit" to do so); *Buckley*, 525 U.S. at 195–96 (cognizable injury established where plaintiff self-censors rather than comply with registration requirement). Both Ms. Scoon and Ms. Chandler testified that such beliefs drove them to stop collecting petitions. Ms. Scoon told this Court that "[LWVFL] members and myself don't feel that we should have to register to talk to other citizens, to talk to Floridians about things of importance to them," because "[t]hat's our individual right under our citizens' initiative laws that preexisted [HB] 1205 and under the First Amendment." Day 6 (Scoon) Tr. 1663:7–13. As for Ms. Chandler, she stated that she was not "real happy about the government telling me who I can talk to and carry on a conversation with and directing the terms of that conversation." Day 6 (Chandler) Tr. at 1704:4–6; *see Watchtower*, 536 U.S. at 165–67.

**b)    The threat of criminal prosecution for "possessing" more than 25 petitions without registering, filling in missing voter information, or retaining voter information also qualify as injuries in fact.**

A statutory scheme that threatens criminal penalties for engaging in constitutionally protected activity inflicts an injury-in-fact even before enforcement because the threat itself deters the would-be speaker. *See Henry*, 45 F.4th at 1288 (standing exists where statute would cause reasonable speaker to self-censor);

83

*Wollschlaeger v. Gov. of Fla.*, 848 F.3d 1293, 1304–05, 1320–21 (11th Cir. 2017) (en banc) (recognizing injury where statutory "threat" deters protected expression). HB 1205's twenty-five-petition limitation subjects anyone who "physically possesses" more than twenty-five signed petitions without registration to third-degree felony liability and significant fines.  Day 6 (Scoon) Tr. 1663:20–21.

For both Individual Plaintiffs—circulators who routinely collected more than one hundred petitions in a single day at large community events—the threat of accidentally crossing the threshold is not hypothetical, but rather the inevitable consequence of effective petition circulation.  Day 6 (Scoon) Tr. 1633:6–10; Day 6 (Chandler) Tr. 1698:6–11; 1707:2–3.  Ms. Scoon had already collected twenty-five petitions for the Right to Clean Water and Florida Decides Healthcare Initiatives prior to the passage of HB 1205, and Ms. Chandler would have done so but for the new statute.[27]  Day 6 (Scoon) Tr. 1633:22–1634:6, 1702:8–14.  Although Defendants may suggest (as their counsel did during trial, *see* Day 6 (Lowe-Minor) Tr. 1589:20–21) that petition circulators could merely hand out blank petition forms after discussing the relevant ballot initiative with prospective voters, that would

---

[27] Ms. Chandler believes that, without registering, she can collect up to twenty-five petitions "over the two-year circulation period, I think"—but she has not collected even that number because, as a former constitutional law professor and criminal defense attorney, she finds that provision too vague to confidently parse.  Day 6 (Chandler) Tr. 1704:15–20.

drastically reduce the effectiveness and efficiency of the collection process. As Ms. Scoon explained, talking to voters without collecting signed forms is "[a]bsolutely not . . . real world": voters have only "five to ten minutes" of attention, they "want to sign a document, and they want to hand it over to us to handle it," and they are "not in a position to lock in their mind, I'm going to take this petition . . . and I'm going to mail it." Day 6 (Scoon) Tr. 1669:13–1670:10.

The statute's reference to "possession" rather than "collection" also posed a risk of injury to Individual Plaintiffs. As Ms. Chandler (drawing on her lawyerly understanding of "constructive possession" and "joint possession") recognized, at LWVFL events "all of us . . . would be in possession of those forms," meaning every volunteer could be deemed in physical possession of more than twenty-five signed petitions. Day 6 (Chandler) Tr. 1697:25–1698:5. Similarly, Ms. Scoon testified that when gathered petitions were transported after an event, one person would be in possession of all petitions for a period of time. Day 6 (Scoon) Tr. 1644:8–14.

Additional criminal provisions independently deter Ms. Chandler. HB 1205 makes it a third-degree felony to fill in missing information on a signed petition— yet (prior to HB 1205) she had routinely assisted voters with disabilities. Day 6 (Chandler) Tr. at 1705:12–23 ("What am I supposed to say to somebody that's sight-impaired and asks me to help them fill out the information? . . . I just don't know what the limits of the law are."). And the law's prohibition on copying or

85

retaining voter information bars LWVFL's longstanding practice of recording contact information from new members recruited at events. *Id.* at 1706:4–16.

###### c) The Individual Plaintiffs were also harmed by the vagueness of the statute's criminal provisions

Although HB 1205's threat of criminal penalties itself constituted an injury to both Ms. Scoon and Ms. Chandler for purposes of assessing their standing to bring this lawsuit, the vagueness of those provisions provides an independent source of injury because speakers cannot know in advance what conduct is prohibited. *See Reno v. ACLU*, 521 U.S. 844, 871–72 (1997) ("[T]he vagueness of [a criminal statute's] content-based blanket restrictions . . . raises special First Amendment concerns because of its obvious chilling effect on free speech."); *see also Gale Force Roofing & Restoration v. Brown*, 2021 WL 4958101, at *1 (N.D. Fla. June 29, 2021) (plaintiff need only show she was "chilled from exercising [her] right to free expression"). Individual Plaintiffs' lack of certainty with respect to several of HB 1205's provisions has also led them to self-censor, thus causing them injury.

First, as discussed above, HB 1205 redefines as predicate acts for purposes of Florida's RICO statute "irregularities" with petitions, stating that "a violation of the Florida Election Code relating to irregularities or fraud involving issue petition activities" constitutes "racketeering activity," but does not define what would constitute such an "irregularity." Fla. Stat §§ 895.02(8)(d)–(e) (2025); Day 6 (Scoon) Tr. 1667:1–9, 1668:22–24. Worse, Ms. Pratt, Director of OECS, admitted

86

that she was unaware of any public-facing definition of the term "irregularity" or, for that matter, any definition that OECS could apply either. Day 8 (Pratt) Tr. 2155:7–10. This puts individuals seeking to conform their conduct to HB 1205 in an impossible position, as they do not know what they may or may not legally do (or what conduct could subject them to prosecution for racketeering, which carries with it a jail term of up to thirty years).

Ms. Scoon's testimony captures the resulting uncertainty: "They may say that an invalid petition is an irregularity. We don't know. . . . We just know that it would be possible for a prosecutor to bring allegations against an individual [LWVFL] member or [LWVFL] itself, which would be extremely hurtful and damaging." Day 6 (Scoon) Tr. 1669:4–9. After all, an "irregularity" could be something as minor as a stray mark on a petition, a non-matching signature, or a fake name given as a prank by the individual filling out the form—none of which are even within the control of the circulator herself. Day 2 (Early) Tr. 471:11–474:24. The possibility that something like that could lead to significant jailtime (or, at the very least, the threat of an OECS investigation if 25 percent or more petition forms are invalidated for these irregularities, which Ms. Scoon described as "terrifying") drove her to stop collecting petitions entirely. Day 6 (Scoon) Tr. 1653:13–15, 1665:6–9, 1669:10–12.

Ms. Chandler's testimony also illustrates the chilling effect that the vagueness of the statute's felony provisions had on her ability to exercise her First Amendment

87

rights. When asked whether she knew what an "irregularity" means in that context, Ms. Chandler—despite having been an attorney for twenty-five years—answered: "Not a clue." Day 6 (Chandler) Tr. 1709:19–21. If a veteran criminal defense lawyer cannot parse the statute's metes and bounds, an ordinary volunteer circulator cannot be expected to do so either. For Ms. Chandler, also, the Investigation Provision compounds the problem; as Ms. Chandler explained, "anytime anyone is under investigation it is extremely stressful both emotionally and financially"—she has "seen people lose their homes over investigations." *Id.* at 1708:23–1709:4; *see Gale Force Roofing*, 2021 WL 4958101, at *1.

### 2) *Individual Plaintiffs' Injuries Are Traceable to Defendants and Redressable by This Court*

Traceability requires only a but-for causal connection between the challenged conduct and the alleged injury. *Bennett v. Spear*, 520 U.S. 154, 168–169 (1997). Here, the Secretary of State administers the registration system and refers violations to the Attorney General; the Attorney General institutes civil enforcement proceedings; the Supervisors of Elections invalidate non-compliant petitions; and the State Attorneys enforce criminal provisions. Fla. Stat. §§ 97.0575(8); *id.* §§ 100.371(4)(a), (g), (11), (14)(h) (2025); *id.* §§ 104.185, 104.187, 104.188. This Court has already recognized those enforcement channels at the preliminary injunction stage. *See* ECF No. 189 (Order on First Mot. for Prelim. Inj.); ECF No.

283 (Order on Collective Mots.) at 14–15 (Non-Resident Ban and Non-Citizen Ban), 18 (Registration Requirement).

But for HB 1205's provisions, Ms. Scoon would be collecting petitions for the initiatives she was actively working on when the law took effect (Day 6 (Scoon) Tr. 1634:1–6), and Ms. Chandler would be collecting petitions "at the same places that I did before, the same events"—such as the Lake Worth Street Painting Festival she talked about at trial (Day 6 (Chandler) Tr. 1702:10–14, 1710:6–12). *See also Bennett*, 520 U.S. at 168–69. The relief sought would permit both plaintiffs to resume that activity—which Ms. Chandler confirmed she would do "[j]oyfully"— free from the threat of prosecution, compelled disclosure, or punishment for vague noncompliance. Day 6 (Chandler) Tr. 1710:4; *see* ECF No. 283 at 15 (finding standing met Non-Resident and Non-Citizen Ban), 18 (finding standing Registration Requirement).

### ii.  LWVFL Has Article III Standing

#### 1)  *LWVFL Has Associational Standing to Challenge HB 1205*

LWVFL sufficiently satisfies the three prongs of associational standing: (i) LWVFL's members would otherwise have standing to sue in their own right; (ii) LWVFL seeks to protect interests that are germane to LWVFL's mission and purpose; and (iii) the claims asserted nor relief requested requires the participation of individual members in the lawsuit.

### a) LWVFL's Members Have Standing to Sue in Their Own Right and Have Suffered Harm under HB 1205

As discussed above, Individual Plaintiffs Ms. Scoon and Ms. Chandler, members of LWVFL, have standing to sue in their own right and have suffered an injury-in-fact as related to the following Challenged Provisions of HB 1205: Registration Restrictions, Personal Use Petition Restriction, Ten-Day Return Provision, Criminal Provisions, and Investigation Provision.[28]

A number of other LWVFL members also offered testimony during trial evidencing that they, too, have standing to sue.[29]  Christine Poff is a non-resident member of LWVFL and has standing to challenge HB 1205's Non-Resident Ban because she has and will continue to refrain from petition circulation due to HB 1205. Day 6 (Poff) Tr. 1485:11–16, 1503:6–16. Ms. Poff is a Massachusetts resident and one of LWVFL's "snowbirds" who travel to Florida during the winter months. *Id*. at 1486:8–15.   Ms. Poff has extensive petition-circulation experience in Massachusetts and has worked with LWVFL to assist with on-the-ground Get Out the Vote efforts in Florida.  *Id*. at 1494:13–20, 1498:6–16.  But for the passage of HB 1205, Ms. Poff would have worked with LWVFL to circulate petitions for the Florida Decides Healthcare and Right to Clean Water Initiatives during the 2026

---

[28] *Supra* Section IV.B(i).

cycle upcoming. *Id*. at 1501:23–1502:1. In particular, and as she testified, she would have spent her Saturday mornings circulating petitions in front of her local Publix or ALDI's, at street fairs or markets, or at other locations suggested by LWVFL. *Id*. at 1502:5–18. She expected to collect "probably a few hundred" signed petitions this way—but under HB 1205, Ms. Poff understands that she is prohibited from registering as a petition circulator due to her non-resident status, and that this directly affects her ability to participate in the petition-circulation process. *Id*. at 1503:1–16.

Cecilia González Herrera is a LWVFL member from Venezuela who also has standing to challenge HB 1205—specifically, the Non-Citizen Ban. Day 7 (González Herrera) Tr. 1757:12–19, 1758:20–21. Ms. González Herrera serves as an appointed, voluntary advisory board member in her local LWVFL chapter in Orange County. *Id*. at 1758:8–17. As part of her membership, she circulated petitions for the Right to Clean Water Initiative. *Id*. at 1767:14–19. While circulating petitions, she would explain LWVFL's activities and share information about initiatives including Right to Clean Water Initiative and use that opportunity to not only collect petitions but recruit potential new LWVFL members. *Id*. at 1768:7–1769:6. But after HB 1205's Non-Citizen Ban and Criminal Provisions went into effect, Ms. González Herrera abandoned her intentions to volunteer with LWVFL for petition collection due to fear of jeopardizing her and her family's asylum case and their safety. *Id*. at 1771:17–1772:8. But-for HB 1205, Ms.

91

González Herrera would have circulated petitions for the Right to Clean Water Initiative by attending community fairs and festivals, committee fairs, and tabling events attended by LWVFL. *Id*. at 1770:1–1771:4, 1772:10–14. Because HB 1205 prohibits her from registering as a petition circulator and imposes criminal penalties for violations, she can no longer engage in petition circulation in a meaningful way and thus has ceased collecting petitions.

LWVFL has also historically relied on returning citizens—individuals working towards restoration of their voting rights—as volunteers for petition circulation and other activities with LWVFL, and it is substantially likely that LWVFL would continue to rely on them absent HB 1205. Day 6 (Lowe-Minor) Tr. 1568:17–1570:13. Because of HB 1205's Categorical Bans, LWVFL has instructed, and will continue to instruct, returning citizens (as well as LWVFL other non-resident and non-citizen volunteers) to cease collecting petitions. As with Ms. Poff and Ms. González Herrera, returning citizens should not be prohibited from engaging in petition circulation based on their status, and should be able to participate meaningfully in the petition-circulation process.

> **b)** **LWVFL's Interests Are Germane to its Organizational Purpose, and Neither the Claims Asserted Nor the Relief Requested Require Individual Member Participation**

LWVFL's interests in this litigation are germane to its organizational purpose. LWVFL's mission is to empower voters and defend democracy, and petition

circulation in support of citizen-led initiatives is a core function of that mission. Joint Pretrial Stipulation; Agreed Facts ¶ 71, ECF No. 596; Day 6 (Lowe-Minor) Tr. 1519:3–16.  To this end, LWVFL has long organized, supported, and facilitated participation in petition circulation.  Day 6 (Lowe-Minor) Tr. 1518:10–14, 1519:3–16; 1531:18–1532:7.  For more than a decade, LWVFL has mobilized thousands of its volunteers to collect petitions on behalf of ballot initiatives, often collecting tens of thousands of signed petitions to place citizen amendments on the ballot.  *See supra* Section II.A(i)(1).  Furthermore, LWVFL seeks injunctive relief, therefore neither the claims asserted nor the relief requested requires the participation of individual members.[30]

### 2)    *LWVFL Has Organizational Standing to Challenge HB 1205*

LWVFL also has organizational standing because (1) HB 1205 directly impedes LWVFL's ability to accomplish its mission[31] and (2) in the months since

---

[30] *See Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F. 3d 1153, 1160 (11th Cir. 2008).

[31] *See, e.g.*, *Fla. State Conf. of the NAACP*, 680 F. Supp. 3d at 1308 ("The Florida NAACP Plaintiffs assert that they have suffered both a direct organizational injury and a diversion-of-resources injury.  This court, however, **does not need their diversion of resource theory because the record is clear that the [Plaintiffs] have directly suffered a concrete, particularized, actual and imminent injury**.") (emphasis added); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) ("If, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers, **there can be no question that the organization has suffered injury in fact.**  Such concrete and demonstrate injury to the organization's activities—with the consequent drain on the organization's

HB 1205 was introduced, LWVFL has been forced to divert resources, including members' and volunteers' time and energy and organizational funds, from activities central to its mission to counteract HB 1205.

> a) **HB 1205 Impedes LWVFL's Ability to Attract Members, Raise Revenues, and Fulfill its Mission by Obstructing its Core Mission Activities**

The trial record establishes that HB 1205 has inflicted concrete, tangible injuries on LWVFL as an organization by preventing it from fulfilling its core missions of empowering voters and defending democracy. *See* Day 6 (Lowe-Minor) Tr. 1518:1–3; *Joint Pretrial Stipulation*, Agreed Facts ¶ 71, ECF No. 596. Petition circulation in support of citizen-led initiatives is a core function of that mission, and LWVFL has long organized, supported, and facilitated participation in petition circulation as part of its century-old commitment to defending democracy and increasing participation in the democratic process. Day 6 (Lowe-Minor) Tr. 1518:10–14, 1519:3–16, 1531:18–1532:7. Yet, because of the Challenged Provisions, the League is now "[un]able to play a role at all" in petition circulation. *Id.* at 1574:8–10.

---

resources—constitutes far more than simply a setback to the organization's abstract social interests."); *Florida Democratic Party v. Hood*, 342 F. Supp. 2d 1073, 1079 (N.D. Fla. 2004) ("[A]n organization has standing to challenge conduct that impedes its ability to attract members, to raise revenues, or to fulfill its purposes.").

94

First, HB 1205 forced LWVFL to place a moratorium on all organization-led petition circulation—a shutdown of one of its core programs. Day 6 (Lowe-Minor) Tr. 1520:9–15, 1543:2–11. LWVFL determined it could not, in good conscience, encourage volunteer petition circulation knowing that its members would be forced to assume risks to their personal safety from making their home addresses public alongside information on political causes they support. Day 6 (Lowe-Minor) Tr. 1520:9–15, 1543:2–11, 1545:12–1546, 1548:18–1549:5, 1553:15–22. As explained by Ms. Lowe-Minor, HB 1205 "makes it impossible for [LWVFL] to do petition gathering as an organization or encourage our members to do it on our behalf" because doing so could place its volunteers "at risk of falling into legal jeopardy," "open [LWVFL] up to investigations," or otherwise "run afoul of the law." *Id.* at 1572:22–1573:2. Altogether, these concerns mean that it is "next to impossible for volunteer groups like [LWVFL] to do petition gathering as . . . a civic service." *Id.* at 1572:24–1573:8. This moratorium has directly prevented LWVFL from carrying out activities that further its stated purpose.

That LWVFL's volunteers may (as Defendants' counsel were at pains to point out—repeatedly) still talk to 25 or more voters and hand out blank petitions for the voter themselves to take home, fill, and sign is "absolutely not" "a feasible alternative." Day 6 (Scoon) Tr. 1669:17–18. The mere fact that HB 1205 "leaves open a more burdensome avenue of communication does not relieve its burden" on

95

LWVFL or its volunteers.  *Fla. State Conf. of the NAACP*, 680 F. Supp. 3d at 1308 n.12; *see Meyer v. Grant*, 486 U.S. 414, 424 (1988).  There should be no mistake: as the undisputed testimony adduced during trial demonstrated, concluding the petition circulation process by handing out a blank form rather than talking the voter through completion of the petition and then collecting it is a far less efficient—and less effective—manner of exercising the volunteer's First Amendment rights. Additionally, the conversations that generally accompany petition circulation are a central part of the practice as a whole.  Rather than just distributing blank forms, circulators engage in a process of approaching a voter, educating them about the initiative, inviting them to sign, and ultimately collecting the signed petition on the spot.  Each step is an essential part of petition collection.  The significant link between these conversations and collection has been underscored by witnesses' testimony.  Ms. Scoon explained that "educational conversations are a big part of [LWVFL's] mission" and that the "opportunities to have those conversations pretty much only come up when someone is thinking about signing a petition."  Prelim. Inj. (Scoon) Tr. 105:13–17 (June 30, 2025).  Ms. González Herrera similarly testified that "in order for [my engagement with a voter] to be effective, I need to be able to have a result out of that interaction.  Because in order to just talk, I could just talk all day, but we go there with a purpose, which is defending and promoting this initiative."  Day 7 (González Herrera) Tr. 1775:3–6.  Additionally, in-person

96

collection serves a vital quality control function.  When a circulator is present while a voter signs a petition, they are able to catch common mistakes that the voter can correct while still present.  In her testimony, Ms. Scoon stated that, after receiving a petition, volunteers "would look it over and try to make sure that there were no errors or things they could correct while they were still there" and "would absolutely look at what [the petition signer] filled out, because in the moment they could fix it."  Day 6 (Scoon) Tr. 1641:5–16.

Furthermore, the State's suggestion "offer[s] little solace to individuals facing a felony prosecution for violating the statute." *Fla. State Conf. of Branches & Youth Units of the NAACP*, 680 F. Supp. 3d at 1309.  Even for those who do not collect any petitions or who would be willing to hand out blank forms, the Criminal Provisions of HB 1205 that do not pertain to on-the-ground petition gathering independently chill participation in the initiative process.  The Ten-Day Return Deadline imposed by the law and its ability to subject sponsors to hefty fines for violations has been shown to prevent engagement by organizations that would otherwise circulate petitions.  Ms. Lowe-Minor testified that, even if the other provisions were removed, the Ten-Day Return Deadline would stop her from recommending that LWVFL continue its petition circulating efforts, as it would be forced to "turn in any forms [they] have as quickly as possible, even if those forms have an error," and these errors could leave the organization "liable for

97

investigations." Day 6 (Lowe-Minor) Tr. 1564:19–1565:4. These investigations—automatically triggered by the invalidation of 25 percent or more petition forms submitted for an initiative in a reporting period—further deter individuals from participating in petition collection. Ms. Scoon confirmed in her testimony that the "threat of an OECS investigation [] for having too many invalid ballots" was something that stopped her from personally collecting petitions after HB 1205 took effect. Day 6 (Scoon) Tr. 1666:18–21. The fears associated with these provisions are compounded by HB 1205's expansion of the definition of "racketeering activity" and uncertainty around what kind of "irregularities" could lead to a felony conviction that may carry up to 30 years' imprisonment. Fla. Stat. § 895.04; Fla. Stat. § 775.082(3)(b). As explained by Ms. Lowe-Minor, LWVFL could not provide "sufficient guidance to its members to avoid liability under this provision" as they "really don't know what would incur those charges," and, as a result, decided that they "would just not gather petitions." Day 6 (Lowe-Minor) Tr. 1567:9–14. With these provisions in place, HB 1205 chills the participation of potential circulators before they ever collect a single petition.

