**APPENDIX B**

This section examines Supreme Court and circuit court decisions pertaining to challenges against petition collection restrictions, emphasizing the legal standards adopted by the courts and their methods of application.  Its purpose is to address this Court's question about what the proper legal standard is.  The Supreme Court, in particular, has not been clear about whether strict scrutiny or exacting scrutiny applies to regulations like those at issue here.  But the throughline is that the Court must apply strict, exacting, or intermediate scrutiny to speech restrictions—and all three of these tiers of scrutiny require narrow tailoring.[1]

***Sister circuits have applied strict scrutiny to residency and voter registration requirements.***  In *We the People PAC v. Bellows*, 40 F.4th 1 (1st Cir. 2022), the First Circuit held that residency and registered voter requirements for initiative petition collectors were subject to strict scrutiny.  Specifically, the residency requirement

---

[1] There is a related doctrine known as the *Anderson/Burdick* balancing test, named after *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*, 504 U.S. 428 (1992), that applies to First and Fourteenth Amendment ballot access and right to vote cases.  Under this test, "[a] court considering a challenge to a state election law must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'"  *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789).  For the most part courts have not applied the *Anderson-Burdick* balancing test in petition collection regulation challenges, but *Anderson-Burdick* has been referenced in a few of relevant cases discussed below.

1

"would appear to bar the petition proponents from reaching into a pool of more than 250 million people of voting age to assist in the collection of signatures—and to engage in the face-to-face, interactive communication designed to bring about political change that accompanies that collection of signatures—that the Supreme Court has deemed core political speech." *Id.* at 14. The First Circuit affirmed the district court's findings that the residency and registered voter requirements imposed severe burdens on free speech that were subject to strict scrutiny. *Id.* at 19, 24.

The state argued that requiring petition circulators to be residents was needed to protect voter integrity, maintain jurisdiction, and aid investigations. *Id.* The court dismissed the argument, stating the requirement was unnecessary since circulators must already provide their address, can be subpoenaed, and are as accessible as state residents. *Id.* at 20. Maine also contended that it had a compelling interest in limiting participation in its political process to residents. *Id.* at 21. The court found that the regulation was not narrowly tailored to protect that interest because only Maine voters could sign the petitions, and if the petition was placed on the ballot, only Maine voters could vote on the petition. *Id.* at 22.

Two Tenth Circuit cases, *Chandler v. City of Arvada*, 292 F.3d 1236 (10th Cir. 2002) and *Yes On Term Limits, Inc. v. Savage*, 550 F.3d 1023 (10th Cir. 2008), similarly hold that limitations restricting initiative petition circulation to residents constitute a severe burden on free speech which triggers strict scrutiny.

In *Chandler*, the city of Arvada claimed its residency requirement for circulators was "narrowly tailored to prevent fraud, malfeasance, and corruption in municipal elections within the City" because the city had no authority to subpoena nonresidents for a petition protest hearing. 292 F.3d at 1242. The court found that there was a less restrictive alternative available: requiring circulators to submit to the City's jurisdiction. *Id.* at 1244.

In *Yes on Term Limits*, Oklahoma contended that it had a compelling interest in election integrity and claimed that the non-resident ban was necessary because: "(1) non-resident circulators have a demonstrated lack of integrity and propensity to flout state laws, and (2) non-residents are more difficult for those protesting signatures to locate and question." 550 F.3d at 1029. As to the first justification, the court found "Oklahoma has failed to prove the ban is narrowly tailored to protect the initiative process due to a higher rate of non-resident circulator fraud" because Oklahoma had provided no data demonstrating that nonresidents had engaged in more fraudulent petition activity than residents. *Id.* As to the second argument, the court identified a less restrictive alternative: "Oklahoma could require that in order to circulate petitions, non-residents enter into agreements *with the state*, rather than the initiative proponent, wherein the circulators provide their relevant contact information and agree to return in the event of a protest." *Id.* at 1030 (emphasis in original).

