**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

|  |  |
|---|---|
| FLORIDA DECIDES HEALTHCARE, INC., *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>CORD BYRD, in his official capacity as Secretary of State of Florida, *et al.*,<br><br>*Defendants*. | Case No. 4:25-cv-00211-MW-MAF |

## <u>FLORIDA RIGHT TO CLEAN WATER PLAINTIFFS'</u>
## <u>NOTICE OF APPEAL</u>

Plaintiffs FloridaRighttoCleanWater.org and Melissa Martin (together, "Florida Right to Clean Water Plaintiffs" or "RTCW Plaintiffs") appeal to the U.S. Court of Appeals for the Eleventh Circuit from the final order on the merits, Doc. 679, and clerk's judgment, Doc. 682, both entered on April 30, 2026.

1

Respectfully submitted this 1st day of June, 2026,

*/s/ Brent Ferguson*
Danielle Lang (D.C. Bar No. 1500218)*
Brent Ferguson (D.C. Bar No. 1782289)*
Sejal Jhaveri (N.Y. Bar No. 5396304)*
William Hancock (D.C. Bar No. 90002204)*
Heather Szilagyi (D.C. Bar No. 90006787)*
Ellen Boettcher (D.C. Bar No. 90005525)*
Melissa Neal (D.C. Bar No. 90018637)*
Alexis Grady (D.C. Bar No. 90017620)*
Samantha Perlman (Mass. Bar No. 715595)*
Simone Leeper (Fla. Bar No. 1020511)
Campaign Legal Center
1101 14th Street NW, Ste. 400
Washington, DC 20005
(202) 736-2200
dlang@campaignlegalcenter.org
bferguson@campaignlegalcenter.org
sjhaveri@campaignlegalcenter.org
whancock@campaignlegalcenter.org
hszilagyi@campaignlegalcenter.org
eboettcher@campaignlegalcenter.org
mneal@campaignlegalcenter.org
agrady@campaignlegalcenter.org
sperlman@campaignlegalcenter.org
sleeper@campaignlegalcenter.org

*Counsel for Plaintiffs FloridaRighttoCleanWater.org and Melissa Martin*

*admitted *pro hac vice*

2

## CERTIFICATE OF SERVICE

I certify that on June 1, 2026, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record in this case.

*/s/ Brent Ferguson*
Brent Ferguson

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

FLORIDA DECIDES HEALTHCARE,
INC., et al.,

     *Plaintiffs/Intervenor-Plaintiffs*,

v.                            **Case No.: 4:25cv211-MW/MAF**

CORD BYRD, et al.,

     *Defendants/Intervenor-Defendants.*

_____/

## FINAL ORDER ON MERITS

This Order is entered following a bench trial on Plaintiffs' claims challenging the constitutionality of several provisions of HB 1205, which amended Florida's laws pertaining to the statewide ballot initiative process.

"Florida's Constitution gives 'the people' the power to propose amendments to the state constitution." *Biddulph v. Mortham*, 83 F.3d 1491, 1493 (11th Cir. 1996) (citing Art. XI, § 3, Fla. Const.). This right of the people "derive[s] from wholly state-created procedures by which issues that might otherwise be considered by elected representatives may be put to the voting populace." *Gibson v. Firestone*, 741 F.2d 1268, 1273 (11th Cir. 1984). As Plaintiffs' expert, Dr. Dan Smith, explained at trial, Florida's Constitution Revision Commission of 1966, led by Democrat Chesterfield Smith, recognized that when the governing party centralizes so much

power, as the Florida Democratic party did in the 1950s and '60s, it begins to act as a cartel. ECF No. 644 at 45–46. As a result, many issues may go unheard, despite public support for legislation. *Id.* To combat the chokehold this "cartel interest" has on legislation, Florida created the right of citizens to directly bring issues to public vote.[1]

But this right of the people is not without limits. "The state, having created such a procedure, retains the authority to interpret its scope and availability." *Gibson*, 741 F.2d at 1273. In other words, "[s]tates allowing ballot initiatives have considerable leeway to protect the integrity and reliability of the initiative process, as they have with respect to election processes generally." *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182, 191 (1999).

To that end, Florida has, over the years, enacted myriad regulations of this process, including regulations of the framing of proposed language for ballot initiatives, signature requirements to qualify for ballot placement, deadlines for returning signed petitions, etc. Indeed, before the Legislature enacted the challenged legislation at issue in this case, the chance of successfully proposing and passing a statewide ballot initiative was an uphill battle unless a sponsor was able to marshal

---

[1] Now, like the Democrats in the 1950s and '60s, Republicans have a chokehold on power in the Florida Legislature. Recently, the Legislature has enacted more regulations on Floridians' right of direct democracy, and, in the words of Defendant Earley, appear to "kill the ability to bring citizen initiative petitions to the ballot," with HB 1205. *See* ECF No. 639 at 180–81.

enormous resources and put them to work in a massive statewide campaign. Now, according to Plaintiffs, that process has gotten even more challenging, inefficient, and expensive due to new restrictions imposed by HB 1205.

Plaintiffs include three statewide ballot initiative sponsors, Smart & Safe Florida ("Smart & Safe"), Florida Decides Healthcare ("FDH"), and Right to Clean Water ("RTCW"), who had active campaigns to reach the ballot for the 2026 general election. Plaintiffs also include individuals associated with FDH—Jordan Simmons and Mitchell Emerson—and RTCW's campaign coordinator, Melissa Martin. And Plaintiffs include community organizations, the League of Women Voters ("the League") and the League of United Latin American Citizens ("LULAC"), and League members Cecile Scoon and Debra Chandler.

These Plaintiffs challenge most of the changes enacted through HB 1205, including new deadlines and requirements for returning signed petitions, who can serve as petition circulators, registration requirements for petition circulators, new criminal prohibitions and investigatory requirements associated with petition circulation, how much the State may charge initiative sponsors to verify signed petitions, what language must be included on initiative petitions, and how many initiatives a sponsor may propose. Plaintiffs' claims assert most of these provisions violate their First Amendment rights to speech and association by imposing a severe burden on their petition circulation efforts. Smart & Safe also contends the new

3

financial impact statement requirement compels speech in violation of the First Amendment, while FDH contends the new verification costs violate its right to equal protection and the League Plaintiffs assert one of the petition circulator eligibility requirements violates their rights to equal protection. But before this Court can address the merits of the claims presented in this case, it must first address the threshold question of standing.

I

First, this Court addresses whether Plaintiffs have standing to pursue prospective relief for each of the provisions they challenge. *Hallandale Prof'l Fire Fighters Local 2238 v. City of Hallandale*, 922 F. 2d 756, 759 (11th Cir. 1991) ("Before rendering a decision . . . every federal court operates under an independent obligation to ensure it is presented with the kind of concrete controversy upon which its constitutional grant of authority is based; and this obligation on the court to examine its own jurisdiction continues at each stage of the proceedings . . . ."). "Plaintiffs must maintain their personal interest in the dispute at all stages of litigation." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). "[I]n a case like this that proceeds to trial, the specific facts set forth by the plaintiff to support standing must be supported adequately by the evidence adduced at trial." *Id*. (internal quotation marks and citation omitted). "And standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and

4

for each form of relief that they seek (for example, injunctive relief and damages)."
*Id*. (citations omitted).

The parties are well familiar with the requirements for demonstrating Article III standing—namely, injury in fact, traceability, and redressability. This Court addresses each Plaintiff's standing as to each claim in turn, starting with each Plaintiff's evidence concerning the injuries suffered as the result of the challenged provisions. This Court's discussion begins with Smart & Safe.

A

First, this Court addresses those claims for which Smart & Safe has not demonstrated standing. Smart & Safe is a registered Florida political committee that sponsored a citizen initiative entitled "Adult Personal Use of Marijuana" during the 2026 election cycle. ECF No. 596 ¶ 63. Smart & Safe also attempted to sponsor a second proposed amendment entitled "Home Cultivation of Medical Marijuana" during the 2026 election cycle. *Id*. ¶ 65. The parties stipulated that if this second proposed amendment was unsuccessful in making the ballot for 2026, it would sponsor the same initiative for the 2028 election cycle. *Id*.[2] However, as Defendants point out, the testimony Smart & Safe introduced at trial failed to demonstrate that

---

[2] Smart & Safe asserted in the pretrial stipulation that it intends to campaign for its ballot initiatives in the 2028 election cycle if it obtains the necessary relief before this Court. *See* ECF No. 596 at 60, ¶¶ 17–18. However, Defendants did not stipulate to these assertions of fact nor were these facts proven at trial.

5

it intends to proceed with collecting signatures for the 2028 petition initiative cycle for any ballot initiative. At most, Meghan Cox, Smart & Safe's only live witness,[3] testified that she did not know yet if Smart & Safe has an active political committee trying to get on the 2028 ballot, ECF No. 638 at 193, and that Smart & Safe's decision to collect signatures toward the 2028 ballot depends on the outcome of this litigation and whether any fines assessed against Smart & Safe for the 2026 election cycle are cost prohibitive, *id.* at 190.