Second, HB 1205 has impeded LWVFL's ability to attract new members and recruit volunteers. LWVFL has historically organized petition-related civic engagement events at which it recruited new members and volunteers to participate in same-day petition circulation. *Id.* at 1538:7–18. By requiring volunteers to

98

register in advance and attempt to be approved as circulators, the Registration Restrictions have eliminated LWVFL's ability to expand its membership—and spread its message—through spontaneous, day-of volunteer sign-ups at petition circulation events. *Id.* at 1538:21–1539:4. Being unable to "add folks into [LWVFL's] network" at these events "reduces [LWVFL's] effectiveness as an organization[.]" *Id.* at 1560:13–22. Former LWVFL President Ms. Chandler similarly explained that when circulating petitions, she would "strike up a conversation with [the voter] and we would be talking about a particular issue, and, you know, they would join [LWVFL] right on the spot." Day 6 (Chandler) Tr. 1706:8–16. She further testified that "one of the things that was most enjoyable about tabling and collecting the petitions is frequently we would get new members of [LWVFL]"—a pathway to organizational growth now foreclosed by HB 1205. *Id.* at 1706:8–9; *see supra* Section II.A(i)(1).

Because "one of [LWVFL's] previously most cherished volunteer activities [is] no longer available," LWVFL's membership has dwindled. Day 6 (Lowe-Minor) Tr. 1594:1–9. LWVFL's members are "looking for ways to add value to the democratic process," and "engage[] as citizens," so the fact that LWVFL can no longer play a role in petition circulation due to HB 1205 is a "significant contributing

99

factor" to the decrease in membership. *Id.* at 1594:4–9.[32]  This membership decline has, in turn, directly impacted LWVFL's ability to obtain funding.  LWVFL's members are its largest source of individual private donations, and over the last year, LWVFL's "overall budget has shrunk" and "the donations part of [LWVFL's] budget is smaller than it was last year." *Id.* at 1541:17–24.

The Categorical Bans have also reduced LWVFL's pool of volunteers and stifled its ability to advance its mission. *See id.* at 1570:21–1571:12.  LWVFL's membership encompasses Floridians of all backgrounds, including non-residents like Ms. Poff and non-citizens like Ms. González Herrera, and LWVFL has relied on these members' language skills and cultural connections to reach communities that the majority-White organization could not access on its own. *See* Day 7 (González Herrera) Tr. 1758:4–7; Prelim. Inj. (Scoon) Tr. 84:3–13 (June 30, 2025).  LWVFL has also historically relied on returning citizens as volunteers for petition circulation and other activities.  Day 6 (Lowe-Minor) Tr. 1568:17–1570:2, 1570:12–13.  The Categorical Bans have severed these connections and diminished LWVFL's operational capacity.  Because HB 1205 prohibits these members from registering as petition circulators, LWVFL has instructed, and will continue to instruct,

---

[32] While analysis or polling has not been done by LWVFL to determine the reason for the decrease in membership, Ms. Lowe-Minor testified that, though there may be other reasons for the decrease, HB 1205 was "an important factor."  Day 6 (Lowe-Minor) Tr. 1594:10–21.

100

non-citizen, non-resident, and returning citizen volunteers to cease collecting petitions.

The substantial injury to LWVFL's core mission activities—its petition circulation efforts—with the consequent drain on LWVFL's resources, "constitutes far more than simply a setback to [LWVFL's] abstract social interests," and there can be "no question that [LWVFL] suffered injury-in-fact." *Havens Realty Corp v. Coleman*, 455 U.S. 363, 379 (1982).

### b)    HB 1205 Forced LWVFL to Divert Resources from its Core Mission Activities to Counteract HB 1205

Before it ceased collecting petitions entirely as a result of HB 1205, LWVFL was forced to divert substantial resources from its core activities to evaluate the restrictions imposed by the new statute and in an ultimately fruitless attempt to put in place procedures to allow for compliance of the law while enabling LWVFL's members to continue circulating petitions in an effective and efficient manner. Indeed, HB 1205's impact on LWVFL far exceeds the "identifiable trifle" sufficient to establish Article III standing. *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973). Before LWVFL halted its petition circulation, it was forced to divert staff and volunteer hours to interpret HB 1205's provisions, educate its volunteers, consult with counsel, and update compliance review processes for petition forms. *See supra* Section II.A(i)(1). To this effect, LWVFL devoted one of its Lunch and Learns, biweekly events that

101

LWVFL hosts to discuss topics that would be helpful to its members, to bring in subject matter experts to discuss and answer questions about HB 1205 when the bill was moving through the legislature. Day 6 (Scoon) Tr. 1675:22–1677:9. After HB 1205 was passed and signed into law, further resources were spent responding to members communications of their concerns, with Ms. Scoon testifying that the law was "all we talked about for maybe a month" and that "everybody was up in arms"— "There were phone calls. There were texts. There were emails." Day 6 (Scoon) Tr. 1679:14–24. These resources would have otherwise been spent supporting volunteers, educating the public, and advancing other initiatives that are core to LWVFL's mission. *See supra* Section II.A(i)(1). LWVFL held training sessions and fielded questions on HB 1205 for its members. *See supra* Section II.A(i)(1). This diversion of resources is independently sufficient to demonstrate standing. *See Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341–42 (11th Cir. 2014); *Lee*, 576 F. Supp. 3d at 971.

The record is clear that LWVFL may establish organizational standing. *See PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*, 711 F. Supp. 3d 1325, 1330 n.8 (N.D. Fla. 2024).

### iii.    LULAC's Has Article III Standing

LWVFL's established organizational and associational standing are sufficient to satisfy Article III standing for the League Plaintiffs. *Alachua Cnty. Educ. Ass'n.*

102

*v. Carpenter*, 757 F. Supp. 3d 1248, 1254 (N.D. Fla. 2024) ("[T]he standing requirement is satisfied so long as a single plaintiff has standing" for each statutory provision challenged).    Nevertheless, LULAC can independently establish associational and organizational standing for the Challenged Provisions.

### 1)    *LULAC Has Associational Standing to Challenge HB 1205*

LULAC has associational standing under Article III to sue on behalf of its members because (i) its members would otherwise have standing to sue in their own right; (ii) LULAC's interests at stake are germane to its mission and purpose; and (iii) neither the claims asserted nor relief requested requires participation of LULAC's individual members. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

### a)    LULAC members have independent standing to challenge HB 1205's Challenged Provisions

HB 1205's Non-Citizen Ban directly and categorically prohibits LULAC's non-citizen members from engaging in petition circulation—thereby inflicting concrete harms sufficient to establish their independent standing to challenge HB 1205. For example, Karen Patricio, a non-citizen LULAC member, exemplifies this harm. Ms. Patricio had previously collected petitions for the Voting Restoration Amendment and Amendment to Limit Government Interference with Abortion, and had specific, concrete plans to assist with petition collection this year. Day 6 (Patricio) Tr. 1723:24–1724:14, 1730:25–1731:9.  However, she was forced to

103

"stop[] collecting after HB 1205 passed" because her "immigration status limit[ed]" her ability to collect petitions and she did not want to "risk being in trouble or fined or, you know, harm my community in anyway." Day 6 (Patricio) Tr. 1731:10–16.

While Ms. Patricio's harm is sufficient for establishing Article III standing as to the Non-Citizen Ban, it is clear that *all* of LULAC's non-citizen members are harmed by HB 1205's Non-Citizen Ban. *See Am. All. For Equal Rts. v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 773 (11th Cir. 2024) (making clear that associational standing does not require "identify[ing] affected members by their legal names," and that "an organization need only make specific allegations based on specific facts … that one or more of [its] members would be directly affected") (cleaned up). LULAC's CEO, Juan Proaño, had several conversations with specific non-citizen LULAC members—who have previously circulated petitions for the Voting Restoration Amendment and Amendment to Limit Government Interference with Abortion—about their plans to "be more engaged" and "to go out and actually collect petitions" for the Florida Decides Healthcare Initiative and Right to Clean Water Initiative. Day 5 (Proaño) Tr. 1452:24–1453:8. Yet, Mr. Proaño is not "aware of any LULAC members who have registered as circulators in Florida," nor is he "aware of any [members] that plan to register." *Id.* at 1457:24–1458:3. This reluctance stems not only from the Non-Citizen Ban, but also from the Affidavit Requirement and Registration Requirement: "The burdens seem to be too high

104

relative to the requirements to actually register, … [a]nd many fear, you know, political targeting and harassment given the fact that this information"—including the circulator's name, permanent address, and supported initiative—"would be public[ly] available." *Id.* at 1458:4–12.

Indeed, HB 1205's Affidavit Requirement weighs heavily on LULAC members and causes them to fear for their safety, and has harmed LULAC's members. For example, Dr. Medrano, LULAC's current Tampa district director, testified that she would not register as a petition circulator because she was "concerned that this information is going to be published" and "used for political reasons," or that third parties will "know the causes I work for, what I believe." Day 6 (Medrano) Tr. 1616:10–24 (further expressing concern that we "live in a very divided world" in which there "is a lot of violence.").

Similarly, LULAC's members are harmed by, and have standing to challenge, the Registration Requirement, which requires individuals to register as petition circulators if they wish to collect more than 25 signed petition forms. These members are harmed in two distinct ways: first, the Non-Citizen and Non-Resident Bans prohibit LULAC's non-citizen and non-residents from registering at all, thereby barring them from collecting, delivering, or physically possessing more than 25 signed petition forms; and second, these affected LULAC members, who routinely collected more than 25 signed petition forms prior to HB 1205's

105

enactment, sometimes collecting over 100 a day, have ceased circulating petitions. Day 5 (Proaño) Tr. 1457:7–23; Day 6 (Medrano) Tr. 1609:20–1610: 6 (explaining that Dr. Medrano collected more than 100 petitions each for Voting Restoration Amendment and Amendment to Limit Government Interference with Abortion); Day 6 (Medrano) Tr. 1616:6–9 (noting that, following the enactment of HB 1205's Registration Provision, Dr. Medrano ceased circulating petitions).

Also, HB 1205's Non-Resident Ban has specifically harmed LULAC's non-resident members. For example, Domingo Garcia, LULAC's past President, is a non-resident who visits Florida with his family roughly six times a year for extended periods of time. *Id.* at 1455:25–1456:5. He had previously collected petitions for the Voting Restoration Amendment and Amendment to Limit Government Interference with Abortion, and had planned to "come to the state of Florida and help join [LULAC's] efforts," but is now prohibited from collecting petitions because of the Non-Resident Ban. Day 5 (Proaño) Tr. 1455:24–1456:9.

For the same reasons as the harmed LWVFL members, the harmed LULAC members satisfy the traceability and redressability prongs of standing. The injuries suffered by these members are traceable to Defendants and would be redressable through enjoining the enforcement of HB 1205, which would enable harmed LULAC members to resume petition collection.

106

> **b)** **LULAC's interests are germane to its organizational purpose, and neither the claims asserted nor the relief requested require individual member participation.**

LULAC further satisfies the second and third requirements of associational standing. Petition circulation is the core component of LULAC's civic engagement work in Florida, and the interests that LULAC seeks to protect—LULAC members' access to civic engagement through petition circulation—are germane to its organizational purpose: "to advance the economic condition, educational attainment, political influence, housing, health and civil rights of the Hispanic population of the United States." Proaño Supp. Decl. ¶ 2. Indeed, petition circulation is particularly important to LULAC's non-citizen members because it gives them a voice:

> [Petition circulation] is really one of the only ways in which they actually can participate in our governments. It's a First Amendment right for them to be able to go out and petition our government. They can't vote, and so this is one of the ways that they actually can engage. . . . And for many of them, these issues are really pertinent to them and their livelihoods.

Day 5 (Proaño) Tr. 1454:21–1455:8. LULAC's members have circulated petitions for the Voting Restoration Amendment and Amendment to Limit Government Interference with Abortion in the past to advocate for the initiatives they believe in, and to "support the community," "empower our citizens," and "engage the Hispanic community." Day 5 (Proaño) Tr. 1445:16-21; Day 6 (Medrano) Tr. 1609:9–19, 1610:18–1611:24. Yet, HB 1205 has caused LULAC and

107

its members to cease collecting petitions entirely.  Day 5 (Proaño) Tr. 1457:24-1458:3.

Finally, neither the claims asserted nor the relief sought requires the participation of individual members as plaintiffs, in that the claims and relief that LULAC seeks are not unique to any individual member.

### 2)    *LULAC has organizational standing to challenge HB 1205*

LULAC also has organizational standing because HB 1205 also inflicted direct injury on LULAC as an organization by impeding its core mission.  In *Florida State Conference of the NAACP v. Byrd*, Florida enacted a law that made a felony for a person engaged in voter registration to copy or retain information from a voter registrant.  680 F. Supp. 3d 1291, 1300 (N.D. Fla. 2023).  This Court held that voter registration groups suffered a direct injury resulting from the information retention ban, and that because the groups "will no longer be able to carry out their mission of increasing political participation by contacting voters they have registered," the "ban directly impedes" the groups' ability to accomplish their missions.  *Id.* at 1308.  Likewise, HB 1205 directly impedes LULAC's mission.

The Categorical Bans prohibit non-resident and non-citizen LULAC members from collecting petitions. LULAC's "growing and expanding" non-citizen membership is "critically important" to the organizations overall work.  Day 5 (Proaño) Tr. 1451:17–23.  Non-citizen members "do the same work that every other

member does," providing support to the organization's programs and services, including petition circulation. *Id.* at 1451:9–14. The Non-Citizen Ban excludes these members from circulating petitions. LULAC District Director and Apopka Council President Ms. Patricio similarly testified that HB 1205 has had a "giant impact on the work that" her district does: as a result of the Non-Citizen Ban and other provisions of HB 1205, Ms. Patricio's district has "definitely [been] seeing a loss in [member] participation" after passage of HB 1205. Day 6 (Patricio) Tr. 1733:20–21, 1732:1. Ms. Patricio explained that "[people] stopped coming;" "[t]hey stopped being present at the meetings, whether it was virtual or in person." *Id.* at 1732:16–20. More specifically, Ms. Patricio explained collecting petitions was "one of the pillars" of the work her newly-created district intended to do, but that because of HB 1205, "we actually decided to just avoid that in general" because half of the members in the district are non-citizens. *Id.* at 1728:8–18.

The Categorical Bans also harm LULAC's ability to communicate its message to Florida voters. Mr. Proaño testified that non-citizen members help to get the organization's message out to the community, describing them as "our boots on the ground" and "the first connection we actually have to the community." Day 5 (Proaño) Tr. 1454:14–18. This matters because, according to Mr. Proaño, some members of the community "may not necessarily as tuned in to" discussions of specific issues, and that contact with circulators is "the first time that they may

109

actually hear about" these issues. *Id.* at 1453:23–1454:9. Ms. Patricio similarly testified that, when she is circulating petitions, she provides background on initiatives to voters and answers questions, often in Spanish, presenting "information to them for the first time." Day 6 (Patricio) Tr. 1726:5–10. By excluding non-citizens from this process entirely, it has cut off a crucial line of communication between LULAC and the community.

LULAC also has suffered an injury with respect the Registration Requirement. National LULAC recommended its Florida members to halt petition collection out of concern for their privacy and safety relating to the Registration Requirement and the Disclosure Requirement. This concern was based on other instances of harassment suffered by LULAC members.

LULAC Tampa District Director Dr. Medrano exemplifies the injury to LULAC of the Registration Requirement. She testified that she has collected more than 100 petitions each for Voting Restoration Amendment and Amendment to Limit Government Interference with Abortion, and hoped to collect hundreds more for the Florida Decides Healthcare Initiative. Day 6 (Medrano) Tr. 1609:20–1610:6; 1614:10–14. When she collects petitions, Dr. Medrano wears LULAC apparel. Day 6 (Medrano) Tr. 1610:10–17; 1611:23–1612:7. When circulating, Dr. Medrano would approach voters, introduce herself as a member of LULAC, and engage them in conversations about an initiative before asking them to sign. *Id*. at 1610:10–17.

110

In speaking to voters, she was able to address any concerns that a voter would have about an initiative. For example, regarding the Voting Restoration Amendment, Dr. Medrano was able to respond to the concerns of several voters by explaining that people convicted of murder would not be able to get their rights restored. Day 6 (Medrano) Tr. 1617:10-1617:24. Because of the Registration Requirement and the Disclosure Requirement, Dr. Medrano no longer circulates petitions after HB 1205 and has no plans to register as a circulator. Day 6 (Medrano) Tr. 1616:6–9.

For the same reasons as LWVFL, LULAC satisfies the traceability and redressability prongs of standing. The injuries suffered by these members are traceable to Defendants and would be redressable through enjoining the enforcement of HB 1205, which would enable LULAC to resume petition collection.

## V.    THE CHALLENGED PROVISIONS VIOLATE THE FIRST AND FOURTEENTH AMENDMENTS[33]

### A.    Legal Standards

#### i.    HB 1205's Restrictions on Petition Collection Burden Core Political Speech and Thus Are Subject to Strict or Exacting Scrutiny (Count I)

Petition circulation is "core political speech" that entails "interactive communication concerning political change," for which constitutional protection "is at its zenith." *Buckley*, 525 U.S. at 186–87 (quoting *Meyer*, 486 U.S. at 422–25).

---

[33] Counts I and II set forth First Amendment claims which implicate the Fourteenth Amendment through the incorporation doctrine.

Accordingly, governmental regulations that severely restrict petition circulation—like those at issue here—are squarely subject to heightened scrutiny. *Meyer*, 486 U.S. at 423 ("[S]tatutes that limit the power of the people to initiate legislation are to be ***closely scrutinized and narrowly construed***.") (citation omitted) (emphasis added). As the Supreme Court explained in *Meyer*:

> The circulation of an initiative petition of necessity involves both the expression of a desire for political change and a discussion of the merits of the proposed change. Although a petition circulator may not have to persuade potential signatories that a particular proposal should prevail to capture their signatures, he or she will at least have to persuade them that the matter is one deserving of the public scrutiny and debate that would attend its consideration by the whole electorate. This will in almost every case involve an explanation of the nature of the proposal and why its advocates support it. Thus, the circulation of a petition involves the type of interactive communication concerning political change that is appropriately described as "core political speech."

*Meyer*, 486 U.S. at 421–22.

A challenged law impermissibly burdens petition circulation—and therefore political expression—in at least two ways:

> First, it limits the number of voices who will convey appellee's message and the hours they can speak and, therefore, limits the size of the audience they can reach. Second, it makes it less likely that appellees will garner the number of signatures necessary to place the matter on the ballot, thus limiting their ability to make the matter the focus of statewide discussion."

*Id.* at 422–23. Some ten years after *Meyer*, in *Buckley*, the Supreme Court applied that analytical framework in holding unconstitutional a Colorado law that required initiative-petition circulators to (1) be registered voters and (2) wear an

112

identification badge bearing the circulator's name; and (3) required that proponents of an initiative report the names and addresses of all paid circulators and the amount paid to each circulator. *Buckley*, 525 U.S. at 186–87.

The criteria identified and applied by both the *Meyer* and *Buckley* Courts have been identified as "two non-exhaustive considerations that aid in determining whether a regulation of the initiative process imposes such a severe burden on core political speech that it triggers strict scrutiny." *Pierce v. Jacobsen*, 44 F.4th 853, 860 (9th Cir. 2022). As discussed in Appendix B, circuit courts have fleshed out the types of restrictions which fall into one of these two categories, thus compelling the application of some sort of heightened scrutiny to petition circulation regulations. And courts across jurisdictions agree that strict scrutiny applies to laws (like the Categorical Bans here) that preclude certain people from circulating petitions and those that heighten restrictions on speech via felony penalties (like the Criminal Provisions here).

"'[I]t is the rare case in which a speech restriction withstands strict scrutiny.'" *Reed v. Town of Gilbert*, 576 U.S. 155, 180 (2015) (Kagan, J., concurring) (quoting *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 444 (2015). To prevail, the government must show that the challenged restriction (1) "is necessary to serve a compelling state interest and is narrowly drawn to achieve that end," *id.* at 180–81, and (2) represents the least restrictive means of achieving the compelling governmental

113

interest, *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004). The government's burden in satisfying the least restrictive alternative test is "is well-nigh insurmountable" where the challenged "statute trenches upon an area in which the importance of First Amendment protections is 'at its zenith.'" *Meyer*, 486 U.S. at 425.

As explained further below, even if the Court does not apply strict scrutiny, the speech burdens at issue here mandate that it at the very least apply exacting scrutiny. Under this standard, Defendants must show that the Challenged Provisions are "narrowly tailored to the interest [they purportedly] promote[], even if [they are] not the least restrictive means of achieving that end." *Bonta*, 594 U.S. at 609–10. "Narrow tailoring is crucial where First Amendment activity is chilled—even if indirectly—'because First Amendment freedoms need breathing space to survive.'" *Id.* at 609 (quoting *NAACP v. Button*, 371 U. S. 415, 433 (1968)). Indeed, "even a 'legitimate and substantial' governmental interest 'cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.'" *Id.* (quoting *Shelton v. Tucker*, 364 U.S. 479, 488 (1960)).[34]

---

[34] Defendants do not appear to argue that intermediate scrutiny applies, but even if they did, Defendants would still be required to show that the Challenged Provisions are "'narrowly tailored to serve a significant governmental interest." *Packingham v. North Carolina*, 582 U.S. 98, 105–06 (2017) (quoting *McCullen v. Coakley*, 573 U.S. 464, 486 (2014)).

### 1) Petition collection regulations that significantly limit one-on-one communications are subject to strict or exacting scrutiny

Courts have found that either strict or exacting scrutiny applies to regulations—like those at issue here—that "restrict access to the most effective, fundamental, and perhaps economical avenue of political discourse—direct one-on-one communication"—as such laws have "the inevitable effect of reducing the total quantum of speech on a public issue." *Meyer*, 486 U.S. at 423–24. Regulations restrict speech when they, for example, (1) expressly preclude a significant number of potential circulators from collecting petitions; (2) deter would-be circulators due to fear of harassment or retaliation; (3) impose severe sanctions for noncompliance, including felony liability; or (4) force speakers to choose between silence and sacrificing deeply held beliefs. *See id.* at 421–423, 424–427; *Buckley*, 525 U.S. at 219, 227–228.

It is simply not enough that "other avenues of expression remain open to" those challenging a speech restriction, as inferior alternatives simply do not "relieve[]" a law's "burden[s] on First Amendment expression." *Meyer*, 486 U.S. at 424. Nor does the State's authority to impose limitations on the scope of the state-created right to legislate by initiative give it a free pass at imposing restrictions: instead, "the power to ban initiatives entirely" does not "include[] the power to limit discussion of political issues raised in initiative petitions." *Id.* at 425.

115

While the State no doubt has an interest in protecting the integrity of the initiative process, it must substantiate that interest with cited evidence. *Id.* at 426. That existing statutes criminalizing fraud already exist weighs in favor of finding that new restrictions are not sufficiently tailored. *Id.* at 427 (concluding that the pre-existing protections "seem adequate to the task of minimizing the risk of improper conduct in the circulation of a petition").