3

Similarly, in *Pierce v. Jacobsen*, 44 F.4th 853 (9th Cir. 2022), the Ninth Circuit held that a Montana law that prevented non-residents from circulating initiative petitions triggered strict scrutiny because it reduced the pool of circulators and the audience reached by circulators. *Id.* at 860–61 (quoting *Buckley*, 525 U.S. at 194–95). It was of no moment that only the first *Meyer* consideration was met, as that was sufficient to trigger strict scrutiny:

> *Meyer*, however, did not create a two-part test, but rather identified certain considerations to help guide our review. Therefore, Plaintiffs' lack of evidence on the second *Meyer* consideration is not dispositive of the severity of the burden—at least under the circumstances here. Instead, we must weigh all the effects of the regulation to determine whether, on the whole, it severely burdens core political speech. Plaintiffs have shown that the residency requirement imposes an outright ban on a form of core political speech for all non-residents and necessarily diminishes the pool of circulators. We thus hold that the residency requirement here imposes a severe burden on the First Amendment rights of both out-of-state residents and in-state proponents and is therefore subject to strict scrutiny.

*Id.* at 861. Montana contended that its non-resident ban was necessary based on its experience regarding fraud by out-of-state residents in a recent election. Here, again, the court found that this concern could be more narrowly addressed by requiring out-of-state circulators to submit to jurisdiction. *Id.* at 862–63. Montana also claimed that the requirement was necessary to protect the state's right to self-governance. *Id.* at 863. The court found that this interest could be protected by a less restrictive alternative: "requiring that official proponents, petition signers, and voters on initiatives be residents." *Id.* at 863.

4

Finally, the Eighth Circuit has applied the second *Meyer* consideration twice. In *Bernbeck v. Moore*, 126 F.3d 1114 (8th Cir. 1997), the Nebraska laws at issue required petition initiative circulators to be registered voters. The evidence "showed that the Nebraska statutes made it less likely that the appellees, as sponsors of initiatives, would be able to collect the necessary number of signatures to place their initiatives on the ballot. The effect, therefore, of these statutes is a restriction of the people's constitutional right to express core political speech." *Id.* at 1116. The court also found that the statutes implicated the first *Meyer* consideration as well and applied strict scrutiny. *Id.*

As to strict scrutiny, Nebraska claimed that its requirement that circulators be registered voters prevented fraud in the process. *Id.* at 1116. The Eighth Circuit found the law was not narrowly tailored because "less restrictive provisions of Nebraska law [were] adequate to prevent signature fraud without imposing a voter-registration requirement" and that "in no other situation does Nebraska law prohibit or restrict Nebraskans who advocate or oppose electoral measures from hiring or recruiting non-registered voters to champion their cause[.]" *Id.* at 1116–17.

These cases from the First, Eighth, Ninth, and Tenth Circuits establish that petition collection laws that ban a group of people from collecting petitions are

subject to strict scrutiny because they prevent one-on-one communication.  And

crucially, they rejected a host of arguments raised here.[2]

*Sister circuits have applied strict scrutiny to criminal provisions implicating*

*speech.*  *Citizens for Tax Reform v. Deters*, 518 F.3d 375 (6th Cir. 2008), illustrates

that felony penalties for a violation can also constitute a severe burden on speech

triggering strict scrutiny.  *Deters* involved an Ohio ban on paying circulators per

signature.  Although the court noted that per-signature compensation bans had been

upheld in other states under a less exacting form of scrutiny, the court applied strict