But Smart & Safe is pursuing only prospective relief, which requires proof of an ongoing or imminent injury that is concrete and particularized, not speculative or hypothetical. *See Church v. City of Huntsville*, 30 F. 3d 1332, 1337 (11th Cir. 1994). To the extent some of Smart & Safe's claims hinge on impacts to any of its efforts in current or future campaign cycles, Smart & Safe has not demonstrated any present or future intention to collect signatures toward a ballot initiative for the 2028 election cycle or beyond. This failure in proof dooms these claims. Simply put, prospective relief with respect to challenged provisions that apply only to current or future

---

[3] Ms. Cox is a political consultant whose company was retained to manage the field efforts for Smart & Safe's petition gathering campaign in support of the Adult Personal Use of Marijuana ballot initiative for the 2026 election cycle. ECF No. 638 at 102–03. Her testimony focused on the nuts and bolts of running the campaign, but Ms. Cox could not speak to higher-level decisionmaking by Smart & Safe with respect to its plans or intentions for election cycles beyond the 2026 general election.

election cycles will afford no redress to Smart & Safe if it has no intention of engaging in petition gathering for current or future election cycles.[4]

For example, inasmuch as Smart & Safe asserts the new financial impact statement requirement violates its First Amendment rights by compelling speech on its initiative petition forms, Smart & Safe has failed to demonstrate that it is likely, and not merely speculative, that Smart & Safe plans to engage in any further petitioning for current or future election cycles and will thus suffer an ongoing or imminent speech injury based on this provision. The same is true with Smart & Safe's challenges to the additional amendment prohibition,[5] the registration

---

[4] Smart & Safe argues that its claims are capable of repetition yet evading review inasmuch as this case involves ballot initiatives that operate over a shortened time frame for each election cycle. *See* ECF No. 665 at 15–16. However, this argument addresses whether this case has become moot, not whether Plaintiff has demonstrated that it is suffering or will suffer an imminent injury in fact for standing purposes. Moreover, the cases Smart & Safe cites in support of this contention are distinguishable. Notably, the Supreme Court in *Meyer* relied on evidence that the initiative proponents continued advocating for their failed initiative and planned future attempts to obtain signatures to place the issue on the ballot to determine that the case was not moot. *Meyer v. Grant*, 486 U.S. 414, 417 n.2 (1988). Thus, there was a reasonable expectation that the proponents would be subjected to the same challenged action again. *See also Wood v. Raffensperger*, 981 F. 3d 1307 (11th Cir. 2020). Here, however, Smart & Safe has offered no evidence to demonstrate by a preponderance of the evidence that it is planning or intends to gather any signatures for the current or future election cycles and this Court will not speculate as to this fact given Ms. Cox's testimony.

[5] Smart & Safe argues that this provision injures it because it is prohibited from sponsoring multiple ballot initiatives during the 2028 election cycle. ECF No. 665 at 18. But Smart & Safe has not demonstrated that it intends or is attempting to sponsor more than one ballot initiative during the 2028 election cycle. Accordingly, based on this record, Smart & Safe's asserted injury is unsupported and merely hypothetical.

requirements,[6] the mandatory decertification requirements,[7] and the voter notice and verification costs.[8] Inasmuch as Smart & Safe has not demonstrated an ongoing or imminent injury in fact that could be remedied by prospective relief with respect to these challenged provisions, Smart & Safe has not demonstrated standing to challenge these provisions.

With respect to the non-resident circulator prohibition, Smart & Safe's asserted injury is based on fears that the State will assess fines against it for the use of non-resident circulators during the time when this Court's preliminary injunction was in effect in 2025. ECF No. 665 at 13–14. However, the Director of the Office of Election Crimes and Security, Jillian Pratt, testified unequivocally that her office would issue no fines for the use of non-resident petition circulators during the injunction period in 2025. *See* ECF No. 654 at 199. Under these specific

---

[6] Smart & Safe's trial brief includes no discussion of its standing to seek prospective relief with respect to the registration requirements beyond the assertion that the Attorney General and State Attorneys are responsible for enforcing the criminal penalties associated with violations of the registration requirements. *See* ECF No. 665 at 17.

[7] In asserting it has standing to challenge these provisions, Smart & Safe offers no explanation beyond the fact that the financial impact statement and mandatory decertification requirements would apply to it if it sponsored an initiative in the future. Setting aside the lack of evidence demonstrating how these provisions are injuring or will injure Smart & Safe, any purported injury with respect to the decertification requirement appears to be wholly speculative at this juncture, inasmuch as this provision requires the decertification of an initiative's ballot position only if the Florida Supreme Court later determines in an advisory opinion that the initiative petition is invalid based on, among other reasons, an improper financial impact statement.

[8] Again, Smart & Safe has not demonstrated that it is likely to incur any future verification costs inasmuch as it has not demonstrated that it intends to collect petition signatures for another ballot initiative during the 2028 election cycle.

8

circumstances, Smart & Safe's subjective fears of enforcement for something the State has unequivocally disavowed an intention to enforce do not give rise to a cognizable injury. *Compare Wollschlaeger v. Gov. of Fla.*, 848 F. 3d 1293, 1306 (11th Cir. 2017) (nonbinding letter disavowing enforcement in general terms did not deprive plaintiff of standing where defendant had previously taken contradictory position) *with Wilson v. State Bar of Ga.*, 132 F. 3d 1422, 1429 (11th Cir. 1998) (disbarred attorneys' asserted belief that they would have to forego protected speech to avoid sanctions under challenged amendments to Bar Rules was not objectively reasonable in light of the State Bar's position that it would not sanction disbarred attorneys for engaging in such speech).

That leaves Smart & Safe's challenge to the ten-day delivery requirement and fines for late deliveries. Smart & Safe contends that it reasonably fears the imposition of fines for late petition deliveries that its circulators returned during the 2025–2026 campaign. ECF No. 665 at 13. To support this, Smart & Safe points to Ms. Cox's testimony which demonstrates that certain batches of Smart & Safe's signed petitions delivered to the Supervisors likely contained petitions that are at least one day late and thus subject to a fine. *See* ECF No. 638 at 147–50, 155–58. Likewise, Smart & Safe also points to Director Pratt's testimony insofar as she testified that her office has not issued any fines for late or incorrect deliveries for the 2025–2026 cycle, but there was no deadline for doing so. ECF No. 654 at 198.

9

Inasmuch as Director Pratt did not disavow the imposition of fines for late deliveries and given the volume of petitions submitted and the delivery notifications indicating that at least some of these petitions were turned in after the ten-day deadline, this Court concludes that Smart & Safe has demonstrated that it is more likely than not that it will be fined for late deliveries under the challenged provision. This injury is traceable to the Secretary of State, whose Office of Election Crimes and Security is responsible for issuing fines for late petitions. And this injury is redressable by an injunction prohibiting the imposition of fines for late deliveries from the 2025–2026 campaign cycle. Accordingly, Smart & Safe has demonstrated that it has standing to seek prospective relief solely with respect to the ten-day delivery requirement and associated fines provisions.

B

Next, this Court considers the RTCW Plaintiffs' standing to pursue prospective relief. RTCW is a registered Florida political committee that sponsored a citizen initiative entitled "Right to Clean and Healthy Waters" during the 2026 election cycle. ECF No. 596 ¶ 76. Plaintiff Melissa Martin is RTCW's campaign coordinator and a resident of Oregon. *Id*. ¶¶ 82–83. Again, as Defendants point out, the testimony RTCW introduced at trial failed to demonstrate that it intends to proceed with collecting signatures for the 2028 petition initiative cycle for any ballot initiative. At most, Ms. Martin testified that RTCW is still a registered political

10

committee and would remain registered for the next election cycle. ECF No. 637 at 87. However, Ms. Martin also testified that RTCW does not have any "active petition-gathering efforts right now," *id*. at 21, and RTCW's plans with respect to a 2028 initiative campaign are "[h]ighly contingent on this case," and that, "ideally, if things work out in [their] favor, [they] would be able to ramp something up for [2027]." *Id*.

RTCW argues that it has been injured by the myriad changes to Florida's ballot initiative process insofar as it had to cease petition gathering for the 2025–2026 cycle. *See, e.g.*, ECF No. 666 at 11–14. But the petition-gathering cycle has now ended for the 2026 general election, and RTCW has not demonstrated that it is currently subject to, or will imminently be subjected to, any of the challenged requirements going forward. This is because RTCW has not demonstrated that it is currently engaging in petition gathering or that it imminently intends to do so for the 2028 general election. Instead, RTCW has taken a wait-and-see approach and seeks prospective relief that is premised only on past injuries and hypothetical future injuries in the event it decided to pursue another petition-gathering campaign. Thus, like Smart & Safe, RTCW has not demonstrated an ongoing or imminent injury that would be redressed by prospective relief for those claims that hinge on harm to RTCW's current or future petition-gathering efforts. "When a plaintiff cannot show that an injury is likely to occur immediately, the plaintiff does not have standing to

11

seek prospective relief even if he has suffered a past injury." *31 Foster Children v. Bush*, 329 F.3d 1255, 1265 (11th Cir. 2003).