Lower courts have been especially solicitous of *Meyer*'s concern for participation in the democratic process, applying strict scrutiny to initiative petition restrictions that prohibit some persons from engaging in petition collection and then striking down those prohibitions. A fulsome discussion of lower courts' application of *Meyer* is contained in **Appendix B.**

### 2) *Regulations that make it less likely that petitions will get on the ballot are also subject to heightened scrutiny*

While the first consideration in *Meyer* focuses on whether the quantum of speech (or number of voices speaking) is reduced because of a regulatory scheme, the second consideration focuses on whether the effect of the regulatory scheme is to make it less likely the petition will get on the ballot, thus limiting the ability of an initiative's supporters to make "the matter the focus of statewide discussion." *Meyer*, 486 U.S. at 422–23.

Applying this *Meyer* consideration, the Eighth Circuit recently held that a South Dakota law that prevented a person from signing a petition to initiate state

116

statutes in the year immediately before a general election violated the First Amendment. *SD Voice v. Noem*, 60 F.4th 1071, 1083 (8th Cir. 2023). The plaintiffs adduced evidence showing that the reduction of time made it more difficult to get a petition on the ballot and led to a reduction in the number of issues making it on to the ballot after the one-year deadline had been enacted though some initiatives had made it to the ballot. *Id.* at 1079. Based on these facts, the court held that the filing deadline implicated the First Amendment under *Meyer*. *Id.* The court stated that it "harbor[ed] doubt that the burden on the ability to engage in political speech as a result of the deadline is less than severe," but it did not decide whether strict scrutiny applied because it "conclude[d] the statute fails under scrutiny for burdens that are less than severe." *Id.* at 1080. The state offered three rationales for its one-year deadline for petition initiatives: "election integrity, administrative efficiency, and the Legislature's ability to respond to petitions." *Id.* The court found that evidence showed that South Dakota did not need such a long deadline to accomplish these objectives. *Id.* at 1081–82.

Under either strict or exacting scrutiny, courts test—not merely accept—justifications offered by the government, closely analyzing the legitimacy of the state interest, including whether there was an actual problem that the regulation would solve. *See, e.g.*, *Buehrle v. City of Key W.*, 813 F.3d 973, 978–79 (11th Cir. 2015) (declining to "simply take the [government] at its word"; rather, it "must demonstrate

117

that it had a reasonable basis for believing that its regulation would further [its stated]

legitimate interests"); *Messina v. City of Fort Lauderdale*, 713 F. Supp. 3d 1292,

1331 (S.D. Fla. 2024) ("When First Amendment freedoms are at stake, the Supreme

Court has been clear, the [government's] say-so just won't do."). They have also

looked to see whether the preexisting measures already adequately addressed the

state interest. *Meyer*, 486 U.S. at 427. Where courts have applied strict or exacting

scrutiny in petition collection cases, governments have typically failed to meet their

burden. *See generally* Appendix B.

### ii.    Rational Basis Review Does Not Apply

The state claims that "rational basis applies" because, according to it, HB 1205

"regulate[s] the process by which petitions are collected and submitted, not the way

a petition circulator communicates or interacts with Florida voters." *Joint Pretrial

Stipulation* 16, ECF No. 596. Defendants' reliance on the Eleventh Circuit's

decision in *Biddulph v. Mortham*, 89 F.3d 1491 (11th Cir. 1996) is misplaced. *See*

Sec'y & AG's Resp. in Opp'n to Pls.' First Prelim. Inj. Mot. 18, ECF No. 105. In

*Biddulph*, the plaintiff challenged only Florida's single-subject and clarity

requirements for ballot language, not any restriction regulating circulators. 89 F.3d

at 1493. The court rejected the plaintiff's argument that strict scrutiny applied,

though it did not state what the appropriate test was, whether rational basis or

something else, and did not apply any test to the facts. *Id.* at 1500–01.

118

Because the regulation at issue in *Biddulph* did not regulate any activities of petition circulators who interacted with voters, it bears no resemblance to the Challenged Provisions in HB 1205. Indeed, in distinguishing *Meyer*, the court in *Biddulph* noted that *Meyer* limited state regulation "to the extent to which it can permissibly burden the communication of ideas about the political change at issue in an initiative proposal that occurs during petition circulation," whereas "Biddulph does not complain that exclusion of his initiative proposal limited discussion during petition circulation." *Id.* at 1498. Here, by contrast, each of the Challenged Provisions implicates circulator communication with voters, including factors courts consistently identify as requiring heightened scrutiny. For instance, the Categorical Bans prohibit certain groups from circulating petitions; the Registration Restrictions, backed up by third-degree felony liability, predictably deter would-be circulators and forces them to choose between sacrificing political beliefs or silencing themselves. *See supra* Section II.A(iii)(1)–(2). The law in *Biddulph* did none of these things. It is worth noting that circuits like the Eighth, Ninth, and Tenth Circuits, which have found regulations banning or deterring people from circulating petitions implicate strict or exacting scrutiny, have also found that restrictions like those in *Biddulph* were not subject to heightened scrutiny. *See, e.g.*, *Missouri Roundtable for Life v. Carnahan*, 676 F.3d 665, 675–77 (8th Cir. 2012) (citing *Biddulph* in holding that summary statements, fiscal note summaries, and fiscal

119

notes prepared for ballot initiatives did not implicate free speech concerns); *PEST Committee v. Miller*, 626 F.3d 1097, 1107–08 (9th Cir. 2010) (citing *Biddulph* in holding single-subject, description-of-effect, and pre-election challenge provisions do not burden free speech rights); *Campbell v. Buckley*, 203 F.3d 738, 746–47 (10th Cir. 2000) (citing Biddulph in holding that single subject requirement for initiative petitions did not implicate heightened scrutiny).

At any rate, while rational basis review is deferential, laws that do not bear a rational relationship to their stated rationale are unconstitutional. *Hooper v. Bernalillo Cnty. Assessor*, 472 U.S. 612, 618, 622 (1985).

### iii. Petition Circulation Restrictions That Substantially Burden the Freedom of Association Are Subject to Strict Scrutiny (Count II)

The Eleventh Circuit has held that petition circulation is protected by the freedom of association under the First Amendment because it involves "the communication of ideas to voters." *Clean-Up '84 v. Heinrich*, 759 F.2d 1511, 1513 (11th Cir. 1984).[35]  As this circuit has held, "[t]he constitutional right of association explicated in *NAACP v. Alabama*, stemmed from the Court's recognition that 'effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association.'" *Id.* at 1513.

---

[35] League Plaintiffs' second count asserts that the Challenged Provisions, including but not limited to the Non-Resident Ban, Non-Citizen Ban, and Former Felon Ban, violates the freedom of association under the First Amendment.

Courts across circuits consistently hold that laws—like those at issue here—that impose, e.g., residency requirements facially violate the First Amendment right to association. *See, e.g.*, *Lerman v. Bd. of Elecs.*, 232 F.3d 135, 150 (2d Cir. 2000) (residency and voter registration requirements for petition circulators violated the right to association under the First Amendment); *Krislov v. Rednour*, 226 F.3d 851, 866 (7th Cir. 2000) (similar). As the Second Circuit succinctly explained, when a challenged law bars certain categories of "'potential circulators [from] invit[ing] voters to sign" petitions, the law impermissibly "inhibits the expressive utility of associating." *Lerman*, 232 F.3d at 147 (quoting *Krislov*, 226 F.3d at 861). This is so regardless of whether plaintiffs could associate with non-residents in other, non-circulation contexts. *Id.*

Courts apply strict scrutiny where, as here, the Challenged Provisions substantially burden the right to freedom of association, and they strike those laws as unconstitutional unless the government demonstrates narrowly tailoring to advance a compelling state interest. *Krislov*, 226 F.3d at 862–83; *Lerman*, 232 F.3d at 149. It goes without saying that an interest in election integrity, or fraud prevention without adequate evidentiary support, cannot save a law that infringes on the right to associate. *Lerman*, 232 F.3d at 150 (citing *Turner Broadcasting Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664 (1994)).

### iv. Laws Are Impermissibly Vague when Those Who Enforce the Law or Those Subject to its Enforcement Must Necessarily Guess at Their Meaning (Count III)

A statute is unconstitutionally vague when "(1) the contested law is so unclear that no person of ordinary intelligence would be able to read the law and understand what conduct it prohibits, or (2) the law is so unclear that it effectively empowers" those who enforce the law to do so "on an ad hoc, subjective, arbitrary, or discriminatory basis." *Fla. Action Comm., Inc. v. Seminole Cnty.*, 212 F. Supp. 3d 1213, 1224 (M.D. Fla. 2016) (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)).[36] The Supreme Court "has long recognized that the constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of *mens rea*," *Colautti v. Franklin*, 439 U.S. 379, 395 (1979), as statutes that lack a *mens rea* requirement are "little more than 'a trap for those who act in good faith.'" *Id.* (quoting *United States v. Ragen*, 314 U.S. 513, 524 (1942)).

---

[36] Under Count III, Plaintiffs claim that three provisions of HB 1205 are vague: (1) Fla. Stat. § 100.371(8) ("fills in *missing information*") (emphasis added); (2) Fla. Stat. § 100.371(9) ("*copies* or *retains* a voter's personal information, such as the voter's Florida driver license number, Florida identification card number, social security number, or signature) (emphasis added); and (3) Fla. Stat. § 895.02(8) ("any *irregularities* or fraud involving . . . issue petition activities") (emphasis added). *Id.* Each provision has a significant penalty: sponsors of petitions are subject to a $5,000 fine for each petition that violates § 100.371(8); those who violate § 100.371(9) are guilty of a felony of the third degree; and those who violate § 895.02(8) are guilty of a felony of the first degree. Fla. Stat. § 895.04.

122

> **v.**    **A Statute is Overbroad When a Substantial Number of its Applications are Unconstitutional, Judged in Relation to the Statute's Plainly Legitimate Sweep (Count IV)**

A law is overbroad under the First Amendment when "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010).[37]  That is:

> [A law] is facially invalid as overbroad in that it violates the *First Amendment* in a substantial number of its applications. It discriminates against paid circulators for reasons unrelated to legitimate state interests, reduces the pool of circulators available to DFH, and restricts the speech of DFH by sweeping too broadly in its requirements. Put another way, [a law is facially invalid where it] is not narrowly tailored to serve [the state's] important interests.

*Dakotans for Health*, 52 F.4th at 392.  It is of no moment that a challenged law could be constitutional in some circumstances; so long as its deterrent effect on protected speech is real and substantial in relation to its legitimate applications, it must be stricken as invalid:

> We have no trouble concluding here that the Attorney General's disclosure requirement is overbroad. The lack of tailoring to the State's investigative goals is categorical—present in every case—as is the weakness of the State's interest in administrative convenience." Every demand that might chill association therefore fails exacting scrutiny.
>
> *Bonta*, 594 U.S. at 615.

---

[37] Under Count IV, Plaintiffs allege that the Challenged Provisions regulate a substantial swath of protected speech in relation to any potentially legitimate applications, including by investigating and prosecuting minor clerical errors by volunteer petition gatherers.

123

### vi. The Non-Citizen Ban is Subject to Strict Scrutiny under the Fourteenth Amendment (Count V)

The Supreme Court has held that "[a]s a general matter, a state law that discriminates on the basis of alienage can be sustained only if it can withstand strict judicial scrutiny." *Bernal v. Fainter*, 467 U.S. 216, 219 (1984). As detailed below, both LWVFL and LULAC provided evidence at trial that they have non-citizen members who have circulated petitions and would circulate petitions but for the Non-Citizen Ban.[38]   Under strict scrutiny, that ban must be stricken as unconstitutional unless Defendants can "prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015) (quoting *Arizona Free Enter. Club PAC v. Bennett*, 564 U.S. 721, 734 (2011)).

### vii. The Court Can and Should Review the Cumulative Impact of the Challenged Provisions

When reviewing constitutional challenges of several provisions within a statutory scheme, courts analyze the cumulative effect of the provisions when they are mutually reinforcing. *See Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (Eighth Amendment); *Kassel v. Consol. Freightways Corp. of Del.*, 450 U.S. 662, 667–69

---

[38] Under Count V, Plaintiffs contend that the Non-Citizen Ban violates the Equal Protection Clause of the Fourteenth Amendment.

(1981) (dormant commerce clause); *Miller v. Carson*, 563 F.2d 741, 746 n.6 (5th Cir. 1977) (substantive due process and Eighth Amendment).

The same applies in petition-collection cases.  In *Dakotans for Health*, the Eighth Circuit enjoined a South Dakota law, S.B. 180, that imposed four restrictions on petition circulations: (1) requiring petition circulators to register their name, address, and other personal identifying information prior to circulation; (2) making registration information publicly available; (3) voiding all petitions collected by a circulator whose registration form was false or incomplete; and (4) requiring updates within seven days of any change to registration information.  52 F.4th at 384. Applying *Meyer* and *Buckley*, the court evaluated the four provisions holistically: "Taken together, the pre-circulation disclosure requirements [ ] are intrusive and burdensome. As such they present a severe burden on  speech." *Id.* at 391; *see also Citizens for Tax Reform v. Deters*, 518 F.3d 375, 380, 384–85 (6th Cir. 2008) (analyzing two Ohio petition-collection restrictions as part of a single "per-time-only system," characterizing the restrictions as imposing a single "requirement," and weighing the "cumulative effect of the inefficiencies caused").  The Eleventh Circuit has similarly mandated cumulative impact review. *See Swanson v. Worley*, 490 F.3d 894, 903 (11th Cir. 2007) (expressly evaluating the two candidate-petition regulations "independently and in combination" to assess the "character and magnitude of the asserted injury"); *cf. Libertarian Party of Ala. v. Merrill*, 2021 WL

125

5407456, *9 (11th Cir. Nov. 19, 2021) (declining to consider the cumulative impact of "all of Alabama's onerous ballot access burdens on minor parties" because the plaintiff "challenged only a single election regulation in its complaint" and was precluded from arguing that "the cumulative effect of other, unchallenged ballot access regulations renders the voter list law constitutionally infirm").

Consequently, although each of the Challenged Provisions is independently unconstitutional, the Court here should analyze and strike down HB 1205's provisions collectively.[39]

## B.    Argument

As discussed above, the Challenged Provisions can and should be reviewed cumulatively.  With apologies to Benjamin Franklin, however, they not only fail

---

[39] At trial, the Court raised the issue of whether it should examine the cumulative effect of the Challenged Restrictions.  Day 1  Tr. 322:21–323:19.  In doing so, the court discussed a petition collection case raised by FDH plaintiffs in the *Joint Pretrial Stipulation,* Agreed Facts ¶ 7 n.5, ECF No. 596, *Pierce*, 44 F.4th 853, where the *Pierce* court stated the cumulative effect standard should be applied in petition initiatives cases as in ballot access cases.  The court then identified two cases cited by the defendants, *Gibson v. Firestone*, 741 F.2d 1268 (11th Cir. 1984) and footnote ten of *Biddulph v. Mortham*, 89 F.3d 1491 (11th Cir. 1996), where the courts stated that petition initiative cases are different than ballot access cases.  Regardless of whether petition initiative cases should be analogized to ballot access cases in determining whether the court should analyze the cumulative effect, the above discussion demonstrates that  courts have applied the cumulative effect standard in a variety of contexts.  Specifically in the petition collection context, *Dakotans for Health* analyzes cumulative effect without analogizing it to ballot access cases.  52 F.4th at 391.  Moreover, as discussed above, the Eleventh Circuit applied a cumulative effect test in *Swanson*, which is a ballot access case.  490 F.3d at 903.

together—they most assuredly also fail separately. Below, we walk through each of them in turn.

### i. The Categorical Bans Fail Under the First and Fourteenth Amendments

HB 1205's Categorical Bans prohibit non-citizens, non-residents, and persons with felony convictions whose voting rights have not been restored from circulating petitions. Fla. Stat. § 100.371(4)(b). The Categorical Bans violate the freedom of speech and freedom of association guaranteed by the First Amendment. The Non-Citizen ban also independently violates the Equal Protection Clause of the Fourteenth Amendment.

Courts have on several occasions analyzed challenges to bans on non-residents or non-registered voters and have almost always found those bans unconstitutional. These courts have applied strict scrutiny, primarily because these bans prohibit one-on-one communications involving speech but also because they severely burden freedom of expression and lessen the likelihood initiatives will get on the ballot. Those courts have then rejected arguments that the bans are narrowly tailored to meet any legitimate government purpose, including preventing fraud or facilitating investigations.

By definition, the Categorical Bans prohibit millions of people from engaging in petition collection. (To be clear, the same result holds even if only one person found themselves silenced as a result). Defendants' suggestion (made through

127

various cross-examinations) that these individuals can communicate their political beliefs in alternative ways have been rejected roundly by every other court to have heard them.  Nor is there a compelling state interest at play: unlike in other cases (where the argument has also been rejected), Defendants here have produced *no* evidence that any person subject to the Categorical Bans has committed petition fraud.  Accordingly, the Categorical Bans cannot satisfy any heightened level of scrutiny, be it strict, exacting, or intermediate; indeed, they cannot even satisfy rational basis.

### 1)    *The Categorical Bans Violate the Freedom of Speech Clause Under the First Amendment*

#### a)    **The Bans Drastically Reduce the Pool of Individuals Who May Engage in Petition Circulation**

*First*, the Bans drastically shrink the pool of eligible petition circulators, thereby limiting the number of voices available to convey proponents' message and thus implicating the first *Meyer* consideration.  *See supra* V.A(i).  The Non-Citizen Ban alone precludes approximately two million Florida residents from participating in petition circulation.  Day 5 (Smith) Tr. 1310:3–4.  The Non-Resident Ban sweeps even more broadly because it includes the hundreds of millions of people who reside in the United States but not in Florida,[40] including reaching the approximately one

---

[40] As noted above, courts have used a national figure to describe the number of people affected by a residency ban.  *See We the People*, 40 F.4th at 14 (noting that a non-residency ban affected more than 250 million people); *Pierce*, 44 F.3d at 860–

128

million people who own second homes in Florida. *Id.* at 1308:10–11. And the Former Felon Ban excludes an additional 935,000 individuals—roughly five percent of the voting-age population. *Id.* at 1307:22–25. In some communities, these exclusions are particularly devastating. Karen Patricio, a LULAC district director, testified that roughly half of the members in her district—16 or 17 individuals—are non-citizens now barred from circulating petitions. Day 6 (Patricio) Tr. 1765:19–20.

As discussed above and in Appendix B, courts have repeatedly recognized that restrictions limiting the pool of available speakers trigger strict scrutiny because they reduce the number of voices capable of conveying the political message. *See, e.g.*, *We the People PAC v. Bellows*, 40 F.4th 1, 19, 24 (1st Cir. 2022) (finding that residency and registered voter requirements implicated strict scrutiny); *Chandler v. City of Arvada*, 292 F.3d 1236, 1241–42 (10th Cir. 2002) (holding that a residency ban was subject to strict scrutiny); *Yes On Term Limits, Inc. v. Savage*, 550 F.3d 1023, 1029 (10th Cir. 2008) (same); *Pierce*, 44 F.4th at 860–61 (same).

Based on their cross-examination of League witnesses, Defendants will likely contend that HB 1205 does not burden speech because even if individuals are barred from physically circulating petitions, there exist alternatives to that exercise of their

---

61 (a non-residency ban barred the "vast majority of individuals in this country" from collecting petitions).

129

free speech rights, such as educating voters on a given initiative or handing out blank petition forms and asking recipients to mail them in or drop them off. Day 6 (Poff) Tr. 1508:16-1509:10; Day 6 (Lowe-Minor 1589-9:1590:20); Day 7 (González Herrera) Tr. 1774:18-1777:8).

The problem for Defendants is that this argument was roundly rejected in *Meyer*, where Colorado similarly asserted that the burden on speech was permissible "because other avenues of expression remain open to appellees." The Court found that regardless of the existence of alternatives, restricting access to the "most effective, fundamental, and perhaps economical avenue of political discourse" does not "relieve" the "burden on First Amendment expression." *Id.* at 424. That is because petition circulation "of necessity involves *both* the expression of a desire for political change [*i.e.*, the circulation, collection, and submission of a petition] and a discussion of the merits of the proposed change." 486 U.S. at 421 (emphasis added). The State cannot sever the communicative aspect of petition circulation from the practical act of collecting signatures and then deny that it has burdened speech. *See* ECF No. 283 (Order on Collective Mots.) at 23–24 (rejecting Defendants' "conduct-not-speech" argument).[41]

---

[41] The Eleventh Circuit's stay order does not alter this analysis. As discussed *supra* at Section III, the order is not binding and rests on significant factual and legal errors. For the same reasons, the Eleventh Circuit's reliance on *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353 (2009), is misplaced. *Ysursa* involved a state law that prohibited payroll deductions for political activities—a restriction on one method of raising

The League Plaintiffs' witnesses also testified that the alternatives posed by Defendants are no substitute for petition circulation and collection. Ms. Lowe-Minor, President of LWVFL, testified that giving a blank petition to a potential voter and asking them to fill it out is like handing out "homework"; it's a "pain in the butt" which decreases the value of LWVFL's work and makes it less effective. Day 6 (Lowe-Minor) Tr. 1589:19–1590:16, 1600:4–1602:2. Ms. González Herrera, a non-citizen LWVFL member, was asked whether she could still engage voters concerning initiatives. She testified that the engagement would not be as effective because she would not be able to secure a result (i.e., a signed petition ripe for submission). Day 7 (González Herrera) Tr. 1774:18–1775:16. As for sitting at a table and talking to passersby about a petition issue without handing them a petition, Ms. González Herrera again said she would be unlikely to go that route because it would not be effective. *Id.* 1775:16–1775:25, 1777:14–1777:23.

---

funds, not a ban on who may engage in core political speech. The Court explained that Idaho's law "does not restrict political speech, but rather declines to promote that speech by allowing public employee checkoffs for political activities." *Id.* at 359. And although the Idaho statute carried criminal penalties, those penalties targeted employers who made unauthorized payroll deductions—not individuals for exercising their right to engage in political speech. Here, by contrast, the Categorical Bans impose felony criminal liability directly on individuals for the act of circulating petitions. Nothing in *Ysursa* supports rational basis review of such a direct prohibition on protected expression.

131

### b) The Categorical Bans Impose Severe Criminal Penalties, thus Dissuading Core Political Speech

Under Fla. Stat. § 100.371(4)(b), people subject to the Categorical Bans cannot register as petition collectors. Should such a person not only circulate petitions, but also collect, deliver, or otherwise physically possess more than 25 signed petition forms (in addition to their own form or one belonging to an immediate family member), that person has committed a felony in the third degree. Fla. Stat. § 100.371(4)(a).