---

[2] There is one outlier circuit court decision that predated the circuit court decisions above and is inconsistent with *Meyer*/*Buckley* and the later circuit court decisions. *Initiative & Referendum Inst. v. Jaeger*, 241 F.3d 614 (8th Cir. 2001).  *Jaeger* held that a North Dakota residency requirement for petition circulators was constitutional because the state had "a compelling interest in preventing fraud and the regulation does not unduly restrict speech." *Id.* at 616.  As to the finding on speech, the court did not faithfully apply the first consideration from *Meyer* (whether the restriction limited the quantum of speech by reducing the number of people who could engage in petition circulation).  Instead, the court improperly considered the two *Meyer* considerations together, not separately, stating that because of the "high success rate" of petitions circulated after the residency provision had been enacted, "no severe burden has been placed on those wishing to circulate petitions." *Id.* at 617. It also found no severe burden because non-residents could communicate their views in other ways, because "[n]on-residents are still free to speak to voters regarding particular measures; they certainly may train residents on the issues involved and may instruct them on the best way to collect signatures; and they may even accompany circulators."  *Id.*  This discussion of alternatives also conflicts with *Meyer*, which rejected the proposition that the availability of other, less effective means for communication eliminates the burdens on free speech.  *Meyer,* 486 U.S. at 424.  Unsurprisingly, several of the other circuit court decisions have squarely rejected *Jaeger*'s holding. *Jacobsen*, 44 F.4th at 862 n.5; *Chandler*, 292 F.3d at 1244–45; *We the People*, 40 F.4th at 18.

scrutiny to overturn the statute because (1) the Ohio law punished violations as a felony rather than as a misdemeanor or with a fine; and (2) it also banned incentives for productivity. *Id.* at 386–87. Accordingly, the court found the law more analogous to a complete paid circulator ban than a typical per-signature ban. *Id.* at 386–87.

Ohio argued that its ban on compensating circulators per signature was necessary to prevent election fraud, pointing to anecdotes where circulators who engaged in fraud were paid on a per signature basis. *Id.* The court rejected the state's arguments because it did not show that the per-signature payment system caused or significantly contributed to the fraud, thereby utterly failing to prove that the provision was "narrowly tailored (or even reasonably tailored) to the State's legitimate interest in reducing election fraud." *Id.* at 387. The court also found that existing laws, which already criminalized election fraud, adequately served the interest articulated by the state, thus rendering the challenged provision unnecessary. *Id.* at 388.

***Sister circuits have applied exacting scrutiny to disclosure requirements.*** In *Dakotans for Health v. Noem*, 52 F.4th 381 (8th Cir. 2022), the Eighth Circuit applied exacting scrutiny to a law that required paid circulators to disclose personal information to the government. The case involved a challenge to four provisions of a 2020 South Dakota law (SB 180) that: (1) required petition circulators to register

their name, address, and other personal identifying information prior to circulation; (2) made registration information publicly available; (3) voided all petitions collected by a circulator whose registration form was false or incomplete; and (4) required updates within seven days of any change to registration information. *Id.* at 384–85. Taken together, the court found that the challenged law would "have the effect of limiting the pool of circulators who will carry [plaintiff's] message, thus reducing the size of its audience, and making it less likely it will gather the necessary signatures." *Id.* at 387. The court applied "exacting scrutiny" because "[a] statute compelling disclosure of information to the government related to political activity is typically subject to 'exacting scrutiny.'" *Id.* at 388–89 (quoting *Bonta*, 594 U.S. at 607).

While the state undoubtedly had an interest in the "prevention of corruption and protection of the integrity of the ballot initiative process," the state failed at narrow tailoring for two reasons. *Id.* at 389. First, there was insufficient evidence on the record before the court indicating that paid circulators engaged in a higher incidence of fraud than volunteer circulators. *Id.* at 390. Second, "disclosing a circulator's phone number, home address, and email address prior to the signature verification process are not substantially related to South Dakota's interests" and was a "recipe for harassment, especially given the requirement for public disclosure of circulators' phone numbers, residential addresses, and email addresses." *Id.* at 391.

This substantial body of Supreme Court and circuit court decisions establish that regulations on petition circulation which limit communication between circulators and voters are subject to strict or exacting scrutiny. Courts have consistently found that such laws are not narrowly tailored to advance the state's interests.