Accordingly, RTCW has not demonstrated by a preponderance of the evidence that it faces an ongoing or imminent injury in fact with respect to the challenged registration requirements,[9] the affidavit requirement,[10] the non-resident circulator prohibition and associated fines,[11] the non-citizen circulator prohibition and associated fines,[12] the fine for pre-filling petitions,[13] and the petition invalidation

---

[9] Insofar as registering to gather petitions places a burden on potential volunteers who would otherwise gather petitions on RTCW's behalf, RTCW has not demonstrated that it is currently or reasonably likely to sponsor another ballot initiative that anyone could voluntarily gather petitions for. Thus, any ongoing or imminent injury to RTCW or its volunteers is purely hypothetical at this juncture.

[10] Any chill on petition circulators as a result of the affidavit requirement is now purely hypothetical inasmuch as RTCW has not demonstrated that it is currently or reasonably likely to begin an active petition-gathering campaign in the immediate future.

[11] RTCW contends that it has standing to challenge the non-resident circulator prohibition and associated fines as the provisions bar non-resident volunteers, including Plaintiff Melissa Martin, from circulating RTCW's petitions on RTCW's behalf. However, now that RTCW's 2026 campaign has ended and there is no evidence of a current or imminent petition-gathering campaign for the 2028 election cycle, any asserted injuries flowing from these provisions are merely hypothetical.

[12] As with the non-resident prohibition and associated fines, RTCW's asserted injuries flowing from the non-citizen circulator prohibition and associated fines are merely hypothetical in the absence of a current or imminent 2028 petition-gathering campaign.

[13] Again, RTCW has not demonstrated that it is currently refraining from or would otherwise provide pre-filled petitions to voters for a current ballot initiative or that it is imminently going to do so.

provision.[14] Likewise, Plaintiff Melissa Martin has not demonstrated standing to pursue prospective relief with respect to the non-resident circulator prohibition and associated fines inasmuch as RTCW has not demonstrated that it has a current or imminent petition-gathering campaign that Ms. Martin would participate in but for the challenged provision. Nor is Ms. Martin's testimony, *see* ECF No. 637 at 21, concerning her general intentions to begin gathering petitions someday in the future, sufficient to confer standing for prospective relief. *See, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992) ("Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require."); *Fla. St. Conf. of Branches & Youth Units of NAACP v. Byrd*, 794 F. Supp. 3d 1131, 1159 (N.D. Fla. 2025) (Walker, J.) (finding no standing for individual plaintiff following bench trial due to speculative injury based on "someday intentions" to come to Florida to participate in voter registration drives).

Finally, to the extent RTCW appears to have challenged certain provisions in its operative complaint but failed to address those challenges in its evidence at trial and written closing arguments, this Court is not persuaded that RTCW has met its burden to demonstrate standing to seek prospective relief concerning challenges that

---

[14] Inasmuch as RTCW does not have an active petition-gathering campaign and has introduced no evidence to suggest a campaign is imminent, RTCW has not demonstrated that it is likely to be harmed from the invalidation provision going forward.

have been essentially abandoned at trial. This includes RTCW's challenges to the misdemeanor notice provision, section 100.371(3)(a)5., Florida Statutes, and the full amendment provision, section 100.371(3)(b), Florida Statutes. *See* ECF No. 418 ¶¶ 63–66.[15]

As for RTCW's challenge to the ten-day delivery requirement and associated fines, including fines for delivering signed petitions to the wrong county, RTCW introduced evidence demonstrating that it had petitions delivered late and to the wrong county during the 2025–2026 cycle, and is thus subject to fines under these provisions. *See* ECF No. 637 at 52 and 65–66. In addition, Ms. Martin, on behalf of RTCW, testified that RTCW is not aware of how much it will be fined in total for late-delivered and misfiled petitions as it has not yet received any notice from the State. *Id.* at 66. And, as this Court already discussed, the State has yet to determine the fines imposed for late and misfiled petitions for the 2025–2026 election cycle. *See* ECF No. 654 at 198. Accordingly, based on this record, RTCW has demonstrated that it is more likely than not that it will be fined for late and misfiled deliveries under the challenged provisions. This injury is traceable to the Secretary of State, whose Office of Election Crimes and Security is responsible for issuing fines for late

---

[15] Although the misdemeanor notice and full amendment provisions are included in RTCW's allegations and are alleged to have substantially increased the burden on RTCW to gather petition signatures, RTCW does not include these provisions among the "challenged provisions" at issue in the complaint. *See* ECF No. 418 ¶ 67. This Court addresses them here in the interest of being thorough.

and misfiled petitions. And this injury is redressable by an injunction prohibiting the imposition of fines for late and misfiled deliveries from the 2025–2026 campaign cycle. Accordingly, RTCW has demonstrated that it has standing to seek prospective relief solely with respect to the ten-day delivery requirement and associated fines and the wrong-county delivery provisions.

C

Next, this Court turns to the FDH Plaintiffs and whether they have demonstrated standing to seek prospective relief. Unlike the other two ballot initiative sponsors in this case, FDH introduced substantial evidence demonstrating a concrete intention of pursuing another petition-gathering campaign for a proposed statewide ballot initiative to expand Medicaid eligibility for the 2028 general election. For example, FDH's Executive Director Mitchell Emerson testified that FDH is currently trying to get on the ballot for the 2028 cycle. ECF No. 640 at 268, 279. Mr. Emerson testified that FDH has "been communicating with the coalition partners that [it was] continuing to grow from 2025 to let them know to be prepared to be engaged," that FDH has "done some press . . . letting folks know that [they] are going to seek getting on the 2028 ballot again," and that, in response to the challenged provisions, FDH has shifted its petition-gathering strategy to "a digital method" where they provide a link where voters can request a petition and FDH

15

"will mail them a petition along with a return envelope so that they can fill it out and return it." *Id.* at 268–69, 279.

FDH's evidence also demonstrates that its current shift away from paid petition circulators and volunteer petition circulators for the 2028 petition-gathering campaign is in response to several of the challenged provisions in an effort to avoid liability for violating such provisions, including fines and invalidation of petitions for violating the circulator eligibility requirements,[16] fines and invalidation of petitions submitted in violation of the petition circulator registration requirements,[17]

---

[16] FDH presented testimony demonstrating that the vendor it contracted with to run its paid petition-circulator efforts for the 2026 election cycle employed non-citizens, non-residents, and some convicted felons. *See* ECF No. 640 at 36–38, 109–10, 115, 130–32. However, this vendor suspended its work with FDH in late August or early September in light of FDH's decision to halt its petition-gathering campaign and the potential financial and criminal liability that its team faced for violating the myriad provisions of HB 1205. *Id.* at 135. Moreover, employees for FDH's chosen vendor for paid petition circulation testified that the financial risk involved in petition gathering under HB 1205 has dissuaded the vendor from working on Florida ballot initiatives going forward. *Id.* at 135, 202. And FDH submitted evidence demonstrating that, if the circulator eligibility requirements remain in place, it would continue to forego the use of paid circulators for the 2028 election cycle based on the limitations the requirements pose for hiring staff. *Id.* at 270–71. In short, this record demonstrates that FDH is suffering an ongoing injury in fact with respect to the circulator eligibility requirements insofar as the burden of complying with these provisions and the risks attendant to violating them have chilled FDH from engaging in in-person petition gathering.

[17] FDH's witnesses testified to the impact the petition circulator registration requirement had on its petition-gathering efforts during the 2026 election cycle and continues to have on its efforts to get on the ballot in 2028. ECF No. 640 at 73–76, 272. In light of these impacts, including the potential liability for violating the registration requirements and the drop in recruitment for volunteers to engage in petition circulation beyond the 25-petition limit, FDH has opted instead to use a digital program that does not rely on volunteer circulators to gather signed petitions. *Id.* at 271–72; *see also* ECF No. 639 at 27–28. This evidence is sufficient to demonstrate an injury in fact to challenge the petition circulator registration requirements.

16

and fines for violating the ten-day return deadline.[18] This evidence is sufficient to demonstrate an ongoing injury in fact caused by the circulator eligibility requirements, the petition circulator registration requirements, and the ten-day return deadline. These injuries are traceable to the respective enforcers of each of the challenged provisions. The Secretary of State and Supervisors of Elections are responsible for enforcing the eligibility and registration requirements by issuing fines and invalidating petitions submitted in violation of these provisions. *See* §§ 100.371(4)(g), 100.371(11), 100.371(14)(h), Fla. Stat. Relatedly, the Attorney General and State Attorneys are responsible for enforcing the criminal prohibitions associated with violations of the registration requirements for petition circulators. *See* §§ 104.187, 104.188(2), 100.371(11), Fla. Stat. And an injunction prohibiting these actors from enforcing their respective provisions would redress FDH's injuries by eliminating the threat of crippling fines, invalidated petitions, and criminal prosecution. Accordingly, FDH has demonstrated standing to challenge the petition circulator eligibility requirements, the petition circulator registration requirements, and the ten-day delivery requirement and associated fines.