Unsurprisingly, so serious a threat has also significantly chilled speech, particularly given that the vast majority of petition circulators collect (and possess) more than 25 petitions. Ms. Poff, who spends roughly a third of each year in Gulfport, Florida, testified that she understands she is "not allowed to" circulate petitions under the law and believes she "could be arrested." Day 6 (Poff) Tr. 1503:6–16. Ms. Patricio likewise testified that both she and other non-citizen LULAC members fear criminal liability. Day 6 (Patricio) Tr. 1765:11–16. And Ms. González Herrera, a Venezuelan asylee, explained that she ceased all petition-circulation activity as soon as HB 1205 took effect because a criminal conviction "could jeopardize mine and my parents' asylum case in the country." Day 7 (González Herrera) Tr. 1772:1–4.

The chill extends beyond individuals who are themselves within the banned categories: LWVFL and LULAC have eliminated their petition-circulation programs

132

entirely for fear of exposing any of their members to felony prosecution, a decision which relied at least in part on the existence of the categorical bans. Day 6 (Lowe-Minor) Tr. 1545:12–1546:1; Day 5 (Proaño) Tr. 1447:24-1448:12. That of course further reduced the number of voices carrying the initiative proponents' message to voters. These fears are also objectively reasonable.

The Supreme Court has long recognized that "[t]he threat of sanctions may deter [exercise of speech] almost as potently as the actual application of sanctions." *Button*, 371 U.S. at 433. Where criminal penalties attach to the exercise of First Amendment rights, even the mere credible threat of prosecution is enough to establish a constitutionally significant chill. *See Wollschlaeger*, 848 F.3d at 1304–05, 1320–21. In the context of petition collection, the *Meyer* court seized upon the criminal penalties attached to violating the paid circulator ban in holding that the "burden that Colorado must overcome to justify this criminal law is well-nigh insurmountable." 486 U.S. at 425. And, as discussed in Appendix B, the Sixth Circuit in *Deters* found a severe burden as to Ohio's pay-by-signature circulator ban in part because, as opposed to other states with similar bans, violations of the Ohio law were felonies. *Deters*, 518 F.3d at 381, 386–87.

> ### c) The Categorical Bans Reduce the Likelihood That an Initiative Will Qualify for Placement on the Ballot

In reducing the number of potential circulators, the Categorical Bans also "make it less likely that appellees will garner the number of signatures necessary to

place the matter on the ballot, thus limiting their ability to make the matter the focus of statewide discussion." *Meyer*, 486 U.S. at 423.  As *Meyer* and at least one Circuit court has held, that circumstance is sufficient to trigger strict scrutiny.  *Id.*; s*ee also Bernbeck*, 126 F.3d at 116.  And the Eighth Circuit reached a similar result in *SD Voice* based on the fact that, after the challenged restriction was enacted, fewer initiatives qualified for the ballot than had in the prior election.  *Id.* at 1080.  Notably, the Court in that case saw no need to reach the question of whether strict scrutiny applied, as it found the provision at issue unconstitutional even under a less exacting level of scrutiny.  *Id*.

The record here is even stronger regarding the impact of HB 1205 on the League Plaintiffs' ability to make the two petitions for which they were circulating. As Florida's Attorney General was quick to note (in an AI-generated 12:01 AM tweet, naturally), not *one* petition initiative made it to the ballot in Florida after HB 1205 was enacted.  *See supra* note 10.  And the evidence shows that the Categorical Bans made a significant difference in the petition collection process by prohibiting millions of non-citizens, non-residents and persons with felony convictions who have not had their rights restored from circulating petitions. Witnesses from LWVFL and LULAC discussed the effect on their organizations and their members.  For LWVFL, Ms. Lowe-Minor, confirmed that LWVFL had non-resident and non-citizen members who previously circulated petitions but could no longer do under

134

HB 1205. Day 6 (Lowe-Minor) Tr. 1570:17–1571:12. She also discussed the extensive work LWVFL has done with persons returning citizens who had been convicted of a felony who are now banned from circulating petitions under HB 1205. *Id.* 1568:12–1570:13. Ms. Poff testified she had planned to circulate petitions for the Florida Decides Healthcare and Right to Clean Water Initiatives but could not because of HB 1205. Day 6 (Poff) Tr. 1495:23–1502:18. Ms. González Herrera, who had collected petitions for LWVFL in support of the Right of Clean Water Initiative, stopped doing so because of HB 1205. Day 7 (González Herrera) Tr. 1767:14–1772:14. In addition, past LWVFL President Ms. Scoon testified that non-resident LWVFL members had previously assisted with petition circulation but could no longer do so under the law. Day 6 (Scoon) Tr. 1671:9–1672:24.

As for LULAC, Mr. Proaño, LULAC's CEO, testified that non-citizen and non-resident LULAC members circulated petitions in past initiative cycles and had concrete plans to do so again for the Florida Decides Healthcare and Right to Clean Water Initiatives. Day 5 (Proaño) Tr. 1447:24–1148:19. Ms. Patricio testified that her councils had planned to engage in petition circulation as a pillar of their work but did not because half of the members, including her, are non-citizens and thus prohibited by HB 1205 from collecting petitions. Day 6 (Patricio) Tr. 1728:11–18; 1731:10–20.

135

   **d)**  **The State's Rationale for the Categorical Bans Does Not Satisfy Even Some Lesser Level of Scrutiny, Including Intermediate Scrutiny or Even Rational Basis Review**

As discussed *supra* Section V.B(i)(1), the severe burden to free speech posed by the Categorical Bans requires that the State satisfy strict scrutiny. But even if the Court applied exacting scrutiny or even intermediate scrutiny (as the Eleventh Circuit suggested was appropriate in its stay order), the state could not satisfy those standards either, as each requires that the regulations be narrowly tailored to a substantial government interest. The State also cannot satisfy rational basis as there is no connection between what the provisions do and their purpose.

Defendants' principal justification for the Categorical Bans is that they reduce the risk of fraud in petition circulation—primarily because non-residents or non-citizens are purportedly more difficult to investigate and better able to flee. ECF No. 474 at 5–6. (Defendants do not appear to be making the argument that non-citizens, non-residents, or returning citizens are more likely to be election fraudsters, nor can they: there is absolutely no evidence of any such thing being true). These rationales have been repeatedly rejected by prior courts for a variety of reasons: first, because there was no evidence supporting the State's justification; second, because the evidence that did exist was insufficient to justify a ban; and third, because existing

136

statutes prohibiting fraudulent conduct were adequate to meet the "threat," such as it was.[42]

Here, Defendants have hit the trifecta. They have produced no evidence that non-citizens who reside in Florida or returning citizens have committed fraud in circulating petitions. They claim that "non-citizens, by being non-citizens, are difficult to locate and investigate, given their ties to other countries," ECF No. 470-4 at 6, but so bare an allegation is insufficient to demonstrate narrow tailoring. Nor is there anything to support it: on cross-examination, Director Pratt admitted that OECS had no research or data demonstrating that non-citizens (or, for that matter, returning citizens) are more likely than citizens to commit petition fraud. Day 8 (Pratt) Tr. 2136:23–2137:1; 2137:21–25. As for evidence of petition collection fraud by non-residents, all Defendants could muster was two examples where they had

---

[42] *See Meyer*, 483 U.S. at 426 (paid circulator ban could not be justified when there was no evidence paid circulators committed more petition fraud than non-circulators and existing provisions were adequate to prevent fraud); *We the People*, 40 F.4th at 21 (Maine failed to prove non-residents ban was necessary for investigative purposes because non-state residents could be contacted as easily as residents); *Yes on Term Limits*, 553 F.3d at 1029 (Oklahoma non-resident ban could not be justified as being necessary to prevent voter fraud when Oklahoma had provided no data demonstrating that non-residents had engaged in more fraudulent petition activity than residents); *Pierce*, 44 F.4th at 862 (non-resident ban was not necessary notwithstanding past experience regarding fraud by non-residents in petition collection because a less restrictive alternative was available in requiring non-residents to submit to jurisdiction); *Dakotans for Health*, 52 F.4th at 389 (restrictions for paid petition circulators were not narrowly tailored where there was no evidence that paid circulators had committed more petition fraud than volunteer circulators).

137

difficulty subpoenaing or otherwise getting information from out-of-state agencies that employed petition circulators—problems that would have existed even after HB 1205. Day 7 (Bridges) Tr. 1876:18–1879:19. Tellingly, Director Pratt admitted that, before HB 1205, OECS had no evidence or data indicating that fining a sponsor $50,000 for hiring a non-resident, non-U.S. citizen, or person with a felony conviction would deter fraud. Day 8 (Pratt) Tr. 2138:6–10. And the Attorney General's ability to identify (and investigate) non-resident individuals who might have engaged in illegal activity even in the absence of HB 1205 shows that pre-existing Florida statutes were themselves sufficient to satisfy the State's interest.

The State's showing is even weaker when applied to volunteer circulators, the precise category into which *all* of LWVFL and LULAC's fall. The only potential instance of any issue involving a volunteer circulator involved an instance where the state received information that two petitions were submitted on behalf of a voter, one was pre-filled and one was not. The State did not even institute an investigation as it was not clear that this happened for fraudulent reasons. Day 7 (Bridges) Tr. 1890:8–1893:15. This isolated instance hardly constitutes narrow tailoring that justifies the bans, especially when the issue of a duplicate is one easily addressed by county election officials.

At bottom, the Categorical Bans operate as exceptionally blunt instruments bearing no rational relationship to the purpose for which they are being used. They

bar millions of individuals from collecting petitions in Florida, including many who have done so in the past and wish to continue doing so. *See, e.g.*, Day 6 (González Herrera) Tr. 1767:14–16; Day 6 (Poff) Tr. 1494:13–20. Petition circulation has long served as a means through which ordinary individuals engage voters in organic, face-to-face conversations about political change. Eliminating that channel for entire categories of speakers goes far beyond what could be necessary to advance Defendants' stated objectives.

Nor have Defendants shown that less restrictive alternatives are unavailable. As *Buckley* emphasized, states already possess an "arsenal of safeguards" to deter and detect fraud. 525 U.S. at 205. For example, Florida could require circulators within the excluded categories to register and comply with existing anti-fraud provisions. If service-of-process concerns were genuine, the State could require out-of-state circulators to consent to jurisdiction. *Pierce*, 44 F.3d at 862–63; *We the People*, 40 F.4th at 20. Indeed, Florida already requires registered circulators to consent to Florida's jurisdiction. Fla. Stat. § 100.371(4)(c)(3)–(4). That requirement underscores that less restrictive tools for addressing investigative concerns not only exist—they are already embedded in Florida law.

Finally, even if heightened scrutiny did not apply, the Categorical Bans would still fail rational basis review. Rational basis is not a rubber stamp for arbitrary legislation. Both the Supreme Court and the Eleventh Circuit have struck down laws

139

under this standard when neither the record nor the court could identify a plausible

connection between the law and the interest it purportedly served.  *See, e.g.*, *Hooper*,

472 U.S. at 612 (1985) (tax exemption for Vietnam veterans limited to those who

resided in the state before a certain date failed rational basis); *DeWeese v. Town of

Palm Beach*, 812 F.2d 1365 (11th Cir. 1987) (town's ban on shirtless male runners

did not survive rational basis).  So too here.

### 2)    *The Categorical Bans Violate the Right to Freedom of Association Under the First Amendment*

The Categorical Bans independently violate the First Amendment's protection

of freedom of association.  As discussed *supra* Section V.A(iii), the Eleventh Circuit

has recognized that petition circulation implicates associational rights because it

involves "the communication of ideas to voters."  *Clean-Up '84*, 759 F.2d at 1513.

Other circuits have gone further, applying strict scrutiny and striking down circulator

bans restricting non-residents and non-registered voters.  *See Lerman*, 232 F.3d at

145–49 (holding that New York's residency and voter-registration requirements

violated the right to association because they "inhibit[ed] the expressive utility of

associating" with excluded individuals who "cannot invite voters to sign" petitions)

(quoting *Krislov*, 226 F.3d at 861); *Krislov*, 226 F.3d at 859–62 (holding that

Illinois's ban on non-residents and non-registered voters from circulating petitions

"substantially burden[ed]" associational rights and could not survive strict scrutiny).

The Categorical Bans at issue here are materially indistinguishable from those invalidated in *Lerman* and *Krislov*. Like the plaintiffs in *Lerman*, the League Plaintiffs are organizations whose members are barred from circulating petitions solely because they fall within excluded categories. And both courts emphasized the significance of the sheer number of individuals swept within the restrictions. *See Lerman*, 232 F.3d at 147 (holding that the restrictions "substantially burden[ed] the right to political association" regardless of whether plaintiffs could associate with non-residents in other contexts); *Krislov*, 226 F.3d at 859–60 (finding that the ban reduces the "number of potential circulators" and thereby burdens associational rights).

The undisputed evidence here establishes that the Categorical Bans exclude an enormous portion of the population. The Non-Citizen Ban alone prevents approximately two million Florida residents from participating in petition circulation. Day 5 (Smith) Tr. 1310:3–4. The Former Felon Ban excludes roughly another million individuals. *Id.* at 1307:22–25. And the Non-Resident Ban reaches an even broader group, hundreds of millions of people, including the approximately one million individuals who own second homes in Florida. *Id.* at 1308:10–11.[43]

---

[43]*Lerman* and *Krislov* both involved candidate petitions rather than initiative petitions. But as the court in *Lerman* observed, there is no reason to treat initiative petitions differently because "the nature of the regulated activity is identical in each instance." 232 F.3d at 148. As discussed above, the Eleventh Circuit in *Biddulph* stated that ballot initiative petitions should be treated differently than candidate

Strict scrutiny therefore applies when it comes to Categorical Bans' impingement upon League Plaintiffs' right to freedom of association, as well. And for the reasons explained above, Defendants cannot carry that burden.

### 3)    *The Categorical Bans Are Overly Broad*

A law is overbroad under the First Amendment when "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (citation omitted); *see also Bonta*, 594 U.S. at 615 (finding donor disclosure requirements overbroad when donor disclosure requirements lacked tailoring to the state's asserted interest categorically); *Dakotans for Health*, 52 F.4th at 392 (finding series of disclosure requirements for paid circulations was "facially invalid as overbroad in that it violates the First Amendment in a substantial number of its applications [by discriminating] against paid circulators for reasons unrelated to legitimate state interests.").

The same is true here. Each of the Categorical Bans prohibits millions of people from participating in the petition circulation process without any evidence

---

petitions for free speech claims because ballot initiatives are state-created. *Biddulph*, 89 F.3d at 1500 n.10. Even if that were correct statement of the law, the *Biddulph* court noted that the plaintiff did not raise a freedom of association claim, and were that right "directly burdened, strict scrutiny indeed might apply." *Id.* at 1499 n.8; *see also id.* at 1500 n.10 (distinguishing case from those in which plaintiffs raised a freedom of association claim).

142

that non-citizens, non-residents, or people with felony convictions and without restored rights have engaged in petition circulator fraud. And, as discussed above, the state's secondary stated interest in making non-resident circulators available for investigations could be accomplished by less restrictive means such as making them register.

### 4) *The Non-Citizen Ban Violates the Equal Protection Clause of the Fourteenth Amendment*

Even if the Non-Citizen Ban survived First Amendment review—which it does not—it would independently violate the Equal Protection Clause of the Fourteenth Amendment. As discussed *supra* Section V.A(vi), classifications based on alienage are subject to strict scrutiny. *Bernal*, 467 U.S. at 219. Under that standard, the State must "prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 576 U.S. at 171 (quoting *Arizona Free Enter. Club PAC v. Bennett*, 564 U.S. 721, 734 (2011)).

Although the Supreme Court has recognized a limited "political function exception" to strict scrutiny in the alienage context, *Bernal*, 467 U.S. at 221, that exception is narrow and does not apply here. That is because the exception exists only for "persons holding state elective or important nonelective executive, legislative, and judicial positions, for officers who participate directly in the formulation, execution, or review of broad public policy perform functions that go

to the heart of representative government." *Sugarman v. Dougall*, 413 U.S. 634, 647 (1973); *Bernal*, 467 U.S. at 221.

In their Motion for Summary Judgment, the State Defendants argued unsuccessfully that the political function exception applies here. Chopping up the above quote from *Sugarman* and changing its meaning, Defendants claim that "petition circulators are 'nonelective' 'positions'" that 'participate directly in the formulation, execution,' and 'review' of 'public policy,'" and therefore fall into the political-function exception. ECF No. 474 at 15 (quoting *Sugarman*, 413 U.S. at 647). Petition collectors are not even governmental employees, let alone occupants "elective or important nonelective executive, legislative, and judicial positions" or serve as "officers who participate directly in the formulation, execution, or review of broad public policy." Indeed, in *Sugarman* itself, the Supreme Court held that a citizenship requirement for competitive civil service positions in New York State did not fall under the exception because regular employees did not have special roles. 413 U.S. at 647–49. Examples of governmental officials or employees who fall within the exception include police officers, *Foley v. Connelie*, 435 U.S. 291 (1978), teachers, *Ambach v. Norwick*, 441 U.S. 68 (1979), and probation officers, *Cabell v. Chavez-Salido*, 454 U.S. 432 (1982).

Petition circulators do not have a public function in the same way as police officers, teachers, and probation officers do; indeed, their situation isn't really akin

of that of even civil service employees, who do not qualify for the exception.  At

most, petition circulations are more like notaries, who fall outside of the exception

as held in *Bernal*.  *Id.* at 217–18.[44]  The Supreme Court explained:

> To be sure, considerable damage could result from the negligent or
> dishonest performance of a notary's duties.  But the same could be said
> for the duties performed by cashiers, building inspectors, the janitors
> who clean up the offices of public officials, and numerous other
> categories of personnel upon whom we depend for careful, honest
> service.  What distinguishes such personnel from those to whom the
> political-function exception is properly applied is that the latter are
> invested either with policymaking responsibility or broad discretion in
> the execution of public policy that requires the routine exercise of
> authority over individuals.  Neither of these characteristics pertains to
> the functions performed by Texas notaries.

*Id.* at 225–26.  The same could be said about petition collectors—though damage

could result if they perform their duties in a negligent or dishonest matter, they

obviously do not exercise policymaking responsibility or broad discretion in the

execution of public policy.

Indeed, this Court has expressly rejected the argument that the political

function exception applies in a challenge to a Florida law that required individuals

who handled voter registration applications on behalf of a third-party voter

---

[44] In their Motion for Summary Judgment, State Defendants acknowledged that "non-citizens who work for the government may collect and handle sensitive voter information," ECF No. 474 at 16, but tried to distinguish them on the grounds that these employees must undergo background checks to determine that they are lawfully in the United States.  But if the legislature wished to bar non-citizens without lawful status, it could have simply narrowed the non-citizen ban to that specific class.

registration organization to be citizens. *Fla. State Conf. of Branches & Youth Units of the NAACP*, 680 F. Supp. 3d 1291 (on preliminary injunction); *Hispanic Fed'n v. Byrd*, 719 F. Supp. 3d 1236 (N.D. Fla. 2024) (on cross-motions for summary judgment). This Court first found that the Non-Citizen Ban implicated strict scrutiny under *Bernal*. *Fla. State Conf.* 680 F. Supp. 3d at 1311. It then found that the political-function exception did not apply because:

> [T]he citizenship requirement does not apply only to persons holding state elective or important nonelective executive, legislative, and judicial positions and, thus, participating directly in the formulation, execution, or review of broad public policy. Without dispute, 3PVRO staff, members, and volunteers are not public employees of any branch of state government. Nor do they participate directly in the formulation, execution, or review of broad public policy.

*Id.* at 1312. The same analysis applies here: petition circulators are not public employees of any branch of state government and they do not participate directly in the formulation, execution, or review of broad public policy.[45]

Defendants have cited two other cases in support of their position, again at summary judgment. ECF No. 474 at 15 (citing *OPAWL v. Yost*, 118 F.4th 770 (6th Cir. 2024); *Bluman v. FEC*, 800 F. Supp. 2d 281 (D.D.C. 2011)). But these cases are

---

[45] Indeed, if this Court chooses to accord any weight to the Eleventh Circuit's stay opinion (which, for reasons described above, it should not do) the political-function exception cannot apply. After all, the stay opinion describes petition circulation as the mere "carrying sheets of paper from one place to another" a description entirely at odds with anything resembling a political function. *Fla. Decides Healthcare Inc.*, 2025 WL 3738554, at *6.

146

legally and factually inapposite—both involved a ban on financial contributions to political campaigns that was challenged under the First Amendment but not the Equal Protection Clause.

Thus, strict scrutiny applies.

### ii.    The Registration Restrictions Violate the First and Fourteenth Amendments

With the passage of HB 1205, League Plaintiffs can no longer gather and circulate volunteer petition forms in support of causes they believe in, as they did for years without issue.  *See* Day 6 (Lowe-Minor) Tr. 1518:10–14, 1519:3–16, 1531:18–1532:7.  Instead, they must select one of two bad "options": either (1) limit their involvement in the ballot initiative process to handling 25 or fewer petitions at any given time (over the course of two years)—while risking third-degree felony charges for any mistakes—or (2) register essentially as professional petition circulators, and in so doing agree to make both their sensitive personal information (e.g., permanent home address, date of birth, driver's license number, and partial Social Security number) and association with a given initiative matters of public record, available on a State database and on every printed form they circulate.  *See* Fla. Stat §§ 100.371(3)(d)–(e), (4)(a), (4)(c), (4)(f), (6) (2025); *id.* § 104.188(2).

Unwilling on the one hand to circulate a set number of personal use forms while risking criminal sanctions and on the other to submit to the State's mandated registration and disclosure requirements, League Plaintiffs have been boxed out of

147

petition circulation altogether.  *See, e.g.*, Day 6 (Lowe-Minor) Tr. 1547:21–1548:4, 1551:22–1552:18; Day 6 (Chandler) Tr. 1704:4–6; Day 7 (Newlon) Tr. 1790:6–8; League PX-16, ¶ 12.  As discussed, the Registration Restrictions impose onerous limits on speech that both trigger and crumble under heightened scrutiny.  Such restrictions are so baseless that they are doomed to fail under rational basis review as well.  Alternatively, "[t]he Court need not resolve the parties' dispute as to what standard of review to use here because the breadth of speech affected by the [Registration Restrictions] and the nature of the regulation make it clear" that the provisions cannot stand.  *See Watchtower Bible*, 536 U.S. at 151.