---

[18] FDH introduced evidence of an ongoing shift in operations as a result of the ten-day return deadline. When the law went into effect in 2025, FDH's petition circulators had to change the way they engaged in petition gathering and processing of signed petitions to avoid incurring substantial fines for late-delivered petitions. *See* ECF No. 640 at 192–93, 263. This change in operations continues through to the 2028 election cycle and FDH's decision not to engage in traditional in-person petition circulation. *Id.* at 271. This evidence is sufficient to demonstrate an ongoing injury in fact with respect to the ten-day return deadline.

17

Likewise, FDH's evidence also demonstrates a cognizable injury with respect to the challenged increase in verification costs that the Supervisors of Elections charge under the "actual cost" provision enacted through HB 1205. This provision has dramatically increased the cost to verify petitions submitted toward FDH's 2028 ballot initiative campaign and forced FDH to forego using paid petition circulators. *See* ECF No. 640 at 270; *see also* ECF No. 596 at 37–39 (stipulated chart of increase in verification fees across all counties except for Sumter County); *id.* at 40 (stipulation that reasonable estimate of verification cost for statewide ballot initiative petitions has increased from $1,131,000.00 before HB 1205 took effect to $4,381,000.00 under current verification fees). The Supervisors are also responsible for calculating and charging the increased verification costs, and thus, FDH's injury is traceable to the Supervisors. *See* § 100.371, Fla. Stat. And an injunction prohibiting the Supervisors from charging these increased costs would redress FDH's injury. Thus, FDH has standing to challenge the verification costs provision.

However, FDH has not pointed to evidence demonstrating that it suffers an ongoing or imminent injury related to the prohibitions on filling in missing information on signed petitions, sending out pre-filled petitions to voters to sign, or copying or retaining voter information. At most, FDH has demonstrated that employees of its paid petition circulator vendor previously filled in missing information on signed petitions and scanned copies of signed petitions as part of its

18

quality control[19] and that FDH worked with another third party to send voters pre-filled petitions[20] before the challenged provisions went into effect during its petition-gathering campaign for the 2026 general election. But FDH's evidence fails to demonstrate that it would have continued to engage in the same conduct for the 2028 cycle in the absence of these provisions.

Likewise, FDH's evidence has not demonstrated that it is more likely than not injured or will imminently be injured by the voter PII disclosure requirements. This provision requires voters to now include the last four digits of their social security numbers or their driver's license ("DL") or state identification number on their signed petition to be validated. FDH introduced evidence demonstrating that voters were far more hesitant to fill out the required information or even sign a petition after the requirement went into effect in 2025. ECF No. 640 at 133–34. This resulted in a reduction in completed petitions for FDH in 2025. *Id*. However, FDH's evidence demonstrates that voters were hesitant to sign petitions or include this personal

---

[19] Prior to HB 1205's enactment, FDH's petition circulators would fill in some missing information on signed petitions and scan and retain copies of signed petitions as part of its quality control process. *See* ECF No. 640 at 128, 196. FDH's paid petition circulators stopped curing petitions and retaining scanned copies once the law prohibiting these practices went into effect and instead began turning in signed petitions that had missing information and which would presumably not be counted toward FDH's signature goal. *Id*. at 195.

[20] FDH's evidence demonstrates that FDH hired a third party to do quality control and data aggregation during FDH's petition-gathering efforts in 2025. ECF No. 640 at 52. With the help of this third party, FDH would send pre-filled petitions to voters for their signatures. *Id*. This was not FDH's "primary mode of gathering petitions," *id*. at 53, and there is no evidence in the record that FDH would resume this activity if the prohibition was enjoined.

information on their signed petitions when the petition would be collected by an in-person petition circulator. *Id*. FDH's evidence does not demonstrate, however, that voters are less likely to include this personal information or sign petitions provided through the digital-only method FDH is now using for the 2028 election cycle. Nor does FDH's evidence demonstrate that its shift in operations to a digital-only petition-gathering campaign is based on the PII disclosure requirement. In short, given the other provisions that have led to a change in FDH's operations for the 2028 election cycle, FDH has not shown that it is currently injured or faces an imminent injury based on the PII disclosure requirement.[21]

FDH also argues that Plaintiff Michell Emerson is injured by the voter PII disclosure requirement as a Florida voter who will now have to disclose either his DL number, state identification number, or last four digits of his social security number on his signed petition form. ECF No. 667 at 72–73. But Plaintiffs' evidence fails to demonstrate that Mr. Emerson is currently suffering or is likely to suffer an imminent injury with respect to this provision. Instead, FDH merely points to Mr. Emerson's testimony that he previously signed a petition for the 2026 campaign. *See* ECF No. 640 at 257. But this raises the question as to whether Mr. Emerson signed

---

[21] In addition, the asserted injury to FDH also depends on the action of third parties not before this Court—namely, voters who are likely to sign FDH's petition. Thus, expectations concerning how voters will react to the PII disclosure requirement going forward are speculative.

a petition for the 2026 campaign after the voter PII disclosure requirements became effective, whether he plans to sign a petition for the 2028 campaign and, if so, whether he would be dissuaded from doing so because of the challenged voter PII disclosure requirement. This Court cannot fill in the gaps for Plaintiffs. Accordingly, on this record, Mr. Emerson has not demonstrated, let alone clearly argued, that he has standing to challenge the voter PII disclosure requirement.

Accordingly, for all these reasons, FDH has demonstrated standing to seek prospective relief only with respect to its challenges to the petition circulator eligibility requirements, [22] the petition circulator registration requirements, the ten-day delivery requirement and associated fines, and the increased verification costs provision. Next, this Court turns the League Plaintiffs' standing.

D

As to the League Plaintiffs, this Court will address the individual Plaintiffs and the organizational Plaintiffs in turn, starting with the individual Plaintiffs—Cecile Scoon and Debra Chandler. Both Ms. Scoon and Ms. Chandler assert they have standing to challenge the registration requirements, including the requirement that they disclose certain personal information on signed petitions, the prohibitions

---

[22] Plaintiff Jordan Simmons has demonstrated that he was previously injured by the non-resident prohibition. However, as a Missouri resident who testified only generally to the desire to work on FDH's petition-gathering campaign sometime in the future, Mr. Simmons has not demonstrated an ongoing or imminent injury with respect to the non-resident prohibition of the petition circulator eligibility requirements. *See* ECF No. 640 at 136, 138.

on filling in missing voter information on signed petitions or retaining voters' personal information, and the investigation provision. However, Ms. Scoon's testimony did not include any details about future plans to collect signed petitions. Instead, her testimony largely focused on the impacts HB 1205 had on the League's activities with respect to petition gathering for FDH and RTCW's ballot initiatives for the 2026 campaign cycles, which have now ended. Given this lack of specificity concerning the new election cycle, Ms. Scoon has not demonstrated a current or imminent injury with respect to the challenged provisions.

Likewise, with respect to the prohibition of copying or retaining voter information, Ms. Chandler testified that she is concerned about the fact that voters sometimes provide their contact information to her at tabling events when they are also interested in joining the League of Women Voters. ECF No. 646 at 228; *see also id*. at 81–82. But such concerns do not constitute a reasonable fear of prosecution for violating section 100.371(9) merely because a voter who is interested in joining the organization may provide the League with their contact information—separate and apart from signing an initiative petition. In short, Ms. Chandler has not demonstrated a cognizable injury in fact sufficient to challenge the prohibition on copying or retaining voter information.

But Ms. Chandler has demonstrated that, but for other challenged provisions currently chilling her petition-gathering efforts, she would continue gathering signed

22

petitions on behalf of FDH in the same manner she has previously employed and at the same community events where she has previously engaged in petition gathering. *See* ECF No. 646 at 224; *see also id.* at 214–24 (describing previous petition circulation efforts). Specifically, Ms. Chandler testified that she is chilled from gathering petitions in light of the requirement that she now register with the State to avoid criminal prosecution for possessing more than 25 signed petitions, privacy concerns she has as a result of the compelled disclosure of her personal information on petition forms, and fears of running afoul of the criminal prohibition against filling in missing information on signed petitions—for instance, if she were to help sight-impaired voters fill out petitions. *See id.* at 224–29.

Ms. Chandler also testified that she is chilled from gathering petitions in light of the investigation provision, which triggers an investigation by the Office of Election Crimes and Security when a Supervisor of Election reports that 25% or more petitions are invalid in a given reporting period. *See* § 100.371(14)(g), Fla. Stat.; *see also* ECF No. 646 at 230–31. This fear of investigation is reasonable in light of Supervisor of Elections Mark Earley's testimony that initiative petitions are deemed invalid for a number of reasons at least a third of the time. *See* ECF No. 639 at 290–91.

The chill to Ms. Chandler's petition gathering constitutes a cognizable, ongoing injury in fact traceable to the Secretary of State, Attorney General, and Ms.

23

Chandler's local State Attorney for the Fifteenth Judicial Circuit,[23] who are responsible for enforcing the challenged provisions. And an injunction prohibiting these Defendants' enforcement of the challenged provisions would redress Ms. Chandler's injuries with respect to petition circulation. Accordingly, Ms. Chandler has demonstrated that she has standing, as an individual, to challenge the registration requirements, the criminal prohibitions against filling in missing information on signed petitions and possessing more than 25 signed petitions as an unregistered petition circulator, and the investigation provision.