### 1) *The Court should review the Registration Restrictions under strict or heightened scrutiny*

#### a) Strict Scrutiny is Appropriate Because Violating the Registration Restrictions Is a Felony

Most modern decisions have applied exacting (and not strict) scrutiny to regulations—such as the Registration Restrictions—which involve compelled disclosure in connection with petition circulation (or otherwise).[46]  But there is a

---

[46] To be clear, there are certainly some (older) cases which would support the application of strict scrutiny to the Registration Restrictions.  After all, in forcing registrants to disclose their names and personal information alongside information on causes they support, these provisions "[m]andate speech that a speaker would not otherwise make[,] . . . [thereby] necessarily alter[ing] the content of the speech," *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 795 (1988), while impermissibly "compel[ling] disclosure of political associations and beliefs," *Brown v. Socialist Workers '74 Campaign Comm. (Ohio)*, 459 U.S. 87, 91 (1982).  This is precisely where First Amendment protections are at their highest.  *See Brown*, 459

strong argument to be made that the severe criminal penalties attached to violation of the Registration Restrictions directly chill speech and thus push the Registration Restrictions over the edge into the world of strict scrutiny.[47]

It is undisputed that "it is a third degree felony to collect, deliver, or otherwise physically possess more than 25 signed petition forms" without registering.  *See Joint Pretrial Stipulation*, Agreed Facts ¶ 49, ECF No. 596.  Witnesses testified that it was not clear to them what it means to "otherwise physically possess" a form— and that they fear inadvertently exceeding the personal use limit by, for example, being handed a twenty-sixth signed form by a fellow circulator.  *See, e.g.*, Day 6 (Lowe-Minor) Tr. 1554:14–22; Day 7 (Newlon) Tr. 1791:19–24; *see supra* Section II.A(iii)(2)(d)(iii).[48]

Accordingly, League Plaintiffs' reasonable fears of triggering criminal penalties for honest mistakes have led them to pull out of the process altogether.  *See* Day 6 (Lowe-Minor) Tr. 1554:14–22 ("[T]he risks just feels too high."); *see supra*

---

U.S. at 102 (applying strict scrutiny); *Riley*, 487 U.S. at 795 (construing the compelled disclosure of donor names as a content-based regulation for which strict scrutiny applies); *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958) (noting courts' staunch protections for "privacy in one's associations").

[47] At the end of the day, the distinction may be more academic than anything else: after all, the Registration Restrictions cannot meet either test (and, based on the evidence adduced at trial, likely do not meet the rational basis standard, to boot). *See infra* Section II.A(iii)(2).

[48] Or sitting at a table holding more than 26 petitions, or volunteering to transport the petitions of other volunteers to the local LWVFL hub. *See* Section II.A(iii)(3)(a).

Section II.A(iii)(2)(d)(iii) (noting decisions to stop circulating due to fears triggering the Criminal Provisions); *see infra* Section IV.B(i)(1)(c).  Where, as here, a disputed law demonstrably chills speech with the threat of severe criminal penalties for violating difficult-to-understand statutory provisions, strict scrutiny applies.  *See Reno v. ACLU*, 521 U.S. 844, 872 (1997).

### b)      At the Very Least, Exacting Scrutiny Applies

If the Court declines to review the Registration Restrictions under strict scrutiny, it must do so under exacting scrutiny, as they both "limit[] the size of the audience [League Plaintiffs] can reach," and "limit[] their ability to make the[ir chosen initiatives] the focus of statewide discussion."  *Meyer*, 486 U.S. at 422–23.  Additionally, the Registration Restrictions serve as disclosure requirements, which are subject to the exacting scrutiny under the First Amendment.  *See Dakotans for Health*, 52 F.4th at 388–89 ("A statute compelling disclosure of information to the government related to political activity is typically subject to 'exacting scrutiny.'") (quoting *Bonta*, 594 U.S. at 607); *see Buckley*, 525 U.S. at 199 (where circulators are forced to identify themselves when their interest in anonymity is greatest, the number of voices speaking is reduced and heightened scrutiny applies).

*Numeric cap on petitions.*  To start, the Registration Requirement directly limit unregistered individuals to circulating "or otherwise physically possess[ing]" up to only 25 signed petition forms.  Fla. Stat. § 100.371(4)(a) (2025).  That cap

directly impedes League Plaintiffs' ability to get their chosen initiatives on the ballot:

As witness Marc Walsh (who has overseen circulator campaigns for over 16 years)

explained, it would be "probably impossible" to collect the "1.3 million" signatures

needed to get an initiative on the ballot using only unregistered circulators who are

limited to each collecting up to 25 signed forms. *See* Day 1 (Walsh) Tr. 202:21–23.

***Reduced pool of volunteers.*** The Registration Restrictions have also directly

reduced LWVFL's pool of volunteers. To start, principled objectors to registration

with the State are directly barred from petition circulation. Like the speakers in

*Watchtower Bible*, LWVFL members have expressed "firm convictions about their

constitutional right to engage in uninhibited debate in the context of door-to-door

advocacy, [and have testified] that they would prefer silence to speech licensed by a

petty official." 536 U.S. at 167. They have stopped circulating for this reason. *See,*

*e.g.*, *supra* Section II.A(iii)(2)(d)(ii) (Ms. Lowe-Minor, Ms. Newlon, and Ms.

Chandler refuse on principle to obtain the State's permission to engage in petition

circulation). As the *Buckley* Court explained, that registration itself might be easy

entirely "misses the point." 525 U.S. at 197. For some individuals, the Court

explained, declining to register is itself a form of "public and private protest" that is

subject to strict or heightened scrutiny. *See id.* at 185–86.

Next, the Registration Restrictions' mandated training and application process

bars League Plaintiffs from expanding its base via recruitment of on-the-spot

151

volunteers.  *See supra* Section II.A(iii)(2)(d)(iv).  Historically, LWVFL has relied on volunteer sign-ups from among the enthusiastic and energized friends and associates of LWVFL members.  *See supra* Section II.A(i)(1).  Following HB 1205's enactment, they can no longer do so.  The same requirements have also directly led to applicants' wholesale rejection from unfettered, registered participation, as the State maintains broad discretion to reject applicants and has done so without substantive explanation.  *See, e.g.*, Day 4 (Perez) Tr. 999:9–1002:2 (testifying that Mr. Perez's circulator application was rejected multiple times by the Division of Elections with no explanation other than "incorrect form uploaded"; that he received no guidance on how to correct the error despite multiple calls to the Division).

Finally, the Registration Restrictions severely deter speech, with the same volunteer pool-reducing effects.  First, criminal penalties associated with a violation of the Personal Use Petition Restriction severely deter speech.  Unintentionally collecting or "otherwise physically possess[ing]" over 25 signed forms while unregistered carries with it criminal and misdemeanor penalties.  Fla. Stat. §§ 100.371(4)(a), 104.187, 104.188(2) (2025).  Uncertain how to keep themselves safe from prosecution under this unclear provision, League Plaintiffs have self-censored.  *See supra* Section II.A(iii)(2)(d)(iii).

Second, the intrusive, pre-circulation public disclosure of sensitive personal information—particularly given the documented risk of harassment and

152

retaliation—have also caused would-be circulators to refuse to participate. *See* Fla. Stat. §§ 100.371(3)(d), 100.371(4)(c)(1)–(2) (2025); *see also supra* Section II.A(iii)(2)(c). The Supreme Court has long recognized individuals' right to "support causes anonymously," whether out of "'fear of economic or official retaliation, [] concern about social ostracism, or merely [due to] a desire to preserve as much of one's privacy as possible.'" *Watchtower Bible*, 536 U.S. at 166 (quoting *McIntyre*, 514 U.S. at 341–342); *see also Buckley*, 525 U.S. at 199 (holding that the injury to speech is heightened by a requirement which "compels personal name identification at the precise moment when the circulator's interest in anonymity is greatest"—that is, when she is physically circulating petitions). HB 1205's "requirement that a [circulator] must be identified in a [registration] application filed [with the State] and available for public inspection necessarily results in a surrender of that anonymity." *Watchtower Bible*, 536 U.S. at 166. Such forced "identification" inherently restricts "freedom of expression," *Talley v. California*, 362 U.S. 60, 64 (1960), thereby triggering at least "'exacting scrutiny.'" *McIntyre*, 514 U.S. at 347 (quoting *First Nat. Bank of Bos. v. Bellotti*, 435 U.S. 765, 783 (1978)); *Bonta*, 594 U.S. at 616 ("Exacting scrutiny is triggered by 'state action which *may* have the effect of curtailing the freedom to associate,' and by the '*possible* deterrent effect' of disclosure.") (quoting *NAACP v. Alabama*, 357 U.S. 449, 460–461 (1958)).

153

To illustrate the issue in more concrete terms, the Disclosure Requirement mandates that if LWVFL member Ms. Heidi Davis would like to circulate over 25 petition forms (as she has always done), she must first surrender the protection of her anonymity. S*ee* League PX-16 ¶¶ 5–7. Ms. Davis testified that she was aggressively harassed by protesters while circulating petitions, who shouted slurs at her because they disagreed with the initiative for which she had volunteered. *See id.* ¶¶ 7–9. At the time, prior to HB 1205's enactment, Ms. Davis kept herself safe by simply walking away. *See id.* ¶ 10. Had the incident occurred today, those same protesters could find Ms. Davis at her permanent address, *listed on the petition forms themselves*, and continue their harassment. *See* Fla. Stat. § 100.371(3)(d) (2025) (requiring that each form petition circulators distribute carry their name and permanent address). Those same protesters—or anyone else—could alternatively file a public records request to identify Ms. Davis as a registrant for the initiative they oppose and find her permanent address that way. *See* Fla. Stat. § 100.371(6) (2025) ("The division shall maintain a database of all registered petition circulators and the petition forms assigned to each. . . . The division must update information on petition forms daily and make the information publicly available."). League Plaintiffs—many of whom live alone and have also experienced threats—have testified that they cannot register as circulators given their own safety concerns. *See, e.g.*, *supra* Section II.A(iii)(2)(d)(i) (testimony by Ms. Scoon and Ms. Newlon

154

explaining that, given past threats, they do not feel safe being included as registrants in the State's circulator database). By stripping Ms. Davis and other similarly situated individuals of their anonymity, the Registration Restrictions "preclude such persons from canvassing for unpopular causes"—a direct and severe speech restriction. *Watchtower Bible*, 536 U.S. at 167. And by doing so "at the same time they deliver their political message," when (as illustrated vividly by Ms. Davis's account) the reaction to that message "may be [at its] most intense, emotional, and unreasoned," the Registration Restrictions "do[] not qualify for inclusion" amongst the type of requirements that might be justified by a State's enforcement interest. *Buckley*, 525 U.S. at 199–200.

Each of these limits is squarely a form of "speech diminution" that greatly "'cut[s] down 'the size of the audience [proponents] can reach,'" *id.* at 183 (citation omitted), and reduces the likelihood that supporters of an initiative "will garner the number of signatures necessary to place the matter on the ballot, thus limiting their ability to make the matter the focus of statewide discussion," *Meyer*, 486 U.S. at 423. This, too, necessarily limits the pool of volunteers available to engage voters in "interactive communication concerning political change"—i.e., "'core political speech.'" *Id.* at 422. With fewer circulators reaching fewer voters, League Plaintiffs are less likely to gather enough signatures to qualify their chosen initiatives for the

155

ballot. This is more than sufficient to warrant exacting scrutiny. *See id.*; *accord Dakotans for Health*, 52 F.4th at 389.

***Countervailing considerations fail to demonstrate that the burdens on speech here are not severe.*** In a last-ditch attempt to avoid heightened scrutiny, Defendants have tried casting the Registration Restrictions' burdens on speech as minimal because League Plaintiffs and their members already must disclose their addresses on other government forms. *See, e.g.*, Day 2 (Ardilia) Tr. 391:24–392:1 (asking witness, "You are aware, are you not, that in order for somebody to vote, that information -- that identifying information has to be on record with the State; correct?"). That is wholly beside the point. As the Supreme Court has explained, the fact that certain information is already disclosed to the government has no bearing on its analysis of the government's speech restriction because "each governmental demand for disclosure brings with it an additional risk of chill." *Bonta*, 594 U.S. at 617–18. That is especially true here, where the State's petition circulator database includes not just basic identifying information found on other government forms, but also information regarding the initiative for which the circulator has registered and, accordingly, the political and social causes she supports. *See* Fla. Stat. § 100.371(6) (2025).

Should Defendants argue in their post-trial brief (as seems likely) that the Registration Restrictions' speech burdens are not severe because volunteers can

156

simply, for example, hand out blank petition forms, that too fails. As explained below (and as numerous League witnesses testified, *see supra* Section IV.B(i)(1)(b), petition circulation encompasses the persuasion *and* signing that occur as part of the same interaction, *see infra* Section V.B(ii)(2)(b). That entire process, from the initiation of the conversation up to and including the collection of a signature, is protected speech; simply handing voters blank forms (or even watching them fill out those forms and then telling them to mail them in) is an inadequate, ineffective, and inefficient replacement. *See id.* And as discussed *supra* Section V.A(i)(1), such an argument is at odds with *Meyer*, where the Court rejected the argument that the First Amendment is not implicated when there are alternative—and less effective—means of communication to petition collection.

Next, to the extent Defendants contend that Plaintiffs must present evidence of threats of harassment *specifically related* to their advocacy to demonstrate a chilling effect, they are wrong.[49] The standard for proving a First Amendment chilling effect claim is a forgiving one. Where, as here, League Plaintiffs allege that the compelled disclosure of personal information will lead to harassment and retaliation by third parties, thereby chilling their speech, they need only show "a reasonable probability that the compelled disclosure . . . will subject them to threats,

---

[49] League Plaintiffs note that even if this were the standard, at least one member-volunteer, Ms. Newlon, has testified that she experienced threats while circulating for a current initiative. *See supra* Section II.A(iii)(2)(d)(i).

harassment, or reprisals from either Government officials or private parties." *Buckley*, 424 U.S. at 74. This standard—described by Justice Blackmun as a "flexible proof rule," *Brown*, 459 U.S. at 102 (Blackmun, J., concurring)—can be met with "specific evidence of past or present harassment of members due to their associational ties, or of harassment directed against the organization itself. A pattern of threats or specific manifestations of public hostility may be sufficient." *Buckley*, 424 U.S. at 74.

This objective-chill standard does not require proof that League Plaintiffs engage in advocacy on controversial issues likely to prompt harassment or retaliation.[50] In *Bonta*, Plaintiffs challenged a California regulation requiring nonprofits to disclose the names and address of donors to the California Attorney General, alleging that such disclosure would deter donors from giving and subject them to reprisals. 594 U.S. 595, 603 (2021). The California Attorney General, who supported the rule, argued that "certain donors—like those who give to noncontroversial charities—are unlikely to be deterred from contributing." *Id.* at 615. The majority was "unpersuaded" by this argument, concluding that the disclosure requirement "'creates an unnecessary risk of chilling' . . . indiscriminately

---

[50] We note that this discussion addresses one of the overarching issues identified by the Court regarding whether the law requires that a petition circulator's fears be "reasonable." Day 4 (Proceedings) Tr. 997:9–99:19.

158

sweeping up the information of every major donor with reason to remain anonymous." *Id.* at 616–17 (quoting *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 968 (1984)). The *Bonta* court went on to cite evidence from the petitioners about the threats they had been subjected to and noted that these "risks are heightened in the 21st century and seem to grow with each passing year." *Id.* at 617. The Court rebutted the dissent's argument that a facial challenge requires a showing that "donors to a substantial number of organizations will be subjected to harassment and reprisals." *Id.* Instead, the Court concluded, "plaintiffs may be required to bear this evidentiary burden where the challenged regime is narrowly tailored to an important government interest. Such a demanding showing is not required, however, where—as here—the disclosure law fails to satisfy these criteria." *Id.* As the Court explained in striking down the disclosure law at issue in that case, "[t]he risk of a chilling effect on association" is inherently harmful "'[b]ecause First Amendment freedoms need breathing space to survive.'" *Id.* at 618–19 (quoting *Button*, 371 U.S. at 433).

Defendants' reliance on *Doe v. Reed*, 561 U.S. 186, 202 (2010), which preceded *Bonta*, for any countervailing position is misguided. *See, e.g.*, ECF No. 358 at 10 (citing *Reed* for the proposition that "there's no First Amendment right to petition-signing secrecy"); ECF No. 471 at 9 (same). At most, the *Reed* Court held that to determine the "'strength of the governmental interest'" involved, courts must

159

consider whether the interest reflects "'the seriousness of the actual burden on First Amendment rights.'" 561 U.S. at 196 (quoting *Davis v. FEC*, 554 U.S. 724, 744 (2008)). It offered guidance only on a subpart of the broader exacting scrutiny analysis (whether a law meets the relevant means-end test). And at any rate, as described above, *Bonta* squarely rejected the Attorney General's argument that donors who give to uncontroversial charities are unlikely to be deterred, such that donor disclosure is not facially invalid. 594 U.S. at 617. The Court cited amicus briefs submitted in support of Plaintiffs, from nonprofits "spanning the ideological spectrum" and the "full range of human endeavors," many of which were "far from uniquely sensitive cases," to conclude that "[t]he deterrent effect feared by these organizations is real and pervasive," even if the causes they support are non-controversial (*e.g.,* "hunger relief"). *Id.* at 617.

Justice Sotomayor's dissent in *Bonta* further highlights this point by explaining that the *Reed* Court "did the opposite of what the Court does today" by insisting on objective evidence that supporters will be subject to threats and harassment and applying a loose means-ends analysis. *Id.* at 645 (Sotomayor, J., dissenting). Had *Bonta*'s narrow tailoring analysis applied to *Reed*, Justice Sotomayor concluded, it was "unlikely the disclosure requirement would have survived." *Id.* at 633.

160

### c)    No Authority Supports Rational Basis Review

As the foregoing discussion makes clear, the Registration Restrictions directly regulate, curtail, and chill speech, making it harder to elicit a statewide discussion of the issues implicated by potential initiatives. As Defendants' own cited authority, *Reed*, makes clear, "precedent[ial cases] considering First Amendment challenges to disclosure requirements in the electoral context" agree that those challenges are reviewed "under what has been termed 'exacting scrutiny'"—nothing less. 561 U.S. at 196 (citing cases and declining to review disclosure requirements under rational basis review) (citation omitted); *accord Dakotans for Health*, 52 F.4th at 389 ("A statute compelling disclosure of information to the government related to political activity is typically subject to 'exacting scrutiny.'") (quoting *Bonta*, 594 U.S. at 607); *see Buckley*, 525 U.S. at 209 (Thomas, J., concurring) (advocating for application of not only exacting, but strict scrutiny to disclosure requirements).

The Registration Restrictions are not, as Defendants have implausibly argued, merely "process" or "conduct" restrictions warranting only rational basis review. *See, e.g.*, Prelim. Inj. Hr'g Tr. 68:21–69:18, ECF No. 132; ECF No. 514 at 3 (suggesting that only "the interactive communication between a canvasser and a voter implicates speech" while "everything that follows is conduct"). The Supreme Court has squarely dismissed Defendants' interpretation, explaining that a state's disclosure requirement was ***not*** merely a regulation of the "mechanics of the

161

electoral process.  It [wa]s [instead] a regulation of pure speech." *McIntyre*, 514 U.S. at 345.  While in other contexts, as with "bans on soliciting funds[,] it is possible to separate the protected speech involved in the solicitation from the related conduct of actually collecting funds," petition circulation is not so neat.  *Initiative & Referendum Inst. v. U.S. Postal Serv.*, 417 F.3d 1299, 1311 (D.C. Cir. 2005).  Instead, the protected "interactive communication" comprises the whole petition circulation process, from "the request for the signature and the signature itself" to "the ***collection of signatures***," as each part "***is essential to accomplishing the circulator's purpose***."  *Id.* at 1311–12 (emphases added).

Notably, throughout the extensive briefing in this case, Defendants have never cited any authority for the proposition that anything less than exacting scrutiny applies to the Court's analysis of registration and disclosure restrictions.  *See generally* Sec'y & AG's Resp. in Opp'n to Pls.' First Prelim. Inj. Mot., ECF No. 105 (citing no case reviewing analogous provisions under rational basis review); Sec'y & AG's Supp. Br., ECF No. 279 (same); Sec'y & AG's Resp. in Opp'n to Pls.' Third Set of PI Mots., ECF No. 337 (same); Sec'y & AG's Mot. to Dismiss League Pls.' Operative Compl., ECF No. 360 (same); Sec'y & AG's Opp'n to Pls.' Fourth Round of Prelim. Inj. Mots., ECF No. 393 (same); Sec'y & AG's Mot. for Summ. J. as to League Pls., ECF No. 474 (same).  That is because they cannot: no authority supports

162

the application of rational basis here—not in this circuit or in any other jurisdiction. *See* Appendix B.

### 2) *The Registration Restrictions Fail Under Any Level of Scrutiny Applied*

With no reasoned basis whatsoever, the State has eliminated volunteer petition forms, creating instead a system in which volunteers hoping to contribute meaningfully to a ballot initiative campaign (i.e., by collecting more than 25 petitions) must register with the State as petition circulators. The Registration Restrictions' burdens on speech fail under any tier of review applied.

### a) The Registration Restrictions Easily Fail Under Strict Scrutiny because Defendants Cannot Pass the "Least Restrictive Means" Test

Should the Court hinge its ruling on the Registration Restrictions' criminal provisions and apply strict scrutiny, Defendants' case is dead in the water. Defendants have never so much as attempted to demonstrate that the Registration Restrictions are the "least restrictive means" available to prevent petition fraud, nor could they. *McCullen*, 573 U.S. at 478; *see generally* Days 1–9 Tr. (no description by any witness of any less intrusive means to combat fraud considered in lieu of passing the Registration Restrictions). They have not, for instance, demonstrated that the State considered modifying rather than eliminating the volunteer petition form, then enacted the Registration Requirements only after determining that registration at the 25-petition mark was necessary to combat fraud. *See generally*

163

Days 1–9 Tr..  The Court may end its inquiry there: under strict scrutiny, the complete absence of any evidence that the State considered "least restrictive" alternatives to the Registration Restrictions is fatal to Defendants' defense.  *See, e.g.*, *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1258 (11th Cir. 2005) (under strict scrutiny, a law is constitutional "only if it constitutes the least restrictive means of advancing a compelling government interest"); *McCullen*, 573 U.S. at 494 (government must show "it considered different methods that other jurisdictions have found effective" to survive strict scrutiny); *FF Cosmetics FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1301 (11th Cir. 2017) (holding law failed strict scrutiny where State "failed to consider numerous and obvious less-burdensome alternatives").

> **b)** **The Registration Restrictions Fail Under Exacting Scrutiny Because Defendants Cannot Show the Provisions Were Narrowly Tailored**

The Registration Restrictions also easily fail under exacting scrutiny because Defendants cannot show—as they must—that they were "narrowly tailored to the interest [the State] promotes," *Bonta*, 594 U.S. at 609–10, and that the State "seriously undertook to address the [purported] problem with less intrusive tools readily available to it," *see McCullen*, 573 U.S. at 494.