Turning to the organizational Plaintiffs' standing, the League and LULAC assert they have associational and organizational standing to challenge the registration requirements for petition circulators, including the non-citizen, non-resident, and felon ban on petition circulation, the ten-day delivery requirement, and the investigation provision. With the exception of the League Plaintiffs' Fourteenth Amendment claim against the non-citizen ban, other Plaintiffs have already demonstrated standing to challenge these provisions. Thus, this Court need not

---

[23] Ms. Chandler testified that she resides in Palm Beach County and engages in petition circulation in Palm Beach County. *See* ECF No. 646 at 208–09. Accordingly, the only State Attorney against whom she has standing to seek prospective relief is the State Attorney for the Fifteenth Judicial Circuit, who has jurisdiction to prosecute crimes in Palm Beach County.

address the organizations' standing to reach the merits of these claims except for their claim that the non-citizen ban violates the Fourteenth Amendment.[24]

As to the League's equal protection claim, the only testimony the League points to in support of its standing to challenge the non-citizen ban is from member Cecilia González Herrera, who is originally from Venezuela and is not a U.S. citizen. *See* ECF No. 668 at 112. She previously circulated petitions for RTCW's ballot initiative in 2025. ECF No. 652 at 26. However, she lives in Washington, D.C. *Id*. at 18. And although she intends to return to live near her family in Florida and circulate petitions in the future for the RTCW ballot initiative in the event the non-citizen ban is enjoined, she provided few specifics about those plans. *Id*. at 18–19. Moreover, based on the record presented by RTCW, it is not clear that RTCW has an active petition gathering campaign at this time or will in the imminent future.

Although Ms. González Herrera offered compelling testimony regarding her community involvement and contributions, her testimony does not provide a basis for demonstrating a concrete and ongoing or imminent injury with respect to the non-citizen ban. Instead, it appears any asserted injury suffered as a result of the non-

---

[24] No other Plaintiffs raise an equal protection challenge to the non-citizen ban. Accordingly, this Court must address whether the League or LULAC have demonstrated standing to challenge the non-citizen ban on this basis. *See TransUnion LLC v. Ramirez*, 594 U.S. at 431 ("And standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages).").

citizen ban is merely speculative and hypothetical at this juncture as it depends on Ms. González Herrera returning to Florida at some point in the future and engaging in petition circulation if the time permitted and the ballot initiative she has chosen to support is working towards ballot placement.

In addition, to the extent the League attempts to argue that the non-citizen ban has directly harmed the League as an organization by forcing a diversion in resources or by obstructing its core mission and reducing its membership, this Court is not persuaded. *See, e.g.*, *City of South Miami v. Gov.*, 65 F.4th 631, 638–39 (11th Cir. 2023) ("Although an organization can establish standing under a diversion-of-resources theory, it cannot do so by inflicting harm on itself to address its members' 'fears of hypothetical future harm that is not certainly impending.' "). Notably, the League's discussion of these alternative theories of organizational standing fail to highlight the evidence as it pertains specifically to the non-citizen ban and its effects on the League or its activities.[25]

---

[25] The League's reliance on this Court's standing analysis in an earlier case is not persuasive. *See* ECF No. 668 at 114 n.31 (discussing *Fla. State Conf. of the NAACP v. Byrd*, 680 F. Supp. 3d 1291 (N.D. Fla. 2023)). In that case, this Court determined that the third-party voter registration organizations had demonstrated, at the preliminary injunction stage, that they relied heavily on noncitizens to engage in voter registration and that targeted voter outreach following registration was central to their missions to increase voter participation. *See Fla. State Conf. of the NAACP*, 680 F. Supp. 3d at 1300 & 1308. Here, on the other hand, the League introduced evidence that the current president is aware of only one noncitizen who has engaged in petition circulation in the past on a volunteer basis. *See* ECF No. 646 at 93 ("And then also noncitizens, we do have at least one that we're aware of who has done petition gathering for us in a volunteer capacity."). This is hardly the "heavy reliance" on noncitizen participation that the plaintiffs demonstrated in this Court's earlier case. In short, the facts of these cases and the import of those facts are distinguishable, and this Court is not convinced that because this Court found a direct injury to an

Instead, the questioning at trial and the League's arguments concerning organizational standing relate to HB 1205 as a whole, which includes myriad other challenged provisions. But, again, standing is not dispensed in gross. Moreover, the League's current president's testimony undermines the assertion that the non-citizen ban is responsible for direct harm to the League as an organization. *See* ECF No. 668 at 118–19; ECF No. 646 at 86–87 (testifying that if all other provisions "went away," she would still not recommend that League members participate in petition circulation if the ten-day return deadline provision remained in effect). Accordingly, on this record, the League of Women Voters has not demonstrated that any non-citizen member has suffered a cognizable injury in fact sufficient to support the League's standing to challenge the non-citizen ban, nor has the League demonstrated that it has suffered a direct injury as an organization due to the non-citizen ban.

As for LULAC, Plaintiffs point to testimony from a noncitizen member, Karen Patricio, who has previously collected petitions for ballot initiatives in the 2018 and 2024 election cycles. *See* ECF No. 646 at 246. She testified that she was in the process of planning to collect petitions in 2025, but she decided against it after HB 1205 passed. *Id*. at 250. And she testified that she would collect petitions if HB 1205 is repealed. *Id*. at 256. But Ms. Patricio also testified that her decision to collect

---

organization in the past, that means the same conclusion is inevitable based on the record in this case.

27

initiative petitions depends on the cause and whether there is some "personal problem" or "community needs" for which she wishes to advocate. *Id*. at 246. However, Ms. Patricio did not identify any particular ballot initiative for which she would currently gather petitions but for the non-citizen ban. Her generalized testimony, on its own, therefore does not confer standing on LULAC to challenge the non-citizen ban, as any injury to Ms. Patricio is not ongoing or imminent, but rather hypothetical and speculative based on this record.

LULAC also points to the testimony of its CEO, Juan Proaño, as additional evidence supporting LULAC's standing to challenge the non-citizen ban. *See* ECF No. 668 at 125. However, Mr. Proaño's testimony is also too generalized to satisfy LULAC's burden to demonstrate an ongoing or imminent injury in fact. With respect to non-citizens, Mr. Proaño testified that LULAC has non-citizen members, that some of these members collected signed petitions for 2018 and 2024 campaigns, and that some non-citizen members plan to collect petitions in the future. *See* ECF No. 644 at 213–15. But, again, "someday intentions" absent specific facts do not give rise to an imminent injury in fact. *See Lujan*, 504 U.S. at 564. This is particularly true, here, where the ballot initiative sponsors that LULAC had recently been interested in assisting have not demonstrated that they have an active petition-gathering campaign (RTCW) or have switched to an online distribution model only

28

(FDH). As a result, LULAC's evidence also fails to demonstrate that any non-citizen member has suffered an injury in fact sufficient to support LULAC's standing.

LULAC's attempt to demonstrate organizational standing to challenge the noncitizen ban also falls short. LULAC points to the testimony of Ms. Patricio concerning her initial, unsuccessful efforts to start focusing more on petition circulation within newly created districts that she joined in 2025 as evidence that the noncitizen ban has impeded LULAC's core mission. ECF No. 668 at 129–30. Inasmuch as the petition-gathering cycle for the 2026 general election has now ended, this evidence of a past injury, on its own, does not amount to a cognizable injury for purposes of seeking prospective relief.

In addition, LULAC's CEO testified that petition circulation is "critically important" to the organization's overall mission to promote civic engagement and advocacy for the Latino community. *See* ECF No. 644 at 208–09. But this activity is highly dependent on the existence of an active ballot initiative and petition-gathering campaign for LULAC's Florida members to choose to take part in.[26] And the only initiative sponsor before this Court that has demonstrated an active and ongoing effort to gather signed petitions has shifted to an online-only distribution strategy.

---

[26] Again, this case is distinguishable from this Court's earlier case involving third-party voter registration organizations, *see* 680 F. Supp. 3d 1291, inasmuch as voter registration can happen any time and is not dependent on a third party, such as an initiative sponsor, creating a window of opportunity that would allow volunteers to gather signatures. Ballot initiative petition circulation, on the other hand, inherently depends upon initiative sponsors and the existence of an active campaign for a proposed ballot initiative.

*See* ECF No. 640 at 269. LULAC's evidence does not account for this absence of opportunity for in-person petition circulation attributable to initiative sponsor's campaign strategy in response to HB 1205, nor does LULAC's evidence identify any other active ballot initiative that it would seek to assist through petition gathering during the current or future elections cycles. Thus, on this record, LULAC's organizational injuries appear to be hypothetical at this juncture. Accordingly, this Court is not persuaded that LULAC has demonstrated standing to challenge the non-citizen ban under the Fourteenth Amendment.