*No real-world problem addressed.*  Defendants fail at the threshold because they cannot so much as point to an actual problem that the Registration Restrictions address.  Through nine days of trial, they adduced no evidence of a *single* volunteer

conviction for petition fraud. *See generally* Days 1–9 Tr. Director Pratt expressly admitted that OECS has never been able to identify an actual volunteer who has committed petition fraud. Day 8 (Pratt) Tr. 2160:2–5. The Court must not credit Defendants' attempts at fabricating volunteer-specific concerns through mere speculation. For instance, whether registration might in theory make it *easier* to investigate and prosecute fraudsters is of no moment; "'the prime objective of the First Amendment is not efficiency.' . . . Mere administrative convenience does not remotely 'reflect the seriousness of the actual burden' [of forced identification an disclosure]." *Bonta,* 594 U.S. at 597–98 (quoting *McCullen*, 573 U.S. at 495 and *Reed*, 561 U.S. at 196). And here, the actual burdens on speech are great compared to the half-baked justifications for the Registration Restrictions. *See supra* Section II.A(ii)(2)(b).

That the State can substantiate no real problem "*over any time period*" is dispositive. *Messina v. City of Fort Lauderdale, Fla.*, 713 F. Supp. 3d 1292, 1323, 1325 (S.D. Fla. 2024) (emphasis in original) (holding that a city's ordinance was not narrowly tailored where the city "produced no evidence of" the purported problem and instead relied on expert opinions "unmoored from any on-the-ground data"). The Registration Restrictions present a solution in search of a problem. The State may not enact these sweeping restrictions on volunteers—backed by felony penalties—without any evidence that volunteers were responsible for the fraud the

165

State claims to be targeting in the first place. *See Shaw v. Hunt*, 517 U.S. 899, 908 n.4 (1996) (mere conjecture is not tantamount to advancing an "actual" purpose; speech restrictions must be based in a "strong basis in evidence" to stand).

*No narrow tailoring.* Even if Defendants could base the Registration Restrictions in some non-speculative, real-world animating purpose, on this record, they cannot claim to have "seriously undert[aken] to address [the] problem," *see McCullen*, 573 U.S. at 494, much less "satisf[ied] the means-end fit that exacting scrutiny requires," *Bonta*, 594 U.S. at 613.

There is no doubt, as the Court explained in its preliminary injunction order, that there are at least some instances when League Plaintiffs' "anonymity interests may justifiably give way to 'the special state interest in protecting the integrity of a ballot-initiative process.'" ECF No. 283 at 29. But that is not the case here, where Defendants offer, at most, speculation that registration *might* detect fraud (*see, e.g.*, Day 7 (Bridges) Tr. 1886:6–19 (suggesting that investigation of volunteers was difficult because "there was nothing on the petition that showed who the volunteer was")), and where the trial record directly undermines the proposition that registration with the State would prevent or deter volunteer fraud, *see* Day 7 (Bridges) Tr. 1893:23–1894:4 (acknowledging that fraudsters have, in the past, used incorrect addresses on petition circulator forms).

166

Instead, as Defendants' own witnesses have conceded, Defendants cannot show that the Registration Restrictions were reasonably likely to prevent the very fraud that HB 1205 was purportedly enacted to combat. *See supra* Section II.A(ii)(2)(a). Critically, HB 1205's personal-use provision eviscerates any claimed anti-fraud purpose. Any person may download a "personal use" petition form without registering with the State, completing any training, or providing any identifying information whatsoever. *See* Fla. Stat. § 100.371(4)(a) (2025). When asked whether "a would-be fraudster, even after HB 1205, would be able to use a personal-use form, forge someone's name and identity, and turn that in to the State, Mr. Bridges answered unequivocally: "Yes." Day 7 (Bridges) Tr. 1898:15–18. He further admitted that such a fraudster could "do that 100 times" with personal-use forms "and you would have no idea" because "they wouldn't have to give any of their information to the State." *Id.* 1898:19–1899:11. When pressed on whether the registration requirement for individuals wishing to collect more than 25 petitions would "help to catch fraudsters," Director Pratt conceded: "It's my understanding that—no, I guess, no." Day 8 (Pratt) Tr. 2162:17–25.

Mr. Bridges, who is tasked with enforcing laws governing circulation—confirmed the senselessness of the registration system by acknowledging that fraudsters "would actually have to register" for the State to be able to prosecute them. Day 7 (Bridges) Tr. 1897:17–1898:3. Actual fraudsters, of course, would have no

167

incentive to provide correct identifying information to the State—particularly not when HB 1205 bakes in a run-around which allows them to submit false personal use forms without divulging their names.  And even if a fraudster did for some reason take it upon himself to complete the State's training and other registration requirements, registration is itself not a panacea; as Mr. Bridges acknowledged, fraudsters can and do provide false or unusable information, rendering registration data useless for investigative purposes.  Day 7 (Bridges) Tr. 1893:17–1894:4.

Nor have Defendants demonstrated that the Registration Restrictions were designed based on any studies, data, or analysis demonstrating that the provisions would actually prevent fraud.  *See supra* II.A(ii)(2)(b).  Director Pratt testified that OECS conducted no research to assess whether registration of volunteers would reduce petition fraud: "Q. But you conducted no studies, you did no research, you put together no statistical information confirming that, correct? A. Correct."  Pratt Dep. Tr. 182:11–14.  She admitted that OECS has no data connecting volunteers who collect more than 25 petitions to higher rates of fraud, stating "[w]e don't have any data" establishing such a link.  *Id.* 182:5–10; Day 8 (Pratt) Tr. 2138:16–18.  And when asked whether the OECS had examined whether the Registration Restrictions' additional personal identifying information requirements would reduce fraud, Director Pratt conceded: "I am not aware of any."  Pratt Dep. Tr. 77:18–23.  To the extent that Defendants rely on the OECS Reports' presentation of a purported fraud

problem, that reliance is misplaced and indefensible, as those reports are inherently unreliable—not least because they rely on cherrypicked data and fail to incorporate basic principles of statistics—and have nothing to do with volunteers at all. *See supra* Section II.A(ii)(2)(a).

Defendants fail to show narrow tailoring for the additional reason that they have not so much as *attempted* to demonstrate why or how already-existing "tools readily available to [the State]," *McCullen*, 573 U.S. at 494, were insufficient to combat fraud. *See supra* Section II.A(ii)(2)(c); *see generally* Days 1–9 Tr. The facts support the opposite conclusion—that the system was working just fine. *See supra* Section II.A(ii)(2)(c).

***No alternative channels available to Plaintiffs.*** Under exacting scrutiny, the availability of "ample alternative channels for communication" is a litmus test for narrow tailoring, as a restriction cannot be proportionate to the interest it promotes if it effectively forecloses a speaker's only viable and effective means of reaching their audience. *See City of Ladue v. Gilleo*, 512 U.S. 43, 56 (1994) (citation omitted). Here, "ample alternative channels" do not exist for League Plaintiffs: registration is mandatory for all volunteers committed to securing over 25 signatures in support of an initiative they support, and there is no replacement for this interactive speech.

At trial, Defendants repeatedly asked questions implying either that individuals could simply bypass registration altogether (by collecting less than 25

169

forms), or that speech restrictions are minimal here because volunteers may still (1) speak generally with others about a ballot initiative (*see, e.g.*, Day 2 (Prieto) Tr. 449:19–21 (asking witness if he "understand[s] that even under this law, you can -- you would be able to talk to neighbors and other people about a particular petition like the expanding health care")); (2) hand out "blank forms" at an event (*see, e.g.*, Day 2 (Bonilla) Tr. 427:16–22 (suggesting witness could simply pass out "blank forms at these events")); or (3) refer voters to registered circulators present at the same event (*see, e.g., id.* at 428:2–3 (suggesting the witness could "also refer [the voter] to a registered circulator"). At base, each of these three purported alternatives is woefully inadequate and different in kind from the types of protected, meaningful interactions that occur via petition circulation.

The first proposed "alternative" proves too much. Under their apparent logic, the State could prohibit petition circulation entirely so long as volunteers remain free to discuss initiatives in the abstract. But the Supreme Court has squarely rejected that premise, recognizing that circulation itself—that is, a proposal made while requesting a voter's signature—*is* core political speech. *See Meyer*, 488 U.S. at 421–22. As long-time RTCW organizer Mr. Pereira Bonilla explained, simply "educat[ing] [a voter] about the issue, and then leav[ing] it on them to go and do something afterwards" creates "a much higher bar for effort" on the voter's part, significantly decreasing the odds that they will, in fact, remain motivated enough to

170

sign a petition and reducing the volunteer's reach.  *See* Day 2 (Bonilla) Tr. 414:19–415:16.  It would be no different from "inform[ing] [a voter] on social media or anywhere else" about a particular cause.  *Id.* at 427:18–20.  "[T]alking is just not enough" to compel a voter to take action on her own; the purpose of petition circulation is to increase the effectiveness of speech by linking it directly to a desired outcome.  Day 7 (González Herrera) Tr. 1778:14–21.

Next, Defendants' suggestion that an unregistered volunteer may simply direct voters to a registered circulator at best confirms the burden on speech.  Crucially, the volunteer herself remains barred from engaging in the protected activity because she cannot personally engage in the act of circulation.  This does not preserve an alternative channel of communication; it substitutes another's speech for the would-be speaker's own.  Nor would it be an effective substitute.  As RTCW director Mr. Thomas Perez explained, "volunteers are a very limited resource"; pairing a non-registered volunteer with a registered circulator at an event would take "twice" the resources while reducing the group's reach.  *See* Day 4 (Perez) Tr. 990:24–991:7. Mr. Bonilla confirmed the futility of this endeavor: He could not imagine successfully gathering signatures by talking to a voter and saying "Hey, go to that guy 20 feet away, actually walk to that person" to sign and submit a petition form. Day 2 (Bonilla) Tr.  428:4–7.  He then described a prior attempt at coordinating efforts with a registered circulator as "very ineffective and quite disastrous," because

if the two spoke to different prospective signatories at once, even interested people would walk away "in the 10 or 15 seconds" it took for the registered circulator to walk over with a petition. *Id.* at 416:1–13.

Defendants' third proposal—simply handing out blank petition forms (presumably in reference to the downloadable personal use forms)—fares no better because it requires the volunteer to stop short of collecting the voter's signature on the petition—i.e., completing the protected interaction. *See Initiative & Referendum Inst.*, 417 F.3d at 1312 (given that the "collection of signatures . . . is essential to accomplishing the circulator's purpose," the collection itself is part and parcel of the protected speech involved in circulation). Instead, the volunteer must rely on the voter to later fill out and mail the petition independently. That forced separation of persuasion from signing and collection is different in kind from circulation and is not a meaningful alternative channel of communication—not least because it is also ineffective. Across the board, Plaintiffs' witnesses agreed: "the ability to collect the petition right then and there while [the circulator] ha[s] that person's attention, while [the voter is] feeling fired up about the issue is significantly more impactful than simply asking them to [sign] it on their own after we stop talking." Day 2 (Bonilla) Tr. 415:14–22; Day 6 (Lowe-Minor) Tr. 1601:1–16 (testifying that if you tell a voter to take a blank form, "take this envelope and then you have to put a stamp on it and then you have to send it to, you know, the Supervisor of Elections' office . . . it just

172

becomes a little overwhelming for people.  And I think many voters would be likely to be turned off [by the interaction"); Day 6 (Scoon) Tr. 1669:13–1670:10 (voters "want to sign a document, and they want to hand it over to us to handle it").

Meaningful interactions with voters, by contrast to the above, occur "*over the course of* somebody signing [the petition]," Day 1 (Walsh) Tr. 215:11–16 (emphasis added), because that is when voters feel engaged in "kind of a service, an opportunity . . . to make an impact but in an easy and accessible way."  Day 6 (Lowe-Minor) Tr. 1601:11–16.  That is when the volunteer can answer questions and engage in the type of interactions that drive political change.  *See, e.g.*, Day 6 (Scoon) Tr. 1631:13–1632:2 ("And in that magical 5 to 10 minutes, they are asking us questions, and we are trying to answer."); Day 1 (Simmons) Tr. 151:6–16 ("[B]y collecting a signature from a voter, you are able to engage in a conversation and actually spread the message a bit more. . . . I've had quite a few occasions where I've talked to somebody about the issue and I collected the signature, and then they are like, Hey, I'm going to bring my friend over to come sign the petition, too, because what you said is super important."); Day 2 (Ardila) Tr. 358:10–22 ("[O]nce you explain [an initiative] to someone, all the impacts of it, the amount of people that would benefit from it, it's really common for us to see someone go from no interest or never heard of it to excited to sign it and excited to see it hopefully be on the ballot.").

173

All three of Defendants proposed "alternatives" eliminate the very communicative exchange—direct advocacy culminating in a voter's signature—that courts have recognized time and again as core political speech. *Meyer*, 486 U.S. at 421–22 (petition circulation as core political speech combines advocacy with the act of soliciting a voter's signature); *Initiative & Referendum Inst.*, 417 F.3d at 1312 (the protected speech is the means of "'plac[ing] the matter on the ballot, [and thus making] the matter the focus of statewide discussion,'" and that necessarily includes the entire interactive communication, from signature solicitation to collection) (citation omitted). As League Plaintiffs have demonstrated that voters may "not be reached nearly as well by [the] other means" proposed by Defendants, ample alternatives to registration simply do not exist on this record. *Gilleo*, 512 U.S. at 57.

*       *       *

As the foregoing discussion makes clear, "[t]aken together, the pre-circulation disclosure requirements . . . are intrusive and burdensome." *Dakotans for Health*, 52 F.4th at 391. On a record as devoid of relevant facts as this, Defendants cannot justify those burdens via "'reasonable inferences *based on substantial evidence*[.]'" *See Messina*, 713 F. Supp. 3d at 1321 (emphasis in original) (quoting *Turner II*, 520 U.S. at 195. The "dramatic mismatch . . . between the interest[s] that the [State] seeks to promote and the disclosure regime that [it] has implemented in service to that end" is fatal to Defendants' case. *Dakotans for Health*, 52 F.4th at 391 (citation

174

omitted).  As the State "had not even considered alternatives" to the Registration Restrictions, these provisions fail narrow tailoring and cannot withstand heightened scrutiny.  *See Bonta*, 594 U.S. at 613; *McCullen*, 573 U.S. at 467 ("To meet the narrow tailoring requirement, . . . the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier.").

<blockquote>

**c)      The Registration Restrictions Are so Irrational and Untethered to the Facts That They Fail Even Under Rational Basis Review**

</blockquote>

As discussed, no authority supports the proposition that rational basis review applies—but even if it did, Defendants would still fail to carry their burden, because the record reflects that the Registration Restrictions are inherently irrational and baseless.  It bears emphasis that these provisions burden only law-abiding individuals engaged in constitutionally protected political speech—including League Plaintiffs' volunteers—while leaving actual fraudsters untouched.  *See, e.g.*, Day 8 (Pratt) Tr. 2162:17–25.  And the Registration Restrictions do nothing to address the most obvious avenues for committing fraud through a downloaded personal use form that anyone can sign and submit (*see* Day 7 (Bridges) Tr. 1898:15–1899:11).  Again, Defendants cite no fact-based justification for applying onerous professional circulator restrictions to volunteers in the first place.  *See supra* Section II.A(ii)(2)(b).

175

One need look no further than to the text of the statute itself to understand its senselessness. A person who signs another person's name on a petition—actual, unambiguous fraud—triggers a $5,000 fine for the sponsor. Fla. Stat. § 100.371(8) (2025). But under the Registration Restrictions, a person who in good faith accidentally collects (or, for that matter, simply *possesses*) over 25 petitions without properly registering triggers a $50,000 fine for the sponsor and potential felony prosecution. Fla. Stat. §§ 104.188(2), 100.371(4)(g) (2025); *see* Prelim. Inj. Hr'g. Tr. 202:12–14, ECF No. 278 ("Why if the State is looking at fraud do they make the fine ten times for what it is for actual fraud? The State can't explain that."). This irrational disparity between penalties for actual fraud and penalties for technical violations of the Registration Restrictions is revealing: A law that punishes honest mistakes ten times more severely than intentional fraud isn't actually aimed at preventing fraud.

The statute's weight falls particularly heavily on volunteers (like League Plaintiffs), not one of whom has ever been prosecuted or convicted of fraud. Defendants have not placed a single fact in the record that justifies the burdens which have caused League Plaintiffs' exclusion from this process. *See supra* Section II.A(ii)(2)(b). What remains are provisions "that, on the one hand, appear[] to further no government interest at all and which, on the other, broadly impinges on 'the essence of First Amendment expression.'" *Messina*, 713 F. Supp. 3d at 1327

176

(quoting *McCullen*, 573 U.S. at 488–89).  Because Defendants cannot point to any reasoned, non-speculative justification for the Registration Restrictions, and because the Registration Restrictions are inherently irrational and seemingly arbitrary, Defendants fail to demonstrate that these provisions should be upheld under any tier of scrutiny applied, including rational basis.  *See Turner*, 512 U.S. at 664 ("[The State] must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way.").

### 3)    *The Registration Restrictions Fail as Unconstitutionally Vague*

The Registration Restrictions are unconstitutionally vague in violation of the Due Process Clause of the Fifth and Fourteenth Amendments.  Again, the void for vagueness doctrine requires that laws—particularly those imposing criminal penalties—be written with sufficient clarity and specificity that ordinary people can understand what conduct is prohibited and that enforcement is not arbitrary or discriminatory.  *See supra* Section V.A(iv).  Here, the Registration Restrictions bar the act of "collect[ing], deliver[ing], or otherwise physically possess[ing] more than 25 signed petition forms" without registering, yet HB 1205 never defines what "otherwise physically possess" means in this context.  *See generally* DX-1.  League Plaintiffs cannot know, for instance, whether they could be held in violation of this provision for transporting other members' signed forms in their car or for sitting at a table at a volunteer event where a stack of forms has been collected.  *See supra*

177

Section II.A(iii)(2)(d)(iii); Day 6 (Chandler) Tr. 1697:25–1698:5; Day 6 (Scoon) Tr. 1644:8–14.

The provision's indeterminacy is particularly problematic given the severe third-degree felony attached to the act of exceeding that threshold without registering as a petition circulator—apparently without regard to *mens rea*, though that, too, is left vague. *See generally* DX-1 (no clear statement of applicable *mens rea*, if any). Because volunteers cannot ascertain with any reasonable certainty what conduct triggers criminal liability, the Registration Restrictions unconstitutionally put League Plaintiffs at risk of felony liability without providing adequate clarity as to what the Law requires. *See supra* II.A(iii)(2)(d) (describing League Plaintiffs' members' uncertainty about the law's requirements). This uncertainty has a profound chilling effect, as League Plaintiffs have already foregone participating in petition collection altogether rather than risk felony prosecution for misinterpreting an ill-defined provision. *See supra* II.A(iii)(2)(d)(iii) (describing League Plaintiffs' members' decision to stop circulating out of fear of prosecution).

### 4) *The Registration Requirements Fail as Unconstitutionally Overbroad*

The Registration Restrictions burden far more speech than is necessary to achieve any purported anti-fraud purpose. By requiring all volunteers to register to circulate over 25 petitions, the State has effectively silenced the very grassroots speech the First Amendment was designed to protect. Accordingly, the Registration

178

Restrictions are substantially overbroad in violation of the First and Fourteenth Amendments, sweeping so broadly as to chill constitutionally protected speech. *See Moody*, 603 U.S. at 725 ("[F]or [] individualized-explanation provisions, [the court examines] as to each thing covered [by the law], [and] whether the required disclosures unduly burden expression.").

The Registration Restrictions seek personal information from all volunteers who wish to circulate over 25 petitions and make that information public alongside information on initiatives the registrant supports. *See supra* Section II.A(ii)(2)(c). League Plaintiffs have substantiated their fears stemming from that disclosure. *See supra* Section II.A(iii)(2)(d)(i). Here, as in *Bonta*, the disclosure requirements "'create[] an unnecessary risk of chilling' in violation of the First Amendment," not least because they "indiscriminately sweep[] up the information of *every*" volunteer who wishes to circulate over 25 petitions, regardless of her legitimate "reason[s] to remain anonymous." 594 U.S. at 616–17 (emphasis in original) (citing *Secretary of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 968 (1984)). And here, that risk of chilling has already materialized: League Plaintiffs—many of whom have circulated petitions for years—have stopped circulating due to those fears, out of principle, and due to fear of punishment. *See supra* Section III.A(iii)(2)(d).

"Given the amount and sensitivity of th[e] information harvested by the State, one would expect [the registration system set up by HB 1205] to form an integral

179

part of [the State's] fraud detection efforts. It does not." *Bonta*, 594 U.S. at 613. To the contrary, here, as in *Bonta*, "the record amply supports" that registration is *not* central to any of the State's "investigative, regulatory or enforcement efforts'" to combat fraud. *Id.* As Defendants' own witnesses have admitted, the Registration Restrictions do not prevent fraud, were not based on any evidence or data, and may be circumvented entirely by any fraudster using personal-use forms.

At most, Defendants cite cherrypicked instances of *paid* petitioner fraud to justify restrictions on volunteers. *See supra* Section II.A(ii)(2)(a). If the Registration Restrictions applied only to paid circulators, then "arguably the [restrictions] would have been tailored to the [State's] interest in . . . preventing fraud." *Watchtower Bible*, 536 U.S. at 151. But, of course, they are not so cabined. And like the city in *Watchtower Bible*, the State has not shown that evidence supporting a law's application to one group remotely supports its application to a different group in wholly separate circumstances. *See id.* On this record, the State cannot demonstrate narrow tailoring. *See id.*

Where, as here, "a widespread burden on [League Plaintiffs'] associational rights . . . cannot be justified on the ground that the regime is narrowly tailored," the burden imposed is "facially unconstitutional, because it fails exacting scrutiny in 'a substantial number of its applications . . . judged in relation to [its] plainly legitimate sweep.'" *Bonta*, 594 U.S. 595, 618 (quoting *Stevens*, 559 U.S., at 473).

180

### iii.    The Criminal Provisions Violate the First and Fourteenth Amendments.

HB 1205's Criminal Provisions impose draconian sanctions on core political speech without any justification—much less the compelling or substantial justification the First Amendment demands.  These provisions subject petition circulators to third-degree felony liability and potential RICO prosecution carrying up to thirty years in prison, thereby chilling the very "interactive communication concerning political change" that the Supreme Court has recognized as lying at the heart of the First Amendment.  *See Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 186–87 (1999) (petition circulation is "core political speech" for which First Amendment protection "is at its zenith" (quoting *Meyer v. Grant*, 486 U.S. 414, 422–25 (1988))).  When the State attaches severe criminal penalties to such speech, constitutional scrutiny is at its apex.  *See Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982) (recognizing diminished tolerance for imprecision where criminal sanctions are imposed "because the consequences . . . are qualitatively [more] severe").