E

Finally, this Court considers the issue of Plaintiffs' claims challenging HB 1205's amendment to Florida's definition of "racketeering activity." After the trial, Defendants filed a suggestion of mootness with respect to Plaintiffs' claims challenging this particular provision, inasmuch as the Legislature had struck the challenged language in new legislation, HB 991, which the Governor signed into law on April 1, 2026. *See* ECF No. 671. Plaintiffs were afforded an opportunity to respond to Defendants' suggestion of mootness, and both the FDH Plaintiffs and the League Plaintiffs argue that their claims challenging Florida's "racketeering activity" statute are not moot despite the fact that the Legislature has repealed the language that both groups of Plaintiffs challenged in this action. ECF No. 674. This Court Ordered Defendants to provide an additional response to the issue of the

repeal's July 1, 2026, effective date, and Defendants raised the additional argument of prudential mootness. ECF No. 676.

Having considered the parties' arguments, the operative complaints, ECF Nos. 413 and 431, the Plaintiffs' written closing arguments, ECF Nos. 667 and 668, and the trial record, this Court agrees with Defendants that Plaintiffs' claims challenging HB 1205's amendment to the "racketeering activity" definition—namely, the inclusion of "violation[s] of the Florida Election Code relating to irregularities or fraud involving issue petition activities" within that definition—will become "constitutionally moot" once the HB 991's amendment of this definition takes effect on July 1, 2026. *See* ECF No. 671-1 at 65, 69–70 (amendment striking challenged provision and setting effective date of July 1, 2026); *see also Jordan v. Sosa*, 654 F.3d 1012, 1023–24 (10th Cir. 2011) (discussing "constitutional" and "prudential" mootness). This Court also acknowledges that many of Plaintiffs' arguments in support of standing to challenge the "racketeering activity" definition while it is still in effect are undermined by the record in this case. For example, Defendants make a persuasive argument that any fears of prosecution under the challenged racketeering provision are not reasonable given the lack of any enforcement to date and the statute's imminent repeal, such that Plaintiffs have not demonstrated a cognizable, ongoing injury in fact. *See* ECF No. 676 at 2.

31

Nonetheless, assuming, for the sake of argument, that any Plaintiffs who challenge this provision are able to demonstrate standing while the law remains in effect until June 30, 2026, Defendants assert this Court should find Plaintiffs' challenges to the "racketeering activity" definition to be prudentially moot. This Court agrees. With respect to prudential mootness, the Eleventh Circuit has held that "[t]he critical question becomes 'whether changes in circumstances that prevailed at the beginning of the litigation have forestalled any occasion for meaningful relief.' " *Ingaseosas Intern. Co. v. Aconcagua Investing Ltd.*, 479 F. App'x 955, 962 (11th Cir. 2012) (quoting *Int'l Bhd. of Boilermakers v. Kelly*, 815 F.2d 912, 915 (3d Cir. 1987)).

This Court acknowledges that prudential mootness is a "rarely invoked doctrine," that comes into play only when "a controversy . . . has become 'so attenuated that considerations of prudence and comity counsel the court to stay its hand, and to withhold relief it has the power to grant." *Baker*, 164 F.4th at 860 n.6 (internal quotation marks and citation omitted). Even so, here, this Court is ultimately persuaded that the unique change in circumstances with respect to the controversy involving the "racketeering activity" definition—namely, the fact that there has been no enforcement of this provision during its brief tenure in the Florida Statutes (despite the fact that this Court's preliminary injunction was granted in favor of only one individual Plaintiff), there is no evidence of any prospective

enforcement, and the provision's imminent repeal takes effect July 1, 2026, counsels in favor of staying this Court's hand with respect to granting equitable relief under the doctrine of prudential mootness. *See Ingaseosas Intern. Co.* at 963 (concluding that unique circumstances where "any effective relief is so remote," appeal should be treated as moot for prudential reasons). Accordingly, this Court treats Plaintiffs' claims challenging the "racketeering activity" definition, now repealed by HB 991, as moot for prudential reasons.

* * *

In sum, this Court concludes that Smart & Safe and RTCW have demonstrated standing only as to their claims seeking prospective relief with respect to the ten-day delivery requirement and associated fines. FDH has demonstrated standing with respect to the delivery requirement and fines, as well as the petition circulator eligibility requirements, the petition circulator registration requirements, and the increased verification costs provision. And Debra Chandler has also demonstrated standing to seek prospective relief with respect to the registration requirements, the criminal prohibitions against filling in missing information on signed petitions and possessing more than 25 signed petitions as an unregistered petition circulator, and the investigation provision. Finally, to the extent Plaintiffs' challenges to the "racketeering activity" definition may not yet be technically moot, this Court will

33

treat those challenges as moot for prudential reasons in light of the imminent effective date of the provision's repeal.

This Court now turns to the merits of Plaintiffs' claims for which they have demonstrated standing.

## II

## A

Turning to the merits, this Court first addresses Plaintiffs' challenges to the ten-day return deadline and associated fines, including fines for returning signed petitions to the wrong county Supervisor of Elections' office. This Court previously considered the merits of such claims at the preliminary injunction stage in this case and concluded that Plaintiffs had failed to establish a substantial likelihood of success in demonstrating that the shortened deadline and fines violated Plaintiffs' constitutional rights. *See* ECF No. 189. Based on the trial record, this Court remains unpersuaded that the return deadline, fines for late returns, and fines for erroneous returns constitute a severe burden on Plaintiffs' speech in violation of their First Amendment rights. Instead, this Court agrees with Defendants that these provisions fall within the heartland of permissible State regulation of the ballot initiative process—as one of the many "restrictions a state might impose on its initiative process" that does "not implicate First Amendment concerns." *Biddulph*, 89 F.3d at 1500.

As Judge Lagoa noted in the stay panel opinion in this case, *Biddulph* continues to bind the Eleventh Circuit (and this Court). *See* ECF No. 427 at 14. And *Biddulph* emphasized that "states maintain broad discretion in fashioning initiative mechanisms," so long as they do not impermissibly burden the free expression of ideas about the objective of an initiative proposal. 89 F.3d at 1500. Notwithstanding Plaintiffs' evidence concerning the great expense the new return deadline and associated fines have placed on ballot initiative sponsors, this Court is not persuaded that these provisions implicate Plaintiffs' First Amendment rights. Accordingly, judgment is due in Defendants' favor on Plaintiffs' claims challenging these provisions.

B

For similar reasons, this Court agrees with Defendants that the verification notice and increased verification cost provisions also do not run afoul of FDH's constitutional rights. For starters, to the extent FDH claims that the verification costs violate its First Amendment rights, this claim fails for reasons similar to the ten-day return deadline and associated fines. The costs to verify signed petitions are assessed only after petition circulators have spoken with voters and successfully persuaded them to sign petitions. On this record, the verification cost provision is well within the State's authority to regulate the state-created ballot initiative process and does not implicate FDH's First Amendment rights.

35

And to the extent FDH argues that the increase in verification costs for statewide ballot initiatives amounts to an equal protection violation, this Court disagrees. Statewide ballot initiative sponsors are not a suspect classification, nor does placing a statewide ballot initiative on the ballot implicate a fundamental right. *See* ECF No. 664 at 91–92. Moreover, this record readily demonstrates that treating statewide ballot initiatives differently than candidate petitions or local referenda is rationally related to a legitimate government purpose. *See, e.g.*, *id*. at 100.

Accordingly, this Court is not persuaded that the verification notice and increased verification cost provisions violate FDH's constitutional rights. Judgment is due in Defendants' favor on these claims.

## C

Next, this Court considers Plaintiffs' claims challenging the petition circulator registration requirements and criminal prohibition on possessing more than 25 signed initiative petitions without registering as a petition circulator. This Court previously denied preliminary injunctive relief to Plaintiffs challenging these provisions under the First Amendment and Fourteenth Amendment. *See* ECF No. 283 at 28–30. And Plaintiffs' evidence at trial has not persuaded this Court that the merits of Plaintiffs claims have gained strength since the preliminary injunction stage. This Court again rejects the same arguments recycled from the preliminary

injunction stage for the reasons previously expressed and incorporated by reference herein. *Id.*

True, this record demonstrates that the registration requirements create hurdles for would-be volunteers who wish to gather more than 25 signed initiative petitions and financial risks for initiative sponsors in the event unregistered circulators exceed the 25-petition limit on their behalf. But contrary to Plaintiffs' argument, ECF No. 667 at 138, the registration requirement does not totally foreclose would-be volunteers from engaging in spontaneous speech. Eligible Florida residents may still partake in unregistered petition circulation unless and until they reach the 25-petition threshold. Only then must they complete the task of registering to continue gathering signed petitions. And while registering may be inconvenient,[27] it does not pose the sort of severe burden on core political speech that runs afoul of *Meyer* and *Buckley*. Again, states maintain authority to regulate the ballot initiative process, which includes the authority to regulate petition circulators. *See Buckley*, 525 U.S. at 191 ("As the Tenth Circuit recognized in upholding the age restriction [for petition circulators], the six-month limit on

---

[27] Plaintiffs cite the fact that the State's required training and test to complete registration is only offered in English as an example of the burdensome nature of the registration requirements. *See* ECF No. 667 at 138. However, Plaintiffs do not point to evidence of any would-be petition circulators who did not complete the training or successfully register because of the English-only option. Moreover, Plaintiffs do not bring a standalone claim challenging the English-only option. Accordingly, while this Court considers this fact as relevant to Plaintiffs' claim, it is certainly not determinative, nor does this Court afford this fact any special weight.

circulation, and the affidavit requirement [for petition circulators], States allowing ballot initiatives have considerable leeway to protect the integrity and reliability of the initiative process, as they have with respect to election processes generally."); *see also Miracle v. Hobbs*, 427 F. Supp. 3d 1150 (D. Ariz. 2019) (denying preliminary injunction with respect to First Amendment claim challenging Arizona's "strikeout law" for petition circulators who fail to respond to subpoenas).