As explained *supra* Section V.A(i), strict or at least heightened scrutiny applies to these provisions.  But even under the most deferential standard, the Criminal Provisions fail.  The trial record is devoid of any evidence that these provisions meaningfully advance a legitimate governmental interest.  Defendants offered no evidence that volunteer petition circulators have engaged in the type of

conduct these provisions purport to address.  OECS has never identified a single volunteer who submitted a fraudulent petition form.  The State's own OECS reports to the Legislature contain no findings of petition fraud by volunteers.  Day 8 (Pratt) Tr. 2138:16–20.  Plaintiffs' expert, Dr. Daniel Smith, testified that petition fraud is a "very small quantum" and a "rare event," and that he is aware of "no study" linking volunteer circulation to fraud.  Day 5 (Smith) Tr. 1323:1–13.  He characterized HB 1205's criminal regime as a "sledgehammer," not a "scalpel"—the most burdensome among the fifteen comparable states he analyzed.  *Id.* at 1509:8–9.  Absent *any* evidence connecting volunteers to systemic fraud, the Criminal Provisions cannot survive even rational basis review.  *See Hooper v. Bernalillo Cnty. Assessor*, 472 U.S. 612, 621–22 (1985) (invalidating a law that lacked even a rational basis).

The Criminal Provisions also violate the Due Process Clause because they are unconstitutionally vague and substantially overbroad.  A criminal statute must define the offense "with sufficient definiteness that ordinary people can understand what conduct is prohibited" and in a manner that does not invite "arbitrary and discriminatory enforcement."  *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).  HB 1205 satisfies neither requirement.  Each provision hinges on terms that Florida law does not define, Defendants have not interpreted, and that the State's own enforcement arm—the Office of Election Crimes and Security—cannot elucidate.  Day 8 (Pratt) Tr. 2156:15–18.  A statute that imposes felony liability for undefined

182

conduct violates the most basic requirement of due process: that "those who enforce the law or those who are subject to its enforcement" not be required to "necessarily guess at its meaning and differ as to its application." *Fla. Action Comm., Inc. v. Seminole Cnty.*, 212 F. Supp. 3d 1213, 1224 (M.D. Fla. 2016) (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)).

This Court already recognized the constitutional infirmity of these provisions at the preliminary injunction stage, identifying serious concerns with HB 1205's criminal provisions and the chilling effect they produce. ECF No. 283 at 16–17. The trial record confirms what the earlier ruling suggested: these provisions have already chilled protected activity. Witness after witness—including experienced civic participants with decades of service and familiarity with the petition process— testified that the Criminal Provisions caused them to cease petition circulation entirely. They did so not because they intended to commit fraud, but because the provisions are so vague and the penalties so severe that no reasonable person would risk felony prosecution to engage in the protected activity.

### 1) The RICO Provision

HB 1205 expands the definition of "racketeering activity" under Florida's RICO statute to include "a violation of the Florida Election Code relating to irregularities or fraud involving issue petition activities." Fla. Stat. § 895.02(8)(d). A RICO conviction carries up to thirty years' imprisonment. Fla. Stat. § 895.04.

183

The provision thus subjects volunteer petition circulators—individuals engaged in the most fundamental form of democratic participation—to the same statutory framework designed to combat organized crime.[51]

The RICO provision is unconstitutional for three independent reasons: (1) its reliance on the nebulous term "irregularities" renders it void for vagueness; (2) it chills constitutionally protected speech and induces self-censorship among petition circulators; and (3) it is not narrowly tailored to serve any governmental interest and fails under any level of scrutiny.   The trial evidence confirms each of these constitutional defects.

### a)   The Term "Irregularities" is a Constitutional Nullity

The RICO provision's fundamental defect is its reliance on the term "irregularities"—a word that HB 1205 does not define, the Florida Election Code does not define, and the State's own enforcement agency cannot explain.   OECS has

---

[51] One begins to see the problem when examining Florida's RICO statute, which provides in relevant part that "[i]t is unlawful for any person employed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering activity or the collection of an unlawful debt."   Florida Statutes 895.03.   Both LWVFL and LULAC qualify as "enterprises" within the statute's definition of same, and a "pattern of racketeering activity" simply means two or more predicate acts—which now encompass these undefined "irregularities." Hypothetically, then, were the League to organize a petition circulation activity, and were two League members to collect and submit two petitions (in total!) with missing information or "USA" written in the blank space for "County" (both of which Ms. Pratt identified as potential "irregularities"), RICO liability could attach. That is, in a word, insane.

no internal definition, no published guidance, and no written criteria for determining what constitutes an "irregularity." Day 8 (Pratt) Tr. 2156:15–18. Defendants have been unable to offer an authoritative interpretation at any point in this litigation. The terms is, in every constitutionally relevant sense, meaningless. A statute that imposes severe criminal penalties based on an undefined term violates due process because it fails to provide the "fair notice of what is prohibited" that the Constitution demands. *See City of Chicago v. Morales*, 527 U.S. 41, 56 (1999). The vagueness problem is particularly acute here because the provision imposes felony liability and targets expressive conduct protected by the First Amendment. *See Hoffman Estates*, 455 U.S. at 498–99.

OECS Director Jillian Pratt's trial testimony laid this constitutional deficiency bare. When asked whether OECS has "some sort of internal definition of irregularities that they give to their employees or their investigators," her answer was unequivocal: "No." Day 8 (Pratt) Tr. 2156:15–18. No published standard exists. No written definition has been disseminated, to the public, to law enforcement, or even within OECS itself. When asked where one could find such a definition, she confirmed that none exists. *Id.* at 2157:15–17. Whether a given act constitutes a potentially RICO-predicate "irregularity" is left entirely to the ad hoc discretion of unelected officials—in this case, Ms. Pratt and the Secretary of State. *Id.* at 2157:1-7.

185

This Court identified the core constitutional problem at trial: whether citizens and law enforcement have meaningful guidance regarding what conduct constitutes a crime. Day 8 (Pratt) Tr. 2158:4–2159:8. Director Pratt acknowledged that OECS has published no guidance that either law enforcement or members of the public could rely upon to determine what constitutes an "irregularity." *Id.* at 2155:7–16. A statute that threatens citizens with thirty years in prison while leaving the predicate conduct undefined is the paradigmatic example of a law that fails to provide fair notice. *See Morales*, 527 U.S. at 56.

### b) OECS Conflates Invalidity with Fraud, Compounding the Vagueness Problem

The vagueness of "irregularities" is compounded by OECS's conflation of invalidity with fraud—a false equivalence that renders the term not merely vague but affirmatively misleading. The OECS reports catalogue instances of invalidity alongside instances of suspected fraud without distinguishing between the two, creating the misimpression that every invalid petition evidences wrongdoing. *See* Day 9 Tr. 2198:11–25. The Due Process Clause prohibits criminal statutes that invite "a standardless sweep" allowing law enforcement "to pursue their personal predilections." *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972). The RICO provision creates precisely this risk by permitting enforcers to treat any departure from expectations—including entirely innocent conduct—as a predicate for racketeering prosecution.

186

The trial record confirms this danger. When asked for examples of "irregularities," Director Pratt offered: "when we see a petition circulator with a very high invalidity rate, that's something that we want to investigate to see if there is a potential for fraud." Day 8 (Pratt) Tr. 2154:21–25. She further confirmed that clerical errors such as listing "USA" instead of a county could constitute an irregularity, as could a form "missing certain information." *Id.* at 2156:5–8.

But invalidity does not equate to fraud—as Ms. Pratt herself acknowledged when she was at pains to distinguish "irregularities" from crimes. *Id.* at 2153:1–2157:21. As this Court observed, a high invalidity rate might simply reflect carelessness—or, "the sloppiest, laziest paid petitioner," who "never include[s] an address on any of the petitions"—resulting in a "100 percent invalidation rate . . . even though there may be no allegation of fraud." Day (Pratt) 8 Tr. 2096:3–9. A petition can be "invalid" for entirely innocent reasons—a missing date, an incomplete address, a voter who wrote "USA" instead of the county. Yet under the RICO Provision, these same clerical errors and innocent mistakes can serve as predicates for racketeering prosecution carrying decades of imprisonment. This is not mere imprecise drafting. By allowing innocent clerical errors to serve as RICO predicates, the statute delegates unbounded prosecutorial discretion over core political speech—exactly what the vagueness doctrine forbids. *See Grayned*, 408 U.S. at 108–09.

187

c)      **The RICO Provision Chills Protected Speech and Induces Self-censorship**

A law that criminalizes protected expression imposes a "chilling effect" cognizable under the First Amendment when its "operation or enforcement . . . would cause a reasonable would-be speaker to self-censor." *Henry v. Att'y Gen., Ala.*, 45 F.4th 1272, 1288 (11th Cir. 2022); *see also Reno v. ACLU*, 521 U.S. 844, 872 (1997) ("[T]he vagueness of [a criminal statute's] content-based blanket restrictions . . . raises special First Amendment concerns because of its obvious chilling effect on free speech."). That standard is met here many times over.

LWVFL's past copresident Cecile Scoon described the RICO provision as a "major hammer," describing how every year the Florida Legislature "come[s] up with new laws that seem to be targeting [LWVFL]," and by "criminaliz[ing] actions" and "increas[ing] the penalty," the Legislature is directly targeting organizations like LWVFL. Day 6 (Scoon) Tr. 1668:5–11. Former copresident Debbie Chandler, when asked whether she understood what conduct would subject her to RICO liability, answered: "Not a clue." Day 6 (Chandler) Tr. 1709:21. If a veteran criminal defense attorney with over twenty-five years of experience cannot parse the statute's reach, an ordinary volunteer circulator cannot be expected to do so either.

Recent LWVFL President Jessica Lowe-Minor similarly confirmed that "racketeering sounds very scary" and that the organization "do[es]n't want any of our members to have anxiety about things that the League is doing or that anything

188

that we're involved in would be part of a racketeering investigation or charges." Day 6 (Lowe-Minor) Tr. 1567:3–8. She explained that LWVFL does not "have the legal wherewithal to advise our members on how to avoid those charges, like, I don't even know what would bring about those charges, so we would just not gather petitions." *Id.* at 1567:15–18. When asked whether she would recommend restarting petition circulation if all other provisions of HB 1205 were repealed but the RICO provision remained, Lowe-Minor was unequivocal: "No, I would not recommend that." *Id.* at 1568:1.

The ten-day return deadline further compounds the RICO provision's chilling effect. Before HB 1205, LWVFL had thirty days to review petition forms, contact voters who had made errors, and ensure accuracy before submitting forms to sponsors. Under the new ten-day deadline, that quality-control process has become impossible: LWVFL is "forced to turn in any forms we have as quickly as possible, even if those forms have an error." *Id.* at 1564:4–9. Those very errors may then be deemed "irregularities" under the RICO provision, meaning the compressed deadline directly increases circulators' exposure to the very racketeering liability that chills their speech.

### d) The RICO Provision Is Not Narrowly Tailored and Fails Under Any Level of Scrutiny

Even assuming Florida has a compelling interest in combating fraud in the petition initiative process, HB 1205's RICO provision is not remotely tailored to

189

meet that interest. Under strict scrutiny, the government must demonstrate that a challenged restriction is narrowly tailored to serve a compelling interest; under exacting scrutiny, it must show "a substantial relation" between the provision and a "sufficiently important governmental interest." *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021). The RICO provision satisfies neither standard. It sweeps far beyond fraud to encompass any "irregularities"—a term so capacious that it reaches minor clerical errors, missing information, and any deviation from undefined expectations. A statute that threatens thirty years in prison for conduct its own enforcing agency cannot define, applied to an activity the Supreme Court has placed at the "zenith" of First Amendment protection, cannot survive any form of scrutiny.

Federal courts have consistently invalidated criminal penalties in the petition-circulation context where the state failed to demonstrate that the severity of the penalty was proportionate to any demonstrated harm. In *Meyer*, the Supreme Court struck down a state's felony prohibition on paid petition circulators because it "limit[ed] the number of voices who will convey [the proponents'] message"—even though the state asserted an interest in preventing fraud. 486 U.S. at 425–28. The Court held that the State "cannot assume" that circulators are "more likely to accept false signatures" where "[n]o evidence has been offered to support the speculation." *Id.* at 426; *see also Idaho Coalition United for Bears v. Cenarrusa*, 234 F. Supp. 2d

190

1159, 1166–68 (D. Idaho 2001) (striking down a felony provision in a petition-circulation statute where a "reasonable circulator would be chilled from exercising protected speech by this vague statute that threatens criminal liability" and the chill constituted a "severe burden" subject to strict scrutiny); *Bernbeck v. Moore*, 126 F.3d 1114, 1116–17 (8th Cir. 1997) (striking down statute requiring petition circulators to be registered voters because "the law . . . restricts core political speech and the statutory requirement is not the least restrictive means available"); *Reno*, 521 U.S. at 870–72 (striking down the Communications Decency Act in part because its "vague criminal provisions" were not "carefully tailored" to achieve the government's interest).

The same reasoning applies *a fortiori* here, where the State has produced no evidence of volunteer fraud and yet has extended RICO liability—among the most severe criminal sanctions in its arsenal—to encompass the activities of volunteers gathering signatures for ballot initiatives. The RICO provision fails strict scrutiny because it is not narrowly tailored to serve a compelling interest. It fails exacting scrutiny because there is no "substantial relation" between the provision and any "sufficiently important governmental interest." *Bonta*, 594 U.S. at 607. And, although rational basis has no application here, it would not meet that test either: in the absence of any definition regarding what "irregularities" actually are, the provision can bear no rational relationship to any legitimate governmental purpose,

191

as we don't know what the government's purpose actually is (other than reducing the amount of ballot initiatives and thus speech, which is most assuredly not legitimate).

### 2) *The Investigations Trigger Provision*

HB 1205 mandates that when "the percentage of petition forms deemed invalid by the supervisor exceeds a total of 25 percent of the petition forms received by the supervisor for that reporting period," the supervisor must notify OECS, which then must conduct a "preliminary investigation" into "the activities of the sponsor, one or more petition circulators, or a person collecting petition forms on behalf of a sponsor." Fla. Stat. § 100.371(14)(d). If warranted, OECS may "report findings to the statewide prosecutor or the state attorney . . . for prosecution." *Id.* This mandatory-investigation provision, backed by the threat of criminal referral, independently violates the First and Fourteenth Amendments.

The Investigations Trigger provision is unconstitutional for three reasons. First, it imposes criminal process based on the accumulation of innocent errors. A petition may be "deemed invalid" for a wide array of reasons having nothing to do with fraud: a missing signature, an incorrect date, an incomplete address, a voter's failure to include an identification number. Day 2 (Earley) Tr. 465:4–19. A high invalidity rate may simply reflect a careless circulator or confused voters—not criminal conduct. Under HB 1205, however, accumulating too many such

192

innocuous errors automatically triggers a government investigation with potential criminal consequences. This scheme punishes the very act of engaging in large-scale petition circulation: the more forms collected, the more inevitable it becomes that clerical errors will exceed the 25-percent threshold. *See Buckley*, 525 U.S. at 192–97 (requiring narrow tailoring where challenged restrictions impose a severe burden on core political speech).

Second, the ten-day return deadline makes this a structural rather than incidental problem. Before HB 1205, LWVFL and similar organizations had thirty days to coordinate with sponsors, conduct quality-control reviews, reach out to voters who had made errors, and give those voters the opportunity to cure mistakes. The ten-day return deadline eliminates this possibility, forcing organizations to submit forms they know contain errors. As Dr. Smith testified, the compressed deadline places sponsors in a "damned if you do, damned if you don't" situation: they can either rush to meet the deadline and submit unvetted petitions—increasing invalidity rates—or review the petitions carefully and face $50-per-day fines for late submissions. Day 5 (Smith) Tr. 1352:4. The provision thus creates a vicious cycle: the compressed deadline guarantees more errors, and more errors guarantee investigation.

Third, the provision is not narrowly tailored to any governmental interest. Triggering a criminal investigation based on a percentage of invalid forms—without

193

any requirement of intentional misconduct or evidence of fraud—bears no relationship to combating fraud. Director Pratt acknowledged that OECS has never identified "any actual volunteer who, in fact, submitted a fraudulent petition form." Day 6 (Pratt) Tr. 2160:3–5. A law that subjects ordinary citizens to criminal investigations simply for the predictable occurrence of clerical mistakes while engaging in lawful political activity is one that "prohibits more protected speech than is necessary" to achieve any governmental interest. *See Term Limits Leadership Council, Inc. v. Clark*, 984 F. Supp. 470, 482 (S.D. Miss. 1997) (striking down criminal penalties on petition circulators where "the State has failed to present evidence of fraud or actual threat to its citizens' confidence in government").

The Investigations Trigger provision has chilled precisely the speech it targets. Ms. Lowe-Minor testified that LWVFL is now "forced to turn in any forms [it has] as quickly as possible, even if those forms have an error. And then . . . if they end up having an error rate of 25 percent or more, then our organization is liable for investigations, so we're—all of that sounds very scary." Day 6 (Lowe-Minor) Tr. 1564:19–24. The threat of an OECS investigation was a "concern[]" that "play[ed] a role" in LWVFL's decision to cease petition circulation. *Id.* at 1574:10. Ms. Scoon confirmed that the "threat of an OECS investigation" for having "too many invalid ballots" stopped her personally from collecting petitions. Day 6 (Scoon) Tr. 1666:18–22. Ms. Chandler further testified that "[a]nytime anyone is

194

under investigation it is extremely stressful both emotionally and financially"—she has "seen people lose their homes over investigations." Day 6 (Chandler) Tr. 1708:24–25. This is precisely the kind of imposed self-censorship that the First Amendment forbids. *Henry*, 45 F.4th at 1288.

### 3)    *The Missing Information Provision*

HB 1205 makes it a third-degree felony—punishable by up to five years in prison—for any person "collecting petition forms on behalf of a sponsor of an initiative petition" to "fill[] in missing information on a signed petition." Fla. Stat. §§ 100.371(8), 104.185(2). The provision criminalizes routine, benign conduct integral to effective petition circulation—including assisting voters with disabilities—in language too vague to provide fair notice and without any scienter requirement to distinguish innocent assistance from deliberate falsification. It violates the First and Fourteenth Amendments.

### a)    **The Missing Information Provision is Unconstitutionally Vague**

HB 1205 does not define "missing information." SAC ¶ 70. It does not specify whether the prohibition extends to a circulator who, at a voter's direction, writes in the voter's county of residence, corrects a transposed digit, or assists a blind voter in completing the form. As this Court credited at the motion-to-dismiss stage, the provision leaves circulators to "guess whether they would be subject to felony liability if they 'help[] a blind or disabled voter to correct a date or add a missing

county.'"  ECF No. 387 at 28 (quoting SAC ¶ 70).  These ambiguities are the hallmark of unconstitutional vagueness.  *See Fla. Action Comm.*, 212 F. Supp. 3d at 1224 (finding a statute vague where it "contained criminal penalties without a scienter requirement, and invited arbitrary enforcement").

### b)   The Missing Information Provision Is Not Narrowly Tailored and Fails under any Level of Scrutiny

Even if the State had a legitimate interest in preventing falsification of petition forms, this provision is not tailored to that interest for two independent reasons. First, it lacks any scienter requirement, imposing felony liability regardless of whether the circulator acted at the voter's express direction, corrected an obvious error, or attempted to falsify information.  The Supreme Court has squarely held that a strict-liability criminal offense that chills First Amendment speech is unconstitutional.  *See Smith v. California*, 361 U.S. 147, 150–53 (1959) (holding that strict criminal liability for conduct implicating protected expression "eliminates the mental element" that would otherwise "tend to restrict the [punished] activity" to its unprotected manifestations).  Second, the provision is unnecessary.  Existing Florida law already criminalizes the fraudulent alteration of petition forms, *see* Fla. Stat. § 104.185 (pre-HB 1205), so the "fills in missing information" provision adds nothing to the State's anti-fraud arsenal—it merely threatens prosecution for benign voter assistance.

196

### c)    The Missing Information Provision Chills Protected Speech and Induces Self-Censorship

The trial record confirmed what these constitutional deficiencies produce in practice: self-censorship by citizens who would otherwise assist disabled voters in exercising their democratic rights.  Before HB 1205, LWVFL volunteers routinely assisted "individuals who, for whatever reason, are—maybe they are visibly impaired, maybe they are physically impaired, and can't complete the petition themselves."  Day 6 (Lowe-Minor) Tr. 1156:2–13.  LWVFL's practice was to "read to them the various fields of the form and allow them to dictate . . . how to spell their name, what their address is," to "physically complete the form," and then to hand it to the voter "so that they could make a mark or . . . indicate their signature to the best of their ability."  *Id.*  Now, there is a "very real fear" that "making any kind of mark at all on the form, even if you are trying to help a disabled voter participate by completing the form" is unlawful under the statute.  *Id.* at 1156:18–22.

Ms. Chandler's testimony succinctly captured the dilemma: "What am I supposed to say to somebody that's sight-impaired and asks me to help them fill out the information? . . . I wouldn't even be able to tell them, 'You can get your friend to help you or something,' because then I'd be abetting that third-degree felony."  Day 6 (Chandler) Tr. 1705:20–23.  She reported not "know[ing] what the limits of the law are" when it comes to assisting "people with tremors that can't write adequately" or "somebody with a broken arm," and she is "not willing to risk [her]

197

reputation." *Id.* at 1705:16–1706:3. She "wouldn't even want [to risk] a criminal investigation of [her]self." *Id.* at 1706:1–3.

Even standing alone, this provision would prevent LWVFL from resuming petition circulation. When asked whether LWVFL would circulate petitions if all other provisions were eliminated but this one remained, Ms. Lowe-Minor stated: "No, because we wouldn't want to be in a situation where we were kind of forced to discriminate against voters who couldn't complete the petition with their own hand." Day 6 (Lowe-Minor) Tr. 1558:13–16. "Not being able to help voters complete the form at their request" would be "a real change of practice for us and a violation of our values in terms of voter inclusion." *Id.* at 1558:17–19.

This provision fails strict scrutiny because it is not narrowly tailored to a compelling interest; it fails exacting scrutiny because it is not substantially related to any important interest; and it fails rational basis review because threatening five years in prison for helping a blind voter complete a petition form bears no rational relationship to any legitimate governmental purpose. *See Colautti v. Franklin*, 439 U.S. 379, 395 (1979) (recognizing that statutes lacking a mens rea requirement can be "little more than a trap for those who act in good faith").