Nor does the registration requirement's circulator affidavit and disclosure requirements impose a severe burden on core political speech. Plaintiffs again raise the same arguments this Court previously rejected at the preliminary injunction stage regarding the affidavit requirement and the disclosure of would-be circulators' names and addresses on signed petitions. *See* ECF No. 667 at 139–40; ECF No. 668 at 101–04.

To the extent Plaintiffs argue that the affidavit will operate in the same manner as the compelled name tags at issue in *Buckley*, the plain language of the statute undermines that argument. Under the challenged provision, petition circulators need not display their names nor identify themselves to voters prior to speaking. Instead, only after they have persuaded voters to sign a petition do they provide the petition form for signature, which may include their name and address. *See* § 100.371(3)(d), Fla. Stat.; *see also Buckley*, 525 U.S. 182, 199 ("While the affidavit reveals the name of the petition circulator and is a public record, it is tuned to the speaker's interest as

well as the State's. Unlike a name badge worn at the time a circulator is soliciting signatures, the affidavit is separated from the moment the circulator speaks."). Indeed, the Supreme Court has already distinguished compelled identification at the moment a petition circulator seeks to engage in core political speech from subsequent disclosure that follows such speech and concluded that this subsequent disclosure does not place the same unconstitutional burden on a would-be speaker. *Buckley*, 525 U.S. at 199 ("The affidavit, in contrast, does not expose the circulator to the risk of 'heat of the moment' harassment.").

Moreover, as this Court has previously explained, the Supreme Court has acknowledged that anonymity interests may justifiably give way to the special state interest of protecting the integrity of the ballot initiative process. *See* ECF No. 283 at 29 (quoting *Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton*, 536 U.S. 150, 167 (2002)). And the Supreme Court has also determined that a law requiring public disclosure of ballot initiative signers survived exacting scrutiny in a broader First Amendment challenge similar to Plaintiffs' claims here. *See John Doe No. 1 v. Reed*, 561 U.S. 186, 195–201 (2010). As in *Doe*, this Court is satisfied that the record amply supports the State's asserted interests in combatting fraud in the initiative petition process. And, based on this record, this Court is persuaded that the registration requirement, including disclosure of registered circulators' names and addresses, is narrowly tailored to furthering the State's

39

weighty interest in ensuring the integrity of the ballot initiative process. Accordingly, judgment is due in Defendants' favor with respect to these claims as well.

D

Next, this Court considers the petition circulator eligibility requirements. To the extent Plaintiffs have standing to raise First Amendment challenges to the petition circulator eligibility requirements—namely, the non-citizen, non-resident, and felon bans for petition circulators—and associated fines and invalidation of signed petitions based on violations of these restrictions, this Court is guided by the Eleventh Circuit's recent treatment of such claims in the stay panel opinion in this case. *See* ECF No. 427.

The stay panel's reasoning is persuasive inasmuch as it represents the collective voice of at least two Eleventh Circuit judges who rejected this Court's prior analysis in favor of their view of how Plaintiffs' First Amendment claims should be analyzed. According to the stay panel, the eligibility requirements—specifically, the non-resident and non-citizen prohibitions for petition circulators—are *not* subject to exacting scrutiny under *Meyer*, as they do not "restrict any speech elements of the petition-circulation process."[28] ECF No. 427 at 12. Moreover, the

---

[28] The stay panel's slicing and dicing of the core political speech of petition circulation into speech plus conduct (i.e., collecting a signed petition) fails to take cognizance of the reality of petition circulation and imposes a new layer to the analysis that the Supreme Court never previously imposed when it determined that initiative petition circulation constitutes core political speech. *See Meyer*, 486 U.S. at 421–22; *see also Baker v. City of Atlanta*, 164 F.4th 850, 868–69 (11th Cir. 2026) (Newsom, J., dissenting) (discussing *Meyer* and, without slicing and dicing speech

40

stay panel also concluded that to the extent these provisions are subject to some form of heightened review as restrictions on expressive conduct, they satisfy intermediate scrutiny based on evidence that Defendants introduced in early stages of this case pertaining to the State's asserted interest in combatting fraud in the initiative petition process. *Id*. at 18.

Whether or not this Court agrees with the majority's reasoning in the stay panel's opinion, this Court is hard pressed to ignore the panel's analysis.[29] This is particularly true now that Defendants have introduced additional evidence at trial concerning past instances of fraud in the initiative petition process, *see, e.g.*, ECF No. 639 at 246–47 & 251–53, which further supports the panel's conclusion that the petition circulator eligibility requirements satisfy intermediate scrutiny.[30] Moreover,

---

plus conduct, describes "the circulation of a citizen-initiated petition that seeks to place an issue on a general-election ballot" as "the particular type of speech act" at issue). Indeed, witness Cecilia González Herrera offered a helpful illustration of the importance of each step of petition circulation at trial. To her, talking to voters about a ballot initiative, without more, is akin to merely planting a seed. ECF No. 652 at 37. But petition circulators are trying to grow a relationship that bears fruit in the form of a signed initiative petition, and to do that, they must water the seed—by providing the petition—and grab the fruit and collect that signed petition once the conversation has blossomed into something greater. *Id*. However, the stay panel's analysis carves up this political speech and leaves petition circulators casting seeds in a dessert without water.

[29] Indeed, were this Court writing on a blank slate, it would have held to its prior analysis, in line with the vast majority of circuits to have considered similar challenges, and concluded that the bans on non-residents and non-citizens from circulating ballot initiative petitions severely burden core political speech and fail exacting scrutiny. But this Court is not writing on a blank slate, as the stay panel unequivocally rejected this prior analysis.

[30] To be clear, while this Court noted its concerns for the record and did not admit certain portions of proffered reports, this Court notes that Defendants introduced additional evidence of fraud to support the preliminary showing the Eleventh Circuit stay panel already found to be

41

as the Eleventh Circuit has often emphasized, the legislature need not wait for evidence of fraud to materialize before acting. *See League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 925 (11th Cir. 2023) ("Even if there were no evidence of voter fraud in Florida, our precedents would not require it before a bill like S.B. 90 could be adopted."). In short, this Court is not persuaded that the trial record permits this Court to deviate from the analysis set forth by the stay panel in this case, which this Court finds persuasive for the reasons set out above. In other words, in applying the stay panel's analysis to the record now before this Court, Plaintiffs have not demonstrated a First Amendment violation with respect to the petition circulator eligibility requirements. Accordingly, judgment is due in favor of Defendants as to these claims.

E

Finally, this Court considers Ms. Chandler's claims challenging the prohibition against filling in missing information on signed petitions and the investigation provision.

For starters, this Court finds the missing information provision is not void for vagueness in violation of the Fourteenth Amendment. To be clear, the challenged language prohibits "person[s] collecting petition forms on behalf of a sponsor of an

---

sufficient to withstand Plaintiffs' First Amendment challenges to the petition circulator eligibility requirements.

42

initiative petition" from "fill[ing] in missing information on a signed petition," among other acts, such as signing a fictitious name to any petition. § 100.371(8), Fla. Stat.; § 104.185(2), Fla. Stat. The plain language of the statute is clear. If you are collecting petitions on behalf of an initiative sponsor, you are prohibited from filling in any missing information on that petition once it is signed. As the record demonstrated at trial, a petition form has many blanks for voters to fill out. Blanks left unfilled plainly constitute "missing information." This Court is not persuaded otherwise, particularly where Plaintiffs rely primarily on a conclusory citation to their own argument at the motion-to-dismiss stage and suggest this Court credited that argument when this Court, in fact, dismissed their amended complaint as a shotgun pleading. *See* ECF No. 409.

This Court is also not persuaded that the missing information provision runs afoul of the First Amendment. While Plaintiffs suggest the prohibition may result in higher rates of invalidated petitions inasmuch as it prevents petition circulators from correcting minor omissions before returning signed petitions to the Supervisors of Elections, such policy arguments fail to demonstrate that the prohibition implicates the core political speech of petition circulation. Instead, the prohibition applies once the speech has already occurred and is supported by the State's interest in combatting fraud in the ballot initiative process. *See* ECF No. 663 at 86. In short, judgment is

43

due in favor of Defendants on Plaintiffs' claims challenging the missing information provision.