### 4)    *The Retention of Information Provision*

HB 1205 makes it a third-degree felony—again punishable up to five years in prison—for a person collecting petition forms "on behalf of a sponsor of an initiative

198

petition" to "cop[y] or retain[] a voter's personal information—such as their driver's license or ID card number, their social security number, or their signature—for any reason other than to provide such information to the sponsor of the initiative petition." Fla. Stat. § 100.371(9). The provision criminalizes the quality-control and associational activities at the heart of effective petition circulation, using terms so vague that neither citizens nor law enforcement can determine what conduct is prohibited. It violates the First and Fourteenth Amendments.

### a)    The Retention of Information Provision Is Unconstitutionally Vague

The provision is unconstitutionally vague in at least four respects. First, it does not define what it means to "retain" voter information or specify how long a volunteer may possess personal information before it has been "retain[ed]." Fla. Stat. § 100.371(9); SAC ¶ 71. Is a circulator who takes a petition form home overnight before delivering it to the sponsor "retaining" voter information? The statute does not say. Second, the phrase "personal information, such as" creates more irreducible ambiguity and makes it unclear whether such "personal information" is limited only to those enumerated—i.e., driver's license numbers, Social Security numbers, signatures—or if it extends to any information that could identify a voter, such as a name, email address, or a county of residence. ECF No. 387 at 19. Third, the exception for retaining information "to provide such information to the sponsor" is ambiguous as to whether a circulator who submits

199

petitions directly to the supervisor of elections, rather than to the sponsor, falls within its protection. SAC ¶ 72. Fourth, none of these terms have been clarified by any agency guidance, regulation, or interpretive rule.

### b) The Retention of Information Provision Chills Protected Speech and Induces Self-censorship

These ambiguities have produced exactly the chill that the vagueness doctrine exists to prevent. Before HB 1205, LWVFL regularly offered voters the opportunity to "sign up for an email list" or to "join our organization" at the same time they signed petitions. Day 6 (Lowe-Minor) Tr. 1559:17–23. This practice is now potentially criminal: having "an email sign-up at the same time that you are doing . . . a petition collection" is associated with "a felony-level charge." *Id.* at 1560:2–7. LWVFL also previously retained "first and last names of petition signers and their counties of residence" to contact voters who "filled out their petition form incorrectly or forgot to sign." *Id.* at 1527:20–24. This quality-control practice—the very activity that reduces the invalid petition forms triggering OECS investigation—is now potentially criminal as well.

Ms. Chandler emphasized the loss to associational activity: "one of the things that was most enjoyable about tabling and collecting the petitions is frequently we would get new members of [LWVFL]." Day 6 (Chandler) Tr. 1706:8–16. The First Amendment protects not only the act of gathering petition signatures but also the associational activity intertwined with it. *See Clean-Up '84 v. Heinrich*, 759 F.2d

200

1511, 1513 (11th Cir. 1984) (holding that petition circulation is protected by the freedom of association because it involves "the communication of ideas to voters").

Even if all other HB 1205 provisions were repealed but this provision remained, LWVFL still would not resume petition circulation because it would not "want to put [its] members at risk." Day 6 (Lowe-Minor) Tr. 1560:11–12. The provision independently chills speech.

**c)    The Retention of Information Provision Creates an Inescapable Catch-22**

The irony of the "retains voter information" provision is stark. HB 1205 simultaneously threatens criminal investigation for submitting too many invalid forms (through the Investigations Provision) and criminal prosecution for retaining the very information needed to correct those forms and prevent invalidity. The ten-day return deadline ensures that circulators cannot perform the quality-control checks that previously prevented errors. The "retains voter information" provision then ensures that circulators cannot maintain the records necessary to facilitate voter corrections even during the brief window available. Together, these provisions create an inescapable catch-22: comply with one and violate the other. As Dr. Smith testified, HB 1205 places sponsors in a "damned if you do and damned if you don't situation"—and the "retains voter information" provision is a central mechanism of that trap. Day 5 (Smith) Tr. 1352:4.

201

**d)** **The Retention of Information Provision Is Not Narrowly Tailored and Fails under Any Level of Scrutiny**

Even if the State has an interest in protecting the petition initiative process for fraud, felony liability for possessing information that voters voluntarily provided during a political interaction is not tailored to that interest. The provision applies regardless of the voter's consent—a voter who affirmatively provides an email address is no less "protected" than a voter whose driver's license number is surreptitiously copied.

The provision also lacks any scienter requirement: a volunteer who inadvertently retains a petition form overnight faces the same felony exposure as a deliberate data harvester. *See Smith*, 361 U.S. at 152–53 (holding that strict criminal liability for conduct implicating protected expression is unconstitutional where "the constitutional guarantees of the freedom of speech and of the press stand in the way of imposing a similar requirement").

Finally, the provision is unnecessary. Existing Florida law already criminalizes the misuse of personal identification information. *See* Fla. Stat. § 817.568. If the concern is data misuse, the remedy is to prosecute misuse—not to criminalize possession.

202

### 5)   *Sum of the Criminal Provisions*

Taken together, HB 1205's Criminal Provisions form an interlocking scheme that imposes a practical bar to participation in petition circulation by attaching vague rules to extreme penalties.   Each provision reinforces the others.   The RICO provision transforms undefined "irregularities" into potential racketeering predicates.   The Investigations Trigger provision ensures that the innocent clerical errors inevitable in large-scale petition drives trigger criminal referrals.   The Missing Information Provision makes it a felony to help disabled voters complete their forms.   And the "retains voter information" provision criminalizes the quality-control practices that could reduce the errors triggering investigation.   The cumulative effect is greater than the sum of its parts.

These provisions are also independently vague and substantially overbroad, in violation of the First and Fourteenth Amendments.   Each provision uses terms that lack statutory definition, provide no guidance to citizens or law enforcement, and invite arbitrary enforcement.   "Irregularities," "missing information," "retains," and "personal information, such as" are all undefined, and Defendants have offered no authoritative interpretation.   A statute is unconstitutionally vague when "those who enforce the law or those who are subject to its enforcement must necessarily guess at its meaning and differ as to its application." *Fla. Action Comm.*, 212 F. Supp. 3d at 1224 (quoting *Connally*, 269 U.S. at 391).

203

The provisions are also substantially overbroad. "A law is overbroad under the First Amendment when a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010). The first step in this analysis is to determine the "full scope of the law's coverage"—"[w]hat activities, by what actors, do the laws prohibit or otherwise regulate?" *Moody v. NetChoice, LLC*, 603 U.S. 707, 724 (2024). Here, the Criminal Provisions regulate everything from whom a circulator may assist, to what information a circulator may possess, to what undefined "irregularities" may trigger decades of imprisonment. The "plainly legitimate sweep" of these provisions is, at best, the prevention of deliberate fraud in petition circulation. But their actual reach extends to routine assistance for disabled voters, standard quality-control practices, the retention of voluntarily provided contact information, and any undefined "irregularity" in the petition process. The unconstitutional applications vastly outweigh any legitimate ones.

In sum, each of the Criminal Provisions independently violates the First and Fourteenth Amendments, and they do so collectively with even greater force. They chill core political speech, induce self-censorship, impose draconian penalties without adequate notice or scienter requirements, and serve no legitimate governmental interest that could justify their burden on protected expression. This

204

Court should declare them unconstitutional and permanently enjoin their enforcement.

### iv.    The Ten-Day Return Deadline

HB 1205's Ten-Day Return Deadline imposes fines on sponsors for every signed petition in support of their initiative that arrives late or to the wrong supervisor of elections.  Fla. Stat. § 100.371(7)(a).  As partners with the sponsors in pursuit of the same goal, this provision chills League Plaintiffs' core political speech and ability to associate freely with groups holding similar values.  Thus, strict scrutiny, or at least exacting scrutiny, applies.  *See supra* Section V.A(i).  Although Defendants contend that the Ten-Day Return Deadline is justified by an interest in preventing fraud, the trial record lacks sufficient evidence to survive under any level of scrutiny

#### 1)    *The Ten-Day Return Deadline and Fines Provisions Violate the Freedom of Speech Clause under the First Amendment*

The Ten-Day Return Deadline burdens core political speech protected by the First Amendment and is therefore subject to strict or exacting scrutiny.

First, where, as here, a law restricts circulators' time to put an initiative on the ballot, it impermissibly burdens petition circulation because it limits the quantum of speech and makes it less likely any initiative will achieve placement on the ballot. *Meyer*, 486 U.S. at 422–23; *Noem*, 60 F.4th at 1079.

205

Second, the League Plaintiffs and their volunteers have self-censored and ceased collecting petitions altogether in response to the Ten-Day Return Deadline and related fines (Day 6 (Lowe-Minor) Tr. 1542:18–1543:6; Day 6 (Scoon) Tr. 1649:22–1650:15), thereby necessarily reducing the number of voices advocating for citizens initiatives and the number of voters who can hear that message and sign a petition.  Day 6 (Lowe-Minor) Tr. 1572:15–21.

Third, the Ten-Day Return Deadline makes it less likely that initiatives will garner the signatures necessary to achieve ballot placement.  *Meyer*, 486 U.S. at 422–23.  With fewer volunteers (and none from the League Plaintiffs), initiatives are less likely to gather enough signatures to make it onto the ballot.  And when sponsor resources are expended to pay for late fines and expedited shipping costs, those resources are diverted away "from opportunities to communicate with voters and educate voters about what the initiative does."  Day 6 (Lowe-Minor) Tr. 1563:19–21.

Given the above, there is no question that either strict or exacting scrutiny applies.  *See Buckley*, 525 U.S. at 186–87 (holding that petition circulation involves "core political speech" protected by the First Amendment "at its zenith") (citing *Meyer*, 486 U.S. at 422–25 (1988)).

The Ten-Day Return Deadline fails strict or exacting scrutiny because the State cannot demonstrate that a ten-day deadline is necessary or is a less restrictive

(much less the least restrictive means) of preventing fraud in volunteer petition circulation. *Reed*, 576 U.S. at 180–81; *Ashcroft*, 542 U.S. at 666; *Bonta*, 594 U.S. at 609–10. Defendants contend that the Ten-Day Return Deadline is justified by the government's interest in preventing fraud in petition circulation. *See* H.B. 1205, § 1(1)–(2). But the trial record fatally undermines this asserted justification. *See supra* Section II.A(ii)(2)(b). Defendants' last-ditch attempt to justify the provision came from a Supervisor of Elections employee who testified that since HB 1205, the smaller batches and fewer late petitions were easier to process. Day 7 (Molina) Tr. 1825:5–11. Setting aside the fact that easier processing was never a stated goal of HB 1205, the Ten-Day Return Deadline does not actually provide supervisors additional review time because they have the same 60-day processing window after receipt. Fla. Stat. § 100.371(14)(b). The throughline is this: Notwithstanding the arduous deadline and associated fines, neither the Attorney General's Office nor the Secretary of State's Office are aware of any empirical evidence showing that a Ten-Day Return Deadline results in fewer instances of fraud. Day 8 (Pratt) 2138:11–15; Bridges Dep. 276:5–9, 276:11–13, ECF No. 620-1.

A ten-day deadline cannot be narrowly tailored where, as here, there is no substantive justification for selecting ten days instead of fifteen (or eleven or even sixty) days. The provision thus fails under strict or exacting scrutiny. *Reed*, 576 U.S. at 180–81; *Bonta*, 594 U.S. at 609–10. Though League Plaintiffs contend that

intermediate scrutiny does not apply, the record is nonetheless clear that the Ten-Day Return Deadline fails under that tier of review as well. For the reasons set forth above, the Ten-Day Return Deadline does not bear a substantial relationship to preventing petition fraud. *See Craig v. Boren*, 429 U.S. 190, 197 (1976) (to requiring that to survive, the statue "must be substantially related to achievement of those objectives" set by the government). That dearth of evidence is fatal to Defendants' claim. *See Turner Broad. Sys.*, 512 U.S. at 533. Indeed, the provision fails even rational basis review because it fails to further any "government interest at all" while "broadly" chilling the freedom of expression. *Messina*, 713 F. Supp. 3d at 1327 (quoting *McCullen*, 573 U.S. at 488–89). Indeed, the trial record affirmatively demonstrates that the Ten-Day Return Deadline is counterproductive to its stated goal: shorter submission windows correlate with higher invalidation rates. Day 5 (Smith) Tr. 1348:17–23, 1349:16–25. On this record, where the State's own witnesses were unable to identify any evidentiary basis for the proposition that a ten-day deadline advances the State's fraud-prevention interest, and where the provision demonstrably undermines the very interest it purports to serve, the Ten-Day Return Deadline cannot survive even the most deferential standard of review.

208

> **2)** ***The Ten-Day Return Deadline and Fines Provisions Violate the Freedom of Association Clause Under the First Amendment.***

The Ten-Day Return Deadline directly inhibits the League Plaintiffs' partnerships with initiative sponsors formed to advance shared political objectives, which is independently protected by the First Amendment's guarantee of freedom of association. *Clean-Up '84*, 759 F.2d at 1513; *see supra* Section V.A(iii). The impossibly short return deadline and increased fines limit "the communication of ideas to voters" and harm the League Plaintiffs' "effective advocacy of both public and private points of view" through petition circulation. *Id*.

As discussed above, under the Ten-Day Return Deadline, LWVFL will inevitably deliver more invalid petitions and cause the sponsor to pay more fines, damaging LWVFL's strong reputation as a reliable petition circulation operation with sponsors in the prosses. Day 6 (Lowe-Minor) Tr. 1563:19–21; Day 6 (Chandler) Tr. at 1700:23–25 (expressing concern that LWVFL's inability to comply with the new deadline while ensuring quality petitions will "tarnish that reputation . . . among the sponsors or among other organizations that collaborate with us"). Continuing to collect petitions under these provisions would irreparably damage LWVFL's relationships with its sponsor partners because resources would be diverted from voter education to reimbursing those sponsors for fines caused by the League Plaintiffs' late forms. Day 6 (Chandler) Tr. 1708:1–8. As a result, the

Ten-Day Return Deadline effectively bars the League Plaintiffs from associating with sponsor organizations to advance shared goals through petition circulation, directly impairing LWVFL's ability to carry out its mission-driven work, and strict scrutiny applies.  Day 6 (Lowe-Minor) Tr. 1572:15–21, 1574:2–7.

But the Ten-Day Return Deadline cannot survive strict scrutiny because the State failed to demonstrate that it is narrowly tailored to advance a compelling government interest.  *Krislov*, 226 F.3d at 862–83; *Lerman*, 232 F.3d at 149.  An interest in election integrity is insufficient absent evidence that the challenged provision actually advances that interest.  Accordingly, for the same reasons articulated above with respect to the freedom of speech (i.e., zero evidence tying the shorter deadline to less petition fraud), the Ten-Day Return Deadline fails under any standard of review.

### 3)       *The Ten-Day Return Deadline and Related Fines Are Unconstitutionally Overbroad.*

Finally, this provision may be stricken for the independent reason that it is unconstitutionally overbroad.  That is because the Ten-Day Return Deadline and related fines operate in tandem to suppress petition circulation altogether rather than to address any discrete category of fraudulent conduct.  *Stevens*, 559 U.S. at 473.  As discussed above, signed petitions submitted between eleven and thirty days produce a higher rate of valid forms, so the Ten-Day Return Deadline imposes penalties for countless valid forms.  Rather than preventing fraudulent petitions, these provisions

210

eliminate petitions entirely—impermissibly sweeping within their reach a substantial amount of constitutionally protected political speech.

>  v.  **The Challenged Provisions, Reviewed Cumulatively, Are Unconstitutional**

As discussed above in the Legal Standards section, when multiple components of a statutory scheme implicate constitutional protections, it is appropriate to examine the cumulative effect. Stepping back from the provision-by-provision analysis set forth above, a clear picture emerges: the Challenged Provisions cannot be disentangled from one another. They form an interlocking regulatory scheme in which each provision amplifies the burdens imposed by the others, and together they not only satisfy the *Meyer* considerations—they limit the number of voices that engage in petition collection and they it make it less likely that initiatives will garner the number of necessary signatures to get on the ballot — but do so to an extreme and unprecedented degree. When weighed against the complete lack of a record of fraud by non-residents, non-citizens, person with felony convictions who have not had their rights restored, and volunteers that is detailed above and not repeated here, it is abundantly clear that HB 1205 is unconstitutional.

Expert Dr. Daniel A. Smith compared Florida to the fourteen other states that have similar initiative petition processes. Florida is an outlier when it comes to the use of Categorical Bans and the number of people who are prohibited from circulating petitions because of them. Regarding the Non-citizen Ban, only three of

211

the comparator states (Colorado, Oklahoma, and North Dakota) have bans on non-citizens. Day 5 (Smith) Tr. 1315:9-13. Florida has a lot of non-citizens, 2 million or around 9% of the population. Day 5 (Smith) Tr. 1306:17-1307:9. There are only two other states (North Dakota and Oklahoma), that have bans on non-residents circulating petitions. Day 5 (Smith) Tr. 1317:15-17. Florida has a large number of non-residents who have second homes in Florida, around a million, that is larger in number and percentage than the comparator states. Day 5 (Smith) Tr. 1308:6-1308:15, 1317:15-25. Only three other states (Arkansas, Oregon, and Missouri) have bans on persons with felony convictions circulating petitions and those bans are more limited than Florida. Day 5 (Smith) Tr. 1315:15-1315:6. Florida has around a million people, or about 5% of the voting age population, who are prohibited from circulating petitions because of the convictions, which is in number and percentage than those other states. Day 5 (Smith) Tr. 1307:10-1308:5. Thus, Florida is the only state that has all three categorical bans and the combined effect of the Categorical Bans, if you only count the non-residents conservatively by including those who have second homes in Florida, is that it prohibits around four million people from circulating petitions. Day 5 (Smith) Tr. 1309:24-1310:15.

The Registration Provisions also have a significant negative effect. Dr. Smith testified that Florida is the only "state that has a restriction on volunteers that requires them to register and take a training module and take a test." Day 5 (Smith) Tr.

1328:24-25.  Only one other state, Missouri, even requires volunteers to register. Day 5 (Smith) Tr. 1329:19-1330:4.  Dr. Smith testified that the registration provisions deters volunteers from gathering petitions "now that they have these onerous restrictions on them."  Day 5 (Smith) Tr. 1327:17-18.  And as discussed in detail above, Plaintiffs LWVFL, LULAC, Chandler and Scoon also stopped their volunteer petition collection efforts because of the Registration Provisions, because of the amount of effort and the public disclosure of their personal information, and the Criminal Provisions.[52]

It is undeniable that the Challenged Restrictions, when combined, have taken numerous millions of people out of the pool of potential circulators.  And that more than satisfies the first *Meyer* consideration.  This undoubtedly also satisfies the second *Meyer* consideration: by taking numerous millions of people out of the pool of potential circulators, it is less likely that petitions will get on the ballot.  Prior to HB 1205, it was challenging to get a petition on the ballot in Florida.  Dr. Smith testified that prior to HB 1025, forty-four measures out of 428, around 10%, made it to on the ballot, because it was really difficult to get qualified and approved to be placed on the ballot through all [the Florida] regulations."  Day 5 (Smith) Tr.

---

[52] Dr. Smith also testified that Florida's Ten-Day Return Deadline is an outlier.  Day 5 (Smith) Tr. 1354:20-1355:6.

1391:10-17.  But HB 1025 has made it worse.  No initiatives qualified for the ballot in 2026.  As Dr. Smith described the cumulative effect of the statutory scheme:

> Florida has layered on, over time and then with HB 1205, this sledge hammer of individual things which have made it virtually impossible for all but the most moneyed special interests to qualify. And as a result, you've effectively created these barriers where even just being an initiative state is no longer really going to allow all of those positive secondary effects -- these educative effects that I talked about three hours ago -- from happening, because there's just no chance of being able to qualify a measure in Florida when you put these things individually and collectively.

Day 5 (Smith) Tr. 1391:10–17.  HB 1025 not only lessens the likelihood that a petition will make to the ballot—"which make[s] the matter the focus of statewide discussion, *Meyer*, 486 U.S. at 423— but makes it virtually impossible.

## VI.    CONCLUSION

The State's proof does not identify a volunteer-specific problem or demonstrate narrow tailoring in light of existing safeguards and less-burdensome alternatives.  Because Plaintiffs have demonstrated that the Challenged Provisions—reviewed either separately or cumulatively—violate the First and Fourteenth Amendments, and because Defendants have wholly failed to carry their burden under any applicable standard of review, this Court should declare the Challenged Provisions unconstitutional and permanently enjoin their enforcement.

214

For the foregoing reasons, the Court must permanently enjoin HB 1205's

Challenged Provisions as unconstitutional and grant such other relief as justice

requires.

Respectfully submitted,                                    Dated: March 19, 2026

*/s/ George E. Mastoris*
GEORGE E. MASTORIS**
gmastoris@winston.com
SOFIA ARGUELLO**
sarguello@winston.com
JOHANNA RAE HUDGENS**
jhudgens@winston.com
TYLER DATO**
tdato@winston.com
SAMANTHA OSAKI**
sosaki@winston.com
NATHAN C. GREESS**
ngreess@winston.com
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
Telephone: (202) 294-6700

SPENCER KLEIN**
spencer@statedemocracydefenders.org
POOJA CHAUDHURI**
pooja@statedemocracydefenders.org
SOFIA FERNANDEZ GOLD**
sofia@statedemocracydefenders.org
NORMAN EISEN**
norman@statedemocracydefenders.org
TIANNA MAYS*
tianna@statedemocracydefenders.org
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Ave. SE, Suite 15180

215

Washington, DC 20003
Telephone: (202) 594-9958

JON GREENBAUM**
jgreenbaum@justicels.com
JUSTICE LEGAL STRATEGIES PLLC
P.O. Box 27015
Washington, D.C. 20038
Telephone: (202) 601-8678

GERALD E. GREENBERG
Florida Bar No. 440094
ggreenberg@gsgpa.com
SHANE GRANNUM
Florida Bar No. 1055050
sgrannum@gsgpa.com
GELBER SCHACHTER & GREENBERG, P.A.
One Southeast Third Avenue, Suite 2600
Miami, FL 33131
Telephone: (305) 728-0950
E-service: efilings@gsgpa.com

\* *Pro hac vice* applications forthcoming
\*\* *Pro hac vice* granted
*Counsel for League Plaintiffs*

216

## CERTIFICATE OF COMPLIANCE

I certify that this document complies with the typeface and formatting requirements in Local Rule 5.1.

*/s/ George E. Mastoris*
George E. Mastoris

## CERTIFICATE OF SERVICE

I certify that on March 19, 2026, the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system, which sends the document to all counsel of record.

*/s/ George E. Mastoris*
George E. Mastoris