The same is true with respect to the investigation provision. This provision requires Supervisors of Elections to notify the Office of Election Crimes and Security when more than 25 percent of petition forms received by the Supervisors during a given reporting period are deemed invalid. § 100.371(14)(g), Fla. Stat. The Office of Election Crimes and Security then must "conduct a preliminary investigation into the activities of the sponsor, one or more petition circulators, or a person collecting petition forms on behalf of a sponsor, to determine whether the invalidated petitions are a result of fraud or any other violation of this section." *Id*.

The League Plaintiffs contend this provision is unconstitutionally overbroad under the First Amendment, that it violates their First Amendment rights by unconstitutionally chilling petition circulation, and is void for vagueness under the Fourteenth Amendment. This Court disagrees.

As to Plaintiffs' First Amendment claims, the investigation provision, by its very terms, kicks in after the core political speech of petition circulation has ended and petitions have been returned to the Supervisors of Elections for validation. And Plaintiffs identify no authority for the proposition that states cannot proactively investigate potential fraud or widespread clerical mistakes as part of regulating the statewide ballot initiative process or enact a particular trigger for such a proactive

44

investigation. In short, the investigation provision does not appear to implicate the League Plaintiffs' First Amendment rights in the first instance.

To be clear, however, this Court recognizes that this provision, in tandem with the shortened delivery deadline and fines provisions, gives rise to contradictory incentives for sponsors and proponents of proposed ballot initiatives. Either rush to return signed petitions on time to avoid fines and likely end up with higher rates of invalidation and potentially trigger a preliminary investigation, or take time to conduct quality checks and return fewer signed petitions and/or pay higher fines for late deliveries while also decreasing the invalidity rate and hopefully avoiding a preliminary investigation. But the pitfalls of either result and the policy arguments challenging these provisions as making the process harder, more expensive, and less efficient, do not transform Plaintiffs' legitimate concerns into a constitutional violation under *Biddulph*, *Meyer,* and *Buckley.* Moreover, as this Court has noted already, Defendants presented several examples of fraud in the ballot initiative context which support Defendants' justification for this provision. Indeed, even Defendants' preliminary evidence for enacting HB 1205 to combat fraud in the ballot initiative process already satisfied two Eleventh Circuit judges that other challenged provisions would survive intermediate scrutiny. In short, this Court is not persuaded that the subjective chill on the League Plaintiffs' petition circulation efforts as a

45

result of their members' fears concerning the investigation provision is so severe and so unjustified as to violate the League Plaintiffs' First Amendment rights.

Finally, with respect to the League Plaintiffs' Fourteenth Amendment claim challenging the investigation provision as unconstitutionally vague, this Court cannot agree. Although the League Plaintiffs lump this provision in with other challenged provisions in its brief argument concerning vagueness, *see* ECF No. 668 at 224, the League Plaintiffs fail to identify what language in the investigation provision is so vague as to fail to provide notice or invite arbitrary enforcement. Instead, their argument appears to focus on the specific language of other provisions at issue in this case. *Id*. Likewise, the League Plaintiffs' overall discussion of this provision in its written closing argument cites no record evidence supporting the alleged vagueness asserted in the League Plaintiffs' operative complaint. *See id*. at 78–83. Indeed, it appears the League Plaintiffs have all but abandoned this claim.

But to the extent the League Plaintiffs continue to press this claim, this Court is not persuaded that the investigation provision is unconstitutionally vague in violation of the Fourteenth Amendment. For starters, the provision is a directive to state actors regarding reporting invalidity rates and when to initiative a preliminary investigation of high rates of invalidated petitions. It is not a criminal statute that prohibits certain conduct. *See Wollschlaeger*, 848 F.3d at 1319 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) ("It is, by now, a 'basic principle of due

46

process that an enactment is void for vagueness if its prohibitions are not clearly defined.' "). And this Court agrees with Defendants that the language is not so standardless as to leave the public guessing about when the Supervisors of Elections must notify the Office of Election Crimes and Security and when the Office of Election Crimes and Security must conduct a preliminary investigation—namely, "[f]or any reporting period in which the percentage of petition forms deemed invalid by the supervisor exceeds a total of 25 percent of the petition forms received by the supervisor for that reporting period." § 100.371(14)(g), Fla. Stat.; *see also* ECF No. 663 at 87. The provision is also clear about what the Office of Election Crimes and Security must do during the preliminary investigation—namely, "investigat[e] . . . the activities of the sponsor, one or more petition circulators, or a person collecting petition forms on behalf of a sponsor[] to determine whether the invalidated petitions are a result of fraud or any other violation of this section." *Id*. In short, the plain language of the challenged statute is clear—if more than 25% of petitions are deemed invalid during a particular reporting period, the initiative sponsor, registered circulators, or unregistered circulators may be investigated to determine the cause or causes of that invalidity rate. For these reasons, judgment is due in Defendants' favor on the League Plaintiffs' challenges to the provision prohibiting filling in missing information and the investigation provision.

47

*       *       *

This Court recognizes that Plaintiffs and other proponents of Floridians' right of direct democracy are understandably dismayed by the Legislature's decision to further regulate the process, effectively making it even harder and more expensive to put issues on the ballot for public vote. The evidence at trial made this effect clear. It is incredibly expensive to successfully place a statewide ballot initiative on the ballot. It is virtually impossible to collect enough signatures for ballot placement without hiring paid petition circulators. And the changes wrought by HB 1205 have created new barriers to entry, making it even harder for initiative sponsors and supporters to accomplish their goals. The citizen initiative process, which gives Floridians a path to amend their Constitution, is virtually dead save for the most controversial issues for which tens of millions of dollars can be raised. But Plaintiffs' quarrels with the wisdom of the Legislature's actions—at least with respect to those provisions under HB 1205 for which Plaintiffs had standing to challenge—are policy arguments, not constitutional violations for which this Court may grant relief. And it is not for this Court to determine whether it is a good or bad thing that political power is being further consolidated in Tallahassee and reclaimed from the safety-valve of direct democracy that the first Constitution Revision Commission saw fit to propose for inclusion in Florida's modern Constitution.

48

Accordingly,

**IT IS ORDERED:**

1. With respect to the Florida Decides Healthcare, Inc., Jordan Simmons, and Mitchell Emerson, the Clerk shall enter judgment stating, "Judgment is entered in favor of Defendants with respect to Florida Decides Healthcare Inc.'s challenges to the petition circulator eligibility requirements, the petition circulator registration requirements, the ten-day delivery requirement and associated fines, and the increased verification costs provision. The Florida Decides Healthcare Plaintiffs' challenges to the "racketeering activity" definition are **DISMISSED as moot for prudential reasons.** The balance of the Florida Decides Healthcare Plaintiffs' claims are **DISMISSED for lack of standing**."

2. With respect to Smart & Safe Florida, the Clerk shall enter judgment stating, "Judgment is entered in favor of Defendants with respect to Smart & Safe Florida's challenge to the ten-day delivery requirement and associated fines. The balance of Smart & Safe Florida's claims are **DISMISSED for lack of standing**."

3. With respect to Floridarighttocleanwater.org and Melissa Martin, the Clerk shall enter judgment stating, "Judgment is entered in favor of Defendants with respect to Right to Clean Water Plaintiffs' challenge to the ten-day delivery requirement and associated fines. The balance of Right to Clean Water Plaintiffs' claims are **DISMISSED for lack of standing**."

49

4. With respect to the League of Women Voters of Florida, the League of Women Voters of Florida Education Fund, Inc., LULAC, Cecile Scoon, and Debra Chandler, the Clerk shall enter judgment stating, "Judgment is entered in favor of Defendants with respect to the League Plaintiffs' challenges to the registration requirements, the criminal prohibitions against filling in missing information on signed petitions and possessing more than 25 signed petitions as an unregistered petition circulator, and the investigation provision. The League Plaintiffs' challenges to the "racketeering activity" definition are **DISMISSED as moot for prudential reasons.** The balance of the League Plaintiffs' claims are **DISMISSED for lack of standing**."

5. Consistent with this Court's prior Order acknowledging the Poder Latinx Plaintiff's stipulation of dismissal, ECF No. 498, the Clerk shall enter judgment stating, "Plaintiffs Poder Latinx, Yivian Lopez Garcia, and Humberto Orjuela Prieto's claims are **DISMISSED without prejudice**."

6. The Clerk shall **VACATE** this Court's prior preliminary injunction with respect to Jordan Simmons's vagueness claim challenging the "racketeering activity" definition, ECF No. 189, and close the file.

**SO ORDERED on April 30, 2026.**

**s/Mark E. Walker**
**United States District Judge**

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

FLORIDA DECIDES HEALTHCARE,
INC., et al.,

    *Plaintiffs/Intervenor-Plaintiffs*,

v.                                  Case No.: 4:25cv211-MW/MAF

CORD BYRD, et al.,

    *Defendants/Intervenor-Defendants*.

_____/

## JUDGMENT

Judgment is entered in favor of Defendants with respect to Right to Clean Water Plaintiffs' challenge to the ten-day delivery requirement and associated fines. The balance of Right to Clean Water Plaintiffs' claims are **DISMISSED for lack of standing**.

                                       JESSICA J LYUBLANOVITS,
                                       CLERK OF COURT

April 30, 2026                s/ *Kimberly J. Westphal*
DATE                         DEPUTY CLERK